UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

—————————————

No. 24-1690

—————————————

ANDRES MEJIA; CHRISTINA KIM PHILIBOTTE; NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE; LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO; JOCELYN MERRILL; KIMBERLY GREEN ELLIOT; RYAN RICHMAN; MEGHAN EVELYN DURDEN; JOHN DUBE,

Plaintiffs - Appellees,

v.

FRANK EDELBLUT, in their official capacity as Commissioner, New Hampshire Department of Education; JOHN M. FORMELLA, in their official capacity as New Hampshire Attorney General; AHNI MALA-CHI, in their official capacity as Executive Director, New Hampshire Commission for Human Rights; CHRISTIAN KIM, in their official capacity as Chairperson, New Hampshire Commission for Human Rights; KEN MERRIFIELD, in their official capacity as Commissioner, New Hampshire Department of Labor,

Defendants – Appellants.

———————————————————————

On Appeal from the United States District Court for the District of New Hampshire

———————————————————————

**APPENDIX TO THE BRIEF FOR DEFENDANTS – APPELLANTS**

JOHN M. FORMELLA
NEW HAMPSHIRE
ATTORNEY GENERAL

and

ANTHONY J. GALDIERI
NEW HAMPSHIRE
SOLICITOR GENERAL

MARY A. TRIICK, No. 1213543
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H.  03301
(603) 271-0447

and

SAMUEL R.V. GARLAND, No. 1189913
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H.  03301
(603) 271-3650

# TABLE OF CONTENTS

USDC-NH Civil Docket ............................................................. 4

Notice of Appeal ................................................................... 38

Mekia / Philibotte / NEA-NH Complaint and Exhibits .................. 43-588

AFT Complaint and Exhibits ......................................... 589-642

Defendants' Motion to Dismiss Exhibits .............................. 643

Plaintiffs' Motion to Dismiss Exhibits ................................. 993

September 14th, 2022 Motion to Dismiss Hearing Transcript ........... 1079

February 15th, 2023 Status Conference Transcript............................ 1175

Plaintiffs' Statement of Undisputed Facts in Support of
Summary Judgement motion and public/redacted exhibits...... 1209-2610

Plaintiffs' Exhibit to Objection to Motion for Summary Judgment .. 2611

January 16th, 2024 Public Transcript of Summary Judgment
Motion Hearing ................................................................. 2666

Pls.' SJ Exhibit 109 – Educator Code of Conduct ............................ 2812

# U.S. District Court
## District of New Hampshire (Concord)
## CIVIL DOCKET FOR CASE #: 1:21-cv-01077-PB

Local 8027, AFT-New Hampshire, AFL-CIO et al v. NH
Department of Education, Commissioner et al
Assigned to: Judge Paul J. Barbadoro
Related Case: 1:21-cv-01063-JL
Case in other court: First Circuit Court of Appeals, #24-01690
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 12/20/2021
Date Terminated: 06/24/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**Andres Mejia**                          represented by   **David A. Vicinanzo**
Nixon Peabody LLP
900 Elm St, 14th Flr
Manchester, NH 03101-2031
603 628-4000
Email: dvicinanzo@nixonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris Erchull**
GLBTQ Legal Advocates & Defenders
(GLAD)
18 Tremont St, Ste 950
Boston, MA 02108
520-360-1846
Email: cerchull@glad.org
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY 10004
646 885-8331
Email: esykes@aclu.org
*ATTORNEY TO BE NOTICED*

**Henry Klementowicz**
American Civil Liberties Union of New
Hampshire
18 Low Ave
Concord, NH 03301
603 333-2201
Email: henry@aclu-nh.org
*ATTORNEY TO BE NOTICED*

**Jennifer A. Eber**
Disability Rights Center - NH
64 North Main Street

Suite 2, 3rd Floor
Concord, NH 03301
603-228-0432
Fax: 603-225-2077
Email: jennifere@drcnh.org
*ATTORNEY TO BE NOTICED*

**Kayla Jade Turner**
Disability Rights Center
64 N Main St, Ste 2
Concord, NH 03301-4913
603-410-5188
Email: kaylat@drcnh.org
*ATTORNEY TO BE NOTICED*

**Leah Watson**
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY 10004
404-717-3853
Email: lwatson@aclu.org
*ATTORNEY TO BE NOTICED*

**Morgan C. Nighan**
Nixon Peabody LLP
Exchange Place
53 State St
Boston, MA 02109-2835
617-345-1031
Fax: 855-451-6607
Email: mnighan@nixonpeabody.com
*ATTORNEY TO BE NOTICED*

**Pamela E. Phelan**
Disability Rights Center
64 N Main St, Ste 2
Concord, NH 03301-4913
603 228-0432
Email: pamelap@drcnh.org
*TERMINATED: 10/26/2022*

**Peter J. Perroni**
Peter J. Perroni, ESQ.
73 Princeton
Chelmsford, MA 01863
978-454-3800
Email: peter@nolanperroni.com
*ATTORNEY TO BE NOTICED*

**SangYeob Kim**
American Civil Liberties Union of New
Hampshire
18 Low Ave
Concord, NH 03301

603 224-5591
Fax: 603 617 7264
Email: SangYeob@aclu-nh.org
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY 10004
212-519-7882
Email: shinger@aclu.org
*ATTORNEY TO BE NOTICED*

**Sarah J. Jancarik**
Disability Rights Center
64 N Main St, Ste 2
Concord, NH 03301-4913
603-228-0432
Fax: 603-225-2077
Email: sarahj@drcnh.org
*TERMINATED: 10/26/2022*

**Suzanne Amy Spencer**
Nixon Peabody LLP
900 Elm St, 14th Flr
Manchester, NH 03101-2031
603-628-4000
Email: aspencer@nixonpeabody.com
*ATTORNEY TO BE NOTICED*

**William E. Christie**
Shaheen & Gordon
107 Storrs St
PO Box 2703
Concord, NH 03302-2703
603 225-7262
Email: wchristie@shaheengordon.com
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
American Civil Liberties Union of New
Hampshire
18 Low Ave
Concord, NH 03301
603 224-5591
Email: Gilles@aclu-nh.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christina Kim Philibotte**          represented by   **David A. Vicinanzo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris Erchull**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry Klementowicz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer A. Eber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kayla Jade Turner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan C. Nighan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pamela E. Phelan**
(See above for address)
*TERMINATED: 10/26/2022*

**Peter J. Perroni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SangYeob Kim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah J. Jancarik**
(See above for address)
*TERMINATED: 10/26/2022*

**Suzanne Amy Spencer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William E. Christie**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**National Education Association-New Hampshire**     represented by   **Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Kane Dickinson**
NEA-New Hampshire
9 South Spring St
Concord, NH 03301
603-224-7751
Email: edickinson@nhnea.org
*TERMINATED: 02/28/2024*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Walta**
National Education Association
1201 16th St NW, 8th Flr
Washington, DC 20036
202-822-7035
Fax: 202-822-7033
Email: jwalta@nea.org
*ATTORNEY TO BE NOTICED*

**Lauren Snow Chadwick**
PO Box 713
New London, NH 03257
603-731-4296
Email: lchadwick@nhnea.org
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan Reed Fennessy**
Preti Flaherty Beliveau Pachios LLP
57 N Main St
PO Box 1318
Concord, NH 03302-1318
603 410-1528
Email: nfennessy@preti.com
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Rue Toland**
Preti Flaherty Beliveau Pachios LLP
57 N Main St
PO Box 1318
Concord, NH 03302-1318
603-410-1524
Fax: 603-410-1501
Email: rtoland@preti.com
*TERMINATED: 01/05/2023*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Suzanne Amy Spencer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Local 8027, AFT-New Hampshire, AFL-CIO**              represented by **Harry Sandick**
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2723
Email: hsandick@pbwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000
Fax: 212-336-2222
Email: cmoerdler@pbwt.com
*ATTORNEY TO BE NOTICED*

**David Kahne**
Steptoe LLP
1114 Avenue of the Americas
Ste Floor 34
New York, NY 10036
212-506-3900
Email: dkahne@stroock.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
212-918-3000
Fax: 212-918-3100
Email: tina.milburn@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000
Fax: 212-336-2222
Email: jgoldman@pbwt.com
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joceyln Merrill**                    represented by **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kimberly Green Elliot**                    represented by    **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ryan Richman**                    represented by    **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Meghan Evelyn Durden**                     represented by   **Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Dube**                     represented by   **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**NH Department of Education,**
**Commissioner**
*in his official capacity*
*other*
Frank Edelblut

represented by **Samuel R. V. Garland**
NH Attorney General's Office (Civil)
Civil Bureau
33 Capitol St
Concord, NH 03301-6397
603 271-3650
Email: samuel.rv.garland@doj.nh.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan W. Kenison-Marvin**
NH Attorney General's Office (DOJ)
Department of Justice
33 Capitol St
Concord, NH 03301
603-271-3650
Fax: 603-271-2110
Email: nathan.w.kenison-
marvin@doj.nh.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**NH Attorney General**
*in his official capacity*
*other*
John M. Formella

represented by **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NH Commission for Human Rights,**
**Executive Director**
*in her official capacity*
*other*
Ahni Malachi

represented by   **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NH Commission for Human Rights,**
**Chairperson**
*in his official capacity*
*other*
Christian Kim

represented by   **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NH Department of Labor, Commissioner**
*in his official capacity*
*other*
Ken Merrifield

represented by   **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/20/2021 | 1 | NEW CASE/ COMPLAINT Filing fee $ 402, receipt number ANHDC-2197173 filed by National Education Association-New Hampshire, Christina Kim Philibotte, Andres Mejia. (Attachments: # 1 Exhibit 1 -- Text of Banned Concept Act, # 2 Exhibit 2 -- Educator Code of Conduct, # 3 Exhibit 3 -- LEACT Materials, # 4 Exhibit 4 -- DOJ Implicit Bias Training, # 5 Exhibit 5 -- Courts Implicit Bias Training, # 6 Exhibit 6 -- 9.22.20 Trump Executive Order, # 7 Exhibit 7 -- 9.28.20 Executive Order Enforcement Memo, # 8 Exhibit 8 -- HB544, # 9 Exhibit 9 -- Select HB544 Written Testimony Before House Committee, # 10 Exhibit 10 -- HB2 Materials, # 11 Exhibit 11 -- Rep. Itse Op-ed, # 12 Exhibit 12 -- Open Letter from Business Community, # 13 Exhibit 13 -- SAU70 Resolution Against HB544, # 14 Exhibit 14 -- Hopkinton School District Opposing HB544, # 15 Exhibit 15 -- Manchester School District Opposition to HB544, # 16 Exhibit 16 -- Edelblut Op-ed, # 17 Exhibit 17 -- GACDI Letters, # 18 Exhibit 18 -- 7.12.21 and 8.5.21 NEA-NH Letters, # 19 Exhibit 19 -- 7.21.21 Guidance, # 20 Exhibit 20 -- 9.7.21 Opinion, # 21 Exhibit 21 -- McLane Middleton Discussion of Banned Concepts Act, # 22 Exhibit 22 -- Drummond Woodsum Discussion of Banned Concepts Act, # 23 Exhibit 23 -- Department of Education Complaint Website, # 24 Exhibit 24 -- Moms for Liberty |

| | | |
|---|---|---|
| | | Bounty Tweet, # <u>25</u> Civil Cover Sheet, # <u>26</u> Summons - Waiver Summons (Edelblut), # <u>27</u> Summons - Waiver Summons (Formella), # <u>28</u> Summons - Waiver Summons (Malachi), # <u>29</u> Summons - Waiver Summons (Kim), # <u>30</u> Summons - Waiver Summons (Merrifield))(Bissonnette, Gilles) (Entered: 12/20/2021) |
| 12/20/2021 | <u>2</u> | NOTICE of Attorney Appearance by SangYeob Kim on behalf of Andres Mejia, Christina Kim Philibotte Attorney SangYeob Kim added to party Andres Mejia(pty:pla), Attorney SangYeob Kim added to party Christina Kim Philibotte(pty:pla).(Kim, SangYeob) (Entered: 12/20/2021) |
| 12/20/2021 | <u>3</u> | NOTICE of Attorney Appearance by Esther Kane Dickinson on behalf of National Education Association-New Hampshire Attorney Esther Kane Dickinson added to party National Education Association-New Hampshire(pty:pla).(Dickinson, Esther) (Entered: 12/20/2021) |
| 12/20/2021 | | Case assigned to Judge Paul J. Barbadoro. The case designation is: 1:21-cv-1077-PB. Please show this number with the judge designation on all future pleadings. (mc) (Entered: 12/20/2021) |
| 12/20/2021 | <u>4</u> | NOTICE of Attorney Appearance by Morgan C. Nighan on behalf of Andres Mejia, Christina Kim Philibotte Attorney Morgan C. Nighan added to party Andres Mejia(pty:pla), Attorney Morgan C. Nighan added to party Christina Kim Philibotte(pty:pla).(Nighan, Morgan) Modified on 12/20/2021 to remove: Appearance for National Education Association-New Hampshire (js). (Entered: 12/20/2021) |
| 12/20/2021 | <u>5</u> | NOTICE of Attorney Appearance by Nathan Reed Fennessy on behalf of National Education Association-New Hampshire Attorney Nathan Reed Fennessy added to party National Education Association-New Hampshire(pty:pla).(Fennessy, Nathan) (Entered: 12/20/2021) |
| 12/20/2021 | | NOTICE. This case has been designated for Electronic Case Filing. All further submissions shall be filed in compliance with the Administrative Procedures for Electronic Case Filing. Pro se litigants are not required to file electronically and may continue to file documents in paper format. Persons filing electronically are strongly encouraged to complete the interactive training modules available on the courts website. To access these modules, click <u>HERE</u>. (mc) (Entered: 12/20/2021) |
| 12/20/2021 | <u>6</u> | Summonses issued electronically as to NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. **NOTICE: Counsel shall print and serve the summonses <u>and</u> all attachments in accordance with Fed. R. Civ. P. 4.** (Attachments: # <u>1</u> Notice ECF)(mc) (Entered: 12/20/2021) |
| 12/20/2021 | | Corrective Entry to <u>4</u> Notice of Attorney Appearance by Morgan C. Nighan. Entry corrected by removing appearance with respect to the National Education Association-New Hampshire chosen mistakenly at filing. (js) (Entered: 12/20/2021) |
| 12/20/2021 | <u>7</u> | NOTICE of Attorney Appearance by Rue Toland on behalf of National Education Association-New Hampshire Attorney Rue Toland added to party National Education Association-New Hampshire(pty:pla).(Toland, Rue) (Entered: 12/20/2021) |
| 12/22/2021 | <u>8</u> | WAIVER OF SERVICE Returned Executed as to NH Department of Education, Commissioner by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |

| 12/22/2021 | 9 | WAIVER OF SERVICE Returned Executed as to NH Attorney General by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
|---|---|---|
| 12/22/2021 | 10 | WAIVER OF SERVICE Returned Executed as to NH Commission for Human Rights, Executive Director by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 11 | WAIVER OF SERVICE Returned Executed as to NH Commission for Human Rights, Chairperson by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 12 | WAIVER OF SERVICE Returned Executed as to NH Department of Labor, Commissioner by National Education Association-New Hampshire, Christina Kim Philibotte, Andres Mejia. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 13 | NOTICE of Attorney Appearance by Chris Erchull on behalf of Andres Mejia, Christina Kim Philibotte Attorney Chris Erchull added to party Andres Mejia(pty:pla), Attorney Chris Erchull added to party Christina Kim Philibotte(pty:pla).(Erchull, Chris) (Entered: 12/22/2021) |
| 12/22/2021 | 14 | Assented to MOTION for Travis Hill to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198515.) filed by Andres Mejia, Christina Kim Philibotte.(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 15 | Assented to MOTION for Alice O'Brien to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198517.) filed by National Education Association-New Hampshire. (Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 16 | Assented to MOTION for Jason Walta to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198525.) filed by National Education Association-New Hampshire. (Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 17 | Assented to MOTION for Leah Watson to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198526.) filed by Andres Mejia, Christina Kim Philibotte.(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 18 | NOTICE of Attorney Appearance by Henry Klementowicz on behalf of Andres Mejia, Christina Kim Philibotte Attorney Henry Klementowicz added to party Andres Mejia(pty:pla), Attorney Henry Klementowicz added to party Christina Kim Philibotte(pty:pla).(Klementowicz, Henry) (Entered: 12/22/2021) |
| 12/22/2021 | 19 | NOTICE of Attorney Appearance by William E. Christie on behalf of Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte Attorney William E. Christie added to party Andres Mejia(pty:pla), Attorney William E. Christie added to party National Education Association-New Hampshire(pty:pla), Attorney William E. Christie added to party Christina Kim Philibotte(pty:pla).(Christie, William) (Entered: 12/22/2021) |
| 12/23/2021 | 20 | NOTICE of Attorney Appearance by Suzanne Amy Spencer on behalf of Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte Attorney Suzanne Amy Spencer added to party Andres Mejia(pty:pla), Attorney Suzanne Amy Spencer added to party National Education Association-New Hampshire(pty:pla), |

| | | |
|---|---|---|
| | | Attorney Suzanne Amy Spencer added to party Christina Kim Philibotte(pty:pla). (Spencer, Suzanne) (Entered: 12/23/2021) |
| 12/28/2021 | | **ENDORSED ORDER granting <u>14</u> Motion Travis Hill to Appear Pro Hac ; granting <u>15</u> MOTION for Alice O'Brien to Appear Pro Hac Vice; granting <u>16</u> MOTION for Jason Walta to Appear Pro Hac Vice; granting <u>17</u> MOTION for Leah Watson to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro.** **The clerks office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.**(vln) (Entered: 12/28/2021) |
| 12/29/2021 | <u>21</u> | NOTICE of Attorney Appearance by Sarah J. Jancarik on behalf of Andres Mejia, Christina Kim Philibotte Attorney Sarah J. Jancarik added to party Andres Mejia(pty:pla), Attorney Sarah J. Jancarik added to party Christina Kim Philibotte(pty:pla).(Jancarik, Sarah) (Entered: 12/29/2021) |
| 01/10/2022 | <u>22</u> | NOTICE of Attorney Appearance by Lauren Snow Chadwick on behalf of National Education Association-New Hampshire Attorney Lauren Snow Chadwick added to party National Education Association-New Hampshire(pty:pla).(Chadwick, Lauren) (Entered: 01/10/2022) |
| 01/12/2022 | <u>23</u> | Assented to MOTION for Sarah Hinger to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2204372.) filed by Andres Mejia, Christina Kim Philibotte. (Bissonnette, Gilles) (Entered: 01/12/2022) |
| 01/12/2022 | <u>24</u> | Assented to MOTION for Emerson Sykes to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2204382.) filed by Andres Mejia, Christina Kim Philibotte. (Bissonnette, Gilles) (Entered: 01/12/2022) |
| 01/12/2022 | | **ENDORSED ORDER granting <u>23</u> Motion for Sarah Hinger to Appear Pro Hac Vice; granting <u>24</u> Motion for Emerson Sykes to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro.** **The clerks office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.**(vln) (Entered: 01/12/2022) |
| 02/18/2022 | <u>25</u> | Assented to MOTION to Consolidate Cases this case with 1:21-cv-01063-JL *(CONSOLIDATE INTO CASE NO. 1:21-CV-01077 AND TO CONDUCT A STATUS CONFERENCE DURING THE WEEK OF FEBRUARY 21, 2022 BEFORE ISSUANCE OF ANY FORM CONSOLIDATION ORDER)* filed by Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte.(Bissonnette, Gilles) (Entered: 02/18/2022) |
| 02/18/2022 | <u>26</u> | NOTICE of Attorney Appearance by Samuel R. V. Garland on behalf of NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH |

| | | Department of Labor, Commissioner Attorney Samuel R. V. Garland added to party NH Attorney General(pty:dft), Attorney Samuel R. V. Garland added to party NH Commission for Human Rights, Chairperson(pty:dft), Attorney Samuel R. V. Garland added to party NH Commission for Human Rights, Executive Director(pty:dft), Attorney Samuel R. V. Garland added to party NH Department of Education, Commissioner(pty:dft), Attorney Samuel R. V. Garland added to party NH Department of Labor, Commissioner(pty:dft).(Garland, Samuel) (Entered: 02/18/2022) |
|---|---|---|
| 02/18/2022 | 27 | Assented to MOTION to Extend Time to Answer to March 14, 2022 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 02/18/2022) |
| 02/23/2022 | | NOTICE of Hearing re: 25 Assented to MOTION to Consolidate Cases this case with 1:21-cv-01063-JL. Status Conference set VIA VIDEO CONFERENCE for 2/28/2022 02:00 PM before Judge Paul J. Barbadoro.(js) (Entered: 02/23/2022) |
| 02/23/2022 | | **ENDORSED ORDER granting 27 Assented to MOTION to Extend Time to Answer to March 14, 2022.** *Text of Order: Motion to Extend Time to Answer is granted. For the reasons stated in the motion, the court finds good cause to extend the deadline for issuing the scheduling order pursuant to Fed. R. Civ. P. 16(b).* **So Ordered by Judge Paul J. Barbadoro.(js)** (Entered: 02/23/2022) |
| 02/23/2022 | 28 | NOTICE of Attorney Appearance by Jason Walta on behalf of National Education Association-New Hampshire Attorney Jason Walta added to party National Education Association-New Hampshire(pty:pla).(Walta, Jason) (Entered: 02/23/2022) |
| 02/25/2022 | 29 | Assented to MOTION to Continue (RESCHEDULE THE FEBRUARY 28, 2022 HEARING/STATUS CONFERENCE ON CONSOLIDATION) filed by Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte.Follow up on Objection on 3/11/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 02/25/2022) |
| 02/27/2022 | | **ENDORSED ORDER granting 29 Motion to Continue (RESCHEDULE THE FEBRUARY 28, 2022 HEARING/STATUS CONFERENCE ON CONSOLIDATION).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Status Conference set VIA VIDEO CONFERENCE for 3/8/2022 09:00 AM before Judge Paul J. Barbadoro.(js)** (Entered: 02/28/2022) |
| 03/08/2022 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. STATUS CONFERENCE held VIA VIDEO CONFERENCE on 3/8/2022. Court granted motion to consolidate 21-cv-1063-JL into this case. The clerk shall docket the complaint from Judge Laplante's case into this action. Case caption shall be updated to reflect the case caption from Judge Laplante's case. The parties shall meet and confer and file a proposed case management order within 14 days. (Court Reporter: Jan-Marie Glaze) (Pltfs Atty: Gilles R. Bissonnette, David A. Vicinanzo, Peter Perroni, Morgan C. Nighan, Chris Erchull, Esther Kane Dickinson, Jason Walta, Nathan Reed Fennessy, Emerson Sykes, Charles Moerdler, David J. Kahne) (Defts Atty: Samuel R. V. Garland)(Total Hearing Time: 45 minutes) (js) (Entered: 03/08/2022) |
| 03/08/2022 | 30 | COMPLAINT against NH Attorney General, NH Commission for Human Rights, Chairperson, NH Department of Education, Commissioner with Jury Demand filed by Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Kimberly Green Elliot, Ryan Richman, Meghan Evelyn Durden, John Dube. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Formella Summons, # 4 Kim Summons, # 5 Edelblut Summons) (js) (Entered: 03/08/2022) |

| 03/08/2022 | | **ORAL ORDER granting 25 Assented to MOTION to Consolidate Cases this case with 1:21-cv-01063-JL (CONSOLIDATE INTO CASE NO. 1:21-CV-01077). 1:21-cv-01063-JL to be statistically closed. So Ordered by Judge Paul J. Barbadoro.(js)** (Entered: 03/15/2022) |
|---|---|---|
| 03/09/2022 | 31 | NOTICE of Attorney Appearance by Charles Moerdler on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Charles Moerdler added to party John Dube(pty:pla), Attorney Charles Moerdler added to party Meghan Evelyn Durden(pty:pla), Attorney Charles Moerdler added to party Kimberly Green Elliot, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Charles Moerdler added to party Joceyln Merrill(pty:pla), Attorney Charles Moerdler added to party Ryan Richman(pty:pla). (Moerdler, Charles) (Entered: 03/09/2022) |
| 03/09/2022 | 32 | NOTICE of Attorney Appearance by David Kahne on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney David Kahne added to party John Dube(pty:pla), Attorney David Kahne added to party Meghan Evelyn Durden(pty:pla), Attorney David Kahne added to party Kimberly Green Elliot(pty:pla), Attorney David Kahne added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney David Kahne added to party Joceyln Merrill(pty:pla), Attorney David Kahne added to party Ryan Richman(pty:pla). (Kahne, David) (Entered: 03/09/2022) |
| 03/21/2022 | 33 | Joint Assented to MOTION for Entry of Case Management Order filed by Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte. Attorney Gilles R. Bissonnette added to party National Education Association-New Hampshire(pty:pla).(Bissonnette, Gilles) (Entered: 03/21/2022) |
| 03/21/2022 | 34 | NOTICE of Attorney Appearance by Pamela E. Phelan on behalf of Andres Mejia, Christina Kim Philibotte Attorney Pamela E. Phelan added to party Andres Mejia(pty:pla), Attorney Pamela E. Phelan added to party Christina Kim Philibotte(pty:pla).(Phelan, Pamela) (Entered: 03/21/2022) |
| 03/21/2022 | | **ENDORSED ORDER granting 33 Joint Assented to Motion for Entry of Case Management Order. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(js)** (Entered: 03/22/2022) |
| 03/25/2022 | 35 | Assented to MOTION to Exceed Page Limit filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 03/25/2022) |
| 03/25/2022 | 36 | MOTION to Dismiss for Failure to State a Claim filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.Follow up on Objection on 4/8/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Memorandum of Law, # 2 Exhibit HB 544 Docket, # 3 Exhibit HB 544 - As Introduced, # 4 Exhibit Amendment to HB 544, # 5 Exhibit HB 2 Docket, # 6 Exhibit Senate Finance Committee Minutes, # 7 Exhibit Amendment to HB 2, # 8 Exhibit Education FAQs, # 9 Exhibit Employer FAQs, # 10 Exhibit Attorney General Opinion)(Garland, Samuel) (Entered: 03/25/2022) |
| 03/25/2022 | 37 | MOTION to Dismiss for Failure to State a Claim filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of |

| | | |
|---|---|---|
| | | Labor, Commissioner.Follow up on Objection on 4/8/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Garland, Samuel) (Entered: 03/25/2022) |
| 03/28/2022 | | **ENDORSED ORDER granting <u>35</u> Assented to Motion to Exceed Page Limit. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 03/28/2022) |
| 03/29/2022 | <u>38</u> | MOTION for Elizabeth C. Milburn to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2231827.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman.Follow up on Objection on 4/12/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # <u>1</u> Exhibit (Affidavit))(Perroni, Peter) (Entered: 03/29/2022) |
| 03/29/2022 | | ACTION REQUIRED - NOTICE Nonconforming Document re <u>38</u> MOTION for Elizabeth C. Milburn to Appear Pro Hac Vice filed by Meghan Evelyn Durden, Kimberly Green Elliot, Joceyln Merrill, John Dube, Ryan Richman, Local 8027, AFT-New Hampshire, AFL-CIO.<br><br>The document fails to comply with LR 7.1- No statement of concurrence was included. File statement as addendum using the Other Documents/Addendum event and link filing(s) to document no. 38.<br><br>The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. **Compliance Deadline set for 3/30/2022.**(js) (Entered: 03/29/2022) |
| 03/29/2022 | <u>39</u> | Addendum/ to <u>38</u> MOTION for Elizabeth C. Milburn to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2231827.) *pursuant to L.R. 7.1* by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman. (Perroni, Peter) (Entered: 03/29/2022) |
| 03/31/2022 | | **ENDORSED ORDER granting <u>38</u> Motion for Elizabeth C. Milburn to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro.**<br><br>**The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.**(js) (Entered: 03/31/2022) |

| 04/04/2022 | [40] | NOTICE of Attorney Appearance by Sarah Hinger on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman Attorney Sarah Hinger added to party John Dube(pty:pla), Attorney Sarah Hinger added to party Meghan Evelyn Durden(pty:pla), Attorney Sarah Hinger added to party Kimberly Green Elliot(pty:pla), Attorney Sarah Hinger added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Sarah Hinger added to party Andres Mejia(pty:pla), Attorney Sarah Hinger added to party Joceyln Merrill(pty:pla), Attorney Sarah Hinger added to party National Education Association-New Hampshire(pty:pla), Attorney Sarah Hinger added to party Christina Kim Philibotte(pty:pla), Attorney Sarah Hinger added to party Ryan Richman(pty:pla). (Hinger, Sarah) (Entered: 04/04/2022) |
|---|---|---|
| 04/04/2022 | [41] | NOTICE of Attorney Appearance by Leah Watson on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman Attorney Leah Watson added to party John Dube(pty:pla), Attorney Leah Watson added to party Meghan Evelyn Durden(pty:pla), Attorney Leah Watson added to party Kimberly Green Elliot(pty:pla), Attorney Leah Watson added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Leah Watson added to party Andres Mejia(pty:pla), Attorney Leah Watson added to party Joceyln Merrill(pty:pla), Attorney Leah Watson added to party National Education Association-New Hampshire(pty:pla), Attorney Leah Watson added to party Christina Kim Philibotte(pty:pla), Attorney Leah Watson added to party Ryan Richman(pty:pla). (Watson, Leah) (Entered: 04/04/2022) |
| 04/04/2022 | [42] | NOTICE of Attorney Appearance by Elizabeth Clarke Milburn on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Elizabeth Clarke Milburn added to party John Dube(pty:pla), Attorney Elizabeth Clarke Milburn added to party Meghan Evelyn Durden(pty:pla), Attorney Elizabeth Clarke Milburn added to party Kimberly Green Elliot(pty:pla), Attorney Elizabeth Clarke Milburn added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Elizabeth Clarke Milburn added to party Joceyln Merrill(pty:pla), Attorney Elizabeth Clarke Milburn added to party Ryan Richman(pty:pla).(Milburn, Elizabeth) (Entered: 04/04/2022) |
| 04/18/2022 | | **ENDORSED ORDER.** *Text of Order: By May 16, 2022, the parties shall jointly file a Bates-stamped copy of the agreed-upon complete legislative history of the challenged state statute. All subsequent filings shall refer to the legislative history using the Bates-stamped version.* **So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 04/18/2022) |
| 05/16/2022 | [43] | THE PARTIES JOINT SUBMISSION OF LEGISLATIVE HISTORY by Andres Mejia, Christina Kim Philibotte (Attachments: # [1] Exhibit A -- Notice of Conventional Filing re HB544 Legislative History, # [2] Exhibit B -- Notice of Conventional Filing re HB2 Legislative History)(Bissonnette, Gilles) (Entered: 05/16/2022) |

| | | |
|---|---|---|
| 05/20/2022 | 44 | Assented to MOTION to Exceed Page Limit on Objections to Motion to Dismiss filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. Attorney Gilles R. Bissonnette added to party John Dube(pty:pla), Attorney Gilles R. Bissonnette added to party Meghan Evelyn Durden(pty:pla), Attorney Gilles R. Bissonnette added to party Kimberly Green Elliot(pty:pla), Attorney Gilles R. Bissonnette added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Gilles R. Bissonnette added to party Joceyln Merrill(pty:pla), Attorney Gilles R. Bissonnette added to party Ryan Richman(pty:pla). (Bissonnette, Gilles) (Entered: 05/20/2022) |
| 05/20/2022 | 45 | MEMORANDUM in Opposition re 37 MOTION to Dismiss for Failure to State a Claim , 44 Assented to MOTION to Exceed Page Limit on Objections to Motion to Dismiss , 36 MOTION to Dismiss for Failure to State a Claim *(Joint Opposition)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. Attorney Peter J. Perroni added to party Andres Mejia(pty:pla), Attorney Peter J. Perroni added to party National Education Association-New Hampshire(pty:pla), Attorney Peter J. Perroni added to party Christina Kim Philibotte(pty:pla). Follow up on Reply on 5/27/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit Exhibit A- No Left Turn Correspondence 2/7/22, # 2 Exhibit Exhibit B- Commissioner Edelblut Op-Ed 4/15/22)(Perroni, Peter) Modified on 5/23/2022 to add descriptions for exhibits as provided by counsel(js). (Entered: 05/20/2022) |
| 05/20/2022 | 46 | MEMORANDUM in Opposition re 36 MOTION to Dismiss for Failure to State a Claim , 37 MOTION to Dismiss for Failure to State a Claim , 44 Assented to MOTION to Exceed Page Limit on Objections to Motion to Dismiss filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill. Follow up on Reply on 5/27/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Perroni, Peter) (Entered: 05/20/2022) |
| 05/23/2022 | | **ENDORSED ORDER granting 44 Assented to Motion to Exceed Page Limit on Objections to Motion to Dismiss. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(js)** (Entered: 05/23/2022) |
| 05/23/2022 | | NOTICE of ECF Filing Error re: 45 Memorandum in Opposition to Motion filed by Andres Mejia, Meghan Evelyn Durden, Kimberly Green Elliot, John Dube, Ryan Richman, Local 8027, AFT-New Hampshire, AFL-CIO, National Education Association-New Hampshire, Joceyln Merrill, Christina Kim Philibotte. <br><br> No description of exhibit or attachment was included. Exhibit or attachment shall be followed by a short description of the document and shall not exceed five words. AP 2.5(a). See Properly Attach Exhibits to Pleadings in ECF. <br><br> Please email description for exhibits to jennifer_sackos@nhd.uscourts.gov.(js) (Entered: 05/23/2022) |
| 06/10/2022 | 47 | Assented to MOTION to Extend Time to Reply and Surreply filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 06/10/2022) |

| | | |
|---|---|---|
| 06/13/2022 | | **ENDORSED ORDER granting 47 Assented to Motion to Extend Time to Reply and Surreply.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Follow up on Reply on 6/24/2022. Surreply due by 7/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (js) (Entered: 06/13/2022)** |
| 06/24/2022 | 48 | REPLY to Objection to Motion re 36 MOTION to Dismiss for Failure to State a Claim , 37 MOTION to Dismiss for Failure to State a Claim *(Reply to Joint Objection)* filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. Surreply due by 6/29/2022. (Garland, Samuel) (Entered: 06/24/2022) |
| 06/24/2022 | 49 | REPLY to Objection to Motion re 36 MOTION to Dismiss for Failure to State a Claim *(Reply to AFT Objection)* filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. Surreply due by 6/29/2022. (Garland, Samuel) (Entered: 06/24/2022) |
| 07/05/2022 | 50 | NOTICE of Attorney Appearance by Emerson J. Sykes on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman Attorney Emerson J. Sykes added to party John Dube(pty:pla), Attorney Emerson J. Sykes added to party Meghan Evelyn Durden(pty:pla), Attorney Emerson J. Sykes added to party Kimberly Green Elliot(pty:pla), Attorney Emerson J. Sykes added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Emerson J. Sykes added to party Andres Mejia(pty:pla), Attorney Emerson J. Sykes added to party Joceyln Merrill(pty:pla), Attorney Emerson J. Sykes added to party National Education Association-New Hampshire(pty:pla), Attorney Emerson J. Sykes added to party Christina Kim Philibotte(pty:pla), Attorney Emerson J. Sykes added to party Ryan Richman(pty:pla). (Sykes, Emerson) (Entered: 07/05/2022) |
| 07/19/2022 | | NOTICE re: 36 MOTION to Dismiss for Failure to State a Claim, 37 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 9/14/2022 01:00 PM before Judge Paul J. Barbadoro.(js) (Entered: 07/19/2022) |
| 07/22/2022 | 51 | Assented to MOTION to Exceed Page Limit for Sur-replies Regarding Defendants' Motion to Dismiss filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Bissonnette, Gilles) (Entered: 07/22/2022) |
| 07/22/2022 | 52 | SURREPLY to Reply to 36 MOTION to Dismiss for Failure to State a Claim , 37 MOTION to Dismiss for Failure to State a Claim *(AFT Plaintiffs)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill. (Perroni, Peter) (Entered: 07/22/2022) |
| 07/22/2022 | 53 | SURREPLY to Reply to 35 Assented to MOTION to Exceed Page Limit , 36 MOTION to Dismiss for Failure to State a Claim *(All Plaintiffs Joint Surreply)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Perroni, Peter) (Entered: 07/22/2022) |
| 07/25/2022 | | **ENDORSED ORDER granting 51 Assented to Motion to Exceed Page Limit for Sur-replies Regarding Defendants' Motion to Dismiss.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.(js) (Entered: 07/25/2022)** |

| 08/23/2022 | 54 | NOTICE of Supplemental Authority by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Supplemental Authority)(Perroni, Peter) (Entered: 08/23/2022) |
|---|---|---|
| 09/14/2022 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. MOTION HEARING held on 9/14/2022 re 36 MOTION to Dismiss for Failure to State a Claim, 37 MOTION to Dismiss for Failure to State a Claim. Order to issue. (Court Reporter: Brenda Hancock) (Pltfs Atty: Charles Moerdler, Gilles R. Bissonnette, Peter J. Perroni, Elizabeth Clarke Milburn, David Kahne)(Total Hearing Time: 2 hours 30 minutes) (js) (Entered: 09/14/2022) |
| 10/18/2022 | 55 | TRANSCRIPT of Proceedings for Motion Hearing held on September 14, 2022. Court Reporter: Brenda K. Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 11/8/2022. Redacted Transcript Follow Up 11/18/2022. Release of Transcript Restriction set for 1/13/2023.(js) (Entered: 10/18/2022) |
| 10/26/2022 | 56 | NOTICE of Attorney Withdrawal by Pamela E. Phelan on behalf of Andres Mejia, Christina Kim Philibotte(Phelan, Pamela) (Entered: 10/26/2022) |
| 10/26/2022 | 57 | NOTICE of Attorney Appearance by Jennifer Aimee Eber on behalf of Andres Mejia, Christina Kim Philibotte Attorney Jennifer Aimee Eber added to party Andres Mejia(pty:pla), Attorney Jennifer Aimee Eber added to party Christina Kim Philibotte(pty:pla).(Eber, Jennifer) (Entered: 10/26/2022) |
| 10/26/2022 | 58 | NOTICE of Attorney Withdrawal by Sarah J. Jancarik on behalf of Andres Mejia, Christina Kim Philibotte(Jancarik, Sarah) (Entered: 10/26/2022) |
| 11/08/2022 | 59 | NOTICE of Supplemental Authority by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. (Attachments: # 1 Exhibit Frese v. Formella Opinion)(Garland, Samuel) (Entered: 11/08/2022) |
| 11/09/2022 | 60 | RESPONSE re 59 Notice (Other), *of Supplemental Authority* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Bissonnette, Gilles) (Entered: 11/09/2022) |
| 11/18/2022 | 61 | NOTICE of Supplemental Authority (Second) by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Pernell Order)(Bissonnette, Gilles) (Entered: 11/18/2022) |

| 01/05/2023 | 62 | NOTICE of Attorney Withdrawal by Rue Toland on behalf of National Education Association-New Hampshire(Toland, Rue) (Entered: 01/05/2023) |
|---|---|---|
| 01/12/2023 | 63 | ///**MEMORANDUM & ORDER granting in part and denying in part 36 Motion to Dismiss for Failure to State a Claim; denying 37 Motion to Dismiss for Failure to State a Claim. So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 01/12/2023) |
| 01/13/2023 | | NOTICE OF PRETRIAL CONFERENCE. Pretrial Conference set VIA VIDEO CONFERENCE for 2/15/2023 04:00 PM before Judge Paul J. Barbadoro. Follow up on Discovery Plan 2/8/2023. (js) (Entered: 01/13/2023) |
| 01/26/2023 | 64 | Assented to MOTION to Extend Time to Answer to February 9, 2023 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 01/26/2023) |
| 01/27/2023 | | **ENDORSED ORDER granting 64 Assented to MOTION to Extend Time to Answer to February 9, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 01/27/2023) |
| 02/09/2023 | 65 | Assented to MOTION to Extend Time to File a Discovery Plan to Monday, February 13, 2023 filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 02/09/2023) |
| 02/09/2023 | | **ENDORSED ORDER granting 65 Assented to Motion to Extend Time to File a Discovery Plan to Monday, February 13, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 02/09/2023) |
| 02/09/2023 | 66 | Assented to MOTION to Extend Time to Answer to February 14, 2023 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 02/09/2023) |
| 02/13/2023 | | **ENDORSED ORDER granting 66 Assented to MOTION to Extend Time to Answer to February 14, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 02/13/2023) |
| 02/13/2023 | 67 | Proposed Discovery Plan *(Joint)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Bissonnette, Gilles) (Entered: 02/13/2023) |
| 02/14/2023 | 68 | ANSWER to 30 Complaint, filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Department of Education, Commissioner.(Garland, Samuel) (Entered: 02/14/2023) |
| 02/14/2023 | 69 | ANSWER to 1 Complaint - New Case,,,,,, filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 02/14/2023) |
| 02/15/2023 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. PRETRIAL CONFERENCE held on 2/15/2023. Discovery plan approved as proposed. Case to be decided on cross motions for summary judgment. 50 page limit on briefs. Oral Argument to be held. No reply or surreply shall be allowed. (Court Reporter: Liza Dubois) (Pltfs Atty: Charles Moerdler, Gilles R. Bissonnette, Peter J. Perroni, Elizabeth Clarke Milburn, |

| | | |
|---|---|---|
| | | David Kahne; Morgan C. Nighan, Chris Erchull, Esther Kane Dickinson; Henry Klementowicz; Jennifer Eber; Suzanne Amy Spencer; Nathan Reed Fennessy) (Defts Atty: Samuel Garland)(Total Hearing Time: 1 hour) (js) (Entered: 02/16/2023) |
| 02/15/2023 | | **ORAL ORDER approving 67 Discovery Plan. So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 02/16/2023) |
| 02/17/2023 | 70 | Assented to MOTION to Clarify Order on Discovery Plan *(and for Imposition of a Revised Discovery Plan)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 02/17/2023) |
| 02/21/2023 | 71 | NOTICE of Attorney Appearance by Kayla Jade Turner on behalf of Andres Mejia, Christina Kim Philibotte Attorney Kayla Jade Turner added to party Andres Mejia(pty:pla), Attorney Kayla Jade Turner added to party Christina Kim Philibotte(pty:pla).(Turner, Kayla) (Entered: 02/21/2023) |
| 02/21/2023 | | **ENDORSED ORDER granting 70 Motion to Clarify Order on Discovery Plan (and for Imposition of a Revised Discovery Plan).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 02/21/2023) |
| 02/21/2023 | | NOTICE of Hearing. Oral Argument set for 8/14/2023 02:00 PM before Judge Paul J. Barbadoro.(js) (Entered: 02/21/2023) |
| 02/22/2023 | | NOTICE OF CANCELLATION: Oral Argument set for 8/14/2023 is CANCELLED. The hearing will be rescheduled after the court confers with the parties about a new date once the briefing is completed. (js) (Entered: 02/22/2023) |
| 03/22/2023 | 72 | TRANSCRIPT of Proceedings for STATUS CONFERENCE HELD VIA VIDEOCONFERENCE on February 15, 2023. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. <br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** <br><br>Redaction Request Follow Up 4/12/2023. Redacted Transcript Follow Up 4/24/2023. Release of Transcript Restriction set for 6/20/2023.(js) (Entered: 03/22/2023) |
| 03/24/2023 | 73 | NOTICE of Attorney Appearance by Nathan W. Kenison-Marvin on behalf of NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner Attorney Nathan W. Kenison-Marvin added to party NH Attorney General(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Commission for Human Rights, Chairperson(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Commission for Human Rights, Executive Director(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Department of Education, Commissioner(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Department of Labor, Commissioner(pty:dft).(Kenison-Marvin, Nathan) (Entered: 03/24/2023) |

| 05/01/2023 | 74 | NOTICE of Attorney Withdrawal by Suzanne Amy Spencer on behalf of Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte Attorney Suzanne Amy Spencer added to party National Education Association-New Hampshire(pty:pla).(Spencer, Suzanne) (Entered: 05/01/2023) |
|---|---|---|
| 05/03/2023 | 75 | Joint Assented to MOTION for Protective Order filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit A -- Proposed Protective Order)(Bissonnette, Gilles) (Entered: 05/03/2023) |
| 05/04/2023 | | **ENDORSED ORDER granting 75 Motion for Protective Order.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 05/04/2023) |
| 05/04/2023 | 76 | **PROTECTIVE ORDER. So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 05/04/2023) |
| 05/22/2023 | 77 | Joint Assented to MOTION to Continue and Extend Deadlines ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Civil Form 3)(Bissonnette, Gilles) (Entered: 05/22/2023) |
| 05/24/2023 | | **ENDORSED ORDER granting 77 Joint Assented to MOTION to Continue and Extend Deadlines ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.** (js) (Entered: 05/24/2023) |
| 05/25/2023 | 78 | THE PARTIES ERRATUM REGARDING THEIR JOINT MOTION TO EXTEND DEADLINES ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER by National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman(Bissonnette, Gilles) (Entered: 05/25/2023) |
| 05/26/2023 | | **ENDORSED ORDER re: 78 THE PARTIES ERRATUM REGARDING THEIR JOINT MOTION TO EXTEND DEADLINES ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER.** *Text of Order: Reviewed.* **So Ordered by Judge Paul J. Barbadoro.**(lw) (Entered: 05/26/2023) |
| 06/23/2023 | 79 | Assented to MOTION to Continue and Extend Deadlines ESTABLISHED IN THE COURTS MAY 24, 2023 ORDER filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Civil Form 3)(Bissonnette, Gilles) (Entered: 06/23/2023) |
| 07/10/2023 | | **ENDORSED ORDER granting 79 Motion to Continue and Extend Deadlines ESTABLISHED IN THE COURT'S MAY 24, 2023 ORDER.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 07/10/2023) |
| 07/19/2023 | 80 | NOTICE of Attorney Appearance by Suzanne Amy Spencer on behalf of Andres Mejia, Christina Kim Philibotte (Spencer, Suzanne) (Entered: 07/19/2023) |
| 08/07/2023 | 81 | Assented to MOTION to Extend Time to File Briefing Schedule filed by NH Attorney General, NH Commission for Human Rights, Chairperson. (Attachments: # 1 Exhibit Civil Form 3)(Garland, Samuel) (Entered: 08/07/2023) |

| 08/09/2023 | | ENDORSED ORDER granting 81 Motion to Extend Time to File Briefing Schedule. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. Summary Judgment Motions due by 8/14/2023. Response deadline set for 9/18/2023.(jwb) (Entered: 08/09/2023) |
|---|---|---|
| 08/14/2023 | 82 | Joint Assented to MOTION to Exceed Page Limit for Memoranda of Law In Support of Motions for Summary Judgment filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 08/14/2023) |
| 08/14/2023 | 83 | MOTION for Summary Judgment filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. **HEARING REQUESTED.**Follow up on Objection on 9/13/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Notice of Provisional Filing Under Seal)(Bissonnette, Gilles) (Additional attachment(s) added on 8/16/2023: # 2 Memorandum of Law Redacted Public Version) (jwb) (Entered: 08/14/2023) |
| 08/14/2023 | 84 | MOTION for Summary Judgment filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. **HEARING REQUESTED.**Follow up on Objection on 9/13/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Memorandum of Law in Support of Defendants' Motion for Summary Judgment)(Kenison-Marvin, Nathan) (Entered: 08/14/2023) |
| 08/14/2023 | 85 | Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman (Attachments: # 1 Exhibit (Affidavit) Declaration of Attorney Gilles Bissonnette, # 2 Exhibit 1 -- The Amendments (Depo. Ex. 1), # 3 Exhibit 2 -- Edelblut Transcript (Redacted), # 4 Exhibit 3 -- Fenton Transcript (Redacted), # 5 Exhibit 4 -- Farrell Transcript (Redacted), # 6 Exhibit 5 -- Malachi Transcript (Redacted), # 7 Exhibit 6 -- Cohen Transcript (Redacted), # 8 Exhibit 7 -- Declaration of NEA-NH President Megan Tuttle, # 9 Exhibit 8 -- Declaration of AFT-NH President Deb Howes, # 10 Exhibit 9 -- Declaration of Plaintiff John Dube, # 11 Exhibit 10 -- Declaration of Kamren Munz, # 12 Exhibit 11 -- Declaration of Alison OBrien, # 13 Exhibit 12 -- Declaration of Patrick Keefe, # 14 Exhibit 13 -- Declaration of Plaintiff Christina Kim Philibotte, # 15 Exhibit 14 -- Declaration of Jennifer Given, # 16 Exhibit 15 -- Declaration of Plaintiff Andres Mejia, # 17 Exhibit 16 -- Declaration of Sean OMara, # 18 Exhibit 17 -- Declaration of Plaintiff Ryan Richman, # 19 Exhibit 18 -- Declaration of Plaintiff Jocelyn Merrill, # 20 Exhibit 19 -- July 26, 2021 email from DOE Commissioner Frank Edelblut, # 21 Exhibit 20 -- HRCs October 7, 2021 Commissioners meeting minutes (Depo. Ex. 56), # 22 Exhibit 21 -- DOE Commissioner Edelbluts June 13, 2021 op-ed (Depo. Ex. 4), # 23 Exhibit 22 -- Northwood Republican Town Committees CRT Parents Guide (Depo. Ex. 51), # 24 Exhibit 23 -- Depo. Ex. 32 (Sealed), # 25 Exhibit 24 -- HRC docketed charge (Depo. Ex. 62) (Sealed), # 26 Exhibit 25 -- Depo. Ex. 63 (Sealed), # 27 Exhibit 26 -- Depo. Ex. 64 (Sealed), # 28 Exhibit 27 -- Kathryn Borysenkos Aug. 19, 2022 article (Depo. Ex. 65), # 29 Exhibit 28 -- Depo. Ex. 66 (Sealed), # 30 Exhibit 29 -- August 2022 Actively Unwoke tweets (Depo. Ex. 67) (Conventionally Filed), # 31 Exhibit 30 -- Depo. Ex. 68 (Sealed), # 32 Exhibit 31 -- Depo. Ex. 69 (Sealed), # 33 Exhibit 32 -- Depo. Ex. 70 (Sealed), # 34 Exhibit 33 -- Depo. |

Ex. 71 (Sealed), # 35 Exhibit 34 -- Depo. Ex. 72 (Sealed), # 36 Exhibit 35 -- Depo. Ex. 73 (Sealed), # 37 Exhibit 36 -- Depo. Ex. 74 (Sealed), # 38 Exhibit 37 -- Depo. Ex. 75 (Sealed), # 39 Exhibit 38 -- Depo. Ex. 76 (Sealed), # 40 Exhibit 39 -- Depo. Ex. 77 (Sealed), # 41 Exhibit 40 -- DOE Commissioner Edelbluts April 15, 2022 op-ed and attachments (Depo. Ex. 14), # 42 Exhibit 41 -- September 22, 2021 email exchange between AFT and DOE Commissioner Edelblut (Depo. Ex. 9), # 43 Exhibit 42 -- NEA-NHs July 12, 2021 and August 5, 2021 letters (Depo. Ex. 11), # 44 Exhibit 43 -- Sept. 13, 2021 NEA-NH email to the HRC (Depo. Ex. 54), # 45 Exhibit 44 -- Oct. 18, 2021 email from R. Farrell to D. Fenton (Depo. Ex. 24), # 46 Exhibit 45 -- July 21, 2021 Guidance (Depo. Ex. 55), # 47 Exhibit 46 -- DOJs interrogatory responses, # 48 Exhibit 47 -- HRCs interrogatory responses (Depo. Ex. 58), # 49 Exhibit 48 -- DOEs interrogatory responses (Depo. Ex. 57), # 50 Exhibit 49 -- RCs website and questionnaire (Depo. Ex. 60), # 51 Exhibit 50 -- DOEs December 2021 presentation (Depo. Ex. 3), # 52 Exhibit 51 -- DOEs August 2021 presentation (Depo. Ex. 7), # 53 Exhibit 52 -- Nov. 24, 2021 J. McKim email chain, # 54 Exhibit 53 -- Attorney Generals 2021-02 Opinion dated Sept. 7, 2021 (Depo. Ex. 12), # 55 Exhibit 54 -- Excerpts of the 2019 book How to be an Anti-racist by Dr. Ibram X. Kendi (Depo. Ex. 50), # 56 Exhibit 55 -- Sept. 28, 2020 Executive Office of the Presidents Memorandum, # 57 Exhibit 56 -- Excerpts of the July 8, 2021 Board of Education meeting, # 58 Exhibit 57 -- Dec. 14, 2021 email chain with DOE Commissioner F. Edelblut, # 59 Exhibit 58 -- July 22, 2021 email from S. Gibson to A. Malachi (Depo. Ex. 47), # 60 Exhibit 59 -- Nov. 15, 2021 F. Edelblut/Northwood GOP Meeting email exchange (Depo. Exs. 37 and 52), # 61 Exhibit 60 -- Jan. 20, 2023 D. Fenton email exchange (Depo. Ex. 10), # 62 Exhibit 61 -- HRCs May 2, 2022 letter to NEA-NH, # 63 Exhibit 62 -- Nov. 15, 2021 R. Farrell email exchange (Depo. Ex. 34), # 64 Exhibit 63 -- Aug. 20, 2021 F. Edelblut email exchange (Depo. Ex. 45), # 65 Exhibit 64 -- Aug. 25, 2022 email to F. Edelblut (Depo. Ex. 48), # 66 Exhibit 65 -- Excerpts of the Mar 8, 2023 HB533 hearing (Depo. Ex. 6), # 67 Exhibit 66 -- Aug. 27, 2021 F. Edelblut email exchange, # 68 Exhibit 67 -- Oct. 21, 2021 F. Edelblut email exchange, # 69 Exhibit 68 -- Dec. 13, 2021 F. Edelblut email exchange (Depo. Ex. 15), # 70 Exhibit 69 -- Aug. 23, 2021 F. Edelblut email exchange (Depo. Ex. 19), # 71 Exhibit 70 -- Aug. 12, 2021 F. Edelblut email exchange, # 72 Exhibit 71 -- June 14, 2022 email to R. Farrell (Depo. Ex. 36), # 73 Exhibit 72 -- Nov. 15, 2021 DOE email exchange (Depo. Ex. 22), # 74 Exhibit 73 -- Nov. 15, 2021 F. Edelblut email exchange, # 75 Exhibit 74 -- Dec. 28, 2021 F. Edelblut email exchange (Depo. Ex. 43), # 76 Exhibit 75 -- HRCs March 4, 2022 letter (Depo. Ex. 53), # 77 Exhibit 76 -- Implicit Bias Training Hosted by the New Hampshire Attorney Generals Office on November 20, 2020, # 78 Exhibit 77 -- May 3, 2021 and May 4, 2021 Presentations to N.H. Court System, # 79 Exhibit 78 -- Sept. 22, 2020 Trump Executive Order, # 80 Exhibit 79 -- HB544 Docket and Language, # 81 Exhibit 80 -- Select Written Testimony from Public Supporting HB544, # 82 Exhibit 81 -- HB2/Budget Trailer Materials, # 83 Exhibit 82 -- Article Compromise Sought on Anti-Critical race Theory Bill from April 19, 2021, # 84 Exhibit 83 -- Rep. Daniel Itse, Taxpayers Money is Being Used to Promote Systemic Racism in NH,, # 85 Exhibit 84 -- Excerpt from the Jan. 11, 2022 HB1313 hearing, # 86 Exhibit 85 -- Feb. 1, 2022 F. Edelblut email exchange, # 87 Exhibit 86 -- Mar. 18, 2022 D. Fenton email exchange (Depo. Ex. 23), # 88 Exhibit 87 -- Drummond Woodsum August 5, 2021 Presentation, # 89 Exhibit 88 -- DOEs Nov. 10, 2021 website (Depo. Ex. 21), # 90 Exhibit 89 -- DOEs Nov. 10, 2021 press release (Depo. Ex. 25), # 91 Exhibit 90 -- Nov. 15, 2021 F. Edelblut email exchange (Depo. Ex. 41), # 92 Exhibit 91 -- Nov. 17, 2021 HRC email exchange (Depo. Ex. 61), # 93 Exhibit 92 -- Oct. 25, 2021 F. Edelblut email exchange (Depo. Ex. 33), # 94 Exhibit 93 -- Oct. 26, 2021 F. Edelblut email exchange (Depo. Ex. 38), # 95 Exhibit 94 -- Oct. 1, 2021 F. Edelblut email exchange, # 96 Exhibit 95 -- Oct. 26, 2021 F. Edelblut email exchange, # 97 Exhibit 96 -- Sept. 7, 2021 F. Edelblut email exchange (Depo. Ex. 16), # 98 Exhibit 97 -- Sept. 3, 2021 F. Edelblut email exchange (Depo. Ex. 17), # 99 Exhibit 98 -- Depo Ex. 31 (Sealed), # 100 Exhibit 99 -- Depo. Ex. 40 (Sealed), #

| | | |
|---|---|---|
| | | 101 Exhibit 100 -- Feb. 7, 2022 No Left Turn Letter (Depo. Ex. 26), # 102 Exhibit 101 -- Feb. 22, 2022 F. Edelblut email exchange (Depo. Ex. 27), # 103 Exhibit 102 -- Feb. 14, 2022 R. Farrell email exchange (Depo. Ex. 28), # 104 Exhibit 103 -- Apr. 7, 2022 DOE email exchange (Depo. Ex. 18), # 105 Exhibit 104 -- Depo. Ex. 46 (Sealed), # 106 Exhibit 105 -- Aug. 24, 2022 R. Farrell email exchange (Depo. Ex. 29), # 107 Exhibit 106 -- Sept. 21, 2021 F. Edelblut email exchange (Depo. Ex. 39), # 108 Exhibit 107 -- Jan. 7, 2022 email from Ann Marie Banfield opposing SB304, # 109 Exhibit 108 -- Feb. 18, 2021 email from D. Richards in HB544s legislative history (Depo. Ex. 49), # 110 Exhibit 109 -- Educator Code of Conduct)(Bissonnette, Gilles) (Additional attachment(s) added on 8/16/2023: # 111 Plaintiff's Statement Public Redacted) (jwb). (Entered: 08/14/2023) |
| 08/14/2023 | 86 | Assented to MOTION SEAL (I) THE UNREDACTED VERSION OF PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, (II) THE UNREDACTED VERSION OF PLAINTIFFS STATEMENT OF UNDISPUTED FACTS, (III) UNREDACTED COPIES OF FIVE DEPOSITION TRANSCRIPTS, AND (IV) 18 EXHIBITS ATTACHED TO PLAINTIFFS STATEMENT OF UNDISPUTED FACTS filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 08/14/2023) |
| 08/15/2023 | | **ENDORSED ORDER granting 86 Assented to MOTION SEAL (I) THE UNREDACTED VERSION OF PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, (II) THE UNREDACTED VERSION OF PLAINTIFFS STATEMENT OF UNDISPUTED FACTS, (III) UNREDACTED COPIES OF FIVE DEPOSITION TRANSCRIPTS, AND (IV) 18 EXHIBITS ATTACHED TO PLAINTIFFS STATEMENT OF UNDISPUTED FACTS.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | | **ENDORSED ORDER granting 82 Motion to Exceed Page Limit for Memoranda of Law In Support of Motions for Summary Judgment.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | 87 | SEALED PLAINTIFFS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT re: 83 Motion for Summary Judgment at Level I filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | 88 | SEALED PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND EXHIBITS 2-6, 23-26, 28, 30-39, 98, 99 AND 104 re: 85 Plaintiffs' Statement of Undisputed Facts at Level I filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit 2- Edelblut Transcript, # 2 Exhibit 3- Fenton Transcript, # 3 Exhibit 4- Farrell Transcript, # 4 Exhibit 5- Malachi Transcript, # 5 Exhibit 6- Cohen Transcript, # 6 Exhibit 23- Depo. Ex. 32, # 7 Exhibit 24- HRC docketed charge (Depo. Ex. 62), # 8 Exhibit 25- Depo. Ex. 63, # 9 Exhibit 26- Depo. Ex. 64, # 10 Exhibit 28- Depo. Ex. 66, # 11 Exhibit 30- Depo. Ex. 68, # 12 Exhibit 31- Depo. Ex. 69, # 13 Exhibit 32- Depo. Ex. 70, # 14 Exhibit 33- Depo. Ex. 71, # 15 Exhibit 34- Depo. Ex. 72, # 16 Exhibit 35- Depo. Ex. 73, # 17 Exhibit 36- Depo. Ex. 74, # 18 Exhibit 37- Depo. Ex. 75, # 19 Exhibit 38- Depo. Ex. 76, # 20 Exhibit 39- |

| | | |
|---|---|---|
| | | Depo. Ex. 77, # 21 Exhibit 98- Depo Ex. 31, # 22 Exhibit 99- Depo. Ex. 40, # 23 Exhibit 104- Depo. Ex. 46)(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | | NOTICE OF CONVENTIONAL FILING re: 85 Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment- Exhibit 29 Filed Conventionally in Clerk's Office. (jwb) (Entered: 08/15/2023) |
| 08/24/2023 | 89 | MOTION for Daniel J. McNeil to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2413914.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill.Follow up on Objection on 9/7/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit AFFIDAVIT)(Perroni, Peter) (Entered: 08/24/2023) |
| 08/24/2023 | | ACTION REQUIRED - NOTICE Nonconforming Document re 89 MOTION for Daniel J. McNeil to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2413914.) filed by Andres Mejia, Meghan Evelyn Durden, Kimberly Green Elliot, Joceyln Merrill, John Dube, Local 8027, AFT-New Hampshire, AFL-CIO.

The document fails to comply with LR 7.1- No statement of concurrence was included. File statement as addendum using the Other Documents/Addendum event and link filing(s) to document no. 89.

The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. **Compliance Deadline set for 8/29/2023.**(jwb) (Entered: 08/24/2023) |
| 09/01/2023 | | SECOND NOTICE ISSUED- ACTION REQUIRED - NOTICE Nonconforming Document re 89 MOTION for Daniel J. McNeil to Appear Pro Hac Vice filed by Andres Mejia, Meghan Evelyn Durden, Kimberly Green Elliot, Joceyln Merrill, John Dube, Local 8027, AFT-New Hampshire, AFL-CIO.

The document fails to comply with LR 7.1-No statement of concurrence was included. File statement as addendum using the Other Documents/Addendum event and link filing(s) to document no. 89. The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. **Compliance Deadline set for 9/6/2023.**(jwb) (Entered: 09/01/2023) |
| 09/01/2023 | 90 | Addendum/ to 89 MOTION for Daniel J. McNeil to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2413914.) *Rule 7.1 Concurrence* by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill. (Perroni, Peter) (Entered: 09/01/2023) |
| 09/05/2023 | | **ENDORSED ORDER granting 89 Motion for Daniel J. McNeil to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro.**

**The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.**(jwb) (Entered: 09/05/2023) |

| | | |
|---|---|---|
| 09/07/2023 | 91 | Joint Assented to MOTION to Extend Time to Object/Respond to 84 MOTION for Summary Judgment , 83 MOTION for Summary Judgment to September 26, 2023 filed by Andres Mejia, Christina Kim Philibotte. (Attachments: # 1 Civil Form 3)(Bissonnette, Gilles) (Entered: 09/07/2023) |
| 09/12/2023 | | **ENDORSED ORDER granting 91 Joint Motion to Extend Time to Object/Respond to 83 Motion for Summary Judgment, 84 Motion for Summary Judgment to September 26, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (jwb)** (Entered: 09/12/2023) |
| 09/25/2023 | 92 | Assented to MOTION to Extend Time to Object/Respond to 84 MOTION for Summary Judgment , 83 MOTION for Summary Judgment to October 3, 2023 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. (Attachments: # 1 Exhibit Completed Civil Form 3) (Kenison-Marvin, Nathan) (Entered: 09/25/2023) |
| 09/27/2023 | | **ENDORSED ORDER granting 92 Motion to Extend Time to Object/Respond RE 83 Motion for Summary Judgment, 84 Motion for Summary Judgment to October 3, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(jwb)** (Entered: 09/27/2023) |
| 10/03/2023 | 93 | Joint Assented to MOTION to Exceed Page Limit filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 10/03/2023) |
| 10/03/2023 | 94 | OBJECTION to 84 MOTION for Summary Judgment filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. Follow up on Reply on 10/10/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit A -- DOE Privilege Log)(Bissonnette, Gilles) (Additional attachment(s) added on 10/10/2023: # 2 REDACTED PLAINTIFFS JOINT OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT) (jwb). (Entered: 10/03/2023) |
| 10/03/2023 | 95 | Assented to MOTION SEAL THE UNREDACTED VERSION OF PLAINTIFFS JOINT OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 10/03/2023) |
| 10/03/2023 | 96 | MEMORANDUM in Opposition re 83 MOTION for Summary Judgment filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. Follow up on Reply on 10/10/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Kenison-Marvin, Nathan) (Entered: 10/03/2023) |
| 10/03/2023 | 97 | SEALED PLAINTIFFS' JOINT OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT re: 94 Objection to Motion at Level I filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman(jwb) (Entered: 10/04/2023) |

| | | |
|---|---|---|
| 10/04/2023 | | ENDORSED ORDER granting 93 Motion to Exceed Page Limit. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(jwb) (Entered: 10/04/2023) |
| 10/04/2023 | | ENDORSED ORDER granting 95 Motion to SEAL THE UNREDACTED VERSION OF PLAINTIFFS JOINT OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(jwb) (Entered: 10/04/2023) |
| 10/10/2023 | | Document Added to 94 Objection to Motion: REDACTED PLAINTIFFS' JOINT OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. (jwb) (Entered: 10/10/2023) |
| 10/13/2023 | | NOTICE re: 83 MOTION for Summary Judgment, 84 MOTION for Summary Judgment. Motion Hearing set for 1/16/2024 10:00 AM before Judge Paul J. Barbadoro.(jwb) (Entered: 10/13/2023) |
| 01/10/2024 | 98 | Assented to MOTION for Harry Sandick to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2464122.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill. (Attachments: # 1 Exhibit (Affidavit))(Perroni, Peter) (Entered: 01/10/2024) |
| 01/10/2024 | 99 | Assented to MOTION for Joshua Goldman to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2464130.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill. (Attachments: # 1 Exhibit (Affidavit))(Perroni, Peter) (Entered: 01/10/2024) |
| 01/11/2024 | | ENDORSED ORDER granting 98 Motion for Harry Sandick to Appear Pro Hac Vice; granting 99 Motion for Joshua Goldman to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro.<br><br>The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(jwb) (Entered: 01/11/2024) |
| 01/12/2024 | 100 | NOTICE of Attorney Appearance by Harry Sandick on behalf of John Dube, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Harry Sandick added to party John Dube(pty:pla), Attorney Harry Sandick added to party Kimberly Green Elliot(pty:pla), Attorney Harry Sandick added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Harry Sandick added to party Joceyln Merrill(pty:pla), Attorney Harry Sandick added to party Ryan Richman(pty:pla).(Sandick, Harry) (Entered: 01/12/2024) |
| 01/12/2024 | 101 | NOTICE of Attorney Appearance by Joshua M. Goldman on behalf of John Dube, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Joshua M. Goldman added to party John Dube(pty:pla), Attorney Joshua M. Goldman added to party Kimberly Green Elliot(pty:pla), Attorney Joshua M. Goldman added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Joshua M. Goldman added to party Joceyln Merrill(pty:pla), Attorney Joshua M. Goldman added to party Ryan Richman(pty:pla).(Goldman, Joshua) (Entered: 01/12/2024) |
| 01/16/2024 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. MOTION HEARING held on 1/16/2024 re 84 MOTION for Summary Judgment, 83 MOTION for Summary |

| | | |
|---|---|---|
| | | Judgment. Motions taken under advisement. Order to issue. (Court Reporter: Brenda Hancock) (Pltfs Atty: Gilles R. Bissonnette; Charles Moerdler; Joshua M. Goldman; Harry Sandick; Morgan C. Nighan; Chris Erchull) (Defts Atty: Samuel R. V. Garland; Nathan W. Kenison-Marvin)(Total Hearing Time: 3 hours 15 minutes) (jwb) (Entered: 01/16/2024) |
| 01/16/2024 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. IN CAMERA HEARING HELD UNDER SEAL on 1/16/2024. (Court Reporter: Brenda Hancock) (Pltfs Atty: Gilles R. Bissonnette; Charles Moerdler; Joshua M. Goldman; Harry Sandick; Morgan C. Nighan; Chris Erchull) (Defts Atty: Samuel R. V. Garland; Nathan W. Kenison-Marvin)(Total Hearing Time: 35 minutes) (jwb) Modified on 1/17/2024 to add UNDER SEAL(jwb). (Entered: 01/16/2024) |
| 01/18/2024 | 102 | NOTICE of Additional Authority Referenced at Rule 56 Hearing by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Perroni, Peter) (Entered: 01/18/2024) |
| 02/28/2024 | 103 | NOTICE of Attorney Withdrawal by Esther Kane Dickinson on behalf of National Education Association-New Hampshire(Dickinson, Esther) (Entered: 02/28/2024) |
| 03/05/2024 | 104 | NOTICE of Supplemental Authority by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit 11th Circuit Honeyfund Decision)(Bissonnette, Gilles) (Entered: 03/05/2024) |
| 03/18/2024 | 105 | SEALED TRANSCRIPT of Proceedings for SEALED IN CAMERA HEARING held on January 16, 2024. Sealed at Level I. Court Reporter: Brenda Hancock, Telephone # 603-225-1454.(jwb) (Entered: 03/19/2024) |
| 05/09/2024 | 106 | NOTICE of Regarding Plaintiff Andres Mejia by Andres Mejia, Christina Kim Philibotte. (Bissonnette, Gilles) (Entered: 05/09/2024) |
| 05/14/2024 | 107 | NOTICE of Supplemental Authority by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Tenn. Educ. Assn v. Reynolds, No. 3:23-cv-00751, 2024 U.S. Dist. LEXIS 80277 (M.D. Tenn. May 2, 2024))(Bissonnette, Gilles) (Entered: 05/14/2024) |
| 05/28/2024 | 108 | TRANSCRIPT of Proceedings for TWO EXCERPTS FROM MOTION HEARING BEFORE THE HONORABLE PAUL J. BARBADORO held on January 16, 2024. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. <br><br> **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** <br><br> Redaction Request Follow Up 6/18/2024. Redacted Transcript Follow Up 6/28/2024. Release of Transcript Restriction set for 8/26/2024.(jwb) (Entered: 05/28/2024) |

| | | |
|---|---|---|
| 05/28/2024 | 109 | ///**MEMORANDUM AND ORDER granting 83 Motion for Summary Judgment; denying 84 Motion for Summary Judgment.** *For the reasons discussed, the plaintiffs' motion for summary judgment (Doc. 83) is granted as set forth herein. The defendants' cross-motion for summary judgment (Doc. 84) is denied.* **So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 05/28/2024) |
| 06/02/2024 | 110 | TRANSCRIPT of Proceedings for Hearing on Motions for Summary Judgment held on January 16, 2024. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/24/2024. Redacted Transcript Follow Up 7/3/2024. Release of Transcript Restriction set for 9/3/2024.(jwb) (Entered: 06/03/2024) |
| 06/12/2024 | | NOTICE of VIDEO Conference. Status Conference set VIA VIDEO CONFERENCE for 6/17/2024 03:00 PM before Judge Paul J. Barbadoro.(jwb) (Entered: 06/12/2024) |
| 06/12/2024 | | RESCHEDULING NOTICE of Hearing. Status Conference set VIA VIDEO CONFERENCE for 6/18/2024 10:00 AM before Judge Paul J. Barbadoro.(jwb) (Entered: 06/12/2024) |
| 06/18/2024 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. STATUS CONFERENCE held on 6/18/2024. (Court Reporter: Liza Dubois) (Pltfs Atty: Gilles R. Bissonnette, Charles Moerdler, Chris Erchull, Harry Sandick, Joshua M. Goldman, Kayla Jade Turner, Morgan C. Nighan, Nathan Reed Fennessy, Peter J. Perroni, Suzanne Amy Spencer) (Defts Atty: Samuel Garland)(Total Hearing Time: 15 min.) (lw) (Entered: 06/18/2024) |
| 06/18/2024 | | **ENDORSED ORDER -** *Text of Order: Within 14 days of the date a notice of appeal is filed or the appeal period has run, whichever occurs first, the parties shall file a joint status report proposing a schedule for the resolution of any issue concerning attorneys' fees.* **So Ordered by Judge Paul J. Barbadoro.**(lw) (Entered: 06/18/2024) |
| 06/24/2024 | 111 | **JUDGMENT is hereby entered in accordance with 63 Order on Motion to Dismiss for Failure to State a Claim, 109 Order on Motion for Summary Judgment. Signed by Daniel J. Lynch, Clerk of Court. APPROVED AS TO FORM: by Paul J. Barbadoro.** *(Case Closed)* (jwb) (Entered: 06/24/2024) |
| 07/24/2024 | 112 | NOTICE OF APPEAL as to 111 Judgment, by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.( Filing fee $ 605, receipt number ANHDC-2534501.) [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF** |

| | | Information section at **http://www.ca1.uscourts.gov/cmecf** (Garland, Samuel) (Entered: 07/24/2024) |
|---|---|---|
| 07/24/2024 | <u>113</u> | Appeal Cover Sheet as to <u>112</u> Notice of Appeal filed by NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Commission for Human Rights, Chairperson, NH Attorney General, NH Department of Labor, Commissioner. (jwb) (Entered: 07/24/2024) |
| 07/24/2024 | <u>114</u> | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals documents numbered 63, 109, 111-114, re <u>112</u> Notice of Appeal. A copy of the Notice of Appeal electronically mailed to all parties this date.(jwb) (Entered: 07/24/2024) |
| 07/24/2024 | | Appellate Case Number: First Circuit Court of Appeals #24-1690 re <u>112</u> Notice of Appeal filed by NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Commission for Human Rights, Chairperson, NH Attorney General, NH Department of Labor, Commissioner.(jwb) (Entered: 07/24/2024) |
| 07/29/2024 | <u>115</u> | STATUS REPORT by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman : (Joint) Regarding Attorneys' Fees(Bissonnette, Gilles) (Entered: 07/29/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/23/2024 11:51:56 | | |
| **PACER Login:** | garl0796 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01077-PB |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

———————————————————————— )
LOCAL, 8027 AFT-NEW HAMPSHIRE, )
AFL-CIO, et al., )
 )
    Plaintiffs, )
 )
    v. )   Case No. 1:21-cv-1077-PB
 )
FRANK EDELBLUT, in his official )
capacity only as the Commissioner )
of the New Hampshire Department )
of Education, et al., )
 )
    Defendants. )
———————————————————————— )

## <u>NOTICE OF APPEAL</u>

  Notice is hereby given that defendants Frank Edelblut, in his official capacity as Commissioner of the Department of Education; John M. Formella, in his official capacity as Attorney General of the State of New Hampshire; Ahni Malachi, in her official capacity as Executive Director of the New Hampshire Commission for Human Rights; Christian Kim, in his official capacity as Chair of the Commission for Human Rights; and Kenneth Merrifield, in his Official Capacity as Commissioner of the Department of Labor, hereby appeal to the United States Court of Appeals for the First Circuit from this Court's June 24, 2024 Judgment awarding the plaintiffs "declaratory relief that N.H. Rev. Stat. Ann. §§ 354-A:31, 354-A:32, and 193:40 are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment."

      [Signature Page to Follow]

Respectfully submitted,

FRANK EDELBLUT, in his official capacity as Commissioner of the Department of Education,

JOHN M. FORMELLA, in his official capacity only as Attorney General of the State of New Hampshire,

AHNI MALACHI, in her official capacity as Executive Director of the Commission for Human Rights,

CHRISTIAN KIM, in his official capacity as Chair of the Commission for Human Rights,

     *and*

KENNETH MERRIFIELD, in his official capacity as Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: July 24, 2024

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Senior Assistant Attorney General
Nathan Kenison-Marvin, Bar # 270162
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov
Nathan.w.kenison-marvin@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

/s/ Samuel Garland
Samuel R.V. Garland

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| ANDRES MEJIA,                                              ) | |
| )                                                          | |
| CHRISTINA KIM PHILIBOTTE, and          )                   | |
| )                                                          | |
| NATIONAL EDUCATION                           )            | |
| ASSOCIATION-NEW HAMPSHIRE,         )                       | |
| )                                                          | Civil No. _____ |
| Plaintiffs,                     )                          | |
| )                                                          | |
| v.                                   )                     | |
| )                                                          | |
| FRANK EDELBLUT, in his official       )                    | |
| capacity only as the Commissioner of the )                | |
| New Hampshire Department of Education, )                   | |
| )                                                          | |
| JOHN M. FORMELLA, in his official    )                     | |
| capacity only as the Attorney General of the )            | |
| State of New Hampshire,                   )               | |
| )                                                          | |
| AHNI MALACHI, in her official capacity  )                 | |
| only as the Executive Director of the New )               | |
| Hampshire Commission for Human Rights, )                  | |
| )                                                          | |
| CHRISTIAN KIM, in his official capacity  )                | |
| only as the Chairperson of the New      )                 | |
| Hampshire Commission for Human Rights, )                  | |
| )                                                          | |
| KEN MERRIFIELD, in his official capacity )                | |
| only as the Commissioner of the New     )                 | |
| Hampshire Department of Labor,           )                | |
| )                                                          | |
| Defendants.                     )                          | |

**COMPLAINT FOR INJUNCTIVE RELIEF**

## **TABLE OF CONTENTS**

Introduction ……………………………………………………………………………1

Parties …………………………………………………………………………………..8

    I.       Plaintiff Andres Mejia……………………………………………………8
    II.     Plaintiff Christina Kim Philibotte……………………………………………10
    III.    Plaintiff National Education Association-New Hampshire…………………………12
    IV.    Defendants……………………………………………………………...15

Jurisdiction and Venue………………………………………………………………...19

Facts……………………………………………………………………………………...19

    I.       The 2020 Racial Justice Protests in New Hampshire, and the Recognition of the
          Importance of DEI Instruction Throughout the Granite State………………………...19
    II.     The Growing Need and Demand for DEI Instruction in Education—Including in New
          Hampshire—Following the 2020 Racial Justice Protests……………………………23
    III.    The National Backlash, and President Trump's September 22, 2020 Executive
          Order………………………………………………………………………27
    IV.    The New Hampshire Backlash and the Enactment of the Banned Concepts Act ……...29
          A.  The Banned Concepts Act in the New Hampshire House of Representatives…….29
          B.  The Banned Concepts Act in the New Hampshire Senate......................................31
    V.     The Banned Concepts Act's Provisions Are Vague…………………………………33
          A.  The Act's Four Banned Concepts………………………………………………33
               (1) Banned Concept #1……………………………………………34
               (2) Banned Concept #2……………………………………………35
               (3) Banned Concept #3……………………………………………37
               (4) Banned Concept #4……………………………………………38
           B.  The Act's Penalties and Reporting Requirement………...……………………41
    VI.    The Defendants' Failure to Answer Specific Questions Concerning the Banned
          Concepts Act………………………………………………………………43
    VII.   Even Education Lawyers Do Not Know What the Banned Concepts Act Actually
          Bans………………………………………………………………………51
    VIII.  Defendant Commissioner Edelblut's Website and the Moms for Liberty Bounty……53
    IX.    The Chill of the Banned Concepts Act…………………………………………55
    X.     The Harm of Chilling DEI Instruction…………………………………………57

Cause of Action………………………………………………………………………..60

## INTRODUCTION

1.      Martin Luther King Jr. wrote in 1967 that "Whites, it must frankly be said, are not putting in a … mass effort to reeducate themselves out of their racial ignorance."  Martin Luther King Jr., *Where Do We Go From Here: Chaos or Community?* 24 (1967; 2010 ed.).  He added: "It is an aspect of their sense of superiority that the white people of America believe they have so little to learn."  *Id.*  Similarly, he said in an interview that "[t]he concept of supremacy is so imbedded in the white society that it will take many years for color to cease to be a judgmental factor."  Martin Luther King Jr., *A Testament of Hope: The Essential Writings of Martin Luther King Jr.* 375 (1986).  The teachings of Martin Luther King Jr. have been commonly taught in New Hampshire public schools for more than 50 years since his assassination.  However, under a recently enacted law at N.H. Rev. Stat. Ann. ("RSA") 354-A:29-34 and RSA 193:40 (hereinafter, the "Banned Concepts Act" or the "Act"), these words could only be taught in New Hampshire public schools and in trainings of public employees as an outdated historical relic with no application to either present-day society or participants' personal experiences.  And any educator or other public employee with the temerity to suggest otherwise risks investigation, public condemnation, and professional ruin.

2.      Plaintiffs—New Hampshire educators and two diversity, equity, and inclusion school administrators—seek a declaration that the Due Process Clause of the Fourteenth Amendment forbids enforcement of this Banned Concepts Act.  The vague provisions of the Act, which became effective June 25, 2021, leave New Hampshire educators and school administrators with an impossible and unconstitutional choice: either avoid important topics in classroom discussion and instruction related to race, gender, gender identity, sexual orientation, and disability—including topics like systemic racism and implicit bias—or risk losing their licenses

and livelihoods for violating the Act.  The full text of the Banned Concepts Act is attached as _Exhibit 1_.

3.      The Banned Concepts Act's vagueness creates a chill that effectively prevents teachers from doing what society needs them to do: teach.  While RSA 193:40, II ostensibly permits discussion of "the historical existence of ideas and subjects identified [in the Banned Concepts Act]," the Act may even forbid teachers from guiding students to apply the lessons of the past to the world of the present, their hopes for the future, and their own personal experiences. Where instruction crosses the line between permissible instruction about the past existence of discrimination and present reality is impossible to discern.  Yet educators must bet their jobs every day on how that line might be drawn by every single person in New Hampshire—all of whom are empowered to file a lawsuit for any perceived transgression of the Act's illusory and opaque provisions.

4.      The very purpose of public education is to teach students the relevance of history and ideas to their lives and push students to use what they learn to form their own opinions and forge their own path.  This task of preparing students to thrive as citizens is so essential that it is recognized as one of the most fundamental duties of the state of New Hampshire by both the New Hampshire Constitution and the decisions of the New Hampshire Supreme Court.  As the New Hampshire Supreme Court has recognized, public education is the "cornerstone of our democratic system."  _Claremont v. Governor_, 635 A.2d 1375, 1381 (N.H. 1993).  It serves to prepare students to thrive as "citizens who are able to participate intelligently in the political, economic and social functions" of our society.  _Id._

5.      Yet in New Hampshire today, because of the Act's vagueness, educators across the state are pulling books from the curriculum and avoiding discussing and instructing on concepts

that are necessary for students preparing to take their place as full participants in our increasingly complex and diverse society.  For example, the Banned Concepts Act has already led New Hampshire educators to temporarily postpone from either staff or classroom instruction books like *Stamped (For Kids): Racism, Antiracism, and You* (which was adapted by Sonja Cherry-Paul from the work of Dr. Ibram X. Kendi) and *This Book is Anti-Racist* by Tiffany Jewell—a book designed to empower 11-15-year-olds, including those of color—based on reasonable fears that such instruction may cross the murky line drawn by the Act and place educators' licenses and livelihood at risk.  The reasonableness of these fears is underscored by Defendant Commissioner of Education Frank Edelblut's own suggestion in a June 13, 2021 op-ed that Dr. Ibram X. Kendi's book *How to be an Anti-Racist* would be banned under the Act, and his subsequent suggestion at a July 8, 2021 State Board of Education meeting that Tiffany Jewell's *This Book is Anti-Racist* would also be banned.  Are any of these books banned under the Act's terms?  No one knows, the Defendants have not provided straight answers, and the Act's incomprehensible terms provide educators with no clarity in resolving these questions.  Simply put, thanks to the Act's vague commands and Commissioner Edelblut's public remarks, it appears that book banning is happening in New Hampshire.

6.      By its terms, the Act broadly prohibits public employees and government contractors from "teach[ing]," "train[ing]," "instruct[ing]" on a series of concepts, including:

- that "one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin";

- that "an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously";

- that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin"; or

- that "people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."

While one may teach the "historical existence of" these concepts—albeit only "as part of a larger course of academic instruction," whatever that may mean, *see* RSA 193:40, II—the ability to teach the continuing relevance of this history, and make it personally relevant, to students is unclear. Can one discuss the reasons why in our country's entire history only a single African American has ever been elected the President of the United States and no woman ever has? Can one teach about the proven fact that racial and other unconscious biases shut the doors of opportunity for so many? Can one teach Martin Luther King Jr.'s "I Have a Dream" speech and discuss whether that dream has been realized?

7.     When educators guess at the answers to these and other questions, they do so subject to severe penalties if they guess wrong. Any person may file suit in court or a complaint with the New Hampshire Commission for Human Rights for violations of the Banned Concepts Act. Significantly, "[a]ny person" claiming to be aggrieved by a violation of the Banned Concepts Act "may pursue all of the remedies available under" any applicable laws, *see* RSA 354-A:34, as well as file a complaint against a school or school district. RSA 193:40, III. And violations of the Banned Concepts Act "shall be considered a violation of the educator code of conduct that justifies disciplinary action by the state board of education." RSA 193:40, IV. Disciplinary action for violations of the code of conduct can lead to suspension and revocation of an educator's teaching

license, meaning not only the loss of their job, but also the loss of their ability to obtain another teaching job in the future.  *See* N.H. Admin. Code R. Ed 511.02.  Moreover, because a licensed educator's failure to report a suspected violation of the code of conduct is itself a violation of the same code, the Act presses educators into service as mandatory informants on their colleagues to enforce the Act's vague restrictions.  *See id.* 510.05.

8.     Further, even if an educator is ultimately found not to have violated the Banned Concepts Act, they nevertheless suffer harm because the educator is forced to expend time and resources defending themselves and is exposed to public scrutiny about their actions.  Educators now find their teaching being critiqued and their personal character being attacked on social media, in the news, and at school board meetings.

9.     In an unprecedented move, the Department of Education has published a complaint form on its website for anyone to make complaints about supposed violations of the Banned Concepts Act and send them to the New Hampshire Commission for Human Rights.  No such specific Department of Education complaint website exists for violations of other provisions of the Law Against Discrimination or RSA 193:38-39 that were added in 2019 to apply to public schools.

10.    The Department of Education's public complaint form was immediately seized on by the group "Moms for Liberty NH" by way of this November 12, 2021 tweet offering $500 for any person "catch[ing]" a teacher violating the Act:



11.    The impact of the vague and unclear provisions of the Banned Concepts Act—compounded by the sweeping enforcement dragnet that the Act and the Department of Education have set up—have had broad effects on the instruction that students are being provided.  Through the Act's chill, students are (and have been) robbed of the information, ideas, and instructional approaches that would prepare them to engage in the robust dialogue and analytical thinking necessary to effectively function as citizens in America's democratic system.  Our schools are "nurseries of democracy."  *See Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021).  As the United States Supreme Court has explained:

> The classroom is peculiarly the "marketplace of ideas."  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (alteration in original)).  By chilling instruction involving race, racism, and gender—as well as silencing discussion of and instruction on the perspectives of Black, Hispanic, Native American, and other communities—the Act prevents

students from being exposed to perspectives that are critical to enable them to be active participants in democracy.

12.     The chill and self-censorship of teaching practices created by the Banned Concepts Act also frustrate the competency-based approach to classroom instruction that is widely accepted by New Hampshire educators and promoted by the New Hampshire Department of Education.[1] Competency-based learning is designed to ensure that students have meaningful opportunities to achieve critical knowledge and skills, and then apply the same skill and knowledge as citizens. Students are robbed of such opportunities when their teachers are afraid to engage with them on topics which, while developing critical thinking and citizenship skills, may be perceived to touch on banned concepts under the Act.

13.     The Defendants are aware of the widespread chill that the Banned Concepts Act has had on educators.  However, despite repeated requests by Plaintiff NEA-New Hampshire, they have refused to clarify key points of the Act that would provide educators with certainty as to how to comply with it.  Accordingly, the NEA-NH, along with Andres Mejia and Christina Kim Philibotte—the only two full-time diversity, equity, and inclusion administrators employed by school districts in New Hampshire (collectively, "Plaintiffs")—come to this Court for relief from the unconstitutionally vague provisions of the Banned Concepts Act.  They bring a claim for declaratory and injunctive relief against officials of the State of New Hampshire who are charged with enforcing the Act.  Plaintiffs seek a ruling (i) declaring that the Banned Concepts Act violates the Due Process Clause of the Fourteenth Amendment both facially and as applied because it is unconstitutionally vague, and (ii) permanently enjoining these state officials from enforcing the

---

[1]     N.H.    Dep't    of    Education,    "Performance    Assessment    of    Competency    Education," https://www.education.nh.gov/who-we-are/division-of-learner-support/bureau-of-instructional-support/performance-assessment-for-competency-education.

Act.

In support of their claim, Plaintiffs further allege as follows:

## PARTIES

### I.      Plaintiff Andres Mejia

14.      Plaintiff Andres Mejia lives in Strafford County, New Hampshire.  Mr. Mejia is the Director of Diversity, Equity, Inclusion, and Justice for the Exeter Region Cooperative School District.  Mr. Mejia is the first person to hold this position, and he started on August 2, 2021.  The Exeter Region Cooperative School District—along with the Manchester School District—are the first school districts in New Hampshire to have full-time DEI ("diversity, equity, and inclusion") administrators.  Mr. Mejia brings this claim in his individual capacity, and not on behalf of the District.

15.      In his role, Mr. Mejia works closely with various stakeholders and is responsible for prioritizing and operationalizing DEI initiatives, especially those dealing with curriculum, cultural competency, faculty and staff recruitment and retention, and professional learning.[2]  Mr. Mejia has dedicated his entire professional life to DEI work because he believes that it is critical to create an education community where every student—including students who are less privileged and who may be from historically marginalized communities—feels like they belong.

16.      Prior to accepting this position with the Exeter Region Cooperative School District and after graduating from the University of New Hampshire, Mr. Mejia worked for four years as a program manager with New Hampshire Listens—a civic engagement initiative of the Carsey School of Public Policy at the University of New Hampshire.  New Hampshire Listens has a

---

[2] *See* "'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity," *Portsmouth Herald* (Aug. 2, 2021), https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

mission to "build, strengthen, and sustain civic infrastructure to support a sustainable democracy" by helping "communities talk, listen and act together so communities can work for everyone."

17.     In his role as Director of Diversity, Equity, Inclusion, and Justice, Mr. Mejia is directly impacted and harmed by the Banned Concepts Act.  As part of his duties, he conducts staff trainings within the District on concepts like implicit bias, institutional bias, race, racism, belonging, and inclusiveness.  Because of the Act's ambiguity, if he teaches these topics, he may be violating the Act, and potentially will subject himself to a complaint or lawsuit—even if such trainings are voluntary.  Accordingly, there is a substantial risk that Mr. Mejia will be prosecuted under the Act.  This risk is all the more credible where Defendant Commissioner Edelblut has set up a website to field complaints for prosecution under the Act.

18.     Mr. Mejia also routinely fields inquiries from teachers in Exeter as to whether certain books, video content, curriculum, materials, and information—as well as what a teacher would say—would be banned under the Banned Concepts Act.  Yet, given the Act's vagueness, he cannot answer basic questions as to what is covered under the Act.  As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences. For example, professional development around implicit bias, race, and racism has been put on hold.  Especially given Defendant Commissioner Edelblut's June 13, 2021 statements condemning Dr. Ibram X. Kendi's book *How to Be an Antiracist*, and his July 8, 2021 critique of Tiffany Jewell's book *This Book is Anti-Racist*[3]—Mr. Mejia is struggling to evaluate whether the concepts "anti-bias" and "anti-racism" can be used.  Perhaps even worse, the Act chills and causes teachers to second guess how to respond to incidents of racism and bullying against Black and LGBTQ+

---

[3] *See* N.H. State Board of Education Meeting (July 8, 2021),
https://us02web.zoom.us/rec/play/9LhY5d2K7pIYMFI_k_Y03oe4-
IAF2kBzSxqGiFW_AYoJCAwC_4FGOgkvueh7OsagTe0sVbKwPttCNONe.pDFAngwZ6nvzBFP1 (starting at
3:22:19).

children for fear that, if they take appropriate action, they will be accused of violating the Act and lose their licenses.

19.    Finally, as an agent of a "public employer" under RSA 354-A:30, III, as a conductor of government training programs, and as someone who advises teachers on how to comply with the Act, Mr. Mejia is also subjected to the restrictions imposed under the Banned Concepts Act at RSA 354-A:31-32 and RSA 193:40, including any applicable penalties.

**II.    Plaintiff Christina Kim Philibotte**

20.    Plaintiff Christina Kim Philibotte lives in Merrimack County, New Hampshire. She grew up in Manchester and graduated from West High School.[4]  She is the Chief Equity Officer for the Manchester School District, which is the largest and most diverse school district in New Hampshire with over 40% of its students being of color.[5]  Ms. Philibotte is the first person to hold this position, and she started in July of 2021.  Ms. Philibotte brings this claim in her individual capacity, and not on behalf of the District.

21.    In her role, Ms. Philibotte is devoted to nurturing an equitable and inclusive school environment where all students feel seen, heard, and valued.  She brings to this role over 15 years of experience in public education advocating and applying anti-racist/anti-bias and culturally responsive teaching practices as a DEI educational consultant, English teacher, and Dance/Performing Arts Teacher/Director.  Through her work, she has led and designed (and

---

[4] See Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum; *see also* Manchester Proud, "Champion Spotlight: Tina Philibotte, MSD Chief Equity Officer," https://www.manchesterproud.org/champion-spotlight-tina-philibotte/.
[5] See Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html ("The school district's population of 12,400 students is split almost equally between Whites and minorities.").

continues to lead and design) conversations about race and equity through teacher/leader workshops, presentations, and trainings.

22.     Ms. Philibotte previously was an English teacher and Director of the Dance Program at Goffstown High School for nearly 13 years.  In this role, she was a finalist for New Hampshire Teacher of the Year, as well as the recipient of the School Administrative Unit ("SAU") 19 Dreamkeeper award.

23.     Ms. Philibotte is a fellow with New Hampshire Listens.  She is also a two-time fellow of the National Writing Project—a network of teachers, university faculty, researchers, writers, and community educators working to advance writing and the teaching of writing.  She is in the current 2022 class of Leadership New Hampshire—a statewide program whose mission is to "build[] a community of informed and engaged leaders."  She is also an Advisory Group member of the Endowment for Health's Race & Equity Series—a series that holds important convenings of diverse stakeholders, as well as ongoing working groups, tackling racial justice and equity challenges in New Hampshire, including in civic engagement, economic development, education, government, health, and law enforcement/criminal justice.

24.     Ms. Philibotte is directly impacted by the Banned Concepts Act.  She conducts staff trainings within the District focusing on culturally responsive education—a student-centered practice of mindfully and intentionally incorporating the experiences, culture, and identity of students (including those from historically marginalized groups) to help expand their educational opportunities.  This includes developing strategies for how to relate and empathize with students, as well as developing curriculum consistent with these goals, so that each student is seen, heard, and valued.  Previously, in conducting DEI trainings before the Act, she would specifically use terms and concepts like "anti-racism" and "anti-bias."  Due to the chill from the Act, she has

stopped using these terms and concepts focusing on "anti-racism"—and advised others to avoid them as well—out of fear of the Act's penalties. Due to her work, there is a substantial risk that Ms. Philibotte will be prosecuted under the Act if she discusses these concepts. This risk is all the more credible where Defendant Commissioner Edelblut has set up a website to field complaints for prosecution under the Act.

25. As one of only two full-time DEI school administrators in New Hampshire, Ms. Philibotte also routinely fields inquiries from teachers throughout New Hampshire as to whether certain books and information would be banned under the Banned Concepts Act. Yet, given the Act's vagueness, she cannot answer basic questions as to what is covered under the Act. As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences.

26. Finally, as an agent of a "public employer" under RSA 354-A:30, III, as a conductor of government training programs, and as someone who advises teachers on how to comply with the Act, Ms. Philibotte is also subjected to the restrictions imposed under the Banned Concepts Act at RSA 354-A:31-32 and RSA 193:40, including any applicable penalties. Further, she is certified by the State Board of Education and, thus, is subject to the Educator Code of Conduct that is now embedded within the Banned Concepts Act's provisions in RSA 193:40. *See* RSA 193:40, V (defining "[a]dministrators" as an "educator").

## III. Plaintiff National Education Association-New Hampshire

27. Plaintiff National Education Association-New Hampshire ("NEA-NH") is located in Concord, New Hampshire and was founded in 1854—then as the New Hampshire State Teachers Association. It is suing on its behalf and on behalf of its members.

28.     The NEA-NH became one of the "founding ten" state education associations that formed the National Education Association ("NEA") in 1857.

29.     The NEA-NH is comprised of more than 17,000 member educators in New Hampshire representing the majority of all public-school employees in the state.  The NEA-NH's mission is to strengthen and support public education and serve their members' professional, political, economic, and advocacy needs.  The NEA-NH's members are public school educators in all stages of their careers, including classroom teachers and other certified professionals, education support personnel, instructors and staff at public higher education institutions, students preparing for a teaching career, and those retired from the profession.

30.     The NEA-NH has standing to pursue this action both in its own right and on behalf of its members.  The Banned Concepts Act has forced the NEA-NH to divert its organizational resources to identify and counteract the Act's impermissibly vague restrictions, and it has frustrated the NEA-NH's mission of advocating for public school employees and for the kind of robust public education that will prepare the children of New Hampshire as citizens and members of society.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (describing the requirements for direct organizational standing).  Moreover, NEA-NH members adversely affected by the Banned Concepts Act would have standing to sue, the interests at stake in this suit are germane to the NEA-NH's purpose, and neither the claims asserted nor the relief sought requires participation of the NEA-NH's individual members to adjudicate the claims.  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (describing the requirements for representational standing).

31.     The NEA-NH also provides a service to its members by assisting with collective bargaining of contracts with local school districts.  Job security, termination of employment,

discipline, evaluation, and academic freedom are all topics which can be bargained for.  The NEA-NH cannot properly advise its membership as to how to adjust their collective bargaining agreements to account for the Act's edicts due to its vague nature.

32.     Members of the NEA-NH also receive the benefit of extensive professional development programming by the organization.  The Banned Concepts Act's vague nature has made it impossible for the NEA-NH to provide meaningful professional development about the Act to its members despite the demand from its membership to do so.

33.     The NEA-NH also represents members in matters before the State Board of Education—both in licensure actions contesting alleged violations of the Educator Code of Conduct and in actions representing educators appealing the non-renewal of their teaching contracts.

34.     Members of the NEA-NH are directly subjected to the restrictions in the Banned Concepts Act (*see* RSA 354-A:31-32) not only as agents of "public employers" under RSA 354-A:30, III, and as the conductors of government programs, but also as certified educators who are subject to the Educator Code of Conduct, which now includes the restrictions in RSA 193:40. *See* RSA 193:40, IV.  These members have been directly chilled under the Act.  For example:

- The book *Stamped (For Kids): Racism, Antiracism, and You* was planned for use in an interdisciplinary unit of study in a Cheshire County middle school, but the use of the book was placed on indefinite hold after the Act was passed.

- A complaint was made to the Department of Education regarding *Stamped (For Kids)* being taught by middle school social studies teachers in Hillsborough County.  When made aware of the complaint, the teachers and building administrators could not determine if the book was prohibited by the Act due to its vague provisions.  They did not receive any guidance from the Department of Education or any of the other Defendants after the complaint was made.

- A high school AP English teacher in Hillsborough County has changed their approach to teaching *Beloved*, the Pulitzer Prize winning book by Toni Morrison. While the teacher determined to teach the book despite uncertainty about whether it violates the

Act, they will no longer tie the book's theme of the traumatic, enduring legacy of slavery to current events or students' own experiences because they fear running afoul of the Act.

- A high school social studies teacher in Hillsborough County has disallowed students to pick their own topics for research papers for fear that topics chosen by students may lead to discussions in class that may violate the Act.

- A social studies teacher in Cheshire County had been undertaking a review of their curriculum to ensure that more experiences of Black, Indigenous, and other people of color were represented in their American history units and related materials. However, these plans were curtailed because of passage of the Act.

- A widely understood best practice in teaching is applying the material to students' own experiences and interests. A high school social studies teacher in Hillsborough County has all but ceased that practice in their world history class. Rather, this teacher feels that they must teach the material in a vacuum to limit the analogies students may draw to current events that could implicate one or more of the Act's banned concepts.

- A Cheshire County social studies teacher is spending countless hours finding factual citations for commonly understood historical facts in order to be prepared to field parent complaints that the teacher might be violating the Act simply by presenting accurate historical information on the founding of our country.

## IV.    Defendants

35.    Defendant Frank Edelblut is the Commissioner of the New Hampshire Department of Education. He is named in his official capacity. His office is located at 101 Pleasant Street, Concord, NH 03301. Commissioner Edelblut has enforcement authority over the Banned Concepts Act's provisions located at RSA 193:40, I, which state that violations of the Act "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." *See* RSA 193:40, IV; *see also Exhibit 2* (New Hampshire Code of Conduct for Educational Professionals, codified at N.H. Code Admin. R. Ed 510.01 et seq.). As the Department of Education's administrative rules make clear, the Commissioner and his Department have the authority to field complaints and conduct investigations—as well as impose sanctions—under the Educator Code of Conduct. *See Exhibit 2* (N.H. Code Admin. R. Ed 511.01

entitled "Complaints, Cases and Investigations"; *id.* 511.02 entitled "Reprimand, Suspension, or Revocation"; *id.* 511.03 entitled "Disciplinary Hearings").

36.     Defendant John M. Formella is the Attorney General of the State of New Hampshire.   He is named in his official capacity.   His office is located at 33 Capitol Street, Concord, NH 03301.   The Attorney General is the chief legal officer and chief law enforcement officer of the State.   He "shall act as attorney for the state in all criminal and civil cases in the supreme court in which the state is interested …."   *See* RSA 7:6.   Independent of the Attorney General's supervisory authority over the enforcement of all laws in New Hampshire, the Attorney General also has specific enforcement authority over the Banned Concepts Act because portions of the Act were placed in the Law Against Discrimination at RSA ch. 354-A.   *See* RSA 354-A:29-33; *see also* RSA 354-A:34 (Banned Concepts Act further stating that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under RSA 354-A").   The Law Against Discrimination specifically gives the Attorney General the authority to "make, sign, and file [a] complaint" under the Law, which would include a complaint for an alleged violation of the Banned Concepts Act.   *See* RSA 354-A:21, I(a).   In connection with the filing of a complaint under the Law Against Discrimination, the Attorney General also is "authorized to take proof, issue subpoenas and administer oaths in the manner provided in the civil practice law and rules."   *See* RSA 354-A:21, I(b).   The Banned Concepts Act's provisions at RSA 193:40, III also state that the Attorney General "may initiate a civil action against a school or school district in superior court for legal or equitable relief" for a violation of RSA 193:40, I.   *See* RSA 193:40, III.   Finally, the Attorney General "shall have and exercise general supervision of the criminal cases pending before the supreme and superior courts of the state."   *See* RSA 7:6. The Attorney General's authority over criminal cases is material because a "willful" violation of

any order issued by the New Hampshire Commission for Human Rights under the Law Against Discrimination—including an order addressing the provisions of the Banned Concepts Act located at RSA 354-A:29-34—shall be a "misdemeanor if a natural person, or … a felony if any other person." *See* RSA 354-A:24.

37.     Ahni Malachi is the Executive Director of the New Hampshire Commission for Human Rights.  Christian Kim is the Chairperson of the New Hampshire Commission for Human Rights.  They are named in their official capacities.  The Commission for Human Rights is located at 2 Industrial Park Drive, Building One, Concord, NH 03301.  The Commission for Human Rights is the state agency established to enforce the Law Against Discrimination located at RSA ch. 354-A.  *See* RSA 354-A:5.  Director Malachi and Chairperson Kim, as the heads of the Commission for Human Rights, have enforcement authority over the Banned Concepts Act because portions of the Act were placed in the Law Against Discrimination at RSA ch. 354-A.  *See* RSA 354-A:29-33; *see also* RSA 354-A:34 (Banned Concepts Act further stating that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under RSA 354-A").  The Banned Concepts Act's provisions located at RSA 193:40, III also state that "[a]ny person claiming to be aggrieved by a violation of [RSA 193:40, I] … may initiate a civil action against a school or school district … with the New Hampshire commission for human rights as provided in RSA 354-A:34."  *See* RSA 193:40, III.  Accordingly, Director Malachi and Chairperson Kim have the power to receive, investigate, and make findings on complaints under the Banned Concepts Act, as well as to hold public hearings on alleged violations of the Act.  *See* RSA 354-A:5, VI (stating that the Commission has the power "[t]o receive, investigate and pass upon complaints alleging violations of this chapter"); RSA 354-A:5, VII (stating that the Commission has the power "[t]o hold hearings, subpoena witnesses, compel their attendance,

administer oaths, take the testimony of persons under oath, and, in connection therewith, require the production for examination of any books or papers relating to any matter under investigation or in question before the commission"). Director Malachi, Chairperson Kim, and their Commission also have the authority to engage in outreach, training, research, and education with respect to the Banned Concepts Act. *See* RSA 354-A:5, VIII (stating that the Commission has the power "[t]o create such advisory agencies and conciliation councils, local, regional or statewide, as in its judgment will aid in effectuating the purpose of this chapter, and the commission may empower them to … make recommendations to the commission for the development of … programs of formal and informal education which the commission may recommend to the appropriate state agency").

38.     Ken Merrifield is the Commissioner for the New Hampshire Department of Labor. He is named in his official capacity. His office is located at 95 Pleasant Street, Concord, NH 03301. The Department of Labor helps employers and insurance carriers operate successfully within New Hampshire's labor laws. Commissioner Merrifield has enforcement authority over the Banned Concepts Act. This is because the Banned Concepts Act specifically states that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under … RSA 275-E," which is New Hampshire Whistleblowers' Protection Act. Accordingly, an individual who alleges that a public employee has violated the Banned Concepts Act may file a complaint to the Department of Labor as a purported "whistleblower." The Department of Labor has the authority to investigate and hold hearings on complaints under RSA ch. 275-E. *See* RSA 275-E:4; RSA 275-E:8.

<u>JURISDICTION AND VENUE</u>

39.     This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

40.     Declaratory relief is authorized by 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

41.     Defendants are public officials of the State of New Hampshire.  Defendants reside within this District and/or perform official duties within the State of New Hampshire.  This Court, accordingly, has personal jurisdiction over the Defendants.

42.     Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

<u>FACTS</u>

**I.      The 2020 Racial Justice Protests in New Hampshire, and the Recognition of the Importance of DEI Instruction Throughout the Granite State.**

43.     On May 25, 2020, White Minneapolis police officer Derek Chauvin knelt on the neck and back of George Floyd—a Black man—for 9 minutes and 29 seconds while Mr. Floyd was handcuffed face down in the street.  Mr. Floyd died.[6]  Mr. Chauvin was later convicted of second-degree murder and sentenced to over 22 years in prison.[7]  On December 15, 2021, Mr. Chauvin pleaded guilty to a federal charge of violating Mr. Floyd's constitutional rights.[8]

44.     The killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and numerous other Black people in 2020 reinvigorated the decades long struggle against racism in America and elsewhere.  International protests erupted against systemic racism and police brutality.  These

---

[6] "George Floyd: What Happened in the Final Moments of his Life," *BBC* (July 16, 2020), https://www.bbc.com/news/world-us-canada-52861726.
[7] "George Floyd Murder: Derek Chauvin Sentenced to Over 22 Years," *BBC* (June 25, 2020), https://www.bbc.com/news/world-us-canada-57618356.
[8] Amy Forliti, "Chauvin Pleads Guilty to Federal Charge in Floyd's Death," *Associated Press* (Dec. 15, 2021), https://apnews.com/article/death-of-george-floyd-george-floyd-minneapolis-race-and-ethnicity-st-paul-a8b12b1e3e0fedc1270c659e3428134e.

protests, led by communities of color, are among the most significant mass movements in the country's history.

45.     These protests also erupted in New Hampshire, often spearheaded by young public school students of color and newly-formed local Black Lives Matter chapters.[9]  Protesters flooded cities like Manchester, Nashua, Concord, Dover, and Portsmouth as part of this civil rights movement.[10]

46.     These calls for racial justice reflected a larger shift across the country.  According to a 2020 study conducted by Monmouth University, a newfound majority of Americans agreed that "racism and discrimination is a 'big problem,'" and that "there's a lot of discrimination against black Americans in society."[11]

47.     The 2020 movement for racial justice was intersectional, reflecting an increasing understanding that other identities combined with race—including ethnicity, religion, sex, gender identity, and sexual orientation—are implicated in the disproportionate violence faced by people of color.  Other movements—including the "Me Too" and "Times Up" campaigns—shed light on the rampant discrimination and violence faced by women of color and LGBTQ+ people of color.

---

[9] Indeed, New Hampshire is not immune from such racial justice concerns.  For example, the most recent available data from 2019 compiled by The Sentencing Project shows that, in New Hampshire, the rate of Black people incarcerated is 742 per 100,000 Black people.  *See* The Sentencing Project, New Hampshire Profile, https://www.sentencingproject.org/the-facts/#map. This compares to only 269 out of 100,000 White people.  *Id.*  Thus, New Hampshire has a Black/White imprisonment disparity ratio of 2.8 to 1.  *See id.*  A 2016 New Hampshire Public Radio study further exposed racial disparities in arrests and jailing.  *See* Emily Corwin, "Data Shows Racial Disparities Increase at Each Step of N.H.'s Criminal Justice System," *NHPR* (Aug. 10, 2016) https://www.nhpr.org/nh-news/2016-08-10/data-shows-racial-disparities-increase-at-each-step-of-n-h-s-criminal-justice-system.    Data from this study showed that Black people have a 5 times greater chance of being jailed compared to White people—a statistic that is well above the United States average where Black people are 3.5 times more likely to be in jail than White people.  *Id.*  Equally disturbing is that Black people in New Hampshire have a 2.8 times greater chance of being arrested compared to White people.  And in Hillsborough County—the most populous and diverse county in New Hampshire—African Americans are nearly 6 times more likely to be in jail than White people.  *Id.*
[10]      Wikipedia,      "George      Floyd      Protests      in      New      Hampshire," https://en.wikipedia.org/wiki/George_Floyd_protests_in_New_Hampshire.
[11] Nate Cohn & Kevin Quealy, "How Public Opinion Has Moved on Black Lives Matter," *N.Y. Times* (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matterattitudes.html.

The battle for LGBTQ+ civil rights crested in June of 2020 when the United States Supreme Court issued its momentous decision in *Bostock v. Clayton County*, holding that federal laws prohibiting sex discrimination apply equally to discrimination based on sexual orientation and transgender status. 140 S. Ct. 1731 (2020).[12]

48.    These social and legal shifts popularized discussions about how to dismantle racism and sexism and how to increase inclusivity, surfacing concepts such as "structural," "systemic," or "institutional" racism, and "racial privilege" or "white privilege."  Students in New Hampshire witnessed these events and participated in these conversations.  The largest of the protests in New Hampshire was a march of approximately 2,000 persons in Concord on June 6, 2020, and it was organized, in part, by students of color from Concord High School.[13]

49.    In response to these protests, New Hampshire Governor Chris Sununu signed an Executive Order on June 16, 2020 establishing the formation of a Commission on Law Enforcement Accountability, Community, and Transparency (hereinafter, "LEACT Commission") to, in part, "develop recommendations for reforms … necessary to enhance transparency, accountability, and community relations in law enforcement," including diversity training.  *See Exhibit 3* (June 16, 2020 Executive Order in LEACT Materials).

50.    After over 25 meetings, the LEACT Commission published its recommendations on August 31, 2020.  Many of the recommendations concerned implicit and racial bias training, including the following: (i) mandating that the New Hampshire Police Standards and Training Council ("PSTC")—the body that oversees the certification of police officers—conduct annual in-

---

[12] At the same time, at least 44 transgender and gender nonconforming people were murdered in the United States in 2020, marking the deadliest year on record.  *See* Human Rights Campaign, "Fatal Violence Against the Transgender and Gender Non-Conforming Community in 2020," https://www.hrc.org/resources/violence-against-the-trans-and-gender-non-conforming-community-in-2020.

[13]  *See* Tony Schinella, "Nearly 2,000 March Against Racism in Concord: Watch," *Patch.com* (June 7, 2020), https://patch.com/new-hampshire/concord-nh/nearly-2-000-march-against-racism-concord-watch (noting that protest was organized by Concord High School students).

service training for at least two hours on implicit bias and cultural responsiveness; (ii) encouraging, beginning on January 1, 2021, that all law enforcement agencies require that their officers participate and receive at least two hours of training on implicit bias and cultural responsiveness; (iii) recommending that the PSTC add implicit bias to the police academy and in-service training curriculum; (iv) strongly encouraging implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges; (v) recommending that the Attorney General establish a system whereby all new prosecutor hires receive implicit bias and racial profiling training within 30 days of their start date; and (vi) recommending that the New Hampshire Supreme Court require one hour of yearly continuing legal education credit to be dedicated to implicit bias and racial profiling training. *See id.* (Aug. 31, 2020 LEACT Recommendations in LEACT Materials).

51.    On September 17, 2020, Governor Sununu endorsed all the LEACT Commission recommendations, including those addressing implicit bias training for law enforcement. *See id.* (Sept. 17, 2020 Press Release in LEACT Materials).  Consistent with this support, Governor Sununu signed an Executive Order on October 7, 2020 that implemented many of these recommendations, including the requirement of implicit bias training for law enforcement. *See id.* (Oct. 7, 2020 Executive Order).  Following this Executive Order, the requirement for implicit bias training has largely been implemented. *See id.* (LEACT implementation records); *see also Exhibit 4* (Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11-12, 33 of James McKim's presentation "Are You Your Implicit Bias?"); *Exhibit 5* (May 3, 2021 and May 4, 2021 Presentations to N.H. Court System; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 12-13 of James McKim's May

3, 2021 presentation "Introduction to Diversity, Equity, and Inclusion," and slides 18 and 26 of

James McKim's May 4, 2021 presentation "Race in NH").[14]

## II.     The Growing Need and Demand for DEI Instruction in Education—Including in New Hampshire—Following the 2020 Racial Justice Protests.

52.     Following George Floyd's murder, many schools increased efforts to expose

students to perspectives and experiences—both past and present—of Black, Hispanic, Native

American, and other students of color.  These efforts were part of a growing and widespread

consensus among educators that inclusive education practices that give voice and attention to the

experiences of all students provide students with the robust education necessary to prepare them

to function effectively as participants in our increasingly diverse and multi-racial democracy.  Such

efforts help all students and harm none.  By presenting a more informed and realistic portrayal of

topics such as slavery, Jim Crow, segregation, and racial discrimination[15]—and discussing with

students the legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or

"unconscious bias"[16]—educational opportunities for all students are expanded.  This expansion of

educational opportunity takes many forms but it is unified by the aim of ensuring equal access to

educational content for students of all backgrounds, and exposure to various perspectives that

reflect the diversity of New Hampshire and America.

---

[14] Of course, if such trainings to prosecutors and judges on implicit bias, white privilege, and structural/systemic discrimination reflected in *Exhibits 4 and 5* are permissible under the Banned Concepts Act, then this instruction also would be permissible to students in schools under the Act.  But, as explained below, Defendants have been mum on many of these important questions.
[15] Antonia L. Hill, Culturally Responsive Teaching: An Investigation of Effective Practices for African American Learners 23–24 (Dec. 2012) (Ph.D. dissertation, Loyola University Chicago), https://ecommons.luc.edu/cgi/viewcontent.cgi?article=1352&context=luc_diss; Dr. Chastity McFarlan, "Supporting Marginalized Students Through Culturally Relevant Pedagogy," *Renaissance* (Sept. 10, 2021), https://www.renaissance.com/2021/09/10/blogsupporting-marginalized-students-through-culturally-relevant-pedagogy/.
[16] NEA Ctr. for Soc. Just., *Implicit Bias, Microaggressions, and Stereotypes Resources* (Jan. 2021), https://www.nea.org/resource-library/implicit-bias-microaggressions-andstereotypes-resources.

53.    New Hampshire educators embraced this call and engaged in professional development opportunities to enhance their skills to teach both (i) to Black, Indigenous, Hispanic, Asian, and other students from historically marginalized groups, and (ii) about the experiences and perspectives of those groups.

54.    For example, in 2020, Misty Crompton, a member of the Plaintiff NEA-NH and an educator who teaches in Derry, was awarded the prestigious Christa McAuliffe Sabbatical from the New Hampshire Charitable Foundation for her project called "Promoting Just Schools."[17]  The sabbatical, created in 1986 in honor of the Concord High School teacher and astronaut, gives one exemplary New Hampshire teacher a year off with pay and a materials budget to bring a great educational idea to fruition. Ms. Crompton's project focused on educational equity—namely, levelling the playing field for students by recognizing how identity, race, and culture of students and teachers play out in the classroom.

55.    The importance of elevating the perspectives and histories of individuals of color was confirmed by the 2020 census, which indicated that New Hampshire is rapidly growing more racially diverse.  These results indicated that—while New Hampshire's population grew by a modest 4.6% during the past decade—the number of residents who are people of color increased by 74.4% to 176,900 in 2020.  Black, Hispanic, and other people of color now represent 12.8% (176,900) of the state's population compared to 7.5% (101,400) in 2010.[18]  This diversity is particularly prevalent in the southern part of New Hampshire.  For example, the population of Manchester and Nashua was 98% White in 1980.[19]  Manchester now is 84.8% White, 10.4%

---

[17]    N.H.   Charitable   Foundation,   "Misty   Crompton   Awarded   Christa   McAuliffe   Sabbatical," https://www.nhcf.org/what-were-up-to/misty-crompton-awarded-christa-mcauliffe-sabbatical/.
[18] Kenneth Johnson, "Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard," *Carsey School of Public Policy* (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.
[19]    *See* Census Data for 1980, *available at*   https://www.census.gov/content/dam/Census/library/working-papers/2005/demo/POP-twps0076.pdf (page 76).

Hispanic (approximate population 11,717), and 6.1% Black (approximate population 6,873).[20] Nashua now is 82.6% White, 12.7% Hispanic (approximate population 11,348), and 4.1% Black (approximate population 3,663).[21]

56.     As the Carsey School of Public Policy at the University of New Hampshire explained, "children are at the leading edge of the state's growing diversity."[22]  The *Union Leader* also recently reported that "more than 2 of every 5 children in Manchester and Nashua hail from families of color," and that, "[i]n 30 years, Manchester's youngest generation has shifted from 94% White in 1990 to 57% last year."[23]  Students of color in Manchester are also more likely to live in poorer areas of the city.[24]

57.     Consistent with these demographic trends, the Manchester School District—the largest and most diverse school district in New Hampshire—hired a Chief Equity Officer, Plaintiff Christina Kim Philibotte, in July 2021.  As she told *NHPR*, her role was created by the District to help ensure that—especially given that dropout, detention, and suspension rates are high for students of color—these students are supported and recognized for the institutional disadvantages that they frequently experience.[25]  The goal of this work also is to train staff to understand the needs of communities of color—an effort that, in concert with creating a better sense of belonging

---

[20] 2019 Census Data for Manchester, https://www.census.gov/quickfacts/fact/table/manchestercitynewhampshire/PST045219.
[21] 2019 Census Data for Nashua,  https://www.census.gov/quickfacts/fact/table/nashuacitynewhampshire/PST045219.
[22] Kenneth Johnson, "Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard," *Carsey School of Public Policy* (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.
[23] *See* Michael Cousineau, "NH Grows More Diverse, Faces Call For Change," *Union Leader* (Dec. 19, 2021), https://www.unionleader.com/news/business/whats_working/nh-grows-more-diverse-faces-call-for-change/article_8c1cfc2d-73c1-51f3-9a5d-939525c3c21e.html.
[24] *See* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html.
[25] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum.

for these students, is aimed to address some of the systemic inequities that often exist in education. For example, a report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations—demonstrates that school discipline in New Hampshire is disproportionately harsh on students of color.  During the 2014-2015 academic year, "[w]hile students of color made up 13.9 percent of the student population, they comprised approximately 22.7 percent of students receiving out-of-school suspensions."[26]  In hiring Ms. Philibotte, the Manchester School District is taking proactive steps to tackle these important equity issues, including racial disparities in discipline and test scores.

58.    The Exeter Region Cooperative School District made a similar decision, hiring Plaintiff Andres Mejia on August 2, 2021 as the District's first Director of Diversity, Equity, Inclusion, and Justice.  As the District's superintendent, Dr. David Ryan, stated in announcing the position: "The work around diversity, equity, inclusion and justice is critically important and is helping us create an educational community where every student, educator, parent, guardian and community member feels like they belong."[27]  This work is also vital in Exeter, which has well over 800 residents of color—including over 350 Asian Americans and over 350 Hispanic Americans.[28]  This work not only helps White students in Exeter learn about the growing diversity

[26] *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-
_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf.  Concord High School also experienced similar racial disparities.  *See* Eileen O'Grady, "Suspensions, Expulsions are Used Disproportionately to Discipline N.H. Students of Color," *Concord Monitor* (July 4, 2020), https://www.concordmonitor.com/Race-and-discipline-in-NH-schools-34921292 ("That data showed that in the 2015-16 school year at Concord High School, Black students made up 8% of the student body, but made up 22% of out-of-school suspensions.").  The Concord School District is taking important steps in this area, including through its Racial Equity Advisory Committee.
[27] *See* "'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity," *Portsmouth Herald* (Aug. 2, 2021), https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.
[28] 2019 Census Data for Exeter,
https://www.census.gov/quickfacts/fact/table/exetertownrockinghamcountynewhampshire/HSG650219.

of their community, but also helps students of color in Exeter know that they are not alone and that they are welcome.

59.     The work of the Manchester School District, the Exeter Region Cooperative School District, and other New Hampshire school districts in creating a comprehensive inclusive curriculum is central to the promise in *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), of true integration in education. *Brown* explained that schools are "a principal instrument in awakening the child to cultural values, in preparing [the child] for later professional training, and in helping [the child] to adjust normally to his environment." *Id.* at 493. Moreover, the ability of students to access education equally impacts their "ability to study, to engage in discussions" and to "exchange views with other students." *Id*. (quoting *McLaurin v. Oklahoma State Regents*, 339 U.S. 637, 641 (1950)).

### III.     The National Backlash, and President Trump's September 22, 2020 Executive Order.

60.     As these reforms took hold, so did the backlash.

61.     On September 22, 2020, President Trump signed an Executive Order entitled "Combatting Race and Sex Stereotyping," which targeted diversity, equity, and inclusion trainings in federal government agencies, as well as in businesses contracting with the federal government. *See Exhibit 6* (Sept. 22, 2020 Trump Executive Order).

62.     The Executive Order sought to censor certain viewpoints and chill speech. The Executive Order, in part, banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on the following "divisive" concepts:

   **(1) one race or sex is inherently superior to another race or sex;**

   (2) the United States is fundamentally racist or sexist;

**(3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;**

**(4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;**

**(5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex;**

(6) an individual's moral character is necessarily determined by his or her race or sex;

(7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

[(10)] The term ''divisive concepts'' also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

*See id.* (Sept. 22, 2020 Trump Executive Order, with the bolded text reflecting those concepts that are substantially similar to the prohibited concepts in the Banned Concepts Act).

63.     The Executive Office of the President's September 28, 2020 memorandum implementing this Order specifically referenced the third banned concept—namely, that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously"—and made clear that it was targeting trainings that, for example, used the phrases "white privilege," "intersectionality," "systemic racism," "racial humility," and "unconscious bias."   *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum indicating that such phrases "may help to identify the type of training prohibited by the" Executive Order).

64.     On December 22, 2020, a federal court partially enjoined the Executive Order, in part, on the ground that the plaintiffs were likely to succeed on their vagueness challenge.  *See*

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).  The district court found that the Executive Order's banned concepts are "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited." *Id.*[29]

## IV.    The New Hampshire Backlash and the Enactment of the Banned Concepts Act.

65.    Despite the Court's decision in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, bills copying President Trump's Executive Order began spreading in state houses throughout the United States in an attempt to ban educators from teaching about gender and race discrimination, as well as concepts relating to racial equity and other forms of instruction aimed at acknowledging and addressing the past and present inequities facing historically marginalized communities.

### A.  The Banned Concepts Act in the New Hampshire House of Representatives.

66.    This included New Hampshire House Bill 544's "Propagation of Divisive Concepts Prohibited Act," which copied all ten banned concepts in President Trump's September 22, 2020 Executive Order and applied them not only to all government agencies and employees, but also to (i) private companies that contract with the state, and (ii) course instruction at New Hampshire public colleges and universities.  *See Exhibit 8* (HB544 Docket and Language).

67.    The chief sponsor of HB544 argued that this legislation was necessary to address "critical race theory" and, more specifically, to ban certain "diversity training or inclusion

---

[29] A separate lawsuit was filed by the NAACP Legal Defense Fund in October 2020 (amended complaint filed in January 2021), challenging the Executive Order on behalf of the National Urban League, the National Fair Housing Alliance, and the American Association for Access, Equity and Diversity.  *See National Urban League v. Trump*, 1:20-cv-03121-APM (D.D.C. Jan. 11, 2021), *available at* https://www.naacpldf.org/wp-content/uploads/Amended-Complaint-EO-AAAED.pdf.  The lawsuit raised three constitutional claims: vagueness, viewpoint discrimination, and equal protection. The Court did not issue any substantive orders in the case.  The plaintiffs filed a notice of dismissal with prejudice on June 15, 2021.

training[s]," which he described as "snake oil" that "propos[es] to cure a disease but in actuality it's even making it worse."[30]

68.     Other proponents of HB544 argued that the bill was necessary to eliminate discussion of and instruction on concepts like "implicit bias," "systemic racism," "white privilege," and "anti-racism" in schools and in government trainings, with many specifically calling such topics "Marxist" or "advancing Socialism," and identifying certain books as problematic.  *See* *Exhibit 9* (Select Written Testimony From Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added).

69.     On April 7, 2021, as part of a legislative strategy to ensure the passage of HB544's language in the face of a threatened veto, the House of Representatives amended the budget trailer bill, HB2, to insert the operative provisions of HB544.  HB2 passed the House that same day.  *See* *Exhibit 10* (HB2/Budget Trailer Materials, Docket Entry Approving Amendment 2021-1059h). The next day, having accomplished its mission in passing this legislation, the House of Representatives tabled the original version of HB544.  *See* *Exhibit 8* (HB544 Docket and Language).

70.     After this language was inserted in HB2, one legislator supporting HB544 explained that the legislation was needed to address, for example, a staff training in a school district that referenced "white privilege," as well as programs at one New Hampshire university where employers and managers discuss "unconscious bias."  *See* *Exhibit 11* (Rep. Daniel Itse, "Taxpayers Money is Being Used to Promote Systemic Racism in NH," *Union Leader* (Apr. 28, 2021)).

---

[30]  *See* Executive Departments and Administration Hearing on HB 544 (Feb. 11, 2021), https://www.youtube.com/watch?v=ycrODcuaLDc (Rep. Keith Ammon's remarks starting at 1:31:50, with quotation at 1:37:20).

71.     In response to these claims, several school districts made clear that HB544's language, if enacted in HB2, would potentially deprive students of vital information.  For example, the Oyster River Cooperative School District and the Concord School District, along with other organizations, called the law "ambiguous" and "antithetical" to the principles of diversity and inclusion.  *See Exhibit 12* (Open Letter from Business Community).  The school district covering Hanover, Dresden, and Norwich, as well as the Hopkinton School District, also formally opposed the legislation.  *See Exhibit 13* (SAU70 Resolution Opposing HB544); *Exhibit 14* (Hopkinton School District May 6, 2021 Opposition to Divisive Concepts Language in HB2).  The Manchester School District similarly declared its opposition, announcing that "[w]e are opposed to any bill which will limit any school's ability to talk about race or gender, or to educate our students and staff about the historical discrimination against communities of color, women, and other marginalized groups, and the impacts this long standing racism and sexism has had on the American people."  *See Exhibit 15* (Manchester School Board Committee Meeting Agendas, Materials, and Minutes Concerning Opposition to HB544).

**B.  The Banned Concepts Act in the New Hampshire Senate.**

72.     When HB2 moved to the Senate, the Senate Finance Committee, on or about May 28, 2021, proposed an amendment to HB2's "divisive concepts" provisions.  *See Exhibit 10* (HB2/Budget Trailer Materials, Senate Finance May 28, 2021 2021-1799s amendments).  This amendment deleted six of the ten "divisive concepts" and made some cosmetic changes to the language.  In an effort to politically rebrand the restrictions as an "anti-discrimination law," the amendment also inserted its banned concepts in the Law Against Discrimination at RSA ch. 354-A and expanded the focus of the restrictions from "race or sex" to "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin."  Lastly, the amendment changed the restrictions to no longer apply to (i) private companies contracting with the State of New Hampshire, or (ii) course instruction at state colleges and universities *by faculty*.  *See* RSA 354-A:29, III.

73.    The Senate's effort to reframe the law also went even further than the original language in HB544 insofar as it now included the draconian penalty provisions specifically targeting certified educators by making violations of the law punishable under the Educator Code of Conduct.  *See* RSA 193:40, IV.

74.    On June 3, 2021, the Senate passed HB2, including the provisions constituting the Banned Concepts Act, by a vote of 14 to 9.  *See Exhibit 10* (HB2/Budget Trailer Materials).

75.    The House did not concur with the Senate's version of HB2.  As a result, a committee of conference was appointed.

76.    As this committee of conference process was getting underway, Defendant Commissioner Edelblut published an op-ed in which he claimed that the Banned Concepts Act was necessary to prevent concepts like those in Dr. Ibram X. Kendi's book *How to Be an Antiracist* from being taught in schools.  *See Exhibit 16* (Frank Edelblut, "Teach Children About Racism, Not to Be Racists," Union Leader (June 13, 2021)).

77.    In the meantime, the committee of conference ultimately agreed on a report recommending the language to be included in HB2, and it included the Senate's version of the Banned Concepts Act.  This report was filed on June 24, 2021, and it was approved in both chambers.

78.    The governor signed the Banned Concepts Act, along with all of HB2, into law on June 25, 2021.  The Banned Concepts Act immediately became effective.

79.     Following the Governor's signing of the Act into law, 10 of the 17 members of his Advisory Council on Diversity and Inclusion resigned in protest.  *See Exhibit 17* (Governor's Advisory Council on Diversity and Inclusion Correspondence Regarding Banned Concepts Act, June 29, 2021 Letter).

80.     Educators immediately began requesting assistance in understanding the Act. Plaintiff NEA-NH heard from members all over the state about their outrage and disappointment with the Act, their confusion about its meaning, and their fear about the consequences of violating it.[31]

### V.     The Banned Concepts Act's Provisions Are Vague.

#### A.  The Act's Four Banned Concepts.

81.     The text of the Banned Concepts Act is ambiguous and confusing, leaving educators, DEI trainers, school districts, and government employees to guess what it means, chilling instruction and important trainings, and encouraging arbitrary and discriminatory enforcement.

82.     For example, the Act bans public employers—"either directly or through the use of an outside contractor"—and government programs from "teach[ing]," "train[ing]," or

---

[31] Consistent with this backlash against the 2020 racial justice protests and following up on the passage of the Banned Concepts Act, several New Hampshire legislators—including two of the sponsors of HB544—recently proposed HB1255, which states the following: "No teacher shall advocate any doctrine or theory promoting a negative account or representation of the founding and history of the United States of America in New Hampshire public schools which does not include the worldwide context of now outdated and discouraged practices.  Such prohibition includes but is not limited to teaching that the United States was founded on racism."  *See* Eileen O'Grady, "N.H. 'Teacher Loyalty' Bill Would Restrict How U.S. History, Especially Racism, Can Be Discussed in School," *NHPR* (Dec. 3, 2021), https://www.nhpr.org/nh-news/2021-12-03/teacher-loyalty-bill-would-restrict-how-u-s-history-especially-racism-can-be-discussed-in-school.  In response to a question from *WMUR* about how this bill would impact classroom discussion of the Three-Fifths Compromise which dehumanized Black Americans, sponsor Representative Erica Layon explained: "The three-fifth compromise actually made it so that the slaveholding south didn't have more of a voice in Congress.  They actually were worried that … [if] they counted each slave as a whole vote and a whole voter, that then there would be more slavery throughout the country, and that it would be unequal because a viewpoint that was on its way out would be overrepresented."  *See* https://twitter.com/AdamSextonWMUR/status/1466584833312710657.

"instruct[ing]" on any of four banned concepts.  RSA 354-A:31, RSA 354-A:32.  The Act also states that "[n]o pupil in any public school … shall be taught [or] instructed" on any of the four banned concepts.  *See* RSA 193:40.  Moreover, given the passive voice usage of the phrase "shall be taught," this language, though unclear, may even include discussion without an educator's input where students engage each other on these concepts.

83.    The four banned concepts themselves are vague and aimed at chilling classroom discussions, instruction, and course materials.  These four banned concepts are substantially similar to four of the ten banned concepts from former President Trump's September 22, 2020 Executive Order.  Although a federal court barred portions of the Executive Order from going into effect, in part, on vagueness grounds on December 22, 2020, *see Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020), the New Hampshire legislature enacted the Banned Concepts Act without curing the vague terminology.

### (1) Banned Concept #1.

84.    Under the Act's first banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *are inherently superior or inferior* to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(a); RSA 354-A:31, I; RSA 543-A:32, I; RSA 354-A:33, I (emphasis added).

85.    The Act does state that "[n]othing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."  RSA 193:40, II.  But the limitation that only the "historical

existence" of an idea may be discussed leaves impermissibly vague at what point the discussion of that history's relevance to students' lives crosses the line and is now prohibited.

86.     One of Plaintiff NEA-NH's members has given the example of being free to teach that the Declaration of Sentiments was written at the Seneca Falls women's rights convention of 1848, but wondering if students would misunderstand the lesson as the teacher critiquing White men.

### (2) Banned Concept #2.

87.     Under the Act's second banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat an individual, *by virtue of his or her* age, sex, gender identity, sexual orientation, race, creed, marital status, familial status, mental or physical disability, religion or national origin *is inherently racist, sexist, or oppressive, whether consciously or unconsciously*."  *See* RSA 193:40, I(b); RSA 354-A:31, II; RSA 543-A:32, II; RSA 354-A:33, II (emphasis added).

88.     This broad and vaguely worded second banned concept arguably deprives students, teachers, and other public employees of information about (among other things) "implicit bias" or "unconscious bias," which is a concept relevant to many academic fields and is a key portion of the instruction provided by professionals who specialize in diversity, equity, and inclusion.  While most commonly associated with race, these concepts are also integral to educating people about how to relate to individuals with disabilities and individuals who differ in some way from themselves.[32]

89.     The Court in *Santa Cruz Lesbian & Gay Cmty. Ctr.* specifically concluded that the analogous provision in President Trump's Executive Order was vague in the face of the plaintiffs'

---

[32] *See* Michigan State University, "The Unpopular Truth About Biases Toward People with Disabilities," *ScienceDaily* (July 18, 2019), www.sciencedaily.com/releases/2019/07/190718112453.htm.

allegations that "training on unconscious bias is critical" to their work, and plaintiffs "do not know whether they can continue with this critical training" under this language. *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543-44. As in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, Plaintiffs Andres Mejia and Christina Kim Philibotte—and educators throughout New Hampshire—have no idea whether this specific prohibition in the Act's text includes concepts like "unconscious" or "implicit bias" that have (i) become important components to trainings and education addressing diversity, equity, and inclusion, and (ii) been targeted by proponents of the law.

90.    For example, it is unclear based on the Act's terms whether it goes so far as to potentially bar voluntary staff trainings addressing "implicit bias," "unconscious bias," "white privilege," "anti-racism," and "systemic racism," as well as instruction where all the students and their families are willing and eager to engage with this information. New Hampshire law already creates a process for students' families who object to certain course material to opt out of that instruction. *See* RSA 186:11, IX-c (stating that school districts shall implement a policy including "a provision requiring the parent or legal guardian to notify the school principal or designee in writing of the specific material to which they object and a provision requiring an alternative agreed upon by the school district and the parent, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area"). But the Act goes even further and bans any covered instruction even where there is no objection from a student or their family. The reasonableness of the fears that such instruction is barred is underscored by the fact that the Trump Administration construed its own Executive Order using nearly identical terms as rendering suspect the topics of "white privilege," "systemic racism" and "unconscious bias." *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum).

91.     The ban on this concept has chilled educators in their pursuit of professional development that would aid them in identifying their own biases which can impact their students. For example, an educator in Hillsborough County was brutally criticized by parents on social media and at a local school board meeting for attending a training that addressed bias and anti-racism instruction.  Colleagues who witnessed the backlash are unlikely to risk the same fate.

92.     The Act does add that it does not "prohibit racial, sexual, religious, or other workplace sensitivity training on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect."  *See* RSA 354-A:29, II.  But this proviso only adds to the Act's ambiguity, given that it provides no definition of "sensitivity training" that would allow educators or trainers to understand when concepts like implicit bias and systemic racism may be discussed.

### (3) Banned Concept #3.

93.     Under the Act's third banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat an individual *should be discriminated against or receive adverse treatment solely or partly* because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(c); RSA 354-A:31, III; RSA 543-A:32, III; RSA 354-A:33, III (emphasis added).

94.     This sweeping prohibition chills classroom discussion on and instruction of important contemporary topics, as educators fear the significant repercussions of making an erroneous guess as to what discussions are permissible and what discussions are forbidden. Further, this concept may demand race neutrality or color blindness, and thus potentially even implicates instruction on topics like affirmative action and other race-conscious remedies.

95.     This banned concept's ambiguity chills discussions with students about whether or how to rectify wrongs of the past—discussions that are essential because students will shape this country's future.  For example, because of this prohibition, educators may not know whether they can introduce materials where the authors debate or critique the concept of reparations for the descendants of enslaved people or affirmative action for Black Americans and other historically marginalized groups.  Although both are topics currently debated by policy makers and in the news, educators may fear that they cannot bring that type of discussion into their classroom because of the potential negative repercussions that could result for them professionally and personally.

### (4) Banned Concept #4.

96.     Under the Act's fourth banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *cannot and should not attempt to treat others equally and/or without regard to* age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(d); RSA 354-A:31, IV; RSA 543-A:32, IV; RSA 354-A:33, IV (emphasis added).

97.     The Act's contorted prohibition of the concept that people "cannot and should not attempt to treat others equally and/or without regard to" categories like age, race, sex, or disability is undecipherable.  It is unclear what it would mean to treat a person "without respect to" age, race, sex, or disability, and it is further unclear what it would mean to teach that a person "cannot and should not attempt" to do so.  Combining these phrases in one prohibition creates a confusing double negative.  Both state and federal laws and regulations addressing discrimination are well

established, but the New Hampshire legislature did not reference existing law to clarify its meaning or explain the intended operation of this concept in relation to these laws.   While the New Hampshire legislature intended this banned concept to have some force and effect, it is not clear what it prohibits.  As such, educators are left to guess at its meaning, violating their due process rights.

98.     Like the third banned concept, this fourth banned concept also may demand race neutrality or color blindness, and thus potentially implicates instruction on topics like affirmative action, reparations for descendants of enslaved African Americans, and other race-conscious remedies because of generations of discrimination—policies in which people are subjected to certain treatment "with regard to" race.

99.     Similarly, this banned concept may impact discussions and considerations required by state and federal law that entitle persons with disabilities to receive reasonable accommodations or modifications to ensure that they are treated equitably in society.   In other words, these laws require specific treatment "with regard to" disability.  *See* RSA 354-A:7(VII)(a), 10, 12(III)(B), 17 (in employment, housing, and public accommodations, highlighting obligations to provide access and make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person with a disability an equal opportunity to such services); 42 U.S.C. §§ 12112(b), 12132, 12182(a) (federal Americans with Disabilities Act ("ADA") provisions proscribing discrimination on the basis of disability, and entitling persons with disabilities to reasonable accommodations or modifications to ensure that they are not denied employment, "the benefits of services, programs, or activities of a public entity," or "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation").

100.    Indeed, discussing the importance of equity for individuals with disabilities—including through the provision of reasonable accommodations "with regard to" disability that would not necessarily be provided to others—is critical to allowing students and other individuals with disabilities to exercise their civil rights and participate in their communities in ways that those without disabilities are able to do with no need to talk about accommodations.  *See also* *Exhibit 5* (Disability Rights Center Presentation to N.H. Court System, The Disability Community and Access to Justice (May 3, 2021) (noting the need to "[i]dentify auxiliary aids/accommodations")).

101.    A report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations which includes the Disability Rights Center-New Hampshire—demonstrates that school discipline in New Hampshire is disproportionately harsh on students with disabilities.  During the 2014-2015 academic year, "while students with disabilities made up 20.3 percent of the student population, they comprised approximately 38 percent of students receiving out-of-school suspensions."[33]   Clear and honest discussions about disabilities, including discussions about accommodations and modifications, are essential to eliminate the isolation of persons with disabilities, as Congress intended to do when it enacted the ADA.  *See* 42 U.S.C. § 12101(a).

102.    This banned concept also seems to ignore the fact that the law specifically provides anti-discrimination protections "with regard to" age.  For example, the federal Age Discrimination in Employment Act of 1967 ("ADEA") protects certain applicants and employees 40 years of age and older from discrimination on the basis of age in hiring, promotion, discharge, compensation, or terms, conditions or privileges of employment.  Those under 40 years of age cannot avail

---

[33] *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf.

themselves of this law.  *See* 29 U.S.C. §§ 621-634.  Under this concept, can a teacher facilitate a discussion that the line drawn by this federal statute is appropriate?  This is unclear.

### B.  The Act's Penalties and Reporting Requirement.

103.    The Banned Concepts Act couples these ambiguities with strict penalties for violations, particularly for educators.

104.    One remedy for a perceived violation is a civil action in Superior Court against a government entity (including a school district)—and potentially even the employee—for damages and equitable relief, including an injunction to stop the instruction of or training on the banned concept.  *See* RSA 354-A:34 ("*Any person aggrieved* by an act made unlawful under this subdivision may pursue all remedies available under RSA 354-A, RSA 491 ….") (emphasis added); RSA 193:40 III ("Any person claiming to be aggrieved by a violation of this section [government teaching banned concepts in schools], including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief ….").  The private right of action afforded to "[a]ny person aggrieved by an act made unlawful" under the Banned Concepts Act will serve to compound the chilling effect of the law.  *See* RSA 354-A:34.  For example, under RSA 193:40 III, any parent, co-worker, or even neighbor that sees a teacher's lesson plan with the name of a book perceived as being prohibited by the Banned Concepts Act could file a Superior Court lawsuit against the teacher's school, school district, and potentially the teacher.

105.    Another remedy is a complaint against the government entity or its employee to the New Hampshire Commission on Human Rights, which has the power to receive, investigate, and pass upon complaints of illegal discrimination by teaching prohibited concepts.  RSA 193:40 III.

There does not appear to be any "qualified immunity" for a public employee who has violated the Act but done so reasonably or unintentionally.

106.    The Act also contemplates especially harsh and punitive sanctions for educators. In particular, the Act states that "[v]iolation of this section by an educator *shall* be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education."  RSA 193:40, III (emphasis added); *see also* RSA 193:40, V (establishing that this section extends to "[a]dministrators, specialists, and teachers").  Violations of the Educator Code of Conduct can lead to the occupational and professional "death penalty" of revoking an educator's license to work in the state.  *See Exhibit 2* (N.H. Code Admin. R. Ed 511.02 addressing sanctions). A teacher's entire professional life depends on interpreting a statute which is indecipherable.

107.    The Act also leverages the threat of professional sanctions to press educators into service as informants of their fellow colleagues and enforcers of the Act's vague restrictions.  That is because a licensed educator's failure to report a suspected violation of the Code of Conduct is itself punishable as a violation of the Code.  *See id*. 510.05(a) (stating that "[a]ny credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures"); *id.* 510.05(f) (stating that, "[i]f the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c)"). As a result, educators must risk their livelihood on their best guess of the Act's inscrutable restrictions—not only when it comes to their own teaching, but also in deciding whether to report and jeopardize the career of a fellow teacher.  Further, the prospect of an educator needing to file

a report will be constant considering that educators cannot parse the Act with enough specificity to be sure that they have no *suspicion* of any conduct which violates the Act.

108.    All of these remedies are costly and time consuming for educators to defend. Reputational harm and unwanted personal scrutiny will result even from complaints which are ultimately unfounded.  Even if a complaint in any of these venues is ultimately dismissed, the educator will still be subjected to the process of defending themselves.  The threat of lengthy legal proceedings and public scrutiny influences educator choices and causes them to shy away from any topic or material which could be misinterpreted.

## VI.    The Defendants' Failure to Answer Specific Questions Concerning the Banned Concepts Act.

109.    Immediately after passage of the Banned Concepts Act, Plaintiff NEA-NH began to hear from members that they were confused about what they could and could not teach under the Act, as well as scared of the repercussions for guessing wrong.

110.    On July 12, 2021, NEA-NH President Megan Tuttle, on behalf of more than 17,000 educator members, wrote to Defendant Attorney General Formella requesting clarification of the ambiguity of the Act.  *See Exhibit 18* (July 12, 2021 NEA-NH Letter).  The letter asked 12 specific questions which reflected the sentiments that the NEA-NH had been hearing from its members who are the vast majority of the state's educators impacted by the Act.

111.    Defendant Attorney General Formella did not respond to that letter even to acknowledge receipt.

112.    On July 21, 2021, Defendants Commissioner Edelblut, Attorney General Formella, and Director Malachi issued so-called "guidance" on the Banned Concepts Act.  *See Exhibit 19* (July 21, 2021 Guidance).

113.     As a threshold matter, New Hampshire state courts have independent enforcement authority over the Banned Concepts Act apart from any interpretation that the Attorney General may give to the Act's terms.  The Act provides for a private right of action for any individuals allegedly "aggrieved" by the Act.  *See* RSA 193:40, III (allowing "aggrieved" persons to "initiate a civil action against a school or school district in superior court for legal or equitable relief").  As a result, any interpretation from the Attorney General is not binding, as enforcement power under the Act is also delegated to a state judicial branch that is outside the Attorney General's control.

114.     In any event, this July 21, 2021 "guidance" barely scratches the surface of the Act's provisions.  The "guidance" fails to provide any extensive and concrete examples.  It does not explain what specific types of diversity, equity, and inclusion training are or are not covered under the Act.  The "guidance" also fails to directly answer all the questions posed by Plaintiff NEA-NH on behalf of its members.

115.     For example, the July 21, 2021 "guidance" for K-12 educational programs says, generically and without elaboration, that the Act does not "prohibit *discussions* related to current events including … efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups."  *See Exhibit 19* (July 21, 2021 Guidance) (emphasis added).  But it did so while explicitly omitting whether such efforts—including those that capture concepts like "implicit bias" or "white privilege"—can be "taught," "advocated for," "trained on" "advanced," or "instructed" in schools despite the Act's terms.  *See* RSA 354-A:31 (no public employer "either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train" on the banned concepts); RSA 354-A:32 ("[n]o government program shall teach, advocate, or advance" on the banned concepts); RSA 193:40, I (no pupil "shall be taught, instructed or compelled to express belief in" a banned concept).

116.    The line between discussing (perhaps allowed under the "guidance") and teaching/advocating for/training on/advancing/instructing (perhaps prohibited) is so murky that enforcement of the Act poses a danger of arbitrary and discriminatory application.  *See Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 544 ("The line between teaching or implying (prohibited) and informing (not prohibited) is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.") (internal citations omitted).

117.    The July 21, 2021 "guidance" for K-12 educational programs also does not address fundamental questions like whether the Act specifically prohibits or allows classroom instruction to students on topics like "systemic racism," "implicit" or "unconscious bias," and "white privilege."  This "guidance" for educational programs fails to address these questions despite the fact that the Trump Administration construed its own Executive Order using nearly identical terms as rendering suspect the topics of "white privilege," "systemic racism," and "unconscious bias." *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum).

118.    For educators, rather than clarifying the Act, the July 21, 2021 "guidance" only further confuses matters when read in conjunction with the Act's text and with the knowledge of what the legislature sought to do.  For example, the guidance says that the Act does not prohibit "discussions related to current events including but not limited to: the Black Lives Matter movement."  *See Exhibit 19* (July 21, 2021 Guidance).   However, the Black Lives Matter movement's mission is, among other things, to "eradicate white supremacy and build local power to intervene in violence inflicted on Black communities by the state and vigilantes," and to work for a world "where Black lives are no longer systematically targeted for demise."[34]   A teacher cannot, on one hand, have a "permissible" discussion about the Black Lives Matter movement in

---

[34] *See* Black Lives Matter, About, https://blacklivesmatter.com/about/.

the news and yet, on the other hand, completely ignore discussing white privilege, systemic racism, and unconscious bias—concepts that are foundational to understanding this movement.

119.    The July 21, 2021 "guidance" for public employers and government programs similarly is problematic.  While it is nominally more instructive in saying that the Act does not "prohibit implicit bias training" and allows public employers to have "trainings" and "programs" "to examine issues related to equity, diversity, inclusion, and equality," the guidance does not include or reference classroom instruction to students, nor does the "guidance" reference specific concepts like "systemic racism" and "anti-racism" that have become staples in DEI instruction, would benefit students in creating a more inclusive educational environment, and were specifically targeted by proponents of the Act.

120.    Given the deficiencies in the July 21, 2021 "guidance," Plaintiff NEA-NH wrote Defendants Attorney General Formella and Commissioner Edelblut on August 5, 2021 presenting a reasoned and plausible interpretation of the Banned Concepts Act and asking for confirmation that their interpretation of the guidance was correct before disseminating such advice to their concerned members prior to the 2021-2022 school year.  For example, the NEA-NH sought confirmation, among other things, that the following was appropriate:

(i) "[i]ntroducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group";

(ii) discussion of "Structural Racism (a.k.a Societal Racism, Systemic Racism) [which] describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government";

(iii) "[a]ssigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion"; and

(iv) discussion of "the subject of 'white privilege,' a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is 'inherent' or cannot be overcome."

*See* *Exhibit 18* (NEA-NH Aug. 5, 2021 Letter).

121.    The NEA-NH also sought confirmation that "[s]pecific books or works of certain authors are not 'banned' under the law." *Id.*  This question was particularly important given that Defendant Commissioner Edelblut, in a June 13, 2021 op-ed in the *Union Leader*, left the distinct impression that Dr. Ibram X. Kendi's book *How to be an Anti-Racist* may not be read under the Act.  *See* *Exhibit 16* (Frank Edelblut, "Teach Children About Racism, Not to Be Racists," *Union Leader* (June 13, 2021)).  The NEA-NH added that, "if there are certain texts which your offices' believe are per se prohibited under this law, please provide a list so educators know that prior to making 2021-2022 lesson plans." *See* *Exhibit 18* (NEA-NH Aug. 5, 2021 Letter).  The NEA-NH's concern was further realized when Commissioner Edelblut later raised a complaint about Tiffany Jewell's book for 11-15-year-olds entitled *This Book is Anti-Racist* at the July 8, 2021 State Board of Education meeting.  At this meeting, the Commissioner read portions of Chapter 10 from this text, and strongly suggested that he believed that this book was banned under the Act.[35]

122.    Neither Attorney General Formella nor Commissioner Edelblut directly responded to these reasonable questions in Plaintiff NEA-NH's August 5, 2021 letter.  *See* RSA 21-N:1, II(a) (noting that "[t]he department [of education] shall have the dual role of providing regulatory direction and instructional assistance to public elementary and secondary schools").

---

[35]    *See* N.H. State Board of Education Meeting (July 8, 2021), https://us02web.zoom.us/rec/play/9LhY5d2K7pIYMFI_k_Y03oe4-IAF2kBzSxqGiFW_AYoJCAwC_4FGOgkvueh7OsagTe0sVbKwPttCNONe.pDFAngwZ6nvzBFP1 (starting at 3:22:19).

123.    Rather than respond to the NEA-NH—the chosen representative of the vast majority of educators in New Hampshire—Defendant Commissioner Edelblut blithely suggested during an interview on *WMUR* in late August 2021 that, "if there are educators who are concerned about a particular curricular material or something like that, they can reach out to the Department [of Education] and we can take a look at that for them and provide feedback for them on that."[36]

124.    Further, in response to a specific question from *WMUR* as to whether under the Act "a teacher should lose their license if they teach that systemic racism exists in the United States," Commissioner Edelblut did not directly answer and, instead, said that the circumstance would have to be looked at individually.  He agreed that there is "not a bright line," but that the "bright line … that we all share is that we are not discriminating against one another, whether that is in the classroom or outside the classroom."[37]  Defendant Commissioner Edelblut also noted in a separate *NHPR* interview in late August 2021 that, "if educators believe that somehow this is providing a chilling effect—the conversations that they're having—they should consider what it is that they're talking about."[38]

125.    On September 7, 2021, Defendant Attorney General Formella issued "Attorney General Opinion No. 2021-01" entitled "Request for Attorney General's Opinion Regarding New Anti-Discrimination Protections."  *See Exhibit 20* (Sept. 7, 2021 Attorney General Opinion).  This opinion letter has no binding effect.  *See Hess v. Turner*, 529 A.2d 386, 387 (N.H. 1987) ("the way the attorney general chooses, in his discretion, to implement [the statute] does not determine for

---

[36] Adam Sexton, "CloseUp: Commissioner Expects to Fund 1000-1500 Education Freedom Accounts This Year," *WMUR* (Aug. 29, 2021), https://www.wmur.com/article/closeup-commissioner-expects-to-fund-1000-1500-education-freedom-accounts-this-year/37424825 (starting at 9:58).
[37] *Id.*
[38] "N.H. Education Commissioner: 'Divisive Concepts' Restrictions Won't Hinder Classroom Conversations," *NHPR* (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.

us what the statute compels the State to do").  And, far from resolving or narrowing the ambiguity and confusion over effect of the Banned Concepts Act, it only serves to add more.

126.    The opinion apparently was in response to a request from the New Hampshire Commission on Human Rights for an official opinion "concerning the scope and application of the" Banned Concepts Act.  *See Exhibit 20* (Sept. 7, 2021 Attorney General Opinion).  In responding to the Commission, the Attorney General's nine-page opinion effectively memorialized the July 21, 2021 "guidance," while acknowledging that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."  However, like the July 21, 2021 "guidance," this opinion fails to provide any extensive and concrete examples of what specific texts and types of diversity, equity, and inclusion trainings are (or are not) covered under the Act.

127.    Much of the confusion sewn by this non-binding September 7, 2021 opinion comes from Defendant Formella's argument that the Act's overall purpose is to prohibit teaching that racism and other biases are "natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging."  To begin with, virtually no one believes that racism is "natural, biological, or innate" in the kind of genetically-preordained sense suggested by Defendant Formella's opinion, thereby raising the question of why such time and effort would be devoted to restricting the teaching of concepts that are all but non-existent.  Likewise, no one would understand what is meant by the claim that teaching about racism and other bias is permissible so long as they are presented as being "accidental" or "apparent"—the idea is simply non-sensical.

128.    The confusion only grows when Defendant Formella attempts to provide further detail.  For example, Defendant Formella asserts that the Act's use of the term "inherently" in the prohibition on teaching that certain groups are "inherently racist, sexist, or oppressive, whether consciously or unconsciously" must be read to include "belonging by … settled habit."  Yet, at the same time, Defendant Formella's opinion states that the Act does not prohibit teaching that certain groups are biased or racist "because of external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging."  Educators unwilling to risk their livelihood have no way of reliably distinguishing between lessons that discuss racist beliefs acquired though "settled habit" (perhaps prohibited) and those that discuss racist beliefs due to "external action or external factors" (perhaps not prohibited).  (The opinion creates the same confusion and ambiguity for trainers of implicit bias: it declares that trainings cannot teach that certain groups are "racist, sexist, or oppressive, whether consciously or unconsciously" out of "settled habit," while at the same time claiming that the Act does not prohibit training that "recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources.").

129.    Finally, Defendant Formella's opinion exacerbates the vagueness and chilling effect of the Act by declaring that a violation may occur not just because of the content of a lesson or instructional material, but also because of implications and inferences that a student or trainee may subjectively draw from the material.  For example, the opinion explains that, while it may be permissible to provide "Anti-Racist Resources," those resources may not be offered in a way that "may imply that white people … are in need of anti-racist resources."

130.    In sum, Defendants have allowed the chill of the Act to persist.  The Defendants' refusal to answer specific questions as to what texts are covered under the Act is not only unhelpful

and indifferent, but also affirms the broadest and most variable interpretation of the Act and invites arbitrary and discriminatory enforcement.

131.    Moreover, the Human Rights Commission's need to ask for a formal opinion on the Act's scope and the Attorney General's need to issue two (albeit not specific and lacking in specificity themselves) "guidance" documents only highlight the Act's vagueness and lack of clarity.  And if Defendants cannot (or are unwilling to) answer basic questions as to what texts are specifically banned under the Act's text, educators cannot possibly be expected to decipher these vague prohibitions for themselves and comply.  Instead, educators have been left to "dangle in the wind" as they attempt to interpret how to comply with the Act's provisions in the face of dire penalties.

132.    As a result, the NEA-NH has not been able to confidently provide guidance to its members as to how they could comply with the vague prohibitions in the Act.  Educators still do not know what topics can be taught or trained.  If the Defendants know specific books, lessons, or materials which are prohibited, then they should just say so explicitly.

**VII.    Even Education Lawyers Do Not Know What the Banned Concepts Act Actually Bans.**

133.    Prominent education lawyers who give advice to educational institutions have highlighted the Act's ambiguity, and how this ambiguity creates a chilling effect given the Act's penalties—even in the face of Defendants' July 21, 2021 "guidance."

134.    For example, the Banned Concepts Act uses the passive voice, stating in part that "[n]o pupil in any public school in this state shall be taught, instructed, [or] inculcated" on any of the banned concepts.  RSA 193:40, I.  Thus, as Attorney David Wolowitz from McLane Middleton explained in a piece published in July/August 2021, this Act may even capture classroom discussion on banned topics where students are teaching one another:

> As drafted, the construction of sentence prohibits teaching or instruction of the prohibited concepts, regardless of whether the teaching or instruction inculcates or compels the students to believe in or support the concepts … Classroom discussions present a particular risk because a teacher cannot predict what students might say and because the definition of 'taught' is so broad …. [I]f a student were to assert that the prohibitions and penalties in the new law are motivated by racism or sexism, which some critics have argued, permitting such discussion to continue could be construed as a violation of the statute.

See *Exhibit 21* (David Wolowitz, "A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act," (July 6, 2021/Aug. 2, 2021)).

135.    Accordingly, even in the face of Defendants' July 21, 2021 "guidance," Attorney Wolowitz advised educators to exercise extreme caution, explaining that, "to protect themselves against potential professional conduct complaints, teachers should be prepared to immediately stop any classroom discussions on any and all topics potentially relating to the prohibited concepts." *Id.* He added—confirming the potential chill of the law—that, "[g]iven the extraordinarily high risk of teaching related to any of these topics, I recommend that teachers exercise caution even when they are confident their teaching does not violate the statutory prohibitions." *Id.*

136.    Similarly, attorneys Meghan S. Glynn, James A. O'Shaugnessy, and Milliana R. Zonarich of the law firm Drummond Woodsum—who represent school districts throughout New Hampshire—have conducted trainings of educators on behalf of their education institution clients. The attorneys' materials explained the Act's ambiguity.  For example, these lawyers highlighted as a "gray area" the following: (i) "[p]rograms that involve discussion of power structures or power imbalances in society"; and (ii) "programs that involve advocating for … [a]ffirmative action to promote equity, [r]eparations for past wrongs, [and] [w]hite privilege."  *See Exhibit 22* (Drummond Woodsum August 5, 2021 Presentation).  These lawyers also added that a "gray area" includes "[d]iscussions regarding power structures in present-day society," and "[d]iscussions of

cultural sensitivity." *Id.*  These lawyers further explained that: (i) "The state guidance [issued on July 21, 2021], while helpful, does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law;" (ii) "The law is difficult to understand, often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions"; and (iii) "One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech." *Id.*  Drummond Woodsum's trainings with this information are ongoing.

137.    In short, even lawyers who regularly advise school districts do not know what the Act means and cannot answer many fundamental questions as to what is covered under the Act— an uncertainty that only has scared and chilled educators further.  If lawyers do not know where to draw the lines, then how can teachers?  The (understandable) inability of experienced education lawyers to understand the Act means that school districts and those authorized to enforce the Act are likely to apply the Act in ways that are arbitrary and discriminatory.

138.    Moreover, some of Plaintiff NEA-NH's members report either no training on the Act at all by their school district or training which left them confused about what was permissible. These educators are being left to fend for themselves because of the vagueness of the Act and the Defendant's refusal to provide concrete, unambiguous guidance to them.  Members have conveyed that they feel like the lack of clarity on the Act amounts to a trap being set, and educators fear that they are walking into it unwittingly and unavoidably.

**VIII.   Defendant Commissioner Edelblut's Website and the Moms for Liberty Bounty.**

139.    If the inherent chill of the Act was not enough, it was compounded when Defendant Commissioner Edelblut and the Department of Education, on or about November 10, 2021, published a website to invite members of the public to file complaints against teachers under the

Act.  *See Exhibit 23* (DOE Website as of Dec. 19, 2021).  The website contains a complaint form

that can be sent directly to the Commission for Human Rights.

140.    The Department of Education's website (at least initially before it was later deleted)

also included an email address of a Department of Education employee who could field complaints

directly.  The Department of Education initially included a Department employee as a person to

field complaints despite the fact that the Defendants' July 21, 2021 "guidance" said that complaints

should be sent to the New Hampshire Commission for Human Rights or the New Hampshire Office

of the Attorney General.  *See Exhibit 19* (July 21, 2021 Guidance).

141.    The Department of Education established and advertised this complaint website

even though, to the best of Plaintiffs' knowledge, the Department of Education has not established

a similar, specific website for violations of other provisions of the Law Against Discrimination or

RSA 193:38-39 that were added in 2019 to apply to public schools.[39]

142.    In other words, the Department of Education set up this website to target teachers

directly under the Banned Concepts Act.

143.    As of December 19, 2021, the Department of Education's complaint website, *see*

*Exhibit 23*, also fails to mention or make reference to the Attorney General's September 7, 2021

opinion purporting to interpret the Act's provisions.

144.    Adding to this chill—and the underlying intent of the Act to cause teachers to self-

censor with respect to important conversations on race and gender—the group "Moms for Liberty

---

[39]  *See* Department of Education, Complaints and Concerns,  https://www.education.nh.gov/who-we-
are/commissioner/complaints-and-concerns; *see also* RSA 354-A:27-28 (added in 2019, and stating, in part, that "[n]o
person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public
schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status,
disability, religion or national origin, all as defined in this chapter"); RSA 193:38-39 (added in 2019, and stating, in
part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination
in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial
status, disability, religion, or national origin, all as defined in RSA 354-A").

NH" published a tweet on November 12, 2021 in response to the Department of Education's complaint website.  The tweet stated the following:



*See* <u>Exhibit 24</u> (Bounty Tweet).[40]

**IX.     The Chill of the Banned Concepts Act.**

145.    Through usage of vague terms with a harsh enforcement mechanism and draconian

---

[40] A similar "Moms for Liberty" group in Tennessee has alleged that the books being assigned to Second Graders in one county entitled *Martin Luther King Jr. and the March on Washington* by Frances E. Ruffin and *The Story of Ruby Bridges* by Robert Coles—which is about the Black 6-year-old who integrated a Louisiana public school in 1960—violate Tennessee's similar "divisive concepts" law.  *See* Gabriella Borter, "'Critical Race Theory' Roils a Tennessee School District," *Reuters* (Sept. 21, 2021), https://www.reuters.com/world/us/critical-race-theory-roils-tennessee-school-district-2021-09-21/; *see also* Moms for Liberty Letter (June 30, 2021), https://drive.google.com/file/d/16W9grkwSFsIPRQOSpQfnAHNJzvDH5Bkk/view.

penalties, the Act chills permissible instruction by teachers who are uncertain whether their instruction could lead students to inquire about a prohibited concept as described throughout this Complaint. As a result, teachers across New Hampshire have begun self-censoring certain texts and discussions on race and gender. This should hardly be surprising. The Act's ambiguities and penalties—coupled with the Department of Education's cultivation of a climate of fear—create strong incentives for school districts (even those who want to actively promote DEI work) to, upon fielding a parental complaint, immediately shelve books slated for classroom instruction to avoid liability.

146.    Similarly, educators fear that students, as well as parents, will respond to this Moms for Liberty "bounty" given its monetary reward. Teachers are already subject to students creating social media pages targeting them or clandestinely videoing their lessons and classroom interactions. Educators feel like they cannot freely engage with their students and, instead, have retreated to guarded lessons that do not serve these students as well as an honest education does.

147.    In addition to the examples in Paragraph 34, examples of this chill include the following:

- A group of teachers focused on diversity at a Rockingham County middle school received a grant to purchase Lisa Moore Ramée's book *A Good Kind of Trouble*—and a collection of other titles, including *So You Want to Talk About Race* by Ijeoma Oluo, *The New Jim Crow* by Michelle Alexander, *The Black Friend: On Being a Better White Person* by Frederick Joseph, *Ghost Boys* by Jewell Parker Rhodes, *Raising White Kids: Bringing Up Children in a Racially Unjust America* by Jennifer Harvey, *Me and White Supremacy* by Layla Saad, and *The Hate U Give* by Angie Thomas—as part of efforts to focus more on equity in schools. The group wanted to have these books used as resources and included in their classroom libraries, but those plans have been put on hold.

  In particular, *A Good Kind of Trouble* is for students ages 8-12 and tells the story of a 12-year-old Young African American girl who, after experiencing a powerful racial justice protest, starts getting more active in the Black Lives Matter movement. With respect to this book, a parent sent an email to Defendant Commissioner Edelblut in October 2021 demanding that the "so-called professionals that are allowing this in

school need to be disciplined!"  The parent also complained that the "book has an underlying tone that white people and police officers are against black people all the way down to how white people look at a black person."  Further, she objected to certain so-called "gender books" being read.  The parent concluded by asking Commissioner Edelblut, in part, "[w]hat disciplinary action will result?," and "[h]ow do we proceed? Do I need to get a lawyer?"

- Similarly, a Rockingham County middle school has temporarily set aside Tiffany Jewell's book entitled *This Book is Anti-Racist*, which was used by a teacher group for professional development.

### X.    The Harm of Chilling DEI Instruction.

148.    The Act's chill of education focusing on race, gender, and DEI concepts harms all Granite Staters because the inclusion of such concepts in classrooms provides a multitude of benefits for students and society at large.  Student body diversity—and the resultant diversity in views and perspectives that flows from such diverse students' participation—improves critical thinking and problem solving, increases cross-racial understanding, reduces stereotypes and prejudices, and develops leadership skills and many other skills necessary to thrive in an increasingly diverse society.[41]  Research also shows that a culturally inclusive education can increase graduation rates, school attendance, and standardized test scores.[42]  These benefits manifest for all students.

149.    While all Granite Staters are harmed by the Act, the Act's chill of instruction on race and gender inflicts disproportionate injury on students of color, with compounded harms for LGBTQ+, women, and girls of color.  Instruction on race and gender, including DEI concepts, serves to close existing opportunity gaps and inequalities faced by students of color and other historically marginalized groups.  Research demonstrates that increasing cultural proficiency

---

[41] *See, e.g.,* Roslyn Arlin Mickelson, *Research Brief: School Integration and K-12 Outcomes: An Updated Quick Synthesis of the Social Science Evidence* 5, Nat'l Coal. On Sch. Diversity (Oct. 2016), https://files.eric.ed.gov/fulltext/ED571629.pdf.

[42]   *See, e.g.*, Thomas Dee & Emily Penner, The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum, 54 Am. Educ. Res. J. 127, 217 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

among teachers and introducing culturally responsive teaching practices and pedagogy can provide effective support for students of color.[43]  Studies in brain science and education find that drawing on learners' background knowledge shapes comprehension.[44]  Research also illustrates that instructional materials, assignments, and texts that reflect students' backgrounds and experiences are critical to engagement and deep, meaningful learning.[45]  Additional research shows that enrollment in an ethnic studies course results in positive academic outcomes across a variety of indicators, including a 21% increase in ninth-grade attendance rates and average GPA increase of 1.4 grade points.[46]

150.    In addition, this type of instruction serves to break down stereotypes and prejudices that disproportionately inflict harm on students of color, both within the educational system and broader society across healthcare, the penal system, and workplaces.  For example, trainings on implicit bias help to counteract existing prejudice which research suggests results in educators disciplining Black students more harshly than their White peers for similar offenses.[47]

151.    Such barriers are compounded for students of color who have other marginalized identities, including LGBTQ+ students of color.  LGBTQ+ students are subject to bullying and harassment at much higher rates.  One 2019 state survey assessing school climate for LGBTQ+ youth in New Hampshire's secondary schools found that up to 63% of respondents reported verbal harassment based on sexual orientation, and up to 22% reported physical harassment based on

---

[43] *Id.* at 127–66.

[44] *See Understanding Culturally Responsive Teaching,* New Am., https://www.newamerica.org/education-policy/reports/culturally-responsiveteaching/understanding-culturally-responsive-teaching/ (discussing and citing studies).

[45] Alfred Tatum, *Black Males and Critical Literacy* 66, The Reading Teacher, 661–69. (2013).

[46] Dee & Penner, *supra* note 42, at 129.

[47] *See, e.g., "*Educator Bias is Associated with Racial Disparities in Student Achievement and Discipline," *Brookings* (July 20, 2020), https://www.brookings.edu/blog/browncenter-chalkboard/2020/07/20/educator-bias-is-associated-with-racial-disparities-instudent-achievement-and-discipline/.

sexual orientation, with 8% of those cases resulting in physical assaults.[48]  LGBTQ+ students of color face additional barriers, as surveys indicate that LGBTQ+ youth of color report a higher likelihood of dropping out of school due to hostile school climates as compared to their White LGBTQ+ peers.[49]  While instruction on sexual orientation, gender identity, and DEI serves to address these barriers, the Act's chill further deprives LGBTQ+ youth of color of anti-discrimination measures, educational supports, and engaging curricula.  Evidence shows that education policies that are inclusive of LGBTQ+ students aid student well-being and success by reinforcing a positive school climate.[50]  Likewise, LGBTQ+-inclusive curricula contribute to school safety for all students.[51]

152.    Women and girls of color also face a range of compounded barriers in the education context due to the intersections between their racial and gender identity.  For example, girls of color disproportionately face punitive disciplinary measures in school and sexual harassment.  DEI work in schools can serve to effectively address these intersectional barriers.

153.    Plaintiffs Andres Mejia and Christina Kim Philibotte have dedicated their professional lives to training on diversity, equity, and inclusion.  Their experiences confirm the findings that such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color.  This instruction has increased the engagement, participation, and sense of belonging for students of color in their districts.  And students of color have expressed to Mr. Mejia and Ms. Philibotte their desire to gain greater exposure to the perspectives of communities of color and theories related to race and gender

---

[48] "School Climate for LGBTQ Students in New Hampshire," *GLSEN* (2019), https://www.glsen.org/sites/default/files/2021-01/New-Hampshire-Snapshot-2019.pdf.

[49] "Educational Exclusion: Drop Out, Push Out, and the School-to-Prison Pipeline Among LGBTQ Youth," *GLSEN* (2013), https://www.glsen.org/sites/default/files/2019-11/Educational_Exclusion_2013.pdf.

[50] The National Academies of Science, Engineering, and Medicine, Understanding the Well-Being of LGBTQI+ Populations, at 9-5 (2020).

[51] *Id.* at 9-8.

because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities.  White students also have asked them to learn more about DEI, gender, LGBTQ+ race, racism, and other perspectives about marginalized identities.  These courageous conversations are essential for all students—especially those of color—as they build community where people feel seen and validated in a secure space, and thus more comfortable speaking and sharing their experiences on complex topics which, in turn, teaches other students.

## CAUSE OF ACTION

## COUNT ONE – FOURTEENTH AMENDMENT -- VAGUENESS

154.    The foregoing allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

155.    A law is "void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This principle applies to administrative, civil, and criminal prohibitions.  *See, e.g., FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).  A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

156.    The Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 is unconstitutionally vague on its face and as applied to Plaintiffs because it fails to provide fair notice of what educators can and cannot include in their courses, and because it invites arbitrary and discriminatory enforcement—up to and including the loss of teaching licenses.

157.     Educators and administrators, including Plaintiffs, at every level are confused about what they can legally teach and train, and they risk the loss of employment, licenses, and certifications if they unwittingly violate the Banned Concepts Act.

158.     The Banned Concepts Act is vague and violates the Fourteenth Amendment rights of Plaintiffs facially and as applied by Defendants Commissioner Frank Edelblut, Attorney General John Formella, Director Ahni Malachi, Chairperson Christian Kim, and Commissioner Ken Merrifield—all of whom have enforcement authority under the Banned Concepts Act.

159.     Because of the Banned Concepts Act's vagueness, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment right to due process.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief as follows:

A.     Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing the Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40;

B.     Declare that the Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 is unconstitutional facially and as applied under the Fourteenth Amendment's Due Process provisions to the United States Constitution;

C.     Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

D.     Award such other relief as the Court deems just and equitable.

ANDRES MEJIA AND CHRISTINA KIM PHILIBOTTE,

By and through their attorneys,

/s/ Gilles R. Bissonnette
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
SangYeob Kim (N.H. Bar No. 266657)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
18 Low Avenue, Concord, NH  03301
Tel.:  603.225.3080
gilles@aclu-nh.org
henry@aclu-nh.org
sangyeob@aclu-nh.org

Chris Erchull (N.H. Bar No. 266733)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org

Sarah J. Jancarik (N.H. Bar No. 272310)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
Sarahj@drcnh.org

William E. Christie (N.H. Bar No. 11255)
S. Amy Spencer (N.H. Bar No. 266617)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH  03302
Tel.: 603.225.7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com

/s/ David A. Vicinanzo
David A. Vicinanzo (N.H. Bar No. 9403)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com

Travis Hill*
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036-4120
Tel.: 212.940.3131
thill@nixonpeabody.com

Morgan C. Nighan (N.H. Bar No. 21196)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA  02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com

Emerson Sykes*
Speech, Privacy, and Technology Project
Leah Watson*
Sarah Hinger*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY  10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

NATIONAL EDUCATION ASSOCIATION-
NEW HAMPSHIRE,

By and through its attorneys,

*/s/ Esther K. Dickinson*
Esther K. Dickinson (N.H. Bar No. 20764)
Lauren Snow Chadwick (N.H. Bar No. 20288)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
   NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
edickinson@nhnea.org
lchadwick@nhnea.org

Nathan R. Fennessy (N.H. Bar No. 264672)
Rue K. Toland (N.H. Bar No. 269021)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
nfennessy@preti.com
rtoland@preti.com

Alice O'Brien*
Jason Walta*
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
aobrien@nea.org
jwalta@nea.org

*Certifications for admission *pro hac vice* to follow.

December 20, 2021

# EXHIBIT 1

## Full text of
## The Banned Concepts Act

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**

7Apr2021... 1059h
06/03/2021  1799s
06/03/2021  1816s
06/03/2021  1859s
06/03/2021  1842s
06/03/2021  1821s
06/03/2021  1827s
06/03/2021  1866s
06/03/2021  1884s
24Jun2021... 2040CofC
24Jun2021... 2048EBA

2021 SESSION

21-1082
08/10

HOUSE BILL          *2-FN-A-LOCAL*

AN ACT          relative to state fees, funds, revenues, and expenditures.

SPONSORS:       Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:      Finance

───────────────────────────────────────────────────

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments from  the retirement system.

9.  Enables the supreme court to transfer funds.

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**

66.   Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

67.   Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

68.   Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

69.   Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

70.   Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

71.   Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

72.   Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

73.   Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

74.   Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

75.   Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

76.   Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

77.   Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

78.   Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

79.   Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

80.   Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

81.   Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 145 -**

91:297   New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

II.  Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect.

III.  Nothing in this subdivision shall be construed to limit the academic freedom of faculty members of the university system of New Hampshire and the community college system of New Hampshire to conduct research, publish, lecture, or teach in the academic setting.

354-A:30  Definitions.  In this subdivision:

I.  "Government program" means any activity undertaken by a public employer, both as an employer and in performance of its government function.

II.  "Public employee" means any person working on a full-time or part-time basis for the state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

III.  "Public employer" includes the state or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 146 -**

1 recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

2 following:

3     I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

4 status, familial status, mental or physical disability, religion, or national origin, are inherently

5 superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

6 color, marital status, familial status, mental or physical disability, religion, or national origin;

7     II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

8 race, creed, color, marital status, familial status, mental or physical disability, religion, or national

9 origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10     III.  That an individual should be discriminated against or receive adverse treatment solely

11 or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

12 status, familial status, mental or physical disability, religion, or national origin; or

13     IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

14 marital status, familial status, mental or physical disability, religion, or national origin cannot and

15 should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

16 orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

17 or national origin.

18     354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

19 program shall teach, advocate, or advance any one or more of the following:

20     I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21 status, familial status, mental or physical disability, religion, or national origin are inherently

22 superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23 color, marital status, familial status, mental or physical disability, religion, or national origin;

24     II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25 race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26 origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27     III.  That an individual should be discriminated against or receive adverse treatment solely

28 or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29 status, familial status, mental or physical disability, religion, or national origin; or

30     IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31 marital status, familial status, mental or physical disability, religion, or national origin cannot and

32 should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33 orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34 or national origin.

35     354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse

36 employment action, warning, or discipline of any kind for refusing to participate in any training,

37 program, or other activity at which a public employer or government program advocates, trains,

teaches, instructs, or compels participants to express belief in, or support for, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any other applicable common law or statutory cause of action.

91:298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after section 39 the following new section:

193:40  Prohibition on Teaching Discrimination.

I.  No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b)  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c)  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 148 -**

1   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

2   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

3   origin.

4        II.   Nothing in this section shall be construed to prohibit discussing, as part of a larger

5   course of academic instruction, the historical existence of ideas and subjects identified in this

6   section.

7        III.   Any person claiming to be aggrieved by a violation of this section, including the attorney

8   general, may initiate a civil action against a school or school district in superior court for legal or

9   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

10  A:34.

11       IV.   Violation of this section by an educator shall be considered a violation of the educator

12  code of conduct that justifies disciplinary sanction by the state board of education.

13       V.   For the purposes of this section, "educator" means a professional employee of any school

14  district whose position requires certification by the state board pursuant to RSA 189:39.

15  Administrators, specialists, and teachers are included within the definition of this term.

16  91:299  Severability.  If any provision of sections 297-298, or the application of any provision to

17  any person or circumstance is held to be invalid, the remainder of such sections, and their

18  application to any other persons or circumstances shall not be affected thereby.

19  91:300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



# EXHIBIT 2

## New Hampshire Code of Conduct for Educational Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  <u>Purpose</u>.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d) Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  <u>Definitions</u>.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

>(1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

>(2)  Meets at least one of the following qualifications:

>>a. Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

>>b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1)  Pathway 4 certification as specified in Ed 505.04; or

(2)  Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  <u>Confidentiality of Credential Holder Certification Records</u>.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1)  The name of the credential holder;

(2)  The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3)  The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4)  The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1)  Informal or formal investigations; or

(2)  Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1)  A party in an adjudicatory proceeding when:

a.  The credential holder is a party to the proceeding; and

b.  The credential holder's credential record is relevant to the proceeding;

(2)  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3)  A certifying agency of another jurisdiction for:

a.  Purposes of credentialing the credential holder in the other jurisdiction; or

b.  An investigation of the credential holder by the other jurisdiction, when:

1.  The credential holder was the subject of a formal investigation under Ed 511; or

2.  Disciplinary action was taken against the credential holder by the board under Ed 511;

(4)  Board investigators or prosecutors; or

(5)  Persons to whom the credential holder has given a release.

(d)  The bureau shall report:

(1)  Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

(2)  Any reprimand to the credential holder's current superintendent of school in N.H.;

(e)  The department shall maintain a list of all credential holders whose credential~~s has~~ *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04  Emergency Authorization.

(a)  The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b)  The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

(1)  Paid the applicable application fee, provided in Ed 508.06(c); and

(2)  Filed with the bureau the information and documentation required in (c) and (e).

(c)  An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13)  Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14)  Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15)  Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a.  American Indian;

    b.  Asian/Pacific;

    c.  African-American/Non-Hispanic;

    d.  White/Non-Hispanic;

    e.  Hispanic;

    f.  Multi-ethnic; and

    g.  Other/do not wish to specify.

(d)  If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e)  If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f)  An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a)  The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b)  If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

(1)  Is in the process of certification;

(2)  Has submitted a completed application for certification; and

(3)  Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01 <u>Principle 1—Responsibility to the Education Profession and Educational Professionals</u>.

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5)  Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02   <u>Principle 2—Responsibility to Students</u>.

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

    a. Abuse, including, but not limited to physical and emotional abuse;

    b. Cruelty or any act of endangerment;

    c. Any sexual act with or from any student; and

    d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03   Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04    Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b) Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2) Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)  Whether:

a.  The communication made was covert in nature;

b.  The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c.  The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05  Duty to Report.

(a) Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:.

(1)  When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2)  When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d)  If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e)  Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1)  His or her immediate supervisor, superintendent, or both; and

(2) The department of health and human services, pursuant to RSA 169-C:29.

(f)  If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an  investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g)  The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01    Complaints, Cases and Investigations.

(a)  A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b)  After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c)  Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d)  Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

    (1) The department shall create a report which documents the results of the investigation;

    (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

        a. Suspension;

        b. Revocation; or

        c. Reprimand; and

    (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

    (4) The following shall be considered aggravating circumstances:

        a. The seriousness of the offense;

        b. The credential holder's prior disciplinary record;

        c. The credential holder's lack of willingness to cooperate with the department during an investigation;

        d. Potential harm to public health and safety; and

        e. The purpose of the rule violated;

    (5) The following shall be considered mitigating circumstances:

        a. Absence of a prior disciplinary record;

b.  The credential holder's willingness to cooperate with the department during an investigation;

c.  The credential holder's acknowledgment of his or her wrongdoing; and

e.  The purpose of the rule or statute violated;

(6)  The credential holder shall be notified in writing of any proposed discipline;

(7)  If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k)  Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2)  If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a.  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b.  A certifying agency of another jurisdiction for:

1.  Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i)  The credential holder was the subject of a formal investigation under Ed 5101; or

(ii)  Disciplinary action was taken against the credential holder by the board pursuant to Ed 5101;

c.  Other states' licensing board investigators or prosecutors; and

d.  Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

(a)  If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b)  All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline.  The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c)  Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03  <u>Disciplinary Hearings</u>.

(a)  If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1)  Completion of an informal or formal investigation; and

(2)  Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b)  The provisions of Ed 200 shall apply to all disciplinary hearings and ***such hearings*** shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.0~~4~~  <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

(a)  When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b)  The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c)  In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 <u>Grounds for Reinstatement After Suspension</u>.

(a)  A credential which has been suspended shall be reinstated for one of the following reasons:

(1)  The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2)  A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b)  Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512  DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 <u>Denial of Credential</u>.

(a)  A credential application shall be denied by the board based on the following grounds:

(1)  Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b)  An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision.  If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

**APPENDIX I**

| RULE | STATUTE |
|---|---|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

# EXHIBIT 3

Commission on Law
Enforcement Accountability,
Community, and Transparency
Materials



**STATE OF NEW HAMPSHIRE**
OFFICE OF THE GOVERNOR

CHRISTOPHER T. SUNUNU
Governor

**STATE OF NEW HAMPSHIRE**
**BY HIS EXCELLENCY**
**CHRISTOPHER T. SUNUNU, GOVERNOR**

**Executive Order 2020-11**

**An order establishing the New Hampshire Commission on Law Enforcement**
**Accountability, Community, and Transparency**

**WHEREAS,** in the wake of the tragic murder of George Floyd in Minneapolis, MN, our country is engaged in a nationwide conversation regarding law enforcement, social justice, and the need for reforms to enhance transparency, accountability, and community relations in law enforcement; and

**WHEREAS,** law enforcement in New Hampshire make daily sacrifices, serve our State admirably, and are a necessary and pivotal part of our communities; and

**WHEREAS,** the State of New Hampshire has an obligation to participate in the national conversation and engage in self-examination to identify any opportunities to improve the state of our law enforcement and the relationship between law enforcement and the communities they serve; and

**WHEREAS,** New Hampshire finds itself in a pivotal moment that demands prompt action to initiate important conversations and develop recommendations for reform.

**NOW, THEREFORE, I, CHRISTOPHER T. SUNUNU, GOVERNOR** of the State of New Hampshire, by the authority vested in me pursuant to part II, article 41 of the New Hampshire Constitution, do hereby order, effective immediately, that:

1. There is established the New Hampshire Commission on Law Enforcement Accountability, Community and Transparency (the "Commission"). The Commission shall consist of the following members:

    (a) The Attorney General, or designee, who shall chair the Commission
    (b) The Commissioner of the Department of Safety, or designee
    (c) The Executive Director of the New Hampshire Commission for Human Rights
    (d) The Director of the Police Standards and Training Council
    (e) The Chair of the Governor's Advisory Council on Diversity and Inclusion
    (f) The President of the Manchester, NH NAACP

    (g) A current justice of the New Hampshire Superior or Circuit Court, appointed by and
        serving at the pleasure of the Governor
    (h) A representative of the New Hampshire Police Association, appointed by and serving at
        the pleasure of the Governor
    (i) The President of the New Hampshire Association of Chiefs of Police
    (j) The Executive Director of the New Hampshire Chapter of the National Alliance on
        Mental Illness
    (k) A representative from the New Hampshire ACLU, appointed by and serving at the
        pleasure of the Governor
    (l) Two members of the public, appointed by and serving at the pleasure of the Governor

2. If any of the members named in Paragraph 1 become unable to serve for any reason, then the
   Governor shall appoint a new member to serve in their place.

3. The Commission shall engage all interested and relevant public, private, and community
   stakeholders and develop recommendations for reforms that the Commission deems
   necessary to enhance transparency, accountability, and community relations in law
   enforcement. To fulfill this charge, the Commission shall examine the following:

    (a) Training curriculum, procedures and policies developed by State Police, local police
        departments, and the Police Standards and Training Council, and potential options for
        improving the same to better address certain areas which may include, but are not limited
        to, (i) de-escalation, (ii) use of deadly and non-deadly force force, and (iii) diversity
        training;
    (b) State and local procedures related to the reporting and investigation of police misconduct,
        and potential reforms which may include, but are not limited to, development of a
        uniform statewide system for the reporting, investigation, and punishment of police
        misconduct;
    (c) The current state of relationships between law enforcement and the communities they
        serve, and potential steps that can be taken to enhance these relationships; and
    (d) Any other subject matter which the Commission deems relevant to the overall mission of
        enhancing transparency, accountability, and community relations in law enforcement.

4. For the purpose of this Order, the term "law enforcement" is intended to refer to individuals
   who are employed by a municipal, county, or state governmental agency in the State of New
   Hampshire; certified by the Police Standards and Training Council; responsible for the
   prevention, detection, or prosecution of crimes and the enforcement of the laws of the state
   and of its political subdivisions; and have full general arrest powers. Such individuals may
   include, but not necessarily be limited to, chiefs, police officers, sheriffs, deputy sheriffs,
   colonels, troopers, conservation officers, liquor commission inspectors, fire
   investigators/marshals, state troopers, forest rangers, and marine patrol officers.

5. The Commission shall meet at the call of the Chair, and as often as necessary to complete its
   work. A majority of the appointed Commission members shall constitute a quorum, and all
   official actions of the Commission shall require a majority vote of those present and voting.

6. All meetings and proceedings of the Commission shall comply with the requirements of RSA 91-A.

7. No later than 45 days from the date of this Order, the Commission shall submit a report containing its recommendations to the Governor, the Speaker of the House, and the President of the Senate. The Commission's report shall be posted publicly on the Governor's Office website.

Given under my hand and seal at the Executive Chambers in Concord, this 16th day of June, in the year of Our Lord, two thousand and twenty, and the independence of the United States of America, two hundred and forty-four.

**GOVERNOR OF NEW HAMPSHIRE**

# New Hampshire Commission on Law Enforcement Accountability, Community, and Transparency



# Report and Recommendations

## Submitted August 31, 2020

## TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

TRAINING CURRICULUM, PROCEDURES AND POLICIES ....................................1
    Commission Recommendations.........................................................................8

REPORTING AND INVESTIGATION OF POLICE MISCONDUCT ......................10
    Commission Recommendations.......................................................................17

CURRENT STATE OF RELATIONS BETWEEN LAW ENFORCEMENT AND THE
COMMUNITIES THEY SERVE ..................................................................................19
    Commission Recommendations.......................................................................23

OTHER SUBJECT MATTERS CONSIDERED BY THE COMMISSION ...............26
    Commission Recommendations.......................................................................27

CONCLUSION..............................................................................................................28

COMPILATION OF COMMISSION RECOMMENDATIONS...................................31

APPENDIX A ................................................................................................................41

APPENDIX B ................................................................................................................47

APPENDIX C ................................................................................................................51

APPENDIX D................................................................................................................58

APPENDIX E ................................................................................................................65

## I.      Introduction

On June 16, 2020, Governor Christopher T. Sununu established the Commission on Law Enforcement Accountability, Community and Transparency (LEACT) by Executive Order 2020-11 (on June 22, 2020, Executive Order 2020-13 amended the original Order).  Copies of these Orders appear at Appendix A.  The LEACT Commission was specifically charged with examining law enforcement training curriculum, procedures and policies throughout the State; procedures related to the reporting and investigation of police misconduct; the current state of relationships between law enforcement and the communities they serve; and any other subject matter the Commission deemed relevant.  Through the course of its work, the Commission deemed the following other subject matters relevant to the overall mission of enhancing transparency, accountability, and community relations in law enforcement: mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant New Hampshire Police Standards and Training Council Performance Audit.

Over the course of 10 weeks, the Commission met 26 times and heard testimony from 24 subject matter experts, including Commission members, and 25 members of the public.  Many individuals who testified before the Commission also submitted written testimony.  Additionally, the Commission received more than 50 written submissions from a variety of individuals who did not testify.  Oral and written testimony is part of the public record and is accessible at www.governor.nh.gov/accountability.  Commission members considered all written submissions and asked probative questions of witnesses in order to make the following comprehensive recommendations.

## II.      Training Curriculum, Procedures and Policies

Executive Order 2020-11 directs that the Commission shall examine: "[t]raining curriculum, procedures and policies developed by State Police, local police departments and the Police Standards and Training Council, and potential options for improving the same to better address certain areas which may include, but are not limited to, (i) de-escalation, (ii) use of deadly and non-deadly force, and (iii) diversity training."  Executive Order 2020-11, at ¶ 3 (a).

This section of the report describes the current state of training curriculum, procedures and policies with respect to the New Hampshire Police Standards and Training Council (NH PSTC), the New Hampshire State Police and local police departments; summarizes public testimony and recommendations on these subjects; discusses recent relevant legislative changes; and sets forth the Commission's recommendations with respect to training curriculum, procedures and policies.

### a.      Current State of Training, Curriculum and Policies

### i.      Police Standards and Training Council

The legislature has assigned the responsibility for the education and training of all law enforcement officers, state corrections officers and state probation-parole officers to NH PSTC. RSA 106-L:1 & 6.  By law, no person may serve as a law enforcement officer in New Hampshire "unless such person has satisfactorily completed a preparatory program of police, corrections, or probation-parole training appropriate to such person's position at a school approved by the council."  RSA 106-L:6, I.  NH PSTC oversees such a school, known informally as the police academy.[1]

NH PSTC is an executive branch agency, RSA 106-L:4, and it is comprised of 14 members, RSA 106-L:3.  Four Council members (the chancellor of the community college system, the director of the division of state police, the attorney general and the commissioner of the department of corrections) serve *ex officio*; the governor appoints the other members to two-year terms.  RSA 106-L:3, I & II.  NH PSTC has extensive enumerated powers including with respect to rulemaking, standard setting and the conduct of administrative hearings.  RSA 106-L:5.  NH PSTC is 100 percent funded by the General Fund.  Its total budget for the State Fiscal Year 2021 is $3,472,749.

NH PSTC also has authority to nominate and appoint a director of police standards and training.  RSA 106-L:5, XVIII.  On March 16, 2020, NH PSTC appointed John Scippa as the director.  Director Scippa serves as a member of this Commission.

The Police Academy is located at 17 Institute Drive, Concord.  It is formally known as the Arthur D. Kehas Law Enforcement Training Facility and Campus.  It contains lecture halls, classrooms, and a tactical training center.  There is adjacent dormitory space.

NH PSTC provides three academies: a full-time officer academy, a part-time officer academy and a corrections academy.  It also provides in-service training.  At present, the full-time academy lasts sixteen weeks.  There are three full-time officer academies per year.

Students, known as recruits, are hired and screened by their employing agency.  Criteria to qualify for employment as a law enforcement or corrections officer are set forth in the NH PSTC's administrative rules.  *See* N.H. Admin. R. Pol 300.  Those criteria include: a high school diploma or equivalent, fingerprints and a criminal record check, proof of United States citizenship, a physical examination, a background investigation, drug testing and psychological screening.  *See id.*  Employing agencies may have additional criteria.

---

[1] The legislature has also assigned to the Police Standards and Training Council the responsibility for the suspension or revocation of law enforcement officer certification "in the case of egregious misconduct or failure to comply with council standards."  RSA 106-L:5, V.  This responsibility is discussed in detail in § III.a, *infra*.

The academy is paramilitary in nature and the recruits live on-site, Monday through Friday, for the duration of the 16-week academy. The current curriculum consists of 684 hours of instruction on various topics. A copy of the current curriculum topics and hours appears at Appendix B. There are both classroom and hands-on components to the curriculum. Class exams are conducted during the course of an academy.

Director Scippa testified before the Commission and provided written materials that are part of the record. His testimony focused on academy training with respect to three specific areas: diversity, de-escalation and use of force. The current block of instruction regarding diversity lasts two hours. It is classroom based and focuses on recognizing differences among cultures. It advocates a "Stop, Look and Listen" approach to dealing with individuals from different cultures. Very little time is devoted to defining and recognizing bias, including implicit bias, or overcoming and controlling the bias.

Recruits attend a six-hour block of instruction entitled "Communication Techniques" which deals generally with strategies relating to communication and de-escalation. However, Director Scippa testified that communication and de-escalation are themes throughout the academy, including during use-of-force scenarios. Recruits also receive 16 hours of instruction on "Mental Illness Dynamics," which consists of both lecture and practical exercises.

Use-of-force instruction includes classroom lectures and practical applications in the use of firearms, physical force, defensive tactics, oleoresin capsicum spray (otherwise known as "pepper spray"), and use of a baton. The classroom lectures include discussion of the mechanics of each area as well as the law governing use of deadly and non-deadly force.[2] Practical and physical skills comprise 93.25 hours. Most recruits do not have experience in the use-of-force and repetitious practice is required to ensure competent and accurate use-of-force under stressful circumstances. Toward the end of the academy, recruits participate in scenario-based training designed to replicate stressful and realistic situations recruits will likely face on the job. The academy uses a VirTra use-of-force simulator. The simulator can replicate up to 125 different scenarios which can be created by academy staff. After a review, the simulated scenarios incorporate a fair cross-section of participants from various communities.

A chokehold is not a technique that is taught at the academy, however, there is no training that expressly prohibits it.[3] There is no training on the duty to intervene when another officer engages in the use of inappropriate force or other misconduct.

The part-time officer academy is 200 hours. All law enforcement officers are required to complete eight hours of in-service or refresher training annually. N.H. Admin. R. Pol 403.01.

---

[2] RSA 627:5, captioned "Physical Force in Law Enforcement" sets forth the legal standards for the use of both non-deadly force, RSA 627:5, I, and deadly force, RSA 627:5, II, by law enforcement officers.
[3] The use of chokeholds by law enforcement officers is now prohibited by New Hampshire law. *See* § II.a.iv., *infra.*

That is exclusive of firearms training, which requires a separate annual certification.  N.H. Admin. R. 404.04.

## ii.   New Hampshire State Police

The legislature established the New Hampshire State Police in 1937.  It is a division within the Department of Safety.  RSA 106-B:2.  It is comprised of approximately 350 sworn officers and is the largest law enforcement agency in New Hampshire.  In addition to field operations spread across seven troops, the State Police also engages in numerous highly specialized functions, such as the Major Crime Unit and the state's only Forensic Science Laboratory.  The director of the division of state police holds the rank of colonel.  RSA 106-B:4.  Colonel Nathan Noyes was sworn into office on April 8, 2020.  Colonel Noyes testified before the Commission and provided written materials that are part of the record.

The legislature has assigned to the colonel, with the approval of the commissioner of safety, responsibility for the training of division members.  RSA 106-B:6.  The colonel is also ultimately responsible for policies and written directives governing the division's work.  *See id.*

New Hampshire State Troopers attend the police academy.  State Police receive in-service training that exceeds the eight-hour annual requirement.  Colonel Noyes testified that, in recent years, State Police training has focused on issues including unconscious bias, fair and impartial policing and mental and physical wellness and resilience.  Four times per year, troopers attend use-of-force training which encompasses review of relevant statutes, case law, recent events, internal policies as well as scenario-based training.  Other trainings include an emergency vehicle operators' course, search and seizure training, response to active shooters, as well as policy review for the division's Fair and Impartial Policing, discussed below.  In addition, when a new trooper is hired, he or she is required to spend at least one day at the New Hampshire Hospital, an experience intended to educate new troopers about appropriate responses with individuals in a mental health crisis.

Chokeholds are not an approved technique and are not taught by State Police in its use-of-force instructions. [4]

With respect to policies and procedures relating to race and bias, in February 2019, State Police issued General Order 100.04, captioned "Fair and Impartial Policing."  A copy of the policy appears at Appendix C.  Its purpose is to: "prevent and prohibit the practice of biased policing and other discriminatory practices in any law-enforcement related activity involving a member of the Division."  The policy states that: "[i]n the absence of any specific report or suspicious circumstances, the actual or perceived race, ethnic background, color, age, gender, sexual orientation, religion, economic status, cultural group or any other identifiable group of any person will not be the basis for the detention, interdiction or other disparate treatment of any

---

[4] The use of chokeholds by law enforcement officers is now prohibited by New Hampshire law.  *See* § II.a.iv., *infra.*

individual by any member of the Division of State Police." This policy was developed with the input of community leaders and the ACLU-NH and has become a standard for other New Hampshire law enforcement agencies.

### iii.    Local Police Departments

There are approximately 210 municipal law enforcement agencies in New Hampshire. They range in size from one law enforcement officer to over 200. The chief of police generally has control and direction of police within a jurisdiction. *See* RSA 48:10 (cities) and RSA 105:2-a (towns). Chiefs are generally appointed by municipalities' executive (e.g., selectmen, RSA 105:1, mayor or city manager).[5] Charlie Dennis is the Chief of Police in Hanover and currently serves as the President of the New Hampshire Association of Chiefs of Police. He is a member of the Commission. Chief Dennis testified before the Commission and provided written materials that are part of the record.

Each police department is responsible for writing, maintaining and enforcing its own policies and procedures, including with respect to training. There are no model statewide policies or standards. The Police Standards and Training Council has no role in developing or approving local policies and procedures. There is no statute or rule that governs local policies or procedures.

Because of the enormous variation in department sizes and resources, there is variation in policies, procedures and training. For example, the Manchester Police Department – the largest municipal law enforcement agency in New Hampshire – requires newly hired officers to undergo eight weeks of training, both before and after the academy.

The Commission on Accreditation for Law Enforcement Agencies (CALEA) was founded in 1979 as a joint effort of the International Association of Chiefs of Police (IACP), the National Organization of Black Law Enforcement Executives (NOBLE), the National Sheriffs Association and Police Executive Research Forum (PERF). Its purpose was to create policies and procedures for law enforcement based on best practices.

CALEA is expressly committed to procedural justice, ethical policing, community trust and engagement, transparency and service delivery, appropriate organizational culture, fairness in systems and processes, and consistency in what the public should expect from a law enforcement agency. Basic accreditation requires compliance with 181 standards. There are

---

[5] Police commissions exist in at least the following cities:  Manchester, Nashua, Portsmouth, Laconia and Berlin. The commissions are authorized by statute, *see* N.H. Laws of 1913, ch. 148, and city charters. They are comprised of three to five citizens. The roles and responsibilities vary among police commissions but, generally, they can be an important source of community input for the police department's leadership.

substantial costs to becoming accredited and to maintaining CALEA accreditation.  At present, there are 14 law enforcement agencies in New Hampshire which have CALEA accreditation.[6]

### iv.    Recent Legislative Changes

Since the creation of the Commission on June 16, 2020, the legislature has passed and the governor has approved statutory changes that implicate matters within the Commission's charge. On July 16, 2020, Governor Sununu signed HB 1645 into law.  Section 25 of that bill amends RSA 627:5 (addressing the use of physical force in law enforcement) by adding a new section to prohibit the use of chokeholds by any law enforcement officer.  This provision, which took effect on July 16, 2020, defines "chokehold" as "the application of any pressure to the throat, windpipe, or neck, which prevents or reduces intake of air, or oxygen to the brain."

Another section of HB 1645 requires that it "shall be the duty of any law enforcement officer who observes misconduct by another law enforcement officer to notify the chief law enforcement officer in his or her department in writing immediately or as soon as practicable after observing such misconduct."  Within seven days of such a notification, the chief must report the misconduct to the Police Standards and Training Council.  The new statute defines misconduct as:  "assault, sexual assault, bribery, theft, tampering with evidence, tampering with a witness, use of a chokehold, or excessive and illegal use of force as defined by the New Hampshire criminal code."

### b.    Summary of Public Testimony Received by the Commission



[6] The CALEA accredited agencies are:  Claremont Police Department, Dover Police Department, Durham Police Department, Goffstown Police Department, Hollis Police Department, Hudson Police Department, Keene Police Department, Laconia Police Department, Manchester Police Department, Nashua Police Department, Pelham Police Department and Portsmouth Police Department.  In addition, the Strafford County Sheriff's Office and the University of New Hampshire Police Department are CALEA accredited.  Four other local law enforcement agencies are currently pursuing CALEA accreditation.



## c.   Commission Recommendations

The Commission makes the following recommendations for reforms and improvements with respect to training curriculum, procedures and policies:

### I.   Required Training to Maintain Law Enforcement Officer Certification

1. As soon as practicable, NH PSTC, with input from all relevant law enforcement agencies, should pursue all actions necessary, including emergency rulemaking pursuant to RSA 541-A, to amend existing administrative rules to provide as follows:

   a. Increase the mandatory number of hours of annual in-service training for law enforcement officers on an incremental basis over the next three years.  By January 1, 2024, the total mandatory hours of annual in-service training should be a minimum of twenty-four (24) hours.

   b. Mandate that annual in-service training as approved by NH PSTC include, at a minimum, two (2) hours on each of the following topics:
      i.    Implicit bias and cultural responsiveness;
      ii.   Ethics; and
      iii.  De-escalation.

2. Beginning January 1, 2021, strongly encourage all law enforcement agencies to require their officers to participate and receive, at a minimum two (2) hours annually, of training in the following areas:

   a.    Implicit bias and cultural responsiveness;

    b.      Ethics; and
    c.      De-escalation.

## II. NH Police Standards and Training Council General Recommendations

3. NH PSTC should arrange for a Job Task Analysis (JTA) for entry-level law enforcement officers and entry-level corrections officers, and based on those findings, conduct an overall review of the present academy curriculums. Based on curriculum changes found by the JTA, an extension of the length of the police academy beyond its current 16 weeks may be warranted.

4. NH PSTC needs to leverage technology and be allowed to purchase and deploy a robust database management system and on-line learning platform for the twofold purpose of: 1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from one agency to another and/or decertification, and 2) to develop and deliver standardized on-line training to all law enforcement officers in an efficient and economical way.

5. NH PSTC, in collaboration with other law enforcement agencies, using nationally vetted best practices as set forth by IACP, CALEA, PERF, and NOBLE, shall create policy guidelines on the following topics that serve as a minimum standard with which all law enforcement agencies must comply:
   - Use of Force
   - Duty to Intervene
   - Code of Conduct
   - Duty to Report Misconduct
   - Prohibition of Chokeholds
   - Procedures to Guard Against Positional Asphyxia

6. NH PSTC should increase the number of hours of scenario-based training in both academy and in-service settings.

7. NH PSTC should improve and augment police academy training on diversity by conducting a review of the present lesson plan on cultural dynamics, and amend it to properly address the topic. Training to be developed with one or more community partner(s).

8. NH PSTC should improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the IACP recognized Fair and Impartial Policing training or similar type training.

9. NH PSTC should improve and augment police academy and in-service training on de-escalation techniques by adopting the PERF's Integrated Communication and Tactics training (ICAT) or similar training.

10. NH PSTC should improve and augment police academy training on police ethics by re-instituting the Ethics block of instruction.

11. NH PSTC should improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training, (formally known as EPIC training) or similar training.

12. NH PSTC should include in its instruction *State of New Hampshire v. Jones* (decided January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered while reaching its decision. These cases should be part of the lesson plan in those relevant topic areas that are already delivered.  An attorney from the Attorney General's Office will be dedicated to teach at NH PSTC and regularly update materials.

13. Recognizing that certain NH police agencies need to rely on part-time law enforcement officers, NH PSTC should re-evaluate the Part-Time Police Officer certification process upon receipt of the JTA and consider extending the length of such training and give certain consideration to what law enforcement functions part-time officers be allowed to perform.

14. NH PSTC should amend administrative rule POL 301.05 <u>Background Investigations</u> to mandate that background investigations specifically vet police recruit candidates in the area of having demonstrated outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources to help determine the overall fitness for duty the candidate possesses and to consider those findings in the overall decision to hire the candidate.

## III. Other Recommendation

15. All law enforcement agencies should be encouraged to pursue CALEA accreditation.  In the absence of CALEA accreditation, agencies should continually review and maintain policies consistent with nationally accepted best practices.

█ ████████████████████████████████████████████

████████████████████████████████████████████████████████

### c.  Commission Recommendations

The Commission makes the following recommendations for reforms and improvements with respect to reporting and investigation of police misconduct:

1.  Support the establishment of a single, neutral and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers with the following components:

    a.  Staffed by full-time attorneys, paralegals, legal assistants and investigators;

    b.  Provide robust due process with multiple levels of review, including both sides having the right to appeal;

    c.  Members of the various committees and panels to be appointed by the Governor, consisting of community members, current or retired judges, law enforcement officers, attorneys; 3-year terms (initially staggered). Any committee or panel would be slightly weighted toward law enforcement;

    d.  Statewide, universal definition regarding what constitutes misconduct;[10]

    e.  Notice of complaint to the officer and an opportunity to be heard;

    f.  Initial screening of all complaints received by the entity to determine if an investigation is warranted;

    g.  Investigation following consistent and defined standards;

    h.  Statewide, universal standards to apply with respect to determination of whether misconduct occurred;

    i.  Executive summary of finding to be made available to the public with the full investigative report subject to disclosure upon in-camera review. Sustained findings publicly accessible in a database maintained by the entity;

---

[10] Definition of misconduct should take into consideration the policy guidelines regarding Code of Conduct to be developed by NH PSTC.  Discussed above at § II.c.II.5.

j.     Right of appeal to New Hampshire Supreme Court;

k.     Require all law enforcement agencies to report alleged misconduct to this entity; and

l.     Nothing in this recommendation would limit the ability of the hiring law enforcement agency or NH PSTC to investigate, discipline, or take any action consistent with their rules, regulations, and collective bargaining agreements; or would limit the ability of the Office of the Attorney General or County Attorney with jurisdiction to investigate or prosecute any criminal conduct.

2.     To promote a uniform approach to investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials, establish by statute, a dedicated Public Integrity Unit within the Attorney General's Office with permanent and sustainable resources, including full-time attorneys, paralegals, legal assistants, and investigators.

3.     To promote equal justice under the law in all aspects of the criminal justice system, the Commission strongly encourages implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges.

a.     The Office of the Attorney General shall require such training for all attorneys, investigators, legal staff and victim/witness advocates in the Attorney General's Office; all County Attorney Offices; and all state agency attorneys.

b.     The Office of the Attorney General shall facilitate and arrange for such trainings as described in 3(a) no later than April 1, 2021.

c.     The Office of the Attorney General shall establish a system whereby all new prosecutor hires receive implicit bias and racial profiling training within 30 days of their start date.

d.     Recommend the New Hampshire Supreme Court require one hour of yearly continuing legal education credit (CLE) to be dedicated to implicit bias and racial profiling training.

4.     Establish a community outreach position within the Attorney General's Office to facilitate communication between all state, county and local prosecution offices and New Hampshire's diverse communities.

5.      Amend RSA 33-A:3-a, CVIII to require "police, non-criminal-internal affairs investigations" to be retained, at a minimum, for a period of 20 years after retirement or separation.

6.      Encourage all law enforcement agencies to use body and/or dash cameras.

7.      Make the existing Exculpatory Evidence Schedule (EES) public subject to the following provisions:

   a.      The Office of the Attorney General will provide immediate written notice to all living persons on the current list that they are on the list with the following notifications that:

      i.      Six (6) months from date of notification to request a hearing in Superior Court to have his or her name removed from the EES.

      ii.      Six (6) months from date of notification, individual names on the list with a sustained finding shall be made public, except for any individual with a pending Superior or Supreme Court action in regard to removal from the EES.

   b.      The names of deceased former law enforcement officers shall be released once there has been a determination that the officer was afforded due process prior to placement on the list or the conduct subject to EES was previously provided as discovery in a criminal case.





### c.    Commission Recommendations

The Commission makes the following recommendations for reforms and improvements with respect to the current state of relationships between law enforcement and the communities they serve:

**I.  Data Collection**

1.  All law enforcement agencies should gather, analyze and make available to the public, at least annually, data on demographics (including, at a minimum, gender and race) for arrests, citations and motor vehicle and subject stops regardless of disposition.

2.  New Hampshire Department of Motor Vehicles should include a person's race on NH Drivers' Licenses and Non-Drivers' Identification Cards, with the option for the person to opt out from answering the question.

3.  All law enforcement agencies will comply with RSA 106-B:14-c by submitting crime reports to the Department of Safety, Division of State Police based on the specifications prescribed by the Federal Bureau of Investigation (FBI).

## II. Community Policing and Engagement

4.  All law enforcement agencies should adopt the definition of Community Policing as set forth by IACP:

> "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties."

5.  Encourage all law enforcement agencies, when practicable, to dedicate an officer or unit to community policing and engagement.

6.  Encourage all law enforcement agencies to engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs. Models like New Hampshire Blue and You, the Mirror Project, Police Athletic Leagues (PALs), and citizen police academies serve as a guide for such efforts.

7.  All law enforcement agencies should establish ongoing officer training at all levels to encourage a culture that empowers individual officers to engage in community policing and relationship building efforts.

8.  All law enforcement agencies should publish/advertise community events and consider the use of social media and the establishment of Public Service Announcement (PSA) campaigns to educate the public about police officers and their work.

9.  NH PSTC should maintain and publish a list of all currently CALEA accredited law enforcement agencies.

### III. School Resource Officers

10. NH PSTC should set forth mandated "certification" for SROs that would require the officer to complete National Association of School Resource Officers (NASRO) training, Mirror Project Train-the-Trainer and Effective Police Contact with Youth training prior to assignment.  Further, certain annual in-service hours to maintain SRO "certification" should be identified and mandated by NH PSTC.

11. NH PSTC should work with stakeholders and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SRO's role in student discipline for non-criminal matters.

12. Each law enforcement agency should have a field training program specifically for SROs.  A transition plan should be implemented over a course of weeks/months between each outgoing/incoming SRO so there is overlap, information exchange, and adjustment for the stakeholders.

13. MOUs between law enforcement agencies and SAUs should be made public.

### IV. Hiring/Recruitment of Officers

14. Recognizing the difficulty of hiring and recruiting qualified candidates, law enforcement agencies should continue efforts to recruit officers from minority communities to allow for a diverse law enforcement workforce.

15. All public entities should develop a comprehensive strategy to actively attract, recruit, and retain diverse law enforcement candidates, to include candidates from outside New Hampshire.

### V. Other

16. In order to advance relationships with the trans and gender non-conforming population, all law enforcement agencies should seek and provide training on pronoun inclusion.

17. In order to advance relationships with the deaf and hard of hearing community, law enforcement agencies should continue to seek a better understanding of, and communication with, members of that community, to include the greater use and dissemination of driver visor cards by law enforcement.

18. In order to advance a greater understanding of juvenile offenders, form a separate commission to review the present state of juvenile justice laws.  In particular, the commission should review the minimum age for juvenile prosecutions and the statute that creates a presumption of transfer to the adult criminal court.



### b.      Commission Recommendations

The Commission makes the following recommendations for reforms and improvements with respect to mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit.

1.      Specially trained mental health professionals should be embedded in tactical response teams.  There should be a review to determine if such mental health professionals will be afforded protection from litigation stemming from their participation in such activities.

2.      Encourage partnerships between communities and local law enforcement to pursue services and resources dedicated to individuals with substance use disorders (SUDs) and mental illness and to make those services readily available in order to reduce the burden on law enforcement responding to issues stemming from SUDs as well as mental illness.

3.      Offer training regarding the mental well-being of law enforcement officers. Training should include information regarding the high rates of post-traumatic stress, depression and suicide among law enforcement officers and available resources for seeking help.  Enhance the availability and encourage the continued collaboration of law enforcement peer support programs in the state.

4.      NH PSTC should explore the issue of requiring mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and/or assist with referring officers for mental health treatment/support.

5.      The University of New Hampshire and other higher education institutions within New Hampshire are encouraged to collaborate with NH PSTC to develop specialized curriculum and/or graduate/post-graduate certificate programs dedicated:

    a.      To mental health providers who collaborate with law enforcement officers in responding to individuals experiencing a mental health crisis, in order to respond more effectively to critical incidents involving individuals who are a danger to themselves or others.

    b.      To address the special mental health needs of law enforcement officers/first responders including, trauma, depression, and substance misuse, in order to enhance the skills, understanding, and availability of

licensed mental health professionals in New Hampshire who can provide treatment/support and collaborate with our law enforcement community.

6.   Endorse the findings and recommendations of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit and ensure that sufficient funding is allocated to implement and sustain the recommendations.

7.   In order to enhance transparency, accountability, and community relations between law enforcement and the people they serve, the Commission strongly encourages the Governor and the legislature to allocate or re-allocate appropriate funding needed to implement and sustain the recommendations made by this Commission.  Stakeholders are encouraged to advocate for their funding needs before House Finance Committee or their local funding body.

8.   Extend, as needed, this Commission to assist with implementation of any recommendation.





🌐 Change Site Language     🔍 Search The Site





☰ **OPEN MENU**

Home  >  News and Media  >  Governor Chris Sununu Endorses All LEACT Recommendations, Puts Forward Road Map for Implementation

# Press Release

For Immediate Release

---

## Contact

Communications Director
(603) 271-2121 | Sununu.Press@nh.gov

---

# Governor Chris Sununu Endorses All LEACT Recommendations, Puts Forward Road Map for Implementation

Concord, NH — Today, Governor Chris Sununu put forward a roadmap for the State of New Hampshire to implement all recommendations that arose from the New Hampshire Commission on Law Enforcement Accountability, Community, and Transparency (LEACT), which Governor Chris Sununu established through an Executive order in June after the murder of George Floyd.

LEACT released a report containing three parts which focused on training, reporting and investigation of police misconduct, and community relations. They detailed numerous reforms for the State of New Hampshire to take action on.

"Today I am endorsing every single recommendation from all three parts of the LEACT report," said Governor Chris Sununu. "Their charge was difficult — to come up with recommendations on how to improve Law Enforcement here in New Hampshire. As I have long said, New Hampshire has some of the best law enforcement in the country, but there is always room to improve, grow, and adapt. I cannot thank the members of the Commission enough for their tireless work. These issues are incredibly important and should not be political. I am confident these reforms, which received unanimous support from the Commission, will be enacted with bipartisan support. And, as I have long said, cost will not be a barrier to implementation."

The roadmap for these recommendations details the avenues that each reform will be implemented through.

- First, immediate reforms that can be accomplished through Executive Order.
- Second, immediate reforms that can be initiated through rulemaking
- Third, reforms that need to be taken up by the legislature
- Fourth, reforms which will be implemented by local law enforcement agencies through encouragement and assistance from the state.

Governor Chris Sununu will be issuing an Executive Order to take immediate action on many of these reforms within the next two weeks.

For reforms that require legislation, Governor Sununu has asked the Attorney General to lead the effort to craft legislation for the Legislature's consideration. Once a draft of that legislation is prepared, Governor Sununu will be asking the majority and minority leaders in both houses of the next Legislature to sponsor and shepherd this legislation through to passage.

A copy of the roadmap can be found here. 

---

📄 Portable Document Format (.pdf) . Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

---



**About Governor Sununu**

**News and Media**

**Contact Governor Sununu**

**NH Web Portal – NH.gov**

**NH Travel & Tourism**

**ReadyNH.gov**

**NH Government Careers**

107 North Main Street | Concord, NH | 03301
(603) 271-2121 | TDD Access: Relay NH 1-800-735-2964

11/24/21, 10:36 AM

Governor Chris Sununu Endorses All LEACT Recommendations, Puts Forward Road Map for Implementation | Governor Christopher T. Sununu

154

**Hours:** Monday thru Friday | 8:30am - 5:00pm

Transparent NH

Directions to the NH State House ›

© 2021 State of New Hampshire • All rights reserved  |  Privacy Policy  |  Accessibility Policy  |  Webmaster

AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE

| Title of Recommendation | Implementation |
|---|---|
| **A. TRAINING** | |
| **I. Required Training to Maintain Law Enforcement Officer Certification** | |
| 1. As soon as practicable, NH PSTC, with input from all relevant law enforcement agencies, should pursue all actions necessary, including emergency rulemaking pursuant to RSA 541-A, to amend existing administrative rules to provide as follows: | |
| 1-A. Increase the mandatory number of hours of annual in-service training for law enforcement officers on an incremental basis over the next three years.  By January 1, 2024, the total mandatory hours of annual in-service training should be a minimum of twenty-four (24) hours. | Executive Order and Rulemaking |
| 1-B. Mandate that annual in-service training as approved by NH PSTC include, at a minimum, two (2) hours on each of the following topics:<br>i. Implicit bias and cultural responsiveness;<br>ii. Ethics; and<br>iii. De-escalation. | Executive Order and Rulemaking |
| 2. Beginning January 1, 2021, strongly encourage all law enforcement agencies to require their officers to participate and receive, at a minimum two (2) hours annually, of training in the following areas:<br>a. Implicit bias and cultural responsiveness;<br>b. Ethics; and<br>c. De-escalation. | Executive Order - Contracting |
| **II. NH Police Standards and Training Council General Recommendations** | |
| 3. NH PSTC should arrange for a Job Task Analysis (JTA) for entry-level law enforcement officers and entry-level corrections officers, and based on those findings, conduct an overall review of the present academy curriculums.  Based on curriculum changes found by the JTA, an extension of the length of the police academy beyond its current 16 weeks may be warranted. | Executive Order |
| 4. NH PSTC needs to leverage technology and be allowed to purchase and deploy a robust database management system and on-line learning platform for the twofold purpose of:    1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from one agency to another and/or decertification, and 2) to develop and deliver standardized on-line training to all law enforcement officers in an efficient and economical way. | Executive Order & potential legislation for funding |

| Title of Recommendation | Implementation |
|---|---|
| 5. NH PSTC, in collaboration with other law enforcement agencies, using nationally vetted best practices as set forth by IACP, CALEA, PERF, and NOBLE, shall create policy guidelines on the following topics that serve as a minimum standard with which all law enforcement agencies must comply: - Use of Force<br>- Duty to Intervene<br>- Code of Conduct<br>- Duty to Report Misconduct<br>- Prohibition of Chokeholds<br>- Procedures to Guard Against Positional Asphyxia | Executive Order and Rulemaking |
| 6. NH PSTC should increase the number of hours of scenario-based training in both academy and in-service settings. | Executive Order and Rulemaking |
| 7. NH PSTC should improve and augment police academy training on diversity by conducting a review of the present lesson plan on cultural dynamics, and amend it to properly address the topic. Training to be developed with one or more community partner(s). | Executive Order and Rulemaking |
| 8. NH PSTC should improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the IACP recognized Fair and Impartial Policing training or similar type training. | Executive Order and Rulemaking |
| 9. NH PSTC should improve and augment police academy and in-service training on de-escalation techniques by adopting the PERF's Integrated Communication and Tactics training (ICAT) or similar training. | Executive Order and Rulemaking |
| 10. NH PSTC should improve and augment police academy training on police ethics by re-instituting the Ethics block of instruction. | Executive Order and Rulemaking |
| 11. NH PSTC should improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training, (formally known as EPIC training) or similar training. | Executive Order and Rulemaking |
| 12. NH PSTC should include in its instruction State of New Hampshire v. Jones (decided January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered while reaching its decision. These cases should be part of the lesson plan in those relevant topic areas that are already delivered.  An attorney from the Attorney General's Office will be dedicated to teach at NH PSTC and regularly update materials. | Executive Order and Rulemaking |

| Title of Recommendation | Implementation |
|---|---|
| 13. Recognizing that certain NH police agencies need to rely on part-time law enforcement officers, NH PSTC should re-evaluate the Part-Time Police Officer certification process upon receipt of the JTA and consider extending the length of such training and give certain consideration to what law enforcement functions part-time officers be allowed to perform. | Executive Order and Rulemaking<br>Potential legislation for funding |
| 14. NH PSTC should amend administrative rule POL 301.05 Background Investigations to mandate that background investigations specifically vet police recruit candidates in the area of having demonstrated outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources to help determine the overall fitness for duty the candidate possesses and to consider those findings in the overall decision to hire the candidate. | Executive Order and Rulemaking |
| **III. Other Recommendation** | |
| 15. All law enforcement agencies should be encouraged to pursue CALEA accreditation.  In the absence of CALEA accreditation, agencies should continually review and maintain policies consistent with nationally accepted best practices under Section C:1-a-l. | Recommendation, and potential Executive Order related to State assistance |
| **B. REPORTING AND INVESTIGATION OF POLICE MISCONDUCT** | |
| 16. Support the establishment of a single, neutral and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers with the noted componets from the LEACT Report: | Legislation |
| 17. To promote a uniform approach to investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials, establish by statute, a dedicated Public Integrity Unit within the Attorney General's Office with permanent and sustainable resources, including full-time attorneys, paralegals, legal assistants, and investigators. | Executive Order<br>Legislation for addional funding |
| 18. To promote equal justice under the law in all aspects of the criminal justice system, the Commission strongly encourages implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges. | Executive Order for prosecutors and public defenders<br>Legislation for judges |
| 19. Establish a community outreach position within the Attorney General's Office to facilitate communication between all state, county and local prosecution offices and New Hampshire's diverse communities. | Executive Order<br>Legislation for addional funding |
| 20. Amend RSA 33-A:3-a, CVIII to require "police, non-criminal-internal affairs investigations" to be retained, at a minimum, for a period of 20 years after retirement or separation. | Legislation |

| Title of Recommendation | Implementation |
|---|---|
| 21.  Encourage all law enforcement agencies to use body and/or dash cameras. | Executive Order for State Police - with potential legislation for funding<br>Legislation for local law enforcement |
| 22. Make the existing Exculpatory Evidence Schedule (EES) public subject to the following provisions:a. The Office of the Attorney General will provide immediate written notice to all living persons on the current list that they are on the list with the following notifications that:<br>i. Six (6) months from date of notification to request a hearing in Superior Court to have his or her name removed from the EES.<br>ii. Six (6) months from date of notification, individual names on the list with a sustained finding shall be made public, except for any individual with a pending Superior or Supreme Court action in regard to removal from the EES.<br>b. The names of deceased former law enforcement officers shall be released once there has been a determination that the officer was afforded due process prior to placement on the list or the conduct subject to EES was previously provided as discovery in a criminal case. | Legislation |
| **C. COMMUNITY RELATIONS** | |
| **I. Data Collection** | |
| 23. All law enforcement agencies should gather, analyze and make available to the public, at least annually, data on demographics (including, at a minimum, gender and race) for arrests, citations and motor vehicle and subject stops regardless of disposition. | Legislation |
| 24. New Hampshire Department of Motor Vehicles should include a person's race on NH Drivers' Licenses and Non-Drivers' Identification Cards, with the option for the person to opt out from answering the question. | Legislation |
| 25. All law enforcement agencies will comply with RSA 106-B:14-c by submitting crime reports to the Department of Safety, Division of State Police based on the specifications prescribed by the Federal Bureau of Investigation (FBI). | Recommendation and communication push from State to remind local law enforcement agencies of statutory requirements |

| Title of Recommendation | Implementation |
|---|---|
| **II. Community Policing and Engagement** | |
| 26. All law enforcement agencies should adopt the definition of Community Policing as set forth by IACP: "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties." | Executive Order for State Police Recommendation for local law enforcement |
| 27. Encourage all law enforcement agencies, when practicable, to dedicate an officer or unit to community policing and engagement | Executive Order for State Police Recommendation for local law enforcement |
| 28. Encourage all law enforcement agencies to engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs.  Models like New Hampshire Blue and You, the Mirror Project, Police Athletic Leagues (PALs), and citizen police academies serve as a guide for such efforts. | Executive Order for State Police Recommendation for local law enforcement |
| 29. All law enforcement agencies should establish ongoing officer training at all levels to encourage a culture that empowers individual officers to engage in community policing and relationship building efforts. | Executive Order for State Police Recommendation for local law enforcement |
| 30. All law enforcement agencies should publish/advertise community events and consider the use of social media and the establishment of Public Service Announcement (PSA) campaigns to educate the public about police officers and their work. | Executive Order for State Police Recommendation for local law enforcement |
| 31. NH PSTC should maintain and publish a list of all currently CALEA accredited law enforcement agencies. | Executive Order |
| **III. School Resource Officers** | |
| 32. NH PSTC should set forth mandated "certification" for SROs that would require the officer to complete National Association of School Resource Officers (NASRO) training, Mirror Project Train-the-Trainer and Effective Police Contact with Youth training prior to assignment.  Further, certain annual in-service hours to maintain SRO "certification" should be identified and mandated by NH PSTC. | Executive Order and Rulemaking Potential legislation for funding |

| Title of Recommendation | Implementation |
|---|---|
| 33. NH PSTC should work with stakeholders and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SRO's role in student discipline for non-criminal matters. | Executive Order |
| 34. Each law enforcement agency should have a field training program specifically for SROs.  A transition plan should be implemented over a course of weeks/months between each outgoing/incoming SRO so there is overlap, information exchange, and adjustment for the stakeholders. | Recommendation |
| 35. MOUs between law enforcement agencies and SAUs should be made public. | Legislation |
| **IV. Hiring/Recruitment of Officers** | |
| 36. Recognizing the difficulty of hiring and recruiting qualified candidates, law enforcement agencies should continue efforts to recruit officers from minority communities to allow for a diverse law enforcement workforce. | Executive Order for State Police<br>Recommendation for local law enforcement<br>Legislation for funding for these efforts |
| 37. All public entities should develop a comprehensive strategy to actively attract, recruit, and retain diverse law enforcement candidates, to include candidates from outside New Hampshire. | Executive Order for State entities<br>Recommendation for public non-state entities |
| **V. Other** | |
| 38. In order to advance relationships with the trans and gender non-conforming population, all law enforcement agencies should seek and provide training on pronoun inclusion. | Executive Order for State Police<br>Recommendation for local law enforcement |
| 39. In order to advance relationships with the deaf and hard of hearing community, law enforcement agencies should continue to seek a better understanding of, and communication with, members of that community, to include the greater use and dissemination of driver visor cards by law enforcement. | Executive Order for State Police<br>Recommendation for local law enforcement |
| 40. In order to advance a greater understanding of juvenile offenders, form a separate commission to review the present state of juvenile justice laws.  In particular, the commission should review the minimum age for juvenile prosecutions and the statute that creates a presumption of transfer to the adult criminal court. | Legislation |

| Title of Recommendation | Implementation |
|---|---|
| **The Commission makes the following recommendations for reforms and improvements with respect to mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit.** | |
| 41. Specially trained mental health professionals should be embedded in tactical response teams. There should be a review to determine if such mental health professionals will be afforded protection from litigation stemming from their participation in such activities. | Recommendation |
| 42. Encourage partnerships between communities and local law enforcement to pursue services and resources dedicated to individuals with substance use disorders (SUDs) and mental illness and to make those services readily available in order to reduce the burden on law enforcement responding to issues stemming from SUDs as well as mental illness. | Recommendation and State assistance for local law enforcement agencies |
| 43. Offer training regarding the mental well-being of law enforcement officers.  Training should include information regarding the high rates of post-traumatic stress, depression and suicide among law enforcement officers and available resources for seeking help.  Enhance the availability and encourage the continued collaboration of law enforcement peer support programs in the state. | Executive Order for State Police<br>Recommendation and State assistance for local law enforcement<br>Potential legislation for funding |
| 44. NH PSTC should explore the issue of requiring mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and/or assist with referring officers for mental health treatment/support. | Executive Order |
| 45. The University of New Hampshire and other higher education institutions within New Hampshire are encouraged to collaborate with NH PSTC to develop specialized curriculum and/or graduate/post-graduate certificate programs dedicated:<br>a. To mental health providers who collaborate with law enforcement officers in responding to individuals experiencing a mental health crisis, in order to respond more effectively to critical incidents involving individuals who are a danger to themselves or others.<br>b. To address the special mental health needs of law enforcement officers/first responders including, trauma, depression, and substance misuse, in order to enhance the skills, understanding, and availability of licensed mental health professionals in New Hampshire who can provide treatment/support and collaborate with our law enforcement community. | Recommendation<br>Governor conversation with the USNH and CCSNH boards |

| Title of Recommendation | Implementation |
|---|---|
| 46. Endorse the findings and recommendations of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit and ensure that sufficient funding is allocated to implement and sustain the recommendations. | Legislation - next biennal budget |
| 47. In order to enhance transparency, accountability, and community relations between law enforcement and the people they serve, the Commission strongly encourages the Governor and the legislature to allocate or re-allocate appropriate funding needed to implement and sustain the recommendations made by this Commission.  Stakeholders are encouraged to advocate for their funding needs before House Finance Committee or their local funding body. | Legislation - next biennal budget |
| 48. Extend, as needed, this Commission to assist with implementation of any recommendation. | Commission to re-convene to assess progress on recommendations after next legislative session |



## STATE OF NEW HAMPSHIRE
### OFFICE OF THE GOVERNOR

CHRISTOPHER T. SUNUNU
Governor

### STATE OF NEW HAMPSHIRE
### BY HIS EXCELLENCY
### CHRISTOPHER T. SUNUNU, GOVERNOR

**Executive Order 2020-19**

**An order regarding implementation of recommendations of the New Hampshire Commission on Law Enforcement Accountability, Community, and Transparency**

**WHEREAS,** in the wake of the tragic murder of George Floyd in Minneapolis, Minnesota, our country continues to engage in a nationwide conversation regarding law enforcement, social justice, and the need for reforms that enhance transparency, accountability, and community relations in law enforcement; and

**WHEREAS,** law enforcement in New Hampshire make daily sacrifices, serve our State admirably, and are a necessary and pivotal part of our communities; and

**WHEREAS,** the State of New Hampshire has an obligation to participate in the national conversation and engage in self-examination to identify opportunities to improve the state of our law enforcement and the relationship between law enforcement and the communities they serve; and

**WHEREAS,** New Hampshire finds itself in a pivotal moment that demands prompt action to initiate important conversations and develop recommendations for reform; and

**WHEREAS,** on June 16, 2020, the Governor issued Executive Order 2020-11, which established the New Hampshire Commission on Law Enforcement Accountability, Community and Transparency (the "LEACT Commission"); and

**WHEREAS,** on August 31, 2020, the LEACT Commission issued its final report, which included 48 recommendations for reforms that the Commission deemed necessary to enhance transparency, accountability and community relations in law enforcement; and

**WHEREAS,** on September 17, 2020, the Governor issued a statement endorsing all of the recommendations of the LEACT Commission and put forward a road map for implementation of each of the recommendations; and

**WHEREAS,** many of the recommendations of the LEACT Commission can be implemented in whole or in part by Executive Order and rulemaking.

107 North Main Street, State House - Rm 208, Concord, New Hampshire 03301
Telephone (603) 271-2121 • FAX (603) 271-7640
Website: http://www.governor.nh.gov/ • Email: governorsununu@nh.gov
TDD Access: Relay NH 1-800-735-2964

**NOW, THEREFORE, I, CHRISTOPHER T. SUNUNU, GOVERNOR** of the State of New Hampshire, by the authority vested in me pursuant to part II, article 41 of the New Hampshire Constitution, do hereby order, effective immediately, that:

<u>Certification - Training Requirements</u>

1. The Director of the Police Standards and Training Council (PSTC) shall take all necessary steps, including initiating appropriate rulemaking, to:

   (a) Increase the mandatory number of required hours of annual in-service training on an incremental basis over the next three years to ensure that, by January 1, 2024, the total mandatory number of hours of annual in-service training is no less than twenty-four hours.

   (b) Mandate that annual in-service training as approved by PSTC include, at a minimum, two hours on each of the following topics:

        i.   Implicit bias and cultural responsiveness
        ii.   Ethics
        iii.   Descalation

   (c) Incentivize and encourage all law enforcement agencies to require their officers to receive at least two hours of training annually in the following areas:

        i.   Implicit bias and cultural responsiveness
        ii.   Ethics
        iii.   Descalation

<u>Certification and Ongoing Training Curriculum</u>

2. The Director of PSTC shall conduct a review of academy and in-service training curriculum and take all necessary steps, including initiating appropriate rulemaking, to:

   (a) increase the number of hours or scenario based training in both academy and in-service settings by an amount which PSTC deems necessary after consultation with the Department of Justice, Department of Safety, local law enforcement agencies, and community partners;

   (b) in consultation with one or more community partners, amend the current lesson plan on cultural dynamics as necessary to ensure that the topic is properly addressed;

   (c) improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the International Association of Chiefs of Police (IACP) recognized Fair and Impartial Policing training or similar type training;

(d) improve and augment police academy and in-serving training on de-escalation techniques by adopting the Police Executive Research Forum's (PERF) Integrated Communication and Tactics training (ICAT) or similar training;

(e) improve and augment police academy training on police ethics by re-instituting the ethics block of construction in police academy training;

(f) improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training or similar training; and

(g) utilize an attorney from the Attorney General's Office to provide, during training on applicable topics, instruction on State of New Hampshire v. Jones (January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered when reaching its decision.

3. In addition to the specific steps outlined in Section 2 of this Order, the Director of PSTC shall take all necessary steps to initiate a Job Task Analysis for entry-level law enforcement officers and entry-level corrections officers and, based upon those findings, conduct an overall review of the present academy curriculums. Based upon this review, the Director shall, within 120 days from the date of this Order, submit a recommendation to PSTC and the Governor as to whether the current length of the police academy should be expanded beyond 16 weeks.

4. Upon completion of the Job Task Analysis conducted pursuant to Section 3 of this Order, the Director of PSTC shall conduct a review of the Part-Time Police Officer certification process. Based upon this review, the Director shall, within 120 days from the date of this Order, submit a recommendation to PSTC and the Governor as to whether changes should be made to (i) the length of the training period for part time officers and (ii) the scope of law enforcement functions that part-time officers are allowed to perform.

5. The Director of PSTC shall take all necessary steps, including but not limited to providing recommendations to the Governor on necessary funding in the next biennial budget, to develop and deploy a robust database management system and on-line learning platform for the twofold purpose of: 1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from agency to another, and decertification, and (2) developing and delivering standardized on-line training to all law enforcement officers in an efficient and economical way.

Reporting and Investigation of Misconduct

6. The Director of PSTC, in collaboration with other law enforcement agencies and using nationally vetted best practices as set forth by the IACP, PERF, Commission on Accreditation for Law Enforcement Agencies (CALEA), and National Organization of Black Law Enforcement Executives (NOBLE), shall create policy guidelines on the following topics:

a) Use of Force
b) Duty to Intervene
c) Code of Conduct
d) Duty to Report Misconduct
e) Prohibition of Chokeholds
f) Procedures to Guard Against Positional Asphyxia

7. The Director of PSTC shall initiate rulemaking to amend administrative rule POL 301.05 to mandate that background investigations for police recruit candidates specifically vet such candidates for demonstrations of outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources, and that these findings be considered in the overall decision to hire such candidates.

8. Within 30 days of the date of this Order, the Attorney General shall take the following actions:

a) Establish a Public Integrity Unit within the Department of Justice using existing resources within the Department. The purpose of the Public Integrity Unit shall be to promote a uniform approach to the investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials. Within 60 days of the date of this Order, the Attorney General shall submit recommendations to the Governor for additional necessary resources for the completion of the build out of the Unit, including estimated funding needs for inclusion in the next biennial budget.

b) Establish a community outreach position within the Department of Justice to facilitate communication between all state, county, and local prosecution offices and New Hampshire's diverse communities.

c) Take all necessary action to require or provide implicit bias and racial profiling training for all New Hampshire prosecutors, including city prosecutors and police prosecutors.

d) Take all necessary actions to require or provide implicit bias and racial profiling training for all attorneys, investigators, legal staff, and victim/witness advocates in the Attorney General's Office and County Attorney Officers, and for all State agency attorneys.

9. The Executive Director of the Judicial Council shall take all necessary steps, including initiating rulemaking or seeking contract amendments, to require implicit bias and racial profiling training for all New Hampshire public defenders.

10. The Commissioner of the Department of Safety and the Colonel of the State Police shall take all necessary steps to equip State Police with body worn cameras, including but not limited to either (i) identifying available funding in the Department of Safety's existing budget and seeking necessary approvals to utilize such funding for the purpose of equipping State Police with body worn cameras or (ii) providing recommendations to the Governor on necessary funding to be included in the next biennial budget. Once funding has been identified and

approved and the necessary equipment is obtained and ready for use, the use of body worn cameras shall be required for State Police in any circumstance where State Police interact with members of the public and use of body worn cameras is permitted by existing State or Federal law. Within 60 days of the date of this Order, the Commissioner of the Department of Safety shall submit a plan for implementation of this directive to the Governor. This plan shall include, at a minimum, identification of the necessary funding and a timeline for final implementation.

<u>Law Enforcement and Community Relations</u>

11. All State law enforcement agencies shall:

   a) Take all necessary steps, including initiating rulemaking, to adopt the following definition of "community policing" as set forth by IACP:

   "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties."

   b) Establish and dedicate a team to focus on community policing and engagement. This team shall, among other things, (i) engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs and (ii) identify opportunities to promote community events and use social media and Public Service Announcement (PSA) campaigns to educate the public about law enforcement officers and their work.

   c) Take all necessary steps, including initiating rulemaking, to require ongoing training for law enforcement officers that empowers and enables individual officers to engage in community policing and relationship building efforts.

12. The Director of PSTC shall ensure that PSTC maintains and publishes a list of all currently CALEA accredited law enforcement agencies within New Hampshire.

<u>School Resource Officers</u>

13. The Director of PSTC shall:

   a) Take all necessary steps, including initiating rulemaking, to mandate certification for school resource officers (SROs) that requires each SRO to complete, prior to assignment, both (i) National Association of School Resource Officers (NASRO) training and (ii)

Mirror Project Train-the-Trainer and Effective Police Contact with Youth training. If the Director determines that legislation is necessary to enable rulemaking on this topic, the Director shall submit recommended legislative language to the Governor within 30 days of this Order.

b) Take all necessary steps, including initiating rulemaking, to develop and implement mandatory annual in-service training requirements for SROs to maintain their certifications. If the Director determines that legislation is necessary to enable rulemaking on this topic, the Director shall submit recommended legislative language to the Governor within 30 days of this Order.

c) Work with stakeholders and the State Board of Education and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SROs's role in student discipline for non-criminal matters.

<u>Recruitment for State Law Enforcement Agencies</u>

14. All State law enforcement agencies shall establish a team to continue and enhance the each agency's efforts to recruit officers from minority communities. This shall include the development of a new comprehensive plan and strategy to actively attract, recruit, and retain diverse law enforcement candidates, including candidates from outside New Hampshire. Each State law enforcement agency shall submit this plan and strategy to the Governor within 60 days of the date of this Order, and upon submittal this plan and strategy shall be published on each agency's website and Governor's Office website.

<u>Gender Non-Conforming Community</u>

15. All State law enforcement agencies shall take all necessary steps, including initiating rulemaking, to require ongoing training for law enforcement officers that advances the relationship between officers and the gender non-conforming population including, but not limited to, training on pronoun inclusion.

<u>Deaf and Hard of Hearing Community</u>

16. Each law enforcement agency shall develop a plan to advance relationships with the deaf and hard of hearing community. The plan for the Division of State Police shall address, among other things, the potential for greater use and dissemination of driver viser cards by State Police.

<u>Mental Well-Being of Officers</u>

17. All State law enforcement agencies shall take all necessary steps, including initiating rulemaking, to require ongoing training regarding the mental well-being of officers. Such

training shall include information regarding the high rates of post-traumatic distress, depression and suicide among law enforcement officers and available resources for seeking help.

18. The Director of PSTC shall form a team to review whether to require mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and assist with referring officers for mental health treatment and support.

<u>Implementation of the Directives in this Order</u>

19. Within 60 days of the date of this Order, the Director of the PSTC, the Attorney General, the Executive Director of the Judicial Council, the Commissioner of the Department of Safety, and the head of each State law enforcement agency shall, as applicable, submit to the Governor an estimated timeline for implementation of the Directives contained in this Order.

20. On or before November 1, 2020, and the first day of every month thereafter until implementation of all directives in this Order is complete, the Director of the PSTC, the Attorney General, the Executive Director of the Judicial Council, the Commissioner of the Department of Safety, and the head of each State law enforcement agency shall, as applicable, submit monthly reports to the Governor summarizing the progress made on implementation of each of the directives in this Order. These reports shall be posted on the Governor's Office website on the LEACT Commission page.

21. All directives contained within this Order shall be fully implemented by July 1, 2021, unless otherwise provided in this Order. The Governor may approve extensions to this deadline on a case by case basis.

Given under my hand and seal at the Executive Chambers in Concord, this 7th day of October, in the year of Our Lord, two thousand and twenty, and the independence of the United States of America, two hundred and forty-four.

**GOVERNOR OF NEW HAMPSHIRE**

| LEACT Dashboard | Updated June 9, 2021 |
|---|---|
| **Title of Recommendation** | **Current Implementation Status** |
| **A. TRAINING** | |
| **I. Required Training to Maintain Law Enforcement Officer Certification** | |
| 1. As soon as practicable, NH PSTC, with input from all relevant law enforcement agencies, should pursue all actions necessary, including emergency rulemaking pursuant to RSA 541-A, to amend existing administrative rules to provide as follows: | |
| 1-A. Increase the mandatory number of hours of annual in-service training for law enforcement officers on an incremental basis over the next three years.  By January 1, 2024, the total mandatory hours of annual in-service training should be a minimum of twenty-four (24) hours. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. Presently the scenario training at the recruit academy is 76 hours as scheduled. We are in final stages of council approval to bring back live dosing labs to augment DWI detection class. Once full approved, recruits will have the ability to conduct SFSTs on dosed subjects. We anticipate further increases once the JTA is completed and a deeper review of the academy curriculum can be conducted. This will be an ongoing effort for the next 12 to 18 months.** |
| 1-B. Mandate that annual in-service training as approved by NH PSTC include, at a minimum, two (2) hours on each of the following topics:          i. Implicit bias and cultural responsiveness; ii. Ethics; and iii. De-escalation. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. The final adoption and anticipated completion date is dependent on the JLCAR process. All mandatory in-service training listed above is ready and we will be delivering each of the three classes at the NH Association of Chiefs of Police summer conference this year. Further, we will are offering these classes in a webinar style using Zoom technology to reach as many as possible. Each topic will be offered a number of times during a particular month. Finally, NH BET from the NH Department of Administrative has completed one of the three on-line learning modules so officers can take the training online. They have begun work on the remaining two classes.   This has been completed by the Liquor Commission. State Police completed additional training on de-escalation and is in progress on training on ethics and implicit bias.** |
| 2. Beginning January 1, 2021, strongly encourage all law enforcement agencies to require their officers to participate and receive, at a minimum two (2) hours annually, of training in the following areas: a. Implicit bias and cultural responsiveness; b. Ethics; and c. De-escalation. | **Completed.** |
| **II. NH Police Standards and Training Council General Recommendations** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 3. NH PSTC should arrange for a Job Task Analysis (JTA) for entry-level law enforcement officers and entry-level corrections officers, and based on those findings, conduct an overall review of the present academy curriculums.  Based on curriculum changes found by the JTA, an extension of the length of the police academy beyond its current 16 weeks may be warranted. | **JTA in progress. Anticipated completeion date prior to August 2021.** |
| 4. NH PSTC needs to leverage technology and be allowed to purchase and deploy a robust database management system and on-line learning platform for the twofold purpose of: 1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from one agency to another and/or decertification, and 2) to develop and deliver standardized on-line training to all law enforcement officers in an efficient and economical way. | **PSTC has purchased software from Benchmark Analytics and is working to customize it. Anticipate that the training software will be operational by June 1, 2021. Record management system may take longer to implement.** |
| 5. NH PSTC, in collaboration with other law enforcement agencies, using nationally vetted best practices as set forth by IACP, CALEA, PERF, and NOBLE, shall create policy guidelines on the following topics that serve as a minimum standard with which all law enforcement agencies must comply: - Use of Force<br>- Duty to Intervene<br>- Code of Conduct<br>- Duty to Report Misconduct<br>- Prohibition of Chokeholds<br>- Procedures to Guard Against Positional Asphyxia | **Nationally vetted position papers developed by the IACP and PERF on each topic have been posted online. The Model Policy on the Use of Force has been drafted and is being reviewed by the NHDOJ, NH Chiefs of Police, and the NH Police Association.** |
| 6. NH PSTC should increase the number of hours of scenario-based training in both academy and in-service settings. | **Completed. PSTC has increased the number of scenario and deescalation training by 15 hours. These hours will further increase over the next 12-18 months.** |
| 7. NH PSTC should improve and augment police academy training on diversity by conducting a review of the present lesson plan on cultural dynamics, and amend it to properly address the topic. Training to be developed with one or more community partner(s). | **Completed for the January 2021 acadamy session.** |
| 8. NH PSTC should improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the IACP recognized Fair and Impartial Policing training or similar type training. | **Completed. Increased training on Cultural Dynamics and Implicit Bias from 2 hours to 16 hours.** |
| 9. NH PSTC should improve and augment police academy and in-service training on de-escalation techniques by adopting the PERF's Integrated Communication and Tactics training (ICAT) or similar training. | **Completed.** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 10. NH PSTC should improve and augment police academy training on police ethics by re-instituting the Ethics block of instruction. | **Completed.** |
| 11. NH PSTC should improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training, (formally known as EPIC training) or similar training. | **Completed. A new course was added to the PSTC curriculum, making New Hampshire the first state to do so as a state-wide initiative.** |
| 12. NH PSTC should include in its instruction State of New Hampshire v. Jones (decided January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered while reaching its decision. These cases should be part of the lesson plan in those relevant topic areas that are already delivered.  An attorney from the Attorney General's Office will be dedicated to teach at NH PSTC and regularly update materials. | **In progress. PSTC anticipates that the incoming NHAG will address this mandate and will be dependent on the availability of an attorney to review our present lesson plan on Search and Seizure.** |
| 13. Recognizing that certain NH police agencies need to rely on part-time law enforcement officers, NH PSTC should re-evaluate the Part-Time Police Officer certification process upon receipt of the JTA and consider extending the length of such training and give certain consideration to what law enforcement functions part-time officers be allowed to perform. | **In progress, awaiting JTA's completion prior to August 2021.** |
| 14. NH PSTC should amend administrative rule POL 301.05 Background Investigations to mandate that background investigations specifically vet police recruit candidates in the area of having demonstrated outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources to help determine the overall fitness for duty the candidate possesses and to consider those findings in the overall decision to hire the candidate. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. The final adoption and anticipated completion date is dependent on the JLCAR process.** |
| **III. Other Recommendation** | |
| 15. All law enforcement agencies should be encouraged to pursue CALEA accreditation.  In the absence of CALEA accreditation, agencies should continually review and maintain policies consistent with nationally accepted best practices under Section C:1-a-l. | **PSTC published a list of CALEA accredited law enforcement agencies.** |
| **B. REPORTING AND INVESTIGATION OF POLICE MISCONDUCT** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 16. Support the establishment of a single, neutral and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers with the noted componets from the LEACT Report: | **Legislation and funding proposed in the Governor's budget. (See HB 2)** |
| 17. To promote a uniform approach to investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials, establish by statute, a dedicated Public Integrity Unit within the Attorney General's Office with permanent and sustainable resources, including full-time attorneys, paralegals, legal assistants, and investigators. | **Completed. The Unit curretly is comprised of two attorneys. The Department has identified funding to fill two other positions within the unit and is taking steps to recruit and hire candidates to fill more positions.** |
| 18. To promote equal justice under the law in all aspects of the criminal justice system, the Commission strongly encourages implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges. | **Completed/ongoing. On November 20, 2020 over 600 attorneys, prosecutors, and staff, including the entire NHDOJ, participated in an implicit bias training. Further trainings to be scheduled. All future hires at the NHDOJ will be required to view this recorded presentation within thirty days of hiring. The Judicial Council completed a training for all Public Defenders and has scheduled another training for early 2021.        Legislation introduced for judges. The Public Defender's office completed its training on April 16, 2021. (SB 96)** |
| 19. Establish a community outreach position within the Attorney General's Office to facilitate communication between all state, county and local prosecution offices and New Hampshire's diverse communities. | **On February 3, 2021, the Executive Council approved a request to reclassify a vacant, classified position  in order to create this position. The House Budget funded the position beginning January 1, 2023. In the meantime, the Department is continuing with the recruiting process contingent upon approval of funding. We will be monitoring the progress of the budget to see if the funding date changes.** |
| 20. Amend RSA 33-A:3-a, CVIII to require "police, non-criminal-internal affairs investigations" to be retained, at a minimum, for a period of 20 years after retirement or separation. | **Legislation introduced. (SB 96)** |
| 21.  Encourage all law enforcement agencies to use body and/or dash cameras. | **RFP issued for State Police and responses are due on February 26, 2021. Liquor Commission has identified funding and is developing a draft  RFP and anticipates implimentation prior to July 1, 2021.**<br>**Legislation introduced to establish a funding source for local agencies. (SB 96)** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 22. Make the existing Exculpatory Evidence Schedule (EES) public subject to the following provisions:a. The Office of the Attorney General will provide immediate written notice to all living persons on the current list that they are on the list with the following notifications that:<br>i. Six (6) months from date of notification to request a hearing in Superior Court to have his or her name removed from the EES.<br>ii. Six (6) months from date of notification, individual names on the list with a sustained finding shall be made public, except for any individual with a pending Superior or Supreme Court action in regard to removal from the EES.<br>b. The names of deceased former law enforcement officers shall be released once there has been a determination that the officer was afforded due process prior to placement on the list or the conduct subject to EES was previously provided as discovery in a criminal case. | **Legislation introduced. (Amendment to HB 471)** |
| **C. COMMUNITY RELATIONS** | |
| **I. Data Collection** | |
| 23. All law enforcement agencies should gather, analyze and make available to the public, at least annually, data on demographics (including, at a minimum, gender and race) for arrests, citations and motor vehicle and subject stops regardless of disposition. | **Legislation introduced. (SB 96)** |
| 24. New Hampshire Department of Motor Vehicles should include a person's race on NH Drivers' Licenses and Non-Drivers' Identification Cards, with the option for the person to opt out from answering the question. | **Legislation introduced. (SB 96)** |
| 25. All law enforcement agencies will comply with RSA 106-B:14-c by submitting crime reports to the Department of Safety, Division of State Police based on the specifications prescribed by the Federal Bureau of Investigation (FBI). | **In progress.Approximately 85% meet this requirement. State Police continues to work with Law Enforcement Agencies to bring them into compliance.** |
| **II. Community Policing and Engagement** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 26. All law enforcement agencies should adopt the definition of Community Policing as set forth by IACP: "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties." | **Completed. Recommendation for local law enforcement.** |
| 27. Encourage all law enforcement agencies, when practicable, to dedicate an officer or unit to community policing and engagement | **In progress for State Police.**<br>**Recommendation for local law enforcement.** |
| 28. Encourage all law enforcement agencies to engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs. Models like New Hampshire Blue and You, the Mirror Project, Police Athletic Leagues (PALs), and citizen police academies serve as a guide for such efforts. | **Completed by State Police, Liquor Commission and Fish and Game Department. This will be an ongoing and continuing effort by the State.**<br>**Recommendation for local law enforcement.** |
| 29. All law enforcement agencies should establish ongoing officer training at all levels to encourage a culture that empowers individual officers to engage in community policing and relationship building efforts. | **Completed by State Police, Liquor Commission and Fish and Game Department.          Recommendation for local law enforcement.** |
| 30. All law enforcement agencies should publish/advertise community events and consider the use of social media and the establishment of Public Service Announcement (PSA) campaigns to educate the public about police officers and their work. | **Completed by State Police, Liquor Commission and Fish and Game Department. This will be an ongoing and continuing effort by State.**<br>**Recommendation for local law enforcement.** |
| 31. NH PSTC should maintain and publish a list of all currently CALEA accredited law enforcement agencies. | **Completed.** |
| **III. School Resource Officers** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 32. NH PSTC should set forth mandated "certification" for SROs that would require the officer to complete National Association of School Resource Officers (NASRO) training, Mirror Project Train-the-Trainer and Effective Police Contact with Youth training prior to assignment.  Further, certain annual in-service hours to maintain SRO "certification" should be identified and mandated by NH PSTC. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. The final adoption and anticipated completion date is dependent on the JLCAR process.** |
| 33. NH PSTC should work with stakeholders and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SRO's role in student discipline for non-criminal matters. | **Completed. Sample MOU is posted on PSTC's website.** |
| 34. Each law enforcement agency should have a field training program specifically for SROs.  A transition plan should be implemented over a course of weeks/months between each outgoing/incoming SRO so there is overlap, information exchange, and adjustment for the stakeholders. | **Recommendation for local law enforcement agencies.** |
| 35. MOUs between law enforcement agencies and SAUs should be made public. | **Legislation introduced. (SB 96)** |
| **IV. Hiring/Recruitment of Officers** | |
| 36. Recognizing the difficulty of hiring and recruiting qualified candidates, law enforcement agencies should continue efforts to recruit officers from minority communities to allow for a diverse law enforcement workforce. | **Completed by the State Police Recruitment and Training Unit, and will require ongoing efforts. Recommendation for local law enforcement.** |
| 37. All public entities should develop a comprehensive strategy to actively attract, recruit, and retain diverse law enforcement candidates, to include candidates from outside New Hampshire. | **Completed by State Police,  Liquor Commission and NH Fish and Game Department. Recommendation for public non-state entities** |
| **V. Other** | |
| 38. In order to advance relationships with the trans and gender non-conforming population, all law enforcement agencies should seek and provide training on pronoun inclusion. | **In progress for State Police and NH Fish and Game Department. Completed by Liquor Commission. Recommendation for local law enforcement** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 39. In order to advance relationships with the deaf and hard of hearing community, law enforcement agencies should continue to seek a better understanding of, and communication with, members of that community, to include the greater use and dissemination of driver visor cards by law enforcement. | **Completed by State Police and Liquor Commission. Recommendation for local law enforcement** |
| 40. In order to advance a greater understanding of juvenile offenders, form a separate commission to review the present state of juvenile justice laws.  In particular, the commission should review the minimum age for juvenile prosecutions and the statute that creates a presumption of transfer to the adult criminal court. | **Based on feedback from community stakeholders, specific legislative changes were introduced in lieu of a commission. (SB 96)** |
| **The Commission makes the following recommendations for reforms and improvements with respect to mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit.** | |
| 41. Specially trained mental health professionals should be embedded in tactical response teams.  There should be a review to determine if such mental health professionals will be afforded protection from litigation stemming from their participation in such activities. | **In progress for State Police.** |
| 42. Encourage partnerships between communities and local law enforcement to pursue services and resources dedicated to individuals with substance use disorders (SUDs) and mental illness and to make those services readily available in order to reduce the burden on law enforcement responding to issues stemming from SUDs as well as mental illness. | **Recommendation** |
| 43. Offer training regarding the mental well-being of law enforcement officers.  Training should include information regarding the high rates of post-traumatic stress, depression and suicide among law enforcement officers and available resources for seeking help.  Enhance the availability and encourage the continued collaboration of law enforcement peer support programs in the state. | **In progress for PSTC. Completed by State Police and Liquor Commission. In progress for NH Fish and Game Department.** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 44. NH PSTC should explore the issue of requiring mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and/or assist with referring officers for mental health treatment/support. | **In progress for PSTC.** |
| 45. The University of New Hampshire and other higher education institutions within New Hampshire are encouraged to collaborate with NH PSTC to develop specialized curriculum and/or graduate/post-graduate certificate programs dedicated: a. To mental health providers who collaborate with law enforcement officers in responding to individuals experiencing a mental health crisis, in order to respond more effectively to critical incidents involving individuals who are a danger to themselves or others. b. To address the special mental health needs of law enforcement officers/first responders including, trauma, depression, and substance misuse, in order to enhance the skills, understanding, and availability of licensed mental health professionals in New Hampshire who can provide treatment/support and collaborate with our law enforcement community. | **In progress.** |
| 46. Endorse the findings and recommendations of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit and ensure that sufficient funding is allocated to implement and sustain the recommendations. | **Legislation proposed for the next biennial budget** |
| 47. In order to enhance transparency, accountability, and community relations between law enforcement and the people they serve, the Commission strongly encourages the Governor and the legislature to allocate or re-allocate appropriate funding needed to implement and sustain the recommendations made by this Commission.  Stakeholders are encouraged to advocate for their funding needs before House Finance Committee or their local funding body. | **Recommendation for future action.** |
| 48. Extend, as needed, this Commission to assist with implementation of any recommendation. | **Commission to re-convene to assess progress on recommendations after next legislative session** |

## LEACT Recommendations Completed & In Progress as of 9/2/21

**Completed By Legislative Action** *(listed with recommendation number)*

- ✓ 19. Establish a community outreach position within the Attorney General's Office.
- ✓ 20. Retain police, non-criminal-internal affairs investigations for 20 years following end of service.
- ✓ 21. Encourage all law enforcement agencies to use body and/or dash cameras.
- ✓ 22. Make the existing Exculpatory Evidence Schedule (EES) public with conditions.
- ✓ 35. MOUs between law enforcement agencies and SAUs to be made public.
- ✓ 40. Reformed juvenile justice laws based on stakeholder input.
- ✓ 47. Encourage Governor and the legislature to allocate funding to support recommendations.

**Completed By Executive Action** *(listed with recommendation number)*

- ✓ 1-A. Increase NH PSTC in-service training hours.  (Pending JLCAR approval)
- ✓ 1-B. Mandate NH PSTC training on implicit bias and cultural responsiveness, ethics and de-escalation
- ✓ 2. Encourage all law enforcement agencies to require implicit bias and cultural responsiveness, ethics and de-escalation training.
- ✓ 3. NH PSTC perform Job Task Analysis (JTA) to evaluate training.
- ✓ 4. Purchase and upgrade NH PSTC technology and database management.
- ✓ 5. NH PSTC created nationally vetted best practices and model policy guidelines.
- ✓ 6. NH PSTC increase scenario-based training hours.
- ✓ 7. NH PSTC review and amend training on diversity.
- ✓ 8. NH PSTC developed 16 hours on the topics of IACP Fair and Impartial Policing training.
- ✓ 9. NH PSTC review and amend de-escalation techniques.
- ✓ 10. NH PSTC review and amend ethics instruction.
- ✓ 11. NH PSTC review and amend training related to duty to intervene.
- ✓ 14. NH PSTC amend background investigations for police recruits in reviewing fitness for duty. (Pending JLCAR approval)
- ✓ 15. All law enforcement agencies to pursue CALEA accreditation or accepted best practices.
- ✓ 17. Establish Attorney General's Public Integrity Unit with necessary resources.
- ✓ 18. Require implicit bias training for all prosecutors, criminal defense attorneys and judges.
- ✓ 23. All law enforcement agencies to collect and report data on demographics for NIBRS.
- ✓ 25. Law enforcement agencies to submit crime reports to DOS as prescribed by FBI.
- ✓ 26. Adopt the definition of Community Policing as set forth by IACP.
- ✓ 28. Encourage all law enforcement agencies to engage in community relationship building.
- ✓ 29. Training for law enforcement that empowers community policing and relationship building.
- ✓ 30. All law enforcement agencies to promote community events through social media or PSAs.
- ✓ 31. NH PSTC maintain a list of all currently CALEA accredited law enforcement agencies.
- ✓ 32. NH PSTC to require National Association of School Resource Officers (NASRO) training. (Pending JLCAR approval)
- ✓ 33. NH PSTC develop SRO MOU for police departments and SAUs.
- ✓ 34. Law enforcement agency field training for SROs.
- ✓ 36. Encourage the recruitment of qualified officers from minority communities.
- ✓ 37. Strategy for recruiting and retaining diverse law enforcement candidates.
- ✓ 38. Training to improve relationships with the trans and gender non-conforming communities.
- ✓ 39. Training to advance relationships with the deaf and hard of hearing including driver visor cards.
- ✓ 42. Encourage partnerships to support issues stemming from SUDs as well as mental illness.
- ✓ 43. Offer training regarding the mental well-being of law enforcement officers.
- ✓ 44. NH PSTC explore requiring mandatory periodic psychological screenings of law enforcement.
- ✓ 46. Endorse and Fund the February 2019 Office of LBA NH PSTC Performance Audit report.
- ✓ 48. Extend, as needed, this Commission to assist with implementation of any recommendation.

| ***Recommendations In Progress*** *(listed with recommendation number)* |
|---|
| ✓  12. NH PSTC include instruction by DOJ attorney on cases concerning race or protected classes. |
| ✓  13. NH PSTC to evaluate the Part-Time Police Officer certification process upon receipt of the JTA. |
| ✓  16. Establishment a statewide entity to receive and review misconduct complaints. |
| ✓  24. Provide opt-out race indication on NH Drivers' Licenses and Non-Drivers' Identification Cards. |
|     ○   Study Commission passed in 2021. |
| ✓  27. Encourage all law enforcement agencies, to dedicate an officer or unit to community policing. |
| ✓  41. Embed specially trained mental health professionals in tactical response teams. |
| ✓  45. UNH and Higher Ed collaboration with NH PSTC to develop specialized mental health curriculum. |

# EXHIBIT 4

Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on November 20, 2020

## New Hampshire
# Department of Justice
*Office of the Attorney General*

# 2020 Implicit Bias Training Hosted by the New Hampshire Attorney General's Office

*November 20, 2020 9 a.m. – 12:30 p.m.*

*Required for all attorneys, investigators, legal staff and victim/witness advocates in the Attorney General's Office, all County Attorney Offices, all state agency attorneys, and all prosecutors, including police prosecutors.*

## Presenters:

### Jarvis Parsons - District Attorney of Brazos County Texas

- Bias: What You Don't Know Can Hurt Others 

Currently serving his second term, District Attorney Parsons was an assistant D.A. for 10 years prior. A Louisiana native, Parsons graduated from McNeese State University in 1998 and graduated from the University Of Maine School Of Law in 2001. He was a judicial law clerk for a year in Warren County, New Jersey before becoming a Brazos County prosecutor in 2002, prosecuting everything from state jail felonies up to death penalty cases and everything in between.

Parsons is currently the chairman of the board for the Texas District and County Attorneys Association and has served on its Legislative Committee, Training Committee, and is one of the founding members of the Diversity Recruitment and Retention Committee.

He is on the Board of the TEEX Central Texas Police Academy, which guides the Police Academy leadership on needs specific to training and courses and establishes standards and methods to evaluate the effectiveness of training, equipment and facilities at the training academy.

### James McKim, PMP, ITIL - President of the Manchester NAACP

- Presentation: Are You Your Implicit Bias?

Mr. McKim is Founder and Managing Partner of Organizational Ignition, a management consulting firm. Prior to his current role, Mr. McKim was Chief of Staff of the Technical Training Division at Hewlett Packard Enterprise where he led the organization to deliver award-winning performance enhancement solutions. He has, also, held business and technology leadership roles in for-profit and non-profit organizations such as FIRST, Hawkeye Data, LLC, and Digital Equipment Corp.

Mr. McKim has facilitated startup and growth of statewide organizations such as the Economic Vitality New Hampshire and the Software Association of New Hampshire. He has played an active role in the shaping of public policy affecting the Technology industry. He serves, currently on several Boards playing leading roles as Vice-President of Membership a the Project Management Institute NH Chapter, Chair of the NH PBS Finance Committee, Chair of the Episcopal Church's National Executive Council Committee Anti-Racism, and President of the Manchester NAACP.

## Links:

- **Register for Implicit Bias Training [https://nhgov.webex.com/mw3300/mywebex/default.do? nomenu=true&siteurl=nhgov&service=6&rnd=0.13424712364303681&main_url=https%3A%2F%2Fnhgo v.webex.com%2Fec3300%2Feventcenter%2Fevent%2FeventAction.do%3FtheAction%3Ddetail%26%26 %26EMK%3D4832534b00000004dacaad18d1077ec99dbcbbc64d287582dc9277bc4b1ed0dcae760fbaffe55 13f%26siteurl%3Dnhgov%26confViewID%3D175086893217620704%26encryptTicket%3DSDJTSwAAAAR ZS9f3rBoMFJ_v1B4et_2m4n2dUMlng2m3lLOSmjTHFA2%26]**

- Certificate of Attendance 📄

- Implicit Bias Training Itinerary 📄

- Implicit Bias Training Video


📄 Portable Document Format (.pdf). Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

New Hampshire Department of Justice
33 Capitol Street | Concord, NH | 03301
Telephone: 603-271-3658

# NEW HAMPSHIRE ATTORNEY GENERAL'S OFFICE IMPLICIT BIAS TRAINING

November 20, 2020

## **AGENDA**

**9:00 a.m.** – Welcome and Introduction

*Attorney General Gordon J. MacDonald*

*Senior Assistant Attorney General David Rotman*

**9:10 a.m.** – Presentation\*

*Jarvis Parsons, District Attorney of Brazos County Texas*

**10:50 a.m.** – Presentation\*

*James McKim, PMP, ITIL, President of the Manchester NAACP*

**12:25 p.m.** – Concluding Remarks

*Attorney General Gordon J. MacDonald*

*\*There will be a five minute break during each presentation.*

# BIAS: WHAT YOU DON'T KNOW CAN HURT OTHERS

## Jarvis Parsons,
## Brazos County District Attorney

# How I Became a Prosecutor



# #SQUAD GOALS

- To be intelligent as we can is a moral obligation—that if we haven't exhausted every opportunity to know whether what we are doing is right, it will be **no excuse** for us to say that we meant well.
  - John Erskine (1915)



# **Prosecutorial Power**

- Charging Decision
- Bond
- Jury Selection
- Plea Offer
- Closing Argument

# Cognitive Bias Defined

- A **cognitive bias** is a type of error in thinking that occurs when people are processing and interpreting information in the world around them.

- Cognitive biases are often a result of your brain's attempt to **simplify** information.



# Confirmation Bias

- The tendency to search for, interpret, focus on, and remember information in a way that confirms ones preconceptions/beliefs. **

- Also called the "Prosecutor's Bias".

- What you believe, you see.

# Confirmation Bias



9

# CONFIRMATION BIAS: REAL WORLD EXAMPLE



# TUNNEL VISION



# What You See Is All There Is



# % Of DV Victims Who Recant?

We presume they will recant…so we look to:

✇ 911 call, EMS record, Medical Records

✇ Social Media, text messages, jail calls

✇ Determine Primary Aggressor On Scene

✇ Meet w/victim early in process, neighbors, family, friends, etc...

✇ Look for prior victims

# Just World Theory



14

# Just World Theory

People have an automatic tendency to look for something or someone to blame for unfortunate events. But rather than simply attributing a bad turn of events to bad luck, people tend to look at the individual's behavior as a source of blame.

- What was she wearing?
- Why did she let him walk her home?
- How much she had to drink?

15

# Just World Theory



# Just World Theory



# Defensive Attribution



# Defensive Attribution

- The similarity of the witness to the person(s) involved in the misfortune – in terms of situation, age, gender, personality, etc. – changes the amount of blame one is ready to ascribe.

- This is related to the empathy response, which is more likely to be activated if the witness sees similarities between themselves and the person(s) involved.

# Defensive Attribution



20



# Michael Morton Act



# Implicit Bias:  How We See People



# Implicit Bias

We all have differences. We see age, gender and skin color. That's not bias.



# "Halo Effect"

- Research has shown that we automatically assign to good-looking individuals favorable traits such as talent, kindness, honesty, and intelligence –*Thorndike 1920*



# "Halo Effect"

- Physically attractive individuals are more likely to be…
  - Hired and less likely to be fired
  - More likely to get a call back for interviews
  - Higher wage earners (10-15%)
  - Less likely to get in trouble when they are children

# Sexual Harassment Study



# GENDER



# Gender Bias:
# Police Chief Edition

Michael vs. Michelle

- Michael—streetwise, worked tough neighborhoods, got along with fellow officers. Poorly educated and lacked administrative skills.

- Michelle—smart, well schooled and experienced in administration, family oriented, little street experience and didn't get along with officers.

29

# Gender Bias:
# Who Do You Hire?



# Gender Bias:
# Who Do You Hire?

When the male applicant had experience and no education, participants chose…

The Man

When the male applicant had no experience and was educated, participants chose…

The Man

31

# Gender Bias:
# Women's Studies Professor



32

# Implicit Racial Bias

- Researched for over two decades.
- A majority of Americans harbor negative implicit attitudes toward African-Americans

# Implicit Racial Bias

- Influenced by attitudes and stereotypes that we all hold based on our experiences.

- Guides how we act in a subconscious way, even if we renounce prejudice and stereotypes explicitly.





# Microaggression

**Prejudices that leak out in many interpersonal situations. A.K.A. Slights, insults, indignities and denigrating messages.**

# Microaggression Examples

- Can I touch your hair?

- You don't sound black.

- You look too white to be Hispanic/Arab/etc…

- When I look at you, I don't see color.

# Robbery In Black and White

- University of Hawaii Study, 66 participants
  - Japanese American, White, Chinese, Native Hawaiian, Pacific Islander, Korean American and Latino

# Robbery In Black and White



40

# Ambiguous Crime Details

- Prior drug addict, served with eviction notice
- Left handed
- Golden Gloves boxing champ in 2006
- NO License
- Owner Identifies defendant's voice
- Defendant had movie ticket stub for show that started 20 minutes before robbery

# Robbery In Black and White: Results

How Guilty Is The Defendant?
Scale (0-100)
- Darker Skin Tone  66.97


- Lighter Skin Tone  56.37

# What About Victims?



# U. Nebraska at Lincoln: Harrison and Esqueda (2000)

- Police respond to anonymous phone call reporting a domestic dispute.
- Jeff Davis is a Black (White) male,
- Cindy Davis is a Black (White) female,
- Drinking and Non-drinking scenarios.

44

# Same Facts? Different Race? Different Results

- AA women who drank were perceived as **more blameworthy** than AA women who did not.

- **No distinction** between drinking and non-drinking white females.

- AA women received **more blame** in DV situations for the **same amount** of drinking as white women.

# Not Just Black Women...

- Black boys as young as 10 are seen as **more responsible** for their actions compared to their white counterparts.
  - Viewed as **older** (up to 4½ years) and less innocent.
    - *The Essence of Innocence: Consequences of Dehumanizing Black Children (Goff, 2014).*
- Black Girls are viewed as **less innocent** and need **less nurturing** than their white counterparts.
  - *Girl Interrupted: The Erasure of Black Girls Childhood (Epstein, Blake & Gonzalez, 2017)*

46

# But I'm Educated...



# Written in Black and White

Memo drafted by a hypothetical law student given to 60 partners in 22 law firms.

- 37 men, 23 women, 39 white,
- 21 racial/ethnic minorities
- Memo had **22** writing and analytical errors.
- Same memo. **Only** difference was race of the "writer".

48

# Results

- White "Thomas Meyer" averaged 4.1/5.0.

- Black "Thomas Meyer" averaged <u>3.1</u>/5.0 scale, for the same memo.

# Quantitative Results: Errors Spotted by Lawyers

**White Thomas Meyer:**

**10.2 errors found avg.**

**Black Thomas Meyer:**

**<u>14.6</u> errors found avg.**

# Qualitative Results: Opinion of the Students

**White Thomas Meyer:**

"good writer but needs to work on", "has potential", "good analytical skills".

**Black Thomas Meyer:**

"Needs lots of work", "can't believe he went to NYU", "average at best".

51

# Greg vs. Jamal

- Study of 1300 ads and over 5,000 resumes.

- White-sounding names like Emily or Greg get 50% more call backs for job interviews with the exact same resume.

- "A white-sounding name yields as many more callbacks as black sounding name with **eight** years of experience".
  - *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment in Market Discrimination. (Bertrand and Mullainathan, 2003)*

52

# The Implicit Association Test (IAT)

- **Designed to measure implicit bias**

- **https://implicit.harvard.edu/implicit/takeatest.html**

- **Flowers vs. Insects**

# My Story

- **Took the Implicit Association Test…**



Study.



**Your result:**

**Your data suggest a slight automatic preference for White people over Black people.**

The sorting test you just took is called the Implicit Association Test (IAT). Half of you completed the task for African Americans and European Americans, whereas the other half completed the task for Black People and White people. You categorized good and bad words with images of African Americans (or Black People) and European Americans (or White People).

# My Story

- **About 50% of African-Americans show a preference toward whites.**
  - ***Nosek, Banaji, & Greenwald, 2002***.



# Attacking Implicit Bias

- Understand and acknowledge cognitive bias
- Start With Yourself And Just Begin
- Evidence/words that hits on a stereotype (misdemeanor murder).

# Blinding



# Other Disciplines Use Blinding

- Scholarly Journal editors routinely remove author names and institutions.
- Professors mask student names when grading
- Lineups (Double Blind Lineups)
- Federal Death Penalty Decisions

# Empirical Example



# Orchestra Blinding Results

- Using a Screen to conceal candidates from the raters increased the likelihood that a female would advance to the next round by

- 11%

- During the final round "blind" auditions increased the likelihood of female musicians being selected by

- **30%.**

# Outsmarting The Bias



63

# Collaboration



# Outsmarting The Bias: Group Decision Making

- **200 participants**

- **83% white, 17% Black**

- **Ages 18-78**

- **Created 29 juries of 6 people per jury (some alternates).**

# Outsmarting The Bias: Group Decision Making

- Viewed a video of a 30-minute Court TV summary of Black Male Defendant and White Female Victim.

- Heard testimony of 10 Witnesses (7 state & 3 defense)

# Outsmarting The Bias: Group Decision Making

## Recorded jury deliberations

- Looking for breadth of discussion

- Accuracy of statements

- Corrected Inaccuracies

# Outsmarting The Bias: Group Decision Making

**Diverse Juries**

- **Discussed <u>more</u> facts**
- **Made <u>more accurate</u> statements of facts**
- **<u>Corrected</u> more inaccurate statements**

# IMPLICATIONS

The more you bring in <u>different perspectives</u>, the better your outcome will be.

# Any Questions?

# Jarvis Parsons

## [jparsons@brazoscountytx.gov](mailto:jparsons@brazoscountytx.gov)

## 979-361-4320

# Are You Your Implicit Bias?

## James McKim

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Introduction



What is the underlying issue in the photos?

Copyright© 2020 Organizational Ignition

# Objectives & Agenda

## Objectives

- Understand the depth of the problem with implicit bias
- Understand the 9 de-biasing techniques
- Understand how implicit bias & discrimination can be eliminated

## Non-Objective

- Make you an expert on Implicit Bias
- De-bias you

## Agenda

- Demographics
- 6 Key Concepts
- Manifestations of Implicit Bias – including in your own
- Forms/Types of Implicit Bias
- Eliminating Bias & Discrimination
- Wrap-up
- Homework

Copyright© 2020 Organizational Ignition

# Current NH Demographics By Age/Gender



# Current NH Demographics By



## Race and Ethnicity                                     #1

Percentage of the total population.
Scope: population of the United States and New Hampshire

**Percentage of Population by Racial or Ethnic Group**
Estimates for 2014-2018, Hispanic Origin Included in Racial Groups

■ New Hampshire    ■ Manchester    ■ Nashua

Percentage of Population

<- Margin of Error

Black or African American    Asian    Hispanic or Latino, of Any Race

**Racial or Ethnic Group**
Note: Margins of Error represent 90 percent confidence intervals
Source: U.S. Census Bureau, American Community Survey, 2014-2018

New Hampshire Fiscal Policy Institute                                11

Copyright© 2020 Organizational Ignition                           5

# 6 Key Concepts



# What is Race?



- Q: What word or phrase comes to mind after viewing this video?

VOX – "The myth of race, debunked in 3 minutes
https://www.youtube.com/watch?v=VnfKgffCZ7U

Copyright© 2020 Organizational Ignition

7

# Gender





# Diversity



*Diversity* is counting, and *inclusion* is cultivating… Diversity is being invited to the party, but inclusion is being asked to dance."

**VOL. 37, NO. 4**
<u>ABA Bar Leader</u>
"Beyond diversity: The bar leader's role in fostering inclusion"

Copyright© 2020 Organizational Ignition

265

# Equality Vs. Equity



Copyright© 2020 Organizational Ignition

10

266

# "isms"

## Imagine...

**Structural/ Systemic Discrimination**

**Micro aggressions**

**Isms**
Using our power to reinforce our discrimination and prejudice in the institutions and groups to which we belong

**White Privilege**

**Discrimination**
taking an action on our prejudice

**Prejudice**
a value judgment based on our feelings associated with the stereotype

**Stereotype**
an incomplete or distorted picture in our head



**Generalization:** The process of formulating general concepts by abstracting common properties of instances

Unconscious Implicit Bias

Copyright© 2020 Organizational Ignition

# Structural/Systemic Discrimination



Media

Wealth

Housing

## Cultural

"Culture is how our bodies retain and re-enact history through the foods we eat; the stories we tell; the things that hold meaning for us; the images that move us…Change culture and you change lives…. Social activism is necessary for changing the world in productive ways." – Resmaa Menakem

## Institutional

Best Practices /Policies /Procedures

## Legal

State* | Local

Education

Criminal Justice

Copyright© 2020 Organizational Ignition

12

# The Cause of Discrimination…
# Unconscious Cognitive Implicit Bias



An Introduction to Unconscious Bias

https://www.youtube.com/watch?v=KCgIRGKAbfc

Copyright© 2020 Organizational Ignition

# Examples of Implicit Bias on Individuals



# Interpersonal Examples of Implicit Bias

## Cases and deaths by race/ethnicity

| Race/ethnicity | Percentage of population | Percentage of cases | Percentage of deaths |
|---|---|---|---|
| Black or African American alone | 1% | 6% ◆ | 2% |
| Hispanic or Latino * | 4% | 13% ◆ | 3% |
| Asian alone | 3% | 3% | <1% |
| Native Hawaiian and Pacific Islander alone | <1% | 0% ① | 0% ① |
| American Indian or Alaska Native alone | <1% | 0% ① | 0% ① |
| Two or more races | 2% | 0% ① | 0% ① |
| White alone | 90% | 74% | 94% |
| Some other race alone | <1% | 4% ① | <1% ① |



- **Discrimination in every day life & the emotional toll it takes**
- **Special fear of life when pulled over by police – regardless of agency**

Copyright© 2020 Organizational Ignition

# Examples of Implicit Bias on Organizations (Employment Cycle)



















# Understand Your Own Biases (Breakout)



- When and how did you first become aware that there was such a thing as racial/ethnic differences, and that people were treated differently on the basis of those differences?
- Growing up, what contact did you have with people whose racial and ethnic heritage was different from your own?

# 5 Minute Break



# Types of Implicit Biases

## Decision-making, Belief, and Behavioral/Confirmational (125+)



- Automation bias
- Bias blind spot
- Dunning–Kruger effect
- Stereotyping
- Zero-sum bias

## Social /Attributional (220+)



- Group attribution error
- In-group/Affinity
- Puritanical bias

## Memory Errors (40+)



- Consistency bias
- Cross-race effect
- Stereotypical bias

Copyright© 2020 Organizational Ignition

# Bias Impact Context

- Information Overload
- Feelings Over Facts
- Need for Speed
- What to remember



**The Cognitive Bias Codex: A Visual Of 180+ Cognitive Biases**

# Eliminating Bias & Discrimination



# How We Think



## Which are You?

Copyright© 2020 Organizational Ignition                                    22

# Types of De-Biasing Techniques

## Countersterotype Training

- Dasgupta and Asagari (2004)

## Negation

- Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

## Perspective-taking

- Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

## Meditation/Lovingkindness meditation (LKM)

- Stell, A. J., & Farsides, T. (2016).

## Implicit bias workshops

- like the one we offer

Copyright© 2020 Organizational Ignition

# Critical Thinking/Decision-Making



Wasabi Learning Flow Charts     https://www.wabisabilearning.com/blog/5-useful-critical-thinking-flowcharts

Copyright© 2020 Organizational Ignition                                    24

# How We Behave



Difficult Conversations

Communication

Steps in Criminal Justice

EQ

Copyright© 2020 Organizational Ignition

25

# Emotional Intelligence

- Critical in understanding and dealing with diversity is **Emotional intelligence**
- The ability to manage your own **emotions**, as well as the **emotions** of others.
  - Self (our own feelings and how they impact our perceptions an behavior - aka Implicit Bias) "How do I feel?"
  - Others (the feelings of others and why they behave the way they behave - aka empathy) "Put yourself in their shoes."

**Empathy**

Rapport   Affinity Communion   Emotion

Compassion

**Feelings**   Sorrow

**Pity**

Copyright© 2020 Organizational Ignition

# Understanding Communication Basics



*Shannon and Weaver Model*

*Dr. Albert Mehrabian's 7-38-55 Rule of Personal Communication*

Copyright© 2020 Organizational Ignition

# Rules for Difficult Conversations



• Who's right?
• What was the intent?
• Who's to blame?

• Uncontrollable urge

What happened

Feelings

Way forward: Shift to a learning stance

Identify

• Have your feelings or they will have you!
• Not who's right - understand each other's story
• Don't assume they meant it - disentangle intent from impact
• Abandon blame

• Am I competent?
• Am I a good person?
• Am I worthy of love?

Difficult Conversations by Douglas Stone, Bruce Patton, & Sheila Heen

Copyright© 2020 Organizational Ignition

# Criminal Justice Process



https://www.fbi.gov/resources/victim-services/a-brief-description-of-the-federal-criminal-justice-process

# Pulling It All Together



Justice mindful
of an equity lens

# Seeing Through an Equity Lens (Breakout)



- What decision is being made?
- Who is at the table?
- How is the decision being made?
- What assumptions are at the foundation of the issue?
- What is likely impact?
- What is your decision?



# Wrap-up





AN
INTRODUCTION TO
UNCONSCIOUS BIAS

An Introduction to Unconscious Bias







What will you do?







| Decision-making, Belief, and Behavioral/Confirmational (125+) | Social /Attributional (220+) | Memory Errors (40+) |
|---|---|---|
| • Automation bias<br>• Bias blind spot<br>• Dunning–Kruger effect<br>• Stereotyping<br>• Zero-sum bias | • Group attribution error<br>• In-group/Affinity<br>• Puritanical bias | • Consistency bias<br>• Cross-race effect<br>• Stereotypical bias |



**Counterstereotype Training**
• Dasgupta and Asagari (2004)

**Negation**
• Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

**Perspective-taking**
• Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

**Meditation/Lovingkindness meditation (LKM)**
• Stell, A. J., & Farsides, T. (2016).

**Implicit bias workshops**
• like the one we offer

Copyright© 2020 Organizational Ignition

# Homework Assignment

- Record an example of microaggression and what caused it to happened
- Record an example of where you observed/experienced white privilege
- Record an example of discrimination in an institution or organization
- Record an example of discrimination through culture



Copyright© 2020 Organizational Ignition

# Contact

James McKim

Organizational Ignition

James.McKim@organizationalignition.com

http://www.organizationalignition.com

# EXHIBIT 5

# May 3, 2021 and May 4, 2021 Presentations to N.H. Court System

# Week Three Agenda – Understanding the Communities We Serve

### May 3, 2021 – The Communities We Serve
#### *1 Granite Place*
#### Facilitator: Gina

9:00 – 10:00: Access to Justice: What do we mean?
- **Presenter(s):** Margaret Huang, Heather Kulp
- **Location:** In-person

10:00 – 11:00: New Hampshire's Diverse Communities
- **Presenter(s):** Dr. Jessica Carson, UNH Carsey School of Public Policy
- **Location:** WebEx

11:00 – 11:15: Break

11:15 – 12:45: Diversity, Equity, and Inclusion
- **Presenter(s):** James McKim, President, Manchester NAACP
- **Location:** WebEx

12:45 – 1:15 Lunch

1:15 – 2:15: Introduction to the Disability Community and Access to Justice (New Judge Education > Week 3 > Disability Community, Accessibility, and Access to Justice)
- **Presenter(s):** Pamela Phelan, Litigation Director, Disability Rights Center; Déodonné Bhattarai, Communications Specialist, Disability Rights Center
- **Location:** In-person

2:15 – 2:30: Break

2:30 – 3:30: Queer in the Granite State
- **Presenter(s):** Chris Erchull, Staff Attorney, GLBTQ Legal Advocates and Defenders (GLAD)
- **Location:** WebEx

3:30 – 4:15: Veterans Justice Outreach Program
- **Presenter(s):** Diane Levesque, Manchester VA; Daniel Bricker, Manchester VA
- **Location:** In-person

# Introduction to Diversity, Equity, & Inclusion

James McKim, Managing Partner
James.McKim@OrganizationalIgnition.com

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Imagine...

Copyright© 2020 Organizational Ignition

2

# Introduction



## What is the underlying issue in the photos?

Copyright© 2020 Organizational Ignition

# Objectives & Agenda

## Objectives

- Understand basic concepts in diversity
- Relate your experiences to the diversity challenge

## Non-Objective

- Make you an expert on diversity

## Agenda

- 8 Key Concepts
- Manifestations of Implicit Bias
- Wrap-up

Copyright© 2020 Organizational Ignition

# 8 Key Concepts



Copyright© 2020 Organizational Ignition

# What is Race?



- Q: What word or phrase comes to mind after viewing this video?

VOX – "The myth of race, debunked in 3 minutes
https://www.youtube.com/watch?v=VnfKgffCZ7U

Copyright© 2020 Organizational Ignition

6

# Gender





# Age

Characteristics of Generations

| | Traditionalists | Boomers | Gen X | Millennials |
|---|---|---|---|---|
| **Born** | 1922-1943 | 1943-1960 | 1960-1980 | 1980-2000 |
| **Influences** | Great Depression; military model; formality; patriotism; atomic bomb | Korean War; Civil, Women and Reproductive Rights and Ecology Movements; Woodstuck, Sputnik; TV; dual incomes | moon landing; Watergate; MTV; video games; AIDS; CNN; web; latchkey; divorce | 9/11; Challenger; cellphones; pagers; computers; IM |
| **Values** | respect; security; loyalty; obedience | challenge; ambition; achievement; power | leadership; freedom; truth; independence | safety; loyalty; security; hope |
| **Work Preferences and Style** | hierarchical command and control; formal environment with dress code and strict conduct rules; one job, one employer | politically savvy; competitive environment; challenge authority for feedback; opportunity seekers; frequent job changers | work-life balance; skeptical of authority; self-reliant; oppose hierarchy; innovative; intentional, frequent job changing | diverse culture; collaborate; meaningful work; fun at work; flexibility |
| **Meeting Career Needs** | define and build legacy; annual feedback outlining contributions | define promotional opportunities; annual feedback on progress with documentation | define career path expectations; real time feedback on progress | define career path opportunities; real time feedback on progress and alignment |

# Neurodiversity

## Thinking  Styles



## Neurodivergent



James McKim - Copyright© 2020
Organizational Ignition

# Diversity



*Diversity* is counting, and *inclusion* is cultivating… Diversity is being invited to the party, but inclusion is being asked to dance."

**VOL. 37, NO. 4**
ABA Bar Leader
"Beyond diversity: The bar leader's role in fostering inclusion"

Copyright© 2020 Organizational Ignition                                    10

# Equality Vs. Equity



303

"isms"

**Structural/ Systemic Discrimination**

Imagine…

**Attitudes Isms**

Using our power to reinforce our discrimination and prejudice in the institutions and groups to which we belong

**Micro aggressions**

**White Privilege**

**Discrimination**    taking an action on our prejudice

**Prejudice**    a value judgment based on our feelings associated with the stereotype

**Stereotype**    an incomplete or distorted picture in our head



**Generalization:** The process of formulating general concepts by abstracting common properties of instances

Unconscious Implicit Bias

Copyright© 2020 Organizational Ignition

12

# Structural/Systemic Discrimination <sup>304</sup>



Copyright© 2020 Organizational Ignition

13

# Institutional/Systemic Racism

"The complex interaction of culture, policy, and institutions that holds in place the outcomes we see in our lives."  - Glen Harris, President of the New Race Forward

"The collective failure of an organization to provide an appropriate and professional service to people because of their colour, culture, or ethnic origin. It can be seen or detected in processes, attitudes, and behavior that amounts to discrimination through prejudice, ignorance, thoughtlessness, and racist stereotyping which disadvantage minority ethnic people". - Sir William Macpherson

Copyright© 2020 Organizational Ignition

# The Cause of Discrimination…
# Unconscious Cognitive Implicit Bias



https://www.nytimes.com/video/us/100000004818663/peanut-butter-jelly-and-racism.html



**Cycle of Socialization**

Lens of Identity

Lens of Socialization & Teaching

Socialized—Taught on a personal level by Parents, Relatives, Teachers, People We Love & Trust—Shapers of Expectations, Norms, Values, Roles, Rules, Models of Ways to Be, Sources of Dreams

1st Socialization

Institutional & Cultural Socialization

The Beginning

Born into a World with Mechanisms in Place
No Blame, No Consciousness
No Guilt, No Choice
Limited Information
No Information
Misinformation
Biases
Stereotypes
Prejudices
History
Habit
Tradition

Core

Reinforced/bombarded with messages from:
**Institutions**     **Culture**
Churches         Practices
Schools          Lyrics
Television        Language
Legal system      Media
Mental Health     Patterns of
Medicine          Thought
On Conscious and Unconscious levels

Fear
Ignorance
Confusion
Insecurity

Enforced
Sanctioned
Stigmatized

Do Nothing

Don't Make Waves

Promote Status Quo

Rewards and Punishments

Actions

Lens of Experience

Change
Interrupt
Educate
Take a Stand
Raised Consciousness
Question
Reframe

Resulting in:
Dissonance, Silence, Anger,
Dehumanization, Guilt,
Collusion, Ignorance,
Self-hatred, Stress,
Lack of Reality, Violence,
Horizontal Violence,
Inconsistency, Crime,
Internalization of
Patterns of Power

Privilege
Persecution

Discrimination
Empowerment

Enforcements

Results

**Direction for Change**

12/9/2020

B. Harro (1982), in Teaching for Diversity and Social Justice: A Sourcebook. (1997). Adams, Bell, Griffin [Eds.].

Copyright© 2020 Organizational Ignition



# NH CIRCUIT COURT NEW JUDGE EDUCATION

CHRIS ERCHULL

MAY 3, 2021

CALL GLAD ANSWERS!!!
M-F, 1:30-4:30 PM



2

**Sexual orientation** refers to a person's emotional, romantic, or sexual attraction to people of the same sex, different sex, or any sex.

**Gender identity** is an individual's insistent, persistent, and consistent understanding of themselves as male, female, both, or neither. For most people, gender identity aligns with sex assigned at birth. E.g., person assigned male at birth identifies as a man. For many people, gender identity and assigned sex do not align.

**Gender expression/presentation** is an individual's external expression and/or perception of their gender, manifested through clothing, voice, mannerisms**,** names/pronouns, or even physical features.



**Sexual orientation** means having or being perceived as having an orientation for heterosexuality, bisexuality, or homosexuality. This definition is intended to describe the status of persons and does not render lawful any conduct prohibited by the criminal laws of this state or impose any duty on a religious organization. This definition does not confer legislative approval of such status, but is intended to assure basic rights afforded under this chapter.
RSA 354-A:2 (XIV-c)



**Gender Identity** means a person's gender-related identity, appearance, or behavior, whether or not that gender-related identity, appearance, or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth. Gender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity provided, however, that gender-related identity shall not be asserted for any improper purpose.
RSA 354-A:2 (XIV-e)



5

**Gender dysphoria** is a medical condition recognized in the DSM-5.

- Clinically significant distress caused by incongruence between a person's gender identity and assigned sex
- A serious but highly treatable medical condition
- Untreated or under-treated gender dysphoria can be disabling for some people



**Gender transition** is the ONLY widely accepted treatment for gender dysphoria, but the course of treatment is highly individualized.

- Social Transition
  - *Legal Transition*
- Hormone Therapy
- Surgical Treatment



- RSA 354-A (1965)
  - *Created the NH Commission on Human Rights*
  - *Bars discrimination in employment, housing, public accommodations*
  - *Sexual Orientation-1996 Gender Identity-2018*
- RSA 193:38-39 (2019)
  - *Prohibits discrimination in public schools*
- RSA 5-C:87 (2005)
  - *Corrections to birth records*



- "A judge shall perform the duties of judicial office impartially and diligently."
- Sexual Orientation & Gender Identity are listed with the protected classifications in parts (5) & (6)
- Applies to:
  - *Judges*
  - *Staff, court officials under the judge's direction*
  - *Lawyers before the judge*



- Respect preferred names and pronouns
  - *Avoid assumptions*
  - *Ask when uncertain*
- Avoid gendered terms and honorifics
  - *Use Attorney Jones instead of Mr./Ms. Jones*
  - *Use "the defendant" or "your client" instead of Mr./Ms. ___.*
- Generously allow motions to amend captions, etc., whenever possible



- Boston Straight Pride Parade: Aug. 31, 2019
  – *Counter-protesters significantly outnumbered the Straight Pride demonstrators*
  – *36 arrests, predominantly LGBTQ people*
- Boston Municipal Court Judge denies ADA's request to drop charges against 18 defendants
- Judge intentionally misgenders one transgender defendant and forces her to wait house under guise of clarifying her "alias"



- In Ohio, parents of a transgender teenage boy petition for name change
  - *Parents present evidence that the boy has been treated for over a year for gender dysphoria*
- Judge denies petition, claiming it is premature, against the advice of medical providers and the wishes of the young person's parents



- In Texas, parents disagree about young child's gender transition in the midst of custody dispute
- Jury verdict awarded legal custody to the mother
- Judge reverses jury verdict
  - *Judge made comment about case on Facebook*
  - *Judge removed from case*
  - *Jury verdict reinstated*
- Appeals still pending



13

- Jury selection in a civil trial
- Plaintiff's attorney exercises peremptory strike
  - *Defense counsel objects, claims improperly struck based on sexual orientation*
- Record demonstrates no basis for strike other than sexual orientation

How do you proceed with respect to the defense counsel's Batson objection?



# GLAD Answers: 1-800-455-GLAD

## Questions & Contact

CHRIS ERCHULL
CERCHULL@GLAD.ORG





# The Disability Community and Access to Justice

*Pamela E. Phelan, Litigation Director*
*Déodonné Bhattarai, Communications Specialist*

*Protection and Advocacy System for New Hampshire*

# Presentation outline

- About DRC-NH
- What is the 'disability community'?
- What is a 'disability'?
- Disability data
- Disability etiquette
- Discussion/Q&A



## About DRC-NH

- New Hampshire's designated *Protection and Advocacy* agency.

- Authorized by federal statute "to pursue legal, administrative and other appropriate remedies" on behalf of individuals with disabilities.

- Statewide organization independent from state government or service providers.



The disability rights movement's struggle for access [has shown] that the exclusion of persons with disabilities from the public sphere was not only the outcome of stigma, but also the product of an exclusionary environment that includes physical and structural barriers. In the absence of access, disabled people cannot benefit from the services and opportunities that are available to the public at large and are unable to exercise their rights as citizens of equal value and status.

Sagit Mor, *With Access and Justice for All*, Cardozo Law Review, Vol. 39, Issue 2 (2018).



Ensuring equal access necessarily must encompass considerations of legal capacity, physical access to courts and other legal tribunals, access to legal proceedings and representation, communication, information, language barriers, socioeconomic barriers, structural biases within the legal process and more. *Id.*



# What is the 'disability community'?

- Only minority group anyone can join at anytime
- Plaintiff, defendant, witness, victim, lawyer, CASA volunteer, guardian, friend, family, court employee, or visitor





DISABILITY RIGHTS
CENTER- NH

# What is a 'disability' - Legal

The ADA defines a person with a disability as a person who has a physical or mental impairment that substantially limits one or more major life activity. This includes people who have a record of such an impairment, even if they do not currently have a disability. It also includes individuals who do not have a disability but are regarded as having a disability. The ADA also makes it unlawful to discriminate against a person based on that person's association with a person with a disability.

https://adata.org/faq/what-definition-disability-under-ada



DISABILITY RIGHTS
CENTER - NH

# What is a 'disability' – Lived

- Disability is a natural part of the human experience.

- Types of disabilities are as diverse as the individuals who experience them. Among other things, a disability may affect a person's mental health, vision, hearing, movement, ability to learn or communicate. Disabilities include substance abuse disorder.

- Disabilities affect people in different ways. Two people with the same diagnosis may experience it very differently.

- Disabilities are both visible (e.g., a wheelchair) and invisible (e.g., an intellectual disability). One individual may have multiple disabilities (27%).

DRC
DISABILITY RIGHTS
CENTER - NH

# Data – Disability by the numbers

- About 1 out of every 8 NH residents (**12.6%**) report having a disability

- Number of children and adults engaging in the state's public mental health system is increasing



| UNITED STATES | NEW HAMPSHIRE |
|---|---|
| **POPULATION** | **POPULATION** |
| ♿ 39,792,082 | ♿ 165,149 |
| 🧍 316,027,641 | 🧍 1,314,875 |
| **% OF TOTAL** | **% OF TOTAL** |
| ♿ 12.6% | ♿ 12.6% |
| 🧍 87.4% | 🧍 87.4% |

♿ WITH DISABILITY 🧍 WITHOUT DISABILITY



DRC
DISABILITY RIGHTS
CENTER · NH

# Data – Disability by the numbers

- Less likely to attend college
  - 19.2 percentage points
- Less likely to be employed
  - 40.2 percentage points
- Higher rates of poverty (19.6% v. 5.8%)
- More likely to have public insurance (50.1% v. 12.8%)



FACTS & FIGURES

THE 2019 REPORT ON DISABILITY IN NEW HAMPSHIRE

Institute on Disability/UCED
University of New Hampshire



DRC
DISABILITY RIGHTS
CENTER - NH

# Disability etiquette

- Everyone who works in or comes to court

- Dignity + Respect

- They're the experts about disabilities + needs

- People first language



Image credit: Disabled and Here



DISABILITY RIGHTS
CENTER · NH

# Etiquette: Person-first language

| Preferred | Avoid |
|-----------|-------|
| an individual who has a disability | disabled or special needs |
| an individual with a physical disability | crippled, handicapped; deformed; defective; lame |
| an individual who uses a wheelchair | wheelchair bound or confined to a wheelchair |
| an individual who is blind or has low vision | the blind |
| an individual who is deaf or hard of hearing | the deaf; deaf and dumb; mute; hearing impaired |
| an individual with an intellectual or a developmental disability | slow; retarded; dim-witted |
| an individual with a psychiatric disability or a mental health diagnosis | crazy; maniac; lunatic; demented; schizo; psycho; feeble-minded |

*Person-first language should be used unless an individual prefers identity-first language. Best guideline when referring to people with disabilities is to ASK.*



DISABILITY RIGHTS
CENTER · NH

# Etiquette (continued)

- Ask before acting

- Assume competence and independence

- Identify auxiliary aids/accommodations

- May be hesitant to acknowledge a disability or need



Image credit: Lawrence Roffee



# Etiquette (continued)

- Be mindful of invisible disabilities

- Secondary trauma

- Implicit biases

- Appreciate barriers to services that may impact matters before the court



Image credit: autismspeaks.org





Pamela E. Phelan, Litigation Director
pamelap@drcnh.org

Déodonné Bhattarai, Communications Specialist
deodonneb@drcnh.org

*Protection and Advocacy System for New Hampshire*

# Data-The employment gap detail

In NH, the employment gap
is 40.2 percentage points
(national is 40.6 pts)





# Data-The education gap detail

In NH, the education gap is 19.2 percentage points (national is 19.8 pts)





## <u>May 4, 2021 – Confronting the Twin Challenges of Poverty and Racism</u>
### *WebEx*
### Facilitator: Ryan Guptill

9:00 – 10:00: Understanding Immigrant and Refugee Experiences
- **Presenter(s):** Dawn Higgins, NHTI
- **Location:** WebEx

10:00 – 11:00: Race and Racial Justice in New Hampshire Presentation (<u>New Judge Education ></u> <u>Week 3 > Implicit Bias, Racism, and Racial Justice</u>)
- **Presenter(s):** James McKim, President of Manchester NAACP
- **Location:** WebEx

11:00 – 11:15: Break

11:15 – 12:15: Race and Racial Justice in New Hampshire Panel
- **Presenter(s):** Joseph Lascaze, ACLU Smart Justice Organizer; Donna Brown, Manchester NAACP; Professor John DeJoie, UNH
- **Location:** WebEx

12:15 – 1:15 Lunch and Conversation on Bias and Judicial Decision-Making
- **Presenter(s):** Judge James Leary
- **Location:** WebEx

1:15 – 2:45: The Real Impact of Poverty
- **Presenter(s):** Professor Stephen Pimpare, UNH
- **Location:** WebEx

2:45 – 3:00: Break

3:00 – 4:00: Panel: Poverty, Homelessness, and New Hampshire Families
- **Presenter(s):** Stephanie Savard, Chief External Relations Officer, Families in Transition; Allie Reyes
- **Location:** WebEx

# Race in NH

James McKim, Managing Partner
James.McKim@OrganizationalIgnition.com

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Agenda



Session Objective

Session Objective
- Understand racism in NH

Agenda
- Recap
- Deeper Dive on Implicit Bias
- Microaggressions & White Privilege
- Racism in NH
- Putting It All Together

# Recap







EQUALITY VERSUS EQUITY





"isms"

Structural/ Systemic Discrimination

Micro aggressions

White Privilege

Unconscious Implicit Bias



Copyright© 2020 Organizational Ignition                    19

# Big Picture View of Racism



Safehouse Progressive Alliance for Nonviolence (2005)
"Building a Multi-Ethnic, Inclusive & Antiracist Organization-Tools for Liberation Packet for Anti-Racist Activists, Allies, & Critical Thinkers")

Copyright© 2020 Organizational Ignition                                        20

# Types of Implicit Biases

**Decision-making, Belief, and Behavioral/Confirmational (125+)**



- Automation bias
- Bias blind spot
- Dunning–Kruger effect
- **Stereotyping**
- **Zero-sum bias**

**Social /Attributional (220+)**



- **Group attribution error**
- **In-group/Affinity**
- **Puritanical bias**

**Memory Errors (40+)**



- Consistency bias
- **Cross-race effect**
- **Stereotypical bias**

Copyright© 2020 Organizational Ignition

# Bias Impact Context

- Information Overload
- Feelings Over Facts
- Need for Speed
- What to remember



**The Cognitive Bias Codex: A Visual Of 180+ Cognitive Biases**

# Micro-aggression Summary

| | | |
|---|---|---|
| Alien in own land | Ascription of Intelligence | Color Blindness |
| Denial of racism | Myth of meritocracy | Pathologizing cultural values/styles |
| Second class citizen | Environmental | Assumption of criminal status |

## 9 Flavors – 2 forms

# Verbal Micro-aggression Exercise

**"Where are you from? You speak good English!"**

"You are a credit to your race."
"You are so articulate."

"When I look at you, I don't see color."
"America is a melting pot.
"There is only one race, the human race."

A person asking an Asian American to teach them words in their native language.

Assuming everyone can read English

Everyone is the same.

You are not American.
You are a foreigner.

People of color are generally not as intelligent as Whites.
All Asians are intelligent and good in Math / Sciences.

Racial /ethnic experiences are don't matter. There is no value in them.

Copyright ©  Organizational Ignition 2020

# Behavioral Micro-aggression Exercise

PoC mistaken for a service worker.
Taxi cab passes a PoC – picks up a white person
PoC ignored at a store counter

College/University w/buildings with all white heterosexual upper class male names.
Media without PoC.
Overcrowding of public schools in communities of color.

White person clutching purse/wallet as PoC approaches/passes.
Store owner follows PoC around the store

PoC are servants to whites.
PoC are likely t cause trouble.
You don't belong. You are a lesser being.

You don't belong/won't succeed here.
You are an outsider./You don't exist.
PoC don't value education.
PoC are deviant and belong together in schools.

PoC are dangerous.
PoC are likely to cause trouble.

# What is White Privilege?



https://www.youtube.com/watch?v=ysj_8fqnNcY

# Current NH Demographics By Age/Gender



# Current NH Demographics By



## Race and Ethnicity                                    #1

Percentage of the total population.

Scope: population of the United States and New Hampshire

**Percentage of Population by Racial or Ethnic Group**
Estimates for 2014-2018, Hispanic Origin Included in Racial Groups

■ New Hampshire     ■ Manchester     ■ Nashua

Percentage of Population (y-axis: 0% to 16%)

Racial or Ethnic Group: Black or African American, Asian, Hispanic or Latino, of Any Race

<- Margin of Error

Note: Margins of Error represent 90 percent confidence intervals
Source: U.S. Census Bureau, American Community Survey, 2014-2018

New Hampshire Fiscal Policy Institute                                    11

Copyright© 2020 Organizational Ignition

353

# NH Examples of Implicit Bias – Part I



# NH Examples of Implicit Bias – Part II

## Cases and deaths by race/ethnicity

| Race/ethnicity | Percentage of population | Percentage of cases | Percentage of deaths |
|---|---|---|---|
| Black or African American alone | 1% | 6% ◆ | 2% |
| Hispanic or Latino * | 4% | 13% ◆ | 3% |
| Asian alone | 3% | 3% | <1% |
| Native Hawaiian and Pacific Islander alone | <1% | 0% ① | 0% ① |
| American Indian or Alaska Native alone | <1% | 0% ① | 0% ① |
| Two or more races | 2% | 0% ① | 0% ① |
| White alone | 90% | 74% | 94% |
| Some other race alone | <1% | 4% ① | <1% ① |



- **Discrimination in every day life & the emotional toll it takes**
- **Special fear of life when pulled over by police – regardless of agency**

Copyright© 2020 Organizational Ignition

# Criminal Justice Process

## Overview of the criminal process



https://www.fbi.gov/resources/victim-services/a-brief-description-of-the-federal-criminal-justice-process

# Seeing Through an Equity Lens (Breakout)



- What decision is being made?
- Who is at the table?
- How is the decision being made?
- What assumptions are at the foundation of the issue?
- What is likely impact?
- What is your decision?



**Overview of the criminal process**

# Wrap-up





AN INTRODUCTION TO UNCONSCIOUS BIAS

An Introduction to Unconscious Bias







What will you do?

| Decision-making, Belief, and Behavioral/Confirmational (125+) | Social /Attributional (220+) | Memory Errors (40+) |
|---|---|---|
| • Automation bias<br>• Bias blind spot<br>• Dunning–Kruger effect<br>• Stereotyping<br>• Zero-sum bias | • Group attribution error<br>• In-group/Affinity<br>• Puritanical bias | • Consistency bias<br>• Cross-race effect<br>• Stereotypical bias |







**Counterstereotype Training**
• Dasgupta and Asagari (2004)

**Negation**
• Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

**Perspective-taking**
• Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

**Meditation/Lovingkindness meditation (LKM)**
• Stell, A. J., & Farsides, T. (2016).

**Implicit bias workshops**
• like the one we offer

Copyright© 2020 Organizational Ignition

33

# Eliminating Bias & Discrimination



# How We Think



Wasabi Learning Flow Charts    https://www.wabisabilearning.com/blog/5-useful-critical-thinking-flowcharts

Copyright© 2020 Organizational Ignition

35

# How We Behave



Communication

Difficult Conversations

Steps in Criminal Justice

EQ

# Understanding Communication Basics



*Shannon and Weaver Model*

*Dr. Albert Mehrabian's 7-38-55 Rule of Personal Communication*

Copyright© 2020 Organizational Ignition

# Rules for Difficult Conversations



- Who's right?
- What was the intent?
- Who's to blame?

- Uncontrollable urge

- Have your feelings or they will have you!
- Not who's right - understand each other's story
- Don't assume they meant it - disentangle intent from impact
- Abandon blame

- Am I competent?
- Am I a good person?
- Am I worthy of love?

What happened

Feelings

Way forward: Shift to a learning stance

Identify

<u>Difficult Conversations </u>by Douglas Stone, Bruce Patton, & Sheila Heen

Copyright© 2020 Organizational Ignition

# Pulling It All Together



Justice mindful
of an equity lens

# References

Garcia, C. E. (2020). Belonging in a predominantly White institution: The role of membership in Latina/o sororities and fraternities. *Journal of Diversity in Higher Education, 13*(2), 181–193. https://doi.org/10.1037/dhe0000126

National Organization of Nurse Practitioner Faculties.  (2018, August).  *NONPF Calls for Greater Racial and Ethnic Diversity in Nurse Practitioner Education.*  Retrieved May 20, 2020 from https://cdn.ymaws.com/www.nonpf.org/resource/resmgr/docs/20180807_diversity_statement.pdf

Perez, R. J., Robbins, C. K., Harris, L. W., & Montgomery, C.  (2020). Exploring graduate students' socialization to equity, diversity, and inclusion.  *Journal of Diversity in Higher Education, 13*(2), 133-145. https://doi.org/10.1037/dhe0000115

# EXHIBIT 6

Sept. 22, 2020 Trump
Executive Order



60683

**Federal Register**

Vol. 85, No. 188

Monday, September 28, 2020

# Presidential Documents

Title 3—

**The President**

## Executive Order 13950 of September 22, 2020

## Combating Race and Sex Stereotyping

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*, and in order to promote economy and efficiency in Federal contracting, to promote unity in the Federal workforce, and to combat offensive and anti-American race and sex stereotyping and scapegoating, it is hereby ordered as follows:

**Section 1.** *Purpose.* From the battlefield of Gettysburg to the bus boycott in Montgomery and the Selma-to-Montgomery marches, heroic Americans have valiantly risked their lives to ensure that their children would grow up in a Nation living out its creed, expressed in the Declaration of Independence: "We hold these truths to be self-evident, that all men are created equal." It was this belief in the inherent equality of every individual that inspired the Founding generation to risk their lives, their fortunes, and their sacred honor to establish a new Nation, unique among the countries of the world. President Abraham Lincoln understood that this belief is "the electric cord" that "links the hearts of patriotic and liberty-loving" people, no matter their race or country of origin. It is the belief that inspired the heroic black soldiers of the 54th Massachusetts Infantry Regiment to defend that same Union at great cost in the Civil War. And it is what inspired Dr. Martin Luther King, Jr., to dream that his children would one day "not be judged by the color of their skin but by the content of their character."

Thanks to the courage and sacrifice of our forebears, America has made significant progress toward realization of our national creed, particularly in the 57 years since Dr. King shared his dream with the country.

Today, however, many people are pushing a different vision of America that is grounded in hierarchies based on collective social and political identities rather than in the inherent and equal dignity of every person as an individual. This ideology is rooted in the pernicious and false belief that America is an irredeemably racist and sexist country; that some people, simply on account of their race or sex, are oppressors; and that racial and sexual identities are more important than our common status as human beings and Americans.

This destructive ideology is grounded in misrepresentations of our country's history and its role in the world. Although presented as new and revolutionary, they resurrect the discredited notions of the nineteenth century's apologists for slavery who, like President Lincoln's rival Stephen A. Douglas, maintained that our government "was made on the white basis" "by white men, for the benefit of white men." Our Founding documents rejected these racialized views of America, which were soundly defeated on the blood-stained battlefields of the Civil War. Yet they are now being repackaged and sold as cutting-edge insights. They are designed to divide us and to prevent us from uniting as one people in pursuit of one common destiny for our great country.

Unfortunately, this malign ideology is now migrating from the fringes of American society and threatens to infect core institutions of our country. Instructors and materials teaching that men and members of certain races, as well as our most venerable institutions, are inherently sexist and racist are appearing in workplace diversity trainings across the country, even in

components of the Federal Government and among Federal contractors. For example, the Department of the Treasury recently held a seminar that promoted arguments that "virtually all White people, regardless of how 'woke' they are, contribute to racism," and that instructed small group leaders to encourage employees to avoid "narratives" that Americans should "be more color-blind" or "let people's skills and personalities be what differentiates them."

Training materials from Argonne National Laboratories, a Federal entity, stated that racism "is interwoven into every fabric of America" and described statements like "color blindness" and the "meritocracy" as "actions of bias."

Materials from Sandia National Laboratories, also a Federal entity, for non-minority males stated that an emphasis on "rationality over emotionality" was a characteristic of "white male[s]," and asked those present to "acknowledge" their "privilege" to each other.

A Smithsonian Institution museum graphic recently claimed that concepts like "[o]bjective, rational linear thinking," "[h]ard work" being "the key to success," the "nuclear family," and belief in a single god are not values that unite Americans of all races but are instead "aspects and assumptions of whiteness." The museum also stated that "[f]acing your whiteness is hard and can result in feelings of guilt, sadness, confusion, defensiveness, or fear."

All of this is contrary to the fundamental premises underpinning our Republic: that all individuals are created equal and should be allowed an equal opportunity under the law to pursue happiness and prosper based on individual merit.

Executive departments and agencies (agencies), our Uniformed Services, Federal contractors, and Federal grant recipients should, of course, continue to foster environments devoid of hostility grounded in race, sex, and other federally protected characteristics. Training employees to create an inclusive workplace is appropriate and beneficial. The Federal Government is, and must always be, committed to the fair and equal treatment of all individuals before the law.

But training like that discussed above perpetuates racial stereotypes and division and can use subtle coercive pressure to ensure conformity of viewpoint. Such ideas may be fashionable in the academy, but they have no place in programs and activities supported by Federal taxpayer dollars. Research also suggests that blame-focused diversity training reinforces biases and decreases opportunities for minorities.

Our Federal civil service system is based on merit principles. These principles, codified at 5 U.S.C. 2301, call for all employees to "receive fair and equitable treatment in all aspects of personnel management without regard to" race or sex "and with proper regard for their . . . constitutional rights." Instructing Federal employees that treating individuals on the basis of individual merit is racist or sexist directly undermines our Merit System Principles and impairs the efficiency of the Federal service. Similarly, our Uniformed Services should not teach our heroic men and women in uniform the lie that the country for which they are willing to die is fundamentally racist. Such teachings could directly threaten the cohesion and effectiveness of our Uniformed Services.

Such activities also promote division and inefficiency when carried out by Federal contractors. The Federal Government has long prohibited Federal contractors from engaging in race or sex discrimination and required contractors to take affirmative action to ensure that such discrimination does not occur. The participation of contractors' employees in training that promotes race or sex stereotyping or scapegoating similarly undermines efficiency in Federal contracting. Such requirements promote divisiveness in the workplace and distract from the pursuit of excellence and collaborative achievements in public administration.

Therefore, it shall be the policy of the United States not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes. In addition, Federal contractors will not be permitted to inculcate such views in their employees.

Sec. 2. *Definitions.* For the purposes of this order, the phrase:

(a) "Divisive concepts" means the concepts that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "divisive concepts" also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

(b) "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

(c) "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

(d) "Senior political appointee" means an individual appointed by the President, or a non-career member of the Senior Executive Service (or agency-equivalent system).

Sec. 3. *Requirements for the United States Uniformed Services.* The United States Uniformed Services, including the United States Armed Forces, shall not teach, instruct, or train any member of the United States Uniformed Services, whether serving on active duty, serving on reserve duty, attending a military service academy, or attending courses conducted by a military department pursuant to a Reserve Officer Corps Training program, to believe any of the divisive concepts set forth in section 2(a) of this order. No member of the United States Uniformed Services shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to these concepts.

Sec. 4. *Requirements for Government Contractors.* (a) Except in contracts exempted in the manner provided by section 204 of Executive Order 11246 of September 24, 1965 (Equal Employment Opportunity), as amended, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

"During the performance of this contract, the contractor agrees as follows:

1. The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt

to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.

2. The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under the Executive Order of September 22, 2020, entitled Combating Race and Sex Stereotyping, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

3. In the event of the contractor's noncompliance with the requirements of paragraphs (1), (2), and (4), or with any rules, regulations, or orders that may be promulgated in accordance with the Executive Order of September 22, 2020, this contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246, and such other sanctions may be imposed and remedies invoked as provided by any rules, regulations, or orders the Secretary of Labor has issued or adopted pursuant to Executive Order 11246, including subpart D of that order.

4. The contractor will include the provisions of paragraphs (1) through (4) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States."

(b) The Department of Labor is directed, through the Office of Federal Contract Compliance Programs (OFCCP), to establish a hotline and investigate complaints received under both this order as well as Executive Order 11246 alleging that a Federal contractor is utilizing such training programs in violation of the contractor's obligations under those orders. The Department shall take appropriate enforcement action and provide remedial relief, as appropriate.

(c) Within 30 days of the date of this order, the Director of OFCCP shall publish in the *Federal Register* a request for information seeking information from Federal contractors, Federal subcontractors, and employees of Federal contractors and subcontractors regarding the training, workshops, or similar programming provided to employees. The request for information should request copies of any training, workshop, or similar programing having to do with diversity and inclusion as well as information about the duration, frequency, and expense of such activities.

Sec. 5. *Requirements for Federal Grants.* The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the concepts that

(a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. Within 60 days of the date of this order, the heads of agencies shall each submit a report to the Director of the Office of Management and Budget (OMB) that lists all grant programs so identified.

**Sec. 6.** *Requirements for Agencies.* (a) The fair and equal treatment of individuals is an inviolable principle that must be maintained in the Federal workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. Accordingly:

(i) The head of each agency shall use his or her authority under 5 U.S.C. 301, 302, and 4103 to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming (for purposes of this section, "training") to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in section 2(a) of this order. Agencies may consult with the Office of Personnel Management (OPM), pursuant to 5 U.S.C. 4116, in carrying out this provision; and

(ii) Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by Federal law.

(b) The Director of OPM shall propose regulations providing that agency officials with supervisory authority over a supervisor or an employee with responsibility for promoting diversity and inclusion, if such supervisor or employee either authorizes or approves training that promotes the divisive concepts set forth in section 2(a) of this order, shall take appropriate steps to pursue a performance-based adverse action proceeding against such supervisor or employee under chapter 43 or 75 of title 5, United States Code.

(c) Each agency head shall:

(i) issue an order incorporating the requirements of this order into agency operations, including by making compliance with this order a provision in all agency contracts for diversity training;

(ii) request that the agency inspector general thoroughly review and assess by the end of the calendar year, and not less than annually thereafter, agency compliance with the requirements of this order in the form of a report submitted to OMB; and

(iii) assign at least one senior political appointee responsibility for ensuring compliance with the requirements of this order.

**Sec. 7.** *OMB and OPM Review of Agency Training.* (a) Consistent with OPM's authority under 5 U.S.C. 4115–4118, all training programs for agency employees relating to diversity or inclusion shall, before being used, be reviewed by OPM for compliance with the requirements of section 6 of this order.

(b) If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts set forth in section 2(a) of this order, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with

applicable law and regulations, and in consultation with the Interagency Suspension and Debarment Committee.

(c) Within 90 days of the date of this order, each agency shall report to OMB all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion, whether conducted internally or by contractors. Such report shall, in addition to providing aggregate totals, delineate awards to each individual contractor.

(d) The Directors of OMB and OPM may jointly issue guidance and directives pertaining to agency obligations under, and ensuring compliance with, this order.

**Sec. 8.** *Title VII Guidance.* The Attorney General should continue to assess the extent to which workplace training that teaches the divisive concepts set forth in section 2(a) of this order may contribute to a hostile work environment and give rise to potential liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* If appropriate, the Attorney General and the Equal Employment Opportunity Commission shall issue publicly available guidance to assist employers in better promoting diversity and inclusive workplaces consistent with Title VII.

**Sec. 9.** *Effective Date.* This order is effective immediately, except that the requirements of section 4 of this order shall apply to contracts entered into 60 days after the date of this order.

**Sec. 10.** *General Provisions.* (a) This order does not prevent agencies, the United States Uniformed Services, or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this order.

(b) Nothing in this order shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in section 2(a) of this order in an objective manner and without endorsement.

(c) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

(d) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(e) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(f) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*September 22, 2020.*

[FR Doc. 2020–21534
Filed 9–25–20; 8:45 am]
Billing code 3295–F0–P

# EXHIBIT 7

Sept. 28, 2020 Executive Office of the President's Memorandum



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

September 28, 2020

M-20-37

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:        Russell T. Vought
             Director

SUBJECT:     Ending Employee Trainings that Use Divisive Propaganda to Undermine the
             Principle of Fair and Equal Treatment for All

On September 4, 2020, M-20-34 was issued at the President's direction, which states in part, "The President, and his Administration, are fully committed to the fair and equal treatment of all individuals in the United States."

M-20-34 alerted agencies that some Federal worker "training" sessions are being held – at taxpayer expense – that demonstrably undermine this core American principle by stereotyping and scapegoating specific groups of people. These divisive trainings constitute a malign <u>subset</u> of a larger pool of Federal agency trainings held to promote diversity and inclusiveness. The sort of training at issue does neither; it sows division among the workforce by attempting to prescribe and impose upon employees a conformity of belief in ideologies that label entire groups of Americans as inherently racist or evil (e.g., critical race theory).

On September 22, 2020, the President issued an Executive Order on Combating Race and Sex Stereotyping. The Executive Order encourages diversity and inclusion efforts consistent with principles of fair and equal treatment, and it defines the sort of divisive trainings the Administration seeks to end.

The President and the Administration believe the fair and equal treatment of individuals is an inviolable principle that must be maintained in the Federal workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. As stated previously in M-20-34, the Federal government is proud that as an employer we have employees of all races, ethnicities, and religions. Our commitment and efforts to welcome all individuals who seek to serve the American people remains, and our commitment to the fair and equal treatment of Federal employees is enduring. Taking the steps described in this memorandum will help ensure that all Federal workers are treated with the individual respect they deserve and that the Federal government continues to foster a workplace of respect for all. Agencies should take immediate and substantive action to begin this implementation, and complete implementation within the time frame required by the E.O.

Agency employees and contractors are not to engage in divisive training of Federal workers. Noncompliance by continuing with prohibited training will result in consequences, which may include adverse action for Federal employees who violate the Order.

Federal contractors are to be required to represent that they will not conduct such trainings for their own employees, with potential sanctions for noncompliance. Agencies are to review their grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the divisive concepts set forth in the E.O.

With respect to spending transparency, the EO states that, "Within 90 days of the date of this order, each agency shall report to OMB all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion, whether conducted internally or by contractors. Such report shall, in addition to providing aggregate totals, delineate awards to each individual contractor."

In furtherance of the Executive Order on Combating Race and Sex Stereotyping and M-20-34, agencies must:

-   Identify all agency training programs related to diversity and inclusion held during Fiscal Year 2020, including both those conducted by the agency's own employees and those conducted by others (e.g., outside vendors). Determine the spending on each such session, and the aggregate spending on all such sessions. The data should be presented so that all awards to an individual contractor are viewable together. Since these trainings and the dollars spent on them may be difficult to track or identify, it is recommended that agency leadership consult with the heads of component offices that offer such trainings to obtain their assistance in identifying them and determining the sums obligated.

-   Review these trainings to determine whether they teach, advocate, or promote the divisive concepts specified in the Executive Order on Combating Race and Sex Stereotyping (e.g., that the United States is fundamentally racist or sexist or that an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive). Reviews of specific training curriculum materials can be supplemented by a broader keyword search of agency financial data and procurements for terms including, but not limited to: "critical race theory," "white privilege," "intersectionality," "systemic racism," "positionality," "racial humility," and "unconscious bias." When used in the context of diversity training, these terms may help to identify the type of training prohibited by the E.O. Searching for these key words without additional review does not satisfy the review requirements of the E.O.

To prevent prohibited trainings going forward, except for those contracts specifically exempted by the E.O. (see Section 4 and FAR Subpart 22.807), every government contract must include the provisions required by Section 4 of the E.O.

Where diversity and inclusion training is to be provided to Federal employees by contractors, the following steps must be taken:

- Agencies must ensure that requirements are scoped consistent with the E.O. Existing contracts should be reviewed to ensure that training is consistent with this E.O. and any work identified as inconsistent is immediately removed, if necessary and permissible through a partial termination for convenience of the government.

- For future awards, agency solicitations or statements of work concerning Federal employee training shall include the provisions set forth in Section 4 of the E.O.

Contractors who are found to have provided a training for agency employees that teaches, advocates, or promotes the divisive concepts specified in the E.O. in violation of the applicable contract will be considered for suspension and debarment procedures consistent with the E.O. and in accordance with the procedures set forth in Part 9 of the Federal Acquisition Regulation.

For Federal financial assistance, as required by Section 5 of the E.O., Federal awarding agencies are required to identify all programs for which the agency may, as a condition of receiving Federal grants and cooperative agreements, require the recipient to certify that it will not use Federal funds to promote the concepts listed in Section 5 of the E.O. Additionally, although training and education for employee development may otherwise be an allowable cost under 2 CFR 200.472, training or education on the divisive concepts specified in the Executive Order is not an allowable cost unless otherwise provided by law.

As Federal awarding agencies are conducting their review of programs to identify those for which the agency may lawfully impose the condition described in Section 5 of the E.O., they must look at all Federal grant and cooperative agreement programs, not just those for the purposes of providing training. For those programs so identified, Federal awarding agencies must update their guidance, practices, and procedures to ensure that future notice of funding opportunities and the terms and conditions of Federal awards restrict the use of Federal funds, including funds to meet cost share requirements, from being used to promote the divisive concepts set forth in the E.O. (including by conducting research premised upon these concepts), to the extent consistent with the statute(s) governing the grant program and all other applicable law.

By November 20, 2020, Federal awarding agencies are required to report to OMB, through their RMO, those programs for which the agency may impose the conditions identified in Section 5 of the E.O.

The agency head shall designate at least one senior political appointee to review and approve in advance any expenditure on Federal employee diversity and inclusion training (via contract or SF-182), and the senior political appointee shall do so only after certifying that the curriculum meets the standard of fair and equal treatment of individuals.

Pursuant to Section 7 of the E.O. all training programs for agency employees relating to diversity or inclusion must be reviewed by the Office of Personnel Management (OPM) for compliance with the E.O. prior to the training program being used. OPM will issue guidance to agencies on the process for submitting training programs for review and the approval process.

Finally, agencies should take all appropriate actions to align their public-facing information with the requirements for training Federal employees outlined in the E.O. Agencies should encourage their employees to report to the agency Inspector General (IG) any agency-sponsored training session that violates the standard of fair and equal treatment of individuals set forth in the E.O., to support the IG reviews described in Section 6(c)(ii) of the E.O.

# EXHIBIT 8

HB544 Docket and Language

# HB544

| Body | Description |
| --- | --- |
| H | Introduced (in recess of) 01/06/2021 and referred to Executive Departments and Administration **HJ 2** P. 53 |
| H | ==RECESSED== Public Hearing: 02/11/2021 11:30 am Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/91078617911 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | ==CONTINUED== Public Hearing: 02/18/2021 01:30 pm Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/97238685330 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | Majority Committee Report: Ought to Pass with Amendment # 2021-0611h (Vote 10-9; RC) **HC 18** P. 45 |
| H | Minority Committee Report: Inexpedient to Legislate |
| H | Lay on Table (Rep. Osborne): MA DV 347-18 04/08/2021 **HJ 6** P. 72 |

**HB 544  - AS INTRODUCED**

2021 SESSION

21-0732
05/04

HOUSE BILL        *544*

AN ACT            relative to the propagation of divisive concepts.

SPONSORS:         Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4

COMMITTEE:        Executive Departments and Administration

─────────────────────────────────────────────────────────────

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Explanation:      Matter added to current law appears in ***bold italics.***
                  Matter removed from current law appears [in brackets and struckthrough.]
                  Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.

**HB 544 - AS INTRODUCED**

21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT                    relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1      1  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after
2  chapter 10-B the following new chapter:
3                                    CHAPTER 10-C
4                      PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED
5      10-C:1  Definitions.  In this chapter:
6      I. "Contractor" means any and all persons, individuals, corporations, or businesses of any
7  kind that in any manner have entered into a contract, or perform a subcontract pursuant to a
8  contract, with the state of New Hampshire.
9      II. "Divisive concept" means the concept that:
10         (a)  One race or sex is inherently superior to another race or sex;
11         (b)  The state of New Hampshire or the United States is fundamentally racist or sexist;
12         (c)   An individual, by virtue of his or her race or sex, is inherently racist, sexist, or
13  oppressive, whether consciously or unconsciously;
14         (d)  An individual should be discriminated against or receive adverse treatment solely or
15  partly because of his or her race or sex;
16         (e)   Members of one race or sex cannot and should not attempt to treat others without
17  respect to race or sex;
18         (f) An individual's moral character is necessarily determined by his or her race or sex;
19         (g)   An individual, by virtue of his or her race or sex, bears responsibility for actions
20  committed in the past by other members of the same race or sex;
21         (h)    Any  individual  should  feel  discomfort,  guilt,  anguish,  or  any  other  form  of
22  psychological distress on account of his or her race or sex; or
23         (i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by
24  a particular race to oppress another race.
25         (j)  The term "divisive concepts" includes any other form of race or sex stereotyping or
26  any other form of race or sex scapegoating.
27      III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical
28  codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or
29  sex.
30      IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to
31  members of a race or sex because of their race or sex.  It similarly encompasses any claim that,

**HB 544  - AS INTRODUCED**
**- Page 2 -**

1   consciously or unconsciously, and by virtue of his or her race or sex, members of any race are

2   inherently racist or are inherently inclined to oppress others, or that members of a sex are

3   inherently sexist or inclined to oppress others.

4        V.  "The state of New Hampshire" means all agencies and political subdivisions of the state

5   of New Hampshire, including counties, cities, towns, school districts, and the state university

6   system.

7        VI.  "Student" means any and all students of any school district, school, college, or university

8   which receives grants, funds, or assets from the state of New Hampshire.

9   10-C:2  Unlawful Propagation of Divisive Concepts.

10       I.  Requirements for the state of New Hampshire:

11       (a)   The state of New Hampshire shall not teach, instruct, or train any employee,

12   contractor, staff member, student, or any other individual or group, to adopt or believe any of the

13   divisive concepts defined in RSA 10-C:1, II.

14       (b)  No employee, contractor, staff member, or student of the state of New Hampshire

15   shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse,

16   embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

17       II.  Requirements for government contractors:

18       (a)   All state contracts entered into on or after the effective date of this chapter shall

19   include the following provision:

20   "During the performance of this contract, the contractor agrees as follows:

21   The contractor shall not use any workplace training that inculcates in its employees any form of race

22   or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race

23   or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or

24   sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual

25   should be discriminated against or receive adverse treatment solely or partly because of his or her

26   race or sex; (d) members of one race or sex cannot and should not attempt to treat others without

27   respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race

28   or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed

29   in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt,

30   anguish, or any other form of psychological distress on account of his or her race or sex; or (h)

31   meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular

32   race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

33   values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual

34   because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault,

35   blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

36       (b)   The contractor shall send to each labor union or representative of workers with

37   which the contractor has a collective bargaining agreement or other contract or understanding, a

**HB 544  - AS INTRODUCED**
**- Page 3 -**

1    notice, to be provided by the agency contracting officer, advising the labor union or workers'

2    representative of the contractor's commitments under this section, and shall post copies of the notice

3    in conspicuous places available to employees and applicants for employment.

4          (c)   In the event of the contractor's noncompliance with the requirements of this section,

5    or with any rules, regulations, or policies that may be promulgated in accordance with this section,

6    the contract may be canceled, terminated, or suspended in whole or in part and the contractor may

7    be declared ineligible for further government contracts.

8          (d)   The contractor shall include the provisions of this section in every subcontract or

9    purchase order unless exempted by rules, regulations, or policies of the department of administrative

10   services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor

11   shall take such action with respect to any subcontract or purchase order as may be directed by the

12   department of administrative services as a means of enforcing such provisions including sanctions

13   for noncompliance.

14         III.  The department of administrative services, or an agency designated by the department

15   of administrative services, is directed to investigate complaints received alleging that a state

16   contractor is utilizing such training programs in violation of the contractor's obligations under the

17   binding provisions of this section.  The department shall take appropriate enforcement action and

18   provide remedial relief, as appropriate.

19         IV.  The heads of all agencies shall review their respective grant programs and identify

20   programs for which the agency may, as a condition of receiving such a grant, require the recipient to

21   certify that it will not use state funds or assets to promote any of the divisive concepts defined in

22   RSA 10-C:1, II.

23         V.  Requirements for agencies.

24         (a)   The fair and equal treatment of individuals is an inviolable principle that must be

25   maintained in the state workplace.   Agencies should continue all training that will foster a

26   workplace that is respectful of all employees.  Accordingly:

27              (1)   The head of each agency shall use his or her authority under to ensure that the

28   agency, agency employees while on duty status, and any contractors hired by the agency to provide

29   training, workshops, forums, or similar programming, for purposes of this section, "training", to

30   agency employees do not teach, advocate, act upon, or promote in any training to agency employees

31   any of the divisive concepts listed in RSA 10-C:1; and

32              (2)   Agency diversity and inclusion efforts shall, first and foremost, encourage agency

33   employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic

34   protected by federal or state law.

35         (b)   The commissioner of the department of administrative services, pursuant to RSA

36   541-A, shall develop regulations for the enforcement of the provisions of this statute.

37         (c)   Each agency head shall:

HB 544  - AS INTRODUCED
- Page 4 -

1    (1)    Issue a policy incorporating the requirements of this chapter into agency
2    operations, including by making compliance with the policy a provision in all agency contracts;

3    (2)    Request that the agency thoroughly review and assess not less than annually
4    thereafter, agency compliance with the requirements of the policy in the form of a report submitted
5    to the department of administrative services; and

6    (3)    Assign at least one senior political appointee responsibility for ensuring
7    compliance with the requirements of the policy.

8    VI.   Review of agency training.

9    (a)   All training programs for state agency employees relating to diversity or inclusion
10    shall, before being used, be reviewed by the department of administrative services for compliance
11    with the requirements of RSA 10-C:2, V.

12    (b)   If a contractor provides a training for agency employees relating to diversity or
13    inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and
14    such action is in violation of the applicable contract, the agency that contracted for such training
15    shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and
16    regulations.

17    10-C:3  General Provisions.

18    I.   Nothing in this chapter shall prevent agencies or contractors from promoting racial,
19    cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the
20    requirements of this chapter.

21    II.   Nothing in this chapter shall be construed to prohibit discussing, as part of a larger
22    course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner
23    and without endorsement.

24    III.   If any provision of this chapter, or the application of any provision to any person or
25    circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions
26    to any other persons or circumstances shall not be affected thereby.

27    2  Effective Date.  This act shall take effect January 1, 2022.

Rep. Ammon, Hills. 40
March 3, 2021
2021-0611h
05/04

Amendment to HB 544

1    Amend RSA 10-C:1, I as inserted by section 1 of the bill by replacing it with the following:

2

3        I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any

4    kind that in any manner have entered into a contract to perform a service for, or perform a

5    subcontract pursuant to a contract to perform a service for, or with the state of New Hampshire.

6

7    Amend RSA 10-C:2, V(a)(1) as inserted by section 1 of the bill by replacing it with the following:

8

9        (1)  The head of each agency shall ensure that the agency, agency employees while on

10    duty status, and any contractors hired by the agency to provide training, workshops, forums, or

11    similar programming to agency employees do not teach, advocate, act upon, or promote in any

12    training to agency employees any of the divisive concepts listed in RSA 10-C:1, II; and

13

14    Amend RSA 10-C:3 as inserted by section 1 of the bill by inserting after paragraph II the following

15    new paragraph and renumbering the original paragraph III to read as paragraph IV:

16

17        III  Nothing in this chapter is meant to include as a "contract or subcontract" certain

18    government financial assistance, including but not limited to the taking or receiving of loans, tax

19    credits, tax incentives, tax abatements or gifts deriving from money sent from the federal

20    government or agency designed or meant to assist during or after a declared emergency, including

21    but not limited to health, weather, riot, civil disobedience or acts of foreign agents, or designed as

22    economic stimulus during economic emergency.



**State of
New Hampshire**

# HOUSE RECORD

### First Year of the 167th General Court

## Calendar and Journal of the 2021 Session

#### Web Site Address: www.gencourt.state.nh.us

| Vol. 43 | Concord, N.H. | Friday, April 2, 2021 | No. 18 |

**Contains: House Deadlines; House Bills Amended by Senate; Committee Reports; Meetings and Notices; Revised Fiscal Notes**

# HOUSE  CALENDAR

**MEMBERS OF THE HOUSE:**

The House will meet in session on Wednesday, April 7th at 9:00 a.m., Thursday, April 8th, at 9:00 a.m., and Friday, April 9th at 9:00 a.m. in the NH Sportsplex facility at 68 Technology Dr. in Bedford, NH.

Session day logistics, including arrival times, parking, entry, materials and lunch distribution will be similar to the previous event, and where necessary, updates and modifications have been made. Those details appear in the back of this House Calendar. House members can expect an email with any further details early next week.

I have discussed with the Democratic and Republican Leaders our need to work together to manage our time wisely during the House session days. While there may be disagreement on many issues, we all agree that we can complete our business in a timely manner if we work together with mutual respect and understanding.

The House Finance committee will offer a budget briefing for House members on Monday April 5th at 1:00 p.m. via Zoom webinar. As in prior budget years, members of the public may watch a livestream via YouTube. A link to the YouTube stream is published in a notice in this House Calendar. House members will receive a link to the webinar by email so they may raise their hand and ask questions of the Finance Committee and Legislative Budget Assistant, if desired.

The amendment to House Bill 1 adopted by the majority of the House Finance Committee is one that replaces the entire bill and is over 700 pages long. Rather than print 400 copies of that amendment for next week, the Legislative Budget Assistant's Office has posted a link to that amendment here: http://www.gencourt.state.nh.us/LBA/Budget/Capital_Budget_House/Week%20of%203-29/HB_1_H_Finance_COMBINED_33021.pdf All other amendments to bills will be printed in two addendum calendars.

Additionally, if you are interested in the other documents used throughout the entire House budget process, the LBA has a webpage with those available to you found here:http://www.gencourt.state.nh.us/LBA/Budget/fy2022_2023_budget.aspx

The New Hampshire Automobile Dealers Association will be sponsoring one of our session day's lunches next week at session. Typically the NHADA hosts an annual Crossover reception for all legislators and staff, however in this unusual time, we have not been able to attend the usual social events that may exist for legislators. These receptions go a long way in terms of allowing members across the whole chamber to socialize and get to know their colleagues, and I know I speak for myself when I say this has been missed. We are thankful to the NHADA for sponsoring this lunch.

I am happy to announce that captioning for House sessions is now available. The link to access captions is a separate link from the session streaming link and will be available on the General Court website before the start of each session.

Sherman A. Packard, Speaker of the House

---

## NOTICE

The **Finance** Committee will hold **budget briefings** on *HB 1-A*, making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023, and *HB 2-FN-A-L*, relative to state fees, funds, revenues, and expenditures on April 5th at 1:00 pm. House members will receive secure Zoom links. Members of the public may attend using the following link: https://www.youtube.com/watch?v=MvMW6Lf-ltw.

Rep. Kenneth Weyler, Chairman
Finance Committee

Rep. John Sytek for Executive Departments and Administration. The last major expansion of the franchise – the right to vote and to hold office – occurred 50 years ago. That was the passage of the 26th amendment which granted that right to 18- to 21-year olds. Indeed, many in this chamber witnessed this history-making event. The committee felt that this bill commemorating the anniversary was fitting and appropriate. **Vote 18-0.**

**HB 345,** establishing a license for mushroom harvesters. **MAJORITY: OUGHT TO PASS WITH AMEND-MENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Sallie Fellows for the **Majority** of Executive Departments and Administration. This bill legalizes the sale of safe varieties of wild harvested mushrooms in restaurants and markets. The Food and Drug Administration Food Code explicitly prohibits the sale of wild harvested mushrooms unless an oversight agency establishes an approval process for licensed harvesters. Some wild mushrooms are poisonous. Licensing will ensure those sold in NH are safe. The Department of Health and Human Services (DHHS) will oversee training programs, testing and licensing of harvesters, and will specify the authorized varieties. Harvesters must have permission to take wild mushrooms from someone else's land. This bill doesn't apply to cultivated mushrooms or picking wild mushrooms for personal consumption. DHHS supports this bill and indicated they can absorb the operational cost. The amendment simply adds a definition of mushrooms. **Vote 12-7.**
Rep. Tony Lekas for the **Minority** of Executive Departments and Administration. This bill would license wild mushroom harvesters. Wild mushrooms have been harvested for sale in New Hampshire for many years. Up to now that has not caused enough trouble for there to have been a call for regulating the practice in our state. That would likely still be the case except that, unfortunately, the Department of Health and Human Services chose to adopt the 2017 Food and Drug Administration Food Code into New Hampshire rule and the legislature accepted that action. There are reasons that there are separate states. What is necessary and appropriate for one state may not be for another. We should end the practice of adopting standards without carefully considering if they are all really necessary for New Hampshire. We should not be licensing additional professions just to deal with an earlier error.

**HB 417,** relative to the powers of the governor during a renewal of a declared state of emergency. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill, as amended, changes the emergency powers laws in three ways. First, it extends a declared emergency to 30 days, rather than 21, so that the common weather-related emergencies are not affected. Second, if a state of emergency is renewed, the legislature must meet to approve the extension and any executive orders issued during the emergency. If the legislature cannot meet, the state of emergency and the orders continue in force and are extended in 14-day increments until the legislature can meet. Thirdly, any gifts, grants or other funds obtained for emergency purposes must be accepted by the Governor and Council, rather than the governor alone, which requires Fiscal Committee involvement from amounts over $100,000. These changes go into effect after the end of the current emergency, and so are prospective only. These changes address the most common concerns about the current emergency powers statute, which was updated after the terrorist attacks on September 11, 2001 and never used for an extended period of time until the COVID-19 outbreak. This emergency raised concerns about imposing too much responsibility on the governor alone, and so this bill presents a plan to share the responsibility and provide policy oversight. **Vote 16-2.**
Rep. Peter Schmidt for the **Minority** of Executive Departments and Administration. This bill seeks to address widespread objections to a number of aspects of the Governor's emergency order regime, which is currently in effect in New Hampshire. The minority of the ED&A Committee recognizes and shares many of the majority's concerns, and also supports a review and revision of the existing emergency statute. Nevertheless, the minority opposes passage of HB 417 at this time for the following reasons. First, the bill is entirely prospective; it cures none of the actual or supposed abuses of the Governor's authority at this time. Hence, it has no urgency and should not be substituted for a truly deliberative investigation of the deficiencies of the existing statute, nor of any instances of gubernatorial overreach. Second, instead of this bill, a blue ribbon committee should be empaneled, not to assess blame, but to lay the basis for a wisely revised statute to more perfectly protect the state and its citizens in the future. Third, the bill mistakenly conflates every living NH citizen's experience and expectations of a state of emergency with the fundamentally different duration and reality of this pandemic, which is, in addition, by no means fully understood or resolved. Further, the bill creates a legislative oversight and control structure which the minority believes would likely be in its own way in a typical emergency, in other words, unnecessary, and very likely to hamstring effective emergency management in the case of a future pandemic, or nuclear emergency, in other words, unworkable and counterproductive. For these reasons, this bill should be found Inexpedient to Legislate.

**HB 544,** relative to the propagation of divisive concepts. **MAJORITY: OUGHT TO PASS WITH AMEND-MENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill is an anti-racism piece of legislation that would prohibit the teaching racist ideology to students and employees of state schools.

It would also bar mandatory racist ideology training to employees of state agencies and businesses who contract with the state to provide services to or on behalf of the state. The committee heard testimony that these trainings and teachings do currently occur in New Hampshire and seem to be becoming more of a trend both here and nationwide. The committee also heard testimony that the teaching and training of the concepts prohibited by this bill cause disharmony, resentment and hatred. The majority agrees. The bill does not prohibit teaching about racism and its negative effects throughout history on the people of New Hampshire and the United States. The majority believes teaching about actual history including institutional racism that has existed and the steps we have taken to eradicate it are important aspects of a proper education and a healthy and diverse workplace. The bill, simply put, prohibits teaching that one race is at fault in perpetuity for challenges and disadvantages faced by another race. The majority acknowledges that racism still exists and that we must always be on guard against it to challenge it whenever it rears its ugly head but the majority also believes in the inherent good of each individual Granite State citizen and in the greatness of this state and of the United States of America. Of all the nations on Earth, it is the United States that provides the most opportunity and legal protections to minorities of every race, creed and religion. **Vote 10-9.**

Rep. Sallie Fellows for the **Minority** of Executive Departments and Administration. In 2020 we all saw George Floyd die, Black Lives Matter demonstrations, and white supremacists' counter protests. Public interest led to an exponential growth in books, documentaries, zoom seminars, and courses about racism and bias. The function of this bill is to suppress teaching about racism and sexism. It does so by banning discussion of any "form of race or sex stereotyping." This prohibition applies to state and municipal governments, and all public schools, private schools and colleges receiving state funding. The ban also applies to the internal operations of businesses with state contracts, which would likely result in fewer bidders and higher costs for state projects. In this time of heightened awareness about racism, this bill will tarnish the image of New Hampshire as a great place to live and work. The minority believes it also violates the First Amendment's protection of free speech, which is why we oppose this bill.

**HB 575,** relative to licensure of applicants for cosmetology, esthetics, and manicuring through apprenticeship programs. **OUGHT TO PASS.**

Rep. Tony Lekas for Executive Departments and Administration. This bill would permit an applicant for a license as a cosmetologist, manicurist, or esthetician to complete the training requirement either in an apprenticeship program or a school. While current statute does permit an applicant to complete the training requirement through an apprenticeship it requires twice as many hours in an apprenticeship program than in a school. If this bill is adopted, the number of training hours would be the same for a school or apprenticeship program. The bill also makes it clear that the apprenticeship program must be one approved by the board. In current statute, approval is not required for apprenticeship programs for cosmetologists although it is required for manicurists and estheticians. In either case, the applicant must pass an examination conducted by the board. This would especially benefit those who must work and/or raise a family while training for a new career. It is often not possible for such people to put their lives on hold in order to attend a school full time. An apprenticeship program can offer more schedule flexibility and changing the hours required in such a program the same as those required in a school would reduce the burden on such people. Another potential benefit to an apprenticeship program is that the applicant is likely to receive more hands on practical training than in a school. **Vote 10-9.**

**HB 606,** exempting services provided without renumeration from license requirements for barbering, cosmetology, and esthetics. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Mark Alliegro for the **Majority** of Executive Departments and Administration. Under current New Hampshire law, it is illegal to cut your daughter's hair or file your grandmother's fingernails. This bill remedies such regulatory overreach by stipulating that a person may provide barbering, cosmetology, or esthetics services without payment and not be in violation of the law. This bill does not affect licensure requirements for paid, professional service providers. Opponents warned that this change would put the public at risk from the unauthorized use of dangerous chemicals such as shampoo and hair coloring, or transmissible disease, but no evidence in support of this claim was presented during hearings or deliberation. It was also argued that selective law enforcement renders this bill unnecessary. It is not government's role to interfere with the highly personal acts mentioned in this summary. The adoption of HB 606 is a small step in restoring the inalienable right of caring for one another. **Vote 10-8.**

Rep. Jeffrey Goley for the **Minority** of Executive Departments and Administration. Supporters of this bill believe that under the current RSA a parent who cuts a child's hair or someone who helps a neighbor color their hair is breaking the law. But there is no documented evidence that this type of enforcement has ever been practiced. The bill as written would allow anyone to practice barbering, cosmetology, or esthetics provided they are is no remuneration. Testimony from professionals was that an untrained person doing these procedures may not be as conscientious about necessary sanitation or not trained in the possible dangers of chemicals involved and could subject the recipient to severe chemical burns or injuries. The minority believes this bill should be voted ITL as it is trying to solve a problem that does not exist.

**EXHIBIT 9**

Select Written
Testimony From Public
Supporting HB544 to
House Executive
Departments and
Administration
Committee, With
Highlights Added

My name is Dr. Karlyn Borysenko, I am an organizational psychologist and I reside in Merrimack New Hampshire.

I'm testifying today in strong support of HB544.

How did we get to a place where it would be necessary to have a bill specifying that individuals, by virtue of their race or sex, are not inherently racist, sexist, or oppressive?

It started with a fringe ideology that came out of academia starting in the late 1970s called Critical Race Theory. There are entire libraries of books written about this ideology, but the easiest way to understand it is this:

Martin Luther King, Jr. famously said "I look to a day when people will not be judged by the color of their skin, but by the content of their character."

Critical Race Theory teaches exactly the opposite of this: It says that the ONLY thing we should judge people by is the color of their skin RATHER THAN the content of their character.

Critical Race Theory starts with a simple assumption: That racism exists everywhere.

You and I might define racism as the belief that one race is inherently superior to all other races. I think we can all agree that is a fundamentally bad concept and an idea that should not be perpetuated in any form.

However, that is not how Critical Race Theory defines racism.

This is critical to understand, no pun intended.

Critical Race Theory changes the definition of common words in order to gain wider acceptance. After all, no one wants to be called a racist.

Critical Race Theory views race as a political construction that was invented by white people to give themselves power while excluding all other races from it.

It views racism as the ordinary state of affairs in society, present in all interactions and institutions. Anytime you hear the term "systemic racism," that is what they mean.

Think you're not racist? If you were born white, you would be wrong.

Critical Race Theory teaches that if you are white, you are inherently racist.

There is not a question of if you are a racist. That is assumed. There is only a question of how your racism manifests, and what work you are doing to stop it.

Don't believe me? The bestselling book White Fragility is one of the bibles of Critical Race Theory. In it, author Robin DiAngelo confesses that she has been racist since the womb, has been racist her entire life, and will always be a racist simply because she is white.

I have been working non-stop to understand this ideology and its impact for the last two years, and I have seen how detrimental it is to individuals, and to organizations. I'm currently authoring a book on the subject and have been blessed to receive guidance from some of the foremost experts in the world on the topic.

I encountered Critical Race Theory in organizations I was working with as a consultant, where it's commonly billed as diversity training to gain buy-in and support.

Now, I have to be very clear: Not all diversity training in organizations teaches people that they are inherently racist and sexist based on how they were born. It's important to note that this bill would not eliminate the good kinds of diversity and inclusion training related to exploring different cultures and life experiences.

However, in the aftermath of George Floyd's death, training that was grounded in Critical Race Training took over the corporate training industry. Organizations were suddenly requiring that their employees read texts like DiAngelo's White Fragility or Ibram X Kendi's How To Be An Anti-Racist, and forced white employees to go to internal struggle sessions where they were required to confess their inherent racism at risk of losing their job.

And it's even worse when you look at the school systems.

Right now, in schools all over the country, children as young as five are being taught this ideology.

School systems are integrating these ideas throughout their curriculums, and children who are white and/or male are being forced to confess to their classmates that they are oppressors. If they don't fit into one of the oppressor categories, they are taught they are a victim and will never get ahead in the world because of the oppressors.

And if you think it can't happen in New Hampshire, I have some bad news for you: It already has.

Over the summer, I know of teachers in schools in New Hampshire who read White Fragility as a part of "optional" training courses. In Critical Race Theory, "optional" very rarely means optional, because if you don't do it your colleagues will label you a racist and you could lose your job.

Being called a racist is one of the very worst things we can be called in our society. It is a scarlet letter that followers the wearer around, something they can never escape from.

There is absolutely still work to do with regards to making sure everyone in our society has access to opportunity regardless of the color of their skin or gender, and that everyone is treated fairly.

However, Critical Race Theory is not the way to get there. It is a regressive ideology that is going to lead to MORE racism and misogyny, not less.

I strongly encourage you to support the bill and protect the people of New Hampshire from this harmful ideology.

Additional information about Critical Race Theory can be found here: https://newdiscourses.com/2021/01/what-is-critical-race-theory/

**Archived:** Friday, April 16, 2021 12:52:12 PM
**From:** Thomas Petrucka
**Sent:** Thursday, March 4, 2021 2:50:16 AM
**To:** ~House Executive Departments and Administration
**Subject:** Support for proposal HB544
**Importance:** Normal

---

To whom it may concern,

I am extremely excited to see progress being made in resisting the inherently toxic ideology of critical race theory, and I wanted to applaud your state's proposal to ban it from publicly funded settings.

I grew up a white man in a predominantly white area; but as a child, race and gender have never been some to separate people over. My mother saw her mother's prejudices, and carefully taught me love and listen to everyone while growing up. I wouldn't say that I didn't "see" color, but even through high school--I tried to foster an environment where everyone can feel included and accepted. I did this as a founder of my school's improv troop, and leader in my school theatre program.

And then I went to college. After attending one semester at a local publicly funded university (in its theatre arts programs) I experienced three classes in which I was singled out as a white man, told I was inherently bigoted because of the color of my skin, and listen to performances that reinforced that ideology on repeat--in a required class for my particular program.

I was never very vocal about my moderate conservative viewpoints, but my previously conquered depression resurfaced. I never felt like I could comfortably share any of my opinions without igniting backlash or political debate, and so I stayed silent while my mental health (and subsequently my grades).

I support diversity, and there are plenty of inclusion trainings that have been verified for use, and are effective in uniting a classroom or workplace. *Critical Race Theory* (which this bill opposes) is divisively conceived. It assumes that people of color will always be oppressed. It requires white people to apologize for the acts of some (often imagined) ancestor. Every book or article I have found discussing *critical race theory* lists virtually no sources, and the few studies I see proving any systemic racism present a clear confirmation bias. I cannot thank you enough for leading the charge in combating this corrosive ideology.

I hope this letter may be received well, and I thank you for considering this bill. If someone is truly reading this, I thank you for your public service. Small steps HB544 will be crucial to preserving the American ideals that have allowed this nation to thrive in the past, and I hope the bill passes.

May God bless you,

~ Thomas Petrucka

**Archived:** Friday, April 16, 2021 12:52:12 PM
**From:** gem122782
**Sent:** Thursday, March 4, 2021 1:37:32 AM
**To:** ~House Executive Departments and Administration
**Subject:** SUPPORT for HB544 Bill!!!
**Importance:** Normal

---

Dear Committee members,

I am emailing you as a concerned parent of New Hampshire, to voice my SUPPORT for the HB544 Bill to ban Critical Race Theory. My daughter has already experienced forms of this at Pinkerton Academy and it is a form of racism. This is very harmful and dangerous rhetoric and should absolutely be banned from being taught in our NH schools. A person is not born automatically racist solely based on the color of their skin etc. As I mentioned above my daughter attends Pinkerton Academy and her American Government teacher Mrs. Diane Gioseffi is using her classroom (which is a required credit to graduate) as a platform to indoctrinate all her students during 90 minute classes. In this class my daughter has had lessons on Implicit Bias, White Privilege and been forced to watch The Peanut Butter, Jelly & Racism video and much more. This has no place in American Government class or any other class for that matter. Critical Race Theory is divisive, harmful to the childrens self esteem, mental and emotional well-being, causes racism and teaches children to hate themselves and their Parents. It is so sad to see what this is doing to our children and the future generation, it is a very powerless feeling as a parent. New Hampshire parents need your help in order for our children to have a brighter future! I implore you to please pass this bill and protect the children of New Hampshire's mental health and well-being. You have more support than you know!! Thank you for your time!

Sincerely,
Kristen M.

Sent from my Galaxy

**Archived:** Friday, April 16, 2021 12:52:14 PM
**From:** Lauren Smith
**Sent:** Wednesday, March 3, 2021 5:32:12 PM
**To:** ~House Executive Departments and Administration
**Subject:** I Support HB544
**Importance:** Normal

---

Good morning,

I am reaching out in support of HB544.

I understand many people will be contacting you to oppose this bill by stating it's the equivalent to banning diversity training. This is not the case and I am not opposed to diversity training. This bill targets race and gender scapegoating, which shouldn't be included in diversity training if your aim is a more inclusive and understanding society/workplace.

Critical race theory based training (or anti-racists training) segregates groups based on race (white and non-white). The white group is told they are the oppressor and made to confess to their sin of racism. I realize it sounds outlandish, but individuals in workplaces and colleges have been secretly recording these conversations for at least the last few years. When listening to these conversations there are eerie similarities to the struggle sessions during the cultural revolution in China. During these struggle sessions, a white individual that resists being told they are an oppressor or racists provides additional proof of their guilt. There is no way out for the individual. On the flip side, non-white individuals are grouped together and told they are oppressed by the white population. If a non-white individual resists, by reporting no sense of oppression, this proves they are complicit in systemic racism. Non-white individuals that resist can be ridiculed and labeled race traitors. Essentially this process is striping away individuality and placing everyone into collectives based on immutable characteristics.

Unfortunately it appears our country is forgetting MLK Jr.'s I have a dream speech. Individuals should be judged on the content of their character, not the color of their skin. I'm honestly worried this continued shift is going to increase actual racism in the country and teach a whole new generation of Americans to judge fellow citizens on their skin color (it's already being pushed on children as young as kindergarten). We must stand up for our liberal values and push back on this illiberal ideology.

Thank you for your time.
Lauren

**Archived:** Friday, April 16, 2021 12:52:15 PM
**From:** Scott Slone
**Sent:** Wednesday, March 3, 2021 3:47:38 PM
**To:** ~House Executive Departments and Administration
**Subject:** Live Free or Die, Vote Yes on HB544
**Importance:** Normal

---

Greetings to the House Executive Department,

My name is Scott, I'm a recent New Hampshirite, having moved to the state for work and opportunity in 2017. In the four years I've been here, I've grown in love with the state. It reminds me of my homeland in Alaska, both in culture and nature. I want to live here for years to come, I would like to make a life here, I would like to grow old here.

That being said, the infectious disease known as Critical Race Theory threatens to tear down all we hold dear. It ruins lives, solidarity with our friends, teaches us we are all evil and racist, with the end result being time and time again that all good folk give up all desire to be good, since what is the point? CRT destroys businesses, governments, societies, and the hate that is its source has no intention of peace or justice. It only wants more hate, whether that's through sayings like "Systemic Racism" and "Be Less White." These phrases drip with hatred for our fellow Man, when they should be the ones we love most.

I do know know if anyone in NH's legislative system will read this, but I hope you will. Vote Yes on ending the hatred. Vote Yes on HB544.

-Scott Slone

**Archived:** Friday, April 16, 2021 1:03:44 PM
**From:** Michael Maloney
**Sent:** Tuesday, March 2, 2021 11:09:35 PM
**To:** ~House Executive Departments and Administration
**Subject:** Voicing my support for HB544 [Relative to the propagation of divisive concepts]
**Importance:** Normal

I am writing in to voice my complete support for HB544 to ban the dissemination of divisive concepts in New Hampshire schools.

The Constitution of the United States under the First Amendment mandates the separation of church and state. While a common, myopic interpretation of this is that the state (and state schools) should be separate from any particular denomination of Christianity, the spirit of this Right should be understood in much broader terms, extending even to areas that would be widely considered secular.

Indeed, the rightful interpretation of the separation of church and state is that no man shall ever be compelled to believe any set of doctrines or principles by the state or any public institution. This should be understood to mean not only religion, classically understood, but also secular worldviews

But what we are experiencing right now, with this spreading of Critical Theory (CRT) (including related notions, such as Critical Race Theory, Intersectionality, or watered-down variations which often surround themselves with terms such as "Equity" and "Inclusion"), is several schools and other institutions mandating the belief in a particular secular worldview -- that of Critical Social Justice. Refusal of these ideas often put the student or employee at risk of their grades, their careers, and their future prospects. There is a serious threat of humiliation and ostracization for those who refuse to conform to these beliefs.

We would think it completely *absurd* in modern day America that a public school would ever tolerate a teacher who inquired into their students' belief in God. The belief in God is legitimate, but public schools are the wrong place in society for such inquiry. And moreover, it would be a scandal if any teacher were to do so *publicly* of a student, in front of the entire rest of the class. Such reckless abuse of teacher-parent trust would quickly land the school district in a barrage of costly lawsuits and would further erode trust in a public school system of whose public opinion has been in decline since the 1990s.

And even if the State of New Hampshire does not officially recognize this emerging "Wokeism" as a kind of pseudo-religion, as I and many other American taxpayers do, the above would hold just as firmly for secular beliefs. If a teacher were to publically interrogate their students on the "Failings of Capitalism" or the "Untrustworthiness of the Police" or of "the Importance of Free Love in Society", the religious connotations would not be there, but the sharp sense of a moral overstep on the part of the school system would remain. And this feeling becomes even more acute the younger the students are. Race and gender are important subjects. But the moral disgust felt by parents who feel revulsion at them being taught to (say) third graders is a force that the school systems, and ultimately, the state itself, will have to bear the cost of.

At the public hearing for HB544, there were dozens and dozens of arguments that were presented in support of the bill. It has precedent from the former presidential administration, as HB544 was closely modeled on the relevant executive order to ban "racial scapegoating" in the federal government. This executive order was received with wide support. James Lindsay gave a very

powerful, objective, and well-informed analysis of the underlying philosophy of Critical Theory. He brought up that these ideas have been implemented in several institutions already across the country, and in every case, they lead to decoherence of the social fabric. And, as James explains, this was what the Critical worldview was *designed* to do. Very similar ideas promoting "racial consciousness" have been tried abroad in other countries, including South Africa, with disastrous consequences. The result is more racial tension between students and faculty -- the exact opposite of the outcome Critical Race Theory purports to champion. As was in the very moving testimony by the older Chinese woman "Lily", despite the warm, fuzzy language used by the proponents of Critical Race Theory, the actual policies are disturbingly similar to those that were used in China during the 1960s during the Cultural Revolution under Mao.

Why would we tolerate such practices in our children's curricula?

Of the many testimonies *against* HB544, there were two types of arguments presented.

The first type of argument, presented by the vast majority of speakers, simply promoted Critical Racist Theory and "Anti-Racist" training as being social goods. These were moral arguments, offered by people who, in all likelihood, already subscribe to the Critical worldview. They claimed that HB544 would impede efforts to address racism in society. At a few points during the hearing, there were attempts to insinuate that certain people offering their testimony were, themselves, racist. The most notable example of this, again, was James Lindsay at the end of his testimony, where Rep. Kris Shultz tries several times to suggest that James is involved with white supremacist groups. James's response to her behavior was perhaps the most important part of the whole day's hearing:

Any opposition to Critical Social Justice will be met with animosity and an attempt to silence the dissenting voice.

This is what makes Critical Race Theory so dangerous. Rather than inviting open a conversation about race, it prescribes its interpretation (the so-called "Anti-Racist" approach) and fiercy attacks anyone who proposes alternative ideas.

But the truth is that for nearly 60 years, the United States has been engaging in an alternate interpretation of how to handle the issue of race in our society. Namely, the liberalist approach advocated by Dr. Martin Luther King, Jr. In what is perhaps the most important speech in the history of modern America, Dr. King articulated his belief so concisely that every American over 30 knows it: Judge people not by the color of their skin, but by the content of their character. Despite his hardships while he was alive, Dr. King's message was so powerful and so resonant with our society, that race relations had been objectively improving since the 1960s up until very recently. (And I will leave it to the reader to decide if it is coincidence -- until the last decade where the Critical worldview became prominent).

But sadly, Dr. King's message -- do not judge a person by their race -- is not only an alternative to Critical Race Theory, but it is antithetical to it. Critical Race Theory teaches that race is the *primary* factor on which to judge someone. The idea that all white people have an inherent "White Privilege" and that all black people suffer from "White Oppression" are basic tenets of Critical Race Theory. Although this language is often couched and softened, it is a short exercise in academic history to trace the more administrative dressings of these ideas back to their original sources. And even now, popular accounts of these ideas, such as the various books published in the last few years by Robin DiAngelo and Ibram X Kendi, are very explicit in their language about the problems of society stemming directly from "Whiteness".

It is an absurdity that we must indulge in the Marxist-derived notion of "Anti-Racism" lest our society succumb to racism.  As Americans and as lovers of liberty and equality, we all have a duty to uphold Dr. Martin Luther King, Jr.'s vision of America.

The second point I heard in the hearing for HB544 is also worth addressing here: that HB544 would infringe on the free speech of private companies contracted to create curricula for the New Hampshire school systems.

It's interesting that it is the First Amendment that both protects free speech and also excludes the state from mandated doctrine. That alone is enough to suggest that those presenting the "free speech" argument against HB544 bear just as much the burden of proof as do the proponents of it do.

In defense of the free speech of these companies, I do believe it is their right to design and produce curricula based on Critical Race Theory. This is despite my personal belief that Critical Social Justice is a danger to our society. To the credit of the opponents of HB544, the danger of advocating for state censorship is equally or more dangerous than CRT. And so let me state that I believe it is the right for these companies to sell these materials in the *private* sector, including to the private school system in New Hampshire. If parents want their children to receive an education based on Anti-Racism, they should have every right to do so.

Where I feel there are *limits* to the rights of those in favor of CRT is the teaching of it in *public* schools. This is precisely where we find the conflicting rights: that of the curriculum-writers to sell their product and that of parents and students to be free of indoctrination.

Perhaps to present a thought-experiment for the reader: In any school teaching Critical Race Theory as part of its curriculum, is it possible for a student to pass a class with full marks if they publicly denounce their belief in "Anti-Racism"? Is it possible to get full marks without ever being compelled to write affirmatively about ideas the student and his or her family may not believe in, such as "Privilege", "Systemic Racism", or "Oppression"? --- with all of these taken to mean the technical concepts, as they are written about in the peer-reviewed literature on the subject and not taken to mean the obviously extant notions we mean when these words are used in every-day speech. Is it possible for a student to pass such a class with full marks if they opt out of *all* activities where students are required to affirm or declare their Race, Privilege status, or Oppression status?

My belief is that these situations would not be tolerated by the schools. Students who refuse to affirm would be humiliated by their teachers and failed on the grounds that they were not compliant with the coursework.

To a careful observer, the hearing for HB544 was revealing in more ways that you could count. This bill isn't the result of a special interest lobby group. It is the result of a plurality of concerned parents and American citizens who want to make sure the next generation is able to get the education they deserve without being coerced into believing in a false Critical worldview. It is a concern not just to white parents, but to hispanic parents, asian parents, black parents, and others. The concerns raised against the teaching of Critical Race Theory are diverse and many. And the arguments, by and large, are not grounded in race or racism. While on the other side, those opposed to the bill are singularly preoccupied with both. And they would be content to see every other parent's children be preoccupied with them as well.

The public school system in America is a relatively young institution. The sentiment among a rapidly growing sector of the American public is that if schools are not serving the interests of their children, then they will find alternative ways to find their children succeed in life. It may feel

easy to succumb to the enormous pressures exerted by the activist-class pushing Critical Social Justice. But to vote against HB544 is an invitation to a decade of expensive litigation, with accusations of racial discrimination and violations of Title IX in the short-term --- and a collapse of the school system in the long-term, as Critical Social Justice does what it has a reputation for doing to institutions.

The HB544 bill is perhaps one of the most influential pieces of legislation in the country at the moment. Just as with Brown v. Board of Education in 1954, the great state of New Hampshire is being asked to make an enormously important choice which will affect the future of our the rest of America. Segregation was an evil in our country -- an ugly, residual after-effect of slavery. Today, we see a horrifying resurgence of advocates calling *for* the re-segregation of our society. It is unfathomable. And it is pernicious --- for these advocates have made use of purposefully obscuring language to pass these illiberal ideals off as social justice. Indeed, those pushing Critical Social Justice into our schools, use the Orwellian inversion, "de-segregation", to refer to the practice of creating racially separated spaces.

Thank you for taking the time to read this. Support HB544 and ban the teaching of divisive concepts based on the ideas of Critical Race Theory in public schools.

Michael Maloney

**Archived:** Friday, April 16, 2021 1:04:37 PM
**From:** Diane Champa
**Sent:** Tuesday, March 2, 2021 7:04:12 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Dear Committee Members,

I urge you to pass HB544 that would ban educators from teaching systemic racism and sexism in schools. It is the job of parents to teach their children moral values, not teachers or educators. As a teacher, my job is difficult enough teaching academic subjects, and our job just became more difficult with children out of school for an entire year. However, I do teach kindness and respect to my students, and so far, those simple values seem to work for most children.

Thank you for listening to an educator,

Diane Champa

**Archived:** Friday, April 16, 2021 1:05:11 PM
**From:** Annie Jung
**Sent:** Tuesday, March 2, 2021 5:49:38 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

Hello committee members,

I'm writing in support of HB544.
I'm not a resident of NH, but I've started to see critical race theory creep up in my home state of NY, which has disturbed me profoundly. And I'm not a white person. I'm Asian. I sincerely hope this does not bleed into NH and that's why I'm writing this email.

Below link shows a recent material that was distributed by a NYC public school to the parents of their students. A prime example of critical race theory in practice.
https://www.syracuse.com/state/2021/02/ny-principal-asks-students-parents-to-reflect-on-their-whiteness.html
It lays out "8 white identities", one of which is "white abolitionists".
I'm not a white person, but this is incredibly racist. If anyone reduced me down to 8 possible identities of "Asian" or if anyone did that to any other race, that person would be justifiably condemned and fired immediately .

I'm not writing this to complain. I'm writing to ask you to help stop this kind of racist rhetoric at our public schools, where kids are so impressionable. This only encourages people to see life through race, which is incredibly divisive and patronizing. Furthermore, I wonder if our schools are in fact racist since they are sending these things out. Is this an admission of guilt? They are proclaiming we are governed by whiteness (I'm assuming they mean their school, too, since they're sending it out). If that's the case, there should be an investigation and the staff, principles, and the school board should be fired for white supremacy/racism.

I spent a good part of my teens and early 20's being afraid that whatever I did was a reflection of my race and always feeling insecure about it. I learned this behavior from my family, not white people. It was my non-Asian friends  who helped me realize none of them were judging my actions through my race, but only as an individual. When I realized this, it was incredibly freeing. Critical race theory and materials like the one distributed by East Side Community High School does exactly the opposite. It only reinforces stereotypes, which helps no-one. Groups of people will grow up thinking their destiny is somehow fixed because of their skin color and that they are "oppressed" and will never achieve the same level of success as whites, which stunts them from the beginning. How will they ever achieve something if they don't aim for it because they are told they will never get there because of "systemic racism"? This is called the soft bigotry of low expectations. On the other hand, another group of people will grow up thinking they are bad racist people just because of the color of their skin and that they should live every aspect of their lives to atone for the sin that is the color of the skin - regardless of their beliefs or actions. This is racist. This is backwards. This isn't why my grandparents and father risked everything to come to this country.
Instead, we should be teaching our kids that while life is unfortunately unfair, hard work, persistence, and kindness will get them closer to their goals and a better community. Bashing a group of people for their supposed privilege is lazy, racist, and anything but kind.
Whether intentional or not, CRT is a way to skew the socio-economic class issue into a racial one to divide our communities, rather than unify to solve problems.

Racism is a problem, yes. I have been at the receiving end of racial slurs thrown at me. However, I realize that those who called me names are mentally ill or at such fringes of society that they practically don't matter in my life or the vast majority of my community members' lives, too. So they don't bother me at all. This is what we should be teaching our kids. Racism exists, but we need to be rational, tough, and persevere through the difficulties in life to make our own lives better through hard work and surrounding ourselves with those who uplift us.

I have told my councilmembers that this kind of rhetoric in the public space where my future children will attend has made me looking to other states to put down roots and pay taxes. I am not alone, and I'm sure I wouldn't be alone in NH. Please pass this bill.

Thank you for your time.

--
Annie Jung
anniejung90@gmail.com
661-714-7625

**Archived:** Friday, April 16, 2021 1:05:38 PM
**From:** Adrian Zavalza
**Sent:** Tuesday, March 2, 2021 5:12:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

To whom it may concern,

When I was young, I learned about the Civil Rights movement and the words of Dr. Martin Luther King. I remember being taught the concept of not judging a book by its cover. Being shown that no matter who you are or what you look like, working twice as hard as the person next to you leads to success. I grew up in a diverse neighborhood where skin color was never considered to create friendships.

Today, I see all of the amazing progress the people of this country have made is being forgotten. History rewritten. Critical Race Theory requires that a person view every aspect of society through the lens of race. If you're not white, somehow you have been oppressed by whites. If you are white, somehow you are inherently oppressive or a beneficiary of your immutable characteristic.

I'm not a college graduate or a renowned thinker, but it doesn't take a genius to see the irony in promoting a school of thought which peddles racist ideology in order to rid the world of racism. CRT is the antithesis of our nation's values. HB544 must pass before more unsuspecting citizens and even children are indoctrinated into this horrible ideology.

Proponents of CRT claim it is necessary to overcome systemic racism and to help minorities succeed. The reality is that CRT is just another scheme to support the false idea of systemic racism. It is simultaneously a detriment to society and a distraction from real solutions that would entail reforming or removing actual government policies that negatively impact minority communities.

I support HB544.

Thank you,

Adrian Zavalza

**Archived:** Friday, April 16, 2021 12:52:16 PM
**From:** Orlando Campa
**Sent:** Wednesday, March 3, 2021 3:32:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Good morning,

I am reaching out to you to bring to your attention why Critical Race Theory should not be supported by your State. As a Mexican-American immigrant who is racially of European descent, I take personal umbrage with this supposed "anti-racist" program telling any race that they are lesser than.

I am not "lesser than" because of my Caucasian blood, nor has "Whiteness" made me more arrogant. This type of reasoning may lead to more racial, social, cultural, and political division in your State, but worse, it may set a precedent to other States or even Federally that this kind of indoctrination is okay.

Please do as much research into Critical Race Theory as you can and realize that this is divisive, not unifying, speech.

Thank you for your time.

Orlando Campa

**Archived:** Wednesday, April 7, 2021 1:18:19 PM
**From:** D Hyde
**Sent:** Wednesday, March 3, 2021 9:38:58 AM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal
**Digitally Signed:** Yes

To whom it may concern

As an employer, we are committed to inclusion and diversity in the workplace. However, we have been very concerned about the popularity of Critical Race Theory based programmes being offer to us. We have banned any course or trainer that uses racist stereotyping, makes racial generalisations or promotes discrimination. We support this legislation to help protect all workplaces from racist training like this.

There has been extensive research into CRT based diversity programmes, including by the United Kingdom government and they are proven not to work, to promote racism and racial disunity as well as to increase inefficiencies and damage interpersonal dynamics. The programmes do not foster real anti-racist workplaces. The use of the term 'anti-racism', when used by these programmes does not mean against racism. Indeed it encourages it.

There are wonderful positive diversity and inclusion programmes such as Chloe Valdery's, which we use and is very successful.

In conclusio,n  I urge you not to be swayed by very load activists in this matter. There inteention is not to improve the culture, it is to dismanttle it including your own venerable institution.

Thank you for your attentions.

Yours sincerely,

Danielle Hyde

**Archived:** Friday, April 16, 2021 12:52:18 PM
**From:** austindpowers89@yahoo.com
**Sent:** Wednesday, March 3, 2021 11:57:20 AM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

To whom it may concern, I want to voice my support for HB544. Critical Race Theory is a disgusting and racist ideology that helps divide people along racial lines and antagonize them toward one another. It promotes using shame, intimidation and other bullying tactics in order to berate and belittle people of particular races and justify discriminating against them. Proponents use the guise of "anti-racism" and "social justice" to justify their racist actions and ideology, but while these concepts on their face may sound good, they are just names meant to conceal the racism and injustice they promote.

The critical race theorists believe the only solution for past discrimination is present discrimination. They just want to point the present discrimination in the opposite direction. They say these groups of people were discriminated against and marginalized in the past, and so now its your turn. "It's not enough to be not racist," they say, "you have to be anti-racist..." aka racist against white people. This ideology is directly antithetical to Dr. Martin Luther King Jr's dream where we are not judged by the color of our skin. Critical Race Theory wants people judged by the color of their skin in a racial hierarchy, telling white people to shut up and check their privilege, while promoting "diversity" to favor people of color.

This ideology is dangerous and divisive and has no place being endorsed, promoted or funded by state or federal government dollars. I hope you will support HB544 and help promote and ensure the continued strive toward both Dr. King's and the American dream.

**Archived:** Friday, April 16, 2021 12:52:18 PM
**From:** ellen
**Sent:** Wednesday, March 3, 2021 11:40:59 AM
**To:** ~House Executive Departments and Administration
**Subject:** HB544 - Please Support
**Importance:** Normal

---

Good morning,

I am reaching out in support of HB544. I understand many people will be contacting you to oppose this bill by stating it's the equivalent to banning diversity training. This is not the case and I am not opposed to diversity training. This bill targets race and gender scapegoating, which shouldn't be included in diversity training if your aim is a more inclusive and understanding society/workplace. Critical race theory based training (can also be called anti-racists training) segregates groups based on race (white and non-white). The white group is told they are the oppressor and made to confess to their sin of racism. I realize it sounds outlandish, but individuals in workplaces and colleges have been secretly recording these conversations for at least the last few years. When listening to these conversations there are eerie similarities to the struggle sessions during the cultural revolution in China. During these struggle sessions, a white individual that resists being told they are an oppressor or racists provides additional proof of their guilt. There is no way out for the individual. On the flip side, non-white individuals are grouped together and told they are oppressed by the white population. If a non-white individual resists, by reporting no sense of oppresson, this proves they are complicit in systemic racism. Non-white individuals that resist can be ridiculed and labeled race traitors. Essentially this process is striping away individuality and placing everyone into collectives based on immutable characteristics.

Unfortunately it appears our country is forgetting MLK Jr.'s I have a dream speech. Individuals should be judged on the content of their character, not the color of their skin. I'm honestly worried this continued shift is going to increase actual racism in the country and teach a whole new generation of Americans to judge fellow citizens on their skin color (it's already being pushed on children as young as kindergarten). We must stand up for our liberal values and push back on this illiberal ideology.

Thank you for your time.
Ellen

**Archived:** Friday, April 16, 2021 1:03:57 PM
**From:** Jason Walters
**Sent:** Tuesday, March 2, 2021 9:59:56 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544 Support
**Importance:** Normal

---

Hello all,

I'm writing to show my support for ending the funding of Critical Race Theory. I wanted to let you know that I'm in favor of ending the funding of this racist training. Don't be fooled by the manipulative word play they like to use. Critical Race Theory is what these racists want to make more people racist. Take a close look at the leaders and what they say. They asspose that they are racist and therefore all people of their race must be racist. They preach Anti-Racism but that is only a cover for being racist against those in the racial majority. These people only see you as a racial monolith. To think differently than your group is to be othered.

If you believe that you should be judged on actions, not words, then look at their actions. The people who are pushing Critical Race Theory have pushed to have minorities removed from common place media. You can see examples of this with the removal of positive black role models from store shelves with brands like Uncle Ben and Aunt Jamima, real people who worked hard and brought delight to many, while White faces are allowed to remain without issue. Dr. Suess books have been removed for depicting images of people in traditional ethnic outfits, further removing non-White European images from our cultural landscape.

This ideology pushes people into thinking of themselves as a racial group, and for those in the majority group to punish themselves and hate themselves for being born in the majority. This just breeds more belief that the majority is superior. They would have you believe that the homeless Majority man on the corner is better off than Former President Obama just because they have different skin color.

Don't be fooled by this racist ideology. Please lead the way on removing this cancerous ideology from our society.

Take care and have a nice day.
-Jason Walters
CA Resident hoping for NH to lead the way to MLK's dream.

**Archived:** Friday, April 16, 2021 1:04:43 PM
**From:** Joshua Sanders
**Sent:** Tuesday, March 2, 2021 6:46:33 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Dear Honorable New Hampshire Representative,

I support the passing of HB544 to restrict the usage of public funds teaching of Critical Race Theory (CRT). CRT or otherwise known as Anti-Racism is an Ideologically driven mindset that advocates its adheres to make moral judgements about people based upon their race. Which is the general understanding of the term Racism.

Our nation fought a war to combat institutionalized racism please do your part to prevent our nation from reversing course.

Sincerely,
Joshua Sanders

**Archived:** Friday, April 16, 2021 1:04:48 PM
**From:** Matt Malkan
**Sent:** Tuesday, March 2, 2021 6:32:16 PM
**To:** ~House Executive Departments and Administration
**Subject:** please vote FOR HB544
**Importance:** Normal

Having spent many good times in New Hampshire with the good people there,
I urge you to pass HB544. I stress that this is NOT a partisan issue.
Hardly anybody in either party wants schools or businesses to embrace
ideological indoctrination, whatever name it is called ("Critical Race Theory",
'Anti-Racism' or many other deliberately misleading euphemisms).
This indoctrination is  harmful because it is
founded on the factually incorrect assumption that your skin color
is the most important thing about you, determining your views,
attitudes, values and behavior. It falsely assumes that any differences
can only be explained by unconscious 'racism', and that heavy-handed
government intervention is then required to take away things some people
earned, and give them to others, SOLELY BASED ON THEIR SKIN COLOR.
this is utterly against everything our country stands for, from Dr. King
back to Lincoln.
Please support the passage of HB544.

Thank you for your consideration,
Sincerely
Matt Malkan
Distinguished Prof of Physics, UCLA

**Archived:** Friday, April 16, 2021 1:05:13 PM
**From:** Bob Danielson
**Sent:** Tuesday, March 2, 2021 5:47:48 PM
**To:** ~House Executive Departments and Administration
**Subject:** Please support HB544 and banish the divisive and racist critical race theory movement.
**Importance:** Normal

---

To whom it may concern,

Please support NH HB544 to ban critical race theory training.

Common sense should tell you that critical race theory and it's bedfellow; Anti-Racist and White Fragility training is a horrible political movement/development and will set back race relations and the continued advancement of black people in America.  The teaching from these initiatives is in itself RACIST and frankly bizarre.

You may not know this, but the foundation of critical race theory et al is an offspring of and backdoor to advancing Socialism. I kid you not. But even setting that aside, you do not minimize racism by pushing forward with racist training based in identity politics.

Please Please Please I beg of you... use your heads and do not buckle to the "woke" activists who have become a fixture in many once excellent media organizations (including PBS to my despair for Gods sake).

Thank you for helping put a stop to this madness.

Sincerely,
Robert Danielson

**Archived:** Friday, April 16, 2021 1:05:55 PM
**From:** James Lindsay
**Sent:** Tuesday, March 2, 2021 4:46:41 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

To whom it may concern,

I am writing as an expert and concerned American, though not a New Hampshire citizen, in unequivocal support of HB544 which bans the teaching of certain divisive tenets as though they are fact. I also testified in the committee hearing as an expert on Critical Race Theory, against which this bill is ultimately based, on February 18 of this year. Please give this important, necessary bill your full-throated endorsement and a positive recommendation.

I don't know that this is the time for lengthy written testimony, so I'll try to keep my remarks brief. The bill being proposed, it should immediately be noted, bans not only the divisive tenets that stem from the Critical Race Theory worldview and its related activism, which is very aggressive and very interested in achieving dominance in our schools, workplaces, and lives, but it also bans trainings and uncritical teaching of what would be the more commonly understood forms of unacceptable bias, behavior, and ideology, including both white supremacy and patriarchy. It prohibits recipients of state funding from the same things the Civil Rights Acts and the Fourteenth Amendment are already supposed to protect against, although these are failing. Namely, the bill would prohibit teaching as uncontested fact or mandating training in racial and sex stereotyping, scapegoating, and discrimination, as well as positioning the state, institutions, etc., as intrinsically racist in a "systemic" way, which has allowed them thus far to avoid being found in violation of either the Civil Rights Acts or Fourteenth Amendment despite openly and explicitly advocating, in the words of the theorist Ibram X. Kendi, "present discrimination," which is billed as a necessary remedy to past discrimination. While someone might argue that this bill is unnecessary because of the Civil Rights Act, in practice this has not been borne out, making a bill like this more necessary than not. Every American, and every New Hampshire citizen, should not want discrimination, stereotyping, and scapegoating to be a part of their workplace training modules or children's education. This bill helps support that fundamentally equal and fair treatment before the law, which is currently at risk.

It should also be noted that this bill has First Amendment relevance as well, and not in the way its opponents would explain. The essence of the First Amendment is that people have freedom of conscience, particularly with regard to matters of spiritual belief, and freedom of speech, such that the state can neither compel nor restrict speech. Opponents of this bill will say that the bill seeks to restrict speech, but this is not true. It explicitly leaves provision for workplace trainings and education that don't teach these already-illegal tenets as uncontested fact. Moreover, the situation is quite the opposite to that portrayed by the opponents to the bill who oppose it on free-speech grounds. These workplace trainings and educational programs violate for very many people both freedom of conscience and freedom of speech. Their freedom of speech is violated by compelling them to admit to complicity in racism and sexism, among other social violations that are unlikely to be true. It also compels them to adopt a particular approach to anti-racism and anti-sexism that is very narrow and to speak on its behalf. This latter example, then, not only violates freedom of speech but also the freedom of conscience implied by both the free-exercise and establishment clauses of the First Amendment. It is not the state's place to be dictating (or funding the dictators of) how one is to feel about the issue of racism and sexism. Citizens, the overwhelming majority of whom firmly reject racism and sexism, should be granted the freedom of conscience to oppose

those on terms they find recognizable, which in a free, liberal country like the United States will mostly likely be rooted in equality, colorblindness, individualism, and universal humanity, which are solidly American values. They may also do so from Judeo-Christian principles, for example the famous injunction from Paul that in Christianity there is "neither Jew nor Greek, slave nor free," etc. They should not be compelled to do so in the terms most often employed by so-called "anti-racist," "diversity," "racial sensitivity," and "culturally responsive" programs today, which are a specific ideology known as Critical Theory, which explicitly rejects virtually all of these values for others, sometimes termed "liberationist" and at other times rightly labeled "neo-Marxist," including in the words of the activists pushings these programs themselves. While the law may not bear out today that these trainings and pedagogical pursuits violate the First and Fourteenth Amendments, as well as existing Civil Rights legislation, it is likely that they will eventually. It is therefore better to get on the right side of this issue now and take proactive steps to strengthen a legal architecture that is failing citizens in their most fundamental rights.

For the sake of brevity, I will not elaborate at length on the theory underlying the overwhelming bulk of these trainings and relevant school curricula, which is Critical Race Theory, the same (neo-Marxist) Critical Theory mentioned above specifically made to take race as a category of difference upon which Marxian conflict theory (oppressors versus oppressed) is to be applied. I will simply remind the committee that in addition to this theory being one among many approaches to the issue of race and racism, it is one that is rooted specifically in making precisely the same mistake that made racism the problem it has been throughout our history as a nation, which is specifically placing social significance into racial categories and considering that significance determinant and in some ways relevant to one's social standing and access to power. This was a horrific thing to have done in the 16th century going forward, and it's no better to do in the 21st century. It didn't work out then, and it won't work out now, unless one's goal is to effect an American Cultural Revolution in mirror image to the one Mao perpetrated on China in the 1960s-1970s, which (as few people know) used many of the same arguments and ideas about race, applied to the Han Chinese race instead of "whiteness."

Critical Race Theory begins from the assumption, in its own words, that racism is the normal state of affairs of society, changing the question from "did racism take place?" to "how did racism manifest in that situation?" (for racism is assumed to be relevant to every situation), and it calls into question "the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and the neutral principles of constitutional law." That is, it is presumptive, divisive, and explicitly un-American, if not anti-American. Moreover, it is designed not to be able to be disagreed with, as all disagreement is framed as some variation of racial "fragility" or "privilege-preserving epistemic pushback," which is to say a cynical drive to maintain one's social dominance, not legitimate criticism of the genuinely bad arguments and cynical assumptions put forth by the theory itself. Because it cannot be disagreed with without accusations of bad intentions and motivations, it is divisive and very difficult to uproot once installed. Because it believes "there is no neutral" between "dominance" and "oppression" (Marxian conflict theory), it is again divisive and in fact polarizing. Because its issues are so sensitive and because it addresses them in such an accusatory way (everyone who doesn't agree with it is racist and white supremacist), it diverts incredible volumes of resources to dividing and polarizing every environment it can gain a foothold in. HB544 exists to minimize that destructive influence and colossal waste of (taxpayer-funded) resources. Even worse, not only is there no evidence supporting the application of this theory, there is evidence against its claims that it can generate that which it claims to generate, so it tears apart organizations and poisons minds (including those of children) with its divisive tenets while profiting off a fraudulent enterprise that robs the taxpayers while destroying their communities.

On these grounds, and possibly hundreds of pages more that I could write if needed, I again urge you in the strongest possible way to support and recommend HB544 as a step in the right

direction, away from these divisive teachings and in support of the fundamental inalienable rights this country has always recognized and strived to extend to all citizens, even the allegedly privileged ones. This bill is important for New Hampshire, and it sends a message to America, whose federal government has just unambiguously signaled it wants to take us in the opposite direction by rescinding a similar federal executive order. That opposite direction is back into racial and sex discrimination, stereotyping, and scapegoating, and its into things America has never been and has never been willing to become, namely whatever it is that Critical Theory (i.e., neo-Marxism) aims to make of it.

Thank you.
James Lindsay, Ph.D.

**Archived:** Friday, April 16, 2021 1:06:05 PM
**From:** Kyle Sherman
**Sent:** Tuesday, March 2, 2021 4:23:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

Hello,

I'm writing this email to express profound support for HB544, a desperately needed piece of legislation to combat the rise of dogma and pedagogy in our public institutions. There is no room for divisive and inherently discriminatory critical race theory or anti-racism doctrine within institutions formed to serve the interests of the American people, specifically the people of New Hampshire. We cannot afford to subvert the interests of citizens and students by allowing the this particularly pernicious dogma to infiltrate governance, one that is tantamount to a religion that preaches identarian discrimination, teaches minorities they are hated by the world, and tells youth of a certain skin color that they're inherently evil and born racists. We the people demand these divisive concepts to be outlawed as outlined in HB544.

Yours Truly,
Concerned Citizen

**Archived:** Friday, April 16, 2021 1:06:34 PM
**From:** Mike Breen
**Sent:** Saturday, February 20, 2021 7:41:39 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB 544
**Importance:** Normal

I am contacting you regarding the potential for "Critical Race Theory" being taught in our schools. I have been a professional curriculum developer for the International Association of Chiefs of Police, the Department of State, and the Department of Justice. I have encountered these types of "theories" in the past and rejected their inclusion in curriculum I designed.

Why? "Theories" of this ilk pose as social science theories, presumably grounded in credible replicated research. However, they are not. They are scientifically illiterate radical false narratives sponsored by special interest groups promoting destructive agendas.

Please understand that at its core, "Critical Race Theory" (CRT) is not a Civil Rights Oriented belief system. Rather it asserts that White citizens are unavoidably and inherently racist and that the United States is a racist country. CRT is joined at the hip with a growing Afrocentric racial superiority belief system. Much of the racial scientific and historic illiteracy originates from an assertion that Black citizens are naturally superior to non-Black citizens "spiritually, physically, and intellectually" due to the greater level of melanin in their bodies.  Ironically, all this doublespeak gibberish is coined "anti-racism" by radicals sponsoring federally mandated instructions of this ilk to our children.  It in fact seeks to explain why all White citizens are inherently and unavoidably racist.

Just how mainstream are these racist beliefs? Despite the fact that claims of natural racial superiority are anathema to our civil rights movement, and the spirit and letter of our civil rights laws, Kristen Clark, [a current nominee for the office of the Assistant Attorney General for the Civil Rights Division of the Department of Justice] has publicly proliferated this widely discredited pseudoscience for decades.

Societies have been at these crossroads in the past. The world has not seen this level of race and ethnic hatred and suppression of genuine science since the rise of the Nazi Regime. Recall their teachings were based upon similar eugenic "science" of the day. The United States itself has not experienced this level of proliferated race pseudoscience since the rise of the Ku Klux Klan and has NEVER experienced mandatory racist teachings in local schools. Because history has clearly revealed the consequence of promulgating the hatred at the core of racial inferior "Theories" it will judge those making this mistake again harshly. To expose our children and their teachers to programs and tutelage which asserts that one race is inherently racist--thus inferior, and another is naturally superior is not simply scientifically illiterate. It is immoral on its face. Please protect our teachers and students from this societal cancer coined "Critical Race Theory" and the racist pseudoscience promoting beliefs of this ilk by making HB 544 the law in New Hampshire.

Michael D. Breen, MPA, Ph.D. 42 Marvin Road Moultonborough, NH 03254 Telephone: 603 253 9114

**Archived:** Friday, April 16, 2021 1:07:07 PM
**From:** Rachel Valk
**Sent:** Wednesday, February 17, 2021 12:08:21 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Good Morning,
I am writing in support of Bill HB544. I am just a private citizen who has never been involved in politics but I am very concerned. I clearly see that our American rights and values are being stolen from us and it feels like no one is doing anything about it. These policies are all being promoted under the guise of love, anti-sexism and anti-racism and it's so evident to me when digging deeper that that is not true. Critical Race Theory is divisive and we as a state should not be promoting or mandating that. I for one believe that these social issues are things that should be taught at home not in a school. People are free to believe what they want. This is America. People are free to think and to research for themselves. This is America.


Thank you,
Rachel Valk

# EXHIBIT 10

## HB2/Budget Trailer Materials

# HB2-FN-A-L

| Body | Description |
|------|-------------|
| H | Introduced (in recess of) 02/25/2021 and referred to Finance HJ 4 P. 48 |
| H | Division III Work Session: 03/09/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division III Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Public Hearing: 03/16/2021 01:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | Division III Work Session: 03/12/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division I Work Session: 03/16/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| H | Division III Work Session: 03/19/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division III Work Session: 03/18/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/17/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/18/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division III Work Session: 03/15/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division I Work Session: 03/23/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| H | Division III Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | ==CANCELLED== Division III Work Session: 03/25/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | ==CANCELLED== Division III Work Session: 03/26/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/23/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/24/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/25/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | ==CANCELLED== Division II Work Session: 03/26/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Executive Session: 03/29/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | |

   ==CANCELLED== Executive Session: 03/30/2021 09:00 am Members of the
   public may attend using the following link: To join the webinar:
   https://www.zoom.us/j/92166004660

| | |
|---|---|
| H | ==TIME CHANGE== Executive Session: 03/31/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | Majority Committee Report: Ought to Pass with Amendment # 2021-1059h (Vote 12-9; RC) HC 18 P. 30 |
| H | Minority Committee Report: Inexpedient to Legislate |
| H | FLAM # 2021-1064h (Reps. Walz, Hatch): AF RC 175-203 04/07/2021 HJ 5 P. 89 |
| H | FLAM # 2021-1065h (): AF RC 175-206 04/07/2021 HJ 5 P. 92 |
| H | FLAM # 2021-1068h (Reps. Rogers, Nordgren, Wallner): AF RC 181-199 04/07/2021 HJ 5 P. 94 |
| H | FLAM # 2021-1071h (Rep. McWilliams): AF RC 177-206 04/07/2021 HJ 5 P. 96 |
| H | FLAM # 2021-1073h (Rep. Heath): AF RC 174-206 04/07/2021 HJ 5 P. 99 |
| H | FLAM # 2021-1062h (Reps. Heath, K. Murray): AF RC 178-203 04/07/2021 HJ 5 P. 101 |
| H | FLAM # 2021-1093h (Reps. Leishman, Buco): AF RC 186-197 04/07/2021 HJ 5 P. 104 |
| H | FLAM # 2021-1094h (Reps. Hatch, Leishman, Buco, Walz): AF RC 176-208 04/07/2021 HJ 5 P. 106 |
| H | FLAM # 2021-1063h (Rep. Hatch): AF RC 186-193 04/07/2021 HJ 5 P. 109 |
| H | FLAM # 2021-1069h (Reps. Nordgren, Rogers, Wallner): AF RC 180-201 04/07/2021 HJ 5 P. 115 |
| H | FLAM # 2021-1066h (Reps. Rogers, Nordgren, Wallner): AF RC 184-194 04/07/2021 HJ 5 P. 117 |
| H | FLAM # 2021-1104h (Rep. Almy): AF RC 161-218 04/07/2021 HJ 5 P. 120 |
| H | Ought to Pass with Amendment 2021-1059h: MA RC 200-181 04/07/2021 HJ 5 P. 123 |
| H | Reconsider (Rep. Osborne): MF RC 175-204 04/07/2021 HJ 5 P. 125 |
| S | Introduced 04/01/2021 and Referred to Finance; SJ 11 |
| H | Amendment # 2021-1059h: AA RC 204-178 04/07/2021 HJ 5 P. 87 |
| S | Remote Hearing: 05/04/2021, 01:00 pm; Links to join the hearing can be found in the Senate Calendar; SC 21 |
| S | Remote Hearing: 05/04/2021, 06:00 pm; Links to join the hearing can be found in the Senate Calendar; SC 21 |
| S | Committee Report: Ought to Pass with Amendment # 2021-1799s, 06/03/2021; SC 26 |
| S | Sen. Soucy Moved to divide the Question on Committee Amendment 2021-1799s: on Sections 74-75; Sections 427-429, Sections 397-404; and Section 412; 06/03/2021; SJ 18 |
| S | The Chair ruled the Question Divisible; 06/03/2021; SJ 18 |
| S | Sen. Bradley Moved to divide the Question on Committee Amendment 2021-1799s Sections 89-102 and then the Remainder; 06/03/2021; SJ 18 |
| S | Committee Amendment # 2021-1799s, on Sections 89-102, RC 13Y-10N, AA; 06/03/2021; SJ 18 |
| S | Committee Amendment # 2021-1799s, Remainder of the Committee Amendment, RC 14Y-10N, AA; 06/03/2021; SJ 18 |
| S | Sen. Bradley Floor Amendment # 2021-1816s, RC 24Y-0N, AA; 06/03/2021; SJ 18 |
| S | Sen. Whitley Floor Amendment # 2021-1862s, RC 10Y-14N, AF; 06/03/2021; SJ 18 |
| S | Sen. Kahn Floor Amendment # 2021-1855s, RC 10Y-14N, AF; 06/03/2021; SJ 18 |
| S | Sen. Rosenwald Floor Amendment # 2021-1850s, RC 10Y-14N, AF; 06/03/2021; SJ 18 |
| S | Sen. Kahn Floor Amendment # 2021-1863s, RC 10Y-14N, AF; 06/03/2021; SJ 18 |
| S | Sen. Bradley Moved to divide the Question on Floor Amendment 2021-1861s on Sections 89-102 of the Amending Language and then the Remainder of the Amendment; 06/03/2021; SJ 18 |
| S | The Chair ruled the Question Divisible; 06/03/2021; SJ 18 |
| S | Floor Amendment #2021-1861s, Sections 89-102 of the Amending Language, RC 10Y-13N, AF; 06/03/2021; SJ 18 |
| S | Floor Amendment 2021-1861s; on the Remainder of the Amendment RC 10Y-14N, AF; 06/03/2021; SJ 18 |
| S | Sen. Rosenwald Floor Amendment # 2021-1858s, RC 9Y-14N, AF; 06/03/2021; SJ 18 |

| | |
|---|---|
| S | Sen. Perkins Kwoka Floor Amendment # 2021-1859s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1847s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Birdsell Floor Amendment # 2021-1842s, RC 14Y-9N, AA; 06/03/2021; **SJ 18** |
| S | Sen. Soucy Floor Amendment # 2021-1874s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Kahn Floor Amendment # 2021-1876s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| S | Sen. Whitley Floor Amendment # 2021-1883s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Sherman Floor Amendment # 2021-1878s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1875s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Kahn Floor Amendment # 2021-1852s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Whitley Floor Amendment # 2021-1867s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Soucy Floor Amendment # 2021-1815s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1882s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Daniels Floor Amendment # 2021-1821s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Carson Floor Amendment # 2021-1827s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Giuda Floor Amendment # 2021-1838s, RC 8Y-15N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Hennessey Floor Amendment # 2021-1866s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Bradley Moved to divide the Question on Ought To Pass with Amendment on Sections 89-102 and then the Remainder of the Bill; 06/03/2021; **SJ 18** |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| S | Sen. Bradley Floor Amendment # 2021-1884s, AA, VV; 06/03/2021; **SJ 18** |
| S | Ought to Pass with Amendment on Sections 89-102, RC 13Y-9N, MA, 06/03/2021; **SJ 18** |
| S | Ought to Pass with Amendment on the Remainder of the Bill, RC 14Y-9N, MA, OT3rdg; 06/03/2021; **SJ 18** |
| S | Committee Amendment # 2021-1799s, on Sections 74-75 Sections 427-429 Sections 397-404 and Section 412, RC 24Y-0N, AA; 06/03/2021; **SJ 18** |
| S | Sen. D'Allesandro Floor Amendment # 2021-1861s; 06/03/2021; **SJ 18** |
| S | Without Objection, the Clerk is authorized to make technical and administrative corrections which are necessary to reflect the intent of the Senate, Relative to Bills and Amendments Passed Today, MA; 06/03/2021; **SJ 18** |
| H | House Non-Concurs with Senate Amendment 2021-1799s and 2021-1816s and 2021-1859s and 2021-1842s and 2021-1821s and 2021-1827s and 2021-1866s and 2021-1884s and Requests CofC (Reps. L. Ober, Weyler, Umberger, Turcotte, Packard) MA VV 06/04/2021 **HJ 9** P. 53 |
| H | Speaker Appoints Alternates: Reps. Edwards, Leishman, Wallner, Major, Emerick 06/04/2021 **HJ 9** P. 53 |
| S | Sen. Daniels Accedes to House Request for Committee of Conference, MA, VV; (In recess 06/03/2021); **SJ 19** |
| S | President Appoints: Senators Morse, Bradley, Rosenwald; (In Recess 06/03/2021); **SJ 19** |
| H | ==RECESSED== Conference Committee Meeting: 06/14/2021 11:00 am LOB 210-211 |
| H | Conferee Change: Rep. Erf added as Alternate 06/10/2021 **HJ 10** P. 22 |
| H | ==RECESSED== Conference Committee Meeting: 06/15/2021 01:00 pm LOB 210-211 |
| H | ==RECESSED== Conference Committee Meeting: 06/16/2021 01:00 pm LOB 210-211 |
| H | ==CONTINUED== Conference Committee Meeting: 06/17/2021 10:00 am LOB 210-211 |
| S | Conferee Change; Senator Daniels Replaces Senator Rosenwald; **SJ 20** |
| H | Conferee Change: Rep. Edwards Replaces Rep. Turcotte 06/10/2021 **HJ 10** P. 23 |
| H | Conferee Change: Rep. Emerick Replaces Rep. Packard 06/10/2021 **HJ 10** P. 23 |
| S | Conference Committee Report Filed, # 2021-2040c; 06/24/2021 |
| S | Conference Committee Report # 2021-2040c; RC 14Y-10N, Adopted; 06/24/2021; **SJ 20** |
| H | Reconsider (Rep. Osborne): MF DV 172-203 06/24/2021 |
| H | Conference Committee Report 2021-2040c: Adopted, RC 198-181 06/24/2021 |

423

| S | Enrolled Bill Amendment # 2021-2048e Adopted, VV, (In recess of 06/24/2021); **SJ 20** |
| H | Enrolled Bill Amendment # 2021-2048e: AA VV (in recess of) 06/24/2021 |
| H | Enrolled (in recess of) 06/24/2021 |
| S | Enrolled Adopted, VV, (In recess 06/24/2021); **SJ 20** |
| H | Signed by Governor Sununu 06/25/2021; Chapter 91: Unless otherwise specified the remainder of this act shall take effect: 07/01/2021 |

# House

House Finance
March 31, 2021
2021-1059h
05/06

Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by replacing all after the enacting clause with the following:



Amendment to HB 2-FN-A-LOCAL
- Page 155 -

1 ████████████████████████████████████████████████

2 ████████████████████████████████     ████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████

9 ██████████████████████████████████████

10 ██████████████████████████████████████

11     330  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after

12 chapter 10-B the following new chapter:

13                               CHAPTER 10-C

14                 PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

15     10-C:1  Definitions.  In this chapter:

16     I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any

17 kind that in any manner have entered into a contract, or perform a subcontract pursuant to a

18 contract, with the state of New Hampshire.

19     II.  "Divisive concept" means the concept that:

20         (a)  One race or sex is inherently superior to another race or sex;

21         (b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

22         (c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or

23 oppressive, whether consciously or unconsciously;

24         (d)  An individual should be discriminated against or receive adverse treatment solely or

25 partly because of his or her race or sex;

26         (e)  Members of one race or sex cannot and should not attempt to treat others without

27 respect to race or sex;

28         (f)  An individual's moral character is necessarily determined by his or her race or sex;

29         (g)  An individual, by virtue of his or her race or sex, bears responsibility for actions

30 committed in the past by other members of the same race or sex;

31         (h)  Any individual should feel discomfort, guilt, anguish, or any other form of

32 psychological distress on account of his or her race or sex; or

33         (i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by

34 a particular race to oppress another race.

35         (j)  The term "divisive concepts" includes any other form of race or sex stereotyping or

36 any other form of race or sex scapegoating.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 156 -**

III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.  It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V.  "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI.  "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2  Unlawful Propagation of Divisive Concepts.

I.  Requirements for the state of New Hampshire:

(a)  The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b)  No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II.  Requirements for government contractors:

(a)  All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)   The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)   In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)   The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.   The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.   The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.  Requirements for agencies.

(a)   The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.   Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)  The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training," to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

1    (2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency

2    employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic

3    protected by federal or state law.

4    (b)  The commissioner of the department of administrative services, pursuant to RSA

5    541-A, shall develop regulations for the enforcement of the provisions of this statute.

6    (c)  Each agency head shall:

7    (1)  Issue a policy incorporating the requirements of this chapter into agency

8    operations, including by making compliance with the policy a provision in all agency contracts;

9    (2)  Request that the agency thoroughly review and assess not less than annually

10   thereafter, agency compliance with the requirements of the policy in the form of a report submitted

11   to the department of administrative services; and

12   (3)  Assign at least one senior political appointee responsibility for ensuring

13   compliance with the requirements of the policy.

14   VI.  Review of agency training.

15   (a)  All training programs for state agency employees relating to diversity or inclusion

16   shall, before being used, be reviewed by the department of administrative services for compliance

17   with the requirements of RSA 10-C:2, V.

18   (b)  If a contractor provides a training for agency employees relating to diversity or

19   inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and

20   such action is in violation of the applicable contract, the agency that contracted for such training

21   shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and

22   regulations.

23   10-C:3  General Provisions.

24   I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial,

25   cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the

26   requirements of this chapter.

27   II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger

28   course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner

29   and without endorsement.

30   III.  If any provision of this chapter, or the application of any provision to any person or

31   circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions

32   to any other persons or circumstances shall not be affected thereby.

33   331  Effective Date.  Section 330 of this act shall take effect January 1, 2022.



# HOUSE RECORD

## First Year of the 167th General Court

## Calendar and Journal of the 2021 Session

### Web Site Address: www.gencourt.state.nh.us

**State of
New Hampshire**

| Vol. 43 | Concord, N.H. | Friday, April 2, 2021 | No. 18 |

**Contains: House Deadlines; House Bills Amended by Senate; Committee Reports;
Meetings and Notices; Revised Fiscal Notes**

# HOUSE  CALENDAR

**MEMBERS OF THE HOUSE:**

The House will meet in session on Wednesday, April 7th at 9:00 a.m., Thursday, April 8th, at 9:00 a.m., and Friday, April 9th at 9:00 a.m. in the NH Sportsplex facility at 68 Technology Dr. in Bedford, NH.

Session day logistics, including arrival times, parking, entry, materials and lunch distribution will be similar to the previous event, and where necessary, updates and modifications have been made. Those details appear in the back of this House Calendar. House members can expect an email with any further details early next week.

I have discussed with the Democratic and Republican Leaders our need to work together to manage our time wisely during the House session days. While there may be disagreement on many issues, we all agree that we can complete our business in a timely manner if we work together with mutual respect and understanding.

The House Finance committee will offer a budget briefing for House members on Monday April 5th at 1:00 p.m. via Zoom webinar. As in prior budget years, members of the public may watch a livestream via YouTube. A link to the YouTube stream is published in a notice in this House Calendar. House members will receive a link to the webinar by email so they may raise their hand and ask questions of the Finance Committee and Legislative Budget Assistant, if desired.

The amendment to House Bill 1 adopted by the majority of the House Finance Committee is one that replaces the entire bill and is over 700 pages long. Rather than print 400 copies of that amendment for next week, the Legislative Budget Assistant's Office has posted a link to that amendment here: http://www.gencourt.state. nh.us/LBA/Budget/Capital_Budget_House/Week%20of%203-29/HB_1_H_Finance_COMBINED_33021.pdf All other amendments to bills will be printed in two addendum calendars.

Additionally, if you are interested in the other documents used throughout the entire House budget process, the LBA has a webpage with those available to you found here:http://www.gencourt.state.nh.us/LBA/Budget/ fy2022_2023_budget.aspx

The New Hampshire Automobile Dealers Association will be sponsoring one of our session day's lunches next week at session. Typically the NHADA hosts an annual Crossover reception for all legislators and staff, however in this unusual time, we have not been able to attend the usual social events that may exist for legislators. These receptions go a long way in terms of allowing members across the whole chamber to socialize and get to know their colleagues, and I know I speak for myself when I say this has been missed. We are thankful to the NHADA for sponsoring this lunch.

I am happy to announce that captioning for House sessions is now available. The link to access captions is a separate link from the session streaming link and will be available on the General Court website before the start of each session.

Sherman A. Packard, Speaker of the House

---

### NOTICE

The **Finance** Committee will hold **budget briefings** on **HB 1-A**, making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023, and **HB 2-FN-A-L**, relative to state fees, funds, revenues, and expenditures on April 5th at 1:00 pm. House members will receive secure Zoom links. Members of the public may attend using the following link: https://www.youtube.com/watch?v=MvMW6Lf-ltw.

Rep. Kenneth Weyler, Chairman
Finance Committee

HB 1 provides no funding to the Department of Transportation (DOT) to address the deficit in the Highway Fund and has left DOT with a vacancy level in staffing of 15%. The reduction in the equipment maintenance fund will cause delays in planned road and bridge repairs by about two years.

Four million was cut from the Department of Safety (DOS), resulting in the underfunding of over 50 positions which will likely cause delays in services, especially in the DMV. Constituents using other DOS agencies will find an increase in wait times and a delay in response times across all services due to cuts in almost every line item in the safety portion of HB 1. All of these cuts are compounded by huge lapses back to the general fund in 2021 due to COVID-19. This budget will leave the Department of Safety unable to fully staff its Forensic, CODIS, Toxicology Lab and unable to maintain its vehicle replacement plan.

HB 1 underfunds the Department of Health and Human Services (DHHS) in many areas. This budget fails to fund the gap in federal funding that is vital for family planning providers across the state who provide vital services such as STD testing and cancer screening that do not currently exist in traditionally underserved parts of the state.

The DHHS-Tobacco Prevention and Cessation Unit had requested and was denied in this budget an additional prioritized need of $440,000 to fully implement an adolescent tobacco helpline to address this critical need. Without this additional $440,000, DHHS will be unable to fully implement this program and meet the needs of addicted youth through cessation services. This additional funding is a drop in the bucket compared to the over $214 million New Hampshire generated in tobacco tax revenue in 2020.

The youth rapid rehousing program that addresses teen homelessness is not funded in this budget. The purpose of this program is to support youth 18-24 who are experiencing homelessness by providing two years of rental assistance and supportive services to successfully maintain housing.

This budget directs DHHS to cut $50 million in general funds; $30 million in the first year and $20 million in the second year in any area excluding a few services. At this time there is no way of knowing what services would be reduced since the Finance Committee handed this responsibility to the department. Also, since most general funds at DHHS are matched with federal funds, we stand to lose an additional $50 million in federal matching funds.

In addition to any other required reductions, DHHS is directed to reduce their personnel budget by $22.6 million, which represents 226 full-time positions. This budget also requires that at no time during the biennium shall DHHS exceed 3,000 full-time authorized positions, further restricting the department's ability to provide critical direct services to New Hampshire residents. Here we stand to lose up to an additional $22.6 million in federal matching funds.

This budget fails to fund valuable public health services supported home visiting programs that help strengthen young families in New Hampshire. These services include individualized support, parenting education, and access to resources like primary care, WIC, and early intervention to reduce stress and improve family life. HB 1 dramatically underfunds protective preventive child care services for families who are under stress and involved with DCYF, helping to prevent abuse or neglect.

HB 1 does not fund the widely supported adult dental program that would require DHHS to provide critical adult dental care to residents under the Medicaid managed care program.

The minority finds that it cannot support HB 1 as amended by the Finance Committee due to the extensive underfunding of vital services, programs and positions throughout the state workforce.

**HB 2-FN-A-LOCAL,** relative to state fees, funds, revenues, and expenditures. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Kenneth Weyler for the **Majority** of Finance. HB 1 contains all the spread sheets and line items which are appropriated for spending. However, there are tax changes and reorganizations that are part of the appropriating process. These details are delineated in HB 2, sometimes called the trailer bill. This time HB 2 had more reorganization than normal. We from Finance, asked the policy committee chairmen to review the appropriate sections. The Governor proposed combining the university system with the community college system. The timeline seemed too short, so we stretched it out. Previous budgets funded development money for a 25 bed psychiatric hospital, but in HB 2 it became a 60 bed hospital. We had no warning of such a change, so we will remove that for further study. A 60 page reorganization of the Department of Energy was in the bill. After review by the Science, Technology and Energy Committee, that went forward. We need to not only remember that this is one of our most important votes, but that we all need to support it for the good of our citizens.

A Graphic Services Fund created to better manage Administrative Services, and Payment and Procurement Fund established to pay costs of procurement card collections. Several tax reductions, in Business Profits Tax, Business EnterpriseTax, Rooms and Meals, and Interest and Dividends. Reduction in Carry Forward Tax Credit changed. Historical Horse Racing was added to increase revenue. Some sections eliminated as no longer needed. A major reorganization of the Public Utilities Commission and the Department of Energy were reviewed before inclusion in the bill.

Due to increased revenue projections from Ways and Means and the reduction of the Public School Infrastructure program we were able to fund much needed programs in the Department of Transportation. As you saw in HB 1

we had reduced the highway fund by over $5 million. The extra revenue allowed us to put $19 million back into the highway fund to support the Highway Block Grants, betterment, winter maintenance and provide money for fleet equipment. In the Department of Education (DOE) we were able to put $19,836,000 into building aid and require schools to submit a 10 year plan to the state for building requirements. We also provided $8,000,000 to accelerate payments for current liabilities DOE owes on outstanding school bonds. We will also reduce the SWEPT (State-Wide Education Property Tax) to be collected from cities and towns by $100,000. This reduction to the local taxpayers will be reimbursed to the cities and towns from the state so all school districts will be made whole. We also funded dual and concurrent enrollment program at $1,500,000 per year and transferred the management from DOE to the Community College System of New Hampshire. We also increased the charter school lease cap to $50,000. Finally, several schools that began kindergarten in FY20/21 did not receive their start up grants so we allocated $1,906,313. The Governor had proposed a plan for the merger of the University System and the Community College System with one Board of Trustees starting in July 2021. We believed this action needed to slow down a little and we are recommending a commission to bring back to the legislature by January 22 their plan for merging the two systems. If approved, it will be effective in July 23. We outlined numerous areas that they should look at as well as providing $1.5 million to hire outside experts to assist them. We also approved, with the help of the Transportation Committee the definition of unmanned aircraft, and Fish and Game helped us sort through Wildlife Damage Control: damage by bears.

The legislature lent the Governor a large share of its powers under the state of emergency laws passed in 2002 with the image of 9/11 fresh in our minds. With this first use of those laws, it's become clear that the legislature made it easy for the Governor to declare an emergency and made it very difficult for the legislature to either be involved in crisis management policies, federal funding decisions, restriction of civil and constitutional rights, or in bringing the state of emergency to an appropriate end. The legislature gave up too much involvement and too much discretion and part of HB 2 addresses sharing power more appropriately to bring an emergency to a conclusion. We removed an authorization to build a 60-bed new forensic mental health hospital because the size grew from 25 to 60 and the funds being authorized appeared to circumvent standard capital budgeting processes. We removed $1.5 million from a well-intended program to help senior citizen centers with barrier materials to mitigate virus spread because over 800 centers were eligible and the program overhead costs would make an evaluation and award program ineffective. Family planning programs were fully funded with a $50,000 set-aside for new program awardees. This is intended to stimulate the full, fair and open competition as a restriction is added to prohibit abortion services from being provided at the same location as state funded family planning counseling. Opponents argue that it is impossible to separate abortion services from the seven existing centers offering family planning counseling due to costs. This argument does not recognize that the other seven centers have not been offering abortion and Pro-Choice advocates have often stated that "no family planning money is going to fund abortions." HB 2 helps that to be a true statement. The Department of Health and Human Services has been reluctant to provide alternatives to housing juveniles in the Sununu Youth Center in committed and detained statuses. The state spends about $1 million a year per person to maintain a census of 10-16. With new restrictions on who can be housed at the Center, that $13 million a year would go to a population expected to be less than half the current size. With a 60% recidivism rate, the current model is obviously broken and we are shutting it down in FY23. **Vote 12-9.**

Rep. Mary Jane Wallner for the **Minority** of Finance. The minority of the Finance Committee cannot support HB 2 as presented. Included are over $100 million in revenue cuts resulting from cuts to the Business Enterprise Tax, the Business Profits Tax, The Rooms and Meals Tax, and the Interest and Dividends Tax. The outcomes are dangerous reductions in essential services such as the elimination of water grants already awarded to communities throughout the state, likely causing an increase in local property tax burdens. Revenue sharing in the form of direct support to cities and towns across the state from the previous biennium is not continued. Various policies that have never had a public hearing are included. Specifically, HB 2 includes a very flawed creation of a new Department of Energy that expands government, guts the Public Utilities Commission, and is funded by having our citizens pay more in their electric, gas and water utility bills. It also includes the use of our limited public dollars to reimburse those who gambled their money in the Financial Resources Mortgage (FRM) Ponzi scheme. No state has ever used tax dollars to reimburse people for their own bad investments. HB 2 includes the language of HB 544 that prohibits teaching about "divisive concepts" such as unconscious bias, an ideological policy that should have no place in law, much less in a budget.

HB 2 proposes a merger of the University System of New Hampshire and the Community College System of New Hampshire without any public hearing or input from the major stakeholders, including faculty, students, unions and administration. While the idea may have merit, the timeline proposed is unrealistic and could lead to serious unforeseen and unintended consequences.

Additionally, instead of using $100 million to mitigate losses seen by school districts due to the pandemic, a late amendment was introduced to use that money for a one-time reduction of SWEPT (State-Wide Education Property Tax). This would only result in a very small tax reduction to property owners, while using that money to shore up stressed school budgets would benefit all children in all school districts throughout the state.

This budget unfunds any family planning health care clinic that offers abortion services by requiring that no state funds shall be awarded to any "reproductive health facility" unless the state funded family planning program project is physically and financially separate from a reproductive health facility as defined in RSA 132:37, I. In addition to severely restricting abortion service in the Granite State, language in HB 2 will also make receiving health care services for lower income families extremely difficult. Family planning health care clinics provide the vast majority of STD testing, breast exams and pap tests across the state. This budget puts at risk vital health services and basic care to some of our most vulnerable residents.

This budget only partially funds the implementation of the recommendations of a review conducted by Alvarez & Marsal to increase efficiencies and accountability within DHHS. In particular the report recommends bringing back to New Hampshire, and developing adequate care options, for 38 individual adults with developmental disabilities who are currently receiving services in Florida due to lack of appropriate facilities in New Hampshire. By bringing these individuals home, they would be near their families and existing support networks. This implementation also has the potential for cost savings by providing more appropriate care in-state.

A last minute policy addition to HB 2 dramatically alters the powers of the Governor relating to declaring a state of emergency. Similar policy proposals have been introduced and thoroughly addressed in policy committees. HB 2 is not the appropriate place for additions such as this.

The minority finds that it cannot support HB 2 as amended by the Finance Committee due to the significant underfunding of vital services, programs and positions throughout the state workforce as well as the inclusion of wide reaching and controversial matters that we think should have been worked out with public input in policy committees.

# WEDNESDAY, APRIL 7
# REGULAR CALENDAR - PART TWO
## CHILDREN AND FAMILY LAW

**HB 139,** relative to the submission of evidence in divorce proceedings. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Josh Yokela for the **Majority** of Children and Family Law. This bill addresses the current problem of evidence submitted on the day of court, which is in violation of current court rules that are not always enforced. The bill allows for the opposing party to request a continuance if evidence was submitted 5 days prior to the hearing, allowing for preparation of a rebuttal. It also allows for a judge to declare evidence as de minimis and to record reasoning for not granting a continuance. **Vote 8-7.**

Rep. Debra Altschiller for the **Minority** of Children and Family Law. This bill is well-intentioned, but will undermine current NH Family Division rules which actually provide for submissions of evidence up to five days before a hearing, as set forth in the bill. The committee heard testimony from both the NH Judicial branch and from NH Legal Assistance that this bill would have the opposite effect than is intended. The testimony reinforced that current rules already provide the mechanisms necessary to exclude evidence that is not submitted in a timely fashion. The bill seeks to undermine the judicial rules process where there is already legislative representation and is potentially harmful to an already stressed court.

**HB 142,** relative to causes for divorce. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Debra DeSimone for the **Majority** of Children and Family Law. The current NH statute, reflected in section 458:7, is more than 20 years old and does not reflect societal changes such as same gender marriage and serious drug and alcohol addiction problems. This bill simply updates the law to encompass these issues. **Vote 8-7.**

Rep. Gaby Grossman for the **Minority** of Children and Family Law. This bill is attempting to revise fault-based grounds for divorce to include adultery for same-sex marriage and habitual alcohol and drug abuse. The Supreme Court of NH is currently addressing the issue of adultery in same-sex situations and a finding from the courts related to this matter is expected. The bill text lacks specific language related to alcohol and drug abuse Substance Use Disorder (SUD) treatment may not always be consecutive and recovery from SUD can be a fluid situation which, due to vague language in this legislation, may result in more problems for someone actively seeking treatment.

**HB 161,** relative to the calculation of child support. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Josh Yokela for the **Majority** of Children and Family Law. The majority believes that the calculation of child support is overdue for an update and this bill adopts the recommendations of the last child support study which is required by law to happen every four years. The amendment clarifies that the court can make adjustments to child support for the best interest of the child. The bill raises the self-support reserve so people are not put into homelessness by child support. It updates to the percentages in the child support calculation and adds a credit for shared parenting which causes most of the deviations from the current formula. This bill will smooth the process in the courts with a more predictable and just outcome. **Vote 8-7.**

Rep. Hatch, Coos 6
March 31, 2021
2021-1063h
12/08

Floor Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by deleting sections 330 and 331 relative to the dissemination of divisive concepts.

2021-1063h

AMENDED ANALYSIS

    Delete:

    76.  Defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**

7Apr2021... 1059h

2021 SESSION

21-1082
08/10

HOUSE BILL         *2-FN-A-LOCAL*

AN ACT                relative to state fees, funds, revenues, and expenditures.

SPONSORS:        Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:      Finance

───────────────────────────────────────────────────────────────

AMENDED ANALYSIS

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the retirement system.

9.  Enables the supreme court to transfer funds.

10.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11.  Enables the sale of the lakes region facility in Laconia.

12.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

13.  Repeals provisions relative to the senior volunteer grant program.

14.  Establishes the emergency services for children, youth, and families fund.

15.  Eliminates certain parental reimbursements.

1 ███████████████████████████████████████████████████████

2 ████████████████████████████████████  ██████████████████

3 ███████████████████████████████████████████████████████

4 ███████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████████

7 ███████████████████████████████████████████████████████

8 █████████████████

9   ████████████████████████████████████████

10  ████████████████████████████████████████

11     330  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after

12 chapter 10-B the following new chapter:

13 CHAPTER 10-C

14 PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

15     10-C:1  Definitions.  In this chapter:

16     I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any

17 kind that in any manner have entered into a contract, or perform a subcontract pursuant to a

18 contract, with the state of New Hampshire.

19     II.  "Divisive concept" means the concept that:

20     (a)  One race or sex is inherently superior to another race or sex;

21     (b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

22     (c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or

23 oppressive, whether consciously or unconsciously;

24     (d)  An individual should be discriminated against or receive adverse treatment solely or

25 partly because of his or her race or sex;

26     (e)  Members of one race or sex cannot and should not attempt to treat others without

27 respect to race or sex;

28     (f)  An individual's moral character is necessarily determined by his or her race or sex;

29     (g)  An individual, by virtue of his or her race or sex, bears responsibility for actions

30 committed in the past by other members of the same race or sex;

31     (h)  Any individual should feel discomfort, guilt, anguish, or any other form of

32 psychological distress on account of his or her race or sex; or

33     (i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by

34 a particular race to oppress another race.

35     (j)  The term "divisive concepts" includes any other form of race or sex stereotyping or

36 any other form of race or sex scapegoating.

## HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE
### - Page 156 -

III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.  It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V.  "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI.  "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2  Unlawful Propagation of Divisive Concepts.

I.  Requirements for the state of New Hampshire:

(a)  The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b)  No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II.  Requirements for government contractors:

(a)  All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 157 -**

values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)   The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)   In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)   The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.  The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.  The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.  Requirements for agencies.

(a)   The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.   Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)   The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training," to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 158 -**

1    (2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency

2    employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic

3    protected by federal or state law.

4    (b)  The commissioner of the department of administrative services, pursuant to RSA

5    541-A, shall develop regulations for the enforcement of the provisions of this statute.

6    (c)  Each agency head shall:

7    (1)  Issue a policy incorporating the requirements of this chapter into agency

8    operations, including by making compliance with the policy a provision in all agency contracts;

9    (2)  Request that the agency thoroughly review and assess not less than annually

10   thereafter, agency compliance with the requirements of the policy in the form of a report submitted

11   to the department of administrative services; and

12   (3)  Assign at least one senior political appointee responsibility for ensuring

13   compliance with the requirements of the policy.

14   VI.  Review of agency training.

15   (a)  All training programs for state agency employees relating to diversity or inclusion

16   shall, before being used, be reviewed by the department of administrative services for compliance

17   with the requirements of RSA 10-C:2, V.

18   (b)  If a contractor provides a training for agency employees relating to diversity or

19   inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and

20   such action is in violation of the applicable contract, the agency that contracted for such training

21   shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and

22   regulations.

23   10-C:3  General Provisions.

24   I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial,

25   cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the

26   requirements of this chapter.

27   II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger

28   course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner

29   and without endorsement.

30   III.  If any provision of this chapter, or the application of any provision to any person or

31   circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions

32   to any other persons or circumstances shall not be affected thereby.

33   331  Effective Date.  Section 330 of this act shall take effect January 1, 2022.

34

35

36

37

# Senate

Senate Finance
May 28, 2021
2021-1799s
08/10

Amendment to HB 2-FN-A-LOCAL

1   Amend the bill by replacing all after the enacting clause with the following:



**Amendment to HB 2-FN-A-LOCAL**
**- Page 144 -**



297    New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 145 -**

1     II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or

2 other workplace sensitivity training based on the inherent humanity and equality of all persons and

3 the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4     III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty

5 members of the university system of New Hampshire and the community college system of New

6 Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7     354-A:30  Definitions.  In this subdivision:

8     I.  "Government program" means any activity undertaken by a public employer, both as an

9 employer and in performance of its government function.

10     II.  "Public employee" means any person working on a full-time or part-time basis for the

11 state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,

12 water districts, school districts, school administrative units, or quasi-public entities.

13     III.  "Public employer" includes the state or any subdivision thereof, including, but not

14 limited to counties, cities, towns, precincts, water districts, school districts, school administrative

15 units, or quasi-public entities.

16     354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the

17 use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

18 recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

19 following:

20     I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21 status, familial status, mental or physical disability, religion, or national origin, are inherently

22 superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23 color, marital status, familial status, mental or physical disability, religion, or national origin;

24     II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25 race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26 origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27     III.  That an individual should be discriminated against or receive adverse treatment solely

28 or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29 status, familial status, mental or physical disability, religion, or national origin; or

30     IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31 marital status, familial status, mental or physical disability, religion, or national origin cannot and

32 should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33 orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34 or national origin.

35     354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

36 program shall teach, advocate, or advance any one or more of the following:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 146 -**

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

Amendment to HB 2-FN-A-LOCAL
- Page 147 -

1    354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may

2    pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any

3    other applicable common law or statutory cause of action.

4    298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after

5    section 39 the following new section:

6    193:40  Prohibition on Teaching Discrimination.

7        I.  No pupil in any public school in this state shall be taught, instructed, inculcated or

8    compelled to express belief in, or support for, any one or more of the following:

9            (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital

10   status, familial status, mental or physical disability, religion or national origin is inherently superior

11   to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

12   familial status, mental or physical disability, religion, or national origin;

13           (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual

14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15   or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16           (c)  That an individual should be discriminated against or receive adverse treatment

17   solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

18   marital status, familial status, mental or physical disability, religion, or national origin; or

19           (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

20   marital status, familial status, mental or physical disability, religion, or national origin cannot and

21   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

22   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

23   origin.

24       II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger

25   course of academic instruction, the historical existence of ideas and subjects identified in this

26   section.

27       III.  Any person claiming to be aggrieved by a violation of this section, including the attorney

28   general, may initiate a civil action against a school or school district in superior court for legal or

29   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

30   A:34.

31       IV.  Violation of this section by an educator shall be considered a violation of the educator

32   code of conduct that justifies disciplinary sanction by the state board of education.

33       V.  For the purposes of this section, "educator" means a professional employee of any school

34   district whose position requires certification by the state board pursuant to RSA 189:39.

35   Administrators, specialists, and teachers are included within the definition of this term.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 148 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



**Important Notice**

**Due to the COVID-19 pandemic, the General Court is conducting legislative activities remotely with the exception of publicly noticed sessions in the House or Senate Calendar. During this time, the State House and Legislative Office Building remain closed to visitors.**

May 28, 2021
No. 26

# STATE OF NEW HAMPSHIRE

**Website Address: http://gencourt.state.nh.us**

**NH Senate Digital Calendar Website Address:**
**http://gencourt.state.nh.us/senate/schedule/dailyschedule.aspx**



## First Year of the 167th Session of the New Hampshire General Court

# SENATE CALENDAR

4                                          **Important Notice**

**Due to the COVID-19 pandemic, the General Court is conducting legislative activities remotely with the exception of publicly noticed sessions in the House or Senate Calendar. During this time, the State House and Legislative Office Building remain closed to visitors.**


Senate Finance
May 28, 2021
2021-1799s
08/10

Amendment to HB 2-FN-A-LOCAL

The Senate Amendment to HB 2-FN-A-LOCAL is contained in a separate document labeled as Senate Calendar 26-Supplement 2, Dated May 28, 2021.

Capital Budget
May 27, 2021
2021-1785s
10/04

Amendment to HB 25-A

Amend the bill by replacing all after the enacting clause with the following:

1 Capital Appropriations. The sums hereinafter detailed are hereby appropriated for the projects specified to the departments, agencies, and branches named:

I. Department of Administrative Services

A. Court Facilities

| | |
|---|---|
| 1. Hillsborough County South - Cooling And Controls | 975,000 |
| 2. Lebanon Circuit Courthouse - Remove And Replace Underground Fuel | |
| Storage Tank | 310,000 |
| 3. Portsmouth And Dover Circuit Court Boilers | 570,000 |
| 4. Statewide Courthouse Roof Replacements | 2,100,000 |

B. Facilities and Asset Management

| | |
|---|---|
| 1. Life Safety Upgrades | 570,000 |
| 2. Main Building Rewiring Phase 1 | 800,000 |
| 3. Philbrook Building - Sewer Line Replacement | 300,000 |
| 4. Thayer Building - Replace Roof | 650,000 |
| 5. Tunnel System: Repair And Abandonment Plan | 620,000 |

C. Financial Data Management

| | |
|---|---|
| 1. NH First Migration To Information Cloud Environment | 5,100,000 |

D. General Services

| | |
|---|---|
| 1. HHS Roof Replacement | 2,385,000 |
| 2. HHS/DES Mechanical Replacements And Controls | 1,200,000 |
| 3. Morton, Johnson, HHS Underground Tank Removal | 700,000 |
| 4. Safety Mechanical Replacements And Repairs | 3,125,000 |
| 5. Coos County New Parking Lot and Concrete Plaza Entrance | 442,750 |
| 6. Hillsborough County Courthouse North Cooling Tower | 189,750 |
| 7. Annex 1 - Bancroft ADA Connector | 400,000 |

Sen. Soucy, Dist 18
Sen. Cavanaugh, Dist 16
Sen. D'Allesandro, Dist 20
Sen. Kahn, Dist 10
Sen. Perkins Kwoka, Dist 21
Sen. Rosenwald, Dist 13
Sen. Sherman, Dist 24
Sen. Watters, Dist 4
Sen. Whitley, Dist 15
Sen. Prentiss, Dist 5
June 1, 2021
2021-1815s
11/04


Floor Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by deleting sections 297-300.


2021-1815s

AMENDED ANALYSIS

Delete:

70.   Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**

7Apr2021... 1059h
06/03/2021   1799s
06/03/2021   1816s
06/03/2021   1859s
06/03/2021   1842s
06/03/2021   1821s
06/03/2021   1827s
06/03/2021   1866s
06/03/2021   1884s

2021 SESSION

21-1082
08/10

HOUSE BILL        *2-FN-A-LOCAL*

AN ACT            relative to state fees, funds, revenues, and expenditures.

SPONSORS:         Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:        Finance

───────────────────────────────────────────────────────────────────────────

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the  retirement system.

9.  Enables the supreme court to transfer funds.

10.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11.  Enables the sale of the lakes region facility in Laconia.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 144 -**



297    New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

1    II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or

2    other workplace sensitivity training based on the inherent humanity and equality of all persons and

3    the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4    III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty

5    members of the university system of New Hampshire and the community college system of New

6    Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7    354-A:30  Definitions.  In this subdivision:

8    I.  "Government program" means any activity undertaken by a public employer, both as an

9    employer and in performance of its government function.

10    II.  "Public employee" means any person working on a full-time or part-time basis for the

11    state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,

12    water districts, school districts, school administrative units, or quasi-public entities.

13    III.  "Public employer" includes the state or any subdivision thereof, including, but not

14    limited to counties, cities, towns, precincts, water districts, school districts, school administrative

15    units, or quasi-public entities.

16    354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the

17    use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

18    recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

19    following:

20    I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21    status, familial status, mental or physical disability, religion, or national origin, are inherently

22    superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23    color, marital status, familial status, mental or physical disability, religion, or national origin;

24    II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25    race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26    origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27    III.  That an individual should be discriminated against or receive adverse treatment solely

28    or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29    status, familial status, mental or physical disability, religion, or national origin; or

30    IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31    marital status, familial status, mental or physical disability, religion, or national origin cannot and

32    should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33    orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34    or national origin.

35    354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

36    program shall teach, advocate, or advance any one or more of the following:

1       I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

2    status, familial status, mental or physical disability, religion, or national origin are inherently

3    superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

4    color, marital status, familial status, mental or physical disability, religion, or national origin;

5       II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

6    race, creed, color, marital status, familial status, mental or physical disability, religion, or national

7    origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8       III.  That an individual should be discriminated against or receive adverse treatment solely

9    or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

10   status, familial status, mental or physical disability, religion, or national origin; or

11      IV.   That people of one age, sex, gender identity, sexual orientation, race, creed, color,

12   marital status, familial status, mental or physical disability, religion, or national origin cannot and

13   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15   or national origin.

16      354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse

17   employment action, warning, or discipline of any kind for refusing to participate in any training,

18   program, or other activity at which a public employer or government program advocates, trains,

19   teaches, instructs, or compels participants to express belief in, or support for, any one or more of the

20   following:

21      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

22   status, familial status, mental or physical disability, religion, or national origin are inherently

23   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

24   color, marital status, familial status, mental or physical disability, religion, or national origin;

25      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

26   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

27   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28      III.  That an individual should be discriminated against or receive adverse treatment solely

29   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

30   status, familial status, mental or physical disability, religion, or national origin; or

31      IV.   That people of one age, sex, gender identity, sexual orientation, race, creed, color,

32   marital status, familial status, mental or physical disability, religion, or national origin cannot and

33   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

34   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

35   or national origin.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 147 -**

1   354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may

2   pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any

3   other applicable common law or statutory cause of action.

4   298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after

5   section 39 the following new section:

6   193:40  Prohibition on Teaching Discrimination.

7       I.  No pupil in any public school in this state shall be taught, instructed, inculcated or

8   compelled to express belief in, or support for, any one or more of the following:

9           (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital

10  status, familial status, mental or physical disability, religion or national origin is inherently superior

11  to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

12  familial status, mental or physical disability, religion, or national origin;

13          (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual

14  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15  or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16          (c)  That an individual should be discriminated against or receive adverse treatment

17  solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

18  marital status, familial status, mental or physical disability, religion, or national origin; or

19          (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

20  marital status, familial status, mental or physical disability, religion, or national origin cannot and

21  should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

22  race, creed, color, marital status, familial status, mental or physical disability, religion, or national

23  origin.

24      II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger

25  course of academic instruction, the historical existence of ideas and subjects identified in this

26  section.

27      III.  Any person claiming to be aggrieved by a violation of this section, including the attorney

28  general, may initiate a civil action against a school or school district in superior court for legal or

29  equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

30  A:34.

31      IV.  Violation of this section by an educator shall be considered a violation of the educator

32  code of conduct that justifies disciplinary sanction by the state board of education.

33      V.  For the purposes of this section, "educator" means a professional employee of any school

34  district whose position requires certification by the state board pursuant to RSA 189:39.

35  Administrators, specialists, and teachers are included within the definition of this term.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 148 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.

# Committee of Conference

June 17, 2021
2021-2040-CofC
08/04

1  Committee of Conference Report on HB 2-FN-A-LOCAL, relative to state fees, funds, revenues, and
2  expenditures.

3

4  Recommendation:

5     That the House recede from its position of nonconcurrence with the Senate amendment, and
6  concur with the Senate amendment, and

7     That the Senate and House adopt the following new amendment to the bill as amended by the
8  Senate, and pass the bill as so amended:

9

10 Amend the bill by replacing all after the enacting clause with the following:

11





297    New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 146 -**

1    II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or
2  other workplace sensitivity training based on the inherent humanity and equality of all persons and
3  the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4    III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty
5  members of the university system of New Hampshire and the community college system of New
6  Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7  354-A:30  Definitions.  In this subdivision:

8    I.  "Government program" means any activity undertaken by a public employer, both as an
9  employer and in performance of its government function.

10    II.  "Public employee" means any person working on a full-time or part-time basis for the
11  state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,
12  water districts, school districts, school administrative units, or quasi-public entities.

13    III.  "Public employer" includes the state or any subdivision thereof, including, but not
14  limited to counties, cities, towns, precincts, water districts, school districts, school administrative
15  units, or quasi-public entities.

16  354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the
17  use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service
18  recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the
19  following:

20    I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
21  status, familial status, mental or physical disability, religion, or national origin, are inherently
22  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
23  color, marital status, familial status, mental or physical disability, religion, or national origin;

24    II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
25  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
26  origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27    III.  That an individual should be discriminated against or receive adverse treatment solely
28  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
29  status, familial status, mental or physical disability, religion, or national origin; or

30    IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
31  marital status, familial status, mental or physical disability, religion, or national origin cannot and
32  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
33  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
34  or national origin.

35  354-A:32  Prohibition on the Content of Government Programs and Speech.  No government
36  program shall teach, advocate, or advance any one or more of the following:

Committee of Conference Report on HB 2-FN-A-LOCAL
- Page 147 -

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

Committee of Conference Report on HB 2-FN-A-LOCAL
- Page 148 -

1    354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may

2    pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any

3    other applicable common law or statutory cause of action.

4        298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after

5    section 39 the following new section:

6        193:40  Prohibition on Teaching Discrimination.

7        I.  No pupil in any public school in this state shall be taught, instructed, inculcated or

8    compelled to express belief in, or support for, any one or more of the following:

9            (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital

10   status, familial status, mental or physical disability, religion or national origin is inherently superior

11   to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

12   familial status, mental or physical disability, religion, or national origin;

13           (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual

14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15   or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16           (c)  That an individual should be discriminated against or receive adverse treatment

17   solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

18   marital status, familial status, mental or physical disability, religion, or national origin; or

19           (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

20   marital status, familial status, mental or physical disability, religion, or national origin cannot and

21   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

22   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

23   origin.

24       II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger

25   course of academic instruction, the historical existence of ideas and subjects identified in this

26   section.

27       III.  Any person claiming to be aggrieved by a violation of this section, including the attorney

28   general, may initiate a civil action against a school or school district in superior court for legal or

29   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

30   A:34.

31       IV.  Violation of this section by an educator shall be considered a violation of the educator

32   code of conduct that justifies disciplinary sanction by the state board of education.

33       V.  For the purposes of this section, "educator" means a professional employee of any school

34   district whose position requires certification by the state board pursuant to RSA 189:39.

35   Administrators, specialists, and teachers are included within the definition of this term.

**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 149 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 212 -**

The signatures below attest to the authenticity of this Report on HB 2-FN-A-LOCAL, relative to state fees, funds, revenues, and expenditures.

Conferees on the Part of the Senate                Conferees on the Part of the House

_____                _____

Sen. Morse, Dist. 22                                Rep. L. Ober, Hills. 37


_____                _____

Sen. Bradley, Dist. 3                               Rep. Weyler, Rock. 13


_____                _____

Sen. Daniels, Dist. 11                              Rep. Umberger, Carr. 2


                                                _____

                                                Rep. Edwards, Rock. 4


                                                _____

                                                Rep. Emerick, Rock. 21

# EXHIBIT 11

Rep. Daniel Itse,
"Taxpayers Money is
Being Used to Promote
Systemic Racism in
NH," Union Leader
(Apr. 28, 2021)

Case 1:21-cv-01077-PB - Document 111 - Filed 12/20/21 - Page 2 of 5

https://www.unionleader.com/opinion/op-eds/daniel-itse-taxpayers-money-is-being-used-to-promote-systemic-racism-in-nh/article_e81b9b26-e3f5-5e03-8276-742475a3968c.html

# Daniel Itse: Taxpayers money is being used to promote systemic racism in NH

Apr 28, 2021



Daniel Itse

IT IS IMPORTANT to understand what is happening around us. In the name of anti-racism, our schools and institutions are engaging in racist education.

Here are a few examples:

The University of New Hampshire has a webinar for employees that said the role of White people was to "shut up" and "school yourself."

Southern New Hampshire University has a 5-year plan that involves employees having conversations with their managers about their unconscious bias.

12/2/21, 2:14 PM
Daniel Itse: Taxpayers money is being used to promote systemic racism in NH | Op-eds | unionleader.com
Case 1:21-cv-04577-PB   Document 11   Filed 13/26/21   Page 2 of 5
466

Manchester schools mandated anti-Whiteness training for employees, including a webinar called "what is White privilege really?"

Exeter schools have emailed parents information to educate themselves about anti-racism teaching that Whites are inherently racist.

Holderness has on their website that they are integrating social justice, socialism, into the curriculum: that traditional American values are evil.

Concord is doing "anti-racism" training with teachers, teaching that Whites are inherently racist

These teachings are an attack on what it has traditionally meant to be an American. They are an attempt to make every American subjects rather than citizens. The proposed cure is to transfer wealth from the "oppressor" to the "oppressed". The inevitable result is Marxism. They ignore the fact that American governments are the creations of the people, and the creator is always greater than the creation.

In 1974, the people of New Hampshire amended their Bill of Rights Article 2 by adding a second sentence. "Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin." This may seem intuitively obvious to us, but not to everyone. Importantly, this amendment puts a particular burden not upon you and me, but upon the State of New Hampshire, and by extension its political subdivisions: counties, towns and ... school districts.

This amendment makes it patently unconstitutional for any part of our state or local governments to assign a quality or characteristic upon any person based upon their race (including Caucasian), their creed (including Jewish and Christian), their color (including White), their sex (including male), or national origin (including American). Unfortunately, some of our school districts have been violating this principle by teaching controversial topics such as Critical Race Theory — the theory that White males are inherently oppressors of everyone else. As government officials, our teachers, school administrators and school board members are prohibited from delving into these subjects.

When they took office, our representatives, senators and the governor all took an oath to uphold the Constitution of the state of New Hampshire. That means that they have the duty to enact laws that enforce the Constitution; particularly to prevent members of government from violating the Constitution, such as by teaching Critical Race Theory and similar topics.

Fortunately, Article 38 of our Bill of Rights gives you, the people, the right to enforce the Constitution upon those in public office. It says, in part: And they (the people) have a right to require of their lawgivers (representatives and senators) and magistrates (governor, school administrators, and teachers), an exact and constant observance of them (the principles of the constitution), in the formation and execution of the laws necessary for the good administration of government.

The purpose of House Bill 544 is to enforce the Bill of Rights, Article 2, of the Constitution of the state of New Hampshire upon the government of New Hampshire. Unfortunately, the House of Representatives has laid HB 544 on the table. That means that though it is not dead, neither will it likely go forward.

You, the people of New Hampshire, have the opportunity to lobby your state representatives and senators, and tell them to protect your children from the malfeasance of their teachers and school administrators. You can find your state senator online here — **http://gencourt.state.nh.us**. Tell them what to do.

If the House of Representatives, the Senate and the governor do not take this opportunity to enforce the Constitution, your Constitution, with the school administrators and teachers of this state, then they are declaring war on you and your children.

Daniel Itse served 18 years in the New Hampshire House of Representatives and as vice chair of the Children and Family Law Committee. He lives in Fremont.

# EXHIBIT 12

# Open Letter from
# Business Community



## Your Cart

Your shopping cart is empty.

| Search NHBSR.org | | Search |

<u>Home</u>  <u>About NHBSR</u>  <u>Programs & Services</u>  <u>Our Members</u>  <u>Join NHBSR</u>  <u>News & Events</u>  <u>Blog</u>  <u>Contact Us</u>

## Programs & Services

- ▾ <u>Advocacy</u>
  - ◦ <u>Sustainable Economic Development Vision</u>
  - ◦ Business Values DEI
  - ◦ <u>NH Clean Energy Principles</u>
  - ◦ <u>NH Sensible Housing Principles</u>
- ◦ <u>Cornerstone Award</u>
- ▸ <u>Just One Thing</u>
- ▸ <u>Measure What Matters NH</u>
- ◦ <u>Member Socials</u>
- ◦ <u>NH Workplace Racial Equity Learning Challenge</u>
- ◦ <u>NH Sustainability Awards</u>
- ◦ <u>Partnership for Innovation Award</u>
- ◦ <u>Spring Conference</u>
- ◦ <u>Sustainability Roundtables</u>
- ▸ <u>Sustainability Slam</u>
- ◦ <u>The Art of Conscious Leadership</u>
- ◦ <u>Webinars</u>

# Workplaces Value DEI

**New Hampshire Businesses for Social Responsibility stands in opposition to language of House Bill 544**, An Act Relative to the propagation of divisive concepts, **which is now amended to the budget in HB 2**.  Our vision, *New Hampshire will thrive when we engage the power of business and our people to build a sustainable and prosperous state for all*, inspires us to stand together to achieve our best.  The ambiguous language of HB 544 included in the budget amendment may appear to be supportive of diversity, equity and inclusion (DEI), but its intent is to restrict businesses that contract with the state and organizations receiving funding from the state, from offering DEI training to employees as they deem appropriate.

We know that diversity and inclusion build workplace cultures that thrive because of the innovative ideas and supportive environment that are built on inclusion.  We invite **businesses, nonprofits and educational institutions** around the state to sign onto this letter and raise your voice in support of open and honest exploration of racism and sexism, and in **opposition** to the restrictions within HB 544's language and its inclusion in the House Budget.

### Add your business or organization as a signatory to the following letter ...

An Open Letter Opposing the Language of House Bill 544 to:

State Representatives

State Senators

Governor Christopher T. Sununu

New Hampshire businesses have been challenged on many levels throughout the pandemic, but the resiliency, loyalty and creativity of our employees have been the critical factors in our ability to survive.   We believe that if enacted HB 544, An Act Relative to the propagation of divisive concepts, will have a chilling impact on our workplaces and on the business climate in New Hampshire, and we raise our voices in opposition to it.  Our experience has shown that:

- Diverse and inclusive work environments support innovative thinking and problem solving.  We value the opportunities that arise from different perspectives and open-minded inquiry.  The success of New Hampshire businesses depends on the ability to attract diverse generational, gender and racial employee groups at all levels within our organizations, and we must constantly work to create an environment that makes all employees feel empowered in their roles.

- Our businesses, large and small, have seen that inclusive work environments dramatically increase employee retention, which directly impacts our financial bottom line.  Inclusive work environments must be fostered, including enabling open and honest discussions about racism and sexism, implicit bias and how we can eliminate structural racism.

- As a geographically small state, we constantly compete with neighboring states to attract the best talent.  Creating the image that New Hampshire is regressive and intolerant puts us at an economic disadvantage.

- We value each of our employees and their diverse backgrounds.  We strive to foster an environment that lifts the human spirit and helps individuals to achieve their fullest potential within our workplaces and our communities.  This bill would diminish our ability to do so.

House Bill 544 is antithetical to all of these principles.  The now-rescinded federal executive order that this bill seems to emulate was rightly opposed by business groups including the US Chamber of Commerce. HB 544 would not only harm the ability of New Hampshire businesses to be competitive, it would severely harm the state's image as business-friendly, since it stifles the ability of organizations who do business with the state to foster diverse workforces as they see fit.

It is important to explore, inquire and learn from our past as we move to the future.  We cannot shy away from Diversity, Equity and Inclusion training.  It is critical to our understanding and ability to build strong workplaces.

We believe that New Hampshire is poised to thrive as we emerge from the pandemic.  HB 544's language will stymy the brand image of our businesses as well as the state's innovative spirit and economic opportunities.  We believe that HB 544 disadvantages our businesses and tarnishes New Hampshire's future.

We strongly urge you, our elected representatives, to protect the state, its people, and its businesses from this dangerous and damaging legislation.

**Bolded text indicates >100 employees**

| | | | |
|---|---|---|---|
| 36 Creative | Dimentech, LLC | Meredith Village Savings Bank | Racial Unity Team |
| 350 New Hampshire | Disability Rights Center - NH | Meridan Congregational | Ragged Mountain Equipment |

Case 1:21-cv-0107-PB Document 12 Filed 12/20/21 Page 1 of 6

603 Forward
900 Degrees

ABLE NH

**Adimab, LLC**

AGG Consulting

AHEAD, Inc.

Aileen Dugan State Farm Insurance

Alexandra Chan Photography

Allgood Strategies LLC

Altus Engineering

American Friends Service Committee - NH Program

Ammonoosuc Conservation Trust

**Amoskeag Health**

Amy Conley Music

Anastasia's Table, LLC

**Appalachian Mountain Club**

Arts in Reach

Ascentria Care Alliance

Atlantic Media Productions

Backyard Concept, LLC

Ballantine Partners, LLC

BCM Environmental & Land Law, PLLC

Beechleaf Design

**Bernstein Shur**

Bi-State Primary Care Association

Bill Maddocks Consulting

Blasty Bough Brewing Company

**Boloco**

---

DMS Remodelers

Dover Children's Home

**Easterseals NH, VT, ME & Farnum**

Economic Justice Mission Group, NH Conference Church of Christ

EcoPhotography LLC

Educating for Good

Erin McCabe Wellness

**Families in Transition**

Fat Peach Farm, LLC

**Fidelity Investments**

Flamingos Coffee Bar

Foothills Physical Therapy

Forteng Designs

Frontyard Law, PLLC

Gale River Motel

Garland Mill

Gateways Community Services

Gibson's Bookstore

Global Citizens Circle

Global Round Table Leadership

GoodWork

Granite Backcountry Alliance

Granite Bay Connections

Granite Outdoor Association

**Granite State College**

**Granite State Independent Living**

Granite State Oral Surgery, PLLC

Granite State Organizing Project

---

Church

Mindful Making & Design

MLK and Company

Molan Law Offices, PLLC

Monadnock Conservancy

**Monadnock Food Co-op**

Monadnock Interfaith Project

Morneau Law

Mountain Shadow Adventures

NAMI New Hampshire

Nashua Soup Kitchen & Shelter, Inc.

Natural Dharma Fellowship

Naturesource Communications

Neighborhood Access

NeighborWorks Southern NH

NEMO Equipment

New Directions Collaborative

New Fellowship Baptist Church

New Futures

New Hampshire Alliance for Healthy Aging

New Hampshire Audubon

New Hampshire Business Committee for the Arts

New Hampshire Businesses for Social Responsibility

New Hampshire Center for Nonprofits

New Hampshire Charitable Foundation

New Hampshire Coalition to End Homelessness

New Hampshire College and University Council

New Hampshire Community Action Partnerships

New Hampshire Community Loan Fund

---

Rain for the Sahel and Sahara

Rakowsky Meditation

READ TO ME Literary Arts

Reaching Higher NH

Resilient Buildings Group, LLC

**ReVision Energy**

Reis & Kirkland PLLC

Resilient Buildings Group, Inc.

Revolution

Richardson Media Group

Rights & Democracy NH

Rippleffect Consulting LLC

Rocket Science Rowing

Rooted by Stacey, LLC

RSG

**Saint Anselm College**

Sarah K. Benning Studios

Savings Bank of Walpole

School Administrative Unit 50

Seacoast NH Permaculture

Shaheen & Gordon, P.A.

**Sheehan Phinney**

Sheldon Pennoyer Architects

Shire Digital

Shtudy

Slingshot Ent.

Society for the Protection of New Hampshire Forests

SOS Recovery Community Organization

Bona Fide Green Goods

Brewbakers

**Brewster Academy**

Brown & Company Design

Bruss Construction Management

Burton Strategies

Business Decision Services

**C & S Wholesale Grocers, Inc.**

Caldwell Law

Campus Compact for New Hampshire

Centerbury Center Bed and Breakfast LLC

Canterbury Shaker Village

Capitol Area Public Health Network

Carroll County Coalition for Public Health

Carsey School of Public Policy, UNH

Cayena Capital Management, LLC

Center for Women & Enterprise

Centrus Digital

Chapel+Main Brewpub

Cheshire County TV

Cheshire Garden

Cheshire Housing Trust

**Cheshire Medical Center**

City Year New Hampshire

Clean Water Action

Granite United Way

Greater Nashua Area Branch NAACP

**Greater Seacoast Community Health**

**Hanover Co-op Food Stores & Auto Service Centers**

**Harvard Pilgrim Health Care Foundation**

Heartwood Media

Henry Whipple House

Homefree, LLC

HR State Council of New Hampshire

Hvizda Realty Group

Hypersoft, Inc.

**Hypertherm, Inc.**

Image 4

ISR with Deb Rossetti

JLA Analytics, LLC

JSA Design

John Benford Photography LLC

Kate Johnson, Consultant

**Keene State College**

Kieschnick Consulting Services

Kilwins Portsmouth

**Kimball Union Academy**

Lakes Region Community Developers

Lamprey Health Care

League of Conservation Voters

New Hampshire Council on Developmental Disabilities

New Hampshire Land Trust Coalition

New Hampshire Legal Assistance

New Hampshire Mutual Bancorp

New Hampshire News Views & Blues

New Hampshire Peace Action

New Hampshire Psychiatric Society

New Hampshire Public Health Association

New Hampshire Rivers Council

New Hampshire Trust Company

New Hampshire Womens Foundation

New Hampshire Youth Movement

New Sky Productions

**NFI North**

**Nixon Peabody**

**Norris Cotton Cancer Center**

North Country Climbing Center

**Northeast Delta Dental**

Northeast Organic Farming Association of New Hampshire

Northroad Wood Signs

Northwood Congregational Church

Organizational Ignition

Owl & Pen LLC

**Oyster River Cooperative School District**

Partnered Success College & Life Skills Coaching

South Central Public Health Network

**Southern New Hampshire University**

Square Properties

**St. Joseph Hospital**

**St. Paul's School**

Sterndale Strategic LLC

Stibler Associates

**Stonyfield Organic**

Stratus Telecom LLC

**Sunrise Labs**

Sunset Hill Educational Institute

Sustainable Futures Consulting

Sweaty Turtle Entertainment

Synchrony Advisors, LLC

The Black History Trail of New Hampshire

The Cohen Center for Holocaust & Genocide Studies

The Collector's Eye

**The Duprey Companies**

The Edgewood Centre

The Front Door Agency

The Nature Conservancy

The Nutrition Counseling Center

**The University of New Hampshire**

Throwback Brewery

**Timberland**

| | | | |
|---|---|---|---|
| **Colby-Sawyer College** | **Littleton Food Co-op** | Penumbra | T.L. Hill Group |
| **Community Action Partnership of Strafford County** | Live Free Heating & Cooling | PeopleSense Consulting | TOP Wellness Inc. |
| Concord Food Co-op | Lucky's Coffee Garage | Perform Well | **Tufts Health Plan & Tufts Health Plan Foundation** |
| **Concord School District** | Luminta, LLC | Performance Imaging, Inc. | United Way of Greater Nashua |
| Conservation Law Foundation | MacDowell | Persimmon Consulting, LLC | University of New Hampshire Franklin Pierce School of Law |
| Contract Support Group | Mack Hill Riding Academy LLC | **Pete & Gerry's Organics** | Upper Merrimack Watershed Association |
| Convergent Technical Solutions LLC | MAKE Architects | Petersen Engineering | **Velcro USA Inc** |
| Cornerstone Financial Planning | Manchester Community Action Coalition | **Pierce Atwood, LLP** | Vida Cantina |
| Cornerstone Tree Care | **Mascoma Bank** | Placework | W.S. Badger & Company |
| CUP OF JOE | MasterPeace Massage | **Plymouth State University** | Watson International Consulting |
| Darkfin Studios | MAYO Design | Portsmouth Music and Arts Center | West Central Behavioral Health |
| **Dartmouth College** | **McLane Middleton, PA** | Portsmouth School Board | Wheelhouse Web Solutions |
| **Dartmouth-Hitchcock Health** | McLean Communications | **Prime Buchholz** | **Worthen Industries** |
| David Baum Associates | **MegaFood** | Prince Communications | Yahso Jamaican Grille |
| Davis Pinney Inc. | | Proximity Lab | Yankee Publishing |
| Deep Blue Compass | | | YWCA New Hampshire |

**[Add your company or organization to this letter](#)**

*carnevale*

© **New Hampshire Businesses for Social Responsibility, all rights reserved.**
P.O. Box 3562, Concord, NH 03302-3562. Phone: 603.391.7437

[Terms of Use](#) | [Privacy Policy](#) | [Site Map](#)

 

# EXHIBIT 13

SAU70 Resolution
Opposing HB544



**School Administrative Unit 70**

41 Lebanon Street, Suite 2
Hanover, New Hampshire
*03755-2147*

Hanover High School
Frances C. Richmond Middle School
Bernice A. Ray School
Marion W. Cross School

Whereas HB 544 promotes an unconstitutional restriction on free speech that is harmful to all residents of New Hampshire;

Whereas HB 544 severely impinges upon the concept of local control - the governing and management of public schools by communities through their locally-elected school boards;
Whereas HB 544 prevents our public-school teachers, staff and administrators from receiving Diversity, Equity and Inclusion training designed to address unconscious bias and disparities based on systemic racism and sexism;

Whereas HB 544 denies New Hampshire public school students of all races and genders the opportunity to think critically, openly and inclusively about systemic racism and sexism;

Whereas HB 544 threatens the mental and emotional health of our families and students who identify as black, indigenous, people of color, and LGBTQ+ — protected groups that experience the effects of systemic racism and sexism and its present-day impacts on their daily lives;

Whereas HB 544 threatens to violate our schools' mission and core values of honoring a common vision of equality, empowering students to examine the impact their actions have on themselves, others, and the environment, and of having its students use their hearts and minds to respect and care for the emotional and physical well-being of themselves and others;

Whereas HB 544 places an undue burden on our teachers, staff and administrators by requiring that they adhere to conflicting legislation in two states, as our schools are members of an interstate school district; now, therefore, be it

*Resolved,* the members of the SAU 70, Dresden, Hanover, and Norwich School Boards:

1. affirm our commitment to providing all families and students in our district communities with a supportive, safe, and equitable educational opportunity in our schools;

2. affirm our belief that the freedom to engage in dialogue around topics such as racism and sexism is central to the work of our dedicated staff, teachers, and administrators;

3. oppose New Hampshire HB 544;

4. respectfully request that the New Hampshire Legislature vote no on HB 544; and

5. respectfully request that Governor Sununu veto HB 544 should it pass in the New Hampshire Legislature.

| Jon Hunt | Rick Johnson | Brittany Joyce | Garrett Palm |
| Lisa Christie | Marcela Di Blasi | Kim Hartmann | Kelly McConnell |
| Neil Odell | Tom Candon | Ben Keeney | Kelley Hersey |

# EXHIBIT 14

Hopkinton School District May 6, 2021 Opposition to Divisive Concepts Language in HB2



# HOPKINTON SCHOOL DISTRICT
## School Administrative Unit 66

204 MAPLE STREET · CONTOOCOOK, NH 03229
TEL: (603) 746-5186   FAX: (603) 746-5714

*Above All, Care*

May 6, 2021

Hon. Gary Daniels
Chair, Senate Finance Committee
Concord, NH  03301

**RE: Propagation of Divisive Concepts Prohibited Language in HB 2**

Dear Senator Daniels and members of the Senate Finance Committee:

Thank you for the opportunity to provide comment on language contained within the House passed state budget. The Hopkinton School Board met on May 6th and voted unanimously to register its strong opposition to the embedding of the language in what was HB 544 into the state budget currently being discussed in the Senate Finance Committee.

The Hopkinton School Board agrees with Governor Sununu's stated position that he would likely veto such legislation, as he believes that it infringes on the free speech of NH citizens.  Further, because the HB 544 language is a close model of President Donald Trump's Executive Order 13590, which was struck down in the courts for constitutional violations; and because it is already opposed by numerous prominent NH businesses, organizations, and civil rights groups; it can be expected that such language in the NH budget would be subject to numerous court challenges, with the NH taxpayers footing the legal bills.

Pedagogically, the passage of the current HB 544 language would restrict local control of education and be a hindrance to the proper education of our students.

The mission of the Hopkinton School District is "Above All Care."   Earlier this school year, the Hopkinton School Board passed an updated anti-discrimination policy and plan. We are committed to preventing discrimination by working with students, staff, and families to create an educational and working environment supportive of our diverse school community; by reflecting upon and updating our pedagogy, curriculum, and traditions; and by proactively intervening, responding to and speaking out against discrimination in our community.

Like many school districts and businesses across the state, we are very concerned that our efforts to advance the important work of diversity, equity, inclusion and justice would be undermined by the limitations imposed by the inclusion of this language in the state budget.

| Steven M. Chamberlin | Michelle R. Clark | Mandie Hibbard | Matthew P. Stone |
|---|---|---|---|
| *Superintendent* | *Business Administrator* | *Director of Student Services* | *Director of Technology* |
| schamberlin@hopkintonschools.org | mclark@hopkintonschools.org | mhibbard@hopkintonschools.org | mstone@hopkintonschools.org |

If passed, the language contained in the House budget proposal would fundamentally take away decision making authority on important educational matters and personnel management from the Hopkinton School Board. New Hampshire has traditionally prided itself on a tradition of allowing school districts the latitude to make decisions and set priorities deemed in the best interest of their staff, students and communities. As local elected officials, we take this responsibility seriously – actively engaging with students, families and the greater Hopkinton community to deliver an education that reflects the values of our community. The language contained in the House passed budget seeks to undermine this tradition and make unlawful certain conversations about race, gender and privilege that some members of the Legislature find offensive. We strongly believe that this is the wrong approach.

Aside from political ideology, we fail to understand why the Legislature would undertake this unprecedented action to censor local school districts. It is striking that the House, rather than focus on providing students and communities with the resources needed to provide an adequate education, or address the educational funding gap associated with COVID-19, has instead used the budget process to interfere with local control of education and free speech. We hope that the Senate Finance Committee will use its budget process to focus on providing resources to support student learning and provide local property tax relief, rather than fighting a fictitious culture war – our students and communities deserve better.

Our sincere hope is that rather than use the state budget process to censor certain discussions within our schools, we can instead support the efforts of local decision makers to provide students with the critical thinking skills they need to succeed in the 21st century.

Thank you for your time and consideration of this important issue.

On behalf of the Hopkinton School Board,

Jim O'Brien, Chair
jobrien@sau66.org

2

# EXHIBIT 15

Manchester School Board
Committee Meeting
Agendas, Materials, and
Minutes Concerning
Opposition to HB544

**AGENDA**

**MEETING OF THE
BOARD OF SCHOOL COMMITTEE
MANCHESTER SCHOOL DISTRICT SAU #37**

**May 24, 2021**                                                                  **6:00 p.m.**
**Mayor and all School Board Members**                        Remote Meeting of Board
                                                                                Accessible at MPTV – Channel 22
**Student Representative:** Nycole Spencer (MST)       Call in Phone Number for public: (978) 990-
                                                                              5000 Access code: 761615#

1.       Mayor Craig calls the regular meeting to order.

As Mayor of the City of Manchester and Chair of the Board of School Committee, I find that due to the State of Emergency declared by the Governor as a result of the COVID-19 pandemic and in accordance with the Governor's Emergency Order #12 pursuant to Executive Order 2020-04, this public body is authorized to meet electronically.

Please note that there is no physical location to observe and listen contemporaneously to this meeting, which was authorized pursuant to the Governor's Emergency Order. However, in accordance with the Emergency Order, I am confirming that we are:

   a)   Providing public access to the meeting by telephone, with additional access possibilities by video or other electronic means:

        We are utilizing Manchester Public Television, Channel 22 for this electronic meeting. All members of the Board have the ability to communicate contemporaneously during this meeting through google meets, and the public has access to contemporaneously listen and, if necessary, participate in this meeting through dialing the following phone # 978-990-5000 and password 761615#.

   b)   Providing public notice of the necessary information for accessing the meeting:

        We previously gave notice to the public of the necessary information for accessing the meeting, including how to access the meeting telephonically, located on the website of the Board at:
        https://sites.google.com/a/mansd.org/bosc/.

   c)   Providing a mechanism for the public to alert the public body during the meeting if there are problems with access: If anybody has a problem, please call 715-5280 or email at: publiccomment@mansd.org.

   d)   Adjourning the meeting if the public is unable to access the meeting:

        In the event the public is unable to access the meeting, the meeting will be adjourned and rescheduled. Please note that all votes that are taken during this meeting shall be done by roll call vote. Let's start the meeting by taking a roll call attendance. When each member states their presence, please also state whether there is anyone in the room with you during this meeting, which is required under the Right-to-Know law.

EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.

May 24, 2021 Board of School Committee
Page 2 of 5

**2.**       The Clerk calls the roll.


**PUBLIC FORUM**

**3.**       Mayor Craig advises that the purpose of the public forum is to give the residents of Manchester the opportunity to address the board on items of concerns affecting the community; each person will be allowed only one submission; comments shall be submitted via email to publiccomment@mansd.org and **shall be limited to 400 words or less**.  Your email **MUST** include your **name and address** and must be submitted to the email by 5:00 on the date of the meeting.  The submitted public comments will be read at the meeting by the clerk.  Submissions should be regarding items on this agenda.  Submission of comments shall not be to make complaints of school personnel or complaints against any person connected with the District, other channels are provided for Board consideration and disposition of legitimate complaints involving individuals which should be referred to the superintendent.

**4.**       Mayor Craig advises that if there was no one else present wishing to speak, a motion would be in order to take all comments under advisement and further to receive and file any written documentation presented.

**5.**       Response to Public Comment
        *(Note:  Motions limited to sending items to Committees only.)*


**6.**       **RECOGNITION/PRESENTATIONS**

**7.**       Manchester West NJROTC 50th Anniversary
      https://drive.google.com/file/d/11hj-ky9KjgcJouP3DKGymYDBzxLUGI9b/view

**8.**       Davis Demographics Presentation                               **1 – 30**


**9**.       **ACTION AGENDA**

**10.**     New Hampshire Department of Education (NHDOE) Program     **31 – 72**
        Assurances for Fiscal Year 2022
        **Ladies and Gentlemen, what is your pleasure?**

EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.

May 24, 2021 Board of School Committee
Page 3 of 5

11.   Ratification of the Phone poll approving the submission of the letter to       **73 – 84**
       State Legislators in opposition of HB544
       **Ladies and Gentlemen, what is your pleasure?**

12.   Approval of Job Descriptions and Reorganization of HR and Network       **85 – 102**
       Directors
                 a.     Elimination of three (3) Network Directors   *85 – 93*
                        • Replaced with two (2) Executive Directors of School Leadership and
                          Performance
                 b.     Budgetary savings from elimination of one Network Director used for new
                        position: Chief Talent Officer                   *94 – 102*
                        • Director of Human Resources job description change
       **Ladies and Gentlemen, what is your pleasure?**


13.   **CONSENT AGENDA (ITEMS 13 – 20)**

14.   Mayor Craig advises if you desire to remove any of the following items from the Consent
       Agenda, please so indicate.  If none of the items are to be removed, one motion only will be
       taken at the conclusion of the presentation.

15.   Approval of minutes, if available:  Minutes of the May 10, 2021 Special and Regular Meeting;
       and both of the May 17, 2021 special meetings

16.   Report(s) of the Committee of Policy, if available.

       a.   Fiscal Policy 130: Federal Funds Policies and Procedures              **103 – 136**

17.   Report(s) of the Committee of Teaching and Learning, if available.

18.   Report(s) of the Committee of Finance and Facilities, if available.       **137 – 259**

       a.   SmartShopper Renewal                                     137 – 174
       b.   Financial Reports                                        175 – 191
       c.   Treasurer's Report                                       192 – 197
       d.   City Services Invoices ($909,387.86)                     198 – 200
       e.   Manifest of Authorized Expenditures ($19,152,580.89)     201 – 203
       f.   Grant, Gifts and Donations Report ($161,559.91)          204 – 207
       g.   Anthem 2020 New Hampshire Legislative Mandates ($25,000.00) 208 – 210
       h.   RFP Results – Stop Loss Health Insurance ($947,158.00)   211 – 213

EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.

i.   Facilities Projects                                              214 – 216
j.   RFP Results – Competency-Based Education – School Implementation Training and
     Consulting Services ($261,000.00)                              218 – 219
k.   RFP Results – 2021 Request for Fall Supplies, Equipment and  220 – 226
     Uniforms ($28,941.06)
l.   RFP Results – Art Supplies ($36,000.00)                        227 – 230
m.   RFP Results – Music Supplies ($9,000.00)                       231 – 235
n.   RFP Results – Copy/Printer Paper ($102,298.00)                236 – 238
o.   RFP Results – School and Office Supplies ($179,728.00)        239 – 243
p.   RFP Results – Elevator and Chair Lift Maintenance and Inspection Services   244 – 251
q.   Southern New Hampshire University (SNHU) ESY MOU              252 – 255
r.   Southern New Hampshire University (SNHU) and MSD Aspire 256 – 259
     Program Continuation

**19.**   Report(s) of the Special Committee on Education Legislation, if available.

**20.**   Report(s) of the Committee of Student Conduct, if available.

**LADIES AND GENTLEMEN, HAVING DULY READ THE CONSENT AGENDA, A
MOTION WOULD BE IN ORDER THAT THE CONSENT AGENDA BE APPROVED.**

## <u>COMMUNICATIONS</u>

**21.**   Superintendent's Communications.

   a)   Covid Update

      1.   Mask Use in Schools                                      **260**
           **Ladies and Gentlemen, what is your pleasure?**

   b)   Teaching and Learning Update                                **261 – 262**

      1.   Graduation Numbers

   c)   Athletics: Approval for change in mask requirements and Summer Sports Training -  by
        Amy Allen, Assistant Superintendent of Teaching, Learning and Leading and Christine
        Pariseau-Telge, Athletic Director
        **Ladies and Gentlemen, what is your pleasure?**              **263 – 264**

EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.

May 24, 2021 Board of School Committee
Page 5 of 5

    d)  Update on the Chief Equity Officer Position

    e)  Discussion on in-person meetings

**22.**    Board of School Committee Members' Communications.

**23.**    Personnel Report.
        **Ladies and Gentlemen, what is your pleasure?**    **CONFIDENTIAL**    **265 – 269**

**24.**    **TABLED ITEMS**
        *(A motion would be in order to remove any item from the table.)*

**25.**    **NEW BUSINESS**

**26.**    A motion is in order to go into non-public session under the provisions of RSA 91-A:3 II *(a, b, and c)* for the dismissal, promotion or compensation of any public employee or the hiring of any person as a public employee; and, for matters, which if discussed in public, would likely affect adversely the reputation of any person.

        **A roll call is required on the motion.**        **CONFIDENTIAL**

**27.**    A motion is in order to call the meeting back to order.
        **If the board so desires, a motion is in order to seal the minutes of the non-public session.**

**ADJOURNMENT**

**28.**    If there is no further business, a motion is in order to adjourn.

It is the policy of the Manchester Board of School Committee, in its actions, and those of its employees, that there shall be no discrimination on the basis of age, sex, race, color, marital status, physical or mental disability, religious creed, national origin or sexual orientation for employment in, or operation and administration of any program or activity in the Manchester School District.  The Title IX Coordinator is Mary Steady for staff and students.  Please see above for contact information.

EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.

# 2020-2022
# Board of School Committee

## Yeas and Nays

**Meeting:**   Board of School Committee - PHONE POLL
**Date:**   5/13/2021
**Motion:**   r                              r

d  d

| Committee Member | Yea | Nay | Abstain | Absent |
|---|---|---|---|---|
| Cmt. Member Turner | | | | |
| Cmt. Member Kelley Arnold | | | | |
| Cmt. Member Soule | | | | |
| Cmt. Member Want | | | | |
| Cmt. Member Dobson | | | | |
| Cmt. Member Bergeron | | | | |
| Cmt. Member Shea | | | | |
| Cmt. Member Perich | | | | |
| Cmt. Member Dion | | | | |
| Cmt. Member Beaulieu | | | | |
| Cmt. Member Leapley | | | | |
| Cmt. Member Thomas | | | | |
| Cmt. Member Lachance | | | | |
| Cmt. Member O'Connell | | | | |
| Mayor Craig | | | | |
| **Total:** | **13** | **1** | **1** | **0** |

TO:          Board of School Committee

FROM:        Committee on Policy
             Committee Members Want, Dion, O'Connell, Perich and Leapley

DATE:        May 24, 2021

RE:          Letter opposing HB544

At the May 11, 2021, Committee on Policy meeting, it was moved to approve the submission of the letter to State Legislation in opposition of HB544, as amended, allow the Vice Chair to request a phone poll be done on the approval and forward this item to the full Board of School Committee for approval.

Committee Members Want, Dion, O'Connell, Perich and Leapley were in favor.

Respectfully submitted,

*Angela M Carey*

Angela Carey

Clerk of the Board of School Committee

**Amendments made at 5/11/2021 Policy Committee are in red.**

May 10, 2021

Dear **Governor Sununu**, House, Senate, and Executive Council members,

The Manchester Board of School Committee would like to voice its **opposition to House Bill 544 and the inclusion of its language in current budget proposals**. This bill seeks to define and prohibit  the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.   In reality, this bill is an attempt to silence dialogue and restrict speech.

We are opposed to any bill which will limit any school's ability to talk about race or gender, or to educate our students and staff about the historical discrimination against communities of color, women, and other marginalized groups, and the impacts this long standing racism and sexism has had on the American people.

As a board we have looked at disaggregated data and have identified stark disparities in outcomes for our students of color, students from lower socio-economic backgrounds, as well as, our special needs students. These are national trends. To quote former President George W. Bush they are often the result of "the soft bigotry of lower expectations"[1]. In order to overcome the biases that hold some of our students back from reaching their fullest potential, we believe it is critical for teachers and students to examine the outcome disparities that exist in our society and understand their root causes. Unfortunately, there are long term consequences of slavery and sexism in this country, and while our current laws might mean that such discrimination is illegal today, millions of Americans still experience the effects of that history. We cannot pretend this history does not exist or that it does not affect our present and future. We believe our students should learn to think critically about their world, so that they can not only thrive in it, but work to improve it for themselves and others.

This Board recently passed a policy aimed at creating an equitable education experience for the students in the Manchester school district. This policy acknowledges that students in the Manchester school district do experience the negative impacts of racism and sexism, and this policy aims to study data regarding the real educational hurdles that racism creates for many students. Specifically, this policy seeks to provide "all employees and students opportunities to develop critical racial, ethnic, and cultural competence to understand the contexts in which they teach, work, and learn." This goal is only attainable if the District is (a) able to study data regarding the negative impact of biases against certain students; and (b) work to meaningfully train and educate everyone in the district s community on the nature of implicit bias and how it negatively impacts many students in the district by limiting their access to the same education as their peers. The goal is to provide the same educational access to each student in Manchester, regardless of the student s race or ethnicity. The reach of this policy is wide, as we hope to address not only race and ethnicity, but also those impacted by discrimination due to language, gender identity, special education status, sexual orientation, socioeconomic background, and mobility. Many students in Manchester fall into one of those categories, and to pass a bill such as

**Amendments made at 5/11/2021 Policy Committee are in red.**

this one would severely hamper the ability of our district to move forward in our goal of providing equitable access to education for all our students.

We MUST be able to talk about these issues and not simply pretend they don t exist because they make some of us feel uncomfortable talking about them. We MUST all be able to sit with the discomfort and have real conversations about how we can all work together to create environments in our schools that promote each child s abilities and interests to help them reach their fullest potential.

The Board of School Committee is responsible for working with our community to set expectations of awareness around equal opportunity for all of our students with an understanding that race and gender can impact outcomes if not addressed in an open honest manner.

Manchester is New Hampshire s most diverse community and this bill would harm the Manchester School District students by limiting our freedom of speech and local control. We ask you to vote NO on HB544.

Thank you for taking the time to understand our opposition to HB544.

Sincerely,
The Manchester Board of School Committee


*1 Quote from President George W. Bush in speech to NAACP that marked the launch of the <u>No Child Left Behind Act of 2000</u>.*

# MANCHESTER SCHOOL DISTRICT

**TITLE**: HB544-Letter from the Board

**COMMITTEE ON __Policy_____ MEETING OF: _____5/11/21_____**

ACTION: ____x__          CONSENT:          INFORMATION:

**BACKGROUND:  Attached please find the following policy:**

**HB544-Letter from the Board of School Committee**


FISCAL VERIFICATION: _____

**RECOMMENDATION**:

That the Committee on Policy moves to approve this letter and send it to the full Board of School Committee for approval and submission to the NH State legislature.


Prepared by:                              Presented by:

_____                _____
Katie Cox Pelletier                      Leslie Want
                                         Committee Chair


                                         _____
                                         Leslie Want
                                         Committee Chair

May 10, 2021


Dear House, Senate, and Executive Council members,

The Manchester Board of School Committee would like to voice its objection to HB544. This bill seeks to define and prohibit "the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs." In reality, this bill is an attempt to silence dialogue and restrict speech.

We are opposed to any bill which will limit any school's ability to talk about race or gender, or to educate our students and staff about the historical discrimination against communities of color, women, and other marginalized groups, and the impacts this long standing racism and sexism has had on the American people.

As a board we have looked at disaggregated data and have identified stark disparities in outcomes for our students of color, students from lower socio-economic backgrounds, as well as, our special needs students. These are national trends. To quote former President George W. Bush they are often the result of "the soft bigotry of lower expectations"[1]. In order to overcome the biases that hold some of our students back from reaching their fullest potential, we believe it is critical for teachers and students to examine the outcome disparities that exist in our society and understand their root causes. Unfortunately, there are long term consequences of slavery and sexism in this country, and while our current laws might mean that such discrimination is illegal today, millions of Americans still experience the effects of that history. We cannot pretend this history does not exist or that it does not affect our present and future. We believe our students should learn to think critically about their world, so that they can not only thrive in it, but work to improve it for themselves and others.

This Board recently passed a policy aimed at creating an equitable education experience for the students in the Manchester school district. This policy acknowledges that students in the Manchester school district do experience the negative impacts of racism and sexism, and this policy aims to study data regarding the real educational hurdles that racism creates for many students. Specifically, this policy seeks to provide "all employees and students opportunities to develop critical racial, ethnic, and cultural competence to understand the contexts in which they teach, work, and learn." This goal is only attainable if the District is (a) able to study data regarding the negative impact of biases against certain students; and (b) work to meaningfully train and educate everyone in the district's community on the nature of implicit bias and how it negatively impacts many students in the district by limiting their access to the same education as their peers. The goal is to provide the same educational access to each student in Manchester, regardless of the student's race or ethnicity. The reach of this policy is wide, as we hope to address not only race and ethnicity, but also those impacted by discrimination due to language, gender identity, special education status, sexual orientation, socioeconomic background, and mobility. Many students in Manchester fall into one of those categories, and to pass a bill such as this one would severely hamper the ability of our district to move forward in our goal of providing equitable access to education for all our students.

We MUST be able to talk about these issues and not simply pretend they don't exist because they make some of us feel uncomfortable talking about them. We MUST all be able to sit with the discomfort and have real conversations about how we can all work together to create environments in our schools that promote each child's abilities and interests to help them reach their fullest potential.

The Board of School Committee is responsible for working with our community to set expectations of awareness around equal opportunity for all of our students with an understanding that race and gender can impact outcomes if not addressed in an open honest manner.

Manchester is New Hampshire's most diverse community and this bill would harm the Manchester School District students by limiting our freedom of speech and local control. We ask you to vote NO on HB544.

Thank you for taking the time to understand our opposition to HB544.

Sincerely,
The Manchester Board of School Committee

*1 Quote from President George W. Bush in speech to NAACP that marked the launch of the <u>No Child Left Behind Act of 2000</u>.*



# Bill Text: NH HB544 | 2021 | Regular Session | Introduced
# New Hampshire House Bill 544

**Bill Title:** Relative to the propagation of divisive concepts.

**Spectrum:** Partisan Bill (Republican 3-0)

**Status:** *(Introduced)* 2021-04-08 - Lay on Table (Rep. Osborne): Motion Adopted DV 347-18 04/08/2021 [HB544 Detail]

**Download:** New_Hampshire-2021-HB544-Introduced.html

---

**HB 544  - AS INTRODUCED**


2021 SESSION

21-0732
05/04

HOUSE BILL *544*

AN ACT relative to the propagation of divisive concepts.

SPONSORS: Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4

COMMITTEE: Executive Departments and Administration

-----------------------------------------------------------------

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Explanation: Matter added to current law appears in **bold italics.**
Matter removed from current law appears [in brackets and struckthrough.]
Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.
21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:
CHAPTER 10-C
PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED
10-C:1  Definitions.  In this chapter:
I. "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.
II. "Divisive concept" means the concept that:
(a) One race or sex is inherently superior to another race or sex;
(b) The state of New Hampshire or the United States is fundamentally racist or sexist;
(c) An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
(d) An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;
(e) Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(f) An individual's moral character is necessarily determined by his or her race or sex;

(g) An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h) Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i) Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j) The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

III. "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV. "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V. "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI. "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2 Unlawful Propagation of Divisive Concepts.

I. Requirements for the state of New Hampshire:

(a) The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b) No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II. Requirements for government contractors:

(a) All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that: (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b) The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c) In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d) The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor. The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III. The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section. The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV. The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V. Requirements for agencies.

(a) The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. Accordingly:

(1) The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training", to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

(2) Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by federal or state law.

(b) The commissioner of the department of administrative services, pursuant to RSA 541-A, shall develop regulations for the enforcement of the provisions of this statute.

(c) Each agency head shall:

(1)  Issue a policy incorporating the requirements of this chapter into agency operations, including by making compliance with the policy a provision in all agency contracts;

(2)  Request that the agency thoroughly review and assess not less than annually thereafter, agency compliance with the requirements of the policy in the form of a report submitted to the department of administrative services; and

(3)  Assign at least one senior political appointee responsibility for ensuring compliance with the requirements of the policy.

VI.  Review of agency training.

(a)   All training programs for state agency employees relating to diversity or inclusion shall, before being used, be reviewed by the department of administrative services for compliance with the requirements of RSA 10-C:2, V.

(b)  If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and regulations.

10-C:3  General Provisions.

I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this chapter.

II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner and without endorsement.

III.  If any provision of this chapter, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions to any other persons or circumstances shall not be affected thereby.

2  Effective Date.  This act shall take effect January 1, 2022.

FO  NDATIONS 101 DISTRICT        ITY  OLICY

The Manchester School District is committed to equity and the success of every student. This commitment means that student success will not be predicted based on race, ethnicity, family economics, mobility, gender, sexual orientation, disability, or initial proficiencies. Equity in education is about inclusiveness. Equity is achieved when there is sufficient evidence that each child has a high quality educational experience, and outcomes and successes are not predicted by student subgroup membership.

In order to break the predictive link between student demographics and student achievement, the District must apply the principle of equity to all policies, programs, operations, and practices and ensure all students have access and opportunity to high quality education.

To assure equity, the District will:

- Use data, disaggregated by race: ethnicity, language, special education, gender, sexual orientation, socioeconomic background, and mobility (when available) to inform all district decision-making and report on the district website and to the BOSC annually;

- Create and nurture an inclusive and welcoming environment for all students, families, and staff; provide a report to the BOSC annually which reports student, parent and staff complaints.

- Provide students with equitable access to a high quality curriculum, effective teachers and principals, support, facilities, and sufficient support services; report results of student surveys annually.

- Aspire to recruit, hire and retain high quality personnel that reflect student demographics at all organizational levels; report to the BOSC annually.

- Support personnel at all organizational levels to engage in culturally responsive practices and high quality professional engagement; include evidence of professional development in the district professional development Plan.

- Identify and mitigate culturally biased instructional materials, assessments, and pedagogies that result in achievement disparities;

- Incorporate the voice and perspectives of students, families and communities that reflect student demographics into decisions that benefit student success;

- Assure all students have access to the college planning handbook;

- Translate documents for families so that they have equitable access to information.

First Reading Coordination: 7/11/16
Second Reading and Approval BOSC: 8/8/16

**BOARD OF SCHOOL COMMITTEE**
**MANCHESTER SCHOOL DISTRICT SAU #37**

**May 24, 2021**                                                                 **6:00 p.m.**

**1.**     Mayor Craig calls the regular meeting to order.

As Mayor of the City of Manchester and Chair of the Board of School Committee, I find that due to the State of Emergency declared by the Governor as a result of the COVID-19 pandemic and in accordance with the Governor's Emergency Order #12 pursuant to Executive Order 2020-04, this public body is authorized to meet electronically.

**2.**     The Clerk calls the roll.

Present:     Committee Members Turner, Kelley Arnold, Soule, Want, Dobson, Perich, Dion, Beaulieu, Leapley, Thomas, Lachance, O'Connell, Mayor Craig and Student Representative Mahindru.

Late:   Committee Members Bergeron and Shea.

**<u>PUBLIC FORUM</u>**

**3.**     Mayor Craig advises that the purpose of the public forum is to give the residents of Manchester the opportunity to address the board on items of concerns affecting the community; each person will be allowed only one submission; comments shall be submitted via email to <u>publiccomment@mansd.org</u> and **shall be limited to 400 words or less**.  Your email **MUST** include your **name and address** and must be submitted to the email by 5:00 on the date of the meeting.  The submitted public comments will be read at the meeting by the clerk. Submissions should be regarding items on this agenda.  Submission of comments shall not be to make complaints of school personnel or complaints against any person connected with the District, other channels are provided for Board consideration and disposition of legitimate complaints involving individuals which should be referred to the superintendent.

**1.  Terese Aguirre, 65 Tibbetts Hill Road, Goffstown NH:**
To Whom It May Concern,  I have been a teacher at Hillside for 8 years.  I was not ready to work in the Middle School environment and I went in feeling like a small fish in a big pond.  I was overwhelmed walking into such a big school.  That feeling quickly changed.  I was put on a wonderful Hillside team and everyone made me feel like I have known them for years.  From the start, it was clear that I was never just a number.  I was Therese, with all of my strengths and weaknesses.  I felt comfortable that learning from my mistakes was okay, while at the same time being called on to share my strengths.  Teachers and administrators are always the first to say, "The only mistake is not to try,"

We have talked about consolidating buildings and making beautiful buildings that are high tech.  It was stated that the city needs to do something big to attract families back to the district.

19. It was stated that previous numbers were based on students from outside of the district with no significant changes in programming and we need to create a reason for students to want to come to the district.

**9**.   **ACTION AGENDA**

**10.**   New Hampshire Department of Education (NHDOE) Program Assurances for Fiscal Year 2022

 ere  ere no   estions or comments on t  is item.

 n motion o  **Committee Member Soule,** d  ly seconded by **Committee Member Beaulieu,** it   as mo  ed to a  ro e t e Ne  am s ire  e artment o  d cation  rogram  ss rances or  iscal  ear  .

 oll Call:    Committee Members   rner,  elley  rnold,  o le,  ant,  obson,  ergeron,   ea, eric ,  ion,  ea lie ,  ea ley,  ac ance,   Connell and Mayor Craig  oted yay.  Committee Member   omas   as absent. Motion   assed.

**11.**   Ratification of the Phone poll approving the submission of the letter to State Legislators in opposition of HB544

 ere  ere no   estions or comments on t  is item.

 n motion o  **Committee Member Want,** d  ly seconded by **Committee Member O'Connell,** it   as mo  ed to rati y t e   one  oll and a   ro e t e s bmission o  t e letter to t e  tate  egislators in o   osition o          .

*oll Call:     Committee Members    rner,  elley  rnold,  o  le,   ant,   obson,  ergeron,    ea,*

*eric ,   ion,   ea lie ,   ea ley,     Connell and Mayor Craig   oted yay. Committee Member*

*ac ance   oted nay. Committee Member     omas   as absent. Motion   assed.*

12.     Approval of Job Descriptions and Reorganization of HR and Network Directors
    a.     Elimination of three (3) Network Directors
        • Replaced with two (2) Executive Directors of School Leadership and Performance
    b.     Budgetary savings from elimination of one Network Director used for new position: Chief Talent Officer
        • Director of Human Resources job description change

*n motion o  **Committee Member O'Connell,** d  ly seconded by **Committee Member Lachance,** it   as*

*mo  ed to send item    to t e Committee on   eac ing and   earning or   rt er st dy.*

*oll Call:      Committee Members    rner,  elley  rnold,  o le,   obson,  ergeron,  eric ,   ion,*

*ea lie ,   ea ley,  ac ance,    Connell and Mayor Craig   oted yay. Committee Members    ant and*

*ea   oted nay. Committee Member     omas   as absent. Motion   assed.*

13.     **<u>CONSENT AGENDA (ITEMS 13 – 20)</u>**

14.     Mayor Craig advises if you desire to remove any of the following items from the Consent Agenda, please so indicate.  If none of the items are to be removed, one motion only will be taken at the conclusion of the presentation.

**Committee Member Dobson** removed item 18-i.
**Committee Member Want** removed item 18-b.

The balance of the consent agenda was as follows:

15.     Approval of minutes, if available:  Minutes of the May 10, 2021 Special and Regular Meeting; and both of the May 17, 2021 special meetings

16.     Report(s) of the Committee of Policy, if available.

    a.   Fiscal Policy 130: Federal Funds Policies and Procedures

17.     Report(s) of the Committee of Teaching and Learning, if available.