# EXHIBIT 16

Frank Edelblut, "Teach Children
About Racism, Not To Be Racists,"
Union Leader (June 13, 2021)

12/2/21, 8:26 PM
Teach children about racism, not to be racists | Department of Education
Case 1:21-cv-01077 Document 1 Filed 12/02/21 Page 2 of 4
502

🌐 Change Site Language   🔍 Search The Site

 **ALERT** **Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**

 New Hampshire
# Department of Education



☰ **OPEN MENU**

Home  ❯  Teach children about racism, not to be racists

## In the News

For Immediate Release
June 13, 2021

### Contact

New Hampshire Department of Education
(603) 271-0448 | Comms@doe.nh.gov

# Teach children about racism, not to be racists

## By Frank Edelblut



NEW HAMPSHIRE

# UNION LEADER

THE RIGHT TO FREEDOM WITHOUT DISCRIMINATION legislation recently passed by the New Hampshire Senate is an important, and needed, contribution to our education system. It helps ensure that our students learn about the evils of racism without teaching them to be racists.

This legislation lays out some important instructional boundaries that, with increasing frequency, have been crossed. These guardrails will help instill confidence in parents that our basic values are not being compromised. It will also help educators who increasingly find themselves in uncomfortable training and teaching circumstances that are contrary to their instructional mission.

The Legislation states that no pupil shall be taught:

That one's immutable characteristics (defined as age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) are inherently superior to immutable characteristics of another;

That an individual, by virtue of his or her immutable characteristics, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her immutable characteristics; or

That people of one immutable characteristic cannot and should not attempt to treat others without regard to these immutable characteristics.

One would think that these are common sense concepts that we can all agree on. After all, who wants to teach children that, for example, one race is superior to another?

However, for those who promote Critical Race Theory or similar concepts, their thinking is not built on a foundation of common sense, but on ideology diametrically opposed to the truths found in our Declaration of Independence, that we are all created equal.

In Ibram Kendi's "How to Be an Antiracist" — a prominent text in support of Critical Race Theory — he states, "[t]he only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination … The only remedy to present discrimination is future discrimination." This idea is, of course, in complete opposition to the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution. As Justice John Marshall Harlan stated in his dissension to Plessy v. Ferguson, "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens."

And the concepts of Critical Race Theory actually contradict the very premises of the civil rights movement and Dr. Martin Luther King himself.

One New Hampshire high school offers an enrichment class entitled, "Exploring Whiteness and becoming an Antiracist Activist." In this course, a "Race Literacy Quiz" identifies the Declaration of Independence as the idea tied most directly to the rise of White supremacy.

This notion is completely contradictory to the very words of Dr. King. Speaking at the centennial celebration of the Emancipation Proclamation, Dr. King described the Declaration of Independence as follows, "If our nation had done nothing more in its whole history than to create just two documents, its contribution to civilization would be imperishable. The first of these documents is the Declaration of Independence."

Those opposing Right to Freedom From Discrimination legislation assert that supporters do not want to teach children the complete history of the United States. They assert that there is an attempt to limit speech and academic freedom. They assert that legislation will limit diversity and inclusivity.

Of course, it is Critical Race Theory that would distort our history, limit our speech through its cancel culture and divide us up by immutable characteristics, ignoring the inherent humanity of each individual.

In fact, Right to Freedom From Discrimination legislation can help ensure that students get the whole history, and not a limited or biased view of that history. We should ensure that Title VI of the Civil Rights Act of 1964, which protects all students from being treated differently based on their race, color or national origin, is being followed.

All of us should continue to believe in the dream Dr. King gave us, that children "will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character."

Our education system aspires to teach students about socialism, not to be socialists and about communism, not to be communists. Supporters of Right to Freedom From Discrimination legislation want to make sure that children are taught about racism, but not to be racists, as Kendi seems to advocate.

The guardrails outlined in the legislation recently passed by the New Hampshire Senate help us do just that.

—

Frank Edelblut is commissioner of the New Hampshire Department of Education. He lives in Wilton.

504



New Hampshire
# Department of Education

**101 Pleasant Street | Concord, NH | 03301-3860**
(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 |
info@doe.nh.gov

Directions to NHDOE ›      Subscribe to e-news ›

NH Career and Technical Education

NH Schools

iPlatform

myNHDOE

Educator Search

NH Government Careers

NH Travel & Tourism

NH Web Portal - NH.gov

ReadyNH.gov

Transparent NH

© 2021 State of New Hampshire • All rights reserved  |  Accessibility Policy  |  Privacy Policy      AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE



# EXHIBIT 17

Governor's Advisory
Council on Diversity and
Inclusion Correspondence
Regarding Banned
Concepts Act



**CHRISTOPHER T. SUNUNU**
Governor

**Governor's Advisory Council on Diversity and Inclusion**

March 9, 2021

Ahni Malachi, Chair

Dr. Dottie Morris, Vice Chair

Sean Locke, Secretary

Devon Chaffee

Chief Charlie Dennis

Maria Devlin

Sharon Harris

Ann Landry

James Maggiore

Dr. Salman Malik

Commissioner Ken Merrifield

Dr. James Morse

Pawn Nitichan

Commissioner Robert Quinn

Marianne Rechy

Sheriff Eliezer Rivera

Allyson Ryder

His Excellency Christopher T. Sununu
Governor of the State of New Hampshire
State House
107 North Main Street
Concord, NH 03301

Dear Governor Sununu,

The Governor's Council on Diversity and Inclusion ("the Council") has several concerns about the pending bill, HB 544 "relative to the propagation of divisive concepts." Although the fate of this bill is uncertain, its passage carries the potential to impact both: (1) the ability of people working within and on behalf of the state to engage in honest, robust discussions on matters of pressing concern to Granite Staters and (2) ongoing efforts to create an environment in New Hampshire that is deeply rooted in principles of equity, diversity, and inclusion.

By its own terms, HB 544 would prohibit state actors and contractors with the state from teaching, instructing, or training "any employee, contractor, staff member, student, or any other individual or group" divisive concepts. This could include purely elective educational offerings within the state's university system.

The Council believes that the definition of "divisive concepts" and the prohibitions HB 544 endeavor to create carry the potential to undermine all of the work done within the Granite State over the past few years to promote diversity and inclusion and address the continued harms of racism. This includes efforts that you have championed over the past several years, such as the work done by and recommendations given by the Commission on Law Enforcement Accountability, Community, and Transparency ("LEACT"), the COVID-19 Equity Response Team, and this Council.

Additionally, the controlling nature of the bill could significantly impede important work by educators in this state and our institutions of higher learning. Critical Race Theory, implicit bias, and other concepts, ideas, and theories are a part of academic disciplines. For example, implicit bias is a concept discussed in Social Psychology courses. If this bill is enacted, the interpretation of the bill could extend to these courses.

Governor's Advisory Council on Diversity and Inclusion
Letter to Gov. Sununu re HB 544
Page 2 of 2

The Council believes honest, robust discussion on significant issues such as racism and sexism is important and limiting conversations amongst all citizens of New Hampshire is not reflective of our state's embrace of freedom of speech and freedom of expression. The Council also believes that to ensure educational conversations relative to historical events dealing with race, racial identity, racism, gender, sex, or sexism are not hampered whether they take place in a scholastic or workplace setting.

The Council believes that to address harmful behavior, we must face our past, learn from it, and move forward with a clearer vision. Because of the work and research of genocide and other crimes against humanity by individuals, such as Dr. James Waller at Keene State College, we know the impact of creating repressive measures like those outlined in HB 544. Once language and dialogue are controlled, the path has been laid for other forms of repression to become normalized.

The Council respectfully urges you to continue to consistently speak up in support of equity, diversity, and inclusion efforts. You have demonstrated your commitment by creating committees and task forces to examine how our state is performing and to discover places where there is need for improvement to make the Granite State a more welcoming and inclusive state. You have championed the work and recommendations of this Council, LEACT, and the COVID-19 Equity Task Force in the past; to protect that work, the Council recommends that you to act against HB 544.

We look forward to continuing to work with you to make the State of New Hampshire a model for the positive impact of having equity, diversity, and inclusion as core values. Most of all, we want to work to continue protecting the rights of all Granite Staters to engage in open and honest dialogue to learn to live together.

Sincerely,


The Governor's Advisory Council on
Diversity and Inclusion



CHRISTOPHER T. SUNUNU
Governor

**Governor's Advisory Council on Diversity and Inclusion**

June 2, 2021

Ahni Malachi, Chair

Dr. Dottie Morris, Vice Chair

Sean Locke, Secretary

Devon Chaffee

Sarah Burke Cohen

Jeremy Denlea

Chief Charlie Dennis

Maria Devlin

Sharon Harris

Ann Landry

James Maggiore

Dr. Salman Malik

Dr. James Morse

Pawn Nitichan

Commissioner Robert Quinn

Marianne Rechy

Sheriff Eliezer Rivera

Allyson Ryder

His Excellency Christopher T. Sununu
Governor of the State of New Hampshire
State House
107 North Main Street
Concord, NH 03301

Dear Governor Sununu,

The Governor's Advisory Council on Diversity and Inclusion ("the Council") writes to express our grave concerns regarding section 330 of the Senate Finance Committee's amendment to HB 2 ("Section 330"), replacing the section on "divisive concepts." The ambiguous and contradictory language and enhanced penalties in this new provision threaten to censor New Hampshire schools, police, and other government agencies from having important conversations about race, gender, sex, and ability. As such, the provision is likely to chill honest, frank, and robust discussions that are central to ongoing efforts to make New Hampshire a more equitable, diverse, and inclusive place.

The language in Section 330 presents many of the same serious concerns the Council expressed in its previous letter recommending you act against HB 544.[1] We greatly appreciate your strong leadership in opposing that standalone bill—publicly and definitively. As you rightly stated, HB 544's restrictions would have censored local school districts, encroached upon local control, and prevented local communities from making their own decisions about how to address difficult topics. We recognize the Senate Finance Committee's attempt to address these concerns. Unfortunately, however, Section 330 does not resolve the Council's concerns and would likely have the same detrimental impact as HB 544.

By its own terms, Section 330 would prohibit state employers and programs from teaching, instructing, or training "any employee, student, service recipient, contractor, staff members, inmate or any other individual or group" three enumerated concepts. Section 330 also targets local public schools with explicit prohibitions that threaten to censor how those local institutions address sensitive issues of race, sex, gender, and ability. These prohibitions include disciplinary sanctions and civil action for violations, including lawsuits brought under RSA chapter 345-A.

---

[1] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/20210309-hb544-_1.pdf

Governor's Advisory Council on Diversity and Inclusion
Letter to Gov. Sununu re HB 544
Page 2 of 2

The prohibited concepts seem to target the use of theories critical to most diversity, equity, and inclusion training. For example, the second of these prohibited concepts appears designed to prohibit the discussion of "unconscious" biases. Social psychologists have long demonstrated, through extensive research, the detrimental impact of implicit or unconscious bias; particularly, when a person lacks the tools to make the unconscious conscious. This concept is central to many trainings used by New Hampshire agencies—including the New Hampshire Council on Police Standards and Training. To prohibit such trainings would undermine years of local and state diversity and inclusion efforts.

Although Section 330 includes exceptions for certain types of "sensitivity training" and university activities in an academic setting, these ambiguous allowances add to the confusion over what is permitted and what is prohibited. In the absence of clarity, schools, police departments, and other agencies are likely to self-censor out of fear of potential civil liability.

Our concern here is not hypothetical. Multiple New Hampshire agencies—including the New Hampshire Business and Industry Association, the Municipal Association, the Office of the Child Advocate, and multiple school districts—have expressed their opposition to the Section 330's language, making clear how it would negatively impact their constituencies. Several Council members have witnessed the distress experienced by local educators and agencies who fear having to operate under the proposed restrictions.

The Council believes that Section 330 continues to carry the potential to undermine your administration's recent work to promote diversity and inclusion--including the work done by and recommendations given by the Commission on Law Enforcement Accountability, Community, and Transparency, the COVID-19 Equity Response Team, and this Council.

Honest, robust discussion on significant issues such as racism, sexism, and ableism is important. The Council reiterates its belief that limiting conversations amongst all citizens of New Hampshire is not reflective of our state's embrace of freedom of speech and freedom of expression. The chilling effect that Section 330 threatens to create will harm the Granite State's ability to best understand and meet the needs of all its residents. To protect your administration's work and New Hampshire values, the Council recommends that you act against Section 330, and continue to champion equity, diversity, and inclusion efforts.

As always, we look forward to continuing to work with you to make the State of New Hampshire a more equitable, diverse, and inclusive state, and to protect the rights of all Granite Staters to engage in open and honest dialogue to learn to live together. To that end, the Council would like an opportunity to sit down with you to discuss these issues and more so together we can pursue this important work.

Sincerely,

The Governor's Advisory Council on
Diversity and Inclusion

June 29, 2021

Governor Chris Sununu
107 N. Main St.
Concord, NH 03301

Dear Governor Sununu,

We are writing to inform you of our collective resignation from the Governor's Advisory Council on Diversity and Inclusion, effective immediately.

On June 25, 2021 you signed into law a provision that aims to censor conversations essential to advancing equity and inclusion in our state, specifically for those within our public education systems, and all state employees. This will directly impact those who are working with some of our state's most vulnerable populations, including educators, child welfare workers, and law enforcement.

This is in direct conflict with the stated purpose of the Council laid out in your 2018 Executive Order instructing us to identify ways to "combat discrimination and advance diversity and inclusion." We accepted your appointment to this council out of commitment and love for this state and your stated desire to advance diversity and inclusion. Given your willingness to sign this damaging provision and make it law, we are no longer able to serve as your advisors.

As members of the Council on Diversity and Inclusion, we have spent hundreds of hours in conversation with over a dozen New Hampshire communities over the past three years. We have heard the stories of struggle from individuals who have experienced racism, sexism, ableism and other forms of systemic discrimination right here in the Granite State. We have also heard uplifting stories of growth and learning from local leaders, police departments, and educators coming together to collectively address implicit bias and bias incidents. We have a responsibility to those community members to uplift their truth and ensure their voices are heard over the growing din of politically motivated fear mongering currently dominating the public discourse.

Governor, we feel obligated to inform you that—contrary to your recent public statements—systemic racism does in fact exist here in New Hampshire. You appointed us to explore these issues, and we have reported our findings to you in detail every step of the way. The pain that we heard in the voices of those who came to the meetings to convey their truths and lived experiences served as a call to action. The only way to truly serve all Granite Staters is to acknowledge what is true for some of the citizens, continue to implement many of the strategies suggested by teams and councils you appointed to examine discrimination, and heal from the wounds of the past so we can create a brighter future for our children.

We sent you two letters urging you to oppose this damaging legislative proposal, both in its original form and as passed by the Senate, and requested a chance to meet with you to seek a solution that didn't derail the important efforts underway in New Hampshire. The Council has continuously worked to deliver to you our findings, sent you our opinion that this would weaken—not strengthen—the state's anti-discrimination laws, and urged you to oppose this provision. Your disregard of this work makes clear that we are no longer able to fulfill the Council's mandate.

It should not be taken lightly that nearly every member of the Council that is not part of your administration is resigning today, as we collectively see no path forward with this legislation in place.

Despite our resignation from this Council, we are more committed than ever to advancing the real work that is needed to build a more equitable and inclusive Granite State. Separate from the Council, we will find ways to support local educators, municipal employees, and community leaders as they grapple with the corrosive impact of this legislation, which we are already seeing at a local level throughout the state. We look forward to many future honest and difficult conversations about race, gender, and other forms of discrimination and bias. We also hope that, in time, you will come to understand the true damage that this legislation has caused to the fabric of New Hampshire's communities.


Sincerely,

Dr. Dottie Morris
Devon Chaffee
Maria Devlin
Sharon Harris
James Maggiore
Dr. Salman Malik
Dr. James Morse
Pawn Nitichan
Sheriff Eliezer Rivera
Allyson Ryder

**EXHIBIT 18**

NEA-NH July 12, 2021 and August 5, 2021 Letters



July 12, 2021
**First Class U.S. Mail**

John M. Formella, Esq.
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Re:  Implementation Guidance for Public School Districts Regarding House Bill 2

Dear Attorney General Formella:

As President of NEA-NH, which represents 17,000 educators in our state, I write to request the issuance of formal guidance on the implementation of HB 2 within public school districts and public institutions of higher education across the State of New Hampshire.  More specifically, the statutory language passed, under the section entitled: "Right to Freedom from Discrimination in Public Workplaces and Education," contains ambiguity requiring clarification.  Such clarification is particularly important for certified educators given that the statutory language provides: "IV.  Violation of this section by an <u>educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction</u> by the state board of education." (emphasis added).

Therefore, please issue detailed guidance to be followed by educators, administrators and school boards covering, at a minimum, the following subject areas:

1.  What types of academic instruction regarding inherent and/or institutional bias or discrimination are prohibited;

2.  What it means to permissibly teach prohibited "subjects identified in this section" as a "larger course of academic instruction" as included in section RSA 193:40, II;

3.  Which topics related to racial and/or social justice are specifically prohibited from academic teaching and dialogue within public schools;

4.  Whether or not academic instruction regarding historical racism, including, without limitation, in relation to slavery, segregation, the civil rights movement and affirmative

action, may still be taught in public school classrooms.  If so, how a violation of RSA 193:40 can be avoided when discussing these topics;

5.  What specific categories of literature or written subject matters are prohibited from assignment or dissemination to students;

6.  What are the parameters educators must follow when answering questions from students about current events that touch the topic areas in the law, e.g. the protests surrounding police reform, the Black Lives Matter movement, and news stories about the passage of this law;

7.  What may be taught about historical systems and practices which led to discriminatory outcomes. For example, what is permissible to be taught about "redlining" by the Federal Housing Administration in the 1930's that led to racially segregated neighborhoods throughout the United States;

8.  Is teaching about the existence of implicit bias or other similar social sciences prohibited. If not, what are the guideposts for discussing this kind of theory in classrooms;

9.  What are the best practices for public school districts, administrators and public educators to avoid a violation of the new provisions enacted by HB 2 regarding the education of public school students;

10.  What, if any, discretion remains with the New Hampshire Board of Education to not issue discipline where it is found that a teacher or district allowed students to hear or be taught prohibited information, which, in accordance with RSA 193:40, IV, "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education;"

11.  How does the law apply to higher education <u>staff</u> as the law only mentions the academic freedom of faculty members. Are their prohibitions on what staff members can discuss, teach, or provide to students;

12.  What are the guideposts for academic freedom provided to University System Faculty. HB2 states the law shall not limit academic freedom to "research, publish, lecture, or teach in the academic setting" does this mean their freedom on these topics is absolute?

Once we have received guidance from the Department of Justice, we will swiftly disseminate that much-needed information to our members. As we approach the 2021-22 academic year, time is of the essence.  The current state of confusion caused by HB 2 as it relates to public education will likely lead to unnecessary legal disputes and action if clarification is not provided. If we can be of assistance to you in forming your analysis and/or producing guidance, please do not hesitate to contact us for that purpose.

Thank you for your attention to this important and time-sensitive matter.  We look forward to hearing from you soon.

Sincerely,

Megan Tuttle
President
NEA-NH



August 5, 2021
**EMAIL**

John M. Formella, Esq. (attorneygeneral@doj.nh.gov)
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Frank Edelblut
Commissioner (frank.edelblut@doe.nh.gov)
Department of Education
101 Pleasant Street
Concord, NH 03301

Re:  Request for Further Clarification Concerning Implementation Guidance on House Bill 2for
Public School Districts

Dear Attorney General Formella and Commissioner Edelblut:

I write to you as the President of NEA-NH, an organization representing approximately 17,000
educators in New Hampshire, every single one of whom are impacted by the "Right to Freedom
From Discrimination in Public Workspaces and Education" law signed by Governor Sununu on
June 25, 2021. It is because of this vast impact to our membership that I am following up with a
further communication after our letter of July 12, 2021, has thus far been unanswered by your
offices.

NEA-NH has reviewed the 2½ -page FAQ guidance issued on Wednesday July 21, 2021 (your
Guidance). We appreciate the time and effort expended by your offices in developing this
guidance, which answers a number of questions that our members have had about the new law.
Additional questions remain, however, on which we seek clarification.  Because the licenses,
careers, professional reputations, and livelihoods, of our members are at stake for any violation
of the law, it is imperative that they have a detailed understanding of what conduct and/or
teaching practices are prohibited by the law and constitute "a violation of the educator code of
conduct that justifies disciplinary sanction by the state board of education." With the 2021-2022
school year quickly approaching, we need your assistance in making the full scope of the law
clear.

As we understand the law, as construed though the lens of your July 21st Guidance, we understand it to permit the teaching and discussions described below. If we are mistaken in our legal analysis, please respond in detail to correct our understanding. Given the high stakes for our members, it is imperative for our members to be provided with reliable, detailed guidance that will allow them to clearly avoid the severe consequences of violating this amorphous law.

We understand as follows:

1.      Discussing with students[1] incidents of racism or other prejudices exhibited and experienced by them or others in the school community or elsewhere is permitted.

2.      Engaging in conversations about racism or other prejudices students, or others known to them, may have exhibited in the past is not prohibited provided the educator does not instruct students that they exhibited those behaviors because of inherent characteristics.

3.      It is permissible to draw attention to the language, behavior, or writing of a student that might be sexist, racist, or otherwise prejudicial. The law does not prohibit educators from referring for discipline students for such behavior or comments provided it is done in accordance with school policy and procedure and state law.  In fact, in order to comply with requirements of the "Bullying Law" educators are required to recognize and report such conduct in accordance with the school board policy implementing the law. *See* NH RSA 193-F.

4.      Introducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group. Implicit bias training and education specifically pertaining to states of mind which are learned, assumed, or reinforced by society and not "inherent," is permitted.

5.      Structural Racism (a.k.a Societal Racism, Systemic Racism) describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government. It does not contemplate that persons or groups are naturally, biologically, or innately racist. Therefore, including the concept of Structural Racism in instruction and conversation with students is permitted. [2]

6.      Specific books or works of certain authors are not "banned" under the law. [3] Assigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator

---

[1] "Students," encompasses both K-12 students and higher education students. "Educators," are those teaching and non-teaching employees in both K-12 and public higher education institutions.
[2] For example, students could be taught, not only about the racist historical practice of "redlining," but also about the lasting inequalities and structural barriers it has created for generations of African Americans.
[3] On June 13, 2021 Commissioner Edelblut wrote an Op-Ed in the Union Leader leaving the distinct impression that Dr. Ibram Kendi's book, *How to be an Anti-Racist* may not be assigned under the new law. He raised the same proposition at the July 8, 2021 State Board of Education meeting. The Guidance is not consistent with his statements. Please address this contradiction. Additionally, if there are certain texts which your offices' believe are *per se* prohibited under this law, please provide a list so educator's know that prior to making 2021-2022 lesson plans.

conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion. For example, the works of James Baldwin are not *per se* prohibited from instruction or discussion in accordance with the above.

7.      The law permits teaching novels, non-fiction works, or other approved texts by instructing students on, and discussing, the historical context surrounding the works. Such permitted instruction and discussion includes information on racism or other prejudices which were expressed in both overt and subtle ways by systems, individuals, and government actors.

8.      The law permits instruction on, and discussion of, racism and oppression in teaching historical events and contemporary events, so long as students are not instructed that the individual actors were inherently racist.  For example, educators may explain the racism carried out systematically, collectively and individually by southern slave owners in the United States, prior to the American Civil War.  Educators may also explain the collective and large-scale societal discrimination and genocide carried out by Nazi Germany against Jewish populations in several countries. These historical issues can be connected to the modern era to explain the danger of racism and neo-Nazi groups that exist today.

9.      Teaching historically accurate lessons is permissible under the law, even if that history challenges students' notions of history as they previously understood it, provided the educator does not assign racist or prejudicial actions to the historical actors as inherent to them. For example, accurately teaching about the genocidal impact on Native Americans of the arrival of colonial Americans to the United States, and the subsequent western expansion of the United States, is permitted.

10.      The use of the historical primary sources (original documents) in coursework is permitted provided the use of sources is part of a larger course of academic instruction. This is the case even if the sources may contain an author's assertion that one race or group is inherently inferior to another, for example Thomas Jefferson's *Notes on the State of Virginia.*

11.      Similarly, it is permissible to assign reading of fiction and non-fiction works where character(s) may express discriminatory beliefs or engage in discriminatory acts against other characters or persons, for example *To Kill a Mockingbird* or *Huckleberry Finn*. Discussion about the actions of those characters, their discriminatory beliefs, or intent is not prohibited.

12.      It is permissible under the law to use teaching techniques which probe a student's understanding of their current reality, push them to think critically and analytically about social and historical contexts, and asks them to empathize with others or consider a different perspective then the one they currently have, provided the educator does not require that the student adopt a view that racism is inherent to some individuals.

13.      It is permissible to discuss the subject of "white privilege," a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is "inherent" or cannot be overcome.

14.  It is permissible to engage with students in discussion of gender non-conformity, acknowledging different gender identities of students and colleagues, and curriculum which contains characters and story lines which discuss or highlight gender non-conforming, or LGBTQ individuals provided the text does not promote discrimination of such individuals.

15.     The law permits the exhibiting and sharing of art, music, dance, or other artistic expressions that comment on racism, sexism, or other prejudices provided it is age appropriate and relevant to the curriculum approved by the School Board or higher education institution. It is also permitted for artists, writers, and historians to address students or for students to read about the artist's motivation for the work.

The paragraphs above do not purport to exhaustively describe all of the instruction and discussion that is permitted under the law but are illustrative of the types of discussion and instruction that we understand remain permitted.  We appreciate your prompt response to confirm that these examples are consistent with your understanding of the law, so that educators may plan accordingly for the upcoming year.

We expect that as the implementation of the law moves forward, we may encounter scenarios requiring further analysis.  We are hopeful that your offices, as the chief law enforcement and educational agencies of the Granite State, will have continual open dialogue with us about these issues as they arise.

Sincerely,

Megan Tuttle
President, NEA-New Hampshire

# EXHIBIT 19

July 21, 2021
Guidance



From: **Giaquinto, Kate** <Kate.M.Giaquinto@doj.nh.gov>
Date: Wed, Jul 21, 2021 at 4:45 PM
Subject: NH AG NEWS RELEASE: State Issues Guidance
Regarding New Anti-Discrimination Laws
To: Giaquinto, Kate <Kate.M.Giaquinto@doj.nh.gov>

### NEWS RELEASE

Released by:            Frank Edelblut,
Commissioner, Department of Education
Ahni Malachi, Executive Director,
Commission for Human Rights
John M. Formella, Attorney General
Subject:              State Issues Guidance
Regarding New Anti-Discrimination Laws
Date:                 July 21, 2021
Contact:              Kate Giaquinto,
Directory of Communications

kate.m.giaquinto@doj.nh.gov | (603) 573-6103

Concord, NH – Attorney General John M. Formella, Department of
Education Commissioner Frank Edelblut, and Commission for
Human Rights Executive Director Ahni Malachi announce the release
of guidance related to Sections 297 and 298 of House Bill 2.
The guidance for public employers and government programs is
available at: https://www.doj.nh.gov/civil-rights/documents/faq-
public-government.pdf
The guidance for public schools is available at:
https://www.doj.nh.gov/civil-rights/documents/faq-educational-
programs.pdf
Any person who believes that they have been subjected to
discrimination may file a complaint with the New Hampshire
Commission for Human Rights, nh.gov/hrc/howto.html, or the
Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-
rights/.

### ###

12/19/21, 10:35 AM       State Issues Guidance Regarding New Anti-Discrimination Laws | News Releases | NH Department of Justice

522

**New Hampshire**

# Department of Justice

*Office of the Attorney General*

## News Release

**For Immediate Release**
July 21, 2021

**Contact:**
Kate Giaquinto, Director of Communications
kate.giaquinto@doj.nh.gov | 603-573-6103

## State Issues Guidance Regarding New Anti-Discrimination Laws

Concord, NH – Attorney General John M. Formella, Department of Education Commissioner Frank Edelblut, and Commission for Human Rights Executive Director Ahni Malachi announce the release of guidance related to Sections 297 and 298 of House Bill 2.

The guidance for public employers and government programs is available at: https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf]**

The guidance for public schools is available at: https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf]**

Any person who believes that they have been subjected to discrimination may file a complaint with the New Hampshire Commission for Human Rights, nh.gov/hrc/howto.html **[https://www.nh.gov/hrc/howto.html]** , or the Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-rights/ **[https://www.doj.nh.gov/civil-rights/index.htm]** .

New Hampshire Department of Justice
33 Capitol Street | Concord, NH | 03301
Telephone: 603-271-3658



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1.    What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist.  Teach and treat all equally and without discrimination.**

### 2.    What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

**3.      Does the law prohibit teachers from teaching U.S. history?**

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

**4.      Are schools allowed to teach students historical concepts related to discrimination?**

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

**5.      A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?**

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

**6.      Can parents or guardians refuse to allow their children to participate in specific course material?**

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

**7.      Does the law apply to public schools?**

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

**8.      Does this law apply to all school activities or just teaching?**

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

**9.       Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.      Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes.  For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.      What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they have been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.      Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.      Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A, that impact public employers and government programs. Please see separate document that addresses changes to schools and educational programs contained in RSA chapter 193.

## Changes Regarding Public Employers and Government Programs

1. **What are public employers and government programs prohibited from training and advocating?**

Public employers and government programs are prohibited from training and advocating that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not train or advocate that a person or a group is inherently oppressive, superior, inferior racist, or sexist.  Train and treat all equally and without discrimination.**

2. **What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?**

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

### 3.   Are these the same prohibitions as those contained in the "divisive concepts" bill, HB 544?

No. HB 544 did not become law and therefore, does not apply or impact public employers, government programs, or schools in New Hampshire. The term "divisive concepts" is not found anywhere in the new law.

### 4.   Can public employers and government programs undertake efforts designed to examine issues related to equity, diversity, inclusion, equality, and other related topics?

Yes. Nothing in this new law prohibits public employers or government programs from taking steps to examine issues related to equity, diversity, inclusion, equality and other related topics.

### 5.   Can trainings address practices or ideas that have harmed or continue to harm certain identified groups?

Yes. Nothing prohibits trainings geared toward educating participants about practices or ideas that may disproportionately affect certain identified groups.

### 6.   Can public employers and government programs conduct trainings designed to improve diversity, equity, and inclusion, such as implicit bias training?

Yes. Nothing prohibits trainings geared towards diversity, equity, equality and inclusion.

Nor does anything prohibit implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally.

The new law expressly permits public employers and government programs to provide and require "sensitivity training" based on the "inherent humanity and equality of all persons" and the "ideal that all persons are entitled to be treated with equality, dignity, and respect."

### 7.   A public employee has claimed that a required diversity training has made them uncomfortable. Has the public employer or government program discriminated against that employee?

No. It is important to note that trainings that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make participants uncomfortable. These trainings may encourage or prompt participants to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequence.

**8.**   **What remedies are available to public employees or program participants who believe that a public employer or government program has violated one of the new anti-discrimination statutes?**

A person who believes that they have been subject to discrimination, may file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**9.**   **Can a public employee file a claim based upon a training that occurred in 2020?**

No. Complaints alleging a violation of the new laws may only be considered for conduct that occurred after the enactment of those laws on June 25, 2021.

**10.**   **If I am an individual or group simply using a public facility for non-government use, for example a private event or activity at a school building or town hall, does this new law apply to me?**

No.

# EXHIBIT 20

Attorney General
Opinion No. 2021-01
(Sept. 7, 2021)

530



**ATTORNEY GENERAL**

**DEPARTMENT OF JUSTICE**

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

JOHN M. FORMELLA
ATTORNEY GENERAL

JANE E. YOUNG
DEPUTY ATTORNEY GENERAL

**ATTORNEY GENERAL OPINION NO. 2021-01**

September 7, 2021

Doug Palardy, Chair
Ahni Malachi, Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Building One
Concord, NH  03301

RE:    Request for Attorney General's Opinion regarding new anti-discrimination
       protections

Dear Chair Palardy and Director Malachi:

You requested, on behalf of the New Hampshire Commission for Human Rights, that this office provide an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 ("Sections 297 and 298"),[1] to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40. These statutes collectively comprise a subdivision in RSA chapter 354-A titled "Right to Freedom from Discrimination in Public Workplaces and Education" and new section in RSA chapter 193 titled "Prohibition on Teaching Discrimination."

Some have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions. *See* Governor's Advisory Council on Diversity and Inclusion, *Letter to Gov. re HB 544* (June 2, 2021). To help address these concerns, the Department of Justice, Commission for Human Rights, and the Department of Education released guidance shortly after the new anti-discrimination laws took effect. Recognizing the important need for public employers, government programs, and school systems to engage in sensitivity training that may include frank and candid discussions of the historical aspects of oppression and its contemporary effects, you requested that this office provide an official Attorney General Opinion.

The Commission for Human Rights (the "Commission") was created with the power to eliminate and prevent discrimination in employment, places of public accommodation, housing,

---

[1] Before final passage by the legislature, this legislation was included in HB 2 as Section 330 and 330-a. The final version of HB 2 includes the legislation at Section 297 and 298.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 2 of 9

and, effective in 2019, public education. The Commission is charged with receiving, investigating, and adjudicating complaints related to violations of RSA chapter 354-A that may be filed by members of the public or the Commission and holding hearings as required to execute the Commission's duties. Section 297 prohibits certain public sector activities and expands the Commission's jurisdiction to address such activities. Section 298 prohibits the teaching of certain subjects in elementary and secondary schools and it also places review of violations within the Commission's jurisdiction.

The Attorney General's duties include advising "any state board, commission, agent or officer as to questions of law relating to the performance of their official duties, and he shall, under the direction of the governor and council, exercise a general supervision over the state departments, commissions, boards, bureaus, and officers, to the end that they perform their duties according to law." RSA 7:8. In situations where requests for legal advice are significant to the operation of the state board, commission, or agency and are likely to be of continuing importance, the advice may be issued by an official Attorney General Opinion. In such situations, the questions posed are researched and an opinion drafted by a group of attorneys. The draft opinion is also subject to multiple layers of review, including by the Associate Attorney General for the Division of Legal Counsel and the Solicitor General. The Attorney General provides a final review and approval.

Given the importance of your questions to the education and training of your staff to best serve New Hampshire residents, I am providing an official Attorney General Opinion as set forth below.

## QUESTIONS PRESENTED

1.      What is the scope of Sections 297 and 298 and what types of education and training activities do those sections prohibit and permit?

2.      Do the new sections of RSA chapter 354-A prohibit trainings or programs designed to promote diversity and inclusion or to educate participants about concepts such as implicit bias?

3.      Does RSA 193:40 prohibit education on the historical concepts related to discrimination or oppression?

## CONCLUSION

1.      The new sections added to RSA chapter 354-A prohibit trainings or programs that teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. The new sections added to RSA chapter 354-A also prohibit trainings or programs that teach participants that any identified group can or should be treated unequally to

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 3 of 9

any other identified group and that one identified group should be discriminated against or treated adversely.

Similarly, RSA 193:40 prohibits teaching students that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 also prohibits teaching students that any identified group can or should be treated unequally to any other identified group and that one identified group should be discriminated against or treated adversely.

2.      No. The new sections added to RSA chapter 354-A **explicitly permit** public employers and government programs to provide sensitivity training, which RSA 354-A:29 defines as "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Implicit bias training, for example, is premised on teaching people about biases they may have of which they are not consciously aware and helping people become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training does not violate Section 297. Similarly, the new sections added to RSA chapter 354-A do not prohibit other diversity, equity, inclusion, and equality trainings. Section 297 prohibits trainings if and only if they include concepts of group superiority or inferiority based on inherent or innate group characteristics or advocate for less than equal treatment of identified groups.

3.      No. RSA 193:40 does not prohibit discussion of historical concepts related to discrimination. RSA 193:40 prohibits education related to solely the four subjects identified in Short Answer 1. Specifically, it prohibits teaching that one or more identified groups are: (1) inherently superior or inferior to people of another identified group; (2) inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) should be discriminated against or receive adverse treatment; or (4) should not treat members of other identified groups equally. It is important to note that although education related to racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40.

## BACKGROUND

On June 25, 2021, the Governor signed into law House Bill 2, which added, in Section 297, new provisions to RSA chapter 354-A entitled, "Right to Freedom from Discrimination in Public Workplaces and Education." Specifically, Section 297 adds six new sections to RSA chapter 354-A: (1) RSA 354-A:29, "Right to Freedom from Discrimination in Public Workplaces and Education"; (2) RSA 354-A:30, "Definitions"; (3) RSA 354-A:31, "Prohibition on Public Employers"; (4) RSA 354-A:32, "Prohibition on the Content of Government Programs and Speech"; (5) RSA 354-A:33, "Prohibition on Public Employees"; and (6) RSA 354-A:34, "Remedies."

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 4 of 9

Section 297 is part of the amended progeny of House Bill 544, which was commonly known as the "divisive concepts" bill. The House of Representatives voted to table House Bill 544 but to incorporate its language into House Bill 2. During its review, the Senate Finance Committee stripped the language of House Bill 544 out of House Bill 2 and added the language that is now Sections 297 and 298. The House of Representatives acceded to these changes during the Committee of Conference.

The major provisions of Section 297, codified as RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33, prohibit training, education, or other state-sponsored speech that incorporates any of the following four concepts:

1. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

2. That an individual by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

3. That an individual should be discriminated against or receive adverse treatment solely or partly because of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; and

4. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.[2]

These four new statutory provisions combine to limit the types of training and education public employers may introduce to their employees, and protects employees who object to participating in training programs inconsistent with the new statutory provisions. RSA 354-A:31 prohibits public employers from teaching, advocating, instructing, or training anyone any of the above listed concepts. RSA 354-A:32 prohibits "government programs," which it defines as any

---

[2] This Opinion will use the term "identified group" to mean age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. With this inclusive of a definition, every resident and visitor to New Hampshire is a member of one or more identified groups.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 5 of 9

activity undertaken by a public employer including in the performance of its government function, from teaching, advocating, or advancing any of the above listed concepts. RSA 354-A:33 prohibits a public employer from disciplining a public employee for refusing to participate in any training, program, or other activity that advocates for or compels the employee to express support for any of the above listed concepts.

Section 298 is the remainder of the amended progeny of HB 544. This section creates a new statute, RSA 193:40: "Prohibition on Teaching Discrimination." RSA 193:40 prohibits teaching students in an elementary or secondary education program any of the four concepts that the new sections in RSA chapter 354-A prohibit.

The statutory changes within Sections 297 and 298 are legislation of limited reach. The new statutes do not prohibit racial, sexual, religious, or other workplace sensitivity training "based on the inherent humanity and equality of all persons." They do not prohibit workplace trainings based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." These statutes explicitly exclude such sensitivity trainings from the scope of the new prohibitions created by RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33. Nor do they prohibit discussing or teaching students about the historical existence of ideas related to the four prohibited subjects, such as the history of discrimination.

## ANALYSIS

The scope of Sections 297 and 298's prohibitions hinges on the meaning of the language those sections employ. When interpreting a statute, a court or agency charged with such interpretation must first look to the language of the statute itself. *Conduent State & Local Solutions, Inc. v. N.H. Dep't of Transportation*, 171 N.H. 414, 419 (2018). In doing so, the agency must begin with the plain meaning of the words used. *Union Leader Corp. v. Town of Salem*, 173 N.H. 345, 350 (2020); *see also* RSA 21:2 (2012) ("Words and phrases shall be construed according to the common and approved usage of the language."). The agency must confine itself to the statute as written and not consider what the legislature might have said or add language the legislature did not include. *Conduent State & Local Solutions, Inc.*, 171 N.H. at 420. The agency must look at the statute as a whole and should construe the statute to avoid absurd or unjust results.[3] *Id.* Absent an ambiguity[4] examination of any legislative record beyond the actual text of the statutes is inappropriate.

---

[3] Examples of absurd results include, but are not limited to, situations where the interpretation of one statute negates another. *See Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005) ("When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other."). The goal of statutory interpretation is to strive to read statutes in harmony with one another rather than in dissonance with one another. *See id.* ("[W]e do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme.").

[4] In this context, ambiguity is a legal term of art that applies only if two or more reasonable interpretations of a statute exist after the agency considers the plain meaning of the words in the statute. *Attorney General v. Loreto Publications, Inc.*, 169 N.H. 68, 74 (2016).

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 6 of 9

<u>Prohibitions Related-to Inherent Traits</u>

The scope of Section 297 and 298's first two prohibitions derives substantially from the meaning of the term "inherent." In the first prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently superior or inferior" to another identified group. In the second prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently racist, sexist, or oppressive, whether consciously or unconsciously." Neither section defines the term "inherent," nor are we aware of any other relevant statutory provisions that define "inherent" as the Legislature used it in Sections 297 and 298. When the Legislature does not specifically define a term within a statute, the Legislature is presumed to have used that term as it is commonly understood. *Franciosa v. Hidden Pond Farm, Inc.*, 171 N.H. 350, 359 (2018). In such situations, the New Hampshire Supreme Court will consult a standard dictionary to discern the common understanding of any given term. *Id.* As an adjudicatory body, the Human Rights Commission should also consult a standard dictionary to discern the common understanding of any given term.

"Inherent" means "structural or involved in the constitution or essential character of something : belonging by nature or settled habit : intrinsic, essential." *Webster's Third New International Dictionary* 1163 (unabridged ed. 2002). The definitions of "intrinsic" and "essential" further illuminate the meaning of "inherent." "Intrinsic" means "belonging to the inmost constitution or essential nature of a thing : essential or inherent and not merely apparent, relative, or accidental." *Id.* at 1186. "Essential" means "forming or constituting the essence of something: making up or being the constituent or intrinsic character or very nature of a thing . . . belonging to or being part of the essence of something: belonging to the constituent fundamental character of a thing: not accidental to something." *Id.* at 777.

The common thread that runs through these definitions is that an inherent characteristic is natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging.

"Inherent," therefore, is properly viewed as a limitation of the scope of Sections 297 and 298's first two prohibitions. With respect to the first, Sections 297 and 298 proscribe training, advocacy, or education that teaches participants that, solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, superior or inferior to members of other identified groups. With respect to the second, Sections 297 and 298 proscribe training, advocacy, or education that informs participants that solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, consciously or unconsciously racist, sexist, or oppressive.

<u>Prohibitions Related-to Promoting Discrimination</u>

Interpreting Sections 297 and 298's third and fourth prohibitions does not turn on the meaning of key terms that define the scope of the prohibition. The statutory language makes

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 7 of 9

plain that a public employer or government program may not provide training or education that informs participants that members of an identified group should be discriminated against or receive adverse treatment. Nor may a public employer or government program provide training or education that informs participants that members of one identified group should not treat members of other identified groups equally.

<u>Permitted Trainings, Activities, and Education</u>

Separate from its prohibitions, Section 297 expressly permits certain trainings and programming within the category of "sensitivity training." This is defined as training "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Sensitivity training consistent with the provisions of Section 297 readily encompasses trainings and programming that promote concepts of equality and the equal, respectful, and dignified treatment of all persons—particularly as they relate to the interactions of members of those identified groups with public employers or government programs.

"Sensitivity training" includes implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources. Implicit bias training does not violate Section 297 unless it includes concepts of group superiority or inferiority based on inherent or innate group characteristics or concepts that an identified group should be treated unequally or discriminated against.

"Sensitivity training" is not limited to implicit bias training, however. For example, a public employer or government program may create a web-based resource entitled, "Anti-Racist Resources," and include information designed to promote a better understanding of racism and how to combat racism. But, if that web-based resource stated that it was designed to "serve as a resource to white people" or to "serve as a resource for our white employees," then it could violate Section 297 because it may imply that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.

Section 298 expressly permits schools to educate about and discuss the historical existence of ideas and subjects that are otherwise prohibited under Section 298. Section 298 does not prohibit schools from teaching about discrimination or how discrimination has existed throughout history. Nor does Section 298 prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups. Similar to Section 297, Section 298 does not prohibit teaching students about implicit biases nor does it prohibit schools from creating web-based resources designed to promote a better understanding of racism, sexism, or other forms of oppression. Section 298 is violated only when a school educates about concepts of group superiority or inferiority based on inherent or innate group

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 8 of 9

characteristics divorced from history or educates that an identified group should be treated unequally or discriminated against.

Section 298 applies to educational instruction in K-12 schools only. Nothing in Section 298 limits instruction by educators in post-secondary schools. Section 297's prohibitions, however, do apply to the teaching and training of employees and volunteers in public, post-secondary educational institutions.

<u>Construing the Prohibited Activities Together with the Permitted Activities</u>

Construing these new statutes harmoniously, Sections 297 and 298 allow public employers, government programs, and schools to train and educate in a manner that promote concepts of equality and the equal, respectful, and dignified treatment of all persons. Both sections permit public employers, government programs, and schools to train and educate about concepts such as implicit bias. Public employers, government programs, and schools violate Sections 297 and 298 only when trainings or education programs advocate that identified groups are either: (1) oppressive by their nature and not simply oppressive by accident, apparently oppressive, or oppressive because of external action or external factors; (2) consciously or unconsciously biased by their nature and not simply biased (racist or sexist) by accident, apparently biased (racist or sexist), or biased (racist or sexist) because of external action or external factors; (3) deserving of discrimination or adverse treatment; or (4) deserving of unequal treatment.[5]

This construction comports with traditional definitions of racism and sexism. For example, "racism" means, among other things, "the assumption that psychocultural traits and capacities are determined by biological race and that races differ decisively from one another, which is usually coupled with a belief in the inherent superiority of a particular race and its right to domination over others." *Webster's Third New International Dictionary* at 1870. This construction also strikes a harmonious balance between expressly permitted "sensitivity training" or programming and prohibited programming that exacerbates discrimination.

For the reasons set forth above, the new sections added to RSA chapter 354-A and RSA 193:40 prohibit only those trainings or educational programs that: (1) teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to characteristics which are apparent, accidental, or based on external action or external factors, that make them superior or inferior to other identified groups, or that those inherent characteristics make one identified group consciously or unconsciously racist, sexist, or oppressive or (2) teach participants that one identified group should be discriminated against or treated adversely. The new sections added to RSA chapter 354-A and RSA 193:40 do not prohibit trainings or educational programs that teach participants about disparities that may

---

[5] Like many discrimination claims, review of a claimant's allegations will involve a fact-intensive, case-by-case analysis of the training or programming at issue to determine whether the training or programming violated Sections 297 or 298's prohibitions.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 9 of 9

exist among different identified groups, the current or historical practices that may have
contributed to those disparities, or about concepts such as implicit bias.

Sincerely,

John M. Formella
Attorney General

#3293122

# EXHIBIT 21

David Wolowitz, "A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act," (July 6, 2021/Aug. 2, 2021)

11/24/21, 9:59 AM                A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act - McLane Middleton

540

EDUCATION

# A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act



**David Wolowitz**
Director, Litigation Department and Co-chair of Education Law Group

Published: McLane.com
July 6, 2021



*updated August 2, 2021*

On June 25, 2021, N.H. RSA 354-A:29, the Right to Freedom from Discrimination in Public Workplaces and Education Act, became law. The statute is only five paragraphs. Despite its brevity, or perhaps because of it, it creates a legal minefield for New Hampshire public school teachers and school administrators.

It states as follows:

11/24/21, 9:59 AM          A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act - McLane Middleton

541

2/5

*"The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants."*

The section on the "Prohibition on Teaching Discrimination" enumerates four prohibited concepts:

*"No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:*

*(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;*

*(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;*

*(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or*

*(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."*

The statute permits discussion of the prohibited concepts only under the following circumstances:

*"Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."*

I will leave it to others to address the merits of the statute and the possible constitutional issues raised by the statute. Rather, my focus is the specific, and very real, risk the statute creates to the livelihoods of teachers and administrators.

The statute provides for multiple remedies for a violation of the statute. One remedy is a civil action against a school or school district for legal or equitable relief, most likely an injunction to stop the instruction of prohibited concepts. Another remedy is a complaint to the N.H. Commission on Human Rights which has the power to receive, investigate and pass upon complaints of illegal discrimination by teaching prohibited concepts.

While these remedies are significant, the greatest risk to teachers and administrators is the remedy specifically directed at them: *"Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education."* To avoid any doubt about who is covered by this penalty, the statute provides: *"Administrators, specialists, and teachers are included within the definition of this term."* In my opinion, the effect of this penalty is to make teachers and administrators sitting ducks in the shooting gallery of the culture wars.

Sadly, we live in a time when society is so divided that one of the few areas of agreement is on how divided we are. Among the topics most hotly debated are issues related to discrimination or oppression based on sex, gender identity, sexual orientation, race, religion, and national origin. Teachers who teach any topic, give any assignment, or engage in any classroom discussion that might touch on these issues now face the very real possibility of being reported for violating the educator code of conduct. Violations of the educator code of conduct can lead to serious adverse employment consequences, including the loss of one's license and therefore one's livelihood.

The statutory prohibition may appear at first glance to only prohibit teaching with inculcates or compels students to express belief in or support for a prohibited concept. As drafted, the construction of sentence prohibits teaching or instruction of the prohibited concepts, regardless of whether the teaching or instruction inculcates or compels the students to believe in or support the concepts. This reading of the statute is consistent with the FAQ issued by the N.H. Department of Education, Commission For Human Rights, and Department of Justice. Thus, any parent who believes a teacher or administrator has "taught" or "instructed" any of the prohibited concepts can file a complaint with the Department of Education. No lawyer is needed; it is simply a matter of filling out a form. For a teacher, the process of defending oneself from a professional conduct complaint is stressful, time consuming, and potentially expensive. Moreover, even if the teacher prevails, the fact of having been the subject of a professional conduct complaint can adversely impact one's career as most employers require disclosure of past complaints, regardless of the outcome.

Classroom discussions present a particular risk because a teacher cannot predict what students might say and because the definition of "taught" is so broad. Merriam-Webster has multiple definitions for "teach," including "to guide the studies of." If a student begins discussing a prohibited concept and the teacher permits the discussion to continue, the students are arguably being "taught" or "instructed" about a prohibited concept. For example, if a student were to assert that the prohibitions and penalties in the new law are motivated by racism or sexism, which some critics have argued, permitting such discussion to continue could be construed as a violation of the statute. The teacher could potentially be subject to a

11/24/21, 9:59 AM · A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act - McLane Middleton

542

professional misconduct charge that by permitting students to engage in a classroom discussion on the topic he or she guided the study of the prohibited concept that an individual is inherently racist and thereby "taught" it. As this topic is a current issue, it would not fall under the limited statutory exception which permits the discussion only of "the historical existence of ideas and subjects." Only by stopping the discussion can the teacher make it unambiguously clear that he or she is not instructing in support of the prohibited concept.

Therefore, to protect themselves against potential professional conduct complaints, teachers should be prepared to immediately stop any classroom discussions on any and all topics potentially relating to the prohibited concepts. Given the high personal and professional risk under the statute, teachers should consider alerting students in advance of classes and events in which prohibited concepts could potentially be discussed that such discussions will not be permitted in order to comply with the law.

The risk of being reported is not only from parents. Under the administrative rules for the N.H. Department of Education, teachers and administrator are required to report any suspected violation of the code of conduct. The rules state: *"Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures."*

Failure to report a suspected violation by a colleague is itself a violation of the code of conduct. *"If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder."* Section Ed 510.05 – Duty to Report.

Imagine a teacher trying to decide on a daily basis whether an assignment or lesson plan could prompt a discussion about discrimination based on sex, gender identity, sexual orientation, race, religion, or national origin which might possibly be interpreted by a student or parent as teaching a prohibited concept. Given the high stakes, many teachers will likely consult with an administrator. Many administrators may choose to err on the side of caution and advise against addressing the topic to avoid the risk of a possible professional conduct complaint. Consequently, the statute may have a substantial chilling effect on the teaching of subjects that could possibly engender discussion, or even contemplation, of topics relating to sex, gender identity, sexual orientation, race, religion, or national origin.

Given the extraordinarily high risk of teaching related to any of these topics, I recommend that teachers exercise caution even when they are confident their teaching does not violate the statutory prohibitions. Specifically, I propose that teachers alert parents and students in advance of classes, assignments, and classroom discussions of the statute's purpose, its limitations on teaching prohibited concepts, and what the statute permits. Teachers could then assure parents and students that they have reviewed the teaching content and determined that it is in compliance with the statute.

Such a notice is not a guarantee that a complaint will not be filed with the Board of Education. Parents may assert that a professional conduct violation for teaching prohibited concepts should not be determined by the teacher's intent or the content of the course material, but rather by the subjective reaction of a parent who believes their child was "taught" a prohibited concept. Nonetheless, the notice will be substantial evidence that the educator was aware of the law, took meaningful efforts to comply with it, and did not willfully violate it.

Such a notice could take many forms. I include below a basic sample notice which simply recites the statute as a starting point. Notice could be provided prior to a class, an assignment, or a classroom discussion that has the potential of raising concerns about teaching a prohibited concept. I recommend keeping records of having provided the notice, so that they can be provided in the event of a professional conduct complaint.

It is my hope that no teacher will face a professional conduct complaint unfairly alleging a violation of the new law. However, given the realities of the times we live in, my proposal is intended to help teachers protect themselves so that they can continue to perform their important, underappreciated, and increasingly risky, work.

*Note: This is not intended to constitute legal advice. For advice on complying with the new statute, consult with your legal counsel.*

[Sample Notice]

To: Students and Parents

Re: 354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education Act

On June 25, 2021, N.H. RSA 354-A:29, the Right to Freedom from Discrimination in Public Workplaces and Education Act, became law. It states as follows:

11/24/21, 9:59 AM                    A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act - McLane Middleton

543

*"The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants."*

This is to inform you that nothing in the [class, course materials, assignment, classroom discussion] is intended to teach, instruct, inculcate or compel to express belief in, or support of, any of the following:

*"(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;*

*(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;*

*(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or*

*(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."*

The statute permits the following:

*"Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."*

# Related Insights



EDUCATION

## Defining the Standard of Care

By    David Wolowitz

EDUCATION

## The Importance Of Understanding And Fulfilling The Duty Of Reasonable Care When Re...

By    David Wolowitz

July 12, 2021

May 13, 2020

See more insights

# EXHIBIT 22

# Drummond Woodsum August 5, 2021 Presentation



**Drummond**Woodsum

# Another Brick in the Wall?

## Thursday, August 5, 2021

9:00-11:00 AM | Live Online via Zoom

**Presented by Drummond Woodsum Attorneys:**

**Meghan S. Glynn**
mglynn@dwmlaw.com

**James A. O'Shaughnessy**
joshaughnessy@dwmlaw.com

**Milliana R. Zonarich**
mzonarich@dwmlaw.com

800.727.1941 | dwmlaw.com | SchoolLaw.com | ServingSchools.com

© Copyright 2021 Drummond Woodsum. All rights are expressly reserved.

546



# CERTIFICATE OF ATTENDANCE

This is to certify that _____ has successfully

completed 2 contact hours of continuing education at the program, **"Another**

**Brick in the Wall?"** presented by Drummond Woodsum, held on Thursday, August

5, 2021.

_____

*James A. O'Shaughnessy*
603.792.7411 Direct
joshaughnessy@dwmlaw.com

*This form denotes attendance at entire program.*
*If you arrive late or leave prior to the program ending time, it is your responsibility to adjust hours accordingly.*

*Thank you for attending!*

Adriana Grimes, Events Coordinator
Drummond Woodsum
800.727.1941 Ext. 232
agrimes@dwmlaw.com

# ZOOM LOGIN

Topic: **Another Brick in the Wall?**
Time: **Aug 5, 2021 09:00 AM** Eastern Time (US and Canada)

Join Zoom Meeting
https://dwmlaw.zoom.us/j/82437490390?pwd=TGxqeG1PN2tRaDM1aW9xK0tFbE1yQT09

**Meeting ID: 824 3749 0390**
**Passcode: 281510**

One tap mobile
+19294362866,,82437490390#,,,,*281510# US (New York)
+13017158592,,82437490390#,,,,*281510# US (Washington DC)

Dial by your location
        +1 929 436 2866 US (New York)
        +1 301 715 8592 US (Washington DC)
        +1 312 626 6799 US (Chicago)
        +1 669 900 6833 US (San Jose)
        +1 253 215 8782 US (Tacoma)
        +1 346 248 7799 US (Houston)
Find your local number: https://dwmlaw.zoom.us/u/kYlv7rSx

550

551



## INTRODUCTION

- Topics Covered Today:
    - Prohibition on particular mandated employer trainings
    - Prohibition on teaching "prohibited concepts"
    - Jurisdiction and remedies
    - Protections for public employees
- NOT Covered
    - Critical Race Theory – CRT

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum    2

1

## PROTECTED CLASSES: RSA 354-A

- Age
- Sex
- Gender identity
- Sexual orientation
- Race
- Color

- Marital status
- Familial status
- Disability
- Religion
- National origin

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

3

## NEW HAMPSHIRE'S DIVISIVE CONCEPTS BILL

- Originally considered in the Legislature as House Bill 544

  - The early versions of this bill had a much broader definition of "divisive concepts" – i.e. there were lots more concepts that were considered to be divisive that educators would have had to avoid.

  - HB 544 was NOT enacted into law.

  - However, certain amendments to the New Hampshire Human Rights Act (RSA 354-A) and RSA 193 (Pupils) were appended to the 2022 budget bill, also known as House Bill 2. These amendments include a prohibition on teaching certain divisive concepts. This bill DID pass and is now the law in all New Hampshire school districts.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

4

2

## "DIVISIVE CONCEPTS" (1 OF 4)

- That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, **are inherently superior or inferior** to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin

- ***Inherent****: existing in someone or something as a permanent and inseparable element, quality, or attribute (www.dictionary.com)*

## "DIVISIVE CONCEPTS" (2 OF 4)

- That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin **is inherently racist, sexist, or oppressive, whether consciously or unconsciously**

3

## "DIVISIVE CONCEPTS" (3 OF 4)

- That an individual **should be discriminated against or receive adverse treatment** solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

7

## "DIVISIVE CONCEPTS" (4 OF 4)

- That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin **cannot and should not attempt to treat others equally and/or without regard to** age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

8

4

## EQUITY VS. EQUALITY

- **Equity**: treating individuals based on their individual needs and requirements. Equity involves trying to understand and provide people with what they actually need to function on the same level as others.

- **Equality**: treating individuals equally and in the same manner, regardless of their individual needs or requirements. Equality aims to ensure that everyone receives the same opportunities and that individuals and groups are not treated differently or less favorably.

## PROHIBITION: PUBLIC EMPLOYERS

- No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group [any prohibited concept].

  - Note that K-12 students are covered under this provision, as are volunteers.

## PROHIBITION: TEACHING IN PUBLIC SCHOOLS

- **RSA 193:40**
  - No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any [prohibited concept].
    - <u>Inculcate</u>: "to teach and impress by frequent repetitions or admonitions.... Implies persistent or repeated efforts to impress on the mind."
      – *Merriam-Webster* (*https://www.merriam-webster.com/dictionary/inculcate*).
    - <u>Compel</u>: "to drive or urge forcefully or irresistibly.... to cause to do or occur by overwhelming pressure."
      – *Merriam-Webster* (*https://www.merriam-webster.com/dictionary/compel*).

## REMEDIES AND PENALTIES

- **People asserting that a school district has violated RSA 354-A (NH Law Against Discrimination) can bring claims in:**
  - Superior Court:

    RSA 354-A and other causes of action; Whistleblower Protection Act; RSA 98-E:3 (Public Employee Freedom of Expression)
  - NH Commission for Human Rights: RSA 354-A
    - These remedies include compensatory damages, administrative fines, reinstatement, back-pay, unpaid wages, liquidated damages, attorney's fees, criminal penalties, equitable damages, injunctive relief, and declaratory judgment.

## PENALTIES FOR EDUCATORS

- **For violations of RSA 193:40** (i.e., teaching or training on "divisive concepts"):

  - "Any person" claiming to be aggrieved by this section (including the Attorney General) may:

    - File a civil action against a school **or** school district in Superior Court for legal or equitable relief

    - File a complaint with the NH Commission for Human Rights

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

13

## CODE OF CONDUCT VIOLATION

- **Educator Code of Conduct**

  - Violation of RSA 193:40 by an educator (including any professional employee whose position requires certification by the state board under RSA 189:39) is considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

- <u>Duty to Report – Ed 510.05</u>

  - Every credential holder also has a duty to report <u>any suspected violation</u> of the code of conduct in accordance to local procedures (usually to their principal)

    - Every Principal shall report when the principal <u>has been notified</u> or <u>is personally aware</u> that a credential holder has violated the code of conduct (usually to the Superintendent).

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

14

7

## REPORT TO DEPARTMENT OF EDUCATION

- <u>Duty to Report – Ed 510.05</u>

  - Superintendent must report violations to the Office of Credentialing at the NH Department of Education when:

    - The superintendent <u>has knowledge</u> that a credential holder has violated the code of conduct

- If a credential <u>has made a report</u> and believes the local reporting procedures have not been followed, the reporting credential holder <u>shall</u> notify the department directly.

    - *Note: at the time of the training, Ed 510 has not yet been amended to incorporate the new law.*

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum          15

## PROTECTIONS FOR PUBLIC EMPLOYEES

- A public employee may refuse to participate in any training, program, or other activity at which the public employer "advocates, trains, teaches, instructs, or compels participants to express belief in or support for" a prohibited concept.

  - Such an action may fall under the Whistleblower Protection Act.

- The public employer may not take adverse action against the employee for this refusal.

- Per the NH Department of Education, the NH Commission for Human Rights, and the NH Department of Justice ("State Guidance"), the law does not prohibit employers from mandating attendance at training programs that comply with the law.

- Employees cannot refuse to attend or walk out simply because the training makes them uncomfortable.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum          16

8

## SCHOOL EMPLOYERS: PROHIBITED

- Retaliation or adverse action resulting from a good-faith refusal to participate in a program that violates the new provisions of RSA 354-A

- Programs stating that people:

  - Are inherently superior or inferior,

  - Are inherently racist, sexist, or oppressive (consciously or unconsciously),

  - Should be discriminated against or receive adverse treatment, or

  - Cannot or should not treat others equally and/or without regard to a protected characteristic

  On the basis of a protected characteristic.

## SCHOOLS AS EMPLOYERS: PERMITTED

- Trainings in compliance with federal and state civil rights laws

  - Title IX

  - Title VII

  - The IDEA

  - The ADA/Section 504

  Notwithstanding language in the statute, employers and public entities still have an obligation under federal law to provide accommodations and other differential treatment to individuals with disabilities.

## SCHOOLS AS EMPLOYERS: GRAY AREA

- Programs that involve discussion of power structures or power imbalances in society
  - Depending on how the topic is approached…
    - Safe harbor: discussion of concepts and ideas, rather than compelling a person to adopt a belief or even agree with the concept or idea.
    - Exposure to ideas and viewpoints, rather than asking or requiring acceptance or agreement with the ideas or viewpoints.
- Programs that involve advocating for these concepts will be more problematic:
  - Affirmative action to promote equity
  - Reparations for past wrongs
  - White privilege

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum     19

## STATE GUIDANCE FOR SCHOOL EMPLOYERS

- According to State Guidance, employers may:
  - Take steps to examine issues related to "equity, diversity, inclusion, equality, and other related topics"
  - Conduct trainings "geared towards diversity, equity, equality and inclusion" including implicit bias training
  - Conduct trainings "that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups," even if it makes participants uncomfortable
- Practice Pointers:
  1) Review training materials in advance for compliance
  2) Notify employees that training conforms with RSA 354-A
  3) Add disclaimer to materials: "the Districts/School has reviewed the content of this training program and can confirm that it is in compliance with RSA 354-A."

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum     20

10

## SCHOOLS AS EDUCATORS: PROHIBITED

- Programs, including classroom instruction, stating that people:

  - Are inherently superior or inferior,

  - Are inherently racist, sexist, or oppressive (consciously or unconsciously),

  - Should be discriminated against or receive adverse treatment, or

  - Cannot or should not treat others equally and/or without regard to a protected characteristic

  On the basis of a protected characteristic.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

21

## SCHOOLS AS EDUCATORS: PERMITTED

- Discussing, as a part of a larger course of academic instruction, the historical existence of facts, topics, and subjects identified in the new law (including the prohibited concepts)

- Compliance with the ADA/Section 504 and the Individuals with Disabilities Education Act (IDEA), which require accommodation and other differential treatment for certain students with disabilities

- Teaching about the existence of racism, sexism, and other forms of discrimination

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

22

11

## CLASSROOM TEACHING: GRAY AREA

- Discussions regarding power structures in present-day society
  - These discussions could include debate about possible solutions to social problems, some of which may involve treating some groups differently than others.
  - Again, consider the difference between presenting ideas and concepts vs. compelling belief or agreement.
- Discussions of cultural sensitivity
  - Again, these discussions could involve recommendations about how to treat others in accordance with how *they* wish to be treated, which may not always be "without regard to" their protected characteristics.
- Caution:
  - Testing on controversial subjects
  - Requiring students to adopt belief in or to agree with certain ideas, viewpoints, concepts, or values.
  - Remember that students have first amendment rights in the classroom where the teacher opens up a discussion. Teachers can shut down students' comments only where they cause a "substantial disruption" to the school environment.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

23

## SCHOOLS AS EDUCATORS: STATE GUIDANCE

- According to **guidance** from the NH Department of Education, NH Commission for Human Rights, and the NH Department of Justice, public schools may:
  - Continue to teach historical subjects such as: slavery, treatment of Native American populations, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights Movement.
    - This may include discussion about the lingering impact of historical practices upon different identified groups.
  - Continue to have discussions related to current events, including the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups
  - Present lessons, subjects, or areas of discussion that make students, faculty, or parents uncomfortable

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

24

## CLASSROOM TEACHING: BEST PRACTICES

- Train staff at the beginning of this school year on this new law

- Review lesson plans that related to controversial subjects

- Principals should work with teachers have specific concerns on how to adapt or modify their curriculum and lesson plans if necessary

- Review and prepare for pushback related to "divisive concepts"

- Consider the joint state guidance, as it provides insight into how the Department of Education interprets the law and how it will likely review allegations of teacher misconduct under this statute.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum        25

## FREE SPEECH: STUDENTS

- Free speech – students in the classroom:

  - Schools and the teachers in the classrooms have significant control over student expression in the classroom. Classrooms are not open forums for expression. Teachers can exercise control over student speech to assure that participants learn whatever lessons the activity is designed to teach.

  - Accordingly, teachers should continue to regulate classroom discussions to maintain control of the discussion and to ensure compliance with the law.

  In general, remember that students maintain some free speech rights under the *Tinker* standard, which protects speech that does not create a substantial disruption to the school environment.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum        26

13

## ACADEMIC FREEDOM: TEACHERS

- Free speech – teachers in the classroom:
  - While teachers retain some limited free speech rights at work, courts have consistently held that primary and secondary school teachers really do not have academic freedom while engaged in teaching.

  - Teachers lack the same kind of freedom that professors enjoy to express their personal views and opinions.

  - Translation: teachers have the freedom in the classroom to discuss the assigned subject matter in the manner they deem appropriate, but must ensure that their comments are directly related to the curriculum established by the Board and do not delve into unlawful topics.

  - Collective bargaining agreements – some CBAs contain provisions titled, "Academic Freedom" which, for the most part, do not permit teachers to express their own views and opinions. However, if you have such a provision, teachers should be cautioned that state law now sets limits on what can be taught in the classroom.

## SCHOOL BOARD POLICIES

- Every school district in NH should have board policies which provide a process for:
  - Parents to object to objectionable course material

  - Parents and students to challenge the instructional materials and library resources used in the school's educational program on the basis of appropriateness.

- Familiarize yourself with these policies, ask your policy committee to review and update, and direct the pubic to follow the processes contained therein if they have complaints or issues:
  - IJL - Library and Instructional Materials

  - IGE/IGC - Objectionable Course Material

## OBJECTIONABLE CLASSROOM MATERIAL

- **RSA 186:11, IX-c (board policy IGC/IGE)**

  - Requires school districts to adopt a policy allowing for an exception to objectionable course material.

  - Parent notifies the school principal in writing of the specific material to which they object

  - Principal and parents agree upon an alternative program, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area.

  - Instruction on human sexuality and sexual education – schools must also provide parents and legal guardians not less than 2 weeks advance notice of curriculum course material used for instruction of human sexuality or human sexual education.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

29

## OBJECTION TO LIBRARY AND INSTRUCTIONAL MATERIALS

- American Library Association Positions:

  - Freedom to Read Statement

  - Library Bill of Rights – American Library Association believes that libraries are forums for information and ideas, and that the following basic policies should guide their services (partial list only):

    I.   Books and other library resources should be provided for the interest, information, and **enlightenment of all people of the community** the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation.

    II.  Libraries should provide materials and information presenting **all points of view on current and historical issues.** Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

    III. Libraries should **challenge censorship** in the fulfillment of their responsibility to provide information and enlightenment.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

30

## STUDENT AND STAFF CODE OF CONDUCT

- School districts as both employers and educators should continue to follow and enforce their code of conduct.

- This law does not provide an opportunity for students or staff to engage in discriminatory conduct and such misconduct must continue to be addressed through appropriate methods.

Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond** Woodsum

31

## CLOSING THOUGHTS

- The state guidance, while helpful, does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law.

- The law is difficult to understand, often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions.

- We know from recent US Supreme Court decisions that it is challenging for schools to regulate student conduct without infringing on student's First Amendment rights to free speech.

- One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech.

Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond** Woodsum

32



**Contact Us**

670 N. Commercial Street, Suite 207
Manchester, NH 03101
603.716.2895  Main
603.716.2899  Fax

78 Bank Street
Lebanon, NH 03766
603.433.3317  Main
603.433.5384  Fax

84 Marginal Way, Suite 600
Portland, Maine 04101
207.772.1941  Main
207.772.3627  Fax

800.727.1941 | dwmlaw.com
© Copyright 2021 Drummond Woodsum.  All rights are expressly reserved.

# EXHIBIT 23

# Department of Education Banned Concepts Act Complaint Website as of Dec. 19, 2021

Case 1:21-cv-00291-PB Document 18-1 Filed 12/20/21 Page...

 ALERT **Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**

 New Hampshire
**Department of Education**



 OPEN MENU

Home > Who We Are > Deputy Commissioner's Office > Office of Governance > Right to Freedom from Discrimination in Public Workplaces and Education

# Right to Freedom from Discrimination in Public Workplaces and Education

*The department of education wants to ensure that all students have the opportunity to learn in a safe and encouraging environment that instills hope and promise for a bright future. One aspect of that environment, both for students and teachers alike, is that it is free from discrimination.*

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

This web page is being offered in support of the New Hampshire Commission for Human Rights (Commission) for those who believe that they, or their child, was discriminated against because their child's school was teaching and/or advocating that one identified group is:

- Inherently superior or inferior to people of another identified group
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously
- Should be discriminated against or receive adverse treatment
- Should not treat members of other identified groups equally

Completion of a Public Education Intake Questionnaire does not constitute a formal charge of discrimination, but the first step in making such a determination.

## Filing a Public Education Intake Questionnaire

Please complete and submit the Public Education Intake Questionnaire form below. Before submitting, ensure all contact information provided on the form is as current and up to date as possible. Once the completed questionnaire is received, it will be reviewed by the Commission's Intake Coordinator. The Coordinator may need to reach out to gather more information to determine if the individual filing has grounds to file a formal complaint. Once review is complete, the Intake Coordinator will provide information to explain the next steps in filing a formal complaint or to explain why there is no basis to file a charge of discrimination. We recommend saving or printing a copy of the completed questionnaire for your personal records.

The below form can be submitted to the Commission directly by using the submit button when opened in Adobe. If Adobe is unavailable, please complete the form and submit it via email to humanrights@hrc.nh.gov.

Public Education Intake Questionnaire Form 

## Resources and Links

- New Hampshire Commission for Human Rights Case Processing Procedure and Summary Fact Sheet
- Frequently asked Questions: New Discriminatory practice prohibitions applicable to k-12 public educational programs
- Frequently asked Questions: New Discriminatory practice prohibitions applicable to public employers and government programs
- State Issues Guidance Regarding New Anti-Discrimination Laws
- Chapter 91: HB 2-FN-A-LOCAL Final Version
- NH RSA 354-A
- Educator Code of Conduct and Ethics

## Contact

New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301
Telephone: (603) 271-2767
Fax: (603) 271-6339
E-mail: humanrights@hrc.nh.gov

## To Voice Other Complaints or Concerns

Members of the public who would like to contact a representative from the New Hampshire Department of Education to voice a concern or complaint that is unrelated to alleged discrimination in a school setting are encouraged to find the appropriate staff member here.

 Portable Document Format (.pdf) . Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

 New Hampshire
**Department of Education**

101 Pleasant Street | Concord, NH | 03301-3860
(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 |
info@doe.nh.gov

NH Career and Technical Education

NH Schools

iPlatform

NH Government Careers

NH Travel & Tourism

NH Web Portal - NH.gov

ReadyNH.gov

Directions to NHDOE ›        Subscribe to e-news ›        myNHDOE

Educator Search

Transparent NH

© 2021 State of New Hampshire • All rights reserved  |  Accessibility Policy  |  Privacy Policy        AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE

# EXHIBIT 24

Bounty Tweet



**Moms for Liberty NH**
@Moms4LibertyNH

We've got $500 for the person that first successfully catches a public school teacher breaking this law.

Students, parents, teachers, school staff... We want to know! We will pledge anonymity if you want.

> 🌟 **The Free State** 🦔 @FreeStateNH · 1d
>
> Public school teachers that teach critical race theory in New Hampshire will now lose their jobs and licenses.
>
> Show this thread

## N.H Education Department launches system for parents to lodge discrimination complaints against teachers

New Hampshire Public Radio | By Sarah Gibson

Tweet your reply







Students, parents, teachers, school
staff... We want to know! We will
pledge anonymity if you want.

 **The Free State**  @FreeStateNH · 1d

Public school teachers that teach critical race
theory in New Hampshire will now lose their jobs
and licenses.

Show this thread

# N.H Education Department launches system for parents to lodge discrimination complaints against teachers

New Hampshire Public Radio | By Sarah Gibson

Published November 10, 2021 at 4:31 PM EST

9:28 AM · 11/12/21 · Twitter for Android

**30** Retweets  **12** Quote Tweets  **106** Likes

**Moms for Liberty NH** @Moms4Li... · 7h  ···

Tweet your reply

**The Free State** 🦔
@FreeStateNH

Public school teachers that teach critical race theory in New Hampshire will now lose their jobs and licenses.

## N.H Education Department launches system for parents to lodge discrimination complaints against teachers

New Hampshire Public Radio | By Sarah Gibson

Published November 10, 2021 at 4:31 PM EST

3:12 PM · 11/11/21 · Twitter Web App

**90** Retweets  **26** Quote Tweets  **611** Likes

    

**The Free State** 🦔 @FreeStateNH · 1d    •••



Tweet your reply

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NEA-NH

**DEFENDANTS**

Frank Edelblut, Commissioner of Education, et al.

**(b)** County of Residence of First Listed Plaintiff  Strafford
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Merrimack
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gilles R. Bissonnette, ACLU of New Hampshire, 18 Low Avenue, Concord, NH 03301, 603.225.3080

Attorneys *(If Known)*

New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☒ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 2201 (declaratory relief); 42 USC 1983 (civil rights act)

Brief description of cause:
Constitutional challenge to Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 on 14th Amendment Due Process vagueness grounds.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*

JUDGE  Laplante, J.

DOCKET NUMBER  1:21-cv-01063-JL

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 12/20/21 | /s/ Gilles Bissonnette (NH Bar 265393) |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) )  Civil Action No. |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. | ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Frank Edelblut
Commissioner of Education
Department of Education
101 Pleasant Street, Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
*Signature of Clerk or Deputy Clerk*

580

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE | ) ) ) ) |
| _____ *Plaintiff(s)* | ) ) |
| v. | ) ) |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. | ) ) ) ) |
| _____ *Defendant(s)* | ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   John Formella
Attorney General
Department of Justice
33 Capitol Street
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE <br><br> *Plaintiff(s)* <br><br> v. <br><br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) )  Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Ahni Malachi
Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____       _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE <br><br> *Plaintiff(s)* <br><br> v. <br><br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Christian Kim
Chair
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE <br><br> *Plaintiff(s)* <br><br> v. <br><br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    Ken Merrifield
Commissioner of Labor
Department of Labor
95 Pleasant Street
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL- :
CIO, RYAN RICHMAN, JOHN DUBE and :
JOCEYLN MERRILL, teachers in the New :
Hampshire Public Schools, and KIMBERLY :
GREEN ELLIOTT and MEGHAN EVELYN :
DURDEN, parents or guardians of children in the :
New Hampshire public schools. : No. _____
                               :
                          Plaintiffs, :
                   - against - :
                          :
FRANK EDELBLUT, in his Official Capacity as :
Commissioner of the DEPARTMENT OF :
EDUCATION ("DOE"), CHRISTIAN KIM in his :
Official Capacity as the Chair of the NEW :
HAMPSHIRE COMMISSION ON HUMAN :
RIGHTS, and JOHN FOMELLA in his Official :
Capacity as ATTORNEY GENERAL of the State :
of New Hampshire. :
                          Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **COMPLAINT**

Plaintiffs, LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN,

JOHN DUBE, AND JOCELYN MERRILL, individual teachers in the New Hampshire Public

Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVEYLN DURDEN, individual

parents of children in the New Hampshire public schools, through their attorneys Nolan Perroni,

P.C., Stroock & Stroock & Lavan LLP, Phillips, Richard & Rind, P.C., David Strom, Esq., and

Selendy & Gay PLLC, for their complaint against Commissioner Frank Edelblut, in his official

capacity as Commissioner of DOE, Christian Kim in his Official Capacity as Chair of the New

Hampshire Commission on Human Rights and John Fomella in his Official Capacity as Attorney

General of the State of New Hampshire allege as follows:

## NATURE OF THE ACTION

1.     This action for declaratory and injunctive relief challenges the constitutionality and legality of recently enacted New Hampshire statutory provisions 297 and 298 of 2021 House Bill 2 ("297 and 298" "HB 2"), codified at N.H. REV. STAT. ANN. ("RSA") 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354A:34; and RSA 193:40, all enacted June 25, 2021, which together have come to be known as the "Divisive Concepts Statute" (*see infra*, n.12-13).

2.     Concisely put, the Divisive Concepts Statute was designed to limit teaching in New Hampshire of ideas and societal concerns not to their liking, thereby curtailing speech, limiting the free exchange of ideas within our classrooms and depriving New Hampshire students of their constitutionally and statutorily guaranteed right to an adequate education.  The resulting enactment is at once unconstitutionally vague in violation of the Fourteenth Amendment of the United States Constitution, chills teacher speech in violation of the First Amendment and conflicts with and compels abridgment of New Hampshire's Constitution and laws, thereby creating further vagueness, fear and uncertainty as to what New Hampshire teachers may teach and as a result hurts New Hampshire's students.

3.     The Divisive Concepts Statute invites partisanship into our schools and deputizes private, politically-motivated individuals to enforce its vague proscriptions.  Indeed, in recent weeks, the Divisive Concepts Statute has been seized upon by radical political groups to rationalize an offer of an economic "bounty" for informers who lodge, on a recently created State-established and Department of Education maintained website, complaints about public school teachers.  This threat of a "bounty" looms large in addition to obvious reputational consequences and penalties, including firing, that the Defendant Education Commissioner may thereafter seek to impose, underscoring the Statute's chilling effect not just on teachers' constitutionally

protected rights but, as a result, on the education students must have to prepare for life, college, careers and citizenship. Indeed, teachers, including a Plaintiff in this action, have been made the subject of online harassment, obscenities and vicious attacks as a direct result of the climate of political intimidation created by and with the facilitation of various Defendants.

4. The "culture wars" have no place in New Hampshire's classrooms. Our public school teachers and support staff are dedicated public servants who have stepped up and devoted themselves beyond measure during the pandemic to continue to teach our children. Yet, they are being politically targeted and threatened with public shaming and undeserved disciplinary proceedings (not to mention the cost of defending themselves) for doing their jobs in accordance with the curriculum formally adopted by the state. New Hampshire parents, too, are entitled to send their children to school, expecting a full and robust exchange of ideas in the classroom, uncorrupted by censorship and extremist partisanship.

5. Because it is hopelessly and unconstitutionally vague on its face, the State and its agencies have on at least two separate occasions since its passage weighed in to attempt to clarify the meaning and scope of the Divisive Concepts Statute. In July 2021, the Commission for Human Rights, Department of Justice and Department of Education issued a guidance document entitled "*Frequently Asked Questions*: *New discriminatory practice prohibitions applicable to public prohibitions applicable to k-12 educational programs*"[1], (the "FAQ"), in an attempt to define certain ambiguous words in the statute and identify what teachers may (and may not) teach. After it became clear that the attempted clarification had fallen woefully short, on September 7, 2021, in response to a request from the Human Rights Commission (the same State agency that previously issued the FAQ), the Attorney General again attempted in a formal opinion

---

[1] Dep't of Educ., Comm'n for Human Rights and Dep't of Justice, *Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs*, https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf (last accessed Dec. 10, 2021).

to resolve the confusion and identify what is and what is not prohibited by the Statute.[2]  The need

for repeated clarification and restatement by each of these state entities underscores the law's

vagueness and the unquestionable difficulty public school teachers have in understanding it, much

less complying with it while, at the same time, adhering to conflicting state laws and mandated

curriculum.

6.      While the Attorney General's September 7th Opinion (together with the July 21st

FAQ's) make strides towards interpreting, and seemingly limiting some of the unconstitutional

educational restrictions imposed on teachers by the Divisive Concepts Statute, it does not fully

cure the statute's defects—particularly as to the unbridled claims of third party bounty hunters or

the cadre of informers assembled through the Department of Education's website.  Nor is it

comprehensive or binding authority.  And while the Attorney General's opinion is dated

September 7, 2021, as of the date of this complaint (December 13, 2021), the Department of

Education does not even reference it much less include it as part of its purported governing

interpretations listed on the Department of Education website.  Thus, teachers now are placed in

the impossible position of interpreting a statute that the Attorney General, the State Human Rights

Commission and even the Department of Education agree is confusing and one that on its face

conflicts with state education laws and curriculum mandates and, which, if the teachers'

interpretation as non-lawyers is in error, subjects them to reputational injury, disciplinary

procedures and potentially the loss of their livelihoods, not to mention the vengeance of bounty

hunters empowered by the Divisive Concepts Statute to maintain harassing litigation.  The

intervention and imprimatur of this Court through declaratory relief thus is necessary (a) to clarify

the Divisive Concepts Statute, and correct it's infirmities, starting with, but not limited to, the

---

[2] Attorney General Dep't of Justice, Attorney General Opinion No. 2021-01, Request for Attorney General's Opinion
regarding new anti-discrimination protections (Sept. 7, 2021), https://www.doj.nh.gov/public-
documents/documents/opinion-2021-01-hb2-anti-discrimination.pdf.

direction recognized as essential by the Attorney General in his formal Opinion, or (b) invalidate it, particularly because the statute authorizes private individuals in this highly charged political environment to bring private suits against individual teachers to enforce its ambiguous provisions, regardless of any limiting language from the Attorney General, or otherwise.

## THE PARTIES

7.      Plaintiff Ryan Richman is a high school World History teacher at Timberlane, Regional High School.  Since the start of the school year, the Divisive Concepts Statute has had the effect of chilling Mr. Richman's ability to provide his students with the nature, content and quality of education guaranteed and mandated by the New Hampshire Constitution and laws.  His interaction with his students has been materially curtailed given Mr. Richman's uncertainty as to what he can and cannot teach and what questions he can and cannot answer.  As a result, his students – along with the students of all other New Hampshire teachers in this complaint – are put at a competitive disadvantage as they are not receiving the comprehensive education to which they are entitled under New Hampshire law, and which other students in the United States are receiving.

8.      Plaintiff John Dube is a high school U.S. History and AP U.S. History teacher at Timberlane Regional High School.  After the Divisive Concepts Statute was passed, Mr. Dube signed an online petition promising to teach "honest" history.  A New Hampshire rightwing group published all of the names of teachers who signed the petition, pledging to "shame" them.  Mr. Dube was subject to online harassment, threats and obscenities for simply doing his job in the classroom – requiring federal and local law enforcement intervention.  He continues to fear for his own personal safety and, in fact, has had to install personal security and safety equipment at his home in light of the threats.  *See* Exhibit A.

9.      Plaintiff Jocelyn Merrill is a ninth grade English teacher at Nashua High School North.  She has been teaching for 10 years.  Since the Divisive Concepts Statute was passed, Ms. Merrill has limited her classroom discussion of race to specific passages in assigned literature and has avoided any discussion of racism's systemic impact with her students.

10.     Plaintiff Kimberly Green Elliott is a Reading Specialist at Fairgrounds Middle School and lives in Merrimack, New Hampshire.  Ms. Elliot has two children, a daughter who graduated from Merrimack public schools and is now in college, and a son, who currently attends Merrimack High School.  Ms. Elliott believes the Divisive Concepts Statute will prevent her son from receiving a full and robust education for, among other reasons, those highlighted in paragraph 6, *supra*.  In fact, since the Divisive Concepts Statute was passed, Ms. Elliott has observed a noticeable difference in the breadth of the education her son has received and has even seen one of her son's teachers self-censor on certain controversial topics.

11.     Plaintiff Meghan Evelyn Durden is an Art Teacher at Charlotte Avenue Elementary School. Her daughter is in public elementary school in Nashua.  As described in paragraph 6, *supra*, Ms. Durden believes the Divisive Concepts Statute will prevent Ms. Durden's daughter from receiving a full and robust education for, among other reasons.

12.     Plaintiff Local 8027, AFT-New Hampshire, AFL-CIO is a labor union representing approximately 3,400 public school teachers, school support staff, city and town employees, police officers, library employees, and higher education faculty.  Local 8027 is a member of the New Hampshire AFL-CIO, and is the state affiliate for the American Federation of Teachers with more than 3,000 local affiliates nationwide, 43 state affiliates, and more than 1.7 million members.

13.     Defendant New Hampshire Education Commissioner Frank Edelblut, in his Official Capacity as Commissioner of DOE, is tasked under RSA § 21-N:4 with "[e]stablishing the organizational goals of the department and representing *the public interest* in the administration of the functions of the department of education and being responsible to the governor, the general court, and the public for such administration."  (Emphasis added).

14.     Defendant Christian Kim, in his Official Capacity as Chair of the New Hampshire Commission for Human Rights, is tasked with enforcing the law against discrimination and to "receiv[ing], investigat[ing] and mak[ing] findings" on complaints.  Relevant here, the Commission for Human Rights is empowered under the Divisive Concepts Statute to enforce its provisions.

15.     Defendant John Fomella is the Attorney General of the State of New Hampshire and is the chief legal officer in the State. His duties and responsibilities include, among others, addressing challenges to New Hampshire statutes and related constitutional challenges, the subject of these proceedings.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Constitution and the laws of the United States.

17.     Venue is proper in this District under 28 U.SC. § 1391(b) because at least one Defendant resides within this District, all Defendants reside in the State in which this District is located, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

18.     The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 1983.

19.      The Court has jurisdiction of claims viewed as being cognizable only under state law as a matter of supplemental jurisdiction. 28 U.S.C. § 1367.

### BACKGROUND

20.      Education is a vital function of state and local governments.  Public education is the lifeblood of our democracy and enables our children to be prepared for their lives, for college and career, as well as for civic participation.  As the Supreme Court famously put it, "[i]t is the very foundation of good citizenship."  *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954), supplemented sub nom, *Brown v. Bd. Of Educ. of Topeka, Kan,* 349 U.S. 294 (1955).

21.      Within our free and diverse educational system, broad exposure and the freedom to explore and examine areas of scholarship, art, history and science, together with the development of critical basic skills, are essential to training our young citizens for the privileges and responsibilities necessary for full participation in a democratic society.  Any attempt to diminish public education through misinformation, selective teaching or censorship directly threatens both our young citizens and our democracy.  Critical thinking and the ability to independently and freely evaluate ideas exchanged in public debate are core skills at the foundation of all educational training.

22.      Aside from being a country devoted to freedom, democracy, opportunity and justice for all, what sets our great nation apart is its unique diversity – of race, ethnicity, religion, viewpoint, among many others – and our steadfast commitment to celebrate that diversity rather than muzzle it.

23.      Politically-driven censorship (reminiscent of the 1933 book burnings here, or in Germany or in Austria) has no place in a vital and vibrant America, and is especially unwelcome in American classrooms.  Our judiciary understands the anathema that censorship represents and the need to protect against it.  Nearly a century ago, the United States Supreme Court recognized

that "[m]ere knowledge" of concepts, perspectives, and events "cannot reasonably be regarded as harmful" when taught in public schools. *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923). That is particularly true today, when students, armed with the internet and other technological advances, have free and unfiltered access to more information than at any other time in history. The public school classroom – the cornerstone of a sound education and educational system – must be a safe forum for the free exchange of ideas and information. It is a young American's initial and foundational exposure to the importance of independent thought and expression, and a critical first component for the cultivation of democratic ideals.

24.     New Hampshire has long been a beacon of American public education, with a rich history of preparing well-rounded students for successful participation in our ever changing society. These basic precepts have been acknowledged and practiced in New Hampshire's public education system for decades. Indeed, the need for a diverse and well-rounded educational experience is enshrined in the New Hampshire Constitution which guarantees a minimally "adequate education," and in case law explaining the touchpoints of such an education. Thus, New Hampshire's highest court has made clear that:

> Given the complexities of our society today, the State's constitutional duty [to provide a constitutionally adequate education] extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas.

*Claremont Sch. Dist. v. Governor*, 138 N.H. 183, 192 (1993) (*Claremont I*). Indeed, in the progeny of *Claremont I* the principles of curricular openness have consistently been strengthened and reiterated.

25.     New Hampshire's uniform state educational standards contemplate that students will be engaged and challenged on a diversity of topics even in those instances where confronting

certain materials or topics may cause discomfort (*e.g.*, historical events such as the Cocheco

Massacre and its aftermath[3]) but at the same time teach vital lessons.  For example, New

Hampshire has long mandated by statute that in all public and private schools, there shall be

courses teaching about "intolerance, bigotry, antisemitism, and national, ethnic, racial, or

religious hatred and discrimination *[that] have evolved in the past, and can evolve, into genocide

and mass violence"* and *"to prevent the evolution of such practices"* in the future.[4]  (Emphasis

added).  New Hampshire law thus requires students to examine – and it follows that teachers shall

provide the instruction for students to learn – controversial events from multiple perspectives and

ideologies and learn to defend and challenge differing views on a wide variety of topics.  In short,

New Hampshire state law promises to develop students into well-rounded, well-educated young

adults who are prepared to embrace all the challenges, complexities, privileges and

responsibilities of American citizenship, who are prepared to live in an increasingly diverse

world, and who can compete successfully in the New Hampshire, national and global economies.

The accomplishment of that goal has long been a hallmark of New Hampshire and of its

educational system.  Parents rely on New Hampshire's public schools to educate their children

consistent with those standards.  And every year, high school seniors seek their degrees to prepare

them for the workforce, college, and whatever else may lay ahead of them, assured, consistent

with those standards, that they have acquired the necessary knowledge and skills to survive and

thrive in a complex, ever-changing, competitive world.

    A.      *The Divisive Concepts Statute*

    26.      On June 25, 2021, New Hampshire lawmakers launched a devastating blow to the

education New Hampshire parents have come to expect and thrust upon New Hampshire's

---

[3] *See* The Dover, N.H. Public Library, Dover History, https://www.dover.nh.gov/government/city-operations/library/history/the-cochecho-massacre.html (last accessed Dec. 10, 2021).
[4] *See* RSA § 189:11(i)(j).

teachers an impossible predicament.  Rather than uphold the longstanding tradition of educational

excellence, New Hampshire legislators, as part of a political arrangement necessitated by a

deadline for the timely enactment of the biennial state budget, accepted a falsely-premised

national political narrative of opposition to "political correctness" by enacting the statute that is

the subject of this litigation, RSA § 193:40.

27.     They did so in the wake of nationwide efforts to politicize and censor education.[5]

As his term in office drew to a close, President Trump established the "1776 Commission," a

group created to "promote patriotic education,"[6] defined by its opposition to a controversial

theorem, The Critical Race Theory ("CRT"), which they termed  "toxic propaganda"[7], the *New

York Times*' 1619 Project, and the late Howard Zinn, author of *A People's History of the United

States.*  President Trump also issued a November 2020 Executive Order prohibiting federal

institutions from providing diversity and inclusion training and discussing topics about systemic

racism, white privilege and other race and gender bias issues.[8]  Willingness to pursue such

mandates for thinking, learning and teaching became for some the political litmus test for

educational existence.

28.     Nonprofit organizations challenged the above Executive Order in federal court,

arguing that it violated their free-speech rights and hampered their ability to conduct their

businesses, including their ability to conduct training for their workforce on topics such as

"implicit bias."  A federal judge agreed, enjoining *on a nationwide basis* the enforcement of the

Executive Order restraining the education and training of federal employees respecting "divisive

---

[5] Adam Harris, *The GOP's 'Critical Race Theory' Obsession*, THE ATLANTIC (May 7, 2021),
https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixation-explained/618828/.
[6] Olivia B. Waxman, *Echoing Decades of Fighting Over U.S. History Classrooms, President Trump Announces a
Push for 'Patriotic Education*,*'* TIME (Sept. 17, 2020), https://bit.ly/3xs1qHX.
[7] *Id.*
[8] Establishing the President's Advisory 1776 Commission, Pres. Exec. Order No. 13958, 85 Fed. Reg. 70951 (Nov. 2,
2020).

concepts" (*i.e.*, race and gender), as violative of the First Amendment.[9]  With bipartisan support, President Biden rescinded the order shortly after taking office,[10] thus mooting the litigation.

29.     Nevertheless, as one commentator aptly put it, the rebranding of the "critical race theory was already a part of the conservative lexicon" by that point.[11]  Supporters of the "divisive concepts" ban rushed to generate a rash of proposed state legislative measures in various states designed to replicate, if not expand, the federal constraints that had just been enjoined based on serious constitutional concerns.

30.     Spurred on by committed ideological zealots who wanted to re-write history, some New Hampshire politicians were persuaded to follow suit.  After unsuccessfully attempting to pass stand-alone legislation explicitly banning the teaching of "divisive concepts" related to race and gender, the Legislature included prohibitions against teaching in order to gain the requisite votes to timely pass the biannual $13.5 billion state budget bill (an acutely time sensitive measure which if not enacted precisely in accordance with sensitive timelines would cripple the state).

31.     The new bill created sections 297 and 298, and to conceal its true meaning and purpose, was entitled "Right to Freedom From Discrimination in Public Workplaces and Education" (June 25, 2021) (the "Teaching Discrimination Statute").  It was joined with contemporaneously enacted amendments to RSA § 354-A:30-34 (the "Contemporaneous Amendments"),[12] into a single bill (HB 2), skillfully crafted to conceal through ambiguity the true censorship purposes of its architects.[13]

---

[9] *See Santa Cruz Lesbian and Gay Community Center v. Trump,* 508 F. Supp. 3d 521 (N.D. Cal. 2020).
[10] Harris, *supra* n.5.
[11] *Id.*
[12] The Contemporaneous Amendments include: "354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education;" "354-A:31 Prohibition on Public Employers;" "354-A:33 Protection for Public Employees," and "354-A:34 Remedies").
[13] The full text of the operative provisions of HB 2, the Budget Bill which added the above-cited provisions as adopted, is attached hereto as Appendix A.  For convenience, that portion which is the focus of these proceedings and is captioned "*Prohibition on Teaching Discrimination*" is in full text as follows:

32.     In their effort to legislate around expressly banning CRT and related topics, the

legislative sponsors drafted the Divisive Concepts Statute with language that is vague beyond

comprehension and is one that flies squarely in the face of the United States Constitution and

New Hampshire statutory and constitutional law.  The Divisive Concepts Statute was broadly

couched as seemingly aimed at prohibiting teaching that "an individual, by virtue of his or her

age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status,

mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive,

whether consciously or unconsciously."

33.     Similarly, the measure was cast as also prohibiting teaching that (i) "people of one

age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status,

"91:298 New Section; Prohibition on Teaching Discrimination. Amend RSA 193 by inserting after section 39 the
following new section:
193:40 *Prohibition on Teaching Discrimination*. I. No pupil in any public school in this state shall be taught,
instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:
(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or
physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity,
sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national
origin;
(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or
oppressive, whether consciously or unconsciously;
(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or
her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical
disability, religion, or national origin; or
(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status,
mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard
to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical
disability, religion, or national origin.
II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction,
the *historical existence* of ideas and subjects identified in this section.
III. Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a
civil action against a school or school district in superior court for legal or equitable relief, or with the New
Hampshire commission for human rights as provided in RSA 354-A:34.
IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that
justifies disciplinary sanction by the state board of education.
V. For the purposes of this section," educator" means a professional employee of any school district whose position
requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are
included within the definition of this term. 91:299 Severability. If any provision of sections 297-298, or the
application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and
their application to any other persons or circumstances shall not be affected thereby.
91:300 Effective Date. Sections 297-299 of this act shall take effect upon passage.

mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard [sic] to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin" or (ii) that one's "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."

34.     Importantly, the statute authorizes "*[a]ny person* claiming to be aggrieved by a violation of the [Divisive Concepts Statute]" to "initiate a civil action against a school or school district in superior court for legal or equitable relief..." (Emphasis added).

35.     The overbreadth and ambiguity of the statute makes it impossible for teachers to follow and highly susceptible to arbitrary and discriminatory enforcement, particularly by State enabled private citizen "bounty hunters" and informers.

36.     What does it mean, for example, to prohibit teaching that people of one particular group "cannot and should not attempt to treat others without regard" for their age, sex, gender, mental or physical disabilities?  Indeed, our laws *mandate* the accommodation of certain groups of people, including those with mental and physical disabilities, and purposefully treat individuals *with regard* for their chronological age.  What does it mean to prohibit teaching that an individual, by virtue of one's age, cannot make one "inherently superior" or "inherently inferior" to a younger individual?  Here, too, our laws recognize and plainly differentiate "by virtue of one's age."  A 12 year-old cannot get a chauffeur's license in most jurisdictions.  A 90-year old cannot get a paragliding permit or train operating engineer's license in most jurisdictions. Additional examples concretely illustrate the ambiguities:

- Can a teacher discuss, debate, or answer questions in their classroom about the policy of affirmative action, a policy that necessarily treats members of certain identified groups differently and *with regard* for their identification?  Can a teacher discuss for example, programs such as the Small Business Association's affirmative action programs for the treatment of disabled individuals, which necessarily treats disabled applicants differently?

- Can a teacher discuss or debate New Hampshire's mandatory retirement age (since 1792) for judges attaining 70 years of age and whether the law ought to force retirement at a certain age in the judiciary or elsewhere?

- Can a teacher discuss or debate the Americans with Disabilities Act and whether the law should accommodate, and *not treat equally*, those who need or require special accommodation?

- Can a teacher discuss the failure of all states to ratify the Equal Rights Amendment, and whether other measures should be taken to ensure women are treated equally with their male counterparts?  Perhaps more simply, can a teacher posit that women today, by virtue of their gender, are inappropriately paid less than men?

- Can a teacher discuss why the midnight thrill of a Crawford Notch first vote is a greater testament to democracy than a poll tax, or the limitation on the number of polling places or like constraints on voting?  Or that these constraints on voting are impairing democracy or discriminatory to marginalized communities?

The statutory provisions arguably proscribing the foregoing remain on the books, providing a basis for the politically motivated to terrorize or intimidate teachers.  As set forth in greater detail below, with the Department and Commissioner of Education permitting, and tacitly encouraging, the formation and deployment of a cadre of informers and bounty hunters to report violations of the statute using the simple expedient of an online complaint, thereby triggering inquiry, and perhaps discipline, the chilling effect of that prospect will have the desired result in many cases, with those fearful of job loss, possible investigation and reputational harm becoming ready prey.

37.    Moreover, the Divisive Concepts Statute's constraining mandates squarely collide with long-standing provisions of New Hampshire's law directing what shall be taught. Consequently, New Hampshire's teachers face a situation that is impossible to navigate: if they

attempt to comply with the statute's substantive prohibitions, they could run afoul of New Hampshire's mandatory educational standards; but if they attempt to comply with New Hampshire's long-standing educational standards, they could run afoul of the substantive prohibitions in the Divisive Concepts Statute.[14]

38.     This is not simply a "theoretical conflict."  It is a Hobson's choice that teachers in New Hampshire now are asked to face every day.  Since the start of the school year, teachers across New Hampshire have struggled to understand the scope of what they can and cannot teach and what questions they can and cannot answer under the Divisive Concepts Statute.

39.     Plaintiff Ryan Richman, for example, who teaches world history class at Timberlane Regional High School, in Plaistow, N.H, is facing this dilemma.  He often asks his students to "[f]ind an event in the news, bring it to class, and be prepared to discuss its connections with the past."[15]  "Nine times out of 10, they are stories about oppression.  They're stories about exclusionism. They're about the Rohingya genocide, they're about the Uyghur genocide, which are going on right this second. They're about Black Lives Matter."[16]  He, like many other teachers, is now left wondering whether the Divisive Concepts Statute "will affect his class, or that instruction."[17]

40.     For example, the Divisive Concepts Statute prohibits teaching that an individual, by virtue of his religion or race is "oppressive, whether consciously or unconsciously."  Mr. Richman teaches genocide studies.  In discussions of the expanding influence of China, can Mr. Richman teach about Chinese claims of racial and religious superiority and oppression of Uyghur

---

[14] See infra, ¶¶ 63-75.
[15] Ethan DeWitt, *NH teachers consider how 'divisive concepts' law will affect lesson plans,* VALLEY NEWS (July 14, 2021), https://www.vnews.com/teachers-respond-to-divisive-concepts-legislation-from-41432485.
[16] See id.
[17] See id.

Muslim women who are raped as part of a supposed re-indoctrination program?[18]  Can he discuss

Russia's oppressive treatment of the Chechen people?  While teaching about genocide and the

Holocaust, which are expressly mandated by the New Hampshire State curriculum, Mr. Richman

worries what he can teach about Nazism, Aryan supremacy philosophy generally, and how white

supremacy still exists today.  Mr. Richman also teaches constitutional law to his high school

students.  He worries whether he can teach about affirmative action, the Voting Rights Act and

the Equal Rights Amendment and whether protections are still needed today, without running

afoul of the Divisive Concepts Statute.

41.     Elizabeth Dubrelle, who trains teachers on how to teach civics and social studies at

the New Hampshire Historical Society, says it's a blow to an area of education that already lacks

robust standards.  She said that "[s]ocial studies was already hanging on by its fingernail."  She

added, "My concern is that schools will decide that since it's already in peril, it's not worth the

risk and they'll just do the bare minimum."[19]

42.     Moreover, under New Hampshire law, public school teachers have a five-year

waiting period before they can achieve tenure.  Before a teacher reaches that threshold, school

districts can choose not to renew their contract without strongly stated reasons.  Many believe that

"[t]eachers that are newer, that are more concerned about making sure that they have their jobs

and they have a livelihood, are going to feel the most pressure to kowtow to this political

manipulation of curriculum," Richman said, "not talking about anything that could potentially

ruffle any feathers at the expense of the students."[20]

---

[18] *See* Matthew Hill et al., *'Their goal is to destroy everyone': Uighur camp detainees allege systematic rape,* BBC
NEWS (Feb. 2, 2021), https://www.bbc.com/news/world-asia-china-55794071.

[19] Sarah Gibson, *Despite New State Law, Debate Continues Over Discussing Race And Equity in N.H. Schools,* NEW
HAMPSHIRE PUBLIC RADIO (July 8, 2021), https://www.nhpr.org/nh-news/2021-07-08/despite-new-state-law-debate-
continues-over-discussing-race-and-equity-in-n-h-schools.

[20] DeWitt, *supra* n.15.

43.     New Hampshire's Divisive Concepts Statute is not aimed at any existing teaching practice: teachers do not indoctrinate their students or seek to have their students agree or disagree with any particular political viewpoint; rather, they want only to retain the professional integrity and freedom that they have traditionally been afforded under New Hampshire law.  They endeavor to open their students' minds by exposing them to a wide variety of materials, viewpoints and challenging concepts, without risking their careers or their district's funding. They seek to help children learn *how* to think, not *what* to think. The statute's vague and broad language unfairly chills teachers' attempts to do their jobs and teach a wide range of materials and viewpoints.

44.     And the consequences for a teacher for violating the Divisive Concepts Statute's broad prohibitions are stark.  They include disciplinary proceedings that can lead to dismissal and reputational disgrace.  *See* RSA § 193: 40 (IV).  Strict enforcement of the State's mandate permitting only a single interpretation of American history with these consequences is directly analogous to the actions, past and present, of totalitarian states.[21]   Certainly this is not consistent with a free society or the principles that underlie "Live Free or Die."

45.     Sadly, there is today no shortage of culture warriors – politically-charged groups and individuals – who remain laser focused on persecuting public school teachers and preventing them from teaching accurate history.  In fact, just this month "Moms for Liberty NH," a group devoted to the nonexistent problem of critical race theory in public schools, announced a bounty,

---

[21] The Nuremberg Laws, though initially focused on Jews, applied with equal force to Blacks and other minorities. *See The Nuremberg Race Laws,* Holocaust Encyclopedia, United States Holocaust Memorial Museum, https://encyclopedia.ushmm.org/content/en/article/the-nuremberg-race-laws (2021) (last accessed Dec. 10, 2021). *Cf.,* James Q. Whitman, *Hitler's American Model,* PRINCETON UNIV. PRESS (Feb. 21, 2017) (Discussing the impact of America's Jim Crow laws on the Nuremberg laws and Nazi Germany). *See also* Austin Ramzy & Chris Buckley, *The Xingiang papers: 'Absolutely No Mercy':  Leaked files expose How China Organized Mass Detention of Muslims,* N.Y. TIMES (Nov. 16, 2019), https://www.nytimes.com/interactive/2019/11/16/world/asia/china-xinjiang-documents.html.

a $500 reward, for any individual who reports a teacher violating the ban on "divisive concepts", thereby triggering Department of Education inquiry, and perhaps more.[22]



The Moms for Liberty NH "bounty" came hand-in-hand with Commissioner Edelblut's and the Department of Education's effort to create an avenue for informants to inform on public school teachers. Indeed, the Twitter "bounty" followed just two days after Commissioner Edelblut created a website and form to report complaints against teachers.[23] Shades of the authoritarianism of totalitarian states are inescapable. These parallel efforts will undoubtedly chill responsible and ethical teaching about our nation's history. Public school teachers now have a target on their backs, and Commissioner Edelblut and the Department of Education have opened a pathway for political extremists to instigate ideologically-motivated investigations that may lead to the

---

[22] Paul Blest, *An Anti-CRT Group Is Offering People $500 to Snitch on Teachers,* VICE NEWS (Nov. 15, 2021), https://www.vice.com/en/article/y3vga5/anti-crt-group-offering-teachers-money-new-hampshire.

[23] New Hampshire Dep't of Educ., *Right to Freedom from Discrimination in Public Workplaces and Education*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination (last accessed Dec. 10, 2021).

discipline and possible loss of professional credentials of teachers and administrators across the State.

46.     The Divisive Concepts Statute has brought partisanship into our classrooms and ignited the fires of confrontation and discord in New Hampshire communities.  To illustrate, that conflagration has been kindled, of all places, on an official website created and controlled by the Defendant New Hampshire Commissioner of Education.  Indeed, the Commissioner's website demonstrates how the Divisive Concepts Statute's alleged neutrality and overbreadth can be used for political purposes to target teachers directly.  Under the Divisive Concepts Statute, complaints for violations of the statute may be brought by the aggrieved as a formal civil action in superior court or with the New Hampshire Commissioner of Human Rights against a school or school district.  RSA § 193:40(III).  The Department of Education website provides a link to facilitate the filing of complaints against teacher "…for those who believe that they, or their child, was discriminated against because their child's school was teaching and/or advocating …" matter in violation of the Statute[24].  It then lists a series of reference works.

47.     Studiously omitted however, is the Attorney General's September 7, 2021 formal opinion No. 2021-01, which expressly states that the Statute was viewed as "…confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."[25]  As set forth in greater detail below, the Opinion makes clear that in the view of the Attorney General the Divisive Concepts Statute required some 9-pages of non-binding clarification because vague and confusing.  Significantly, however, that attempt at clarity is wholly omitted from the Education Department's website months after issuance of the Opinion (*i.e.*, at the time of filing of this Complaint) despite the citation of other reference works. One result is to facilitate the

---

[24] *See supra*, n.23.
[25] Attorney General Opinion No. 2021-01, s*upra,* n.2.

improper filing of complaints asserting supposed violations alleging conduct and stimulating investigation, reputational harm and burden through the Department of Education, with the attendant dangers of arbitrary and discriminatory application.

    *B.*    <u>*The FAQs and Attorney General's Opinion*</u>

48.    Since its passage, the State has attempted on at least two occasions, in an FAQ document issued in July and in a September 7, 2021 Attorney General's opinion, Opinion No. 2021-01, to clarify the language and narrow the meaning of the uncontrovertibly vague and confusing Divisive Concepts Statute.

49.    The mere fact that the initial guidance was immediately needed and, two months after it was provided, one of the authors of the initial clarification (the July FAQ's)—the Department of Human Rights – acknowledged it was confused and required clarification as to the very nature and scope of the Divisive Concepts Statute, highlights not only the ambiguity of the Statute, but also the perception that, in its quest to stifle speech and ban important and difficult discussions of race, even an enforcer of the Statute finds it inherently "fuzzy."  Significantly, however, while both efforts to try to remedy the flaws in the legislation seemingly move the needle towards a more comprehensible (albeit redundant) law, the FAQ and Attorney General Opinion still leave ambiguity and have no dispositive legal force.  Indeed, it is as if the Attorney General (and even those who lent their names to initial FAQ's) are saying to those who read and rely on these successive restatements of the Statement "*the Legislators really did not mean what they enacted*"; yet, the law, as they enacted it, is still the law and is being used by the DOE and its Commissioner, as well as their cadre of informers and bounty hunters, to confuse, intimidate and bully teachers who have no idea if and when they teach according to the educationally-prescribed curriculum, or answer forthrightly a student's question, they will be pilloried, shamed or fired. Until substantially recast or nullified, the Divisive Concepts Statute remains the vague law of

New Hampshire, largely unintelligible by those intended to be affected and in direct conflict with the United States Constitution and New Hampshire's education laws.  A few examples of the FAQ's attempt to seemingly correct the defective legislation emphasize the point.

50.     First, the FAQ sets out to define certain terms of the statute.  In a section entitled, "What do the phrases 'inherently superior or inferior'" or 'inherently racist, sexist, or oppressive' mean?,'" the FAQ tries to clarify this ambiguity, explaining that "'[i]nherent' means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors."[26]

51.     Second, in a section entitled "Does the law prohibit teachers from teaching U.S. history," the FAQ seeks to temper the impact of the Divisive Concepts Statutes, stating that nothing therein precludes teachers from teaching historical subjects (like slavery or Jim Crow) or discussions relating to current events (like the Black Lives Matter movement), or even efforts to promote equality and inclusion, or other contemporary events that impact "certain identified groups."[27]  It also indicates that topics relating to racism, sexism or other beliefs that make students, faculty or parents uncomfortable will not *automatically* violate the statute.[28]  The use of the term "*automatically*" is telling.  How is a teacher to know what topics will violate the statute if it is not "automatically" enforceable?  Who or what triggers enforceability?  If, for example, a student asks about current policies that attempt to correct for historical racism, sexism or other oppression, such as affirmative action, may the teacher respond by providing examples of the appropriateness or inappropriateness of such measures?

52.     Finally, while the statute indicates that it should not be construed to prohibit discussing, "as part of a larger course of academic instruction, the *historical existence* of ideas

[26] *See* FAQ.
[27] *See id.*
[28] *See id.*

and subject[s]" such as discrimination and racism, the FAQ suggests that discussion of historical practices may also include a discussion about how these practices "continue to harm certain identified groups" and "their lingering impact."  Again, the line between teaching or describing the "lingering impact" or "continue to harm" of racism and sexism in our country versus how or whether these issues can or should be affirmatively addressed appears to be intentionally blurred, so as to leave teachers in grave doubt regarding what they can and cannot say or teach in their classrooms.[29]

53.    The FAQ's did not resolve the all of the inherent flaws in the Divisive Concepts Statute and neither has the September 7, 2021 Opinion of the Attorney General.  In response to the request from the Chair and Executive Director of the Commission for Human Rights to clarify the "scope and application" of the Divisive Concepts Statute, the Attorney General framed his own set of questions issued a series of questions regarding ambiguities in the law and attempted to address them.  The Attorney General frankly admits that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."

54.    Importantly, as previously noted, the Attorney General's September 7th Opinion has seemingly been wholly ignored by the Department of Education, the entity that directly interacts with teachers and administers potential discipline.  The refusal to even cite it is telling, especially because the Opinion makes clear that the Statute must be recast in fundamental respects and provides the beginning of a roadmap to fundamental interpretative restatement of the fatally flawed Divisive Concepts Statute that this Court may employ through Declaratory Relief.

---

[29] It should not go unnoticed that in the same FAQ that attempted to "address[] questions that may arise regarding the changes to schools and educational programs," the Department of Education tacitly encouraged informers, pointing out that any "student or parent" may file a complaint with the New Hampshire Commission for Human Rights, Attorney General or file a civil claim in superior court for damages or injunctive relief.

55.     In stark contrast with the Divisive Concept Statute, the Attorney General's
Opinion expands the permissible scope of teaching, advising, for example, that, while the statute
is silent on the matter, the Divisive Concepts Statute should not be viewed as prohibiting and does
not "prohibit schools from teaching about the role that discrimination may play in creating
disparities among different identified groups."  The Attorney General also suggests that
educational programs may teach "participants about disparities that may exist among different
identified groups, the current or historical practices that may have contributed to those disparities,
or about concepts such as implicit bias."  That small but significant substantive step forward does
not however make the statute as a whole readily understandable neither, we must stress, is it
enforceable, especially in the private actions seemingly encouraged by the DOE.

56.     The Attorney General's Opinion itself  makes clear that even after the FAQ
restatement, ambiguities remain that are unresolved.  What does it mean to teach about
"disparities that may exist among different identified groups" and "historical practices" that may
have led to the disparities?  Can teachers in New Hampshire teach not only the historical
existence of segregation and Jim Crow and its impact on America, even today, but also remedial
proposals to address ongoing racial inequity?  Can Mr. Richman, for example, teach or have his
students debate whether certain voting rights laws that restrict voting for certain groups constitute
racially charged "modern day Jim Crow" laws?  Can his students debate affirmative action or
question whether race pays a role in police shootings today? Can those students be permitted to
discuss voter registration or reinstatement laws and procedures?  Certainly, the Attorney
General's Opinion moves in the direction of statutory clarity, but it does not provide enforceable
guidance or cure the statute's facial infirmities.

57.     Moreover, regardless of how the FAQ or the Attorney General's Opinion seek to explain how the statute *ought* to be enforced, the statute provides for *a private right of action* for any person , who may initiate a civil action against a school or school district, for their individual dissatisfaction with curricular choices.  "Any person"—not even limited to someone with a child in a public school—may "initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights." Such a delegation of enforcement power is troubling insofar as it turns citizen on citizen, and encourages a culture of surveillance and vigilantism. But even more worrisome is the likelihood that in response to such actions, the Divisive Concepts Statute will undoubtedly be enforced in arbitrary ways—leaving teachers unable to predict what lesson plans or classroom discussion is tolerated by the statute and which ones run afoul of it.

58.     When enforcement power is dispersed and privatized in this manner, there is no consistency in how a law is enforced, which heightens the harm attributable to the unconstitutional vagueness of the Divisive Concept Statute. No single, publicly-accountable body sets enforcement priorities.  Instead, individuals are left to determine, without any prior approval or oversight, when a complaint should be prosecuted and why. Individuals have maximum discretion—and minimal oversight. The problem with such private delegation of power is exacerbated when a statute has no fixed meaning, like the Divisive Concepts Statute here. Individuals will have unchecked authority to bring cases under their interpretation of the statute. They will not have to abide by or even read (or have ready access) to the conflicting policies set by the Department of Education or the Attorney General, flouting the guardrails of due process. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (describing the risk of

"frivolous complaints" when the "universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations").

59.     And while the courts may rebuff the most extreme interpretations put forward, the mere fact that individuals can enter court with those interpretations in the first place does damage enough: it will chill the speech of teachers who do not want themselves, their schools or their school districts hailed to court on their behalf, and who worry about the reputational harm that would undoubtedly result. Moreover, every day that debate is stifled, the students of New Hampshire suffer, and are put at a competitive disadvantage in a complex, multi-cultural world.

60.     The private delegation of enforcement authority—combined with the vagaries of the statute—will simply embolden those with the most polarizing views, who will seek to use this new power that they have been granted to put pressure on teachers. Teachers will teach with the eyes of these extremists on them, and will no doubt feel compelled to change their lesson plans accordingly.  Simply put, the guidance set forth in the FAQ or the Attorney General's Opinion will not stop the white nationalists, for example, who have bombarded New Hampshire school board meetings,[30] or "Moms for Liberty NH," from attempting to use the statute's vague and easily adaptable language to serve their own political purposes.  It has not stopped the bounty hunters from accessing the Commissioner of Education's newly established website and offering 500 pieces of silver to those who point the finger of accusation, merited or not.

61.     Time and again, history has demonstrated that the first effort of advocates of totalitarianism is to censor education and understanding.  The failure, as exemplified by the initiators and facilitators of the Divisive Concepts Statute, to learn that lesson, would, to paraphrase the noted philosopher Santayana, condemn us all to relive the darkest hours of history.

---

[30] *N.H. Education Commissioner: 'Divisive Concepts' Restrictions Won't Hinder Classroom Conversations,* NEW HAMPSHIRE PUBLIC RADIO (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.

62.     In reality, the broadly drawn Divisive Concepts Statute was designed to prohibit forthright and balanced teaching by limiting New Hampshire's students and future generations' awareness and understanding of our shared history, along with the broadest spectrum of philosophies, viewpoints and approaches.  This, in turn, deprives New Hampshire students of the well-rounded and competitive ability to critically analyze and confront effectively facts and ideas that are in broad circulation in the modern economy. The Divisive Concepts statute is an imprecise and overwrought effort to cabin the teaching of our country's history of racism, sexism, homophobia and the like to static, historical events rather than a continuing struggle for justice. This "Big Brother" approach directly interferes with the competent functioning of public school classrooms.  This suppressive measure seeks to conceal our historical flaws such as the ill-treatment of certain groups of people in this country (whether the Quakers in early New England or African Americans in the Deep South or Asians-Americans during World War II and other victims of blind intolerance), thereby attempting to create ill-educated students unaware of our national commitment and struggle towards equality for all.  In the process, it deprives New Hampshire students of understanding and appreciating the heroic measures undertaken to secure positive change and the arguments advanced both in favor of and against change.

63.     Plaintiffs thus call upon this Court to resolve an issue of significant constitutional import: to declare the Divisive Concepts Statute constitutionally void for vagueness or otherwise invalid, or, alternatively, to declare in simple declaratives what curriculum – the basic legislatively outlined curriculum historically adopted or some constitutionally acceptable modification thereof – teachers may safely employ so that they do not violate the Divisive Concepts Statute's vague strictures. Without this Court's specific declaratory guidance, teachers, including Plaintiffs, have no fair notice of what curriculum is acceptable in practice.  And it

merits emphasis that that declaration will in no way diminish or adversely impact the nature, scope or enforceability of New Hampshire's longstanding and sweeping laws, regulations and enforcement structure aimed at proscribing discrimination in the schools, the workplace and in society in general.

64.     Accordingly, Plaintiffs invoke this Court's Declaratory Judgment jurisdiction to declare that the Divisive Concepts Statute is void for vagueness, violative of the U.S. and New Hampshire constitutions and invalid under New Hampshire state law or, alternatively, to build upon the Attorney General's interpretation a substantially recast version that eliminates those fatal flaws and permits New Hampshire teachers to teach and its students to learn the lessons they require for their future careers, lives and civic participation.

## SPECIFIC FACTUAL ALLEGATIONS

A.     *Teaching American History, Social Studies, and Current Events in New Hampshire's Schools*

65.     New Hampshire courts have a long history of ensuring that New Hampshire schools are properly educating its children.

66.     In a series of cases going back to 1993, the New Hampshire Supreme Court has held that the State has an obligation to provide and fund a constitutionally adequate elementary and secondary education for all and that it is for the legislature and the Governor to define the parameters of the education mandated by the State Constitution. *Claremont Sch. Dist. v. Governor*, 138 N.H. 183 (1993) (*Claremont I*); *Claremont Sch. Dist. v. Governor*, 142 N.H. 462 (1997) (*Claremont II*); *Claremont Sch. Dist. v. Governor*, 147 N.H. 499 (2002) (*Claremont III*).

*Accord Contoocook Valley Sch. Dist. v. State,* 174 N.H. 154 (2021)[31]; *Londonderry Sch. Dist. SAU No. 12 v. State,* 154 N.H. 153 (2006).

     67.    Consistent with those rulings, the Legislature has statutorily codified the parameters of an adequate education.  The State's overarching policy is to "provide all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come."  *See* RSA § 193–E:1(I).  The legislature views "[a] well-educated populace [a]s essential for the maintenance of democracy, the continued growth of our economy, and the encouragement of personal enrichment and development."  RSA § 193–C:1.

     68.    As set forth in New Hampshire's state law, the criteria for an "Adequate Public Education," includes: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens."  *See* RSA § 193–E:2(IV).  It also includes "Grounding in . . . literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas."  *See* RSA § 193–E:2(V).

---

[31] "The State does not contest the underlying law applicable to the issues in this case. Under our education funding jurisprudence, Part II, Article 83 of the State Constitution 'imposes a duty on the State to provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding.'  *Claremont School Dist. v. Governor*, 138 N.H. 183, 184, 635 A.2d 1375 (1993).

To comply with that duty the State must "*define an adequate education, determine the cost, fund it with constitutional taxes, and ensure its delivery through accountability.*"  *Londonderry Sch. Dist. v. State*, 154 N.H. 153, 155-56, 907 A.2d 988 (2006) (quotation omitted).  The plaintiffs do not challenge the constitutionality of the definition of an adequate education set forth in RSA §193-E:2-a (Supp. 2020).  Rather, the plaintiffs' grievance is that the State is not fulfilling its constitutional duty because local school districts require substantially more funding than the State currently provides under RSA 198:40-a, II(a) in order for them to deliver the opportunity for a constitutionally adequate education, as defined in RSA 193-E:2-a, to the public school children in New Hampshire."

*Contoocook Valley Sch. Dist. v. State*, 174 N.H. at 274 (Donovan, J. Opinion).

69.    Indeed, New Hampshire's Legislature sets forth minimum standards for
"Instruction in National and State History and Government."  RSA § 189:11.  New Hampshire
law requires that "[i]n all public and private schools in the state there shall be given regular
courses of instruction in the history, government and constitutions of the United States and New
Hampshire. . . ."  *See* RSA § 189:11(I).  Specifically, *at a minimum*, courses must include
instruction on:

> (b) Skills to effectively participate in civic affairs.
>
> ….
>
> (j) How intolerance, bigotry, antisemitism, and national, ethnic,
> racial, or religious hatred and discrimination *have evolved in the
> past, and can evolve, into genocide and mass violence, such as the
> Holocaust, and how to prevent the evolution of such practices.*

*See* RSA § 189:11(I)(j) (Emphasis added[32]).

70.    In furtherance of the above-stated educational goals and advancing its underlying
objectives, the State's public policy has long demanded that discrimination of any kind be barred
from its public schools, mandating instead that schools and education are neither the vehicles for
nor a means by which discrimination may lawfully be advanced.

71.    Accordingly, the New Hampshire legislature has barred:

> discrimination in public schools because of . . . age, sex, gender
> identity, sexual orientation, race, color, marital status, familial
> status, disability, religion, or national origin.

RSA § 354-A:27.

72.    Moreover, Chapter Ed 300 of New Hampshire's Education laws addresses the
"Administration Of Minimum Standards In Public Schools."[33]  As stated by the legislature, social

---

[32] The Divisive Concepts Statute by its terms limits such teaching as is permitted to the teaching of "existence" not,
as mandated by law, its past, present and prospect evolution into "genocide or mass violence."  By so doing, the
Divisive Concepts Statute in critical terms stands squarely in conflict with RSA § 189:11(I)(j).

studies programs should give students an opportunity "to acquire the knowledge, skills, and attitudes necessary for effective participation in the life of the community, the state, the nation, and the world."[34]  Middle schoolers must therefore receive "[s]ystemic instruction and activities designed to enable students to . . . [a]cquire and use information to clarify issues and seek solutions to societal problems. . . ."[35]  High schoolers must "acquire knowledge and modes of inquiry in the areas of civics, economics, geography, world history, and United States and New Hampshire history. . . ."[36]

73.     Specifically, New Hampshire promulgated a "k-12 Social Studies New Hampshire Curriculum Framework"[37] (last approved by the N.H. DOE in July 2006), setting forth specific topics ("Strands") in Civics, Economics, Geography, New Hampshire and United States History, and World History and Contemporary Issues, that must be taught for each grade level.  The framework sets forth a set of standards for teaching social studies to different grade levels so that students have "knowledge and skills needed to participate intelligently and responsibly in our ongoing democratic experiment and in an interdependent world."  To that end, the New Hampshire guide states that "[a]n effective study of social studies must focus on conceptual frameworks and themes rather than solely an examination of facts."[38]

74.     These Standards and Benchmarks encourage, among other things, the development of research and inquiry skills, critical thinking and analysis, the ability to discern between fact and opinion, the use of primary and secondary sources, and a deep understanding of the unvarnished

---

[33] Chapter Ed. 300, Administration of Minimum Standards in Public Schools,
http://www.gencourt.state.nh.us/rules/state_agencies/ed300.html (last accessed Dec. 10, 2021).
[34] *Id.* at 306.46(a)(4).
[35] *Id.* at 306.46(b)(4)(a).
[36] *Id.* at 306.46(c)(1).
[37] K-12 Social Studies New Hampshire Curriculum Framework,
https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf?2 (June 2006) (last accessed Dec. 10, 2021).
[38] *Id.* at 5.

story of our nation's history, as well as that of the world. They highlight ten curricular themes as creative approaches to social studies to encourage higher-order thinking in students.[39] The first theme is "Patterns of Social and Political Interaction," which includes: "human rights issues, the changing role of women in the economy, immigration issues, and slavery."[40] Themes for U.S. History topics include: "slavery; racism; 'Jim Crow'; Darwinism; eugenics."[41] For grades 9-12, students should be analyzing the impact of various labor systems, including "slavery, the medieval guilds, or wage labor" or how "suffrage expanded to various groups of citizens" (like African Americans and women).[42] An understandable and robust education program thus is outlined and can be followed to benefit our children now and in the future.

75. Consistent with these standards, on December 14, 2017, Governor Sununu also established an Advisory Council on Diversity and Inclusion pursuant to Executive Order 2017-09.[43] The Council is charged with working cooperatively with the New Hampshire Commission for Human Rights, the Civil Rights Unit of the New Hampshire Department of Justice, and any other relevant State entities to:

- Review and analyze New Hampshire laws, regulations, and agency policies and procedures, and recommend changes or amendments, where necessary, to further combat discrimination and advance the ends of diversity and inclusion;

- Identify and recommend ways in which the State can support local and community efforts, through educational programs or otherwise, to combat discrimination and advance diversity and inclusion;

- Identify and recommend ways in which the State can partner with non-governmental organizations to combat discrimination and advance diversity and inclusion; and

---

[39] *Id.* at 7.
[40] *Id.* at 9.
[41] *Id.* at 11.
[42] *Id.* at 62; 100.
[43] Gov. Chris Sununu, Governor's Advisory Council on Diversity and Inclusion, https://www.governor.nh.gov/diversity (last accessed Dec. 10, 2021).

- Identify and recommend revisions to RSA 354-A and the scope of the duties of the Commission for Human Rights to combat discrimination and advance diversity and inclusion.[44]

76.     Taken together, these Standards, Benchmarks and diversity initiatives are intended to teach students in New Hampshire public schools to be educated, informed, inclusive, critically thinking and engaged public citizens.

77.     To be clear, despite the misinformed political rallying cry, none of the lessons and activities outlined in New Hampshire curricular law require the teaching of CRT to primary and secondary school students.  CRT is "a practice of interrogating the role of race and racism in society that emerged in the *legal academy* and spread to other fields of scholarship."[45]  CRT developed from the Critical Legal Studies (CLS) movement, "which argued that the law was not objective or apolitical" in the 1970s, and expanded its reach to examination in law schools in the 1980s and 1990s.[46]  As Kimberlé Williams Crenshaw, one of the leading scholars of CRT, notes, CRT "is considered to be an evolving and malleable practice [that] critiques how the social construction of race and institutionalized racism perpetuate a racial caste system that relegates people of color to the bottom tiers."[47]

>     B.     *The Legislature Promulgates A Sweeping, Politically-Motivated, and Vague Ban on Teaching So-Called Divisive Concepts Such as Gender, Age, Sexual and Racial Discrimination*

78.     It is in the context of New Hampshire's longstanding judicial and legislative commitment to a well-rounded public education and emphasis on diversity and inclusion that

---

[44] *Id.*
[45] Janel George, *A Lesson on Critical Race Theory*, ABA (Jan. 12, 2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/civil-rights-reimagining-policing/a-lesson-on-critical-race-theory/ (emphasis added).
[46] *Id; see also* Kimberlé Williams Crenshaw, *Twenty Years of Critical Race Theory: Looking Back to Move Forward*, 43 Conn. L. Rev. 1253 (2011), https://scholarship.law.columbia.edu/faculty_scholarship/2864 (last accessed Dec. 10, 2021).
[47] Janel George, *A Lesson on Critical Race Theory*.

makes the Legislature's sudden obeisance to the extremist political winds of the day in the Divisive Concepts Statute so jarring.

79.     On January 12, 2021, Keith Ammon, a majority member of the House of Representatives introduced New Hampshire House Bill HB 544, titled an act "relative to the propagation of divisive topics."[48]  Disingenuously framed under the banner of national "unity," the bill's introducing sponsor unapologetically indicated at the legislative hearing for the bill that he did not believe in systemic racism and likened individuals who conduct diversity and inclusion trainings to "snake oil salesman."[49]  The bill prohibited the teaching of so-called "divisive concepts" and threatened to financially penalize public employees, private businesses and current and prospective state contractors for teaching or training on supposed "divisive concepts" related to race and sex.  Divisive concepts were defined as claims that individuals in New Hampshire or the United States were "fundamentally racist or sexist" or that "by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others."  Governor Sununu threatened to veto HB 544 if it was enacted, so the bill was ultimately tabled.

80.     Meanwhile, the 2022-23 State Biennial Budget had to be adopted before July 1, 2021—the commencement of the new fiscal year—in order to avert a shutdown of all state operations.  The House and Senate each adopted separate budget bills, requiring reconciliation by a Joint Conference Committee chaired by the Chairman of the House Finance Committee.  The Chairman went on record stating that the "divisive concepts" provision needed to be included in the budget bills as a prerequisite to getting House votes for passage of HB1 (the budget measure).

---

[48] NH House Bill 544 (May 7, 20201), https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixation-explained/618828/.
[49] Eileen O'Grady, "*N.H. lawmakers debate banning schools from teaching about systemic racism and sexism*," CONCORD MONITOR, (Feb. 18, 2021), https://www.concordmonitor.com/Education-bill-would-ban-teaching-racism-sexism-38821767.

81.     With the deadline for adoption of HB 1 looming, and the specter of mandatory shutdown of State operations present, a *quid quo pro* solution suddenly "materialized."  The Senate re-wrote HB 544 to expand its scope.  The new bill created RSA § 193:40 (June 25, 2021) (the "Teaching Discrimination Statute"), which was included (by way of amendment) as part of HB2, the Budget Bill's companion measure calculated to force adoption of a Biannual Budget and avoid shutting down State operations.

82.     On June 24, 2021, HB1 and HB 2 were enacted just before expiration of the budgetary deadline and signed by the Governor on June 25, 2021.  HB2 was trumpeted as an anti-discrimination measure and righteously captioned "193:40 Prohibition on Teaching Discrimination."

83.     By its terms, HB 2 includes a provision on "Prohibition on Teaching Discrimination," which applies only to public employees.  It provides that:

*Prohibition on Teaching Discrimination.*

I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical *existence* of ideas and subjects identified in this section.

III. Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education. (Emphasis added).

84.      More than half of Gov. Chris Sununu's Advisory Council on Diversity and Inclusion, including both local members, resigned in protest of Sununu's decision to sign into law the Divisive Concepts Statute.[50]  They wrote that the law "aims to censor conversations essential to advancing equity and inclusion in our state, specifically for those within our public education systems, and all state employees.  This will directly impact those who are working with some of our state's most vulnerable populations, including educators, child welfare workers, and law enforcement."[51]

85.      The Advisory Council on Diversity and Inclusion also maintained that the Divisive Concepts Statute was "in direct conflict with the stated purpose of the Council laid out in your 2018 Executive Order instructing us to identify ways to "combat discrimination and advance diversity and inclusion."[52]

---

[50] Caleb Symons, "*10 resign from state's diversity over 'divisive concepts' law*, SENTINEL (June 29, 2021), https://www.sentinelsource.com/news/local/10-resign-from-states-diversity-panel-over-divisive-concepts-law/article_c7c08f8e-e7a2-5a12-ba8a-7f5f3b43d33a.html.
[51] *Resignation letter*, (June 29, 2021) https://www.aclu-nh.org/sites/default/files/gacdi-resignation-letter.pdf.
[52] *See id.*

86.     Lest there be any doubt that the Divisive Concepts Statute was meant to be a solution for the non-existent problem of mandatory teaching of CRT, New Hampshire's public figures have repeatedly reaffirmed it.

87.     Defendant Frank Edelblut advanced the charge, stating that "our basic values are at risk if teachers claim that racism played a critical role in American History."[53]  He stated in a tweet:



> **Frank Edelblut** ✓
> July 8 at 6:58 AM · 🌐
>
> SOME IN MEDIA ARE EXPRESSING CONCERN ABOUT OUR NEW NH LAW STOPPING DIVISIVE CRITICAL RACE THEORY FROM BEING TAUGHT IN OUR SCHOOLS. As you may know, I support this new legal language in New Hampshire. Here is how public radio recently described the new law. I would like to know - doesn't this make sense to you?  Public radio: "So, the law is called the Right to Freedom From Discrimination in Public Workplaces and Education. Basically, it bans advocating or teaching that certain groups of people are inherently racist, sexist or otherwise oppressive, even if unconsciously. And it also promotes teaching that people should treat others without regards to their differences. So, basically equal treatment of everyone, regardless of race, gender, disability, any other category." ... Well this certainly makes sense to me.
>
> 👍 224                                              438 Comments  68 Shares

88.     Rep. Ken Weyler (R-Kingston), House Finance Chair, who supported the Divisive Concepts Statute, considered CRT to be a "Marxist, anti-American, anti-White" program.[54]

89.     And since passage of the Divisive Concepts Statute, New Hampshire Governor Sununu has tried to distance himself from CRT:

- "The ideas of Critical Race Theory and all of this stuff, I personally don't think there's any place for that in schools. . . .";[55]

- He "doesn't like Critical Race Theory as much as anyone";[56]

[53] David Scannell, *Much ink has already been spilled about HB 544, the so-called 'divisive concepts' bill – here's some more* (June 15, 2021), https://manchesterinklink.com/much-ink-has-already-been-spilled-about-hb-544-the-so-called-divisive-concepts-bill-heres-some-more/.
[54] Damien Fisher, *Compromise Sought on Anti-Critical Race Theory Bill,* NH JOURNAL (April 19, 2021) https://nhjournal.com/compromise-sought-on-anti-critical-race-theory-bill/.
[55] Michael Graham, *Sununu: I Don't Like Critical Race Theory, But I Won't Ban It, Either,* NH J. (April 8, 2021) https://nhjournal.com/sununu-i-dont-like-critical-race-theory-but-i-wont-ban-it-either/.
[56] *See id.*

90.     New Hampshire has a long and rich history, particularly in the field of public education.  The first publicly funded school was opened in Hampton, N.H. some 372 years ago, on May 31, 1649.  The sole qualification for admission was that girls and boys be "capable of learning."[57]  New Hampshire also has a well-established constitutional, legislative, and administrative regimen ensuring that as a matter of public policy:

> [P]ublic elementary and secondary education shall provide all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come. . . .

RSA § 193-E:1.  However, as one of only six states to pass a law restricting certain kinds of teaching on race and gender, the law has had its intended purpose of thrusting New Hampshire to the forefront of the culture wars, questioning a noble educational heritage.

91.     Reopen NH, which organized against COVID restrictions and masks during lockdown, has been posting about Critical Race Theory and urging people to attend school board meetings. So have some white nationalist groups.[58]  As noted, Moms for Liberty NH has offered a bounty on public school educators who the informant believes have strayed by "breaking this law" (*see supra*, ¶ 45).

---

[57] Higher education has also long been a hallmark of the Granite State.  Dartmouth College has since 1769 been one of the nation's most respected institutions of learning.  The University of New Hampshire, a public land grant college and research university, was founded in 1893.

[58] Sarah Gibson, *Despite New State Law, Debate Continues Over Discussing Race and Equity in N.H. School,* NEW HAMPSHIRE PUBLIC RADIO (July 8, 2021), https://www.nhpr.org/nh-news/2021-07-08/despite-new-state-law-debate-continues-over-discussing-race-and-equity-in-n-h-schools.



92.    HB 2 was not a law passed to end discrimination in New Hampshire public

schools, nor was it viewed as such – those laws clearly already exist; indeed it merits emphasis

that at best, to the extent HB 2 effects any proper proscription against discrimination it is

unnecessarily confusing, wholly redundant of and in a number of instances conflict with long-

established and well enforced New Hampshire laws and regulations.  The passage of HB 2, in its

watered-down form, was intended to inject partisan politics into New Hampshire's educational

regimen by adding New Hampshire and its far right-leaning legislators to the political map and

the national conversation surrounding the manufactured and contrived political controversy of

critical race theory.  It is, however, unconstitutional and should be invalidated unless the court

construes it exceedingly narrowly and substantially recasts it along the lines of the roadmap

provided by New Hampshire's Attorney General.

C.      *The Legislature Implemented the Divisive Concepts Statute to Threaten Plaintiffs'*
        *Ability to Teach Freely, Sowing Confusion and Inflaming Tensions*

93.     While the CRT issue is a politically manufactured problem employed by partisan

zealots without any basis in reality, teachers face the very real possibility of losing their jobs on

account of the Divisive Concepts Statute.  Should a "bounty hunter" or Department of Education

informant simply chose to identify a teacher as having allegedly violated the Divisive Concepts

Statute, an inquisition begins, legal fees become a reality, and a teacher's character, reputation

and occupation are jeopardized.

94.     In the FAQ, the New Hampshire Department of Education explained that students

and parents that believe their school has violated the Divisive Concepts Statute may simply reach

for their computer and file a complaint with the New Hampshire Commission for Human Rights,

a complaint with the New Hampshire Office of the Attorney General, or a civil claim in the

superior court to seek damages or declaratory relief.[59]  An educator can also individually face

disciplinary sanction by the state board of education for violating the educator code of conduct.[60]

95.     To enforce the Divisive Concepts Statute, Commissioner Edelblut has now created

a website to report complaints of teachers allegedly violating the statute and indicated that he will

investigate any such claim as educator misconduct, placing a teacher's livelihood in jeopardy.

And, as noted, it is Commissioner Edelblut's state-funded website that will be the forum for the

proclaimed bounty prize from the Moms for Liberty NH for informers (identified or anonymous).

96.     Thus, any individual – anonymously, if they wish – can report a teacher for

teaching history, economics or civics that does not conform to their own personal views of the

---

[59] *See id.*

[60] Pursuant to New Hampshire's Education Law, the state board of education is tasked with adopting rules for disciplinary proceedings, including procedures assuring due process.  See RSA § 193–D:2.  It also gives the state board of education discretion to adopt "[a] complaint procedure for those asserting that a provision of this chapter has been violated, and possible sanctions and penalties for such violation. . . ."  *See id.*

world.  Just two days after the website and complaint form was published, the Moms of Liberty NH announced their "bounty" on teachers.  To put it more concretely, the teacher who assigns a student or a class an oral report on race in America or New Hampshire and receives student work that includes reference to systemic discrimination, could implicate a rush to collect the bounty or file a complaint.  If a current events question is raised concerning the nature and circumstances under which affirmative action was directed in a given circumstance and the teacher explains what was involved, whether it is merited and what other remedies are available, they too could be subject to "bounty hunters."  To most, such debates, even if controversial, are part of a robust and well-rounded education; but now in New Hampshire, teachers must think twice before engaging in these discussions, particularly if teaching is the sole basis for their livelihood.  Mr. Richman's teaching of ethnic and racial genocide is now fraught with danger.  And all of this is the result of partisan political crusade to resuscitate a constitutionally flawed Presidential Executive Order that was judicially enjoined.  Simply by continuing to teach lesson plans about history as they have always been taught in accordance with New Hampshire's education laws, teachers in New Hampshire now risk professional discipline and severe reputational harm.

    *D.*   *It Is Impossible for New Hampshire Teachers to Comply with the Vague Statutory Proscriptions and Universal State Education Standards*

97.    The Divisive Concepts Statute is incompatible with New Hampshire's Constitution, Education Law and curriculum requirements, rendering it impossible for teachers to teach and follow state-mandated Standards and Benchmarks and still comply with the political manifesto.  Part II, Article 83 requires the State to "provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding."  The Supreme Court of New Hampshire considers an "adequate public education" to be a fundamental right.

98.     Thus, an adequate education must include the following curricular subjects:

(b) Skills to effectively participate in civic affairs.

….

(j) How intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices.

RSA § 189:11.

99.     Yet, the Divisive Concepts Statute's prohibition against teaching racial superiority or age discrimination—while also limiting teachers to instruction on the "historical existence of [proscribed] ideas and subjects"—is internally inconsistent with the Education Law's mandate to teach on the evolution of intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination, and importantly, potential preventive measures.  Section 189 requires teachers to teach more substantive history than just the mere "existence" of genocide or mass violence directed by the Divisive Concepts Statute.  They are commanded by law to make clear to students "…how to prevent the evolution of such [discriminatory] practices," what solutions or measures have been proposed, their rationale and alternatives  And they should.

100.    Take, for example, Jim Crow.  Section 189:11 requires public schools to teach about its evolution: its roots in slavery, its worldwide negative impact, that it was an acknowledged precursor to Hitler's Nuremberg Laws and has frequently been cited by totalitarian states as indicative of this nation's lack of moral fiber.  However, the Divisive Concepts Statute *on its face* would directly limit discussion of Jim Crow, permitting teachers to only discuss the "*historical existence*" of Jim Crow.  A teacher in American History in New Hampshire cannot tell whether he or she is permitted to take that discussion further to include, for example, how the laws worked and who it benefited, how it impacted the lives of generations past and present and,

in turn, has had a continuing impact on our society and nation, much less what options have been proposed for rectifying it.  True, the Attorney General has opined that there is a re-interpretive path to surgically erase and restate certain portions of the Statute, but that does not carry the force of law or bind the private citizens who are empowered under the Statute to enforce it.

101.    In June 2006, the New Hampshire Department of Education promulgated "*New Hampshire  K-12 Social Studies Curriculum Framework,"* (N.H. Department of Education, 2006)[61].  Among the prescribed educational themes were the following:

> Theme I: Patterns of Social and Political Interaction
>
> This theme focuses on the changing patterns of class, ethnicity, race, and gender in social and political relations.
>
> Examples of these patterns are human rights issues, the changing role of women in the economy, immigration issues, and slavery.

*Id.* at 9.  The Divisive Concepts Statute therefore violates Part II, Article 83 and the Education laws and curricular standards promulgated thereunder by diminishing through censorship students' ability to examine how important the history of our country – and recurring issues related to class, ethnicity, race and gender – continue to have a lasting impact on our country— and the proposals for change.

## COUNT I
## VIOLATION OF THE DUE PROCESS CLAUSE AS VOID FOR VAGUENESS AGAINST ALL DEFENDANTS

102.    The allegations in paragraphs 1 through 101 are incorporated herein by reference.

103.    The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.  It is a basic tenet of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.

---

[61] *New Hampshire K-12 Social Studies Curriculum Framework,* NH DEPT. OF EDUCATION (June 2006), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf?2.

104.    The Divisive Concepts Statute is inherently contradictory and fails to provide adequate notice and a reasonable opportunity to teachers to know what, precisely, is prohibited.

105.    It forbids teaching the concept that one race or sex is inherently oppressive, "whether consciously or unconsciously," but specifically carves out from the ban discussing "as part of a larger course of academic discussion, the *historical existence*" of these ideas and subjects.  Teachers are permitted to teach about historical "existence" of racism, sexism and other biases. – *i.e.*, that they existed – but they are *forbidden* to discuss their nature, scope and their impacts both historically and today, much less proposals on how they can be prevented, an explicit requirement of the Education Law.

106.    All of the provisions of the Divisive Concepts Statute require highly personal and amorphous value judgments that are incompatible with the requirement that laws provide clear notice and due process to those impacted.  The Attorney General's opinion provides some basis towards statutory clarity but is not binding on this Court nor any citizen individual bringing suit under the private right of action authorized by the Divisive Concepts Statute.

107.    Plaintiffs have been prevented and chilled from exercising their due process rights by the vagueness of the Divisive Concepts Statute, its punitive opportunities ranging from censure, dismissal by their local school board and complete loss of their teaching license by the State Commissioner of Education, who appears politically motivated to enforcing the law in a biased and improper fashion.

108.    The overbreadth and vagueness of the law will lead to its arbitrary and capricious enforcement (whether in governmental enforcement proceedings or private actions by citizens) and chill constitutionally protected speech.

109.    The vagueness of the law will also lead politically-motivated groups and individuals to use the law to lodge complaints to suit their agendas.

110.    In the absence of injunctive relief, Plaintiffs are threatened with irreparable harm as a result of the violation of their Due Process rights.

111.    As a result, Plaintiffs seek a judgment compelling Defendants to cease and desist from engaging in an unconstitutional impairment of their due process rights and a declaration that the Divisive Concepts Statute is void for vagueness.

## COUNT II
## THE CONFLICT BETWEEN THE DIVISIVE CONCEPT STATUTE AND NEW HAMPSHIRE LAW ADDS TO AND UNDERSCORES THE UNCONSTITUTIONAL  VAGUENESS OF THE STATUTE

112.    The allegations in paragraphs 1 through 111 are incorporated herein by reference.

113.    The Divisive Concepts Statute conflicts with existing New Hampshire law.   Thus, teachers are placed in an unacceptable quandary: if they comply with New Hampshire law, they can be charged with violation of the Divisive Concept Statute and if they comply with the latter they violate New Hampshire Law and the mandated curriculum. That conflict of itself renders the Statute void for vagueness.

114.    The New Hampshire Constitution Part II, Article 83 provides every citizen with a fundamental right to an education.

115.    In *Londonberry Sch. Dist. v. State*, 154 N.H. 153, 155-56 (2006), the New Hampshire Supreme Court tasked the Legislature with setting the parameters for a constitutionally adequate education.

116.    The Legislature subsequently enacted N.H. Rev. State 193-E:2 setting forth a substantive educational program to deliver the opportunity for an adequate education for kindergarten through twelfth grade.  It provided that students shall have "[k]nowledge of civics,

and government, economics, geography, history and Holocaust and genocide education to enable

them to participate in the democratic process and to make informed choices as responsible

citizens." While it left specific curricular choices to local school boards, by statute, the

legislature mandated that New Hampshire schools statewide must, at a minimum, instruct on

"[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and

discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as

the Holocaust, *and how to prevent the evolution of such practices*." RSA 189:11(j) (emphasis

added).

117.    The Divisive Concepts Statute rebuffs the New Hampshire Constitution and the

Legislature's educational enactments by diminishing through censorship students' explanatory

knowledge base. It permits teachers to teach about the historical existence of a topic, not the

substantive concerns, facts, theories and policies surrounding critical events in history, let alone

any proposals for ultimate resolution or amelioration of resultant concerns. *See* N.H. Rev. State

193.40 (I) (a) (precluding any teaching that one's age, sex, gender identity, sexual orientation,

race, creed, color, marital status, familial status, mental or physical disability, religion or national

origin is inherently superior to people of another age, sex, gender identity, sexual orientation,

race, creed, color, marital status, familial status, mental or physical disability, religion, or national

origin). It even casts doubt upon, if not entirely precludes, teaching both or many of the

expressed sides of any issues involving the basic matters detailed in N.H. Rev. Sta. 193.40(I)(a).

Teachers cannot, among other things, teach about how bigotry and intolerance has evolved and

how to prevent the evolution of these practices.

118.    In construing the Divisive Concepts Statute's constitutionality "strict scrutiny" is

the applicable test. The Statute prohibits teachers from teaching distinct matter pertaining to

recognized "suspect classifications (*e.g.*, "age, sex, gender identity sexual orientation, race...").
Thus construed, and given the absence of any contrary compelling state interest, the Divisive
Concepts Statute fails to pass muster.

119.    Further, New Hampshire law contains a "Freedom of Expression" Act, RSA
Chapter 98-E, that reaches broader than the federal First Amendment and allows every public
employees "a full right to publicly discuss and give opinions as an individual on all matters
concerning any government entity and its policies."  RSA 98-E:1.  By curtailing and chilling
teacher speech, the Divisive Concept Statute violates RSA 98-E.

120.    At the very least, because of the litany of state laws that conflict with the Divisive
Concepts Statute, it is impermissibly vague and therefore violates Plaintiffs' constitutional right to
due process under the New Hampshire Constitution (N.H. Const. pt. 1, art. 12), as well as the
Fourteenth Amendment of the U.S. Constitution.

121.    Plaintiffs seek a judgment compelling Defendants to cease and desist from
engaging in the enforcement or in any application of the unconstitutionally vague Divisive
Concept Statute which simultaneously unconstitutionally impairs New Hampshire citizens' rights
and violates New Hampshire law.

## COUNT III
## VIOLATION OF THE FIRST AMENDMENT
## AGAINST ALL DEFENDANTS

122.    The allegations in paragraphs 1 through 121 are incorporated herein by reference.

123.    As a direct and proximate result of the Divisive Concepts Statute, Defendants have
violated the established rights of Plaintiffs to freedom of speech under the First Amendment of
the United States Constitution as applied to the states and their political subdivisions by the
Fourteenth Amendment, in that Defendants have censored Plaintiffs' speech by restricting
Plaintiffs' proper curricular discretion.  Indeed, it broadly precludes any teaching that relies on

concepts that certain members of the New Hampshire legislature deem offensive, including the idea that individuals may possess implicit or unconscious biases.

124.    As a direct and proximate result of the Divisive Concepts Statute, Defendants have also violated the established rights of Plaintiffs under the Free Speech Clause, Part I, Article 22 of the New Hampshire Constitution and abridged the public policy of New Hampshire concerning the right of public employees to "publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies" as mandated by RSA Chapter 98-E:1.

125.    Plaintiffs have been prevented and chilled from exercising their rights by threat of disciplinary action, private suit or the loss of their teaching license for violation of the Divisive Concepts Statute.

126.    By its plain terms, violation of the Divisive Concepts Statute is considered a violation of the educator code of conduct, which may result in disciplinary or state licensure action, potentially depriving teachers of their livelihood.

127.    The creation of the Commissioner of Education's website as a recognized vehicle for the filing of formal complaints against teachers for alleged violation of the Divisive Concepts Statute– accessible to anyone with a political agenda, personal grudge or worse – subjects teachers to arbitrary and capricious enforcement of the Divisive Concepts Statute and its draconian consequences.

128.    Plaintiff teachers under threat of Department of Education or private citizen complaint are justifiably forced to self-censor their own free speech to avoid these severe and draconian threats.

129.    The subject matter of the restraint on speech and the issues herein tendered are such to mandate invocation of "strict scrutiny."  Defendants have failed to establish a compelling

state interest that would justify such censorship and the Divisive Concepts Statute cannot and does not survive the "strict scrutiny" test.

130.     In the absence of injunctive relief, Plaintiffs are threatened with irreparable harm as a result of the violation of their First Amendment rights.

131.     Plaintiffs have no adequate remedy at law for the loss of their First Amendment Rights.

132.     As a result, Plaintiffs seek a judgment compelling Defendants to cease and desist from engaging in an unconstitutional impairment of their first amendment rights to freedom of speech.

## COUNT IV
## DECLARATORY JUDGMENT INTERPRETING THE RULE
## AGAINST ALL DEFENDANTS (DECLARATORY RELIEF)

133.     The allegations in paragraphs 1 through 132 are incorporated herein by reference.

134.     28 U.S.C. § 2201 empowers the Court to "declare the rights and other legal relations of any other interested party seeking such declaration, whether or not further relief is or could be sought."

135.     The Constitution of New Hampshire likewise accords the judiciary the right to declare the rights of interested parties respecting the validity and scope of state statutes and rules and regulations promulgated thereunder (*See, e.g.*, N.H. Const., Part 2, Art. 72-a).

136.     The Divisive Concepts Statute broadly prohibits teachers from teaching distinct matter pertaining to the recognized "suspect classifications (*e.g.*, "age, sex, gender identity sexual orientation, race..."). To illustrate, the Teacher Discrimination Statute prohibits instruction concerning claims of racial superiority (*id.* at (a)) or age discrimination (*id.* at (b)).  However, the Divisive Concepts Statute also requires teachers to comply with New Hampshire's Constitution (*e.g.* Part II, Art 83 of the State Constitution as construed and applied by the Supreme Court of

New Hampshire[62]) as well as statewide educational standards that have been in place for decades. This includes N.H. Rev. Stat. Ann. § 189:11 and the statewide "*New Hampshire K-12 Social Studies Curriculum Framework,*" (N.H. Department of Education, 2006), which mandate that students be taught (among other things) about the evolution of intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination and patterns of class, ethnicity, race, and gender in social and political relations. The Divisive Concepts Statute thus is not only void for vagueness, but it also poses an irreconcilable conflict with state educational provisions, which must be resolved for the sake of New Hampshire's teachers and students.

137.    Giving broad meaning to the Divisive Concepts Statute—such that it could prohibit the teaching of materials that otherwise would be in accord with state educational standards—would raise serious questions about whether it violates the New Hampshire Constitution, and accordingly such an interpretation should be avoided.

138.    The Divisive Concepts Statute must be limited and construed in a manner that preserves New Hampshire's teachers' abilities to teach the wide variety of materials and concepts mandated by state law. Interpreting the Divisive Concepts Statute to give full force and effect to its broad prohibition, on the other hand, would run afoul of the New Hampshire's Constitution's free speech guarantee because it would be a non-viewpoint-neutral prior restraint on protected speech.

139.    Plaintiffs therefore seek a declaratory judgment that:

a)  the Teaching Discrimination Statute is void for vagueness, and

b)  the Teaching Discrimination Statute and any Regulations promulgated thereunder, as well as, RSA §§ 354-A:30-34, to the extent applicable, are invalid and void under the Constitutions of the State of New Hampshire and of the United States, or, in the alternative,

---

[62]  *See, e.g.*, *Claremont School Dist. v. Governor*, 138 N.H. 183, 184 (1993).

c) clarifying that, in accordance with subdivision II of the Teaching Discrimination Statute and the applicable principles and provisions of the Constitution and laws of the State of New Hampshire and of the United States, nothing contained in the Teaching Discrimination Statute, or in. the Contemporaneous Amendments, precludes or limits, nor may the State or any agent or instrumentality thereof, including, without limitation, the New Hampshire Commissioner of Education, employ same to bar or deter, teachers from teaching or students from learning the nature, substance, history, relevant theories and/or existence of ideas, subject matter, events and concerns relating or pertaining to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, past or present;

d) the Teaching Discrimination Statute and any Regulations promulgated thereunder are in conflict with the public policy of the State of New Hampshire,

e) the Teaching Discrimination Statute and the Contemporaneous Amendments are invalid under Part 2, Article 18-a, of the New Hampshire Constitution because an invalid addition to a Budget Bill.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

First, an order declaring the Divisive Concepts Statute unconstitutionally vague in violation of Fourteenth Amendment and First Amendments of the United States Constitutions and New Hampshire Constitutions Part 1, Arts. 12 and 22 (speech and vagueness);

Second, preliminary and permanent injunctions prohibiting Defendants from enforcing the Divisive Concepts Statute against any teacher;

Third, in the alternative, an order declaring the Divisive Concepts Statute must be narrowly construed in order to avoid infirmity under the free speech and due process guarantees of the New Hampshire and United States Constitutions, and therefore, among other things, does not prohibit any New Hampshire teacher from utilizing materials and promoting concepts mandated by or permitted under any New Hampshire law.

And any additional relief this court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury for all issues so triable as a matter of right.

Dated: December 13, 2021          Respectfully submitted,

                _____/s/ Peter J. Perroni_____
NOLAN PERRONI PC
NH Bar. No. 16250
73 Princeton Street
North Chelmsford, MA 01863
(978) 454-3800
peter@nolanperroni.com

STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.
David J. Kahne, Esq.
(*pro hac vice* pending)
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cmoerdler@stroock.com

SELENDY & GAY PLLC
Faith Gay, Esq.
(*pro hac vice* pending)
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

AMERICAN FEDERATION OF TEACHERS
David J. Strom
(*pro hac vice* pending)
555 New Jersey Ave. NW
Washington DC 20001
(202) 393-7472
dstrom@aft.org

PHILLIPS, RICHARD & RIND, P.A.
Mark Richard
(*pro hac vice* pending)
9360 S.W. 72nd Street, Suite 283
Miami, FL 33137
(305) 412-8322

*Co-Counsel for Plaintiff Local 8027, AFT-New Hampshire, AFL-CIO and individual teachers and parents*

# Exhibit A



Keith Butterz

**Keith Butterz**

Facebook

You're not friends on Facebook

1 mutual friend: Melissa Marr

**VIEW PROFILE**

9:33 AM

Whats up homo? I heard your teaching Marxist commie CRT in your classrooms....

You can fuck right off you garbage human!

If you reply, Keith Butterz will also be able to call you and see info like your Active Status and when you've seen messages.

**Block**          **Delete**

Aa

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____
                                      )
LOCAL, 8027 AFT-NEW HAMPSHIRE,        )
AFL-CIO, et al.,                      )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )     Case No. 1:21-cv-1077-PB
                                      )
FRANK EDELBLUT, in his official       )
capacity only as the Commissioner     )
of the New Hampshire Department       )
of Education, et al.,                 )
                                      )
          Defendants.                 )
_____)

## MOTION TO DISMISS AFT-NH COMPLAINT (ECF Doc. No. 30)

Frank Edelblut, in his official capacity as Commissioner of the Department of Education,

John M. Formella, in his official capacity as Attorney General of the State of New Hampshire, Ahni

Malachi, in her official capacity as Executive Director of the Commission for Human Rights,

Christian Kim, in his official capacity as Chair of the Commission for Human Rights, and Kenneth

Merrifield, in his official capacity as Commissioner of the Department of Labor (the "defendants"),

by and through the Office of the New Hampshire Attorney General, move to dismiss the complaint

filed by Local 8027, AFT-New Hampshire, AFL-CIO, Ryan Richman, John Dube, Jocelyn Merrill,

Kimberly Green Elliott, and Meghan Eveyln Durden (ECF Doc. No. 30) (the "AFT-NH

complaint"). The AFT-NH complaint should be dismissed under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6) for the reasons set forth in the memorandum of law filed contemporaneously

with this motion. **Sections I**, **II**, and **III** of the argument section of the defendants' memorandum of

law pertain to the claims asserted in the AFT-NH complaint. *See* Defs.' Mem. Law at 11–37.

WHEREFORE, the defendants respectfully request that this Honorable Court:

A.      Dismiss the AFT-NH complaint (ECF Doc. No. 30) for the reasons set forth in **Sections I**, **II**, and **III** of the memorandum of law filed contemporaneously with this motion; and

B.      Grant such other relief as the Court deems just and equitable.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity as Commissioner of the Department of Education,

JOHN M. FORMELLA, in his official capacity only as Attorney General of the State of New Hampshire,

AHNI MALACHI, in her official capacity as Executive Director of the Commission for Human Rights,

CHRISTIAN KIM, in his official capacity as Chair of the Commission for Human Rights,

*and*

KENNETH MERRIFIELD, in his official capacity as Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date:  March 25, 2022

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

/s/ Samuel Garland
Samuel R.V. Garland

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

_____
                                                     )
LOCAL, 8027 AFT-NEW HAMPSHIRE,        )
AFL-CIO, et al.,                                     )
                                                     )
            Plaintiffs,                               )
                                                     )
      v.                                             )        Case No. 1:21-cv-1077-PB
                                                     )
FRANK EDELBLUT, in his official            )
capacity only as the Commissioner        )
of the New Hampshire Department          )
of Education, et al.,                             )
                                                     )
            Defendants.                            )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF MOTIONS TO DISMISS**

**Introduction**

The primary questions before this Court are whether recently enacted antidiscrimination

provisions violate, on their face, the Due Process Clause of the Fourteenth Amendment and the

Free Speech Clause of the First Amendment. During the 2021 legislative session, after months of

debate, negotiation, and amendments, the state legislature passed and Governor Christopher

Sununu signed into law new antidiscrimination provisions that prohibit public employees and

government programs, including primary and secondary public education programs, from

teaching, advocating, or advancing the following:

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color,
> marital status, familial status, mental or physical disability, religion or national
> origin is inherently superior to people of another age, sex, gender identity, sexual
> orientation, race, creed, color, marital status, familial status, mental or physical
> disability, religion, or national origin;
>
> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual
> orientation, race, creed, color, marital status, familial status, mental or physical

disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

N.H. Rev. Stat. Ann. § ("RSA") 193:40; *see also* RSA 354-A:31; RSA 354-A:32; RSA 354-A:33.

In this consolidated action, two groups of plaintiffs seek a declaration that the new antidiscrimination provisions are unconstitutional. They also seek to permanently enjoin the enforcement of those provisions. The first group of plaintiffs consists of Local 8027 AFT-New Hampshire, AFL-CIO and four educators (the "AFT plaintiffs"). The second group of plaintiffs consists of the National Education Association-New Hampshire, the Director of Diversity, Equity, Inclusion, and Justice for the Exeter Region Cooperative School District, and the Chief Equity Officer for the Manchester School District (the "NEA-NH plaintiffs").

All of the plaintiffs allege that the new antidiscrimination provisions, on their face, violate the Due Process Clause of the Fourteenth Amendment because they are unconstitutionally vague. ECF Doc. No. 30 ¶¶ 102–111; ECF Doc. No. 1 ¶¶ 154–159. The AFT plaintiffs also allege that: (1) the conflict between existing New Hampshire law and the new antidiscrimination provisions renders those new provisions unconstitutionally vague, ECF Doc. No. 30 ¶¶ 112–121; and (2) the new antidiscrimination provisions constitute a general violation of the AFT plaintiffs' constitutional rights protected by the First Amendment, ECF Doc. No. 30

¶¶ 122–132. The AFT plaintiffs further argue that the new antidiscrimination provisions violate state law. *See* ECF Doc. No. 30 ¶¶ 112–139.

All of the plaintiffs have asked this Court to declare that the new antidiscrimination provisions are unconstitutional and enjoin their enforcement. ECF Doc. No. 30, p. 51 (Prayers 1 and 2); ECF Doc. No. 1, p. 61. (Prayers A and B). The AFT plaintiffs appear to recognize, however, that a constitutional construction of the new antidiscrimination provisions exists, grounded in Attorney General John Formella's interpretation of the statutes. ECF Doc. No. 30 ¶¶ 6, 47, 49–64, 100, & p. 51. They therefore alternatively ask that this Court construe the new antidiscrimination provisions narrowly. ECF Doc. No. 30, p. 51 (Prayer 3).

For the reasons set forth below, all of the plaintiffs' claims fail as a matter of law. To the extent the AFT plaintiffs' claims arise under state law, they are barred by the Eleventh Amendment. The AFT plaintiffs have likewise failed to state a viable First Amendment claim, as the curricular and pedagogical speech upon which they premise that claim is not constitutionally protected. The plaintiffs' vagueness claims fail because the new antidiscrimination provisions not vague on their face. The language of the provisions, particularly when coupled with guidance issued by the Department of Education, the Commission for Human Rights, and the Department of Justice, demonstrates that the new antidiscrimination provisions provide a discernible, objective standard for what conduct is proscribed. The robust process available under the provisions further protects against arbitrary and discriminatory enforcement. The plaintiffs have accordingly failed to state a viable claim for relief, and their complaints should be dismissed in their entirety.

## Standard of Review

When analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court assumes the truth of the plaintiffs' well-pleaded facts and draws all reasonable inferences in the plaintiffs' favor. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018). "Well-pleaded facts must be non-conclusory and non-speculative." *Id.* (citation and quotation marks omitted). Thus, the Court need not assume the truth of a plaintiff's "legal conclusions and characterizations." *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 750 (1st Cir. 2016) (same omissions). Nor need it credit "bald conclusions, unrelieved rhetoric, and pejorative epithets." *Vigueira v. First Bank*, 140 F.3d 12, 15 (1st Cir. 1998). Dismissal is appropriate if the well-pleaded facts, when assumed true, fail to state a claim for relief. *Barchock*, 886 F.3d at 48. Put differently, "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to `remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Id.* (same omissions). This same standard applies when, as here, a defendant also challenges a court's subject-matter jurisdiction under Rule 12(b)(1) on the basis of pleading sufficiency. *See Gordo-Gonzalez v. United States*, 873 F.3d 32, 35 (1st Cir. 2017).

## Background

### A.   House Bill 544 in the New Hampshire House of Representatives.

On January 6, 2021, the New Hampshire House of Representatives introduced House Bill 544, "An Act relative to the propagation of divisive concepts," and referred the bill to the Executive Departments and Administration committee. *See* Docket of HB544, General Court of New Hampshire – Bill Status System (attached as **Attachment A**).[1] As introduced, the bill added

---

[1] A court ruling on a motion to dismiss may consider "documents the authenticity of which are not disputed by the parties"; "official public records"; "documents central to the plaintiffs' claims"; and "documents sufficiently referred to in the complaint." *Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017) (citation and quotation marks omitted).

a chapter prohibiting the propagation of "divisive concepts." *See* HB 544 – As Introduced, 2021

Session, 21-0732 (attached as **Attachment B**). The original text of the bill defined "divisive

concept" to include the following concepts:

a) One race or sex is inherently superior to another race or sex;

b) The state of New Hampshire or the United States is fundamentally racist or sexist;

c) An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

d) An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

e) Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

f) An individual's moral character is necessarily determined by his or her race or sex;

g) An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

h) Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

i) Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

j) The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

**Attachment B** at 1–2.

Among other things, House Bill 544 proposed prohibiting the following: (1) the State of

New Hampshire from "teach[ing], instruct[ing], or train[ing] any employee, contractor, staff

member, student, or any individual or group, to adopt or believe any of the divisive concepts

defined" in the new statutes; (2) any contractor with the State of New Hampshire from "us[ing]

any workplace training that inculcates in its employees any form of race or sex stereotyping or

any form of race or sex scapegoating" including training on the divisive concepts; and (3) any

grantee of the State of New Hampshire from "us[ing] state funds or assets to promote any of the divisive concepts." *See* **Attachment B** at 2–3.

The House of Representatives' Executive Departments and Administration committee heard testimony in support of and in opposition to House Bill 544 across two days of hearings. *See* **Attachment A**. On March 24, 2021, the committee voted with ten in favor and nine opposed to recommend that House Bill 544 pass with an amendment that clarified the definition of contractor and what it means to be a contractor or grantee. *See* **Attachment A**; *see also* Amendment to HB 544, March 3, 2021, 2021-0611h (attached as **Attachment C**).

At the House of Representatives' April 8, 2021 session, that body voted to table House Bill 544 with 347 members voting to table and eighteen opposing the motion to table. *See* **Attachment A**. Before the motion to table occurred, however, the House of Representative's Finance committee voted to amend House Bill 2, the biennial budget's trailer bill, to incorporate, among other things, the text of House Bill 544. *See* Docket of HB2, General Court of New Hampshire – Bill Status System (attached as **Attachment D**). House Bill 2, including the text of House Bill 544, passed through the House of Representatives by a vote of 200 in favor and 181 opposed. **Attachment A** at 2.

**B.** **Removal of House Bill 544's language in the New Hampshire Senate and introduction of new antidiscrimination provisions into House Bill 2.**

House Bill 2, including the language of House Bill 544, was introduced in the New Hampshire Senate on April 1, 2021, and referred to the Senate's Finance committee. **Attachment D** at 3. The Senate Finance committee held hearings on all of House Bill 2, including House Bill 544's language, on May 4, 2021. *Id*. Many testified in opposition to including House Bill 544 in the budget trailer bill, including the New Hampshire affiliate of the American Civil Liberties Union, which expressed many of the same arguments made in both

complaints here. *See* Senate Finance Committee, Minutes, May 4, 2021 Hearing (attached as

**Attachment E**). Thereafter, the Senate Finance committee removed House Bill 544's language

entirely and replaced it with new antidiscrimination provisions. Amendment to HB 2-FN-A-

Local, Senate Finance, May 28, 2021, at 144–147 (attached as **Attachment F**). The new

legislation would prohibit public employees and government programs, including primary and

secondary public education programs, from teaching, advocating, or advancing the following:

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

> (c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

> (d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**Attachment F** at 147.

The new legislation abandoned the prohibition of "divisive concepts," ceased to apply to

contractors and grantees, and did not limit the academic freedom of professors and scholars at

public colleges and universities. *See* **Attachment F** at 144–147. The new legislation also

narrowed its proscriptions to permit "sensitivity trainings" grounded in the "inherent humanity

and equality of appall persons and the ideal that all persons are entitled to be treated with

equality, dignity, and respect," to permit "discussing, as part of a larger course of academic

instruction, the historical existence of ideas and subjects identified in this section," and to apply only to public employees performing work in their official capacities. *Id*. at 145.

In addition to removing House Bill 544's broad prohibition on "divisive concepts," in favor of a narrow set of antidiscrimination provisions, House Bill 2 provided for an enforcement system. It permitted those aggrieved by an alleged violation to file a complaint with the New Hampshire Commission for Human Rights or the superior court alleging that the school, school district, or government agency violated the new antidiscrimination provisions. *Id*. at 147. It also empowered the Board of Education to discipline licensees who had violated the new antidiscrimination provisions. *Id*.

On June 3, 2021, the Senate considered the amended version of House Bill 2, including the new antidiscrimination provisions, and voted in favor of passage with fourteen voting in favor of the bill and nine voting in opposition. **Attachment D** at 3–4. Because of the amendments made to House Bill 2 by the Senate, the House of Representatives sought a committee of conference. *Id*. at 4–5 The committee of conference made some changes to House Bill 2, but kept the new antidiscrimination provisions intact. *Id*. at 5. House Bill 2 passed both chambers of the state legislature and, on June 25, 2021, Governor Christopher Sununu signed it into law. *Id*.

## C.   Guidance produced by the Department of Education, Department of Justice, and the Commission for Human Rights.

In part based on concerns expressed by groups like NEA-NH, *see*, *e.g.*, ECF Doc. No. 1-18 at 2–4, the Department of Education, Commission for Human Rights, and Department of Justice (the "enforcing agencies") produced guidance regarding the scope and effect of the new antidiscrimination provisions. The enforcing agencies produced two sets of guidance documents, framed as "frequently asked questions." *See* Frequently Asked Questions: New discriminatory

practice prohibitions applicable to K-12 educational programs, Department of Education, Commission for Human Rights, and Department of Justice (hereinafter "Education FAQs") (attached as **Attachment G**); Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs, Department of Education, Commission for Human Rights, and Department of Justice (hereinafter "Employer FAQs") (attached as **Attachment H**). One set of frequently asked questions was designed to address the concerns of educators in K-12 programs and the other was designed to address the concerns of public employers and government programs.

In anticipation of complaints being filed with the Commission for Human Rights at the start of the school year, the Attorney General Formella also issued an opinion in relation to the new antidiscrimination provisions. Attorney General Opinion No. 2021-01, New Hampshire Department of Justice, Sept. 7, 2021 ("Attorney General Opinion 2021-01") (attached as **Attachment I**). That opinion elaborated on the guidance that had previously been issued and provided the Commission for Human Rights, which is the state agency charged with investigating and adjudicating complaints under the new antidiscrimination provisions, with a foundation upon which it could build any investigation of alleged violations or rule on any alleged violations. *See generally id.*

Additionally, to avoid the danger of two separate agencies reaching two different conclusions regarding the existence of discrimination, the enforcing agencies developed a protocol for evaluating complaints alleging a violation of the new antidiscrimination provisions by public educators. Consistent with the statutory language, the first step is for the aggrieved individual to either: (1) file a complaint with the Commission for Human Rights and avail themselves of that agency's processes or (2) file a lawsuit in the superior court. RSA 193:40, III.

In either circumstance, the complaint would be filed against the school or school district, not the individual teacher or administrator. *Id.* Only after the final determination, including the exhaustion of all appellate rights by the parties, that a violation of the antidiscrimination laws had occurred could the matter proceed to the second step. RSA 351-A:21, :21-a, :22. At that step, the Department of Education could commence disciplinary proceedings before the Board of Education to determine what sanction, if any, to impose upon the licensee. RSA 193:40, IV.

**D.   Procedural history.**

The AFT-NH plaintiffs initiated this action on December 13, 2021, by filing a 52-page complaint against the Commissioner of Education, the Chair of the Commission for Human Rights, and the Attorney General. ECF Doc. No. 30. The AFT-NH complaint contained the four counts identified above. *See id.* One week later, the NEA-NH plaintiffs filed their own 65-page complaint, naming the same three defendants as the AFT-NH complaint, plus the Executive Director of the Commission for Human Rights and the Commissioner of the Department of Labor. ECF Doc. No. 1. Despite its length, the NEA-NH complaint asserts a single count of vagueness. *See id.*

On January 12, 2022, the plaintiffs filed assented-to motions in both dockets seeking consolidation. *See, e.g.*, ECF Doc. No. 25. The Court held a hearing on the motion on March 8, 2022. During the hearing, the Court granted the motion to consolidate and directed the parties to file a case management order setting deadlines to brief the defendants' anticipated motion to dismiss. The parties filed a joint motion for entry of a case management order on March 21, 2022, which the Court granted in a margin order. Consistent with the deadline in that order, the defendants now move to dismiss both complaints in their entirety.

**Argument**

**I.**   **The Eleventh Amendment bars the AFT plaintiffs' claims to the extent they assert violations of or seek declarations under state law.**

"As a general matter, states are immune under the Eleventh Amendment from private suit in federal courts, absent their consent." *Wojcik v. Mass State Lottery Comm.*, 300 F.3d 92, 99 (1st Cir. 2002) (citation and quotation marks omitted). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation omitted). "As such, it is no different from a suit against the State itself." *Id.* (citations omitted). Accordingly, "neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action." *Fantini v. Salem State Coll.*, 557 F.3d 22, 33 (1st Cir. 2009) (citation, quotation marks, and bracketing omitted).

The *Ex parte Young* doctrine provides "an important limit on the state sovereign-immunity principle." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). *Ex parte Young* "permits suits to proceed against state officers in their official capacities to compel them to comply with federal law." *Vaquieria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 478 (1st Cir. 2009) (citation omitted). But the doctrine stands as a "narrow" exception to Eleventh Amendment immunity, *see P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993), "limited to [the] precise situation" where "a federal court commands a state official to do nothing more than refrain from violating federal law," *Va. Office for Prot. & Advocacy*, 563 U.S. at 255 (citations omitted). It

does not allow for claims based on purported violations of state, rather than federal, law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).[2]

Three of the AFT plaintiffs' claims appear to arise at least in part under New Hampshire law. In Count II, the AFT plaintiffs contend that the new antidiscrimination provisions conflict with or otherwise violate: Part I, Article 12 and Part II, Article 83 of the New Hampshire Constitution; RSA 193-E:2; RSA 189:11, I(j); and RSA chapter 98-E. ECF Doc. No. 30 ¶¶ 114, 116, 117, 119, 121. The AFT plaintiffs ask this Court to order the defendants to "cease and desist from engaging in the enforcement or any application of" the new antidiscrimination provisions, which they contend "simultaneously unconstitutionally impairs New Hampshire citizens' rights and *violates New Hampshire law*." ECF Doc. No. 30 ¶ 121 (emphasis added). Similarly, the AFT plaintiffs contend in Count III that the new antidiscrimination provisions violate, *inter alia*, "the established rights of Plaintiffs under the Free Speech Clause, Part I, Article 22 of the New Hampshire Constitution[,] and abridge the public policy of New Hampshire concerning the right of public employees to 'publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies' as mandated by RSA Chapter 98-E:1." ECF Doc. No. 30 ¶ 124. They also contend that the challenged provisions are "considered a violation of the educator code of conduct." ECF Doc. No. 30 ¶ 126. In Count IV, the AFT plaintiffs seek a declaration—seemingly under the New Hampshire Constitution, ECF Doc. No. 30 ¶ 135—that the challenged provisions "pose[] an irreconcilable conflict with state educational provisions,

---

[2] Additionally, *Ex parte Young* "permits equitable relief against only those officials who possess authority to enforce a challenged state law." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534, 536 (2021); *see id.* at 540–41 (Thomas, J., concurring in part and dissenting in part); *id.* at 544–45 (Roberts, C.J., concurring in part and dissenting in part); *id.* at 547–50 (Sotomayor, J., concurring in part and dissenting in part); *see also Ex parte Young*, 209 U.S. at 157, 161. At this stage in the proceedings, the defendants do not press an argument that one or more of them lacks authority to enforce the antidiscrimination provisions. If, however, this case survives dismissal, the defendants reserve the right to pursue such an argument.

which must be resolved for the sake of New Hampshire's teachers and students," ECF Doc. No. 30 ¶ 137. They further request a declaration that the new antidiscrimination provisions "are invalid and void under the Constitutions *of the State of New Hampshire* and the United States, or, in the alternative," that the challenged provisions "are in conflict with the public policy of the State of New Hampshire" and "are invalid under Part 2, Article 18-a, of the New Hampshire Constitution because [they are] an invalid addition to a Budget Bill." ECF Doc. No. 30 ¶ 139(b), (d), (e).

To the extent these arguments are intended to be freestanding claims or requests for relief, they are barred under *Pennhurst*. A federal court may not, consistent with *Pennhurst*, enjoin the enforcement of a state statute because it "violates" another provision of state law. *Pennhurst*, 465 U.S. at 106. Indeed, the Court observed in *Pennhurst* that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* If the AFT plaintiffs believe that the new antidiscrimination provisions violate the State Constitution or one or more state statutes, or that there is some other state-law-based reason why those provisions should be invalidated, they are free to bring an action in state court. Under the *Ex parte Young* doctrine, they may only proceed in this forum based on purported violations of *federal* law. Counts II, III, and IV of the AFT plaintiffs' complaint should accordingly be dismissed to the extent they are premised on state-law theories.

## II.     The AFT plaintiffs have failed to state a First Amendment claim because the new antidiscrimination provisions do not implicate protected speech.

In Count III of their complaint, the AFT plaintiffs bring what purports to be a freestanding First Amendment claim. They do not identify under what First Amendment theory they seek relief, and Count III is arguably deficient for this reason alone. *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (observing that a complaint should "give the defendant fair notice of what the claim is and the grounds upon which it rests" (citation, quotation marks, and ellipsis omitted)). Ultimately, however, Count III fails for a more fundamental reason: the AFT plaintiffs do not identify any protected speech implicated by the new antidiscrimination provisions.

In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006). In reaching this holding, the Court observed that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at 421–22. Rather, such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created" because "[w]hen [the employee] went to work and performed the tasks [the employee] was paid to perform, [the employee] acted as a government employee." *Id*. "The fact that [the employee's] duties sometimes require[] [the employee] to speak or write does not mean [the employee's] supervisors were prohibited from evaluating [the employee's] performance." *Id*.

The threshold question under *Garcetti* is whether the speech at issue is "made pursuant to the employee's official duties." *Id.* at 413. If the answer is yes, then the speech is not protected by the First Amendment. *See id.* at 421. The First Circuit has adopted a "two-step, context-specific inquiry" to assist in making this determination. *Decotiis v. Whittemore*, 635 F.3d 22, 31 (1st Cir. 2011) (quotation omitted). "First, a court must ask, 'what are the employee's official responsibilities?'" *Id.* In resolving this question, "the proper inquiry is practical rather than

formal, focusing on the duties an employee is actually expected to perform, and not merely those formally listed in the employee's job description." *Id.* (citation and quotation marks omitted). Second, a court must ask "'was the speech at issue made pursuant to those responsibilities?'" *Id.* The First Circuit has identified "several non-exclusive factors" that "are instructive" when resolving this question: (1) "whether the employee was commissioned or paid to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [the employee's] place of employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [the employee] spoke (lending it 'official significance')"; (6) "whether the employee's speech derived from special knowledge obtained during the course of . . . employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id*. at 32 (citations omitted).

Applying this two-step inquiry to the allegations in the AFT complaint demonstrates that AFT plaintiffs' First Amendment claim is premised on speech "made pursuant to [their] official duties." *Garcetti*, 547 U.S. at 421. Each of the individual AFT plaintiffs is a public employee. *See* ECF Doc. No. 30 ¶¶ 7, 8, 9, 10, 11. The institutional AFT plaintiff—Local 8027, AFT, AFL-CIO ("Local 8027")—alleges that it represents "approximately 3,400 public school teachers, school support staff, city and town employees, library employees, and higher education faculty," ECF Doc. No. 30 ¶ 12, all of whom are likewise public employees. Local 8027 does not purport to bring a First Amendment claim on its own behalf; rather, the AFT plaintiffs collectively allege that the new antidiscrimination provisions violate the First Amendment by "restricting [their] proper curricular discretion." ECF Doc. No. 30 ¶ 123. They contend that they have been "chilled from exercising their rights by threat of disciplinary action, private suit or loss of their teaching

license for violation of" the new antidiscrimination provisions. ECF Doc. No. 30 ¶ 125. In particular, three of the individual AFT plaintiffs express concerns about what they are allowed to teach under the new antidiscrimination provisions. *See* ECF Doc. No. 30 ¶¶ 7, 8, 9, 39, 40, 42, 56, 96.[3] The AFT complaint makes clear that these concerns are premised on RSA 193:40. ECF Doc. No. 30 ¶¶ 1, 26, 44, 46, 81, 82.

As discussed previously, RSA 193:40 prohibits an "educator"—meaning "a professional employee of any school district whose position requires certification by the state board [of education]," RSA 194:40, V—from "[t]eaching [d]iscrimination" as set forth in RSA 193:40, I(a) through (d). A "[v]iolation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." RSA 193:40, IV. It is also under RSA 193:40 that "any person" may "initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34." RSA 193:40, III. These potential outcomes, the AFT plaintiffs contend, "chill [them] from exercising their rights" to "proper curricular discretion." ECF Doc. No. 30 ¶¶ 123, 125.

If an educator has such rights, they are not protected by the First Amendment. The allegations in the AFT complaint (as well as common sense) dictate that teaching is

---

[3]While the other two individual AFT plaintiffs identify as educators, they appear to base their claims entirely on conclusory assertions in the "parties" section of the complaint about what their children will be taught under the new antidiscrimination provisions. ECF Doc. No. 30 ¶¶ 10, 11. They do not otherwise provide any factual basis for their claims. It is far from clear how a parent's conclusory concerns about the education his or her child might receive confers that parent with standing to maintain a First Amendment claim based on "curricular discretion." ECF Doc. No. 30 ¶ 123. The defendants do not press this issue now, however, because "[i]t is sufficient for the case to proceed if at least one [plaintiff] has standing." *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 55 (1st Cir. 2001) (citation omitted). Nevertheless, "standing is 'an indispensable part of the plaintiff's case [and] each element must be supported with the manner and degree of evidence required at successive stages of the litigation.'" *People To End Homelessness, Inc. v. Develco Singles Apartments Assocs.*, 339 F.3d 1, 8 (1st Cir. 2003) (ellipsis omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The defendants therefore reserve the right to press standing, as may be appropriate, in the future.

quintessentially one of "the duties [an educator] is actually expected to perform" such that it would constitute an "official responsibilit[y]." *Decotiss*, 635 F.3d at 32. To the extent teaching involves speech, it is speech that an "educator" is "commissioned or paid to make," typically occurring at the educator's "place of employment," and relating to the specific "subject matter" that the educator is authorized to teach. *See id.* Because an educator's curriculum is set by a combination of state statute, *see, e.g.*, RSA 193-E:2-a, Board of Education regulation, *see, e.g.*, N.H. Admin. R. Ed 306.26, 306.27, and the local education unit, *see, e.g.*, N.H. Admin. R. Ed 302.01, 302.02, 303.01, an "objective observer[]" would be hard-pressed to believe that an educator's speech in the classroom is made the capacity as a "citizen" rather than "pursuant to their official duties," *Decotiss*, 635 F.3d at 32. It is also apparent that an educator's speech in the classroom—which is often subject-matter specific—can derive from "special knowledge obtained during the course of [an educator's] employment," *Decotiss*, 634 F.3d at 32. And there is no clear "citizen analog" to the act of teaching in a public-school classroom, *see id.*; indeed, educators have to be certified by the State Board of Education and hired by their schools to perform their official roles, *see* RSA 189:39. In short, nearly all of the factors set forth in *Decotiis* weigh in favor of the conclusion that an educator's curricular choices are "made pursuant to [that educator's] official duties." *Garcetti*, 547 U.S. at 413, 421. Those choices are not entitled to First Amendment protection. *Id.* at 421.

This conclusion finds significant support in the decisions of several courts of appeals. For instance, in *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, the Sixth Circuit held that "the First Amendment does not protect primary and second school teachers' in-class curricular speech[.]" 624 F.3d 332, 342 (6th Cir. 2010). In reaching this holding, the court observed that, "[a]s with any other individual in the community, [teachers

have] no more free-speech right to dictate the school's curriculum than [they have] to obtain a platform—a teaching position—in the first instance for communicating [their] preferred list of books and teaching methods." *Id*. at 340. For this reason, the court observed, "no relevant analogue exists between [a teacher's] in-class curricular speech and speech by private citizens." *Id.* at 340–41 (citation, quotation marks, and bracketing omitted). The court further recognized that, under state law, curriculum-related decisions are prescribed by elected officials, which provides a degree of public accountability with regard to those decisions. *Id.* at 341. The court noted that teachers may speak or write routinely during the course of their work but that fact alone does not make them "sovereigns unto themselves" when it comes to making curriculum-related decisions for their classrooms. *Id*. (quotation and brackets omitted). The court thus concluded that in light of *Garcetti*, the First Amendment does not "insulate" teachers from employer discipline, "even discipline prompted by [the teacher's] curricular and pedagogical choices." *Id*.

Similarly, in *Mayer v. Monroe County Community School Corporation*, the Seventh Circuit held that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." 474 F.3d 477, 480 (7th Cir. 2007). The Seventh Circuit emphasized that a case involving a teacher's curricular choices is "easier [to resolve] than *Garcetti*" because "teachers hire out their own speech and must provide the service for which employers are willing to pay." *Id.* at 479. While the court acknowledged that "[m]ajority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination," it observed that "if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers." *Id.*

at 479–80. The court noted that the teacher was permitted under the school's policy to "draw[] out arguments from all perspectives, as long as she kept her opinion to herself." *Id.* at 480. The court emphasized, however, that "[t]he Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Id.*

As the Sixth Circuit observed in *Evans-Marshall*, several other circuits have applied pre-*Garcetti* precedents to conclude that "[a] teacher's curricular and pedagogical choices are categorically unprotected" by the First Amendment. 625 F.3d at 342; *see id.* at 642–43 (citing *Panse v. Eastwood*, 303 F. App'x 933, 935 (2d Cir. 2008); *Lee v. York County Sch. Div.*, 484 F.3d 687, 694 n.11, 695, 697 (4th Cir. 2007); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.)). Several circuits have likewise concluded that *Garcetti* applies to elementary- and secondary-school employees in other contexts, including: to a school teacher's speech about curriculum, *see Brammer-Hoetler v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007); to the filing of union grievances related to student discipline, *see Weintraub v. Board of Educ. Of City School Dist. of New York*, 593 F.3d 196, 201–02 (2d Cir. 2010); to writing memoranda requesting information about the use of funds, *see Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693–94 (5th Cir. 2007); and to placing signs or banners in the classroom or on school bulletin boards, *see*, *e.g.*, *Johnson v. Poway Unified School Dist.* 658 F.3d 954, 970 (9th Cir. 2011); *Lee v. York County School Div.*, 484 F.3d 687, 698-99 (4th Cir. 2007). As the Sixth Circuit noted, "[t]he common thread through all of these cases is that, when it comes to in-class curricular speech at the primary and secondary school level, no other court of appeals has held that such speech is protected by the First Amendment." *Evans-Marshall* 624 F.3d at 343. The defendants have not identified any decision post-dating *Evans-Marshall* that reaches a contrary conclusion.

In sum, the AFT plaintiffs' First Amendment claim is premised upon speech that is not entitled to First Amendment protection. Count III of the AFT complaint accordingly fails regardless of what First Amendment theory it is brought under. The Court should therefore dismiss Count III for failure to state a claim.

**III.    The plaintiffs' vagueness claims fail as a matter of law because the new antidiscrimination provisions set forth a discernible standard of conduct and protect against arbitrary or discriminatory enforcement.**

Both sets of plaintiffs contend that the new antidiscrimination provisions are void for vagueness. Because the plaintiffs contend their vagueness claims are "virtually identical," ECF Doc. No. 25 ¶ 4, the defendants address them together. The defendants further address these claims as facial vagueness challenges. While the NEA-NH complaint contains four stray references to an "as applied" vagueness claim, ECF Doc. No. 1 ¶¶ 13, 156, 158, Prayer B, the defendants do not take this to be a standalone claim. These references appear to have been added to the complaint as an afterthought, and the NEA-NH plaintiffs make no attempt to explain how the new antidiscrimination provisions have been applied to them in an unconstitutional manner. See *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." (cleaned up)). "[B]ecause this is a pre-enforcement challenge, [an as-applied] claim would indeed be inappropriate." *Worman v. Healey*, 293 F. Supp. 3d 251, 268 (D. Mass. 2018), *aff'd* 922 F.3d 26 (1st Cir. 2019).

Moreover, the Supreme Court has made clear that when determining whether a claim is facial or as applied, "[t]he label is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Rather, the question is whether the "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs." *Id.* (citation omitted). If they do, then the plaintiffs must "satisfy [the] standards for a facial challenge to the extent of that reach."

*Id.* Here, the plaintiffs seek "injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing" the new antidiscrimination provisions. ECF Doc. No. 1, Prayer A. This is quintessential facial relief. *See John Doe No. 1*, 561 U.S. at 194 (noting that "an injunction barring the secretary of state from making referendum petitions available to the public" was a request for facial relief (quotation marks omitted)).[4]

### A.     The vagueness standard.

"Vague laws offend several important values." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "First, because [courts] assume that man is free to steer between lawful and unlawful conduct, [they] insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id*. "Vague laws may trap the innocent by not providing fair warning." *Id*. "Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id*. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id*. at 108–09. "To comport with the strictures of due process, a law must define an offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13–14 (1st Cir. 2011) (quotation omitted).

Because the plaintiffs bring facial vagueness challenges, they must "demonstrate that the [new antidiscrimination provisions are] impermissibly vague in *all* of [their] applications."

---

[4] The defendants also take at face value the plaintiffs' representation that consolidation was appropriate in this case because both vagueness claims are "virtually identical." ECF Doc. No. 25 ¶ 4. Notably, the AFT plaintiffs do not purport to bring their vagueness claim as an as-applied challenge. *See generally* ECF Doc. No. 30.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)

(emphasis added). To prevail, the plaintiffs must show "that the enactment is vague 'not in the

sense that it requires a person to conform his conduct to an imprecise by comprehensible

normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Id.* at

495 n.7 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). A unconstitutionally

vague provision "'simply has no core.'" *Id.* (quoting *Smith v. Goguen*, 415 U.S. 566, 578

(1974)). In the context of civil, as opposed to criminal, statutes, the Supreme Court has been

more tolerant of imprecision in statutory language. *See Village of Hoffman*, 455 U.S. at 498–99

("The Court has also expressed greater tolerance of enactments with civil rather than criminal

penalties because the consequences of imprecision are qualitatively less severe.").

> "In evaluating a facial challenge to a state law, a federal court must, of course, consider

any limiting construction that a state court or enforcement agency has proffered." *Kolender v.

Lawson*, 461 U.S. 352, 354 (1983) (quotation omitted). The reviewing court may also turn to

dictionary definitions to determine the plain meaning of statutory terms and resolve any

ambiguity challenges. *Village of Hoffman Estates*, 455 U.S. at 501. So long as the "language of

proscription . . . 'conveys sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices,'" the statute is not deficient. *Precious Metals

Associates, Inc. v. Commodity Futures Trading Commission*, 620 F.2d 900, 907 (1st Cir. 1980)

(quoting *Jordan v. DeGeorge*, 341 U.S. 223, 231–32 (1951)).

### A.    The new antidiscrimination provisions provide ample notice of what conduct they prohibit.

The plaintiffs first contend that the new antidiscrimination provisions are vague because

they provide insufficient notice of the conduct they proscribe. Under this type of vagueness

challenge, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult

to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). "[W]ords are rough-hewn tools, not surgically precise instruments. Consequently, some degree of inexactitude is acceptable in statutory language." *URI Student Senate*, 631 F.3d at 14. "The Constitution does not require impossible standards; all that is required is that the language conveys sufficient[l]y definite warning as to the proscribed conduct when measured by common understanding and practices." *Roth v. United States*, 354 U.S. 476, 491 (1957) (quotations and brackets omitted). "[L]ack of precision is not itself offensive to the requirements of due process," *id*., and "'the fact that a statute requires some interpretation does not perforce render it unconstitutionally vague," *URI Student Senate*, 631 F.3d at 14 (quoting *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 61 (1st Cir. 2008)).

The new antidiscrimination provisions set forth an objectively discernible standard of conduct. RSA 193:40 describes four categories of information that "[n]o pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in or support for[.]" RSA 193:40, I. While this language is worded in the passive voice, the New Hampshire Supreme Court has made clear that, when interpreting a New Hampshire statute, a court must "not consider words and phrases in isolation, but rather within the context of the statute as a whole, which enables [the court] to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme." *Doe v. Comm'r of N.H. Dep't of Health & Hum. Servs.*, 174 N.H. 239, 261 A.3d 968, 974 (2021). RSA 193:40 goes on to provide that "[v]iolation of this section *by an educator* shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the board of education." RSA 193:40, IV (emphasis added). Read in context, then, it

is clear that RSA 193:40 prohibits an educator from teaching, instructing, or inculcating any public school student, or otherwise compelling any public school student to express belief in, one or more of the proscribed categories of information.

The language of the other challenged provisions supports this reading. "When interpreting two statutes that deal with similar subject matter, [the New Hampshire Supreme Court] construe[s] them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes." *Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005). RSA 354-A:31 provides that "[n]o public employer . . . shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group" the same information prohibited under RSA 193:40, IV. RSA 354-A:32 provides that "[n]o government program shall teach, advocate, or advance any one or more" of those same categories. RSA 354-A:33 provides that "[n]o public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," one or more of the same categories. The use of active voice in each of these provisions confirms that the focus of the new antidiscrimination provisions is on the conduct of the person or entity conveying the information in question, not on the subjective belief of the person receiving it.

This construction finds further support in the guidance the enforcing agencies have issued with respect to the new antidiscrimination provisions. The Education FAQs expressly state that "[t]he mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the [new antidiscrimination provisions." Education FAQs

(**Attachment G**) at 2. Similarly, the Employer FAQs state that "[t]he mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequences." Employer FAQs (**Attachment H**) at 2. And Attorney General Opinion 2021-01 states: "It is important to note that although education related to racism, sexism, and other practices or ides that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40." Attorney General Opinion 2021-01 (**Attachment I**) at 3. These statements further demonstrate that a violation of the new antidiscrimination provisions is determined by the actions of the educator or trainer, not the subjective beliefs of the student or trainee.

The enforcing agencies' guidance documents further resolve any ambiguity with respect to the word "inherent" as it used in the new antidiscrimination provisions. Although the enforcing agencies recognized that the plain meaning of the language in the new antidiscrimination provisions is clear on its own, they provided additional guidance on the term "inherent" because the legislature did not define that term. *See* Attorney General Opinion 2021-01 (**Attachment I**) at 6–7; Education FAQs (**Attachment G**) at 1–2; Employer FAQs (**Attachment H**) at 1–2. In doing so, the enforcing agencies consulted a standard dictionary and concluded that for the purposes of the new antidiscrimination provisions, "inherent" refers to characteristics that are "natural, biological, or innate, as opposed to being apparent accidental, or a characteristic created by extern action or external factors." Attorney General Opinion 2021-01 (**Attachment I**) at 6; *see also* Education FAQs (**Attachment G**) at 1; Employer FAQs (**Attachment H**) at 1. Notably, this understanding of "inherent" is reflected in the fact that RSA

193:40 does not prohibit "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in [RSA 193:40, I]." RSA 193:40, II. It is likewise reflected in the fact that RSA 354-A:29 does not "prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect." RSA 354-A:29, II.

The statutory language, FAQs, and Attorney General Opinion 2021-01 make unambiguously clear that the new antidiscrimination provisions *do not prohibit* education and training that: (1) discusses historic or current events; (2) discusses topics that may make people uncomfortable; (3) discusses how historical events or acts have effects that linger into the present day; (4) discusses how psychological development, messaging, or other phenomena may create implicit biases; or (5) discusses any other concepts so long as those concepts promote equality and the equal, respectful, and dignified treatment of all people. Attorney General Opinion 2021-01 (**Attachment I**) at 7–8; Education FAQs (**Attachment G**) at 2; Employer FAQs (**Attachment H**) at 2. The Education FAQs explicitly state:

> Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

Education FAQs (**Attachment G**) at 2. Attorney General Opinion 2021-01 and the FAQs also explicitly state that nothing prohibits training or education geared towards diversity, equity, equality, and inclusion, including implicit bias training. Attorney General Opinion 2021-01 (**Attachment I**) at 7; Employer FAQs (**Attachment H**) at 2. Attorney General Opinion 2021-01

further recognizes that government programs or schools may create resources to combat racism and that schools may teach about discrimination, its historical existence, and its role in creating disparities among different identified groups. Attorney General Opinion 2021-01 (**Attachment I**) at 7–8.

The plain language of the statutes coupled with the enforcing agencies' combination of general guidance and specific examples provides more than sufficient notice to the public of what does and does not constitute a violation of the new antidiscrimination provisions. *Williams*, 553 U.S. at 306; *Kolender*, 461 U.S. at 358. Under RSA 193:40, an educator may not teach, instruct, or inculcate a public school student, or otherwise compel any public school student to express the belief, that one identified group possesses natural, biological, or innate characteristics (as opposed to apparent or accidental characteristics) that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 further prohibits an educator from teaching, instructing, or inculcating a public school student, or otherwise compelling a public school student to express the belief, that any identified group can or should be treated unequally to any other identified group or that one identified group should be discriminated against or treated adversely. RSA 354-A:31 and :32 place similar prohibitions on public employers and government programs. These are "comprehensible normative standard[s]," *Village of Hoffman Estates*, 455 U.S. at 495 n.7, that "convey[] sufficient[l]y definite warning as to the proscribed conduct when measured by common understanding and practices," *Roth*, 354 U.S. at 491. In short, they are not vague.

The plaintiffs nonetheless profess confusion in their pleadings about whether the new antidiscrimination provisions prohibit various types of conduct. The AFT plaintiffs wonder whether a teacher can discuss subjects like affirmative action, New Hampshire's mandatory

retirement age for judges, the Americans with Disabilities Act, the Equal Rights Amendment and

pay disparities, and how midnight voting in Crawford Notch fits within the larger historical

narrative of voting rights. *See* ECF Doc. No. 30 ¶ 36. The AFT complaint further identifies a

teacher who purports not to know whether the new antidiscrimination provisions prohibit

teaching about the Rohingya and Uighur genocides, the Holocaust, the Black Lives Matter

movement and "its connection to the past," and issues such as affirmative action, the Voting

Rights Act, and the Equal Rights Amendment. *Id.* ¶¶ 39–40. The NEA-NH plaintiffs suggest

they have received concerns from a teacher who "second guesses" responding to incidents of

racism and bullying against Black and LGBTQ+ students, ECF Doc. No. 1 ¶ 18; an administrator

who avoids using terms such as "anti-racist" or "anti-bias" during trainings with staff, *id.* ¶ 24; a

teacher who will no longer allow students to "pick their own topics for research papers," *id.* ¶ 34;

a teacher who abandoned a plan to ensure that "more experiences of Black, Indigenous, and

other people of color were represented in their American history units and related materials," *id.*

¶ 34; and a teacher who now teaches world history "in a vacuum" rather than applying the

material to the experiences and interests of the students "to limit the analogies students may draw

to current events," *id.* The NEA-NH plaintiffs also express concerns about whether teachers or

schools may continue to teach certain books. *Id.* ¶¶ 19, 34.

The statutory language, the FAQs, and Attorney General Opinion 2021-01 provide ample

guidance with respect to these questions. RSA 193:40, II provides that "[n]othing in this section

shall be construed to prohibit discussing, as part of a larger course of academic instruction, the

historical existence of ideas and subjects identified in [RSA 193:40, I]." RSA 354-A:29, II

provides that "[n]othing in this subdivision shall be construe to prohibit racial, sexual, religious,

or other workplace sensitivity training based on the inherent humanity and equality of all persons

and the ideal that all persons are entitled to be treated with equality, dignity, and respect." The

Education FAQs provide:

> Nothing [in the new antidiscrimination provisions] prohibits the teaching of historical subjects including, but not limited to, slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact identified groups.

Education FAQs (**Attachment G**) at 2. The Education FAQs further provide that "[n]othing

prohibits schools from teaching about discrimination, including the historical existence of these

ideas." *Id.*

Likewise, Attorney General Opinion 2021-01 reiterates that the new antidiscrimination

provisions allow for "sensitivity training" that "promote[s] concepts of equality and the equal,

respectful, and dignified treatment of all persons—particularly as they relate to the interactions

of members of those identified groups with public employers and government programs."

Attorney General Opinion 2021-01 (**Attachment I**) at 7. These trainings, the opinion makes

clear, may include "implicit bias training" that "recognizes that biases develop over time through

such means as personal experiences, messaging people may receive from the media, and other

sources," may provide "Anti-Racist Resources," and may "include information designed to

promote a better understanding of racism and how to combat racism." *Id.* The opinion further

makes clear that the new antidiscrimination provisions do not prohibit schools from "(1) teaching

about discrimination or how discrimination has existed throughout history" or "the role that

discrimination may play in creating disparities among different identified groups," or "(2)

creating web-based resources designed to promote a better understanding of racism, sexism, or

other forms of oppression." *Id.*

Given the statutory language and the agency guidance, it is hard to conceive how the plaintiffs still harbor the confusion they profess in their pleadings. Indeed, many of their questions have been *directly* answered. For those that are not directly addressed, the plaintiffs (and, more generally, the public) have been provided a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Precious Metals Associates, Inc.*, 620 F.2d 907 (quoting *Jordan*, 341 U.S. 231–32). Again, "[w]hat renders a statute vague is not the possibility it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of what precisely that fact is." *Williams*, 553 U.S. at 306. Even if the plaintiffs think some of their examples present close cases—a point the defendants would not concede—it is a "basic mistake" to conclude "that the mere fact that close cases can be envisioned renders a statute vague." *Id.* at 305. As the Second Circuit has observed, when a statute is "sufficiently clear to satisfy the Due Process Clause, [the] inability to supply precise answers regarding its hypothetical application is insufficient to render that [statute] unconstitutionally vague." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 38 (2d Cir. 2015).

The plaintiffs' contention that the new antidiscrimination provisions are vague insofar as they conflict with other state statutes and regulations is similarly misplaced. In preparing their guidance, the enforcing agencies recognized that they must endeavor to construe and enforce the statutes such that the new antidiscrimination provisions exist in harmony with existing statutes regarding mandatory curriculum in New Hampshire public schools, the State's anti-bullying laws, and other relevant state and federal laws. *See Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872, 890 (1st Cir. 1979) ("Common sense dictates that two statutes be read, insofar as possible, in harmony with one another."); *Soraghan*, 152 N.H. at 405 ("When interpreting two

statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes."). The Attorney General's Opinion reflects this well-established canon of construction by explicitly noting that any agency attempting to determine whether challenged conduct violated the new antidiscrimination provisions must construe the new provisions in a manner that avoids creating absurd or unjust results, such as unnecessarily negating the effect of other statutes. *See* Attorney General Opinion 2021-01 (**Attachment I**) at 5 n.3.

While the AFT plaintiffs contend that the new antidiscrimination provisions inhibit teachers from meeting the requirements of RSA 193-E:2, ECF Doc. No. 30 ¶¶ 63-73, both the statutory language, *see, e.g.*, RSA 193:40, II, and the enforcing agencies' guidance, *see* Employer FAQs (**Attachment H**) at 2; Education FAQs (**Attachment G**) at 2; Attorney General Opinion 2021-01 (**Attachment I**) at 3, 5–8, make clear that nothing in those provisions prevents or prohibits providing students with "[k]nowledge of civics and government, economics, geography, history, and Holocaust and genocide education" or, more generally, with an education that enables them "to participate in the democratic process and to make informed choices as responsible citizens." RSA 193-E:2, IV. Similarly, nothing in the statutory language or agency guidance prohibits a school district from providing instruction in "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices." RSA 189:11, I(j). Consistent with the New Hampshire Supreme Court's established canons of construction, the new antidiscrimination provisions must also be read so as not to prohibit enforcement of the state's anti-bullying laws or the obligation of schools and school districts to prevent discrimination against students. *See* RSA

193:38 (Discrimination in Public Schools); RSA 193-F:4 (Pupil Safety and Violence

Prevention); RSA 354-A:27 (Opportunity for Public Education Without Discrimination a Civil

Rights). The enforcing agencies' guidance likewise reflects that the new antidiscrimination

provisions must be read in a manner consistent with state and federal laws prohibiting

discrimination against disabled individuals. *See, e.g.* Education FAQs (**Attachment G**) at 2.[5]

Nor do the new antidiscrimination provisions conflict with RSA chapter 98-E. That

chapter provides that "a person employed as a public employee in any capacity shall have the full

right to publicly discuss and give opinions as an individual on all matters concerning any

government entity and its policies." RSA 98-E:1. By its plain terms, the protections under RSA

chapter 98-E are limited to when a public employee speaks "as an individual." *Id.* Under New

Hampshire Supreme Court precedent, "the relevant distinction [is] whether the [employee] spoke

as an individual or as a spokesperson for [the government], rather than whether he spoke as a

citizen or as a citizen who happens to be an employee of [the government]." *Appeal of Booker*,

139 N.H. 337, 341 (1995). For the reasons discussed in Section II above, an educator or other

public employee is not speaking "as an individual" when they are teaching in a public school

classroom or providing training on behalf of a government employer. Any restrictions the new

antidiscrimination provisions impose on what a public employee may say therefore do not

conflict with RSA chapter 98-E.

For all of these reasons, the new antidiscrimination provisions provide sufficient notice of

the conduct they proscribe to survive a facial vagueness challenge. The plaintiffs' vagueness

claims therefore fail as a matter of law to the extent they are based on a lack-of-notice theory.

---

[5] This interpretation would also be consistent with the new antidiscrimination provisions' plain language, which contains a section that prohibits teaching or advocating that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her . . . mental or physical disability." *See*, *e.g.*, RSA 193:40, I(3); RSA 354-A:32, III.

**B.      The new antidiscrimination provisions do not encourage arbitrary or discriminatory enforcement.**

The plaintiffs also contend that the new antidiscrimination provisions are unconstitutionally vague because they encourage arbitrary or discriminatory enforcement. This contention, too, fails as a matter of law. This second type of vagueness challenge arises out of "the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Unsubstantiated fears that a statutory scheme "might be used to harass individuals with alternative lifestyles and views" are insufficient to support a claim that a statute creates a risk of discriminatory enforcement. *Village of Hoffman*, 455 U.S. at 503. When administrative regulations and processes exist to place checks upon arbitrary enforcement, there is no basis to sustain a complaint of vagueness. *See id*. at 504 (crediting the potential for administrative regulations and checks on the arbitrary enforcement of the law as a basis for rejecting a vagueness challenge).

As an initial matter, the plaintiffs' contention that the new antidiscrimination provisions encourage arbitrary or discriminatory enforcement fails for the same reasons that their lack-of-notice argument does. The statutory language and agency guidance "provide[] specific guidance that would allow individuals and . . . enforcement officials alike to determine" what conduct violates the statutes. *United States v. Zhen Zhou Wu*, 711 F.3d 1, 14 (1st Cir. 2013). For this reason alone, any arbitrary-enforcement-based argument fails.

But that argument also fails because the new antidiscrimination provisions embed multiple layers of adjudicatory review that *protects against* arbitrary and discriminatory enforcement. An individual who seeks to make a complaint under the new antidiscrimination provisions must begin just as any other individual wishing to make a discrimination complaint: with the Commission for Human Rights. RSA 354-A:34. The complaint is lodged against the

school or school district, not the teacher, administrator, or other staff person. RSA 193:40, III. The complainant must provide a signed, verified complaint to begin the process. RSA 354-A:21, I(a). After this occurs, one of the commissioners, with the assistance of staff, will investigate the allegations, encourage the parties to resolve the dispute, and ultimately determine whether probable cause supports the allegations or not. RSA 354-A:21, II(a). Throughout this stage of the process, the complaint, the opposing party, and the allegations remain confidential. *Id*.

If the commissioner finds that probable cause exists, the complaint becomes public and the parties may proceed to a public hearing before the entire commission or remove the case for a *de novo* trial in superior court. *Id*. After the matter is adjudicated, there is a right to appeal to the New Hampshire Supreme Court to redress claims of legal error or other matters that warrant appellate review. RSA 354:A:22, III. If the commissioner finds that probable cause is lacking, then the process ends, subject to a deferential, judicial-review process that the complainant may wish to pursue in the superior court. RSA 354-A:21, II(a). Only after an allegation of discrimination has been deemed to be supported by probable cause, subjected to an administrative hearing or civil trial, and, unless an appeal is waived, ruled upon by the New Hampshire Supreme Court, does the finding of discrimination become final. RSA 354-A:22, III. This process is identical should a complainant wish to initiate their case in the superior court rather than the Commission for Humans Rights, save that the complaint would not be subject to the confidentiality provisions accorded to parties in the Commission for Human Rights. RSA 354-A:21-a, I & II..

It is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted. RSA 193:40, IV. This enforcement

proceeding also brings with it a panoply of procedural safeguards. The process begins with a formal complaint, notice to the educator, an investigation, a formal report, and notification in writing of any proposed discipline. *See* N.H. Admin. R. Ed 511.01. An educator who does not agree with the proposed disciplinary finding is entitled to an adjudicatory hearing. *See* N.H. Admin. R. Ed 511.03. The adjudicatory hearing is a multi-level process with procedural protections akin to a judicial proceeding. *See* N.H. Admin. R. Ed 202–212. An educator is entitled to seek a rehearing of any adverse ruling and then take an appeal directly to the New Hampshire Supreme Court under RSA chapter 541. *See* N.H. Admin. R. Ed 213.02. This process provides further robust protection against arbitrary or discriminatory enforcement of the new antidiscrimination provisions.

In their complaints, the plaintiffs contend that the new antidiscrimination provisions are susceptible of arbitrary or discriminatory enforcement because politically motivated individuals and groups might use those provisions to target or harass educators with whose views they disagree. *See* ECF Doc. No. 30 ¶¶ 35, 47, 57, 108; ECF Doc. No. 1 ¶¶ 81, 116, 137. The Supreme Court has made clear, however, that a vagueness challenge does not turn on whether a law "might be used to harass individuals with alternative lifestyles and views." *Village of Hoffman Estates*, 455 U.S. at 503. A "speculative danger of arbitrary enforcement does not render [a law] void for vagueness." *Id.* The plaintiffs here do not provide any non-speculative basis to conclude that process described above—which involves two separate adjudicatory proceedings, the first of which is not brought against the educator at all—would fail to weed out the types of harassing or spurious complaints they appear to be concerned with.

In short, the plaintiffs cannot demonstrate that the new antidiscrimination provisions are vague because they encourage arbitrary and discriminatory enforcement. They have accordingly also failed to state a viable vagueness claim under such a theory. *Kolender*, 461 U.S. at 358.

### C.   If the Court believes questions of state statutory construction bear on the vagueness inquiry, then it should resolve those questions to avoid any constitutional problem or otherwise certify them to the New Hampshire Supreme Court.

As previously noted, a federal court is required to "consider any limiting construction that a state court or enforcement agency has proffered" when assessing whether a state statute is facially vague. *Kolender*, 461 U.S. at 354 (quotation omitted). Here, as explained, the statutory language and agency guidance sufficiently demonstrate that the new antidiscrimination provisions are not vague on their face. The complaints should accordingly be dismiss.

If, however, the Court believes that the vagueness inquiry turns on an unresolved question of state law, then it should take one of two courses of action. First, the Court can "make an informed prophecy of what [the New Hampshire Supreme Court] would do in the same situation." *Galvin v. EMC Mort. Corp.*, 27 F. Supp. 3d 224, 227 (D.N.H. 2014). In doing so, the Court should apply the New Hampshire Supreme Court's well-established rule that it "will construe a statute to avoid conflict with constitutional rights wherever reasonably possible." *Doe*, 261 A.3d at 976 (citation and quotation marks omitted). Second, this Court is "permitted to certify questions of law to the New Hampshire Supreme Court when questions of New Hampshire law are determinative of the case, and there is no controlling precedent from the New Hampshire Supreme Court." *Old Republic Ins. Co. v. Stratford Ins. Co.*, 777 F.3d 74, 86 (1st Cir. 2015) (citing N.H. Sup. Ct. R. 34). This course of action is arguably preferable, as it would allow for a definitive construction of New Hampshire law from the State's highest court.

Again, the Court need not take either course of action because there is nothing unconstitutionally vague about the new antidiscrimination provisions. But if the Court has any doubts about vagueness, then it must refrain striking down the new antidiscrimination provisions before conclusively determining that "no construction can save [the provisions] from this claim of unconstitutionality[.]" *Screws v. United States*, 325 U.S. 91, 100 (1945).

## Conclusion

To the extent the AFT plaintiffs bring claims arising under state law, those claims are barred by the Eleventh Amendment. The AFT plaintiffs have likewise failed to state a freestanding First Amendment claim because they have not identified any protected speech implicated by the new antidiscrimination provisions. And both sets of plaintiffs have failed to state viable vagueness claims because the statutory text and the guidance produced by the enforcing agencies confirm that the new antidiscrimination provisions set forth a discernible standard of conduct and do not encourage arbitrary and discriminatory enforcement. For all of these reasons, and those stated above, the plaintiffs' respective complaints should be dismissed in their entirety.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity
as Commissioner of the Department of
Education,

JOHN M. FORMELLA, in his
official capacity only as Attorney General
of the State of New Hampshire,

AHNI MALACHI, in her official capacity as
Executive Director of the Commission for
Human Rights,

CHRISTIAN KIM, in his official capacity as
Chair of the Commission for Human Rights,

     *and*

KENNETH MERRIFIELD, in his official
capacity as Commissioner of the Department of
Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL


Date:  March 25, 2022

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording

using the Court's electronic-filing service.

*/s/ Samuel Garland*
Samuel R.V. Garland

**General Court of New Hampshire - Bill Status System**

# Docket of HB544

Docket Abbreviations

**Bill Title:** relative to the propagation of divisive concepts.

*Official Docket of* **HB544.**:

| Date | Body | Description |
|------|------|-------------|
| 1/12/2021 | H | **Introduced** (in recess of) 01/06/2021 and referred to Executive Departments and Administration **HJ 2** P. 53 |
| 2/3/2021 | H | ==RECESSED== Public Hearing: 02/11/2021 11:30 am Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/91078617911 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| 2/11/2021 | H | ==CONTINUED== Public Hearing: 02/18/2021 01:30 pm Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/97238685330 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| 3/24/2021 | H | Majority Committee Report: Ought to Pass with Amendment **#2021-0611h** (Vote 10-9; RC) **HC 18** P. 45 |
| 3/24/2021 | H | Minority Committee Report: Inexpedient to Legislate |
| 4/8/2021 | H | Lay on Table (Rep. Osborne): MA DV 347-18 04/08/2021 **HJ 6** P. 72 |
| 1/6/2022 | H | Died on Table, Session ended 01/05/2022 |

NH House                                                  NH Senate

**HB 544  - AS INTRODUCED**

686

EXHIBIT

**B**

2021 SESSION

21-0732
05/04

HOUSE BILL *544*

AN ACT relative to the propagation of divisive concepts.

SPONSORS: Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4

COMMITTEE: Executive Departments and Administration

------------------------------------------------------------------

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Explanation: Matter added to current law appears in ***bold italics.***
Matter removed from current law appears [in brackets and struckthrough.]
Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.
21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:

CHAPTER 10-C

PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

10-C:1  Definitions.  In this chapter:

I. "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.

II.  "Divisive concept" means the concept that:

(a) One race or sex is inherently superior to another race or sex;

(b) The state of New Hampshire or the United States is fundamentally racist or sexist;

(c) An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(d) An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(e) Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(f) An individual's moral character is necessarily determined by his or her race or sex;

(g) An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h) Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i) Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j) The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

III. "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV. "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V. "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI. "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2 Unlawful Propagation of Divisive Concepts.

I. Requirements for the state of New Hampshire:

(a)  The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b)  No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II.  Requirements for government contractors:

(a)  All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)  The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)  In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled,

terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d) The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor. The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III. The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section. The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV. The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V. Requirements for agencies.

(a) The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. Accordingly:

(1) The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training", to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

(2) Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by federal or state law.

(b) The commissioner of the department of administrative services, pursuant to RSA 541-A, shall develop regulations for the enforcement of the provisions of this statute.

(c) Each agency head shall:

(1) Issue a policy incorporating the requirements of this chapter into agency operations, including by making compliance with the policy a provision in all agency contracts;

(2) Request that the agency thoroughly review and assess not less than annually thereafter, agency compliance with the requirements of the policy in the form of a report submitted to the department of administrative services; and

(3) Assign at least one senior political appointee responsibility for ensuring compliance with the requirements of the policy.

VI. Review of agency training.

(a) All training programs for state agency employees relating to diversity or inclusion shall, before being used, be reviewed by the department of administrative services for compliance with the requirements of RSA 10-C:2, V.

(b) If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and regulations.

10-C:3 General Provisions.

I. Nothing in this chapter shall prevent agencies or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this chapter.

II. Nothing in this chapter shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner and without endorsement.

III. If any provision of this chapter, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions to any other persons or circumstances shall not be affected thereby.

2 Effective Date. This act shall take effect January 1, 2022.

689



Rep. Ammon, Hills. 40
March 3, 2021
2021-0611h
05/04

Amendment to HB 544

1   Amend RSA 10-C:1, I as inserted by section 1 of the bill by replacing it with the following:

2

3       I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any

4   kind that in any manner have entered into a contract to perform a service for, or perform a

5   subcontract pursuant to a contract to perform a service for, or with the state of New Hampshire.

6

7   Amend RSA 10-C:2, V(a)(1) as inserted by section 1 of the bill by replacing it with the following:

8

9       (1)  The head of each agency shall ensure that the agency, agency employees while on

10  duty status, and any contractors hired by the agency to provide training, workshops, forums, or

11  similar programming to agency employees do not teach, advocate, act upon, or promote in any

12  training to agency employees any of the divisive concepts listed in RSA 10-C:1, II; and

13

14  Amend RSA 10-C:3 as inserted by section 1 of the bill by inserting after paragraph II the following

15  new paragraph and renumbering the original paragraph III to read as paragraph IV:

16

17      III   Nothing in this chapter is meant to include as a "contract or subcontract" certain

18  government financial assistance, including but not limited to the taking or receiving of loans, tax

19  credits, tax incentives, tax abatements or gifts deriving from money sent from the federal

20  government or agency designed or meant to assist during or after a declared emergency, including

21  but not limited to health, weather, riot, civil disobedience or acts of foreign agents, or designed as

22  economic stimulus during economic emergency.



**General Court of New Hampshire - Bill Status System**
# Docket of HB2

Docket Abbreviations

**Bill Title:** relative to state fees, funds, revenues, and expenditures.

*Official Docket of* **HB2.**:

| Date | Body | Description |
|------|------|-------------|
| 3/2/2021 | H | **Introduced** (in recess of) 02/25/2021 and referred to Finance **HJ 4** P. 48 |
| 3/8/2021 | H | Division III Work Session: 03/09/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/9/2021 | H | Division III Work Session: 03/12/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/12/2021 | H | Division III Work Session: 03/15/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/10/2021 | H | Division I Work Session: 03/16/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| 3/10/2021 | H | Division II Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/8/2021 | H | Division III Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/16/2021 | H | Public Hearing: 03/16/2021 01:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 3/12/2021 | H | Division II Work Session: 03/17/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/11/2021 | H | Division III Work Session: 03/18/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/12/2021 | H | Division II Work Session: 03/18/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/11/2021 | H | Division III Work Session: 03/19/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | Division II Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/17/2021 | H | Division III Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | Division II Work Session: 03/23/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/15/2021 | H | Division I Work Session: 03/23/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |

| 3/17/2021 | H | Division II Work Session: 03/24/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/17/2021 | H | ==CANCELLED== Division III Work Session: 03/25/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | Division III Work Session: 03/25/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/17/2021 | H | ==CANCELLED== Division III Work Session: 03/26/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | ==CANCELLED== Division II Work Session: 03/26/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/25/2021 | H | Executive Session: 03/29/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 3/25/2021 | H | ==CANCELLED== Executive Session: 03/30/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 3/25/2021 | H | ==TIME CHANGE== Executive Session: 03/31/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 4/1/2021 | H | Majority Committee Report: Ought to Pass with Amendment **#2021-1059h** (Vote 12-9; RC) **HC 18** P. 30 |
| 4/1/2021 | H | Minority Committee Report: Inexpedient to Legislate |
| 4/7/2021 | H | Amendment **#2021-1059h**: AA **RC** 204-178 04/07/2021 **HJ 5** P. 87 |
| 4/7/2021 | H | FLAM **#2021-1064h** (Reps. Walz, Hatch): AF **RC** 175-203 04/07/2021 **HJ 5** P. 89 |
| 4/7/2021 | H | FLAM **#2021-1065h** (): AF **RC** 175-206 04/07/2021 **HJ 5** P. 92 |
| 4/7/2021 | H | FLAM **#2021-1068h** (Reps. Rogers, Nordgren, Wallner): AF **RC** 181-199 04/07/2021 **HJ 5** P. 94 |
| 4/7/2021 | H | FLAM **#2021-1071h** (Rep. McWilliams): AF **RC** 177-206 04/07/2021 **HJ 5** P. 96 |
| 4/7/2021 | H | FLAM **#2021-1073h** (Rep. Heath): AF **RC** 174-206 04/07/2021 **HJ 5** P. 99 |
| 4/7/2021 | H | FLAM **#2021-1062h** (Reps. Heath, K. Murray): AF **RC** 178-203 04/07/2021 **HJ 5** P. 101 |
| 4/7/2021 | H | FLAM **#2021-1093h** (Reps. Leishman, Buco): AF **RC** 186-197 04/07/2021 **HJ 5** P. 104 |
| 4/7/2021 | H | FLAM **#2021-1094h** (Reps. Hatch, Leishman, Buco, Walz): AF **RC** 176-208 04/07/2021 **HJ 5** P. 106 |
| 4/7/2021 | H | FLAM **#2021-1063h** (Rep. Hatch): AF **RC** 186-193 04/07/2021 **HJ 5** P. 109 |
| 4/7/2021 | H | FLAM **#2021-1069h** (Reps. Nordgren, Rogers, Wallner): AF **RC** 180-201 04/07/2021 **HJ 5** P. 115 |
| 4/7/2021 | H | FLAM **#2021-1066h** (Reps. Rogers, Nordgren, Wallner): AF **RC** 184-194 04/07/2021 **HJ 5** P. 117 |
| 4/7/2021 | H | FLAM **#2021-1104h** (Rep. Almy): AF **RC** 161-218 04/07/2021 **HJ 5** P. 120 |
| 4/7/2021 | H | **Ought to Pass with Amendment** 2021-1059h: MA **RC** 200-181 04/07/2021 **HJ 5** P. 123 |

| | | |
|---|---|---|
| 4/7/2021 | H | Reconsider (Rep. Osborne): MF **RC** 175-204 04/07/2021 **HJ 5** P. 125 |
| 4/7/2021 | S | Introduced 04/01/2021 and Referred to Finance; **SJ 11** |
| 4/22/2021 | S | Remote **Hearing:** 05/04/2021, 01:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** |
| 4/22/2021 | S | Remote **Hearing:** 05/04/2021, 06:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** |
| 5/28/2021 | S | Committee Report: Ought to Pass with Amendment **#2021-1799s**, 06/03/2021; **SC 26** |
| 6/3/2021 | S | Sen. Soucy Moved to divide the Question on Committee Amendment 2021-1799s: on Sections 74-75: Sections 427-429, Sections 397-404; and Section 412; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Committee Amendment **#2021-1799s**, on Sections 74-75 Sections 427-429 Sections 397-404 and Section 412, **RC** 24Y-0N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Moved to divide the Question on Committee Amendment 2021-1799s Sections 89-102 and then the Remainder; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Committee Amendment **#2021-1799s**, on Sections 89-102, **RC** 13Y-10N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Committee Amendment **#2021-1799s**, Remainder of the Committee Amendment, **RC** 14Y-10N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Floor Amendment **#2021-1816s**, **RC** 24Y-0N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Whitley Floor Amendment **#2021-1862s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1855s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1850s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1863s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. D'Allesandro Floor Amendment **#2021-1861s**; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Moved to divide the Question on Floor Amendment 2021-1861s on Sections 89-102 of the Amending Language and then the Remainder of the Amendment; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Floor Amendment **#2021-1861s**, Sections 89-102 of the Amending Language, **RC** 10Y-13N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Floor Amendment 2021-1861s; on the Remainder of the Amendment **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1858s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Perkins Kwoka Floor Amendment **#2021-1859s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1847s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Birdsell Floor Amendment **#2021-1842s**, **RC** 14Y-9N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Soucy Floor Amendment **#2021-1874s**, **RC** 9Y-14N, AF; |

| | | |
|---|---|---|
| | | 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1876s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Whitley Floor Amendment **#2021-1883s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Sherman Floor Amendment **#2021-1878s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1875s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1852s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Whitley Floor Amendment **#2021-1867s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Soucy Floor Amendment **#2021-1815s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1882s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Daniels Floor Amendment **#2021-1821s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Carson Floor Amendment **#2021-1827s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Giuda Floor Amendment **#2021-1838s**, **RC** 8Y-15N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Hennessey Floor Amendment **#2021-1866s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Floor Amendment **#2021-1884s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Moved to divide the Question on **Ought to Pass with Amendment** on Sections 89-102 and then the Remainder of the Bill; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | **Ought to Pass with Amendment** on Sections 89-102, **RC** 13Y-9N, MA, 06/03/2021; **SJ 18** |
| 6/3/2021 | S | **Ought to Pass with Amendment** on the Remainder of the Bill, **RC** 14Y-9N, MA, OT3rdg; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Without Objection, the Clerk is authorized to make technical and administrative corrections which are necessary to reflect the intent of the Senate, Relative to Bills and Amendments Passed Today, MA; 06/03/2021; **SJ 18** |
| 6/9/2021 | H | House Non-Concurs with Senate Amendment 2021-1799s and 2021-1816s and 2021-1859s and 2021-1842s and 2021-1821s and 2021-1827s and 2021-1866s and 2021-1884s and Requests CofC (Reps. L. Ober, Weyler, Umberger, Turcotte, Packard): MA VV 06/04/2021 **HJ 9** P. 53 |
| 6/9/2021 | H | Speaker Appoints Alternates: Reps. Edwards, Leishman, Wallner, Major, Emerick 06/04/2021 **HJ 9** P. 53 |
| 6/10/2021 | S | Sen. Daniels Accedes to House Request for Committee of Conference, MA, VV; (In recess 06/03/2021); **SJ 19** |
| 6/10/2021 | S | President Appoints: Senators Morse, Bradley, Rosenwald; (In Recess 06/03/2021); **SJ 19** |
| 6/10/2021 | H | ==RECESSED== Conference Committee Meeting: 06/14/2021 11:00 am LOB 210-211 |

| 6/14/2021 | H | Conferee Change: Rep. Erf added as Alternate 06/10/2021 **HJ 10** P. 22 |
| 6/15/2021 | H | ==RECESSED== Conference Committee Meeting: 06/15/2021 01:00 pm LOB 210-211 |
| 6/16/2021 | H | ==RECESSED== Conference Committee Meeting: 06/16/2021 01:00 pm LOB 210-211 |
| 6/17/2021 | H | ==CONTINUED== Conference Committee Meeting: 06/17/2021 10:00 am LOB 210-211 |
| 6/17/2021 | S | Conferee Change; Senator Daniels Replaces Senator Rosenwald; **SJ 20** |
| 6/17/2021 | H | Conferee Change: Rep. Edwards Replaces Rep. Turcotte 06/10/2021 **HJ 10** P. 23 |
| 6/17/2021 | H | Conferee Change: Rep. Emerick Replaces Rep. Packard 06/10/2021 **HJ 10** P. 23 |
| 6/17/2021 | S | Conference Committee Report Filed, **#2021-2040c**; 06/24/2021 |
| 6/24/2021 | S | Conference Committee Report **#2021-2040c**; **RC** 14Y-10N, Adopted; 06/24/2021; **SJ 20** |
| 6/24/2021 | H | Conference Committee Report 2021-2040c: Adopted, **RC** 198-181 06/24/2021 |
| 6/24/2021 | H | Reconsider (Rep. Osborne): MF DV 172-203 06/24/2021 |
| 6/25/2021 | S | Enrolled Bill Amendment **#2021-2048e** Adopted, VV, (In recess of 06/24/2021); **SJ 20** |
| 6/25/2021 | H | Enrolled Bill Amendment **#2021-2048e**: AA VV (in recess of) 06/24/2021 |
| 6/25/2021 | S | Enrolled Adopted, VV, (In recess 06/24/2021); **SJ 20** |
| 6/25/2021 | H | Enrolled (in recess of) 06/24/2021 |
| 6/28/2021 | H | Signed by Governor Sununu 06/25/2021; Chapter 91; Unless otherwise specified the remainder of this act shall take effect: 07/01/2021 |

| NH House | NH Senate |



# Senate Finance Committee
### *Deb Martone  271-4980*

**HB 2-FN-A-LOCAL,** relative to state fees, funds, revenues, and expenditures.

**HB 1-A,** making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023.

**Hearing Date**:      May 4, 2021

**Time Opened**:      1:00 p.m.                    **Time Closed**:      10:20 p.m.

**Members of the Committee Present**:      Senators Daniels, Reagan, Giuda, Hennessey, Morse, Soucy and Rosenwald

**Bill Analysis**:      1.   Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the retirement system.

9.  Enables the supreme court to transfer funds.

10.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11.  Enables the sale of the lakes region facility in Laconia.

12.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

13.  Repeals provisions relative to the senior volunteer grant program.

14.  Establishes the emergency services for children, youth, and families fund.

15.  Eliminates certain parental reimbursements.

16.  Prohibits the distribution of state funds awarded by the department of health and human services to a reproductive health care facility for provision of abortion services.

17.  Makes an appropriation to the department of health and human services for streamlining agency operations.

18.  Requiring the commissioner of the department of health and human services to submit an amendment to the Centers for Medicare and Medicaid Services to suspend all catastrophic aid payments to hospitals for the biennium.

19.  Enables the department of military affairs and veterans services to provide support for veterans' mental health and preventing social isolation.

20.  Transfers the controlled drug prescription health and safety program to the department of health and human services.

21.  Suspends revenue sharing with cities and towns for the biennium.

22.  Enables the liquor commission to process merchant cards.

23.  Enables the department of education to accept gifts, contributions, and bequests for the New Hampshire scholars program.

24.  Changes the calculation for pupils eligible for a free or reduced price meals.

25.  Makes transfers to the education trust fund.

26.  Authorizes expenditures for energy efficient school buses.

27.  Establishes the position of director of intergovernmental affairs in the department of business and economic affairs.

28.  Repeals the bureau of film and digital media.

29.  Suspends the crediting of meals and rooms tax revenue to the division of travel and tourism.

30.  Enables the department of corrections to transfer funds.

31.  Changes the approval threshold for contracts set by the governor and council manual of procedures.

32.  Prohibits the dispersing of state aid grants for certain new infrastructure projects in the department of environmental services unless the state general fund unrestricted revenues as reported by the department of administrative services are above the revenue plan.

33.  Renames the divisions of the office of professional licensure and certification and establishes pharmacy compliance investigator positions within the office.

34.  Renames the divisions of the office of professional licensure and certification and establishes pharmacy compliance investigator positions within the office.

35.  Makes an appropriation to the New Hampshire Internet crimes against children fund.

36.  Transfers funds from the investors education fund and the department of justice consumer protection escrow account to the FRM victims recovery fund and removes the prospective repeal of the fund.

37.  Makes an appropriation to the department of health and human services for the purpose of funding one-time maintenance of the Medicaid management information system.

38.  Amends the powers of the governor relating to declaring a state of emergency and authorizes the creation of a nominal state of emergency for the purpose of continuing a state of emergency for financial reasons.

39.  Provides for transfer of funds from the revenue stabilization reserve account to the general fund surplus account based the most recent fiscal biennium rather than fiscal year.

40.  Reduces the tax rate of, and in 2027 eliminates, the interest and dividends tax.

41.  Reduces the tax rate of the meals and rooms tax.

42.  Increases the filing threshold for the business enterprise tax and reduces the rate of the tax; and reduces the rate of the business profits tax.

43.  Limits the amount of the credit allowed against overpayment of the business profits tax and the business enterprise tax and establishes a commission to study limiting the business tax credit carry over.

44.  Allows the New Hampshire veterans' home to transfer funds within accounting units for the biennium ending June 30, 2023.

45.  Revises the procedure for compensation for loss of agricultural products or livestock due to bears.

46.  Establishes the New Hampshire higher education merger assessment commission.

47.  Authorizes the department of information technology to fill unfunded positions.

48.  Modifies the composition and operation of the adult parole board and permits remote meetings during a pandemic or other declared state of emergency.

49.  Requires employer pro rata payments to the workers' compensation administration fund to be based on the preceding calendar year ratios and amends the payment of per diems to workers' compensation appeals board members.

50.  Makes various changes to the apprenticeship programs in trade and industry.

51.  Amends the unemployment compensation fund balance necessary to trigger increases or decreases in employer contributions to the fund and repeals the emergency surcharge power of the commissioner of the department of employment security.

52.  Imposes strict liability on any person who renders any highway unsuitable for public travel, including full and current replacement cost.

53.  Provides that proceeds from a sale that results from money provided by the highway fund for payback of real property purchased with federal funds shall be credited to the department of transportation for the purpose of meeting federal obligations or reimbursing the highway fund for payment of federal obligations.

54.  Adds definitions relating to small unmanned aircraft and small unmanned aircraft systems to the New Hampshire aeronautics act.

55.  Amends an appropriation to the department of transportation for the 2018 fiscal year and provides that it lapse to the highway fund and be expended for the purpose of funding state red list bridge projects.

56.  Appropriates funds to the department of cultural and natural resources for state park and recreational area projects.

57.  Establishes a body-worn and dashboard camera fund and makes an appropriation to the fund; establishes a classified business administrator I position in the department of safety; and establishes a commission to develop recommendations for legislation to establish a single, neutral, and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers.

58.  Requires the department of safety, in collaboration with the department of administrative services, to establish standards for radio infrastructure-related hardware, computers, software, related licenses, media, documentation, support and maintenance services.

59.  Establishes within the department of justice an unclassified position of director of diversity and community outreach.

60.  Authorizes the judicial council to request additional funding expenditures for termination of parental rights services that are greater than amounts appropriated in the operating budget.

61.  Moves the governor's scholarship program and fund from the office of strategic initiatives to the college tuition savings plan and authorizes the college tuition savings plan advisory commission to transfer funds between the governor's scholarship fund and the New Hampshire excellence in higher education endowment trust fund.

62.  Transfers the regulation of audiologists and hearing aid dealers to the governing board of speech language pathology.

63.  Establishes the department of energy, to govern energy and utilities matters, and have oversight on matters under the public utilities commission.

64.  Administratively attaches the public utilities commission to the department of energy and makes corresponding changes to existing laws relating to the organization and duties of the public utilities commission to reflect this change.

65.  Transfers certain duties from the public utilities commission to the department of energy.

66.  Adds the commissioner of the department of energy to the New Hampshire site evaluation committee.

67.  Requires that the department of energy advocate for New Hampshire in regional activities concerning competitive electricity suppliers.

68.  Requires that the department of energy require electric and gas utilities to operate an online energy data platform and, in conjunction with the public utilities commission, implement a statewide electric utility restructuring plan.

69.  Requires the bank commissioner to charge the public deposit investment pool for actual costs incurred by the banking department to operate the pool.

70.  Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

71.  Delays the enactment of the single sales factor for determining apportionment under the business profits tax and the business enterprise tax and extends and amends the legislative committee on apportionment.

72.  Defines and regulates pari-mutuel pools on historic horse racing.

73.  Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

74.  Makes changes to liquor license fees for agency licenses and retail tobacco licenses and clarifies certain other liquor license fee provisions.

75.  Renames the enforcement and licensing division in the liquor commission as education and licensing and renames liquor investigators as liquor license specialists.

76.  Defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

77.  Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

78.  Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

79.  Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

80.   Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

81.   Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

82.   Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

83.   Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

84.   Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

85.   Makes an appropriation to the education trust fund.

86.   Makes an appropriation to the department of transportation for federal and state highway aid, the highway and bridge betterment program, the acquisition of fleet vehicles, and for winter maintenance operations.

87.   Makes an appropriation to the department of education to accelerate remaining school building aid payments to school districts.

88.   Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

89.   Requires the department of health and human services to fund employment-related child care services without a wait list.

90.   Addresses the criteria for secure detention pending adjudication and the circumstances in which a minor may be committed to the department of health and human services for the remainder of his or her minority.

91.   Requires the closure of the Sununu youth services center and the transfer of all children committed or detained at the facility.

92.   Establishes a commission to study the closure of the Sununu youth services center.

93.   Makes an appropriation to the department of health and human services for the general purpose of closing the Sununu youth services center and related activities.

94.   Makes an appropriation to the department of health and human services for job training and incentive programs for state workers with priority given to employees displaced by the closure of the Sununu youth services center.

95.   Directs the department of administrative services to take possession of the Sununu youth services center (SYSC) property.

96.   Limits further expansion of the closed loop referral system by the department of health and human services pending review of the system by the legislative oversight committee on health and human services.

**Sponsors**:

Rep. Weyler                  Rep. L. Ober                  Rep. Edwards
Rep. Umberger

---

**Who supports the bill**:  Please refer to Public Hearing Sign-In Sheets.

**Who opposes the bill**:  Please refer to Public Hearing Sign-In Sheets.

**Who is neutral on the bill:**  Please refer to Public Hearing Sign-In Sheets.

**Summary of testimony presented**:

**Maria Camerlengo:**
- Ms. Camerlengo is the Director of the nonprofit Silverthorne Adult Day Program in Salem.
- This program is important but unaffordable to many seniors.
- The current rate for Medicaid reimbursement is $54.44 per day.  The cost to run the program is over $100 per day.
- Due to COVID, her 2020 losses amounted to over $85,000.
- The VA has increased their rates to $113 per day, covering two days per week for Silverthorne's veterans.
- They need more help to keep the doors open.
- Medicare does not cover adult day care.
- Many seniors fall between the cracks.
- The monthly rate to run the program is $1,700.
- They are looking for more help so that they may help more families.

**Lori Breen:**
- Please support the developmental services budget, and those that carry out the work.
- Her 22 yr. old son, Jake, is supported by Gateway Services in Nashua.
- He wants to be independent, have his own place, and be a valued member of the community.  He is willing to work and have meaningful employment.

- Jake participated in an internship program through St. Joseph Hospital, "Project Search", learning transferable job skills.  He is now working at Five Guys Burgers and Fries.
- A fully funded developmental services budget secured Jake's participation in Project Search.  He is learning necessary skills to thrive as an adult.  Full funding offers a good quality of life for Jake, as well as the remainder of his family.  This allows Lori to continue to work full-time and secure the health care benefits she needs for her family.
- Fully funding is a major factor in the success of the community as a whole.

**Lisa Beaudoin, ABLE NH:**
- Fully support the budget for the developmental disability community, and go beyond it.
- Include full funding for a Medicaid adult dental benefit, which is listed as a "priority need" in the State office of Medicaid.
- Support the In-Home Supports Waiver, the Choices for Independence Waiver and the acquired Brain Disorder Waiver.
- Now is the time to reverse "penny-wise and pound-foolish" health care policies which significantly contribute to people with disabilities experiencing the poorest health outcomes of any identified population in America.
- If NH is interested in raising rates of employment as well as improving health outcomes and lowering health care costs for people with disabilities, we must finally provide the funds for fiscally sound and comprehensive oral health care in NH.
- RSA 171-A mandates the New Hampshire Legislature fully fund the adult developmental disability service system.  People with disabilities must have the support they are entitled to in order to participate in the American dream.

**Katherine Goodwin:**
- Katherine is a Program Director at the Kimi Nichols Center in Plaistow.
- They support over 64 developmentally disabled adults both residential and day care.
- If these programs were not fully funded, it would be a great disadvantage to the people they are serving.
- Dental hygiene is not necessarily a top priority.
- The Kimi Nichols Center cares for the whole person.
- Southern New Hampshire area agencies continue to close their doors.
- The cost of caring for a person who truly cannot care for themselves is skyrocketing.  Without these supports more people will end up in nursing home facilities, hospitals and in medical crises.

**Forrest Beaudoin-Friede:**
- Fully fund the developmental services budget, as well as a Medicaid adult dental benefit.
- Forrest receives supports and services through the DD Waiver.  He is a Medicaid recipient as well.

- It is extremely important these priorities are funded.
- With these supports, Forrest lives independently in his own apartment.  He works part-time.
- Oral health is an important part of overall health.

**Gail Brown:**
- Gail is the Director of the NH Oral Health Coalition.
- Include funding for a Medicaid adult dental benefit in support of responsible management of scarce resources.  This request supports the opportunity for integrated health delivery of medical and dental care by funding the inclusion of oral health and dental services for adults into a Medicaid managed care program.
- This is the opportunity for New Hampshire to fund that benefit allowing for integrated cost-effective medical/dental care that supports:  (a) dental treatment in the right setting at the right time; (b) readiness for employment and education of Medicaid expansion enrollees; and (c) the opportunity for successful substance abuse treatment and extended recovery.
- Over 100 medical conditions are associated with dental diseases and conditions that can result in increased chronic care costs, avoidable hospitalizations, and emergency room visits that provide antibiotics and pain relief but no dental repair, at a very high cost drawn from scarce Medicaid funds.

**Amy Moore:**
- Ms. Moore is the Director of Ascentria In-Home Care, which provides personal care services for over 400 people through CFI.
- Thousands of Granite Staters depend on the CFI program.  These are medically vulnerable individuals ages 18 to 100 who qualify for nursing homes, but who choose to remain in their own homes.  Home and community-based care costs a fraction of what a nursing home does.
- These programs have been underfunded for over a decade--so badly that New Hampshire ranks 50th in the amount of Medicaid funding it spends on home and community-based care.
- CFI is failing our most vulnerable citizens.  Rates are so low that providers cannot hire the workers they need to care for these individuals.  You can go to work at Market Basket, McDonalds or Walmart and receive a much higher wage than currently working for a CFI program.
- We hail these caregivers and health care workers as heroes during this pandemic, but we won't pay them a livable wage.
- Based on DHHS data, the entire CFI appropriation is rarely spent.  This is not because the budget is too large; it's because agencies can't provide the services.  Funds are being left on the table that could enhance rates and eliminate gaps in care.
- "We're not asking you to put more money into the budget.  We're asking you to direct the Department of Health and Human Services to put the money that is there into rate increases."
- We must strengthen our home and community-based care system NOW.

**Matthew Houde:**
- Matt is VP-Government Relations for Dartmouth-Hitchcock.
- The pandemic has highlighted gaps in our system that are designed to provide for people in their time of need.
- We need to rebuild a robust continuum of behavioral health care, supported by ancillary community services, that will help avoid institutional care by providing prevention and early intervention, integrate behavioral health with physical health, and ensure adequate crisis care is available and accessible when necessary--as well as transitions for patients after institutional care so as to avoid further hospitalization.
- Both the Governor and the House budgets recognized the 3.1 percent Medicaid provider rate increase authorized in the prior budget as well as the Medicaid Enhancement Tax and the Medicaid Disproportionate Share Hospital Agreement reached by the State of New Hampshire and providers several years ago.  Dartmouth-Hitchcock Health requests the Senate Finance Committee maintain those provisions in HB 1-A.
- The line item for indirect and direct graduate medical education in the DHHS budget has been suspended for at least a decade.  As the state's only academic medical center, Dartmouth-Hitchcock Health is ever hopeful that New Hampshire will resume support for the work of training the medical workforce of the future.
- As a contractor with the state, Dartmouth-Hitchcock is concerned that their efforts to advance diversity, equity and inclusion could be undermined by the limitations imposed by the divisive concepts policy.  This policy provision should be removed from HB 2-FN-A-LOCAL.
- DHHS entered into a contract with UniteUs to implement a closed loop referral system.  This referral system will enable social service organizations to coordinate services, which in turn will allow for the efficient use of limited resources.  The policy provision in HB 2-FN-A-LOCAL pertaining to the closed loop referral system should be removed.

**Jeff Dickinson:**
- Jeff is the Advocacy Director for Granite State Independent Living.
- CFI services Jeff utilizes are personal care services at his home in Franklin.  He is 50 yrs. old and has a form of Muscular Dystrophy.  He uses a power wheelchair, and at times a ventilator.  He needs full help with all activities of daily living, such as showering, dressing and eating.  These services allow Jeff to remain at home in his community.
- Please continue to make CFI a priority.

**Arthur Gardiner:**
- Fully fund the initiatives in the 10-Year Mental Health Plan adopted in January 2019.  Folks in the Upper Valley in Hanover are particularly concerned that adequate funding be provided to permit the initiation and successful operation of a mobile crisis support facility in this part of the state.  Legislative

support is needed to ensure an adequate budget for that greatly needed treatment facility.

- Mr. Gardiner has a family member who is burdened with mental illness. He has direct experience with the serious consequences of the emergency room boarding crisis.
- The long wait in a very busy emergency room, unable to cope in a humane way with a serious attack of fear and paranoia, has contributed in a major way to delusional memories of trauma. With every good motivation, a system designed to protect and cure has a harmful rather than helpful effect. The emergency room boarding crisis has to be addressed and eliminated.
- The emergency boarding problem is the result of a much broader issue--an overburdened mental health care system stretched beyond its limit. There are not enough first contact crisis support facilities to provide needed treatment and to separate more serious from less serious mental problems. People sufficiently ill to visit an emergency room face the waiting time that so prominently evidences the system's lack of sufficient capacity. Those who finally reach a Designated Receiving Facility receive treatment from a caring and competent, but frantically busy staff. Many beds there are used by patients who could successfully be treated in transition facilities offering less intensive support but there are not enough available. And the entire care structure suffers from a wage structure that is really inadequate for its needs.
- We need to be aware that the spectrum of mental illness includes a large cohort of people just as impaired by illness as those suffering from melanoma or arteriosclerosis. An adequate health care system must be available to treat such illness every time and on time.
- Regarding "divisive concepts," our history is what it is--both its tremendous achievements and its difficulties. We must realistically fashion our future from our history--viewed from all perspectives.

**Leslie Want:**
- Leslie is the Vice-Chair of the Manchester Board of School Committee.
- HB 1-A and HB 2-FN-A-LOCAL do not meet the needs of Manchester students and taxpayers. While cutting corporate taxes it underfunds public schools in New Hampshire. Its contribution to public schools is last in the nation. We can do better than that.
- Manchester stands to lose $5.2 million in adequacy aid, due to low enrollment and fewer free and reduced-lunch applications.
- The New Hampshire Retirement System increase leaves Manchester with a $7.4 million shortfall, after receiving a tax cap increase from city aldermen, assuming they get that increase.
- Please fund education so our students can recover from their learning losses and go on to meet their fullest potential.
- Do not let the budget include HB 544. It would harm Manchester students, the largest and most diverse community in the state.
- Ms. Want urged the committee to pass HB 135 with Rep. Luneau's amendments.

**David Chandler:**
- Mr. Chandler volunteers at both the Community Kitchen and the Senior Center in Keene.
- Make funds available for disabled people deeply in need.

**Owen Houghton:**
- Increase adult care rates.
- Mr. Houghton's personal belief in the value of adult medical daycare comes from his past need for relief from caregiving.  The Alzheimer's Disease diagnosis in 2010 of his wife, Norma, a 30-yr. RN at Monadnock Community Hospital, required his full-time attention for over six years.  During those difficult years the Monadnock Family Services Adult Care Center Program came to his rescue, and provided quality medical, emotional and social care for both him and his wife.  After she died, Mr. Houghton learned of the financial costs of her care at the Adult Care Center.  Mr. Houghton wondered how they could have provided such support with a full staff and services on a daily reimbursement fixed rate of $54.44.
- The inequity with nursing home rates nearly four times the current adult daycare rate is clear.
- An increase to $75 per day is needed to keep our Adult Care Center open.

**Kristine Stoddard:**
- Kristine is the Director of Public Policy at Bi-State Primary Care Association.
- Bi-State represents 14 New Hampshire community health centers, which are located in areas of the state with limited access to health care services.  New Hampshire's community health centers are nonprofit organizations that provide integrated substance use disorder treatment, behavioral health, primary care, and oral health services to nearly 120,000 patients, including approximately 20 percent of Medicaid expansion enrollees.
- In 2019 the Legislature and the Governor overwhelmingly supported a non-lapsing $6.5 million appropriation to the State Loan Repayment Program because of the health care workforce shortage.  This program provides partial payment towards educational loans of health care professionals in exchange for a commitment of three years to serve in a medically underserved area.  The program is an invaluable recruitment tool for community health centers, community mental health centers, critical access hospitals, and other community-based health care providers.
- There should be approximately $5.1 million of this 2019 appropriation still available.  The Senate should ensure the funding be made available to expand access to this program as intended.
- The family planning program should have $1.2 million appropriated so there is no gap in service due to impending federal changes  Please provide General Funds so that no gap occurs.
- Section 34 of HB 2-FN-A-LOCAL, Reproductive Health Facilities, should be removed.  It would require the physical separation of health care services,

making the provision of these services by New Hampshire's family planning providers impossible.

- The "divisive concepts" language should be removed from HB 2-FN-A-LOCAL. Health care providers are required to provide culturally competent care.

### Jennifer Smith, MD:

- Dr. Smith is a retired family physician who worked at community health centers for many years.
- Oral health has been neglected. It is very important.
- Strip out language that would prevent Planned Parenthood from being able to access state funds for their important reproductive health work because a small amount of their work includes pregnancy terminations, a necessary service.
- Divisive language is inappropriate for the state budget. We shouldn't want to stop good discussion of what our history is with respect to minorities. It is impacting public health currently.
- There is a much higher rate of maternal death from people of color. We need to discuss how we remedy problems from the past. That includes why they happened in the past.
- DHHS is the most important part of our budget in many, many ways, in terms of protecting people's health and wellness. In light of the recent pandemic, "back of the budget" cuts should never have been suggested.

### Marianne Jackson, MD:

- Dr. Jackson is the Executive Director of the Gibson Center for Senior Services.
- They have a very vibrant senior center, and are asking support of the $1.5 million appropriation in the budget for senior centers.
- They provide nutritious meals, transportation to necessary activities of normal living, and resources for older adults in the community.
- They are a family, a social, caring web of people who need and serve each other.
- Senior centers have stayed connected to their patrons even if the doors were locked due to COVID. It has been grueling.
- They have sponsored vaccination clinics for RSVP and Meals on Wheels drivers, Meals on Wheels recipients and other elders.
- They have provided computer literacy training and free laptops to give people a chance to connect with email, Zoom and Telehealth. They made phone calls, wrote cards, created online programs and made every effort to leave no one behind.
- All of this takes effort and funds. Last year and this year, due to COVID, the Gibson Center for Senior Services was unable to hold its annual fundraising events, resulting in a 5 percent loss. Grant funding has been almost completely diverted to emergency efforts creating an additional 10 percent loss of expected revenue.

### Audrey Gerkin:

- Ms. Gerkin is seeking support of the developmental services budget. Her family and daughter, Lexi, is one of the 15,000 families supported by the area agencies.

She receives assistance through One Sky's Family Support Program as she moves towards transitioning to adult services.

- Lexi is almost 20 years old and attends the Monarch School of New England. She has worked at the Dover Children's Museum.  For Lexi to continue seamlessly to be a part of the community as she turns 21, it is very important the budget be fully funded, and the waitlist continue to be nonexistent.
- Fully fund the Medicaid adult dental program.  Lexi will benefit from this service, as well.  She has many medical complications, and a trip to the dentist for even only a cleaning, typically, means anesthesia will be involved.  By funding the Medicaid adult dental benefit it would ensure this basic care will be covered.
- Also, they rely heavily on Lexi's two full-time home nurses.  They know how lucky they are to have that coverage.  However, their three overnight shifts remain uncovered.
- Work to strengthen home and community-based services.

**Alyssa Antman:**
- Alyssa is a patient of the Equality Health Center.
- The language in HB 2-FN-A-LOCAL defunds essential reproductive health care providers during a pandemic.  Should it become law, thousands of Granite Staters, such as Alyssa, would be at risk of losing access to the critical lifesaving health care that they rely on.
- Alyssa shared with committee members her experience at the Equality Health Center with what turned out to be not such a routine change in her birth control.  She was also given a cancer screening.
- She is forever grateful for the care she received at the health center.
- By requiring an unnecessary physical and financial separation, this budget is designed to force reproductive health care providers out of the program. Blocking funding for reproductive health providers could result in patients like Alyssa delaying or going without necessary care.
- Funding preventative services such as cancer screenings and birth control is good for the health of our communities and the overall economy.
- We should be working on expanding access to these services, not stripping them away.

**Jennifer Bertrand:**
- Please fully fund DD services and the Medicaid adult dental benefit.
- Her 21 yr. old daughter, Chloe, has been diagnosed with autism.  She needs assistance with all activities of daily living.  But with supports she has achieved monumental tasks such as attending high school, and was able to open her own shredding business during the pandemic.
- Raising Chloe has definitely presented some challenges.  The family has had to navigate multiple systems.
- The support of the DD Waiver has helped their family stay together.
- As parents, Jennifer and her husband will continue to provide wraparound services for Chloe in her adult years, but they cannot do it alone.  No one can.

- Hardworking families need the State of New Hampshire to do their part and fully fund DD services.

## Heidi Marandos:
- Fully fund DD services and the Medicaid oral health care benefit.
- Heidi and her husband adopted two special needs children out of foster care. They receive supports from Pathways, the area agency.  Their older son has a cognitive impairment and is medically complex.  And he is loved by everyone in their community.  He is transitioning to adult community supports, which will aid him in accessing employment and personal care.   He will need a day program so that Heidi and her husband can continue to work.
- Their son also suffers from a congenital tooth enamel issue and needs comprehensive, ongoing dental work.
- Heidi worries that once her son reaches adulthood, shortages and supports for personal care needs and a lack of good oral health could lead to serious complications for the vibrant son who brings joy to everyone he meets.

## Ken Barnes:
- Mr. Barnes supports the removal of school voucher language from the budget.  It is a terrible idea.  It discriminates against our public school children.
- Remove HB 544 from the budget; it doesn't belong there.  It turns freedom of speech and thought on its head.  It attempts to censor teaching in an effort to make our society more inclusive and fair.
- Fully fund DHHS.  Restore the back-of-the-budget cuts and the vacant positions.
- Support the Medicaid adult dental benefit, DD services, home and community-based care and community health centers.  Those supports are very necessary and important for those who must rely on those types of services, as well as address health care disparities.
- It will be very costly for the state to defend the large number of lawsuits that will, no doubt, be filed against the constitutionality of HB 544.  Training to make our society better would be illegal under HB 544.  Take that language out of the budget.

## Christopher Becker:
- Mr. Becker is a public charter school employee.
- The language of HB 544 limits academic judgment through censorship.
- There is a shift in the ways Social Studies and English are being taught.
- The wording of the bill makes it seem like teachers are teaching to hate others; to regard those of particular races and genders as inferior.
- It is suggested that the way history is being taught paints a picture of males and white people as apparently sexist and racist, and therefore inferior.
- Students are able to separate their personal identities from the historical deeds that we study much more so than adults.  High school students are uniquely suited to grapple with challenging and complex historical topics in nuanced ways.  They actually don't need any interpretation or interjection from their teacher, since the primary sources speak for themselves.  Students are able to

perceive racism and sexism and where it exists in the historical record because they are intelligent and compassionate, not because their instructor instructs them to do so.  They can recognize bias on their own.

- Western civilization has a long history of discriminatory practices and policies.

**Maureen Meletis:**
- Maureen is an advocate with the Alzheimer's Association MA/NH Chapter, which currently supports 26,000 people living with Alzheimer's in the Granite State.
- Support the Governor's budget request to include critical increases in three Medicaid services under the Choices for Independence Waiver:  personal care, homemaker and case management.
- Invest in adult medical day services by adding $4 million to the state budget.
- Restore the Governor's funding for senior centers to provide essential services.
- Over 57,000 individuals in New Hampshire are a caregiver to a loved one living with Alzheimer's, creating a total of 82 million hours of unpaid care for a total value of $1.5 billion.
- Eighty percent of older adults with Alzheimer's/dementia receive help with a daily personal care activity such as bathing, dressing and grooming.  Unfortunately, services that could help these families like the CFI program have been underfunded for years with the health care workforce continuing to decline, and putting more pressure on a loved one serving as the primary caregiver.
- COVID-19 has played a significant role in adding additional strain on family caregivers due to the reduction of outside support and resources.
- Please provide our families with the support they need to keep their loved ones at home.

**Ann Sanok:**
- Ann has a 26 yr. old son, Alex, who has been supported by One Sky.  He presently lives in a group home which is qualified to provide intensive behavioral services.  These supports are needed for individuals who may engage in extreme behaviors, such as prone to aggression or violence, breaking things, excessive rocking or noises.  Some individuals may be non-verbal or physically impaired.  Some have extreme OCD or anxiety.  They typically cannot tolerate much stimulation and need one-on-one supervision.  They are unable to drive, many can't read or write, and most of the more challenged population will never work.
- Autism is a nightmare for many, the ones with the most profound disabilities.  It's a life sentence for the child and the parent.  It can be crippling physically, emotionally and financially.
- The number one issue of overwhelming concern to parents of autistic children is what happens when the parents die.
- Do not forget the forgotten.  Support this budget and support the cause and lives of these citizens.  They deserve the same liberties and freedoms but need a

helping hand to live a life that is going to be very different, but which will be safe, meaningful and rich in its own way.
- New Hampshire can do better.  Fully fund the developmental services budget, and learn more about this system and the unique, loving people you will help by doing so.

**Devon Chaffee:**
- Devon is the Executive Director of ACLU NH.
- The divisive concepts provision attempts to censor concepts that are used in diversity training to educate individuals on discrimination that people of color face.
- Diversity trainings are currently used by law enforcement, schools, state and local agencies and private employers.  Most often they're used because these entities want to create workplaces and communities that are more equitable and inclusive.
- This language was taken directly from a federal Executive Order that was stayed by a federal judge and is now defunct.  Identical language is now being pushed in a number of states across the country by D.C.-based think tanks.
- For schools, this provision is an attack on parents and communities to come together and address difficult topics.
- "Do you want this Legislature to start down the road of issuing state government mandates about what can and can't be discussed in our local schools?  Is it the role of this Legislature to begin censoring local school districts?  Or do you trust the local families and communities in your district to work with your local schools to best identify the way forward on difficult topics."
- This provision would bar the implementation of the recommendations made by the Governor's Commission on Law Enforcement, Accountability, Community and Transparency, often referred to as "LEACT".  These recommendations include annual training on implicit bias and cultural responsiveness.
- Agencies see these trainings as important opportunities for public servants to learn how stereotypes impact behavior.
- Remove the divisive concepts provision from HB 2-FN-A-LOCAL.

**Rep. Tony Caplan:**
- This budget cuts childcare and K-12 education.  It defunds health care by close to $100 million.  At the same time it provides tax giveaways to corporations and the wealthiest in our state.
- The definition of "divisive concepts" in HB 2-FN-A-LOCAL is vague and general.  It is guaranteed to increase divisions in our society.
- This is government weighing in on race and gender.  These issues remain relevant today.
- The attempt to limit speech and conversation on these issues is unconstitutional, and infringes on free speech.  It usurps local control on education.  Most importantly, it interrupts the free flow of ideas that we depend on as free people.  In a democracy it disrupts the "free marketplace of ideas".  Remove this provision from the budget where it does not belong.

- Education freedom accounts would neither improve our education or increase our freedom. New Hampshire families for generations have relied on public schools to educate their children, and set us up for success as a society.
- Yes, there are problems with our public schools that we need to work on. But the answer is not taking money away from the public school system and sending it to private schools. This will inevitably increase local property taxes. This goes against our separation of church and state.
- New Hampshire's public school system is one of the finest in the country. Remove this provision from the budget, as well.

**Lyn Schollett:**
- Lyn is the Executive Director at the New Hampshire Coalition Against Domestic and Sexual Violence.
- Maintain the $1.26 million appropriation that was part of the domestic violence prevention program. This would adequately fund the lifesaving services provided by their 12-member programs to address domestic violence and sexual assault across the state.
- In the last two years the New Hampshire Coalition has provided free and confidential services to nearly 30,000 victims, including providing shelter to over 1,000 adults and children in their 12 emergency domestic violence shelters.
- During this same timeframe, they were forced to turn away over 1600 adults and over 740 children seeking emergency shelter.
- The state has worked tirelessly to respond to the opioid crisis, the lack of mental health services, and to improve child protection. We need to respond earlier and more comprehensively to those who suffer from domestic and sexual violence.
- The essential role our crisis centers play in responding to trauma is becoming increasingly apparent during the pandemic. Imagine the terror when being forced to shelter at home with the person who is continually raping and assaulting you. In spite of the pandemic, our emergency crisis centers have received well over 100,000 calls in the last year.
- They were forced to shelter victims in hotels during the pandemic, not an optimal place. They've worked with the courts to change the process for seeking a protective order. They've hosted support groups on Zoom. Advocates can now reach victims through text and chat.
- The long term effects of trauma manifest in many ways, including chronic and physical and mental health issues, depression, suicide, substance abuse disorders, and difficulty maintaining employment.

**Cathy Spinney:**
- Cathy is the parent of an almost 40 yr. old daughter, Kelly, who has significant developmental disabilities.
- Please support and add to the DD budget.
- Kelley needs help with almost everything, including all of her personal care. She uses a wheelchair and cannot speak. Cathy, 63 yrs. old, is still an active participant in her daughter's caregiving team. But it is getting physically harder for Cathy to do so. Imagine picking up your 40 yr. old daughter and carrying them around.

- We have a shortage of staff wanting to do this type of work. It doesn't pay well. Most do not receive health insurance. And it is too expensive to afford out-of-pocket.
- We need to offer these direct support individuals a wage that is competitive with McDonalds, and provide them decent health care insurance.
- Get rid of the divisive concepts language.

**Lindsey Collins:**
- Lindsey opposes the divisive concepts in HB 2-FN-A-LOCAL.
- The state has no business restricting important conversations about race, gender or antisemitism. These conversations are essential to building a multiracial democracy.
- Lindsey is a proud Jewish mother to a kindergartner, and was disgusted by Rep. Dawn Johnson, a Laconia School Board member, who on multiple occasions promoted antisemitism and white supremacy on her own social media with no repercussions.
- How is it going to benefit our children if we allow racism, white supremacy and hate to be upheld in our schools?
- Marginalized children need our support the most.

**Carolyn Virtue:**
- Carolyn owns and operates Granite Case Management. She provides elderly and adult services.
- She thanked those who worked on bringing the case management rate into compliance with federal law in this budget.
- Any other CFI services that do not have parity should be looked at.
- We have tremendous shortages in many of our services.
- PCSP is reimbursed at a higher rate.
- We need to address the access to care issues that are occurring in the CFI Waiver.

**Kyle Worth:**
- Kyle is the Executive Director at Nashua Adult Day Health.
- He strongly urges the increase of adult medical day reimbursement to $75.
- Approximately 800 seniors attend adult daycare centers in this state. They have Alzheimer's, dementia, or need complete assistance with toileting or eating; strictly nursing home-level care.
- Even at that increased rate it is the best bang for your buck in terms of senior services. No other services can compare to that price. We are one of the lowest, if not the lowest, in the nation for adult day reimbursement.
- Many adult day programs have, and many will go out of business and no longer serve patients if there is not a raise increase. Hundreds of patients would be in need of nursing home-level care. That would roughly cost four times what adult daycare services cost.
- It's a great program that keeps people living in their communities rather than in institutions.

- The majority of Kyle's business is Medicaid.

**Marianne Baxter:**
- Marianne is the Executive Director of Merrimack Valley Daycare and Blueberry Express.
- Please reinstate the funds from the childcare scholarship budget to their previous levels.
- Low income families cannot afford childcare.
- The scholarship programs enable families to become self sufficient, increase their wages, spend time in a work setting and increase their personal wealth to the point where they can get off all state assistance.
- Coming off the pandemic, this is just not the year to try and cut this budget.

**David Doherty:**
- David is opposed to SB 130's inclusion into the budget. It has not been afforded the same scrutiny that SB 193 in 2018 or HB 20 this session has received. It contains many problems that have not been addressed. Those bills included complex challenges, including constitutional, historical, educational, organizational, public, private and financial issues, that were identified as needing working. Experts testified about the intricacies of special education funding, transportation issues and many other issues that intersected with the plan of SB 193. A bipartisan majority of the committee ultimately decided the bill wasn't ready to be enacted as unresolved issues remained.
- All of those issues and more remain unresolved, and appear in SB 130.
- Such a complex bill should not be wrapped into HB 2-FN-A-LOCAL, with all its potential for unintended consequences, until a deep dive can be done into the specifics, as was done in 2018 and fix it.

**Mayor Jim Donchess, Nashua:**
- Restore the lost school aid which is resulting from the COVID-19 pandemic impact on the school aid formula for all public schools across New Hampshire.
- School aid for all cities and towns is projected to be down because there are fewer free and reduced lunch students, and a lower census in public schools. These numbers are artificially low due to the pandemic.
- The federal government has made all lunches free to all students due to the pandemic. So there is no longer an incentive for free and reduced lunch families to complete the paperwork necessary to qualify and be certified. School districts are working hard to get the families to complete the paperwork, but have been only partially successful.
- For this coming year, consider equalizing school aid for all districts to the levels they received in the current fiscal year, so that we do not suffer next year a big decline as the result of these pandemic impacts.
- A big reduction in school aid will result in a big increase in taxes. It will impact Nashua's tax rate by approximately four percent.

**Linda Bundy:**

- The divisive concepts in HB 2-FN-A-LOCAL would not be taught in diversity or inclusive trainings.  Nor would they be a part of school instruction.
- The systemic racism that has evolved during our country's 400-year history does need to be discussed.  The conversations are difficult but essential.
- This provision would block the ability for businesses and schools to discuss, explore and to think critically about our past, our present, and our vision about how to move forward.
- By rejecting this provision, New Hampshire can set an example for the country.
- Please remove the divisive concepts provision.

**Maggie Fogarty:**
- Maggie is with the American Friends Service Committee, and the grassroots Coalition for a People's Budget.  They include faith leaders, advocates for health care, housing, environmental sustainability, racial justice.
- These budget documents fall short of what New Hampshire people deserve.
- Dream bigger and demand better when it comes to our state budget.
- We've been told we have to accept scarcity as the norm, and to beg for crumbs.
- What people are pleading for should be guaranteed in a wealthy state in a wealthy country.
- Affordable housing for everyone.  High quality education for everyone, no matter where you live.  Good health care for everyone, including mental health care, addiction treatment, disability and developmental services.  Clean water and air for everyone.  Public transportation in rural communities.  Caring for our elders and our little ones.  Keeping young adults in our state.  Making sure our state workers earn a dignified wage and benefits, and that none of them are making less than $15 per hour.  New beginnings for people coming out of incarceration and non-police alternatives when there a crises in our communities so that we don't send so many people to incarceration.
- We will do this by raising taxes on the wealthiest New Hampshire people and corporations
- Our budgets are moral documents.  Show that we really care for all communities in New Hampshire with a budget that invests in all of us.

**Bonnie Dunham:**
- Bonnie is the mother of a wonderful 40 yr. old son who experiences complex mental disabilities.
- Shawn is determined and a hard worker.  He works at Wendy's and leads a full and active life.  However, that life is not guaranteed.  His continued quality of life is dependent upon the services he receives through Gateways Community Services.
- Shawn needs full-time one-on-one support.  He receives that support from a direct support provider.  That provider is committed to Shawn and makes far less than she could make in the private sector.  The low pay for these providers has resulted in a shortage of staff, with devastating consequences for families with disabilities.
- The need for adequate staff and funding will become even more critical.

- Families desperately need the services that area agencies provide.  High quality and cost effective services that change lives.
- Please include funding for oral health care for adults with disabilities on Medicaid.
- Fully fund the developmental services budget.
- Don't include the language for other unnecessary legislation such as SB 130 and HB 544.  Don't let these bills hold the budget hostage.  Let them pass or fail on their own merits.

### Asma Elhuni:
- Asma is the Movement Politics Director for Rights and Democracy.  She supports the "People's Budget".
- The inclusion of the divisive language amendment bans state agencies, K-12 schools, public colleges and universities and state contractors from learning about and addressing systemic racism and sexism, which is critical to overcoming barriers to a healthy and equitable community.
- If we can't talk about it, we will never address the issues that plague all of our communities.
- The language has a foreseeable chilling effect on our most important state-funded institutions.
- Why do all statistics point to a rise in hate crimes?  Why are COVID-19 victims disproportionately people of color?
- Recently, two currently serving state representatives have used harmful antisemitic rhetoric on their personal social media pages and have claimed they were unaware of the antisemitic history of these items.  Another state representative was accused of being Islamophobic.
- Remove this language from the budget.

### Carol Conforti-Adams:
- Reinstate the Governor's budget which called for funding essential programs and staffing for DHHS.  The House cut the budget for individuals living with disabilities and older adults.
- State revenues are far exceeding projections.  Why cut these critical services?
- Carol is a quadriplegic and paralyzed.  She needs morning and evening personal care services.  Once placed in her power wheelchair, she can live independently.  She works three part-time jobs, drives, pays state and federal taxes, and actively participates in her community.
- If there were no programs, Carol would have been placed in a nursing home.
- Increases do not provide living wages for workers providing daily home care services.  These low wages have resulted in a 40 percent vacancy rate in home personal care workers, and a 60 percent turnover rate due to the competitive job market.

### Steve Boczenowski:
- Steve's son, Jeffrey, took his own life eleven years ago.  His life changed that day, and he is not the same person he was.

- Jeffrey was 21 yrs. old when he died; a 4th year college student.  He struggled with mental illness.  He had depression and substance abuse issues.  He was a hard-working and responsible young man.
- Suicide is a rare event, but lots more people live with mental illness, and they struggle each and every day.
- If there were more robust treatment options, Jeffrey would be alive today.
- People with mental illness create a drag on our economy.  People with untreated mental illness cost more money to treat their physical illnesses.  And these people put a burden on law enforcement.
- Fully fund the 10-Year Mental Health Plan and look favorable upon mental health considerations in the budget.

**Marcela DiBlasi:**
- HB 2-FN-A-LOCAL contains far too many cuts at a time Granite Staters need more support from the government.
- As it currently stands, the budget will effectively be defunding abortion, guaranteed by Roe v. Wade.
- Remove all language of HB 544.  It is a manipulative attack on the attempt to meaningfully educate about race and gender in our state.  Fundamentally, the bill is rife with faulty logic.  Learning about difference is not the same as teaching divisiveness.
- The provision is hugely influenced by Donald Trump's 1776 Commission, whose report was a response to George Floyd and the subsequent human rights protests.
- This bill isn't about free and open dialog.  Please remove this harmful language from HB 2-FN-A-LOCAL.

**Jackie Cowell:**
- Jackie is with Early Learning New Hampshire.
- Employment related childcare allows families that qualify for their income to receive assistance affording the childcare they need to keep working.
- Approximately $15.2 million would be removed over the biennium, specifically for that program.
- Demand has decreased for this program, so DHHS decreased the appropriation.
- This also supports those who are job searching to have childcare while they job search.
- These funds should be restored and level-funded.  The current appropriation is far too low.
- This can really help families move ahead.

**Shannon MacLeod:**
- Ms. MacLeod testified on behalf of the Mayor of Manchester, Joyce Craig.  She referenced the April 14, 2021 letter written by 13 city mayors of the state outlining the impacts New Hampshire's state budgets have had on municipal governments and local property taxpayers over the last decade.

- These budgets have resulted in significant losses of revenue to municipalities, contributing to property tax increases and delays in needed infrastructure improvements.
- There are always competing priorities, finite resources and a need to reinvest for growth in balancing a budget.
- In the last decade the state has failed to prioritize funding for local municipalities, resulting in heavy financial burden on local taxpayers, particularly retired Granite Staters on fixed incomes.
- One of the most significant losses in revenue to municipalities was the reduction in the Meals and Rooms Tax distribution.  Since 2011, the local municipalities' share has been trending downward, while the overall revenue collected has increased by 60 percent.  Manchester alone has lost out on over $41 million over the last decade due to the failure of the state to live up to its commitment.
- Revenue sharing has been suspended since FY 2009, resulting in a loss of over $300 million to municipalities and counties.
- From state pension costs to state aid grants, the State of New Hampshire continues to renege on its commitments to municipalities and local taxpayers.
- Cities and towns will continue to provide all the necessary services to residents.
- Please put an end to unsustainable downshifting.

**Jim Doremus:**
- Mr. Doremus is the CEO of the Concord Family YMCA, and the YMCA Alliance, comprising the nine YMCAs in New Hampshire.
- The "Y" is the largest provider of childcare and summer camps in the Granite State.
- The Alliance opposes the cut in the childcare scholarship program in HB 1.  The program offers critical support for thousands of New Hampshire children.  More than 2/3 of "Y" families benefit from this program.

**Rev. John Gregory-Davis:**
- Reverend Gregory-Davis represents the Meriden Congregational Church and the New Hampshire United Church of Christ Economic and Racial Justice Ministry Team.
- They support the "People's Budget".
- The major difference between HB 1-A, HB 2-FN-A-LOCAL and the "People's Budget" is their underlying morality.
- Budgets express the values of those proposing them.
- The proposed BPT and BET tax cuts will primarily benefit 76 large, multi-national corporations that do business in this state, while depleting state revenue and downshifting costs to municipal property taxes to fund essential infrastructure and public education.  In doing so, it bails out the wealthiest and further adds to the struggles of Granite Staters.
- It is simply not true that we cannot do better.
- Remove the divisive concepts language from HB 2-FN-A-LOCAL.

**Claudia Istel:**

- Claudia is a retired public high school teacher, and adjunct to CCSNH.
- Funding for education is inadequate. The state is once again reneging on its responsibility to provide an adequate education.
- Placing school vouchers in the budget is forcing Granite Staters to accept vouchers and their financial burden on school districts without the usual scrutiny a standalone bill would receive. Public school districts will have to provide all the same services at the same level of quality and standards with less money. Public schools cannot afford money taken out of their limited budgets. Local property taxpayers cannot afford to pay more.
- The divisive concepts language has no place in the state budget. Education, knowledge and thoughtful discussion are the ways to make change for the better. The intent of the language is to promote more division and hardship to the most vulnerable members of our communities.
- Please read the demands of the "People's Budget". It is a moral document. It will raise up the wellbeing of all.
- The proposed budget takes more from those who have the least to give.

**Marcia Hayward:**
- Keep the school voucher bill out of the budget.
- There has been a lack of vetting of the educational service provider in SB 130. There are no guidelines, certifications or licensing provided for.
- The scholarship organization would work on a commission basis. This is a conflict of interest, as there is a built-in incentive to approve any request.

**Christina Darling:**
- Christina has two sons who both receive the childcare scholarship. The program has allowed her to find full-time employment and keep her apartment. Her children are safe and cared for while she is gone during the day.
- Christina has a sister who had to leave her job as a nursing assistant due to childcare difficulties.
- Which costs more, the childcare benefit or state welfare?

**Judy Lundahl:**
- Judy spoke on behalf of the Monadnock Interfaith Project ("MIP") in Keene.
- MIP opposes HB 544 that seeks to prohibit teaching about systemic racism and sexism in public schools and state-funded programs. The intent of the language contradicts MIP's mission for community understanding and mutual respect.
- Collectively, we need to face head on the present racism and sexism, existing virtually in every system in our lives--education, criminal justice, housing, economy and religion.
- Instead of limiting discussion, let's commit to deep reflection, hard conversations, and changing practices and policies in all of our institutions to move beyond racism and sexism.

**Kim Memmesheimer:**

- Support the Governor's budget request regarding critical increases to three Medicaid services under the Choices for Independence Waiver: personal care, homemaker and case management services.
- Increase the budget by $4 million for adult day services.
- Restore the Governor's funding for senior centers.
- Kim is an attorney in the area of elder care. She works with clients who either desire for themselves or their loved ones to stay in their homes. Choices for Independence is critical to that goal. Allowing people with dementia to stay at home longer will save money for the state in the long run. Funding home health care and personal services is vital to protecting the state's budget.
- All of these budget items provide vital resources to the unsung heroes for our communities--the unpaid family caregiver. Twice as many caregivers of those with dementia indicate substantial financial, emotional, and physical difficulties compared with caregivers of people without dementia. Dementia caregivers also report lower quality of life than non-caregivers, and they are more likely than non-caregivers or other caregivers to report that their health is fair or poor.
- Unfortunately, services that could help these families, like the CFI program and adult daycare, have been underfunded for years. The decline of the heath care workforce puts more pressure on family members to become the primary caregiver. Adult day services and senior centers have also been underfunded, which reduces families' ability to keep their loved ones at home. This can result in needing to utilize long-term care services earlier than a family would like to, which can be incredibly expensive at both the public and private levels.
- In addition to the failure to fund these vital programs, COVID-19 has added strain to the burden of family caregivers. Many senior centers are not able to provide in-person services and programs due to limited staff and volunteers. Isolation over the past 14 months has hit those living with Alzheimer's and other dementia especially hard, and it has also been an incredible strain on family caregivers who have lost access to outside supports and other resources during this time.
- Please provide our families the supports they need to keep their loved ones at home.

**Jeff McLynch:**
- Jeff is Project Director of the NH School Funding Fairness Project.
- While the focus of the proposed budget is the provision of public services in each of the next two years, it is important to acknowledge at the outset that, when it comes to school funding, two fundamental injustices have been allowed to persist in New Hampshire for at least several decades. Despite a clear constitutional mandate, far too many of our children continue to face deep and enduring inequities in the educational opportunities available to them, diminishing not only their futures, but that of the Granite State as a whole. At the same time, enormous disparities in the property taxes paid by residents and businesses in different communities pose oftentimes barriers to economic security and development.

- Unless the committee acts to improve HB 1-A and HB 2-FN-A-LOCAL, the challenges before this state's public schools--and the students, families and communities they serve--will be even more severe in the coming biennium. More specifically, according to data from the Office of the Legislative Budget Assistant and the Department of Education, due to the pandemic and the termination of additional aid and fiscal capacity disparity aid, state education aid is expected to fall, in total, by roughly $90 million between FY 2021 and FY 2022.
- The versions of HB 1-A and HB 2-FN-A-LOCAL before the committee today failed not only to begin to rectify the school funding injustices that have plagued for so long, but also to respond appropriately to the difficulties created by the pandemic and by expiring law.  While HB 2-FN-A-LOCAL in its current form does contain provisions intended to mitigate the effect on school finances of temporarily lower numbers of students completing the paperwork for free and reduced price meals, it only does part of the job, closing just $17 million of the expected $90 million gap in FY 2022.
- Although HB 2-FN-A-LOCAL identifies an additional $100 million for use by the Education Trust Fund in FY 2023, it devotes those funds to a reduction in the statewide education property tax ("SWEPT"), rather than targeting greater assistance to those communities most in need.
- The committee is urged to strengthen the proposed budget significantly before it is considered by the full Senate.  In particular, remove the proposed $100 million reduction in the SWEPT.
- New Hampshire has long fallen hundreds of millions of dollars short, on an annual basis, of meeting its obligations to provide an adequate education to every child in the state.  Solving the problem at hand is urgent and necessary, but the time to recast the system as a whole, so that all Granite State families are treated more equitably, is well past due.
- The NH School Funding Fairness Project stands ready to work with all Senators to build a more just school funding and property tax system in the year ahead.

**Peter Miller:**
- School vouchers, education savings accounts, divisive concepts are all included in the budget.  Mr. Miller opposes same.
- This budget is inadequate for school funding.
- SB 130 is a major policy issue, establishing the most expansive school voucher program in the United States.  It should be debated and considered on its own merits, not hidden in the state budget.  In 2018 the Legislature decided not to implement a much smaller school voucher program after concluding many issues remained unresolved.  The same issues remain unresolved in the much bigger SB 130.
- Public funds diverted from our public schools will be used for school vouchers.  Public schools are highly accountable for meeting students needs.  Will voucher schools be as responsible?
- School vouchers have been used inappropriately throughout the country.

- Hiding major policy inside the budget, shielding it from debate, is a bad way to adopt major policy changes.

**Rep. David Luneau:**
- The impact of the $100 million appropriation to the Education Trust Fund is felt most significantly in towns that have the lowest property tax rates in the state, and the highest property wealth.  This just doesn't make any sense.
- A far better use of this appropriation would be to extend the equitable grants to school districts that were funded in the FY 2021 budget, and are offered by HB 623 and the amendments to SB 135.  These grants have significant impacts for students and taxpayers in towns with the highest property tax rates, lowest property values and higher incidences of poverty.  They provide meaningful school funding and property tax relief to cities like Manchester, and towns like Charlestown, Haverhill, Claremont, Pittsfield, and so many others.
- HB 623 has a fiscal note and a town-by-town analysis prepared by the LBA, making it easy to see how these equitable grants benefit our communities, students, taxpayers, and the state as a whole.

**Ken Norton, NAMI New Hampshire:**
- During Governor Sununu's budget address in February, he once again stated New Hampshire is in a mental health crisis.  Fully fund mental health services as proposed in the Governor's budget.
- It's important we prioritize mental health funding to address the mental health crisis and the anticipated long-term impact of the pandemic it will have on mental health.  That is evidenced by the significant increase in stress, anxiety and depression we are seeing across all ages.  In particular, it is impacting children and young adults.
- During the last several months we have exceeded previous highs of the numbers of people being boarded in emergency departments, with 51 children being boarded on February 14, 2021, and a combined high of 89 children and adults being boarded during several days.  Many of these people were experiencing suicidal intensity.
- Suicide continues to be a significant public health issue in our state.  It is the second leading cause of death in New Hampshire for those ages 10-34.
- While Emergency Department Boarding is the tip of the iceberg relative to timely access to mental heath care, there are long waits for outpatient treatment.
- We need to continue the work done in the 2019 Legislative session in fully funding the 10-Year Mental Health Plan by building out community-based services for mental health crisis response, step-up and step-down services, inpatient and outpatient capacity, supported housing, peer support, suicide prevention and substance use disorder services.
- NAMI NH supports moving ahead with building a new forensic hospital in order to end the practice of people with mental health conditions who have not been charged with crimes being transferred to the Department of Corrections and the

Secure Psychiatric Unit.  It opposes the back of the budget cut to DHHS currently contained in the House budget.

- As a member of the Governor's Law Enforcement Accountability, Community and Transparency Commission ("LEACT"), Mr. Norton urges strong support for fully funding Police Standards and Training as included in the Governor's Budget.
- Mr. Norton, as a member of the LEACT Commission, personally opposes the divisive concepts language currently included in the House budget.  It would undermine much of the work done by the commission to address implicit bias and related recommendations for law enforcement, as well as the courts.

### Rep. Mel Myler:
- Rep. Myler is the ranking member of the House Education Committee.
- That committee reviewed HB 20, which is almost identical to SB 130. Ultimately, they decided it was not ready to be considered by the House.  They voted 20-0 to retain HB 20, based on the inadequacies of the language in the bill.
- Remove SB 130 from the budget.  There is much opposition to it.

### William Maddocks:
- HB 2-FN-A-LOCAL is woefully inadequate to meet the health, educational and other human needs of Granite Staters.
- HB 544 attacks widespread efforts to diversify the state.  Enforcing this law will be a daunting task.
- There are hundreds of New Hampshire corporations carrying out inclusion work.
- "Drop a dime on diversity"--the new ad campaign?
- Mr. Maddocks gave examples of books which could be read for their "instruction" on divisive concepts.
- This is a crazy piece of legislation.  It is unenforceable and offensive.
- Embrace the courageous conversations on diversity.

### Kayla Montgomery:
- Ms. Montgomery is VP of Public Affairs for Planned Parenthood New Hampshire Action Fund and Planned Parenthood of Northern New England.
- They strongly oppose the language of Section 34 of HB 2, requiring the physical and financial separation of services.
- There are currently 10 providers in the New Hampshire family planning program.  With the requirement of a physical separation, the entire program would be dismantled.
- New Hampshire's family planning program provides funding for STD tests and treatment, birth control and cancer screenings, and breast exams and PAP tests. It does not and cannot fund abortion care.  For patients to access abortion care, they must pay out-of-pocket or private insurance.  It has never covered abortions.
- The dismantling of the program would affect statewide access to free or low cost

services.  These services are offered on a sliding scale based on income.
- This program provides care for the uninsured and low income, and provides coverage in rural areas.
- Please keep the New Hampshire family planning program whole.

## Virginia Nossiff:
- Ginny is opposed to cuts in mental health services in HB 1-A.
- Implement a mental health system that works for all of our citizens, especially those in the North Country.
- In 2018 her son, a sophomore engineering student at UNH, came home one weekend and began to hallucinate, the beginning episodes of psychosis.  It is a severe mental health condition.  He was confused, frightened, and said things that made no sense.  Having no other options they brought him to Memorial Hospital in North Conway, where he laid in a windowless room, on a mattress on the floor for 2.5 weeks, with no psychiatric care provided.  There was no room at New Hampshire Hospital.  Everyone told them it was someone else's responsibility, and that the system was broken.  How had mental health care come to this in our state?
- Had there been a mobile crisis unit that could have traveled to their home, or had there been a facility that could provide the proper treatment, or had there even been staff that was trained in psychiatric care.
- For all those affected by mental illness and their families, oppose the cuts made to mental health services in HB 1-A.

## Linda Mattlage:
- Linda strong opposes the inclusion of SB 130 in HB 2-FN-A-LOCAL.  This bill has many problems.
- Now, in the middle of a pandemic, is not the time to take on the major change of vouchers, also known as Education Freedom Accounts.  School districts are already grappling with losing students due to the pandemic, demographic changes, and the doubling of charter school seats that we'll see shortly due to the federal grant Gov. Sununu accepted.  This grant requires the state to double the number of charter school seats in the state by expanding some existing charter schools and adding some new ones.  It is estimated that doing this will cost the state between $57 million and $104 million in the first ten years.
- If people are concerned about kids not getting what they need in public school, aren't charter schools created for just that reason?
- We should see how the expansion of charter schools works before spending additional state funds for a whole new parallel structure and funding system.
- Remove SB 130 language from the budget.

## Jim O'Connell:
- Mr. O'Connell is a Manchester School Board member.
- The state's budget reduces educational funding by $90 million.  It is hard to understand and justify.

- Manchester is looking at a $7.4 million dollar shortfall.  Of the $90 million being saved by the state, close to ten percent is coming out of Manchester.
- Manchester already spends less than practically every other school district in the state in terms of per student expenditures.
- The budget will have a very serious effect.  It is not addressing some key issues.
- The Commission on School Funding spent almost one year looking at adequacy and how the state spends its money on education.
- Ten percent of the education budget will be spent on administration.
- The divisive concepts provision would become an embarrassment to the state should it become law.  It would have a detrimental effect on the way we are viewed by other states.
- Take a second look at the funding for education in this bill.

**Deborah Opramolla:**
- As a disability organizer and advocate, Deborah opposes the language of HB 544.  It is unacceptable.  Disability justice requires everyone to realize having a disability is a normal part of life.  What is not is being embarrassed or ashamed of family members that experience a disability.  What is not normal is to become silent.
- The People's Budget demands investment in services such as fully funding the waitlist and dental care for those who experience a disability.  This must be an investment that not only takes individuals off the waitlist and provides dental care, but allows them all the services an individual needs to partake in the community.
- Silencing our ability to have discussions on our culture, history, and training of our workforce sends the message we are not welcome in this state.
- Daily there are between 25 and 30 children waiting in emergency rooms in urgent need of mental health care.
- The State House budget closes the Sununu Youth Services Center, but where will these children go?
- Appropriations to solve the mental health crisis in our hospital emergency rooms must be developed.  Fully fund DHHS, as it provides vital services to the disabled community.  It is the moral and legal obligation of the state to continue to provide these services.

**Charyl Reardon:**
- Charyl is President of the White Mountains Attractions Association.
- Add back into the budget the funding the House eliminated in the Division of Travel and Tourism Development budget.  These dollars are not only an investment in our future tourism economy, but supplement the state's overall revenue which helps fund some of the additional and important needs of our citizens.
- Tourism is the second largest industry and economic driver in the state of New Hampshire.  Every dollar spent on marketing on our great state has a significant return,

- Governor Sununu's budget seeks to fund the Travel and Tourism Division by $9.5 million approximately, each fiscal year.  This is just shy of the 3.15 percent net income earned from the Meals and Rooms tax.
- Tourists to New Hampshire leave behind an economic impact that drives billions of dollars to the bottom line.
- Tourism supports essential services such as public safety, education, parks, roads and infrastructure.  Without tourism, each household in New Hampshire would have to pay additional taxes every year to make up the difference that comes from visitor spending.
- According to independent researcher SMARInsights, in 2019 over 600,000 trips to New Hampshire were influenced by Travel and Tourism advertising campaigns, contributing $371 million in travel spending, and collecting $33 million in Rooms and Meals taxes from visitor spending--about 10 percent of the state's General Fund.  Not only does the promotion drive traffic to this state, we have seen it achieve a return on investment of $13 for every $1 spent.
- We understand the need to adjust the budget to address the shortfalls caused by the pandemic.  But consider the proven track record that additional spending has had on our businesses and taxes.  Investing in tourism marketing yields positive results, and is not only critical to growth, but also to recapture and maintain our market share.   The investment of $9.5 million in tourism promotion for each of the next two years could shorten the tourism industry's timeline for recovery by 2-3 years.

**Paul Reuland:**
- Mr. Reuland is the Board Chair of Media Power Youth.
- Please reinstate the $50,000 Department of Justice grant to Media Power Youth that has been removed from the proposed budget.  Without the grant funds, our organization will struggle to continue to employ a full-time program manager, and be unable to service many youth organizations as it has in previous years.
- They intend to launch a new program this fall with the grant funds.  It would teach social and emotional learning skills necessary for the healthy youth and social media.  This particular program is preventative in nature, and designed to address issues in children of school age before they arise.
- Mr. Reuland has both a son and a daughter.  His desire is to equip his children with the tools they need to handle the emotional challenges they will face as they grow.
- Changes in the technological landscape have been so vast and distinct, that it inhibits his ability to help his children.
- The social media they consume impacts the way in which they see themselves, the world, and their peers.
- It's critically important that programs like these continue to receive the support of state government.

**Angela Pape:**
- Angela had close friends experience racism.  She shared a number of her friends' experiences with committee members.

- Having friends that were multi-cultured made Angela think she was not racist. Her own biases were very revealing to her.
- Racism exists consciously and unconsciously, and in all of our systems. We need to grapple with it and make real changes.
- HB 544 shuts down conversation. If we don't talk about a problem, how can we begin to solve it?
- It is uncomfortable for those of color to endure racism day in and day out.
- American ideals are for equality and opportunity. We must stand up for all of us.

**Laura Pelletier:**
- Interlakes Daycare Center in Meredith is celebrating its 50th anniversary this year.
- They stayed open last year during the pandemic for families of essential workers.
- Forty percent of the children they care for are from low income families, to qualify for the state childcare scholarship.
- The need for families to access affordable childcare may be greater than it was pre-pandemic.
- The scholarship program helps families get ahead. They grow in their jobs and contribute to the economy.
- Please support this worthwhile program, which enable parents to get ahead.

**Susan Richman:**
- Susan has been a public school teacher for over 30 years.
- There is no accountability for home school instruction.
- Some students who receive an educational voucher will require special services-- reading, speech, help with autism--not provided by their private school or in-home schooling. They are entitled to attend their local public school up to 50 percent of the school day, to receive those special services and more. But the $4,000-$8,000 of adequacy and differentiated funds allocated for that child's educational voucher would remain with the private school or the home schooling. That money could have paid for a paraeducator to work with a group of special needs students.
- Money equals the ability to offer services to students. That voucher student is removing money from the public school, while receiving services. After nine years, that child's public school will have lost approximately $50,000 in adequacy and differentiated aid.
- Services are finite; they cost money.
- SB 130 needs more consideration to enable learning what happens when these educational dollars are taken from our public schools.

**Susan Stearns:**
- Please fully fund mental health services originally included in Governor Sununu's budget and ensure the budget you pass fully funds critically needed mental health services accessible to all Granite Staters.

- Yesterday there were 43 adults and 7 children experiencing a mental health crisis waiting in emergency departments for an inpatient psychiatric bed. We all know this emergency department boarding crisis has been going on, unabated, for over 8 years in our state.
- Susan has an adult child who lives with a serious mental illness. Two years ago while traveling and going through a recent medication change, her son was in crisis, fearing he would hurt himself. He asked her if he should go to the emergency room. Susan did not know how to answer her son.
- Susan has been her son's advocate since he was first diagnosed with an emotional disorder at age five. She has been a mental health advocate for over 20 years. It is what she does. But faced with her son in crisis--over 500 miles away, Susan was terrified. She was afraid for his safety should he wind up boarding in the emergency department without an advocate at his side.
- Susan's son is 6'6", not violent at all, but highly sensitive and emotional. He had never had an inpatient psychiatric admission. She knew he would become despondent at being held for days with nothing to do, and likely very emotional. She thought he might prove frightening to the staff because of his size. She was afraid he could wind up injured by security or placed in the county jail.
- In one of the hardest decisions of her life, Susan told her son not to go to the emergency room. She was able to access family support for her son. He returned home the next day. They successfully managed his crisis with his doctor.
- We have not yet seen the impact of this pandemic on Granite Staters. Those numbers of folks waiting in emergency departments are just the tip of the iceberg.
- Increase funding for mental health services and ensure full funding for NH's 10-Year Mental Health Plan.

**Louise Spencer:**
- Louise is a co-founder of the Kent Street Coalition.
- Let the principles of the People's Budget guide the committee's work as you craft a budget that meets the needs of Granite Staters.
- On the House side of the budget process we saw a lack of transparency, and a process that failed to give the public real and substantial opportunities for meaningful input. The budget was dramatically amended after public testimony had concluded, with the public then not given any additional opportunity to comment on those changes.
- One day of public testimony hardly seems sufficient to speak to the myriad of needs and concerns that a fair and humane budget must address.
- The majority has taken the opportunity to advance social policies in formulating the budget.
- Remove SB 130 and HB 544 from the budget, and hold additional hearings for the public to comment, should you change the budget substantially.

**Rep. Joshua Query:**

- Representative Query is a Planned Parenthood patient.  He knows how critical the services they provide are.
- Last year he was unknowingly exposed to the HIV virus.  He was uninsured and unemployed.  So many health care providers were closed due to the pandemic.  But he knew he needed to see a doctor quickly.  He received a telehealth appointment, with the first portion of the appointment via the phone.  They let him share what happened in a way that made Rep. Query feel more comfortable.  He was told he needed to go to the health center to receive an instant HIV test.  He had indeed been exposed.  They attempted to determine through blood work if he was HIV-positive.  He immediately began post-exposure treatment, which slows the chance of contracting the disease.  A 30-day supply of these pills cost over $12,000, which Rep. Query did not have.
- Planned Parenthood worked with him and the drug manufacturer to ensure he qualified for the reduced cost.  Rep. Query started the treatment at no cost to himself.
- The treatment lasted 90 days, which would have cost almost $40,000.
- Rep. Query was tested monthly at Planned Parenthood.  His third HIV test confirmed he was HIV-negative.
- Planned Parenthood saved Rep. Query's life.  He continues to go to the health center every 90 days to maintain the HIV-negative status.  For all these visits the health center charged him based on his income, instead of a flat rate.
- Rep. Query represents so many people in this state who lost insurance coverage or are under-insured.  He represents people who face astronomical medical costs, who need to decide either the debt or the disease is the harder battle.  He represents people who rely on community health centers or Planned Parenthood, who offer care based on a patient's circumstances for preventative health care.
- Remove the language about physical and financial separation requirements on reproductive health facilities to ensure trusted providers like Planned Parenthood can continue providing critical and lifesaving care to Granite Staters like himself.

**Leah Quimby:**
- Leah is another former patient of Planned Parenthood.
- Planned Parenthood has been there for Leah when she needed them for many stages of her life.
- There were times in her life when she had no health insurance and needed birth control.  She received regular reproductive health care checks.
- All the health center workers were kind and helpful.  Leah trusts Planned Parenthood to listen and support her.
- Blocking funding for Planned Parenthood and abortion providers could result in patients facing interruptions in necessary care.
- Make it more possible for people like Leah to receive the care and important cancer screenings they need.

**Anthony Poore:**

- Anthony believes issues of diversity, equity and inclusion are the defining issues of our time.  If we are to achieve the hopes and aspirations that came before us, we must work collectively towards comprehensive, enduring, equitable solutions.
- There is undeniable evidence that diversity, equity and inclusion in business and government leads to heightened levels of innovation, customer service, citizen engagement, and long-term economic growth.
- When legislative leaders create environments where everyone is encouraged to bring their differences to work and school, organizations and governments thrive.
- If your goal is to achieve social and economic justice for all, then diversity, equity and inclusion efforts are some of the most powerful tools legislators can leverage to improve the upward mobility of historically marginalized populations.
- The divisive concepts amendment is an attempt to ban racial and gender equity efforts in government by silencing any conversation or effort that recognizes the existence of white supremacy or systemic racism.  It refers to unifying racial justice and equity efforts as "divisive" and prohibits any training that would create anguish or guilt, with the intended effect of shutting down all conversation about race and gender in government, by government contractors, or in publicly funded schools and universities.
- As a parent of two multi-racial school age children, Anthony can personally appreciate the challenges children of color face when confronted with the consistent and pervasive bigotry of low expectations, and appreciate a community where all students have the chance to gift New Hampshire with their potential and fulfill their destiny.

**Allan Reetz:**
- Mr. Reetz represents the Hanover Co-op Food Stores and Auto Service Centers.  They stand opposed to HB 544 and its inclusion in the state's budget.  They are aligned with the 240 other businesses and entities that signed the anti-HB 544 letter sent by New Hampshire Businesses for Social Responsibility.  Those businesses represent over 60,000 workers and are some of the largest employers in the state of New Hampshire.  A look at the list of signatories will show a vibrant portion of the state's economy that this legislation will turn away.
- The unwieldy intent of HB 544 seeks to legislate against corporate free speech.  Proposed restrictions extend to subcontractors and vendors, all because they do business with our state or were hired to help.
- The provision contains directives that, at first glance, seem benign, but onerous upon a second reading.  It begs the question, "What successful legislation is this modeled on, and what problems does it seek to solve?"  Supporters might state that its language seeks to unite, not to divide.  Yet, how is that not evident to business leaders across the state?
- We live in a civil society where constructive debate is encouraged and necessary.  The effort to legislate away the risk of hurt feelings or the assignment of blame

will not work in business any better than it would in the New Hampshire House and Senate.
- Let us never silence the past or prevent discussion of our future.  The wise voice of New Hampshire history still has much to teach us.

**Steve Ahnen:**
- Steve is President of the New Hampshire Hospital Association.
- New Hampshire's hospitals and the heath care heroes who work in them are driven by a mission to provide high quality health care and improve the health and well-being of the communities they serve.  That is true every day, and that resolve has certainly been demonstrated throughout the past year, however hospitals have been challenged as they have responded to the COVID-19 pandemic.
- The pandemic has challenged us all and, working together, we believe we can emerge from this crisis, but it will take great care and diligence to ensure that New Hampshire does so and that we are able to serve citizens across the state and help everyone return to what we all hope will be a much more normal, vibrant and healthy New Hampshire.
- It is absolutely essential that we have a robust and effective Medicaid program that helps to ensure recipients are getting the right care, at the right time, and in the right place.  Resolution of the many challenges just a few years ago over the Medicaid Enhancement Tax and the Medicaid Disproportionate Share Hospital payment program was an important step forward to creating stability in the Medicaid program for patients, providers and the State of New Hampshire.
- We are very appreciative that the Medicaid rate increases that were included in the last budget are maintained in the current budget before the Senate.
- There is no more urgent and pressing priority than addressing the behavioral health crisis facing New Hampshire.  We appreciate the tremendous amount of work and effort that is being done in this area up-to-date, but it is imperative that this budget, as well as other legislative and regulatory efforts, collectively design a plan forward and articulate how it will be funded and carried out in the months and years ahead.
- The 10-Year Mental Health Plan was built as a blueprint for rebuilding a behavioral health system across the full continuum of care and services for those suffering a mental health issue.  The ongoing crisis of patients waiting in hospital emergency departments until they can be transferred to New Hampshire Hospital or other appropriate settings for their care continues to be all too common.  The waitlist is truly a symptom of a broader, systemic problem.  We simply do not have adequate resources across our entire system to care for those with a mental health issue.
- This is our time to resolve these issues once and for all, so that patients with a mental health issue can get the care they need and deserve, when and where they need it.
- We are very concerned about the addition of non-budgetary policy provisions that were added to HB 2-FN-A-LOCAL during the House phase of the budget,

specifically that which seeks to incorporate HB 544 related to divisive concepts. Our hospitals and the dedicated caregivers who serve their patients every day strive to do so with the utmost care and respect for every patient. And they work to foster a culture of diversity, equity and inclusion within their organizations to attract and retain a workforce to deliver the highest quality of care to all of their patients. Inclusion of HB 544 will have a chilling effect on the important work that is occurring throughout the health care system to better serve all patients. We ask the Senate to remove this provision.

### Ed Robbins:
- Mr. Robbins is opposed to the language of HB 544 that was incorporated into HB 2-FN-A-LOCAL. It is a tenuous connection that such legislation has to the state's budget. Including the language of HB 544 in HB 2-FN-A-LOCAL is just a way to bypass a process in which support is not widespread.
- New Hampshire prides itself as the "Live Free or Die" state, the place where we believe that the individual is responsible enough to do right and not be burdened by state supervision, and yet here we are discussing just that.
- Others have testified regarding the potential and financial effects that may befall the state should the divisive concepts language be included. I'll appeal to that Yankee pragmatism and simply say that this legislation is a solution in search of a problem, and as such it should not be included in HB 2-FN-A-LOCAL.

### Sarah Aiken:
- Sarah represents Community Bridges, one of ten area agencies that support those with developmental disabilities and acquired brain disorders and their families.
- Please support the developmental services budget.
- Sarah is the parent of a young man with a disability. Her son was served by the disability system for years. The services and skills he learned within the system were nothing short of miraculous. Diagnosed on the autism spectrum, in addition to having cancer and a rare genetic diagnosis, Sarah was unsure of her son's survival, never mind if he would work or go to school. Through Community Bridges he learned to walk, talk and be social.
- Sarah's son no longer needs services. He is no longer on Medicaid and he will never be on the waitlist. Not every child, however, has the same experience. Some need services throughout their lives.
- The services provided by the area agencies and their vendors allow for inclusion, skill building, access to the community, work, and all that encompasses a good life.
- We attribute the system's successes to the many thousands of wonderful people who work with the individuals that we serve, and the training they are able to provide staff.
- As a state contracted agency, it is for this reason that Community Bridges encourages the committee to review the divisive concept language, and how that language would change the availability of the trainings they provide.

- We've come a long way since the closure of the Laconia State School and Training Center.
- Fully fund the developmental services budget, reconsider the divisive concepts language, and increase wages for those who are front line workers, such as case managers and direct support personnel.

**Karen Trudel:**
- Fully fund the mental health budget as put forth in Governor Sununu's budget.
- Medicaid reimbursement needs to increase so we can retain staff.
- The mobile crisis units need to be fully funded and implemented, especially in the North Country.  Karen has utilized the mobile crisis units a number of times, and has found it to be an extremely useful tool.
- Peer supports need additional funding, as well.  Again, staffing is an issue.

**Rep. Amanda Toll:**
- This budget irresponsibly cuts the Business Enterprise Tax, the Business Profits Tax, the Rooms and Meals Tax, and the Interest and Dividends tax resulting in revenue decline for the state.  Consequently, there will be massive cuts to social services and education.  Costs will shift to towns, likely forcing them to increase property taxes, which will disproportionately harm folks on fixed incomes.
- The people of New Hampshire deserve a state budget that invests in the health, education, recovery, opportunity and vitality of our communities.
- Rep. Toll endorses the NH People's Budget, which was drafted by a coalition of social justice organizations.  This should be the budget before you today.  The People's Budget demands we invest in our recovery from the COVID-19 pandemic, in real economic security, in our state workers, in adequately funding education, in our young adults, in people with disabilities and their families, in our children, parents, caregivers, elders, and in comprehensive health care including but not limited to mental health, reproductive health and dental health.
- To have the language of HB 544 in this budget is an abomination.  The proposal is absurd.  We must reckon with systemic injustices in order to move forward towards a compassionate and just future together.
- As one of the many citizens of New Hampshire who has utilized our reproductive health care centers, I also find it utterly shameful that this budget will be used to strip funding from necessary reproductive health care centers.  Patients visit Planned Parenthood for many reasons; primarily, it is to access affordable health care.  Stripping funding from Planned Parenthood and other reproductive health care centers will impact low income folks the most, and will have negative impacts on health outcomes for the most vulnerable.

**Joan Ascheim:**
- Joan is testifying on behalf of the New Hampshire Public Health Association.
- Part III of SB 104 sought funding for a community health worker at each public health network in the state, but it was removed.  The deployment of community

health workers was a recommendation from the Governor's COVID-19 Equity Response Team as an effort to lift up some of our most vulnerable citizens during the pandemic and beyond.

- Please add $1.2 million to the state budget to support a community health worker in each of the state's 13 public health networks. There is a large body of research now relative to community health worker effectiveness in improving health outcomes, reducing health care costs and bridging gaps in health disparities.
- SB 140 sought funding for several programs for families including community collaborations, family connections, home visiting and family resource centers to eliminate funding gaps for these programs. As families continue to recover from the economic and social effects of COVID and strive to balance the ongoing daily challenges of work, school and parenting, these programs are more important than ever.
- Please add $1.37 million to the budget to fully fund these primary prevention programs for families.
- The language of HB 544 seeks to prevent New Hampshire state agencies, contractors, and schools from teaching concepts relative to diversity, equity and inclusion. At a time when our country is trying to confront the injustices of systemic racism, hate crimes, and health inequities that have been illuminated through the pandemic, this bill is dangerous and does not reflect the values of the people of this state. If we in public health cannot educate students, public health professionals and policy makers about such inequities, we only perpetuate them.
- Remove the language of HB 544 from HB 2-FN-A-LOCAL.

## Rep. Joe Shapiro:

- Do not fold SB 130, education freedom accounts, into the state budget.
- Starting with a $90 million shortfall from the last biennium and extending to COVID-related decreases in enrollment and resources, and the unpredictable effects of planned increases in charter school placements, the funding picture for our local school districts is very much in flux and very much in jeopardy.
- Now is not the time to add a new and largely unknown element into the mix.
- Education freedom accounts will further eat into our school budgets.
- Keene schools will lose more than one-half million dollars during the next five years.
- The full future damage to our public education system through unintended consequences is largely unknown.
- Education freedom accounts are like a time bomb. Once you put them in place and the fuse is lit, we will have little to no ability to limit the damage to our schools.
- Further erosion to public school funding will expand the disparity between wealthy and poor communities.
- In Keene, where the property tax rate is five times the rate of the wealthiest New Hampshire communities, taxes will likely increase. This will further the

burden on homeowners and increase the obstacles to new economic development.  Others will be forced to make drastic cuts.
- Leave education freedom accounts for another day.

## Gina Balkus:
- Gina is CEO of the Granite State Home, Health and Hospice Association.
- Direct DHHS to increase home health provider rates for the Choices for Independence program to realistic levels.
- The current reimbursement rates fail to cover the cost of reasonable wages, travel time, mileage, supervision, training, background checks, benefits and other business costs.  Because of this, home care agencies can't fully staff all the services that CFI enrollees need.
- People who are lucky enough to get care generally get about 65 percent of the home care services they are authorized to receive.
- It is close to impossible for new enrollees to receive any services at all.
- This means that vulnerable adults and elders who qualify for nursing home level of care are at risk of illness, injury and neglect in their own homes.
- Between 2017 and 2020 DHHS underspent the CFI home health services line between $11 million and $15 million each year.  These funds could have been deployed to rate increases so that home health agencies could offer competitive wages or benefits.  That is what DHHS did several years ago in the Title III-B and Title XX programs funded through the Older Americans Act.  The Department should do the same for CFI, and bring the rates to parity with the Title programs and close to Medicare cost levels and close to private market rates.
- We believe there are sufficient funds in the line to significantly increase rates and reduce gaps in care.
- The Department's lapse should not be borne by vulnerable adults and elders.
- CFI enrollees are in a desperate situation.  Many providers will no longer participate in the CFI program.
- Amend HB 2-FN-A-LOCAL or attach a budget footnote to direct DHHS to make meaningful rate increases for CFI home health providers so people can get the care and the support they need to live in their homes.

## Mary Schiavoni:
- Mary is speaking on behalf of Adimab, LLC, a global biotechnology company headquartered in Lebanon.  Adimab strongly opposed HB 544 before it was rightly tabled in the NH House of Representatives, and they continue to firmly oppose its back door incarnation as the divisive concepts amendment to budget bill HB 2-FN-A-LOCAL.
- This amendment tramples on First Amendment rights to free speech, represents government overreach, and will impede the ability of New Hampshire businesses to attract and retain top talent.
- Adimab has a highly diverse workforce of discerning scientists, engineers and researchers for whom inquiry and debate are essential drivers of success in the workplace and in their industry.

- Adimab competes with research centers across the country and the globe to recruit the best talent to New Hampshire. This is a challenge that will become immeasurably harder if our state is viewed as a regressive and intolerant place to live and work, as is sure to be the case if the divisive concepts amendment is passed into law.
- Vote down the divisive concepts amendment, and in doing so maintain New Hampshire's standing as a business-friendly state that supports inclusive and empowered work environments unencumbered by restrictive legislation.

### Rep. Tim Horrigan:
- Rep. Horrigan represents Durham, the home of the University System. He sees no point in merging USNH with the Community College System at this time.
- Durham is also the home of the Small Business Development Center. The House increased the SBDC's funding from $50,000 to $450,000 over the biennium, but the increase was merely an increase over the Governor's original proposal.
- The House Finance Committee took $400,000 from the Travel and Tourism budget, which shows how shortsighted state government is.
- The budget contains some very small tax cuts, which will supposedly attract businesses from other states. No one is going to move their business here from out of state, however, just because our business taxes went down a fraction of a percentage point. The secret to growing our economy is to grow the businesses which are already here. The tax cuts in the budget will accomplish nothing aside from lowering state revenues, which is not a good thing.
- The budget includes an abortion "gag-rule" provision, which would almost certainly shut down every reproductive health facility in the state.
- Craft a budget that the House, Senate and the Governor can sign.

### Heather Carroll:
- Heather represents the NH Alliance for Healthy Aging.
- Investing in home and community-based services is a cost effective way to build infrastructure to support older adults who live here.
- New Hampshire needs a home and community system that works for all of us.
- Currently, there is a patchwork of services which leads to significant gaps and unmet needs. The result is that too many older adults end up in more expensive institutionalized care, when they truly want to remain in their homes and communities.
- There are cost effective measures the Senate can take now to improve home and community-based services. Support budget requests that include critical increases to 3 Medicaid services under the Choices for Independence Waiver. They are personal care, homemaker services and case management.
- Presumptive eligibility should be fully funded.
- The gap in adult medical day services should be looked at, and raise the daily rate to $75. This investment of state dollars over the biennium is a cost effective way to keep older adults in their communities longer. It also encompasses those

who truly need to have caregiver support for folks who are still in the working world.

- They would like to see the $1.5 million for senior centers to support services for older adults struggling with mental health and social isolation. During the pandemic, senior centers helped many seniors with telehealth services and with the social isolation for those folks who live alone.

**Guy Chapdelaine:**

- Guy is a member of the NH AARP/Capital City Taskforce.
- CFI is a cost effective program for seniors or adults with disabilities.
- In a typical year a significant portion of the funding for CFI goes unused because the number of visits made falls far short of those funded. This has occurred repeatedly over a number of recent bienniums.
- In FY 2020, between 31 percent and 45 percent of the funded visits were not made for skilled nursing home visits, home health aide short and long visits, personal care visits and homemaker services. This shortfall resulted in at least $11 million in appropriated funds not being spent and lapsing to the General Fund.
- This money should be used to increase the availability of services that can help people remain safely at home
- One of the primary reasons for the shortfall in the various types of visits is the low level of reimbursement funded by the state through Medicaid. It's extremely difficult to hire staff to perform these services when the rate of reimbursement is so low in comparison to compensation paid for far less skilled positions in other businesses.
- Greater transparency in rate setting is needed to ensure that rates cover the cost of services to be performed.
- Ensure that rates for services for seniors and adults with physical disabilities are set comparably to rates for services to other groups receiving similar services.
- Expedite eligibility determinations for these services so that seniors and adults with disabilities receive their services in a timely manner.

**Kate Frey:**

- There are several harmful provisions included in the House budget including: 1) abolishing the Enforcement Division of the NH State Liquor Commission, jeopardizing the safe operation of alcohol establishments; 2) banning dissemination of certain "divisive concepts" like unconscious bias related to sex and race that are critical to addressing public health disparities across New Hampshire; 3) defunding essential health reproductive health care providers during a pandemic; and 4) eliminating $50 million and 226 positions from DHHS in "back-of-the-budget" cuts that could limit our ability to overcome COVID-19 and respond to future public health crises.
- New Futures' Five-Point Plan for a Health State Budget is comprised of 5 initiatives, if fully funded in the NH state budget, will go far to address issues resulting from the pandemic, overcome health disparities for historically

marginalized groups, and prevent adverse health impacts on NH's children and families. These initiatives include: 1) supporting critical local and state public health programs and services; 2) ensuring access to health care by supporting a strong health care workforce; 3) supporting efforts to sustain and grow behavioral health services; 4) sustaining investments that help mitigate and prevent childhood trauma to help Granite State children and families thrive; and 5) protecting children's behavioral health programs and services to ensure coordinated and timely care for Granite State youth.

- Investments are needed in community health workers, the state's health care workforce, youth prevention programs and family supports.
- Include $1.2 million over the biennium to support a community health worker position in each of the 13 public health networks.
- Increase funding for the student loan repayment program or make unspent SLRP funds in the current budget nonlapsing.
- Fully fund DHHS' request of $220,000 per year to fund tobacco cessation services directed at youth trying to quit vaping.
- Restore $1.37 million for family resource centers and primary prevention programs within the department.

**Emily Johnson:**
- Emily is the state manager for Save the Children Action Network.
- They oppose cuts to employment-related childcare funding in the state budget.
- Employment-related childcare funds grant assistance to hard working families with young children. Parents are income-eligible for the assistance benefit by having the ability to continue to work and earn a living while their children receive high quality care and education. Without this assistance, New Hampshire children would miss out on that high quality care and foundational education, while their parents would likely miss out on earnings or career advancement, and would be forced to stay home with the kids.
- Employment-related childcare assistance is essential not only for child wellbeing but for working parents and their ability to earn money for basic costs for survival.
- It's not unlikely for income-eligible families to wind up qualifying for increased state aid assistance when denied a childcare scholarship.
- More families will require childcare assistance in the coming years.
- Provide at least level funding for employment-related childcare in FY 2022/2023.

**Megan Tuttle:**
- Meagan is President of NEA New Hampshire.
- Refrain from including a school voucher plan like SB 130, which downshifts costs onto local taxpayers.
- Pass a public school funding formula that is more equitable and accounts for the pandemic effects on school budgets.
- Remove entirely and without replacement the harmful language of HB 544.

- Regarding SB 130, do we really want to make things worse for local property taxpayers?  To date, there has been no financial analysis completed from the LBAO on this bill.
- We appreciate our teachers for many things, including their ability to spark our young peoples' minds with critical thinking skills; the language from HB 544 would stifle that.
- Our country is at a crossroads with respect to racial and gender equity and inclusion.  These discussions in the classroom and in the workplace are tools we use in this country to combat systemic racism and gender inequality.
- This budget can be a better representation of the priorities the people of New Hampshire hold.
- Support a strong public education for all by funding our schools and striving to be a more inclusive and just community.

**Michelle Veasey:**
- Michelle is the Executive Director of New Hampshire Businesses for Social Responsibility.
- The divisive concepts language in the budget is grossly out of step with New Hampshire's workplace culture.  It will have a chilling impact on our workplaces and on our state.  It is a bill that is intended to hold us back and maintain the structure which will allow racism and sexism to flourish.
- These 243 businesses value their employees, and are not afraid to do the hard work to erase the structural racism and sexism in our organizations, schools and businesses.
- Many of the state's largest employers have signed on to the testimony submitted.
- We strongly urge you to protect the state, its people, and its businesses from this dangerous and damaging legislation.
- Diversity helps us to approach challenges with an innovated lens.
- An inclusive environment helps all employees to share their ideas and know they are valued.
- This language will make New Hampshire less attractive to potential employees.
- Remove HB 544 from HB 2-FN-A-LOCAL.

**Esperanza Rivera:**
- Support the developmental services budget in HB 1-A and the people that carry out the work.
- Ms. Rivera has family members and friends who have been supported by the Moore Center for several years.  The Moore Center is the lifeline to people with intellectual and developmental disabilities.
- If you don't fund this program it would threaten the essential services that people with disabilities rely on to maintain their health and independence.
- Fully fund the developmental services budget.

**Michael Kiess:**
- Michael testified on behalf of Vital Communities, whose top priority is housing.

- Make a significant investment in the Affordable Housing Fund.
- Currently, there are not enough places to live to meet the needs of our seniors, working families or our youth.
- The current market is not meeting their individual and shared needs.
- This is a shared challenge.  We cannot solve this alone.  We need to enable and create solutions.
- Your leadership is essential.  Public investment in the Affordable Housing Fund leverages private capital and town and federal resources.  Investors can help shape a new housing future for our communities based on low interest funds available from the Affordable Housing Fund.
- It is time to act together.

**Janet Ward:**
- Janet is opposed to SB 130, a bill which should have serious independent review.
- By directing public tax dollars to a private scholarship organization rather than requiring taxpayers to send their tax dollars directly toward home schooling, religious or private schools, which taxpayers might not wish to support, the bill's sponsors are trying to avoid our state constitution's prohibition regarding the use of public tax dollars to support schools.
- New Hampshire's scholarship organization will be working on commission, and can be paid up to ten percent of every dollar it provides.  This is an obvious conflict of interest.
- The bill's legislative oversight commission can only recommend legislative changes should it detect a problem.
- Your attention to these concerns is essential.

**Douglas McNutt:**
- Douglas is the Associate State Director for Advocacy at AARP NH.
- We need to do a better job providing home care services.  We need a broad based array of services.
- The adult medical daycare program allows working people to keep their loved ones at home, which is critical.
- With the Medicare rates being as low as they are, many of these services have closed.  It not only removes the service from Medicaid residents, it also takes it away from private payors who also need the same service.
- DHHS has suggested the presumptive eligibility be suspended.  Rather, it should be fully funded.  We need to get these services to people who need them in their homes as quickly as possible to avoid unnecessary institutionalization.

**Mary Roberge:**
- Fully fund all services for everyone receiving waivered services.
- It is less expensive to allocate funds for adequate home care than to pay for institutionalized and/or nursing home care.  Home care provides a healthy and safe living environment for those receiving services under the Choices for Independence and disability waivers.  The current pandemic emphasizes the

importance of ensuring New Hampshire residents, especially the elderly and physically disabled adults, continue to receive services and home care that provides for their wellbeing, safety and independence.
- It is important that services for our seniors and adults with physical disabilities are transparent in the rates that are established.  It is equally important our seniors and adults with physical disabilities become eligible for these services in a timely manner.

### Jonathan Weinberg:
- Mr. Weinberg is a member of the Concord School Board.  The board opposes both SB 130 and HB 544.
- Most of the burden of the NH Retirement System has been shifted to the local taxpayers.  Municipalities are carrying the brunt of these costs.
- We are not serving the needs of New Hampshire or the needs of its students with HB 544.  If we want to attract young people to this state, HB 544 would not be the mechanism to retain these young folks.  Remove this language from the budget.

### Rev. Jason Wells:
- Rev. Wells is the Executive Director of the NH Council of Churches.
- Adopting a budget is essentially a moral and value-based process, rather than a strictly fiduciary one.
- Reject the HB 544 provisions placed into HB 2-FN-A-LOCAL.  The sins of racism, sexism, genocide and more continue to wound our nation.  Many of our churches are already having the needed, honest conversations on these and other difficult topics.
- Our budget must prioritize public education for all.
- The Legislature should adopt the "People's Budget".

### Nancy Vaughn:
- The American Heart Association asks for the Senate's support in funding two of the most impactful ways to help improve health.  Fund a food assistance program to help under-resourced and struggling citizens, and provide tobacco cessation recourses to help youth stop vaping and adults trying to quit smoking.
- New Hampshire's food assistance program is a lifeline for thousands of Granite Staters, including children, the elderly and people with disabilities, who at times struggle to put food on their tables.  A modest investment of $200,000 each year will create a dollar-for-dollar match of state funds to Federal Supplemental Nutrition Assistance Program (SNAP) benefits spent on healthy produce at farmers markets and participating NH grocery stores.  This will help increase food access, make diets healthier, and lessen chronic illnesses.  The money spent on fruit and vegetables produces economic benefits for local farmers and communities, as well.
- One third of youth in our state are using tobacco products and many are now addicted to nicotine, caused largely by electronic cigarettes.  The DHHS Tobacco Prevention and Cessation Program has prioritized a cessation initiative

specifically tailored for those under age 18.   More people, including those on Medicaid, can be helped to quit smoking with additional funding.   An investment of $300,000 per year would support programs and help youth and adults quit tobacco and live healthier lives.

- Please remove a provision included in the House budget which repeals the enforcement authority of the NH Liquor Commission.   The section abolishes 21 enforcement positions within the Division of Liquor Enforcement.
- Pull the language concerning divisive concepts.

**John Willis:**
- Remove from the budget Section 330 in HB 2-FN-A-LOCAL, "Propagation of Divisive Concepts".
- School cirricula and staff training programs would become chaotic.
- There is no mechanism for defense against false accusations, and no provision for due process.
- The provisions contain expensive requirements for state agencies, contractors and subcontractors.

**Matthew Gerding:**
- Matthew is a middle school teacher and city councilor in Somersworth.
- Cities and towns throughout New Hampshire have been losing funding from the state year after year.   These repeated gaps in funding are causing dramatic rises in local property taxes, as well as harmful cuts to essential services in our public schools.
- NH schools and communities have advocated for decades the state is not performing its constitutional duty to fund public schools and yet they continue to be neglected.
- The Commission to Study School Funding examined equitable and adequate solutions to the school funding crisis and drafted a proposal that would alleviate the burden on local taxpayers and help provide a stronger education to students.   These proposals were intended to be incorporated into the state's budget.
- New Hampshire's education funding system remains extremely regressive, utilizes inaccurate funding models, is providing fewer resources to needier communities, and produces decreased educational outcomes for less-advantaged communities.
- Most importantly, the commission determined that the responsibility for these faults is due to the lack of funding by the state.
- The commission's recommendations will result in a true and complete reduction in local property taxes for the vast majority of New Hampshire's cities and towns.   The commission's proposals are glaringly absent from HB 1-A and HB 2-FN-A-LOCAL.
- Local property taxes are forced to rise in response to anemic state funding.
- The state needs to take dramatic efforts to reform the ways in which we fund public education.

**Teresa Moler:**

- Teresa is in remission from mental health problems.
- Providers and mental health facilities need funds from the government to provide treatment.
- On occasion, Teresa finds herself in need of emergency treatment. She wants to see 24/7 access to mental health treatment for all.

**Rep. Mary Heath:**
- This is not a budget that is good for New Hampshire citizens. It will result in higher property taxes.
- Do not promote SB 130. Vouchers are wrong for New Hampshire. They undermine public education and will put additional burdens on our education trust funds. Existing states that have adopted voucher programs are fraught with problems, fraud and lack of accountability for student learning.
- Remove the $1 million SWEPT reduction and apply those dollars to our local schools based on the 20/21 formula. The SWEPT reduction is frivolous and benefits only property-rich towns, and leaves districts like Manchester significantly underfunded. It will result in higher property taxes, and the money that is spent will not benefit our schools.
- Incorporate SB 135 into the school funding portion of the budget to address the impact of COVID on the enrollment and free and reduced lunch cuts that cities and towns have experienced.

**Deborah Nelson:**
- Ms. Nelson is a member of the Coalition for a People's Budget.
- As a prior school teacher, she dealt with multiple complex issues such as slavery, native removal, reconstruction, the many amendments to the Constitution, economics and equality, civil rights and women's movements. Students came to understand the complexity of America's past. She never had a student damaged by a greater understanding of racism and sexism. The language of HB 544 does our young people a great disservice. Her students care deeply about this state and this country.
- Remove the language of HB 544 from the budget.
- Please support public education and educators by funding public schools adequately.

**Sonia Prince:**
- SB 130 is bad for our public schools.
- New Hampshire tends to spend the least amount of money on education. We need to change that.
- It will cost our state a ton of money.
- Planned Parenthood has helped many women who are in need.
- Regarding HB 544, history can't be whitewashed. This is just an attempt to try and stop talking about racism. It is real and exists everywhere. We need to educate people to check their biases.

**Janet Perkins-Howland:**

- Ms. Perkins-Howland is an OB GYN and is passionate about issues surrounding reproductive equity.
- When times are the toughest, birth control and preventative care become even more essential.
- When people find themselves poor, their lives chaotic, when they're struggling that's time they need help with reproductive care.
- She is a big believer in preventionism. Pap smears and mammograms can catch small problems before they become big or deadly.
- We need to fund these programs to help people take care of themselves and prevent more deadly and costly interventions in the future.
- Don't undercut funding for reproductive services in New Hampshire. It is good public policy.
- Passage of HB 544 would effectively suspend inquiry and dialog to improve patient outcomes based on bias.

**Maris Toland:**
- Ms. Toland is a resident physician at Dartmouth-Hitchcock.
- She is concerned about the physical and financial separation link, and how it affects the ability of providers to deliver the care our state's low income, uninsured families rely on.
- As a provider of reproductive health services, she is repeatedly told by patients how much they rely on family planning to receive cancer screenings, birth control, STD screenings and testing and treatment, as well as patients who have lifesaving diagnoses. Without that service, they could have lost their lives.
- This budget disproportionately marginalizes people in communities. It is poor public policy planning.
- What purpose does the divisive concept language serve? It sensors speech on things that have value. We should be expanding our language, our understanding and our discourse on systemic racism and gender inequality.

**Dr. Marie Ramas:**
- Dr. Ramas is President-elect of the NH Academy of Family Physicians.
- She has witnessed firsthand the challenges communities face as they strive to achieve the American dream of life, liberty and the pursuit of happiness.
- Adding non-budgetary language into the language of HB 2-FN-A-LOCAL removes the focus on the important work our state faces as we emerge from the pandemic.
- She is deeply concerned her ability to practice medicine will be affected in an unethical manner in caring for both rural and urban patients.
- Community health centers in which she works receive both state and federal funds.
- Allowing divisive concepts into the budget will interfere with clinicians' ability to provide appropriate care that recognizes and validates the lived experiences of our patients.

**Carrie Duran:**

- She is a single mom of three articulate, smart, young ladies.
- Her youngest daughter, Katie, experiences Down Syndrome.  She currently receives in-home supports through their area agency.  The help of this amazing program helps Katie access her community safely and engage in developing skills she will need to live her best life.  Carrie is very grateful for this program.
- Fully fund developmental services in the budget.
- Equity, inclusion and diversity is talked about in the Duran household.  Having a child with a disability makes you become an activist and advocate from the moment your child is born.
- Speak up about injustice.
- Remove the divisive concept language.

**Abigail Carey:**
- Abigail is a current patient at the Derry Health Center.
- She accessed Planned Parenthood to secure safe birth control measures.
- She felt welcome in the health center.  They helped her apply for affordable health care insurance.
- Experiencing the compassionate care of Planned Parenthood helped her refer them to others.
- By requiring providers who offer abortion services to physically and financially separate abortion services from other types of care, makes it more difficult for people like Abigail.  This requirement is unnecessary and impossible for providers to comply with.  It places undue burden on someone looking to make the best option for themselves.
- Without Planned Parenthood people would go without essential care, just because it is too expensive.

**Carolyn Dever:**
- Divisive concepts is not a New Hampshire idea.  It is not a New Hampshire solution to a New Hampshire problem.  It is identical to bills across the country that mirror the previous administration's efforts to censor conversations about complex issues of history, identity and equality.  As employers across the state have made clear, the proposed legislation is regressive and, if passed, will do significant harm to New Hampshire's economy.
- Her son, Noah, is eager to learn all about the world around him.  He is one of only a few Black children in his school.  It is crucial not only for him but for all of his classmates to find ways to understand each other, to work together, to build our future together, in the context of their differences.
- We strengthen our communities when we recognize our differences and use them to work together.  We are stronger together; we are weakened when we fear each other.  When New Hampshire gives voice to all of its citizens, the state stands ready for future prosperity.
- Remove the divisive concepts bill from the state budget.  Demonstrate that freedom of speech still means something to the "Live Free or Die" state.

**Michael Claflin:**

- Michael is the Executive Director of HEAD, a nonprofit housing developer in Littleton.
- There are obvious moral and ethical issues contained in the language of HB 544, as well as potential, economical ramifications to our state.  It should be debated based on its language and its merits.  It should not be attached to or included in the budget.

**Lucas Meyer:**
- Lucas is Chair of 603 Board, which looks to give voice and power to young working people in this state.
- He supports the "Save Our Granite Stages" Act.  This is a new fund dedicated to some of the smaller music venues in our state which have been exceptionally hard hit by the pandemic, and face a long road towards recovery.
- A lack of culture and loneliness plague New Hampshire's young workers.
- This bill will bolster our live musical venues and bolster the cultural sector in our state, which is a huge economic driver.  It is also a tool in our state's toolbox to attract and retain young people.
- Keep this fund intact in the budget.

**Deb Howes:**
- Mrs. Howes is Vice-President of the Nashua Teachers' Union and a member of the Executive Council of the NH AFL-CIO.
- School vouchers or as some might call them, "Education Freedom Savings Accounts", do not belong in the state budget.  New Hampshire has a longstanding problem with underfunding its public schools, as witnessed by numerous lawsuits, i.e., Claremont and Claremont II.  Currently, the state is being sued by a group of school districts lead by Con-Val.  The voucher program envisioned by SB 130 does nothing to solve the problem of the disparate ability to fund an adequate education through local property taxes.  In fact, it exacerbates it.  Vouchers would drain $70-$90 million of limited education funding over three years to help students who are already in private schools or being homeschooled.
- A school like Ms. Howes' school in Nashua with 300 students, could potentially lose a classroom's worth of students in 2.5 years, and the funding that goes with them.
- With students leaving public schools under a voucher program, local districts will have to choose between raising property taxes or looking for program cuts that seem like extras such as arts, music, gifted programs, or consolidating classrooms or schools.  This will force already struggling public schools to eliminate those markers of a quality education that every parent values most for their children.
- If adopted on its own or part of the budget, the voucher program envisioned in SB 130 would further disadvantage all public schools and do the most damage to those in property poor towns and cities.

**Thomas Gaumont:**

- Divisive concept is an undemocratic concept.  If allowed to stay in the budget, it could set a precedent for creating an authoritarian form of education.
- John Dewey, who is viewed by many as the father of modern democratic education in the US, argued that curriculum should be relevant to students' lives, and include open discussions of current events and develops critical thinking skills.  Most teachers support and advocate for continued democratic educational practices.
- Do you want to support democratic educational practices in our state or would you rather support an anti-democratic step as manifested in the divisive concept provision of the current budget being developed?

**Coral Hampe:**
- Coral is President of the Timberlane Teachers Association.
- Schools in our state are compared to schools nationwide and worldwide.  Having a voucher program hurts the students who attend public schools.  Even as funding is drained away, overhead costs remain.  Districts will be forced to make cuts to programs like art, music, languages or sports.
- If we reallocate funding away from public schools, how do we give our students a well-rounded education that can compete worldwide?
- Do not include SB 130 in the budget.  Let's give our public school students the best opportunities possible.  Public dollars should stay with public schools.

**Kate Hilton:**
- One thing Kate loves about New Hampshire is our commitment to local control.  HB 544 is the state government's direct control of the speech of state employees and contractors.  We cannot live freely if we cannot speak freely.
- This legislation is not who we are.  Its language is not from New Hampshire.  This same bill is being proposed in ten other states.
- There are real budget implications and costs to the state to enforce this legislation, and to defend the lawsuits that will be filed on First Amendment grounds; to pursue litigation against those who will be morally justified to defy it.
- It is the ultimate irony that we need look no further than the language of HB 544 to see what state-perpetuated systemic racism and sexism looks like.
- Kate's son, Hans, expressed the importance of being able to speak openly with his teachers about systemic racism and sexism.
- HB 544 cancels New Hampshire's culture of local control, and our business communities' diversity, inclusion and equity efforts.  It also cancels our teachers and students' freedom of speech.

**Gary Cahoon:**
- Mr. Cahoon is the owner and administrator of Friendship Manor in New Ipswich.
- DHHS has suggested the suspension of the presumptive eligibility statute be continued for another two years.  Presumptive eligibility is a process to fast track eligibility for home and community-based services for those in desperate

need of these services, who upon review are deemed highly likely to qualify for them.

- Studies in several states have indicated presumptive eligibility does not increase costs, but rather reduces them overall by reducing unnecessary nursing home placements.
- The median time to determine financial eligibility for the state is 65 days, and in many cases require more than 90 days. This means elderly and disabled citizens go without services when they critically need them. Further, the time to determine eligibility has been significantly and negatively impacted by the pandemic. The entire process has become much more cumbersome.
- Please allow presumptive eligibility to work as intended.
- Unmet needs are not easily determined in residential care because services are not authorized until a client finds a bed. Mr. Cahoon receives 2-3 referrals per week for the 3-4 beds he has per year.
- The rates are too low. As a result, people are often forced to go without services, or are unnecessarily sent to nursing homes. These CFI rates need to be addressed.

**Mary Carlson:**
- Mary is in support of the developmental services budget.
- Her family is connected to the Gateway Services agency in Nashua. Her adult daughter has developmental disabilities, being on the autistic spectrum, and suffers from mental health challenges including significant anxiety. She is bright but learns painfully slow. Teaching her requires a great deal of patience and knowledge. Anything she learns needs to be broken down into chunks.
- Mary's daughter benefits from her interactions with her service providers, who work very hard for very little pay. In recent years it has not always been easy to attract and retain staff to provide her services.
- During the early months of COVID visits were minimal and Mary's daughter suffered.
- If funding is eliminated or reduced, those who receive services will suffer the most, including our most vulnerable individuals.
- Fully fund services for those who cannot advocate for themselves. Our society will be judged on how we treat our most vulnerable individuals.

**Julie Hilliard:**
- Julie has spent the last 30 years struggling to keep the teeth of her 30 yr. old son, Cameron, healthy. He is a difficult case and requires an OR certified dentist. The Hilliards, therefore, are unable to seek low cost or income based dental services. These specialists are hard to find and do not accept payment plans. Many times they are forced to travel out of state to find him dental care.
- Every couple of years Julie starts the process of coming up with funding and grants to pay for the procedure. Payment has to be guaranteed before an appointment will be booked, and then it is usually several months to get an appointment.

- Cameron routinely goes without dental care for long periods due to the difficulty of getting care and finding a dentist willing to take him as a patient.
- What New Hampshire provides for Cameron currently under Medicaid is to wait until he has painful abscesses, and then have the teeth removed on a strictly emergency basis. The dentist can't even clean the teeth or do any other dental work during the procedure. That means Cameron would suffer unbearable pain indefinitely, and have his teeth pulled out one by one until he has no teeth. This is shameful and seems deliberately cruel.
- New Hampshire Medicaid can't even authorize exceptions for special cases like Cameron.
- Cameron has many challenges but Julie wants him to have healthy teeth for as long as possible, and she works very hard to make sure he will.

**Elaine Fagga:**
- Elaine has a son who is transitioning this year into adult services, and she is very concerned about the staffing issues in Sullivan County. Pathways has been unable to staff her son's in-home support program for the last 3 years. When his school program ends in August, Elaine is afraid her son will end up back home with her full-time. She will be forced to place him in a residential program, as she is unable to take care of him full-time.
- Elaine has a ward that is currently living out of state, and will turn 21 in January, and transitioning into adult services as well. Her ward lives out-of-state as there are no programs in New Hampshire to meet her needs.
- The lack of housing services for people with dual diagnoses are nonexistent for the most part in this state.
- Pathways has helped with financing for Elaine's van, transportation being a vital service.
- Currently, no adult members of Elaine's family have access to dental care.
- The low funding reimbursement rates of CFI impacts the ability to hire and train staffing. New Hampshire needs to step up their Medicaid reimbursement rates.

**Regan Lamphier:**
- Regan has close ties with the disability community in New Hampshire. Her son, Ethan, had a major stroke when he was 3 years old. That is when they qualified for a direct support, which allowed her to keep her job, insurance and her home. She supports her family financially.
- Ethan had serious developmental disabilities, and was medically complex. He passed away suddenly at the age of 8. If he had reached adulthood, their need for home and community-based service would have continued.
- Regan cares deeply for those with disabilities, including many of our seniors.
- Currently there is a dire workforce shortage in this state. The Choices for Independence program is essential to keeping these individuals in their homes and out of institutions.

- The pandemic has exposed the gaping holes in our state safety net.  It doesn't benefit anyone when individuals fall through the cracks.  There are children and families in dire need across New Hampshire.  The crisis is real and growing.
- We have a moral and legal obligation to fully fund DHHS.  If the department is funded properly, our families and communities will be stronger and more successful.  That means a brighter future for everyone in New Hampshire.

**Courtney Lawson:**
- Courtney is currently on CFI.  There is a major issue with staffing.  She is receiving only half of her services, due to the low wages being paid.
- These rates must be raised.
- They deserve to be able to live independent lives.
- At the age of 40, Courtney does not want to go into a nursing home.

**Kayla Berry:**
- Kayla works for Courtney Lawson and assists her on the night shift.  Courtney is a complete quadraplegic.  Without the CFI funding there would be no way for Courtney to get out of bed.  There have been times previously when Courtney has been left in bed for 4 days.
- Courtney is unable to access mental health services.
- Kayla has, at times, worked 2 weeks straight, morning and night as there were no other available aides.  She has a full-time job elsewhere as well.
- Courtney's brother even helps out with her personal care.
- Many of the caregivers Courtney has had in the past left due to low wages.  They've gone to work at McDonald's, which pays more.

**Louisa Ledbetter:**
- Louisa is the parent of a 22 year-old with developmental disabilities who is supported by Pathways.
- Finding support staff who have experience with or understanding of the disabled across a wide spectrum of disabilities is difficult when the highest hourly wage is much less than a school paraprofessional.  The job itself is much more difficult than a paraprofessional as they are responsible for those they support out in the community as well as in the home.  They are entirely on their own when they provide this support.  They should be entitled to a wage competitive for what they do.  Parents entrust them with the physical, social and emotional support of their child, as well as helping to build functional life skills.
- It is hard to get the best quality when the wage offered is so low.  When you find dedicated staff who are willing to train and learn how to best care and support for your child, you want to be able to keep them.  A fair wage is one way to do that.  Not being able to offer a fair wage also significantly reduces the pool of candidates from which we can choose support staff for our children.
- Fully fund the developmental services budget to allow for a more competitive wage for support staff to work with the disabled in New Hampshire.

**Annie Johnson:**
- If this budget becomes law, thousands of Granite Staters like Annie would be at risk of losing access to critical, lifesaving health care.
- For thousands of people, under-insured or uninsured, there are no other viable options waiting in the wings to do this work.
- The average hospital ER, in a pandemic, cannot take on the task of providing these thousands of people with routine testing, early intervention for HIV exposure, checkups and providing birth control and free contraception. These people will either take on astronomical debt or go without care.
- Preventative health care saves taxpayer dollars at a rate of one dollar spent for every seven dollars saved.
- Planned Parenthood serves a huge community, literally 72 percent of the entire family planning program, and their services throughout New Hampshire ensure that anyone can access birth control, cancer screenings, checkups and STD testing.

**Dr. Sue Kim:**
- As a psychologist, Dr. Kim is obligated to speak up against HB 544 as it violates three of her profession's ethical principles and code of conduct.
- Her ethics code requires her to operate with integrity. For decades, psychology research has found that systemic racism, institutional, interpersonal and internalized racism all exist, and need to be discussed and addressed in order for people and our society at large to heal. If HB 544 passes, it would be illegal in the state for psychologists to present accurate, honest and truthful information about racism and sexism, information supported by empirical data.
- Dr. Kim's ethics code also requires her to uphold justice. If HB 544 passes, psychologists in this state would not be permitted to offer workshops, training and seminars designed to help people understand how unconscious bias operates, strategies to cope with psychological distress and discomfort related to discussing racism, and ways to become resilient rather than avoiding these important topics. Avoiding discussing something often makes things much worse than just learning how to talk about it.
- Dr. Kim's ethics code requires her to operate with respect for people's rights and dignity. As a psychologist, she must be aware of and respect people's differences, and attempt to eliminate her own biases. HB 544 would outlaw the training she would need in assessing and monitoring her hidden biases.
- Remove HB 544 from the budget bill.

**Nirav Kapadia:**
- Mr. Kapadia is a person of color, a father and a husband. He is a cancer doctor who serves in an underserved, rural, almost entirely white population in the North Country.
- To defund Planned Parenthood would devastate his patients. Many of them have their cancer screenings and detection through Planned Parenthood.
- Racism hurts white people as well.

- Black people are twice as likely to be ignored when having a heart attack, severe back pain or a migraine. To be able to talk about these things lets us understand these things. If we can understand these things, only then can we fix them.
- HB 544 is government overreach at its worse. How will it be funded?

### Rev. Dr. Gail Kinney:
- Dr. Kinney represents the Economic Justice Team of the United Church of Christ.
- A state budget conveys what we value. The budget the House delivered to the Senate is not a People's Budget, nor a moral budget. The House does not value health and human services based on the proposed back-of-the-budget cuts to an absolutely essential state agency. The House doesn't seem to value safe and accessible reproductive and related health services for women in New Hampshire. The House doesn't value providing needed adequacy support for public schools. But, apparently, the House does give priority to shifting adequacy costs downward to local property taxpayers, with the low income and municipalities being hurt the most.
- HB 544 calls for the censoring of public agencies, state contractors and public educational institutions when it comes to training or teaching about systemic racism or sexism and implicit bias, all things which are still among us. This language has no business in the budget trailer bill, and in New Hampshire statute period. It is breathtakingly vague, it calls for censorship, it mandates that certain topics can be discussed only "without endorsement". It calls upon the Department of Administrative Services to become the "thought police". It is incredibly frightening in its scope, and is completely unworkable. If this language becomes law, it will become a national story, and it won't be a positive story for New Hampshire. It will bring shame and economic consequences.
- Crafting HB 2-FN-A-LOCAL is not a game. Remove this language entirely from the budget trailer bill.

### Alex Koutroubas:
- Dennehy & Bouley have many clients with strong interests in the state budget.
- Fully support long-term supports and services under DHHS.
- We also need to support our state's hospitals, assisted living homes, senior centers, Meals on Wheels, and our fellow citizens with disabilities.
- They are strongly opposed to the divisive concepts language in HB 2-FN-A-LOCAL.
- Dennehy & Bouley represents ACEC-NH, an engineering firm in this state. Many of these clients work for state agencies. New Hampshire's engineers oppose contractual language that is unreasonable and overly burdensome to comply with.
- We will put important state contracts at risk if we go down this road. Remove the language from HB 2-FN-A-LOCAL.
- Restore the state aid grant program for our cities and towns.
- Fully fund DOT's budget to continue to keep the traveling public safe.

**Dr. Clare O'Grady:**
- Dr. O'Grady is a family medicine resident physician. She practices medicine in a rural clinic. Bucolic landscapes, fresh farm produce and neighborly waves unfortunately mask the health care disparities her rural patients face.
- In the past year of her practice, Dr. O'Grady has listened to her patients' stories about newfound poverty as the few local businesses in town closed their doors. She's witnessed retrogression in their mental health at the hands of pandemic-induced seclusion atop the physical seclusion they already possess simply by being a rural resident. Most tragically, she has watched them decline lifesaving treatments because they can no longer afford the gas to drive the forty miles to specialty clinics.
- New Hampshire is a state that is comprised of an expansive and proud rural population that already struggles with access. Ultimately, limiting availability to medically-proven, safe, family planning programs, as is suggested in HB 2-FN-A-LOCAL, will further widen this gap. This will be true especially for Dr. O'Grady's rural patients, for rural women, and for herself.
- This goes against the very autonomy that this state boasts and promises to its residents.

**Janine Lademan:**
- Janine is opposed to any cuts to the mental health services budget. She has a 19 yr. old son and is desperately seeking mental health services for him. He has been experiencing delusions and has been hallucinating. She was able to admit him to the ER department, but he needed hospitalization. He stayed in the ER for one week while his mental health unraveled. He was finally transferred to a stabilization unit in Manchester, where he was placed on medication. After five days he was sent home.
- Janine cannot get an appointment for her son until mid-July. His medication is running out and she can't find anyone to manage his refills.
- In the meantime she has called every psychiatrist, counselor, hospital and counseling center in New Hampshire and Massachusetts. Most places don't bother to return a call.
- Just today they went back to a different ER but her son was turned away. Apparently, her son is not psychotic enough for hospitalization and services.
- What will it take to get help? Where are the services in this state? The lack of mental health resources in this state is shameful.
- Dedicate and prioritize funds and resources to provide mental health services to those who so desperately need it.

**Anna Shultz:**
- Anna is a home health social worker and a private geriatric care manager. She supports the proposed rate increases for the CFI program. Many of the individuals she assists are in dire need of more hours to meet the assigned hours by the state.

- Should she report CFI to the state Adult Protective Services program for neglect?  How can she help these patients get the services they need?  If they received the appropriate level of care, most of them would be able to stay in their own home.
- The rate increase would help secure consistent staff, have a regular schedule of living and ensure the type of help needed to the CFI recipients is available day, night and weekends.  The proposed rate increases are needed to make sure people on the CFI program are assisted in their home in order to stay in their home.
- Support the rate increase to CFI in this budget as it will directly impact your constituents and is the economically, sound choice over more costly institutionalized care.

**William Rescsanski:**
- Property-poor towns like Charlestown will not receive adequate aid for school funding.
- Property-rich towns like Newington pay $2.70 per thousand dollars of property value for school funding.  Charlestown pays $24.89 per thousand dollars of property value as it is a property-poor town.  This is nine times more than Newington's.
- Charlestown spends so much money on school funding that it always looks for ways to cut or constrain municipal spending.  The town cannot grow or do fun things like hire a recreation director.  It struggles to maintain existing assets.  Residents like William cannot afford to retire in Charlestown.
- Every year Charlestown has at least 20 properties with delinquent taxes.  Ten were sold last weekend.
- It is hopeful the Con-Val lawsuit will solve these problems.
- Charlestown's tax rate would be much lower if the state provided adequate funding for students.
- Please increase aid for school funding for property-poor towns with low equalized value per pupil.  HB 623 would have done this.  Include this bill, or something like it in the state's budget.
- According to the NH School Funding Fairness Project, 4.4 percent of the SWPT reduction flows to 20 most property poor towns in New Hampshire.
- The New Hampshire Constitution requires taxes to be proportionate and reasonable.

**Ilyssa Sherman:**
- The current budget makes it impossible for reproductive health centers to be part of the New Hampshire family planning program because of unnecessary requirements designed to defund abortion care providers.
- This language is clearly only intended to make it impossible for reproductive health centers to participate in the family planning program, even though 79 percent of patients in the program are cared for at reproductive health centers.  Ilyssa has been one of those patients.

- Ilyssa's father passed away two months prior to her wedding.  She had just turned 26 and was relying on her father for health insurance until her wedding.  Her only option was to go on COBRA, but with the waiting period Ilyssa went without insurance for two weeks.  During this time period she had a flare up with endometriosis, and had been seeing a specialist to manage her condition.  However, she could not afford to see the specialist without insurance.
- Ilyssa made an appointment at her local Planned Parenthood health center, where she received the patient-centered care she needed at the time.  In a time in her life when she felt so incredibly broken, the staff at Planned Parenthood helped her start the process of picking up the pieces.
- Four years later Ilyssa is a sexual and reproductive health nurse.  She now speaks as both a former patient and as a caregiver to this population.  Many of her patients have low incomes or are uninsured and rely on the low or no-cost services provided through the family planning program.  They deserve access to preventative care.  Don't take this care away, especially during a time when accessibility is already an incredibly large barrier.
- Reproductive health services are so greatly needed for people all across New Hampshire.  It is completely unacceptable that this budget prioritizes slashing access to preventative health care, especially in the midst of a pandemic.
- If finalized, this budget will cause an undue physical and psychological burden on people all across New Hampshire, and will result in a public health disaster for this state.

**Laura Vincent:**
- SB 130, Education Freedom Accounts, should be omitted from HB 2-FN-A-LOCAL.
- There is a lack of accountability in this bill for student outcomes in the language about EFAs.  Although the language has been amended to include three choices to measure student progress, a large loophole remains.  The three choices listed to assess student progress are:  (1) using the NH state assessment used in public schools; (2) using another standardized test; and (3) using an evaluation of a portfolio of student work.  This assessment by portfolio evaluation is where the loophole lies.
- For instance, a student being homeschooled could have their portfolio evaluated by any "teacher" selected by the parent.  The teacher doing the evaluation, perhaps a relative or friend of the family, does not have to be certified and does not have to have experience at the student's grade level, such as a non-certified teacher working in a private kindergarten evaluating a high school student's portfolio.
- There is no language requiring this portfolio evaluation to be reported to the state or school district, only to the scholarship organization.  The scholarship organization is not authorized or required to do anything further with the portfolio, and is not authorized or required to terminate an EFA even if the student shows no progress year after year.
- Although this situation may not occur frequently, when it does occur, there is no recourse for addressing the student's unmet needs.

- This issue could be considered under the increased scrutiny of a stand-alone bill.

**Mary Wilke:**
- It is critical the entire $89 million funding loss that school districts are facing be restored to the budget.  Even with this money, many of our districts will remain grossly underfunded.  This is a bare minimum.
- Don't included SB 130, the voucher bill, in the budget.  The bill needs the kind of close scrutiny it can only get as a stand-alone bill.  SB 130 has many problems associated with it.
- The private nonprofit and for-profit educational service providers that would be paid with our money are not required to have any particular credentials, licenses or certification, or even to conduct criminal background checks on employees who would be working with children.
- Nothing in the bill prevents employees of the scholarship organization or their family members from setting up their own for-profit tutoring service or therapy center, steering parents to those providers, and then paying them with our taxpayer dollars.
- Why does the bill grant the scholarship organization immunity from legal liability?  They won't be held to the usual standard of reasonable care that applies to the rest of us.  We the taxpayers have the right to expect them to use reasonable care if they are going to handle tens of millions of dollars of our collective money.
- The LBAO has not issued a detailed fiscal analysis of the impact of this bill.  Meanwhile, the DOE has made some fiscal predictions that need more scrutiny.
- If a child took an EFA, the associated public school would lose the adequacy money and differentiated aid it would otherwise receive on the child's behalf.  Yet the child could continue to attend public school for up to 50 percent of each week for the remainder of the child's school life.
- If the child had special needs the public school would remain responsible for addressing all of the special needs, which can be very expensive, without receiving any of that state assistance.  The money would be going to the private school which would have no obligation to provide special ed services.
- Don't place SB 130 into the budget.

**Morgan Wilson:**
- The House budget defunds Planned Parenthood of Northern New England  and independent abortion providers.  It defunds essential health care providers during a pandemic.
- As a former patient of Planned Parenthood, Morgan knows firsthand the importance of the reproductive health services they offer.  She has the knowledge she can always return to Planned Parenthood for understanding, compassionate care.  They offer high quality care while making it affordable for those under-insured or uninsured.
- Many are only able to access vital reproductive health care through Planned Parenthood.
- This program is greatly needed for people like Morgan all across the state.

- This budget will cause significant harm to public health in New Hampshire, and reduce the access residents have to affordable health care services.
- Please oppose this language in the budget.

**James Bomersbach:**
- Mr. Bomersbach is a licensed psychologist in New Hampshire.
- HB 544 is based on factual falsehoods.  The claims made about Critical Race Theory and other theories are not based in reality.
- We should be focused on increasing discussion of bias, in all of its forms, across this state.  That is how we are going to do as much as we can to eliminate these from society.  That should be our goal.
- This bill puts us in the wrong direction.
- In consideration of the practical side of this, there are costs associated with this that are not included in the bill, including enforcement and the inevitable legal challenges.
- New Hampshire could lose out on important infusions of money to the state because we will become one of the few states who has passed this type of hateful rhetoric.

**Rep. Larry Welkowitz:**
- As the Chair of the Psychology Department at Keene State College, disgusting, divisive concepts are at the heart of academics.  Classroom conversations are essential to breaking down core issues.
- They talk about institutional racism in professional psychology.  Why are there so few blacks in psychology?
- In New Hampshire there is no public program for doctoral level education in clinical psychology.  We may be the only state in the country without one.
- Can we talk about differential impacts on people with different economic status?  We must.
- We can't simply avoid divisive concepts if we are to effectively review and discuss all these types of topics.
- A vote for this bill is a strike against the academic process.  The language won't be followed in academia.
- There will be an immediate First Amendment challenge in court, that will sadly have to be paid for by the citizens of New Hampshire.
- Oppose this section of the budget.

**Dan Weeks:**
- Dan is a Director and Co-Owner of ReVision Energy.
- Their business is always concerned with bringing their employees back, particularly female employees.
- Keep the budget level funded so that families experiencing hardship during the pandemic can afford childcare they need to keep working, or get back to work.  This will ensure equity in the workforce.
- ReVision Energy has been awarded many public sector contracts to install energy systems for different municipalities and school districts.  It's not the

state's business what internal trainings they offer their employees to support an inclusive workplace.
- They struggle to meet their workforce needs.  They need to retain young people and attract new workers out of state to New Hampshire.
- Passing the language of HB 544 will be a black eye for our state.  It will attract a lot of national negative attention.
- It will make it harder to create the kind of diverse, productive, inclusive workforce that is good for their business and for our state.
- The requirements of HB 544 are onerous.

**Crystal Paradis:**
- Crystal was diagnosed with menorrhagia.  The symptoms leave her unable to work or do any usual tasks a few days each month.  She was uninsured and reached out to Planned Parenthood for help.
- As Crystal was uninsured and low-income, the services Planned Parenthood provided her were 100 percent covered by family planning funding.
- This access to timely, compassionate care changed Crystal's life.
- Everyone is aware of the potential gap in Title X funding for family planning services here in New Hampshire.  Cutting this critical gap funding would be unnecessarily cruel as we recover from the biggest health crisis in generations.
- Amend HB 1-A to include funding for this 9-month gap for family planning.

**Hunter Porter:**
- The Nashua High School South Democrats oppose HB 2-FN-A-LOCAL because of the horrendous inclusion of HB 544.  The bill would prohibit students from truly learning the history of our country.  Teachers would be unable to fully discuss the racism and sexism that colors the past and present of this country.
- As can be seen in the police killings that engulf our news, police officers have a clear bias against people of color.  This bias has fatal consequences.  Bias training is a necessary and extremely important part of police training.  Prohibiting the state from providing bias training opens the door to racism and sexism in many workplaces.
- Racial sensitivity training helps people of color and women from experiencing micro-aggressions that white people may not have been aware of before the training.  This is extremely harmful to marginalized groups because they will not feel completely safe in their workplaces.
- People should not expect to experience racism and sexism in their workplaces.  Some may say if people feel uncomfortable in their workplace, they should leave.  This is not a choice for many New Hampshire citizens.

**Nicolette Gallibrano:**
- Private schools are often more well funded, and can offer exciting opportunities that our public schools have been forced to cut by repeated reductions in state funding.
- The private school and the scholarship organization benefit from education freedom accounts, not the family.

- When private schools give students scholarships based on need, they ask to see what resources the family has available to them, including any other grants and scholarships. They take these resources into account.
- There are much better uses for state funds for education. This is just one of the many flaws and gaps in SB 130 that need to be considered and addressed. It's unlikely in a budget year the Legislature will have the capacity to do so.
- SB 130 should not be rolled into the budget.

**Dennis Calcutt:**
- Dennis is the Director of Connected Families NH. They have benefited from children's mental health services. They are a care management entity for the state.
- If HB 544 remains in the budget, they would be in direct conflict of its provisions. They would probably have to return grant money to the federal government, and cease the work they are doing. This would hamper the progress they have made around the system of care work, as well as children's mental health.

**Katrina Miamis:**
- Katrina suffers from endometriosis, which made her physically incapable of going to work  Her pain was greatly reduced by having an IUD inserted at the Lovering Health Center in Greenland. She no longer misses work due to pain.
- A cut in funding will be a reduction in resources, and women like Katrina will go untreated.
- Don't exclude the Lovering Health Center from the state's family planning program.

**Former Sen. Melanie Levesque:**
- No one should be blamed or made to feel guilty for the acts of the past.
- What may seem divisive to one person, may be a life experience of another.
- Sen. Levesque's own parents were unable to purchase a home as the realtor would not sell it to them. Their neighbors voted on whether to allow them to move into the neighborhood.
- Unbiased information is very difficult to find these days. Public institutions are defunded and speech is stifled. Neighbors turn against neighbors.
- Our government puts divisive language such as HB 544 into our laws.
- Remove the divisive language from the state budget. Produce a budget that allows all of our people in New Hampshire not just to survive, but to thrive.

**Rep. Matt Wilheim:**
- Rep. Wilheim's legislative district encompasses the heart of downtown Manchester and the historic Millyard.
- He supports the Save our Granite Stages Act.
- Downtown Manchester is home to a number of small to mid-size performance venues.

- The live music industry was the first to close during the pandemic, and will be among the last to reopen.
- It's been heartbreaking to see how the pandemic has impacted the livelihood of Rep. Wilheim's friends and former coworkers.
- There was a clear, direct increase in direct economic activity on nights when there was a show in town.
- It's critical we do what we can to support these economic drivers for communities across our state.
- Include Save our Granite Stages Act in the state budget.

**Karen Blake:**
- Fully fund all the line items for developmental disabilities services in the budget, and the people who carry out the work, such as direct support professionals.
- Support the adult dental benefit, as well as funding for the 10-Year Mental Health Plan.
- Her 14 yr. old son has been diagnosed with autism and ADHD, and is currently supported by Northern Human Services through the In-Home Supports Waiver.
- They have also received family-centered supports and services in the past.
- They consider themselves lucky having been able to find a provider for their son. It took them two years to find one.  These services are helping their son to work on social interaction, using money and beginning to cook using the microwave. Someday, likely, he will need support to be a successful adult.
- As a Medicaid recipient he will need adult dental benefits and employment support to live as independently as possible.  He may need mental health services and support as well.

**Rep. Maria Perez:**
- We need to work at diversity inclusion.
- HB 544 doesn't belong in the budget.
- More people in our communities are suffering from mental illness due to the pandemic.  We are losing many lives.  We need to provide more of these services.

**David Docken:**
- David has a sister who has been on the CFI program for a number of years.
- This program helps her and is essential.
- There is not enough money to pay caregivers to come into the home and provide the services required.
- There should be more oversight to guarantee these services are actually performed, and the caregivers are trained.
- Without this funding costs will increase for the state on many different levels.

dm
Date Hearing Report completed:  May 23, 2021



Senate Finance
May 28, 2021
2021-1799s
08/10

Amendment to HB 2-FN-A-LOCAL

1   Amend the bill by replacing all after the enacting clause with the following:

2

3   1  Reimbursement of Sheriff's Offices.  Amend RSA 104:31, X-XI to read as follows:

4   X.  ***The judicial branch shall incorporate remote technology whenever possible to***

5   ***minimize the amount of physical transportation and security time associated with court***

6   ***hearings.***

7   *XI.*  The [state] *judicial branch* shall reimburse the sheriff's office for court security,

8   within available funds appropriated by the legislature, $80 for each full day and $40 for each half

9   day, plus traveling expenses to attend any official business, for any person employed as a bailiff by

10   the sheriff's office.  For the purpose of this paragraph, a half day shall be defined as a day in which a

11   bailiff works 4 hours or less.  The [state] *judicial branch* shall reimburse the counties, within

12   available funds appropriated by the legislature, for all costs associated with employing court bailiffs,

13   if those costs are the result of job requirements imposed by federal and state governments.

14   [XI] *XII*.  The [state] *judicial branch* shall reimburse the sheriff's office for prisoner

15   custody and control, within available funds appropriated by the legislature, $65 for each full day and

16   $35 for each half day, plus traveling expenses to attend any official business, for any person

17   employed as a sheriff for prisoner custody and control.  For the purpose of this paragraph, a half day

18   shall be defined as a day in which a sheriff works 4 hours or less.  The [state] *judicial branch* shall

19   reimburse the counties, within available funds appropriated by the legislature, for all costs

20   associated with employing sheriffs, if those costs are the result of job requirements imposed by

21   federal and state governments.   Billing for reimbursement of costs associated with video

22   arraignments shall not be allowed under this paragraph.  Custody and control of prisoners for the

23   purpose of video arraignments shall be the responsibility of the county in which the video

24   arraignment occurs, and such custody and control may be exercised by county correctional officers.

25   2  State Heating System Savings Account.  Amend RSA 21-I:19-ff to read as follows:

26   21-I:19-ff  State Heating System Savings Account.  There is hereby established the state heating

27   system savings account for the transfer of unexpended state heating system appropriations due to

28   reduced heating system costs resulting from the 26 state buildings served by the Concord Steam

29   project authorized in 2017, 2.  Notwithstanding RSA 21-I:19-e, at the end of each state fiscal year,

30   the commissioner of administrative services shall identify the unexpended appropriations in the

31   accounts and class lines for the 26 state buildings served by the replacement of the Concord Steam

32   facility.  The commissioner shall deposit such sums into the account established by this section.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 2 -**

Funds in the state heating system savings account shall be nonlapsing and appropriated to the department of administrative services for the biennium ending June 30, [2019] *2021,* and the fiscal year ending [2020] *June 30, 2022* and may be used to pay principal and interest on bonds and notes issued to fund the capital project for the heating of state facilities located at the Governor Hugh J. Gallen state office park and state-owned buildings in downtown Concord.

3   Divisions of Procurement and Support Services; Planning and Management Functions. Amend RSA 21-I:11,I(c)(4) to read as follows:

(4)   Supervising the [activities and functions of the bureau of] planning and management *functions of* [under] RSA 21-I:12, II(a).

4   New Subparagraph; Graphic Services Fund Established; Department of Administrative Services.   Amend RSA 21-I:12, I by inserting after subparagraph (e) the following new subparagraph:

(f)(1)   There is hereby established in the state treasury a graphic services fund, which shall be a revolving fund administered by the department of administrative services.  The fund shall be nonlapsing and continually appropriated to the department of administrative services.  Revenue received by the bureau of graphic services shall be deposited into this fund.

(2)   The graphic services fund shall be maintained at such a level as to cover the necessary costs of the administration, management, operations, activities, positions, capital, or other needs of the bureau of graphic services.  The department of administrative services may use any excess amounts in the fund to fund the administration, management, operations, positions, activities, capital, or other needs of the department or any of its divisions, bureaus, units, or subunits.

5  Division of Plant and Property; Planning and Management.  Amend RSA 21-I:12, II to read as follows:

II.  The division of plant and property shall [include the following internal organizational units and functions]:

(a)   [A bureau of planning and management under the supervision of a classified administrator of planning and management who shall be] Be responsible for the following functions *relative to planning and management*, in accordance with applicable laws:

(1)   Recommending assignment of office and office-related space, including rented space, or space under consideration for rental, to the director, who shall report such recommendations to the commissioner.

(2)   Preparing and maintaining an inventory of all physical space in real property rented or leased for use by the state.  This inventory shall be made available to the comptroller in order to assist the comptroller to comply with accounting principles.

(3)   Planning for any additional office space needs of the state in consultation with the division of public works design and construction.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 3 -**

1    (4)  Planning for any major renovation to state office buildings in consultation with
2    the division of public works design and construction.

3    (5)  Centrally managing all space rented by, or all proposed rentals of space by, state
4    agencies, and providing central administration and management of the processes by which space is
5    rented by state agencies, except as is otherwise provided by law.  Unless otherwise allowed by law,
6    agencies seeking to rent space shall do so only in consultation with the bureau of planning and
7    management.  The central management and administration provided by the bureau shall include
8    assisting agencies in their selection of property, in the formulation of rental documents, in the
9    preparation of notices, in agencies' solicitation of bids or proposals and selection of lessors, in space
10   planning, in office layout, and in such other matters as are necessary for effective central planning
11   and management relative to rented space but shall not include the power to enter into rental
12   agreements on behalf of an agency.

13   (b)  ***Include the following internal organizational units and functions:***

14   ***(1)***  A bureau of general services under the supervision of a classified administrator
15   of general services who shall be responsible for the following functions, in accordance with applicable
16   laws:

17   [(1)] ***(A)***  Providing support services, including but not limited to, mailing and
18   messenger services to state government.

19   [(2)] ***(B)***  Providing for the general maintenance of state-owned buildings and
20   grounds, except as otherwise provided by law.

21   [(c)] ***(2)***  A bureau of court facilities under the supervision of a classified administrator
22   who shall be responsible for the following functions, in accordance with applicable laws:

23   [(1)] ***(A)***  Providing suitable court facilities for the conduct of all court sessions held
24   within each judicial district and county, subject to the availability of appropriated funds, in
25   accordance with RSA 490-B.

26   [(2)] ***(B)***  Providing for the general maintenance of state-owned court buildings and
27   grounds, except as otherwise provided by law.

28   [(d)] ***(C) Be responsible for*** the department's functions relating to energy management,
29   managed by such personnel as may be assigned by the commissioner.

30   [(e)] ***(D) Be responsible for*** the department's support of facilities of the department of
31   health and human services managed by such personnel as may be assigned by the commissioner.

32   6  Department of Administrative Services; Payment and Procurement Card Fund.  Amend RSA
33   9-D:3, III to read as follows:

34   III.  All funds accumulated from rebates under RSA 9-D:2, I(a) or (b) shall be deposited in the
35   fund established in paragraph I.  Expenditures from the fund shall be restricted to the following
36   purposes:

1    (a)    Paying the necessary costs of administration and management of the credit,

2    payment, or procurement card programs handled by the department of administrative services and

3    maintaining a working capital reserve in an amount, not to exceed $25,000, which is deemed

4    sufficient by the division of procurement and support services to cover the costs of the programs and

5    to pay amounts under [subparagraph] *subparagraphs* (b)(1) *and (2)*.

6    (b)    After deducting the foregoing amounts, making such payments, if any, that the

7    department of administrative services concludes are appropriately payable:

8    (1)    By an entity which is part of the state to any credit, payment, or procurement

9    card issuer under contracts secured by the division of procurement and support services pursuant to

10   RSA 21-I, including but not limited to payments for purchases and payments which must be made in

11   order for the state to obtain available rebates, or to avoid incurring, or to pay, interest, penalties, or

12   other costs imposed on the state by issues of credit, payment, or procurement cards.

13   (2)    [To the state's general fund or any federal, highway, turnpike, or liquor fund, as

14   a share of rebates obtained on credit card contracts under RSA 9-D:2.  The] *To the* department of

15   administrative services [shall pay any remaining] *to address its procurement-related needs or*

16   *expenses.  The department may use* rebate amounts to [the general] fund *its administration,*

17   *management, operations, positions, activities or capital, or other needs, or the needs of any*

18   *of its divisions, bureaus, units or subunits, relating to the procurement of goods or services*.

19   7    New Subparagraph; Graphic Services Fund.   Amend RSA 6:12, I(b) by inserting after

20   subparagraph (364) the following new subparagraph:

21   (365)    Moneys received by the department of administrative services, division of

22   procurement and support services, bureau of graphic services which shall be credited to the graphic

23   services fund established in RSA 21-I: 12, I (f).

24   8    Department of Administrative Services; Consolidation of Human Resources and Payroll

25   Functions.

26   I.    Notwithstanding any law or administrative rule to the contrary, the commissioner of

27   administrative services, with the prior approval of the fiscal committee of the general court and the

28   governor and council, may make such transfers of appropriation items and changes in allocations of

29   funds available for operational purposes to the department of administrative services from any other

30   agency necessary to effectuate the efficient consolidation or deconsolidation of human resources,

31   payroll, and business processing functions within state government.   Such business processing

32   functions shall include:

33   (a)  Accounts receivable;

34   (b)  Accounts payable;

35   (c)  Collection of fines, penalties, fees, restitution, remittances, and other moneys due to

36   the state; and

**Amendment to HB 2-FN-A-LOCAL**
**- Page 5 -**

1    (d)  Such additional finance, accounting, and other functions and transactions that the
2    commissioner of administrative services determines may potentially achieve substantial efficiencies
3    from consolidation.

4    II.  The commissioner of administrative services may establish the number of total personnel
5    required for human resources, payroll, and business processing functions in the executive branch of
6    state government and, with the prior approval of the governor and council, may eliminate
7    unnecessary positions and may transfer positions to or from the department of administrative
8    services to or from any other agency if the commissioner of administrative services concludes that
9    such transfers or eliminations are necessary to effectuate the efficient consolidation or
10    deconsolidation of human resources, payroll, or business processing functions within state
11    government.  Such transfers may, if deemed appropriate by the commissioner of administrative
12    services, include the transfer of all associated books, papers, records, personnel files, and equipment,
13    including, but not limited to, work station and information technology equipment, and may, if
14    deemed appropriate by the commissioner of administrative services, include the transfer of any
15    unexpended appropriations for any of the foregoing, and any unexpended appropriations for salary,
16    payroll, benefits, support costs, or any other costs associated with the transferred personnel.  The
17    department of administrative services may also establish new full-time temporary positions within
18    the department, if the commissioner of administrative services deems it necessary to effectuate the
19    efficient consolidation or deconsolidation of human resources, payroll, or business processing
20    functions.

21    III.  The commissioner of administrative services may locate personnel whose positions have
22    been transferred in such work spaces as the commissioner determines will efficiently effectuate the
23    consolidation or deconsolidation of functions.  Such work spaces may include either space currently
24    owned or rented by the state, or space which may be rented by the commissioner utilizing amounts
25    which may be saved by the state as the result of the consolidation or deconsolidation of functions.

26    IV.  If the commissioner of administrative services consolidates, deconsolidates or, pursuant
27    to 2015, 276:2 or other law, has consolidated or deconsolidated, any human resources, payroll, or
28    business processing function and subsequently determines that such consolidation or deconsolidation
29    is not cost effective or beneficial to the interests of the state, the commissioner may, with the prior
30    approval of the fiscal committee of the general court, deconsolidate or reconsolidate, fully or
31    partially, any human resources, payroll, or business processing function within the executive branch
32    of state government.  As part of a deconsolidation, the commissioner, after consultation with the
33    heads of such executive branch agencies as may be affected, shall determine positions to be
34    transferred to another agency, shall determine positions to be transferred elsewhere within the
35    department of administrative services, or shall determine positions to be eliminated.

36    V.  Any unspent balance remaining of the $250,000 appropriation made by 2011, 224:86 to
37    the department of administrative services for the biennium ending June 30, 2013, for the purpose of

1    selecting and retaining an independent business processing consultant to evaluate and make
2    recommendations relative to the consolidation of business processing functions within state
3    government, shall not lapse until June 30, 2023.  The department of administrative services may use
4    this balance to fund such projects, functions, or activities as the commissioner of administrative
5    services may direct relating to the efficiency of state government, including, but not limited to, the
6    selection and retention of an independent business processing consultant and/or other projects,
7    functions, or activities relating to the consolidation or deconsolidation of human resource, payroll,
8    and business processing functions.

9        9  New Paragraphs; Department of Administrative Services; State Employee Health Plan;
10   Application.  Amend RSA 21-I:30 by inserting after paragraph XVI the following new paragraphs:

11       XVII.  The cost sharing and plan design for unrepresented active state employees who
12   participate in the health plans offered by the state shall be the same as those for individuals covered
13   by the collective bargaining agreement between the state of New Hampshire and the State
14   Employees' Association of New Hampshire, Inc.  Changes to the above plan design cost sharing
15   provisions consistent with RSA 21-I:30, I are permitted with the prior approval of the fiscal
16   committee of the general court.  The cost sharing and plan designs for represented active state
17   employees who participate in the health plans offered by the state shall be in accordance with the
18   provisions of the collective bargaining agreements between the state and the employee organizations
19   representing those employees.

20       XVIII.  Agencies may use funds in existing class 60 budgets to pay any penalties imposed
21   under the employer shared responsibility for health coverage under section 4980H of the Internal
22   Revenue Code.

23       10  All Agencies; Electronic Mail.  Unless restricted by law or administrative rule, upon request
24   of an intended recipient, an agency may provide documents by electronic mailing in lieu of mail.

25       11  Department of Administrative Services; Funding and Staffing Resource Limitations.

26       I.  Due to inadequate funding and staffing resources at the department of administrative
27   services, the commissioner of the department of administrative services may suspend the obligations
28   or requirements under RSA 21-I:7-c as it applies to addressing performance and financial legislative
29   budget assistant audit findings from 2006, 2011, and 2014 regarding management of the employee
30   and retiree health benefit program, including establishing rules and operational policies for the
31   program, for each fiscal year of the biennium ending June 30, 2023.

32       II.  Due to inadequate funding and staffing resources at the department of administrative
33   services, the commissioner of the department of administrative services may suspend the following
34   requirements or obligations of the department for each fiscal year of the biennium ending June 30,
35   2023:

36       (a)  The provisions relating to identification and implementation of energy efficiency
37   projects in compliance with the governor's executive order 2016-03.

(b)  The provisions relating to data analysis and the development of performance metrics for buildings and vehicles to monitor energy and water usage, use of fossil fuels, and greenhouse gas emissions in compliance with governor's executive order 2016-03.

(c)  Rulemaking required by RSA 21-I:14, V, standards for the provision of graphic services which will ensure efficiency and high quality work; RSA 21-I:14, VI, standards governing the purchasing and continuing ownership of graphic services equipment by agencies not exempted by RSA 21-I:12, I(e); RSA 21-I:14, VII, standards governing the allocation and use of state photocopiers by the agencies not exempted by RSA 21-I:12, I(e); RSA 21-I:14, XIII, management of the state employees and retiree group insurance program authorized by RSA 21-I:26 through 36 and the programs established in RSA 21-I:44-a and RSA 21-I:44-b; and RSA 21-I:14, XVI, public works services, including bidding for major projects as described in RSA 21-I:78, as authorized by RSA 21-I:80; RSA 21-I:81, and RSA 21-I:82, bidder qualifications, agency requests for public works services, charges and fees, selection of persons or entities to perform public works projects, public works construction and design, dispute resolution, and such other requirements or procedures relating to public works as are necessary for the division of public works design and construction to properly perform its duties and functions in accordance with applicable law.

12  Repeal.  2005, 291:3, V(c), relative to the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services, is repealed.

13  Appropriation; Department of Administrative Services.  Any remainder of the sum of $1,300,000 appropriated for the fiscal year ending June 30, 2020 to the department of administrative services for the purpose of obtaining scheduling software under 2019, 346:244 shall not lapse until June 30, 2023.  The governor is hereby authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

14  Retirement System; Medical Benefits.  Amend RSA 100-A:52, III-III-a to read as follows:

III.  In the case of group II members retired from state employment before July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall pay not less than the amounts provided in paragraph II* on account of such persons *and* shall [be paid] *pay those amounts* over to the state. [and] *Such payments shall be* used to pay for all or part of the medical benefits provided under RSA 21-I:26-36 for such persons, and the balance shall be paid by the state as provided in RSA 21-I:26-36.

III-a.  In the case of group II members retired from state employment on or after July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall pay not less than the amounts provided in paragraph II* on account of such persons *and* shall [be paid] *pay those amounts* over to the state. [and] *Such payments shall be* used to pay for all or part of the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 8 -**

1  medical benefits provided under RSA 21-I:26-36 for such persons, and the state shall pay its portion

2  as provided in RSA 21-I:26-36.  If the cost of the premium for any retired group II member and

3  spouse, surviving spouse, or any other person entitled to benefits under paragraph I shall exceed the

4  maximum under paragraph II, and the state does not elect to pay the excess cost above the amount

5  to be paid under RSA 21-I:26-36, the excess cost shall be paid by the retiree or qualified surviving

6  spouse and may be deducted from retirement benefits as provided in RSA 100-A:51.  The state may

7  require, as a condition for coverage, that the retiree or surviving spouse apply for deduction of such

8  excess cost from retirement benefits as provided in RSA 100-A:51.

9      15  Retirement System; Medical Benefits.  Amend RSA 100-A:52-b, V and VI to read as follows:

10         V.  As of July 1, 2001, in the case of group I members retired from state employment before

11  July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also

12  under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system ***shall pay***

13  ***not less than the amounts provided in paragraph III*** on account of such persons ***and*** shall [be

14  paid] ***pay those*** over to the state***.*** [and] ***Such payments shall be*** used to pay for all of part of the

15  medical benefits provided under RSA 21-I:26-36 for such persons, and the balance shall be paid by

16  the state as provided in RSA 21-I:26-36.

17         VI.  As of July 1, 2001, in the case of group I members retired from state employment on or

18  after July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and

19  also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system ***shall***

20  ***pay not less than the amounts provided in paragraph III*** on account of such persons ***and*** shall

21  [be paid] ***pay those amounts*** over to the state***.*** [and] ***Such payments shall be*** used to pay for all or

22  part of the medical benefits provided under RSA 21-I:26-36 for such persons, and the state shall pay

23  its portion as provided in RSA 21-I:26-36.  If the cost of the premium for any retired group I member

24  and spouse, surviving spouse, or any other person entitled to benefits under paragraph I shall exceed

25  the maximum under paragraph III, and the state does not elect to pay the excess cost above the

26  amount to be paid under RSA 21-I:26-36, the excess cost shall be paid by the retiree or qualified

27  surviving spouse and may be deducted from retirement benefits as provided in RSA 100-A:51.  The

28  state may require, as a condition for coverage, that the retiree or surviving spouse apply for

29  deduction of such excess cost from retirement benefits as provided in RSA 100-A:51.

30      16  Retirement System; Medical Benefits.  Amend RSA 100-A:54, III(c) to read as follows:

31         (c)  The department of administrative services shall provide information as to the total

32  monthly premium cost for each participant to the retirement system for purposes of calculating this

33  deduction.  Deducted amounts, which shall be in addition to and notwithstanding any amounts

34  payable by the retirement system pursuant to RSA 100-A:52, RSA 100-A:52-a, and RSA 100-A:52-b,

35  shall be deposited in the employee and retiree benefit risk management fund.  ***The deductions***

36  ***pursuant to subparagraphs (a) and (b) shall be made prior to any payments made by the***

37  ***retirement system pursuant to RSA 100-A:52, RSA 100-A:52-a and RSA 100-A:52-b.***  In the

1 event the retiree's monthly allowance is insufficient to cover the certified contribution amount, the

2 retirement system shall so notify the department of administrative services, which shall invoice and

3 collect from the retiree and/or each applicable spouse the remaining contribution amount.  Failure to

4 remit payment of the contribution amount in full within 30 days of billing shall be grounds for

5 terminating benefits, effective from the beginning of the billing period.  Reenrollment shall be

6 dependent upon payment of any outstanding contribution or other amounts within 6 months of the

7 termination date.  The department of administrative services shall provide notice of the termination

8 of benefits as provided in RSA 21-I:30, III.

9  17  Judicial Branch; Transfer Among Accounts and Classes.  Notwithstanding any provision of

10 law to the contrary, and subject to approval of the fiscal committee of the general court, for the

11 biennium ending June 30, 2023, the supreme court may transfer funds within and among all

12 accounting units within the judicial branch as the supreme court deems necessary and appropriate

13 to address budget reductions or to respond to changes in federal laws, regulations, or programs, and

14 otherwise as necessary for the efficient management of the judicial branch.  If the supreme court

15 intends to transfer funds which would otherwise meet the transfer requirements as set forth in RSA

16 9:17-d, prior approval of the fiscal committee of the general court shall be required for transfers of

17 $100,000 or more.

18  18  Judicial Branch; Reimbursement of Sheriff's Office for Court Security.  For the biennium

19 ending June 30, 2023, the state shall reimburse the sheriff's office for court security at the rates

20 provided in the collective bargaining agreement applicable to per diem court security officers

21 employed by the judicial branch to attend any official business, for any person employed as a bailiff

22 by the sheriff's office.

23  19  New Section; Sale of Lakes Region Facility.  Amend RSA 10 by inserting after section 10 the

24 following new section:

25  10:11  Sale of Lakes Region Facility.

26   I.  In this section, "lakes region facility" means all land, easements, buildings, structures,

27 and appurtenances owned or controlled by the state of New Hampshire in the city of Laconia

28 formerly known as the Laconia State School.

29   II.  Notwithstanding any other provision of law, the governor, with approval of the executive

30 council, shall have the sole authority to sell, convey, lease, rent, exchange, transfer, abandon, or

31 otherwise dispose of any of the property, whether tangible or intangible, at the lakes region facility

32 on such terms and conditions as the governor and executive council deem appropriate and without

33 regard to any other provision of law affecting or restricting the sale, conveyance, lease, rental,

34 exchange, transfer, abandonment or other disposal of state property.

35  20  Lakeshore Redevelopment Planning Commission; Definitions; Lakes Region Facility.  Amend

36 RSA 10:5, II to read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 10 -**

II.   In this subdivision, "commission" means the lakeshore redevelopment planning commission, and "lakes region facility" means the former Laconia state school land and buildings and training center property*, excluding the separate parcel identified as Ahern State Park, formerly Governor's State Park, which was transferred to the division of parks and recreation in November 1994 and preserved as a state park in perpetuity pursuant to RSA 216-H*.

21  Commissioner of Health and Human Services; Quarterly Reports.  During the biennium ending June 30, 2023, the commissioner of health and human services shall make quarterly reports to the governor, the speaker of the house of representatives, and the senate president on the status of estimated Medicaid payments in relation to actual costs.  Further contents of such reports shall be as specified by the governor.

22  Department of Health and Human Services; Unfunded Positions; Authorization. Notwithstanding any other provision of law to the contrary, the department of health and human services may fill unfunded positions during the biennium ending June 30, 2023, provided that the total expenditure for such positions shall not exceed the amount appropriated for personal services.

23  Department of Health and Human Services; Bureau of Adult and Elderly Services; Congregate Housing and Services.  Congregate housing provided for under the Medicaid waiver pursuant to RSA 151-E and congregate services provided for in RSA 161-F:37 are suspended for the biennium ending June 30, 2023.

24  Department of Health and Human Services; Foster Grandparent Program.  The reimbursements to the foster grandparent program through the senior volunteer grant program, established in RSA 161-F:40, are hereby suspended for the biennium ending June 30, 2023.

25  Department of Health and Human Services; Social Services Block Grant Cost of Living Adjustment to Income Levels.  Notwithstanding any other provision of law, for the biennium ending June 30, 2023, the department of health and human services shall raise the income eligibility for elderly and adult clients under the social services block grant program each January, by the percentage amount of the cost of living increase in social security benefits on a yearly basis provided such amount is consistent with federal law and regulations relative to the social services block grant income eligibility.

26  County Reimbursement of Funds; Limitations on Payments.  Amend RSA 167:18-a to read as follows:

167:18-a  County Reimbursement of Funds; Limitations on Payments.

I.  These expenditures shall in the first instance be made by the state, but each county shall make monthly payments to the state for the amounts due under this section within 45 days from notice thereof.

(a)  Counties shall reimburse the state for expenditures for recipients for whom such county is liable who are eligible for nursing home care and are receiving services from a licensed

**Amendment to HB 2-FN-A-LOCAL**
**- Page 11 -**

1    nursing home, or in another New Hampshire setting as an alternative to a licensed nursing home

2    placement and are supported under the Medicaid home and community-based care waiver for the

3    elderly and chronically ill, as such waiver may be amended from time to time, to the extent of 100

4    percent of the non-federal share of such expenditures.  *If at any point the Federal Medical*

5    *Assistance Percentage increases, the counties' portion of the non-federal share shall be*

6    *reduced by the amount of the increased federal percentage, if allowable under federal law*

7    *and subject to any conditions on the funding.*  Expenditures shall not include payments made

8    for skilled care.

9        (b)  Counties shall not be liable for Medicaid recipients in state institutions, the Crotched

10    Mountain Rehabilitation Center, and intermediate care facilities (ICF) approved by the department

11    of health and human services and servicing developmentally impaired persons.

12        II.(a)  The total billings to all counties made pursuant to this section shall not exceed the

13    amounts set forth below for state fiscal years [2020-2021] *2022-2023*:

14            (1) State fiscal year [2020] *2022*, [$123,372,750] *$129,362,411*.

15            (2) State fiscal year [2021] *2023*, [$126,923,933] *$131,849,659*.

16        (b)  The caps on total billings for fiscal years after fiscal year 2015 shall be established by

17    the legislature at least on a biennial basis.

18        III.(a)  *The cap in total billings shall not exceed an annual increase of 2 percent in*

19    *any year of the biennium.*

20        *(b)*  The counties shall have an aggregate credit of $5,000,000 against amounts due

21    under this section for each fiscal year beginning July 1, 2008.  The credit shall be allocated as

22    follows:

23            (1) For fiscal year 2009, $4,000,000 shall be allocated among the counties based upon

24    the proportion each paid for such expenditures in the prior fiscal year, and $1,000,000 shall be

25    allocated among the counties based upon their relative proportions of residents age 65 or older who

26    are Medicaid recipients.

27            (2) For fiscal year 2010, $2,000,000 shall be allocated among the counties based upon

28    the proportion each paid for such expenditures in the prior fiscal year, and $3,000,000 shall be

29    allocated among the counties based upon their relative proportions of residents age 65 or older who

30    are Medicaid recipients.

31            (3)  For fiscal year 2011 and for each fiscal year thereafter, $5,000,000 shall be

32    allocated among the counties based upon their relative proportions of residents age 65 or older who

33    are Medicaid recipients.

34        *(4)  For fiscal year 2021, in addition to the $5,000,000 allocated pursuant to*

35    *subparagraph III(b)(3), a credit of $9,721,305 shall be allocated among the counties based*

36    *upon their relative proportions of residents aged 65 years of age or older who are Medicaid*

37    *recipients.*

**Amendment to HB 2-FN-A-LOCAL**
**- Page 12 -**

[(b)] *(c)* The credit shall be made available as soon as possible after the start of the fiscal year. The department shall adopt county credit criteria in consultation with the county-state finance commission and in accordance with the provisions of RSA 541-A. The total aggregate obligation of the counties shall be reduced by the amount of the credit in each fiscal year.

IV. *Budgeted general funds shall be applied to the funding of Medicaid long-term services and supports after the allocation of the credit and prior to any county funds.*

*V.* Notwithstanding the procedures of paragraphs I-III of this section, no county shall be liable for total billings in fiscal year 2009 or fiscal year 2010 in an amount which would be greater than the amount of liability projected for that fiscal year using the methodology for determining county payments in former RSA 167:18-a, 167:18-b, and 167:18-f prior to its repeal together with the amount of liability projected for that fiscal year using the repealed methodology for determining county payments in RSA 169-B, 169-C, and 169-D.

[V.] *VI.*(a) Any shortfall between the state audited Medicaid allowances incurred by the state's county operated nursing homes and amounts otherwise reimbursed by federal 50 percent Medicaid matching funds or other income, shall be certified as a public expenditure and be eligible for additional federal funding match.

(b) The department of health and human services shall seek federal Medicaid assistance match for any state audited county nursing home Medicaid expense which is not fully reimbursed through rates. Any revenue realized through such a match shall be paid to the nursing homes which incurred the unreimbursed expense.

27 Department of Health and Human Services; Prospective Repeal Regarding the Exemption from Certain Transfer Procedures Extended. Amend 2018, 163:11, IV, as amended by 2019, 346:64 to read as follows:

IV. Section 10 of this act shall take effect [June 30, 2021] *June 30, 2023*.

28 Effective Date. Section 27 of this act shall take effect June 30, 2021.

29 The New Hampshire Granite Advantage Health Care Trust Fund. Amend RSA 126-AA:3, I(e)-(g) to read as follows:

(e) Funds received from the assessment under RSA 404-G; [and]

(f) *Revenue from the Medicaid enhancement tax to meet the requirements provided in RSA 167:64; and*

*(g)* Funds recovered or returnable to the fund that were originally spent on the cost of coverage of the granite advantage health care program.

30 New Subparagraph; Emergency Services for Children, Youth and Families Fund. Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

(365) Moneys deposited in the emergency services for children, youth and families fund established in RSA 170-G:4-h.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 13 -**

1    31   New Section; Department of Health and Human Services; Establishing the Emergency
2    Services for Children, Youth, and Families Fund.  Amend RSA 170-G by inserting after section 4-g
3    the following new section:

4    170-G:4-h  Establishing the Emergency Services for Children, Youth, and Families Fund.  There
5    is hereby established in the state treasury the emergency services for children, youth, and families
6    fund.  The funds shall be used by the department to meet the immediate needs of children and
7    families as required to ensure the department is making reasonable efforts to avoid the removal of
8    children and support reunification.  The use of these funds shall be limited to instances when there
9    are no other supports or services available to meet the immediate need in a timely manner.  The
10   funds may be comprised of public funds, gifts, grants or donations or any other source of funds.  The
11   fund shall be non-lapsing and shall be continually appropriated to the department for purposes
12   funding emergency services administered by the department, or its providers, under RSA 169-B,
13   RSA 169-C, RSA 169-D or under this chapter.

14   32  Parental Reimbursement; Child Services.  Amend 2020, 26:57, II-III to read as follows:

15        II.  Sections *12-29,* 30, 32, 33, 35, 44, 51-53 and 55 of this act shall take effect July 1, 2020.

16        III.  Sections 1-8, [12–29,] and RSA 169-C:12-f, III as inserted by section 54 of this act of shall
17   take effect January 1, 2021.

18   33   New Hampshire Department of Health and Human Services; Elimination of Parental
19   Reimbursement.  The department of health and human services shall be authorized to motion the
20   court to terminate any court orders for parental reimbursement either for on-going repayment or
21   arrears pursuant to implementation of 2020, 26:12 through 2020, 26:29 in existence as of the
22   effective date of any court order rendered pursuant to this act.

23   34  Department of Health and Human Services; Program Eligibility; Additional Revenues.  For
24   the biennium ending June 30, 2023, the department of health and human services shall not
25   authorize, without prior consultation with the house health, human services and elderly affairs
26   committee and the senate health and human services committee and the approval of the fiscal
27   committee of the general court and governor and council, any change to program eligibility
28   standards or benefit levels that might be expected to increase or decrease enrollment in the program
29   or increase expenditures from any source of funds; provided, however, that no such prior approval
30   shall be required if a change to a federal program in which the state is participating as of the
31   effective date of this section is required by federal law.

32   35  Department of Health and Human Services; Change in Federal Match Revenue.  During the
33   biennium ending June 30, 2023 any item submitted to the fiscal committee of the general court
34   which increases a draw on federal funds, as a result of miscalculation of or change in the state's
35   share of a federal match program in excess of $100,000 in an accounting unit, shall include an
36   explanation stating if any general funds have been supplanted, and if so, for what purpose those

**Amendment to HB 2-FN-A-LOCAL**
**- Page 14 -**

1   supplanted general funds will be used, and the amount of supplanted general funds anticipated to
2   lapse.

3     36  Reproductive Health Facilities.  No state funds awarded by the department of health and
4   human services to a reproductive health care facility, as defined in RSA 132:37, I, shall be used to
5   provide abortion services.  This section shall not apply to funding available from the state pursuant
6   to Title XIX of the Social Security Act to the minimum extent necessary to comply with federal
7   conditions for the state's participation in the Medicaid program.

8     37  Title.  Sections 38-39 of this act may be known and cited as the "Fetal Life Protection Act."

9     38  Legislative Findings and Purpose.

10     I.  The general court finds that:

11     (a)  The prohibition of late-term abortion is supported by history and the common law.
12   The Hippocratic Oath as Literary Text:  A Dialogue Between Law and Medicine, 2 Yale J. Health
13   Policy L. & Ethics 299, 308 (discussing the Hippocratic Oath's prohibition on abortion); Digest of
14   Justinian:  Digest 4.48.8.8 (classifying abortion as a form of homicide); 2 Bracton on Laws and
15   Customs of England 341 (S. Thorne trans. 1968) (classifying abortion as a form of homicide
16   "especially if [the fetus] is quickened"); 1 W. Blackstone, Commentaries on the Law of England 125
17   (1773) (stating that the common law has historically prohibited abortion "as soon as an infant is able
18   to stir in the mother's womb.").  The New Hampshire supreme court has observed that "The common
19   law has always been most solicitous for the welfare of the fetus in connection with its inheritance
20   rights as well as protecting it under the criminal law." *Poliquin v. Donald*, 101 N.H. 104, 107 (1957).

21     (b)  The United States Supreme Court, in holding that the United States Constitution
22   protects abortion, also stated that "The pregnant woman cannot be isolated in her privacy.  She
23   carries an embryo and, later, a fetus… The situation therefore is inherently different from marital
24   intimacy [etc.]… it is reasonable and appropriate for a State to decide that at some point in time
25   another interest, that of… [fetal] life, becomes significantly involved.  The woman's privacy is no
26   longer sole and any right of privacy she possesses must be measured accordingly." *Roe v. Wade*, 410
27   U.S. 113, 159 (1973).

28     (c)  The *Roe* Court specifically rejected the view that "the woman's right is absolute and
29   that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever
30   reason she alone chooses." *Roe v. Wade*, 410 U.S. 113, 153 (1973).

31     (d)  The *Roe* Court affirmed that "For the stage subsequent to viability, the State in
32   promoting its interest in the potentiality of human life may, if it chooses, regulate, and even
33   proscribe, abortion except where it is necessary, in appropriate medical judgment, for the
34   preservation of the life or health of the mother." *Roe v. Wade*, 410 U.S. 113, 164-165 (1973).

35     (e)  The United States Supreme Court, in rejecting the trimester framework of *Roe*,
36   reaffirmed "the State's power to restrict abortions after fetal viability, if the law contains exceptions
37   for pregnancies which endanger the woman's life or health" and stated that "the State has legitimate

**Amendment to HB 2-FN-A-LOCAL**
**- Page 15 -**

1  interests from the outset of the pregnancy in protecting… the life of the fetus that may become a

2  child." *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992).

3  (f)  Already in 1973, the Supreme Court had observed that "Viability is usually placed at

4  about seven months (28 weeks) but may occur earlier, even at 24 weeks." *Roe v. Wade*, 410 U.S. 113,

5  160 (1973).  Since that time, however, there has been "dramatic improvement in survival for infants

6  born at the border of viability (≤24 weeks)." Barbara Luke and Morton B. Brown, The changing risk

7  of infant mortality by gestation, plurality, and race: 1989-1991 versus 1999-2001, Pediatrics, Dec.

8  2006, 118 (6): 2488-2497.

9  (g)  The Supreme Court has observed that "In some broad sense it might be said that a

10  woman who fails to act before viability has consented to the State's intervention on behalf of the

11  developing child." *Planned Parenthood v. Casey*, 505 U.S. 833, 870 (1992).

12  (h)  New Hampshire has historically seen the fetus as a separate entity from the mother

13  with distinct legal interests. *Bennett v. Hymers*, 101 N.H. 483, 485 (1958) ("We adopt the opinion

14  that the fetus from the time of conception becomes a separate organism and remains so throughout

15  its life."); N.H. Rev. State. Ann § 630:1-a: IV (stating that "the meaning of 'another' shall include a

16  fetus" under specified criminal laws).

17  (i)  "[R]espect for the dignity of human life" is a legitimate state purpose. *Gonzales v.*

18  *Carhart*, 550 U.S. 124, 157 (2007).  The United States Supreme Court has said that "Respect for

19  human life finds an ultimate expression in the bond of love the mother has for her child… While we

20  find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women

21  come to regret their choice to abort the infant life they once created and sustained." Id. at 159.

22  (j)  In addition, there is substantial medical evidence that a fetus by at least 20 weeks'

23  gestation has the capacity to feel pain during an abortion. K. Anand and P. R. Hickey, Pain and its

24  effects in the human neonate and fetus, N.E.J.M., 1987, 317:1321.

25  II.  Based on the findings in paragraph I, the general court's purposes in promulgating this

26  act are:

27  (a)  Based on the state's interest in protecting fetal life, to prohibit abortions at or after

28  24 weeks gestation, except in cases of a medical emergency.

29  (b)  To define "medical emergency" to encompass "significant health risks," namely those

30  circumstances in which a pregnant woman's life or a major bodily function is threatened. *Gonzales v.*

31  *Carhart*, 550 U.S. 124, 161 (2007).

32  39  New Subdivision; Fetal Life Protection Act.  Amend RSA 329 by inserting after section 42 the

33  following new subdivision:

34  Fetal Life Protection Act

35  329:43  Definitions.  In this subdivision:

36  I.  "Abortion" means the act of using or prescribing any instrument, medicine, drug, or any

37  other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy

of a woman with knowledge that the termination by those means will with reasonable likelihood cause the death of the fetus.  Such use, prescription, or means is not an abortion if done with the intent to:

(a)  Save the life or preserve the health of the fetus;

(b)  Remove a dead fetus caused by spontaneous abortion; or

(c)  Remove an ectopic pregnancy.

II.  "Attempt to perform" means an act or omission of a statutorily required act that, under the circumstances as the actor believes them to be, constitutes a substantial step in a course of conduct planned to culminate in the performance or inducement of an abortion.

III.  "Conception" means the fusion of a human spermatozoon with a human ovum.

IV.  "Gestational age" means the time that has elapsed since the first day of the woman's last menstrual period.

V.  "Major bodily function" includes, but is not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

VI.  "Medical facility" means any public or private hospital, clinic, center, medical school, medical training institution, health care facility, physician's office, infirmary, dispensary, ambulatory surgical treatment center, or other institution or location wherein medical care is provided to any person.

VII.  "Health care provider" means any person who provides health care services.  The term includes but is not limited to medical doctors, doctors of osteopathy, nurses, or any employee of a medical facility.

VIII.  "Pregnant" or "pregnancy" means the female reproductive condition of having one or more developing embryos or fetuses implanted in the uterus or elsewhere in the female body.

IX.  "Probable gestational age" means what, in reasonable medical judgment, will with reasonable probability be the gestational age of the fetus at the time the abortion is considered, performed, or attempted.

X.  "Reasonable medical judgment" means that medical judgment that would be made by a reasonably prudent physician in the community, knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved.

XI.  "Fetus" means an unborn offspring, from the embryo stage which is the end of the twentieth week after conception or, in the case of in vitro fertilization, the end of the twentieth week after implantation, until birth.

329:44 Prohibition.

I.  Except in the case of a medical emergency as specifically defined in paragraph III, no abortion shall be performed, induced, or attempted by any health care provider unless a physician has first made a determination of the probable gestational age of the fetus.  In making such a

Amendment to HB 2-FN-A-LOCAL
- Page 17 -

1    determination, the physician shall make such inquiries of the pregnant woman and perform or cause

2    to be performed all such medical examinations, imaging studies, and tests as a reasonably prudent

3    physician in the community, knowledgeable about the medical facts and conditions of both the

4    woman and the fetus involved, would consider necessary to perform and consider in making an

5    accurate diagnosis with respect to gestational age, provided, however, that the physician shall

6    conduct an obstetric ultrasound examination of the patient for the purpose of making the

7    determination.

8        II.   Except in a medical emergency as specifically defined in paragraph III, no health care

9    provider shall knowingly perform, induce, or attempt to perform an abortion upon a pregnant

10   woman when the probable gestational age of her fetus has been determined to be at least 24 weeks

11   or in the absence of a determination by a physician pursuant to paragraph I as to the fetus' probable

12   gestational age.

13       III.  For the purposes of this subdivision only, "medical emergency" means a condition in

14   which an abortion is necessary to preserve the life of the pregnant woman whose life is endangered

15   by a physical disorder, physical illness, or physical injury, including a life-endangering physical

16   condition caused by or arising from the pregnancy itself, or when continuation of the pregnancy will

17   create a serious risk of substantial and irreversible impairment of a major bodily function, as defined

18   in RSA 329:43, V, of the pregnant woman.

19   329:45  Reporting.

20       I.  Any health care provider who performs an abortion under this subdivision shall report, in

21   writing, to the medical facility in which the abortion is performed the reason for the determination

22   that a medical emergency existed.  The health care provider's written report shall be included in a

23   written report from the medical facility to the department of health and human services.  If the

24   abortion is not performed in a medical facility, the health care provider shall report, in writing, the

25   reason for the determination that a medical emergency existed to the department of health and

26   human services as part of the written report made by the health care provider to the department.

27   The health care provider and the medical facility shall retain a copy of the written reports required

28   under this section for not less than 5 years.

29   329:46  Criminal Penalties.

30       I.  Any health care provider who fails to perform the determination required in RSA 329:44,

31   I, under circumstances where the probable gestational age is less than 24 weeks, shall be guilty of a

32   misdemeanor.

33       II.  Any health care provider who knowingly performs or induces an abortion in violation of

34   any other provision of this subdivision shall be guilty of a class B felony and, in addition to any other

35   penalties the court may impose, be fined not less than $10,000 nor more than $100,000.

36   329:47  Civil Remedies.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 18 -**

I.  The woman, the father of the fetus if married to the mother at the time she receives an abortion in violation of this subdivision, and/or, if the mother has not attained the age of 18 years at the time of the abortion, the maternal grandparents of the fetus may in a civil action obtain appropriate relief, unless the pregnancy resulted from the plaintiff's criminal conduct or, if brought by the maternal grandparents, the maternal grandparents consented to the abortion.

II.  Such relief shall include monetary damages for all psychological and physical injuries caused by the violation of this subdivision.

329:48  Review by New Hampshire Board of Medicine.

I.  A defendant health care provider accused of violating this subdivision may seek a hearing before the board of medicine as to whether the health care provider's conduct was necessary to save the life of the mother whose life was endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself; and/or as to whether the continuation of the pregnancy would have created a serious risk of substantial and irreversible impairment of a major bodily function, as defined in RSA 329:43, V, of the pregnant woman.

II.  The findings on this issue are admissible at the criminal and civil trials of the defendant. Upon a motion of the defendant, the court shall delay the beginning of the trial for not more than 30 days to permit such a hearing to take place.

329:49  Construction.  Nothing in this subdivision shall be construed as creating or recognizing a right to abortion.

329:50  Severability.  If any provision of this subdivision or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the subdivision which can be given effect without the invalid provision or application, and to this end the provisions of this subdivision are declared to be severable.

40  Effective Date.  Sections 37-39 of this act shall take effect January 1, 2022.

41  Appropriation; Department of Health and Human Services.  There is hereby appropriated to the department of health and human services the sum of $3,300,000, for the biennium ending June 30, 2023, for the purpose of implementing certain recommendations, from a financial review conducted by Alvarez & Marsal, to streamline certain agency operations resulting in greater efficiencies and accountability, and involving certain transformation projects over a 4-year period. Additionally, the department may accept and expend any applicable federal funds, and any gifts, grants, or donations that may be available for the purposes of this section.  This appropriation shall not lapse until June 30, 2023.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

42  Health and Human Services; Suspension of Catastrophic Aid Payment to Hospitals.  The commissioner of the department of health and human services shall submit a Title XIX Medicaid

1    state plan amendment to the federal Centers for Medicare and Medicaid Services to suspend all

2    catastrophic aid payments to hospitals effective for the biennium ending June 30, 2023.

3        43  Appropriation; Department of Military Affairs and Veterans Services; Support for Veterans

4    Mental Health and Social Isolation.  There is hereby appropriated to the department of military

5    affairs and veterans services the sum of $1,500,000 for the fiscal year ending June 30, 2021 for the

6    purposes of supporting services to combat struggles with mental health and social isolation.  This

7    appropriation shall not lapse until June 30, 2023.  The governor is authorized to draw a warrant for

8    said sum out of any money in the treasury not otherwise appropriated.

9        44  Effective Date.  Section 43 of this act shall take effect June 30, 2021.

10       45  New Subdivision; Controlled Drug Prescription Health and Safety Program.  Amend RSA

11    126-A by inserting after section 88 the following new subdivision:

12                Controlled Drug Prescription Health and Safety Program

13    126-A:89  Definitions.  In this subdivision:

14        I.(a)  "Chronic pain" means a state in which pain persists beyond the usual course of an acute

15    disease or healing of an injury, or that might or might not be associated with an acute or chronic

16    pathologic process that causes continuous or intermittent pain over months or years.  It also includes

17    intermittent episodic pain that might require periodic treatment.

18           (1)  For the purpose of this subdivision, chronic pain does not cover or in any way

19    determine treatment for pain from terminal disease.

20           (2)  For the purpose of this subdivision, chronic pain includes but may not be limited

21    to pain defined as "chronic," "intractable," "high impact," "chronic episodic," and "chronic relapsing."

22        (b)  A diagnosis of chronic pain made by a practitioner licensed in any of the states in the

23    United States or the District of Columbia and supported by written documentation of the diagnosis

24    by the treating practitioner shall constitute proof that the patient suffers from chronic pain.

25        II.  "Commissioner" means the commissioner of the department of health and human

26    services.

27        III.  "Controlled substance" means controlled drugs as defined in RSA 318-B:1, VI.

28        IV.  "Department" means the department of health and human services, established in RSA

29    126-A:4.

30        V.  "Dispense" means to deliver a controlled substance by lawful means and includes the

31    packaging, labeling, or compounding necessary to prepare the substance for such delivery.

32        VI.  "Dispenser" means a person or entity who is lawfully authorized to deliver a schedule II-

33    IV controlled substance, but does not include:

34        (a)  A licensed hospital pharmacy that dispenses less than a 48-hour supply of a schedule

35    II-IV controlled substance from a hospital emergency department or that dispenses for

36    administration in the hospital;

37        (b)  A practitioner, or other authorized person who administers such a substance;

**Amendment to HB 2-FN-A-LOCAL**
**- Page 20 -**

1      (c)  A wholesale distributor of a schedule II-IV controlled substance or its analog;

2      (d)  A prescriber who dispenses less than a 48-hour supply of a schedule II-IV controlled

3      substance from a hospital emergency department to a patient; or

4      (e)  A veterinarian who dispenses less than a 48-hour supply of a schedule II-IV

5      controlled substance to a patient.

6      VII.  "Patient" means the person or animal who is the ultimate user of a controlled substance

7      for whom a lawful prescription is issued and for whom a controlled substance or other such drug is

8      lawfully dispensed.

9      VIII.  "Practitioner" means a physician, dentist, podiatrist, veterinarian, pharmacist, APRN,

10      physician assistant, naturopath, or other person licensed or otherwise permitted to prescribe,

11      dispense, or administer a controlled substance in the course of licensed professional practice.

12      "Practitioner" shall also include practitioners with a federal license to prescribe or administer a

13      controlled substance.

14      IX.  "Prescribe" means to issue a direction or authorization, by prescription, permitting a

15      patient to lawfully obtain controlled substances.

16      X.  "Prescriber" means a practitioner or other authorized person who prescribes a schedule

17      II, III, or IV controlled substance.

18      XI.  "Program" means the controlled drug prescription health and safety program that

19      electronically facilitates the confidential sharing of information relating to the prescribing and

20      dispensing of controlled substances listed in schedules II-IV, established by the department

21      pursuant to RSA 126-A:90.

22      126-A:90  Controlled Drug Prescription Health and Safety Program Established.

23      I.  The department shall design, establish, and contract with a third party for the

24      implementation and operation of an electronic system to facilitate the confidential sharing of

25      information relating to the prescribing and dispensing of schedule II-IV controlled substances, by

26      prescribers and dispensers within the state.

27      II.  The department may establish fees for the establishment, administration, operations and

28      maintenance of the program.  The program may also be supported through grants and gifts.  The fee

29      charged to individuals requesting their own prescription information shall not exceed the actual cost

30      of providing that information.

31      III.  Prescription information held by the program relating to any individual shall be deleted

32      3 years after the initial prescription was dispensed.  All de-identified data may be kept for statistical

33      and analytical purposes in perpetuity.

34      IV.  The commissioner shall establish an advisory council, as provided in RSA 126-A:96.

35      126-A:91  Controlled Drug Prescription Health and Safety Program Operation.

Amendment to HB 2-FN-A-LOCAL
- Page 21 -

I.  The department shall develop a system of registration for all prescribers and dispensers of schedule II-IV controlled substances within the state.  The system of registration shall be established by rules adopted by the department, pursuant to RSA 541-A.

II.   All prescribers and dispensers authorized to prescribe or dispense schedule II-IV controlled substances within the state shall be required to register with the program as follows:

(a)  Practitioners who prescribe but do not dispense schedule II-IV controlled substances shall register with the program as a prescriber;

(b)  Practitioners who dispense but do not prescribe schedule II-IV controlled substances shall register with the program as a dispenser unless exempted pursuant to RSA 126-A:89, VI; and

(c)  Practitioners who prescribe and dispense schedule II-IV controlled substances shall register with the program as both a prescriber and a dispenser unless exempted pursuant to RSA 126-A:89, VI.

III.   Only registered prescribers, dispensers, or their designees, and federal health prescribers and dispensers working in federal facilities located in New Hampshire, Massachusetts, Maine, and Vermont shall be eligible to access the program.

IV.  The chief medical examiner and delegates may register and access the program.

V.  Each dispenser shall submit to the program the information regarding each dispensing of a schedule II-IV controlled substance.  Any dispenser located outside the boundaries of the state of New Hampshire and who is licensed and registered by the pharmacy board, established in RSA 318:2, shall submit information regarding each prescription dispensed to a patient who resides within New Hampshire.

VI.  Each dispenser required to report under paragraph V of this section shall submit to the program by electronic means information for each dispensing that shall include, but not be limited to:

(a)  Dispenser's Drug Enforcement Administration (DEA) registration number.

(b)  Prescriber's DEA registration number.

(c)  Date of dispensing.

(d)  Prescription number.

(e)  Number of refills granted.

(f)  National Drug Code (NDC) of drug dispensed.

(g)  Quantity dispensed.

(h)  Number of days supply of drug.

(i)  Patient's name.

(j)  Patient's address.

(k)  Patient's date of birth.

(l)  Patient's telephone number, if available.

(m)  Date prescription was written by prescriber.

1    (n)  Whether the prescription is new or a refill.

2    (o)  Source of payment for prescription.

3    VII.(a)  Except as provided in subparagraphs (b) and (c), each dispenser shall submit the

4    required information in accordance with transmission methods daily by the close of business on the

5    next business day from the date the prescription was dispensed.

6    (b)  Veterinarians shall submit the information required under subparagraph (a) no more

7    than 7 days from the date the prescription was dispensed.

8    (c)  Dispensers who have a federal Drug Enforcement Administration license, but who do

9    not dispense controlled substances may request a waiver from the requirements of subparagraph (a)

10   from the department.

11   VIII.  The program administrator may issue a waiver to a dispenser that is unable to submit

12   prescription information by electronic means.  Such waiver may permit the dispenser to submit

13   prescription information by paper form or other means, provided all information required by

14   paragraph VI is submitted in this alternative format and within the established time limit.

15   IX.  The program administrator may grant a reasonable extension to a dispenser that is

16   unable, for good cause, to submit all the information required by paragraph V within the established

17   time limits.

18   X.  Any dispenser who in good faith reports to the program as required by paragraphs V and

19   VI shall be immune from any civil or criminal liability as the result of such good faith reporting.

20   126-A:92  Confidentiality.

21   I.  Information contained in the program, information obtained from it, and information

22   contained in the records of requests for information from the program, is confidential, is not a public

23   record or otherwise subject to disclosure under RSA 91-A, and is not subject to discovery, subpoena,

24   or other means of legal compulsion for release and shall not be shared with an agency or institution,

25   except as provided in this subdivision.  This paragraph shall not prevent a practitioner from using or

26   disclosing program information about a patient to others who are authorized by state or federal law

27   or regulations to receive program information.

28   II.  The department shall establish and maintain procedures to ensure the privacy and

29   confidentiality of patients and patient information.

30   III.  The department may use and release information and reports from the program for

31   program analysis and evaluation, statistical analysis, public research, public policy, and educational

32   purposes, provided that the data are aggregated or otherwise de-identified at all levels of use.  The

33   department shall not acquire, use or release information from the program for these purposes unless

34   all patient-specific protected health information has been de-identified in accordance with section

35   164.514(b)(2) of the HIPAA Privacy Rule.

36   126-A:93  Providing Controlled Drug Prescription Health and Safety Information.

Amendment to HB 2-FN-A-LOCAL
- Page 23 -

I. The program administrator may provide information in the prescription health and safety program upon request only to the following persons:

(a) By electronic or written request to prescribers, dispensers, and the chief medical examiner and delegates within the state who are registered with the program:

(1) For the purpose of providing medical or pharmaceutical care to a specific patient with whom the requester has a practitioner-patient relationship. This shall not include department staff seeking to access the program for state, federal or private agency purposes, or on behalf of the department or other requesting agency;

(2) For reviewing information regarding prescriptions issued or dispensed by the requester; or

(3) For the purpose of investigating the death of an individual.

(b) By written request, to:

(1) A patient who requests his or her own prescription monitoring information.

(2) The board of dentistry, the board of medicine, the board of nursing, the board of registration in optometry, the board of podiatry, the board of veterinary medicine, and the pharmacy board; provided, however, that the request is pursuant to the boards' official duties and responsibilities and the disclosures to each board relate only to its licensees and only with respect to those licensees whose prescribing or dispensing activities indicate possible fraudulent conduct.

(3) Authorized law enforcement officials on a case-by-case basis for the purpose of investigation and prosecution of a criminal offense when presented with a court order based on probable cause. No law enforcement agency or official shall have direct access to query program information.

(4) A practitioner or consultant retained by the state to review the system information of an impaired practitioner program participant or a referral who has agreed to be evaluated or monitored through the program and who has separately agreed in writing to the consultant's access to and review of such information.

(c) By electronic or written request on a case-by-case basis to:

(1) A controlled prescription drug health and safety program from another state; provided, that there is an agreement in place with the other state to ensure that the information is used or disseminated pursuant to the requirements of this state.

(2) An entity that operates a secure interstate prescription drug data exchange system for the purpose of interoperability and the mutual secure exchange of information among prescription drug monitoring programs, provided that there is an agreement in place with the entity to ensure that the information is used or disseminated pursuant to the requirements of this state.

II. The program administrator shall notify the appropriate regulatory board listed in subparagraph I(b)(2) and the prescriber or dispenser at such regular intervals as may be established by the department if there is reasonable cause to believe a violation of law or breach of professional

standards may have occurred.  The program administrator shall provide prescription information required or necessary for an investigation.

III.  The program administrator shall review the information to identify information that appears to indicate whether a person may be obtaining prescriptions in a manner that may represent misuse or abuse of schedule II-IV controlled substances.  When such information is identified, the program administrator shall notify the practitioner who prescribed the prescription.

IV.  The program administrator shall make a report, at least annually, commencing on November 1, 2021, to the senate president, the speaker of the house of representatives, the oversight committee on health and human services, established in RSA 126-A:13, the advisory council established in RSA 126-A:96 and the licensing boards of all professions required to use the program relative to the effectiveness of the program.

126-A:94  Unlawful Act and Penalties.

I.  Any dispenser or prescriber who fails to submit the information required in RSA 126-A:91 or knowingly submits incorrect information shall be subject to a warning letter and provided with an opportunity to correct the failure.  Any dispenser or prescriber who subsequently fails to correct or fails to resubmit the information may be subject to discipline by the appropriate regulatory board.

II.  Any dispenser or prescriber whose failure to report the dispensing of a schedule II-IV controlled substance that conceals a pattern of diversion of controlled substances into illegal use shall be guilty of a violation and subject to the penalties established under RSA 318-B:26 and the department's and appropriate regulatory board's rules as applicable.  In addition, such dispenser or prescriber may be subject to appropriate criminal charges if the failure to report is determined to have been done knowingly to conceal criminal activity.

III.  Any person who engages in prescribing or dispensing of controlled substances in schedule II-IV without having registered with the program may be subject to discipline by the appropriate regulatory board.

IV.  Any person, including department staff, authorized to receive program information who knowingly discloses such information in violation of this subdivision shall be subject to discipline by the appropriate regulatory board and to all other relevant penalties under state and federal law.

V.  Any person authorized to receive program information who uses such information for a purpose in violation of this subdivision shall be subject to disciplinary action by the appropriate regulatory board and to all other relevant penalties under state and federal law.

VI.  Unauthorized use or disclosure of program information shall be grounds for disciplinary action by the relevant regulatory board.

VII.  Any person who knowingly accesses, alters, destroys, or discloses program information except as authorized in this subdivision or attempts to obtain such information by fraud, deceit, misrepresentation, or subterfuge shall be guilty of a class B felony.

Amendment to HB 2-FN-A-LOCAL
- Page 25 -

1    126-A:95  Rulemaking.  The department shall adopt rules, pursuant to RSA 541-A, necessary to
2    implement and maintain the program including:

3        I. The criteria for registration by dispensers and prescribers.

4        II.  The criteria for a waiver pursuant to RSA 126-A:91, VIII for dispensers with limited
5    electronic access to the program.

6        III.  The criteria for reviewing the prescribing and dispensing information collected by the
7    program.

8        IV.  The criteria for reporting matters to the applicable health care regulatory board for
9    further investigation.

10       V.  The criteria for notifying practitioners of individuals that are engaged in obtaining
11   controlled substances from multiple practitioners or dispensers.

12       VI.  Content and format of all forms required under this subdivision.

13   126-A:96  Advisory Council Established.

14       I.  There is hereby established an advisory council to carry out the duties under this
15   subdivision.  Members of the council shall not be compensated for serving on the council, or serve on
16   the council for more than one 5-year term except for the attorney general, or designee, or the
17   commissioner of the department of health and human services, or designee.  The members of the
18   council shall be as follows:

19           (a) A member of the board of medicine, appointed by such board.

20           (b) A member of the pharmacy board, appointed by such board.

21           (c) A member of the board of dental examiners, appointed by such board.

22           (d) A member of the New Hampshire board of nursing, appointed by such board.

23           (e) A member of the board of veterinary medicine, appointed by such board.

24           (f) A physician appointed by the New Hampshire Medical Society.

25           (g) A dentist appointed by the New Hampshire Dental Society.

26           (h) A chief of police appointed by the New Hampshire Association of Chiefs of Police.

27           (i)  A community pharmacist appointed jointly by the New Hampshire Pharmacists
28   Association, the New Hampshire Independent Pharmacy Association, and the New Hampshire
29   Association of Chain Drug Stores.

30           (j)  Two public members appointed by the governor's commission on alcohol and drug
31   abuse prevention, treatment, and recovery, one of whom may be a member of the commission.

32           (k) A hospital administrator appointed by the New Hampshire Hospital Association.

33           (l)  A nurse practitioner appointed by the New Hampshire Nurse Practitioner
34   Association.

35           (m) A veterinarian appointed by the New Hampshire Veterinary Medical Association.

36           (n) The attorney general, or designee.

37           (o) The commissioner of the department of health and human services, or designee.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 26 -**

1      (p)  A member of the senate, appointed by the president of the senate.

2      (q)  Two members of the house of representatives, appointed by the speaker of the house

3 of representatives.

4      II.  The council shall:

5      (a)  Make recommendations to the department relating to the design, implementation,

6 and maintenance of the program, including recommendations relating to:

7      (1)  Rules.

8      (2)  Legislation.

9      (3)  Sources of funding, including grant funds and other sources of federal, private, or

10 state funds;

11      (b)  Review the program's annual report and make recommendations to the department

12 regarding the operation of the program.

13      (c)  Provide ongoing advice and consultation on the implementation and operation of the

14 program, including recommendations relating to:

15      (1)  Changes in the program to reflect advances in technology and best practices.

16      (2)  Changes to statutory requirements.

17      (3)  The design and implementation of an ongoing evaluation component of the

18 program.

19      (d)  Advise the commissioner regarding the implementation of this subdivision.

20      (e)  Adopt rules necessary for the operation of the council.

21      (f)  Develop a mission statement for the program and strategic goals for its

22 implementation, develop metrics in conjunction with the legislative budget assistant to measure the

23 program's efficient operation, review the performance of the program against the metrics, and make

24 recommendations to the program and ensure they are incorporated.

25      III.  The council shall meet at least quarterly to effectuate its goals.  A chairperson shall be

26 elected by the members.  A majority of the members of the council constitutes a quorum for the

27 transaction of business.  Action by the council shall require the approval of a majority of the

28 members of the council.

29      IV.  Members of the advisory council, previously established in RSA 318-B:38, shall be

30 appointed as members of the advisory council established under this section to the extent possible.

31      126-A:97  Competency Requirements.  Except for veterinarians who shall complete continuing

32 education requirements in accordance with RSA 332-B:7-a, XV, all prescribers required to register

33 with the program who possess a United States Drug Enforcement Administration (DEA) license

34 number shall complete 3 contact hours of free appropriate prescriber's regulatory board-approved

35 online continuing education or pass an online examination, in the area of pain management and

36 addiction disorder or a combination, as a condition for initial licensure and license renewal.

37 Verification of successful completion of the examination or of the required continuing education shall

1   be submitted to the prescriber's regulatory board with the licensee's application for initial licensure
2   or renewal.  A list of the prescriber's regulatory boards' approved continuing education courses and
3   online examinations in pain management and addiction disorder, shall be available on the
4   department of health and human service's Internet website.

5   46  Repeal.   OPLC; Controlled Drug Prescription Health and Safety Program.   RSA 318-B:31-
6   38, relative to the controlled drug prescription health and safety program, are repealed.

7   47  Reference Corrected.  Veterinary Board.  Amend RSA 332-B:3, I (b) to read as follows:

8        (b)   Representing the board on the advisory council established in RSA [318-B:38] *126-*
9   *A:96*;

10   48  Revenue Sharing; Suspension.  RSA 31-A, relative to revenue sharing with cities and towns
11   shall be suspended for the biennium ending June 30, 2023.

12   49  Liquor Commission; Processing of Merchant Cards.  For the biennium ending June 30, 2023,
13   the liquor commission, for purposes of supporting merchant card activity, may:

14        I.   Implement necessary business strategies in the event of a disaster or loss of services to
15   insure the continuity of the commission's business operations, including the processing of merchant
16   cards, which includes the ability to transfer funds from accounting unit 01-03-03-030010-7677 in
17   consultation with the commissioner of the department of information technology.  The commissioner
18   shall report to the fiscal committee of the general court within 30 days any instances where it would
19   need to implement such business strategies, including any costs and loss of revenue associated with
20   the disaster or loss of services and the implementation of such business strategies.

21        II.   Enter into contracts for technical and hosting services to support retail operations and
22   merchant card processing.  The commission shall comply with RSA 176:18 for any contracts entered
23   into to support retail operations and merchant card processing.

24        III.   Hire information technology technical support personnel to support its merchant card
25   activity and related technical support operations in retail stores.

26   50  Department of Education; Acceptance of Gifts.  For the biennium ending June 30, 2023, the
27   department of education may, subject to the approval of the governor and council, accept gifts,
28   contributions, and bequests of unrestricted funds from individuals, foundations, corporations, and
29   other organizations or institutions for the purpose of funding appropriations for New Hampshire
30   scholars made in accounting unit 06-56-56-562010-7534.

31   51  Certain Differential Aid Calculations; Fiscal Year 2022.

32        I.   Average Daily Membership in Attendance; Fiscal Year 2022.  The commissioner of the
33   department of education shall compare the average daily membership in attendance (ADMA),
34   defined in RSA 198:38, for each district and town for school year 2019-2020 and school year 2020-
35   2021.  The greater enrollment shall be used to calculate the cost of an opportunity for an adequate
36   education under RSA 198:40-a and relief funding under RSA 198:40-e for the fiscal year ending June
37   30, 2022.

Amendment to HB 2-FN-A-LOCAL
- Page 28 -

1    II.  When determining ADMA for third grade pupils scoring below proficiency on the reading

2    component of the state assessment as required by RSA 198:40-a, II(e) for the fiscal year ending June

3    30, 2022, the commissioner of the department of education shall compare the ADMA for this

4    category of differentiated aid in school year 2018-2019 and school year 2020-2021.  The greater

5    ADMA shall be used to calculate the cost of an opportunity for an adequate education under RSA

6    198:40-a, II(e) for the fiscal year ending June 30, 2022.

7    52  Conditional Differential Aid Calculation For Pupils Eligible for a Free or Reduced Price Meal;

8    Fiscal Year 2023.

9    I.  If, as of any of the dates set forth in RSA 198:41, V, VI, or VII, either (a) the state of New

10   Hampshire is in a declared state of emergency pursuant to RSA 4:45 as it relates to the COVID-19

11   pandemic or (b) the U.S. Department of Agriculture has not rescinded the Child Nutrition Covid-19

12   Waivers enacted in response to the pandemic, or both, then the department of education shall, in

13   consultation with the governor, determine whether the alternative differential aid calculation set

14   forth in paragraph II is required for fiscal year 2023 when making the required estimate or final

15   determination described in RSA 198:41, V, VI, or VII as applicable.

16   II.  Upon making a determination that the alternative differential aid calculation applies

17   pursuant to paragraph I, the department of education shall divide each pupil in the ADMA who is

18   eligible for a free or reduced price meal by the average daily member in attendance (ADMA), defined

19   in RSA 198:38, for each district and town for school year 2019-2020.  The percentage shall be applied

20   to the ADMA for school year 2021-2022 to establish a new calculation of ADMA for who is eligible for

21   a free or reduced price meal.  The greater of the ADMA of pupils who are eligible for a free or

22   reduced price meal for school year 2021-2022 and the new calculation based on the 2019-2020 school

23   year percentage shall be used to calculate the differential aid under RSA 198:40-a, II(b) and relief

24   aid under RSA 198:40-e.

25   53  New Section; Relief Funding.  Amend RSA 198 by inserting after section 40-d the following

26   new section:

27   198:40-e  Relief Funding.

28   I.  In a school district in which 48 percent or more of the ADMA is eligible to receive a free or

29   reduced-priced meal, an additional $600 for each pupil in the ADMA who is eligible for a free or

30   reduced-priced meal.

31   II.  In a school district in which at least 12 percent but less than 48 percent of the ADMA is

32   eligible to receive a free or reduced-priced meal, an amount equal to $150 plus $0.1250 for each 0.01

33   percent that its free or reduced-priced meal eligibility rate exceeds 12 percent, for each pupil in the

34   ADMA who is eligible for a free or reduced-priced meal.

35   III.  A school district in which less than 12 percent of the ADMA is eligible to receive a free or

36   reduced-priced meal shall receive no additional aid under this section.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 29 -**

1    IV.   The department of education shall adjust aid to each district calculated under this
2  section to the statewide total of $17,500,000.  Adjustments under this paragraph shall be made on a
3  pro-rata basis.

4    54  Additional Aid to Education.  The governing body of a school district may call a special
5  meeting pursuant to RSA 197:3-a to determine how any adjustment in education aid shall be
6  budgeted.

7    55  Transfer; Education Trust Fund.  At the close of the fiscal year ending June 30, 2021, the
8  state treasurer shall transfer the sum of $35,000,000 from the education trust fund surplus to a
9  restricted account under the department of education for purposes of providing relief funding
10  pursuant to RSA 198:40-e for fiscal years 2022 and 2023.

11    56  Effective Date.  Section 55 of this act shall take effect June 30, 2021.

12    57  New Subparagraph.  Amend RSA 198:41, I by inserting after subparagraph (c) the following
13  new subparagraph:

14        (d)  Add the municipality's additional aid for relief funding pursuant to RSA 198:40-e.

15    58  Department of Education; State Maintenance of Equity; Biennium Ending June 30, 2023.

16    I.  For the biennium ending June, 30, 2023, the department of education shall determine, in
17  consultation with the governor, whether the state of New Hampshire is compliant with the state
18  maintenance of equity requirements of Section 2004(b) of the American Rescue Plan Act of 2021.  If
19  it is determined that the high-need and highest poverty local educational agencies as referenced in
20  Section 2004(b) and defined in Section 2004(d) of the American Rescue Plan Act of 2021 have
21  experienced a greater reduction in state aid per pupil than the state maintenance of equity
22  requirements permit under the American Rescue Plan Act for either fiscal year 2022 or 2023, the
23  department of education, with the approval of the fiscal committee of the general court, shall
24  increase state aid to such agencies to bring the state into compliance.

25    II.  If state aid is increased pursuant to paragraph I to achieve compliance with Section
26  2004(b) of the American Rescue Plan Act of 2021, the department of education shall determine if the
27  increase brings the state into compliance by eliminating an overall per-pupil reduction in state
28  funds, in which case the department shall issue the state aid on a prorated basis to the local
29  educational agency or agencies needing an increase in state aid in order to achieve compliance.

30    III.  Any state aid distributed under this section shall be an education grant in addition to
31  the state grant calculated under RSA 198:41 and shall be distributed to school districts accordingly.
32  Depending on how the United States Department of Education allows states to define "pupil" as it
33  relates to determining state aid per pupil under Section 2004(b) of the American Rescue Plan Act of
34  2021, the department of education may experience delays in accurately collecting pupil data to meet
35  the definition as defined by the United States Department of Education, thereby delaying the
36  calculation of the grant award.  If such delay occurs, the department of education may issue the

1   grants described in this section up to 120 days after the end of the applicable fiscal year being

2   assessed for compliance with federal law.

3       IV.   In seeking fiscal committee approval and establishing grants under this section, the

4   department of education may calculate the grants in manner that increases the likelihood of

5   compliance with Section 2004(b) of the American Rescue Plan Act of 2021 while utilizing the

6   minimum amount of state resources.   The department of education may also make minor rounding

7   adjustments to the grant awards under the condition all rounding adjustments are applied in a

8   consistent and uniform manner.

9       V.   In the event grants are required to be disbursed to districts, the commissioner of

10   education may request the fiscal committee of the general court to authorize additional funding.

11   Funds requested and approved shall be a charge to the education trust fund.   Such warrants for

12   payment shall be issued regardless of the balance of funds available in the education trust fund.   If

13   the balance in the education trust fund, after the issuance of any such warrant, is less than zero, the

14   comptroller shall transfer sufficient funds from the general fund to eliminate such deficit.   The

15   commissioner of the department of administrative services shall inform the fiscal committee and the

16   governor and council of such balance.   This reporting shall not in any way prohibit or delay the

17   distribution of any grant or transfer of funds authorized under this chapter.

18       59  Appropriation; Department of Education.  For the biennium ending June 30, 2023, the sum of

19   $3,000,000 is hereby appropriated to the department of education for the purpose of funding

20   operating costs for a state student data collection and reporting system.   Said appropriation shall be

21   a charge against the education trust fund.

22       60  Education Trust Fund Created and Invested.  Amend RSA 198:39, I to read as follows:

23       I.   The state treasurer shall establish an education trust fund in the treasury.   Moneys in

24   such fund shall not be used for any purpose other than to distribute adequate education grants to

25   municipalities' school districts and to approved charter schools pursuant to RSA 198:42, to provide

26   low and moderate income homeowners property tax relief under RSA 198:56-198:61, ***to distribute***

27   ***school building aid to school districts and approved chartered public schools pursuant to***

28   ***RSA 198:15-b, to distribute tuition and transportation funds to school districts for students***

29   ***attending career and technical education programs pursuant to RSA 188-E:9, to distribute***

30   ***special education aid to school districts pursuant to RSA 186-C:18, to fund department of***

31   ***education operating costs for a state student data collection and reporting system,*** and to

32   fund kindergarten programs as may be determined by the general court.   The state treasurer shall

33   deposit into this fund immediately upon receipt:

34       (a)   Funds certified to the state treasurer by the commissioner of revenue administration

35   pursuant to RSA 77-A:20-a, relative to business profits taxes.

36       (b)   Funds certified to the state treasurer by the commissioner of revenue administration

37   pursuant to RSA 77-E:14, relative to business enterprise tax.

Amendment to HB 2-FN-A-LOCAL
- Page 31 -

1    (c) Funds collected and paid over to the state treasurer by the commissioner of revenue
2 administration pursuant to RSA 78-A:26, III relative to the tax on motor vehicle rentals.

3    (d) Funds collected and paid over to the state treasurer by the department of revenue
4 administration pursuant to RSA 78:24, relative to tobacco taxes.

5    (e) Funds certified to the state treasurer by the commissioner of revenue administration
6 pursuant to RSA 78-B:13, relative to real estate transfer taxes.

7    (f) Funds collected and paid over to the state treasurer by the department of revenue
8 administration pursuant to RSA 83-F:7, I, relative to the utility property tax.

9    (g) [Repealed.]

10    (h) All moneys due the fund in accordance with RSA 284:21-j, relative to sweepstakes
11 and the lottery.

12    (i) Tobacco settlement funds in the amount of $40,000,000 [annually] or, ***for any year***
13 ***in which the total tobacco settlement funds received by the state is less than $40,000,000,***
14 ***the total amount of tobacco settlement funds received by the state***.

15    (j) The school portion of any revenue sharing funds distributed pursuant to RSA 31-A:4
16 which were apportioned to school districts in the property tax rate calculations in 1998.

17    (k) Funds collected and paid over to the state treasurer by the lottery commission
18 pursuant to RSA 284:44, RSA 284:47, and RSA 287-I.

19    (l) Any other moneys appropriated from the general fund.

20   61 Transfer; Education Trust Fund.  The comptroller shall transfer the following amounts from
21 the education trust fund to the public school infrastructure fund established in RSA 198:15-y:
22 $1,000,000 on July 1, 2021 and $1,000,000 on July 1, 2022.

23   62 Public School Infrastructure Fund.  Amend RSA 198:15-y to read as follows:

24   198:15-y Public School Infrastructure Fund.

25    I. The general court recognizes that there is a need to provide funding for infrastructure
26 projects for public elementary and secondary schools.  Therefore, it is the intent of this chapter to
27 designate certain surplus funds in the 2016-2017 biennial budget to provide grants to fund select
28 school infrastructure projects in accordance with this chapter.

29    II. There is hereby established in the office of the state treasurer the public school
30 infrastructure fund which shall be kept distinct and separate from all other funds and which shall be
31 administered by the department of education.  After transferring sufficient funds to the revenue
32 stabilization reserve account to bring the balance of that account to $100,000,000, the state treasurer
33 shall transfer the remainder of the general fund surplus for fiscal year 2017, as determined by the
34 official audit performed pursuant to RSA 21-I:8, II(a), to the fund.  Any earnings on fund moneys
35 shall be added to the fund.  All moneys in the fund shall be nonlapsing and continually appropriated.
36 The department of education may retain up to 3 percent of the total annual appropriation of the
37 public school infrastructure fund on or after July 1, 2019, to be used to administer the public school

Amendment to HB 2-FN-A-LOCAL
- Page 32 -

1    infrastructure program.  [Any unexpended or unencumbered balance as of June 30, 2021 shall be
2    transferred to the general fund.]

3        III.   The governor, in consultation with the public school infrastructure commission, may
4    authorize fund expenditures with approval of the fiscal committee of the general court and the
5    executive council.  Funds may be expended for the following purposes:

6        (a)   A school building or infrastructure proposal in which the condition of such school
7    building or portion thereof constitutes a clear and imminent danger to the life or safety of occupants
8    or other persons and requires remediation as soon as practicable.

9        (b)   A school building or infrastructure proposal in which a structural deficiency in the
10    function or operation of a school building or portion thereof presents a substantial risk to the life or
11    safety of the occupants or other persons and is more than a technical violation of the fire code, and
12    requires remediation as soon as practicable.

13        (c)   Support of fiber optic connections for schools to enhance and improve reliance on
14    Internet technology tools, provided matching funds are available.

15        (d)   Funding for the department of safety, division of homeland security and emergency
16    management's school emergency readiness program to improve security in public schools, after the
17    completion of a security assessment, and in consultation with municipal officials.

18        (e)   A school building or infrastructure proposal which is necessary to comply with
19    Americans with Disabilities Act (ADA) regulations.

20        (f)   ***Energy efficient school buses or other vehicles used for transportation of***
21    ***students.***

22        ***(g)***   Other school building or infrastructure needs the governor, in consultation with the
23    public school infrastructure commission, may identify, except for school building aid projects that are
24    otherwise prohibited by law.

25        ***IV.   In order for a school to be eligible for a grant from the public school***
26    ***infrastructure fund, the public school infrastructure commission in consultation with the***
27    ***department of education shall determine that the school has a need unmet by federal***
28    ***stimulus funds for the project.***

29    63  Repeal.  2017, 156:72, relative to the prospective repeal of the public school infrastructure
30    fund and commission, is repealed.

31    64  Department of Agriculture, Markets, and Food; Integrated Pest Management Program.
32    Amend RSA 430:50, II to read as follows:

33        II.   There is established a nonlapsing fund to be known as the integrated pest management
34    fund.  Twenty-five percent of the pesticide registration fees collected under RSA 430:38, III shall be
35    deposited in the fund.  The fund shall only be used to support the purposes of the integrated pest
36    management program ***and the division of pesticide control***.  The state treasurer may invest
37    moneys in the fund as provided by law and all interest received on such investment shall be credited

1 to the fund.  The commissioner shall be authorized to accept grants, gifts, and donations from any
2 public or private sources for deposit in the fund.

3 65  Department of Business and Economic Affairs; New Hampshire Economic Development
4 Fund.  Amend RSA 12-O:21 to read as follows:

5 12-O:21  New Hampshire Economic Development Fund.

6 I.  There is hereby established the New Hampshire economic development fund which shall
7 be administered by the commissioner of the department of business and economic affairs.  Said fund
8 shall be for the purpose of providing funds for grants, loans and other economic development
9 initiatives which shall be generally considered to be beneficial to the state's overall economy as
10 provided for in paragraph II.

11 II.  Said fund shall be distributed or expended by the commissioner with prior approval of
12 the fiscal committee of general court and the governor and council for any of the following purposes:

13 (a)  Business financing and expansion initiatives.

14 (b)  [Job] *Workforce recruitment* retention and creation.

15 (c)  International trade.

16 (d)  Research and development activities.

17 (e)  Other projects or programs recognized as being beneficial to business activity in New
18 Hampshire.

19 III.  To maximize the economic impact of expenditures from this fund, and to leverage
20 additional funding from other sources, the commissioner may contract with such organizations as,
21 but not limited to, the following:

22 (a)  [New Hampshire Business Development Corporation] *Chambers of commerce*.

23 (b)  [Small Business Investment Corporation] *Regional economic development or*
24 *planning organizations*.

25 (c)  Innovation Research Center.

26 (d)  Small Business Development Center.

27 IV.  All moneys *appropriated to the fund as well as moneys* returned to the department
28 as a result of contracts between the commissioner and any other party as authorized shall be
29 redeposited into the New Hampshire economic development fund.  In addition, the department may
30 accept gifts, grants, donations or other moneys for the purposes of this section.  Said moneys shall be
31 deposited into the New Hampshire economic development fund.

32 66  New Section; Department of Business and Economic Affairs; Director of Intergovernmental
33 Affairs.  Amend RSA 12-O by inserting after section 5 the following new section:

34 12-O:5-a  Director of Intergovernmental Affairs.

35 I.  There is established in the office of the commissioner the unclassified position of director
36 of intergovernmental affairs.  The director shall be qualified to hold that position by reason of

1   education and experience and shall perform such duties as the commissioner from time to time may

2   authorize.

3       II.  The commissioner shall nominate for appointment by the governor, with the consent of

4   the council, this unclassified director of intergovernmental affairs who shall serve for a term of 4

5   years.

6       III.  The salary of the director of intergovernmental affairs shall be determined after

7   assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for

8   the position which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

9       IV.  Upon completion of the appointment of the first director of intergovernmental affairs,

10  position number 40049 shall be abolished to allow for the transition of this classified position with

11  its available appropriations into the unclassified position of director of intergovernmental affairs.

12  Funding shall be transferred into a new expenditure class number 11 within accounting unit 03-22-

13  22-220010-2007.

14      67  Repeal.  RSA 12-O:11-a, relative to the bureau of film and digital media, is repealed.

15      68  Reference Deleted.  Department of Business and Economic Affairs.  Amend RSA 12-O:2, I

16  to read as follows:

17      I.  There shall be a department of business and economic affairs under the executive

18  direction of a commissioner of business and economic affairs, consisting of a division of economic

19  development which shall include but not be limited to a bureau of workforce development, and a

20  division of travel and tourism development which shall include but not be limited to a bureau of

21  visitor service [and a bureau of film and digital media].  The department's purpose shall be to ensure

22  the efficient coordinated function of the department, economic development policies of the state of

23  New Hampshire and the collaborative participation of all related state departments, agencies, and

24  authorities.

25      69  Distribution of Meals and Rooms Tax; Division of Travel and Tourism Development.  The

26  provisions of RSA 12-O:11-b, crediting a portion of meals and rooms tax revenue to the division of

27  travel and tourism development, are hereby suspended for the biennium ending June 30, 2023.

28      70  Department of Corrections; Transfer Authority.  The following classes within the department

29  of corrections shall be exempt from the transfer restrictions in RSA 9:17-a, 9:17-c, classes 10-

30  personal services-perm classified, 11-personal services unclassified, 12-personal services-

31  unclassified, 18-overtime, 19-holiday pay, 50-personal service-temp/appointed and 60-benefits.  The

32  department is authorized to transfer funding in these classes within and amongst all accounting

33  units provided that any transfer of $100,000 or more shall require prior approval of the fiscal

34  committee of the general court and governor and council.  The provisions in this paragraph shall

35  remain in effect for the biennium ending June 30, 2023.

36      71  Equipment Purchases.  Amend RSA 622:28-a,V to read as follows:

V.  All purchases of materials, supplies, and equipment into the inventory account shall be made in accordance with the provisions of RSA 21-I:11 and any equipment purchase in excess of [$5,000] *the approval threshold for contracts set by the governor and council manual of procedures*, and made under the provisions of this section, shall require the prior approval of both the fiscal committee of the general court and the governor and council.

72  Department of Environmental Services; Appropriation Extended.  Amend 2019, 346:304, I to read as follows:

I.  The sum of $6,000,000 for the fiscal year ending June 30, 2020 is hereby appropriated to the department of environmental services for the purpose of studying, investigating, and testing for contamination caused by perfluorinated chemicals, and the preliminary design for a treatment system for such contamination.  This appropriation shall not lapse until June 30, [2021] *2023*.  Such appropriation shall be a charge against the drinking water and groundwater trust fund established in RSA 6-D:1.

73  Effective Date.  Section 72 of this act shall take effect June 30, 2021.

74  State Aid Grants; Department of Environmental Services.

I.  Notwithstanding RSA 486, for the biennium ending June 30, 2023, no state aid grants shall be made for any new infrastructure projects that would have otherwise been eligible for state aid grants under RSA 486, RSA 486-A, or RSA 149-M, except that infrastructure projects that have achieved substantial completion by December 31, 2019, shall be eligible for state aid grants, subject to availability of funding and in accordance with other provisions of current law.  Nothing in this section shall affect the provision of the future water supply land protection grants under RSA 486-A if funding is available for such purposes.

II.  The sum of $15,576,939 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of environmental services for the purpose of funding payments on existing grants.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.  Said appropriation shall not lapse until  June 30, 2023.

75  Effective Date.  Section 74 of this act shall take effect June 30, 2021.

76  Office of Professional Licensure and Certification; Renaming and Reorganizing of Divisions.  Amend RSA 310-A:1-a to read as follows:

310-A:1-a  Office of Professional Licensure and Certification; Division of [Technical Professions] *Licensing and Board Administration* and Division of [Health Professions] *Enforcement* Established.  There shall be an office of professional licensure and certification that shall consist of the division of [technical professions] *licensing and board administration* and the division of [health professions] *enforcement*.

I.  The [division of technical professions] *office of professional licensure and certification* shall consist of each of the boards, councils, and commissions of:

(a)  Professional engineers under RSA 310-A:3.

1     (b)  Architects under RSA 310-A:29.

2     (c)  Land surveyors under RSA 310-A:55.

3     (d)  Natural scientists under RSA 310-A:81.

4     (e)  Foresters under RSA 310-A:100.

5     (f)  Professional geologists under RSA 310-A:120.

6     (g)  Landscape architects under RSA 310-A:142.

7     (h)  Court reporters under RSA 310-A:163.

8     (i)  Home inspectors under RSA 310-A:186.

9     (j)  Accountants under RSA 309-B:4.

10    (k)  Manufactured housing installers under RSA 205-D:2.

11    (l)  Real estate appraisers under RSA 310-B:4.

12    (m)  Electricians under RSA 319-C:4.

13    (n)  Board of manufactured housing under RSA 205-A:25.

14    (o)  Guardians ad litem under RSA 490-C:1.

15    (p)  Family mediators under RSA 328-C:4.

16    (q)  Real estate commission under RSA 331-A:5.

17    (r)  Septic system evaluators under RSA 310-A:206.

18    [II.  The division of health professions shall consist of each of the boards, councils,

19    commissions, and practices of:

20    (a)] *(s)*  Hearing care providers under RSA [137-F:3] *326-F and RSA 328-F*.

21    [(b)] *(t)*  Examiners of nursing home administrators under RSA 151-A:3.

22    [(c)] *(u)*  Podiatry under RSA 315:1.

23    [(d)] *(v)*  Chiropractic examiners under RSA 316-A:2.

24    [(e)] *(w)*  Dental examiners under RSA 317-A:2.

25    [(f)] *(x)*  Registration of funeral directors and embalmers under RSA 325:2.

26    [(g)] *(y)*  Midwifery council under RSA 326-D:3.

27    [(h)] *(z)*  Licensed dietitians under RSA 326-H:7.

28    [(i)] *(aa)*  Optometry under RSA 327:2.

29    [(j)] *(bb)*  Naturopathic board of examiners under RSA 328-E:7.

30    [(k)] *(cc)*  Licensed allied health professionals under RSA 328-F:3.

31    [(l)] *(dd)*  Acupuncture licensing under RSA 328-G:3.

32    [(m)] *(ee)*  Psychologists under RSA 329-B:3.

33    [(n)] *(ff)*  Mental health practice under RSA 330-A:3.

34    [(o)] *(gg)*  Licensing for alcohol and other drug use professionals under RSA 330-C:3.

35    [(p)] *(hh)*  Electrologists under RSA 314:2-a.

36    [(q)] *(ii)*  Body art practitioners under RSA 314-A.

37    [(r)] *(jj)*  Ophthalmic dispensers under RSA 327-A:2.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 37 -**

1    [(s)] *(kk)*  Reflexology, structural integrators, and Asian bodywork therapists under RSA

2 328-H:6.

3    [(t)] *(ll)*  Massage therapists under RSA 328-B:5.

4    [(u)] *(mm)*  Medicine under RSA 329:2.

5    [(v)] *(nn)*  Nursing under RSA 326-B:3 and nursing assistant registry under RSA 326-

6 B:26.

7    [(w)] *(oo)*  Pharmacy under RSA 318:2.

8    [(x)] *(pp)*  Barbering, cosmetology, and esthetics under RSA 313-A:2.

9    [(y)] *(qq)*  Medical technicians under RSA 328-I:2.

10   [(z)] *(rr)*  Medical imaging and radiation therapists under RSA 328-J:1.

11   *(ss)  Board of veterinary medicine under RSA 332-B.*

12   *(tt)  Mechanical licensing board under RSA 153:27-a.*

13   [III.] *II.*   Administrative rules adopted pursuant to RSA 541-A governing the licensing

14 boards, commissions, and councils set forth in [paragraphs I and II] *paragraph I* shall remain in

15 effect until amended, expired, or repealed.

16  77 Temporary Licensing Process; Reference Change.  Amend RSA 310-A:1-f, I to read as follows:

17   I.  Health care professionals shall [be defined as] *include* those individuals licensed by the

18 boards, councils, and commissions within the [division of health professions] *office of professional*

19 *licensure and certification* as set forth in RSA 310-A:1-a, [II, with the exception of those licensed

20 pursuant to RSA 314, RSA 314-A, RSA 313, RSA 328-B, and RSA 328-H] *who perform specified*

21 *medical or ancillary services within the scope of his or her authority, as determined by the*

22 *executive director*.

23  78 Telemedicine; Reference Change.  Amend RSA 310-A:1-g, IV to read as follows:

24   IV.   Notwithstanding any provision of law to the contrary, an out-of-state healthcare

25 professional providing services by means of telemedicine or telehealth shall be required to be

26 licensed, certified, or registered by the appropriate licensing board within the [division of health

27 professions] *office of professional licensure and certification*.  This paragraph shall not apply to

28 out-of-state physicians who provide consultation services pursuant to RSA 329:21, II.

29  79 Office of Professional Licensure and Certification; Division Directors; Unclassified Positions

30 Established.  Amend RSA 310-A:1-c to read as follows:

31  310-A:1-c  Division Directors*; Pharmacy Compliance Investigators*.

32   I.  There is established in the office of professional licensure and certification 2 unclassified

33 directors:   The director of the division of [technical professions] *licensing and board*

34 *administration* and director of the division of [health professions] *enforcement*.  Each director

35 shall be qualified to hold that position by reason of education and experience and shall perform such

36 duties as the executive director from time to time may authorize.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 38 -**

1    II.  The executive director shall nominate for appointment by the governor, with the consent

2    of the council, each unclassified division director, each of whom shall serve for a term of 4 years.

3    ***III.   There are established in the office of professional licensure and certification***

4    ***the unclassified position of chief pharmacy compliance investigator and 2 unclassified***

5    ***pharmacy investigator positions.  Each investigator shall be qualified for the position by***

6    ***reason of education and experience, shall be nominated by the executive director for***

7    ***appointment by the governor and council, and shall serve at the pleasure of the executive***

8    ***director.  The chief pharmacy compliance investigator shall oversee pharmacy compliance***

9    ***and investigations, shall supervise the pharmacy compliance investigators, and shall***

10   ***perform such duties as the executive director from time to time may authorize.***

11   80   Office of Professional Licensure and Certification; Classified Positions Abolished; Funding

12   Transferred to Unclassified Positions.

13   I.   Upon the appointment of a chief pharmacy compliance investigator and 2 pharmacy

14   investigators to the office of professional licensure and certification, the following positions shall be

15   abolished to allow for the transition of these classified positions with their available appropriations

16   into the unclassified positions established in RSA 310-A:1-c, III.  Funding shall be transferred into

17   expenditure class 011, within accounting unit 01-21-21-216010-33020000.  The incumbents in the

18   abolished classified positions shall be offered the opportunity to seek the executive director's

19   nomination for the unclassified positions:

20           (a)  Pharmacy Board Compliance Investigator, 22008.

21           (b)  Pharmacy Board Compliance Investigator, 14337.

22           (c)  Program Specialist I/Assistant Pharmacy Inspector, 17094.

23   II.  The salary of the unclassified positions shall be determined after assessment and review

24   of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the positions which shall

25   be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

26   81   Office of Professional Licensure and Certification; Fees.  Amend RSA 310-A:1-e, I to read as

27   follows:

28   I.(a)   The executive director of the office of professional licensure and certification shall

29   assess annual or biennial license, certification, and renewal fees, as well as any necessary

30   administrative fees for each professional regulatory board, council, or commission administered by

31   the office.  ***Such fees shall be sufficient to produce estimated revenues up to 125 percent of***

32   ***the total operating expenses for the office, as determined by averaging the operating***

33   ***expenses for the office for the previous 2 fiscal years.***

34           (b)  There is hereby established the office of professional licensure and certification fund

35   into which the fees collected under subparagraph (a) shall be deposited.  After paying all costs and

36   salaries associated with the office, moneys in this fund shall lapse to the general fund at the close of

37   each [~~fiscal year~~] ***biennium***.

1    82  Mechanical Licensing Board; Transfer to Office of Professional Licensure and Certification.
2    Amend the introductory paragraph of RSA 153:27-a to read as follows:

3    153:27-a  Mechanical Licensing Board.  There is hereby established as a unit within the [division
4    of fire safety a mechanical licensing board] *office of professional licensure and certification*.
5    The term of office for the members appointed to the board shall be 3 years and until a successor is
6    appointed.  The initial appointed members of the board shall serve staggered terms.  Vacancies shall
7    be filled in the same manner and for the unexpired terms.  No member of the board shall be
8    appointed to more than 2 consecutive terms.  A member of the board shall serve as the board
9    secretary.

10   83  Appropriation; Internet Crimes Against Children Fund.  The sum of $250,000 for the fiscal
11   year ending June 30, 2022, and the sum of $250,000 for the fiscal year ending June 30, 2023, are
12   hereby appropriated to the New Hampshire Internet crimes against children fund established in
13   RSA 21-M:17.  The governor is authorized to draw a warrant for said sums out of any money in the
14   treasury not otherwise appropriated.

15   84  Attorney/Administrator.  Amend RSA 359-P:4 to read as follows:

16   359-P:4  Attorney/Administrator.  The director shall [hire/appoint a private] *hire an* attorney or
17   administrator who shall [collect gifts and contributions,] review applications for assistance
18   submitted pursuant to this chapter, make awards of assistance in accordance with the procedures of
19   this chapter, and report annually to the director commencing on February 1, [2017] *2022* and each
20   February 1 thereafter.  The director shall negotiate the attorney's or administrator's [compensation
21   which in any calendar year shall be no more than 10 percent of any private sector contributions
22   received in that calendar year] *salary and benefit level in accordance with similar levels
23   within the department*.

24   85  Appropriation; FRM Victims' Contribution Recovery Fund.  For the purpose of awarding
25   recovery assistance to victims of the FRM fraud, there is hereby appropriated the sum of $5,000,000
26   for the fiscal year ending June 30, 2022, and the sum of $5,000,000 for the fiscal year ending June
27   30, 2023, to the FRM victims' contribution recovery fund established in RSA 359-P:2.  The governor
28   is authorized to draw a warrant for said sums out of any money in the treasury not otherwise
29   appropriated.

30   86  Repeal of the Prospective Repeal of FRM Fund.  2016, 293:6, relative to the July 1, 2023
31   repeal of the FRM victims' contribution recovery fund in RSA 359-P:2, is repealed.

32   87  Revenue Stabilization Account; Cap.  Amend RSA 9:13-e, V to read as follows:

33        V.  If, after the requirements of paragraphs II-IV have been met and the balance remaining
34   in the revenue stabilization reserve account is in excess of an amount equal to 10 percent of the
35   actual general fund unrestricted revenues for the most recently completed fiscal [year] *biennium*,
36   then such excess, less any amounts deposited pursuant to RSA 7:6-e, shall be transferred, without
37   further action, to the general fund surplus account.

Amendment to HB 2-FN-A-LOCAL
- Page 40 -

88   Appropriation; Department of Health and Human Services.   The sums of $12,401,552 in fiscal year 2022 and $13,031,765 in fiscal year 2023 are hereby appropriated to the department of health and human services for the purpose of funding one-time maintenance of the legacy Medicaid management information system as the department transitions to new modular information technology systems.   The department may accept and expend matching federal funds without prior approval of the fiscal committee.   The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

89   Rate.   Amend RSA 77:1 to read as follows:

77:1   Rate.

*I.*   The annual tax upon incomes shall be levied at the rate of 5 percent *for all taxable periods ending before December 31, 2023.*

*II.   The annual tax upon incomes shall be levied at the rate of 4 percent for all taxable periods ending on or after December 31, 2023.*

*III.   The annual tax upon incomes shall be levied at the rate of 3 percent for all taxable periods ending on or after December 31, 2024.*

*IV.   The annual tax upon incomes shall be levied at the rate of 2 percent for all taxable periods ending on or after December 31, 2025.*

*V.   The annual tax upon incomes shall be levied at the rate of 1 percent for all taxable periods ending on or after December 31, 2026*.

90   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 14-B:8, III(q) to read as follows:

(q)   New Hampshire taxes, specifying if business profits tax[,] *or* business enterprise tax[, or interest and dividends tax].

91   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 15-A:5, I(d)(17) to read as follows:

(17)   New Hampshire taxes, specifying if business profits tax[,] *or* business enterprise tax[, or interest and dividends tax].

92   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:31 to read as follows:

21-J:31   Penalty for Failure to File.   Any taxpayer who fails to file a return when due, unless an extension has been granted by the department, shall pay a penalty equal to 5 percent of the amount of the tax due or $10, whichever is greater, for each month or part of a month during which the return remains unfiled.   The total amount of any penalty shall not, however, exceed 25 percent of the amount of the tax due or $50, whichever is greater.   This penalty shall not be applied in any case in which a return is filed within the extended filing period as provided in [RSA 77:18-b,] RSA 77-A:9, RSA 77-E:8, RSA 83-C:6, RSA 83-E:5, RSA 84-A:7, or RSA 84-C:7, or the failure to file was due to reasonable cause and not willful neglect of the taxpayer.   The amount of the penalty is

**Amendment to HB 2-FN-A-LOCAL**
**- Page 41 -**

1      determined by applying the percentages specified to the net amount of any tax due after crediting

2      any timely payments made through estimating or other means.

3      93   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:33-a, I to read as

4      follows:

5      I.   If there is a substantial understatement of tax imposed under [RSA 77,] RSA 77-A,

6      RSA 77-E, RSA 78-A, RSA 78-C, RSA 82-A, RSA 83-C, RSA 83-E, or RSA 84-A for any taxable

7      period, there shall be added to the tax an amount equal to 25 percent of the amount of any

8      underpayment attributable to such understatement.

9      94   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:46, III to read as

10     follows:

11     III.   This section shall apply only to tax returns and associated payments under [RSA 77,]

12     RSA 77-A[,] and RSA 77-E.

13     95   References to Interest and Dividends Tax Deleted; 2027.   Amend RSA 71-C:4, I and II to

14     read as follows:

15     I.   On or before December 15 of every fiscal year the commissioner of the department of

16     revenue administration shall certify in a report to the general court and the governor an analysis of

17     each of the past fiscal year's tax expenditures as identified in RSA 71-C:2, and other credits allowed

18     under [RSA 77,] RSA 77-A, RSA 77-E, RSA 77-G, RSA 78, RSA 78-A, 78-B, RSA 82-A, RSA 83-E,

19     RSA 84-A, RSA 84-C, and RSA 400-A.

20     II. The report shall be divided into the following parts:

21     (a)   Tax expenditures as determined by the joint committee on tax expenditure review

22     under RSA 71-C:3;

23     (b)   Potential liabilities against the state's revenues, specifically:

24     (1)   Other credits allowed under [RSA 77,] RSA 77-A, RSA 77-E, RSA 77-G, RSA 78,

25     RSA 78-A, RSA 78-B, RSA 82, RSA 82-A, RSA 83-E, RSA 84-A, RSA 84-C, and RSA 400-A against

26     the business profits tax imposed by RSA 77-A; and

27     (2)   Credit carryovers from overpaid taxes.

28     96   Education Tax Credit Scholarship Organizations; 2027.   Amend RSA 77-G:3 to read as

29     follows:

30     77-G:3    Contributions to Scholarship Organizations.   For each contribution made to a

31     scholarship organization, a business organization, business enterprise, or individual may claim a

32     credit equal to 85 percent of the contribution against the business profits tax due pursuant to RSA

33     77-A, against the business enterprise tax due pursuant to RSA 77-E, [against the tax on interest and

34     dividends under RSA 77,] or apportioned against each provided the total credit granted shall not

35     exceed the maximum education tax credit allowed.   Credits provided under this chapter shall not be

36     deemed taxes paid for the purposes of RSA 77-A:5, X.   The department of revenue administration

37     shall not grant the credit without a scholarship receipt.    No business organization, business

1  enterprise, or individual shall direct, assign, or restrict any contribution to a scholarship
2  organization for the use of a particular student or nonpublic school.  No business organization,
3  business enterprise, or individual shall receive more than 10 percent of the aggregate amount of tax
4  credits permitted in RSA 77-G:4.

5  97  Education Tax Credit Scholarship Organizations; 2027.  Amend RSA 77-G:5, I, (i)(2) to read
6  as follows:

7  (2)  Not knowingly award a scholarship to any lineal descendant or equivalent step-
8  person of any proprietor, partner, or member of any business organization, business enterprise, or
9  individual making a contribution to a scholarship organization and claiming a credit against the
10  business profits tax[,] *or* business enterprise tax, [or tax on interest and dividends,] nor any lineal
11  descendant or equivalent step-person of any officer, director, or owner of more than a 5 percent
12  interest in any business organization, business enterprise, or individual making a contribution to a
13  scholarship organization and claiming a credit against the business profits tax[,] *or* business
14  enterprise tax, [or tax on interest and dividends,] nor any employee who is among the highest-paid
15  20 percent of paid employees in any business organization, business enterprise, or individual making
16  a contribution to a scholarship organization and claiming a credit against the business profits tax[,]
17  *or* business enterprise tax[, or tax on interest and dividends].

18  98  Issuance of Electric Rate Reduction Bonds; 2027.  Amend RSA 369-B:5, VI to read as follows:

19  VI.  The exercise of the powers granted by this chapter shall be in all respects for the benefit
20  of the people of this state, for the increase of their commerce, welfare, and prosperity, and as the
21  exercise of such powers shall constitute the performance of an essential public function, neither any
22  electric utility, any affiliate of any electric utility, any financing entity, nor any collection or other
23  agent of any of the foregoing shall be required to pay any taxes or assessments upon or in respect of
24  any revenues or property received, acquired, transferred, or used by any electric utility, any affiliate
25  of any electric utility, any financing entity, or any collection or other agent of any of the foregoing
26  under the provisions of this chapter or upon or in respect of the income therefrom, and any rate
27  reduction bonds shall be treated as notes or bonds of a political subdivision of the state [for purposes
28  of RSA 77].

29  99  Repeals; Interest and Dividends Taxation; 2027.  The following are repealed:

30  I.  RSA 21-J:45, I(c), relative to reports on status of requested interest and dividends tax
31  refunds.

32  II.  RSA 77, relative to taxation of incomes.

33  III.  RSA 77-A:4-c, II(c), relative to the duty of a committee to study the taxation of
34  distributions received by investment organizations under the interest and dividends tax.

35  IV.  RSA 77-A:4, I, relative to an adjustment to the business profits tax for taxes under
36  RSA 77.

1      V.   RSA 195-H:10, relative to exemption from RSA 77 for income and distributions from

2   qualified tuition programs.

3      VI.   RSA 195-K:4, relative to exemption from RSA 77 for income and distributions in the

4   ABLE savings account program.

5      VII.   RSA 261:52-a, relative to notice that the interest and dividends tax may be due.

6      VIII.   RSA 391:3, relative to the taxation of common trust funds under RSA 77.

7     100  Returns for Interest and Dividends Taxes; 2027.   All persons who are liable for a tax under

8   RSA 77 as of December 31, 2026, who thereafter are no longer liable for a tax under RSA 77 because

9   of the passage of this act shall make a return of such taxes due the commissioner of revenue

10  administration in such manner and on such forms as the commissioner shall prescribe in rules

11  adopted under RSA 541-A.   The administrative provisions of RSA 77 shall remain in effect to permit

12  the audit and collection of taxes upon income taxable under RSA 77 which is received by persons

13  subject to taxation under that chapter through December 31, 2026, and to permit the distribution of

14  that revenue.   Persons who are liable for a tax under RSA 77 who do not report the payment of

15  federal income taxes on a calendar year basis are entitled to such proportion of the exemptions

16  allowed in RSA 77 as the reporting period bears to their taxable year.

17     101  Application; Repeal of RSA 77.   Paragraph II of section 99 shall apply to taxable periods

18  beginning after December 31, 2026.

19     102  Effective Date.

20      I.  Section 89 this act shall take effect January 1, 2022.

21      II.  Sections 90-100 of this act shall take effect January 1, 2027.

22     103  Imposition of Tax.  Amend RSA 78-A:6 to read as follows:

23   78-A:6  Imposition of Tax.

24      I.  A tax of [9] *8.5* percent of the rent is imposed upon each occupancy.

25      II.  A tax is imposed on taxable meals based upon the charge therefor as follows:

26        (a)  Four cents for a charge between $.36 and $.37 inclusive;

27        (b)  Five cents for a charge between $.38 and $.50 inclusive;

28        (c)  Six cents for a charge between $.51 and $.62 inclusive;

29        (d)  Seven cents for a charge between $.63 and $.75 inclusive;

30        (e)  Eight cents for a charge between $.76 and $.87 inclusive;

31        (f)  Nine cents for a charge between $.88 and $1.00 inclusive;

32        (g)  [Nine] ***Eight and a half*** percent of the charge for taxable meals over $1.00, provided

33  that fractions of cents shall be rounded up to the next whole cent.

34      II-a.  A tax of [9] *8.5* percent is imposed upon the gross rental receipts of each rental.

35      III.  The operator shall collect the taxes imposed by this section and shall pay them over to

36  the state as provided in this chapter.

104  Applicability.  RSA 78-A:6, as amended by section 103 of this act, shall be applicable to taxable periods beginning on or after October 1, 2021.

105  Effective Date.  Sections 103-104 of this act shall take effect upon its passage.

106  Business Enterprise Tax; Returns.  Amend RSA 77-E:5, I to read as follows:

I.  Every business enterprise having gross business receipts in excess of [$200,000] *$250,000* as defined by RSA 77-E:1, X, during the taxable period or the enterprise value tax base of which is greater than [$100,000] *$250,000* shall, on or before the fifteenth day of the third month in the case of enterprises required to file a United States partnership tax return, and the fifteenth day of the fourth month in the case of all other business enterprises, following expiration of its taxable period, make a return to the commissioner.  For tax years beginning January 1, 2015, the commissioner shall biennially adjust these threshold amounts rounding to the nearest $1,000 based on the 2-year (24-month) percentage change in the Consumer Price Index for All Urban Consumers, Northeast Region as published by the Bureau of Labor Statistics, United States Department of Labor using the amount published for the month of June in the year prior to the start of the tax year.  All returns shall be signed by the business enterprise or by its authorized representative, subject to the pains and penalties of perjury and the penalties provided in RSA 21-J:39.

107  Applicability.  RSA 77-E:5, I, as amended by section 106 of this act, shall be applicable to taxable periods ending on or after December 31, 2022.

108  Effective Date.  Sections 106-107 of this act shall take effect January 1, 2022.

109  Business Enterprise Tax; Rate Reduced.  Amend RSA 77-E:2 to read as follows:

77-E:2  Imposition of Tax.

I.  For all taxable periods ending on or after December 31, 2019, a tax is imposed at the rate of 0.6 percent upon the taxable enterprise value tax base of every business enterprise.

II.  For all taxable periods ending on or after December 31, [2021] *2022*, a tax is imposed at the rate of [0.675] *0.55* percent upon the taxable enterprise value tax base of every business enterprise.

[III.  For all taxable periods ending on or after December 31, 2021, a tax is imposed at the rate of 0.5 percent upon the taxable enterprise value tax base of every business enterprise.

IV.  Upon completion of the audited comprehensive annual report performed pursuant to RSA 21-I:8, II(a), the commissioner of the department of revenue administration shall report the total amount of combined unrestricted general and education trust fund revenue collected for the fiscal year ending June 30, 2020, as reported in the schedule of undesignated/unassigned fund balance for the general fund and education fund, to the secretary of state with copies to the governor, speaker of the house of representatives, the senate president, the fiscal committee of the general court, and the director of the office of legislative services.  If the combined amount of general and education trust fund revenue collected, not including sums appropriated to the education trust fund in section 386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more below the

1   official revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph II
2   and the rate in paragraph III shall not take effect.  If the combined amount of general and education
3   trust fund revenue collected, not including sums appropriated to the education trust fund in section
4   386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more above the official
5   revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph III and the
6   rate in paragraph II shall not take effect.  If the combined amount of general and education trust
7   fund revenue collected, not including sums appropriated to the education trust fund in section 386 of
8   this act, for the fiscal year ending June 30, 2020 is not 6 percent or more below or above the official
9   revenue estimates for said fiscal year, the tax shall continue to be imposed at the rate in paragraph
10  I, and the rates in paragraphs II and III shall not take effect.]

11      110  Business Profits Tax; Rate Reduced; Contingency Deleted.  Amend RSA 77-A:2 to read as
12  follows:

13      77-A:2  Imposition of Tax.

14          I.  For all taxable periods ending on or after December 31, 2019, a tax is imposed at the rate
15  of 7.7 percent upon the taxable business profits of every business organization.

16          II.  [For all taxable periods ending on or after December 31, 2021, a tax is imposed at the
17  rate of 7.9 percent upon the taxable business profits of every business organization.

18          III.]  For all taxable periods ending on or after December 31, [2021] *2022*, a tax is imposed at
19  the rate of [7.5] *7.6* percent upon the taxable business profits of every business organization.

20          [IV.  Upon completion of the audited comprehensive annual report performed pursuant to
21  RSA 21-I:8, II(a), the commissioner of the department of revenue administration shall report the
22  total amount of combined unrestricted general and education trust fund revenue collected for the
23  fiscal year ending June 30, 2020, as reported in the schedule of undesignated/unassigned fund
24  balance for the general fund and education fund, to the secretary of state with copies to the governor,
25  speaker of the house of representatives, the senate president, the fiscal committee of the general
26  court, and the director of the office of legislative services.  If the combined amount of general and
27  education trust fund revenue collected, not including sums appropriated to the education trust fund
28  in section 386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more below the
29  official revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph II
30  and the rate in paragraph III shall not take effect.  If the combined amount of general and education
31  trust fund revenue collected, not including sums appropriated to the education trust fund in section
32  386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more above the official
33  revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph III and the
34  rate in paragraph II shall not take effect.  If the combined amount of general and education trust
35  fund revenue collected, not including sums appropriated to the education trust fund in section 386 of
36  this act, for the fiscal year ending June 30, 2020 is not 6 percent or more below or above the official

1  revenue estimates for said fiscal year, the tax shall continue to be imposed at the rate in paragraph

2  I, and the rates in paragraphs II and III shall not take effect.]

3  111  Effective Date.  Sections 109-110 of this act shall take effect upon its passage.

4  112   New Section; Business Profits Tax; Clarification of PPP Loans.   Amend RSA 77-A by

5  inserting after section 3-b the following new section:

6  77-A:3-c  Clarification of Tax Treatment of Paycheck Protection Program (PPP) Loans.   In

7  determining gross business profits for any period, before net operating loss and special deductions,

8  notwithstanding any other provision of law, a business organization shall apply the provisions of the

9  United States Internal Revenue Code consistent with the following adjustments:

10  I.  No amount shall be included in the gross business income of the eligible recipient by

11  reason of forgiveness of indebtedness issued or created under the federal Paycheck Protection

12  Program (PPP) which was first established under the federal Coronavirus Aid, Relief, and Economic

13  Security Act (P.L. 116-136, enacted March 3, 2020) or issued or created under the federal PPP

14  Second Draw Loan Program established under the federal Consolidated Appropriations Act, 2021

15  (P.L. 116-260, enacted December 27, 2020).

16  II.  No deduction shall be denied, no tax attribute shall be reduced, and no basis increase

17  shall be denied, by reason of the exclusion from gross business income provided by paragraph I.

18  III.  This section shall apply to taxable years ending after March 3, 2020, corresponding with

19  the date of the enactment of the federal Coronavirus Aid, Relief, and Economic Security Act.

20  113  Meals and Rooms Tax; Disposition of Revenue; Fund Established.  Amend RSA 78-A:26 to

21  read as follows:

22  78-A:26  Disposition of Revenue.

23  I.  Beginning on July 1, 1995, and for each fiscal year thereafter, the department shall pay

24  over all revenue, except revenues identified in [paragraph III] *paragraphs II and III* of this

25  section, collected under this chapter to the state treasurer.  On or before September 15 of each year,

26  the department shall determine the cost of administration of this chapter for the fiscal year ending

27  on the preceding June 30, and it shall notify the state treasurer of these costs by a report certified by

28  them as to correctness.  After deducting the cost of administration of the chapter from the total

29  income, the state treasurer shall distribute the net income as follows:

30  (a)  The amount necessary to provide payments of principal and interest on the bonds

31  and notes authorized under RSA 198:15-a, II for the fiscal years ending June 30, 2009 through June

32  30, 2030; *and*

33  [(b)  [Repealed];

34  (c)  Forty percent of the net income under the introductory paragraph of paragraph I of

35  the most recent fiscal year to the unincorporated towns, unorganized places, towns, and cities.  The

36  amount to be distributed to each such town, place, or city shall be determined by multiplying the

37  amount to be distributed by a fraction, the numerator of which shall be the population of the

1  unincorporated town, unorganized place, town or city and the denominator of which shall be the

2  population of the state.  The population figures shall be based on the latest resident population

3  figures furnished by the office of strategic initiatives; and

4          (d)] *(b)*  The remainder to the general fund.

5          II.  [Each fiscal year, the amount to be distributed shall be equal to the prior year's

6  distribution plus an amount equal to 75 percent of any increase in the income received from the

7  meals and rooms tax for the fiscal year ending on the preceding June 30, not to exceed $5,000,000,

8  until such time as the total amount distributed annually is equal to the amount indicated in

9  subparagraph I(c).

10          III.]  Beginning on July 1, 1999, and for each fiscal year thereafter, the department shall pay

11  over all revenue collected pursuant to RSA 78-A:6, II-a to the state treasurer for deposit in the

12  education trust fund established by RSA 198:39.

13          ***III.  On or before December 1, 2021 and each December 1 thereafter, 30 percent of the***

14  ***net income determined under the introductory paragraph of paragraph I of the most recent***

15  ***fiscal year, after deductions for the cost of administration and revenues deposited in the***

16  ***education trust fund pursuant to paragraph II, shall be deposited into the meals and***

17  ***rooms municipal revenue fund for distribution to the unincorporated towns, unorganized***

18  ***places, towns, and cities.  The amount to be distributed to each such town, place, or city***

19  ***shall be determined by multiplying the total amount to be distributed by a fraction, the***

20  ***numerator of which shall be the population of the unincorporated town, unorganized***

21  ***place, town, or city and the denominator of which shall be the population of the state.  The***

22  ***population figures shall be based on the latest resident population figures furnished by the***

23  ***office of strategic initiatives.***

24          ***IV.  There is hereby established in the treasury the meals and rooms municipal***

25  ***revenue fund.  Any money deposited into the meals and rooms municipal revenue fund***

26  ***shall be nonlapsing and continually appropriated to the state treasurer for distribution to***

27  ***the unincorporated towns, unorganized places, towns, and cities pursuant to paragraph***

28  ***III***.

29          114  New Subparagraph; Treasury; Application of Receipts.  Amend RSA 6:12, I(b) by inserting

30  after subparagraph (364 ) the following new subparagraph:

31          (365)  Moneys deposited in the meals and rooms municipal revenue fund established

32  in RSA 78-A:26, IV.

33          115  Reference Changed; Education Trust Fund.  Amend RSA 198:39, I(c) to read as follows:

34          (c)  Funds collected and paid over to the state treasurer by the commissioner of revenue

35  administration pursuant to RSA 78-A:26, [III] *II* relative to the tax on motor vehicle rentals.

36          116  Business Profits Tax; Credit Carry-forward Limited; Payments Due With Returns and

37  Estimates.  Amend RSA 77-A:7, I(b) to read as follows:

1      (b)  If the return required by RSA 77-A:6, I shows an additional amount to be due, such

2 additional amount is due and payable on the prescribed payment date.  If such return shows an

3 overpayment of the tax due, the commissioner shall refund or credit the overpayment to the

4 taxpayer in accordance with RSA 21-J:28-a*, except that:*

5      *(1)  For taxable periods ending on or after December 31, 2022 a credit shall*

6 *only be allowed in an amount up to 500 percent of the total tax liability for the taxable*

7 *period and the remainder of the overpayment shall be refunded;*

8      *(2)  For taxable periods ending on or after December 31, 2025 a credit shall*

9 *only be allowed in an amount up to 250 percent of the total tax liability for the taxable*

10 *period and the remainder of the overpayment shall be refunded; and*

11      *(3)  For taxable periods ending on or after December 31, 2027 a credit shall*

12 *only be allowed in an amount up to 100 percent of the total tax liability for the taxable*

13 *period and the remainder of the overpayment shall be refunded.*

14      117  Business Enterprise Tax; Credit Carry-forward Limited; Payments Due With Returns.

15 Amend RSA 77-E:6, II to read as follows:

16      II.  If the return required by RSA 77-E:5, I shows an amount to be due, such amount is due

17 and payable on the prescribed payment date.  If such return shows an overpayment of the tax due,

18 the commissioner shall refund [such] *or credit the* overpayment to the business enterprise [or shall

19 allow the enterprise a credit against a subsequent payment or payment due, to the extent of the

20 overpayment, at the enterprise's option] *in accordance with RSA 21-J:28-a, except that:*

21      *(a)  For taxable periods ending on or after December 31, 2022 a credit shall only*

22 *be allowed in an amount up to 500 percent of the total tax liability for the taxable period*

23 *and the remainder of the overpayment shall be refunded;*

24      *(b)  For taxable periods ending on or after December 31, 2025 a credit shall only*

25 *be allowed in an amount up to 250 percent of the total tax liability for the taxable period*

26 *and the remainder of the overpayment shall be refunded; and*

27      *(c)  For taxable periods ending on or after December 31, 2027 a credit shall only*

28 *be allowed in an amount up to 100 percent of the total tax liability for the taxable period*

29 *and the remainder of the overpayment shall be refunded.*

30      118  New Section; Commission to Study Limiting the Business Tax Credit Carry Over.  Amend

31 RSA 77-A by inserting after section 7-a the following new section:

32      77-A:7-b  Commission to Study Limiting the Business Tax Credit Carry Over.

33      I.  There is a established a commission to study limiting the business tax credit carry over.

34 The members of the commission shall be as follows:

35      (a)  Four members of the house of representatives, appointed by the speaker of the house

36 of representatives with at least 2 members from the ways and means committee and one member

37 from the finance committee.

1    (b)  One member of the senate, appointed by the president of the senate.

2    (c)  The treasurer for the state of New Hampshire, or designee.

3    (d)  The comptroller for the state of New Hampshire, or designee.

4    (e)  The commissioner for the department of revenue administration, or designee.

5    (f)  One member representing the accounting or auditing industry, appointed by the
6    governor.

7    II.  Legislative members of the commission shall receive mileage at the legislative rate when
8    attending to the duties of the commission.

9    III.  The commission's study shall include, but not be limited to, examining the credit carry
10   over for the business profits tax and business enterprise tax, the liability associated with the credit
11   carry over, and the impact of limiting the credit carry over may have on cash flow and liquidity, and
12   make recommendations on future limitations of the credit carry over.  The commission shall also
13   examine whether a business tax credit or other type of credit could be made available to those
14   entities using their credit carry over refund to invest in affordable housing development in New
15   Hampshire and make recommendations on how this type of program would be implemented.

16   IV.  The commission may solicit input from any person or entity the commission deems
17   relevant to its study.

18   V.  The members of the commission shall elect a chairperson from among the members.  The
19   first meeting of the commission shall be called by the first-named house member.  The first meeting
20   of the commission shall be held as soon as practical but not later than 30 days of the effective date of
21   this section.  Five members of the commission shall constitute a quorum.

22   VI.  The commission shall submit a report including its findings and any recommendations
23   for proposed legislation on or before November 1, 2021 to the speaker of the house of representatives,
24   the president of the senate, the house clerk, the senate clerk, the governor, and the state library.

25   119  Repeal.  RSA 77-A:7-b, relative to the commission to study limiting the business tax credit
26   carry over, is repealed.

27   120  Effective Date.

28   I.  Sections 116-118 of this act shall take effect upon its passage.

29   II.  Section 119 of this act shall take effect November 1, 2021.

30   121  New Hampshire Veterans' Home; Unfunded Positions; Authorization.  Notwithstanding any
31   other provision of law to the contrary, the New Hampshire veterans' home may fill unfunded
32   positions during the biennium ending June 30, 2023, provided that the total expenditure for such
33   positions shall not exceed the amount appropriated for personal services.

34   122  New Hampshire Veterans' Home; Transfer Among Accounts and Classes.  Notwithstanding
35   any provision of law to the contrary, for the biennium ending June 30, 2023, the commandant of the
36   New Hampshire veterans' home is authorized to transfer funds within and among all accounting
37   units within the home and to create accounting units and expenditure classes as required and as the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 50 -**

1   commandant deems necessary and appropriate to address present or projected budget deficits, or to
2   respond to changes in federal law, regulations, or programs, and otherwise as necessary for the
3   efficient management of the home, including funding of unfunded positions, provided that if a
4   transfer does not include new accounting units or expenditure classes, only such transfers of
5   $100,000 or more shall require prior approval of the fiscal committee of the general court and the
6   governor and council.  The New Hampshire veterans' home shall be exempt from RSA 9:17-a, I and
7   RSA 9:17-c, subject to approval by the fiscal committee of the general court of any transfer of
8   appropriations from permanent personal services or employee benefits to any other use or purpose.

9   123  Wildlife Damage Control; Limitations for Persons Posting Property.  Amend RSA 207:22-a
10   to read as follows:

11   207:22-a  Limitations for Persons Posting Property.

12   *I.*  Any person whose land is posted pursuant to RSA 635:4 to prohibit hunting shall forfeit
13   the right to participate in the wildlife damage control program established pursuant to RSA 207:22-
14   c, or to receive payment pursuant to RSA 207:23-a, except that this limitation shall not apply in the
15   following circumstances:

16   [I.] *(a)*  To a person who posts only the person's land lying within 100 yards of a dwelling or
17   other farm or outbuildings contiguous to the person's dwelling and used regularly by the person, or
18   the person's family or tenant.

19   [II.] *(b)*  To any person whose land is posted for the protection of crops only during the closed
20   season for the type of game birds or animals for which the person seeks assistance from the wildlife
21   damage control program.

22   [III.] *(c)*   To any person who posts such person's land "Hunting by Permission Only",
23   provided that the names and addresses of the hunters who have received permission to hunt that
24   land in that year shall be furnished when requested by the executive director, and that in the
25   judgment of the executive director, the history of hunter access and hunter density represents a
26   good-faith effort by the landowner to allow hunting.

27   *II.  Any person who has received payment pursuant to RSA 207:23-a shall forfeit the*
28   *right to receive payment in a future year or growing season unless such person implements*
29   *measures to prevent or mitigate future conflicts with bear that have been recommended in*
30   *writing by the executive director or the executive director's agent.*

31   124  Damage by Bears.  Amend RSA 207:23-a to read as follows:

32   207:23-a  Damage by Bears [or Mountain Lions].

33   *I.*  [A person] *Any person engaged in the husbandry and sale of at least $1,000 in*
34   *agricultural products as defined in RSA 21:34-a* who suffers loss or damage to livestock, bees,
35   orchards or growing crops, *in an amount of $250 or more at the current wholesale value of the*
36   *items,* by bear [or mountain lion,] shall, if he *or she* claims damage therefor, notify the executive
37   director of fish and game in writing of such damage *within 30 days of the discovery of such*

*damage*.  The executive director or [his] *the executive director's* agent shall investigate such claim within 30 days from the receipt [by him] of notice of such damage, and [within one year] *in accordance with RSA 541-A:29,* determine whether such damage was caused by bear [or mountain lion], and appraise the amount to be paid*, and notify the claimant in writing of the determination*.

    *II.   If the person sustaining the damage claimed under this section is dissatisfied with the finding of the executive director, such person shall notify the executive director in writing, and an adjudicative proceeding shall be commenced pursuant to RSA 541-A:31.*

    *III.   If the person sustaining the damage is dissatisfied with the decision of the executive director following the adjudicative proceeding, a further appeal shall be available in accordance with RSA 541.*

    *IV.*  The executive director, [immediately upon making any appraisal of damage thereof] *upon reaching final agreement with the claimant, or after the conclusion of an appeal*, shall present [his] *a* certificate of the amount of appraisal to the governor, who is authorized to draw [his] *a* warrant upon any money in the treasury not otherwise appropriated in payment therefor.

    *V.   The executive director shall, in accordance with RSA 541-A, adopt rules to administer this provision, to include:*

        *(a)   Criteria to determine whether a person engaged in the husbandry and sale of agricultural products as defined in RSA 21:34-a qualifies to be a claimant hereunder, provided that any such person who shall document gross sales of any qualifying crop of at least $1,000 in a calendar year shall be deemed to qualify as a claimant.*

        *(b)   Procedures used to receive and document claims of damage by bear from claimants, to include when the damage occurred, which qualifying crop is affected, and what losses may be fairly attributed to action by such bear;*

        *(c)   A method to determine the current wholesale value of items covered by this section, to be used in the process of investigating and adjudicating any claim;*

        *(d)   Procedures to be used in the conduct of adjudicative proceedings hereunder; and*

        *(e)   Criteria to be used to recommend preventive measures and mitigating measures that claimants may use to prevent future harm, and that will be used to determine whether claims in future years shall be allowed for payment.*

    125  Repeal.  RSA 207:24, relative to an appeal from the executive director, is repealed.

    126   Department of Information Technology; Unfunded Positions.  Notwithstanding any other provision of law to the contrary, the department of information technology may fill unfunded positions during the biennium ending June 30, 2023, provided that the total expenditure for such positions shall not exceed the amount appropriated for personnel services.

    127  Adult Parole Board; Establishment.  Amend RSA 651-A:3 to read as follows:

1    651-A:3  Adult Parole Board; Establishment; Procedures.

2        I.  There shall be an adult parole board with [9] *5* members, ***2 of which shall be attorneys***

3    ***with active licenses***.  The members of the board shall be appointed by the governor with the

4    consent of the council for staggered terms of 5 years or until their successors are appointed.  No

5    member shall serve more than 2 consecutive terms.  A vacancy on the board shall be filled for the

6    unexpired term.

7        ***II.  The composition of the board shall be as follows:***

8        ***(a)  One member as chairman.***

9        ***(b)  Four additional members, to include:***

10       ***(1)  One member with law enforcement or corrections experience, either***

11   ***current or former.***

12       ***(2)  One member with criminal justice experience, which may be direct***

13   ***employment experience, current or former, in some capacity within the criminal justice***

14   ***system, or post-secondary school teaching, scholarship, and research pertaining to the***

15   ***criminal justice system.***

16       ***(3)  One at-large member who is either an attorney with an active New***

17   ***Hampshire license or a mental health professional with an active New Hampshire license;***

18       ***(4)  One at-large member without any categorical designation.***

19       ***III.***    The governor shall designate one member as chairman [and the chairman shall

20   designate one other member to serve as chairman in his absence].  ***The salary of the chairman***

21   ***shall be that established in RSA 94:1-a as grade GG, with appropriate step to be***

22   ***determined in accordance the provisions of RSA 94:1-d.  The chairman shall designate one***

23   ***other member to serve as temporary designee chairman in his or her absence, however, the***

24   ***designated chairman shall not receive the chairman's salary or employee status while***

25   ***serving in the chairman's absence.***  In the case of a revocation hearing an attorney of the board

26   shall be present at the hearing.  Board members shall be paid [$100 a day plus mileage at the state

27   employee rate while engaged in parole hearings or administrative meetings.] ***an annual stipend of***

28   ***$20,000 for each member, to be paid in equal installments on each state employee pay***

29   ***period date.  Board members shall be paid mileage at the state employee rate while***

30   ***engaged in parole hearings or administrative meetings.***

31       [II] ***IV.***  The board shall hold at least [24] ***36 days*** of parole hearings and ***36 days of parole***

32   ***revocation hearings*** each year and may hold more hearings as necessary.  Each parole ***and***

33   ***parole revocation*** hearing shall be held by a hearing panel consisting of exactly 3 members of the

34   board.  The board shall establish operating procedures which provide for rotation of board members

35   among hearing panels.

36       ***V.  In the event of a pandemic or other extraordinary occurrence declared an***

37   ***emergency by the governor that results in restricted movement or quarantining of inmates***

1  *at any New Hampshire state prison facility, the parole board may conduct all hearings via*
2  *teleconference or other video conference technology.*

3  128  Applicability.  On the effective date of section 127 of this act, the current chairman of the
4  adult parole board shall remain chairman and designate 4 current members who fit the criteria
5  outlined in RSA 651-A:3, II(b)(1)-(4) as inserted by section 127 of this act, to remain members of the
6  parole board according to their current terms.  In the event that there are not 4 members on the
7  existing board who meet the criteria outlined in RSA 651-A:3, II(b)(1)-(4), the chairman may
8  designate an existing member to temporarily occupy any open member vacancy until a new
9  appointment for the vacancy is nominated by the governor and confirmed by the executive council.
10  Any current members who remain on the board, including the current chairman, shall serve until
11  the expiration of their current terms or until a successor is appointed and qualified.

12  129  Workers' Compensation; Administration Fund.  Amend RSA 281-A:59, III to read as follows:

13      III.  Each insurance carrier and self-insurer, including the state, shall make payments to the
14  fund of its pro rata share of one fiscal year's costs to be appropriated out of the fund.  The governor is
15  authorized to draw a warrant for any sum payable by the state under this paragraph out of any
16  money in the treasury not otherwise appropriated.  The pro rata share shall be computed on the
17  basis which the total workers' compensation benefits, including medical benefits, paid by each
18  insurance carrier and self-insurer bore to the total workers' compensation benefits, including
19  medical benefits, paid by all insurance carriers and self-insurers in the [fiscal year ending in the]
20  preceding calendar year; provided, however, that no insurance carrier or self-insurer shall pay an
21  assessment of less than $100.  The commissioner shall assess each insurance carrier and self-insurer
22  as soon as possible after July 1 of each year.  Total assessments shall not exceed the amount
23  appropriated for the fund, which shall include the budget of the workers' compensation division of
24  the department of labor for the fiscal year in which the assessment is made and all other costs of
25  administering this chapter.  The balance in the fund at the beginning of the new fiscal year shall
26  proportionately reduce the assessments under this section.  The commissioner shall have the
27  authority to adopt rules, pursuant to RSA 541-A, relative to the manner in which such payments are
28  to be made.

29  130  Workers' Compensation; Special Fund for Second Injuries.  Amend RSA 281-A:55, III to
30  read as follows:

31      III.  Each insurance carrier and self-insurer shall, pursuant to rules adopted by the
32  commissioner, make payments to the fund in an amount equal to that proportion of 115 percent of
33  the total obligation of the fund during the preceding 12 months, less the amount of the net assets in
34  the fund as of March 31 of the current year, which the total workers' compensation benefits,
35  including medical benefits, paid by each insurance carrier and self-insurer bore to the total workers'
36  compensation benefits, including medical benefits, paid by all insurance carriers and self-insurers in
37  the [fiscal year ending in the] preceding calendar year.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 54 -**

1    131  Workers' Compensation; Hearings and Awards.  Amend RSA 281-A:43, I(a) to read as
2  follows:

3      I.(a)  In a controversy as to the responsibility of an employer or the employer's insurance
4  carrier for the payment of compensation and other benefits under this chapter, any party at interest
5  may petition the commissioner in writing for a hearing and award.  The petition shall be sent to the
6  commissioner at the department's offices in Concord and shall set forth the reasons for requesting
7  the hearing and the questions in dispute which the applicant expects to be resolved.  The
8  commissioner or the commissioner's authorized representative shall schedule a hearing, either in
9  Concord or at a location nearest the employee as determined by the commissioner, by fixing its time
10  and place and giving notice at least 14 days prior to the date for which it is scheduled.  The hearing
11  date shall be set for a time not to exceed 6 weeks from the date the petition was received.  In those
12  instances where an expedited hearing is requested, the petition for hearing shall set forth the facts
13  in sufficient detail to support the request for an expedited hearing.  The commissioner, or his or her
14  authorized agent shall, in his or her discretion, determine whether the need exists for an expedited
15  hearing.  Any requests for an expedited hearing shall be periodically reviewed by the commissioner
16  to determine whether such requests are given proper attention.  The commissioner shall also identify
17  any overutilization by the requesting parties and responses given to such requests by the
18  commissioner.  An annual report of the expedited requests, responses, the number of continuances,
19  the reasons for such continuances, the number of requests for hearing, and the time within which
20  the hearings were held shall be made annually to the advisory council established in RSA 281-A:62.
21  The notice may be given in hand [or by certified mail, return receipt requested], *via first class*
22  *mail, or, upon consent of the parties, by electronic transmission*.  Continuances of any hearing
23  are discouraged; however, should a continuance be necessary, the parties requesting such
24  continuance shall file with the department a written petition for such continuance at least 7 days
25  prior to the hearing.  Failure to file such a petition shall bar any right to a continuance.  Thereafter,
26  a continuance may only be granted upon the commissioner's finding that a compelling need exists so
27  as to require a continuance.  At such hearing, it shall be incumbent upon all parties to present all
28  available evidence and the person conducting the hearing shall give full consideration to all evidence
29  presented.  In addition, the person conducting the hearing shall freely and comprehensively examine
30  all witnesses to determine the merits of the matter.  Also, the person conducting the hearing may
31  recess the hearing to a date certain and direct the parties, or either of them, to provide such further
32  information that may be necessary to decide the matter.  No later than 30 days after the hearing, the
33  commissioner or the commissioner's authorized representative shall render a decision and shall
34  forthwith notify the parties of it.  When appropriate, the commissioner, or his or her authorized
35  representative, may render a decision at the hearing.  Unless excused for good cause shown, *or a*
36  *party has not received notice,* failure of any or all parties at interest to appear at a duly scheduled
37  hearing or to petition for a continuance shall bar such parties from any further action concerning an

1    adverse decision, a decision by default, or a dismissal of a petition for hearing and award. ***The***
2 ***commissioner, or his or her authorized representative, shall serve notice of a pending***
3 ***default, default decision, or dismissal of a petition for hearing and award on the***
4 ***defaulting party via certified mail, return receipt requested. Upon receipt of undeliverable***
5 ***certified mail, the commissioner, or his or her authorized representative, shall stay the***
6 ***proceedings for up to one year from the date of the receipt of undeliverable certified mail***
7 ***during which time the commissioner, or his or her authorized representative, shall make***
8 ***all reasonable attempts to provide notice to the defaulting party. If notice cannot be***
9 ***provided within one year, the commissioner, or his or her authorized representative, shall***
10 ***render a decision in favor of the non-defaulting party.***

11    132 Unemployment Compensation; Contributions; Minimum Rate. Amend RSA 282-A:82, II-III
12 to read as follows:

13    II. There shall be subtracted in any calendar quarter from every employer's contribution
14 rate one percent whenever the unemployment compensation fund equals or exceeds [$275,000,000]
15 ***$350,000,000*** throughout the next preceding calendar quarter.

16    III. There shall be subtracted in any calendar quarter from every employer's contribution
17 rate 1.5 percent whenever the unemployment compensation fund equals or exceeds [$300,000,000]
18 ***$400,000,000*** throughout the next preceding calendar quarter.

19    133 Unemployment Compensation; Contributions; Inverse Minimum Rate. Amend RSA 282-
20 A:82-a, II-III to read as follows:

21    II. There shall be added in any calendar quarter to every such employer's contribution rate
22 one percent whenever the unemployment compensation fund fails to equal or exceed [$275,000,000]
23 ***$350,000,000*** throughout the next preceding calendar quarter.

24    III. There shall be added in any calendar quarter to every such employer's contribution rate
25 .5 percent whenever the unemployment compensation fund fails to equal or exceed [$300,000,000]
26 ***$400,000,000*** throughout the next preceding calendar quarter.

27    134 Repeal. The following are repealed:

28    I. RSA 282-A:84, relative to emergency power of the commissioner of the department of
29 unemployment security.

30    II. RSA 282-A:84-a, relative to the emergency surcharge power of the commissioner of the
31 department of unemployment security.

32    135 Liability for Obstruction or Injury to Highway; Civil Liability. Amend RSA 236:39 to read
33 as follows:

34    236:39 Civil Liability.

35    ***I.*** If any person, without authority, shall place any obstruction in a highway, or cause any
36 defect, insufficiency, or want of repair of a highway which renders it unsuitable for public travel, he
37 or she shall be liable to the state for all damages to the highway, including ***full and current***

Amendment to HB 2-FN-A-LOCAL
- Page 56 -

1  replacement costs of protective barriers, **and any structure or device that is part of the**
2  **highway or turnpike system,** when maintained by the state, or to the municipality for all damages
3  to a highway, including **full and current** replacement costs of protective barriers **and any**
4  **structure or device that is part of the highway**, when maintained by the municipality, and for
5  all damages and costs which the state or municipality shall be compelled to pay to any person
6  injured by such obstruction, defect, insufficiency, or want of repair as established through an
7  appropriate contribution claim or under the rules of joint and several liability.

8      II.  *"Full and current replacement cost" as used in this section means actual or*
9  *reasonable estimates of labor, including contracted labor, material, equipment, and*
10  *overhead.  Such costs shall not be reduced for depreciation.*

11      136  Repeal.  1959; 286, relative to the Sandwich Notch and Dale Road in the towns of Sandwich
12  and Thornton, is repealed.

13      137  Department of Transportation; Disposal of Highway or Turnpike Funded Real Estate.
14  Amend the section heading for RSA 4:39-c to read as follows:

15      4:39-c  Disposal of Highway**, Federal,** or Turnpike Funded Real Estate.

16      138  Department of Transportation; Disposal of Highway or Turnpike Funded Real Estate.
17  Amend RSA 4:39-c, III to read as follows:

18      III.  The proceeds from a sale, conveyance, transfer, or lease under this section shall be
19  credited to either the highway fund, **restricted federal fund,** or the turnpike fund, whichever fund
20  provided money for the original purchase.  ***Proceeds from a sale that results from money***
21  ***provided by the highway fund for payback of real property purchased with federal funds***
22  ***shall be credited to the department and shall be nonlapsing and continually appropriated***
23  ***to the department for the purposes of meeting federal obligations or reimbursing the***
24  ***highway fund for payment of federal obligations.***

25      139  New Paragraphs; New Hampshire Aeronautics Act; Definitions.  Amend RSA 422:3 by
26  inserting after paragraph XXVII the following new paragraphs:

27      XXVII-a.  "Small unmanned aircraft" means an unmanned aircraft as defined in federal
28  regulations, as amended.

29      XXVII-b.  "Small unmanned aircraft system" means a small unmanned aircraft and its
30  associated elements as defined in federal regulations, as amended.

31      140  New Paragraph; New Hampshire Aeronautics Act; Definitions.  Amend RSA 422:3 by
32  inserting after paragraph XXIX the following new paragraph:

33      XXX.  "Unmanned aircraft" means an aircraft as defined in federal regulations, as amended.

34      141  New Hampshire Aeronautics Act; Duties of the Commissioner.  Amend RSA 422:4, VI to
35  read as follows:

36      VI.  Effecting uniformity in the regulations pertaining to the operation of aircraft by
37  adopting uniform rules consistent with federal regulations and making noncompliance with federal

1  regulations a violation of state law, thereby enabling the law enforcement agencies of the state to

2  enforce the laws regulating the operation of aircraft.   For the purposes of this paragraph, aircraft

3  shall include ultralight vehicles [as defined in 14 C.F.R. part 103] *as defined in federal*

4  *regulations, as amended, and small unmanned aircraft systems as defined in RSA 422:3,*

5  *XXVII-b*.

6      142  Department of Transportation; Appropriation Amended.  Amend 2018;162:25, I to read as

7  follows:

8      I. The sum of $20,000,000 is hereby appropriated to the department of transportation for the

9  fiscal year ending June 30, 2018, which shall be [nonlapsing and] expended for the purposes of

10  funding state red list bridge projects *and shall lapse to the highway fund on June 30, 2021*.

11  The governor is authorized to draw a warrant for said sum out of any money in the treasury not

12  otherwise appropriated.

13      143  Effective Date.  Section 142 of this act shall take effect on June 30, 2021.

14      144  Department of Safety; Fund Transfer; Unfunded Positions; Authorization.

15      I. Notwithstanding the provisions of RSA 9:16-a, for the biennium ending June 30, 2023, the

16  department of safety may transfer funds between accounting units in classes 027-transfers to the

17  department of information technology, 028-transfers to general services, 064-retiree pension benefit

18  health insurance compensation, and 211-property and casualty insurance, upon approval of the

19  department of administrative services' budget office.

20      II. Notwithstanding any other provision of law to the contrary, the department of safety may

21  fill unfunded positions during the biennium ending June 30, 2023, provided that the total

22  expenditure for such positions shall not exceed the amount appropriated for personal services.

23      145  New Section; Body-Worn Cameras.  Amend RSA 105-D by inserting after section 2 the

24  following new section:

25  105-D:3  Body-Worn and Dashboard Camera Fund.

26      I.   There is hereby established the body-worn and dashboard camera fund within the

27  department of safety for the purpose of encouraging local law enforcement agencies to equip officers

28  with body-worn cameras and agency vehicles with dashboard cameras.  All moneys in the fund shall

29  be nonlapsing and continually appropriated to the department of safety.

30      II.(a)  The fund shall provide matching grants to local law enforcement agencies to assist

31  agencies with the purchase, maintenance, and replacement of body-worn and dashboard cameras

32  and ongoing costs related to the maintenance and storage of data recorded by body-worn and

33  dashboard cameras.

34      (b)  The commissioner of the department of safety may also use the fund to pay for the

35  classified position of business administrator I established in the department of safety, division of

36  administration.

37      III. All local law enforcement agencies shall be eligible to apply for grants from the fund.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 58 -**

1       IV.  The fund shall be overseen by the commissioner of the department of safety and the

2 attorney general who shall, within 180 days of the effective date of this section, jointly establish a

3 process for the application for matching grants from the fund.  Such process shall be established in

4 rules adopted jointly by the commissioner of safety and attorney general in accordance with RSA

5 541-A.

6       V. The commissioner of the department of safety may charge administrative costs related to

7 this section to the fund.

8      146  Body-Worn and Dashboard Camera Fund; Appropriation.  The sum of $1,000,000 for the

9 fiscal year ending June 30, 2022 is hereby appropriated to the body-worn and dashboard camera

10 fund established in RSA 105-D:3.  The governor is authorized to draw a warrant for said sum out of

11 any money in the treasury not otherwise appropriated.

12      147  Body Worn Cameras Purchase; Appropriation; Department of Corrections.  There is hereby

13 appropriated to the department of corrections the sum of $720,000 for the fiscal year ending June 30,

14 2021 to fund the purchase of body worn cameras for corrections and probation and parole officers.

15 The governor is authorized to draw a warrant for said sum out of any money in the treasury not

16 otherwise appropriated.   This appropriation shall not lapse until June 30, 2023.

17      148  Effective Date.  Section 147 of this act shall take effect June 30, 2021.

18      149  Department of Safety; Position Created.  There is hereby established in the department of

19 safety, division of administration, the full-time classified position of business administrator I.  The

20 commissioner of the department of safety may use the body-worn and dashboard camera fund

21 established in RSA 105-D:3 to fund the position.

22      150  New Section; Complaints Alleging Law Enforcement Misconduct; Commission Established.

23 Amend RSA 105-D by inserting after section 2 the following new section:

24      105-D:2-a  Statewide Entity to Receive Complaints Alleging Misconduct Regarding Sworn and

25 Elected Law Enforcement Officers; Commission Established.

26       I. There is hereby established a commission to develop recommendations for legislation to

27 establish a single, neutral, and independent statewide entity to receive complaints alleging

28 misconduct regarding all sworn and elected law enforcement officers pursuant to recommendation

29 #16 in the final report issued by the New Hampshire commission on law enforcement accountability,

30 community and transparency.  The commission shall be composed of the following members:

31         (a) The attorney general, or designee, who shall be the chairperson of the commission.

32         (b) One member of the house of representatives, appointed by the speaker of the house.

33         (c) One member of the senate, appointed by the president of the senate.

34         (d)  The director of the New Hampshire police standards and training council, or

35 designee.

36         (e) The commissioner of safety, or designee.

1      (f)  Four additional members from the New Hampshire commission on law enforcement
2  accountability, community and transparency established in Executive Order 2020-11, appointed by
3  the attorney general.  Two of these members shall be law enforcement members and 2 of these
4  members shall not be law enforcement members.

5      II.  Legislative members of the commission shall receive mileage at the legislative rate when
6  attending to the duties of the commission.

7      III.  The chairperson of the commission shall call the first meeting within 30 days of the
8  effective date of this section.  Five members of the commission shall constitute a quorum.

9      IV.  The commission shall submit a report containing its recommendations for legislation to
10  the governor, the speaker of the house of representatives, the president of the senate, and the state
11  library no later than November 1, 2021.

12  151  Appropriation; Statewide Entity to Receive Complaints of Misconduct.  The sum of $100,000
13  for the fiscal year ending June 30, 2023 is hereby appropriated the department of administrative
14  services which shall be available to fund an independent statewide entity to receive complaints
15  alleging misconduct regarding all sworn and elected law enforcement officers established pursuant
16  to recommendation #16 in the final report issued by the New Hampshire commission on law
17  enforcement accountability, community and transparency.  Any unexpended amount of said
18  appropriation shall lapse to the general fund on June 30, 2023.  The governor is hereby authorized to
19  draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

20  152  Contingency.  If an independent statewide entity to receive complaints alleging misconduct
21  regarding all sworn and elected law enforcement officers as a result of recommendation #16 in the
22  final report issued by the New Hampshire commission on law enforcement accountability,
23  community, and transparency becomes law by July 1, 2022, then section 151 of this act shall take
24  effect July 1, 2022.  If such an entity does not become law by July 1, 2022, then section 151 of this
25  act shall not take effect.

26  153  Effective Date.  Section 151 of this act shall take effect as provided in section 152 of this act.

27  154  Department of Safety; Radio Infrastructure Equipment Purchases; Procurement.

28      I.  The department of safety shall, in collaboration with the department of administrative
29  services, establish standards for radio infrastructure-related hardware, computers, software, related
30  licenses, media, documentation, support and maintenance services, and other related services.

31      II.  Prior to an agency's issuance of a solicitation for the purchase of radio infrastructure-
32  related computer or radio hardware, software, related licenses, media, documentation, support and
33  maintenance services, and other related services including a request for proposal, request for
34  purchase, or other procurement documentation, the agency shall consult with and seek approval
35  from the department of safety, division of emergency services and communications.

1   III.   The department of safety, division of emergency services and communications, shall
2   annually review and set dollar, or other, limits for purchases and contracts that require approval
3   from the director of the division of emergency services and communications before proceeding.

4   IV.   For purposes of this section, "agency" shall have the same meaning as in RSA 21-I:11,
5   II(b), but shall not include:

6        (a)  The university system of New Hampshire.

7        (b)  The court systems.

8        (c)  The legislature, secretary of state, and the state reporter.

9        (d)  The retirement system.

10       (e)  The community college system of New Hampshire.

11   155  New Paragraph; Office of the Chief Medical Examiner; Definitions.  Amend RSA 611-B:1 by
12   inserting after paragraph II the following new paragraph:

13   II-a.  "Associate medical examiner" means the licensed physician certified by the American
14   Board of Pathology as a qualified pathologist and appointed pursuant to RSA 611-B:3-a.

15   156  New Section; Office of the Chief Medical Examiner; Associate Medical Examiner.  Amend
16   RSA 611-B by inserting after section 3 the following new section:

17   611-B:3-a  Associate Medical Examiner.  There is hereby established within the office of the chief
18   medical examiner the position of associate medical examiner.  The associate medical examiner shall
19   be appointed in the same manner as the chief medical examiner as provided in RSA 611-B:2, and
20   shall be a licensed physician, certified by the American Board of Pathology as a qualified pathologist,
21   with training and experience in forensic medicine.  The associate medical examiner shall serve under
22   the professional direction and supervision of the chief medical examiner and deputy chief medical
23   examiner and shall act as the chief medical examiner whenever the chief medical examiner and
24   deputy chief medical examiner are absent, or unable to act for any cause.

25   157  Office of the Chief Medical Examiner; Acting Chief Medical Examiner.  Amend RSA 611-B:4
26   to read as follows:

27   611-B:4  Acting Chief Medical Examiner.  The chief medical examiner may designate in writing
28   an acting chief medical examiner who shall be a licensed physician, certified by the American Board
29   of Pathology as a qualified pathologist with training and experience in forensic medicine.  The acting
30   chief medical examiner shall act as the chief medical examiner whenever the chief medical
31   examiner*, [and the] deputy chief medical examiner, **and the associate medical examiner** are
32   absent, or unable to act [from] **for** any cause.

33   158     Department of Justice; Director of Diversity and Community Outreach; Position
34   Established.   There is established within the department of justice an unclassified position of
35   director of diversity and community outreach.  The director of diversity and community outreach
36   shall be qualified to hold the position by reason of education and experience, and shall be appointed
37   to serve for a term of 5 years.  The position shall assist the attorney general and deputy attorney

**Amendment to HB 2-FN-A-LOCAL**
**- Page 61 -**

1   general to establish goals and milestones towards creating a more diverse, inclusive, and culturally

2   aware law enforcement community through efforts that increase equity and cultural awareness

3   among state, county, local prosecution, law enforcement and diverse communities to foster positive

4   relationships, understanding and respect.  The salary of the director of diversity and community

5   outreach shall be determined after assessment and review of the appropriate letter grade allocation

6   in RSA 94:1-a, I for positions which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

7   Funding shall be appropriated from expenditure class 014 within accounting unit 02-20-20-200010-

8   2601.

9   159  New Paragraph; Department of Justice; Attorney General Position Established.  Amend

10   RSA 21-M:3 by inserting after paragraph XII the following new paragraph:

11          XIII.  The attorney general, subject to the approval of the governor and council, may appoint

12   a permanent director of diversity and community outreach, within the limits of the appropriation

13   made for the appointment, who shall hold office for a term of 5 years.  Any vacancy in such position

14   may be filled for the unexpired term.  The director of diversity and community outreach may be

15   removed only as provided by RSA 4:1.

16   160  Effective Date.  Sections 158-159 of this act shall take effect January 1, 2023.

17   161  Judicial Council; Expenditures for Termination of Parental Rights Services.  In the event

18   that expenditures for termination of parental rights services are greater than amounts appropriated

19   in the operating budget, the judicial council may request, with prior approval of the fiscal committee

20   of the general court, that the governor and council authorize additional funding.  For funds

21   requested and approved, the governor is authorized to draw a warrant from any money in the

22   treasury not otherwise appropriated.

23   162  College Tuition Savings Plan; Advisory Commission.  Amend the introductory paragraph in

24   RSA 195-H:2, I(a) to read as follows:

25          I.(a)    There is established the New Hampshire college tuition savings plan advisory

26   commission which shall ensure the proper administration and management of the savings plan.  The

27   advisory commission shall ensure that the savings plan complies with the requirements of section

28   529 of the Internal Revenue Code of 1986, as amended, and any related federal law applicable to the

29   savings plan.  The commission shall also be responsible for ensuring the proper administration,

30   implementation, and management of the New Hampshire excellence in higher education endowment

31   trust fund established in RSA 6:38, and the governor's scholarship program and fund established in

32   [RSA 4-C:31-34] *RSA 195-H:11-14.  The commission, by a majority vote, may transfer funds*

33   *between the New Hampshire excellence in higher education endowment trust fund and the*

34   *governor's scholarship fund.*  The commission shall consist of the following members:

35   163  New Subdivision; Governor's Scholarship Program and Fund.  Amend RSA 195-H by

36   inserting after section 10 the following new subdivision:

37          Governor's Scholarship Program and Fund

1    195-H:11  Definitions.  In this subdivision:

2        I.  "Eligible institution" means a postsecondary educational institution or training program

3    within the university system of New Hampshire as defined in RSA 187-A, a postsecondary

4    educational institution within the community college system of New Hampshire as defined in RSA

5    188-F, or a private postsecondary institution approved to operate in this state that:

6            (a)  Is approved by the higher education commission pursuant to RSA 21-N:8-a and

7    accredited by the New England Commission of Higher Education; and

8            (b)  Is a not-for-profit organization eligible to receive federal Title IV funds.

9        II.  "Eligible student" means a first-year, full-time, Pell Grant-eligible student who meets the

10   eligibility and residency requirements of RSA 195-H:13.  "First-year" means a student who has never

11   enrolled in an eligible institution.

12       III.  "Full-time" means an enrolled student who is carrying an academic course load that is

13   determined to be full-time by the eligible institution based on a standard applicable to all students

14   enrolled in a particular educational program.  The student's course load may include any

15   combination of courses, work, research, or special studies that the eligible institution considers

16   sufficient to classify the student as full-time.

17   195-H:12  Governor's Scholarship Program and Fund Established.

18       I.  There is hereby established the governor's scholarship program and the governor's

19   scholarship fund.  The program and fund shall be administered by the commission.  The fund shall

20   be kept distinct and separate from all other funds and shall be used to provide scholarships which a

21   recipient shall apply to the costs of an education at an eligible institution.  The funds shall be

22   distributed to an eligible institution based on the number of eligible students awarded a scholarship

23   and upon receipt of a request for reimbursement for such scholarship funds accompanied by

24   appropriate documentation.

25       II.  The state treasurer shall credit to the fund any appropriation relating to the governor's

26   scholarship fund made in each fiscal year to the commission.  The state treasurer shall invest the

27   fund in accordance with RSA 6:8.  Any earnings shall be added to the fund.

28       III.  All moneys in the fund shall be nonlapsing and continually appropriated to the

29   commission for the purposes of this subdivision.

30       IV.  The commission may institute promotional programs and solicit and receive cash gifts or

31   other donations for the purpose of supporting educational scholarships from the fund.  The

32   commission shall not solicit or accept real property.

33       V.  All gifts, grants, and donations of any kind shall be credited to the fund.

34   195-H:13  Eligibility.

35       I.  Any person who meets the following requirements shall be an eligible student:

36           (a)  A person shall meet the residency requirements of RSA 193:12; be a graduate of a

37   New Hampshire high school, public academy, chartered public school, New Hampshire private

1    preparatory high school, a high school-level home education program as defined in RSA 193-A; have

2    received a New Hampshire high school equivalency certificate; have completed at least 3 years of

3    high school in this state; be pursuing a certificate, associate, or bachelor degree at an eligible

4    institution in this state; and be eligible to receive a Pell grant; or

5           (b)  A person shall be a graduate of a preparatory high school outside of this state while a

6    dependent of a parent or legal guardian who is a legal resident of this state and who has custody of

7    the dependent; or

8           (c)  A person shall have a parent or guardian who has served in or has retired from the

9    United States Army, Navy, Air Force, Marine Corps, or Coast Guard within the last 4 years and is a

10   resident of this state; or

11          (d)  A person shall be a graduate of a high school, public academy, chartered public high

12   school, or a high school-level home education program outside of this state but have maintained his

13   or her primary residence in this state for not less than 5 years preceding the date of application for a

14   scholarship.

15          II.  A person shall meet the qualifications for academic performance or work experience as

16   established by the commission.

17          III.  A person shall not have been adjudicated delinquent or convicted or pled guilty or nolo

18   contendere to any felonies or any second or subsequent alcohol or drug-related offenses under the

19   laws of this or any other state, or under the laws of the United States, except that an otherwise

20   eligible person who has been adjudicated delinquent or has been convicted or pled guilty or nolo

21   contendere to a second or subsequent alcohol or drug-related misdemeanor offense shall be eligible

22   or continue to be eligible for a scholarship after the expiration of one academic year from the date of

23   adjudication, conviction, or plea.

24   195-H:14  Procedures.

25          I.  All scholarship funds shall be distributed to the eligible student by the eligible institution.

26   The institution shall include the scholarship in the student's financial aid package and may seek

27   subsequent reimbursement.  The state shall provide the reimbursements twice per year to each

28   eligible institution for the number of eligible students enrolled in the current semester or term who

29   are receiving a scholarship.  The institution shall submit the list of scholarship recipients to the

30   commission or its designee no later than November 30 and April 30 of each academic year, and shall

31   be reimbursed within 30 days of submission.

32          II.  An eligible student may receive a scholarship in the amount of $1,000 per year provided

33   he or she maintains at least a 2.0 grade point average.  An eligible student who earned the New

34   Hampshire scholar designation at the time of high school graduation may receive a scholarship in

35   the amount of $2,000 per year provided he or she maintains at least a 2.5 grade point average.  The

36   eligible institution shall not reduce any merit or need-based grant aid that would have otherwise

1 been provided to the eligible student.  An eligible student may receive an annual scholarship for a
2 maximum of 4 years.

3     III.  In the event the state does not reimburse the eligible institution for scholarship amounts
4 paid to an eligible student receiving an award, the eligible institution shall agree not to seek
5 additional payments from the eligible student and to absorb the loss of funds without any
6 consequence to the eligible student.

7     IV.  The commission shall adopt rules, pursuant to RSA 541-A, relative to awarding and
8 disbursing scholarship funds to an eligible student enrolled in an eligible institution.

9     V.  An eligible student, who initially attends a community college and transfers directly to an
10 eligible institution, without a break in attendance, shall remain an eligible student for a maximum
11 of 4 years of total eligibility.

12     VI.  The commission may hire staff or enter into a contract for services or personnel
13 necessary to administer the program.

14     164  Application of Receipts; Governor's Scholarship Program and Fund.  Amend RSA 6:12,
15 I(b)(336) to read as follows:

16     (336)  Moneys deposited into the governor's scholarship fund established in [~~RSA 4-~~
17 ~~C:32~~] *RSA 195-H:12*.

18     165  Allied Health Professionals; Re-ordering of Definitions.   RSA 328-F:2 is repealed and
19 reenacted to read as follows:

20     328-F:2  Definitions.  In this chapter:

21     I.  "Athletic training" means "athletic training" as defined in RSA 326-G:1, III.

22     II.  "Board of directors" means the chairpersons or their appointees of all the governing
23 boards which shall be responsible for the administrative operation of the office of licensed allied
24 health professionals.

25     III.  "Genetic counseling" means genetic counseling as defined in RSA 326-K:1.

26     IV.  "Governing boards" means individual licensing boards of athletic trainers, occupational
27 therapy assistants, occupational therapists, recreational therapists, physical therapists, physical
28 therapist assistants, respiratory care practitioners, speech-language pathologists and hearing care
29 providers, and genetic counselors.

30     V.  "Hearing care providers" mean audiologists and hearing aid dealers as defined in RSA
31 326-F:1.

32     VI.  "Occupational therapy" means "occupational therapy" as defined in RSA 326-C:1, III.

33     VII.  "Office of licensed allied health professionals" means an agency of multiple governing
34 boards in professions of the allied health field.

35     VIII.  "Physical therapy" or "physiotherapy" means "physical therapy" or "physiotherapy" as
36 defined in RSA 328-A:2, IX.

37     IX.  "Recreational therapy" means "recreational therapy" as defined in RSA 326-J:1, III.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 65 -**

1    X.   "Respiratory care" means "respiratory care" as defined in RSA 326-E:1, X.

2    XI.   "Speech-language pathology" means "speech-language pathology" as defined in RSA

3    326-F:1.

4    166   Allied Health Professionals; Governing Boards; Hearing Care Providers.   Amend RSA 328-

5    F:3, I to read as follows:

6    I.  There shall be established governing boards of athletic trainers, occupational therapists,

7    recreational therapists, respiratory care practitioners, physical therapists, speech-language

8    pathologists*, hearing care providers,* and genetic counselors.

9    167   Allied Health Professionals; Governing Boards; Membership.   Amend RSA 328-F:4, I to

10    read as follows:

11    I.   Each governing board shall be composed of 5 persons, each to be appointed by the

12    governor with the approval of the council, to a term of 3 years*, except the speech-language*

13    *pathology and hearing care provider governing board which shall be composed of 6*

14    *members, each to be appointed by the governor with the approval of the council, to a term*

15    *of 3 years.*   Members shall serve until the expiration of the term for which they have been

16    appointed or until their successors have been appointed and qualified.   No board member shall be

17    appointed to more than 2 consecutive terms, provided that for this purpose only a period actually

18    served which exceeds 1/2 of the 3-year term shall be deemed a full term.   Any professional members

19    of all governing boards shall maintain current and unrestricted New Hampshire licenses.

20    168   Speech Language Pathology and Hearing Care Provider Governing Board; Membership.

21    Amend RSA 328-F:4, VIII to read as follows:

22    VIII.   The speech-language pathology *and hearing care provider* governing board shall

23    consist of 4 licensed speech-language pathologists who have actively engaged in the practice of

24    speech-language pathology in this state for at least 3 years*, one licensed individual in the field*

25    *of hearing care who has actively engaged in the practice,* and one public member.   At least

26    one speech-language pathologist shall be employed in an educational setting and at least one

27    employed in a clinical setting.

28    169   New Paragraph; Allied Health Professionals; Governing Boards; Duties; Registration.

29    Amend RSA 328-F:5 by inserting after paragraph I-a the following new paragraph:

30    I-b.   Issue initial registrations, conditional initial registrations, renewed registrations,

31    conditionally renewed registrations, reinstated registrations, and conditionally reinstated

32    registrations to businesses who are eligible if authorized to do so by the board's practice act.

33    170   New Paragraph; Allied Health Professionals; Governing Boards; Duties; Businesses.

34    Amend RSA 328-F:5 by inserting after paragraph II the following new paragraph:

35    II-a.   Investigate registered businesses and take necessary disciplinary action against them.

36    171   New Paragraph; Allied Health Professionals; Governing Boards; Rulemaking; Hearing Aid

37    Dealers.   Amend RSA 328-F:11 by inserting after paragraph II the following new paragraph:

1       III.   The speech-language pathology and hearing care provider governing board shall adopt

2    rules on eligibility requirements and procedures for the issuance of registrations to hearing aid

3    dealers.

4       172  Allied Health Professionals; Governing Board; Fees.   Amend RSA 328-F:15, I to read as

5    follows:

6       I.  The board of directors shall establish fees for:

7          (a)   The processing of applications for initial and reinstatement of licensure, [or]

8    certification*, or registration*.

9          (b)  Initial licenses, [and] certifications*, and registrations*.

10         (c)  Renewal of licenses, [and] certifications*, and registrations*.

11         (d)  Late filing of applications for license renewal and renewal of certification.

12         (e)  Reinstatement of licenses, [and] certifications*, and registrations*.

13         (f)  Transcribing and transferring records.

14         (g)   The costs of a hearing by any governing board at which the issue is denial of, or

15    imposition of conditions on, an initial license or certification, including the per diem and mileage of

16    board members attending the hearing and the cost of a shorthand court reporter if one is used to

17    record the hearing.

18         ***(h)  The registration of hearing aid dealers.***

19       173   Allied Health Professionals; Governing Boards; Initial Licenses, Certifications, and

20    Registrations.  Amend RSA 328-F:18, IV to read as follows:

21       IV.   Initial licenses***, certifications, and registrations***, including conditional licenses***,***

22    ***certifications, and registrations*** that are the first license***, certificate, or registration*** issued to

23    the individual ***or hearing aid dealer***, and provisional licenses***, certifications, and registrations***

24    shall be:

25         (a)   Signed and dated by the chairperson of the governing board issuing them ***or his or***

26    ***her designee***.

27         (b)  Numbered consecutively and recorded.

28       174  Allied Health Professionals; License Provisions; Renewal.  Amend RSA 328-F:19 to read as

29    follows:

30       328-F:19  Renewal.

31       I.   Initial licenses and renewals shall be valid for 2 years, except that timely and complete

32    application for license renewal by eligible applicants shall continue the validity of the licenses being

33    renewed until the governing board has acted on the renewal application.  Licenses issued pursuant

34    to RSA 328-A, RSA 326-G, and RSA 326-J shall expire in even-numbered years and licenses issued

35    pursuant to RSA 326-C, RSA 326-E, RSA 326-F, and RSA 326-K shall expire in odd-numbered years.

36       ***I-a.   A license issued to a hearing care provider shall expire at 12:01 a.m. on July 1***

37    ***of the odd-numbered year next succeeding its date of issuance.  The governing board shall***

1   *notify the licensee, on or before May 1 of the renewal year, but failure of any licensee to*
2   *receive this notification shall not relieve him or her of the obligation to comply with the*
3   *rules of the governing board and this section.  Timely submission of renewal applications*
4   *shall be evidenced by postmark or, for applications delivered by hand, by date stamp or*
5   *other record made at the time of delivery.*

6   II.   Each governing board shall renew the licenses of applicants who meet the eligibility
7   requirements and complete the application procedure.

8   III.   Applicants *whose licenses expire on December 31 of the renewal year* shall submit
9   completed applications for renewal on or before December 1 of the renewal year.   Completed
10   renewal applications submitted between December 2 and December 31 of the renewal year shall be
11   accompanied by a late filing fee.   Licenses shall lapse when completed renewal applications have not
12   been filed by December 31 of the renewal year, and their holders are not authorized to practice until
13   the licenses have been reinstated.

14   IV.   The governing boards shall provide licensees *whose licenses expire on December 31*
15   *of the renewal year*, on or before November 1 of their renewal years, with materials needed to
16   complete their renewal applications, but failure of any licensees to receive these materials shall not
17   relieve them of the obligation to comply with the rules of the governing boards and this section.
18   Timeliness of submission of renewal applications shall be evidenced by postmark or, for applications
19   delivered by hand, by date stamp or other record made at the time of delivery.

20   V.   Upon the request of a licensee who is a member of any reserve component of the armed
21   forces of the United States or the national guard and is called to active duty, the governing board
22   shall place the person's license on inactive status.   The license may be reactivated within one year of
23   the licensee's release from active status by payment of the renewal fee and with proof of completion
24   of the most current continuing education requirement unless still within the renewal period.

25   175  Allied Health Professionals; License Provisions; Obligation to Report.   Amend RSA 328-
26   F:25, I and II to read as follows:

27   I.   Persons and entities regulated by the state, including but not limited to, licensees,
28   certified individuals, *registrants,* insurance companies, health care organizations, and health care
29   facilities shall report to the board of directors and the appropriate governing board any criminal
30   conviction of a licensee, [or] certified individual, *registered hearing aid dealer,* or any
31   determination by a regulatory agency indicating that a licensee, [or] certified individual, *or*
32   *registered hearing aid dealer* has violated this chapter or the practice act of his or her governing
33   board.   Persons and entities so reporting shall be immune from civil liability if the report is made in
34   good faith.

35   II.   Every individual, agency, facility, institution or organization regulated by the state and
36   employing licensed allied health professionals *or using the services of a registered hearing aid*
37   *dealer* within the state shall report to the appropriate governing board within 30 days any act by an

1  individual licensed or certified by the board that appears to constitute misconduct.   Persons and
2  entities so reporting shall be immune from civil liability if the report is made in good faith.

3  176  Allied Health Professionals; Unauthorized Practice.   Amend RSA 328-F:27, II to read as
4  follows:

5     II.  Practice of an allied health profession by any person who is not licensed [or]**,** certified**, or**
6  **registered** to practice such profession shall constitute unauthorized practice.  A business which
7  holds itself out, through advertising or in any other way, as providing an allied health service but
8  does not have available to supervise its services an allied health professional licensed [or]**,** certified**,**
9  **or registered** to provide the services which the business purports to offer, is engaged in
10  unauthorized practice.

11  177  Speech Language Pathology Practice.   Amend the chapter heading of RSA 326-F to read as
12  follows:

13                                    CHAPTER 326-F

14        SPEECH-LANGUAGE PATHOLOGY **AND HEARING CARE PROVIDERS** PRACTICE

15  178  Speech-Language Pathology and Hearing Care Providers Practice; Definitions.   RSA 326-
16  F:1 is repealed and reenacted to read as follows:

17  326-F:1  Definitions.   In this chapter and RSA 328-F:

18     I.  "Audiologist" means any person who renders or offers to render to the public any service
19  involving the application of principles, methods, and procedures for the measurement of testing,
20  identification, appraisal, consultation, counseling, instruction, and research related to the
21  development and disorders of hearing and vestibular function for the purpose of diagnosing,
22  designing, and implementing programs for the amelioration of such disorders and conditions.

23     II.  "Audiology" means the application of principles, methods, and procedures related to the
24  development and disorders of human communication, which disorders shall include any and all
25  conditions whether of organic or nonorganic origin, that impede the normal processes of human
26  communication and balance including, but not limited to, disorders of hearing, vestibular function,
27  and central auditory processing.

28     III.  "Board" means the governing board of speech-language pathologists and hearing care
29  providers established in RSA 328-F.

30     IV.  "Hearing aid" means any wearable instrument or device designed for or offered for the
31  purpose of or represented as aiding or compensating for impaired human hearing and any parts or
32  attachments, including ear molds, but excluding batteries and cords or accessories thereto, or
33  equipment, devices, and attachments used in conjunction with services provided by a public utility
34  company.

35     V.  "Hearing aid dealer" means any person engaged in the testing of human hearing for the
36  purpose of selecting, fitting, or otherwise dealing in hearing aids.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 69 -**

VI.   "Otolaryngologist" means a physician licensed in the state of New Hampshire who specializes in medical problems of the ear, nose, and throat, and is eligible for qualification by the American Board of Otolaryngology as an otolaryngologist.

VII.  "Practice of audiology" means, but shall not be limited to:

(a)   Screening, identifying, assessing, interpreting, diagnosing, rehabilitating, and preventing hearing disorders.

(b)   Rendering to individuals or groups of individuals, who are suspected of having hearing disorders, basic and comprehensive audiological and vestibular site-of-lesion tests, including otoscopic examinations, electrophysiologic test procedures, and auditory evoked assessment.

(c)   Rendering basic and comprehensive auditory and vestibular habilitative and rehabilitative services, including aural rehabilitative assessment and therapy, vestibular rehabilitative assessment and therapy, and speech and language screening.

(d)   Providing basic and comprehensive audiological and psychoacoustic evaluations for the purpose of determining candidacy for amplification or assistive alerting/listening devices; providing tinnitus evaluations and therapy; providing hearing aid fitting and orientation; taking ear impressions; and providing hearing aid product dispensing, repair, and modification.

(e)   Providing preoperative evaluation and selection of cochlear implant candidacy and post-implant rehabilitation.

(f)   Providing occupational hearing conservation.

VIII.  "Practice of speech-language pathology" means, but shall not be limited to:

(a)   Screening, identifying, assessing, interpreting, diagnosing, rehabilitating, and preventing disorders of speech and language.

(b)   Screening, identifying, assessing, interpreting, diagnosing, and rehabilitating disorders of oral-pharyngeal function and related disorders.

(c)   Screening, identifying, assessing, interpreting, diagnosing, and rehabilitating cognitive communication disorders.

(d)   Assessing, selecting, and developing augmentative and alternative communication systems and providing training in their use.

(e)   Providing aural rehabilitation and related counseling services to deaf or hard of hearing individuals and their families.

(f)   Enhancing speech-language proficiency and communication effectiveness.

(g)   Screening of hearing and other factors for the purpose of speech-language evaluation or the initial identification of individuals with other communication disorders.

IX.  "Rental or selling of hearing aids" means the selection, adaptation, and sale or rental of hearing aids.  Also included is the making of impressions for ear molds and instruction pertaining to the use of hearing aids.

1       X.  "Sell" or "sale" means any transfer of title or of the right of use by sale, conditional sales

2  contract, lease bailments, hire-purchase or any other means, excluding wholesale transactions of

3  dealers and distributors.

4       XI.  "Speech-language assistant" means any person certified by the board who meets

5  minimum qualifications established by the board which are less than those established by this

6  chapter as necessary for licensing as a speech-language pathologist, and who does not act

7  independently but works under the direction and supervision of a speech-language pathologist

8  licensed under this chapter.

9       XII.  "Speech-language pathologist" means any person who renders or offers to render to the

10  public any service involving the application of principles, methods, and procedures for the

11  measurement of testing, identification, appraisal, consultation, counseling, instruction and research

12  related to the development and disorders of speech, voice, or language for the purpose of diagnosing,

13  designing, and implementing programs for the amelioration of such disorders and conditions.

14       XIII.  "Speech-language pathology" means the application of principles, methods, and

15  procedures related to the development and disorders of human communication, which disorders shall

16  include any and all conditions whether of organic or nonorganic origin, that impede the normal

17  process of human communication including, but not limited to, disorders and related disorders of

18  speech, articulation, fluency, voice, verbal and written language, auditory comprehension, cognition,

19  communication, swallowing, and oral, pharyngeal or laryngeal sensorimotor competencies.

20    179  New Paragraph; Speech Language Pathology and Hearing Care Providers Practice;

21  Eligibility for Initial Licensure.   Amend RSA 326-F:3 by inserting after paragraph II the following

22  new paragraph:

23       III.  To be eligible for initial licensure as an audiologist an applicant shall:

24       (a)  Demonstrate sufficient evidence of good professional character and reliability to

25  satisfy the board that the applicant shall faithfully and conscientiously avoid professional

26  misconduct and otherwise adhere to the requirements of this chapter.

27       (b)  Possess at least a master's degree in audiology from an educational institution

28  approved by the board which consists of course work approved pursuant to rules adopted by the

29  board pursuant to RSA 541-A.

30       (c)  Complete a supervised postgraduate professional experience at an educational

31  institution or its cooperation programs, approved pursuant to rules adopted by the board pursuant to

32  RSA 541-A.

33       (d)  Pass an examination specified by the board in rules adopted under RSA 541-A.

34       (e)  Complete a supervised postgraduate professional experience.

35       (f)  If applicable, submit proof of licensure in another state in which the licensure

36  requirements are equivalent to or greater than those in this chapter.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 71 -**

1     180    New Paragraph; Speech Language Pathology and Hearing Care Providers Practice;

2   Rulemaking.    Amend RSA 326-F:5 by inserting after paragraph VII the following new paragraph:

3        VIII.   The sale and fitting of hearing aids.

4     181    Speech Language Pathology and Hearing Care Providers Practice; Eligibility for Renewal of

5   Licenses.    Amend RSA 326-F:6, I to read as follows:

6        I.    ***For speech-language pathologists,*** have completed 30 hours of continuing education

7   which meet the requirements established by the board through rulemaking pursuant to RSA 541-A

8   and at least 50 percent of which are directly related to the practice of speech-language pathology.

9   ***For audiologists, have completed 20 hours of continuing education which meet the***

10   ***requirements established by the board through rulemaking pursuant to RSA 541-A.***

11     182    New Paragraphs; Speech-Language Pathology and Hearing Care Providers Practice;

12   Professional Identification.    Amend RSA 326-F:8 by inserting after paragraph IV the following new

13   paragraphs:

14        V.    No person shall practice audiology or represent oneself as an audiologist in this state,

15   unless such person is licensed in accordance with the provisions of this chapter.

16        VI.    No person shall represent oneself or use the following words to represent oneself:

17   audiologist, audiology, audiometry, audiometrist, audiological, audiometrics, hearing therapy,

18   hearing therapist, hearing clinic, hearing aid audiologist, or any other variation or synonym which

19   expresses, employs, or implies these terms or functions unless the person has been duly licensed as

20   an audiologist.

21     183    New Sections; Registration of Hearing Aid Dealers; Temporary Licensure for Audiologists;

22   Audiologists From Other Jurisdictions; Disclosure to Customers; Unsolicited Home Sales Prohibited;

23   Return of Hearing Aid; Deceptive Advertising Prohibited.    Amend RSA 326-F by inserting after

24   section 8 the following new sections:

25     326-F:9    Registration of Hearing Aid Dealers Required.    No person shall engage in the business

26   of selling or offering for rent hearing aids unless such person is registered in accordance with this

27   chapter and unless the registration of such person is current and valid.    The fee for an initial

28   registration under this section shall not exceed $300.    This section includes the selling or renting of

29   hearing aids by mail in this state by a person outside the state.    Registration certificates shall be

30   renewed biennially on or before June 30 upon payment of a renewal fee.

31     326-F:10    Temporary Licensure for Audiologists.

32        I.    A temporary license may be granted for up to 120 days to a person who has moved to this

33   state from another jurisdiction, if the person holds an audiologist's license in the other jurisdiction

34   and the other jurisdiction's requirements for licensure are greater than or equal to the requirements

35   in this state, and the person has applied for a license under this chapter.

36        II.    A temporary license issued under this section shall expire no later than 120 days after

37   issuance.    The date shall be stated on the license.

Amendment to HB 2-FN-A-LOCAL
- Page 72 -

326-F:11   Audiologists From Other Jurisdictions; Licensure.   The board may waive licensure requirements for an applicant who:

I.   Is licensed by another jurisdiction where the requirements for licensure are greater than or equal to those required in this state; and

II.   Is practicing audiology 20 days or less in New Hampshire in any calendar year.

326-F:12   Hearing Aid Dealer and/or Audiologist Disclosure to Customers.

I.   No hearing aid dealer or audiologist shall sell a hearing aid without presenting the purchaser an itemized receipt, which shall include the following:

(a)   The name and address and signature of the purchaser.

(b)   The date of the sale.

(c)   The name and the regular place of business of the hearing aid dealer or dealer's registration number or of the audiologist or audiologist's license number, and signature of the registrant or licensee.

(d)   The make, model, serial number, and purchase price of the hearing aid and the terms of the warranty.

(e)   An itemization of the total purchase price, including but not limited to the cost of the aid, ear mold, and batteries and other accessories and any other services.

(f)   A statement as to whether the hearing aid is "new," "used" or "reconditioned."

(g)   The complete terms of the sale, including a clear and precise statement of the 30-day money back guarantee required under RSA 326-F:14.

(h)   The name, address and telephone number of the consumer protection and antitrust bureau, division of public protection, department of justice, with a statement that complaints which arise with respect to the transaction may be submitted in writing to the consumer protection and antitrust bureau.

(i)   The following statements in 10 point type or larger:   1) "This hearing aid will not restore normal hearing nor will it prevent further hearing loss;" 2) "You have the right to cancel this purchase or rental for any reason within 30 days after receiving the hearing aid."

II.   Each registrant or licensee shall keep records of every customer to whom such person renders services or sells hearing aids, including a copy of the receipt as specified under paragraph I, a record of services provided, any correspondence to or from a customer and any records required under the rules for the hearing aid industry as promulgated by the United States Federal Trade Commission on July 20, 1965, or as amended, or any rules for the hearing aid industry promulgated by the United States Food and Drug Administration.   These records shall be preserved for at least 3 years after the date of transaction.

326-F:13   Unsolicited Home Sales Prohibited.   No hearing aid dealer or audiologist, employee or agent thereof, shall canvass either in person or by telephone from house to house for the purpose of

1    selling or renting a hearing aid without prior request from the prospective customer, a relative or
2    friend of the prospective customer.

3        326-F:14   Return of Hearing Aid; Cancellation Fee.   No hearing aid shall be sold to any person
4    unless accompanied by a 30-day written money back guarantee that if the person returns the
5    hearing aid in the same condition, ordinary wear and tear excluded, as when purchased, within 30
6    days from the date of delivery, the hearing aid dealer or audiologist may be entitled to a cancellation
7    fee of 5 percent of the purchase price.  In computing the actual purchase price, all rebates, discounts,
8    and other similar allowances provided to the seller shall be considered.  For the purpose of this
9    section, any consumer who initiates the return of a hearing aid within said 30-day period shall be in
10   compliance with this section.  The addressing of any claimed deficiency or return shall be resolved
11   within 90 days from date of delivery.

12       326-F:15   Deceptive Advertising Prohibited.

13        I.   No hearing aid dealer or audiologist, or employee or agent thereof, shall use or cause to be
14   used or promote the use of any advertising matter, promotional literature, testimonial, guarantee,
15   warranty, label, brand, insignia, or other representation, however disseminated or published, which
16   is misleading, deceptive, or untruthful.   All advertising by mail which offers free hearing testing or
17   other services by a hearing aid dealer or audiologist shall clearly state in such advertising that the
18   offers are made by a hearing aid dealer or audiologist.

19        II.   No hearing aid dealer, or employee or agent thereof, shall represent that the services or
20   advice of an individual licensed to practice medicine or of an individual certified as an audiologist
21   will be used or made available in the selection, fitting, adjustment, maintenance, or repair of hearing
22   aids where that is not true; or use or incorporate in any title or designation the words, "doctor,"
23   "otologist," "clinic," "clinical audiologist," "audiologist," "state licensed clinic," "state certified," "state
24   approved," "state registered," "certified hearing aid audiologist," or any term, abbreviation, or symbol
25   which would give the false impression that one is being treated medically or audiologically or that
26   the registrant's services have been recommended by the state.

27        III.   No hearing aid dealer or audiologist, or employee or agent thereof, shall use any
28   advertisement or any other representation which has the effect of misleading or deceiving
29   purchasers or prospective purchasers in the belief that any hearing aid or device, or part or
30   accessory thereof, is a new invention or involves a new mechanical or scientific principle when such
31   is not a fact.

32        IV.  No hearing aid dealer or audiologist, or employee or agent thereof, shall state or imply
33   that the use of any hearing aid will restore hearing to normal, or preserve hearing, or prevent or
34   retard the progression of a hearing impairment or make any false or misleading or medically or
35   audiologically unsupportable claims regarding the efficacy or benefits of hearing aids.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 74 -**

V.   No hearing aid dealer or audiologist, or employee or agent thereof, shall advertise a particular model, type, or kind of hearing aid when the offer is not a bona fide effort to sell the product so offered as advertised.

VI.   No hearing aid dealer or audiologist, or employee or agent thereof, shall advertise that a hearing aid will be beneficial to persons with hearing loss, regardless of the type of loss.   No such dealer, employee, or agent shall advertise that a hearing aid will enable persons with hearing loss to consistently distinguish and understand speech sounds in noisy situations.

VII.   No hearing aid shall be sold to any person unless the packaging containing the hearing aid carries the following disclaimer in 10 point type or larger:   "This hearing aid will not restore normal hearing nor will it prevent further hearing loss."

326-F:16  Out-of-State Sales Regulated.

I.   No person shall conduct or operate a business outside of the state for the sale at retail of hearing aids to individuals within the state unless such business is registered with a permit issued by the board.

II.   The board shall issue a permit to such out-of-state business if the business discloses and provides proof:

(a)   That the business is in compliance with all applicable laws and rules in the state in which the business is located;

(b)   Of the operating locations and the names and titles of all principal corporate officers;

(c)   That the business complies with all lawful directions and requests for information from the board of all states in which it conducts business; and

(d)   That the business agrees in writing to comply with all New Hampshire laws and rules relating to the sale or dispensing of hearing aids.

III.   The board shall assess fees as established by rules adopted by the board, pursuant to RSA 541-A, for out-of-state hearing aid sales companies.

184  General Administration of Regulatory Boards and Commissions; Reciprocity Information.   Amend the introductory paragraph of RSA 332-G:12, I to read as follows:

I.   All boards or commissions[, including the board of hearing care providers established in RSA 137-F:3,] shall post information on their website relative to reciprocal licensure or certification for persons holding a current and valid license or certification for the practice of the regulated profession in another state.   Such information shall include a list of the states which the board or commission has determined to have license or certification requirements equal to, or greater than, the requirements of this state.   The posting shall also list states with which the board or commission has:

185  Repeals.   The following are repealed:

I.   RSA 137-F, relative to hearing care providers.

II.   RSA 310-A:1-a, II(a), relative to hearing care providers.

186   Transition; Rules; Hearing Care Providers.

I.   The rules adopted for hearing care providers under the former RSA 137-F in effect on the effective date of this act shall, to the extent practicable, continue and be effective and apply to hearing care providers until they expire or are amended or repealed.

II.   Registrations or licenses of hearing care providers under the former RSA 137-F shall be valid until they expire or are revoked or suspended as provided in RSA 326-F as amended by section 183 of this act.

187   New Chapter; Department of Energy.   Amend RSA by inserting after chapter 12-O the following new chapter:

CHAPTER 12-P

DEPARTMENT OF ENERGY

12-P:1  Definitions.  In this chapter:

I. "Commission" means the public utilities commission.

II.  "Commissioner" means the commissioner of energy.

III.  "Department" means the department of energy

12-P:2  Establishment; Purpose.

I.  There shall be a department of energy under the executive direction of a commissioner of energy and consisting of the divisions of administration, policy and programs, enforcement, and regulatory support.

II.   The purpose of this chapter is to improve the administration of state government by providing unified direction of policies, programs, and personnel in the field of energy and utilities, making possible increased efficiency and economies from integrated administration and operation of the various energy and utility related functions of the state government.

III.   In addition to its other functions, it shall be the duty of the department of energy to provide all necessary administrative support to the public utilities commission to assist the commission in carrying out its regulatory and adjudicative functions.

IV.  The department shall have the authority to investigate any matter that may come before the public utilities commission and to appear before the commission to advocate for the department's position and for the purposes of providing a complete record for consideration by the commission.

12-P:3  General Provisions.

I.  Upon the recommendation of the commissioner after consultation with division directors concerned, the governor and council are authorized to approve revisions in internal administrative departmental organization as the governor and council find from time to time may improve or make more economical the administration of the department.

II.   The department of energy is authorized to work with the department of business and economic affairs and the department of administrative services to coordinate the implementation of the establishment of the department, and to transfer appropriations and create the proper

**Amendment to HB 2-FN-A-LOCAL**
**- Page 76 -**

1    expenditure lines, if needed, for the establishment of their respective operations, including but not
2    limited to the relocation of personnel, work stations, books, papers, personnel record files, and
3    equipment, with the approval of the governor and council and of the director of personnel.

4        12-P:4  Commissioner; Deputy Commissioner; Directors

5        I.  The commissioner of the department of energy shall be appointed by the governor, with
6    the consent of the council, and shall serve for a term of 4 years.  The commissioner shall be qualified
7    to hold that position by reason of education and experience.  Directors of departmental divisions
8    shall be subject to the supervisory authority of the commissioner, which authority shall include
9    power to establish department and divisional policy as well as to control the actual operations of the
10   department and all divisions therein.  The commissioner is authorized to establish any advisory
11   committees and programs which the commissioner may deem necessary to carry out the mission and
12   operations of the department.

13       II.   The commissioner of energy shall nominate a deputy commissioner of energy for
14   appointment by the governor and council.  The deputy commissioner shall hold office for 4 years and
15   until a successor has been appointed and qualified.  The deputy commissioner shall be qualified to
16   hold that position by reason of education and experience.  The deputy commissioner shall perform
17   such duties as the commissioner may assign.  The deputy commissioner shall perform the duties of
18   the commissioner if for any reason the commissioner is unable to do so.

19       III.   Division directors shall be appointed to initial terms as stated below, and then
20   subsequently to terms of 4 years.  Terms notwithstanding, each division director shall serve until a
21   successor has been appointed and qualified.

22           (a)   The commissioner shall nominate for appointment by the governor and council a
23   director of the division of policy and programs for an initial term of one year.  All subsequent terms
24   shall be 4 years.  The director of the division of policy and programs shall be qualified to hold that
25   position by reason of education and experience.

26           (b)   The commissioner shall nominate for appointment by the governor and council a
27   director of the division of administration for an initial term of 2 years.  All subsequent terms shall be
28   4 years.  The director of the division of administration shall be qualified to hold that position by
29   reason of education and experience.

30           (c)   The commissioner shall nominate for appointment by the governor and council a
31   director of the division of enforcement for an initial term of 3 years.  All subsequent terms shall be 4
32   years.  The director of the division of enforcement shall be qualified to hold that position by reason of
33   education and experience.

34           (d)   The commissioner shall nominate for appointment by the governor and council a
35   director of the division of regulatory support for an initial term of 3 years.  All subsequent terms
36   shall be 4 years.  The director of the division of regulatory support shall be qualified to hold that
37   position by reason of education and experience.

1    IV.   The salaries of the commissioner, the deputy commissioner, and each division director

2    shall be as specified in RSA 94:1-a.

3    12-P:5  Duties of Commissioner.   In addition to the powers, duties, and functions otherwise

4    vested by law in the commissioner of the department of energy, the commissioner, except as

5    otherwise provided in this chapter, shall:

6        I.   Represent the public interest in the administration of the functions of the department of

7    energy and be responsible to the governor, the general court, and the public for such administration.

8        II.   Provide for, in consultation with the commissioner of the department of administrative

9    services and the state treasurer, a system of accounts and reports which will ensure the integrity

10   and lawful use of all fees, funds, and revenues collected by the department, the use of which is

11   restricted by state or federal law.

12       III.   Have the authority to receive, administer, and internally audit all present and future

13   federal and state energy-related grant programs.

14       IV.   Have the authority to adopt rules, pursuant to RSA 541-A, necessary to assure the

15   continuance or granting of federal funds or other assistance intended to promote the administration

16   of this chapter, not otherwise provided for by law, and to adopt all rules necessary to implement the

17   specific statutes administered by the department or by any division or unit within the department,

18   whether the rulemaking authority delegated by the legislature is granted to the commissioner, the

19   department, or any administrative unit or subordinate official of the department.

20       V.   Have the authority to reorganize rules of the department to conform to the requirements

21   of RSA 541-A and the uniform drafting and numbering system adopted by the division of

22   administrative rules, office of legislative services.   Reference changes shall be limited to title,

23   chapter, part, and section designations and numbers and substitution of terms reflecting

24   reorganization of the department to the existing statutory structure, and shall be made subject to

25   review by the division of administrative rules, office of legislative services for consistency and

26   accuracy of such changes.   Such reference changes shall be integrated into the rules and such

27   amendments to the rules shall become effective when notice of these reference changes is published

28   by the director of legislative services in the rulemaking register.   Reference changes made prior to

29   July 1, 2022, shall be exempt from the procedures and requirements of RSA 541-A.   Changes

30   authorized under this section shall not affect the adoption or expiration date of rules changed under

31   this section.

32       VI.   Collect and account for all fees, funds, taxes, or assessments levied upon any person

33   subject to the jurisdiction of the department of energy and the public utilities commission.

34       VII.   Ensure that the department provides all necessary support to the public utilities

35   commission, the site evaluation committee, office of the consumer advocate, and any other entity

36   that is administratively attached to the department, provided that, other than for administrative

37   functions, department employees shall not communicate with the public utilities commission and its

Amendment to HB 2-FN-A-LOCAL
- Page 78 -

1    staff in connection with any issue in a matter pending before the commission or the department,

2    except upon notice and opportunity for all parties to participate.

3         12-P:6  Division of Administration.  There is established within the department the division of

4    administration, under the supervision of an unclassified director of the division of administration.

5    The division, through its officials, shall be responsible for all functions, duties, and responsibilities

6    which may be assigned to it by the commissioner or laws enacted by the general court.

7         12-P:7  Division of Policy and Programs.  There is established within the department the division

8    of policy and programs, under the supervision of an unclassified director of the division of policy and

9    programs.  The division, through its officials, shall be responsible for all functions, duties, and

10    responsibilities which may be assigned to it by the commissioner or laws enacted by the general

11    court.  In addition, the division shall administer fuel assistance contracts and weatherization

12    contracts.  In administering fuel assistance and weatherization contracts, the division shall ensure

13    that when an individual applies for fuel assistance or weatherization, the individual shall be

14    provided with application forms and information about the Link-Up New Hampshire and Lifeline

15    Telephone Assistance programs, and shall be provided assistance in applying for these programs.

16         12-P:7-a  State Energy Strategy.

17         I.  The division of policy and programs, with approval of the commissioner, and with

18    assistance from an independent consultant and with input from the public and interested parties,

19    shall prepare a 10-year energy strategy for the state.  The division shall review the strategy and

20    consider any necessary updates in consultation with the senate energy and natural resources

21    committee and the house science, technology and energy committee, after opportunity for public

22    comment, at least every 3 years starting in 2021.  The state energy strategy shall include, but not be

23    limited to, sections on the following:

24         (a)  The projected demand for consumption of electricity, natural gas, and other fuels for

25    heating and other related uses.

26         (b)  Existing and proposed electricity and natural gas generation and transmission

27    facilities, the effects of future retirements and new resources, and consideration of possible

28    alternatives.

29         (c)  Renewable energy and fuel diversity.

30         (d)  Small-scale and distributed energy resources, energy storage technologies, and their

31    potential in the state.

32         (e)  The role of energy efficiency, demand response, and other demand-side resources in

33    meeting the state's energy needs.

34         (f)  The processes for siting energy facilities in the state and the criteria used by the site

35    evaluation committee in giving adequate consideration to the protection of the state's ecosystems

36    and visual, historic, and aesthetic resources in siting processes.

1        (g)   The relationship between land use and transportation policies and programs on

2    electricity and thermal energy needs in the state.

3        (h)   New Hampshire's role in the regional electric markets, how the regional market

4    affects the state's energy policy goals, and how the state can most effectively participate at the

5    regional level.

6        II.  The strategy shall include a review of all state policies related to energy, including the

7    issues in paragraph I, and recommendations for policy changes and priorities necessary to ensure

8    the reliability, safety, fuel diversity, and affordability of New Hampshire's energy sources, while

9    protecting natural, historic, and aesthetic resources and encouraging local and renewable energy

10   resources.   The strategy shall also include consideration of the extent to which demand-side

11   measures including efficiency, conservation, demand response, and load management can cost-

12   effectively meet the state's energy needs, and proposals to increase the use of such demand resources

13   to reduce energy costs and increase economic benefits to the state.

14       III.  The strategy development process shall include review and consideration of relevant

15   studies and plans, including but not limited to those developed by the independent system operator

16   of New England (ISO-NE), the public utilities commission, the energy efficiency and sustainable

17   energy board, legislative study committees and commissions, and other state and regional

18   organizations as appropriate.  The strategy shall also include consideration of new technologies and

19   their potential impact on the state's energy future.

20   12-P:7-b  Office of Offshore Wind Industry Development Established.

21       I.   There is established in the department of energy the office of offshore wind industry

22   development.  The office shall be under the supervision of a classified director of the office of offshore

23   wind industry development, who shall serve under the supervision of the commissioner.  The

24   director shall provide administrative oversight and ensure that the responsibilities of the office

25   described in this section are fulfilled.

26       II.  The office of offshore wind industry development shall:

27       (a)   Support the work of the New Hampshire members of the Intergovernmental

28   Renewable Energy Task Force administered by the federal Bureau of Ocean Energy Management

29   (BOEM).

30       (b)  Support the work of the offshore wind commission established in RSA 374-F:10.

31       (c)   Assist the offshore wind commission to develop and implement offshore wind

32   development strategies including:

33          (1)  Assessment of port facilities.

34          (2)  Economic impact analyses.

35          (3)  Supply chain analyses.

36          (4)  Outcome and performance measurements.

1     (d)    Collaborate with key state agencies and partners on offshore wind industry
2  development initiatives.

3     (e)  Coordinate offshore wind industry economic development policy, including:

4        (1)  Development of workforce.

5        (2)  Identification of and recruitment of offshore wind development employers.

6        (3)  Identification and recruitment of offshore wind supply chain employers.

7        (4)  Promotion of New Hampshire's benefits to the various components of the offshore
8  wind industry.

9        (5)    Provide updates and guidance to the general court with regard to policy and
10  funding.

11     12-P:8  Division of Enforcement.  There is established within the department the division of
12  enforcement, under the supervision of an unclassified director of the division of enforcement.  The
13  division, through its officials, shall be responsible for all functions, duties, and responsibilities which
14  may be assigned to it by the commissioner or laws enacted by the general court.

15     12-P:9  Division of Regulatory Support.  There is established within the department the division
16  of regulatory support, under the supervision of an unclassified director of the division of regulatory
17  support.   The division, through its officials, shall be responsible for all functions, duties, and
18  responsibilities which may be assigned to it by the commissioner or laws enacted by the general
19  court.   The division shall automatically be a party to all proceedings before the public utilities
20  commission.

21     12-P:10  Specific Answers.  The department or the commission may require any public utility or
22  entity subject to its jurisdiction to make specific answers to questions upon which the department or
23  commission may need information.

24     12-P:11   Transfer of Functions, Powers, Duties.  All of the functions, powers, duties, records,
25  personnel, and property of the public utilities commission incorporated in the statutes establishing
26  the department of energy and which replace the authority of the commission with the authority of
27  the department of energy, are hereby transferred, as of July 1, 2021, to the department of energy.

28     12-P:12  Prohibited Service.  No member of the commission shall render any professional service
29  for any public utility in this state, or any affiliate thereof, or act as attorney or render professional
30  service against any such public utility or affiliate; nor shall he or she be a member of a firm which
31  renders any such service; nor shall he or she directly or indirectly be a party to any contract with
32  any such public utility, except a contract for the transportation of telephone or telegraph messages,
33  or a contract for the purchase of water, gas, or electricity or for other similar service.

34     12-P:13  Pipeline Operation Safety.

35     I. The department of energy shall apply annually to the Pipeline and Hazardous Materials
36  Safety Administration of the United States Department of Transportation for authorization to take

1 such actions on its behalf to oversee pipeline operation safety, security, monitoring, and compliance

2 through an inspection process.

3      II.   The department of energy shall report annually to the house science, technology, and

4 energy committee prior to October 1 on the status of pipeline safety, new and proposed projects, any

5 deficiency in state law that limits the department's ability to oversee interstate pipelines, or state

6 regulations for pipelines that do not meet the minimum federal standard.

7      12-P:14   Transfer of Rules, Orders, Approvals.   Existing rules, orders, and approvals of the

8 public utilities commission which are associated with any functions, powers, and duties, transferred

9 to the department of energy pursuant to RSA 12-P:11 or any other statutory provision, shall

10 continue in effect and be enforced by the commissioner of the department of energy until they expire

11 or are repealed or amended in accordance with applicable law.

12      12-P:15   Suppliers of Natural Gas and Aggregators of Natural Gas Customers; Rulemaking.

13      I.   The department is authorized to adopt rules, pursuant to RSA 541-A, establishing

14 requirements for suppliers of natural gas and the aggregators of natural gas customers, including

15 registration of such suppliers and aggregators before soliciting or doing business in the state,

16 registration fees, disclosure of information to customers, standards of conduct, submission to

17 commission jurisdiction for mediation and resolution of disputes, imposition of penalties for failure

18 to comply with commission requirements, and consumer protection and assistance requirements.

19      II.   The department of energy shall adopt rules under RSA 541-A which require all natural

20 gas companies to report to the department, the senate president, and the speaker of the house of

21 representatives, in a uniform manner, lost and unaccounted for gas for each year.

22      (a)   Such rules shall include a method using operational and billing data to determine the

23 total amount of lost and unaccounted for gas and to identify and measure each of its components.

24      (b)   The department may grant waivers from the rules as necessary for the development

25 of innovative projects to reduce lost and unaccounted for gas.   Such innovative projects shall be

26 intended to reduce costs to ratepayers and to reduce greenhouse gas emissions.   An application for a

27 waiver shall include the goals of the innovative project, the expected cost, the expected benefit to

28 ratepayers and the expected reduction in greenhouse gas emissions.

29      (c)   For the purposes of this paragraph, "lost and unaccounted for gas" shall mean an

30 amount of gas that is the difference between the total gas purchased by a gas company and the sum

31 of: (1) total gas delivered to customers; and (2) total gas used by a gas company in the conduct of its

32 operations.

33      III.   This section shall not in any way affect the utility or non-utility status of any supplier of

34 natural gas or aggregator of natural gas customers, nor shall it be construed to limit the

35 commission's and the department of energy's existing authority with regard to the regulation of gas

36 utilities or the scope of the commission's and the department's authority in considering whether to

1  expand the availability of competitive natural gas supplies through the distribution system of gas
2  utilities.

3     188  Department of Energy; Interim Commissioner. Until appointment of a commissioner under
4  RSA 12-P:4, the governor may initially designate an interim commissioner to serve for up to 60 days
5  from the effective date of this section.

6     189  Repeals. The following are repealed:

7       I.  RSA 4-C, relative to the office of strategic initiatives; the governor's scholarship program
8  and fund, and state demography.

9       II.  RSA 4-E, relative to the state energy strategy.

10      III.  RSA 12-O:51 and 52, relative to the office of offshore wind industry development.

11     190  Office of Strategic Initiatives; Revolving Funds; Reference Change. Amend RSA 6:12, I(b)
12  (79) to read as follows:

13         (79) Moneys deposited in the publications revolving fund under ***RSA 12-O:60, I*** [RSA
14  4-C:9-a].

15     191  Office of Strategic Initiatives; Revolving Funds; Reference Change. Amend RSA 6:12,
16  I(b)(169)

17         (169) Moneys deposited in the municipal and regional training fund under ***RSA 12-***
18  ***O:60, II*** [RSA 4-C:9-a, II].

19     192  Organization of the Executive Branch. Amend RSA 21-G:6-b, II to read as follows:

20     II. The executive departments are as follows:

21       (a) The department of administrative services.

22       (b) The department of agriculture, markets, and food.

23       (c) The department of banking.

24       (d) The department of business and economic affairs.

25       (e) The department of corrections.

26       (f) The department of education.

27       (g) The department of employment security.

28       ***(h) The department of energy.***

29       [(h)] ***(i)*** The department of environmental services.

30       [(i)] ***(j)*** The department of health and human services.

31       [(j)] ***(k)*** The department of information technology.

32       [(k)] ***(l)*** The department of insurance.

33       [(l)] ***(m)*** The department of labor.

34       [(m)] ***(n)*** The department of military affairs and veteran services.

35       [(n)] ***(o)*** The department of natural and cultural resources.

36       [(o)] ***(p)*** The department of revenue administration.

37       [(p)] ***(q)*** The department of safety.

1        [(q)] *(r)* The department of transportation.

2      193  Department of Energy; Unclassified Positions Established.

3          I.  The following positions are hereby established in the department of energy, shall be

4  qualified by reason of education or experience or both, and shall be appointed by the commissioner

5  and perform assigned duties according to applicable law.  Each position shall be temporarily

6  assigned to its respective unclassified salary letter grade, as follows:

| Labor Grade | Title | Job Code | Position # |
|---|---|---|---|
| GG | Director of Regulatory Support | 9U9962 | GV008 |
| GG | Director of Enforcement | 9U9963 | GV009 |
| GG | Director of Policy & Programs | 9U9964 | GV010 |
| GG | Director of Administration | 9U9966 | GV012 |
| HH | Deputy Commissioner of Energy | 9U9967 | GV013 |
| II | Commissioner of Energy | 9U9968 | GV020 |

14          II.  The permanent salaries of these positions shall be determined after assessment and

15  review of the appropriate letter grade allocation in RSA 94:1-a, I(b) for the positions which shall be

16  conducted pursuant to RSA 94:1-d and RSA 14:14-c.

17      194  Public Utilities Commission; Unclassified Positions Established.

18          I.  The following positions are hereby established in the public utilities commission, shall be

19  qualified by reason of education or experience or both in one or more of the following areas:

20  engineering, economics, accounting, finance, or law; and shall be appointed by the agency head and

21  perform assigned duties according to applicable law.  Each position shall be temporarily assigned to

22  its respective unclassified salary letter grade, as follows:

| Labor Grade | Title | Job Code | Position # |
|---|---|---|---|
| GG | Senior Advisor | 9U9969 | GV014 |
| GG | Senior Advisor | 9U9970 | GV015 |
| GG | Senior Advisor | 9U9971 | GV016 |
| GG | Senior Advisor | 9U9972 | GV017 |
| GG | Senior Advisor | 9U9973 | GV018 |
| GG | Senior Advisor | 9U9974 | GV019 |

30          II.  The permanent salaries of these positions shall be determined after assessment and

31  review of the appropriate letter grade allocation in RSA 94:1-a, I(b) for the positions which shall be

32  conducted pursuant to RSA 94:1-d and RSA 14:14-c.

33      195  New Subdivision; Department of Business and Economic Affairs; Office of Planning and

34  Development.  Amend RSA 12-O by inserting after section 52 the following new subdivision:

35                            Office of Planning and Development

36      12-O:53  Office of Planning and Development.

1     I.  There is established the office of planning and development within the department of

2    business and economic affairs.  The office of shall be under the supervision of a classified director of

3    the office of planning and development, who shall serve under the supervision of the commissioner.

4     II.  The office of planning and development shall:

5        (a)  Plan for the orderly development of the state and the wise management of the state's

6    resources.

7        (b)  Compile, analyze, and disseminate data, information, and research services as

8    necessary to advance the welfare of the state.

9        (c)  Encourage and assist planning, growth management, and development activities of

10    cities and towns and groups of cities and towns with the purpose of encouraging smart growth.

11        (d)  Encourage the coordination and correlation of state planning by agencies of state

12    government.

13        (e)  Participate in interstate, regional, and national planning efforts.

14        (f)  Administer federal and state grant-in-aid programs assigned to the office by statute

15    or executive order.

16        (g)  Participate and advise in matters of land use planning regarding water resources

17    and floodplain management.

18        (h)  Take a leadership role in encouraging smart growth and preserving farmland, open

19    space land, and traditional village centers.

20        (i)  Administer the following programs:  the statewide comprehensive outdoor recreation

21    plan, the national flood insurance program, and the land conservation investment program.  The

22    office shall employ necessary personnel to administer these programs.

23        (j)  Perform such other duties as the commissioner may assign.

24    12-O:54  State Development Plan.

25     I.  The office of planning and development, under the direction of the commissioner, shall:

26        (a)  Assist the commissioner in preparing, publishing, and revising the comprehensive

27    development plan required under RSA 9-A.

28        (b)  Coordinate and monitor the planning efforts of various state agencies and

29    departments to ensure that program plans published by such agencies are consistent with the

30    policies and priorities established in the comprehensive development plan.

31        (c)  Coordinate and monitor the planning efforts of the regional planning commissions to

32    ensure that the plans published by the commissions are consistent, to the extent practical, with the

33    policies and priorities established in the state development plan.

34     II.  In preparing the state development plan, the office of planning and development shall

35    consult with the chief executive officers of the various departments and agencies of state

36    government.  The office shall also consult with officials of regional planning commissions and

**Amendment to HB 2-FN-A-LOCAL**
**- Page 85 -**

1 regional and local planning and development agencies, local officials, representatives of the business

2 and environmental community, and the general public.

3     III.  All state agencies and departments shall provide the office of planning and development

4 with information and assistance as required by the office to fulfill its responsibilities under

5 paragraph I.  The office shall maintain the confidentiality of any information which is protected by

6 law.

7     12-O:55  Data and Information Services.  The office of planning and development shall:

8     I.  Gather, tabulate, and periodically publish information on the location and pace of

9 development throughout the state, including, but not limited to, population, housing, and building

10 permit data.

11     II.  Initiate data coordination procedures as the state agency responsible for coordinating

12 data collection and dissemination among the state, the private sector, and the various political

13 subdivisions.

14     III.  Gather information for storage in a data bank concerning the data which is currently

15 available within all state agencies.  This data shall be used to provide information which is useful in

16 measuring growth and its impact and for statewide planning purposes in general.  The data

17 available for dissemination shall include, but shall not be limited to, information for determining

18 future demands for state services and demographic and economic statistics.  Any other state agency

19 or department which initiates a data collection program shall inform the office of planning and

20 development of its efforts so that the office may utilize that information for planning purposes in its

21 dissemination program.

22     IV.  Cooperate with the department of environmental services in identifying potential sites

23 for hazardous waste facilities.

24     V.  Develop and maintain a computerized geographic information system in support of state,

25 regional, or local planning and management activities.

26     VI.  Cooperate with the Bureau of the Census and other federal agencies with the objective of

27 improving access to the statistical products, data, and information of the federal government.

28     VII.  Annually estimate the resident population for all cities and towns of the state pursuant

29 to RSA 78-A:25.

30     12-O:56  Policies and Plans.

31     I.  The office of planning and development shall formulate policies and plans for

32 consideration by the commissioner and the governor which serve to integrate and coordinate

33 resource and development activities affecting more than one state agency, level of government, or

34 governmental function.  Such activities may include, but shall not be limited to, the following subject

35 areas:

36     (a)  Water resources.

37     (b)  Transportation.

1      (c)  Recreation and natural resources.

2      (d)  Solid waste and hazardous waste management.

3      (e)  Off-shore, coastal, and estuarine resources.

4      (f)  Housing.

5      (g)  Economic development.

6      (h)  Energy.

7      (i)  Shoreland protection.

8      (j)  Smart growth.

9    12-O:57  Program Established.  The director of the office of planning and development shall
10  establish a program of regional and municipal assistance within the office of planning and
11  development.  This program shall coordinate state, regional, and local planning efforts with the goal
12  of assuring delivery of efficient and effective assistance to local governments in areas related to
13  growth management and resource protection.

14    12-O:58  Responsibilities for Assistance.  The office of planning and development shall:

15    I.  Provide technical assistance and, within the limits of biennial legislative appropriations,
16  financial grants to regional planning commissions established under RSA 36:45-36:53 in support of:

17      (a)  Planning assistance to local units of government.

18      (b)  Preparation of regional plans.

19      (c)  Contributions to and coordination with statewide planning and management
20  activities, including the formulation and updating of the comprehensive state development plan
21  prepared pursuant to RSA 12-P:54.

22    II.  As requested and in cooperation with regional planning commissions, provide technical
23  assistance and information in support of the planning and growth management efforts of local units
24  of government, including training requested under RSA 673:3-a.  The office shall encourage
25  municipalities to first seek assistance from established regional planning commissions.

26    III.  Provide computer interface capability among and between each regional planning
27  commission, the office of strategic initiatives, and state data collection and storage sources.  The
28  computer interface capability shall be used by regional planning commissions to respond to
29  municipal requests for assistance in the preparation and amending of master plans and in the
30  evaluation of municipal infrastructure needs.  The computer interface capability shall also be used
31  by regional planning commissions to develop and update regional master plans, as provided in RSA
32  36:47.  The computer equipment used for the purposes of this paragraph shall be compatible and
33  able to interface with the office of planning and development's geographic information system, as
34  well as with other similar state computerized data collection and storage sources.

35    IV.  Provide technical assistance and information to municipalities with the cooperation of
36  other state and regional planning agencies in the following areas:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 87 -**

(a) Use and application of geographic data available in the state's geographic information system (GIS) for local planning and growth management purposes.

(b) Recommending standard procedures for the establishment of accurate, large-scale base mapping to support municipal administrative functions such as tax assessment, public facility management and engineering.

12-O:59 Coordination at State Level. The office of planning and development shall coordinate efforts by state agencies to provide technical assistance to municipal governments in areas related to growth management and resource protection.

12-O:60 Revolving Funds. In order to enhance its ability to provide education and training assistance to municipalities and regional agencies, the following nonlapsing revolving funds, which shall not exceed $20,000 on June 30 of each year, shall be established in the office of planning and development:

I. A revolving fund known as the publications revolving fund.

(a) The moneys in this fund shall be used for the purposes of printing materials for distribution. A reasonable charge shall be established for each copy of a document. This charge shall be only in the amount necessary to pay the cost of producing such document.

(b) The amount in the nonlapsing publications revolving fund shall not exceed $20,000, on June 30 of each year and any amounts in excess of $20,000 on June 30 of each year shall be deposited in the general fund as unrestricted revenue.

II. A revolving fund known as the municipal and regional training fund.

(a) The moneys in this fund shall be used for the purpose of providing training to local and regional officials. A reasonable charge shall be established for such training. This charge shall be fixed to reflect the cost of payments to experts to provide the training, the cost of written training material, rental of facilities, advertising and other associated costs. Such training shall be conducted in a geographically dispersed manner and scheduled with the convenience of part-time officials in mind.

(b) The amount in the nonlapsing municipal and regional training revolving fund shall not exceed $20,000 on June 30 of each year and any amounts in excess of $20,000 on June 30 of each year shall be deposited in the general fund as unrestricted revenue.

196 State Development Plan. Amend RSA 9-A:2 to read as follows:

9-A:2 [Office of Strategic Initiatives] *Office of Planning and Development*. The office of [strategic initiatives] *planning and development*, under the direction of the [governor] *commissioner of business and economic affairs*, shall:

I. Assist the [governor] *commissioner* in preparing, publishing and revising the comprehensive development plan.

II. Develop and maintain a technical data base of information to support statewide policy development and planning.

Amendment to HB 2-FN-A-LOCAL
- Page 88 -

1    III.  Coordinate and monitor the planning efforts of various state agencies and departments

2    to ensure that program plans published by such agencies are consistent with the policies and

3    priorities established in the comprehensive development plan.

4    IV.  Coordinate and monitor the planning efforts of the regional planning commissions.

5    197  State Development Plan; References Changed.  Amend RSA 9-A:4 to read as follows:

6    9-A:4  Consultation With Other Agencies.

7    I.  In preparing the state development plan, the office of [strategic initiatives] *planning and*

8    *development* shall consult with the chief executive officers of the various departments and agencies

9    of state government with responsibilities which are relevant to economic development.

10   II.  The office may also consult with officials of regional and local planning and development

11   agencies and representatives of business and industry.

12   III.  All state agencies and departments shall provide the office of [strategic initiatives]

13   *planning and development* with such information and assistance required by the office to fulfill

14   its responsibilities under RSA 9-A:2.  The office shall maintain the confidentiality of any information

15   which is protected by law.

16   198  Name Change; Office of Planning and Development.  Amend the following RSAs by

17   replacing "office of strategic initiatives" with "office of planning and development":  RSA 4-F:1; 12-

18   G:13; 17-M:2; 21-O:5-a; 21-P:48; 36:45; 36:46; 36:47; 36-B:1; 78-A:25; 78-A:26; 125-O:5-a; 126-A:4;

19   162-L:15; 162-L:19; 204-C:8; 216-A:3-c; 216-F:5; 217-A:3; 227-C:4; 227-G:2; 227-M:4; 233-A:2; 235:23;

20   238:20; 270:64; 270:71; 432:19; 482-A:32; 483:8; 483:10; 483-A:6; 483-A:7; 483-B:5; 483-B:12; 483-

21   B:16; 483-B:22; 485-A:4; 673:3-a; 674:3; 675:9.

22   199  Council on Resources and Development; Membership.  Amend RSA 162-C:1 to read as

23   follows:

24   162-C:1  Council Established.  There is established a council on resources and development

25   which shall include the following members:

26   I.  [The director or assistant director of the office of strategic initiatives who shall serve as

27   chairperson of the council.

28   II.] The commissioner or appropriate division director, department of business and economic

29   affairs, or designee*, who shall serve as chairperson of the council*.

30   [III.] *II.*   The commissioner or assistant commissioner, department of environmental

31   services, or designee.

32   [IV.] *III.*   The commissioner or appropriate division director, department of agriculture,

33   markets, and food, or designee.

34   [V.] *IV.*   The executive director or appropriate division director, fish and game department,

35   or designee.

36   [VI.] *V.*   The commissioner or assistant commissioner, department of safety, or designee.

1    [~~VII.~~] *VI.*  The commissioner of the department of health and human services or a member of

2    the senior management team, or designee.

3    [~~VIII.~~] *VII.*  The commissioner or assistant commissioner, department of education, or

4    designee.

5    [~~IX.~~] *VIII.*  The commissioner or assistant commissioner, department of transportation, or

6    designee.

7    [~~X.~~] *IX.*  The commissioner or appropriate division director, department of natural and

8    cultural resources, or designee.

9    [~~XI.~~] *X.*  The commissioner or appropriate division director, department of administrative

10   services, or designee.

11   [~~XII.~~] *XI.*  The executive director or chairman of the New Hampshire housing finance

12   authority, or designee.

13   200  Name Change; Department of Energy.  Amend the following RSAs by replacing "office of

14   strategic initiatives" with "department of energy":  RSA 9-E:5; 12-K:2; 12-K:3; 12-K:6; 12-K:8; 12-

15   K:9; 38-D:6; 147-B:4; 162-H:10; 167:4-c; 369-B:2; 374:22-j.

16   201  Reference Changed: State Energy Strategy; Offshore Wind Commission.  Amend RSA 374-

17   F:10, I to read as follows:

18   I.  There is established a commission to investigate, in parallel with the work of the Gulf of

19   Maine Intergovernmental Renewable Energy Task Force established by the Bureau of Ocean Energy

20   Management (BOEM) study, the economic development opportunities for New Hampshire in supply

21   chain needs, port capabilities, workforce development, energy procurement, transmission and

22   storage, and fisheries and marine environment, to ensure the success of offshore wind in the Gulf of

23   Maine.  The commission may consider, at an appropriate time, in relation to the New Hampshire

24   state energy strategy, outlined in RSA [~~4-E~~] *12-P*, if contracts with developers and utilities can

25   deliver lower costs to ratepayers.  The commission may coordinate with the advisory boards

26   established in Executive Order 2019-06 as to assist the commission in reaching its

27   recommendations.

28   202  Reference Changed; State Energy Policy; Least Cost Energy Planning.  Amend RSA 378:38,

29   VII to read as follows:

30   VII.  An assessment of plan integration and consistency with the state energy strategy under

31   RSA [~~4-E:1~~] *12-P*.

32   203  Reference Changed; Motor Vehicle Waste Fee.  Amend the introductory paragraph of RSA

33   261:153, V to read as follows:

34   V.  Beginning July 1, 1989, in addition to each registration fee collected under paragraph I,

35   there may be collected an additional fee for the purposes of a town reclamation trust fund as

36   established in RSA 149-M:18.  Of this amount, $.50 shall be retained by the city official designated

37   by the city government or by the town clerk for administrative costs and the remaining amount shall

1   be deposited into the reclamation trust fund established by the town for the purpose of paying
2   collection and disposal fees for the town's motor vehicle waste and paying for the recycling and
3   reclamation of other types of solid waste.  For the purposes of this paragraph, "motor vehicle waste"
4   means "motor vehicle waste" as defined in RSA 149-M:18.  A town which collects such additional fees
5   shall not charge a disposal fee for motor vehicle waste at the town's solid waste disposal facility.  If a
6   town finds the additional fee is not sufficient to cover fees for collection and disposal of town motor
7   vehicle waste, it shall notify the office of [strategic initiatives] *planning and development*.  The
8   office shall study the fee in accordance with RSA [4-C:1] *12-O:53* and make recommendations, if
9   necessary, for increases in the fee.  The additional fee schedule shall be graduated by class of vehicle
10  as follows:

11      204  Public Utilities Commission; Prohibition on Future Employment.  Amend RSA 363:12-b to
12  read as follows:

13      363:12-b  Prohibition on Future Employment.  No commissioner, *or former* executive director,
14  finance director, *or* general counsel[, or chief engineer] of the commission shall accept any
15  employment with any utility under the control of the commission until one year after he or she shall
16  become separated from the commission.

17      205  Repeal.  RSA 363:4-a, relative to duties of commissioners of the public utilities commission,
18  is repealed.

19      206  Public Utilities Commission; Prohibition on Future Employment.  Amend RSA 363:12-b to
20  read as follows:

21      363:12-b  Prohibition on Future Employment.  No commissioner, *or former* executive director,
22  finance director, *or* general counsel[, or chief engineer] of the commission shall accept any
23  employment with any utility under the control of the commission until one year after he or she shall
24  become separated from the commission.

25      207  Public Utilities Commission; Quorum.  Amend RSA 363:16 to read as follows:

26      363:16  Quorum.  A majority of the commission shall constitute a quorum to issue orders [or
27  adopt rules], and any hearing [or investigation] may be held or conducted by 2 commissioners or by a
28  single commissioner.

29      208  Public Utilities Commission; Request for Full Commission.  Amend RSA 363:17 to read as
30  follows:

31      363:17  Request for Full Commission.  No hearing [or investigation], except in accident cases,
32  shall be held or conducted by a single commissioner if any party whose interests may be affected
33  shall, 5 days before the date of hearing, file a request in writing that the same be held or conducted
34  by the full commission, or a majority thereof.  If no such request is filed, the commission may assign
35  one of its members or appoint a qualified member of its staff as examiner to hear the parties, report
36  the facts, and make recommendations to the commission.

37      209  Repeal.  The following are repealed:

Amendment to HB 2-FN-A-LOCAL
- Page 91 -

1  I.  RSA 363:18-a, relative to the authority of the public utilities commission to contract for

2 power.

3  II.  RSA 363:22-a, relative to pipeline operation safety.

4  210  Public Utilities Commission; Staff.  Amend RSA 363:27 to read as follows:

5  363:27  Staff[; Separation of Functions].

6  I.  In the exercise of the jurisdiction and performance of the duties prescribed by law, the

7 commission shall have the power, subject to the state personnel regulations and within the limits of

8 the appropriation for such purpose, to employ and fix the compensation of such regular staff,

9 including experts, as it shall deem necessary.  Notwithstanding any other provision of law, if the

10 expenditure of additional funds over budget estimates is necessary for the proper functioning of the

11 public utilities commission, the governor and council, with the prior approval of the fiscal committee

12 of the general court, upon request from the commission, may authorize an additional assessment

13 pursuant to RSA 363-A for such purpose.

14  II.  The staff of the commission shall be organized as the [commission] *chairperson*

15 determines best achieves its statutory responsibilities.

16  III.  [Executive Director and General Counsel.  The commission shall appoint an executive

17 director, who shall serve for a term of 4 years.  The commission shall also appoint a general counsel,

18 who shall serve for a term of 4 years and until a successor is appointed and qualified.]  *"Staff"*

19 *means the employees of the commission and any consultants and other contractors*

20 *retained by the commission for the purpose of assisting the commission and its employees*

21 *in providing advice or information, or for the purpose of supplementing the work of the*

22 *commission and its employees.*

23  [IV.  Director of Safety and Security.  The commission shall appoint a director of safety and

24 security, who shall serve a term of 4 years.  The director of safety and security shall be qualified to

25 hold that position by reason of education and experience and shall perform such duties as are

26 assigned by the chairman of the commission.]

27  211  Office of the Consumer Advocate; Attachment to Department of Energy.  Amend the

28 introductory paragraph of RSA 363:28, I to read as follows:

29  I.  The office of the consumer advocate shall be an independent agency administratively

30 attached to the [public utilities commission] *department of energy* pursuant to RSA 21-G:10.  The

31 office shall consist of the following:

32  212  Office of the Consumer Advocate; Attachment to Department of Energy.  Amend RSA

33 363:28, III to read as follows:

34  III.  The consumer advocate shall have authority to contract for outside consultants within

35 the limits of funds available to the office.  With the approval of the fiscal committee of the general

36 court and the governor and council, the office of the consumer advocate may employ experts to assist

37 it in proceedings before the public utilities commission, and may pay them reasonable compensation.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 92 -**

1   The [public utilities commission] *department of energy* shall charge a special assessment for any

2   such amounts against any utility participating in such proceedings and shall provide for the timely

3   recovery of such amounts for the affected utility.

4   213  Repeal.  RSA 363:30 through RSA 363:36, relative to participation of staff of the public

5   utilities commission in adjudicative proceedings, are repealed.

6   214  Public Utilities Commission; Complaints.  Amend RSA 363:39 to read as follows:

7   363:39  Complaints [to the Commission].  When complaints to the [public utilities commission]

8   *department of energy* are initiated by residential customers, the [commission] *department* shall

9   provide to the consumer advocate access to the complaint, by paper or electronically, with the

10  customer name blocked out, at the same time as the [commission] *department* forwards the

11  complaint to the utility in compliance with [commission] *department* rules.

12  215  Electric Vehicle Charging Stations Infrastructure Commission; Membership.  Amend RSA

13  4-G:1, II(a)(1) to read as follows:

14          (1)  [Office of strategic initiatives] *Department of energy*.

15  216  Electric Vehicle Charging Stations Infrastructure Commission; Duties.  Amend RSA 4-G:1,

16  III(f) to read as follows:

17          (f)   Changes needed to state laws, rules, and practices, including building codes*,*

18  *department of energy rules,* and public utilities commission rules, to further the development of

19  zero emission vehicle technology and infrastructure.

20  217  Maintenance of Funds Collected Pursuant to Electric Utility Restructuring Orders.  Amend

21  RSA 6:12-b to read as follows:

22  6:12-b  Maintenance of Funds Collected Pursuant to Electric Utility Restructuring Orders.  On

23  request of the [public utilities commission] *department of energy*, the state treasurer shall

24  maintain custody over funds collected by order of the public utilities commission consisting of only

25  that portion of the system benefits charge directly attributable to programs for low income customers

26  as described in RSA 374-F:4, VIII(c).  All funds received by the state treasurer pursuant to this

27  section shall be kept separate from any other funds and shall be administered in accordance with

28  terms and conditions established by the [public utilities commission] *department of energy*.  Plans

29  for the administration of such funds shall be approved by the fiscal committee of the general court

30  and the governor and council prior to submission to the [public utilities commission] *department of*

31  *energy*.  Appropriations and expenditures of such funds in fiscal years 2002 and 2003 shall be

32  approved by the fiscal committee of the general court and the governor and council prior to

33  submission to the [public utilities commission] *department of energy*.  For each biennium

34  thereafter, appropriations and expenditures of such funds shall be made through the biennial

35  operating budget.

36  218  Energy Efficiency and Clean Energy Districts.  Amend RSA 53-F:6, I to read as follows:

1    I.  Improvements financed pursuant to an agreement under this chapter shall be based upon
2    an audit performed by a person who has been certified as a building analyst by the Building
3    Performance Institute or who has obtained other appropriate certification as determined by the
4    [public utilities commission] *department of energy* or another appropriate New Hampshire-based
5    entity.  The audit shall identify recommended energy conservation and efficiency and clean energy
6    improvements; provide the estimated energy cost savings, useful life, benefit-cost ratio, and simple
7    payback or return on investment for each improvement; and provide the estimated overall difference
8    in annual energy costs with and without recommended improvements.  Financed improvements
9    shall be consistent with the audit recommendations.  The cost of the audit may be included in the
10   total amount financed under this chapter.

11   219  Enhanced 911 Commission; Membership.  Amend the introductory paragraph of RSA 106-
12   H:3, I(a) to read as follows:

13       (a)  There is hereby established an enhanced 911 commission consisting of 19 members,
14   including the director of the division of fire standards and training and emergency medical services
15   or designee, the [chairman of the public utilities commission] *commissioner of the department of*
16   *energy* or designee, the commissioner of the department of safety or designee, a public member, a
17   police officer experienced in responding to emergency calls, a representative of the disabled
18   community, and one active member recommended by each of the following organizations, nominated
19   by the governor with the approval of the council:

20   220  Energy Efficiency and Sustainable Energy Board; Membership.  Amend RSA 125-O:5-a,
21   II(b) to read as follows:

22       II.  The members of the board shall be as follows:

23           (a)  The chairman of the public utilities commission, or designee.

24           (b)  The [director of the office of strategic initiatives] *commissioner of the department*
25   *of energy*, or designee.

26           (c)  The consumer advocate, or designee.

27           (d)  The commissioner of the department of environmental services, or designee.

28           (e)  The commissioner of the department of business and economic affairs, or designee.

29           (f)   The president of the Business and Industry Association of New Hampshire, or
30   designee.

31           (g)  The executive director of the New Hampshire Municipal Association, or designee.

32           (h)  The executive director of New Hampshire Legal Assistance, or designee.

33           (i)   The president of the Homebuilders ampersand Remodelers Association of New
34   Hampshire, or designee.

35           (j)   Two members of the house science, technology and energy committee appointed by
36   the speaker of the house of representatives.

1    (k)   One member of the senate energy, environment and economic development
2    committee, appointed by the president of the senate.

3    (l)  Three representatives from not-for-profit groups representing energy, environmental,
4    consumer, or public health issues and knowledgeable in energy conservation policies and programs,
5    appointed by the [chairman of the public utilities commission] *commissioner of the department of*
6    *energy*.

7    (m)  The commissioner of the department of administrative services, or designee.

8    (n)  The state fire marshal, or designee.

9    (o)  The executive director of the New Hampshire housing finance authority, or designee.

10    III.  The board shall include, as nonvoting participants, the following:

11    (a)   One representative from each utility-administered electric and natural gas energy
12    efficiency program appointed by the [chairman of the public utilities commission] *commissioner of*
13    *the department of energy*.

14    (b)  A representative of energy services companies delivering energy efficiency services to
15    residential and business customers, appointed by the [chairman of the public utilities commission]
16    *commissioner of the department of energy*.

17    (c)   A representative of a business or association of businesses selling or installing
18    sustainable or renewable energy systems, appointed by the [chairman of the public utilities
19    commission] *commissioner of the department of energy*.

20    (d)   A representative from the investment community with expertise in efficiency
21    investments and financing, appointed by the [chairman of the public utilities commission]
22    *commissioner of the department of energy*.

23    IV.  The chairman of the public utilities commission shall call the first meeting of the board.
24    The board shall elect a chairperson from among its members.  Seven members of the board shall
25    constitute a quorum.  The board shall make an annual report on December 1 to the governor, the
26    speaker of the house of representatives, the president of the senate, the house science, technology
27    and energy committee, the senate energy, environment and economic development committee, *the*
28    *department of energy,* and the public utilities commission, to provide an update on its activities
29    and recommendations for action including possible legislation.

30    V.   The board shall be administratively attached to the [public utilities commission]
31    *department of energy* under RSA 21-G:10.

32    221  State Building Code Review Board; Membership.  Amend RSA 155-A:10, I(k) to read as
33    follows:

34    (k)   One representative from the New Hampshire [public utilities commission]
35    *department of energy*, nominated by the [chairman of the commission] *commissioner of the*
36    *department of energy*.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 95 -**

1    222  Nuclear Decommissioning Financing Committee; Membership.  Amend RSA 162-F:15, II to

2    read as follows:

3         II.  Each committee shall consist of one person who is a resident of the town or city in which

4    the facility is located and who shall be appointed by the selectmen of the town or the mayor and

5    council of the city, the chairman of the public utilities commission, ***the commissioner of the***

6    ***department of energy,*** one senator, to be appointed by the senate president, one house member, to

7    be appointed by the speaker of the house of representatives, the state treasurer or designee, the

8    commissioner of the department of health and human services or designee, ***and*** the commissioner of

9    the department of safety or designee[~~, and the director of the governor's office of energy and~~

10   ~~community services or designee~~].

11   223  Conduct of Studies Concerning Changes in Laws and Regulations with a View to Atomic

12   Development.  Amend RSA 162-B:3, IV to read as follows:

13        IV.  The public utilities commission ***and the department of energy***, particularly as to the

14   transportation of special nuclear materials and by-product materials by common carriers or public or

15   private air carriers not in interstate commerce and as to the participation by public utilities subject

16   to [~~its~~] ***their*** jurisdiction in projects looking to the development of production or utilization facilities

17   for industrial or commercial use.

18   224  New Hampshire Building Code; Energy Code Compliance Form.  Amend RSA 155-A:10-a to

19   read as follows:

20   155-A:10-a  Energy Code Compliance Form.  The state building code review board shall prescribe

21   by rule and make available to the public, in electronic formats, a simplified residential energy code

22   compliance form based upon the energy provisions in the International Residential Code and the

23   International Energy Conservation Code identified in RSA 155-A:1.  The correctly completed form

24   shall be accepted by all code enforcement authorities within the state of New Hampshire as one

25   method of verification that the applicable project meets the code requirements.   Completed

26   compliance forms shall be submitted to the building official in those municipalities that have

27   adopted an enforcement mechanism under RSA 674:51. For municipalities without an adopted code

28   enforcement mechanism, completed compliance forms shall be submitted to the New Hampshire

29   [~~public utilities commission~~] ***department of energy***, on behalf of the building code review board, for

30   verification that the applicable project meets the code requirements.   The [~~public utilities~~

31   ~~commission~~] ***department of energy*** shall then forward the reviewed compliance forms to the

32   municipality for retention in property records.

33   225  Organization of Nuclear Decommissioning Financing Committees.  Amend RSA 162-F:17, I

34   to read as follows:

35        I.  The temporary chairman of each committee formed, who shall be the [~~chairman of the~~

36   ~~public utilities commission~~] ***commissioner of the department of energy***, shall call an

37   organizational meeting within 90 days of formation.  At the organizational meeting, the committee

**Amendment to HB 2-FN-A-LOCAL**
**- Page 96 -**

1     shall select a chairman to serve for a 3-year term, elect such other officers as the members shall

2     determine, and establish a schedule of meetings for determining the requirements of the

3     decommissioning fund.

4        226   Decommissioning of Nuclear Electric Generating Facilities; Report; Public Hearing.  Amend

5     RSA 162-F:21, III-IV to read as follows:

6        III.   Each committee shall rely on all available data and experience in determining the

7     amount of such fund including, but not limited to, information from the Nuclear Regulatory

8     Commission; the public utilities commission; ***the department of energy,*** the owner or owners of the

9     facility; municipal and regional planning commissions and municipal governing bodies; and relevant

10    construction cost indices.  The committee shall publish a transcript of all proceedings during which

11    information was presented or offered into testimony, and a detailed analysis of the facts and figures

12    used in determining the amount of the fund.

13        IV.   Following the committee's deliberation and prior to final hearing, the plan for scheduled

14    payments into the fund and relevant evidence, including the transcripts and analysis published

15    pursuant to RSA 162-F:21, III, shall be available for public review in the clerk's office of the city or

16    town where the facility is located and in the office of the [public utilities commission] ***department of***

17    ***energy*** at least 30 days prior to the one or more public hearings on the committee's proposed plan.

18    At least one hearing shall be held in the city or town where the facility is located.  A notice of the

19    time and place of each hearing shall be posted in 2 appropriate public places in the city or town

20    where the facility is located and shall be printed at least twice in a newspaper of general circulation

21    for that city or town and in a newspaper of state-wide circulation 2 weeks prior to each hearing.

22    Testimony presented at the hearings held pursuant to this paragraph shall be taken into

23    consideration by the committee when it formalizes the payment schedule plan.  All testimony shall

24    be transcribed and made a permanent record.

25        227   Site Evaluation Committee; Membership; Administrative Attachment.  Amend RSA 162-

26    H:3, IV to read as follows:

27        IV.   The committee shall be administratively attached to the [public utilities commission]

28    ***department of energy*** pursuant to RSA 21-G:10.

29        228   Committee Established.  There is established a committee to study necessary revisions to

30    the site evaluation committee.

31        I. The members of the committee shall be as follows:

32        (a)  Two members of the senate, appointed by the president of the senate.

33        (b)   Three members of the house of representatives, at least one of whom shall be a

34    member of the science, technology, and energy committee, one of whom shall be a member of the

35    finance committee, and at least one of whom shall be a member of the minority party, appointed by

36    the speaker of the house of representatives.

Amendment to HB 2-FN-A-LOCAL
- Page 97 -

1  II. Members of the committee shall receive mileage at the legislative rate when attending to
2  the duties of the committee.

3  III. The committee shall:

4  (a) Evaluate the current structure, processes, authorities, funding, and functions of the
5  site evaluation committee and whether the statutory purpose and original legislative intent of the
6  site evaluation committee is being achieved.

7  (b) Review the structure, processes, authorities, funding, and functions of public bodies
8  with jurisdiction over siting large energy facilities that have been established by other states.

9  (c) Consider the site evaluation committee's relationship to the department of energy
10 and other state agencies.

11 (d) Review the timeliness of site evaluation committee decisions, the on-going
12 enforcement of certificates issued by the site evaluation committee, public input to the orderly siting
13 of energy infrastructure, and any changes required to minimize delays siting energy infrastructure.

14 (e) Make recommendations for legislation to restructure the site evaluation committee
15 no later than October 1, 2021.

16 IV. The members of the study committee shall elect a chairperson from among the members.
17 The first meeting of the committee shall be called by the first-named senate member. The first
18 meeting of the committee shall be held within 45 days of the effective date of this section. Three
19 members of the committee shall constitute a quorum.

20 V. The committee shall report its findings and any recommendations for proposed legislation
21 to the president of the senate, the speaker of the house of representatives, the senate clerk, the
22 house clerk, the governor, and the state library on or before October 1, 2021.

23 229 Minimum Energy Efficiency Standards for Certain Products; Definitions. Amend RSA 339-
24 G:1, II to read as follows:

25 II. [~~"Commission" means the public utilities commission.~~] *"Department" means the*
26 *department of energy.*

27 230 Reference Change; Minimum Energy Efficiency Standards for Certain Products;
28 Department. Amend the following RSA provisions by replacing the term "commission" with
29 "department": 339-G:3, III(b), 339-G:4, II, 339-G:5, 339-G:6, 339-G:7, 339-G:8, 339-G:9.

30 231 Gas Companies; When Public Utilities. Amend RSA 362:4-b, III to read as follows:

31 III. Nothing in this section prevents the [~~commission~~] *department of energy* from
32 monitoring or enforcing the provisions of federal pipeline safety standards relative to liquefied
33 petroleum gas systems pursuant to the Natural Gas Pipeline Safety Act.

34 232 New Paragraph; Limited Electrical Energy Producers Act; Definitions. Amend RSA 362-
35 A:1-a by inserting after paragraph II-d the following new paragraph:

36 II-e. "Department" means the New Hampshire department of energy.

1   233  Reference Change; Net Energy Metering; Department of Energy.  Amend the following RSA

2   provisions by replacing the term "commission" with "department": 362-A:9, X-XII.

3   234  Net Energy Metering.  Amend RSA 362-A:9, XIV to read as follows:

4          XIV.(a)  A customer-generator may elect to become a group host for the purpose of reducing

5   or otherwise controlling the energy costs of a group of customers who are not customer-generators.

6   The group of customers shall be located within the service territory of the same electric distribution

7   utility as the host.  The host shall provide a list of the group members to the commission and the

8   electric distribution utility and shall certify that all members of the group have executed an

9   agreement with the host regarding the utilization of kilowatt hours produced by the eligible facility

10  and that the total historic annual load of the group members together with the host exceeds the

11  projected annual output of the host's facility.  The [commission] *department* shall verify that these

12  group requirements have been met and shall register the group host.  The [commission] *department*

13  shall establish the process for registering hosts, including periodic re-registration, and the process by

14  which changes in membership are allowed and administered.  Net metering tariffs under this section

15  shall not be made available to a customer-generator group host until such host is registered by the

16  [commission] *department*.

17         (b)  Except as provided in subparagraph (c), the provisions of this section shall apply to a

18  group host as a customer-generator.

19         (c)  Notwithstanding paragraph V, a group host shall be paid for its surplus generation at

20  the end of each billing cycle at rates consistent with the credit the group host receives relative to its

21  own net metering under either subparagraph IV(a) or (b) or alternative tariffs that may be

22  applicable pursuant to paragraph XVI.  Alternatively, a group host may elect to receive credits on

23  the customer electric bill for each member and the host, with the utility being allowed the most cost-

24  effective method of doing so according to an amount or percentage specified for each member on PUC

25  form 909.09 (Application to Register or Re-register as a Host), along with a 3 cent per kwh addition

26  from July 1, 2019 through July 1, 2021 and a 2.5 cent per kwh addition thereafter for low-moderate

27  income community solar projects, as defined in RSA 362-F:2, X-a.  On or before July 1, 2022, the

28  [commission] *department* shall report on the costs and benefits of such an addition and the

29  development of the market for low-moderate income community solar projects, and provide a

30  recommendation on whether the addition shall be increased or decreased.  The [commission]

31  *department* shall report on the costs and benefits of low-moderate income community solar projects,

32  as defined in RSA 362-F:2, X-a on or before June 1, 2020.  The [commission] *department* shall

33  authorize at least 2 new low-moderate income community solar projects, as defined in RSA 362-F:2,

34  X-a, each year in each utility's service territory beginning January 1, 2020.  On an annual basis, for

35  all group host systems except for residential systems with an interconnected capacity under 15

36  kilowatts, the electric distribution utility shall calculate a payment adjustment if the host's surplus

37  generation for which it was paid is greater than the group's total electricity usage during the same

**Amendment to HB 2-FN-A-LOCAL**
**- Page 99 -**

1   time period.   The adjustment shall be such that the resulting compensation to the host for the
2   amount that exceeded the group's total usage shall be at the utility's avoided cost or its default
3   service rate in accordance with subparagraph V(b) or paragraph VI or alternative tariffs that may be
4   applicable pursuant to paragraph XVI.  The utility shall pay or bill the host accordingly.

5        (d)  [Repealed.]

6        (e)  The ***department is authorized to petition the*** commission [is authorized] to assess
7   fines against, revoke the registration of, and prohibit from doing business in the state, any group
8   host which violates the requirements of this paragraph and rules adopted pursuant to this
9   paragraph.  ***The commission is authorized to grant or deny such petitions.***

10   235  Repeal.  RSA 362-F:2, IV, relative to the definition of "commission" as it pertains to electric
11   renewable portfolio standards, is repealed.

12   236  Electric Renewable Energy Classes; Reference Changed.  Amend RSA 362-F:4, I(i)-(k) to
13   read as follows:

14        (i)  The incremental new production of electricity in any year from an eligible biomass or
15   methane source or any hydroelectric generating facility licensed or exempted by Federal Energy
16   Regulatory Commission (FERC), regardless of gross nameplate capacity, over its historical
17   generation baseline, provided the [commission] ***department of energy*** certifies demonstrable
18   completion of capital investments attributable to the efficiency improvements, additions of capacity,
19   or increased renewable energy output that are sufficient to, were intended to, and can be
20   demonstrated to increase annual renewable electricity output.  The determination of incremental
21   production shall not be based on any operational changes at such facility but rather on capital
22   investments in efficiency improvements or additions of capacity.

23        (j)  The production of electricity from a class III or IV source that has begun operation as
24   a new facility by demonstrating that 80 percent of its resulting tax basis of the source's plant and
25   equipment, but not its property and intangible assets, is derived from capital investment directly
26   related to restoring generation or increasing capacity including department permitting requirements
27   for new plants.  Such production shall not qualify for class III or IV certificates.  Commencing July 1,
28   2013, a class III source eligible as a class I source under this subparagraph or subparagraph (i) may
29   submit a notice to the [commission] ***department of energy*** electing to be a class III source instead
30   of a class I source.  Once such notice is given, the production from such a source shall qualify for
31   class III certificates, provided the source meets the other requirements of a class III eligible biomass
32   technology.

33        (k)  The production of electricity from any fossil-fueled generating facility that originally
34   commenced operation prior to January 1, 2006, if after January 1, 2012 such facility co-fires with
35   class I eligible biomass fuels to displace the combustion of an amount of fossil fuels.  The portion of
36   the total electrical energy output that qualifies as class I from a facility in a given time period shall
37   be the fraction of electrical production derived from the combustion of biomass fuels based on the

1    heat input at the facility in that time period as determined by the [commission] *department of*
2    *energy* in consultation with the department.   To qualify under this paragraph, the electricity
3    generation facility that co-fires with biomass fuels shall:

4               (1)   Either have a quarterly average nitrogen oxide (NOx) emission rate, as measured
5    and verified under RSA 362-F:12, of less than or equal to 0.075 pounds/million British thermal units
6    (lbs/Mmbtu) or be a participant in a plan approved by the department for reductions in NOx from
7    other emission sources.   The quantity of reductions required shall be the fraction of electrical
8    production derived from the combustion of biomass fuels, as determined under this paragraph,
9    multiplied by the difference between the generation unit's NOx emissions rate and the 0.075
10    lbs/Mmbtu rate.   The plan shall contain reductions, in the aggregate or individually, in NOx
11    emissions from other emission sources under the jurisdiction of the department and demonstrate
12    that the reductions will be quantifiable.   The department shall expeditiously review the plan and, if
13    approved, provide such information as it deems relevant to the [commission] *department of energy*.
14    The application submitted to the [commission] *department of energy* under RSA 362-F:11 shall
15    inform the [commission] *department of energy* of the plan and the [commission] *department of*
16    *energy* shall certify the source in accordance with the plan approved by the department; and

17               (2)   Either have an average particulate emission rate, as measured and verified
18    under RSA 362-F:12, of less than or equal to 0.02 lbs/Mmbtu or be a participant in a plan approved
19    by the department for reductions in particulate matter emissions from emission sources owned by or
20    affiliated with the co-firing entity.   The quantity of reductions required shall be the fraction of
21    electrical production derived from the combustion of biomass fuels, as determined under this
22    paragraph, multiplied by the difference between the generation unit's particulate matter emissions
23    rate and the 0.02 lbs/Mmbtu rate.   The plan shall contain reductions, in the aggregate or
24    individually, in particulate matter emissions from other emission sources under the jurisdiction of
25    the department and demonstrate that the reductions will be quantifiable.   The department shall
26    expeditiously review the plan and, if approved, provide such information as it deems relevant to the
27    [commission] *department of energy*.   The application submitted to the [commission] *department*
28    *of energy* under RSA 362-F:11 shall inform the [commission] *department of energy* of the plan and
29    the [commission] *department of energy* shall certify the source in accordance with the plan
30    approved by the department.

31    237  Electric Renewable Energy Classes; Reference Change.  Amend RSA 362-F:4, IV-VI to read
32    as follows:

33            IV.(a)  Class IV (Existing Small Hydroelectric) shall include the production of electricity from
34    hydroelectric energy, provided the facility:

35            (1)  Began operation prior to January 1, 2006;

36            (2)   When required, has documented applicable state water quality certification
37    pursuant to section 401 of the Clean Water Act for hydroelectric projects; and

1       (3)  Either:

2       (A)  Has a total nameplate capacity of 5 MWs or less as measured by the sum of

3  the nameplate capacities of all the generators at the facility and has actually installed both

4  upstream and downstream diadromous fish passages and such installations have been approved by

5  the Federal Energy Regulatory Commission, or;

6       (B)  Has a total nameplate capacity of one MW or less as measured by the sum of

7  the nameplate capacities of all generators at the facility, is in compliance with applicable Federal

8  Energy Regulatory Commission fish passage restoration requirements, and is interconnected with

9  an electric distribution system located in New Hampshire.

10      (b)(1)  Notwithstanding subparagraph (a), the [commission] *department of energy* shall

11  re-certify as class IV renewable energy sources the facilities named in *public utilities* commission

12  order numbers 24,940 and 24,952.  These facilities are:

13       (A)  The Canaan, Gorham, Hooksett, and Jackman hydroelectric facilities [owned

14  by Public Service Company of New Hampshire], which had been previously certified by the *public*

15  *utilities* commission on September 23, 2008; and

16       (B)  The North Gorham and Bar Mills projects owned by FPL Energy Maine

17  Hydro, LLC which had been previously certified by the *public utilities* commission on October 30,

18  2008.

19       (2)  These facilities shall not qualify or be certified as class IV renewable energy

20  sources after March 23, 2009, unless they meet the requirements of subparagraph (a).  Such

21  facilities shall be eligible for class IV renewable energy certificates for all electricity generated

22  between the effective date of each facility's original certification by the *public utilities* commission

23  through March 23, 2009.  Such certificates shall have the same validity as any other class IV

24  certificate issued under RSA 362-F, and may be sold, exchanged, banked, and utilized accordingly.

25      V.  For good cause, and after notice and hearing, the commission may accelerate or delay by

26  up to one year, any given year's incremental increase in class I or II renewable portfolio standards

27  requirement under RSA 362-F:3.

28      VI.  After notice and hearing, the [commission] *department of energy* may modify the class

29  III and IV renewable portfolio standards requirements under RSA 362-F:3 for calendar years

30  beginning January 1, 2012 such that the requirements are equal to an amount between 85 percent

31  and 95 percent of the reasonably expected potential annual output of available eligible sources after

32  taking into account demand from similar programs in other states.

33      238  Renewable Energy Certificates.  Amend RSA 362-F:6, V to read as follows:

34      V.  A qualified producer of useful thermal energy shall provide for the metering of useful

35  thermal energy produced in order to calculate the quantity of megawatt-hours for which renewable

36  energy certificates are qualified, and to report to the [public utilities commission] *department of*

37  *energy* under rules adopted pursuant to RSA 362-F:13.  Monitoring, reporting, and calculating the

1    useful thermal energy produced in each quarter shall be expressed in megawatt-hours, where each

2    3,412,000 BTUs of useful thermal energy is equivalent to one megawatt-hour.

3    239  Electric Renewable Portfolio Standard; Information Collection; Reference Change.  Amend

4    RSA 362-F:8 to read as follows:

5    362-F:8  Information Collection.

6            I.  By July 1 of each year, each provider of electricity shall submit a report to the

7    [commission] *department of energy*, in a form approved by the [commission] *department of*

8    *energy*, documenting its compliance with the requirements of this chapter for the prior year.  The

9    [commission] *department of energy* may investigate compliance and collect any information

10    necessary to verify and audit the information provided to the [commission] *department of energy*

11    by providers of electricity.

12            II.  The [commission] *department of energy* shall adopt rules governing the reporting

13    requirements under paragraph I that are designed to minimize the administrative costs and burden

14    on electricity providers.

15            III.  Beginning October 1, 2019 and by October 1 of each subsequent year, the [commission]

16    *department of energy* shall disclose the information collected under paragraph I as public

17    information in the [commission's] *department of energy* annual report pursuant to RSA 362-F:10,

18    IV.  No information shall be disclosed to the public that is confidential as defined by [public utilities

19    commission] *department of energy* or NEPOOL Generation Information System rules.

20            IV.  The [commission] *department of energy* shall provide as part of the annual renewable

21    energy fund report, pursuant to RSA 362-F:10, IV, renewable portfolio standard compliance costs

22    and average electric rate impact; renewable energy certificate versus alternative compliance

23    payments comparison; and alternative compliance payments by class and provider of electricity.  The

24    report shall also include the number of renewable energy certificates that were purchased during the

25    prior compliance year by class.

26            V.  The [commission] *department of energy* shall complete the rulemaking process and

27    submit requests to the administrator of the NEPOOL Generation Information System that are

28    necessary to implement this section no later than April 1, 2019.

29    240  Electric Renewable Portfolio Standard; Renewable Energy Fund.  Amend RSA 362-F:10 to

30    read as follows:

31    362-F:10  Renewable Energy Fund.

32            I.  There is hereby established a renewable energy fund.  This *nonlapsing* special fund shall

33    be [nonlapsing] *continually appropriated to the commission to be expended in accordance*

34    *with this section*.  The state treasurer shall invest the moneys deposited therein as provided by

35    law.  Income received on investments made by the state treasurer shall also be credited to the fund.

36    All payments to be made under this section shall be deposited in the fund.  Any remaining moneys

37    paid into the fund under paragraph II of this section, excluding class II moneys, shall be used by the

1   [commission] *department of energy* to support thermal and electrical renewable energy initiatives.

2   Class II moneys shall primarily be used to support solar energy technologies in New Hampshire.  All

3   initiatives supported out of these funds shall be subject to audit by the [commission] *department of*

4   *energy* as deemed necessary.   All fund moneys including those from class II may be used to

5   administer this chapter, but all new employee positions shall be approved by the fiscal committee of

6   the general court.  No new employees shall be hired by the [commission] *department of energy* due

7   to the inclusion of useful thermal energy in class I production.

8        II.  In lieu of meeting the portfolio requirements of RSA 362-F:3 for a given year if, and to the

9   extent sufficient certificates are not otherwise available at a price below the amounts specified in

10   this paragraph, an electricity provider may, at the time of report submission for that year under RSA

11   362-F:8, make payment to the [commission] *department of energy* at the following rates for each

12   megawatt-hour not met for a given class obligation through the acquisition of certificates:

13        (a)  Class I-$55, except for that portion of the class electric renewable portfolio standards

14   to be met by qualifying renewable energy technologies producing useful thermal energy under RSA

15   362-F:3 which shall be $25 beginning January 1, 2013.

16        (b)  Class II-$55.

17        (c)  Class III-$31.50.

18        (d)  Class IV-$26.50.

19        III.(a)  Beginning in 2013, the [commission] *department of energy* shall adjust these rates

20   by January 31 of each year using the Consumer Price Index as published by the Bureau of Labor

21   Statistics of the United States Department of Labor for classes III and IV and 1/2 of such Index for

22   classes I and II.

23        (b)  In lieu of the adjustments under subparagraph (a) for class III in 2015 and 2016, the

24   class rate in each of those years shall be $45.  In lieu of the adjustments under subparagraph (a) for

25   class III in 2017, 2018, and 2019, the class rate in each of those years shall be $55.

26        (c)  By January 31, 2020 the [commission] *department of energy* shall compute the

27   2020 class III rate to equal the rate that would have resulted in 2020 by the application of

28   subparagraph (a) to the 2013 rate and each subsequent year's rate to 2020.

29        (d)  In 2021 and thereafter, the class III rate shall be determined by application of

30   subparagraph (a) to the prior year's rate.

31        IV.  The [commission] *department of energy* shall make an annual report by October 1 of

32   each year, beginning in 2009, to the legislative oversight committee to monitor the transformation of

33   delivery of electric services established under RSA 374-F:5, the house science, technology and energy

34   committee, and the senate energy and natural resources committee detailing how the renewable

35   energy fund is being used and any recommended changes to such use.  The report shall also include

36   information on the total peak generating capacity that is net energy metered under RSA 362-A:9

37   within the franchise area of each electric distribution utility, and the percentage this represents of

Amendment to HB 2-FN-A-LOCAL
- Page 104 -

1    the amount that is allowed to be net metered within each franchise area. Information shall be

2    provided on net metered group host registrations and the associated customer groups, including

3    number and location of group host facilities, generation by renewable source and size of facility, and

4    group load served by such facilities.

5           V. The [public utilities commission] *department of energy* shall make and administer a

6    one-time incentive payment of $3 per watt of nominal generation capacity up to a maximum

7    payment of $6,000, or 50 percent of system costs, whichever is less, per facility to any residential

8    owner of a small renewable generation facility, that would qualify as a Class I or Class II source of

9    electricity, begins operation on or after July 1, 2008, and is located on or at the owner's residence.

10          VI. Such payments shall be allocated from the renewable energy fund established in

11    paragraph I, as determined by the [commission] *department of energy* to the extent funding is

12    available up to a maximum aggregate payment of 40 percent of the fund over each 2-year period

13    commencing July 1, 2010.

14          VII. The [commission] *department of energy* shall, after notice and hearing, by order or

15    rule establish an application process for the incentive payment program established under

16    paragraph V. The application process shall include verification of costs for parts and labor,

17    certification that the equipment used meets the applicable safety standards of the American

18    National Standards Institute (ANSI) or Underwriters Laboratory (UL) or similar safety rating

19    agency, and that the facility meets local zoning regulations, and receives any required inspections.

20          VIII. The [commission] *department of energy* may, after notice and hearing, by order or

21    rule, establish additional incentive or rebate programs and competitive grant opportunities for

22    renewable thermal and electric energy projects sited in New Hampshire.

23          IX. For good cause the [commission] *department of energy* may, after notice and hearing,

24    by order or rule, modify the program, including reducing the incentive level, created under RSA 362-

25    F:10, V.

26          X. Consistent with RSA 362-F:10, VI, the [commission] *department of energy* shall, over

27    each 2-year period commencing July 1, 2010, reasonably balance overall amounts expended,

28    allocated, or obligated from the fund, net of administrative expenditures, between residential and

29    nonresidential sectors. Funds from the renewable energy fund awarded to renewable projects in the

30    residential sector shall be in approximate proportion to the amount of electricity sold at retail to that

31    sector in New Hampshire, and the remaining funds from the renewable energy fund shall be

32    awarded to projects in the nonresidential sector which include commercial and industrial sited

33    renewable energy projects, existing generators, and developers of new commercial-scale renewable

34    generation in New Hampshire, provided no less than 15 percent of the funds shall annually benefit

35    low-moderate income residential customers, including, but not limited to, the financing or leveraging

36    of financing for low-moderate income community solar projects in manufactured housing

37    communities or in multi-family rental housing.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 105 -**

XI.  The [commission] *department of energy* shall issue requests for proposals that provide renewable projects in the nonresidential sector, which include commercial and industrial sited renewable energy projects, existing generators, and developers of new commercial-scale renewable generation in New Hampshire, with opportunities to receive funds from the renewable energy fund established under RSA 362-F:10.  The requests for proposals shall provide such opportunities to those renewable energy projects that are not eligible to participate in incentive and rebate programs developed by the [commission] *department of energy* under RSA 362-F:10, V and RSA 362-F:10, VIII.  The [commission] *department of energy* shall issue a request for proposals no later than March 1, 2011 and annually thereafter, and select winning projects in a timely manner.

241  References Change; Electric Renewable Portfolio Standards; Department of Energy.  Amend the following RSA provisions by replacing "commission" with "department of energy":  362-F:5, 362-F:6, I-IV, 362-F:9, 362-F:11, 362-F:12, 362-F:13, 362-F:14.

242  Expenses of the Public Utilities Commission Against Certain Utilities.  Amend RSA 363-A:1 to read as follows:

363-A:1  Ascertainment of Expenses.  The [public utilities commission] *department of energy* shall annually, after the close of the fiscal year, ascertain the total of its expenses *attributable to support of the public utilities commission and to performance of all duties and responsibilities transferred to the department from the public utilities commission, in addition to the total of the public utilities commission's expenses* during such year incurred in the performance of its duties relating to public utilities as defined in RSA 362 and other entities subject to its regulatory and enforcement authority and relating to the office of the consumer advocate.  In the determination of such expenses there shall be excluded the expenses which have been or may be charged and recovered under the provisions of RSA 365:37, RSA 365:38, and RSA 374-F:7, I.

243  Expenses of Public Utilities Commission Against Certain Utilities; Assessment.  Amend RSA 363-A:2, III-IV to read as follows:

III.  Each entity described in subparagraph I(e) shall be assessed the sum of $10,000 on an annual basis and shall pay such assessed sum to the [commission] *department of energy*.  Each electric load aggregator, and each aggregator of natural gas customers shall be assessed the sum of $2,000 on an annual basis and shall pay such assessed sum to the [commission] *department of energy*.  Each telecommunications carrier voluntarily registered with the commission shall be assessed the sum of $1,000 on an annual basis and shall pay such sum to the [commission] *department of energy*.

IV.  The expenses of the [commission] *department of energy and the public utilities commission, and the office of the consumer advocate*, less the total of the assessed sums paid [to the commission] pursuant to paragraph III, shall be allocated to each utility and other assessed entity in direct proportion as the revenue calculation for such utility or other assessed entity relates

**Amendment to HB 2-FN-A-LOCAL**
**- Page 106 -**

1    to the total of all such revenue calculations as a whole, except as otherwise provided in paragraph V.

2    Each such expense allocation shall be assessed against each public utility and other assessed entity

3    in an amount equal to its proportionate share as determined under this section, except that the

4    expense allocation attributed to each entity described in subparagraph I(e) shall be imputed to and

5    included in the expense allocation to each electric or natural gas distribution utility or rural electric

6    cooperative for which a certificate of deregulation is on file with the commission, in correspondence

7    to the revenue portion reported pursuant to paragraph II as having been received from the

8    distribution customers of such distribution utility or the members of such rural electric cooperative

9    for which a certificate of deregulation is on file with the commission.

10    244    Expenses of Public Utilities Commission Against Certain Utilities; Certification of

11    Assessment; Collection.  Amend RSA 363-A:3 and RSA 363-A:4 to read as follows:

12    363-A:3  Certification of Assessment.  It shall be the duty of the [public utilities commission]

13    ***department of energy*** to calculate the amount to be assessed against each such public utility and

14    each other entity subject to assessment in accordance with RSA 363-A:1 and RSA 363-A:2.  At the

15    beginning of each fiscal year, the [public utilities commission] ***department of energy*** shall estimate

16    [its] ***the*** total expenses for the fiscal year, and then, based on such estimate, shall calculate the

17    amount to be assessed quarterly on August 10, October 15, January 15, and April 15 of that fiscal

18    year, against each such public utility and other assessed entity in accordance with RSA 363-A:1 and

19    RSA 363-A:2.  The [public utilities commission] ***department of energy*** shall then make a list

20    showing the amount due on August 10, October 15, January 15, and April 15 of that fiscal year from

21    each of the several public utilities and other entities assessed under the provisions hereof, and,

22    together with a statement of the full name and mailing address of each such public utility and other

23    assessed entity, shall certify the same.  After the close of each fiscal year, the [public utilities

24    commission] ***department of energy*** shall ascertain [its] ***the*** actual total expenses in accordance

25    with RSA 363-A:1 and RSA 363-A:2, and then shall adjust the assessment for the first quarterly

26    payment of the new fiscal year for each such public utility or other assessed entity for any

27    underpayment or overpayment by each such public utility or other assessed entity for the prior fiscal

28    year.

29    363-A:4  Collection.  Upon the completion of each such list, on or before August 10, October 10,

30    January 10, and April 10 of each fiscal year, the [public utilities commission] ***department of energy***

31    shall bill each public utility and each other entity subject to assessment for the quarterly amount

32    assessed against it within 10 working days.  Such bill shall be sent registered mail, and shall

33    constitute notice of assessment and demand for payment.  Payment shall be made to the [public

34    utilities commission] ***department of energy*** within 30 days after the receipt of the bill.  After the

35    expiration of 30 days from the receipt of an original bill, the [public utilities commission]

36    ***department of energy*** may add to the assessment a late penalty fee and may commence an action

37    at law for the recovery of the assessment.  Within 30 days of the assessment for the first quarterly

1    payment, each public utility or other assessed entity which has any objection to the amount assessed

2    against it for the prior fiscal year shall file with the [commission] *department* its objection in

3    writing, setting out in detail the grounds upon which it is claimed that said assessment is excessive,

4    erroneous, unlawful, or invalid.  If such objections are filed, the [commission] *department*, after

5    reasonable notice to the objecting public utility or other assessed entity, shall hold a hearing on such

6    objections, and if the [commission] *department* finds that said assessment or any part thereof is

7    excessive, erroneous, unlawful, or invalid, the [commission] *department* shall reassess the amount

8    to be paid by such public utility or other assessed entity, and shall order that an amended bill be

9    sent to such public utility or other assessed entity in accordance with such reassessment.  The

10   [public utilities commission] *department of energy* shall not commence an action at law for

11   recovery of any assessment for the first quarterly payment until any such objection has been

12   resolved.

13       245  Public Utility Recovery of Assessment Costs.  Amend RSA 363-A:6, I to read as follows:

14       I.  Assessment amounts determined with reference to the revenues of competitive electric

15   power suppliers and all assessments against regulated electric distribution utilities and electric

16   cooperatives for which a certificate of deregulation is on file with the [commission] *department*

17   shall be collected from electric customers through the distribution rates of the respective electric

18   distribution utility or rural electric cooperative for which a certificate of deregulation is on file with

19   the [commission] *department*; provided that an amount equal to the amount assessed directly to a

20   competitive electric power supplier under RSA 363-A:2, III shall be collected from the energy service

21   or default service customers of each electric distribution utility or rural electric cooperative for which

22   a certificate of deregulation is on file with the [commission] *department*.

23       246  Complaints to and Proceedings Before the Department of Energy and the Commission.

24   Amend the chapter title of RSA 365 to read as follows:Amend the chapter title of RSA 365 to read as

25   follows:

26                  COMPLAINTS TO[;] *THE DEPARTMENT OF ENERGY*

27                  AND PROCEEDINGS BEFORE[;] THE COMMISSION

28       247  Complaint Against Public Utilities.  Amend RSA 365:1 to read as follows:

29       365:1  Complaint Against Public Utilities.  Any person may make complaint to the [commission]

30   *department of energy* by petition setting forth in writing any thing or act claimed to have been

31   done or to have been omitted by any public utility in violation of any provision of law, or of the terms

32   and conditions of its franchises or charter, or of any order of the commission.

33       248  Complaints to the Department of Energy and Proceedings Before the Commission.  Amend

34   RSA 365:2 through RSA 365:7 to read as follows:

35       365:2  Order.  Thereupon the [commission] *department of energy* shall cause a copy of said

36   complaint to be forwarded to the public utility complained of, which may be accompanied by an

Amendment to HB 2-FN-A-LOCAL
- Page 108 -

1   order, requiring that the matters complained of be satisfied, or that the charges be answered in

2   writing within a time to be specified by the [commission] *department*.

3   365:3   Reparation.   If the public utility complained of shall make reparation for any injury

4   alleged and shall cease to commit or to permit the violation of law, franchise, or order charged in the

5   complaint, and shall notify the [commission] *department of energy* of that fact before the time

6   allowed for answer, the [commission] *department* shall not be required to take any further action

7   upon the charges.

8   365:4   Investigation.   If the charges are not satisfied as provided in RSA 365:3, and it shall

9   appear to the [commission] *department of energy* that there are reasonable grounds therefor, it

10   shall investigate the same in such manner and by such means as it shall deem proper[, and, after

11   notice and hearing, take such action within its powers as the facts justify]. *After investigation, the*

12   *department of energy may bring proceedings on its own motion before the public utilities*

13   *commission, with respect to any complaint or violation of any provision of law, rule, terms*

14   *and conditions of its franchises or charter, or any order of the commission.*

15   365:5   Independent Inquiry.   The commission, on its own motion or upon petition of a public

16   utility, *and the department of energy* may investigate or make inquiry in a manner to be

17   determined by it as to any rate charged or proposed or as to any act or thing having been done, or

18   having been omitted or proposed by any public utility; and [the commission or] shall make such

19   inquiry in regard to any rate charged or proposed or to any act or thing having been done or having

20   been omitted or proposed by any such utility in violation of any provision of law or order of the

21   commission *or the department*.

22   365:6   Inspection.   [The] *Both the* commission *and the department of energy* may at any time

23   personally, or by its experts or agents, inspect the property, works, system, plant, devices, appliances

24   and methods used by any public utility, or its books, papers and records.

25   365:7   Authority to Inspect.   Any expert or agent of the *department of energy or the*

26   commission, who shall make a demand on behalf of the commission *or the department* to be

27   allowed to inspect as provided in RSA 365:6, shall produce written authority to make such inspection

28   signed by the [secretary or assistant secretary or some member] *chairperson* of the commission *or*

29   *the commissioner of the department of energy*.

30   249   Proceedings Before the Public Utilities Commission.   Amend RSA 365:8, I(j) to read as

31   follows:

32         (j)  Standards and procedures for determination and recovery of rate [case] *proceedings*

33   expenses.

34   250   Proceedings Before the Public Utilities Commission.   Amend RSA 365:8, II to read as

35   follows:

36         II.  Where the commission has adopted rules in conformity with this section, [complaints to

37   and] proceedings before the commission shall not be subject to RSA 541-A:29 or RSA 541-A:29-a.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 109 -**

1    251  Repeal.  The following are repealed:

2        I.  RSA 365:8-a, relative to suppliers of natural gas an aggregators of natural gas customers.

3        II.   RSA 374-F:4, III, relative to certain compliance filings filed with the public utilities

4    commission.

5    252  Complaints to Department of Energy and Public Utilities Commission; Expense of

6    Investigations; Rate Proceeding.  Amend RSA 365:37 and 365:38 to read as follows:

7    365:37  Expense of Investigations.

8        I.  Whenever any investigation *by the commission or the department of energy* shall be

9    necessary to enable the commission to pass upon any petition for authority to issue stocks, bonds,

10   notes, or other evidence of indebtedness, for authority to operate as a public utility or to expand

11   operations as a public utility, to make extensions into new territory, to discontinue service, to

12   condemn property for flowage rights and dam construction, or for authority to sell, consolidate,

13   merge, transfer, or lease the plant, works, or system of any public utility, or any part of the same, or

14   for any other matter which requires the [commission's] approval *of the commission or the*

15   *department of energy*, the petitioner shall pay to the [commission] *department of energy* the

16   expense involved in the investigation of the matters covered by said petition, including the amounts

17   expended for experts, accountants, or other assistants.  Such expense shall not include any part of

18   the salaries or expenses of the commissioners or of employees of the commission or *department of*

19   *energy or*, unless the proceeding is being conducted pursuant to RSA 38, the fees of experts

20   testifying as to values in condemnation proceedings.

21       II.  Whenever the commission institutes a proceeding, or when more than one utility subject

22   to the jurisdiction of the commission shall be involved in a proceeding in which the commission *or*

23   *the department of energy* requires the assistance of experts, accountants or other assistants,

24   regardless of whether they petitioned the commission in the first instance, the commission *and the*

25   *department of energy* may assess the costs of experts, accountants or other assistants hired by the

26   commission *or the department of energy* against the utilities and any other parties to the

27   proceeding.  The commission *and the department of energy* shall not, however, assess any such

28   costs against the office of the consumer advocate or against any voluntary corporation, not-for-profit

29   organization, or any municipality unless the municipality is involved in a proceeding before the

30   commission pursuant to RSA 38.  In the case of a utility, the assessment of those costs shall be based

31   on the annual revenues of the participating utilities in the same manner as issued in assessing the

32   annual operating expenses of the commission *and the department of energy*, or as appropriate

33   and equitable on a case by case basis.  In the case of a party who is not a utility, the assessment of

34   those costs shall be as appropriate and equitable on a case by case basis.  Such expenses shall not

35   include any part of the salaries or expenses of the commissioners or of employees of the commission

36   *or of employees of the department of energy* or, unless the proceeding is being conducted

37   pursuant to RSA 38, the fees of experts testifying as to values in condemnation proceedings.

Amendment to HB 2-FN-A-LOCAL
- Page 110 -

1   III. For investigations or proceedings involving the acquisition, merger, transfer, sale, or
2 lease of the works or system of a public utility, the commission ***and the department of energy***
3 shall not enter into a contract with experts, accountants, or other assistants in an amount greater
4 than [$250,000] ***$10,000***, including any contract extension, without the approval of the governor and
5 council. For all other investigations or proceedings, the commission ***and the department of energy***
6 shall not enter into a contract with experts, accountants, or other assistants in an amount greater
7 than [$100,000] ***$10,000***, including any contract extension, without the approval of governor and
8 council.

9   365:38 Rate Proceeding. Whenever any investigation ***or proceeding*** shall be necessary to
10 enable the commission to pass upon the reasonableness of the rates or charges by a public utility, the
11 utility[, upon order of the commission,] shall pay to the [commission its] ***department of energy the***
12 expenses involved in the investigation, including the amounts expended by [it] ***the commission and***
13 ***the department of energy*** for attorneys, experts, accountants, or other assistants, but not
14 including any part of the salaries or expenses of the commissioners or of employees of the
15 commission ***or department of energy***; provided, that the amount charged to the utility [by the
16 commission] in any such case shall not exceed 3/4 of one percent of the existing valuation of the
17 utility investigated, such expenses with 6 percent interest to be charged by the utility to operating
18 expenses and amortized over such period as the commission shall deem proper and allowed for in the
19 rates to be charged by the utility.

20   253 Complaints to Department of Energy and Public Utilities Commission; Penalty Against
21 Utility. Amend RSA 365:41 to read as follows:

22   365:41 Penalty Against Utility. Any public utility which shall violate any provisions of this title,
23 or fails, omits or neglects to obey, observe or comply with any order, direction or requirement of the
24 commission ***or the department of energy***, shall be subject to a civil penalty, as determined by the
25 commission, not to exceed $250,000 or 2.5 percent of the annual gross revenue that the utility
26 received from sales in the state, whichever is lower. Such penalties shall be applied to the benefit of
27 the utility's ratepayers through a credit to bills, or, if the credit is of an amount determined by the
28 commission to be insignificant on a per customer basis, to programs that benefit low income
29 ratepayers. No portion of any fine, nor any costs associated with an administrative or court
30 proceeding which results in a fine pursuant to this section, shall be considered by the commission in
31 fixing any temporary, permanent, or emergency rates or charges of such utility.

32   254 Affiliates of Public Utilities; Department of Energy. Amend RSA 366:2 through 366:9 to
33 read as follows:

34   366:2 Sale of Securities to or by Employees. No public utility shall, without the approval of the
35 [commission] ***department of energy***, permit any employee to sell, offer for sale, or solicit the
36 purchase of any security issued by an affiliate during such hours as such employee is engaged to
37 perform any duty of such public utility; nor shall any public utility by any means or device

Amendment to HB 2-FN-A-LOCAL
- Page 111 -

1 whatsoever require any employee to purchase or contract to purchase any of its securities or those of
2 any other person or corporation; nor shall any public utility require any employee to permit the
3 deduction from his wages or salary of any sum as a payment or to be applied as a payment on any
4 purchase or contract to purchase any security of such public utility or of any other person.

5  366:3  Filing of Contracts.  The original or a verified copy of any contract or arrangement and of
6 any modification thereof or a verified summary of any unwritten contract or arrangement, the
7 consideration of which exceeds $500, hereafter entered into between a public utility and an affiliate
8 providing for the furnishing of managerial, supervisory, construction, engineering, accounting,
9 purchasing, financial, or any other services either to or by a public utility or an affiliate shall be filed
10 by the public utility with the [commission] *department of energy* within 10 days after the date on
11 which the contract is executed or the arrangement entered into.  The [commission] *department* may
12 also require a public utility to file in such form as the [commission] *department* may require full
13 information with respect to any purchase from or sale to an affiliate, whether or not made in
14 pursuance of a continuing contract or arrangement.

15  366:4  Failure to File.  Any contract or arrangement not filed with the [commission] *department*
16 *of energy* pursuant to RSA 366:3 shall be unenforceable in any court in this state and payments
17 thereunder may be disallowed by the [commission] *department* unless the later filing thereof is
18 approved in writing by the [commission] *department*.  *The commission shall disallow payment*
19 *if recommended by the department.*

20  366:5  Investigation and Proof.  The [commission] *department of energy* shall have full power
21 and authority to investigate any such contract, arrangement, purchase, or sale and[, if] *initiate a*
22 *proceeding related thereto before the commission.  If* the commission after notice and hearing
23 shall find any such contract, arrangement, purchase, or sale to be unjust or unreasonable, the
24 commission may make such reasonable order relating thereto as the public good requires.  In any
25 such investigation, the burden shall be on the public utility and affiliate to prove the reasonableness
26 of any such contract, arrangement, purchase, or sale with, from, or to an affiliate.  If the public
27 utility shall fail to satisfy the commission of the reasonableness of any such contract, arrangement,
28 purchase, or sale, the commission may disapprove the same and disallow payments thereunder or
29 such part of any such payment as the commission shall find to be unjust or unreasonable.  No
30 payment disallowed by the commission shall be capitalized or included as an operating cost of the
31 public utility in the fixing of rates or as an asset in fixing a rate base.  If in any such investigation
32 the public utility or affiliate shall unreasonably refuse to comply with any request of the commission
33 *or the department* for information with respect to relevant accounts and records, whether of such
34 public utility or any affiliate, any portion of which may be applicable to any transaction under
35 investigation, so that such parts thereof as the commission *or the department* may deem material
36 may be made part of the record, such refusal shall justify the commission in disapproving the
37 transaction under investigation and disallowing payments in pursuance thereof.

Amendment to HB 2-FN-A-LOCAL
- Page 112 -

1    366:6  Summary Order in Certain Cases.  If as a result of an investigation *or proceeding* in
2    accordance with RSA 366:5 the commission shall find that any public utility is making any payment
3    or about to make any payment or doing or about to do any other thing which substantially threatens
4    or impairs the ability of the public utility to render adequate service at reasonable rates or otherwise
5    to discharge its duty to the public, the commission may apply to the superior court for an order
6    directing the public utility to cease making any such payment or doing such other thing; and,
7    thereupon, the court shall make such order as the public good may require.

8    366:7  Disallowance of Charges Under Existing Contracts.  In any proceeding whether upon the
9    *department's initiation or* commission's own motion or upon complaint involving the rates or
10   practices of any public utility, the commission may disallow the inclusion in the accounts of a public
11   utility of any payments or compensation to an affiliate for any services rendered, or property
12   furnished, under existing contracts or arrangements with an affiliate unless such public utility shall
13   establish the reasonableness of such payment or compensation.

14   366:8  Annual Reports.  Every public utility annually reporting to the commission *or*
15   *department of energy* under RSA 374 shall also annually report the name and address of, and the
16   number of shares held by, its officers and directors and each holder of one percent or more of the
17   voting capital stock of the reporting public utility according to its records.

18   366:9  Information Concerning Control.  The commission *or department of energy* may also
19   require such other information as to the direct or indirect control of a public utility or affiliate from a
20   public utility, affiliate, or other person as may be reasonably required for the effective enforcement of
21   this chapter.

22   255  References Change; Service Equipment of Public Utilities; Department of Energy.  Amend
23   the following RSA provisions by replacing "commission" with "department of energy":  370:2, 370:8,
24   370:9.

25   256  Service Equipment of Public Utilities; Units of Service.  Amend RSA 370:1 to read as
26   follows:

27   370:1  Units of Service.  The [public utilities commission] *department of energy* may ascertain,
28   determine and fix, for each kind of public utility, suitable and convenient standard commercial units
29   of service, product or commodity, which units shall be lawful units for the purposes of this chapter.

30   257  Service Equipment of Public Utilities; Department of Energy.  Amend RSA 370:3 through
31   370:7 to read as follows:

32   370:3  Meters.  The [commission] *department of energy* may ascertain, determine and fix
33   reasonable rules, regulations, specifications and standards to secure the accuracy of all meters and
34   appliances for measurement, and every public utility is required to carry into effect all orders issued
35   by the [commission] *department* relative thereto.

36   370:4  Service Inspections.  The [commission] *department of energy* may provide for the
37   inspection of the manner in which every public utility conforms to the reasonable regulations

**Amendment to HB 2-FN-A-LOCAL**
**- Page 113 -**

1   prescribed by the [commission] *department* for examination and testing of its service, product or
2   commodity, and for the measurement thereof, and may supplement such inspections by
3   examinations and testing.

4       370:5  Inspection of Meters.  The [commission] *department of energy* may provide for the
5   inspection of the manner in which every public utility has carried into effect the reasonable rules,
6   regulations, specifications and standards fixed by [orders of the commission] *rules adopted by the*
7   *department* relative thereto, and may examine and test any meters and appliances for
8   measurements under such reasonable rules and regulations as it may prescribe.

9       370:6  Testing Appliances.  The [commission] *department* may provide for the examination and
10  testing of any appliances used for the measuring of any service, product or commodity of a public
11  utility.

12      370:7  At Consumer's Request.  Any consumer or user may have any such appliance tested by the
13  [commission] *department of energy*.  The [commission] *department* may declare and establish
14  reasonable fees to be paid for examining and testing such appliances on the request of consumers or
15  users, the fee to be paid by the consumer or user at the time of his request; but, if the measuring
16  appliance be found unreasonably defective or incorrect to the disadvantage of the consumer or user,
17  the [commission] *department* shall repay such fee to the consumer or user and collect the same
18  from the public utility.

19      258  Rights in Public Waters and Lands; License by Notification of New Attachments on Existing
20  Utility Poles.  Amend RSA 371:17-a to read as follows:

21      371:17-a  License by Notification of New Attachments on Existing Utility Poles.  Whenever it is
22  necessary, in order to meet the reasonable requirements of service to the public, that any public
23  utility other than electric or gas should construct a cable, conduit, or wires and fixtures upon an
24  existing line of poles or towers over, under, or across any of the public waters of this state, or over,
25  under, or across any of the land owned by this state, the public utility shall file written notification
26  with the [commission] *department of energy* for a license to construct and maintain such cable,
27  conduit, or wires and fixtures.  In this section, "public waters" means all ponds of more than 10
28  acres, tidewater bodies, and such streams or portions thereof as the commission may prescribe.
29  Every corporation and individual desiring to cross any public waters or land for the purposes of this
30  section shall file written notification in the same manner prescribed for a public utility.  The
31  notification shall include a description of the specific geographic and pole locations of the crossing
32  and verification that there is a valid pole attachment license or that an application for a pole
33  attachment license has been submitted to the utility or utilities that own such poles or towers.  The
34  notification shall include an affidavit signed by the responsible officer confirming that the crossing
35  shall be completed in compliance with such pole attachment license and the National Electrical
36  Safety Code.  Upon receipt of such notification, no further inquiries or investigations by the
37  [commission] *department of energy* shall be required in granting the requested license.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 114 -**

259  Rights in Public Waters and Lands; Hearing; Order.  Amend RSA 371:20 to read as follows:

371:20  Hearing; Order.  ***Whenever a hearing shall be necessary,*** the commission shall hear all parties interested; and, in case it shall find that the license petitioned for, subject to such modifications and conditions, if any, and for such period as the commission may determine, may be exercised without substantially affecting the public rights in said waters or lands, it shall render judgment granting such license.  Provided, however, that such license may be granted ***by the department of energy*** without hearing when all interested parties are in agreement and in cases involving filings made under RSA 371:17-a and RSA 371:17-b.  [The executive director of the commission may issue licenses under RSA 371:17-a and RSA 371:17-b.]

260  References Changed; Proceedings to Acquire Property or Rights; Rights in Public Waters and Lands; Department of Energy.  Amend the following RSA provisions by replacing "commission" with "department of energy": 371:17, 371:18, 371:19.

261  Extent of Power.  Amend RSA 374:3 to read as follows:

374:3  Extent of Power.  The public utilities commission ***and department of energy*** shall have the general supervision of all public utilities and the plants owned, operated or controlled by the same so far as necessary to carry into effect the provisions of this title.

262  Supervisory Power of Department of Energy and Public Utilities Commission.  Amend the subdivision heading following RSA 374:3-b to read as follows:

Supervisory Power of Department of [Transportation]

***Energy and Public Utilities Commission***

263  Duties.  Amend RSA 374:4-374:5-a to read as follows:

374:4  Duty to Keep Informed.  The commission ***and the department of energy*** shall have power, and it shall be [its] ***their*** duty, to keep informed as to all public utilities in the state, their capitalization, franchises and the manner in which the lines and property controlled or operated by them are managed and operated, not only with respect to the safety, adequacy and accommodation offered by their service, but also with respect to their compliance with all provisions of law, orders of the commission and charter requirements.

374:5  Additions and Improvements.  For the purpose of enabling the commission ***and the department of energy*** to perform [its] ***their*** duty to keep informed as provided in RSA 374:4, every public utility, before making any addition, extension, or capital improvement to its fixed property in this state, except under emergency conditions, shall report to the commission ***and the department of energy*** the probable cost of such addition, extension, or capital improvement whenever the probable cost thereof exceeds a reasonable amount to be prescribed by general or special order of the commission.  For this purpose, the commission may classify public utilities according to the amount of their respective fixed capital accounts, and prescribe a reasonable limitation for each such classification.  In no case shall the minimum amount prescribed be less than 1/4 of one percent of such fixed capital account as of December 31 of the preceding year, or $10,000, whichever is the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 115 -**

1   smaller amount.  Reports shall be filed in writing [~~with the commission~~] within such reasonable time
2   as may be prescribed by the commission before starting actual construction on any addition,
3   extension, or improvement.  The commission shall have discretion to exclude the cost of any such
4   addition, extension, or capital improvement from the rate base of said utility where such written
5   report thereof shall not have been filed in advance as herein provided.

6   374:5-a  Power to Hire Consultants Firm.  The commission ***and the department of energy*** may
7   utilize and employ a consultant firm to provide it with technical assistance in evaluating cost factors
8   relating to the effective use of substantial investments of utilities regulated by the commission.

9   264  Investigation of Other Utilities; Orders; Violation.  Amend RSA 374:7-374:7-a to read as
10  follows:

11  374:7  Investigation of Other Utilities; Orders.  The commission ***and the department of energy***
12  shall have power to investigate and ascertain, from time to time, the quality of gas supplied by
13  public utilities and the methods employed by public utilities in manufacturing, transmitting or
14  supplying gas or electricity for light, heat or power, or in transmitting telephone and telegraph
15  messages, or supplying water, and, after notice and hearing thereon, shall have power to order all
16  reasonable and just improvements and extensions in service or methods.

17  374:7-a  Violation.

18       I.  Any person who knowingly or willfully violates any provision of RSA 370:2 or any
19  standards or rules adopted under it by the public utilities commission ***or the department of***
20  ***energy***, relative to gas pipelines and liquefied petroleum gas systems pursuant to the Natural Gas
21  Pipeline Safety Act, shall be subject to a civil penalty not to exceed the maximum civil penalty under
22  49 U.S.C. section 60122(a), as amended.

23       II.  Any person who otherwise violates any provision of RSA 370:2 or any standards or rules
24  adopted under it by the public utilities commission ***or the department of energy***, relative to gas
25  pipelines and liquefied petroleum gas systems pursuant to the Natural Gas Pipeline Safety Act,
26  shall be subject to a civil penalty not to exceed the maximum civil penalty under 49 U.S.C. section
27  60122(a), as amended.

28       III.  ***The department of energy shall assess and enforce civil penalties related to this***
29  ***section.***  Any civil penalty assessed under this section may be [~~compromised~~] ***appealed to the***
30  ***public utilities commission, and the commission may uphold, reverse, or compromise such***
31  ***civil penalty*** [~~by the public utilities commission~~].  In determining the amount of the penalty, ***the***
32  ***outcome of an appeal,*** or the amount agreed upon in compromise, the appropriateness of the
33  penalty to the size of the business of the person charged, the gravity of the violation, the good faith of
34  the person charged in attempting to achieve compliance, after notification of a violation, the degree
35  of culpability of the person, the history of prior violations, the effect of the penalty on the person, and
36  any other identifiable factor related to the circumstances of the person and the nature and
37  circumstances of the violation, shall be considered.  The amount of the penalty, when finally

**Amendment to HB 2-FN-A-LOCAL**
**- Page 116 -**

1    determined, or the amount agreed upon in compromise, may be deducted from any sums owing by

2    the state to the person charged or may be recovered in a civil action in the state courts.

3    265  Public Utilities; Reports; Filing.  Amend RSA 374:15 to read as follows:

4    374:15   Filing.   Every public utility shall file with the commission *and the department of*

5    *energy* reports at such times, verified by oath in such manner, and setting forth such statistics and

6    facts, as may be required by the commission *or the department of energy*.

7    266  Public Utilities; Reports.  Amend RSA 374:17-374:19 to read as follows:

8    374:17  Neglect to Report.  If any public utility shall neglect or refuse to make and file any report

9    within a time specified by the commission *or the department of energy*, or shall neglect or refuse

10   to make specific answer to any question lawfully asked by the commission *or the department of*

11   *energy*, it shall forfeit to the state the sum of $100 for each day it shall continue to be in default with

12   respect to such report or answer, unless it shall be excused [by the commission] from making such

13   report or answer, or unless the time for making the same shall be extended [by the commission].

14   374:18  Production of Books, Etc.  The commission, by order, *or the department of energy,* may

15   require any public utility to produce within the state, at such time and place as it may designate,

16   any accounts, records, memoranda, books*, or papers kept in any office or place without the state, or

17   verified copies thereof, in order that an examination thereof may be made by *or under the*

18   *direction of* the commission or [under its direction] *the department of energy*.

19   374:19  False Statements, Etc.  No public utility shall willfully make any false statement or false

20   entry in any report to the commission *or the department of energy*, or in any answer to any

21   question lawfully asked by the commission *or the department of energy*.

22   267  Service Territories; Department of Energy Jurisdiction.  Amend RSA 374:22-e to read as

23   follows:

24   374:22-e  Service Territories; [Commission] *Department of Energy* Jurisdiction.

25          I.  If 2 or more telephone utilities find that they provide the same service in the same area or

26   that existing maps create overlapping service territories, the [commission] *department of energy*,

27   upon application by one or both of the affected utilities, shall define, alter, or establish service

28   territories.  In establishing or altering service territories, the [commission] *department of energy*

29   shall consider the following:

30          (a)  Existing service areas;

31          (b)   Any voluntary agreements between or among 2 or more such telephone utilities

32   which define the service territories of those utilities;

33          (c)  Consistency with the orderly development of the region;

34          (d)  Natural geographical boundaries;

35          (e)  Compatibility with the interests of all consumers; and

36          (f)  All other relevant factors.

1  II.  The [commission] *department of energy* shall have power to exercise the jurisdiction
2  conferred in this section only after due notice to all interested parties and hearing.  After
3  consideration of the factors established by paragraph I of this section, and after making findings that
4  the service territories established or altered are consistent with the public good, the [commission]
5  *department of energy* shall establish the service territory of each telephone utility.  The service
6  territory thus established shall be sufficiently definite and precise so that its boundaries may be
7  accurately determined.

8  268  Service Territories Served by Certain Telephone Utilities.  Amend RSA 374:22-g to read as
9  follows:

10  374:22-g  Service Territories Served by Certain Telephone Utilities.

11  I.  To the extent consistent with federal law and notwithstanding any other provision of law
12  to the contrary, all telephone franchise areas served by a telephone utility that provides local
13  exchange service, subject to the jurisdiction of the [commission] *department of energy*, shall be
14  nonexclusive.  The [commission] *department of energy*, upon petition or on its own motion, shall
15  have the authority to authorize the providing of telecommunications services, including local
16  exchange services, and any other telecommunications services, by more than one provider, in any
17  service territory, when the [commission] *department of energy* finds and determines that it is
18  consistent with the public good unless prohibited by federal law.

19  II.  In determining the public good, the commission shall consider the interests of
20  competition with other factors including, but not limited to, fairness; economic efficiency; universal
21  service; carrier of last resort obligations; the incumbent utility's opportunity to realize a reasonable
22  return on its investment; and the recovery from competitive providers of expenses incurred by the
23  incumbent utility to benefit competitive providers, taking into account the proportionate benefit or
24  savings, if any, derived by the incumbent as a result of incurring such expenses.

25  III.  The *department of energy* shall adopt rules, pursuant to RSA 541-A, relative to the
26  enforcement of this section.

27  269  Shared Tenant Services Authorized; Limited Regulation; Rulemaking.  Amend RSA 374:22-l
28  and m to read as follows:

29  374:22-l  Shared Tenant Services Authorized; Limited Regulation.

30  I.  The [public utilities commission] *department of energy* shall authorize the provision of
31  shared tenant services by providers meeting the minimum requirements established by the
32  [commission] *department of energy* to operate shared tenant services networks.

33  II.  Providers of shared tenant services shall be subject to the following limited regulation by
34  the [commission] *department of energy*:

35  (a)  Providers of shared tenant services shall disclose to tenants and prospective tenants
36  all pricing information relative to their services in the manner prescribed by the [commission]
37  *department of energy*.

1    (b) Providers of shared tenant services shall disclose to tenants and prospective tenants
2    that they can at their option obtain basic exchange and other service from an authorized local
3    telephone utility rather than from the shared tenant services provider.

4    (c) Without penalty and in accordance with the rules of the [commission] *department of*
5    *energy*, telephone number retention and access to telecommunications services shall be permitted by
6    providers of shared tenant services and authorized local telephone utilities into and out of shared
7    tenant services properties.

8    (d) The [commission] *department of energy* shall have jurisdiction to hear matters
9    pertaining to the unauthorized provision of shared tenant services, violations of [commission]
10    *department* rules relating to shared tenant services, and customer complaints against shared
11    tenant services providers.

12    374:22-m  Rulemaking.  The [public utilities commission] *department of energy* shall adopt
13    rules, pursuant to RSA 541-A, relative to:

14    I.   Minimum requirements for shared tenant services, including disclosure of available
15    options and terms and prices of shared tenant services.

16    II.  Customer access to services of authorized local telephone utilities.

17    III.  Telephone number retention and recovery of costs, if any, associated with number
18    retention.

19    IV.  The charges a local telephone utility establishes for a shared tenant services provider to
20    purchase services for use by the provider's tenants.

21    V.   Procedures for complaints to the [commission] *department* regarding shared tenant
22    services.

23    270  Regulation of Competitive Telecommunications Providers Limited; Affordable Telephone
24    Service; Public Interest Payphones.  Amend RSA 374:22-o-374:22-p to read as follows:

25    374:22-o  Regulation of Competitive Telecommunications Providers Limited.  Any person or
26    business entity authorized by the [commission] *department of energy* to engage in business as a
27    competitive local exchange carrier and any competitive toll provider having less than a 10 percent
28    share of toll revenue in New Hampshire shall not be required to seek prior [commission]
29    *department* approval of financings or corporate organizational changes, including, without
30    limitation, mergers, acquisitions, corporate restructurings, issuance or transfer of securities, or the
31    sale, lease, or other transfer of assets or control.  Nothing in this section shall exempt any such
32    competitive telecommunications service provider from such advance notice as the [commission]
33    *department* may prescribe or from the requirements of RSA 374:28-a or RSA 378:46.

34    374:22-p  Affordable Telephone Service; Rulemaking; Standards.

35    I.(a)  For the purposes of this section, "Federal Telecommunications Act" means the federal
36    Telecommunications Act of 1996, Public Law 104-104, 110 Stat. 56.

37    (b)  For purposes of this section "basic service" means:

1    (1)  Safe and reliable single-party, single line voice service;

2    (2)  The ability to receive all noncollect calls, at telephone lines capable of receiving

3    calls, without additional charge;

4    (3)  The ability to complete calls to any other telephone line, which is capable of

5    receiving calls, in the state;

6    (4) The opportunity to presubscribe to interLATA toll carriers;

7    (5) The opportunity to presubscribe to intraLATA toll carriers;

8    (6) Dialing parity;

9    (7) Number portability;

10   (8)  Enhanced 911, pursuant to the requirements of the department of safety, bureau

11   of emergency communications, or its successor agency;

12   (9) Access to statewide directory assistance;

13   (10) Telecommunications relay service (TRS);

14   (11) A published directory listing, at the customer's election;

15   (12) A caller identification blocking option, on a per-call basis;

16   (13)  A caller identification line blocking option that is available to all customers

17   without a recurring charge and is provided upon customer request without charge to customers who

18   have elected nonpublished telephone numbers and is available without a nonrecurring charge to

19   customers who certify that caller identification threatens their health or safety and is available

20   without a nonrecurring charge when requested with installation of basic service;

21   (14)  A blocking option for pay-per-call calls, such as blocking all 900 or all 976 area

22   code calls;

23   (15)  The ability to report service problems to the customer's basic service provider on

24   a 24-hour basis, 7 days a week; and

25   (16)  Automatic Number Identification (ANI) to other carriers which accurately

26   identifies the telephone number of the calling party.

27   (c)  Any combination of basic service along with any other service or feature offered by

28   the telecommunications service provider is nonbasic service and shall not be regulated by the

29   commission.

30   (d)  Any telecommunications service provider which is not an incumbent local exchange

31   carrier shall not be required to provide basic service.

32   II.  Subject to RSA 362:6, the [commission] *department of energy* shall require every

33   provider of intrastate telephone service to participate in outreach programs designed to increase the

34   number of low-income telephone customers on the network through increased participation in any

35   universal service program approved by the [commission] *department* and statutorily established by

36   the legislature.  Statewide outreach programs shall continue until further order of the [commission]

37   *department*.

Amendment to HB 2-FN-A-LOCAL
- Page 120 -

III.   The [commission] *department of energy* shall seek to ensure that affordable basic telephone services are available to consumers throughout all areas of the state at reasonably comparable rates.

IV.(a)   The [commission] *department of energy* shall [develop draft] *maintain and update* rules to implement this section and shall, after the statutory establishment of a universal service fund, require every provider of intrastate telephone services to contribute to a state universal service fund to support programs consistent with the goals of applicable provisions of this title and the Federal Telecommunications Act.

(b)   If the [commission] *department of energy*, upon statutory establishment of a universal service program, establishes a state universal service fund pursuant to this section, the [commission] *department* shall contract with an appropriate independent fiscal agent that is not a state entity to serve as administrator of the state universal service fund.  Program administration shall be designed in the most cost-effective manner possible.  Funds contributed to a state universal service fund are not state funds and therefore are not subject to provisions of law relating to the general fund.  Rules and any state universal service fund requirements established by legislative enactment and by the [commission] *department* pursuant to this section shall:

(1)   Be reasonably designed to maximize federal assistance available to the state for universal service purposes.

(2)   Meet the state's obligations under the Federal Telecommunications Act.

(3)   Be consistent with the goals of the Federal Telecommunications Act.

(4)   Ensure that any requirements regarding contributions to a state universal service fund be nondiscriminatory and competitively neutral.

(5)   Require explicit identification on customer's bills of contributions to and in the event of fund termination, refunds from, any state universal service fund established pursuant to the section.

(6)   Allow consideration in appropriate rulemaking proceedings of contributions to and in the event of fund termination, refunds from, any state universal service fund established pursuant to this section.

(c)   For purposes of this section, "providers of intrastate telephone services" includes providers of radio paging service and, subject to the provisions of the Federal Communications Act as amended and codified at 47 U.S.C. sec. 332(c)(3)(A), mobile telecommunications services.

(d)   Prior to requiring that providers of intrastate telephone service contribute to a state universal service fund and prior to statutory establishment of a universal service fund, the [commission] *department of energy* shall report to the general court its determination of the expected program costs, the amount and type of the funding mechanism, the number of people proposed to be served, the level of proposed service, and the administrative design of the proposed fund.

1    V.  The [commission] *department of energy*, annually, shall assess the penetration rate of

2    basic telephone services.  If this penetration rate ever falls below the national average penetration

3    rate, the [commission] *department* shall commence an investigation and take steps to enhance

4    telephone market penetration.  The [commission] *department*, annually, shall assess the success of

5    any action taken by the [commission] *department* to achieve the purpose of this section.  The public

6    policy goal should be to raise the low income penetration level as close as reasonably possible to the

7    statewide average.

8    VI, VII.  [Repealed.]

9    VIII.  Notwithstanding the provisions of RSA 374:1-a:

10    (a)  Incumbent local exchange carriers, whether qualified as an excepted local exchange

11    carrier or otherwise, may not discontinue residential basic service, regardless of technology used, in

12    any portion of their franchise area unless the [commission] *department of energy* determines that

13    the public good will not be adversely affected by such withdrawal of service;

14    (b)    Rates for basic service of incumbent local exchange carriers which qualify as

15    excepted local exchange carriers may not increase by more than 5 percent for Lifeline Telephone

16    Assistance customers and by more than 10 percent for all other basic service customers in each of

17    the 8 years after the effective date of this paragraph or the effective date of an existing alternative

18    plan of regulation, except for additional rate adjustments, with [public utilities commission]

19    *department of energy* review and approval, to reflect changes in federal, state, or local government

20    taxes, mandates, rules, regulations, or statutes; and

21    (c)  Incumbent local exchange carriers which qualify as excepted local exchange carriers

22    shall report the rates for basic service to the [commission] *department of energy* within 60 days of

23    the effective date of this paragraph and upon any changes to the rates.

24    271  Pole Attachments.  Amend RSA 374:34-a to read as follows:

25    374:34-a  Pole Attachments.

26    I.  In this subdivision, a "pole" means any pole, duct, conduit, or right-of-way that is used for

27    wire communications or electricity distribution and is owned in whole or in part by a public utility,

28    including a rural electric cooperative for which a certificate of deregulation is on file with the

29    commission pursuant to RSA 301:57.

30    II.    Whenever a pole owner is unable to reach agreement with a party seeking pole

31    attachments, the commission shall regulate and enforce rates, charges, terms, and conditions for

32    such pole attachments, with regard to the types of attachments regulated under 47 U.S.C. section

33    224, to provide that such rates, charges, terms, and conditions are just and reasonable.  This

34    authority shall include but not be limited to the state regulatory authority referenced in 47 U.S.C.

35    section 224(c).

36    III.  The [commission] *department of energy* shall adopt rules under RSA 541-A to carry

37    out the provisions of this section, including appropriate formula or formulae for apportioning costs.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 122 -**

IV.   In exercising its authority under this subdivision, the [commission] *department of energy* shall consider the interests of the subscribers and users of the services offered via such attachments, as well as the interests of the consumers of any pole owner providing such attachments.

V.   Nothing in this subdivision shall prevent parties from entering into pole attachment agreements voluntarily, without commission approval.

VI.   Any pole owner shall provide nondiscriminatory access to its poles for the types of attachments regulated under this subdivision.  A pole owner may deny access to its poles on a nondiscriminatory basis where there is insufficient capacity and for reasons of safety, reliability, and generally applicable engineering purposes.

VII.   The commission shall have the authority to hear and resolve complaints concerning rates, charges, terms, conditions, voluntary agreements, or any denial of access relative to pole attachments.

VIII.   The [commission] *department of energy* shall retain its authority to regulate the safety, vegetation management, emergency response, and storm restoration requirements for poles, conduits, ducts, pipes, pole attachments, wires, cables, and related plant and equipment of public utilities and other private entities located within public rights-of-way and on, over, or under state lands and water bodies.

272  Repeals.  The following are repealed:

I.  RSA 374:35, relative to transmitting electricity out of the state.

II.  RSA 374:36, relative to investigations and orders.

273  Investigation of Accidents.  Amend RSA 374:37-374:40 to read as follows:

374:37  By [Commission] *Department*.   The [commission] *department of energy* shall investigate the causes of all accidents in connection with the operation of public utilities in the state, which, in the opinion of the commission *or the department of energy*, ought to be investigated.

374:38  Manner.  Any such investigation may be made by the [full commission] *department of energy* [, or by a single commissioner, or by an agent of the commission,] in such manner as the [commission] *department of energy* may determine.

374:39  Reports.  Every public utility shall report to the *department of energy and the* commission accidents occurring in connection with the operation of its business wherein loss of life occurs or any person is injured, or of such a nature as to endanger the safety, health or property of its consumers or the public, as and whenever directed by such rules and regulations as the *department of energy and the* commission may prescribe.

374:40  Publicity.  Reports of accidents filed under RSA 374:39 shall not be made public otherwise than in the published reports of the commission *or the department of energy*.

274  New Paragraph; Definitions.  Amend RSA 374:48 by inserting after paragraph II the following new paragraph:

1    II-a.  "Department" means the department of energy.

2    275  Rulemaking.  Amend the introductory paragraph of RSA 374:50 to read as follows:

3    The [commission] *department* shall adopt rules, pursuant to RSA 541-A, relative to:

4    276  Civil Penalty.  Amend RSA 374:55 to read as follows

5    374:55  Civil Penalty.

6    I.  Proof that an excavation has been made without compliance with the notice requirement

7    of RSA 374:51 and that damage to an underground facility has occurred shall be prima facie

8    evidence in any court or administrative proceeding that the damage was caused by the negligence of

9    the excavator.

10    II.  Any excavator who does not give notice of or identify the proposed excavation area as

11    required by RSA 374:51 or rules of the [commission] *department* regarding tolerance zones and

12    marking procedures shall be subject to the penalties in paragraph VIII, in addition to any liability

13    for the actual damages.

14    III.  Any operator which does not mark the location of its underground facilities as required

15    by RSA 374:53 or rules of the [commission] *department* regarding tolerance zones and marking

16    procedures shall be subject to the penalties in paragraph VIII.

17    IV.  If underground facilities are damaged because an operator does not mark its

18    underground facilities as required by RSA 374:53, the operator shall be subject to the penalties in

19    paragraph VIII, liable for damages sustained to its facilities and, in addition, shall be liable for any

20    damages incurred by the excavator as a result of the operator's failure to mark such facilities.

21    V.  If marked underground facilities are damaged, the excavator shall be subject to the

22    penalties in paragraph VIII and liable for the cost of repairs for the damage.

23    VI.  Any excavator who damages an underground facility and fails to notify the operator, or

24    backfills the excavation without receiving permission, as required by RSA 374:54, shall be subject to

25    the penalties in paragraph VIII.

26    VII. The [commission] *department* or any [commission] *department* employee, involved in

27    an underground facility damage prevention program approved by the [commission] *department* and

28    designated by the [commission] *department*, may enforce violations of this subdivision.  Any

29    excavator or operator that violates this subdivision shall be subject to the penalties in paragraph

30    VIII.  In addition, the [commission] *department* may assess the excavator for expenditures made to

31    collect the civil penalty.  Any excavator or operator which suffers damage resulting from violation of

32    this subdivision may petition the [commission] *department* to initiate an enforcement action.

33    VIII.  Any excavator or operator that does not comply with RSA 374:51 through 374:54 shall

34    be required either to complete an underground facility damage prevention program approved by the

35    [commission] *department*, or to pay a civil penalty of up to $500.  The civil penalty may be up to

36    $5,000 if the excavator or operator previously violated RSA 374:51 through 374:54 within the prior

37    12 months or if the violation results in bodily injury or property damages exceeding $50,000,

1    excluding utility costs.  This paragraph shall not apply to a homeowner excavating on his or her own
2    property or to a legal occupant of residential property excavating on the property of his or her
3    primary residence with the permission of the owner.

4    277  Telephone Number Conservation and Area Code Implementation Policy Principles.  Amend
5    RSA 374:59 to read as follows:

6    374:59  Telephone Number Conservation and Area Code Implementation Policy Principles.

7    I.  In this section:

8    (a)  ["Commission"] "*Department*" means the [public utilities commission] *department*
9    *of energy*.

10    (b)  "Geographic split" means the division of an area code into typically 2 areas each
11    served by its own area code.

12    (c)  "Overlay" means the addition of a new area code serving the same geographic area as
13    the existing area code.

14    II.  The [commission] *department* should promote and adopt telephone number conservation
15    measures to the maximum extent allowed by federal law for area code 603 and any subsequently
16    assigned New Hampshire area codes.

17    III.  The [commission] *department* should adopt measures, to the maximum extent
18    allowable by federal law and availability of technology, to provide that all customers of all suppliers
19    have equitable access to all currently available unassigned telephone numbers and equitable access
20    to numbers that have not been assigned to a customer which are available for porting to a second
21    supplier.  Blocks of telephone numbers that are currently assigned but may be retrievable if
22    thousands number block pooling becomes available should be assigned on an equitable basis to all
23    suppliers.

24    IV.  The [commission] *department* should adopt measures, to the maximum extent
25    allowable by federal law and availability of technology, to provide for local number portability by all
26    suppliers of local exchange service.

27    V.  To the extent that any one competitor is responsible for managing a pool of numbers
28    which is to be assigned to customers of that competitor and other competitors, the [commission]
29    *department* should adopt policies to require that the assignment and management of the numbers
30    be kept segregated from the marketing portion of that competitor.

31    VI.  When determining whether to implement a new area code via geographic split or overlay
32    the [commission] *department* should consider, but not be limited to, the following criteria when
33    determining the public interest:

34    (a)  Which method best minimizes customer disruption from having to change numbers;

35    (b)  Which method is the least costly for business and residents;

36    (c)  Which method best minimizes customer confusion;

37    (d)  Which method is the least costly for providers to implement;

1    (e)   Which method most effectively conserves the total pool of telephone numbers once a

2    new area code is created;

3         (f)   Which method minimizes geographic controversy;

4         (g)   Which method is most equitable to every resident and business in New Hampshire;

5         (h)   Which method minimizes repeating the disruption of area code changes in the future;

6         (i)   Which method best ensures public safety;

7         (j)   Which method is more competitively neutral; and

8         (k)   Which method utilizes best available technology and comprehensive

9    telecommunications planning.

10    278  Renewable Energy and Energy Efficiency Project Loan Programs.  Amend RSA 374:61 to

11    read as follows:

12    374:61  Renewable Energy and Energy Efficiency Project Loan Programs.  A public utility may

13    seek [commission] authorization *from the department of energy*, either individually or in

14    combination with other public utilities, to establish loan, financing, or cost amortization programs

15    for owners and tenants of residential, public, nonprofit, and business property to finance or

16    otherwise amortize cost effective fuel neutral renewable energy and energy efficiency investments

17    and improvements to the owner's or tenant's premises.  The total amount loaned in such programs

18    shall not exceed $5,000,000.  The [commission] *department* shall authorize terms, conditions, and

19    tariffs for the repayment of such loans and financed or underwritten investments and improvements

20    through charges billed through and that run with the meter or meters assigned to the location where

21    the investments are located, provided that such investments or improvements to a tenant's premises

22    are only made with the written consent of the owner or the owner's authorized management

23    representative.  Pursuant to RSA 477:4-h, the owner, seller, lessor, or transferor of any real property

24    subject to unamortized or ongoing charges under such a tariff shall disclose such fact to a prospective

25    buyer, lessee, or occupant who might be responsible for paying such charges as a condition of utility

26    service.  A public utility may not finance these loan, financing, or cost amortization programs

27    through its rate base, nor earn its regulated rate of return on such program investments and

28    improvements to the owner's or tenant's premises, unless such investment is approved as part of a

29    strategy for minimizing transmission and distributions costs pursuant to RSA 374-G.

30    279  Electric Utility Restructuring; Purpose.  Amend RSA 374-F:1, III to read as follows:

31         III.   The following interdependent policy principles are intended to guide the New

32    Hampshire public utilities commission *and the department of energy* in implementing a statewide

33    electric utility industry restructuring plan, in establishing interim stranded cost recovery charges, in

34    approving each utility's compliance filing, in streamlining administrative processes to make

35    regulation more efficient, and in regulating a restructured electric utility industry.  In addition,

36    these interdependent principles are intended to guide the New Hampshire general court and the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 126 -**

1  department of environmental services and other state agencies in promoting and regulating a
2  restructured electric utility industry.

3  280  New Paragraph; Definitions.  Amend RSA 374-F:2 by inserting after paragraph I-a the
4  following new paragraph:

5  I-b.  "Department" means the department of energy.

6  281  Restructuring Policy Principles; Implementation.  Amend RSA 374-F:3 and 374-F:4 to read
7  as follows:

8  374-F:3  Restructuring Policy Principles.

9  I.  System Reliability.  Reliable electricity service must be maintained while ensuring public
10  health, safety, and quality of life.

11  II.  Customer Choice.  Allowing customers to choose among electricity suppliers will help
12  ensure fully competitive and innovative markets.  Customers should be able to choose among options
13  such as levels of service reliability, real time pricing, and generation sources, including
14  interconnected self generation.  Customers should expect to be responsible for the consequences of
15  their choices.  The [commission] *department* should ensure that customer confusion will be
16  minimized and customers will be well informed about changes resulting from restructuring and
17  increased customer choice.

18  III.  Regulation and Unbundling of Services and Rates.  When customer choice is introduced,
19  services and rates should be unbundled to provide customers clear price information on the cost
20  components of generation, transmission, distribution, and any other ancillary charges.  Generation
21  services should be subject to market competition and minimal economic regulation and at least
22  functionally separated from transmission and distribution services which should remain regulated
23  for the foreseeable future.  However, distribution service companies should not be absolutely
24  precluded from owning small scale distributed generation resources as part of a strategy for
25  minimizing transmission and distribution costs.  Performance based or incentive regulation should
26  be considered for transmission and distribution services.  Upward revaluation of transmission and
27  distribution assets is not a preferred mechanism as part of restructuring.  Retail electricity suppliers
28  who do not own transmission and distribution facilities, should, at a minimum, be registered with
29  the [commission] *department*.

30  IV.  Open Access to Transmission and Distribution Facilities.  Non-discriminatory open
31  access to the electric system for wholesale and retail transactions should be promoted.
32  Comparability should be assured for generators competing with affiliates of groups supplying
33  transmission and distribution services.  Companies providing transmission services should file at the
34  FERC or with the commission, *or with the department of energy,* as appropriate, comparable
35  service tariffs that provide open access for all competitors.  The commission *and the department*
36  should monitor companies providing transmission or distribution services and take necessary
37  measures to ensure that no supplier has an unfair advantage in offering and pricing such services.

1      V.  Universal Service.

2          (a)   Electric service is essential and should be available to all customers.  A utility

3    providing distribution services must have an obligation to connect all customers in its service

4    territory to the distribution system.  A restructured electric utility industry should provide adequate

5    safeguards to assure universal service.   Minimum residential customer service safeguards and

6    protections should be maintained.  Programs and mechanisms that enable residential customers

7    with low incomes to manage and afford essential electricity requirements should be included as a

8    part of industry restructuring.

9          (b)   As competitive markets emerge, customers should have the option of stable and

10   predictable ceiling electricity prices through a reasonable transition period, consistent with the near

11   term rate relief principle of RSA 374-F:3, XI.  Upon the implementation of retail choice, transition

12   service should be available for at least one but not more than 5 years after competition has been

13   certified to exist in at least 70 percent of the state pursuant to RSA 38:36, for customers who have

14   not yet chosen a competitive electricity supplier.   Transition service should be procured through

15   competitive means and may be administered by independent third parties.  The price of transition

16   service should increase over time to encourage customers to choose a competitive electricity supplier

17   during the transition period.  Such transition service should be separate and distinct from default

18   service.

19         (c)   Default service should be designed to provide a safety net and to assure universal

20   access and system integrity.  Default service should be procured through the competitive market and

21   may be administered by independent third parties.  Any prudently incurred costs arising from

22   compliance with the renewable portfolio standards of RSA 362-F for default service or purchased

23   power agreements shall be recovered through the default service charge.  The allocation of the costs

24   of administering default service should be borne by the customers of default service in a manner

25   approved by the commission.  If the commission determines it to be in the public interest, the

26   commission may implement measures to discourage misuse, or long-term use, of default service.

27   Revenues, if any, generated from such measures should be used to defray stranded costs.

28         (d)   The commission should establish transition and default service appropriate to the

29   particular circumstances of each jurisdictional utility.

30         (e)   Notwithstanding any provision of subparagraphs (b) and (c), as competitive markets

31   develop, the commission may approve alternative means of providing transition or default services

32   which are designed to minimize customer risk, not unduly harm the development of competitive

33   markets, and mitigate against price volatility without creating new deferred costs, if the commission

34   determines such means to be in the public interest.

35         (f)(1)  For purposes of subparagraph (f), "renewable energy source" (RES) means a source

36   of electricity, as defined in RSA 362-F:2, XV, that would qualify to receive renewable energy

1   certificates under RSA 362-F, whether or not it has been designated as eligible under RSA 362-F:6,
2   III.

3        (2)  A utility shall provide to its customers one or more RES options, as approved by
4   the commission, which may include RES default service provided by the utility or the provision of
5   retail access to competitive sellers of RES attributes.  Costs associated with selecting an RES option
6   should be paid for by those customers choosing to take such option.  A utility may recover all
7   prudently incurred administrative costs of RES options from all customers, as approved by the
8   commission.

9        (3)  RES default service should have either all or a portion of its service attributable
10  to a renewable energy source component procured by the utility, with any remainder filled by
11  standard default service.  The price of any RES default service shall be approved by the commission.

12       (4)  Under any option offered, the customer shall be purchasing electricity generated
13  by renewable energy sources or the attributes of such generation, either in connection with or
14  separately from the electricity produced.  The regional generation information system of energy
15  certificates administered by the ISO-New England and the New England Power Pool (NEPOOL)
16  should be considered at least one form of certification that is acceptable under this program.

17       (5)  A utility that is required by statute to provide default service from its generation
18  assets should use any of its owned generation assets that are powered by renewable energy for the
19  provision of standard default service, rather than for the provision of a renewable energy source
20  component.

21       (6)  Utilities should include educational materials in their normal communications to
22  their customers that explain the RES options being offered and the health and environmental
23  benefits associated with them.  Such educational materials should be compatible with any
24  environmental disclosure requirements established by the [commission] ***department***.

25       (7)  For purposes of consumer protection and the maintenance of program integrity,
26  reasonable efforts should be made to assure that the renewable energy source component of an RES
27  option is not separately advertised, claimed, or sold as part of any other electricity service or
28  transaction, including compliance with the renewable portfolio standards under RSA 362-F.

29       (8)  If RES default service is not available for purchase at a reasonable cost on behalf
30  of consumers choosing an RES default service option, a utility may, as approved by the commission,
31  make payments to the renewable energy fund created pursuant to RSA 362-F:10 on behalf of
32  customers to comply with subparagraph (f).

33       (9)  The commission shall implement subparagraph (f) through utility-specific filings.
34  Approved RES options shall be included in individual tariff filings by utilities.

35       (10)  A utility, with commission approval, may require that a minimum number of
36  customers, or a minimum amount of load, choose to participate in the program in order to offer an
37  RES option.

Amendment to HB 2-FN-A-LOCAL
- Page 129 -

VI.  Benefits for All Consumers.  Restructuring of the electric utility industry should be implemented in a manner that benefits all consumers equitably and does not benefit one customer class to the detriment of another.  Costs should not be shifted unfairly among customers.  A nonbypassable and competitively neutral system benefits charge applied to the use of the distribution system may be used to fund public benefits related to the provision of electricity.  Such benefits, as approved by regulators, may include, but not necessarily be limited to, programs for low-income customers, energy efficiency programs, funding for the electric utility industry's share of commission **and department** expenses pursuant to RSA 363-A, support for research and development, and investments in commercialization strategies for new and beneficial technologies.  Legislative approval of the New Hampshire general court shall be required to increase the system benefits charge.  This requirement of prior approval of the New Hampshire general court shall not apply to the energy efficiency portion of the system benefits charge if the increase is authorized by an order of the commission to implement the 3-year planning periods of the Energy Efficiency Resource Standard framework established by commission Order No. 25,932 dated August 2, 2016, ending in 2020 and 2023, or, if for purposes other than implementing the Energy Efficiency Resource Standard, is authorized by the fiscal committee of the general court; provided, however, that no less than 20 percent of the portion of the funds collected for energy efficiency shall be expended on low-income energy efficiency programs.  Energy efficiency programs should include the development of relationships with third-party lending institutions to provide opportunities for low-cost financing of energy efficiency measures to leverage available funds to the maximum extent, and shall also include funding for workforce development to minimize waiting periods for low-income energy audits and weatherization.

VII.  Full and Fair Competition.  Choice for retail customers cannot exist without a range of viable suppliers.  The rules that govern market activity should apply to all buyers and sellers in a fair and consistent manner in order to ensure a fully competitive market.

VIII.  Environmental Improvement.  Continued environmental protection and long term environmental sustainability should be encouraged.  Increased competition in the electric industry should be implemented in a manner that supports and furthers the goals of environmental improvement.  Over time, there should be more equitable treatment of old and new generation sources with regard to air pollution controls and costs.  New Hampshire should encourage equitable and appropriate environmental regulation, based on comparable criteria, for all electricity generators, in and out of state, to reduce air pollution transported across state lines and to promote full, free, and fair competition.  As generation becomes deregulated, innovative market-driven approaches are preferred to regulatory controls to reduce adverse environmental impacts.  Such market approaches may include valuing the costs of pollution and using pollution offset credits.

IX.  Renewable Energy Resources.  Increased future commitments to renewable energy resources should be consistent with the New Hampshire energy policy as set forth in RSA 378:37

**Amendment to HB 2-FN-A-LOCAL**
**- Page 130 -**

1   and should be balanced against the impact on generation prices.  Over the long term, increased use
2   of cost-effective renewable energy technologies can have significant environmental, economic, and
3   security benefits.  To encourage emerging technologies, restructuring should allow customers the
4   possibility of choosing to pay a premium for electricity from renewable resources and reasonable
5   opportunities to directly invest in and interconnect decentralized renewable electricity generating
6   resources.

7        X.   Energy Efficiency.   Restructuring should be designed to reduce market barriers to
8   investments in energy efficiency and provide incentives for appropriate demand-side management
9   and not reduce cost-effective customer conservation.  Utility sponsored energy efficiency programs
10  should target cost-effective opportunities that may otherwise be lost due to market barriers.

11       XI.   Near Term Rate Relief.  The goal of restructuring is to create competitive markets that
12  are expected to produce lower prices for all customers than would have been paid under the current
13  regulatory system.  Given New Hampshire's higher than average regional prices for electricity,
14  utilities, in the near term, should work to reduce rates for all customers.  To the greatest extent
15  practicable, rates should approach competitive regional electric rates.  The state should recognize
16  when state policies impose costs that conflict with this principle and should take efforts to mitigate
17  those costs.  The unique New Hampshire issues contributing to the highest prices in New England
18  should be addressed during the transition, wherever possible.

19       XII.   Recovery of Stranded Costs.

20       (a)   It is the intent of the legislature to provide appropriate tools and reasonable
21  guidance to the commission in order to assist it in addressing claims for stranded cost recovery and
22  fulfilling its responsibility to determine rates which are equitable, appropriate, and balanced and in
23  the public interest.  In making its determinations, the commission shall balance the interests of
24  ratepayers and utilities during and after the restructuring process.  Nothing in this section is
25  intended to provide any greater opportunity for stranded cost recovery than is available under
26  applicable regulation or law on the effective date of this chapter.

27       (b)   Utilities should be allowed to recover the net nonmitigatable stranded costs
28  associated with required environmental mandates currently approved for cost recovery, and power
29  acquisitions mandated by federal statutes or RSA 362-A.

30       (c)   Utilities have had and continue to have an obligation to take all reasonable measures
31  to mitigate stranded costs.  Mitigation measures may include, but shall not be limited to:

32       (1)   Reduction of expenses.

33       (2)   Renegotiation of existing contracts.

34       (3)   Refinancing of existing debt.

35       (4)   A reasonable amount of retirement, sale, or write-off of uneconomic or surplus
36  assets, including regulatory assets not directly related to the provision of electricity service.

Amendment to HB 2-FN-A-LOCAL
- Page 131 -

1   (d)  Stranded costs should be determined on a net basis, should be verifiable, should not
2   include transmission and distribution assets, and should be reconciled to actual electricity market
3   conditions from time to time.  Any recovery of stranded costs should be through a nonbypassable,
4   nondiscriminatory, appropriately structured charge that is fair to all customer classes, lawful,
5   constitutional, limited in duration, consistent with the promotion of fully competitive markets and
6   consistent with these principles.  Entry and exit fees are not preferred recovery mechanisms.
7   Charges to recover stranded costs should only apply to customers within a utility's retail service
8   territory, except for such costs that have resulted from the provision of wholesale power to another
9   utility.  The charges should not apply to wheeling-through transactions.

10      XIII.  Regionalism.  New England Power Pool (NEPOOL) should be reformed and efforts to
11   enhance competition and to complement industry restructuring on a regional basis should be
12   encouraged.  New Hampshire should work with other New England and northeastern states to
13   accomplish the goals of restructuring.  Working with other regional states, New Hampshire should
14   assert maximum state authority over the entire electric industry restructuring process.  While it is
15   desirable to design and implement a restructured industry in concert with the other New England
16   and northeastern states, New Hampshire should not unnecessarily delay its timetable.  Any pool
17   structure adopted for the restructured industry should not preclude bilateral contracts with pool and
18   non-pool services and should not preclude ancillary pool services from being obtained from non-pool
19   sources.

20      XIV.  Administrative Processes.  The commission **and the department** should adapt [its]
21   **their** administrative processes to make regulation more efficient and to enable competitors to adapt
22   to changes in the market in a timely manner.  The market framework for competitive electric service
23   should, to the extent possible, reduce reliance on administrative process.  New Hampshire should
24   move deliberately to replace traditional planning mechanisms with market driven choice as the
25   means of supplying resource needs.

26      XV.  Timetable.  The commission should seek to implement full customer choice among
27   electricity suppliers in the most expeditious manner possible, but may delay such implementation in
28   the service territory of any electric utility when implementation would be inconsistent with the goal
29   of near-term rate relief, or would otherwise not be in the public interest.

30   374-F:4  Implementation.

31      I.  The commission is authorized to require the implementation of retail choice of electric
32   suppliers for all customer classes of utilities providing retail electric service under its jurisdiction.
33   The commission shall require such implementation at the earliest date determined to be in the
34   public interest by the commission.  However, in no event may the implementation be delayed beyond
35   July 1, 1998 without legislative approval or a finding of public interest by the commission that delay
36   is required due to events beyond the control of the commission or that implementation of retail
37   choice within the service territory of any electric utility would be inconsistent with the goal of near-

**Amendment to HB 2-FN-A-LOCAL**
**- Page 132 -**

1   term rate relief or would otherwise not be in the public interest.  In the event that implementation of
2   retail choice is delayed in the service territory of an electric utility, the electric utility shall continue
3   to provide reliable retail service at the lowest reasonable cost in accordance with state law.   In
4   addition, at the earliest practical date, the commission should make effective the unbundling of
5   components of rates into at least distribution, transmission, and generation for each jurisdictional
6   utility.

7       II.   Upon the effective date of this chapter, the commission shall undertake a generic
8   proceeding to develop a statewide industry restructuring plan in accordance with the above
9   principles, and shall, after public hearings, issue a final order no later than February 28, 1997.  In
10  its order, the commission shall establish the interim stranded cost recovery charge for each electric
11  utility as provided in paragraph VI.

12      III.   The commission shall require all electric utilities subject to its jurisdiction to submit
13  compliance filings ***to the department of energy***, which shall include open access tariffs and such
14  other information as the commission may require, no later than June 30, 1997.  The [commission]
15  ***department*** shall investigate and ***the commission*** shall approve utility compliance filings, subject
16  to modification by the commission if necessary, after public hearing and subject to a finding that the
17  filings are in the public interest and substantially consistent with the principles established in this
18  chapter.

19      IV.   A utility having less than a 50 percent share of statewide retail electric distribution
20  sales (measured in kilowatt hours per year) may seek a ruling by the commission that it is in the
21  public interest that implementation of such utility's compliance filing be deferred until compliance
22  filings representing 70 percent of retail electric sales have been or are being implemented.

23      V.  The commission is authorized to allow utilities to collect a stranded cost recovery charge,
24  subject to its determination in the context of a rate case or adjudicated settlement proceeding that
25  such charge is equitable, appropriate, and balanced, is in the public interest, and is substantially
26  consistent with these interdependent principles.  The burden of proof for any stranded cost recovery
27  claim shall be borne by the utility making such claim.

28      VI.(a)   In order to facilitate the rapid transition to full competition, the commission is
29  authorized, in its generic restructuring order as provided in paragraph II, to set, without a formal
30  rate case proceeding, an interim stranded cost recovery charge for each electric utility.  Such interim
31  stranded cost recovery charges shall be effective for not more than 2 years from the implementation
32  of utility compliance filings and shall be based on the commission's preliminary determination of an
33  equitable, appropriate, and balanced measure of stranded cost recovery that takes into account the
34  near term rate relief principle, is in the public interest, and is substantially consistent with these
35  interdependent principles.  The commission shall also consider the potential for future rate impacts
36  due to possible differences between interim stranded cost recovery charges and charges that may
37  finally be approved for stranded cost recovery.

1    (b)  Any utility may seek adjustment of the interim stranded cost recovery charge at any

2 time based on severe financial hardship, as determined by the commission.  The setting of an interim

3 stranded cost recovery charge shall establish no legal, factual, or policy precedent with respect to the

4 final determination of stranded cost recovery by the commission in any subsequent administrative or

5 judicial proceeding.

6    VII.   The interim stranded cost recovery charge established for a utility as provided in

7 paragraph VI may also be adjusted based upon the outcome of rate case proceedings to adjudicate

8 claims for stranded cost recovery pursuant to paragraph V of this section.  Any amounts approved by

9 the commission for stranded cost recovery shall be net of amounts previously collected through

10 interim stranded cost recovery charges.

11    VIII.(a)  The commission is authorized to order such charges and other service provisions and

12 to take such other actions that are necessary to implement restructuring and that are substantially

13 consistent with the principles established in this chapter.  The commission is authorized to require

14 that distribution and electricity supply services be provided by separate affiliates.

15    (b)  [Repealed.]

16    (c)  The portion of the system benefits charge due to programs for low-income customers

17 shall not exceed 1.5 mills per kilowatt hour.  If the commission determines that the low-income

18 program fund has accumulated an excess of $1,000,000 and that the excess is not likely to be

19 substantially reduced over the next 12 months, it shall suspend collection of some or all of this

20 portion of the system benefits charge for a period of time it deems reasonable.

21    (d)  [Repealed.]

22    (e)   Targeted conservation, energy efficiency, and load management programs and

23 incentives that are part of a strategy to minimize distribution costs may be included in the

24 distribution charge or the system benefits charge, provided that system benefits charge funds are

25 only used for customer-based energy efficiency measures, and such funding shall not exceed 10

26 percent of the energy efficiency portion of a utility's annual system benefits charge funds.  A proposal

27 for such use of system benefits charge funds shall be presented to the commission for approval.  Any

28 such approval shall initially be on a pilot program basis and the results of each pilot program

29 proposal shall be subject to evaluation by the commission.

30    (f)  Beginning in 2000, the commission ***and the department*** shall submit a report to the

31 legislative oversight committee to monitor the transformation of delivery of electric services by

32 October 1 of each year.  The report shall concern the results and effectiveness of the system benefits

33 charge.

34    (g)  [Repealed.]

35    VIII-a.  Any electric utility that collects funds for energy efficiency programs that are subject

36 to the commission's approval, shall include in its plans to be submitted to the commission program

37 design, and/or enhancements, and estimated participation that maximize energy efficiency benefits

**Amendment to HB 2-FN-A-LOCAL**
**- Page 134 -**

1    to public schools, including measures that help enhance the energy efficiency of public school
2    construction or renovation projects that are designed to improve indoor air quality.  The report
3    required under RSA 374-F:4, VIII(f) shall include the results and effectiveness of the energy
4    efficiency programs for schools and, in addition to other requirements, be submitted to the
5    commissioner of the department of education.

6         IX.  An electricity supplier shall be eligible to compete, subject to necessary limitations
7    established by the commission, for open access customers only if affiliated utilities file comparable
8    open access transmission and distribution rates with the FERC or the commission, or both as
9    appropriate, for all of their transmission facilities in New Hampshire and to the extent practicable,
10   all of their distribution facilities in New Hampshire.

11        X.  Nothing in this chapter shall be construed to prohibit the commission from otherwise
12   exercising its lawful authority under title 34, in proceedings which relate to the introduction of
13   competition in the retail electric utility industry including the retention of experts and consultants to
14   assist the commission in its investigations and the assessment of such costs against utilities and any
15   other parties to the proceedings, consistent with RSA 365:37 and RSA 365:38.

16        XI.  Any administrative or adjudicative proceeding or public hearing relating to this chapter
17   shall be subject to the provisions of RSA 541-A.

18        XII.  To the extent that the provisions of this chapter are applicable to rural electric
19   cooperatives for which a certificate of deregulation is on file with the commission, the commission
20   shall exercise its authority with regard to such deregulated rural electric cooperatives only when and
21   to the extent that the commission finds, after notice and hearing, that such action is required to
22   ensure that such deregulated rural electric cooperatives do not act in a manner which is inconsistent
23   with the restructuring policy principles of RSA 374-F:3.  The commission shall have the authority to
24   require that such deregulated rural electric cooperatives participate in proceedings, answer
25   commission ***and department*** for information and file such reports as may be reasonably necessary
26   to permit the commission to make an informed finding concerning the relevant restructuring policy
27   principle actions of such deregulated rural electric cooperatives.  Absent such a finding by the
28   commission, the active role of assuring that the restructuring policy principles are appropriately
29   addressed within their service territories shall be reserved to the deregulated rural electric
30   cooperatives.  Notwithstanding the foregoing, deregulated rural electric cooperatives shall be subject
31   to the commission's jurisdiction with regard to those provisions of RSA 374-F pertaining to stranded
32   cost recovery, customer choice, open access tariffs, default service, energy efficiency, and low income
33   programs to the same extent as other public utilities.

34        282  Electric Utility Restructuring; Ratepayer Protection.  Amend RSA 374-F:4-b to read as
35   follows:

36        374-F:4-b  Ratepayer Protection.

1      I.  Within 60 days of the effective date of this section, the commission shall initiate a

2 proceeding to develop rules to allow residential and small commercial customers to choose how they

3 receive communication from competitive electric suppliers and to implement the provisions of this

4 section.  Where the commission has adopted rules in conformity with this section, complaints to and

5 proceedings before the commission shall not be subject to RSA 541-A:29 or RSA 541-A:29-a.

6      II.  [Within 120 days of the effective date of this section, the commission shall redesign its

7 website to] ***The department of energy shall*** enable residential and small commercial customers to

8 compare standard pricing policies and charges and to require competitive electric suppliers to input

9 such information ***on the department's website***.  Such information shall be input no less frequently

10 than once per month, unless there is no change in such information.  [Such redesign shall:

11      (a)  Reflect the best practices of similar commission websites in other states and develop

12 a process for removal of a competitive electric supplier's listings from such Internet website based on

13 protocols established by the commission to ensure compliance with this section and to address

14 customer complaints.

15      (b)  Emphasize:

16      (1)  Uniformity in the way competitive electric suppliers provide information for each

17 category on the commission's website.

18      (2)  Ease of use by customers.

19      (3)  Ease of selecting and purchasing a specific contract from a competitive electric

20 supplier shown on the commission's website.

21      (c)  Include separate input boxes for the following information:

22      (1)  A link to the provider's web page.

23      (2)  Contract durations.

24      (3)  Whether the contract has variable or fixed rates, or both, and when such rates

25 apply.

26      (4)  Cancellation charges.

27      (5)  Rates.

28      (6)  Other relevant information.]

29      III.  [On or before July 1, 2017, and every 2 years thereafter, the commission] ***The***

30 ***department of energy*** shall review its website ***every 2 years*** and ensure that the site remains an

31 efficient tool for the comparison of pricing policies and charges among competitive electric suppliers.

32      IV.  Unless the contract specifies a month-to-month variable rate, no competitive electric

33 supplier shall charge a residential customer a variable rate, including during a contract term or

34 following the expiration of a contract, without first providing written notification in a form approved

35 by the commission of the nature of such variable rate 45 days prior to the commencement of the

36 variable rate.  The residential customer shall select the method of written notification at the time

**Amendment to HB 2-FN-A-LOCAL**
**- Page 136 -**

1   the contract is signed.  Such customer shall have the option to change the method of notification at
2   any time during the contract.

3        V.  Competitive electric suppliers shall retain records of any of the notices required in this
4   section for a period of not less than 2 years and shall make such records available to the commission
5   upon its request.

6   283  Oversight Committee; Report.  Amend RSA 374-F:5, III to read as follows:

7        III.  The committee shall provide an interim report on or before April 1, and an annual report
8   on or before November 1 to the governor, the speaker of the house, the senate president, the state
9   library, [and] the public utilities commission*, and the department of energy* on activities before
10  the public utilities commission and other cognizant state agencies in regard to evolving changes in
11  the provision of electric services to New Hampshire customers, including modernization of the
12  electric grid, development of technologies for electric storage, electrification of transportation, the
13  growth of distributed generation, the commission's role in a deregulated market, and such matters
14  as may arise that may present opportunities to improve the delivery of electric services or to reduce
15  cost.

16  284  Competitive Electricity Supplier Requirements; Participation in Regional Activities.  Amend
17  RSA 374-F:7 and 374-F:8 to read as follows:

18  374-F:7  Competitive Electricity Supplier Requirements.

19       I.  Competitive energy suppliers are not public utilities pursuant to RSA 362:2, though a
20  competitive energy supplier may seek public utility status from the [commission] *department* if it
21  so chooses.  Notwithstanding a competitive energy supplier's non-utility status, the [commission]
22  *department* is authorized to establish requirements, excluding price regulation, for competitive
23  electricity suppliers, including registration, registration fees, customer information, disclosure,
24  standards of conduct, and consumer protection and assistance requirements.  Unless electing to do
25  so, an electricity supplier that offers or sells at retail to consumers within this state products and
26  services that can lawfully be made available to such consumers by more than one supplier shall not,
27  because of such offers or sales, be deemed to be a public utility as defined by RSA 362:2.  These
28  requirements shall be applied in a manner consistent with the restructuring principles of this
29  chapter to promote competition among electricity suppliers.

30       II.  Aggregators of electricity load that do not take ownership of power or other services and
31  do not represent any supplier interest are not public utilities pursuant to RSA 362:2, but shall notify
32  the [commission] *department* of their intent to do business.  Municipalities that aggregate electric
33  power or energy services for their citizens pursuant to RSA 53-E are not public utilities pursuant to
34  RSA 362:2 and are not subject to the provisions of paragraph III and RSA 374-F:4-b.

35       III.  The *department may investigate and petition the* commission [may] *to* assess fines
36  against, revoke the registration of, order the rescission of contracts with residential customers of,

1  order restitution to the residential customers of, and prohibit from doing business in the state any
2  competitive electricity supplier, including any aggregator or broker, which is found to have:

3      (a)   Engaged in any unfair or deceptive acts or practices in the marketing, sale, or
4  solicitation of electricity supply or related services;

5      (b)   Violated the requirements of this section or any other provision of this title
6  applicable to competitive electricity suppliers; or

7      (c) Violated any rule adopted by the [commission] *department* pursuant to paragraph V
8  and RSA 374-F:4-b.

9      IV.  As a condition of operation, for a 2-year interim period from the date that competition is
10  implemented in one or more areas of the state, competitive energy suppliers and load aggregators
11  shall submit to the jurisdiction of the commission for mediation and resolution of disputes between
12  customers and competitive energy suppliers or aggregators.  Municipalities that aggregate electric
13  power or energy service for their citizens pursuant to RSA 53-E are not subject to this paragraph.

14      V.  The [commission] *department* shall adopt rules, under RSA 541-A, to implement this
15  section.  Where the [commission] *department* has adopted rules in conformity with this section,
16  complaints to and proceedings before the commission shall not be subject to RSA 541-A:29 or RSA
17  541-A:29-a.

18  374-F:8  Participation in Regional Activities.  The [commission] *department* shall advocate for
19  New Hampshire interests before the Federal Energy Regulatory Commission and other regional and
20  federal bodies.  The commission shall participate in the activities of the New England Conference of
21  Public Utility Commissioners, *and* the National Association of Regulatory Utility Commissioners,
22  and the *department shall participate in the activities of the* New England States Committee on
23  Electricity, or other similar organizations, and work with the New England Independent System
24  Operator and NEPOOL to advance the interests of New Hampshire with respect to wholesale
25  electric issues, including policy goals relating to fuel diversity, renewable energy, and energy
26  efficiency, and to assure nondiscriminatory open access to a safe, adequate, and reliable
27  transmission system at just and reasonable prices.  The [commission] *department* shall advocate
28  against proposed regional or federal rules or policies that are inconsistent with the policies, rules, or
29  laws of New Hampshire.  In its participation in regional activities, the commission *and the*
30  *department* shall consider how other states' policies will impact New Hampshire rates and work to
31  prevent or minimize any rate impact the commission *or department* determines to be unjust or
32  unreasonable.

33  285  Offshore Wind and Port Development; Commission Established; Membership.  Amend RSA
34  374-F:10, II(c) to read as follows:

35      (c) The [director of the office of strategic initiatives] *commissioner of the department*
36  *of energy*, or designee.

1    286  Reference Changed; Office of Offshore Wind Industry Development.  Amend RSA 374-F:10,

2    VI to read as follows:

3        VI.  The commission shall receive staff support and other services, including research and

4    facilities assessments, from the department of [business and economic affairs] *energy*, office of

5    offshore wind industry development established in RSA [12-O:51 ] *12-P:7-b*.

6    287  Definitions  Amend RSA 374-H:1, I to read as follows:

7        I.  ["Commission"] *"Department"* means the [public utilities commission] *department of*

8    *energy*.

9    288  Investigation of Energy Storage.  Amend RSA 374-H:2 to read as follows:

10    374-H:2  [Commission] *Department* Investigation of Energy Storage.

11        I.  Within 30 days of the effective date of this chapter, the [commission] *department* shall

12    [initiate a proceeding to investigate] *conduct an investigation into* ways to enable energy storage

13    projects to receive compensation for avoided transmission and distribution costs, including but not

14    limited to avoided regional and local network service charges, while also participating in wholesale

15    energy markets.  The [commission] *department* shall investigate how this might be done for both

16    utility-owned and non-utility-owned energy storage projects, as well as for both behind-the-meter

17    storage and front-of-the-meter storage.

18        II.    The  [commission's  investigative  proceeding]  *department's  investigation*  shall

19    specifically consider the following:

20        (a)   How public policy can best help establish accurate and efficient price signals for

21    energy storage projects that value their ability to avoid transmission and distribution costs while

22    simultaneously reducing wholesale electricity market prices.

23        (b)   How to compensate energy storage projects that participate in wholesale electricity

24    markets for avoided transmission and distribution costs in a manner that provides net savings to

25    consumers.

26        (c)   How best to encourage both utility and non-utility investments in energy storage

27    projects.

28        (d)   The costs and benefits of a potential bring your own device program; how such a

29    program might be implemented; any statutory or regulatory changes that might be needed to create,

30    facilitate,  and  implement  such  a  program;  and  whether  such  a  program  should  include  all

31    distributed energy resources or be limited to distributed energy storage projects.

32        (e)   Any statutory changes the general court should implement, including but not limited

33    to changes to or exceptions from RSA 374-F or RSA 374-G, to enable energy storage projects to

34    receive  appropriate  compensation  for  avoided  transmission  and  distribution  costs  while  also

35    participating in wholesale energy markets.

36        (f)   Any other topic the [commission] *department* reasonably believes it should consider

37    in order to diligently conduct the proceeding.

1    III.  The [commission] *department* shall report its findings and recommendations to the
2    standing committees of the house of representatives and senate with jurisdiction over energy and
3    utility matters no later than 2 years after initiating the proceeding.  The report shall identify ways
4    any recommended statutory changes can minimize any potential conflict with the restructuring
5    policy principles of RSA 374-F.

6    289  Fixing of Rates by Commission; Energy Policy Act Standards.  Amend RSA 378:7 and 378:7-
7    a to read as follows:

8    378:7  Fixing of Rates by Commission.  Whenever the commission shall be of opinion, after a
9    hearing had upon its own motion *or on motion of the department of energy* or upon complaint,
10   that the rates, fares or charges demanded or collected, or proposed to be demanded or collected, by
11   any public utility for service rendered or to be rendered are unjust or unreasonable, or that the
12   regulations or practices of such public utility affecting such rates are unjust or unreasonable, or in
13   any wise in violation of any provision of law, or that the maximum rates, fares or charges chargeable
14   by any such public utility are insufficient, the commission shall determine the just and reasonable or
15   lawful rates, fares and charges to be thereafter observed and in force as the maximum to be charged
16   for the service to be performed, and shall fix the same by order to be served upon all public utilities
17   by which such rates, fares and charges are thereafter to be observed.  The commission shall be under
18   no obligation to investigate *or hear* any rate matter which it has investigated within a period of 2
19   years, but may do so within said period at its discretion.

20   378:7-a  Energy Policy Act Standards.  [The commission] ***Consistent with their statutory***
21   ***authority, the commission and the department of energy*** may establish requirements for net
22   metering, fuel diversity, fossil fuel generation efficiency, advanced metering, time-based rates, and
23   interconnection with on-site generation facilities of customers in a manner not inconsistent with
24   section 111 of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. Chapter 46) as amended
25   by the Energy Policy Act of 2005.

26   290  Contracts for Advertising.  Amend RSA 378:24 to read as follows:

27   378:24  Contracts for Advertising.  All advertising contracts of public utilities shall be made at
28   regular, established, commercial advertising rates; and such contracts shall be open to inspection by
29   the commission ***and the department of energy*** at all times.

30   291  Filing; Inspection; Temporary Rates.  Amend RSA 378:26 and 378:27 to read as follows:

31   378:26  Filing; Inspection.  A copy of such list for the preceding year shall be filed with the
32   commission ***and the department of energy***, in such form and under such regulations as [the
33   commission] *they* may prescribe.  Such list, together with the books, records and papers of the
34   carrier so far as relevant, shall be open at all times to the inspection of the commission, who shall
35   examine the same whenever they deem it necessary to the due enforcement of this title.

36   378:27  Temporary Rates.  In any proceeding involving the rates of a public utility brought either
37   upon motion of the commission ***or the department of energy*** or upon complaint, the commission

1    may, after reasonable notice and hearing, if it be of the opinion that the public interest so requires,

2    immediately fix, determine, and prescribe for the duration of said proceeding reasonable temporary

3    rates; provided, however, that such temporary rates shall be sufficient to yield not less than a

4    reasonable return on the cost of the property of the utility used and useful in the public service less

5    accrued depreciation, as shown by the reports of the utility filed with the commission ***and the***

6    ***department of energy***, unless there appears to be reasonable ground for questioning the figures in

7    such reports.

8    292  Multi-use Data Energy Platform.  Amend RSA 378:50-378:52 to read as follows:

9    378:50  Definitions.  In this subdivision:

10    I. "Data sharing" means providing data and accessing data provided by others.

11    II. "Individual customer data" means the customer's name, address, opt-in status pursuant

12    to RSA 374:62, energy usage as recorded by meters supplied by electric and natural gas utilities, and

13    other data segments established and authorized by the [commission] ***department of energy***.

14    III. "Third party" means:

15    (a) Any service provider within the meaning of RSA 363:37, II other than a utility; and

16    (b) The office of the consumer advocate established pursuant to RSA 363:28.

17    378:51  Online Energy Data Platform Established.

18    I. The [commission] ***department of energy*** shall require electric and natural gas utilities to

19    establish and jointly operate a statewide, multi-use, online energy data platform.  The data platform

20    shall:

21    (a)  Consist of a common base of energy data for use in wide range of applications and

22    business uses.

23    (b) Adhere to specific and well-documented standards.

24    (c) Provide a user-friendly interface.

25    (d)  Adhere to a common statewide logical data model that defines the relationships

26    among the various categories of data included in the platform.

27    (e) Allow for sharing of individual customer data consistent with the opt-in requirements

28    for third-party access specified in RSA 363:38.

29    (f) Protect from unauthorized disclosure the personally identifying information of utility

30    customers in a manner that advances applicable constitutional and statutory privacy rights,

31    including the protections of RSA 363:38.

32    (g)  Provide for the voluntary participation of municipal utilities and deregulated rural

33    electric cooperatives in data sharing and the operation of the online energy data platform, subject to

34    terms, conditions, and cost sharing which are reasonable and in the public interest.

35    II.  The commission shall open an adjudicative proceeding within 90 days of the effective

36    date of this subdivision, to which all electric and natural gas utilities shall be mandatory parties, to

37    determine:

1     (a)  Governance, development, implementation, change management, and versioning of
2    the statewide, multi-use, online energy data platform.

3     (b)  Standards for data accuracy, retention, availability, privacy, and security, including
4    the integrity and uniformity of the logical data model.

5     (c)  Financial security standards or other mechanisms to assure compliance with privacy
6    standards by third parties.

7    III.   The [commission] *department of energy* shall defer the implementation of the
8    statewide, multi-use, online energy data platform pursuant to paragraph I if [it] *the commission*
9    determines that the cost of such platform to be recovered from customers is unreasonable and not in
10   the public interest.

11    IV.  The [commission] *department of energy* may adopt *additional* rules pursuant to RSA
12  541-A as necessary to implement this section.

13  378:52  Platform Requirements.  The utilities shall:

14    I.  Design and operate the energy data platform to provide opportunities for utilities, their
15  customers, and third parties to access the online energy data platform and to participate in data
16  sharing.

17    II.  Require, as a condition of accessing the online energy data platform, that a third party
18  complete a qualification and registration process to ensure that any customer data downloaded from
19  the platform remains in a safe, secure environment according to data privacy standards established
20  by the [commission] *department of energy*.

21    III.  Administer the online energy data platform in a manner consistent with RSA 363:38.

22  293  Regional Greenhouse Gas Initiative; Energy Efficiency Fund and Use of Auction Proceeds.
23  Amend RSA 125-O:23 to read as follows:

24  125-O:23  Energy Efficiency Fund and Use of Auction Proceeds.

25    I.  There is hereby established an energy efficiency fund.  This nonlapsing, special fund shall
26  be continually appropriated to the [commission] *department of energy* to be expended in
27  accordance with this section.  The state treasurer shall invest the moneys deposited therein, as
28  provided by law.  Income received on investments made by the state treasurer shall also be credited
29  to the fund.  All programs supported by these funds shall be subject to audit by the [commission]
30  *department of energy* as deemed necessary.  A portion of the fund moneys shall be used to pay for
31  [commission] *department of energy* and department *of environmental services* costs to
32  administer this subdivision, including contributions for the state's share of the costs of the RGGI
33  regional organization.  No fund moneys shall be used by the [commission] *department of energy* or
34  the department *of environmental services* to contract with outside consultants.  The *department*
35  *of energy* [commission] shall transfer from the fund to the department *of environmental services*
36  such costs as may be budgeted and expended, or otherwise approved by the fiscal committee of the

Amendment to HB 2-FN-A-LOCAL
- Page 142 -

1   general court and the governor and council, for the department's cost of administering this

2   subdivision.

3        II.  All amounts in excess of the threshold price of $1 for any allowance sale shall be rebated

4   to all retail electric ratepayers in the state on a per-kilowatt-hour basis, in a timely manner to be

5   determined by the commission.

6        III.  All remaining proceeds received by the state from the sale of allowances, excluding the

7   amount used for [commission] *department of energy* and department *of environmental services*

8   administration under paragraph I, shall be allocated by the commission as follows:

9        (a)  At least 15 percent to the low-income core energy efficiency program.

10        (b)  Beginning January 1, 2014, up to $2,000,000 annually to utility core programs for

11   municipal and local government energy efficiency projects, including projects by local governments

12   that have their own municipal utilities.  Funding elements shall include, but not be limited to,

13   funding for direct technical and project management assistance to identify and encourage

14   comprehensive projects and incentives structured to assist municipal and local governments funding

15   energy efficiency projects.  In calendar years 2014, 2015, and 2016, any unused funds allocated to

16   municipal and local government projects under this paragraph remaining at the end of the year shall

17   roll over and be added to the new calendar year program funds and continue to be made available

18   exclusively for municipal and local government projects.  Beginning in calendar year 2017, and all

19   subsequent years, funds allocated to municipal and local government projects under this paragraph

20   shall be offered first to municipal and local governments as described in this paragraph for no less

21   than 4 full calendar months.  If, at the end of this time, municipal and local governments have not

22   submitted requests for eligible projects that will expend the funds allocated to municipal and local

23   government projects under this paragraph within that program year, the funds shall be offered on a

24   first-come, first-serve basis to business and municipal customers who fund the system benefits

25   charge.

26        (c)  The remainder to all-fuels, comprehensive energy efficiency programs administered

27   by qualified parties which may include electric distribution companies as selected through a

28   competitive bid process.  The funding shall be distributed among residential, commercial, and

29   industrial customers based upon each customer class's electricity usage to the greatest extent

30   practicable as determined by the commission.  Bids shall be evaluated based on, but not limited to,

31   the following criteria:

32        (1)  A benefit/cost ratio analysis including all fuels.

33        (2)  Demonstrated ability to provide a comprehensive, fuel neutral program.

34        (3)  Demonstrated infrastructure to effectively deliver such program.

35        (4)  Experience of the bidder in administering energy efficiency programs.

36        (5)  Ability to reach out to customers.

37        (6)  The validity of the energy saving assumptions described in the bid.

IV.  The [electric] division of *policy and programs of* the [commission] *department of energy* shall conduct a competitive bid process for the selection of programs to be funded under subparagraph III(c), with such funding to begin January 1, 2015.  The [commission] *department of energy* may petition the governor and council to extend existing contracts until such time as the competitive bids are approved by the governor and council, but in no event later than July 1, 2015. The competitive bid process shall be repeated every 3 years thereafter.  Before extending any existing program, public comment on the proposed extension shall be accepted.

V.  Each entity receiving funding under subparagraph III(c) shall file an annual report on the performance of the entity's program.  The [commission] *department of energy* shall establish the format, content, and the methodologies used to provide the content of the reports.  The [commission] *department of energy* shall make use of, as applicable and appropriate, the monitoring and verification requirements used in the natural gas and electric utility core programs. The annual reports shall be delivered to the governor, the president of the senate, the speaker of the house of representatives, the chairmen of the senate and house standing committees with jurisdiction over energy matters, *the commissioner of the department of energy* and the [chairman] *chairperson* of the public utilities commission.  The reports shall include, but not be limited to, the following:

(a)  Program expenditures, including direct customer installation costs.

(b)  Resulting actual and projected energy savings by fuel type and associated $CO_2$ emissions reductions.

(c)  Any measurement and verification data that corroborate projected savings.

(d)  The number of customers served by the programs.

(e)  Other data as required by the commission in order to determine program effectiveness.

294  New Paragraph; Bank Commissioner; Public Deposit Investment Pool.  Amend RSA 383:22 by inserting after paragraph IV the following new paragraph:

V.  The commissioner shall charge the public deposit investment pool any actual costs incurred by the department for the operation of the pool as well as any expenses of department personnel assisting in the operation of the pool.  The cost for personnel assisting in the operation of the pool shall be determined in accordance with the per diem examination charge established in RSA 383:11, I, provided that the requirement that no entity shall be charged or pay less than one full day shall not apply.  The private investment advisor retained under paragraph II shall be responsible for processing any invoice submitted for the actual costs incurred by the department and the expenses of department personnel under this paragraph.

295  Tax Expenditure Report; Weighted Apportionment Factors Removed.  Amend RSA 71-C:2 to read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 144 -**

71-C:2  Tax Expenditures Specified.  Tax expenditures include, but may not be limited to, the community development finance authority investment tax credit as computed in RSA 162-L:10; the economic revitalization zone tax credit as computed in RSA 162-N:6; the research and development tax credit under RSA 77-A:5, XIII; the Coos county job creation tax credit under RSA 77-E:3-c; the education tax credit as computed in RSA 77-G:4; [the weighted apportionment factors under RSA 77-A:3, II(a);] *the regional career and technical education center tax credit pursuant to RSA 188-E:9-a;* and the exemption for qualified regenerative manufacturing companies allowed under RSA 77-A:1, I and RSA 77-E:1, III.

296  New Paragraph; Unemployment Compensation; Fraud Detection.  Amend RSA 282-A:118 by inserting after paragraph VII the following new paragraph:

VIII.   That for the purpose of preventing and detecting fraud in the unemployment compensation system as well as efficiently coordinating and streamlining integrity improvement efforts, the commissioner of the department of employment security may enter into an agreement with the National Association of State Workforce Agencies' Center for Employment Security Education and Research, Inc. (CESER) as agent for the United States Department of Labor (USDOL) for participation in the Integrity Data Hub (IDH).  The department's participation in IDH and any resulting use of confidential data by USDOL and CESER shall be in accordance with all state laws, federal laws as well as state and federal regulations pertaining to prevention and detection of fraud, waste, and abuse in the unemployment compensation system.  The information thus provided by the department to the IDH shall be used solely for administration of state and federal unemployment compensation laws.  Information under this paragraph shall only be provided upon a finding by the commissioner that sufficient guarantees of continued confidentiality are in place.

297   New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

Amendment to HB 2-FN-A-LOCAL
- Page 145 -

1    II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or

2    other workplace sensitivity training based on the inherent humanity and equality of all persons and

3    the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4    III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty

5    members of the university system of New Hampshire and the community college system of New

6    Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7    354-A:30  Definitions.  In this subdivision:

8    I.  "Government program" means any activity undertaken by a public employer, both as an

9    employer and in performance of its government function.

10   II.  "Public employee" means any person working on a full-time or part-time basis for the

11   state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,

12   water districts, school districts, school administrative units, or quasi-public entities.

13   III.  "Public employer" includes the state or any subdivision thereof, including, but not

14   limited to counties, cities, towns, precincts, water districts, school districts, school administrative

15   units, or quasi-public entities.

16   354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the

17   use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

18   recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

19   following:

20   I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21   status, familial status, mental or physical disability, religion, or national origin, are inherently

22   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23   color, marital status, familial status, mental or physical disability, religion, or national origin;

24   II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26   origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27   III.  That an individual should be discriminated against or receive adverse treatment solely

28   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29   status, familial status, mental or physical disability, religion, or national origin; or

30   IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31   marital status, familial status, mental or physical disability, religion, or national origin cannot and

32   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34   or national origin.

35   354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

36   program shall teach, advocate, or advance any one or more of the following:

Amendment to HB 2-FN-A-LOCAL
- Page 146 -

1    I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
2    status, familial status, mental or physical disability, religion, or national origin are inherently
3    superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
4    color, marital status, familial status, mental or physical disability, religion, or national origin;

5    II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
6    race, creed, color, marital status, familial status, mental or physical disability, religion, or national
7    origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8    III.  That an individual should be discriminated against or receive adverse treatment solely
9    or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
10   status, familial status, mental or physical disability, religion, or national origin; or

11   IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
12   marital status, familial status, mental or physical disability, religion, or national origin cannot and
13   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
15   or national origin.

16   354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse
17   employment action, warning, or discipline of any kind for refusing to participate in any training,
18   program, or other activity at which a public employer or government program advocates, trains,
19   teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
20   following:

21   I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
22   status, familial status, mental or physical disability, religion, or national origin are inherently
23   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
24   color, marital status, familial status, mental or physical disability, religion, or national origin;

25   II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
26   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
27   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28   III.  That an individual should be discriminated against or receive adverse treatment solely
29   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
30   status, familial status, mental or physical disability, religion, or national origin; or

31   IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
32   marital status, familial status, mental or physical disability, religion, or national origin cannot and
33   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
34   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
35   or national origin.

354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any other applicable common law or statutory cause of action.

298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after section 39 the following new section:

193:40  Prohibition on Teaching Discrimination.

I.  No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b)  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c)  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.

III.  Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV.  Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

V.  For the purposes of this section, "educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are included within the definition of this term.

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any
2    person or circumstance is held to be invalid, the remainder of such sections, and their application to
3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.

5    301  Application of Emergency Orders.

6        I.   The state hereby recognizes that the issuance of multiple executive orders may have
7    created undue hardship or confusion and contributed to the stressful environment for business
8    operations, particularly small business entities.  The penalties associated with violations of these
9    orders, while issued in the interest of public health, should not unduly penalize law-abiding
10   businesses.

11       II.   Notwithstanding any provision of law to the contrary, state, county, and local
12   jurisdictions shall not enforce, and shall reverse, any violation of the governor's emergency orders
13   regarding the COVID-19 pandemic.

14       III.  Any business fines issued under executive or emergency orders issued in response to
15   COVID-19 or in accordance with RSA 4:47 shall be refunded.  The governor is hereby authorized to
16   draw a warrant for up to $10,000 for this purpose out of any money in the treasury not otherwise
17   appropriated.

18       IV.  The attorney general shall request that the court dismiss any pending enforcement
19   action related to violation of an emergency order issued by the governor in response to the COVID-19
20   pandemic.

21       V.   Any record of violation or written warning for such violations shall be expunged if
22   requested in writing, and such records shall not be admissible in any subsequent or future court
23   proceeding.  Notwithstanding the provisions of RSA 651:5, IX, there shall be no charge to the
24   petitioner for expungement of these records.

25   302  New Sections; Animal Records Database.  Amend RSA 437 by inserting after section 8 the
26   following new sections:

27   437:8-a  Animal Records Database Established.

28       I.   The department of agriculture, markets, and food shall design, establish, and contract
29   with a third party for the implementation and operation of an electronic system to facilitate the
30   handling of animal records.

31       II.   The department shall maintain a reporting system capable of receiving electronically
32   transmitted records from veterinarians.  The commissioner shall adopt rules under RSA 541-A to
33   govern methods of obtaining, compiling, and maintaining such information he or she deems
34   necessary to manage such database including procedures for providing authorized access.  The
35   commissioner shall also ensure that the database is secure from unauthorized access or use.

36       III.  The commissioner may issue a waiver to a veterinarian who is unable to submit
37   information by electronic means.  Such waiver may permit the veterinarian to submit information by

1   paper form or other means, provided all information required by RSA 437:8 is submitted in this
2   alternative format and within the established time limit.

3         IV.   The commissioner may grant a reasonable extension to a veterinarian who is unable, for
4   good cause, to submit all the information required by RSA 437:8 within the established time limits.
5   Any veterinarian who in good faith reports to the program as required by RSA 437:8 shall be
6   immune from any civil or criminal liability as the result of such good faith reporting.

7         V.  There is established a nonlapsing fund to be known as the animal records database fund
8   in the department of agriculture, markets, and food which shall be kept distinct and separate from
9   all other funds.  All moneys in the animal records database fund shall be nonlapsing and continually
10  appropriated to the commissioner, and except as otherwise provided in law, shall be used for the
11  purpose of administering and maintaining the animal records database established in this section.
12  The database fund shall draw moneys only from grants and appropriations.

13        VI.   Notwithstanding paragraph V, the fund shall be initiated by transfers from the
14  agricultural product and scale testing fund established under RSA 435:20, IV, as provided in RSA
15  435:20, V.

16  437:8-b  Confidentiality.

17        I.  Information submitted to the animal records database is exempt from public disclosure,
18  and shall not be subject to discovery, subpoena, or other means of legal compulsion for release.
19  Disclosure to local, state, and federal officials is not public disclosure.  This exemption shall not
20  affect the disclosure of information used in official local, state, or federal animal health
21  investigations or pet vendor license investigations under this chapter.   Database records,
22  information, or lists may be made available pursuant to a court order on a case-by-case basis.  Any
23  information, record, or list received pursuant to this paragraph shall not be transferred or otherwise
24  made available to any other person or listed entity not authorized under this paragraph.

25        II.   The department shall establish and maintain procedures to ensure the privacy and
26  confidentiality of animal and animal owner information.

27        III.   The department may use and release information and reports from the program for
28  program analysis and evaluation, statistical analysis, public research, public policy, and educational
29  purposes, provided that the data are aggregated or otherwise de-identified.

30        IV.   No animal records database records, information, or lists shall be sold, rented,
31  transferred, or otherwise made available in whole or in part, in any form or format, directly or
32  indirectly, to another person.

33        V.  Certificates of transfer shall be removed from the animal records database after 4 years.

34        VI.   Any person who knowingly accesses, alters, destroys, publishes, or discloses animal
35  records database information except as authorized in this section or attempts to obtain such
36  information by fraud, deceit, misrepresentation, or subterfuge shall be guilty of a class B felony.

1     VII.  Nothing in this section shall limit the right of a person damaged by a violation to
2  pursue any other appropriate cause of action.

3     303  Certificates of Transfer for Dogs and Cats.  RSA 437:8 is repealed and reenacted to read as
4  follows:

5     437:8  Certificates of Transfer for Dogs, Cats, and Ferrets.

6     I.  For purposes of this chapter, an official certificate of transfer means an electronic record
7  electronically submitted to the animal records database by a licensed veterinarian, containing the
8  name and address of the entity transferring ownership of the dog, cat, or ferret, the age, gender,
9  breed, microchip number, tattoo number, ear tag number, or physical description of the dog, cat, or
10  ferret, and the certification by the veterinarian that the dog, cat, or ferret is free from evidence of
11  communicable diseases or internal or external parasites.  A list of all vaccines and medication
12  administered to the dog, cat, or ferret shall be included in or attached to the certificate.  An official
13  certificate of transfer is distinct from a federal certificate of veterinary inspection and is not
14  interchangeable with a certificate of veterinary inspection .

15     II.  The electronically submitted certificate of transfer shall be considered the official
16  certificate of transfer.  A copy of the certificate of transfer of the dog, cat, or ferret offered for
17  transfer by a licensee shall be kept on the premises where dogs, cats, and ferrets are displayed, and
18  made available for inspection by the department, local officials, or a member of the public upon
19  request up to one year after the animal has left the facility.  The public shall be informed of their
20  right to inspect a copy of the certificate of transfer for each dog, cat, or ferret offered for transfer by a
21  sign prominently displayed in the area where dogs, cats, or ferrets are displayed.  Upon transfer of a
22  dog, cat, or ferret, a copy of that animal's certificate of transfer shall be given to the transferee in
23  addition to any other documents which are customarily delivered to the transferee.

24     III.  For purposes of this chapter, an official certificate of transfer waiver means an electronic
25  record electronically submitted to the animal records database provided in lieu of an official
26  certificate of transfer for a dog, cat, or ferret that has failed the examination for an official certificate
27  of transfer because of a non-contagious illness, feline leukemia, or feline immunodeficiency virus.
28  The waiver shall contain the name and address of the entity transferring ownership of the dog, cat,
29  or ferret; the age, gender, breed, microchip number, tattoo number, ear tag number, or physical
30  description of the dog, cat, or ferret; the reason for failure of the examination for the official
31  certificate of transfer; and the signature of the transferee indicating that the transferee has
32  knowledge of the dog's, cat's, or ferret's non-contagious medical condition.  A list of all vaccines and
33  medication administered to the dog, cat, or ferret shall be included in or attached to the certificate of
34  transfer waiver.  The waiver shall be submitted electronically to the animal records database by a
35  New Hampshire licensed veterinarian.

36     IV.  No person, firm, corporation, or other entity shall ship or bring into the state of New
37  Hampshire, to offer for transfer in the state of New Hampshire, any cat, dog, or ferret less than 8

1   weeks of age.  No person, firm, corporation, or other entity shall offer for transfer any cat, dog, or

2   ferret less than 8 weeks of age.

3        V.  Once a dog, cat, or ferret intended for transfer has entered the state, it shall be held at

4   least 48 hours at a facility licensed under RSA 437 or at a facility operated by a licensed veterinarian

5   separated from other animals on the premises before being offered for transfer.

6        VI.  No animal shelter shall transfer any dog, cat or ferret that is received from outside of the

7   state until the quarantine requirements in 437:8, V have been met and without an official transfer

8   certificate.  Animal shelter facilities, as defined in RSA 437:1, I, are exempt from the requirements of

9   this section relative to transferring dogs, cats, and ferrets except that:

10        (a)  All animal shelter facilities shall have on premises a microchip scanner and shall

11   maintain a file of recognized pet retrieval agencies, including but not limited to national tattoo or

12   microchip registries.

13        (b)  Where an owner is not known, all animal shelter facilities shall inspect for tattoos,

14   ear tags, or other permanent forms of positive identification and shall scan for a microchip upon

15   admission of an unclaimed or abandoned animal as defined in RSA 437:18, IV and prior to

16   transferring ownership of an unclaimed or abandoned animal.

17        VII.  No dog, cat, or ferret shall be offered for transfer by a licensee or by any individual

18   without first being protected against infectious diseases using vaccines approved by the state

19   veterinarian.  No dog, cat, or ferret shall be offered for transfer by a licensee or by any individual

20   unless accompanied by a copy of the official certificate of transfer or official certificate of transfer

21   waiver issued by a licensed veterinarian within the prior 14 days.  No transfer shall occur unless the

22   transferred animal is accompanied by a copy of the official certificate of transfer or official certificate

23   of transfer waiver.  The official certificate of transfer or official certificate of transfer waiver shall

24   reside in the animal records database.  Copies shall be provided to the veterinarian, transferor, and

25   the transferee, who shall retain copies for their records.  The transferor shall retain a copy for his or

26   her records.  If an official certificate of transfer or official certificate of transfer waiver is produced, it

27   shall be prima facie evidence of transfer.

28   304  New Subparagraph; Animal Records Database Fund.  Amend RSA 6:12, I(b) by inserting

29   after subparagraph (364) the following new subparagraph:

30        (365)  Moneys deposited in the animal records database fund established in RSA

31   437:8-a, V.

32   305  New Paragraph; Agricultural Product and Scale Testing Fund; Transfer Authority.  Amend

33   RSA 435:20 by inserting after paragraph IV the following new paragraph:

34        V.  The commissioner shall transfer funds from the agricultural product and scale testing

35   fund established under RSA 435:20, IV to the animal records database fund established in RSA

36   437:8-a to develop and make operational the animal records database.  The commissioner shall

37   certify to the secretary of state and the director of the office of legislative services the date on which

Amendment to HB 2-FN-A-LOCAL
- Page 152 -

1   the animal records database is operational.  For 2 years after such certification, if needed for

2   database operation and maintenance, the commissioner may continue to transfer additional funds

3   from the agricultural product and scale testing fund to the animal records database fund for this

4   purpose.

5   306  Repeal.  RSA 435:20, V, relative to the authority of the commissioner of the department of

6   agriculture, markets, and food to transfer funds from the agricultural product and scale testing fund,

7   is repealed.

8   307  Applicability; Effective Dates.

9      I.  Section 303 of this act shall take effect 90 days after the commissioner of the department

10   of agriculture, markets, and food certifies to the secretary of state and the director of the office of

11   legislative services that the animal records database established in RSA 437:8-a is operational.

12      II.  Section 306 of this act shall take effect 2 years from the date on which the commissioner

13   of the department of agriculture, markets, and food certifies to the secretary of state and the director

14   of the office of legislative services, that the animal records database established in RSA 437:8-a is

15   operational.

16   308  Appropriation.  The sum of $250,000 for the fiscal year ending June 30, 2023 is hereby

17   appropriated to the department of agriculture, markets, and food for the maintenance of the animal

18   records database.  These appropriations are in addition to any other funds appropriated to the

19   department of agriculture, markets, and food.  The governor is authorized to draw a warrant for said

20   sum out of any money in the treasury not otherwise appropriated.

21   309  Position Established.  The classified position of IT manager III is established in the

22   department of information technology to develop and administer the animal records database

23   established in RSA 437:8-a.

24   310  Effective Date.

25      I.  Section 302 of this act shall take effect upon its passage.

26      II.  Section 303 of this act shall take effect as provided in paragraph I of section 307 of this

27   act.

28      III.  Section 306 of this act shall take effect as provided in paragraph II of section 307 of this

29   act.

30   311  Community College System of New Hampshire; Dual and Concurrent Enrollment Program.

31   Amend RSA 188-E:25 through 188-E:29 to read as follows:

32   188-E:25  Definitions.  In this subdivision:

33      I. ***"CCSNH" means the community college system of New Hampshire.***

34      ***II.*** "Concurrent enrollment" means courses taught at the high school by high school teachers

35   approved by [the community college system of New Hampshire (CCSNH)] ***CCSNH*** in which high

36   school students earn both high school and college or university credit while students are still

37   attending high school or a career technical education center.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 153 -**

1    [II.] *III.* "Dual enrollment" means college courses taught by instructors from [the community

2    college system of New Hampshire (CCSNH)] *CCSNH* in which high school students earn college

3    credit while students are still enrolled in high school or a career technical education center.

4    188-E:26  Program Established.  There is established a dual and concurrent enrollment program

5    in [the department of education] *CCSNH*.  Participation in the program shall be offered to high

6    school and career technical education center students in grades 10 through 12.  The program shall

7    provide opportunities for qualified New Hampshire high school students to gain access and support

8    for dual and concurrent enrollment in STEM (science, technology, engineering, and mathematics)

9    and STEM-related courses that are fundamental for success in postsecondary education and to meet

10   New Hampshire's emerging workforce needs.

11   188-E:27  Enrollment Requirements.

12       I.  An interested high school student in grades 10 through 12 may enroll in a course that is

13   designated by [the] CCSNH as part of the dual and concurrent enrollment program.

14       II.  A student in the program shall be provided funding for enrollment in no more than 2 dual

15   or concurrent enrollment courses taken in grade 10, no more than 2 dual or concurrent enrollment

16   courses taken in grade 11, and no more than 2 dual or concurrent enrollment courses taken in grade

17   12.  A student may take more than 2 dual or concurrent enrollment courses per year at his or her

18   own expense.

19       III.(a)  The state shall pay the current rate of concurrent enrollment tuition, which is

20   established at $150 per course, to the CCSNH institution where a high school or career and technical

21   education student successfully completes the concurrent enrollment course.

22           (b)  The state shall pay the current rate of dual enrollment tuition, which is established

23   at 1/2 the regular cost of the course, to the CCSNH institution where a high school or career and

24   technical education student successfully completes a dual enrollment course and [the] CCSNH shall

25   accept such amount as full payment for course tuition.

26       IV.  Each high school should provide a designated individual to serve as the point of contact

27   on matters related to the program, including but not limited to, student counseling, support services,

28   course scheduling, managing course forms and student registration, program evaluation, course

29   transferability, and assisting with online courses.  Each high school shall annually notify all high

30   school students and their parents of dual and concurrent enrollment opportunities.

31   188-E:28  School Board Policy.

32       I.  No later than July 1, 2018, the school board of each school district shall develop and adopt

33   a policy permitting students residing in the district who are in grade 11 or 12 to participate in the

34   dual and concurrent enrollment program.  The policy shall, at a minimum, include compliance with

35   measurable educational standards and criteria approved by [the] CCSNH and that meet the same

36   standard of quality and rigor as courses offered on campus by [the] CCSNH.  The policy shall also

37   comply with the standards for accreditation and program development established by the National

**Amendment to HB 2-FN-A-LOCAL**
**- Page 154 -**

1   Alliance for Concurrent Enrollment Partnerships.  The policy shall include, but not be limited to,

2   student eligibility criteria, standards for course content, standards for faculty approval, program

3   coordination and communication requirements, tuition and fees, textbooks and materials, course

4   grading policy, data collection, maintenance, and security, revenue and expenditure reporting, and

5   process for renewal of the agreement.

6       II.  The department of education and [the] CCSNH shall develop and approve a model dual

7   and concurrent enrollment agreement that shall be used by the CCSNH and the school board of a

8   school district participating in the dual and concurrent enrollment agreement program.  The model

9   agreement shall include standards established by [the] CCSNH, shall include elements, standards,

10  and criteria that have been approved by the department of education and CCSNH, and shall serve as

11  the framework for the development, implementation, and administration of the dual and concurrent

12  enrollment program in each school district by clearly defining the procedures related to concurrent

13  and dual enrollment of high school students in college classes.  [The department] *CCSNH* shall

14  further develop guidelines for the program relating to reporting, accountability, and payment of

15  available funds to [the] CCSNH.

16      188-E:29  Budget Requests.

17      *I*.  The [commissioner of the department of education] *chancellor of CCSNH, or his or her*

18  *designee,* shall submit expenditure requests in accordance with RSA [9:4] *9:4-e* to fund the dual and

19  concurrent enrollment program established in this subdivision.

20      *II.  In the event expenditures by CCSNH for the dual and concurrent enrollment*

21  *program exceed amounts appropriated by the state, the chancellor, or his or her designee,*

22  *may request the fiscal committee of the general court authorize additional funding.*

23  *Amounts requested under this paragraph shall be limited to direct program costs and*

24  *shall not include costs relative to program administration.  For funds requested and*

25  *approved, the governor is authorized to draw a warrant from any money in the treasury*

26  *not otherwise appropriated.*

27      312  Dual and Concurrent Enrollment Program; Appropriation.  The sums of $1,500,000 for the

28  fiscal year ending June 30, 2022, and $1,500,000 for the fiscal year ending June 30, 2023, are hereby

29  appropriated to community college system of New Hampshire for the purpose of funding and

30  administering the dual and concurrent enrollment program under RSA 188-E:26.   This

31  appropriation shall be in addition to any other funds appropriated to the community college system

32  of New Hampshire.  The governor is authorized to draw a warrant for said sums out of any money in

33  the treasury not otherwise appropriated.  Said appropriation shall not lapse.

34      313  School Building Aid; Annual Grant for Leased Space.  Amend the introductory paragraph of

35  RSA 198:15-hh, I to read as follows:

36      I.  The amount of the annual grant for a lease to any school district duly organized, any city

37  maintaining a school department within its corporate organization, any cooperative school district as

1    defined in RSA 195:1, or any receiving district operating an area school as defined in RSA 195-A:1,
2    shall be a sum equal to 30 percent of the amount of the annual payment of the lease incurred, for the
3    cost of leasing permanent space in a building or buildings not owned by the school district or school
4    administrative unit which is used for the operation of a high school vocational technical education
5    program, to the extent approved by the state board of education.  For the purposes of this section,
6    the amount of the annual grant for a lease to a vocational technical education center shall be
7    calculated in the same manner as a cooperative school district.  The amount of the annual grant for a
8    chartered public school authorized under RSA 194-B:3-a shall be a sum equal to 30 percent of the
9    annual lease payment incurred for the cost of leasing space; provided that no annual grant for leased
10   space provided to a chartered public school in accordance with this section shall exceed [$30,000]
11   **$50,000** in any fiscal year.  The total amount of grants to schools pursuant to this section shall not
12   exceed the state appropriation for leased space.  If the amount appropriated is insufficient therefor,
13   the appropriation shall be prorated proportionally among the schools eligible for a grant.  Such lease
14   agreements shall be eligible for grants under this section, provided all of the following conditions
15   apply:

16   314  New Paragraph; Ten Year Plan for Grant Projects.  Amend RSA 198:15-a by inserting after
17   paragraph IV the following new paragraph:

18       V.  The department of education shall develop and maintain a 10-year school facilities plan of
19   potential school building grant projects.  Potential projects shall include, but not be limited to,
20   criteria pursuant to RSA 198:15-c, II(b).  The 10-year plan is intended to create a method to identify
21   and enhance school facilities in a safe, healthy, and efficient manner while providing adequate
22   learning environments for New Hampshire's students.  The 10-year plan shall be updated every
23   biennium to provide the department a summary of projects and school facility capital expenditures
24   that are anticipated for the next 10 years.  The state board of education shall adopt rules pursuant to
25   RSA 541-A relative to this paragraph.  The plan shall identify new construction, renovation, and
26   emergency projects, and describe the overall condition of projects contained in the plan.

27   315  New Paragraph; Kindergarten Adequate Education Grants.  Amend RSA 198:48-b by
28   inserting after paragraph II the following new paragraph:

29       III.  For the fiscal year ending June 30, 2021, and every fiscal year thereafter, the amount
30   necessary to fund the grants under this section is hereby appropriated to the department from the
31   education trust fund established in RSA 198:39.  If the balance in the education trust fund is less
32   than zero, the governor is authorized to draw a warrant for sufficient funds to eliminate such deficit
33   out of any money in the treasury not otherwise appropriated.  The commissioner of the department
34   of administrative services shall inform the fiscal committee and the governor and council of such
35   balance.  This reporting shall not in any way prohibit or delay the distribution of kindergarten
36   adequate education grants.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 156 -**

316  Appropriation; Department of Education.  The sum of $1,906,313 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of education for the purpose of funding and distributing additional adequate education grants under RSA 198:48-b, I and II.  Of this appropriation, $840,039 shall be for payments for those districts that would have been eligible for said grants had the provisions of RSA 198:48-b, I and II, been in effect for the fiscal year ending June 30, 2020.  Said appropriation shall be a charge against the education trust fund and shall not lapse.

317  Effective Date.  Sections 315 and 316 of this act shall take effect June 30, 2021.

318  School Planning Committees; Vacancies.  Amend RSA 671:33 to read as follows:

671:33  Vacancies.

I.  Vacancies among members of cooperative or area school planning committees shall be filled by the moderator for the unexpired term.

II.(a)  The school board shall fill vacancies occurring on the school board, except as provided in subparagraph (b), and in all other district offices for which no other method of filling a vacancy is provided.  Appointees of the school board shall serve until the next district election when the voters of the district shall elect a replacement for the unexpired term.  In the case of a vacancy of the entire membership of the school board, or if the remaining members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or towns involved shall appoint members by majority vote in convention.

(b)  In a cooperative school district, the remaining school board members representing the same town or towns as the departed member shall fill a vacancy on the school board, provided that there are at least 2 such members.  *A member-at- large shall also be included as a representative of the same town.*  If there are less than 2 remaining members on the cooperative school board representing the same town or towns as the departed member, or if the remaining members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or towns involved shall fill the vacancy by majority vote in convention.  If the selectmen are unable to fill the vacancy then the cooperative school district moderator shall make the appointment.  A member appointed to fill a vacancy under this subparagraph shall serve until the next district election when the voters of the district shall elect a replacement for the unexpired term.

III.  Vacancies in the office of moderator shall be filled by vote at a school meeting or election, provided that, until a replacement is chosen, the school district clerk shall serve as moderator or shall appoint a moderator pro tempore.

IV.  In a cooperative school district, the remaining budget committee members representing the same town or towns as the departed member shall fill a vacancy on the budget committee, provided that there are at least 2 such members.  *A member-at- large shall also be included as a representative of the same town.*  If there are less than 2 remaining members on the budget committee representing the same town or towns as the departed member, or if the remaining

1    members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or

2    towns involved shall fill the vacancy by majority vote in convention.  If the selectmen are unable to

3    fill the vacancy then the cooperative school district moderator shall make the appointment.  If the

4    vacancy is for the cooperative school board representative to the cooperative school district budget

5    committee, such vacancy shall be filled by the cooperative school board.  A member appointed to fill a

6    vacancy under this subparagraph shall serve until the next district election when the voters of the

7    district shall elect a replacement for the unexpired term.

8        319  Appropriation; Department of Transportation.

9            I.  There is hereby appropriated to the department of transportation the sum of $11,000,000

10   for the biennium ending June 30, 2023, which shall be expended pursuant to this section.  The

11   governor is authorized to draw a warrant for said sum out of any money in the treasury not

12   otherwise appropriated.

13           II.  The sum appropriated in this section shall be allocated as follows:

14               (a)  $5,000,000 for the highway and bridge betterment program established in RSA

15   235:23-a.

16               (b)  $6,000,000 for the acquisition of fleet vehicles and equipment.

17       320  Appropriation; Department of Education.

18           I.  There is hereby appropriated to the department of education the sum of $30,000,000, for

19   the fiscal year ending June 30, 2021, for school building aid on new projects under RSA 198:15-a.

20   This appropriation shall be a charge against the education trust fund and shall not lapse until June

21   30, 2023.

22           II.  The $50,000,000 cap on school building aid grants for construction or renovation projects

23   approved by the department of education under RSA 198:15-a, IV shall be suspended for the

24   biennium ending June 30, 2023.

25       321  Section 320 of this act shall take effect June 30, 2021.

26       322  Education Tax Revenue; Fiscal Year 2023.  For the fiscal year ending June 30, 2023, and

27   notwithstanding RSA 76:3, the commissioner of the department of revenue administration shall set

28   the education tax rate at a level sufficient to generate revenue of $263,000,000 when imposed on all

29   persons and property taxable pursuant to RSA 76:8, except property subject to tax under RSA 82 and

30   RSA 83-F.  The education property tax rate shall be effective for tax periods beginning on or after

31   April 1, 2022.  The rate shall be set to the nearest 1/2 cent necessary to generate the revenue

32   required in this section.

33       323  Supplemental Education Payment; Fiscal Year 2023.  The commissioner of education, in

34   consultation with the commissioner of the department of revenue administration, shall determine if

35   any municipality's total education grant pursuant to RSA 198:41, including all statewide education

36   property tax raised and retained locally, is decreased due to the statewide education property tax

37   reduction in  section 322 of this act.  Any amounts identified shall be paid to impacted municipalities

**Amendment to HB 2-FN-A-LOCAL**
**- Page 158 -**

1    pursuant to the distribution schedule under RSA 198:42.  The governor is authorized to draw a

2    warrant from the education trust fund to satisfy the state's obligation under this section.

3    324  Effective Date.  Sections 322 and 323 of this act shall take effect July 1, 2021.

4    325  Department of Health and Human Services; Child Care Services.  The commissioner of the

5    department of health and human services shall be responsible for determining, on an ongoing basis

6    through June 30, 2023, whether there is sufficient funding in account 05-95-42-421110-2977, class

7    536, to fund employment-related child care services to avoid a wait list.  If at any time the

8    commissioner determines that funding is insufficient, he or she shall, to the extent allowed by

9    applicable federal regulations, utilize available federal Temporary Assistance to Needy Families

10   reserve funds to cover the amount of the shortfall.  The department shall report quarterly to the

11   fiscal committee of the general court on any funds expended on employment-related child care

12   services, including funds budgeted in account 05-95-42-421110-2977 as well as federal Temporary

13   Assistance to Needy Families funds authorized by this section.  The department shall provide

14   enrollment-based reimbursement, rather than attendance-based payment, to child care providers

15   who accept child care scholarships through the Child Care and Development Fund (CCDF) for the

16   fiscal year ending June 30, 2022 using, to the extent allowable by applicable federal regulations,

17   federal recovery funds.   No state general funds shall be used to make enrollment-based

18   reimbursement payments to providers.

19   326  Statement of Findings.  The general court finds that:

20       I.  Placement in corrections settings can be harmful to children and lead to increased

21   delinquency and adult criminal behavior.  It should therefore be reserved for those circumstances in

22   which the safety of a child or of the community requires such confinement.

23       II.  Placement of children who are not serious violent offenders in settings other than the

24   Sununu Youth Services Center (SYSC) complies with The Families First Act, PL 115-123, and the

25   New Hampshire system of care established pursuant to 2019; 44 (SB 14), which prioritize

26   community-based treatment of children.

27       III.  This act is in furtherance of these goals.

28   327  Appropriation; Department of Health and Human Services; Sununu Youth Services Center.

29   The sum of $10,400,000 for the fiscal year ending June 30, 2022 and the sum of $9,922,157 for the

30   fiscal year ending June 30, 2023, are hereby appropriated to the department of health and human

31   services for the purpose of operating the Sununu youth services center as the department transitions

32   to an replacement facility.  Of the amount appropriated for the fiscal year ending June 30, 2022,

33   $9,000,000 shall be state general funds and $1,400,000 shall be other funds. Of the amount

34   appropriated in the fiscal year ending June 30, 2023, $9,000,000 shall be state general funds and

35   $922,157 shall be other funds.  Such funds shall not lapse until June 30, 2023.  The governor is

36   authorized to draw a warrant for the sums out of any money in the treasury not otherwise

37   appropriated.

Amendment to HB 2-FN-A-LOCAL
- Page 159 -

328  Transfer of Funds for Operation of the Sununu Youth Services Center.  Notwithstanding RSA 9:16-a and RSA 9:16-c, for the biennium ending June 30, 2023, prior approval of the fiscal committee of the general court shall be required for any transfer of funds required for the operation of the Sununu youth services center.

329  Findings; Sununu Youth Services Center.  The general court finds that the current Sununu youth services center shall be closed no later than March 1, 2023 and the opening of a replacement facility shall occur no later than March 1, 2023.

330  Committee Established.

I.  There is established a committee to develop a plan for the closure and replacement of the Sununu youth services center.  The members of the committee shall be as follows:

(a)  Three members of the house of representatives, each of whom shall be from a standing committee having jurisdiction over juvenile justice, appointed by the speaker of the house of representatives.

(b)  Two members of the senate, appointed by the president of the senate.

II.  In addition, the legislative members of the committee shall seek input and expert advice from, but not limited to, the following:

(a)  The department of health and human services.

(b)  The office of the child advocate.

(c)  The Disabilities Rights Center.

(d)  The National Alliance on Mental Illness.

(e)  New Futures.

(f)  Any other group or organization the committee deems necessary.

III.  Legislative members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

IV.  The committee shall develop a plan for the closure and replacement of the Sununu youth services center, including cost estimates for the construction and operation of a new facility.  The committee's plan for a replacement facility shall meet the following requirements:

(a)  It shall be operated by the department of health and human services.

(b)  It shall be designed to meet the unique needs of up to 18 youth at a time who are at the facility pursuant to RSA 169-B:14, detention; RSA 169-B:19, commitment; RSA 169-B:24, transfer to superior court, RSA 169-B:32; RSA 651:17-a, service of adult sentence of incarceration at the youth development center, and 169-A, interstate compact on juveniles.

(c)  It shall accommodate requirements to separate youth by gender, treatment needs, court order, safety, and security.  The facility shall include 3 separate residential spaces, each including capacity for 6 youth.

(d)  It shall have capacity to provide services to meet the medical, physical, and behavioral health needs of all potentially eligible youth.

Amendment to HB 2-FN-A-LOCAL
- Page 160 -

1    (e)  It shall have space for 18 beds, including space for flexibility to meet the needs of all
2    genders, safety and security, crisis stabilization and admissions and discharges.

3    (f)  It shall have adequate space to meet the educational needs of all youth potentially
4    eligible, including youth with special education needs.

5    (g)  It shall have adequate space for indoor and outdoor recreation.

6    (h)  It shall have the capacity to meet the nutritional needs of all youth.

7    (i)  It shall have necessary elements to be architecturally secure and equipped with video
8    surveillance.

9    (j)  The opening of the replacement facility shall be no later than March 1, 2023.

10    V.  The committee shall prepare legislation relative to the implementation of the plan
11    developed in paragraph IV for submission for the 2022 legislative session.

12    VI.  The members of the study committee shall elect a chairperson from among the members.
13    The first meeting of the committee shall be called by the first-named senate member.  The first
14    meeting of the committee shall be held within 30 days of the effective date of this section.  Four
15    members of the committee shall constitute a quorum.

16    VII.  The committee shall issue their final report to speaker of the house of representatives,
17    the senate president, the senate clerk, the house clerk, the governor, and the state library on or
18    before November 1, 2021 and submit the plan to the joint fiscal committee for approval.

19    331    Department of Health and Human Services; Closed Loop Referral System.
20    Notwithstanding any other provision of the law to the contrary, there shall be no further expansion
21    of the "closed loop referral" system by the department of health and human services beyond that
22    which has been or will be implemented pursuant to the sole source grant agreement to Unite USA
23    Inc. of Nashua in the amount of $700,000 dated October 19, 2020.  Before the department
24    undertakes any further utilization of the closed loop referral system beyond that authorized by the
25    preceding sentence, the legislative oversight committee on health and human services, established in
26    RSA 126-A:13, shall conduct a comprehensive review of the information intended to be stored in the
27    master index file or accessed using the master indexes within and between the closed loop referral
28    system and other interconnected systems.  Further, the oversight committee shall assess the privacy
29    protections and access/release limitations afforded by this system, and the adequacy of the
30    procedures utilized by the system to insure that persons using it have given informed consent to the
31    ("opt-in") release of their personally identifiable information available through the system of
32    systems.  The department shall provide all requested data and information regarding the closed loop
33    referral system and systems with which it is intended to interconnect within one week of the request
34    by the oversight committee. The oversight committee shall report its findings and recommendations,
35    if any, to the legislature, the governor, and the department of health and human services by
36    November 1, 2021.  The department of health and human services is prohibited from accessing an
37    individual's information from the closed loop referral system who is not receiving services funded

through a department of health and human services program. Within 48 hours of becoming aware of a data breach, Unite USA Inc. shall begin the process of notification by first class mail to all individuals impacted by the data breach. Any individual whose information is intended to be included in the closed loop referral shall retain the right to opt in to the system on each referral and retain the right to revoke consent to be in the system at any time.

332 American Rescue Plan Act; Unanticipated Revenue. Funds received by municipalities from the American Rescue Plan Act of 2021 may be considered unanticipated revenue under RSA 31:95-b and may be accepted and expended pursuant to RSA 31:95-b, II-IV whether or not a political subdivision has adopted the provisions of RSA 31:95-b.

333 Salary Schedules. RSA 99:1-a is repealed and reenacted to read as follows:

99:1-a Salary Schedules. The department of administrative services shall develop and implement for the executive branch such salary schedules as authorized by collective bargaining agreements between the state and an employee organization and subject to appropriation. The department shall apply the appropriate salary schedules to all unrepresented employees. The department shall post base salary schedules on its public Internet website.

334 Corrections Officers' Salaries.

I. Effective July 2, 2021, part-time corrections officers and corrections officer corporals shall be compensated in accordance with the salary schedule applicable to full-time corrections officers and corrections officer corporals.

II. Effective July 2, 2021, corrections officer majors shall be compensated in accordance with the salary schedule applicable to corrections officer lieutenants, sergeants and captains.

335 Parking; Concord. The department of administrative services is authorized to spend such funding as appropriated for additional parking for full-time and part-time employees who are assigned to the downtown Concord area and who are not provided a state-provided parking space for their personal vehicle.

336 Compensation for Certain State Officers; Unclassified State Employees; July 2, 2021. RSA 94:1-a, I (a) is repealed and reenacted to read as follows:

I.(a) The following salary ranges shall apply to the following grades:

| GRADE | STEP 01 | STEP 02 | STEP 03 | STEP 04 | STEP 05 | STEP 06 | STEP 07 |
|-------|---------|---------|---------|---------|---------|---------|---------|
| AA | 56,082.00 | 59,748.00 | 63,388.00 | 67,054.00 | 70,694.00 | 74,360.00 | 78,026.00 |
| BB | 58,318.00 | 62,114.00 | 65,910.00 | 69,732.00 | 73,528.00 | 77,324.00 | 81,120.00 |
| CC | 61,022.00 | 65,000.00 | 68,978.00 | 72,982.00 | 76,960.00 | 80,938.00 | 84,942.00 |
| DD | 64,246.00 | 68,432.00 | 72,644.00 | 76,830.00 | 81,042.00 | 85,228.00 | 89,414.00 |
| EE | 68,042.00 | 72,488.00 | 76,934.00 | 81,406.00 | 85,852.00 | 90,298.00 | 94,744.00 |
| FF | 72,748.00 | 77,506.00 | 82,264.00 | 87,048.00 | 91,806.00 | 96,564.00 | 101,322.00 |
| GG | 78,520.00 | 83,668.00 | 88,816.00 | 93,964.00 | 99,112.00 | 104,260.00 | 109,408.00 |
| HH | 85,514.00 | 91,104.00 | 96,720.00 | 102,336.00 | 107,952.00 | 113,568.00 | 119,184.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | II | 90,402.00 | 96,330.00 | 102,284.00 | 108,212.00 | 114,166.00 | 120,094.00 | 126,048.00 |
| 2 | JJ | 95,290.00 | 101,556.00 | 107,822.00 | 114,088.00 | 120,354.00 | 126,620.00 | 132,886.00 |
| 3 | KK | 97,734.00 | 104,156.00 | 110,578.00 | 117,026.00 | 123,448.00 | 129,870.00 | 136,318.00 |
| 4 | LL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140,634.00 |
| 5 | MM | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 145,392.00 |
| 6 | NN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150,956.00 |
| 7 | OO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 157,482.00 |
| 8 | PP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 165,282.00 |
| 9 | QQ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 174,668.00 |

10    337  Salary Wages for Councilors and Commissioners; July 2, 2021.  RSA 94:1-a, II is repealed

11    and reenacted to read as follows:

12            II.  The salary wages for the positions set forth below shall be as follows commencing July 2,

13    2021:

14                                                                    Maximum

15            Governor's councilors                          $17,732.00

16            Racing and charitable gaming commissioners    $13,754.00

17            Sweepstakes commission, chairman              $19.994.00

18            Sweepstakes commission, members               $11,258.00

19    338  Compensation for Certain State Officers; Unclassified State Employees; July 1, 2022.  RSA

20    94:1-a, I (a) is repealed and reenacted to read as follows:

21            I.(a)  The following salary ranges shall apply to the following grades:

| | GRADE | STEP 01 | STEP 02 | STEP 03 | STEP 04 | STEP 05 | STEP 06 | STEP 07 |
|---|---|---|---|---|---|---|---|---|
| 22 | | | | | | | | |
| 23 | AA | 56,732.00 | 60,424.00 | 64,142.00 | 67,834.00 | 71,526.00 | 75,218.00 | 78,936.00 |
| 24 | BB | 58,994.00 | 62,842.00 | 66,690.00 | 70,538.00 | 74,386.00 | 78,234.00 | 82,082.00 |
| 25 | CC | 61,724.00 | 65,754.00 | 69,784.00 | 73,814.00 | 77,844.00 | 81,874.00 | 85,904.00 |
| 26 | DD | 65,000.00 | 69,238.00 | 73,476.00 | 77,740.00 | 81,978.00 | 86,216.00 | 90,454.00 |
| 27 | EE | 68,822.00 | 73,320.00 | 77,844.00 | 82,342.00 | 86,840.00 | 91,338.00 | 95,862.00 |
| 28 | FF | 73,580.00 | 78,416.00 | 83,226.00 | 88,062.00 | 92,872.00 | 97,682.00 | 102,518.00 |
| 29 | GG | 79,430.00 | 84,630.00 | 89,856.00 | 95,056.00 | 100,256.00 | 105,482.00 | 110,682.00 |
| 30 | HH | 86,502.00 | 92,170.00 | 97,838.00 | 103,532.00 | 109,200.00 | 114,894.00 | 120,562.00 |
| 31 | II | 91,442.00 | 97,448.00 | 103,454.00 | 109,460.00 | 115,492.00 | 121,498.00 | 127,504.00 |
| 32 | JJ | 96,408.00 | 102,726.00 | 109,070.00 | 115,414.00 | 121,758.00 | 128,102.00 | 134,446.00 |
| 33 | KK | 98,852.00 | 105,352.00 | 111,878.00 | 118,378.00 | 124,878.00 | 131,378.00 | 137,878.00 |
| 34 | LL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 142,272.00 |
| 35 | MM | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 147,082.00 |
| 36 | NN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 152,724.00 |
| 37 | OO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 159,302.00 |

Amendment to HB 2-FN-A-LOCAL
- Page 163 -

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | PP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167,206.00 |
| 2 | QQ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 176,696.00 |

3  339  Salary Wages for Councilors and Commissioners; July 1, 2022.  RSA 94:1-a, II is repealed
4  and reenacted to read as follows:

5      II.  The salary wages for the positions set forth below shall be as follows commencing July 1,
6  2022:

| | Maximum |
|---|---|
| 7 | |
| 8 | Governor's councilors | $17,940.00 |
| 9 | Racing and charitable gaming commissioners | $13,910.00 |
| 10 | Sweepstakes commission, chairman | $20,228.00 |
| 11 | Sweepstakes commission, members | $11,388.00 |

12  340  Department of Justice; Attorney Salaries; July 2, 2021.  RSA 94:1-a, I(c) is repealed and
13  reenacted to read as follows:

14      I.(c)  For attorney positions in the department of justice, except for the attorney general and
15  deputy attorney general, the following shall apply commencing on July 2, 2021:

| | Minimum | Market anchor | Maximum |
|---|---|---|---|
| 16 | | | |
| 17 | $54,617 | | $126,532 |
| 18 | Attorney | $65,838 | |
| 19 | Assistant attorney general | $89,682 | |
| 20 | Senior assistant attorney general | $110,722 | |
| 21 | Associate attorney general | $121,943 | |

22  341  Department of Justice; Attorney Salaries; July 1, 2022.  RSA 94:1-a, I(c) is repealed and
23  reenacted to read as follows:

24      I.(c)  For attorney positions in the department of justice, except for the attorney general and
25  deputy attorney general, the following shall apply commencing on July 1, 2022:

| | Minimum | Market anchor | Maximum |
|---|---|---|---|
| 26 | | | |
| 27 | $55,252 | | $128,001 |
| 28 | Attorney | $66,603 | |
| 29 | Assistant attorney general | $90,723 | |
| 30 | Senior assistant attorney general | $112,007 | |
| 31 | Associate attorney general | $123,359 | |

32  342  Legislative Employees; July 2, 2021.  Legislative employees shall receive 1.16 percent salary
33  increases effective July 2, 2021, if such increases are approved by the appointing authority.

34  343  Legislative Employees; July 1, 2022.  Legislative employees shall receive 1.16 percent salary
35  increases effective July 1, 2022, if such increases are approved by the appointing authority.

36  344  Judicial Salaries; July 2, 2021. RSA 491-A:1 is repealed and reenacted to read as follows:

37  491-A:1  Salaries Established.  The salaries for the positions set forth below shall be as follows:

| | | |
|---|---|---|
| 1 | Chief justice, supreme court | $183,394 |
| 2 | Associate justices, supreme court | $177,878 |
| 3 | Chief justice, superior court and administrative | |
| 4 | judges appointed pursuant to supreme | |
| 5 | court rule 54 | $177,878 |
| 6 | Associate justices, superior court | $166,825 |
| 7 | District court justices prohibited | |
| 8 | from practice pursuant to | |
| 9 | RSA 502-A:21 | $166,825 |
| 10 | Probate judges prohibited from | |
| 11 | practice pursuant to RSA 547:2-a | $166,825 |

12     345  Judicial Salaries; July 1, 2022.  RSA 491-A:1 is repealed and reenacted to read as follows:

13     491-A:1  Salaries Established.  The salaries for the positions set forth below shall be as follows:

| | | |
|---|---|---|
| 14 | Chief justice, supreme court | $185,522 |
| 15 | Associate justices, supreme court | $179,942 |
| 16 | Chief justice, superior court and administrative | |
| 17 | judges appointed pursuant to supreme | |
| 18 | court rule 54 | $179,942 |
| 19 | Associate justices, superior court | $168,761 |
| 20 | District court justices prohibited | |
| 21 | from practice pursuant to | |
| 22 | RSA 502-A:21 | $168,761 |
| 23 | Probate judges prohibited from | |
| 24 | practice pursuant to RSA 547:2-a | $168,761 |

25     346  Judges; State Employee Health Plan; Application.  The cost sharing and plan design for

26 judges who participate in the health plans offered by the state shall be the same as those for

27 individuals covered by the collective bargaining agreement between the state of New Hampshire and

28 the State Employees' Association of New Hampshire, Inc.

29     347  Judicial Employees; July 2, 2021.  All unrepresented judicial employees shall receive 1.16

30 percent salary increases on July 2, 2021.

31     348  Judicial Employees; July 1, 2022.  All unrepresented judicial employees shall receive 1.16

32 percent salary increases on July 1, 2022.

33     349  Appropriations.

34         I.  The following sums are appropriated from the following sources for the purposes of

35 sections 333 -352 of this act for the fiscal year ending June 30, 2022:

36                                     FY 2022

37         All     Liquor     General     Federal     Highway     Turnpike     Fish & Game          Other

$12,592,000   $400,000   $5,750,000  $1,773,000  $1,265000   $235,000        $99,000   $3,070,000

II.   The following sums are appropriated from the following sources for the purposes of sections 333-352 of this act for the fiscal year ending June 30, 2023:

FY 2023

| | All | Liquor | General | Federal | Highway | Turnpike | Fish & Game | Other |
|---|---|---|---|---|---|---|---|---|
| | $23,208,000 | $800,000 | $10,250,000 | $3,484,000 | $2,486,000 | $455,000 | $183,000 | $5,550,000 |

III.   The department of administrative services is authorized to make any rounding adjustments of up to +$.01 per hour as needed to properly process the employee's payroll within the currently designed human resources/payroll system (NH FIRST).

350  Longevity Pay.  Amend RSA 94:4 to read as follows:

94:4  Longevity Pay.  Any state official who has completed 10 years of service for the state shall be paid, in addition to his or her statutory salary the sum of [$300] *$350* annually and an additional [$300] *$350* for each additional 5 years of state service.  Any state official who transfers, without a break in service, to a position in the classified system may transfer all time served for purposes of longevity pay.

351  Longevity Pay for Regular Classified Employees.  Amend RSA 99:5 to read as follows:

99:5  Longevity Payment for Regular Classified Employees.  Any regular classified employee of the state who has completed 10 years of continuous service for the state other than a law enforcement employee, shall be paid, in addition to the salary to which he or she is entitled by the classification plan, the sum of [$300] *$350* annually and an additional [$300] *$350* for each additional 5 years of continuous state service.  The additional compensation provided by the provisions of this section shall not affect the maximums set by the classification plan and the receipt of said long service payments shall not prohibit the recipient from receiving the yearly increments to which he or she may be otherwise entitled within his or her classification ranges.  Any regular classified employee who transfers, without a break in service, to a position in the unclassified system may transfer all time served for purposes of longevity pay.

352  Longevity Pay for New Hampshire State Troopers.  Amend RSA 99:5-a to read as follows:

99:5-a  Longevity Payments for New Hampshire State Troopers and State Trooper Command Staff.  Any state trooper or eligible state trooper command staff member who has completed 10 years of continuous service for the state shall be paid, in addition to the salary to which he or she is entitled by the classification plan, the sum of [$300] *$350* annually and an additional[ $300] *$350* for each additional 5 years of continuous law enforcement service.  The additional compensation provided by the provisions of this section shall not affect the maximums set by the classification plan and the receipt of said long service payments shall not prohibit the recipient from receiving the yearly increments to which he or she may be otherwise entitled within his or her classification ranges. Any state trooper or eligible state trooper command staff member who transfers, without a

1 break in service, to a position in the unclassified system may transfer all time served for purposes of
2 longevity pay.

3     353  Repeals.  The following are repealed:

4         I.  RSA 99:1-b, relative to New Hampshire state trooper salaries.

5         II.  RSA 99:3, relative to increases in salary.

6     354  Effective Date.

7         I.  Sections 336, 337, 340, 342, 344, and 347 of this act shall take effect July 2, 2021.

8         II.  Sections  338, 339, 341 343, 345 and 348 of this act shall take effect July 1, 2022.

9     355  Department of Administrative Services; Rehiring of Laid Off Classified State Employees.

10         I.  For purposes of this section, "laid off" means any person in a classified position as
11 described in RSA 21-I:49 who receives written notice of the state's intent to lay him or her off or who
12 is laid off between July 1, 2021 and June 30, 2023, as a result of reorganization or downsizing of
13 state government.

14         II.  It is the intent of the general court that any classified position which becomes available
15 in a department or establishment, as defined in RSA 9:1, shall be filled, if possible, by a state
16 employee laid off, as defined in paragraph I, if such person is not currently employed by the state of
17 New Hampshire, if he or she meets the minimum qualifications for the position, and if he or she does
18 not receive a promotion as a result of the rehire.

19         III.  The head of each department or agency shall submit the name and classification of any
20 individual laid off between July 1, 2021 and June 30, 2023, to the director of the division of
21 personnel within 10 days of the layoff.

22     356  New Subdivision; Granite State Paid Family Leave Plan.  Amend RSA 21-I by inserting
23 after section 95 the following new subdivision:

24                 Granite State Paid Family Leave Plan

25     21-I:96  Granite State Paid Family Leave Plan.  There is hereby established the granite state
26 paid family leave plan, which shall be implemented under this subdivision and as provided in RSA
27 282-B and RSA 77-E.

28     21-I:97  Purpose and Policy.  The purpose of this subdivision is to leverage the purchasing power
29 and economies of scale available to the state when it is acting as purchaser on behalf of state
30 employees and to align this purchasing initiative with a business tax incentive in order to make
31 available to all other public and private employers in the state, on a voluntary basis, advantageously
32 priced family and medical leave insurance (FMLI) wage replacement benefits.  By purchasing FMLI
33 coverage for state employees through the medium of commercial insurance, by linking that contract
34 with a contract to make the same coverage available statewide, by acting as premium aggregator for
35 individuals whose employers do not sponsor such coverage, and by introducing a new business tax
36 incentive, the state will position itself to create a market for advantageously priced FMLI benefits.
37 It is the intent of this subdivision to significantly increase the number of employees in the state who

Amendment to HB 2-FN-A-LOCAL
- Page 167 -

1   receive FMLI wage replacement benefits.  The social benefits of increasing the rate of FMLI coverage

2   include attracting and retaining workers, including younger workers, to the state, enabling parents

3   to bond with biological, adopted, or foster children, helping to meet the needs of an aging population,

4   promoting workplace stability, and enhancing worker retention and productivity.  While many larger

5   employers provide paid FMLI benefits through self-insurance, this is not feasible for most mid-sized

6   and smaller businesses.  The general court therefore finds that it is in the public interest for the

7   state to strategically use its purchasing power and tax expenditure authority to establish a

8   marketplace in the state for advantageously priced FMLI wage replacement benefits.

9       21-I:98  Definitions.  In this subdivision:

10      I.  "Child" has the same meaning as "son or daughter" in 29 U.S.C. section 2611(12).

11      II.  "Commissioner" means the commissioner of the department of administrative services.

12      III.  "Department" means the department of administrative services.

13      IV.  "Family and medical leave" means leave from work:

14          (a)  Because of the birth of a child of the employee, within the past 12 months;

15          (b)  Because of the placement of a child with the employee for adoption or fostering

16   within the past 12 months;

17          (c)  Because of a serious health condition of a family member; or

18          (d)  Because of any qualifying exigency arising from foreign deployment with the armed

19   forces, or to care for a service member with a serious injury or illness as permitted under the federal

20   Family and Medical Leave Act, 29 U.S.C. section 2612(a)(1)(E) and 29 C.F.R. section 825.126(a)(1)-

21   (8), as they existed on October 19, 2017, for family members as defined in paragraph VI.

22      V.  "Family and Medical Leave Act" means the federal Family and Medical Leave Act of

23   1993, Pub.L. 103-3, 29 U.S.C. section 2601 et seq.

24      VI.  "Family member" means a "child" as defined in paragraph I, a biological, adoptive, or

25   foster parent, stepparent, or legal guardian of the child or the child's spouse or domestic partner, a

26   biological, adoptive, or foster grandparent or step grandparent, or a spouse or domestic partner.

27      VII.  "FMLI" means family and medical leave insurance providing wage replacement benefits

28   under specified conditions.

29      VIII.  "Serious health condition" means any illness of a family member covered by the Family

30   and Medical Leave Act including treatment for addiction as prescribed by a treating clinician,

31   consistent with American Society of Addiction Medicine criteria, as well as treatment for a mental

32   health condition, consistent with American Psychiatric Association criteria.

33      IX.  "State rate" means the per employee premium amount that is charged by the successful

34   bidder for the state contract for FMLI coverage for state government employees as provided in this

35   subdivision.  The state rate shall be expressed as a percentage of wages.

36      21-I:99  Contracting and Administrative Authority.

Amendment to HB 2-FN-A-LOCAL
- Page 168 -

1     I.  The commissioner may solicit information about, seek proposals for, negotiate, enter into,

2  and administer group insurance contracts with duly authorized accident and life insurance carriers

3  as necessary and appropriate to provide to qualifying state employees, at state expense and at no

4  cost to such employees, an FMLI plan of wage replacement as described in this subdivision.  The

5  provision of this coverage shall be considered a matter of legislatively established public policy that

6  is designed to benefit all employers and employees in the state and that is "confined exclusively to

7  the public employer by statute" as provided in RSA 273-A:1, XI and shall not be subject to collective

8  bargaining.  Nothing in this subdivision shall be construed to invalidate any portion of a collective

9  bargaining agreement entered into by the state.

10     II.  The state shall provide to all permanent state employees wage replacement coverage for

11  qualified leave, which shall be available for the same types of leave as protected under the Family

12  and Medical Leave Act except leave for a health condition of the employee.  This shall include leave

13  for:

14     (a)  The birth of a child and the care of the newborn child within one year of birth;

15     (b)  The placement with the employee of a child for adoption or foster care and the care of

16  the newly placed child within one year of placement;

17     (c)  Caring for the employee's spouse, child, or parent who has a serious health condition;

18  or

19     (d)  Any qualifying exigency arising out of the fact that the employee's spouse, child, or

20  parent is a covered military member on covered active duty, or caring for a covered service-member

21  with a serious injury or illness if the eligible employee is the service-member's spouse, child, parent,

22  or next of kin.

23     III.  Subject to any changes authorized under RSA 21-I:103, the wage replacement benefits

24  under this FMLI plan shall be structured as follows:

25     (a)  Eligible employees shall receive 60 percent of their average weekly wage.

26     (b)  The maximum duration of wage replacement shall be 6 weeks per year, with no

27  minimum duration required.

28     (c)  Wages used to determine the 60 percent FMLI coverage shall be capped at the

29  amount of the Social Security taxable wage maximum as amended from time to time.

30     IV.  Except as provided in RSA 21-I:100, III regarding individual pool coverage, the

31  commissioner shall establish, through his or her discretionary authority in administering the

32  request for information and the request for proposals process, the following additional elements of

33  the benefit structure consistent with the purposes and policy of this subdivision:

34     (a)  The base period by which the average weekly wage shall be determined.

35     (b)  The tenure requirement, expressed in terms of months of work, before an employee is

36  eligible to be covered provided, however, that no tenure requirement shall apply to an employee who

37  has already met the requirement and then changes jobs.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 169 -**

     (c)   A waiting period or elimination period provided, however, that a waiting or elimination period shall not be a required element of the benefit structure, and the commissioner shall have authority to implement a plan with no such requirement.

21-I:100  State Employee Coverage Linked to Coverage Offerings for Other Employers and for Individual Employees.  The commissioner shall include in the request for proposals for FMLI benefits for state employees a requirement that the winning bidder shall, as a condition of the state contract, also offer the same FMLI coverage to other public employers, private employers with more than 50 employees, and individual employees on the following terms:

     I.  Private and public non-state employers shall receive a rate that is derived from the state rate through the application of rating factors that are actuarially justified and specified in the bid response.

     II.  Employers with more than 50 employees who choose to sponsor coverage for their employees shall contract directly with the winning bidder.

     III.  Individuals who work for employers who choose not to offer FMLI coverage under this subdivision or who fail to meet minimum participation requirements and who do not offer an FMLI benefit that is at least equivalent to the granite state paid family leave plan shall have the opportunity to contract indirectly with the winning bidder through the purchasing pool for family and medical leave insurance authorized under RSA 282-B and administered by the department of employment security.  The pool may be experience rated.  Coverage through the pool shall include a 7-month waiting period, a one-week elimination period, and a 60-day annual open enrollment period as established by the commissioner in the procurement process.  Premiums for individual pool coverage shall not exceed $5 per subscriber per week.

     IV.  The commissioner shall establish, through his or her discretionary authority in administering the request for information and the request for proposals process, the following additional elements of the benefit structure and plan administration specifically for employees of sponsoring non-state employers consistent with the purposes and policy of this subdivision:

     (a)  The minimum participation requirement.

     (b)  The parameters for open enrollment periods.

     (c)  Procedures for contributory plans, partially contributory plans, and non-contributory plans.

     (d)  Procedures for payroll deduction and premium remittance for employers with more than 50 employees.

21-I:101  Conditions of Non-State Employer Participation.  Participation in the plan by non-state employers shall be voluntary.  In addition, non-state employers may choose to provide FMLI at no cost to their employees or on a contributory or partially contributory basis.

21-I:102  Procurement Process.  The commissioner may issue a request for information or a request for proposals to secure FMLI coverage for all eligible employees of the state of New

1    Hampshire and to make advantageously priced coverage available to all other private employers
2    with more than 50 employees and public employers in the state as provided in this subdivision.  The
3    department, the department of employment security, and the department of insurance shall jointly
4    evaluate the proposals received in response to the request for proposals.  The department shall
5    contract with an insurance carrier or carriers to provide FMLI coverage.  The contract with the
6    winning bidder shall be subject to governor and council approval.  The selected insurance carrier
7    shall be licensed by the state of New Hampshire and in good standing.  The selected insurance
8    carrier shall be subject to all applicable insurance laws and regulations of the state of New
9    Hampshire, and the rates and forms for the FMLI contracts shall be filed for approval with the
10   insurance commissioner.

11       21-I:103  Commissioner Discretion to Adjust Initial FMLI Benefit Structure.  In exercising
12   authority under this subdivision to contract for FMLI coverage for state employees and also for the
13   availability of advantageously priced FMLI coverage for employees of all non-state employers, the
14   commissioner shall have discretionary authority in initiating this program to make changes to the
15   benefit structure of the FMLI plan under RSA 21-I:99, III and may retain a consulting actuary or
16   other benefit advisors in support of this discretionary determination.  This discretionary authority
17   shall be exercised in consideration of the stated purposes and policy goals of this subdivision and of
18   the counsels of the FMLI advisory board established in RSA 21-I:104.  Any such changes made under
19   this paragraph shall be subject to approval by the governor and council and the legislative fiscal
20   committee prior to implementation and shall be offered by the legislative fiscal committee as an
21   amendment to this subdivision in the next regular session of the general court.

22       21-I:104  Family and Medical Leave Insurance Advisory Board.  There is hereby established the
23   family and medical leave insurance advisory board, which shall be administratively attached to the
24   department, and which shall hereinafter be called the FMLI advisory board.  The FMLI advisory
25   board shall consist of 9 members to be appointed, with the exception of the legislative members, by
26   the governor.  Three of the appointees shall be persons who, because of their vocations, employment,
27   or affiliations, shall represent employers; 3 shall be persons who, because of the vocations,
28   employment, or affiliations, shall represent employees; one shall be a senator appointed by the
29   senate president; one shall be a representative appointed by the speaker of the house of
30   representatives; the remaining appointee, who shall be appointed as chairman, shall be a person
31   whose training and experience qualify her or him to successfully resolve the problems of FMLI
32   procurement, eligibility, benefit design, and program administration.  The advisory board shall meet
33   no later than 45 days after each calendar quarter and aid the commissioner in formulating policies
34   and discussing problems related to the implementation and administration of this subdivision and
35   RSA 282-B and in assuring impartiality and freedom from political influence in the solution of such
36   problems.  Advisory board meetings shall provide opportunity for public comment.

37       21-I:105  Report and Outreach.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 171 -**

1       I.  Working in coordination with the commissioner of administrative services as provided in
2   RSA 282-B:6, I, the department shall produce, on an annual basis, a summary report on the granite
3   state paid family leave plan.  This report shall be made public and delivered to the governor, the
4   senate president, and the speaker of the house of representatives.  It shall include, but not be limited
5   to, a description of progress in carrying out the processes contemplated under this subdivision,
6   progress in improving the rate of FMLI coverage of employees in the state, and recommendations for
7   more fully achieving the purposes and policy goals of this subdivision.

8       II.  Working in coordination with the department of employment security as provided in RSA
9   282-B:6, II, the department shall develop and implement an outreach program to ensure that
10  employers who might benefit from sponsoring FMLI coverage for their employees and individuals
11  who may be eligible to receive FMLI coverage under this subdivision are made aware of this
12  program.  Outreach information shall explain in an easy to understand format, eligibility
13  requirements, benefit structures, and the process for accessing coverage, enrolling individuals, and
14  qualifying for the business tax credit provided for in RSA 77-E:3-d.

15  21-I:106  Rulemaking.  The commissioner may adopt rules, pursuant to RSA 541-A, as deemed
16  necessary for the implementation of this chapter.

17  21-I:107  Appropriation and Funding Transfer.  The state treasurer shall transfer funds from the
18  general fund to the department of administrative services for payment of the administrative and
19  implementation costs associated with this chapter.

20  21-I:108  Program Start-up.  The request for proposals for FMLI coverage as described in this
21  subdivision shall be issued no later than January 1, 2022.  The FMLI coverage shall be in place for
22  state government employees and available for purchase by other public and private employers with
23  more than 50 employees and individuals by October 1, 2022.

24  357  Insurance; Allocation of State Premium Tax.  Amend RSA 400-A:32, III to read as follows:

25  III.(a)  Except as provided in [subparagraph (b)] *subparagraphs (b) and (c)*, the taxes
26  imposed in paragraphs I and II of this section shall be promptly forwarded by the commissioner to
27  the state treasurer for deposit to the general fund.

28       (b)  Taxes imposed attributable to premiums written for medical and other medical
29  related services for the newly eligible Medicaid population as provided for under RSA 126-AA shall
30  be deposited into the New Hampshire granite advantage health care trust fund established in RSA
31  126-AA:3.  The commissioner shall notify the state treasurer of sums for deposit into the New
32  Hampshire granite advantage health care trust fund no later than 30 days after receipt of said taxes.
33  The moneys in the trust fund may be used for the administration of the New Hampshire granite
34  advantage health care program, established in RSA 126-AA.

35       *(c)  Taxes imposed on premiums written by duly authorized insurance*
36  *companies for family and medical leave insurance written in connection with the*
37  *administration of RSA 21-I:96 through RSA 21-I:108 or RSA 282-B shall be deposited into*

Amendment to HB 2-FN-A-LOCAL
- Page 172 -

1   *the FMLI premium stabilization trust fund established in RSA 282-B:5.  The commissioner*
2   *shall notify the state treasurer of sums for deposit into the FMLI premium stabilization*
3   *trust fund no later than 30 days after receipt of said taxes.*

4   358  New Chapter; Purchasing Pool for Family and Medical Leave Insurance.  Amend RSA by
5   inserting after chapter 282-A the following new chapter:

6   CHAPTER 282-B

7   PURCHASING POOL FOR FAMILY AND MEDICAL LEAVE INSURANCE

8   282-B:1  Purpose.  The purpose of this chapter is to establish a group purchasing mechanism
9   whereby individuals who work for employers with more than 50 employees who do not to offer either
10  family and medical leave insurance (FMLI) coverage under the granite state paid family leave plan
11  as authorized under RSA 21-I:96 through RSA 21-I:108 or an FMLI benefit that is at least
12  equivalent to such coverage will have the opportunity to purchase granite state paid family leave
13  plan coverage through a mechanism established by the state in conjunction with the state
14  government employee FMLI plan.

15  282-B:2  Definitions.  In this chapter:

16      I.  "Child" has the same meaning as "son or daughter" in 29 U.S.C. section 2611(12).

17      II.  "Commissioner" means the commissioner of the department of employment security.

18      III.  "Department" means the department of employment security.

19      IV.  "Employer" has the same definition as relevant provisions of RSA 282-A:8, except as
20  provided in RSA 282-A:9.

21      V.  "Employment" means wages paid for services by an employer that is covered by this
22  chapter.

23      VI.  "Family and medical leave" means leave from work:

24      (a)  Because of the birth of a child of the employee, within the past 12 months;

25      (b)  Because of the placement of a child with the employee for adoption or fostering
26  within the past 12 months;

27      (c)  Because of a serious health condition of a family member; or

28      (d)  Because of any qualifying exigency arising from foreign deployment with the armed
29  forces, or to care for a service member with a serious injury or illness as permitted under the federal
30  Family and Medical Leave Act, 29 U.S.C. section 2612(a)(1)(E) and 29 C.F.R. section 825.126(a)(1)
31  through (8), as they existed on October 19, 2017, for family members as defined in paragraph VIII.

32      (e)  A serious health condition of the employee that isn't related to employment and their
33  employer does not offer Short Term Disability insurance.

34      VII.  "Family and Medical Leave Act" means the federal Family and Medical Leave Act of
35  1993, Pub.L. 103-3, 29 U.S.C. section 2601 et seq.

VIII.  "Family member" means a child, a biological, adoptive, or foster parent, stepparent, or legal guardian of the child or the child's spouse or domestic partner, a biological, adoptive, or foster grandparent or step grandparent, or a spouse or domestic partner.

IX.  "FMLI" means family and medical leave insurance providing wage replacement benefits under specified conditions.

X.  "Individual Pool" means the pooled purchasing mechanism established in this chapter for the purpose of providing individual employees of employers who do not sponsor qualifying FMLI coverage the option to purchase such coverage on an individual basis.

XI.  "Serious health condition" means any illness covered by the federal family and medical leave act including treatment for addiction as prescribed by a treating clinician, consistent with American Society of Addiction Medicine criteria, as well as treatment for a mental health condition, consistent with American Psychiatric Association criteria.

282-B:3  Employer and Employee Rights and Responsibilities.

I.  Individuals who are employed by private employers with more than 50 employees who do not  offer either FMLI coverage under the granite state paid family leave plan under RSA 21-I:96 - RSA 21-I:108 or an FMLI benefit that is at least equivalent to such coverage will have the opportunity to purchase granite state paid family leave plan coverage through the individual pool. The individual pool shall operate by payroll deduction for employees of employers with more than 50 employees whereby premiums are paid into an FMLI premium fund administered by the department as provided in this chapter and established in coordination with the commissioner of administrative services under RSA 21-I:96 through RSA 21-I:108.

II.  Individuals employed by employers with more than 50 employees opting into the individual pool shall be required to make their premium remittances by payroll deduction.  All private employers with more than 50 employees who have employees who have individually opted into this pooled purchasing mechanism shall remit FMLI premium payments to the department in a manner as directed by the commissioner.

III.  Employers with fewer than 50 employees who wish to purchase FMLI coverage through the granite state paid family leave plan shall have the opportunity to purchase such coverage by making premium remittances into an FMLI premium fund administered by the department as provided in this chapter and established in coordination with the commissioner of administrative services acting pursuant to RSA 21-I:96.

282-B:4  FMLI Premium Fund Established.  There is established the FMLI premium fund for deposits of insurance premium payments paid pursuant to RSA 282-B:3 and for remittance of such premiums to the FMLI carrier or carriers participating in the twin state voluntary leave plan.  The department shall develop standard enrollment procedures in coordination with participating carriers and shall transmit enrollment and eligibility information to such carriers on a timely basis.  The department shall establish procedures and mechanisms for the billing and collection of premiums

1    from employers.   The department shall specify in contracts with participating carriers how all

2    premiums shall be transmitted and the frequency of that transmission and how penalties and grace

3    periods on late payments of premiums shall be calculated.   The department may contract with

4    qualified, independent vendors for the services necessary to carry out some or all of the duties under

5    this paragraph.

6        282-B:5  FMLI Premium Stabilization Trust Fund Established.

7            I.  There is established the FMLI premium stabilization trust fund which shall be held and

8    accounted for separately from all other funds.   Interest, dividends, and other earnings of the fund

9    shall be added to the fund.  Deposits into the fund shall be limited exclusively to:

10           (a)   Premium  taxes  imposed  on  premiums  written  by  duly  authorized  insurance

11    companies for family and medical leave insurance written in connection with the administration of

12    RSA 21-I:96 through RSA 21-I:108 or RSA 282-B as provided in RSA 400-A:32, III(c); and

13           (b)  Gifts, grants, and donations.  The moneys in the fund shall not be subject to any

14    state taxes and shall not be subject to any federal taxes to the extent allowed by applicable federal

15    law.

16           II.  The moneys in the fund shall constitute a premium stabilization reserve and shall be

17    used exclusively for the purpose of assuring that the premiums charged to participants in the

18    individual pool remain stable from year to year and do not exceed 5 dollars per subscriber per week.

19    The fund shall be administered by the commissioner, who shall be authorized to make such periodic

20    payments to participating FMLI carriers as are necessary to meet the purposes of this paragraph.

21    The department is authorized to contract with qualified, independent vendors for the services

22    necessary to carry out some or all of the duties under this paragraph.

23       282-B:6  Report and Outreach.

24           I.  Working in coordination with the commissioner of administrative services as provided in

25    RSA 21-I:105, I the department shall produce, on an annual basis, a summary report on the granite

26    state paid family leave plan.  The report shall be made public and delivered to the governor, the

27    senate president, and the speaker of the house of representatives.  It shall include but not be limited

28    to, a description of progress in implementing the provisions of this chapter, payments into and out of

29    the fund, the number of employees in the state participating in the purchasing mechanism, and

30    recommendations for improvement of the program and for further increasing the rate at which New

31    Hampshire employees have FMLI coverage.

32           II.  Working in coordination with the department of administrative services as provided in

33    RSA 21-I:105, II, the department shall develop and implement an outreach program to ensure that

34    individuals who may be eligible to receive FMLI benefits under this chapter or under RSA 21-I:96

35    through RSA 21-I:108 are made aware of these benefits.  Outreach information shall explain in an

36    easy to understand format, eligibility requirements, benefit structures, and the process for accessing

37    coverage and enrolling.

1  282-B:7  Rulemaking.  The commissioner may adopt rules, pursuant to RSA 541-A, as deemed
2  necessary for the implementation of this chapter.

3  282-B:8  Appropriation and Funding Transfer.  The state treasurer shall transfer funds from the
4  general fund to the department of employment security for payment of the administrative and
5  implementation costs associated with this chapter.

6  282-B:9  Implementation.  The individual pool shall be operational and available for use by
7  individuals on a timetable that is sufficient to ensure that FMLI coverage shall be available for
8  purchase by January 1, 2022.

9  282-B:10  Application; Employers with Fewer than 50 Employees.  No provision of this chapter
10  shall require employers with fewer than 50 employees to offer family medical leave or process payroll
11  deductions on behalf employees choosing to participate in the program as individuals.

12  359  New Section; Family Medical Leave Insurance; Discrimination in the Workplace.  Amend
13  RSA 275 by inserting after section 37-c the following new section:

14  275:37-d  Family and Medical Leave Insurance.  If an employer has 50 or more employees and
15  sponsors family and medical leave insurance pursuant to RSA 21-I:96, then any employee of that
16  employer who takes family or medical leave and accesses wage replacement benefits under such
17  family and medical leave insurance coverage shall be restored to the position she or he held prior to
18  such leave or to an equivalent position by her or his employer consistent with the job restoration
19  provisions of the federal Family and Medical Leave Act of 1993, Public Law 103-3, 29 U.S.C. section
20  2601 et seq.  Such employers shall continue to provide health insurance to employees during the
21  leave.  However, employees shall remain responsible for any employee-shared costs associated with
22  the health insurance benefits.  Such employers shall not discriminate or retaliate against any
23  employee for accessing family or medical leave wage replacement benefits.  Employers of employees
24  participating in the granite state paid family leave plan may require that paid leave taken under
25  this program be taken concurrently or otherwise coordinated with leave allowed under the terms of a
26  collective bargaining agreement or other established employer policy or the Family and Medical
27  Leave Act, as applicable.

28  360  New Subparagraphs; Application of Receipts.  Amend RSA 6:12, I(b) by inserting after
29  subparagraph (364) the following new subparagraphs:

30  (365)  Moneys deposited in the FMLI premium fund established in RSA 282-B:4.

31  (366)  Moneys deposited in the FMLI premium stabilization trust fund established in
32  RSA 282-B:5.

33  361  New Section; Business Enterprise Tax; Granite State Paid Family Leave Plan Tax Credit.
34  Amend RSA 77-E by inserting after section 3-d the following new section:

35  77-E:3-e  Granite State Paid Family Leave Plan Tax Credit.  There shall be a tax credit allowed
36  against the tax due under this chapter in an amount equal to 50 percent of the premium paid by a

sponsoring employer for family and medical leave insurance coverage offered to employees pursuant to RSA 21-I:100 for the taxable period in which the premium is paid.

362  Annual and Sick Leave; Executive Branch.  Amend RSA 94:3-a to read as follows:

94:3-a  Annual and Sick Leave for Unclassified Legislative Employees **and Executive Branch Unclassified and Nonclassified Employees**.

I.  Annual Leave.  All full-time, nonelective unclassified legislative officials and employees shall accumulate annual or biennial leave to the extent authorized for each position by the appointing authority.  If, at the time of his separation from service, such an official or employee has credit for unutilized annual leave time, he shall be paid for such time at the same rate he was receiving at the time of his separation.

II.  Sick Leave.  All full-time, nonelective unclassified legislative officials and employees, shall accumulate sick leave credit to the extent authorized for each position by the appointing authority.  All unutilized sick leave credit shall lapse at the time of separation from service, except that should such an official or employee die while in service, his estate shall be paid for any unutilized sick leave credit at the same rate the official or employee was receiving at the time of his death.

III.  Transfer of Credit**; Legislative**.  Any official or employee who transfers without a break in service, from the classified service to a full-time, nonelective, unclassified legislative position may transfer all the days of sick leave credit and annual leave credit that he has accumulated in the classified service.  Any full-time, nonelective unclassified legislative official or employee who transfers, without a break in service, to the classified service may transfer all the days of sick leave credit and annual leave credit that he has accumulated in the unclassified service pursuant to this section.  The rate of accrual for all sick and annual leave shall be the same as the rate immediately prior to the transfer.

***III-a.  Transfer of Credit; Executive.  Any official or employee who transfers without a break in service, from the classified service to an unclassified or nonclassified executive branch position shall retain all annual leave, sick leave, longevity pay, and bonus leave already accumulated in the classified system.  Such leave, longevity pay, and bonus time shall not be paid out until the employee's cessation of employment and shall be carried forward if the employee again transfers into the classified service.***

IV.  The appointing authority may deny compensation to any legislative official or employee for any annual leave time or sick leave time taken in excess of annual leave time or sick leave time accumulated pursuant to this section.

363  Terminal Pay.  RSA 94:9 is repealed and reenacted to read as follows:

94:9  Terminal Pay.

I.  Any full-time state official or employee other than those in the state classified system who retires, resigns, dies in office, or is terminated as a result of not being reappointed, shall receive

**Amendment to HB 2-FN-A-LOCAL**
**- Page 177 -**

1    upon such cessation of employment 3 days' salary for each year of employment in nonclassified or
2    unclassified service.

3         II.   Terminal Pay; Leave Time and Longevity Pay.  Any full-time state official or employee
4    other than those in the state classified system who retires, resigns, dies in service, or is terminated
5    shall receive termination pay that includes any unused annual leave, bonus leave, or longevity pay
6    accumulated from their service as member of the classified system.

7         III.  Terminal Pay; Sick Time.  Any full-time state official or employee other than those in
8    the state classified system who retires shall receive termination pay that includes unused sick leave
9    accumulated while a member of the classified system.  The calculation of such unclassified sick leave
10   payout shall be according to the calculations of sick leave upon termination of service of a
11   confidential classified employee as specified in the rules of the division of personnel.

12        IV.   The governor is authorized to draw warrants for the sums necessary to make the
13   payments under this section, which shall be a charge against the general fund or such special fund
14   as may be appropriate.

15        364   New Paragraph; Administrative Services; Rulemaking; Executive Branch Employees.
16   Amend RSA 21-I:14 by inserting after paragraph XVII the following new paragraph:

17        XVIII.  Employees serving in executive branch unclassified positions relating to:

18             (a)  Annual Leave;

19             (b)  Sick Leave;

20             (c)  Transfers between positions within the executive branch and across branches of state
21   government; and

22             (d)  Termination and payouts upon termination of employment.

23        365   Report; Executive Branch Employees.   The commissioner of the department of
24   administrative services shall report to the fiscal committee of the general court on the progress of
25   the adoption of administrative rules under RSA 21-I:14, XVIII, relating to employees serving in
26   executive branch unclassified positions, not later than April 30, 2022.

27        366   Abolished Positions.  All classified full-time positions which were vacant prior to July 1,
28   2018 and remain vacant as of July 1, 2021 shall be abolished on September 30, 2021.  Executive
29   branch agencies, as defined in RSA 9:1, shall identify such positions using the last vacancy report
30   from the state human resources system produced before June 30, 2021.  Positions on such report
31   that have been filled as of July 1, 2021, or for which and offer has been extended and accepted, shall
32   not be abolished.   Each executive agency shall prepare a list of positions to be abolished for
33   submission to the department of administrative services on or before September 1, 2021.  For each
34   position the list shall include the amounts appropriated by fiscal year for salary and benefits and the
35   source of funds for such appropriations.  The department of administrative services shall transfer
36   the unexpended general fund appropriations for the abolished positions to the salary adjustment
37   fund in RSA 99:4 and the benefit adjustment account in RSA 9:17-c.  The department of

Amendment to HB 2-FN-A-LOCAL
- Page 178 -

1    administrative services shall submit a report of the abolished positions and transferred
2    appropriations to the legislative fiscal committee by December 31, 2021.  Individual exceptions to
3    these provisions may be requested by any department in writing to the governor, and any such
4    exception granted by the governor shall be transmitted to the fiscal committee of the general court.
5    This section shall not apply to any positions at the department of health and human services which
6    the department intends to use toward meeting required budget reductions.

7        367  Appropriation: Department of Agriculture, Markets, and Food; Cost of Care Fund.  The sum
8    of $100,000 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of
9    agriculture, markets, and food to fund the cost of care fund established in RSA 437-B:1.  The
10   governor is authorized to draw a warrant for said sums out of any money in the treasury not
11   otherwise appropriated.

12       368  Effective Date.  Section 367 of this shall take effect on June 30, 2021.

13       369    Department of Agriculture, Markets, and Food; Disease Data Manager; Position
14   Established; Appropriation.

15           I.  There is hereby established with the department of agriculture, markets, and food, a Word
16   Processor I position.  Such position shall enter and compile test data needed to demonstrate to the
17   USDA that the state is performing adequate testing in order to maintain its status as a TB and
18   Brucellosis-free state.

19           II.  The sum of $53,000 for the fiscal year ending June 30, 2022, and the sum of $58,000 for
20   the fiscal year ending June 30, 2023, are hereby appropriated to the department of agriculture,
21   markets, and food for the purpose of funding the position in paragraph I.  The governor is authorized
22   to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

23       370  Department of Justice; Positions Established and Reclassified.

24           I.  Position Reclassification; Department of Justice.  The position of attorney II, position
25   #14956, transferred to the department of justice in fiscal year 2021 from the department of health
26   and human services accounting unit 05-95-95-952010-5680 to the department of justice accounting
27   unit 02-20-20-201010-2620 and fully funded by the department of health and human services, shall
28   be designated as an unclassified position.

29           II.  There is established within the department of justice the unclassified position of
30   assistant attorney general.  The salary for the position shall be set forth in RSA 94:1-c.

31           III.  Upon reclassification of the position and appointment of the assistant attorney general,
32   position #14956 shall be abolished to allow for the transition of its available appropriations into the
33   unclassified position of assistant attorney general.  Funding shall be transferred into the proper
34   unclassified expenditure class for the civil law accounting unit.  The incumbent in the abolished
35   position shall be offered the opportunity to seek the attorney general's nomination for the
36   unclassified position of assistant attorney general.

Amendment to HB 2-FN-A-LOCAL
- Page 179 -

371  National Guard Enlistment Incentive Program.  The subdivision heading before RSA 160-B:60 is repealed and reenacted to read as follows:

National Guard Enlistment Incentive Program

372   National Guard Enlistment Incentive Program.   RSA 110-B:60-62 are repealed and reenacted to read as follows:

110-B:60  New Hampshire National Guard Enlistment Incentive Program Established.  For the purpose of encouraging enlistment in the national guard there is hereby established a New Hampshire national guard enlistment incentive program.  This program authorizes a cash incentive up to $500 to current members of the New Hampshire national guard in the pay grades of E-1 to O-3 or any former member of the New Hampshire national guard for each new or prior service recruit that they bring into the New Hampshire national guard.

110-B:61  Revenue for Enlistment Incentive Program.

I.  There is hereby established a fund to be known as national guard enlistment incentive program fund.  Any appropriations received shall be deposited in the fund.  Moneys in the fund and any interest earned on the fund shall be used for the purpose of encouraging enlistment in the national guard and shall not be used for any other purpose.  The adjutant general shall oversee expenditures from the fund.  The moneys in the fund shall be nonlapsing.

II.  In addition to any moneys appropriated, the New Hampshire national guard enlistment incentive program fund may consist of an annual appropriation, as determined by the general court, to be awarded in accordance with written policies promulgated by the adjutant general under RSA 110-B:62.

110-B:62  Oversight and Administration.  The adjutant general shall adopt rules pursuant to RSA 541-A relative to the administration of the enlistment incentive program and relative to its execution by the New Hampshire Army and Air National Guard recruiting offices in coordination with the department of military affairs and veterans services.

373  New Subparagraph; National Guard Enlistment Incentive Program Fund.  Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

(365)  Moneys deposited in the national guard enlistment incentive program fund established in RSA 110-B:61.

374  Reference to National Guard Scholarship Fund Removed.  Amend RSA 110-B:55, I to read as follows:

I.  Fines may be paid to a military court or to an officer executing its process.  The amount of any fine imposed may be noted upon any state roll or account for pay of the delinquent and deducted from any pay or allowance due or thereafter to become due them, until said fine is liquidated; or the same may be collected with lawful costs of collection, as in the case of executions issued in action founded upon torts.  [Fines shall be paid over to the state treasurer and credited to the New Hampshire national guard recruitment and retention scholarship fund under RSA 110-B:60.]

Amendment to HB 2-FN-A-LOCAL
- Page 180 -

375  Reference to National Guard Scholarship Fund Removed.  Amend RSA 110-B:29 to read as follows:

110-B:29  Use of Armories or Other National Guard Facilities.

[I.]  All New Hampshire national guard facilities shall be primarily for the military duty, instruction, and training of the national and state guard and for the storage and maintenance of military property.  Other use of national guard facilities may be authorized by the adjutant general and shall be governed by rules and regulations promulgated under this section.

[II.  Rental fees for the use of national guard facilities shall be fixed by the adjutant general and shall be declared as revenue and paid to the adjutant general subject to the provisions of RSA 110-B:61.]

376  Repeal.  RSA 110-B:63, relative to the national guard scholarship program, is repealed.

377  Appropriation: Department of Military Affairs and Veterans Services; National Guard Enlistment Incentive Fund.  The sum of $25,000 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of military affairs and veterans services to fund the national guard enlistment incentive fund established in RSA 110-B:61.  Such appropriation shall be nonlapsing. The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

378  Effective Date.  Section 377 of this act shall take effect June 30, 2021.

379  Insurance Department; Positions Established.

I.  There is established within the insurance department the unclassified position of director of life and health.  The director of life and health shall be qualified to hold that position by reason of education and experience and shall perform such duties and exercise such powers as the commissioner may authorize.

II.  The salary of the director of life and health shall be determined after assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the position which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.  Upon completion of this action and appointment of the director of life and health, position #16733 shall be abolished to allow for the transition of this classified position within its available appropriations into the unclassified position of director of life and health.  Funding shall be transferred into a new expenditure class 011, within accounting unit 02-24-24-240010-2520.  The incumbent in the abolished position shall be offered the position of director of life and health.

III.  There is established within the insurance department the position of director of property and casualty.  The director of property and casualty shall be qualified to hold that position by reason of education and experience and shall perform such duties and exercise such powers as the commissioner may authorize.

IV.  The salary of the director of property and casualty shall be determined after assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the position

1    which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.  Upon completion of this action

2    and appointment of the director of property and casualty, position #19998 shall be abolished to allow

3    for the transition of this classified position with its available appropriations into the unclassified

4    position of director of property and casualty.  Funding shall be transferred into a new expenditure

5    class 011, within accounting unit 02-24-24-240010-2520.  The incumbent in the abolished position

6    shall be offered the position of director of property and casualty.

7        380  Insurance Department; Department Positions.  Amend RSA 400-A:6, VII to read as follows:

8            VII.  The commissioner shall appoint, as the commissioner's assistants, a director of financial

9    regulation, *a director of life and health,* a director of health economics, a director of health care

10   analytics, a general counsel, an insurance fraud director, a senior insurance fraud investigator, *a*

11   *director of property and casualty,* a property and casualty actuary, a chief property and casualty

12   actuary, a workers' compensation analyst, a chief life, accident and health actuary, a compliance and

13   enforcement counsel, a chief financial examiner, a communications director, and a health reform

14   coordinator, each of whom shall serve at the pleasure of the commissioner.  The director of financial

15   regulation, *director of life and health,* director of health economics, director of health care

16   analytics, general counsel, insurance fraud director, senior insurance fraud investigator, *director of*

17   *property and casualty,* property and casualty actuary, chief property and casualty actuary,

18   workers' compensation analyst, chief life, accident and health actuary, compliance and enforcement

19   counsel, chief financial examiner, communications director, and health reform coordinator, shall

20   perform such duties and exercise such powers as the commissioner may authorize.

21       381  Appropriation; Business Finance Authority; Grants to Regional Economic Development

22   Corporations.  The sum of $200,000 is hereby appropriated for the fiscal year ending June 30, 2022,

23   and the sum of $200,000 is hereby appropriated for the fiscal year ending June 30, 2023 to the

24   business finance authority for the purpose of providing equal grants to regional economic

25   development corporations in furtherance of the objectives set forth in RSA 162-A:1.  The governor is

26   authorized to draw a warrant for said sums out of any money in the treasury not otherwise

27   appropriated.  Funds appropriated to the authority under this section shall be excluded from the

28   repayment provisions of RSA 162-A:30.

29       382  Appropriation; Affordable Housing Fund.  The sum of $25,000,000 for the fiscal year ending

30   June 30, 2021, is hereby appropriated to the housing finance authority for deposit in the affordable

31   housing fund established in RSA 204-C:57, for the purpose of providing financing or state matching

32   funds for affordable housing.  The appropriation shall be in addition to any other funds appropriated

33   to the housing finance authority.  The governor is authorized to draw a warrant for said sum out of

34   any money in the treasury not otherwise appropriated.

35       383  Effective Date.  Section 382 of this act shall take effect June 30, 2021.

36       384  Department of Natural and Cultural Affairs; Bureau of Trails; Grant in Aid.

Amendment to HB 2-FN-A-LOCAL
- Page 182 -

1       I.   For the biennium ending June 30, 2023 and notwithstanding any provision of law or

2  administrative rule to the contrary, the limitations on percentages of grant-in-aid administered by

3  the bureau of trails, division of parks and recreation, for the development and maintenance of OHRV

4  trails on private, state, federal, or municipal lands for the grant period of June 1, 2021 to May 31,

5  2022 shall be as follows:

6        (a)  90 percent of the cost of renting equipment required to complete a project.

7        (b)  90 percent of the cost of purchasing trail grooming equipment.

8        (c)  90 percent of the cost of reconditioning trail grooming equipment.

9        (d)  90 percent of the cost of operations for summer trail grading.

10       II.   Except as expressly provided above, all other administrative rules regarding the

11  administration of this grant in aid program remain in full force and effect.

12      385  Appropriation; Hampton Beach Area Commission.  The sum of $20,000 for the fiscal year

13  ending June 30, 2021 is hereby appropriated to the Hampton Beach area commission to be credited

14  to the Hampton Beach master plan fund under RSA 216-J:5 for the purpose of updating the

15  environmental components of the master plan.  The governor is authorized to draw a warrant for

16  said sum out of any money in the treasury not otherwise appropriated.

17      386  Effective Date.  Section 385 of this act shall take effect June 30, 2021.

18      387  Substance Abuse Enforcement Program; Appropriations.

19       I.  The sum of $587,700 for the fiscal year ending June 30, 2021 is hereby appropriated to the

20  department of safety.  This sum shall be expended as follows:

21        (a)  $171,600 shall be expended for the purpose of funding overtime at the state forensic

22  laboratory as a result of increased caseloads attributable to narcotics related enforcement and

23  investigations, with no more than 50 percent of the appropriation expended in each fiscal year of the

24  biennium ending June 30, 2023.

25        (b)  $416,100 shall be expended for the purpose of funding overtime at the state police for

26  narcotics related enforcement and investigations, with no more than 50 percent of the appropriation

27  expended in each fiscal year of the biennium ending June 30, 2023.

28       II.  The sum of $2,400,000 for the fiscal year ending June 30, 2021 is hereby appropriated to

29  the department of safety to disburse grants to county and local law enforcement agencies for the

30  purpose of funding overtime costs for county and local law enforcement officers performing law

31  enforcement activities attributable to the substance abuse enforcement program established in RSA

32  21-P:66.  No more than 50 percent of the appropriation shall be expended in each fiscal year of the

33  biennium ending June 30, 2023.

34       III.  The governor is authorized to draw a warrant for said sums out of any money in the

35  treasury not otherwise appropriated.

36       IV.  No appropriation made in this section shall lapse until June 30, 2023.

37      388  Effective Date.  Section 387 of this act shall take effect June 30, 2021.

389  Fire Standards and Training and Emergency Medical Services Fund; Appropriation.  There is hereby appropriated to the fire standards and training and emergency medical services fund established under RSA 21-P:12-d, the sums of $300,000 for the fiscal year ending June 30, 2022 and $300,000 for the fiscal year ending June 30, 2023.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

390  Department of Safety; Appropriation.  There is hereby appropriated to the department of safety, division of fire standards and training and emergency medical services, the sums of $200,000 for the fiscal year ending June 30, 2022 and $200,000 for the fiscal year ending June 30, 2023.  Such sums shall be used for the purpose of funding additional part-time instruction or increasing the tuition discount provided to New Hampshire emergency service personnel for certain programs through administrative rulemaking.  Such appropriations shall be a charge against the fire standards and training and emergency medical services fund established pursuant to RSA 21-P:12-d.

391  General Fund Transfer to Highway Fund.  The sum of $50,000,000 for the fiscal year ending June 30, 2022, is hereby appropriated to the highway fund.  This appropriation shall not lapse.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

392  Appropriation; Department of Transportation.  There is hereby appropriated to the department of transportation the sum of $7,000,000 for the fiscal year ending June 30, 2021, for the purpose of the Conway Bypass right-of-way payback to the federal highway administration, understanding the department will continue to negotiate with the federal highway administration on a specific payback plan.  This appropriation shall not lapse.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

393  Effective Date.  Section 392 of this act shall take effect June 30, 2021.

394  Department of Transportation; Removal of Toll Booths.  Notwithstanding any provision of law to the contrary, the commissioner of the department of transportation shall remove the northbound and southbound toll booths on exit 10 on the F.E. Everett turnpike in the town of Merrimack.

395  Department of Transportation; Town of Tilton; Appropriation.

I.  The project named Tilton, project number 29753, to reconstruct and re-classify 1.97 miles of Calef Hill Road shall be added to the 10-year transportation improvement plan with engineering totaling $350,000 in fiscal year 2022 and construction totaling $2,900,000 for the biennium ending June 30, 2023.

II.  There is hereby appropriated $3,250,000 in the fiscal year ending June 30, 2022, to the department of transportation for funding the project identified in paragraph I.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.  Amounts appropriated under this section shall not lapse.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 184 -**

396   Appropriation; Department of Transportation.   There is hereby appropriated to the department of transportation the sum of $5,000,000 for the fiscal year ending June 30, 2022 for the purpose of leveraging federal discretionary grants on transportation projects with required state cash match.  Such appropriation shall not lapse.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

397   Appropriation to the Department of Health and Human Services for Child Welfare Behavioral Health Services.  Lapse Extension.  Amend 2019, 346:347 to read as follows:

346:347  Appropriation; Department of Health and Human Services; Child Welfare Behavioral Health Services.  The sum of $6,084,000 for the fiscal year ending June 30, 2020, and the sum of $13,164,000 for the fiscal year ending June 30, 2021, are hereby appropriated to the department of health and human services for the purposes of sections 330-346 of this act.  *The $13,164,000 appropriation for fiscal year 2021 shall not lapse until June 30, 2022.*  Notwithstanding RSA 14:30-a, VI, the department may accept and expend any federal fund match to the appropriation in this section without prior approval of this fiscal committee of the general court.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

398  Effective Date.  Section 397 of this act shall take effect June 30, 2021.

399  Annual Report on State Mental Health Plan; Child Welfare Component.  Amend RSA 126-A:5, XXXIII to read as follows:

XXXIII.*(a)*  On or before September 1, 2019, the commissioner shall submit a report on the New Hampshire 10-year mental health plan of 2018 containing the priorities for implementation of the plan to the oversight committee on health and human services, established under RSA 126-A:13, the chairpersons of the house and senate policy committees with jurisdiction over health and human services matters, the president of the senate, the speaker of the house of representatives, [and] the governor*, and the office of the child advocate established in RSA 21-V*.  The commissioner shall submit a report on or before September 1, 2020 and annually thereafter on the status of the implementation of the 10-year mental health plan including, but not limited to, unmet benchmarks and recommendations for any necessary barrier resolution or necessary adjustments or modifications to the plan to better serve New Hampshire citizens, to the oversight committee on health and human services and the chairpersons of the house and senate policy committees with jurisdiction over health and human services matters.  The annual report shall include any recommendations by the commissioner for legislation as needed or appropriate in achieving important benchmarks in fully implementing the 10-year mental health plan.

*(b)  As part of the annual report required by this paragraph, the commissioner of the department of health and human services, in conjunction with the commissioner of the department of education, shall issue a joint report on the implementation of 2019, 44 (SB 14), relative to child welfare.  This portion of the report shall address in detail the*

1  *implementation status of each section of 2019, 44 (SB 14) and include all information*
2  *related to progress toward full implementation of a system of care under RSA 135-F.  The*
3  *report shall also address the following:*

4  *(1)  The total cost of children's behavioral health services.*

5  *(2)  The identification of barriers and service gaps in the array of children's*
6  *behavioral health services, along with a description of efforts and plans to fill those gaps.*

7  *(3)  The availability of mobile crisis and stabilization services in each part of*
8  *the state and plans to fill any gaps.*

9  *(4)  Changes to statutes, administrative rules, policies, practices, and*
10  *managed care and provider contracts which will be necessary to fully implement the*
11  *system of care.*

12  *(5)  Shortfalls in workforce sufficiency affecting full implementation of the*
13  *system of care as well as efforts and plans for addressing those shortfalls.*

14  *(6)  Numbers of children and youth awaiting services in various categories.*

15  *(7)  Plans to coordinate the system of care with existing efforts addressing*
16  *early childhood interventions, primary prevention, and primary care integration.*

17  *(8)  Plans to develop and/or coordinate a cross-system assessment tool and*
18  *data collection system to measure outcomes, including but not limited to status upon exit*
19  *from the system of care, measured treatment results, recidivism, and other returns to the*
20  *service system.*

21  400  Repeal.  RSA 135-F:6, relative to reporting requirements on the system of care for children's
22  mental health, is repealed.

23  401  System of Care for Children's Mental Health; Duties of the Commissioner of Health and
24  Human Services; Reference Change.  Amend the introductory paragraph of RSA 135-F:4, II to read
25  as follows:

26  II.  Develop a plan for full establishment and maintenance of a system of care.  Such plan
27  shall be reviewed and amended annually.  It shall include sufficient detail to allow compliance with
28  the reporting requirements of RSA [135-F:6] *126-A:5, XXXIII*, and shall address at least the
29  following elements:

30  402  System of Care for Children's Mental Health; Duties of the Commissioner of the
31  Department of Education; Reference Change.  Amend the introductory paragraph of RSA 135-F:5, II
32  to read as follows:

33  II.  Develop a plan for full support and participation of the department of education in the
34  establishment and maintenance of a system of care.  Such plan shall be reviewed and amended
35  annually.  It shall include sufficient detail to allow compliance with the reporting requirements of
36  RSA [135-F:6] *126-A:5, XXXIII*, and shall address at least the following elements:

Amendment to HB 2-FN-A-LOCAL
- Page 186 -

1    403  Department of Health and Human Services; Contracts and Procurement Unit; Positions
2    Established.  There are hereby established within the department of health and human services for
3    the biennium ending June 30, 2023, 8 full-time, classified positions in the office of business
4    operations, contracts and procurement unit.

5    404  Appropriation; Department of Health and Human Services; Contracts and Procurement
6    Unit.  The sum of $644,260 for the fiscal year ending June 30, 2022, and the sum of $810,607 for the
7    fiscal year ending June 30, 2023, are hereby appropriated to the department of health and human
8    services for the purpose of funding positions in the office of business operations, contracts and
9    procurement unit.  The governor is authorized to draw a warrant for said sums out of any money in
10   the treasury not otherwise appropriated.

11   405  Duties of the Department of Health and Human Services; Administration of State Food
12   Stamp Program; Reference to SNAP (Supplemental Nutrition Assistance Program) Added.  Amend
13   RSA 161:2, XIII to read as follows:

14         XIII. Food Stamp Program.  Develop and administer a food stamp program within the state*,*
15   *also known as SNAP, the Supplemental Nutritional Assistance Program,* under the
16   provisions of the Federal Food Stamp Act of 1964, as amended, and in accordance with Federal
17   Regulations duly promulgated by the United States Department of Agriculture and the United
18   States Department of Health, Education and Welfare.

19         *XIII-a.  SNAP Incentive Programs.  Implement SNAP incentive programs enabling*
20   *beneficiaries of the federal Supplemental Nutrition Assistance Program to receive a dollar-*
21   *for-dollar match for fresh fruits and vegetables, with an emphasis on locally grown, at*
22   *participating farmer's markets, farm stands, mobile markets, community supported*
23   *agriculture sites, grocery stores, or other participating direct food retailers.*

24   406  New Paragraph; Department of Health and Human Services; Rulemaking.  Amend RSA
25   161:4-a by inserting after paragraph XI the following new paragraph:

26         XI-a. The implementation of SNAP incentive programs under RSA 161:2, XIII-a.

27   407  Department of Health and Human Services; Appropriation.  The sum of $150,000 for the
28   biennium ending June 30, 2023 is hereby appropriated to the department of health and human
29   services for the SNAP incentive programs under RSA 161:2, XIII-a.  The governor is authorized to
30   draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

31   408  Prospective Repeal Regarding Eligibility for Services Extended.  Amend 2011, 209:6, I, as
32   amended by 2013, 140:1, I, as amended by 2015, 276:41, I, as amended by 2017, 156:85, I, as
33   amended by 2019, 346:61, I, to read as follows:

34         I. Section 5 of this act shall take effect July 1, [2021] *2023*.

35   409  New Paragraph; Rulemaking; Exception Added; Cost-of-living Adjustment.  Amend RSA
36   541-A:21 by inserting after paragraph III-a the following new paragraph:

III-b.   Rules adopted relative to the cost of living adjustment in social security benefits contained within the Social Services Block Grant program shall be exempt from the provisions of RSA 541-A:5 through RSA 541-A:14, provided that recipients receive proper notice that the income level has been adjusted.

410  Eligibility for Home and Community-Based Services; Suspension.  RSA 151-E:18, regarding presumptive eligibility for home and community-based services, shall be suspended for the biennium ending June 30, 2023.

411  Social Security Act Waiver Programs; Committee Established.

I.   There is established a committee to study achieving parity in reimbursement among organizations that provide Social Security Act Section 1915(c) waiver programs.  The members of the committee shall be as follows:

(a)   Two members of the senate finance committee, one of whom shall be from the majority party and one of whom shall be from the minority party, appointed by the president of the senate.

(b)   Two members of the house of representatives finance committee, one of whom shall from the majority party and one of whom shall be from the minority party, appointed by the speaker of the house of representatives.

II.   Members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

III.(a)   The committee shall examine the issue of achieving parity in reimbursement among organizations that provide services under Social Security Act Section 1915(c) waiver programs and the potential solutions and impact of such reimbursement parity on the state and its counties, the contracting organizations, and clients.

(b)   The study shall include a comparison between all Social Security Act Section 1915(c) waiver reimbursements, including reimbursement for providers in the following program areas: choices for independence, developmental services, in-home support, and acquired brain disorder services.

IV.   The committee shall meet in duly noticed public meetings, take testimony when the committee determines it is appropriate, and may accept and solicit information from any person or entity the committee deems relevant to its study.

V.  The members of the study committee shall elect a chairperson from among the members. The first meeting of the committee shall be called by the first-named senate member.  The first meeting of the committee shall be held within 45 days of the effective date of this section.  Three members of the committee shall constitute a quorum.

VI.   The committee shall report its findings and any recommendations for proposed legislation to the president of the senate, the speaker of the house of representatives, the senate clerk, the house clerk, the governor, and the state library on or before November 15, 2022.

1    412   Appropriation; Department of Health and Human Services; Transitional Housing Beds.
2    There is hereby appropriated to the department of health and human services the sum of $6,000,000
3    for the fiscal year ending June 30, 2021, which shall be nonlapsing until June 30, 2023, for the
4    purposes of increasing rates paid for transitional housing beds and for funding new transitional
5    housing beds for forensic patients and/or patients with complex behavioral health conditions
6    including those transitioning from the New Hampshire hospital.  In addition, any unspent funds
7    from the appropriation made under 2019, 346:221 may be used for the purposes of this section.  The
8    governor is authorized to draw a warrant for said sum out of any money in the treasury not
9    otherwise appropriated.

10    413  Effective Date.  Section 412 of this act shall take effect June 30, 2021.

11    414  Health and Human Services; State Loan Repayment Program.  Of the funds appropriated to
12    account 05-95-90-901010-7965, Rural Health & Primary Care, class 103 for the biennium ending
13    June 30, 2021, $1,533,566 shall not lapse until June 30, 2023 and shall be treated as restricted
14    revenue for the purpose of funding the state loan repayment program.  The department of health
15    and human services is authorized to accept and expend any matching federal funds for the purposes
16    of this section without prior approval of the fiscal committee of the general court.

17    415  Effective Date.  Section 414 of this act shall take effect June 30, 2021.

18    416   Department of Health and Human Services; Division of Medicaid Services.  Any funds
19    appropriated to activity 05-95-47-470010, division of medicaid services, for the biennium ending
20    June 30, 2021 shall not lapse until June 30, 2023, and shall be treated as restricted revenue for the
21    purpose of funding expenditures in account 05-95-47-470010-7948, medicaid care management.  The
22    department of health and human services is authorized to accept and expend any matching federal
23    funds for the purposes of this section without prior approval of the fiscal committee of the general
24    court.

25    417  Effective Date.  Section 416 of this act shall take effect June 30, 2021.

26    418  Appropriation; Department of Health and Human Services.  There is hereby appropriated to
27    the department of health and human services the sum of $30,000,000 for the fiscal year ending June
28    30, 2021 for the purpose of constructing a 24-bed forensic psychiatric hospital.   The sum
29    appropriated shall be nonlapsing, provided that any unexpended amount following construction shall
30    lapse to the general fund.  The governor is authorized to draw a warrant for said sum out of any
31    money in the treasury not otherwise appropriated.

32    419  Effective Date.  Section 418 of this act shall take effect June 30, 2021.

33    420  Waiver/Nursing Facility Payments.

34    I.  Notwithstanding RSA 167:18-a or any other provision of law to the contrary, any funds
35    appropriated to activity 05-95-48-482010, waiver and nursing facilities, for the biennium ending
36    June 30, 2021 shall not lapse until June 30, 2023, and shall be treated as restricted revenue for the
37    purpose of funding expenditures contained in the operating budget for the fiscal year ending June

1    30, 2022  in account 05-95-48-482010-2152, waiver/nursing facility payments – county participation.
2    The department of health and human services is authorized to accept and expend any matching
3    federal funds for the purposes of this section without prior approval of the fiscal committee of the
4    general court.

5    421  Effective Date.  Section 420 of this act shall take effect June 30, 2021.

6    422  Home Visiting Program.  Amend RSA 167:68-a to read as follows:

7    167:68-a  Home Visiting Programs.  Home visiting programs for children and their families
8    established pursuant to this subdivision shall be made available to all Medicaid eligible [children
9    and] pregnant women*, infants, and families with children up to age one,* without restriction.
10   The commissioner shall adopt rules, pursuant to RSA 541-A, relative to administering this section.

11   423  Rulemaking; Home Visiting Program.  Amend RSA 167:3-c, XV to read as follows:

12       XV.  Procedures for making the home visiting program available to all Medicaid eligible
13   [children and] pregnant women*, infants, and families with children up to age one* pursuant to
14   RSA 167:68, II(e).

15   424  Graduate Medical Education Payments Suspended.  The commissioner of the department of
16   health and human services shall submit a Title XIX Medicaid state plan amendment to the federal
17   Centers for Medicare and Medicaid Services to suspend the provision of direct and indirect graduate
18   medical education payments to hospitals as provided in 42 C.F.R. section 413.75 for the biennium
19   ending June 30, 2023.  Upon approval of the state plan amendment, and as of the effective date of
20   the state plan amendment, any obligations for payment of direct and indirect graduate medical
21   education shall be suspended for the biennium ending June 30, 2023.

22   425    Department of Health and Human Services; Juvenile Diversion; Supplemental
23   Appropriation.  The sum of $300,000 for the fiscal year ending June 30, 2022, and the sum of
24   $300,000 for the fiscal year ending June 30, 2023 are hereby appropriated to the department of
25   health and human services for the purpose of extending existing grants to the certified juvenile
26   diversion providers who provide diversion services pursuant to RSA 169-B:10.  Any unexpended
27   funds remaining from the appropriation made in 2019, 346:371 shall not lapse and may be used for
28   the purposes of this section.  The governor is authorized to draw a warrant for said sums out of any
29   money in the treasury not otherwise appropriated.

30   426  New Paragraph; Delinquent Children; Juvenile Diversion.  Amend RSA 169-B:10 by
31   inserting after paragraph II-a the following new paragraph:

32       II-b.  Consistent with the referral procedures established pursuant to paragraph II-a, the
33   department of health and human services, division for children, youth and families, shall have the
34   authority establish procedures for the state-funded diversion programs.

35   427  Statement of Purpose.  To improve overall health, promote savings in the state's Medicaid
36   managed care program, and prevent future health conditions caused by oral health problems, and
37   based on the recommendation of the working group convened pursuant to 2019, 346:225, the general

Amendment to HB 2-FN-A-LOCAL
- Page 190 -

1  court hereby determines that it is in the best interest of the state of New Hampshire to extend

2  dental benefits under the Medicaid managed care program to individuals 21 years of age and over.

3      428  New Paragraph; Medicaid Managed Care Program; Dental Benefits.  Amend RSA 126-A:5

4  by inserting after paragraph XIX the following new paragraph:

5      XIX-a.(a)(1)   The commissioner shall pursue contracting options to administer the state's

6  Medicaid dental program with the goals of improving access to dental care for Medicaid populations,

7  improving health outcomes for Medicaid enrollees, expanding the provider network, increasing

8  provider capacity, and retaining innovative programs that improve access and care through a value-

9  based care model.

10      (2)   The commissioner shall issue a request for information to assist in selecting the

11  administrative model for the state's Medicaid dental program.  Such model shall be either a model

12  administered by a dental managed care organization or a model administered by the state's current

13  medical managed care organizations.  The commissioner shall obtain the requested information from

14  both the current medical managed care organizations and any interested dental managed care

15  organization.  The administrative model selected shall demonstrate the greatest ability to satisfy the

16  state's need for value, quality, efficiency, innovation, and savings.  The request for information shall

17  be released no later than November 1, 2021.  The request for information shall address improving

18  health outcomes, expanding the provider network, increasing capacity of providers, integrating a

19  value-based care model, and exploring innovative programs for children and adults.

20      (3)  If the model administered by a dental managed care organization is selected, the

21  commissioner shall issue a 2-year request for proposals, with 2 optional one-year extensions, to enter

22  into contracts with the vendor that demonstrates the greatest ability to satisfy the state's need for

23  value, quality, efficiency, innovation, and savings.  The state plan amendment shall be submitted to

24  the Centers for Medicare and Medicaid Services (CMS) within the quarter of the program effective

25  date.  Implementation of a procured contract shall begin January 1, 2023 for the adult benefit.  The

26  department, in consultation with oral health stakeholders, will determine the value of

27  implementation of the pediatric dental benefit in a value-based benefit plan.  Implementation of the

28  pediatric benefit will occur on a date that follows the successful implementation of the adult dental

29  benefit.  The commissioner shall establish a capitated rate for the appropriate model for the contract

30  that is full risk to the vendor.  In contracting for a dental managed care model and the various rate

31  cells, the department shall ensure no reduction in the quality of care of services provided to enrollees

32  in the managed care model and shall exercise all due diligence to maintain or increase the quality of

33  care provided.  The department shall seek, with the review of the fiscal committee of the general

34  court, all necessary and appropriate state plan amendments and waivers to implement the

35  provisions of this paragraph.  The program shall not commence operation until such state plan

36  amendments or waivers have been approved by CMS.  All necessary state plan amendments and

37  waivers shall be submitted within the quarter of the program effective date.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 191 -**

1        (4)   The commissioner shall adopt rules, pursuant to RSA 541-A, if necessary, to

2 implement the provisions of this paragraph.

3        (b)   Any vendor awarded a contract pursuant to this paragraph shall provide the

4 required dental services to children with an implementation date to be determined by the

5 department after the successful implementation of the adult benefit and the following dental

6 services to individuals 21 years of age and over, reimbursed under the United States Social Security

7 Act, Title XIX, or successors to it:

8        (1)   Preventive dental services including examinations, necessary x-rays or other

9 imaging, prophylaxis, topical fluoride, oral hygiene instruction, behavior management and smoking

10 cessation counseling, and other services as determined by the commissioner.

11        (2)  Restorative treatment to restore tooth form and function.

12        (3)   Periodontal treatment and oral and maxillofacial surgery to relieve pain,

13 eliminate infection, or prevent imminent tooth loss.

14        (4)  Removable prosthodontics to replace missing teeth subject to medical necessity.

15        (c)   In this paragraph, "dental managed care organization" means any dental care

16 organization, dental service organization, health insurer, or other entity licensed under Title

17 XXXVII, that provides, directly or by contract, dental care services covered under this paragraph

18 rendered by licensed providers and that meets the requirements of Title XIX or Title XI of the

19 federal Social Security Act.

20    429  Dental Benefit; Appropriation.  The sum of $1,460,000 is hereby appropriated to the

21 department of health and human services for the fiscal year ending June 30, 2023 for the purposes of

22 implementing the dental benefit described in section 428 of this act.  The governor is authorized to

23 draw a warrant for said sum out of any money in the treasury not otherwise appropriated.  The

24 department is authorized to accept and expend matching federal funds for the purposes of this

25 program without prior approval of the fiscal committee of the general court.

26    430  Home Visiting Programs; Limitation.  The home visiting programs available to all Medicaid

27 eligible children and pregnant women as required by RSA 167:68-a, shall be subject and limited to

28 available appropriations for the biennium ending June 30, 2023.

29    431  Department of Health and Human Services; Income Eligibility for "In and Out Medical

30 Assistance;" Suspension.  Chapter 39:1 Laws of 2020 requiring the department of health and human

31 services to amend the income standard used for eligibility for the "in and out medical assistance"

32 policy, shall be suspended for the biennium ending June 30, 2023.

33    432  Medicaid to Schools Program; Fiscal Committee Approval of Supplemental Funding.  For

34 the biennium ending June 30, 2023, in the event funds appropriated in accounting unit 05-95-47-

35 0010-7207 Medicaid to schools are insufficient, the department of health and human services may

36 accept and expend additional federal funds with the prior approval of the fiscal committee of the

37 general court.  Any request to the fiscal committee shall include a detailed explanation of the types

Amendment to HB 2-FN-A-LOCAL
- Page 192 -

1   of assistance the department is providing to school districts to ensure eligibility for reimbursement

2   under the Medicaid to schools program.

3       433   Appropriation; Department of Health and Human Services; Grants to Support Senior

4   Centers; Supports for Mental Health and Social Isolation.   There is hereby appropriated to the

5   department of health and human services the sum of $1,500,000, for the fiscal year ending June 30,

6   2021, for the purpose of providing grants to senior centers or other organizations serving senior

7   citizens for purposes of supporting services to combat struggles with mental health and social

8   isolation.  This appropriation shall not lapse until June 30, 2023.  The governor is authorized to

9   draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

10      434  Effective Date.  Section 433 of this act shall take effect June 30, 2021.

11      435   New Hampshire Veterans' Home; Appropriation.   The sum of $80,000 for the fiscal year

12  ending June 30, 2021 is hereby appropriated to the veterans' home for the purpose of funding the

13  veterans' home master plan update.  The governor is authorized to draw a warrant for said sums out

14  of any money in the treasury not otherwise appropriated and the appropriation shall not lapse until

15  June 30, 2023.

16      436  Effective Date.  Section 435 of this act shall take effect June 30, 2021.

17      437  Appropriation; Lottery Commission.  There is hereby appropriated to the lottery commission

18  the sum of $2,715,000 for the fiscal year ending June 30, 2021 for the purpose of paying the total

19  principal balance on the commercial mortgage on its headquarters building.   The governor is

20  authorized to draw a warrant for said sum out of any money in the treasury not otherwise

21  appropriated.  Any unexpended amount of the appropriation shall lapse to the general fund on June

22  30, 2022.

23      438  Effective Date.  Section 437 of this act shall take effect June 30, 2021.

24      439  Keno License; Fee.  Amend RSA 284:44, I to read as follows:

25      I.  The license fee for a commercial premises keno license issued under RSA 284:46 shall be

26  [$500] *$100* per year.   Such fee shall be submitted to the lottery commission at the time the

27  application is made and shall be refunded if the application is denied.

28      440   Pari-Mutuel Pools on Historic Horse Races; Date Change to May 1, 2021.   Amend RSA

29  284:22-b, II to read as follows:

30      II.  In order to be eligible for a license to sell pari-mutuel pools on historic races, an applicant

31  shall have been game operator employer licensed under RSA 287-D as of May 1, [2020] *2021* and

32  still licensed as of the effective date of this section, provided such sales are within the enclosure of a

33  facility at which the licensee holds its licensed activities under RSA 287-D, and that such facility is

34  located within the city or town in which the licensee held its license on May 1, [2020] *2021*.  An

35  application that is approved by the lottery commission, and a license that is granted shall not be

36  permitted to be transferred or sold.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 193 -**

1    441  Applicability.  Section 440 of this act shall take effect one minute after the effective date of

2    HB626-FN of the 2021 regular legislative session.  If HB626-FN does not become law, section 440 of

3    this act shall not take effect.

4    442  Effective Date.

5         I.  Section 440 of this act shall take effect as provided in section 441 of this act.

6         II.  Section 441 of this act shall take effect upon its passage.

7    443  Governor's Scholarship Fund; Appropriation.  The sum of $6,000,000 for the fiscal year

8    ending June 30, 2021 is hereby appropriated to the governor's scholarship fund established under

9    RSA 195-H:12.  Such funds shall not lapse.  The governor is authorized to draw a warrant for said

10   sum out of any money in the treasury not otherwise appropriated.

11   444  Effective Date.  Section 443 of this act shall take effect June 30, 2021.

12   445  New Chapter; Education Freedom Accounts.  Amend RSA by inserting after chapter 194-D

13   the following new chapter:

CHAPTER 194-E

EDUCATION FREEDOM ACCOUNTS

16   194-E:1  Definitions.  In this chapter:

17        I.  "Adequate education grant" means the grant calculated under RSA 198:41.

18        II.  "Curriculum" means the lessons and academic content taught in a specific course,

19   program, or grade level.

20        III.  "Department" means the department of education.

21        IV.  "Education freedom account" or "EFA" means the account to which funds are allocated

22   by the scholarship organization to the parent of an EFA student in order to pay for qualifying

23   education expenses to educate the EFA student under this chapter.

24        V.  "Education service provider" means a person or organization that receives payments from

25   education freedom accounts to provide educational goods and services to EFA students.

26        VI.  "Eligible student" means a resident of this state who is eligible to enroll in a public

27   elementary or secondary school and whose annual household income at the time the student applies

28   for the program is less than or equal to 300 percent of the federal poverty guidelines as updated

29   annually in the Federal Register by the United States Department of Health and Human Services

30   under 42 U.S.C. section 9902(2).  No income threshold need be met in subsequent years, provided the

31   student otherwise qualifies.  Students in the special school district within the department of

32   corrections established in RSA 194:60 shall not be eligible students.

33        VII.  "EFA student" means an eligible student who is participating in the EFA program.

34        VIII.  "Full-time" means more than 50 percent of instructional time.

35        IX.  "Remote or hybrid" shall mean any public school that is not providing instruction in-

36   person where the student or the educator are both not physically present in the traditional

37   classroom due to full-time or part-time classroom closure.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 194 -**

X.  "Parent" means a biological or adoptive parent, legal guardian, custodian, or other person with legal authority to act on behalf of an EFA student.

XI.  "Program" means the education freedom account program established in this chapter.

XII.  "Scholarship organization", means a scholarship organization approved under RSA 77:G, that administers and implements the EFA Act.

194-E:2  Program.

I.  The commissioner of the department of education shall transfer to the scholarship organization the per pupil adequate education grant amount under RSA 198:40-a, plus any differentiated aid that would have been provided to a public school for that eligible student.  The transfers shall be made in accordance with the distribution of adequate education grants under RSA 198:42.

II.  Parents of an EFA student shall agree to use the funds deposited in their student's EFA only for the following qualifying expenses to educate the EFA student:

(a)  Tuition and fees at a private school.

(b)  Tuition and fees for non-public online learning programs.

(c)  Tutoring services provided by an individual or a tutoring facility.

(d)  Services contracted for and provided by a district public school, chartered public school, public academy, or independent school, including, but not limited to, individual classes and curricular activities and programs.

(e)  Textbooks, curriculum, or other instructional materials, including, but not limited to, any supplemental materials or associated online instruction required by either a curriculum or an education service provider.

(f)  Computer hardware, Internet connectivity, or other technological services and devices, that are primarily used to help meet an EFA student's educational needs.

(g)  Educational software and applications.

(h)  School uniforms.

(i)  Fees for nationally standardized assessments, advanced placement examinations, examinations related to college or university admission or awarding of credits and tuition and/or fees for preparatory courses for such exams.

(j)  Tuition and fees for summer education programs and specialized education programs.

(k)  Tuition, fees, instructional materials, and examination fees at a career or technical school.

(l)  Educational services and therapies, including, but not limited to, occupational, behavioral, physical, speech-language, and audiology therapies.

(m)  Tuition and fees at an institution of higher education.

(n)  Fees for transportation paid to a fee-for-service transportation provider for the student to travel to and from an education service provider.

1    (o)  Any other educational expense approved by the scholarship organization.

2    III.  The funds in an EFA may only be used for educational purposes in accordance with
3    paragraph II.

4    IV.  EFA funds shall not be refunded, rebated, or shared with a parent or EFA student in
5    any manner.  Any refund or rebate for goods or services purchased with EFA funds shall be credited
6    directly to the student's EFA.

7    V.  Parents may make payments for the costs of educational goods and services not covered
8    by the funds in their student's EFA.  However, personal deposits into an EFA shall not be permitted.

9    VI.  Funds deposited in an EFA shall not constitute taxable income to the parent or the EFA
10   student.

11   VII.  An EFA shall remain in force, and any unused funds shall roll over from quarter-to-
12   quarter and from year-to-year until the parent withdraws the EFA student from the EFA program or
13   until the EFA student graduates from high school, unless the EFA is closed because of a substantial
14   misuse of funds.  Any unused funds shall revert to the education trust fund established in RSA
15   198:39 and be allocated to fund other EFAs.

16   VIII.  Nothing in this chapter shall be construed to require that an EFA student must be
17   enrolled, full- or part-time, in either a private school or nonpublic online school.

18   IX.  A home education program pursuant to RSA 193-A:5 is terminated upon the
19   commencement of a student's participation in an EFA program.  A parent shall provide notification
20   pursuant to RSA 193-A:5 when a student starts participating in an EFA program.

21   194-E:3  Application for an Education Freedom Account.

22   I.  A parent may apply to the scholarship organization to establish an EFA for an eligible
23   student.  The scholarship organization shall accept and approve applications for the fall and spring
24   semesters each year and shall establish procedures for approving applications in an expeditious
25   manner.

26   II.  The scholarship organization shall create a standard form that parents can submit to
27   establish their student's eligibility for the EFA program and shall ensure that the application is
28   publicly available and may be submitted through various sources, including the Internet.

29   III.  The scholarship organization shall approve an application for an EFA if:

30   (a)  The parent submits an application for an EFA in accordance with application
31   procedures established by the scholarship organization.

32   (b)  The student on whose behalf the parent is applying is an eligible student.

33   (c)  Funds are available for the EFA.

34   (d)  The parent signs an agreement with the scholarship organization:

35   (1)  To provide an education for the eligible student in the core knowledge domains
36   that include science, mathematics, language, government, history, health, reading, writing, spelling,

1    the history of the constitutions of New Hampshire and the United States, and an exposure to and

2    appreciation of art and music.

3             (2)  Not to enroll the eligible student as a full-time student in their resident district

4    public school while participating in the EFA program.

5             (3)  To provide an annual record of educational attainment by:

6                (A)   Having the student take a nationally-standardized, norm-referenced

7    achievement test and to provide the results to the scholarship organization by the end of each school

8    year which the scholarship organization shall make available to the department as aggregate scores;

9    or

10               (B)  Having the student take the statewide student assessment test pursuant to

11    RSA 193-C:6; or

12               (C)  Maintaining a portfolio including, but not limited to, a log which designates

13    by title the reading materials used; samples of writings, worksheets, workbooks, or creative

14    materials used or developed by the student.  The parent shall have a certified teacher or a teacher

15    currently teaching in a nonpublic school, who is selected by the parent, evaluate the student's

16    educational progress upon review of a portfolio and discussion with the parent or student.

17             (4)  To use the funds in the EFA only for qualifying expenses to educate the eligible

18    student as established by the EFA program.

19             (5)  To comply with the rules and requirements of the EFA program.

20    IV.  The signed agreement between the parent and the scholarship organization shall satisfy

21    the compulsory school attendance requirements of RSA 193:1.

22    V.  The scholarship organization shall annually renew a student's EFA if funds are available.

23    VI.   Upon notice to the scholarship organization, an EFA student may choose to stop

24    receiving EFA funding and enroll full-time in a public school.

25    (a)  Enrolling as a full-time student in the resident district public school shall result in

26    the immediate suspension of payment of additional funds into the student's EFA.  However, an EFA

27    that has been open for at least one full school year shall remain open and active for the parent to

28    make qualifying expenditures to educate the student from funds remaining in the EFA.  When no

29    funds remain in the student's EFA, the scholarship organization may close the EFA.

30    (b)  If an eligible student decides to return to the EFA program, payments into the

31    student's existing EFA may resume if the EFA is still open and active.  A new EFA may be

32    established if the student's EFA was closed.

33    194-E:4   Authority and Responsibilities of the Scholarship Organization.   The scholarship

34    organization shall have the following additional duties, obligations, and authority:

35    I. The scholarship organization shall maintain an updated list of education service providers

36    and shall ensure that the list is publicly available through various sources, including the Internet.

II.   The scholarship organization shall provide parents with a written explanation of the allowable uses of EFA funds, the responsibilities of parents, the duties of the scholarship organization, and the role of any financial management firms that the scholarship organization may contract with to administer any aspect of the EFA program.

III.   The scholarship organization shall ensure that parents of students with disabilities receive notice that participation in the EFA program is a parental placement under 20 U.S.C. section 1412, Individuals with Disabilities Education Act (IDEA), along with an explanation of the rights that parentally placed students possess under IDEA and any applicable state laws.

IV.   The scholarship organization shall, in cooperation with the department, determine eligibility for differentiated aid subject to any applicable state and federal laws.

V.   The scholarship organization may withhold from deposits or deduct from EFAs an amount to cover the costs of administering the EFA program, up to a maximum of 10 percent annually.

VI.  The scholarship organization shall implement a commercially viable system for payment of services from EFAs to education service providers by electronic or online funds transfer.

(a)   The scholarship organization shall not adopt a system that relies exclusively on requiring parents to be reimbursed for out-of-pocket expenses, but rather shall provide maximum flexibility to parents by facilitating direct payments to education service providers.  Scholarship organizations may pre-approve requests for reimbursements for qualifying expenses, including expenses pursuant to RSA 194-E:2, II, but shall not disperse funds to parents without receipt that such pre-approved purchase has been made.

(b) A scholarship organization may contract with a private institution or organization to develop the payment system.

VII.  The scholarship organization may also seek to implement a commercially viable system for parents to publicly rate, review, and share information about education service providers, ideally as part of the same system that facilitates the electronic or online funds transfers.

VIII.  If an education service provider requires partial payment of tuition or fees prior to the start of the academic year to reserve space for an EFA student admitted to the education service provider, such partial payment may be paid by the scholarship organization, if funds are available, prior to the start of the school year in which the EFA is awarded and deducted in an equitable manner from subsequent quarterly EFA deposits to ensure adequate funds remain available throughout the school year; but if an EFA student decides not to use the education service provider, the partial reservation payment shall be returned to the scholarship organization by such education service provider and credited to the student's EFA.

IX.  The scholarship organization shall continue making deposits into a student's EFA until:

(a)   The scholarship organization determines that the EFA student is no longer an eligible student.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 198 -**

  (b) The scholarship organization determines that there was substantial misuse of the funds in the EFA.

  (c) The parent or EFA student withdraws from the EFA program.

  (d) The EFA student enrolls full-time in the resident district public school.

  (e) The EFA student graduates from high school.

  X. The scholarship organization may conduct or contract for the auditing of individual EFAs, and shall at a minimum conduct random audits of EFAs on an annual basis.

  XI. The scholarship organization may make any parent or EFA student ineligible for the EFA program in the event of intentional and substantial misuse of EFA funds.

  (a) The scholarship organization shall create procedures to ensure that a fair process exists to determine whether an intentional and substantial misuse of EFA funds has occurred.

  (b) If an EFA student is free from personal misconduct, that student shall be eligible for an EFA in the future if placed with a new guardian or other person with the legal authority to act on behalf of the student.

  (c) The scholarship organization may refer suspected cases of intentional and substantial misuse of EFA funds to the attorney general for investigation if evidence of fraudulent use of EFA funds is obtained.

  (d) A parent or EFA student may appeal the scholarship organization's decision to deny eligibility for the EFA program to the department.

  XII. The scholarship organization may bar an education service provider from accepting payments from EFAs if the scholarship organization determines that the education service provider has:

  (a) Intentionally and substantially misrepresented information or failed to refund any overpayments in a timely manner.

  (b) Routinely failed to provide students with promised educational goods or services.

  XIII. The scholarship organization shall create procedures to ensure that a fair process exists to determine whether an education service provider may be barred from receiving payments from EFAs.

  (a) If the scholarship organization bars an education service provider from receiving payments from EFAs, it shall notify parents and EFA students of its decision as quickly as possible.

  (b) Education service providers may appeal the scholarship organization's decision to bar them from receiving payments from the EFA to the department.

  XIV. The scholarship organization may accept gifts and grants from any source to cover administrative costs, to inform the public about the EFA program, or to fund additional EFAs.

  XV. The department shall adopt rules that are necessary for the administration of this chapter.

XVI.  The scholarship organization shall adopt policies or procedures that are necessary for the administration of this chapter.  This may include policies or procedures:

(a)  Establishing or contracting for the establishment of an online anonymous fraud reporting service.

(b)  Establishing an anonymous telephone number for fraud reporting.

(c)  Requiring a surety bond for education service providers receiving more than $100,000 in EFA funds.

(d)  Refunding payments from education service providers to EFAs.

(e)  Ensuring appropriate use and rigorous oversight of all funds expended under this program.

XVII.  The scholarship organization shall not exclude, discriminate against, or otherwise disadvantage any education provider with respect to programs or services under this section based in whole or in part on the provider's religious character or affiliation, including religiously based or mission-based policies or practices.

194-E:5  Parent and Education Service Provider Advisory Commission.

I.  There is established the parent and education service provider advisory commission to assist the scholarship organization by providing recommendations about implementing, administering, and improving the EFA program.

II.  The commission shall consist of 7 members who shall be parents of EFA students or education service providers and shall represent no fewer than 4 counties in the state.  The members shall be appointed by the director of the scholarship organization and serve at the director's pleasure for one calendar year after which they may be reappointed.  The director of the scholarship organization, or designee, shall serve as a non-voting chairperson of the commission.  The commissioner of the department of education, or designee, shall serve as a non-voting member of the commission.

III.  The scholarship organization may request the commission to meet, in person or virtually, to review appeals of education service provider denials pursuant to RSA 194-E:4, XI and to provide a recommendation to the scholarship organization as to whether an education service provider should be allowed to receive, or continue receiving, payments from EFAs.

194-E:6  Requirements for Education Service Providers.

I.  The scholarship organization may approve education service providers on its own initiative, at the request of parents, or by notice to the scholarship organization provided by prospective education service providers.

II.  A prospective education service provider that wishes to receive payments from EFAs shall:

(a)  Submit notice to the scholarship organization that it wishes to receive payments from EFAs.

Amendment to HB 2-FN-A-LOCAL
- Page 200 -

(b)  Agree not to refund, rebate, or share EFA funds with parents or EFA students in any manner, except that funds may be remitted or refunded to an EFA in accordance with procedures established by the scholarship organization.

(c)  Comply with all state and federal anti-discrimination laws.

194-E:7  Independence of Education Service Providers.

I.  Nothing in this chapter shall be deemed to limit the independence or autonomy of an education service provider or to make the actions of an education service provider the actions of the state government.

II.  Education service providers shall be given maximum freedom to provide for the educational needs of EFA students without governmental control.

III.  Nothing in this chapter shall be construed to expand the regulatory authority of the state, its officers, or any school district to impose any additional regulation of education service providers beyond those necessary to enforce the requirements of the EFA program.

IV.  Any education service provider that accepts payment from an EFA under this chapter is not an agent of the state or federal government.

V.  An education service provider shall not be required to alter its creed, practices, admissions policy, or curriculum in order to accept payments from an EFA.

194-E:8  Responsibilities of Public Schools and School Districts.  A public school, or school district, that previously enrolled an EFA student shall provide a private school that is also an education service provider and that has enrolled an EFA student with a complete copy of the ESA student's school records, in a timely manner, while complying with 20 U.S.C. section 1232g, the Family Educational Rights and Privacy Act of 1974.

194-E:9  Legal Proceedings.

I.  In any legal proceeding challenging the application of this chapter to an education service provider, the state bears the burden of establishing that the law is necessary and does not impose any undue burden on the education service provider.

II.  No liability shall arise on the part of the scholarship organization or the state or of any public school or school district based on the award of or use of an EFA pursuant to this chapter.

III.  If any part of this chapter is challenged in a state court as violating either the state or federal constitutions, parents of eligible and/or EFA students shall be permitted to intervene as of right in such lawsuit for the purposes of defending the EFA program's constitutionality.  However, for the purposes of judicial administration, a court may require that all parents file a joint brief, so long as they are not required to join any brief filed on behalf of any named state defendant.

IV.  If any provision of this chapter, or the application thereof to any person or circumstances, is held invalid, such invalidity shall not affect other provisions or applications of this chapter which can be given effect without the invalid provision or application, and to this end the provisions of this chapter are declared to be severable.

194-E:10 Phase-Out Grants.

I.  For each school district, the commissioner shall calculate the amount of the reduction in adequate education grants pursuant to RSA 194-E:2, I for each student receiving an EFA under this chapter.  In the first year of the grant reduction, the commissioner shall calculate 50 percent of the reduction for each student and shall disburse that amount to the district as a district funding phaseout grant.  In the second year of the grant reduction, the commissioner shall calculate 25 percent of the reduction for each student and shall disburse that amount to the district as a district funding phase-out grant.  All district funding phase-out grants shall be included in the September 1 disbursement required pursuant to RSA 198:42.

II.  The phase-out grants will terminate for new EFA students receiving an EFA effective July 1, 2026.

194-E:11  Appropriation From Education Trust Fund.  The amount necessary to fund any grants or transfers of funds authorized under this chapter is hereby appropriated to the department from the education trust fund created under RSA 198:39.  The governor is authorized to draw a warrant from the education trust fund to satisfy the state's obligation under this section.  Such warrant for payment shall be issued regardless of the balance of funds available in the education trust fund.  If the balance in the education trust fund, after the issuance of any such warrant, is less than zero, the comptroller shall transfer sufficient funds from the general fund to eliminate such deficit.  The commissioner of the department of administrative services shall inform the fiscal committee and the governor and council of such balance.  This reporting shall not in any way prohibit or delay the distribution of any grant or transfer of funds authorized under this chapter.

194-E:12  Legislative Oversight Committee Established.  There is established an education freedom savings account oversight committee.

I. The members of the committee shall be as follows:

(a)  Two members of the senate, one of whom shall be a member of the majority party and one of whom shall be a member of the minority party, appointed by the president of the senate.

(b)  Three members of the house of representatives, one of whom shall be a member of the majority party and one of whom shall be a member of the minority party, appointed by the speaker of the house of representatives.

II.  Members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

III.  The committee shall monitor the implementation of RSA 194-E, including the impact of state education funding to local district schools, and make recommendations for any legislative changes to the education freedom savings account program.

IV.  The members of the study committee shall elect a chairperson from among the members. The first meeting of the committee shall be called by the first-named senate member.  The first

1   meeting of the committee shall be held within 45 days of the effective date of this section.  Three
2   members of the committee shall constitute a quorum.

3       V.   The committee shall submit a report on or before November 30, 2022, and each year
4   thereafter, to the general court including findings, recommendations, and any corrective or technical
5   improvements that the education freedom account program may require.

6       446  Duty of Parent; Compulsory Attendance by Pupil.  Amend RSA 193:1, I(g) and (h) to read as
7   follows:

8           (g)   The pupil has been accepted into an accredited postsecondary education program;
9   [or]

10          (h)   The pupil obtains a waiver from the superintendent, which shall only be granted
11  upon proof that the pupil is 16 years of age or older and has an alternative learning plan for
12  obtaining either a high school diploma or its equivalent.

13              (1)   Alternative learning plans shall include age-appropriate academic rigor and the
14  flexibility to incorporate the pupil's interests and manner of learning.  These plans may include, but
15  are not limited to, such components or combination of components of extended learning opportunities
16  as independent study, private instruction, performing groups, internships, community service,
17  apprenticeships, and on-line courses.

18              (2)   Alternative learning plans shall be developed, and amended if necessary, in
19  consultation with the pupil, a school guidance counselor, the school principal and at least one parent
20  or guardian of the pupil, and submitted to the school district superintendent for approval.

21              (3)   If the superintendent does not approve the alternative learning plan, the parent
22  or guardian of the pupil may appeal such decision to the local school board.  A parent or guardian
23  may appeal the decision of the local school board to the state board of education consistent with the
24  provisions of RSA 21-N:11, III; *or*

25          *(i)   The pupil is enrolled in the education freedom account program pursuant to*
26  *RSA 194-E and is therefore exempt from this requirement*.

27      447  Effective Date.  Sections 445 and 446 of this act shall take effect 60 days after its passage.

28      448   Town of Haverhill; Woodsville Fire District.   Amend 1887, 204:3, as amended by 1899,
29  196:2; 1990, 37:1; and 2009, 147:1 to read as follows:

30      SECT. 3.  Said district at each annual meeting shall elect by ballot a moderator, a clerk, one
31  auditor, a treasurer, and three commissioners.  All of said officers shall be elected by a majority vote
32  of all the voters present and voting at the annual meeting.  Said officers shall exercise in relation to
33  district meetings the like powers to those of moderator, clerk, and selectmen of towns.   The
34  commissioners shall have within the district all the powers of the mayor and aldermen of any city
35  respecting highways, sidewalks, and sewers.  They shall control and direct the expenditure of all
36  moneys raised under authority of the district and by the town of Haverhill for expenditure in the
37  district.  They shall have sole authority to appoint a highway surveyor in said district, and in default

1   of such appointment shall themselves perform the duties of that office.   The surveyor or
2   commissioners performing the duties of highway surveyor in the district shall give bond to the town
3   to account for all money coming into their hands, and for the proper care and custody of the property
4   of the town or district which may come into their custody or control, and shall be deemed officers of
5   the town.  Nothing in this act shall be construed to impose any distinct or special liability upon the
6   district respecting highways within its limits.  ***Nothing in this section shall preclude the***
7   ***Woodsville fire district from maintaining the roads within the precinct at its own expense***.
8   Vacancies that may occur in the office of commissioner in the district shall be filled by appointment
9   of the remaining commissioners or commissioner, but any commissioner appointed to fill a vacancy
10  shall hold office only until the next annual district meeting.  Commissioners shall be residents of the
11  district.   [The money appropriated for the distribution of highway funds in the district which is
12  attributable to the town of Haverhill shall be determined by a fraction, the numerator of which shall
13  be the assessed valuation of the properties in the district, and the denominator of which shall be the
14  assessed valuation of the properties in the entire town of Haverhill as determined annually from the
15  town MS-1 form.   The town of Haverhill shall appropriate the percentage represented by such
16  fraction for distribution to the highway fund in care of the Woodsville fire district commissioners.]
17  ***Highway block grant funds shall be distributed in accordance with the department of***
18  ***transportation formula.   Any appropriations to the Woodsville fire district shall be as***
19  ***directed by warrant articles duly voted by the voters present and voting at each annual***
20  ***Haverhill town meeting.***

21      449  Financial Audit Requirement.  No later than one year after the effective date of section 448
22  of this act, the Woodsville fire district shall provide financial audits by a certified public accountant
23  approved by the department of revenue administration that is compliant with generally accepted
24  accounting practices (GAAP), of all funds received from the town of Haverhill and all other sources
25  including state and federal funds, and of all funds expended by the fire district, for each calendar
26  year commencing January 1, 2015 to the effective date of section 448 of this act, as directed by the
27  department of revenue administration.  The department of revenue administration shall approve the
28  scope of the audit and shall receive monthly updates from the certified public accountant and the
29  Woodsville fire district on the status of the audit while it is in progress.  The results of the audit
30  shall be published on the town of Haverhill website within 60 days of delivery by the certified public
31  accountant to the Woodsville fire district and the department of revenue administration.  The audit
32  shall be at the expense of the Woodsville fire district.  Reimbursement of any expenses related to the
33  audit incurred by the department of revenue administration shall be in accordance with the
34  provisions of RSA 21-J:22.  The department of revenue administration may levy a fine of $250 per
35  day against the Woodsville fire district for every day of noncompliance with section 448 of this act
36  beyond one year from the effective date of section 448 of this act.  The commissioner may waive such

Amendment to HB 2-FN-A-LOCAL
- Page 204 -

1   fine at his or her discretion, subject to the good faith efforts of the Woodsville fire district to comply

2   with all relevant laws and the provisions of section 448 of this act.

3      450  Effective Date.  Sections 448 and 449 of this act shall take effect upon its passage.

4      451  Findings.

5         I.  On March 13, 2020, the governor signed the first declaration of a state of emergency due

6   to COVID-19.  As of January 1, 2021, this order has been extended 14 times.

7         II.  Between March 26, 2020 and June 16, 2020, a "Stay at Home" order had been in-place

8   under the authority of the governor as measure to prevent the spread of COVID-19.  This order

9   included the closing of schools, prohibited gatherings of 10 or more people, and limited business

10  operations that were not considered essential.

11        III.  Between March and August of 2020, 449 New Hampshire business closed temporarily or

12  permanently, with 280 remaining closed.

13        IV.  New Hampshire began "reopening" on May 11, 2020 with restrictions, some of which

14  remain in place today and continue to impact the micro enterprise sector, those businesses with

15  between 1 and 5 employees including the proprietor.  According to the Small Business

16  Administration, Office of Advocacy, there are 25,478 business with between 1-19 employees and

17  101,795 non-employer businesses.

18        V.  It is incumbent upon the state government to take prompt, proactive, and continuing

19  action to protect the economic health of New Hampshire communities through building out the

20  infrastructure and sustainability of micro enterprises.

21     452  New Subdivision; COVID-19 Micro Enterprise Relief Fund.  Amend RSA 12-O by inserting

22  after section 52 the following new subdivision:

23                        COVID-19 Micro Enterprise Relief Fund

24  12-O:53  COVID-19 Micro Enterprise Relief Fund.

25        I.  There is established in the office of the state treasurer a fund to be known as the COVID-

26  19 micro enterprise relief fund.  Notwithstanding RSA 4:45, RSA 4:47, RSA 21-P:43, or any other law

27  to the contrary, to the extent permissible under federal law $1 of any federal funds received by the

28  state in response to the COVID-19 public health emergency shall be deposited into the fund,

29  provided that at no time shall the balance of the fund exceed $1 in any fiscal year.

30        II.  Funds shall be disbursed at the discretion of the commissioner to the 10 New Hampshire

31  regional economic development corporations to be awarded to local or regional micro enterprises.

32  Each regional development corporation shall receive up to $1.  Each regional development economic

33  council shall be authorized to assess an administrative fee up to 10 percent of the funds received

34  through the state to manage this grant program.  Any regional economic development corporation

35  that does not award all of the funds received in grants to local micro enterprises shall return the

36  funds to micro enterprise relief fund at the department of business and economic affairs for

37  redistribution at the discretion of the commissioner.

Amendment to HB 2-FN-A-LOCAL
- Page 205 -

III.  With each award, an agreement for technical assistance shall be put in place between the regional development corporation, the New Hampshire small business development center, and the micro enterprise to support the implementation of the funds.  18 months after the implementation of the program, the regional economic development councils will prepare and submit reports to the commissioner, that include the number of grants and the amounts, and the use of each grant by the recipient.  The commissioner shall compile these reports and submit a compiled report to the speaker of the house of representatives, the senate president, the house clerk, the senate clerk, the state library, and the governor.

IV.  Regional economic development corporations shall award one-time grants of up to $1 to support one or more areas of need, including development of e-commerce capabilities, upgrading business practices, or maintaining storefront presence.  The regional economic development corporations shall ensure micro enterprises awarded grants pursuant to this subdivision are provided such assistance as may be necessary to support implementation of any grants awarded.

V.  For purposes of this subdivision, "micro enterprise" shall mean an entity with 10 or fewer employees, including any proprietor, that has been in business prior to March 13, 2020, when the governor signed the first declaration of a state of emergency due to COVID-19 and that has demonstrated a financial impact during the COVID-19 public health emergency, such as temporary closure, reduction in workforce, or loss of revenue of 50 percent or greater when compared to the same time period during the previous year.  Financial statements demonstrating losses, closures, or reduction in workforce shall be supplied as part of the application process.

453  New Subparagraph; Application of Receipts; COVID-19 Micro Enterprise Relief Fund.  Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

(365)  Moneys deposited into the COVID-19 micro enterprise relief fund established in RSA 12-O:53.

454  Purpose Statement.  Independent live venues are important entertainment hubs and economic multipliers for New Hampshire's local economies.  They serve as critical tax bases as employers and tourism destinations and as revenue generators for neighboring businesses such as restaurants, hotels, and retail.  The cultural impact of New Hampshire's independent live venues is difficult to calculate and serves as an important draw for young people to the state.  Unfortunately, these businesses were among the first to close as COVID-19 spread across the country, will likely be the last to reopen, and will take years to recover if they can stay in business at all.  Smaller venues with a capacity of 300 or less are being impacted the most by the COVID-19 economic and public health crisis.  Sections 455-458 of this act provides targeted assistance and long-term planning support and recognizes the importance of independent live venues to New Hampshire's economy.

455  Council on the Arts; Declaration of Policy.  Amend RSA 19-A:1 to read as follows:

19-A:1  Declaration of Policy.  It is hereby found that many of our citizens lack the opportunity to view, enjoy or participate in living theatrical performances, musical concerts, operas, dance and

Amendment to HB 2-FN-A-LOCAL
- Page 206 -

1 ballet recitals, art exhibits, examples of fine architecture, and the performing and fine arts
2 generally.  It is hereby further found that, with increasing leisure time, the practice and enjoyment
3 of the arts are of increasing importance and that the general welfare of the people of the state will be
4 promoted by giving further recognition to the arts as a vital aspect of our culture and heritage and as
5 a valued means of expanding the scope of our educational programs.  *It is hereby further found*
6 *that arts organizations and businesses are important entertainment hubs and economic*
7 *multipliers for New Hampshire's local economies.  They serve as critical tax bases as*
8 *employers and tourism destinations and as revenue generators for neighboring businesses*
9 *such as restaurants, hotels, and retail.  The cultural impact of New Hampshire's creative*
10 *sector is difficult to calculate and serves as an important draw for young people to the*
11 *state.*  It is hereby declared to be the policy of the state to join with private patrons and with
12 institutions and professional organizations concerned with the arts to insure that the role of the arts
13 in the life of our communities will continue to grow and will play an ever more significant part in the
14 welfare and educational experience of our citizens.   It is further declared that all activities
15 undertaken by the state in carrying out this policy shall be directed toward encouraging and
16 assisting rather than in any ways limiting the freedom of artistic expression that is essential for the
17 well-being of the arts.

18 456  Council on the Arts; Report.  Amend RSA 19-A:7 to read as follows:

19 19-A:7 Reports.   The council shall make biennial reports to the governor and council.  *The*
20 *council's strategic plan and biennial report under this section shall address the activities*
21 *related to the save our granite stages fund created under RSA 19-A:15.*

22 457  New Subdivision; Council on the Arts; Save Our Granite Stages Fund.  Amend RSA 19-A by
23 inserting after section 14 the following new subdivision:

24 Save Our Granite Stages Fund

25 19-A:15  Save Our Granite Stages Fund.  There is hereby established the save our granite stages
26 fund, which shall be appropriated for fiscal year 2022 to the New Hampshire state council on the
27 arts for the purpose of providing grants to both non-profit and for-profit live venues that did not
28 receive a grant from the federal Shuttered Venue Operators (SVO) program, which was established
29 by Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act (P.L. 116-260).  The fund
30 shall be nonlapsing and kept separate and distinct from all other funds.  Notwithstanding any other
31 provision of law, $1 of any discretionary federal funds received by the state in response to the
32 COVID-19 public health emergency shall be deposited into the fund.   In addition to state
33 appropriations, the council may accept grants, gifts, and donations for deposit in the fund.

34 458  New Subparagraph; Dedicated Funds; Save our Granite Stages Fund.  Amend RSA 6:12,
35 I(b) by inserting after subparagraph (364) the following new subparagraph:

36 (365)  Moneys deposited in the save our granite stages fund under RSA 19-A:15.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 207 -**

1    459  Repeal.  RSA 19-A:15 and RSA 6:12, I(b)(365), relative to the save our granite stages fund,

2    as inserted by sections 457 and 458 of this act, respectively, are repealed.

3    460  Effective Date.

4        I.  Section 459 of this act shall take effect June 30, 2023.

5        II.  Sections 451 through 458 of this act shall take effect upon its passage.

6    461  Effective Date.  Unless otherwise specified, the remainder of this act shall take effect July 1,

7    2021.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 208 -**

2021-1799s

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments from the retirement system.

9.  Clarifies the administration of the retirement system of payments made for medical benefits of state retirees.

10.  Enables the supreme court to transfer funds.

11.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

12.  Enables the sale of the lakes region facility in Laconia.

13.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

14.  Suspends congregate housing and services and the foster grandparent program for the biennium ending June 30, 2023.

15.  Establishes the emergency services for children, youth, and families fund and eliminates certain parental reimbursements.

16.  Prohibits the distribution of state funds awarded by the department of health and human services to a reproductive health care facility for provision of abortion services, and prohibits a health care provider from performing an abortion if the gestational age of the fetus is at least 24 weeks unless there is a medical emergency.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 209 -**

17.  Makes an appropriation to the department of health and human services for streamlining agency operations.

18.  Requiring the commissioner of the department of health and human services to submit an amendment to the Centers for Medicare and Medicaid Services to suspend all catastrophic aid payments to hospitals for the biennium.

19.  Enables the department of military affairs and veterans services to provide support for veterans' mental health and preventing social isolation.

20.  Transfers the controlled drug prescription health and safety program to the department of health and human services.

21.  Suspends revenue sharing with cities and towns for the biennium.

22.  Enables the liquor commission to process merchant cards.

23.  Enables the department of education to accept gifts, contributions, and bequests for the New Hampshire scholars program.

24.  Provides for increased education grants to bring the state into compliance with the American Rescue Plan Act of 2021 .

25.  Makes transfers to the education trust fund.

26. Makes an appropriation from the education trust fund to the department of education to fund operating costs for a student data collection and reporting system.

27.  Authorizes expenditures for energy efficient school buses.

28.  Establishes the position of director of intergovernmental affairs in the department of business and economic affairs.

29.  Repeals the bureau of film and digital media.

30.  Suspends the crediting of meals and rooms tax revenue to the division of travel and tourism.

31.  Enables the department of corrections to transfer funds.

32.  Changes the approval threshold for contracts set by the governor and council manual of procedures.

33.  Prohibits the dispersing of sate aid grants for certain new infrastructure projects in the department of environmental services.

34.  Renames the divisions of the office of professional licensure and certification and establishes pharmacy compliance investigator positions within the office.

35.  Makes an appropriation to the New Hampshire Internet crimes against children fund.

36.  Makes an appropriation to the FRM victims recovery fund and removes the prospective repeal of the fund.

37.  Provides for transfer of funds to the revenue stabilization reserve account  based on the most recently completed fiscal biennium.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 210 -**

38.   Makes an appropriation to the department of health and human services for the purpose of funding one-time maintenance of the Medicaid management information system.

39.   Reduces the tax rate of, and in 2027 eliminates, the interest and dividends tax.

40.   Reduces the tax rate of the meals and rooms tax.

41.   Establishes the meals and rooms municipal revenue fund for the distribution of meals and rooms tax revenues by the state treasurer to towns, cities, and places.

42.   Increases the filing threshold for the business enterprise tax and reduces the rate of the tax; and reduces the rate of the business profits tax.

43.   Limits the amount of the credit allowed against overpayment of the business profits tax and the business enterprise tax and establishes a commission to study limiting the business tax credit carry over.

44.   Excludes under the business profits tax the  business income of a taxpayer received by reason of forgiveness of indebtedness issued or created under the federal Paycheck Protection Program (PPP).

45.   Allows the New Hampshire veterans' home to transfer funds within accounting units for the biennium ending June 30, 2023.

46.   Revises the procedure for compensation for loss of agricultural products or livestock due to bears.

47.   Authorizes the department of information technology to fill unfunded positions.

48.   Modifies the composition and operation of the adult parole board and permits remote meetings during a pandemic or other declared state of emergency.

49.   Requires employer pro rata payments to the workers' compensation administration fund to be based on the preceding calendar year ratios and amends the payment of per diems to workers' compensation appeals board members.

50.   Amends the unemployment compensation fund balance necessary to trigger increases or decreases in employer contributions to the fund and repeals the emergency surcharge power of the commissioner of the department of employment security.

51.   Imposes liability on any person who renders any highway unsuitable for public travel, including full and current replacement cost.

52.   Provides that proceeds from a sale that results from money provided by the highway fund for payback of real property purchased with federal funds shall be credited to the department of transportation for the purpose of meeting federal obligations or reimbursing the highway fund for payment of federal obligations.

53.   Adds definitions relating to small unmanned aircraft and small unmanned aircraft systems to the New Hampshire aeronautics act.

54.   Amends an appropriation to the department of transportation for the 2018 fiscal year and provides that it lapse to the highway fund and be expended for the purpose of funding state red list bridge projects.

Case 1:21-cv-01077-PB   Document 36-7   Filed 03/25/22   Page 211 of 215

55.  Establishes a body-worn and dashboard camera fund and makes appropriations; establishes a classified business administrator I position in the department of safety; and establishes a commission to develop recommendations for legislation to establish a single, neutral, and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers.

56.  Requires the department of safety, in collaboration with the department of administrative services, to establish standards for radio infrastructure-related hardware, computers, software, related licenses, media, documentation, support and maintenance services.

57.  Establishes within the department of justice an unclassified position of director of diversity and community outreach.

58.  Authorizes the judicial council to request additional funding expenditures for termination of parental rights services that are greater than amounts appropriated in the operating budget.

59.  Moves the governor's scholarship program and fund from the office of strategic initiatives to the college tuition savings plan and authorizes the college tuition savings plan advisory commission to transfer funds between the governor's scholarship fund and the New Hampshire excellence in higher education endowment trust fund.

60.  Transfers the regulation of audiologists and hearing aid dealers to the governing board of speech language pathology.

61.  Establishes the department of energy, to govern energy and utilities matters, and have oversight on matters under the public utilities commission.

62.  Administratively attaches the public utilities commission to the department of energy and makes corresponding changes to existing laws relating to the organization and duties of the public utilities commission to reflect this change.

63.  Transfers certain duties from the public utilities commission to the department of energy.

64.  Adds the commissioner of the department of energy to the New Hampshire site evaluation committee.

65.  Requires that the department of energy advocate for New Hampshire in regional activities concerning competitive electricity suppliers.

66.  Requires that the department of energy require electric and gas utilities to operate an online energy data platform and, in conjunction with the public utilities commission, implement a statewide electric utility restructuring plan.

67.  Requires the bank commissioner to charge the public deposit investment pool for actual costs incurred by the banking department to operate the pool.

68.  Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

69.  Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

Amendment to HB 2-FN-A-LOCAL
- Page 212 -

70.  Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

71.  Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

72.  Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

73.  Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

74.  Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

75.  Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

76.  Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

77.  Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

78.  Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

79.  Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

80.  Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

81.  Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

82.  Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

83.  Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

84.  Establishes a committee to develop a plan for the closure and replacement of the Sununu youth services center.

85.  Limits further expansion of the closed loop referral system by the department of health and human services pending review of the system by the legislative oversight committee on health and human services.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 213 -**

86. Allows political subdivisions to treat funds received pursuant to the American Rescue Plan Act of 2021 as unanticipated revenue under RSA 31:95-b.

87. Established salaries and salary schedules for certain state officers, and classified and unclassified state employees.

88. Provides that positions in state government which become available as a result of reorganization or downsizing of state government be filled, if possible, by laid off state employees.

89. Establishes the granite state paid family leave plan.

90. Establishes procedures and rulemaking for executive branch employee annual leave, sick leave, transfer credit, and terminal pay.

91. Abolishes classified full-time positions which were vacant prior to July 1, 2018 and remain vacant as of July 1, 2021.

92. Makes an appropriation to the department of agriculture, markets, and food to fund the cost of care fund; establishes a disease data manager position in the department and makes an appropriation for the position.

93. Establishes the unclassified position of assistant attorney general in the department of justice.

94. Creates the National Guard enlistment incentive program and makes an appropriation therefor.

95. Establishes the positions of director of life and health and director of property and casualty within the insurance department.

96. Makes an appropriation to the business finance authority to provide grants to regional economic development corporations.

97. Makes an appropriation to the affordable housing fund.

98. Makes limitations on the grant in aid program administered by the bureau of trails, division of parks and recreation, in the department of natural and cultural affairs for OHRV trails.

99. Makes an appropriation to the Hampton Beach area commission for environmental master plan updates.

100. Appropriates funds to the department of safety for overtime costs at the state forensic laboratory; to the state police for narcotics-related enforcement; and to disburse grants to county and local law enforcement agencies for the purpose of funding overtime costs for county and local law enforcement officers performing law enforcement activities attributable to the substance abuse enforcement program.

101. Appropriates funds to the fire standards and training and emergency medical services fund for the 2022 and 2023 fiscal years, and to the department of safety, division of fire standards and training and emergency medical services, to fund additional part-time instruction or increase the tuition discount for certain emergency service personnel.

102. Transfers funds from the general fund to the highway fund.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 214 -**

103.  Appropriates $7,000,000 to the department of transportation for the Conway Bypass  right-of-way payback to the federal highway administration.

104.  Directs the commissioner of the department of transportation to remove toll booths on exit 10 in Merrimack.

105.  Appropriates $3,250,000 to the department of transportation for a project in Tilton.

106.  Makes an appropriation to the department of transportation for matching grants.

107.  Extends a prior appropriation to the department of health and human services for child welfare behavioral health services.

108.  Requires that the New Hampshire 10-year mental health plan include a report on implementation of 2019, 44 (SB 14), relative to child welfare.

109.  Establishes positions in the department of health and human services contracts and procurement unit and makes an appropriation for this purpose.

110.  Requires the department of health and human services to implement SNAP health incentive programs and makes an appropriation to the department for this purpose.

111.  Extends the prospective repeal relative to the waitlist for community mental health services.

112.  Adds an exception for rulemaking by the department of health and human services for cost of living adjustments in social security benefits contained within the Social Services Block Grant program.

113.  Continues the suspension of RSA 151-E:18, regarding presumptive eligibility for long-term care home and community-based services, from HB 4, Chapter 346:69 Laws of 2019.

114.  Establishes a committee to study parity in reimbursement among organizations that provide Social Security Act waiver programs.

115.  Makes an appropriation to fund transitional housing beds and to increase rated paid for transitional housing beds, and allows funds appropriated in 2019 to be used to for these purposes.

116.  Restricts a portion of rural health & primary care funding for the state loan repayment program.

117.  Changes the lapse period for certain funds appropriated to the department of health and human services, division of medicaid services and requires such funds to be treated as restricted revenue.

118.  Makes an appropriation to the department of health and human services for the construction of a forensic psychiatric hospital.

119.  Provides that certain waiver/nursing facility funds shall be treated as restricted revenue for funding expenditures for waiver/nursing facilities-county participation.

120.  Provides that the home visiting program shall be available to all Medicaid eligible pregnant women, infants, and families with children up to age one.

121.  Suspends graduate medical education payments for the biennium ending June 30, 2023.

122.   Makes a supplemental appropriation to the department of health and human services for juvenile diversion programs and provides that the department of health and human services shall establish procedures for administration of the state-funded programs.

123.   Requires the commissioner of the department of health and human services to solicit information and to contract with dental managed care organizations to provide dental care to persons under the Medicaid managed care program and makes an appropriation for the dental benefit for 2023 fiscal year.

124.   Limits the home visiting program to available appropriations for the biennium ending June 30, 2023.

125.   Suspends certain income eligibility standards for in-and-out medical assistance for the biennium ending June 30, 2023.

126.   Allows the department of health and human services to accept and expend additional federal funds with the prior approval of the fiscal committee for the Medicaid to schools program.

127.   Makes an appropriation to the department of health and human services to provide grants to senior centers or other organizations serving senior citizens.

128.   Makes an appropriation to the lottery commission for the purpose of paying off the commercial mortgage on the building serving as the lottery commission's headquarters.

129.   Lowers Keno license fees.

130.   Makes an appropriation from the education trust fund to the department of education to fund operating costs for a student data collection and reporting system.

131.   Makes an appropriation to the governor's scholarship fund.

132.   Establishes the education freedom account program which permits the treasurer to transfer adequate education grants, plus any differentiated aid that would have been provided to a public school, to a scholarship organization for disbursement to parents to be used for certain educational purposes; appropriates the funds authorized under this program from the education trust fund; and authorizes the comptroller to transfer funds from the general fund to eliminate any deficit in the education trust fund created by the payment of grants or transfers of funds under the program.

133.   Modifies the law on the operation and funding of the Woodsville fire district and directs that appropriations to the Woodsville fire district shall be as directed by warrant articles duly voted at each annual Haverhill town meeting.

134.   Establishes a COVID-19 micro enterprise relief fund.

135.   Provides for the support and promotion of New Hampshire's live performance industry by the council on the arts.





# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

### Changes Regarding Schools and Educational Programming

1. **What are schools prohibited from teaching students?**

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination.**

2. **What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?**

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

### 3.      Does the law prohibit teachers from teaching U.S. history?

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

### 4.      Are schools allowed to teach students historical concepts related to discrimination?

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

### 5.      A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

### 6.      Can parents or guardians refuse to allow their children to participate in specific course material?

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

### 7.      Does the law apply to public schools?

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

### 8.      Does this law apply to all school activities or just teaching?

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

**9.      Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.      Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes.  For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.      What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they have been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.      Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.      Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.





# Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A, that impact public employers and government programs. Please see separate document that addresses changes to schools and educational programs contained in RSA chapter 193.

## Changes Regarding Public Employers and Government Programs

1. **What are public employers and government programs prohibited from training and advocating?**

Public employers and government programs are prohibited from training and advocating that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not train or advocate that a person or a group is inherently oppressive, superior, inferior racist, or sexist.  Train and treat all equally and without discrimination.**

2. **What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?**

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

**3.**    **Are these the same prohibitions as those contained in the "divisive concepts" bill, HB 544?**

No. HB 544 did not become law and therefore, does not apply or impact public employers, government programs, or schools in New Hampshire. The term "divisive concepts" is not found anywhere in the new law.

**4.**    **Can public employers and government programs undertake efforts designed to examine issues related to equity, diversity, inclusion, equality, and other related topics?**

Yes. Nothing in this new law prohibits public employers or government programs from taking steps to examine issues related to equity, diversity, inclusion, equality and other related topics.

**5.**    **Can trainings address practices or ideas that have harmed or continue to harm certain identified groups?**

Yes. Nothing prohibits trainings geared toward educating participants about practices or ideas that may disproportionately affect certain identified groups.

**6.**    **Can public employers and government programs conduct trainings designed to improve diversity, equity, and inclusion, such as implicit bias training?**

Yes. Nothing prohibits trainings geared towards diversity, equity, equality and inclusion.

Nor does anything prohibit implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally.

The new law expressly permits public employers and government programs to provide and require "sensitivity training" based on the "inherent humanity and equality of all persons" and the "ideal that all persons are entitled to be treated with equality, dignity, and respect."

**7.**    **A public employee has claimed that a required diversity training has made them uncomfortable. Has the public employer or government program discriminated against that employee?**

No. It is important to note that trainings that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make participants uncomfortable. These trainings may encourage or prompt participants to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequence.

**8.** **What remedies are available to public employees or program participants who believe that a public employer or government program has violated one of the new anti-discrimination statutes?**

A person who believes that they have been subject to discrimination, may file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**9.** **Can a public employee file a claim based upon a training that occurred in 2020?**

No. Complaints alleging a violation of the new laws may only be considered for conduct that occurred after the enactment of those laws on June 25, 2021.

**10.** **If I am an individual or group simply using a public facility for non-government use, for example a private event or activity at a school building or town hall, does this new law apply to me?**

No.



**EXHIBIT**

**I**

## ATTORNEY GENERAL
## DEPARTMENT OF JUSTICE

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

JOHN M. FORMELLA
ATTORNEY GENERAL

JANE E. YOUNG
DEPUTY ATTORNEY GENERAL

## ATTORNEY GENERAL OPINION NO. 2021-01

September 7, 2021

Doug Palardy, Chair
Ahni Malachi, Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Building One
Concord, NH  03301

RE:   Request for Attorney General's Opinion regarding new anti-discrimination
      protections

Dear Chair Palardy and Director Malachi:

You requested, on behalf of the New Hampshire Commission for Human Rights, that this office provide an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 ("Sections 297 and 298"),[1] to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40. These statutes collectively comprise a subdivision in RSA chapter 354-A titled "Right to Freedom from Discrimination in Public Workplaces and Education" and new section in RSA chapter 193 titled "Prohibition on Teaching Discrimination."

Some have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions. *See* Governor's Advisory Council on Diversity and Inclusion, *Letter to Gov. re HB 544* (June 2, 2021). To help address these concerns, the Department of Justice, Commission for Human Rights, and the Department of Education released guidance shortly after the new anti-discrimination laws took effect. Recognizing the important need for public employers, government programs, and school systems to engage in sensitivity training that may include frank and candid discussions of the historical aspects of oppression and its contemporary effects, you requested that this office provide an official Attorney General Opinion.

The Commission for Human Rights (the "Commission") was created with the power to eliminate and prevent discrimination in employment, places of public accommodation, housing,

---

[1] Before final passage by the legislature, this legislation was included in HB 2 as Section 330 and 330-a. The final version of HB 2 includes the legislation at Section 297 and 298.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 2 of 9

and, effective in 2019, public education. The Commission is charged with receiving, investigating, and adjudicating complaints related to violations of RSA chapter 354-A that may be filed by members of the public or the Commission and holding hearings as required to execute the Commission's duties. Section 297 prohibits certain public sector activities and expands the Commission's jurisdiction to address such activities. Section 298 prohibits the teaching of certain subjects in elementary and secondary schools and it also places review of violations within the Commission's jurisdiction.

The Attorney General's duties include advising "any state board, commission, agent or officer as to questions of law relating to the performance of their official duties, and he shall, under the direction of the governor and council, exercise a general supervision over the state departments, commissions, boards, bureaus, and officers, to the end that they perform their duties according to law." RSA 7:8. In situations where requests for legal advice are significant to the operation of the state board, commission, or agency and are likely to be of continuing importance, the advice may be issued by an official Attorney General Opinion. In such situations, the questions posed are researched and an opinion drafted by a group of attorneys. The draft opinion is also subject to multiple layers of review, including by the Associate Attorney General for the Division of Legal Counsel and the Solicitor General. The Attorney General provides a final review and approval.

Given the importance of your questions to the education and training of your staff to best serve New Hampshire residents, I am providing an official Attorney General Opinion as set forth below.

## QUESTIONS PRESENTED

1.      What is the scope of Sections 297 and 298 and what types of education and training activities do those sections prohibit and permit?

2.      Do the new sections of RSA chapter 354-A prohibit trainings or programs designed to promote diversity and inclusion or to educate participants about concepts such as implicit bias?

3.      Does RSA 193:40 prohibit education on the historical concepts related to discrimination or oppression?

## CONCLUSION

1.      The new sections added to RSA chapter 354-A prohibit trainings or programs that teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. The new sections added to RSA chapter 354-A also prohibit trainings or programs that teach participants that any identified group can or should be treated unequally to

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 3 of 9

any other identified group and that one identified group should be discriminated against or treated adversely.

Similarly, RSA 193:40 prohibits teaching students that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 also prohibits teaching students that any identified group can or should be treated unequally to any other identified group and that one identified group should be discriminated against or treated adversely.

2.      No. The new sections added to RSA chapter 354-A **explicitly permit** public employers and government programs to provide sensitivity training, which RSA 354-A:29 defines as "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Implicit bias training, for example, is premised on teaching people about biases they may have of which they are not consciously aware and helping people become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training does not violate Section 297. Similarly, the new sections added to RSA chapter 354-A do not prohibit other diversity, equity, inclusion, and equality trainings. Section 297 prohibits trainings if and only if they include concepts of group superiority or inferiority based on inherent or innate group characteristics or advocate for less than equal treatment of identified groups.

3.      No. RSA 193:40 does not prohibit discussion of historical concepts related to discrimination. RSA 193:40 prohibits education related to solely the four subjects identified in Short Answer 1. Specifically, it prohibits teaching that one or more identified groups are: (1) inherently superior or inferior to people of another identified group; (2) inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) should be discriminated against or receive adverse treatment; or (4) should not treat members of other identified groups equally. It is important to note that although education related to racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40.

## BACKGROUND

On June 25, 2021, the Governor signed into law House Bill 2, which added, in Section 297, new provisions to RSA chapter 354-A entitled, "Right to Freedom from Discrimination in Public Workplaces and Education." Specifically, Section 297 adds six new sections to RSA chapter 354-A: (1) RSA 354-A:29, "Right to Freedom from Discrimination in Public Workplaces and Education"; (2) RSA 354-A:30, "Definitions"; (3) RSA 354-A:31, "Prohibition on Public Employers"; (4) RSA 354-A:32, "Prohibition on the Content of Government Programs and Speech"; (5) RSA 354-A:33, "Prohibition on Public Employees"; and (6) RSA 354-A:34, "Remedies."

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 4 of 9

Section 297 is part of the amended progeny of House Bill 544, which was commonly known as the "divisive concepts" bill. The House of Representatives voted to table House Bill 544 but to incorporate its language into House Bill 2. During its review, the Senate Finance Committee stripped the language of House Bill 544 out of House Bill 2 and added the language that is now Sections 297 and 298. The House of Representatives acceded to these changes during the Committee of Conference.

The major provisions of Section 297, codified as RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33, prohibit training, education, or other state-sponsored speech that incorporates any of the following four concepts:

1. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

2. That an individual by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

3. That an individual should be discriminated against or receive adverse treatment solely or partly because of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; and

4. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.[2]

These four new statutory provisions combine to limit the types of training and education public employers may introduce to their employees, and protects employees who object to participating in training programs inconsistent with the new statutory provisions. RSA 354-A:31 prohibits public employers from teaching, advocating, instructing, or training anyone any of the above listed concepts. RSA 354-A:32 prohibits "government programs," which it defines as any

---

[2] This Opinion will use the term "identified group" to mean age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. With this inclusive of a definition, every resident and visitor to New Hampshire is a member of one or more identified groups.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 5 of 9

activity undertaken by a public employer including in the performance of its government function, from teaching, advocating, or advancing any of the above listed concepts. RSA 354-A:33 prohibits a public employer from disciplining a public employee for refusing to participate in any training, program, or other activity that advocates for or compels the employee to express support for any of the above listed concepts.

Section 298 is the remainder of the amended progeny of HB 544. This section creates a new statute, RSA 193:40: "Prohibition on Teaching Discrimination." RSA 193:40 prohibits teaching students in an elementary or secondary education program any of the four concepts that the new sections in RSA chapter 354-A prohibit.

The statutory changes within Sections 297 and 298 are legislation of limited reach. The new statutes do not prohibit racial, sexual, religious, or other workplace sensitivity training "based on the inherent humanity and equality of all persons." They do not prohibit workplace trainings based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." These statutes explicitly exclude such sensitivity trainings from the scope of the new prohibitions created by RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33. Nor do they prohibit discussing or teaching students about the historical existence of ideas related to the four prohibited subjects, such as the history of discrimination.

## ANALYSIS

The scope of Sections 297 and 298's prohibitions hinges on the meaning of the language those sections employ. When interpreting a statute, a court or agency charged with such interpretation must first look to the language of the statute itself. *Conduent State & Local Solutions, Inc. v. N.H. Dep't of Transportation*, 171 N.H. 414, 419 (2018). In doing so, the agency must begin with the plain meaning of the words used. *Union Leader Corp. v. Town of Salem*, 173 N.H. 345, 350 (2020); *see also* RSA 21:2 (2012) ("Words and phrases shall be construed according to the common and approved usage of the language."). The agency must confine itself to the statute as written and not consider what the legislature might have said or add language the legislature did not include. *Conduent State & Local Solutions, Inc.*, 171 N.H. at 420. The agency must look at the statute as a whole and should construe the statute to avoid absurd or unjust results.[3] *Id.* Absent an ambiguity[4] examination of any legislative record beyond the actual text of the statutes is inappropriate.

---

[3] Examples of absurd results include, but are not limited to, situations where the interpretation of one statute negates another. *See Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005) ("When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other."). The goal of statutory interpretation is to strive to read statutes in harmony with one another rather than in dissonance with one another. *See id.* ("[W]e do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme.").

[4] In this context, ambiguity is a legal term of art that applies only if two or more reasonable interpretations of a statute exist after the agency considers the plain meaning of the words in the statute. *Attorney General v. Loreto Publications, Inc.*, 169 N.H. 68, 74 (2016).

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 6 of 9

<u>Prohibitions Related-to Inherent Traits</u>

The scope of Section 297 and 298's first two prohibitions derives substantially from the meaning of the term "inherent." In the first prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently superior or inferior" to another identified group. In the second prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently racist, sexist, or oppressive, whether consciously or unconsciously." Neither section defines the term "inherent," nor are we aware of any other relevant statutory provisions that define "inherent" as the Legislature used it in Sections 297 and 298. When the Legislature does not specifically define a term within a statute, the Legislature is presumed to have used that term as it is commonly understood. *Franciosa v. Hidden Pond Farm, Inc.*, 171 N.H. 350, 359 (2018).  In such situations, the New Hampshire Supreme Court will consult a standard dictionary to discern the common understanding of any given term. *Id.* As an adjudicatory body, the Human Rights Commission should also consult a standard dictionary to discern the common understanding of any given term.

"Inherent" means "structural or involved in the constitution or essential character of something : belonging by nature or settled habit : intrinsic, essential." *Webster's Third New International Dictionary* 1163 (unabridged ed. 2002). The definitions of "intrinsic" and "essential" further illuminate the meaning of "inherent." "Intrinsic" means "belonging to the inmost constitution or essential nature of a thing : essential or inherent and not merely apparent, relative, or accidental." *Id.* at 1186. "Essential" means "forming or constituting the essence of something: making up or being the constituent or intrinsic character or very nature of a thing . . . belonging to or being part of the essence of something: belonging to the constituent fundamental character of a thing: not accidental to something." *Id.* at 777.

The common thread that runs through these definitions is that an inherent characteristic is natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging.

"Inherent," therefore, is properly viewed as a limitation of the scope of Sections 297 and 298's first two prohibitions. With respect to the first, Sections 297 and 298 proscribe training, advocacy, or education that teaches participants that, solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, superior or inferior to members of other identified groups. With respect to the second, Sections 297 and 298 proscribe training, advocacy, or education that informs participants that solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, consciously or unconsciously racist, sexist, or oppressive.

<u>Prohibitions Related-to Promoting Discrimination</u>

Interpreting Sections 297 and 298's third and fourth prohibitions does not turn on the meaning of key terms that define the scope of the prohibition. The statutory language makes

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 7 of 9

plain that a public employer or government program may not provide training or education that informs participants that members of an identified group should be discriminated against or receive adverse treatment. Nor may a public employer or government program provide training or education that informs participants that members of one identified group should not treat members of other identified groups equally.

<u>Permitted Trainings, Activities, and Education</u>

Separate from its prohibitions, Section 297 expressly permits certain trainings and programming within the category of "sensitivity training." This is defined as training "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Sensitivity training consistent with the provisions of Section 297 readily encompasses trainings and programming that promote concepts of equality and the equal, respectful, and dignified treatment of all persons—particularly as they relate to the interactions of members of those identified groups with public employers or government programs.

"Sensitivity training" includes implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources. Implicit bias training does not violate Section 297 unless it includes concepts of group superiority or inferiority based on inherent or innate group characteristics or concepts that an identified group should be treated unequally or discriminated against.

"Sensitivity training" is not limited to implicit bias training, however. For example, a public employer or government program may create a web-based resource entitled, "Anti-Racist Resources," and include information designed to promote a better understanding of racism and how to combat racism. But, if that web-based resource stated that it was designed to "serve as a resource to white people" or to "serve as a resource for our white employees," then it could violate Section 297 because it may imply that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.

Section 298 expressly permits schools to educate about and discuss the historical existence of ideas and subjects that are otherwise prohibited under Section 298. Section 298 does not prohibit schools from teaching about discrimination or how discrimination has existed throughout history. Nor does Section 298 prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups. Similar to Section 297, Section 298 does not prohibit teaching students about implicit biases nor does it prohibit schools from creating web-based resources designed to promote a better understanding of racism, sexism, or other forms of oppression. Section 298 is violated only when a school educates about concepts of group superiority or inferiority based on inherent or innate group

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 8 of 9

characteristics divorced from history or educates that an identified group should be treated
unequally or discriminated against.

Section 298 applies to educational instruction in K-12 schools only. Nothing in Section
298 limits instruction by educators in post-secondary schools. Section 297's prohibitions,
however, do apply to the teaching and training of employees and volunteers in public, post-
secondary educational institutions.

<u>Construing the Prohibited Activities Together with the Permitted Activities</u>

Construing these new statutes harmoniously, Sections 297 and 298 allow public
employers, government programs, and schools to train and educate in a manner that promote
concepts of equality and the equal, respectful, and dignified treatment of all persons. Both
sections permit public employers, government programs, and schools to train and educate about
concepts such as implicit bias. Public employers, government programs, and schools violate
Sections 297 and 298 only when trainings or education programs advocate that identified groups
are either: (1) oppressive by their nature and not simply oppressive by accident, apparently
oppressive, or oppressive because of external action or external factors; (2) consciously or
unconsciously biased by their nature and not simply biased (racist or sexist) by accident,
apparently biased (racist or sexist), or biased (racist or sexist) because of external action or
external factors; (3) deserving of discrimination or adverse treatment; or (4) deserving of unequal
treatment.[5]

This construction comports with traditional definitions of racism and sexism. For
example, "racism" means, among other things, "the assumption that psychocultural traits and
capacities are determined by biological race and that races differ decisively from one another,
which is usually coupled with a belief in the inherent superiority of a particular race and its right
to domination over others." *Webster's Third New International Dictionary* at 1870. This
construction also strikes a harmonious balance between expressly permitted "sensitivity training"
or programming and prohibited programming that exacerbates discrimination.

For the reasons set forth above, the new sections added to RSA chapter 354-A and RSA
193:40 prohibit only those trainings or educational programs that: (1) teach participants that one
identified group possesses inherent characteristics, meaning natural, biological, or innate
characteristics, as opposed to characteristics which are apparent, accidental, or based on external
action or external factors, that make them superior or inferior to other identified groups, or that
those inherent characteristics make one identified group consciously or unconsciously racist,
sexist, or oppressive or (2) teach participants that one identified group should be discriminated
against or treated adversely. The new sections added to RSA chapter 354-A and RSA 193:40 do
not prohibit trainings or educational programs that teach participants about disparities that may

---

[5] Like many discrimination claims, review of a claimant's allegations will involve a fact-intensive, case-
by-case analysis of the training or programming at issue to determine whether the training or
programming violated Sections 297 or 298's prohibitions.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 9 of 9

exist among different identified groups, the current or historical practices that may have
contributed to those disparities, or about concepts such as implicit bias.

Sincerely,

John M. Formella
Attorney General

#3293122

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

———————————————————— )
                                                              )
LOCAL, 8027 AFT-NEW HAMPSHIRE,    )
AFL-CIO, et al.,                                     )
                                                              )
              Plaintiffs,                               )
                                                              )
       v.                                                    )          Case No. 1:21-cv-1077-PB
                                                              )
FRANK EDELBLUT, in his official           )
capacity only as the Commissioner        )
of the New Hampshire Department        )
of Education, et al.,                                )
                                                              )
              Defendants.                            )
———————————————————— )

## <u>MOTION TO DISMISS NEA-NH COMPLAINT (ECF Doc. No. 1)</u>

Frank Edelblut, in his official capacity as Commissioner of the Department of Education,

John M. Formella, in his official capacity as Attorney General of the State of New Hampshire, Ahni

Malachi, in her official capacity as Executive Director of the Commission for Human Rights,

Christian Kim, in his official capacity as Chair of the Commission for Human Rights, and Kenneth

Merrifield, in his official capacity as Commissioner of the Department of Labor (the "defendants"),

by and through the Office of the New Hampshire Attorney General, move to dismiss the complaint

filed by Andres Mejia, Christina Kim Pilibotte, and the National Education Association–New

Hampshire (ECF Doc. No. 1) (the "NEA-NH complaint"). The NEA-NH complaint should be

dismissed under Federal Rule of Civil Procedure 12(b)(6) for the reasons set forth in the

memorandum of law filed contemporaneously with this motion. **Section III** of the argument section

of the defendants' memorandum of law pertains to the sole claim asserted in the NEA-NH

complaint. *See* Defs.' Mem. Law at 20–37

WHEREFORE, the defendants respectfully request that this Honorable Court:

A.      Dismiss the NEA-NH complaint (ECF Doc. No. 1) for the reasons set forth in **Section III** of the memorandum of law filed contemporaneously with this motion; and

B.      Grant such other relief as the Court deems just and equitable.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity as Commissioner of the Department of Education,

JOHN M. FORMELLA, in his official capacity only as Attorney General of the State of New Hampshire,

AHNI MALACHI, in her official capacity as Executive Director of the Commission for Human Rights,

CHRISTIAN KIM, in his official capacity as Chair of the Commission for Human Rights,

*and*

KENNETH MERRIFIELD, in his official capacity as Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date:  March 25, 2022

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

*/s/ Samuel Garland*
Samuel R.V. Garland

# Exhibit A



**NO LEFT ▉▉ RN**
in ▉▉▉▉▉▉▉

No Left Turn in Education
New Hampshire Chapter
P.O. Box 1101
Moultonborough, NH 03254

February 7, 2022

Superintendent Garth J. McKinney
Nashua SAU Office
141 Ledge Street
Nashua, N.H. 03061-0687

RE:   Probable violation of New Hampshire's Educator Codes of Conduct by educators
      Samantha Leone, Paul Menard, Jocelyn Merrill and Stephanie Cassidy of SAU #42

Superintendent McKinney:

No Left Turn in Education (NLTE) is a national education advocacy organization in which I serve
as the director of the New Hampshire Chapter. We write today to present SAU #42 with evidence
that four educators in your district are engaged in ongoing violation of New Hampshire's Educator
Codes of Conduct.

As you know, on June 25, New Hampshire enacted a Prohibition on Teaching Discrimination. This
law prohibits teaching that any person or group of people is inherently racist, sexist, or oppressive,
or that any person or group of people should be discriminated against on the basis of their race or
sex.

New Hampshire's Department of Education, Department of Justice, and Commission for Human
Rights have issued a joint memorandum summarizing this law in the following words: "In short,
do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist.
Teach and treat all equally and without discrimination."[1]

As acknowledged in the joint memorandum, New Hampshire law also makes any violation of the
Prohibition on Teaching Discrimination a breach of the Educators Code of Conduct. The statute
says that "[v]iolation of this section by an educator *shall be considered a violation* of the educator
code of conduct that justifies disciplinary sanction by the state board of education."

---

[1] https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf

On August 11, in explicit response to the Prohibition on Teaching Discrimination—along with eleven analogous bills introduced in other states—the Marxist organization Zinn Education Project called upon educators around the country to sign a pledge (the "Zinn Pledge") promising to openly violate any such prohibitions should they become law. The organization claims to base this pledge upon the principle that "one has a moral responsibility to disobey unjust laws."[2]

The Zinn Pledge and its signatories are publicly available online. Sadly, at present, 4educators in SAU #42 have openly promised to violate the Prohibition on Teaching Discrimination. These teachers are Samantha Leone, Paul Menard, Jocelyn Merrill and Stephanie Cassidy.  By signing this pledge, these educators have promised not only to violate their ethical obligations and the law, but, more importantly, to promote racism or sexism in their classrooms.

This is not an overstatement. In its own words, the Zinn Pledge says it opposes banning education which "identifies people or groups of people… as inherently, immutably, or systemically sexist, racist, anti-LGBT, bigoted, biased [or] privileged." All of the signatories of the Zinn Pledge can be assumed to have read the public document to which they signed their names.

Some educators signed the Zinn Pledge before New Hampshire's law was passed. However, to downplay the pledge for that reason would be to ignore the pledge's clear words. The pledge's signatories explicitly anticipated the passage of New Hampshire's current law and promised to break that law after it was enacted.

At a minimum, these teachers' decision to sign the Zinn Pledge is evidence that they are potentially violating the Educators Code of Conduct and, more importantly, using their positions as educators to instill racism, sexism, and other forms of invidious prejudice in their students.

It is also more than enough evidence for SAU #42 to investigate these educators—and to trigger the district's ethical duty to act. 510.05 of the Educator Codes, entitled "Duty to Report," states that "*[a]ny credential holder shall report* any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures."[3] The Prohibition on Teaching Discrimination is the law of New Hampshire and states directly that "[v]iolation of this section by an educator *shall be considered a violation* of the educator code of conduct."

Moreover, the Educator Code itself states that "the department [of education] shall undertake an investigation" of any educator if it merely "has reason to suspect" that the educator knowingly *failed to report* a violation of the Codes.[4]

In addition to educators' universal duty to report, superintendents have specific duties under the Codes. 510.05(c) states that a superintendent "*shall report*… to the office of credentialing" when "a superintendent has knowledge that a credential holder has violated the code of conduct."

---

[2] https://www.zinnedproject.org/news/pledge-to-teach-truth
[3] Ed. 510.05(a).
[4] Ed. 510.05(f).

While this provision cites Ed. 510.01 and the following sections, all of these sections state that unprofessional conduct "shall… not be limited to" the offenses those section expressly enumerate. More importantly, New Hampshire statute directly provides that any violation of the Prohibition on Teaching Discrimination "shall be considered a violation of the educator code of conduct."

Accordingly, we urge that the district protect our children by investigating these signatories for potential violations of their ethical obligations and the law.

The names and school district of the signatories in SAU #42 were derived from the Zinn Pledge itself and other publicly available information. We encourage the district to verify the information in this letter directly by viewing the Zinn Pledge online at https://www.zinnedproject.org/news/pledge-to-teach-truth.

Sincerely,

Michael D. Breen, Ph.D.
Director
NH Chapter, No Left Turn in Education

# **Exhibit B**