Skip to main content

scroll to top

A A A Change Text Size

Change Site Language

Search The Site

CLOSE

MAKE TEXT SMALLER

MAKE TEXT LARGER

CLOSE

Select Language

Powered by Google Translate Translate

Powered by:

Reset Language to English

CLOSE

Search entire site by keyword or topic  Search by keyword or topic...

SEARCH

ALERT

**Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**



# New Hampshire
# Department of Education

- 
- 
- 
- 

## Main navigation

☐ OPEN MENU CLOSE MENU

- Home
- Education Pathways
  - Local District Schools
  - Public Charter Schools
  - Private/Nonpublic Schools
  - Home Education
  - Adult and Continuing Education
  - Education Outside the Classroom
  - Higher Education in New Hampshire
  - Bureau of Special Education Support
  - Career and Technical Education
  - Section 504
- Parents and Students
  - My Local School District
  - Services for my child
  - Appeals and Mediation
  - School Safety
  - Transportation
- Educators
  - Bureau of Credentialing
  - Resources for Teachers
  - Grants and Funding
  - Rules and Regulations
  - Bureau of Student Wellness

- Data Reports
- Partners
- Who We Are
- Careers
- Contact Us
  - NHDOE Email Distribution List

- Home
- Education's Sacred Trust

# In the News

For Immediate Release
April 15, 2022

## Contact

Kim Houghton, Communications Administrator
(603) 513-3030 | kimberly.c.houghton@doe.nh.gov

# Education's Sacred Trust

***Op-ed written by Commissioner Frank Edelblut of the New Hampshire Department of Education***

Educators and the public education system are custodians of a sacred trust.

When children come to school, they arrive reflecting the value systems of the families responsible for raising them. Those value systems are as different as the children themselves.

Recent revelations from educators around the country, mostly on social media platforms like TikTok, reveal a number of educators who believe that it is their responsibility to weigh in on and influence the value systems of the children toward a particular goal. This impulse to influence a child's value system is not limited to educators. As was recently revealed, Disney also wants to weigh in. It is not good enough to simply allow parents and caregivers the responsibility to instill a value system they believe is right for the child. Whether it is a rogue educator or a corporation trying to impose a value system on impressionable youngsters, that is not their job. That is the job of parents and caregivers.

Fortunately, parents can choose to turn off Disney. They can't, however, easily escape the efforts of activist educators who might be knowingly dismantling the foundations of a value system they are attempting to build.
That means that families, when they send their children to school, entrust the educators to respect the value systems that the family is building. This is the sacred trust that educators have.

To be fair, most educators do not engage in such practices, and effective educators know that blatant displays of bias are not necessary. They can teach challenging and sometimes controversial topics without allowing their personal preferences to seep through to the children. A student may never even know a teacher's opinion on a topic, particularly a sensitive topic like sexuality and gender, or perspectives on political systems, whether capitalism or socialism, or an ideological engagement of race and diversity.

Rather, these teachers provide instruction that is developmentally appropriate to the child, and parents are left to determine how, and when, to explain the benefits and consequences of adopting beliefs that align with one side of an argument or another.

But when educators overstep, it weakens the ability for parents to achieve the values they believe to be best for their children, and it squanders the credibility of the profession as a whole.

For the most part, New Hampshire has avoided many of the problems seen on a national level. But, that does not mean that we are immune to them.
Recent experiences in New Hampshire show that some of these biases are beginning to seep into our own institutions. This document.pdf 📄 exemplifies actual instructional material from New Hampshire schools that parents have identified as conflicting with their values.

One example includes messaging to children as young as 8 and 9 year "that there are totally more than two genders! Some people identify as a gender that is not male or female, some identify as more than one gender, and some people don't identify as any gender." Not only can this be confusing for a child, but it might conflict with – or worse, undermine – the value system of many of the families.

Children in New Hampshire need to learn about capitalism and socialism. And, when those subjects are taught, the teaching needs to be factually accurate. The goal, however, is not to persuade children to become socialists through a biased or subtle affirmation of the tenants of socialism, even if the educator holds a personal belief in that system. Again, for an effective teacher, those beliefs do not seep through. But, when walls of one New Hampshire classroom are adorned with posters extoling the virtues of socialism, the educators undermine the values of families.

1003

Parents of students taking an art class should have a reasonable expectation that they will be learning about, well, art. They should not be concerned, as occurred in another New Hampshire classroom, that the introduction to art will begin with a lesson in pronouns and links to Black Lives Matters for kids and LGBTQ+ for kids.

For a very long time, educators were a highly trusted partner for parents, and in that role, they were given great latitude. With that latitude came great responsibility. Responsibility to support the parents and not undermine their values.

The actions of some educators, which have become increasingly apparent through social media as a result of the pandemic, are undermining the sacred trust that educators hold. Educators have a position of influence over children. The correct use of that influence will support and not compromise the values of families.

Good educators have always recognized that.



.pdfViewer

 Portable Document Format (.pdf) . Visit nh.gov for a [list of free .pdf readers](#) for a variety of operating systems.

 # New Hampshire
# Department of Education

*25 Hall Street | Concord, NH | 03301-3860*
*(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 | info@doe.nh.gov*
Directions to NHDOE Subscribe to e-news

## Footer - Agency Links

- NH Career and Technical Education
- NH Schools
- iPlatform
- myNHDOE
- Educator Search

## Footer - State Links

- NH Government Careers
- NH Travel & Tourism
- NH Web Portal - NH.gov
- ReadyNH.gov
- Transparent NH

© 2022 State of New Hampshire • All rights reserved

- <u>Accessibility Policy</u>
- <u>Privacy Policy</u>

An official NEW HAMPSHIRE government website



# Original text

Contribute a better translation

# Topic One

# EdChange
informing ourselves
reforming our schools
transforming our world
www.EdChange.org

# Equity & Diversity in the U.S.
## A Re-Perception Quiz

1. 57% of people in state prisons for drug offenses in the US are African American. What percentage of illicit drug users in the US are African American?
   a. 14%
   b. 28%
   c. 42%
   d. 56%

2. According to the Southern Poverty Law Center, 34 anti-Muslim organizations were operating in the US in 2015. How many were operating in the US in 2016?
   a. 21
   b. 34
   c. 101
   d. 146

3. According to GLSEN, what percentage of students who report an incident of homophobia at school say the school did nothing in response or told them to ignore it?
   a. 18%
   b. 31%
   c. 48%
   d. 64%

4. US Census data show that African American and Latina women earn how much for every dollar a White man earns?
   a. one dollar and one dollar, respectively
   b. 81 cents and 79 cents respectively
   c. 64 and 56 cents, respectively
   d. 54 cents and 49 cents, respectively

The Service Women's Action Network has reported that women serving in Iraq and Afghanistan are less likely to have been killed by an enemy than they are to have been:
a. raped by a colleague
b. dishonorably discharged
c. promoted in rank

6. According to the Center for American Progress, compared with schools attended by at least 90% white students, those attended by at least 90% students of color spend how much less per pupil annually?
   a.  $312
   b.  $733
   c.  $1,028

7. About 5% of the world's people live in the United States. About what percentage of people currently in prison live in the United States?
   a.  5%
   b.  25%
   c.  45%
   d.  65%

8. In a study conducted by the National Bureau of Economic Research, researchers replied to help-wanted ads by sending résumés from fictitious applicants. Each applicant had the same qualifications, but some had stereotypically African American sounding names while others had stereotypically White sounding names. How much more likely were applicants with stereotypically White names to get a callback regarding their applications than applicants with stereotypically Black names?
   a.  15% more likely
   b.  26% more likely
   c.  39% more likely
   d.  50% more likely

9. Identify the source of this quote: "We have deluded ourselves into believing the myth that capitalism grew and prospered out of the Protestant ethic of hard work and sacrifices. Capitalism was built on the exploitation of black slaves and continues to thrive on the exploitation of the poor, both black and white, both here and abroad."

   a.  bell hooks
   b.  Michael Moore
   c.  Martin Luther King, Jr.

10. The median household income in the US has increased 16% since 1980. During the same period, corporate profits after taxes increased 182%, the average income for the wealthiest 1% of families increased 190%, and the average income for the wealthiest 0.01% of families grew 322%. What happened to the average income of the poorest 90% during that time?
   a.  increased 16%
   b.  increased 0.03%
   c.  decreased 16%

For a list of references as well as other quizzes and answer keys, please visit the Multicultural Pavilion Web site at http://www.edchange.org/multicultural/quizzes.html.

© EdChange and Paul C. Gorski, 2017
http://www.EdChange.org

a. $312
b. $733
c. $1,028

7. About 5% of the world's people live in the United States. About what percentage of people *currently* in prison live in the United States?
a. 5%
b. 25%
c. 45%
d. 65%

8. In a study conducted by the National Bureau of Economic Research, researchers replied to *help-wanted ads by sending résumés from fictitious applicants. Each applicant had the same qualifications, but some had stereotypically African American sounding names while others had stereotypically White sounding names. How much more likely were applicants with stereotypically White names to get a callback regarding their applications than applicants with stereotypically Black names?*
a. 15% more likely
b. 26% more likely
c. 39% more likely
d. 50% more likely

9. Identify the source of this quote: "We have deluded ourselves into believing the myth that *capitalism grew and prospered out of the Protestant ethic of hard work and sacrifices. Capitali was built on the exploitation of black slaves and continues to thrive on the exploitation of the poor, both black and white, both here and abroad.*"
a. bell hooks
b. Michael Moore
c. Martin Luther King, Jr.

2. According to the Southern Poverty Law Center, 34 anti-Muslim organizations were operating in the US in 2015. How many were operating in the US in 2016?

   a.  21
   b.  34
   c.  101
   d.  146

3. According to GLSEN, what percentage of students who report an incident of homophobia at school say the school did nothing in response or told them to ignore it?

   a.  18%
   b.  31%
   c.  48%
   d.  64%

4. US Census data show that African American and Latina women earn how much for every dollar a White man earns?

   a.  one dollar and one dollar, respectively
   b.  81 cents and 79 cents respectively
   c.  64 and 56 cents, respectively
   d.  54 cents and 49 cents, respectively

5. The Service Women's Action Network has reported that women serving in Iraq and Afghanistan are less likely to have been killed by an enemy than they are to have been:

   a.  raped by a colleague
   b.  dishonorably discharged
   c.  promoted in rank



Verizon LTE          8:06 AM          29%

3 People

Thank you

That student told me
Parent pulled him aside
today and asked if he was
given an assignment that
made him
"uncomftorable"

Im not sure how he even
know who it was that
shared that info. Parent
said that teacher had
them fill out permission
slips? But even with a slip,
i would think its still not
allowed.



iMessage



3 People >



Probably they pinpointed him because he was at the meeting I did put in a call to the principal because I've never spoken to him before and I wanted to bring up about the fact that the comfort of the students should be in the forefront

I figured it was because he was sitting with us last night









.ıl Verizon LTE                8:08 AM                @ 36% ⚡

3 People

engaging with ▮ in the middle of
the hallway. ▮ yelled that ▮
talking to me. Loudly. Said it loudly
not exactly yelling but said it
loudly.
I told ▮ I had zero trust in
anything, I told ▮ that as well.
▮ said we had the department of
education emailing them and they

reached out to
someone ▮ trusted, in an
uncomftorable situation,
and they want to punish
▮ for it. Disgusting.

Oh boy.   Please find a
way to acknowledge and
thank this student

I already did. And
reminded ▮ very
brave

iMessage

9

students mom because said student stuck up for what's right that will benefit future grades. Absolutely insane. I couldn't believe that. ███ was so rude and I told ███ lost all respect for ███ understood that because ███ not very nice after school board meetings, apparently, that's what ███ said. ███ gonna "fix it" 🙄 yeah I'm not talking to that ███ ever again.

What did ███ say to you

Wanted to know who I told (didn't tell ███ - all of this at 7:15 am WHILE i was walking to my A period class. Questioned me and I walked away because I wasn't engaging with ███ in the middle of the hallway. ███ yelled that ███ talking to me. Loudly. Said it loudly not exactly yelling but said it loudly.
I told ███ I had zero trust in anything, I told ███ that as well. ███ said we had the department of education emailing them and they were scrambling to fix it. The fact that ███ just assumed it was me no questions asked says enough.

   

**Edelblut, Louis (Frank)**

| | |
|---|---|
| **From:** | Farrell, Richard |
| **Sent:** | Tuesday, April 12, 2022 9:00 AM |
| **To:** | Edelblut, Louis (Frank) |
| **Subject:** | FW█ |
| **Attachments:** | Human Relations Course Syllabus.pdf |

Please review the attachment.
Rich

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

*The contents of this message are <u>CONFIDENTIAL</u> Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is <u>PROHIBITED</u>. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** █
**Sent:** Thursday, April 7, 2022 9:34 AM
**To:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Cc:** █
█
**Subject:** █

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Good morning Rich.
We have had an opportunity to review the material that you'd sent and have the following information for you in response to the inquiry.
First and foremost, the activities identified are from the Human Relations Course at █ After review with the principal, curriculum coordinator, and assistant superintendent, we have determined that these activities do fall within the scope of the course. For your information, I have attached a copy of the syllabus. You'll also notice that this syllabus includes a form for parental notification, as well as an invitation for parents to review class assignments on Google Classroom at any time. I'm told that all participants in the class have submitted signed acknowledgements. Furthermore, neither the teacher nor school administrators have received any complaints to date regarding the course content. Should any such objection be received, the district will handle it in accordance with our Policy IGE – Exceptions to Use of Specific Course Material(s). We have also reviewed this material through the lens of the new Divisive Concepts law, and find that the subject of these activities do not apply.

I have copied the school staff involved in this matter on this email – please feel free to let us know if you require further information.
Regards,
█

1

11

# Human Relations with ██████████

room: ████        email: ████████████        phone: ██████████

---

## Class Description

Students will develop knowledge, skills, and behaviors to create a greater understanding of themselves, other individuals, families and society. The course will proceed by way of class activities and development of skills to contribute to positive relationships, families and an understanding of our society.

## Class Competencies

**Personal Development:** Students will analyze functions and expectations of personal needs, characteristics and the effects on interpersonal relationships.

**Communication Skills**: Students will demonstrate communication skills that contribute to positive relationships in all aspects of life.

**Leadership & Teamwork**: Students will demonstrate leadership and teamwork.

---

# Responsibility and Preparation

Come to class on time and prepared. You should be in your seat by the time the bell rings.

## CLASS EXPECTATIONS = LIVE THE LANCER WAY!

1. **Be Positive & Respectful**
2. **Be Prepared & Organized**
3. **Be Present & On-time**
4. **Be Proud**

Situations disregarding our classroom expectations will be handled on a case-by-case basis to emphasize the importance of being our best.

### *Cell Phone Policy*

Please be respectful with the use of personal devices and keep them put away during instructional time. Your device should not be preventing you from doing your work.

# Google Classroom

All lesson materials and assigned work (including papers that are handed out in class) will be posted on Google Classroom for reference and review purposes, or in the event that you are absent. You are encouraged to invite your parent/guardian to our Google Classroom so that they may stay informed about what we are doing in class.



Course Competencies-
Competency 1 - Communication and Collaboration in the classroom
Competency 2 - Critical Thinking, Creativity and Problem Solving
Competency 3 - Self- Directed Learners
Competency 4 - Engaged Citizens in our communities

# Classroom Work/Grading

Assessments will be done in multiple ways. Bell ringers, quizzes, class activities, exit tickets and  reflections will be used in the classroom to formatively assess the students' learning. Performance tasks, projects, presentations and reflective writing will be used to summatively assess a student's work.

**Summative work counts for 80% of your grade.**
**Formative work counts for 20% of your grade.**

# Attendance-

Students are expected to be in class, on time, every day. Attendance will be taken at the beginning of each class and absences will be noted. **Students who miss more than 5 classes per quarter are in danger of failing** the course. In addition, those students who arrive late (without proper documentation) will also be noted and marked as tardy. **3 tardy arrivals count as 1 absence.** REMEMBER..... Most of our course assignments are completed in class so it is in your best interest to be in class to complete the work.

# Materials

Folder
Pencil/Pen
Notebook or paper (guided note sheets will be provided for some lessons)
Laptop/device to access Google Classroom and online assignments

# Make Up Work & Remediation Plans-

**Make-Up-**
If you are absent---it will be **YOUR** responsibility to do the following-
- Check the **Google Classroom** and your **Weekly Overview**
- Initiate communication with me on how to complete any missing formative or summative work
- All make-up work must be completed within one week after returning to school unless an alternative plan is made with your teacher according to the Student Handbook page 9.

**Late work -**
I understand that life happens and assignments will be accepted late. However if arrangements were not approved in advance and the assignment is more than 1 day late, 5 points will be taken off. If assignments are repeatedly turned in late additional points may be taken off. If you are completing an assignment late that is an online assignment, it will be your responsibility to notify me to check the online assignment for your work (send an email, comment on classroom assignment or discuss in person).

**Remediation-**
If you are not satisfied with your success on a summative assignment and you would like to create a plan to improve, you must make arrangements with me to create a remediation plan. Plans will be created based on the assessment, the competencies addressed and the area of need for the student. Remediation must be completed within the same quarter as the original assignment.

**Extra help -**
For extra help, to make up work or just to talk about life, please see me either before school (7:05-7:15) or during my prep period (C period) or lunch (F period). If you need a longer time period I am happy to schedule one with you.

I am  looking forward to the opportunity to work with you throughout the semester.   LET'S GET GOING! ☺

13

# Human Relations Units of Study

**Values, Goals & Self**
- Values
- Goal-Setting
- Self-Concept
- Self-Esteem

**Media & Technology**
- Social Media
- The Evolution of Dating
- Digital Drama & Cyberbullying

**Stress Management**
- What is stress?
- Managing Stress
- Lifestyle, Attitude & Gratitude
- Time Management

**Relationships**
- Love
- Friendship
- Healthy Relationships
- Ending Unhealthy Relationships
- Partnership & Marriage
- Family & Parenting Styles
- Family Stressors

**Communication**
- "I" Messages
- Levels of Communication
- Handling Conflict
- Communication Styles
- Complaints & Difficult Conversations

**Community**
- Leadership & Teamwork
- Community Resources
- Building Confidence
- Community Service

**Diversity**
- Celebrating our Differences
- Equity vs. Equality
- Race & Privilege
- Gender & Sexuality
- Microaggression





**Welcome to** ███ **Class**

ALL ABOUT
RELATIONSHIPS





███████ **High School---Family & Consumer Sciences Department**

**Teacher** ██████████    **E-Mail-** ████████████    **Phone-** ████████████

If you need assistance please see me in class or send me an email to set up an appointment.

By signing the course agreement, you are stating you understand the requirements of the course and the expectations. Please have your parent/guardian sign so they are aware of the requirements and expectations of the course as well.

## HUMAN RELATIONS COURSE AGREEMENT

### Please read and sign:

I have read and understood the expectations and requirements of Human Relations course..

**Student Name (please type or print):** _____

**Student Signature:** _____

**Please list any food allergies:** _____

Since our class is held in our foods classroom I would like to be aware of any food allergies to ensure classroom safety.

**Parent/Guardian Signature:** _____ **Date:** _____

Parents/Guardians:

- If you have any special skill/experience in relation to the class topics, please feel free to call or email me to set up a time to discuss, or write your phone number below for me to contact you.

- You are welcome to join our Google Classroom to stay up to date on what we are covering in class and review any assignments with your student.
  - Google Classroom code – Human Relations – _____

- Please feel free to contact me if you have any concerns/suggestions about the class or your child. I look forward to working with you and your child(ren) this semester!

# Topic Two



Today

11:58 AM

A friend has a 6th grader at [REDACTED] that came home and said that in their 'debate' class they were debating a sexual Relationship between two men. the sixth grader came home and said their debate was very uncomfortable and was about S E X (spelled out because they are too young to even want to say the word!!). not an appropriate topic for 6th...maybe towards the end of high school but not right around puberty...and we are to trust the 'experts' in education have designed the curriculum and have done their due diligence on what is best for kids and age appropriateness??? This has to stop. My friend is still processing it before deciding how to address it with the school.

12:27 PM

😮 3  😵

# Topic Three



March 16, 2022

Dear Families of Fourth Graders:

The Life Science unit will begin prior to spring break this year. This unit focuses on body development and puberty. This unit can be a way of gathering answers to questions students have been curious about, but frequently it can be an uncomfortable topic for some children. I hope that with support from both home and school, we will be able to help students learn accurate information about their bodies in a way that encourages them to be respectful and accepting of themselves and others. I will work with all fourth grade students together in an open teaching format. There will be a focus on basic scientific facts explaining how everyone will go through adolescent changes at their own body's pace. Now is the perfect opportunity for you to take some time to begin a conversation with your child prior to the school lessons to let them know you are there to answer any questions they may have.

Topics covered:

- Anatomy and physiology of the reproductive system
- Emotional and physical changes that begin with puberty
- Health and hygiene
- Personal safety including strangers, safe phone/internet use
- Peer pressure & respect for self and others

If you would like to review the materials that will be used in teaching please feel free to connect with me. Here is a great website if you are looking for information: Amaze.org There are also many other sites, some better than others, so be sure to review beforehand if you want to use it with your child!

Here are some books you might find helpful:

"The Care and Keeping of You" –American Girl Library

"On Your Mark, Get Set, Grow" –Lynda & Andrea Madaras

**Thank you for your help! Please call anytime if you have questions.**

█████████████

████████████████████████

using some of the following:



Speak with your child when you're both relaxed, like over dinner or in the car

Bring these issues up when you hear someone is getting married

If your child says a friend's sister or a teacher is getting married, you can say, "That's fantastic! Is she marrying a man or a woman?"

If you hear your child or one of their friends say, "That's so gay," address it

What's important to remember is that people deserve to express themselves in ways that feels right for them and to be respected no matter how they identify, look or dress



Are there more genders than "boy" and "girl"?

Yes, there are totally more than two genders! Some people identify as a gender that is not male or female, some identify as more than one gender, and some people don't identify as any gender.

How can I tell a person's gender?

What should I do if I don't feel like either a boy or girl, or if how I feel doesn't match my body?

## Related Videos

know if I am?

How do I figure out my sexual orientation and identity?

Your sexual orientation refers to the gender(s) of who you're attracted to or who you fall in love with. While sexual orientation is not a choice, it can shift over time for some people. It also may be difficult to understand and make sense of your feelings. Separately, your identity is what you decide to call yourself, which is a decision that can only be made by you. You get to figure out which sexual identity best suits you and what that identity means. Some of these identities are gay, pansexual, lesbian, demisexual, heterosexual, bisexual, asexual and more! It's also all right if your identity changes over time or doesn't exactly match up with your sexual orientation or sexual behaviors. There is no need to feel pressured into identifying a certain way.

# Related Videos




# VIDEO TOPICS

## Gender Identity

What Are Pronouns?

Challenging Male Gender Stereotypes With Jason Rogers

Sex Assigned at Birth and Gender Identity: What Is The Difference?

Range of Gender Identities

Puberty and Transgender Youth

Gender Identity: Gender Roles and Stereotypes

How To Be A LGBTQIA+ Ally

My Friend Is Transgender

Being Female, Male, Transgender or Fluid

Expressing Myself. My Way.

## Healthy Relationships

# Topic Four



1031

# Who is Mx. ?

HELLO! I'm...

My name is Mx. ▮▮▮▮

Mx. is pronounced just like the word "mix." It is a gender-neutral prefix/honorific (like Dr. or Professor or Coach) instead of using Ms., Mrs., or Mr.

Click here for more info!



2

SLIDESMANIA.COM

1032

# My pronouns are they/them/theirs

Pronouns are what people use to refer to you without using your name. For example, "This is Mx. ███████ They are my ███ teacher! I like them as a teacher. Their favorite color is peacock blue."

Common pronouns:

She/her/hers

He/him/his

They/them/theirs  ⬅ Click the pronouns for more info on "they"

3

# What else should we know about Mx. ████ ?



Click here for more info
on BLM for kids

Click here for more info
on how to make safer
spaces for LGBTQ+ kids

SLIDESMANIA.COM

4

# Topic Five

1035



Poster reads:

Socialism

An Economic Ideology

Economic system where the basic means of production is primarily owned and regulated by the government

All for one and one for all

"Socialism is workable only in heaven where it isn't needed and hell where they've got it" Cecil Palmer

A few examples: Socialist Republic of Vietnam 1976-Present, Laos 1975-Present

Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.

1

1036



Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.



1038



1039





Black Lives Matter

that Black lives don't matter. #BlackLivesMatter quickly transformed from an antiracist love declaration into an antiracist movement filled with young people operating in local BLM groups across the nation, often led by young Black women. Collectively, these activists were pressing against discrimination in all forms, in all areas of society, and from a myriad of vantage points. And in reaction to those who acted as if Black male lives mattered the most, antiracist feminists boldly demanded of America to #SayHerName, to shine light on the women who have also been affected by the hands and feet of racism. Perhaps they, the antiracist daughters of Davis, should be held up as symbols of hope, for taking potential and turning it into power. More important, perhaps we should all do the same.



OJ Simpson Trial

Kind of Skimmed
over this . . . .

I his com-
m 'ath Row.
H ecause of
th e stay of
ex

on? Not at the Million Man March, that's for sure. He was going was in Texas, pleading to evangelicals for racial healing. Instead of listening to the people dealing with it, he went to beg people not dealing with it to ask God to fix it. And, of course, it slipped into *pray God fixes Black people.* Even though a year later, affirmative action was banned in California, making the playing field, especially as it pertained to higher education

7



Nonetheless, the Civil Rights Act of 1964
first important civil rights legislation since
Rights Act of 1875. Hours after President
signed it into law, on July 2, 1964, he hit the
to play up the whole American id



Wherev...

BSUs o...

and dem...

historica...

   All s...

Separatists, pan-Africanists, and everything in between.
Black Power even appealed to the face of the civil righ...
movement. That's right, even Dr. King, in 1967, was tur...
ing away from assimilationist thought in the same w...
W. E. B. Du Bois had later in his life. Dr. King had n...
realized that desegregation was good only for elite Bl...

BOOKRAGS

Answer

8. Who do Reynolds and Kendi claim was the world's first racist?

Gomes Eanes de Zurara. A loyal commander in Prince Henry's Army. He was the first person to write about it de Black human ownership

9. Who did the world's first racist write a biography about, according to Reynolds and Kendi

Prince Henry.

10. What was the book that the world's first racist wrote titled, according to Reynolds and Kendi?

Bk lo

The Chronicle of the Discovery and Conquest of Guinea. in 1450

11. How was the world's first racist's book received by the public?

It was a bestseller.

12. How did the world's first racist depict Africans in his book, according to Reynolds a Kendi?

As savages that needed training. Africans needed slavery in ord fed and taught Jesus.

13. What did the Climate Theory say about Africans?

They were savages because of the hot weather where they came from and th become white if they moved.

14. What did the Curse Theory say about Africans?

# Original



# Recreation

## 8th Grade                           2021-22

Competency 1: I can demonstrate an understanding of conflict and compromise

| Date: | Monday: 9/20 | Tuesday: 9/21 | Wednesday: 9/22 | Thursday: 9/23 | Friday: 9/24 |
|---|---|---|---|---|---|
| Learning Target | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States |
| Essential Question | What are the causes of Racial Tension? | | | | |
| Formative | US History Formatives: Who was the first Racist? What did he accomplish? | | US History Formatives: Blank Map of New England | | |
| Classwork | Hand out Stamped. Read Aloud chapters 2-4 Answer questions | Hand out Stamped. Read aloud chapters 2-4 Answer questions in packet Slave Trade packet Exit Ticket | Read aloud Chapters 3 and 4 and answer questions together. Slave Trade packet | Read to P. 78 and answer questions together. Review: Slave Trade packet Do exit Ticket | Worksheet: Historical Background: The Development of Race-Based Theory |
| Hw | | | | | |

# Topic Six

# Get to Know You!

Answer the Google Form below to help me get to know you!

What is your first and last name? *

Liam Elliott

What is your preferred name? *

Liam

Who can I use this name in front of? *

☑ I can use this name in front of other students

☑ I can use this name when contacting parents/guardians

☑ I can use this name with other teachers, including substitutes

☐ Any other comments:

☐ Other:

1049

What are your preferred pronouns? *

◉ He/him/his

◯ She/her/hers

◯ They/them/theirs

My preferred learning style is... *

◯ Visual-- maps, graphs, diagrams, charts, etc.

◯ Auditory-- speaking and listening

◉ Kinesthetic-- experience, practice, examples, simulations (hands-on)

◯ Reading and writing

I like when my teacher... *

Gives me A's

One thing you should know about me as a student is... *

I'm a pain

One thing you should know about me in general is... *

I have red hair

2

Any thing else you would like me to know? *

Pronouns are the same ones i got in the womb

This form was created inside of ▮▮▮▮▮▮▮▮▮▮

Google Forms

1051

# Algebra 2 Getting to Know You

Please answer the following questions, so that I can better assist you this semester.

1. Email *



2. Name (First and Last) *

3. Name you want me to call you in class. *

 or _____ whatever you want

4. Pronouns (ex: he/him, she/her, they/them): *

She/her

5. May I use these pronouns in front of the class? *

*Mark only one oval.*

 Yes

◯ No

6. May I use these pronouns when I contact home? *

*Mark only one oval.*

Yes ✓

No

7. May I use these pronouns in front of other teachers? *

*Mark only one oval.*

✓ Yes

No

8. Would you like to follow up with me (in a private conversation) about your pronouns? *

*Mark only one oval.*

Yes

✓ No

9. Are you taking another math class this semester? If so, what is it? *

No

10. What math classes have you taken and at what level? *

Algebra 1 pt 1 &2 (E)
Geometry (H)
Consumer Science (H)

**11.** Why did you take this particular class? *

Because I need the Credit

**12.** What grade do you expect to earn in this class? *

*Mark only one oval.*

◯ A

☑ B

◯ C

**13.** Tell me about your past math experiences. *

I can grasp Concepts very well, but I do
tend to overthink equations and end up overwhelming
myself.

**14.** Tell me three things about yourself. This could be a hobby (or hobbies), interesting facts, or anything you want me to know about you? *

- I write/sing songs
- I play the Piano
- I'm a host at ▇▇▇ in ▇▇▇



15. What would you like to ask me about myself or this class?

If you could teach another class
What would it be and why?

This content is neither created nor endorsed by Google.

Google Forms

# Topic Seven



...pted for use by the Program on Intergroup Relations and the Spectrum Center, University of Michigan.

...urce hosted by LSA Inclusive Teaching Initiative, University of Michigan (http://sites.lsa.umich.edu/inclusive-teaching/).

## DIVERSITY BINGO

**Directions: Find someone in the class to fill each square and ask them to write their name in that square. Each person can only fill ONE square on your card. The first goal is to get Bingo: a row across, down or diagonally. When you do, yell: "BINGO!"**

| Knows what Diwali is | Has memorized a poem | Has travelled to South America | Is a vegetarian | Has a quote that inspires them |
|---|---|---|---|---|
| mes from an nterracial family | Celebrates Yom Kippur or knows what it is | Is a twin or triplet | Has a family member who has a service animal | Has travelled to Europe |
| musical ment | Speaks more than one language (fluently) | Lives on the planet Earth | Is a first generation American (both parents were born in another country) | Was born in another country |
| a ts | Has travelled to Canada | Celebrates Kwanzaa or knows what it is | Sent a handwritten 'thank you' note recently | Does NOT have SnapChat |
| Is of Native American heritage | Does not use binary gender pronouns | Has lived in more than one state | Has a cause they are passionate about | |

2





## Definitions as a Starting Point

Key definitions and concepts associated with anti-racist pedagogy

## Readings to further your understanding

This button links to an anti-racist pedagogy annotated bibliography maintained by CRLT

## Disrupting White Supremacy on Campus

Learn about the historical legacy of racism and activism at U-M

## LSA DEI and Anti-Racism Initiatives

Learn about LSA DEI and anti-racism initiatives

# Practicing Anti-Racism and Anti-Racist Pedagogy: An Overview



# M | LSA INCLUSIVE TEACHING
UNIVERSITY OF MICHIGAN

## Social Identity Wheel

| | |
|---|---|
| **Overview** | The Social Identity Wheel worksheet is an activity that encourages students to identify social identities and reflect on the various ways those identities become visible or more keenly felt at different times, and how those identities impact the ways others perceive or treat them. The worksheet prompts students to fill in various social identities (such as race, gender, sex, ability disability, sexual orientation, etc.) and further categorize those identities based on which matter most in their self-perception and which matter most in others' perception of them. The Social Identity Wheel can be used in conjunction with the Personal Identity Wheel to encourage students to reflect on the relationships and dissonances between their personal and social identities. The wheels can be used as a prompt for small or large group discussion or reflective writing on identity by using the Spectrum Activity Questions on Identity. |
| **Goals** | 1) To encourage students to consider their identities critically and how identities are more or less keenly felt in different social contexts. The classroom and the university can be highlighted as a context as a way to approach questions on barriers to inclusion. |
| | 2) To illuminate how privilege operates to normalize some identities over others. For example, a student who speaks English as their first language can reflect on why they rarely need to think about their language as an aspect of their identity while some of their peers may identify language as the aspect of their identity they feel most keenly in the classroom. |
| | 3) To sensitize students to their shared identities with their classmates as well as the diversity of identities in the classroom, building community and encouraging empathy. |
| **Implementation** | 1) View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom. |
| | 2) There are three ways you can approach this activity:<br>   a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion.<br><br>   b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity.<br><br>   c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |

4

| Implementation | 1) | View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom. |
| | 2) | There are three ways you can approach this activity: |
| | | a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion. |
| | | b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity. |
| | | c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |

| | 3) | If you are choosing Option B or Option C/B, place the social identity categories around the room before class. |
| Challenges | 1) | The students may not perceive the activity as relevant to the course and thus may exhibit resistance. |
| | 2) | Students may not be familiar with particular concepts, or they may have different assumptions about those concepts that the activity assumes. For example, they may not know the difference between the terms "sex" and "gender," or they may be resistant to the distinction between the two. |
| | 3) | If the wheel is used as a discussion prompt or if students are in close quarters and are able to see what their peers have written on their worksheets, this exercise may feel especially vulnerable to students with invisible identities that they may not want to disclose to the class. Disclosure in verbal or written form should be voluntary and discussion questions should be broad enough that students can opt to not talk about more vulnerable aspects of their identities while still leaving space for them to share if |





# Topic Eight

## CHOOSING MY PATH

### 10

### DISRUPT!

### HOW DO I STAND UP? AND SPEAK OUT? WHAT HAPPENS IF I DON'T SAY ANYTHING?

*YOU CAN DO IT. YOU CAN DISRUPT RACISM AND CHANGE THE "NORMAL."*

Y ou are now able to see the world in a way you didn't always notice before. You are building a new lens to see yourself and the world around you. You know more history (the parts you are told about and what has been left out). You are more conscious of the ways people interact with one another. You are attuned to microaggressions and are aware of their impact. You see the work institutions have put in over hundreds of years to maintain the structure of racism. Your school may have rules

around how students can wear their hair or what folx can wear on their head and you understand how this is affirming the dominant culture. You notice that, still, most of the shows and movies you watch have a nearly all-white cast and how every time there is a terrorist that person is Western Asian and speaks Arabic. You see how stereotypes are created and sustained. You have the tools to seek out more knowledge and gain a deeper understanding.

What do you do next?



You have a voice. Use it. Speak the truth. Share it with others. Choosing silence is not an option. Audre Lorde, an American feminist, writer, and activist said,

**"MY SILENCES HAD NOT PROTECTED ME. YOUR SILENCE WILL NOT PROTECT YOU."**

Case 1:21-cv-01077-PB   Document 45-2   Filed 05/20/22   Page 64 of 79

*YOU CANNOT HEAR SILENCE. INACTION CANNOT BE SEEN. WE CANNOT FEEL THE MOMENTUM OF CHANGE IF NOTHING HAPPENS.*

Use your voice to speak the truth about injustice and share the history we are often not told. Talk to your family, your friends, your classmates, anyone and everyone who will listen. Write and write and write and share. Create art and share it. Take risks. You can do this.

I wish I had used my voice when my teacher was so continually awful to us. I wish I had stood up to my teacher. And to our school administration that allowed her to remain there.

What would I do today if I were in that classroom?

I'd physically stand up to her (in my small nine-year-old self). I'd get out of my seat, stand up, and tell her, "You can't talk to him like that. It's not okay."

Then, I'd walk out of that classroom, bringing my friend with me and anyone else who wanted and needed to come. I would walk down the stairs to the office, where I'd ask the school secretary or the principal to file a complaint against that teacher. I'd tell them what happened. I'd tell them she verbally abused my friend. And I'd file that complaint. I would ask the office to call all my friend's parents. He shouldn't have to sit another minute in the classroom with our teacher who assaulted him with her racist words. No one should.

I'd tell my mom. (I did.) We'd talk to his parents. I'd ask all our classmates to share what happened with their families. Our parents

and caregivers would help our voices to be heard. We would be louder than just my own voice. They, too, would file complaints and show up at school the next morning. They'd ask for the resignation of our teacher because she should not be teaching us if she couldn't keep us safe. And she couldn't keep us safe because she was the one causing the harm.

We would all attend the next school board meeting to demand our schools be a place where we can learn, free from racial violence, both verbal and physical.

I think about that day so often and wish I had had the tools to go beyond recognizing what was happening. I wish I had created a plan and spoken up. I wish I had resisted my teacher and everything that kept her in place.

*THIS IS WHY I SHARE WITH YOU. YOU CAN RESIST NOW. YOU CAN DISRUPT NOW.*

What if it's something beyond your daily interactions at school? What if it's something outside of the comfort of what is familiar?

What if you and your family or friends are driving through town, and you see four police officers surrounding two young Black men? Maybe you recognize them, maybe you don't. Maybe one of them was in chorus with you last year. Maybe you've seen them at the store. Or maybe you don't know them at all. It doesn't matter if you know them or not.

You may be able to see if the police are armed. You may not. (While some police

10 THINGS TO DO - DISRUPT!

carry guns and others do not, we do know that they all carry power in their role as law enforcement.) You can see the young Black men are not armed, that they look confused, and that their hands are up.

You've seen the news over and over again; you know history. You think of Eric Garner, Sandra Bland, Philando Castile, Michael Brown, and all the others. You know this happens every day and today can be the day you change that. Here is where you can make a plan so you'll know what you can do if this does come up in your life. **NOTE:** You must make sure YOU are safe and out of harm's way. Talk to a trusted adult BEFORE taking any action.



*Activity:*

First, grab your notebook. Let's start writing!

You've observed what's happening and have examined the situation. You know the folx being held by the police look frightened. They don't want to be there. You don't want these two young Black men to become new hashtags and statistics.

So, there are a bunch of things you can do—take a few minutes and make a list of **every possible outcome** you can think of.

Here's my list:

- Ask the person who is driving the car to stop. We get out and walk over to the situation so we can stand witness.

- Record what is happening with my phone. I can. This is my right to do so. In the United States, the UK, and many other countries I cannot get arrested for recording if I take photos or video of public spaces. The police cannot take my phone from me. (They need a warrant to do so.) They may ask me to stop recording, but I don't have to stop.

If I am inside a store, private property, etc. the owner sets the rules and it is their choice whether I can record or not. This is not the decision of the police.

1065

- Stay in the car and record.

- Stay in the car and shout out to the two being held by the police, "I see this."

- Standing near the police and the young men, I can ask the two Black men if there's anything I can do... if there's anyone I can call for them. (The adults I'm with can stand with me too.)

- Stop other people walking by and ask them to stand witness too. (There is strength and power in numbers.)

- Ask the adult I'm with to intervene while I stay in the car.

- Ignore this and keep driving.

What else?

Do our lists look similar? What am I missing? What are you missing? There's more we can add and we'll look at this in the next couple of chapters! You will continue to build your plan for taking action.

*my choice*

Some of your choices will require you to take risks. Some may not. Understanding your privilege and the power you have—or do not have—is important. It will determine how you approach everything. This situation with the police is one where, especially if you are white and cisgender, you can use your privilege to speak up. **If you are a Black, Brown, or Indigenous Person of the Global Majority, you will need to decide how each outcome could end for you**. White people, this is not something you need to do because you are at the center of the system: taking a risk with any of these choices will, most likely, not have you end up in jail or harmed.

92

4

93

# Topic Nine

# Homework:
## Defining Sexual Orientation

**Name:** _____     **Date:** _____

**Instructions:** View the short animated video from Amaze.org called, "Talking Sexual Orientation with Jane" available here: http://amaze.org/video/talking-sexual-orientation-with-jane/. Once you have watched the video, please write down your own definition of sexual orientation. Then, think of an adult you know well and trust who you could share this definition with. This could be a parent or other adult family member, a friend's parent, someone at school, etc. Tell this person what we discussed in class and share your definition so that they also know what sexual orientation is. See if they agree with your definition, or whether they have another take and add that to what you have. Make sure they sign below!

**1) Sexual orientation is:**

(What I say):

(What the adult I asked says):

**2) Did you learn about sexual orientation when you were growing up?: If so, what did you learn?**

(What the adult I asked said):

Name of adult:          _____

Their signature:         _____

Relationship to you:   _____

**Advocates for Youth**
Rights. Respect. Responsibility.
www.advocatesforyouth.org

1

# Topic Ten

## Exploring Whiteness and Becoming an Anti-Racist Activist

INSTRUCTORS ███████████████████████████████████

LOCATION ███ Classroom Room ███

READINGS TBD

TIME Full Day     MAX ENROLLMENT 16     STUDENT COST $0

DESCRIPTION Students will join in honest, frank, and respectful examination of what it means to be a white person in 21st century America. We will explore many topics on race including: personal identity and power, white privilege, guilt, and fragility, and taking anti-racist action. We will learn how whiteness and race were invented in the early years of our country's formation, further sustained through government programs, and how this has played out in our own community. Students will learn how to take anti-racist action by meeting with college students who currently are engaged in national and local anti-racist work, including where anti-racist work intersects with gun safety, climate change, and LGBTQ rights. This MI is open to all students, and we hope that we will have a diverse group. The course will be designed to be a dynamic and interactive experience based at ███ but also involving field trips off campus.  Tentative plans include interaction with Dartmouth students/staff members and other local community members involved with anti-racism work and correspondence with students from Ashley Hall School in Charleston SC to discuss how we perceive race and each other in New England and the South.

Tuesday 3/10
8:00-8:30 Introductions/Rules of Engagement/ Race Literacy Quiz ████████████
8:30-9:00 Equity and Inclusion Terms, Language, and Definitions ████████████
9:00-9:45 The Invention of Whiteness/ Race the Power of an Illusion ███
9:45-10:00 Break
10:00-11:00 Action Plan Design planning (Group led by ███████████
11:00-12:00 Lunch
12:00-1:00 "Understanding Racism and Systemic Oppression " Brian Cook/Groundswell Change  OK
1:00-1:30 Discussion on Brian Cook's Presentation
1:30-1:45 Break   OK
1:45-2:45  iPod walk-around ███████████
2:45-3:00 Journaling ███ prompts)

Wednesday 3/11
8:00-9:00 How we got here: Jim Crow, Redlining, Racial Wealth Gap ████
9:00-9:30 Shadows Fall North film excerpt ██████
9:30 -10:00 Citrus Preview ████████
10:00-10:30 Brunch
10:30-1:30 (including travel time) Citrus at Northern Stage
1:30-2:00 Citrus Discussion and Journaling ████████ prompts)

Thursday 3/12
8:00-9:00  White Privilege/ White Fragility ████████ (with selected video)
9:00-9:45  Intro to Kendi: Anti-racism/ in-class reading ████████
9:45-10:00 Break
10:00-10:30 Action Plan Design planning (Group/ ███████
10:30-11:30 "Carol Street" Being a Person of Color in an All White Environment (film maker Demetrius Borge)

11:30-12:30 Lunch (can shift later 15 minutes if needed)
12:30- 1:00 walk to Rauner
1:00-2:30 "Ties That Bind" Slavery at Dartmouth Tour and discussion Dr. King
2:30-3:00 Downloading and Journaling

Friday 3/13
8:00-9:00 /Case Studies on Activism Brian Cook/Groundswell Change
9:00-10:00 Anti-Racism Activism Kendi section on activism/in class reading/discussion
████████████████████
10:00-10:15 Break
10:15-11:00 Teaching Tolerance: Speaking up! ████████████
11:00-12:00 Lunch
12:00-12:30 Action Plan Prep for Asma Elhuni ███████████████████
12:30-1:30  Preparing for Activism  Asma Elhuni/Activist and Organizer
1:30-3:00 Action Plan Design/ Closing/ Goals/ Action Steps

*First Draft of Daily Schedule Topics*
*Speakers/video/presentations/discussion TBD*

## Tuesday 3/10
**Introductions/ / Rules of Engagement/ Opening Exercises**
> *http://www.pbs.org/race/002_SortingPeople/002_00-home.htm*
> *race literacy quiz*
> *http://newsreel.org/guides/race/quiz.htm*

**Language and Definitions**
> **The Invention of Race and Whiteness**
> *Tim Wise:what is race  invention of whiteness*
> *https://www.youtube.com/watch?v=jBUnziGqN4o*   *1:53-2:01*
> *Race the Power of an Illusion*
> *Ep 1 The difference between us ... segments*
> *https://www.youtube.com/watch?v=OXEV0tgox9k&t=2s*
> *Discussion Guide pages 7&8 http://newsreel.org/guides/race/race-guide-lores1.pdf*
> *The Other Race (Mixed Race)  Documentary...segments*
> *https://www.youtube.com/watch?v=GfM-F172548*

**White Privilege**
> The advantages of wealth and whiteness  10 question walk/race
> **https://www.youtube.com/watch?v=4K5fbQ1-zps**
> **https://www.nasponline.org/resources-and-publications/resources-and-podcasts/diversity/social-justice/social-justice-lesson-plans/talking-about-race-and-privilege-lesson-plan-for-middle-and-high-school-students**
> **https://www.huffpost.com/entry/explaining-white-privilege-to-a-broke-white-person_b_5269255**
> *"White Immunity": Working through the pitfalls of "privilege" discourse*
> *https://www.youtube.com/watch?v=JtLpAfB-DEc*  segments

**Affirmative Action**
> A Long History of Affirmative Action - For Whites
> http://newsreel.org/guides/race/whiteadv.htm

**Black Lives Matter**
> *NYT A conversation with police*
> **https://www.nytimes.com/video/opinion/100000004027684/a-conversation-with-police-on-race.html?module=inline**   **1:59-2:30**
> Tim Wise  Black Lives Matter/All Lives Matter
> https://www.youtube.com/watch?v=jBUnziGqN4o  42:06

**Wednesday 3/11**

**How we got here: Jim Crow, Redlining, Racial Wealth Gap**

*Race the Power of An Illusion - ep3 The House We Live*
*https://www.youtube.com/watch?v=QHo8AKNfB68*
*https://www.youtube.com/watch?v=mW764dXEI_8*
*THE POWER OF AN ILLUSION How the Racial Wealth Gap Was Created*
*https://www.youtube.com/watch?v=QHo8AKNfB68&t=4s*
*Discussion Guide pages 11-13 http://newsreel.org/guides/race/race-guide-lores1.pdf*

**Being a Person of Color in an all white environment**

**Documentary film maker speaker**

**White Fragility/ White Guilt**

**Robin DiAngelo lecture**

**https://www.youtube.com/watch?v=45ey4jgoxeU&t=1230s**

**https://www.nytimes.com/video/opinion/100000003773643/a-conversation-w ith-white-people-on-race.html?module=inline**

**Thursday 3/12**

**Anti-racism**

**Dartmouth Student Leaders and others**

**Skype with school in South Carolina  North/South perspectives on race**

**Friday 3/13**

**Becoming and activist**

**Dartmouth Student Leaders and others**

**Closing/ Goals/ Action Steps**


CALIFORNIA NEWSREEL

◄ **close**   **home**   **go to** *Race - The Power of an Illusion*

### RACE LITERACY QUIZ
### What differences make a difference?

The Race Literacy Quiz was developed by California Newsreel, in association with the Association of American Colleges and Universities. The myths and misconceptions it raises are explored in the documentary series *RACE - The Power of an Illusion*, available on video from California Newsreel at <u>Newsreel.org</u> or 1-415-284-7800. For more information and background, visit the companion Web site at <u>racepowerofanillusion.org</u>.

<u>JUMP TO ANSWER KEY></u>

**1. Humans have approximately 30,000 genes. On average, how many genes separate all members of one race from all members of another race?**

A. None
B. 1
C. 23
D. 142
E. 1008
F. We don't know

**2. Which characteristic did the ancient Greeks believe most distinguished them from "barbarians"?**

A. Religion
B. Skin color
C. Language
D. Dress
E. Hairiness

**3. In Medieval Europe (circa 1300-1400), Ethiopians were looked upon as:**

A. Savages
B. Saviors
C. Barbarians
D. Infidels
E. Negroes

**4. Members of a race can be identified by their:**

A. Blood group
B. Skin color
C. Ancestry
D. Genes
E. None of the above
F. All of the above

**5. Skin color correlates most closely with:**

A. Hair form
B. IQ
C. Risk for sickle cell, Tay Sachs and other genetic diseases
D. Geographic latitude
E. Continent of ancestral origin
F. Jumping and sprinting ability

**6. When Jamestown colonist John Rolfe and his new wife Pocahontas traveled to the Court of London in 1619, it caused a scandal because:**

A. An Englishman had married an Indian
B. John Rolfe had cuckolded General John Smith, the leader of the colony
C. Pocahontas, a princess, married beneath her station by wedding a commoner
D. Londoners had never seen an Indian before
E. A Christian had married a heathen

**7. The rise of the idea of white supremacy was tied most directly to:**

A. Indian removal
B. Slavery
C. The Declaration of Independence
D. The U.S. Constitution
E. Ancient Greece

**8. Which group has the most genetic variation?**

A. Humans
B. Chimpanzees
C. Penguins
D. Fruit flies
E. Elephants

**9. Which two populations are most likely, on average, to be genetically similar?**

A. Italians and Ethiopians
B. Senegalese and Kenyans
C. Italians and Swedes
D. Chinese and Lakota (Sioux)
E. Saudi Arabians and Ethiopians

**10. Most human genetic variation can be found:**

A. Within any local population, for example, among Zulus, or among Hmong
B. Between two populations on the same continent, for example between Irish and Poles
C. Between two populations on different continents, for example between Koreans and Zulus
D. Between any two continents, for example, between Africa and Asia
E. Between tall people and short people

**11. Which continent has the greatest human genetic diversity?**

A. Europe
B. Asia
C. Africa
D. North America
E. South America

**12. Who was the first American public figure to suggest, albeit "as a suspicion only," that black people might be inherently inferior to whites?**

A. Thomas Jefferson
B. Sir Walter Raleigh
C. George Washington
D. Robert E. Lee
E. Capt. John Smith, founder of the Jamestown colony

**13. Which of the following was NOT an important reason why African slavery first took root in North America:**

A. As non-Christians, they had no legal protections
B. They were skilled semi-tropical farmers
C. The supply of indentured servants from Europe was becoming unreliable
D. They were deemed innately inferior
E. They couldn't easily run away

**14. Which was NOT introduced to Indians by whites?**

A. An Indian identity
B. Democracy
C. Identity by "blood quantum"
D. Horses
E. Measles

**15. Of the $120 billion in home loans underwritten by the federal government between 1933 and 1962, what percentage went to white homeowners?**

A. 45 percent
B. 64 percent
C. 75 percent

D. 88 percent
E. 98 percent

## 16. Which of the following is not a result of federal government policies?

A. Redlining
B. Urban renewal
C. Deterioration of inner cities
D. Affirmative action quotas
E. The wealth gap between black and white families

## 17. Today, the net worth of the average white family is how much compared to the average black family?

A. Three times as much
B. Eight times as much
C. Half as much
D. Twice as much
E. The same

## 18. When white and black families of similar incomes are compared, what is the difference in their net worth?

A. No difference
B. Black net worth is slightly greater
C. White net worth is more than eight times greater
D. White net worth is more than two times greater
E. Black net worth is twice as great

## 19. According to a 1993 study, 86% of suburban whites lived in a community where the black population was:

A. Less than 5%
B. Less than 10%
C. Less than 1%
D. More than 10%
E. More than 15%

## 20. Which is NOT an example of a government racial preference program?

A. 1964 Civil Rights Act
B. 1862 Homestead Act
C. 1790 Naturalization Act
D. 1934 Federal Housing Administration
E. 1935 Social Security Act

## ANSWER KEY

### 1. A. None

There are no characteristics, no traits, not even one gene that distinguish all members of one so-called race from all members of another race.

### 2. C. Language

The word barbarian comes from the Greek word "bar-bar," for someone who stutters, is unintelligible, or does not speak Greek. The Greeks, like most ancient peoples, did not attribute much meaning to physical appearance. In ancient Greece, language was the difference that mattered, because it indicated who was not Greek. Some historians believe that the first to be labeled barbarian were the Scythians of circa 500 B.C., who lived northeast of the Black Sea and were very fair skinned. Ideas of 'race' did not exist during antiquity.

### 3. B. Saviors

In medieval Europe, religion mattered most, not physical appearance. At the time, Christian Europe was at war with the Moslem Empire. Europe looked towards a mythical Christian Ethiopian kingdom, led by the fabled priest-king Prester John, to rescue them from the infidels. Theories of race didn't emerge until the late 18th and early 19th centuries.

### 4. E. None of the above

There are no traits, no characteristics, not even one gene that is present in all members of one so-called race and absent in another. The A, B, and O blood groups can be found in all the world's peoples (the percentage of Estonians and Papua New Guineans with A, B, and O blood are almost exactly identical). Skin color tends to correlate with the earth's geographic latitude not race; sub-Saharan Africans, the Dravidians and Tamils of southern Asia, and Melanesians from the Pacific all have very dark skin. Ancestry is difficult to trace; we all have two parents, four grandparents, etc. If you could trace your family back 30 generations, slightly more than 1,000 years, you'd find one billion ancestors.

### 5. D. Geographic latitude

Skin color tends to correspond with ultra-violet radiation from the sun and hence latitude. People with ancestors from the tropics typically have darker skin while those further north have lighter skin. Sub-Saharan Africans, Asian Indians, Aboriginal Australians and Melanesians all have dark skin. But skin color really is only skin deep. Most traits are inherited independently from one another. The genes influencing skin color have nothing to do with those influencing hair form, eye shape, and blood type, let alone the very complex traits we value such as intelligence, musical ability or athletic ability. Genetic diseases are inherited through families, not race. Sickle cell, for example, confers resistance to malaria. It occurs in people whose ancestors came from where malaria was once common: the Mediterranean, Arabia, Turkey, southern Asia and western and central Africa - but not southern Africa. The presence of sickle cell is not an indicator of race but of having an ancestor from a malarial region.

### 6. C. Pocahontas, a princess, married beneath her station by wedding a commoner

17th century England was a very hierarchical, feudal society where people's class status was fixed at birth. Status was so important that laws regulated the clothing people could wear so they couldn't "pass" as another class. When John Rolfe took his new bride Pocahontas (who had converted to Christianity) back with him to London in 1617, the English had not yet developed the racial ideology that later justified their taking of Indian lands. But it was unthinkable that royalty would marry a commoner.

### 7. C. The Declaration of Independence

Ironically, it was freedom, not slavery, that gave rise to modern theories of race. Until the Revolutionary period, slavery was an unquestioned "fact of life." It was only when Americans proclaimed the radical new idea that "all men are created equal" that slavery was first challenged as immoral. As historian Barbara Fields notes, the new idea of race helped explain why some people could be denied the rights and freedoms that others took for granted.

### 8. D. Fruit flies

Fruit flies have been around for a very long time but they also have a short life span, so lots of genetic mutations have accumulated over many generations. In contrast, modern humans are one of the most genetically similar of all species. On average, only one of every 1,000 nucleotides (the "letters" that make up our DNA) differ one individual from another. This is because we are a relatively young species (approximately 150,000 - 200,000 years old). We simply haven't been around long enough to accumulate much genetic variation. Also, humans have always moved, mixed and mated, further homogenizing our gene pool. Beneath the skin, we're all very similar.

### 9. E. Saudi Arabians and Ethiopians

Populations that live near each other geographically tend to be genetically more alike than populations that live far apart. That's because they are more likely to have intermixed in the recent past and therefore share more genes. So even though Senegalese and Kenyans or Italians and Swedes are traditionally placed in the same "races," they live farther apart from each other and have had less contact and intermixing than Saudis and Ethiopians.

### 10. A. Within a local population

85%, or almost all human variation, can be found within any single local population, whether it's Malay, Irish, Zulus or Koreans. There is FAR more variation within groups than between groups. This means that there may be as many - or more - genetic differences between two random Koreans as between a random Korean and a Zulu. On average, approximately 94% of all genetic variation can be found within any continental area.

### 11. C. Africa

We are all Africans. Modern humans (Homo sapien sapiens) originated in Africa, and we spent most of our evolution as a species together there. Some modern humans first left Africa 50,000 - 70,000 years ago and spread out around the world. All the other populations of the world can be seen as a subset of Africans. Every human genetic trait found elsewhere can also be found in Africa, with the exception of relatively few recent variations favored by the environment, genetic drift, or sexual selection - such as light skin.

### 12. A. Thomas Jefferson

Thomas Jefferson was the first prominent American to speculate that black people might be innately inferior to Europeans. Until then, most Enlightenment figures believed that differences between groups were not inborn but due to environmental factors. It wasn't until Jefferson introduced the radical new ideas of liberty and equality that slavery had to be justified and prejudices against the enslaved began to crystallize into a doctrine of white supremacy. American freedom and the idea of innate racial difference were born together. Historian Barbara Fields calls them "Siamese twins."

### 13. D. They were deemed innately inferior

Throughout much of history, societies have enslaved people, often as a result of conquest, war or even debt. People were not enslaved because they were first deemed inferior. African slaves were well-suited to labor in North America: unlike the Indians, they were resistant to European diseases; they couldn't easily run away; they were not Christians (and hence unprotected by English law); and they were skilled semi-tropical farmers. Finally, in the late 17th century, African slaves became available in large numbers just as the original labor force on Virginia's tobacco plantations - English indentured servants - began to rebel and immigration from England slowed. Over time, the degradation of slavery became identified with blackness, giving white Americans the idea that Africans were a fundamentally different kind of people.

### 14. B. Democracy

United States' representative democracy drew upon the traditions of the Iroquois Confederacy. Indians didn't think of themselves as Indians when European settlers arrived, but rather as members of separate tribes or nations, divided by language, custom and religion. The idea of "blood quantum," i.e., the determination of Indian identity by ancestry, was imposed by the federal government. In contrast, tribal membership traditionally was open to anyone, even Europeans, as long as they accepted tribal customs and authority. There were no horses in the New World until they were brought over by Europeans. Measles, small-pox and other communicable diseases were also unknown in the Americas prior to European exploration. Some historians estimate that up to 90% of all Atlantic coast Indians died from diseases contracted from European traders and explorers by the time of the first Plymouth settlement.

### 15. E. 98 percent

Beginning in the 1930s and 1940s, the federal government created programs that subsidized low-cost home loans, opening up home ownership to millions of Americans for the first time. At the same time, government underwriters introduced a national appraisal system tying property value and loan eligibility to race, inventing "redlining," and effectively locking nonwhites out of home-buying just as most middle class white Americans were beginning to purchase homes.

### 16. D. Affirmative action quotas

Federal affirmative action guidelines specifically prohibit quotas. Beginning in the 1930, the Federal Housing Administration and related programs made it possible for millions of average white Americans to own a home for the first time and set off the post-WWII suburban building boom. The government established a national neighborhood appraisal system, explicitly tying mortgage eligibility to race, a policy known today as "redlining." The FHA and other government policies made possible the post-World War II all-white suburbs, while people of color and in central cities were denied loans. Government policies and practices helped create two legacies that are still with us today: segregated communities and a substantial wealth gap between whites and nonwhites, much of which can be traced to the differential value of their homes.

### 17. B: Eight times as much

Probably no one statistic better captures the cumulative disadvantage of past discrimination than wealth. Even at the same income levels, whites still have, on average, twice as much wealth as nonwhites. Much of this difference is due to the different rates of home ownership and the different values of homes in white and Black neighborhoods. But wealth is not only the end point, it's the starting line for the next generation - helping finance your children's education, helping them through hard times, or helping with the down payment of their own home. Economists estimate 50-80% of one's lifetime wealth accumulation can be traced to this head start. As wealth gets passed down from generation to generation, the legacy of past discrimination accumulates, giving whites and nonwhites vastly different life chances.

### 18. D. White net worth is more than two times greater

See above (Question #17) for explanation.

### 19. C. Less than 1%

According to the 2000 Census, whites are more likely to be segregated than any other group. This is largely a result of past housing discrimination, but it is perpetuated today by unfair practices such as predatory lending, racial steering and a substantial wealth gap between black and white families. Today, 71% of whites own their own home, compared to 44% of African Americans. Black and Latino mortgage applicants are 60% more likely than whites to be turned down for loans, even after controlling for employment, financial, and neighborhood characteristics. On average, nonwhites who are approved for mortgages still pay higher rates.

**20. A. 1964 Civil Rights Act**

The Civil Rights Act made racial discrimination in public places illegal. The other programs are all examples of racial preferences - for white people. Over a 40-year period, the Homestead Act gave away, for free, 270 million acres of what had been Indian Territory, almost all of it to white people. The Naturalization Act allowed only "free white persons" to adopt citizenship, thus opening our doors to European immigrants, but barring Asians and other groups. Racial barriers to citizenship were not removed until 1952. The Federal Housing Administration made it possible for millions of average white Americans - but not others - to own a home for the first time. (see #16 above). And the Social Security Act specifically exempted two occupations from coverage: farm-workers and domestics, both largely non-white.

<BACK TO TOP

▲ back to top

**Home    Titles A-Z    New Releases    Shopping Cart    Order Tracking    Contact Us**



1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                      *
4    LOCAL, 8027 AFT-NEW HAMPSHIRE,   *
     AFL-CIO, ET AL.,                 *
5                                     *
                    Plaintiffs.       *
6                                     *
               v.                     *  No. 1:21-cv-1077-PB
7                                     *  September 14, 2022
                                      *  1:00 p.m.
8    FRANK EDELBLUT, IN HIS OFFICIAL  *
     CAPACITY ONLY AS THE             *
9    COMMISSIONER OF THE NEW          *
     HAMPSHIRE DEPARTMENT OF          *
10   EDUCATION, ET AL.,               *
                                      *
11                  Defendants.       *
                                      *
12   * * * * * * * * * * * * * * * * *

13          TRANSCRIPT OF MOTION HEARING
         BEFORE THE HONORABLE PAUL J. BARBADORO
14

     APPEARANCES:
15

     For the Plaintiffs:      Charles Moerdler, Esq.
16                            David Kahne, Esq.
                              Elizabeth Clarke Milburn, Esq.
17                            Stroock Stroock & Lavan LLP

18                            Gilles R. Bissonnette, Esq.
                              American Civil Liberties Union
19                            of New Hampshire

20                            Peter J. Perroni, Esq.
                              Nolan Perroni, P.C.
21

     For the Defendants:      Samuel R. V. Garland, Esq.
22                            N.H. Attorney General's Office (Civil)

23   Court Reporter:          Brenda K. Hancock, RMR, CRR
                              Official Court Reporter
24                            United States District Court
                              55 Pleasant Street
25                            Concord, NH 03301
                              (603) 225-1454

|   |   |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  All rise for the Honorable Court.  Please |
| 3 | be seated. |
| 4 | This Court is in session and has for consideration |
| 5 | hearings on Motions to Dismiss in civil matter 21-cv-1077-PB, |
| 6 | Local 8027, et al. versus New Hampshire Department of Education |
| 7 | Commissioner, et al. |
| 8 | THE COURT:  All right.  Welcome, everybody.  It's a |
| 9 | big courtroom.  This is the first day I've had my courtroom |
| 10 | restored to normalcy after two years of pandemic construction |
| 11 | work in here.  I actually can see the people who are going to |
| 12 | be arguing in front of me, which is great, because part of the |
| 13 | time I'm, like, looking around barriers to see if I can see the |
| 14 | advocates when they're talking. |
| 15 | So, my thanks to everybody who has worked to put the |
| 16 | courtroom back together today.  This is a good a day for it, |
| 17 | because there are some other people here, which usually is not |
| 18 | the case. |
| 19 | So, let me lay out for you how I want to proceed.  As |
| 20 | the litigants know, there are two lawsuits here.  One of the |
| 21 | lawsuits asserts only a vagueness claim.  The other lawsuit has |
| 22 | two vagueness counts, a First Amendment count and another count |
| 23 | that I don't think does anything that's really distinct. |
| 24 | The way I want to proceed is to address the vagueness |
| 25 | claim first.  I want to give the defendant an opportunity to |

1   outline their argument with respect to vagueness.  I note that

2   one of the complaints includes two counts on vagueness.  I will

3   let you know that I don't construe those as setting forth

4   distinct causes of action.  Rather, I see them as asserting

5   additional theories as to why the statute is vague.

6          So, when your turn comes you should feel free to argue

7   either of those two counts on vagueness; and the Attorney

8   General's Office, to the extent it wants to in its initial

9   presentation, can present on that count as well.  So, Count One

10  in the first complaint and Count One and Two of the second

11  complaint.

12         So, I'll hear the Attorney General's Office.

13         Perhaps it makes sense for whoever is going to

14  advocate for the party that just has the one-count complaint to

15  go next, unless you've internally arranged for a different

16  order, and then have the other plaintiffs' counsel say anything

17  they want to say to supplement.  I'll give the Attorney

18  General's Office a brief opportunity to reply.

19         People who know me know I also ask questions to people

20  out of order, so just be ready for that.

21         And then we'll go into the First Amendment claim that

22  is only asserted in one of the two actions.  I'll hear the

23  Attorney General's Office as to why that should be dismissed

24  and hear the response from the other side.  So, we'll go that

25  way.

1     So, Counsel, you're up, and tell me why you believe

2     the vagueness counts in the two complaints should be dismissed.

3     MR. GARLAND:  Thank you, your Honor.  I was planning

4     to treat them together as well, so that's a helpful

5     clarification.

6     So, under U.S. Supreme Court case law, First Circuit

7     case law and case law this court has also applied frequently,

8     the real threshold question or, really, the thrust of a

9     vagueness claim is, when it's brought as a facial matter, is,

10    is there no discernible standard of conduct in the statute.

11    THE COURT:  Wow, you're going to start right up and

12    get questioned really closely about that assertion.

13    MR. GARLAND:  I anticipated I would be, your Honor.

14    THE COURT:  You make that claim in your initial brief.

15    The defendants respond and say, Whoa, you've forgotten Johnson

16    and Dimaya in which the --

17    Folks can come in.  Can we -- there's a bunch of

18    people that want to come in.

19    THE CLERK:  There is an overflow courtroom.

20    THE COURT:  Oh.  If there are not seats here, there is

21    another courtroom where things will be broadcast.

22    THE CLERK:  Courtroom 1.

23    THE COURT:  But if you can find a seat, you're welcome

24    to come and sit.

25    So, as I was saying, the defendants say you've

1  completely ignored more recent Supreme Court case law in

2  Johnson and Dimaya which specifically rejects the theory on

3  which you're basing your motion, and in your reply you don't

4  even address that argument.

5          So, now is your chance.  Tell me why you've left me in

6  suspense as to why the plaintiffs are wrong in claiming that in

7  Johnson and Dimaya the Supreme Court expressly said, This is

8  not our test for vagueness challenges.

9          MR. GARLAND:  Understood, your Honor.  It was

10  certainly not my intention to leave you in suspense.

11          But I think Johnson and Dimaya are kind of, my

12  understanding of them is they are largely one-off cases that

13  dealt with the categorical rule that was being challenged in

14  those cases, and that subsequent to those cases this court, the

15  First Circuit as well, has applied the general standard to

16  vagueness challenges, facial vagueness challenges, that don't

17  implicate criminal statutes or sentencing laws that have kind

18  of that, the unique categorical approach --

19          THE COURT:  Well, you're saying two things that I'm

20  hearing:  Johnson and Dimaya are one-off cases, they only apply

21  to Johnson and Dimaya and nothing else, but then it seems like

22  you're suggesting a categorical distinction between criminal

23  and civil?  Is that what you're saying?

24          MR. GARLAND:  I'm not, your Honor.  Forgive me.  I may

25  be misusing the term, but I was referencing the specific

1    provisions that Johnson and Dimaya concern which -- I'm

2    forgetting the term of art for the sentencing and the felony --

3    forgive me.

4         I'm not trying to draw a categorical distinction, your

5    Honor, no.  But I do think when you're dealing with a statute

6    that has civil application the First Circuit and this court

7    have continued to apply the no-discernible-standard test.  I

8    think I would have to identify the specific --

9         THE COURT:  I don't think -- I've searched, because

10   you didn't give me anything in your brief.  I can find no First

11   Circuit case that squarely takes on the Johnson and Dimaya

12   statements and concludes that, oh, those cases are limited to

13   civil -- criminal, or those cases are limited to their facts.

14   If you've got one, tell me which one I should look at, because

15   I didn't find one of those.

16        MR. GARLAND:  It may be true, your Honor, and I will

17   defer to you, unless I can find one otherwise, that they

18   haven't specifically conducted that analysis.  I do believe,

19   and I'm going to have to find a case for you, and so forgive

20   me, and I'll certainly correct the record if I'm wrong about

21   this, that the First Circuit has applied the general vagueness,

22   the pre-Johnson and Dimaya vagueness test, and I'm certain that

23   this Court has.  I know that it's not binding on you, but Judge

24   Laplante did recently in a case that both Attorney Bissonnette

25   and I were --

1    THE COURT:  I mean, I have unlimited respect for Judge

2    Laplante, but this is not a court that has the ability to bind

3    other judges.  I have to make my own independent determination

4    on that.

5        Okay.  And I think you're aware that other courts have

6    rejected the view that -- other Circuits have rejected the view

7    that you're advancing, that that standard survives Johnson and

8    Dimaya.  Do you disagree with that?

9        MR. GARLAND:  I don't dispute that, your Honor.  I

10   believe also that the D.C. Circuit has applied the previous

11   standard post Johnson and Dimaya.

12       THE COURT:  But without taking on the Johnson and

13   Dimaya statement, yeah.  The problem is -- I mean, let's go

14   back and just revisit Johnson briefly.  Johnson, as you know,

15   is an opinion by Justice Scalia, who's always quite clear in

16   what he says and what he means, and he specifically says, I'm

17   quoting now:

18       In all events, although statements in some of our

19   opinions could be read to suggest otherwise, our holdings

20   squarely contradict the theory that a vague provision is

21   constitutional merely because there is some conduct that

22   clearly falls within the provision's reach.

23       He then goes on to cite two prior Supreme Court cases

24   for that proposition, and he says, These decisions refute any

25   suggestion that the existence of some obviously risky crimes

1    establishes the residual clause's constitutionality.

2           I mean, that isn't a statement saying that <u>Johnson</u> and

3    <u>Dimaya</u> are -- these are unique cases to which this standard

4    doesn't apply but it applies to others.  It simply says, Our

5    prior holdings do not hold that something -- and, as the court

6    goes on to explain, and this is the problem I'm having, I think

7    you will agree with this, if that is the standard, then the

8    only facial vagueness challenge that a court could ever sustain

9    to a statute is to a statute that is incomprehensible in all of

10   its possible applications.  It's essentially a statute that is

11   nonsensical, because, as the Court acknowledges, every statute

12   is going to have some applications that will be not vague, and

13   this statute has applications that would not be vague.

14          So, if you're right about the standard, I think you

15   win.  Maybe they can explain why I'm wrong about that.  But I

16   think you're wrong about the standard, so that's why you need

17   to really defend this proposition, because I think, if you're

18   right about it, it's hard for me to see how this statute is

19   vague in all possible applications.

20          For example, if a teacher decided to put up White

21   nationalist posters in her classroom and teach White

22   nationalism, that White people are inherently superior to Black

23   people, does anybody say it's unclear that that statute would

24   prohibit that?  I mean, it clearly prohibits that.

25          So, there are applications of the statute that would

1    be not vague.  So, if you're right about the standard, it seems

2    you win, but it seems like, to me, like you're wrong about the

3    standard.

4           So, what would you like to say?

5           MR. GARLAND:  Understood, your Honor.  I think my

6    response to that would be we had presented a particular legal

7    argument in our motion, and we haven't briefed the other one,

8    and I don't want to do that in an abstract sense, and I

9    understand we received the invitation to do so and maybe missed

10   the mark.

11          What I would say, though, is I do not read Johnson and

12   Dimaya for the proposition that a law that can be read as a

13   matter of statutory construction subject to guidance from the

14   enforcing agencies in a way that is understandable, largely

15   understandable, can be defeated by coming up with hypothetical

16   examples where it's inapplicable.

17          THE COURT:  I agree with you that -- so facial

18   challenges like this one are much harder to establish than an

19   as-applied challenge, and the plaintiffs have not elected to

20   present me with an as-applied challenge, but that is a -- it

21   would be much easier for the Court to look at a case in which a

22   plaintiff seeks pre-enforcement review and says, I want to

23   teach implicit bias, and this is how I teach implicit bias, and

24   I can't tell whether the statute would subject me to losing my

25   teaching credential if I taught it, and for that reason it's

1    unconstitutional as applied in this context.

2          The typical as-applied challenge is much easier for a

3    court to address.  A facial challenge, I agree with you the

4    plaintiffs cannot win merely by positing kind of bizarre

5    hypotheticals and saying it might be vague in that context.

6          One example that strikes me as kind of bizarre that is

7    a fifth-grade teacher who explains to her students that, Well,

8    you're not mature enough to drive; you have to develop maturity

9    to reach a driving age.  That would be a violation of the

10   statute.  That seems to be pretty far-fetched, and I don't

11   think I need to take on every hypothetical that the plaintiffs

12   could possibly think up because lawyers have unlimited

13   creativity, and I'm not going to engage in 45 hypothetical

14   situations.

15         But we have more than that here.  We have some real

16   significant issues, like implicit bias, which is something that

17   is clearly of concern to the teachers here, to the

18   administrators here, it was of concern to the -- obviously of

19   concern to the drafters of the legislation, because they talk

20   about unconscious bias.  It was a concern to the drafters of

21   the comments.

22         So, I think we have to -- we say, yes, I'm not going

23   to address and resolve every hypothetical.  A statute is not

24   vague if it is vague in a single application that has no real

25   bearing to the core issues that the statute addresses, but it

1    doesn't have to be vague in all applications if I follow the

2    direction of Justice Scalia in Johnson and, I believe, Justice

3    Kagan in Dimaya.  And so, that's why I think the foundational

4    principle on which your motion rests is at least concerning to

5    me because of the argument that the plaintiffs present.

6              MR. GARLAND:  Understood, your Honor.  One additional

7    point I'd make on that, and I'm happy to address some of what

8    may be closer hypotheticals, is, I also don't read Johnson and

9    Dimaya to contemplate that this is anything other than a legal

10   issue, and so if the -- your criticism is well taken, and if

11   you determine, You haven't presented me with the right

12   argument, I can't grant your motion, I understand that, but I

13   don't think it means that this case proceeds on into full-blown

14   discovery.  I think the question still is, is the text of this

15   statute sufficient, and, though I would have to ask it with my

16   tail between my legs, I think it's still something susceptible

17   to briefing.

18             THE COURT:  No, you should proceed with your argument.

19   I'm just saying that's a theoretical, a foundational concern

20   that I have that I've struggled with when I've tried to make

21   sense of the argument.  But you clearly maintain that argument

22   for purposes of pressing your case, and you're entitled to

23   develop it further if the case proceeds further.  But I still

24   have to decide whether the statute is unconstitutionally vague

25   on its face, so I still have to engage in this.

1    So, let me ask you do you agree that cases like one of

2    the cases you rely most heavily on, Hoffman, talk about factors

3    that can affect a facial vagueness challenge?  The Flipside

4    case, Hoffman, do you remember that one?

5         MR. GARLAND:  Yes, I do.

6         THE COURT:  So, that case identifies things like, if a

7    statute could be applied in ways that impinge upon First

8    Amendment protected rights, that is more likely to be a statute

9    that is going to be found unconstitutionally vague, right?

10   Vague in all of its application standard doesn't apply in that

11   context.  Do you agree with that?

12        MR. GARLAND:  I do agree with that, your Honor.

13        THE COURT:  Do you also agree that that case says that

14   whether a statute has a *scienter* requirement can be important

15   in determining whether something is vague or not?

16        MR. GARLAND:  I agree with that, your Honor, yes.

17        THE COURT:  Okay.  Do you agree that this statute,

18   these statutes -- when I say "statute" I mean all of the

19   sections in 354-A, the educational provision, in particular --

20   that none of those statutes have a *scienter* requirement

21   attached to them?

22        MR. GARLAND:  They don't have a -- yes, your Honor, I

23   agree with that insofar as it doesn't say "knowing," it doesn't

24   say "purposely," et cetera.

25        THE COURT:  So, let's get to what -- I understand your

1    concern, because some of the plaintiffs' briefing is to, like,

2    spin out 30 different hypotheticals, and some of them seem to

3    me quite far-fetched, but I can let you know of my core

4    concern.  This statute doesn't have a *scienter* requirement

5    attached to it, and it seems to me that the Attorney General's

6    Office is asserting that the statute can be violated even if

7    you don't expressly advocate a banned concept, if you advocate

8    in a way that implies that a banned concept is true.  Do you

9    think the statute could be construed to be violated if an

10   educator in teaching implies that a banned concept is true?

11        MR. GARLAND:  That certainly is not my understanding

12   of it, your Honor.

13        THE COURT:  Okay.  Let me show you what I'm concerned

14   about here.  So, your office, your boss, issued a formal AG's

15   opinion interpreting the statute, right?

16        MR. GARLAND:  Yes, your Honor.

17        THE COURT:  Okay.  And if we go and look at that

18   provision, and we look specifically at the provision that

19   discusses the sensitivity training safe harbor -- do you know

20   what I'm talking about?  It's at page 7 of 9.

21        MR. GARLAND:  Yes.  I'm familiar, your Honor, yes.

22        THE COURT:  Okay.  So, if we go halfway down the page

23   I'll read the key portions of it slowly, just so you'll

24   understand my concern.

25             "'Sensitivity training' includes implicit bias

1    training.  Implicit bias training is premised on teaching

2    people about biases they may have of which they are not

3    consciously aware and helping them become aware of those biases

4    so as to encourage treating others with dignity and respect and

5    to avoid treating others less equally.  Implicit bias training

6    recognizes that biases develop over time through such means as

7    personal experiences, messaging people may receive from media

8    and other sources.  Implicit bias training does not violate

9    Section 297 unless it includes concepts of group superiority or

10   inferiority based on inherent or innate group characteristics

11   or concepts that an identified group should be treated

12   unequally or discriminated against."

13          And then in the second paragraph it goes on to talk

14   about the sensitivity training safe harbor in the statute, and

15   what concerns me is the final couple of sentences in that

16   paragraph.  But if someone -- I guess I have to read the

17   sentence above.

18          "For example, a public employer or government program

19   may create a web-based resource entitled, 'Anti-Racist

20   Resources,' and include information designed to promote a

21   better understanding of racism and how to combat racism.  But,

22   if that web-based resource stated that it was designed to

23   'serve as a resource to white people' or to 'serve as a

24   resource for our white employees,' then it could violate

25   Section 297 because it may imply that White people

1    specifically, and for no other reason, are in need of

2    anti-racist resources-resources that could benefit people from

3    all backgrounds."

4         That suggests the Attorney General is saying to

5    people, educators or people who offer sensitivity training,

6    that if you do something that implies that a banned concept is

7    true you could be subject to discipline for violating the

8    statute.  Now, the statute doesn't say that by its terms, but

9    that's how the Attorney General interprets the statute, and

10   that seems to broaden quite expansively, especially when you

11   note that there's no *scienter* requirement.  So, a person could

12   unknowingly teach something that does not expressly advocate a

13   banned concept but that could be understood to imply, even

14   though they do it unknowingly, and they could be disciplined

15   for violating the teacher ethics code.

16        That's where my core concern is.  I think a lot of the

17   things the plaintiffs say, lawyers do what lawyers do, but I

18   think that is -- the core concern I have is, to the extent that

19   the statute can be read and the Attorney General appears to

20   read it to prohibit conduct that does not expressly advocate a

21   banned concept, since there's no *scienter* requirement to the

22   statute, that leaves educators in great doubt as to whether

23   their conduct may comply or not.

24        That's my core concern.  Please feel free to take

25   whatever time you need to answer it.

1     MR. GARLAND:  Absolutely, your Honor.  I have a number

2     of responses to that.  I want to engage with it head on, but

3     then also I have a couple of other points I'd like to make with

4     respect to it.

5         The first is I do not understand, based on my

6     representation to you as a Department of Justice official, that

7     that statement is designed to expand the scope of the statute

8     at all to a world where people who perceive or this subjective

9     perception would be what governs the conduct.  I think our

10    view, as we've laid out hopefully fairly clearly in our

11    briefing, and that the FAQs and the Attorney General's Opinion

12    otherwise identified, is the affirmative act.  It is the

13    affirmative act of doing this.  You use the word "advocate" I

14    think as a fine way to put it.  And so, to the extent that

15    specific portion of this opinion --

16        THE COURT:  Yeah, if you read the statute narrowly and

17    literally, what it bans is -- I want to use the term "advocate"

18    because different statutes use a different litany of things,

19    but I think "advocating" is a good way to describe it, that

20    something is, that something is not, that something should or

21    should not be, and then it makes those statements about what

22    that is or that should be or should not be, et cetera.

23        And if that's all and only what they did it's quite a

24    very narrow statute, but if it could encompass within its sweep

25    conduct that is unintentional but that is deemed by someone to

1     imply the advocacy of a concept, it becomes quite problematic.

2          That's where I'm concerned, and, since the Attorney

3     General issues an official legal opinion in which he states

4     that there can be violations by conduct that does not state but

5     that implies, doesn't that give teachers good reason to fear

6     that it might be applied in that way to them?

7          MR. GARLAND:  Your point is well taken, your Honor.  I

8     do not understand that to have been the intent at all of this

9     Opinion, and it certainly isn't the position I'm here

10    advocating today.

11         THE COURT:  I think what we do have to make clear

12    today is not the day in which this issue would be necessarily

13    resolved.  If I were to grant your motion in its entirety, the

14    case would be resolved.  If I were to deny your motion, it

15    would be only to say that this states a plausible claim that it

16    is unconstitutionally vague, and it's possible that, as things

17    develop, we would probably next revisit it on cross-motions for

18    summary judgment after some limited discovery has occurred.

19         So, it doesn't necessarily follow.  That's my concern.

20    Whether you've addressed it sufficiently as to justify

21    dismissal at the 12(b)(6) stage is one thing.  If you haven't,

22    we just go on to the next stage.

23         MR. GARLAND:  Understood, your Honor, and I think I

24    have two specific responses to that.  They're related.  The

25    first one is we haven't presented this to you as largely a

1    legal question, there's no cross-motion seeking judgment on it,

2    but we present it to you as a matter of statutory construction,

3    and we've used our Guidance documents and the Attorney

4    General's Opinion to put in front of you a construction that we

5    believe survives a facial challenge as a matter of law.

6              But, as a federal judge or any other judge that's

7    considering this, you are able to, it is certainly within your

8    power to say, You know what?  I agree with everything you said,

9    but I don't agree with that statement.  To the extent that

10   statement could be read in the manner that you've expressed

11   concern about, that creates problems and as a matter --

12             THE COURT:  Well, we all agree that, I think we would

13   all agree, that I do not have the power to rewrite the statute

14   to save it, and I wouldn't try to do that.  But I do agree with

15   you to the extent that you're suggesting in order to address

16   their vagueness challenge you have to construe the statute,

17   right?  And so what you're saying is, if you adopted a

18   sufficiently narrow construction, then you wouldn't have the

19   vagueness problem that you're raising.

20             MR. GARLAND:  I think that's right, your Honor, and I

21   think what you could very well do in a memorandum order would

22   be to say, you know, I have acknowledged at oral argument or I

23   brought up at oral argument that this particular provision in

24   the AG's Guidance could create a problem as a matter of

25   statutory construction, based on the verbs that are used in the

1    statute, consistent with the doctrine of constitutional

2    avoidance, I reject that that is a plausible construction or is

3    an appropriate construction because it creates issues that,

4    frankly, judges don't create when they're construing statutes.

5          THE COURT:  Right.  But, again, we have to draw the

6    line.  A judge can't and shouldn't try to save a statute --

7    this isn't a constitutional avoidance kind of claim where I

8    have some duty to construe the statute to try to save it.  It's

9    either vague or it isn't.  I just have to say what it means.

10   And I agree with you, if I said that it meant only conduct that

11   expressly advocates and not anything by implication it would be

12   a far narrower statute and probably of far less concern to the

13   plaintiffs.  But that's not what the statute says.  I would

14   have to give it that construction, and certainly I shouldn't

15   disregard an official Attorney General opinion that construes

16   the statute more broadly than I think it should be -- that I

17   would have to think it's construed to adopt your argument here.

18   See what I'm saying?

19         MR. GARLAND:  I do, your Honor, but I do think it is

20   within your power, and I believe there's a good deal of Supreme

21   Court case law that supports the proposition that facial

22   invalidation is strong medicine; that you aren't required to

23   read it in a way that the language doesn't support, but, to the

24   extent there are plausible readings one way or the other, you

25   can elect the narrower one.  You can also certify the question,

1    which we've raised the specter of, but I think ultimately it's

2    well within your power sitting in this proceeding.

3           THE COURT:  Yeah.  The problem with me is that my

4    construction would not be authoritative.  It might be helpful

5    for people to know what I think about it, but what ultimately

6    matters is what the New Hampshire Supreme Court thinks about

7    it.  They have the final word on what the statute means, not

8    me.

9           If you wanted to go on, I did have another question

10   for you on a different topic, but do you have anything else you

11   want to say in support of the vagueness argument?  Of course,

12   I'll give you a chance to reply after the other side's

13   argument.

14          MR. GARLAND:  I have two very relatively small points

15   on what we were just discussing.  The first is that I think the

16   language of the statute itself does support the proposition --

17   this is really dealing with, as you term it, advocacy, and if

18   you look at 193:40 it talks about the express belief in or

19   support for, which I do think contemplates an affirmative act.

20   It doesn't say "knowingly," it doesn't say "purposefully," and

21   I acknowledge that, but I do think it contemplates some

22   affirmative act, not some perception or inference from the act.

23          And so, I do think the construction you've identified

24   that creates fewer problems, which I -- the construction I

25   intended to advocate today is one that is supported by the

1    explicit statutory text, so I don't think you'd be rewriting

2    the statute to adopt that in an order.

3            THE COURT:  You say that I could -- I just want to be

4    sure that I've got your position.  You believe that I have the

5    power to, and you would not object if I were to, construe that

6    statute to say it only applies to advocacy written broadly to

7    encompass all the various kinds of things that expressly

8    advocates one of the banned concepts, and that it cannot be

9    violated based on someone advocating a banned concept by

10   implication; they have to do it expressly.

11           MR. GARLAND:  Yes, your Honor, and I think that's

12   consistent with 99 percent of the argument I've tried to make.

13           THE COURT:  That would require me to reject that

14   portion of the Attorney General's Opinion when he says

15   something different from that.

16           MR. GARLAND:  I understand, your Honor.

17           THE COURT:  Okay.  All right.  So, what else do you

18   have?

19           MR. GARLAND:  The only other point I would make with

20   respect to that portion of vagueness, your Honor, is that, to

21   the extent there were some concern kind of around the margins,

22   understanding you've identified Johnson and Dimaya as from a

23   standard standpoint about whether implied conduct could violate

24   it, I still am not sure that makes the statute facially vague.

25   I think that's a question that could get resolved really

1    through an as-applied challenge, to the extent it were ever

2    enforced in that manner.

3           And so, I disagree, and I've said today and I'm saying

4    this explicitly, that it should get to inferred conduct or

5    implied conduct, but, to the extent that were a concern, I'm

6    not sure it's a concern that couldn't be sufficiently resolved

7    on a case-by-case basis that would require you to reject the

8    statute outright.

9           THE COURT:  Yeah.  The problem is what is the standard

10   against which you identify when something crosses the line into

11   implying, especially when there's no requirement for *scienter*.

12   You can cross the line unknowingly and be subject to

13   discipline.  So, that's where you would want to have some kind

14   of guidance as to when something is deemed to imply versus not

15   imply something.  That's, I think, the principal problem.

16          I doubt any of the plaintiffs are going to get up and

17   say, I want permission to advocate one of the banned concepts

18   expressly and literally.  What they're concerned about is, I'm

19   afraid in doing my ordinary teaching someone's going to haul me

20   up on charges by implying that I've advocated a banned concept.

21   I think that's got to be what their core concern is.

22          Maybe the plaintiffs have some -- they want to

23   advocate specifically some banned concept, but it doesn't sound

24   like that's what's taught in the schools to me, and so I'm not

25   sure anybody is going to stand up and say, Well, that's what I

1    want to teach.  They want to teach things that someone might

2    argue by implication strays into a banned concept, such as --

3    you're well aware of what implicit bias training is like, and

4    my understanding of implicit bias training is that it teaches

5    that people are prone to stereotypical thinking, they're prone

6    to in-group and out-group stereotyping, and that that can cause

7    people to unconsciously treat people differently based on their

8    race.  Well, you say implicit bias training is fine, but when

9    does it stray into something that is a banned concept if a

10   banned concept can include everything that implies?  So, that's

11   my concern.

12          But let me ask you about -- I'd ask you, since you've

13   asked me to interpret the statute, let me ask you to put on

14   your statutory construction hat and construe the fourth banned

15   concept for me, because that's the one that I have the most

16   difficulty with.  I've spent several days kind of parsing it

17   and trying to think about what it means, and I'm interested in

18   what you say it means.

19          So, you can pick any -- the banned concepts are the

20   same in all of the statutes, I think, but if you want to take

21   the education provision, the specific education provision, you

22   can do that, if you want to do one of them, but just help me

23   understand what you think the fourth concept discusses.

24          MR. GARLAND:  Yes, your Honor.  And I acknowledge that

25   I believe in the <u>Honeyfund</u> case the judge identified really the

1    triple negative in a comparable Florida statute as creating a

2    problem.  How I would read it, and this is actually taken

3    directly from part one of I think both sets of Frequently Asked

4    Questions, is that advocacy that persons in one of the

5    identified groups should not treat members of another -- other

6    identified group equally.  So, it isn't saying -- it's not

7    advocating for a --

8              THE COURT:  Well, let's separate -- it does two

9    things.  It says "cannot," and it says "should not," right?

10   Let's focus on "cannot" first, because you can violate it by

11   advocating that -- and I'll use -- for clarity sake I'll just

12   focus on race, okay?

13             So, the fourth banned concept with respect to "cannot"

14   says, as I'm understanding it, that people of one race cannot

15   treat others without regard to their race, and that seems to be

16   starting to implicate -- if we put in the words "can have

17   difficulty in treating people," that sounds like the core of

18   what implicit bias is.  So, I wouldn't say that, at least the

19   implicit bias training that I'm familiar with doesn't say that

20   someone cannot do it, but they try to teach you about implicit

21   bias so that you can become aware of the potential and

22   hopefully avoid engaging in that kind of stereotypical

23   thinking.

24             But that statute appears -- that provision, the fourth

25   concept on "cannot" seems, if anything, to be even broader than

1   the second concept, because the second concept has a limiting

2   term "inherently" in it.  "Inherently" is important, because

3   that is not my understanding of what implicit bias is.  It's

4   not an inherent characteristic of being White that produces

5   implicit bias.  So, the third concept at least has another

6   limiting term in it, but that term is not in the fourth concept

7   at all.

8          So, if it teaches that something cannot, a White

9   person cannot treat a Black person equally and cannot may imply

10  that they cannot because they're teaching that it often happens

11  that they have difficulty in doing it, then someone who is

12  trying to teach implicit bias the way it's supposed to be

13  taught and the way, according to your Frequently Asked

14  Questions, you want it to be taught, could still result in

15  charges being brought against somebody.  That's the concern.

16         MR. GARLAND:  I understand the concern, your Honor.  I

17  think the race example is probably a good one, because my

18  understanding, and the position that I'm here taking today, is

19  this is basically -- I'm sure the Court is familiar with the

20  concept of colorblindness, as kind of a -- that you shouldn't

21  treat anybody differently because -- like you should

22  functionally be blind to the race of a person.  And my

23  understanding of this provision is it's saying you can't tell

24  someone they can't do that.  That's it, that it's not requiring

25  that somebody do anything beyond that, that it prohibits only

1    that sort of conduct, that this idea of this theory that --

2         THE COURT:  All right.  Students come into the

3    classroom and ask the teacher, Can we talk about reparations as

4    an issue?  Can the teacher talk about reparations, talk about

5    the thinking behind it, and if they were to advocate that

6    reparations is a good thing, wouldn't that violate the fourth

7    concept?  And if they advocate -- even if they don't advocate,

8    if they discuss the reparations movement in ways that could

9    imply agreement with that concept, then they might violate it,

10   right?

11        MR. GARLAND:  I don't think so, your Honor.  I think

12   that that, frankly, has the prohibition backwards; that it's

13   not prohibiting conversations where something raising conscious

14   would be -- you know, affirmative action I think is another

15   example.

16        THE COURT:  Reparations -- doesn't reparations involve

17   treating people differently because of their race?

18        MR. GARLAND:  And I don't think this prohibits a

19   discussion around that topic, your Honor.

20        THE COURT:  It prohibits advocating that they should

21   not be treated differently because of their race, doesn't it?

22        MR. GARLAND:  I'm going to think about how you phrased

23   that.

24        THE COURT:  See, that you and I are having so much

25   trouble even communicating about the fourth concept may tell us

1   something about the challenge.  First, we're both lawyers, and

2   we do statutory interpretation for a living, but if we're

3   having this much trouble about it, do you think a person of

4   ordinary intelligence looking at it with no special skills in

5   the law could clearly discern what that provision means or

6   doesn't mean?

7            MR. GARLAND:  I understand the point you're making,

8   your Honor.  I do think the guidance we provided does provide

9   that clarification.  You may disagree, but I think it really is

10  the idea that it's not prohibiting --

11           THE COURT:  So, I appreciate your effort with

12  Frequently Asked Questions, but those aren't regulations, those

13  aren't law.  That's just informal guidance that the issuer

14  could withdraw at any time, disregard, change, without any

15  consequence, really, right?

16           MR. GARLAND:  Yes, your Honor.

17           THE COURT:  Okay.  So, that's different from a

18  regulation.  If an agency -- like if the Human Rights

19  Commission issued regulations interpreting this provision, then

20  arguably it would have some force of law if it was a

21  permissible interpretation of an otherwise vague statute, but I

22  can't really attach too, too much weight to the Frequently

23  Asked Questions responses, because they don't have the force of

24  law.

25           MR. GARLAND:  You can certainly attach persuasive

1   value, your Honor, and I think there are a number of cases

2   that, you know, if you were grappling between two plausible

3   constructions, again, that's all you'd be able to do, and you

4   say this one creates a problem and this one doesn't, I think

5   you can turn to the Guidance to find that plausible

6   construction, if you agree that it's plausible.

7           The other point I'd make with respect to this, and I

8   don't want to go too far down this road, but I do want to make

9   a point that we should have made in our briefing, and I

10  apologize for not.  There is a severance provision in the

11  statute.  So, they're asking for a strong remedy of striking

12  down the entire law.  They are not asking for any sort of

13  targeted relief, but the law itself has one.  We haven't

14  briefed that.

15          THE COURT:  Okay.  So, fair point to this extent:

16  I've been looking at the severance provision, but you did not

17  argue that that -- you might have argued that, even if the

18  first section is invalid, the second section survives, but the

19  plaintiffs haven't had a chance at this stage to engage with

20  you on that, and I would not grant, in part, dismissal at this

21  stage, because the plaintiffs haven't had any chance to brief a

22  specific argument about severance.

23          We may have to confront severance down the road later

24  on, and you've perfectly preserved that argument for later, but

25  I don't want the plaintiffs to feel that they have to respond

1    to something you throw out in oral argument like this, because

2    that would be a very complicated set of briefing that would

3    have to be used.  The appropriate time to invoke that would be

4    after I -- if I didn't dismiss the case in whole, to then,

5    after appropriate briefing, hear argument about, Well, even if

6    you didn't dismiss it entirely you should dismiss it in part,

7    and then they would have a chance to engage.

8            So, you've preserved the issue, but I'm not going to

9    take it up on the current motion.

10           MR. GARLAND:  And I apologize.  I wasn't advocating

11   that, your Honor.  We've moved to dismiss the case in its

12   entirety, and that's what we've asked you for.  And I do think,

13   in light of the Frequently Asked Questions, which I do believe

14   are a plausible basis to read the statute and resolve the

15   ambiguity you're identifying, that provides a basis for the

16   relief we're asking for.

17           THE COURT:  Okay.  Thank you.  I appreciate it.

18           MR. GARLAND:  Thank you.

19           THE COURT:  So, let me hear from plaintiffs, whichever

20   plaintiff wants to go first.

21           MR. MOERDLER:  May it please the Court, my name is

22   Charles Moerdler.  I am from the firm of Stroock & Stroock &

23   Lavan.  I'm here with Peter Perroni, my colleagues David Kahne

24   and Elizabeth Milburn, and we represent the AFT plaintiffs.

25           First, I would apologize to the Court if I sound a

1    little raspy and confused, but it's that time of year for

2    colds.

3              THE COURT:  That's fine.  That's fine.

4              MR. MOERDLER:  Your Honor, let me tell you, if I may,

5    the areas I would like to touch upon --

6              THE COURT:  Mm-hmm.

7              MR. MOERDLER:  And the questions I would like to

8    address, including each and every one of those that you put to

9    my adversary, because they were as if you had read my outline

10   in some --

11             THE COURT:  Well, I read your brief.

12             MR. MOERDLER:  That's it.  Your Honor, let me, if I

13   may, make two points at the outset.

14             The first is this is the third case in the District

15   Courts passing upon these four bans.  The first, of course, was

16   Santa Cruz.  Each of these bans *in haec verba* were in Santa

17   Cruz.  The second was Honeyfund, decided just a few weeks ago

18   in the State of Florida, and, again, the same four bans, with

19   one word difference.  So that you have here potentially,

20   potentially, an issue as to the weight that ought appropriately

21   to be given to those decisions if *stare decisis* survives after

22   recent decisions of another court.  But, to the extent it does,

23   then it is clear here that what must happen is some weight has

24   to be given to them, and I'm sure the Court will do what it

25   thinks appropriate.

1    THE COURT:  To the extent it's persuasive.  But we

2    trial judges have busy dockets, and we do the best we can

3    sitting alone, and we make our decisions, and I don't expect my

4    colleagues to give much weight to what I do, and I tend to look

5    at what other people do only to the extent it's persuasive.

6    The Courts of Appeals have months to study issues, they have

7    three-judge panels, so I tend to look more closely to Circuit

8    and Supreme Court precedent.

9    MR. MOERDLER:  I understand.

10   THE COURT:  But I, of course, will read them and give

11   them the weight they're due for their persuasiveness.

12   MR. MOERDLER:  All right.  The second point I wanted

13   to make to you is a standard on this motion.  This is simply a

14   motion to dismiss.  We did not seek a preliminary injunction

15   for two reasons.  The first reason, the most important one, is

16   the issue here is of critical importance to the educational

17   system of the United States, no ifs, no ands, no buts, no

18   maybes; there are no reservations on that statement.  Because

19   of that, we believe a complete record is indispensable and can

20   only be had by limited discovery followed either by a bench

21   trial or summary judgment at which your Honor can have a full

22   record to make a decision.

23   THE COURT:  You probably spoke to Mr. Bissonnette at

24   some point, since he's litigated in front of me on preliminary

25   injunctions, and he also knows that I tend to be very cautious

1   about granting preliminary relief, and what I ordinarily do is

2   let's have an accelerated discovery period and combine the

3   preliminary and the permanent, because I don't like to make

4   decisions on the fly without having a chance to think through

5   them, and I don't like people coming to me and making

6   dispositive arguments without them having a full opportunity to

7   develop.  So, I certainly grant preliminary relief on occasion,

8   but on an important issue like this I would have insisted that

9   we all take the time we need to think about it before we make

10   any decisions.

11          MR. MOERDLER:  Let me just, so that the record is

12   complete for your Honor, call to your Honor's attention a First

13   Circuit rule which I've not seen really repeated too much.  It

14   was in the Asociacion case decided in 2004.  A dismissal on the

15   pleadings will be upheld only if it appears beyond doubt that

16   plaintiff cannot prove any set of facts in support of its

17   claims which would entitle it to any relief.  And against that

18   background, the discussion that just preceded mine raises the

19   question in direct proportion.

20          I wanted those preliminaries before I go to this

21   issue.

22          THE COURT:  Can I ask you, so I have put the case to

23   your opponent that the foundational argument -- the foundation

24   for his vagueness argument is based on a standard that the

25   Supreme Court appears to have rejected in Johnson and Dimaya.

1    MR. MOERDLER:  It's done it in three cases, your

2    Honor.

3    THE COURT:  Okay, so maybe three.  I got two of them.

4    But of the two or three where they rejected it, and I'm going

5    to carefully consider what Mr. Garland said to me today about

6    this, and there are other Circuit Court cases that have

7    explored this issue that I will address, even though they

8    weren't in the parties' briefing, but I would ask you, that

9    standard -- and part of the reason why I doubt that that is the

10   standard is because, in my view, that's a standard that, except

11   in cases where constitutional conduct is implicated or the

12   exact facts of Johnson, it would be impossible to bring a

13   facial vagueness challenge, because every statute that I can

14   think of that might be challenged on vagueness grounds has at

15   least one application that's not vague, and this statute

16   appears to have one or more applications that would not be

17   vague.

18   Lawyers don't like to concede anything.  Maybe you

19   will refuse to do it, but would you agree that this statute has

20   some applications that would not be vague such as --

21   MR. MOERDLER:  Your Honor, I don't get to that point,

22   if I may.

23   THE COURT:  I know, but I'm entitled to ask you to get

24   to that point.

25   MR. MOERDLER:  You certainly are, and you're certainly

1   entitled to an answer from me.  But, if I may, let me get first

2   to what the basic -- the premise of the three cases is.

3          The third case was in 2019.  It's a lengthy opinion by

4   Judge Gorsuch, concurred in by six members of the Court.  It's

5   United States against Davis, reported at 139 Supreme Court

6   2319, and if I may read just one sentence from his opinion.  I

7   think it's only one.

8          When Congress passes a vague law, the role of the

9   courts under our *Constitution* is not to fashion a new or

10  clearer law *in haec verba* or otherwise.

11         THE COURT:  I'm with you on that.  I think Mr. Garland

12  agrees.

13         MR. MOERDLER:  But the problem is there are two ways

14  of fashioning a newer and clearer law, and those who have

15  clerked for the Court understands that.  One is by rewriting

16  it, and the other is by interpreting it, and so this case can

17  very easily raise that question in full frame:  Can you, by an

18  interpretation that -- I'm going to prove that in terms of

19  their interpretation of a section of this law, two sections, in

20  fact, that you can actually rewrite the law through

21  interpretation.

22         Let me give you an example, if I may.  You search this

23  law anywhere, and you do not see the words, *in haec verba* or

24  otherwise, of it being extended beyond the classroom.  To the

25  contrary, the first few words of this statute are, A pupil in

1    any, any state --

2        THE COURT:  Well, the Attorney General's Office agrees

3    that it applies outside of the classroom.

4        MR. MOERDLER:  And I say it does not.

5        THE COURT:  They say it can be construed to cover

6    conduct outside of the classroom.

7        MR. MOERDLER:  And that's exactly where we come to

8    part, because I don't believe, maybe I am wrong, that by

9    construction you can turn "yes" into "no," "stop" into "go."

10   The idea --

11       THE COURT:  Where do you find the limiting language

12   that would render the statute inapplicable to a coach, say, or

13   coaching a football team in an away game and having

14   communications with students there?  What is there in the

15   statute that you say makes it inapplicable to that conduct?

16       MR. MOERDLER:  If I may, the first four words come

17   right down to the point.  Let me, if I may:  "No pupil in any

18   public school..."  If it were written to be anything outside of

19   the public school it would read, No public school pupil in this

20   state shall be taught...  That's the English language.  Pause

21   it again, if I may --

22       THE COURT:  You mean physically on school grounds?

23       MR. MOERDLER:  Correct.  It's classroom.

24       THE COURT:  Okay.  There's certainly another way to

25   read that term.  I don't think that's the only way.

1    MR. MOERDLER:  May come into vagueness.

2    THE COURT:  Okay.  That it could be read narrowly to

3    apply only on school property?

4    MR. MOERDLER:  No, no.  I'm in the classroom.  I'm

5    even beyond the property.  It's in the classroom.  It's a

6    classroom definition.  Yes, maybe the hallways and maybe a

7    study hall as in -- it is curriculum intended.

8    THE COURT:  Well, if that's true -- I don't know if

9    you're making the First Amendment argument.

10   MR. MOERDLER:  No.

11   THE COURT:  Whoever is making that will then have to

12   deal with the argument that, Oh, if it's only limited to

13   curricular work, that's very clear, Garcetti applies, it's

14   government speech, the First Amendment doesn't apply.

15   So, whoever you delegate that task to, get ready

16   because your colleague is telling me it only applies in the

17   classroom, so it's only curricular and we all, you know,

18   courts, multiple Circuits have said Garcetti applies, it's not

19   First Amendment.

20   But you made your point.  I understand it.  So, why

21   don't you go on with --

22   MR. MOERDLER:  If I may, your Honor, I will deal with

23   precisely that issue when I get to the First Amendment.

24   THE COURT:  Okay.  Go ahead.

25   MR. MOERDLER:  But here I was trying to parse language

1    for a purpose, and I did not wish to give any offense in doing

2    so.  It was simply and solely to show that rewriting a statute

3    doesn't mean adding or deleting words.  It can be how it is

4    interpreted.

5           Let me give you one that's a little clearer.  All

6    right?

7           There is nothing in here that says extracurricular

8    activities are covered, and yet the opinion of the Attorney

9    General says that.  Now, let me go to that point, because it

10   becomes very important.

11          Johnny is on the swimming team.  Johnny is swimming.

12   He comes out of the pool and a teacher -- let's make it even

13   more ridiculous -- a teacher, not his own, he sees and says,

14   Hey, by the way, did you see the story on the Ukraine?  What's

15   the story between the Russians being oppressive and anti-human

16   in oppressing the Ukrainians?  Now you have the superiority

17   clause of the statute coming into play.  If it were done in the

18   courtroom, I mean, in the schoolhouse you're within the words

19   of the statute, but is it intended to be there?  I think not.

20   And if one reads --

21          THE COURT:  You're giving heavy weight to the word

22   "in," right?

23          MR. MOERDLER:  Yes.

24          THE COURT:  And you say it can only be read one way,

25   and that means physically on the school grounds.  But the issue

1    you raise seems to me to have greater potency when talking

2    about First Amendment, because, even if Garcetti applies,

3    Garcetti doesn't apply to every word that a teacher could speak

4    to a pupil, and so if they run into the pupil at the grocery

5    store with their parent and say something, that is unlikely to

6    be deemed not First Amendment speech.  So, it does have bearing

7    on that issue, but I don't think it's of central importance to

8    the particular vagueness argument we're discussing now.

9            MR. MOERDLER:  Let me, then, deal with the second part

10   of the presentation in that regard.  The focus has been on this

11   being a facial challenge.  At the time the complaint was filed,

12   both complaints, neither of us had any particular documents

13   that would tell us what the position of the State was, what the

14   position of the public was, et cetera.  Let me pause on that

15   sentence.

16           With respect, I do not believe that I, the lawyer who

17   has gone to law school for the purpose of understanding the

18   law, am the right person whose interpretation should at the end

19   of the day carry how it is to be construed, vaguely or

20   otherwise, as contrasted with the ordinary public.  In about

21   two minutes I will show you that since the complaint was filed

22   we now have a beginning of a peek as to how the ordinary public

23   regards it and thereby underscoring the absolute need for

24   discovery and the absolute need for understanding our point in

25   our brief that this is also as applied.

1    THE COURT:  I'm less interested, frankly, in how the

2    public, what they may deem a violation of the statute.  I'm

3    very interested in what the people who enforce the statute say.

4    And so, if you've got -- has the Human Rights Commission passed

5    on this?  Has a court passed on this?  Has the Department of

6    Education -- you in one of your complaints note that one of the

7    named plaintiffs had someone complain about the fact that they

8    signed a petition.  Now, you and I know, and I doubt

9    Mr. Garland would disagree, that that conduct is

10   constitutionally protected, it is not conduct for which they

11   can be disciplined under the statute, and it is completely

12   unreasonable to suggest otherwise.

13        You would agree with that, right, Mr. Garland?

14        MR. GARLAND:  Absolutely, your Honor.

15        THE COURT:  So, that some person thinks that that's

16   complainable under the statute doesn't really tell me anything.

17   What matters is the people who actually have to enforce the

18   statute.

19        MR. MOERDLER:  But you cannot leave without weight the

20   chilling effect that it has on any human being.  For example,

21   if Johnny asks the teacher a question, What is implicit bias?,

22   and the teacher has seconds to answer that question, clearly

23   the statute will have, certainly on all the publicity it's

24   attracted, some significant effect on the teacher being able to

25   respond, being able to deal with it and deal with learning.

1    And the complaint calls attention to the fact that there have

2    been those instances already where teachers feel that they

3    cannot teach adequately.

4            Can I respond to a question, What was Brown against

5    the Board of Education?, or am I violating the statute?

6            THE COURT:  With respect to you folks, I understand

7    your lawyers have to advocate, but some of that stuff seems to

8    me to be completely farfetched.  No teacher could be subject to

9    discipline under the statute for talking about Brown v. Board

10   of Education.  I think I've identified what my core concern is.

11   Maybe you have others.

12           But the problem is not that they won't be able to talk

13   about the Civil Rights Movement or something like that.  The

14   problem is that, to the extent they engage in conduct that

15   could be understood by somebody other than them to imply

16   advocacy of one of the banned concepts, that they could be

17   subject to dismissal for conduct that they don't intend to

18   engage in that they can't know by reading the statute is

19   clearly barred, that's where it starts to have problems.

20           MR. MOERDLER:  And so, let me take what you have just

21   said and take it to one step further as to the problem.

22           By statute in this state the teachers are required to

23   teach how bias came into being, intolerance, discrimination and

24   the like.  What it was by statute and how can we prevent it,

25   that in and of itself is a direct conflict with the statute.

1    And to make that point, because you obviously

2  frequently are called upon to resolve conflicting statutes, let

3  me point out to you that as recently as July of this year that

4  mandate was expanded as to what they have to teach.  Now put

5  myself in the position.  Can I teach and comply with the

6  statute; can I not teach and comply with the other statute?

7        THE COURT:  Again, let's go back to some of my

8  threshold concerns, because, to the extent I have a concern --

9        MR. MOERDLER:  All right.

10        THE COURT:  -- it's really a good idea for you to try

11  to address my concerns.

12        MR. MOERDLER:  I agree.

13        THE COURT:  Okay.  So, I come back to the standard,

14  the standard about vague in all of its applications.  Do you

15  agree that this statute is not vague in all of its

16  applications, and, if you don't agree with that, how do you

17  answer my hypothetical, which it seems to me to be clear and

18  not vague that you can't advocate White supremacy in the

19  classroom without violating the statute?  If you disagree with

20  that and say, Oh, no, somebody could advocate White supremacy

21  and not violate the statute, show me how that's so.  Put on

22  your statutory construction hat and tell me how -- but if you

23  agree with me, just tell me first.  Do you agree or not --

24        MR. MOERDLER:  I do not totally agree.

25        THE COURT:  -- that if the statute is vague -- that if

1    the standard is vague in all of its applications then the

2    vagueness claim fails?

3              MR. MOERDLER:  No.  It's the exact opposite.  If it's

4    vague in all of its applications, it falls.

5              THE COURT:  No.

6              MR. MOERDLER:  And if it's vague in some it falls.

7    That's what <u>Johnson</u> precisely says.

8              THE COURT:  Okay.  Well, you won't answer it.  That's

9    okay.  You want to move on to the next point?

10             MR. MOERDLER:  Well, I'd like to answer the balance of

11   that, Judge.  I'm going to make the assumption that the theory

12   is that, if it's vague in all of its applications or if it's

13   not vague in all of its applications, again I have to say to

14   you what do you tell the teacher when the statute says you must

15   teach precisely the subject you're barred?

16             THE COURT:  If the statute requires you to teach

17   something that you're barred from teaching, that would be a

18   problem.

19             MR. MOERDLER:  That's the point I'm making.  That was

20   the point I was making.

21             THE COURT:  I understand.  All right.  What else have

22   you got?

23             MR. MOERDLER:  All right.  Your Honor, let me, if I

24   may, talk to you about the second aspect of the statute that

25   has not been touched upon today, and that is enforcement.  The

1   statute in plain and precise terms, in terms of its application

2   by the Supreme Court and by all of the courts, focuses very

3   heavily on enforcement.  If you do not have guardrails that

4   limit how it can be enforced, why it can be enforced, when it

5   can be enforced and what can be enforced, according to two

6   United States Supreme Court cases -- pardon me -- three,

7   according to all of them a law must be sufficiently explicit,

8   but it must be stated in such terms and with sufficient

9   guardrails as to limit arbitrary and discriminatory

10   enforcement.  And that is <u>Kolender against Lawson</u> and <u>City of</u>

11   <u>Chicago against Morales</u> decided in 1999.

12          And in cases subsequent to those in the Circuits that

13   has been a major element, more so than the language, because,

14   as I believe it was Justice Kagan recently pointed out, it is

15   not in our province to leave to the policeman one

16   interpretation of the law and leave to the judge another.  It

17   is our requirement that they both look at it and know what they

18   can enforce and how.  Most of the time this has come up in the

19   loitering context or in the reliable identification --

20          THE COURT:  I get it.  That's one of the important

21   considerations in the vagueness doctrine, is you want to have a

22   law that gives fair notice and then a law that is not prone to

23   selective enforcement left entirely to the unfettered

24   discretion of the enforcer.  I'm well aware of those concepts.

25          MR. MOERDLER:  Let me, then, go back to adding a third

1    piece to this, which your Honor touched on in another context,

2    and that is three Supreme Court cases.

3         THE COURT:  Can I just stop you, though?

4         Mr. Garland, on remedy you made an assertion, and I

5    may have misinterpreted you, but I think the plaintiffs

6    disagree with, that is, you seem to say this statute disallows

7    a complaint to the Department of Education until someone has

8    complied with the Human Rights Commission review process.  Are

9    you making that claim?

10        MR. GARLAND:  So, your Honor, in reading my reply we

11   may have overstated, and I apologize for that, and I would

12   certainly retract the statement that it is required by the

13   statute to operate that way.  I can tell you it is operating

14   that way.  The Department of Education is not proceeding with

15   anything until the Human Rights Commission has passed on the

16   conduct --

17        THE COURT:  Because I have looked at your regulations

18   on the Department of Education, and I do not see anything in

19   those regulations that permits the Department of Education to

20   refuse to entertain a teacher misconduct allegation simply

21   because the person making the complaint has not first gone to

22   the Human Rights Commission.

23        So, are you saying that the Department of Education as

24   a matter of practice is simply declining to consider any

25   allegation that these statutes are being violated by any

1    teacher until and unless that person making the complaint has

2    gone to the Human Rights Commission?

3            MR. GARLAND:  Your Honor, as a matter of practice,

4    yes, that's what's happening.

5            THE COURT:  But you understand that only aggrieved

6    people can go to the Human Rights Commission.  So, if you're

7    just a citizen who has read about Ms. Smith teaching prohibited

8    concepts in the school and you want to complain, you can make a

9    complaint to the Department of Education, but you're not an

10   aggrieved person under 354-A who has standing to bring suit.

11   The New Hampshire Supreme Court has rejected that in other

12   contexts.  You're not an aggrieved person.  You can't sue

13   because you've read in the newspaper that Ms. Smith is teaching

14   prohibited concepts.  You can complain to the Department of

15   Education, but you can't sue.

16           And you're telling me the Department of Education

17   simply would not consider that kind of complaint?

18           MR. GARLAND:  I'm telling you -- no, certainly the

19   Department of Education can receive those complaints.  It won't

20   act as a matter of investigative and enforcement authority

21   until the HRC --

22           THE COURT:  That's a matters of their discretionary

23   judgment, not that the statute requires it.

24           MR. GARLAND:  Your Honor, yes.  May I make one more

25   point?

1    THE COURT:  Yes.

2    MR. GARLAND:  That is how as a matter of practice,

3    candidly to the Court, it is operating.  I don't think it's

4    crucial to the vagueness, resolving the --

5    THE COURT:  I don't think it's crucial, but I did

6    think you had over-claimed the actual process, so I wanted to

7    clarify it.

8    MR. GARLAND:  I apologize for that.

9    THE COURT:  No.  No apology needed.

10   Counsel, go ahead.

11   MR. MOERDLER:  Your Honor, I must respectfully point

12   out that the Attorney General is misinformed.  I am now going

13   to tell you that we were able to look behind the curtain and

14   get our first piece of information, and it's in this record

15   that shows they do investigate them, they do comment on them.

16   THE COURT:  Why don't you show me the exhibit number

17   so I can look at it.

18   MR. MOERDLER:  Here it is (indicating).

19   THE COURT:  Okay.  What exhibit?

20   MR. MOERDLER:  It is -- the Department of Education's

21   own website has on it a report, an op-ed article by the

22   Commissioner, and in that article he refers to a bunch of

23   documents that he has attached to it.  So, you go behind that

24   and you look at the documents, and they are 72 pages in number.

25   The first one is a quiz that discusses how teachers -- pardon

1    me -- how people --

2           THE COURT:  Just for the record -- Counsel, you guys

3    know where in the record it is?

4           MR. MOERDLER:  It's an exhibit.

5           MR. KAHNE:  Exhibit B.

6           THE COURT:  Exhibit B to?

7           MR. KAHNE:  To the joint memorandum.

8           THE COURT:  The joint memorandum.  Okay.

9           MR. KAHNE:  It's ECF 45-1.

10          THE COURT:  So, the other side has this?

11          MR. KAHNE:  Yes.

12          MR. GARLAND:  I do, your Honor.

13          THE COURT:  All right.  Good.  Thank you.

14          MR. MOERDLER:  It discusses -- this is a quiz.  It's a

15   survey or a quiz:  "U.S. Census data shows that

16   African-American and Latina women earn how much more (sic) for

17   every dollar that a White man earns?"  And then they give them

18   a whole bunch of choices.

19          "Identify the source of this quote:  We have deluded

20   ourselves into believing the myth that capitalism grew and

21   prospered out of the protestant ethic of hard work and

22   sacrifices.  Capitalism was built on the exploitation of black

23   slaves and continues to thrive on the exploitation of the poor,

24   both black and white, both here and abroad."  And then it says

25   who is the author, and it gives you names.

1       It goes on and on in these veins for four pages of

2   those kind of questions, touching upon implicit bias and every

3   other thing that you've talked about so far.

4       Then it attaches a confidential report of the Chief

5   Investigator of the Department of Education named Mr. Richard

6   Farrell, dated April 22 -- 2022.  Now, understand that's long

7   after the complaint, and that's what we thought was going to be

8   found, and we thought that it would show what they were doing

9   and how they were doing it.  And this is only one that we have

10  found so far that the State put on a website, a state-funded

11  website, and let me read to you a beginning of that.

12      Good morning, Rich.  We've had an opportunity to

13  review the material that you sent, that includes those

14  questionnaires, and have the following information for you in

15  response to your inquiry:  First and foremost, the activities

16  identified are from the Human Relations Course at, redacted

17  school name.  After review with the principal, curriculum

18  coordinator and assistant superintendent, we have determined

19  that these activities do fall within the scope of the course.

20      And, For your information, we have attached a copy of

21  the syllabus.  You'll also notice that this syllabus includes a

22  form for parental notification as well as an invitation for

23  parents to review class assignments...

24      And it goes on and on and then concludes with the

25  following statement:

1        Should any further such objections be received the

2   District will handle them in accordance with our policy, IGE --

3   I have no idea what that one is.

4        THE COURT:  Are you reading this to me because you

5   want me to assume that they are investigating?

6        MR. MOERDLER:  They say so.

7        THE COURT:  Okay.  Do you agree that that's evidence

8   that they're investigating?

9        MR. GARLAND:  Your Honor, I don't.  I would ask that

10   you take a look at it.

11        THE COURT:  I can't absorb something he read to me.

12   I'll have to read it.  I'm going to take a break in a minute,

13   but I want to -- is the other side, the other plaintiff

14   presenting any vagueness argument, or are you just going to

15   rest on theirs?

16        MR. BISSONNETTE:  Yes, your Honor.

17        THE COURT:  Okay.  So, I'll give you, Counsel, another

18   ten minutes, and then I'm going to give the other side an

19   opportunity to argue vagueness, and then I will a take a break.

20        MR. MOERDLER:  Your Honor, I'm going to truncate it so

21   that you do not -- but I want you to know it concludes with a

22   statement:  We have reviewed this material through the lens of

23   the Divisive Concepts law.

24        Now, this was a report to the Chief Investigator, who

25   then sends it on to the Commissioner of Education and asks him

1    to review what to do.  If that isn't an investigation, I don't

2    know what is.

3             THE COURT:  Okay.  Good.

4             MR. MOERDLER:  All right.  Now, I have two other

5    points I'd like to make to you on enforcement.  It starts, I

6    believe, with an FAQ in the Guidelines, because I do want to

7    focus on the Guidelines briefly.

8             The Guidelines pertaining in Exhibit 19 state in FAQ

9    Number 8:  Does this law apply to all activities or just

10   teaching?  And it answers that question as follows:  The

11   prohibitions apply to all school activities carried out by the

12   public in their role as public schools, including those that

13   are part of the public school's work.

14            This foundational confusion caused the result that you

15   mentioned earlier of four teachers being the subject of a

16   complaint, having signed a petition outside of the school.  It

17   is the one that Mr. Bissonnette will address in connection with

18   another one of these document revelations and why we have said

19   to you from the outset and believe most sincerely this case

20   cries out for discovery of the documents behind it.

21            The history of this, and that's why I wanted to

22   mention this, when you have the author of the bill, when you

23   have the Chairman of the Committee both stating its purpose was

24   to address issues that involve CTR and a whole bunch of other

25   things that are disguised behind the background of this, that

1   it was the purpose of it, that we will end it by this statute,

2   tells you where they're going.  And then, when you see the

3   Commissioner direct that path by putting on his website right

4   next to this kind of a report the complaint form so that people

5   can complain to him or to the Human Rights Commission, with

6   respect, enforcement is, at the very least, vague and unclear.

7          Mr. Garland, a highly respected, totally principled

8   lawyer, says to you in a brief, We have a protocol as to how

9   it's to be enforced.  There is no protocol that we have seen.

10  They may have had conversations, but, if they have, the

11  Department of Education is investigating them every day; and,

12  as Mr. Bissonnette will show you, he has written to Human

13  Rights to find out what they've turned down, and Human Rights

14  won't even answer him, even though the law explicitly directs

15  it, allows it to put out all of the complaints to dismiss.

16         Your Honor, there is much more I could say, but

17  there's only one thing that I think I would like to stress

18  again, and, in doing so, let me make a point.  I say it not to

19  give any kind of controversial aspect to it.

20         This statute has a counterpart which one cannot forget

21  either in the First Amendment context but here now in this

22  context.  The other statute, 189:11, is what an explicit

23  statute does.  It says -- and, by the way, these same kind of

24  words were used in the July guidance from the Department of

25  Education.  They are how intolerance, bigotry, et cetera have

1    evolved in the past, can evolve, and how do you prevent it

2    under the statute as construed by the Guidance, assuming that

3    the Guidance has weight, and we will need not press that beyond

4    the briefs, because it's laid out there.  But how do you

5    possibly say I can prevent all forms of bias by the following

6    course of action, whether it be training, education or the

7    like, in order to comply with 189:11 without immediately

8    violating the precise language of 193?

9              And I thank the Court for its courtesy.

10             THE COURT:  All right.  Thank you.  Let me ask my

11   reporter.

12             (The Court conferred with the court reporter)

13             THE COURT:  Mr. Bissonnette, go ahead.

14             MR. BISSONNETTE:  Thank you, your Honor.

15             THE COURT:  So, let me ask you the same question I

16   asked your counterpart to see if you are willing to give me an

17   unequivocal answer on it.

18             MR. BISSONNETTE:  Yes, your Honor.

19             THE COURT:  I've explained my concerns about the

20   standard that the State's brief is based on, the vagueness in

21   all respects, all-applications test, but if that test applies,

22   it would seem that this statute is not vague under that test,

23   because there is at least one application on which it's not

24   vague, and I've pointed to what I think is a pretty clear

25   application, I can't imagine any of your clients would disagree

1   with this, that it's a problem if a teacher tries to promote

2   White supremacy as a part of their curriculum, and that would

3   violate the statute, and that's a clear violation, and if

4   vagueness, facial vagueness and its challenges fail unless it's

5   vague in all applications, then it would appear this case would

6   -- I'm not going to force you to make that concession, but if

7   you're not willing to make it, just give me some kind of

8   understanding of why I might be misguided.

9        MR. BISSONNETTE:  Your Honor, I see exactly where

10   you're going with this, and I completely understand.  I think

11   there probably is one application of the statute in which it

12   would not be vaguely applied, and that is if a teacher said,

13   and I'm looking at Banned Concept 1, a White person is

14   inherently superior or inferior to some other category.  That

15   is really probably the only application, a literal textual

16   application of the statute in which perhaps this statute

17   could -- is not --

18        THE COURT:  I raise this with you, because it points

19   out the problem with this standard of vagueness.  The vague in

20   all application standard eviscerates facial challenges.  Now,

21   maybe as a matter of policy the Court will want to do that,

22   because Justice Thomas, for example, continues to say that's

23   the right standard, and what that really means is only

24   incomprehensible statutes can be challenged on their face; and

25   there still will be opportunities to challenge on vagueness

1    grounds, but it is only in applied challenges, which you

2    haven't brought.

3         MR. BISSONNETTE:  Well, two points I would like to

4    make on that.  So, obviously, to echo some of the prior

5    argument that you heard this afternoon, the standard is not the

6    standard, in our view, that the State has proffered in this

7    particular case.  It is not in all its applications.  The

8    Johnson versus United States, the United States case, squarely

9    addresses -- Honeyfund, in fact, tangentially addresses it,

10   where that court says defendants may be right that some of the

11   prohibited concepts are not vague, but some certainly are, and

12   then presume to enjoin, preliminarily enjoin the statute in its

13   entirety.  And I think that is, frankly, the same analysis

14   here, assuming we were even asking this Court today to enjoin

15   the statute, which we are not.  We are asking this Court simply

16   for the opportunity to proceed to discovery on some discrete

17   things that I would like to explain to this Court why we think

18   it's essential.

19        As to your question, though, about are you making an

20   as-applied challenge in this case, we are, and I want to

21   explain the contours of that as-applied challenge.  So, setting

22   aside that we believe certainly at this pleading stage that we

23   meet the standard for a facial challenge, our as-applied

24   challenge particularly applies to educators with respect to the

25   unique enforcement regime that applies to them that actually

1    doesn't apply, necessarily, to other public officials.

2         THE COURT:  Well, in a typical as-applied enforcement

3    challenge, and you may have brought these in front of me,

4    certainly others have, I have held that a pre-enforcement

5    challenge can be ripe in certain circumstances, and it

6    typically involves someone who has a real threat of having some

7    serious consequence apply to them.  They made clear to the

8    Court, This is what I want to do, and this is why I have a

9    legitimate fear that this is going to happen to me if I do it,

10   and I need you to tell me whether this statute is

11   unconstitutionally vague as applied so that I can do it without

12   fear of losing my teaching license.  That's a typical

13   as-applied challenge.

14        You say you presented that here?  I didn't see it in

15   your complaint.

16        MR. BISSONNETTE:  Yes.  The complaint that the Mejia,

17   Philibotte and NEA plaintiffs have brought have said that this

18   is a facial and as-applied challenge.

19        THE COURT:  They use the word.

20        MR. BISSONNETTE:  And I understand that, and in

21   responding to the critique of the State that, Hey, you're only

22   bringing a facial challenge, we finesse that with a little bit

23   more clarity, wanting to explain that, unlike the types of

24   cases that you're kind of referring to here, our as-applied

25   challenge here is focusing on the unique application to

1   educators, not from a text perspective that you're referring to

2   here, I have a fear that this is going to be applied to me

3   because I want to teach a certain book, but because of the

4   unique prospect for arbitrary or discriminatory enforcement

5   that apply to teachers in particular, and that is because of

6   the issue that you just flagged just a few minutes ago, which

7   is the fact that the Department of Education has unique and

8   inherent enforcement power under this particular statute.

9         Setting aside the lack of a *scienter* requirement,

10  setting aside the fact that there's also a duty-to-report

11  obligation that exists within the Department of Education

12  rules, the department of obligation (sic) is obligated to take

13  up any complaint that comes to its office.  The department of

14  obligation (sic) is obligated to investigate, and the

15  Department of Education is obligated to take action if it

16  believes that a violation has occurred.

17        So, again, the chief ambiguity problem in this case as

18  applies to teachers and more broadly, to some extent, is the

19  fact that you have vague terms.  But it's not just vague terms;

20  it's combined with the prospect of the career death penalty for

21  educators, and I don't mean that to be hyperbolic.

22        THE COURT:  I agree with you that that's highly

23  relevant to the vagueness challenge.  The Supreme Court has

24  made clear that vagueness challenges can be brought to civil

25  statutes, but I think, and Justice Gorsuch in his concurring

1   opinion in <u>Dimaya</u> and perhaps in the majority opinion your

2   colleague referenced, has suggested that there shouldn't be any

3   different standard from a criminal to a civil vagueness

4   challenge, but I think it continues to matter what kind of

5   vagueness challenge.  If you have a regulation that applies, an

6   economic regulation to big business, such as the Sherman

7   Antitrust Act, that bars unreasonable restraints and trade,

8   that sounds on the surface really, really vague, but it is not

9   unconstitutionally vague.

10          MR. BISSONNETTE:  Sure.

11          THE COURT:  Businesses can plan and can do their

12   research, but where individual teachers face career death if

13   they're deemed to be in violation of this provision, not just

14   loss of job but loss of certification, that is a very severe

15   consequence that makes it much more like a criminal statute

16   that should justify a higher level of review on terms of

17   vagueness.  I think that's the most important point to make,

18   that the teacher statute is different from the other provisions

19   which don't apply potentially to educators directly; they apply

20   to government programs.

21          MR. BISSONNETTE:  Yes.

22          THE COURT:  And those statutes, to the extent they're

23   applied outside of the educator context, are arguably less

24   concerning.  It's the attempt to threaten the livelihoods of

25   offending teachers that is the particular problem.

1       MR. BISSONNETTE:  Absolutely, your Honor, and I think

2   that the standard on vagueness is critical here.  And not only,

3   your Honor, did you highlight the lack of a *scienter*

4   requirement and how the <u>Hoffman</u> case, in particular, says,

5   Gosh, if you don't have a *scienter* requirement we need to be

6   really careful here and really conscious of --

7       THE COURT:  I referenced that one, because that's one

8   that the AG's Office relies on.

9       MR. BISSONNETTE:  Absolutely.  But <u>Hoffman</u> actually

10  says something else that I think is material and where the

11  career death penalty kind of component comes in here.  The

12  court there also essentially says that the seriousness of the

13  penalty is a consideration, and that's the issue that we have

14  here in the <u>Sessions</u> case, the case that we've been referring

15  to.  There you didn't have a criminal penalty, necessarily, you

16  had a criminal statute but with civil deportation consequences,

17  and what the Supreme Court there says is, Oh, boy that is such

18  a severe penalty that we need to engage in a more robust

19  vagueness analysis.

20      The same is true here.  We have a statute that lacks a

21  *scienter* requirement, we have a statute with drastic career

22  ramifications, pursuant to a regime where the DOE is obligated

23  to take action and respond to every complaint that goes through

24  its office.

25      And this is why, your Honor, I think the order of

1    operations piece I don't want to gloss over.  I actually think

2    it's incredibly important in this case.  You have the

3    Department of -- much respect for Department of Justice, by the

4    way.  I litigate against them all the time, and they do a great

5    job, but they have represented publicly in pleadings before

6    this Court, Don't worry about this, don't worry about the

7    unique Department of Education enforcement capability of the

8    statute, because we have essentially manufactured a regime

9    where they don't look at it, even though that regime conflicts

10   with the very regulations that the Department of Education is

11   obligated to --

12        THE COURT:  Just to save time, I wanted to clarify

13   that the State was over-claiming the way that regime worked,

14   but the way it actually works I don't attach significance to it

15   from the government's perspective, because it's essentially at

16   the sufferance of the head of the Education Department.  To the

17   extent you don't want to do that anymore, you just stop.  So,

18   even if they have some unofficial practice of not entertaining

19   anything, they could change that any time they wanted.  They

20   just could decide, Well, today we're doing it differently.

21        MR. BISSONNETTE:  I think that's right.  At the

22   statute's core, your Honor, and I'll close the loop on

23   enforcement and arbitrary enforcement, which is an independent

24   component of vagueness, is that you really have five bodies

25   that can adjudicate complaints under the statute.  You have the

1   Department of Education, Department of Labor, Department of

2   Justice, Human Rights Commission, and independent of that

3   Superior Court, the State Super Court.  So, to me, again, all

4   of this highlights --

5            THE COURT:  Am I correct in assuming, so that we don't

6   overstate this, that individual educators, the only enforcement

7   that they experience directly is at the Department of Education

8   complaint level?  They can't be sued individually in the Human

9   Rights Commission.

10           MR. BISSONNETTE:  No.

11           THE COURT:  They can't be sued in Super Court

12   individually.  They can't get damages awarded against them.

13   You think they can.

14           MR. BISSONNETTE:  Absolutely, your Honor.

15           THE COURT:  Tell me how that is so.

16           Do you disagree with that?

17           MR. GARLAND:  I disagree, your Honor.

18           THE COURT:  Yeah, okay.

19           MR. BISSONNETTE:  I have never, frankly, heard that

20   position from the Department of Justice.

21           THE COURT:  I'll explain to you why.  So, the Human

22   Rights Commission -- there's a Supreme Court, New Hampshire

23   Supreme Court case, the case is Cooper against -- no, I don't

24   have it in front of me.  I'll find it at the break.

25           There is a New Hampshire Supreme Court case that

1    defines what an aggrieved person is, and so that limits who can

2    bring the claim, and then there's nothing in the statute that

3    allows for liability for a Human Rights Commission violation

4    against an individual teacher.  It's a liability against the

5    school district that you can bring.  If I've got that wrong,

6    you'll let me know.

7          So, the case about whether you can be -- thank you.  I

8    thank my clerk for bringing it to my attention.

9          The case in which the Supreme Court has defined what

10   an aggrieved party is for purposes of 354-A is State versus

11   Hynes, 159 New Hampshire at 187.  Oh, wait a minute.  I'm

12   sorry.  I've got the wrong case here.  Let me check.

13                         (Pause)

14          THE COURT:  This is the case, yeah, State against

15   Hynes, 159 New Hampshire 187.

16          But then I turn to the -- where in the language of the

17   statute, we'll call it the banned concept statute, does it say

18   a Human Rights Commission complaint can be brought against an

19   individual teacher?

20          MR. BISSONNETTE:  Well, the statute says that, you

21   know, all rights and remedies that exist under the Human Rights

22   Commission statute apply in this particular instance.  I'm

23   going to look at your case to make sure I don't want to

24   overstate the law.

25          But here is one potential concern:  Even if -- sorry.

1    THE COURT:  You don't litigate in this area, but I've

2    spent a lifetime dealing with employment discrimination cases,

3    and, in fact, until the New Hampshire Supreme Court decided the

4    Fuller case, the Fuller Ford case, the Federal Court here

5    recognized you couldn't bring claims against individual people

6    under 354-A, and the New Hampshire Supreme Court disagreed with

7    that in one of my cases that I certified to them, that's the

8    Fuller case, and said those individuals can be liable under an

9    aiding and abetting theory, which is in the statute, but the

10   aiding and abetting theory doesn't apply to this particular

11   provision.

12   So, I do not think at least -- I do not see anything

13   in 354-A that allows a claim to be maintained against an

14   individual teacher, and the statute itself talks about -- the

15   education statute says you can bring a claim against a school

16   district but not the teacher in the Human Rights Commission.

17   So, I don't know how you could possibly get relief against an

18   individual teacher except through a Department of Education

19   complaint.  I don't diminish that, I think that's hugely

20   significant, but your briefing suggested that it could, and I'm

21   just not sure how that's so.

22   MR. BISSONNETTE:  Sure.  The guidance itself, the July

23   FAQ guidance, basically makes clear that, if you think there is

24   a violation, you could file a complaint with the Human Rights

25   Commission.  You can file a complaint --

1     THE COURT:  Against the school district, yes, you can.

2     MR. BISSONNETTE:  And the department of -- well, the

3  Human Rights Commission.  You could file a lawsuit with the

4  Human Rights Commission.  You could file a lawsuit in court.

5     But, regardless of who the defendant is, I actually

6  think, to get really practical here, because I think being

7  practical here is really important, the teacher becomes the

8  subject of that complaint regardless of who the defendant is.

9  Let's say the defendant is the school district.  The school

10  district gets sued because of how a teacher behaved.  The

11  teacher is getting wrapped up into that litigation.

12     THE COURT:  I agree with that.

13     MR. BISSONNETTE:  And so, I actually -- I'm trying to

14  kind of think from a practical perspective.  A teacher's

15  behavior does implicate enforcement, regardless of who the

16  defendant is, in five separate forums, and I think that's

17  critical, because at its core it's that nature of the

18  enforcement, regardless of who the defendant is, that creates

19  this chill.

20     I want to kind of ground this case a little bit into

21  the practical reality of what is occurring, and I know, your

22  Honor, that either you're skeptical of hypotheticals -- I've

23  been in cases before where you've told me that, and I'm well

24  aware of that.

25     THE COURT:  Well, no.  Judges love to ask

1   hypotheticals.  They don't like hypotheticals being put to

2   them.

3           MR. BISSONNETTE:  I know.  I hear you.  I hear you.

4           But I want to explain, actually, why hypotheticals

5   matter, and actually in <u>Santa Cruz</u> and in <u>Honeyfund</u> the courts'

6   posturing of questions was actually part of those courts'

7   analyses in concluding that the statutes are ambiguous.

8           But why kind of this asking of questions is key,

9   because these incidents come up in a million different factual

10  circumstances in schools every day across the State of New

11  Hampshire:  Is this book covered, is that covered?

12          THE COURT:  Do any of your clients -- are they seeking

13  permission to expressly teach any of the banned concepts?

14          MR. BISSONNETTE:  No.  What they're asking, your

15  Honor, is --

16          THE COURT:  Their concern is that it will be

17  interpreted broadly to potentially encompass legitimate conduct

18  that they want to engage in and do engage in every day.

19          MR. BISSONNETTE:  Yes.

20          THE COURT:  I get that completely.  I don't have any

21  sense that any teacher wants to expressly advocate a banned

22  concept.  What I do get is they want to teach history, they

23  want to teach the Civil Rights Movement, they want to teach

24  about racism, they want to teach about sexism, they want to

25  teach about implicit bias, the administrators want to do

1   sensitivity training.  They want to do all those things without

2   expressly advocating any banned concept, and if the statute

3   made it absolutely clear that they could not be subject to

4   discipline unless they expressly and intentionally engaged in

5   teaching those concepts, we might have a very different case.

6   The problem is the statute doesn't -- it allows people to be

7   found liable even though they've acted unintentionally, and it,

8   at least according to the Attorney General, allows people to be

9   liable not because they say something, because they imply

10  something.

11          MR. BISSONNETTE:  Mm-hmm.

12          THE COURT:  You combine those two things together, and

13  it creates a problem.  That's what I see is the --

14          MR. BISSONNETTE:  I'm not going to disagree with you

15  at all, but I do think the harm is a little bit greater than

16  that.

17          There have been specific questions raised of the

18  Department of Justice, the Department of Education, Hey, we got

19  your guidance, and this is actually attached to the Mejia

20  complaint, but we have specific questions, you know, in

21  concrete terms, because this is the way the statute comes up in

22  the classroom every day, you know?  And let me just give you

23  another example.

24          THE COURT:  Give me an example.

25          MR. BISSONNETTE:  Sure.

1         THE COURT:  And then you construe the statute and tell

2    me how the statute can be construed to prohibit that.

3         MR. BISSONNETTE:  A complaint has been filed against

4    the Exeter School District for their collaboration with the

5    Racial Unity Team that is discussing issues like power,

6    privilege, implicit bias, work that's central to school's work

7    to help --

8         THE COURT:  But give me an example of what they did.

9         MR. BISSONNETTE:  One of the complaints that was

10   raised, in addition to just the sheer fact that privilege is

11   being discussed in schools, is that the book *To Kill a*

12   *Mockingbird* was being taught with a focus on underrepresented

13   characters.  This is what we're --

14        THE COURT:  Show me how that could be deemed to -- I

15   know *To Kill a Mockingbird*.  I thought you were going to bring

16   a more contemporary example --

17        MR. BISSONNETTE:  I have them, too, your Honor.

18        THE COURT:  -- like *How to Be an Anti-Racist* and say,

19   Okay, that's a subject of a violation.

20        But if you want to do *To Kill a Mockingbird*, show me

21   how you could construe the statute to make the teaching of *To*

22   *Kill a Mockingbird* unlawful under the banned concept statute.

23        MR. BISSONNETTE:  It's not just the teaching of the

24   book; it's how you talk about it, particularly if you talk

25   about it in connection to contemporary events.  Tom Robinson --

1    THE COURT:  Show me how it could -- you're now charged

2    with construing the statute.

3    MR. BISSONNETTE:  Sure.

4    THE COURT:  How could it be construed to make that

5    conduct unlawful?

6    MR. BISSONNETTE:  It could be construed that way

7    because a complainant has basically said that it could be

8    construed that way.

9    THE COURT:  No.  I'm sorry.

10   MR. BISSONNETTE:  Sure.

11   THE COURT:  We can't give statutory construction power

12   to whatever citizen in the state, because there are people that

13   have very unusual views about things.  So that somebody thinks

14   something violates a statute is not evidence that it violates a

15   statute.

16   MR. BISSONNETTE:  Can I challenge you on that just

17   very briefly?

18   THE COURT:  Yes.

19   MR. BISSONNETTE:  I understand you feel strongly on

20   that, your Honor, but one of the problems with the statute is

21   that --

22   THE COURT:  People who think -- the average person on

23   the street does not have the power to give force to a

24   construction.  It's the governmental agencies that apply it and

25   courts that interpret it that have that power.  They don't have

1   any power, and they have strange views.  I've had many unusual

2   statutory construction views propounded, sometimes by lawyers,

3   but they don't mean anything unless and until somebody adopts

4   that construction.  So, that's why I'm asking you --

5        MR. BISSONNETTE:  No, I understand.

6        THE COURT:  -- tell me how you would construe it to

7   ban the teaching -- I can't see how somebody could ever say

8   credibly it violates the statute to teach *To Kill a*

9   *Mockingbird*.

10       MR. BISSONNETTE:  It's not just -- again, your Honor,

11  it's not just teaching it.  We have to kind of, I think, get a

12  little bit more granular, and I'll get to that, but just to

13  kind of push back ever so slightly, the problem with the

14  statute --

15       THE COURT:  I have a vigorous, very explicit memory of

16  sixth grade when *To Kill a Mockingbird* was taught in my class

17  and we were discussing it together in class, so I actually

18  remember from sixth grade that particular discussion.  I just

19  don't know, though, that -- I can't in any way see how it would

20  have violated the statute.

21       MR. BISSONNETTE:  The concern, though, your Honor, and

22  why the perception of the public matter, and this is why I'm

23  just slightly pushing back, is because it's not just the

24  Department of Education, Department of Justice, the Human

25  Rights Commission and Department of Labor that enforce it.  It

1   is State courts that have an independent obligation to evaluate

2   the text and hear complaints.  So, this regime falls outside

3   the enforcement authority of those that issue the guidance in

4   this case; so the public perception, in my view, actually is

5   really important because individuals essentially have the

6   ability to bring private rights of action independent of any

7   guidance that has been issued.

8          THE COURT:  Yeah.  I do think, though, again, I want

9   to emphasize this, there's a tone in your briefs that this

10  statute is very different from what it is.  This is not a

11  bounty statute.  This is not a statute where the Legislature

12  has purported to give standing to the average citizen to go

13  after people that they think are violating the law.  This

14  statute does not do that.  It allows aggrieved parties to sue.

15  Aggrieved parties have a definition under the human rights

16  statute, and they have a definition under standing law in

17  Superior Court, and they do not entitle people to be bounty

18  hunting.

19         So, to the extent you say that, I say back it up,

20  because that's not what I understand the statute does.  It does

21  many things, but it doesn't do that.

22         MR. BISSONNETTE:  Fair enough, your Honor.  I think

23  the only point that I was trying to make is that individuals

24  have the ability to go to court outside the enforcement

25  mechanisms that have been put forth by the State, which we may

1    disagree on that, but I actually think that's incredibly

2    important in this particular case.

3         And I actually can present to you, again, if the Court

4    is interested, the *To Kill a Mockingbird* reference, a complaint

5    that actually has been filed, it was publicly put out on

6    Twitter, and why I think this example has meaning.  So, I'd be

7    happy to present it to the Court.

8         THE COURT:  Do you have any evidence yet of anyone

9    being disciplined for violating the statute, anyone having been

10   the subject of a successful Human Rights Commission case or a

11   lawsuit for violating the statute?  I haven't seen that, but it

12   may exist.  Do you have any of that?

13        MR. BISSONNETTE:  So, we do know of, and it's very

14   spotty, because I only have what's been voluntarily produced, I

15   have examples of at least three complaints, including this one,

16   that's not part of the record that I could present to the

17   Court.

18        The Human Rights Commission has publicly represented

19   that it hasn't docketed any complaints into, like, the active

20   prosecutorial stage.  But this is all the more reason, your

21   Honor, why discovery is necessary in this particular case,

22   particularly where an element or a factor of vagueness is the

23   notion of enforcement.  So, here I actually think the

24   complaints are vital to learn about in discovery, because we

25   get to learn, we should be able to learn, whether or not the

1    Human Rights Commission is interpreting the statute consistent

2    with its own guidance.  And we also --

3              THE COURT:  I'm going to ask you to wrap up.

4              MR. BISSONNETTE:  Sure.

5              THE COURT:  And then I'm going to let Mr. Garland have

6    a brief response, and then we'll take a break, come back and

7    deal with the First Amendment argument.

8              I'm sorry to cut you off.

9              MR. BISSONNETTE:  No, I understand.  I've been talking

10   for a while.  I think we're fine your Honor.  Thank you very

11   much.  I appreciate it.

12             THE COURT:  Okay.  Mr. Garland, briefly, and then

13   we'll take a break.

14             MR. GARLAND:  I'll be very brief, your Honor, and I'll

15   speak from here, if that's okay.  We believe we've put forth a

16   construction that saves the statute from any facial vagueness

17   challenge.  You have indicated some reservations that appear to

18   be reservations as a matter of statutory construction.  To the

19   extent you are uneasy with whether it's within -- either

20   consistent with the statute to construe away the problem you've

21   identified, or whether that would have any sort of binding

22   effect and really resolve the problem, there is a clear

23   solution short of discovery.  I don't see what discovery does

24   here.

25             New Hampshire Supreme Court can say what the statute

1   means; it can resolve any ambiguity.  We put that as an

2   alternative argument in our brief.  I don't think it's

3   necessary, in light of the arguments I've presented, but it

4   exists as an option.

5          THE COURT:  Okay.  I appreciate that.  Thank you for

6   the good argument you guys have presented so far, and we'll

7   take about a 15-minute break, come back, and we'll finish up

8   with the First Amendment arguments.

9          THE CLERK:  All rise.

10             (Recess taken from 2:43 p.m. to 3:02 p.m.)

11         THE CLERK:  All rise for the Honorable Court.  Please

12  be seated.  This hearing is back in session.

13         THE COURT:  All right.  Did you want to say something,

14  sir?

15         MR. MOERDLER:  Yes, your Honor.  I think we were

16  supposed to speak to the First Amendment claim.

17         THE COURT:  Yeah.  I was going to ask Mr. Garland to

18  go first.  He's the moving party.

19         MR. MOERDLER:  Oh, I'm so sorry.  I apologize.

20         THE COURT:  No.  I'm sorry if I wasn't clear.  That's

21  okay.  As the moving party, I thought I would give him his shot

22  and then hear your response.

23         So, Mr. Garland, what do you want to say?

24         MR. GARLAND:  Thank you, your Honor.  I think, just

25  based upon the colloquy during the vagueness portion of this,

1    you understand our position.  We think Garcetti sets forth the

2    standard.  We think that, as long as the speech is a speech

3    that's being governed as speech pursuant to an official

4    capacity, it is not subject to protection.

5          THE COURT:  So, you know what the question is for you,

6    right?  The plaintiffs make no secret in their brief.  Their

7    brief is that this case's First Amendment claim is governed by

8    the First Circuit's decision in Ward, Garcetti does not provide

9    the controlling standard, Ward does, and under Ward they have a

10    viable First Amendment claim.

11          Your argument is that Ward should not govern, that

12    Garcetti has displaced it, and under the Garcetti framework, at

13    least to the extent that the plaintiffs are seeking relief with

14    respect to speech they undertake in their capacity as

15    government employees, they have no First Amendment right, and

16    the claim fails.  That argument hinges on your contention that

17    Ward doesn't provide the correct standard, Garcetti does.

18          So, tell me why Ward provides the correct standard.

19          MR. GARLAND:  Ward doesn't, your Honor, is our

20    position.

21          THE COURT:  Ward doesn't.  Excuse me.

22          MR. GARLAND:  So, I think we set this forth in our

23    reply, and I don't want to belabor it; I know we've been going

24    on for a while.  I understand that First Amendment precedent is

25    usually binding on this Court almost always, especially on

1    related facts.  We've had cases -- I've had cases before you

2    where that issue has come up.

3            But older precedent or precedent that has been called

4    into question can be displaced by subsequent developments, and

5    Ward really did not address this threshold question.  It

6    assumed that the speech was protected to the extent that it

7    occurred in a classroom, as did Pickering previously and really

8    all of the other cases that predated Garcetti has set forth the

9    balancing framework.

10           Garcetti came along and really was a sea change, in my

11   view.  It said, wait a second, there is a threshold question

12   here; we do not get to balancing until you've answered that

13   question.

14           THE COURT:  So, the real issue, though, is I assume

15   that the plaintiffs are going to say to me that teachers are

16   different from other government employees; they have a measure

17   of academic freedom, even when they are teaching their

18   students; and that academic freedom, the extent to which

19   Garcetti restricts academic free speech was left open expressly

20   by the court in Garcetti, and so Ward remains good law.

21           What do you say to that?

22           MR. GARLAND:  I have two responses to that, your

23   Honor.  The first is that I think most of the academic freedom

24   discussion in Garcetti, if my memory serves me, was

25   post-secondary, and this law doesn't reach that.

1    THE COURT:  Well, I would say specifically the

2    majority in Garcetti was responding to Justice Souter's

3    comment.  Justice Souter's comment was expressly limited to

4    colleges and universities.  Justice Souter did not in any way

5    raise a concern about the application of Garcetti to secondary

6    or elementary schools.

7    And so, one way to read this would be to say, at most,

8    the Court left open the question of its applicability to

9    colleges and universities in order to address what they

10   identified as Justice Souter's concern.  Right?

11   MR. GARLAND:  I think that's right, your Honor.  And I

12   do think -- I'm not aware of anything that doesn't allow you to

13   look at how other Courts of Appeals have considered this, and

14   we've briefed it, and you've already identified Judge Sutton's

15   Sixth Circuit opinion and Judge Easterbrook's Seventh Circuit

16   opinion, and I don't have much more to add beyond the fact that

17   those decisions, admittedly, are as-applied challenges but

18   appear to support our position explicitly that Garcetti extends

19   to teachers.

20   THE COURT:  Yes, you've identified the Sixth and the

21   Seventh Circuit I think most strongly and directly have taken

22   this issue on and said that Garcetti does apply to elementary

23   and secondary school teachers, and teachers in elementary and

24   secondary school do not have a First Amendment right to teach

25   something that is inconsistent with the curriculum; they have

1   to teach what's in the curriculum.  They have no First

2   Amendment right to teach something that they're not allowed to

3   teach under the established curriculum.  That's your view.

4          Okay.  Let's assume that Ward applies.  Even if Ward

5   applies, the school board at the local level and the Department

6   of Education at the statewide level have unlimited ability to

7   impose any speech restriction that they choose on teaching as

8   long as it serves a legitimate pedagogical purpose and the

9   school gives notice before disciplining, right?

10          MR. GARLAND:  Yes, your Honor.

11          THE COURT:  Do you contend that this statute serves a

12   legitimate pedagogical purpose?

13          MR. GARLAND:  Yes, your Honor.

14          THE COURT:  Okay.  So, to the extent that it does and

15   it's not vague, you would say that ends the First Amendment

16   inquiry, even if Ward is the standard?

17          MR. GARLAND:  That's precisely the argument we've made

18   in reply.  Yes, your Honor.

19          THE COURT:  All right.  So, that's your position:

20   first, Ward doesn't apply at all; second, if Ward does apply,

21   Ward gives only limited discretion to teachers, that is, only

22   to teach -- they have to teach any restriction or any

23   requirement, as long as it has a legitimate pedagogical

24   purpose, which is a very low threshold, and there's notice.

25   Here you say it's notice.  If it's not vague, then you're

1    probably right; if it is vague, you're probably not right, and

2    that's how you would dispose of that.

3           All right.  Here's my question to you; this is

4    something your opponent referenced with respect to the

5    vagueness challenge:  You know Garcetti only -- you know that

6    government employees under Garcetti do not completely surrender

7    their First Amendment rights, right?

8           MR. GARLAND:  Yes, your Honor.

9           THE COURT:  Okay.  They retain First Amendment rights,

10   although limited by Pickering, to the extent they are engaging

11   in speech on a matter of public concern as a citizen, right?

12          MR. GARLAND:  Yes, your Honor.

13          THE COURT:  And the opposite of that is

14   quintessentially government speech.  To the extent they are

15   instructed to engage in speech as a part of their government

16   duties or to refrain from certain speech as a part of their

17   government duties, you would say no First Amendment protection,

18   but otherwise they do retain First Amendment protection.

19          To the extent this statute applies beyond the

20   classroom and extends to other interactions that could be

21   construed as teaching or advocacy directed at a pupil, that

22   could implicate First Amendment behavior, even under Garcetti,

23   couldn't it?

24          MR. GARLAND:  It could, your Honor, sure.  I accept

25   the premise.  I have a further response, though.

1          THE COURT:  Okay.  I'm interested in your response,

2    but I wondered if you thought about the Supreme Court's

3    decision in Bremmerton, which you're well aware of that recent

4    case involving a high school principal that the Supreme Court

5    said was allowed to engage in prayer at the 50-yard line after

6    a game with students.  And the Court there actually discussed

7    the Garcetti standard in that case and said that that principal

8    -- or excuse me -- that coach, even though he was on school

9    property with his students that he was charged with coaching

10   and engaging in prayer with them at the 50-yard line, that that

11   was non-governmental speech that would be judged -- if it was a

12   non-religious-type speech it would, therefore, be judged under

13   the broader standard, not under Garcetti, right?

14         So, if that's true, then one could envision a great

15   deal of speech that a teacher might engage in with a pupil

16   outside of the teaching of the classroom that could be swept

17   within the scope of this statute.  Now, they seem to argue

18   otherwise, but, to the extent that that's true, couldn't that

19   preserve a First Amendment claim, at least a limited First

20   Amendment claim, for teachers who might fear that -- say, for

21   example -- I don't know.

22         Do schools have after-school clubs where teachers

23   volunteer to supervise students?  If they're supervising as a

24   volunteer an after-school program, a chess club or something,

25   and someone engages in a discussion with them about racial

1    issues and they are to make a statement about that, they would

2    arguably have First Amendment rights on that issue, even under

3    Garcetti; and, if that's true, that, even if you're right about

4    the Garcetti framework, wouldn't that preserve a limited First

5    Amendment claim at least at the 12(b)(6) level for teachers

6    that are concerned that -- because, frankly, I think the

7    plaintiffs' argument that teachers retain academic freedom to

8    disregard the curriculum set by the school board, that's a very

9    troubling proposition that I don't think finds much support in

10   the case law.  But, to the extent that teachers have First

11   Amendment rights notwithstanding their role as teachers when

12   they do things like the coach in the program in Bremmerton,

13   that they might have First Amendment rights that would be

14   curtailed if they were subject to discipline for advocating one

15   of these banned concepts in a situation like that.

16        So, what's your response?

17        MR. GARLAND:  Thank you, your Honor.  I have a couple

18   of responses to that specific question.

19        First off, I think what you're getting at is the

20   concept of an overbreadth challenge, and that's how I

21   understand this First Amendment challenge, too.  But the

22   plaintiffs here are bringing a facial claim, and the standard

23   for a facial overbreadth challenge requires both that the text

24   of the statute sweep in, as you say, protected speech and that

25   actual fact demonstrate it at the pleading stage; presumably

1    that's the allegations in the complaint.

2         I would think the text of the statute contemplates the

3    circumstances that they are reaching here, that the text really

4    does tether the proscription to things folks are doing in their

5    official capacities.  It does so I think explicitly -- the

6    language in our guidance I think further clarifies that.  I

7    think reading it in conjunction with RSA 98-E as a matter of

8    State statutory construction further confirms it, because 98-E

9    protects in a similar manner.

10        THE COURT:  98-E specifically gives government

11   employees, recognizes the right that they have to speech

12   notwithstanding the fact that they are government employees.  I

13   agree with you on that.

14        MR. GARLAND:  Exactly, your Honor.  And so, I think as

15   a matter of how this statute must be construed as a matter of

16   statutory construction, it does not on its face extend to

17   speech that would be protected by the First Amendment.

18        THE COURT:  Maybe the plaintiff agrees with you.  I

19   thought he was making that argument.  I'm not inclined to agree

20   with that.  I think the statute seems to prohibit any advocacy

21   directed at a pupil, and so I think it sweeps broadly enough to

22   encompass that, or at least that's my concern.

23        Now, do you have a different reading of the statute?

24        MR. GARLAND:  I do, your Honor.  Forgive me.  I just

25   want to run back to my desk.

1    THE COURT:  Sure.

2    MR. GARLAND:  So, your Honor, my reading is, once

3    again, consistent with the FAQs, and I don't want to read too

4    much into the record here, but the statute reaches conduct of

5    people who work to administer programs on behalf of the State

6    of New Hampshire, including teachers in an educational setting.

7    I think as a matter of facial construction that only reaches a

8    governmental speech under the Garcetti framework.  I would

9    point the Court to --

10    THE COURT:  Yeah, but let's focus on the -- I don't

11    have it in front of me now, I have so many papers, but the

12    actual statute itself is directed at pupils, right?  And it

13    says, Pupils shall not be, and it's phrased in that kind of

14    confusing way.  I mean, it's not the ideal way to write a

15    statute, but it says, No pupil shall be, and taught is one of

16    the things.  But it goes quite beyond taught."  It includes

17    more advocacy.  And it doesn't say "in the classroom" or

18    anything like that, "in school," which could be a club,

19    after-school club for which a teacher is doing work, or in

20    lower grades, if a teacher stays on in an after-school program

21    and supervises the kids while they're on the playground waiting

22    for parents to come and pick them up or something.  Those are

23    activities that, arguably, are not governmental speech.  The

24    employer, the school district is not dictating what they may

25    say and not say, except to the extent they impose these banned

1    concepts on them, and they would retain some First Amendment

2    rights.

3         So, my concern is I think, to the extent the

4    plaintiffs assert that there is this First Amendment right to

5    academic freedom for elementary and secondary school teachers,

6    I have trouble squaring that with many cases, but, to the

7    extent that they are saying, We're afraid even when we're not

8    teaching the curriculum that we're subject to the statute and

9    could be disciplined for engaging in conduct that we have a

10   First Amendment right, it would require a Pickering balance

11   test.  Do you know what I mean?

12        Because this statute, if it were applied privately,

13   if, like, the Legislature adopted it and said, No person shall,

14   it would be unconstitutional in a second, because it's a

15   viewpoint-based discrimination that can't be -- speech

16   restriction that can't be justified and is not narrowly

17   tailored.

18        But what Pickering says is governmental employees who

19   engage in speech, even if they're not engaged in government

20   speech, they have First Amendment rights, but they're not the

21   same as everybody else's; they're subject to balancing in a

22   different way.

23        So, that's my concern, is, is there that space left

24   for a First Amendment claim, even if I am persuaded by your

25   contention that under Garcetti the core curricular teaching

1   that's done has to be done the way the school tells the teacher

2   to do it; they're not like university professors that arguably

3   have academic freedom that gives them greater First Amendment

4   protection.

5          Are the plaintiffs really advocating that teachers can

6   disregard the instructions on curriculum from the school board?

7   That somehow seems wrong to me.

8          MR. GARLAND:  Your point is well taken, your Honor.

9   My response to that, again, is, as a matter of construction,

10  which does require I think that this Court look to 98-E, it

11  shouldn't preserve that sphere.  It really couldn't without

12  conflicting, I think, with the speech protections that exist

13  under State law.

14         I point the Court to, and this isn't cited in our

15  brief, and I apologize for that, but United States versus

16  National Treasury Employees Union.  It's 513 U.S. 454.  I'm

17  going to characterize it.  I know you're going to read it.  But

18  all nine justices in that case have dealt with honoraria for

19  federal employees, and it was blanket ban on them.  All nine

20  justices in that case appeared to contemplate that, if there

21  were a sufficient nexus between the ban and the governmental --

22  the role as a governmental employee, that would survive a

23  facial challenge.  It was really a dispute in that case between

24  whether this ban could be saved because insofar as, you know,

25  could the private speech be severed from the public speech.

1    Justice O'Connor thought it could, five-justice majority

2    thought it couldn't, and then the three justices then took a

3    slightly different view and thought the whole thing survived.

4         But the point being that there is a pretty long

5    dialogue in that case about if a statute is connecting the

6    proscriptive conduct to governmental activity that's probably

7    okay, and I think that's reflected as well both in Honeyfund

8    and in Santa Cruz, where -- in Honeyfund, at least, it's really

9    just a footnote.  The footnote says, There's no dispute this

10   reaches private speech, so we're not going to get into that.

11        But in Santa Cruz Judge Freeman made the point that,

12   if this were limited to contract --

13        THE COURT:  Slow down.

14        MR. GARLAND:  I apologize.  If that case were limited

15   just to contractors doing work pursuant to their federal

16   contracts, it would be a different case.  Her concern was what

17   they're doing in private and it extending to private trainings

18   given by contractors unrelated to it.  The same view with

19   grantees there.  And I do think those cases support the notion

20   that, at least as a facial matter, if as a matter of statutory

21   construction the statute is tethered just to the sort of speech

22   that Garcetti would say isn't protected by First Amendment, the

23   facial challenge fails.  There may well be an as-applied

24   challenge if the concern that you have addressed comes to pass.

25        And I would note that I haven't been able to find any

1    facial challenge, at least at a U.S. Court of Appeals level, I

2    don't want to make a representation for District Courts, post

3    Garcetti that allowed a case to go forward based on the sort of

4    overbreadth theory that you've identified.  Every challenge

5    I've found has been an as-applied challenge.  Bremmerton was an

6    as-applied challenge.  The Sixth Circuit and Seventh Circuit

7    cases were as-applied challenges, too.

8              So, our position is as a matter of statutory

9    construction this does not sweep in enough protected conduct,

10   we don't think it sweeps in any, that it wouldn't be remedied

11   through that sort of challenge if it were misapplied, is our

12   position.  Thank you.

13             THE COURT:  Okay.  Good.  Anything else?

14             MR. GARLAND:  That's all, your Honor.

15             THE COURT:  Okay.  Thank you.  I'll hear plaintiffs on

16   the First Amendment issue.

17             MR. MOERDLER:  Your Honor, I have taken perhaps much,

18   too much time, but I would ask you to indulge me for a few

19   moments.

20             THE COURT:  I will.  It's an important issue.  I'll

21   hear you.

22             MR. MOERDLER:  And let me make very clear I doubt that

23   there was a single statement you just made that I would

24   disagree with, and yet I would say to you that First Amendment

25   protections are very much here.

1    Let me tell you why we pled a First Amendment claim.

2    The Supreme Court of the United States in three cases has said,

3    in words or substance that I'll give the Court in a moment, the

4    Court has said that the standard for First Amendment challenges

5    is more exacting where a void for vagueness challenge, not

6    determination, void for vagueness challenge is presented,

7    thereby suggesting to those on the FCC against Fox case and

8    also Baggett against Bullitt and Grayned, all three of those

9    Supreme Court cases.

10    Now that can be interpreted many, many ways.  One way

11    in which it is interpreted is the two interact, and you nailed

12    me on that in my main presentation when I talked about 189:11,

13    because what that does, it says to you the following:  I am

14    applying Garcetti because you are required to teach the

15    subject, but I'm not going to let you get off the hook on that,

16    because you're barred from doing it under this statute.

17    Put vagueness aside.  How do I know what speech is

18    chilled here?

19    Now, that isn't a total answer, and it cannot be until

20    there is discovery, which is what we said right from the

21    get-go, and that is exactly the point.  We reserved the right

22    to make an as-applied challenge depending on discovery.  If

23    there isn't a discovery here that shows it's there, I cannot

24    under Rule 11 allege it any further, but very clearly the

25    indicators are there, as I showed you in one of the documents

1    that was an exhibit.

2              Let me go a couple of steps further, if I may.  You

3    pointed out, quite correctly, and, as I said, I agree with

4    substantially everything you said to my adversary, that we seem

5    to argue otherwise from what the Court does.  We don't.

6              THE COURT:  Maybe you can help me with this, because

7    this is the struggle I have:  I read the case law, including

8    Ward, including Griswold, a number of other cases from outside

9    the Circuit that draw a distinction for First Amendment

10   purposes, academic freedom purposes between school teachers in

11   the elementary and secondary schools and college professors,

12   and that the concern that Justice Souter was expressing in

13   Garcetti, which I think is a very well-taken concern, that if

14   you simply say if you're engaging in government speech for your

15   employer, say at the University of New Hampshire, that you have

16   no First Amendment protection right would be very problematic

17   in a college or university setting.

18             On the other hand, it seems to me quite problematic to

19   suggest that that academic freedom extends in the same way to a

20   high school teacher, and I don't find support in the case law

21   for that.  But what I do find support for is that they don't

22   lose their First Amendment rights entirely.  They can't teach

23   something the school says they can't teach as long as the

24   school tells them clearly what it is they can't teach, but they

25   outside of the school might have -- outside of the classroom

1    doing their teaching duties might have a number of interactions

2    with pupils for which they could retain some residuum of First

3    Amendment protection.

4         So, I'm drawing that distinction.  If you think it's a

5    bad one, tell me --

6         MR. MOERDLER:  No, I don't.

7         THE COURT:  -- between curriculum control --

8         MR. MOERDLER:  I don't think it's a bad one.

9         THE COURT:  -- and speech outside of the curriculum.

10        You think that's a legitimate way to --

11        MR. MOERDLER:  I do not think it's a bad one.

12        THE COURT:  Okay.

13        MR. MOERDLER:  I suggest to you, however, the

14   following, and it is one that the case law has tended to go,

15   but I think it's the wrong test for the case law, and I believe

16   this case shows me why.

17        I keep coming back to 189, because there is a lengthy

18   dissertation by the Department of Education, which is also part

19   of the record, as to what you're allowed to teach and supposed

20   to teach.  You're supposed to teach genocide.  That's

21   superiority.  Take a look at Russia.  Can I teach the pupil by

22   saying that the Ukrainians were not of the match to the

23   Russians, that there's superiority there?  I'm required to

24   teach it.

25        I think what you get to is a principle which I can't

1    fully articulate but I will point to.  It's a waiver principle.

2    It's a principle that when government tells you to do it, it's

3    waived the protections of Garcetti, number one.

4         Number two, I have to take you back to one of my very

5    favorite quotes and why I have this case.  It's by Frankfurter

6    and John Marshall Harlan in Sweezy against New Hampshire.  It

7    is as follows:

8         I say that in these matters of the spirit inroads on

9    legitimacy must be resisted at their incipiency.  This kind of

10   evil grows by what it is allowed to feed on.  The admonition of

11   the Court in another context is applicable here.  It may be

12   that it is the least of the obnoxious thing in its mildest and

13   least repulsive form; but the illegitimate and unconstitutional

14   practices get their first footing in that way, namely, by

15   silent approaches and slight deviations from the legal modes of

16   procedure.

17        Now, I say to you that this is an as-applied case

18   because I believe that when we get into it, just based on the

19   statements of the legislators who introduced it, and based on

20   Edelblut's statement, based on those you're going to see that.

21   You're going to see partisan that's already been shown.

22        What about Pico, which specifically says in the

23   Supreme Court that if it is --

24        THE COURT:  Pico is a very important case, as you

25   know, a plurality decision --

1    MR. MOERDLER:  Right.

2    THE COURT:  -- that dealt with a very specific and a

3    highly First Amendment-ly sensitive issue of removal of books

4    from a school library, and I think Justice Souter's decision,

5    when writing for the Circuit in Griswold, made a very big

6    distinction.  He specifically talks about should a curriculum

7    decision be subject to the Pico review, or should it be subject

8    to our decisions about curricular control and concluded it

9    isn't a Pico case.

10    So I'm, frankly, reluctant to take that case, which

11    deals with a very important concept of library and what can be

12    removed from a library, and say, no, that wouldn't necessarily

13    apply in our case.

14    MR. MOERDLER:  I understand that, and I fully would

15    join in it if it were not, again, for the same fact, how do you

16    tell me what the curriculum is, when as recently as a few

17    months ago you're told to do it?

18    THE COURT:  Okay.  So, I think you have done a good

19    job of sensitizing me and to make me very carefully look at

20    your claim in your second count and maybe insofar as it relates

21    to your First Amendment claim as well, this argument that

22    you've expounded on in different ways that there are

23    requirements to teach X and prohibitions on teaching Y, and,

24    when you look at the two together, they leave a teacher with an

25    impossible burden.  That's your point?

1          MR. MOERDLER:  Yes, and I leave it there.

2          THE COURT:  And lend support to vagueness and First

3     Amendment.  I hear you on that.  I'll study it carefully before

4     I make any decision on the issue.

5          MR. MOERDLER:  I have one more point, two more points,

6     if I may.

7          THE COURT:  Go ahead.

8          MR. MOERDLER:  The first is, there is in the guidance

9     an explicit statement under Guidance Number 8 issued in the

10    name of the Department of Education and Human Rights and

11    Justice, which specifically says extracurricular activities are

12    part of the public school's work.

13         Now, that plays into the following question.  Let's

14    take Bremmerton a different way.  What is the difference if

15    that coach -- it's a high school football game.  What is the

16    difference if that coach assembles the kids in the break in

17    between the first and the second half and teaches religion,

18    pointing out, as the Supreme Court did, that freedom of speech

19    is in precisely the same provision of the *Constitution* as

20    freedom of religion?  And what if he wears a T-shirt that says,

21    Ukraine is right?  What is the difference between --

22         THE COURT:  I think maybe a more applicable problem

23    is, say, while the Black Lives Matter protests are going on,

24    and before that, when a professional football player is

25    criticized for kneeling at the *National Anthem* and a coach who

1    has a multi-racial staff of students is approached by students

2    after practice and say, We need to -- want to talk about this.

3    And, now, the coach may not be an educator under the standard,

4    but a lot of coaches are educators under the standard.  If he's

5    an educator under the standard and talks to pupils in ways that

6    could be -- that might not be governmental speech to which the

7    coach has no First Amendment right, and to the extent they

8    retain a First Amendment right it requires a balancing under

9    the more First Amendment protective standard that preceded

10   Garcetti, and under that, you know, combine that with the

11   vagueness argument you have, and you have a potential First

12   Amendment overbreadth argument.

13             MR. MOERDLER:  Exactly.

14             THE COURT:  I think you've made that point well.

15             MR. MOERDLER:  That is my point, and I add one last --

16   two words.

17             THE COURT:  Okay.

18             MR. MOERDLER:  Prior restraint.  Now, you add that to

19   the mix, and where are you?  You are in a situation, with

20   respect, your Honor, you are in a situation where you have

21   State action in the 189, you have specific counseling in the

22   FAQs that this is barred, you have a prior restraint, you have

23   no idea what is and isn't covered, and you have a prior

24   restraint that you can be brought up on charges right then and

25   there.  How do you do that?

1    THE COURT:  Okay.  All right.  I hear you on that,

2    although the words "prior restraint" do not appear in any of

3    the briefs that I've read.

4    MR. MOERDLER:  Your Honor, you are absolutely right.

5    I must confess to you that it is something I did in the

6    preparation of this argument.

7    THE COURT:  All right.  Well, I appreciate it.

8    So, let me just make clear to you, I have a very large

9    workload burden at the moment, and I'm trying to finish several

10   other very significant cases.  I don't expect I'll have a

11   decision for you until at least 60 days.  It won't be longer

12   than 90, but it will probably be about 60 days.

13   If the case survives the motion, then I will convene a

14   pretrial conference, and we can discuss the scope of any

15   discovery.  If the case, obviously, does not survive, then I'll

16   issue the order, the case will end, and appeal rights can be

17   preserved.  But as soon as I can get to a decision I'll issue

18   it, and then, if the case survives, we'll meet and talk about

19   the scope of discovery.

20   MR. MOERDLER:  Your Honor, I have no wish to give

21   offense in what I am about to say to anyone, least of all

22   Mr. Garland and his office.  I do hope that they and the

23   Department of Education and the other agencies have in mind the

24   preservation of all documents during that period.

25   THE COURT:  Well, you can send a preservation letter

1    to him.  He's probably done something already.

2          What do you want to say?

3          MR. GARLAND:  As a matter of course, your Honor, we

4    send document preservation notices.  I have no reason to

5    believe that one wasn't sent, but I will confirm when I get

6    back.

7          MR. MOERDLER:  Oh, that's fine.  Thank you.

8          THE COURT:  Okay, good.

9          I did not give the other side -- you're not raising a

10   First Amendment issue, but if you wanted to add anything, I'll

11   let you do it.

12         MR. BISSONNETTE:  My only addition, your Honor, is not

13   on the First Amendment claim, is to say, to the extent that

14   this claim survives, we probably will be seeking expedited

15   discovery.  We have the school year underway here.  There's a

16   lot of anxiety.

17         THE COURT:  Yeah.  I think, to the extent it survives,

18   now, I want to be -- I think we could envision an expedited

19   discovery regime but also a tightly focused discovery regime.

20   This is not a case where we need 200 depositions and 3 million

21   documents.  We can be targeted, and we can be expedited, and we

22   can be focused, and we can get the discovery done in a matter

23   of months, and we can get cross-motions for summary judgment,

24   which is where these cases ordinarily sort out if they don't

25   end up in a dismissal at the 12(b)(6) stage.  So, that would be

1    my intention:  fast, efficient, fair, narrow, get us to summary

2    judgment and then get a ruling one way or the other, if the

3    case survives the 12(b)(6) issue.

4         Okay.  All right.  I appreciate the good quality of

5    argument.  Thank you for your help.

6         THE CLERK:  All rise.

7    (WHEREUPON, the proceedings adjourned at 3:37 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3

4         I, Brenda K. Hancock, RMR, CRR and Official Court

5  Reporter of the United States District Court, do hereby certify

6  that the foregoing transcript constitutes, to the best of my

7  skill and ability, a true and accurate transcription of the

8  within proceedings.

9

10

11

12

13  Date: ___10/17/22          /s/ *Brenda K. Hancock*
                            Brenda K. Hancock, RMR, CRR

14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 20, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
LOCAL 8027 AFT-N.H.,                *
AFL-CIO, ET AL                      *
                                    *
              Plaintiffs,           *   1:21-cv-1077-PB
                                    *   February 15, 2023
              v.                    *   4:00 p.m.
                                    *
FRANK EDELBLUT, COMMISSIONER, N.H.  *
DEPARTMENT OF EDUCATION, ET AL      *
                                    *
              Defendants.           *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF STATUS CONFERENCE
HELD VIA VIDEOCONFERENCE
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Plaintiff:        Charles Moerdler, Esq.
                          David Kahne, Esq.
                          Strook, Strook & Lavan LLP

                          Gilles R. Bissonnette, Esq.
                          American Civil Liberties Union of NH

For the Defendant:        Samuel R.V. Garland, Esq.
                          NH Attorney General's Office

Also Present:             Peter J. Peronni, Esq.
                          Elizabeth Clark Milburn, Esq.
                          Morgan C. Nighan, Esq.
                          Esther Kane Dickinson, Esq.
                          Henry Klementowicz, Esq.
                          Jennifer A. Eber, Esq.
                          Suzanne Amy Spencer, Esq.
                          Nathan Reed Fennessy, Esq.

Court Reporter:           Liza W. Dubois, RMR, CRR
                          Official Court Reporter
                          U.S. District Court
                          55 Pleasant Street
                          Concord, New Hampshire 03301
                          (603) 225-1442

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  Good afternoon, Judge.

 3            We're here in the matter of Local 8027, et al vs.

 4   New Hampshire Department of Education, et al, for a preliminary

 5   pretrial conference, 21-cv-1077-PB.

 6            THE COURT:  All right.  So I've read the submission.

 7   It seems like both parties believe that this case is resolvable

 8   on cross motions for summary judgment.

 9            The plaintiffs would like expedited discovery.  The

10   defendant contends that while discovery isn't necessary, they

11   agree that what discovery can be had should be expedited.

12            I'll start with each plaintiff, whichever one wants

13   to go first.  What -- what else would you like to tell me about

14   how you'd like the case to proceed from here?

15            MR. MOERDLER:  If I may, unless Mr. Bissonnette

16   wishes to go first, Charles Moerdler, Strook, Strook & Lavan in

17   New York for AFT.

18            Judge, I think I need to give you a little bit of

19   additional background.

20            Over the course of the past few weeks, we have been

21   trying to deal with the Attorney General's Office to see if we

22   can find a way of resolving even more of this and having even

23   less of a burden on both lawyers and the Court.  Our thinking

24   had been that your Honor's decision was clear as a bell,

25   explicit, and it resolved, for all purposes, those things I
```

1    won, those things I lost; better stated, those things I won and

2    Gilles lost.

3            THE COURT:  I guess I have to admire your sense of

4    self-confidence, sir.

5            MR. MOERDLER:  I'm so sorry, Judge.

6            THE COURT:  That's all right.  I know you couldn't

7    resist.  Just go ahead.

8            MR. MOERDLER:  You're absolutely right.

9            So the -- what we were thinking of doing was trying

10   to do the following, or we had proposed it.

11           If we could reduce the findings that we thought the

12   Court or the conclusions that the Court had reached into the

13   form of a finding which was a final finding that could be a

14   judgment and that -- in that event, we would then have a final

15   order.  Various portions, including my leave to amend, then

16   going out the window, being dismissed and gone, and thereby be

17   able if they wish to go up, as I understand they do, they would

18   have a final order.  We would then be able to dispense with

19   discovery and go to the First Circuit, if that is their wish,

20   on that basis.

21           Unfortunately, that didn't seem to work too well and

22   the Attorney General's Office thought that it was more

23   appropriate for them to have -- go another round and

24   additionally to raise two what I call new but they're certainly

25   different issues, one of which you specifically commented on in

1    the opinion.

2                     (Technical difficulties.)

3              THE COURT:  Did I lose counsel?  I think I did.

4              Let's hope that he logs on again.

5              And maybe -- Mr. Bissonnette, maybe you can fill us

6    in on your client's position while we're waiting.

7              MR. BISSONNETTE:  Sure.  Thank you, your Honor.

8              And I think the -- one of the common themes, I

9    think, between kind of my side and AFT'S side represented by

10   Attorney Moerdler is just the concern about any kind of further

11   delay that would prevent us from getting to final judgment and

12   final resolution.

13             And so Attorney Moerdler is correct that we've been

14   having some discussions with the State to try to see if there

15   was some sort of way, some sort of mechanism, to get to final

16   judgment as quickly as possible, obviously with them reserving

17   their appellate rights.

18             You know, because -- you know, I agree with Attorney

19   Moerdler that it seems like your order was pretty close to

20   final on a lot of these issues recognizing, of course, it was

21   in the posture of a motion to dismiss, but it really wasn't

22   clear to us that there was much left with respect to the

23   analysis.

24             And so that did, as Attorney Moerdler said, led to

25   multiple discussions.  One was in the form of a potential

1  stipulation that would, you know, get this case to final

2  judgment quickly, preserving appellate rights; the other was

3  potentially the option, and this is mentioned in the discovery

4  plan, of foregoing discovery, you know, with the -- with there

5  being a preliminary injunction, agreed-upon preliminary

6  injunction in place, that would serve to provide our clients

7  with the protection that they're entitled to while briefing,

8  summary judgment briefing, occurs.

9          So these are kind of various permutations that we've

10 all discussed to try to get there.

11         Where Moerdler left off, and I know it's a little

12 bit of a cliffhanger, we have -- in the purpose -- as we've

13 been having these discussions with the State, it does seem that

14 there are two other issues that the State, you know, may want

15 to raise.  I'll let Attorney Garland, you know, present those.

16 But I think from where we stand --

17         THE COURT:  I have to acknowledge I'm a little bit

18 confused because when I read the filing, I thought it was you

19 guys that wanted to do discovery and the State said it was a

20 pure legal question --

21         MR. BISSONNETTE:  Sure.

22         THE COURT:  -- that didn't need discovery.  Now I'm

23 hearing you want to do it as a pure legal question and the

24 State wants the chance to do discovery?

25         MR. BISSONNETTE:  Yeah.

```
 1                THE COURT:  I --
 2                MR. BISSONNETTE:  Well, I think the concern that we
 3    have, I -- I see that.  I think that one of the things that
 4    we're struggling with, all of us here, is, you know, discovery
 5    could be necessary.  We certainly presented that at the
 6    hearing, right, the notion that even in the context of a facial
 7    claim there could be issues, important issues, that this Court
 8    may think need to be addressed in discovery germane to the
 9    facial claim; for example, complaints, how the relevant
10    agencies interpret the law in question, the order of
11    operations.
12                And so I think that certainly are germane, but, you
13    know, there have been questions raised by the State as to
14    whether or not that discovery is necessary for the facial
15    claim.  I think I'm very interested in your thoughts, your
16    Honor, on that because we don't want to forgo something when
17    your Honor may think it's critical to your analysis to reach
18    final judgment.  So I think that kind of, to some extent,
19    explains, you know, the position that we took in the discovery
20    plan.
21                I think where I am at at the end of the day
22    representing my side is however your Honor wants to approach
23    this case, you know, we're amenable, but we are very concerned
24    about delay because --
25                THE COURT:  Yeah.  And I -- I understand that.  Let
```

1  me offer a couple of comments and then I'll turn to Mr. Garland

2  for his views about the additional issues.

3          I do want -- and you acknowledge this,

4  Mr. Bissonnette.  I was present with a Rule 12(b)(6) motion.

5  The standard in a Rule 12(b)(6) motion, as we all know, is a

6  plausibility standard.  I cannot, in ruling on a 12(b)(6)

7  motion, decide the case for the plaintiffs.  I can only decide

8  whether claims should be dismissed.  And there were certain

9  claims that were dismissed and the remaining claims were not

10  dismissed.

11          Now, because of the complexity of the legal issues

12  that you presented to me, I felt it would be helpful for this

13  case going forward to give you a full-throated, carefully

14  considered explanation of how I viewed the relevant law and I

15  took the extra time to do that so that it would be my best

16  effort to tell you how I think the law works in this particular

17  case.

18          That does not mean that I've decided the case.  I

19  was not in a position to decide it and I'm sure those of you

20  that undertook a close reading would find the word plausible or

21  plausibly interspersed with a lot of my conclusions, first.

22          Second, I left certain issues open because they

23  weren't reached by Mr. Garland, at least to my satisfaction.

24  One of the principal issues was in resolving ATF (sic)

25  plaintiff's First Amendment claim, I concluded that the

 1    plaintiffs do not have a First Amendment right to control

 2    curricular speech.  And so I found that claim to be deficient

 3    as to how it applied to curricular speech.  I -- and that

 4    ruling has been made.

 5             But I made clear that implicit in their argument,

 6    your -- the ATF plaintiff's argument, was an argument that even

 7    if there is not a First Amendment protected right on the part

 8    of teachers over curricular speech that the laws, arguably, I

 9    emphasize arguably, reached beyond curricular speech and dealt

10    with let's call it extracurriculars such as the prayers that

11    were recently decided were not curricular speech and were

12    entitled to First Amendment protection in the recent Supreme

13    Court decision.

14             Now, that issue, I -- ATF asserts that the law can

15    be read broadly enough to encompass a wide range of

16    extracurricular speech.  Under *Garcetti*, government employees

17    may retain certain First Amendment rights with respect to their

18    speech even though they are government employees and I simply

19    was trying to make clear on that issue, the issue has not been

20    fully joined and I certainly can't dismiss the claim in its

21    entirety.

22             So that's important to note as an example of the

23    case where I said there is an issue here, the -- the

24    defendants' briefing does not warrant complete dismissal of the

25    claim and there may be a remnant of protection, but that

1    doesn't mean I know the outer boundaries of that remnant of

2    protection.  I -- it doesn't mean I've explained to you how I

3    would resolve the issue if I determined that there was

4    extracurricular speech that could potentially be encompassed by

5    the rule because then I would not be doing an all-or-nothing

6    *Garcetti* analysis; I would be doing a more nuanced balancing

7    analysis that would have been required under pre-*Garcetti* case

8    law.

9          So that's an example of an area where my order was

10   not dispositive.  And I -- I would -- while I have tried to be

11   as clear as I possibly can about my views on the relevant law,

12   and I recognize particularly with respect to the vagueness

13   claim I have outlined my views about how a vagueness -- a

14   facial vagueness challenge should be raised.  I have identified

15   various problems with the vagueness of the statute, but I

16   haven't made a definitive ruling and nobody should count their

17   chickens here.  Okay?

18         As to -- and I'll turn now to Mr. Garland.

19         And, Mr. Garland, things seem to have flipped.  It

20   seems like you want discovery delay and they want an immediate

21   ruling.  Tell me about your thinking.

22         MR. GARLAND:  I don't know if that's quite right,

23   your Honor.  Our position still, our default position, is that

24   we can do additional briefing on the First Amendment issue you

25   just identified.  We've identified a few areas where I think we

1     feel we need to -- particularly given the posture in the

2     briefing on the 12(b)(6) motion -- certainly need to preserve

3     arguments with respect to vagueness, if not persuade you that

4     the statute is not, in fact, vague.

5             And so we couldn't agree to a stipulation based on

6     the framework of your order though we do very much appreciate,

7     you know, the effort you put into it.  It's very helpful to

8     see, you know, the framework and your views on the law.  That's

9     been very useful for our analysis.

10            And so my default position is we can brief those

11    remaining issues in cross motions now.  I think they're legal

12    issues.  No discovery is necessary.  But understanding that --

13    you know, my understanding is the plaintiffs didn't agree to

14    that, short of us agreeing to a PI, which I'm not authorized to

15    do, or agreeing to a stipulation, which I'm not authorized to

16    do, we tried to find some middle ground of compromise --

17            THE COURT:  Let me stop you because I need to

18    understand.

19            I get it, PI, to the extent they wanted a PI to

20    leave in place while we do something, you aren't able to agree

21    to that.  I understand.  I'm not sure what this stipulation

22    that you both are talking about would entail.  And what, if

23    anything, can you tell me about this idea of a stipulation?

24            MR. GARLAND:  Yeah, absolutely, your Honor.

25            So after your order came out, we -- we talked within

```
1    a few days, I think Attorney Moerdler and Attorney Bissonnette
2    and myself, about, you know, what your order said and kind of
3    the road map that we all saw from it and I think we all agreed
4    that it was a very thorough order that gave us a lot of clarity
5    on where you view -- view the case in terms of, you know, the
6    legal analysis.
7              My proposal then was further briefing, just as I
8    just suggested to you.  The response that I got from -- to
9    that, and understandably, was that the plaintiffs were
10   resistant to that, but if we were willing to agree to some sort
11   of stipulation of final judgment along the terms of your order
12   that would end the district court matter, we would preserve our
13   right to appeal, and that would be something that they would
14   entertain.  And I certainly -- I brought it back to my clients
15   and it was not something we could agree to.
16             And so.
17             THE COURT:  Are you saying a stipulation that given
18   the Court's rulings that judgment should enter for the
19   plaintiff but the defendant wants to preserve its rights to
20   challenge on appeal?  Is that your position?
21             MR. GARLAND:  Exactly, your Honor.  And we
22   weren't --
23             THE COURT:  That's the stipulation that was being --
24             MR. GARLAND:  Yes.
25             THE COURT:  Okay.  And you couldn't do that is what
```

1    it comes down to.

2           MR. GARLAND:  I think we -- there are issues that we

3    need to at a very least preserve, if not -- if not, you know,

4    kind of -- there's no --

5           THE COURT:  Testify what those issues would be.

6           MR. GARLAND:  Yes, your Honor.

7           So I think one issue that you've already identified

8    is the scope of the -- kind of the application of this law to

9    speech and whether that implicates extracurricular speech at

10   all.  And if it does, whether under the Pickering Connick

11   standard it violates the Constitution.  And so I think that

12   issue is certainly still out there, it's not something that

13   we've briefed, and we acknowledge that.

14          Another issue that I think we need to provide some

15   clarification on, because your order pointed out, in your view,

16   inconsistencies are what I said in court to you during the

17   hearing versus what the Attorney General's opinion says.

18   And -- and, you know, I've gone back and read the hearing

19   transcript and I think I could have certainly been clearer on

20   that with you at that time.

21          And so --

22          THE COURT:  That's a nice way of saying that I got

23   it wrong in describing your position; is that --

24          MR. GARLAND:  I don't want to go so far as to say

25   that, your Honor.  Certainly not that.

1    But in terms of there being detention there, I think

2  that's something that we've given additional thought to in

3  light of your order and the way that certainly it's framed

4  there.

5    And then I think also there's a question of

6  severability.  You correctly noted we never briefed that.  I

7  think there is an important question around that, particularly

8  insofar as you've identified the penalties really being a

9  significant factor in your -- in your analysis.  And we think

10  there's some briefing we could do around that.

11    There may well be --

12    THE COURT:  There definitely could be a severability

13  argument presented here because there is a -- as you well

14  know -- a severability provision in the statute.  And although

15  Mr. Bissonnette tried to characterize his claim as an as

16  applied claim as to teachers, what I really think it is is a

17  facial challenge by teachers' groups about the way in which the

18  statute affects teachers.  And that was the focus of my

19  analysis because that was the -- what the plaintiffs were

20  presenting to me.

21    And it would not necessarily follow that the

22  entire statute would fall root and branch even if it is a --

23  my ultimate conclusion that the claims presented by teachers,

24  that the claim can -- that the statute cannot be

25  constitutionally applied to teachers because of the sanction

1   provisions which affect them in unique ways and leave them

2   particularly vulnerable in ways that require greater notice to

3   satisfy fair notice concepts.

4            And that was at the heart of my analysis about the

5   way I think facial challenges work and about the way vagueness

6   challenges work when there are aspects of the law that are

7   particularly problematic in that they impose very, very serious

8   career-ending sanctions on teachers.  And it does not follow

9   that every other provision in the statute, it applies much more

10  broadly than teachers, and for which there are not comparable

11  penalties.

12           And so I think that's something that definitely is

13  the case and certainly I would fully understand if any

14  stipulation you were being asked to enter into would be a

15  stipulation only as to the vagueness of the statute as it

16  applies to educators.  And I use the term educators as that's

17  the statutory term there which is broader than what we think of

18  as just teachers but encompasses a variety of people that

19  require certifications for their ability to practice their

20  profession.

21           So I -- I understand your concern about that.  I

22  understand your desire to be able to weigh in on the Pickering

23  Connick standard and how it might apply to speech by teachers

24  outside of the classroom which really hasn't been addressed.

25  But that's fine.  Nobody can make you enter into a stipulation

1    or a preliminary injunction.

2         I understand -- I -- look.  I -- I am sufficiently

3    humble that I understand the reality of my situation.  It is

4    highly, highly likely that however this case is resolved at my

5    level, it will be appealed.  And it is highly, highly likely

6    that the Court of Appeals will be the -- the final voice on

7    this particular issue.  And why not get it to them as soon as

8    we possibly can.  That -- that is a sensible thing.

9         But I can tell you, having sat with appellate panels

10   many, many times, that's great, but an appellate panel doesn't

11   want to issue a definitive case-resolving decision on less than

12   a complete record.  They would rather have me make sure that I

13   develop a complete record before they have to weigh in on these

14   issues.

15        And so I -- I think we have to be somewhat cautious

16   on simply saying, oh, Barbadoro in the 12(b)(6) order told us

17   clearly about what he thinks.  Yeah, I've told you what I think

18   about the way vagueness law works, for example, the way facial

19   challenges to vague statutes work, and those are unresolved

20   issues.  They have not been authoritatively resolved by the

21   First Circuit.  So the First Circuit might well take a

22   different view on that matter and if they do, it could end the

23   litigation right there because this is a facial vagueness

24   challenge.

25        So I understand the parties wanting to get it to the

1  Court of Appeals and I would be happy to have the Court of

2  Appeals hear it.  I just want to be sure I don't let the Court

3  of Appeals down here and I develop a record that is sufficient

4  so that that court will be comfortable in resolving those

5  issues.

6          And so you asked me about, you know, are there

7  things that could -- if I were an appellate judge, for example,

8  reviewing a record in this case, one of the things I might want

9  to know more about, for example, is exactly what kinds of

10  extracurricular speech do teachers have with their students.

11          We had some discussion of that, but there's no

12  evidence in the record about what kinds of extracurricular

13  speech teachers actually have with their students.

14          It might be useful to know during the ensuing months

15  since this case has been filed, have there been any complaints

16  about violations of the statute by teachers or educators more

17  broadly.

18          It could be valuable to know what -- whether there

19  have been further expressions of opinion by implementers of

20  the -- the statute between now and then.

21          If the parties -- but it is up to the parties to

22  develop their cases, not me.  I'm here to respond to what you

23  do, not sit -- try to set up the case the way I would want it

24  to be set up.  But I do think that those are a couple of things

25  the Court of Appeals, a judge on the Court of Appeals, might

1   want to know something about and I could see a question being

2   asked, well, why shouldn't we just remand that to the trial

3   judge here, let him develop a record.  And that then delays the

4   case by another year.

5           So you don't want to bring it up prematurely and

6   then it takes -- because this -- these raise -- these are very

7   important and complex and unresolved issues.  I guarantee you

8   the Court of Appeals will want to carefully consider these

9   issues before it writes an opinion.

10          It will take many, many months.  It'll be well over

11  a year before the Court of Appeals likely responds on it.  So

12  the last thing you want is to push it up prematurely to the

13  Court of Appeals, only to be told that it has to be -- certain

14  issues have to be developed on remand and we're now three years

15  into the process.

16          So I will not -- it's up to you to build the record

17  that you both want to build.  I'm here to help you do that.

18  But those are a couple of thoughts that I have.  And then --

19          MR. BISSONNETTE:  Sure.

20          THE COURT:  -- one thought that I almost always do,

21  and there may just be nothing on this point, is I like to have

22  a full indexed copy of the legislative history of a statute

23  like this in the record.  And it may be that my brief summary

24  of that legislative history is all that there is and if that's

25  so, fine.  But if there were any statements on the floor, if

1    there were any statements in committee of which there's a

2    record, it probably is worthwhile to collect and include it in

3    the record --

4            MR. BISSONNETTE:  Yes.

5            THE COURT:  -- so that the Court of Appeals doesn't

6    have to go hunting around in it -- for it if they think it is.

7            So those are, I guess, three things that -- three or

8    four things that if I were an appellate judge potentially I

9    might need to see something in the record about before I could

10   finally resolve the matter.

11           So I -- I understand.  I don't fault the Attorney

12   General for not agreeing to a stipulation.  I -- I don't fault

13   the Attorney General for not agreeing to a PI.

14           It remains if the -- if the plaintiffs -- and I

15   think the plaintiffs made absolutely the right choice in not

16   seeking a PI initially because, again, I think Mr. Bissonnette

17   has enough experience with me to know that I don't rush into

18   making difficult decisions on the constitutionality of state

19   statutes and I don't do that lightly and it would have taken me

20   several months before I could feel comfortable giving you the

21   analysis I gave here.

22           So I don't fault anybody here, but it -- if -- if

23   you are unable to agree on either a stipulation or a -- the

24   entry of a PI, the plaintiffs certainly could ask for a

25   preliminary injunction.  Again, I would want to be sure that

1    the record was sufficiently developed so the Court of Appeals

2    could finally resolve the case, but it might make more sense to

3    simply do some limited expedited discovery on a targeted set of

4    issues and have a schedule for cross motions, where both

5    parties agree now the record is fully complete, we've had a

6    chance to build our record, we're satisfied, we both believe

7    the Court has everything it needs to resolve all issues in the

8    case, and then I can take my crack at it and then you can go

9    back -- go to the Court of Appeals.

10            MR. BISSONNETTE:  Yup.

11            THE COURT:  You know, so if after -- you know,

12   unlike at the current stage, where I have only issued a ruling

13   denying a motion to dismiss, if I conclude after a fully

14   developed record that the plaintiffs are entitled to summary

15   judgment, at that point I would either enter the preliminary --

16   the permanent injunction or I would say to the State Attorney

17   General's Office what I have said in the very few times I have

18   ever held a state statute unconstitutional:  Oh, by the way,

19   I've given you this explanation, I don't expect you to be

20   enforcing this thing against anybody while you're on appeal and

21   if you're feeling otherwise, tell me, you know.  Because

22   normally state officials are presumed to follow rules of

23   federal courts and -- rulings of federal courts and unless you

24   ask for my permission to stay the effect of my order, I'd

25   expect you to abide by it, you know.

1        MR. BISSONNETTE:  Yeah.

2        THE COURT:  So -- so that's where I am.  I

3   understand your positions now.

4        Counsel, I'm sorry we lost you for a minute, but you

5   have an able colleague in Mr. Bissonnette who was able to, I

6   believe, fully describe your position.  You must have other AFT

7   counsel here on the file -- or in the hearing.  If you want any

8   of them to speak or if you want to say anything else, go ahead,

9   but where I am is this.

10        It sounds like the parties undertook reasonable

11   efforts to get an expedited decision by way of the entry of a

12   PI that could be appealed or a stipulation for judgment

13   reserving the right to appeal.  Those are both legitimate

14   things to do for legitimate reasons.  The Attorney General is

15   not prepared to enter into a stipulation or agreed-upon PI and

16   so we are then left with how do we proceed.

17        Mr. Garland acknowledges there are a couple of

18   issues that he needs to do supplemental briefing on based on my

19   order.  Even if there were no facts in dispute, he'd need to do

20   briefing on that.  Mr. Bissonnette said, you know, we want a

21   fast ruling, we want to get this thing moving, but, you know,

22   if there are particular concerns the Court has, we would

23   obviously want to listen to that.  My response to that,

24   paraphrasing again, is it's up to you guys to build the record

25   that you want.

1   I don't -- that's not my role.  But I tried to

2   identify a handful of issues on which it might be helpful to a

3   Court of Appeals judge reviewing this case and I -- I -- I

4   think I identified what some -- some discovery or record

5   stipulations could maybe do it about what teachers do in their

6   interactions with students that could be characterized as

7   extracurricular in a way that would entitle them to Pickering

8   Connick First Amendment protection even if they have no First

9   Amendment protection as to curricular speech.

10   Another issue that -- that I identified was it could

11   be helpful to know what, if any, complaints have, in fact, been

12   made between now -- the time of the statute's effectiveness and

13   now that weren't provided to me and, finally, to the extent

14   there have been enforcer interpretation in addition to what I

15   had available to me, those would be potentially relevant to

16   know.

17   And then the last thing I referenced was if there is

18   any substantial legislative history that wasn't in front of me,

19   I didn't go out and try to do it myself.  The preferred way, at

20   least for me, is for the parties to collect it, stipulate it,

21   index it, Bates stamp it, and submit it as an exhibit so that

22   no -- no other law clerk or Court of Appeals judge has to send

23   somebody up to the New Hampshire Archives to try to dig out

24   obscure legislative history.

25   Some judges think it's relevant.  Some don't.  I

1    have used it on occasion.  I don't -- I'm cautious about using

2    it.  But generally when the constitutionality of a statute is

3    challenged, I like to see the legislative history.

4              So in response to Mr. Bissonnette's question, those

5    are some things that you might want to consider.  But if you're

6    just ready to file your motions and you agreed to file them,

7    I'll rule on what I -- what you've given.

8              Okay?  So, Mr. Bissonnette, do you want to follow up

9    and then --

10             MR. BISSONNETTE:  I do.

11             THE COURT:  Okay.  Go ahead.

12             MR. BISSONNETTE:  I just want to say I think this

13   has been really helpful for me just -- to learn just how to --

14   how we as litigants in the parties here should interpret your

15   order in this case.  And what I was struggling with in reading

16   this order is that, you know -- and obviously I saw all the

17   Rule 12(b)(6) caveats, but, you know, one of the questions that

18   was really presented in my brain is is this kind of an unusual

19   case where maybe there were legal rulings kind of embedded

20   within that 12(b)(6).

21             Clearly you made clear to us that I shouldn't over

22   read that and I appreciate that very much.  And I think, two,

23   our discovery plan really was designed to reflect what we

24   talked about at the inception of this case at the motion to

25   dismiss argument which is if it was denied -- it was denied,

1   then we do expedited discovery and cross motions in the normal

2   course but on an expedited basis, recognizing that at least in

3   the plaintiff's view there is exigence here and harm the longer

4   this law moves forward without some sort of relief.

5          So I just want to say that this has been very

6   helpful to me, I'm sure to all of my colleagues here.  We are

7   prepared to move forward on an expedited basis as reflected in

8   the discovery plan, a truncated 90-day discovery window with

9   various discovery topics that we've specified in the discovery

10  plan, much of which you've already covered during this status

11  conference.

12         So I just -- I want to just be very clear we're

13  ready to move forward.  We're ready to move forward quickly.

14  We're ready to move forward now on these limited issues.  You

15  know, because -- and we really do not want this to go beyond

16  90 days.  We're all going to have to work fast and quickly in

17  order to get that brief -- get that -- those briefs on file.

18         I would say that I do believe the legislative

19  history may already be part -- may have already been docketed.

20  I'd have to go and check that.  But on those --

21         THE COURT:  I just wanted to be sure we had it --

22         MR. BISSONNETTE:  Yeah, I'll agree.  I'll check that

23  again, your Honor.  I don't want to misspeak.

24         But we're prepared to move forward along the lines

25  that you've conveyed to us.

1   THE COURT:  All right.  So I -- I do think,

2   Mr. Garland, so you have some legal issues that you want to be

3   able to brief.  We've talked about those.  I think they're

4   appropriate to raise in a -- in the cross motions for summary

5   judgment practice.  I -- I think if the discovery is narrow and

6   focused and it will require some work on each side to get this

7   record fully developed, there's a reasonable possibility that

8   you can get the discovery done in this kind of expedited way.

9   I would take, at most, a handful of depositions.  A lot of it

10  would be, you know, paper discovery.  A lot of it -- and it

11  is -- we're not talking hundreds of thousands of pages here.

12  We're talking a very limited subset of pages.

13          But I'm thinking, for example, to the extent

14  Mr. Bissonnette decides that it's important to have in the

15  record how teachers interact with students on an

16  extracurricular basis, he's got to come forward with some

17  evidence on that particular point and you should be entitled to

18  interrogate that evidence in order to make sure the issue is

19  fairly represented.

20          And so I think a relatively small subset of

21  depositions with lawyers working together -- Mr. Moerdler, one

22  thing we did not -- we talked about while you were

23  unfortunately offline was -- and I'm not sure, it looks like

24  your screen's frozen, but if you're hearing me -- there's also

25  a severance question here because at least my order was

1   targeted at the relief that the two groups of plaintiffs were

2   seeking, which was really targeted at teachers who, in my view,

3   are in the most vulnerable position as a result of this statute

4   and who face unique problems that make the State's position far

5   less tenable.

6            And so there's a reasonable likelihood here that I

7   would do nothing more by way of final judgment than determine

8   that any application of the statute -- that the provision --

9   the only provision that I'm saying are unconstitutionally

10  vague are those provisions that bear directly on what educators

11  are -- how they affect educators and leaving potentially other

12  for further development perhaps in other cases those provisions

13  which have no bearing on educators.

14           So that -- unless the parties posture the case in a

15  different way, there is a severability provision.  I would be

16  inclined to focus any ruling I make on those provisions which

17  have been litigated in front of me and not on sweeping

18  wholesale invalidation of the statute, even if I'm persuaded by

19  the plaintiffs' position.

20           And, you know, I understand, Mr. Bissonnette, I -- I

21  could have written a 15-page order that just would have denied

22  in part and granted in part, but I felt that the legal issues

23  are complex enough that as you go forward you ought to at least

24  know my position so that you can, in the final set of briefing,

25  stake out your reasoning why I'm right on this and wrong on

1    that and give me one last chance to correct any mistakes and

2    then -- then the Court of Appeals can have it.

3         So that's why I did what I did.  And I understand

4    it.  I mean, there -- on certain issues like how -- how should

5    a vagueness challenge be viewed and what does fair notice

6    require, and what do the kind of penalty provisions -- how do

7    these provisions operate and what are the challenges they

8    present when -- in the face of a vagueness challenge, those are

9    my views.  They're not likely to change because I spent a lot

10   of time thinking about them.  And other people -- other judges

11   might have different views and the Court of Appeals might well

12   correct me on those views.  But I'm unlikely to change them

13   between now and then unless you present me with some obvious

14   legal analysis on a point that I've overlooked and I didn't

15   think through.

16        So I think we're -- we've got a path going forward.

17   It seems like that path involves this expedited discovery and I

18   do think in the long run, Mr. Bissonnette, what your clients

19   want is not just a quick ruling that gets -- that ends up with

20   three years of delay; you want a ruling that can form a basis

21   for a successful appellate challenge, as does Mr. Garland

22   because both sides have an interest in having the final

23   authoritative determination on the constitutionality of this

24   statute, which we all know isn't going to come from me.

25        So let's -- let's do this.  Let's get the expedited

1    discovery done.  Let's follow the briefing schedule you've

2    negotiated.

3              Mr. Moerdler, I'll give you a chance in just a

4    second.

5              Let's get the cross motions for summary judgment

6    filed.

7              The one thing, you know, I -- Mr. Garland served as

8    a law clerk on this court.  He knows well our law clerk

9    changing schedule.  I was -- I was saddened to see that you're

10   proposing a schedule that doesn't let me decide the case until

11   I have a turnover of law clerks because that means a very

12   substantial reeducation campaign with some relatively new law

13   school graduates.  But, you know, I -- as valuable as my law

14   clerks are on this, is my work, I fully know the law in this

15   area, so I'll have to make the most of my experience and

16   educate them quickly.

17             But, you know, again, it'll be a new crop of law

18   clerks in September trying to struggle with whatever happens at

19   oral argument.  And it may take me a few months to get a final

20   order out although I really hope that that order of mine is

21   clear enough and is careful enough in a legal analysis that at

22   least it sets forth my position that should enable all of us to

23   do our work more efficiently, at least at this level.

24             So, Mr. Moerdler, I'm sorry.  You were cut off and I

25   just didn't want to wait until we got you back on.  I hope

1   there's another representative of AT that was on the line that

2   can brief you.  In any event, I have a court reporter here and

3   if you need a transcript, you can order one.  But I think I've

4   summarized what -- where we were on this.

5          But what else would you like to say, sir?

6          I'm sorry, I'm not hearing you now.

7          Who's local counsel for Mr. Moerdler?

8          MR. KAHNE:  I can -- Chuck, it sounds like you might

9   be muted.

10          This is David --

11          THE COURT:  Yeah, you're muted.  So let me turn to

12   your cocounsel and just, sir, what would you like to say?

13          MR. KAHNE:  Thank you, Judge.  There's just one

14   point I wanted to make and I think it's just sort of for

15   clarification purposes.

16          The stipulation that we were contemplating, I think

17   it did not -- it wasn't so expansive as to get into the area of

18   the First Amendment.  It was really supposed to be sort of

19   narrowly focused on the facial -- and not even the as applied

20   challenge, only the facial vagueness challenge.  Because as you

21   pointed out, I think your opinion in that area was particularly

22   clear.

23          So -- but we fully understand your -- your point

24   about you're developing an entire record as opposed to going

25   up piecemeal, but I just wanted to make clear that the part of

1  the -- of the stipulation and that the expedition that we were

2  seeking was just on that portion of the facial vagueness, to

3  get that up to the First Circuit as quickly as possible.

4          THE COURT:  And I get that, because that's the

5  portion of my order which is the most definitive.  It does turn

6  largely on legal issues and facts that are either undisputed or

7  language in the statute itself.

8          And you could do that, but, again, suppose you had a

9  one judge on a three-judge panel that said, you know, I'm not

10  sure that a facial vagueness challenge should be subject to --

11  to review, but maybe there's a First Amendment claim here that

12  is sufficient to justify a -- a more exacting vagueness review

13  standard, but we can't answer that question.

14          So you never know what a panel on the Court of

15  Appeals would be interested in knowing and since there is that

16  issue hanging out there, if, for example, there -- you were to

17  persuade me that there is First Amendment-protected speech that

18  is affected by this statute, that would bolster your vagueness

19  challenge because, as we know, First Amendment vagueness

20  challenges are subject to a quite rigorous standard of review

21  and it might give the -- the Court of Appeals an alternative

22  path if the Court did not want to take up the issue that I took

23  up about how *Johnson* affects facial vagueness challenges; they

24  might want to focus on the First Amendment as an alternative

25  route to getting to the same standard of review.

1    So you could -- so I -- I understand your concern,

2    but the absolute worst thing we could have is a remand here.

3    Okay?  We need to get it done with me and so that the court

4    that really will decide the case can decide it.  And that's the

5    quickest path to answering the question for both sides, which

6    is so important.

7    So I think you just have to bear with us.  The

8    reality is federal courts, appropriately, are very deferential

9    to state and federal legislative bodies.  We don't lightly

10   entertain constitutional challenges to state or federal

11   legislation.  There are only, really, two cases in 30 years

12   where I've found a state statute unconstitutional.

13   In both cases, I was ultimately upheld.  The -- one

14   by Mr. Bissonnette in the First Circuit and one by the Supreme

15   Court in the Vermont case that affirmed my decision after the

16   First Circuit reversed me on it.  But they're very important,

17   serious challenges that you don't resolve lightly.  And I have

18   great respect for the New Hampshire Legislature and I'm going

19   to carefully consider any constitutionality challenge to a

20   state statute.  It just takes time.  It's too important to do

21   it quickly.

22   So I'll get it done as fast as I can, but it's going

23   to take a little bit of time.

24   I don't know, Mr. Moerdler.  Are you back online?

25   Oh, no, sorry.  I -- I'm sorry, Mr. Moerdler.  We'll

1   just try to get you next time.  And I -- you, fortunately, have

2   a very good team of lawyers here who can speak for your client

3   as well as for the coplaintiff.

4            So I think we've about covered it.

5            Mr. Bissonnette, anything more from you?

6            MR. BISSONNETTE:  No, your Honor.  Thank you.

7            THE COURT:  Mr. Garland, anything from you?

8            MR. GARLAND:  No.  The only thing I want to flag,

9   your Honor, is I think -- you're probably aware of it -- is the

10  only real dispute in terms of the discovery plan that we've

11  generally agreed to in our -- is with respect to the

12  presumptive limits on the number of depositions, the number of

13  interrogatories, et cetera.

14           So there -- I just want to flag there's a dispute

15  there.  I don't want to -- I don't need to advocate anything,

16  but --

17           THE COURT:  Here's what I would say.  You guys have

18  been good at working together.  Meet and confer and try to

19  reach reasonable agreements.  If somebody thinks someone else

20  is going too far -- we don't want to delay the case.

21  Somebody -- if there's a dispute, the proponent of the

22  deposition is going to have to make a strong case that -- and

23  explain specifically what they could get from the deposition.

24           Otherwise, I wouldn't -- these are not just general

25  fishing expedition kind of discovery here.  We're going to move

1    quickly.  And I'm confident that you will.  We've got good

2    lawyers all around on this case, so I think you can work

3    through those things.

4            So I won't make any ruling on it now.  We'll --

5    we'll approve the plan as proposed, enter the deadlines that

6    have been proposed.  If you need to modify them, if you can

7    agree, I'll agree to reasonable modifications.  If you run into

8    discovery disputes, I don't like to engage on those matters,

9    but I will in this case.  Just ask for a conference and I'll --

10   I'll help you resolve it quickly.

11           I -- the parties I don't think have asked for this,

12   but I -- I recognize that the briefing limitations are probably

13   not sufficient here, so we ought to use a 50-page limit on

14   briefs rather than our limit in the rule and a -- I -- I

15   think -- I can't remember whether you envisioned this, but we

16   could have a 50-page on the briefs and I'm going to set it for

17   oral argument.  I don't think we need reply and surreply briefs

18   because we'll do oral argument.  All right?  So that will save

19   us a couple of weeks while we wait for replies and surreplies.

20           So give you a good, full briefing opportunity for

21   opening briefs and then we'll set oral argument and we should

22   be able to get through the case like that.  Okay?

23           MR. BISSONNETTE:  Your Honor, I appreciate that.  In

24   the spirit of expediting this, I appreciate that.  That's

25   helpful.  Thank you.

1    THE COURT:  Anything else, Mr. Garland?

2    MR. GARLAND:  Not at all.  Thank you very much, your

3  Honor.

4    THE COURT:  Mr. Kahne, anything from the AT

5  plaintiffs?

6    MR. KAHNE:  No.  Thank you, Judge.

7    THE COURT:  Okay.  Thanks, folks.  I'll look for

8  your -- for your briefs and let me know if you need anything

9  before then.

10    MR. BISSONNETTE:  Thank you, your Honor.

11    MR. GARLAND:  Thank you.

12    THE COURT:  Thank you.  That concludes the hearing.

13    (Proceedings concluded at 4:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 3/22/23          /s/  Liza W. Dubois
                            LIZA W. DUBOIS, RMR, CRR

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                          Case No.   1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)


**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs has conventionally filed the following attachment or exhibit: Plaintiffs' Statement of Facts in Support of Their Motion for Summary Judgment.

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential— Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART Hum 219.04(a), or it contains personal identifying information.


Date: August 14, 2023                    /s/  Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette
Gilles Bissonnette
265393
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
603-224-5591
gilles@aclu-nh.org

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. <br>         Plaintiffs, <br>             v. <br> FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION, CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. <br>         Defendants. <br> ------------------------------------------------------------------------- <br> ANDRES MEJIA, <br> CHRISTINA KIM PHILIBOTTE, and <br> NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, <br>         Plaintiffs, <br>             v. <br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, <br> JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, <br> AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, <br> CHRISTIAN KIM, in his official capacity <br> only as the Chair of the New Hampshire Commission for Human Rights, <br> KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, <br>         Defendants. | Civil No. 1:21-cv-01077-PB |

**DECLARATION OF GILLES BISSONNETTE, ESQ.**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Gilles Bissonnette, Esq., declare as follows:

I am the Legal Director for the American Civil Liberties Union of New Hampshire and co-counsel for Plaintiffs Christina Kim Philibotte and Anders Mejia in this case.  I am an active member of the New Hampshire bar.  I make this declaration in support of Plaintiffs' Motion for Summary Judgment.

1.      Attached as Exhibit 1 is a true and correct copy of the full text of the Amendments (Depo. Ex. 1).

2.      Attached as Exhibit 2 is a true and correct copy of the deposition transcript of Department of Education Commissioner Frank Edelblut.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

3.      Attached as Exhibit 3 is a true and correct copy of the deposition transcript of Department of Education Attorney Diana Fenton.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

4.      Attached as Exhibit 4 is a true and correct copy of the deposition transcript of Department of Education Investigator Richard Farrell.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

5.      Attached as Exhibit 5 is a true and correct copy of Human Rights Commission Director Ahni Malachi.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

6.      Attached as Exhibit 6 is a true and correct copy of Human Rights Commission Assistant Director Sarah Burke Cohen.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

7.       Attached as Exhibit 7 is a true and correct copy of the declaration of NEA-NH President Megan Tuttle.

8.       Attached as Exhibit 8 is a true and correct copy of the declaration of AFT-NH President Deb Howes.

9.       Attached as Exhibit 9 is a true and correct copy of the declaration of Plaintiff John Dube.

10.      Attached as Exhibit 10 is a true and correct copy of the declaration of Kamren Munz.

11.      Attached as Exhibit 11 is a true and correct copy of the declaration of Alison O'Brien.

12.      Attached as Exhibit 12 is a true and correct copy of the declaration of Patrick Keefe.

13.      Attached as Exhibit 13 is a true and correct copy of the declaration of Plaintiff Christina Kim Philibotte.

14.      Attached as Exhibit 14 is a true and correct copy of the declaration of Jennifer Given.

15.      Attached as Exhibit 15 is a true and correct copy of the declaration of Plaintiff Andres Mejia.

16.      Attached as Exhibit 16 is a true and correct copy of the declaration of Sean O'Mara.

17.      Attached as Exhibit 17 is a true and correct copy of the declaration of Plaintiff Ryan Richman.

18.      Attached as Exhibit 18 is a true and correct copy of the declaration of Plaintiff Jocelyn Merrill.

19.     Attached as Exhibit 19 is a true and correct copy of a July 26, 2021 email from DOE Commissioner Frank Edelblut.

20.     Attached as Exhibit 20 is a true and correct copy of the HRC's October 7, 2021 Commissioners' meeting minutes (Depo. Ex. 56).

21.     Attached as Exhibit 21 is a true and correct copy of DOE Commissioner Edelblut's June 13, 2021 op-ed (Depo. Ex. 4).

22.     Attached as Exhibit 22 is a true and correct copy of the Northwood Republican Town Committee's "CRT Parents' Guide" (Depo. Ex. 51).

23.     Attached as Exhibit 23 is a true and correct copy of Depo. Ex. 32.  This has been filed under seal.

24.     Attached as Exhibit 24 is a true and correct copy of the HRC docketed charge (Depo. Ex. 62).  This has been filed under seal.

25.     Attached as Exhibit 25 is a true and correct copy of Depo. Ex. 63.  This has been filed under seal.

26.     Attached as Exhibit 26 is a true and correct copy of Depo. Ex. 64.  This has been filed under seal.

27.     Attached as Exhibit 27 is a true and correct copy of Kathryn Borysenko's Aug. 19, 2022 article (Depo. Ex. 65).

28.     Attached as Exhibit 28 is a true and correct copy of Depo. Ex. 66.  This has been filed under seal.

29.     Attached as Exhibit 29 is a true and correct copy of the August 2022 "Actively Unwoke" tweets (Depo. Ex. 67).

30.     Attached as Exhibit 30 is a true and correct copy of Depo. Ex. 68.  This has been filed under seal.

31.     Attached as Exhibit 31 is a true and correct copy of Depo. Ex. 69.  This has been filed under seal.

32.     Attached as Exhibit 32 is a true and correct copy of Depo. Ex. 70.  This has been filed under seal.

33.     Attached as Exhibit 33 is a true and correct copy of Depo. Ex. 71.  This has been filed under seal.

34.     Attached as Exhibit 34 is a true and correct copy of Depo. Ex. 72.  This has been filed under seal.

35.     Attached as Exhibit 35 is a true and correct copy of Depo. Ex. 73.  This has been filed under seal.

36.     Attached as Exhibit 36 is a true and correct copy of Depo. Ex. 74.  This has been filed under seal.

37.     Attached as Exhibit 37 is a true and correct copy of Depo. Ex. 75.  This has been filed under seal.

38.     Attached as Exhibit 38 is a true and correct copy of Depo. Ex. 76.  This has been filed under seal.

39.     Attached as Exhibit 39 is a true and correct copy of Depo. Ex. 77.  This has been filed under seal.

40.     Attached as Exhibit 40 is a true and correct copy of DOE Commissioner Edelblut's April 15, 2022 op-ed and attachments (Depo. Ex. 14).

41.     Attached as Exhibit 41 is a true and correct copy of a September 22, 2021 email exchange between AFT and DOE Commissioner Edelblut (Depo. Ex. 9).

42.     Attached as Exhibit 42 is a true and correct copy of the NEA-NH's July 12, 2021 and August 5, 2021 letters (Depo. Ex. 11).

43.     Attached as Exhibit 43 is a true and correct copy of a Sept. 13, 2021 NEA-NH email to the HRC (Depo. Ex. 54).

44.     Attached as Exhibit 44 is a true and correct copy of an Oct. 18, 2021 email from R. Farrell to D. Fenton (Depo. Ex. 24).

45.     Attached as Exhibit 45 is a true and correct copy of the July 21, 2021 Guidance (Depo. Ex. 55).

46.     Attached as Exhibit 46 is a true and correct copy of the DOJ's interrogatory responses.

47.     Attached as Exhibit 47 is a true and correct copy of the HRC's interrogatory responses (Depo. Ex. 58).

48.     Attached as Exhibit 48 is a true and correct copy of the DOE's interrogatory responses (Depo. Ex. 57).

49.     Attached as Exhibit 49 is a true and correct copy of the HRC's website and questionnaire (Depo. Ex. 60).

50.     Attached as Exhibit 50 is a true and correct copy of the DOE's December 2021 presentation (Depo. Ex. 3).

51.     Attached as Exhibit 51 is a true and correct copy of the DOE's August 21 presentation (Depo. Ex. 7).

52.     Attached as Exhibit 52 is a true and correct copy of a Nov. 24, 2021 J. McKim email chain.

53.     Attached as Exhibit 53 is a true and correct copy of the Attorney General's 2021-02 Opinion dated Sept. 7, 2021 (Depo. Ex. 12).

54.     Attached as Exhibit 54 is a true and correct copy of excerpts of the 2019 book *How to be an Anti-racist* by Dr. Ibram X. Kendi (Depo. Ex. 50).

55.     Attached as Exhibit 55 is a true and correct copy of the Sept. 28, 2020 Executive Office of the President's Memorandum.

56.     Attached as Exhibit 56 is a true and correct copy of excerpts of the July 8, 2021 Board of Education meeting.

57.     Attached as Exhibit 57 is a true and correct copy of a Dec. 14, 2021 email chain with DOE Commissioner F. Edelblut.

58.     Attached as Exhibit 58 is a true and correct copy of a July 22, 2021 email from S. Gibson to A. Malachi (Depo. Ex. 47).

59.     Attached as Exhibit 59 is a true and correct copy of the Nov. 15, 2021 F. Edelblut/Northwood GOP Meeting email exchange (Depo. Exs. 37 and 52).

60.     Attached as Exhibit 60 is a true and correct copy of a Jan. 20, 2023 D. Fenton email exchange (Depo. Ex. 10).

61.     Attached as Exhibit 61 is a true and correct copy of the HRC's May 2, 2022 letter to NEA-NH.

62.     Attached as Exhibit 62 is a true and correct copy of a Nov. 15, 2021 R. Farrell email exchange (Depo. Ex. 34).

63.     Attached as Exhibit 63 is a true and correct copy of an Aug. 20, 2021 F. Edelblut email exchange (Depo. Ex. 45).

64.     Attached as Exhibit 64 is a true and correct copy of an Aug. 25, 2022 email to F. Edelblut (Depo. Ex. 48).

65.     Attached as Exhibit 65 is a true and correct copy of excerpts of the Mar 8, 2023 HB533 hearing (Depo. Ex. 6).

66.     Attached as Exhibit 66 is a true and correct copy of an Aug. 27, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

67.     Attached as Exhibit 67 is a true and correct copy of an Oct. 21, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

68.     Attached as Exhibit 68 is a true and correct copy of a Dec. 13, 2021 F. Edelblut email exchange (Depo. Ex. 15).   This has been redacted to omit personally identifiable information.

69.     Attached as Exhibit 69 is a true and correct copy of an Aug. 23, 2021 F. Edelblut email exchange (Depo. Ex. 19).   This has been redacted to omit personally identifiable information.

70.     Attached as Exhibit 70 is a true and correct copy of an Aug. 12, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

71.     Attached as Exhibit 71 is a true and correct copy of a June 14, 2022 email to R. Farrell (Depo. Ex. 36).  This has been redacted to omit personally identifiable information.

72.     Attached as Exhibit 72 is a true and correct copy of a Nov. 15, 2021 DOE email exchange (Depo. Ex. 22).

73.     Attached as Exhibit 73 is a true and correct copy of an Nov. 15, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

74.     Attached as Exhibit 74 is a true and correct copy of true and correct copy of a Dec. 28, 2021 F. Edelblut email exchange (Depo. Ex. 43).

75.     Attached as Exhibit 75 is a true and correct copy of the HRC's March 4, 2022 letter (Depo. Ex. 53).

76.     Attached as Exhibit 76 is a true and correct copy of an Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on November 20, 2020.

77.     Attached as Exhibit 77 is a true and correct copy of May 3, 2021 and May 4, 2021 Presentations to N.H. Court System.

78.     Attached as Exhibit 78 is a true and correct copy of Sept. 22, 2020 Trump Executive Order.

79.     Attached as Exhibit 79 is a true and correct copy of HB544 Docket and Language.

80.     Attached as Exhibit 80 is a true and correct copy of Select Written Testimony from Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added.

81.     Attached as Exhibit 81 is a true and correct copy of HB2/Budget Trailer Materials.

82.     Attached as Exhibit 82 is a true and correct copy of the article "Compromise Sought on Anti-Critical race Theory Bill" from April 19, 2021.

83.     Attached as Exhibit 83 is a true and correct copy of Rep. Daniel Itse, "Taxpayers Money is Being Used to Promote Systemic Racism in NH," Union Leader (Apr. 28, 2021).

84.     Attached as Exhibit 84 is a true and correct copy of an excerpt from the Jan. 11, 2022 HB1313 hearing.

85.     Attached as Exhibit 85 is a true and correct copy of a Feb. 1, 2022 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

86.     Attached as Exhibit 86 is a true and correct copy of a Mar. 18, 2022 D. Fenton email exchange (Depo. Ex. 23).   This has been redacted to omit personally identifiable information.

87.     Attached as Exhibit 87 is a true and correct copy of Drummond Woodsum August 5, 2021 Presentation

88.     Attached as Exhibit 88 is a true and correct copy of the DOE's Nov. 10, 2021 website (Depo. Ex. 21).

89.     Attached as Exhibit 89 is a true and correct copy of the DOE's Nov. 10, 2021 press release (Depo. Ex. 25).

90.     Attached as Exhibit 90 is a true and correct copy of a Nov. 15, 2021 F. Edelblut email exchange (Depo. Ex. 41).

91.     Attached as Exhibit 91 is a true and correct copy of a Nov. 17, 2021 HRC email exchange (Depo. Ex. 61).

92.     Attached as Exhibit 92 is a true and correct copy of an Oct. 25, 2021 F. Edelblut email exchange (Depo. Ex. 33).   This has been redacted to omit personally identifiable information.

93.     Attached as Exhibit 93 is a true and correct copy of an Oct. 26, 2021 F. Edelblut email exchange (Depo. Ex. 38).   This has been redacted to omit personally identifiable information.

94.     Attached as Exhibit 94 is a true and correct copy of an Oct. 1, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

95.     Attached as Exhibit 95 is a true and correct copy of an Oct. 26, 2021 F. Edelblut email exchange that was redacted by the DOE under RSA ch. 91-A.

96.     Attached as Exhibit 96 is a true and correct copy of a Sept. 7, 2021 F. Edelblut email exchange (Depo. Ex. 16).   This has been redacted to omit personally identifiable information.

97.     Attached as Exhibit 97 is a true and correct copy of a Sept. 3, 2021 F. Edelblut email exchange (Depo. Ex. 17).   This has been redacted to omit personally identifiable information.

98.     Attached as Exhibit 98 is a true and correct copy of Depo. Ex. 31.  This has been filed under seal.

99.     Attached as Exhibit 99 is a true and correct copy of Depo. Ex. 40.  This has been filed under seal.

100.    Attached as Exhibit 100 is a true and correct copy of the Feb. 7, 2022 No Left Turn Letter (Depo. Ex. 26).

101.    Attached as Exhibit 101 is a true and correct copy of a Feb. 22, 2022 F. Edelblut email exchange (Depo. Ex. 27).

102.    Attached as Exhibit 102 is a true and correct copy of a Feb. 14, 2022 R. Farrell email exchange (Depo. Ex. 28).

103.    Attached as Exhibit 103 is a true and correct copy of an Apr. 7, 2022 DOE email exchange (Depo. Ex. 18).  This has been redacted to omit personally identifiable information.

104.    Attached as Exhibit 104 is a true and correct copy of Depo. Ex. 46.  This has been filed under seal.

105.    Attached as Exhibit 105 is a true and correct copy of an. Aug. 24, 2022 R. Farrell email exchange (Depo. Ex. 29).

106.    Attached as Exhibit 106 is a true and correct copy of a Sept. 21, 2021 F. Edelblut email exchange (Depo. Ex. 39).   This has been redacted to omit personally identifiable information.

107.    Attached as Exhibit 107 is a true and correct copy of a Jan. 7, 2022 email from Ann Marie Banfield opposing SB304.

108.    Attached as Exhibit 108 is a true and correct copy of a Feb. 18, 2021 email from D. Richards in HB544's legislative history (Depo. Ex. 49).

I hereby declare under penalties of perjury that the foregoing is true and accurate.

*/s/ Gilles Bissonnette_____*
Gilles Bissonnette

August 14, 2023

# EXHIBIT 1

## Full text of
## The Amendments

1224



# EXHIBIT 1

Full text of
The Banned Concepts Act

## CHAPTER 91
## HB 2-FN-A-LOCAL - FINAL VERSION

7Apr2021... 1059h
06/03/2021   1799s
06/03/2021   1816s
06/03/2021   1859s
06/03/2021   1842s
06/03/2021   1821s
06/03/2021   1827s
06/03/2021   1866s
06/03/2021   1884s
24Jun2021... 2040CofC
24Jun2021... 2048EBA

### 2021 SESSION

21-1082
08/10

HOUSE BILL          *2-FN-A-LOCAL*

AN ACT              relative to state fees, funds, revenues, and expenditures.

SPONSORS:           Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:          Finance

---

### AMENDED ANALYSIS

This bill:

1. Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2. Makes a transfer of unexpended funds to the state heating system savings account.

3. Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4. Establishes the graphic services fund in the department of administrative services.

5. Consolidates human resources and payroll functions in the department of administrative services.

6. Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7. Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8. Directs the payment of state employee medical benefits payments from the retirement system.

9. Enables the supreme court to transfer funds.

CHAPTER 91
HB 2-FN-A-LOCAL - FINAL VERSION

66. Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

67. Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

68. Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

69. Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

70. Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

71. Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

72. Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

73. Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

74. Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

75. Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

76. Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

77. Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

78. Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

79. Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

80. Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

81. Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

1
2
3
4
5
6
7
8

9    91:297    New Subdivision; State Commission on Human Rights; Right to Freedom From
10   Discrimination in Public Workplaces and Education. Amend RSA 354-A by inserting after section 28
11   the following new subdivision:

12              Right to Freedom from Discrimination in Public Workplaces and Education

13       354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education.

14       I. The general court hereby finds and declares that practices of discrimination against any
15   New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed,
16   color, marital status, familial status, mental or physical disability, religion, or national origin are a
17   matter of state concern, that discrimination based on these characteristics not only threatens the
18   rights and proper privileges of New Hampshire inhabitants but menaces the institutions and
19   foundation of a free democratic state and threatens the peace, order, health, safety and general
20   welfare of the state and its inhabitants.

21       II. Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or
22   other workplace sensitivity training based on the inherent humanity and equality of all persons and
23   the ideal that all persons are entitled to be treated with equality, dignity, and respect.

24       III. Nothing in this subdivision shall be construed to limit the academic freedom of faculty
25   members of the university system of New Hampshire and the community college system of New
26   Hampshire to conduct research, publish, lecture, or teach in the academic setting.

27       354-A:30 Definitions. In this subdivision:

28       I. "Government program" means any activity undertaken by a public employer, both as an
29   employer and in performance of its government function.

30       II. "Public employee" means any person working on a full-time or part-time basis for the
31   state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,
32   water districts, school districts, school administrative units, or quasi-public entities.

33       III. "Public employer" includes the state or any subdivision thereof, including, but not
34   limited to counties, cities, towns, precincts, water districts, school districts, school administrative
35   units, or quasi-public entities.

36       354-A:31 Prohibition on Public Employers. No public employer, either directly or through the
37   use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

1   recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the
2   following:

3       I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
4   status, familial status, mental or physical disability, religion, or national origin, are inherently
5   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
6   color, marital status, familial status, mental or physical disability, religion, or national origin;

7       II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
8   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
9   origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10       III. That an individual should be discriminated against or receive adverse treatment solely
11   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
12   status, familial status, mental or physical disability, religion, or national origin; or

13       IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color,
14   marital status, familial status, mental or physical disability, religion, or national origin cannot and
15   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
16   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
17   or national origin.

18   354-A:32 Prohibition on the Content of Government Programs and Speech. No government
19   program shall teach, advocate, or advance any one or more of the following:

20       I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
21   status, familial status, mental or physical disability, religion, or national origin are inherently
22   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
23   color, marital status, familial status, mental or physical disability, religion, or national origin;

24       II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
25   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
26   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27       III. That an individual should be discriminated against or receive adverse treatment solely
28   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
29   status, familial status, mental or physical disability, religion, or national origin; or

30       IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color,
31   marital status, familial status, mental or physical disability, religion, or national origin cannot and
32   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
33   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
34   or national origin.

35   354-A:33 Protection for Public Employees. No public employee shall be subject to any adverse
36   employment action, warning, or discipline of any kind for refusing to participate in any training,
37   program, or other activity at which a public employer or government program advocates, trains,

1  teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
2  following:

3      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
4  status, familial status, mental or physical disability, religion, or national origin are inherently
5  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
6  color, marital status, familial status, mental or physical disability, religion, or national origin;

7      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
8  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
9  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10      III.  That an individual should be discriminated against or receive adverse treatment solely
11  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
12  status, familial status, mental or physical disability, religion, or national origin; or

13      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
14  marital status, familial status, mental or physical disability, religion, or national origin cannot and
15  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
16  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
17  or national origin.

18      354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may
19  pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any
20  other applicable common law or statutory cause of action.

21      91:298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting
22  after section 39 the following new section:

23      193:40  Prohibition on Teaching Discrimination.

24      I.  No pupil in any public school in this state shall be taught, instructed, inculcated or
25  compelled to express belief in, or support for, any one or more of the following:

26      (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital
27  status, familial status, mental or physical disability, religion or national origin is inherently superior
28  to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,
29  familial status, mental or physical disability, religion, or national origin;

30      (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual
31  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
32  or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

33      (c)  That an individual should be discriminated against or receive adverse treatment
34  solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,
35  marital status, familial status, mental or physical disability, religion, or national origin; or

36      (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
37  marital status, familial status, mental or physical disability, religion, or national origin cannot and

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 148 -**

1  should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,
2  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
3  origin.

4      II. Nothing in this section shall be construed to prohibit discussing, as part of a larger
5  course of academic instruction, the historical existence of ideas and subjects identified in this
6  section.

7      III. Any person claiming to be aggrieved by a violation of this section, including the attorney
8  general, may initiate a civil action against a school or school district in superior court for legal or
9  equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-
10  A:34.

11      IV. Violation of this section by an educator shall be considered a violation of the educator
12  code of conduct that justifies disciplinary sanction by the state board of education.

13      V. For the purposes of this section, "educator" means a professional employee of any school
14  district whose position requires certification by the state board pursuant to RSA 189:39.
15  Administrators, specialists, and teachers are included within the definition of this term.

16  91:299 Severability. If any provision of sections 297-298, or the application of any provision to
17  any person or circumstance is held to be invalid, the remainder of such sections, and their
18  application to any other persons or circumstances shall not be affected thereby.

19  91:300 Effective Date. Sections 297-299 of this act shall take effect upon passage.

20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37



# EXHIBIT 2

## DOE Commissioner Frank Edelblut Deposition Transcript Redacted, Publicly-filed

## (Unredacted version has been filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

FRANK EDELBLUT

May 23, 2023



AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

**Page 1**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

CERTIFIED ORIGINAL

Local 8027, AFT-New Hampshire, et al.,

              Plaintiff,

     v.

Frank Edelblut, Commissioner, et al,

              Defendants.

              No. 1:21-cv-01077-PB

DEPOSITION OF FRANK EDELBLUT

taken on behalf of the Plaintiffs

at New Hampshire Department of

Education, Concord, New Hampshire,

on May 23, 2023, at 10:20 a.m.

Court Reporter:

Cynthia Foster, LCR

LCR #14 (RSA 310-A:161-181)

**Page 2**

1  APPEARANCES:
2      On behalf of the Plaintiffs, Local 8027, AFT-New
    Hampshire, AFL-CIO:
3      STROOCK & STROOCK & LAVAN LLP
    By: Charles Moerdler, Esq.
4          Elizabeth C. Milburn, Esq.
        David Kahne, Esq., by Zoom
5      180 Maiden Lane
    New York, NY  10038
6      212-806-5648
    cmoerdler@stroock.com
7      ecmilburn@stroock.com
8      On behalf of the Plaintiffs, Christina
    Philibotte, Andres Mejia, NEA-New Hampshire:
9      ACLU OF NEW HAMPSHIRE
    By: Gilles Bissonnette, Esq.
10     18 Low Avenue, Unit 12
    Concord, NH  03301
11     603-225-3080
    gilles@aclu-nh.org
12
    On behalf of the Defendants, Frank Edelblut,
13     Ahni Malachi, John Formella, et al:
    NH DEPARTMENT OF JUSTICE
14     By: Nathan W. Kenison-Marvin, Esq.
    33 Capitol Street
15     Concord, NH  03301
    603-271-1292
16     nathan.w.kenison-marvin@doj.nh.gov
17     Also present:
    Elizabeth A. Brown, Attorney
18     Department of Education
    Office of the Commissioner
19
    By Zoom:
20     Peter Perroni, Esq.
    Nathan Fennessy, Esq., nfennessy@preti.com
21     Morgan Nighan, Esq., mnighan@nixonpeabody.com
    Jennifer Eber, Esq.
22     Kayla Turner, Esq., kaylat@drcnh.org.
    Esther Dickinson, Esq., edickinson@nhnea.org
23

**Page 3**

1                 INDEX
2            Deposition of Frank Edelblut
3  Examination by Mr. Moerdler:       7
4  Examination by Mr. Bissonnette:    115
5              EXHIBITS
6  38  Email, Edelblut to Farrell, Oct 26, 2021,
7      DOE-00710-713       23
8  39  Email, Edelblut to Farrell, Sept 21, 2022,
9      DOE-09896-09898      35
10 40  Email, DOE Communications Office to Edelblut,
11     Oct 5, 2021, with attachments    91
12 41  Email, Edelblut to m41 hillsboroughnh, 15 Nov
13     2021, DOE-00871      112
14 42  Email, Edelblut to SAU 5, 17 Nov 2021,
15     DOE-00866-868      113
16 43  Email, Edelblut to Breen, 28 Dec 2021,
17     DOE-00848-849      113
18 44  Email, Andrus to Edelblut, 15 May 2022,
19     DOE-01136      114
20 45  Email, Sanborn to Edelblut, 20 Aug 2021,
21     DOE-00067-69      126
22 46  Email, Farrell to Fenton, 19 Aug 2022,
23     DOE-009900-9901, 10298-10299   129

**Page 4**

1  47  Email, Gibson to Malachi, 22 Jul 2021,
2      DOE-00308      133
3  48  Email, Huyett to Edelblut, 25 Aug 2022,
4      DOE-07694-95      134
5  49  Richards to House Executive Departments and
6      Administration, February 18, 2021,
7      HB544 0203, 0296, 0297, 0241, 0243, 0244  136
8  50  How To Be An Antiracist, pages 18-20   146
9  51  CRT Parents Guide, PL00787-788    175
10 52  Email, Edelblut to Dean, 15 Nov 2021,
11     DOE-00869-870      175
12     (Original exhibits retained by reporter)
13     (Scanned copies provided to all counsel)

**5**

REQUESTS

Page 11    Emails reviewed by Commissioner Edelblut
           in preparation of the deposition
Page 94    Responsive material to Exhibit 40
Page 107   Communications

**7**

1    MR. MOERDLER:  Good morning, Commissioner.
2    My name is Charles Moerdler.  I'm a member of
3    the firm of Stroock & Stroock & Lavan in New
4    York, and we represent the American Federation
5    of Teachers.  To my right is my colleague,
6    Elizabeth Milburn, and she, too, is from Stroock
7    & Stroock & Lavan, and she, too, represents the
8    AFT.
9        COMMISSIONER EDELBLUT:  Welcome to New
10   Hampshire.
11       MR. MOERDLER:  I spent many a happy year in
12   New Hampshire and indeed in Concord, just
13   outside of it.
14       FRANK EDELBLUT, DULY SWORN
15       MR. KENISON-MARVIN:  We can do the same
16   stipulations with respect to objections and
17   reserving rights as we've done in the prior two
18   depositions.
19       MR. MOERDLER:  Agreed.
20       MR. KENISON-MARVIN:  And also just putting
21   on the record the parties' agreement and
22   acknowledgement that there is a video recording
23   this morning so that counsel of record can

**6**

STIPULATIONS

1              It is agreed that the deposition shall
2    be taken in the first instance in stenotype and when
3    transcribed may be used for all purposes for which
4    depositions are competent under New Hampshire
5    practice.
6              Notice, filing, caption and all other
7    formalities are waived.  All objections except as to
8    form are reserved and may be taken in court at trial.
9              It is further agreed that if the
10   deposition is not signed within thirty (30) days
11   after submission to counsel, the signature of the
12   deponent is waived.
13             It is further agreed that exhibits may
14   be retained by counsel until the time of trial.

**8**

1    participate by being here live to view the
2    deposition as it proceeds today, and that the
3    video is for that limited purpose and the
4    parties have agreed that no recording shall be
5    made of the video.
6        MR. BISSONNETTE:  I can confirm that
7    agreement.
8        MR. EDELBLUT:  Can you just clarify?  You
9    said there's a video recording.  There's not a
10   video.  There's video transmission, but there's
11   not video recording.
12       MR. KENISON-MARVIN:  Correct.  Thank you.
13   I meant just video recording in the sense of
14   video running.  So thank you.  The court
15   reporter, Cindy, has informed me that she is
16   taking an audio recording for her own quality
17   assurance purposes, and she uses that strictly
18   for her own quality assurance in creating the
19   transcript and that when she's done creating the
20   transcript, that work product is permanently
21   destroyed.  My understanding is consistent with
22   your practice?
23       COURT REPORTER:  Yes.

---

**9**

1  BY MR. MOERDLER:

2  Q   Have you been deposed before, Commissioner?

3  A   I have.

4  Q   Can you tell us under what circumstances and how

5      often if you can remember approximately?

6  A   Yes.  I was deposed about a month ago.  For

7      another lawsuit involving the State.

8  Q   And that is the only time?

9  A   No.  I was deposed many, many years ago in

10     another party associated with a corporation.

11 Q   You know that this is going to be a question and

12     answer session where your answers are sworn and

13     recorded.  You have the same duty to tell the

14     truth as if you were in court.  You understand

15     that, sir?

16 A   I do.

17     I must go through this.

18 A   I do know.

19 Q   It's obligatory.  Would you only provide verbal

20     answers to questions rather than shaking your

21     head which is what most of us do most of the

22     time, but would you try and be responsive orally

23     and verbally rather than just by motion?

---

**10**

1  A   I will.

2  Q   And if you do not answer, if you do not

3      understand a question, please ask, and we'll be

4      happy to try and oblige.  If you do not ask to

5      have a question reread, we will assume that you

6      have understood it at least to the best of your

7      ability and are prepared to answer it; is that

8      correct?

9  A   That's correct.

10 Q   Please do something I fail to do too often, and

11     that is let me finish the question before you

12     answer it even though you know where I'm going.

13     Is that all right?

14 A   That's all right.

15 Q   And if you need any breaks we'll do whatever we

16     can to oblige you and accommodate that.

17     Do you understand these requests or

18     instructions, sir?

19 A   I do.

20 Q   And is there any reason you are unable to

21     testify truthfully or completely today?

22 A   Not that I'm aware of.

23 Q   What did you do to prepare for this deposition

---

**11**

1      today?

2  A   So I met with my counsel.

3  Q   Putting that aside, anything else?

4  A   I did not.

5  Q   Did you look at any documents?

6  A   I did.

7  Q   And can you tell us what they are?

8  A   I was provided by my counsel a series of emails.

9  Q   Do you have a list of those emails?

10 A   I do not.

11     MR. MOERDLER:  Nate, can I get a list of

12     the emails, please?

13     MR. KENISON-MARVIN:  To the extent there

14     are documents that you reviewed specifically.

15     MR. MOERDLER:  Yes.

16     MR. KENISON-MARVIN:  I'm not committing

17     that he reviewed the entire list of emails.  I

18     can talk to the witness about the emails that he

19     reviewed prior to the deposition today.

20     MR. MOERDLER:  Can you do that, please?

21     MR. KENISON-MARVIN:  We can talk about

22     that.

23     MR. MOERDLER:  What I would like to know is

---

**12**

1  what he reviewed as contrasted necessarily with

2  what you've given him.  He may not have had a

3  chance to read all of them.

4      MR. KENISON-MARVIN:  I can represent to you

5  that he has only been provided with documents

6  that are Bates stamped and have been provided to

7  Plaintiff's counsel.

8      MR. MOERDLER:  Perfect.  If you could

9  provide us the list though I would appreciate

10 it.

11 Q   Okay.  Would you please tell us your educational

12     background, sir?

13 A   Sure.  I have a bachelor of science degree and a

14     master's degree.

15 Q   In what subject?

16 A   Bachelor of science degree in business

17     administration with an emphasis in accounting,

18     and I have a master's degree in theology.

19 Q   And they are from?

20 A   The University of Rhode Island is my

21     undergraduate degree, and my graduate degree is

22     from the Greek Orthodox School of Theology.

23 Q   And would you tell us your work background?  If

---

13

1    you can.  As completely as you can.  In other
2    words, your employment background prior to
3    becoming Commissioner?
4  A    Sure.  I was initially out of college so I'll
5    start there.  I'm sure you don't want to know
6    when I start working or before that.
7        I was an accountant for the firm of
8    PriceWaterhouseCoopers.  I left there.  I was
9    the Chief Financial Officer for a company called
10   Niagara Corporation.  I left there.  I started a
11   company called Control Solutions.  I exited that
12   company and was a member of an early stage
13   investing group called Common Angels which then
14   ultimately changed its name to Converge Systems.
15   And so that's my professional career.
16 Q    And then did there come a point where you ceased
17   to be primarily occupied in a professional
18   career?  In other words, I believe I'm correct
19   in stating you became at some point in time a
20   member of the New Hampshire House of
21   Representatives.  Am I right?
22 A    That's correct.
23 Q    So was that your first, as somebody who's been

14

1    down this road, your first adventure into the
2    world of politics and government?
3  A    So what I would say is that in New Hampshire
4    participation as a State Representative is not a
5    vocational calling such that it would be the
6    professional career in the sense that State
7    Representatives in New Hampshire earn only $100
8    per year so it would be difficult to make that a
9    vocational endeavor.
10 Q    So were you doing that at the same time that you
11   were engaged in some other occupation?
12 A    Yes.
13 Q    And what was the other occupation while you were
14   doing that?
15 A    I was a member with Common Angels.
16 Q    And when did you first become a member of the
17   House of Representatives?
18 A    I believe in the 2014 time frame.
19 Q    And you then became Commissioner directly from
20   your service as a member of the House of
21   Representatives; is that correct?
22 A    That's correct.
23 Q    And were you appointed?

15

1  A    I'm nominated, and then I go through a
2    confirmation process with the Governor and
3    counsel.
4  Q    Who nominated you?
5  A    The Governor.
6  Q    The Governor nominated you, and then you go to
7    the confirmation process; is that correct?
8  A    That's correct.
9  Q    That was as of when?
10 A    In March of 2017, I believe.
11 Q    And you have been the Commissioner of Education
12   since that time?
13 A    That's correct.
14 Q    Could you describe your responsibilities as the
15   Commissioner of Education for New Hampshire?
16 A    Sure.  So I have oversight responsibility for
17   the agency that comprises the New Hampshire
18   Department of Education.  Many of those
19   responsibilities are enumerated in statute.
20 Q    Would you tell us in your own words what are
21   those responsibilities, whether they are
22   oversight of the agency or individually,
23   separately and apart?

16

1  A    I'm not sure I understand the question.
2  Q    Tell me what it is that you are charged with
3    actually doing in the area of education.
4        MR. KENISON-MARVIN:  Objection.  Calls for
5    a local contention, you can answer.
6        MR. MOERDLER:  Sorry?
7        MR. KENISON-MARVIN:  Object to the extent
8    it calls for a legal contention.  He can answer.
9        MR. MOERDLER:  All I want to know is what
10   he does.
11 A    So I have oversight responsibility for the
12   agency.
13 Q    And what does the agency do?
14 A    So the agency has a variety of activities.
15   Probably one of the easiest places to understand
16   many of those is in statute.  Particularly in
17   RSA 21:10 I believe is the statute.
18 Q    Does your agency have responsibility for the
19   public school system in the State of New
20   Hampshire?
21 A    I'm not sure I understand what you mean by
22   responsibility for them.
23 Q    Does it have any responsibility for the public

17

1    school system?
2        MR. KENISON-MARVIN:  Objection.  Vague and
3    legal contention.  You can answer.
4  A   So the New Hampshire Department of Education has
5    responsibility for administering the statutes,
6    many of which govern aspects of the education
7    system in New Hampshire, both public, nonpublic
8    and other educational programs.
9  Q   So you do have responsibility, for example, of
10   the charter schools.
11 A   I don't know what you mean by "responsibility."
12 Q   You have some jurisdictional responsibilities.
13 A   We have certain statutes that effect charter
14   schools, and we're responsible, some of those
15   statutes are our responsibility that we
16   administer.
17 Q   All right.  Now, in terms of private schools, do
18   you have the same kind of areas of
19   responsibilities?
20 A   We have areas of responsibility, but they are
21   not the same.  They as well, you know, are
22   enumerated in statute and rule and we administer
23   the statutes and the rules.

18

1  Q   Do you try to stay jurisdictionally within the
2    four Corners of those statutes that govern your
3    responsibilities?
4        MR. KENISON-MARVIN:  Objection, vague and
5    legal contention.
6  Q   Let me restate it then.  You've indicated in
7    your testimony that your responsibilities are
8    essentially those that are within the four
9    corners of a variety of statutes, correct?
10 A   I'm not sure I understand the question at this
11   point.
12 Q   I'll restate it again.  You've testified that in
13   response to my question as to what is your
14   responsibility, what are your responsibilities
15   as Commissioner, you've said they are oversight
16   of those areas as to which statute defines
17   responsibilities; is that correct?
18 A   So statute and rule.
19 Q   Statute and rule.  Now, within that area, do you
20   try to keep your activities within the confines
21   of that statutory scheme or rule scheme,
22   regulatory scheme?
23 A   So I'm not sure I understand the premise of the

19

1    question.  The Department is responsible for
2    administrating those statutes and rules as
3    they're enumerated.
4  Q   And when you act in an official capacity, do you
5    make a conscious effort to do no more than the
6    statute authorizes you as Commissioner to do?
7  A   So we as an agency attempt to act consistent
8    with the statutes and the rules which govern our
9    activities.
10 Q   And do you have anyone who counsels you as to
11   whether something is within or not within the
12   scope of those statutes?
13 A   We do as an agency.
14 Q   And that is?
15 A   It's a variety of people.
16 Q   And they are?
17 A   So we have legal counsel, we have an Attorney
18   General's office, we have legislators, and there
19   may be others in the agency who observe a
20   particular statute and may weigh in on whether
21   or not the activities of the agency are within
22   the scope of those.
23 Q   And you make a conscious effort to stay within

20

1    those areas; is that correct?
2        MR. KENISON-MARVIN:  Objection.  Vague.
3  A   The agency administers the statutes and not
4    beyond the statutes.
5  Q   Right.  That's all I wanted to know.
6        Now, you meet with parents from time to
7    time, do you not?
8  A   I do.
9  Q   And --
10 A   Can you just define what you mean by "meet"?
11   Just so that we understand.
12 Q   That's the expression you've used in a number of
13   the emails.
14 A   So I'm just trying to understand what you mean
15   by that.
16 Q   I think I use the English language pretty well,
17   sir.  Have you been trained in it.  Do you get
18   together with them?
19 A   So physically present, on a Zoom call, on a
20   telephone, can I just understand what you mean
21   by meet.
22 Q   Do you communicate in an oral capacity with
23   parents from time to time?

**21**

1  A    I do.

2  Q    Do you communicate with parents in writing from

3       time to time?

4  A    I do.

5  Q    Is there any other means by which you

6       communicate with parents?

7  A    I'm not sure, again, what you mean by

8       communication.  If I'm communicating with

9       someone --

10 Q    Sir, all I'm trying to do is get an answer to a

11      very simple question.  You've pointed me down

12      this road by telling me you didn't comprehend

13      the word "meet" so I'm going to take all the

14      component parts of the word "meet," and I'm

15      going to ask you those.

16 A    Thank you.

17 A    I do try to do it as politely as I know how.

18 A    Yes.  So I communicate with parents.

19 Q    All right.  Do you communicate with school

20      officials?

21 A    I do.

22 Q    Superintendents?

23 A    Yes.

**22**

1  Q    Principals?

2  A    Yes.

3  Q    People in the administrative area of schools?

4  A    Yes.

5  Q    When you do that, do you prepare some form of

6       written report for yourself or reminder or memo

7       as a matter of course in what you did or what

8       you're going to do?

9  A    As a matter of course, no.

10 Q    Now, do you meet with political party officials?

11 A    I have.

12 Q    All right.  Give me just a moment.  I'm trying

13      to find a document.  I do apologize, sir.

14      So I'm going to show you a document that

15      has been Bates numbered by the Attorney

16      General's office in producing it to us.  It's

17      document numbered 0711.  It is a portion of the

18      production covering additional pages to that.

19      If you'll look at page 0711 it is led by 0700 as

20      a memo or an email from you to a man by the name

21      of ▬▬▬▬▬▬ with a copy to Diana Fenton.

22      MR. KENISON-MARVIN:  Objection.

23      Foundation.  Can we mark this?

**23**

1       MR. MOERDLER:  I'm sorry.

2       MR. KENISON-MARVIN:  We're up to 38, I

3       think.

4       (Exhibit 38 marked for identification)

5  Q    I will come back to the specifics of that

6       meeting in a moment.  My question to you is here

7       is --

8  A    Might I read through the document first?

9  Q    Oh, sure.  Please.  Perhaps you'll read through

10      to 0713.

11 A    Okay.  So your question, sir?

12 Q    ▬▬▬▬▬▬▬▬▬▬▬▬▬

       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

15 Q    Who is she?  Do you know that?

16      MR. KENISON-MARVIN:  Objection.  Compound.

17      You can answer.

18      MR. MOERDLER:  I'm sorry?

19      MR. KENISON-MARVIN:  Compound.  Form.

20 Q    Do you know her?

21 A    I've spoken to her.

22 Q    Have you met with her?

23 A    No.  I've not met with her.

**24**

1  Q    Now, what I would like to just go through with

2       you is this apparently, I say apparently, if you

3       look at page 0712, ▬▬▬▬▬▬▬▬▬▬

4       communicated with you concerning an issue at

5       Kensington Elementary SAU 16, and you indicated

6       at the top of page 0712 that your memory was

7       refreshed, and you know the issue and spoke with

8       the superintendent.

9       Can you give us your best present

10      recollection of what that issue was?

11 A    Sure.  So my memory was refreshed because I did

12      not recall what SAU she was involved in, and I

13      believe that ▬▬▬, the parent of a student as

14      she expressed in the initial email dated

15      September 30th, was concerned about the content

16      of a reading book in her daughter's classroom.

17 Q    And upon receiving this information, you spoke

18      to the superintendent of SAU 16?

19 A    That's correct.

20 Q    And do you have any recollection at all as to

21      what you said to the superintendent and what he

22      said to you or she said to you?

23 A    I don't have specifics in terms of what the

25

1  content of that conversation was.  I can try
2  to --
3  Q  Give me your best present recollection.
4  A  Yes.  So my recollection would be that I would
5  point out that there is a parent of a student in
6  the district who is concerned about a particular
7  reading material in her classroom.
8  Q  And you communicated to that superintendent that
9  concern; am I correct?
10 A  I believe so.
11 Q  Did you give the superintendent any counsel as
12 to what he or she should or shouldn't do in
13 regard thereto?
14 A  I don't recall any specific counsel.
15 Q  Do you know what the superintendent said to you?
16 A  I don't recall what the superintendent said to
17 me.
18 Q  And do you remember reading the book?
19 A  I do.
20 Q  Do you know what the book was?
21 A  I may be able to recollect from --
22 Q  Perhaps I can help you, sir.
23 A  Okay.

26

1  Q  This is a book called A Good Kind of Trouble.
2  A  Okay.
3  Q  And do you remember reading it?
4  A  I do recall reading it.  I read a number of
5  books.  I don't remember the details of the
6  book.
7  Q  What I'm really trying to get at, sir, and I'm
8  trying to simplify it, if not I can go back into
9  the depths of it, would it be fair to say that
10 you are an activist Commissioner, hands-on
11 Commissioner, who believes in dealing with those
12 people in those areas that you have
13 responsibility either by oversight or otherwise
14 responsibility for?  Is that a fair statement?
15    MR. KENISON-MARVIN:  Objection.  Vague.
16 A  So I would say that I am a Commissioner who
17 tries to execute his responsibilities with
18 fidelity to the law and the rule.
19 Q  Do you do that on an active basis or delegative
20 basis?
21    MR. KENISON-MARVIN:  Same objection.
22 A  So again, I would say that I am a Commissioner
23 who tries to execute his responsibilities with

27

1  fidelity to the law.
2  Q  Do you do it personally or do you delegate it?
3     MR. KENISON-MARVIN:  Same objection.
4  A  I would say as a Commissioner I am both doing
5  activities as well as delegating activities.
6  Q  Now, here is a parent who has complained about a
7  book, and I will go into that book in a little
8  while.  What is your normal reaction, if there
9  is a normal reaction, when a parent complains
10 about a book, do you pick up the book and try
11 and read it?  Do you find out what the issue is?
12 What is the norm?
13 A  So it would depend on the circumstances of the
14 individual inquiry into the Department.
15 Q  Let's take a look at the query.
16 A  Okay.
17 Q  The query is on page 713.  What was it in that
18 query that triggered you to read the book?
19 A  Because I had a concerned parent.
20 Q  So that was my question.  When you have a
21 concerned parent, do you then try and get to the
22 bottom of the concern, communicate the concern,
23 and try and find out exactly what's involved?

28

1     MR. KENISON-MARVIN:  Objection.  Compound.
2  You can answer.
3  A  So --
4  Q  I'm happy to break it down.
5     MR. KENISON-MARVIN:  I guess I would ask
6  that we do it one question at a time if we can
7  as a matter of course.
8  Q  I'm trying to do that.
9  A  So again, depending on the individual inquiry to
10 me, I might take different pathways in terms of
11 trying to understand the context of the concern
12 of the parent.
13 Q  So let me take you to that concern as expressed
14 on 0713.
15 A  Okay.
16 Q  What was it in that concern that triggered you
17 to read the book?
18 A  Because the parent had reached out to me.
19 Q  So when a parent reaches out to you and says
20 that he or she has a concern about a book and
21 gives you some details as here, is it your
22 practice to then read the book?
23 A  I do read quite a lot of content, yes.

29

1  Q    And where in the statutes that you said marked
2       your responsibility is there one that says you
3       have a duty to read books?
4  A    So my duty is to support my customers to the
5       agency which include a variety of
6       constituencies.  Parents are one of them.  So I
7       try to be as prepared as possible to support my
8       constituencies.
9  Q    And then what was it that you did in terms of
10      calling and scheduling an appointment with the
11      superintendent?
12 A    I'm sorry.  Can you -- I'm not sure I understand
13      the question.
14 Q    Well, let me take you over to document number
15      DOE 70.
16          MR. BISSONNETTE:  Fenton Exhibit 19 that
17      was previously marked.  Nate will hold the
18      exhibits.
19 Q    Who is David Ryan, sir?
20 A    Can I just read the email first?
21 Q    Oh, please do.
22 A    Okay.  I've read the email.
23 Q    If you will go back and look at the document

30

1       that was 711 which is in front of you, you will
2       see that the date of your first email in there
3       is in the month of October, but that there are
4       emails going back for a little while before
5       that.  So, for example, if we look at the
6       document that is Exhibit 19 you will see it goes
7       back to August.  So would it be fair to say that
8       this query spanned a period of several months?
9  A    So I just want to correct.  You mentioned that
10      my first email was in October, but it's actually
11      September 30th.
12 Q    That's all right.  That's all right.
13 A    Okay.  So it does seem that there have been,
14      there's issues related to the Exhibit 38 which
15      are specifically enumerated in that email.  In
16      the Exhibit 19 which you provided to me, it
17      seems that there are a number of concerns that
18      this parent is raising.
19 Q    And you tried to get hold of the superintendent
20      there?
21 A    That's correct.
22 Q    And to discuss it with the superintendent?
23 A    That's correct.

31

1  Q    And what if you can recall was the general gist
2       because you said you could not remember
3       specifics, and I understand that.  What was the
4       general gist of your communication with the
5       superintendent?
6  A    That he had a parent who was concerned about the
7       content of a reading book in the classroom.
8  Q    And you have read the book, I take it, at this
9       point?
10 A    I did.
11 Q    Did you form an impression concerning the book?
12 A    I don't know what that means.
13 Q    Well, normally when you read a book, you either
14      like it, you dislike it, it's a tough book, it's
15      a not tough book.  Did you form any impression
16      concerning the book?
17 A    The recollection that I have from reading the
18      book in particular was that it was very poorly
19      written.
20 Q    And did you do anything beyond communicating the
21      concern of the parent to the superintendent?
22 A    At that time, that was the extent of it.
23 Q    Did you thereafter do anything concerning that

32

1       book?
2  A    So with respect to this book, subsequent, I
3       don't recall the date, the school invited me to
4       an event, and when I was at that event, then
5       they asked me to meet with the superintendent,
6       the two assistant superintendents, and the
7       principal to talk about that book.
8  Q    Do you have a recollection of what was said by
9       whom including yourself at that meeting?
10 A    I think it was the same conversation that I had
11      expressed to the superintendent, assuming that I
12      had connected to him.  I don't recall
13      specifically.  But that there was a parent who
14      was concerned about the content of this book.  I
15      believe that the school also shared information
16      about this parent.
17 Q    Was the book a book that was read in class; is
18      that what you said?
19 A    So my understanding from the email from ███ is
20      that this is a book that, it says in her email
21      this book was read aloud to my daughter's entire
22      class.  And so Read-Aloud is a pedagogical
23      technique where a teacher will actually read a

---

**33**

1    book to a group of students.
2  Q   And do teachers also assign books to read at
3       home as homework or otherwise?
4  A   Some teachers may.
5  Q   And do teachers say to students in these reading
6       type of courses go select a book and tell us
7       what you think of it?
8  A   Some teachers may.
9  Q   And do they give them areas in respect of which
10      those books to be read should fall?
11 A   They may do that or not.  That would not be part
12      of a Read-Aloud though.
13 Q   What would be?
14 A   So a Read-Aloud is where --
15 Q   No, no.  What would that be?
16 A   What would what be?
17 Q   When you assign a subject matter to a student to
18      find a book, read it and report on it?
19 A   That would be a pedagogical exercise that the
20      teacher assigns to the student.
21 Q   All right.  Now, do you have any recollection
22      you were asked to look at a book that had been
23      selected by a student in that regard?

---

**34**

1  A   You mean any time or in this context?
2  Q   Any time.
3  A   Any time.  So I have been on school visits where
4       students are participating in the pedagogy that
5       you've described, and the students may be in an
6       independent reading time, and so the educators
7       have encouraged me, and I've encouraged myself
8       as well to sit down with students and ask them
9       what are you reading about.  So that probably
10      has happened many times at that point in time.
11 Q   Do they to the best of your knowledge,
12      information, belief have in the New Hampshire
13      school system a reading club in various of the
14      schools?
15      MR. KENISON-MARVIN:  Objection.  Vague.
16 A   Yeah.  I'm not sure what you mean by "reading
17      club."
18 Q   Do they have clubs where students are encouraged
19      to read books of one kind or another?
20      MR. KENISON-MARVIN:  Same objection.
21 A   I have no knowledge of a specific club, but I
22      would assume that there probably are clubs, but
23      I have no knowledge of them.

---

**35**

1      (Discussion off the record)
2  Q   Let me see if we can move to another area and
3       come back to this.
4      (Exhibit 39 marked for identification)
5  A   Okay.  So your question.  I've read the email.
6  Q   Now, you have before you a document that bears
7       Bates numbers 09896 and running through 09898,
8       Bates marked numbers having been affixed by your
9       counsel.
10      Have you had a chance to read this?
11 A   I have.
12 Q   Now, do you know Betsi Harrington?
13 A   I do.
14 Q   How long have you known Ms. Harrington?
15 A   Since she contacted the agency.
16 Q   Not before that?
17 A   No.
18 Q   And when you received the email from Ms.
19      Harrington dated September 20, 2022, did you
20      read the book?
21 A   I did not.  Actually which book was this?  Let
22      me just see what book is that?  Yeah, so I was
23      not able to because it was on the Sora app, and

---

**36**

1       I didn't have access to that.
2  Q   So you've not seen or consulted the Sora app?
3  A   So can you correct that?  Rephrase that
4       question?
5  Q   Have you ever consulted or looked at the Sora
6       app?
7  A   So I've only seen screen shots of it because I
8       didn't have access to it --
9  Q   All right.
10 A   -- at this time.
11 Q   It's an app according to Ms. Harrington that's
12      used in many of the schools in the state.
13 A   That's correct.
14 Q   Do you have occasion to check the various apps
15      that are used by the schools in the state?
16      MR. KENISON-MARVIN:  Objection.  Vague.
17 A   I do not.
18 Q   Does your Department?
19 A   It would depend upon the nature of the checking
20      what an agency might have access to.  Sora would
21      not be one of those applications that we would
22      have access to.
23 Q   Is it not a commonly used application?

---

37

1  A   It's in many of our schools.

2  Q   Why wouldn't you have access to it?

3  A   Because that would constitute in most cases

4      curricular material, and the curricular material

5      is the domain of the school, and it is not

6      inside the jurisdiction of the agency.

7  Q   Let me see if I understand what you just said to

8      me.

9  A   Okay.

10  Q   Your agency does not have oversight jurisdiction

11     of matters relating to curricular; is that what

12     you're saying?

13  A   That's correct.

14  Q   And you do not look into that or inquire into

15     that?

16  A   Well, so I mean, again, the inquiries would

17     happen, we saw in an example here where someone

18     brought curricula material to our attention.  We

19     are seeing here where a parent is bringing

20     curricula material to our attention.  So that is

21     how the curricula material comes to our

22     attention.

23  Q   And does that happen frequently, infrequently,

38

1      just periodically?  What is your best

2      recollection?

3  A   I would describe it as periodically.

4  Q   All right.  And when you received this email

5      from Ms. Harrington --

6  A   Yes.

7  Q   -- and she had some concerns about the app and

8      what it showed and what it led to, you asked

9      that she give you a call to discuss it?

10  A   Yes.

11  Q   Why?

12  A   So that I could understand the details of the

13     problem that she understood there to be.

14  Q   And what did you do by way of followup, if

15     anything?

16  A   Well, when I'm looking at this particular email

17     I sent that to Rich Farrell.

18  Q   And what did you ask him to do?

19  A   I didn't ask him to do anything.

20  Q   Why did you send it to him?

21  A   Because this would fall within his domain at the

22     agency as something that needed to be looked at.

23  Q   So let me get this straight, and if I'm being

39

1      clumsy in it, I apologize.  If you send an email

2      to Mr. Farrell, does it presuppose that he will

3      look at it?

4  A   It would depend upon the nature of the email

5      that was sent to Rich, but when I send an email

6      to someone I do understand that they will look

7      at it, but I don't have, I guess it depends on

8      what the email is and their reaction to that,

9      but that was the assumption.

10  Q   You don't intend it to be a deadend street, you

11     just sent it to him?

12  A   No.  I assume that he will take the appropriate

13     action.

14  Q   All right.  Now, what kind of action would you

15     expect him to take?

16  A   That would depend upon the nature of the email

17     that I send to him.

18  Q   All right.  Let's take this one as an example.

19  A   Okay.

20  Q   What would you expect him to do?

21  A   Well, so this particular email has a number of

22     different pieces of content so there may be a

23     number of different aspects of this that Rich

40

1      may or may not take a look at.

2  Q   And do you have any expectation when you send

3      this one, for example, to Mr. Farrell that he

4      would inquire into what was involved here,

5      whether the claim was correct or not correct?

6  A   Again, I assume he would take whatever the

7      appropriate action is with respect to this

8      information.

9  Q   Would you expect a report back from him on it?

10  A   So he would probably report back not specific to

11     this but in a more general context of reporting

12     on activities that his particular bureau is

13     working on.

14  Q   You have a periodic meeting of a misconduct

15     committee?

16  A   We do.  That would be incorrect.  It's not a

17     committee.

18  Q   It's a grouping of three people, correct?

19  A   There are personnel.  Okay.

20  Q   I apologize.  Is that where you would expect

21     this to be reported on?

22  A   If there was something that needed to be brought

23     to my attention, that would be the format and

41

1    the forum whereby it would be brought to my
2    attention, correct.
3  Q   All right. If you haven't heard back from Mr.
4      Farrell on, hypothetically, this issue, do you
5      follow up? Is that your practice?
6  A   It would depend upon the nature of the issue.
7  Q   On issues such as is here tendered.
8  A   So in this particular case, you know, I would
9      assume that he would explain that to me in one
10     of my educator misconduct meetings and bring
11     that to my attention. If not, I may have
12     brought it up or I may not have. I don't know
13     the answer to that.
14 Q   Fair enough. And would you expect to see some
15     sort of a written report from him on the
16     subject?
17 A   Generally, I don't review written reports.
18 Q   So you deal primarily with him in terms of oral
19     communications?
20 A   Well, we have the meeting where he's describing
21     and explaining things, correct.
22 Q   Now, am I correct that there are three people
23     who attend these meetings; they are Ms. Fenton,

42

1      Mr. Farrell, and you usually; is that correct?
2  A   Generally, and sometimes occasionally the Deputy
3      Commissioner might sit in as well.
4  Q   Does Mr. Berwick sit in?
5  A   Generally, he does not participate.
6  Q   And are there any notes, memoranda or the like
7      maintained at those meetings?
8  A   So I don't maintain any notes or memoranda.
9  Q   Do you know if anyone does?
10 A   I don't know the answer to that.
11 Q   Are they recorded?
12 A   They're not to my knowledge.
13 Q   Let's assume hypothetically that he reported on
14     something concerning this, and he said that's
15     nothing, don't worry about it. Is that the end
16     of it?
17     MR. KENISON-MARVIN: Objection. Vague.
18     I'm trying to just understand the process.
19 A   So it may be that he comments, and that's the
20     end of it or it may be that I say had you
21     considered this or, you know, just in my typical
22     supervisory role I may inquire about it or I may
23     assume that he's done whatever he needs to do

43

1      with it, and I have no further inquiry.
2      And the other thing that sometimes happens
3      is maybe you have this inquiry followed by other
4      inquiry by the same family. You know.
5  Q   Does there come a point in time or has there
6      ever come a point in time when there is a
7      question in your mind that this ought to be
8      examined further, investigated formally or
9      reported to the Human Resources or Rights
10     Commission? Has that ever happened?
11     MR. KENISON-MARVIN: Objection. Vague and
12     compound.
13 A   That's a little bit compound. If you would
14     break that down.
15 Q   Sure.
16 A   Because you escalated considerably in that
17     conversation.
18 Q   Please understand, I have nothing about the
19     utmost respect for you as an activist,
20     purposeful, and proper Commissioner in any way,
21     shape or form. And so what I'm trying to do is
22     to phrase my questions so I can get through this
23     as fast as I can.

44

1  A   Very well.
2  Q   To your benefit and mine. Does there ever come
3      a time that any of these misconduct committee
4      meetings, I'm calling it a committee but it is
5      not a formal committee, I understand that.
6  A   Just a meeting in the Department.
7  Q   Well, I should tell you your colleagues have
8      referred to it as the misconduct committee.
9      When there is an issue raised that is
10     elevated in your mind to being a matter of
11     further concern --
12 A   So I just want to go on the record. You
13     referred to me as an activist, and I think
14     that's an incorrect characterization of the role
15     that I play.
16 Q   It was intended as a compliment, sir.
17 A   But as a role that I play as the Commissioner.
18     So then can you please repeat the questions?
19 Q   Please understand I have served as a
20     Commissioner of the State of New York and of the
21     City of New York, and I think of nothing higher
22     in deserving of respect and I still serve as one
23     than an activist Commissioner who does his job.

45

1   So I meant that has a compliment, sir.

2   A   If you may repeat the question for me?

3   Q   Madame reporter?

4   (Requested portion read back by court reporter)

5   A   Certainly.

6   Q   And what do you do then, if I may?  If there is

7   a practice or general procedure.

8   MR. KENISON-MARVIN:  Objection.  Compound.

9   A   There is conversation in the meeting until we

10   determine what the next steps should be, if any.

11   Q   And at the end of the day, who makes the

12   decision, you?

13   A   Well, I mean we all are collaborating around

14   what would happen next.  So it would depend on

15   the individual case.

16   Q   And to coin a phrase, does the buck stop with

17   you, sir?

18   MR. KENISON-MARVIN:  Objection.  Vague.

19   A   The buck does stop at Commissioner.

20   Q   I'm quoting Mr. Farrell, sir.

21   All right.  Now, what I'd like to

22   ascertain, this email that is Exhibit 39 raises

23   a number of questions about the propriety of the

46

1   materials that one can get through the Sora app.

2   A   That's correct.

3   Q   Did you at this point in time, September of

4   2022, have a view as to whether or not this was

5   something that would constitute a potential

6   violation of or concern with respect to what is

7   known as HB 2 and what's been referred to in

8   these depositions as HB 2?

9   MR. KENISON-MARVIN:  Objection, vague,

10   foundation, compound.

11   Q   Let's see if we can agree.  Exhibit 1 is the

12   full text of the so-called Banned Concepts Act.

13   I show it to you, sir.

14   MR. KENISON-MARVIN:  Exhibit 1.  I'll

15   provide it to the witness.

16   MR. BISSONNETTE:  I would note for the

17   record that the cover page of this document that

18   I created as this was affixed as Exhibit 1

19   attached to the Philibotte and Mejia Complaint

20   filed in this case.

21   A   So I have a document in front of me, you know,

22   referencing Chapter 91, HB 2.  It has several,

23   an Amended Analysis, and then it goes to page

47

1   145.  It has redacted content.  I don't know

2   what that is.  And then it has what is

3   referenced as 91:297 and other sections of law,

4   and then it's further redacted.  So you're

5   saying that this is?

6   Q   We have been using in the depositions thus far

7   the phrase HB 2.

8   A   To refer to this document.

9   Q   For discussion purposes, for simplicity, I can

10   refer to as the material in Exhibit 1 if you

11   prefer.  I can do it in any way that is most

12   convenient for you.

13   A   Okay.  I'm comfortable, have the document, and I

14   have, without going to the state statutory rule

15   I wouldn't know if this is the exact language or

16   not, but I have the document presented to me.

17   Q   Did you form an opinion to the best of your

18   recollection that the claims that here were

19   made, referring to Exhibit 39, rose to the level

20   of a potential questionable violation of HB 2?

21   MR. KENISON-MARVIN:  Objection.  Vague.

22   A   Yes.  So with respect to this particular

23   complaint, my recollection is that the direction

48

1   we took was not concern over a specific piece of

2   content so much as it was the Sora app and what

3   students may or may not be able to access using

4   that particular application and whether schools

5   had configured correct security parameters in

6   that application to prevent students from

7   accessing content that may not be

8   developmentally appropriate for them.

9   Q   Is this app available to students outside of the

10   classroom context?

11   A   These are part of the inquiries that we were

12   trying to make and to understand how does a

13   student access it, what are the protections that

14   are afforded relative to this application.

15   You know, my recollection from the various

16   conversations I had both with Ms. Harrington as

17   well as other school personnel relative to this

18   is that generally if the application is

19   configured correctly, in the school setting,

20   that we are able to limit students to

21   appropriate levels of content or the application

22   itself possesses the ability to limit students

23   to developmentally appropriate content.

49

1      But there was concern that when a student
2  is outside of the school environment and outside
3  of the school's either devices or firewall that
4  there may be an opportunity for that student to
5  use a third party device to use their log-in to
6  access the app and access material that may be
7  developmentally inappropriate for those
8  students.
9  Q   And what, if anything, did you do about that?
10 A   So we had a number of conversations. We spoke
11     with the individuals at this particular school.
12     I believe it was the superintendent, it may have
13     been the librarian, to explain, and we had
14     conversations with Sora to understand what the
15     controls are in place. There's the ability to
16     in Sora to allow certain materials to be
17     accessible to different age levels based on
18     developmentally appropriate content and make
19     sure that this particular School District was
20     able to configure those controls and implement
21     those. I believe in this case that those times
22     of controls had not been configured.
23 Q   And was the application available to or used by,

50

1  and I know that's compound but I can break it
2  down if you wish, any other school to the best
3  of your knowledge?
4  A   I believe it's in a number of schools.
5  Q   A number of them.
6  A   That's correct.
7  Q   And did you have that communication with the
8      other schools also?
9  A   So we had that communication with a number of
10     the schools where that issue took place just
11     informally. It may have been the content of a
12     broader communication. We do calls with our
13     school leaders, and we may have notified them in
14     that call that if you're using Sora, there are
15     certain configuration aspects that need to be
16     done.
17         We did speak with Sora to make sure that
18     they as the vendor were able to work with their
19     customers who are the school districts to make
20     sure that Sora communicated to the districts
21     that these access controls are available to
22     them.
23 Q   To what extent did you find that they were

51

1  available, the application, to students outside
2  of the school setting? In other words,
3  extracurricular like?
4  A   I'm not sure I understand the question.
5  Q   You indicated that the application is available
6      to students outside of the school setting,
7      correct?
8  A   Well, so again, depending upon how it was
9      configured.
10 Q   So it's the configuration rather than the
11     application, right?
12 A   Those are the same things. You have an
13     application that is configured. So how you
14     configure the application is what determines
15     your ability to access it in various modalities.
16 Q   And if it had been inappropriately or not
17     configured at all, would this type of conduct
18     have risen to the level where you would have had
19     some concerns respecting HB 2?
20         MR. KENISON-MARVIN: Objection. Vague.
21 A   I'm not sure I understand the --
22 Q   Well, let me be specific. You have before you
23     Exhibit 39, and you have specific claims there

52

1  of it being inappropriately configured from the
2  standpoint of Ms. Harrington, and you indicated
3  that on the basis of what you had been given by
4  way of information that the application as used
5  in one or more of the schools had not been
6  properly configured when made available to
7  students. And my question is -- did you view
8  the application, by the way, at any point?
9  A   So ultimately, I had Sora provide me with access
10     to the application, but this was much later down
11     the process.
12 Q   Okay. Did you at any point form an opinion,
13     howsoever limited, as to whether when not
14     properly configured or not configured at all
15     information such as that as appears in Exhibit
16     39 would rise to the level of a potential
17     violation of HB 2 or the document before you?
18         MR. KENISON-MARVIN: Objection. Vague and
19     to the extent this question is based on premises
20     leading up to this question that misstates prior
21     testimony. You can answer.
22 A   So my recollection of this particular incident
23     is that it was focused on the issue of access to

---

**53**

1  the Sora content.  I don't recall that there was
2  an educator misconduct aspect discussed relative
3  to this.  I don't have that recollection.
4      What I do recall relative to this is
5  principally the issue of the Sora application
6  and access to developmentally inappropriate
7  materials.
8  Q   Did you think the information it gleaned as
9  determined on page 09898 by Ms. Harrington would
10  be information that would be violative of HB 2
11  or would warrant checking whether it was?
12      MR. KENISON-MARVIN:  Objection, vague,
13  compound, legal contention.
14  A   I have not actually gone through that exercise
15  at this point in time.
16  Q   Have you ever looked at a complaint through the
17  lens of --
18  A   Can I just correct something?  I just want to be
19  clear about that.  So I'm not sure that I'm
20  understanding your question.  Can you just
21  repeat that last question?  I want to make sure
22  I answer it precisely.
23  Q   Sure.  Looking at what Ms. Harrington believed

---

**54**

1  the Sora application permitted someone to see,
2  if she was correct in her analysis, would you
3  say that is elevated to the level of raising
4  concerns under HB 2?
5      MR. KENISON-MARVIN:  I'm going to object to
6  the extent that that question is different than
7  the prior one so it's unclear the prior
8  question.
9  Q   Have you ever looked at a complaint such as is
10  in Exhibit 39 through the lens of whether or not
11  cause for concern under HB 2 is present?
12      MR. KENISON-MARVIN:  Objection.  Vague.
13  A   So the responsibility of the agency is to
14  incorporate all laws in all of the actions that
15  it follows, whether it is, you know, the 193:40
16  or whether it is some other law, you know,
17  whether it's dealing with student privacy or
18  some other matter.  So we bring all of those to
19  the table.  The thing that I was trying to
20  clarify --
21  Q   Before you go further if I may.  Bringing all of
22  those to the table as you put it.
23  A   Yes.

---

**55**

1  Q   Have you ever had occasion to look at whether
2  something like this would be elevated to raising
3  a concern under all of those as you defined it?
4      MR. KENISON-MARVIN:  Same objection.
5  A   So I would say no.  This particular email is
6  dealing with content, and it's not dealing with
7  educator actions per se where, you know, so I'm
8  having difficulty creating the nexus to the
9  statute so I would say I'm not sure I understand
10  that.
11  Q   Let's see if we can take you there.
12  A   Okay.
13      MR. KENISON-MARVIN:  Whenever there's a
14  good point for a break I have to use the
15  restroom.
16      (Discussion off the record)
17      (Recess taken 11:26 - 11:34 a.m.)
18  Q   Commissioner, let me ask you again to put before
19  you Exhibit 19.  You indicated earlier that when
20  you talked to the superintendent you conveyed
21  various complaints; is that correct?
22  A   So you're referring to Exhibit 19?
23  Q   Let's take that one as an example.

---

**56**

1  A   So with respect to Exhibit 19, I would have
2  expressed the concern about that the parent had
3  expressed to me that they were concerned about
4  the content of the particular Read-Aloud.
5  Q   And what would you expect that the
6  superintendent would do about that?
7  A   So I would assume as the superintendent they
8  would want to know if they have a parent who is
9  upset about something happening in their
10  instructional environment so I'm trying to bring
11  that to their attention.
12  Q   And would you expect that the superintendent
13  would have a conversation with the teacher?
14  A   I would expect that the superintendent would do
15  whatever is appropriate given the nature of the
16  specific complaint.
17      MR. BISSONNETTE:  I'm accepting Esther
18  Dickerson from NEA into the Zoom.  She's counsel
19  of record as well.
20      COMMISSIONER EDELBLUT:  Do we need to
21  notice her about the recording aspect of this?
22      MR. BISSONNETTE:  She's aware of it, but I
23  can convey to all lawyers that are present,

---

57

1    including Attorney Dickinson, just want to make
2    sure that everyone is aware that there will be
3    no record of the deposition per the agreement of
4    counsel.
5         COMMISSIONER EDELBLUT:  Thank you.
6  Q   If you will look at the first page of Exhibit 19
7    which is also marked as DOE 70 Bates stamped,
8    you'll see at the bottom ████████████████
9    copies not only you but the superintendent; do
10   you see that?
11 A   I see that ██████ has copied a number of people.
12 Q   Correct.  Copies the teacher, correct?
13 A   I don't know who the teacher is.
14 Q   Teacher is mentioned in the second line in the
15   bottom paragraph.  ████████████████
16 A   Okay.  So we can stipulate that, that's fine.  I
17   notice that the Governor as well is copied.
18 Q   Understood.  And do you have any view as to what
19   impact that has on the teacher?
20        MR. KENISON-MARVIN:  Objection.  Vague.
21 A   I don't know the answer to that, but I would
22   assume that bringing this to the attention of
23   the superintendent would help them to manage

58

1    that well.
2  Q   And what impact would it have on the teacher?
3        MR. KENISON-MARVIN:  Same objection.
4  A   So again I would hope that, I have no idea what
5    the impact would be on the teacher.  My hope
6    would be that the teacher would recognize that
7    they, too, have a parent who is uncomfortable
8    with some of the matters that are taking place
9    in the school, and they would work with that
10   parent to try to resolve those.
11 Q   So they would be guided accordingly.
12 A   Well, now there's a number of different
13   guidance, right?  So the teacher is aware of it,
14   the superintendent is aware of it.
15 Q   All right.  Now, other than the code of conduct
16   under what we've termed or I've termed as HB 2,
17   if a complaint is filed or a proceeding is
18   brought by either the Attorney General or the
19   Human Rights Commission, does the remedy include
20   any punishment for the teacher or is it only the
21   school?
22        MR. KENISON-MARVIN:  Objection.
23 A   I'm not sure I understand the question.

59

1         MR. KENISON-MARVIN:  Objection.  Vague,
2    compound, legal contention, assumes facts not in
3    evidence.  You can answer.
4  Q   Do you know what the remedies are, putting
5    complete aside the Code of conduct, what other
6    remedies that are capable of being assessed
7    under HB 2 for a violation and proceeding
8    brought either by or by the
9    Attorney General or anybody else?
10        MR. KENISON-MARVIN:  Same objections.
11 Q   I just want to know his knowledge.
12 A   So I believe you're making reference to PL
13   00007, paragraph III.  "Any person claiming to
14   be aggrieved by a violation of the section
15   including the Attorney General may initiate a
16   civil action against a school or school district
17   in superior court for legal or equitable relief,
18   or with the New Hampshire commission for human
19   rights as provided under RSA 354-A-34.
20 Q   Doesn't that relief run against the school?
21   Look at Section III.  Against a school or a
22   School District, correct?
23 A   Those are the words of that statute.  I've not

60

1    had to legally interpret this so --
2  Q   I have no problem with that.  It doesn't provide
3    any remedy as against the teacher, does it?
4    Does it mention the teacher?
5         MR. KENISON-MARVIN:  Objection.  Compound,
6    legal contention.
7  A   It does not mention the teacher.
8  Q   What impact do you think it has upon the School
9    District, the superintendent or the School
10   District or the principal of the school when
11   there's a complaint that a teacher has done
12   something wrong?
13        MR. KENISON-MARVIN:  Objection.  Vague,
14   compound.
15 A   I think it would depend on the nature of the
16   complaint.
17 Q   Have you at any time formed an opinion as to
18   whether or not a book, let's take A Good Kind of
19   Trouble as an example.
20 A   So are we on a certain exhibit?
21 Q   No.  I'm not on an exhibit.
22 A   Okay.
23 Q   Whether a book raises concerns within the

61

1  parameters of HB 2?
2        MR. KENISON-MARVIN:  Objection.
3  Q   I'll repeat that.  Would you repeat it, please,
4  Madame Reporter?
5     (Requested portion read back by court reporter)
6        MR. KENISON-MARVIN:  Objection.  Vague and
7  compound.
8  A   So again, like the previous example, I'm not
9     sure I understand the nexus between specific
10    content and as I understand RSA 193:40 which
11    talks about, you know, teaching and instruction
12    and so on.
13 Q   See if I understand what you've just said.  If a
14    teacher reads out loud a paragraph or more of a
15    book, do you now understand the context?
16 A   I know what reading out loud means so I'm not
17    sure I understand the question.
18 Q   Have you ever formed an opinion as to whether
19    any material that, in my first example, a
20    teacher reads automatic out loud or is asserted
21    to have read out loud from a book rises to a
22    level of concern under HB 2?
23       MR. KENISON-MARVIN:  Objection.  Compound,

62

1     vague.
2  A   So it would be incomplete information to make
3     that determination because a teacher could read
4     many different parts of content that are not
5     connected to as I understand 193 about the
6     activities of the educator.
7  Q   What if the book is in the curriculum?
8  A   So I'm not sure I understand.  What is the
9     question?
10 Q   The question is simply this.  Have you ever
11    formed an opinion as to whether any content read
12    aloud from a book by a teacher in a classroom
13    rises to the level of concern with respect to HB
14    2?
15 A   So with all due respect, content is not the
16    subject of the purported HB 2 or 193:40.  The
17    activities, as I understand the law, you know,
18    no pupil in any public school in this state
19    shall be taught, instructed, inculcated, or
20    compelled to express belief in or support for
21    one or more of the following.
22       So an educator could use a wide variety of
23    content that doesn't then violate A, B, C or D.

63

1  I'm trying to understand what you're -- you've
2  created this nexus, and I'm not sure where
3  you're going.
4  Q   I have no problem with that.
5  A   Okay.
6  Q   I'll just ask you this question.
7        Is it your understanding just reading the
8  content, any content you'd like, stuff that Ms.
9  Harrington called to your attention, reading it
10 out loud is not teaching; is that what your
11 position is?
12 A   So it's not that it's not teaching.  You have to
13    go to A, B, C and D so you would say not
14    teaching A, if that teaching includes that one's
15    age, sex, gender identity, sexual orientation,
16    race, creed, color, marital status, familial
17    status, mental or physical disability, religion
18    or national origin is inherently superior to
19    people of another age, sex, gender identity,
20    sexual orientation, race, creed, color, marital
21    status, familial status, mental or physical
22    disability, religion or national origin as an
23    example, so if that is what is being taught, but

64

1  content itself doesn't do that.  Content is
2  neutral relative to the actions.
3  Q   So you bifurcate the term "teaching" from the
4     subject matter of the teaching.  Is that what
5     you're saying?
6  A   It is possible that someone could use content,
7     that the content itself is potentially
8     problematic relative to this statute, and the
9     teacher may use that content to demonstrate how
10    it's inappropriate to, you know, to assert that
11    one's, you know, age, sex is inherently superior
12    to another.
13       So in other words, the content is not, I'm
14    having trouble creating nexus to the content.
15 Q   Would teaching the subject of affirmative action
16    violate HB 2 under that hypothesis?
17       MR. KENISON-MARVIN:  Objection.
18 A   You'd have to give me more context around the
19    teaching of affirmative action.
20 Q   Affirmative Action is a wonderful thing now.  Is
21    that good?
22 A   So what I would --
23       MR. KENISON-MARVIN:  Same objection.  And

65

1  vague.  You can answer.
2  A    No pupil in any public school of this state
3  shall be taught, instructed, inculcated or
4  compelled to express a belief in or support for
5  any one or more of the following.  That one's,
6  you know, affirmative action, so that one's
7  race, you know, is inherently superior to the
8  people of another race, and so the adjudication
9  of that is something that would be made by the
10  Human Rights Commission.
11  Q    Putting aside the adjudication, I'm seeking your
12  opinion.  Would a teacher saying we need to have
13  more affirmative action because it is a good
14  thing be raised to the level of concern under HB
15  2?
16  A    I would need to have more context than the
17  simple statement that you provided to me.  Is
18  the context of the totality of the pedagogical
19  instruction one that teaches, instructs,
20  inculcates, compels, express belief in or
21  support for that one's race is inherently
22  superior.
23      So simply Title IX itself, at least my

66

1  limited understanding of it, does not state that
2  one race is inherently superior to another race
3  is my understanding of that.  So I would need to
4  have more context to understand the actions of
5  the educator.
6  Q    I'd like to take you for a moment to just jump
7  ahead.  Let me take you back to Exhibit 19 and
8  to what I believe is the third page of that
9  document.  First word on that page being trust.
10  A    Okay.
11  Q    And take you down to the third paragraph?
12  A    Which begins with regarding?
13  Q    Regarding.
14  A    Okay.
15  Q    I'd ask you to read that, please.
16  A    Okay.  So your question?
17  Q    Question, turning to that paragraph starting
18  with the word "regarding," let me just read two
19  sentences I'm interested in.  Regarding the
20  book, quote, "A Good Kind of Trouble," it is a
21  terrible book that shames, quote, "white"
22  children into thinking they are the oppressors
23  in society.  This book talks about gunshots,

67

1  rioting, looting, burning down buildings.  It
2  also made our daughter very uncomfortable and
3  scared," unquote.
4      Would you think that, did you form any
5  opinion as to whether or not that would raise a
6  level of concern under HB 2?
7  A    So again --
8      MR. KENISON-MARVIN:  Objection.  Vague.
9  Compound.  You can answer.
10  A    My response is not to adjudicate whether or not
11  they are violations of the particular law.  When
12  I read that paragraph, and even just reading it
13  now, I saw a number of concerns that the parent
14  had with respect to their child, and so that is
15  really what I focused in on in terms of I have a
16  child who's in school who is scared relative to
17  some of that content and wanted to make sure
18  that we try to support that child.
19  Q    Is it your testimony that when you read
20  something like this you exclude from your
21  consideration the provisions of HB 2?
22      MR. KENISON-MARVIN:  Objection.  Vague.
23  A    So my responsibility is not to adjudicate.

68

1  Q    I didn't ask you about adjudicating.  Put aside
2  adjudicating.  Is it your position that when you
3  read something like this, material I just
4  quoted, you exclude from your consideration any
5  concern with respect to HB 2?
6      MR. KENISON-MARVIN:  Same objection.
7  A    So again, when I read a paragraph like this, my
8  concern is all of the statutes which we are
9  responsible for administering.
10  Q    Okay.  That's fine.  I'd like to take you now to
11  a copy of your OpEd piece captioned, "Teach
12  children about racism, not to be racists."  All
13  right?  Exhibit 4.  This is a copy of an OpEd
14  piece in the Union Leader.  Correct?  And you
15  wrote that; is that correct?  That's the
16  question.  Please read it.
17  A    So my question --
18  Q    I have a clearer copy of the text if that's what
19  you want.
20  A    I have to put my glasses on for this one because
21  it's so tiny.
22  Q    I have one that was taken from the online --
23  A    That's okay.  I can read it here.  I've got my

---

**69**

1  glasses on.

2  Q  Sir, this is a copy of it, if this helps you.

3  A  No.  This is fine.  I can read it right here.

4  Okay.

5  Q  I will take you to the paragraph that is Exhibit

6  4, paragraph 10.

7  A  Okay.

8  Q  Starts with the words, In Ibram Kendi's "How to

9  be an Antiracist."

10  A  That's correct.

11  Q  Do you see that paragraph, sir?

12  A  I do.

13  Q  Would you say reading just the following would

14  raise concerns for you under HB 2.  Quote, "In

15  Ibram Kendi's "How to Be an Antiracist," a

16  prominent text in support of Critical Race

17  Theory, he states, quote, "the only remedy to

18  racist discrimination is antiracist

19  discrimination.  The only remedy to past

20  discrimination is present discrimination...The

21  only remedy to present discrimination is future

22  discrimination," close the quote within the

23  quote and close the main quote.

---

**70**

1  If a teacher were to teach that, would that

2  raise concerns under HB 2?

3  MR. KENISON-MARVIN:  Objection.  Vague.

4  Legal contention.

5  A  Again, depending on how the teacher was teaching

6  content.  Content itself.  Ibram Kendi's

7  material itself is not the subject as I

8  understand it to 193:40.  If the teacher, you

9  know, believes that we should teach students to

10  discriminate against others based on, from

11  193:40-I, you know, age, sex, gender identity,

12  sexual orientation, race, creed, color, then I

13  think that that would be a problem.

14  Again, I don't have adjudicatory

15  responsibility for that so these are my

16  opinions, but the intent of the OpEd is to say

17  we do not want discrimination in our New

18  Hampshire schools.

19  Q  And if a teacher were to say I want you to read

20  that book and focus on that paragraph, would

21  that raise concerns?

22  A  So again --

23  MR. KENISON-MARVIN:  Objection.

---

**71**

1  A  This is a book that is used in schools in New

2  Hampshire, and even if a teacher were to focus

3  on the book, the question would be you need the

4  broader context.  How is it that the teacher is

5  focusing on that particular passage.  If the

6  teacher were to focus on that passage with the

7  idea that we do not want to discriminate against

8  individuals based upon their age, sex, gender

9  identity, sexual orientation, race, creed,

10  color, marital status, familial status, mental

11  and physical disability, religion or natural

12  origin, it might be a very compelling lesson.

13  Q  And would that disclaimer that you have just

14  quoted from be sufficient to take it out of your

15  areas of concern under HB 2?

16  MR. KENISON-MARVIN:  Same objections.

17  A  I'm not sure I understand the question.

18  Q  Very simple.  If the teacher were to recite just

19  the first material I quoted without in any way

20  adding the material you just quoted, would that

21  raise a matter of concern?

22  A  So --

23  MR. KENISON-MARVIN:  Same objection.

---

**72**

1  A  I would need to see it in its complete context.

2  Q  That's the complete context.

3  A  There is no circumstance where that's the

4  context.

5  Q  That's it.

6  A  So the purpose of the OpEd is that we want to

7  teach students about racism but not to be

8  racists.  So the determination of whether or not

9  a teacher is discriminating against someone or

10  teaching students that one group is inherently

11  superior to another would be a determination by

12  the Human Rights Commission.

13  Q  Now my question.  Please read it back.

14  (Requested portion read back by court reporter)

15  Q  I repeat my question.

16  MR. KENISON-MARVIN:  Same objection.

17  A  I just think it's a fallacious hypothetical.

18  Q  Forget whether it's fallacious, wrong, anything

19  you like.  I'm asking you would it raise concern

20  in your mind.

21  A  I can't adjudicate it because I don't have

22  enough information.

23  Q  That's all the information there is.

---

73

1  A    I can't adjudicate it then.  I don't have enough
2       information.
3  Q    So you would not form an opinion based on that?
4  A    I don't believe that I would ever be faced with
5       a set of circumstances that are limited to one
6       sentence out of context.
7  Q    Are you incapable of forming an opinion based on
8       that?
9  A    No.  I think it's very easy to form opinions
10      about things, and my opinion is that you have
11      provided insufficient context in your
12      hypothetical to be able to form an accurate
13      opinion.
14 Q    I didn't ask you whether it was accurate or
15      inaccurate.  I asked you if you could form an
16      opinion.
17 A    I'm not able to form an opinion based on that
18      limited --
19 Q    Fair enough.  Can a teacher say they agree with
20      Kendi?
21 A    I don't understand why they would not be able to
22      agree with Kendi.  The question that would come
23      back are are they teaching, instructing,

74

1       inculcating or compelling to express belief in
2       or support for any one or more of the following.
3       That one's age, sex, gender identity, sexual
4       orientation, race, creed, color, marital status,
5       any of these immutable characteristics is
6       inherently superior to those of another.  That
7       is the salient question.
8  Q    No, it isn't, sir.  My question is very simply
9       this.
10          Can a teacher say I agree with the
11      quotation by Kendi that is as follows and no
12      more.  "How to Be an Antiracist, a prominent
13      text in support of Critical Race Theory states
14      the only remedy to racist discrimination is
15      antiracist discrimination.  The only remedy to
16      past discrimination is present discrimination.
17      The only remedy to present discrimination is
18      future discrimination," unquote.  Can a teacher
19      say I agree with that premise?
20          MR. KENISON-MARVIN:  Same objection.
21 A    So there's insufficient information to
22      adjudicate that.
23 Q    I'm not asking you to adjudicate, sir.  I'm just

75

1       asking --
2  A    So I don't have the context.  So a teacher may
3       say I agree with Kendi as a rhetorical device to
4       stimulate conversation among students.
5  Q    So you would have no problem then, for example,
6       in allowing a teacher to put forward -- hear my
7       question, please.  You would have no problem
8       with a teacher putting forward Mr. Kendi's book
9       and focusing on that paragraph.
10          MR. KENISON-MARVIN:  Objection.  Vague.
11 A    So the teacher themselves would be in the best
12      position to know if they are teaching,
13      instructing, inculcating or compelling to
14      express a belief in or support for any one or
15      more of the following, as I've repeated, that
16      one's age, you know or this immutable
17      characteristic is inherently superior to another
18      one.  The teacher themselves have clarity of the
19      action that they are doing at that time.  I have
20      a hypothetical construct that is really limited.
21 Q    Let me ask you this question.  Do you have any
22      concern that Kendi's book with all of the
23      content in it is shown to students in class?

76

1  A    So it would depend on the context of how that
2       material was used in the class.
3  Q    Read the book.  That's the context.  The sole
4       context.  I'd like to you read the book, and we
5       will discuss it.
6  A    So now there's more context.  It would depend on
7       what that discussion is, and I would go back to
8       the statute, and I would say that the educator
9       themselves would have clarity if they are
10      teaching, instructing, inculcating or compelling
11      to express a belief in or support for one or
12      more of these following things.
13 Q    Have you ever read the book Stabbed?
14 A    I have not.
15 Q    Would you have any concern if a teacher said I'd
16      like you as an extracurricular activity to read
17      anyone of the following books:  Stamped, Kendi's
18      How to Be an Antiracist, or the book that I
19      mentioned earlier, A Good Kind of Trouble.
20      Would you have any problem with that?  Read any
21      one of those books in your free time.
22 A    So again --
23          MR. KENISON-MARVIN:  Objection.  Compound.

---

**77**

1  A    The jurisdiction of the Department is not on the
2       curricular materials in the school.  Right?  So
3       that's not in the scope of my responsibility to
4       administer the various materials that are used
5       in curriculum.
6  Q    If a complaint came in saying that the Kendi
7       book, the Stamped book, or the A Good Kind of
8       Trouble have been listed by a teacher as books
9       that kids should read in their free time, would
10      you have any problem in terms of how to handle
11      that complaint?
12 A    Again, the curricular materials that a school is
13      choosing are not within the domain of the
14      Department of Education.
15 Q    Then why is it that you went to the
16      superintendent and talked to them about A Good
17      Kind of Trouble?
18 A    Because they had a parent who was upset, and I
19      would assume if I were a superintendent and I
20      had an upset parent that I would want to know
21      about that trying to help them support their
22      families.
23 Q    But you just said that's not within your domain.

---

**78**

1           MR. KENISON-MARVIN:  Objection.
2  A    What is within the domain of the Department is
3       to make sure that the system is able to function
4       well, and part of functioning well is to make
5       sure that the constituencies are being served.
6           So as I support my superintendents, if I
7       have a complaint from a parent, I bring that to
8       the attention of the superintendent so they can
9       manage it appropriately.
10 Q    And that's because you believe it's within your
11      responsible area as the Commissioner of
12      Education, correct?
13 A    To support them, correct.
14 Q    And so in doing that, do you in any manner, way,
15      shape or form tell them that there are issues
16      concerning the prescription of any of the three
17      books I've just mentioned?
18 A    So --
19          MR. KENISON-MARVIN:  Objection.  Vague.
20      Legal contention.  You can answer.
21 A    I mean, if I have a conversation with the
22      superintendent, in a particular conversation
23      hypothetically I may express like I don't think

---

**79**

1       that's a very good book.  In fact, I think I
2       shared with you earlier the conversation that I
3       had with the superintendent, two assistant
4       superintendents and their principal, and I
5       expressed my perspective to them about the
6       literary quality of the particular book, but it
7       remains their determination whether or not
8       they're going to use that book.  So that is
9       purely an opinion that I have shared with them.
10 Q    That's exactly what I want.  And now tell me, if
11      you will, do you think that would have any
12      persuasive impact upon them?
13 A    I don't know the answer to that.
14 Q    Do you think it would have any persuasive impact
15      upon the teacher if that were communicated by
16      the superintendent to the teacher the
17      Commissioner of Education has said he doesn't
18      think that's a very good book.
19          MR. KENISON-MARVIN:  Objection.  Vague.
20      Calls for speculation.
21 A    I think it would depend on how the
22      superintendent communicated that to the teacher.
23 Q    You just said the Commissioner of Education has

---

**80**

1       told us that's not a very good book.  Do you
2       think that would have a persuasive impact on the
3       teacher?
4           MR. KENISON-MARVIN:  Same objection.
5       Vagueness, speculation.  You can answer.
6  A    So I will speculate we have very capable
7       superintendents in the State of New Hampshire
8       who would take a piece of information like that
9       and they would manage it well to provide
10      constructive feedback to any of their educators.
11 Q    Thank you.  Give me just two minutes if I may.
12          One more question about this OpEd.  Did
13      anybody assist you or work with you in the
14      drafting of Exhibit 4?
15 A    I don't have any specific recollection, but
16      normally when I'm writing an OpEd it could be
17      that my Public Information Officer would be
18      assisting me and proofreading it.
19 Q    Anyone else?
20 A    I don't recall.
21 Q    Now, sir, I would like to show you a document I
22      don't think has yet been marked.
23          I ask you to take a look at Exhibit 14,

---

81

1    please.
2         Now, the second page of Exhibit 14 is an
3    OpEd that you wrote captioned Education's Sacred
4    Trust.
5  A    That's correct.
6  Q    If you prefer I can give you a blownup version
7    unless you can read that with ease.
8  A    I'll put my glasses on.  Okay.  I've read the
9    OpEd.  Not the attachments.
10 Q    Did anyone assist you in writing that OpEd?
11 A    Again, it may be that my Public Information
12   Officer reviewed a draft of it, but otherwise I
13   don't know.
14 Q    Anyone else?  You don't remember.
15 A    Not that I recall.
16 Q    Now, you'll see that in that document there is a
17   link to some external materials.  Correct?
18 A    Correct.
19 Q    Who compiled those materials?
20 A    I did.
21 Q    Pardon me?
22 A    I did.
23 Q    Okay.  And did you read them before you referred

82

1    to them?
2  A    I did.
3  Q    And you referred to those as, quote,
4    "exemplifying," quote, "actual instructional
5    material from New Hampshire schools that parents
6    have identified as conflicting with their
7    values."
8  A    That's correct.
9  Q    Now, what I would ask you is a couple of very
10   quick preliminary questions.  Where were the
11   materials obtained by you?
12 A    So generally they would have come into me via an
13   email or perhaps they came in directly to Rich
14   or Diana, and they were brought to my attention
15   or they may have come in to Stephen Berwick or
16   someone else in the organization.  So some place
17   here they came to my attention.
18 Q    And did you ask whether consents had been
19   obtained from either the person who photographed
20   the photographs that are part of it or any of
21   the materials that are in there to
22   republication?
23 A    I don't believe so.

83

1  Q    You saw, of course, that there are photographs
2    in there, correct?
3  A    Correct.  In the exhibit.
4  Q    And did you ask whether consents had been
5    obtained from the people who were photographed?
6  A    I did not.
7  Q    I'm going to show you a document that's been
8    Bates marked DOE 07053, and ask if you have seen
9    it before, and then I'm going to ask that it be
10   marked as an exhibit.
11       MR. BISSONNETTE:  For simplicity, this has
12   been previously marked as Exhibit 31.
13 Q    Have you seen that document before?
14 A    Let me just read it real quickly.
15 Q    For the record, I said 053 so it's 054.
16       Look at Exhibit 32, Nate.  I'm going to
17   give you 32 as well.
18       MR. KENISON-MARVIN:  Would you like me to
19   hand him 32?
20       MR. MOERDLER:  Yes.
21       MR. KENISON-MARVIN:  This one is marked
22   yellow, but all the others are gray.  It's not
23   the --

84

1         MR. BISSONNETTE:  Yes.  The reason is I
2    copied that internally, not externally, because
3    it is marked Confidential under Protective
4    Order.
5         (Discussion off the record)
6         MR. BISSONNETTE:  32 is marked
7    confidential.  Not 31.  I comply with protective
8    orders.
9  A    So your question.
10 Q    All right.  Now, my first question is did you
11   see this document before?
12 A    32?
13 Q    31.
14 A    I have seen 31.
15 Q    And 32 is the attachments to 31.
16 A    Sorry.  32 is?
17 Q    Yes.
18 A    So not all of 32.
19 Q    I believe --
20 A    32 has an email that's not associated with it so
21   what you're asserting is the attachments to 31
22   are pages 2 through the end but not the first
23   page of 32 because that's something different.



**85**

1 Q    Not the first page.  That's absolutely correct.

2 A    Okay.  So I'll stipulate that if you think these

3      are the attachments I don't know because I don't

4      have these.

5 ████████████████████████████████████

████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████

13 Q    Let me go off the record for a moment.

14      (Discussion off the record)

15 Q    If you will take a look at Exhibit 14, the

16      document --

17      MR. KENISON-MARVIN:  Is this for me or the

18      witness?

19 Q    Both of you.  It's on the record.

20      Look at the document that's marked, it's

21      already part of the court record, I might add.

22      The document that's marked at the bottom PL

23      00696.

**86**

1 A    Just that page, 696?  Then your question?

2 Q ██████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████

██████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████

████████████████████████████████████

██████████████████████████

████████████████████████████████

████████████████████████

██████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████

**87**

1 ██████████████████████████████

2 A    There's topic dividers in there, and the topic

3      that you initially referred to was Topic One and

4      now we're on Topic Five which begins on page PL

5      00714.

6 Q    So let me take this piece by piece if I may.

7 A    Okay.

8 Q    That's the only way I can do it rationally.  You

9      have seen Exhibit 31 before, correct?

10 A    31, I've now read that and I believe I've seen

11      31 before, yes.

12 Q    And you have seen Exhibit 32 before.

13 A    I have not seen Exhibit 32.  I've seen the

14      attachments to Exhibit 32.

15 Q    And you had not previously seen 32.

16 A    No.

17 Q    If you will look at Exhibit 32 so we complete

18      it, other than the -- may I see 32 for a moment,

19      please?  Other than the top 2, 4, 6, 8 lines, it

20      is Exhibit 31.  Is it not?

21 A    It's not because Exhibit 31 includes content at

22      the top as well that's not part --

23 Q    That's what I said.  That's what I said.

**88**

1 A    Actually you referenced the header at the top of

2      32 but Exhibit 31 similarly has information.

3 ██████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

7 Q    Right.

8 A    The content of that email appears to be --

9 Q    Included in.

10 A    -- consistent between Exhibits 31 and 32.

11 Q    And so are the attachments, are they not?

12 A    So there are no attachments on 31.  There are

13      just references to attachments.

14 Q    Right.  Okay.

15      MR. MOERDLER:  Nate, I'm going to ask that

16      you produce for us a copy of the full text of

17 ██████████████████████████████████████████

██████████████████.  That means including the exhibits,

19      not just the references.

20      MR. KENISON-MARVIN:  31 exhibits?

21      MR. MOERDLER:  Yes.

22      MR. KENISON-MARVIN:  I'll look at and see

23      if that's been done or not.  I'll take your



89

1   request.  I will represent to you that I will
2   look.  I can do it during a break as well.
3      MR. MOERDLER:  Okay.
4      MR. BISSONNETTE:  I didn't mean to
5   interrupt.  I can just say that I'm on
6   Relativity right now and have looked at the
7   documents after Bates stamped DOE 7054 in
8   Exhibit 31 and just haven't seen the exhibits.
9      MR. KENISON-MARVIN:  I'll take a look.  I
10  can do it now.  I can do it during a break later
11  and see.
12     MR. MOERDLER:  Let's do it so we know we're
13  talking about the same things as apples and
14  apples.
15  A   The other thing that I will stipulate is that
16  you put on the record there was an email from
17  ████ to Commission Edelblut, and that's not
18  the case.
19  Q   Say that again?
20  ████████████████████████
   ██████████████████████████
   ████████████████████████

90

1   ████████████
2   A   Thank you.  Just trying to be precise.
3   Q   I stand corrected.
4   A   If you wanted to stipulate that these may be the
5   attachments --
6      MR. KENISON-MARVIN:  I want to take an
7   opportunity to look and see what's going on.
8      MR. MOERDLER:  I'm going to make the
9   assumption that they are, although they haven't
10  been produced, just for simplicity's sake, all
11  right, without prejudice to you're saying they
12  weren't attached, all right?
13     MR. KENISON-MARVIN:  If you're comfortable
14  going forward on that basis.  I'm also happy to
15  take a look now and get you an answer.
16     MR. MOERDLER:  Go ahead.
17     MR. KENISON-MARVIN:  If we want to go off
18  the record.
19  Q   Sure.
20     (Lunch recess taken 12:31 - 1:15 p.m.)
21  Q   Madam reporter, I'm going to mark a document,
22  portions of which have previously been referred
23  to albeit they were not complete.  So I'm now

91

1   going to ask that you mark as a separate number
2   a copy of a communication from DOE
3   Communications Office to Commissioner Edelblut
4   with a series of 11 attachments as a separate
5   exhibit; is that correct?  Is that stipulated?
6   Those are the attachments.
7      MR. KENISON-MARVIN:  That the document that
8   you're holding, it has, the email on top is the
9   email that is document --
10  Q   This document is complete; is that correct?
11  Both as to the document itself and the
12  attachments?
13     MR. KENISON-MARVIN:  It has all of these
14  attachments.
15     MR. MOERDLER:  Correct.
16     MR. BISSONNETTE:  Is that, this document,
17  Exhibit 40?
18     (Exhibit 40 marked as an exhibit)
19     MR. MOERDLER:  Mr. Attorney General,
20  Mr. Bissonnette, we are agreed, are we not, that
21  Exhibit 40 is subject to the same protective
22  order that has previously been entered into
23  respecting confidentiality of documents.

92

1      MR. KENISON-MARVIN:  Yes, I'll agree with
2   that.  Thank you for bringing it up.
3      MR. BISSONNETTE:  Yes.  Plaintiffs
4   Philibotte and Mejia are on board.
5   Q   Commissioner, I ask you to place before you
6   Exhibit 40, and I ask you to note a couple of
7   things.  ████████████████
   ██████████████████
   ████████████████████████████
   ███████████████████
   ██████████████████████████████
   ████████████████████████
   █████████████████████
   ███████████
17  Q   Okay.  Now, did you at some point become aware
18  of Exhibit 32?
19  A   So the first time I've seen this is today.
20  Q   Were you aware there was such a document without
21  seeing the document itself?
22  A   I was not aware of it.
23  Q   ████████████████████████



93

1    ███████████████████████

     ███████████   ████████

4        Now, would you tell me, your OpEd was
5        written in April of 2021, correct?
6  A    That would be Exhibit 4?  What exhibit am I
7        referring to?
8  Q    It's 14.
9  A    Okay.  14.  Got it.  Okay.
10   ██████████████████████████████████

12  A   So your question is when was that OpEd written?
13  Q   I didn't ask the question.
14  A   Oh.  You had mentioned a date.
15  Q   I know.
16  A   I'm trying to understand what the question was.
17  Q   When was that OpEd written?  I have April 15,
18       2022.
19  A   That's when it looks like it was released on the
20       Department of Education's website.  I don't know
21       when I was actually published.
22  Q   Okay.  It was separately published in the Union
23       Leader at some point?

94

1  A    Correct.

   ████████████████████████████

   ████████   ████

   ██████████████████████████████

   ████████████████████████

   █████████████████████████████

   ████████████████████████████

   ████████████████

   ██████████████████████████████████

   ████████████████████████████████

   ████████████████████████

   ████████████████████████████████████

   ██████████████████████████████

   ██████████████████████████████

   ██████████████████████

16  Q   Fine.  Now, would you tell us what you did with
17       Exhibit Number 40 upon receipt?
18  A   I don't recall exactly.  I imagine that I
19       somehow got the content of that information to
20       Rich Farrell.
21  Q   Did you get any report from Rich Farrell with
22       respect to that document?
23  A   If I did, I don't recall what that was.

95

1        MR. MOERDLER:  Nate, for the record, would
2   you please check the files to see if there's any
3   responsive material at all to Exhibit 40?  In
4   other words, when the Commissioner received it,
5   what did he do with it, are there any documents,
6   I'm looking for documents.
7        MR. KENISON-MARVIN:  I understand.  I'll
8   look.
9        MR. MOERDLER:  Is it logged, was it sent to
10  Farrell, if it was sent to somebody, did that
11  person report?  On his end it ends with the
12  receipt here.
13       MR. KENISON-MARVIN:  Understood.  I'll
14  look, and there are privilege logs forthcoming.
15  That's been something as we try to work through
16  discovery that we are getting to them as we've
17  indicated as quickly as we can.
18       MR. MOERDLER:  Do you have a sense it was
19  privileged?  Farrell's?
20       MR. KENISON-MARVIN:  There have been, there
21  are documents that are being withheld from being
22  delivered on process privileged grounds with
23  respect to communications amongst Department

96

1        members about deliberating with respect to
2        issues that the Department is deciding.  So that
3        will all be logged.  I can't tell you right now
4        if there's one that relate to this series of
5        emails, but I can look specifically.
6  Q    Let me ask a question.  If you object, you'll
7        object.
8        MR. KENISON-MARVIN:  Sure.
9  Q    Do you recall either your communicating or your
10       asking someone else to communicate with
11       Mr. ███████ that he should communicate with
12       HRC?
13  A   So I don't, I don't have any recollection of
14      communicating directly with Mr. ████████ on this
15      matter.
16  Q   Do you have any recollection of having asked
17      somebody else to do so?
18  A   And I don't have any recollection of asking
19      somebody else to do so.
20  Q   Do you have any recollection somebody else did
21      so even without asking you?
22  A   I don't know if they have or have not.
23  Q   Just completing the circle.



**97**

1 [redacted]

[redacted]

[redacted]

5  Q    Exhibit 14 was published on the 15th of April of
6       the year 2022.
7  A    Yes.
8  Q    [redacted]
9  [redacted]

[redacted]

**98**

1  A  [redacted]

[redacted]

3  Q    All right.  And if you did, do you have any
4       recollection as to why you picked these items
5       bearing in mind this is some six months after
6       publication some six months after receipt?  Do
7       you have any recollection as to had you marked
8       it as something to follow up on or what?
9           MR. KENISON-MARVIN:  Objection.
10          MR. MOERDLER:  I know it's multiple,
11      compounded, and I acknowledge that.  I can do it
12      piece by piece.  Correct?
13          MR. KENISON-MARVIN:  Objection.  Vague.
14      Compound and calls for speculation.
15          MR. MOERDLER:  I know it's compound.  We'll
16      do it slowly.
17  [redacted]

[redacted]

**99**

1           You have acknowledged that you did the
2       compilation of the materials that are in Exhibit
3       14.
4  A    Okay.
5  [redacted]

[redacted]

8  [redacted]

[redacted]

11 [redacted]

[redacted]

**100**

1  [redacted]

[redacted]

9           MR. KENISON-MARVIN:  Objection.  Assumes
10      facts not testified to.  Misstates prior
11      testimony.
12          MR. MOERDLER:  I'm sorry?
13          MR. KENISON-MARVIN:  Assumes facts not
14      testified to and misstates prior testimony.
15          MR. MOERDLER:  All right.  We'll go through
16      it.
17          MR. KENISON-MARVIN:  I can explain my basis
18      if you want me to.
19          MR. MOERDLER:  No, it's going to take too
20      long.  Let's do it again.
21  [redacted]

[redacted]

Case 1:21-cv-01077-PB   Document 85-3   Filed 08/14/23   Page 28 of 52
1258



**101**

16 Q    And you did not have a separate memorandum or
17       notation, this is important, we'll take a look
18       at it down the road?
19 A    No.  I have nothing like that.
20 Q    Do you know whether Exhibit 40 was the subject
21       of discussion at the misconduct, I call it
22       committee or group?
23 A    I don't have any recollection of this being part

**102**

1        of that conversation.
2 Q    Do you have any recollection that Exhibit 40 was
3        the subject of any conversation in or about
4        October of 2021 between you and either
5        Mr. Farrell or Ms. Fenton?
6 A    Yes.  So I have to assume it was part of some
7        kind of a conversation that took place.
8 Q    All right.  You testified, I believe, that you
9        did not communicate at any point with
10       Mr. [redacted].
11 A    I don't believe I have, no.
12
16 Q    Do you have any reason to believe that anyone
17       associated with DOE communicated with
18       Mr. [redacted] prior to the publication in Exhibit
19       14?
20 A    I don't know the answer to that.
21 Q    Do you have any knowledge, information or
22       belief, and I'd like you to take a look at
23       Exhibit 40 as I ask that.

**103**

1

**104**

1

12       MR. BISSONNETTE:  That's Bates stamped
13       00321.
14       MR. MOERDLER:  Not on my copy.
15       MR. BISSONNETTE:  Oh, I'm sorry.  Carry on.



**105**

**106**

16 Q    Do you have any assumption concerning whether
17     either/or any of the principal, superintendent,
18     were notified of these claims?
19 A   So I don't have any knowledge as to what the
20     further action our agency would have taken with
21     regard to that.
22 Q   Are there any records that are maintained in the
23     ordinary course of business where your agency

**107**

1    notes that they have had a communication with a
2    superintendent and/or a principal concerning
3    these kind of matters?
4 A   It would depend upon the nature of the matter.
5 Q   Who would do that?
6 A   So it would depend on who is having the
7    conversation with the superintendent and what
8    the nature of the conversation was.
9        MR. MOERDLER:  Nate, if there have any
10    communication -- (cell phone ringing).
11        (Discussion off the record)
12        MR. MOERDLER:  Are there are any records
13    that show that there were any communications, A,
14    within the Department of this, this being 40; B,
15    whether there are any communications within the
16    Department showing who they communicated with in
17    the school or the school district.  If you wish
18    to assert some form of privilege as to that I
19    would like to at least know that such occurred
20    without putting the comment on the content.
21        MR. KENISON-MARVIN:  I can represent to you
22    that in review of the documents, to the extent
23    there was a communication not within the

**108**

1    Department but a communication out to a school
2    official, documents have not been withheld.  We
3    have limited our search to the email
4    communications of the individuals we'd
5    identified at the beginning of discovery.  So to
6    the extent there would be communications that
7    wouldn't be within the emails of some other
8    individual, I can't rule out that possibility a
9    hundred percent, but to the extent there's a
10    communication that any of the individuals that
11    we've agreed to search, I can represent that to
12    the extent one of those individuals had a
13    communication regarding this matter with an
14    individual outside of the Department, I wouldn't
15    have withheld that document on the basis of
16    privilege.
17        MR. MOERDLER:  And could you just check if
18    there has been any communication with Messrs.
19    Farrell and Fenton in any way on this document?
20        MR. KENISON-MARVIN:  Just the question of
21    whether there was a communication.
22        MR. MOERDLER:  You know what will happen if
23    the answer is yes so you may as well save some

109

```
 1   time.
 2       MR. KENISON-MARVIN:  I mean, I'm happy to
 3   look to, and you will, that would be logged,
 4   too, you would see that in a privileged log.  So
 5   I'm happy to, I think that that's fair question
 6   for you to ask.
 7       MR. MOERDLER:  And the last question is
 8   since Mr. Berwick has said in writing he logs
 9   everything that passes his desk, that's an
10   exaggeration, but would you check with him as
11   well?
12       MR. KENISON-MARVIN:  Who did you ask about?
13       MR. MOERDLER:  Berwick.
14       MR. KENISON-MARVIN:  Berwick.
15       MR. MOERDLER:  All right?
16       MR. KENISON-MARVIN:  So that we can keep
17   things moving here, I'll make sure that we're on
18   the same page.  Let's talk about this when we're
19   all wrapped up just to make sure we're on the
20   same page.
21       MR. MOERDLER:  Okay.  Good.
22 Q   Now, would you tell me, please, referring to
23   Exhibit 14, why these materials were included in
```

110

```
 1   the article?  I know you said that you wanted to
 2   use them as illustrative of something, and I'm
 3   trying to understand what it is that you're
 4   trying to communicate as the bottom line
 5   message --
 6 A   So I think that the OpEd is fairly
 7   self-explanatory.  "When children come to school
 8   they arrive reflecting the value systems of the
 9   families responsible for raising them.  Those
10   value systems are as different as the children
11   themselves."  I'm going to -- if I continue on.
12       "Recent revelations from educators around
13   the country, mostly on social media platforms
14   like TikTok, reveal a number of educators who
15   believe that it is their responsibility to weigh
16   in on and influence the value systems of
17   children towards a particular goal.  This
18   impulse to influence a child's value system is
19   not limited to educators."
20       And -- then we talk about, I'll just keep
21   reading.  "As was recently revealed, Disney also
22   wants to weigh in.  It is not good enough simply
23   to allow parents and caregivers the
```

111

```
 1   responsibility to install a value system they
 2   believe is right for the child.  Whether it is a
 3   rogue educator or a corporation trying to impose
 4   a value system on impressionable youngsters,
 5   that is not their job.  That is the job of
 6   parents and caregivers.
 7       "Fortunately, parents can choose to turn
 8   off Disney.  They can't, however, easily escape
 9   the efforts of activist educators who might be
10   knowingly dismantling the foundations of the
11   value system they're attempting to build.  That
12   means that families, when they send their
13   children to school, entrust educators to respect
14   the value systems that the family is building,
15   that this is the sacred trust that educators
16   have."
17       So the point of these examples is really to
18   flag or highlight content that individuals among
19   my constituencies have brought to our attention
20   that they believe may conflict with value
21   systems of the families of the children that are
22   in the schools.
23 Q   Do you within that framework believe it is not
```

112

```
 1   the responsibility of teachers to influence the
 2   value systems of the children toward a
 3   particular goal such as "thou shalt not steal"?
 4 A   So I believe that it is the responsibility of
 5   the educators to support parents and support the
 6   value systems of parents in the education of
 7   children.
 8 Q   And those values being whatever the parent deems
 9   appropriate?
10 A   Well, so we have content standards that they
11   teach to students, and those content standards
12   are broad in terms of the content that they
13   have.  So for example, in our social studies
14   content standards, we talk about the importance
15   of law abiding, and stealing would not be law
16   abiding.  So the parents would know in advance
17   that this is the content that their children
18   might learn which is thou shalt not steal.  So
19   that would be a value system that the parent
20   understands entering into the system, that that
21   is a value system of our historical context that
22   will be presented to their children.
23 Q   I'm going to ask you, if I may, simply to
```

113

1  identify a couple of documents.  I'm going to
2  show you a document which has the Bates stamp
3  871, and we'll mark that as an exhibit.  It's a
4  document from you to "m41 hillsboroughnh."
5      (Exhibit 41 marked for identification)
6  Q   You've seen that before?
7  A   Hang on.  I'm just finishing reading it, if I
8  may.  Okay.  So I'm familiar with this email.
9  Q   This is an authentic copy of it?
10 A   I believe so.
11 Q   I'm going to show you a document that's been
12     Bates stamped DOE 00866 and ask you if you are
13     familiar with this document.
14     (Exhibit 42 marked for identification)
15 A   Let me just read this.  Okay.  I'm familiar with
16     Exhibit 42 now.
17 Q   That is a document that you --
18 A   I believe I'm familiar with it, yes.
19 Q   One more and we'll ask the question.  Same
20     question will apply on this document, your
21     familiarity with it.
22     (Exhibit 43 marked for identification)
23 A   So I'm familiar with all three of these.

114

1  Q   One more document.
2      I'll show you one more document and ask you
3      if you recall receiving this document from
4      Representative Louise Andrus on or about May 15,
5      2022.
6      (Exhibit 44 marked for identification)
7  A   I've reviewed all four documents.
8  Q   And do you recall receiving the document that
9      would be Exhibit 44?
10 A   I believe I did.
11 Q   Do you have any recollection of having responded
12     to it?
13 A   I do believe I had a conversation with
14     Representative Andrus.
15 Q   What did you say to her and what did she say to
16     you if you remember?
17 A   If I recall correctly, I encouraged her to talk
18     to the superintendent and indicate that the
19     titles of the books would be subject probably to
20     a Right-to-Know request and that collaboration
21     and cooperation might make it easier for both
22     parties to be able to satisfy the needs that Ms.
23     Andrus was seeking.

115

1  Q   I have one last question.
2  A   I believe as well I called the superintendent
3      and indicated to him that Representative Andrus
4      was inquiring about this matter also.
5  Q   One last question.  Do you have any recollection
6      of having suggested to Ms. Fenton and/or
7      Mr. Farrell at any point in time that they
8      should steer questions relating to possible
9      misconduct areas away from you or handle it
10     themselves?
11 A   I don't recall such a conversation.
12 Q   Would you have had such a conversation?  Would
13     you have suggested they take them away from you,
14     they should handle them without you?
15 A   So I don't believe so, and that would be
16     contradictory to our operation and function as
17     an agency.
18 Q   Thank you.  I thank you for your cooperation.
19     EXAMINATION
20 BY MR. BISSONNETTE:
21 Q   Thank you, Commissioner.  I know we have an hour
22     left, and I'm going to be as brief as I can.
23     Again, to introduce myself, I'm Gilles

116

1  Bissonnette with the ACLU.  I'm here on behalf
2  of the Plaintiffs Mejia and Philibotte.
3      Cindy, would you mind just reading back
4  that last response?  I just wanted to ask a
5  followup question.
6  (Requested portion read back by court reporter)
7  Q   Why would it be contradictory to how your agency
8      functions?
9  A   Because when the "committee" to use the
10     attorney's comment but basically when the Bureau
11     of governance meets to review various matters
12     associated with their work they're going to
13     bring to me anything that they think is
14     important for me to look at.
15 Q   And you are involved in the decision-making
16     process concerning whether something may
17     constitute a violation of the Code of conduct?
18 A   So I think I've described before how in that
19     meeting there's a presentation of various
20     matters in various stages of development, and
21     there is generally a recommendation from the
22     team in terms of if there was some type of an
23     action that we would take including gathering

117

1  additional information or something else, then I
2  would weigh in in that conversation on that.
3  Q  Do you view your role in those meetings as
4  accepting or rejecting the recommendations that
5  are presented to you?
6  A  No.  I review it as supervisory of a function in
7  the agency.
8  Q  But you're involved in the final approval
9  process then it sounds like; is that fair to
10  say?
11  A  Yes.  Can I just clarify that?
12  Q  Of course.
13  A  I'm involved in the final approval process when
14  it reaches a point of a final action that may be
15  taken.  It is possible that there are matters
16  that are resolved that either I have forwarded
17  over or have come in in other places that they
18  may take, act on, and it never rises to the
19  level of attention that they believe I need to
20  be part of that conversation.
21  Q  Is something that would reach your level of
22  attention included in the Department's
23  determination as to whether or not there's been

118

1  a violation of the Code of conduct?
2  A  Generally, if there's a violation of the code of
3  conduct, then I would know about it.
4  Q  Would you be involved in the final approval
5  process in determining whether, in the
6  Department's determination as to whether there's
7  a violation?
8  A  Yes.  So the way that most -- and quite frankly,
9  I'm going to conjecture a bit, speculate a
10  little bit, outside of my realm I would need to
11  confer with others in my agency relative to
12  this, but the work I'm involved with mostly is
13  oftentimes when there is a code of conduct
14  violation that's being evaluated by the
15  governance team, they are working with the
16  educator, generally the educator's legal
17  counsel, and reaching what I inartfully refer to
18  as kind of a plea bargain, an agreement in terms
19  of what action should be taken.  If no agreement
20  can be reached, then it's really not a
21  Department's action.  I believe at that point in
22  time it goes to a hearings officer and to the
23  State Board of Education.

119

1  So it's really my involvement is in that
2  process where there's some type of an agreement
3  reached with an educator and then I would sign
4  that settlement agreement.
5  Q  What if there's not an agreement reached and the
6  Department thinks there's a violation, how are
7  you involved in that process?
8  A  So generally not, I mean, I may have been
9  involved leading up to the point where there's
10  no agreement that's reached.  It's only ever
11  happened twice I think since I've been here.
12  And those matters then fall to Diana, and they
13  arrange for a Hearing Officer to hear it, and
14  then it goes before the State Board of
15  Education.  But my role, I'm no longer part of
16  that process.
17  Q  I don't mean to beat a dead horse --
18  A  No, no.  That's okay.
19  Q  But what I'm trying to understand is are you
20  involved in essentially what I'm going to call
21  like the charging decision.  That may not be the
22  right term for it, but that's what I'm really
23  trying to get at.  So I don't know if you can

120

1  describe your involvement in that piece.
2  A  So most of the time the way that it works is
3  that there's a recommendation made to me by my
4  governance team, and then we discuss how they
5  arrived there and if that seems like it's an
6  appropriate place.
7  Q  That's helpful.  Thank you.  I don't know
8  anything about this so I appreciate it, besides
9  what I've learned in this case.
10  I want to direct your attention,
11  Commissioner, to two exhibits that are already
12  before you that have been previously marked.
13  Exhibits 18 and 14.  So if you can just have
14  those in front of you.  I know you may already
15  have Exhibit 14 in front of you.
16  A  I don't know if I have 18.
17  Q  18 might be a new one for you.  Thank you.
18  A  Trying to keep track here.  And 14 is the other
19  one I do have.  Yes.
20  Q  Commissioner, this is the exhibit we talked
21  about.  So if you do need assistance, please let
22  me know in reviewing it.
23  So I'd just ask you, so my question which

**121**

1   is not a question is I just ask you to review
2   Exhibit 18 and let me know when you're done,
3   please.
4   A    So your question?
5   Q    I'm just going to direct your attention to the
6   page 10287 on Exhibit 18 with the line, can you
7   look into this.  Do you see the language?
8   A    Yes.  Well, I can't see it now, but now I can.
9   Q    Fair enough.  So that's the portion of the chain
10  that you are on; is that correct?
11  A    Correct.  I am on that portion of the chain.
12  Q    And if I direct your attention to the bottom of
13  that page on 10287, there is an email from Ms.
14  ████████ to you saying, "This was brought to my
15  attention today.  A Human Relations teacher at
16  the Londonderry High School gave these
17  worksheets out to students.  Is this allowed."
18  Do you see the language?
19  A    That's the very first string of the email.
20  Q    Exactly.  And the last two pages are those
21  worksheets.  Correct?
22  A    I can assume that they are, but I don't know.
23  I'd have to go back and look at the original

**122**

1   email.
2   Q    Okay.  I'm going to -- do you recall seeing
3   those worksheets on or around April 4th, 2022?
4   A    I mean, I may have.  I'd have to go back and
5   refresh my memory because I see a lot of
6   content.
7   (Court reporter admonition re simultaneous talking)
8   Q    I'm trying to cut to the chase.  All I'm really
9   trying to get at is demonstrating that that
10  attachment was in your April 2022 OpEd.
11  So now I'm going to direct your attention
12  to Exhibit 14 on Topic Seven, Bates stamped PL
13  735 to 737.  Do you see those?
14  A    I see those.
15  Q    Are those the same worksheets that are in
16  Exhibit 18?
17  A    They appear to be, yes.
18  Q    And in fact, did you get those worksheets --
19  A    So the only thing I would correct is that the,
20  on PL 00737 there are, in Exhibit 14 there's
21  redactions of responses, and those are not
22  redacted in 10289.
23  Q    Gotcha.  So thank you for that, and that's an

**123**

1   important clarification.  Are the pages in
2   Exhibit 14, Topic Seven, Bates stamped 736 to
3   737, the same worksheets that you received on
4   April 4th?
5   A    I believe they probably are, but without going
6   back to the original email, right?  But I
7   believe they probably are.
8   Q    Gotcha.  So your understanding is that these
9   worksheets in Exhibit 14 that we just
10  referenced, you received those about a little
11  over a week prior to the publication of your
12  April 15th OpEd receiving them from a Ms.
13  ████, correct?
14  A    I believe so.
15  Q    We're done with that.  Thank you.  I just have a
16  couple other, well, few other questions.
17  There's a duty to report under the educator
18  Code of conduct, correct?
19  A    I believe there's a duty to report for every
20  citizen in the State of New Hampshire.
21  Q    What do you mean by that?
22  A    If someone believes that a child is being
23  abused, then they have a duty to report.

**124**

1   Q    Fair enough.  You're referring to New Hampshire
2   abuse and neglect statute?
3   A    Correct, which is a duty to report.
4   Q    Fair enough.  What I'm referring to, though, is
5   the duty to report in the Educator Code of
6   conduct.  Would you agree with me that there's a
7   duty to report under the Educator Code of
8   conduct?
9   A    Yes, I believe there is.
10  Q    And there's a specific provision in the
11  Education administrative rules governing the
12  contours of that duty to report obligation,
13  correct?
14  A    I believe so.  I haven't looked at that portion
15  of the rules in some time, but I believe that
16  there is a duty to report for educators relative
17  to misconduct.
18  Q    Fair enough.  That would include violations of
19  HB 2, correct?  Because HB 2 is part of the
20  Educator Code of conduct?
21  MR. KENISON-MARVIN:  Objection.  Vague and
22  legal contention.
23  A    So can you repeat the question?

125

1  Q    Could you read it back?
2       (Requested portion read back by court reporter)
3  A    So I believe, and I haven't looked at the
4       Educator code of conduct of recent, but I
5       believe that the code of conduct refers to RSA
6       354-A. I don't know if it makes reference to
7       193:40.
8  Q    I'd just refer you to Exhibit 1.
9  A    Which one?
10 Q    Exhibit 1.
11 A    Yes, I do. Okay.
12 Q    I'm just going to direct your attention to page
13      Bates stamped 07.
14 A    Okay.
15 Q    IV.
16 A    Yes.
17 Q    That says violation of this section by an
18      educator shall be considered a violation of the
19      educator code of conduct that justifies
20      disciplinary sanction by the state board of
21      education. Do you see that?
22 A    I do.
23 Q    So is a violation of HB 2 a violation of the

126

1       educator code of conduct?
2       MR. KENISON-MARVIN: Same objection.
3  A    So your initial question was is HB 2 part of the
4       code of conduct. I responded that RSA 354-A is
5       part of the educator code of conduct. This
6       states clearly that the violation of this
7       section by an educator shall be considered a
8       violation of the educator code of conduct that
9       justifies disciplinary sanction by the state
10      board of education.
11 Q    And that section is RSA 193:40, correct?
12 A    Correct.
13 Q    Okay. Sorry. I now understand why you said
14      what you said. Thank you for that.
15 A    Okay.
16 Q    Fair enough. No, I've got you. I'm going to
17      mark an exhibit here, and I do not know where we
18      are.
19      (Exhibit 45 marked for identification)
20 Q    When you're done reviewing Exhibit 45, just let
21      me know, please.
22 A    Okay. So I've read it.
23 Q    I'm just going to submit to you, Commissioner,

127

1       this looks like this is an exchange between you
2       and an individual named Kyle Sanborn who is a
3       member of the Gilford School Board. Is that an
4       accurate reflection of Exhibit 45?
5  A    He asserts that he is a member of the Gilford
6       School Board. I'm not intimately familiar with
7       that.
8  Q    Any reason to disbelieve --
9  A    No.
10 Q    There's reference here on the bottom of page 67
11      of Exhibit 45 that there is a section that you
12      will be referencing. Do you see that language?
13 A    I do.
14 Q    Where would you have referenced this -- strike
15      that.
16      I'll go back to that question. What
17      context would you have been referencing the
18      language at the bottom of page 67 of Exhibit 45?
19 A    So from the email and my recollection of the
20      conversation is he believed that there was, he
21      states in his email to me, and I think, I don't
22      see it in that email, but I believe it was part
23      of the conversation about a duty to report and

128

1       so I was trying to reference back to him this
2       duty to report.
3  Q    I guess what I'm interested in is the language
4       "that I will be referencing."
5  A    Yes.
6  Q    Where would you be referencing this is what I'm
7       trying to get at. Was there a presentation, a
8       speaking engagement? Is that what you were
9       referring to there?
10 A    I'm not certain. Because the email is a little
11      bit kind of chopped up as well. You'll see like
12      there's a certain font and is this correct and
13      it pastes something in then I have a statement
14      down below that says, and there's an aberrant
15      parentheses floating around in there, any
16      credential holder shall report any suspected
17      violation of code of conduct following the
18      school, the school district or the SAU reporting
19      procedures.
20      So I'm referencing this in this
21      conversation is what I believe I'm doing.
22 Q    Do you recall anything else about your
23      communications with Mr. Sanborn you haven't

---

129

1    testified to?

2  A   I believe that Mr. Sanborn was concerned about

3        the new law, and he was concerned whether or not

4        educators were following that.

5  Q   Did you ever have a communication with Mr.

6        Sanborn outside of what exists in Exhibit 45?

7  A   So the only the thing is I did, I met him at an

8        event up in Gilford. Might have been the

9        Belknap County meeting and had a conversation

10       with him there. That was the conversation I had

11       that I recall.

12  Q   Did you talk about the duty to report at that

13       meeting?

14  A   I don't recall that.

15  Q   Do you recall talking about HB 2?

16  A   I don't recall if I did what I might have said.

17  Q   We can move on from that document. I promised

18       to be efficient.

19         The next exhibit is 46.

20         (Exhibit 46 marked for identification)

21  Q   So Commissioner, I'm actually, before you read

22       that, I'd also just ask you to pull Exhibit 29.

23       These two documents go hand in hand. I don't

---

130

1    want to hide the ball here.

2  A   Do I have 29? I don't recall having 29 yet. We

3        just need to get that.

4  Q   Just let me know when you have both exhibits in

5        front of you.

6  A   Which one should I read first?

7  Q   I'm not going to have you read any right now,

8        but I'm sure that I'm going to have you to refer

9        to them. Are you aware of a woman named Karlyn

10       Borysenko?

11  A   Maybe the name is vaguely familiar. It's an

12       unusual name, but that's the extent that I have

13       for that.

14  Q   Okay. So maybe I will direct your attention now

15       to the exhibits. Your name is not on either of

16       them so that's why I hesitated to officially

17       direct your attention to them.

18         So first I'm going to direct your attention

19       to Exhibit 29 in the email from Mr. Farrell to

20       Karlyn Borysenko. Do you see that email? I

21       haven't asked you to read it yet, but do you see

22       the email I'm referencing?

23  A   So I see an email that says on August 24 at 9:37

---

131

1    Richard Farrell wrote. It's unclear who that

2        was sent to although the respondent at the top

3        is Karlyn Borysenko.

4  Q   I know you're not on this email. Have you seen

5        Exhibit 29 before?

6  A   Let me just read it?

7  Q   Of course. Please do.

8  A   So I've read 29.

9  Q   So the bottom of page 29, Mr. Farrell tells Ms.

10       Borysenko, Commissioner Edelblut has forwarded

11       your inquiry directly to Ahni Malachi on 19

12       August 2022 for her review.

13         So my question is do you recall ever

14       sending an inquiry from Ms. Borysenko to

15       Director Malachi in August of 2022?

16  A   I don't have that recollection.

17  Q   Now I'm going to have to direct your attention

18       to Exhibit 46.

19  A   Okay.

20  Q   So exhibit, I would just represent to you

21       Exhibit 46, also a document you are not on, is

22       an email from Ms. Borysenko to the Human Rights

23       Commission but also copying Department of

---

132

1    Education. What I'm referring to there is the

2        email at the bottom of page 9900 in Exhibit 46.

3        Do you see that?

4  A   I see an email from Karlyn to the Human Rights

5        Commission with a cc to DOE info and Rich

6        Farrell.

7  Q   So there are to two attachments to this email.

8        Exeter Regional School District Violation and

9        Exeter Regional School District Violation Data.

10       I'm going to submit to you on the version that

11       you have in Exhibit 46 you only have one of

12       those attachments. We're sorting that out with

13       your counsel, but I wanted to flag this is not a

14       full and complete document with all the

15       attachments.

16         But my question to you is do you recall of

17       seeing this email on page 9901 of Exhibit 46 and

18       the HRC form that Ms. Borysenko completed also

19       in Exhibit 46?

20  A   Yes, I have no recollection of seeing either of

21       these.

22  Q   So you, I presume then it's fair to say you have

23       no recollection of ever forwarding this August

---

133

1    19th, 2022, complaint to Director Malachi?

2  A   Correct.

3  Q   Do you ever send complaints under HB 2 to

4    Director Malachi directly?

5  A   I don't believe I ever have.

6  Q   Okay.  Do you have any -- let me go back to

7    Exhibit 29.

8    Mr. Farrell represents that you forwarded

9    Ms. Borysenko's inquiry directly

10    Mr. Commissioner Malachi.  Would you have any

11    reason to think that Mr. Farrell is mistaken?

12  A   Or it could be that Mr. Farrell is referring to

13    the fact that it's possible that either he or

14    Diana forwarded something representing the

15    agency, and so maybe that's what he's referring

16    to when he's referring to that.

17  Q   Do you know one way or the other sitting here

18    today though?

19  A   No.

20    (Exhibit 47 marked for identification)

21  Q   Commissioner Edelblut, I'd just ask you to

22    review Exhibit 47 and let me know when you've

23    finished your review.

134

1  A   So your question?

2  Q   My question is you're on this email chain,

3    correct?

4  A   Correct.

5  Q   Did your Department ever respond to this press

6    inquiry?

7  A   I don't know the answer to that.

8  Q   Did you respond to this press inquiry?

9  A   I don't know the answer to that.

10  Q   Do you know if any of your colleagues at the

11    Department responded to this inquiry?

12  A   I don't know the answer to that.

13  Q   You can set it aside.

14    (Exhibit 48 marked for identification)

15  Q   After you've reviewed Exhibit 48, commissioner,

16    just let me know that you're done.

17  A   Yes.  Okay.  I've read it.

18  Q   Do you recall receiving this email from Ian

19    Huyett on Thursday, August 25th, 2022?

20  A   I do.

21  Q   Did you respond in writing to this email?

22  A   I believe I forwarded this to Diane.

23  Q   Do you recall Attorney Fenton responding to this

135

1    email?

2  A   I don't know what Attorney Fenton's actions were

3    with respect to this.  I believe she may have

4    had conversations with the Attorney General's

5    office.

6  Q   I guess my question is do you know whether or

7    not the Department had any communications with

8    Mr. Hewitt about this email after it was sent on

9    August 25, 2022?

10  A   I don't believe I've had any email

11    correspondence.

12  Q   Anyone from the Department have email

13    correspondence with Mr. Huyett?

14  A   Not to my knowledge.

15  Q   Anyone from the Department have verbal

16    communication with Mr. Huyett concerning the

17    contents of this August 25th email?

18  A   So I believe that Mr. Huyett followed up in a

19    conversation with me and asked me about it and I

20    indicated to him that I had referred it to my

21    attorney.

22  Q   Do you recall anything else about that

23    conversation sitting here today?

136

1  A   No.  I don't.  That was the gist of

2    conversation.

3  Q   How long did that conversation last?

4  A   I don't recall.

5  Q   So I'm going to ask you -- you can set that

6    aside, Commissioner, and I'm moving quickly as

7    you can see since I know we're getting close.

8    I'm going to have you again put before you

9    Exhibit 14 which are the topics to your April

10    2022 OpEd.  Do you have that in front of you?

11  A   I do.

12  Q   I'm going to direct your attention to Topic Ten

13    on Exhibit 14 which is Bates stamped 748 to 758.

14    Do you see that?

15  A   I do.

16  Q   What is Topic Ten?

17  A   So I believe that this is content that we

18    received from a parent that was about Exploring

19    Whiteness and Becoming an Anti-Racist, and I

20    believe that it takes place in a school district

21    as kind of an extra class.

22  Q   Was that parent Dan Richards?

23  A   I believe it was.

137

1  Q    I'm just going to, just closing the loop, so I'm
2       going to mark another exhibit.
3       (Exhibit 49 marked for identification)
4  Q    So do you have Exhibit 49 before you,
5       Commissioner?
6  A    Yes.
7  Q    I'm just going to represent to you what this is.
8       So this is portions of the legislative history
9       of HB 544 in which Mr. Richards submitted some
10      written testimony to the House Executive
11      Departments and Administration Committee, and
12      this is a reflection of what his testimony is.
13 A    Okay.
14 Q    Okay?  And I would just note that on Exhibit 49
15      Mr. Richards attaches a document entitled on
16      page 544 241, Exploring Whiteness and Becoming
17      an Anti-Racist Activist.  Do you see those
18      pages?
19 A    I do.
20 Q    241 to 244.  Correct?
21 A    Yes.  I'm just pointing out that they're
22      different than in 14.
23 Q    I was just about to do that.  So it looks to me

138

1       like --
2  A    Part of the syllabus was cut off at some point.
3  Q    Yes.  Page 241 in Exhibit 49 is the same thing
4       as page 749 in Exhibit 14.  Correct?
5  A    That's what it looks like other than there is a
6       notation on 00749 that's not on 0241.
7  Q    Those notations are, in addition to redactions
8       in page 749, you also have two handwritten
9       comments that say okay.  Am I correct?
10 A    Correct.  Those are the notations.
11 Q    Those redactions on page 749 are the Department
12      redactions, I presume?
13 A    Correct.
14 Q    Also going to turn your attention on Exhibit 14
15      to page 72 of 79 in the upper right.  Do you see
16      that?
17 A    Yes.
18 Q    Same page as page 243 in Exhibit 49.  Correct?
19 A    That looks correct.
20 Q    And it's the same for the next pages of those
21      documents, correct?  They're the same?
22 A    They appear to be.
23 Q    So I just want to make sure I understand that

139

1       the documents, the syllabus on Exhibit 49 that
2       Mr. Richards submitted to the House Executive
3       Department's Administration Committee is the
4       same document that you received from
5       Mr. Richards, a portion of which you attached as
6       Topic Ten to Exhibit 14; is that correct?
7  A    Correct.
8  Q    You can set that aside.
9       MR. KENISON-MARVIN:  Can I use the
10      restroom?
11      MR. BISSONNETTE:  Of course.
12      (Recess taken 2:33 - 2:38 p.m.)
13 Q    Commissioner, before you you should have two
14      exhibits, Exhibits 12 and 13.  Are they in front
15      of you?
16 A    They are.
17 Q    So I'm just going to represent to you that
18      Exhibit 12 is an Attorney General Memorandum
19      directed to the HRC.  Exhibit 13 looks to be
20      information, a reflection of a meeting that may
21      have occurred on September 8th, 2021, right
22      after the date that Exhibit 12 was issued.
23      So my question is do you remember a meeting

140

1       that took place on September 8, 2021, between
2       you and Director Malachi?
3  A    I don't remember specific -- I mean, I've had
4       various meetings with Ahni Malachi over the
5       years.  I don't remember a specific meeting on
6       that day.  To be clear as well, I don't actually
7       book my calendar.  That's done by a scheduler.
8  Q    Fair enough.  Fair enough.  I just noticed
9       because this is the date right after the AG memo
10      was issued so do you recall any meeting with
11      Director Malachi about Exhibit 12?
12 A    I don't.
13 Q    Okay.
14 A    In fact, I don't even recall a conversation with
15      Ahni Malachi about this AG memo.
16 Q    Fair enough.  When you typically meet with
17      Director Malachi on issues is it usually you two
18      that are present or are there other individuals
19      also that participate or does it depend?
20 A    It depends on what the issue is.  So Ahni
21      Malachi is also on the Board of Directors of one
22      of our charter schools.  So I see her in that
23      context, and I see her in a professional

141..144

141

1    context.  Generally if I'm meeting with Ahni
2    Malachi relative to any matter like this,
3    there's probably an Attorney General individual
4    who would be present.
5  Q    Okay.  You tell me if this isn't fair to say,
6    but I'm relying directly on your OpEd on Exhibit
7    4 just to not hide the ball, but is it fair to
8    say --
9  A    Exhibit 4.  Which one is that.  I do a lot of
10    OpEds.
11  Q    Teach children about racism.
12  A    Okay.
13  Q    So what I want to make sure is is it fair to say
14    that you supported HB 2?
15  A    So what I support is to make sure that children
16    and educators in New Hampshire are not
17    discriminated against in any way, shape or form.
18  Q    And in your view, as reflected in Exhibit 4,
19    they would be protected by HB 2 in your view,
20    right?
21  A    So can you repeat that question?
22  Q    Strike that.  I'm just going to refer you to the
23    bottom of Exhibit 4, page 398, quote, "The

142

1    guardrails outlined in this legislation recently
2    passed by the New Hampshire Senate help us to do
3    just that.  "Do just that" is the language that
4    precedes that sentence in the OpEd.  Do you see
5    that language?
6  A    I mean, it's all of the preceding language like
7    a summarizing sentence.
8  Q    I agree with that.  My question is you're
9    referring to HB 2 in that sentence, correct?
10  A    I quote aspects of that legislation in there
11    that are, I believe, excerpts from RSA 193:40,
12    and so I do believe that that law will help
13    protect our teachers and our students from being
14    discriminated against.
15  Q    And, in fact, you say on the opening sentence of
16    this OpEd it's important, correct?
17  A    I think it's important to make sure that our
18    students are not discriminated against and our
19    teachers are not discriminated against.
20  Q    So you think it's important.
21  A    I think not discriminating is important.
22  Q    When you say "not discriminating," what you're
23    referring to are the provisions that refer to HB

143

1    2, right?
2  A    I believe those are contributing to that.
3    Clearly, I've not in this OpEd excerpted the
4    entire content of Exhibit 1.
5  Q    Um-hum.
6  A    But I think that these are components that help
7    us toward that mission.
8  Q    I'm not trying to hide the ball here.  What I'm
9    just trying to get is, Commissioner, you say
10    twice in this OpEd, the last line and the first
11    line, "legislation recently passed by the New
12    Hampshire Senate."  That's HB2 as reflected in
13    Exhibit 1, correct?
14  A    Say that again?
15  Q    Sure.  You say in the first line and the last
16    line of your OpEd as reflected in Exhibit 4,
17    you're referring to legislation recently passed
18    by the New Hampshire Senate.  You see both of
19    those references?
20  A    Yes.
21  Q    In there you're referring to HB 2, right?
22  A    I'm referring to specifically the components of
23    193:40, but I believe that the other parts of HB

144

1    2 potentially are contributory to that, but this
2    OpEd is focused on those elements of 193:40.
3  Q    I got you.  That's fair.  I see what you're
4    saying.  So the language though that you're
5    referring to on both the first sentence and the
6    last sentence on Exhibit 4 is if I now turn your
7    attention to Exhibit 1 the provisions of RSA
8    193:40.
9  A    Well, so not all of 193:40, but specifically
10    193:40-I(a), (b), (c), and (d) which are in my
11    mind the provisions that the legislation passed
12    in order to try and not result in
13    discrimination.
14  Q    In those provisions that you just referenced, is
15    it fair to say based on the language in your
16    OpEd that you supported that language?
17  A    So I believe as I have indicated in this OpEd
18    that that will help avoid discrimination against
19    our educators and our students in New Hampshire.
20  Q    You're saying something a little bit different
21    from what I'm asking which is did you support
22    that language?
23  A    So I don't know what you mean by "support that

145

1 language."
2 Q   Did you oppose it?  Did you oppose the language?
3 A   So I don't have an opportunity to vote yes or no
4     on any particular piece of legislation, and so
5     in this OpEd I'm reflecting my opinion that
6     those aspects of RSA 193:40 that are referenced
7     and summarized in this OpEd are important
8     towards avoiding discrimination of our students
9     and our students in New Hampshire.
10 Q  And in your view they're also needed, correct?
11 A  Well, I believe that those provisions will help
12    avoid discrimination of students and educators
13    in the state of New Hampshire.  Whether or not
14    they're needed is a determination that the
15    legislature has to make.
16 Q  I'm just using your language, Commissioner.  I
17    don't mean to fight you on this, but you say in
18    the opening sentence of Exhibit 4 that it's
19    needed.  That was your position, correct?
20 A  Yes, it is.
21 Q  Okay.  So I'm just going to ask you again.  Is
22    it fair for me to characterize Exhibit 4 as
23    reflecting the Department of Education's support

146

1     for the provisions of HB 2 reflected in RSA
2     193:40 that you mentioned just moments ago?
3 A   I think the better way to understand this OpEd
4     is that I as the Commissioner of Education
5     believe that we do not want to, and as the
6     title, states, right?  We want to teach our
7     children about racism and not to be racist so
8     that is the intent of this OpEd.
9 Q   And the portions that you referenced before in
10    RSA 193:40 would do that in your view, correct?
11 A  I believe that they will contribute to that.
12 Q  And therefore in your view that language is
13    important and needed, correct?
14 A  So I believe that language is needed in the
15    context of being helpful towards making sure
16    that our teachers and our students are not
17    discriminated against.
18 Q  Okay.
19        (Exhibit 50 marked for identification)
20 Q  Before I direct your attention to Exhibit 50,
21    does the Department of Education take positions
22    on legislation?
23 A  We do not take positions on legislation.  We

147

1     simply provide legislators with either the
2     benefits or the negative consequences as we
3     understand them associated with proposed
4     legislation.
5 Q   You're familiar with the parental bill of rights
6     legislation?
7 A   I am.
8 Q   Did the Department of Education take a position
9     on that piece of legislation?
10 A  We did not.
11 Q  Did the Department of Education tweet about the
12    outcome of that bill this week?
13 A  I believe it did.
14 Q  Do you recall a statement, quote, "The New
15    Hampshire Department of Education is
16    disappointed with the indefinite postponement of
17    SB 272 by the House and is hopeful that this
18    conversation will continue since it is possible
19    to simultaneously support students, educators,
20    and parents."  Do you recall that?
21 A  So I believe that that is a partial reflection
22    of a statement that this Department put out.
23 Q  You don't think that that tweet reflects the

148

1     Department's support for SB 272?
2 A   So similar to the OpEd which was put out after
3     the legislature acted on the legislation and
4     that tweet which was put out after the
5     legislature acted on it, we are simply
6     reflecting what we believe are the benefits or
7     detrimental effects of certain legislation.
8 Q   So I just want to make sure I understand your
9     testimony.  You don't believe that tweet that
10    was published last week to reflect the
11    Department's support for that bill?  You don't
12    interpret it that way?
13 A  So what I would understand that to be is it's
14    not possible to support something that is no
15    longer a bill and is indefinitely postponed.
16 Q  Okay.  I may have misheard this, Commissioner.
17    I apologize if I did, but there was some
18    reference before to the book, How to be
19    Antiracist, by Ibram X. Kendi.  Do you remember
20    generally talking about that book earlier today?
21 A  I believe it came up in your line of
22    questioning.
23 Q  I believe it did.  So I want to just direct your

149

1    attention to page 19 of what's been photocopied.
2    The language that is underlined.  I just want to
3    make sure that's the language that you quoted in
4    your OpEd on Exhibit 4.  Correct?
5  A  I can go look.
6  Q  Okay.
7  A  So I, the language looks similar.  I do note
8    that there's a "dot dot dot" in my quotation in
9    my OpEd so it could be that my quotation, I
10   don't recall exactly where I got it from, but it
11   could be from a presentation that Mr. Kendi
12   provided some place as opposed to quoting
13   directly out of that text, but he may have been
14   quoting the text himself, and I quoted that.
15  Q  Where did you get that quote then in Exhibit 4?
16   Do you recall?
17  A  I don't recall where I got it.
18  Q  Have you read the book How to be an Antiracist
19   by Ibram Kendi, portions of which are reflected
20   in Exhibit 50?
21  A  I have not, and I think I represented that
22   already.
23  Q  Before you were given Exhibit 50 moments ago,

150

1    had you seen the language around the underlying
2    portions of Exhibit 50 before today?
3  A  So can you repeat that question?
4  Q  Could you read it back?  See if I can do a
5    better job.  I might not be able to.
6    (Requested portion read back by court reporter)
7  A  So to be precise, I've not seen the language in
8    the text of the book.  I've seen the language
9    from other presentations made by Mr. Kendi, and
10   they are similar.
11  Q  They're similar.  Did those other references
12   that you've seen of Dr. Kendi's quotes, did it
13   include contextual language like the contextual
14   language that surrounds the underlined quote on
15   page 19 of Exhibit 50?
16  A  I don't recall.
17  Q  I'm going to -- my notes are all over the place.
18   This is what happens when you bat cleanup.  So
19   I'm going to come back to this, but I want to
20   probe a little bit more into your testimony with
21   respect to kind of what teaching means, and so
22   I'm going to direct your attention back to
23   Exhibit 1, and in particular the language on PL

151

1    00006 that says on line 24 to line 25, "No pupil
2    in any public school shall be taught,
3    instructed, inculcated or compelled to express
4    belief in, or support for, any one or more of
5    the following."  Do you see that language?
6  A  I do.
7  Q  So here I'm not talking about the four concepts
8    below.  I just have some questions about that
9    specific phrase.  So that's what I want to get
10   at.
11   So is there written criteria that the
12   Department has that defines what it means to
13   teach, instruct, inculcate or compel to express
14   belief in or support for something?
15  A  I would need to make reference to other people
16   in the agency to get a more specific response to
17   that question.
18  Q  We have done that, in fairness, but I just want
19   to ask you are you aware of any written criteria
20   that defines those terms on page 00006 of
21   Exhibit 1, lines 24 to 25?
22  A  So I'm not familiar with them.
23  Q  So is there any written criteria that you're

152

1    aware of in the Department that explains whether
2    or not a read-along would constitute teaching,
3    instructing, inculcating or compelling to
4    express a belief in?
5  A  I don't know the answer to that.
6  Q  You mentioned rhetorical devices as a possible
7    device that teachers may use.  Is there any
8    criteria within the Department that explains
9    what rhetorical devices a teacher may use that
10   would or would not constitute teaching,
11   instructing, inculcating or compelling to
12   express a belief in?
13  A  So I'm not aware of that.
14  Q  Is there any criteria within the Department that
15   explains whether assigning a book to students to
16   read constitutes teaching, instructing,
17   inculcating or compelling to express a belief?
18  A  I would have to make reference to others in the
19   agency.
20  Q  Sitting here today, are you aware of any?
21  A  Am I aware of any?  Could you repeat that?
22  Q  Could you just restate my last question?
23   (Requested portion read back by court reporter)

153

1  A   So I would have to reach further into the agency
2      to determine that.
3  Q   But sitting here today, are you aware?
4  A   I'm not aware of what those might be.
5  Q   So now I want to go back to now Exhibit 50, and
6      I want you to just assume for, and I'm
7      referencing the underlying language on Exhibit
8      50 that's also in your OpEd. I want you to
9      assume that a teacher has taught, instructed,
10     inculcated that underlined language. If that's
11     true, would that underlined language fall under
12     any of the four concepts lines 26 to the next
13     page on line 3.
14        MR. KENISON-MARVIN: I'll object to the
15     legal contention, and you can answer.
16 A   So I will start with the fact that it's not my
17     job, it's not within the purview of my
18     responsibility to adjudicate whether or not
19     certain actions by an educator would be some
20     type of an action under 193:40. So I can
21     speculate if that's where you want me to go.
22 Q   I would like you to speculate. How would you
23     speculate?

154

1  A   So the question then again is?
2  Q   The question then is if a teacher taught or
3      instructed, those two sentences that are
4      underlined on page 50, would it fall in your
5      view under any of the four concepts that are
6      listed on page 6 of Exhibit 1, line 26, to line
7      3 on page 7?
8  A   Am I allowed to write on this one?
9  Q   I can give you a copy.
10 A   I want to just go through and underline all the
11     principals and run each of them through my head.
12 Q   Please do. This can be your copy.
13 A   The question is with respect to this underlined
14     language in Exhibit 50?
15 Q   Um-hum.
16 A   So to your question, I think it would depend
17     upon the context of the instruction. The
18     content of Exhibit 50, again, content being
19     being neutral, it's what you do with that
20     content.
21 Q   So my question is a little different, and I'll
22     explain why. So what I'm trying to do is parse
23     out teaching, instruction, and inculcating which

155

1      is kind of element one of the statute with
2      element 2 of the statute which is whether that
3      teaching, instruction or inculcating fits within
4      one of the four concepts. So what my question
5      is trying to do is assume that this would meet
6      the definition of teacher inculcate. So I'm
7      going to now reframe my question.
8         If a teacher taught, instructed or
9      inculcated students along the lines of what's
10     been underlined on Exhibit 50 that you also
11     quote in your OpEd on Exhibit 4, would that fit
12     any of the four concepts that are listed at the
13     bottom of page 6 and go on to the beginning
14     of 07?
15        MR. KENISON-MARVIN: I'll make the same
16     objection. Vagueness. Legal contention and
17     compound. And it represents the nature of the
18     first elements of the statute. You can answer.
19 A   So I think that it would be most clear in the
20     mind of an educator to determine whether or not
21     in teaching the text that you refer to in
22     Exhibit 50 if they are teaching that, one, a
23     group in this list of things is inherently

156

1      superior, that one group is inherently racist,
2      that one group receives adverse treatment or
3      should receive adverse treatment and should be
4      discriminated against or receive adverse
5      treatment solely because of those
6      characteristics or that they cannot and should
7      not attempt to treat others without regard to
8      those items.
9         So those are the four salient questions
10     that I think an educator would ask relative to
11     any content. Am I teaching that the inherent
12     superiority, the inherently racist, the adverse
13     treatment, and to not attempt to treat others
14     without regard to.
15 Q   I hear you. My question is a little different.
16        My question is would a teacher if they
17     taught that underlined language be teaching a
18     banned concept under the statute?
19 A   So there's not enough knowledge to know what the
20     question is. Is that teacher when they are
21     teaching this part of the context, are they
22     teaching that there is an inherently superior
23     group, an inherently racist, a group that should

157

1    receive adverse treatment solely or probably
2    because of these characteristics or that they
3    cannot and should not attempt to be treated
4    without regard to these characteristics.  So
5    that is really, you have to see the context of
6    what's taking place.
7  Q    Here though the context is, as I'm saying, they
8    are teaching or inculcating, that language
9    that's underlined.  So my question is if they
10    are teaching or inculcating that principle that
11    is underlined, would that fit any of the
12    concepts?
13  A    So again, you'd have to have its bigger context.
14    Right?  So you can't --
15  Q    I'm sorry.  Go on.
16  A    You have to have the full context of what is
17    being discussed.  I mean, in other words and I
18    think we ran into the same problem here.  You're
19    constructing a hypothetical with one sentence
20    and that's not how instruction takes place.
21        So you would have to put it in context and,
22    again, the individual who is doing the educating
23    would be very clear if they are inculcating or

158

1    teaching or instructing students that one's age,
2    sex, gender, et cetera, you know, is inherently
3    superior to another age, sex, gender or that an
4    individual by virtue of their age, sex, gender,
5    et cetera, is inherently racist or sexist or
6    oppressive or that an individual should be
7    discriminated against or receive adverse
8    treatment because of their age, sex, gender, et
9    cetera or that the people of one age, sex,
10    gender cannot and should not attempt to treat
11    others without regard to those things.  So that
12    is the context that you need.
13  Q    So you can't answer the question without that
14    context; is that correct?
15  A    So what I say is I don't have any instruction in
16    New Hampshire that is one sentence long.
17  Q    What if a teacher had the very question I just
18    asked you, how would you respond to that
19    teacher?  Can I teach page 19 of Exhibit 50.
20    Give me guidance.  What would your response be?
21        MR. KENISON-MARVIN:  Objection.
22  A    I'm sorry.  Did you --
23        MR. KENISON-MARVIN:  Objection.  Vague.

159

1  A    My response would be to go to the statute, go to
2    the Q & A which enumerates what you can and
3    can't do and ask yourself educator, am I
4    teaching, instructing or inculcating a student.
5    That seems very clear to the person who's doing
6    it that one's age, sex, gender, et cetera, is
7    inherently superior to another or that -- et
8    cetera.  I don't want to --
9  Q    No, that's fine.  Just reciting.
10  A    Exactly.  I've done it a couple times.  So this
11    is if you're an educator seems like very
12    straight forward that you would be able to just
13    look at these things.  Is my instruction doing
14    that, and it's not, the concept here keeps
15    coming back to the content.
16  Q    Even with that, if an educator still had a
17    question and thought it was maybe a little bit
18    less clear than you seem to think it is, could
19    they come to you for advice with respect to how
20    to comply with HB 2?
21  A    So right now we're in the midst of a lawsuit
22    with HB 2.  So most of the questions that we
23    would have would probably end up as a question

160

1    for perhaps the Human Rights Commission to
2    answer.
3  Q    Okay.  Based on your quotation of Dr. Kendi in
4    your OpEd on Exhibit 4, do you think it would be
5    reasonable for an educator to think they
6    couldn't assign Dr. Kendi's book under HB 2?
7        MR. KENISON-MARVIN:  Objection.
8    Speculation.  You can answer.
9  A    So if they were to have reached that conclusion,
10    and I would have to speculate relative to that,
11    my observation really would be, one, that and
12    this is which exhibit?  Let me get that right.
13    Let me get the right OpEd in front of me.  Is
14    that they have not read the OpEd in its
15    totality.  Because really the, if you look at
16    the rhetorical device associated with that,
17    there is a list of contradictory things the
18    paragraph before.  Right?  "For those who
19    promote Critical Race Theory or similar concepts
20    their thinking is not built on a foundation of
21    common sense, but on ideology, but on ideology
22    diametrically opposed to the truths found in our
23    Declaration of Independence, that we are all

**161**

1  created equal."

2       And then I use another counter argument to

3  that, and then I present another argument.

4  "This idea of is, of course, in complete

5  opposition to the Equal Protection clause of the

6  Fourteenth Amendment to the US Constitution.  As

7  Justice John Marshall Harlan stated in his

8  dissent of Plessy v. Ferguson, our Constitution

9  is color-blind and neither knows nor tolerates

10  classes among citizens."

11       I then go on to elaborate.  "And the

12  concepts of Critical Race Theory actually

13  contradict the very premises of the civil rights

14  movement and Dr. Martin Luther King himself."

15       And so what I would encourage my educators

16  to do if they were teaching this, so I myself

17  have used that contents, and I have used it in

18  the context of the Declaration of Independence

19  in the context of the Fourteenth Amendment, in

20  the context of Plessy v. Ferguson, in the

21  context of Martin Luther King so it seems to me

22  that the particular text that we're referring to

23  is quite rich in terms of the opportunity for

**162**

1       instruction of students.

2  Q    But I believe your prior testimony said if an

3       educator has questions about whether specific

4       instruction violates the statute they can't get

5       those answers from the DOE right now, it's

6       because of this litigation, is that your

7       position?

8  A    So if an educator comes to me, we provide

9       information to them, we provide guidance to

10       them, and that guidance includes a combination

11       of a Q & A document that we have published to

12       provide them specific guidance relative to that,

13       and it is specific reference to RSA 193:40,

14       prohibition of teaching of discrimination which

15       in my mind are quite clear in terms of

16       clarifying what can and can't happen.

17            Our educators are professionally educated.

18       They mostly have master's degrees.  And so I

19       don't think that the guidance that we are

20       providing to them is obscure to them or

21       unattainable in terms of understanding for

22       individuals who are highly educated.

23  Q    That's true, but I believe your prior testimony

**163**

1       is that while you think it's clear you're unable

2       to tell me whether if a teacher taught the

3       underlined language on Exhibit 4, you're unable

4       to tell me whether that's covered under HB 2

5       without context.  Correct?

6  A    So let me clarify.

7            MR. KENISON-MARVIN:  Objection.  Still

8       vague.

9  Q    Please do.

10  A    So then let me clarify.  So my question answer

11       is that if a teacher were to ask me a question,

12       I would provide them with what we believe is a

13       large body of guidance for them to be able to

14       make a determination or not.

15  Q    Is any of that guidance in the context of

16       specific books that they can or cannot teach

17       under the statute?

18  A    So the premise to your question is about

19       content.

20  Q    Yeah.

21  A    And that's not, my law says no pupil in any

22       public school shall be taught, instructed,

23       inculcated relative to that one's sex, et

**164**

1       cetera, is inherently superior, inherently

2       racist, received adverse treatment or cannot and

3       should not attempt to treat others without

4       regard.  It's not content specific.  So the

5       indicator should not be asking themselves what

6       is the content but what is the context of the

7       instruction that I'm providing to students.

8  Q    But you agree with me that you cite content in

9       your OpEd, correct, in the form of Dr. Kendi's

10       book, right?

11  A    I cite a number of pieces of content.  I cite

12       the Declaration of Independence --

13  Q    Not my question.  You cite Dr. Kendi as content,

14       correct?

15  A    So my OpEd cites the Declaration of

16       Independence, it cites Dr. Kendi, it cites the

17       Fourteenth Amendment, it cites Plessy v.

18       Ferguson, it cites Dr. Martin Luther King.  So

19       my OpEd has a number of citations in that

20       context.

21  Q    Thank you.  You cite Dr. Kendi as content,

22       correct?

23  A    I have cited Dr. Kendi as content --

165

1 Q    Thank you.

2 A    -- in this OpEd.

3 Q    All I'm asking. Not trying to trick you.

4      I'm going to refer you to Exhibit 9. After

5 you've reviewed Exhibit 9, just let me know when

6 you're ready. Thank you.

7      MR. KENISON-MARVIN: Gilles, I don't

8 know what your plan is --

9      MR. BISSONNETTE: I have five more minutes.

10     MR. KENISON-MARVIN: Okay. 5.

11     MR. BISSONNETTE: Five more minutes from

12 when he says he's reviewed it.

13 A   So your question?

14 Q   My question is this is an email between you and

15 the President of AFT New Hampshire; is that

16 correct?

17 A   That's correct.

18 Q   There's a line in here that says, this is the

19 second part of a sentence, but I'm just trying

20 to streamline things. We also want to reiterate

21 our offer to try to work through individual

22 circumstances that may be unclear to teachers.

23 In these cases the best approach is for them to

166

1 reach out directly and share the specific facts

2 and circumstances so that we can provide them

3 with clear guidance.

4      Is that a reflection of the Department of

5 Education's policy?

6 A   So I would hope that it is a reflection of the

7 Department of Education's policy. I can tell

8 you that this email came together with input

9 from a variety of places within the agency to be

10 able to support the educators at a time when I

11 believe there were either lawsuits or threats of

12 lawsuits pending.

13 Q   So if a teacher has questions about whether

14 specific instruction is covered by the law, they

15 could come to the Department and work through

16 individual circumstances that may be unclear to

17 them; is that still something that could occur

18 today?

19 A   Correct, and the guidance that we would provide

20 them today would be in the form of a Q & A

21 guidance and questionnaire as well as reference

22 to the statute.

23 Q   Is that the only guidance that they would be

167

1 provided to a teacher if they were confused, the

2 Q & A from July 2021 and the statute? Is that

3 all you'd give them?

4      MR. KENISON-MARVIN: Objection. Vague and

5 scope.

6 A   And I believe pending this lawsuit that that

7 would be the extent of the guidance that we

8 would provide to them.

9 Q   So you wouldn't answer if they had a followup

10 question, is Dr. Kendi's book, if I teach it, is

11 that covered under the statute, you wouldn't be

12 able to answer that question?

13     MR. KENISON-MARVIN: Objection. Vague.

14 A   So I would, and I would answer that question for

15 the educator principally by looking at the Q & A

16 but principally coming back to RSA 913:40, and I

17 would say are you teaching, inculcating, or are

18 you compelling to express a belief in or support

19 for any one or more of the following; that one's

20 immutable characteristics are inherently

21 superior, that an individual by virtue of these

22 immutable characteristics is inherently racist,

23 sexist or oppressive or that an individual

168

1 should be discriminated against because of these

2 immutable characteristics and that people cannot

3 and should not attempt to treat others without

4 regard to these immutable characteristics, and I

5 believe in that conversation with an educator

6 given the highly educated state and status of

7 our educators that they would be able to

8 understand that and apply that to their

9 pedagogy.

10 Q   I'm asking for your opinion though.

11 A   Yes.

12 Q   What is your opinion as to whether or not those

13 two sentences in your OpEd fall under the four

14 concepts in Exhibit 1. I want to know what your

15 opinion is. Could you tell me that?

16 A   So I think I've made that clear that content is

17 not what falls under the RSA 193:40. Behavior

18 and how we treat other people including

19 instructing, teaching, inculcating or compelling

20 to express belief in or support for, the fact of

21 inherent superiority, inherently racist, receive

22 adverse treatment solely because of these

23 immutable characteristics or they cannot and

169

1    should not attempt to treat others without
2    regard to these immutable characteristics.  So I
3    think that I've asked and answered that several
4    times now.
5  Q    I don't think you've answered it, but I'm going
6       to move on.
7  A    Okay.
8  Q    Exhibit 14?
9  A    Yes, I have it in front of me.
10 Q    There's a reference here if I could find it, and
11      I'm expediting this considerably.  Topic Eight,
12      page 742 to 745.  Do you see that?  It's a
13      chapter of Tiffany Jewell's book, This Book is
14      Anti-Racist.
15 A    Okay.
16 Q    Do you see that chapter?
17 A    I do.
18 Q    Have you read it before?
19 A    I have.
20 Q    Did you read it to the Board of Education on
21      July 8th, 2021?
22 A    I believe I did.  Or at least excerpts.
23 Q    Why did you read it to the Board on July 8th,

170

1    2021?
2  A    Because I needed to make sure that the Board
3       understood some of the concerns that parents
4       were raising to the Department.
5  Q    Were those concerns justification for why HB 2
6       was necessary?
7       MR. KENISON-MARVIN:  Objection.  Legal
8       contention.
9  A    Can you repeat the question?
10      (Requested portion read back by court reporter)
11 A    So again, HB 2 or really it's RSA 193:40 in
12      particular I believe are helpful to ensure that
13      our teachers and our students in the State of
14      New Hampshire are not discriminated against.
15 Q    Are you aware of that chapter being used
16      anywhere in the State of New Hampshire in
17      school?
18 A    I believe it is.  Or it was.
19 Q    What was your understanding at the time as to
20      how it was being used in New Hampshire?
21 A    I only know that a parent brought it to our
22      attention and said that it was being used.
23 Q    Besides that parent bringing it to your

171

1    attention, any other complaints about that book?
2  A    There may have been more than one.  I don't
3       recall.
4  Q    Is that parent ███████████?
5  A    I don't recall if it was her.  I believe it was
6       in the Exeter School District.
7  Q    Given that you referenced that text during the
8       July 8, 2021, Board of Education meeting, if I
9       taught that chapter, if I'm a middle school
10      teacher in Exeter, would I be violating HB 2?
11      MR. KENISON-MARVIN:  Objection.
12 A    So that would depend on whether you are
13      teaching, instructing, inculcating or compelling
14      to express a belief in or support for any one or
15      more of the following.  That one's age, sex,
16      gender identity, sexual orientation, et cetera,
17      are inherently superior to other, that they are
18      inherently racist, that they receive adverse
19      treatment solely or partly because of or that
20      they cannot or should not attempt to treat
21      others without regard to these immutable
22      characteristics.
23 Q    Besides reading that statue though, you can't

172

1    tell me whether if I taught that I'm violating
2    the law, right?
3  A    I would have to see how it's being used in this
4       context.  When you say "if I taught that," there
5       is not a content standard.  There is an activity
6       standard.  So I would have to see it in this
7       context, and again, I think that the best person
8       to know if they're violating these statutes
9       really are the individuals who are actually
10      doing the teaching.
11 Q    But if I taught that chapter.
12 A    Um-hum.
13 Q    If I taught it.
14 A    Yes.
15 Q    You can't answer today whether I'd be violating
16      the statute --
17 A    Because I don't know what your --
18      (Court reporter admonition - simultaneous talking)
19      MR. KENISON-MARVIN:  Objection.  Stop.
20      Stop.  It's misstating what the statute says,
21      first of all, and second, I'm just going to
22      instruct him not to answer anymore.  Let's talk
23      about if we have a basis to continue or not

173

1 because we've well over.
2    MR. BISSONNETTE:  I'd like an answer to
3 that, and I have one last question.
4    MR. KENISON-MARVIN:  Well, I'm going to
5 instruct -- don't answer the question.  We can
6 talk about it.  I do think that misrepresents
7 what the statute says at least and the question
8 is very vague the way it's asked right now.  So
9 I'm happy to talk about it.  If we want to do it
10 outside of the witness's presence, I can tell
11 you specifically my problem is, but we're well
12 over.  I'm happy to talk about how we're going
13 to proceed from this moment, but I've been
14 pretty liberal in allowing this to go on beyond
15 our agreed time, and I'm happy to talk about
16 continuing to keep questions on the table.  I
17 just, think we need to slow down here and talk
18 about where we're at and where we're going.
19    MR. BISSONNETTE:  Off the record.
20       (Discussion off the record)
21       (Recess taken 3:20 - 3:25 p.m.)
22 (Requested portion read back by court reporter)
23    MR. BISSONNETTE:  Strike that.  I'm going

174

1       to withdraw the question.
2 Q   Can you identify, Commissioner, an incident of
3     instruction that occurred in New Hampshire
4     before HB 2 that would violate HB 2 had it been
5     in effect at the time the instruction occurred?
6       MR. KENISON-MARVIN:  Objection.  Vague.
7     Calls for legal contention.
8 A   I'm not familiar with any.
9 Q   The Exploring Whiteness syllabus that's on
10     Exhibit 14, Topic Ten.  I just wanted you to
11     describe to me --
12 A   Just give me the page.
13 Q   Yes, of course.  It's page 749, Topic Ten, of
14     Exhibit 14.
15 A   Okay.
16 Q   Do you have the context of this class?  I
17     believe it was in Hanover.
18 A   I believe it was in Hanover, and I believe it
19     was an elective class that students signed up
20     for in a specials week that they have.
21 Q   Was it a class that students were required to go
22     to; do you know?
23 A   I think I indicated it was an elective class.

175

1 Q   Sorry.  I didn't understand the terminology.  I
2     appreciate that.
3       Just going through my note.  I might be
4     done.
5       I'm introducing an exhibit and my question
6     is just going to be whether you've seen it
7     before.
8       (Exhibit 51 marked for identification)
9 A   I don't think I've seen this before.
10 Q   Do you recall ever speaking to the Northwood
11     GOP?
12       MR. KENISON-MARVIN:  Objection.  Vague.
13 A   Can you put a time frame on that?
14 Q   November 2021.
15 A   I don't recall that.  I have spoken to the
16     Northwood GOP years ago.
17 Q   This would be to refresh your recollection.  So
18     I've just marked as Exhibit 52 an email.
19       (Exhibit 52 marked for identification)
20 Q   Does Exhibit 52 refresh your recollection as to
21     whether or not you've ever spoken to the
22     Northwood GOP?
23 A   So it refreshes my recollection that I was

176

1     invited.  I don't recall if I ever went out and
2     spoke to them or not.  I don't have recollection
3     of that.  I do speak to many groups though.
4 Q   You've spoken to political groups before, fair
5     to say?
6 A   I speak to all kinds of groups.
7 Q   I know.  I get that.  I'm just asking political
8     groups.  Have you spoken to political groups
9     before?
10 A   All kinds of groups.
11 Q   Which includes political groups, correct?
12 A   That would include political groups.
13 Q   And in those political groups, have you
14     referenced HB 2 before?
15 A   I may have answered a question on it or have
16     spoken about various aspects of education.
17 Q   You ever speak about why it was necessary in
18     those group meetings?
19 A   I don't have any specific recollection of the
20     type of content that I would have shared on
21     that.
22 Q   Okay.
23       MR. BISSONNETTE:  We'll all reserve,

177

```
1   obviously, and I want to thank the Commissioner
2   for his time.  Thank you, Elizabeth.  Thank you,
3   Nate, and thank you, Cindy, very much.
4        MR. KENISON-MARVIN:  I want to speak with
5   the Commissioner briefly about any areas for
6   followup before we recess for the day.  Give me
7   five minutes.
8            (Recess taken 3:30 - 3:40 p.m.)
9        MR. KENISON-MARVIN:  We don't have any
10  questions for the witness, and I just want to
11  reserve our right to read and sign the
12  transcript.
13       MR. BISSONNETTE:  We'll reserve as well,
14  and just thank you everyone very much.
15           (Deposition suspended at 3:40 p.m.)
16
17
18
19
20
21
22
23
```

179

```
1                C E R T I F I C A T E
2        I, Cynthia Foster, Registered Professional
3   Reporter and Licensed Court Reporter, duly authorized
4   to practice Shorthand Court Reporting in the State of
5   New Hampshire, hereby certify that the foregoing
6   pages, numbered 7 through 177, are a true and
7   accurate transcription of my stenographic notes of
8   the deposition of FRANK EDELBLUT who was first duly
9   sworn by me on May 23, 2023, for use in the matter
10  indicated on the title sheet, as to which a
11  transcript was duly ordered;
12        I further certify that I am neither
13  attorney nor counsel for, nor related to or employed
14  by any of the parties to the action in which this
15  transcript was produced, and further that I am not a
16  relative or employee of any attorney or counsel
17  employed in this case, nor am I financially
18  interested in this action.
19
20
21                        Cynthia Foster, LCR
22
23
```

178

```
1           I have carefully read the foregoing
2        deposition, and the answers made by me are true.
3
4
                 _____
5                   FRANK EDELBLUT
6
7
8   STATE OF _____
9   _____, SS.
10
11        At_____on the
12        _____ day of _____ A.D.
13  2023, personally appeared the above-named FRANK
14  EDELBLUT and made oath that the foregoing answers
15  subscribed by him are true.
16                   Before me,
17
18
19
                 _____
20                   Notary Public
21
22
23
```

180

```
1                E R R A T A
2        I, the undersigned, FRANK EDELBLUT, have read
    the transcript of my deposition held on May 23, 2023,
3   in the matter of Local 8027, AFT-New Hampshire,
    AFL-CIO v. Frank Edelblut, Commissioner, et al; and
4   the same is true and correct, to the best of my
    knowledge, with the exception of the following
5   changes noted below, if any:
6   PAGE/LINE  CORRECTION AND REASON FOR CORRECTION
7   _____
8   _____
9   _____
10  See attached sheet(s) for additional information:
11  ___Yes___No
12
                 _____
                   FRANK EDELBLUT
13
14  STATE OF _____)
                        ) ss.:
15  COUNTY OF _____)
16
        Subscribed and sworn to before me this _____ day
17  of _____, 2023.
18
19                   _____
                        Notary Public
20
    My commission expires:
21
    _____
22
23
```

1  I have carefully read the foregoing

2  deposition, and the answers made by me are

   true.[1]

3

4  _____

5  FRANK EDELBLUT

6

7

8  STATE OF *New Hampshire*

9  _____, SS.

10

11  At *25 Hall St, Concord* on the

12  _____*29*_____ day of *June*_____ A.D.

13  2023, personally appeared the above-named FRANK

14  EDELBLUT and made oath that the foregoing answers

15  subscribed by him are true.

16  Before me,

17

18

19

20  _____
   Notary Public

21

22  [1] Subject to the exception of the changes identified in the accompanying errata sheet and the

23  attachment thereto.

```
 1              E R R A T A

 2         I, the undersigned, FRANK EDELBLUT, have read
         the transcript of my deposition held on May 23, 2023,
 3       in the matter of Local 8027, AFT-New Hampshire,
         AFL-CIO v. Frank Edelblut, Commissioner, et al; and
 4       the same is true and correct, to the best of my
         knowledge, with the exception of the following
 5       changes noted below, if any:

 6       PAGE/LINE   CORRECTION AND REASON FOR CORRECTION

 7       P9 / L10         See attachment
         _____
 8       P15 / L3         See attachment
         _____
 9       P16 /L17         See attachment
         _____
10       See attached sheet(s) for additional information:

11       ■ Yes___No

12                                    _____
                                      FRANK EDELBLUT
13

14       STATE OF  N H       )
                             ) ss.:
15       COUNTY OF Merrimack )

16

17            Subscribed and sworn to before me this 29  day

18       of  June        , 2023.

19                                    _____
                                      Notary Public
20

21       My commission expires:

22       May 31, 2028

23
```

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner, et al. (No. 1:21-cv-01077-PB)

FRANK EDELBLUT

# ERRATA SHEET

## ATTACHMENT

Page 9, Line 10, Change:

>   Replace "party" with "matter" such that the transcript states:
>
>   "I was deposed many, many years ago in another ***matter*** associated with a corporation."
>
>   <u>Reason</u>: Transcription error.


Page 15, Line 3, Change:

>   Replace "counsel" with "Council" such that the transcript states:
>
>   "I'm nominated, and then I go through a confirmation process with the Governor and ***Council***."
>
>   <u>Reason</u>: Transcription error.


Page 16, Line 17, Change:

>   Replace "RSA 21:10" with "RSA 21-N" such that the transcript states:
>
>   "Particularly in ***RSA 21-N*** I believe is the statute."
>
>   <u>Reason</u>: Transcription error.


*[intentionally blank; continued on next page]*

Page **1** of **3**

Page 40, Lines 16–17, Change:

> After "We do" add "have a periodic meeting";
> Before "That would be incorrect" add "But"; and
> After "That would be incorrect" add "to characterize it as a 'committee'"

> With these changes, the transcript states:

> "We do ***have a periodic meeting***.  ***But*** that would be incorrect ***to characterize it as a 'committee.'***  It's not a committee."

> <u>Reason</u>: To clarify testimony.

Page 47, Line 22, Change:

> After "Yes" add ", I agree with the objection that the question is vague, but I will try to answer it" such that the transcript states:

> "Yes***, I agree with the objection that the question is vague, but I will try to answer it***. So with respect to this particular complaint, my recollection is that the direction we took was not concern over a specific piece of content so much as it was the Sora app and what students may or may not be able to access using that particular application and whether schools had configured correct security parameters in that application to prevent students from accessing content that may not be developmentally appropriate for them."

> <u>Reason</u>: To clarify testimony.

Page 49, Line 21, Change:

> Replace "times" with "types" such that the transcript states:

> "I believe in this case that those ***types*** of controls had not been configured."

> <u>Reason</u>: Transcription error.

*[intentionally blank; continued on next page]*

Page **2** of **3**

Page 133, Line 20, Change:

After "Yes" add ", I understand." such that the transcript states:

"Yes*, I understand.* I have no recollection of seeing either of these."

Reason: To clarify testimony.


Page 161, Line 17, Change:

Replace "contents" with "content" such that the transcript states:

"And so what I would encourage my educators to do if they were teaching this, so I myself have used that *content*, and I have used it in the context of the Declaration of Independence in the context of the Fourteenth Amendment, in the context of Plessy v. Ferguson, in the context of Martin Luther King so it seems to me that the particular text that we're referring to is quite rich in terms of the opportunity for instruction of students."

Reason: Transcription error.


Page 164, Line 5, Change:

Replace "indicator" with "educator" such that the transcript states:

"So the *educator* should not be asking themselves what is the content but what is the context of the instruction that I'm providing to students."

Reason: Transcription error.


[*end*]

**EXHIBIT 3**

DOE Attorney
Diana Fenton
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)



# Transcript of Diana Fenton

**Date:** May 17, 2023
**Case:** Local 8027, AFT-New Hampshire, et al. -v- Edelblut, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
1              UNITED STATES DISTRICT COURT

2                DISTRICT OF NEW HAMPSHIRE

3

4   LOCAL 8027, AFT NEW HAMPSHIRE,    )

5   et al.,                          )

6                 Plaintiffs,         )

7       v.                           )

8   FRANK EDELBLUT, in his official  )

9   capacity as Commissioner of the  )

10  Department of Education ("DOE"),  )

11                Defendant           )

12  -------------------------------- C.A. 1:21-cv-01077-PB

13  ANDRES MEJIA, et al.,            )

14                Plaintiffs,         )

15      v.                           )

16  FRANK EDELBLUT, in his official  )

17  capacity as Commissioner of the  )

18  Department of Education ("DOE"),  )

19                Defendant.          )

20  --------------------------------)

21

22           DEPOSITION OF DIANA FENTON

23

24

25
```

**Page 2**

```
1            DEPOSITION OF DIANA FENTON

2

3     THIS DEPOSITION TAKEN PURSUANT TO NOTICE OF DEPOSITION

4   AT NEW HAMPSHIRE DEPARTMENT OF JUSTICE, 33 CAPITOL STREET,

5   CONCORD, NEW HAMPSHIRE, ON WEDNESDAY, MAY 17, 2023,

6   COMMENCING AT 10:10 A.M.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
1                    APPEARANCES

2   For Plaintiffs Local 8027, AFT New Hampshire:
3   STROOCK & STROOCK & LAVAN, LLP
    David J. Kahne, Esq.
    Elizabeth C. Milburn, Esq.
4   Charles Moerdler, Esq. (via videoconference)
    180 Maiden Lane
5   New York, New York 10038-4982
    (212) 806-6419
6   dkahne@stroock.com
    emilburn@stroock.com
7   cmoerdler@stroock.com

8   For Plaintiffs Andres Mejia and Christina Philibotte:
    AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
9   Gilles Bissonnette, Esq.
    18 Low Avenue
10  Concord, New Hampshire 03301
    (603) 224-5591
11  gilles@aclu-nh.org

12    - and -

13  DISABILITY RIGHTS CENTER - NEW HAMPSHIRE
    Kayla Turner, Esq. (via videoconference)
14  64 North Main Street, Suite 2
    Concord, New Hampshire 03301
15  (603) 228-0432
    kaylat@drcnh.org

16    - and -

17  GLBTQ LEGAL ADVOCATES & DEFENDERS
18  Chris Erchull, Esq. (via videoconference)
    18 Tremont Street, Suite 950
19  Boston, Massachusetts 02108
    (617) 426-1350
20  cerchull@glad.org

21    - and -

22  NIXON PEABODY, LLP
    Morgan C. Nighan, Esq. (via videoconference)
23  Exchange Place
    53 State Street
24  Boston, Massachusetts 02109
    (617) 345.1031
25  mnighan@nixonpeabody.com
```

**Page 4**

```
1                APPEARANCES (Cont'd)

2
    For Defendants Frank Edelblut, Christian Kim, John
3   Formella, Ahni Malachi, and Ken Merrifield:
    NEW HAMPSHIRE DEPARTMENT OF JUSTICE
4   Civil Bureau
    Nathan W. Kenison-Marvin, Esq.
5   33 Capitol Street
    Concord, New Hampshire 03301
6   (603) 271-1292
    nathan.w.kenison-marvin@doj.nh.gov

7   For Defendants National Education Association - New
    Hampshire:
8   NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE
    Esther K. Dickinson, Esq. (via videoconference)
9   9 South Spring Street
    Concord, New Hampshire 03301
10  (603) 224-7751
    edickinson@nhhea.org
11

12  For Plaintiff American Federation of Teachers:
    NOLAN PERRONI, P.C.
13  Peter J. Perroni, Esq. (via videoconference)
    73 Princeton Street
14  North Chelmsford, Massachusetts 01863
    (978) 454-3800
15  peter@nolanperroni.com

16  For Defendant Department of Education:
    DEPARTMENT OF EDUCATION
17  Elizabeth A. Brown, Esq. (via videoconference)
    101 Pleasant Street
18  Concord, New Hampshire 03301
    (603) 271-6338
19  elizabeth.a.brown@doe.nh.gov

20  Court reporter:
    Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR
21

22

23

24

25
```

**5**

STIPULATIONS

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under Federal law.

Notice, filing, caption and all other formalities are waived. All objections, except as to form, are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

**7**

EXHIBITS (Cont'd)

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 15 | 12/13/21 Email | 123 |
| 16 | 9/03/21 Email Chain | 126 |
| 17 | 5/24/21 Email Chain | 126 |
| 18 | 4/07/22 Email | 137 |
| 19 | 8/23/21 Email with Attachments | 148 |
| 20 | 2/22/22 Email | 154 |
| 21 | Right to Freedom from Discrimination in Public Workplaces and Education | 159 |
| 22 | 11/15/21 Email Chain | 162 |
| 23 | 3/18/22 Email | 165 |

(Original exhibits were returned to Attorney Bissonnette.)

(Electronic copies of the exhibits are attached to the transcript.)

**6**

INDEX

| WITNESS | | PAGE |
|---------|---|------|
| Diana Fenton | | |
| By Mr. Bissonnette | | 8 |
| By Mr. Kahne | | 143 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1 | Full Text of The Banned Concepts Act | 11 |
| 2 | New Hampshire Code of Conduct for Educational Professionals | 15 |
| 3 | Overview of the Department of Education's Educator Misconduct Practices | 18 |
| 4 | Frank Edelblut, Teach Children About Racism, Not to be Racists | 34 |
| 5 | 1/26/23 House Judiciary Hearing Transcript | 77 |
| 6 | 3/08/23 House Judiciary Hearing Transcript | 77 |
| 7 | 8/17/21 Email with Attachment | 92 |
| 8 | 1/18/23 Email | 99 |
| 9 | 9/21/22 Email with Attachment | 102 |
| 10 | 1/20/23 Email with Attachment | 107 |
| 11 | NEA-NH 7/12/21 and 8/05/21 Letters | 110 |
| 12 | Attorney General Opinion No. 2021-01 | 114 |
| 13 | 9/08/21 Email | 115 |
| 14 | NH Department of Education Website | 116 |

**8**

DIANA FENTON,
having been duly sworn by Ms. Saalfield,
was deposed and testified as follows:
EXAMINATION
MR. BISSONNETTE: Good morning, Ms. Fenton.
THE WITNESS: Good morning.
MR. BISSONNETTE: It's nice to see you again. My name is Gilles Bissonnette. I'm one of several lawyers that represent the plaintiffs in this case. And thank you for coming in for a deposition.

I just wanted to say at the outset that counsel in the case have conferred and have agreed to the normal stipulations which is that all objections, except those to the form of the question, shall be reserved to the time of trial. Of course, that stipulation excludes privilege, which can be raised as well in this particular case by defense counsel.

And you had a -- you wanted to make sure you preserved ability to read and sign?

MR. KENISON-MARVIN: Just make it clear on the record that we do request that our right to -- we'll exercise our right to do that under the rules.

MR. BISSONETTE: Sure.

BY MR. BISSONNETTE:
Q. Attorney Fenton, have you been deposed before?

**Page 9**

1  A.  No.

2  Q.  No.  So just some kind of -- I know you're an attorney,

3  but just some common ground rules, roadmap for the

4  deposition today.  There's no intention here to ask you

5  any trick questions.  If you have any questions or

6  concerns about the language I'm using in asking the

7  question, please let me know.  Obviously, the goal here

8  of all of us is to make sure we have a clear record

9  where you understand the question being asked so you

10  can answer to the best of your abilities.  Does that

11  make sense to you?

12  A.  It does.  Thank you.

13  Q.  Sure.  And, of course, if you need to take a break at

14  any point, just let me know.  We'll, of course, do

15  that.  I think we'll take breaks on the hour.  My only

16  request is that if you are asking for a break, that we

17  just close out a particular question before we do so.

18  Of course, no objection if there's a privilege concern

19  prior to answering a question if you want to confer

20  with your counsel on that, okay?

21  A.  Yes.  Thank you.

22  Q.  And do you know as well -- I just want to make sure

23  that you understand that the court may read portions of

24  this transcript, correct?

25  A.  Yes.

**Page 10**

1  Q.  Okay.  And you know that you're under oath, correct?

2  A.  Yes.

3  Q.  Will anything prevent you from giving truthful and

4  accurate testimony today?

5  A.  I don't believe so.

6  Q.  Okay.  Throughout this deposition, I just want to make

7  sure we agree on terminology just so there's no

8  confusion and so the record is clean.  I know that in

9  the lawsuit, and in communications related to the

10  lawsuit, there's been various names for the statute

11  that's being challenged here, the banned concepts,

12  divisive concepts.

13     To avoid any kind of wrangling over terminology,

14  when I'm talking about the challenged law in this

15  deposition, I'm just going to use the phrase "HB 2."

16  Is that something we can agree on from a terminology

17  term?  I won't be talking about the other portions of

18  HB 2, but just limiting it to the challenged law.  So

19  if I use the term "HB 2" for the challenged law, will

20  we have a common understanding?

21     MR. KENISON-MARVIN:  Just object on the

22  foundation.

23     MR. BISSONETTE:  You can still answer the

24  question.

25     THE WITNESS:  If you could clarify what you

**Page 11**

1  mean by "other portions," I believe that's a phrase you

2  used.  Other portions of the law?

3     MR. BISSONETTE:  Sure, sure.  So why don't we

4  introduce an exhibit.

5     (Exhibit 1 marked for identification.)

6  BY MR. BISSONETTE:

7  Q.  So, Ms. Fenton, I would just ask you to review Exhibit

8  1 and just let me know when you're done reviewing it,

9  please.

10  A.  I'm all set.

11  Q.  All set?  Thank you.  What is Exhibit 1?

12  A.  Exhibit 1 is House Bill 2.

13  Q.  Okay.  I'm going to refer you to pages Bates stamped

14  PL04 to PL07.  Are those the provisions of House Bill 2

15  that are being challenged in this particular lawsuit?

16  A.  That is my understanding, yes.

17  Q.  So if I were, throughout this deposition, to describe

18  those challenged provisions between PL04 and PL07 as HB

19  2, would we have just a common understanding on the

20  terminology?

21  A.  Yes.

22  Q.  Okay.  Are you a licensed attorney?

23  A.  Yes.

24  Q.  Before your role with the Department of Education,

25  which we're going to get into, what was your prior

**Page 12**

1  position?

2  A.  I worked for the New Hampshire Attorney General's

3  office.

4  Q.  What was your role there at the time?

5  A.  I worked in the criminal bureau.

6  Q.  How long did you work in the criminal bureau?

7  A.  I worked for the New Hampshire Attorney General's

8  office from the spring of 2007 until the fall of

9  2015.

10  Q.  What were your general responsibilities in your role in

11  the criminal bureau between 2007 and 2015?

12  A.  My role was -- my position, I should say, was

13  grant-funded by the National Traffic Safety -- I forget

14  the last word.  National Traffic Safety Association.

15  It was a federal grant.

16  Q.  Okay.

17  A.  I focused on traffic fatalities.  That included

18  training law enforcement.  I did appellate work and I

19  did file work.

20  Q.  And is it fair to say in the fall of 2015, is that when

21  you moved to Department of Education, around that

22  time?

23  A.  That is accurate, yes.

24  Q.  And when you joined the Department of Education in

25  what was your role?

13

1   **A.  My role was to oversee legislative matters, rulemaking**
2      **that came from newly enacted legislation, and to work**
3      **on educator misconduct issues.**
4   Q.  And you've been with the Department of Education since
5      the fall of 2015; is that correct?
6   **A.  That's correct, yes.**
7   Q.  And those responsibilities that you just listed, are
8      those still your current responsibilities?
9   **A.  There are some additional ones, but, yes, those are —**
10  Q.  What would those be?  Thank you.  Sorry to cut you off.
11  **A.  That's okay.  I oversee special ed complaints, and I**
12      **oversee the individual who handles our constituent**
13      **concerns.**
14  Q.  Okay.  Is your job -- is one of your jobs as well
15      overseeing investigations under the code of conduct?
16  **A.  Yes.**
17  Q.  What does it mean to oversee an investigation under the
18      code of conduct?  How would you describe that
19      responsibility?
20          MR. KENISON-MARVIN:  Objection.
21          MR. BISSONETTE:  I'll rephrase.
22      BY MR. BISSONETTE:
23  Q.  What does it mean to oversee investigations under the
24      code of conduct?
25  **A.  I work with and supervise Richard Farrell, who is the**

14

1      **investigator for the Department of Education.**
2   Q.  Any other responsibilities that you have in this
3      oversight function concerning investigations under the
4      code of conduct?
5   **A.  Can you clarify the question?**
6   Q.  Sure.  When you're overseeing investigations under the
7      code of conduct, in addition to working with
8      Mr. Farrell, are there any other things that you do in
9      that oversight role?
10  **A.  I work with the union attorneys who are representing**
11      **educators.**
12  Q.  Anything else that you do?
13  **A.  I work with the school districts that might be involved**
14      **in the situation.**
15  Q.  Okay.  Would it also -- would this responsibility in
16      overseeing investigations under the code of conduct
17      also involve interpreting the code of conduct and what
18      may be a violation?
19  **A.  Can you clarify your question?**
20  Q.  Sure.  In overseeing investigations under the code of
21      conduct, is one of your responsibilities to interpret
22      under the code of conduct what could constitute a
23      violation?
24  **A.  Yes.**
25  Q.  In addition to working with school districts as part of

15

1      this oversight role -- strike that.
2          As part of this oversight role, when you're
3      working with school districts, would you also request
4      documents from school districts?
5   **A.  Yes.**
6   Q.  And when -- strike that.
7          I'm going to introduce one more exhibit.  It's the
8      code of conduct.  I just need to identify it.  Let me
9      find it here.  It's right here.
10         (Exhibit 2 marked for identification.)
11  BY MR. BISSONETTE:
12  Q.  Before I ask you just to identify Exhibit 2, in your
13      oversight role with respect to overseeing
14      investigations under the code of conduct, does that
15      also include having communications with school district
16      superintendents?
17  **A.  Yes.**
18  Q.  Would that also include having communications with
19      teachers directly?
20  **A.  It could, yes.**
21  Q.  Could you identify -- strike that.
22          Could you just review Exhibit 2 and let me know
23      when you've completed your review of it, please?  Thank
24      you.
25          Have you finished reviewing Exhibit 2?

16

1   **A.  Yes.**
2   Q.  Thank you.  What is Exhibit 2?
3   **A.  It is more expansive than the code of conduct.  It**
4      **starts with Administrative Rule Ed 501.01.  It goes**
5      **into Ed 502, which is public information to include the**
6      **confidentiality of credential holders, certification**
7      **records.  Ed 504.04, emergency authorization.  And then**
8      **it goes into Ed 510, which is entitled code of conduct.**
9      **It also includes Ed 511, which is investigations and**
10      **disciplinary proceedings.  And it includes Ed 512,**
11      **denial of certifications.**
12  Q.  The code of conduct begins on the page Bates stamped
13      PL00015, correct?
14  **A.  Yes.**
15  Q.  What is the code of conduct?
16  **A.  The code of conduct is for licensed educators in the**
17      **state of New Hampshire.**
18  Q.  And what is the code of conduct -- strike that.
19          When was the code of conduct created?
20  **A.  It was created in 2018.  It was adopted by the state**
21      **board in November of 2018.**
22  Q.  And why was the code of conduct created in 2018?
23  **A.  The code of conduct was created in 2018 in response to**
24      **a statute that had passed.**
25  Q.  Did that statute require the creation of a code of

**17**

1    conduct?
2 **A.  Yes.**
3 Q.  Is that a statute that the Department of Education
4    supported?
5 **A.  As a public agency, as a state agency, the Department**
6 **of Education does not support or oppose legislation.**
7 Q.  Did the Department of Education testify on the
8    legislation that authorized the creation of a code of
9    conduct?
10 **A.  I do not recall.**
11 Q.  So the legislature mandated the creation of the code of
12    conduct; is that correct?
13 **A.  Yes.  That is what I testified to.**
14 Q.  Do you know why -- why did the legislature -- do you
15    know why the legislature required the creation of a
16    code of conduct?
17 **A.  I can't speculate as to why the legislature passed that**
18 **bill.**
19 Q.  Were you involved in discussions with legislators with
20    respect to the bill requiring the creation of a code of
21    conduct?
22 **A.  I'm sure I was.  I don't recall the details of those**
23 **conversations.**
24 Q.  Did you have any internal communications with
25    Department of Education employees at or around 2018

**18**

1    about the need for a code of conduct?
2 **A.  Sitting here today, I do not recall if I had --**
3 Q.  I'm sorry, I didn't mean to interrupt.
4    Do you have any understanding why the code of
5    conduct was created?
6 **A.  My understanding was the code of conduct was created**
7 **pursuant to the law that had passed.**
8 Q.  Do you have any understanding why that law was
9    passed?
10 **A.  I think that question would cause me to speculate on**
11 **legislative intent.**
12    MR. BISSONETTE:  Okay.  I'm going to mark
13    this exhibit.  This will be Exhibit 3.
14    (Exhibit 3 marked for identification.)
15    BY MR. BISSONETTE:
16 Q.  So, Attorney Fenton, I'd just ask you to review Exhibit
17    3.  Just let me know when you're done.
18 **A.  I don't think you meant to give this to me at this**
19 **time.**
20 Q.  You're right.  I don't think so.  My apologies.
21    There's too many documents.
22    Have you finished reviewing Exhibit 3?
23    MR. KENISON-MARVIN:  Let the record reflect
24    that the witness handed the paper back to Attorney
25    Bissonnette.

**19**

1    MR. BISSONETTE:  It is reflected.  Thank you.
2    BY MR. BISSONETTE:
3 Q.  So before you, you have Exhibit 3, correct?
4 **A.  Yes.**
5 Q.  What is Exhibit 3?
6 **A.  Exhibit 3 is -- appears to be printouts of a PowerPoint**
7 **presentation, the title of which is "Overview of the**
8 **Department of Education's Educator Misconduct Practices**
9 **and Conducting Effective Investigations."**
10 Q.  Did you prepare Exhibit 3?
11 **A.  Yes.**
12 Q.  Okay.  Did you get any assistance from other Department
13    of Education employees in preparing Exhibit 3?
14 **A.  I might have.  Sitting here today, I do not recall.**
15 Q.  I'm just going to refer you to page two of Exhibit 3,
16    which is Bates stamped DOE5650.
17    The first bullet point says, "The reason behind
18    the COC."
19    Did you write those words?
20 **A.  I believe I did, yeah.**
21 Q.  Do you give presentations about the code of conduct and
22    the reasons behind the code of conduct?
23 **A.  That's a compound question.**
24    MR. BISSONETTE:  I'll strike that.
25    BY MR. BISSONETTE:

**20**

1 Q.  Do you give presentations on the code of conduct?
2 **A.  I do.**
3 Q.  Who do you give presentations to?
4 **A.  I give presentations on the code of conduct to**
5 **educators, and I give presentations on the code of**
6 **conduct to administrators, and most recently was asked**
7 **to present on the code of conduct to noncertified**
8 **school staff.**
9 Q.  And, as part of those presentations, do you explain the
10    reasons behind the code of conduct?
11 **A.  Yes.**
12 Q.  And, in those presentations, what do you say when you
13    discuss the reasons behind the code of conduct?
14 **A.  Can you clarify your question, please?**
15    MR. BISSONETTE:  Can you read the question
16    back, please?
17    (Court reporter read back question.)
18    THE WITNESS:  Are we just referring to the
19    presentation I give that is labeled as Exhibit 3, or
20    other presentations?
21    BY MR. BISSONETTE:
22 Q.  Why don't we limit it to the one that's on Exhibit 3
23    dated December 2021.  Fair enough.
24 **A.  Okay.  So I believe in this particular presentation,**
25 **this was for superintendents or administrators, and I**

**21**

1      wanted to address the role of the code of conduct and
2      how it intersects with the administrator's role in
3      handling employment issues.
4   Q.   What do you recall saying when you discussed the reason
5      behind the code of conduct in this presentation,
6      Exhibit 3?
7   A.   I think it's set out on DOE05650, what was discussed.
8   Q.   And what was that?
9   A.   That handling issues of educator misconduct as an
10      employment issue only does not solve what is a
11      statewide issue.
12   Q.   Do you recall at this presentation discussing any other
13      reasons behind the code of conduct?
14   A.   Again, referencing exhibit -- DOE05650, which I am sure
15      I referenced in giving the presentation, it states that
16      child safety is not a ZIP code issue, which seems to
17      tie into local control does not solve what is a
18      statewide issue of educator misconduct.
19   Q.   Beyond what's on page 5650 of Exhibit 3, are there any
20      other reasons that you're aware of why the code of
21      conduct exists?
22   A.   The code of conduct exists because it was required
23      pursuant to the legislation that was passed.
24   Q.   Do you think the code of conduct is important for the
25      state of New Hampshire?

**22**

1      MR. KENISON-MARVIN: Objection. Vague.
2      MR. BISSONETTE: You can answer.
3      THE WITNESS: I do.
4   BY MR. BISSONETTE:
5   Q.   Why?
6   A.   The code of conduct helps to protect children in the
7      state of New Hampshire.
8   Q.   How does it help them?
9   A.   When educators who are having an inappropriate
10      relationship with a child are released from employment
11      in one district, and they go to another district and
12      reoffend, the code of conduct helps to prevent that.
13   Q.   Are there any other scenarios in which you think the
14      code of conduct is important to have in the state of
15      New Hampshire?
16   A.   Not that I can recall at this moment sitting here.
17   Q.   With respect to the code of conduct back on Exhibit 2,
18      again, starting on page 0015, is this something that
19      you were involved in drafting?
20   A.   And are you referring to it in its entirety from
21      0015 --
22   Q.   No, that's a great question. I'm referring to the
23      pages starting at section Ed 510.01 to page 23 -- 22.
24      So were you involved in drafting any portions of
25      those pages?

**23**

1   A.   There appear to be two administrative rules within the
2      pages you've referenced. Can we address them
3      individually?
4   Q.   What's the first administrative rule you're referring
5      to?
6   A.   So administrative rule Ed 510.
7   Q.   And the second is 511?
8   A.   Yes.
9   Q.   Great. No, I appreciate that clarification.
10      Why don't we just focus now on 510? Are you
11      involved in drafting that provision of those
12      administrative rules?
13   A.   Are you referring to all of them, 510.01 through
14      510.05?
15   Q.   I am. Any portion of those provisions.
16   A.   Yes.
17   Q.   And which portions?
18   A.   I participated in the drafting of Ed 510.01, Ed 510.02,
19      Ed 510.03, Ed 510.04, and Ed 510.05.
20   Q.   Okay. And now on to section 511. Were you involved in
21      the drafting of any portions of that administrative
22      rule?
23   A.   I was involved in drafting Ed 511.01. I was involved
24      in drafting Ed 511.02. I was involved in drafting Ed
25      511.03. I was involved in drafting Ed 511.04. And I

**24**

1      was involved in drafting Ed 511.05.
2   Q.   Thank you. With respect to those provisions, section
3      511 and 510, was there any other DOE employees involved
4      in the drafting of those provisions?
5   A.   You're referring to Ed 510 and 511?
6   Q.   Yes.
7   A.   In their entirety?
8   Q.   Yes.
9   A.   Yes.
10   Q.   And who would those individuals be?
11   A.   These are individuals from the Department of Education?
12   Q.   Yes.
13   A.   Nicole Highmark, Amanda Phelps. There were probably
14      others, but, sitting here today, I can't recall other
15      than those exact individuals.
16   Q.   It was five years ago. Who enforces -- strike that.
17      Does the Department of Education enforce the code
18      of conduct?
19   A.   What do you mean by "enforce"?
20   Q.   Bear with me. So the definition of "enforce," as I
21      understand it, is "compelling compliance with." So is
22      that your understanding of what "enforcement" means?
23   A.   I can agree to that term, yes.
24   Q.   Okay. So does the Department of Education enforce the
25      code of conduct?

Page 25

1  A.  Yes.
2  Q.  Okay.  Does any other entity enforce the code of
3     conduct in the state of New Hampshire?
4  A.  **My understanding is that there are school districts**
5     **that have adopted the code of conduct into their school**
6     **policies, so I'm not sure if that falls within your**
7     **vision of the question.**
8  Q.  So beyond school districts that have independently
9     placed the code of conduct in their policies, is there
10    any other entity in the state of New Hampshire that
11    enforces the code of conduct that's in Exhibit 2?
12 A.  **To the best of my knowledge, no.**
13 Q.  Okay.  So would it be fair to say then if the
14    Department of Education enforces the -- strike that.
15    I'm going to move on.
16    With respect to Exhibit 1, which is the -- which
17    is HB 2, I just want to direct your attention to page
18    07, Roman numeral IV, that says, "A violation of this
19    section by an educator shall be considered a violation
20    of the Educator Code of Conduct that justifies
21    disciplinary sanction by the State Board of Education."
22    Do you see that language?
23 A.  **I do.**
24 Q.  Is it fair to say that the language -- that language in
25    HB 2 makes clear that the prohibitions in HB 2 are in

Page 26

1  the Educator Code of Conduct?
2     MR. KENISON-MARVIN:  Objection to the extent
3  it calls for a legal opinion.
4     MR. BISSONETTE:  You can answer if you can.
5     MR. KENISON-MARVIN:  Also object under Rule
6  106, completeness, with the redaction at the bottom of
7  the page not being -- you can provide the witness with
8  a -- that information is --
9     MR. BISSONETTE:  I can submit that that
10 redacted information is a separate portion of HB 2 that
11 has no bearing on the challenged statute in this case.
12    MR. KENISON-MARVIN:  Okay.  Do you have an
13 unredacted copy just so that I can see that?
14    MR. BISSONETTE:  I can submit it on the
15 record.  You know, we can -- at a break, I can show it
16 to you.
17    MR. KENISON-MARVIN:  Okay.
18    MR. BISSONETTE:  Again, I'm not --
19    MR. KENISON-MARVIN:  I think that's -- I
20 think that's correct.
21    MR. BISSONETTE:  I'm not trying to slip one
22 past anyone.  This was filed as an exhibit to the
23 lawsuit in this particular case as Exhibit 1.  The
24 redactions exist just so individuals can differentiate
25 the portions of the challenged law and the challenged

Page 27

1  law at issue in this case, differentiate that from the
2  other provisions of the HB 2 trailer bill that have no
3  bearing on this case, and, in many instances, reflect
4  issues that are totally unrelated to the topics in this
5  case.
6     MR. KENISON-MARVIN:  I would just preserve an
7  objection to the extent if there were information
8  that's redacted, it would be responsive to the
9  question.  I preserve that.
10    MR. BISSONETTE:  Fair enough.  Can I get the
11 question read back, please?
12    (Court reporter read back question.)
13    THE WITNESS:  I don't think it makes clear
14 that a violation is in the code of conduct, no.  That's
15 not how I read that.
16 BY MR. BISSONETTE:
17 Q.  Was the Department of Education involved in drafting
18    that section, Roman numeral IV?
19 A.  **When you ask about the Department of Education, I can't**
20    **speak to the entire office.  I can speak to my role.**
21 Q.  Did you have a role with respect to the language in
22    paragraph four on page 07 of Exhibit 1?
23 A.  **No, I did not.**
24 Q.  Reading Roman numeral IV, do you believe that the
25    provisions of HB 2 are in the code of conduct?

Page 28

1     MR. KENISON-MARVIN:  Objection.  Vague.  You
2  can answer.  Also object to the extent it calls for a
3  legal opinion.
4     THE WITNESS:  I assume I can answer?
5     MR. BISSONETTE:  If you can.
6     THE WITNESS:  Can you read back the question?
7     (Court reporter read back question.)
8     THE WITNESS:  The exact provisions of HB 2 in
9  the code of conduct?  No, I do not.
10 BY MR. BISSONETTE:
11 Q.  Is that reflective of the Department of Education's
12    positions since the enactment of HB 2 in June 2021?
13 A.  **I can't speak for the entire department.**
14 Q.  What's your role as the individual that oversees
15    investigations in the code of conduct?
16 A.  **I'm involved in imposing discipline, when appropriate,**
17    **on an educator's license if there's a confirmed**
18    **violation of the code of conduct.**
19 Q.  Do you know if anyone in the Department of Education
20    was involved in the drafting of paragraph four?
21    MR. KENISON-MARVIN:  Objection to the extent
22 information calls -- responsive information talks about
23 legislative privilege and relates to conversations that
24 anyone at DOE would have had with legislators in
25 creating the statute -- the bill that was presented to

**29**

1 the legislature. We would take the position that those
2 conversations are a legislative act for which the
3 legislative privilege would apply.
4 MR. BISSONETTE: I just want to make sure I
5 understand the objection. Are you instructing her not
6 to answer to the extent it implicates communications
7 that occurred between the Department of Education and
8 legislators?
9 MR. KENISON-MARVIN: Can I hear the question
10 one more time?
11 (Court reporter read back question.)
12 MR. KENISON-MARVIN: So the substance of
13 communications. I would maintain the objection.
14 MR. BISSONETTE: Okay.
15 MR. KENISON-MARVIN: To the extent the
16 question is "Do you know if anyone was involved," you
17 can answer that question. The substance of their
18 communications, to the extent you are aware of any, I
19 would instruct you not to answer those on the basis
20 that it's protected by legislative privilege.
21 THE WITNESS: I am not aware of anyone at the
22 Department of Education who was directly involved in
23 drafting paragraph four on lines 11 and 12.
24 BY MR. BISSONETTE:
25 Q. Did the Department of Education support the inclusion

**30**

1 of paragraph four?
2 **A. I've testified previously that the Department of**
3 **Education is a state agency, and it does not support or**
4 **oppose legislation.**
5 Q. Did the commissioner of education support HB 2?
6 MR. KENISON-MARVIN: Objection. Vague.
7 THE WITNESS: I cannot speak --
8 BY MR. BISSONETTE:
9 Q. Do you recall ever reading an op-ed published by the
10 commissioner of education in which he articulated his
11 support for HB 2?
12 **A. I think you asked me a question, I didn't get a chance**
13 **to fully answer it, and then you asked another**
14 **question. If we could pick those apart so I could**
15 **fully answer them?**
16 Q. Sure.
17 **A. I apologize.**
18 Q. Sure. I believe your testimony is that the Department
19 doesn't take -- doesn't support or oppose legislation;
20 is that correct?
21 **A. That's correct.**
22 Q. Okay.
23 **A. The state agency only provides what we refer to as**
24 **technical assistance.**
25 Q. Got you. It's true, though, that the commissioner of

**31**

1 education will take positions on legislation, right?
2 **A. I'm not here to testify on behalf of Commissioner**
3 **Edelblut.**
4 Q. That's not my question. You work with Commissioner
5 Edelblut, correct?
6 **A. Yes, I do.**
7 Q. Are you aware of the positions that he takes on
8 legislation?
9 **A. All legislation? Can you clarify your question?**
10 Q. Generally. Generally. Are you aware of positions that
11 the commissioner of education takes on legislation?
12 **A. You're going to have to clarify your question. It's a**
13 **very broad question.**
14 Q. Sure. Are you aware of any instance in which the
15 commissioner of education has conveyed his support for
16 legislation?
17 MR. KENISON-MARVIN: I guess I will state --
18 instruct the witness not to answer to the extent there
19 were conversations that the legislative privilege would
20 protect with respect to the commissioner's knowledge of
21 conversations between commissioner and a legislator.
22 I'm not sure if you're asking for that, but I would
23 assert that privilege.
24 MR. BISSONETTE: I think that objection
25 doesn't come close to the question, frankly, that I've

**32**

1 asked. So I'd just ask that it be read back just so
2 the witness is aware of it. Thank you.
3 (Court reporter read back question.)
4 THE WITNESS: Would it be possible to narrow
5 the time frame? I've worked in this role overseeing
6 the legislative affairs -- as you, yourself, said, it
7 was five years ago -- since 2015. I believe
8 Commissioner Edelblut began in 2017. You probably
9 would know better than I would. So that's a big chunk
10 of time over which we've had a lot of bills come
11 forward. Is it possible for you to narrow your
12 question?
13 BY MR. BISSONETTE:
14 Q. Sure. I just want to -- I'm not trying to hide the
15 ball here. Really, what I'm trying to get at is your
16 testimony that the Department doesn't support or oppose
17 bills.
18 **A. Yes.**
19 Q. And I'm trying to flush that out. So my question is
20 are you aware of any instance in which the commissioner
21 of education, on behalf of the Department of Education,
22 has conveyed support publicly for legislation? Are you
23 aware of any instance?
24 MR. KENISON-MARVIN: Objection. Vague.
25 THE WITNESS: Support publicly, or

---

**33**

1 conversations that he and I have had or we have had as
2 a legislative team?
3 BY MR. BISSONETTE:
4 Q.  That's a fair clarification.  Public support.  Can you
5 answer the question with that caveat?
6 **A.  So just so I'm clear, Commissioner Edelblut, speaking**
7 **publicly, supporting or opposing a particular bill?**
8 Q.  Yes.
9 **A.  Do I have personal knowledge of it?  I have heard of**
10 **it.  I am not aware of -- I can't think of a particular**
11 **instance in which that has occurred.**
12 Q.  With respect to that situation in which you've heard of
13 it, do you recall the context?
14 MR. KENISON-MARVIN: Objection.  Vague.
15 Misstating prior testimony as well.
16 THE WITNESS:  Is it possible to clarify the
17 question?
18 MR. BISSONETTE:  Can you read back her prior
19 response, please?
20 (Court reporter read back answer.)
21 BY MR. BISSONETTE:
22 Q.  When you said you have heard of it, what were you
23 referring to?
24 **A.  I have heard of other people saying to me there was an**
25 **op-ed or Commissioner Edelblut attended an event, but I**

**34**

1 **have not personally read the op-eds or attended those**
2 **events with Commissioner Edelblut.**
3 Q.  What Commissioner Edelblut writes an op-ed, do you know
4 if he's writing on behalf of the Department of
5 Education or himself in an individual capacity?  Do you
6 have any knowledge of that?
7 MR. KENISON-MARVIN: Objection.  Vague.
8 Calls for a legal conclusion.
9 THE WITNESS:  Do I still answer the question?
10 MR. KENISON-MARVIN: You can answer to the
11 extent you know.  I maintain the objection.
12 THE WITNESS:  I am not aware.  That's a
13 question better posed to Commissioner Edelblut.
14 MR. BISSONETTE:  I'm going to mark the next
15 exhibit, which I think is Exhibit 4, if I'm not
16 mistaken.
17 (Exhibit 4 marked for identification.)
18 MR. KENISON-MARVIN: We're running up on the
19 hour.  I don't know if you want to do this?
20 MR. BISSONETTE:  Yes, we'll finish Exhibit 4.
21 MR. KENISON-MARVIN: Okay.
22 BY MR. BISSONETTE:
23 Q.  Are you finished reviewing Exhibit 4?
24 **A.  I have.  Thank you.**
25 Q.  What is Exhibit 4?

**35**

1 **A.  Exhibit 4 is entitled Frank Edelblut, "Teach Children**
2 **About Racism, Not To Be Racist."  Union Leader.  And**
3 **then in parentheses it has the date of June 13th, 2021.**
4 **It appears to be what's referred to as an op-ed**
5 **written by Commissioner Edelblut.**
6 Q.  Have you seen this before your deposition today?
7 **A.  No.**
8 Q.  So this is the first time you've seen this document?
9 **A.  First time.**
10 Q.  And did you just read it just moments ago?
11 **A.  I did.**
12 Q.  Do you think it would be correct based on this op-ed to
13 say that Commissioner Edelblut supported HB 2?
14 **A.  I'm not here to testify on behalf of Commissioner**
15 **Edelblut.  Based on your question and my interpretation**
16 **of the op-ed, I think the op-ed is pretty clear.  It**
17 **speaks for itself that he is in support of it, yes.**
18 Q.  I want to go back if I may, Attorney Fenton, just to
19 Exhibit 1, paragraph four again, that states,
20 "Violation of this section by an educator shall be
21 considered a violation of the Educator Code of
22 Conduct."
23 As someone who enforces the code of conduct, under
24 this provision, is a violation of HB 2 a violation of
25 the code of conduct?

**36**

1 MR. KENISON-MARVIN: Objection to the extent
2 it calls for a legal opinion.  You can answer.
3 THE WITNESS:  Based on my plain reading of
4 the -- of this statute -- and, again, referencing
5 section IV, which is lines 11 and 12 -- yes, it would
6 be a violation of the Educator Code of Conduct.
7 BY MR. BISSONETTE:
8 Q.  Do you know -- do you know of anyone at the Department
9 of Education was involved in drafting this language?  I
10 think I asked that, but I just wanted to make sure I
11 have the answer correct.
12 **A.  I can only speak to what my actions were.  I think my**
13 **testimony was clear.  I was not involved.  To the best**
14 **of my recollection, sitting here today, I was not an**
15 **active participant in crafting paragraph four, which is**
16 **lines 11 and 12.**
17 Q.  My question is a little different, though.  Do you know
18 if anyone else at the Department of Education was
19 involved in drafting section four?  I know you weren't,
20 but was anyone else?
21 MR. KENISON-MARVIN: Well, asked and
22 answered.  You can answer.
23 THE WITNESS:  To the best of my knowledge, I
24 don't know of anyone who was directly involved in
25 drafting section four, no.

37

1    BY MR. BISSONETTE:
2  Q.  Were you ever in meetings at or around June 2021 in
3       which this section was discussed by your DOE
4       colleagues?
5           MR. KENISON-MARVIN:  Objection.  Vague.  You
6       can answer.
7           THE WITNESS:  To the best of my recollection,
8       I do not recall being in a meeting where this
9       provision, section IV of HB 2, was discussed.
10          MR. BISSONETTE:  Is now a good time for a
11      break?  We've been going for an hour.  Is that good?
12          MR. KENISON-MARVIN:  Yes.
13          MR. BISSONETTE:  Great.
14          (Recess taken.)
15     BY MR. BISSONETTE:
16  Q.  You're still under oath, Attorney Fenton.  I want to
17      just go now to Exhibit 2, and I'm going to be asking
18      you some questions on the code of conduct provisions.
19      Again, the provisions start on the page Bates stamped
20      PL00015.
21  A.  **Before we do that, may I clarify --**
22  Q.  Absolutely.
23  A.  **-- some testimony I gave prior to the break on what is**
24      **marked as Exhibit 4?  It's Commissioner Edelblut's**
25      **op-ed.  I believe my testimony, when asked if I was**

38

1       **familiar with this document, was no.  I would like to**
2       **clarify that to the best of my recollection, I had not**
3       **seen that or read that document in its entirety until**
4       **today.**
5   Q.  Okay.  Before today, had you seen portions of the
6       op-ed?
7   A.  **I don't believe I'd seen portions of it.**
8   Q.  Okay.
9   A.  **Again, to the best of my recollection --**
10  Q.  Okay.
11  A.  **-- this was the first time that I had read it in --**
12      **certainly in its entirety.**
13  Q.  Okay.  Were you aware it existed before today?
14  A.  **Was I aware of this exact op-ed?  No.  Am I aware that**
15      **Commissioner Edelblut writes op-eds?  Yes, I am.**
16  Q.  Did you have -- even though you hadn't read it in full
17      until just moments ago, did you have any awareness of
18      the contents of the op-ed?
19          MR. KENISON-MARVIN:  Objection.  Vague.
20          THE WITNESS:  Is it possible to clarify that
21      question?
22     BY MR. BISSONETTE:
23  Q.  So I know that you haven't read it.  I guess what I'm
24      trying to --
25  A.  **Well, I did read it before the break.**

39

1   Q.  Yes, of course.  I know that you didn't read it in full
2       until today, correct?
3   A.  **That is correct.**
4   Q.  Were you a party to any Department of Education
5       communications about the contents of this op-ed before
6       today?
7   A.  **To the best of my knowledge, sitting here today, I do**
8       **not recall being involved in any such discussions.**
9   Q.  Before you read it in full today, did you have any
10      understanding as to any portions of this op-ed?
11          MR. KENISON-MARVIN:  Objection.  Vague.  You
12      can answer.
13          THE WITNESS:  Would it be possible to clarify
14      that, what you mean by "understanding any portions"?
15          (Court reporter read back question.)
16     BY MR. BISSONETTE:
17  Q.  Before you read it in full today, did you have any
18      awareness of any portion of this op-ed?
19          MR. KENISON-MARVIN:  Same objection.  You can
20      answer.
21          THE WITNESS:  I apologize for being
22      difficult.  I think the question is very broad.
23     BY MR. BISSONETTE:
24  Q.  Do you have any ability to answer that question?
25  A.  **I'll refer back to my prior testimony that I was aware**

40

1       **that Commissioner Edelblut likes to write op-eds about**
2       **a variety of topics.  Was I directly aware of this**
3       **op-ed marked as Exhibit 4?  No, I was not.**
4   Q.  And I believe your testimony, just so I'm clear, was
5       that you don't recall being a party to any internal
6       Department of Education communications in which this
7       op-ed was discussed, correct?
8   A.  **That is correct.  Sitting here today, I do not recall**
9       **being involved in any internal discussions about this**
10      **particular op-ed.**
11  Q.  So I'm going to go back now to just Exhibit 2 kind of
12      where we left off moments ago.
13  A.  **Thank you for the opportunity to clarify.**
14  Q.  No, that's important, and it's part of the process, so,
15      no, I appreciate that.
16          The code of conduct, again, it starts on Exhibit 2
17      at Bates stamp PL00015.  I'm not going to ask you any
18      questions about specific provisions right now, but,
19      just generally, can anyone make a complaint under the
20      code of conduct?
21          Why don't I ask it this way?  Strike that.
22          Who can make a complaint under the code of
23      conduct?
24  A.  **Pursuant to the code of conduct, superintendents have**
25      **an obligation to report any time there is belief that**

41

1    there has been a violation of the code of conduct.  I
2    believe you'll find that in Ed 510.05.
3  Q.  Is there any language that you're aware of in the code
4      of conduct in Exhibit 2 that limits who can make a
5      complaint under the code?
6  A.  No.  I'm not aware of any language that would limit
7      that.
8  Q.  And just so as to not hide the ball, I'm looking, in
9      particular, at section 511.01 (A) which is on page 18.
10     And that language says, in subsection A, "A case shall
11     be opened when a complaint of possible misconduct
12     against a credential holder has come to the attention
13     of the Department either through direct reporting or
14     other means."
15        Do you see that language?
16 A.  I do, yes.
17 Q.  And, just so I'm clear, anyone can make a complaint
18     under that language, right?
19 A.  Yes.
20 Q.  And, again, so as to not hide the ball, I'm still on
21     that section, 511.01 (A).  Would you agree with me that
22     the Department of Education is required to open a case
23     when a complaint of possible misconduct against a
24     credentialed teacher has come to the attention of the
25     Department?

42

1  A.  I want to clarify that you had referenced the code of
2      conduct.  My reading of this document, we are now in Ed
3      511, which is investigations and disciplinary
4      proceedings.  That's a separate section from the code
5      of conduct.
6  Q.  That's a great clarification.  So when you look at
7      subsection A, and it says "possible misconduct," is
8      that -- does that include violations of the code of
9      conduct?
10 A.  Yes.
11 Q.  Okay.  So kind of going back now to my original
12     question.  Would you agree with me that the Department
13     of Education is required to open a case when a
14     complaint of possible misconduct against a credentialed
15     teacher has come to the attention of the Department?
16 A.  Yes.
17 Q.  So what does "opening a case" mean?
18 A.  The Department's practice is to document what is
19     reported.
20 Q.  And how does the Department document what is reported
21     when it opens a case?
22 A.  I would refer most of these questions to Richard
23     Farrell, who is the investigator who does most of the
24     paperwork piece of this.
25 Q.  I definitely will ask him that, but I want your

43

1    understanding, the best you possibly can.
2        MR. BISSONETTE:  So could I just have that
3    question read back for me, please?
4        (Court reporter read back question.)
5  BY MR. BISSONETTE:
6  Q.  So what's your understanding?
7  A.  How does it document what is reported?
8  Q.  Yes.  I believe your testimony was, when I asked what
9      does it mean to open a case, and you said the
10     Department documents what is reported.  And what I want
11     to know is how does the Department document what is
12     reported, based on your understanding?
13 A.  We document -- the Department, rather, would make note
14     of the allegation, the person who is reporting it, the
15     person involved, and their -- depending on the
16     circumstance, there could be other information gathered
17     as well.
18 Q.  In deciding whether to open a case -- strike that.
19     In determining whether there's possible misconduct
20     which would require the Department to open a case, does
21     the Department reach out to the complaining party?
22 A.  I guess I'm confused by your question.  A complaining
23     party would be the person who's reporting it.
24 Q.  So I guess my question is you receive a complaint.
25     Would there be follow-up by the Department with the

44

1    complaining party as the Department decides when to
2    open a case or if to open a case?
3  A.  Depending upon the facts, there could be that
4      additional follow-up, yes.
5  Q.  So let me kind of get to the heart of this, then.  So
6      in looking at this language in 511.01 (A) which states
7      that "a case shall be opened when a complaint of
8      possible misconduct against a credential holder has
9      come to the attention of the Department either through
10     direct reporting or other means," what is the process
11     that is used to determine whether -- what is a
12     complaint of possible misconduct that would trigger a
13     case opening?
14 A.  Some of the initial criteria that the Department of
15     Education considers is whether or not the individual
16     that is being reported is, in fact, a licensed
17     educator.
18 Q.  If I may?  If the person is, in fact, a licensed
19     educator, is there any other criteria that's used in
20     determining whether or not the complaint consists of
21     possible misconduct that would trigger opening a case?
22 A.  The process would include getting some facts that would
23     support the allegation to determine if the allegation
24     does, in fact, fall within the code of conduct or if it
25     falls outside of the code of conduct.

45

1  Q.  Got you.  So I know this happens before you open a
2      case.  So in determining whether the case should be
3      opened, and when you're gathering those facts, how
4      would the Department go about gathering those facts?
5  A.  **Your question is very broad.  Every case is different,**
6      **as I think you well know.  In general terms, those**
7      **facts are gathered during that initial conversation.**
8  Q.  Okay.  Are facts gathered by reaching out to school
9      superintendents at this stage in deciding whether to
10     open a case?
11 A.  **That could be done, yes.**
12 Q.  Are documents requested?
13 A.  **That request could be made, yes.**
14 Q.  Who's involved in the Department in the decision to
15     decide whether to open a case?
16 A.  **Typically, the decision is a discussion between myself**
17     **and Richard Farrell.**
18 Q.  Is the commissioner involved in those decisions in
19     deciding whether to open a case?
20 A.  **No.**
21 Q.  Has he ever been involved in that decision to decide
22     whether to open a case?
23 A.  **When the Department of Education opens a case, it's**
24     **just in receipt of information.  There's no**
25     **decision-making position at that point in time.**

46

1  Q.  But in reading -- I just want to make sure my
2      understanding is correct here.  In looking at 511.01
3      (A), my reading of that is that a case is opened when a
4      complaint of possible misconduct occurs.  So is it
5      inaccurate to say that the Department makes a
6      determination as to whether or not possible misconduct
7      occurred before opening a case?
8  A.  **I think that Ed 511.01 (A) has to be read in**
9      conjunction with Ed 511.01 (B).
10 Q.  Okay.  Is there a difference between opening a case and
11     an investigation within the Department?
12 A.  **Based upon my understanding of the code of conduct and**
13     **Ed 511, yes, there is.**
14 Q.  So that's really what I'm trying to parse out here.  So
15     going back to subsection A.  Does the Department make a
16     determination as to whether possible misconduct may
17     have occurred in deciding whether to open a case?
18 A.  **No.**
19 Q.  So how do you -- how would you then explain the process
20     in deciding whether to open a case, just so I
21     understand the process clearly.
22 A.  **My understanding of the code of conduct in Ed 511.01**
23     **and the Department of Education's practice as it**
24     **relates to this area is that a case is opened when**
25     **information is received.**

47

1  Q.  Would you open a case if a complaint was made but you
2      couldn't identify any potential violation of the code
3      of conduct in the complaint?
4      MR. KENISON-MARVIN:  Can I object?
5      Vagueness.  Can you clarify when you're saying "you"?
6      Some of your questions have been DOE.  Can you just
7      clarify that?
8      MR. BISSONETTE:  I'm asking -- she oversees
9      these investigations, so I'm asking what she knows.
10     THE WITNESS:  Can you read the question back?
11     (Court reporter read back question.)
12     THE WITNESS:  So opening a case would be
13     getting enough information to decide if there was a
14     possible violation or there wasn't.  It's the initial
15     fact-finding, if you will, fact gathering.
16 BY MR. BISSONETTE:
17 Q.  Got it.  So, just so I'm clear, a case will be opened
18     before a determination has been made that there's
19     possible misconduct.  Is that an accurate understanding
20     of how the Department proceeds?
21 A.  **In terms of documenting information received, yes.**
22 Q.  Okay.  Gotcha.  Okay.  I'm going to move on now to
23     paragraph B here that says, "After an initial review,
24     if the Department determines that a possible violation
25     of the code" -- I'm going to delete the as-specified

48

1      language -- "has occurred, an investigation shall be
2      opened."
3      Do you see that language?
4  A.  **Yes.**
5  Q.  So I just want to make sure it's accurate to say that
6      an investigation shall be opened by the Department
7      after an initial review if the Department determines
8      there's a possible violation, right?
9  A.  **Yes, that is what Ed 511.01 (B) says, yes.**
10 Q.  So if the Department concludes that there has been a
11     possible violation, the Department is obligated to open
12     an investigation, right?
13     MR. KENISON-MARVIN:  Objection to the extent
14     it calls for a legal conclusion.  You can answer.
15     THE WITNESS:  Can you read the question back?
16     (Court reporter read back question.)
17     THE WITNESS:  That is my understanding of Ed
18     511.01 (B), yes.
19 BY MR. BISSONETTE:
20 Q.  So in determining whether there has been a possible
21     violation, I want to make sure I understand your
22     testimony correct.  That would also include reaching
23     out to gather information from school districts,
24     correct?
25 A.  **It could.**

---

**49**

1  Q. What else could it include?
2  A. **We could talk to other individuals that might be**
3  **administrators. Depends on the nature of the facts.**
4  Q. And it could include requesting documents from school
5  districts, right?
6  A. **I believe I've already testified to that, yes.**
7  Q. I just wanted to confirm.
8      And, under subsection B, it is only the Department
9  that makes this determination as to whether a possible
10  violation of the code of conduct has occurred,
11  correct?
12  A. **That is my reading of Ed 511.01 (B), yes.**
13  Q. In practice, is that how this works?
14  A. **Yes.**
15  Q. Okay. Now kind of moving on to the duty to report. I
16  know there was some testimony before a little bit about
17  that. That is on page PL00017 of Exhibit 2.
18      Can you explain to me how the duty to report works
19  under the code of conduct?
20      MR. KENISON-MARVIN: Objection. Vague. You
21  can answer.
22      THE WITNESS: Can you specify which section
23  of Ed 510.05 your question pertains to?
24      MR. BISSONETTE: Subsection A.
25      THE WITNESS: Ed 510.05 (A) states that "any

**50**

1  credential holder or licensed educator in the state of
2  New Hampshire has an obligation to report a suspected
3  violation of the code of conduct in accordance with
4  their school reporting procedures."
5  BY MR. BISSONETTE:
6  Q. And that's how this applies in practice, just pursuant
7  to those very terms, correct? Strike that.
8      The Department enforces those provisions in
9  subsection A, correct?
10      Let me ask it another way. I'm not trying to
11  trick you.
12      The duty to report language in subsection A,
13  that's enforced by the Department, right?
14  A. **I can't think of an instance in which the Department**
15  **has enforced that particular subparagraph. Is that**
16  **your question?**
17  Q. No, no. I'm sorry. I see the confusion. My question
18  is a little different. This is -- subsection A in
19  510.05, that applies to educators in the state of New
20  Hampshire, right?
21      MR. KENISON-MARVIN: Objection. Vague.
22      THE WITNESS: No, it does not.
23  BY MR. BISSONETTE:
24  Q. Okay. Why doesn't it?
25  A. **Well, you said "educator." It doesn't apply to a**

**51**

1  **nonlicensed individual.**
2  Q. Does the Department of Education believe that section
3  510.05 (A) is enforceable?
4      MR. KENISON-MARVIN: Objection to the extent
5  it calls for a legal opinion. You can answer.
6      THE WITNESS: I suppose it could be
7  enforceable.
8  BY MR. BISSONETTE:
9  Q. Does the Department enforce it? It may not have cited
10  an educator for it, but is it something that it
11  enforces?
12      MR. KENISON-MARVIN: Objection. Vague.
13      THE WITNESS: It's difficult to say that the
14  Department enforces a particular provision, in this
15  instance, Ed 510.05 (A), if the Department has not done
16  so.
17  BY MR. BISSONETTE:
18  Q. Does the Department of Education expect credential
19  holders to comply with section 510.05 (A)?
20  A. **Yes.**
21  Q. Okay. Is a credential holder's failure to comply with
22  section 510.05 (A) an independent violation of the code
23  of conduct?
24      MR. KENISON-MARVIN: Objection to the extent
25  it calls for a legal conclusion, and it's a

**52**

1  hypothetical.
2      THE WITNESS: Recognizing that it's a
3  hypothetical question, I suppose the Department could
4  take action in that instance under 510.05 (A), yes.
5  BY MR. BISSONETTE:
6  Q. I believe your earlier testimony is that you were
7  involved in the drafting of this section. Can you
8  describe what you recall about your involvement in the
9  drafting of this section?
10      MR. KENISON-MARVIN: Object and instruct the
11  witness not to answer the question to the extent that
12  the question calls for specific details as to
13  conversation -- pre-decisional deliberations with
14  respect to the finality.
15      I don't know if you want me to say any more,
16  Gilles?
17      MR. BISSONETTE: Yeah, let me -- can you just
18  read back the question? Thank you for that. I just
19  want to make sure we're all in the same direction here.
20      (Court reporter read back question.)
21      MR. BISSONETTE: Is there a deliberative
22  process objection to that?
23      MR. KENISON-MARVIN: Yeah, I think that
24  question calls for information that would be
25  pre-decisional before this was final, and was

**53**

1 deliberative as to what it would be.
2 BY MR. BISSONETTE:
3 Q. Going back to your earlier testimony that you were
4 involved in this drafting. Who else was involved in
5 the drafting of this section besides you?
6 **A. As to this particular section?**
7 Q. Yes.
8 **A. Ed 510.05 (A). Sitting here today, I do not recall all**
9 **of the individuals who were involved in the drafting.**
10 Q. Do you recall why this language was put in the code?
11 MR. KENISON-MARVIN: Again, instruct the
12 witness not to answer to the extent the responsive
13 information would be -- involve pre-decisional
14 conversations about purposes of the code -- purposes of
15 this provision.
16 MR. BISSONETTE: So I think my question was
17 just do you recall why?
18 MR. KENISON-MARVIN: Okay.
19 MR. BISSONETTE: So I think what I would just
20 do is ask yes or no, and, based on your response, I'll
21 decide the extent to which I probe.
22 Does that make sense, Nate?
23 MR. KENISON-MARVIN: Yeah, I just want to
24 instruct the witness not to --
25 MR. BISSONETTE: Fair enough. No, I see

**54**

1 where you're going.
2 THE WITNESS: Can you repeat the question?
3 (Court reporter read back question.)
4 THE WITNESS: The code of conduct was created
5 by a stakeholder group, and the general sense was
6 wanting certified educators to report any instances of
7 misconduct. I cannot recall any exact discussions that
8 were had back when the code was created as it pertains
9 to Ed 510.05 section A, in particular, sitting here
10 today, anyway.
11 BY MR. BISSONETTE:
12 Q. In evaluating a -- in evaluating the duty to report
13 violation -- sorry, strike that.
14 In evaluating a duty to report potential
15 violation, can the Department investigate an educator
16 for failing to comply with that duty as well as the
17 other educator who may have actually violated the code?
18 Can those investigations happen at the same time, is my
19 question.
20 MR. KENISON-MARVIN: I will object to it
21 being compound.
22 THE WITNESS: Is it possible to break out
23 those questions?
24 MR. BISSONETTE: Yeah, sure.
25 BY MR. BISSONETTE:

**55**

1 Q. In evaluating the duty to report, the Department can
2 conduct investigations concerning whether an educator
3 has complied with that duty, right?
4 **A. You're referring to 510.05 (A), right?**
5 Q. Mm-hm.
6 **A. I believe my testimony previous was yes.**
7 Q. Okay.
8 **A. The Department would have that authority.**
9 Q. So my question is can the Department investigate
10 simultaneously a potential duty to report violation
11 alongside an investigation into the educator whose
12 conduct substantively violated the code?
13 **A. I suppose that the Department could do that, yes.**
14 Q. Are you aware of any educator who has been found in
15 violation of the duty to report since the code -- since
16 the code's enactment?
17 **A. When you use the term "educator," can you clarify what**
18 **you mean?**
19 Q. What I mean is credential holder.
20 **A. Thank you. Can you repeat the question?**
21 (Court reporter read back question.)
22 THE WITNESS: As it pertains to Ed 510.05
23 (A), to the best of my recollection sitting here today,
24 I am not aware of any action taken under that
25 particular provision, 510.05 (A).

**56**

1 BY MR. BISSONETTE:
2 Q. Gotcha. Thank you. And I'm going to just refer you to
3 page 10 which is actually Bates stamped PL18,
4 subsection F in particular. I just want to make sure I
5 have a handle on that section. I want to flag it for
6 you just so I'm not hiding the ball, but I just want to
7 make sure I understand it.
8 Is it fair to say that under these sections, the
9 Department must investigate a duty to report violation
10 where they have -- strike that. Let me make sure I
11 have this language correct.
12 What's your understanding of subsection F?
13 **A. My understanding of Ed 510.05 (F) is that the**
14 **Department has the ability to undertake an**
15 **investigation, as it's stated in the rule, if there is**
16 **a reason to believe that a licensed educator failed to**
17 **report a violation of the code of conduct.**
18 Q. And the language in subsection F says "shall," correct?
19 "Shall undertake an investigation"?
20 **A. Yes, it uses the word "shall undertake an**
21 **investigation," yes.**
22 Q. So just so I understand. So if the Department has
23 reason to suspect that a violation of the code of
24 conduct was known by a credential holder and not
25 reported, the Department must undertake an

**57**

1    investigation, right?
2            MR. KENISON-MARVIN: Objection to the extent
3    it calls for a legal conclusion. You can answer.
4            THE WITNESS: Can you read the question back?
5            (Court reporter read back question.)
6            THE WITNESS: I think that's an accurate
7    interpretation of Ed 510.05 (F), yes.
8    BY MR. BISSONETTE:
9    Q.   An accurate?
10   A.   An accurate.
11   Q.   Inaccurate?
12   A.   No. Accurate.
13   Q.   It is accurate?
14   A.   It is accurate, yes.
15   Q.   Okay. Thank you. Sorry. I wasn't trying to belabor
16       the point.
17   A.   I should have been clearer.
18   Q.   I just wanted to make sure.
19   A.   That's all right.
20   Q.   Thank you.
21           MR. KENISON-MARVIN: I missed where we left
22   off with that.
23           MR. BISSONETTE: It is accurate.
24           MR. KAHNE: Yes.
25           MR. BISSONETTE: It is accurate.

**58**

1            MR. KENISON-MARVIN: Can you -- can we just
2    clarify?
3            MR. BISSONETTE: Do you want to read the
4    question back? I'm sure the people on Zoom are
5    chuckling right now.
6            (Court reporter read back testimony.)
7    BY MR. BISSONETTE:
8    Q.   So we just had that answer read back. Is that an
9        accurate reflection of your testimony?
10   A.   Yes.
11   Q.   Okay.
12   A.   I think so.
13   Q.   Yes. I think we're good.
14           MR. BISSONETTE: Are we good?
15           MR. KENISON-MARVIN: I'm good.
16           MR. BISSONETTE: Okay. Thank you.
17   BY MR. BISSONETTE:
18   Q.   I want to just pivot now to penalties under the code of
19       conduct. What are the penalties that exist if the
20       Department concludes that there's been violation of the
21       code?
22   A.   Is there a particular section of the code of conduct
23       that you're referring to?
24   Q.   Sure. I believe the language is in PL19 of Exhibit 2,
25       so I could direct your attention to, particularly, the

**59**

1    language in subsection J.
2    A.   According to this document, which is Ed 511.01 (J)(2),
3        the potential discipline would be either a suspension
4        or revocation, or a reprimand.
5    Q.   Okay. I know you said "potential." Based on my
6        reading of this, is it fair to say that under
7        subsection J, if there is -- if a credential holder is
8        deemed in violation of the code, that there has to be a
9        form of discipline? Is that an accurate reading of
10       this?
11           MR. KENISON-MARVIN: Objection to the extent
12   it calls for a legal opinion, and under 106 for
13   completeness with respect to other parts of the code,
14   and the administrative rules. You can answer.
15           THE WITNESS: Looking at 511.01 (J)(2), it
16   reads that the "Department shall propose a form of
17   discipline as follows."
18   BY MR. BISSONETTE:
19   Q.   So I guess my question is -- I'm going to ask about the
20       code and then in practice.
21       So, under the code, is it your position that if
22       there is a violation, that discipline has to be
23       proposed?
24           MR. KENISON-MARVIN: Same objections. You
25   can answer.

**60**

1            THE WITNESS: Based upon the plain reading of
2    511.01 (J)(2), I would agree with that interpretation,
3    yes.
4    BY MR. BISSONETTE:
5    Q.   Is that consistent with the Department's practice, that
6        interpretation?
7    A.   The Department's practice does not look at 511.01
8        (J)(2) in isolation. It would incorporate all of the
9        other provisions that follow it in its entirety.
10   Q.   And are those provisions -- what provisions are you
11       referring to?
12   A.   (J)(3) and (J)(4), (J)(5).
13   Q.   Is it correct to say, though, that those provisions
14       give criteria for the Department in deciding what
15       discipline to implement, but they don't allow the
16       Department to not impose discipline? Is that a correct
17       reading of the code?
18   A.   I disagree with that, actually.
19   Q.   Okay. Explain why.
20   A.   I'm looking at 511.01 (J)(7), which is on PL00020.
21       Seven says, "If no disciplinary sanction is proposed,
22       the Department shall notify the credential holder in
23       writing that the investigation is closed."
24   Q.   So your -- I just want to make sure I understand with
25       respect to section seven. You read that to mean even

61

1  if a violation was found, there could be a situation in
2  which no disciplinary sanction is proposed, correct?
3  **A. That is my interpretation looking at (J) in its**
4  **totality, not just in isolation of certain**
5  **subparagraphs, yes.**
6  Q. In practice, is that the practice of the Department?
7  **A. That's a very broad question.**
8  Q. Well, getting back to the specifics. It seems that the
9  Department, or at least you, read the rule to suggest
10  that even if there's been a violation, that no
11  disciplinary -- it's possible for no disciplinary
12  sanctions to be proposed. Is that a position that you
13  have as you are overseeing investigations under the
14  code of conduct?
15  MR. KENISON-MARVIN: Objection. Vague and
16  compound.
17  THE WITNESS: I believe that we have followed
18  that practice. Sitting here today, to the best of my
19  recollection, I cannot think of a particular
20  instance.
21  BY MR. BISSONETTE:
22  Q. Okay. So just so I'm clear, sitting here today, you
23  can't think of a particular instance in which there's
24  been a finding that the code of conduct has been
25  violated, but where no disciplinary sanction was

62

1  proposed, right?
2  **A. To the best of my recollection, sitting here today, I**
3  **cannot think of a particular case that would fall**
4  **within that fact pattern, but that doesn't mean it**
5  **doesn't exist.**
6  Q. Okay. Besides the three sanctions that we talked about
7  before, suspension, revocation, and reprimand, are
8  there other sanctions that the Department may oppose --
9  may propose if it concludes that there's been a
10  violation of the code of conduct?
11  **A. To the best of my knowledge, no.**
12  MR. BISSONETTE: I'm going to finish my line
13  with the code of conduct then maybe we can take a break
14  for a half an hour lunch. Does that make sense.
15  MR. KENISON-MARVIN: Fine with me.
16  MR. BISSONETTE: Okay. I want to -- and then
17  I can promise we won't talk as much about the code of
18  conduct after we eat.
19  BY MR. BISSONETTE:
20  Q. I want to just turn your attention, Attorney Fenton, to
21  page 18 on Exhibit 2. I'm going back to the language
22  in 511.01.
23  The Department determines that a possible
24  violation of the code has occurred, an investigation
25  shall be opened. We had a discussion about that

63

1  language.
2  Can you walk me through what those investigations
3  look like after there's been that threshold
4  determination of a possible violation of the code?
5  **A. Pursuant to Ed 511.01 (B), if the Department of**
6  **Education opens an investigation against a credentialed**
7  **educator, that individual is notified via a certified**
8  **letter.**
9  **I'll rephrase. It's a letter sent via certified**
10  **mail. Copies of that letter are sent to the respective**
11  **union, who is representing that individual, and the**
12  **employing superintendent. And those letters to the**
13  **union and the superintendent are sent via regular**
14  **mail.**
15  Q. And, after that process occurs, is there anything else
16  the Department does as part of its investigation to
17  decide whether there has been an actual violation of
18  the code?
19  **A. Depending upon the facts of the particular case,**
20  **additional steps could be taken, yes.**
21  Q. Could you just walk me through what those -- some of
22  those steps could be?
23  **A. Those steps could be receiving additional documentation**
24  **from the school district. Those steps could be meeting**
25  **with the educator. Those steps could include**

64

1  **interviewing other witnesses. Those steps could**
2  **include speaking with the union attorney representing**
3  **the individual.**
4  MR. BISSONETTE: Can I just have one minute?
5  MR. KENISON-MARVIN: Yes.
6  MR. BISSONETTE: I think can we go off, Nate?
7  MR. KENISON-MARVIN: I'm good with that.
8  (Recess taken.)
9  BY MR. BISSONETTE:
10  Q. Thank you, Attorney Fenton. I hope everyone had a good
11  lunch. I do have some -- a few follow-up questions on
12  the code of conduct. I know I promised I wouldn't,
13  but, I do, and then we're going to quickly pivot to
14  some other topics, thankfully.
15  So I'm going to just again go back to Exhibit 2,
16  direct your attention -- you have it in front of you.
17  Great. I'm looking, in particular, at Bates stamp PL21
18  in section 511.02. When you've identified that, just
19  let me know. I'm not asking you to read it, but just
20  when you're at that page.
21  Are you at that page?
22  **A. Yes, I'm at the page. Could you remind me what --**
23  Q. 511.02.
24  **A. Okay.**
25  Q. So I'm just looking at subsection A. I'm just going to

---

**65**

1  read the first clause. "If the Department determines
2  that a credential holder has violated the code of
3  conduct."
4      My question is who, at the Department, makes the
5  decision that a credential holder has violated the code
6  of conduct?
7  **A.  There is no one person at the Department of Education**
8  **who makes that determination.**
9  Q.  So who are the individuals that are involved in that
10  decision?
11  **A.  Again, your question is very broad, keeping in mind**
12  **that each case is fact dependent.**
13  Q.  So I believe your testimony that there's no one
14  individual.  So who would be the individuals that would
15  be involved in that decision?
16  **A.  The individuals who could be involved, depending on the**
17  **nature of the case, would be myself, Richard Farrell,**
18  **the commissioner, the deputy commissioner, and there**
19  **could be others, depending upon the nature of the**
20  **case.**
21  Q.  What's the criteria used in deciding -- strike that.
22      What's the criteria that the Department uses in
23  determining whether a credential holder has violated
24  the code of conduct?
25  **A.  That determination would be made based on the facts of**

---

**66**

1  **the individual case.**
2  Q.  So it would depend on the facts.  Would it depend on
3  anything else?
4  **A.  Are you referring to whether or not there's been a**
5  **violation of the code of conduct?**
6  Q.  Yeah.
7  **A.  Or are you referring to 511.02 (A), which is broader**
8  **than just determining whether the code of conduct has**
9  **been violated?**
10  Q.  That's a good question.  I think really what I'm just
11  trying to get at is that determination that a violation
12  has been occurred, and the process the Department goes
13  through in making that decision.
14      So I'll kind of reiterate my question.  I know
15  that you said that decision is based on the facts of
16  the individual case.  Is there any other criteria -- my
17  question, is there any other criteria that's used by
18  the Department in deciding whether a credential holder
19  has violated the code of conduct?
20  **A.  In large part, that determination is made based on the**
21  **individual facts of the case.  However, there could be**
22  **instances in which other criteria, other information is**
23  **taken into account.**
24  Q.  Any idea what that criteria would be just beyond the
25  individual facts of each case?

---

**67**

1  **A.  Sitting here today, I can't thank of a particular for**
2  **instance.**
3  Q.  Is there any criteria in the code of conduct in Exhibit
4  2 that articulates how the Department decides whether a
5  credential holder has violated the code?
6  **A.  I'd have to review the document.**
7  Q.  Please do.  Having looked at the document, do you have
8  a response?
9  **A.  Not that I can see.**
10  Q.  Okay.  I know that you listed many people who could be
11  involved in the decision -- the decision as to whether
12  there's been a violation.  Are there regular meetings
13  that occur within the Department to make those
14  determinations?
15  **A.  To explicitly make those determinations, no, but we do**
16  **have regular meetings, yes.**
17  Q.  So are there meetings that occur within the Department
18  where these determinations are made?
19  **A.  Yes.**
20  Q.  Do they just depend on when the need arises, or are
21  they regularly scheduled meetings?
22  **A.  In most part, they are regularly scheduled meetings.**
23  Q.  Do you know how frequently those meetings occur?
24  **A.  Generally, monthly.**
25  Q.  And who would be at those meetings?

---

**68**

1  **A.  I believe the individuals that I previously testified**
2  **to.  I will reiterate.  Myself, Richard Farrell, the**
3  **commissioner, and the deputy commissioner.**
4  Q.  Gotcha.  Thank you.  Are these group decisions or --
5  sorry, strike that.
6      Is the decision as to whether or not a violation
7  has occurred a group decision, or does one person in
8  those meetings have the final say?
9  **A.  Whether or not there's been a violation of the code of**
10  **conduct is based upon the facts as presented.**
11  Q.  No, I understand.  I think my question is a little
12  different, though.  I'm just trying to figure out who
13  makes the decision based on the facts presented that
14  there's been a violation.
15      So kind of to reiterate my question, is the
16  decision as to whether or not a violation has occurred
17  based on the facts presented a group decision, or a
18  decision that's made by one person in that meeting?
19  **A.  I apologize if I'm being difficult, but it's -- it's**
20  **not an individual or a group of people who decide**
21  **whether or not there's been a violation of the code of**
22  **conduct.  It's, again, based upon the facts as**
23  **presented.**
24  Q.  Yeah, but you'd agree with me that someone's making the
25  decision based upon the facts presented that there's

**69**

1    been a violation, right?
2  **A.  I disagree with how you're phrasing it.**
3  Q.  Okay.  I'm going to try to phrase it again.
4        So you have monthly meetings, approximately, in
5    which there are discussions concerning whether
6    violations have occurred under the code of conduct,
7    correct?
8  **A.  That is not the purpose of those meetings, no.**
9  Q.  But during those meetings, those discussions occur,
10    correct?
11 **A.  Those discussions can occur at that meeting.  They**
12    **don't always occur at that meeting.**
13 Q.  Okay.  So I guess my question is during those meetings,
14    I know who's present, but who makes the final decision
15    that there has been a violation?  Whose decision is
16    that, is the question I'm asking.
17 **A.  And I'm not able to attribute that decision to any one**
18    **individual.  The decision is based, again, as I've**
19    **testified, upon the facts of the case.**
20 Q.  Would you describe it as a group decision then?  I'm
21    not trying to be difficult here.
22 **A.  No, neither am I.**
23 Q.  I'm just trying to understand.  Is it a group decision
24    that's made by all the participants in that meeting?
25    Is that how you would frame it, describe it?

**70**

1  **A.  Again, I'm not able to attribute the decision-making as**
2    **it pertains to whether there's been a violation of the**
3    **code of conduct to any one individual.  It is fact**
4    **dependent.**
5  Q.  Okay.  So you can't attribute it to any individual.
6    Can you attribute it to a group of individuals?  Would
7    it be to everyone in that room?  Who makes -- strike
8    that.
9        Who, in that room, makes the decision?
10 **A.  As I've testified to, I'm unable to attribute the**
11    **decision of whether there's been a violation of the**
12    **code of conduct to any one individual or a group of**
13    **individuals as that determination is pursuant to the**
14    **facts of the individual case.**
15 Q.  So I just want to make sure I understand.  So you're
16    not able to testify as to who makes the decision within
17    the Department that a violation has occurred; is that
18    correct?
19 **A.  That is correct.  It is a fact-dependent**
20    **determination.**
21 Q.  Would there be -- ever be a series of facts in which
22    you make the final decision as to whether or not
23    misconduct occurred?
24 **A.  Whether or not there's a violation of the code of**
25    **conduct is based upon the facts of the case.  It is not**

**71**

1    **attributable to any one individual.**
2  Q.  I hear you.  I think that's where my question was a
3    little different.
4        Would there ever be a set of facts in which you
5    were the final decision-maker in deciding whether
6    misconduct occurred?
7  **A.  I suppose there could be.  I can't think of a**
8    **particular for instance when that has occurred.**
9  Q.  Okay.  Has there been a situation -- strike that.
10        Has there been a time in which a determination has
11    been made that there was a violation under the code of
12    conduct in which you were the final decision-maker?
13 **A.  As I've testified to previously, a determination of**
14    **whether or not there's a code of conduct violation is**
15    **determined by the facts.  It's not attributable to any**
16    **one person.  That would include myself.**
17 Q.  Is it attributable -- it's attributable to the
18    Department, I assume?  The Department's making the
19    decision?
20 **A.  Again, I will refer you to my prior testimony.  It's**
21    **based upon the facts of the individual case.**
22 Q.  Are you aware of a scenario, based on the facts of an
23    individual case, in which you made the decision that a
24    violation had occurred?
25 **A.  Sitting here today, I do not recall such an instance.**

**72**

1    I will refer to my prior testimony that that decision
2    is based upon the facts.
3  Q.  Okay.  Has there ever been a series of facts in a case
4    in which a determination of misconduct -- a
5    determination that there's been a violation of the code
6    of conduct -- let me strike that again.  There's a lot
7    there.
8        Has there been a situation in which there's been a
9    determination made in which -- that there's been a
10    violation, and that the commissioner was the
11    decision-maker in determining that there was a
12    violation?
13 **A.  I will refer you to my prior testimony that the**
14    **determination of whether there's been a violation of**
15    **the code of conduct is not attributable to any one**
16    **individual.  Sitting here today, I'm not -- I do not**
17    **recall a situation in which the commissioner made the**
18    **determination that there was a violation of the code of**
19    **conduct.**
20 Q.  If it's not attributable to any one individual, is it
21    attributable to the people in the meeting in which that
22    decision is made?
23 **A.  Again, and I apologize for being difficult.  I think**
24    **we're getting into the world of asked and answered, but**
25    **I won't play the role of the lawyer here.**

73

1      I will refer you to my prior testimony.  The
2  decision as to whether there's been a violation of the
3  code of conduct is based upon the facts.  It is not
4  attributable to any one individual.
5  Q.  I just want to -- the problem I'm having is that you're
6      using passive voice.  I'm trying to use active voice.
7      So what I'm just trying to get at is who individually
8      makes these decisions based on the facts of each case?
9      That's it.  Is that something that you feel comfortable
10     answering?
11 A.  To the best of my ability, I feel I've already answered
12     that question.
13         MR. BISSONETTE:  Well, it's your -- it's your
14     lawyer that makes the decision whether to instruct you
15     not to answer.  You don't have that prerogative,
16     regrettably, so I would just ask your counsel, is that
17     instruction being made?  And, if not, I would ask that
18     it be answered.  It's that simple.
19         So if that instruction's being made, we can
20     log it, have a conversation with the judge.  There's no
21     privilege assertion.  It's clearly relevant to this
22     case.  Just trying to get at one of the core aspects of
23     this case as to who makes the decision.  It's that
24     simple.  So unless there's an instruction not to
25     answer, I would ask that the witness answer it.

74

1         MR. KENISON-MARVIN:  Do you mind if we take a
2      break?
3         MR. BISSONETTE:  Sure.
4         MR. KENISON-MARVIN:  And I just talk with her
5      real fast?  We can leave.  We'll go.
6         (Recess taken.)
7         (Court reporter read back question.)
8  BY MR. BISSONETTE:
9  Q.  Is that something that you can answer?
10 A.  In large part, keeping in mind that each case is fact
11     dependent, the information that is provided to the
12     Department of Education comes through from a report, an
13     investigative report, that is done by the district, or
14     the district hires outside counsel to do that
15     investigation, and that investigation already makes the
16     finding.
17         That is why my testimony was that it's not
18     attributable to one individual because the
19     determination has already been made by an independent
20     report that was provided by the school district.  Where
21     the Department will have discussions is when we decide
22     whether a particular fact pattern should be dealt with
23     as an employment issue or if it rises to the level of a
24     code of conduct.
25 Q.  So on the question as to whether it rises to the level

75

1      of a code of conduct violation, that's really the
2      decision that I'm interested in.
3  A.  Okay.
4  Q.  So I just -- my question is is that decision a group
5      decision, or is there any person at the DOE that has
6      final decision-making authority over that decision?
7  A.  Again, keeping in mind that each case is individual and
8      fact-dependent, in large part, we reach those decisions
9      as a group.
10 Q.  What happens if there's disagreement among individuals
11     in the group as to whether or not something reaches the
12     level of a code of conduct violation?
13 A.  Again, keeping in mind that every case is individual
14     and fact-dependent, we will discuss our respective
15     views.
16 Q.  And who makes the decision?
17 A.  I hate to use the old lawyer answer, it depends, but it
18     depends.
19 Q.  Okay.  Have there been situations in which you have
20     made that decision in the event of a disagreement?
21 A.  I imagine that there have been, yes.
22 Q.  Have there been circumstances in which, in the event of
23     a disagreement, the commissioner that made that
24     decision?
25 A.  I would imagine that there have been, yes.

76

1  Q.  Have there been situations where there's disagreement
2      and Mr. Farrell has made the decision in determining
3      whether or not something has been a code of conduct
4      violation?
5  A.  I would imagine that there have been, yes.
6  Q.  Okay.
7         MR. BISSONETTE:  Real quick.
8         (Discussion off record.)
9  BY MR. BISSONETTE:
10 Q.  Thank you for that.  I'm going to kind of move on, I
11     know, as promised from the code of conduct.
12         So as to not hide of ball, what I'm going to be
13     talking a little bit about and asking you some
14     questions on is kind of this DOE referral process to
15     the Human Rights Commission.  I know there was some
16     legislative testimony on that so I just want to just
17     kind of name where we'll be going there.
18 A.  I appreciate that.  Thank you.
19 Q.  Not trying to hide the ball here.
20         I'm happy to present this as an exhibit, Attorney
21     Fenton, but I know that in your -- there was discussion
22     on January 26th in your testimony on HB33 that there
23     have been instances in which the Department says --
24 A.  I'm sorry, HB33 or --
25 Q.  I got it wrong.  Let me start over.

**77**

1  A.  Okay.
2      MR. BISSONETTE:  You know, I'm just going to
3  introduce it.  It makes things easier.  We'll do
4  Exhibit 5.
5      (Exhibits 5 and 6 marked for identification.)
6  BY MR. BISSONETTE:
7  Q.  I'm just pausing to find the language I'm referring to.
8  I'm sorry, just bear with me.
9  A.  Take your time.
10 Q.  So, Attorney Fenton, I'm just going to refer you to
11 Exhibit 5 which I would represent is a portion of the
12 hearing, not the complete hearing, on HB33.  HB533.
13     And just directing your attention to the page
14 Bates stamped 795, on the bottom right, the language
15 stating, and I quote, "And imbedded within that fact
16 pattern there have been instances in which the
17 Department says there might be more here, there might
18 be something for the Human Rights Commission to look
19 at, and we have tried to refer that matter over."
20     Do you see that language?
21 A.  I do.
22 Q.  What instances were you referring to in your testimony
23 to the House Judiciary Committee there?
24 A.  **Understanding the language of House Bill 2, that**
25 **matters that fall within HB 2 are to be adjudicated or**

**78**

1  **reviewed by the Human Rights Commission and/or the**
2  **Attorney General's office, there have been times in**
3  **which matters were brought to the Department's —**
4  **Department of Education's attention which the**
5  **Department then wanted to refer to the Human Rights**
6  **Commission for their review and adjudication if**
7  **appropriate.**
8  Q.  And so that testimony dealt with code of conduct issues
9  with respect to HB 2 in particular, or more broadly?
10 A.  **I would say issues that may or may not fall within HB**
11 **2.**
12 Q.  Do you recall what those specific instances were that's
13 referenced on page 795, page eight, line 21?
14 A.  **I believe what I was referring to here was an instance**
15 **that the Department of Education was in receipt of**
16 **information about actions that an educator took which**
17 **may or may not have been a violation of HB 2.**
18 Q.  In that particular instance, had the -- I won't get
19 into the facts of it, but had the Department made a
20 decision on its own that there was a violation of HB
21 2?
22 A.  **Absolutely not.**
23 Q.  Okay.  Did the Department think it could have been a
24 possible violation?
25 A.  **No.**

**79**

1  Q.  Do you recall what the specific complaint was about, or
2  complaints?  Let me strike that.
3      When you say "instances," were you referring to
4  one instance or multiple instances?
5  A.  **In this particular reference that you've made,**
6  **referring to Bates stamp 0795, page eight, I believe**
7  **what I was referring to in that instance was a matter**
8  **which had been brought to the Department of Education's**
9  **attention by a superintendent pursuant to the code of**
10 **conduct.**
11 Q.  Do you recall what the nature -- strike that.
12     Do you recall what the substance of the report was
13 by the superintendent to the Department?
14 A.  **Yes.**
15 Q.  What was it?
16 A.  **The nature of the report that was brought to the**
17 **Department of Education's attention via the code of**
18 **conduct was that a licensed educator had used a racial**
19 **slur in her classroom.  It was not in reference to any**
20 **one individual, but had used it more than one time.**
21 Q.  Do you recall the SAU that was involved?
22 A.  **I do not recall the number of the SAU.**
23 Q.  Do you recall the -- where that school was located?
24 A.  **Without being coy, I think so.  I'm not entirely**
25 **certain.**

**80**

1  Q.  Recognizing that you may not be 100 percent certain, we
2  can caveat answers like that -- without being 100
3  percent sure, do you have an idea as to what the
4  municipality is, recognizing, again, that you're not a
5  hundred percent sure?
6  A.  **I believe it was in the Sullivan County area.**
7  Q.  Do you have an idea as to what the municipality was of
8  where this occurred?
9  A.  **Might have been Newport.  Might have been**
10 **Charlestown.**
11 Q.  Okay.  Besides this potential Sullivan County instance,
12 because I hear what you're saying, were there any other
13 instances that you were referring to when you used the
14 term "have been instances" on page 795 of Exhibit 5?
15 A.  **That is the instant that really comes to my mind.**
16 Q.  Okay.
17 A.  **Were there other issues that were brought to the**
18 **Department's attention that may or may not have fallen**
19 **within the purview of House Bill 2?  Yes.**
20 Q.  Bear with me for one moment, please.
21 A.  **Take your time.**
22 Q.  So I think, Attorney Fenton, at least, I'm going to ask
23 you to set those aside.  We can kind of move on from --
24 oh, that's not true.  I'm sorry.  You can set aside
25 Exhibit 5, but I am going to have a question about

81

1  Exhibit 6. My apologies.
2       And, in full disclosure, this is going to be the
3  line of questions asking about the standard operating
4  procedure, so I just want to define that for everyone.
5  A.  I appreciate that. Thank you.
6  Q.  No problem. Again, not trying to hide the ball.
7       I'm going to refer you, Attorney Fenton, to
8  Exhibit 6, in particular, PL806. And the language at
9  the bottom of page 19 in 806 that starts with -- I'm
10 going to quote, "And in working with Representative
11 Lynn and in working with the Attorney General's office
12 on the original bill, 533, we have since worked with
13 the AG's office to come up with an SOP as to how we
14 transfer those cases to the Human Rights Commission and
15 AG's office."
16      Attorney Fenton, do you see that language that I
17 just referred you to on PL806?
18 A.  I do.
19 Q.  Okay. Is there currently a standard operating
20 procedure in place with respect to how cases are
21 transferred from the DOE to the Human Rights
22 Commission?
23 A.  No.
24 Q.  So why did you make that statement to the
25 legislature -- excuse me, to the House Judiciary

82

1  Committee?
2  A.  I had met with --
3       MR. KENISON-MARVIN: I'm going to object to
4  the extent that the question calls for communications
5  related to legislative acts, and it would be subject to
6  legislative privilege.
7       So to the extent your answer would include
8  communications that you had about the bill with
9  representatives or -- legislators or their aids, I
10 instruct you not to state that information in response
11 to the question.
12      MR. BISSONETTE: Without getting into too
13 many lawyerly diatribes, I would argue that this is a
14 public statement, and to the extent any privilege
15 exists, that it's been waived, but I -- in the spirit
16 of not getting bogged down in the weeds, I'll just
17 rephrase the question.
18 BY MR. BISSONETTE:
19 Q.  Your testimony is that there is no current SOP in place
20 as to how cases are transferred from the HRC --
21 sorry -- from the DOE to the HRC, correct?
22 A.  That is correct, yes.
23 Q.  Okay. Is it fair to say, without getting into the
24 nature of those discussions, that there were
25 discussions with legislators about that?

83

1  A.  Yes.
2  Q.  Were there -- excluding discussions in which
3  legislators were involved, have there been -- and
4  without getting into the substance, have there been
5  internal Department of Education discussions concerning
6  an SOP?
7  A.  Yes.
8  Q.  Okay. Has there been any discussion about -- has
9  anything changed since January -- strike that.
10      Has anything changed since January 2023 when HB533
11 was introduced with respect to how cases can be
12 transferred from the Department of Education to the
13 HRC?
14      MR. KENISON-MARVIN: Objection.
15      MR. BISSONETTE: I'm just asking what the
16 current process is.
17      MR. KENISON-MARVIN: Vague and assuming facts
18 not testified to.
19      You can answer to the extent you know.
20      THE WITNESS: As it relates to the Department
21 of Education's ability to transfer cases to the Human
22 Rights Commission --
23      MR. BISSONETTE: Yes.
24      THE WITNESS: -- to the best of my knowledge,
25 nothing has changed. I should say, directly to the

84

1  Human Rights Commission, nothing has changed.
2  BY MR. BISSONETTE:
3  Q.  I understand. Has anything changed with how these --
4  strike that.
5       Are you aware of statements that Representative
6  Glenn Cordelli made in March 2023 when he said that the
7  Attorney General's office has been more cooperative
8  with respect to getting cases referred to the Human
9  Rights Commission? Are you aware of that statement?
10 A.  Do you have it?
11 Q.  No. I'm just -- it's my -- are you aware of
12 Representative Cordelli having said that publicly? Is
13 that something that you're aware of?
14 A.  I wasn't -- to the best of my knowledge, I wasn't
15 present when he said that.
16 Q.  Would you agree with the statement that the Attorney
17 General's office has been more cooperative with getting
18 cases referred to the Human Rights Commission since
19 January 2023?
20 A.  Yes.
21 Q.  Okay. How have they -- how has the Attorney General's
22 office been more cooperative?
23 A.  That's a pretty broad question. Is there a way to
24 narrow that down?
25 Q.  I'm afraid not. You said that you agreed with that

**85**

1  statement, and I'm just trying to get at how the
2  Attorney General's office has been more cooperative
3  since January 2023.
4  **A. Since January of 2023, I had a meeting with Attorney**
5  **Sean Locke of the Attorney General's office, and**
6  **Attorney Luke Brown, and we discussed procedural**
7  **mechanisms by which the Department of Education could**
8  **refer cases that may or may not fall within the purview**
9  **of HB 2 to the Attorney General's office for review.**
10 Q.  And was a decision made during that meeting as to what
11 new process to implement?
12 **A. We agreed to terms as to what that procedural mechanism**
13 **would look like, and those terms were outlined and**
14 **written down.**
15         MR. BISSONETTE:  Okay.  Can I go off the
16 record?
17         (Recess taken.)
18         (Court reporter read back answer.)
19 BY MR. BISSONETTE:
20 Q.  What was the structure of that agreement?
21 **A. Not to be difficult, but what do you mean by**
22 **"structure"?**
23 Q.  What was that agreement?  I'll just say that.  What was
24 the agreement?
25 **A. It's difficult for me to go into the details of it**

**86**

1  because I don't have it in front of me, but, based upon
2  my recollection, what we had agreed to was that there
3  would be a procedural mechanism in place by which the
4  Department of Education could transfer cases that could
5  or could not fall within HB 2 -- that is not a
6  determination for the Department of Ed to make -- to
7  the Attorney General's office for their review.  And
8  each party agreed to what each agency's role would
9  play, and it was Sean Locke who wrote down an outline
10 of what that would look like.
11 Q.  Was that outline written during that meeting or after
12 that meeting?
13 **A. The outline that I referred to was written during that**
14 **meeting.**
15 Q.  And was that outline during that meeting circulated to
16 the meeting's participants?
17 **A. The three of us in that meeting all participated**
18 **verbally in the creation of it, so when you say**
19 **"circulate," I envision each of us holding it,**
20 **reviewing it.  Liz Brown was on a Zoom call, so that**
21 **would not be possible.**
22 Q.  Gotcha.
23 **A. But did we all work collaboratively?  Yes.**
24 Q.  I just want to make sure I understand who the
25 participants were.  It was obviously you, Attorney

**87**

1  Locke, Liz Brown.  Were there any others in that
2  meeting?
3  **A. To the best of my recollection --**
4  Q.  Okay.
5  **A. -- there were not.**
6  Q.  And that outline that you were referencing, that's
7  something that all three of those participants -- I
8  want to make sure I understand.  Did all three of those
9  participants in that meeting have access to that
10 outline during that meeting?
11 **A. What do you mean by "access"?**
12 Q.  When was that outline prepared?
13 **A. I've already testified to that.**
14 Q.  Can you remind me?  I'm sorry.  Because I don't
15 remember it, so forgive me.  When was the outline
16 prepared?
17 **A. The outline was prepared during the meeting.**
18 Q.  Okay.  And then everyone had access to it during the
19 meeting; is that correct?
20 **A. I'm not sure what you mean by the term "access."**
21 Q.  I'm just trying to just get to the heart of this.  Can
22 you describe the process by which that outline was
23 created and given to the participants of that
24 meeting?
25 **A. The three of us discussed what the issue -- the**

**88**

1  underlying issue was, and that is having the ability
2  for the Department of Education to transfer matters
3  which may or may not fall within the purview of House
4  Bill 2 to the Attorney General's office for review.
5  The three of us worked collaboratively, and it was
6  Attorney Sean Locke who wrote down the outline as to
7  that procedural mechanism.  It was -- so all three of
8  us contributed to it.  We did not take turns writing
9  it.
10        As I mentioned before, Attorney Brown was on a
11 Zoom -- Zoom function.  But it was collaborative in
12 nature, and it was a very strong working draft that
13 Sean then said he would type up and send to me and Liz
14 Brown for review and final steps.
15 Q.  That's helpful.  Thank you.  Did he prepare -- he
16 prepared that outline during the meeting again; is that
17 accurate to say?
18 **A. So I think I've testified to this previously.  Sean**
19 **Locke wrote an outline during that meeting --**
20 Q.  Okay.
21 **A. -- that we all contributed to.  It was verbal.  I**
22 **cannot testify whether or not he wrote a different**
23 **outline at a different time, but there was an outline**
24 **produced during that meeting.**
25 Q.  Okay.  Is the process that was agreed -- I know that

89

1 it's still being written up, but is the process that
2 was agreed to during that meeting the process that
3 existed now with respect to whether and how cases can
4 be transferred from the DOE to the HRC?
5 **A.  You'll have to clarify your question.  My understanding**
6 **is that the Department of Education is not able to**
7 **transfer matters that may or may not fall within the**
8 **purview of House Bill 2 to the Human Rights**
9 **Commission.**
10 Q.  I guess my question is a little bit more simpler, I
11 think, which is, is the agreement that was reached
12 during that meeting that we just discussed, are the
13 terms of that agreement currently in effect with
14 respect to the transfer of cases from the DOE to the
15 HRC?
16      MR. KENISON-MARVIN:  Object as vague and
17 asked and answered.  If you want me to explain what I'm
18 thinking, I'm happy to.
19      MR. BISSONETTE:  Do you want to do it on or
20 off the record?
21      MR. KENISON-MARVIN:  I can do it on.
22      MR. BISSONETTE:  Okay.
23      MR. KENISON-MARVIN:  I'm just referring to
24 the first question about the standard operating
25 procedure.  You'd asked if there was one, and the

90

1 answer, I believe, was no.  So if you want to just
2 clarify when you're talking about process, if you're
3 distinguishing that from standard operating procedure?
4      MR. BISSONETTE:  I got you.  I got you.
5 That's fair.  That's fair.  So I'll strike the last
6 question.
7 BY MR. BISSONETTE:
8 Q.  My question is the agreement that was reached during
9 the meeting that you previously testified to, are the
10 terms of that agreement the process that currently
11 exists with respect to how cases can be transferred
12 from the DOE to the HRC?
13 **A.  The agreement that was reached in that meeting that I**
14 **testified to talked about transfer of matters that may**
15 **or may not fall within the purview of House Bill 2 from**
16 **the Department of Education to the Attorney General's**
17 **office.**
18 Q.  I see.  I got you.  Is --
19 **A.  I'm not trying to be difficult.**
20 Q.  No, no.  You're right.  The way that I framed that was
21 not fully reflective of that caveat, so I'll kind of go
22 back and kind of try to find a way to just be more
23 direct.
24      Is the agreement that was reached during that
25 meeting the way the process currently works with

91

1 respect to DOE referrals under HB 2?
2 **A.  Prior to that meeting, which occurred on or about**
3 **February 14th, '23, just so we have a reference point,**
4 **prior to that meeting with the Attorney General's**
5 **office, my understanding was that the Department of**
6 **Education was not in a position, nor was it allowed to**
7 **transfer any matters which may or may not fall within**
8 **the purview of House Bill 2 to the Human Rights**
9 **Commission for review.  And it was -- it had been**
10 **unclear -- prior to my testimony on House Bill 533, it**
11 **was unclear that the Department of Education was able**
12 **to transfer those matters which may or may not fall**
13 **within HB 2 to the Attorney General's office.**
14 Q.  And so after -- I guess my question is the agreement
15 that was reached during that meeting that may have
16 occurred on or about February 14th, has that agreement
17 been in effect since that meeting?
18 **A.  Yes.**
19      MR. BISSONETTE:  Okay.  I'm going to just
20 switch gears a bit now that we've avoided the sticky
21 wicket of the SOP.  Let me just express my thanks,
22 Attorney Kenison, for the dialogue that we've been able
23 to have on this.
24 BY MR. BISSONETTE:
25 Q.  We talked a little bit before about trainings, a

92

1 presentation on the code of conduct.  Have you
2 conducted trainings on HB 2 in particular, the
3 challenged law in this case?
4 **A.  I have not done trainings exclusive to House Bill 2.**
5 Q.  Okay.
6 **A.  I have included information -- limited information**
7 **about House Bill 2 in some of the trainings that I've**
8 **done on the code of conduct, yes.**
9 Q.  Okay.  So I think I know what you're referring to, but
10 to not hide the ball, I'll just mark it as my next
11 exhibit.  Fair enough?
12 **A.  I appreciate that.  Thank you.**
13      MR. BISSONETTE:  That's how I try to operate.
14 So this next exhibit will be Exhibit 7.
15      (Exhibit 7 marked for identification.)
16 BY MR. BISSONETTE:
17 Q.  So I'd just ask you to -- you don't need to read it
18 word for word, but just take a quick scan of Exhibit 7.
19 Just let me know when you're done.
20      What is Exhibit 7?
21 **A.  Exhibit 7 starts off with an email from myself to**
22 **Richard Farrell, who is the investigator for the**
23 **Department of Education.  The subject is code of**
24 **conduct.  The date is August 17th of 2021.  And behind**
25 **that email is a printout of the PowerPoint of the code**

93

1  of conduct presentation.
2  Q.  Is this the type of presentation you were referring to
3  in your prior testimony?
4  **A.  Which part of my testimony?**
5  Q.  I believe you testified that you've given presentations
6  in which -- that haven't been exclusive to HB 2 but in
7  which HB 2 was referenced.  That's a ballpark of what I
8  understood your testimony to be.  Is that accurate?  Is
9  my rendition of your prior testimony accurate?
10 **A.  I hope not.**
11 Q.  Tell me how it's wrong.
12 **A.  So I believe my testimony was this is a code of conduct**
13 **presentation.  My presentations concern the code of**
14 **conduct, and I had included some limited information**
15 **about HB 2.**
16 Q.  And I just want to make sure I understand.  Is the
17 limited information that you're referring to pages on
18 Exhibit 7 Bates stamped DOE 10079 to 10081?
19 **A.  Yes.**
20 Q.  Okay.  Do you recall how many times you've given this
21 presentation that include those pages I just referenced
22 on HB 2?
23 **A.  In exact number, I do not.**
24 Q.  Do you have an estimate, a ballpark, that you can
25 provide?

94

1  **A.  Certainly less than 10 times.  Probably not more than**
2  **five.**
3  Q.  Okay.
4  **A.  But I hesitate to lock myself in that much.**
5  Q.  I understand.  Your caveat lays that out.  I
6  understand.  I've been in that situation.
7       Do you recall, during these presentations in which
8  you've used these slides, have you received direct
9  questions about what might be covered under HB 2?
10 **A.  I do not recall any instances in which I received**
11 **questions as it pertained to what HB 2 entailed or what**
12 **HB 2 covered.  Any such questions I would have liked to**
13 **think I would refer to the Attorney General's office.**
14 **I would not have felt comfortable answering them.**
15 Q.  So you don't recall, just so I'm clear, in these --
16 strike that.
17      In these approximate five to 10 presentations,
18 recognizing that is not a number that you could
19 commit to, even, but during those presentations, who
20 would be the audience, for the most part?
21 **A.  Generally, for the presentation that you've given to me**
22 **which is marked as Exhibit 7, this is typically**
23 **provided to or presented to educators.**
24 Q.  I just want to button this up.  So you don't recall any
25 specific questions by educators at the time you've

95

1  given these presentations about what's covered under HB
2  2?
3  **A.  No, I do not.**
4  Q.  Okay.  The slides that we referenced before in
5  exhibit --
6  **A.  May I just --**
7  Q.  Yes, of course.
8  **A.  What you were looking at is not what Exhibit 7 is.**
9  Q.  Exactly.  I just realized that.  That's why I was
10 trying to find the page numbers.
11 **A.  So if we could just make sure we're on the same --**
12 Q.  We are on the same page.
13 **A.  Okay.  Those are different trainings.**
14 Q.  Yeah.
15 **A.  So you're asking me questions about Exhibit 7, and I'm**
16 **looking at Exhibit 7, and you're looking at a different**
17 **exhibit.**
18 Q.  I'm looking at, for the record, Exhibit 3, because I'm
19 planning out where I'm going to be going.
20 **A.  Okay.**
21 Q.  So don't worry too much about what I'm looking at.  But
22 you're right, the questions that I was asking were
23 tailored to Exhibit 7 to educators, the presentation
24 that we were just talking about.  Okay.
25      Was there ever a discussion within the Department

96

1  of Education on making a list of reading materials or
2  books that could potentially be violative of HB 2?
3       MR. KENISON-MARVIN:  Object to the extent
4  that -- I instruct you not to answer to the extent
5  there's responsive information about internal
6  discussions, predecisional discussions, regarding that
7  subject on the basis that it's protected under the
8  deliberative process privilege.
9       MR. KAHNE:  Predecisional to what?
10      MR. BISSONETTE:  Sorry.  I didn't mean to
11 have two lawyers arguing against you.
12      MR. KAHNE:  Sorry.
13      MR. BISSONETTE:  There would need to be an
14 actual decision, though, at some point, so...
15      MR. KENISON-MARVIN:  I think the case law is
16 clear that that's not the case.  There can be
17 circumstances of discussions involving nondecisions and
18 I have some case law to cite if you'd like me to.  I
19 think some courts have, in fact, made it clear that you
20 don't need a final decision.  There can be --
21 essentially, to fulfill the purpose of the privilege,
22 which is to encourage discussions about something that
23 might be done in the event that people want to have a
24 discussion, government workers want to have a
25 discussion about something to do with the policy behind

**97**

1 the privilege, is to encourage them to have that
2 discussion. If they decide not to take a final action,
3 that's okay. So I think I would stand behind the
4 objection.
5     MR. BISSONETTE: Okay.
6     MR. KENISON-MARVIN: Whatever the answer is,
7 if there's a final decision of something or not, I
8 don't think a final decision is necessary for that
9 privilege to apply.
10     MR. KAHNE: Just if I could just add? If the
11 decisional process privilege applied to all
12 communications within an agency without the need for
13 any final determination, that could potentially cover
14 all communications within an agency, so I don't think
15 that's contemplated by the privilege. So you've said
16 your point.
17     MR. BISSONETTE: I'm going to let that
18 question stand and just see what the instruction will
19 be.
20     MR. KENISON-MARVIN: I forget what the
21 question is.
22     MR. BISSONETTE: Why don't we start over? If
23 you could read the question and I just -- I'm mainly
24 interested in just what the instruction is. And I'm
25 sure for the witness, she'd probably like to know what

**98**

1 the instruction is, too.
2     (Court reporter read back question.)
3     MR. KENISON-MARVIN: I guess -- I think,
4 Gilles, the question, to the extent it calls for a yes
5 or no, I'm happy to let that answer go.
6     MR. BISSONETTE: I appreciate it.
7     MR. KENISON-MARVIN: And then we'll go from
8 there.
9     MR. BISSONETTE: Okay.
10     THE WITNESS: To the best of my recollection,
11 no.
12     MR. BISSONETTE: Bear with me. I'm just
13 trying to find a document.
14 BY MR. BISSONETTE:
15 Q.  So beyond these -- the presentations that we just
16     discussed, outside that context, have you ever been
17     asked by an educator about whether specific texts are
18     covered by HB 2?
19 **A.  Do you have a document you'd like to show me?**
20 Q.  Just based on your recollection.
21 **A.  I believe there was a communication from an**
22     **administrator, superintendent, to me, asking what HB 2**
23     **covered potentially in terms of what could be taught**
24     **and what couldn't be taught.**
25 Q.  Aside from that communication, do you recall any other

**99**

1 administrators or educators that asked you what may be
2 covered under HB 2?
3 **A.  I do not recall having those discussions with**
4     **administrators or educators. To the extent those**
5     **occurred, I would refer them to the Attorney General's**
6     **office. I did have them with attorneys, however.**
7     MR. BISSONETTE: Okay. I'm going to mark
8 this. I can't find my other copies. That's what's
9 been driving me crazy over here. So I'm just going to
10 give you both of them.
11     MR. KENISON-MARVIN: Do you want me to go
12 make any copies or anything for you?
13     MR. BISSONETTE: No, I'm happy to. That way,
14 we can know what we're looking at.
15     MR. KENISON-MARVIN: Do you want me to --
16     MR. BISSONETTE: Do you mind? Okay, maybe
17 we'll go off the record and do it.
18     (Exhibit 8 marked for identification.)
19 BY MR. BISSONETTE:
20 Q.  Have you had an opportunity, Attorney Fenton, to look
21     at Exhibit 8?
22 **A.  Yes.**
23 Q.  Have you seen Exhibit 8 before?
24 **A.  Yes.**
25 Q.  And I apologize. It's not Bates stamped. I'm unclear

**100**

1 how that occurred. But with respect to Exhibit 8, in
2 which you're having a conversation with the
3 superintendent of SAU 4, is that the communication that
4 you're referencing in your earlier testimony?
5 **A.  It was, yes.**
6 Q.  Okay. Great. And I note that your response above that
7     quote, divisive topics, is handled by the Human Rights
8     Commission, et cetera. Is that -- that's the statement
9     that you made before that you would have referred them
10     to the Human Rights Commission?
11 **A.  Yes.**
12 Q.  And had you been asked by other individuals, educators,
13     as to what's covered by HB 2, is that the typical
14     response that you would be likely to give?
15 **A.  Can you clarify the question?**
16 Q.  Yeah. You know, I believe your testimony is you only
17     recalled specifically this one superintendent reaching
18     out with questions about what might be covered. If you
19     were asked by others, would this be the similar
20     response that you would give under -- today, sitting
21     here today?
22 **A.  Before looking at this document, my testimony was that**
23     **I had referred -- I had believed that I had referred**
24     **Pierre Couture to the Attorney General's office, and I**
25     **see, now that I've had an opportunity to review this, I**

---

101

1  suggested that he perhaps reach out to the
2  superintendents' association to see if they have any
3  guidance.
4       Your question, as it pertains to individual
5  educators, which I cannot think of a time where I've
6  had that conversation with an individual indicator, I
7  would not necessarily refer that person to the
8  superintendents' association. That would not be the
9  appropriate place to send them.
10 Q.  Are you aware of the superintendents' association
11 having created guidance on HB 2 at all?
12 A.  I, myself, am not aware of what the superintendents'
13 association did as it pertains to HB 2.
14 Q.  Okay. Do you know if the superintendents' association
15 has ever reached out to the Department of Education
16 about guidance concerning HB 2?
17 A.  I personally have not had a discussion with the
18 superintendents' association as it pertains to HB 2,
19 but they have reached out to the Department of
20 Education. They could have, and spoken to individuals
21 other than myself.
22 Q.  Gotcha. Fair enough. Are you aware of statements
23 made -- strike that.
24      I'm reading from a document. You're not on it,
25 okay? But I'm -- I just want to ask you about it.

---

102

1       Are you aware of statements made by the
2  commissioner of education to AFT that -- in which the
3  commissioner said, "Recognizing that a wide variety of
4  situations may arise, we also want to reiterate our
5  offer to try to work through individual circumstances
6  that may be unclear to teachers. In these cases, the
7  best approach is for them to reach out directly and
8  share the specific facts and circumstances so that we
9  can provide them with clear guidance."
10      Are you aware of statements made by the
11 commissioner of education to educators that they should
12 contact the DOE if they have -- if they want to work
13 through individual circumstances that may be unclear to
14 teachers?
15 A.  May I see that document?
16 Q.  Sure.
17 A.  Thank you.
18      MR. BISSONETTE: We'll mark it.
19      (Exhibit 9 marked for identification.)
20      MR. BISSONETTE: When you're done reviewing
21 Exhibit 9, just let me know.
22      THE WITNESS: Okay. I will do that. Thank
23 you.
24      MR. KENISON-MARVIN: Object on 106,
25 completeness, with respect to this being -- it appears

---

103

1  to be a response to an email. Do you have the email
2  that this responds to that the witness can also review?
3       MR. BISSONETTE: I do not. I mean, I'm
4  looking at the bottom of Bates stamp 7231 and I don't
5  see a chain. It is a complete version of this
6  document. Had there been a chain, I would have,
7  obviously, included in the exhibit.
8  BY MR. BISSONETTE:
9  Q.  So my question, though --
10      MR. KENISON-MARVIN: Let me stop you there.
11      MR. BISSONETTE: Of course. Of course.
12      MR. KENISON-MARVIN: Do you know if you --
13 maybe we need to look through and see if there is a
14 chain with this.
15      MR. BISSONETTE: My question is just going to
16 be have you seen this document before?
17      MR. KENISON-MARVIN: Okay.
18 BY MR. BISSONETTE:
19 Q.  Have you seen this document before?
20 A.  So as it pertains to Exhibit 9, because Exhibit 9 is
21 made up of the email and then the frequently asked
22 questions, new discriminatory practice prohibitions
23 which was created by the Attorney General's office, I
24 have to bifurcate this.
25      To the best of my recollection, I have not seen

---

104

1  this email that is the start of Exhibit 9. However, I
2  am familiar with, and have reviewed, the Attorney
3  General's office frequently asked questions. I refer
4  to it as a technical advisory. I think I put that in
5  my slide, in fact.
6  Q.  So I think my question has to do with recognizing you
7  haven't seen this document, but I want to -- I'm trying
8  to understand what DOE policy is. So in this
9  particular document from the commissioner to AFT,
10 there's a statement that, "We also want to reiterate
11 our offer to try to work through individual
12 circumstances that may be unclear to teachers. In
13 these cases, the best approach is for them to reach out
14 directly and share the specific facts and circumstances
15 so that we can provide them with clear guidance."
16      Is that the policy of the Department of Education
17 currently?
18 A.  I'm not sure if that policy still stands. I think, as
19 a state agency, we are very open to having people
20 contact us on a general basis, yes.
21 Q.  But it sounds like, based on Exhibit 8, when at least
22 one superintendent has reached out to you, your
23 approach has been to refer them to the Human Rights
24 Commission, correct?
25 A.  I don't think that's a fair statement of Exhibit 8.

---

**105**

1 Q. How is it unfair?

2 A. Well, what I stated was that these issues, which fall

3 within the purview of HB 2, is handled by the Human

4 Rights Commission and the Attorney General's office.

5 The Department, meaning the Department of Education,

6 has not issued much information on that topic. And

7 then I said to perhaps reach out to the

8 superintendents' association to see if they have any

9 guidance.

10 Q. If an educator reached out to you with individual

11 circumstances that they thought was unclear, and they

12 reached out to try to obtain clear guidance from the

13 Department, would they currently get it?

14 MR. KENISON-MARVIN: Objection. Vague. You

15 can answer.

16 THE WITNESS: If they reached out to me

17 personally, I would refer them to another agency.

18 MR. BISSONETTE: Okay.

19 THE WITNESS: I believe HB 2 is very clear

20 that any matters falling within HB 2 are to be handled

21 by the Human Rights Commission, and it was the Attorney

22 General's office that put out this frequently asked

23 questions. If anything, I would refer that individual

24 to this document, meaning the frequently asked

25 questions created by the Attorney General's office.

**106**

1 What other people in the Department of Education would

2 do, I'm not in a position to testify to.

3 BY MR. BISSONETTE:

4 Q. Gotcha. And it looks like, in this instance, the

5 commissioner is saying that we'll provide guidance

6 based on the individual circumstances of your case if

7 you find it unclear, right?

8 A. Yes.

9 Q. I'm just going to -- I just want to be clear. Back on

10 Exhibit 9, just the attachment to Exhibit 9. This is

11 issued by both the HRC, the Department of Justice, and

12 the Department of Education, right?

13 A. Yes, that's what it says. But to be clear --

14 Q. Of course. Please.

15 A. -- I did not -- I was not an active participant in

16 creating this document. This document was created by,

17 obviously, the entities listed there, but my

18 understanding is that Attorney Chris Bond was perhaps

19 an active participant in this document. I want my

20 testimony to be clear. I was not. So I read it when

21 everybody else read it, when it was made public.

22 Q. We all want it to be clear. That's helpful. When you

23 say "the document," I just want to be clear, you mean

24 the attachment to Exhibit 9, Bates stamped 7232 to

25 7234? That's what you're referring to?

**107**

1 A. That is correct. And, as you've already noted, I was

2 not included on the email that is 07231.

3 MR. BISSONETTE: I'm going to mark for

4 Exhibit 10 -- this is to close the loop on Exhibit 8,

5 because I found it.

6 (Exhibit 10 marked for identification.)

7 BY MR. BISSONETTE:

8 Q. So once you've finished reviewing Exhibit 10, Attorney

9 Fenton, just let me know.

10 A. Yes.

11 Q. So I'm now potentially concerned that Exhibit 8 may be

12 a draft and not something that was actually sent, so I

13 want to just close the loop on this.

14 So just kind of comparing Exhibit 8 and Exhibit

15 10, it looks like Exhibit 10 is a reflection of what

16 you may have actually sent Superintendent Pierre

17 Couture. I want to just get your confirmation on that,

18 if you know.

19 A. So it does -- I believe Exhibit 10, Bates stamped

20 DOE807808 is clear on its face. It's an email that I

21 sent to Pierre Couture, superintendent of SAU 4, and I

22 referred him to the Attorney General's website and the

23 frequently asked question document that is part of

24 Exhibit 9. I think that's consistent with my prior

25 testimony that I would refer people to this document,

**108**

1 being the frequently asked questions from the Attorney

2 General's office.

3 Q. I agree. I just wanted to make sure because I noticed

4 that there was some -- a difference between Exhibit 8

5 and 10, so I was just trying to close the loop on it.

6 My understanding of the document -- I just want to

7 make sure that you agree with me -- is that the version

8 of this email that was sent by you to Mr. Couture is

9 the version in Exhibit 10.

10 A. I don't know what Exhibit 8 is. I don't know if that's

11 a -- it looks to be a draft, and I will tell you why I

12 think that --

13 Q. Please do. Please do.

14 A. -- if I may? Because, again, I'm not trying to hide

15 the ball on you.

16 When I look at this, starting after that last

17 hyphen there, "Maybe reach out to the superintendents'

18 association and see if they have any guidance, or the

19 school," I would assume what I meant was the school

20 boards association, and that's not completed. And,

21 typically, knowing my style, I usually say a thank you

22 or a -- what have you. So it would appear to be a

23 draft, Exhibit 8. I cannot testify with all certainty

24 that it is.

25 Q. That's helpful. I appreciate that. As soon as I saw

**109**

1  both versions, I realized we were -- may have been
2  operating and doing questioning on a draft. I kind of
3  panicked. So I think we figured it out there. Thank
4  you for your testimony on that. I appreciate it.
5      MR. BISSONETTE: I have one more set of
6  questions that'll just take a few minutes and we can
7  take a two-minute break.
8      MR. KENISON-MARVIN: Can I just note
9  something for the record?
10     MR. BISSONETTE: Yeah.
11     MR. KENISON-MARVIN: To the extent that
12 goes -- not understanding that it was a draft, we'd put
13 on the record now we reserve our right to call that
14 back. Based on the discussion there, it sounds like
15 that's probably the case and it was inadvertent.
16     MR. BISSONETTE: Understood.
17     THE WITNESS: And it's not Bates stamped.
18     MR. KAHNE: That's just a printing issue, I
19 think.
20     MR. BISSONETTE: Is it?
21     MR. KAHNE: If we have it, it should have
22 been Bates stamped, I believe.
23     MS. MILBURN: I can check.
24     MR. KAHNE: Yeah.
25     MR. BISSONETTE: Here we go. Sorry. You can

**110**

1  set that aside, Attorney Fenton. Thank you. The next
2  exhibit will be Exhibit 10 (sic).
3      (Discussion off record.)
4      (Exhibit 11 marked for identification.)
5  BY MR. BISSONETTE:
6  Q. I'm just going to have you review Exhibit 11. Just let
7  me know when you're done reviewing it. My question is
8  going to be -- without the need for you necessarily to
9  read it all -- you certainly can -- is have you seen
10 these documents before?
11 A. To the best of my knowledge, sitting here today, this
12 is the first time I've seen these documents, and they
13 are not addressed to me.
14 Q. Were you ever involved in any meetings with your fellow
15 Department of Education employees about potential
16 responses to these letters?
17 A. To the best of my knowledge, sitting here today, my
18 knowledge and recollection, no, I was not involved in
19 any such meetings --
20 Q. Okay.
21 A. -- as it pertained to these letters.
22     MR. BISSONETTE: Okay. So we're just going
23 to take just a two-minute break to use the restroom.
24 Does that sound good?
25     MR. KENISON-MARVIN: Yes.

**111**

1      (Recess taken.)
2  BY MR. BISSONETTE:
3  Q. Attorney Fenton, you're still under oath. Thank you.
4      I want to just direct your attention to Exhibit 1
5  again, which is the text of HB 2. I'm just going to
6  refer you to page six. It's lines 24 to 25.
7  A. Oh, the Bates stamp number?
8  Q. Yes, I'm sorry, yes. PL0006. Yes.
9  A. Yes.
10 Q. So the language I'm just going to read into the record
11 says, "No people in any public school in the state
12 shall be taught, instructed, inculcated or compelled to
13 express a belief in or support for any one or more of
14 the following."
15     My question is does the Department of Education
16 have any criteria or policies that define what it means
17 to "teach, instruct, inculcate, or compel to express a
18 belief in or support for"?
19 A. To the best of my knowledge, sitting here today, I do
20 not believe so, other than the frequently asked
21 questions document that is on the Attorney General's
22 website. I preface that because, as pointed out to me,
23 it does say -- if I may refer to it?
24 Q. Absolutely. And you're referring to the exhibit on --
25 the attachment to Exhibit 9?

**112**

1  A. Yes. So it is issued by the Department of Education,
2  Commission for Human Rights, and Department of Justice.
3  So to the extent that this document addresses that
4  portion of the statute, I will tell you I refer to this
5  document, the frequently asked questions. I refer to
6  it as an Attorney General document.
7  Q. So beyond the FAQ that's the attachment to Exhibit 9,
8  is there any other criteria that you're aware of that
9  the Department uses in determining what "teach,
10 instruct, inculcate, or compel to express a belief in"
11 means?
12 A. To the best of my knowledge, no.
13 Q. Okay. Does the Department have a position on whether
14 HB 2 can be violated if a student makes a comment in
15 teacher-facilitated group discussion?
16 A. Does the Department have a position on that?
17 Q. Yeah.
18 A. To the best of my knowledge, no.
19 Q. Does the Department have a position on whether that
20 provision I'm referring to, "taught, instructed
21 inculcate, or compel to express a belief in," that that
22 would include playing devil's advocate, including a
23 teacher presenting two sides of a controversial
24 subject?
25 A. I'm sorry, can you repeat the question?

113

1  Q.  Sure.  I'm really just trying to get at how the
2      Department construes that provision, "shall be taught,
3      instructed, inculcated, or compelled to express a
4      belief in," lines 24 to 25 on Exhibit 1, Bates stamped
5      006.
6          So does that language in -- does the Department
7      have a position on whether that language includes a
8      teacher playing devil's advocate, including presenting
9      two sides of a controversial subject?
10         MR. KENISON-MARVIN:  Objection.  You can
11     answer.
12         THE WITNESS:  To the best of my knowledge,
13     no, the Department does not have a position on that.
14 BY MR. BISSONETTE:
15 Q.  With respect to that same language on Bates stamp 06,
16     does the Department have a position as to whether it
17     includes assigning -- a teacher assigning to a student
18     a point of view to argue?
19 **A.  To the best of my knowledge, I'm not aware that the**
20     **Department has a position on that provision.**
21 Q.  Again, with respect to that same language on PL006,
22     does the Department have a position as to whether or
23     not that language includes a teacher assigning a book
24     for general discussion in class?
25         MR. KENISON-MARVIN:  Objection.  It's vague,

114

1      and it's calling for application of fact to law.
2          MR. BISSONETTE:  I'm just asking if they have
3      a position.
4          MR. KENISON-MARVIN:  Maintain the same
5      objection.  You can answer.
6          THE WITNESS:  To the best of my knowledge,
7      the Department does not have a position on that.
8          MR. BISSONETTE:  I'm going to close the loop
9      on Exhibit 1.  I have another exhibit.  I'm so sorry.
10     Are we on Exhibit 12?
11         THE REPORTER:  Yes.
12         MR. BISSONETTE:  Thank you.
13         (Exhibit 12 marked for identification.)
14 BY MR. BISSONETTE:
15 Q.  So, Attorney Fenton, please do take a look at Exhibit
16     12.  My question to you will be have you seen this
17     document before, after you've reviewed it.
18 **A.  Okay.**
19 Q.  So my question is just have you seen this document
20     before?
21 **A.  I have, yes.**
22 Q.  Okay.  Does this memo in any way govern the DOE's
23     enforcement of HB 2?
24         MR. KENISON-MARVIN:  Object as vague and
25     misstating prior testimony.

115

1          MR. BISSONETTE:  You know, I can ask a better
2      question, actually.
3  BY MR. BISSONETTE:
4  Q.  Does the DOE at all use the memo that's in Exhibit 12
5      with respect to how it enforces HB 2?
6          MR. KENISON-MARVIN:  Same objection.  You can
7      answer.
8          THE WITNESS:  I can only answer that I have
9      not utilized this document.  In fact, I was not aware
10     of it until very recently, so I have not used it.  How
11     the Department uses it, I'm not in a position to
12     testify on behalf of the Department as a whole.
13         (Exhibit 13 marked for identification.)
14 BY MR. BISSONETTE:
15 Q.  Attorney Fenton, I've just put before you what's been
16     marked as Exhibit 13.  You are not on this document,
17     but I wanted to put it before you to ask the question
18     are you aware of a meeting between the Department of
19     Education and the Human Rights Commission that occurred
20     after the issuance of the memo that's at Exhibit 12?
21 **A.  I do not recall this meeting exactly, no.**
22         MR. BISSONETTE:  Okay.  We're going to plow
23     through some documents, hopefully efficiently.  The
24     next exhibit is going to be Exhibit --
25         THE REPORTER:  14.

116

1          (Exhibit 14 marked for identification.)
2  BY MR. BISSONETTE:
3  Q.  Again, I'm not going to ask you to view every page
4      because we would be here until tomorrow, Attorney
5      Fenton.  I'm just going to just ask for a particular
6      focus on Bates stamped PL682 and 683.  Obviously, you
7      can read the whole thing, but my only question is going
8      to be, you know, have you seen this op-ed before?
9  **A.  Is there a date on that op-ed?**
10 Q.  I can represent that it is April 2022, but I'm --
11         MR. KAHNE:  15.
12         MR. BISSONETTE:  Oh, there it is, Attorney
13     Fenton.  It's on page two, right below, "In the news.
14     For immediate release, April 15, 2022."
15         THE WITNESS:  Okay.  Thank you.
16         MR. BISSONETTE:  Of course.
17         THE WITNESS:  Do you have the document that
18     it's referencing?
19         MR. BISSONETTE:  I do, in fact.  Those are
20     the attachments.
21         THE WITNESS:  Those are the attachments.
22     Okay.
23         MR. BISSONETTE:  Yes, yes.  And, again, I'm
24     not entirely sure if I'll go through them.  I'm not
25     asking you to review them right now, just those two

**117**

1   pages.
2      THE WITNESS: I understand.
3      MR. BISSONETTE: Okay.
4   BY MR. BISSONETTE:
5   Q. Have you seen this op-ed before, those two pages, PL682
6   to 683?
7   **A. I was aware of this op-ed. I think this is the first**
8   **time I've read it in its entirety, but I was aware of**
9   **the general premise of it, if you will.**
10   Q. So it's fair to say you didn't read any drafts of this
11   before it was published?
12   **A. To the best of my knowledge, I did not read any drafts**
13   **of this op-ed before it was published, no.**
14   Q. Before this op-ed was published, did you have --
15   actually, strike that.
16      I am now just going to just refer on page 682, the
17   line that says, "This document.PDF exemplifies actual
18   instruction material from New Hampshire schools that
19   parents have identified as conflicting with their
20   values."
21      Have you seen -- you may need to go page by page,
22   but have you seen these topics before that were
23   attached to this press release?
24      MR. KENISON-MARVIN: I'll object as vague.
25   If you want to go through them one by one just so it's

**118**

1   clear what you're asking?
2      MR. BISSONETTE: Why don't we -- why don't I
3   withdraw that question and do it more individually. I
4   think that's fair.
5   BY MR. BISSONETTE:
6   Q. I wanted to close -- before I get into some individual
7   complaints, I wanted to close the loop on two questions
8   on some of the prior exhibits, so I'm going to refer
9   you to Exhibit 3. And my question is hopefully a
10   simple one. I'm trying to differentiate this
11   presentation on Exhibit 3 from the presentation on
12   Exhibit 7. And so my question is with respect to
13   Exhibit 3, who the audience was for that
14   presentation?
15   **A. To the best of my recollection, Exhibit 3 was a**
16   **presentation that was given to superintendents or**
17   **administrators.**
18   Q. Gotcha. And with respect to -- how would that audience
19   be different from the presentation that's attached to
20   Exhibit 7?
21   **A. The presentation contained in Exhibit 3 -- give Nate a**
22   **minute to catch up here. We're leaving him in the**
23   **dust. Slow it down.**
24      THE WITNESS: Are we good?
25      MR. KENISON-MARVIN: Thank you. Go for it.

**119**

1      THE WITNESS: The presentation that's
2   contained within Exhibit 3 -- give me a minute while I
3   just quickly review it -- does not appear to go through
4   the particular provisions of the code of conduct as it
5   does in Exhibit 7, and Exhibit 7 is the code of conduct
6   for educators.
7      Exhibit 7 really sets out what those
8   particular provisions are, what they entail, what the
9   expectation for individual credentialed educators is,
10   whereas in Exhibit 3, it's really focusing more on the
11   Department of Education's relationship with
12   superintendents and how when we -- when we look at
13   instances of educator misconduct, they have to be
14   worked on as a partnership between the Department of
15   Education and the individual districts.
16   BY MR. BISSONETTE:
17   Q. That's helpful. I'm just -- one of these slides,
18   5665 on Exhibit 3, there's a reference that the
19   Department does not adjudicate these matters. It's
20   under HB 2. And then there's a question, "So why the
21   website?"
22      And I'm just kind of curious in this presentation
23   what you verbally told the superintendents as to why a
24   website was necessary?
25   **A. To the best of my recollection, sitting here today,**

**120**

1   **your question is what I told the superintendents?**
2   Q. During this presentation, yes.
3   **A. Understood.**
4   Q. Yes, yeah.
5   **A. To the best of my recollection, what I told the**
6   **superintendents, or other administrators who were in**
7   **the audience, was the website was there to facilitate**
8   **the transfer of these issues, which may or may not fall**
9   **within the purview of House Bill 2, to the HRC for**
10   **determination. It goes to assist parents, largely, but**
11   **other citizens as well, not just parents.**
12   Q. Do school -- strike that.
13      Do school districts have an obligation to conduct
14   their own investigations under the code of conduct?
15   How does that work?
16      I guess my question is how does that work when a
17   school district conducts its own investigation? Are
18   there requirements?
19      Now that I've given you three questions at once,
20   I'm going to withdraw all of them and just ask a very
21   clear question --
22   **A. Do you want to break that down for me?**
23   Q. -- which is does the code of conduct require school
24   districts to conduct their own investigations as to
25   potential violations?

121

1  A.  To the best of my understanding of the code of conduct,
2     it does not.
3  Q.  Okay.  So what's the scenario to which a school
4     district would be conducting an investigation under the
5     code of conduct?
6         MR. KENISON-MARVIN: Objection.  Vague.  You
7     can answer.
8         THE WITNESS: Recognizing that all cases are
9     different and unique based upon the individual facts,
10    typically, a school district would undertake an
11    investigation, whether that's done by an administrator
12    in-house or they hire a private firm to do that
13    investigation.  They would do that because, presumably,
14    a code of conduct -- a violation of the code of conduct
15    would also be an employment matter, so the district
16    would undertake it for employment purposes.
17    BY MR. BISSONETTE:
18 Q.  Gotcha.  Do school districts themselves have an
19    obligation to conduct investigations under HB 2?
20        MR. KENISON-MARVIN: Objection.  Vague.
21    Calls for legal opinion.  You can answer.
22        THE WITNESS: Can you reread the question?
23        (Court reporter read back question.)
24        THE WITNESS: I am not aware of any such
25    obligation.

122

1  BY MR. BISSONETTE:
2  Q.  Have there been any discussions within the Department
3     of Education that you're aware of about whether Ibram
4     Kendi's How to Be an Antiracist violates HB 2?  To not
5     hide the ball, I only ask because it's in Exhibit 4
6     which is Commissioner Edelblut's op-ed.
7  A.  Exhibit 4.
8         MR. KENISON-MARVIN: Same issue we had
9     earlier.  I'll -- I'm fine with a yes or no answer
10    there, and to the extent further information would be
11    privileged under deliberative, I instruct the witness
12    not to provide that information in response to this
13    question.
14        THE WITNESS: Can you restate the question?
15        (Discussion off record.)
16        (Court reporter read back question.)
17        THE WITNESS: I'm not aware of any such
18    discussions.
19    BY MR. BISSONETTE:
20 Q.  Have you ever read that book?
21 A.  I have not.
22 Q.  Have you read any portion of it?
23 A.  I don't think so.
24        MR. BISSONETTE: Thank you.  We're going to
25    mark another exhibit.

123

1         (Exhibit 15 marked for identification.)
2  BY MR. BISSONETTE:
3  Q.  I'll just ask you to review it and just let me know
4     when you're done.
5         MR. BISSONETTE: And also, while the witness
6     is reviewing, for the record, I know that there are
7     attachments.  I do not have them.  I'm not entirely
8     sure why.  Maybe they didn't follow sequentially in the
9     Bates stamp, or maybe I missed it, but, I just want to
10    make sure the witness and everyone knows that the
11    attachments are not affixed to the exhibit that is
12    being reviewed.
13    BY MR. BISSONETTE:
14 Q.  Have you seen Exhibit 15 before?
15 A.  I have, yes.
16 Q.  Okay.  What is Exhibit 15?
17 A.  Exhibit 15 is an email from Commissioner Edelblut to
18    myself, cc'd to Richard Farrell and Christopher Bond.
19    It's in regards to an issue from SAU 29, which is in
20    Cheshire County.  And the email below is from a
21    gentleman by the name of ███████ to Frank Edelblut
22    as a concerned parent.
23 Q.  And I see that this email was forwarded to you with a
24    message.  What did you do when you received this email
25    in response to Mr. ████ s (sic), for lack of a better

124

1     word, complaint?
2         MR. KENISON-MARVIN: I'd just instruct the
3     witness to the extent the question is calling for
4     predecisional processes, discussions about what to do,
5     that we would assert deliberative process privileges to
6     that, discussions with any counsel within the DOE or
7     AG's office, and assert attorney/client privilege as to
8     that information.  So --
9         MR. BISSONETTE: I hear you on that.  Can I
10    just rephrase the question?  That's fair.
11    BY MR. BISSONETTE:
12 Q.  Did -- was there an investigation in response to this,
13    this complaint from Mr. ████ (sic)?
14 A.  So I will begin by saying the first part of the email
15    was brought for Chris Bond's attention.  The second
16    part of the email was for my review and Rich Farrell's
17    review.  And I believe that referred to the student
18    threatening to shoot up the school.
19       Are you referring to an investigation pursuant to
20    the code of conduct?
21 Q.  Yes.  Let me just direct your attention to the bottom
22    of page 9586 where there's a complaint with respect to
23    a film called White Like Me by Tim Rise (sic).  And
24    then the email goes on to say, "This film emphasizes
25    white privilege and equates conservatism with white

Transcript of Diana Fenton
Conducted on May 17, 2023

---

125

1  supremacy. The film should not be shown at all as it
2  is clearly CRT and in direct violation of New Hampshire
3  Bill HB 2, Sections 297 and 298, right to freedom from
4  discrimination and workplaces in education."
5      So my question is what, if anything, after you
6  received this email, did you do in response to that
7  specific complaint?
8          MR. KENISON-MARVIN: Same objections under
9  the deliberative process and attorney/client
10 privileges. I'll instruct you not to answer to the
11 extent you had conversations with other folks within
12 the Department about what to do in response to this
13 prior to making a decision about what would be done in
14 response to -- what, if anything, would be done in
15 response to receiving this email from this individual.
16         THE WITNESS: To the best of my recollection,
17 based on my interpretation of the email, that portion
18 that you referenced, the film emphasizing white
19 privilege, was directed to Chris Bond.
20         MR. BISSONETTE: Okay.
21         THE WITNESS: To the best of my knowledge.
22 To the best of my recollection, sitting here today, I
23 do not recall taking any action as it pertained to
24 anything dedicated to the film, any reference to the
25 film.

---

126

1          BY MR. BISSONETTE:
2  Q.   That's helpful. Do you know if anyone else in the
3       Department took action with respect to the film White
4       Like Me?
5  A.   Since Commissioner Edelblut said the first part of this
6       email, which I interpret to be reference to the film,
7       is for Chris, I can't speak for Attorney Bond, what
8       action he did or did not take as it pertains to any
9       reference to that film.
10 Q.   Without getting into the substance, were you involved
11      in any internal meetings concerning the film White Like
12      Me by Tim Wise, which that was discussed?
13 A.   To the best of my recollection, sitting here today, no,
14      I was not.
15 Q.   Okay. We'll just set that aside.
16         (Exhibit 16 marked for identification.)
17      BY MR. BISSONETTE:
18 Q.   I'd just ask you to take a look at Exhibit 16. Just
19      let me know when you're done, please.
20         MR. BISSONETTE: In the interest of
21      completeness, I'm going to couple this with another
22      related exhibit, if you don't mind.
23         (Exhibit 17 marked for identification.)
24      BY MR. BISSONETTE:
25 Q.   You are not on that second email, but I have a question

---

127

1  about it and I don't want to hide the ball. So just --
2  I'm sorry. You're still reading, Attorney Fenton.
3      I'm sorry. I think I just kicked you. I'm sorry.
4  My apologies.
5  A.   You're fine. I probably deserve to be kicked at some
6       point.
7  Q.   I don't know how that that'll come out in the
8       transcript.
9  A.   Hopefully, it was amusing for all our Zoom viewers
10      here. Okay.
11 Q.   Thank you. So with respect to -- what is Exhibit 16?
12 A.   Exhibit 16 is an email to me from Commissioner
13      Edelblut. Wait, no. I'm sorry. Okay. The top of
14      it -- all right. The top of it is from me to
15      Commissioner Edelblut and Richard Farrell, the
16      investigator, and cc'd to the deputy commissioner in
17      response to the email that Commissioner Edelblut had
18      sent to myself and Richard Farrell and the deputy.
19         In that email he says, "I think we need to look
20      into this. The events happened prior to the
21      anti-discrimination law, but, if true, certainly would
22      be considered unprofessional."
23         And then below that is an email from ▮▮▮▮▮
24      ▮▮▮▮▮ to a long string of people that I will just
25      let the exhibit speak for itself on that.

---

128

1  Q.   Sure.
2  A.   And it contains a forwarded message that was sent to
3       Superintendent Corey from a concerned Hollis parent. I
4       can only assume Superintendent Corey is the
5       superintendent of Hollis school district. I don't know
6       off the top of my head.
7  Q.   Thank you. So my -- I take it you've seen Exhibit 16
8       before?
9  A.   I have, yes. And I believe I testified to that, yes.
10 Q.   Thank you. Sorry if I made you repeat that.
11      Just with respect to your -- your email to
12      Commissioner Edelblut, "Thank you. We will look into
13      it."
14      My question is did you look into it?
15 A.   I would like to think if I told my boss I would do
16      something, that I did it. To the best of my
17      recollection, I did.
18 Q.   Do you recall what you did in response to this email
19      from the commissioner on September 3rd, 2021?
20         MR. KENISON-MARVIN: Same objection.
21      Deliberative process privilege. I'd instruct you not
22      to answer to the extent it's calling for discussions
23      you had prior to making any decision about what to do
24      in looking -- "looking into" the process by anything --
25      discussions you had related to what you would do. I

---

Transcript of Diana Fenton
Conducted on May 17, 2023

---

**129**

1  instruct you not to provide that in responding to this
2  question.
3          Same with attorney/client privilege.  So to
4  the extent you spoke with attorneys to seek legal
5  advice about what to do, same instruction.
6          THE WITNESS:  I don't recall the exact steps
7  that were taken in this particular instance.  In
8  general, if you would like me to --
9          MR. BISSONETTE:  Absolutely.
10         THE WITNESS:  -- set that out?
11         MR. BISSONETTE:  Please do.
12         THE WITNESS:  And, again, this is to the best
13 of my recollection without being able to say exactly
14 what steps I took as it pertains to this exact matter.
15 My typical process would be to have Richard Farrell
16 call the superintendent and find out more information
17 about the underlying issue.  In this instance, it looks
18 like the time frame might have been an issue.
19 BY MR. BISSONETTE:
20 Q.  Do you recall ever having conversations with
21 Ms. ▓▓▓ about the email she sent on September
22 3rd?
23 A.  **To the best of my recollection, as I sit here today, I**
24 **do not recall having any such conversations with**
25 **Ms. ▓▓▓.**

---

**130**

1  Q.  With respect to that process that you generally
2  articulated, recognizing that you don't remember the
3  specifics of this particular, again, complaint, for
4  lack of a better term, that would occur before -- would
5  that come before any, like, case is formally opened
6  under the Educator Code of Conduct?
7  A.  **This matter -- and I'm going to speak in somewhat**
8  **general terms.  This would not rise to the level of a**
9  **code of conduct issue.**
10 Q.  But before that determination is made, there would
11 still be outreach to the superintendent, potentially to
12 the complainant, generally, right?
13 A.  **I think that's a fair statement, yes.**
14 Q.  I'm just going to refer you to the first page of
15 Exhibit 17.  Recognizing that you are not on this
16 email, but Commissioner Edelblut responds to
17 Ms. ▓▓▓ by saying, "If I open an inquiry on the
18 referenced educators, would this woman be willing to
19 provide testimony to our investigator?"
20         Can the commissioner unilaterally open an inquiry
21 on educators under the code of conduct?
22 A.  **This is the first I'm seeing of this email.  I'm --**
23 Q.  I'm sorry, go on.  I interrupted you.
24 A.  **I'm not aware that there was any inquiry opened as it**
25 **pertains to this issue that was brought to the**

---

**131**

1          **attention of the Department of Education.**
2  Q.  Generally, though, I guess my question is outside the
3  context of this specific complaint that Ms. ▓▓▓
4  lodged, does the commissioner have the ability to
5  unilaterally open an inquiry on an educator?
6          MR. KENISON-MARVIN:  Objection to the extent
7  it calls for a legal conclusion.
8          THE WITNESS:  In general, again, recognizing
9  that all cases are fact dependent, no.
10 BY MR. BISSONETTE:
11 Q.  And why is that?
12         MR. KENISON-MARVIN:  Same objection.
13         THE WITNESS:  When the Department places an
14 individual under investigation -- and by "individual,"
15 I mean a licensed credential holder -- those letters go
16 out with the deputy commissioner's signature on them.
17 They're not approved by the commissioner.  They are
18 created by myself and Richard Farrell, and signed by
19 their deputy.
20         I think that's not directly answering your
21 question.  You asked for an inquiry.  I answered about
22 the investigation, which are two separate things.
23 Q.  Got you.  So pivoting now.
24 A.  Sure.
25 Q.  You spoke about investigation.  That's helpful.

---

**132**

1  A.  Sure.
2  Q.  And I think a distinction seems meaningful under the
3  code.
4          So with respect to -- I want to ask the same
5  question, but with respect to -- strike that.
6          I want to make sure I understand your testimony.
7          So going back to the code of conduct on Exhibit 2,
8  page 18, 511.01 (B).  Is the process that you were just
9  referring to subsection B?
10 A.  Yes.
11 Q.  Okay.  So your testimony is the commissioner doesn't
12 have the ability to unilaterally open an investigation
13 under 511.01 (B), correct?
14 A.  **I am not aware of any instance in which the**
15 **commissioner has initiated that process.  He might --**
16 **let me clarify.  He might express to me that he wants**
17 **me to look into it or flush it out, perhaps, but the**
18 **formal process of placing an educator under**
19 **investigation pursuant to Ed 511.01 (B), that process,**
20 **the mechanics of it, do not involve the commissioner.**
21 **He doesn't create the letter.  He doesn't approve the**
22 **letter.  He might know it's going out, but, in large**
23 **part, he's not a direct participant in that process, if**
24 **that helps.**
25 Q.  That does.  Is that process with respect to the

**133**

1 mechanics of how an investigation shall be opened, is
2 that memorialized in a formal policy, procedure,
3 anywhere within your Department?
4 **A. That process and procedure might be in draft form. I**
5 **don't think there's a formal document. But that is the**
6 **process that has been established when — not**
7 **necessarily when Commissioner Edelblut started, but,**
8 **more importantly, when the deputy commissioner started,**
9 **because she has that direct oversight in those**
10 **matters.**
11 Q. Now, it seems like the commissioner doesn't have a lot
12 of involvement in the mechanics of opening the
13 investigation, but does he have unilateral authority to
14 commence the investigation? They're sort of different
15 kind of things. So is that a distinction that's
16 meaningful to you in your practice?
17      MR. KENISON-MARVIN: Objection. Compound.
18      THE WITNESS: There are questions on the
19 table right now, too.
20      MR. BISSONETTE: Do you want to give that
21 back? And I'll separate my two bad questions into
22 maybe one good one.
23      (Court reporter read back question.)
24 BY MR. BISSONETTE:
25 Q. So does the commissioner have the unilateral ability to

**134**

1 decide under 511.01 (B) that an investigation shall be
2 opened? The decision is what I'm referring to.
3      MR. KENISON-MARVIN: Objection. Legal
4 conclusion. You can answer.
5      THE WITNESS: Does he have the authority? I
6 suppose an argument could be made that he does, based
7 on how the rules are written. I can tell you, as a
8 matter of practice, I am not familiar with an instance
9 where he has initiated an investigation. He might tell
10 me, as he did in that email, "Please review it. Take a
11 look at it," but as I've previously testified, the
12 mechanics of that don't involve him.
13 BY MR. BISSONETTE:
14 Q. Gotcha. Just referring to 511.01 (A) on Exhibit 2 --
15 **A. Yes.**
16 Q. -- can the commissioner unilaterally open a case?
17      MR. KENISON-MARVIN: Same objection.
18      THE WITNESS: That would not be my
19 interpretation of that particular rule.
20 BY MR. BISSONETTE:
21 Q. I'm just curious why you don't read it that way?
22      MR. KENISON-MARVIN: Same objection.
23      THE WITNESS: If we take Exhibit 16, for
24 example, it's not uncommon for the commissioner to
25 refer matters, or issues, or information that he has

**135**

1 received in his capacity to myself and Richard Farrell,
2 and we will then address it as we deem appropriate.
3      We will reach out to the superintendent or
4 the complainant and determine -- and then I think we
5 fall within the purview of 511.01 (A) where we take
6 down that information and go through our process, which
7 I've previously testified to. Some of the things we
8 consider are whether or not the individual is a
9 certified educator. If it is, in fact, an issue that's
10 enumerated in the code of conduct, things of that
11 matter. Frank is, in large part, not an active
12 participant in that process. He might refer a matter
13 to me, as I mentioned, as highlighted in Exhibit 16,
14 and then Rich and I review it, and the process moves
15 from there.
16 BY MR. BISSONETTE:
17 Q. That's helpful. What I'm really trying to do, not to
18 hide the ball, is mirror Exhibit 16 in just how this,
19 in real life, kind of falls within the Educator Code of
20 Conduct.
21      So I guess my question is assuming you looked into
22 it with respect to Exhibit 16, where would that have
23 fallen as to where the DOC was in its process?
24 **A. The --**
25 Q. The DOE in its process under 511.01.

**136**

1 **A. Again, without being able to recollect the exact steps**
2 **taken as it pertains to Exhibit 16, I believe that it**
3 would fall within Ed 511.01 (A), and it would not -- it
4 would not have fallen within 511.01 (B). It would not
5 have risen to a code of conduct. And to the extent
6 that actions are deemed unprofessional, as is stated in
7 Commissioner Edelblut's email, those, in large part,
8 are employment matters. They're not code of conduct
9 issues.
10 Q. Gotcha. That's helpful. I don't do this work every
11 day, so trying to relate these principles to what's
12 happening, that's helpful for me.
13 **A. If it — if I may?**
14 Q. Yes, please. Of course. Absolutely.
15 **A. The code of conduct is narrowly tailored, and it, in**
16 **large part, addresses actions in which children are**
17 **being physically harmed. There are some other things**
18 **in there about falsifying professional qualifications,**
19 **things of that nature. But I have stated on many**
20 **occasions that the code of conduct should be narrowly**
21 **construed, and it was written by the stakeholder group**
22 **to be narrowly tailored to address those issues I just**
23 **related.**
24 Q. That's helpful. I was involved tangentially in the
25 Concord school district case, so I have some connection

Transcript of Diana Fenton
Conducted on May 17, 2023

---

137

1  to what you just said.
2  **A.  I'm sorry to hear that.**
3  Q.  Well, it was as an advocate, not in a personal
4  capacity.
5      The next exhibit here is going to be 18.
6      (Exhibit 18 marked for identification.)
7      THE WITNESS:  And I do have a time by which I
8  have to leave.
9      MR. BISSONETTE:  What would that be?
10     THE WITNESS:  4:00.  I could push it to 4:30.
11     MR. BISSONETTE:  We did not expect that.  I
12  think we expected to going to 5:00 at this rate.
13     Off the record.
14     (Recess taken.)
15  BY MR. BISSONETTE:
16  Q.  Exhibit 18, Attorney Fenton, after you've had an
17  opportunity to review it, I'm just going to ask whether
18  you've seen this document before.
19  **A.  Okay.**
20  Q.  Thank you.  I'm going to just quickly go to page 10287,
21  which is page two of the document.  And there's an
22  email from you to Mr. Farrell that says, "Can you look
23  into this?"
24     Do you see that email?
25  **A.  Mm-hm.**

---

138

1  Q.  What were you asking Mr. Farrell to look into?
2  **A.  Just to -- well, let me preface.  I am familiar with**
3  **this document.  I do not recall all the exact details,**
4  **but my expectation in saying that to Richard Farrell**
5  **would be to better understand what this matter entails.**
6  **This apparently was brought to us by a citizen, perhaps**
7  **a parent, and sent to -- looks like it was sent to**
8  **Commissioner Edelblut.**
9      **And my expectation in saying to Rich Farrell, "Can**
10  **you look into this," would be that he would reach out**
11  **to the superintendent and get more information as it**
12  **pertains to what was brought to our attention.**
13  Q.  Had you made a determination when you asked Mr. Farrell
14  to do this that there may have been a violation under
15  the code of conduct?
16  **A.  No.**
17  Q.  Okay.  So you made this request -- strike that.
18     Was this a -- do you have any understanding at the
19  time you wrote the email, "Can you look into this,"
20  that this was a complaint under HB 2?
21  **A.  I do not recall if I -- if that was my understanding of**
22  **it.**
23  Q.  Okay.  Do you know whether or not this complainant,
24  Ms. ▮▮▮▮, has filed separately a Human Rights
25  Commission complaint?

---

139

1      It's okay if you don't know.  I'm just asking if
2  you have any understanding whether or not she's done
3  anything with the HRC.
4  **A.  What Ms. ▮▮▮▮ might or might not have done with the**
5  **Human Rights Commission, I am not aware of.**
6  Q.  Is there a criteria that you use when you decide to ask
7  Mr. Farrell to look into something?
8      MR. KENISON-MARVIN:  Objection.  Vague.
9      THE WITNESS:  I can answer in general
10  terms --
11     MR. BISSONETTE:  Sure.
12     THE WITNESS:  -- not necessarily as it
13  relates to what's identified in Exhibit 18.
14     Generally, in these instances, we get
15  information from a concerned citizen or a parent, and I
16  ask Rich to reach out to the superintendent so that we
17  can get some additional information so that we can
18  determine what the next steps may or may not be.
19  BY MR. BISSONETTE:
20  Q.  Gotcha.  That's helpful.  Do you recall if Mr. Farrell
21  did reach out to the superintendent in this instance?
22  **A.  Based upon Exhibit 18, it looks that he did.  Scott**
23  **Laliberte who is, if the superintendent or**
24  **Londonderry, or was at the time.**
25  Q.  And then kind of back on page one of Exhibit 18, Bates

---

140

1  stamped 10286, Mr. Farrell writes to the commissioner,
2  you, and two other DOE employees, "Please review the
3  responses from Londonderry."
4      Did you review those responses from Londonderry?
5  **A.  To the best of my recollection, sitting here today, I**
6  **believe that I did.**
7  Q.  Okay.  Was this discussed in any meeting?  Strike that.
8      Looking at the email from Commissioner Edelblut to
9  Mr. Farrell to you and two other DOE employees, there's
10  a statement, "Can we discuss in our next meeting?"
11     Was there a discussion at a meeting about this
12  Londonderry complaint?
13  **A.  Sitting here today, I don't recall if there was a**
14  **meeting as it pertained to this particular instance.**
15  **Based on the email, I would assume there was, or it**
16  **more likely than not was an issue that Commissioner**
17  **Edelblut discussed with Attorney Christopher Bond.**
18  Q.  The last -- the first portion, Mr. Farrell to you, "You
19  should review the text messages," did you review the
20  text messages?
21  **A.  I'm -- can we clarify what the text messages -- is that**
22  **what's attached to this document?**
23  Q.  I can't clarify.  I think these attachments are what I
24  believe followed the email as it was produced, so...
25  **A.  If the premise is -- if the text messages are the**

---

141

1    images that are attached to Exhibit 18, then -- and
2    there are only two images -- the third page is cut
3    off -- then, yes, based on my recollection, I believe
4    that I did review those, yes.
5  Q.  And, again, do you recall any discussion that you were
6    involved in about those attachments?
7  A.  I do not recall any particular meeting or exact
8    discussion --
9  Q.  Okay.
10 A.  -- as it would pertain to those exact attachments.
11 Q.  To close the loop on this, and then I am done, I just
12   want to have you pull up exhibit -- I think it's 14.
13   It's the big stack of documents.  I'm going to refer
14   you to -- if you could just look at 696 to 700?  And
15   when you're done reviewing those, I'll have two other
16   pages.
17 A.  Okay.
18 Q.  Do you recognize the pages 697 to 700?
19 A.  I do not recall them sitting here today.  I do not
20   recall them.  I would imagine that I saw them at some
21   point, but I don't recall seeing this exact document,
22   no.
23 Q.  Do you know whether or not these are documents that
24   would be associated with the email that's referenced in
25   Exhibit 18?

142

1  A.  I would not have any knowledge of that, no.
2  Q.  So now I'm just going to turn your attention to 736 and
3    737.
4  A.  Okay.
5  Q.  I just want to make sure that we're on the same page,
6    that those are --
7  A.  These -- these two documents, yes.  736 and 737 --
8  Q.  Are the same documents attached --
9  A.  -- are the -- appear to be the documents that were
10   attached to Exhibit 18.
11 Q.  Okay.
12 A.  However, there's been -- it's been redacted in Exhibit
13   14.
14 Q.  Do you know how the Department ultimately responded to
15   this complaint on April 7th?
16 A.  To the best of my knowledge, sitting here today, this
17   matter would not have prompted an investigation to have
18   been opened, nor would it have been a violation of the
19   code of conduct as set out in exhibit -- what's the
20   exhibit?
21       MR. KAHNE: 2.
22       MR. BISSONETTE: 2.
23       THE WITNESS: Oh, thank you.  Exhibit 2.
24 BY MR. BISSONETTE:
25 Q.  When you say -- sorry, go on.  I was about to cut you

143

1    off.  So you don't recall anything being done?
2  A.  Done in terms of --
3  Q.  Enforcement.
4  A.  Enforcement under the code of conduct?  No, I do not.
5  Q.  You said that you didn't view it as necessarily
6    violating the code of conduct.  Did you have a view at
7    the time as to whether or not it violated HB 2?
8  A.  It was --
9  Q.  I'm sorry?
10 A.  -- not my decision to make.  Those matters pursuant to
11   the law are to be referred to the Human Rights
12   Commission for determination.
13 Q.  So when you say "code of conduct," I just want to make
14   sure what you were referencing was the code of conduct
15   in Exhibit 2, but you were excluding the provisions of
16   HB 2?
17 A.  Yes.
18       MR. BISSONETTE: Okay.  Thank you.
19             EXAMINATION
20 BY MR. KAHNE:
21 Q.  Attorney Fenton, my name is David Kahne.  I represent
22   the American Federation of Teachers in this action, and
23   I'm going to ask you a few questions, some follow-up
24   questions.  Same rules apply as for -- what we went
25   over from the beginning.  And I'll try to be as

144

1    efficient as possible because I understand that you
2    have some time constraints.
3        Why don't we stay on Exhibit 18?  If you look at
4    the bottom, the last email on the bottom of what's been
5    marked DOE10286, there's an email from Scott Laliberte,
6    who presumably is the superintendent of Londonberry
7    (sic), to Richard Farrell.  The last sentence -- or,
8    sorry, I should say the second to last sentence says,
9    "We have also reviewed this material through the lens
10   of the new divisive concepts law and find that the
11   subject of these activities do not apply."
12       Do you see that?
13 A.  I do.
14 Q.  My first question for you, Attorney Fenton, is why
15   wasn't this complaint referred to the HRC?
16 A.  I'm not sure if it wasn't referred to the HRC.
17   However, notwithstanding this instance, my
18   understanding is that the Department of Education is
19   not in a position to refer matters which may or may not
20   fall within House Bill 2 to the Human Rights Commission
21   for consideration.  That's what I have been told on
22   another matter.
23 Q.  So let's break that down.  Do you have knowledge of
24   Commissioner Edelblut ever forwarding complaints that
25   he receives to Commissioner Malachai?

**145**

1  A.  I am not here to testify on behalf of Commissioner
2      Edelblut.  He might have.  He might not have.  I don't
3      have any personal information as it pertains to that.
4  Q.  You don't -- do you know personally whether any
5      complaints have been received by the DOE and
6      transferred or referred to the HRC?
7  A.  I do not have personal information as it pertains to
8      referring cases to the Human Rights Commission.  I can
9      speak from my own personal experience in a case that I
10     referenced earlier during my testimony where I, through
11     the Department of Education, tried to refer a case to
12     the Human Rights Commission and was told that they
13     could not take that as a referral.
14 Q.  And I believe we've seen documents today, have we not,
15     where you instruct individuals to file a complaint with
16     the HRC, that that is the appropriate venue for those
17     complaints, right?
18         MR. KENISON-MARVIN:  Objection.  Compound.
19     BY MR. KAHNE:
20 Q.  Is that a fair characterization of documents that we've
21     seen?
22 A.  Could you specify which document?
23 Q.  Exhibit 10.  So in Exhibit 10, you refer Pierre Couture
24     to the Human Rights Commission.  You say that because
25     divisive concepts is handled by the Human Rights

**146**

1      Commission and the AG's office.  Do you see that?
2  A.  I do.
3  Q.  Okay.  So my question is, in the case of Londonberry,
4      why wasn't the superintendent of Londonberry referred
5      to the HRC?
6  A.  Well, getting back to Exhibit 10, I'm not necessarily
7      referring Pierre Couture to the Human Rights
8      Commission.  I'm just informing him that this issue is
9      handled by the Human Rights Commission and the Attorney
10     General's office.  Therefore, the Department has not
11     issued much information on this topic, and so then I
12     referred him to the Attorney General's website where
13     they had that FAQ.  I don't read this email in Exhibit
14     10 as me referring him to the Human Rights
15     Commission.
16 Q.  Okay.  I'm not talking about a formal referral.  I'm
17     just talking about telling an individual, who has a
18     complaint, that the proper place to bring a complaint
19     is with the Human Rights Commission.
20 A.  And going back to Exhibit 18, that conversation could
21     have occurred.  I am not -- I do not have any personal
22     information, as I'm sitting here today, to say whether
23     or not that was done or not.
24 Q.  Has the commissioner of education ever asked you to
25     investigate potential violations of HB 2?

**147**

1  A.  The law is clear that the Department of Education does
2      not adjudicate matters that may or may not fall within
3      HB 2.
4  Q.  I understand your testimony.  My question, though, is
5      has the commissioner of education ever asked you to
6      investigate potential violations of HB 2?
7          MR. KENISON-MARVIN:  I'll instruct the
8      witness with respect to any information the
9      commissioner sought from you that would have been a
10     privileged attorney/client communication where he's
11     seeking advice from you about whether or not to do
12     that, to not -- that that information is privileged and
13     to not provide it in response to that question.
14         THE WITNESS:  So I don't feel I can answer
15     that question without violating a potential privilege.
16     BY MR. KAHNE:
17 Q.  What privilege are you violating?
18 A.  Possible attorney/client.
19 Q.  Is the commissioner consulting you in your capacity as
20     his attorney?
21 A.  Generally, his attorney was Christopher Bond, and
22     Christopher Bond would advise him on those matters.
23 Q.  I'm also not asking you for the substance.  I'm asking
24     you if it has occurred.
25         Has the commissioner asked you to investigate

**148**

1      potential violations of HB 2?
2  A.  To the best of my recollection, sitting here today, he
3      has not.  And to the extent that he ever has, I would
4      have told him that we do not have the authority to do
5      so.
6          MR. KAHNE:  Okay.  Let's look at document --
7      what are we up to?
8          MR. BISSONETTE:  This will be 19.
9          (Exhibit 19 marked for identification.)
10     BY MR. KAHNE:
11 Q.  You don't need to read the entire thing, but does this
12     refresh your recollection of this series of emails that
13     occurred on or about August 23rd, 2021?
14 A.  Yes, I recall this email.  Yes.
15 Q.  Okay.  And what -- Commissioner Edelblut says on
16     Friday, August 20th, at 8:15 a.m., "I did call David
17     Ryan to ask for and about the book.  Can you get a
18     copy?  He has not returned my call."
19         Do you see that?
20 A.  I do, yes.
21 Q.  And what was Commissioner Edelblut referring to
22     there?
23 A.  I believe there was a book being referenced.  Perhaps
24     it was within this email.
25 Q.  Okay, so -- I'm sorry.  Go ahead.

149

1  **A.  I believe if you look -- oh, the Bates number is cut**
2  **off, but I believe they're referencing the book A Good**
3  **Kind of Trouble.**
4  Q.  Okay.  And so am I correct that Commissioner Edelblut
5  was asking you to find a copy of A Good Kind of
6  Trouble?
7  **A.  That was my interpretation of his request, yes, and I**
8  **was going to go on Amazon and buy him a copy of the**
9  **book.**
10 Q.  And I asked you earlier whether the commissioner had
11 ever asked you to investigate into potential violations
12 of HB 2.  Do you not understand this document to be a
13 complaint relating to a potential violation of HB 2?
14 **A.  I took his request, the commissioner's request, as**
15 **simply wanting a copy of the book.**
16 Q.  Right, but he could have asked his secretary for the
17 book, right?
18 **A.  Well, I think, in this instance, I became the**
19 **secretary.  That's -- that was my limited role in this.**
20 **It might be silly, but I was going to go on Amazon and**
21 **get him a copy of the book, so I interpreted his email**
22 **as being that limited.  He wanted to see what it was**
23 **all about.**
24 Q.  Okay.  And getting back to 18, which is the Londonberry
25 email, that was -- that complaint was about course

150

1  conduct, too, right?  Course content, I should say.
2  Excuse me.
3  **A.  Yes.**
4  Q.  Okay.
5  **A.  That is my understanding, yes.**
6  Q.  There is a discussion at the DOE about this particular
7  course conduct, wasn't there?
8  **A.  I don't have any particular recollection of any exact**
9  **meeting, but, I would assume, based on the nature of**
10 **the emails, that there was further discussion, and I**
11 **would believe that it would involve Chris Bond.**
12 **Attorney Bond, in large part, advised Commissioner**
13 **Edelblut as it pertained to matters that fell within HB**
14 **2.**
15 Q.  And but you said -- it says here, you say to
16 Commissioner Edelblut, "Yes, we need to discuss at our
17 next ed misconduct meeting in further detail."
18 **A.  Yes.**
19 Q.  That suggests to me that it was not just a conversation
20 with Attorney Bond and the commissioner, right?
21 **A.  Yes, but I included Christopher Bond about that string.**
22 **And, in large part, Christopher Bond would not be part**
23 **of our routine educator misconduct meeting, so he's**
24 **included here because, to the extent it involves or may**
25 **involve HB 2, I would have deferred to Attorney**

151

1  **Christopher Bond to guide Commissioner Edelblut as to**
2  **the next step.**
3  Q.  Okay.  But fair to say that course content was
4  discussed at the board of ed at an educator misconduct
5  meeting?
6  **A.  I don't recall having that at an official educator**
7  **misconduct meeting, but I -- I would imagine that, yes,**
8  **it was discussed in some context.  It might have been**
9  **an informal meeting between me and Christopher Bond and**
10 **the commissioner.**
11 Q.  Including whether it violates HB 2?
12 **A.  We didn't make a determination as to whether or not it**
13 **violated HB 2.  We would make a determination as to**
14 **this is not within our purview.  It should be referred**
15 **or have someone contact the Human Rights Commission.**
16 **It needs to be reviewed by the Human Rights Commission.**
17 Q.  But there is a certain amount of groundwork that gets
18 done at the DOE to determine whether it rises to the
19 level of a potential violation of HB 2, right?
20 **A.  I disagree with how you phrased that.  It's not**
21 **determining whether it violates HB 2.  It's determining**
22 **whether it falls within the Department of Education's**
23 **jurisdiction or it falls outside the Department of**
24 **Education's jurisdiction.**
25 Q.  Department of Education's jurisdiction is the code of

152

1  conduct, right?
2  **A.  Yes.**
3  Q.  And violations of HB 2 are violations of the code of
4  conduct, are they not?
5  **A.  That is what the law says.**
6       MR. KENISON-MARVIN:  Objection.  Vague.
7  BY MR. KAHNE:
8  Q.  The complaint process that you spoke about earlier
9  that's referenced in the Educator Code of Conduct which
10 is Exhibit 2, subdivision A, which says, "The case
11 shall be opened when a complaint of possible misconduct
12 against a credential holder has come to the attention
13 of the department either through direct reporting or
14 other means," those complaints can come in through
15 emails, right?
16 **A.  I would imagine, yes.**
17 Q.  Calls?
18 **A.  Yes.**
19 Q.  Direct calls to the commissioner?
20 **A.  Yes.**
21 Q.  Direct emails to the commissioner?
22 **A.  Yes.**
23 Q.  And when it says "a case shall be opened," can you
24 describe for me what it means for a case to be
25 opened?

153

1  A.  I've already testified to that.
2  Q.  Well, you said that things get documented, but you
3      didn't specify how they get documented.
4  A.  I believe I did go into detail as to what that means.
5  Q.  I don't recall.  Can you refresh my recollection?
6  A.  In large part, it would be the investigator, Richard
7      Farrell, and he would document the name of the person
8      the allegation is against, the name of the person
9      making the allegation, the school district, any other
10     facts which might be relevant.
11 Q.  Where does that get documented?
12 A.  That's probably a question best directed to Richard
13     Farrell.  He has his notes, and then he creates — and
14     again, this is to the best of my knowledge.  I would
15     refer your question to Richard Farrell.  He has folders
16     where he writes down that information.
17 Q.  Folders?
18 A.  Mm-hm.
19 Q.  When a case is opened about a particular credential
20     holder, does that go into a credential holder's
21     personnel file?
22 A.  No, it does not.
23 Q.  Is it only when a formal investigation is opened?
24 A.  So we do not have personnel files.  Personnel files are
25     employment.  We do not govern employment.

154

1  Q.  So you've testified, I believe, that a formal letter
2      goes out to an educator or licensed credential holder
3      when an investigation is opened; is that right?
4  A.  That's correct.  That's my testimony.
5  Q.  Other than Richard Farrell documenting in a folder, is
6      there anything else that happens in connection with a
7      case being opened?
8  A.  I will defer your questions to Richard Farrell.  He can
9      better detail what he — the information he takes and
10     what he opens.  If your question is about what is
11     logged in our EIS system, there is nothing logged in
12     our EIS system when a case is opened in accordance with
13     511.01 (A).
14 Q.  So let me show you what's been marked DOE10010.
15     MR. KAHNE:  What are we up to?  21?
16     THE REPORTER:  20.
17     (Exhibit 20 marked for identification.)
18     BY MR. KAHNE:
19 Q.  Do you see this, the document that's — that I've —
20     that's Exhibit 20?
21 A.  I do.
22 Q.  Okay.  Do you see — who's Stephen Berwick?
23 A.  Stephen Berwick is — oversees our constituent concerns
24     and complaints.
25 Q.  Okay.  Do you see it says, "Diana — here you go!  By

155

1      the way, don't forget, anything that comes in as a
2      complaint to me does get logged -- I do get some
3      discrimination and refer to HRC... however, great
4      responses to their questions."
5          Do you see that?
6  A.  Yes, I do.
7  Q.  Why is he saying that anything that comes in to him as
8      a complaint gets logged?
9  A.  So Stephen handles all of our constituent concerns that
10     come in, and he logs them in a database which is shared
11     with myself and the commissioner and the deputy, and I
12     believe the governor's office.  Those are — that's his
13     database.  He does not oversee, nor is he involved in
14     educator misconduct cases.  So while he will log it
15     because it's a call that he got, he will document it in
16     his own database, he will then ultimately refer any
17     educator misconduct cases to Richard Farrell.  And, as
18     stated, anything that he feels might be HB 2, or not HB
19     2, he refers to the Human Rights Commission.
20 Q.  Are complaints that are opened made public?
21 A.  No.
22 Q.  Investigations?
23     MR. KENISON-MARVIN:  Objection.  Vague.
24     THE WITNESS:  Could you clarify your
25 question, please.

156

1      BY MR. KAHNE:
2  Q.  Are investigations that are opened by the Department of
3      Education made available to the public?
4  A.  In what sense?
5  Q.  In any sense.
6  A.  That's pretty broad.
7      MR. KENISON-MARVIN:  I will object to that as
8  being vague.
9      THE WITNESS:  Could you clarify?
10     BY MR. KAHNE:
11 Q.  Can a member of the public find out whether an educator
12     has had an investigation opened with respect to their
13     conduct?
14 A.  No.
15 Q.  You testified earlier that -- about your meeting, your
16     investigative meeting.  You testified about receiving
17     an investigative file from a superintendent.  Do you
18     remember that, from superintendents?  And reviewing
19     them?
20 A.  Yes, we have received investigation reports or files
21     from superintendents, depending on the case, yes.
22 Q.  And do superintendents, are they authorized to conduct
23     those investigations on their own?
24     MR. KENISON-MARVIN:  Objection.  Calls for a
25     legal conclusion.  You can answer.

157

1        THE WITNESS:  I believe that falls within the
2    purview of their role as superintendent, yes.
3    BY MR. KAHNE:
4    Q.  And within that investigation that superintendents can
5        conduct, can they also conduct -- can they conduct
6        investigations relating to potential violations of the
7        code of conduct?
8        MR. KENISON-MARVIN:  Same objection.
9        THE WITNESS:  To the extent that the code of
10       conduct has been incorporated within their district
11       policies, I believe that they can, yes.
12   BY MR. KAHNE:
13   Q.  Okay.  I want to draw your attention to Exhibit 3 which
14       is the training that you spoke about with Attorney
15       Bissonnette.  I wanted to cut out some time, direct
16       your attention directly to DOE05665.
17   **A.  Oh, okay.  Exhibit 3.  Got it.  It's on the top of the**
18       **pile.  Which one?  Which number?**
19   Q.  3.  It's 3.  It's 5665.
20   **A.  Okay.**
21   Q.  By the way, before we talk about this, you testified
22       earlier that you've included in your training now
23       sections on HB 2, right, since its passage?
24   **A.  I have done that.  I don't know if that's my current**
25       **practice as I do code of conduct training.**

158

1    Q.  Okay.  Why did you incorporate it?
2    **A.  I incorporated it at the time into my trainings that**
3        **we've referenced because it seemed to me there was a**
4        **lot of confusion in the field.  I received calls from**
5        **attorneys that had some confusion as to the**
6        **Department's role under HB 2, and I wanted to take an**
7        **opportunity to clarify that.**
8    Q.  So there was confusion among attorneys, you said; is
9        that right?
10   **A.  Yes.**
11   Q.  Confusion among superintendents, too, in your view?
12   **A.  In my view, yes.**
13   Q.  Among parents as well?
14   **A.  I would expect so, but my -- when I say there was**
15       **confusion in the field, I am referring to educators,**
16       **attorneys for school districts, and union attorneys,**
17       **and superintendents.**
18   Q.  Fairly educated people, right?
19   **A.  In my experience, yes.**
20   Q.  So the last bullet, "So why the website," is what you
21       were asked about before.  I just want to sort of close
22       the loop here.  Is the website here referring to the
23       Department of Education website?
24   **A.  Yes, I think that is what I was referring to.**
25   Q.  And is that because there was a -- there was

159

1        information on the Department of Education website
2        concerning HB 2?
3    **A.  No.**
4    Q.  Okay.  So what does this mean, "So why the website?"
5    **A.  So the website, at least when I wrote this, was in**
6        **reference to the --**
7    Q.  Sorry.  Go ahead.
8    **A.  So the reference to the website, when I wrote this, was**
9        **really a reference to the link by which complaints**
10       **could be filed that were sent directly to the Human**
11       **Rights Commission.**
12   Q.  Okay.  I'm going to show you a document that actually
13       does not have a Bates number on it.  It says, "Right to
14       freedom from discrimination in public workplaces and
15       education."
16       And it is, and I will represent on the record,
17       that it is a snapshot of the Department of Education
18       from November 10th, 2021.
19       (Exhibit 21 marked for identification.)
20   BY MR. KAHNE:
21   Q.  So does this refresh your recollection as to what the
22       Department of Education website said about HB 2 on or
23       around November of 2021?
24   **A.  It does, yes.**
25   Q.  Okay.  And I think you mentioned earlier a link to

160

1        public -- you mentioned a link on the website, right?
2    **A.  Yes, it's the filing of public education intake**
3        **questionnaire.**
4    Q.  Right.  Right.
5    **A.  That's -- that was what I was referring to in that**
6        **slide in Exhibit 3.**
7    Q.  So why the website is that -- you saying why --
8        **Why that link, that page?**
9    Q.  Why is the link on the DOE website?
10   **A.  Yes, that's what I was referring to.**
11   Q.  And why was it on the DOE website?  Go ahead.  I'm
12       listening.
13   **A.  I was not directly involved in the creation of that**
14       **link.  I believe that was worked on by Attorney Chris**
15       **Bond and the commissioner, but it was not worked on**
16       **directly by me.**
17       **My understanding, as kind of being peripheral to**
18       **those discussions, was that there was so much**
19       **information that was coming into the Department of**
20       **Education, which, again, may or may not have fallen**
21       **within the purview of HB 2, that the Department of**
22       **Education wanted to provide a resource, for lack of a**
23       **better term, by which individuals could directly file**
24       **those complaints with the Human Rights Commission,**
25       **noting that the Department of Education was not able to**

161

1    refer those matters to the Human Rights Commission for
2    review.
3    Q.   Do you recall whether there was press about the
4    launching of a website relating to these complaints?
5    A.   I would imagine there was. I don't have any personal
6    knowledge as to what that encompassed.
7    Q.   Before we get to that, do you see where it say under --
8    the intake form, it says, "If you believe an educator
9    may have violated the code of conduct, such a complaint
10   can be filed to the Department of Education by email to
11   Kate Walker. Kate.a.walker2@doe.nh.gov."
12         Do you see that?
13   A.   Mm-hm.
14   Q.   Who is Kate Walker?
15   A.   So Kate Walker worked within my unit for a short period
16   of time. She was -- her role was to assist me with
17   legislative affairs but also to help myself and Rich
18   with just keeping track of any allegations of code of
19   conduct cases that came in.
20   Q.   Okay. And so her name -- and she's a DOE employee --
21   is listed within the same paragraph as filing a public
22   education intake questionnaire, right? Or within the
23   same section, I should say.
24   A.   Yes.
25   Q.   Okay. Do you think this added to the confusion about

162

1    where to file complaints?
2    A.   I'm not in a position to say one way or the other.
3    Q.   Did the DOE continue to receive complaints regarding HB
4    2 after this website was launched?
5         MR. KENISON-MARVIN: Objection. Misstates
6    prior testimony.
7         THE WITNESS: Could you clarify your
8    question?
9    BY MR. KAHNE:
10   Q.   Did complaints relating to HB 2 continue to come in to
11   the Department of Education after the launch of this
12   website?
13        MR. KENISON-MARVIN: Same objection.
14        THE WITNESS: To the best of my knowledge,
15   yes, they did.
16        MR. KAHNE: I want to mark a new exhibit.
17        (Exhibit 22 marked for identification.)
18   BY MR. KAHNE:
19   Q.   Have you had a chance to review Exhibit 22?
20   A.   Yes, yes.
21   Q.   And what is this?
22   A.   It appears to be an email from Richard Farrell, who is
23   the investigator for the Department, to me. The
24   subject is "New Hampshire Moms for Liberty chapter
25   offers $500 to anyone who can catch teachers breaking a

163

1    new discrimination law."
2         Rich sends that to me saying "An anti-LGBTQ group
3    is also offering $500."
4         And then, below that, still the same subject --
5    and below that, there's a reference to an article from
6    Business Insider Australia.
7    Q.   And this email is from November 15th, 2021, right?
8    A.   Yes.
9    Q.   And the document I showed you earlier about the launch
10   of the new website was November 12th, I believe, 2021,
11   right? Or, I'm sorry, November 10th, 2021.
12   A.   So that appears to be the date at the very top that's
13   circled, and then it's written "11/10/21 Wayback
14   Machine." I'm not sure what that's in reference to.
15   Q.   Do you recall a bounty being offered for violations of
16   the new discrimination law on or around this time?
17   A.   I recall receiving this email.
18   Q.   Is that all you recall about it?
19   A.   I might have viewed the article that's referenced here.
20   As I say, I saw that when I was talking with Chris
21   earlier today, but I don't recall becoming very
22   familiar with this bounty that was being offered, no.
23   Q.   Do you recall having any conversations with anyone at
24   the DOE regarding the bounty?
25   A.   I would infer from my email that I talked to Chris

164

1    about it.
2    Q.   Do you recall that conversation?
3    A.   I don't recall the exact details of it.
4    Q.   Do you recall having any conversations with the
5    commissioner about the bounty?
6    A.   No, I do not.
7    Q.   Richard Farrell says to you, "An anti-LGBTQ group is
8    also offering $500."
9         Do you know which group he's referring to there?
10   A.   I do not.
11   Q.   Did you have any further conversations with Mr. Farrell
12   about bounties being offered for violation of the new
13   discrimination law?
14   A.   I do not recall any detailed discussions I had with
15   Richard. I do recall, I think, the extent of it was
16   that I found it very upsetting.
17   Q.   Why was it upsetting?
18   A.   I just find it very upsetting that people are putting
19   out bounties on educators. But that's a personal -- my
20   mom was a New Hampshire educator. I found that very
21   upsetting. But that had more to do with my personal
22   views rather than my professional views. But to the
23   extent I had any conversation with Richard Farrell
24   about it, I'm sure that was the tone of it.
25   Q.   Did he feel the same way, to your recollection?

**165**

1 A. That question is probably better directed to Richard
2 Farrell.
3 Q. Is it your understanding that the subject matter of HB
4 544 was put into HB 2 and then passed into law? I'm
5 switching gears. Sorry.
6 A. Thank you. Do you have HB 554 (sic)?
7 Q. I don't have the text.
8 MR. BISSONETTE: I actually do, if you think
9 it'd be useful.
10 BY MR. KAHNE:
11 Q. Actually, just based on your own recollection of what
12 it was. Is it your understanding that 544 became HB
13 2?
14 A. I would have to look at that time if I could.
15 Q. I'll just show you the email, DOE812.
16 (Exhibit 23 marked for identification.)
17 A. Okay.
18 Q. Do you see where it says -- it's an email from you to
19 Kayla Page, March 18th, 2022, and it says, "Richard
20 Farrell forwarded the email that you sent to him. You
21 are correct that the subject matter of HB 544 was put
22 into HB 2 and was passed into law last year."
23 Do you see that?
24 A. I do, yeah.
25 Q. And to the best of your recollection, is that the way

**166**

1 that you thought --
2 A. Apparently.
3 Q. -- about both bills?
4 A. Yes, apparently.
5 Q. Okay. Any reason to doubt why you would put that in an
6 email?
7 A. I would think the younger 2022 version of me would.
8 Q. Would know more?
9 A. Would have recollected that probably a little better.
10 So, yes, I will stand by what I wrote in the email. I
11 wish that I had more context as to the email that I was
12 responding to, but I stand by what I wrote, yes.
13 Q. Okay. Before I move on, I had shown you the website
14 before, the DOE website, the snapshot, which was
15 Exhibit 21. And I showed you that it had Kate Walker's
16 email address on it.
17 A. Yes.
18 Q. An employee of the DOE, an investigator, right?
19 A. She's not an investigator, no.
20 Q. I'm sorry. What is her position at DOE?
21 A. Well, she's no longer with the Department of Education,
22 and we never replaced her.
23 Q. What was --
24 A. She was really just an administrative assistant to me
25 and to Rich Farrell. And, to be clear, that section

**167**

1 also has a link to the Educator Code of Conduct and
2 Ethics.
3 Q. Right. And to your knowledge, do you know whether
4 the -- whether her name was eliminated -- was removed
5 from the website?
6 A. I believe that it was, yes.
7 Q. Why was it removed?
8 A. I know that Kate had expressed some hesitation of
9 having her name on there. Other than that, I don't
10 know ultimately why that decision was made. I know I
11 advocated for her because she reported to me.
12 Ultimately why that decision was made would probably be
13 with the commissioner.
14 Q. And so the commissioner made the ultimate decision to
15 do that, to remove her name?
16 A. I would -- I would think so.
17 Q. And it was strictly based on her own personal desire
18 not to be on the website?
19 A. No. My testimony is that she expressed to me
20 hesitation in having her name on the website. I
21 understood why she was hesitant, and I advocated on
22 behalf of her either to the commissioner directly or
23 more likely to the deputy commissioner. That is who I
24 directly report to.
25 Q. And you didn't have any conversations about it being

**168**

1 confusing to have a DOE employee listed near the
2 complaint intake form?
3 A. I don't recall that level of detail. That might have
4 occurred. I'm telling you what I recall, sitting here
5 today, and, what I recall, sitting here today, is that
6 it was expressed to me by someone who reports to me,
7 Kate Walker, that she was uncomfortable with that, and
8 I shared that with the deputy commissioner and/or the
9 commissioner, more likely than not the deputy
10 commissioner since I directly report to her.
11 Q. You testified earlier about -- well, switching gears.
12 Let's go to exhibit -- I think it's 5, which is your
13 testimony.
14 THE WITNESS: I apologize for being rude.
15 Can we do a time check? I do have to leave at 5:00,
16 and that was our agreement.
17 MR. KENISON-MARVIN: I have 5:00. How much
18 longer do you think you have?
19 MR. KAHNE: Is it 5:00?
20 MR. KENISON-MARVIN: Yeah.
21 MR. BISSONETTE: How much more? Do you want
22 to debrief real quick?
23 MR. KAHNE: Yeah.
24 (Recess taken.)
25 BY MR. KAHNE:

169

1 Q. Attorney Fenton, you previously testified, and I don't
2     want to get into the details of it, but there was an
3     SOP regarding when DOE transfers matters to the AG's
4     office, right?
5 **A. Yes, that was my testimony.**
6 Q. Is there a difference between transferring for the DOE
7     transferring matters to the AG's office versus the
8     HRC?
9 **A. I was told numerous times that the Department of**
10 **    Education could not refer any issue, any matters, to**
11 **    the Human Rights Commission for review and**
12 **    determination, and — can you repeat the question? I'm**
13 **    sorry.**
14 Q. I'm just trying to understand whether there's a
15     procedure in place as to how the DOE can refer matters
16     to the HRC versus the Attorney General's office.
17 **A. I'm not aware of the Department of Education being able**
18 **    to refer matters to the Human Rights Commission other**
19 **    than the link on the website which allows the complaint**
20 **    to go directly to the Human Rights Commission, which is**
21 **    why there was a need for the SOP, for the Department to**
22 **    refer these matters to the Attorney General's office**
23 **    for review.**
24 Q. Did the DOE seek legislation in the form of an
25     amendment to HB 2 to allow it to file complaints

170

1     directly with the HRC?
2 **A. To HB 2?**
3 Q. To HB 2.
4     MS. MILBURN: An amendment.
5     BY MR. KAHNE:
6 Q. An amendment to HB 2. Sorry. Let me strike that.
7     Did the DOE seek an amendment to HB 2 to allow it
8     to file complaints with the HRC?
9 **A. The only legislation I'm aware of is House Bill 533,**
10 **    which was brought forth this session.**
11 Q. Right. And the DOE supported that bill?
12 **A. So, as I testified previously, a state agency doesn't**
13 **    support or oppose. We provide technical assistance.**
14 **    And I didn't — I didn't see House Bill 533 as being an**
15 **    amendment to HB 2.**
16 Q. Okay. But it was going to add a section to HB 2,
17     didn't it?
18 **A. It would add a section to the law that HB 2 created.**
19 **    But, just so we're clear, I don't — I didn't think of**
20 **    HB 533 as amending House Bill 2, but I understand what**
21     you're saying. It amended the law, the 354 (A), yes.
22 Q. Did you speak with the commissioner about HB 533?
23 **A. I'm sure that I — I'm sure that I did because we talk**
24 **    about all legislative affairs.**
25 Q. Do you know whether he was in favor of HB 533?

171

1 **A. I'm not in a position to testify on what Commissioner**
2 **    Edelblut likes or doesn't like.**
3 Q. Did he ever express to you that he was in favor of HB
4     533?
5 **A. Sitting here today, I do not recall, but I can tell you**
6 **    in general terms he knows my position on the state**
7 **    agency and testimony that we don't support or oppose.**
8 **    We provide technical assistance.**
9 Q. You testified earlier that the code of conduct is
10     narrowly tailored, right?
11 **A. Yes.**
12 Q. Does the incorporation of HB 2 into the code of conduct
13     expand the code of conduct?
14     MR. KENISON-MARVIN: Objection. Vague.
15     Calls for a legal conclusion. Misstates prior
16     testimony. You can answer.
17     THE WITNESS: I'll have to refer back to my
18     prior testimony. I don't -- I don't believe, looking
19     at the section -- when I read HB 2, I don't think I
20     interpreted it as expanding the code of conduct.
21     BY MR. KAHNE:
22 Q. You're saying this was already covered in the code of
23     conduct?
24 **A. No. I saw it as being separate from the code of**
25 **    conduct. The code of conduct is a document that was**

172

1 **    created by a different law. It was created pursuant to**
2 **    rulemaking. This does not allow for any rulemaking for**
3 **    the code of conduct.**
4 Q. But it expands the categories of conduct that is
5     prohibited under the code of conduct?
6 **A. I can understand your interpretation of that. That**
7 **    wasn't my interpretation of it.**
8 Q. Okay. You've had a chance to review HB 2, right?
9 **A. Yes.**
10 Q. Okay. Do you have an understanding of what is
11     prohibited from being taught now in schools that was
12     not previously prohibited?
13 **A. Based on my review of the law?**
14 Q. Yeah.
15 **A. Yes.**
16 Q. Okay. So what? What is prohibited now that was not
17     previously prohibited?
18     MR. KENISON-MARVIN: Objection. Vague.
19     Calls for a legal conclusion. You can answer.
20     THE WITNESS: I would just refer you back to
21     HB 2.
22     BY MR. KAHNE:
23 Q. How about specific books? Are there books that you
24     know of that were -- could have previously been taught
25     and now cannot be taught because of HB 2?

173

1          MR. KENISON-MARVIN:  Same objection.  You can
2   answer.
3          THE WITNESS:  I'm not aware of any exact
4   books, no.
5      BY MR. KAHNE:
6   Q.   Any material at all?  Instructional material?
7          MR. KENISON-MARVIN:  Same objections.
8          THE WITNESS:  No, I am not aware of any books
9   or instructional material.
10     BY MR. KAHNE:
11  Q.   Your testimony is that violations of HR -- HB 2 are
12    for the HRC to make; is that right?
13  A.   Yes.
14  Q.   Is it your view that if there's a finding by the HRC of
15    discrimination, it's automatically a violation of the
16    code of conduct?
17         MR. KENISON-MARVIN:  Same objections.
18         THE WITNESS:  So looking at HB 2, section
19    four, which we've testified to previously, says,
20    "Violations of this section by an educator shall be
21    considered a violation of the Educator Code of Conduct
22    that justifies disciplinary sanction by the State Board
23    of Education."
24         So, yes, it could -- yes.  It could warrant
25    disciplinary sanction.

174

1      BY MR. KAHNE:
2   Q.   Could warrant or does warrant?
3   A.   Well --
4          MR. KENISON-MARVIN:  Same objections.
5          THE WITNESS:  We have not yet had one of
6    these cases adjudicated by the HRC, so it's speculation
7    at best.
8      BY MR. KAHNE:
9   Q.   But is it your view, if there were a determination, is
10    there still discretion within the DOE to determine
11    whether it's been a violation of the code of conduct?
12         MR. KENISON-MARVIN:  Same objections.
13         THE WITNESS:  Well, as I look at what is
14    marked as Exhibit 2, Ed 511.01 (J)(7), "If no
15    disciplinary sanction is proposed, the department shall
16    notify the credential holder in writing that the
17    investigation is closed."
18     BY MR. KAHNE:
19  Q.   So you've just read the code of conduct?
20  A.   Yes.
21  Q.   What's the answer to the question?
22  A.   Well, I think, if you look at 511.01 (J) in its
23    entirety, it sets out what the form of discipline can
24    be, the suspension, revocation, reprimand, but, in my
25    reading of subsection seven, the Department could

175

1    propose no disciplinary sanction.
2   Q.   So if an educator violates HB 2, they could have their
3    credentials revoked, right?
4   A.   Yes.
5   Q.   Okay.  Under the SOP, does the DOJ have to make a
6    referral to the HRC for complaints that it receives?
7   A.   Sitting here today, I'm not aware of that level of
8    detail.  I can't testify to that.  I don't have the
9    document in front of me.
10         MR. KAHNE:  One second.
11     BY MR. KAHNE:
12  Q.   The op-ed that you were shown earlier, Exhibit 12, I'm
13    not going to make you look through it.
14         I guess you could look through it.
15  A.   I think I was shown a couple of op-eds.
16  Q.   With the topics, topic one, topic two, topic three,
17    topic four, that op-ed, do you recall that?
18         THE WITNESS:  I just messed up your nice
19    pile.  I apologize.
20         MR. KAHNE:  I think it's Exhibit 14.
21         THE WITNESS:  Is it 14?  Oh, okay.
22     BY MR. KAHNE:
23  Q.   Did you -- and you don't have to look through every
24    single --
25  A.   Sure.

176

1   Q.   -- piece of paper.  Did you have any role in providing
2    the commissioner with the topics that are annexed to
3    the op-ed that is reflected in Exhibit 14?
4          MR. KENISON-MARVIN:  Let the record reflect
5    that Attorney Bissonnette has left the room.  I guess,
6    at this point, just to interrupt, I will say I think
7    we're taking the position that this will be the last
8    question, where one of the attorneys for plaintiffs has
9    needed to leave.  I think it's appropriate that we end
10    on this question.  I'll instruct the witness to not
11    answer any further questions after her answer to this
12    question.
13         THE WITNESS:  To the best of my recollection,
14    sitting here today, I did not personally provide the
15    commissioner with any of those attachments.
16         MR. KAHNE:  Thank you.  Before we close the
17    record, I don't believe Attorney Fenton has gone for
18    seven hours.  We have a few -- a few lines of
19    questioning that we just want to -- that we've spoken
20    to Nate about and we think that we can do it likely
21    next week by Zoom to lessen any inconvenience to you.
22         THE WITNESS:  Thank you.
23         MR. KAHNE:  I don't believe it'll last more
24    than half hour, 45 minutes at the most.
25         MR. KENISON-MARVIN:  And I haven't agreed to

177

1  that yet. I'd just let the record reflect that I want
2  to discuss it more with plaintiff's counsel.
3         And could the record just also reflect that
4  when Attorney Bissonnette left, he indicated to me that
5  he was -- I'm not sure if it already captures this, but
6  that he had something to the effect of childcare
7  responsibilities and that he needed to leave the
8  deposition for that purpose.
9         (Whereupon, the deposition was suspended at
10 5:21 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

178

1         C E R T I F I C A T E
2         I, Sharon G. Saalfield, a Licensed Shorthand
3  Reporter for the State of New Hampshire, Certified Shorthand
4  Reporter for the Commonwealth of Massachusetts, Registered
5  Diplomate Reporter and Certified Realtime Reporter, do
6  hereby certify that the foregoing is a true and accurate
7  transcript of my stenographic notes of the proceeding taken
8  at the place and on the date hereinbefore set forth to the
9  best of my skill and ability under the conditions present at
10 the time.
11         I further certify that I am neither attorney or
12 counsel for, nor related to or employed by any of the
13 parties to the action in which this proceeding was taken,
14 and further that I am not a relative or employee of any
15 attorney or counsel employed in this case, nor am I
16 financially interested in this action.
17         Before completion of the deposition, review of the
18 transcript was requested.
19         The foregoing certification of this transcript
20 does not apply to any reproduction of the same by any means
21 unless under the direct control and/or direction of the
22 certifying reporter.
23
24
25 Sharon G. Saalfield | Lic. No. 147, CSR, RDR, CRR

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner, et al. (No. 1:21-cv-01077-PB)

Diana Fenton

## ERRATA

    I, the undersigned, DIANA FENTON, have read the transcript of my deposition held on May 17, 2023, in the matter of Local 8027, AFT-New Hampshire, et al. v. Edelblut, et al.; and the same is true and correct, to the best of my knowledge, with the exception of the changes noted below on Page 2 of 2 of this Errata:

*Diana E. Fenton*
Diana Fenton

STATE OF ___NH___ )
                  ) ss.:
COUNTY OF __Merrimack__ )

    Subscribed and sworn to before me this __3__ day of __July__, 2023.

*Brendan O'Donnell*
Notary Public

My commission expires:

__10|17|2023__



*[intentionally blank; continued on next page]*

Page **1** of **2**

<u>Changes to Transcript</u>

Page 12, Line 19, Change:

Replace "file" with "trial" such that the transcript states:

"I did appellate work and I did ***trial*** work."

<u>Reason</u>: Transcription error.

Page 24, Line 13, Change:

Replace "Highmark" with "Heimarck" such that the transcript states:

"Nicole ***Heimarck***, Amanda Phelps."

<u>Reason</u>: Transcription error.

Page 85, Line 6, Change:

Replace "Luke" with "Liz" such that the transcript states:

"Since January of 2023, I had a meeting with Attorney Sean Locke of the Attorney General's office, and Attorney ***Liz*** Brown, and we discussed procedural mechanisms by which the Department of Education could refer cases that may or may not fall within the purview of HB 2 to the Attorney General's office for review."

<u>Reason</u>: Transcription error.

Page 101, Line 6, Change:

Replace "indicator" with "educator" such that the transcript states:

"Your question, as it pertains to individual educators, which I cannot think of a time where I've had that conversation with an individual ***educator***, I would not necessarily refer that person to the superintendent's association."

<u>Reason</u>: Transcription error.

[*end*]

# EXHIBIT 4

DOE Investigator
Richard Farrell
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)



# Transcript of Richard Farrell

**Date:** May 18, 2023
**Case:** Local 8027, AFT-New Hampshire, et al. -v- Edelblut, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

## 1

```
1              UNITED STATES DISTRICT COURT
2               DISTRICT OF NEW HAMPSHIRE
3
4   LOCAL 8027, AFT NEW HAMPSHIRE,   )
5   et al.,                          )
6               Plaintiffs,          )
7   v.                               )
8   FRANK EDELBLUT, in his official  )
9   capacity as Commissioner of the  )
10  Department of Education ("DOE"),  )
11              Defendant            )
12  ---------------------------------  C.A. 1:21-cv-01077-PB
13  ANDRES MEJIA, et al.,            )
14              Plaintiffs,          )
15  v.                               )
16  FRANK EDELBLUT, in his official  )
17  capacity as Commissioner of the  )
18  Department of Education ("DOE"),  )
19              Defendant.           )
20  ---------------------------------)
21
22            DEPOSITION OF RICHARD FARRELL
23
24
25
```

## 2

```
1            DEPOSITION OF RICHARD FARRELL
2
3     THIS DEPOSITION TAKEN PURSUANT TO NOTICE OF DEPOSITION
4   AT NEW HAMPSHIRE DEPARTMENT OF JUSTICE, 33 CAPITOL STREET,
5   CONCORD, NEW HAMPSHIRE, ON THURSDAY, MAY 18, 2023,
6   COMMENCING AT 10:13 A.M.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 3

```
1                      APPEARANCES
2
3   For Plaintiffs Local 8027, AFT New Hampshire:
    STROOCK & STROOCK & LAVAN, LLP
    David J. Kahne, Esq.
    Elizabeth C. Milburn, Esq.
4   Charles Moerdler, Esq. (via videoconference)
    180 Maiden Lane
5   New York, New York 10038-4982
    (212) 806-6419
6   dkahne@stroock.com
    emilburn@stroock.com
7   cmoerdler@stroock.com
8   For Plaintiffs Andres Mejia and Christina Philibotte:
    AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
9   Gilles Bissonnette, Esq.
    18 Low Avenue
10  Concord, New Hampshire 03301
    (603) 224-5591
11  gilles@aclu-nh.org
12    - and -
13  DISABILITY RIGHTS CENTER - NEW HAMPSHIRE
    Kayla Turner, Esq. (via videoconference)
14  64 North Main Street, Suite 2
    Concord, New Hampshire 03301
15  (603) 228-0432
    kaylat@drcnh.org
16    - and -
17  GLBTQ LEGAL ADVOCATES & DEFENDERS
18  Chris Erchull, Esq. (via videoconference)
    18 Tremont Street, Suite 950
19  Boston, Massachusetts 02108
    (617) 426-1350
20  cerchull@glad.org
21  For Defendants National Education Association - New
    Hampshire:
22  NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE
    Esther K. Dickinson, Esq. (via videoconference)
23  9 South Spring Street
    Concord, New Hampshire 03301
24  (603) 224-7751
    edickinson@nhnea.org
25
```

## 4

```
1                   APPEARANCES (Cont'd)
2
3   For Defendants Frank Edelblut, Christian Kim, John
    Formella, Ahni Malachi, and Ken Merrifield:
4   NEW HAMPSHIRE DEPARTMENT OF JUSTICE
    Civil Bureau
5   Nathan W. Kenison-Marvin, Esq.
    33 Capitol Street
6   Concord, New Hampshire 03301
    (603) 271-1292
7   nathan.w.kenison-marvin@doj.nh.gov
8   For Plaintiff American Federation of Teachers:
    NOLAN PERRONI, P.C.
9   Peter J. Perroni, Esq. (via videoconference)
    73 Princeton Street
10  North Chelmsford, Massachusetts 01863
    (978) 454-3800
11  peter@nolanperroni.com
12  For Defendant Department of Education:
    DEPARTMENT OF EDUCATION
13  Elizabeth A. Brown, Esq. (via videoconference)
    101 Pleasant Street
14  Concord, New Hampshire 03301
    (603) 271-6338
15  elizabeth.a.brown@doe.nh.gov
16  Court reporter:
    Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR
17
18
19
20
21
22
23
24
25
```

**5**

STIPULATIONS

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under Federal law.

Notice, filing, caption and all other formalities are waived. All objections, except as to form, are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

**6**

INDEX

| WITNESS | PAGE |
|---|---|
| Richard Farrell | |
| By Mr. Kahne | 7 |
| By Mr. Bissonnette | 145 |
| By Ms. Milburn | 171 |
| By Mr. Kenison-Marvin | 203 |
| By Mr. Kahne | 204 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1-23 | Marked previously | |
| 24 | 10/18/21 Email Chain with Attachments | 53 |
| 25 | 11/10/21 Department of Education Press Release | 63 |
| 26 | 2/07/22 Letter with Attachments | 72 |
| 27 | 2/22/22 Email Chain | 76 |
| 28 | 2/09/22 Email Chain | 79 |
| 29 | 8/24/22 Email | 86 |
| 30 | 9/17/21 Email Chain | 92 |
| 31 | 10/04/21 Email Chain | 152 |
| 32 | 10/04/21 Email Chain | 152 |
| 33 | 9/30/21 Email Chain | 156 |
| 34 | 11/11/21 Email Chain | 172 |
| 35 | 4/01/21 Email Chain | 189 |
| 36 | 6/14/22 Email Chain | 194 |
| 37 | 11/15/21 Email Chain | 198 |

**7**

RICHARD FARRELL,
having been duly sworn by Ms. Saalfield,
was deposed and testified as follows:
EXAMINATION
BY MR. KAHNE:

Q. Good morning, Mr. Farrell.

A. Good morning.

MR. KAHNE: Nate, before we start, we'll do the same stipulations that we did yesterday with Ms. Fenton?

MR. KENISON-MARVIN: Correct. And I'll also put on the record now that we'll reserve our right to read and sign in accordance with the rules.

BY MR. KAHNE:

Q. Mr. Farrell, can you state your name and address for the record?

A. Sure. Richard J. Farrell, F-A-R-R-E-L-L, Junior. My address is 36 Arrow, A-R-R-O-W, Lane, in Nashua, New Hampshire.

Q. Thank you, Mr. Farrell. My name is David Kahne. I represent one of the plaintiffs in this action, the American Federation of Teachers. Have you ever been deposed before?

A. I have.

Q. When were you deposed?

**8**

A. It was while I was a member of the New Hampshire State Police, so it's a number of years ago.

Q. You were deposed once?

A. Several times.

Q. In connection with more than one case?

A. Oh, yes.

Q. And what were the cases concerning?

A. Some of them were civil actions regarding motor vehicle accidents; others were criminal — depositions in criminal cases.

Q. Okay. So you have some experience here with depositions. So, you know, this is just sort of a question and answer session, but your answers are sworn, and so you have the same duty to tell the truth as you would in court. You understand that?

A. I do.

Q. Okay. Please provide only verbal responses to my questions. You shouldn't shake your head so that the transcript can accurately reflect your answers. Do you understand that?

A. I do.

Q. Okay. If you don't understand a question, just ask me for clarification. If you do answer a question, the record and I will both assume that you heard the question, that you understood it, and that you've

**9**

1  provided me with your best recollection in the answer.
2  Do you understand that?
3  **A. I do.**
4  Q. Please, to the best of your ability, let me finish my
5  questions completely even if you think you might know
6  what I am asking, okay?
7  **A. Yes.**
8  Q. If you need any breaks during the course of the
9  deposition, we're happy to accommodate. The only thing
10  I do ask you is that you answer a question and don't
11  try to leave in the middle of a question. But if you
12  need to take a break, we're happy to accommodate,
13  okay?
14  **A. Yes.**
15  Q. Any reason you're unable to testify truthfully today?
16  **A. No.**
17  Q. Any medications that would impair your ability to
18  testify truthfully?
19  **A. No.**
20  Q. What did you do to prepare for this deposition?
21  **A. I consulted with this gentleman. That's about it.**
22  Q. Okay. Did you have a meeting?
23  **A. Yes.**
24  Q. Okay. How long did the meeting last?
25  **A. Approximately one hour.**

**10**

1  Q. Did you review any documents with --
2  **A. What type of documents? I don't know what you mean.**
3  Q. Any documents at all. Did you look at any documents in
4  preparation for this?
5  **A. Yes.**
6  Q. Okay. What documents were those?
7  **A. I looked at the code of conduct and I looked at the**
8  **administrative rules supporting the code of conduct.**
9  Q. Anything else?
10  **A. No.**
11  Q. Did you discuss your deposition testimony with anyone
12  other than counsel today?
13  **A. My testimony? No.**
14  Q. Did you discuss the substance of this litigation with
15  anyone other than counsel?
16  **A. Yes.**
17  Q. And who did you discuss it with?
18  **A. Well, "discuss." I talked with Attorney Fenton. I**
19  **talked with my wife.**
20  Q. Okay. Let's start with Attorney Fenton. What did you
21  discuss with Attorney Fenton about this case?
22  **A. Times, locations, dates, duration of the deposition.**
23  **Not anything of substance. Just logistics.**
24  Q. Did you speak to her after her testimony yesterday?
25  **A. I have not.**

**11**

1  Q. And I assume the same thing with your wife? Discussing
2  this case was just logistics as well?
3  **A. Yes.**
4  Q. Are you familiar with the nature of this action?
5        MR. BISSONNETTE: Objection. Vague. You can
6  answer.
7        MR. KAHNE: You can answer.
8        THE WITNESS: Generally, yes.
9  BY MR. KAHNE:
10  Q. Okay. What do you generally know about it?
11  **A. I understand, and I could be wrong, that the action is**
12  **related to a piece of legislation that might be**
13  **unconstitutional, and what my role in that might be.**
14  Q. And what piece of legislation are you referring to?
15  **A. The so-called HB 2 --**
16  Q. Okay.
17  **A. -- legislation.**
18  Q. Okay. And do you have an understanding of why it's
19  being challenged?
20  **A. I think I do.**
21  Q. What is that understanding?
22  **A. Not being an attorney, I think it is that the law**
23  **itself may be somewhat vague.**
24  Q. Okay. So, for the purposes of this deposition, you've
25  already referred to the legislation as "HB 2." And is

**12**

1  it okay -- it's also been referred to as the divisive
2  concepts ban, the banned concept statute. But if I
3  refer to HB 2, you understand that I'm talking about
4  the legislation that's challenged in this action,
5  right?
6  **A. As a general concept, yes.**
7  Q. Okay. Can you tell me a little bit about your
8  educational background?
9  **A. How far back do you want to go?**
10  Q. You can give me college.
11  **A. Okay. I attended the University of Notre Dame,**
12  **attended the University of Lowell, which is now the**
13  **University of Massachusetts at Lowell. Undergraduate**
14  **degree there. I also was a licensed educator upon**
15  **graduating from the University of Massachusetts. And**
16  **then multiple trainings of various types including the**
17  **FBI training, NEA, national academy, things like that,**
18  **when I was within law enforcement.**
19  Q. Okay. And you mentioned -- am I right that you were an
20  English teacher?
21  **A. I was.**
22  Q. And for how long were you an English teacher?
23  **A. About three -- well, just three years. I was two years**
24  **at Bishop Guertin High School, one year in Lowell,**
25  **Massachusetts school system, and I was Prop**

13

1  two-and-a-halfed, so we all lost our jobs on the same
2  day.
3      When I retired from the state police in 2012, I
4  worked for the Nashua school district for a period of
5  2012 and for the entire 2013 – 2012-2013 school year
6  as an at-will substitute teacher, long-term substitute
7  teacher.
8  Q.  Okay.  I want to make sure I have the sequence here.
9      After you graduated, was the first job that you had as
10  an educator?
11 A.  Yes.
12 Q.  And how long was that?
13 A.  That was two years at Bishop Guertin High School in
14  Nashua, would have been year in the Lowell school
15  district, and then 30 years in the state police, and
16  then more or less one year working in the Nashua school
17  district.
18 Q.  Okay.  And what did you do for -- what grade did you
19  teach English?
20 A.  High school.
21 Q.  High school English?  And what did do you for the state
22  police?
23 A.  It depends on when it was.
24 Q.  So starting at the beginning.
25 A.  Uniform patrol.  I went from uniform patrol to

14

1  detective.  Detective to – I was appointed first court
2  officer the state police ever had in the Manchester
3  District Court.  And then from there, the pilot program
4  included five different district courts where I was the
5  court officer and prosecutor for that.  From there, I
6  went to the auto theft unit.  I was in the major crime
7  unit.  Promoted back to uniform, was a supervisor in
8  two different capacities.  I got promoted a second
9  time, and then spent the last 10 years of my career at
10  the Attorney General's office.  I was the operations
11  officer for the New Hampshire Drug Task Force.
12 Q.  And your current position is as -- is investigator for
13  the Department of Education; is that right?
14 A.  That's correct.
15 Q.  And when did you start that?
16 A.  July 1st of 2013.
17 Q.  Is the investigator -- is it an appointed position?
18 A.  Well, that's a different type of question.  At first.
19  The first eight years, it was a contract position.  So
20  I had four two-year contracts as an independent
21  contractor working here, and then it was determined
22  that the Department wanted me to become an employee
23  here, so for the past two years ending this coming July
24  1st, I've been an actual employee for the State of New
25  Hampshire again.

15

1  Q.  And who made the decision to hire you to the Department
2  of Education?
3  A.  That was Dr. Judith Fillion.  F-I-L-L-I-O-N.
4      Dr. Fillion interviewed me and she recommended to the
5  then commissioner, Dr. Barry, that I be awarded the
6  first contract.
7  Q.  Okay.  Now you are an employee of the Department of
8  Education; is that right?
9  A.  That's correct.
10 Q.  Okay.  Can you describe your responsibilities as an
11  investigator for the Department of Education?
12 A.  My responsibilities?
13 Q.  What are your job duties?
14 A.  My job duties.  I investigate allegations of code of
15  conduct violations for the Department of Education.
16 Q.  Is it only code of conduct violations?
17 A.  There are times when I have performed trainings for the
18  code of conduct.  I have done some basic and cursory
19  background investigations, worked with superintendents
20  to walk with them through the criminal background
21  checks process.  So kind of a jack-of-all-trades, but
22  my primary mission is the code of conduct and
23  investigating violations, or alleged violations, of the
24  code of conduct.
25 Q.  So I want to understand how you investigate alleged

16

1  violations of the code of conduct.  Is the first step
2  when the Department of Education receives a
3  complaint?
4  A.  That's one of the ways we get information about
5  allegations of code of conduct violations.  That's one
6  of several different sources.
7  Q.  Okay.  So starting with complaints.  How do you receive
8  those complaints?
9  A.  The complaints could be from – excuse me – an
10  individual parent.  They could come from a
11  self-reporting through the superintendent or a member
12  of the superintendent's staff.  We've received them
13  from law enforcement.  We've received them from the
14  DCYF, Department of Children, Youth, and Families.  I'm
15  sure there are others, but...
16 Q.  So, fair to say you received complaints from parents, I
17  think you said, right?
18 A.  Yes.
19 Q.  From superintendents?
20 A.  Yes.
21 Q.  From principals?
22 A.  Yes.
23 Q.  Do you receive those complaints by email?
24 A.  Some.
25 Q.  Do you receive some complaints by phone call?

**17**

1  A.  Yes.
2  Q.  Do those complaints come in to you directly?
3  A.  Sometimes.
4  Q.  Do they sometimes come directly to the commissioner?
5  A.  Sometimes.
6  Q.  Do they come to anybody else at the Department of
7    Education?
8  A.  Sure.  They can go to the commissioner.  They can go to
9    the deputy commissioner.  Many superintendents contact
10   Attorney Fenton directly.  They can come through the
11   Bureau of Credentialing.  They can come from, as I
12   said, parents, superintendents, principals.
13      I'm sure there are others, but those are the
14   primary areas of -- those are the primary places we get
15   reports.
16  Q.  Okay.  And now when you receive one of these
17    complaints, can you describe what you do as the
18    investigator for the Department of Education?
19  A.  The first thing that I would do is determine -- back
20   up.  I will gather facts and circumstances from the
21   complainant.
22  Q.  Does that include reaching out to superintendents?
23  A.  Occasionally.
24  Q.  Does that include speaking to principals?
25  A.  Occasionally.

**18**

1  Q.  Does that include speaking to other educators at the
2    school?
3  A.  Sometimes.
4  Q.  Does that include requesting documents?
5  A.  Sometimes.
6  Q.  When you receive a complaint, do you document that
7    complaint in any way?
8  A.  It depends on whether it actually falls within my
9    jurisdiction.
10  Q.  And your jurisdiction is possible violation of the code
11    of conduct?
12  A.  Correct.
13  Q.  Okay.  Now, assume that a case falls within your
14    jurisdiction.  Do you document that complaint in any
15    way?
16  A.  Initially, no.
17  Q.  Okay.  You qualified with "initially, no."  So does
18    that mean eventually, yes?
19  A.  Eventually, if it meets the criteria necessary for an
20   actual violation, then we would document the fact that
21   it was received.
22  Q.  Okay.  Do you have a folder where you mark down
23    complaints with the name of the complainant and
24    other -- other information like that?
25  A.  A folder?

**19**

1  Q.  Yeah.
2  A.  I don't know what that means.
3  Q.  So we heard testimony yesterday from Attorney Fenton,
4    I'll represent to you, that there's an intake process
5    and you receive information, that you document that
6    information in a folder which includes information such
7    as the complainant's name, the school that it relates
8    to, the alleged violator of the code of conduct.
9      Does that -- is that something that you do?
10      MR. KENISON-MARVIN:  I'll object to the
11   extent it misrepresents testimony yesterday.  You can
12   answer.
13      THE WITNESS:  If the information received
14   from the source, whatever that source might be, reaches
15   a level of a potential code of conduct violation, then
16   we will document it.  If it doesn't, we won't.
17  BY MR. KAHNE:
18  Q.  Who decides whether it reaches the level of a potential
19    code of conduct violation?
20  A.  Everything it goes through my supervisor, who would
21   be Attorney Diana Fenton.
22  Q.  Okay.  Now, assume -- what criteria do you use to
23    decide whether a complaint possibly violates the code
24    of conduct?
25  A.  You read the code of conduct, you examine the contents

**20**

1    of the complaint, and you determine whether or not we
2    have jurisdictional standing.
3  Q.  And is that a decision that's made with you and
4    Attorney Fenton?
5  A.  Attorney Fenton makes the final decision.  I provide
6    her with facts, and a decision is made.
7  Q.  Now, assume that Attorney Fenton has decided that a
8    complaint rises to the level of a possible code of
9    conduct violation.  How do you document that?
10  A.  I draw a case number.  The case number then relates to
11   a -- the name of the educator or the name of the
12   individual.  I create a folder, a file, and then I go
13   about the business of finding facts.
14  Q.  And, again, could you just describe how you go about
15    finding facts?
16  A.  It depends on the case.  Every case is different.  So
17   perhaps you could give me an idea of what you're
18   looking for.  I'm not sure.
19  Q.  If you could give me some examples of what -- how you
20    factually investigate complaints?
21  A.  Well, again, every case is different.  If the case
22   involves an alleged sexual assault of a child, we would
23   collect facts from a number of stakeholders -- law
24   enforcement, parents, staff -- and go in that
25   direction.

**21**

1    If it's something less than that, something that's
2  not criminal, we do go in a different direction,
3  gaining facts from documents, emails, interviews, that
4  type of thing.
5  Q.  And interviews are with superintendents, for example?
6  A.  Potentially.
7  Q.  Principals?
8  A.  Possibly.
9  Q.  Okay.  You spoke before about the decision as to
10  whether something rises to the level of a possible code
11  of conduct complaint.  Do you remember that?
12  A.  Yes.
13  Q.  And you said Attorney Fenton was involved in that?
14  A.  Yes.
15  Q.  Is the commissioner involved in that decision?
16  A.  At that stage?  I don't -- I don't recall right now
17  whether there's an individual case where he was
18  involved in that triage process.
19  Q.  Is the commissioner ever involved in the factual
20  investigation of a case?
21  A.  To the extent that he receives direct emails or
22  correspondence from complainants, yes.  To the extent
23  that he actually interjects himself into actual
24  investigations, no.
25  Q.  After he receives a complaint, do you speak with him

**22**

1  about the factual gathering in a complaint?
2  A.  I try not to.
3  Q.  Why?
4  A.  I think that at that stage of the investigation, the
5  facts should be facts.
6  Q.  Why would having the commissioner involved in the
7  factual investigation not -- make it not about facts?
8  A.  Because the commissioner has a different role than I
9  do.
10  Q.  What's the commissioner's role?
11  A.  Well, you'd have to ask him.
12  Q.  What's your view of his role?
13  A.  I can tell you what my role is.  My role is gathering
14  facts, being an independent gatherer of facts, and
15  providing those to Attorney Fenton.
16  Q.  Does the commissioner ever ask you to request documents
17  from the superintendent?
18  A.  He may.  He may have.  He may have suggested that.  I
19  don't recall an instance where he has, but anything is
20  possible.  That's possible.
21  Q.  Has he asked you to talk to complainants directly?
22  A.  He has sent me emails, and I have, on occasion, spoken
23  to complainants.
24  Q.  Do you understand those emails from the commissioner to
25  be requests that you talk to complainants?

**23**

1  A.  No.
2  Q.  What do you understand those emails to be?
3  A.  Those are intake of a complaint, and we would then
4  refer to -- or defer to our usual practice.
5  Q.  Which is gathering factual information?
6  A.  Right.
7  Q.  Okay.  What we've been talking about thus far is
8  strictly about opening a case; isn't that right?
9  A.  Define "case."
10  Q.  Well, so the Educator Code of Conduct says that "a case
11  shall be opened when a complaint of possible misconduct
12  against a credential holder has come to the attention
13  of the department, either through direct reporting or
14  other means."
15  A.  Good definition.
16  Q.  And what we've been just talking about is the opening
17  of a case, right?
18  A.  Correct.
19  Q.  And all the factual investigation that goes -- that
20  comes after the opening of a case?
21  A.  Yes.
22  Q.  Okay.  And this is before the Department of Education
23  determines whether to open a formal investigation,
24  right?
25  A.  Yes.

**24**

1  Q.  Okay.  And that involves issuing a certified letter and
2  other procedures, right?
3  A.  Correct.
4  Q.  Okay.  So you spoke about criteria for deciding whether
5  something rises to the level of a possible code of
6  conduct violation.  Do you remember that?
7  A.  I do.
8  Q.  Okay.  What is the criteria that you and Attorney
9  Fenton use for moving from documenting and opening a
10  folder versus not opening a folder?
11       MR. KENISON-MARVIN:  Objection to the extent
12  it misstates prior testimony.  You can answer.
13       THE WITNESS:  Ask the question again, please.
14  BY MR. KAHNE:
15  Q.  Yeah, that's fair.  I think what you were -- what you
16  said is you just decide whether it's within your
17  jurisdiction, right?
18  A.  The case.
19  Q.  The case?
20  A.  Correct.
21  Q.  And if it is within your jurisdiction, you open a case
22  file?
23  A.  Correct.
24  Q.  And how do you determine whether something is within
25  your jurisdiction?

25

1  A.  I look at the complaint, the facts of the complaint,
2      and determine whether or not the code of conduct
3      applies.
4  Q.  Okay.  So it's just based on what the facts are and
5      whether you think it could potentially violate the code
6      of conduct?
7  A.  No, it's not what I think.  It is whether the
8      collection of data and facts support an allegation of a
9      code of conduct violation, and that's done in
10     consultation with Attorney Fenton.
11 Q.  Okay.  And the only things that you're looking at when
12     you're making that determination are the code of
13     conduct and the facts that you've gathered?
14 A.  That is absolutely correct.
15 Q.  Okay.  Can a school district independently investigate
16     possible violations of the code of conduct?
17 A.  Of course.
18         MR. KENISON-MARVIN:  Objection to the extent
19     it calls for a legal conclusion.  You can answer.
20         THE WITNESS:  Yes.
21     BY MR. KAHNE:
22 Q.  In your experience, can a superintendent independently
23     investigate possible violations of the code of
24     conduct?
25 A.  A superintendent can authorize an investigation at his

26

1      level for code of conduct violations.
2  Q.  And that includes -- that's an investigation that
3      includes talking to teachers.  That includes fact
4      gathering.  The same type of fact gathering
5      investigation that you were just talking about?
6         MR. KENISON-MARVIN:  Objection.  Compound.
7      You can answer.
8         THE WITNESS:  Slowly.
9      BY MR. KAHNE:
10 Q.  In your experience, how do superintendents conduct
11     those types of investigations?
12 A.  Every superintendent is different.  Some
13     superintendents -- almost all superintendents in the
14     larger districts will delegate to subordinates.  Other
15     superintendents will ask for an independent
16     investigation.  They'll hire an attorney or a fact
17     finder.  There's any number of ways they conduct their
18     business.  But, again, that's their business, not
19     mine.
20 Q.  And they can conduct investigations for any possible
21     code of conduct violation?
22 A.  They conduct investigations that, generally speaking,
23     are policy, individual school district policies and
24     procedures.  Some of those bleed over into code of
25     conduct.  Some of them do not.

27

1  Q.  Do they refer the results of their investigation to the
2      DOE?
3  A.  If we ask them to.  Many times they conduct
4      investigations that have nothing to do with us.
5  Q.  How would you know about those investigations?
6  A.  We wouldn't.
7  Q.  I think you just testified, "If we ask them for the
8      investigation."
9         How would that come to your attention?
10 A.  I don't understand the question.
11 Q.  I'm just trying to understand how an investigation that
12     a superintendent independently conducts arrives at the
13     DOE.
14 A.  Well, if we have received a complaint, either
15     self-reporting from the superintendent or other
16     sources, we would then reach out to the district, the
17     charter school, for example, the head of school, the
18     superintendent's office, and ask them for supporting
19     documents and factual data during our triage process.
20 Q.  Are you -- strike that.
21         Are you aware of superintendents conducting
22     investigations into violations of HB 2?
23 A.  I have no idea.
24 Q.  You have no idea whether that is occurring or is not
25     occurring?

28

1  A.  Correct.
2  Q.  Do you have meetings with Attorney Fenton and
3      Commissioner Edelblut and the deputy commissioner,
4      periodic meetings, to discuss investigations?
5  A.  Yes.
6  Q.  How often do those meetings occur?
7  A.  They're supposed to occur once a month.
8  Q.  Why do you say they're supposed to occur once a
9      month?
10 A.  Sometimes schedules, conflicts, vacations, illnesses
11     put them off, so every four weeks become every six
12     weeks.  Sometimes we skip a month.  It all depends.
13     There's no rule.  There's no requirement.  It all
14     depends on scheduling.
15 Q.  Is there a name for that meeting?
16 A.  Educator misconduct meeting.
17 Q.  And can you describe what occurs during that meeting?
18         MR. KENISON-MARVIN:  I'll just instruct
19     the -- Mr. Farrell to not answer with respect to
20     specific discussions and deliberations that occur
21     during those meetings, but to the extent the question
22     calls for generalized process during the meeting and
23     how the meeting proceeds, you can answer the question.
24         THE WITNESS:  There is a discussion about
25     individual cases.  Those cases are either progress

## 29

1 reports or determinations as to whether or not an
2 investigation should occur.  And progress reports also
3 lead to proposed possible sanctions that might be
4 involved.
5 BY MR. KAHNE:
6 Q.  What are the sanctions that the code of conduct
7 provides for?
8 A.  **There are four things that would occur:  One, there is**
9 **no sanction; two, there's a letter of reprimand; three,**
10 **there's a suspension; four, the revocation of**
11 **license.**
12 Q.  And in your education misconduct meeting, are
13 determinations made as to what penalty, if any, to
14 impose?
15 A.  **Those general discussions do occur, yes.**
16 Q.  Well, general discussions, but is there a final
17 decision made during those meetings?
18 A.  **Sometimes.**
19 Q.  Do you vote?
20 A.  **Do I vote?  I have no vote, no.  No.  There's no**
21 **vote.**
22 Q.  So who is -- who is the decision-maker in that
23 meeting?
24 A.  **It's a collaborative effort.  I think, ultimately, the**
25 **buck stops with the commissioner, but the effort itself**

## 30

1 **is a collaborative effort.**
2 Q.  Okay.  Is it possible to make a finding of educator
3 misconduct but determine that there is no sanction?
4 MR. KENISON-MARVIN:  Objection to the extent
5 it calls for a legal conclusion.  You can answer.
6 THE WITNESS:  I don't understand the
7 question.  I'm sorry.
8 BY MR. KAHNE:
9 Q.  Under the -- in your experience, under the Educator
10 Code of Conduct, can there be a finding of educator
11 misconduct without the imposition of a sanction?
12 MR. KENISON-MARVIN:  Same objection.  You can
13 answer.
14 THE WITNESS:  I don't remember that type of
15 resolution.  I just don't remember that.
16 BY MR. KAHNE:
17 Q.  Okay.  But, to your knowledge, is that possible?
18 A.  **I don't think it's possible, but I'm -- again, I've**
19 **never seen that.**
20 Q.  Certainly very unlikely?
21 A.  **It's unlikely.**
22 Q.  So fair to say that when there's a violation of the
23 code of conduct, there's going to be the imposition of
24 a sanction?
25 MR. KENISON-MARVIN:  Objection to the extent

## 31

1 it misstates the testimony.  It's also a legal
2 conclusion, but you can answer.
3 BY MR. KAHNE:
4 Q.  In your experience --
5 A.  **So rephrase that for me, please.**
6 Q.  -- is it fair to say that if there's been a violation
7 of the Educator Code of Conduct, that the Department of
8 Education will impose a sanction?
9 A.  **No, that's not fair to say.**
10 Q.  Why not?
11 A.  **There are times when we identify a code of conduct**
12 **violation, and we work with the individual school or**
13 **school district, and the imposition of sanction is left**
14 **at the employment -- in the employment world and not in**
15 **the license world.**
16 Q.  Okay, but separate that out.  I understand there's two
17 separate lines:  There's the employment line and
18 there's the credentialing line.
19 A.  **Yes.**
20 Q.  With respect to the credentialing line, have you ever
21 had the experience where there's been a violation of
22 the code of conduct and there has not been the
23 imposition of a sanction, to your recollection?
24 A.  **So my recollection, I think the answer to that is**
25 **yes.**

## 32

1 Q.  Okay.  When do you recall that happening?
2 A.  **I don't recall specifically, but I can tell you that**
3 **there are instances where code violation has occurred**
4 **and we do not take formal sanction against the licensed**
5 **educator.**
6 Q.  Okay.  Would it be fair to say that the vast majority
7 of the time there is an imposition of a sanction?
8 MR. KENISON-MARVIN:  Objection to the extent
9 it misstates testimony.  You can answer.
10 THE WITNESS:  More likely than not, yes.
11 BY MR. KAHNE:
12 Q.  Okay.  Are there any other meetings that you -- are
13 there any other scheduled meetings that you have
14 regarding investigations on a periodic basis?
15 A.  **With whom?**
16 Q.  With Attorney Fenton and others at the DOE.
17 A.  **I meet with Attorney Fenton, either in person or**
18 **virtually, every day.  With respect to the**
19 **commissioner, the deputy commissioner, those meetings**
20 **are, generally speaking, once a month.**
21 Q.  Okay.
22 A.  **The educator misconduct meetings.**
23 Q.  Okay.  So you have educator misconduct meetings once a
24 month.  You speak with Attorney Fenton every day.  Is
25 there any other type of formal meeting that you have on

**33**

1  a periodic basis at the DOE?
2  **A.  I do not think so.**
3  Q.  Is there a duty to report in the Educator Code of
4  Conduct?
5        MR. KENISON-MARVIN: Objection. Legal
6  conclusion.
7        THE WITNESS: There is.
8  BY MR. KAHNE:
9  Q.  What do you understand about the duty to report?
10  **A.  First of all, there is a duty to report provision**
11  **within the code of conduct. That's question one.**
12  Q.  The answer is yes?
13  **A.  Yes.**
14  Q.  Now, my question is what do you understand the duty to
15  report -- the duty to report to encompass?
16  **A.  If -- I think it's a threefold area. The duty to**
17  **report pertains to individual educators, individual**
18  **administrators, and superintendents. And each of those**
19  **groups of people have duties to report violations of**
20  **code of conduct that they're aware of. So I think that**
21  **answers the question.**
22  Q.  Okay. So -- and is failing to report a code of conduct
23  violation an independent violation of the code of
24  conduct?
25        MR. KENISON-MARVIN: Same objection. Legal

**34**

1  conclusion. You can answer.
2        THE WITNESS: That's not a fair question.
3        MR. KAHNE: Okay.
4        THE WITNESS: Because, for example, a
5  teacher's responsibility under reporting is limited, so
6  if the teacher goes to a supervisor and makes a report,
7  then the teacher is perfectly fine.
8        If it's an individual administrator makes the
9  report up the chain to command to their next superior,
10  they've covered their responsibility and duty. It is
11  only when the chain is broken where a person is aware
12  of a code of conduct violation and either refuses to
13  make the report or fails to make the report.
14        So it's a loaded question. It all depends on
15  what level and in which -- if a teacher tells her boss,
16  she's all set. He's all set. Done. The boss, in the
17  administrative level, makes the report. All done. It
18  then goes --
19  BY MR. KAHNE:
20  Q.  I think I understand your testimony. So let me start
21  at the base level. If a teacher that knows of a code
22  of conduct violation and does not report that anywhere,
23  is that a violation of the code of conduct?
24        MR. KENISON-MARVIN: Objection. Legal
25  conclusion.

**35**

1        THE WITNESS: My understanding is
2  potentially, yes. Potentially, yes.
3  BY MR. KAHNE:
4  Q.  Why do you say "potentially, yes"?
5  **A.  Well, we don't know what the facts and circumstances**
6  **are, what she knew, when she knew it. Who did she**
7  **speak to? What was her understanding of the code of**
8  **conduct? There are any number of reasons why that type**
9  **of report would not be made.**
10  **So it's -- I'm a fact-based guy. So it's**
11  **potentially, but it's not clear until you get the facts**
12  **supporting it.**
13  Q.  Do they have to know of an actual violation of the code
14  of conduct, or do they have to report a possible
15  violation of the code of conduct?
16        MR. KENISON-MARVIN: Same objection.
17        THE WITNESS: That's an interesting question.
18  I think that if they -- that's one of the things that
19  we would do in the triage process to see whether
20  misconduct has occurred. What did they know? When did
21  they know it? What was their understanding? What were
22  their duties and responsibilities? And you mix that up
23  not only with the code of conduct at the state level,
24  and licensure, but you also look at it at the policy
25  level at the individual school district.

**36**

1        So it's a very loaded question and it has
2  many nuances. So I'm not going to tell you yes or no.
3  It's not going to happen.
4  BY MR. KAHNE:
5  Q.  But it is possible that you would open an investigation
6  or you would -- sorry -- you would open a case to look
7  into a failure to report for a teacher that didn't
8  report a possible violation of the code of conduct?
9  **A.  It is possible.**
10  Q.  Okay. Same question with respect to superintendents.
11  Superintendents have a duty to report possible
12  violations of the code of conduct?
13  **A.  They do.**
14  Q.  Okay. And if they do not report a possible code of
15  conduct violation, that is a -- that could be a
16  violation of the code of conduct?
17  **A.  Depending on the fact pattern, yes.**
18  Q.  Okay. And I just -- loss of teaching credentials is
19  one of the potential sanctions in the code of
20  conduct?
21  **A.  Well, let's talk about the term "credential." What do**
22  **you mean?**
23  Q.  Well, a credential -- the credential, the ability to
24  teach, for example, within the state of New Hampshire.
25  I'm looking at the code of conduct. It says

**37**

1 "suspension, revocation, or reprimand." And I
2 assume -- I was referring to revocation. So what do
3 you understand revocation to be?
4 **A. Revocation for New Hampshire is the permanent removal**
5 **of a license.**
6 Q. Okay. So it is possible to have -- for the Department
7 of Education to permanently remove the license of a
8 teacher for violation of the code of conduct?
9 MR. KENISON-MARVIN: Objection. Legal
10 conclusion. But you can answer.
11 THE WITNESS: Is it possible? Repeat for me.
12 BY MR. KAHNE:
13 Q. Yeah. So one of the sanctions that the Department of
14 Education can impose for a violation of the code of
15 conduct is revocation of teaching credentials?
16 **A. Yes. Credential, though. I like to talk about**
17 **licenses and endorsements, which are, you know, part**
18 **and parcel of the overall term "credential."**
19 **So I prefer to use the term "license" and, within**
20 **license, "endorsement." Credential is — my**
21 **understanding of credential is any piece of paper this**
22 **agency produces for an educator. So I prefer, if we're**
23 **going to talk about sanctions, I'd prefer to use the**
24 **term "license."**
25 Q. Okay.

**38**

1 **A. And endorsement. I think it's a better way to talk**
2 **about what we do.**
3 Q. Okay. And revocation would mean the loss of a license,
4 right?
5 **A. Correct.**
6 Q. Okay. I want to talk about your role in conducting
7 trainings, which I think you referred to earlier.
8 MR. KAHNE: One second.
9 (Discussion off record.)
10 BY MR. KAHNE:
11 Q. All right. Is it your understanding that a violation
12 of HB 2 would be a violation of the code of conduct?
13 MR. KENISON-MARVIN: Same objection.
14 THE WITNESS: That's not my understanding.
15 MR. KENISON-MARVIN: Legal grounds. You can
16 answer.
17 BY MR. KAHNE:
18 Q. I'm going to show you what's been previously marked --
19 I think it's 1. Exhibit 1.
20 **A. Thanks. What do you want me to do with this?**
21 Q. I'd like you to turn to page PL007.
22 **A. Okay, do you mind if I take a look at the page first?**
23 Q. Yeah, yeah. Please do. Please do.
24 **A. I think you said 007?**
25 Q. That's right.

**39**

1 **A. I'm there now.**
2 Q. Okay. And I'm specifically looking at Roman numeral
3 IV.
4 **A. "Violation of this section by an educator shall be**
5 **considered a violation of the Educator Code of Conduct**
6 **that justifies disciplinary sanction by the State Board**
7 **of Ed." Yes.**
8 Q. Okay. So I'm just -- what I was asking before is
9 whether a violation of -- do you understand this to be
10 HB 2, or what we've been discussing?
11 **A. Yeah.**
12 Q. Okay. And what I was asking before is whether a
13 violation of HB 2 is a violation of the code of
14 conduct?
15 **A. Based upon the Attorney General — Department of**
16 **Justice, the Attorney General's office, their**
17 **determination. Also the determination made here at the**
18 **Department of Education. We would only be — involve**
19 **ourselves after the Human Rights Commission process is**
20 **over.**
21 **So, for example, in this case, if the Human Rights**
22 **Commission determines, through their investigative**
23 **process, not ours, that they have a finding, then it**
24 **would be reported to us and a decision to examine that**
25 **set of facts would be determined. We don't — I don't**

**40**

1 involve myself with these investigations at all.
2 Q. Where does it say that? What you just described, that
3 process, where does it say that?
4 **A. My understanding, it's in the Department of Justice**
5 **memo that went out to the field and to us, and that's**
6 **my marching orders from my supervisors.**
7 Q. Okay. I want to get back for a second to the meetings
8 that you talked about with Attorney Fenton, the
9 commissioner, and the deputy commissioner, the monthly
10 educator misconduct meetings.
11 **A. Yes, sir.**
12 Q. I just want to be clear. The commissioner is involved
13 in the decision as to whether there's been a violation
14 of the code of conduct, right?
15 **A. He is — the meetings have different levels within the**
16 **meetings and different stages of the investigation, so**
17 **to the extent that he — we conduct those meetings and**
18 **he asks questions, he is involved in the process. But**
19 **it's not until a decision is made that he then becomes**
20 **in agreement or disagreement with the recommendation.**
21 Q. Right. And I think you said the buck stops with him,
22 right?
23 **A. Correct.**
24 Q. So he's thumbs up, thumbs down?
25 **A. At the end of the day.**

**41**

1 Q. Okay. And do you ever recall during those meetings
2 discussing course materials of teachers in those
3 educator misconduct meetings?
4 A. **Almost likely.**
5 Q. Almost likely?
6 A. **Yeah.**
7 Q. So you think -- you think you recall that?
8 A. **Maybe. But I don't know in what term do you mean? I**
9 **mean, does it come up in conversation? Does it come**
10 **related to an investigation?**
11 Q. Yeah, either way. Either way.
12 A. **I'm sure it has.**
13 Q. Okay.
14 A. **I don't recall a specific instance, but I'm sure it**
15 **has.**
16 Q. Okay. And what do you recall about that?
17 A. **I don't recall anything about it.**
18 Q. But you do have a recollection that discussions of
19 educator material has come up in those meetings?
20 A. **Sure.**
21 Q. Okay. Frequently?
22 A. **No, not frequently. And -- no, not frequently.**
23 Q. And does the commissioner -- do you recall ever -- the
24 commissioner speaking about educator materials during
25 those meetings?

**42**

1 A. **Specifically or generally?**
2 Q. Take one and then the other.
3 A. **Specifically, I don't recall.**
4 Q. Okay.
5 A. **Generally, I'm almost certain that there have been**
6 **general discussions.**
7 Q. And what do you recall -- what general discussions do
8 you recall about course material with the
9 commissioner?
10 MR. KENISON-MARVIN: I just instruct --
11 object under the deliberative process privilege
12 grounds. To the extent there were discussions of
13 particular materials and discussions about what to do,
14 if anything, with respect to particular materials, I
15 would instruct you not to provide that information in
16 response to this question. To the extent the answer
17 calls for generalized information about discussions,
18 you can provide a generalized answer, but nothing
19 specific as to particular deliberations of any issue.
20 THE WITNESS: I don't know what any of that
21 means. Let's try again.
22 MR. KAHNE: Okay. Yeah.
23 BY MR. KAHNE:
24 Q. Have you ever discussed course materials with -- this
25 can be a yes or no -- with the commissioner during an

**43**

1 educator misconduct meeting?
2 A. **Course materials? You mean curriculum?**
3 Q. Sure.
4 A. **I mean, generally. Maybe. I don't have a direct**
5 **recollection of a specific instance, but, generally,**
6 **maybe.**
7 Q. Have you ever discussed HB 2 during those educator
8 misconduct meetings?
9 A. **I haven't discussed HB 2 with the commissioner or**
10 **anybody else in this building for a long time.**
11 Q. When was the last time you remember discussing?
12 A. **Shortly after it was passed.**
13 Q. Okay. And what do you remember about those
14 conversations?
15 A. **What is -- what is our -- I was curious as to what my**
16 **role would be.**
17 Q. Okay. And did you have -- so you were curious as to
18 what your role would be, and so did you have
19 conversations with people at the DOE about that?
20 MR. KENISON-MARVIN: I'll instruct the
21 witness not to answer specifics as to conversations
22 with the -- to the extent the question calls for "did
23 you have conversations," you can answer.
24 THE WITNESS: I'm certain we had
25 conversations, and I am also certain that the

**44**

1 Department of Justice solved the problem for me.
2 BY MR. KAHNE:
3 Q. Did you have conversations with the commissioner?
4 A. **I don't remember. Generally. Perhaps, but I don't**
5 **remember.**
6 Q. Do you have an understanding as to whether the
7 commissioner supported the passage of HB 2?
8 A. **You'll have to ask him. I have no idea.**
9 Q. Okay. I started to talk about your trainings that you
10 conduct.
11 A. **Yes.**
12 Q. Do I have it correct that you conduct trainings on both
13 the code of conduct and the code of ethics?
14 A. **Well, code of conduct, not the code of ethics. Code of**
15 **ethics is not in my realm.**
16 Q. Okay.
17 A. **Code of conduct is the enforceable action. Therefore,**
18 **I would only -- code of ethics is theoretical and**
19 **guidance. Code of conduct is actually enforceable. So**
20 **the trainings that I would -- that I have conducted in**
21 **the past have centered on code of conduct as opposed to**
22 **the code of ethics.**
23 Q. Who do you give those trainings to?
24 A. **It depends on who asks, and it depends on whether I go**
25 **individually, whether I go with Attorney Fenton, or**

---

45

1    whether Attorney Fenton handles them. So it depends.
2 Q. Okay. So break down those scenarios. When you go with
3    Attorney Fenton, is it usually to a certain type of
4    audience?
5 A. No, no. We've -- Attorney Fenton and I, together, have
6    conducted those trainings for small -- very small
7    groups, and very large groups. Generally, the issue as
8    to who provides the training has to do with what the
9    schedule looks like and whether, you know, we're
10   available, who's available. And that's how -- that's
11   what determines which one of us goes or whether we both
12   go.
13 Q. I'm interested in who the -- like, who the audience is.
14 A. Oh. Audiences could be -- we have done trainings for
15   individual charter schools. We've done trainings for
16   individual schools. We've done training for train the
17   trainer, where administrators for a large district
18   would come together and provide the training to
19   administrators who then go out and provide the training
20   to their subordinates. We've -- in smaller districts,
21   we have provided training for the entire district.
22        So it depends. We're pretty responsive to the
23   people asking us to come in. I try to be very
24   responsive. So I've done trainings for 10 people, and
25   I've done trainings for several hundred.

46

1 Q. So -- and the audience can be comprised of
2    superintendents?
3 A. Oh, we've done superintendent meetings, yeah, sure.
4 Q. Teachers themselves? Educators?
5 A. Teachers, yeah. Yeah.
6 Q. All right. Let's do Exhibit 7.
7 A. Do you want this one back?
8 Q. Sure. Yeah. Thank you.
9 A. Okay. How can I help you?
10 Q. So looking at Exhibit 7, it's DOE10057. This appears
11   to be an email from Diana Fenton to you. The subject
12   is "code of conduct." And the subject -- the email
13   itself says, "I updated it to include section 297 or HB
14   2. Please review."
15        Do you see that?
16 A. I do.
17 Q. Do you remember receiving this email?
18 A. I do.
19 Q. And the attachment, which, if you look, appears to be
20   your presentation, right?
21 A. It's the Department of Education presentation.
22 Q. Okay, but a presentation that you deliver along with
23   Attorney Fenton?
24 A. I have. I have done this presentation.
25 Q. Okay. My question is why was it updated to include

47

1    section 295 for HB 2?
2 A. Do you mind if I take a look at it to make sure?
3 Q. Sure, sure. Go ahead.
4 A. Thanks. This looks like the PowerPoint.
5 Q. It looks like the PowerPoint that you delivered to
6    superintendents?
7 A. Anybody that asks.
8 Q. So that could include superintendents?
9 A. Yeah.
10 Q. Could include teachers?
11 A. Sure.
12 Q. Okay. So what I was going to ask you is why was this
13   presentation updated to include section 297?
14 A. Well, the field was asking a great deal of questions
15   about the so-called HB 2 and our role in it. And I
16   thought, as well as Attorney Fenton thought, it would
17   be very important to let the field know exactly how
18   that would work for us, and what to expect from us. So
19   I think it was only fair to tell the field -- make the
20   field aware of our position and alleviate some of their
21   concerns.
22        There was a great amount of concern when this was
23   first put into place, and I think adding it was the very
24   appropriate thing to do.
25 Q. So I want to -- you used the term "the field." Who is

48

1    "the field"?
2 A. Teachers, administrators. Educators.
3 Q. So there was a great deal of concern from teachers,
4    educators, superintendents, too?
5 A. Everybody including me.
6 Q. About HB 2?
7 A. Yes.
8 Q. Okay. Why was there concern?
9 A. What was -- what did it mean? What was their role?
10   What was a violation? How would the process work? And
11   would there actually be sanctions on the license, which
12   basically you're talking about people's livelihood.
13   And what would the process be?
14        So we included that in our presentation.
15 Q. And you were concerned, too, you said?
16 A. Sure.
17 Q. And why were you concerned?
18 A. Because I'm the one that has to investigate this stuff,
19   and I wanted it to be as crystal clear as possible. I
20   don't like murky. I like clear.
21 Q. And fair to say when it was first passed, there was a
22   good deal of murkiness?
23 A. There was a perception of murkiness. What would we do?
24   How would we do it? I'm not talking about anybody
25   or -- anybody, anything in particular. I'm just

**49**

1    looking at what was the role of this agency going to
2    be?  And there was a lot of rumor, innuendo, murkiness,
3    and I wanted -- I'm a guy that likes clear.  So I
4    thought it was important to add this in.
5  Q.   When you delivered this -- and it looks like this is
6    August 2021, so pretty soon after the passage of HB
7    2 -- did you receive questions at these trainings
8    regarding HB 2?
9  A.   I'm sure I did.
10 Q.   Okay.  And what types of questions did you get?
11 A.   Well, again, I'm just reviewing.  Questions.  What
12   would happen if this?  What do you do?  What does the
13   department do?  And the answers, basically, were what
14   was in the PowerPoint presentation.
15 Q.   Well, so let's look at that.  So what's in the
16   PowerPoint presentation, it appears to be, if you look
17   at -- I think it's starting on DOE10079, I believe it's
18   the three pages concerning HB 2, so it looks like the
19   presentation has the actual statute?
20 A.   That's what it looks like, yep.  Yep.
21 Q.   Okay.  But were you asked questions about what was
22   covered by the statute?
23 A.   I don't know.
24 Q.   What types of material was -- is prohibited under the
25   statute?

**50**

1  A.   No, I think -- my recollection is most of the questions
2    would center around what would we, as an agency, do for
3    complaints?  And that's what I limited it to.
4  Q.   And what was your answer when that was asked?
5  A.   Technical advisory by the Attorney General's office,
6    and that we wouldn't be investigating those.  They
7    would go to the human rights -- HRC or to the
8    Department of Justice.  And it would only occur after a
9    finding was made in those places.
10       So the idea that we were out conducting these
11   investigations, I wanted it clear that we did not until
12   such time as there was a finding with the -- with the
13   Human Rights Commission and with the Department of
14   Justice.
15 Q.   And, again, the fact that you were not going to conduct
16   those investigations, where did you get that
17   instruction from?
18 A.   Attorney Fenton and the leadership in this building.
19 Q.   And is there a writing about that?
20 A.   I don't recall, but I know what -- I know what my
21   mission is.
22       MR. KAHNE:  Okay.  And to the extent that
23   there is a writing, Nate, we would call for the
24   production of that.
25   BY MR. KAHNE:

**51**

1  Q.   Was there -- were you asked questions about what the
2    statute means during these trainings?
3  A.   I may have been, but I wouldn't have answered those
4    questions.  I would have said this is our process, and
5    the process is refer to the Human Rights Commission,
6    Department of Justice.  The finding occurs, then it
7    comes back to us.
8  Q.   Do you have an understanding of what's prohibited under
9    the statute?
10 A.   I try not to.
11 Q.   Why do you try not to?
12 A.   It's just not my role.  It just isn't my role.  My role
13   is if HRC or the Department of Justice has a finding
14   that there is a violation of HB 2, then my role begins.
15   Nothing before that.
16 Q.   Do you understand the words -- the way the statute
17   operates?
18 A.   I understand.
19       MR. KENISON-MARVIN:  Objection to the extent
20   it's calling for legal analysis.
21   BY MR. KAHNE:
22 Q.   Just do you understand it?
23 A.   I've read it.
24 Q.   Okay.  You've read it, but do you understand what's
25   prohibited under it?

**52**

1  A.   I'm not an attorney.  I read it.  I think I understand
2    it, but it's irrelevant to me.  It's completely
3    irrelevant to me because my mission, my goal, occurs
4    only after there's a finding with the HRC.
5  Q.   You were a teacher?
6  A.   I was.
7  Q.   Right?  Do you -- having read the statute, do you have
8    a sense of what you couldn't teach as a teacher?
9  A.   I was a teacher 30 -- 40 years ago.
10 Q.   Assume you're a teacher now.
11 A.   I don't want to do that.
12 Q.   Okay.  Well, I'm asking you.  Just assume.  What would
13   you not be able to teach under the statute?
14       MR. KENISON-MARVIN:  Same objection, to the
15   extent it calls for a legal conclusion.
16   BY MR. KAHNE:
17 Q.   If you know?
18 A.   I don't.
19 Q.   You don't know.  Okay.  You referenced, I believe, a
20   DOJ memo out to the field regarding the DOE's role in
21   HB 2?
22 A.   No, not the DOE memo.  It would be the DOJ memo.
23 Q.   What memo?
24 A.   The technical advisory.
25 Q.   Is that the FAQ?  Is that what you're talking about?

**53**

1      Don't know?  Let's go to exhibit -- this is a
2  new -- this is a new exhibit.  Exhibit 24.
3      (Exhibit 24 marked for identification.)
4  BY MR. KAHNE:
5  Q.  And take a moment.  I don't want to --
6  **A.  Okay.  What am I looking at?**
7  Q.  So what I've just put in front of you is a document
8  that bears Bates number DOE09644, and it appears to be
9  an email from you to Diana Fenton regarding code of
10  ethics training dated October 18th, 2021.
11      And the email from you reads, "I have been asked
12  to schedule this training and perhaps do the
13  presentation.  Please find attached documents for
14  dissemination to your staff.  Is it possible to provide
15  a laptop and a PowerPoint for use?"
16      And it goes on.  Do you see that?
17  **A.  I do.**
18  Q.  First of all, is there a code of ethics training versus
19  a code of conduct training?
20  **A.  I don't do code of ethics training, so it would be code**
21  **of conduct training.**
22  Q.  So it just says code of ethics because it's a
23  mistake?
24  **A.  I have no idea why it says that.**
25  Q.  Okay.  Do you recall doing this training that's

**54**

1  referenced in Exhibit 24?  Compass Classic Academy.
2  **A.  I don't recall doing that training.**
3  Q.  Okay.  Attached to this email is a document that I just
4  referred to as "FAQ."  What I meant by that is
5  frequently asked questions.
6  **A.  Yes.**
7  Q.  Did you circulate this in connection with the
8  presentation to Compass Classic Academy?
9  **A.  I don't recall doing a presentation at Compass**
10  **Academy.**
11  Q.  Okay.
12  **A.  So if this was generated, it wasn't generated by me.**
13  Q.  Okay.  Did you, from time to time, in advance of your
14  presentations, circulate the frequently asked questions
15  document?
16  **A.  I don't recall sending that document related to the**
17  **code of conduct training.**
18  Q.  You mentioned -- you talked about a memo, a DOJ memo.
19  Is this the DOJ memo that you were talking about, or is
20  there another one?
21  **A.  What I'm referring to is the technical advisory.  So if**
22  **this is the technical advisory, that's what I'm talking**
23  **about.**
24  Q.  Have you ever seen the -- is this the technical
25  advisory?

**55**

1  **A.  I don't know.**
2  Q.  Do you recall ever speaking with training participants
3  about this document?
4  **A.  No.**
5  Q.  Have you reviewed this document before?
6  **A.  Yes.**
7  Q.  Okay.  So you know sort of in substance what it says?
8  **A.  I do.**
9  Q.  And is it your testimony that you would not answer
10  questions about what was and was not prohibited under
11  the statute at these trainings?
12  **A.  I stayed away from that.  I talked about our role and**
13  **our process in general because that's what the code of**
14  **conduct is.**
15  Q.  Did Attorney Fenton discuss what is and was not
16  prohibited?
17  **A.  You know, in the past year anyway, Attorney Fenton has**
18  **done more of these trainings than I have, so I can't**
19  **answer that question.  In many instances, I wasn't**
20  **there.**
21  Q.  Okay.  But in the ones that you were with Attorney
22  Fenton, do you recall any questions about what could
23  not be taught under the statute?
24  **A.  If there were such questions, I would have deferred to**
25  **her.  She's -- she's the legal person and she's my**

**56**

1  **boss.**
2  Q.  And do you have any recollections of what she said?
3  **A.  I don't.**
4  Q.  Okay.
5  **A.  I honestly don't.**
6  Q.  Do you recall those questions coming?
7  **A.  I don't.**
8      MR. KENISON-MARVIN:  Are we on a good spot to
9  take five?
10      MR. KAHNE:  Sure, sure.  We've been going a
11  while.
12      (Recess taken.)
13  BY MR. KAHNE:
14  Q.  Investigator Farrell, when we talked before the break,
15  you mentioned a technical advisory?
16  **A.  Yes.**
17  Q.  And can you describe for me what the technical advisory
18  is, to the best of your understanding?
19  **A.  To the best of my understanding, technical advisory**
20  **basically outlines how HB 2, compliance with HB 2,**
21  **would take place.**
22  Q.  Okay.  And we were just looking at -- I think it's 24.
23  **A.  Yep.**
24  Q.  And the second page of that is a frequently asked
25  questions document.  My question for you is do you know

57

1  whether this is the technical advisory you were
2  referring to?
3  **A.  I believe it is.**
4  Q.  You believe it is?
5  **A.  Yeah.**
6  Q.  Okay.  And I believe you testified that the technical
7     advisory indicates that complaints are to be filed with
8     the Human Rights Commission?
9  **A.  HRC or the Department of Justice.**
10  Q.  Okay.  Where does it say that?
11  **A.  I haven't read it today.**
12  Q.  Okay.  So can you take a look at it?
13  **A.  Okay.**
14  Q.  Okay.  So do you have -- where, in the technical
15     advisory, does it say that complaints are supposed to
16     be filed with the Commission for Human Rights?
17        MR. KENISON-MARVIN:  Objection.  Misstates
18     prior testimony.  You can answer.
19        THE WITNESS:  I think it's under 11 and 12.
20     At least that's my understanding of it.
21     BY MR. KAHNE:
22  Q.  Does it say anywhere here that a complaint can be filed
23     for a code of conduct violation with the Department of
24     Education?
25  **A.  It doesn't say that, nor does it say it can be.**

58

1  Q.  So it doesn't either -- it doesn't say either way,
2     right?
3  **A.  That's correct.**
4  Q.  And, in addition to the Human Rights Commission, it
5     does also say that a complaint can be filed with the
6     Attorney General's office, right?
7  **A.  Correct.**
8  Q.  And it says that a civil claim can be filed in superior
9     court.  Do you see that?
10  **A.  I do.**
11  Q.  Okay.  Do you understand those to be other avenues for
12     filing a complaint?
13  **A.  Yes.**
14  Q.  You testified, I believe, that your understanding of
15     the procedure was that complaints about HB 2 were
16     supposed to go to HRC; is that right?
17  **A.  HRC, and I said Department of Justice and the Attorney**
18     **General's office.**
19  Q.  All right.  Is that right?  Is that all complaints
20     about HB 2?
21        MR. KENISON-MARVIN:  Objection to the extent
22     it calls for a legal conclusion.  You can answer.
23     BY MR. KAHNE:
24  Q.  I'm interested in what your understanding of the
25     Department's policy is with respect to complaints filed

59

1  about HB 2.
2  **A.  My understanding --**
3        MR. KENISON-MARVIN:  Objection.  Vague.  You
4     can answer.
5        THE WITNESS:  My understanding is that my
6     marching orders are that those complaints go to HRC,
7     Department of Justice.  They don't come to me.
8     BY MR. KAHNE:
9  Q.  All complaints?
10  **A.  For human -- for HB 2.**
11  Q.  Right.  Okay.  I'd like to use -- I'm going to show you
12     a document that's been previously marked Exhibit 3.
13     Just take a quick -- if you want to take a quick look?
14     Does this look familiar to you?
15  **A.  Yes.**
16  Q.  Okay.  And what is this?
17  **A.  It's a PowerPoint presentation that was created by**
18     **Attorney Fenton regarding practices and our**
19     **investigations.**
20  Q.  Did you play any role in drafting this?
21  **A.  I reviewed it, I think -- if I recall correctly, I**
22     **think I made a couple of spelling corrections, things**
23     **like that, but Attorney Fenton is the -- is the**
24     **architect.**
25  Q.  Okay.  First, if you go to DOE05656, there's a slide

60

1  that says, "Who do I call?"
2  **A.  Yes.**
3  Q.  It says, "All reports of educator misconduct are made
4     to Richard Farrell," with your contact information, and
5     Diana Fenton with her contact information.  Do you see
6     that?
7  **A.  Yes.  Yes, sir.**
8  Q.  And is that true?
9  **A.  It's true because it's here.  And, in practice, they**
10     **come to me and they come to Attorney Fenton.**
11  Q.  And this presentation, like the previous presentation
12     we were looking at, was updated to include the new HB
13     2.  And I'm looking specifically at DOE05665.
14        MR. KENISON-MARVIN:  To the extent there's a
15     question, I'll object to it being vague.
16        MR. KAHNE:  There's no question yet.
17        THE WITNESS:  What's the number again?  I'm
18     sorry.
19        MR. KAHNE:  05665.
20        THE WITNESS:  Yeah, there were -- I see them.
21     BY MR. KAHNE:
22  Q.  Okay.  And so does this -- does it appear here that
23     this training was updated to include a section on HB
24     2?
25  **A.  There were two -- there were two additions.  First one**

61

1     was HB 1240, and the second addition was HB 2.
2  Q.  Okay.  Speaking specifically about the page on HB 2.
3     There's text about an allegation of violation of HB 2,
4     how it's to be adjudicated.  The third bullet on this
5     page says, "So why the website?"
6        Do you have an understanding as to why it says
7     that?
8  A.  I think I do, but that's just an opinion.
9  Q.  Okay.  What is your opinion?
10 A.  There was a --
11       MR. KENISON-MARVIN:  I'm just going to
12    instruct the witness not to answer to the extent that
13    your opinion would involve testimony about discussions,
14    deliberations about why a website exists, or something
15    related to a website existing.  Deliberative
16    discussions about why the website.  If you want to hear
17    the question again, I can make that more specific.
18    BY MR. KAHNE:
19 Q.  The question is what is your understanding of why this
20    bullet, "So why the website?" is there?
21 A.  My understanding is there is a reference to a website
22    where complaints can be filed.  It was posted on the
23    Department of Education website.  I think that's what
24    it is, but I don't know.
25 Q.  Okay.  There was a -- your understanding is that there

62

1     was a website where complaints could be filed on the
2     Department of Education website?
3  A.  It's in the Department of Education website, I
4     believe.
5  Q.  What is the answer to this question:  So why the
6     website?
7  A.  I don't have an answer to the question.  This is --
8     this training is generally conducted by Diana Fenton.
9     I don't know why it's there, and if I were conducting
10    the training, I don't know that I would have an answer
11    for it.
12 Q.  Do you have an understanding as to whether there was
13    confusion about where members of the public could file
14    complaints?
15 A.  Ask it again, please.
16 Q.  Was there confusion about where members of the public
17    could file complaints after the passage of HB 2?
18       MR. KENISON-MARVIN:  Objection.  Vague and
19    compound to the extent it's a different question to the
20    one that was asked and asked to be repeated.
21       MR. KAHNE:  That's not really --
22       MR. KENISON-MARVIN:  What I mean is the first
23    question is "Do you understand," and the second one is
24    "Is there."
25    BY MR. KAHNE:

63

1  Q.  So my question is was there confusion after the passage
2     of HB 2 as to where people could file complaints?
3  A.  My recollection is that there -- there was a lack
4     of mechanism, period.
5  Q.  What do you mean by "lack of mechanism"?
6  A.  Well, I think -- there was no place identified for
7     people to go.
8  Q.  And do you recall on or about November of 2021 there
9     being the launch of a DOE website for the filing of
10    complaints?
11 A.  I don't have an independent recollection of that.
12 Q.  Okay.
13 A.  If you have something?
14 Q.  Yeah, I do.
15       MR. KAHNE:  This is going to be Exhibit 25.
16       (Exhibit 25 marked for identification.)
17    BY MR. KAHNE:
18 Q.  So does that refresh your recollection as to the DOE
19    launching a website for the reporting of complaints?
20 A.  I remember this press release.
21 Q.  Okay.  What do you remember about it?
22 A.  I remember that it was issued.
23 Q.  Okay.  Do you remember Diana Krol building a website
24    for individuals to use to report incidences of
25    discrimination?

64

1  A.  I don't know what Diana Krol did.
2  Q.  Okay.  Do you recall having discussions with the
3     commissioner about the launching of the web page?
4  A.  Define "discussions."
5  Q.  Any conversations.
6  A.  I think I recall that there was a website that was
7     going to be launched.  Other than that, that was the
8     extent of the discussion.
9  Q.  Do you know why the DOE launched a website?
10       MR. KENISON-MARVIN:  Objection.  I instruct
11    you not to answer to the extent the answer calls for
12    deliberations as to why something was being done.
13       THE WITNESS:  No idea.
14    BY MR. KAHNE:
15 Q.  Do you know who, at the DOE, wanted the website?
16 A.  I don't.
17 Q.  Do you know whether it was the commissioner?
18 A.  I don't.
19 Q.  I want to show you -- do you know whether there was
20    contact information for DOE employees on the website?
21 A.  I do not.
22 Q.  Who is Kate Walker?
23 A.  Oh, Kate Walker no longer works here.  She was a staff
24    person here.
25 Q.  A what?

**65**

1  A.  A staffer here.

2  Q.  And what were her job responsibilities?

3  A.  I really don't know.

4  Q.  Did she have any role in investigations?

5  A.  There was a period of -- no, not in investigations,

6  no.

7  Q.  You were about to say there was a period?

8  A.  There was a period of time where she was trying to

9  create a dashboard, but that never got off the ground.

10  So in terms of active role in investigations, she had

11  none.

12  Q.  Let me show you a document that was previously marked

13  Exhibit 21.  And I'm going to represent to you that

14  this is a snapshot of the DOE website from November

15  10th, 2021.

16  MR. BISSONNETTE:  Could I just also add to

17  the record that there is handwriting at the top of the

18  document.  That is my handwriting, just to more visibly

19  reflect my understanding that this is an extraction of

20  the website as of November 10th, 2021.  I just wanted

21  to make that clear because I didn't yesterday.

22  THE WITNESS:  The Wayback Machine?

23  MR. KENISON-MARVIN:  We can have a

24  discussion --

25  THE WITNESS:  Brings back memories.

**66**

1  MR. KENISON-MARVIN:  We can have a discussion

2  off the record about what the Wayback Machine is.  But

3  I did want to explain where that handwriting came from,

4  that it is mine.

5  BY MR. KAHNE:

6  Q.  So is this the Department of Education's website, to

7  your knowledge?

8  MR. KENISON-MARVIN:  I'm going to object on

9  106.  It was represented that this is a portion of, so

10  to the extent --

11  BY MR. KAHNE:

12  Q.  Okay.  So is it your understanding this is a portion of

13  the Department of Education's website?

14  A.  Sure.

15  Q.  And is this the -- we previously looked at a Exhibit

16  25, which was a press release about the launching of a

17  website.  Is it your understanding that this is the

18  website that was launched in November 2021?

19  MR. KENISON-MARVIN:  Same objection on

20  completeness under Rule 106.

21  MR. KAHNE:  You can answer.

22  THE WITNESS:  I had virtually nothing to do

23  with this.

24  BY MR. KAHNE:

25  Q.  Ever go to the website?

**67**

1  A.  No.

2  Q.  Do you know -- have any knowledge about whether DOE --

3  whether Kate Walker's name was removed from the website

4  at any point?

5  A.  I have no idea.

6  Q.  Let me show you a document that's been previously

7  marked Exhibit 22.  Have you had a chance to look at

8  that?

9  A.  I did.

10  Q.  What do you recall about Exhibit 22?

11  A.  Nothing.

12  Q.  This appears to be an email from you to Diana Fenton on

13  November 15th, 2021, and the subject line is "New

14  Hampshire Moms for Liberty chapter offers $500 to

15  anyone who can catch teachers breaking a new

16  discrimination law."

17  Do you see that?

18  A.  I do.

19  Q.  And it looks like you forwarded an email to Diana

20  Fenton from Business Insider Australia.  Do you see

21  that, too?  Do you see that?

22  A.  I do.

23  Q.  What do you recall about forwarding this article to

24  Diana Fenton?

25  A.  Absolutely nothing.

**68**

1  Q.  What do you recall about the Moms for Liberty bounty?

2  A.  I knew it was out there.  That's it.

3  Q.  Well, what did you -- how did I find it?

4  A.  Someone sent it to me, I think.  But, again, that's

5  speculation.  I don't know.  I became aware of it.  I

6  sent it to my supervisor.

7  Q.  Why did you send it to your supervisor?

8  A.  I think it potentially was germane to the topic.

9  Q.  Germane to what topic?

10  A.  Our involvement in HB 2.

11  Q.  Okay.  And why was -- why was the moms -- I'm just

12  trying to unpack this.  Why was Moms for Liberty bounty

13  germane to your involvement in HB 2?

14  A.  I wanted --

15  MR. KENISON-MARVIN:  Objection to the extent

16  it doesn't represent the testimony.  You can answer if

17  you understood the question.

18  THE WITNESS:  I provide Attorney Fenton with

19  anything that I think is relevant to our ongoing

20  process.  So this -- and I'm speculating because I

21  don't see the initial email because there had to have

22  been an initial email.  I don't know why I sent it to

23  her other than it was a timely topic and I wanted her

24  to be aware of it.

25  BY MR. KAHNE:

**Page 69**

1   Q.  Why did you want her to be aware of it?
2   A.  **Seriously?**
3   Q.  Yeah.
4   A.  **Because it was germane to the topic of the day, meaning**
5       **HB 2. So I saw it and I sent it to her.**
6   Q.  Were you concerned by it?
7   A.  **Not particularly.**
8   Q.  Why not?
9   A.  **I think it speaks for itself.**
10  Q.  You say here, "An anti-LGBT group is also offering
11      $500."
12          Do you know what LGBT group?
13  A.  **Anti.**
14  Q.  Sorry. Anti-LGBT group.
15  A.  **And I don't recall.**
16  Q.  Do you recall conversations with Attorney Fenton about
17      the bounties?
18  A.  **I'm sure we had discussions, but I don't recall that.**
19  Q.  You don't recall anything about them?
20  A.  **I just -- no, I honestly don't. I sent it up. It was**
21      **timely. And that's the end of it.**
22  Q.  And was it timely because -- it was timely because of
23      the passage of HB 2 and DOE's role in enforcing HB 2?
24  A.  **I think it was just timely in that it involved**
25      **teachers, and education, and the education field, so I**

**Page 70**

1       think it was timely in that respect.
2   Q.  This -- the article is from November 15th, 2021. Do
3       you see that?
4   A.  **I see that.**
5   Q.  Okay. And the website I showed you was from November
6       10th, 2021.
7   A.  **Okay.**
8   Q.  Do you see any connection between those two things?
9   A.  **I don't.**
10  Q.  Did you see an increase in complaints to the DOE after
11      the establishment of the website, the launch of the
12      website?
13  A.  **I don't think we got an increase in complaints because**
14      **there were no complaints before HB 2 regarding HB 2, so**
15      **any complaint would be more than what we had before HB**
16      **2.**
17  Q.  Well, sure. But HB 2 was passed in June of 2021,
18      right? And then the website launched in November of
19      2021?
20  A.  **Let's think about the timing here. June. Summer**
21      **vacation. Kids aren't in school.**
22  Q.  Okay.
23  A.  **There's a practical application here. So before HB 2,**
24      **there were no HB 2 complaints. After HB 2, it happened**
25      **in the summer. There's -- kids aren't in school.**

**Page 71**

1       There's a lot of other things happening. And then the
2       fall comes in, and one complaint under HB 2 would be
3       more than we had in May of 2021.
4   Q.  So but fair to say that you received more HB 2
5       complaints after November of 2021?
6   A.  **No, that's not fair to say. I don't -- I never said**
7       **that, and I don't recall.**
8   Q.  Do you think that the passage of HB 2 impacted teachers
9       in the field?
10  A.  **You're asking me for an opinion?**
11  Q.  Yeah.
12  A.  **You'd have to ask the teachers in the field.**
13  Q.  Did you observe any -- in your investigations, any
14      difference in the way things were being reported to the
15      DOE?
16          MR. KENISON-MARVIN: Objection. Vague. You
17      can answer.
18          THE WITNESS: No, the same types of
19      misconduct when things came in at the same relative
20      rate regarding code of conduct violations.
21      BY MR. KAHNE:
22  Q.  But then you would also receive complaints relating to
23      HB 2?
24  A.  **I don't know that we received a great deal of**
25      **complaints, to be honest with you. And, if we did, I**

**Page 72**

1       didn't deal with them.
2   Q.  Did the commissioner ever ask you to look into course
3       material after the passage of HB 2?
4           MR. KENISON-MARVIN: I'll just instruct the
5       witness to not answer to the extent you would say --
6       information about conversations, deliberations about
7       what that means. It's a yes-or-no question. You can
8       answer to the extent the question calls for that.
9           THE WITNESS: Okay. So one more time?
10      BY MR. KAHNE:
11  Q.  Did the commissioner ever ask you to look into course
12      material after the passage of HB 2?
13  A.  **Course material?**
14  Q.  Instructional material, curriculums.
15  A.  **I honestly don't recall him asking me to look into**
16      **instruction materials. He may have. I don't -- just**
17      **don't recall.**
18          MR. KAHNE: I'm going to show you a new
19      document that is Bates number 000068 and it will be a
20      new document number 26.
21          (Exhibit 26 marked for identification.)
22      BY MR. KAHNE:
23  Q.  Okay. Do you recall receiving this letter?
24  A.  **I remember reading it, yes.**
25  Q.  Okay. What is "No Left Turn," to your knowledge?

73

1  A. I have absolutely no idea.
2  Q. Okay. Well, the first line says, "No Left Turn in
3     Education is a national education advocacy
4     organization."
5        Any reason to believe that's not true?
6  A. If that's what they say they are, I guess it's true.
7  Q. Okay. What is your recollection of receiving this --
8     receiving this letter?
9  A. I don't know what you mean.
10 Q. What do you remember about receiving this letter?
11 A. I received it.
12 Q. Anything -- the circumstances surrounding your receipt
13    of this letter?
14 A. No.
15 Q. Okay. If you look at the second page, the second to
16    last paragraph says, "It is" -- so I should say, the
17    paragraph before says, "While some educators signed the
18    same pledge before New Hampshire's law was passed, they
19    did so anticipating passage of New Hampshire's law and
20    promising to break it after enactment."
21       Then the next paragraph says, "It is more than
22    enough evidence for this board to act and for the
23    bureau to open investigations into all New Hampshire's
24    Zinn pledge signatories. The educator code itself
25    states that the Department of Education shall undertake

74

1     an investigation of an educator if the department
2     merely has reason to suspect that any educator
3     knowingly failed to report a violation of the codes."
4        Do you see that?
5  A. I see it.
6  Q. Do you agree with it?
7  A. Do I agree with what?
8  Q. With that characterization of the educator code.
9        MR. KENISON-MARVIN: Objection to the extent
10    it calls for a legal conclusion.
11       BY MR. KAHNE:
12 Q. Do you agree with that characterization of that -- is
13    that an accurate reflection of what the educator code
14    says?
15 A. No.
16 Q. It doesn't say that it shall undertake an
17    investigation?
18       MR. KENISON-MARVIN: Objection to the extent
19    there's a completeness issue about what the code says.
20    And the entire code is not in front of him.
21       MR. KAHNE: You can answer.
22       THE WITNESS: Try again.
23       BY MR. KAHNE:
24 Q. Why is that incorrect?
25       MR. KENISON-MARVIN: Same objections. You

75

1     can answer.
2        THE WITNESS: They took on the pieces of the
3     code. They didn't take out the entire code, nor did
4     they take any technical advisory, nor did they take in
5     our policies and procedures. This is their opinion.
6     It's some character named Michael Green. Because he
7     says it doesn't make it so.
8        BY MR. KAHNE:
9  Q. He attached a list of teachers to this letter?
10 A. Yes.
11 Q. Did you see that?
12 A. I did.
13 Q. Okay. And did you look into any of these teachers that
14    is attached to this letter?
15 A. I don't remember. I remember that we got the letter.
16    It went to Drew Cline, the board chair. I believe
17    that's who he is. And I don't know that we looked into
18    or conducted an investigation into any of these
19    teachers.
20 Q. You don't know if you did?
21 A. I don't remember doing it.
22 Q. But you may have?
23 A. I don't know.
24       MR. KAHNE: That's a new document, Exhibit
25    27.

76

1        (Exhibit 27 marked for identification.)
2        BY MR. KAHNE:
3  Q. So this is a document dated February 22nd, 2022. It is
4     from Diana Krol to Commissioner Edelblut. Do you see
5     that?
6  A. I do.
7  Q. And if you look all the way at the bottom, there is a
8     series of media inquiries --
9  A. Yes, sir.
10 Q. -- including one involving the New Hampshire chapter of
11    No Left Turn in Education. Do you see that?
12 A. Where is that?
13 Q. So there's an email from Kimberly Houghton to
14    Commissioner Edelblut, and it says, "I have some media
15    inquiries from over the weekend."
16 A. I'm reading that, yep.
17 Q. Okay. And then if you look to the next page, DOE06882,
18    at the bottom, there's a press release from the New
19    Hampshire chapter of No Left Turn in Education. Do you
20    see that?
21 A. Got it.
22 Q. Okay. And the press release appears to relate to the
23    letter and the signing of the Zinn pledge that's
24    reflected in the letter. Do you see that?
25 A. I do.

77

1  Q.  Okay. Now, at the top of this email chain, Diana Krol
2     says to the commissioner, "I have Rich doing some
3     digging as well. Below is the link to the contact
4     section on their website, if all else fails," and it
5     appears to have the No Left Turn website.
6        Do you see that?
7  A.  I see it.
8  Q.  Does it refresh your recollection as to what digging
9     you did regarding the No Left Turn letter?
10  A.  It doesn't.
11  Q.  Do you have any reason to believe that you didn't do
12     the digging that's reflected here?
13  A.  Well, you have to look at who wrote the email. And
14     Diana Krol — I don't work for Diana Krol, so I don't
15     know where she would represent to the commissioner that
16     I did anything.
17  Q.  So she would have no reason to know if you were
18     investigating?
19  A.  I'm not sure, but she's not my boss. I wouldn't be
20     responding to her.
21  Q.  Did you communicate with superintendents about the No
22     Left Turn letter?
23  A.  I think some superintendents communicated with us.
24  Q.  Okay. And what do you recall about that?
25  A.  That they saw some of the media attention to No Left

78

1     Turn and were concerned about it.
2  Q.  Why were they concerned about it?
3  A.  Because they have educators that work for them on the
4     list, so, of course, they would be concerned.
5  Q.  Okay. And do you know whether educator --
6     superintendents also received the same No Left Turn
7     letter?
8  A.  I believe. I believe many of them did, but, again,
9     that's an independent recollection. I can't say yes,
10     but I believe that some of them, or many of them,
11     did.
12  Q.  And then your recollection is they contacted you?
13  A.  I think there was some contact between some
14     superintendents and me.
15  Q.  And what do you recall about those communications that
16     you had?
17  A.  The only thing I can remember — and I think there
18     might be some emails where I said — where this is not
19     our thing.
20  Q.  Why was it not your thing?
21  A.  Because HB 2 isn't my thing. HB 2 violations are not
22     my thing. And many of the — many of the allegations
23     made in the No Left Turn stuff just were factually not
24     true.
25  Q.  Well, which is it? Was it not your thing, or was it

79

1     the -- that the allegations were not true?
2  A.  Well, so it was really easy for me because I'm not
3     doing HB 2 investigations. So that was very easy for
4     me. In reading, independently reading the documents,
5     some of what they wrote in their documents just weren't
6     factual.
7  Q.  What wasn't factual that you remember?
8  A.  Well, let me review some of this stuff.
9        In Exhibit 26, they make their decision that
10     there's more than enough evidence for us to open an
11     investigation, when, in fact, that's not true.
12  Q.  Okay. It's not true because there was not enough
13     evidence to open an investigation?
14  A.  It's not true because we don't investigate these
15     allegations.
16  Q.  Okay.
17        (Exhibit 28 marked for identification.)
18     BY MR. KAHNE:
19  Q.  Okay. So are you familiar with this email?
20  A.  Yeah, I sent it to Garth McKinney.
21  Q.  And who is Garth McKinney?
22  A.  The former interim superintendent of the Nashua school
23     district.
24  Q.  And it appears from this email that Mr. McKinney is
25     asking if you should investigate the No Left Turn

80

1     letter, right?
2  A.  No, he's asking if he should.
3  Q.  Yeah. Sorry. If he should investigate?
4  A.  Yeah.
5  Q.  And so he's one of the superintendents that also
6     received the No Left Turn letter then?
7  A.  Yes, sir.
8  Q.  And you responded, "I wanted to give you an update
9     regarding the No Left Turn letter. I received a
10     similar letter with all the names on it. Additionally,
11     Drew Cline, state board chair, and the state board
12     members, got the same letter. Every school district
13     with an identified teacher received the same letter
14     specific to the identified educator. I have consulted
15     with the Assistant Attorney General assigned to our
16     office, Chris Bond, and Attorney Diana Fenton. Neither
17     of these lawyers feel we have an interest in the
18     allegations."
19        What is your understanding of why you wrote, "We
20     do not have an interest in the allegations"?
21     MR. KENISON-MARVIN: Object and instruct --
22     on deliberative process and attorney/client privilege
23     grounds. To the extent your answer would include
24     information regarding advice or legal -- legal advice
25     or interpretations provided by lawyers and

**81**

1  deliberations about why anybody has an interest in
2  anything, I instruct the witness not to answer the
3  question.
4  BY MR. KAHNE:
5  Q.  I'm just asking what you meant by -- did you think that
6  you didn't have an interest in the allegations?
7  A.  What do you mean?
8  Q.  Well, you wrote that "we don't" -- "none of the lawyers
9  feel we have an interest in the allegations."
10  Did you feel you didn't have an interest in the
11  allegations?
12  A.  That's not my job to make that decision. I went to my
13  supervisors who expressed their concerns and their
14  interest.
15  Q.  Okay.
16  A.  And I responded to Garth.
17  Q.  Okay. And it looks like the next sentence says that
18  they reviewed the list back in the summer, right?
19  "Attorney Fenton and Chris Bond reviewed the list back
20  in the summer, and the decision was the same, and the
21  day of action in New Hampshire took place on June 12th,
22  2021. Therefore, it is believed that the signatures,
23  if confirmed, were affixed to the pledge prior to HB 2
24  becoming law."
25  Do you see that?

**82**

1  A.  Mm-hm.
2  Q.  Is that your understanding of why there was no
3  investigation into the No Left Turn letter?
4  MR. KENISON-MARVIN: Objection. Vague.
5  THE WITNESS: Well --
6  MR. KAHNE: You can answer.
7  THE WITNESS: In the summer, there was no --
8  there was no possible violation of the code of conduct.
9  After the bill was passed, there was still no -- we
10  still didn't have an interest because we didn't
11  investigate HB 2.
12  So before the day of -- what is it called?
13  The day of action? So there was no HB 2 on the day --
14  on the day of action, so there wouldn't have been any
15  violation of anything. And nothing changed at the date
16  of this email.
17  BY MR. KAHNE:
18  Q.  But do you read this email as saying that Chris Bond
19  and Ms. Fenton did not have an interest in the
20  allegations because it's an HB 2 investigation?
21  MR. KENISON-MARVIN: Objection. Vague and
22  compound.
23  BY MR. KAHNE:
24  Q.  Where does it say that here?
25  A.  That's the -- that's what I -- that was the intent of

**83**

1  my email.
2  Q.  It looks like -- to me, it looks like the timing of the
3  signing of the pledge is the reason for not
4  investigating. Do you disagree with that?
5  A.  No, I disagree with that. There are two things that
6  are at play: One, the initial reports came to us and
7  there was no HB 2, so how could there be a violation of
8  HB 2 if there was none?
9  Second, there's new allegations with this letter
10  that was republished or reprinted, and nothing had
11  changed. There was still no Department of Education
12  interest in the case.
13  So one was there was no HB 2. Second one was we
14  still don't have an interest. There's no code of
15  conduct interest here.
16  Q.  Do you know whether the -- did the DOE refer this to
17  HRC?
18  A.  No.
19  Q.  They did not?
20  A.  We can't.
21  Q.  Why can't you?
22  A.  We were told that we didn't have standing to file with
23  HRC; that individuals would have standing, but we did
24  not.
25  Q.  Who told you that?

**84**

1  A.  Attorney Fenton told me that that was the response she
2  got, and that's what we do.
3  Q.  To your knowledge, is there a writing that reflects
4  that the DOE cannot refer matters to the HRC?
5  A.  You'd have to ask Diana Fenton.
6  Q.  Have you ever seen a writing?
7  A.  Again, you'd have to ask Diana. My understanding is
8  very simple.
9  Q.  What is your understanding?
10  A.  We don't -- we don't refer to HRC.
11  Q.  Why wasn't No Left Turn told to file a complaint with
12  the Department of Justice or HRC?
13  A.  Not my job. You'd have to ask Diana.
14  Q.  Aren't there occasions where you tell complainants that
15  the proper way to file a complaint is with the HRC?
16  A.  Yes. Individual parents.
17  Q.  Okay. So individual parents you tell that the
18  proper -- that they should file a complaint with the
19  HRC, but No Left Turn is different than that?
20  A.  They're not an individual parent with standing.
21  They're an entity. So I left it with Diana Fenton and
22  the legal team. There's no —
23  Q.  I'm trying to understand the process here as to how you
24  decide to direct somebody to HRC versus not -- just not
25  conducting an investigation. How does that happen?

85

1  A.  I don't know what that question means.
2  Q.  In certain instances, a complaint comes in and the
3      Department of Education refers that complainant to the
4      HRC, right?
5  A.  Okay.  That has happened.
6  Q.  In other instances, they do not?
7  A.  That has also not happened.
8  Q.  Why -- why do you or do you not refer a complainant to
9      HRC?
10 A.  You'd have to ask Attorney Fenton.
11 Q.  You have no role in that decision?
12 A.  She's the decider.  She is my boss.  I provide her the
13     information.  She turns around and makes the decision
14     and we go with what her decision is.
15 Q.  Does the commissioner have any role in that decision?
16 A.  Once again, you'd have to ask Diana Fenton.
17 Q.  I'd have to ask Diana Fenton if the commissioner has a
18     role?
19 A.  Yes.
20 Q.  To your knowledge, does the commissioner have a role in
21     referring complainants to HRC?
22 A.  Himself?
23 Q.  Yeah.
24 A.  I have no idea.
25 Q.  When a complaint comes in, how do you decide whether or

86

1      not it implicates HB 2?
2          MR. KENISON-MARVIN:  Objection.  Vague.
3          THE WITNESS:  Ask the question again, please.
4      BY MR. KAHNE:
5  Q.  When a complaint comes in, how do you decide whether
6      the complaint concerns a potential violation of HB 2?
7  A.  You listen to the complainant and determine what the
8      complaint is.  And if it falls in that realm, I would
9      then pass it off to Attorney Fenton and say, "Here we
10     have a complainant.  I think this is HB 2.  What's your
11     position?"  And that's where we go.
12 Q.  Do you do any investigation to see whether or not it
13     concerns HB 2?
14 A.  Well, if it's anything remotely associated with the
15     provisions of HB 2, I immediately send it over to my
16     supervisor.  A decision is made to refer the parent
17     elsewhere, I think.
18 Q.  What do you mean, "I think"?
19 A.  That's my general recollection of how the process
20     works.
21 Q.  Let me show you a document which is 29.
22         (Exhibit 29 marked for identification.)
23     BY MR. KAHNE:
24 Q.  Do you recall this email exchange?
25 A.  Yes.

87

1  Q.  Okay.  This appears to be an email that you received
2      from Karlyn Borysenko dated August 24th, '22, and
3      appears to relate to a complaint that she filed or that
4      she was seeking to file.  Do you agree with that?
5  A.  The entire thing is not here.
6  Q.  But what do you recall about receiving information from
7      Karlyn Borysenko of Actively Unwoke?
8          MR. KENISON-MARVIN:  Based on the witness's
9      testimony, I will object to 106 and completeness to the
10     extent the email is not here, but you can answer.
11         THE WITNESS:  So the complaint itself isn't
12     here, so I would assume that it's an HB 2-related
13     complaint, and this is my response to her, and then her
14     unhappiness with her response to me.
15     BY MR. KAHNE:
16 Q.  Do you recall this complaint?
17 A.  I honestly -- I don't recall the complaint.
18 Q.  I want to direct your attention to -- you say in the
19     one, two, three, four, five, six -- "This agency
20     reviews the license status of New Hampshire educators.
21     The current complaint does not allege the violation of
22     any portion of the code of conduct by individual
23     educators within SAU 16."
24         Do you see that?
25 A.  I do.

88

1  Q.  And then she provided the names of specific educators,
2      right?
3  A.  She did.
4  Q.  Okay.  And were you saying that the reason for not
5      reviewing this was because individuals had not been
6      named?
7  A.  No, I'm saying it's -- I'm not investigating it because
8      it's outside of my jurisdiction.  It's an HB 2 issue.
9      And I gave her recourse to contact the Human Rights
10     Commission.
11 Q.  On the bottom, it says, "Commissioner Edelblut has
12     forwarded your inquiry directly to Ahni Malachi on
13     August 19th, 2022, for her review."
14         Do you see that?
15 A.  I do.
16 Q.  Do you recall Commissioner Edelblut forwarding this
17     complaint directly to the commissioner of the HRC?
18 A.  If I wrote that he did, then he did.
19 Q.  And has he done that before?
20 A.  I don't remember.
21 Q.  Is that the protocol for the commissioner to forward
22     directly to the HRC?
23 A.  Commissioner does what the commissioner wants to do.
24     I'm not his boss.
25 Q.  But can he do anything he wants, or is there a protocol

**89**

1  in place for these complaints to be --
2  **A.  You'd have to ask the commissioner.**
3  Q.  Did you have any conversations with the commissioner
4  about Actively Unwoke?
5  **A.  I don't recall whether I did or did not.**
6  Q.  Anything that would refresh your recollection as to
7  whether you had a conversation with him about that?
8  **A.  What does that mean?**
9  Q.  Are there any -- sitting here today, you do not
10  remember.  Is there anything I could show you?
11  **A.  Sure.  If you have something, show it to me, but I**
12  **don't recall.**
13  Q.  Does the commissioner typically receive direct emails
14  from parents?
15  **A.  Yes.**
16  Q.  And does he respond to them directly?
17  **A.  Sometimes.**
18  Q.  And does sometimes he forward emails he receives to
19  you?
20  **A.  Yes.**
21  Q.  What types of emails does he forward to you from
22  parents?
23  **A.  Any number of unhappy parents filing complaints about a**
24  **school district or an individual employee or a policy.**
25  **He gets a lot of stuff, and that -- those**

**90**

1  **communications, he sends them to me.  He sends them to**
2  **Diana Fenton.  He sent them to Chris Bond when he was**
3  **here.  He sent them to Attorney Brown when she was**
4  **here.**
5  Q.  Do you know how he decides whether to send an email to
6  you?
7  **A.  I have no idea.**
8  Q.  Or to Commissioner Malachi?
9  **A.  I have absolutely no idea how he decides, what he**
10  **decides, or what his thought process is.**
11  Q.  Is there -- do you know of a procedure in place for how
12  he triages those complaints from parents?
13  **A.  I have no idea.  You'd have to ask him.**
14  Q.  We looked earlier at a technical advisory that had a
15  series of numbers.  Do you know why that was issued?
16  **A.  Which one?**
17  Q.  The -- it was attached to your presentation.
18  **A.  The FAQs?**
19  Q.  Yeah, the FAQs.  Why was that issued?
20  **A.  You'd have -- that was issued by the Department of**
21  **Justice, correct?**
22  Q.  Well, that's a good question, because it looks like it
23  says it's issued by the Department of Education, the
24  Commission for Human Rights, and the Department of
25  Justice?

**91**

1  **A.  You'd have to ask who wrote it.  I have no idea who**
2  **wrote it.  None whatsoever.**
3  Q.  Do you have an understanding of whether it's a
4  Department of Education document?
5  **A.  I don't.  I thought it was a Department of Justice**
6  **document.  That was my understanding.  I could very**
7  **well be wrong, but I don't know who wrote it.  I just**
8  **know that it's there.**
9  Q.  And do you know what the impetus for that document
10  was?
11  **A.  You'd have to ask the people that wrote it.  I can only**
12  **speculate.**
13  Q.  Fair to say that there needed to be clarification as to
14  HB 2?
15      MR. KENISON-MARVIN:  Objection.  Vague.
16      THE WITNESS:  Again, you'd have to ask the
17  people that wrote it.
18  BY MR. KAHNE:
19  Q.  So on the email that I was showing you, the Actively
20  Unwoke one, it says, "Pursuant" -- the second line
21  says, "Pursuant to guidance from the Office of the
22  Attorney General, Department of Justice, this complaint
23  should first be reviewed by the Human Rights
24  Commission, HRC."
25      Do you see that?

**92**

1  **A.  I do.**
2  Q.  What guidance were you talking about?
3  **A.  I would imagine the FAQs, as well as Attorney Fenton,**
4  **Attorney Chris Bond.**
5  Q.  Well, but you're saying "pursuant to guidance from the
6  Office of the Attorney General."  I'm just trying to
7  understand, is it the FAQ?
8  **A.  I would imagine it's a combination of the FAQ and**
9  **attorney -- Assistant Attorney General Chris Bond and**
10  **Attorney Fenton.**
11  Q.  But when we looked at the FAQ, we didn't see anything
12  that said a complaint couldn't be filed with the --
13  could or couldn't be filed with the DOE?
14  **A.  That's it.  Correct.**
15  Q.  That's correct?
16  **A.  Yeah.**
17  Q.  Here's another.
18      MR. KAHNE:  What document are we up to?
19      THE REPORTER:  30.
20      (Exhibit 30 marked for identification.)
21  BY MR. KAHNE:
22  Q.  Have you had a chance to review this?
23  **A.  I just did, yeah.**
24      MR. KENISON-MARVIN: Can I have it?
25      MR. BISSONNETTE: Oh, I'm sorry.

93

1     MR. KENISON-MARVIN:  That's okay.
2     BY MR. KAHNE:
3  Q.  On Exhibit 30 appears to be an email dated -- starts
4     with an email dated Friday, September 17th, 2021.  It
5     is from -- it says it's from a Plaistow resident.  Am I
6     saying that right?
7  A.  Plaistow, yeah.
8  Q.  Plaistow resident who removed both of his kids from the
9     school district "because of indoctrination and other
10    problems happening in the Timberlane district.  There
11    are many problems swept under the rug and not much
12    accountability.  Many times emails and complaints go
13    nowhere."
14       Do you see that?
15 A.  I do.
16 Q.  And then the commissioner responds directly, right?
17 A.  Yes.
18 Q.  And you say the commissioner does that a fair amount?
19 A.  He does.
20 Q.  He says, "Any time we receive a complaint, we take it
21    very seriously and conduct an investigation where
22    warranted and within our scope of jurisdiction."
23       Do you see that?
24 A.  I do.
25 Q.  He says, "When we have a finding, we take appropriate

94

1     action against an educator's license.  That action
2     ranges from reprimand to suspension to revocation.
3     Under the new anti-discrimination law, we will also
4     investigate and take investigation although that also
5     falls under the Human Rights Commission as the first
6     line of intervention."
7        Do you see that?
8  A.  I do.
9  Q.  So he's saying -- do you understand him to be saying
10    that the DOE is also going to be investigating and
11    taking action under the new anti-discrimination law?
12 A.  You'd really have to ask Frank.
13 Q.  Okay.  But then it gets forwarded to you by Stephen
14    Berwick, and he says, "Heads-up my, friend.  May come
15    your way"?
16 A.  Yes.
17 Q.  Why would he have said that?
18 A.  I've got to know who Stephen Berwick is.
19 Q.  Okay.  So tell me who Stephen Berwick is.
20 A.  Stephen is -- he was wears many hats and he deals with
21    a lot of complaints.  A lot of complaints come his way.
22    He does a lot of stuff with bullying, things like that.
23    And he got the cc and sent it to me.
24 Q.  But your testimony previously was that HB 2 is not
25    your -- not your -- you don't do any investigations

95

1     related to HB 2?
2  A.  I do not.
3  Q.  So why would Stephen Berwick, on this complaint, which
4     is plainly HB 2-related, say, "Head's-up, my friend.
5     May come your way"?
6  A.  Well, I don't know that it's -- I don't know that it's
7     all only about HB 2.  If you read the original email --
8     and I bet you there's more than just this original
9     email, but read it carefully.
10       He says, "Both of my kids are" -- "I removed my
11    kids from school because of indoctrination and other
12    problems happening in the district.  There are many
13    problems swept under the rug and not much
14    accountability."
15       That tells me he's talking about more than one
16    thing.  He went to Berwick.  Berwick sent it to me
17    saying, "Hey, this might come your way."
18       He -- this person who was writing the email has
19    said multiple things in two sentences, or three.  So to
20    say that's all HB 2 related is a slanted view of
21    what he wrote.  He's talking about different things.
22    And Berwick looked at it and said, "Hey, this may come
23    your way."
24 Q.  Heads-up?
25 A.  Yeah.

96

1  Q.  But it's possible that there was a component of this
2     complaint that was related to HB 2, right?
3  A.  Sure.
4  Q.  Okay.  And that could get forwarded to you to
5     investigate?
6  A.  No.  It could get forwarded to me, and I'm not
7     investigating at all.  I go to Attorney Fenton.  I say,
8     "Look, this is HB 2.  I'm not doing this."
9        But, in this instance, there were other things.
10    This is just one email in a vacuum.  What else was he
11    talking about?  I don't know.
12       And read -- if you want to read that three-line --
13    that three-line paragraph, you can read it your way
14    that it's all about HB 2, or you can read it my way,
15    that there's more than one thing happening here.
16 Q.  Okay.  But it does seem like, would you agree with me,
17    that the commissioner is saying under the new
18    discrimination law, we will investigate and take
19    action, although that also falls under the Human Rights
20    Commission?
21 A.  First -- first, I'm not going to agree with you at all
22    because we have different visions of what was just read
23    to us.  That's number one.
24       Number two, ask the commissioner.
25       I'm just -- I just want to understand what your -- if

Transcript of Richard Farrell
Conducted on May 18, 2023

97

1    you -- what you believe the commissioner's position to
2    be.
3    **A.   Ask him.**
4    Q.   I will.  We will.  We certainly will.
5    **A.   I can't --**
6    Q.   But have you had conversations with the commissioner
7    about investigating complaints related to HB 2?  Any
8    conversations at all?
9    **A.   The conversations that I've had with him and with**
10   **Attorney Fenton and Attorney Bond and now Attorney**
11   **Brown is that we don't investigate.  It goes to the**
12   **Human Rights Commission or the Department of Justice.**
13   **Period.**
14   Q.   And what did the commissioner say to you in response to
15   that?
16   **A.   I have no idea.**
17   Q.   You don't have any recollection of --
18   **A.   I don't.**
19   Q.   -- specific conversations you've had with him?
20   **A.   I really don't.  I know what my position is and what I**
21   **believe my job is.**
22   Q.   Did the commissioner ever ask you to collect
23   information for an op-ed that he was writing?
24   **A.   I -- no.  I didn't even know he wrote an op-ed.  I**
25   **don't -- I don't pay a lot of attention to some of that**

98

1    **stuff.  If he did, and it was sent to me, I probably**
2    **read it.  But in terms of providing him stuff...**
3    Q.   Let's do Exhibit 18.
4         MR. KENISON-MARVIN:  Can we do this one, take
5    a break after this?
6         MR. KAHNE:  After this one, sure.
7         THE WITNESS:  Okay.  So, unfortunately, I'm
8    completely challenged here.
9    BY MR. KAHNE:
10   Q.   With the size of the type?
11   **A.   I can't read it.  I mean, if you have a magnifying**
12   **glass or something, or maybe blow it up?**
13   Q.   I'll read --
14   **A.   Or you can read it.**
15   Q.   I'll read it to you.
16   **A.   Okay.  Thanks.**
17   Q.   So, if you look at the bottom, if you go to the second
18   page of this, which is DOE10287, there's an email from
19   ▮▮▮▮▮▮▮▮  The subject line is "Londonberry
20   (sic)."  It says -- and it's to the commissioner.
21        "Good evening.  This was brought to my attention
22   today.  A human relations teacher at the Londonberry
23   High School gave these worksheets out to students.  Is
24   this allowed?"
25        Do you see that?

99

1    A.   I believe you.
2    Q.   Okay.
3    A.   I can't read it.
4         MR. KENISON-MARVIN:  One, he can't read it.
5    And this -- I would make a completeness 106 objection
6    to the extent we need to take a break to blow this up
7    so he can see it.  If he can't see it, I think it's not
8    completely in front of him, practically, and he's
9    entitled to have the whole thing in front of him and
10   look at it when you're presenting it to him.  So we
11   might need to take a break and figure out a way to get
12   this in the size and font that he can see it --
13        MR. KAHNE:  Okay.
14        MR. KENISON-MARVIN:  -- if you want to ask
15   questions about it.
16        MR. KAHNE:  That's fine.  Do you want to take
17   a break and try to blow it up?
18        MS. MILBURN:  I can blow it up on the
19   computer.
20        MR. KAHNE:  But we need to print it out, too,
21   right?
22        MR. KENISON-MARVIN:  I'm wondering if there's
23   a way to project it, if we could do a projection
24   format, or some way so that he can see it.  Otherwise,
25   I think it's unfair to ask him questions about it.

100

1         MR. KAHNE:  Can we pull up it on a computer
2    and zoom in?
3         MR. KENISON-MARVIN:  As long as he can read
4    it.
5         THE WITNESS:  As long as I can read it.
6    That's fine.
7         MR. KENISON-MARVIN:  Do you want to use mine?
8         MS. MILBURN:  I can blow it up.
9         THE WITNESS:  I'm sorry, the 65-year-old eyes
10   are --
11        MR. KAHNE:  You don't have to apologize.
12        MR. BISSONNETTE:  I've got the same issue.
13        MR. KENISON-MARVIN:  Now I'm confused where
14   we left things.  Is Gilles doing something with respect
15   to this?
16        MS. MILBURN:  I think he may have went to the
17   bathroom.
18        MR. KENISON-MARVIN:  I have to go to the
19   bathroom.
20        MR. KAHNE:  Yeah, sure.
21        (Recess taken.)
22   BY MR. KAHNE:
23   Q.   Mr. Farrell, before we get into that, and I do want you
24   to look at that exhibit -- in prior exhibits, you have
25   said that certain complaints that have come in have

Transcript of Richard Farrell
Conducted on May 18, 2023

101

1 included both HB 2 content and other content, right?
2 A. Yes, yes.
3 Q. And so that happens from time to time, right, that a
4    complaint comes in and it doesn't just have a safety
5    issue. It doesn't just have an HB 2 issue; it can be
6    combined, right?
7 A. It can.
8 Q. Okay. If that happens, do you investigate the entire
9    file, or do you somehow wall off the HB 2 aspects of
10   the investigation?
11 A. I'll either do one of two things: I'll either refer
12    the entire matter to the Human Rights Commission, or
13    I'll wall off the additional misconduct allegation.
14    It's really hard to do that because the parent, or the
15    complainant, it just weaves in and out, and it's very
16    hard.
17       So, generally speaking, I will refer the entire
18    matter. And then once HRC is finished, we'll come back
19    and look at whether or not there's still an existing
20    child safety or code of conduct violation.
21 Q. Has that happened before, or you're just saying this is
22    how you would do it?
23 A. It's only one time that I can recall we did it, and we
24    sent the whole thing to HRC, and then it came back to
25    us, and then we looked at only the minimal piece of the

102

1    educator misconduct.
2 Q. That was not related to HB 2?
3 A. Correct.
4 Q. Is there any protocols in place for how you sort of
5    segregate one versus the other?
6 A. That was a unique circumstance. There's no protocol.
7    And I would run it by Attorney Fenton for her approval
8    to determine which way we're going to go.
9       So we'd take the facts, review, send it to —
10    bring it to her, determine which way we're going to go,
11    whether we send the whole thing off or piecemeal it.
12 Q. And is Attorney Fenton the sole decider as to whether
13    something touches HB 2?
14       MR. KENISON-MARVIN: Objection. Vague. You
15    can answer.
16       THE WITNESS: Really, you'd have to ask Diana
17    that. I take the complaints. I'm the
18    boots-on-the-ground guy. I take the complaints, get
19    the facts, review with her. What she does with them,
20    how she does it, who else she speaks to, you'll have to
21    ask her.
22    BY MR. KAHNE:
23 Q. Well, let's look at 18 then.
24 A. Okay. 18.
25 Q. And before we do that, you said there was — I'm going

103

1    to call it a hybrid complaint with both HB 2 and
2    other — and other concerns, code of conduct concerns.
3    What district was that from?
4 A. I think — and, again, it's a recollection, but I
5    thought it was Exeter.
6 Q. Exeter. Okay.
7 A. I think.
8 Q. Okay. Turning to Exhibit 18 which I've been — I'm
9    told is regarding Londonderry. I had mispronounced it
10   before. If you look at the second page, which is DOE
11   10287?
12      MR. KENISON-MARVIN: Let me add, let the
13   record reflect he's viewing this on the monitor and not
14   the marked exhibit.
15      We pressed a button and it's now bringing up
16   a URL, so we might need a little —
17      MS. MILBURN: Here, let me try.
18      MR. KENISON-MARVIN: The mouse would be
19   better. We can go to the mouse for more precision.
20      THE WITNESS: Yeah, let's use the mouse.
21      MS. MILBURN: Hopefully that works.
22      THE WITNESS: Okay. Where am I looking?
23   BY MR. KAHNE:
24 Q. So go to the — I mean, the first email in the chain
25    appears to be dated April 4th, 2022, from ▮▮▮▮▮

104

1    ▮▮▮▮ to Frank Edelblut. Do you see that?
2 A. I'm looking. April 4th?
3 Q. Yeah.
4 A. ▮▮▮▮▮▮ to Frank Edelblut on the 4th.
5 Q. It says, "Good evening."
6 A. Yes.
7 Q. It says, "Good evening. This was brought to my
8    attention today. A human relations teacher at the
9    Londonderry High School gave these worksheets out to
10   students. Is this allowed?"
11      Do you see that?
12 A. I do.
13 Q. Okay. And if you keep going, it looks like she
14    attaches the worksheets that the human relations
15    teacher at Londonderry High School distributed.
16 A. Yes.
17 Q. Okay. And there's Diversity Bingo and there's another
18    worksheet on sexual orientation, national origin. Do
19    you see that?
20 A. I do.
21 Q. So it appears as though the commissioner is receiving
22    this complaint from a parent, right?
23 A. Yes.
24 Q. Okay. And then the commissioner forwards it on to
25    Diana Fenton, right?

Transcript of Richard Farrell
Conducted on May 18, 2023

---

**105**

1  A.  Let me see.  Okay.  "Attorney Fenton, can you look into
2     this?"
3  Q.  Before you even get there, the commissioner is sending
4     it to Diana Fenton?
5  A.  Yes.
6  Q.  He just forwards it.  No email.  Then Diana sends it to
7     you and says, "Can you look into this?"
8        So the first question I have for you is why did
9     Attorney Fenton ask you to look into this if it just
10    concerns a human relation teacher's worksheets in
11    Londonderry?
12 A.  Okay.  Now, again, this is my guess is that this
13    wasn't -- Diana made a triage decision that it wasn't
14    an HB 2 matter, but, rather, what's called a
15    nonacademic survey matter, which there's a nonacademic
16    survey statute in New Hampshire.
17       So my guess is, and my recollection of this case
18    is, that it was deemed not to be a House Bill 2 issue,
19    but, rather, a nonacademic survey, which has
20    requirements within a nonacademic -- I'm sorry,
21    nonacademic survey that talk about parental opt-outs --
22    I'm sorry, parental opt-in notification of the content,
23    and permission slips, per se.
24       That's my guess, that she made that decision that
25    it was not an HB 2 matter, but, rather, a matter

**106**

1     falling under nonacademic surveys.  That's what I'm
2     remembering.
3  Q.  So nonacademic surveys you're saying has to do with
4     whether parents can opt out of curricular --
5  A.  Opt in.
6  Q.  Opt in, or whether they're required to get parental
7     opt-ins for certain material; is that right?
8  A.  That's the only thing that makes sense, because she --
9     that's my recollection that this was.
10 Q.  But there --
11 A.  This was -- this had nothing to do with House Bill 2.
12    It had more to do with nonacademic surveys.  And that's
13    just my remembrance.  I could be totally wrong.  Again,
14    you'd have to ask Diana that, but that's my
15    recollection.
16 Q.  Okay.  There could be a lot of overlap, though,
17    couldn't there, between these nonacademic surveys and
18    what's covered by HB 2?
19       MR. KENISON-MARVIN:  Objection.  Vague.  You
20    can answer.
21    BY MR. KAHNE:
22 Q.  So material that you're saying is -- this material,
23    which you're not sure may have to do with the opt-out
24    or opt-in of a parent, concerns educational materials,
25    right?  Curricular materials?  Isn't it the case that

**107**

1     HB 2 also covers curricular materials?
2        MR. KENISON-MARVIN:  Objection.  Compound.
3        THE WITNESS:  My answer is based on the
4     emails and her -- what you asked me, why would she send
5     it to me?  That's the only logical explanation for me.
6     BY MR. KAHNE:
7  Q.  Aside from Londonderry, now -- because you've raised
8     this opt-in issue that I was not aware of previously.
9     I'm curious as to whether there would be overlap
10    between the opt-in issue and the HB 2 prohibitions?
11 A.  No, because one has to do with nonacademic survey.  The
12    rest would be totally separate from that.
13 Q.  Okay.  But if you look here -- well, first, it does
14    look like you investigated this, right?  That you --
15 A.  You'd have to -- let me finish.
16 Q.  It looks like in the next one you contacted the
17    superintendent, Scott Laliberte?
18 A.  Laliberte.
19 Q.  Laliberte, right?  And you say -- you're asking about
20    ▮▮▮▮▮▮▮▮▮  "Is she on your radar?"  What did you
21    mean by that?
22 A.  Is this educator someone that you've dealt with before?
23 Q.  Well, it's not an educator, right?  ▮▮▮▮▮▮▮▮  is
24    a --
25 A.  That's what I don't --

**108**

1  Q.  Is a parent?
2  A.  I don't recall.  Okay.
3  Q.  So do you remember this now?
4  A.  I remember talking to Laliberte.  I remember that it
5     was determined to be a survey issue, and not House Bill
6     2.  I sent it to the commissioner to review Laliberty's
7     response.  Again, he talks about opt-in content.
8  Q.  But you see at the -- Scott Laliberte, on April 7th,
9     "reviewed the material through the lens of the new
10    divisive concepts law and find that the subject of
11    these activities do not apply," right?
12 A.  Well, that's what his response was.
13 Q.  Right, and so he was looking -- he was also looking at
14    the material through the lens of HB 2, right?
15 A.  That's what he was looking at.
16 Q.  Okay.  And then you got that response, and then you
17    forwarded it to the commissioner?
18 A.  Correct.
19 Q.  And then you discussed that at your next meeting, which
20    presumably is the educator misconduct meeting?
21 A.  Correct.
22 Q.  And so you discussed this material that's attached,
23    which is about Diversity Bingo and "identities that you
24    most often associate with."  You discussed that at an
25    educator misconduct meeting with the commissioner?

109

1  A.  No, I didn't discuss the content.  I discussed strictly
2      looking at the opt-out/opt-in content.  I would say the
3      content of the material may not match the relatively
4      benign syllabus.
5          So I wasn't looking at HB 2 there, nor was -- nor
6      was -- that was my intent.  We met at the educator
7      misconduct meeting, and the topic was not HB 2; it was
8      nonacademic surveys and parental opt-in.
9  Q.  But did you review the material itself?
10  A.  I reviewed the -- what I reviewed wasn't necessarily
11      the material.  What I reviewed was whether or not the
12      policy -- I'm sorry, the statute was followed regarding
13      parental review and parental opt-in.
14  Q.  Did anybody else in the meeting review this course
15      material?
16  A.  I think the commissioner, Attorney Fenton, and the
17      deputy -- whoever was there reviewed the material, not
18      under the guise of HB 2, but under the guise of was
19      this an academic or nonacademic survey, and were
20      parents offered the opt-out -- I'm sorry, the opt-in
21      provision, and were they notified?  And that's the
22      extent of my involvement in this case.
23  Q.  Do you know whether or not this material made its way
24      to any op-ed that the commissioner published with
25      material that he found objectionable?

110

1  A.  I remember the op-ed you're talking about, and it was
2      about Londonderry, but I don't know that it was about
3      this.  I'm not sure.  I think -- you may be conflating
4      some other issues.
5  Q.  So if you want to take a look at Exhibit 14?
6          THE WITNESS:  Do you have it?
7          MR. KENISON-MARVIN:  I do.
8          THE WITNESS:  Are we done with the emails?
9          MR. KAHNE:  I would keep that up.
10          THE WITNESS:  Thanks.
11      BY MR. KAHNE:
12  Q.  Before we get there, that opt-in -- opt-out/opt-in
13      context, is that a provision of the code of conduct?
14  A.  It is a statute, and it's -- it has been deemed to be a
15      possible violation of the code of conduct.
16  Q.  So a violation of the opt-in/opt-out statute is
17      considered a violation of the code of conduct?
18  A.  Possibly.
19          MR. KENISON-MARVIN:  Objection.  Calls for a
20      legal conclusion.
21      BY MR. KAHNE:
22  Q.  It could possibly be?
23  A.  Yeah.
24  Q.  Same way a violation of HB 2 could be a violation of
25      the code of conduct?

111

1          MR. KENISON-MARVIN:  Same objection.
2          THE WITNESS:  No.
3          MR. KAHNE:  You can answer.
4          THE WITNESS:  Two different things that are
5      apples and oranges.  HB 2 has a process that goes
6      through another filter that requires a finding before
7      it gets to us, whereas the opt-in provision is, in
8      itself, a violation of state law.
9      BY MR. KAHNE:
10  Q.  But the opt-in provision is a violation of state law.
11      The violation of HB 2 is a violation of state law?
12  A.  We don't know that at the outset.
13  Q.  Well, but that's just these procedures that have sort
14      of -- right?
15  A.  Well, procedures are important.
16  Q.  Okay.  But the only thing separating them, those two
17      things, is the technical advisory, or whatever other
18      procedures that are unwritten?
19          MR. KENISON-MARVIN:  Objection.  Vague and
20      calls for a legal conclusion.  Legal analysis.
21      BY MR. KAHNE:
22  Q.  You're reviewing opt-in, right, under the code of
23      conduct?
24  A.  Correct.
25  Q.  Because a violation of the opt-in is a violation of the

112

1      code of conduct?
2          MR. KENISON-MARVIN:  Same objection.
3      BY MR. KAHNE:
4  Q.  Can be?
5          MR. KENISON-MARVIN:  Legal analysis.
6          THE WITNESS:  It's possible that it's a
7      violation of the code of conduct.
8      BY MR. KAHNE:
9  Q.  Right.  And I'm just trying to understand.  The thing
10      that makes HB 2 different is this other procedure that
11      you're talking about?
12          MR. KENISON-MARVIN:  Same objection.
13      BY MR. KAHNE:
14  Q.  Right?
15  A.  I think there's a huge difference.
16  Q.  I'm not saying if it's big or small.  I'm just saying
17      that is the difference.
18  A.  Yeah.
19          MR. KENISON-MARVIN:  Same objection.
20      BY MR. KAHNE:
21  Q.  By the way, is a -- is a failure to report a violation
22      of HB 2 a violation of the code of conduct?
23          MR. KENISON-MARVIN:  Same objection.
24          THE WITNESS:  I don't know.
25      BY MR. KAHNE:

113

1  Q.  Could it be?
2        MR. KENISON-MARVIN:  Same objection.
3        THE WITNESS:  That's not my decision to make.
4  BY MR. KAHNE:
5  Q.  Well, whose decision --
6        MR. KENISON-MARVIN:  Same objection.
7        THE WITNESS:  I guess I'm not really
8     understanding the whole question, but any decision
9     would be made by my superiors, not by me.
10  BY MR. KAHNE:
11  Q.  Well, I'm not saying you personally.  I'm saying under
12     your understanding of the code of conduct, which
13     contains a duty to report provision, right, a failure
14     of a teacher to report a violation of HB 2 would be a
15     violation of the code of conduct, right?
16        MR. KENISON-MARVIN:  Same objection.
17        THE WITNESS:  I don't think I'm qualified to
18     answer that question.
19  BY MR. KAHNE:
20  Q.  Why not?
21  A.  It's a trap question, I think.
22  Q.  I'm not trying to trap you.
23  A.  Yeah, you are.
24        No, I honestly don't believe that I'm qualified to
25     answer that question.  A teacher -- you're asking me to

114

1     assume that a teacher, A, knows what the statute is;
2     and, B, that that said teacher understands the
3     statute.
4  Q.  Which is hard.
5  A.  And then knowingly fails to report.  That's a lot of
6     ifs.
7  Q.  And if all of those ifs line up --
8  A.  I just don't see it.  I don't see them all lining up.
9  Q.  Why couldn't they all line up?
10  A.  I've never seen it.
11  Q.  Is it because the statute is hard to understand?
12        MR. KENISON-MARVIN:  Same objection.
13        THE WITNESS:  I have no idea.  All I know is
14     that I've never seen it.
15  BY MR. KAHNE:
16  Q.  This op-ed, April 15th, 2022.  And if you look at -- if
17     you look back at Exhibit 18, that is April 7th, 2022.
18     So about eight days later, right?
19  A.  Okay.
20  Q.  Are you familiar with this op-ed written by the
21     commissioner about Education Sacred Trust?
22  A.  I'll have to read it.
23  Q.  Okay.
24  A.  Okay.
25  Q.  Okay.  So you've had a chance to read this?

115

1  A.  Mm-hm.
2  Q.  How would you characterize the content of this op-ed?
3     What is it about?
4        MR. KENISON-MARVIN:  Objection.  Vague.  You
5     can answer.  And compound.
6  BY MR. KAHNE:
7  Q.  What is this op-ed about, to you?
8  A.  My opinion?
9  Q.  Yes.
10  A.  I think he's talking about parental rights.
11  Q.  Where does it say he's talking about parental rights?
12  A.  I think that's what I just received from reading it.  I
13     think he's talking about parental rights.
14  Q.  If you look here at topic -- it's PL00696.
15  A.  Okay.
16  Q.  This appears to be part of -- the same email chain that
17     we looked at in Exhibit 18 is part of the topics that
18     are covered under Commissioner Edelblut's op-ed; isn't
19     that right?
20  A.  Say that again, please.
21  Q.  The email on 00696, the bottom one, is the same email
22     chain -- is from the same email chain as Exhibit 18?
23  A.  Okay.
24  Q.  So the superintendent, Scott Laliberte, found that the
25     material did not violate the divisive concepts law.  He

116

1     said, "We've reviewed this material through the new
2     divisive concepts law and find the subject of these
3     activities do not apply."  And yet the commissioner
4     included this in his op-ed, right?
5  A.  Where did he do that?
6  Q.  Well, if you keep looking, the human relations course
7     is -- the next couple of pages are the -- and if you
8     look at 7736, it's Diversity Bingo again, and
9     Identities You Think About Most Often, the same
10     material that was the subject of the complaint from
11     ▇▇▇▇▇▇▇▇
12  A.  Okay.
13  Q.  Why did the commissioner include this in his op-ed, to
14     your knowledge?
15  A.  You would have to ask him.
16  Q.  Did he ask you to send materials to him for inclusion
17     in this op-ed?
18  A.  No.
19  Q.  He did this all on his own?  Do you know if he did this
20     all on his own?
21  A.  I don't know.  I honestly don't know.
22  Q.  It looks like he's including --
23        MR. KENISON-MARVIN:  I'm sorry, I'm confused
24     as to document numbers.  There's some in here that
25     don't have a Bates stamp, and there's some where the

**117**

1  Bates stamp has been crossed out at the end, so I'm not
2  able to keep up at the moment. 7736.
3       MR. KAHNE: 7736.
4       MR. KENISON-MARVIN: There's documents in
5  here that don't have a Bates stamp.
6       MR. KAHNE: They do. They're just on the
7  side.
8       MR. BISSONNETTE: It's either on the bottom
9  right or upper right.
10      MR. KENISON-MARVIN: Oh, here. And the two
11 that are at issue, sorry, 7736, and what was the other
12 one that you referenced?
13      MR. KAHNE: Oh. Well, 736, 737.
14      MR. KENISON-MARVIN: Okay.
15      MR. KAHNE: And then Mr. Farrell's email, 696
16 through 700.
17      MR. KENISON-MARVIN: I have those. Okay.
18 I'm good. Thank you.
19 BY MR. KAHNE:
20 Q.  You sent the -- you sent the human relations core
21    syllabus to the commissioner, right?
22 **A.  Where is that?**
23 Q.  That is at 00696 at the top, Richard Farrell to
24    Commissioner Edelblut.
25 **A.  So I sent him Laliberty's email, right?**

**118**

1  Q.  This looks like it's different from the email chain.
2     It looks like, "Please review" -- the attachment is
3     separate from Exhibit 18 when you say, "Please review
4     the responses from Londonderry."
5  **A.  But what is the attachment?**
6  Q.  The attachment is what comes after. It's the syllabus.
7  **A.  Okay. So it starts with the human relations?**
8  Q.  That's right.
9  **A.  Okay.**
10 Q.  And that occurred five days after --
11      MR. KENISON-MARVIN: I'll object just to the
12 extent, like, can you -- on foundation. Can you ask
13 him if that was the attachment?
14      MR. KAHNE: Okay, sure.
15      MR. KENISON-MARVIN: And we'll get some
16 foundation.
17 BY MR. KAHNE:
18 Q.  Is that an accurate reflection of what was attached to
19    your email, to your knowledge?
20 **A.  Perhaps.**
21 Q.  Perhaps? But this email to the commissioner comes
22    after Exhibit 18. It's April 12th, not April 7th. Do
23    you see that?
24 **A.  Okay.**
25 Q.  So my question is did the commissioner ask you to send

**119**

1  this material in connection with his preparation of the
2  op-ed?
3  **A.  I had no idea he was doing an op-ed.**
4  Q.  Do you have a recollection of him asking you to send
5     this in April?
6  **A.  No, I do not.**
7  Q.  Can you look through the topics here and see whether
8     any of the communications, including the text messages
9     that are here, were to or from you?
10 **A.  Where?**
11 Q.  In the attachments. In the attachments to Exhibit 14.
12    Attachments to the op-ed, Education Sacred Trust.
13    Topic one. Topic two.
14 **A.  Okay. So there's a screenshot.**
15 Q.  Where is that?
16 **A.  702.**
17 Q.  Yeah. "A friend has a 6th grader at"?
18 **A.  Yeah.**
19 Q.  Is that your phone?
20 **A.  No.**
21 Q.  Okay. Yes, so I'm asking you to review this document
22    to see whether any of this information came from you.
23      MR. KENISON-MARVIN: I still say that
24 question's vague.
25 BY MR. KAHNE:

**120**

1  Q.  None of this is your -- your phone -- your text
2     messages or anything?
3  **A.  I don't think. See, I don't have a State-issued phone,**
4     **so that cell phone number that you had was -- is my**
5     **personal cell phone number, so I try never to use my**
6     **personal cell phone for this stuff. And I honestly**
7     **don't even really what you're talking about.**
8  Q.  I'm just asking whether you provided any of these
9     materials to the commissioner in connection with his
10    authoring that op-ed.
11 **A.  Absolutely not.**
12 Q.  Okay.
13 **A.  If I -- if I provided anything, background information**
14    **regarding a complaint, possible, but did I -- I didn't**
15    **even know he wrote an op-ed until after the op-ed was**
16    **written, so I have no idea what you're talking about**
17    **there.**
18 Q.  Did you -- in the Londonderry complaint, do you recall
19    whether you sent the materials to the superintendent,
20    Scott Laliberte?
21 **A.  Laliberte?**
22 Q.  Laliberte.
23 **A.  What do you mean by that?**
24 Q.  So if you look at 18, at Exhibit 18 -- I'm jumping.
25    Sorry. So Thursday, April 7th, 2022, it says, "Good

Transcript of Richard Farrell
Conducted on May 18, 2023

121

1  morning, Rich." This is from Scott Laliberte?
2 **A.  What page number is that?**
3 Q.  It's the top page of the last email.  "We have had an
4  opportunity to review the material that you'd sent and
5  have the following information for you in response to
6  the inquiry."
7 **A.  Okay. Okay.**
8 Q.  So you sent the superintendent material, right?
9 **A.  Yeah.  I sent him the material that was -- that I got**
10 **from -- that Ms.        provided, I think.**
11 Q.  So let me just understand the chain of events here.
12  Ms.        provides information to the commissioner?
13 **A.  Yes.**
14 Q.  The commissioner forwards it to Diana Fenton?
15 **A.  Yes.**
16 Q.  Diana Fenton forwards the information to you?
17 **A.  Yes.**
18 Q.  And you forward the information to a superintendent,
19  Scott Laliberte, right?
20 **A.  Yes.**
21 Q.  Who views the material, among other things, through the
22  lens of the divisive concepts law?
23 **A.  That's how he did it.  I can't control that.**
24 Q.  But that is what happened, just as a matter of fact.
25 **A.  Okay.**

122

1 Q.  Okay.  Yes.  Okay.
2 **A.  Wait a minute now.  I sent it to him and said, "Please**
3 **review," correct.**
4 Q.  Yeah, yeah.
5 **A.  Okay.  So I didn't say, "Please review under HB 2," or**
6 **anything else.  He reviewed it under his own guise.  I**
7 **reviewed it under something else.**
8 Q.  All I'm saying is that the superintendent reviewed the
9  material that you had sent to him under the lens, in
10  his words, of the new divisive concepts law?
11 **A.  Well, that's his interpretation of what I sent.**
12 Q.  But he did that?
13 **A.  Yes, that's fine.**
14 Q.  Did you talk on the phone with him about this?
15 **A.  Probably, yeah.**
16 Q.  Okay.  So you had conversations with him before sending
17  him the material?
18 **A.  No.  No.  I think I sent him -- what I traditionally**
19 **do, will send an email to the superintendent and say,**
20 **"Please review attached and give me a call," and then**
21 **we have communications or additional emails.**
22 Q.  Okay.  So what do you remember about your conversation
23  with Scott Laliberte?
24 **A.  I don't.**
25 Q.  Nothing?

123

1 **A.  No.  We've talked a couple of times.  I know he**
2 **reviewed the material.  He had his position.  We**
3 **didn't -- I mean, I didn't do anything with the**
4 **material in terms of educator misconduct.  I provided**
5 **it to him, talked to him about it, got additional**
6 **information, I think, and then we met and discussed the**
7 **matter with Attorney Fenton.**
8 Q.  Why wasn't this referred to the HRC?
9 **A.  As I said before, the view from our -- our vantage**
10 **point was this was about a survey issue under the**
11 **statute regarding nonacademic surveys, and not House**
12 **Bill 2.**
13 Q.  Yeah, I just want to understand the nonacademic
14  surveys.  Explain what that means again.
15 **A.  So if a teacher asks questions, or questionnaires, or**
16 **surveys of students, and, in this case, there was the**
17 **divisive concept ring and then there were questions,**
18 **like a Bingo sheet where questions were asked, the**
19 **determination was that that was potentially a**
20 **nonacademic survey as opposed to an HB 2 issue.  So**
21 **that was my lens.  What Laliberte looked at is -- you'd**
22 **have to ask Laliberte what his lens was.**
23 Q.  This -- how does something become a survey or not?  How
24  is it a survey or not a survey?
25 **A.  Which is, again, why you conduct an investigation to**

124

1  determine if it's a survey.  Does it fall within the
2  statute?  Was there an opt-in?  Was there a syllabus?
3  Parents know what was being distributed?  Those are the
4  kinds of questions that we would ask.
5 Q.  And so it seems as though Laliberte was viewing this as
6  a survey that touched on HB 2 topics?
7 **A.  That is up -- that's his --**
8 Q.  Yes?
9 **A.  -- vision.  I have no control over that.  My vision and**
10 **my lens was strictly not HB 2.  My lens was did the**
11 **teacher engage in a nonacademic survey?  And, if so,**
12 **did it violate the statute?  That's the sole lens that**
13 **I had.**
14 Q.  And did you make that threshold determination?
15 **A.  I don't make that threshold determination.  We work it**
16 **through Attorney Fenton.  She makes the determination.**
17 **As you can see, there was "Let's talk about this at our**
18 **next meeting."**
19     **I don't recall -- I don't believe anything**
20 **happened in terms of sanctions at all.**
21 Q.  Have you been asked to investigate any complaints
22  relating to books being taught in a classroom?
23 **A.  Have I been asked to investigate books being taught?**
24 Q.  Have you been asked to look into further books --
25  certain books being taught in a classroom?

125

1  A.  Well, we've had complaints by parents, in particular,
2     that object to certain books being used in school
3     libraries and school -- and schools, and in
4     classrooms.
5  Q.  And what do you do with those complaints?
6  A.  I immediately run to Diana Fenton and say, "Hey, we
7     have this complaint," and "What do you want do?"
8  Q.  And has there been occasions where she says, "Look at
9     the book"?
10  A.  There's been occasions where it's "Look at the book."
11     There's been occasions where she's asked, "Can you see
12     if these books are there?  Can you determine if
13     it's" -- and it gets very complicated because it's not
14     just the book being in the library.  There's the --
15     there are other issues regarding electronic books and
16     electronic libraries.  So it gets very confusing.  And
17     parents are very creative when it comes to complaining
18     about the books.  So you have to -- you have to cut
19     through the nonsense and determine whether or not
20     there's actually a code of conduct violation.
21  Q.  Do you remember specific books that you've looked at?
22  A.  Sure.  There's -- the one that keeps popping up that
23     everybody likes to hate is Gender Queer.
24  Q.  And so there's a complaint about Gender Queer.  And you
25     look -- do you read the book?

126

1  A.  I've read the book, sure.
2  Q.  Okay.  And you read the book to see whether the
3     inclusion of that book violates the -- or providing
4     that book violates the code of conduct?
5  A.  No.  I read the book because I want to be educated as
6     to what the complaint is about, and then I will go over
7     and talk to Attorney Fenton about that.
8  Q.  Any other books that you remember?
9  A.  If you gave me a list, I could tell you.  There are
10     other books that have been -- people have complained
11     about.  But that's the one that seems to be the one
12     that people object to a lot.
13  Q.  How about A Good Kind of Trouble?
14  A.  Yeah, that.  That's been there.
15  Q.  So have you read that one?
16  A.  I have not.
17  Q.  But people have complained about that, and you've
18     gotten those complaints?
19  A.  Yes.
20  Q.  And have you spoken -- in connection with, you know,
21     let's say A Good Kind of Trouble, have you spoken with,
22     like, superintendents or principals or teachers as part
23     of your looking into it?
24        MR. KENISON-MARVIN:  Objection.  Vague.  You
25     can answer.

127

1        THE WITNESS:  If we get to the complaint
2     where we're doing triage, I might -- I don't talk to
3     teachers about this.  I go way above their pay grade
4     because teachers don't make policy decisions.  So I
5     would go to the superintendent.  I don't even talk to
6     the building principals.  I go right to the
7     superintendent and say, "Hey, we have a complaint from
8     a parent.  This is the book they're complaining about.
9     Is it in your library?"
10        So that's a fact-based inquiry.  I'm not
11     making a judgment one way or the other.  I'm just
12     gaining facts so I can then go to Attorney Fenton and
13     say, "Okay.  I contacted SAU whatever.  This is the
14     book that's been complained about.  The book is in the
15     library.  What do you want to do?"
16  BY MR. KAHNE:
17  Q.  And that's happened more than once?
18  A.  Oh, sure.
19  Q.  And it's happened for multiple books?
20  A.  Multiple books.  Multiple school districts.
21  Q.  And each time you go and you speak with the
22     superintendent about the book being where it was
23     complained of, something similar?
24  A.  Yeah.  You know, is it in the high school library?  Is
25     it the middle school library?  Is it in the elementary

128

1     school library?  Those have bearings.  You know, those
2     are important facts to know.  Or is it even in the
3     building at all?  And is it in the SORA app?
4        So it's a fact-based question.  Is it there?
5     Isn't it there?  Once I get the facts, I provide it to
6     Diana Fenton for her review.
7  Q.  And just in the stage of, you know, sort of from the
8     code of conduct, what you're describing is not a formal
9     investigation, but it's when a complaint -- a case has
10     been opened because of a complaint?
11  A.  It's even before the case has been opened.  I mean, so
12     a parent is angry and upset about a book being in a
13     library.  So let's collect the data and determine
14     whether or not we even go to the triage phase.
15  Q.  Okay.  Has that happened with the commissioner
16     forwarding material, too, like, where the commissioner
17     forwards not A Good Kind of Trouble, but a commissioner
18     forwards some material and you then, to the
19     superintendent, say, "Is this book in your library?"
20     That kind of thing?
21  A.  Sure.
22        MR. KENISON-MARVIN:  Objection.  Vague,
23     compound.  You can answer.
24        THE WITNESS:  Okay.  We get them -- the
25     commissioner could forward it.  I could get it from a

129

1  parent. We can get them from grandparents. I mean, we
2  get them from all sorts of different places. And
3  before you even do the triage phase of this, you
4  determine what are the facts? And the facts are
5  important. And once the facts are presented, the
6  decision is made to leave the -- not even leave the
7  inquiry phase; go to triage or open a case. And so
8  it's a multi-step process. And when it comes to books,
9  you just get the facts.
10  BY MR. KAHNE:
11 Q.  Two more things, and I think we can wrap for your
12  non-lunch. The first is I just want to show you the
13  code of conduct, which I'm sure you're familiar with.
14      Actually, I'm going to give you two documents.
15  One is the code of conduct, which has been marked
16  Exhibit 2, and the other is Attorney General Opinion
17  which has been marked Exhibit 12.
18      MR. KENISON-MARVIN: Can we bring the
19  computer back?
20      MR. KAHNE: Oh, yes. Sorry. Sorry.
21      MS. MILBURN: Thank you.
22      MR. KENISON-MARVIN: Thank you.
23  BY MR. KAHNE:
24 Q.  So on the code of conduct piece, I just want to
25  understand this opt-in -- the subject matter of opt-in

130

1  and how it relates to the code of conduct. Does the
2  code of conduct have a provision relating to opt-in?
3 A.  **Not specifically.**
4 Q.  So how is that within -- you've testified that your
5  jurisdiction is the code of conduct, so I'm trying to
6  understand how do we know that opt-in is part of the
7  code of conduct?
8 A.  **The statute -- there's a statutory requirement that**
9  **there be parental notification and an opt-in. If that**
10  **doesn't occur, then the determination by my superiors**
11  **is that it's a possible code of conduct violation.**
12 Q.  Which -- which provision of the code would that
13  violate?
14      MR. KENISON-MARVIN: Objection. Legal
15  conclusion.
16      THE WITNESS: Well, again, you'd have to ask
17  my superior that. I just -- my bottom line is that
18  I've been told if there is a question about opting into
19  a nonacademic survey, we will investigate it as a
20  possible code of conduct violation.
21  BY MR. KAHNE:
22 Q.  Where does that instruction come from?
23 A.  **From Attorney Fenton, my direct supervisor.**
24 Q.  Is there any writing about that?
25 A.  **What do you mean?**

131

1 Q.  Is there a policy that says if there's an issue
2  relating to opt-in -- there's a violation of opt-in,
3  such violation will be considered a violation of the
4  code of conduct?
5 A.  **There's nothing in writing that I'm aware of.**
6 Q.  Have you had any conversations with the commissioner
7  about investigating -- about opt-in being a violation
8  of the code of conduct?
9 A.  **Yes.**
10 Q.  And what are the nature of those conversations that you
11  had?
12 A.  **Just he would --**
13      MR. KENISON-MARVIN: Objection. Vague.
14      THE WITNESS: Oh, yeah.
15      MR. KENISON-MARVIN: Deliberative process
16  objection to the extent it's asking for specifics about
17  deliberation.
18      MR. KAHNE: All right. Strike that.
19  BY MR. KAHNE:
20 Q.  Do you know whether this is a policy of the
21  commissioner's to look into the opt-in -- opt-in
22  violations as a violation of the code of conduct?
23 A.  **You'd have to ask the commissioner. I take my orders**
24  **at that -- at that level from Attorney Fenton. However**
25  **we get the complaint, we look to see whether or not**

132

1  **there's an opt-in. If there isn't, why not? Many**
2  **times it's resolved without any sanction.**
3 Q.  Exhibit 12. Yeah, Exhibit 12.
4 A.  **Okay.**
5 Q.  Just take a second to look at it. You don't have to
6  read the whole thing.
7 A.  **Okay.**
8 Q.  My question is have you seen this document before?
9 A.  **I don't know whether I have or haven't.**
10 Q.  What do you understand it to be?
11 A.  **Well, I didn't finish reading it, so...**
12 Q.  Okay. Do you use this opinion in any way in your
13  day-to-day work?
14 A.  **Since I don't believe I've read it before, I guess the**
15  **answer would be no.**
16 Q.  When you were referring earlier to the technical
17  advisory, I just want to be sure that this is not what
18  you were talking about.
19 A.  **I don't think this is what I was talking about. I**
20  **think what I was talking about was the FAQ sheet.**
21 Q.  Before when you were talking about books, you talked
22  about A Good Kind of Trouble. I think Queer -- what
23  was it? Queer?
24 A.  **Gender Queer.**
25 Q.  Gender Queer. Have you looked into Stamped?

133

1  A.  You know, I'm not sure.
2  Q.  You can't recall?
3  A.  I can't recall.
4  Q.  Possible?
5  A.  Possible.  Sure.
6  Q.  How to Be an Antiracist?
7  A.  I've seen that.
8  Q.  Have you looked into it, like --
9  A.  No.  I've seen it in a list of banned books.
10 Q.  Okay.  And is it a list of banned books that were part
11     of a fact gathering that you were doing?
12 A.  No, it's from the American Library Association most
13     banned books in the United States, and they list them.
14     So I've seen that title from the American Library
15     Association.
16 Q.  Okay.  But you haven't spoken to any superintendents
17     about it or anything?
18 A.  I don't believe so.
19     MR. KAHNE:  Okay.  Would now be a good time
20     to maybe break?  Is that good?
21     MR. KENISON-MARVIN:  Fine with me.
22     (Recess taken.)
23     BY MR. KAHNE:
24 Q.  I first want to ask you about the procedure for
25     referring complaints received by the Department of

134

1      Education to the Attorney General's office, okay?
2  A.  Sure.
3  Q.  Are you aware of any standard operating procedure for
4      complaints that come in for the -- to the DOE to be
5      referred to the Attorney General's office?
6  A.  No.
7  Q.  Are you aware of any agreement between the Attorney
8      General's office and the DOE regarding what types of
9      complaints can get referred?
10 A.  No.
11 Q.  Have you ever spoken to Attorney Fenton about such
12     standard operating procedure?
13 A.  Yes.
14 Q.  Okay.  What have you discussed with her?
15 A.  Be more specific.
16 Q.  So I just asked if you've discussed a standard
17     operating procedure for transferring complaints from
18     the DOE to the Attorney General's office with Attorney
19     Fenton.  Have you ever had conversations about that?
20 A.  We've had conversations, but there is no SOP that I'm
21     aware of.  Nothing formal.  There's no policy or
22     procedure regarding this agency notifying that agency.
23     Now, I know that there's been discussions about
24     that, but I don't know -- I don't believe there's been
25     any policy decision made.

135

1  Q.  And I think we discussed this earlier, but there is no
2      standard operating procedure for when a complaint gets
3      referred from the DOE to the HRC?
4  A.  We don't refer anything to DOE to HRC in my -- to the
5      best of my knowledge, we don't do that.
6  Q.  And why is that again?
7  A.  My understanding is that we don't have -- the HRC
8      doesn't believe that we have standing to do so, that
9      the individual complainant has standing, but that we,
10     as an agency, do not.
11 Q.  Does the commissioner have the power to unilaterally
12     open a case under the code of conduct?
13     MR. KENISON-MARVIN:  Objection.  Legal
14     conclusion.  You can answer.
15     BY MR. KAHNE:
16 Q.  Can Commissioner Edelblut open a case under the code of
17     conduct?
18     MR. KENISON-MARVIN:  Same objection.
19     THE WITNESS:  He has never done that.
20     BY MR. KAHNE:
21 Q.  And -- okay.  If -- in your view, if HRC makes a
22     determination that there's been a violation of HB 2, is
23     that an automatic violation of the code of conduct?
24     MR. KENISON-MARVIN:  Same objection.
25     THE WITNESS:  I don't believe so, but we

136

1      haven't conducted an investigation.  So if HRC comes
2      back with a finding, we would then determine is the
3      person involved a licensed educator?  If the person
4      involved is not a licensed educator, we have no
5      jurisdiction.  No standing.  No case.
6          We would do our process to determine if it's
7      a code of conduct violation, the finding that was made,
8      and, if there was a code of conduct violation, what
9      would the sanctions potentially be.  So that's a big
10     hypothetical situation that, by the way, has never
11     happened.
12     BY MR. KAHNE:
13 Q.  So you're saying after HRC would make a determination,
14     your understanding is that the Department of Education
15     would make an independent decision about whether that
16     violates the code of conduct?
17     MR. KENISON-MARVIN:  Same objection.
18     THE WITNESS:  I'm sorry.
19     MR. KAHNE:  Go ahead.
20     THE WITNESS:  The facts would -- the fact
21     would be, A, that they made a finding.  Now, what is
22     that finding?  B, let's look at the finding in light of
23     the code of conduct, determine through our process
24     whether it meets the criteria.  If so, what would any
25     sanction be?

137

1        So it would be -- they refer to us. Who
2   knows what their determination was? They've just made
3   a determination. We would then decide, investigate,
4   gather facts to determine is it, in fact, a code of
5   conduct violation.
6   BY MR. KAHNE:
7   Q. And is that because the DOE has exclusive jurisdiction
8      to decide whether there's been a violation of the code
9      of conduct?
10        MR. KENISON-MARVIN: Same objection.
11        THE WITNESS: I think that a better way to
12   phrase it is that we have jurisdiction and control over
13   license status.
14   BY MR. KAHNE:
15   Q. Is any other agency able to determine whether a license
16      holder has violated the code of conduct?
17        MR. KENISON-MARVIN: Same objection.
18        THE WITNESS: Well, I would -- again, this
19   is -- I'm not an attorney. However, I would say other
20   agencies would have a standing when it comes to Section
21   5 violations.
22        So, for example, if a police agency arrests a
23   teacher for one of the 20 identified Section 5
24   violations, they -- that alone would be enough for us
25   to take an immediate sanction on the license.

138

1        So they don't have jurisdiction over the
2   license, but their actions would have a direct bearing
3   on a required sanction by this agency.
4   BY MR. KAHNE:
5   Q. Right, but the only agency that can actually issue
6      those penalties to the license holder is the Department
7      of Education?
8   A. Well, again, that's not actually accurate. The
9      Department of Education doesn't take action or
10      sanctions. The state board of education ultimately
11      takes the sanction. So it's a common mistake, but the
12      Department of Education doesn't issue sanctions. The
13      state board ultimately issues sanctions.
14   Q. So does it propose those sanctions?
15   A. No, the Department of Education -- in the protracted
16      practice, the hearings officer will make a
17      recommendation based upon a hearing with the Department
18      of Education, me, Attorney Fenton, and witnesses, and
19      they would make a proposal to the state board after
20      that hearing for sanction. So the state board takes
21      the action.
22   Q. Okay. Did there come a time when the Department of
23      Education sought subpoena power -- to grant subpoena
24      power to you as investigator?
25   A. Yes.

139

1   Q. When did that occur?
2   A. This -- very recently.
3   Q. It was in March?
4   A. Yeah, I think I testified in front of the House
5      Judiciary Committee.
6   Q. Why was that -- was the legislation supported by the
7      Department of Education?
8   A. I guess.
9   Q. Okay. And why was the subpoena power sought?
10   A. I've been here 10 years, and everything I do here is
11      based on relationships and good faith working
12      relationships with superintendents and other
13      stakeholders, the union representatives, AFT. Attorney
14      Donovan's awesome to work with. The attorneys for NEA
15      are great.
16        So everything is about good faith and trust. And,
17      at a given point, all of that good faith and trust and
18      working relationships comes -- in the legal process
19      comes to an end. And we've been looking for -- I've
20      been looking for some level of subpoena power since
21      shortly after I arrived here. And it's not so much
22      that the field generally is obstructive. They're not.
23      Everybody wants to cooperate with these things because
24      my goal is to keep kids safe. But it's a practical
25      application.

140

1        And I'll give you some examples. Let's say a
2   local police department gets involved in a sexual
3   assault, and a teacher is involved in a sexual assault,
4   and there's an action. There's an arrest. There's a
5   conviction. And we are going to have a contested
6   hearing regarding that educator. The educator doesn't
7   want to surrender the licensing. We want the police to
8   come in and testify to what they did, what they saw,
9   and they're more than willing to do that.
10        However, as a practical matter, police officers
11   have days off. They work nights. They work weekends.
12   And the police chief will say to us, "Hey, I'm happy to
13   help, but my guy, he can't be there on Tuesday because
14   it's his day off. If you give me a subpoena, I can pay
15   him."
16        No subpoena, you're not going to get paid. So
17   it's a practical application.
18        Think about this also as an example. You have a
19   teacher in classroom 1, and that teacher is accused of
20   misconduct of some form or fashion, and teacher number
21   2 is a material witness to that action. Both of them
22   are represented by the American Federation of Teachers,
23   for example. And I have no subpoena power to have the
24   teacher in classroom 2 come in and testify at a
25   hearing. They can just tell me, "Sorry. No subpoena?"

141

1  Sorry."
2      Now, it's a material witness and there's
3  absolutely nothing I can do to prevent that or to
4  change it.
5      There are sometimes documents involved and police
6  reports.  They say, "Happy to help.  You need to
7  generate a subpoena."
8      So far, I've been very fortunate because people
9  know me.  I think most people trust that I'm doing the
10  right thing and they're cooperative.  But there are
11  times when they're not.  And I don't have the ability
12  to subpoena documents or persons.  So it's a practical
13  matter as opposed to some nefarious evil, you know,
14  desire to go after teachers.
15  Q.  Sure.  So I think you testified before the House
16  Judiciary Committee -- at the House judiciary hearing
17  that your subpoena power, while not limited in words,
18  would be limited to enforcing the code of conduct?
19  A.  Stay in my lane.  Code of conduct.
20  Q.  Stay in your lane.  Code of conduct.
21  A.  Correct.
22  Q.  Okay.  And that would include using the subpoena for
23  any potential violations of the code of conduct by a
24  teacher?
25  A.  Yeah.

142

1  Q.  Yeah.  Okay.  When you were talking about that, you
2  said that you have to be careful that people weaponize
3  the code of conduct.  Parents weaponize it on occasion.
4  School districts, perhaps.  "We don't want to weaponize
5  the code.  We want to stay within the bounds of the
6  code, and weaponizing it is a really bad idea."
7      Do you remember that?
8  A.  I stand by every word.
9  Q.  Okay.  What did you mean by weaponizing the code of
10  conduct?
11  A.  I think that speaks for itself.  I can give you
12  examples if you'd like.
13  Q.  Sure.  Parents that are in the IEP process and -- or a
14  504, a combination process, and they're unsuccessful in
15  their efforts to change an IEP, get an IEP, or make
16  accommodation changes.  In their zeal to protect their
17  child, they will then turn around and become aware of
18  the code of conduct and allege misconduct because the
19  door for due process in the IEP, for example, process,
20  has closed.  So we can open a door alleging misconduct.
21      That's what weaponizing the code of conduct is.
22  And I don't think we should weaponize the code of
23  conduct.  We have educators -- I'll give you a very
24  good example.  You understand the code of conduct
25  didn't exist until 2018, and, for all intents and

143

1  purposes, January 1st of 2019.  Prior to that, if a
2  teacher broke their contract with a school district,
3  that was actually a possible code of conduct violation.
4  It no longer is.
5      Currently, because of the circumstances with
6  teacher shortages, superintendents have contacted this
7  agency and said, "Teacher X has violated the contract.
8  I want to file a code of conduct violation."  That's
9  weaponizing the code.  It doesn't exist any longer.
10      So I don't want superintendents weaponizing it.  I
11  don't want teacher-on-teacher weaponizing it.  I don't
12  want parents weaponizing it.  And I don't want anybody
13  at the Department of Education to do that, either.
14  Stay within the bounds of what the code talks about.
15  Q.  What about parents who disagree with curricular
16  decisions?  Would that -- and lodge a code of conduct
17  violation?  Would that be weaponizing the code of
18  conduct?
19  A.  It depends on what the complaint is.  I mean, every
20  complaint's different.  You'd have to give me a fact
21  pattern.  But, I mean, potentially, sure.  Parents
22  could weaponize the code of conduct.  Parents -- by --
23  because of curriculum.  They could weaponize the code
24  of conduct because of books in libraries.  They can do
25  anything they want.  That's why I think it's critically

144

1  important to narrow the scope and really work against
2  weaponizing that code.
3  Q.  Give me a second here.
4      So I've previously showed this to you.  It's sort
5  of what we've been discussing a lot of today.  And I
6  just want you to look at it for a minute, review it.
7      What I'm specifically going to refer to is on
8  00005.
9  A.  Okay.
10  Q.  Sorry, give me one second.  Okay.  I'm sorry.  000006.
11  And 91:298 says, "New section.  Prohibition on teaching
12  discrimination."
13      Do you see it?
14  A.  I do.
15  Q.  And you've reviewed this before?  Have you seen it
16  before?
17  A.  I have.
18  Q.  Okay.  I just want your understanding as to what this
19  banned concept -- these are four banned concepts, A, B,
20  C, and D?  Have you heard it referred to as four banned
21  concepts?
22  A.  I have.
23  Q.  Okay.  If you look at banned concept four, which is in
24  D, could you read that and tell me what you believe is
25  prohibited under subsection D?

145

1  A. Beginning with that "People of one age, sex, gender,
2     identity, sexual orientation, race, creed, color,
3     marital status, familial status, mental, physical
4     disability, religion or national origin cannot/should
5     not attempt to treat others with regard to age, sex,
6     gender," et cetera. Okay.
7  Q. What does that mean to you?
8        MR. KENISON-MARVIN: Objection to the legal
9     conclusion. You can answer.
10       THE WITNESS: What exactly are you asking me?
11    BY MR. KAHNE:
12 Q. What can't a teacher teach under that subdivision?
13 A. I have no idea. I have no idea.
14       MR. KAHNE: All set. Yeah. I'm going to
15    turn it over to --
16       MR. BISSONNETTE: Thank you, Mr. Farrell.
17       EXAMINATION
18    BY MR. BISSONNETTE:
19 Q. I know that we've met once or twice before, but my name
20    is Gilles Bissonnette, and I'm counsel to a separate
21    plaintiff's group in this case against two individuals,
22    Andres Mejia and Tina Philibotte.
23       Thank you again for coming in today. I know we're
24    at the tail end of this, but we all do appreciate it.
25       I'm going to ask you some questions. I'm going to

146

1     do my absolute best to not duplicate anything that's
2     been covered, I think.
3  A. Okay.
4  Q. That's only fair to you and to everyone in this room.
5        So I just have a few topics that I want to cover
6     in addition to just a few additional documents that I
7     want to present to you. So can I begin?
8  A. Sure.
9  Q. I want to just kind of close the loop on some of the
10    questions you've received about the standard operating
11    procedure. So what I would like to do, if it's okay
12    with you, is just turn your attention to Exhibit 6,
13    please.
14       If you have Exhibit 6, I'm going to turn your
15    attention to the page that's Bates stamped PL806.
16       Let me just say at the outset, Mr. Farrell, that
17    I'm going to represent to that you this is a transcript
18    of the House Judiciary Committee hearing on HB 533 that
19    took place on March 8, 2023. I believe you were in
20    attendance at that hearing, correct?
21 A. Correct.
22 Q. And what Exhibit 6 is is just a transcript, not of the
23    complete hearing, but just certain portions.
24 A. Okay.
25 Q. Okay? So I would like to direct your attention to page

147

1     806. And in the bottom left portion of the document,
2     page 19 of the quadrants on the page, Attorney Fenton
3     publicly stated, "And in working with Representative
4     Lynn and in working with the Attorney General's office
5     on the original House Bill 533, we have since worked
6     with the AG's office to come up with an SOP as to how
7     we'd transfer those cases to the Human Rights
8     Commission and the AG's office."
9        Do you see that?
10 A. I do.
11 Q. That statement?
12 A. I do.
13 Q. Are you aware of a meeting that took place in February
14    of 2023 before this hearing about a procedure by which
15    complaints would get transferred to the Human Rights
16    Commission and the AG's office?
17 A. I was not aware. I'm not sure what you're talking
18    about, but I wasn't part of any of that type of a
19    meeting.
20 Q. So you weren't involved in a meeting with Attorney
21    Fenton and Sean Locke with the Department of Justice
22    about a procedure that would exist to transfer cases to
23    the Human Rights Commission and Department of
24    Justice?
25 A. I was not involved in that meeting at all.

148

1  Q. So you never saw, on or about February 14th, 2023, any
2     document that was prepared by Attorney Locke
3     memorializing and understanding among all of those
4     offices about how cases would be transferred?
5  A. I don't believe I was, no.
6  Q. Okay. Do you have any -- just so I understand your
7     testimony, you have no knowledge of that meeting?
8  A. I knew about the meeting after it happened, but I was
9     not a participant in the meeting.
10 Q. Who did you -- who talked to you about that meeting
11    after it occurred?
12 A. I would imagine — the only person I would have talked
13    to is Diana Fenton.
14 Q. What did Ms. Fenton say about that meeting?
15 A. I don't recall directly. I don't know that there was a
16    resolution. I still don't know whether there's a
17    resolution.
18 Q. Okay. Besides that conversation that you had after
19    that meeting with Ms. Fenton, have you had any other
20    internal conversations within the Department about any
21    agreement that may have been reached at that meeting?
22 A. To the best of my knowledge, no.
23 Q. How long did that discussion with Ms. Fenton occur
24    about that February meeting?
25 A. Well, it wasn't a meeting. It was — it was a brief

**149**

1  conversation.

2  Q. Brief conversation. Couple minutes?

3  A. Couple minutes.

4  Q. Okay. Thank you. I appreciate that. I'm going to

5  move on. I can play the video if you want -- and I'm

6  switching gears. Well, strike that. I'm just going to

7  ask this question.

8  If I'm a teacher, and I want to sign a book, and

9  I'm unsure if it's covered under HB 2, could I call the

10  Department of Education and get an answer as to whether

11  a book is covered or not?

12  A. I don't know the answer. I know I have never taken

13  such a call.

14  Q. Okay.

15  A. And in terms of whether they can, or can't, or if they

16  have, I don't know. I've never been involved in

17  that.

18  Q. If you received a call about whether this book, this

19  antiracist, is covered under the law, and I'm thinking

20  about teaching it, how would you respond today to that

21  type of inquiry?

22  A. A teacher calls me?

23  Q. Yes, sir.

24  A. My first -- the first thing I think I would do is refer

25  her or him back to the superintendent because it was --

**150**

1  it'd be more of a curriculum question.

2  Q. So what if that superintendent called you and said, "A

3  teacher has reached out to me about whether a book is

4  covered under HB 2, and I'm looking for guidance from

5  the Department as to whether it's covered or not," how

6  would you respond to that question?

7  A. I would do probably two things: I would say, "You have

8  an attorney that you hired. Get a hold of your

9  attorney."

10  And the second thing I would do is "Perhaps you

11  should talk directly to my attorney, Attorney

12  Fenton."

13  Q. So besides inviting that superintendent to reach out to

14  his district counsel, your other likely response would

15  be to talk to your supervisor?

16  A. Correct.

17  Q. Any other potential responses you think you'd give

18  beyond those two referrals?

19  A. That's it.

20  Q. I'm just going to refer you as well, Mr. Farrell, to --

21  let me just try to identify the exhibit. Exhibit 10.

22  And I'll just freely acknowledge, Mr. Farrell, you are

23  not on this email.

24  A. Thanks.

25  Q. But I would like you to take a look because I just have

**151**

1  some questions about Department procedure.

2  A. Okay.

3  Q. Take a look at it, and when you're done, please let me

4  know.

5  A. Okay.

6  Q. So I would just submit that this is an email from

7  someone from SAU 4 asking Attorney Fenton as to whether

8  or not there's someone at the DOE who can speak with a

9  teacher and principal here in Newfound with specifics

10  about what she can say or not say regarding issues that

11  might pertain to divisive concepts.

12  Do you see that at the bottom of the document --

13  document 807 of Exhibit 10?

14  A. Yeah. Pierre Couture talks to Diana Fenton, who

15  responds.

16  Q. Yeah. Have you ever seen this email before?

17  A. No.

18  Q. Were you ever aware that Attorney Fenton had a

19  conversation with Pierre Couture, the superintendent of

20  Newfound area school district?

21  A. Say it again?

22  Q. Are you aware that Ms. Fenton had a conversation with

23  the superintendent in SAU 4?

24  A. No.

25  Q. Okay. Were you aware that Ms. Fenton told the

**152**

1  superintendent -- expressing thanks for reaching out

2  but that divisive concepts is handled by the Human

3  Rights Commission?

4  A. That --

5  Q. I'm just asking are you aware --

6  A. No, no.

7  Q. I'll say it again just so we can have a clean record.

8  A. I've got it now. No, I am not aware that she had this

9  conversation with Pierre and that Pierre was referred

10  to the HRC.

11  Q. Okay.

12  MR. BISSONNETTE: I'll mark two additional

13  exhibits.

14  (Exhibits 31 and 32 marked for

15  identification.)

16  BY MR. BISSONNETTE:

17  Q. Can I just ask you to read just the cover emails on the

18  top of both Exhibits 31 and 32 and just let me know

19  when you're done, please?

20  A. You want me to do what now?

21  Q. Sorry. Just read the front pages of Exhibits 31 and

22  32.

23  A. Oh, okay.

24  Q. Thank you.

25  A. Okay.

Transcript of Richard Farrell
Conducted on May 18, 2023

153

1  Q.  My question is have you seen either of these documents
2      before?  I know you're not on there, but have you seen
3      them before?
4  A.  I've seen 31 before.
5  Q.  And with respect to 31, Exhibit 31, I know that there
6      are not attachments on Exhibit 31, but if I refer you
7      to the attachments to Exhibit 32.
8  A.  Yes.
9  Q.  Would those attachments have been the attachments that
10     would have been affixed to Exhibit 31?
11 A.  I think so.
12 Q.  Okay.  Not a trick question.  I thought so, I just -- I
13     just wanted to confirm.
14         When did you see Exhibit 31?
15         Maybe I'll ask it this way.  Withdraw that
16     question.
17
18
19
20
21
22
23
24
25

154

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20 Q.  Okay.  Do you recall any investigation being conducted
21     by the Department in response to this complaint?
22 A.  I do not believe any investigation was conducted.
23 Q.  Setting aside the term "investigation."  Do you recall
24     any specific contact that you may have had with anyone
25     within that school district about the complaint?

155

1
2
3
4
5
6
7
8
9
10
11
12
13 Q.  Anything else that you recall about -- anything else
14     that you can recall that you haven't testified to today
15     with respect to how the Department has handled the
16     _____ complaint in Exhibit 31 and 32?
17 A.  I have nothing more to give.
18         MR. KENISON-MARVIN:  I don't want to
19     interrupt.  Maybe we can do this later.  I'm just
20     forgetting the exact provisions of the protective order
21     with respect to information -- if we're marking it
22     confidential for purposes of the deposition.  We can do
23     that later.
24         MR. BISSONNETTE:  I have to look at the
25     provision.  Can we go off the record?

156

1         (Discussion off record.)
2         MR. BISSONNETTE:  I'm going to introduce an
3      exhibit.  What number are we at?
4         THE REPORTER:  33 is next.
5         (Exhibit 33 marked for identification.)
6  BY MR. BISSONNETTE:
7  Q.  Mr. Farrell, I'll just ask you to take a look at
8      Exhibit 33.  Just let me know when you're done.
9         And after you reviewed that -- again, so as to not
10     hide The ball, I'm also going to ask you to look at
11     Exhibit 19, so I don't know if you have that.
12         So no need for you to read all of this, but my
13     reading of Exhibits 19 and 33 suggest that there's a
14     complaint about a book A Good Kind of Trouble.  And so
15     my question to you is were you familiar with a
16     complaint that a parent submitted concerning the book A
17     Good Kind of Trouble?
18 A.  I don't remember the first one -- the first complaint
19     was September 30th, yes?  From Ms. _____.  Mr.?
20     I was not involved in any of that email chain at all.
21     I don't know what --
22 Q.  What I'm referring to, if you can just look on Exhibit
23     19, page 72?  I recognize that you're not on this
24     email, but I don't want my questions to be viewed as
25     shots in the dark here as to why I'm asking them.



Transcript of Richard Farrell
Conducted on May 18, 2023

157

1   But there's language on Exhibit 19, page 72, where
2   an individual is complaining about the book A Good Kind
3   of Trouble.  Do you see that language beginning with
4   the paragraph regarding the book A Good Kind of
5   Trouble?
6   A.  Yes.  I'm looking at it now.
7   Q.  Gotcha.  And this is an email lodging a complaint
8   arising out of SAU 16; is that correct?
9   A.  SAU 16?
10  Q.  Yes.
11  A.  Yeah.
12  Q.  So I guess my question to you is were you aware --
13  setting these emails aside, were you aware of a
14  specific complaint in SAU 16 concerning the book A Good
15  Kind of Trouble?
16  A.  I honestly -- this is new to me.
17  Q.  Okay.
18  A.  Unless you can show me somewhere where these were
19  forwarded to me, this is brand-new to me.
20  Q.  I cannot.  And so what I'm asking is did you --
21  A.  No.
22  Q.  Were you involved in any investigation concerning the
23  book A Good Kind of Trouble?
24  A.  No.
25  Q.  Okay.  That's all I'm trying to get at.

158

1   A.  I'm actually kind of surprised my name isn't on some of
2   that stuff.
3   Q.  With respect to Exhibit 33, if you just look at page
4   one, Commissioner Edelblut writes to Ms. ▮▮▮▮▮▮
5   saying, "I met with the school last week on October
6   25th, 2021."
7       Do you know what Commissioner Edelblut is
8   referring to in that email?
9   A.  I have no idea.
10  Q.  He also says, "Know that I have read the book and we
11  are taking appropriate action."
12      Do you know any action that Commissioner Edelblut
13  has taken in response to this complaint?
14  A.  No.
15  Q.  Thank you.  I'm going to refer you to Exhibit 16.  This
16  is an email that you were on, but I'd just ask you to
17  take a look at it and let me know when you've finished
18  reading it.
19  A.  Okay.
20  Q.  So this is an email.  The bottom portion of page 59 is
21  an email from Ms. ▮▮▮▮▮ to various individuals
22  concerning a complaint arising out of Hollis.  And
23  Commissioner Edelblut elevates this to Ms. Fenton who
24  then responds, "Thank you.  We will look into it."
25      Is that -- did I accurately describe generally

159

1   what Exhibit 16 is?
2   A.  Yes.
3   Q.  Okay.  Do you know what, if anything, the Department
4   did in response to this complaint from Ms. ▮▮▮▮▮?
5   A.  I do not.
6   Q.  Did you ever speak to Ms. ▮▮▮▮ about this Hollis
7   complaint?
8   A.  No.
9   Q.  Did you ever engage -- did you ever have a
10  communication with anyone that works for a public
11  school in Hollis about this complaint?
12  A.  I don't remember communicating with anybody about this
13  complaint.
14  Q.  Okay.  Do you have any internal communications within
15  the Department about this complaint?
16  A.  If I did, it would have been with Attorney Fenton, but
17  I don't recall.
18  Q.  When Ms. Fenton says, "We will look into it," do you
19  know what Ms. Fenton did in response to this
20  complaint?
21  A.  That's a pretty standard response --
22  Q.  Okay.
23  A.  -- that Diana would give, I mean, with any kind of
24  communication.
25  Q.  Gotcha.

160

1   So what she did after this email, I have no idea.
2   Q.  You don't know.  Okay.  Thank you.  Done with that.
3   I'm also going to refer you to Exhibit 15.
4       So, Mr. Farrell, just take a look at Exhibit 15.
5   When you're done reviewing it, let me know.
6   A.  Okay.
7   Q.  And I would just represent to you, and correct me if
8   you think this is inaccurate, that what Exhibit 15 is
9   is an email from Matt Carney to Commissioner Edelblut
10  articulating various concerns, and Commissioner
11  Edelblut then forwards that email with a sentence of
12  commentary on his part.  He sent it to Diana Fenton,
13  copies you and Christopher Bond; is that correct?
14  A.  Correct.
15  Q.  Okay.  I want to refer you to the line at the bottom of
16  page 9586 on Exhibit 15 in which a complaint is made
17  about the film White Like Me by Tim Wise.  And then the
18  email goes on to say, "This film emphasizes white
19  privilege and equates conservatism with white
20  supremacy.  The film should not be shown at all as it's
21  clearly CRT and in direct violation of NH Bill HB 2,
22  sections 237 and 298, right to freedom from
23  discrimination in public workplaces in education."
24      Do you see that language at the bottom of the
25  page?

161

1  A.  I do.
2  Q.  Do you recall what, if anything, the Department did in
3      response to that specific concern that was raised?
4  A.  I don't recall anything that was done regarding
5      paragraph two.
6  Q.  Do you recall any communications that you were a party
7      to within the Department about the film White Like Me
8      by Tim Wise?
9  A.  No.
10 Q.  Did you -- with respect to the complaint about that
11     film, did you ever have any conversations with anyone
12     in Keene employed by that school district about that
13     film?
14 A.  About paragraph two, or the film?
15 Q.  Yes, sir.
16 A.  No.
17 Q.  With respect to that email in its entirety that
18     Mr. Carey submitted to Commissioner Edelblut, did you
19     have a conversation with anyone employed within the
20     Keene school district?
21 A.  We -- I had discussions with Rob Malay, the
22     superintendent, and I had conversations with Cindy
23     Gallagher. She's the principal. But it didn't -- I
24     didn't address paragraph two. It was more about the
25     allegations of violence and fights and fight clubs and

162

1      filming violence in the school.
2  Q.  Do you recall -- in speaking with Superintendent Malay,
3      do you recall any reference to the film?
4  A.  I, honestly, focused on the allegations about violence
5      in the school and classrooms.
6  Q.  So do you recall asking any questions about the film?
7  A.  I don't recall.
8  Q.  Did Ms. Gallagher -- same question. Do you recall
9      asking any questions about the film White Like Me?
10 A.  No, I was focused on the rest of the complaint.
11 Q.  Okay.
12         MR. BISSONNETTE: Can I go off the record for
13     just one minute, please?
14         (Discussion off record.)
15 BY MR. BISSONNETTE:
16 Q.  I am going to refer you to an exhibit that was
17     previously marked as Exhibit 4. And I know that you're
18     taking a look, Mr. Farrell, at this exhibit. I can
19     just tell you that it was an op-ed published by the
20     commissioner on June 13th, 2021. My question just will
21     be before today, had you read this op-ed before?
22 A.  Have I read it before? Yes.
23 Q.  When did you read this op-ed?
24 A.  After it was published.
25 Q.  Okay. So I'm going to just direct your attention to a

163

1      provision of the op-ed that says -- that references the
2      book by Ibram Kendi How to Be an Antiracist. Do you
3      see that?
4  A.  Whereabouts? Oh, I see.
5  Q.  Sure. It's in -- you got it? Okay.
6  A.  Yep.
7  Q.  My question is is that -- have you read that book
8      before?
9  A.  I've read portions of the book and reviews of it, but I
10     haven't read the entire book.
11 Q.  Did you read the portion of the book in which Mr. Kendi
12     states -- and this is quoted by Commissioner
13     Edelblut -- "The only remedy to racist discrimination
14     is antiracist discrimination."
15 A.  Yeah, I think so.
16 Q.  Why did you read the book?
17 A.  It was -- the book itself is circulating in the agency.
18     It had been talked about before. And, as I said
19     earlier --
20         MR. KENISON-MARVIN: I am going to object and
21     just instruct him not to answer that question on the
22     basis that he was asked to review it for some sort of
23     deliberative purpose to have a discussion with other
24     agency staff about an issue related to the book.
25         So to the extent your answer calls for that

164

1      deliberative type of information about why you're doing
2      something, I would instruct you not to answer.
3          MR. BISSONNETTE: Let me just ask a question
4      about that.
5          MR. KENISON-MARVIN: Sure.
6  BY MR. BISSONNETTE:
7  Q.  When did you read the book?
8  A.  I didn't read the entire book.
9  Q.  Sorry. When did you read portions of the book? Thank
10     you for your correction.
11 A.  So I read portions of the book because it was -- it
12     came up in the agency, and I wanted to educate myself
13     as to what the book was about.
14 Q.  When did it come up in the agency? Before or after the
15     op-ed was published?
16 A.  I honestly don't remember.
17 Q.  Did it come up in the context of a specific complaint
18     that was made to the department?
19 A.  I don't think so.
20         MR. BISSONNETTE: Okay. So I'm actually
21     going to ask that question again because I don't think
22     that deliberative process privilege now applies in
23     light of those responses.
24 BY MR. BISSONNETTE:
25 Q.  So do you remember specifically why you read the book?

165

1   Was it just because it was being discussed within the
2   Department?
3   A.   Yeah. I try to -- I try to educate myself on things
4       that are coming into the agency.
5   Q.   Who was discussing this book within the Department?
6   A.   I honestly don't recall.
7   Q.   Were you involved in discussions with -- strike that.
8       Were you a party to discussions in which the
9   commissioner referenced How to Be an Antiracist?
10  A.   I'm trying to recall if that -- if the author came up
11      during an educator misconduct meeting, but not related
12      to a complaint, but related to a misconduct meeting
13      generally.
14  Q.   Do you know one way or the other --
15  A.   No.
16  Q.   -- sitting here today?
17  A.   No.
18  Q.   Do you think the portions of the book that you read of
19  Dr. Kendi's How to Be an Antiracist would be covered
20  under HRC?
21      MR. KENISON-MARVIN: Objection to legal
22  conclusion. You can answer.
23      THE WITNESS: That the book itself was an HB
24  2 violation?
25      MR. BISSONNETTE: Well, start with the

166

1   portions that you read.
2       THE WITNESS: I didn't have a complaint.
3       MR. BISSONNETTE: Okay.
4       THE WITNESS: So I don't know that I would
5   have ever made that inquiry.
6   BY MR. BISSONNETTE:
7   Q.   Okay. If I were a teacher, though, and I read
8   Commissioner Edelblut's op-ed, and I read the book How
9   to Be an Antiracist, and I thought I would want to
10  include it in a high school class, how would I get an
11  answer as to whether that book is covered or not?
12  A.   Well, I think I would begin at the local level.
13  Q.   Okay.
14  A.   I would go to my principal or my department head,
15      principal, curriculum director, superintendent, and the
16      local elected school board.
17      I think it's important to note that New Hampshire
18      is a local-control state, and I would think that that
19      would be my first series of steps.
20  Q.   And if I were a teacher and I couldn't get that answer
21  from my superintendent, could I get that answer from
22  the Department of Education as to whether or not this
23  particular book is covered under HB 2?
24  A.   I think that that question would ultimately go to Diana
25  Fenton.

167

1   Q.   Okay.
2   A.   And I would defer to her expertise in answering the
3       question. I certainly wouldn't answer the question.
4   Q.   Okay. Do you think it would be reasonable for an
5   educator reading this op-ed to think that the book How
6   to Be an Antiracist is covered under HB 2?
7       MR. KENISON-MARVIN: Objection. Vague and
8   legal conclusion. You can answer.
9       THE WITNESS: I honestly -- I couldn't put
10  myself in that position right now. Maybe 30 years ago,
11  maybe I could, being a teacher, but, right now, I don't
12  think I could answer that question honestly.
13  BY MR. BISSONNETTE:
14  Q.   Okay. I know that you testified before that you were
15  unsure whether this book came up in the context of a
16  misconduct meeting. My question is why would it
17  potentially have come up in a misconduct meeting?
18  A.   These meetings -- the meeting themselves talk about
19      current cases, status of the current cases, direction,
20      conclusions, and then they devolve into other topics of
21      discussion. And so it's not -- those monthly meetings
22      are not limited to the ongoing cases that we have.
23      They kind of devolve into other things.
24  Q.   Are you aware of this book ever having been used in a
25  public school, whether at the instruction level or the

168

1   staff training level?
2   A.   I do not.
3   Q.   Okay. I'm going to direct your attention as well --
4   thank you for that, Mr. Farrell -- to Exhibit 14 which
5   is the thick document that I know was before you
6   before. And I am going to direct your attention to the
7   pages Bates stamped 741 to 745.
8   A.   Topic eight?
9   Q.   Yes. Yes, sir.
10  A.   Okay.
11  Q.   I would just represent to you, Mr. Farrell, that this
12  is, you know, one of the topics that was attached to
13  Commissioner Edelblut's April 15, 2022, op-ed. And I'd
14  also represent to you that what those pages are, they
15  are chapter 10 of a book, This Book is Antiracist by
16  Tiffany Jewell.
17      I just have it right here. My question to you is
18  have you seen this chapter before?
19  A.   I don't remember seeing this chapter, no.
20  Q.   So you don't recall reading it before?
21  A.   No.
22  Q.   Okay. Have you been involved in any Department of
23  Education meetings in which this chapter was
24  discussed?
25  A.   I never read it and I don't remember being involved in

169

1     a discussion about it.
2  Q.  Do you attend board of education meetings?
3  A.  I try not to.
4  Q.  Okay.
5  A.  I attend one a year for sure.
6  Q.  Fair enough.  So what I'm going to represent to you is
7      that portions of this chapter were read by the
8      commissioner during a July 8, 2021, board of education
9      meeting.  So my question is did you attend that
10     meeting?
11 A.  I did not.
12 Q.  Okay.  Thank you.  I appreciate it.  I just have one
13     last question.  Have you ever had any communications
14     with your Department of Education colleagues about
15     instruction that had occurred in New Hampshire that
16     would be banned by HB 2?
17 A.  You know, I don't believe we've ever had that direct
18     conversation.  With me, anyway.
19 Q.  Sure.  Have you been involved in any communications
20     within the Department of Education about specific books
21     that were taught before HB 2 but now couldn't be taught
22     because of HB 2?
23 A.  I've never had a conversation.
24 Q.  Okay.  Have there been any discussions about books that
25     were taught before HB 2 that potentially now could be

170

1      banned under HB 2?
2  A.  No.
3  Q.  Do you know -- you read exhibit -- Exhibit 16 which is
4      Commissioner Edelblut's op-ed?
5  A.  Yes.
6  Q.  Fair to say that he supported HB 2, correct?
7  A.  You really have to ask him.  I mean, you could read and
8      make assumptions, but you'd have to ask him.
9  Q.  I'm asking what your assumption is after having read
10     Exhibit 4.
11 A.  I don't think he's opposed to HB 2.  I really don't
12     know.  He's an interesting person, so I don't really
13     know what -- I just -- I can't answer that question.
14 Q.  I'm not trying to hide the ball.  What I'm --
15 A.  I know.
16 Q.  -- trying to get at specifically are the types of
17     instruction that HB 2 was trying to get at that now can
18     no longer be implemented in New Hampshire.  So that's
19     really what I'm trying to get at.
20     So based on your communications with Commissioner
21     Edelblut, are you aware of any instruction that
22     previously occurred in New Hampshire before HB 2 that
23     now could not occur in New Hampshire?
24 A.  I don't know of any.
25     MR. KENISON-MARVIN:  I'm going to object on

171

1      legal conclusion grounds.  You can answer.
2          THE WITNESS:  Yeah, I honestly don't know of
3      any.
4  BY MR. BISSONNETTE:
5  Q.  You don't know one way or the other?
6  A.  No.
7          MR. BISSONNETTE:  Okay.  I'm going to turn it
8      over to my colleague who's going to address another
9      segment of the case and then, hopefully, we'll be
10     done.
11         MR. KENISON-MARVIN:  Depending on how long, I
12     do need to run to the restroom at some point unless
13     you're going to be a couple minutes.
14         MS. MILBURN:  Yeah, let's take a break.
15     (Recess taken.)
16         EXAMINATION
17 BY MS. MILBURN:
18 Q.  Hi, Mr. Farrell.
19 A.  Hi.
20 Q.  My name is Tina Milburn, and I represent one of the
21     plaintiffs in this case, the American Federation of
22     Teachers, along with David Kahne.
23     I know it's been a long day, so I'm going to try
24     and be brief, but I'm going to be asking you some
25     follow-up questions on your testimony from earlier, and

172

1      also some questions specifically related to the claims
2      that the AFT has brought in this case.  The same rules
3      that applied with Mr. Bissonnette and Mr. Kahne apply
4      with respect to my questions.
5  A.  Okay.
6  Q.  Okay.  Great.  So if I understood your testimony from
7      earlier today, you stated that the DOE does not
8      formally investigate teachers for violations of HB 2
9      until there's been a finding by the HRC; is that fair
10     to say?
11 A.  Yes.
12 Q.  I want to show you a new exhibit.
13     (Exhibit 34 marked for identification.)
14 BY MS. MILBURN:
15 Q.  So I want to direct your attention to DOE705.  This is
16     an email chain between you and Terri Donovan.  Do you
17     know who Terri Donovan is?
18 A.  Oh, sure.
19 Q.  Who is Terri Donovan?
20 A.  Terri Donovan is an attorney for the American
21     Federation of Teachers.  She's a sweetheart.  I'm going
22     to a training for her on June the 7th.
23 Q.  So Terri Donovan asks, "I'm curious how many complaints
24     over the new law have been received."  And that's at
25     the bottom of the DOE 705.

173

1    And then your response is that "I have not
2    undertaken any formal investigation related to the
3    divisive concepts."
4    Q.  Do you see that?
5    A.  Let's start again.
6    Q.  The bottom of the first page, 705.
7    A.  Okay.  Terri Donovan says, "I understand the HRC part."
8    Q.  Right.  She says, "I'm curious how many complaints over
9    the new law have been received."
10   A.  All right.  And my response is above, correct.
11   Q.  Correct.  And in your response, you say, "I have not
12   undertaken any formal investigation related to divisive
13   content."
14   A.  Correct.
15   Q.  Is that right?
16   A.  Yeah.
17   Q.  Were there any informal investigations related to the
18   divisive content?
19   A.  No.
20   Q.  That's it with this.
21   A.  Okay.
22   Q.  So you previously testified that you were a high school
23   English teacher; is that right?
24   A.  Was, yes.
25   Q.  And how many teachers -- or is it fair to say that you

174

1    have a good understanding about what a teacher's
2    day-to-day work looks like based off of that
3    experience?
4    A.  Sure.
5    Q.  They interact with students outside of the classroom?
6    A.  Yes.
7    Q.  Is that correct?  In hallways?  In the hallway --
8    A.  Yeah.
9    Q.  -- for example?  In a schoolyard?  Lunch room?
10   A.  Yes.
11   Q.  In a library?
12   A.  Yes.
13   Q.  What do you consider to be part of the school
14   curriculum, in your view?
15   A.  I don't understand the question.
16   Q.  There -- schools have curriculums; is that right?
17   A.  Yes.
18   Q.  What do you consider that to entail?
19   A.  A curriculum meaning subjects taught, the way they're
20   taught.  Curriculum would deal with credit hours,
21   requirements for graduation, and the subsets in each --
22   in each field.  So that would be curriculum.
23   Q.  I'm going to show you what's been previously marked as
24   Exhibit 24.
25   A.  Okay.

175

1    Q.  If you could turn to the second page?  Do you recognize
2    this document?
3    A.  The FAQ?
4    Q.  Correct.
5    A.  Yeah.
6    Q.  If you could go to item number eight?
7    A.  Yes.
8    Q.  It discusses that this law applied to all school
9    activities, or just teaching?
10   A.  Okay.
11   Q.  And it says, "The prohibitions apply to all activities
12   carried out by public schools in their role as public
13   schools, including extracurricular activities that are
14   part of the public school's work," correct?
15   A.  Correct.
16   Q.  How would you define "extracurricular activities"?
17   A.  Extracurricular activities could be anything from
18   sporting situations, coaching, dance, plays.  Anything
19   that happens -- better way to put it.  Anything that
20   happens within the confines of the definition of the
21   Safe Schools Act.  So anything -- if it's defined as a
22   safe school, the property of the Safe Schools, anything
23   that happens within the confines of that Safe Schools
24   Act would apply.
25   Q.  Okay.  I'm not familiar with the Safe Schools Act.

176

1    A.  Safe schools basically says that Safe Schools -- the
2    Safe Schools Act talks about where -- what is a school?
3    What is the definition of the curtilage of the school?
4        So, for example, under the Safe Schools Act, a
5    teacher on a bus to and from a field trip, that's Safe
6    Schools.  That's covered.  A teacher that's becoming a
7    coach and working as a coach, theater, drama.  Anything
8    within the curtilage or the extended portion of a
9    school.
10       It gets kind of creative because many hockey
11   programs -- for example, hockey rinks are not --
12   they're private facilities, but if a hockey team for a
13   high school is playing and/or practicing on that
14   facility, it becomes an extension of Safe Schools.
15       So I would say the answer to that would be
16   anything that falls within the curtilage of the Safe
17   Schools definition.
18   Q.  Understood.  So just to provide some clarification, an
19   after-school debate club, for example, would be
20   considered an extracurricular activity?
21   A.  Sure, yes.
22   Q.  Discussion with a student in the library?
23   A.  Yeah.
24   Q.  Any activity after school hours?
25   A.  Yes.

177

1  Q.  Anything outside of school property?
2  A.  **As long as it's covered under the Safe Schools, yes.**
3  Q.  Understood.
4       Okay.  Does the statute apply -- does the HB 2
5  apply to a teacher's expression of their personal
6  beliefs in the classroom, in your view?
7       MR. KENISON-MARVIN:  Objection.  Legal
8  conclusion.  You can answer.
9       THE WITNESS:  Say it again now?
10  BY MS. MILBURN:
11  Q.  If a teacher is expressing their own personal beliefs
12  on a particular subject in the classroom, could HB 2
13  apply to what they're saying?
14       MR. KENISON-MARVIN:  Same objection.
15       THE WITNESS:  I don't think I have enough
16  information to give you a reasonable response.
17       MS. MILBURN:  I'll give you an example.
18       THE WITNESS:  Okay.
19  BY MS. MILBURN:
20  Q.  Let's say a teacher says that they like the book How to
21  Be an Antiracist in the classroom.  Could that be
22  covered by the statute?
23       MR. KENISON-MARVIN:  Same objection.
24       THE WITNESS:  I don't think I'm qualified to
25  make that -- to answer that question properly.

178

1       BY MS. MILBURN:
2  Q.  Okay.  Just going back to the FAQs.  It says the law
3  does not apply to all activities that may occur on a
4  public school's property.  Do you see that at the
5  bottom of the --
6  A.  Yes.
7  Q.  What activities would occur in a public school that are
8  not covered by HB 2 under your interpretation of these
9  FAQs?
10       MR. KENISON-MARVIN:  Same objection.
11       THE WITNESS:  Well, many schools -- I live in
12  Nashua, and there are two beautiful theaters and two
13  high schools.  The middle school, the Elm Street Middle
14  School, has the lovely O'Keefe auditorium.  It's a
15  beautiful theater.  And that rent that space out
16  routinely to other types of third-party groups.
17       I don't think any of this provision, although
18  it's in a school, I don't think it covers any of those
19  activities.  They're not licensed educators.  They're
20  third parties.  They're not employees.  It's nothing to
21  do with HB 2, in my view.  I could be wrong, certainly.
22  I'm not an attorney.  But that kind of thing wouldn't
23  be covered.
24  BY MS. MILBURN:
25  Q.  So fair to say, like, if you're contracting out to a

179

1  third-party vendor, and a third party is involved,
2  that's when HB 2 would not apply?
3       MR. KENISON-MARVIN:  Same objection.
4       THE WITNESS:  I just don't think it applies
5  to anyone that's not a licensed educator, that's not an
6  employee of a school district.
7  BY MS. MILBURN:
8  Q.  So we've previously discussed that you were a high
9  school teacher.  I'd like to ask you some questions
10  about HB 2 and what is and is not covered under the
11  statute.  Are you familiar with affirmative action?
12  A.  Yes.
13  Q.  And you have previously said that a debate club would
14  be covered under the statute; is that correct?
15  A.  **Possibly.**
16  Q.  Possibly?
17       MR. KENISON-MARVIN:  That does misstate the
18  prior testimony.  I'll object to that.  And legal
19  conclusion.
20  BY MS. MILBURN:
21  Q.  You previously said that a debate club was an
22  extracurricular activity; is that right?
23  A.  Yes.
24  Q.  If a teacher discussed affirmative action during the
25  debate club, in your view, would that violate HB 2?

180

1       MR. KENISON-MARVIN:  Objection.  Legal
2  conclusion.
3       THE WITNESS:  I don't think it's a fair
4  question for me because I don't know the context.  I
5  mean, are you talking about "Here's a debate topic.
6  We're going to talk about affirmative action today and
7  we're going to debate the merits of it."
8       I mean, that's one question.  If it's a
9  unilateral discussion or presentation by the teacher,
10  it's a different discussion.  So what are you talking
11  about?
12       MS. MILBURN:  Let's keep your former example.
13       THE WITNESS:  Okay.
14  BY MS. MILBURN:
15  Q.  So the teacher asked the students to debate the merits
16  of affirmative action during debate club.  Would you
17  view that as a violation of HB 2?
18       MR. KENISON-MARVIN:  Same objection.
19       THE WITNESS:  I'm not an attorney.  So, as a
20  former teacher, I think it would be a useful debate
21  tool.
22  BY MS. MILBURN:
23  Q.  As a former teacher, would you -- and understanding the
24  statute, HB 2, would you view that as a violation of
25  the statute if you made that a debate question?

181

1          MR. KENISON-MARVIN: Objection. Vague and
2     legal conclusion.
3          THE WITNESS: Again, this is -- you're asking
4     me personally?
5          MS. MILBURN: Your personal opinion.
6          THE WITNESS: I think utilizing that topic as
7     a debate topic doesn't violate anything.
8     BY MS. MILBURN:
9  Q.  Going to another example. If a teacher in the hallway
10     wore a pin that said "America is Racist," would you
11     view that in your own personal view as being a
12     violation of HB 2?
13          MR. KENISON-MARVIN: Same objection. Legal
14     conclusion.
15          THE WITNESS: I think there are people that
16     would make that allegation.
17     BY MS. MILBURN:
18 Q.  What about in your personal opinion?
19          MR. KENISON-MARVIN: Same objection.
20          THE WITNESS: In my personal capacity or in
21     my professional capacity?
22          MS. MILBURN: Personal capacity.
23          THE WITNESS: Personal capacity? I mean, I
24     don't think it's the best idea for a teacher to do a
25     number of things because it impacts other students.

182

1     But is it their right? I suspect it probably is.
2     BY MS. MILBURN:
3  Q.  Switching to another example. What if during -- would
4     you consider an after-school film club to be an
5     extracurricular activity?
6          MR. KENISON-MARVIN: Objection. Vague and
7     legal conclusion.
8          THE WITNESS: Again, it comes down to is it
9     approved by the school board? Is it approved by the
10     school superintendent? Is it an approved program? If
11     it's an approved program, sure.
12     BY MS. MILBURN:
13 Q.  And what if a teacher showed students during the
14     after-school film club the movie that we were
15     previously discussing, White Like Me by Tim Wise?
16     Would that be a violation of HB 2?
17          MR. KENISON-MARVIN: Same objection.
18          THE WITNESS: I don't know. I haven't seen
19     the film.
20          MS. MILBURN: Okay.
21          THE WITNESS: So I can't -- I can't answer
22     that question.
23     BY MS. MILBURN:
24 Q.  You previously testified, I think, that you had read
25     portions of How to Be an Antiracist; is that right?

183

1  A.  Yes.
2  Q.  If a teacher recommended to a student in the library
3     that they read that book, would you view that as being
4     a violation of HB 2?
5          MR. KENISON-MARVIN: Same objection.
6          THE WITNESS: Under what context?
7     BY MS. MILBURN:
8  Q.  A student comes to a teacher and asks, "What do you
9     think I should read in my own free time?" And the
10     teacher recommends that book. Do you think that's a
11     violation of HB 2?
12          MR. KENISON-MARVIN: Same objection.
13          THE WITNESS: I honestly don't know. I don't
14     know the answer to the question.
15     BY MS. MILBURN:
16 Q.  Is there any public guidance beyond these FAQs that
17     would help teachers understand answers to the questions
18     that I just posed to you?
19 A.  From this agency?
20 Q.  From the DOE or from any other agency.
21 A.  I'm not aware of any.
22 Q.  So, just in your work for the DOE, I get the sense that
23     you're concerned with children's safety. That's
24     important to you; is that right?
25 A.  That's my number one priority.

184

1  Q.  And it's fair to say that you stay informed of whether
2     or not there are any safety concerns in schools at any
3     time; is that fair to say?
4          MR. KENISON-MARVIN: Objection. Vague.
5          THE WITNESS: That's fair.
6     BY MS. MILBURN:
7  Q.  And you're concerned with whether or not children are
8     being put at risk by teachers; is that fair to say?
9  A.  Yes.
10 Q.  Are you aware of any incidents at any school where
11     extracurricular activities were disrupted because a
12     teacher discussed a topic that was banned under HB 2?
13 A.  No.
14 Q.  And we previously talked about a teacher wearing a pin
15     that says "America is Racist"; is that right?
16 A.  We talked about that, yeah.
17 Q.  Would you consider that to be disruptive behavior?
18          MR. KENISON-MARVIN: Objection. Vague.
19          THE WITNESS: Does it potentially have the
20     ability to disrupt? Certainly.
21     BY MS. MILBURN:
22 Q.  But you're not aware of any instance where --
23 A.  None that I'm aware of, no.
24 Q.  What about recommending the book that we were
25     previously discussing, How to Be an Antiracist, to a

---

185

1 student? Would you consider that to be disruptive
2 behavior?
3         MR. KENISON-MARVIN: Same objection.
4         THE WITNESS: Context.
5 BY MS. MILBURN:
6 Q.  What if, in response to a student's question like we
7    discussed before about what they would recommend for
8    outside-of-class reading, they recommended that book?
9    Is that disruptive?
10        MR. KENISON-MARVIN: Same objection.
11        THE WITNESS: Disruptive to whom?
12        MS. MILBURN: To the school in general.
13        THE WITNESS: I don't know.
14 BY MS. MILBURN:
15 Q.  So we've previously discussed the Moms for Liberty
16    bounty. Do you remember that?
17 A.  Yes.
18 Q.  Did you ever discuss any concerns with teachers about
19    Moms for Liberty?
20 A.  Individual teachers?
21 Q.  Yes.
22 A.  I don't recall doing that.
23 Q.  Did you ever have any conversations with anyone who was
24    concerned about Moms for Liberty in general, about
25    being reported on by Moms for Liberty, or because of

---

186

1    the Moms for Liberty bounty?
2         MR. KENISON-MARVIN: Objection. Vague and
3    compound.
4         THE WITNESS: I don't have direct
5    recollection of having that kind of a discussion with
6    anyone here.
7 BY MS. MILBURN:
8 Q.  And we previously discussed the No Left Turn group?
9 A.  Yes.
10 Q.  Is that right? I'm going to show you another document.
11        (Discussion off record.)
12        MR. BISSONNETTE: Exhibit 28.
13 BY MS. MILBURN:
14 Q.  So if we could show Exhibit 28?
15 A.  Okay.
16 Q.  So you're familiar with the No Left Turn in
17    Education --
18 A.  Yes.
19 Q.  -- group? Did you ever discuss No Left Turn with any
20    teacher?
21 A.  With a teacher?
22 Q.  With any teachers.
23 A.  Not that I recall, no.
24 Q.  And do you remember any teacher ever expressing
25    concerns about potentially violating HB 2 in response

---

187

1    to No Left Turn?
2 A.  I don't believe I ever communicated with any of the
3    teachers identified on that list, so, no.
4 Q.  What about any teachers --
5 A.  No.
6 Q.  -- that were not on the list?
7 A.  I wouldn't have any reason to. These are confidential
8    matters, so I wouldn't talk about that outside.
9 Q.  Are you aware of any teachers who were found to have
10    violated HB 2 because they signed the pledge?
11 A.  Absolutely not.
12 Q.  This email says, "We reviewed the same list back in the
13    summer, and the decision was the same. Moreover, the
14    day of action in New Hampshire took place on June 12,
15    2021. Therefore, it is believed that the signatures,
16    if confirmed, were affixed to the pledge prior to HB 2
17    becoming law."
18        Do you see that?
19 A.  I see.
20 Q.  In your view, would a teacher have violated the statute
21    if they had signed the pledge after the law was
22    passed?
23 A.  I think that was clear --
24        MR. KENISON-MARVIN: Objection. Legal
25    conclusion. You can answer.

---

188

1         THE WITNESS: I think that's clear. And the
2    email speaks for itself. One, it was -- the day of
3    action was before; and, two, no. So I think that
4    speaks for itself.
5 BY MS. MILBURN:
6 Q.  So, no, they would not have violated the statute if
7    they had signed the pledge after the law was passed?
8 A.  That's what the email says, yeah.
9 Q.  Is it your understanding that the Zinn pledge was
10    signed by teachers outside of the school grounds?
11 A.  I have no idea where they signed it.
12 Q.  Teachers have social media platforms; is that right?
13 A.  Yes. Yes, they do.
14 Q.  And they're friends with students on those platforms,
15    right?
16 A.  Oh, yes, indeed, they are.
17 Q.  You sound concerned with the social media platforms.
18 A.  Oh, I wish teachers could live in my shoes for a few
19    minutes, and they would have a different opinion, I
20    think, at the end of spending a day in my shoes.
21 Q.  And so teachers can share content with students on
22    these platforms; is that right?
23 A.  Oh, I would assume so, yeah.
24 Q.  In your view, would public postings that a teacher
25    makes on their social media platform be covered under

---

**189**

1  HB 2?
2       MR. KENISON-MARVIN: Objection. Legal
3  conclusion.
4       THE WITNESS: The question is too broad for
5  me. I mean, is it while they were working? Was it a
6  sanctioned website? Was it on their email account?
7  Was it text messages? Was it a Facebook or Instagram?
8  When did it occur? Under what context?
9       MS. MILBURN: So I'll show you a document.
10      (Exhibit 35 marked for identification.)
11 BY MS. MILBURN:
12 Q.  So if you could turn your attention to the second page,
13 which is DOE00909?
14 A.  Yes.
15 Q.  It's an email from James Laboe to Edelblut. You're not
16 on this email. He says, "Frank, I'm not sure if you've
17 had a chance to view Kate LeClaire's Twitter feed in
18 relation to the study guide materials that she was
19 circulating to teachers. Because of our presentation
20 Tuesday night, she is now restricted access, i.e. her
21 Twitter feed is no longer open to the public."
22      So taking a look at this email, if a teacher is
23 circulating study guide materials on their Twitter
24 feed, is there a possibility that they would violate HB
25 2?

**190**

1       MR. KENISON-MARVIN: Same objection. Legal
2  conclusion.
3       THE WITNESS: I can't answer that question
4  because I don't know what the study guide is. I have
5  no idea what's being provided. As a general rule,
6  Twitter accounts and Instagram, Facebook, communicating
7  with kids outside of the normal structured email for
8  the district is never a good idea, which leads to
9  things like this. So I can't answer your question
10 because I don't know what the study guide says or what
11 it provides.
12 BY MS. MILBURN:
13 Q.  Is the code of conduct covered outside of school
14 property? Does the code of conduct apply outside of
15 school property?
16 A.  If you take a look at Ethical Use of Technology, which
17 I think is principle four, yes, it does, depending on
18 what the content is and what's been transmitted. I
19 mean, the cases that I like to work on, almost
20 invariably with educator misconduct, in some form or
21 fashion, has a social media component to it.
22      So in terms of your question, I can't answer
23 because I don't know what, hypothetically, you're
24 talking about.
25 Q.  Is it fair to say that the code of conduct would apply

**191**

1  to a teacher's social media account?
2  A.  Depending on what the social media is doing. We've had
3  teachers grooming kids. We've had teachers going onto
4  certain websites and trying to groom kids or connect
5  with them sexually. So, yeah, it certainly could be a
6  violation of the code of conduct.
7  Q.  In your view, would a teacher violate HB 2 if they said
8  "America is a racist country" on their Twitter feed and
9  shared that content with students?
10      MR. KENISON-MARVIN: Objection. Legal
11 conclusion.
12      THE WITNESS: I'd have to see the full
13 context.
14 BY MS. MILBURN:
15 Q.  Have you heard of any instances where a teacher removed
16 a post from their social media platform because they
17 thought it might violate HB 2?
18 A.  No. I'm not familiar with any specific instance that
19 you've described.
20 Q.  Let's assume in my hypothetical that a teacher's
21 Twitter feed did violate HB 2.
22 A.  Well, that would be -- that would be a process after it
23 goes to the Human Rights Commission, the Department of
24 Justice. It's a long process.
25 Q.  Let's assume that it went through that process. It was

**192**

1  determined that the content violated the statute.
2  Would the Twitter feed be covered under the statute?
3       MR. KENISON-MARVIN: Same objection, and
4  vague.
5       THE WITNESS: I'm not sure I -- I'm not
6  following what you mean. So let me just understand
7  your question. There's been a full investigation
8  referred to the Human Rights Commission. There's been
9  a finding, and the finding has been referred to us.
10      MS. MILBURN: Correct.
11      THE WITNESS: Okay. Now, what's your
12 question?
13 BY MS. MILBURN:
14 Q.  In your view, after it's reached that point, would the
15 Twitter feed violate the statute?
16      MR. KENISON-MARVIN: Objection.
17 BY MS. MILBURN:
18 Q.  In your --
19 A.  You've already said it did.
20      MR. KENISON-MARVIN: Same objection. Vague
21 and legal conclusion.
22      MS. MILBURN: Sorry. Let me take that back.
23 BY MS. MILBURN:
24 Q.  Would the DOE, in your opinion, take the position that
25 it violates the Educator Code of Conduct?

193

1    MR. KENISON-MARVIN: Same objections.
2    THE WITNESS: Well, again, we talked about
3  this earlier. It's the process.
4    MS. MILBURN: Correct.
5    THE WITNESS: So once it comes back with a
6  finding, there would be an investigation at the DOE
7  level to determine if there is code of conduct
8  violation. So you're asking me a question that I can't
9  answer.
10  BY MS. MILBURN:
11 Q. Just taking my scenario one last time. Once the HRC
12  has determined that there was a violation of the
13  statute, what would be left for the DOE to investigate
14  in that instance?
15 **A. Well, what's left is what is the pleading? What are**
16  **the facts? Does it form within the code of conduct?**
17  **And, if so, what would any sanction be? I think that's**
18  **what our role would be after the finding.**
19 Q. And is it possible that a teacher's posting on Twitter
20  could be found to be a violation of the code of
21  conduct?
22 **A. Well, you've already -- this is a strange question.**
23  **You've already told me that the Human Rights Commission**
24  **has had a finding that it violated the statute.**
25 Q. Correct.

194

1 **A. Correct?**
2 Q. Correct.
3 **A. Okay. So then it comes to us to review, and does it**
4  **violate the code of conduct? And, if so, what's the**
5  **sanction? We're not reinventing the wheel. There's**
6  **already been a finding. So Twitter account, social**
7  **media, drawing of the blackboard. It's all the same.**
8  **They've made a finding. We now investigate and**
9  **determine sanctions.**
10 Q. So it's your testimony that the posting on Twitter
11  could be sanctionable?
12    MR. KENISON-MARVIN: Objection. Misstates
13  the testimony. Asked and answered.
14    THE WITNESS: That's not what I said.
15  There's already been a finding.
16    MS. MILBURN: Correct.
17    THE WITNESS: So we go over, we do our work,
18  and determine the sanction. We're not reinventing
19  anything.
20    MS. MILBURN: Got it. Okay. I'm going to
21  show you a new document.
22    (Exhibit 36 marked for identification.)
23  BY MS. MILBURN:
24 Q. Do you recall this email between you and Brian Taylor
25  on June 14th, 2022?

195

1 **A. Okay. I don't recall getting it. I got it.**
2 Q. So you don't -- do you recall Rachael Blansett?
3 **A. So Rachael Blansett, I think the first thing that I**
4  **would have done in receiving this email would be to**
5  **determine whether Rachael Blansett is a licensed**
6  **educator. And if she was a licensed educator, I would**
7  **go one way. If she's not a licensed educator, I have**
8  **no jurisdictional involvement, so I'd go a different**
9  **way.**
10  **And if this is the only email correspondence, my**
11  **guess is -- and I could be wrong -- that she's not a**
12  **licensed educator. Therefore, I have no say in it at**
13  **all.**
14 Q. Do you recall -- you don't recall what happened with
15  this complaint?
16 **A. Well, I can tell you nothing happened with the**
17  **complaint, because I have a pretty good memory, and**
18  **this is recent. And this name does not register with**
19  **me as a sanctionable -- a person with any kind of**
20  **sanction or investigation.**
21 Q. If a teacher posted this same content that you've had a
22  chance to review here in the email online, on a blog
23  post, would you view that as violating HB 2?
24    MR. KENISON-MARVIN: Objection. Legal
25  conclusion.

196

1    THE WITNESS: Well, it didn't, so...
2  BY MS. MILBURN:
3 Q. I understand. But if it was a teacher or they posted
4  this same content, would you view that as violating HB
5  2?
6    MR. KENISON-MARVIN: Same objection.
7    THE WITNESS: Well, to whom was it posted?
8  There are too many unanswered questions. I mean, it's
9  a social media post. It's off work. It's wherever.
10  She's a teacher. She does it in July, on the 4th of
11  July. School's not in session. Who was her audience?
12  I have no idea. I don't have enough facts to make that
13  kind of a determination.
14  BY MS. MILBURN:
15 Q. What if they were sharing this content with students on
16  the blog?
17 **A. I'd have to look at the facts. My guess is send it off**
18  **to Human Rights Commission.**
19 Q. Based off of what you see in this email, would a parent
20  have legitimate grounds to file a complaint against a
21  teacher with the Human Rights Commission?
22    MR. KENISON-MARVIN: Same objection.
23    THE WITNESS: Say it again.
24  BY MS. MILBURN:
25 Q. Based off the facts that you have in this email --

197

1   A.  Yep.
2   Q.  -- would a parent have legitimate grounds to file a
3       complaint against the teacher with the HRC?
4           MR. KENISON-MARVIN:  Same objection, and
5   vague.  You can answer.
6           THE WITNESS:  A parent can file a legitimate
7   complaint about anything; whether there's a finding is
8   a different story.  So could a parent take this stuff
9   and file a complaint?  Anybody can file a complaint.
10  BY MS. MILBURN:
11  Q.  Do you think it would be reasonable, based off of these
12      set of facts, to file a complaint?
13          MR. KENISON-MARVIN:  Same objections.
14          THE WITNESS:  Reasonable for whom?  The
15  parent or the --
16          MS. MILBURN:  Reasonable for the parent.
17          THE WITNESS:  Sure.  A parent can file
18  anything they want.  It's more than reasonable to file.
19  Whether there's any substance to it is a different
20  story.
21  BY MS. MILBURN:
22  Q.  And we previously touched on this, but I just want to
23      clarify.  Just to confirm the Educator Code of Conduct
24      does apply to educators or credential holders when
25      they're off duty?

198

1   A.  It can.
2   Q.  Are you aware of any private citizens who have
3       investigated teachers when they're off duty for
4       violating HB 2?
5   A.  I have no idea what you're talking about.  No.
6   Q.  Has the DOE received any complaints from private
7       citizens in investigating teachers when they're off
8       duty for violating HB 2?
9   A.  So say it again one more time, please.
10  Q.  Sure.  Has the DOE received any complaints from private
11      citizens who are investigating teacher conduct off duty
12      that violates HB 2?
13          MR. KENISON-MARVIN:  Objection.  Vague.
14          THE WITNESS:  So what you're asking me is
15  they're conducting their own investigation?  I have no
16  idea.  I've never heard of that, to tell you the truth.
17          MS. MILBURN:  I'm going to show you one more
18  document.  I think this is 37.
19          (Exhibit 37 marked for identification.)
20  BY MS. MILBURN:
21  Q.  Again, you're not copied on this email, but let me know
22      once you've had a chance to read it.
23  A.  Okay.
24  Q.  Are you familiar with Cheryl Dean?
25  A.  I have no idea who she is.

199

1   Q.  Are you aware of any private hotlines that had been
2       created to report on teachers?
3   A.  First I've seen.  No, I don't.
4   Q.  Any other efforts that have been taken by private
5       citizens to report on teachers?
6   A.  You mean as an organization?  No.
7   Q.  The last document I am going to show you is -- I think
8       it's Exhibit 31.
9   A.  I've got it, I think.  Yep.  Okay.
10
11
12
13  
14
15
16
17
18      Do you see that?
19  A.  I do.
20  Q.  Have you received any complaints about books that
21      teachers have on their shelves in their classrooms?
22
23  
24
25

200

1
2   Q.  In your personal view, do you believe that books that
3       teachers have in their classrooms are covered under HB
4       2?
5           MR. KENISON-MARVIN:  Objection.  Legal
6   conclusion and vague.
7           THE WITNESS:  You'd have to provide me
8   context for it.  I mean, is the teacher reading the
9   book and it's in her book bag and it's not being used
10  for curriculum purposes as opposed to something else?
11  The question is -- I can't answer that question.
12  BY MS. MILBURN:
13  Q.  Let's assume that it's just out on their bookshelf for
14      students to see, but they're not using it as part of
15      their instruction.
16  A.  And that's the question?  Is that --
17  Q.  Could that violate HB 2?
18          MR. KENISON-MARVIN:  Same objections.
19          THE WITNESS:  I'd have to know the context.
20  And even if it did, or we thought it did, I would refer
21  to the Human Rights Commission anyway.  I wouldn't be
22  involved until the very end of the process.
23          MS. MILBURN:  Could we just take a two-minute
24  break?
25          (Recess taken.)

---

**201**

1    MS. MILBURN: I just have one final question.
2    BY MS. MILBURN:
3  Q.  Is there any scenario in which a teacher's social media
4    platform could be covered under HB 2?
5        MR. KENISON-MARVIN: Objection. Legal
6    conclusion and vague.
7        THE WITNESS: I would have to see the case.
8    I don't know.
9    BY MS. MILBURN:
10 Q.  Are there any set of facts where it's possible that it
11   could be covered?
12       MR. KENISON-MARVIN: Same objection.
13       THE WITNESS: I mean, that would be a
14   decision made by the Human Rights Commission, so we
15   would, if we got an intake like that, refer, and let
16   them do their work. So I really can't answer that
17   question.
18       MS. MILBURN: Thank you.
19       MR. BISSONNETTE:  Attorney Kenison and I did
20   have a discussion off the record that I'll place on the
21   record with respect to Exhibit 32 which is a document
22   that was produced by the Human Rights Commission, not
23   the Department of Education, which is Bates stamped 53
24   to 64. It's been designated confidential subject to
25   protective order. That is Exhibit 32 in its entirety.

---

**202**

1    The parties agree that discussion with
2  respect to Exhibit 2 in the deposition transcript will
3  also be designated as confidential subject to
4  protective order.
5        And, in addition, because the witness
6  reviewed and had placed before him Exhibit 32, that
7  there would also -- there's an understanding among the
8  parties that the witness will sign the acknowledgment
9  form at the back end of the protective order in order
10 to ensure the confidentiality of Exhibit 32.
11       Of course, the plaintiffs aren't waiving
12 their rights with respect to challenging that
13 designation at any point, particularly in advance of
14 the filing of a public pleading, but this is to
15 maintain, in the interim, that designation if, and
16 until, any party elects to challenge that designation
17 subject to the terms of the protective order.
18       Did I get that right? I think.
19       MR. KENISON-MARVIN: It sounded eloquent.
20       MR. BISSONNETTE: With that, I mean, I think
21 on behalf of all of us, I think we wanted to express
22 our thanks.
23       MR. KENISON-MARVIN: I do have a few
24 redirects.
25       MR. BISSONNETTE: Oh, of course. Of course.

---

**203**

1    MR. KENISON-MARVIN: I think I do, but I'd
2  like to take another break just to speak shortly with
3  Mr. Farrell.
4    (Recess taken.)
5        EXAMINATION
6  BY MR. KENISON-MARVIN:
7  Q.  I'm just going to have -- I intend one or two short
8    questions for you just to follow up on the testimony
9    you gave today. Try to be brief.
10   I want to have you look at Exhibit 1, cover page
11   titled "Full Text of the Banned Concepts Act."
12   And earlier today you were asked to look at the
13   page marked PL0006, particularly the provision 193:41D.
14   Do you see where I'm looking?
15 A.  Yes. Line 36.
16 Q.  Correct. And it continues onto the next page, that
17   whole provision. I think Attorney Kahne had read that
18   provision and asked you something to the effect of if
19   you knew what it meant. Do you remember giving that
20   testimony?
21       MR. KAHNE: Objection.
22       MR. KENISON-MARVIN: Can you tell me what
23   the --
24       MR. KAHNE: Objection. Mischaracterizes my
25   question, and I didn't read the section.

---

**204**

1  BY MR. KENISON-MARVIN:
2  Q.  Do you remember looking at this section earlier?
3  A.  I do.
4  Q.  Okay. And do you remember being asked something to the
5    effect of if you knew what that meant?
6  A.  Yes.
7  Q.  And do you remember giving testimony to the effect of
8    "I have no idea"?
9  A.  Yes.
10 Q.  Can you explain that testimony and what you meant when
11   you said "I have no idea"?
12 A.  I obviously can read the language, but I had -- I have
13   no idea because this would all go to the Human Rights
14   Commission and it has no bearing on me. So when I -- I
15   was answering the question badly. I should have said I
16   understand what it means: One group of people can't
17   harm another group of people. And I understand what
18   that means, but it has no bearing on me because these
19   will all be referred to HRC for their findings. So I
20   misspoke.
21       MR. KENISON-MARVIN: I don't have anything
22   else.
23       MR. KAHNE: Just one follow-up here.
24       EXAMINATION
25 BY MR. KAHNE:

---

205

1   Q.  Mr. Farrell, I understand your testimony now is that
2       you understand what these words mean, but I believe my
3       question earlier was do you understand what it
4       prohibited under subsection D?  And so my question is
5       do you know what materials are prohibited under
6       subsection D?
7               MR. KENISON-MARVIN:  Objection as to legal
8       conclusion.
9       BY MR. KAHNE:
10  Q.  From instruction.  From educational instruction.
11              MR. KENISON-MARVIN:  Objection as to -- it
12      calls for a legal conclusion.
13              THE WITNESS:  So, in reading it, first of
14      all, the complaint would be forwarded.  I would not be
15      involved in this until a finding is made.  But what it
16      seems to me to mean is that one group of people or one
17      group of thoughts can't be imposed to another group of
18      people based on the prerequisites:  Race, religion,
19      creed, color, et cetera.
20      BY MR. KAHNE:
21  Q.  Okay.  But the language here says that one group of
22      people cannot and should not attempt to treat others
23      without regard to age, sex, gender identity.  Do you
24      see that?
25  A.  I do.

206

1               MR. KENISON-MARVIN:  Objection to the extent
2       it misstates what the language says.
3               MR. KAHNE:  Well, how have I misstated it?
4               MR. KENISON-MARVIN:  Sorry.  I'm looking for
5       the language where it says "one group of people."
6       BY MR. KAHNE:
7   Q.  Would affirmative action be covered under subsection
8       D?
9               MR. KENISON-MARVIN:  Objection.  Legal
10      conclusion.  Asked and answered.
11      BY MR. KAHNE:
12  Q.  Do you know?
13  A.  I don't.
14  Q.  Do you know if reparations would be covered under
15      subsection D?
16              MR. KENISON-MARVIN:  Objection.  Same.  Same
17      objections.
18              THE WITNESS:  Again, I don't, and that would
19      be a decision made by the Human Rights Commission, and
20      not me.
21      BY MR. KAHNE:
22  Q.  So, fair to say you have no idea whether those topics
23      would be covered?
24  A.  No.
25              MR. KENISON-MARVIN:  Same objections.

207

1       BY MR. KAHNE:
2   Q.  And are you aware of any book covered under -- that
3       would be prohibited under the law?
4               MR. KENISON-MARVIN:  Objection.  Vague.
5       BY MR. KAHNE:
6   Q.  Are you aware of any book that is prohibited under the
7       prohibition on teaching discrimination?
8               MR. KENISON-MARVIN:  Same objection.  And I
9       think that goes beyond the scope of what I was
10      redirecting him on, to the extent you're asking about
11      the law and not subsection D.  I just asked about
12      subsection D.
13              MR. KAHNE:  So subsection D.
14              THE WITNESS:  The question is?
15      BY MR. KAHNE:
16  Q.  Are you aware of any book that is prohibited from being
17      taught in New Hampshire public schools under subsection
18      D of the law?
19  A.  I am not.
20              MR. KAHNE:  Okay.
21              (Whereupon, the deposition was concluded at
22      4:39 p.m.)
23
24
25

208

1           C E R T I F I C A T E
2       I, Sharon G. Saalfield, a Licensed Shorthand
3   Reporter for the State of New Hampshire, Certified Shorthand
4   Reporter for the Commonwealth of Massachusetts, Registered
5   Diplomate Reporter and Certified Realtime Reporter, do
6   hereby certify that the foregoing is a true and accurate
7   transcript of my stenographic notes of the proceeding taken
8   at the place and on the date hereinbefore set forth to the
9   best of my skill and ability under the conditions present at
10  the time.
11          I further certify that I am neither attorney or
12  counsel for, nor related to or employed by any of the
13  parties to the action in which this proceeding was taken,
14  and further that I am not a relative or employee of any
15  attorney or counsel employed in this case, nor am I
16  financially interested in this action.
17          Before completion of the deposition, review of the
18  transcript was requested.
19          The foregoing certification of this transcript
20  does not apply to any reproduction of the same by any means
21  unless under the direct control and/or direction of the
22  certifying reporter.
23
24          _Sharon G. Saalfield_
        _____
25          Sharon G. Saalfield,
            Lic. No. 147, CSR, RDR, CRR

# EXHIBIT 5

HRC Director
Ahni Malachi
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

AHNI MALACHI

May 24, 2023



AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

3

```
 1
 2                          INDEX
 3             Deposition of Ahni Malachi
 4   Examination by Mr. Bissonnette:            5
 5                        EXHIBITS
 6   53   Letter, Malachi to DiLorenzo,
 7        March 4, 2022, DOE-10269-72          19
 8   54   Email, BurkeCohen to Malachi,
 9        20 Sep 2021, HRC-00379-380          49
10   55   Exhibit 19, July 21, 2021,
11        Guidance, PL 00415-423              77
12   56   NH Commission for Human Rights,
13        Minutes, October 7, 2021,
14        HRC-00391-394                       94
15   57   Commissioner Edelblut's Objections
16        and Responses to the Plaintiffs'
17        First Set of Interrogatories        99
18   58   Christian Kim and Ahni Malachi's
19        Objections and Responses to the
20        Plaintiffs' First Set of
21        Interrogatories                    101
22        (Original exhibits retained by reporter)
23        (Scanned copies provided to all counsel)
```

---

1

```
            UNITED STATES DISTRICT COURT
               DISTRICT OF NEW HAMPSHIRE

                  CERTIFIED
                  ORIGINAL

   Local 8027, AFT-New Hampshire, et al.

                  Plaintiff,

   v.

   Frank Edelblut, Commissioner, et al

                  Defendants.

            No. 1:21-cv-01077-PB


                    VOLUME I
            DEPOSITION OF AHNI MALACHI
               taken on behalf of the Plaintiffs
               at the New Hampshire Commission
               for Human Rights, Concord, NH,
               on May 24, 2023, at 11:15 a.m.


   Court Reporter:
   Cynthia Foster, LCR
   LCR #14 (RSA 310-A:161-181)
```

---

2

```
 1
 2   APPEARANCES:
 3       On behalf of the Plaintiffs, Local 8027, AFT-New
         Hampshire, AFL-CIO:
 4   STROOCK & STROOCK & LAVAN LLP
     By: Charles Moerdler, Esq.
 5       Elizabeth C. Milburn, Esq.
         David Kahne, Esq., by Zoom
 6   180 Maiden Lane
     New York, NY  10038
 7   212-806-5648
     cmoerdler@stroock.com
 8   ecmilburn@stroock.com
 9       On behalf of the Plaintiffs, Christina
         Philibotte, Andres Mejia, NEA-New Hampshire:
10   ACLU OF NEW HAMPSHIRE
     By: Gilles Bissonnette, Esq.
11   18 Low Avenue, Unit 12
     Concord, NH  03301
12   603-225-3080
     gilles@aclu-nh.org
13
         On behalf of the Defendants, Frank Edelblut,
14       Ahni Malachi, John Formella, et al:
     NH DEPARTMENT OF JUSTICE
15   By: Nathan W. Kenison-Marvin, Esq.
     33 Capitol Street
16   Concord, NH  03301
     603-271-1292
17   nathan.w.kenison-marvin@doj.nh.gov
18   By Zoom:
     Peter Perroni, Esq.
19   Nathan Fennessy, Esq., nfennessy@preti.com
     Morgan Nighan, Esq., mnighan@nixonpeabody.com
20   Jennifer Eber, Esq.
     Kayla Turner, Esq., kaylat@drcnh.org.
21   Esther Dickinson, Esq., edickinson@nhnea.org
22
23
```

---

4

```
 1
 2            S T I P U L A T I O N S
 3            It is agreed that the deposition shall
 4   be taken in the first instance in stenotype and when
 5   transcribed may be used for all purposes for which
 6   depositions are competent under New Hampshire
 7   practice.
 8            Notice, filing, caption and all other
 9   formalities are waived.  All objections except as to
10   form are reserved and may be taken in court at trial.
11            It is further agreed that if the
12   deposition is not signed within thirty (30) days
13   after submission to counsel, the signature of the
14   deponent is waived.
15            It is further agreed that exhibits may
16   be retained by counsel until the time of trial.
17
18
19
20
21
22
23
```

5

1           AHNI MALACHI, DULY SWORN
2              EXAMINATION
3   BY MR. BISSONNETTE:
4   Q    Thank you, and I just want to make clear for the
5       record that we have the same stipulations as
6       yesterday.  I think we're all in an agreement,
7       and there's obviously going to be no recording
8       of this deposition today.  We're all in
9       agreement there.
10          MR. KENISON-MARVIN:  I agree.
11  Q    Director Malachi, I know we've met before.  My
12      name is Gilles Bissonnette.  I represent Tina
13      Philibotte and Andres Mejia in this case.  Thank
14      you so much for coming in today.  I'm just going
15      to kind of walk you through kind of what the
16      deposition process looks like, the common
17      understandings and agreements that we have amid
18      this process.  So before I kind of go through
19      that, I just want to ask you have you ever been
20      deposed before?
21  A    No.
22  Q    Okay.  So the way this works, obviously, is
23      we're in a room, a reporter is going to be

6

1       recording everything that we say to one another.
2       So I think it's important that we don't talk
3       over each other.  That's more an issue for the
4       lawyers as opposed to the witnesses so I can
5       promise you I will do my best to let you finish
6       your answers before I ask another question, and
7       reciprocally, I would just ask that you wait to
8       provide an answer until I finish my question.
9       Does that make sense?
10  A    Yes.
11  Q    And if you don't understand a question, please
12      tell me, and I'll be happy to rephrase or make
13      an effort to reclarify.  If you don't do that
14      and you respond to the question, I'm going to
15      assume that you have understood the question.
16      Okay?
17  A    Okay.
18  Q    And as well, I would just ask you given the fact
19      that we have a court reporter here transcribing
20      the deposition that I'd ask that you just avoid
21      nonverbal cues so just make sure your responses
22      are verbal and are loud enough to be heard by
23      both the folks in this room and the reporter.

7

1       Okay?
2   A    Yes.
3   Q    And this is especially important.  I know this
4       isn't always, you know, a fun process going
5       through a deposition, you can take breaks at any
6       time.  Typically, we do them on the hour.  If
7       you need them sooner, that's totally fine.
8       Whatever makes you the most comfortable if you
9       need a break.  My only kind of caveat would be
10      if there's a pending question that we just
11      answer that question before we take that break.
12          There's one exception to that.  If there's
13      a privilege assertion or a privilege question
14      being raised either by you or by counsel, of
15      course, I think then it would be appropriate to
16      take a break even if we don't yet have an answer
17      to that question.  Okay?
18  A    Yes.
19          (Discussion off the record re Zoom)
20  Q    If the Zoom component of this deposition becomes
21      a distraction visually, I can move myself so
22      it's less in sight so that is an option I just
23      want to make you aware of as well.

8

1       Obviously, you were just sworn in.  You do
2       know that you're under oath, correct?
3   A    Yes.
4   Q    Okay.  And I'm going to just kind of represent
5       to you that there is a chance in this case that
6       the deposition today, either in whole or in
7       part, would be made available to the judge in
8       this case.  Is that something that you're aware
9       of?
10  A    Yes.
11  Q    Will anything prevent you from giving truthful
12      and accurate testimony today?
13  A    I don't understand the question.
14  Q    Is there anything that would prevent you from
15      giving truthful testimony today at this
16      deposition?  Medications, family issues, is
17      there anything kind of in your life that would
18      prevent you from giving truthful testimony.
19  A    No.
20  Q    Okay.  I assume that you know that this is a
21      lawsuit that challenges portions of what the
22      Plaintiffs have called the Banned Concepts Act.
23      Do you understand that's what's being litigated

9

1     in this case?

2  A   I would push back against the title of that.

3  Q   Please do.  Yes.  How so?

4  A   So if you are talking about RSA 354-A:29 through

5     34, is that what you're asking me?

6  Q   That is.  Do you understand that those are the

7     provisions of New Hampshire law that are being

8     challenged in this case?

9  A   Yes.

10 Q   If I were to call those provisions that are

11    being challenged "HB 2," and I wouldn't be

12    referencing the entire bill of HB 2, but if I

13    were to use the term "HB 2" to reference those

14    provisions 354-A:29 to 34, do we have a common

15    understanding on just the title of the

16    challenged law?

17 A   The preference would be the freedom from

18    discrimination in public workplaces and

19    education because that's the name of the amended

20    section.

21 Q   Would you prefer that I call it the Freedom from

22    Discrimination Law?  I just want to make sure we

23    have a common understanding on terminology.

10

1     That's all.  Would that be your preference?

2  A   I can agree to that portion of the exact title.

3     Yes.

4  Q   Okay.  So if I were to use the term the Freedom

5     from Discrimination Law in the course of this

6     deposition, you would understand that what I'm

7     referring to are the provisions in New Hampshire

8     law RSA 354-A:29 to 34.

9  A   Yes.

10 Q   Okay.  I'm just going to just so again we have a

11    common understanding on terminology, I'm just

12    going to put before you what's been previously

13    marked as Exhibit 1, and I am going to ask you

14    to just review this, Director Malachi, briefly,

15    but I do want to represent to you that that

16    first page is a page created by me as Exhibit 1

17    to the lawsuit that Majia/Philibotte Plaintiffs

18    filed in this case.

19       So setting that cover page aside, I would

20    just ask you to review pages marked PL 004 to PL

21    007 and my question is going to be when you're

22    done reviewing that is this the law that you

23    understand to be challenged in this case and

11

1     that we are calling the Freedom from

2     Discrimination Law in this deposition.

3  A   PL 004 through?

4  Q   004 to 007.

5  A   Okay.  So to answer your question, there's a bit

6     of a discrepancy.  So are you asking me if pages

7     4 through 7 are relative to 354-A and the

8     section entitled Right to Freedom from

9     Discrimination in Public Workplaces in Education

10    or is there an additional question that you're

11    asking?

12 Q   Sure.  I guess my opening question is is it your

13    understanding that the unredacted language on

14    pages 4 and 7 of Exhibit 1 contain the statutory

15    language that's being challenged by the

16    Plaintiffs in this case?

17 A   So my specific answer would be in part, yes.

18    There are other statutes that are listed there.

19 Q   Okay.  When I use the phrase in this case, the

20    "Freedom from Discrimination Law" which is the

21    common terminology we discussed, the law being

22    challenged in this case, is it your

23    understanding that we're referring to the

12

1     language on pages 4 through 7 on Exhibit 1?

2  A   As it relates to 354-A, subsections 29 through

3     34?

4  Q   Okay.

5  A   Yes.

6  Q   And I'm going to just direct your attention to

7     just page 6 which deals with RSA 193:40.  Do you

8     see that language?

9  A   193:40.  I see that.

10 Q   Yes.  I would just, I don't know if you know

11    this, but I will just represent to you again so

12    we have a common understanding that that portion

13    which is not in 354-A is also being challenged

14    by the Plaintiffs.  So is that something that

15    you knew before today?

16 A   I have knowledge about 354-A and subsections

17    dealing with :29 through :34.

18 Q   Do you have any knowledge with respect to

19    193:40?

20 A   That's not the statute that I work with.

21 Q   Okay.  We'll get to that.  That's good to know

22    though.  Thank you.

23       Director Malachi, what's your current

13

1      position?
2  A   I'm Executive Director of the New Hampshire
3      Commission on Human Rights.
4  Q   How long have you been in that role?
5  A   Five years.  Little over.
6  Q   What are your duties in that role?
7  A   They're a variety of duties.  I could certainly,
8      maybe faster to give you my job description in
9      writing.
10 Q   Well, I think maybe just give me a summary of
11     how you would describe those duties.
12 A   I'm in charge of the New Hampshire Commission
13     for Human Rights.  The staff, media liaison,
14     legislative liaison, budgeting, liaison to the
15     Governor's office, other duties as assigned.
16 Q   When you say "other duties as assigned," who
17     would be doing the assigning?
18 A   It could be the legislature could, the Governor
19     could, the Commissioners could.
20 Q   When you say "Commissioners," who are you
21     referring to?
22 A   The Commissioners of the Commission.
23 Q   For Human Rights?

14

1  A   Yes.
2  Q   How many are there?
3  A   There are 7.
4  Q   How would you describe how your role interacts
5      with the role of the Commissioners within the
6      Commission of Human Rights?
7  A   Could you be more specific?
8  Q   Within the structure of the Commission for Human
9      Rights Commission, do you report to
10     Commissioners, do they supervise you, how would
11     you describe that relationship?
12 A   I communicate with all of the Commissioners, but
13     primarily the Chair of the Commission, and it
14     could be day to day, it could be -- we have a
15     meeting every month.  The Commission meets
16     monthly.
17 Q   Okay.  And outside the meetings that occur, what
18     are the general topics of conversation that you
19     have with the Chair of the Commission?
20 A   We talk about the status of affairs with the
21     Commission.  So caseload, legislation, budgets,
22     other topics.
23 Q   I know that you said that the Commission meets

15

1      every month.  What are the general topics of
2      agenda items that are covered by the Commission
3      when they meet monthly?
4  A   Those are the topics, the ones I just mentioned,
5      those are the topics that we cover.
6  Q   Okay.  Is the actual Commission involved in the
7      processing and handling of complaints that come
8      into the office or is that outside their
9      responsibilities?
10 A   Are you asking me if the Commission or the
11     Commissioners?
12 Q   What would be the difference?
13 A   The Commission would be staff in this office.
14     The Commissioners would be the individuals.
15 Q   Thank you.  I appreciate that.
16 A   So I wasn't clear.
17 Q   I appreciate that.  Are the Commissioners
18     involved in processing complaints that come into
19     the office?
20 A   If I understand your question, are you asking me
21     if they have any involvement in charges that
22     come in?
23 Q   Yes.

16

1  A   Okay.  They do.
2  Q   Could you describe that involvement generally?
3      MR. KENISON-MARVIN:  Objection.
4  Foundation.  You can answer.
5  A   The Commissioners upon completion of an
6      investigation, there's an Investigating
7      Commissioner that's assigned to a charge who
8      would then make a finding of probable cause or
9      no probable cause.
10 Q   So I just want to be clear.  We'll get into kind
11     of what that process looks like in just a few
12     minutes, but I just want to make sure I
13     understand the Investigating Commissioner is a
14     Commissioner on the Commission for Human Rights;
15     is that fair to say?
16 A   Yes.
17 Q   Okay.  I kind of zoomed a little bit too far
18     forward.  I did want to get to your tenure, your
19     work history before you took this job with the
20     HRC five years ago.  So what was your place of
21     employment before you took this position at the
22     Human Rights Commission?
23 A   Hearst, Inc.

---

17

1  Q   What was your role at Hearst, Inc.?
2  A   So specifically I worked for WMUR, and I was
3      the, what it's called, Public Service Manager.
4  Q   And could you give me the approximate duration
5      of that employment using years?  You don't have
6      to give me months.
7  A   Approximately six years.
8  Q   Could you give me the years, that six-year
9      range?  Was that 2000 when to when?
10 A   I believe it was 2012 to 2018.
11 Q   Okay.  Is 2018 when you assumed this role at the
12     Human Rights Commission?
13 A   Yes.
14 Q   What were your responsibilities in that role at
15     Hearst, Inc.?
16 A   Producing Public Service Announcements for
17     charities, and other nonprofits.  Responsibility
18     for public-facing events where the TV station
19     was involved and other duties.
20 Q   I'm now going to kind of go back into our
21     discussion with complaints.
22        Could you just describe how the Human
23     Rights Commission processes complaints?

---

18

1         MR. KENISON-MARVIN:  Objection.  Foundation
2      and vague.
3  Q   Let me ask this.  Does the Human Rights
4      Commission process complaints made by members of
5      the public under the law against discrimination?
6         MR. KENISON-MARVIN:  Objection.  Vague.
7  A   Is there something more specific that you can
8      offer --
9  Q   I'm afraid not.
10 A   -- to allow me to answer?
11 Q   My question is pretty direct.  Yes or no, does
12     the New Hampshire Commission for Human Rights
13     process complaints made by the public under the
14     law against discrimination?
15        MR. KENISON-MARVIN:  Freedom from
16     Discrimination Law?
17 Q   I'm actually just talking about 354-A here
18     generally.  So I could, maybe I'll clarify my
19     question.  I'm not getting into HB 2 right now,
20     and we will get there, but just generally with
21     respect to 354-A, does the Human Rights
22     Commission process complaints made by the public
23     under RSA Chapter 354-A?

---

19

1  A   Yes.
2  Q   Can you describe for me what that process looks
3      like?
4  A   Someone who believes they've been discriminated
5      against will make a call, and if the context of
6      what they're alleging meets prima facie then a
7      charge is docketed, the other party is noticed,
8      and then there would be an investigation of the
9      charge.
10 Q   Okay.  I'm going to mark Exhibit 53.
11        (Exhibit 53 marked for identification)
12 Q   I put before you a document that's marked as
13     Exhibit 53.  Do you have Exhibit 53 in front of
14     you?
15 A   It looks like that's what it says here.
16 Q   Okay.  So I would just ask you to just review
17     Exhibit 53.  I'm just going to have some
18     questions about it so let me know when you're
19     finished reviewing it.
20        Have you reviewed Exhibit 53?
21 A   I have looked at it, yes.
22 Q   Great.  Thank you.  Have you seen Exhibit 53
23     before?

---

20

1  A   Exhibit 53?
2  Q   Yes.
3  A   No.
4  Q   Exhibit 53 at least to me looks like a letter
5      from you dated March 4th, 2022, to
6      Representative DiLorenzo.  Have I accurately
7      described Exhibit 53?
8  A   As it appears here, yes, but I'm not sure unless
9      I compare it to something that I wrote to know
10     if this is exactly the same thing.
11 Q   Well, I can submit to you that this is a
12     document that it seems that you copied to
13     Commissioner Frank Edelblut and that was
14     produced to us by the Department of Education.
15     Any reason to think this is not an accurate
16     reflection of a letter that you wrote on March
17     4th to Representative DiLorenzo?
18 A   Based on what this looks like here?  Yes.
19     However, if I'm not comparing it to the signed
20     copy that I have, then I'm assuming that this is
21     the same thing.
22 Q   Okay.
23 A   But without comparing it, I can't say that it

---

21

1      is.

2  Q   I'm just going to refer you to the last page of

3      the document, page 10272.  Does that look like

4      your signature?

5  A   Yes, it does.

6  Q   So I just want to make sure that we have a

7      common understanding.  Any reason for you to

8      believe sitting here today without you having

9      cross-referenced this with a copy of your files

10      that this is not a true and accurate copy of a

11      letter that you wrote on March 4th, 2022, to

12      Representative DiLorenzo?

13  A   As I sit here today, it looks like it.

14  Q   Okay.

15  A   Without having the opportunity to

16      cross-reference.

17  Q   Okay.  I'm just going to direct your attention

18      on page 2 of this document, Bates stamped 10270,

19      the language that states, that begins with "To

20      fully answer your question," and goes on to the

21      next page and ends in paragraph (d) ending with

22      the language "to appeal in a public forum, New

23      Hampshire Superior Court."

---

22

1          Do you see the language that I just

2      referred to you in Exhibit 53?

3  A   So where specifically are you on page 2?  So I

4      make sure I'm in the same place with you.

5  Q   Subsection 5(a) begins with "to fully answer

6      your question."  Do you see that language?

7  A   I do.

8  Q   And now the box of text that I'm just wanting to

9      direct your attention to would end in subsection

10      (d) on the next page which begins with "both

11      parties are afforded."  Do you see that?

12  A   I do.

13  Q   My question is just that an accurate

14      reflection of how the complaint process works

15      within the Human Rights Commission?

16  A   I will need to read this section.

17  Q   Please do.

18  A   Okay.

19  Q   Director Malachi, have you reviewed the language

20      that we just referenced moments ago, subsections

21      (a) through (d) on pages 10270 to 10271 on

22      Exhibit 53?

23  A   I did.

---

23

1  Q   Is it an accurate reflection at the time it was

2      written on March 4th, 2022, of how the complaint

3      process works within the Human Rights

4      Commission?

5  A   As I sit here today reading this, it does appear

6      to be an accurate reflection of the

7      Commissioner's process.

8  Q   Sitting here today on May 24th, 2023, is this

9      still an accurate reflection of how the

10      complaint process works within the Human Rights

11      Commission?

12  A   Yes.

13  Q   Okay.  You mentioned earlier in your testimony

14      that a complaint could come in through a call.

15      I guess my question for you is what are the ways

16      in which complaints come into the office?

17  A   Can you clarify by what you mean regarding a

18      complaint?

19  Q   Well, you use the term on Exhibit 53, bottom of

20      page 10270, use the phrase "understanding of the

21      complaint process."  So what did you mean there

22      when you said "complaint process"?

23  A   So the Commission, regarding the word complaint,

---

24

1      complaint for the Commission means a docketed

2      charge.  So is that the question that you're

3      asking?

4  Q   Well, my question just was just what did you

5      mean when you said complaint process?  So I want

6      to make sure I understand that your definition

7      of complaint as it was used on the bottom of

8      10270 is a docketed complaint; is that what

9      you're saying?

10  A   Correct.

11  Q   So what I'm going to, my question here is going

12      to be a little bit different, but I appreciate

13      that definition you provided.

14          What are the forms in which predocketed

15      complaints come into your office?

16  A   So a complaint is only something that's

17      docketed.  So that's why I'm asking for clarity.

18  Q   What if I just used the phrase "allegations of

19      discrimination," would that be an easier phrase

20      to use?

21  A   Are you using allegation as something that's not

22      docketed versus a complaint that is?

23  Q   I am in part because that's the language that's

---

25

1  used at the bottom of 10270 where you state
2  investigate and pass upon allegations of
3  discrimination.
4      So I think my question to you is going to
5  be what are the forms in which allegations of
6  discrimination are made that come to your
7  office?
8  A  A person who believes they've been discriminated
9     against can make a phone call and talk to us
10    about it.  They can email us.  They could drop
11    something off.
12  Q  Okay.  The language at the bottom of 10270 says
13    that an assessment is made to ensure the
14    complainant has a prima facie case.  Do you see
15    that language?
16  A  Yes.
17  Q  And then the second sentence, the next page or
18    additional sentence on the next page says, "If
19    this is the determination, the allegation of
20    discrimination is verified," there's some
21    bracketed language, then "submitted to the
22    Commission, and becomes a docketed charge of
23    discrimination whereby both parties are notified

26

1  in writing."  Do you see that language?
2  A  Yes.
3  Q  Is there a form a complaint needs to be
4     submitted in for it to be docketed?
5      MR. KENISON-MARVIN:  Objection.  Vague.
6  Mischaracterizes prior testimony.
7  Q  Let me ask the question more directly.  Can a
8     complaint be documented if it's oral?
9      MR. KENISON-MARVIN:  Same objections.
10  A  I'm unclear as to the question.
11  Q  I'm afraid I don't really know how to ask it
12    more directly.  Are there criteria -- let me ask
13    it this way.  Are there criteria for how a
14    complaint must be submitted for it to be
15    docketed?
16      MR. KENISON-MARVIN:  Same objections.
17  A  Could you ask the question again, please?
18  Q  Could you read it back, please?
19      (Requested portion read back by court reporter)
20      MR. KENISON-MARVIN:  Same objections.
21  A  That question is confusing.
22  Q  Why is it confusing?
23  A  So I'm unclear if you're asking about, because

27

1  we've talked about allegations, we've talked
2  about complaints.  So --
3  Q  Gotcha.
4  A  The Commission language has bearing.  So in
5     order to answer the question I need clarity on
6     what you're asking.
7  Q  Yes.  I see the confusion now.  So my question
8     is going to be for an allegation of
9     discrimination to be docketed, does the Human
10    Rights Commission have criteria -- strike that.
11      For an allegation of discrimination to be
12    docketed, does the Commission have requirements
13    as to the form in which the allegation is
14    submitted to the Commission?
15  A  Are you ultimately asking about people
16    communicating with us or a docketed charge?
17  Q  Why don't you read the question back just so
18    we're all rowing in the same direction.
19      (Requested portion read back by court reporter)
20  Q  So that question is I'm referring to predocketed
21    allegations, and all I'm trying to get at is is
22    there a requirement for them to be in writing,
23    can they be oral, that's what I'm getting at.

28

1  That's a compound question, and I'm only
2  providing that for context.  I'm going to reask
3  the question again.
4      For an allegation of discrimination to be
5  docketed, does the Commission have requirements
6  as to the form in which the allegations are
7  submitted to the Commission?
8  A  To answer your question, in reading 5(a), it
9     clearly states that it must be verified and
10    verification is a notary seal.
11  Q  Okay.  Can you refer that page to me?
12  A  It is -- so if you're looking at the document,
13    the number 5 starts on page 2, and then (a) is
14    on page 2, and towards the end of (a) which is
15    now on page 3 at the very top.
16  Q  Thank you.  So just so I'm clear, for an
17    allegation of discrimination to be docketed, is
18    it your testimony that it would need to be in a
19    writing, signed by the complainant, and
20    witnessed by a notary and submitted to the
21    Commission; is that correct?
22  A  That is correct.
23  Q  Okay.  For an allegation of discrimination to be

29

1  docketed, does the complainant have to use a
2  form provided by the Human Rights Commission or
3  can they use any other form of writing that is
4  verified and signed by the Complainant and
5  witnessed by a notary?
6  A   The complainant would need to use a form by the
7      Commission.
8  Q   Okay.  Did anyone assist you in writing the
9      letter marked as Exhibit 53?
10 A   There's always legal review.
11 Q   Fair.  Do you recall there being legal review
12     with respect to Exhibit 53?
13 A   As I sit here today, I'm unsure.
14 Q   Okay.  I know you haven't been deposed before.
15     I want to say that depositions are not a memory
16     test.  So if you can't remember, it's fine and
17     understandable especially if we're talking about
18     events years ago.  So I understand.
19         With respect to the language on page 2 and
20     beginning on page 3, Bates stamped 10270, "an
21     assessment is made to ensure that the
22     complainant has a prima facie case, i.e., "at
23     first sight" the claim meets the legal standard

30

1  to file a charge with the Commission."  Do you
2  see that language?
3  A   Yes.
4  Q   Who makes that decision within the Commission as
5      to whether a prima facie case has been made?
6  A   Staff and/or legal assistance.
7  Q   Who would be just the names of the staff and/or
8      legal assistants that would be involved in that
9      decision?
10 A   The actual name or the position name?
11 Q   You know, actually, let's do positions.  That's
12     probably easier.  Thank you for the
13     clarification.
14 A   So the intake coordinator is the first step with
15     the Commission, and that would be in
16     consultation with the Assistant Director.  And
17     if there was additional consultation needed,
18     then we would speak with our client services
19     representative in the Department of Justice.
20     Civil Bureau, Department of Justice.
21 Q   Okay.  Is the client services representative at
22     the Department of Justice right now, who would
23     that be?

31

1  A   Sean Locke.
2  Q   The intake coordinator.  Do you have one intake
3      coordinator or multiple intake coordinators?
4  A   Usually there is one, but if they're not in, it
5      could be someone else.
6  Q   Who would that other person would be if that
7      intake coordinator is not in?
8  A   It varies.  It could be the Assistant Director.
9      Could be an investigator.
10 Q   Who is the Assistant Director currently?
11 A   Sarah Burke Cohen.
12 Q   And you just mentioned the investigator moments
13     ago.  Does the Commission have one investigator,
14     multiple investigators?
15 A   Multiple.
16 Q   How many?
17 A   Five.
18 Q   How does an intake coordinator decide when to
19     consult with the Assistant Director about
20     whether to docket an allegation of
21     discrimination?
22     MR. KENISON-MARVIN:  Objection.
23     Foundation.  Vague.  Asks for speculation.  You

32

1  can answer.
2  Q   You can answer it if you can.
3  A   The Assistant Director is the supervisor of the
4      intake coordinator.
5  Q   Does the intake, what I'm just trying to get at
6      is how these decisions are made.  That's it.  So
7      I guess what I'm trying to figure out is are
8      there standards that exist with respect to when
9      the intake coordinator consults with the
10     Assistant Director making this decision?  Are
11     there policies in place concerning when that
12     consultation occurs?
13     MR. KENISON-MARVIN:  Objection.  Compound.
14     You can answer.
15 A   Broadly speaking.  There are for all of the
16     areas of jurisdiction that the Commission has
17     there are legal standards.
18 Q   Um-hum.
19 A   So the prima facie is based on the legal
20     standard.
21 Q   Do you know how frequently the intake
22     coordinator consults with the Assistant Director
23     with respect to decisions as to when to docket

33

1     an allegation of discrimination that's been
2     made?
3  A  I do not.
4  Q  Are there periodic meetings that occur within
5     the intake coordinator and the Assistant
6     Director with respect to whether to docket
7     allegations of discrimination?
8  A  I believe they meet weekly, but I'm unsure.
9  Q  Okay.  Are those meetings that you're present
10    for?
11 A  I am not.
12 Q  Who is present at those meetings in which
13    decisions are made as to whether or not to
14    docket an allegation of discrimination?
15    MR. KENISON-MARVIN:  Objection.
16    Foundation.  You can answer.
17 A  I would want to clarify something.
18 Q  Please do.  Of course.
19 A  Those are weekly meetings that take place,
20    generally speaking.
21 Q  Okay.
22 A  It's not always whether to docket or not to
23    docket.

34

1  Q  Gotcha.
2  A  The initial step in docketing is the legal
3     standard.
4  Q  I'm just trying to get at how that decision is
5     made.  That's all.  So in these weekly meetings
6     is it fair to say that there are agenda items
7     that exist independent of decisions whether to
8     docket allegations of discrimination?
9  A  I would be making an assumption because I don't
10    attend those meetings.
11 Q  Without guessing, what's your knowledge of
12    what's discussed during those weekly meetings,
13    the generally topics of discussion?
14 A  Generally speaking, I think it would depend.  If
15    the intake coordinator is a new person, then
16    you're still in the process of training and
17    looking at the legal standard to make sure
18    there's understanding.
19    If they're someone that's more seasoned,
20    then there could be potentially a clarification
21    on something.  It could be any number of things.
22 Q  Okay.  Now, I know that this docketing decision
23    is done by the intake coordinator in

35

1     consultation with the Assistant Director.  Does
2     the Assistant Director ever bring you in to the
3     decision as to whether or not to docket an
4     allegation of discrimination?
5  A  Could you ask that again?
6  Q  Could you read that back, please?
7     (Requested portion read back by court reporter)
8  A  To answer the first part of your question, the
9     intake coordinator is not always meeting with
10    the Assistant Director to make a determination
11    of whether or not to docket a charge.
12 Q  Is it fair to say that sometimes the intake
13    coordinator is making that decision without
14    consulting the Assistant Director, right?
15 A  It would be fair to say that the intake
16    coordinator may not need the assistance of the
17    Assistant Director to make that determination.
18 Q  Have you ever been consulted by members of your
19    staff about a decision whether or not to docket
20    an allegation of discrimination?
21 A  I'm unsure how to answer that question.
22 Q  What about the question kind of gives you pause?
23 A  It's very broad.  Could you ask it again?

36

1  Q  I'm happy to ask the court reporter to state the
2     question again.
3     (Requested portion read back by court reporter)
4  A  So that's a very broad question.  The best
5     answer that I could give you sitting here today
6     would be if there were a question, we would
7     speak with an attorney if there was an issue
8     that could not be resolved.
9  Q  Has a member of your staff ever asked for your
10    feedback as to whether or not the Commission
11    should docket an allegation of discrimination?
12 A  Maybe.
13 Q  Do you recall any instances sitting here today
14    where that may have occurred?
15 A  Sitting here today, I can't give you a
16    definitive answer.
17 Q  Okay.  So you don't recall sitting here today a
18    specific example in the context of a specific
19    allegation where you were asked to provide
20    feedback as to whether or not that allegation
21    should be docketed, correct?
22 A  That is correct.
23 Q  I just want to go back again to the kind of the

**37**

1     format of these allegations of discrimination.

2     Besides being in writing, verified, signed by

3     the complainant and witnessed by a notary, are

4     there any other requirements for allegations of

5     discrimination to become docketed complaints?

6  A   I'm sorry. Are there other requirements?

7  Q   Yes. Beyond meeting the prima fascia legal

8     standard, are there any other format

9     requirements that exist within the Commission

10    for those allegations to become docketed?

11  A  Can you just go over your list again to make

12    sure that I'm --

13  Q  Absolutely. In writing, verified, signed by the

14    complainant, and witnessed by the notary.

15       MR. KENISON-MARVIN: Let me just object to

16    the extent it calls for a legal contention, but

17    you can answer.

18  A  I'm unaware of any other bases. It must be

19    verified which means it's on paper, and it has

20    to have a signature which the notary is

21    verifying.

22  Q  Just referring to the last line of paragraph (a)

23    that is on page 271, there's language that

**38**

1     states whereby both parties are notified in

2     writing. Do you see that?

3  A   Yes.

4  Q   So I just want to make sure I understand the

5     process. Once an allegation of discrimination

6     becomes a docketed complaint, a notice is

7     submitted to the complaining party and the

8     individual alleged to have violated the law; is

9     that correct?

10  A  Yes.

11  Q  What does that writing look like actually? What

12    is the format in which that notice is provided?

13       Why don't I ask one good question instead

14    of two compound questions. So what is the

15    format in which that notice is provided to the

16    complaining party and the individual alleged to

17    have engaged in discrimination?

18  A  The parties receive a cover letter from the

19    Commission. Enclosed with that is a copy of the

20    charge made by the Complainant.

21  Q  Is that docketed complaint once it is docketed,

22    is it something that becomes a public record at

23    all?

**39**

1  A   No. It's confidential.

2  Q   Referring to now subsection (b), "The complaint

3     is investigated, and a determination is made by

4     the Investigating Commission whether the charge

5     has a Probable Cause (PC) or No Probable Cause

6     (NPC) finding." Do you see that language I just

7     referenced?

8  A   Yes.

9  Q   How are docketed complaints investigated?

10    What's that process?

11  A  The investigation process is the investigator

12    reviews any documentation that has already been

13    submitted by either parties and/or requests

14    additional documentation from the parties. Has

15    interviews with the parties.

16  Q  Is the investigator here a member of the

17    Commission?

18  A  I'm unclear about the question.

19  Q  I believe in earlier testimony we talked about

20    Commission investigators. Do I have that

21    recollection correct?

22       Let me ask this. Who is doing the

23    investigating with respect to "the complaint is

**40**

1     investigated" language in paragraph B of page

2     10271 in Exhibit 53?

3  A   There's a staff member that is an

4     anti-discrimination investigator.

5  Q   Is that staff member a Commissioner or someone

6     who's on staff?

7  A   It is not a Commissioner.

8  Q   Okay. How is that investigator assigned?

9     What's that process? Strike that.

10       How is the investigator assigned?

11       MR. KENISON-MARVIN: Objection.

12    Foundation.

13  A  The Assistant Director will assign new cases

14    each month to the investigators.

15  Q  Are you involved in that assignment process?

16  A  No.

17  Q  Am I correct -- I didn't write this down, but I

18    want to make sure I have this crystal clear. I

19    believe you earlier said that there's around

20    five investigators. Am I accurately remembering

21    your testimony?

22  A  Yes.

23  Q  After that investigation is completed, what does

41

1    the investigator do next?
2         MR. KENISON-MARVIN: Objection. Vague,
3    foundation, speculation. You can answer.
4  Q    Why don't I ask you it this way. I'm not trying
5    to hide the ball. I'm trying to streamline this
6    process.
7         Paragraph (b) says that the complaint is
8    investigated and then a determination is made by
9    the Commissioner as to whether or not there's
10   probable cause or no probable cause. Is that an
11   accurate reflection of the current process?
12 A    Yes.
13 Q    Why don't we take just a short break.
14        (Recess taken at 12:23 - 12:37 p.m.)
15 Q    Director Malachi, there is one background
16   question that I actually just forgot to ask so
17   I'm going to go back into my introductory line
18   of questions, and I just wanted to describe
19   your educational background for me. My
20   apologies for forgetting to ask that.
21 A    How far back are you asking?
22 Q    Why don't you start post high school.
23 A    I have a degree in journalism. Are you asking

42

1    for the school or just the degrees?
2  Q    Yes. School, degrees and approximate dates.
3  A    Ooh.
4  Q    Approximate dates.
5  A    Long time ago. Degree in journalism. Georgia
6    State University. 1989 maybe. Master's degree
7    in human services counseling, Liberty University
8    maybe 2017. You're asking completed programs?
9  Q    Yes. If you have programs that you didn't
10   complete as well, that would be helpful, too.
11 A    Currently enrolled in a doctoral program. I
12   don't know if you're --
13 Q    Oh. I didn't know that. Where is that
14   occurring?
15 A    Liberty University as well. That would be a
16   doctorate of strategic leadership when
17   completed.
18 Q    Any idea when you'll complete it? I know that's
19   a hard question to ask for any doctoral program.
20 A    It is a very tough question to answer. A couple
21   of years.
22 Q    Okay.
23 A    Not exactly sure. Could be less, could be more.

43

1  Q    Okay.
2  A    You know how that goes.
3  Q    I sure do. I sure do. Thank you. That's
4    helpful.
5         I have a few kind of followup questions on
6    just the general complaint process, and then I
7    promise that we are going to move on.
8         Do allegations of discrimination before
9    they're docketed, do they have to come from the
10   person who has -- strike that.
11        Can allegations of discrimination, can they
12   be forwarded by other state agencies to be
13   considered by the Commission for docketing?
14 A    I am unclear on what, how to answer that
15   question. Is there a way to be more specific so
16   I can --
17 Q    Sure. If an allegation of discrimination comes
18   in from the Department of Education, can the
19   Department of Education forward that allegation
20   of discrimination to the Human Rights Commission
21   for consideration?
22 A    To clarify --
23 Q    For consideration as to whether it would be

44

1    docketed?
2  A    On whether to docket?
3  Q    Yes.
4  A    So that's a little tough to answer, but I will
5    try my best.
6  Q    Please do.
7  A    Ultimately, a docketed charge has to be
8    completed by the complainant. So there isn't a
9    way, other than a complainant's attorney.
10   Outside of the complainant themselves signing
11   and swearing under the pains and penalties of
12   perjury, then their attorney could do that on
13   their behalf. That is the only way to docket a
14   charge.
15 Q    Before an allegation of discrimination is
16   docketed, do staff members at the HRC ever
17   consult with other state agencies?
18 A    Could you clarify?
19 Q    I believe your testimony before is that as part
20   of the docketing decision process there will
21   sometimes be consultation with your attorney
22   representative of the Department of Justice; is
23   that fair to say?

45

1  A   Relatively speaking.  So it's not an everyday
2      thing to do that.  If something is different,
3      then we would consult.
4  Q   It would depend on the circumstances, right?
5  A   Context.
6  Q   Exactly.  I understand what you're saying.  I
7      guess my question is whether when a complaint
8      is -- strike that.
9          When an allegation of discrimination comes
10     into your office, excluding the Department of
11     Justice, is there any other state agency that
12     would be consulted as part of the
13     decision-making process as to whether to docket
14     an allegation of discrimination?
15  A   As I sit here today, I'm unaware of another
16     agency that we would consult.
17  Q   Okay.
18  A   If I'm understanding your term.
19  Q   You are.  I think you are.
20         Has there ever been an instance that you're
21     aware of in which an allegation of
22     discrimination has been brought forward to your
23     office in which members of your staff have had

46

1      conversations with Department of Education about
2      whether to docket that allegation?
3  A   Clarification.  Are you asking ever in the
4      history, ever?
5  Q   Since you've been here.
6  A   Relative to?
7  Q   Sorry.  Relative to any allegation of
8      discrimination with the time frame being since
9      you've been Executive Director of the
10     organization.
11  A   Okay.  As of 2019 is when education meaning K
12     through 12 public education which covers public
13     schools, public charter schools as well as
14     public academies, that is when education was
15     added to the statute for the Commission so prior
16     to that there were no education charges.
17         Since then as far as I know sitting here
18     today I mean I could certainly confer with
19     staff, but I am unaware of a time that there was
20     consultation with the Department of Education
21     relative to a docketed charge.
22  Q   Okay.  That's helpful.
23         I'm going to refer you back, Director

47

1      Malachi, on Exhibit 53 to the language 5(a) to
2      5(d).  Do you see that language?
3  A   Yes.
4  Q   I just want to confirm.  Is that the same
5      process that exists with respect to allegations
6      of discrimination that are brought under the
7      Freedom from Discrimination statute we
8      referenced before in 354-A:9 to 354-A:34?
9  A   A-29 through A-34?
10  Q   Yes.  The question is is it the same process.
11     That's all.
12  A   Okay.  So to specifically answer your question,
13     what's described in the section that you
14     mentioned on the document on Exhibit 53 is the
15     process for the Commission full stop.
16  Q   And that would include how allegations of
17     discrimination are handled under the Freedom
18     from Discrimination Law in Exhibit 1 located at
19     RSA 354-A:29 to 34.  Correct?  And I'm excluding
20     from that question 193:40, to be clear.
21  A   So to be specific, what's mentioned in Exhibit
22     53 is the Commission's process which is no
23     different relative to any part of how the

48

1      Commission is looking at a charge.  So anything
2      that's assigned to the Commission to look at as
3      a potential allegation or I should say as a
4      docketed charge, (a) through (d).
5  Q   And just trying to close the loop on that.  So
6      that would include allegations made under the
7      right to freedom from discrimination statute in
8      RSA 354-A:29 to 34.  Right?
9  A   It includes the entire statute, yes.
10  Q   I want to direct your attention also on Exhibit
11     53 to (e) on page 10271.  The language that says
12     "Finally, the Department of Education (DOE)
13     would be the arbiters of "educator discipline"
14     according to RSA 193:40 (IV), and as "educator"
15     as defined by RSA 193:40 (V)."  Do you see that
16     language?
17  A   Yes.
18  Q   Just to be clear, that was your understanding as
19     of March 4th, 2022.  Correct?
20  A   Yes.
21  Q   Is that still your understanding of the law?
22  A   Yes.
23  Q   Since the Freedom from Discrimination Law was

49

1    passed, and I want to be very clear, just
2    talking now about RSA 354-A:29-34. Okay? Have
3    you or members of the Commission conducted any
4    trainings on those provisions, public trainings?
5  A    No.
6  Q    So there have been no trainings from the Human
7    Rights Commission to educators; is that correct?
8  A    Correct.
9  Q    Have there been requests for the Human Rights
10    Commission to provide such trainings by any
11    member of the public?
12  A    I'm unsure. I would have to confer.
13  Q    Okay.
14        (Exhibit 54 marked for identification)
15  Q    So Director Malachi, I've put before you what's
16    been marked as Exhibit 54 and just ask you to
17    review Exhibit 54 and let me know when you're
18    done.
19  A    Okay.
20  Q    Have you seen Exhibit 54 before?
21  A    Maybe.
22  Q    I would just note that the top of Exhibit 54 is
23    an email from Sarah Burke Cohen who I believe is

50

1    the, I want to get the title, Assistant
2    Director, to you dated Monday, September 20th,
3    2021, forwarding an email chain from Irv
4    Richardson of New Hampshire NEA to the Human
5    Rights Commission email address.
6        So do you recall seeing this email,
7    Director Malachi, on or about September 20th,
8    2021?
9  A    Maybe. I mean that was multiple years ago. So
10    lots of emails.
11  Q    I would just note that at the bottom of Exhibit
12    54 is a request made from Mr. Richardson of NEA
13    New Hampshire stating do you have someone
14    associated with the Human Rights Commission that
15    might provide further clarification on the law
16    and answer questions from educators using a
17    virtual platform? I have reached out to the New
18    Hampshire Department of Education, and they
19    indicated that I should make such a request to
20    you.
21        Do you recall how the Human Rights
22    Commission responded to this request from NEA
23    New Hampshire?

51

1  A    I don't recall.
2  Q    Do you recall you or any member of your staff
3    ever speaking to NEA New Hampshire about
4    clarifications on the law, sections 297 and 298
5    of House Bill 2?
6  A    I do not recall.
7  Q    Do you recall any internal communications about
8    whether or not to accept this invitation from
9    NEA New Hampshire?
10  A    I don't recall.
11  Q    Any communications externally with the
12    Department of Education about whether to accept
13    this invitation?
14  A    I don't recall.
15  Q    I want to go back to a series of questions I
16    asked about whether complaints can be referred
17    by other agencies. Are you aware of any
18    standard operating procedure or agreement that
19    exists between the Department of Education and
20    the Department of Justice with respect to how
21    complaints the Department of Education receives
22    under RSA Chapter 354-A can be referred to the
23    Human Rights Commission?

52

1  A    Ask that again? Because I'm unsure how to
2    answer that.
3  Q    I'm not entirely sure what I asked.
4        (Requested portion read back by court reporter)
5        MR. KENISON-MARVIN: I'll object as
6    compound.
7  Q    Is that a question you can answer?
8  A    Is there a more specific part of that question
9    that you're asking?
10  Q    I'm going to try to ask it a better way, and I'm
11    going to pull up a document to just assist me in
12    asking the question.
13        I'm just going to refer you to Exhibit 6.
14        MR. BISSONNETTE: Nate, is that something
15    that you could just pull? Thank you.
16  Q    So what I'm going to direct your attention to,
17    you've never seen this before is my assumption,
18    Director Malachi, but in the interest of
19    streamlining this inquiry, I'm going to direct
20    you to Bates stamped 806 on Exhibit 6. If you
21    go to the bottom left quadrant, page 19, on page
22    806, there's language from Ms. Diana Fenton that
23    begins with, and this is in the middle of a

---

**53**

1    sentence, quote, "we have since worked with the
2    AG's office to come up with an SOP as to how we
3    transfer those cases to the Human Rights
4    Commission and to the AG's office."
5        Do you see, my question only right now is
6    do you see the language that I just referenced?
7 A  No.
8 Q  Okay.
9 A  What line are you on?
10 Q  Absolutely.  Page 19 begins on the bottom left
11    quadrant beginning on line 25.  I'll just read
12    it just once more just so we're on the same
13    page.  "We have since worked with the AG's
14    office to come up with an SOP as to how we
15    transfer those cases to the Human Rights
16    Commission and the AG's office."  Do you see
17    that language?
18 A  I do.
19 Q  Okay.  Do you know who Diana Fenton is?
20 A  Yes.
21 Q  Who is Diana Fenton?
22 A  She's an attorney.
23 Q  Okay.  And I just represent to you that this is

---

**54**

1    a portion of the hearing testimony that occurred
2    on March 8, 2023, before the House Judiciary
3    Hearing.  So that's why I asked that prior
4    question to you.  So I'm just trying to get at
5    what your understanding is of this SOP.  So I'm
6    going to reask the question.
7        Are you aware of any standard operating
8    procedure that exists that governs how cases
9    that the Department of Education receives under
10    RSA 354-A can be referred to the Human Rights
11    Commission?
12 A  How allegations are referred?
13 Q  Allegations of discrimination.  Yes.
14 A  That would be between the AG's office and the
15    Department of Education.
16 Q  Okay.  I'm just asking about what you're aware
17    of.  Are you though sitting here today aware of
18    any standard operating procedure?
19 A  Sitting here today, I'm unclear.  You would have
20    to speak with the AG's office to understand what
21    that process is.
22 Q  Have you ever had any communications with the
23    Department of Education about a standard

---

**55**

1    operating procedure that would refer allegations
2    of discrimination to your office that were
3    received by the Department of Education?
4 A  I'm sorry.  Say that again?
5    (Requested portion read back by court reporter)
6 A  I'm sorry.  Read it one more time.
7    (Requested portion read back by court reporter)
8 A  So the question is unclear because, generally
9    speaking, the Commission covers education.
10 Q  Um-hum.
11 A  Which is separate from HB 2 or 354-A:29 through
12    34.  So are you asking, so could you clarify the
13    question that you're asking?
14 Q  Sure.  What I was asking is about any provision
15    of 354-A which would include the provisions that
16    have been challenged in this case in
17    354-A:29-34.  So with that I'll just, I'll kind
18    of reframe my question.
19        Have you been a party to any communications
20    with the Department of Education concerning a
21    standard operating procedure that would allow
22    for the referral of allegations of
23    discrimination under RSA chapter 354-A to the

---

**56**

1    Commission from the Department of Education?
2 A  Okay.  If I understand your question -- I'm,
3    okay.  Have I ever been a party to conversations
4    regarding an SOP for transferring allegations
5    from the Department of Education to the
6    Commission.
7 Q  Precisely.
8 A  Okay.  Thank you.
9 Q  No.  No.  It's fine.  I want to make sure we're
10    on the same page.  I understand.
11 A  Have there ever been conversations between
12    myself and the Department of Education?  Broadly
13    speaking, yes.  To the specifics that you're
14    asking, it is not my understanding that I have
15    been.
16 Q  Okay.  When you say "broadly speaking," you're a
17    party to those communications, when would those
18    communications have occurred and with whom?
19 A  In 2019.  Somewhere thereabouts because that was
20    when education was included in the statute so it
21    would have been with my agency attorney and with
22    Diana Fenton to have an understanding of some of
23    the specific kinds of education cases we could

---

57

1  get.  So to further answer the question, 504 and
2  IEP, the Commission would not have experience in
3  that area.  However, if a student was not
4  receiving that assistance due to discrimination,
5  then there would have to be a further
6  conversation to address how to move that case
7  forward regarding our confidentiality which is
8  different from other agencies and so there could
9  need to be a conversation.
10 Q   That makes sense in light of those changes in
11     2019.
12         After the enactment of the Freedom from
13     Discrimination Law memorialized in 354-A:29 to
14     34, did you ever have a similar conversation as
15     to how cases could be referred from the DOE to
16     the Human Rights Commission under those new
17     provisions?
18 A   I believe there may have been some general
19     conversation and to be specific about the
20     generalization, the individual who is
21     potentially aggrieved has to file a charge.
22 Q   Okay.
23 A   In order for the Commission to take action.

58

1  Q   Okay.  So you said general conversations?  Do
2      you recall when those general conversations
3      occurred and with whom?
4  A   I don't.  I mean, certainly it would have been
5      after the act was signed.  So some time after --
6      I believe it went into effect in 2021.  So it
7      would have been some time after June of 2021.
8      More specifically, I can't tell you.
9  Q   Okay.  If you had those communications with the
10     Department of Education do you know whether or
11     not Diana Fenton would have been a participant
12     in those discussions?
13 A   Yes.  I believe she would have been.
14 Q   Do you also believe that Elizabeth Brown would
15     have been a party to those communications?
16 A   I don't know.
17 Q   Do you know who Elizabeth Brown is?
18 A   I do not know what that is.
19 Q   Fair enough.  Would an attorney from the
20     Department of Justice also have been a party to
21     those communications?
22 A   I need a moment.
23 Q   Please do.  Just for the record I'm not asking

59

1  for the substance of those communications, just
2  whether the attorney would have been a party,
3  but I'm happy to give you a minute.
4  A   Yes.
5      (Director Malachi and Atty. Kenison-Marvin
6       leave the conference room and return)
7  (Requested portion read back by court reporter)
8  A   Okay.  That's a lot.  So the question was
9      generally speaking conversations with the
10     Department of Education relative to the Freedom
11     from Discrimination Law act.
12 Q   No.  Relative to whether and how referrals could
13     be made of complaints that the Department of
14     Education receives under RSA 354-A:29 to 34, how
15     and if those referrals could be made by the
16     Department of Education to the Human Rights
17     Commission.
18 A   Okay.  Now that I'm clear, I would not have been
19     a party to conversations between the Department
20     of Education and the AG's office relative to the
21     referral of cases or allegations or -- it could
22     only be an allegation.
23 Q   Okay.  I want to make sure that I now understand

60

1  your prior testimony.  After the enactment of
2  the, let me just say the challenged law in this
3  case, have you had conversations with Attorney
4  Fenton about how allegations of discrimination
5  under the Freedom from Discrimination Law could
6  be referred by the Department of Education to
7  the Human Rights Commission?
8  A   That actually needs a little more clarity.  If
9      you're asking if it was made clear that there
10     has to be someone to sign a charge, meaning a
11     complainant, then there was a conversation
12     relative to that.
13 Q   Okay.
14 A   Outside of that, meaning that general charges,
15     general, no, not that I can recall.
16 Q   That meeting that you just referenced, who was a
17     participant in that meeting?
18 A   So the meeting that I referenced was in larger
19     context of the new amendment.  It was not
20     specific to an agreement or a standard operating
21     procedure between the Department of Education
22     and the Department of Justice to be clear.
23 Q   That's helpful.  Do you know when this meeting

---

61

1  occurred?

2  A   Which meeting?

3  Q   The meeting that you just referenced that was

4      part of a larger context in which there was a

5      discussion that someone has to sign a charge for

6      the Commission to accept it.  That meeting.

7  A   I do not recall.

8          MR. KENISON-MARVIN:  I want to object.  I

9      think that mischaracterizes the testimony.

10         MR. BISSONNETTE:  I was just trying to get

11     at that meeting.  Whatever that was discussed at

12     that meeting.

13         MR. KENISON-MARVIN:  I don't want to make a

14     speaking objection, but I want to try to cut to

15     the chase if I can be helpful.

16         MR. BISSONNETTE:  Please do.

17         MR. KENISON-MARVIN:  Maybe I'm wrong in my

18     misunderstanding, whether there's a distinction

19     between the general meeting and the conversation

20     with Diana Fenton.

21         MR. BISSONNETTE:  Okay.

22         MR. KENISON-MARVIN:  That's where my

23     objection is based.

---

62

1  Q   May I have, Cindy, I'm sorry to burden you.  Can

2      I just have read back to me the portion of

3      Director Malachi's response in which she talks

4      about the larger context.

5      (Requested portion read back by court reporter)

6  Q   So my question is what do you remember about

7      that meeting in which that larger context was

8      referenced and who participated in that meeting?

9  A   The meeting would have been some time ago.  I am

10     not a hundred percent clear on all of the

11     individuals that may have been there.

12 Q   Okay.  What do you recall, is there anything you

13     could recall sitting here today about the

14     substance of that meeting that was part of a

15     larger context?

16 A   Generally speaking, my recollection, I believe

17     we may have talked about the case processing

18     process.

19 Q   Okay.

20 A   I know that attorneys were present.

21 Q   Okay.  When you refer to "case processing," do

22     you recall any specifics about that?

23         MR. KENISON-MARVIN:  I'll state a limited

---

63

1      objection.  To the extent that you have a

2      recollection of conversations that anyone was

3      asking attorneys for legal advice or how law

4      would apply, that information we would claim a

5      privilege to and I would instruct you not to

6      provide the details of those conversations as

7      well as any decisions that were being made,

8      deliberations related to decisions to be made,

9      substance of those conversations.  So I would

10     instruct you not to provide those details on the

11     basis of those privileges.  To the extent you

12     can answer the question without providing,

13     there's information in response to the question

14     that you could provide that's not what I

15     described, you can answer it.

16         MR. BISSONNETTE:  I'm going to withdraw the

17     question real quickly in light of that

18     objection.

19 Q   Back to this meeting I would, though, in an

20     effort to try to probe that privilege a bit,

21     just try to get a handle on who all the

22     participants were in that meeting if you could

23     remember.  Just if you could list them all out.

---

64

1  A   As I stated, that was several years ago so I

2      don't have a complete recollection of everyone

3      that was in the room.

4  Q   Okay.  Do you know if Attorney Sean Locke was in

5      the room?  Any recollection?

6  A   I do not recall.

7  Q   Okay.  Were other state agencies represented at

8      that meeting?

9  A   Could you be more specific?

10 Q   Sure.  Did the Department of Education have a

11     representative at that meeting?

12 A   Yes.

13 Q   Who was that representative?

14 A   In my hazy recollection I believe their attorney

15     was there which would have been Chris Bond I

16     believe at the time.

17 Q   Okay.  And do you recall anyone else that was

18     present during this meeting?

19 A   The Commissioner might have been there, but I am

20     not a hundred percent sure.

21 Q   You may have answered this and I forget the

22     response and I apologize, but obviously we know

23     that the challenged law in this case was enacted

---

65

1  in June 2021.  Do you recall when this meeting
2  occurred after June 2021?
3  A   I do not recall.
4  Q   Okay.  Do you recall whether any decisions were
5  made during this meeting about how to process
6  claims of discrimination that are made under
7  354-A:29 to 34?
8  A   I don't recall the full context or content of
9  the conversations.
10 Q   I want to kind of now pivot from that meeting,
11 Director Malachi.  I know that you said earlier
12 that there was a discussion or statement made
13 where you said that for a case to be docketed by
14 the HRC that someone has to sign a charge.  Am I
15 accurately remembering your testimony?
16 A   I would hope I would have stated that the
17 complainant has to sign a charge.
18 Q   Yes, please.  I'm sorry.
19 A   Or their attorney.
20 Q   Thank you.  Was that something that was
21 discussed in a separate conversation with
22 Attorney Fenton?
23 A   I don't recall.

66

1  Q   Aside from the meeting that you just referenced
2  moments ago that was part of a larger context,
3  do you recall any other communications with any
4  other state officials outside of the HRC about
5  how allegations of discrimination could be
6  referred from the Department of Education to the
7  Human Rights Commission?
8  A   Could you ask that again, please?
9  Q   Sure.  Excluding the meeting that we just
10 referenced that was part of a larger context, do
11 you recall having any other discussions with
12 state officials outside of the Human Rights
13 Commission about how allegations of
14 discrimination could be referred by the
15 Department of Education to the Human Rights
16 Commission?
17 A   Are you asking if it's an allegation or are you
18 asking if it's a charge?
19 Q   Allegation of discrimination.  Hasn't been
20 docketed, it comes to the Department of
21 Education, Department of Education may think
22 that that could constitute a violation under
23 Exhibit 1, the challenged law in this case, and

67

1  conversations about whether the Human Rights
2  Commission could accept that as an allegation
3  and then proceed to make a determination as to
4  whether or not it should be docketed.
5  A   I'm unsure of any -- I don't recall any
6  conversations.
7  Q   Okay.  I don't want to know the contents, but I
8  do have to ask the question.  Did you ever
9  receive a document from Attorney Sean Locke that
10 generally discussed how allegations of
11 discrimination that the DOE may receive could be
12 referred to the Human Rights Commission?  Just
13 asking whether you received a document along
14 those lines.
15 A   I don't recall.
16 Q   Okay.  Last question along these lines, and I'm
17 going to wrap up this inquiry.  I'm just going
18 to submit to you that Representative Glenn
19 Cordelli stated in March 2023 that the Attorney
20 General's office has, quote, "been more
21 cooperative," end quote, with respect to, quote,
22 "getting cases referred to the Human Rights
23 Commission."  This was stated around March 2023.

68

1  Do you know what Representative Cordelli is
2  talking about there?
3  A   You would have to ask him.
4  Q   But you've never had communications with the
5  Department of Education, the Department of
6  Justice about the Attorney General's office
7  becoming more cooperative with respect to
8  getting cases referred to the Human Rights
9  Commission; is that true?
10 A   I don't recall any conversations of that type.
11 Q   Okay.  With respect to the challenged law in
12 this case in Exhibit 1, was your office ever
13 involved in drafting the language of Exhibit 1
14 when HB 2 was in the Senate, to be considered in
15 the Senate?
16 A   Could I see Exhibit 1?
17 Q   Yes.  Of course.
18 A   Could you ask me your question again, please?
19     (Requested portion read back by court reporter)
20 A   No.
21 Q   Were you ever asked for feedback while Exhibit 1
22 was being considered in the Senate by
23 legislators concerning the language in Exhibit

69

1        1?
2    A   No.
3    Q   You can set that aside.  Thank you, Director
4        Malachi.
5            I just did have a couple followup questions
6        about this referral business, and I'm sorry to
7        belabor the point.
8            Besides yourself, and I know we went over
9        the conversations that you may or may not have
10       been involved in with respect to whether
11       allegations could be referred, are you aware of
12       any communications that Commissioners within the
13       Human Rights Commission may have had with the
14       Department of Justice or the DOE about how
15       allegations of discrimination could be referred
16       by the DOE to the HRC?
17   A   I don't recall having any knowledge.
18   Q   Have there been any writings issued by either
19       you or the Commissioners to staff about whether
20       to accept allegations of discrimination under
21       the challenged law from the Department of
22       Education?
23   A   Could you be more specific on the writings?

70

1    Q   Sure.  By writing, what I mean are any
2        directive, policies, or guidance.
3    A   No.
4    Q   The communication that you had as part of a
5        larger context that we referenced before, did
6        you brief your fellow Commissioners about that
7        conversation?  Strike that.
8            That conversation that you referenced in
9        your earlier testimony that was part of a larger
10       context, did you brief the Commissioners about
11       that communication?
12   A   Sitting here today, I don't recall.
13   Q   I'm going to switch gears here.  Okay?  Director
14       Malachi, there was a statement made by the
15       Attorney General's office at the Motion to
16       Dismiss hearing in this case, quote, "The
17       Department of Education as a matter of practice
18       is simply declining to consider any allegation
19       that these statutes are being violated by any
20       teacher until and unless that person making the
21       complaint has gone to the Human Rights
22       Commission."  And I think I can go back to make
23       sure I'm accurately reflecting that, but I

71

1        believe the Attorney General's office confirmed
2        that during the hearing, but my question to you
3        is is that your understanding of the process
4        with respect to when the Department of Education
5        under their code of conduct can pursue a charge
6        under the challenged law?
7    A   Could you reread the part that you'd like me to
8        answer.
9    Q   Sure.  Quote, "The Department of Education as a
10       matter of practice is simply declining to
11       consider any allegation that these statutes are
12       being violated by any teacher until and unless
13       that person making the complaint has gone to the
14       Human Rights Commission."
15           My question to you is is that your
16       understanding as well of when the Department of
17       Education can pursue action against an educator
18       under the challenged law?
19   A   If I'm understanding the question, the answer
20       would be statutorily someone has to come to the
21       Commission first.
22   Q   Okay.
23   A   And then once we have completed our process and

72

1        any appeals that the person may have, then it
2        moves on to wherever it goes after that.
3    Q   Okay.  Where does that understanding come from?
4        Is that in a writing, in a document?  What's the
5        basis of your statement that someone first has
6        to come to the HRC?
7            MR. KENISON-MARVIN:  Objection to the
8        extent it calls for a legal contention.  You can
9        answer.
10   A   Statutorily to file a charge of discrimination
11       under 354-A a Complainant has to come to the
12       Commission, whether it's employment, public
13       accommodation, housing, or K through 12
14       education, and as such unless outlined
15       differently there would be any other amended
16       section based on the statute.
17   Q   Do you have any other basis for that besides
18       what's in the statute?
19           MR. KENISON-MARVIN:  Same objection.
20   Q   Any other basis for believing that?
21   A   I'm sorry?  Restate?
22   Q   Besides what's in the statute, do you have any
23       other reason for believing that a complainant

73

1 must first seek relief before the Human Rights
2 Commission before action can be taken against an
3 educator?
4 A The statute is the guidance.
5 Q Okay. I'm just going to direct your attention
6 back to Exhibit 1, and page PL 006 starting at
7 line 23. It goes on to page 7, line 15. So
8 this is the statute RSA 193:40, and when you see
9 that language just let me know.
10 A I'm sorry. Line 23 through?
11 Q I'm sorry. Line 23 to the next page, line 19,
12 and it's RSA 193:40 on Exhibit 1.
13 A I see it.
14 Q Okay. Do you have any authority in enforcing
15 that statute?
16 MR. KENISON-MARVIN: Objection. Legal
17 contention. You can answer.
18 A The Commission does not have jurisdiction over
19 193:40.
20 Q So if someone brought a claim to the Human
21 Rights Commission under RSA 193:40, your view is
22 you would have no jurisdiction to adjudicate it;
23 is that correct?

74

1 MR. KENISON-MARVIN: Same objection.
2 A The Commission has jurisdiction over 354-A.
3 Q And RSA 193:40 is not within RSA 354-A so is it
4 fair to say in your view you do not believe the
5 Commission has jurisdiction to hear a claim
6 under RSA 193:40?
7 MR. KENISON-MARVIN: Same objection.
8 A As I sit here today it would be my understanding
9 that the Commission only has authority over
10 354-A.
11 Q Do you know sitting here today who would have
12 jurisdiction over a complaint made exclusively
13 under 193:40?
14 MR. KENISON-MARVIN: Same objection.
15 A I do not have expertise in 193 so whose RSA that
16 belongs to would be the body that has authority
17 over 193:40.
18 Q Okay. Besides the statute has there been
19 written guidance that explains that a person
20 must first go to the Human Rights Commission
21 before action could be taken against the
22 teacher?
23 MR. KENISON-MARVIN: Same objection.

75

1 A Could you clarify which statute?
2 Q I'm going to withdraw the question.
3 I would like to direct your attention,
4 Director Malachi, back to Exhibit 1. I'm just
5 going to direct your attention in particular to
6 page 004, line 37. Bear with me one second,
7 please.
8 On line 36 on page PL 004 of Exhibit 1
9 there's language there that states, quote, "no
10 public employer, either directly or through the
11 use of an outside contractor, shall teach,
12 advocate, instruct or train any employee,
13 student, service recipient, contractor, staff
14 member, inmate or any other individual group,
15 any one or more of the following." Do you see
16 that language?
17 A Yes.
18 Q What I'm going to just kind of focus you on is
19 the language "shall teach, advocate, instruct or
20 train" in the statute. Okay? So that's the
21 language that I'm targeting right now in my next
22 line of questions on line 37 on page PL 004 of
23 Exhibit 1.

76

1 So my question is does the Human Rights
2 Commission have any internal policy or guidance
3 as to what the terms mean, "teach, advocate,
4 instruct or train" under that statute?
5 A No.
6 Q Is there any internal guidance within the
7 Commission explaining whether or not the phrase
8 "teach, advocate, instruct or train" would
9 include teacher-facilitated group instruction in
10 a classroom?
11 A No.
12 Q Is there any written guidance or policy that
13 would explain whether or not the phrase "teach,
14 advocate, instruct or train" would include
15 assigning a book to students in a classroom?
16 A I'm sorry. Internal policy or the FAQ?
17 Q Any internal policy -- that's a fair question.
18 So any internal policy excluding the FAQ as
19 to whether the phrase "teach, advocate, instruct
20 or train" includes assigning a book to students?
21 A I'm sorry. Is there a policy, no.
22 Q You just referenced guidance. Were you
23 referring to the July 2021 guidance that was

77

1   issued with respect to the challenged law?

2   A   I don't know the date.  If you're asking about

3   the FAQ provided by the Attorney General, that

4   is what I'm speaking of.

5   Q   I'm just going to direct your attention to --

6        MR. BISSONNETTE:  If you wouldn't mind just

7   pulling out real quick, Nate, just Exhibit 24.

8        MR. KENISON-MARVIN:  For the witness?

9        MR. BISSONNETTE:  You know what?  Pull that

10   one back.  I'm sorry.

11       (Exhibit 56 marked for identification)

12   Q   So my question to you is going to be, after

13   you've reviewed it, are these the FAQs that you

14   just referenced that are in Exhibit 55.

15   A   Sitting here today without comparing to any

16   notes I might have, it does appear that this is

17   most likely the Frequently Asked Questions

18   guidance.

19   Q   That's all I wanted to know.  So setting aside

20   the contents of Exhibit 55, is there any other

21   internal policy or procedure that exists within

22   the Commission that defines what it means to

23   "teach, advocate, instruct or train" under the

78

1   provisions of RSA 354-A:31 in Exhibit 1?

2   A   No.

3   Q   I'm sorry to bounce around, Director Malachi.  I

4   know moment a ago you said you're not an expert

5   on 193:40 in Exhibit 1.  Is there anyone at the

6   Human Rights Commission that would be an expert

7   in RSA 193:40 and what it means and how it

8   operates?

9   A   No.

10   Q   With respect to how an allegation of

11   discrimination is docketed, and the prima facie

12   determination that's made, are there any

13   internal policies or procedures within the

14   Commission as to when a prima facie case has

15   been made under RSA 354-A:29-34?

16   A   Specifically speaking, no.

17   Q   Do you know sitting here today how decisions are

18   made as to whether a prima facie case has been

19   satisfied under the provisions in RSA

20   354-A:29-34?

21   A   Generally speaking, there's a legal standard and

22   so when that legal standard is met, then the

23   allegation can then become a charge, provided

79

1   the complainant is pursuing a charge.

2   Q   Okay.  So the reference "legal standard."  I

3   just want to make sure.  Is what you're

4   referring to just the language of the statute in

5   RSA 354-A:29-34?

6   A   To that I understand, yes.

7   Q   Are there any other standards that you're using

8   in deciding whether or not an allegation of

9   discrimination brought under RSA 354-A:29-34

10   should be docketed?

11       MR. KENISON-MARVIN:  Objection to the

12   extent it misstates prior testimony.

13   A   Could you be a little more specific?

14   Q   How about this.  Beyond the FAQs that we just

15   presented to you in Exhibit 54, and beyond the

16   language of the statute in RSA 354-A:29-34, is

17   there any other policy or guidance that the

18   Commission uses in deciding whether an

19   allegation of discrimination under RSA

20   354-A:29-34 should be docketed?

21   A   No.

22   Q   Can we take a two-minute break?

23       (Discussion off the record)

80

1        (Lunch recess taken 1:51 - 2:32 p.m.)

2   Q   So we're back on.  I'm just going to have your

3   attorney put before you what's been previously

4   marked as Exhibits 12 and 13.  I'd just ask you

5   to review Exhibits 12 and 13 briefly and just to

6   let me know when you finish.

7        Thank you, Director Malachi.  With respect

8   to Exhibit 12, I would just represent to you

9   that the cover page to Exhibit 12 is a document

10   I created just as a cover sheet to the September

11   7, 2021, AG memo that was affixed to the Mejia

12   and Philibotte complaint in this case.  So I

13   just wanted to flag that for you.

14       But with respect to PL 425 to 433 on

15   Exhibit 12, have you seen this document before?

16   A   To the extent that this is the Attorney

17   General's opinion, without comparing it to the

18   actual copy that I have, I can't state that this

19   is exactly it.  However, if this is the Attorney

20   General's opinion, then I've seen his opinion.

21   Q   Okay.  Any reason though to believe sitting here

22   today that this document that I've put before

23   you at PL 425 to 433 is not the Attorney

81

1    General's opinion from September 7, 2021?
2  A   I don't have, I don't have my copy and I'm just
3    looking at this copy.  So without comparing,
4    then I would say I can't be a hundred percent
5    sure.  However, if you're stating that it's the
6    Attorney General's opinion that I have a copy
7    of, then it's probably that.
8  Q   Do you have a copy handy in your office?
9  A   I'm not sure.
10 Q   Okay.
11 A   It might be in a file.
12 Q   I guess my question is without having looked at
13   the copy in your office, do you have any reason
14   to believe having reviewed Exhibit 12 that this
15   would not be the version of the Attorney General
16   memo that you have in your office?
17 A   Specifically to answer your question, I don't
18   have it memorized so I couldn't say that this is
19   the exact copy.
20 Q   I just want to close the loop without having to
21   send you on a fishing expedition so I do need an
22   answer to this.
23     Do you have any reason to believe after

82

1    having reviewed the pages affixed to Exhibit 12
2    that this is not the version of the September
3    7th, 2021, version that's in your office?
4  A   As I stated, I don't have it in front of me.
5  Q   Okay.
6  A   If you're stating that you have made no changes,
7    then I guess I have to trust you.
8  Q   Okay.  I'm going to have to, in light of that
9    testimony I'm going to have to ask her to go get
10   a copy.  Sorry.
11     MR. KENISON-MARVIN:  She said maybe, I
12   think.
13     MR. BISSONNETTE:  Can we go off the record?
14     (Discussion off the record)
15     (Director Malachi and Atty. Kenison-Martin
16   leave the conference room and return
17     2:39 - 2:46 p.m.)
18 Q   Director Malachi, without having seen the
19   version of Exhibit 12 that resides in the
20   offices of the Commission, do you have any
21   reason to believe that the document following
22   Exhibit 12 is not an accurate depiction of the
23   September 7, 2021, AG memo?

83

1  A   As I sit here today I don't have a specific
2    reason to think this isn't it.  However, I'm not
3    a hundred percent sure, but I don't have a
4    specific objection or question or issue.
5  Q   Thank you.  I appreciate that.  My question is
6    without getting into -- strike that.
7      Does this memo govern how the Human Rights
8    Commission enforces RSA 354-A:29 to 34?
9      MR. KENISON-MARVIN:  Objection.  Vague.
10   Legal contention.  You can answer.
11 A   When you say "govern," could you be more clear?
12 Q   Maybe I'll just ask the question more generally.
13     Does Exhibit 12 have any impact on how the
14   Human Rights Commission enforces RSA 354-A:29 to
15   34?
16     MR. KENISON-MARVIN:  Same objection.  You
17   can answer.
18 A   I'm not still a hundred percent certain that I
19   understand your question.  However, all of 354-A
20   is governed by the statute as it's written as
21   well as the legal standard.
22 Q   So direct your attention to the first page of
23   Exhibit 12 Bates stamped PL 00425.  This is

84

1    directed to Chairman Palardy and to you,
2    Director Malachi, and the first sentence states,
3    "You requested, on behalf of the New Hampshire
4    Commission for Human Rights, that this office
5    provide an official Attorney General opinion
6    concerning the scope and application of the
7    recently passed sections 297 and 298 of House
8    Bill 2."  Do you see that language?
9  A   I do.
10 Q   Did the Commission request an official Attorney
11   General opinion concerning the scope and
12   application of Sections 297 and 298 of House
13   Bill 2?
14 A   I'm not sure that that, your question, I think
15   it may speak to privilege.
16 Q   I think with respect to that particular question
17   I'm just referencing confirmation as to what's
18   in a public document.
19     MR. KENISON-MARVIN:  Object to maybe
20   compound question.  Just clarify now what the
21   question is on the table?
22 Q   Sure.  I just want to confirm whether it is
23   accurate that the Commission for Human Rights

85

1    requested that the Attorney General's office
2    provide an official Attorney General opinion
3    concerning the scope and application of the
4    recently passed Sections 297 and 298?
5         MR. KENISON-MARVIN:  I'll object on
6    attorney-client privilege to the extent the
7    question relates to not what's stated in the
8    document but with respect to specific requests
9    or communications made to the Attorney General
10   by the HRC.
11        MR. BISSONNETTE:  And I am not, just to be
12   very clear because I understand the objection, I
13   am not asking for communications beyond seeking
14   confirmation that there was a request from the
15   Human Rights Commission to the Attorney
16   General's office along the lines of the first
17   sentence on page 425 of Exhibit 12.
18        MR. KENISON-MARVIN:  Mind if we step out
19   for just a second?
20        (Director Malachi and Atty. Kenison-Marvin
21          leave the conference room and return
22          2:50 - 3:42 p.m.)
23  Q    So Director Malachi, I'm just going to obviously

86

1    reference the first sentence on Exhibit 12
2    beginning with the statement you requested on
3    behalf of the New Hampshire Commission for Human
4    Rights that this office provide an official
5    Attorney General opinion concerning the scope
6    and application of the recently passed Sections
7    297 and 298 of House Bill 2.  Do you see that
8    language in Exhibit 12?
9  A    Yes.
10 Q    So my question is did the Commission for Human
11   Rights request that the Attorney General's
12   office provide an official opinion concerning
13   the scope and application of Section 297 and 298
14   of House Bill 2?
15 A    As it relates specifically to me, did I go to
16   the AG and request an opinion, no.  However, I
17   think it would be fair to say that the
18   Commission requested an opinion.
19 Q    Okay.  Excluding any communications that the
20   Commission may have had with its lawyers at the
21   Department of Justice, can you explain to me why
22   the Commission sought an opinion?
23 A    I'm sorry.  Could you say that again?

87

1  Q    Yes.  Excluding the contents of any
2    communications that the Commission may have had
3    with its lawyers at the Department of Justice,
4    could you explain why the Commission sought the
5    opinion?
6         MR. KENISON-MARVIN:  Objection to the
7    extent it misstates the witness's answer to the
8    prior question.
9  Q    Can I withdraw the question?  I'd just like to
10   hear back exactly what the witness said.  Thank
11   you.
12        (Requested portion read back by court reporter)
13 Q    Excluding any communications that the Commission
14   had with its lawyers at the New Hampshire
15   Department of Justice, can you explain why the
16   Commission requested an opinion?
17 A    I'm unclear if that's privileged communication.
18        MR. KENISON-MARVIN:  The question doesn't
19   include any information that was discussed with
20   attorneys.  I believe I understand it to be
21   attorneys at DOJ, but to the extent there was
22   counsel not only with DOJ attorneys but any
23   attorney representing HRC that was a privileged

88

1    communication seeking advice to do something or
2    whether or not to do something, that would be
3    privileged, but I understand the question not to
4    ask for that information about content of
5    communications with attorneys that were
6    representing the HRC; is that correct?
7         MR. BISSONNETTE:  That is.  Yes.
8  A    With that clear, could you, I'm sorry, could you
9    ask the question one more time so I could
10   answer?
11 Q    Understood.  Just going to have it read back.
12   Thank you, Cindy.
13        (Requested portion read back by court reporter)
14 A    The Commission was aware of concern from the
15   public about Sections 297 and 298 and requested
16   the opinion.
17 Q    Okay.  And do you recall the specific concerns
18   from the public that were raised?
19 A    No.  I don't remember.  I don't recall the
20   specifics.
21 Q    Okay.  Were those specific concerns that you're
22   referencing, did they reflect the general
23   concern that the law was confusing?

89

1  A    I couldn't speak to my recollection of the
2       conversation.  It would be reflected in whatever
3       the opinion was.
4  Q    Is that reflected, just to be clear, I'm not
5       getting into communications with lawyers here,
6       but are those concerns reflected on the first
7       sentence of the second paragraph on page 1 in
8       which the memo states, "Some have voiced
9       concerns that these new statutes are confusing
10      and that public employers in schools will
11      struggle to understand the scope of the new
12      prohibitions"?
13 A    That could be.
14 Q    Sitting here today, can you recall anything more
15      specific about the concerns that are referenced
16      in Exhibit 12 and that were a reason for why the
17      Commission requested an opinion?
18 A    Sitting here today, no.
19 Q    I'm just going to refer you to you to Exhibit
20      13, Director Malachi, that's been placed in
21      front of you.  I would just submit to you this
22      is a document produced not by the HRC but by the
23      Department of Education.  That seems to suggest

90

1       an accepted meeting, I'm not sure by whom,
2       concerning Review and Discuss Procedure/Process
3       for Incidences of Anti-Discrimination in which
4       there potentially were as attendees you and
5       Commissioner Edelblut.
6          Have I accurately described at least what
7       Exhibit 13 reflects?
8  A    I don't have a recollection of this.
9  Q    Do you recall a meeting with Commissioner
10      Edelblut on or about September 8, 2021?
11 A    I don't recall a specific meeting.
12 Q    Okay.  Does the fact that this September 8 date
13      on Exhibit 13, does the fact that that's one day
14      after the September 7, 2021, AG memo in Exhibit
15      12 refresh your recollection at all about
16      whether a meeting occurred and what may have
17      been discussed?
18 A    No.
19 Q    Sitting here today, you have no recollection,
20      just to be clear, you have no recollection of
21      any meeting with Commissioner Edelblut on or
22      about September 8, 2021, correct?
23 A    No.

91

1  Q    You can set those aside.
2          I did have another question on Exhibit 12.
3       My apologies.  How does this memo impact if at
4       all how the Commission enforces RSA 354-A:29 to
5       34?
6          MR. KENISON-MARVIN:  Objection.  Compound
7       and foundation.
8  Q    I'm going to withdraw.  I'm not going to use the
9       term "impact."  I'm trying to figure out if this
10      is a memo you use in enforcing RSA 354-A:29-34
11      so I'm just going to ask the question that way.
12         Does Exhibit 12 guide how the Commission
13      for Human Rights enforces RSA 354-A:29 to 34?
14 A    So I'm a bit unclear on the question.  Are you
15      asking me specifically this document?  Or does
16      an AG opinion affect how the Commission does its
17      work?
18 Q    No, good question.  I'm simply referring to
19      Exhibit 12 and whether it guides how the
20      Commission applies specifically RSA 354-A:29 to
21      34?
22 A    If I understand your question, insomuch as it is
23      information from the Attorney General of the

92

1       State of New Hampshire, then yes.  However, it
2       doesn't change our process.
3  Q    Okay.  I guess my question is how do you use
4       this document?  How does the Commission use
5       Exhibit 12?
6  A    If you're asking do we use it in our day-to-day
7       work, is that what you're asking?
8  Q    How does the Commission use Exhibit 12 with
9       respect to its duties in enforcing RSA 354-A:29
10      to 34?
11         MR. KENISON-MARVIN:  Objection.
12      Foundation.
13 A    Please ask the question again?
14 Q    Cindy, would you mind reading the question back?
15      (Requested portion read back by court reporter)
16 A    Respective of this document we don't.
17 Q    Does it in any way guide how the Commission
18      applies RSA 354-A:29 to 34?
19 A    Are you asking additionally?  Outside of the
20      statute?
21 Q    Yes.  I'm just trying to figure out how this
22      memo is used by your office.  So we've
23      established, correct, that the Commission

93

1  requested an AG memo, right?

2  A   Yes.

3  Q   We've established that the Commission received

4      an AG memo, right?

5  A   That would be fair.

6  Q   So my question is having requested it and

7      received it, does Exhibit 12 guide in any way

8      the Commission's application of RSA 354-A:29 to

9      34?

10     MR. KENISON-MARVIN:  Objection.

11     Foundation.

12 A   Insomuch as the document was requested by the

13     Commission, it was requested for the public.

14 Q   Okay.  So this wasn't requested with the intent

15     to assist the Commission in enforcing the

16     statute?  Do I understand your testimony

17     correctly?

18 A   Correct.

19 Q   Has the Commission since the issuance of the

20     September 7, 2021, opinion used this opinion in

21     interpreting the provisions of RSA 354-A:29 to

22     34?

23 A   Could you clarify relative to what?

94

1  Q   Relative to any allegation of discrimination

2      that has been received by the Commission under

3      the challenged law in this case.

4  A   No.

5  Q   I'm going to set that aside.  I'm going to have

6      one more exhibit.

7      (Exhibit 56 marked for identification)

8  Q   So Director Malachi, just as you read this, I'm

9      only going to have you look at one particular

10     paragraph, and that's the paragraph on the

11     bottom of page 2 of Exhibit 56 that's Bates

12     stamped HRC 00392, and that has been

13     highlighted, and I will submit that that

14     highlighting has been done by Plaintiffs'

15     counsel in this case.

16     So I think just to kind of streamline this

17     process I think what I would just ask you to do

18     is read that entire paragraph beginning with

19     "Director Malachi discussed the impact of HB 2,"

20     and when you finish that paragraph on page 2,

21     just let me know when you're done, please.

22 A   Okay.

23 Q   So I'm going to just direct your attention to

95

1      the language again that Plaintiffs' counsel has

2      highlighted in this document.  Director Malachi

3      explained -- strike that.

4      I want to direct your attention to the

5      language that's been highlighted by Plaintiffs'

6      counsel, "Assistant Director Burke Cohen and

7      Director Malachi explained that the likely

8      inspiration was that there have been instances

9      in which information has been presented in

10     trainings and K - 12 classrooms that states

11     directly and/or impliedly that inherent traits

12     establish a person's inferiority/superiority."

13     Do you see that language?

14 A   Yes.

15 Q   Is that an accurate reflection of what was said

16     during the October 7, 2021, meeting of the Human

17     Rights Commissioners?

18 A   I don't have a recollection.

19 Q   Okay.  Any reason to think that that isn't an

20     accurate reflection of what was said at the

21     meeting?

22 A   No.

23 Q   Sitting here today, do you continue to believe

96

1      that the likely inspiration for HB 2 was that

2      there been instances in which information has

3      been presented in trainings in K through 12

4      classrooms that states directly and/or impliedly

5      that inherent traits establish a person's

6      inferiority or superiority?

7  A   I'm sorry.  Ask the first part of the question

8      again?

9  Q   Sure.  I know that you have no reason to believe

10     this was an inaccurate reflection of what you

11     said at the meeting.  My question to you is that

12     is this still your present understanding that

13     the likely inspiration by the supporters of the

14     challenged law, quote, "was that there have been

15     instances in which information has been

16     presented in trainings in K through 12

17     classrooms that states directly and/or impliedly

18     that inherent traits establish a person's

19     inferiority/superiority?

20 A   I'm not having an opinion one way or the other.

21 Q   I just want to short-circuit this.  All I'm

22     asking for is you had an opinion at the time as

23     to what the likely inspiration was for HB 2.  So

97

1    my question is sitting here today, does the
2    opinion on page 2 that you had on October 7th,
3    2021, continue to be your opinion sitting here
4    today.  That's all.
5        MR. KENISON-MARVIN:  Objection to the
6    extent it mischaracterizes and misstates prior
7    testimony.
8    A    Sitting here today I haven't given much thought
9    to this statement two years ago.
10    Q    But you had an opinion obviously on October 7,
11    2021, correct?
12        MR. KENISON-MARVIN:  Objection.
13    Misrepresents prior testimony.
14    Q    Are you able to answer that question?
15    A    Oh, if I had an opinion?
16    Q    Then.
17    A    Then?
18    Q    Yes.
19    A    This is part of a discussion so I'm reading
20    what's written here.
21    Q    I understand that.  It seems to me based on the
22    minutes that this is a summary of at least an
23    explanation provided by Assistant Director Burke

98

1    Cohen and Director Malachi which is you.  So I
2    guess what I'm trying to get at is you had this,
3    this is an explanation -- strike that.
4        Do you know what is being referenced when
5    the language states in this explanation that,
6    quote, "there have been instances in which
7    information has been presented in trainings in K
8    through 12 classrooms that states directly
9    and/or impliedly that inherent traits establish
10    a person's inferiority/superiority?
11    A    I'm sorry.  Are you asking if I have --
12    Q    What were the instances being referred to.
13    That's what I'm trying to forget at.
14        MR. KENISON-MARVIN:  Objection.
15    Foundation.
16    A    I don't have a recollection.
17    Q    So you don't know what was being referred to
18    with respect to the specific instances that are
19    on the bottom of page 2 HRC-00392?
20    A    I do not have a specific recollection.
21    Q    Do you have any recollection of this discussion
22    that took place on October 7, 2021, that's
23    referenced in the highlighted language on page

99

1    2, HRC-00392?
2    A    I do not.
3    Q    I'm going to also introduce another exhibit.
4        (Exhibit 57 marked for identification)
5        MR. BISSONNETTE:  And I am also going to,
6    if it's okay, Nate, I'm going to have before the
7    witness the exhibit previously marked Exhibit 32
8    as well.  I'm just going to use these in
9    conjunction with each other.  Thank you.
10        (Discussion off the record)
11    Q    Director Malachi, Exhibit 57 are Christian Kim's
12    and your objections and responses to the
13    Plaintiff's First Set of Interrogatories,
14    correct?
15    A    You said 57?
16    Q    There should be two exhibits in front of you.
17    The first is 57.
18        MR. KENISON-MARVIN:  Just clarify the title
19    of the document versus caption.
20    Q    So I'll strike my last question.
21        I want to just to confirm that in this case
22    in which Commissioner Edelblut and other state
23    actors are Defendants, can you confirm that

100

1    Exhibit 57 consists of the Objection and
2    Responses to the Plaintiff's First set of
3    Interrogatories submitted to Chairperson
4    Christian Kim and you, Executive Director Ahni
5    Malachi?
6    A    I would have to look through this and speak with
7    counsel to give you an answer to that question.
8    Q    Take as much time as you need.  I do need you to
9    confirm that.
10        MR. KENISON-MARVIN:  Off the record for
11    just a second.
12        (Director Malachi and Atty. Kenison-Marvin
13        leave the room and return
14        4:09 - 4:21 p.m.)
15    Q    If you could just reread the last question?
16        (Requested portion read back by court reporter)
17    A    Okay.  I'm very unclear in looking and this
18    document which is noticed as Exhibit 57, these
19    are questions for the Commissioner of Education.
20    This is an Interrogatory for him specifically.
21    So I can't answer or attest to anything for the
22    Commissioner of Education.  Am I looking at the
23    wrong document?

101

1  Q   Are you referring to the caption that says Local
2      8027 versus Frank Edelblut?  Is that what you're
3      referring to?
4  A   So I'm referring to Exhibit 57 that has that
5      caption, and in looking through this document it
6      talks about the Commissioner objecting and
7      carries through on the Commissioner's
8      objections, and it states the Human Rights
9      Commission in some of the objections as part of
10     Commissioner's answer.
11         MR. KENISON-MARVIN:  I do have a different
12     document than her, I think.
13 A   It is not for the Human Rights Commission if you
14     look at the signatures.  Verification pages.
15 Q   So you have the wrong document?  That's my
16     fault.
17         MR. KENISON-MARVIN:  I can just look at
18     everything, but yeah, it's captioned the
19     Commissioner Frank Edelblut.
20         (Exhibit 58 marked for identification)
21         MR. BISSONNETTE:  Thank you for flagging
22     that, and I apologize.  So that's on me.  Thank
23     you.

102

1  Q   So while you're reviewing that, Director
2      Malachi, I'll have the same question with the
3      caveat now is whether Exhibit 58 consists of
4      Chairperson Christian Kim's and your objections
5      and responses to the Plaintiffs' First Set of
6      Interrogatories in this case.
7  A   Okay.  For the 13th time, your question again?
8         (Discussion off the record)
9  Q   Is Exhibit 58 the Interrogatory Responses of
10     both Chairman Kim and you in response to the
11     Plaintiffs' First Set of Interrogatories in this
12     case?
13 A   That is a fair assessment.
14 Q   Okay.  And you reviewed these responses before
15     they were submitted to Plaintiffs' counsel in
16     this case, I assume?
17 A   That's fair.
18 Q   And you signed a verification on page 15 of
19     Exhibit 58, correct?
20 A   That would be my electronic signature.
21 Q   I'm only going to direct your attention to page
22     10 and the response to Interrogatory number 6.
23     There's a statement, quote, "The HRC Defendants

103

1      can confirm that the HRC has docketed one
2      complaint made under the amendments," end quote.
3      Do you see that sentence?
4  A   Where are you on the page?
5  Q   Sure.  I'm on page 10.
6  A   Yes.
7  Q   Above paragraph 7, the statement, quote, "The
8      HRC Defendants can confirm that the HRC has
9      docketed one complaint made under the
10     amendments."
11 A   I see that.
12 Q   Sure.  I've also put before you a document
13     that's been previously marked as Exhibit 32.  Do
14     you see, I'm not asking you to read it yet but
15     do you see is Exhibit 32 in front of you?
16 A   Yes.
17 Q   So my question is and you can take time to
18     answer this, is Exhibit 32 the docketed
19     complaint referenced on page 10 of your
20     Interrogatory responses in Exhibit 58?  And if
21     we need a minute to go off the record I'm happy
22     to do so as well.
23 A   So Exhibit 32 is not a docketed response or not

104

1      a docketed charge.
2  Q   Okay.  What is that sentence on page 2, what is
3      the complaint that it is referencing
4      specifically?
5  A   Which document are you on?
6  Q   I'm on Exhibit 58.
7  A   Okay.
8  Q   Quote, "The HRC Defendants can confirm that the
9      HRC has docketed one complaint made under the
10     amendments," end quote.  Do you see that
11     language?
12 A   I do.
13 Q   What is the Commission referring to in that
14     statement?
15 A   It's referring to a docketed charge, a docketed,
16     so it's an allegation and then it becomes,
17     potentially becomes docketed and so it is
18     referring to a docketed charge.
19 Q   Okay.  And was that docketed charge produced in
20     this litigation, do you know?
21 A   I would need to confer with my attorney because
22     once we take a charge, well, anything, so
23     conversations, questionnaires, charges are all

---

**105**

1    confidential.

2  Q   Um-hum.  Okay.  Is the complaint in Exhibit 32,

3      talking about the contents of the complaint, let

4      me start again.

5        Is the contents of the complaint from

6      Mr. ███████ in Exhibit 32 the same contents of

7      the complaint that was docketed and that is

8      reflected on page 10 of Exhibit 58?

9  A   I may need to confer with my attorney.  I'm

10     unsure of what I can share based on

11     confidentiality of the Commission.

12       MR. KENISON-MARVIN:  I'm happy to do this

13     just off the record quickly.

14         (Discussion off the record)

15     (Requested portion read back by court reporter).

16  A   So I need clarification.  Are you asking if

17     Mr. ███████ completed one of our forms?  Are

18     you asking if just this information is a charge?

19     I'm not clear on what you're asking.

20  Q   I'm a little bit at a disadvantage because I

21     only have what the Commission produced to us in

22     litigation.  The only documents with respect to

23     Mr. ███████'s complaint that have been produced

---

**106**

1      in this litigation is what's reflected in

2      Exhibit 32.  That's all we've received.  In

3      addition, there's been a representation made to

4      us by counsel that this complaint has been

5      docketed.

6        So all I'm just trying to get at is are the

7      contents of Mr. ███████ s complaint in his

8      email in Exhibit 32 the contents of the

9      complaint that has been docketed by the HRC as

10     reflected on page 10 of Exhibit 58?

11  A   Okay.  So the answer to the question is a

12     docketed charge is on a specific form with the

13     Commission.  That form is then verified.  Any

14     additional information that a complainant wishes

15     to add to that, whatever that is, at the time of

16     filing the charge they are welcome to do that.

17     They are not required to do that.  All that is

18     required is their sworn affidavit that the

19     events that they are discussing or the events

20     that they are alleging have happened and then

21     that form is verified.  So their signature and

22     then their signature is witnessed by a notary.

23     So all charges, regardless of type, are on

---

**107**

1      official documents with the commission.  So it

2      has to be on that form which is signed by the

3      Complainant and verified by a notary.  So I'm

4      not sure if that answers your question.

5  Q   It's difficult for me because all I have with

6      respect to Mr. ███████'s allegation is what's

7      reflected in Exhibit 32.  I don't have anything

8      else produced with respect to that allegation,

9      but there's been an indication made to me that

10     this is a docketed complaint.  There's been a

11     statement under oath from the Human Rights

12     Commission that there's one docketed complaint

13     under the amendments, and I'm trying to get at

14     what that docketed complaint is.  What are its

15     contents.

16       So that's going to be my question to you.

17     I'm referring you back, Director Malachi, to the

18     statement, quote, "The HRC Defendants can

19     confirm the HRC has docketed one complaint made

20     under the amendments," end quote.  What is the

21     substance of that complaint that has been

22     docketed?

23  A   So the substance of the docketed complaint would

---

**108**

1      be whatever the individual is alleging took

2      place, that information is put on a specific

3      form that they would then sign and that

4      signature is verified and that becomes the

5      docketed complaint.

6  Q   So I haven't received that form.  So I guess my

7      question is can you sitting here today, can you

8      recall what the allegation was in the form that

9      was docketed and led to a docketed complaint

10     made under the amendments?  What was the

11     complaint about?  That's all I'm trying to get

12     at.

13  A   To my recollection -- I'll stay that.  Question

14     again, please?

15     (Requested portion read back by court reporter)

16  A   Without having the exact complaint document in

17     front of me, I cannot tell you with a hundred

18     percent certainty what is in the complaint.

19     However, it would allude to something that is in

20     this email to the Commission, but I don't have

21     the exact language in front of me.

22  Q   Can we go off the record?  Can I just speak with

23     you?

109

```
1              (Counsel leave the conference
2         room and return 4:43 - 4:49 p.m.)
3      MR. BISSONNETTE:  After conferring with
4  counsel, we are going to suspend this deposition
5  and reconvene at a later time to cover just a
6  few of the outstanding issue areas, and I
7  believe there's agreement between counsel on
8  that.
9      MR. KENISON-MARVIN:  Yes.  Before we go off
10 the record, I'll put on the record officially
11 that we will be reserving the right to read and
12 sign once everything is concluded.
13             (Deposition suspended at 4:49 p.m.)
14
15
16
17
18
19
20
21
22
23
```

111

```
1           C E R T I F I C A T E
2      I, Cynthia Foster, Registered Professional
3  Reporter and Licensed Court Reporter, duly authorized
4  to practice Shorthand Court Reporting in the State of
5  New Hampshire, hereby certify that the foregoing
6  pages, numbered 5 through 109, are a true and
7  accurate transcription of my stenographic notes of
8  the deposition of AHNI MALACHI who was first duly
9  sworn by me on May 24, 2023, for use in the matter
10 indicated on the title sheet, as to which a
11 transcript was duly ordered;
12      I further certify that I am neither
13 attorney nor counsel for, nor related to or employed
14 by any of the parties to the action in which this
15 transcript was produced, and further that I am not a
16 relative or employee of any attorney or counsel
17 employed in this case, nor am I financially
18 interested in this action.
19
20
21                          Cynthia Foster, LCR
22
23
```

110

```
1      I have carefully read the foregoing
2  deposition, and the answers made by me are true.
3
4
                     _____
5                    AHNI MALACHI
6
7
8  STATE OF _____
9  _____, SS.
10
11      At_____on the
12 _____ day of _____ A.D.
13 2023, personally appeared the above-named AHNI
14 MALACHI and made oath that the foregoing answers
15 subscribed by her are true.
16                    Before me,
17
18
19
                     _____
20                   Notary Public
21
22
23
```

112

```
1           E R R A T A
2      I, the undersigned, AHNI MALACHI, have read the
   transcript of my deposition held on May 24, 2023, in
3  the matter of Local 8027, AFT-New Hampshire, et al v.
   Frank Edelblut, Commissioner, et al; and the same is
4  true and correct, to the best of my knowledge, with
   the exception of the following changes noted below,
5  if any:
6  PAGE/LINE  CORRECTION AND REASON FOR CORRECTION
7  _____
8  _____
9  _____
10 See attached sheet(s) for additional information:
11 ___Yes___No
12
                     _____
                     AHNI MALACHI
13
14 STATE OF _____)
                       ) ss.:
15 COUNTY OF _____)
16
17      Subscribed and sworn to before me this _____ day
   of _____, 2023.
18
19
                     _____
20                   Notary Public
   My commission expires:
21
   _____
22
23
```

```
 1              I have carefully read the foregoing

 2         deposition, and the answers made by me are

 3    true.¹

 4                                    _Ahni Mal_

 5                                    AHNI MALACHI

 6

 7

 8    STATE OF  New Hampshire

 9    Merrimack                  , SS.

10

11              At Merrimack County on the

12    17th      day of    July        A.D.

13    2023, personally appeared the above-named AHNI

14    MALACHI and made oath that the foregoing answers

15    subscribed by her are true.

16                                    Before me,

17

18

19

20                                    Notary Public

21

22

23    ¹ Subject to the changes indicated on the accompanying errata and
      attachment thereto.
```

1  ERRATA

2     I, the undersigned, AHNI MALACHI, have read the
transcript of my deposition held on May 24, 2023, in
3  the matter of Local 8027, AFT-New Hampshire, et al v.
Frank Edelblut, Commissioner, et al; and the same is
4  true and correct, to the best of my knowledge, with

5  the exception of the following changes noted below,

6  if any:

7  PAGE/LINE   CORRECTION AND REASON FOR CORRECTION

8     P23 / L7   See attachment

9     P27 / L4   See attachment

10

11  See attached sheet(s) for additional information:

   X  Yes ___ No
12                         _Ahni Mal._
                        AHNI MALACHI
13

14  STATE OF New Hampshire
                        ) ss.:
15  COUNTY OF Merrimack )

16

17     Subscribed and sworn to before me this 17th day

18  of  July  , 2023.

19                         _____
                        Notary Public
20

21  My commission expires:

   ┌─────────────────────────────────────────┐
22 │      Kelly A. Mederos, Esq                │
   │ Notary Public, State of New Hampshire     │
   │ My Commission Expires December 21, 2027    │
23 └─────────────────────────────────────────┘

Local 8027, AFT-New Hampshire, et al., Plaintiffs vs. Frank Edelblut, Commissioner, et al., Defendants (D.N.H. Case No. 1:21-cv-01077-PB)

Ahni Malachi

# ERRATA SHEET

## ATTACHMENT

Page 23, Line 7, Change:

    Replace "Commissioner's" with "Commission's" such that the transcript states:

    "As I sit here today reading this, it does appear to be an accurate reflection of the ***Commission's*** process."

    <u>Reason</u>: Likely transcription error; otherwise, to clarify testimony.

Page 27, Line 4, Change:

    Replace "bearing" with "meaning" such that the transcript states:

    "The Commission language has ***meaning***."

    <u>Reason</u>: Likely transcription error; otherwise, to clarify testimony.

*[end]*

# EXHIBIT 6

HRC Assistant
Director
Sarah Cohen
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

SARAH COHEN

June 26, 2023



**AVICORE REPORTING**

15 Constitution Drive, Suite 1A  •  Bedford, NH 03110  •  (603) 666-4100
info@avicorereporting.com  •  www.avicorereporting.com

Court Reporter:
Cynthia Foster, LCR
LCR #14 (RSA 310-A:161-181)

**Page 1**

```
                    UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW HAMPSHIRE




         Local 8027, AFT-New Hampshire, et al.

                            Plaintiff,

         v.                             CERTIFIED
                                        ORIGINAL
         Frank Edelblut, Commissioner, et al

                            Defendants.

                    No. 1:21-cv-01077-PB




                    DEPOSITION OF SARAH BURKE COHEN

                    taken on behalf of the Plaintiffs

                    at the New Hampshire Attorney

                    General's Office, Concord, NH,

                    on June 26, 2023, at 10:08 a.m.
```

**Page 2**

1   APPEARANCES:
2       On behalf of the Plaintiffs, Local 8027, AFT-New
        Hampshire, AFL-CIO:
3   STROOCK & STROOCK & LAVAN LLP
    By: David Kahne, Esq., by Zoom
4   180 Maiden Lane
    New York, NY  10038
5   212-806-5648
    dkahne@stroock.com
6
        On behalf of the Plaintiffs, Christina
7       Philibotte, Andres Mejia, NEA-New Hampshire:
    ACLU OF NEW HAMPSHIRE
8   By: Gilles Bissonnette, Esq.
    18 Low Avenue, Unit 12
9   Concord, NH  03301
    603-225-3080
10  gilles@aclu-nh.org
11      On behalf of the Defendants, Frank Edelblut,
        Ahni Malachi, John Formella, et al:
12  NH DEPARTMENT OF JUSTICE
    By: Nathan W. Kenison-Marvin, Esq.
13  33 Capitol Street
    Concord, NH  03301
14  603-271-1292
    nathan.w.kenison-marvin@doj.nh.gov
15
    By Zoom:
16  Peter Perroni, Esq.
    Jennifer Eber, Esq.
17  Kayla Turner, Esq., kaylat@drcnh.org.
    Esther Dickinson, Esq., edickinson@nhnea.org
18
19
20
21
22
23

**Page 3**

```
1                       INDEX

2           Deposition of Sarah Burke Cohen

3   Examination by Mr. Bissonnette:          5

4   Examination by Mr. Kahne:                96

5   Examination by Mr. Kenison-Marvin:      119

6

7                       EXHIBITS

8   59   Complaint                           10

9   60   Commission for Human Rights website  26

10  61   Email BurkeCohen to Sheldon, 17 Nov 2021,

11       HRC-00413-415                        26

12  62   Charge of Discrimination, ████████

13       HRC-00416-420                        37

14  63   Public Education Questionnaire,

15       HRC-00065-00067, 00067.1, 00068.1    63

16  64   Fax from Perroni to Borysenko,

17       Borysenko R.45 Response, 000001-17   72

18  65   Exeter Regional Cooperative School

19       District article by Karlyn Borysenko 72

20  66   Email, Malachi to ████ , 31 Aug 2022,

21       HRC-00709-713                        72

22  67   Unwoke Army Tweet Thread and Related

23       Documents, PL 00576-677              73
```

**Page 4**

```
1            (EXHIBITS - continued)

2   68   Email, BurkeCohen to Malachi, 18 Nov

3        2021, ████ , HRC-00359-360, 00046-49,

4        HRC-00930                            77

5   69   Email, BurkeCohen to Malachi, ████ ,

6        18 Nov 2021, HRC-00039-50            78

7   70   Email, BurkeCohen to Malachi, ████ ,

8        18 Nov 2021, HRC-00042-45, HRC-00932 80

9   71   Public Education Intake Questionnaire,

10       ████████ , HRC-00343-344,

11       HRC-00936                            81

12  72   Email, BurkeCohen to Malachi, ████ ,

13       HRC-00036-00038, HRC-965-966         82

14  73   Email, BurkeCohen to Malachi, ████ ,

15       HRC-000178-186, HRC-00213            82

16  74   Email, ████ to HRC, HRC-01003-09     83

17  75   Email, HRC to ████ , 15 Apr 2022,

18       HRC-00086-87                         85

19  76   Email, HRC to Malachi, 22 Apr 2022,

20       ████ , HRC-00340-341                 86

21  77   Email, ████ to Malachi, 7 Dec 2022,

22       HRC-00187-212                        87

23
```

**5**

```
1              EXHIBITS (continued)
2    78   Email, BurkeCohen to Malachi, 18 Nov
3         2021, ███████, HRC-00977-988      88
4         (Original exhibits retained by court reporter
5              and returned to Attorney Bissonnette)
6         (Scanned copies provided to all counsel)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

**6**

```
1           S T I P U L A T I O N S
2              It is agreed that the deposition shall
3    be taken in the first instance in stenotype and when
4    transcribed may be used for all purposes for which
5    depositions are competent under New Hampshire
6    practice.
7              Notice, filing, caption and all other
8    formalities are waived.  All objections except as to
9    form are reserved and may be taken in court at trial.
10             It is further agreed that if the
11   deposition is not signed within thirty (30) days
12   after submission to counsel, the signature of the
13   deponent is waived.
14             It is further agreed that exhibits may
15   be retained by counsel until the time of trial.
16
17
18
19
20
21
22
23
```

**7**

```
1        SARAH BURKE COHEN, DULY SWORN
2        MR. BISSONNETTE:  I know, Attorney Kenison,
3    we have the same agreement with respect to prior
4    stipulations. Just confirming that.
5        MR. KENISON-MARVIN:  Yes.
6             EXAMINATION
7    BY MR. BISSONNETTE:
8    Q    Assistant Director Cohen, my name is Gilles
9        Bissonnette.  I'm the Legal Director of the ACLU
10       of New Hampshire.  I'm not sure we've met before
11       in fact.
12   A    I'm not sure.
13   Q    But it's a pleasure to meet you today, and my
14       role in this case is I represent a client group
15       in this case, in particular Andres Mejia and
16       Tina Philibotte with respect to a challenge to
17       kind of what we have all kind of called either
18       HB 2 or the amendments.
19   A    Okay.
20   Q    In this case.  So that's my role and it's a
21       pleasure to meet you.
22            I'm just going to start off by just asking
23       whether or not you've ever been deposed before.
```

**8**

```
1    A    I have not.
2    Q    So the way this process works, I'm not trying to
3        trick you.  There are no trick questions here.
4        So if you don't understand a question, please
5        tell me.  If you don't understand wording, you
6        know, please let me know.  Otherwise, I will
7        assume that you understand the question.  Okay?
8    A    Okay.
9    Q    And please as well just try to avoid nonverbal
10       cues.  As you know, we have a stenographer here
11       today.  Her role is to record in full our
12       conversation, but what you cannot do is record
13       nonverbal communication.  So I'd just ask that
14       you communicate orally.  Okay?
15   A    Okay.
16   Q    If you need a break at any time, absolutely ask
17       me.  It will absolutely be accommodated.  The
18       only caveat there is that if there's a pending
19       question I would just ask that that question be
20       answered before we break, but I want to make
21       sure that you feel comfortable, as comfortable
22       as one can be amidst this process so if you need
23       to use the restroom, grab a drink of water, just
```

9

1    mentally take a break for a couple minutes, I
2    understand.  Just let me know at any time.
3  A    Okay.
4  Q    Will anything prevent you from giving truthful
5    and accurate testimony today?
6  A    No.
7  Q    You're aware that this lawsuit is about a
8    challenge to what some have called or the
9    Plaintiffs have called the banned concepts law?
10  A    Yes.
11  Q    Just so we have the same kind of terminology, I
12    I'm either going to use the term "the
13    amendments" or "HB 2" to refer to the challenged
14    legislation in this case, and I just want to
15    make sure that when we both use that terminology
16    that we're referring to the same thing.  Does
17    that make sense?
18  A    It does.
19  Q    Okay.  Have you spoken to anyone at the Human
20    Rights Commission about your deposition today?
21  A    No.
22  Q    I'm just going to mark Exhibit 59.
23        (Exhibit 59 marked for identification)

10

1  Q    So I'm just going to ask to you review Exhibit
2    59, Assistant Director Cohen.  Just let me know
3    when you're finished reviewing.
4  A    Okay.
5  Q    Have you reviewed Exhibit 59 --
6  A    I have.
7  Q    -- Assistant Director Cohen?  And I just want to
8    make sure that you understand that you're
9    testifying on behalf of the Human Rights
10    Commission with respect to the topics that are
11    designated in Schedule A of Exhibit 59.  Do you
12    understand that to be the case?
13  A    I do.
14  Q    Okay.  And you're prepared today to testify on
15    those topics, correct?
16  A    I am.
17  Q    And I also just want to make clear that you
18    understand that to the extent a question falls
19    outside of these topics that you'll be
20    testifying in your individual capacity; is that
21    correct?
22  A    I understand that to be correct.
23  Q    What is your role at the Human Rights

11

1    Commission?
2  A    I am the Assistant Director.
3  Q    And how long have you been in that role?
4  A    Since 2018.
5  Q    And what are your responsibilities in that role?
6  A    I am the direct supervisor for the intake
7    coordinator and investigators.
8  Q    How do you supervise the intake coordinators?
9  A    We meet, the intake coordinators and I meet
10    bi-weekly, and we discuss any questions the
11    intake coordinator has about intakes that are
12    coming in.
13  Q    Are decisions made in those meetings about
14    whether to docket an allegation of
15    discrimination?
16  A    Not always.
17  Q    Sometimes, though; is it fair to say?
18  A    Sometimes.
19  Q    What's the standard that's used in determining
20    whether or not an allegation of discrimination
21    should be docketed?
22        MR. KENISON-MARVIN:  Objection.  Scope.
23    You can answer.

12

1  A    So answering in my personal capacity, not as the
2    Commission, we look at the jurisdiction, what
3    the statute reads, right?  So we determine in a
4    light most favorable to the intake inquiry
5    whether we'll take it or not.  We base it on
6    jurisdiction of number of employees, whether it
7    substantively falls within the scope of 354-A.
8  Q    Okay.  I think you also said that in your role
9    you are direct supervisor of investigators as
10    well.
11  A    Correct.
12  Q    Can you explain to me how that role functions?
13  A    I meet with the investigators once a month.  We
14    discuss their caseload, we discuss any questions
15    they have moving cases along legal standard
16    wise, any research that we need to do relative
17    to a specific case, and I review their reports
18    before they go up to the Commissioners to ensure
19    they are complete.
20  Q    Are these cases that have already been docketed
21    by the Human Rights Commission that are being
22    investigated by the investigators?
23  A    Correct.

13

1  Q    When you say review reports that are completed
2      by the investigators, is a report completed in
3      every case that is docketed by the Human Rights
4      Commission?
5          MR. KENISON-MARVIN:  Objection, scope.  You
6      can answer.
7  A    Answering in my, personally, so there are a
8      number of different ways cases move through the
9      Commission for Human Rights.  You have cases
10     that we go through what we call a full
11     investigation so they get to the point where
12     there is a finding issued by an investigating
13     commissioner of either probable cause or no
14     probable cause.
15         However, there are other times that a case
16     can sort of be resolved at the Commission.
17     Complainants have the ability to remove the case
18     to court.  There's also potential of settlement
19     of the cases.  So if there's a resolution of
20     settlement, then it gets closed.  Or there are
21     times where complainants decide they do not want
22     to pursue their charge at the Commission any
23     longer.

14

1  Q    Okay.  So with the exception of those cases in
2      which there's been a settlement or withdrawal or
3      removal to Superior Court, in all other cases
4      are reports completed by investigators?
5          MR. KENISON-MARVIN:  Same objection.
6  A    Answering for myself personally, yes.
7  Q    Thank you.  I know we got into the weeds pretty
8      quickly there, but I'm going to take a little
9      bit of a step back.  Before 2018, what were you
10     doing before 2018?
11 A    I was --
12 Q    Before your role here.  Sorry.  To be specific.
13     Professionally.
14 A    So I have been with the Commission since 2015.
15 Q    Okay.  What was your role between 2015 and 2018
16     at the Commission?
17 A    I started in 2015 as the intake coordinator.
18 Q    How long were you in that role?
19 A    I was in that role, so I was promoted to a
20     full-time investigator in 2016.  However,
21     because of staffing I was still completing the
22     position of intake coordinator.
23 Q    Understand.  Okay.

15

1  A    Until about probably close to the end of 2016.
2  Q    Okay.  What does it mean to be a -- I know you
3      supervise intake coordinators, but describe to
4      me what that role entails.
5          MR. KENISON-MARVIN:  Objection.  Scope.
6      You can answer.
7  A    Answering with my personal knowledge, the intake
8      coordinator's role is receive calls that come
9      in, inquiries that come into the Commission.
10     These inquiries come in both orally via the
11     phone or via someone coming, a walk-in.  Or they
12     come in in written form via email or regular
13     mail.
14         The intake coordinator role is to sort of
15     look at the jurisdictional components, and if
16     the intake meets the jurisdictional components,
17     to send out an intake questionnaire to that
18     person, and then from there the intake
19     questionnaire comes in and if it still meets the
20     jurisdictional components for a charge of
21     discrimination, the intake coordinator for those
22     who are pro se or unrepresented as a courtesy
23     assist them with drafting a charge of

16

1      discrimination.
2  Q    Okay.  Once that charge of discrimination comes
3      in, what's the intake coordinator's role at that
4      point in evaluating it?
5          MR. KENISON-MARVIN:  Same objection.
6  A    Answering for my personal knowledge is once, so
7      charge comes in as docketed, it has to be signed
8      and verified by the Complainant.  That is
9      considered a docketed charge.  The intake
10     coordinator's role is also to be the keeper of
11     the cases that are unassigned, that they have
12     not been assigned to an investigator.
13 Q    Okay.  Is part of the role of an intake
14     coordinator in assessing whether or not there's
15     a prima facie claim of discrimination?
16         MR. KENISON-MARVIN:  Same objection.
17 A    For my personal knowledge, yes.
18 Q    What is the criteria used in determining whether
19     the prima facie standard has been met by a
20     person alleging discrimination?
21         MR. KENISON-MARVIN:  Same objection.
22 A    From my personal experience, evaluating an
23     inquiry is looking at the statutory jurisdiction

17

1     of the Commission for Human Rights pursuant to
2     354-A which looks at number, looking at what
3     type of claim it is, public accommodation,
4     public education, housing, or employment, and
5     looking at the statutory requirements depending
6     on that from there.
7         If it's employment you look at the number
8     of employees to ensure that there are the
9     requisite number of employees.  From there you
10    also look to see if the allegations actually
11    fall within what our statute says we can
12    investigate.
13  Q   Gotcha.  Okay.  Thank you.  That's helpful.
14  A   Um-hum.
15  Q   I just want to make sure I understand your
16    background.  You were promoted in 2016 to, how
17    did you frame it?  Full-time intake coordinator?
18  A   No.  That is not what I said.
19  Q   What did you say?
20  A   So in 2015 intake coordinator was part-time.
21  Q   Okay.
22  A   2015.  So I was part-time in 2015.  I was
23    promoted in 2016 to full-time investigator.

18

1   Q   Full-time investigator.  I'm sorry.  Okay.
2         How long were you in that full-time
3     investigator role?
4   A   From 2016 until my promotion to Assistant
5     Director in 2018.
6   Q   Okay.  So approximately two years.  Could you
7     describe to me what your role was as a full-time
8     investigator between 2016 and 2018?
9   A   So describing, I'm describing it from my
10    personal experience.
11  Q   Um-hum.
12  A   That an investigator's role is to investigate
13    the cases that are docketed, right?  So part of
14    that is requesting information, document
15    information, it can be, it is also interviewing
16    complainants and individually named parties and
17    any other witnesses that would have relevant
18    information for the case.
19  Q   Before you joined the Human Rights Commission in
20    2015, what were you doing professionally?
21  A   I was a staff attorney at New Hampshire Legal
22    Assistance.
23  Q   I didn't know that.

19

1   A   Um-hum.
2   Q   Great organization.  How long were you a staff
3     attorney at NHLA?
4   A   I was a staff attorney at NHLA starting in 2011.
5   Q   Okay.  What was your role as a staff attorney at
6     NHLA at that time?
7   A   I worked in the Fair Housing project.
8   Q   With Elliott Barry?
9   A   With Elliott.
10  Q   One of my heroes.  Okay.  As an attorney in the
11    Fair Housing project, what generally were your
12    day-to-day responsibilities?
13  A   That's going back a bit.  Generally, so I was,
14    working in this project I was also the testing
15    coordinator for the Fair Housing program.  So
16    some of that was scheduling Fair Housing
17    testing, some of it was representing clients.
18    Some of it was preparing reports for the federal
19    government as it is a federal grant that they
20    have.
21  Q   Okay.  Did you have any employment positions
22    prior to 2011?
23  A   I was with New Hampshire Legal Assistance from

20

1     2008.
2   Q   Okay.  What was your role at NHLA generally
3     between 2008 and 2011?
4   A   I was considered a paralegal.
5   Q   Okay.  You went to law school, I know.
6   A   I did.
7   Q   When did you graduate law school?
8   A   I graduated law school in 2004.
9   Q   Where did graduate from?
10  A   Suffolk University Law School.
11  Q   And after you graduated, what was your first
12    position of employment?
13  A   I believe I was working at RiverStone Claims
14    Management.
15  Q   And how long were you there?
16  A   Let's see.  I was there I believe a couple of
17    years.  Honestly, I can't remember.
18  Q   That's a long time ago, I know.
19  A   It is.
20  Q   And just to kind of short circuit this and close
21    the loop kind of on your background, I'm just
22    curious, kind of what were you doing
23    professionally between 2004 when you graduated

**21**

1    and 2008 before you joined NHLA?

2  A   So I was -- I took the bar exam.  I took some

3    time off from, I worked.  During law school I

4    worked for MetLife Auto and Homes in-house

5    counsel.  I took some time off after I graduated

6    to study for the bar exam. ███████████████████

███████████████████████████ I started working at

8    RiverStone Claims Management as a legal

9    assistant/paralegal.  I can't remember exactly

10    what the title was.  And I was processing or

11    doing sort of the background of processing

12    general liability claims for the attorneys that

13    worked for RiverStone.

14  Q   Are you currently licensed in New Hampshire?

15  A   I am.

16  Q   When did you obtain your license?

17  A   2011.

18  Q   Do you personally assign cases to investigators

19    after a case is docketed?

20  A   Yes.

21  Q   How is that decision made as to who a case gets

22    assigned to?

23        MR. KENISON-MARVIN:  Objection.  Scope.

**22**

1    You can answer.

2  A   So we assign cases in order of the way they've

3    been received.

4  Q   Okay.  Is your supervisor, the Director, ever

5    involved in determining whether or not an

6    allegation of discrimination should be docketed?

7  A   Yes.

8  Q   Okay.  Under what circumstances would the

9    Director be involved in that docketing decision?

10        MR. KENISON-MARVIN:  Same scope objection.

11  A   So from my personal knowledge, it could be, if

12    it's a case, so some of it is if I'm not

13    available.

14  Q   Okay.

15  A   Sometimes it's if it's something that we are

16    doing that's newer.  Like when public education,

17    straight-up public education was added to the

18    statute.  We also had discussions, would have

19    been revolving around RSA 354:29 through 34 when

20    it was added to the statute.

21  Q   Could I have that last response just read back

22    to me just so I make sure I heard it correctly?

23      (Requested portion read back by court reporter)

**23**

1  Q   With respect to allegations of discrimination

2    that are made under RSA 354-A:29 to 34, are

3    those cases in which the Director would always

4    be involved in determining whether it's

5    docketed?

6        MR. KENISON-MARVIN:  Same objection.

7  A   From my personal knowledge, I believe so.

8  Q   Okay.  And I believe you testified earlier that

9    there are meetings that occur between you and

10    intake coordinators about how to handle

11    allegations of discrimination including whether

12    to docket them, correct?

13  A   Correct.

14  Q   Okay.  And at least in some instances during

15    those meetings there's determinations made as to

16    whether or not the prima facie standard has been

17    met, correct?

18  A   Correct.

19  Q   Is the Director involved in those meetings as

20    well or present during those meetings?

21        MR. KENISON-MARVIN:  Same objection.

22  A   Sometimes.  Depending on her schedule.

23  Q   I was going to ask kind of what determines that.

**24**

1    So it's scheduling issues would dictate whether

2    or not she's there or not there; is that

3    correct?

4  A   Correct.

5  Q   Just so we have a common understanding, I'm

6    actually just going to put before you a document

7    that's been previously marked Exhibit 1.

8        I'm going to ask you to review Exhibit 1,

9    but I'm going to give you my question in advance

10    before you read it and simply going to be is it

11    your understanding that this is the law being

12    challenged in this case.  So that's the

13    question, and I'd just ask you to review it, and

14    let me know when you're done with your review.

15        I know, Assistant Director Cohen, that

16    you're still reviewing this document, but I just

17    wanted to flag the operative text on Exhibit 1

18    is PL 004 to PL 007.  Thank you.

19  A   I'm sorry.  What was the question?

20  Q   Sure.  So the question is I just want to make

21    sure we have a common understanding that the

22    language in Exhibit 1 from PL 004 to PL 007 is

23    the text of the legislation that's being

25

1    challenged in this case.
2  A    So the text that I am familiar with that I am
3        here to, my understanding is what I'm here to
4        testify under would be PL 004 to PL 006. I can
5        only testify as to 354-A. The remaining
6        sections of 006 and 007 are not the statute that
7        I am familiar with.
8  Q    Okay.
9  A    So with that caveat, it is my understanding that
10       it appears that the document that you provided
11       has the statutory addition to 354-A.
12 Q    Okay. So I just want take make sure I
13       understand your testimony that you're prepared
14       to, you're prepared to talk about with respect
15       to complaints in particular those made under
16       354-A:29 to 34. Correct?
17 A    That is correct.
18 Q    And that's not the case with respect to RSA
19       193:40. Is that fair to say?
20 A    That is correct.
21 Q    And I just want to make sure I understand your
22       testimony that is not a statute that you're
23       familiar with, correct?

26

1  A    Correct.
2  Q    Okay. That's helpful. I appreciate that, and
3        again, it's just to make sure that we're on the
4        same page when we talk about the challenged law
5        and the amendments so I appreciate that
6        clarification.
7            I am going to mark a new exhibit.
8            (Exhibit 60 marked for identification)
9            (Exhibit 61 marked for identification)
10 Q    I've put two exhibits before you. Exhibit 60 is
11       a printout of the HRC's website stating How to
12       File a Complaint, and also attached to Exhibit
13       60 is a blank Public Education Intake
14       Questionnaire Form for RSA 354-A:29 to 34 that I
15       can represent to you that I printed out from the
16       HRC's website.
17           So I'd ask you to review Exhibit 60 and
18       confirm whether or not this is an accurate
19       reflection of the HRC's website with respect to
20       how to file a complaint and an accurate
21       reflection of the Public Intake Questionnaire
22       Form under RSA 354-A:29-34.
23           MR. KENISON-MARVIN: Objection on scope and

27

1        compound.
2  A    Answering personally, it appears that this is
3        the Commission's website. It appears that this
4        is the intake questionnaire that is available on
5        the Commission's website.
6  Q    Okay. I'm going to refer you to the front page
7        of the blank questionnaire form on Exhibit 60.
8        Do you see that?
9  A    Yes.
10 Q    And the language states, Was the offered
11       program/training part of an extracurricular
12       activity, question mark. Do you see that?
13 A    I do.
14 Q    Were you involved in the creation of this
15       questionnaire or the form questionnaire on
16       Exhibit 60?
17 A    Personally, yes.
18 Q    How were you involved in its creation?
19 A    I typed it into the system.
20 Q    I guess my -- maybe I could ask a question a
21       little bit more generally. Who took a stab at
22       the first draft of the questionnaire that's
23       attached to Exhibit 60?

28

1            MR. KENISON-MARVIN: Objection. Scope and
2        vague. You can answer.
3  A    I don't recall.
4  Q    Okay. Were you involved in reviewing drafts of
5        this form questionnaire?
6  A    Yes.
7  Q    Do you recall providing feedback or comments on
8        any provisions of the form?
9  A    I do not recall specifically.
10 Q    Okay. I'm just going to refer you now to
11       Exhibit 61 which I'll just submit is an email
12       from you to it seems like several other New
13       Hampshire employees copied Director Ahni Malachi
14       dated November 17, 2021.
15           I'll just ask you to review Exhibit 61 and
16       let me know when you're completed your review.
17       Have you finished reviewing Exhibit 61?
18 A    I have.
19 Q    What is Exhibit 61?
20 A    It appears to be an email.
21 Q    Okay. And it seems to me at least that this is
22       an email exchange in mid-November 2021 that's
23       discussing how to modify the HRC's complaint

---

29

1  website to reflect the passage of the
2  amendments.  Is that a correct characterization
3  of what this email chain is?
4  A   It appears to be an email to, yes, Department of
5      Information Technology to update the
6      commission's website with the specified updates.
7  Q   When was the Human Rights Commission's website
8      updated to reflect the fact that members of the
9      public can file allegations of discrimination
10     under the amendments?
11         MR. KENISON-MARVIN:  Objection.  Scope.
12 A   I'm not sure.
13 Q   Would it have been -- what I'm trying to get at
14     is timing.  Would it have been around November
15     of 2021?
16 A   I don't recall.
17 Q   Okay.  Bear with me.  I just wanted to ask a
18     followup question with respect to the role of
19     investigators.  Is there a scenario in which an
20     investigation concerning an allegation of
21     discrimination can occur before it is docketed?
22         MR. KENISON-MARVIN:  Objection.  Scope.
23 A   I'm sorry.  Can you ask that again?

---

30

1  Q   Sure.  Of course.  My question is are there
2      circumstances in which an allegation of
3      discrimination could be investigated before it's
4      actually docketed by the Human Rights
5      Commission?
6          MR. KENISON-MARVIN:  Same objection.
7  A   I'm not sure I can answer that.
8  Q   Is it because of the term "investigation"?
9  A   Yes.
10 Q   So I'll try not to use that word because I can
11     see how that could complicate things.
12         Is there any fact gathering that the HRC
13     conducts with respect to allegations of
14     discrimination before a determination is made
15     that it meets the prima facie threshold and is
16     docketed?  And if so, just what does that look
17     like?
18         MR. KENISON-MARVIN:  Objection.  Scope.
19     Compound.  You can answer.
20 A   I'm going to say potentially, and then I need
21     you to, I would prefer you be more specific
22     about any other further questions on that.
23 Q   Sure.  So what if any fact gathering does the

---

31

1  Human Rights Commission do in evaluating whether
2  an allegation of discrimination meets the prima
3  facie threshold?  And what I mean by fact
4  gathering is just external factual
5  investigations of the claim.
6          MR. KENISON-MARVIN:  Objection.  Scope.
7      Vague.  Compound.  You can answer.
8  A   It may not seem like it is, but that is a
9      complicated question.
10 Q   I'm not familiar with this process.
11 A   I'm struggling with answering, you know, that
12     question.
13     It's probably because just being an outsider to
14     this process I'm using terms that may not make
15     as much sense to you.  So what's complicated,
16     why is that question kind of hard to answer from
17     your perspective?
18 A   So answering this personally --
19 Q   Um-hum.
20 A   -- an intake comes in and an inquiry is made.
21     An intake questionnaire is requested of the
22     inquirer, I would say, if that person hasn't
23     already submitted one.  So that would be

---

32

1  gathering evidence.
2  Q   Okay.
3  A   Or gathering information.  So I'm not sure,
4      that's why I'm struggling with understanding
5      what you're looking for.
6  Q   Okay.  So I guess that's helpful so beyond kind
7      of reaching out to the complainant and asking
8      them to submit a questionnaire, is there any
9      other fact gathering that the Human Rights
10     Commission would do before it's decided to
11     docket a complaint?
12         MR. KENISON-MARVIN:  Same objection.
13     Scope.
14 A   Not generally.
15 Q   Okay.  Thank you.  You can set both of those
16     aside.
17 A   I put them over here.
18 Q   You already did it.  Great.
19     I'm going to direct your attention to
20     Exhibit 56.
21     So I'd just ask you to review Exhibit 56,
22     Assistant Director Cohen, and let me know when
23     you've done your review.

---

**33**

1    While you review that, Assistant Director
2    Cohen, so as to not hide the ball what I'm going
3    to be referring you to and asking you about is
4    the text that's highlighted on page 28 of
5    Exhibit 56, HRC-00392.  So I just wanted to
6    highlight that before you review, and just let
7    me know when you've completed it.
8  A   Okay.
9  Q   So what is Exhibit 56?
10 A   Exhibit 56 appears to be the New Hampshire
11    Commission for Human Rights Commissioners'
12    Meeting minutes from October 7th, 2021.
13 Q   Okay.  And on the bottom of page 2, on the page
14    Bates stamped HRC-00392, there is a sentence
15    that states, "Assistant Director Burke Cohen and
16    Director Malachi explained that the likely
17    inspiration was that there have been instances
18    in which information has been presented in
19    trainings in K through 12 classrooms that states
20    directly and/or impliedly that inherent traits
21    establish a person's inferiority/superiority."
22    Do you see that language?
23 A   I do.

---

**34**

1  Q   Is that an accurate reflection of what was
2    stated during the October 7, 2021, HRC
3    Commissioner's meeting?
4    MR. KENISON-MARVIN:  Objection.  Scope.
5  A   I can say that it's in the meeting minutes.
6  Q   Do you recall this being stated during the
7    October 2021 meeting?
8  A   I do not recall specifically.
9  Q   Do you know what's being referenced on page 2
10    when the document states that the inspiration
11    was that there have been instances in which
12    information has been presented in trainings and
13    K through 12 classrooms that states directly
14    and/or impliedly that inherent traits establish
15    a person's inferiority/superiority?
16    MR. KENISON-MARVIN:  Same objection.
17 A   Answering personally, and looking at the
18    document, it says in the first paragraph, I mean
19    in that earlier paragraph the impact of HB 2.
20 Q   Um-hum.  There's a reference here to, quote,
21    "have been instances" on page 2 of this exhibit.
22    Do you recall with any specificity what those
23    instances are that are referred to?

---

**35**

1    MR. KENISON-MARVIN:  Same objection.
2  A   Answering from my personal recollection, no.
3  Q   Okay.  You can set that aside.
4    I recognize that the limits of your
5    testimony here are kind of with respect to HSA
6    354-A:29-34 so that's what I'm going to be
7    referring to in this next series of questions,
8    but my question is do you know what types of
9    instruction that has occurred in New Hampshire
10    that the amendments in RSA 354-A:29-34 were
11    intended to ban?
12    MR. KENISON-MARVIN:  Objection.  Scope.
13    Vague.
14 A   Could you ask that question again, please?
15 Q   Sure.  I guess what I'm trying to figure out is
16    could you identify, are you aware of any
17    instruction that occurred by an educator in New
18    Hampshire before the enactment of the amendments
19    that would have violated the amendments had the
20    amendments been in effect during that time of
21    instruction?
22    MR. KENISON-MARVIN:  Same objections.
23 A   No.

---

**36**

1  Q   Okay.  I'm going to move on to just some of the
2    complaints now that I know are in the topics of
3    Exhibit 59.  So I'm just going to direct your
4    attention, if you go back, Assistant Director
5    Cohen, to Exhibit 59?  I'm trying to find a way
6    to streamline this so we're not here all day.
7    So if you look at the Schedule A to Exhibit 59?
8    (Discussion off the record)
9    (Recess taken 10:57 - 11:01 a.m.)
10 Q   Thank you, Assistant Director Cohen.  I'm going
11    to direct your attention to Exhibit 59 and in
12    particular on the Schedule A at the bottom of
13    page 1 of the Schedule A on to page 2 of the
14    Schedule A there are a list of kind of
15    complaints as defined in that Schedule A made
16    under the amendments based on at least my review
17    of the documents that have been produced by the
18    Human Rights Commission.
19    So my question to you is are the complaints
20    that are listed on the bottom of page 1 and 2 in
21    the Schedule A the complete list of complaints
22    or allegations of discrimination that have been
23    made under the amendments to the Human Rights

---



37

1      Commission?

2  A    Yes.

3  Q    Okay.  Are you aware of any other complaints or

4      allegations of discrimination made under the

5      amendments that are not listed on pages 1 and 2

6      of the Schedule A in Exhibit 59?

7  A    No.

8  Q    Okay.  Thank you.  You can set that aside.

9          Now what I'm going to do is pull out a few

10      documents, and this is with respect to the ████

████████████  complaint so just bear with me for one

12      moment.

13          MR. BISSONNETTE:  Would you mind, Nate,

14      pulling out Exhibit 32?

15  Q    So I'm going to have you review 32 along with a

16      new exhibit that we are going to mark as Exhibit

17      62.

18          (Exhibit 62 marked for identification)

19  Q    I just want to make sure everyone is settled

20      with respect to Exhibits 32 and 62.  I'll let

21      Nate get settled here.

22          MR. KENISON-MARVIN:  Go for it.

23  Q    Assistant Director Cohen, I'm just going to have

38

1      you review Exhibit 32 and Exhibit 62 ███████

███████████████████████████████████████████

███████████████  , and I'd ask

4      you to review both of those exhibits and just

5      let me know when your review is complete.

6          (Discussion off the record)

7  A    I'm ready.

8  Q    Assistant Director, Cohen have you reviewed

9      Exhibit 62 and 32?

10  A    I have.

11

39

1

12  Q    Can I interrupt you?  I want to be very clear

13      that here are you testifying on behalf of the

14      Human Rights Commission.

15          MR. KENISON-MARVIN:  As to the specific

16      order as to what you did next I would take the

17      position that HRC is not here to be deposed

18      about each specific item in response to a

19      complaint.  I don't think that was contemplated

20      that level of specificity.

21          MR. BISSONNETTE:  You can respond how you

22      see fit.

23

40

1



41

12  A    Answering from my personal knowledge of
13        generally how charges are drafted, there is a
14        template form obviously for the charge part of
15        it with filling in the boxes.
16  Q    Um-hum.
17  A    And then using information supplied by the
18        complainant, the intake coordinator drafts the
19        charge of discrimination for the complainant's
20        review.

42

8   A    Complaints are formally docketed by the
9        Commission upon receipt of a verified, signed
10        and verified charge.

43

44



47

2  A    So every investigator has a caseload of 25.
3       When they finish up a case, it's a continual 25
4       cases, they get a new case assigned.

8        As I previously testified, the intake
9    coordinator is the keeper of the cases that are
10   unassigned.



49

1

15

50

1

18     MR. KENISON-MARVIN:  Recognizing you don't
19   want to lose momentum, there's a part of the
20   back of my brain thinks if we take a quick break
21   right now we could get past this.
22     MR. BISSONNETTE:  Okay.
23     MR. KENISON-MARVIN:  At the risk of

51

1     potentially that not working out.  Let us review
2   it real quick.
3          (Recess taken 11:26 - 11:31 a.m.)
4     (Requested portion read back by court reporter)
5  Q    We're back.  Thank you.  I'm going to withdraw
6   the last question and just reask it just for the
7   clarity of the record.
8

52



53

1

55

1

4  Q    I don't want to get into the nature of that

5       meeting, but I do want to know whether it's

6       typical for the Department of Justice to be

7       consulted when an allegation of discrimination

8       is made under 354-A generally.  How typical is

9       it?

10          MR. KENISON-MARVIN:  Objection.  Scope.

11       You can answer.

12  A    It really depends on the complexity of the case.

54

1

56



57

59

I have kind of two kind of
6    cleanup questions on process that I neglected to
7    ask, and then we'll go through the rest of the
8    complaints.
9        With respect to on Exhibit 1, the
10   amendments that have been challenged in this
11   case, with respect to RSA 193:40 on the page
12   Bates stamped 006 to 007, I believe your
13   testimony earlier was you're not familiar with
14   that section; is that correct?
15  A    Not familiar.  Have I read it before, yes.  Am I
16   familiar with it, not particularly.
17  Q    Is it the Department of Education that's tasked
18   with enforcing those provisions?
19       MR. KENISON-MARVIN:  Objection.  Scope.
20   Calls for legal conclusion.  You can answer.
21  A    It appears that is what RSA 193 does.
22  Q    Okay.  With respect to, now I'm going to turn
23   your attention to other provisions of Exhibit 1.

58

60

1    In particular, RSA 354-A:31 on page PL 0004.  Do
2    you see that?
3   A    Starts on line 36 of PL 0004?
4   Q    Yes.  And in particular the statute says no
5    public employer.  Do you see that language?
6   A    Yes.
7   Q    Is it correct that under RSA 354-A:31 it is only
8    a public employer and not an individual employee
9    that would be held liable under this section?
10       MR. KENISON-MARVIN:  Objection.  Scope.
11   Calls for legal conclusion.
12  A    Did you want me to answer?  Okay.
13  Q    Yes.  If you can.
14  A    I thought you didn't want me to answer.  I'm
15   sorry.  I was confused by that.  I'm sorry.  Now
16   we have to go back.
17  Q    Let me just ask it a different way.  I'm not
18   trying to trick you here.
19  A    No.
20  Q    What I'm trying to get at is under RSA 354-A:31,
21   can an individual public employee be sued?
22       MR. KENISON-MARVIN:  Same objection.
23  Q    Or is that statute limited to public employers?



61

1   That's really the question that I'm trying to
2   get at.
3        MR. KENISON-MARVIN:  Same objections.
4  A   It appears from the writing of 354-A:31 and the
5   definition of what a public employer means at
6   354-A:30 that a public employer includes the
7   state or any subdivision, does not include
8   individuals in that definition.
9  Q   Okay.  I'm going to move on now to some of the
10  other complaints.  Thank you, by the way.
11  ███████████████████████████████ It's going to require
13  Exhibit 14.
14       So I put before you, Exhibit 14, Assistant
15  Director Cohen.  Please do not read the entire
16  document because it is long, and I'm only going
17  to direct your attention to a few pages.
18  A   Okay.
19  Q   Exhibit 14 before you is an OpEd that I'll
20  submit to you in an effort to streamline things
21  an OpEd published by the Commissioner of
22  Education dated April 25th, 2022, and attached
23  to that OpEd hyperlinked in the OpEd are a

62

1   series of documents that the Commissioner put
2   together, and I'm going to direct your attention
3   to the following pages Bates stamped.  Okay?
4   And they start at PL 00714.
5  A   Um-hum.
6  Q   To 725.  I'd ask you to review those pages
7   quickly.  So it's 714 to 725 on Exhibit 14.
8  A   Okay.
9  ████████████████████████████████████████████

21       We're going to mark a new exhibit.  I
22  believe this is Exhibit 63.
23       (Exhibit 63 marked for identification)



11  Q    Okay.  I'm going to refer you back now to

12      Exhibit 14 that I know you had before you a few

13      minutes ago.  It's that thick document there.

14          I'm going to refer you to on Exhibit 14

15      which again just for the clarity sake in the

16      record is an OpEd that Commissioner Edelblut

17      published on April 2022 embedded within which is

18      are various attachments.  One of those

19      attachments I'm going to refer to is on PL 736

20      to 737.

21          My question is have you seen these two

22      pages before which is a worksheet with a circle

23      on it that talks about various identities and



69

1    another, this is for the record, and a worksheet

2    with the phrase "Diversity Bingo."

3        My question is have you seen those two

4    worksheets before?

5  A    I don't recall.

6 ▮

70

1 ▮

71

1 ▮

4  Q    Okay.  All right.  So we're going to move now on

5    to another complaint, and then we're going to

6    plow ahead.  I'm doing the ones that I'm likely

7    to ask more questions first.  Can we just pause

8    for one second?

9        (Discussion off the record)

10  Q    So before you, Assistant Director Cohen, I know

11    that you have I believe five exhibits, and I

12    think these all pertain to a complaint that was

13    submitted by ▮, and

14    so kind of in the interest of not hiding the

15    ball and just making sure that all the documents

16    are in one place, I just wanted to present them

17    all before you at once.

18        So I'm just going to kind of list off for

19    people on Zoom and for clarity in the record

20    just what these ▮ exhibits are and I'll

21    just go exhibit by exhibit.

22        So the first is an exhibit previously

23    marked as Exhibit 46 that's actually in this

72

1    instance produced by the Department of

2    Education, and at the bottom of Exhibit 46 ▮

▮

▮.  That's Exhibit

6    46.

7        Exhibit 64 is the complete set of documents

8    that were presented by Ms. Borysenko in response

9    to a subpoena that was served in this case.

10    Those documents are Bates stamped Borysenko 01

11    to 17.

12        In addition, in Exhibit 65 I have a website

13    article published by Ms. Borysenko on August

14    19th, 2022.  Incidentally, that website is

15    referenced by Ms. Borysenko in Exhibit 46 in her

16    email to the Human Rights Commission dated

17    August 19th of 2022.

18        Exhibit 66 is an email chain Bates stamped

19    HRC 709 to 713 that ▮

▮

▮

▮.



73

1        And lastly, on Exhibit 67 is a series of
2    tweets from Ms. Borysenko published on Twitter
3    on or about August 19th, 2022, that I compiled
4    from Twitter reflecting what Ms. Borysenko said
5    publicly on Twitter concerning her complaint
6    that was submitted in August.
7

74

1
2   Q    Oh, okay.  How long were you on maternity leave
3        for?  Approximate dates if you don't mind me
4        asking.
5   A    July 14th through October 15th, we'll just say.
6   Q    Okay.  First, congratulations.
7   A    Thank you.
8   Q    I hope your child which would now be what, a
9        year?
10  A    Almost a year.
11  Q    Hope it's sleeping.
12  A    Mostly.  Mostly.
13  Q    I know the troubles there.  Nate and I were just
14       talking about that incidentally.  I recognize
15       you don't have personal knowledge.  You were on
16       maternity leave or parental leave at that time.
17       Do you recall though how the Commission
18       responded?  Do you have knowledge about how the
19       Commission responded to this complaint?
20  A

75

1
2

14

20

76

1



77

1

2          (Exhibit 68 marked for identification)

3   Q

79

1

78

80

8   Q     Okay.  You can set that aside.

9             (Exhibit 70 marked for identification)

10

20          (Exhibit 69 marked for identification)



81

83

14        (Exhibit 74 marked for identification)

21        (Exhibit 72 marked for identification)

82

1

14        (Exhibit 73 marked for identification)

84



85

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓
▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓
14  Q    Okay.  You can set it aside.
15        (Exhibit 75 marked for identification)
16             (Discussion off the record)
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓

86

1 ▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓
12        (Exhibit 76 marked for identification)
13 ▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓
▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓

87

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓
▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓
10         (Exhibit 77 marked for identification)
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓

88

1 ▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓
6         (Exhibit 78 marked for identification)
7  Q    Before you in Exhibit 78 is what I'm going to
8       call the ▓▓▓▓▓ complaint.  It's Bates stamped
9       HRC-977 to 988.
10        Now, this is kind of more of a complaint
11      against the law to some extent than anything
12      else, but I wanted to just ask you whether or
13      not Exhibit 78 is a complete reflection of how
14      the Human Rights Commission responded to the
15      concerns raised by Mr. ▓▓▓▓▓.
16  A    It appears to be.
17  Q    Okay.  You can set that aside as well.  One
18      minute, please.
19 ▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓



**89**

1 ▮▮▮▮▮▮▮▮▮▮▮▮

**91**

1 Q    So I'm going to start with Exhibit 4 which you
2      haven't yet seen in this case and this is an
3      OpEd that was published by the Commissioner of
4      Education in June of 2021 as this law was being
5      processed by the legislature.
6 A    Um-hum.
7 Q    You are welcome to read this entire thing and
8      you probably should, but I'm going to in
9      particular direct your attention to a paragraph
10     that talks about Ibram Kendi.  So why don't you
11     just read this OpEd and tell me when you're
12     done, and I'll direct your attention
13     specifically to the Kendi provision of the OpEd.
14     Okay?
15 A   Um-hum.  Okay.
16 Q    Have you seen Exhibit 4 before today?
17 A   I may have read it when it came out.  I don't
18     remember.
19 Q    Okay.  I'm just going to refer you, there's a
20     paragraph here about a book written by Dr. Kendi
21     in which Commissioner Edelblut quotes a portion
22     of that book with a quote being, "The only
23     remedy to racist discrimination is antiracist

**90**

1 ▮▮▮▮▮▮▮

10 Q    Okay.  It's fair then to say even before the
11     docketing which didn't occur in this instance
12     there was no engagement between the Human Rights
13     Commission and the School District, correct?
14 A   It appears that way from what you've presented
15     to me.
16 Q    Okay.  Let me just go over my notes.  I have a
17     couple questions.  Probably five minutes left.
18 A   If you want to go over your notes, I'm going to
19     go to the ladies room.
20         (Recess taken 12:51 - 12:57 p.m.)
21 Q    I'm going to put before you Exhibit 4 and
22     Exhibit 14.
23 A   Okay.

**92**

1      discrimination.  The only remedy to past
2      discrimination is present discrimination.  The
3      only remedy to present discrimination is future
4      discrimination."
5          So my question is if a teacher taught those
6      quoted sentences in a New Hampshire school, does
7      the Human Rights Commission have an opinion as
8      to whether or not that would violate RSA
9      354-A:29-34?
10         MR. KENISON-MARVIN:  Objection.  Scope.
11     Legal conclusion.  Vague.  You can answer from
12     your personal knowledge.
13 A   My personal knowledge would be you would have to
14     have an intake questionnaire.
15 Q    So I guess my question is -- I understand that.
16     I suppose if a teacher had this concern, you
17     know, hey, the Commissioner of Education wrote
18     this in an OpEd, I want to use this book and
19     teach this book, and they're concerned that
20     doing so may violate RSA 354-A:29 to 34, could
21     they call the Human Rights Commission and get an
22     answer to that question?
23         MR. KENISON-MARVIN:  Objection.  Scope.

93

1  A    The Human Rights Commission is open to answer
2       questions about the statute to either party to a
3       charge. Right? To either a complainant calling
4       with questions about whether they have a charge
5       or a respondent calling with questions about,
6       you know, the law itself.
7  Q    Sure. So if an educator called and said I want
8       to teach this book, I don't know whether it's
9       covered by the law or not, especially because
10      Commissioner Edelblut cited it in an OpEd, would
11      they be able to get an answer from the Human
12      Rights Commission as to whether or not teaching
13      that book would be covered under the law or not?
14          MR. KENISON-MARVIN: Objection. Scope.
15 A    In my personal opinion, there's a lot more to,
16      as you may know or may not know, when you're
17      teaching a course there's a lot more to whether
18      you're teaching a book or not teaching a book
19      and what goes along with that course. It's a
20      complicated question because you have to look at
21      the context of things. Are you mentioning the
22      book? I mean, there's a lot to it. You know,
23      that's what I'll say.

94

1  Q    Sure. So I guess I'll try to put a finer point
2       on it because we have in Exhibit 4 three
3       sentences that the Commissioner of Education
4       cites as being potentially problematic.
5          So if a teacher taught the following
6       sentences in a classroom, quote, "the only
7       remedy to racist discrimination is antiracist
8       discrimination, the only remedy to past
9       discrimination is present discrimination, the
10      only remedy to present discrimination is future
11      discrimination," if that was taught in a public
12      school would that violate RSA 354-A:29 to 34?
13          MR. KENISON-MARVIN: Objection, scope.
14 A    I'm not sure I would. People call and ask
15      us advice about the law there's a fine line
16      between us telling them what the law says and
17      giving them legal advice. I could not give a
18      teacher or complainant legal advice on whether
19      them teaching that would make a charge or not.
20 Q    Okay.
21 A    That would be something they would have to talk
22      to an attorney about.
23 Q    Okay. You can set that aside. I'm going to

95

1       refer you now to Exhibit 14.
2          So on Exhibit 14 I'm just going to refer
3       you to what's listed as Topic Eight, PL 741 to
4       745. This is a chapter of a book by Tiffany
5       Jewell, Chapter 10. The book is called This
6       Book is Anti-Racist. I would submit to you that
7       it's for 11 to 15 year olds. And I'd also
8       submit to you that it's a book that was
9       referenced by the Commissioner of Education with
10      respect to the amendments during a July 2021
11      Board of Education meeting.
12          So my question to you is if an educator in
13      light of the Department of Education's reference
14      to this book had a concern about whether the
15      teaching of this book violated RSA 354-A:29-34,
16      your recommendation would be that they would
17      reach out to District Counsel as to get an
18      answer as to whether or not this complied with
19      the law?
20 A    Correct.
21 Q    Any other recommendation for an educator wanting
22      to know whether or not teaching this book would
23      violate the law?

96

1          MR. KENISON-MARVIN: Objection. Scope.
2       106.
3  A    What?
4          MR. KENISON-MARVIN: Rule of completeness.
5       You can answer.
6  A    I would suggest that the educator read the law,
7       read the FAQs that are available as well as the
8       opinion issued by the Attorney General's office.
9  Q    And what if they after reading the law, reading
10      the FAQ, and reading the September 21 AG opinion
11      still had questions about whether certain
12      instructions were covered, what would that
13      educator do?
14          MR. KENISON-MARVIN: Same objection on
15      scope.
16 A    I would suggest they contact their legal counsel
17      for legal advice.
18 Q    Okay. You can set those aside.
19          MR. BISSONNETTE: Attorney Kahne, I'm done
20      with my examination.
21              EXAMINATION
22 BY MR. KAHNE:
23 Q    I'm sorry I'm doing this virtually, Assistant

97

1    Director Burke Cohen.  It's better to be there
2    in person, but hopefully, I'll ask Gilles to
3    assist me with some of the documents.  There
4    shouldn't be very many documents, and I also
5    shouldn't be very long.  So I think we can do
6    this pretty efficiently if that's okay.
7  A   Okay.
8  Q   My name is David Kahne.  I am an attorney for
9    the American Federation of Teachers.  In this
10    lawsuit the same rules that Gilles went over
11    with you will apply to my questioning.  Do you
12    understand that?
13  A   I do.
14  Q   Okay.  There's a few areas I'd like to ask you
15    about, some of which you covered with Gilles.
16    I'd just like to ask a few followup questions.
17    The first is the process about docketing
18    complaints.  If I understand your testimony
19    correctly, allegations of discrimination that
20    are brought to the HRC can become a docketed
21    complaint; is that right?
22  A   Yes.
23  Q   And they become a docketed complaint after there

98

1    has been a finding that the prima facie elements
2    of discrimination have been met?
3    MR. KENISON-MARVIN:  Objection to scope.
4    Go ahead.
5  A   Personally, from my personal experience, yes.
6  Q   Okay.  And after there is a docketed complaint,
7    is it your testimony that after that occurs then
8    a factual investigation takes place?
9    MR. KENISON-MARVIN:  Objection, scope.  You
10    can answer.
11  A   Yes.  An investigation occurs after -- I'm
12    sorry.  Not directly after.  Once an
13    investigator is assigned to the case, an
14    investigation commences.
15  Q   Okay.  And you testified that you previously
16    were an investigator; is that right?
17  A   I was.
18  Q   Okay.  And so I'm interested in your describing
19    the investigation process and particularly in
20    the context of public schools.
21  A   Okay.  From my personal experience as an
22    investigator, if you've reviewed our Commission
23    rules you can see what tool kit, like tools we

99

1    have available to us.
2    So an investigation starts with often we
3    request information in our notice letter from
4    the respondent which is their answer to the
5    charge as well as any affirmative defenses that
6    they are putting forward.
7    From there we ask for additional
8    information as we need it.  We interview
9    complainants or witnesses or respondents
10    depending on the case and depending on the fact
11    pattern.  It's hard to make a generalized
12    outline of what an investigation looks like
13    because I don't know the facts of each specific
14    case.
15    But generally speaking, collect
16    information, documentation, that may or may not,
17    you know, help with the case, right?  Sometimes
18    you get documentation from parties that is not
19    super helpful, but we also use our tools of
20    interviewing people so that we can gather that
21    information and make a recommendation to the
22    Investigating Commissioner.
23  Q   And as part of that investigation has it, in

100

1    your experience, has it been contacting school
2    principals?
3  A   In my experience, yes, that can be part of an
4    investigation.
5  Q   How about contacting district superintendents?
6  A   It can be part of an investigation.
7  Q   Are there any protocols in place as to when a
8    superintendent should be contacted?
9    MR. KENISON-MARVIN:  Objection.  Scope.
10  Q   Or is it at the discretion of the investigator?
11    MR. KENISON-MARVIN:  Same objection.
12  A   It would be -- again, each case is different.
13    No case that we have is the same.  So it would
14    be sort of at the discretion of the
15    investigator.  You can see that how that's
16    outlined in the rules.  The investigator
17    determines the relevancy of interviews with
18    parties, interviews with witnesses, and
19    collection of documents.
20    So if a superintendent was part of that
21    case fact pattern and needed to be contacted for
22    investigation, that would happen.  Generally by
23    the time a case is assigned to an investigator,

---

**101**

1    the respondent is represented by counsel.  So
2    any contact with the school would be through
3    counsel.
4  Q    Do investigators contact other state agencies in
5    your experience during the investigation phase
6    like the Department of Education?
7  A    I suppose it could.  We could.
8  Q    Who makes the ultimate determination as to
9    whether or not a complaint gets docketed?
10       MR. KENISON-MARVIN:  Objection.  Scope.
11  A    The ultimate decision essentially would be from
12    the Executive Director, I mean, but with the
13    caveat on that of it's determined by whether
14    there's jurisdiction of the Commission.  If
15    there is a prima facie case, it is docketed.  If
16    there is not a prima facie case, then it's not
17    docketed.
18  Q    But the determination as to whether or not
19    there's been as prima facie case is made by the
20    Executive Director?
21  A    I mean, that would be the ultimate decision
22    maker.  Yes.
23  Q    Are allegations of discrimination referred to

---

**102**

1    the HRC from other state agencies?
2       MR. KENISON-MARVIN:  Objection.  Scope.
3  A    In my experience they can be, yes.
4  Q    And under what circumstances have you had
5    complaints referred to the HRC?
6  A    In my experience, we have had complaints
7    referred from the New Hampshire Employment
8    Security Office for employment-related
9    complaints that they receive from their clients
10    during unemployment filings, and we've received
11    them on occasion from the Department of Labor as
12    well.
13  Q    How about from the Department of Education?
14  A    We have received referrals from the Department
15    of Education.  Generally we ask that the
16    referring agency tell the person to contact us
17    directly.
18  Q    So generally that's what you do, but there have
19    been instances in which the Department of
20    Education has referred cases to the HRC?
21       MR. KENISON-MARVIN:  Objection.  Scope.
22  A    So when cases are referred to us from any
23    agency, we generally tell the agency to suggest

---

**103**

1    to that person that they contact us directly.
2  Q    Has there been a case that the HRC opened where
3    the Department of Education simply referred it
4    the HRC without an individual filing an intake
5    questionnaire?
6       MR. KENISON-MARVIN:  Objection.  Scope.
7  A    I'm not sure.  For my personal experience.
8  Q    You spoke earlier about your client service
9    representative, right?
10  A    Yes.
11  Q    I'm not familiar with that so can you explain,
12    the client service representative is an attorney
13    at the Department of Justice; is that right?
14  A    That is correct.
15  Q    Is there one particular attorney that's assigned
16    to the Human Rights Commission?
17  A    Yes.
18  Q    Who is that attorney?
19  A    During the time period of these, during the time
20    period of this, I guess the complaints that
21    we've discussed today, we've had two client
22    service representatives.  Assistant Attorney
23    General Jill Perlow and Assistant Attorney

---

**104**

1    General Sean Locke.
2  Q    And who is the person from HRC that decides
3    whether to consult with your client service
4    representative?
5  A    That would be the Director.
6  Q    Are there policies/procedures in place for when
7    that request should be made for a consultation?
8       MR. KENISON-MARVIN:  Objection.  Scope.
9  A    No specific procedures, no.
10  Q    So in this particular case, Attorney Bissonnette
11    was referring to the ███████ complaints.  Do
12    you remember his series of questions about that?
13  A    I do.
   ████████████████████████████████████
   ███████████████████████████████
   █████████████████████████████████████
   ████████████████
19  Q    Okay.  And you said that the reason that you did
20    so was because, I believe this is your
21    testimony, that it was a relatively new
22    statutory amendment; is that right?
23  A    That is correct.

105

1  Q    Is it because you were looking for clarity on
2        how to apply the new amendments?
3            MR. KENISON-MARVIN: Objection. Scope.
4  A    I would say yes.
5    [REDACTED]

[REDACTED lines 6-23]

106

[REDACTED lines 1-19]

20  Q    Are there any processes or procedures, written
21       processes or procedures involved describing how
22       a complaint under the new amendment could be
23       referred to the HRC from the DOE?

107

1            MR. KENISON-MARVIN: Objection. Scope.
2  A    I believe there is something on their website.
3        Well, it's not referred from -- I believe there
4        is a page on their website that tells people how
5        to file a complaint with the Commission, the
6        HRC.
7  Q    In your view was there -- shortly after the
8        passage of the amendments, in your view was
9        there confusion amongst the public as to where
10       to file a complaint?
11           MR. KENISON-MARVIN: Objection. Scope.
12       Calls for speculation. Vague. You can answer.
13  A   In my opinion, I suppose.
14  Q    Why do you say that?
15           MR. KENISON-MARVIN: Same objections.
16  A   Because I believe it was in the newspapers, the
17       press.
18  Q    Aside from the [REDACTED] complaint, am I correct
19       that there was one other complaint that Attorney
20       Bissonnette referred to where you also consulted
21       your client services representative?
22           MR. KENISON-MARVIN: Objection. Scope.
23  A   Without you specifying, I'm not --

108

1  Q    You don't recall?
2  A    Sorry. No.
3  Q    How often do you consult with the DOJ regarding
4        allegations of a complaint that come into the
5        HRC?
6            MR. KENISON-MARVIN: Objection. Scope.
7  A    In my experience, you know, it really depends on
8        the complexity of the complaint or other issues
9        that may be involved in a complaint that we are
10       not specialists in. For example, I can use, my
11       example would be bankruptcy cases. We have
12       respondents that are bankrupt sometimes. I am
13       not a specialist in bankruptcy. Neither is
14       anyone on my staff. So we consult with the
15       Attorney General's office to understand what
16       Chapter 11, Chapter 9, and how that relates to
17       our ability to investigate a case.
18  Q    Does it also have to do with the complexity of
19       the law that you're applying?
20           MR. KENISON-MARVIN: Objection. Scope.
21  A   In my opinion, I would say yes.
22   [REDACTED]
[REDACTED]





**109**

1 [redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]

**110**

1 [redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
16 Q    That question does not appear on all of the
17      intake questionnaire forms that I have reviewed.
18      I'll represent that to you.  Do you know whether
19      that question was added to the intake
20      questionnaire form?
21          MR. KENISON-MARVIN:  Objection.  Scope.
22      Completeness, 106.
23          MR. KAHNE:  What's the completeness

**111**

1      objection?
2          MR. KENISON-MARVIN:  Putting all the
3      documents that relate to your question that
4      you're making representation --
5 Q    Okay.  Then Let's look at the Borysenko intake
6      questionnaire if you don't mind, Gilles.
7          MR. BISSONNETTE:  That's going to be
8      Exhibit 64.  So just for the record, everyone,
9      we're now referring to the one of the Borysenko
10     exhibits.  Exhibit 64, Bates stamped 000011.
11 A   Okay.
12 Q    So if you compare those two documents, the
13     Borysenko intake questionnaire?
14 A   Um-hum.
[redacted]
[redacted]
[redacted]
19 Q    Okay.  Do you have any knowledge as to why that
20     question was added to the questionnaire?
21          MR. KENISON-MARVIN:  Objection.  Scope.
22 A   I don't recall sitting here right now.
23 Q    Do you recall anything about that question?

**112**

1          MR. KENISON-MARVIN:  Objection.  Scope.
2 A   I mean, I would have added the boxes, but I
3      don't have any memory of why we put it on there
4      or what the purpose was.
5 Q    Okay.  And when you added the boxes, NH DOE
6      refers to, I assume, the New Hampshire
7      Department of Education?
8 A   That is my assumption as well.
9 Q    Okay, and so you would have added that for the
10     complainant to indicate whether they filed a
11     complaint with the New Hampshire Department of
12     Education.  Is that fair?
13          MR. KENISON-MARVIN:  Same objection.
14 A   Yes.
15 Q    What would the nature of that complaint be if
16     you know?
17          MR. KENISON-MARVIN:  Same objection.
18 A   I assume the nature of that complaint would be
19     under whatever the part of the statute that was
20     added that's under what, RSA 193?
21 Q    Okay.  Do you have any recollection whether, I
22     should say, I don't, based on the, we'd have to
23     look at the dates, but do you have an

---

113

1    understanding as to whether or not it was added
2    or deleted from the intake questionnaire.
3        MR. KENISON-MARVIN:  Same scope objection.
4        MR. BISSONNETTE:  If it would assist the
5    witness, I would just say that the current
6    version of the questionnaire is Exhibit 60.
7  A    Okay.  Thank you.
8  Q    Thank you, Gilles.
9        MR. BISSONNETTE:  Yes.
10 A    So it appears that it was deleted using Exhibit
11     60 as the current iteration.
12 Q    Does that refresh your recollection as to why it
13     was deleted from the intake questionnaire form?
14 A    I don't know why it was deleted.
15 Q    Have you had any conversations with Commissioner
16     Edelblut about the amendments?
17 A    No.
18 Q    How about Richard Farrell?
19 A    No.
20 Q    You testified to a conversation that you
21     understand Commissioner Malachi had with
22     Investigator Farrell about one particular
23     complaint.  Do you know whether Commissioner

---

114

1    Malachi has had other conversations with
2    Investigator Farrell about other complaints?
3  A    Director Malachi?  And Investigator Farrell?  I
4    do not know.
5  Q    Do you know how frequently she speaks with the
6    Department of Education?
7  A    I do not know.
8  Q    You testified, Attorney Bissonnette went through
9    some of the complaints and asked whether or not
10   certain content would violate the statute.  I
11   think you testified in sum and substance that it
12   would depend on certain circumstances.
13       My question is does the HRC have any
14   guidance as to whether any particular
15   educational materials violate RSA 354?
16       MR. KENISON-MARVIN:  Objection to scope.
17 A    I would say the guidance we have was issued by
18   the Attorney General's office in his opinion and
19   our FAQ on the statutes.
20 Q    Do you know whether anyone at the HRC uses the
21   Attorney General's opinion or the FAQs?
22       MR. KENISON-MARVIN:  Objection to form.
23 A    Uses it for what?

---

115

1  Q    Applies it to complaints that come in through
2    the complaint process.
3  A    Yes.
4  Q    Do you have any particular examples of that?
5  A    I do not.
6  Q    Do you know why the HRC requested that the
7    Attorney General issue an opinion on the
8    amendments?
9        MR. KENISON-MARVIN:  Objection.  Scope.
10 A    I do not specifically, no.
11 Q    Does the HRC have any obligation to notify the
12   Department of Education when there's been a
13   docketed complaint?
14 A    No.
15 Q    How about when there's been a finding of
16   probable cause for discrimination?
17 A    No.
18 Q    Ultimately, do the Commissioners vote once a
19   complaint has gone through the docketed
20   complaint phase, there's been an investigation,
21   there's an Investigative Commissioner, can you
22   just take me through the process after there's
23   been a docketed complaint what else has to

---

116

1    happen?
2        MR. KENISON-MARVIN:  Objection.  Scope.
3    Vague.
4  A    In accordance with RSA 354-A, if you read the
5    statute, the way the Commission's process works
6    is an Investigating Commissioner following the
7    investigation makes a finding of either probable
8    cause or no probable cause.  If a case is found
9    to be no probable cause, it is dismissed with
10   appeal rights.  If the case is found to be
11   probable cause, it moves on in the process
12   towards the public hearing.  In between the
13   public hearing and moving it from probable cause
14   to public hearing, the parties meet for a
15   conciliation and a prehearing, and then it moves
16   to public hearing.  After probable cause is
17   found, both parties have the ability to remove
18   the case to Superior Court.
19 Q    When Attorney Bissonnette showed you Exhibit 1,
20   he asked you a question about who the, I don't
21   know if it's respondent or charged party,
22   typically is in these cases, and you looked at
23   the definition of public employer and saw that

---

117

1    it listed counties, cities, towns, precincts,
2    districts, school administrative units, et
3    cetera, and you said that it appeared from the
4    text of the statute that that's who the, it was
5    a prohibition on public employers.
6        Aside from the text of the statute, in
7    these cases have you ever seen a case that was
8    not brought against one of these entities?
9        MR. KENISON-MARVIN:  Objection.  Scope.
10   Vague.
11 A   In the text -- I'm sorry.  Can you clarify that
12   question?
13 Q   Yes.  So you were looking at 354-A:31?
14 A   Yes.
15 Q   Which is the prohibition on public employers.
16 A   Okay.
17 Q   And I believe the question was regarding who the
18   charged or responding party is in these cases.
19 A   Correct.
20 Q   And your testimony was that it lists who the
21   public employers are, and I'm just asking in
22   your experience has it been the case in these
23   cases that the charged party is school

118

1    districts, school administrative units or
2    quasi-public entities?
3 A   ████████████████████████████████████████████
████████████████████
5 Q   How about allegations of discrimination?
6 A   The intake inquiries have been generally from
7    the documentation the School Districts with the
8    exception I think as I recall one is naming the
9    Commissioner of Education directly.
10 Q   Are you aware of a bounty that was put on
11   teachers by Moms for Liberty as a result of the
12   passage of the amendments?
13       MR. KENISON-MARVIN:  Objection.  Scope.
14 A   I am.
15 Q   And what is your understanding of that?
16       MR. KENISON-MARVIN:  Same objection.
17 A   My understanding is whatever was, I think it was
18   WMUR had an article on it.  So I believe, my
19   understanding is that this group put a bounty
20   for and would pay for a docketed charge.
21 Q   Did you have any conversations with anyone at
22   HRC about that article?
23 A   Maybe.  I don't remember specifically.

119

1 Q   Just give me a couple more seconds here.  Okay.
2    I think that's all I have.
3        MR. KENISON-MARVIN:  I think I might have a
4    few quick followups, but I need to run to the
5    restroom quickly.
6        (Recess taken 1:37 - 1:53 p.m.)
7        MR. KENISON-MARVIN:  First, before I do one
8    quick area of followup, I just wanted to put on
9    the record our right to read and sign and
10   reserving that.
11       MR. BISSONNETTE:  Yes.  So we've agreed
12   that hopefully we can get it done shorter than
13   the 30-day deadline because of briefing
14   purposes.  Okay.  Thank you.
15       MR. KENISON-MARVIN:  I don't think we have
16   a final agreement as to date because we'll work
17   to get that done in accordance with the briefing
18   date.
19       MR. BISSONNETTE:  So long as it's a few
20   days before the briefing deadline.
21       MR. KENISON-MARVIN:  That's our intention.
22              EXAMINATION
23 BY MR. KENISON-MARVIN:

120



18 Q   Okay.  I don't have anything else.
19       MR. BISSONNETTE:  Okay.  I'm good if
20   Attorney Kahne is good?
21       MR. KAHNE:  I'm good.
22       MR. BISSONNETTE:  Okay.  Thank you.
23          (Deposition ended at 1:54 p.m.)

121

```
 1         I have carefully read the foregoing
 2      deposition, and the answers made by me are true.
 3
 4
                        _____
 5                          SARAH BURKE COHEN
 6
 7
 8  STATE OF _____
 9  _____, SS.
10
11         At_____on the
12  _____ day of _____ A.D.
13  2023, personally appeared the above-named SARAH BURKE
14  COHEN and made oath that the foregoing answers
15  subscribed by her are true.
16                              Before me,
17
18
19
                        _____
20                          Notary Public
21
22
23
```

123

```
 1              E R R A T A
 2         I, the undersigned, SARAH BURKE COHEN, have read
    the transcript of my deposition held on June 26,
 3  2023, in the matter of Local 8027, AFT-New Hampshire,
    et al v. Frank Edelblut, Commissioner, et al, and the
 4  same is true and correct, to the best of my
    knowledge, with the exception of the following
 5  changes noted below, if any:
 6  PAGE/LINE   CORRECTION AND REASON FOR CORRECTION
 7  _____
 8  _____
 9  _____
10  See attached sheet(s) for additional information:
11  ___Yes___No
12                        _____
                             SARAH BURKE COHEN
13
14  STATE OF _____)
                        ) ss.:
15  COUNTY OF _____)
16
         Subscribed and sworn to before me this _____ day
17  of _____, 2023.
18
19                        _____
                             Notary Public
20
    My commission expires:
21
    _____
22
23
```

122

```
 1              C E R T I F I C A T E
 2         I, Cynthia Foster, Registered Professional
 3  Reporter and Licensed Court Reporter, duly authorized
 4  to practice Shorthand Court Reporting in the State of
 5  New Hampshire, hereby certify that the foregoing
 6  pages, numbered 7 through 120, are a true and
 7  accurate transcription of my stenographic notes of
 8  the deposition of SARAH BURKE COHEN who was first
 9  duly sworn by me on June 26, 2023, for use in the
10  matter indicated on the title sheet, as to which a
11  transcript was duly ordered;
12         I further certify that I am neither
13  attorney nor counsel for, nor related to or employed
14  by any of the parties to the action in which this
15  transcript was produced, and further that I am not a
16  relative or employee of any attorney or counsel
17  employed in this case, nor am I financially
18  interested in this action.
19
20
21                          Cynthia Foster, LCR
22
23
```



1    I have carefully read the foregoing

2    deposition, and the answers made by me are true.

3

4

5                                    SARAH BURKE COHEN

6

7

8    STATE OF New Hampshire

9    Merrimack            , ss.

10

11            At Merrimack County on the

12    21st   day of July            A.D.

13    2023, personally appeared the above-named SARAH BURKE

14    COHEN and made oath that the foregoing answers

15    subscribed by her are true.

16                              Before me,

17

18

19

20                    Notary Public

21

22    Kelly A. Mederos, Esq
      Notary Public, State of New Hampshire
23    My Commission Expires December 21, 2027

# EXHIBIT 7

# Declaration of
NEA-NH President
Megan Tuttle

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.

    Plaintiffs,

     v.

FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.

    Defendants.

-------------------------------------------------------------------------

Civil No. 1:21-cv-01077-PB

ANDRES MEJIA,
CHRISTINA KIM PHILIBOTTE, and
NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,

    Plaintiffs,

     v.

FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,

JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,

AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,

CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights,

KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,

    Defendants.

## DECLARATION OF MEGAN TUTTLE

  I, Megan Tuttle, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Merrimack County, New Hampshire.

2.      I am the President of NEA-NH, a union of more than 16,000 public school educators, the majority of public-school employees in the state.

3.      Prior to becoming president, I was a middle school social studies teacher in New Hampshire.

4.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

5.      I am offering this Declaration in my capacity of President of NEA-NH.

6.      In the wake of George Floyd's May 25, 2020 murder, many New Hampshire educators have engaged in professional development opportunities to enhance their skills to teach both (i) to Black, Indigenous, Hispanic, Asian, and other students from historically marginalized groups, and (ii) about the experiences and perspectives of those groups.  This not only includes the decision of the Manchester, Exeter Region Cooperative, Concord, and Oyster River school districts to hire diversity, equity, and inclusion professionals, but it also includes educators themselves exploring how they can adjust their teaching methods to provide a more inclusive education.

7.      For example, in 2020, Misty Crompton, a member of the Plaintiff NEA-NH and an educator who teaches in Derry, was awarded the prestigious Christa McAuliffe Sabbatical from the New Hampshire Charitable Foundation for her project called "Promoting Just Schools."   The sabbatical, created in 1986 in honor of the Concord High School teacher and astronaut, gives one exemplary New Hampshire teacher a year off with pay and a materials budget to bring a great educational idea to fruition. Ms. Crompton's project focused on educational equity—namely, levelling the playing field for students by recognizing how identity, race, and culture of students and teachers play out in the classroom.

8.      Since the passage of the Banned Concepts Act, we have received information from our members that they are confused about what is and is not permissible under the law.

9.      On two occasions, I wrote to the Attorney General and the Department of Education on behalf of our members asking for specific examples of texts, curriculum, instruction, or other materials which our members could no longer teach.  I received no response from either the DOJ or the DOE.

10.     On September 13, 2021, Irv Richardson—the Coordinator for Public Education and School Support for the NEA-NH—also asked the Human Rights Commission in an email whether the HRC "had someone … who might provide further clarification on the [Act] and answer questions from educators using a virtual platform."  He added in the email to the Human Rights Commission that "our next conference [is] scheduled for October 8th but this topic is so important, we can accommodate any time that would be convenient for the presenter you recommend."  The HRC did not respond to this email or accept this speaking invitation.

11.     By virtue of their membership in NEA-NH, members receive access to extensive professional development programming.  The Act by its vague nature has made it impossible for NEA-NH to provide meaningful professional development about the Act to its members despite demand from its membership to do so.

12.     One particular source of confusion is that while the Act was being considered, there were no examples offered of materials, lessons, books, or instruction that were actually being taught in New Hampshire that would be outlawed by the Act. Without these examples, and due to the lack of concrete information offered by the DOJ, DOE or HRC, our members have nothing they can compare their own actions to in order to understand if they may be violating the law.

13.     We encouraged members to ask their school administration for assistance with training and clarifying the law. However, we have found that school administration also does not know what is impermissible under the law and therefore cannot provide this necessary training or guidance.

14.     I also hear from members that they are nervous about violating the law because they don't want to be investigated by the Department of Education and they don't want to lose their teaching licenses.

15.     Since the Act was passed, I have heard of a marked increase in stress of our members worried about licensure actions and parent complaints.

16.     The climate created by the Act- one of uncertainty and fear- has led to deep frustration by our members who cannot understand why the enforcement agencies will not assist them in not violating the law.

17.     Since the Act passed, I have heard from numerous members that they feel targeted, scared, and that they are considering leaving the profession.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of July, 2023

/s/ Megan Tuttle
Megan Tuttle

# EXHIBIT 8

Declaration of
AFT-NH President
Deb Howes

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. <br>    Plaintiffs, <br>      v. <br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. <br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| ------------------------------------------------------------------------- | )  Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, <br>CHRISTINA KIM PHILIBOTTE, and <br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, <br>    Plaintiffs, <br>      v. <br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, <br>JOHN M. FOMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, <br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, <br>CHRISTIAN KIM, in his official capacity <br>only as the Chair of the New Hampshire Commission for Human Rights, <br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, <br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## <u>DECLARATION OF DEBRAH HOWES</u>

I, Debrah Howes, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      My name is Debrah Howes.  I am the President of the American Federation of Teachers-NH ("AFT-NH").  AFT-NH represents 3,500 teachers, paraeducators and school support staff, public service employees, and higher education staff across New Hampshire.

2.      Prior to serving as President of AFT-NH, I was a reading and math intervention teacher with the Nashua Public School District since 2003.  I spent 17 of those years teaching at the same school in Nashua, Amherst Street School, a K-5 Elementary school receiving Title 1 support, where between 62 and 78% of the families meet federal poverty guidelines in any given year and many students are English Language Learners.  According to US Census data, the majority of the students enrolled at Amherst Street School are from recognized minority groups, with Hispanic being most numerous. Amherst Street School also serves a number of refugee families from Africa and Asia.

3.      I first heard of a proposed bill HB544, a bill that would ban teaching on and discussion of certain divisive concepts related to sex and race (among other things) from public schools in January of 2021.  At the time I was Vice-President of AFT-NH and active with our Legislative Committee, which follows legislation that could have an impact on the day-to-day work of our members.

4.      Our first analysis of the legislation was that the bill, if it passed, would be extremely problematic. The language was hopelessly vague and, among other things, it prohibited teaching or discussions that explicitly or implicitly taught that any race or sex was superior to another or inferior to another or even made someone feel guilty about their race or sex.  The bill only had three sponsors out of 400 members of the NH House, which is not many. In a year when a new state budget needed to be written and more than 600 other bills needed to be heard and considered, we were not sure this was anything more than an extremist reaction to

the widespread calls for more and better discussion, including in public schools, about longstanding racial inequities in our country and systemic racism that were brought to mainstream attention by the death of George Floyd and the Black Lives Matter protests in the summer of 2020.

5.      When it came to the public hearing – held over zoom because vaccines were still not available to most – I was astonished to hear claims from a small group of supporters of the bill, who claimed that kids were being taught to hate themselves for being white and that schools were teaching students they could not be friends with people of other races and that kids were coming home in tears because of it.  This is not what we do in New Hampshire public schools!  I know because I teach in one and I lead a union of teachers and paraeducators who work in other schools across the state! Let me be clear: in my experience, I have never seen or heard of any of these things happening at the school where I worked, or in the Nashua public schools.  Nor have any of the members of AFT-NH seen it, done it, or heard of it happening.

6.      The public hearing on HB544 overwhelmingly consisted of people speaking *against* the adoption of the "Divisive Concepts" bill including teachers, university professors, faith leaders, community leaders even business leaders. We thought this bill would be put to rest because it was simply not actually happening in our public schools, but also was a really badly worded piece of legislation which left educators unsure of what exactly they could and could not talk about in the classroom. When the bill was tabled by the House instead of passed, we believed that would be the end of the legislation.  However, the bill language was inserted within the massive annual budget, without further hearings, which was then passed.

7.      When the budget including the "Divisive Concepts" language was signed into law on June 25, 2021, I had recently become president of AFT-NH after the sudden death of our

previous President (who was also a NH legislator.)  Members were concerned about what the "Divisive Concepts" language would mean in practical terms for them.  From my own colleagues there were questions about how to approach teaching the necessary background knowledge for students to understand a biography of Harriet Tubman commonly read by 5th graders.  How much can you explain about the conditions of slavery and its impact on our country before you would break the law? Could we still read "The Story of Ruby Bridges" in 2nd or 3rd grade?  How about "Martin's Big Words?"  These books require honest and factual conversations about US history with students, so they have sufficient background to understand the events in the story including what segregation was, how it hurt people and that there were some people who fought to keep it from ending.

8.      A 2nd grade teacher in another AFT-NH local wanted to know how they would teach about Native Americans and still be honest about the historical facts. A middle school teacher wondered if she could still assign a classic American novel "To Kill A Mockingbird." How careful would she have to be about the conversations she was having around it and what a student might subjectively infer?

9.      A high school teacher wondered if the newly adopted law requiring the teaching about the Holocaust was in conflict with the new "Divisive Concepts" law. A member who teaches high school in another district was concerned that the "Divisive Concepts" language would be used to eliminate the ability of teachers to express support for LGBTQ students by designating their classrooms as a safe or welcoming place because expressing any support could lead to an inference that you are discriminating against others.

10.     With the law newly in effect, but most schools on summer recess, I joined other education leaders in July 2021 in asking NH Commissioner of Education Frank Edelblut for

clarification on what exactly we were allowed to teach, say and do in the classroom and in school and what would run afoul of the new law.  His response was that there would be a frequently asked questions ("FAQ") document that would clarify everything. That FAQ put out by the NH Department of Education, NH Department of Justice and the NH Commission on Human Rights repeated much of the same vague language from the bill without really clarifying it. We could teach history and current events, but if a student or parent ever felt that the lesson or teacher was directly stating or even somehow implying that the student was racist, sexist, or anti-LGBTQ then the teacher could be disciplined: up to and including loss of license.  It is this subjective nature of what a student infers, or at a further remove, what a parent who isn't even in the classroom, infers about a lesson or classroom discussion (even what a teacher may be implying) that makes this hard to clearly define and incredibly frustrating.

11.    These subjective inferences from students and parents not only impacts what happens in the classroom under the law, but it also impacts extra-curricular activities. The FAQs made clear that the "Divisive Concepts" bill applies to extra-curricular activities and, in fact, all teacher speech when interacting with students.  Teachers interact with students throughout the day in innumerable touchpoints – in hallways, on sports fields, in after-school clubs, traveling to competitions, in teachers offices and in a myriad of other ways.  The bill broadly reaches all discussions in all of these every day activities.

12.    I surveyed the AFT-NH locals to find out what advice they were getting from their district administration on handling "Divisive Concepts" as school was getting ready to reopen for fall of 2021.  Most were not hearing anything from their district administration.  One district administration did have a legal presentation from a law firm that handles education cases. They were advised that if their curriculum guide was available so parents could exercise their opt

out rights for students, and if they were thoughtful about what they said in spontaneous conversations in response to events or to other student remarks and tied things back to content that is covered in the curriculum, they should be within the boundaries of the law.  Yet, in another district, teachers were advised to take down all classroom rainbow flags and signs that stated "You Are Welcome Here."  The lack of clear, uniform guidance was creating disparity between the working and learning conditions in different New Hampshire school districts.

13.    Knowing that most of my members started the school year with no guidance, other than those FAQs, on how to handle this "Divisive Concepts" law, I started planning a virtual Town Hall on the topic for October.  I invited Commissioner of Education Edelblut to come have talk about the law and answer members questions about what they could and could not teach.  Commissioner Edelblut declined the invitation.  He referred us to the FAQs, which he called "straightforward and clear" and offered to meet one on one with any member who wanted to discuss individual circumstances.  We had our Town Hall without him. While we weren't able to add any clarification from the NH Department of Education, we did have informative presentations on First Amendment Rights and their limits under the US and NH Constitutions as well as similar "Divisive Concepts" laws that were showing up in other states.  Members were able to share their experiences from the first 6 weeks of school.  Mostly members expressed some level of concern that they might be perceived by a student or parent as crossing a line because of an inference, especially because that line had not been made clear.

14.    By far the biggest fear was that the "Divisive Concepts" law would be weaponized – that the same people who showed up at our school board meetings calling teachers, school administrators and school board members "child abusers" for having students wear masks during the COVID pandemic, would now be coming after teachers because they

somehow thought we had made a student feel labeled as racist, sexist or anti-LGBTQ. And that is more or less what happened.  An online extremist group "Moms for Liberty" Hillsborough County (NH) offered a $500 reward for the first person who caught a teacher violating the "Divisive Concepts" law.  Another group called "No Left Turn" reported teachers to the Department of Education for signing a pledge to teach "honest" history.

15.     The day after the Moms for Liberty "bounty," the NH Commissioner of Education announced he was adding a page to the NH Department of Education website to make it easier for parents, students, families, other teachers  or even members of the public to report teachers for what they consider violations of this law.  AFT-NH had been looking at challenging the legality of the "Divisive Concepts" law, but adopting a wait and see attitude while it rolled out until the webpage encouraging complaints was put up.  At that point we decided that it was time to move forward with the lawsuit challenging the law before our members started losing their jobs for doing something no one could clearly define or give examples of, and that rested mostly on subjective perceptions of what someone might have meant.

16.     Since the commencement of the lawsuit, in my role as President of the AFT-NH, I have been made aware that members have been complained about simply for promising to teach "honest" history and for trying to make their classrooms inclusive for all.  Without clear guidance, the "Divisive Concepts" law has operated as a black cloud over educators, who are fearful that its vague language will be weaponized for political purposes.  It has chilled their ability to have open discussions in their classrooms and to teach and prepare our New Hampshire public school students to be critical thinkers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023.

*/s/ Debrah Howes*

Debrah Howes

# EXHIBIT 9

# Declaration of
# Plaintiff John Dube

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. <br>        Plaintiffs, <br>              v. <br> FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. <br>        Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| ------------------------------------------------------------------------ | )   Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, <br> CHRISTINA KIM PHILIBOTTE, and <br> NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, <br>        Plaintiffs, <br>              v. <br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, <br> JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, <br> AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, <br> CHRISTIAN KIM, in his official capacity <br> only as the Chair of the New Hampshire Commission for Human Rights, <br> KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, <br>        Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DECLARATION OF JOHN DUBE

I, John Dube, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I was a U.S. History teacher in New Hampshire public schools for 38 years.  For 34 of those years, I taught in the Timberlane School District.

2.      Most recently, I was a high school history teacher at Timberlane Regional High School, teaching U.S. History and Advanced Placement (AP) U.S. History.

3.      From 2000-2005, I was the History Department Chair at Timberlane Regional High School.

4.      Throughout my career I worked on writing the U.S. History curriculum, both for Timberland Regional High School as well for the entire district.

5.      As a history teacher, I have always encouraged my students to debate and learn, to inquire and analyze, and to learn from our history and compare it to our current world circumstances.  History is about patterns and parallels.

6.      Allowing students to debate topics such as woman's suffrage, affirmative action, reparations and the criminal justice system is vital to understanding the impact of our nation's past on our present.  It is also instrumental in fostering critical thinking for our students and creating a full and robust exchange of ideas in our classroom.

7.      Shortly before and after HB2 ("the Divisive Concepts Law") was passed in June 2021, I read about the legislation in some of the local news outlets.  Needless to say, I was troubled.

8.      I also reviewed the language of the statute, and the prohibited concepts, which I continue to find hopelessly vague.  It seemed to me that the statute is a "word salad."   I did not understand (and still do not understand), what is and is not prohibited.

9.      I did not receive any clarifying guidance from my school district as to what could and could not be taught in my U.S. History courses after the Divisive Concepts Law was passed.

10.     Yet, the consequences of such a difficult to understand and abstract law, particularly without appropriate clarifying guidance on what content is proscribed, are very concrete for public school teachers in New Hampshire.

11.     For me, and teachers like me teaching U.S. History, a vague statute like the Divisive Concepts Law, and the risk of potentially losing my license, has chilled important discussions of in the classroom.

12.     In the Spring of 2021, because I felt the new law hindered my ability to teach U.S. History as I had for 38 years, I signed an online petition created by the Zinn Project that was circulated to me in which I promised to teach "honest" history.

13.     By the start of the next school year, I learned that a political group in New Hampshire published the names of all of the teachers in New Hampshire who had signed the pledge.

14.     Shortly thereafter, I was subject to severe online harassment, threats and obscenities.

15.     For example, I received a text message that read "Whats up homo? I heard your teaching Marxist commie CRT in your classrooms…You can fuck right off you garbage human!"

16.     Facebook posts directed at me contained similar obscenities and threats.

17.     Shortly after Labor Day, the Plaistow Police Department came to my house. They were sent by the FBI in response to the threats I was receiving.  The Police Department explained that right-wing groups had been targeting the teachers who signed the online pledge.

18.     The Police Department sent patrols by our house periodically for a few weeks, and we were forced to install security cameras and safety equipment at our home in light of the threats.

19.     My wife and I feared for our personal safety, particularly because my wife works from home.

20.     I finished the 2021-2022 school year at Timberlane Regional High School, but decided to retire at the end of the year, despite feeling that I have more to give to my students.

21.     In light of the Divisive Concepts Law and the climate of political intimidation created by it, I did not feel I could teach in New Hampshire any longer.

22.     I also did not feel I could live in New Hampshire any longer.  My wife and I moved to another community in Vermont.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023

_____
                    */s/ John Dube*
                        John Dube

# EXHIBIT 10

Declaration of
Kamren Munz

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.<br>　　　　　Plaintiffs,<br>　　　　　　　v.<br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.<br>　　　　　Defendants.<br>------------------------------------------------------------------------<br>ANDRES MEJIA,<br>CHRISTINA KIM PHILIBOTTE, and<br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,<br>　　　　　Plaintiffs,<br>　　　　　　　v.<br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,<br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,<br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,<br>CHRISTIAN KIM, in his official capacity<br>only as the Chair of the New Hampshire Commission for Human Rights,<br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil No. 1:21-cv-01077-PB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF MX. KAMREN MUNZ

I, Mx. Kamren Munz, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      My name is Mx. Kamren Munz. I am a New Hampshire resident and taught in

Nashua, New Hampshire as an art educator for eleven years, from 2011-2022.

2.      Elm Street Middle School in Nashua was my home for eight out of my 11 total

years teaching. I loved my job and was a proud public educator. During my tenure at Elm Street I

created and advised the Photography Club, created and advised the Pride Squad Club, was an

assistant Softball Coach for five years, painted two murals in the school, and volunteered my

time on various committees.  I worked closely with the school administration, guidance

departments, and my fellow educators to do the best I could to support all of my students.

3.      In 2017, I was awarded Nashua's Art Educator of the Year Award by the Nashua

Education Foundation.

4.      Following passage of HB2 ("the Divisive Concepts Law") in 2021, teaching

became painfully scripted, lacking in the "teachable moments" that educators dream of.  It was,

quite frankly, terrifying.  In my view, the politicized atmosphere created by the Divisive

Concepts Law, and its severe consequences for educators, has damaged the relationship between

public educators and the communities they serve.

5.      The effects are felt heavily in the classroom.  In my experience, students see and

hear guardians at home challenging educators' professionalism and curriculum, contributing to

an astronomical increase in student disengagement, disrespect, and apathy. Student behavior has

driven educators and students alike to feel uninspired, unheard, and unsafe. The lack of educator

support is palpable.

6.      After the passage of the Divisive Concepts Law, I felt like I was taking a risk as a

transgender educator whenever I introduced myself to students, staff, or community members

saying, "Hi, my name is Mx. Munz. My pronouns are they/them".  Not many middle school

students, or adults, know that "Mx." is a gender neutral title.  In the past, I would use students'

questions asking "What is Mx.?" to facilitate discussion and create teachable moments about

gender neutral pronouns.  Some middle school students, and adults, lacked an accurate education

on using singular "They" (despite it being Merriam-Webster's 2019 Word of the Year).  Again,

teachable moments typically occurred through this discussion.

       7.     In March 2022, despite the fear in schools created by the Divisive Concepts Law,

I handed out my ungraded, not-mandatory, "Welcome to Art!" get-to-know-you form to my

classes, as I usually did. This form asked what students were excited to learn in Art class, what

their favorite medium in Art is, something good that happened recently, and other similar

questions.

       8.     In addition to asking students' "name" as it appears on their student account, the

form also asked the name they would like me to call them in class, and their pronouns.  I had

started each of my classes this way for the previous four years, about 430 students per year, with

zero complaints (and only thanks from students, guardians, and staff).

       9.     Yet, on March 31, 2022, I was pulled into my Principal's office to discuss an

email sent by a parent angered that I was "inquiring [about] students' pronouns."  In the email,

my title Mx. was placed in parentheses.  I immediately thought that this person intended to be

disrespectful and transphobic.

       10.    Around the same time, this same parent posted on social media, along with a

screenshot of her email, "We picked a bad generation to start WWIII…they can't even fight

anxiety from being called by the wrong pronoun."

11.     I felt threatened professionally and personally.  Around this time I was also aware that the "Mom's for Liberty" NH group had a $500 "bounty" they would pay for anyone who was successful in "catching" an educator breaking the Divisive Concepts Law.

12.     After the meeting with my Principal, in April 2022, I found out that someone had supplied Commissioner Edelblut with my teaching materials.  The materials contained my name, pronouns, the subject I teach, and a picture of me (an introduction I gave to my students, and emailed to adults at home).

13.     Commissioner Edelblut included these materials, along with materials from other educators across the state, in his op-ed article, *Education's Sacred Trust*. The op-ed included damaging accusations like, "activist educators who might be knowingly dismantling the foundations of a value system," and "squanders the credibility of the profession as a whole."

14.     In what I perceived as a direct criticism of me, Edelblut wrote, "Parents of students taking an art class should have a reasonable expectation that they will be learning about, well, art. They should not be concerned, as occurred in another New Hampshire classroom, that the introduction to art will begin with a lesson in pronouns…"

15.     This article can still be found on the NH Department of Education website with an attached word document containing teaching materials, including mine.  The document has a photo of me (with my face obscured, but not my tattoos or other personally identifiable information).

16.     My last name was redacted, but my title Mx. and my pronouns were displayed. This outs me as a Trans educator to anyone who happens upon this article painting me in a very negative light.  My identity can easily be determined whether or not my name appears.  In the

state of New Hampshire I am likely the only Art teacher, with the title Mx., they/them pronouns, and certainly the only one at Elm Street in Nashua with a full forearm tattoo (which was pictured in the op ed).  In addition, every other educator's full name, including title, in the op-ed was redacted.  I could not help but think that the Commissioner's decision to keep my title listed was deliberate.

17.     I finished the school year feeling disrespected, afraid, and targeted after giving all of myself to Nashua's students for over a decade.

18.     Because of these events, after serving the Nashua School District as a full time Art Educator for 11 years, I decide to resign in July 2022.  The decision to resign was not made lightly.  The state of public education in New Hampshire has led me to seek employment out of the classroom entirely.  I left teaching feeling squeezed out by the actions of trans/homophobic individuals that were given a social and political platform to question my professionalism, reputation, and cause fear for my profession and my person because of the Divisive Concepts Statute and the politically charged environment it created.

19.     Today, I still fear for my safety and I am still negatively impacted emotionally, despite no longer being a NH Public Educator.

20.     Laws like the Divisive Concepts Law written to directly undermine an educator's ability to educate truthfully is disastrous to a functioning society and to Trans educators like me, trying to teach inclusion and tolerance for all in the classroom.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023



Mx. Kamren Munz

# EXHIBIT 11

# Declaration of
Alison O'Brien

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) |
|           Plaintiffs, | ) ) |
|           v. | ) |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) |
|           Defendants. | ) |
| ------------------------------------------------------------------------ | ) |
| ANDRES MEJIA,<br>CHRISTINA KIM PHILIBOTTE, and<br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) |
|           Plaintiffs, | ) |
|           v. | ) |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) |
|           Defendants. | ) |

Civil No. 1:21-cv-01077-PB

## <u>DECLARATION OF ALISON R. O'BRIEN</u>

I, Alison R. O'Brien, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Rockingham County, New Hampshire.

2.      I am a high school Social Studies teacher at Windham High School in Windham, New Hampshire. I teach College Preparation American Studies ("C.P. Am. Studies") and Advanced Placement United States History ("AP US History").  I have been a teacher for 14 years, the past 9 of which have been at Windham High School.

3.      I am a member of NEA-NH and the Windham Education Association.

4.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

5.      I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.

6.      I have been directly impacted and harmed by the Banned Concepts Act. In the spring of 2022, I was subject to an "investigation" by the New Hampshire Department of Education into one of the lessons I taught to my 10th grade C.P. Am. Studies class.

7.      On April 19, 2022, the Social Studies Department Director (my direct administrative supervisor) and the English Department Director ("the Directors") came to my classroom to inform me that a parent had complained to a Windham School Board member that I had shown a video that was, in their opinion, "offensive" and that my class focused too much "on the oppression of just one group and was not a balanced view of history." The school board member had contacted the Superintendent's office. The Social Studies Department Director was also the acting Assistant Superintendent and had come to discuss the lesson with me as part of her investigation into this complaint.

8.      The parent complaint concerned two music videos that I showed: "Formation" by Beyoncé (I only show a section of this video) and "This is America" by Childish Gambino. I assumed the parent complained that I had violated the newly passed Banned Concepts Act given the comments made about the focus I was placing on "oppression" of one group.

9.      I show these videos as part of a unit on the Harlem Renaissance. In the same lesson we also listen to Strange Fruit by Billie Holiday, read poetry, and study paintings by Harlem Renaissance artists. I then ask students if they see any connections between these two modern music videos and the art and culture of the Harlem Renaissance. We explore their analysis as a class.

10.     In this lesson I tell students that the point of the exercise is not to decide if we agree or disagree with the message of the artist, nor do I require them to agree with the message. Instead, students are asked to look for historical connections between these modern artists and those of the Harlem Renaissance.

11.     Using modern examples of artists that students are aware of helps them to make connections to historical events such as the Harlem Renaissance in a manner that is relevant to them so they can better understand, analyze, and critique the information. This technique is known as Semantic Encoding as it gives the students a frame of reference to understand the historical context. Throughout my career I have used this technique with many other materials as it helps students be successful.

12.     I have received praise for using these techniques in formal administrative observations and in feedback from numerous students. This technique is also supported by the New Hampshire Curriculum Framework for Social Studies. Specifically:

a.  SS:HI:3: World Views and Value systems and their Intellectual and Artistic Expressions includes SS:HI:12:3.2: which states that students will "[a]nalyze how the arts and science often reflect and/or influence major ideas, values and conflicts of particular time periods, e.g., the impact of the Enlightenment on the founding of our nation or the Harlem Renaissance. (Themes: A: Conflict and Cooperation, E: Cultural Development, Interaction, and Change, A0: Human Expression and Communication)";

b.   SS:HI:12:3.3: which states that students will "Critique how the art, music and literature of our nation have been influenced by groups, e.g., the Spanish colonists in the Southwest or the 60s counter culture movement. (Themes: E: Cultural Development, Interaction, and Change, A0: Human Expression and Communication)"; and

c.  SS:HI:12:3.4: which states that students will "Analyze the spread of American ideas and culture around the world using examples, e.g., the Bill of Rights or popular music. (Themes: B: Civic Ideals, Practices, and Engagement, E: Cultural Development, Interaction, and Change, F: Global Transformation)".

13.     When they inquired about the videos, I explained the lesson to the Directors and neither said I had violated the Banned Concepts Act. They said they did not intend to do any further investigation or issue any discipline.  My impression from the meeting was that they both

understood the point of the lesson and respected the teaching technique.  I was not directed to cease teaching the lesson nor was I told to stop showing the particular material. At that point I believed there would be nothing more that would come of the complaint.

14.     Around 12:15 p.m. that same day, I was visited by the Windham High School Assistant Principal ("A.P.") while I was teaching my class. I was asked to leave the class to speak with him in the hall. This is a conspicuous event which students and staff members take note of when it happens, particularly when it interrupts instruction. The Assistant Principal asked me if I had shown the "This is America" music video to the class. He showed me his phone which had a text message showing and the link to the music video had been texted to him. I did not see who the text was from.

15.     I told the Assistant Principal that I had met with the Directors that morning on the same issue and asked if he would speak with them as I wanted to return to my ongoing class, which had been left without instruction as I had been so suddenly removed.

16.     While I was teaching another class later in the day, I was summoned to the Principal's office. I received this call around 1:45 pm and our school day ends at 2:17 pm. When I asked if I could come down at the end of the day instead so I could finish the instruction, I was told no, I had to come immediately and that the Assistant Principal was coming to cover my class. Again, this is a conspicuous event which was not lost on my students or colleagues who observed it.

17.     Both the Principal and the Social Studies Department Director were there when I arrived. They told me that the SAU office had been contacted by Richard Farrell, an Investigator from the Department of Education who conveyed that he was "investigating" me based on complaints the Department had received from parents regarding the two videos.

18.     Since the Social Studies Department Director was also the Assistant Superintendent, she had spoken to Investigator Farrell when he called the office of the Superintendent. Investigator Farrell asked her if she had read Commissioner of Education Frank Edelblut's most recent Op Ed in the *New Hampshire Union Leader.*[1]  He told her "she might want

---

[1]Commissioner Edelblut authored an Op-Ed called "Education's Sacred Trust" on April 15, 2022 where he criticized "activist educators who might be knowingly dismantling the foundations of a value system [parents] are attempting to build," provided 68 pages of "actual instructional material from New Hampshire schools that parents have identified as conflicting with their values," and said the materials demonstrated "biases [which] are beginning to seep into our own institutions."

to look at it so she could understand the context of his investigation." She had brought a copy of the Op Ed to the meeting for me to look at.

19.     As I had already provided the background information about the videos to the administration, the purpose of the meeting appeared to be to tell me I was being "investigated" by the Department, to relay Investigator Farrell's comments to me about the Commissioner's Op-Ed, and to give me a copy of the Op-Ed.

20.     I felt confused and concerned when I heard the Department of Education Investigator was investigating my teaching lesson. I was confused because I did not believe I had taught anything contrary to the Act, or the Educator Code of Conduct broadly, and yet the Department was taking an active interest in my actions. I didn't understand what I could have done wrong that would have necessitated an investigation. I was concerned because I know that the Department has the ability to take action which can lead to revoking my teaching license.

21.     This episode became known to my fellow teachers at the High School. It is extremely rare for a teacher to be interrupted three times throughout the day by administrators. Prior to them knowing the substance of the complaint, my colleagues certainly knew something serious was going on.

22.     My colleagues later learned that the Department was investigating my actions. I had multiple colleagues tell me they did not want the same thing to happen to them and that they were scared it would.

23.     One colleague decided not to show a clip from a popular TV show because she did not want to face the same kind of scrutiny and stress that I had faced.

24.     Another teacher was looking to incorporate some modern data about how race impacted business practices in a relevant course and decided against it due to this incident.

25.     Ultimately, even though this episode was very disruptive to my work and personal life, and caused me much concern and stress, I never heard anything more from the Department of Education.  The Department of Education never formally opened an investigation and I later learned this was just a "background inquiry" that was done prior to a formal investigation being opened. I was never told directly that I was not being "investigated."

26.     The Department of Education never made a public statement or retraction of the original statement that I was being "investigated."

27.     The Department of Education never clarified for me, the administration, or my colleagues what might have been the specific cause for concern.

28.     I was left to only make assumptions as to those concerns. This means that to this day, I don't know if I could be subject to investigation again regarding teaching this same lesson.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of July, 2023


*/s/ Alison R. O'Brien*
Alison R. O'Brien

# EXHIBIT 12

# Declaration of
Patrick Keefe

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. ) ) ) ) ) ) )

Plaintiffs, )

v. )

FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. ) ) ) ) ) ) ) )

Defendants. )

------------------------------------------------------------------------ )

ANDRES MEJIA,
CHRISTINA KIM PHILIBOTTE, and
NATIONAL EDUCATION ASSOCIATION-NEW
HAMPSHIRE, ) ) ) )

Plaintiffs, )

v. )

FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, ) ) )

JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, ) )

AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, ) ) )

CHRISTIAN KIM, in his official capacity
only as the Chair of the New Hampshire Commission for Human Rights, ) ) )

KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, ) )

Defendants. )

Civil No. 1:21-cv-01077-PB

## DECLARATION OF PATRICK KEEFE

I, Patrick Keefe, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Merrimack County, New Hampshire.

2.      I am a high school teacher at Campbell High School in Litchfield, New Hampshire. I teach Advanced Placement English Literature and Composition ("AP English"), Honors Senior English, and Grade 9 English.  I have been a teacher for 22 years.

3.      I am a member of NEA-NH and the Litchfield Education Association.

4.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

5.      I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.

6.      I have been directly impacted and harmed by the Banned Concepts Act (the "Act") as I have been forced to change my teaching practices for fear that it might violate the Act.

7.      As an AP English teacher my course is designed to prepare students for college level courses and also the Advanced Placement Exam which focuses on reading, analyzing, and writing about imaginative literature, poetry, and drama.  As they read, students consider a work's structure, style, and themes as well as its use of figurative language, imagery, and symbolism. Writing assignments include expository, analytical, and argumentative essays that require students to analyze and interpret literary works.

8.      AP English teachers select literary works that require students to read and evaluate complex text by identifying, analyzing, and applying those aforementioned literary devices as well as a plethora of other literary elements. The AP exam does not require students to have read any specific texts, but certain literary texts are often present on the exam.

9.      In recent years I have assigned *Heart of Darkness* by Joseph Conrad. This is a well-known literary work which often shows up on the AP exam.  It has been equally criticized and celebrated for its depiction of race and 19th Century European imperialism. It remains a staple of AP and college English courses not only in the United States but across Europe.

10.     AP English and Composition requires students to also study poetry. Because of its thematic similarity to *Heart of Darkness*, I also assign *The White Man's Burden,* a poem by

Rudyard Kipling. This poem was written and takes place in the same time period as *Heart of Darkness* and shares similar themes such as colonialism, imperialism, and racism.

11.     Reading these works together is a good opportunity for students to think analytically about language, imagery, symbolism, and theme within the works. They can also practice analytical skills by comparing and contrasting the works and critiquing them.

12.     Before the Banned Concepts Act, in order for students to practice the skills they would see on the AP exam, I would ask them to take argumentative positions, write persuasive essays, and critique the author's style and substance.

13.     Both of these writings have long histories of being critiqued which serve to inform students of how these works have been perceived through the lens of history and by various other cultures. Students could be successful in this assignment not by taking a particular position, but by showing analytic skill, persuasive writing, and thorough research. However, I cannot ask students to explore the notion of white supremacy in Kipling's *The White Man's Burden*, why he wrote it, what he may have been thinking, what his motivations were, or explore his perspective, because doing so could easily be misconstrued as teaching, instructing, inculcating or compelling my students to express belief or support for either Kipling's white supremacist ideas and writings. Conversely, condemning his writing also seems fraught since it requires first explaining why he thought what he did and in doing so, my comments could be misconstrued to be excusing or explaining away his racist views.

14.     I assign *Heart of Darkness* and *The White Man's Burden* because they often appear on the AP exam but recognize that given the time period and setting they depict, they may not feel particularly relevant to students in 2023.

15.      Prior to the Banned Concepts Act I would have asked students to draw on things they saw in the news, popular culture, or their own experiences and use these frameworks to inform their analysis. I do this because the state standards require students to be able to write about experiences (both their own and others), understand different cultures and experiences other than their own, and critically examine the information they receive in the media every day.[1] However, I am concerned about doing that now.

16.      For example, a technique I might have used in the past in the unit on *Heart of Darkness* and *The White Man's Burden* is to ask students to identify and analyze contemporary forms of imperialism, colonialism, and/or racism. However, in light of the Act, I am no longer comfortable asking students to freely identify instances of racism or colonialism, or the movements opposing those ideologies, in contemporary society for fear that it will be perceived that I am teaching that these ideas or movements opposing them are either good or bad or somehow correct or incorrect or an answer I am requiring them to give.

17.      I have the same concerns with another classic book I assign. *Beloved* by Toni Morrison is a fictional account of an African American woman's experience as an enslaved person and her life afterward. The theme of the book is how the destructive legacy of slavery impacts this character.

18.      Prior to the Act's passage, a technique I would use while assigning this book would be to ask students to identify whether the legacy of slavery is evident in the modern world. Could they connect any of the characters' stories to their own experiences or observations?

19.      Given the Act's restrictions, I feel less comfortable placing these books in a contemporary framework and asking students, for example, if they think the Black Lives Matter movement could be considered a result of the destructive legacy of slavery or asking, "does the legacy of slavery continue and if so, how?" The Act keeps me from engaging in that discussion

---

[1] Common Core State Standards For English Language Arts & Literacy in History/Social Studies, Science, and Technical Subjects. https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-ela.pdf Accessed July 21, 2023. *See also*: Ed306.37 English/Language Arts and Reading Program.
    (c)  "Pursuant to Ed 306.27, the local school board shall require that an English/language arts program in each high school provides":
        (2) "Opportunities for students to develop proficiency and control in the use of language, an appreciation of a variety of literary forms, <u>an understanding and appreciation of various aspects of past and present cultures as expressed in literature</u>, and interests for lifelong learning";
        (4) Systematic instruction and activities designed to enable students to:
           (k):  Develop study skills which contribute to academic success, such as using the dictionary, note taking, locating information, <u>distinguishing good sources of information from bad sources, and applying information in solving of real-life problems.</u>(emphasis added).

because I know it could easily be misunderstood as me "requiring" students to agree with the question I have posed or that there is a "correct" answer to my question. Some students will understand that I am simply "throwing it out there" for discussion while others may go home and say "my teacher told us BLM is good because it is counteracting the effects of slavery."

20.     Our students need to learn critical thinking skills such as taking in material, analyzing it, finding their own conclusions, and then formulating and defending an argument based on their conclusions. I don't tell my students what to think because that is not teaching.  I hope they will formulate their own arguments and draw their own conclusions. But in the wake of the Banned Concepts Act being passed, my job is more challenging because I am concerned a complaint will be made to the state that I have attempted to indoctrinate my students to the notion that white people are inherently racist. I do not believe this to be true in the least, but the Act is written so that any contemporary investigation of race invites a claim the Act has been violated.

21.     I fear my students are losing valuable analytical training and will be ill-prepared at the college level if they cannot practice generating their own opinions on challenging works from our past and connecting them to their world today.

22.     I have found that the Act is particularly limiting because parents and students misunderstand instruction techniques, such as using the Socratic method, playing devil's advocate, or seemingly agreeing or disagreeing with a student in order to draw out analytical thinking.This misunderstanding of how teaching works and the authority of what I say while teaching is very limiting for me because it means a parent could easily misunderstand a classroom exercise and file a complaint based on their perception of what I have said.

23.     I have also served as the union president for my local teacher's union for the past three years. In this capacity, I had asked our administration for more professional development on how teachers and professional staff should avoid violating the Banned Concepts Act and I was told there was none available other than the Attorney General's Frequently Asked Questions.


 I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st  day of July, 2023


*/s/ Patrick Keefe*
Patrick Keefe

# EXHIBIT 13

# Declaration of Plaintiff Christina Kim Philibotte

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.
        Plaintiffs,
        v.
FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.
        Defendants.

---------------------------------------------------------------------------

ANDRES MEJIA,
CHRISTINA KIM PHILIBOTTE, and
NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,
        Plaintiffs,
        v.
FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,
JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,
AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,
CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights,
KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,
        Defendants.

Civil No. 1:21-cv-01077-PB

## DECLARATION OF CHRISTINA KIM PHILIBOTTE

I, Christina Kim, Philibotte, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Merrimack County, New Hampshire. I grew up in Manchester and graduated from West High School.[1]

2.      I am the Chief Equity Officer for the Manchester School District, which is the largest and most diverse school district in New Hampshire.  Approximately 49% of the District's students were of color as of the 2021-2022 school year.[2]  I am the first person to hold this position, and I started in July 2021.  The Manchester Board of School Committee approved my position on June 28, 2021—three days after the Amendments went into effect.

3.      This position was created following robust community engagement, and this creation was part of the Manchester School District's February 2020 strategic plan. This position was crafted to help ensure that—especially given the disproportionate rates of graduation, reading and math proficiency, as well as suspension rates among students of color—institutional systems are created that support and rectify the hardship that many of students of color experience because of systemic racism.[3] As stated in the February 2020 strategic plan, the goal was to do the following:

> Hire an Equity Director to Oversee Alignment of All Equity Work—This role would prioritize the district's focus on issues of diversity, equity, and inclusion (DEI). This is a cross-cutting role that will support work across the entire organization. The director would work to coordinate multiple coherent streams of DEI work across the system including aligned professional development, curricular support, disciplinary actions, hiring and retention of people from diverse backgrounds throughout MSD, and systems improvement, as well as grant-funded projects. A key focus would be to adopt tools, resources, and concepts within MSD that bring an equity lens.

4.      One of the goals of my position is to train teachers and faculty to understand the needs of students of color and those with marginalized identities.  This effort is aimed at creating a more culturally fluent teaching staff so that this staff can better connect with their learners.  This

---

[1] *See also* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum; *see also* Manchester Proud, "Champion Spotlight: Tina Philibotte, MSD Chief Equity Officer," https://www.manchesterproud.org/champion-spotlight-tina-philibotte/.

[2] *See also* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html ("The school district's population of 12,400 students is split almost equally between Whites and minorities.").

[3] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum ("Manchester's overall test scores are lower than the state average. According to analysis by the community group Manchester Proud, scores for low-income, Black and Latino students are even lower — in some cases, half of the average Manchester score.  Dropout rates are also higher in the district, as are detention and suspension rates for students of color and students with disabilities. Many families of all ethnic backgrounds are disconnected from school.").

effort reinforces the creation of a sense of belonging for these students where these students would now feel more connected to, and better represented in, the books they read and the discussions they have in the classroom.

5.      In my role, I am taking proactive steps to tackle important equity issues, including the need to create frameworks to engage and enhance student voice, as well as improve family engagement.  This engagement helps make sure that students feel like they are agents in their own learning.

6.      The Manchester School District—along with School Administrative Unit ("SAU") 16—are the first school districts in New Hampshire to have full-time DEI administrators.  Two additional DEI administrators have since been employed by the Oyster River Cooperative School District and the Concord School District since the filing of this December 2021 lawsuit.

7.      Indeed—following George Floyd's murder on May 25, 2020—these districts have created these positions in an increased effort to expose students to the lived experiences, contributions, and history—both past and present—of BIPOC (Black, Indigenous, and People of Color) individuals. These efforts are part of a growing and widespread consensus among educators that inclusive education practices that give voice and attention to the experiences of all students are critical.  Students must see themselves in the books they read and in the classroom discussions they have to become contributing participants in our increasingly diverse and multi-racial democracy.

8.      For example, by presenting a more informed and truthful portrayal of topics such as the empowering experiences and achievements of BIPOC and marginalized communities in the face of African enslavement, Jim Crow, segregation, and racial discrimination—and discussing with students the existing legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or "unconscious bias"—educational opportunities for all students are expanded.  This expansion of these educational opportunities takes many forms, but is unified by the aim of ensuring equal access to educational content for students of all backgrounds, and exposure to various perspectives that reflect the diversity of New Hampshire and America.

9.      In my role, I am devoted to nurturing an equitable and inclusive school environment where all students feel seen, heard, and valued.  I bring to this role over 15 years of experience in public education advocating and applying anti-racist/anti-bias and culturally responsive teaching practices as a DEI educational consultant, English teacher, and Dance/Performing Arts Teacher/Director. Through my work, I have led and designed (and continue to lead and design)

conversations about race and equity through teacher/leader workshops, presentations, and trainings.

10.    I previously was an English teacher and Director of the Dance Program at Goffstown High School for nearly 13 years. In this role, I was a 2019 finalist for New Hampshire Teacher of the Year, as well as the recipient of the 2019 SAU19 Dreamkeeper award.

11.    I am a fellow with New Hampshire Listens. I am also a two-time fellow of the National Writing Project—a network of teachers, university faculty, researchers, writers, and community educators working to advance writing and the teaching of writing. I was in the 2022 class of Leadership New Hampshire—a statewide program whose mission is to build a community of informed and engaged leaders.  I was also an Advisory Group member of the Endowment for Health's Race & Equity Series—a series that holds important convenings of diverse stakeholders, as well as ongoing working groups, tackling racial justice and equity challenges in New Hampshire, including in civic engagement, economic development, education, government, health, and law enforcement/criminal justice.  I have received the 2022 NAACP Manchester Excellence in Education award, as well as the Martin Luther King Jr. Coalition's 2023 Social Justice award.

12.    I have dedicated my professional life to training and instruction on DEI concepts. Such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color. This instruction has increased the engagement, participation, and sense of belonging for students in my District. And students have expressed to me their desire to gain greater exposure to the perspectives of communities of color through the books they read and through course curriculum.

13.    For example, students have come to several Manchester Board of School Committee meetings stating their desire to have cultural studies in the curriculum, and they have given testimony before the Board that they want to feel more represented in the curriculum.  And students have told me that they want to talk about their own personal experiences in the classroom and how these experiences relate to course materials.  For these students, having these conversations is essential to help them process their own lived experiences where literature and history are used as a tool to help the students navigate the current world around them.  If we do not provide thoughtful and safe environments where students can connect the curriculum to their own lives with caring adults—and where teachers can affirm their students' lived experiences—then students are not meaningfully learning, they are robbed of a full education, and they feel

uncared for.  Learning does not happen in the abstract.  It happens when teachers and students can ask questions and acknowledge both the flawed and joyous world that has a direct impact on students, and where students can talk about their lives in the context of the course material.

14.     I am directly impacted by the Amendments challenged in this case.  I conduct staff trainings within the Manchester School District focusing on culturally-responsive education—a student-centered practice of mindfully and intentionally incorporating the experiences, culture, and identity of students (including those from historically marginalized groups) to help expand their educational opportunities. This includes developing strategies for how to relate and empathize with students, as well as developing curriculum consistent with these goals, so that each student is seen, heard, and valued.

15.     Previously, in conducting DEI trainings before the Amendments and before I assumed the role of Chief Equity Officer for the Manchester School District, I would specifically use terms and concepts like "anti-racism" and "anti-bias."  Because of the Amendments and their penalties, I now rarely use terms and concepts focusing on "anti-racism" in staff trainings—and have advised others to avoid them as well.

16.     For example, I now rarely use the term "anti-bias" in Manchester staff trainings because of the Amendments, and I have limited reference to implicit bias or "unconscious bias" in these trainings.  I have also told educators to avoid references to implicit bias or "unconscious bias."  Instead of being explicit and referencing "anti-bias" concepts directly, I now have to resort to using terms that are less precise, including now using the term "self-awareness" as an alternative—a different concept that involves understanding one's emotions and personal identity based on self-definition and others' perceptions, as well as recognizing how we are socialized.

17.     Also, instead of directly using the term "anti-racism," I now "dance around" this concept if I ever have the opportunity to address it—which is less often given the fear that exists around the Amendments.  Instead, if given the opportunity, I now talk more about my own personal experience as a South Korean adoptee to try to make connections for students and educators that could much more easily be accomplished if I felt that I was able to use the term "anti-racism."  I rarely use the term "anti-racism" because of its connection to Ibram X. Kendi's 2019 book *How to be an Antiracist*, which the Commissioner of Education cited as a reason why the Amendments are necessary.

18.     As one of only four current full-time DEI school administrators in New Hampshire, I also routinely field inquiries from teachers throughout New Hampshire as to whether certain

books and information would be banned under the Amendments. Yet, given the Amendments' vagueness, I cannot answer basic questions as to what is covered under the Amendments. As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences.

19.     Teachers throughout New Hampshire regularly ask me for validation if certain books or concepts related to race are covered under the Amendments.  I cannot answer because the Amendments are unclear, and I ask the teachers to think through scenarios if they are challenged about what they are teaching.  I explain that I cannot insulate them if they are challenged by a parent or member of the public.  For example, in these conversations, I have recommended that teachers omit reciting during a "read aloud" certain lines of text in Jewell Parker Rhodes's 2018 book *Ghost Boys*—a book that follows the story of Jerome, a 12-year-old Black boy, who is shot and killed by a White police officer before coming back as a ghost.  The lines of text in this book that I have recommended be omitted from a "read aloud" reference unconscious racial bias, particularly during the courtroom scene on pages 85-87 where the prosecutor asks the officer who shot Jerome the following: "Have you heard of racial bias?"; [Have you] heard prejudice can affect your thoughts, actions?  Whether consciously. Knowing. Or unconsciously?"; and "Possibly you were responding to unconscious stereotypes of black men as large, threatening, dangerous?"  I have told the teacher that, at most, if these portions are to be presented at all during the class, it should come from the audiobook, not from the teacher.  Portions of *Ghost Boys* are attached to this declaration.

20.     When I explain to these teachers that the Amendments exist and that I cannot provide validation that certain instruction or reading material are exempt from the Amendments, the teacher often has an emotional response where they now feel that they have to make a choice between talking about a text in a culturally relevant way or being subjected to scrutiny from a principal or, even worse, potentially having their license impacted.  These educators are scared.

21.     I have also spoken to public school students about issues concerning race at events in my individual capacity.  For example, in around the Fall of 2021, I had conversations with Concord public school students while volunteering for that school district about "anti-racism" and the fact that there are few teachers of color in New Hampshire, as well as the Amendments.  These issues were of public concern to the students, and I was speaking as a private person.  I also spoke to public school students at a superintendents' conference on or about Tuesday, November 9, 2021 where I told these students my personal experiences of racism, as well as acknowledged the racism

that these students have experienced.  These issues were of public concern to the students, and I was speaking as a private person in these examples.

22.     I am certified by the State Board of Education and, thus, am subject to the Educator Code of Conduct that is now embedded within the Amendments' provisions in RSA 193:40.

23.     I am bringing this lawsuit in my individual capacity, and not on behalf of the Manchester School District that employs me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of August, 2023.


*/s/ Christina Kim Philibotte*
Christina Kim Philibotte

