# Human Relations Units of Study

**Values, Goals & Self**
- Values
- Goal-Setting
- Self-Concept
- Self-Esteem

**Stress Management**
- What is stress?
- Managing Stress
- Lifestyle, Attitude & Gratitude
- Time Management

**Communication**
- "I" Messages
- Levels of Communication
- Handling Conflict
- Communication Styles
- Complaints & Difficult Conversations

**Diversity**
- Celebrating our Differences
- Equity vs. Equality
- Race & Privilege
- Gender & Sexuality
- Microaggression

**Media & Technology**
- Social Media
- The Evolution of Dating
- Digital Drama & Cyberbullying

**Relationships**
- Love
- Friendship
- Healthy Relationships
- Ending Unhealthy Relationships
- Partnership & Marriage
- Family & Parenting Styles
- Family Stressors

**Community**
- Leadership & Teamwork
- Community Resources
- Building Confidence
- Community Service





Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 21 of 79

Welcome to
Class
ALL ABOUT
RELATIONSHIPS

**[REDACTED] High School---Family & Consumer Sciences Department**

**Teacher** [REDACTED] **E-Mail-** [REDACTED] **Phone-** [REDACTED]

If you need assistance please see me in class or send me an email to set up an appointment.

By signing the course agreement, you are stating you understand the requirements of the course and the expectations. Please have your parent/guardian sign so they are aware of the requirements and expectations of the course as well.

## Human Relations Course Agreement

**Please read and sign:**

I have read and understood the expectations and requirements of Human Relations course..

**Student Name (please type or print):** ________________________________________

**Student Signature:** ________________________________________

**Please list any food allergies:** ________________________________________

Since our class is held in our foods classroom I would like to be aware of any food allergies to ensure classroom safety.

**Parent/Guardian Signature:** ____________________________ **Date:** ______________

Parents/Guardians:

- If you have any special skill/experience in relation to the class topics, please feel free to call or email me to set up a time to discuss, or write your phone number below for me to contact you.
- You are welcome to join our Google Classroom to stay up to date on what we are covering in class and review any assignments with your student.
  - Google Classroom code - Human Relations - ______________
- Please feel free to contact me if you have any concerns/suggestions about the class or your child. I look forward to working with you and your child(ren) this semester!

# Topic Two



Today
11:58 AM
A friend has a 6th grader at [redacted] that came home and said that in their 'debate' class they were debating a sexual
Relationship between two men. the sixth grader came home and said their debate was very uncomfortable and was about S E X (spelled out because they are too young to even want to say the word!!). not an appropriate topic for 6th...maybe towards the end of high school but not right around puberty...and we are to trust the 'experts' in education have designed the curriculum and have done their due diligence on what is best for kids and age appropriateness??? This has to stop. My friend is still processing it before deciding how to address it with the school.
12:27 PM
3

1755

# Topic Three

PL 00703



March 16, 2022

Dear Families of Fourth Graders:

The Life Science unit will begin prior to spring break this year. This unit focuses on body development and puberty. This unit can be a way of gathering answers to questions students have been curious about, but frequently it can be an uncomfortable topic for some children. I hope that with support from both home and school, we will be able to help students learn accurate information about their bodies in a way that encourages them to be respectful and accepting of themselves and others. I will work with all fourth grade students together in an open teaching format. There will be a focus on basic scientific facts explaining how everyone will go through adolescent changes at their own body's pace. Now is the perfect opportunity for you to take some time to begin a conversation with your child prior to the school lessons to let them know you are there to answer any questions they may have.

Topics covered:

- Anatomy and physiology of the reproductive system
- Emotional and physical changes that begin with puberty
- Health and hygiene
- Personal safety including strangers, safe phone/internet use
- Peer pressure & respect for self and others

If you would like to review the materials that will be used in teaching please feel free to connect with me. Here is a great website if you are looking for information: amaze.org. There are also many other sites, some better than others, so be sure to review beforehand if you want to use it with your child!

Here are some books you might find helpful:

"The Care and Keeping of You" –American Girl Library

"On Your Mark, Get Set, Grow" –Lynda & Andrea Madaras

**Thank you for your help! Please call anytime if you have questions**

using some of the following:

Speak with your child when you're both relaxed, like over dinner or in the car 

Bring these issues up when you hear someone is getting married 

If your child says a friend's sister or a teacher is getting married, you can say, "That's fantastic! Is she marrying a man or a woman?"

If you hear your child or one of their friends say, "That's so gay," address it 

What's important to remember is that people deserve to express themselves in ways that feels right for them and to be respected no matter how they identify, look or dress

Are there more genders than "boy" and "girl"?

Yes, there are totally more than two genders! Some people identify as a gender that is not male or female, some identify as more than one gender, and some people don't identify as any gender.

How can I tell a person's gender?

What should I do if I don't feel like either a boy or girl, or if how I feel doesn't match my body?

## Related Videos

know if I am?

How do I figure out my sexual orientation and identity?

Your sexual orientation refers to the gender(s) of who you're attracted to or who you fall in love with. While sexual orientation is not a choice, it can shift over time for some people. It also may be difficult to understand and make sense of your feelings. Separately, your identity is what you decide to call yourself, which is a decision that can only be made by you. You get to figure out which sexual identity best suits you and what that identity means. Some of these identities are gay, pansexual, lesbian, demisexual, heterosexual, bisexual, asexual and more! It's also all right if your identity changes over time or doesn't exactly match up with your sexual orientation or sexual behaviors. There is no need to feel pressured into identifying a certain way.

## Related Videos



Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 29 of 79

# VIDEO TOPICS

## Gender Identity

What Are Pronouns?
Challenging Male Gender Stereotypes With Jason Rogers
Sex Assigned at Birth and Gender Identity: What Is The Difference?
Range of Gender Identities
Puberty and Transgender Youth
Gender Identity: Gender Roles and Stereotypes
How To Be A LGBTQIA+ Ally
My Friend Is Transgender
Being Female, Male, Transgender or Fluid
Expressing Myself. My Way.

## Healthy Relationships

1761
Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 30 of 79

# Topic Four

PL 00709

Art with Mx.
PL 00710
SLIDESMANIA.COM

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 32 of 79

# Who is Mx. [REDACTED]?

My name is Mx. [REDACTED]

Mx. is pronounced just like the word "mix." It is a gender-neutral prefix/honorific (like Dr. or Professor or Coach) instead of using Ms., Mrs., or Mr.

Click here for more info!

PL 00711

SLIDESMANIA.COM

# My pronouns are they/them/theirs

Pronouns are what people use to refer to you without using your name. For example, "This is Mx. [redacted] They are my [redacted] teacher! I like them as a teacher. Their favorite color is peacock blue."

Common pronouns:

She/her/hers

He/him/his

They/them/theirs

Click the pronouns for more info on "they"
PL 00712

SLIDESMANIA.COM



What else should we know about Mx. [redacted]?
this teacher believes
BLACK LIVES MATTER
I support my
LGBT
STUDENTS
Click here for more info on BLM for kids
Click here for more info on how to make safer spaces for LGBTQ+ kids
SLIDESMANIA.COM
PL 00713

1766

# Topic Five

PL 00714



Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 36 of 79

Poster reads:

Socialism

An Economic Ideology

Economic system where the basic means of production is primarily owned and regulated by the government

All for one and one for all

"Socialism is workable only in heaven where it isn't needed and hell where they've got it" Cecil Palmer

A few examples: Socialist Republic of Vietnam 1976-Present, Laos 1975-Present

Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 37 of 79
Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.
TEACHER'S
Discovery
Goods

PL 00716

SERIOUSLY?
I ♡ This book because it's history with a lot of opinion. It is not presented like "fact"
We should start the book by reading the Afterward

4

PL 00718

5

Case 1:21-cv-01077-PB Filed 05/20/22 Page 40 of 79
A TEACHER TA
OPENS A MIND
HEART. SHAPES
JASON REYNOLDS
IBRAM X. KENDI
STAMPED

PL 00719





Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 41 of 79

...raining with
antiracist decl
social media o
g antiracist pr
protesters reject
that Black lives don't matter. #BlackLivesMatter quickly transformed from an antiracist love declaration into an antiracist movement filled with young people operating in local BLM groups across the nation, often led by young Black women. Collectively, these activists were protesting against discrimination in all forms, in all areas of society, and from a myriad of vantage points. And in reaction to those who acted as if Black male lives mattered the most, antiracist feminists boldly demanded of America to #SayHerName, to shine light on the women who have also been affected by the hands and feet of racism. Perhaps they, the antiracist daughters of Davis, should be held up as symbols of hope, for taking potential and turning it into power. More important, perhaps we should all do the same.



OJ Simpson Trial

Kind of Skimmed over this

his com-
ath Row.
ecause of
e stay of

an? Not at the Million Man March, that's for sure. He was going
was in Texas, pleading to evangelicals for racial healing.
Instead of listening to the people dealing with it, he went
to beg people not dealing with it to ask God to fix it.
And, of course, it slipped into *pray God fixes Black people.*
Even though a year later, affirmative action was banned
in California, making the playing field, especially as it
pertained to higher education

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 43 of 79

the Civil Rights Act of 196
important civil rights legislation since
Act of 1875. Hours after President
into law, on July 2, 1964, he hit the
up the whole American

Desegregation is
good for only
elite Blacks!
P 185

Black Power even appealed to the face of the civil righ
movement. That's right, even Dr. King, in 1967, was tur
W. E. B. Du Bois had later in his life. Dr. King had n



BOOK RAYS

Answer

8. Who do Reynolds and Kendi claim was the world's first racist?

Gomes Eanes de Zurara. a royal commander of Prince Henry's Army. He was the first person to write about the black human ownership

9. Who did the world's first racist write a biography about, according to Reynolds and Kendi?

Prince Henry

10. What was the book that the world's first racist wrote titled, according to Reynolds and Kendi?

The Chronicle of the Discovery and Conquest of Guinea. in 1450

11. How was the world's first racist's book received by the public?

It was a bestseller.

12. How did the world's first racist depict Africans in his book, according to Reynolds and Kendi?

As savages that needed training. Africans needed slavery in ord... fed and taught Jesus

13. What did the Climate Theory say about Africans?

They were savages because of the hot weather where they came from. and they become white if they moved

14. What did the Curse Theory say about Africans?

8th Grade

2021-22

PL 00725

Original

# Recreation

## 8th Grade 2021-22

Competency 1: I can demonstrate an understanding of conflict and compromise

| Date: | Monday: 9/20 | Tuesday: 9/21 | Wednesday: 9/22 | Thursday: 9/23 | Friday: 9/24 |
|---|---|---|---|---|---|
| Learning Target | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States |
| Essential Question | What are the causes of Racial Tension? | | | | |
| Formative | US History Formatives: Who was the first Racist? What did he accomplish? | | US History Formatives: Blank Map of New England | | |
| Classwork | Hand out Stamped. Read Aloud chapters 2-4 Answer questions | Hand out Stamped. Read aloud chapters 2-4 Answer questions in packet Slave Trade packet Exit Ticket | Read aloud Chapters 3 and 4 and answer questions together. Slave Trade packet | Read to P. 78 and answer questions together. Review: Slave Trade packet Do exit Ticket | Worksheet: Historical Background: The Development of Race-Based Theory |
| HW | | | | | PL 00726 |

1779

# Topic Six

PL 00727

# Get to Know You!

Answer the Google Form below to help me get to know you!

What is your first and last name? *

Liam Elliott

What is your preferred name? *

Liam

Who can I use this name in front of? *

- [x] I can use this name in front of other students
- [x] I can use this name when contacting parents/guardians
- [x] I can use this name with other teachers, including substitutes
- [ ] Any other comments:
- [ ] Other:

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 50 of 79

What are your preferred pronouns? *

- (•) He/him/his
- ( ) She/her/hers
- ( ) They/them/theirs

My preferred learning style is... *

- ( ) Visual-- maps, graphs, diagrams, charts, etc.
- ( ) Auditory-- speaking and listening
- (•) Kinesthetic-- experience, practice, examples, simulations (hands-on)
- ( ) Reading and writing

I like when my teacher... *

Gives me A's

One thing you should know about me as a student is... *

I'm a pain

One thing you should know about me in general is... *

I have red hair

Any thing else you would like me to know? *

Pronouns are the same ones i got in the womb

This form was created inside o[redacted]

Google Forms

# Algebra 2 Getting to Know You

Please answer the following questions, so that I can better assist you this semester.

1. Email *

2. Name (First and Last) *

3. Name you want me to call you in class. *

or
whatever you want

4. Pronouns (ex: he/him, she/her, they/them): *

She/her

5. May I use these pronouns in front of the class? *

*Mark only one oval.*

Yes

No

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 53 of 79

6. May I use these pronouns when I contact home? *

*Mark only one oval.*

- [x] Yes
- [ ] No

7. May I use these pronouns in front of other teachers? *

*Mark only one oval.*

- [x] Yes
- [ ] No

8. Would you like to follow up with me (in a private conversation) about your pronouns? *

*Mark only one oval.*

- [ ] Yes
- [x] No

9. Are you taking another math class this semester? If so, what is it? *

No

10. What math classes have you taken and at what level? *

Algebra 1 pt 1 &2 (E)
Geometry (H)
Consumer Science (H)

11. Why did you take this particular class? *

Because I need the Credit

12. What grade do you expect to earn in this class? *

*Mark only one oval.*

- ( ) A
- (✓) B
- ( ) C

13. Tell me about your past math experiences. *

I can grasp Concepts very well, but I do tend to overthink equations and end up overwhelming myself.

14. Tell me three things about yourself. This could be a hobby (or hobbies), interesting facts, or anything you want me to know about you? *

- I write/sing songs
- I play the Piano
- I'm a host at [redacted] in [redacted]

15. What would you like to ask me about myself or this class?

If you could teach another Class What would it be and why?

This content is neither created nor endorsed by Google.

Google Forms

1787

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 56 of 79

# Topic Seven

PL 00735



LSA
Ethnicity
Socio-Economic Status
Race
Religious or Spiritual Affiliation
Gender
1. Identities you think about most often
2. Identities you think about least often
3. Your own identities you would like to learn more about
Sex
Age
4. Identities that have the strongest effect on how you perceive yourself
5. Identities that have the greatest effect on how others perceive you
Sexual Orientation
Physical, Emotional, Developmental (Dis)Ability
National Origin
First Language
ıpted for use by the Program on Intergroup Relations and the Spectrum Center, University of Michigan.
ırce hosted by LSA Inclusive Teaching Initiative, University of Michigan (http://sites.lsa.umich.edu/inclusive-teaching/).

# DIVERSITY BINGO

*Directions: Find someone in the class to fill each square and ask them to write their name in that square. Each person can only fill ONE square on your card. The first goal is to get Bingo: a row across, down or diagonally. When you do, yell: "BINGO!"*

| | | | | |
|---|---|---|---|---|
| Knows what Diwali is | Has memorized a poem | Has travelled to South America | Is a vegetarian | Has a quote that inspires them |
| ...mes from an ...terracial family | Celebrates Yom Kippur or knows what it is | Is a twin or triplet | Has a family member who has a service animal | Has travelled to Europe |
| ...musical ...ment | Speaks more than one language (fluently) | Lives on the planet Earth | Is a first generation American (both parents were born in another country) | Was born in another country |
| ...a ...ts | Has travelled to Canada | Celebrates Kwanzaa or knows what it is | Sent a handwritten 'thank you' note recently | Does NOT have SnapChat |
| Is of Native American heritage | Does not use binary gender pronouns | Has lived in more than one state | Has a cause they are passionate about | |

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 59 of 79

9:41

sites.lsa.umich.edu

Definitions as a Starting Point

Key definitions and concepts associated with anti-racist pedagogy

Readings to further your understanding

This button links to an anti-racist pedagogy annotated bibliography maintained by CRLT

Disrupting White Supremacy on Campus

Learn about the historical legacy of racism and activism at U-M

LSA DEI and Anti-Racism Initiatives

Learn about LSA DEI and anti-racism initiatives

## Practicing Anti-Racism and Anti-Racist Pedagogy: An Overview

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 60 of 79

9:46

sites.lsa.umich.edu

LSA INCLUSIVE TEACHING
UNIVERSITY OF MICHIGAN

| Social Identity Wheel | |
|---|---|
| **Overview** | The Social Identity Wheel worksheet is an activity that encourages students to identify social identities and reflect on the various ways those identities become visible or more keenly felt at different times, and how those identities impact the ways others perceive or treat them. The worksheet prompts students to fill in various social identities (such as race, gender, sex, ability disability, sexual orientation, etc.) and further categorize those identities based on which matter most in their self-perception and which matter most in others' perception of them. The Social Identity Wheel can be used in conjunction with the Personal Identity Wheel to encourage students to reflect on the relationships and dissonances between their personal and social identities. The wheels can be used as a prompt for small or large group discussion or reflective writing on identity by using the Spectrum Activity Questions on Identity. |
| **Goals** | 1) To encourage students to consider their identities critically and how identities are more or less keenly felt in different social contexts. The classroom and the university can be highlighted as a context as a way to approach questions on barriers to inclusion.<br><br>2) To illuminate how privilege operates to normalize some identities over others. For example, a student who speaks English as their first language can reflect on why they rarely need to think about their language as an aspect of their identity while some of their peers may identify language as the aspect of their identity they feel most keenly in the classroom.<br><br>3) To sensitize students to their shared identities with their classmates as well as the diversity of identities in the classroom, building community and encouraging empathy. |
| **Implementation** | 1) View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom.<br><br>2) There are three ways you can approach this activity:<br>a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion.<br>b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity.<br>c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 61 of 79

| | |
|---|---|
| **Implementation** | 1) View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom.<br><br>2) There are three ways you can approach this activity:<br>a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion.<br>b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity.<br>c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |
| | 3) If you are choosing Option B or Option C/B, place the social identity categories around the room before class. |
| **Challenges** | 1) The students may not perceive the activity as relevant to the course and thus may exhibit resistance.<br><br>2) Students may not be familiar with particular concepts, or they may have different assumptions about those concepts that the activity assumes. For example, they may not know the difference between the terms "sex" and "gender," or they may be resistant to the distinction between the two.<br><br>3) If the wheel is used as a discussion prompt or if students are in close quarters and are able to see what their peers have written on their worksheets, this exercise may feel especially vulnerable to students with invisible identities that they may not want to disclose to the class. Disclosure in verbal or written form should be voluntary and discussion questions should be broad enough that students can opt to not talk about more vulnerable aspects of their identities while still leaving space for them to share if |




1793

# Topic Eight

PL 00741

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 63 of 79

CHOOSING MY PATH

10

# DISRUPT!

HOW DO I STAND UP? AND SPEAK OUT? WHAT HAPPENS IF I DON'T SAY ANYTHING?

*YOU CAN DO IT. YOU CAN DISRUPT RACISM AND CHANGE THE "NORMAL."*

You are now able to see the world in a way you didn't always notice before. You are building a new lens to see yourself and the world around you. You know more history (the parts you are told about and what has been left out). You are more conscious of the ways people interact with one another. You are attuned to microaggressions and are aware of their impact. You see the work institutions have put in over hundreds of years to maintain the structure of racism. Your school may have rules around how students can wear their hair or what folx can wear on their head and you understand how this is affirming the dominant culture. You notice that, still, most of the shows and movies you watch have a nearly all-white cast and how every time there is a terrorist that person is Western Asian and speaks Arabic. You see how stereotypes are created and sustained. You have the tools to seek out more knowledge and gain a deeper understanding.

What do you do next?

You have a voice. Use it. Speak the truth. Share it with others. Choosing silence is not an option. Audre Lorde an American feminist, writer, and activist said,

"MY SILENCES HAD NOT PROTECTED ME. YOUR SILENCE WILL NOT PROTECT YOU."

*YOU CANNOT HEAR SILENCE. INACTION CANNOT BE SEEN. WE CANNOT FEEL THE MOMENTUM OF CHANGE IF NOTHING HAPPENS.*

Use your voice to speak the truth about injustice and share the history we are often not told. Talk to your family, your friends, your classmates, anyone and everyone who will listen. Write and write and write and share. Create art and share it. Take risks. You can do this.

I wish I had used my voice when my teacher was so continually awful to us. I wish I had stood up to my teacher. And to our school administration that allowed her to remain there.

What would I do today if I were in that classroom?

I'd physically stand up to her (in my small nine-year-old self). I'd get out of my seat, stand up, and tell her, "You can't talk to him like that. It's not okay."

Then, I'd walk out of that classroom, bringing my friend with me and anyone else who wanted and needed to come. I would walk down the stairs to the office, where I'd ask the school secretary or the principal to file a complaint against that teacher. I'd tell them what happened. I'd tell them she verbally abused my friend. And I'd file that complaint. I would ask the office to call my friend's parents. He shouldn't have to sit another minute in the classroom with our teacher who assaulted him with her racist words. No one should.

I'd tell my mom. (I did.) We'd talk to his parents. I'd ask all our classmates to share what happened with their families. Our parents and caregivers would help our voices to be heard. We would be louder than just my own voice. They, too, would file complaints and show up at school the next morning. They'd ask for the resignation of our teacher because she should not be teaching us if she couldn't keep us safe. And she couldn't keep us safe because she was the one causing the harm.

We would all attend the next school board meeting to demand our schools be a place where we can learn, free from racial violence, both verbal and physical.

I think about that day so often and wish I had had the tools to go beyond recognizing what was happening. I wish I had created a plan and spoken up. I wish I had resisted my teacher and everything that kept her in place.

*THIS IS WHY I SHARE WITH YOU. YOU CAN RESIST NOW. YOU CAN DISRUPT NOW.*

What if it's something beyond your daily interactions at school? What if it's something outside of the comfort of what is familiar?

What if you and your family or friends are driving through town, and you see four police officers surrounding two young Black men? Maybe you recognize them, maybe you don't. Maybe one of them was in chorus with you last year. Maybe you've seen them at the store. Or maybe you don't know them at all. It doesn't matter if you know them or not.

You may be able to see if the police are armed. You may not. (While some police

Case 1:21-cv-01077-PB Document 85-2 Filed 05/20/22 Page 65 of 79

carry guns and others do not, we do know that they all carry power in their role as law enforcement.) You can see the young Black men are not armed, that they look confused, and that their hands are up.

You've seen the news over and over again: you know history. You think of Eric Garner, Sandra Bland, Philando Castile, Michael Brown, and all the others. You know this happens every day and today can be the day you change that. Here is where you can make a plan so you'll know what you can do if this does come up in your life. **NOTE:** You must make sure YOU are safe and out of harm's way. Talk to a trusted adult BEFORE taking any action.

*Activity:*

First, grab your notebook. Let's start writing!

You've observed what's happening and have examined the situation. You know the folx being held by the police look frightened. They don't want to be there. You don't want these two young Black men to become new hashtags and statistics.

So, there are a bunch of things you can do—take a few minutes and make a list of **every possible outcome** you can think of.

Here's my list:

- Ask the person who is driving the car to stop. We get out and walk over to the situation so we can stand witness.

- Record what is happening with my phone. I can. This is my right to do so. In the United States, the UK, and many other countries I cannot get arrested for recording if I take photos or video of public spaces. The police cannot take my phone from me. (They need a warrant to do so.) They may ask me to stop recording, but I don't have to stop.

If I am inside a store, private property, etc. the owner sets the rules and it is their choice whether I can record or not. This is not the decision of the police.



- Stay in the car and record.

- Stay in the car and shout out to the two being held by the police, "I see this."

- Standing near the police and the young men, I can ask the two Black men if there's anything I can do... if there's anyone I can call for them. (The adults I'm with can stand with me too.)

- Stop other people walking by and ask them to stand witness too. (There is strength and power in numbers.)

- Ask the adult I'm with to intervene while I stay in the car.

- Ignore this and keep driving.

What else?

Do our lists look similar? What am I missing? What are you missing? There's more we can add and we'll look at this in the next couple of chapters! You will continue to build your plan for taking action.

my choice

Some of your choices will require you to take risks. Some may not. Understanding your privilege and the power you have—or do not have—is important. It will determine how you approach everything. This situation with the police is one where, especially if you are white and cisgender, you can use your privilege to speak up. **If you are a Black, Brown, or Indigenous Person of the Global Majority, you will need to decide how each outcome could end for you**. White people, this is not something you need to do because you are at the center of the system: taking a risk with any of these choices will, most likely, not have you end up in jail or harmed.

1798

# Topic Nine

PL 00746

# Homework:
# Defining Sexual Orientation

**Name:** ______________________ **Date:** ______________

**Instructions:** View the short animated video from Amaze.org called, "Talking Sexual Orientation with Jane" available here: http://amaze.org/video/talking-sexual-orientation-with-jane/. Once you have watched the video, please write down your own definition of sexual orientation. Then, think of an adult you know well and trust who you could share this definition with. This could be a parent or other adult family member, a friend's parent, someone at school, etc. Tell this person what we discussed in class and share your definition so that they also know what sexual orientation is. See if they agree with your definition, or whether they have another take and add that to what you have. Make sure they sign below!

**1) Sexual orientation is:**

(What I say):

(What the adult I asked says):

**2) Did you learn about sexual orientation when you were growing up?: If so, what did you learn?**

(What the adult I asked said):

Name of adult: ______________________

Their signature: ______________________

Relationship to you: ______________________

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 69 of 79

# Topic Ten



Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 70 of 79

## Exploring Whiteness and Becoming an Anti-Racist Activist

INSTRUCTORS [redacted]
LOCATION [redacted] Classroom Room [redacted]
READINGS TBD
TIME Full Day MAX ENROLLMENT 16 STUDENT COST $0

DESCRIPTION *Students will join in honest, frank, and respectful examination of what it means to be a white person in 21st century America. We will explore many topics on race including: personal identity and power, white privilege, guilt, and fragility, and taking anti-racist action. We will learn how whiteness and race were invented in the early years of our country's formation, further sustained through government programs, and how this has played out in our own community. Students will learn how to take anti-racist action by meeting with college students who currently are engaged in national and local anti-racist work, including where anti-racist work intersects with gun safety, climate change, and LGBTQ rights. This MI is open to all students, and we hope that we will have a diverse group. The course will be designed to be a dynamic and interactive experience based at [redacted] but also involving field trips off campus. Tentative plans include interaction with Dartmouth students/staff members and other local community members involved with anti-racism work and correspondence with students from Ashley Hall School in Charleston SC to discuss how we perceive race and each other in New England and the South.*

Tuesday 3/10
8:00-8:30 Introductions/Rules of Engagement/ Race Literacy Quiz [redacted]
8:30-9:00 Equity and Inclusion Terms, Language, and Definitions [redacted]
9:00-9:45 The Invention of Whiteness/ Race the Power of an Illusion [redacted]
9:45-10:00 Break
10:00-11:00 Action Plan Design planning (Group led by [redacted]
11:00-12:00 Lunch
12:00-1:00 "Understanding Racism and Systemic Oppression " Brian Cook/Groundswell Change (OK)
1:00-1:30 Discussion on Brian Cook's Presentation (OK)
1:30-1:45 Break
1:45-2:45 iPod walk-around [redacted]
2:45-3:00 Journaling [redacted] prompts)

Wednesday 3/11
8:00-9:00 How we got here: Jim Crow, Redlining, Racial Wealth Gap [redacted]
9:00-9:30 Shadows Fall North film excerpt [redacted]
9:30 -10:00 Citrus Preview [redacted]
10:00-10:30 Brunch
10:30-1:30 (including travel time) Citrus at Northern Stage
1:30-2:00 Citrus Discussion and Journaling [redacted] prompts)

Thursday 3/12
8:00-9:00 White Privilege/ White Fragility [redacted] (with selected video)
9:00-9:45 Intro to Kendi: Anti-racism/ in-class reading [redacted]
9:45-10:00 Break
10:00-10:30 Action Plan Design planning (Group/ [redacted]
10:30-11:30 "Carol Street" Being a Person of Color in an All White Environment (film maker Demetrius Borge)

Case 1:21-cv-01077-PB Document 45-2 Filed 05/20/22 Page 71 of 79

11:30-12:30 Lunch (can shift later 15 minutes if needed)
12:30- 1:00 walk to Rauner
1:00-2:30 "Ties That Bind" Slavery at Dartmouth Tour and discussion Dr. King
2:30-3:00 Downloading and Journaling

Friday 3/13
8:00-9:00 /Case Studies on Activism Brian Cook/Groundswell Change
9:00-10:00 Anti-Racism Activism Kendi section on activism/in class reading/discussion
10:00-10:15 Break
10:15-11:00 Teaching Tolerance: Speaking up!
11:00-12:00 Lunch
12:00-12:30 Action Plan Prep for Asma Elhuni (
12:30-1:30 Preparing for Activism Asma Elhuni/Activist and Organizer
1:30-3:00 Action Plan Design/ Closing/ Goals/ Action Steps

***First Draft of Daily Schedule Topics***
***Speakers/video/presentations/discussion TBD***

## Tuesday 3/10

**Introductions/ / Rules of Engagement/ Opening Exercises**

*http://www.pbs.org/race/002_SortingPeople/002_00-home.htm*
*race literacy quiz*
*http://newsreel.org/guides/race/quiz.htm*

**Language and Definitions**

**The Invention of Race and Whiteness**
*Tim Wise:what is race invention of whiteness*
*https://www.youtube.com/watch?v=jBUnziGgN4o 1:53-2:01*
*Race the Power of an Illusion*
*Ep 1 The difference between us ... segments*
*https://www.youtube.com/watch?v=OXEV0tqox9k&t=2s*
*Discussion Guide pages 7&8 http://newsreel.org/guides/race/race-guide-lores1.pdf*
*The Other Race (Mixed Race) Documentary...segments*
*https://www.youtube.com/watch?v=GfM-F172548*

**White Privilege**

The advantages of wealth and whiteness 10 question walk/race
**https://www.youtube.com/watch?v=4K5fbQ1-zps**
**https://www.nasponline.org/resources-and-publications/resources-and-podcasts/diversity/social-justice/social-justice-lesson-plans/talking-about-race-and-privilege-lesson-plan-for-middle-and-high-school-students**
**https://www.huffpost.com/entry/explaining-white-privilege-to-a-broke-white-person_b_5269255**
***"White Immunity": Working through the pitfalls of "privilege" discourse***
*https://www.youtube.com/watch?v=JtLpAfB-DEc segments*

**Affirmative Action**

A Long History of Affirmative Action - For Whites
http://newsreel.org/guides/race/whiteadv.htm

**Black Lives Matter**

***NYT A conversation with police***
**https://www.nytimes.com/video/opinion/100000004027684/a-conversation-with-police-on-race.html?module=inline 1:59-2:30**
Tim Wise Black Lives Matter/All Lives Matter
https://www.youtube.com/watch?v=jBUnziGgN4o 42:06

## Wednesday 3/11

How we got here: Jim Crow, Redlining, Racial Wealth Gap

*Race the Power of An Illusion - ep3 The House We Live*
https://www.youtube.com/watch?v=QHo8AKNfB68
https://www.youtube.com/watch?v=mW764dXEI_8
*THE POWER OF AN ILLUSION How the Racial Wealth Gap Was Created*
https://www.youtube.com/watch?v=QHo8AKNfB68&t=4s
*Discussion Guide pages 11-13* http://newsreel.org/guides/race/race-guide-lores1.pdf

**Being a Person of Color in an all white environment**

**Documentary film maker speaker**

**White Fragility/ White Guilt**

**Robin DiAngelo lecture**
https://www.youtube.com/watch?v=45ey4jgoxeU&t=1230s

https://www.nytimes.com/video/opinion/100000003773643/a-conversation-with-white-people-on-race.html?module=inline

## Thursday 3/12

**Anti-racism**
**Dartmouth Student Leaders and others**
**Skype with school in South Carolina North/South perspectives on race**

## Friday 3/13

**Becoming and activist**
**Dartmouth Student Leaders and others**
**Closing/ Goals/ Action Steps**


CALIFORNIA NEWSREEL

ORDER TRACKING CONTACT US

◄ close home go to *Race - The Power of an Illusion*

**RACE LITERACY QUIZ**
**What differences make a difference?**

The Race Literacy Quiz was developed by California Newsreel, in association with the Association of American Colleges and Universities. The myths and misconceptions it raises are explored in the documentary series *RACE - The Power of an Illusion*, available on video from California Newsreel at Newsreel.org or 1-415-284-7800. For more information and background, visit the companion Web site at racepowerofanillusion.org.

JUMP TO ANSWER KEY>

**1. Humans have approximately 30,000 genes. On average, how many genes separate all members of one race from all members of another race?**

A. None
B. 1
C. 23
D. 142
E. 1008
F. We don't know

**2. Which characteristic did the ancient Greeks believe most distinguished them from "barbarians"?**

A. Religion
B. Skin color
C. Language
D. Dress
E. Hairiness

**3. In Medieval Europe (circa 1300-1400), Ethiopians were looked upon as:**

A. Savages
B. Saviors
C. Barbarians
D. Infidels
E. Negroes

**4. Members of a race can be identified by their:**

A. Blood group
B. Skin color
C. Ancestry
D. Genes
E. None of the above
F. All of the above

**5. Skin color correlates most closely with:**

A. Hair form
B. IQ
C. Risk for sickle cell, Tay Sachs and other genetic diseases
D. Geographic latitude
E. Continent of ancestral origin
F. Jumping and sprinting ability

**6. When Jamestown colonist John Rolfe and his new wife Pocahontas traveled to the Court of London in 1619, it caused a scandal because:**

A. An Englishman had married an Indian
B. John Rolfe had cuckolded General John Smith, the leader of the colony
C. Pocahontas, a princess, married beneath her station by wedding a commoner
D. Londoners had never seen an Indian before
E. A Christian had married a heathen

**7. The rise of the idea of white supremacy was tied most directly to:**

A. Indian removal
B. Slavery
C. The Declaration of Independence
D. The U.S. Constitution
E. Ancient Greece

**8. Which group has the most genetic variation?**

A. Humans
B. Chimpanzees
C. Penguins
D. Fruit flies
E. Elephants

**9. Which two populations are most likely, on average, to be genetically similar?**

A. Italians and Ethiopians
B. Senegalese and Kenyans
C. Italians and Swedes
D. Chinese and Lakota (Sioux)
E. Saudi Arabians and Ethiopians

**10. Most human genetic variation can be found:**

A. Within any local population, for example, among Zulus, or among Hmong
B. Between two populations on the same continent, for example between Irish and Poles
C. Between two populations on different continents, for example between Koreans and Zulus
D. Between any two continents, for example, between Africa and Asia
E. Between tall people and short people

**11. Which continent has the greatest human genetic diversity?**

A. Europe
B. Asia
C. Africa
D. North America
E. South America

**12. Who was the first American public figure to suggest, albeit "as a suspicion only," that black people might be inherently inferior to whites?**

A. Thomas Jefferson
B. Sir Walter Raleigh
C. George Washington
D. Robert E. Lee
E. Capt. John Smith, founder of the Jamestown colony

**13. Which of the following was NOT an important reason why African slavery first took root in North America:**

A. As non-Christians, they had no legal protections
B. They were skilled semi-tropical farmers
C. The supply of indentured servants from Europe was becoming unreliable
D. They were deemed innately inferior
E. They couldn't easily run away

**14. Which was NOT introduced to Indians by whites?**

A. An Indian identity
B. Democracy
C. Identity by "blood quantum"
D. Horses
E. Measles

**15. Of the $120 billion in home loans underwritten by the federal government between 1933 and 1962, what percentage went to white homeowners?**

A. 45 percent
B. 64 percent
C. 75 percent

D. 88 percent
E. 98 percent

**16. Which of the following is not a result of federal government policies?**

A. Redlining
B. Urban renewal
C. Deterioration of inner cities
D. Affirmative action quotas
E. The wealth gap between black and white families

**17. Today, the net worth of the average white family is how much compared to the average black family?**

A. Three times as much
B. Eight times as much
C. Half as much
D. Twice as much
E. The same

**18. When white and black families of similar incomes are compared, what is the difference in their net worth?**

A. No difference
B. Black net worth is slightly greater
C. White net worth is more than eight times greater
D. White net worth is more than two times greater
E. Black net worth is twice as great

**19. According to a 1993 study, 86% of suburban whites lived in a community where the black population was:**

A. Less than 5%
B. Less than 10%
C. Less than 1%
D. More than 10%
E. More than 15%

**20. Which is NOT an example of a government racial preference program?**

A. 1964 Civil Rights Act
B. 1862 Homestead Act
C. 1790 Naturalization Act
D. 1934 Federal Housing Administration
E. 1935 Social Security Act

**ANSWER KEY**

**1. A. None**

There are no characteristics, no traits, not even one gene that distinguish all members of one so-called race from all members of another race.

**2. C. Language**

The word barbarian comes from the Greek word "bar-bar," for someone who stutters, is unintelligible, or does not speak Greek. The Greeks, like most ancient peoples, did not attribute much meaning to physical appearance. In ancient Greece, language was the difference that mattered, because it indicated who was not Greek. Some historians believe that the first to be labeled barbarian were the Scythians of circa 500 B.C., who lived northeast of the Black Sea and were very fair skinned. Ideas of 'race' did not exist during antiquity.

**3. B. Saviors**

In medieval Europe, religion mattered most, not physical appearance. At the time, Christian Europe was at war with the Moslem Empire. Europe looked towards a mythical Christian Ethiopian kingdom, led by the fabled priest-king Prester John, to rescue them from the infidels. Theories of race didn't emerge until the late 18th and early 19th centuries.

**4. E. None of the above**

There are no traits, no characteristics, not even one gene that is present in all members of one so-called race and absent in another. The A, B, and O blood groups can be found in all the world's peoples (the percentage of Estonians and Papua New Guineans with A, B, and O blood are almost exactly identical). Skin color tends to correlate with the earth's geographic latitude not race; sub-Saharan Africans, the Dravidians and Tamils of southern Asia, and Melanesians from the Pacific all have very dark skin. Ancestry is difficult to trace; we all have two parents, four grandparents, etc. If you could trace your family back 30 generations, slightly more than 1,000 years, you'd find one billion ancestors.

**5. D. Geographic latitude**

Skin color tends to correspond with ultra-violet radiation from the sun and hence latitude. People with ancestors from the tropics typically have darker skin while those further north have lighter skin. Sub-Saharan Africans, Asian Indians, Aboriginal Australians and Melanesians all have dark skin. But skin color really is only skin deep. Most traits are inherited independently from one another. The genes influencing skin color have nothing to do with those influencing hair form, eye shape, and blood type, let alone the very complex traits we value such as intelligence, musical ability or athletic ability. Genetic diseases are inherited through families, not race. Sickle cell, for example, confers resistance to malaria. It occurs in people whose ancestors came from where malaria was once common: the Mediterranean, Arabia, Turkey, southern Asia and western and central Africa - but not southern Africa. The presence of sickle cell is not an indicator of race but of having an ancestor from a malarial region.

**6. C. Pocahontas, a princess, married beneath her station by wedding a commoner**

17th century England was a very hierarchical, feudal society where people's class status was fixed at birth. Status was so important that laws regulated the clothing people could wear so they couldn't "pass" as another class. When John Rolfe took his new bride Pocahontas (who had converted to Christianity) back with him to London in 1617, the English had not yet developed the racial ideology that later justified their taking of Indian lands. But it was unthinkable that royalty would marry a commoner.

**7. C. The Declaration of Independence**

Ironically, it was freedom, not slavery, that gave rise to modern theories of race. Until the Revolutionary period, slavery was an unquestioned "fact of life." It was only when Americans proclaimed the radical new idea that "all men are created equal" that slavery was first challenged as immoral. As historian Barbara Fields notes, the new idea of race helped explain why some people could be denied the rights and freedoms that others took for granted.

**8. D. Fruit flies**

Fruit flies have been around for a very long time but they also have a short life span, so lots of genetic mutations have accumulated over many generations. In contrast, modern humans are one of the most genetically similar of all species. On average, only one of every 1,000 nucleotides (the "letters" that make up our DNA) differ one individual from another. This is because we are a relatively young species (approximately 150,000 - 200,000 years old). We simply haven't been around long enough to accumulate much genetic variation. Also, humans have always moved, mixed and mated, further homogenizing our gene pool. Beneath the skin, we're all very similar.

**9. E. Saudi Arabians and Ethiopians**

Populations that live near each other geographically tend to be genetically more alike than populations that live far apart. That's because they are more likely to have intermixed in the recent past and therefore share more genes. So even though Senegalese and Kenyans or Italians and Swedes are traditionally placed in the same "races," they live farther apart from each other and have had less contact and intermixing than Saudis and Ethiopians.

**10. A. Within a local population**

85%, or almost all human variation, can be found within any single local population, whether it's Malay, Irish, Zulus or Koreans. There is FAR more variation within groups than between groups. This means that there may be as many - or more - genetic differences between two random Koreans as between a random Korean and a Zulu. On average, approximately 94% of all genetic variation can be found within any continental area.

**11. C. Africa**

We are all Africans. Modern humans (Homo sapien sapiens) originated in Africa, and we spent most of our evolution as a species together there. Some modern humans first left Africa 50,000 - 70,000 years ago and spread out around the world. All the other populations of the world can be seen as a subset of Africans. Every human genetic trait found elsewhere can also be found in Africa, with the exception of relatively few recent variations favored by the environment, genetic drift, or sexual selection - such as light skin.

**12. A. Thomas Jefferson**

Thomas Jefferson was the first prominent American to speculate that black people might be innately inferior to Europeans. Until then, most Enlightenment figures believed that differences between groups were not inborn but due to environmental factors. It wasn't until Jefferson introduced the radical new ideas of liberty and equality that slavery had to be justified and prejudices against the enslaved began to crystallize into a doctrine of white supremacy. American freedom and the idea of innate racial difference were born together. Historian Barbara Fields calls them "Siamese twins."

**13. D. They were deemed innately inferior**

Throughout much of history, societies have enslaved people, often as a result of conquest, war or even debt. People were not enslaved because they were first deemed inferior. African slaves were well-suited to labor in North America: unlike the Indians, they were resistant to European diseases; they couldn't easily run away; they were not Christians (and hence unprotected by English law); and they were skilled semi-tropical farmers. Finally, in the late 17th century, African slaves became available in large numbers just as the original labor force on Virginia's tobacco plantations - English indentured servants - began to rebel and immigration from England slowed. Over time, the degradation of slavery became identified with blackness, giving white Americans the idea that Africans were a fundamentally different kind of people.

**14. B. Democracy**

United States' representative democracy drew upon the traditions of the Iroquois Confederacy. Indians didn't think of themselves as Indians when European settlers arrived, but rather as members of separate tribes or nations, divided by language, custom and religion. The idea of "blood quantum," i.e., the determination of Indian identity by ancestry, was imposed by the federal government. In contrast, tribal membership traditionally was open to anyone, even Europeans, as long as they accepted tribal customs and authority. There were no horses in the New World until they were brought over by Europeans. Measles, small-pox and other communicable diseases were also unknown in the Americas prior to European exploration. Some historians estimate that up to 90% of all Atlantic coast Indians died from diseases contracted from European traders and explorers by the time of the first Plymouth settlement.

**15. E. 98 percent**

Beginning in the 1930s and 1940s, the federal government created programs that subsidized low-cost home loans, opening up home ownership to millions of Americans for the first time. At the same time, government underwriters introduced a national appraisal system tying property value and loan eligibility to race, inventing "redlining," and effectively locking nonwhites out of home-buying just as most middle class white Americans were beginning to purchase homes.

**16. D. Affirmative action quotas**

Federal affirmative action guidelines specifically prohibit quotas. Beginning in the 1930, the Federal Housing Administration and related programs made it possible for millions of average white Americans to own a home for the first time and set off the post-WWII suburban building boom. The government established a national neighborhood appraisal system, explicitly tying mortgage eligibility to race, a policy known today as "redlining." The FHA and other government policies made possible the post-World War II all-white suburbs, while people of color and in central cities were denied loans. Government policies and practices helped create two legacies that are still with us today: segregated communities and a substantial wealth gap between whites and nonwhites, much of which can be traced to the differential value of their homes.

**17. B: Eight times as much**

Probably no one statistic better captures the cumulative disadvantage of past discrimination than wealth. Even at the same income levels, whites still have, on average, twice as much wealth as nonwhites. Much of this difference is due to the different rates of home ownership and the different values of homes in white and Black neighborhoods. But wealth is not only the end point, it's the starting line for the next generation - helping finance your children's education, helping them through hard times, or helping with the down payment of their own home. Economists estimate 50-80% of one's lifetime wealth accumulation can be traced to this head start. As wealth gets passed down from generation to generation, the legacy of past discrimination accumulates, giving whites and nonwhites vastly different life chances.

**18. D. White net worth is more than two times greater**

See above (Question #17) for explanation.

**19. C. Less than 1%**

According to the 2000 Census, whites are more likely to be segregated than any other group. This is largely a result of past housing discrimination, but it is perpetuated today by unfair practices such as predatory lending, racial steering and a substantial wealth gap between black and white families. Today, 71% of whites own their own home, compared to 44% of African Americans. Black and Latino mortgage applicants are 60% more likely than whites to be turned down for loans, even after controlling for employment, financial, and neighborhood characteristics. On average, nonwhites who are approved for mortgages still pay higher rates.

**20. A. 1964 Civil Rights Act**

The Civil Rights Act made racial discrimination in public places illegal. The other programs are all examples of racial preferences - for white people. Over a 40-year period, the Homestead Act gave away, for free, 270 million acres of what had been Indian Territory, almost all of it to white people. The Naturalization Act allowed only "free white persons" to adopt citizenship, thus opening our doors to European immigrants, but barring Asians and other groups. Racial barriers to citizenship were not removed until 1952. The Federal Housing Administration made it possible for millions of average white Americans - but not others - to own a home for the first time. (see #16 above). And the Social Security Act specifically exempted two occupations from coverage: farm-workers and domestics, both largely non-white.

<BACK TO TOP

▲ back to top

**Home** **Titles A-Z** **New Releases** **Shopping Cart** **Order Tracking** **Contact Us**

# EXHIBIT 41

Sept. 22, 2021
AFT/Edelblut Email
Exchange

(Depo. Ex. 9)

EXHIBIT 9
D. Fenton
5/17/2023
Reporter: Sharon Saalfield RDR, CRR

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "president@aft-nh.org" <president@aft-nh.org>
**Bcc:** "Bond, Christopher" <Christopher.G.Bond@doe.nh.gov>
**Subject:** AFT Invitation
**Date:** Wed, 22 Sep 2021 16:59:38 -0000
**Importance:** Normal
**Attachments:** Anti-Discrimination_faq-educational-programs.pdf
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

Deb,

Thank you for the invitation to join you on the 14th to discuss "Freedom from Discrimination in Public Education."

The department has worked closely with the department of justice and with the human rights commission to craft straight-forward and clear question and answer style guidance for the application of the new legislation. I am attaching a copy of the guidance for your reference.

This guidance gives educators the direction needed to work with the law in their individual education settings. Recognizing that a wide variety of situations may arise, we also want to reiterate our offer to try to work through individual circumstances that may be unclear to teachers. In these cases, the best approach is for them to reach out directly and share the specific facts and circumstances so that we can provide them with clear guidance. Toward that end, if there are specific questions you are seeking guidance on, I would encourage you to submit those to the department and we can provide you with additional information, as appropriate.

In our view, the key here is to not overly complicate the application of the law so that we can ensure all of our students and educators can have a discrimination-free learning environment.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
New Hampshire Department of Education
101 Pleasant Street | Concord, NH 03301
Phone: 603-271-3144

New Hampshire
**Department of Education**



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1. What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

**In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination.**

### 2. What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32; RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

3. **Does the law prohibit teachers from teaching U.S. history?**

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

4. **Are schools allowed to teach students historical concepts related to discrimination?**

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

5. **A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?**

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

6. **Can parents or guardians refuse to allow their children to participate in specific course material?**

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

7. **Does the law apply to public schools?**

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

8. **Does this law apply to all school activities or just teaching?**

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

**9.  Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.  Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes.  For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.  What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they have been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.  Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.  Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.

# EXHIBIT 42

NEA-NH July 12, 2021 and August 5, 2021 Letters (Depo. Ex. 11)

1817

EXHIBIT 11
D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 18

NEA-NH July 12, 2021 and August 5, 2021 Letters



July 12, 2021
**First Class U.S. Mail**

John M. Formella, Esq.
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Re: Implementation Guidance for Public School Districts Regarding House Bill 2

Dear Attorney General Formella:

As President of NEA-NH, which represents 17,000 educators in our state, I write to request the issuance of formal guidance on the implementation of HB 2 within public school districts and public institutions of higher education across the State of New Hampshire. More specifically, the statutory language passed, under the section entitled: "Right to Freedom from Discrimination in Public Workplaces and Education," contains ambiguity requiring clarification. Such clarification is particularly important for certified educators given that the statutory language provides: "IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." (emphasis added).

Therefore, please issue detailed guidance to be followed by educators, administrators and school boards covering, at a minimum, the following subject areas:

1. What types of academic instruction regarding inherent and/or institutional bias or discrimination are prohibited;

2. What it means to permissibly teach prohibited "subjects identified in this section" as a "larger course of academic instruction" as included in section RSA 193:40, II;

3. Which topics related to racial and/or social justice are specifically prohibited from academic teaching and dialogue within public schools;

4. Whether or not academic instruction regarding historical racism, including, without limitation, in relation to slavery, segregation, the civil rights movement and affirmative

action, may still be taught in public school classrooms. If so, how a violation of RSA 193:40 can be avoided when discussing these topics;

5. What specific categories of literature or written subject matters are prohibited from assignment or dissemination to students;

6. What are the parameters educators must follow when answering questions from students about current events that touch the topic areas in the law, e.g. the protests surrounding police reform, the Black Lives Matter movement, and news stories about the passage of this law;

7. What may be taught about historical systems and practices which led to discriminatory outcomes. For example, what is permissible to be taught about "redlining" by the Federal Housing Administration in the 1930's that led to racially segregated neighborhoods throughout the United States;

8. Is teaching about the existence of implicit bias or other similar social sciences prohibited. If not, what are the guideposts for discussing this kind of theory in classrooms;

9. What are the best practices for public school districts, administrators and public educators to avoid a violation of the new provisions enacted by HB 2 regarding the education of public school students;

10. What, if any, discretion remains with the New Hampshire Board of Education to not issue discipline where it is found that a teacher or district allowed students to hear or be taught prohibited information, which, in accordance with RSA 193:40, IV, "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education;"

11. How does the law apply to higher education staff as the law only mentions the academic freedom of faculty members. Are their prohibitions on what staff members can discuss, teach, or provide to students;

12. What are the guideposts for academic freedom provided to University System Faculty. HB2 states the law shall not limit academic freedom to "research, publish, lecture, or teach in the academic setting" does this mean their freedom on these topics is absolute?

Once we have received guidance from the Department of Justice, we will swiftly disseminate that much-needed information to our members. As we approach the 2021-22 academic year, time is of the essence. The current state of confusion caused by HB 2 as it relates to public education will likely lead to unnecessary legal disputes and action if clarification is not provided. If we can be of assistance to you in forming your analysis and/or producing guidance, please do not hesitate to contact us for that purpose.

Thank you for your attention to this important and time-sensitive matter. We look forward to hearing from you soon.

Sincerely,

Megan Tuttle

Megan Tuttle
President
NEA-NH



NEA New Hampshire
Shaping the Future, One Student at a Time

August 5, 2021
**EMAIL**

John M. Formella, Esq. (attorneygeneral@doj.nh.gov)
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Frank Edelblut
Commissioner (frank.edelblut@doe.nh.gov)
Department of Education
101 Pleasant Street
Concord, NH 03301

Re: Request for Further Clarification Concerning Implementation Guidance on House Bill 2for Public School Districts

Dear Attorney General Formella and Commissioner Edelblut:

I write to you as the President of NEA-NH, an organization representing approximately 17,000 educators in New Hampshire, every single one of whom are impacted by the "Right to Freedom From Discrimination in Public Workspaces and Education" law signed by Governor Sununu on June 25, 2021. It is because of this vast impact to our membership that I am following up with a further communication after our letter of July 12, 2021, has thus far been unanswered by your offices.

NEA-NH has reviewed the 2½ -page FAQ guidance issued on Wednesday July 21, 2021 (your Guidance). We appreciate the time and effort expended by your offices in developing this guidance, which answers a number of questions that our members have had about the new law. Additional questions remain, however, on which we seek clarification. Because the licenses, careers, professional reputations, and livelihoods, of our members are at stake for any violation of the law, it is imperative that they have a detailed understanding of what conduct and/or teaching practices are prohibited by the law and constitute "a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." With the 2021-2022 school year quickly approaching, we need your assistance in making the full scope of the law clear.

As we understand the law, as construed though the lens of your July 21st Guidance, we understand it to permit the teaching and discussions described below. If we are mistaken in our legal analysis, please respond in detail to correct our understanding. Given the high stakes for our members, it is imperative for our members to be provided with reliable, detailed guidance that will allow them to clearly avoid the severe consequences of violating this amorphous law.

We understand as follows:

1. Discussing with students[1] incidents of racism or other prejudices exhibited and experienced by them or others in the school community or elsewhere is permitted.

2. Engaging in conversations about racism or other prejudices students, or others known to them, may have exhibited in the past is not prohibited provided the educator does not instruct students that they exhibited those behaviors because of inherent characteristics.

3. It is permissible to draw attention to the language, behavior, or writing of a student that might be sexist, racist, or otherwise prejudicial. The law does not prohibit educators from referring for discipline students for such behavior or comments provided it is done in accordance with school policy and procedure and state law. In fact, in order to comply with requirements of the "Bullying Law" educators are required to recognize and report such conduct in accordance with the school board policy implementing the law. *See* NH RSA 193-F.

4. Introducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group. Implicit bias training and education specifically pertaining to states of mind which are learned, assumed, or reinforced by society and not "inherent," is permitted.

5. Structural Racism (a.k.a Societal Racism, Systemic Racism) describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government. It does not contemplate that persons or groups are naturally, biologically, or innately racist. Therefore, including the concept of Structural Racism in instruction and conversation with students is permitted. [2]

6. Specific books or works of certain authors are not "banned" under the law. [3] Assigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator

[1] "Students," encompasses both K-12 students and higher education students. "Educators," are those teaching and non-teaching employees in both K-12 and public higher education institutions.

[2] For example, students could be taught, not only about the racist historical practice of "redlining," but also about the lasting inequalities and structural barriers it has created for generations of African Americans.

[3] On June 13, 2021 Commissioner Edelblut wrote an Op-Ed in the Union Leader leaving the distinct impression that Dr. Ibram Kendi's book, *How to be an Anti-Racist* may not be assigned under the new law. He raised the same proposition at the July 8, 2021 State Board of Education meeting. The Guidance is not consistent with his statements. Please address this contradiction. Additionally, if there are certain texts which your offices' believe are *per se* prohibited under this law, please provide a list so educator's know that prior to making 2021-2022 lesson plans.

conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion. For example, the works of James Baldwin are not *per se* prohibited from instruction or discussion in accordance with the above.

7. The law permits teaching novels, non-fiction works, or other approved texts by instructing students on, and discussing, the historical context surrounding the works. Such permitted instruction and discussion includes information on racism or other prejudices which were expressed in both overt and subtle ways by systems, individuals, and government actors.

8. The law permits instruction on, and discussion of, racism and oppression in teaching historical events and contemporary events, so long as students are not instructed that the individual actors were inherently racist. For example, educators may explain the racism carried out systematically, collectively and individually by southern slave owners in the United States, prior to the American Civil War. Educators may also explain the collective and large-scale societal discrimination and genocide carried out by Nazi Germany against Jewish populations in several countries. These historical issues can be connected to the modern era to explain the danger of racism and neo-Nazi groups that exist today.

9. Teaching historically accurate lessons is permissible under the law, even if that history challenges students' notions of history as they previously understood it, provided the educator does not assign racist or prejudicial actions to the historical actors as inherent to them. For example, accurately teaching about the genocidal impact on Native Americans of the arrival of colonial Americans to the United States, and the subsequent western expansion of the United States, is permitted.

10. The use of the historical primary sources (original documents) in coursework is permitted provided the use of sources is part of a larger course of academic instruction. This is the case even if the sources may contain an author's assertion that one race or group is inherently inferior to another, for example Thomas Jefferson's *Notes on the State of Virginia.*

11. Similarly, it is permissible to assign reading of fiction and non-fiction works where character(s) may express discriminatory beliefs or engage in discriminatory acts against other characters or persons, for example *To Kill a Mockingbird* or *Huckleberry Finn*. Discussion about the actions of those characters, their discriminatory beliefs, or intent is not prohibited.

12. It is permissible under the law to use teaching techniques which probe a student's understanding of their current reality, push them to think critically and analytically about social and historical contexts, and asks them to empathize with others or consider a different perspective then the one they currently have, provided the educator does not require that the student adopt a view that racism is inherent to some individuals.

13. It is permissible to discuss the subject of "white privilege," a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is "inherent" or cannot be overcome.

14. It is permissible to engage with students in discussion of gender non-conformity, acknowledging different gender identities of students and colleagues, and curriculum which contains characters and story lines which discuss or highlight gender non-conforming, or LGBTQ individuals provided the text does not promote discrimination of such individuals.

15. The law permits the exhibiting and sharing of art, music, dance, or other artistic expressions that comment on racism, sexism, or other prejudices provided it is age appropriate and relevant to the curriculum approved by the School Board or higher education institution. It is also permitted for artists, writers, and historians to address students or for students to read about the artist's motivation for the work.

The paragraphs above do not purport to exhaustively describe all of the instruction and discussion that is permitted under the law but are illustrative of the types of discussion and instruction that we understand remain permitted. We appreciate your prompt response to confirm that these examples are consistent with your understanding of the law, so that educators may plan accordingly for the upcoming year.

We expect that as the implementation of the law moves forward, we may encounter scenarios requiring further analysis. We are hopeful that your offices, as the chief law enforcement and educational agencies of the Granite State, will have continual open dialogue with us about these issues as they arise.

Sincerely,

Megan Tuttle

Megan Tuttle
President, NEA-New Hampshire

# EXHIBIT 43

Sept. 13, 2021
NEA-NH Email to
HRC

(Depo. Ex. 54)

EXHIBIT 54
WIT: Malachi
DATE: 5-24-23
Cynthia Foster, RPR, LCR #14

**From:** "BurkeCohen, Sarah" <Sarah.E.BurkeCohen@hrc.nh.gov>
**To:** "Malachi, Ahni" <Ahni.N.Malachi@hrc.nh.gov>
**Subject:** Requesting a workshop or Webinar to further clarify Sections 297 and 298 of HB 2
**Date:** Mon, 20 Sep 2021 15:08:31 -0000
**Importance:** Normal

---

See below.

*Sarah E. Burke Cohen, Esq.*
Assistant Director
NH Commission for Human Rights
2 Industrial Park Drive
Concord, New Hampshire 03301
Phone: (603) 271-6840
Fax: (603) 271-6339

****PLEASE NOTE MY NEW EMAIL ADDRESS AND UPDATE YOUR ADDRESS BOOK****
**Sarah.E.BurkeCohen@hrc.nh.gov**

Statement of Confidentiality

The information contained in this electronic message and any attachments to this message may contain confidential or privileged information and is intended for the exclusive use of the addressee(s). Please notify the Human Rights Commission immediately at (603) 271-6840 or reply to Sarah.E.BurkeCohen@hrc.nh.gov if you are not the intended recipient and destroy all copies of this electronic message and any attachments.

---

**From:** Irv Richardson <irichardson@nhnea.org>
**Sent:** Monday, September 13, 2021 11:02 AM
**To:** HRC: Human Rights Commission <humanrights@nh.gov>
**Cc:** Irv Richardson <irichardson@nhnea.org>
**Subject:** Requesting a workhop or Webinar to further clarify Sections 297 and 298 of HB 2

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

---

Good morning,

My name is Irv Richardson and I am the Coordinator for Public Education and School Support for NEA-New Hampshire. One of the responsibilities of my role is to provide professional development for educators in New Hampshire – particularly the 17,000 educators who are members of our organization. Many of the licensed educators who teach Social Studies in New Hampshire's public school are seeking clarification on Sections 297 and 298 of House Bill 2. We have shared the guidance on your website with members but many of our members still have questions and want to better understand the law.

Do you have someone associated with the Human Rights Commission who might provide further clarification on the law and answer questions from educators using a virtual platform? I have reached out to the New Hampshire

Department of Education and they indicated that I should make such a request to you. We have our next conference scheduled for October 8th but this topic is so important, we can accommodate any time that would be convenient for the presenter you recommend.

I look forward to hearing from you.

Sincerely,

Irv Richardson, Ed.D.
Coordinator for Public Education and School Support, NEA-New Hampshire

# EXHIBIT 44

Oct. 18, 2021
Email from R.
Farrell to D.
Fenton

(Depo. Ex. 24)

EXHIBIT 24
R. Farrell
5/18/2023
Reporter: Sharon Saalfield
RDR, CRR

**From:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
**To:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
**Subject:** RE: Code of Ethics training
**Date:** Mon, 18 Oct 2021 16:26:56 -0000
**Importance:** Normal
**Attachments:** continued_excellence--HB2.pptx; Ed_511.pdf; Crimes_Which_Bar_Employment_in_Education.pdf; AG_guidance_HB_2.pdf

---

Good Morning,
I have been asked to schedule this training and, perhaps, do the presentation. Please find attached documents for dissemination to your staff. Is it possible to provide a laptop and power point for use? We would prefer a start time of 1030. That will give us approximately 60 minutes for the presentation and room for questions.
Will that work for you? Thank you for giving us the opportunity to meet your staff.
Respectfully,
Rich Farrell

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

***The contents of this message are CONFIDENTIAL Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is PROHIBITED. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.***

---

**From:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Sent:** Monday, October 18, 2021 12:10 PM
**To:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Subject:** FW: Code of Ethics training

Pls see if you can cover this

---

**From:** Judy Tilton <jtilton.cca@gmail.com>
**Sent:** Monday, October 18, 2021 11:12 AM
**To:** Fenton, Diana <Diana.Fenton@doe.nh.gov>
**Subject:** Code of Ethics training

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

---

Good Morning,
I was wondering if you could give a COE training to our staff on their next PD day, 11/3/2021?
We can do it at whatever time is convenient for you.
Thank you in advance,
Judy Tilton
Compass Classical Academy
603-455-3455



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1. What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

**In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination.**

### 2. What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

3. **Does the law prohibit teachers from teaching U.S. history?**

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

4. **Are schools allowed to teach students historical concepts related to discrimination?**

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

5. **A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?**

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

6. **Can parents or guardians refuse to allow their children to participate in specific course material?**

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

7. **Does the law apply to public schools?**

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

8. **Does this law apply to all school activities or just teaching?**

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

**9.    Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.    Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes. For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.    What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they have been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.    Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.    Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.

New Hampshire
**Department of Education**

# CONTINUED EXCELLENCE

ELEVATING AN ESTEEMED PROFESSION

**Diana E. Fenton**, Esq., Chief, Governance Unit
**Richard Farrell**, Investigator

**"An ethics code reflects a collective decision that a profession is better off when ethical standards are not based solely on individual assessments of what is or is not acceptable."**

Fisher. C. (2013). Decoding the Ethics Code: A practical guide for psychologists (3rd edition).

## Code of Conduct is Not Punishment—

## **It is about Process!!!**

# A BRIEF HISTORY OF CREATING THE CODE OF ETHICS & CODE OF CONDUCT

June 2015—PSB began to look into a code of ethics;

August 2016—Commissioner Barry created Ethics Task Force;

Sept-Dec 2016—Task Force begins work on Code of Ethics;

April 2017—HB 210 signed into law;

Sept-Dec 2017—Task Force transitions focus to Code of Conduct;

Summer of 2018—State Board accepts Code of Ethics;

November 2018—State Board adopts Code of Conduct



1836

# STAKEHOLDERS

aft
A Union of Professionals
NEA New Hampshire
New Hampshire
Council for Teacher Education
IHE NETWORK
A CONSORTIUM OF NH EDUCATOR PREPARATION PROGRAMS
New Hampshire
Professional Standards Board
NHSAA
New Hampshire School Administrators Association
New Hampshire
Department of Education

New Hampshire
**Department of Education**

DOE-09651

# STATUTE

TITLE I
STATE AND ITS GOVERN...

CHAPTER 21-N
DEPARTMENT OF EDUCATION

Section 21-N:9

(cc)(1) The establishment and enforcement of a code of ethics for certified educational personnel, which shall be adopted no later than July 1, 2018. This professional code shall include a statement of purpose and standards defining each of the 4 primary principles which are:

(A) Responsibility to the education profession and educational professionals.

(B) Responsibility to students.

(C) Responsibility to the school community.

(D) Responsible and ethical use of technology as it relates to students, schools, and other educational professionals.

(2) The professional code of ethics shall apply to all teachers, supervisors, administrators, and other personnel licensed or seeking licensure in the education profession in the state of New Hampshire. In this subparagraph, "teacher" means a person who has applied for or holds a valid teaching license, credential, or other equivalent certificate issued by the state board of education.

## RSA 21-N:9, II(CC)

New Hampshire
**Department of Education**

# RULES

PART Ed 510 CODE OF CONDUCT

Section Ed 510.01 Principle I – Responsibility to the Education Profession and Educational Professionals
Section Ed 510.02 Principle 2 – Responsibility to Students
Section Ed 510.03 Principle 3 – Responsibility to the School Community
Section Ed 510.04 Principle 4 – Responsible and Ethical Use of Technology
Section Ed 510.05 Duty to Report

– Responsibility to the Education Profession and
Principle 2 – Responsibility to Students
Principle 3 – Responsibility to the School Community
Principle 4 – Responsible and Ethical Use of Technology
510.05 Duty to Report

DENIAL, INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS
Section Ed 511.01 Complaints, Cases and Investigations
Section Ed 511.02 Reprimand, Suspension, or Revocation
Section Ed 511.03 Disciplinary Hearings
Section Ed 511.04 Status of a Credential Pending Completion of Disciplinary Proceeding
Section Ed 511.05 Grounds for Reinstatement After Suspension

PART Ed 512 DENIAL OR CERTIFICATION

MASTER PLAN AND RECERTIFICATION

of Local Professional Development Master Plan
Development Plan
of Educators Under the Professional Development Master Plan
of Educators Not Under the Local Professional Development Master Plan

REQUIREMENTS FOR INITIAL CERTIFICATION
Section Ed 514.01 Basic Academic Skills and Subject Area Assessment
Section Ed 514.02 Validation Studies
Section Ed 514.03 Highly Qualified Teacher

CHAPTER Ed 600 APPROVAL OF PROFESSIONAL PREPARATION PROGRAMS
PART Ed 601 DEFINITIONS
Section Ed 601.01 Definitions

PART Ed 602 PROCEDURES FOR APPROVAL
Section Ed 602.01 Scope of Approval Process
Section Ed 602.02 Evaluation Requirements
Section Ed 602.03 Demonstrated Competencies
Ed 602.04 Approval Requirement
602.05 Application Fees for Program Approval
Option 1
Option 2

Approval Recommendations

New Hampshire
**Department of Education**

DOE-09653

# THE DIFFERENCE

**Code of Conduct**
*NH's Principles of Professional Conduct*

**Code of Ethics**
*The Code of Ethics for New Hampshire Educators*

New Hampshire
**Department of Education**

# ARE YOU TALKING TO ME?

Who is the document applicable to??

Code of Ethics—Applicable to all educators and all school personnel

Code of Conduct—Applicable to all credential holders

"Credential" is defined in Ed 501.02(g)—page 9 of the Code of Ethics & Conduct booklet!



# WHY IS A CODE OF CONDUCT IMPORTANT?

- **Child Safety should not be determined by zip code!!**
- Teachers are asked to play an increasingly expansive role in students' lives without any discussion of the inherent risks of this.
- All professions that are characterized by intimate relationships rely on professional standards and norms that help them recognize and respond appropriately when navigating interactions.

# CODE OF CONDUCT VS. CODE OF ETHICS

Code of Ethics is guidance—aspirational in nature—articulates responsibilities common to all members of the education profession.

Code of Conduct establishes the lowest standard of care—it is actionable only against credential holders

Applicable on or off duty!

New Hampshire
Department of Education

# CODE OF ETHICS & CONDUCT

***Difference in language:***

*Code of ethics:*

When communicating with students, utilizes social media responsibly, transparently and primarily for the purposes of teaching and learning

*Code of Conduct:*

An educator shall not engage in harassment, stalking, or bullying via electronic media.

# EMPLOYMENT VS. LICENSURE

- Licenses are required in professions that require public trust;
- Employment and licensure are separate concepts;
- The Department's role is ***broader in jurisdiction***, but ***narrower in scope***.

# The Analysis…..

*Separate and distinct, but sometimes they affect each other.*

Employment
Code of Ethics
Code of Conduct

# CODE OF ETHICS & CONDUCT

Four Principles:

Principle I—Responsibility to the Education Profession and Educational Professionals;

Principle II—Responsibility to Students;

Principle III—Responsibility to the School Community;

Principle IV—Responsible and Ethical Use of Technology

**Principle V—Duty to Report

# CODE OF CONDUCT—PRINCIPLE 1 (ED 510.01)

***Responsibility to the Education Profession & Educational Professionals:***

- Failure to report if arrested for RSA 189:13-a, V offense;
- Falsifying professional qualifications;
- Unlawful possession of drug;
- Possessing or being under influence of drugs or alcohol on school premises or school sponsored activity where students are present.



# CODE OF CONDUCT—PRINCIPLE II (ED 510.02)

***Responsibility to Students:***

- Failure to provide appropriate supervision of students pursuant to local policy;
- Furnishing alcohol or illegal drugs to students;
- Engaging in sexual activity with student;
- Soliciting participation in sexual relationship

* "Student" is defined as being up to 10 months after graduation

# CODE OF CONDUCT—PRINCIPLE III (ED 510.03)

***Responsibility to the School Community:***

- Accepting gifts or favors where there might be an actual or appearance of a conflict of interest

**Gifts of small amount shall NOT be deemed conflict of interest.

- Misuse of funds for use by the school
- Intentional altering or misrepresenting student assessments, results or official school records.



## SO WAIT JUST A MINUTE......

What if a parent gives me a bottle of wine as a present?

Am I going to lose my license for that??

# CODE OF CONDUCT—PRINCIPLE IV (ED 510.04)

***Responsible & Ethical Use of Technology:***

- Soliciting a sexual relationship with a student
- Engaging in inappropriate communication—intent, timing, subject matter and amount of communication and whether communication could reasonably be interpreted as being sexual in nature.

* "Student" is defined as being up to 10 months after graduation



# I NEED SOME EXAMPLES OF WHAT YOU ARE SAYING

- “YOU were one of my rare accomplishments”
- “I saw special in you from the beginning”
- “I felt compelled to both nurture and provocatively challenge [your thoughts]”

# CODE OF CONDUCT—PRINCIPLE V (ED 510.05)

***Duty to Report:***

- Any credential holder shall report any suspected violation of the code of conduct
- Superintendent shall report to office of credentialing when a credential holder has been arrested for RSA 189:13-a and violated code of conduct
- Credential holders shall report abuse or neglect



# PROHIBITION ON TEACHING DISCRIMINATION

- Section 297 & 298 of HB 2 was passed during the 2021 Legislative Session

I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior

to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

# PROHIBITION ON TEACHING DISCRIMINATION

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.

# PROHIBITION ON TEACHING DISCRIMINATION

- All suspected violations of this new law are to be reported to the Human Rights Commission
- The Human Rights Commission will adjudicate these cases
- A finding of a violation of this law by the Human Rights Commission shall be a violation of the Code of Conduct for educators.

****Please see Technical Advisory by the NH Attorney General's Office on this law for more guidance.*

# INVESTIGATIONS—ED 511.01

- Initial review
- Credential holder is notified if placed under investigation
- Superintendent is notified if credential holder is placed under investigation

# INVESTIGATIONS—ED 511.01

This letter serves as the official notification, pursuant to New Hampshire Administrative Rule Ed. 511.01, that the New Hampshire Department of Education has initiated an investigation into a complaint against you which alleges that you engaged in an act or acts which violate the New Hampshire Code of Conduct for Educational Professional as enumerated in Ed. 510.01-510.04.

Specifically, the Department of Education has become aware of an action(s) which may have violated Ed ------- of the Code of Conduct for Educational Professionals. Specifically, the allegation is that you ------------------. At this time, no action has been taken against your teaching credential. Therefore, your teaching credential is still valid during this pending investigation. A copy of this letter will be provided to the superintendent of SAU ----- and the Union.



# SANCTIONS—ED 511.02

**Four options---3 forms of sanction:**

*Close out case*—Allegation unfounded—no action taken

*Suspension*—rescinded for set period of time

*Revocation*—permanently rescinded

*Reprimand*—note to file of credential holder

# INVESTIGATIONS—ED 511.01

Considerations of sanctions:

- Seriousness of offense;
- Prior disciplinary record
- Potential harm to students
- Purpose of the rule violated

# REPRIMAND, SUSPENSION OR REVOCATION

Ed 511.02

- All discipline is documented in writing
- Signed by all parties
- Maintained in electronic credentialing file

Ed 502.01

List of suspended and revoked educators is maintained and is on DOE website

Ed 511.05

Grounds for Reinstatement after Suspension



THE STATE OF NEW HAMPSHIRE

In re: NAME

Credential Suspension Agreement

In Consideration For the Suspension of Educator Credential Between:

NAME (EdId: XXXX)

and

The New Hampshire Department of Education

WHEREAS NAME (EdId: XXXX) maintains an Educator Certificate in -------------.

WHEREAS NAME (EdId: XXXX)

NOW THEREFORE, NAME (EdId: XXXX) agrees to voluntarily surrender his Educator Credential in --------------, which will result in a suspension of his educator credential pursuant to the following conditions:

1. NAME shall voluntarily surrender his educator credential. This voluntary surrender will result in the SUSPENSION of his New Hampshire Educator Credential (EdId: XXXX). This suspension shall become effective on XXXX, immediately upon all required parties signing this agreement. The terms of this suspension are as follows:

# OTHER ISSUES TO BE AWARE OF—ED 511.04

If arrested for RSA 189:13-a, V, DOE can do an immediate suspension of credential

- Credential holder and school district will be notified
- Credential holder is entitled to hearing within 10 days.

# NEED TO REPORT?

**Richard Farrell, Investigator**

271-8372 (office)

231-0521 (cell)

**Diana Fenton, Esq. Chief of the Governance Unit**

271-3189 (office)

325-2198 (cell)

New Hampshire
**Department of Education**

# EXHIBIT 45

July 21, 2021
Guidance

(Depo. Ex. 55)



EXHIBIT 55
WIT: Malach
DATE: 5-24-23
Cynthia Foster, RPR, LCR

# EXHIBIT 19

July 21, 2021
Guidance



From: **Giaquinto, Kate** <Kate.M.Giaquinto@doj.nh.gov>
Date: Wed, Jul 21, 2021 at 4:45 PM
Subject: NH AG NEWS RELEASE: State Issues Guidance Regarding New Anti-Discrimination Laws
To: Giaquinto, Kate <Kate.M.Giaquinto@doj.nh.gov>

**NEWS RELEASE**

Released by: Frank Edelblut, Commissioner, Department of Education
Ahni Malachi, Executive Director, Commission for Human Rights
John M. Formella, Attorney General
Subject: State Issues Guidance Regarding New Anti-Discrimination Laws
Date: July 21, 2021
Contact: Kate Giaquinto, Directory of Communications

kate.m.giaquinto@doj.nh.gov | (603) 573-6103

Concord, NH – Attorney General John M. Formella, Department of Education Commissioner Frank Edelblut, and Commission for Human Rights Executive Director Ahni Malachi announce the release of guidance related to Sections 297 and 298 of House Bill 2.
The guidance for public employers and government programs is available at: https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf
The guidance for public schools is available at: https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf
Any person who believes that they have been subjected to discrimination may file a complaint with the New Hampshire Commission for Human Rights, nh.gov/hrc/howto.html, or the Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-rights/.

###

New Hampshire
**Department of Justice**
*Office of the Attorney General*

# News Release

**For Immediate Release**
July 21, 2021

**Contact:**
Kate Giaquinto, Director of Communications
kate.giaquinto@doj.nh.gov | 603-573-6103

## State Issues Guidance Regarding New Anti-Discrimination Laws

Concord, NH – Attorney General John M. Formella, Department of Education Commissioner Frank Edelblut, and Commission for Human Rights Executive Director Ahni Malachi announce the release of guidance related to Sections 297 and 298 of House Bill 2.

The guidance for public employers and government programs is available at: https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf]**

The guidance for public schools is available at: https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf]**

Any person who believes that they have been subjected to discrimination may file a complaint with the New Hampshire Commission for Human Rights, nh.gov/hrc/howto.html **[https://www.nh.gov/hrc/howto.html]**, or the Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-rights/ **[https://www.doj.nh.gov/civil-rights/index.htm]**.

New Hampshire Department of Justice
33 Capitol Street | Concord, NH | 03301
Telephone: 603-271-3658

# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1. What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

**In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination.**

### 2. What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

**3. Does the law prohibit teachers from teaching U.S. history?**

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

**4. Are schools allowed to teach students historical concepts related to discrimination?**

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

**5. A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?**

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

**6. Can parents or guardians refuse to allow their children to participate in specific course material?**

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

**7. Does the law apply to public schools?**

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

**8. Does this law apply to all school activities or just teaching?**

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A, that impact public employers and government programs. Please see separate document that addresses changes to schools and educational programs contained in RSA chapter 193.

## Changes Regarding Public Employers and Government Programs

**1. What are public employers and government programs prohibited from training and advocating?**

Public employers and government programs are prohibited from training and advocating that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

**In short, do not train or advocate that a person or a group is inherently oppressive, superior, inferior racist, or sexist. Train and treat all equally and without discrimination.**

**2. What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?**

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

3. **Are these the same prohibitions as those contained in the "divisive concepts" bill, HB 544?**

No. HB 544 did not become law and therefore, does not apply or impact public employers, government programs, or schools in New Hampshire. The term "divisive concepts" is not found anywhere in the new law.

4. **Can public employers and government programs undertake efforts designed to examine issues related to equity, diversity, inclusion, equality, and other related topics?**

Yes. Nothing in this new law prohibits public employers or government programs from taking steps to examine issues related to equity, diversity, inclusion, equality and other related topics.

5. **Can trainings address practices or ideas that have harmed or continue to harm certain identified groups?**

Yes. Nothing prohibits trainings geared toward educating participants about practices or ideas that may disproportionately affect certain identified groups.

6. **Can public employers and government programs conduct trainings designed to improve diversity, equity, and inclusion, such as implicit bias training?**

Yes. Nothing prohibits trainings geared towards diversity, equity, equality and inclusion.

Nor does anything prohibit implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally.

The new law expressly permits public employers and government programs to provide and require "sensitivity training" based on the "inherent humanity and equality of all persons" and the "ideal that all persons are entitled to be treated with equality, dignity, and respect."

7. **A public employee has claimed that a required diversity training has made them uncomfortable. Has the public employer or government program discriminated against that employee?**

No. It is important to note that trainings that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make participants uncomfortable. These trainings may encourage or prompt participants to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequence.

8. **What remedies are available to public employees or program participants who believe that a public employer or government program has violated one of the new anti-discrimination statutes?**

A person who believes that they have been subject to discrimination, may file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

9. **Can a public employee file a claim based upon a training that occurred in 2020?**

No. Complaints alleging a violation of the new laws may only be considered for conduct that occurred after the enactment of those laws on June 25, 2021.

10. **If I am an individual or group simply using a public facility for non-government use, for example a private event or activity at a school building or town hall, does this new law apply to me?**

No.

# EXHIBIT 46

DOJ's
Interrogatory
Responses

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| Local 8027, AFT-New Hampshire, et al.<br><br>Plaintiff,<br>v.<br><br>Frank Edelblut, Commissioner et al,<br><br>Defendants. | * | No. 1:21-cv-01077-PB |

**ATTORNEY GENERAL JOHN FORMELLA'S OBJECTIONS AND RESPONSES TO THE PLAINTIFFS' FIRST SET OF INTERROGATORIES**

John Formella, in his official capacity as Attorney General of the State of New Hampshire, by and through undersigned counsel, submits the following objections and responses to the plaintiffs' first set of interrogatories.

**GENERAL OBJECTIONS**

The Attorney General incorporates the following General Objections into each and every individualized response contained herein, as set forth below, and into each and every amendment, supplement or modification to the objections and answers hereafter provided to the interrogatories. The Attorney General does not waive any General Objection in response to any interrogatory.

1. The Attorney General objects to each definition, instruction, and interrogatory to the extent that it seeks to impose obligations beyond those imposed by the Federal Rules of Civil Procedure or any other applicable law or rule. As such, the Attorney General's objections and responses do not constitute an adoption of plaintiffs' definitions or instructions.

2.      The Attorney General objects to each definition, instruction, and interrogatory to the extent it purports to require the disclosure or production of information subject to the attorney-client privilege, the work product doctrine, the executive privilege, the legislative privilege, the deliberative process privilege, or any other privilege or is otherwise immune from disclosure under state or federal law.  Any inadvertent disclosure of information that is protected under any privilege, immunity, or legal bar shall not constitute a waiver of that privilege, immunity, or legal bar and shall not prevent the Attorney General from objecting to discovery with respect to such information or use of such information in court.

3.      The Attorney General objects to each definition, instruction, and interrogatory to the extent it seeks the production of information that is irrelevant to the issues germane to this matter or is unduly broad or would subject the Attorney General's Office to unreasonable, oppressive, or undue burden or expense, or is otherwise not proportional to the needs of the case.

4.      The Attorney General objects to each definition, instruction, and interrogatory insofar as it seeks to have the Attorney General identify information or documents already in the plaintiffs' possession or readily accessible to plaintiffs or that the plaintiffs may produce in this case.

5.       The Attorney General objects to each definition, instruction, and interrogatory to the extent that it purports to seek information which is not within the knowledge, possession, custody, or control of the Attorney General's Office.

6.      The Attorney General objects to each definition, instruction, and interrogatory to the extent it calls for speculation or conjecture, opinion, or legal conclusions.

7.      The Attorney General objects to each definition, instruction, and interrogatory to the extent that it is vague or ambiguous.

8. The Attorney General objects to each definition, instruction, and interrogatory to the extent it assumes certain legal conclusions or certain facts not established in this proceeding. The Attorney General does not admit, adopt, or acquiesce to any factual or legal contention, characterization, or implication that is contained in any definition, instruction, or interrogatory.

9. The Attorney General objects to each definition and instruction to the extent it: (i) is unclear, ambiguous, overbroad, or unduly burdensome; (ii) is inconsistent with the ordinary, customary meaning of the words or phrases it purports to define; or (iii) purports to impose any requirement or discovery obligations beyond those set forth in the Federal Rules of Civil Procedure or pertinent case law.

10. The Attorney General reserves all objections as to the relevance or admissibility of any response provided herein and reserves the right to supplement or amend any such answer as discovery continues.

**SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

1. The Attorney General specifically objects to every definition and instruction on relevancy grounds. The Attorney General maintains that the plaintiffs' remaining claims present pure questions of law and that discovery in this case is unnecessary.

2. The Attorney General specifically objects to every definition and instruction other than the fourth definition and instruction (defining "amendments") as overly broad, unduly burdensome, and not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery in this case. During the hearing on the motion to dismiss and the preliminary pretrial conference, the Court made clear that discovery in this case was to be narrow and targeted. The Court approved the parties' discovery plan with this understanding. The definitions and instructions reflect no attempt at narrowing or targeting discovery in the manner

contemplated by the parties and the Court. Rather, the definitions and instructions are as broad, if not broader, than what would typically be included in a case set on a standard or complex trial schedule. The Attorney General specifically objects to the definitions and instructions, except the fourth definition and instruction, on this basis. In responding to these interrogatories, the Attorney General provides the information set forth in the responses based on a reasonably diligent search commensurate with the expedited, streamlined discovery plan set in this case.

## INTERROGATORIES

1. Please identify the following: (i) your name, title and professional address; and (ii) the name and address, and title and professional address, of each person consulted by you in answering these Interrogatories, specifying on which Interrogatories such person was consulted.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks the personal address of each person consulted by the Attorney General's Office in answering these interrogatories. Such information is irrelevant and unduly burdensome to produce in light of privacy interest in such information.

The Attorney General further objects on the basis that part (i) of this interrogatory is ambiguous. Plaintiffs have specifically defined the word "your" to include a vast number of individuals not limited to the present Attorney General John Formella. As such, it is unclear whether plaintiffs intend the term "your" to mean the Attorney General's Office generally, Attorney General John Formella specifically, or something else. In responding to this interrogatory, the Attorney General interprets the term "your" as used in part (i) to mean the Attorney General's Office, generally.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** (i) New Hampshire Department of Justice
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

(ii) Sean R. Locke
Assistant Attorney General
33 Capitol Street
Concord, NH 03301
Consulted on Interrogatory Nos. 1–9

Jill A. Perlow
Associate Attorney General
33 Capitol Street
Concord, NH 03301
Consulted on Interrogatory Nos. 1–9

Nathan W. Kenison-Marvin
Assistant Attorney General
33 Capitol Street
Concord, NH 03301
Consulted on Interrogatory Nos. 1–9

2. Please describe any policies, protocols, procedures, or standards that exist or have existed concerning the enforcement of the amendments, stating when and to whom promulgated or copied and how you have interpreted the amendments' terms.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory to the extent it asks the Attorney General to "interpret the amendments' terms," as "[t]he interpretation of a statute is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans*, Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** On July 21, 2021, the New Hampshire Department of Justice, the New Hampshire Department of Education ("NHED"), and the New Hampshire Commission for Human Rights ("HRC") issued guidance documents in the form of Frequently Asked Questions ("FAQs"). One set of FAQs was for public employees and government programs and the other was for public schools. Links to the FAQs are available on the

DOJ's website at https://www.doj.nh.gov/news/2021/20210721-anti-discrimination-laws.htm, and NHED's website at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination.

On September 7, 2021, the New Hampshire Department of Justice issued Attorney General Opinion No. 2021-01. Attorney General Opinion No. 2021-01 is "an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 [ ], to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40." A link to Attorney General Opinion No. 2021-01 is available on the DOJ's website at https://www.doj.nh.gov/public-documents/opinions.htm.

3. Please identify all memorandum or other written materials explaining the Department of Justice's procedure for evaluating and responding to complaints filed pursuant to the amendments, stating when and to whom promulgated or delivered.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory to the extent it asks the Attorney General to "interpret the amendments' terms," as "[t]he interpretation of a statute is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans*, Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

The Attorney General further objects to this interrogatory because the phrase "all . . . other written materials" is not defined and unclear. For purposes of responding to this interrogatory, consistent with the streamlined, expedited discovery plan the parties agreed to in this case, the Commissioner interprets the phrase "other written materials" to refer to formal documents such as policies, procedures, protocols, standards, training documents, or written information on DOJ's website.

The Attorney General further objects to this interrogatory because the phrase "complaints filed pursuant to the amendments" is not reasonably clear. Specifically, it is unclear whether this is intended to refer to complaints filed with a government entity other than DOJ, complaints filed with DOJ, or complaints filed with either a government entity other than DOJ or with DOJ. In answering this interrogatory, the Attorney General interprets this phrase to mean complaints filed with the DOJ and not with any other government entity.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** There is no memorandum or other written material that explains a procedure specific to evaluating and responding to complaints filed pursuant to the amendments specifically.  Since January 2021, the DOJ Civil Rights Unit has had internal written "Procedures and Protocols" related to evaluating and responding to all complaints that it receives.

    4.    Please describe the training provided to any employees concerning how to implement the amendments, identifying by name, position and duties of each such employee, when, where and how such training was conducted and by whom.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory because the term "training" is not defined and vague.  The Attorney General interprets accordingly interprets this term in accordance with its plain and ordinary meaning, as understood by the Attorney General.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** The Department of Justice did not provide training to any employees concerning how to implement the amendments.

5. Please describe the "order of operations" of how the amendments are enforced as referenced on pages 33-35 of Defendants' March 25, 2022 motion to dismiss—including the contention that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted"—and how this process has been formalized by your office.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory to the extent it seeks a legal opinion beyond the scope of a proper interrogatory. *See Martin v. Evans*, Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** The description of the "order of operations" on pages 33–35 of Defendants' March 25, 2022 motion to dismiss speaks for itself. With respect to the statement therein that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed education is warranted," this statement is based on the plain and ordinary meaning of the language of RSA 193:40, as interpreted in the context of the overall statutory scheme within which it exists.

6. Please describe all complaints (either written or oral) received or concerns raised to and/or by your office alleging a possible violation of the amendments. This request includes a description of: (i) the complainant; (ii) the date and content of, or basis for, the complaint or concern, and identify each item of written matter made, received or exchanged in connection therewith (including the use, retention, or teaching of any books or course materials); (iii) the date your office received the complaint or concern; (vi) who the complaint or concern was delivered to within your office; (v) any response from your office; (vi) if and how the complaint or concern was investigated, by whom and utilizing what means or measures, including but not limited to any other agencies consulted or notified or school officials notified of the complaint; (vii) how the complaint or concern was resolved, and (viii) the school district and educator implicated, if any. "Complaints" as defined herein are not limited to those that have led to a

notice of a public adjudicative hearing issued by the New Hampshire Commission for Human Rights.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. In responding to this interrogatory, the Attorney General interprets the phrase "complaints (either written or oral) received or concerns raised to and/or by your office" to not include attorney-client privileged communications between the DOJ and any governmental agency to which DOJ has provided legal counsel to the agency with respect to any such "complaint" or "concern" received by that agency.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to the definition of "complaints" set forth in this interrogatory, as it does not comport with any relevant legal definition.  Likewise, the undefined phrase "concerns raised" is ambiguous and unduly broad.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** The Attorney General has not received any complaints alleging a possible violation of the amendments, nor has the Attorney General received or raised any concerns alleging a possible violation of the amendments.

7.     Please characterize and set forth your best present recollection of any conversations with which you have been involved concerning or relating to how to interpret the amendments, including but not limited to: (i) questions that have been brought to your attention about the scope of applicability of the amendments; (ii) discussions within your agency about the meaning of the amendments; (iii) conversations between agencies about how to interpret the amendments; and (iv) discussions that led to the production of guidance documents about the meaning and scope of the amendments. Please identify each person (other than your counsel) consulted by you in connection with any aspect of the foregoing and your best present recollection of the approximate date and circumstances of each such consultation and the matters then discussed.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory because the word "conversations" is not defined and is vague and overbroad.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** To the extent the word "conversations," as used in this interrogatory, refers to written communications, review of such communications remains ongoing in response to plaintiffs' document requests and the Attorney General will seasonably produce any responsive, non-privileged written communications that are identified during such review, subject to the above objections and the stipulated limits of the review for such written communications.

8.       Please identify each and every extra-curricular or school-based activity that (i) you and (ii) your agency believes is covered by the July 21, 2021 FAQ 8 issued by the Department of Education, New Hampshire Commission of Human Rights, and Department of Justice concerning the applicability of the amendments to extra-curricular activities.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory to the extent it requests information about what any individual, apart from an agency, personally "believes."

The Attorney General further objects to this interrogatory to the extent it can be read to imply that any defendant has the burden of proof on any of the remaining claims in this case.

The Attorney General further objects to this interrogatory to the extent it asks the Attorney General to interpret the scope of the amendments, as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans*, Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

The Attorney General further objects to this interrogatory on the basis that it asks the Attorney General to express the Attorney General's legal position on unstated hypotheticals rather than on facts. *See Kendrick v. Sullivan*, 125 F.R.D. 1, 3 (D.D.C. 1989).

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** As stated in the FAQs, the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work. The amendments do not apply to activities that may occur on a public school's property and do not prohibit public schools or school districts from making physical space available to third parties for events or activities, including voluntary after-school programs that are administered by third-party organizations.

9. Please identify each item of written matter made, received or exchanged in connection with any aspect of items 2 through 8, inclusive, of the foregoing and your responses thereto.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.  Moreover, this interrogatory is unduly burdensome in that it seeks information duplicative of plaintiffs' requests for documents.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** The Attorney General will produce any responsive, non-privileged documents that have been identified through a reasonably diligent search commensurate with expedited, streamlined discovery plan entered in this case in conjunction with the defendants' responses to the plaintiffs' first requests for production of documents, subject to the objections asserted by the defendants with respect to those requests for production and to any stipulated limits as to the scope of the search for documents responsive to plaintiffs' document requests.

Respectfully submitted,

JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General,

By and through,

Dated: May 12, 2023

/s/ *Nathan W. Kenison-Marvin*
Nathan W. Kenison-Marvin, Bar #270162
Assistant Attorney General
Civil Bureau
N.H. Department of Justice
(603) 271-3650
nathan.w.kenison-marvin@doj.nh.gov

**VERIFICATION**

I, Sean R. Locke, am commissioned as Assistant Attorney General for the State of New Hampshire. The factual matters stated in the foregoing responses are made in my official capacity as an Assistant Attorney General, and they are not necessarily within my personal knowledge or within the personal knowledge of any single individual. Based on the reasonable of inquiry of staff within the New Hampshire Department of Justice, I am informed and believe, and based on such information and belief hereby verify, under penalty of perjury, that the factual statements in the foregoing interrogatory responses are true and correct to the best of my knowledge, information, and belief.

/s/ Sean R. Locke
Sean R. Locke
Assistant Attorney General
New Hampshire Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was provided to Plaintiffs' counsel via email on May 12, 2023.

/s/ *Nathan W. Kenison-Marvin*
Nathan W. Kenison-Marvin

# EXHIBIT 47

HRC's Interrogatory Responses

(Depo. Ex. 58)



EXHIBIT 58
WIT: Malachi
DATE: 5-24-23
Cynthia Foster, RPR, LCR #14

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

```
************************************
Local 8027, AFT-New Hampshire, et al.    *
                                         *
            Plaintiff,                   *
      v.                                 *     No. 1:21-cv-01077-PB
                                         *
Frank Edelblut, Commissioner et al,      *
                                         *
            Defendants.                  *
                                         *
************************************
```

**CHRISTIAN KIM AND AHNI MALACHI'S OBJECTIONS AND RESPONSES TO THE PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Defendants, Christian Kim and Ahni Malachi (the "HRC Defendants"), by and through counsel, submit the following objections and responses to the plaintiffs' first set of interrogatories.

**General Objections**

The HRC Defendants incorporate the following general objections into each and every individualized response contained herein, as set forth below, and into each and every amendment, supplement or modification to the objections and answers hereafter provided to the interrogatories. The HRC Defendants do not waive any general objection in response to any interrogatory.

1. The HRC Defendants object to each definition, instruction, and interrogatory to the extent that it seeks to impose obligations beyond those imposed by the Federal Rules of Civil Procedure or any other applicable law or rule. As such, the HRC Defendants' objections and responses do not constitute an adoption of plaintiffs' definitions or instructions.

2.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent it purports to require the disclosure or production of information subject to the attorney-client privilege, the work product doctrine, the executive privilege, the legislative privilege, the deliberative process privilege, or any other privilege or is otherwise immune from disclosure under state or federal law. Any inadvertent disclosure of information that is protected under any privilege, immunity, or legal bar shall not constitute a waiver of that privilege, immunity, or legal bar and shall not prevent the HRC Defendants from objecting to discovery with respect to such information or use of such information in court.

3.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent it seeks the production of information that is irrelevant to the issues germane to this matter or is unduly broad or would subject the HRC Defendants' office to unreasonable, oppressive, or undue burden or expense, or is otherwise not proportional to the needs of the case.

4.      The HRC Defendants object to each definition, instruction, and interrogatory insofar as it seeks to have the HRC Defendants identify information or documents already in the plaintiffs' possession or readily accessible to the plaintiffs or that the plaintiffs may produce in this case.

5.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent that it purports to seek information which is not within the knowledge, possession, custody, or control of the HRC Defendants.

6.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent it calls for speculation or conjecture, opinion, or legal conclusions.

7.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent that it is vague or ambiguous.

8. The HRC Defendants object to each definition, instruction, and interrogatory to the extent it assumes certain legal conclusions or certain facts not established in this proceeding. The HRC Defendants do not admit, adopt, or acquiesce to any factual or legal contention, characterization, or implication that is contained in any definition, instruction, or interrogatory.

9. The HRC Defendants object to each definition and instruction to the extent it: (i) is unclear, ambiguous, overbroad, or unduly burdensome; (ii) is inconsistent with the ordinary, customary meaning of the words or phrases it purports to define; or (iii) purports to impose any requirement or discovery obligations beyond those set forth in the Federal Rules of Civil Procedure or pertinent case law.

10. The HRC Defendants reserve all objections as to the relevance or admissibility of any response provided herein and reserves the right to supplement or amend any such answer as discovery continues.

**Specific Objections to Instructions and Definitions**

1. The HRC Defendants specifically object to every definition and instruction on relevancy grounds. The HRC Defendants maintain that the plaintiffs' remaining claims present pure questions of law and that discovery in this case is unnecessary.

2. The HRC Defendants specifically object to every definition and instruction other than the fourth definition and instruction (defining "amendments") as overly broad, unduly burdensome, and not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery in this case. During the hearing on the motion to dismiss and the preliminary pretrial conference, the Court made clear that discovery in this case was to be narrow and targeted. The district court approved the parties' discovery plan with this understanding. The definitions and instructions reflect no attempt at narrowing or targeting discovery in the manner contemplated by the parties and the Court. Rather, the definitions and instructions are as broad, if not broader, than what would typically be included in a case set on a standard or complex trial schedule. The HRC Defendants specifically object to the definitions and instructions, except the fourth definition and instruction, on this basis. In responding to these interrogatories, the HRC Defendants provide the information set forth in the responses based on a reasonably diligent search commensurate with the expedited, streamlined discovery plan set in this case.

**Interrogatories**

1. Please identify the following: (i) your name, title and professional address; and (ii)the name and address, and title and professional address, of each person consulted by you in answering these Interrogatories, specifying on which Interrogatories such person was consulted.

**Response:** Ahni Malachi, Executive Director
Sarah Burke Cohen, Assistant Director
New Hampshire Commission for Human Rights
2 Industrial Park, Building 1
Concord, NH 03301

2. Please describe any policies, protocols, procedures, or standards that exist or have existed concerning the enforcement of the amendments, stating when and to whom promulgated or copied and how you have interpreted the amendments' terms.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it asks them to "interpret the amendments' terms," as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The Attorney General issued an opinion relative to the amendments that included interpretation of the amendments. This opinion was posted on the HRC website and the New Hampshire Department of Justice ("DOJ") website. In addition, the HRC, DOJ, and New Hampshire Department of Education ("NHED") published Frequently Asked Questions ("FAQs") on the amendments, which were also published on each agency's website.

Complaints received by the HRC under the amendments are docketed and processed the same way as all other cases. The cases are processed in accordance with N.H. Rev. Stat. Ann. § 354-A and the HRC's administrative rules, both of which are available on the HRC's website.

3. Please identify all memorandum or other written materials explaining the Commission for Human Rights' procedure for evaluating and responding to complaints filed pursuant to the amendments, stating when and to whom promulgated or delivered.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it asks them to "interpret the amendments' terms," as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** See response to Interrogatory 2.

4. Please describe the training provided to any employees concerning how to implement the amendments, identifying by name, position and duties of each such employee, when, where and how such training was conducted and by whom.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it asks a question of law beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory because the term "training" is not defined and vague. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

Complaints received under the amendments are processed in the same manner as all HRC cases. No additional training was required on this process. HRC staff did receive copies of the FAQs and Attorney General Opinion. Those documents were discussed during a staff meeting at some point after the Attorney General Opinion issued. The HRC Defendants have not been able

to determine the precise date of that meeting or who specifically was in attendance. HRC staff were not instructed to process complaints received under the amendments in a manner different from how all other complaints are processed.

5. Please describe the "order of operations" of how the amendments are enforced as referenced on pages 33-35 of Defendants' March 25, 2022 motion to dismiss—including the contention that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted"—and how this process has been formalized by your office.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it seeks a legal opinion beyond the scope of a proper interrogatory. *See Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

Complaints received under the amendments are processed in the same manner as all HRC cases. The "order of operations" referenced in this interrogatory does not affect how the HRC

processes complaints. At the time of this response, no complaint brought under the amendments has been fully adjudicated by the HRC.

6. Please describe all complaints (either written or oral) received or concerns raised to and/or by your office alleging a possible violation of the amendments. This request includes a description of: (i) the complainant; (ii) the date and content of, or basis for, the complaint or concern, and identify each item of written matter made, received or exchanged in connection therewith (including the use, retention, or teaching of any books or course materials); (iii) the date your office received the complaint or concern; (vi) who the complaint or concern was delivered to within your office; (v) any response from your office; (vi) if and how the complaint or concern was investigated, by whom and utilizing what means or measures, including but not limited to any other agencies consulted or notified or school officials notified of the complaint; (vii) how the complaint or concern was resolved, and (viii) the school district and educator implicated, if any. "Complaints" as defined herein are not limited to those that have led to a notice of a public adjudicative hearing issued by the New Hampshire Commission for Human Rights.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it seeks information that is protected under N.H. Administrative Rule Hum 219.04, which provides that "[n]o information regarding complaints filed, investigation of complaints,

pre-determination settlement negotiations, or conciliation negotiations shall be disclosed to the public by any commissioner or staff member prior to the issuance of a notice of public hearing after a finding of probable cause." The HRC Defendants further object to the definition of "complaints" set forth in this interrogatory, as it does not comport with the legal definition under N.H. Rev. Stat. Ann. Ch. 354-A or the HRC's administrative rules. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The HRC Defendants can confirm that the HRC has docketed one complaint made under the amendments. The HRC has received additional inquiries purportedly related to the amendments that the HRC determined were either fraudulent on their face or otherwise did not fall within HRC jurisdiction. In light of the above objections, and particularly the confidentiality protections set forth in N.H. Administrative Rule Hum 219.04, the HRC Defendants cannot provide the information sought in this interrogatory with respect to the complaint or inquiries.

7. Please characterize and set forth your best present recollection of any conversations with which you have been involved concerning or relating to how to interpret the amendments, including but not limited to: (i) questions that have been brought to your intention about the scope of applicability of the amendments; (ii) discussions within your agency about the meaning of the amendments; (iii) conversations between agencies about how to interpret the amendments; and (iv) discussions that led to the production of guidance documents about the

meaning and scope of the amendments. Please identify each person (other than your counsel) consulted by you in connection with any aspect of the foregoing and your best present recollection of the approximate date and circumstances of each such consultation and the matters then discussed.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The HRC Defendants had conversations with respect to the amendments that are subject to the attorney-client privilege. The HRC Defendants decline to identify those conversations. The Chair of the HRC also requested an opinion from the Attorney General with respect to the amendments. After the Attorney General Opinion issued, it was discussed during the HRC staff meeting identified in the response to Interrogatory 4 above. The Director of the HRC also emailed the Intake Questionnaire used by HRC to Diana Krol at NHED. A copy of this email and the Intake Questionnaire will be provided in discovery. It is possible that members of the HRC

staff had other conversations with respect to the amendments that the HRC Defendants are unaware of and have not been able to identify. To the extent the HRC Defendants identify any additional non-privileged conversations that are responsive to this interrogatory, they will supplement their response in accordance with the rules.

8.     Please identify each and every extra-curricular or school-based activity that (i) you and (ii) your agency believes is covered by the July 21, 2021 FAQ 8 issued by the Department of Education, New Hampshire Commission of Human Rights, and Department of Justice concerning the applicability of the amendments to extra-curricular activities.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it can be read to imply that any defendant has the burden of proof on any of the remaining claims in this case. The HRC Defendants further object to this interrogatory to the extent it asks them to interpret the scope of the amendments, as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed

discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

As stated in the FAQs, the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work. The amendments do not apply to activities that may occur on a public school's property and do not prohibit public schools or school districts from making physical space available to third parties for events or activities, including voluntary after-school programs that are administered by third-party organizations.

9. Please identify each item of written matter made, received or exchanged in connection with any aspect of items 2 through 8, inclusive, of the foregoing and your responses thereto.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The HRC Defendants will produce any responsive, non-privileged documents that have been identified through a reasonably diligent search commensurate with expedited, streamlined discovery plan entered in this case in conjunction with the defendants' responses to the plaintiffs' first requests for production of documents.

**VERIFICATION**

I, Ahni Malachi, am Executive Director of the New Hamsphire Commission for Human Rights. The factual matters stated in the foregoing responses are made in my official capacity as Executive Director, and they are not necessarily within my personal knowledge or within the personal knowledge of any single individual. Based on the reasonable of inquiry of staff within the New Hamsphire Commission for Human Rights, I am informed and believe, and based on such information and belief hereby verify, under penalty of perjury, that the factual statements in the foregoing interrogatory responses are true and correct to the best of my knowledge, information, and belief.

/s/ Ahni Malachi
Ahni Malachi
Executive Director
N.H. Commission for Human Rights

Respectfully submitted,

Frank Edelblut, Commissioner of the Department of Education; John Formella, New Hampshire Attorney General; Christian Kim, Chair of the New Hamsphire Commission for Human Rights, Ahni Malchi, Executive Director of the New Hamsphire Commission for Human Rights; Ken Merrifield Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: March 24, 2023

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Senior Assistant Attorney General
Civil Bureau
N.H. Department of Justice
(603) 271-3650
samuel.rv.garland@doj.nh.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was provided to Plaintiffs' counsel via email.

*/s/ Samuel Garland*
Samuel R.V. Garland

# EXHIBIT 48

HRC's
Interrogatory
Responses

(Depo. Ex.
57)



EXHIBIT 57
WIT: Malachi
DATE: 5-24-23
Cynthia Foster, RPR, LCR #14

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

************************************

Local 8027, AFT-New Hampshire, et al. *

Plaintiff, *

v. * No. 1:21-cv-01077-PB

Frank Edelblut, Commissioner et al, *

Defendants. *

************************************

**COMMISSIONER FRANK EDELBLUT'S OBJECTIONS AND RESPONSES TO THE PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Frank Edelblut, in his official capacity as Commissioner of the New Hampshire Department of Education ("the Commissioner"), by and through counsel, submits the following objections and responses to the plaintiffs' first set of interrogatories.

**General Objections**

The Commissioner incorporates the following general objections into each and every individualized response contained herein, as set forth below, and into each and every amendment, supplement or modification to the objections and answers hereafter provided to the interrogatories. The Commissioner does not waive any general objection in response to any interrogatory.

1. The Commissioner objects to each definition, instruction, and interrogatory to the extent that it seeks to impose obligations beyond those imposed by the Federal Rules of Civil Procedure or any other applicable law or rule. As such, the Commissioner's objections and responses do not constitute an adoption of plaintiffs' definitions or instructions.

2. The Commissioner objects to each definition, instruction, and interrogatory to the extent it purports to require the disclosure or production of information subject to the attorney-client privilege, the work product doctrine, the executive privilege, the legislative privilege, the deliberative process privilege, or any other privilege or is otherwise immune from disclosure under state or federal law. Any inadvertent disclosure of information that is protected under any privilege, immunity, or legal bar shall not constitute a waiver of that privilege, immunity, or legal bar and shall not prevent the Commissioner from objecting to discovery with respect to such information or use of such information in court.

3. The Commissioner objects to each definition, instruction, and interrogatory to the extent it seeks the production of information that is irrelevant to the issues germane to this matter or is unduly broad or would subject the Commissioner's office to unreasonable, oppressive, or undue burden or expense, or is otherwise not proportional to the needs of the case.

4. The Commissioner objects to each definition, instruction, and interrogatory insofar as it seeks to have the Commissioner identify information or documents already in the plaintiffs' possession or readily accessible to the plaintiffs or that the plaintiffs may produce in this case.

5. The Commissioner objects to each definition, instruction, and interrogatory to the extent that it purports to seek information which is not within the knowledge, possession, custody, or control of the Commissioner.

6. The Commissioner objects to each definition, instruction, and interrogatory to the extent it calls for speculation or conjecture, opinion, or legal conclusions.

7. The Commissioner objects to each definition, instruction, and interrogatory to the extent that it is vague or ambiguous.

8. The Commissioner objects to each definition, instruction, and interrogatory to the extent it assumes certain legal conclusions or certain facts not established in this proceeding. The Commissioner does not admit, adopt, or acquiesce to any factual or legal contention, characterization, or implication that is contained in any definition, instruction, or interrogatory.

9. The Commissioner objects to each definition and instruction to the extent it: (i) is unclear, ambiguous, overbroad, or unduly burdensome; (ii) is inconsistent with the ordinary, customary meaning of the words or phrases it purports to define; or (iii) purports to impose any requirement or discovery obligations beyond those set forth in the Federal Rules of Civil Procedure or pertinent case law.

10. The Commissioner reserves all objections as to the relevance or admissibility of any response provided herein and reserves the right to supplement or amend any such answer as discovery continues.

**Specific Objections to Instructions and Definitions**

1. The Commissioner specifically objects to every definition and instruction on relevancy grounds. The Commissioner maintains that the plaintiffs' remaining claims present pure questions of law and that discovery in this case is unnecessary.

2. The Commissioner specifically objects to every definition and instruction other than the fourth definition and instruction (defining "amendments") as overly broad, unduly burdensome, and not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery in this case. During the hearing on the motion to dismiss and the preliminary pretrial conference, the Court made clear that discovery in this case was to be narrow and targeted. The Court approved the parties' discovery plan with this understanding. The definitions and instructions reflect no attempt at narrowing or targeting discovery in the manner contemplated by the parties and the Court. Rather, the definitions and instructions are as broad, if not broader, than what would typically be included in a case set on a standard or complex trial schedule. The Commissioner specifically objects to the definitions and instructions, except the fourth definition and instruction, on this basis. In responding to these interrogatories, the Commissioner provides the information set forth in the responses based on a reasonably diligent search commensurate with the expedited, streamlined discovery plan set in this case.

**Interrogatories**

1. Please identify the following: (i) your name, title and professional address; and (ii) the name and address, and title and professional address, of each person consulted by you in answering these Interrogatories, specifying on which Interrogatories such person was consulted.

**Response:** (i) Frank Edelblut
Commissioner of the New Hampshire Department of Education
N.H. Department of Education
25 Hall Street
Concord, NH 03301

Diana E. Fenton, Esq.
Chief, Governance Unit
New Hampshire Department of Education
Office of the Commissioner
25 Hall Street
Concord, NH 03301

Christopher G. Bond, Esq.[1]
Legal Counsel
New Hampshire Department of Education
25 Hall Street
Concord, NH 03301

(ii) The above individuals were consulted on the responses to all interrogatories.

2. Please describe any policies, protocols, procedures, or standards that exist or have existed concerning the enforcement of the amendments, stating when and to whom promulgated or copied and how you have interpreted the amendments' terms.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the extent it asks him to "interpret the amendments' terms," as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

---

[1] Attorney Bond was Legal Counsel for the Department of Education until May 2022. He is now a Senior Assistant Attorney General at the New Hampshire Department of Justice, where he serves as Chief of the Client Counseling Unit within the Civil Bureau.

**Response:** Notwithstanding the above objections, and without waiving them, the Commissioner responds to this interrogatory as follows.

On July 21, 2021, the New Hampshire Department of Education ("NHED"), the New Hampshire Commission for Human Rights ("HRC"), and the New Hampshire Department of Justice ("DOJ") issued joint guidance documents in the form of Frequently Asked Questions ("FAQs"). One set of FAQs was for public employees and government programs and the other was for public schools. Links to the FAQs are available on the DOJ's website at https://www.doj.nh.gov/news/2021/20210721-anti-discrimination-laws.htm, and NHED's website at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination. NHED worked with DOJ and HRC in developing these guidance documents.

The Commissioner is aware that the DOJ also issued an Attorney General Opinion in relation to the amendments. A copy of that opinion is available on the DOJ's website at https://www.doj.nh.gov/public-documents/documents/opinion-2021-01-hb2-anti-discrimination.pdf. NHED did not play a role in developing that opinion.

NHED also added a page to its website in relation to the amendments. That website is available at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination.

It is the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator following a finding of discrimination by the HRC.

3. Please identify all memorandum or other written materials explaining the Department of Education's procedure for evaluating and responding to complaints filed pursuant to the amendments, stating when and to whom promulgated or delivered.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the extent it asks him to "interpret the amendments' terms," as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to this interrogatory because the phrase "all . . . other written materials" is not defined and unclear. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the Commissioner responds to this interrogatory as follows.

For the purposes of this response, consistent with the streamlined, expedited discovery plan the parties agreed to in this case, the Commissioner interprets the phrase "other written

materials" to refer to formal documents such as policies, procedures, protocols, standards, training documents, or written information on NHED's website. In addition to the documents previously identified in response to Interrogatory 1, NHED referenced the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator following a finding of discrimination by the HRC in a PowerPoint presentation used during trainings related to the Educator Code of Conduct. A copy of that PowerPoint presentation will be provided to the plaintiffs in discovery. NHED also added a page to its website in relation to the amendments. That website is available at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination. A link added to that website allows individuals to file complaints under the amendments directly with the HRC via an internet portal. NHED did not and does not have access to any complaints filed through this system.

4. Please describe the training provided to any employees concerning how to implement the amendments, identifying by name, position and duties of each such employee, when, where and how such training was conducted and by whom.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the extent it asks him to "interpret the amendments' terms," as "[t]he interpretation of a statue is a

question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to this interrogatory because the term "training" is not defined and vague. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the Commissioner responds to this interrogatory as follows.

NHED employees did not receive training concerning implementation of the amendments.

5. Please describe the "order of operations" of how the amendments are enforced as referenced on pages 33-35 of Defendants' March 25, 2022 motion to dismiss—including the contention that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted"—and how this process has been formalized by your office.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that

discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the extent it seeks a legal opinion beyond the scope of a proper interrogatory. *See Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

**Response:** Notwithstanding the above objections, and without waiving them, The Commissioner responds to this interrogatory as follows.

It is the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator following a finding of discrimination by the HRC. Any such investigation and disciplinary proceeding would be handled in accordance with the processes and procedures already in existence for educator misconduct cases. NHED did not create any additional process or procedure for implementing the amendments.

6. Please describe all complaints (either written or oral) received or concerns raised to and/or by your office alleging a possible violation of the amendments. This request includes a description of: (i) the complainant; (ii) the date and content of, or basis for, the complaint or concern, and identify each item of written matter made, received or exchanged in connection therewith (including the use, retention, or teaching of any books or course materials); (iii) the date your office received the complaint or concern; (vi) who the complaint or concern was delivered to within your office; (v) any response from your office; (vi) if and how the complaint or concern was investigated, by whom and utilizing what means or measures, including but not limited to any other agencies consulted or notified or school officials notified of the complaint; (vii) how the complaint or concern was resolved, and (viii) the school district and educator

implicated, if any. "Complaints" as defined herein are not limited to those that have led to a notice of a public adjudicative hearing issued by the New Hampshire Commission for Human Rights.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to the definition of "complaints" set forth in this interrogatory, as it does not comport with any relevant legal definition. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, The Commissioner responds to this interrogatory as follows.

It is the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator only after the HRC enters a finding of discrimination. The Commissioner is not aware of any finding of discrimination by the HRC that would permit NHED to initiate an investigation and disciplinary proceeding against an educator for a violation of the amendments.

7. Please characterize and set forth your best present recollection of any conversations with which you have been involved concerning or relating to how to interpret the amendments, including but not limited to: (i) questions that have been brought to your intention about the scope of applicability of the amendments; (ii) discussions within your agency about the meaning of the amendments; (iii) conversations between agencies about how to interpret the amendments; and (iv) discussions that led to the production of guidance documents about the meaning and scope of the amendments. Please identify each person (other than your counsel) consulted by you in connection with any aspect of the foregoing and your best present recollection of the approximate date and circumstances of each such consultation and the matters then discussed.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory because the word "conversations" is not defined and is vague and overbroad. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, The Commissioner responds to this interrogatory as follows.

To the extent the word "conversations," as used in this interrogatory, means written communications, review of those communications remains ongoing and the Commissioner will seasonably produce any responsive, non-privileged written communications that are identified during this review, subject to the above objections.

To the extent the word "conversations," as used in this interrogatory, means verbal communications, the only non-privileged, responsive conversation the Commissioner specifically recalls is a Zoom meeting with leaders of the Educator Preparation Programs during which he brought to their attention the FAQs and encouraged them to make sure that participants in the respective educator preparation programs are made aware of these requirements. The Commissioner believes this conversation happened sometime in Fall 2021 but has not been able to determine the specific date. The Commissioner believes that there have been instances in which NHED officials have been asked questions by members of the press or members or the public but has no specific recollection or knowledge of those conversations.

8. Please identify each and every extra-curricular or school-based activity that (i) you and (ii) your agency believes is covered by the July 21, 2021 FAQ 8 issued by the Department of Education, New Hampshire Commission of Human Rights, and Department of Justice concerning the applicability of the amendments to extra-curricular activities.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the

extent it can be read to imply that any defendant has the burden of proof on any of the remaining claims in this case. The Commissioner further objects to this interrogatory to the extent it asks him to interpret the scope of the amendments, as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, The Commissioner responds to this interrogatory as follows.

As stated in the FAQs, the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work. The amendments do not apply to activities that may occur on a public school's property and do not prohibit public schools or school districts from making physical space available to third parties for events or activities, including voluntary after-school programs that are administered by third-party organizations.

9. Please identify each item of written matter made, received or exchanged in connection with any aspect of items 2 through 8, inclusive, of the foregoing and your responses thereto.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-

client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the Commissioner responds to this interrogatory as follows.

The Commissioner will produce any responsive, non-privileged documents that have been identified through a reasonably diligent search commensurate with expedited, streamlined discovery plan entered in this case in conjunction with the defendants' responses to the plaintiffs' first requests for production of documents, subject to the objections asserted by the defendants with respect to those requests for production.

**VERIFICATION**

I, Frank Edelblut, am Commissioner of the New Hampshire Department of Education. The factual matters stated in the foregoing responses are made in my official capacity as Commissioner, and they are not necessarily within my personal knowledge or within the personal knowledge of any single individual. Based on the reasonable of inquiry of staff within the New Hampshire Department of Education, I am informed and believe, and based on such information and belief hereby verify, under penalty of perjury, that the factual statements in the foregoing interrogatory responses are true and correct to the best of my knowledge, information, and belief.

/s/ Frank Edelblut
Frank Edelblut
Commissioner, New Hampshire Department of Education

Respectfully submitted,

Frank Edelblut, Commissioner of the Department of Education; John Formella, New Hampshire Attorney General; Christian Kim, Chair of the New Hamsphire Commission for Human Rights, Ahni Malchi, Executive Director of the New Hamsphire Commission for Human Rights; Ken Merrifield Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: March 24, 2023

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Senior Assistant Attorney General
Civil Bureau
N.H. Department of Justice
(603) 271-3650
samuel.rv.garland@doj.nh.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was provided to Plaintiffs' counsel via email.

*/s/ Samuel Garland*
Samuel R.V. Garland

# EXHIBIT 49

HRC Website
and
Questionnaire

(Depo. Ex. 60)





an official NEW HAMPSHIRE government website
NEW HAMPSHIRE
Commission for Human Rights

Monday, May 22, 2023

EXHIBIT 60
WIT: S Burkeleater
DATE: 6-26-23
Cynthia Foster, RPR, LCR

- Home
- About Us
- Law and Rules
- Required Posters
- Pregnancy Discrimination
- Disability Discrimination
- Mediation Resolution
- Commission Meetings
- Commission Data
- Human Rights Links
- How to File a Complaint
- Contact Us
- Site Map

# How To File A Complaint

## Who May File

- Any person who believes that he or she has been subjected to unlawful discrimination on the basis of age, sex, gender identity, race, creed (religion), color, marital status, physical or mental disability, national origin or sexual orientation in employment, housing, public accommodations or commercial property, may file a complaint with the Commission. In addition, in the area of housing only, charges alleging familial status discrimination can be filed.

## When to File

- A charge should be filed as soon as possible after the act of discrimination occurs.
- A charge MUST be **filed within 180 days of the last date of discrimination.** (Under certain circumstances **a charge** may be filed up to 300 days from the date of alleged discrimination. If you are beyond 180 days, contact the Commission immediately to find out if you have the basis to file a timely charge.)

## Procedure After Filing

- A copy of the Charge is sent to the respondent for a written response.
- An investigator is assigned to the case and begins an impartial investigation of the Charge.
- If the complainant decides during the investigation that he or she does not want the investigation to be completed, the complainant may withdraw the Charge without prejudice.
- Throughout the investigation, the Commission encourages both parties to consider how they might be willing to resolve the case. The Investigator can assist the parties at any time with settlement discussions. The Commission also offers voluntary mediation at no cost.
- The parties will provide relevant information to the assigned investigator upon request.
- If the case cannot be resolved, the investigator completes the investigation and prepares a report. The assigned Investigating Commissioner will make a decision of Probable or no Probable Cause. The parties are sent a copy of the Investigative Report.
- If there is a finding of Probable Cause by the Investigating Commissioner, the Executive Director will issue an Order of Notice scheduling a Public Hearing. Prior to the Public Hearing, the Commission will attempt to conciliate the case. The parties can decide to remove the case to court. If the Commission hears the case, a Decision is issued either finding in favor of the charging party and ordering appropriate relief, or finding in favor of the responding party and dismissing the charge. Either party can appeal the Commission's decision to Superior Court.
- To get a further understanding of the complaint, investigation, and post-Probable Cause process, please review our Commission Statute, RSA 354-A, and the Commission's Administrative Rules, HUM 100-406.
- ***There is no filing fee to file a complaint at the Commission.***

## If You Want to File

You may contact the Commission either by telephone, or in writing by using an Intake Questionnaire form. Neither being interviewed, nor filling out the questionnaire automatically creates a formal charge of discrimination. You will be contacted by the Commission regarding the filing of a formal charge if your situation comes under our jurisdiction.

If your issue involves a claim of **employment discrimination** or **discrimination in hiring**, you may either,

> Click on this link and fill out the Employment Discrimination Intake Questionnaire form, you may then email the form directly to us at humanrights@hrc.nh.gov or print it and mail to the Commission at the address below;
>
> or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a **housing or commercial property discrimination** claim you may either,

Print our Housing or Commercial Property Discrimination Intake Questionnaire form, write or type in your answers and mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a claim for discrimination in a place of **public accommodation**, you may either:

Print our Public Accommodation Intake Questionnaire form, write or type in your answers and mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a claim of discrimination in **public education**, you may either:

Print our "Public Education General Questionnaire", write or type in your answers and email or mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a claim of discrimination relative to the **Right to Freedom from Discrimination in Public Workplaces and Education**, you may either:

Print our "Public Education RSA 354-A:29 Questionnaire", write or type in your answers and email or mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

## Intake Questionnaire Mailing Address:

Intake Department
NH Commission for Human Rights
2 Industrial Park Drive
Concord, NH 03301

**Post Filing Withdrawal Form**

**Case procedure diagram**



5/22/23, 1:52 PM Case 1:21-cv-01077-PB Document 85-50 Filed 08/14/23 Page 4 of 6 New Hampshire Commission for Human Rights 1926

INTAKE
INTERVENTION MAY
CHARGE FILED
ASSIGNED TO
NO CHARGE TAKEN
NO JURISDICTION
PRELIMINARY INVESTIGATION
RESPONSE & DOCUMENTS REVIEWED
ADDITIONAL EVIDENCE
CASE MAY BE CLOSED
NO JURISDICTION AFTER
COMMISSIONER RULING BASED ON INVESTIGATION REPORT
nh.gov | privacy policy | accessibi
Copyright (c) State of New Hampshire, 2005
NO CAUSE
CASE DISMISSED, SUBJECT TO APPEAL TO
PROBABLE CAUSE
CONCILIAT
REMOVE TO STATE COURT
PUBLIC
NO DISCRIMINATION
DISCRIMINATION FOUND

This symbol indicates the document is in Portable Document Format (PDF). To view PDF files, you will need the Adobe Acrobat Reader which is available for free from **Adobe**.

New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One, Concord, NH 03301

https://www.nh.gov/hrc/howto.html 3/3

# CONFIDENTIAL
## THIS IS NOT A CHARGE OF DISCRIMINATION.

NEW HAMPSHIRE COMMISSION FOR HUMAN RIGHTS
2 INDUSTRIAL PARK DRIVE
CONCORD, NEW HAMPSHIRE 03301
(603) 271-2767
FAX: (603) 271-6339
TTD ACCESS: RELAY NH 1-800-735-2964
Email: humanrights@hrc.nh.gov

**PUBLIC EDUCATION INTAKE QUESTIONNAIRE FOR RSA 354-A:29-34**
**(RIGHT TO FREEDOM FROM DISCRIMINATION IN PUBLIC WORKPLACES & EDUCATION)**

**INSTRUCTIONS:** *This is a questionnaire, not a charge of discrimination.* Please fill out this questionnaire as completely as possible and send a copy back to the Commission either via regular mail, fax or email using the contact information above and keep a copy of the completed questionnaire for your records. The questionnaire will provide a Commission Investigator with information about your claim. The Investigator will use this information to determine whether you have the basis to file a formal charge. After reviewing the questionnaire, the Investigator will contact you to gather further information, as necessary and either explain the next steps in filing a formal charge or explain why you do not have the basis to file a charge of discrimination.

**Is your claim relative to a public school?** ***Yes or No***

**Does the school or school district teach grades K-12?** ***Yes or No***

**Was the offered program/training part of a class?** ***Yes or No***

**Was the offered program/training part of an extra-curricular activity?** ***Yes or No***

---

Student's Name: ______________________________

Parent/Guardian Name: ______________________________

Address: ______________________________

City: ______________ State ______________ Zip Code ______________

Primary Phone number: ______________ Secondary Phone Number ______________

Email address: ______________________________

**Is the student currently enrolled at the school?** ***Yes or No***

**If yes, present Grade:** ______________

---

**Optional**: What is your Race? ____________ What is your National Origin? ____________

---

# CONFIDENTIAL
## THIS IS NOT A CHARGE OF DISCRIMINATION.

---

Name of Public School: ______________________________

Address: ______________________________

City: ____________ State: ____________ Zip Code: ____________

Phone Number (include area code): ______________________________

---

**First date of Discrimination: Month Day Year**
**Last date of Discrimination*: Month Day Year**

**** Please keep in mind that you only have 180 days from the last date of discrimination to file a Charge of Discrimination with the Commission under state laws.***

---

**Please briefly explain in the space provided below or on a separate piece of paper what action was taken against you that you believe to be discriminatory to include a description of the program/training alleged to violate RSA 354-A: 29-34. Provide details such as names and dates, etc. Were other persons treated differently than you? Please describe. What harm, if any, was caused as a result of that action?**

---

# EXHIBIT 50

DOE
December
2021
Presentation

(Depo. Ex. 3)

EXHIBIT 31930
D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

# OVERVIEW OF THE DEPARTMENT OF EDUCATION'S EDUCATOR MISCONDUCT PRACTICES & CONDUCTING EFFECTIVE INVESTIGATIONS

Diana E. Fenton, Esq.
Chief, Governance Unit
Department of Education

December 2021

# Code of Conduct

- The reason behind the CoC

Local Control Does not solve a State Wide problem.

Dealing with educator misconduct issues in the realm of employment only does not solve the entire issue.

Child safety is not a zip code issue!

# Code of Conduct

- District jurisdiction vs. State jurisdiction

- Now issues involving educator misconduct have a two step process/analysis:

1) Dealt with at the district (employment)
2) Lateral pass to DOE for possible action on the credential

DOE involvement breaks the cycle of an educator moving to another district and possibly harming another child

Ed 511 sets out the process for DOE to follow

# When Should I call DOE?

- Anytime there is a suspected CoC violation
- Anytime an educator is placed out on leave**
  (*when/why should an educator be placed on leave*)
- Anytime a superintendent has a question of whether the activity in question rises to a level of the CoC

# RULE OF THUMB

- **IF THE ISSUE DIRECTLY AFFECTS CHILD SAFETY THEN IT IS NOT JUST AN EMPLOYMENT ISSUE.**

**DOE MUST BE NOTIFIED**

# When Should I call the DOE?

- Best Practice is to call DOE as soon as possible
- DOE and District can then determine which agency can lead the investigation/process

Who will lead—the district or DOE?

Often district will lead—district lead investigation and DOE will await the report/result of the district investigation

Typically, DOE will lead on older (aka “cold”) cases

# Off Duty Conduct

- What if the allegation is "off-duty" conduct

- Analysis:

DOE will look to see if there is a nexus to:

1) The educator's ability to be effective in the classroom and

2) The educator's ability to be safe around children

# Who Do I Call?

- All reports of Educator Misconduct are made to:

Richard Farrell contact info:
(603) 271-8372 (work)
(603) 231-0521 (cell)
Richard.J.Farrell@doe.nh.gov

Diana Fenton contact info:
(603) 325-2198
Diana.Fenton@doe.nh.gov

# So what happens next?

- DOE will do an initial screening—is this employment or credentialing

# “Investigation”

- When does DOE place an educator under formal investigation?
- Credential holder is notified in writing via certified mail that an investigation has been opened.
- A copy of the letter is sent to the superintendent
- A copy of the letter is sent to the Union
- Credential is still valid during a pending investigation

# Immediate Suspension

- If an educator is arrested for a Section V violation, it must be reported to DOE
- Immediate suspension with a right to a hearing within 10 days

# INVESTIGATIONS

- How does the DOE Investigation help the district?

# DOE Action

- DOE will review the district's report
- DOE might do additional investigation (if necessary)

- DOE communication with the district is KEY!!

# Credential Sanction

- 4 forms of action/3 forms of discipline
- Close out Case

-Revocation

-Suspension

-Reprimand

**WAIT!!**

What if DOE takes action which is contrary to what the district did?

# Close Out

- Thank you letter
- Close out letter

# HB 1240 (2019-2020 Leg Session)

- HB 1240 became law Jan 1, 2021
- Amends RSA 632-A:2 (Aggravated Felonious Sexual Assault) and RSA 632-A:3 (Felonious Sexual Assault)
- Prohibits "an employee, contractor, or volunteer at a primary or secondary educational institution" from having a sexual relationship with a student.
- Prohibition continues up to 10 months after the student's graduation or departure from school.

# CRT/HB2 Sec 297 and 298

- Any allegation of the violation of HB 2 is adjudicated by the HRC/complaint with AG's office/ or a civil claim in superior court
- Department DOES NOT adjudicate these matters
- So why the website?

1947

# Investigations Tips

DOE-05666

# Things to be Aware of

- Always best to farm investigations out to third party
- Be aware of conflicts—can you do this investigation and be fair?
- Who to interview—even "minor" players can be relevant
- Important to build a foundation—do not assume a level of familiarity
- Two types of questions to ask

1) Open-ended questions
2) Direct questions

# DOE Innovations

- January 1, 2022

DOE will start running the criminal history on all first-time teacher applicants

This does not alleviate District from running check upon employment

DOE will also begin checking a new applicant's name against the Central Registry at DCYF and MA DCF for findings of abuse.



# Questions, Comments, Concerns??

Diana.fenton@doe.nh.gov
325-2198

# EXHIBIT 51

DOE's August 2021 Presentation

(Depo. Ex. 7)



**From:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
**To:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
**Subject:** code of conduct
**Date:** Tue, 17 Aug 2021 12:44:24 -0000
**Importance:** Normal
**Attachments:** continued_excellence--HB2.pptx

---

I updated it to include Section 297 or HB 2—pls review.

~~~~~~~~~~~~~~~~~

Diana E. Fenton, Esq.
Chief, Governance Unit
New Hampshire Department of Education
Office of the Commissioner
101 Pleasant Street
Concord, NH 03301
Diana.fenton@doe.nh.gov
(603) 271-3189
~~~~~~~~~~~~~~~~~

New Hampshire
Department of Education
CONTINUED EXCELLENCE
ELEVATING AN ESTEEMED PROFESSION
Diana E. Fenton, Esq., Chief, Governance Unit
Richard Farrell, Investigator

**"An ethics code reflects a collective decision that a profession is better off when ethical standards are not based solely on individual assessments of what is or is not acceptable."**

Fisher. C. (2013). Decoding the Ethics Code: A practical guide for psychologists (3rd edition).

Code of Conduct is Not Punishment—

**It is about Process!!!**

# A BRIEF HISTORY OF CREATING THE CODE OF ETHICS & CODE OF CONDUCT

June 2015—PSB began to look into a code of ethics;

August 2016—Commissioner Barry created Ethics Task Force;

Sept-Dec 2016—Task Force begins work on Code of Ethics;

April 2017—HB 210 signed into law;

Sept-Dec 2017—Task Force transitions focus to Code of Conduct;

Summer of 2018—State Board accepts Code of Ethics;

November 2018—State Board adopts Code of Conduct

STAKEHOLDERS
aft
A Union of Professionals
NEA New Hampshire
New Hampshire
Council for Teacher Education
IHE NETWORK
A CONSORTIUM OF NH EDUCATOR PREPARATION PROGRAMS
New Hampshire
Professional Standards Board
NHSAA
New Hampshire School Administrators Association
New Hampshire
Department of Education
New Hampshire
Department of Education

DOE-10061



# STATUTE

TITLE I
STATE AND ITS GOVERNMENT

CHAPTER 21-N
DEPARTMENT OF EDUCATION

Section 21-N:9

(cc)(1) The establishment and enforcement of a code of ethics for certified educational personnel, which shall be adopted no later than July 1, 2019. This professional code shall include a statement of purpose and standards defining each of the 4 primary principles which are:

(A) Responsibility to the education profession and educational professionals.

(B) Responsibility to students.

(C) Responsibility to the school community.

(D) Responsible and ethical use of technology as it relates to students, schools, and other educational professionals.

(2) The professional code of ethics shall apply to all teachers, supervisors, administrators, and other personnel licensed or seeking licensure in the education profession in the state of New Hampshire. In this subparagraph, "teacher" means a person who has applied for or holds a valid teaching license, credential, or other equivalent certificate issued by the state board of education.

## RSA 21-N:9, II(CC)

New Hampshire
**Department of Education**



# RULES

PART Ed 510 CODE OF CONDUCT
Section Ed 510.01 Principle 1 – Responsibility to the Education Profession and Educational Professionals
Section Ed 510.02 Principle 2 – Responsibility to Students
Section Ed 510.03 Principle 3 – Responsibility to the School Community
Section Ed 510.04 Principle 4 – Responsible and Ethical Use of Technology
Section Ed 510.05 Duty to Report

...510.01 – Responsibility to the Education Profession and ...
...ciple 2 – Responsibility to Students
... Principle 3 – Responsibility to the School Community
...0.04 Principle 4 – Responsible and Ethical Use of Technology
...510.05 Duty to Report

...511 DENIAL, INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS
...tion Ed 511.01 Complaints, Cases and Investigations
Section Ed 511.02 Reprimand, Suspension, or Revocation
Section Ed 511.03 Disciplinary Hearings
Section Ed 511.04 Status of a Credential Pending Completion of Disciplinary Proceeding
Section Ed 511.05 Grounds for Reinstatement After Suspension

PART Ed 512 DENIAL OR CERTIFICATION

...T MASTER PLAN AND RECERTIFICATION
...e Local Professional Development Master Plan
...evelopment Plan
...of Educators Under the Professional Development Master Plan
...of Educators Not Under the Local Professional Development Master Plan

... Ed 514 REQUIREMENTS FOR INITIAL CERTIFICATION
Section Ed 514.01 Basic Academic Skills and Subject Area Assessment
Section Ed 514.02 Validation Studies
Section Ed 514.03 Highly Qualified Teacher

...TER Ed 600 APPROVAL OF PROFESSIONAL PREPARATION PROGRAMS
PART Ed 601 DEFINITIONS
Section Ed 601.01 Definitions

...T Ed 602 PROCEDURES FOR APPROVAL
Section Ed 602.01 Scope of Approval Process
...tion Ed 602.02 Evaluation Requirements
...on Ed 602.03 Demonstrated Competencies
... Ed 602.04 Approval Requirement
... 602.05 Application Fees for Program Approval
... Option 1
... Option 2
...ption 3

... and Approval Recommendations

New Hampshire
**Department of Education**

DOE-10063

THE DIFFERENCE
STOP
Code of Conduct
NH's Principles of Professional Conduct
Code of Ethics
The Code of Ethics for New Hampshire Educators
New Hampshire
Department of Education

# ARE YOU TALKING TO ME?

Who is the document applicable to??

Code of Ethics—Applicable to all educators and all school personnel

Code of Conduct—Applicable to all credential holders

"Credential" is defined in Ed 501.02(g)—page 9 of the Code of Ethics & Conduct booklet!



# WHY IS A CODE OF CONDUCT IMPORTANT?

- **Child Safety should not be determined by zip code!!**
- Teachers are asked to play an increasingly expansive role in students' lives without any discussion of the inherent risks of this.
- All professions that are characterized by intimate relationships rely on professional standards and norms that help them recognize and respond appropriately when navigating interactions.


# CODE OF CONDUCT VS. CODE OF ETHICS

Code of Ethics is guidance—aspirational in nature—articulates responsibilities common to all members of the education profession.

Code of Conduct establishes the lowest standard of care—it is actionable only against credential holders

Applicable on or off duty!

New Hampshire
Department of Education

# CODE OF ETHICS & CONDUCT

***Difference in language:***

*Code of ethics:*

When communicating with students, utilizes social media responsibly, transparently and primarily for the purposes of teaching and learning

*Code of Conduct:*

An educator shall not engage in harassment, stalking, or bullying via electronic media.



# EMPLOYMENT VS. LICENSURE

- Licenses are required in professions that require public trust;
- Employment and licensure are separate concepts;
- The Department's role is ***broader in jurisdiction***, but ***narrower in scope***.





The Analysis.....
Separate and distinct, but sometimes they affect each other.
Employment
Code of Ethics
Code of Conduct

# CODE OF ETHICS & CONDUCT

Four Principles:

Principle I—Responsibility to the Education Profession and Educational Professionals;

Principle II—Responsibility to Students;

Principle III—Responsibility to the School Community;

Principle IV—Responsible and Ethical Use of Technology

**Principle V—Duty to Report

# CODE OF CONDUCT—PRINCIPLE 1 (ED 510.01)

***Responsibility to the Education Profession & Educational Professionals:***

- Failure to report if arrested for RSA 189:13-a, V offense;
- Falsifying professional qualifications;
- Unlawful possession of drug;
- Possessing or being under influence of drugs or alcohol on school premises or school sponsored activity where students are present.

# CODE OF CONDUCT—PRINCIPLE II (ED 510.02)

***Responsibility to Students:***

- Failure to provide appropriate supervision of students pursuant to local policy;
- Furnishing alcohol or illegal drugs to students;
- Engaging in sexual activity with student;
- Soliciting participation in sexual relationship

* "Student" is defined as being up to 10 months after graduation



# CODE OF CONDUCT—PRINCIPLE III (ED 510.03)

***Responsibility to the School Community:***

- Accepting gifts or favors where there might be an actual or appearance of a conflict of interest

**Gifts of small amount shall NOT be deemed conflict of interest.

- Misuse of funds for use by the school
- Intentional altering or misrepresenting student assessments, results or official school records.



## SO WAIT JUST A MINUTE......

What if a parent gives me a bottle of wine as a present?

Am I going to lose my license for that??



# CODE OF CONDUCT—PRINCIPLE IV (ED 510.04)

***Responsible & Ethical Use of Technology:***

- Soliciting a sexual relationship with a student
- Engaging in inappropriate communication—intent, timing, subject matter and amount of communication and whether communication could reasonably be interpreted as being sexual in nature.

* "Student" is defined as being up to 10 months after graduation

# I NEED SOME EXAMPLES OF WHAT YOU ARE SAYING

- "YOU were one of my rare accomplishments"
- "I saw special in you from the beginning"
- "I felt compelled to both nurture and provocatively challenge [your thoughts]"

# CODE OF CONDUCT—PRINCIPLE V (ED 510.05)

***Duty to Report:***

- Any credential holder shall report any suspected violation of the code of conduct
- Superintendent shall report to office of credentialing when a credential holder has been arrested for RSA 189:13-a and violated code of conduct
- Credential holders shall report abuse or neglect

# PROHIBITION ON TEACHING DISCRIMINATION

- Section 297 & 298 of HB 2 was passed during the 2021 Legislative Session

I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior

to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

# PROHIBITION ON TEACHING DISCRIMINATION

(c) That an individual should be discriminated against or receive adverse treatment

solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color,

marital status, familial status, mental or physical disability, religion, or national origin cannot and

should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

race, creed, color, marital status, familial status, mental or physical disability, religion, or national

origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger

course of academic instruction, the historical existence of ideas and subjects identified in this section.

# PROHIBITION ON TEACHING DISCRIMINATION

- All suspected violations of this new law are to be reported to the Human Rights Commission
- The Human Rights Commission will adjudicate these cases
- A finding of a violation of this law by the Human Rights Commission shall be a violation of the Code of Conduct for educators.

****Please see Technical Advisory by the NH Attorney General's Office on this law for more guidance.*

# INVESTIGATIONS—ED 511.01

- Initial review
- Credential holder is notified if placed under investigation
- Superintendent is notified if credential holder is placed under investigation



# INVESTIGATIONS—ED 511.01

This letter serves as the official notification, pursuant to New Hampshire Administrative Rule Ed. 511.01, that the New Hampshire Department of Education has initiated an investigation into a complaint against you which alleges that you engaged in an act or acts which violate the New Hampshire Code of Conduct for Educational Professional as enumerated in Ed. 510.01-510.04.

Specifically, the Department of Education has become aware of an action(s) which may have violated Ed ------- of the Code of Conduct for Educational Professionals. Specifically, the allegation is that you ------- ------------. At this time, no action has been taken against your teaching credential. Therefore, your teaching credential is still valid during this pending investigation. A copy of this letter will be provided to the superintendent of SAU ----- and the Union.

# SANCTIONS—ED 511.02

**Four options---3 forms of sanction:**

*Close out case*—Allegation unfounded—no action taken

*Suspension*—rescinded for set period of time

*Revocation*—permanently rescinded

*Reprimand*—note to file of credential holder

# INVESTIGATIONS—ED 511.01

Considerations of sanctions:

- Seriousness of offense;
- Prior disciplinary record
- Potential harm to students
- Purpose of the rule violated

# REPRIMAND, SUSPENSION OR REVOCATION

Ed 511.02

- All discipline is documented in writing
- Signed by all parties
- Maintained in electronic credentialing file

Ed 502.01

List of suspended and revoked educators is maintained and is on DOE website

Ed 511.05

Grounds for Reinstatement after Suspension

D E-10086

# OTHER ISSUES TO BE AWARE OF—ED 511.04

If arrested for RSA 189:13-a, V, DOE can do an immediate suspension of credential

- Credential holder and school district will be notified
- Credential holder is entitled to hearing within 10 days.

# NEED TO REPORT?

**Richard Farrell, Investigator**
271-8372 (office)
231-0521 (cell)

**Diana Fenton, Esq. Chief of the Governance Unit**
271-3189 (office)
325-2198 (cell)

New Hampshire
Department of Education

# EXHIBIT 52

Nov. 24,
2021 J.
McKim Email
Chain

**From:** "Rotman, David" <David.S.Rotman@doj.nh.gov>
**To:** "James T. McKim, MP" <james.mckim@organizationalignition.com>
**Cc:** "Formella, John" <john.m.formella@doj.nh.gov>
**Subject:** RE: Training on "Divisive Concepts"
**Date:** Wed, 24 Nov 2021 15:31:20 -0500
**Importance:** Normal

---

Dear James:

The next time I see the General (who I see was "cc'ed" on this email), I will mention your question.

David

**From:** James T. McKim, MP <james.mckim@organizationalignition.com>
**Sent:** Wednesday, November 24, 2021 3:04 PM
**To:** Rotman, David <David.S.Rotman@doj.nh.gov>
**Cc:** Formella, John <john.m.formella@doj.nh.gov>
**Subject:** Re: Training on "Divisive Concepts"

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Thanks, David.

I wasn't so much thinking of training, but guidance on how to interpret the statute given the questions raised about whether affirmative action actions would be considered in violation of the statute.

Happy to chat if it would help in clarifying how the statute is perceived.

Cheers,

James T. McKim, Jr., PMP, ITIL
Managing Partner, Organizational Ignition
www.organizationalignition.com
(603) 540-3988
Schedule a meeting: calendly.com/jtmckimjr

On Wed, Nov 24, 2021 at 2:51 PM Rotman, David <David.S.Rotman@doj.nh.gov> wrote:

> James, I am sorry for not getting back to you sooner. I did speak to the General and it is my understanding we will not be doing a training in the immediate future on how to interpret the statute. When that changes, I will be sure to reach out to you. I hope you and your family have a wonderful thanksgiving.
>
> David
>
> **From:** James T. McKim, MP <james.mckim@organizationalignition.com>
> **Sent:** Wednesday, November 24, 2021 1:35 PM
> **To:** Rotman, David <David.S.Rotman@doj.nh.gov>
> **Subject:** Re: Training on "Divisive Concepts"

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hi David,

I hope this finds you well.

I'm wondering if there were any thoughts on the question I posed in the email below.

A recent article in Nonprofit Quarterly highlighting the recent case in North Carolina also discussed this case and the sense that it seems to challenge the entire notion of hiring racially diverse candidates.

Cheers,

James T. McKim, Jr., PMP, ITIL
Managing Partner, Organizational Ignition
www.organizationalignition.com
(603) 540-3988
Schedule a meeting: calendly.com/jtmckimjr

On Tue, Oct 19, 2021 at 9:42 AM James T. McKim, MP <james.mckim@organizationalignition.com> wrote:

> Hi David,
>
> I hope this finds you well.
>
> With the recent University of North Carolina Affirmative Action case, I received a question about how an Affirmative Action case would stack up against the Right to Freedom from Discrimination in Public Workplaces and Education language in HB2.
>
> This made me reflect on the conversation we had with the General about the topic of Affirmative Action where I believe the consensus was that Affirmative Action would not violate the law because the law prohibits action based "soley" on age, sex, gender identity, sexual orientation, race, creed, color, etc.
>
> But upon review of the actual statute, I find the wording to be "That an individual should be discriminated against or receive adverse treatment **solely or partly** because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;..."
>
> Because the words "or partially" are in the statute, this makes me think that Affirmative Action could, in fact, be seen as violating the law. This made me wonder if you had or were planning any training on how to interpret the statute that might shed some light on this in a proactive manor so we don't get a case brought that will take up time and money?
>
> Cheers,
>
> James T. McKim, Jr., PMP, ITIL
> Managing Partner, Organizational Ignition

www.organizationalignition.com
(603) 540-3988
Schedule a meeting: calendly.com/jtmckimjr

# EXHIBIT 53

Attorney
General
Opinion
2021-01
(Sept. 7,
2021)

(Depo. Ex.
12)



# EXHIBIT 20

Attorney General
Opinion No. 2021-01
(Sept. 7, 2021)

**ATTORNEY GENERAL**
**DEPARTMENT OF JUSTICE**

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

JOHN M. FORMELLA
ATTORNEY GENERAL

JANE E. YOUNG
DEPUTY ATTORNEY GENERAL

## ATTORNEY GENERAL OPINION NO. 2021-01

September 7, 2021

Doug Palardy, Chair
Ahni Malachi, Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Building One
Concord, NH 03301

RE: Request for Attorney General's Opinion regarding new anti-discrimination protections

Dear Chair Palardy and Director Malachi:

You requested, on behalf of the New Hampshire Commission for Human Rights, that this office provide an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 ("Sections 297 and 298"),[1] to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40. These statutes collectively comprise a subdivision in RSA chapter 354-A titled "Right to Freedom from Discrimination in Public Workplaces and Education" and new section in RSA chapter 193 titled "Prohibition on Teaching Discrimination."

Some have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions. *See* Governor's Advisory Council on Diversity and Inclusion, *Letter to Gov. re HB 544* (June 2, 2021). To help address these concerns, the Department of Justice, Commission for Human Rights, and the Department of Education released guidance shortly after the new anti-discrimination laws took effect. Recognizing the important need for public employers, government programs, and school systems to engage in sensitivity training that may include frank and candid discussions of the historical aspects of oppression and its contemporary effects, you requested that this office provide an official Attorney General Opinion.

The Commission for Human Rights (the "Commission") was created with the power to eliminate and prevent discrimination in employment, places of public accommodation, housing,

---

[1] Before final passage by the legislature, this legislation was included in HB 2 as Section 330 and 330-a. The final version of HB 2 includes the legislation at Section 297 and 298.

and, effective in 2019, public education. The Commission is charged with receiving, investigating, and adjudicating complaints related to violations of RSA chapter 354-A that may be filed by members of the public or the Commission and holding hearings as required to execute the Commission's duties. Section 297 prohibits certain public sector activities and expands the Commission's jurisdiction to address such activities. Section 298 prohibits the teaching of certain subjects in elementary and secondary schools and it also places review of violations within the Commission's jurisdiction.

The Attorney General's duties include advising "any state board, commission, agent or officer as to questions of law relating to the performance of their official duties, and he shall, under the direction of the governor and council, exercise a general supervision over the state departments, commissions, boards, bureaus, and officers, to the end that they perform their duties according to law." RSA 7:8. In situations where requests for legal advice are significant to the operation of the state board, commission, or agency and are likely to be of continuing importance, the advice may be issued by an official Attorney General Opinion. In such situations, the questions posed are researched and an opinion drafted by a group of attorneys. The draft opinion is also subject to multiple layers of review, including by the Associate Attorney General for the Division of Legal Counsel and the Solicitor General. The Attorney General provides a final review and approval.

Given the importance of your questions to the education and training of your staff to best serve New Hampshire residents, I am providing an official Attorney General Opinion as set forth below.

## QUESTIONS PRESENTED

1. What is the scope of Sections 297 and 298 and what types of education and training activities do those sections prohibit and permit?

2. Do the new sections of RSA chapter 354-A prohibit trainings or programs designed to promote diversity and inclusion or to educate participants about concepts such as implicit bias?

3. Does RSA 193:40 prohibit education on the historical concepts related to discrimination or oppression?

## CONCLUSION

1. The new sections added to RSA chapter 354-A prohibit trainings or programs that teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. The new sections added to RSA chapter 354-A also prohibit trainings or programs that teach participants that any identified group can or should be treated unequally to

any other identified group and that one identified group should be discriminated against or treated adversely.

Similarly, RSA 193:40 prohibits teaching students that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 also prohibits teaching students that any identified group can or should be treated unequally to any other identified group and that one identified group should be discriminated against or treated adversely.

2. No. The new sections added to RSA chapter 354-A **explicitly permit** public employers and government programs to provide sensitivity training, which RSA 354-A:29 defines as "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Implicit bias training, for example, is premised on teaching people about biases they may have of which they are not consciously aware and helping people become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training does not violate Section 297. Similarly, the new sections added to RSA chapter 354-A do not prohibit other diversity, equity, inclusion, and equality trainings. Section 297 prohibits trainings if and only if they include concepts of group superiority or inferiority based on inherent or innate group characteristics or advocate for less than equal treatment of identified groups.

3. No. RSA 193:40 does not prohibit discussion of historical concepts related to discrimination. RSA 193:40 prohibits education related to solely the four subjects identified in Short Answer 1. Specifically, it prohibits teaching that one or more identified groups are: (1) inherently superior or inferior to people of another identified group; (2) inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) should be discriminated against or receive adverse treatment; or (4) should not treat members of other identified groups equally. It is important to note that although education related to racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40.

## BACKGROUND

On June 25, 2021, the Governor signed into law House Bill 2, which added, in Section 297, new provisions to RSA chapter 354-A entitled, "Right to Freedom from Discrimination in Public Workplaces and Education." Specifically, Section 297 adds six new sections to RSA chapter 354-A: (1) RSA 354-A:29, "Right to Freedom from Discrimination in Public Workplaces and Education"; (2) RSA 354-A:30, "Definitions"; (3) RSA 354-A:31, "Prohibition on Public Employers"; (4) RSA 354-A:32, "Prohibition on the Content of Government Programs and Speech"; (5) RSA 354-A:33, "Prohibition on Public Employees"; and (6) RSA 354-A:34, "Remedies."

Section 297 is part of the amended progeny of House Bill 544, which was commonly known as the "divisive concepts" bill. The House of Representatives voted to table House Bill 544 but to incorporate its language into House Bill 2. During its review, the Senate Finance Committee stripped the language of House Bill 544 out of House Bill 2 and added the language that is now Sections 297 and 298. The House of Representatives acceded to these changes during the Committee of Conference.

The major provisions of Section 297, codified as RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33, prohibit training, education, or other state-sponsored speech that incorporates any of the following four concepts:

1. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

2. That an individual by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

3. That an individual should be discriminated against or receive adverse treatment solely or partly because of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; and

4. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.[2]

These four new statutory provisions combine to limit the types of training and education public employers may introduce to their employees, and protects employees who object to participating in training programs inconsistent with the new statutory provisions. RSA 354-A:31 prohibits public employers from teaching, advocating, instructing, or training anyone any of the above listed concepts. RSA 354-A:32 prohibits "government programs," which it defines as any

---

[2] This Opinion will use the term "identified group" to mean age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. With this inclusive of a definition, every resident and visitor to New Hampshire is a member of one or more identified groups.

activity undertaken by a public employer including in the performance of its government function, from teaching, advocating, or advancing any of the above listed concepts. RSA 354-A:33 prohibits a public employer from disciplining a public employee for refusing to participate in any training, program, or other activity that advocates for or compels the employee to express support for any of the above listed concepts.

Section 298 is the remainder of the amended progeny of HB 544. This section creates a new statute, RSA 193:40: "Prohibition on Teaching Discrimination." RSA 193:40 prohibits teaching students in an elementary or secondary education program any of the four concepts that the new sections in RSA chapter 354-A prohibit.

The statutory changes within Sections 297 and 298 are legislation of limited reach. The new statutes do not prohibit racial, sexual, religious, or other workplace sensitivity training "based on the inherent humanity and equality of all persons." They do not prohibit workplace trainings based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." These statutes explicitly exclude such sensitivity trainings from the scope of the new prohibitions created by RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33. Nor do they prohibit discussing or teaching students about the historical existence of ideas related to the four prohibited subjects, such as the history of discrimination.

## ANALYSIS

The scope of Sections 297 and 298's prohibitions hinges on the meaning of the language those sections employ. When interpreting a statute, a court or agency charged with such interpretation must first look to the language of the statute itself. *Conduent State & Local Solutions, Inc. v. N.H. Dep't of Transportation*, 171 N.H. 414, 419 (2018). In doing so, the agency must begin with the plain meaning of the words used. *Union Leader Corp. v. Town of Salem*, 173 N.H. 345, 350 (2020); *see also* RSA 21:2 (2012) ("Words and phrases shall be construed according to the common and approved usage of the language."). The agency must confine itself to the statute as written and not consider what the legislature might have said or add language the legislature did not include. *Conduent State & Local Solutions, Inc.*, 171 N.H. at 420. The agency must look at the statute as a whole and should construe the statute to avoid absurd or unjust results.[3] *Id.* Absent an ambiguity[4] examination of any legislative record beyond the actual text of the statutes is inappropriate.

[3] Examples of absurd results include, but are not limited to, situations where the interpretation of one statute negates another. *See Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005) ("When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other."). The goal of statutory interpretation is to strive to read statutes in harmony with one another rather than in dissonance with one another. *See id.* ("[W]e do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme.").

[4] In this context, ambiguity is a legal term of art that applies only if two or more reasonable interpretations of a statute exist after the agency considers the plain meaning of the words in the statute. *Attorney General v. Loreto Publications, Inc.*, 169 N.H. 68, 74 (2016).

Prohibitions Related-to Inherent Traits

The scope of Section 297 and 298's first two prohibitions derives substantially from the meaning of the term "inherent." In the first prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently superior or inferior" to another identified group. In the second prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently racist, sexist, or oppressive, whether consciously or unconsciously." Neither section defines the term "inherent," nor are we aware of any other relevant statutory provisions that define "inherent" as the Legislature used it in Sections 297 and 298. When the Legislature does not specifically define a term within a statute, the Legislature is presumed to have used that term as it is commonly understood. *Franciosa v. Hidden Pond Farm, Inc.*, 171 N.H. 350, 359 (2018). In such situations, the New Hampshire Supreme Court will consult a standard dictionary to discern the common understanding of any given term. *Id.* As an adjudicatory body, the Human Rights Commission should also consult a standard dictionary to discern the common understanding of any given term.

"Inherent" means "structural or involved in the constitution or essential character of something : belonging by nature or settled habit : intrinsic, essential." *Webster's Third New International Dictionary* 1163 (unabridged ed. 2002). The definitions of "intrinsic" and "essential" further illuminate the meaning of "inherent." "Intrinsic" means "belonging to the inmost constitution or essential nature of a thing : essential or inherent and not merely apparent, relative, or accidental." *Id.* at 1186. "Essential" means "forming or constituting the essence of something: making up or being the constituent or intrinsic character or very nature of a thing . . . belonging to or being part of the essence of something: belonging to the constituent fundamental character of a thing: not accidental to something." *Id.* at 777.

The common thread that runs through these definitions is that an inherent characteristic is natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging.

"Inherent," therefore, is properly viewed as a limitation of the scope of Sections 297 and 298's first two prohibitions. With respect to the first, Sections 297 and 298 proscribe training, advocacy, or education that teaches participants that, solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, superior or inferior to members of other identified groups. With respect to the second, Sections 297 and 298 proscribe training, advocacy, or education that informs participants that solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, consciously or unconsciously racist, sexist, or oppressive.

Prohibitions Related-to Promoting Discrimination

Interpreting Sections 297 and 298's third and fourth prohibitions does not turn on the meaning of key terms that define the scope of the prohibition. The statutory language makes


plain that a public employer or government program may not provide training or education that informs participants that members of an identified group should be discriminated against or receive adverse treatment. Nor may a public employer or government program provide training or education that informs participants that members of one identified group should not treat members of other identified groups equally.

Permitted Trainings, Activities, and Education

Separate from its prohibitions, Section 297 expressly permits certain trainings and programming within the category of "sensitivity training." This is defined as training "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Sensitivity training consistent with the provisions of Section 297 readily encompasses trainings and programming that promote concepts of equality and the equal, respectful, and dignified treatment of all persons—particularly as they relate to the interactions of members of those identified groups with public employers or government programs.

"Sensitivity training" includes implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources. Implicit bias training does not violate Section 297 unless it includes concepts of group superiority or inferiority based on inherent or innate group characteristics or concepts that an identified group should be treated unequally or discriminated against.

"Sensitivity training" is not limited to implicit bias training, however. For example, a public employer or government program may create a web-based resource entitled, "Anti-Racist Resources," and include information designed to promote a better understanding of racism and how to combat racism. But, if that web-based resource stated that it was designed to "serve as a resource to white people" or to "serve as a resource for our white employees," then it could violate Section 297 because it may imply that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.

Section 298 expressly permits schools to educate about and discuss the historical existence of ideas and subjects that are otherwise prohibited under Section 298. Section 298 does not prohibit schools from teaching about discrimination or how discrimination has existed throughout history. Nor does Section 298 prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups. Similar to Section 297, Section 298 does not prohibit teaching students about implicit biases nor does it prohibit schools from creating web-based resources designed to promote a better understanding of racism, sexism, or other forms of oppression. Section 298 is violated only when a school educates about concepts of group superiority or inferiority based on inherent or innate group

characteristics divorced from history or educates that an identified group should be treated unequally or discriminated against.

Section 298 applies to educational instruction in K-12 schools only. Nothing in Section 298 limits instruction by educators in post-secondary schools. Section 297's prohibitions, however, do apply to the teaching and training of employees and volunteers in public, post-secondary educational institutions.

Construing the Prohibited Activities Together with the Permitted Activities

Construing these new statutes harmoniously, Sections 297 and 298 allow public employers, government programs, and schools to train and educate in a manner that promote concepts of equality and the equal, respectful, and dignified treatment of all persons. Both sections permit public employers, government programs, and schools to train and educate about concepts such as implicit bias. Public employers, government programs, and schools violate Sections 297 and 298 only when trainings or education programs advocate that identified groups are either: (1) oppressive by their nature and not simply oppressive by accident, apparently oppressive, or oppressive because of external action or external factors; (2) consciously or unconsciously biased by their nature and not simply biased (racist or sexist) by accident, apparently biased (racist or sexist), or biased (racist or sexist) because of external action or external factors; (3) deserving of discrimination or adverse treatment; or (4) deserving of unequal treatment.[5]

This construction comports with traditional definitions of racism and sexism. For example, "racism" means, among other things, "the assumption that psychocultural traits and capacities are determined by biological race and that races differ decisively from one another, which is usually coupled with a belief in the inherent superiority of a particular race and its right to domination over others." *Webster's Third New International Dictionary* at 1870. This construction also strikes a harmonious balance between expressly permitted "sensitivity training" or programming and prohibited programming that exacerbates discrimination.

For the reasons set forth above, the new sections added to RSA chapter 354-A and RSA 193:40 prohibit only those trainings or educational programs that: (1) teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to characteristics which are apparent, accidental, or based on external action or external factors, that make them superior or inferior to other identified groups, or that those inherent characteristics make one identified group consciously or unconsciously racist, sexist, or oppressive or (2) teach participants that one identified group should be discriminated against or treated adversely. The new sections added to RSA chapter 354-A and RSA 193:40 do not prohibit trainings or educational programs that teach participants about disparities that may

[5] Like many discrimination claims, review of a claimant's allegations will involve a fact-intensive, case-by-case analysis of the training or programming at issue to determine whether the training or programming violated Sections 297 or 298's prohibitions.

1998

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 9 of 9

exist among different identified groups, the current or historical practices that may have contributed to those disparities, or about concepts such as implicit bias.

Sincerely,

John M. Formella
Attorney General

#3293122

PL 00433

# EXHIBIT 54

Excerpts of How to Be an Anti-Racist

(Depo. Ex. 50)

EXHIBIT 50
2000
WIT: Edelblut
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

# HOW TO BE AN ANTIRACIST

IBRAM X. KENDI

ONE WORLD
NEW YORK