3) Cisgender
4) Male
5) Educated
6) Athletic
7) Neurotypical
8) Able-bodied

You are in the **subordinate culture** if you fit into any of these identities:
1) Brown
2) Indigenous people of color of the global majority
3) Queer, transgender, nonbinary, cisgender women, youth
4) Muslim, Jewish, Buddhist, atheist, non-Christian
5) Neurodiverse
6) Those living with disabilities
7) Those living in poverty, and more.

A student or teacher must then determine which of those two boxes they fit in.

This is why Condoleeza Rice rejected the narrative of CRT that we are seeing in k-12. She disagreed with requiring white people to feel guilty for everything that has happened in the past. She mentions one of the most important features of CRT which is, the idea that black people have to feel disempowered.

Rice rejects this radical worldview, and goes on to say that she wants black kids to be completely empowered, and to know that they are beautiful in their blackness.  But in order to do that, she doesn't want them to make white kids feel bad for being white. Condoleeza Rice just summed up why the radicalized CRT agenda is wrong for students in New Hampshire.

While this radical agenda in our schools may be wrong, the CRT/DEIJ/Anti-Racist agenda also violates our basic civil rights. Those rights were affirmed in HB2 with the anti-discrimination language.

Why would anyone think it's ok to discriminate against any group of people based on their skin color? Why would we want to go backwards? Why would you **not** want to affirm the civil rights of all of the children and teachers in the public school system?

This kind of discriminatory behavior has been happening in many of the New Hampshire schools like Litchfield, Sanborn, Exeter, Hollis-Brookline, and Hopkinton, to name a few.

Parents have set up websites, Facebook pages, and have objected to this discriminatory behavior at school board meetings. HB2 has helped those parents and teachers demand that their school administrators focus on academic achievement for all of their students.

Teachers are in a very difficult position speaking publicly, but HB2 helped them so they aren't subjected to this kind of hate and prejudice in Professional Development.

It was David Ryan, Superintendent of SAU16 who admitted in a public meeting that they would

have to change their professional development because of the anti-discriminatory law. The professional development in SAU16 provided by 2Revolutions was questioned at a public meeting when someone asked about the Professional Development East Kingston teachers had to endure 1:22:29.

According to 2 Revolutions, teachers and children are covert racists and a white supremacists if they are:

1. Of the belief that we should be colorblind when judging someone
2. Silent
3. Are white parents self-segregating in certain neighborhoods & schools
4. Live in an area where education funding is from property taxes
5. Supports the message of Make America Great Again
6. Denies White Privilege
7. Believes in Exceptionalism
8. Celebrates Columbus Day
9. Claims reverse racism
10. Assumes good intentions are enough
11. Believes : But we're all one big human family....there's only one human race.

This is the kind of professional development we have seen in New Hampshire Schools. This is not training that is focused on helping all students succeed academically, but training teachers to blame and shame their colleagues and the children in their care.

The teachers in SAU16 were subjected to professional development by 2Revolutions who was hired to work with the teachers. According to 2 Revolutions if you live in an area that funds public education through property taxes, you are a white supremacist.  That would mean that every resident in New Hampshire is a white supremacist, including all of the members of the Senate Judiciary Committee. They then work on dismantling your inherent white supremacy. But if you look at this new world view, you can never dismantle your inherent racism. These vendors sell their anti-racist propaganda for profit to schools that are willing to violate the civil rights of the teachers and children.

There are many more examples I can share but I think you can see that this kind of destructive bias we saw in New Hampshire schools prior to the passage of HB2. This was damaging to teachers and children in our public schools, but more importantly, it was violating their civil rights. The children who are in the subordinate culture may then begin viewing themselves as abnormal and inferior just as Condoleeze described in her interview.

HB2 provided a way for parents and teachers to fight back against the prejudice aimed at them. They shouldn't be used as a political tool by political radicals. Our schools should be focused on academic excellence and literacy in the core subjects. They should be nurturing children in kindness and compassion instead of the character assassination we've witnessed.

It's unfortunate that some of our educators thought that this radicalized approach in our classrooms was ok. It is not-- it violates our most basic civil rights. There are ways that teachers and children can learn the truth about history without this kind of psychological game being played on them, and it shouldn't include discriminatory actions aimed at teachers and children.

For these reasons I urge you to vote ITL on SB304 and affirm our civil rights.

ADDITIONAL Information:

2REVOLUTIONS:







**Ibram X. Kendi's books have been assigned to children in districts like Hopkinton.**

BAN00000694

2505

Thriving Families Learning Session 1 Final...
1 page — Edited

# SOME CHARACTERISTICS OF WHITE SUPREMACY CULTURE

| CHARACTERISTIC | WHAT IT LOOKS LIKE IN ACTION |
|---|---|
| Perfectionism | Little appreciation expressed among people for the work that others are doing; appreciation that is expressed usually directed to those who get most of the credit anyway |
| Sense of Urgency | Continued sense of urgency that makes it difficult to take time to be inclusive, encourage democratic and/or thoughtful decision-making, to think long-term, to consider consequences |
| Defensiveness | The org structure is set up & much energy spent trying to prevent abuse and protect power as it exists rather than to facilitate the best out of each person or to clarify who has power and how they are expected to use it |
| Quantity over Quality | Things that can be measured are more highly valued than things that cannot; Little or no value attached to process; If it can't be measured, it has no value |
| Paternalism | Those with power think they are capable of making decisions for and in the interests of those without power |
| Either/Or thinking | Good/bad; right/wrong; with us/against us; linked to perfectionism in making it difficult to learn from mistakes or accommodate conflict. No sense that things can be both/and |
| Power Hoarding | Little, if any, value around sharing power |
| Fear of Open Conflict | When someone raises an issue that causes discomfort, the response is to blame the person for raising it, rather than looking at the issue which is actually causing the problem. Culture of politeness |
| Right to Comfort | The belief that those with power have a right to emotional and psychological comfort (valuing logic over emotion) Scapegoating those who cause discomfort |

Source: showingupforracialjustice.org

**ANALYSIS   RACIAL ISSUES**

# VIDEO: 'White people should commit suicide as an ethical act,' Duquesne professor says

MATT LAMB - ASSOCIATE EDITOR   ·   AUGUST 30, 2021

SHARE THIS ARTICLE:   

*He defended a proposition by a fellow professor*

Duquesne University **Professor Derek Hook** said there are merits to the argument proposed by another professor who argued that it would be ethical for white people to kill themselves.



The anti-critical race theory group Mythinformed MKE posted the video recently. "This is part of an 'anti-racist' discussion on 'nice white therapists held by the [American Association for Psychoanalysis in Clinical Social Work]," the group wrote on Facebook. The video appears to be from a **summer session** hosted by Hook, though the content is not otherwise publicly available.

"White people should commit suicide as an ethical act," the top of a presentation by Hook said.



**Rebecca** ~~Jericho~~

I just can't 😔, My 9 year old asked me this weekend if slavery was her fault because she's a white person. (We have an open question/answer about anything) and she is super interested in Rosa Parks and the Underground Railroad. We happened to be in Boston when she asked this one.
I guess we prob need a separate FB page 😔. The look in her eyes thinking that slavery was HER/OUR fault was soul-crushing.

Like · Reply · 1d                     5

**Rebecca is a New Hampshire who posted this on Social Media**

BAN00000696

**EXHIBIT 108**

Feb. 18, 2021 email from D. Richards in HB544 Legislative History

(Depo. Ex. 49

EXHIBIT 49
2508
WIT: _____
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

**Archived:** Wednesday, April 7, 2021 1:18:19 PM
**From:** Daniel Richards
**Sent:** Thursday, February 18, 2021 10:56:22 PM
**To:** ~House Executive Departments and Administration
**Subject:** Testimony
**Response requested:** No
**Importance:** Normal
**Attachments:**
Exploring Whiteness .pdf ;House Testimony 2-18-21 Final.docx ;

Dear House EDA Committee,

Attached to this email is my testimony for today including the "Exploring Whiteness" course syllabus. Please confirm receipt.

Thank you,

Daniel Richards
Etna, NH

Thank you members of the Committee for the opportunity to speak.

My name is Dan Richards and I live in Etna, New Hampshire. I also own and run a company that employs over 200 people that is headquartered in Lebanon, NH.

I come to you today to support and respectfully request you vote in favor of HB 544. My family and our fellow citizens in NH do not believe racist and discriminatory practices are acceptable under <u>any</u> circumstances and this bill would forever enshrine that belief in NH State law.

My wife Melissa and I have two young children, our daughter is in second grade and our son will be entering kindergarten next year at SAU70. My wife and I are deeply concerned about what is being taught and the trainings that are being conducted in our district. But I don't come here just for myself and my family. I also come here today out of concern for the dozens of my employees' children who are being educated in New Hampshire.

Let me give you an example of what is happening. This past spring, a course was taught entitled "Exploring Whiteness and Becoming an Anti-Racist Activist" that contained blatantly racist and anti-American topics. The course syllabus will be submitted following my testimony for your review.

A brief summary of the objectionable content includes:

1. A quiz that asks: The rise of white supremacy was tied most directly to:
   a. Indian removal
   b. Slavery
   c. **The Declaration of Independence**
   d. The US Constitution
   e. Ancient Greece

   The answer demanded is c: The Declaration of Independence.

2. A 2hr 13min <u>lecture</u> given by an individual named Tim Wise. Mr. Wise's lecture includes frequent and repeated racist and anti-American statements, including:
   a. "Rich white people telling working class white people that their problem is other working class people who just so happen to be browner than themselves. That is the whole history of America."
   b. "Let's be clear. Our ancestors from Europe were the losers of their societies."
   c. "Liberty and freedom? You think we believed in that? What history book have you been reading? We didn't believe in that."

3. A 1hr23 minute <u>lecture</u> from Robin DiAngelo whose entire talk is consumed with how all whites are "fragile" due their culpability and complicity in our "racist system."

4. We have also been told by a member of our elementary school leadership team that they will be using "achievement debts accumulated over hundreds of years" to "teach for social transformation." To accomplish this, equity, diversity and inclusion trainings have been conducted for months, I'm told partially funded by state grants, for all teachers, faculty and staff.

In my opinion, these kinds of teachings and trainings are as objectionable as they are false, inflammatory and racist.  They have no place in our NH schools and the training programs of NH companies.

I'd like to conclude by saying I am the son of a Marine veteran and my grandfather and several great uncles served in the armed forces and fought the Axis during WWII.  Some of my ancestors were rounded up, sent to camps and exterminated.  My family knows what racism and white supremacy looks like.  We have fought and we have died to defend the United States and the egalitarian principles for which it stands.  It is sad commentary about our times that we need HB 544, but the reality is that we do.  Our children deserve to be taught the history of this nation, for all of its greatness and flaws.  They do not deserve to be indoctrinated with hatred not only of themselves, but also of those who choose to love this country.

I humbly request you pass HB 544 so I can send my kids to a school free from racism, discrimination and racial stereotyping.

Thank you.

Daniel L. Richards

## Exploring Whiteness and Becoming an Anti-Racist Activist

INSTRUCTORS *John Peterman (cm), Nicole Hansen, Devon Voake (½ day), Amy Good (½ day), Johari Ajwang (s)*
LOCATION HHS Classroom Room 302
READINGS TBD
TIME **Full Day**    MAX ENROLLMENT **16**    STUDENT COST **$0**

DESCRIPTION *Students will join in honest, frank, and respectful examination of what it means to be a white person in 21st century America. We will explore many topics on race including: personal identity and power, white privilege, guilt, and fragility, and taking anti-racist action. We will learn how whiteness and race were invented in the early years of our country's formation, further sustained through government programs, and how this has played out in our own community. Students will learn how to take anti-racist action by meeting with college students who currently are engaged in national and local anti-racist work, including where anti-racist work intersects with gun safety, climate change, and LGBTQ rights. This MI is open to all students, and we hope that we will have a diverse group. The course will be designed to be a dynamic and interactive experience based at HHS, but also involving field trips off campus. Tentative plans include interaction with Dartmouth students/staff members and other local community members involved with anti-racism work and correspondence with students from Ashley Hall School in Charleston SC to discuss how we perceive race and each other in New England and the South.*

Tuesday 3/10
8:00-8:30 Introductions/Rules of Engagement/ Race Literacy Quiz (John)
8:30-9:00 Equity and Inclusion Terms, Language, and Definitions (Meredith/Johari)
9:00-9:45 The Invention of Whiteness/ Race the Power of an Illusion (John)
9:45-10:00 Break
10:00-11:00 Action Plan Design planning (Group led by Johari and Meredith)
11:00-12:00 Lunch
12:00-1:00  "Understanding Racism and Systemic Oppression " Brian Cook/Groundswell Change
1:00-1:30 Discussion on Brian Cook's Presentation
1:30-1:45 Break
1:45-2:45 iPod walk-around  (Nicole)
2:45-3:00 Journaling (Amy prompts)

Wednesday 3/11
8:00-9:00 How we got here: Jim Crow, Redlining, Racial Wealth Gap (John)
9:00-9:30 Shadows Fall North film excerpt (John)
9:30 -10:00 Citrus Preview (Nicole and Johari)
10:00-10:30 Brunch
10:30-1:30 (including travel time) Citrus at Northern Stage
1:30-2:00 Citrus Discussion and Journaling (John/Amy's prompts)

Thursday 3/12
8:00-9:00  White Privilege/ White Fragility (John/Meredith) (with selected video)
9:00-9:45   Intro to Kendi: Anti-racism/ in-class reading (Johari/Meredith)
9:45-10:00 Break
10:00-10:30 Action Plan Design planning (Group/Johari/Meredith)
10:30-11:30 "Carol Street" Being a Person of Color in an All White Environment (film maker Demetrius Borge)

*First Draft of Daily Schedule Topics*
*Speakers/video/presentations/discussion TBD*

## Tuesday 3/10

### Introductions/ / Rules of Engagement/ Opening Exercises

*http://www.pbs.org/race/002_SortingPeople/002_00-home.htm*
*race literacy quiz*
*http://newsreel.org/guides/race/quiz.htm*

### Language and Definitions

#### The Invention of Race and Whiteness

*Tim Wise:what is race  invention of whiteness*
*https://www.youtube.com/watch?v=jBUnziGqN4o    1:53-2:01*
 *Race the Power of an Illusion*
*Ep 1 The difference between us ... segments*
*https://www.youtube.com/watch?v=OXEV0tqox9k&t=2s*
*Discussion Guide pages 7&8 http://newsreel.org/guides/race/race-guide-lores1.pdf*
*The Other Race (Mixed Race)  Documentary...segments*
*https://www.youtube.com/watch?v=GfM-F172548*

### White Privilege

The advantages of wealth and whiteness  10 question walk/race
**https://www.youtube.com/watch?v=4K5fbQ1-zps**
**https://www.nasponline.org/resources-and-publications/resources-and-podcasts/d**
**iversity/social-justice/social-justice-lesson-plans/talking-about-race-and-privilege-l**
**esson-plan-for-middle-and-high-school-students**
**https://www.huffpost.com/entry/explaining-white-privilege-to-a-broke-white-perso**
**n_b_5269255**
*"White Immunity": Working through the pitfalls of "privilege" discourse*
*https://www.youtube.com/watch?v=JtLpAfB-DEc  segments*

### Affirmative Action

A Long History of Affirmative Action - For Whites
http://newsreel.org/guides/race/whiteadv.htm

### Black Lives Matter

*NYT A conversation with police*
**https://www.nytimes.com/video/opinion/100000004027684/a-conversation-with-poli**
**ce-on-race.html?module=inline     1:59-2:30**
Tim Wise  Black Lives Matter/All Lives Matter
https://www.youtube.com/watch?v=jBUnziGqN4o  42:06

HB544 0243

**Wednesday 3/11**

**How we got here: Jim Crow, Redlining, Racial Wealth Gap**

*Race the Power of An Illusion - ep3 The House We Live*

*https://www.youtube.com/watch?v=QHo8AKNfB68*

*https://www.youtube.com/watch?v=mW764dXEI_8*

*THE POWER OF AN ILLUSION How the Racial Wealth Gap Was Created*

*https://www.youtube.com/watch?v=QHo8AKNfB68&t=4s*

*Discussion Guide pages 11-13 http://newsreel.org/guides/race/race-guide-lores1.pdf*

**Being a Person of Color in an all white environment**

**Documentary film maker speaker**

**White Fragility/ White Guilt**

**Robin DiAngelo lecture**

**https://www.youtube.com/watch?v=45ey4jgoxeU&t=1230s**

> **https://www.nytimes.com/video/opinion/100000003773643/a-conversation-with-white-people-on-race.html?module=inline**

**Thursday 3/12**

**Anti-racism**

**Dartmouth Student Leaders and others**

**Skype with school in South Carolina  North/South perspectives on race**

**Friday 3/13**

**Becoming and activist**

**Dartmouth Student Leaders and others**

**Closing/ Goals/ Action Steps**

HB544 0244

**EXHIBIT
109**

Educator
Code of
Conduct



EXHIBIT 2

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 2

New Hampshire
Code of Conduct
for
Educational
Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  Purpose.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d) Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  Definitions.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

> (1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

> (2)  Meets at least one of the following qualifications:

>> a.  Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

>> b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1) Pathway 4 certification as specified in Ed 505.04; or

(2) Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  Confidentiality of Credential Holder Certification Records.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1) The name of the credential holder;

(2) The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3) The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4) The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1) Informal or formal investigations; or

(2) Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1) A party in an adjudicatory proceeding when:

a. The credential holder is a party to the proceeding; and

b. The credential holder's credential record is relevant to the proceeding;

(2) A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3) A certifying agency of another jurisdiction for:

    a. Purposes of credentialing the credential holder in the other jurisdiction; or

    b. An investigation of the credential holder by the other jurisdiction, when:

        1. The credential holder was the subject of a formal investigation under Ed 511; or

        2. Disciplinary action was taken against the credential holder by the board under Ed 511;

(4) Board investigators or prosecutors; or

(5) Persons to whom the credential holder has given a release.

(d) The bureau shall report:

    (1) Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

    (2) Any reprimand to the credential holder's current superintendent of school in N.H.;

(e) The department shall maintain a list of all credential holders whose credentials has *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04 Emergency Authorization.

(a) The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b) The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

    (1) Paid the applicable application fee, provided in Ed 508.06(c); and

    (2) Filed with the bureau the information and documentation required in (c) and (e).

(c) An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13)  Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14)  Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15)  Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a.  American Indian;

    b.  Asian/Pacific;

    c.  African-American/Non-Hispanic;

    d.  White/Non-Hispanic;

    e.  Hispanic;

    f.  Multi-ethnic; and

    g.  Other/do not wish to specify.

(d)  If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e)  If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f)  An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a)  The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b)  If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

    (1)  Is in the process of certification;

    (2)  Has submitted a completed application for certification; and

(3) Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01 <u>Principle 1—Responsibility to the Education Profession and Educational Professionals.</u>

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02  <u>Principle 2—Responsibility to Students.</u>

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

    a. Abuse, including, but not limited to physical and emotional abuse;

    b. Cruelty or any act of endangerment;

    c. Any sexual act with or from any student; and

    d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03  Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04   Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b) Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2) Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)   Whether:

a. The communication made was covert in nature;

b. The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c. The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05   Duty to Report.

(a)  Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:

(1) When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2) When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d) If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e) Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1) His or her immediate supervisor, superintendent, or both; and

(2) The department of health and human services, pursuant to RSA 169-C:29.

(f) If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g) The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01  Complaints, Cases and Investigations.

(a) A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b) After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c) Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d) Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

   (1) The department shall create a report which documents the results of the investigation;

   (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

      a. Suspension;

      b. Revocation; or

      c. Reprimand; and

   (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

   (4) The following shall be considered aggravating circumstances:

      a. The seriousness of the offense;

      b. The credential holder's prior disciplinary record;

      c. The credential holder's lack of willingness to cooperate with the department during an investigation;

      d. Potential harm to public health and safety; and

      e. The purpose of the rule violated;

   (5) The following shall be considered mitigating circumstances:

      a. Absence of a prior disciplinary record;

b. The credential holder's willingness to cooperate with the department during an investigation;

c. The credential holder's acknowledgment of his or her wrongdoing; and

e. The purpose of the rule or statute violated;

(6) The credential holder shall be notified in writing of any proposed discipline;

(7) If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k) Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2) If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a. A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b. A certifying agency of another jurisdiction for:

1. Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i) The credential holder was the subject of a formal investigation under Ed 5101; or

(ii) Disciplinary action was taken against the credential holder by the board pursuant to Ed 5101;

c. Other states' licensing board investigators or prosecutors; and

d. Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

(a)  If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b)  All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline.  The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c)  Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03  <u>Disciplinary Hearings</u>.

(a)  If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1)  Completion of an informal or formal investigation; and

(2)  Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b)  The provisions of Ed 200 shall apply to all disciplinary hearings and *such hearings* shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.04  <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

(a)  When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b)  The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c)  In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 Grounds for Reinstatement After Suspension.

(a) A credential which has been suspended shall be reinstated for one of the following reasons:

(1) The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2) A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b) Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512 DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 Denial of Credential.

(a) A credential application shall be denied by the board based on the following grounds:

(1) Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b) An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision. If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

PL 00022

## APPENDIX I

| RULE | STATUTE |
|---|---|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION, CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) | |
| Defendants. | ) | |
| ------------------------------------------------------------------------- | ) | |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) | Civil No. 1:21-cv-01077-PB |
| Plaintiffs, | ) | |
| v. | ) | |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT [***REDACTED PUBLIC VERSION***][1]

[1] An unredacted, sealed version of this statement has been filed with the Court.

# TABLE OF CONTENTS

Statement of Undisputed Facts [Local Rule 56.1(a)]………………………………………...1

I.     The Educator Code of Conduct and the Department of Education's Complaint
       Process Generally………………………………………………………………...1

II.    The Human Rights Commission Complaint Process Generally………………………9

III.   The Amendments' Origins…………………………………………………………...14

       A.  Increasing Diversity and Inclusion Efforts in New Hampshire Following George
           Floyd's May 2020 Murder……………………………………………………14

       B.  The Backlash………………………………………………………………..19

IV.    The Drafting of the Amendments in New Hampshire………………………………21

       A.  The New Hampshire House of Representatives…………………………………22

       B.  The New Hampshire Senate, and the Commissioner's June 13, 2021 Op-ed…...24

V.     The Amendments' Confusion and Defendants' Purported "Guidance"……………..27

VI.    Defendants' Lack of Clear Policies, and Failure to Explicitly Say What the
       Amendments Mean………………………………………………………………..37

VII.   Complaints Under, and Defendants' Enforcement of, the Amendments……………44

       A.  Department of Education Complaints and Investigations Under the Amendments,
           and the Commissioner's April 15, 2022 Op-ed Highlighting Some of These
           Complaints ……………………………………………………………………48

       B.  Human Rights Commission Complaints Under the Amendments………………57

VIII.  Confusion as to Who Enforces RSA 193:40, and the Amendments' Impact on
       Extracurricular Speech ……………………………………………………………64

IX.    The Chill of the Amendments on New Hampshire Educators…………………………67

Plaintiffs in the first above-captioned action (the "AFT Plaintiffs" or the "AFT Action") and Plaintiffs in the second above-captioned action (the "Mejia Plaintiffs" or "Mejia Action") each filed separate complaints in this consolidated case challenging the provisions of Sections 297 and 298 of 2021 House Bill 2 ("HB2"), codified at N.H. Rev. Stat. Ann. ("RSA") 354-A:29-:34 and RSA 193:40. These provisions were enacted on June 25, 2021 and ban teaching, instructing, inculcating, or compelling a student to express belief in (or support for) four concepts in public schools and places of public employment. They are herein referred to as the "Amendments" and are attached, along with Plaintiffs' other exhibits, as _Ex. 1_ (Depo. Ex. 1) to the accompanying declaration of Attorney Gilles Bissonnette. Plaintiffs have moved for summary judgment as to (i) the Fourteenth Amendment's procedural due process/vagueness claim alleged in Counts I and II of the AFT Action and in Count I of the Mejia Action and (ii) the First Amendment's freedom of speech claim alleged in Count III of the AFT Action given the Amendments' impact on educators' private, extra-curricular speech.

In support of this Motion for Summary Judgment, Plaintiffs submit this Statement of Undisputed Facts pursuant to Local Rule 56.1(a).

## **STATEMENT OF UNDISPUTED FACTS [LOCAL RULE 56.1(A)]**

**I.    The Educator Code of Conduct and the Department of Education's Complaint Process Generally**

1.    RSA 193:40, IV states that a violation of RSA 193:40 constitutes an independent violation of the Educator Code of Conduct.

2.    The Educator Code of Conduct was authored by the Department of Education ("DOE") in 2018 in response to a legislative enactment. *See* Fenton Depo. 16:15-17:2.[2]

---

[2] Attorney Fenton's deposition transcript referenced throughout is attached as _Ex. 3_ to the accompanying declaration of Attorney Gilles Bissonnette.

3.       Any person, aggrieved or not, may file a complaint about an educator's conduct

with the DOE.[3]  Complaints under the Code of Conduct can come from several different sources,

including individual parents, self-reporting through superintendents or their staff, principals, law

enforcement, and the Department of Children, Youth, and Families ("DCYF").  *See* Farrell Depo.

15:25-16:22.[4]

4.       Complaints under the Code usually arrive at the DOE by email or phone call.  *See*

Farrell Depo. 16:23-17:1. Conceivably though, the DOE's administrative rules allow the DOE to

open cases because of a news article or posting on social media which contain information related

to possible misconduct by an educator.[5]

5.       While the Human Rights Commission ("HRC") can only take action against a

"public employer" under RSA 354-A:31 of the Amendments[6], a violation of RSA 193:40 is

enforceable against an individual educator.  *See* RSA 193:40, IV ("Violation of this section by an

educator shall be considered a violation of the educator code of conduct that justifies disciplinary

sanction by the state board of education.").

6.       The DOE has the sole authority to enforce the Educator Code of Conduct.  DOE

Attorney Diana Fenton acknowledged at deposition that the Educator Code of Conduct is

---

[3] *See* Fenton Depo. 41:3-7, 17-19 ("Q. Is there any language that you're aware of in the code of conduct in Exhibit 2 that limits who can make a complaint under the code? A. No."; acknowledging that "anyone can make a complaint under that language").
[4] Investigator Farrell's deposition transcript referenced throughout is attached as *Ex. 4* to the accompanying declaration of Attorney Gilles Bissonnette.
[5] N.H. Code Admin. R. Ed 511.01(a) of the Educator Code of Conduct states that "[a] case *shall* be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting *or other means*."  (emphasis added)
[6] *See* Cohen Depo. 60:20-61:8 ("Q. What I'm trying to get at is under RSA 354-A:31, can an individual public employee be sued?  MR. KENISON-MARVIN: Same objection.  Q. Or is that statute limited to public employers? That's really the question that I'm trying to get at.  MR. KENISON-MARVIN: Same objection. A. It appears from the writing of 354-A:31 and the definition of what a public employer means at 354-A:30 that a public employer includes the state or any subdivision, does not include individuals in that definition."), 118:6-9 ("The intake inquiries have been generally from the documentation the School Districts with the exception I think as I recall one is naming the Commissioner of Education directly.").

investigated and enforceable by the DOE,[7] and that a violation of the Amendments constitutes a violation of the Educator Code of Conduct.[8]

7.      As N.H. Code Admin. R. Ed 511.01(a) of the Educator Code of Conduct states, "[a] case _shall_ be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means."  (emphasis added).  When a case is "opened," the DOE investigator "would document the name of the person [that] the allegation is against, the name of the person making the allegation, the school district, [and] any other facts which might be relevant."[9]  *See also* _Ex. 109 (Depo. Ex. 2)_ (Educator Code of Conduct).

8.      In practice, and according to rule, the DOE "opens a case" and conducts an "initial review" on every complaint it receives in which any possible misconduct is alleged.[10]  *See* N.H. Code Admin. R. Ed 511.01 (a)-(b). This occurs before the DOE determines that a "possible

---

[7] *See* Fenton Depo. 24:24-25:15 (acknowledging that "the Department of Education enforce[s] the code of conduct"), 151:25-152:2 (same).

[8] *See* Fenton Depo. 35:18-36:6 (testifying that a violation of HB2 "would be a violation of the Educator Code of Conduct"), 151:25-152:5 ("Q. And violations of HB 2 are violations of the code of conduct, are they not? A. That is what the law says."); *see also* Edelblut Depo. 124:18-126:12 (RSA 193:40, IV "states clearly that the violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education").

[9] *See* Fenton Depo. 152:23-153:10 ("Q. And when it says 'a case shall be opened,' can you describe for me what it means for a case to be opened?  A. I've already testified to that.  Q. Well, you said that things get documented, but you didn't specify how they get documented. A. I believe I did go into detail as to what that means. Q. I don't recall. Can you refresh my recollection? A. In large part, it would be the investigator, Richard Farrell, and he would document the name of the person the allegation is against, the name of the person making the allegation, the school district, any other facts which might be relevant.").

[10] *See* Fenton Depo. 46:4-25 ("Q. [I]s it inaccurate to say that the Department makes a determination as to whether or not possible misconduct occurred before opening a case? A. I think that Ed 511.01 (A) has to be read in conjunction with Ed 511.01 (B). Q. Okay. Is there a difference between opening a case and opening an investigation within the Department? A. Based upon my understanding of the code of conduct and Ed 511, yes, there is. … Q. Does the Department make a determination as to whether possible misconduct may have occurred in deciding whether to open a case? A. No. Q. So how do you -- how would you then explain the process in deciding whether to open a case, just so I understand the process clearly. A. My understanding of the code of conduct in Ed 511.01 and the Department of Education's practice as it relates to this area is that a case is opened when information is received.")

violation of the code of conduct" exists and before the DOE opens a formal investigation under N.H. Code Admin. R. Ed 511.01(b).[11]

9.      These "initial reviews" occur any time a case is "opened" under N.H. Code Admin. R. Ed 511.01(a) and are done so the DOE can determine whether there was a "possible violation of the code of conduct" that would then require the opening a formal investigation under N.H. Code Admin. R. Ed 511.01(b).

10.      These "initial reviews" can take many forms depending on the facts of the case. They may include interviewing the complainant, contacting superintendents, principals, and other school administrators to interview them or request information, contacting witnesses, including other rank and file teachers or other school employees, and requesting documents.[12]

11.      DOE Investigator Richard Farrell has informed school districts about complaints under the Code of Conduct concerning school library books even before a case was opened under N.H. Code Admin. R. Ed 511.01(a) or before there was a determination that the book or teaching of a book potentially violates the Code of Conduct under N.H. Code Admin. R. Ed 511.01(b).[13]

---

[11] *See* Fenton Depo. 47:17-21 (acknowledging that, "[i]n terms of documenting information received," a case will be opened before a determination has been made that there's possible misconduct), 45:8-46:18 (acknowledging that facts could be gathered by reaching out to school superintendents in deciding whether to open a case, including the requesting of documents); Farrell Depo. 23:19-25 ("Q. And all the factual investigation that goes—that comes after the opening of a case? A. Yes. Q. Okay. And this is before the Department of Education determines whether to open a formal investigation, right? A. Yes."), 25:1-3 (noting that, in deciding whether to open a case, he "look[s] at the complaint, the facts of the complaint, and determine whether or not the code of conduct applies").

[12] *See* Fenton Depo. 45:8-13 ("Q. Okay. Are facts gathered by reaching out to school superintendents at this stage in deciding whether to open a case? A. That could be done, yes. Q. Are documents requested? A. That request could be made, yes."), 48:20-49:6 ("Q. So in determining whether there has been a possible violation, I want to make sure I understand your testimony correct. That would also include reaching out to gather information from school districts, correct? A. It could. Q. What else could it include? A. We could talk to other individuals that might be administrators. Depends on the nature of the facts. Q. And it could include requesting documents from school districts, right? A. I believe I've already testified to that, yes."); Farrell Depo. 17:16-18:5 ("Q. Okay. And now when you receive one of these complaints, can you describe what you do as the investigator for the Department of Education? A. The first thing that I would do is determine back up. I will gather facts and circumstances from the complainant. Q. Does that include reaching out to superintendents? A. Occasionally. Q. Does that include speaking to principals? A. Occasionally. Q. Does that include speaking to other educators at the school? A. Sometimes. Q. Does that include requesting documents? A. Sometimes.").

[13] *See* Farrell Depo. 124:24-129:9 ("Q. And each time you go and you speak with the superintendent about the book being where it was complained of, something similar? A. Yeah. You know, is it in the high school library? Is it the

Investigator Farrell has, in fact, conducted initial reviews of books and school libraries based on these complaints.[14]

12.     Commissioner of Education Frank Edelblut also will often personally react to parental complaints of alleged educator misconduct by responding to parents directly and/or contacting superintendents and other school administrators to alert them to the complaint, and will sometimes do so even when there is no possible violation of the Code of Conduct raised.[15]

13.     The Commissioner engages in these inquiries, in part, because the Commissioner views parents as his "customers," and "if I have a complaint from a parent, I bring that to the attention of the superintendent so they can manage it appropriately."[16]   He also views teachers as having a "[r]esponsibility to support the parents and not undermine their values."   *See Ex. 40 (Depo. Ex. 14)* at PL00683.

14.     After the DOE's "initial review" of a complaint under the Code of Conduct, the DOE has little discretion in deciding to conduct a formal investigation if it concludes that there has been a "possible violation."   This is because an investigation *shall* be opened if there is a

---

middle school library? Is it in the elementary school library? Those have bearings. You know, those are important facts to know. Or is it even in the building at all? And is it in the SORA app? So it's a fact-based question. Is it there? Isn't it there? Once I get the facts, I provide it to Diana Fenton for her review.  Q. And just in the stage of, you know, sort of from the code of conduct, what you're describing is not a formal investigation, but it's when a complaint—a case has been opened because of a complaint? A. It's even before the case has been opened. I mean, so a parent is angry and upset about a book being in a library. So let's collect the data and determine whether or not we even go to the triage phase.").

[14] *Id.*

[15] *See* Edelblut Depo. 20:22-22:4 (noting his communication with these parties) 24:9-25, 58:18-59:16 (noting he contacted a superintendent directly about a parent complaint);32:2-16 (explaining a meeting with superintendent and assistant superintendents about a parent complaint); 38:4-13 (acknowledging direct communication with a parent about a curricular complaint) *see also Ex. 57,* DOE 857 (elevating parental concern under the Amendments about usage of the film "White Like Me" without determining whether there was a violation).

[16] *See* Edelblut Depo. 29:4-8 ("So my duty is to support my customers to the agency which include a variety of constituencies.  Parents are one of them.  So I try to be as prepared as possible to support my constituencies."), 77:15-78:9 ("What is within the domain of the Department is to make sure that the system is able to function well, and part of functioning well is to make sure that the constituencies are being served.  So as I support my superintendents, if have a complaint from a parent, I bring that to the attention of the superintendent so they can manage it appropriately.").

"possible violation of the code of conduct."  *See* N.H. Code Admin. R. Ed 511.01(b) (emphasis added).

15.      If an investigation is formally opened under N.H. Code Admin. R. Ed 511.01(b), the employing superintendent and usually the educator's union attorney are notified via letter.  *See* Fenton Depo. 63:2-14, 154:1-4.  Subsequent steps by the DOE could include receiving additional documentation from the school district, further conversation with school administration, meeting with the educator, interviewing other witnesses, and speaking with the educator's union representative.  *See* Fenton Depo. 63:21-64:3.

16.      Whether a "violation" has occurred under N.H. Code Admin. R. Ed 511.01(j)(2) is determined solely by the DOE and depends on the "individual facts of the case."  There are no additional criteria as to what constitutes a "violation" beyond what exists in the Code of Conduct.  *See* Fenton Depo. 65:22-67:9.

17.      Commissioner Edelblut, DOE Attorney Fenton, DOE Investigator Richard Farrell, and occasionally DOE Deputy Commissioner Christine Brennan meet regularly in a meeting called the "Educator Misconduct Meeting" where they discuss investigations that are ongoing or finished.  *See* Farrell Depo. 29:2-16; Edelblut Depo. 41:20-42:3, 42:19-43:4.[17]  The group discusses the facts of individual cases, any necessary next steps, and possible sanctions for the educator.  *See* Farrell Depo. 28:24-30:1; Edelblut Depo. 45:6-19. Depending on the facts and circumstances of the specific case, any one of those persons may make the recommendation as to what sanction should issue, but ultimately the Commissioner must agree with any recommendation made.[18]

---

[17] Commissioner Edelblut's deposition transcript referenced throughout is attached as *Ex. 2* to the accompanying declaration of Attorney Gilles Bissonnette.

[18] Farrell Depo. 40:12-25 ("Q. I just want to be clear. The commissioner is involved in the decision as to whether there's been a violation of the code of conduct, right? A. He is—the meetings have different levels within the meetings and different stages of the investigation, so to the extent that he—we conduct those meetings, and he asks questions, he is involved in the process. But it's not until a decision is made that he then becomes in agreement or disagreement with the recommendation. Q. Right. And I think you said the buck stops with him, right? A. Correct. Q. So he's thumbs

18.     While the DOE has discretion regarding what sanction will be imposed, it has far less discretion in declining to discipline at all. "If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department _shall_ propose a form of discipline as follows: a.  Suspension; b.  Revocation; or c. Reprimand."  N.H. Code Admin. R. Ed 511.01(j)(2) (emphasis added); _see also Ex. 50 (Depo. Ex. 3)_, at DOE-05662 (listing sanctions in superintendent presentation); _Ex. 51 (Depo. Ex. 7)_, at DOE-10084-86 (in DOE presentation to educators, listing sanctions and considerations); _Ex. 44 (Depo. Ex. 24)_, at DOE-09674-76 (same).  If there is a violation, "[m]ore likely than not" a sanction will be issued.  _See_ Farrell Depo. 32:6-10.

19.     The DOE considers various aggravating and mitigating circumstances in imposing a sanction.   N.H.  Code Admin.  R.  Ed  511.01(j)(3)-(5) (listing aggravating and mitigating circumstances that shall be considered in imposing a sanction).

20.     Once determined by Commissioner Frank Edelblut, DOE Deputy Commissioner Christine Brennan, DOE Attorney Fenton, and DOE Investigator Farrell—or some combination thereof—the proposed sanction is conveyed to the educator.  _Id._ Ed 511.01(j)(6).  The educator can either accept the sanction and sign an agreement with the DOE under N.H. Code Admin. R. Ed 511.02(a) or request an adjudicatory hearing to contest the proposed sanction under N.H. Code Admin. R. Ed 511.03.

21.     If the educator chooses to contest the proposed sanction, a hearing examiner holds an adjudicatory hearing to determine a sanction to recommend to the State Board of Education, which then makes the final determination.  _Id._ Ed 200 et. seq.; _see also_ Farrell Depo. 138:10-21

up, thumbs down? A. At the end of the day."); _see also_ Edelblut Depo. 45:13-19 ("Well, I mean we all are collaborating around what would happen next. So it would depend on the individual case. Q. And to coin a phrase, does the buck stop with you, sir? MR. KENISON-MARVIN:· Objection. Vague. A. The buck does stop at Commissioner.").

(stating that "the hearings officer will make a recommendation based upon a hearing with the Department of Education, me, Attorney Fenton, and witnesses, and they would make a proposal to the state board after that hearing for sanction. So the state board takes the action."). Appeals from the State Board of Education's decision are made to the New Hampshire Supreme Court under N.H. RSA ch. 541.

22.     In a contested or non-contested matter, if an educator's credential is suspended or revoked, it becomes public. N.H. Code Admin. R. Ed 502.01(a)(3) ("Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request: …. The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable.").

23.     DOE presentations to administrators—including those that reference the Amendments—state that school officials should call the DOE "[a]nytime [sic] there is a suspected [Code of Conduct] violation." *See Ex.  50 (Depo. Ex. 3)*, at DOE-05652, 5654, 5656 (DOE presentation stating that the DOE should be called "as soon as possible").

24.     A licensed educator's failure to report a suspected violation of the Code of Conduct is itself punishable as a violation of the Code. *See* N.H. Code Admin. R. Ed 510.05(a) (stating that "[a]ny credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures"); *id.* Ed 510.05(f) (stating that, "[i]f the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c)").[19]

---

[19] *See also* Fenton Depo. 40:24-41:2, 51:18-52:4, 55:1-13 ("Q. In evaluating the duty to report, the Department can conduct investigations concerning whether an educator has complied with that duty, right?  A. You're referring to

25.     This duty to report includes suspected violations of the Amendments.  *See Ex. 63 (Depo. Ex. 45)* (in Aug. 17, 2021 email responding to a school board member "about possibly sending out an advisory to all NH districts highlighting the fact that if an educator disregards the [Amendments], they would be violating the educator code of conduct and would face disciplinary action by the state board of education and their local school board," Commissioner Edelblut acknowledged the duty to report in the Code).

26.     DOE Investigator Farrell testified that Commissioner Edelblut may have asked him to request documents from a superintendent in a case, and the Commissioner has sent him emails regarding complaints to look into.  *See* Farrell Depo. 22:16-23.

## II.     The Human Rights Commission Complaint Process Generally

27.     The HRC receives intake questionnaires under the Law Against Discrimination, RSA ch. 354-A, which are managed by an intake coordinator.  "[T]he intake coordinator's role is [to] receive calls that come in, inquiries that come into the Commission.  These inquiries come in both orally via the phone or via someone coming, a walk-in.  Or they come in in written form via email or regular mail.  The intake coordinator role is to sort of look at the jurisdictional components, and if the intake meets the jurisdictional components, to send out an intake questionnaire to that person …."  *See* Cohen Depo. 15:7-18.[20]  The intake coordinator generally does not do any additional fact gathering beyond asking the complainant to submit an intake

---

510.05 (A), right?  Q. Mm-hm.  A. I believe my testimony previous was yes.  Q. Okay. A. The Department would have that authority.  Q. So my question is can the Department investigate simultaneously a potential duty to report violation alongside an investigation into the educator whose conduct substantively violated the code? A. I suppose that the Department could do that, yes."), 56:13-58:13 (acknowledging duty, and testifying that educators have a duty to comply with this section, and the DOE can conduct investigations with respect to this duty); Edelblut Depo. 124:4-17 (acknowledging the duty to report under the Code of Conduct); Farrell Depo. 33:3-37:15 (describing duty to report; "Q. But it is possible that you would open an investigation or you would—sorry—you would open a case to look into a failure to report for a teacher that didn't report a possible violation of the code of conduct? A. It is possible."); *Ex.51 (Depo. Ex. 7)*, at DOE-10078 (in DOE presentation to educators, listing duty to report obligation under the Code of Conduct); *Ex. 44 (Depo. Ex. 24)*, at DOE-09668 (same).

[20] Attorney Cohen's deposition transcript referenced throughout is attached as *Ex. 6* to the accompanying declaration of Attorney Gilles Bissonnette.

questionnaire.[21]   The HRC Assistant Director directly supervises the intake coordinators.  *See* Malachi Depo. 32:3-4.[22]

28.    When the complainant submits the completed intake questionnaire, the intake coordinator then evaluates whether the allegation presents a *prima facia* claim of discrimination. *See* Cohen Depo. 15:18-21, 16:13-17.  In determining whether there is a *prima facia* claim of discrimination, the HRC "look[s] at the jurisdiction" and "what the statute reads," and it "determine[s] in a light most favorable to the intake inquiry whether we'll take it or not.  We base it on jurisdiction of number of employees, whether it substantively falls within the scope of 354-A." *Id.* 12:2-7.[23]  Beyond the text of RSA ch. 354-A, there is no written policy or guidance that the Commission uses in determining whether the *prima facie* standard is satisfied.[24]

29.    Intake meetings at the HRC occur bi-weekly.  The HRC Assistant Director meets with intake coordinators to "discuss any questions the intake coordinator has about intakes that are coming in."  Sometimes decisions are made in these meetings about whether the *prima facie* standard has been met in a case.  Cohen Depo. 11:8-18.

30.    The intake coordinator may, though not always, decide whether the *prima facia* standard has been satisfied in consultation with the assistance of the HRC Assistant Director.  The HRC Director may further assist if the Assistant Director is unavailable.  *Id.* 22:4-22:13; Malachi

---

[21] Cohen Depo. 32:6-14 ("Q. Okay. So I guess that's helpful so beyond kind of reaching out to the complainant and asking them to submit a questionnaire, is there any other fact gathering that the Human Rights Commission would do before it's decided to docket a complaint? MR. KENISON-MARVIN: Same objection. Scope.  A. Not generally.").

[22] Director Malachi's deposition transcript referenced throughout is attached as *Ex. 5* to the accompanying declaration of Attorney Gilles Bissonnette.

[23] *See also* Cohen Depo. 16:22-17:12 ("From my personal experience, evaluating an inquiry is looking at the statutory jurisdiction of the Commission for Human Rights pursuant to 354-A which looks at number, looking at what type of claim it is, public accommodation, public education, housing, or employment, and looking at the statutory requirements depending on that from there.  If it's employment you look at the number of employees to ensure that there are the requisite number of employees. From there you also look to see if the allegations actually fall within what our statute says we can investigate.").

[24] Malachi Depo. 79:14-21 ("Q. How about this.  Beyond the FAQs that we just presented to you …, and beyond the language of the statute in RSA 354-A:29-34, is there any other policy or guidance that the Commission uses in deciding whether an allegation of discrimination under RSA 354-A:29-34 should be docketed?  A. No.").

Depo. 30:14-20, 35:12-17.   The HRC Director may attend intake meetings depending on her schedule.   *See* Cohen Depo. 23:19-22.   If there is additional consultation needed on whether the *prima facie* standard is satisfied, the HRC will consult the DOJ.   *See* Malachi Depo. 30:14-20. Whether the HRC seeks guidance from the DOJ may depend on the complexity of the law being applied.   *See* Cohen Depo. 108:4-21.   Nevertheless, the HRC Director ultimately decides whether the *prima facie* standard is met.   *Id.* 101:8-22.

31.   When the HRC finds that an allegation of discrimination meets the *prima facie* threshold of discrimination, the intake coordinator sends the complainant a draft charge of discrimination. *Id.* 11:19-12:7.   Upon the HRC's receipt of the charge of discrimination that is signed and verified by the complainant, the complaint now becomes a "docketed complaint"/"docketed charge"/"filed charge" of discrimination.   *See* Malachi Depo. 23:13-24:17, 78:17-79:1.   To be docketed, the complaint must be "[i]n writing," "[s]igned and dated by the complainant," and "[v]erified."   N.H. Code Admin. R. Hum 202.01(b); *see also* RSA 354-A:21, I(a) ("Any person claiming to be aggrieved by an unlawful discriminatory practice may make, sign and file with the commission a verified complaint in writing …."); Malachi Depo. 28:16-22.   Once a charge becomes docketed, both the complainant and the respondent are notified in writing.   *See also Ex. 75 (Depo. Ex. 53)*, at DOE-10270-71 (describing the process).   The HRC's "Summary Fact Sheet" concerning how it processes cases is here: https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/summary-fact-sheet.pdf.

32.   Once a claim of discrimination is docketed, the HRC Assistant Director assigns the case to one of the HRC's five investigators.   *See* Cohen Depo. 21:18-22:7; N.H. Code Admin. R. Hum 206.01(a) ("After the filing of a complaint, the chair of the commission shall designate one

of the commissioners to act as the investigating commissioner for that complaint."); Malachi Depo. 31:12-17.  The HRC Assistant Director meets with investigators monthly about the status of docketed cases that are being investigated.[25]

33.     The investigator investigates the case, including "requesting information" and "interviewing complainants and individually named parties and any other witnesses that would have relevant information for the case."  *See* Cohen Depo. 18:12-18, 98:18-99:22 (describing the investigation process); *see also* N.H. Code Admin. R. Hum 206.03(a) ("The staff investigator shall: (1) Discover facts; (2) Make reports and recommendations to the investigating commissioner; and (3) Assist the parties in settlement negotiations.").  With respect to complaints in the education context, this investigation can involve contacting school principals and school superintendents.  *See* Cohen Depo. 99:23-100:6.  The investigator has discretion with respect to who is contacted.  *See id.* 100:12-15; *see also* N.H. Code Admin. R. Hum 207.02(a) (noting the information that the investigator "shall" request from the respondent if "the investigator considers the information relevant to the investigation"); RSA 354-A:21, II(a) ("After the filing of any complaint, one of the commissioners designated by the chair shall make, with the assistance of the commission's staff, prompt investigation in connection therewith….").

34.     After an investigation, the investigator then determines whether there is probable cause for a case to move forward.[26]  As HRC Assistant Director Sarah Burke Cohen explained: "If a case is found to be no probable cause, it is dismissed with appeal rights.  If the case is found to

---

[25] Cohen Depo. 12:13-19 ("I meet with the investigators once a month.  We discuss their caseload, we discuss any questions they have moving cases along legal standard wise, any research that we need to do relative to a specific case, and I review their reports before they go up to the Commissioners to ensure they are complete.").

[26] Cohen Depo. 13:7-14 ("You have cases that we go through what we call a full investigation so they get to the point where there is a finding issued by an investigating commissioner of either probable cause or no probable cause."); *see also* N.H. Code Admin. R. Hum 210.01(a) ("On the basis of the investigative report the investigating commissioner shall make a determination of probable cause or no probable cause."); <u>*Ex. 75 (Depo. Ex. 53)*</u>, at DOE-10271 (describing the process after a PC/NPC finding is made).

be probable cause, it moves on in the process towards the public hearing.  In between the public hearing and moving it from probable cause to public hearing, the parties meet for a conciliation and a prehearing, and then it moves to public hearing.  After probable cause is found, both parties have the ability to remove the case to Superior Court."  *See* Cohen Depo. 116:4-18; *see also* N.H. Code Admin. R. Hum 210.01(c)-(e) (describing events after PC/NPC determination); RSA 354-A:21, II(a) (describing process, including that, "if such commissioner shall determine after such investigation that probable cause exists for crediting the allegations of the complaint, the commissioner shall immediately endeavor to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion").

35.     Cases can get resolved in other ways, including where a complainant removes the case to superior court, the case settles, or the complainant decides to no longer pursue the case.[27]  Absent resolution through these alternative ways, HRC investigators complete reports concerning their investigation of docketed complaints.  *See* Cohen Depo. 14:1-6.

36.     "Complaints received by the HRC under the amendments are docketed and processed the same way as all other cases. The cases are processed in accordance with N.H. Rev. Stat. Ann. § 354-A and the HRC's administrative rules …."  *See* <u>Ex. 47 (Depo. Ex. 58)</u> (HRC Int. Resp. No. 2).

---

[27] Cohen Depo. 13:15-23 ("However, there are other times that a case can sort of be resolved at the Commission. Complainants have the ability to remove the case to court. There's also potential of settlement of the cases.  So if there's a resolution of settlement, then it gets closed.  Or there are times where complainants decide they do not want to pursue their charge at the Commission any longer.").

III.    **The Amendments' Origins**

A.    **Increasing Diversity and Inclusion Efforts in New Hampshire Following George Floyd's May 2020 Murder**

37.    Following George Floyd's murder on May 25, 2020, many schools created diversity, equity, and inclusion ("DEI") positions in an increased effort to expose students to the lived experiences, contributions, and history—both past and present—of BIPOC (Black, Indigenous, and People of Color) individuals. These efforts are part of a growing and widespread consensus among educators that inclusive education practices giving voice and attention to the experiences of all students are critical.[28]  Students must see themselves in the books they read and in their classroom discussions to become contributing participants in our increasingly diverse and multi-racial democracy.  Educational opportunities for all students are expanded by presenting a more informed and truthful portrayal of topics such as the empowering experiences and achievements of BIPOC and marginalized communities in the face of African enslavement, Jim Crow, segregation, and racial discrimination, as well as discussing with students the existing legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or "unconscious bias."  This expansion of educational opportunities takes many forms, but is unified in ensuring equal access to educational content for students of all backgrounds, and exposure to various perspectives that reflect the diversity of New Hampshire and America.  *See Ex. 13*, Philibotte Decl. ¶¶ 6-8.

---

[28] *See, e.g.*, Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127 (2017) ("These surprisingly large effects suggest that CRP ["culturally relevant pedagogy"], when implemented in a high-fidelity context, can provide effective support to at-risk students."), https://files.eric.ed.gov/fulltext/EJ1132535.pdf; Alfred Tatum, Aaron Johnson, & David McMillon, *The State of Black Male Literacy Research, 1999-2020*, 70 Literacy Research: Theory, Method, and Practice 129-151 (Nov. 2021) (explaining "how literacy research positions Black males to sustain, empower, and protect themselves and their communities within and across social and scientific disciplines and technical and nontechnical fields"), https://journals.sagepub.com/doi/epub/10.1177/23813377211038368; *Understanding Culturally Responsive Teaching* New America (discussing and citing studies), https://www.newamerica.org/education-policy/reports/culturally-responsive-teaching/understanding-culturally-responsive-teaching/.

38.     Similarly, in the wake of George Floyd's murder, many New Hampshire educators engaged in professional development opportunities to enhance their skills to teach both (i) to BIPOC students and students from historically marginalized groups, and (ii) about these groups' experiences and perspectives.  *See Ex. 7*, Tuttle Decl. ¶ 6.

39.     For example, in 2020, Misty Crompton, a member of the Plaintiff NEA-NH and an educator who teaches in Derry, was awarded the prestigious Christa McAuliffe Sabbatical from the New Hampshire Charitable Foundation for her project called "Promoting Just Schools."[29]  The sabbatical, created in 1986 in honor of the Concord High School teacher and astronaut, gives one exemplary New Hampshire teacher a year off with pay and a materials budget to bring a great educational idea to fruition. Ms. Crompton's project focused on educational equity—namely, levelling the playing field for students by recognizing how identity, race, and culture of students and teachers play out in the classroom.  *See Ex. 7*, Tuttle Decl. ¶ 7.

40.     The 2020 census confirmed the importance of elevating the perspectives and histories of individuals of color.  The results indicated that New Hampshire is rapidly growing more racially diverse.  While New Hampshire's population grew by a modest 4.6% during the past decade, the number of residents who are people of color increased by 74.4% to 176,900 in 2020. Black, Hispanic, and other people of color now represent 12.8% (176,900) of the state's population compared to 7.5% (101,400) in 2010.[30]

41.     This diversity is particularly prevalent in the southern part of New Hampshire.  For example, the population of Manchester and Nashua was 98% White in 1980.[31]  Manchester now

---

[29] Dave Tirrell-Wysocki, *Misty Crompton Awarded Christa McAuliffe Sabbatical*, N.H. Charitable Foundation (June 11, 2020), https://www.nhcf.org/what-were-up-to/misty-crompton-awarded-christa-mcauliffe-sabbatical/.

[30] Kenneth Johnson, *Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard*, Carsey School of Public Policy (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.

[31] *See* Census Data for 1980, *available at* https://www.census.gov/content/dam/Census/library/working-papers/2005/demo/POP-twps0076.pdf (Table 30, page 76).

is 80.3% White, 11.0% Hispanic (approximate population 12,665), and 6.0% Black (approximate population 6,908).[32]  Nashua now is now 79.2% White, 13.2% Hispanic (approximate population 12,033), and 3.6% Black (approximate population 3,281).[33]

42.   As the Carsey School of Public Policy at the University of New Hampshire explained, "children are at the leading edge of the state's growing diversity."[34]  The *Union Leader* also reported that "more than 2 of every 5 children in Manchester and Nashua hail from families of color," and that, "[i]n 30 years, Manchester's youngest generation has shifted from 94% White in 1990 to 57% last year."[35]  Students of color in Manchester are also more likely to live in poorer areas of the city.[36]

43.   Consistent with these demographic trends, the Manchester School District—the largest and most diverse school district in New Hampshire—hired a Chief Equity Officer, Plaintiff Christina Kim Philibotte, in the summer of 2021.  This position was crafted to ensure that— especially given the disproportionate rates of graduation, reading and math proficiency, as well as suspension rates among students of color—institutional systems are created to support and rectify the hardship that many students of color experience.[37]  One of the goals of this work is to train

---

[32]           2022          Population          Estimates          for          Manchester, https://www.census.gov/quickfacts/fact/table/manchestercitynewhampshire/PST045219.
[33]           2022          Population          Estimates          for          Nashua, https://www.census.gov/quickfacts/fact/table/nashuacitynewhampshire/PST045219.
[34] Kenneth Johnson, *Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard*, Carsey School of Public Policy (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.
[35] *See* Michael Cousineau, *NH grows more diverse, faces call for change*, Union Leader (Dec. 18, 2021) (updated Mar. 20, 2022), https://www.unionleader.com/news/business/whats_working/nh-grows-more-diverse-faces-call-for-change/article_8c1cfc2d-73c1-51f3-9a5d-939525c3c21e.html.
[36] *See* Michael Cousineau, *Manchester schools' Diversity Efforts Will Take Years*, Union Leader (Dec. 18, 2021) (updated Mar. 20, 2022), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html.
[37] For example, a report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations— demonstrates that school discipline in New Hampshire is disproportionately harsh on students of color.  During the 2014-2015 academic year, "[w]hile students of color made up 13.9 percent of the student population, they comprised approximately 22.7 percent of students receiving out-of-school suspensions."  *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-

teachers and faculty to understand the needs of students of color and those with marginalized identities by creating a more culturally fluent teaching staff to better connect with their learners. This effort reinforces the creation of a sense of belonging for students where they feel more connected to, and better represented in, the books they read and the discussions they have in the classroom. *See Ex. 13*, Philibotte Decl. ¶¶ 3-4.

44.     The Exeter Region Cooperative School District—and later the entire SAU16—made a similar decision, hiring Plaintiff Andres Mejia as Director of Diversity, Equity, Inclusion, and Justice ("DEIJ").  He started in this role on August 2, 2021, but only on behalf of the Exeter Region Cooperative School District.  His role expanded to the entire SAU16 on July 1, 2022. *See Ex. 15*, Mejia Decl. ¶ 3.  As the District's then superintendent, Dr. David Ryan, stated in announcing the position: "The work around diversity, equity, inclusion and justice is critically important and is helping us create an educational community where every student, educator, parent, guardian and community member feels like they belong."[38]  This work is also vital in SAU16.  As of the 2022-2023 academic year, SAU16 has 4,779 students, with at least 425 students of color.   Approximately 153 students identify as Asian, approximately 53 identify as Black/African American, approximately 124 identify as Hispanic or Latino, approximately 28 identify as Native American/Alaska Native, approximately 10 identify as Native Hawaiian/Pacific Islander, and approximately 59 identify as belonging to two or more races.  This work not only helps White students in the Exeter area learn about the growing diversity of their community, but

---

_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf.   Concord High School also experienced similar racial disparities.  *See* Eileen O'Grady, *Suspensions, Expulsions are Used Disproportionately to Discipline N.H. Students of Color*, CONCORD MONITOR (July 4, 2020), https://www.concordmonitor.com/Race-and-discipline-in-NH-schools-34921292 ("That data showed that in the 2015-16 school year at Concord High School, Black students made up 8% of the student body, but made up 22% of out-of-school suspensions.").

[38] *See 'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity*, PORTSMOUTH HERALD  (Aug.  2,  2021),   https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

also helps students of color in the Exeter area know that they are not alone and that they are welcome.  *See Ex. 15*, Mejia Decl. ¶¶ 3-4, 6-7.

45.     Plaintiffs Andres Mejia and Christina Kim Philibotte have dedicated their professional lives to learning and advancing DEI principles.  Their experiences confirm the findings that such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color.  This instruction has increased the engagement, participation, and sense of belonging for students of color in their districts.  And students of color have expressed to Mr. Mejia and Ms. Philibotte their desire to gain greater exposure to the perspectives of communities of color and theories related to race and gender because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities.  White students also have asked them to learn more about DEI concepts, gender, LGBTQ+ race, racism, and other perspectives about marginalized identities. These courageous conversations are essential for all students—especially those of color—as they build community where people feel seen and validated in a secure space, and thus more comfortable speaking and sharing their experiences on complex topics which, in turn, teaches other students.  *See Ex. 15*, Mejia Decl. ¶ 9; *Ex. 13*, Philibotte Decl. ¶¶ 12-13.

46.     Since the filing of this lawsuit, the Oyster River Cooperative School District hired a DEIJ Coordinator who started in August 2022.[39]  And, in November 2022, the Concord School District hired a DEIJ Director.[40]  *See Ex. 15*, Mejia Decl. ¶ 4.

47.     These New Hampshire efforts at improving diversity, equity, and inclusion were not limited to education in the wake of George Floyd's murder.  Following the August 31, 2021

---

[39] *See* Eileen O'Grady, "Concord School District hires DEIJ director," *Concord Monitor* (Nov. 8, 2022), https://www.concordmonitor.com/Concord-School-District-hires-DEIJ-coordinator-48720832.

[40] *See* Eileen O'Grady, "Concord School District hires DEIJ director," *Concord Monitor* (Nov. 8, 2022), https://www.concordmonitor.com/Concord-School-District-hires-DEIJ-coordinator-48720832.

recommendations of the Commission on Law Enforcement Accountability, Community, and Transparency ("LEACT"), trainings on implicit bias have occurred for New Hampshire prosecutors and state judges.  *See Ex. 76* (Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11-12, 33 of James McKim's presentation "Are You Your Implicit Bias?"); *Ex. 77* (May 3, 2021 and May 4, 2021 Presentations to N.H. Court System; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 12-13 of James McKim's May 3, 2021 presentation "Introduction to Diversity, Equity, and Inclusion," and slides 18 and 26 of James McKim's May 4, 2021 presentation "Race in NH").

### B.    The Backlash

48.    Amidst the political intensity of the 2020 general election—and in the wake of these types of efforts in New Hampshire and nationally—then President Donald J. Trump signed an Executive Order on September 22, 2020 entitled "Executive Order on Combatting Race and Sex Stereotyping."  *See Ex. 78* (Sept. 22, 2020 Trump Executive Order).

49.    The Executive Order sought to censor certain viewpoints and chill speech.  The Executive Order, in part, banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on the following "divisive" concepts:

> *(1) one race or sex is inherently superior to another race or sex;* (2) the United States is fundamentally racist or sexist; *(3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex;* (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of

psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. [(10)] The term ''divisive concepts'' also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

*See id.* (Sept. 22, 2020 Trump Executive Order, with the emphasized text reflecting those concepts that are substantially similar to the prohibited concepts in the Amendments).

50.     The Executive Office of the President's September 28, 2020 memorandum implementing this Order specifically referenced the Order's third banned concept—namely, that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously."  The memorandum made clear that it was targeting trainings that, for example, used the phrases "white privilege," "intersectionality," "systemic racism," "racial humility," and "unconscious bias."  *See Ex. 55* (Sept. 28, 2020 Executive Office of the President's Memorandum indicating that such phrases "may help to identify the type of training prohibited by the" Executive Order).  This banned concept in the Executive Order is analogous to the second banned concept in the Amendments challenged in this case.

51.     The Executive Order followed President Trump's September 17, 2020 announcement that he was establishing the "1776 Commission."  This Commission was created to oppose Critical Race Theory, the New York Times' 1619 Project, and Howard Zinn's *A People's History of the United States*—a 1980 book that offers an alternative to telling the story of the United States via the top-down achievements of elite White men.[41]

---

[41] Olivia B. Waxman, *Echoing Decades of Fighting Over U.S. History Classrooms, President Trump Announces a Push for 'Patriotic Education*, TIME (Sept. 17, 2020), ("Speaking on Constitution Day from the National Archives— where original copies of the Declaration of Independence, the Constitution of the United States and the Bill of Rights are on display—during a White House conference on American History, President Donald Trump announced that he was signing an executive order to establish the '1776 Commission,' a group that would 'promote patriotic education,' and that the National Endowment for the Humanities would be awarding a grant to support the development of a 'pro-American curriculum that celebrates the truth about our nation's great history.'"), https://bit.ly/3xs1qHX; Establishing the President's Advisory 1776 Commission, Pres. Exec. Order No. 13958, 85 Fed. Reg. 70951 (Nov. 2, 2020),

52.    On December 22, 2020, a federal court partially enjoined President Trump's Executive Order, in part, ruling that plaintiffs were likely to succeed on their vagueness challenge. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). The district court found that the Executive Order's banned concepts are "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited." *Id*.[42]

53.    This Executive Order was rescinded by President Joseph R. Biden on his first day in office.[43]

## IV.    The Drafting of the Amendments in New Hampshire

54.    Despite the Court's decision in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, bills copying President Trump's Executive Order began spreading in statehouses throughout the United States, in part, at the initiative of political activists.  These activists—including Christopher Rufo, who was then a visiting fellow at the Heritage Foundation and who promoted and helped draft President Trump's Executive Order—brought forward proposals to limit how race and gender are taught in schools under the premise that "critical race theory" was being taught in schools.  "Critical race theory" is a phrase that Mr. Rufo has acknowledged is being used to conflate any number of

---

https://www.federalregister.gov/documents/2020/11/05/2020-24793/establishing-the-presidents-advisory-1776-commission.

[42] A separate lawsuit was filed by the NAACP Legal Defense Fund in October 2020 (amended complaint filed in January 2021), challenging the Executive Order on behalf of the National Urban League, the National Fair Housing Alliance, and the American Association for Access, Equity and Diversity.  *See National Urban League v. Trump*, 1:20-cv-03121-APM (D.D.C. Jan. 11, 2021), *available at* https://www.naacpldf.org/wp-content/uploads/Amended-Complaint-EO-AAAED.pdf.  The lawsuit raised three constitutional claims: vagueness, viewpoint discrimination, and equal protection. The Court did not issue any substantive orders in the case.  The plaintiffs filed a notice of dismissal with prejudice on June 15, 2021.

[43] Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, Pres. Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021), https://www.federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government.

topics.[44] Anti-"critical race theory" laws or restrictions have been passed in approximately 18 states as of June 2023.[45]

55.     New Hampshire is one of these 18 states and was among the first to propose such a law.  The complete paper legislative history of the Amendments was filed with this Court on May 16, 2022 and is incorporated here by reference.  *See* Docket No. 43.

## A.     The New Hampshire House of Representatives

56.     The Amendments' origin begins with its precursor, HB544.  HB544 was proposed in January 2021 and was entitled "Propagation of Divisive Concepts Prohibited Act."  HB544 copied all ten banned concepts contained in President Trump's September 22, 2020 Executive Order and applied them not only to all government agencies and primary and secondary public schools, but also to (i) private companies that contract with the state, and (ii) course instruction at New Hampshire public colleges and universities.  *See Ex. 79* (HB544 Docket and Language).

---

[44] *See* Benjamin Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*, NEW YORKER (June 21, 2021) ("Soon after, Rufo flew to Washington, D.C., to assist in drafting an executive order, issued by the White House in late September, that limited how contractors providing federal diversity seminars could talk about race."),  https://www.newyorker.com/news/annals-of-inquiry/how-a-conservative-activist-invented-the-conflict-over-critical-race-theory; Trip Gabriel, *He Fuels the Right's Cultural Fires (and Spreads Them to Florida)*, N.Y. TIMES (Apr. 24, 2022) ("The next day [after appearing on Fox News in 2020], he said, he received a call from Mark Meadows, the White House chief of staff, telling him that Mr. Trump had seen him on Fox, and asking him to consult on an executive order."),  https://www.nytimes.com/2022/04/24/us/christopher-rufo-crt-lgbtq-florida.html; Laura Meckler & Josh Dawsey, *Republicans, spurred by an unlikely figure, see political promise in targeting critical race theory*," WASHINGTON POST (June 21, 2021), https://www.washingtonpost.com/education/2021/06/19/critical-race-theory-rufo-republicans/ ("Spurred by Rufo, this complaint has come to dominate conservative politics. Debates over critical race theory are raging on school boards and in state legislatures."; noting Mr. Rufo's tweet: "We have successfully frozen their brand—'critical race theory'—into the public conversation and are steadily driving up negative perceptions. We will eventually turn it toxic, as we put all of the various cultural insanities under that brand category …. The goal is to have the public read something crazy in the newspaper and immediately think 'critical race theory.' *We have decodified the term and will recodify it to annex the entire range of cultural constructions that are unpopular with Americans*.") (emphasis added); Matthew S. Schwartz, *Trump Tells Agencies To End Trainings On 'White Privilege' And 'Critical Race Theory*, NPR (Sept. 5, 2020),  https://www.npr.org/2020/09/05/910053496/trump-tells-agencies-to-end-trainings-on-white-privilege-and-critical-race-theor ("On Saturday, Trump retweeted Rufo's appearance on Fox, arguing that diversity training is a threat to American unity.").

[45] *See* Sarah Schwartz, *Map: Where Critical Race Theory Is Under Attack*, Education Week (updated June 13, 2023),  https://www.edweek.org/policy-politics/map-where-critical-race-theory-is-under-attack/2021/06.

57.    The text of HB544, for example, banned any form of "race or sex scapegoating" and any other teaching concept that "[a]ny individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex."  *See* Docket No. 43-1, Filed Legislative History of HB544 at 0005, 06 (HB544 as introduced).

58.    The chief sponsor of HB544 argued that this legislation was necessary to address "critical race theory" and, more specifically, to ban certain "diversity training or inclusion training[s]," which he described as "snake oil" that "propos[es] to cure a disease but in actuality it's even making it worse."[46]

59.    Other proponents of HB544 argued that the bill was necessary to eliminate discussion of and instruction on concepts like "implicit bias," "systemic racism," "white privilege," and "anti-racism" in schools and in government trainings, with many specifically calling such topics "Marxist" or "advancing Socialism," and identifying certain books as problematic.  *See Ex. 80* (Select Written Testimony from Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added).

60.    National anti-"critical race theory" activist Christopher Rufo also testified in support of HB544 before the New Hampshire House Executive Departments and Administration Committee.[47]

61.    On April 7, 2021, as part of a legislative strategy to ensure the passage of HB544's language in the face of a threatened veto, the House of Representatives amended the larger budget trailer bill, HB2, to insert the operative provisions of HB544.  HB2 passed the House that same

---

[46] *See* Executive Departments and Administration Hearing on HB 544 (Feb. 11, 2021), https://www.youtube.com/watch?v=ycrODcuaLDc (Rep. Keith Ammon's remarks at 1:31:50, with quotation at 1:37:20).
[47] *See* Executive Departments and Administration Hearing on HB 544 (Feb. 18, 2021), https://www.youtube.com/watch?v=0ClyrvZ-lv4 (Rufo's remarks at 4:09:40).

day.  *See* *Ex. 81* (HB2/Budget Trailer Materials, Docket Entry Approving Amendment 2021-1059h).  The next day, having accomplished its mission of passing this legislation through the budget process, the House of Representatives tabled the original version of HB544.  *See* *Ex. 79* (HB544 Docket and Language).

62.     At around this time, Representative Ken Weyler, the House Finance Chair and a supporter of HB544, "warned the Senate that the ban on critical race theory is essential for the budget to pass. Weyler said the votes are simply not there if the Senate ditches the ban. Wyler himself considered critical race theory to be a 'Marxist, anti-American, anti-White' program." *See* *Ex. 82* (Damien Fisher, *Compromise Sought on Anti-Critical Race Theory Bill*,  N.H. Journal (Apr. 19, 2021)).

63.     After this language was inserted in HB2, one legislator supporting HB544 explained that the legislation was needed to address, for example, a staff training in a school district that referenced "white privilege," as well as programs at one New Hampshire university where employers and managers discuss "unconscious bias."  *See* *Ex. 83* (Rep. Daniel Itse, *Taxpayers Money is Being Used to Promote Systemic Racism in NH*, Union Leader (Apr. 28, 2021)).

**B.     The New Hampshire Senate, and the Commissioner's June 13, 2021 Op-ed**

64.     When HB2 moved to the Senate, the Senate Finance Committee, on or about May 28, 2021, proposed an amendment to HB2's "divisive concepts" provisions.  *See* *Ex. 81* (HB2/Budget Trailer Materials, Senate Finance May 28, 2021 2021-1799s amendments).  This amendment deleted six of the ten "divisive concepts" and made some other changes to the language.

65.     In an effort to rebrand the restrictions as an "anti-discrimination law," the amendment also inserted its banned concepts in the Law Against Discrimination at RSA ch. 354-A and expanded the focus of the restrictions from "race or sex" to "age, sex, gender identity, sexual

orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin." Lastly, the amendment changed the restrictions to no longer apply to (i) private companies contracting with the State of New Hampshire, or (ii) course instruction at state colleges and universities by faculty. *See* RSA 354-A:29, III.

66.     However, New Hampshire's Law Against Discrimination as amended in 2019—as well as the DOE's administrative rules—already banned discrimination on the basis of race, gender, and other classes. *See* RSA 354-A:27-28; RSA 193:38; N.H. Code Admin. R. Ed 510.01(b)(1), 510.02(b)(1), 510.03(b)(1) (banning discrimination under RSA 354-A:1).

67.     With these changes in the Senate, the four concepts that were to be banned in teaching, instruction, and advocacy in schools and places of public employment were the following:

> (A) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> (B) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

> (C) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; and

> (D) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

68.     Notwithstanding the Senate's effort to rebrand these provisions as an "anti-discrimination law," the Senate went even further than the original language in HB544 insofar as

this new version now included the penalty provisions specifically targeting certified educators by making violations of the law punishable under the Educator Code of Conduct.  *See* RSA 193:40, IV.

69.    The new language also provided a private right of action for a violation of the Amendments, stating that "[a]ny person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34."  RSA 193:40, III.

70.    When the Senate Finance Committee debated the new Senate version on May 27, 2021, supporter Senator Bob Giuda stated that it is designed, in part, "to ensure that the minds of the future generations of our state are not being unduly influenced by advocacy for such toxins as critical race theory."[48]

71.    Statements from at least one prominent supporter after the enactment of the Amendments further confirm that supporter's view that the law would impact diversity, equity, and inclusion instruction.  During the January 11, 2022 testimony of Chairman of the House Education Committee Rick Ladd on an unsuccessful bill designed to expand the Amendments to public colleges, he critiqued "critical race theory," and noted that "[a]ny instructor aligning and communicating one's own vision of race's relations, where the national narrative that uses diversity and inclusion as its platform, is unacceptable."  *See Ex. 84* (PL00789-9, at p. 3:9-13).

72.    On June 3, 2021, the Senate passed HB2, including the provisions constituting the Amendments, by a vote of 14 to 9.  *See Ex. 81* (HB2/Budget Trailer Materials).

---

[48]    Senate   Finance   Committee,   May   27,   2021   HB2   Deliberations   (at   27:13),   https://www.youtube.com/watch?v=0AbLc51xKrU.

73.     The House did not concur with the Senate's version of HB2.  As a result, a committee of conference was appointed.

74.     As this committee of conference process was getting underway, Defendant Commissioner Edelblut published an op-ed on June 13, 2021 in which he attacked "those who promote Critical Race Theory or similar concepts," and claimed that the Amendments were "important" and "needed" to prevent concepts like those in Dr. Ibram X. Kendi's 2019 book *How to Be an Antiracist* from being taught in schools.  *See Ex. 21 (Depo. Ex. 4)*.

75.     In the meantime, the committee of conference ultimately agreed on a report recommending the language to be included in HB2, and it included the Senate's version of the Amendments.  This report was filed on June 24, 2021, and it was approved in both chambers.  *See Ex. 81* (HB2/Budget Trailer Materials).

76.     The governor signed the Amendments, along with all of HB2, into law on June 25, 2021 as part of the larger budget process.  The Amendments immediately became effective upon this signing.  *See Ex. 81* (HB2/Budget Trailer Materials).

**V.     The Amendments' Confusion and Defendants' Purported "Guidance"**

77.     On July 8, 2021, Defendant Commissioner Edelblut again criticized "CRITICAL RACE THEORY" and stated that he "support[s] this new legal language in New Hampshire."



Frank Edelblut ✔
July 8 at 6:58 AM · 🌐

SOME IN MEDIA ARE EXPRESSING CONCERN ABOUT OUR NEW NH LAW STOPPING DIVISIVE CRITICAL RACE THEORY FROM BEING TAUGHT IN OUR SCHOOLS. As you may know, I support this new legal language in New Hampshire. Here is how public radio recently described the new law. I would like to know - doesn't this make sense to you?  Public radio: "So, the law is called the Right to Freedom From Discrimination in Public Workplaces and Education. Basically, it bans advocating or teaching that certain groups of people are inherently racist, sexist or otherwise oppressive, even if unconsciously. And it also promotes teaching that people should treat others without regards to their differences. So, basically equal treatment of everyone, regardless of race, gender, disability, any other category." ... Well this certainly makes sense to me.

👍 224                                                                                  438 Comments  68 Shares

78.    He tweeted this July 8, 2021 "support" for the Amendments—and published a June 13, 2021 op-ed stating that the Amendments were an "important" and "needed contribution to our education system" (*see Ex. 21 (Depo. Ex. 4)*)—despite testifying at deposition that "[w]e do not take positions on legislation.  We simply provide legislators with either the benefits or the negative consequences as we understand them associated with proposed legislation."  *See* Edelblut Depo. 146:20-147:4.[49]   "Critical race theory" and the Amendments were also referenced by Commissioner Edelblut in various emails.  *See e.g., Ex. 85* (in February 1, 2022 email from Commissioner Edelblut, stating that, as part of a particular contract, he has "reserved … the right to edit such content to ensure that the 'woke' CRT type concepts would not be included in this program *that may be a violation of our laws*") (emphasis added).

79.    On July 8, 2021, Commissioner Edelblut also raised a concern at a State Board of Education meeting about Tiffany Jewell's 2020 book entitled *This Book is Anti-Racist*—a book by a woman of color with a focus on 11-to-15-year-old students of color.  At this meeting where the Commissioner referenced the Amendments, the Commissioner read portions of Chapter 10 from this book to rebut the claim of "people [who] will say like, well, this doesn't happen in New Hampshire."  *See Ex. 56* (Transcript of July 8, 2021 remarks).  As noted below, Commissioner

---

[49] Similarly, while DOE Attorney Fenton testified that the DOE "only provides what we refer to as technical assistance" to the legislature and does not support or oppose legislation, *see* Fenton Depo. 30:18-24, 171:3-8, the DOE openly advocated to the legislature on March 8, 2023 for the passage of an amendment to HB533 that would give the DOE subpoena power under the Educator Code of Conduct.  *See Ex. 65 (Depo. Ex. 6)*, at PL0803 (DOE Investigator Farrell noting that "I am asking, the agency is asking, and we need to do three things …."; "Our children should be protected, and subpoena power will allow us to do that.").  This bill was retained before the House Judiciary Committee.

Commissioner Edelblut also issued a public statement on May 18, 2023 in response to the House of Representative's indefinite postponement of the so-called "parental bill of rights" bill at SB272.  He stated: "The New Hampshire Department of Education is disappointed with the indefinite postponement (of) SB 272 by the House and is hopeful that this conversation will continue, since it is possible to simultaneously support students, educators and parents..."   https://twitter.com/KlandriganUL/status/1659249716335345668.   At deposition, despite this public statement, Commissioner Edelblut would not concede that this statement indicated support for the bill because "it's not possible to support something that is no longer a bill and is indefinitely postponed."  *See* Edelblut Depo. 148:8-15.

Edelblut also cited Ms. Jewell's book as an attachment to an April 15, 2022 op-ed in which he argued that educators were overstepping and that "biases are beginning to seep into our own institutions." *See Ex. 40 (Depo. Ex. 14)*, at PL00682, 742-745 (attaching chapter of this book).

80.    After the Amendments were enacted, Plaintiff NEA-NH received information from its members that they are confused about what is and is not permissible under the law. *See Ex. 7*, Tuttle Decl. ¶ 8.  AFT-NH, too, had many questions from its members about prohibited topics of instruction. *See Ex. 8*, Howes Decl. ¶¶ 7-9.  Accordingly, on July 12, 2021, NEA-NH President Megan Tuttle wrote to the DOJ requesting clarification of the Amendments given their ambiguities. *See Ex. 42 (Depo. Ex. 11)*.  The letter asked 12 specific questions reflecting NEA-NH members' concerns regarding the Amendments' impact on them.  AFT President Deb Howes, too, requested that Commissioner Edelblut attend a Town Hall to explain the Amendments because her members were having similar difficulty understanding the law and its prohibitions. *See Ex. 8*, Howes Decl. ¶ 13.

81.    The DOJ did not respond to that NEA-NH letter.  *See Ex. 7*, Tuttle Decl. ¶ 9.  Commissioner Edelblut declined to speak to the AFT.  *See Ex. 8*, Howes Decl. ¶ 13.

82.    On July 21, 2021, Defendants DOE Commissioner Frank Edelblut, Attorney General John Formella, and HRC Director Ahni Malachi issued "guidance" on the Amendments in the form of FAQs.  *See Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*.

83.    The answers to Question Nos. 11 and 12 in these FAQs do not explicitly state that a complaint under the Amendments cannot be filed with the DOE.  *See Ex. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*; *see also* Farrell Depo. 57:22-58:3, 92:11-15 (noting that "it doesn't say either way" whether "a complaint can be filed for a code of conduct violation with the Department of Education").  The DOE was one of the entities that issued the FAQs.

84.     As these July 2021 FAQs confirm, "[t]he prohibitions apply to all activities carried out by public schools in their role as public schools, *including extracurricular activities that are part of the public school's work.*"  *Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)* (emphasis added). The DOJ, HRC, and DOJ also acknowledged in their interrogatory responses that "the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work."  *See Exs. 46, 47 (Depo. Ex. 58), 48 (Depo. Ex. 57)* (DOJ Int. Resp. Nos. 8; HRC Int. Resp. 8; DOE Int. Resp. No. 8).

85.     Given what Plaintiff NEA-NH perceived to be as deficiencies in the July 21, 2021 FAQs, the NEA-NH wrote Defendants Attorney General Formella and Commissioner Edelblut on August 5, 2021 presenting a plausible interpretation of the Amendments, based on the FAQs.  They asked for confirmation that their interpretation of the guidance was correct before disseminating that advice to their concerned members prior to the 2021-2022 school year.  For example, the NEA-NH sought confirmation, among other things, that the following was appropriate:

> (i) "[i]ntroducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group";
>
> (ii) discussion of "Structural Racism (a.k.a Societal Racism, Systemic Racism) [which] describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government";
>
> (iii) "[a]ssigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion"; and
>
> (iv) discussion of "the subject of 'white privilege,' a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as

the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is 'inherent' or cannot be overcome."

*See Ex. 42 (Depo. Ex. 11).*

86.     The NEA-NH also sought confirmation that "[s]pecific books or works of certain authors are not 'banned' under the law." *Id.*  The NEA-NH asked this question because, as the letter explained, "[o]n June 13, 2021 Commissioner Edelblut wrote an Op-Ed in the *Union Leader* leaving the distinct impression that Dr. Ibram Kendi's book, *How to be an Anti-Racist* may not be assigned under the new law.  He raised the same proposition at the July 8, 2021 State Board of Education Meeting." *See Ex. 42 (Depo. Ex. 11)*.  The NEA-NH added that, "if there are certain texts which your offices believe are *per se* prohibited under this law, please provide a list so educator's know that prior to making 2021-2022 lesson plans." *Id.*

87.     Neither the DOJ nor Commissioner Edelblut responded to the NEA-NH's August 5, 2021 letter. *See Ex. 7*, Tuttle Decl. ¶ 9; *see also* RSA 21-N:1, II(a) (noting that "[t]he department [of education] shall have the dual role of providing regulatory direction and instructional assistance to public elementary and secondary schools").

88.     Commissioner Edelblut stated in a July 26, 2021 email that the Amendments' fourth banned concept was confusing, writing that "[t]he double negative is confusing (welcome to legislative language)." *See Ex. 19*.

89.     Assistant Director Cohen testified that the HRC consulted with the DOJ on at least one complaint concerning the Amendments because the HRC was "looking for clarity on how to apply the new amendments."  *See* Cohen Depo. 55:4-21, 104:14-108:21.  DOE Attorney Fenton further testified that, if she received questions during educator presentations as to what might be covered under the Amendments, she thinks that she would have referred them "to the Attorney General's Office," as she "would not have felt comfortable answering them."  *See* Fenton Depo.

94:7-14.  She added that "there was a lot of confusion in the field" concerning the Amendments, including among attorneys, superintendents, and parents—many of whom are "fairly educated people."[50]  And when DOE Investigator Farrell was asked at deposition "[w]hat would [he] not be able to teach under" the Amendments if he knew, he said "I don't."  *See* Farrell Depo. 52:12-18.

90.     As the 2021-2022 school year was beginning, Commissioner Edelblut, in a late August 2021 *WMUR* interview, stated that, "if there are educators who are concerned about a particular curricular material or something like that, they can reach out to the Department [of Education] and we can take a look at that for them and provide feedback for them on that."[51] Further, in response to a specific question from *WMUR* as to whether under the Amendments "a teacher should lose their license if they teach [that] systemic racism exists in the United States," Commissioner Edelblut did not directly answer and, instead, said that the circumstance would have to be looked at individually.  He agreed that there is "not a bright line," but that the "bright line … [that we] all share is that we are not discriminating against one another, whether that is in the classroom or outside the classroom."[52]

91.     Commissioner Edelblut also noted in a separate *NHPR* interview in late August 2021 that, "if educators believe that somehow this is providing a chilling effect—the conversations

---

[50] *See* Fenton Depo. 158:1-19 ("Q. Okay. Why did you incorporate [sections on the Amendments in your code of conduct training]?  A. I incorporated it at the time into my trainings that we've referenced because it seemed to me there was *a lot of confusion in the field*. I received calls from attorneys that had some confusion as to the Department's role under HB 2, and I wanted to take an opportunity to clarify that.  Q. So there was confusion among attorneys, you said; is that right?  A. Yes.  Q. Confusion among superintendents, too, in your view?  A. In my view, yes.  Q. Among parents as well?  A. I would expect so, but my -- when I say there was confusion in the field, I am referring to educators, attorneys for school districts, and union attorneys, and superintendents.  Q. Fairly educated people, right? A. In my experience, yes.") (emphasis added).
[51] Adam Sexton, *CloseUp: Commissioner expects to fund 1000-1500 Education Freedom Accounts this year*,  WMUR (Aug.   29,   2021),   https://www.wmur.com/article/closeup-commissioner-expects-to-fund-1000-1500-education-freedom-accounts-this-year/37424825 (starting at 9:58).
[52] *Id.*

that they're having—they should consider what it is that they're talking about."[53]  He stated that, under the Amendments, our students should "understand important history, but at the same time, [educators should not] come at those topics with any type of bias."[54]

92.     Commissioner Edelblut made no mention in the *WMUR* or *NHPR* interviews that the DOE does not enforce the Amendments.

93.     When pressed for direct answers as to what is covered under the Amendments by one superintendent and at deposition, the DOE referred specific educator questions to the HRC as the agency responsible for applying and enforcing the Amendments.[55]

94.     The DOE appears to not have responded to one specific July 22, 2021 question from a media outlet asking whether an "anti-bias, anti-racist" workshop would be covered under the Amendments.  *See Ex. 58 (Depo. Ex. 47)*; Edelblut Depo. 133:20-134:12 (not knowing whether there was a response).  No written response has been produced in this litigation.

95.     In August 2021, one teacher restricted access to his Twitter feed following a DOE presentation regarding the Amendments.  *See Ex. 70*.

96.     On September 7, 2021, Defendant Attorney General Formella issued "Attorney General Opinion No. 2021-01" entitled "Request for Attorney General's Opinion Regarding New Anti-Discrimination Protections."  *See Ex. 53 (Depo. Ex. 12)*.

---

[53] "N.H. Education Commissioner: *Divisive Concepts' Restrictions Won't Hinder Classroom Conversations*, NHPR (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.
[54] *Id.*
[55] *See Ex. 60 (Depo. Ex. 10)* (in a January 18, 2023 response to an inquiry from a superintendent asking whether "is there somebody at DOE who can speak with a teacher and principal … with specifics about what she can say or not say regarding issues that might pertain to divisive topics," DOE Attorney Fenton stated that the issue of "divisive topics is handled by the Human Rights Commission and the AG's office" and the DOE "has not issued much information on this topic"); Fenton Depo. 105:10-106:2 ("matters falling within HB 2 are to be handled by the Human Rights Commission"); Farrell Depo. 39:18-20 ("We would only be – involve ourselves after the Human Rights Commission process is over.").

97.     The opinion was in response to the HRC's request for an official opinion "concerning the scope and application of the" Amendments.  *See Ex. 53 (Depo. Ex. 12)*.  In responding to the Commission, the Attorney General's nine-page opinion effectively memorialized the July 21, 2021 FAQs, while acknowledging that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."  *See Ex. 53 (Depo. Ex. 12)*, PL00425.  Director Ahni Malachi acknowledged that the HRC requested this opinion because the HRC received concerns from some members of the public that the Amendments were confusing and that some would struggle to understand their scope.[56]

98.     The DOJ's September 7, 2021 opinion declares that a violation may occur not just because of the content of a lesson or instructional material, but also because of implications and inferences that a student or trainee may subjectively draw from the material.  For example, the opinion explains that, while it may be permissible to provide "Anti-Racist Resources," those resources may not be offered in a way that "may imply that white people … are in need of anti-racist resources."  *See Ex. 53 (Depo. Ex. 12)*, PL00431.

99.     HRC Assistant Director Sarah Burke Cohen testified that the HRC uses the Attorney General's September 7, 2021 opinion in applying the Amendments to complaints received, which would include the opinion's "implication" instruction.[57]   However, Director Malachi testified that the Attorney General opinion "wasn't requested with the intent to assist the

---

[56] *See* Malachi Depo. 88:11-89:16 ("The Commission was aware of concern from the public about Sections 297 and 298 and requested the opinion."); *see also* Cohen Depo. 107:7-17 ("Q. In your view was there -- shortly after the passage of the amendments, in your view was there confusion amongst the public as to where to file a complaint? MR. KENISON-MARVIN: Objection. Scope. Calls for speculation. Vague. You can answer.  A. In my opinion, I suppose. Q. Why do you say that? MR. KENISON-MARVIN: Same objections.  A. Because I believe it was in the newspapers, the press.").

[57] *See* Cohen Depo. 114:20-115:3 ("Q. Do you know whether anyone at the HRC uses the Attorney General's opinion or the FAQs?  MR. KENISON-MARVIN: Objection to form.  A. Uses it for what?  Q. Applies it to complaints that come in through the complaint process.  A. Yes.").

Commission in enforcing the statute," and that the HRC has not used the opinion in interpreting RSA 354-A:29-34 relative to an allegation of discrimination received under the Amendments.[58]

100.    When the NEA-NH asked the HRC in September 2021 (after being referred to the HRC by the DOE) for "someone … who might provide further clarification on the law and answer questions from educators using a virtual platform," no response was received.  *See Ex. 43 (Depo. Ex. 54)*; *Ex. 7*, Tuttle Decl. ¶ 10.

101.    When AFT inquired on September 22, 2021 about whether the Commissioner would speak about the Amendments, the Commissioner did not directly respond to the invitation, and instead "reiterate[d] our offer to try to work through individual circumstances that may be unclear to teachers.  In these cases, the best approach is for them to reach out directly and share the specific facts and circumstances so that we can provide them with clear guidance." *See Ex. 41 (Depo. Ex. 9)*; *see also Ex. 8*, Howes Decl. ¶ 13 (noting that the Commissioner declined AFT's invitation to speak at a Town Hall).

102.    During an October 7, 2021 meeting of the HRC's Commissioners, Director Malachi said that the Amendments were "complex."  One commissioner asked Director Malachi what she thought inspired the Amendments.   "Assistant Director Burke Cohen and Director Malachi explained that the likely inspiration was that there have been instances in which information has been presented in trainings and K-12 classrooms that states directly *and/or impliedly* that inherent traits establish a person's inferiority/superiority." *See Ex. 20 (Depo. Ex. 56)* (emphasis added).

103.    In an October 19, 2021 email, one DEI trainer who has given presentations throughout New Hampshire (including to the New Hampshire Department of Justice, *see Ex. 76*

---

[58] *See* Malachi Depo. 93:6-94:4 ("Q.  Has the Commission since the issuance of the September 7, 2021, opinion used this opinion in interpreting the provisions of RSA 354-A:29 to 34?  A. Could you clarify relative to what?  Q. Relative to any allegation of discrimination that has been received by the Commission under the challenged law in this case. A. No.").

and the state court system, *see Ex. 77*), James McKim, expressed concern to the DOJ that teaching on affirmative action under banned concept three—particularly its use of the phrase "solely or partly because of his or her … race"—could violate the Amendments.  *See Ex.  52*.

104.  The Commissioner of Education has received invitations to speak on the Amendments from political groups such as local GOP committees, and he has spoken to political groups where he "may have answered a question on" the Amendments.  *See Ex. 59 (Depo. Exs. 37, 52)* (Northwood GOP invitation to speak on the Amendments); Edelblut Depo. 175:20-176:21 (not recalling speaking to the Northwood GOP but acknowledging that he speaks to political groups).  One of these groups—the Northwood GOP—told Commissioner Edelblut on November 21, 2021 that he could speak to the group anytime, and that "[w]e are very happy with the new law and sent a flyer with information on it to everyone in our town."  *See Ex. 59 (Depo. Exs. 37, 52)*. That flyer appears to be entitled "CRT Parents' Guide," and it states that "NH legislators passed strong anti-discrimination language this year to supplement current civil rights for the protection of all children."  The flyer goes on to include a sample letter to educators asking to "provide a lesson plan for my review if there will be class content, discussion, or assignments related to," among other things, "Race," "Gender identity, or LGBT issues," "Sexuality," or "Equity."  *See Ex. 22 (Depo. Ex. 51)*.  The group added that they had created a "hotline for [their] town to report concerns" about teachers.  *See Ex. 59 (Depo. Exs. 37, 52*).

105.  On March 18, 2022, DOE Attorney Diana Fenton acknowledged to one person who had a question about the Amendments that, in part, "the subject matter of HB 544 was put into HB 2."  *See Ex. 86 (Depo. Ex. 23)*; *see also* Fenton Depo. 166:9-12 (standing by what she wrote in that email).

106.    In June 2022, a "concerned parent" emailed DOE Investigator Richard Farrell to report a DEI coordinator's "openly racist blog."  *See Ex. 71 (Depo. Ex. 36)*.  The parent, citing the Amendments, attached images of the coordinator's personal blog, which that parent maintained "clearly fuel[s] racism which isn't needed in our schools."  *Id*.

107.    In an August 25, 2022 email, one lawyer directly wrote to the DOE explaining that Defendants were not complying with the law based on Defendants' view that the DOE cannot independently investigate educators who may have broken their obligations under the Amendments.  *See Ex. 64 (Depo. Ex. 48)*.

108.    On June 8, 2023, one member of the DOE's State Board of Education, which has the power to issue sanctions under RSA 193:40, IV, made clear his view—with several other Board members agreeing—that DEI "teaching methodologies … [are] extremely divisive ideologies that … are counter towards students' productivity and counter towards their success" and are "destructive," as well as "degrad[e] our American excellence," "degrad[e] Western society," and have an "inherent Communist belief baked into" them.[59]  This same Board member, in a February 27, 2023 op-ed, attacked the "wokeness" of DEI instruction, and complained about the pushing of "woke indoctrination onto students," "devout woketivists," and "woke demands."[60]

## VI.    Defendants' Lack of Clear Policies and Failure to Explicitly Say What the Amendments Mean

109.    Both Defendant Commissioner Edelblut and Attorney Fenton admitted at deposition that there are no criteria to further understand the phrases "taught, instructed, inculcated or compelled to express belief in, or support for" under RSA 193:40, I beyond the July 2021

---

[59] *See* June 8, 2023 N.H. State Board of Education Meeting (starting at 3:24:00-3:28:14), https://vimeo.com/836403362.

[60] Ryan Terrell, *Paying teachers well should be a priority*, Union Leader (Feb. 27, 2023), https://www.unionleader.com/opinion/op-eds/ryan-terrell-paying-teachers-well-should-be-a-priority/article_af0cbb8e-663e-568e-a5e1-caf0a5d11a2e.html.

FAQs.[61]  This includes no policies or procedures about whether the Amendments include a scienter requirement.  There is no definition for what qualifies as "teaching" or "instructing."  Nor have DOE employees received training concerning implementation of the Amendments, which would include training on whether the Amendments contain a scienter requirement.  *See Ex. 48 (Depo. Ex. 57)* (DOE Int. Resp. No. 4).

110.    The educator presentations conducted by the DOE referencing the Amendments have not explained what the Amendments' banned concepts mean aside from reciting their terms. These presentations make no reference to the Amendments having a mental state requirement.  *See Ex. 50 (Depo. Ex. 3)*, at DOE-05665 (in presentation for superintendents and administrators focusing on the DOE's role with districts in evaluating misconduct, referencing Amendments on one slide without stating what they mean); *Ex. 51 (Depo. Ex. 7)*, at DOE-10079-10081 (in presentation addressing the Code of Conduct for credentialed educators, referencing the Amendments' terms); *Ex. 44 (Depo. Ex. 24)*, at DOE-09669-9671 (same); *see also* Fenton Depo. 118:6-119:15 (explaining audiences for presentations).  The Amendments were added to these presentations because "[t]here was a great amount of concern when this was first put into place," and there "was a perception of murkiness."  *See* Farrell Depo. 47:22-49:4.

111.    Similarly, the HRC did not conduct any trainings regarding the Amendments' meaning, including whether they contain a scienter requirement.[62]  The HRC has no internal policy

---

[61] *See* Fenton Depo. 111:4-114:7 ("Q. So beyond the FAQ that's the attachment to Exhibit 9, is there any other criteria that you're aware of that the Department uses in determining what 'teach, instruct, inculcate, or compel to express a belief in' means?  A.  To the best of my knowledge, no."); Edelblut Depo. 150:17-153:4 ("Q. …. So is there written criteria that the Department has that defines what it means to teach, instruct, inculcate or compel to express belief in or support for something?  A.  I would need to make reference to other people in the agency to get a more specific response to that question.  Q.  We have done that, in fairness, but I just want to ask you are you aware of any written criteria that defines those terms on page 00006 of Exhibit 1, lines 24 to 25 [the terms in RSA 193:40, I stating "shall be taught, instructed, inculcated or compelled to express a belief in, or support for"]?  A.  So I'm not familiar with them.")

[62] *See* Malachi Depo. 48:23-49:8 ("Q …. Have you or members of the Commission conducted any trainings on those provisions, public trainings?  A. No.").

or guidelines as to what it means to "teach, advocate, instruct, or train" any employee or student on any of the banned concepts under RSA 354-A:31.[63]   The only guidance the HRC has as to whether any particular educational materials violate the Amendments are the materials "issued by the Attorney General's office in his opinion and our FAQ on the statutes."  Cohen Depo. 114:13-19.

112.    The DOJ has "no memorandum or other written material that explains a procedure specific to evaluating and responding to complaints filed pursuant to the amendments specifically," nor has it provided "training to any employees concerning how to implement the amendments." *See* _Ex. 46_ (DOJ Int. Resp. Nos. 3, 4) *see also* _Ex. 52_ (in a November 24, 2021 email, the Attorney General's Office indicated to DEI trainer James McKim that "I did speak to the General and it is my understanding we will not be doing a training in the immediate future on how to interpret the statute.  When that changes, I will be sure to reach out to you.").

113.    DOE Investigator Richard Farrell also stated at deposition that he had "no idea" what a teacher cannot teach under the fourth banned concept.  *See* Farrell Depo. 144:23-145:13, 204:7-207:19 (while aiming to later clean up this telling testimony with the assistance of counsel, he acknowledged that he is not "aware of any book that is prohibited from being taught in New Hampshire public schools under subsection D of the law").

114.    When asked at deposition about whether the _teaching_ of specific books would be covered under RSA 193:40, Commissioner Edelblut directed Plaintiffs—and educators who may have specific questions—solely to the text of the Amendments and Defendants' July 2021 FAQs:

---

[63] *See* Malachi Depo. 75:3-78:2 (Q....So my question is does the Human Rights Commission have any internal policy or guidance as to what the terms mean, 'teach, advocate, instruct or train' under that statute?  A. No."); 69:18-70:3 ("Q. Have there been any writings issued by either you or the Commissioners to staff about whether to accept allegations of discrimination under the challenged law from the Department of Education?  A. Could you be more specific on the writings? Q. Sure. By writing, what I mean are any directive, policies, or guidance.  A. No.").

Q.    So if a teacher has questions about whether specific instruction is covered by the law, they could come to the Department [of Education] and work through individual circumstances that may be unclear to them; is that still something that could occur today?

A.    Correct, and the guidance that we would provide them today would be in the form of a Q & A guidance and questionnaire as well as reference to the statute.

Q.    Is that the only guidance that they would be provided to a teacher if they were confused, the Q & A from July 2021 and the statute?  Is that all you'd give them?

MR. KENISON-MARVIN: Objection. Vague and scope.

A.    And I believe pending this lawsuit that that would be the extent of the guidance that we would provide to them.

*See* Edelblut Depo. 166:13-169:7; *see also id.* 158:17-160:6; 162:23-164:14.

115.    Commissioner Edelblut testified that "content is not the subject of the purported HB 2 or 193:40"[64] and that whether a violation exists would depend on "context."[65]

116.    As to whether a quotation from Dr. Ibram X. Kendi's 2019 book *How to Be an Antiracist* directly implicating affirmative action (*see Ex. 54 (Depo. Ex. 50)*) was covered under the Amendments, the Commissioner restated the Amendments' provisions and referred these questions back to educators and the HRC.[66]  Despite quoting and condemning the book in his June

---

[64] *See, e.g.,* Edelblut Depo. 62:10-63:3 ("Q. The question is simply this.  Have you ever formed an opinion as to whether any content read aloud from a book by a teacher in a classroom rises to the level of concern with respect to HB 2?  A. So with all due respect, *content is not the subject of the purported HB 2 or 193:40*. The activities, as I understand the law, you know, no pupil in any public school in this state shall be taught, instructed, inculcated, or compelled to express belief in or support for one or more of the following. So an educator could use a wide variety of content that doesn't then violate A, B, C or D.") (emphasis added).

[65] *See, e.g.,* Edelblut Depo. 75:21-76:2 (stating need for "context"), 154:1-158:16 (in the context of Dr. Kendi's quotation Commissioner Edelblut cited for why the Amendments were needed, stating: "So to your question, I think it would depend upon the context of the instruction.  The content itself of Exhibit 50, again, content being neutral, it's what you do with that content.").

[66] *See* Edelblut Depo. 149:18-150:16 (acknowledging that he had not read Dr. Kendi's book); 155:8-156:14, 157:7-160:2 ("Q….If a teacher taught, instructed or inculcated students along the lines of what's been underlined on Exhibit 50 that you also quote in your OpEd on Exhibit 4, would that fit any of the four concepts that are listed at the bottom of page 6 and go on to the beginning of 07?  MR. KENISON-MARVIN: I'll make the same objection.  Vagueness. Legal contention and compound.  And it represents the nature of the first elements of the statute.  You can answer.  A. So I think that it would be most clear in the mind of an educator to determine whether or not in teaching the text that you refer to in Exhibit 50 if they are teaching that, one, a group in this list of things is inherently superior, that one

2021 op-ed justifying the need for the Amendments, the Commissioner admitted at deposition that he never read the book.  *See* Edelblut Depo. 149:18-150:16.

117.    At deposition, the Commissioner would not say whether teaching Tiffany Jewell's 2020 *This Book is Anti-racist* would violate the Amendments, notwithstanding having attached a chapter of this book to his April 15, 2022 op-ed (*see Ex. 40 (Depo. Ex. 14)*, at PL00742-745) and citing the same book in his July 8, 2021 remarks before the State Board of Education for the purpose of referencing the Amendments and rebutting the claim of "people [who] will say like, well, this doesn't happen in New Hampshire," *see Ex. 56*.  At deposition, he said that would depend on if the text of the Amendments was violated.[67]

118.    The Commissioner testified that educators are the ones who are best left to determine what constitutes "teaching," "instruction," or "inculcation" under the Amendments.[68]

---

group is inherently racist, that one group receives adverse treatment or should receive adverse treatment and should be discriminated against or receive adverse treatment solely because of those characteristics or that they cannot and should not attempt to treat others without regard to those items.  So those are the four salient questions that I think an educator would ask relative to any content.  Am I teaching that the inherent superiority, the inherently racist, the adverse treatment, and to not attempt to treat others without regard to."; "Q.  Even with that, if an educator still had a question and thought it was maybe a little bit less clear than you seem to think it is, could they come to you for advice with respect to how to comply with HB 2? A. So right now we're in the midst of a lawsuit with HB 2.  So most of the questions that we would have would probably end up as a question for perhaps the Human Rights Commission to answer."); 167:9-169:4 ("Q. So you wouldn't answer if they had a follow up question, is Dr. Kendi's book, if I teach it, is that covered under the statute, you wouldn't be able to answer that question?  MR. KENISON-MARVIN: Objection. Vague.  A. So I would, and I would answer that question for the educator principally by looking at the Q & A but principally coming back to RSA [193]:40, and I would say are you teaching, inculcating, or are you compelling to express a belief in or support for any one or more of the following; that one's immutable characteristics are inherently superior, that an individual by virtue of these immutable characteristics is inherently racist, sexist or oppressive or that an individual should be discriminated against because of these immutable characteristics and that people cannot and should not attempt to treat others without regard to these immutable characteristics, and I believe in that conversation with an educator given the highly educated state and status of our educators that they would be able to understand that and apply that to their pedagogy.").

[67] *See* Edelblut Depo. 171:7-172:10 ("Q. Given that you referenced that text during the July 8, 2021, Board of Education meeting, if I taught that chapter, if I'm a middle school teacher in Exeter, would I be violating HB 2?  MR. KENISON-MARVIN: Objection. A.  So that would depend on whether you are teaching, instructing, inculcating or compelling to express a belief in or support for any one or more of the following:· That one's age, sex, gender identity, sexual orientation, et cetera, are inherently superior to other, that they are inherently racist, that they receive adverse treatment solely or partly because of or that they cannot or should not attempt to treat others without regard to these immutable characteristics.").

[68] *See* Edelblut Depo. 66:3-5 , 75:7-20 ("Q…. You would have no problem with a teacher putting forward Mr. Kendi's book and focusing on that paragraph.  [Vagueness objection].  A.  *So the teacher themselves would be in the best position to know if they are teaching, instructing, inculcating or compelling to express a belief in or support for any*

119.    Commissioner Edelblut also added that the DOE has no adjudicatory authority under the Amendments and RSA 193:40, instead deferring to the HRC and indicating that the HRC would have to first make a finding of discrimination under the Amendments before DOE involvement.[69]   DOE Investigator Farrell referred similar questions about whether teaching specific texts would be covered to the school district's counsel and to DOE Attorney Diana Fenton.[70]   And Attorney Fenton referred these questions to the HRC.[71]

---

_one or more of the following_, as I've repeated, that one's age, you know or this immutable characteristic is inherently superior to another one.  The teacher themselves have clarity of the action that they are doing at that time.  I have a hypothetical construct that is really limited."), 171:23-172:10 ("Q. Besides reading that statue though, you can't tell me whether if I taught that I'm violating the law, right? A. I would have to see how it's being used in this context.  When you say 'if I taught that,' there is not a content standard.  There is an activity standard.  So I would have to see it in this context, and again, _I think that the best person to know if they're violating these statutes really are the individuals who are actually doing the teaching_.") (emphasis added).

[69] _See_ Edelblut Depo. 65:8-10 (stating that the "adjudication of that [whether a teacher could teach that affirmative action is a wonderful thing] is something that would be made by the Human Rights Commission"), 67:10-11 ("My response is not to adjudicate whether or not they are violations of the particular law"), 67:23 ("So my responsibility is not to adjudicate [HB2]"), 70:5-15 ("I don't have adjudicatory responsibility" for HB2), 153:16-20 ("So I will start with the fact that it's not my job, it's not within the purview of my responsibility to adjudicate whether or not certain actions by an educator would be some type of an action under 193:40."), 159:16-160:2 ("Even with that, if an educator still had a question and thought it was maybe a little bit less clear than you seem to think it is, could they come to you for advice with respect to how to comply with HB 2? A. So right now we're in the midst of a lawsuit with HB 2.  So most of the questions that we would have would probably end up as a question for perhaps the Human Rights Commission to answer.").

[70] _See_ Farrell Depo. 149:8-150:19 ("Q. If I'm a teacher, and I want to sign a book, and I'm unsure if it's covered under HB 2, could I call the Department of Education and get an answer as to whether a book is covered or not?  A. I don't know the answer.  I know I have never taken such a call."; acknowledging that, "besides inviting that superintendent to reach out to his district counsel, [his] other likely response would be to talk to [Farrell's] supervisor [Diana Fenton]"), 166:7-167:3 ("Q. Okay. If I were a teacher, though, and I read Commissioner Edelblut's op-ed, and I read the book How to Be an Antiracist, and I thought I would want to include it in a high school class, how would I get an answer as to whether that book is covered or not? A. Well, I think I would begin at the local level. Q. Okay. A. I would go to my principal or my department head, principal, curriculum director, superintendent, and the local elected school board. I think it's important to note that New Hampshire is a local-control state, and I would think that that would be my first series of steps.  Q. And if I were a teacher and I couldn't get that answer from my superintendent [as to whether _How to be an Antiracist_ by Ibram X. Kendi is covered under the Amendments], could I get that answer from the Department of Education as to whether or not this particular book is covered under HB 2?  A.  I think that that question would ultimately go to Diana Fenton.").

[71] _See_ Fenton Depo. 105:10-106:2 (in response to the question of, "[i]f an educator reached out to you with individual circumstances that they thought was unclear, and they reached out to try to obtain clear guidance from the Department [of Education], would they currently get it?," stating in part that these "matters falling with HB 2 are to be handled by the Human Rights Commission," and, "[i]f anything, I would refer that individual to … the frequently asked questions created by the Attorney General's office"); _see also Ex. 60 (Depo. Ex. 10)_ (in responding to a superintendent's question of whether "is there somebody at the DOE who can speak with a teacher and principal … about what she can say or not say regarding issues that might pertain to divisive topics," DOE Attorney Fenton stating in part that "divisive topics is handled by the Human Rights commission").

120.    When Plaintiffs asked HRC Assistant Director Cohen questions about what specific books would be covered under RSA 354-A:29-24 if taught, she did not answer directly, stating that it is a "complicated question because you have to look at the context of things" and that "I could not give a teacher or complainant legal advice on whether them teaching that would make a charge or not." Cohen Depo. 93:7-23, 94:1-19. Instead, she "would suggest that the educator read the law, read the [July 2021] FAQs that are available as well as the [September 2021] opinion issued by the Attorney General's office." *See id.* 95:21-96:8. And if there are further questions, Assistant Director Cohen testified that "I would suggest they contact their legal counsel for legal advice." *See* Cohen Depo. 96:9-17; *see id.* 94:21-22, 95:12-20. Commissioner Edelblut similarly told at least one superintendent that he should ask his district's counsel if he had questions under the Amendments. *See Ex. 57*, DOE 856-57 ("[i]f you have questions about the material, I would encourage you to reach out to your district's legal counsel").

121.    Lawyers who regularly represent school districts have concluded that the Amendments are ambiguous. For example, attorneys at the law firm Drummond Woodsum—who represent many school districts throughout New Hampshire—have conducted trainings for educators on behalf of their education institution clients. The attorneys' materials explained the Amendments' ambiguity. For example, these lawyers highlighted as a "*gray area*" the following: (i) "[p]rograms that involve discussion of power structures or power imbalances in society"; and (ii) "programs that involve advocating for ... [a]ffirmative action to promote equity, [r]eparations for past wrongs, [and] [w]hite privilege." *See Ex. 87* (Drummond Woodsum August 5, 2021 Presentation). These lawyers also added that a "gray area" includes "[d]iscussions regarding power structures in present-day society," and "[d]iscussions of cultural sensitivity." *Id.* These lawyers further explained that: (i) "The state guidance [issued on July 21, 2021], while helpful,

does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law;" (ii) "The law is difficult to understand, often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions"; and (iii) "One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech." *Id.*

122.   Plaintiff NEA-NH has counsel on staff routinely representing educators in Code of Conduct matters.  They similarly conveyed their view that the Amendments "contain[] ambiguity requiring clarification."  *See Ex. 42 (Depo. Ex. 11)*.

123.   Neither Commissioner Edelblut, DOE Attorney Fenton, DOE Investigator Farrell, nor Assistant HRC Director Cohen could cite at deposition any example of instruction occurring in New Hampshire before the Amendments were enacted on June 25, 2021 that would be barred under the Amendments' terms.[72]

## VII.   Complaints Under, and Defendants' Enforcement of, the Amendments

124.   After the issuance of the DOJ's September 7, 2021 opinion, HRC Director Malachi emailed to the DOE the intake questionnaire used by HRC under the Amendments.  *See Ex. 47 (Depo. Ex. 58)* (HRC Int. Resp. No. 7).

---

[72] *See* Edelblut Depo. 174:2-8 ("Q. Can you identify, Commissioner, an incident of instruction that occurred in New Hampshire before HB 2 that would violate HB 2 had it been in effect at the time the instruction occurred? MR. KENISON-MARVIN: Objection. Vague. Calls for legal contention. A. I'm not familiar with any."); Fenton Depo. 172:23-173:9 ("Q. How about specific books? Are there books that you know of that were—could have previously been taught and now cannot be taught because of HB 2? MR. KENISON-MARVIN: Same objection. You can answer. THE WITNESS: I'm not aware of any exact books, no.  BY MR. KAHNE:  Q. Any material at all? Instructional material?  MR. KENISON-MARVIN: Same objections.  THE WITNESS: No, I am not aware of any books or instructional material."); Farrell Depo. 170:20-24 ("Q.  So based on your communications with Commissioner Edelblut, are you aware of any instruction that previously occurred in New Hampshire before HB 2 that now could not occur in New Hampshire?  A.  I don't know of any."); *see also id.* 169:12-18 (stating that he did not believe there have been direct conversations within the DOE "about instruction that had occurred in New Hampshire that would be banned by HB 2"); Cohen Depo. 35:15-23 ("Q. Sure. I guess what I'm trying to figure out is could you identify, are you aware of any instruction that occurred by an educator in New Hampshire before the enactment of the amendments that would have violated the amendments had the amendments been in effect during that time of instruction? MR. KENISON-MARVIN: Same objections. A. No.").

125.    Commissioner Edelblut and the DOE, on or about November 10, 2021, published a website and press release inviting members of the public to file complaints against teachers under the Amendments.  *See Ex. 88 (Depo. Ex. 21)* (website as of Nov. 10, 2021); *Ex. 89 (Depo. Ex. 25)* (Nov. 10, 2021 DOE Press Release).  The DOE website contains the HRC intake questionnaire that can be sent directly to the HRC.

126.    DOE Attorney Fenton testified, in part, that, because "there was so much information that was coming into the Department of Education, which, again, may or may not have fallen within the purview of [the Amendments]," the DOE "wanted to provide a resource, for lack of a better term, by which individuals could directly file those complaints with the Human Rights Commission."  *See* Fenton Depo. 160:13-161:2.

127.    The DOE's November 2021 website initially (and before it was later deleted) included the email address of a DOE employee, Kate Walker, who could field inquiries directly. *See Ex. 88 (Depo. Ex. 21)* (website as of Nov. 10, 2021); *see also* Fenton Depo. 167:3-7 (noting removal of Kate Walker's name from the website; while not knowing why Ms. Walker's name was removed, Ms. Walker had expressed some hesitation about having her name on the website).

128.    The DOE initially included a DOE employee as a person to field complaints even though Defendants' July 21, 2021 FAQs said that complaints should be sent to the HRC or the New Hampshire Office of the Attorney General.  *See Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*.

129.    The DOE established and advertised this website even though, to the best of Plaintiffs' knowledge, the DOE has not established a similar, specific website for violations of

other provisions of the Law Against Discrimination at RSA 354-A:27-28 or RSA 193:38-39 that

were added in 2019 to apply to public schools.[73]

130.    As of August 10, 2023, the DOE's complaint website[74] does not mention the

Attorney General's September 7, 2021 opinion purporting to interpret the Amendments'

provisions.

131.    In response to the DOE's complaint website announced on November 10, 2021, the

group "Moms for Liberty NH" published a tweet on November 12, 2021.  The tweet stated the

following:



[73] *See* Department of Education, Complaints and Concerns, https://www.education.nh.gov/who-we-are/commissioner/complaints-and-concerns; *see also* RSA 354-A:27-28 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion or national origin, all as defined in this chapter"); RSA 193:38-39 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, or national origin, all as defined in RSA 354-A").
[74] *See* Department of Education, *Right to Freedom from Discrimination in Public Workplaces and Education*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination.

132.   One educator, in a November 15, 2021 email to the DOE responding to this development, raised grave concerns about these tactics.  The educator feared that "people will be rushing to report educators for even broaching the topics of racism, sexism, or other forms of discrimination along the lines of a McCarthy-era witch hunt." *Ex. 73*.

133.   The DOE was aware of this bounty after it was published, as Moms for Liberty directly emailed Commissioner Edelblut on November 15, 2021 notifying him of the bounty.  *See Ex. 90 (Depo. Ex. 41)* (Mom's for Liberty email to Commissioner Edelblut); *see also Ex. 72 (Depo. Ex. 22)* (DOE internal email about bounty).  DOE Attorney Diana Fenton found the bounty "very upsetting." *See* Fenton Depo. 164:18-20.

134.   The Northwood GOP told Commissioner Edelblut on November 21, 2021 that his "new website addition for parents to report concerns is exactly what NH parents needed!" *See Ex. 59 (Depo. Exs. 37, 52)*.

135.   After the Amendments' enactment, the HRC similarly posted on its website an intake questionnaire form for potential violations under the Amendments.  *See Exs. 49 (Depo. Ex. 60), 91 (Depo. Ex. 61)*.  The form originally had a line asking complainants whether they had filed a "complaint[] with another entity," including the "Court," "NH DOE," or "Other." *See Ex. 34 (Depo. Ex. 72)* (December 2021 questionnaire containing line).  The HRC, at some point, deleted this line from the questionnaire form. *See Ex. 49 (Depo. Ex. 60)* (current questionnaire not containing line).  Assistant HRC Director Cohen testified that she supposes that there was public confusion about where to file a complaint shortly after the passage of the Amendments. *See* Cohen Depo. 107:7-17

A. **Department of Education Complaints and Investigations Under the Amendments, and the Commissioner's April 15, 2022 Op-ed Highlighting Some of These Complaints**

136.   The DOE, including the Commissioner himself, received complaints after the Amendments were enacted and took action.  As detailed below, the Commissioner has forwarded complaints to his staff tasked with enforcing the Code of Conduct.

137.   For example, a parent complained in an August 27, 2021 email to Commissioner Edelblut that his "sons have been informed by high school teachers that they are inherently racist and sexist because they are white males …. I do hope this Bill makes a difference."   The Commissioner responded that day: "If you could share with me the names of those educators (if the incident happened after 6/29/2021, the effective date of the statute) I would be happy to look into it."  *See Ex. 66*; *see also Ex. 67* (in October 21, 2021 email from Commissioner Edelblut to a superintendent, Commissioner Edelblut indicating that he tried to call the superintendent with respect to a person's September 23, 2021 email to that superintendent where that person stated, in part, that "[e]xamples of discriminatory ideas [under the Amendments]," include "[w]hite privilege," "[w]hite guilt," and "[e]quity").

138.   Additional DOE complaints referencing the Amendments are detailed below. Some of these complaints led the DOE to engage in varying degrees of inquiries, including using other potential violations (especially under RSA 186:11, IX-c and RSA 186:11, IX-d) to investigate or elevate these complaints to superintendents:

   a.   <u>*Good Kind of Trouble* Complaint</u>: In August 2021, a 2019 book by Lisa Moore Ramée entitled *A Good Kind of Trouble*—which was written by a woman of color for 8-12-year-old readers about a 12-year-old girl of color in a predominantly White school—was the subject of a DEI/"critical race theory" complaint where the book was part of a "read along" in a fourth-grade class in approximately May or June 2021, before the Amendments were enacted.  The parent claimed that the read along violated her child's civil rights, and noted that she "will work as hard as [she] can to get DEIJ/CRT out of [the district]." The superintendent, the teacher, and Commissioner Edelblut were copied on

the complaint.  *See Ex. 69 (Depo. Ex. 19)*.  Portions of this book are attached to the declaration of Plaintiff Andres Mejia.  *See Ex. 15*, Mejia Decl. ¶ 16.

In response, the Commissioner spoke to the parent, called the superintendent in August 2021 (*see Ex. 69 (Depo. Ex. 19)*), personally read the book in October 2021 after asking DOE Attorney Fenton to obtain it, and met with the superintendent in October 2021 so he could convey "there was a parent who was concerned about the content of this book."  *Exs. 92 (Depo. Ex. 33), 93 (Depo. Ex. 38)*; *see also* Edelblut Depo. 26:1-4, 28:17-18, 30:19-33:1, 55:18-56:16 ("So I would assume as the superintendent they would want to know if they have a parent who is upset about something happening in their instructional environment so I'm trying to bring that to their attention."), 57:6-58:15.  Commissioner Edelblut testified at deposition that he recalled thinking that the book was poorly written.  *Id.* 31:13-19.

In an October 1, 2021 email to various school district and DOE officials (as well as Commissioner Edelblut), the parent conveyed her understanding that the Commissioner "informed [her] that anything that contains **equity and inclusion** or sexual content, parents must be given a 2-week notice." *See Ex. 94*, DOE-07022 (emphasis in original).  The parent likely was referring to RSA 186:11, IX-c, which requires districts to have a policy allowing an exception to specific course material based on the parent's determination that the material is objectionable, and which requires not less than two weeks advance notice for instruction of human sexuality or human sexual education.

This parent also sent an email to Defendant Commissioner Edelblut on October 7, 2021 stating that the "so-called professionals that are allowing this in school need to be disciplined!"  The parent complained that the "book has an underlying tone that white people and police officers are against black people all the way down to how white people look at a black person."  Further, she objected to certain so-called "gender books" being read.  The parent concluded by asking Commissioner Edelblut, in part, "[w]hat disciplinary action will result?," and "[h]ow do we proceed? Do I need to get a lawyer?"  *See Ex. 95*, PL00560-61.

b.  Zinn Complaint: On September 3, 2021, a woman shared with Commissioner Edelblut and legislators a May 24, 2021 email that had been sent by a parent, who then had a third-grade student in the school system, to the school district's superintendent.   The May 24, 2021 email from the parent complained about a teacher, prior to Columbus Day, reading from Howard Zinn's 1980 book *A People's History of the United States* "emphasizing the Marxist activist's condemnation of Christopher Columbus."  *See Ex. 96 (Depo. Ex. 16)*.  The parent also complained of statements like "White people cause racism" that were alleged to have been heard over the year.  The complaint stated, in part, that "[t]he indoctrination has to stop" and that "CRT is already in our schools, whatever name it uses, and it starts early in our kids' education."  *Id.*

Commissioner Edelblut forwarded the email on September 3, 2021 to DOE Attorney Diana Fenton stating that "we need to look into this," and that "[t]he events happened prior to the anti-discrimination law [the Amendments], but— if true—certainly would be considered unprofessional."  *Id.*  On September 7, 2021, Attorney Fenton responded to the Commissioner, stating "Thank you— we will look into it."  *Id.*  On September 3, 2021, Commissioner Edelblut wrote to the complainant stating that, "[i]f I open an inquiry on the referenced educators, would this woman [the parent] be willing to provide testimony to our investigator?"  *See Ex. 97 (Depo. Ex. 17)*.

At deposition, Attorney Fenton could not recall if she had conversations with the complainant who shared the email or what exact step she took.  Fenton Depo. 129:6-7, 20-25.  However, she testified that, generally, her "typical process would be to have Richard Farrell call the superintendent and find out more information about the underlying issue."  *See* Fenton Depo. 129:12-19.  She added that, generally, before a determination is made as to whether this would be a code of conduct issue, there would "still be outreach to the superintendent, potentially to the complainant."  *See* Fenton Depo. 130:10-12.





d. _White Like Me_ Complaint: On December 13, 2021, a parent emailed Commissioner Edelblut directly complaining about a 2013 film entitled "White Like Me: Race, Racism & White Privilege in America; featuring Tim Wise" being shown to eighth graders in a school district. The parent said that "[t]he film should not be shown at all, as it is clearly CRT, and in direct violation of NH Bill 'HB 2 Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.'" *See Ex. 68 (Depo. Ex. 15)*. This email apparently followed a conversation that the parent had with Commissioner Edelblut.

Commissioner Edelblut forwarded the complaint to DOE Attorney Diana Fenton, stating that this part of the email was for then DOE Attorney Christopher Bond. *Id.* DOE Attorney Diana Fenton and DOE Investigator Richard Farrell could not recall if the DOE took any action with respect to the film (Mr. Farrell testified that his interactions with the district were focused on other aspects of the parent's complaint and not the Amendments). Fenton Depo. 125:21-126:9; Farrell Depo. 161:2-5, 161:17-162:11.

However, it does appear that either the DOE or Commissioner Edelblut directly elevated this complaint concerning the Amendments directly to the attention of the district's superintendent, who perceived the Amendments as being implicated. In response, the superintendent told the Commissioner the following: "Out of context, and given the title of the film, it would be easy to assume that the use of the film … _would be inappropriate to show in the classroom given the recently passed legislation in NH_. However, when put into real teaching and learning context, I don't believe that to be the case in this situation." *See Ex. 57*, DOE857 (emphasis added). The Commissioner responded, stating that "I want to clarify that I was simply passing along a parent concern that had come to my attention." While stating that the HRC or Superior Court adjudicates violations of the Amendments and that the DOE does not have a role, the Commissioner stated that he "simply wanted to alert you to a parent complaint." He added that "[i]f you have questions about the material, I would encourage you to reach out to your district's counsel." *See Ex. 57*, DOE857.

Demonstrating the scope of the Commissioner's enforcement authority, the Commissioner concluded the email by stating that the superintendent "might want to consider whether your district's 'opt-out' policy under RSA 186:11, IV-c is applicable to this parent concern." *Id.*[75]

e.   <u>"No Left Turn" Complaint</u>: On February 7, 2022, Michael Breen of the group "No Left Turn in Education" wrote to the DOE with "evidence of probable widespread violation of the Education Codes of Conduct." *See Ex. 100 (Depo. Ex. 26)*.   The letter complained that multiple New Hampshire educators promised "to openly violate any such prohibitions that might become law."  The letter went on to state that, "[o]f the sixty-two individuals who asserted they were New Hampshire educators, 35 were confirmed as such by the N.H. Department of Education." *Id.*; *see also Ex. 101 (Depo. Ex. 27)* (DOE receiving No Left Turn press release).  The letter added that this was "more than enough for" the State Board of Education to act and open an investigation into the signatories because "[t]he Educator Code of Conduct itself states that 'the department [of education] *shall undertake* an investigation' of an educator if the department merely 'has reason to suspect' that the educator knowingly failed to report a violation of the Codes." *See Ex. 100 (Depo. Ex. 26)* (emphasis in original).

Prior to the submission of this letter, Commissioner Edelblut, on December 28, 2021, informed Mr. Breen how to find information online concerning New Hampshire educators. *See Ex. 74 (Depo. Ex. 43)*.

Some superintendents reached out to the DOE in response to this letter because they were concerned.  Farrell Depo. 77:21-78:4.  In response to a February 9, 2022 email from an interim superintendent asking whether the district should investigate, DOE Investigator Richard Farrell stated on February 14, 2022 that—after consulting with the Attorney General's Office—the DOE had no interest in the allegations because the "signatures (if confirmed) were affixed to the 'pledge' prior to HB2 becoming law." *See Ex. 102 (Depo. Ex. 28)*.

f.   <u>Human Relations Materials Complaint</u>: On April 4, 2022, M.P. emailed Commissioner Edelblut various attachments and wrote: "A Human Relations teacher at [a] High School gave these worksheets out to students.  Is this allowed?"  The worksheets, among other things, addressed "diversity bingo,"

---

[75] RSA 186:11, IX-c requires school districts to adopt a policy allowing an exception to specific course material based on a parent's or legal guardian's determination that the material is objectionable. "Such policy shall include a provision requiring the parent or legal guardian to notify the school principal or designee in writing of the specific material to which they object and a provision requiring an alternative agreed upon by the school district and the parent, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area. The policy shall also require the school district or classroom teacher to provide parents and legal guardians not less than 2 weeks advance notice of curriculum course material used for instruction of human sexuality or human sexual education. The policy shall address the method of delivering notification to a parent or legal guardian …." *See* RSA 186:11, IX-c.

as well as racial, gender, disability, religious, sexual orientation, and other identities.  *See Ex. 103 (Depo. Ex. 18)*.

The next day, Commissioner Edelblut forwarded this email and attachments to DOE Attorney Diana Fenton, who then forwarded the email and attachments to DOE Investigator Richard Farrell with the text "[c]an you look into this?"  *Id.*  Mr. Farrell then forwarded the attachments to the district's superintendent.

On April 7, 2022, the superintendent wrote Mr. Farrell, stating that "[w]e have had the opportunity to review the material that you'd sent and have the following information for you in response to the inquiry."  He explained that "the activities identified are from the Human Relations Couse at [the district's high school]," and that the district has concluded that the attachments "do fall within the scope of the course."  He noted that the syllabus included parental notification and an invitation for parents to review class assignments.  He added that he was told that all parents submitted acknowledgments, and that no complaints had been received.

Mr. Farrell testified that he "talked a couple times" with the superintendent, "provided [the material] to him, talked to him about it, got additional information … and then we met and discussed the matter with Attorney Fenton."  Farrell Depo. 123:1-7.   Mr. Farrell engaged in this inquiry even though "he didn't do anything with the material in terms of educator misconduct."  *Id.*  He testified that he was not looking at whether the worksheets implicated the Amendments, and rather guessed that the focus instead was on whether the opt-in rules for nonacademic surveys were followed at RSA 186:11, IX-d, *see* Farrell Depo. 102:2-3, 105:24-106:15, 108:22-109:22, 123:8-22.[76]  However, the superintendent apparently assumed that the Amendments were implicated, adding in his April 7, 2022 email that "*[w]e have also reviewed this material through the lens of the new Divisive Concepts law*, and find that the subject of these activities do not apply."  *See Ex. 103 (Depo. Ex. 18)* (emphasis added); Farrell Depo. 123:1-7 (acknowledging that he spoke with the Superintendent a couple times, provided the worksheets to him, got additional information, and then discussed it with Attorney Fenton).  Mr. Farrell forwarded the Superintendent's email to other DOE staff, including the Commissioner.  The Commissioner responded, stating: "Can we discuss in our next meeting?  Looking at the 'opt out/in' content, I would say that the content

---

[76] It is not entirely clear that these worksheets even constitute "a non-academic survey or questionnaire" on their face under RSA 186:11, IX-d.  In any event, Mr. Farrell acknowledged at deposition that violation of the opt-in law with respect to nonacademic surveys at RSA 186:11, IX-d can be considered a violation of the Educator Code of Conduct.  *See* Farrell Depo. 110:12-18, 111:22-112:7.  However, there does not appear to be an explicit statute deeming a violation of RSA 186:11, IX-d as a violation of the Educator Code of Conduct, which demonstrates the breadth of how the DOE perceives its authority.  *See* Farrell Depo. 130:12-132:2 ("Q. Which—which provision of the code [of conduct] would that [the statutory requirement that there be a parental notification and opt-in] violate?  MR. KENISON-MARVIN: Objection. Legal conclusion. THE WITNESS: Well, again, you'd have to ask my superior that. I just—my bottom line is that I've been told if there is a question about opting into a nonacademic survey, we will investigate it as a possible code of conduct violation.").  Unlike RSA 186:11, IX-d, RSA 193:40, IV makes explicit reference to the Educator Code of Conduct.

of the materials may not match the relatively benign syllabus."  Ms. Fenton responded that "Yes, we need to discuss at our next ed misconduct meeting in further detail." *Id.*

While this complaint triggered inquiries to the Superintendent, DOE Attorney Fenton testified that, "[t]o the best of my knowledge, sitting here today, this matter would not have prompted an investigation to have been opened, nor would it have been a violation of the code of conduct ...."  Fenton Depo. 142:16-20.

One week later, on April 15, 2022, Commissioner Edelblut cited these documents in an op-ed in which he argued that educators were overstepping and that "biases are beginning to seep into our own institutions."  *See Ex. 40 (Depo. Ex. 14)*, at PL00696-700 (attaching Human Relations Course syllabus), PL00736-737 (attaching worksheets). ███████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

g.   "Actively Unwoke" DEI Complaint: ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████  K.B.'s complaint also became the subject of an online article (*Ex. 27 (Depo. Ex. 65)*) and a series of tweets (*Ex. 29 (Depo. Ex. 67)*).    There, she not only attacked DEI training as violating the Amendments (including the second banned concept), but also the fact that the district's Racial Unity Project apparently worked with English teachers about ways to re-teach Harper Lee's 1960 book *To Kill a Mockingbird* "through the lens of underrepresented characters," which will "serve[] as an entry point into critical conversations about race and equity."  *See Ex. 29 (Depo. Ex. 67)*, at PL00629; *Ex. 27 (Depo. Ex. 65)*, at 10 of 19.

On August 24, 2022, DOE Investigator Farrell, in part, responded that "Commissioner Edelblut has forwarded your inquiry directly to Ahni Malachi (HRC) on 19 August 2022 for her review."  *See Ex. 105 (Depo. Ex. 29)*. Commissioner Edelblut could not remember whether he forwarded this inquiry to the HRC, *see* Edelblut Depo. 132:9-16, but DOE Investigator Farrell testified that, "[i]f I wrote that he did, then he did."  *See* Farrell Depo. 88:16-24 (noting that "Commissioner does what the commissioner wants to do.  I'm not his boss.").  HRC Assistant Director Cohen also testified that the HRC has "received referrals from the Department of Education," but "[g]enerally we ask that the referring agency tell the person to contact us directly."  Cohen Depo. 102:14-103:1.

h.  *This Book is Anti-racist* Complaint: On September 1, 2022, a parent complained about a book entitled *This Book is Anti-racist* that was apparently accessible on the school district's Sora application—an application that gives students one-tap access to ebooks, audiobooks, Read-Alongs, magazines and other materials on electronic devices.  The parent complained that the book is "blatantly racist" and "direct[s] kids to redistribute wealth from those who earned it, giving it to those who didn't."  The parent stated that the "book openly denies any and all racism exists against whites," and that, "[a]s a person who has experienced white racism, I KNOW this is untrue."  She added that "*[i]t violates the law put into place* to protect against this exact thing, racism," and that students "have a right to educational materials that aren't racist or sexually educational."  She explained that she wants "to protect students by way of *following our laws*," and that the Sora application and its "Sexist and racist curriculum *violates our laws*."  She asked Commissioner Edelblut "to investigate and keep sex Ed and racist texts and teachings, out of our schools, *per the law*."  *See Ex. 106 (Depo. Ex. 39)* (emphasis added).

In response, Commissioner Edelblut said, "[i]f you can give me a call to discuss the below, that would be helpful," apparently referencing his cell phone number.  He then forwarded the email chain to DOE Investigator Richard Farrell the next day to take any action he deemed appropriate.  *Id.*; Edelblut Depo. 39:12-13.

Though the complaint appears to have referenced the Amendments, Commissioner Edelblut testified that he did not go through the exercise of evaluating whether the content mentioned by the complainant would violate the Amendments.  Instead, the DOE viewed the complaint as creating questions of how does a "student access it [the Sora application]" and "what are the protections that are afforded relative to this application."  Edelblut Depo. 48:11-14.  He stated that "there was concern that when a student is outside of the school environment and outside of the school's either devices or firewall that there may be an opportunity for that student to use a third party device to use their log-in to access the app and access material *that may be developmentally inappropriate for those students*."  Edelblut Depo. 49:1-8.  In other words, concerns about a book apparently under the Amendments led the DOE to engage in an investigation of the Sora application at this district out of a concern that students may be accessing books that are "developmentally inappropriate."  This culminated in "a number of conversations," including with the superintendent and library so controls were in place.  Edelblut Depo. 49:10-22.

139.    On April 15, 2022, Commissioner Edelblut published an op-ed entitled "Education's Sacred Trust."  *See Ex. 40 (Depo. Ex. 14)*.  This op-ed argued, among other things, that "[r]ecent experiences in New Hampshire show that some of these biases are beginning to seep into our own institutions."  This op-ed also attached a document containing examples that, in his

view, "exemplifies actual instructional material from New Hampshire schools that parents have identified as conflicting with their values." *See Ex. 40 (Depo. Ex. 14)*.  Many of these attachments directly implicated the Amendments, including some of the complaints that the DOE itself had directly received under the new law:

    a.  <u>The Book Stamped</u>: Printouts of Jason Reynolds/Dr. Ibram X. Kendi's 2020 book for individuals ages 12 and older entitled *Stamped: Racism, Antiracism, and You: A REMIX of the National Book Award-winning "Stamped from the Beginning"*  See Ex. 40 (Depo. Ex. 14), at PL00716-725. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

    b.  <u>Human Relations Materials Complaint</u>: An April 4, 2022 complaint to the DOE from M.P. concerning diversity materials provided in a Human Relations course that, in response to inquiries from the DOE, led to the superintendent to "review[] this material through the lens of the new Divisive Concepts law." *See Ex. 40 (Depo. Ex. 14)*, at PL00696-700, 736-737; *see also Ex. 103 (Depo. Ex. 18)*.  This complaint is detailed above. ██████████████████████ ████████████████████████████████████

    c.  <u>This Book is Antiracist</u>: Chapter 10 of the 2020 book *This Book is Anti-Racist* by Tiffany Jewell. *See Ex. 40 (Depo. Ex. 14)*, at PL00742-745.  Commissioner Edelblut also cited this specific chapter in his July 8, 2021 remarks before the Board of Education where he referenced the Amendments and argued that this book rebuts the claim of "people [who] will say like, well, this doesn't happen in New Hampshire." *See Ex. 56* (Transcript of July 8, 2021 remarks).  A district's purchase of this book was used by a person, in January 2022 written testimony, to argue why the legislature should not repeal the Amendments. *See Ex. 107*, BAN00690, 694.  Indeed, boxes of this book were bought by one district, but were then set aside by the district particularly because of concerns about the Amendments.  Some community members in that district cited this book in public meetings as evidence of why DEI work should not occur in schools. *See Ex. 15*, Mejia Decl. ¶ 16.

    d.  <u>Exploring Whiteness Couse Summary</u>: A course summary of a class entitled "Exploring Whiteness and becoming an Anti-Racist Activist." *See Ex. 40 (Depo. Ex. 14)*, at PL00749-58.  This is the same summary submitted by a parent to the legislature in support for why HB544 was necessary. *See Ex. 108 (Depo. Ex. 49)* (from HB544 legislative history at Docket No. 43-1); Edelblut Depo. 139:1-7 (agreeing that "the syllabus on Exhibit 49 that Mr. Richards

submitted to the House Executive Department's Administration Committee is the same document that you received from Mr. Richards, a portion of which you attached as Topic Ten to Exhibit 14"). The course was apparently an "elective class that students signed up for in a specials week that they have." Edelblut Depo. 174:19-20.

**B.    Human Rights Commission Complaints Under the Amendments**

140.    Since the enactment of the Amendments on June 25, 2021, there have been approximately ▮▮▮ allegations of discrimination submitted to the HRC in various forms complaining that specific educators and school districts were violating the Amendments. The HRC has deemed one these complaints as presenting a *prima facia* claim of discrimination under RSA ch. 354-A and, as a result, has formally docketed the complaint ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ *See Ex. 47 (Depo. Ex. 58)* (HRC Int. Resp. No. 6) ("The HRC Defendants can confirm that the HRC has docketed one complaint made under the amendments."), Resp. No. No. 5 ("At the time of this response, no complaint brought under the amendments has been fully adjudicated by the HRC."). The remaining complaints are either pending review, have not been responded to or resulted in agency action for various reasons, or have been denied as presenting a *prima facie* claim. These complaints are detailed below:

a.












[80] *Things Fall Apart – Thug Notes: Summary and Analysis,*
https://www.youtube.com/watch?v=0_xtOMiW0ys&list=PLghL9V9QTN0hRGuj-cajzmO_WvTrFnAlq&index=16.
[81] https://www.youtube.com/@WisecrackEDU/about.



141.    With respect to complaints made under the Amendments specifically, the HRC Director is always involved in the docketing decision where an inquiry is made as to whether the complaint reaches the *prima facie* threshold of discrimination.  Cohen Depo. 23:1-7.

142.    The HRC has no obligation to notify the DOE if the HRC decides to docket a complaint under the Amendments or if the HRC concludes that there has been a violation under the Amendments.[82]

143.    The HRC has refused to publicly release to the public (and teachers) information concerning the substance of complaints in which the HRC has determined there is no *prima facia* claim.  *See Ex. 61*; *see* RSA 354-A:21, II(a) ("the commission may publish the facts in the case of any complaint which has been dismissed, and the terms of conciliation when the complaint has been so disposed of").

## VIII.   Confusion as to Who Enforces RSA 193:40, and the Amendments' Impact on Extracurricular Speech

144.    Two HRC witnesses testified that the HRC has no enforcement authority over RSA 193:40, explaining that the entity that enforces RSA 193:40 would be the state department that enforces that section of state law (which, here, would be the DOE).   HRC Director Malachi testified as follows:

> Q.    Okay.  I'm just going to direct your attention back to Exhibit 1, and page PL 006 starting at line 23.  It goes on to page 7, line 15.  So this is the statute RSA 193:40, and when you see that language just let me know.
>
> A.    I'm sorry.  Line 23 through?
>
> Q.    I'm sorry.  Line 23 to the next page, line 19, and it's RSA 193:40 on Exhibit 1.
>
> A.    I see it.
>
> Q.    Okay.  Do you have any authority in enforcing that statute?
>
> MR. KENISON-MARVIN: Objection.  Legal contention.  You can answer.
>
> A.    The [Human Rights] Commission does not have jurisdiction over 193:40.

---

[82] *See* Cohen Depo. 115:11-17 ("Q. Does the HRC have any obligation to notify the Department of Education when there's been a docketed complaint? A. No.   Q. How about when there's been a finding of probable cause for discrimination? A. No.").

Q.      So if someone brought a claim to the Human Rights Commission under RSA 193:40, your view is you would have no jurisdiction to adjudicate it; is that correct?

MR. KENISON-MARVIN: Same objection.

A.      The Commission has jurisdiction over 354-A.

Q.      And RSA 193:40 is not within RSA 354-A so is it fair to say in your view you do not believe the Commission has jurisdiction to hear a claim under RSA 193:40?

MR. KENISON-MARVIN: Same objection.

A.      As I sit here today it would be my understanding that the Commission only has authority over 354-A.

Q.      Do you know sitting here today who would have jurisdiction over a complaint made exclusively under 193:40?

MR. KENISON-MARVIN: Same objection.

A.      I do not have expertise in 193 so whose RSA that belongs to would be the body that has authority over 193:40.

*See* Malachi Depo. 73:5-74:17; *see also id.* 12:18-20 (testifying that RSA 193:40 is "not the statute that I work with").  Similarly, HRC Assistant Director Sarah Burke Cohen testified that she was "not familiar with" RSA 193:40 and that the DOE appears to be the enforcer of its provisions.[83]

This testimony from Director Malachi and Assistant Director Cohen is consistent with the fact that the HRC's own intake questionnaire form and "charge of discrimination" form under the Amendments make no reference to RSA 193:40.  *See Ex. 49 (Depo. Ex. 60)* (questionnaire); *Ex.*

---

[83] *See* Cohen Depo. 25:5-26:1 ("I can only testify as to 354-A. The remaining sections of 006 and 007 [at Exhibit 1, including RSA 193:40] are not the statute that I am familiar with."; "Q. Okay. So I just want take make sure I understand your testimony that you're prepared to, you're prepared to talk about with respect to complaints in particular those made under 354-A:29 to 34. Correct?  A. That is correct.  Q. And that's not the case with respect to RSA 193:40.  Is that fair to say?  A. That is correct.  Q. And I just want to make sure I understand your testimony that is not a statute that you're familiar with, correct?  A. correct."), 59:9-21 ("Q….With respect to on Exhibit 1, the amendments that have been challenged in this case, with respect to RSA 193:40 on the page Bates stamped 006 to 007, I believe your testimony earlier was you're not familiar with that section; is that correct?  A. Not familiar.  Have I read it before, yes.  Am I familiar with it, not particularly.  Q. Is it the Department of Education that's tasked with enforcing those provisions? MR. KENISON-MARVIN: Objection. Scope. Calls for legal conclusion. You can answer. A. It appears that is what RSA 193 does.").

*24 (Depo. Ex. 62)*.  The "denial" letters sent by the HRC under the Amendments also make no reference to RSA 193:40.  *See Exs. 34 (Depo. Ex. 72), 35 (Depo. Ex. 73)* (denial letters).

145.     The DOE said the opposite at deposition, insisting that the agency tasked with finding violations of the Amendments and applying RSA 193:40 is the HRC.[84]

146.     It is also unclear whether the DOE can make direct referrals to the HRC for violations under RSA 193:40.  Defendants have declined to produce documents relating to a purported agreement that was reached between the DOE and the DOJ on or about February 14, 2023 where "a procedural mechanism [was put] in place by which the Department of Education could transfer cases that could or could not fall within HB 2 … to the Attorney General's office for their review."'  *See* Fenton Depo. 85:23-86:10; *see also Ex. 65 (Depo. Ex. 6)*, at PL806 (DOE Attorney Diana Fenton testifying before the House Judiciary Committee on March 8, 2023 that "we have since [late January 2023] worked with the AG's office to come with an SOP as to how we transfer those cases to the Human Rights Commission and the AG's office").  DOE Attorney Fenton answered "yes" when asked whether the agreement that was reached during that February 14, 2023 meeting has "been in effect since that meeting."  *See* Fenton Depo. 90:24-91:18.  Despite the apparent agreement that is currently in place, Defendants have declined document requests that would help Plaintiffs and this Court learn more about this process.  HRC was not invited to these meetings.

147.     DOE Investigator Farrell testified what "extra-curricular" means at deposition:

Q.     How would you define "extracurricular activities" [referenced in the July 2021 FAQs]?

---

[84] *See* Edelblut Depo. 65:8-10 (stating that the "adjudication of that [whether a teacher could teach that affirmative action is a wonderful thing] is something that would be made by the Human Rights Commission"), 67:10-11 ("My response is not to adjudicate whether or not they are violations of the particular law"), 67:23 ("So my responsibility is not to adjudicate [HB2]"), 70:5-15 ("I don't have adjudicatory responsibility" for HB2), 153:16-20 ("So I will start with the fact that it's not my job, it's not within the purview of my responsibility to adjudicate whether or not certain actions by an educator would be some type of an action under 193:40.").

> A. Extracurricular activities could be anything from sporting situations, coaching, dance, plays. . . . Anything that happens within the confines of the definition of the Safe Schools Act.  So anything—if it's defined as a safe school, the property of the Safe Schools, anything that happens within the confines of that Safe Schools Act would apply.
>
> . . .
>
> So, for example, under the Safe Schools Act, a teacher on a bus to and from a field trip, that's Safe Schools.  That's covered.  A teacher that's becoming a coach and working as a coach, theater, drama.  Anything within the curtilage or the extended portion of a school.  It gets kind of creative because many hockey programs—for example, hockey rinks are not—they're private facilities, but if a hockey team for a high school is playing and/or practicing on that facility, it becomes an extension of Safe Schools.  So I would say the answer to that would be anything that falls within the curtilage of the Safe Schools definition.

*See* Farrell Depo. 174:23-177:3.  He also testified that the Educator Code of Conduct can apply to educators or credential holders when they are off duty.  *See* Farrell Depo. 197:22-198:1.

## IX.    The Chill of the Amendments on New Hampshire Educators

148.    The Amendments have caused educators and administrators to self-censor with respect to instruction and trainings on race, gender, sexual orientation, and gender identity. Examples of this chill are detailed below.

149.     Plaintiff Christina Philibotte, the Manchester School District's Chief Diversity Officer, testified to the following: "Previously, in conducting DEI trainings before the Amendments and before I assumed the role of Chief Equity Officer for the Manchester School District, I would specifically use terms and concepts like 'anti-racism' and 'anti-bias.'  Because of the Amendments and their penalties, I now rarely use terms and concepts focusing on 'anti-racism' in staff trainings—and have advised others to avoid them as well."  *See Ex. 13*, Philibotte Decl. ¶ 15.  She added that: "I rarely use the term 'anti-racism' because of its connection to Ibram X. Kendi's 2019 book *How to be an Antiracist*, which the Commissioner of Education cited as a reason why the Amendments are necessary."  *See id.* ¶ 17.  Further, she "recommended that

teachers omit reciting during a 'read aloud' certain lines of text in Jewell Parker Rhodes's 2018 book *Ghost Boys*—a book that follows the story of Jerome, a 12-year-old Black boy, who is shot and killed by a White police officer before coming back as a ghost." *See id.* ¶ 19.

150.    Plaintiff Andres Mejia, SAU16's Director of Diversity, Equity, Inclusion, and Justice, has similarly testified to the following: "As a result of this uncertainty [surrounding the Amendments], instructional choices have been chilled in order to avoid enforcement consequences.  Professional development around implicit bias, race, and racism has either been put on hold or modified in ways that prevent or dilute a full discussion of these concepts." *See Ex. 15*, Mejia Decl. ¶ 13.   He added: "[A middle school] has temporarily set aside Tiffany Jewell's 2020 book entitled *This Book is Anti-Racist* and Beverly Daniel Tatum's 2017 book *Why are All the Black Kids Sitting Together in the Cafeteria (Revised and Updated edition)* which were to be used by a teacher group for professional development.  Boxes of these books were bought by the 2020-2021 principal of that middle school, but were then set aside by SAU16 in the Fall of 2021 after the enactment of the Amendments.  These books remain in my office, and I have no ability to know whether they are covered under the Amendments because the Amendments are unclear.  Tiffany Jewell's book was especially set aside because some Exeter Region Cooperative School District community members cited this book in public meetings as evidence of why DEI work should not occur in schools." *See id.* ¶ 16.

151.    A former high school teacher who left her role at the end of the 2022 school year, testified that the Amendments were one of the reasons why she left the profession.  She noted that, "[w]hile I was still teaching, even though I may not have been violating the Act, I had to change my teaching methods significantly out of fear that I would be accused of doing so."  For example, she "went from using assessments such as essay questions and open-ended short answer questions

to using only multiple-choice assessments."  Her concern was that in teaching World History—
which includes units on different political movements and figures—"essay questions or short
answer prompts would be misinterpreted as students believing that they had to agree with a certain
position to score well on the assessment."  *See Ex. 14*, Given Decl. ¶¶ 6-7.  In addition, she
"significantly reduced open discussion and debate of ideas in [her] classroom out of fear that these
discussions would be misinterpreted as teaching or inculcating one of the opinions or concept the
students were arguing about."  *Id.* ¶ 8.  For example, her "World History units cover Marxism,
Stalinism, Naziism and other dictatorship regimes.  Instead of allowing students to analyze and
critique these dictatorships [she] lectured on the topic. It seemed to [her] that an open discussion
where students may offer their own personal support for Marxism or Communist ideas or even
Nazi ideas was too fraught for [her] to consider regardless of the tremendous amount students can
learn while hearing their peers exhibit critical thinking skills."  *Id.*  She also "could not accurately
answer students' questions because [she] did not feel comfortable making any commentary other
than simply the historical context and facts relevant to their inquiry."  *Id.* ¶ 10.  She "severely
limited" her use of the "widely understood best practice" where a teacher applies "material to
students' own experiences and interests so that they can identify material and relate it to their own
lives"—a practice that "is particularly important in social studies curriculums and historical
courses where students can easily believe historical events only happened in the past."  *See id.* ¶
12.  She left the profession "out of frustration because of the frustrating conditions that public
school teachers are subjected to," like the Amendments.  *Id.* ¶ 5.

152.    An AP English teacher at a high school testified that the Amendments have changed
the way he teaches the 1899 book *Heart of Darkness* by Joseph Conrad and the 1987 book *Beloved*
by Toni Morrison, as well as the 1899 poem *The White Man's Burden* by Rudyard Kipling—a

poem that is thematically similar to *Heart of Darkness* and discusses colonialism, imperialism, and racism. *Ex. 12*, Keefe Decl. ¶¶ 9-16. Further, prior to the Amendments' passage, he would use a technique when assigning books that asked students to "identify whether the legacy of slavery is evident in the modern world? Could they connect the characters' stories to their own experiences or observations?" *Id.* ¶ 18. He feels "less comfortable placing these books in a contemporary framework and asking students, for example, if they think the Black Lives Matter movement could be considered a result of the destructive legacy of slavery or asking, 'does the legacy of slavery continue and if so, how?'" *Id.* ¶ 19. Prior to the Amendments' passage, he would also ask "students to draw on things they saw in the news, popular culture, or their own experiences and use these frameworks to inform their analysis." *Id.* ¶ 15. He does this because "the state standards require students to be able to write about experiences" (both their own and others), understand different cultures and experiences other than their own, and critically examine the information they receive in the media every day. *Id.* Now, he is concerned about doing so. *Id.*

153.    An eighth-grade social studies teacher in Cheshire County has also testified that, "[b]ecause our students learn early American history, including slavery, the Civil War, and Reconstruction, we determined that part of instruction would need to address the history of racism in America." *Ex. 16*, O'Mara Decl. ¶ 8. Accordingly, after approval by the school board, 250 copies of Jason Reynolds/Dr. Ibram X. Kendi's 2020 book for individuals ages 12 and older entitled *Stamped: Racism, Antiracism, and You: A REMIX of the National Book Award-winning "Stamped from the Beginning"* were purchased with the intent that all eight graders would read the book. The intent was that many subject areas would interweave this book into their curriculum. *Id.* ¶ 10. It was identified as age appropriate for the students, relevant to the course of study, and authored by credible and knowledgeable scholars. *Id.* ¶ 9. However—seemingly because of the

Amendments and Commissioner Edelblut's June 13, 2021 Op-Ed in the *Union Leader* entitled "Teach Children About Racism, Not to be Racists" that named Dr. Ibram X. Kendi's 2019 book *How to Be an Anti-Racist* as a text that "support[s] Critical Race Theory"—this educator "understood that our school administration had asked [educators] to set the project aside due to this uncertainty [over whether the book was covered under the Amendments due to the Commissioner's statements] and that we should not make further plans for grade-wide engagement with *Stamped*." *Id.* ¶ 19.  Over the next school year, the planned grade-wide reading of *Stamped* was not implemented. The books sat on the shelf untouched.  *Id.* ¶ 20.

154.    Further, one educator was subjected to a DOE inquiry because a parent complained that the educator played two music videos created by two modern Black artists as part of a unit on the Harlem Renaissance.  The teacher was told the context of the inquiry by the DOE was the Commissioner's April 15, 2022 op-ed.  *See Ex. 11,* O'Brien Decl. ¶¶ 7-9, 13-19.

155.    AFT President and former reading and math intervention teacher testified that her colleagues have concerns about "what the 'Divisive Concepts' language would mean in practical terms for them." *Ex. 8*, Howes Decl. ¶ 7.  They have questions like: "How much can you explain about the conditions of slavery and its impact on our country before you would break the law?," or whether they can "still assign a classic American novel 'To Kill a Mockingbird.'" *Id.* ¶¶ 7-8. She laments the Amendments' "black cloud over educators," particularly because they have "chilled [AFT members'] ability to have open discussions in their classrooms and to teach and prepare our New Hampshire public school students to be critical thinkers." *Id.* ¶¶ 16.

156.    A former U.S. History teacher at Timberlane Regional High School testified about leaving the teaching profession due to the Amendments.  *Ex. 9*, Dube Decl. ¶¶ 20-22.  Recognizing the importance of "[a]llowing students to debate topics such as woman's suffrage, affirmative

action, reparations and the criminal justice system," he "encouraged [his] students to debate and learn, to inquire and analyze, and to learn from our history and compare it to our current world circumstances." *Id.* ¶¶ 5-6. The Amendments' passage "chilled" these important discussions in the classroom. *Id.* ¶ 11. After a political group in New Hampshire published his name for signing an online petition pledging to teach "honest history," he was subjected to "online harassment, threats and obscenities." *Id.* ¶¶ 12-14. He left the profession after the police department sent patrols to his home in light of these threats. *Id.* ¶¶ 17-18.

157.     A transgender art educator in Nashua also resigned because they felt "disrespected, afraid, and targeted" after the Amendments' passage. *Ex. 10*, Munz Decl. ¶ 17. They believed they were taking a risk "whenever [they] introduced [themselves] to students, staff, or community members saying, 'Hi, my name is Mx. Munz. My pronouns are they/them.'" *Id.* ¶ 6. In the previous four years, and without incident, they handed out an ungraded, nonmandatory, 'Welcome to Art!' get-to-know-you form, asking students to indicate their pronouns. *Id.* ¶¶ 7-8. After the Amendments' passage, a parent complained to the principal and posted her complaint on social media, threatening the educator professionally and personally. *Id.* ¶¶ 9-10. The educator's teaching materials were also attached to Commissioner Edelblut's April 15, 2022 op-ed *Education's Sacred Trust*, with damaging accusations like, "activist educators who might be knowingly dismantling the foundations of a value system," and "squander[ing] the credibility of the profession as a whole." *Id.* ¶ 16; *see also Ex. 40 (Depo. Ex. 14)*, at PL00709-713. The op-ed and attachments effectively outed them as a trans educator. *See Ex. 10*, Munz Decl. ¶ 16. As a result, they resigned from the profession and continue to fear for their safety. *Id.* ¶ 19.

158.     A ninth grade English and Journalism teacher at Nashua High School testified that "[t]he Divisive Concepts Law has impacted how [she] teach[es]," including "tak[ing] certain

articles and materials out of [her] curriculum." *Ex. 18*, Merrill Decl. ¶ 2.  She no longer shares

articles that she previously used in connection with the book "To Kill a Mockingbird" to discuss

systemic racism and "white privilege." *Id.*  She also refrains from showing videos like "White

Like Me" because she "fear[s] that using these materials would be considered a violation of the

Divisive Concepts Law." *Id.*  In her view, "[t]he law interferes with [educators'] ability to educate

freely and hampers one of the most essential parts of a high school education—guiding students

to be critical thinkers" *Id.*  It has also led to the disbanding of a diversity and inclusion group

comprised of both students and faculty.  *See id.* ¶¶ 7-8. Last school year, the Gay-Straight

Alliance[85] at Timberlane High School organized a school dance.  Shortly thereafter, one of the

district's statement representatives went to the Timberlane School Board meeting and insisted that

it was "not right" for the group to have a school-sponsored dance that was not open to everyone

(despite the dance being open to all).  In the representative's view, the dance should not have taken

place without a similar homecoming dance because if "you're not gay, you're not showing up" for

fear of being ridiculed by other students.  She insisted that the School Board "stop this from

happening in the future."  Richman Decl. ¶ 9.

159.    A high school World history teacher at Timberlane Regional High School describes

feeling "reticent about teaching certain material in the classroom" after the Amendments were

passed. *Ex. 17*, Richman Decl. ¶ 2.  He is "nervous" and "guarded" when discussing topics like

affirmative action, the Voting Rights Act, and the Equal Rights Amendment. *See id.* ¶ 4.  As an

example, he is uncertain whether he will teach about this election's primaries during civics and

economics classes, notwithstanding having taught about current events and the election process in

---

[85] "GSA" is a common abbreviated name for Gender and Sexuality Alliance or Gay-Straight Alliance—a club where students can meet to discuss, among other things, sexual orientation and gender identity in a safe and confidential setting.

prior years.  *See id.* ¶ 11.  He is "constantly worried that there will be a complaint about [his] teaching and that [he] will be subject to investigation, charges, or worse."  *See id.* ¶ 12.  This fear extends to his work as a faculty advisor for Model UN.  He is restrained about what he can say around students in their research for Model UN competitions, including about topics like the War in Ukraine.  *See id.* ¶ 10.  This will be his last year teaching at Timberlane Regional High School because he does not feel like he can teach honestly under current legislative and political circumstances.  *See id.* ¶ 13.

August 14, 2023

Respectfully Submitted,

*/s/ Peter J. Perroni*
NOLAN PERRONI PC
NH Bar. No. 16250
73 Princeton Street
North Chelmsford, MA 01863
(978) 454-3800
peter@nolanperroni.com

STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.*
David J. Kahne, Esq.*
Elizabeth Milburn, Esq.*
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cmoerdler@stroock.com

David J. Strom*
American Federation of Teachers
555 New Jersey Ave. NW
Washington DC 20001
Tel.: 202.393.7472
dstrom@aft.org

Mark Richard*
Phillips, Richard & Rind P.A.
9360 S.W. 72nd Street, Suite 283
Miami, FL 33137
Tel.: 305.412.8322
mrichard@phillipsrichard.com

SELENDY & GAY PLLC
Faith Gay, Esq.*
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

*Co-Counsel for Local 8027, AFT-New*
*Hampshire, AFL-CIO, Ryan Richman,*
*John Dube and Jocelyn Merrill,*

*teachers in the New Hampshire Public
Schools, and Kimberly Green Elliot and
Meghan Evelyn Durden parents or guardians
of children in the New Hampshire public
schools.*

/s/ Gilles R. Bissonnette
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No.
  21177)
SangYeob Kim (N.H. Bar No. 266657)
AMERICAN CIVIL LIBERTIES UNION OF NEW
  HAMPSHIRE
18 Low Avenue, Concord, NH  03301
Tel.  603.224.5591
gilles@aclu-nh.org


/s/ Chris Erchull
Chris Erchull (N.H. Bar No. 266733)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org




Jennifer Eber (N.H. Bar No. 8775)
Kayla Turner (N.H. Bar No. 270167)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
JenniferE@drcnh.org
kaylat@drcnh.org

/s/ Morgan C. Nighan
Morgan C. Nighan (N.H. Bar No. 21196)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA  02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com


/s/ David A. Vicinanzo
David A. Vicinanzo (N.H. Bar No. 9403)
S. Amy Spencer (N.H. Bar. No. 266617)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com
aspencer@nixonpeabody.com


William E. Christie (N.H. Bar No. 11255)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH  03302
Tel.: 603.225.7262
wchristie@shaheengordon.com




Emerson Sykes*
Speech, Privacy, and Technology Project
Leah Watson*
Sarah Hinger*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18th Floor
New York, NY  10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

*Co-counsel for Plaintiffs Andres Mejia and
Christina Kim Philibotte*

*/s/ Jason Walta*
Alice O'Brien*
Jason Walta*
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
aobrien@nea.org
jwalta@nea.org

Esther K. Dickinson (N.H. Bar No. 20764)
Lauren Snow Chadwick (N.H. Bar No. 20288)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
   NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
edickinson@nhnea.org
lchadwick@nhnea.org

Nathan R. Fennessy (N.H. Bar No. 264672)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
rtoland@preti.com


*Co-Counsel for National Education Association-New Hampshire*

*Admitted pro hac vice.*

2611

# **<u>EXHIBIT A</u>**

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | Doc. # | Pages | Filename | Additional Description | Date | Applicable Privileges |
|---|---|---|---|---|---|---|
| **1** | 3825.1 | 5 | 10fd0.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.M. regarding "does HB2 make Sununu's Diversity and Inclusion (DIE) Advisory Council illegal?"** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **2** | 4066.1 | 1 | 11304.eml | **Email correspondence of Attorney General Formella to Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials concerning revisions to draft FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| **3** | 4557.1 | 3 | Frequently_Asked_Questions_for_K-12_educational_programs_v3.docx | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials concerning revisions to draft FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege; work product. |
| **4** | 4679.1 | 3 | Frequently_Asked_Questions_for_K-12_educational_programs_v3.docx | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials concerning revisions to draft FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege; work product. |
| **5** | 4355.1 | 1 | 11398.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding draft FAQ document.** | July 20, 2021 | Attorney/client privilege; work product; deliberative process privilege; work product. |
| **6** | 5607.1 | 8 | Frank_Notes.pdf | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding draft FAQ document.** | July 20, 2021 | Attorney/client privilege; work product; deliberative process privilege; work product. |
| **7** | 4750.1 | 2 | 113df.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.G. subject "Follow-up inquiry on DOE guidance."** | July 22, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **8** | 4905.1 | 2 | 1010f.eml | **Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, and Associate Attorney General Anne Edwards regarding decision-making concerning potential DOE outreach to company regarding website content.** | September 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 9 | 5916.1 | 4 | 10d51.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from A.S. subject "VNH JEDI Taskforce July Meeting- Open Invite- Doodle Poll." | August 3, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 10 | 5352.1 | 4 | 10073.eml | Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, Attorney General Formella, and Associate Attorney General Anne Edwards regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 22, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 11 | 5467.1 | 4 | 10fb7.eml | Email correspondence of Angela Adams to DOE legal counsel Christopher Bond and DOE's Stephen Berwick regarding DOE decision-making concerning potential response to email from T.J. regarding subject "Gender Book." | August 10, 2021 | Attorney/client privilege; deliberative process privilege. |
| 12 | 5813.1 | 2 | 1133b.eml | Email correspondence of Attorney General Formella, Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials regarding draft FAQ document. | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege; work product. |
| 13 | 5849.1 | 3 | 108f8.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT." | August 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 14 | 6081.1 | 3 | 11fb9.eml | Email correspondence of Kimberly Houghton, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request. | February 15, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 15 | 6091.1 | 8 | 11a8a.eml | Email correspondence of Stephen Berwick, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response related to email of J.L. subject "Re: [MSS News] Annual Meeting and HSD -Hopkinton Town Library Hopkinton Reads Program." | June 10, 2021 | Attorney/client privilege; deliberative process privilege. |
| 16 | 6241.1 | 1 | 116ae.eml | Email correspondence of Senior Assistant Attorney General Jill Perlow to Commissioner Edelblut, DOE legal counsel Christopher Bond, and Associate Attorney General Anne Edwards regarding potential draft guidance and process for release of such potential guidance. | June 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 17 | 6505.1 | 3 | 130ae.eml | Email correspondence of Susan Blake to Commissioner Edelblut regarding decision-making concerning potential response to RSA 91-A request. | January 3, 2022 | Deliberative process privilege. |
| 18 | 7411.1 | 3 | 1001c.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 19 | 7732.1 | 10 | 11ab7.eml | **Email correspondence of Stephen Berwick, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response related to email of J.L. subject "Re: [MSS News] Annual Meeting and HSD -Hopkinton Town Library Hopkinton Reads Program."** | June 10, 2021 | Attorney/client privilege; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 20 | 8123.1 | 4 | 1010e.eml | **Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, and Associate Attorney General Anne Edwards regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 21, 2021 | Attorney/client privilege; work product privilege; deliberative process privilege; executive privilege. |
| 21 | 8241.1 | 3 | 10d65.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Kimberly Houghton regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers"** | February 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 22 | 8266.1 | 1 | 12247.eml | **Email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential op-ed.** | June 7, 2021 | Attorney/client privilege; work product privilege; deliberative process privilege; executive privilege. |
| 23 | 8601.1 | 2 | 108fe.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email of G.S. subject "Request for Further Clarification Concerning Implementation Guidance on House Bill 2 for Public School Districts."** | August 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 24 | 8611.1 | 2 | 10576.eml | **Email correspondence of Angela Adams to Commissioner Edelblut regarding decision-making concerning potential response to voicemail concerning "some clarification on the divisive concepts law that was recently passed." *See* DOE-07767.** | September 8, 2021 | Deliberative process privilege. |
| 25 | 9093.1 | 1 | 118eb.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut concerning revisions to draft FAQs.** | July 7, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 26 | 24618.1 | 8 | Attorney_General_Opinion_-_Application_of_HB_2_Section_330_-_Draft_v4.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut concerning revisions to draft FAQs.** | July 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 27 | 24640.1 | 9 | FAQs_from_DOJ_DOE_andHRC_re_HB_2_v4.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut concerning revisions to draft FAQs.** | July 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 28 | 9167.1 | 4 | 10846.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Stephen Appleby regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 29 | 9376.1 | 5 | 10fc6.eml | **Email correspondence of Steven Berwick, DOE legal counsel Christopher Bond, Angela Adams, and Commissioner Edelblut regarding DOE decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 30 | 9511.1 | 3 | 11fb2.eml | **Email correspondence of Kimberly Houghton, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request.** | February 15, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 31 | 9743.1 | 3 | 1080a.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 32 | 10920.1 | 2 | 1011f.eml | **Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, and Diana Fenton regarding decision-making concerning potential response to RSA 91-A request.** | February 1, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 33 | 11737.1 | 2 | 1211d.eml | **Email thread between DOE legal counsel Christopher Bond, Commissioner Edelblut, and Representative Glenn Cordelli concerning potential legislation.** | June 2, 2021 | Legislative privilege; attorney/client privilege; work product. |
| 34 | 12383.1 | 5 | 110cv.eml | **Email correspondence of Diana Fenton to DOE legal counsel Christopher Bond, Commissioner Edelblut, Stephen Berwick, and Richard Farrell regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 12, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 35 | 13022.1 | 3 | 11bd3.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to Deputy Commissioner Christine Brennan and other DOE officials regarding potential response to RSA 91-A request.** | September 23, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 36 | 13189.1 | 4 | 10813.eml | **Email correspondence of Stephen Appleby to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 37 | 13776.1 | 1 | 111fa.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to DOE officials regarding present litigation.** | September 14, 2022 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 38 | 32494.1 | 1 | Unnamed | **Calendar item forwarded by Senior Assistant Attorney General Samuel Garland regarding attorney/client meeting concerning present litigation.** | November 24, 2022 | Attorney/client privilege; work product. |
|---|---|---|---|---|---|---|
| 39 | 14668.1 | 4 | 10814.eml | **Email correspondence of Stephen Appleby to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 40 | 14871.1 | 3 | 11449.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.G. subject "Follow-up inquiry on DOE guidance."** | July 23, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 41 | 15145.1 | 5 | 10fbc.eml | **Email correspondence of Stephen Berwick to DOE legal counsel Christopher Bond, Angela Adams, and Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 42 | 15271.1 | 2 | 11f6a.eml | **Email correspondence of Richard Farrell, Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to media article regarding "No Left Turn in Education NH Complaints Filed Against NH Teachers who Pledged to Break the Law."** | February 14, 2022 | Deliberative process privilege. |
| 43 | 15698.1 | 2 | 103ad.eml | **Email correspondence of Executive Director Malachi to Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Senior Assistant Attorney General Jill Perlow regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 1, 2021 | Deliberative process privilege; attorney/client privilege. |
| 44 | 16075.1 | 5 | 10fbf.eml | **Email correspondence of DOE legal counsel Christopher Bond to Steven Berwick, Angela Adams, and Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 45 | 16197.1 | 5 | 10fba.eml | **Email correspondence of DOE legal counsel Christopher Bond to Steven Berwick, Angela Adams, and Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 46 | 17871.1 | 2 | 113cd.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.G. subject "Follow-up inquiry on DOE guidance."** | July 22, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 47 | 18226.1 | 1 | 1130b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning draft potential FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 48 | 38532.1 | 3 | Frequently_Asked_Questions_for_K-12_educational_programs_v3.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning draft potential FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|----|---------|---|------|------|------|------|
| 49 | 38610.1 | 3 | Frequently_Asked_Questions_for_Public_Employers_v4.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning draft potential FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 50 | 18228.1 | 1 | 1027a.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to RSA 91-A request.** | January 31, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 51 | 18460.1 | 2 | 1200b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding potential draft AG opinion.** | June 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 52 | 19611.1 | 2 | 10ea7.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training."** | August 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 53 | 20712.1 | 1 | 11346.eml | **Email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential press release.** | July 21, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
| 54 | 42672.1 | 3 | faq-public-governement.pdf | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential press release.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 55 | 42774.1 | 1 | 20210721-_State_Issues_Guidance_Regarding_New_Anti-Discrimination_Laws.docx | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential press release.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 56 | 22258.1 | 3 | 10d61.eml | **Email correspondence of Kimberly Houghton to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers"** | February 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 57 | 223112.1 | 1 | 1128f.eml | **Email correspondence of Senior Assistant Attorney General Jill Perlow to Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding draft potential FAQ.** | July 16, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 58 | 44999.1 | 8 | FAQs_from _DOJ_DOE _andHRC_r e_HB_2_v6. docx | **Draft document attached to email correspondence of Senior Assistant Attorney General Jill Perlow to Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding draft potential FAQ.** | July 15, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 59 | 22690.1 | 2 | 10c42.eml | **Email correspondence of Kimberly Houghton to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers"** | February 4, 2022 | Attorney/client privilege; deliberative process privilege. |
| 60 | 22703.1 | 2 | 10db4.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training."** | August 3, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 61 | 48763.1 | 4 | 10213.eml | **Email correspondence of DOE legal counsel Elizabeth Brown, Senior Assistant Attorney General Samuel Garland, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 62 | 49042.1 | 9 | 10c9f.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 12, 2022 | Deliberative process privilege. |
| 63 | 49103.1 | 3 | 10c39.eml | **Email correspondence of Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown.** | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| 64 | 49451.1 | 2 | 10c38.eml | **Email correspondence of Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown.** | August 22, 2022 | Attorney/client privilege; deliberative process privilege. |
| 65 | 49639.1 | 5 | 10d11.eml | **Email correspondence of Richard Farrell, Diana Fenton, and Commissioner Edelblut regarding decision-making concerning potential response to email from "M.P." subject "Londonderry"** | April 12, 2022 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 66 | 50007.1 | 8 | 10c94.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 12, 2022 | Deliberative process privilege. |
| 67 | 50030.1 | 8 | 10c9d.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 13, 2022 | Deliberative process privilege. |
| 68 | 50191.1 | 1 | 10c31.eml | **Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law."** | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 69 | 50253.1 | 2 | 10c32.eml | **Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law."** | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 70 | 50335.1 | 3 | 10c3e.eml | **Email correspondence of Richard Farrell, Diana Fenton, DOE legal counsel Elizabeth Brown, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown.** | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| 71 | 50538.1 | 8 | 10c9e.eml | **Email correspondence of Richard Farrell, Diana Fenton, and Commissioner Edelblut regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 13, 2022 | Deliberative process privilege. |
| 72 | 51042.1 | 5 | 10821.eml | **Email correspondence of Richard Farrell to Commissioner Edelblut, Diana Fenton, DOE legal counsel Christopher Bond, and D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry"** | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| 73 | 52231.1 | 6 | 1006b.eml | **Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut."** | December 7, 2022 | Deliberative process privilege. |
| 74 | 52232.1 | 6 | 1006a.eml | **Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut."** | December 7, 2022 | Deliberative process privilege. |
| 75 | 52268.1 | 1 | 10727.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to Dover CRT accusations.** | February 7, 2023 | Deliberative process privilege. |
| 76 | 53329.1 | 4 | 11439.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE** | February 22, 2023 | Attorney/client privilege; work product. |

2620

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | officials regarding process of responding to plaintiffs' discovery requests. | | |
| 77 | 53354.1 | 3 | 11438.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 78 | 53358.1 | 3 | 11475.eml | Email correspondence of DOE legal counsel Elizabeth Brown, Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct." | August 23, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 79 | 53365.1 | 3 | 1146a.eml | Email correspondence of DOE counsel Elizabeth Brown to Richard Farrell regarding decision-making concerning potential response to RSA 91-A request. | July 5, 2022 | Attorney/client privilege; work product. |
| 80 | 53370.1 | 3 | 11436.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 81 | 53374.1 | 3 | 1143b.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 82 | 53378.1 | 3 | 11435.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 83 | 53445.1 | 2 | 133a3.eml | Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law." | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 84 | 53446.1 | 2 | 133a4.eml | Email correspondence of Diana Fenton, Richard Farrell, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown. | August 22, 2022 | Attorney/client privilege; deliberative process privilege. |
| 85 | 53447.1 | 3 | 133a5.eml | Email correspondence of Diana Fenton, Richard Farrell, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown. | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 86 | 53448.1 | 1 | 133a1.eml | **Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law."** | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 87 | 54633.1 | 8 | 130f5.eml | **Email correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 13, 2022 | Deliberative process privilege. |
| 88 | 54738.1 | 7 | 130f0.eml | **Email correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 12, 2022 | Deliberative process privilege. |
| 89 | 55008.1 | 1 | 12fdc.eml | **Email correspondence of Richard Farrell to Diana Fenton regarding decision-making concerning potential response to RSA 91-A request.** | November 10, 2022 | Deliberative process privilege. |
| 90 | 55446.1 | 6 | 12ed5.eml | **Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut."** | December 7, 2022 | Deliberative process privilege. |
| 91 | 55501.1 | 7 | 130f1.eml | **Email correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 12, 2022 | Deliberative process privilege. |
| 92 | 55833.1 | 3 | 12e4b.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests.** | February 22, 2022 | Attorney/client privilege; work product. |
| 93 | 56642.1 | 2 | 14d6d.eml | **Email correspondence of Commissioner Edelblut, Diana Fenton, and Richard Farrell regarding decision-making concerning potential response to media article regarding "No Left Turn in Education NH Complaints Filed Against NH Teachers who Pledged to Break the Law."** | February 14, 2022 | Deliberative process privilege. |
| 94 | 56942.1 | 5 | 14c3b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Richard Farrell regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 7, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 95 | 58418.1 | 6 | 15588.eml | **Email correspondence of Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, Commissioner Edelblut, D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 8, 2022 | Attorney/client privilege; deliberative process privilege. |
| 96 | 59480.1 | 1 | 19cfe.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding litigation hold.** | December 21, 2021 | Attorney client privilege; work product. |

2622

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 97 | 59494.1 | 3 | 19efe.eml | Draft email correspondence of Diana Fenton to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding potential response to email from T.J. regarding "Inappropriate reading Material, No 2 weeks notice given." | October 25, 2021 | Attorney client privilege; deliberative process privilege. |
| 98 | 60105.1 | 3 | 19e43.eml | Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, and Kate Walker regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | December 1, 2021 | Deliberative process privilege. |
| 99 | 60591.1 | 5 | 15593.eml | Email correspondence of Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, Commissioner Edelblut, D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry." | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| 100 | 61119.1 | 3 | 160e8.eml | Email correspondence of Richard Farrell, Commissioner Edelblut, Diana Fenton, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent." *See* DOE-10134. | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| 101 | 61916.1 | 8 | 16a37.eml | Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)." | September 13, 2022 | Deliberative process privilege. |
| 102 | 62557.1 | 6 | 16bc4.eml | Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut." | December 7, 2022 | Deliberative process privilege. |
| 103 | 62701.1 | 1 | 15bea.eml | Email correspondence of Richard Farrell and Diana Fenton regarding DOE decision-making concerning potential response to email subject "No Left Turn Issues." | February 8, 2022 | Deliberative process privilege. |
| 104 | 62911.1 | 6 | 1558b.eml | Email correspondence of Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, Commissioner Edelblut, D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry." | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| 105 | 63595.1 | 3 | 17023.eml | Email correspondence of Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown. | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| 106 | 63712.1 | 3 | 182e2.eml | Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and Executive Director Malachi regarding decision-making concerning potential response to W.C. email | December 1, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | subject "Discovery of CRT materials (Stamped) and lessons being taught." | | |
| 107 | 64004.1 | 3 | 182f6.eml | Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, Diana Krol, and Kate Walker regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught." | December 1, 2021 | Deliberative process privilege. |
| 108 | 64960.1 | 2 | 17fa0.eml | Email correspondence of Richard Farrell and Diana Fenton regarding DOE decision-making concerning potential response to email subject "No Left Turn Issues." | February 8, 2022 | Deliberative process privilege. |
| 109 | 64979.1 | 5 | 15590.eml | Email correspondence of Commissioner Edelblut, Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, and D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry." | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| 110 | 65324.1 | 5 | 155af.eml | Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, Diana Fenton, Richard Farrell, and D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry." | April 7, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 111 | 65418.1 | 2 | 186c4.eml | Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to feedback regarding DOE web page. | November 12, 2021 | Deliberative process privilege. |
| 112 | 66275.1 | 3 | 17035.eml | Email correspondence of Diana Fenton, D.C. Brennan, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught." | October 7, 2021 | Attorney/client privilege; deliberative process privilege. |
| 113 | 66899.1 | 6 | 1558a.eml | Email correspondence of Richard Farrell, Diana Fenton, Commissioner Edelblut, D.C. Brennan, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from "M.P." subject "Londonderry." | April 8, 2022 | Attorney/client privilege; deliberative process privilege. |
| 114 | 66999.1 | 4 | 182da.eml | Email correspondence of Diana Fenton, D.C. Brennan, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and Kate Walker regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught." | December 1, 2021 | Deliberative process privilege. |
| 115 | 67156.1 | 4 | 18519.eml | Email correspondence of Diana Fenton to Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. subject "Inappropriate reading Material, No 2 weeks notice given." | October 25, 2021 | Deliberative process privilege. |
| 116 | 67518.1 | 3 | 182c9.eml | Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and Kate Walker regarding | December 1, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught." | | |
| 117 | 68878.1 | 2 | 18386.eml | Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Diana Fenton regarding decision-making concerning potential response to report regarding Bartlett teacher. | December 21, 2021 | Attorney/client privilege; work product; deliberative process privilege |
| 118 | 68920.1 | 10 | 1831f.eml | Email correspondence of Kimberly Houghton, Commissioner Edelblut, Diana Fenton, and Richard Farrell regarding decision-making concerning potential response to email from B.S. regarding "Notice of Maladministration" | November 30, 2021 | Deliberative process privilege. |
| 119 | 69242.1 | 3 | 182cc.eml | Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, and Kimberly Houghton regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught." | November 29, 2021 | Deliberative process privilege. |
| 120 | 69284.1 | 2 | 17005.eml | Email correspondence of Diana Fenton, Commissioner Edelblut, and Kimberly Houghton, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught" | October 7, 2021 | Attorney/client privilege; deliberative process privilege. |
| 121 | 70002.1 | 1 | 16910.eml | Email correspondence of Diana Fenton and Commissioner Edelblut regarding decision-making concerning potential response concerning report regarding "complaints filed against NH teachers who pledged to break the law" | February 13, 2022 | Deliberative process privilege. |
| 122 | 71764.1 | 1 | 156b4.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Diana Fenton regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training." | August 3, 2021 | Attorney/client privilege; deliberative process privilege. |
| 123 | 73426.1 | 3 | 169c1.eml | Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | November 29, 2021 | Deliberative process privilege. |
| 124 | 74845.1 | 2 | 16a9e.eml | Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher. | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 125 | 74961.1 | 5 | 14f66.eml | Email correspondence of Stephen Berwick to Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, and D.C. Brennan regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book." | October 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| 126 | 74983.1 | 2 | 16a8a.eml | Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher. | December 6, 2021. | Attorney/client privilege; work product; deliberative process privilege. |

2625

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 127 | 75001.1 | 2 | 16a96.eml | Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher. | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 128 | 75240.1 | 2 | 1466c.eml | Email correspondence of Richard Farrell to Diana Fenton regarding decision-making concerning potential response to report regarding "complaints filed against NH teachers who pledged to break the law" | February 14, 2022 | Deliberative process privilege. |
| 129 | 75860.1 | 1 | 13139.eml | Email correspondence of Senior Assistant Attorney General Sam Garland to DOJ and DOE officials regarding litigation strategy. | September 14, 2022 | Attorney/client privilege; work product. |
| 130 | 261073.1 | 1 | Unnamed | Calendar item shared by Senior Assistant Attorney General Sam Garland regarding litigation strategy. | September 15, 2022 | Attorney/client privilege; work product. |
| 131 | 759791 | 3 | 14742.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent" | December 13, 2021 at 6:57 PM | Attorney/client privilege; deliberative process privilege. |
| 132 | 76451.1 | 2 | 1636e.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel regarding decision-making concerning potential response to 91-A request. | January 31, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 133 | 76915.1 | 3 | 1473f.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent" | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| 134 | 77130.1 | 3 | 1502c.eml | Email correspondence of D.C. Brennan to Commission Edelblut and Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | October 7, 2021 | Deliberative process privilege. |
| 135 | 77253.1 | 5 | 156ff.eml | Email correspondence of Stephen Berwick to Diana Fenton and Richard Farrell regarding legal advice of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book." | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 136 | 78666.1 | 1 | 16e50.eml | Emails correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning release of report in conjunction with timing of release to legislature. | November 12, 2021 | Deliberative process privilege. |
| 137 | 79376.1 | 2 | 16a97.eml | Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher. | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 138 | 81443.1 | 2 | 17c9b.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and Richard Farrell regarding DOE decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | October 5, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 139 | 81735.1 | 9 | 169ae.eml | **Email correspondence of Kimberly Houghton, Commissioner Edelblut, and Diana Fenton regarding decision-making concerning potential response to email from B.S. regarding "Notice of Maladministration"** | November 29, 2021 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 140 | 81877.1 | 3 | 15b85.eml | **Email correspondence of Stephen Appleby to Commissioner Edelblut and Diana Fenton regarding DOE decision-making concerning potential draft letter responding to email from S.R. subject "Teacher resignations requested."** | July 7, 2021 | Deliberative process privilege. |
| 141 | 82322.1 | 2 | 16cd8.eml | **Email correspondence of Diana Krol to Kimberly Houghton and Diana Fenton regarding proposed drafts concerning forms and webpage.** | November 1, 2021 | Deliberative process privilege. |
| 142 | 263927.1 | 3 | Anti-Discrimination_Intake_Website_Draft.docx | **Draft document attached to email correspondence of Diana Krol to Kimberly Houghton and Diana Fenton regarding proposed drafts concerning forms and webpage.** | November 1, 2021 | Deliberative process privilege. |
| 143 | 264251.1 | 2 | Discrimination_intake-draft2-doe.pdf | **Draft document attached to email correspondence of Diana Krol to Kimberly Houghton and Diana Fenton regarding proposed drafts concerning forms and webpage.** | November 1, 2021 | Deliberative process privilege. |
| 144 | 82380.1 | 4 | 134c8.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton, Richard Farrell, D.C. Brennan regarding decision-making concerning potential response to email from A.M.B. subject "Email from a Hollis parent."** | September 3, 2021 | Deliberative process privilege. |
| 145 | 83268.1 | 6 | 134da.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from E.J. and T.J. subject "Gender Book & Review RSA 186:11,IX-b and IX-c. Section 186:11 Duties of State Board of Education."** | August 11, 2021 | Deliberative process privilege. |
| 146 | 83371.1 | 4 | 169c5.eml | **Email correspondence of Diana Krol to Diana Fenton and Kate Walker regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | December 1, 2021 | Deliberative process privilege. |
| 147 | 85028.1 | 7 | 116f3.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU21)."** | September 12, 2022 | Attorney/client privilege; deliberative process privilege. |
| 148 | 85487.1 | 2 | 11f1f.eml | **Email correspondence of Commissioner Edelblut to Representative Cordelli referring to legal advice from DOE legal counsel Christopher Bond concerning potential legislation.** | June 30, 2022 | Legislative privilege; attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 149 | 86052.1 | 3 | 169ea.eml | **Email correspondence of Kate Walker to Diana Fenton and Diana Krol regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | December 1, 2021 | Deliberative process privilege. |
| 150 | 86498.1 | 3 | 1504e.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and D.C. Brennan regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2022 | Deliberative process privilege. |
| 151 | 86512.1 | 3 | 15b87.eml | **Email correspondence of Commissioner Edelblut to Stephen Appleby and Diana Fenton regarding decision-making concerning proposed letter responding to email from S.R. subject "Teacher resignations requested."** | July 7, 2021 | Deliberative process privilege. |
| 152 | 86729.1 | 4 | 11bd3.eml | **Email correspondence of DOE legal counsel Christopher Bond to Richard Sala, Andrew Cline, and Angela Adams containing legal advice regarding matter before Board of Education regarding RSA 354-A:27** | December 2, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 153 | 86730.1.1 | 3 | 11bd1.eml | **Email correspondence of Andrew Cline to DOE legal counsel Christopher Bond, Richard Sala, and Angela Adams regarding legal advice concerning matter before Board of Education regarding RSA 354-A:27.** | December 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 154 | 86734.1 | 3 | 11bcd.eml | **Email correspondence of DOE legal counsel Christopher Bond to Richard Sala, Andrew Cline, and Angela Adams containing legal advice regarding matter before Board of Education regarding RSA 354-A:27.** | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 155 | 86736.1 | 3 | 11bd4.eml | **Email correspondence of Richard Sala to DOE legal counsel Christopher Bond, Andrew Cline, and Angela Adams regarding legal advice concerning matter before Board of Education regarding RSA 354-A:27.** | December 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 156 | 87170.1 | 3 | 15029.eml | **Email correspondence of D.C. Brennan to Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Deliberative process privilege. |
| 157 | 88919.1 | 3 | 1152e.eml | **Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE officials regarding plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 158 | 89462.1 | 2 | 11abe.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email subject "Inquiry Regarding Educator Code."** | August 30, 2022 | Attorney/client privilege; deliberative process privilege. |
| 159 | 89485.1 | 3 | 1151f.eml | **Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE officials regarding plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 160 | 89645.1 | 3 | 12591.eml | **Email correspondence of Commissioner Edelblut to Kiana Krol regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | April 12, 2022 | Deliberative process privilege. |
| 161 | 89656.1 | 4 | 12998.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Senior Assistant Attorney General Jill Perlow regarding legal advice concerning potential RSA 91-A response.** | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 162 | 89804.1 | 1 | 14147.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding litigation hold notice.** | December 21, 2021 | Attorney/client privilege; work product. |
| 163 | 89830.1 | 3 | 12992.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Senior Assistant Attorney General Jill Perlow regarding legal advice concerning potential RSA 91-A response.** | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 164 | 89940.1 | 3 | 15053.eml | **Email correspondence of D.C. Brennan to Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Deliberative process privilege. |
| 165 | 90074.1 | 5 | 157c9.eml | **Email correspondence concerning legal analysis of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from T.J. subject "Gender Book."** | August 11, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 166 | 90374.1 | 1 | 16410.eml | **Email correspondence of Richard Farrell to Diana Fenton regarding decision-making concerning potential response to email subject "No Left Turn Issues."** | February 8, 2022 | Deliberative process privilege. |
| 167 | 91155.1 | 3 | 1279a.eml | **Email correspondence of Commissioner Edelblut and Angela Adams involving DOE legal counsel Christopher Bond and Executive Director Malachi regarding decision-making concerning potential response to questions concerning RSA 354-A:29-34.** | November 15, 2021 | Attorney/client privilege; deliberative process privilege. |
| 168 | 91279.1 | 1 | 16a6b.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Diana Fenton regarding decision-making concerning potential response to report regarding Bartlett teacher.** | December 6, 2021 | Attorney/client privilege; deliberative process privilege. |
| 169 | 93379.1 | 3 | 11687.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to email subject "Banning books and CRT concerned citizen."** | September 6, 2022 | Deliberative process privilege. |
| 170 | 94133.1 | 1 | 11369.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and D.C. Brennan regarding review of draft of proposed legislation of Representative Cordelli.** | November 4, 2022 | Legislative privilege; deliberative process privilege. |
| 171 | 98425.1 | 4 | 11538.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton, DOE legal counsel Elizabeth Brown, and Angela Adams regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 172 | 98600.1 | 3 | 11a68.eml | Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE and DOJ officials regarding responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 173 | 100947.1 | 3 | 120e2.eml | Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE and DOJ officials regarding responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 174 | 101796.1 | 2 | 11759.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding DOE decision-making concerning potential response to email subject "Inquiry Regarding Educator Code." | September 14, 2022 | Attorney/client privilege; deliberative process privilege. |
| 175 | 101971.1 | 4 | 11548.eml | Email correspondence of Commissioner Edelblut to Diana Fenton, DOE legal counsel Elizabeth Brown, and Angela Adams regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 176 | 102101.1 | 5 | 129f2.eml | Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email subject "CRT Concern regarding Nashua BOE contract with Achievement Network." | March 8, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 177 | 102477.1 | 1 | 12668.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.P subject "Londonderry Investigation." | April 19, 2022 | Attorney/client privilege; deliberative process privilege. |
| 178 | 104505.1 | 1 | 141dd.eml | Email correspondence of Diana Fenton to Richard Farrell and Stephen Berwick regarding process of preparing responses to plaintiffs' discovery requests and involving advice of DOJ and DOE legal counsel. | February 24, 2024 | Attorney/client privilege. |
| 179 | 106680.1 | 3 | 141c8.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 180 | 107001.1 | 3 | 148c8.eml | Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown and Richard Farrell regarding DOE process of responding to RSA 91-A request. | May 20, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 181 | 107238.1 | 4 | 12d76.eml | Email correspondence of DOE legal counsel Elizabeth Brown, D.C. Brennan, Diana Krol, Rhonda Kelley, and Angela Adams regarding DOE process of responding to RSA 91-A request. | September 26, 2022 | Attorney/client privilege; work product. |
| 182 | 107358.1 | 5 | 1257d.eml | Email correspondence of Commissioner Edelblut to Diana Krol regarding decision-making concerning potential response to email from M.P subject "Londonderry Investigation." | April 12, 2022 | Deliberative process privilege. |
| 183 | 107575.1 | 3 | 11bf8.eml | Email correspondence of Commissioner Edelblut to Office of the Governor officials Deanna Jurius and Jayne Millerick regarding educator certification renewal data and DOE press release. | July 19, 2022 | Executive privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 184 | 108130.1 | 2 | 1137b.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |
| 185 | 112483.1 | 3 | 141dc.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege; work product. |
| 186 | 112867.1 | 1 | 11ad3.eml | Email correspondence of Commissioner Edelblut, Angela Adams, Diana Fenton, and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege. |
| 187 | 278775.1 | 2 | Search_Term_doc.docx | Document attached to email correspondence of Commissioner Edelblut, Angela Adams, Diana Fenton, and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 188 | 113326.1 | 2 | 12483.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding legal advice concerning potential response to email subject "Reviewing Books in the Merrimack Valley School District Libraries." | May 16, 2022 | Attorney/client privilege; deliberative process privilege. |
| 189 | 113328.1 | 2 | 131a9.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email subject "Inquiry Regarding Educator Code." | November 15, 2022 | Attorney/client privilege; deliberative process privilege. |
| 190 | 113459.1 | 2 | 11376.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |
| 191 | 113479.1 | 3 | 11a4e.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege; work product. |
| 192 | 113826.1 | 3 | 1256d.eml | Email correspondence of Commissioner Edelblut, Diana Krol, Diana Fenton, and Richard Farrell regarding DOE decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | April 12, 2022 | Deliberative process privilege. |
| 193 | 118452.1 | 2 | 1323e.eml | Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown, Commissioner Edelblut, and DOJ's Christopher Bond regarding decision-making concerning potential response to email subject "Inquiry Regarding Educator Code" | September 14, 2022 | Attorney/client privilege; deliberative process privilege. |
| 194 | 118642.1 | 1 | 130ad.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 195 | 118716.1 | 1 | 130b5.eml | **Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints."** | November 4, 2022 | Legislative privilege. |
| 196 | 119080.1 | 1 | 1481b.eml | **Email correspondence of Diana Fenton to Commissioner Edelblut and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege. |
| 197 | 281411.1 | 2 | Search_Term_doc.docx | **Document attached to email correspondence of Diana Fenton to Commissioner Edelblut and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 198 | 119437.1 | 2 | 1683c.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 199 | 120203.1 | 3 | 16d8e.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Senior Assistant Attorney General Jill Perlow regarding legal advice concerning potential RSA 91-A response.** | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 200 | 120638.1 | 4 | 127d0.eml | **Email correspondence of Diana Fenton to DOE legal counsel Diana Fenton, DOJ's Christopher Bond, and other DOE and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 201 | 123591.1 | 2 | 1266d.eml | **Email correspondence from Diana Fenton to Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533.** | February 2, 2023 | Legislative privilege. |
| 202 | 124950.1 | 3 | 13d6c.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, DOE legal counsel Elizabeth Brown, DOJ's Christopher Bond and other DOE and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 22, 2023. | Attorney/client privilege; work product. |
| 203 | 125224.1 | 2 | 137ea.eml | **Email correspondence of Diana Fenton to Commissioner Edelblut regarding Representative Cordelli's draft of proposed legislation regarding "Human Rights complaints."** | November 1, 2022 | Legislative privilege; deliberative process privilege. |
| 204 | 125747.1 | 3 | 15ba9.eml | **Email correspondence of DOE legal counsel Christopher Bond to Cali Egan and Angela Adams regarding DOE process of preparing response to RSA 91-A request.** | March 9, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 205 | 126020.1 | 1 | 1304e.eml | **Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints."** | November 1, 2022 | Legislative privilege. |
| 206 | 126071.1 | 1 | 127de.eml | **Email correspondence of Diana Fenton to DOJ attorneys and DOE legal counsel Elizabeth Brown regarding preparation of responses to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 207 | 284233.1 | 2 | Search_Term_doc.docx | **Document attached to email correspondence of Diana Fenton to DOJ attorneys and DOE legal counsel Elizabeth Brown regarding preparation of responses to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
|---|---|---|---|---|---|---|
| 208 | 126102.1 | 1 | 13025.eml | **Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints."** | October 31, 2022 | Legislative privilege. |
| 209 | 126132.1 | 3 | 131b1.eml | **Email correspondence of Diana Fenton to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Banning books and CRT concerned citizen."** | September 6, 2022 | Deliberative process privilege. |
| 210 | 126245.1 | 2 | 1272e.eml | **Email correspondence of Diana Fenton to DOJ's Sean Locke regarding email subject "CRT in Dover Schools-response to Ed Comm question during HB61 hearing."** | February 14, 2023 | Deliberative process privilege. |
| 211 | 126253.1 | 1 | 1267a.eml | **Email correspondence of Diana Fenton to DOJ's Sean Locke and Executive Director Malachi regarding decision-making process concerning possible memorandum of understanding and draft proposed amendment regarding HB 533.** | February 2, 2023 | Deliberative process privilege; legislative privilege. |
| 212 | 126360.1 | 4 | 127c1.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, DOE legal counsel Elizabeth Brown, and Angela Adams regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 213 | 128498.1 | 1 | 130b8.eml | **Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints."** | November 4, 2022 | Legislative privilege. |
| 214 | 129174.1 | 1 | 14816.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 215 | 129719.1 | 1 | 152b4.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding legal advice concerning "emails to HRC."** | June 17, 2022 | Attorney/client privilege; work product. |
| 216 | 130017.1 | 2 | 1588d.eml | **Email correspondence of Diana Fenton, DOE legal counsel Christopher Bond, and Commissioner Edelblut regarding decision-making concerning potential response to email subject "SAU 16."** | May 25, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 217 | 130044.1 | 3 | 144dd.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to DOE and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 218 | 131294.1 | 1 | 127e0.eml | **Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown, Commissioner Edelblut, and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 219 | 132614.1 | 3 | 112ab.eml | Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown, Commissioner Edelblut, and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
|---|---|---|---|---|---|---|
| 220 | 132670.1 | 3 | 112ac.eml | Email correspondence of Angela Adams to DOE legal counsel Elizabeth Brown and Diana Fenton regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 221 | 132867.1 | 3 | 1185b.eml | Emails correspondence of Richard Farrell to Diana Fenton and DOE legal counsel Elizabeth Brown regarding discussion of potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct." | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| 222 | 133585.1 | 2 | 130c1.eml | Email correspondence of Diana Fenton to Commissioner Edelblut regarding Representative Cordelli's draft of proposed legislation regarding "Human Rights complaints." | November 4, 2022 | Legislative privilege; deliberative process privilege. |
| 223 | 134024.1 | 2 | 12672.eml | Email correspondence of Diana Fenton to Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533. | February 2, 2023 | Legislative privilege. |
| 224 | 134614.1 | 3 | 16dcf.eml | Email correspondence of Representative Cordelli to Commissioner Edelblut and state legislators regarding proposed legislation HB 1255. | March 5, 2022 | Legislative privilege. |
| 225 | 134791.1 | 2 | 15535.eml | Email correspondence of Representative Cordelli, Diana Fenton, and Commissioner Edelblut regarding proposed legislative and concerning legal advice of DOE legal counsel Christopher Bond | June 30, 2022 | Attorney/client privilege; work product; legislative privilege; deliberative process privilege. |
| 226 | 135102.1 | 2 | 13e29.eml | Email correspondence of DOE legal counsel Elizabeth Brown regarding process of preparing responses to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 227 | 136050.1 | 2 | 1c82f.eml | Email correspondence of Commissioner Edelblut regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same. | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 228 | 288617.1 | 2 | RTFDiscrimination Page.docx | Draft document attached to email correspondence of Commissioner Edelblut regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same. | November 4, 2021 | Deliberative process privilege. |
| 229 | 136062.1 | 2 | 1c6e7.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding potential response to email subject "New Hampshire allowing racism with CRT restrictions." | February 24, 2022 | Attorney/client privilege; deliberative process privilege. |
| 230 | 136137.1 | 2 | 1d5b4.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning proposed potential response to RSA 91-A request. | July 22, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 231 | 1363118.1 | 4 | 1cfee.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email subject "Email from a Hollis parent." | September 3, 2021 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 232 | 136399.1 | 2 | 1d5b6.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning proposed potential response to RSA 91-A request. | July 22, 2021 | Attorney/client privilege; deliberative process privilege. |
| 233 | 136420.1 | 1 | 1c4e0.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Kimberly Houghton regarding DOE decision-making concerning publishing information publicly. | December 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| 234 | 136666.1 | 2 | 1c7e2.eml | Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release regarding DOE webpage. | November 4, 2021 | Deliberative process privilege. |
| 235 | 136764.1 | 4 | 1c502.eml | Email correspondence of Commissioner Edelblut and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 236 | 136801.1 | 2 | 1c2aa.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding litigation hold. | December 21, 2021 | Attorney/client privilege; work product. |
| 237 | 136808.1 | 2 | 1c615.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from F.L. subject "URGENT: Report of Discrimination." | November 15, 2021 | Attorney/client privilege; deliberative process privilege. |
| 238 | 136903.1 | 3 | 1c49e.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent." | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| 239 | 137097.1 | 2 | 1db6f.eml | Email correspondence of Commissioner Edelblut to Attorney General Formella and DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 8, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
| 240 | 137151.1 | 1 | 1db8c.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Attorney/client privilege; deliberative process privilege. |
| 241 | 289124.1 | 2 | Divisive_Concepts_Op_ed_6-7-2021.docx | Draft document attached to email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Deliberative process privilege. |
| 242 | 137221.1 | 4 | 1d0ac.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested." | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

2635

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 243 | 137225.1 | 2 | 1d5ca.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to RSA 91-A request. | July 23, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 244 | 137237.1 | 2 | 1da87.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond requesting advice related to Montana AG Opinion letter. | June 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| 245 | 137254.1 | 1 | 1c57c.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from F.L. subject "Report of Discrimination." | November 12, 2021 | Attorney/client privilege; deliberative process privilege. |
| 246 | 137408.1 | 1 | 130bf.eml | Email correspondence of Diana Fenton to Christine Brennan regarding Representative Cordelli's draft legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |
| 247 | 137518.1 | 3 | 127f1.eml | Email correspondence of Diana Fenton to Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533. | February 24, 2023 | Legislative privilege; deliberative process privilege. |
| 248 | 139348.1 | 1 | 11122.eml | Email correspondence of Representative Cordelli to Diana Fenton regarding draft legislation concerning "Human Rights complaints." | October 31, 2022 | Legislative privilege. |
| 249 | 139574.1 | 1 | 106be.eml | Email correspondence of DOJ's Christopher Bond regarding process for responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 250 | 140069.1 | 6 | 1453d.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Diana Fenton and Commissioner Edelblut regarding decision-making concerning potential response to RSA 91-A request. | February 23, 2023 | Attorney/client privilege; deliberative process privilege. |
| 251 | 140411.1 | 2 | 1612b.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email of L.A. subject "Reviewing Books in the Merrimack Valley School District Libraries." | May 16, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 252 | 140417.1 | 2 | 17836.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Commissioner Edelblut concerning order on motion to dismiss and email of Senior Assistant Attorney General Samuel Garland concerning the same. | January 12, 2023 | Attorney/client privilege; work product. |
| 253 | 140767.1 | 1 | 1a1d6.ics | Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel. | February 24, 2023 | Attorney/client privilege. |
| 254 | 141517.1 | 3 | 1c4a7.eml | Email correspondence of Commissioner Edelblut and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for" | December 13, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 255 | 290595.1 | 3 | Freedom_From_Discrimation_Techn | Draft document titled "Right to Freedom from Discrimination Technical Guidance for Schools" | June 29, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | ical_Advisory.docx | | | |
|---|---|---|---|---|---|---|
| **256** | 141675.1 | 2 | 1c843.eml | **Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release regarding DOE webpage.** | November 10, 2021 | Deliberative process privilege. |
| **257** | 141705.1 | 2 | 1c92c.eml | **Email correspondence of Commissioner Edelblut to Executive Director Malachi and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |
| **258** | 290718.1 | 4 | public-education-intake-questionnaire.docx | **Draft document attached email correspondence of Commissioner Edelblut to Executive Director Malachi and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |
| **259** | 142071.1 | 2 | 1c860.eml | **Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release regarding DOE webpage and including legal advice of DOE legal counsel Christopher Bond.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **260** | 142145.1 | 2 | 1c48e.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| **261** | 142184.1 | 5 | 1cd51.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to inquiry regarding UNH curriculum.** | September 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| **262** | 142705.1 | 1 | 1d868.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from Gilles Bissonnette subject "Forthcoming Guidance Concerning Legislation Entitled 'Right to Freedom from Discrimination in Public Workplaces and Education.'"** | July 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| **263** | 142740.1 | 2 | 1da4d.eml | **Email correspondence of Commissioner Edelblut to Kimberly Houghton and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to request for information from NH Journal by email subject "Anti-discrimination complaints."** | February 14, 2022 | Attorney/client privilege; deliberative process privilege. |
| **264** | 142862.1 | 1 | 1d854.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Senior Assistant Attorney General Jill Perlow regarding decision-making concerning potential response to email from Gilles Bissonnette subject "Forthcoming Guidance Concerning Legislation Entitled 'Right to Freedom from Discrimination in Public Workplaces and Education.'"** | July 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| **265** | 142897.1 | 2 | 1ce89.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential DOE outreach to company regarding website content.** | September 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 266 | 142947.1 | 2 | 1d0ae.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT."** | August 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 267 | 143027.1 | 5 | 1d022.eml | **Email correspondence of Commissioner Edelblut to Senior Assistant Attorney General Jill Perlow and Executive Director Malachi regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 8, 2021 | Attorney/client privilege; deliberative process privilege. |
| 268 | 143029.1 | 5 | 1c4f3.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding email from D.S. subject "AFT Lawsuit."** | December 15, 2021 | Attorney/client privilege. |
| 269 | 143036.1 | 2 | 1c80f.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Kimberly Houghton regarding decision-making concerning draft press release with respect to DOE webpage.** | November 5, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 270 | 143045.1 | 2 | 1c2e5.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to RSA 91-A request.** | December 28, 2021 | Attorney/client privilege; deliberative process privilege. |
| 271 | 143144.1 | 2 | 1ce10.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 17, 2021 | Attorney/client privilege; deliberative process privilege. |
| 272 | 143219.1 | 1 | 1d123.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email of G.S. subject "Request for Further Clarification Concerning Implementation Guidance on House Bill 2 for Public School Districts."** | August 20, 2021 | Attorney/client privilege; deliberative process privilege. |
| 273 | 143380.1 | 2 | 1d367.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training."** | August 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 274 | 143437.1 | 3 | 1cc8e.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and D.C. Brennan regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Deliberative process privilege. |
| 275 | 143466.1 | 5 | 1d40f.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond requesting legal advice concerning email from S.M. regarding "does HB2 make Sununu's Diversity and Inclusion (DIE) Advisory Council illegal?"** | August 10, 2021 | Attorney/client privilege. |
| 276 | 143562.1 | 1 | 1d365.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email of G.S. subject "Request for Further Clarification Concerning Implementation Guidance on House Bill 2 for Public School Districts."** | August 5, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| **277** | 143670.1 | 2 | 1655d.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from B.C. subject "Londonderry Investigation."** | April 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| **278** | 144223.1 | 2 | 14094.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown concerning process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| **279** | 144953.1 | 1 | 11eaf.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commission Edelblut and Diana Fenton regarding decision-making concerning potential response to emails regarding SAU 16.** | May 24, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| **280** | 145165.1 | 3 | 10178.eml | **Email correspondence of Angela Adams to D.C. Christine Brennan concerning DOE legal counsel Elizabeth Brown email related to process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| **281** | 151705.1 | 3 | 18888.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding Attorney Brown's email related to process of responding to plaintiffs' discovery requests.** | February 24, 2023 | Attorney/client privilege; work product. |
| **282** | 152236.1 | 3 | 16b15.eml | **Email correspondence from Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding filing of legal memorandum.** | March 31, 2022 | Attorney/client privilege; work product. |
| **283** | 152460.1 | 3 | 1c6fc.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request from freelance editor/writer R.F.** | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **284** | 294159.1 | 8 | Anti-Discrimination_Q&A.docx | **Draft document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 12, 2021 | Deliberative process privilege. |
| **285** | 152516.1 | 1 | 1d4ce.eml | **Email correspondence of Commissioner Edelblut to Governor's legal counsel James Scully regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 17, 2021 | Executive privilege; deliberative process privilege; attorney/client privilege. |
| **286** | 152624.1 | 3 | 1d0cf.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Steven Appleby regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 17, 2021 | Attorney/client privilege; deliberative process privilege. |
| **287** | 294207.1 | 8 | Anti-Discrimination_Q&A.docx | **Draft document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 12, 2021 | Deliberative process privilege. |
| **288** | 152674.1 | 1 | 1d7d7.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Senior Assistant Attorney General Jill Perlow** | July 12, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination" | | |
| 289 | 152675.1 | 2 | 1c2f0.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.B. subject "Request for information." | December 28, 2021 | Attorney/client privilege; deliberative process privilege. |
| 290 | 152743.1 | 2 | 1d2a8.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning DOE attendance at Drummond Woodsum & McMahon program. | August 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 291 | 152817.1 | 2 | 1ce6d.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 20, 2021 | Attorney/client privilege; deliberative process privilege. |
| 292 | 152874.1 | 2 | 1cc21.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | October 5, 2021 | Attorney/client privilege; deliberative process privilege. |
| 293 | 152913.1 | 3 | 1cea3.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 294 | 153010.1 | 2 | 1c5d9.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond, Angela Adams, and Executive Director Malachi regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form." | November 15, 2021 | Deliberative process privilege; attorney/client privilege. |
| 295 | 153413.1 | 2 | 1c38e.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form." | December 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| 296 | 153949.1 | 3 | 106a0.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland to Diana Fenton, DOE legal counsel Elizabeth Brown, and other DOJ officials regarding process for responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 297 | 154222.1 | 3 | 106d2.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding Attorney Brown's email related to process of responding to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege; work product. |
| 298 | 154589.1 | 2 | 16847.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants regarding draft legal memorandum. | March 22, 2022 | Attorney/client privilege; work product. |
| 299 | 155725.1 | 2 | 10497.eml | Email correspondence of Diana Fenton and Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533. | February 2, 2023 | Legislative privilege. |
| 300 | 155777.1 | 2 | 106c0.eml | Email correspondence of DOJ's Christopher Bond to DOJ and DOE officials regarding process for responding to plaintiff's discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |

2640

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 301 | 156225.1 | 1 | 10547.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to Dover CRT accusations.** | February 8, 2023 | Deliberative process privilege. |
| 302 | 156303.1 | 3 | 16d92.eml | **Email correspondence of DOE legal counsel Christopher Bond to Senior Assistant Attorney General Jill Perlow and Commissioner Edelblut regarding decision-making concerning potential response to RSA 91-A request.** | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 303 | 156440.1 | 1 | 189c7.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 22, 2023 | Attorney/client privilege. |
| 304 | 156940.1 | 1 | 18952.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 305 | 157002.1 | 1 | 18946.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 306 | 157013.1 | 3 | 18887.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding process of responding to plaintiffs' discovery requests.** | February 24, 2023 | Attorney/client privilege; work product. |
| 307 | 157169.1 | 3 | 1695e.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants regarding draft memorandum.** | March 25, 2022 | Attorney/client privilege; work product. |
| 308 | 296228.1 | 38 | 3501727.doc | **Draft document titled "Memorandum of Law in Support of Motion to Dismiss" attached to email correspondence of Senior Assistant Attorney General Samuel Garland to defendants regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 309 | 157263.1 | 5 | 14c3c.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to Commissioner Edelblut and Kimberly Houghton regarding DOE process of responding to RSA 91-A request.** | February 24, 2023 | Attorney/client privilege; work product. |
| 310 | 157814.1 | 3 | 18860.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 311 | 158560.1 | 2 | 1c481.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding potential response to report concerning Bartlett teacher.** | December 7, 2021 | Attorney/client privilege. |
| 312 | 158606.1 | 2 | 1d566.eml | **Email correspondence of Commissioner Edelblut to Attorney General Formella, DOE legal counsel Christopher Bond, and other DOJ officials regarding draft FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 313 | 158628.1 | 4 | 1d2a3.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from A.S. subject "VNH JEDI Taskforce July Meeting- Open Invite- Doodle Poll."** | August 3, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 314 | 158660.1 | 1 | 1db7b.eml | Email correspondence of Commissioner Edelblut to Attorney General Formella and DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
|---|---|---|---|---|---|---|
| 315 | 296965.1 | 2 | Divisive_Concepts_Op_Ed_6-7-2021.docx | Draft document attached to email correspondence of Commissioner Edelblut to Attorney General Formella and DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
| 316 | 158895.1 | 3 | 1c51e.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 317 | 159093.1 | 2 | 1cb43.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to vendor screening document. | October 1, 2021 | Attorney/client privilege/work product; deliberative process privilege. |
| 318 | 159389.1 | 1 | 1da1b.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning draft content of technical assistance document. | June 23, 2021 | Attorney/client privilege; deliberative process privilege. |
| 319 | 159578.1 | 3 | 1da51.eml | Email correspondence of Commissioner Edelblut to Kimberly Houghton and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request. | February 15, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 320 | 159671.1 | 3 | 1d7c6.eml | Email correspondence from Commissioner Edelblut to Stephen Appleby regarding decision-making concerning proposed letter responding to email subject "Teacher resignations requested." | July 8, 2021 | Deliberative process privilege. |
| 321 | 159769.1 | 3 | 1d1ff.eml | Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Kimberly Houghton regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers" | February 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 322 | 159802.1 | 3 | 1c86a.eml | Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release concerning DOE webpage. | November 8, 2021 | Deliberative process privilege. |
| 323 | 159821.1 | 1. | 1c972.eml | Email correspondence of Commissioner Edelblut, Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage. | October 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 324 | 297518.1 | 3 | Anti-Discrimination_Intake_Website_Draft.docx | Draft document attached to email correspondence of Commissioner Edelblut, Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage. | October 18, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 325 | 159848.1 | 3 | 1cb3d.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.C. subject "Please attend: 'Divisive Concepts:' A Chilling Effect on Teaching History 2/6 @ 2 PM." | January 28, 2022 | Attorney/client privilege; deliberative process privilege. |
| 326 | 159870.1 | 3 | 1d113.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT." | August 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 327 | 161409.1 | 3 | 106a1.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Senior Assistant Attorney General Samuel Garland and other DOJ and DOE officials regarding process for responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 328 | 16140.1 | 2 | 104e9.eml | Email correspondence of Representative Robert Lynn to Representative Cordelli and Diana Fenton regarding draft of amendment to proposed legislation concerning HB 533. | February 4, 2023 | Legislative privilege. |
| 329 | 163807.1 | 5 | 16ec7.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.C. subject "CRT Concern regarding Nashua BOE contract with Achievement Network." | March 8, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 330 | 165883.1 | 3 | 1c7bd.eml | Email correspondence of Commissioner Edelblut, Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and regarding draft DOE webpage. | November 2, 2021 | Deliberative process privilege. |
| 331 | 165891.1 | 1 | 1d0a1.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Associate Attorney General Anne Edwards regarding decision-making concerning potential response to letter of A.D. subject "Expanding our commitment to diversity, equity, and inclusion." | August 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 332 | 166067.1 | 1 | 1c3c5.eml | Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft statement in potential response to request for information from NHPBS. | November 30, 2021 | Deliberative process privilege. |
| 333 | 166962.1 | 3 | 1e75e.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 13, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 334 | 167168.1 | 3 | 1e7b8.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 335 | 167198.1 | 1 | 1f27a.eml | Email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage. | October 13, 2021 | Deliberative process privilege. |
| 336 | 301092.1 | 2 | 354-A.docx | Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage. | October 6, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 337 | 301406.1 | 4 | public-education-intake-questionnaire-submit.pdf | Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage. | October 4, 2021 | Deliberative process privilege. |
| 338 | 167224.1 | 2 | 1f777.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to vendor screening document. | October 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 339 | 167427.1 | 4 | 1e7e4.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 340 | 167470.1 | 3 | 1ecf1.eml | Email correspondence of DOE legal counsel Christopher Bond to Kimberly Houghton and Commissioner Edelblut regarding decision-making concerning potential response to interview request. | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 341 | 167653.1 | 2 | 1e943.eml | Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft DOE webpage. | November 10, 2021 | Deliberative process privilege. |
| 342 | 168191.1 | 2 | 104f1.eml | Email correspondence of Representative Cordelli to Representative Lynn and Diana Fenton regarding draft of amendment to proposed legislation concerning HB 533. | February 4, 2023 | Legislative privilege. |
| 343 | 168350.1 | 2 | 106c1.eml | Email correspondence of DOJ and DOE attorneys regarding process of responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 344 | 168820.1 | 1 | 1053a.eml | Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to Dover CRT accusations. | February 8, 2023 | Deliberative process privilege. |
| 345 | 168905.1 | 2 | 11b13.eml | Email correspondence of Representative Cordelli to Diana Fenton referring to legal advice from DOE legal counsel Christopher Bond concerning potential legislation. | July 5, 2022 | Legislative privilege; attorney/client privilege; deliberative process privilege. |
| 346 | 169945.1 | 2 | 16842.eml | Email correspondence from Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding filing of legal memorandum. | March 22, 2022 | Attorney/client privilege; work product. |
| 347 | 170373.1 | 2 | 106bf.eml | Email correspondence of DOJ and DOE attorneys regarding process of responding to plaintiffs' discovery requests | February 2023 | Attorney/client privilege; work product. |
| 348 | 171117.1 | 2 | 1538b.eml | Email correspondence of DOJ's Christopher Bond to DOE legal counsel Elizabeth Brown and Commissioner Edelblut regarding draft reply to plaintiffs' objection to defendants' motion to dismiss. | June 22, 2022 | Attorney/client privilege; work product. |
| 349 | 302832.1 | 7 | AFT-Mejia_-_Draft_Reply_6-24- | Draft document attached to email correspondence of DOJ's Christopher Bond to DOE legal counsel Elizabeth Brown and Commissioner Edelblut regarding draft reply to plaintiffs' objection to defendants' motion to dismiss. | June 22, 2022 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | 2022_-_Ready_for_Review.docx | | | |
|---|---|---|---|---|---|---|
| **350** | 172885.1 | 2 | 1fc54.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 17, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **351** | 172975.1 | 2 | 1f0fb.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **352** | 173107.1 | 1 | 1e79b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Kimberly Houghton regarding filing of this lawsuit.** | December 13, 2021 | Attorney/client privilege; work product. |
| **353** | 173254.1 | 3 | 1e8e2.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 9, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **354** | 173322.1 | 3 | 1e7b3.eml | **Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **355** | 173589.1 | 2 | 1fc4b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 17, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **356** | 173626.1 | 2 | 1f142.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **357** | 303904.1 | 2 | RTFDiscriminationPage.docx | **Draft document attached to email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 4, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **358** | 173999.1 | 3 | 1f0fa.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **359** | 174146.1 | 2 | 1e612.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **360** | 175017.1 | 2 | 1f3e4.eml | **Email correspondence of Commissioner Edelblut, Executive Director Malachi, and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 361 | 304395.1 | 2 | NHCHR_Public_Education_RSA_354-A29_Questionnaire.docx | **Draft document attached to email correspondence of Commissioner Edelblut, Executive Director Malachi, and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |
| 362 | 175525.1 | 3 | 100e4.eml | **Email correspondence of Diana Fenton to DOJ and DOE counsel regarding process of responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 363 | 175527.1 | 3 | 100e2.eml | **Email correspondence of Diana Fenton to DOJ and DOE counsel regarding process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 364 | 175544.1 | 1 | 100cv.eml | **Draft email correspondence of Diana Fenton to DOJ's Sean Locke subject "HRC complaint."** | February | Deliberative process privilege. |
| 365 | 175569.1 | 1 | 100c1.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 366 | 175573.1 | 1 | 100c5.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 367 | 178479.1 | 1 | 16834.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 368 | 305912.1 | 30 | AFT-Mejia_-_Draft_Memorandum_3-22-2022.doc | **Draft document attached to email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 369 | 178606.1 | 2 | 14783.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | November 15, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 370 | 178889.1 | 2 | 14069.eml | **Email correspondence of DOE legal counsel Elizabeth Brown, DOJ's Christopher Bond and Jill Perlow, Commissioner Edelblut, and other DOJ officials regarding AG opinion.** | September 1, 2022 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 371 | 178975.1 | 3 | 1e7ad.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent." *See* DOE-10134.** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 372 | 179179.1 | 1 | 1e475.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft statement in potential response to request for information from NHPBS.** | November 30, 2021 | Deliberative process privilege. |
| 373 | 179514.1 | 3 | 1e7b5.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 374 | 179530.1 | 3 | 1e79e.eml | **Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 375 | 179613.1 | 2 | 1fa41.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email of K.D. subject "Resolutions for NHSBA."** | October 7, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 376 | 179784.1 | 2 | 1f0b5.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commission Edelblut and Kimberly Houghton regarding draft press release concerning DOE webpage.** | November 5, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 377 | 197785.1 | 1 | 1dee6.eml | **Email correspondence of Office of the Governor official Deanna Jurius to Commissioner Edelblut regarding draft letter to C.L. concerning Public Education Intake Questionnaire concerns.** | December 17, 2021 | Executive privilege; deliberative process privilege. |
| 378 | 306477.1 | 1 | School_Admin_Assoc_Response_Final.docx | **Draft document attached to email correspondence of Office of the Governor official Deanna Jurius to Commissioner Edelblut regarding draft letter to C.L. concerning Public Education Intake Questionnaire concerns.** | December 17, 2021 | Executive privilege; deliberative process privilege. |
| 379 | 179911.1 | 2 | 1df71.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding litigation hold.** | December 21, 2021 | Attorney/client privilege; work product. |
| 380 | 179919.1 | 3 | 1eeb4.eml | **Email correspondence of Diana Krol regarding draft intake form and draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 381 | 306533.1 | 2 | Discrimination_intake-draft2-doe-fill-submit.pdf | **Draft form attached to email correspondence of Diana Krol regarding draft intake form and draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 382 | 306725.1 | 4 | Anti-Discrimination_Intake_ | **Draft webpage attached to email correspondence Diana Krol regarding draft intake form and draft webpage.** | November 1, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Website_Draft.docx | | | |
| 383 | 180030.1 | 3 | 1e3fb.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Kimberly Houghton regarding decision-making concerning potential response to interview request.** | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 384 | 180079.1 | 2 | 1e79c.eml | **Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 385 | 180411.1 | 3 | 1e7f8.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 386 | 180958.1 | 2 | 1e925.eml | **Email correspondence of Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft press concerning DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 9, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 387 | 180988.1 | 1 | 1f800.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to vendor screening document.** | September 30, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 388 | 181077.1 | 2 | 1e1fc.eml | **Email correspondence of Representative Alicia Lekas to Commissioner Edelblut and state legislators regarding proposed legislation HB 1255.** | February 22, 2022 | Legislative privilege. |
| 389 | 183227.1 | 2 | 16843.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 390 | 183269.1 | 4 | 169ae.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 25, 2022 | Attorney/client privilege; work product. |
| 391 | 183541.1 | 2 | 1503e.eml | **Email correspondence of Diana Krol to Angela Adams regarding decision-making concerning potential response to email from V.C. subject "Merrimack School Board."** | October 1, 2021 | Deliberative process privilege. |
| 392 | 185309.1 | 2 | 1f003.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning draft press release regarding DOE webpage.** | November 4, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 393 | 308944.1 | 2 | RTFDiscriminationPage.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning draft press release regarding DOE webpage, with commentary/redlines.** | November 4, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 394 | 185367.1 | 2 | 1e44a.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding decision-making concerning potential response to request for information from NHPBS.** | November 30, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 395 | 185560.1 | 1 | 1fc03.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding AG opinion. | September 16, 2021 | Attorney/client privilege. |
| 396 | 185802.1 | 1 | 1f828.eml | Email correspondence of Diana Krol to Commissioner Edelblut and Angela Adams regarding draft questionnaire and decision-making regarding the draft. | October 4, 2021 | Deliberative process privilege. |
| 397 | 309148.1 | 4 | Public-education-intake-questionnaire.pdf | Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut and Angela Adams regarding draft questionnaire and decision-making regarding the draft. | October 4, 2021 | Deliberative process privilege. |
| 398 | 186033.1 | 1 | 1df07.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut, Kimberly Houghton, and Diana Krol regarding litigation hold. | December 20, 21 | Attorney/client privilege; work product. |
| 399 | 186049.1 | 3 | 1f009.eml | Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft press release concerning DOE webpage. | November 4, 2021 | Deliberative process privilege. |
| 400 | 186168.1 | 2 | 1f437.eml | Email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage. | October 18, 2021 | Deliberative process privilege. |
| 401 | 309296.1 | 4 | Public-education-intake-questionnaire.docx | Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage. | October 18, 2021 | Deliberative process privilege. |
| 402 | 186277.1 | 4 | 1e7e2.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 403 | 186557.1 | 3 | 1eaa0.eml | Email correspondence of Kimberly Houghton to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft press release concerning DOE web page. | November 17, 2021 | Attorney/client privilege; deliberative process privilege. |
| 404 | 186593.1 | 2 | 1e0a1.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from M.B. subject "Request for information." | December 28, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 405 | 186715.1 | 3 | 1ea63.eml | Email correspondence of Jennifer Doris and Commissioner Edelblut regarding decision-making concerning potential response to email subject "Newfound School District: Reapplication to Promising Futures Grant 2021-2022." | November 15, 2021 | Deliberative process privilege. |
| 406 | 186827.1 | 2 | 1ea4f.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form." | November 15, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 407 | 187725.1 | 1 | 1ee67.eml | Email correspondence of Diana Krol to Commissioner Edelblut regarding draft intake form. | October 29, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 408 | 309923.1 | 2 | Discrimination_intake-draft2-doe.docx | **Draft form attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft intake form.** | October 29, 2021 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 409 | 187731.1 | 2 | 1f02d.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft press release concerning DOE webpage.** | November 4, 2021 | Deliberative process privilege. |
| 410 | 187733.1 | 4 | 1e415.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding decision-making concerning potential responses to media inquiries.** | February 22, 2022 | Deliberative process privilege. |
| 411 | 187846.1 | 1 | 106e2.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 412 | 187929.1 | 1 | 10594.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 413 | 191784.1 | 1 | 11d04.eml | **Email correspondence of Commissioner Edelblut to Governor's legal counsel James Scully regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | September 18, 2021 | Executive privilege; deliberative process privilege; attorney/client privilege. |
| 414 | 312190.1 | 8 | Anti-Discrimination_Q&A.docx | **Draft document attached to email correspondence of Commissioner Edelblut to Governor's legal counsel James Scully regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 12, 2021 | Executive privilege; deliberative process privilege; attorney/client privilege. |
| 415 | 193494.1 | 5 | 152cf.eml | **Email correspondence of Executive Director Malachi to Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Senior Assistant Attorney General Jill Perlow regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 416 | 193856.1 | 1 | 11919.ics | **Calendar item of Commissioner Edelblut related to meeting with DOE and DOJ counsel and Executive Director Malachi.** | November 10, 2021 | Attorney/client privilege. |
| 417 | 194002.1 | 2 | 11bfd.eml | **Email correspondence of Commissioner Edelblut to Stephen Appleby regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | July 7, 2021 | Deliberative process privilege. |
| 418 | 195531.1 | 3 | 1582d.eml | **Email correspondence of Senior Assistant Attorney General Jill Perlow regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 419 | 196119.1 | 5 | 15249.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Senior Assistant Attorney General Jill Perlow, Executive Director Malachi, and other DOJ and DOE officials regarding decision-making concerning potential response to inquiry regarding UNH curriculum.** | September 8, 2021 | Attorney/client privilege; work product |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 420 | 199602.1 | 3 | 1479f.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Executive Director Malachi regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | November 15, 2021 | Deliberative process privilege; attorney/client privilege. |
| --- | --- | --- | --- | --- | --- | --- |
| 421 | 203562.1 | 2 | 1b3ba.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 5, 2021 | Deliberative process privilege. |
| 422 | 204418.1 | 4 | 147a3.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Executive Director Malachi regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | November 15, 2021 | Deliberative process privilege; attorney/client privilege. |
| 423 | 206474.1 | 2 | 15055.eml | **Email correspondence from Representative Roderick Ladd to Angela Adams, Representative Cordelli, and Commissioner Edelblut regarding proposed legislation.** | October 4, 2021 | Legislative privilege. |
| 424 | 206648.1 | 1 | 1b3cd.eml | **Email correspondence of Commissioner Edelblut to Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage.** | October 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 425 | 344843.1 | 3 | Anti-Discrimination_Intake_Website_Draft.docx | **Draft document attached to email correspondence of Commissioner Edelblut to Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage, with commentary and redlines.** | October 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 426 | 207206.1 | 2 | 1bc4c.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to vendor screening document.** | October 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 427 | 208600.1 | 1 | 1a4bf.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from B.C. subject "Londonderry Investigation."** | April 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 428 | 216338.1 | 2 | 10ba8.eml | **Email correspondence of Commissioner Edelblut, Diana Fenton, and DOE legal counsel Elizabeth Brown with DOJ legal counsel regarding discovery scheduling and briefing.** | February 17, 2023 | Attorney/client privilege; work product. |
| 429 | 217129.1 | 2 | 10818.eml | **Email correspondence of Commissioner Edelblut and DOE legal counsel Elizabeth Brown with DOJ legal counsel regarding discovery scheduling and briefing.** | February 17, 2023 | Attorney/client privilege; work product. |
| 430 | 223393.1 | 2 | 13932.eml | **Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential DOE response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education."** | September 22, 2022 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 431 | 225971.1 | 3 | 12e8e.eml | **Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential response to email from "Matthew" subject "CRT in NH."** | March 4, 2022 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 432 | 226076.1 | 1 | 12a18.eml | **Email correspondence of Diana Krol to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from L.G. subject "Help seeking information."** | March 28, 2022 | Attorney/client privilege; deliberative process privilege. |
| 433 | 228067.1 | 2 | 12e8b.emlE | **Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential response to email from "Matthew" subject "CRT in NH."** | March 4, 2022 | Deliberative process privilege. |
| 434 | 229313.1 | 1 | 12cfe.eml | **Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential response to email from M.B. subject "Holocaust & genocide education."** | April 18, 2022 | Deliberative process privilege. |
| 435 | 231124.1 | 2 | 149ed.eml | **Email correspondence of Kimberly Houghton to Diana Krol regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education."** | September 21, 2022 | Deliberative process privilege. |
| 436 | 231967.1 | 2 | 11881.eml | **Email correspondence of Diana Krol to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education."** | September 22, 2022 | Attorney/client privilege; deliberative process privilege. |
| 437 | 231978.1 | 1 | 11833.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to Diana Krol and Rhonda Kelley regarding potential response to RSA 91-A request.** | January 5, 2023 | Attorney/client privilege; work product; deliberative process privilege. |
| 438 | 231981.1 | 2 | 117df.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to Diana Krol, Rhonda Kelley, and D.C. Brennan regarding potential response to RSA 91-A request.** | January 23, 2023 | Attorney/client privilege; work product; deliberative process privilege. |
| 439 | 232022.1 | 2 | 1186d.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to Diana Krol regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education."** | September 22, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 440 | 232125.1 | 2 | 1186e.eml | **Email correspondence of Diana Krol to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education."** | September 22, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 441 | 234396.1 | 1 | 11784.eml | **Email correspondence of DOJ counsel to DOE officials regarding motion argument preparation.** | September 14, 2022 | Attorney/client privilege; work product. |
| 442 | 361887.1 | 1 | Unnamed | **Calendar event organized by Senior Assistant Attorney General Samuel Garland to DOE officials regarding present litigation.** | September 14, 2022 | Attorney/client privilege; work product. |
| 443 | 237259.1 | 1 | 113bb.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 444 | 237377.1 | 3 | 112b9.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concern potential response to email from S.S. subject "Update with pdf's: CRT in Dover Schools-response to Ed Commquestion during HB61 hearing."** | February 6, 2023 | Deliberative process privilege. |
| 445 | 240665.1 | 2 | 159c1.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 446 | 240668.1 | 4 | 159c6.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 447 | 240676.1 | 4 | 159df.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding feedback concerning draft DOE webpage.** | November 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 448 | 240679.1 | 4 | 159c0.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 449 | 240682.1 | 4 | 159e4.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding feedback concerning draft DOE webpage.** | November 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 450 | 240690.1 | 3 | 159c4.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 451 | 240691.1 | 3 | 159d7.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding feedback concerning draft DOE webpage.** | November 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| 452 | 240692.1 | 1 | 159ce.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 453 | 240696.1 | 2 | 159bf.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 6, 2021 | Deliberative process privilege. |
| 454 | 240698.1 | 2 | 159cc.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 455 | 364292.1 | 4 | Public-education-intake-questionnaire-fill.pdf | **Draft document attached to email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege |
| 456 | 240699.1 | 2 | 159cd.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 457 | 240700.1 | 1 | 159f3.eml | **Email correspondence of Diana Krol regarding draft questionnaire.** | November 16, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 458 | 364262.1 | 2 | NHCHR_Public_Education_RSA_354-A29_Questionnaire.pdf | **Draft document attached to email correspondence of Diana Krol regarding draft questionnaire.** | November 16, 2021 | Deliberative process privilege.240702.1 |
|-----|----------|---|-----|-----|-----|-----|
| 459 | 240701.1 | 2 | 159f2.eml | **Email correspondence of Diana Krol regarding draft questionnaire.** | November 16, 2021 | Deliberative process privilege. |
| 460 | 240702.1 | 3 | 159dd.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 461 | 240706.1 | 2 | 159ea.eml | **Email correspondence of Diana Krol, Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft webpage.** | November 4, 2021 | Deliberative process privilege. |
| 462 | 240707.1 | 2 | 159e9.eml | **Email correspondence of Diana Krol, Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft webpage.** | November 3, 2021 | Deliberative process privilege. |
| 463 | 240708.1 | 2 | 159c7.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | October 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 464 | 364267.1 | 4 | public-education-intake-questionnaire.docx | **Draft document attached to email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | October 18, 2021 | Deliberative process privilege. |
| 465 | 240710.1 | 1 | 159d3.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 29, 2021 | Deliberative process privilege. |
| 466 | 364266.1 | 2 | discrimination_intake-draft2-doe.docx | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 29, 2021 | Deliberative process privilege. |
| 467 | 240711.1 | 2 | 159e8.eml | **Email correspondence of Diana Krol, Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft webpage.** | November 4, 2021 | Deliberative process privilege. |
| 468 | 240715.1 | 3 | 159c2.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 469 | 240717.1 | 3 | 159d2.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 1, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 470 | 364332.1 | 2 | discrimination_intake-draft2-doe-fill-submit.pdf | **Draft document attached to email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 471 | 364673.1 | 4 | Anti-Discrimination_Intake_Website_Draft.docx | **Draft document attached to email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 472 | 240722.1 | 1 | 159d0.eml | **Email correspondence of Diana Krol to Commissioner Edelblut, Angela Adams regarding draft DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 473 | 364320.1 | 4 | public-education-intake-questionnaire.pdf | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut, Angela Adams regarding draft DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 474 | 240728.1 | 1 | 159c9.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 13, 2021 | Deliberative process privilege. |
| 475 | 364287.1 | 2 | 354-A.docx | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 6, 2021 | Deliberative process privilege. |
| 476 | 364642.1 | 4 | public-education-intake-questionnaire-submit.pdf | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 477 | 240735.1 | 1 | 159cf.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 478 | 364313.1 | 4 | public-education-intake-questionnaire.pdf | **Draft document attached to email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 479 | 247900.1 | 2 | 1899d.eml | **Email correspondence of DOE legal counsel Christopher Bond to Diana Krol regarding decision-making concerning potential response to email from L.G. subject "Help seeking information."** | March 28, 2022 | Attorney/client privilege; work product; deliberative process privilege. |

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                          *
4      LOCAL 8027 AFT-NEW HAMPSHIRE,       *
       AFL-CIO, ET AL.,                    *
5                                          *
                         Plaintiffs.       *
6                                          *
                  v.                       *   No. 1:21-cv-1077-PB
7                                          *   January 16, 2024
                                           *
8      FRANK EDELBLUT, IN HIS OFFICIAL     *
       CAPACITY ONLY AS THE                *
9      COMMISSIONER OF THE NEW             *
       HAMPSHIRE DEPARTMENT OF             *
10     EDUCATION, ET AL.,                  *
                                           *
11                       Defendants.       *
                                           *
12     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13          TRANSCRIPT OF TWO EXCERPTS FROM MOTION HEARING
                BEFORE THE HONORABLE PAUL J. BARBADORO
14

       APPEARANCES:
15

       For the Plaintiffs:      Charles Moerdler, Esq.
16                              Stroock Stroock & Lavan LLP

17                              Gilles R. Bissonnette, Esq.
                                American Civil Liberties Union
18                              of New Hampshire

19                              Joshua M. Goldman, Esq.
                                Harry Sandick, Esq.
20                              Patterson Belknap Webb & Tyler

21                              Morgan C. Nighan, Esq.
                                Nixon Peabody LLP
22

                                Chris Erchull, Esq.
23                              GLBTQ Legal Advocates & Defenders
                                (GLAD)
24

25               (Appearances continued next page)

```
 1
 2      For the Defendants:        Samuel R. V. Garland, Esq.
                                   Nathan W. Kenison-Marvin, Esq.
 3                                 New Hampshire Department of Justice
                                   Office of the Attorney General (Civil)
 4

 5      Court Reporter:            Brenda K. Hancock, RMR, CRR
                                   Official Court Reporter
 6                                 United States District Court
                                   55 Pleasant Street
 7                                 Concord, NH 03301
                                   (603) 225-1454
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I   N   D   E   X

Page

Excerpt No. 1............................4
Excerpt No. 2............................8

<u>EXCERPT NO. 1</u>

1

2          THE COURT:  Well, is the Socratic method a teaching

3     method?

4          MR. GARLAND:  For sure, your Honor, in the abstract.

5          THE COURT:  Are you teaching when you ask questions

6     using the Socratic method?

7          MR. GARLAND:  Yeah, I think you are, for sure.

8          THE COURT:  When you ask questions of your students

9     about white privilege, are you teaching it, even though you're

10    not taking a view about white privilege; you're trying to get

11    them to think about white privilege, what it means, is it real,

12    what is the extent of it?  If you ask questions, are you

13    teaching?

14         MR. GARLAND:  I think you are, your Honor, and I think

15    that falls within the definitions that we've identified, that,

16    still, it's some sort of affirmative and deliberate act

17    designed to convey information.  As I understood --

18         THE COURT:  So, let me try a hypothetical on you.  So,

19    suppose a high school teacher is teaching Thoreau's book

20    *Walden*, okay, a book near and dear to my heart, I grew up five

21    miles away from Walden Pond, and there's a famous statement

22    that Thoreau makes in that book:  It's never too late to give

23    up our prejudices.  Suppose a teacher writes that on the board,

24    and a student raises his hand and says, People can't give up

25    their prejudices; they're inherent.  What is the teacher

1    supposed to do in response to that to avoid losing their

2    teaching license?

3             MR. GARLAND:  I think a teacher may well have to

4    consider adding context or disclaimer to that sort of

5    statement, may have to identify that it is --

6             THE COURT:  That's wrong?  They have to affirmatively

7    tell the student, That's wrong; that isn't true?

8             MR. GARLAND:  I'm not saying that, your Honor.

9    Something more general in the sense of that's one particular

10   way of looking at it, and I think that's really where this

11   starts to, in my mind, blur the vagueness inquiry and the

12   policy inquiry.  A lot of people of very good faith profoundly

13   disagree that a teacher should have to do that.

14            THE COURT:  Nothing in my ruling -- I don't take any

15   position on whether any of the banned concepts are good or bad,

16   should be in the curriculum, should not be in the curriculum.

17   That's not my job.  I say it's the responsibility of the State.

18   I suggest that school boards are in a better position most

19   often to do that, in conjunction with public hearings and so

20   forth, but it's the State's responsibility, not mine, to

21   declare whether concepts are good.

22            So, I don't take any position on should there be,

23   should it allow, should it not be.  I'm concerned about the

24   vagueness of the statute and how teachers can lose their job,

25   lose their teaching license, potentially be subject to damages

1     for not responding to a comment from a student in a classroom

2     in the right way.  That's my concern.

3               What can you tell me about whether in that

4     hypothetical, what other context would you want to know that

5     could give a teacher guidance about how to respond to a student

6     that challenges Thoreau's statement that, It's never too late

7     to give up our prejudices?

8               MR. GARLAND:  I think the additional guidance that a

9     teacher would need can be found in the statutes, and I think

10    that goes down to Roman numeral I and the letter portions of

11    the statutes, which is, if the statement is coming back of the

12    kind you're describing, a teacher may well have to add a

13    caveat, may well have to add a disclaimer, not a rejection of

14    the notion, I don't think that's contemplated by the statutes,

15    but may well have to make clear how it fits within the larger

16    context of education.  I think the statutes provide sufficient

17    guidance on this, and I do think this is where, when we're

18    talking about cases, that I would posit around the margins the

19    fact that a teacher has to make those judgment calls does not

20    mean the statute is vague.

21              THE COURT:  Could a teacher in a high school civics

22    class assign to students -- and I'm picking up specifically on

23    something from the plaintiffs' brief, where they were picking

24    up on something I said in my opinion about the affirmative

25    action case -- could a teacher assign and have a class

1    discussion about Justice Sotomayor's dissent in that case?

2              MR. GARLAND:  For sure, your Honor.

3              THE COURT:  And they could talk about affirmative

4    action and why reparations might be necessary, not just

5    diversity promotion?  They could talk about that, and that

6    wouldn't in any way endanger a teacher for teaching,

7    advocating, inculcating that one group should be preferred over

8    another?

9              MR. GARLAND:  No, I don't think it would run afoul of

10   it, because the statutes don't simply prohibit what you just

11   described, which is one group preferred over another.  They

12   prohibit the idea that --

13             THE COURT:  I don't know if the plaintiffs will agree

14   with you on that.

15             MR. GARLAND:  I doubt they will, your Honor.

16             THE COURT:  I don't think I'll agree with you on it

17   either.  I mean, I won't try to argue with you on it.  But I

18   think the banned concepts can be read to encompass that, that

19   one group should be -- it is wrong that one group should be

20   preferred over another based on their race, for example.

21             MR. GARLAND:  I don't agree with that, your Honor, but

22   the point that I -- the main point that I would make in

23   response to that focuses on the word "could" have that you just

24   used, because I do think a lot of what we're talking about and

25   part of the peril in hypotheticals is it is a question of

1    could, and it's a question of could in cases that are on the

2    margins, could this violate it.

3           You resisted the notion in the earlier argument, and I

4    remember it well, that you can rewrite the statute, and I'm not

5    advocating that you can, but what you can do, sitting in the

6    context of a federal judge looking at state law, is you can try

7    to divine what the Supreme Court, New Hampshire Supreme Court,

8    would do, again using its rules of construction, and one of its

9    rules of construction is construing language, if it is

10   susceptible of a reading that's broader that creates a

11   constitutional problem and susceptible to narrow

12   construction --

13                      (End of excerpt)

14   (Proceedings continued on the record that are not included in

15   this excerpt transcript)

16                      * * * * * *

17                      EXCERPT NO. 2

18           THE COURT:  Well, how about the concept of structural

19   racism?  You understand what that term is understood to mean,

20   right?

21           MR. GARLAND:  Yes.

22           THE COURT:  Doesn't structural racism -- don't you,

23   engaging in discussions about structural racism, can they not

24   be discussions about how discrimination can evolve into

25   intolerance over time?

1          MR. GARLAND:  I would say they certainly can, your

2     Honor, but, as I understand the concept of structural racism,

3     it doesn't get into the sort of inherent

4     superiority/inferiority, inherent racism, sexism, et cetera,

5     that the statute contemplates.  That's something far narrower,

6     it's something biological, innate, not just simply something

7     that would be more cultural or learned behavior, and I think

8     that is reflected in the AG opinion, it's reflected in our

9     briefing, and that's the distinction.  You can certainly teach

10     about the concept.  I don't understand structural racism to say

11     person X is white and therefore was born racist, which I think

12     is where you would start to cross the line with the statute.

13          THE COURT:  And you would say teachers have no trouble

14     teaching implicit bias training in their classroom, implicit

15     bias, linking them to the famous website where you can engage

16     in questions and get an implicit bias score?  None of that

17     could in any way cross into the line of being impermissible, in

18     danger of violation of the statute?  Is that your view?

19          MR. GARLAND:  It may well, again, require a teacher to

20     identify what they're not providing the information to do, and

21     the teacher may well have to say, and this is, again, trying --

22          THE COURT:  What if a student says, The implicit bias

23     data tells us that we're inherently biased; we can't avoid our

24     discriminatory thinking?  That isn't my view of what the

25     implicit bias data suggests, but students are going to raise

1    those kinds of concerns.  Are you saying that, unless they give

2    what you call a disclaimer, they have to correct the student,

3    essentially; otherwise they will be in violation?

4             MR. GARLAND:  Well, I think it depends on how the

5    student raises it.  I think if a teacher were to provide

6    implicit bias training or to teach about implicit bias, and a

7    student were to run home and say, The teacher taught me that I

8    am inherently racist, I don't think that's a violation.  I

9    think that perhaps could result in a complaint, but that's the

10   sort of thing that would be weeded out based on the constraints

11   that are in the statute.  I think if a student, going back to

12   your initial hypothetical, were to bring it up to the teacher

13   in class, a teacher might have to consider how to contextualize

14   that statement.

15                     (End of excerpt)

16   (Proceedings continued on the record that are not included in

17   this excerpt transcript)

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4              I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     knowledge, skill, ability and belief, a true and accurate

8     transcription of the within proceedings.

9

10

11

12

13    Date:  ___5/28/24_____    /s/ Brenda K. Hancock
                                   Brenda K. Hancock, RMR, CRR
14                                 Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                     UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE

2

3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                                   *
4    LOCAL 8027 AFT-NEW HAMPSHIRE,                 *
     AFL-CIO, ET AL.,                              *
5                                                  *
                           Plaintiffs.             *
6                                                  *
                  v.                               *  No. 1:21-cv-1077-PB
7                                                  *  January 16, 2024
                                                   *  10:00 a.m.
8    FRANK EDELBLUT, IN HIS OFFICIAL               *
     CAPACITY ONLY AS THE                          *
9    COMMISSIONER OF THE NEW                        *
     HAMPSHIRE DEPARTMENT OF                        *
10   EDUCATION, ET AL.,                            *
                                                   *
11                         Defendants.             *
                                                   *
12   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13        TRANSCRIPT OF HEARING ON MOTIONS FOR SUMMARY JUDGMENT
                 BEFORE THE HONORABLE PAUL J. BARBADORO

14

     APPEARANCES:

15

     For the Plaintiffs:      Gilles R. Bissonnette, Esq.
16                            American Civil Liberties Union
                              of New Hampshire

17
                              Charles Moerdler, Esq.
18                            Joshua M. Goldman, Esq.
                              Harry Sandick, Esq.
19                            Patterson Belknap Webb & Tyler

20                            Morgan C. Nighan, Esq.
                              Nixon Peabody LLP

21
                              Chris Erchull, Esq.
22                            GLBTQ Legal Advocates & Defenders
                              (GLAD)

23

24             (Appearances continued next page)

25

For the Defendants:        Samuel R. V. Garland, Esq.
                           Nathan W. Kenison-Marvin, Esq.
                           New Hampshire Department of Justice
                           Office of the Attorney General (Civil)


Court Reporter:            Brenda K. Hancock, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1454

1                    P R O C E E D I N G S

2            THE CLERK:  All rise for the Honorable Court.  Please

3    be seated.

4            This Court is in session and has before it for

5    consideration hearings on Motions for Summary Judgment in

6    21-cv-1077-PB, <u>Local 8027, et al. versus New Hampshire</u>

7    <u>Department of Education, et al</u>.

8            THE COURT:  I was made aware of an email from

9    Mr. Bissonnette about the Protective Order and redactions that

10   were made in the briefing materials.  What more do you want to

11   tell me about that, whoever is speaking?

12           MR. BISSONNETTE:  Thank you, your Honor.  Gilles

13   Bissonnette on behalf of plaintiffs Andres Mejia and Christina

14   Philibotte, also here speaking on behalf of NEA-New Hampshire.

15           I don't have much to add beyond that email.  We just

16   did want to flag, consistent with the Protective Order, that

17   there's some information, I think a small, very small subset of

18   information that is protected.  It principally has to deal with

19   information that has been sent to the Human Rights Commission.

20   There's an assertion that that information is confidential by

21   statute.  That was one of the reasons why we entered into a

22   Protective Order in this case.  The redactions are targeted to

23   that.  Though that could come up in various ways in the course

24   of this argument, we are happy to bifurcate, to not communicate

25   about those issues in open court and have a very small,

1    bifurcated hearing at the end, in the event that the Court

2    wants to hear more about that information in those documents.

3    But that was the reason for bringing it to this Court's

4    attention.

5          THE COURT:  Yeah.  What I would suggest is that no one

6    should unilaterally, without getting permission from the Court,

7    raise a matter that is subject to the Protective Order, but I'm

8    open to hearing the argument that I need to know about

9    something subject to Protective Order.  If someone wants to

10   make that argument, I'll hear it, decide what to do, which

11   could involve a discussion under seal or might involve my

12   decision with respect to the State process.  To the extent that

13   I need to have in the public record something that is required

14   to resolve the claim, I might be required to disclose it,

15   notwithstanding the State provision making it confidential.

16   I'd certainly want to hear from the State and would respect the

17   State interests here.

18         But ultimately I've got to decide a case, and I don't

19   decide cases based on secret information, so that would be a

20   problem for me, if I needed to do it.  It's not apparent to me

21   at the present time that I need to have that information, but

22   I'm open to hearing why I should.  Okay?  Is that acceptable to

23   you?

24         MR. BISSONNETTE:  That is, your Honor.  We are

25   planning today in public court to not bring up that

1    information, not unilaterally breach that agreement that we

2    have entered into.

3            THE COURT:  Mr. Garland, what's your view?

4            MR. GARLAND:  Yeah, I have no problem with any of

5    that, your Honor.  I believe you do have the information --

6            THE COURT:  I do.

7            MR. GARLAND:  -- in the sealed versions of it.  I

8    think you know what our argument is as to whether you need it

9    to resolve the case one way or the other based on the briefing.

10           THE COURT:  You don't think I need anything that was

11   gleaned in the last year to resolve the case.  We're going to

12   get into that.  But I understand your view on that point.

13           MR. GARLAND:  And my only ask would be, if you don't

14   consider that information -- if we don't bring it up today, I'm

15   not planning on getting into the specifics, but in the course

16   of coming to a decision you determine you may need to disclose

17   it, we obviously haven't briefed the State's interest, and I

18   would just ask for an opportunity to do that.

19           THE COURT:  Yeah.  I will make an effort, and my Clerk

20   will remind me as we go through the drafting process, that, to

21   the extent we need to look beyond the redacted briefing and

22   need to refer to materials that are redacted, I'll first

23   consult with the parties and give you an opportunity to be

24   heard about that.

25           MR. GARLAND:  That works for me.  Thank you, your

1    Honor.

2             THE COURT:  Okay.  All right.  A second issue which

3    relates to something that Mr. Garland has raised, and that is,

4    it appears to me, from reading the briefs, that both the

5    plaintiffs and the defendants agree that this case is ready for

6    resolution.  There are Cross-Motions for Summary Judgment

7    pending, and I don't see either party arguing that the other

8    party's motion must be denied because facts material to the

9    resolution of a claim they are making is in genuine dispute,

10   and, if I'm wrong about that, speak now or forever hold your

11   peace.

12            I don't want someone coming up to the Court of

13   Appeals, saying, The judge shouldn't have decided the case

14   because there were facts that were in dispute.  If they're in

15   dispute, tell me, but I didn't see any reference to that from

16   either the plaintiff or the defendant.  In fact, the defendant

17   says, if I'm understanding the defendants' position correctly,

18   is you could have decided this at the complaint level.  To the

19   extent you are inclined to rule against us, we think you made a

20   mistake, but that mistake is a mistake of law, not anything

21   that's factual.  There's no fact that the State thinks in any

22   way affects the resolution of this case, because, to the extent

23   facts were produced, they have no bearing on the question

24   before the Court.

25            So, I take you both to say that, and if either of you

1      says that, Oh, Judge, you know, we should win on summary

2      judgment, but the other side shouldn't, you need to speak up

3      now.

4              Are the plaintiffs making that contention?

5              MR. BISSONNETTE:  No.  We -- I agree with your

6      assessment, your Honor.

7              THE COURT:  Do you agree?  I'm sorry.  Counsel, you

8      agree as well?

9              MR. MOERDLER:  No.

10             THE COURT:  Okay.  Thank you.

11             MR. GARLAND:  Likewise, your Honor.

12             THE COURT:  I tend to forget that there are two

13     plaintiffs, two cases.  I don't want to foreclose anyone from

14     being heard.  I hope that we can, in dealing with the

15     plaintiffs, try not to be redundant but to identify certain

16     areas in which there may be supplemental argument that needs to

17     be made that pertains to one complaint or another, and one of

18     those I will be asking about at some point during the

19     plaintiffs' presentation, in particular, about the nature of

20     the First Amendment claim here, what is or is not being made,

21     which is -- I'll lay on the table my view.

22             I understand the parties to be pressing a facial

23     vagueness argument in which it is facially vague and violates

24     both the Due Process Clause of the Fourteenth Amendment and the

25     First Amendment, to the extent the facial vagueness endangers

1    speech values.  It's not clear to me that there is any other

2    First Amendment claim that's being pressed by anyone, but I do

3    see some allegations about overbreadth as a distinct theory;

4    and, to the extent one of you is asserting an overbreadth

5    claim, I'll ask that person, when I question about it -- and I

6    think it's your group that is raising that argument, Counsel --

7    I will ask for a brief exchange about that particular issue,

8    and I'll disclose to you my view about this very confusing

9    subject of how do facial First Amendment vagueness claims and

10   First Amendment overbreadth claims overlap, and how are they

11   distinct, and, to the extent that they are distinct, does the

12   distinctness matter to this particular case.

13        So, you can start thinking about that.  I'll ask you

14   about it at the appropriate time.

15        All right.  So, I propose, then, to move right into

16   the cross-motions.  Since both sides are seeking judgment, it

17   makes sense to me to have the party who has the burden of proof

18   to go first, have the plaintiffs explain to me why the

19   plaintiffs should win, and then have the defendants respond.

20        I'll also say that we have a distinct issue with

21   respect to severance that I want to leave to the end.  So,

22   don't present your -- you have a severability argument that,

23   even if I say the statute or the amendments are

24   unconstitutional in certain respects, that I should sever off

25   and deal with other portions of the statute.  We're going to

1    save that to the end, okay?

2          So, with that in mind, why don't you briefly present

3    your position, and I'll have some questions as we go along, and

4    if you could explain to me, if at all, how you and

5    Mr. Bissonnette are dividing up the argument.

6          MR. MOERDLER:  Exactly what I intend to do.

7          THE COURT:  Okay.  Go ahead.

8          MR. MOERDLER:  Your Honor, what we have decided to do

9    is to break this essentially into two parts on our side.  The

10   first part is for me to deal with a couple of issues that

11   relate to standard very briefly; then my colleague,

12   Mr. Bissonnette, will deal with vagueness; and I will deal with

13   overbreadth and First Amendment.

14         THE COURT:  Okay.

15         MR. MOERDLER:  Let me just make one more point, if I

16   may, so we have it clear.  It is in that last point, in

17   overbreadth, that we will encounter the issue of the Protective

18   Order.

19         THE COURT:  All right.  When we get to it, you'll

20   point out --

21         MR. MOERDLER:  I just wanted you to know.

22         THE COURT:  Okay.  Yeah.  And that's fine.  I

23   appreciate that.

24         I'm a little bit concerned about your reference to

25   standing.

1          MR. MOERDLER:  No, not standing.  Standards.  I

2     apologize.

3          THE COURT:  Standards.  Okay.  I misheard you.  I

4     said, wow, the defendants, I think wisely, didn't make a

5     standing argument here.  It's complicated enough.  I don't want

6     to hear standing arguments being raised.  Okay.  Standards I'm

7     fine with.  Standing?  Oh, I thought we were past that point.

8          Okay.  Go ahead.

9          MR. MOERDLER:  Your Honor, Charles Moerdler, Patterson

10    Belknap, on behalf of the plaintiffs.

11         When we first appeared before your Honor, you

12    expressed, and it stayed with me throughout, a, quote, core

13    concern, and that core concern, as you put it, was does the

14    statute leave educators, quote, in great doubt as to whether

15    their conduct may or not be read properly.  That was a point

16    that stayed with me, because we were focusing on different

17    legal aspects and question, and that was the gut issue in this

18    case:  Does it confuse?  Does it leave people in doubt as to

19    what they should be doing?  That's the measure in every major

20    Supreme Court decision.

21         THE COURT:  I think you're absolutely right.  I'm only

22    speaking about my concern.  My concern all along has been about

23    educators who have to confront these amendments, and the

24    concern is certainly a notice concern, but there is a related

25    concern which is almost as important, and that is concern about

1    arbitrariness in enforcement.

2           MR. MOERDLER:  I agree.

3           THE COURT:  So, it is a dual concern with facially

4    vague statutes.  The dual concern is do they give adequate

5    notice?  And these are both concepts that are fundamental to

6    the rule of law.

7           Anyone who identifies rule of law concerns as

8    important will list why are they important, what are the

9    essential attributes of a rule of law system.  One of the most

10   important is people need to be able to discern whether their

11   conduct is in violation of the rule of law or not.

12          And the second related rule of law concern is law

13   needs to be enforced evenhandedly, and to the extent that

14   decision-makers are given the power to arbitrarily enforce the

15   law, because the statute is so vague, there is a very serious

16   rule of law concern, and those dual concerns are at the heart

17   of what I have been focused on in examining your claims.

18          MR. MOERDLER:  And I should tell the Court that was

19   the second point I was about to make.

20          THE COURT:  All right.

21          MR. MOERDLER:  And, indeed, we followed both of those

22   points, and, as you will hear at the First Amendment end of it,

23   although it may equally apply to the vagueness point, that's

24   where we focused in the depositions, and that's where I think

25   we hit the smoking gun, if you will, and I will get to that in

1    precise terms.

2         Let me make a point by way of background.  In these

3    depositions, which I must thank the Court for giving us the

4    opportunity to flesh out this record, not one State official,

5    not the Commissioner of Education nor any member of his staff,

6    not the Human Rights Commission or any member of its staff

7    could tell us what conduct was absolutely proscribed.  Not one

8    of them could tell us, and we asked, and we asked again, and we

9    asked again, and all we ever got was to have the statutory

10   language read back us to.

11        THE COURT:  From my reading, they added one other word

12   that they repeated over and over again, which is "context,"

13   right?  They said, Here's the language, and it all depends on

14   context, and I can't say more about it.  I may be

15   oversimplifying, but that's what I took from the briefs that

16   I --

17        MR. MOERDLER:  They were well prepared, your Honor.

18   They did what they had to do, and I compliment them for it as a

19   lawyer.

20        But it is a fact that at no point has any official of

21   the State of New Hampshire been willing to tell us, and I'm not

22   saying able, I said willing to tell us what is proscribed, what

23   was proscribed previously, it is proscribed again, what was not

24   proscribed before and is proscribed now.

25        THE COURT:  Well, let me ask you to engage with

1    Mr. Garland's, I think one of his principal points about that.

2    He argues and cites some cases to support the proposition that

3    what the administrators or the implementers of the law think

4    about how it applies -- if I'm misrepresenting your argument,

5    you'll tell me -- but I understood you to be saying that what

6    matters is the Court's construction of the statute and the

7    analysis of vagueness the way the Court construes the statute,

8    and what the Commissioner of Education thinks the statute means

9    is not relevant at all, so it shouldn't matter.

10        Am I oversimplifying or misstating your position on

11    that?

12        MR. GARLAND:  I don't think you're misstating it, your

13    Honor, probably not oversimplifying it either.  There are

14    certainly portions of the rules of construction that allow you

15    to stray into things like official guidance documents, but,

16    when we're getting into hypotheticals and depositions and

17    things along those lines, that's where I think the case law

18    suggests that's beyond the scope of the Court's analysis.

19        THE COURT:  All right.  So, you're saying that,

20    whether they answered those questions or not, their answers

21    really don't have content that is useful to me in trying to

22    discern the outer boundaries of the statutory language.  That's

23    a job I have to do based on the text of the statute.

24        MR. GARLAND:  And the rules of construction.

25        THE COURT:  And the rules of construction.

1           MR. GARLAND:  That's a fair --

2           THE COURT:  All right.  So, that's what he's saying.

3   What's your response?  Anything you have to say about that?

4           MR. MOERDLER:  He's wrong.  And if I may make the

5   point, it is very clear from Supreme Court of the United States

6   teaching, from <u>Grayned</u> in a direct quote from Frankfurter, no

7   less.  In <u>Grayned</u> the Court made the point that extrinsic

8   evidence is appropriate to define words, to define conduct, to

9   define excess.  There are a half a dozen additional cases,

10  including First Circuit cases, which make exactly the same

11  point, and after the argument, with the Court's permission,

12  since this came up in his brief --

13          THE COURT:  Yes.  I didn't want replies.

14          MR. MOERDLER:  All I want is to give you the

15  citations.

16          THE COURT:  You should just provide the citations.  I

17  would appreciate that.

18          MR. MOERDLER:  Good.  Your Honor, let me just make the

19  point you made from an advocate's point of view.  If you

20  cannot, as the entity charged with enforcement, under oath tell

21  me A is good and B is bad, C is good and D is bad, then how can

22  you enforce it?  Do I have to wait until you punish me?  Do I

23  have to wait until then?

24          Indeed, as I shall point out later on, one of the most

25  concerning pieces of paper in this entire case was touched upon

1     in question number 85 in the Statement of Undisputed Facts.  It

2     was a letter written by one of the unions to the Commissioner,

3     asking specifically, Is A, B, C and D all right, and, if not,

4     what can we do?  No answer.  That was before this litigation

5     started.  They were looking for a path to go forward, not an

6     excuse or an aftermath, because the moment a teacher is

7     criticized to her principal or his principal, that teacher is

8     damned; that career is tainted.

9          That's true of all of us.  When I say to an associate,

10    You did a lousy job, that associate's guaranteed to remember it

11    forever, and that's true of the teacher, and I will demonstrate

12    the proof of that pudding later on.

13         THE COURT:  Can I ask you about -- you're, of course,

14    familiar with a number of Supreme Court decisions.  When the

15    Court decides that a statute is not unconstitutionally vague,

16    you will often see in the Court's opinion statements like

17    these:  A careful advocate could come up with any number of

18    hypothetical cases for which the answer is not clear, and

19    courts should be very cautious about getting lost in

20    hypotheticals, when it comes to vagueness challenges about

21    conduct that is not in fact in issue, and in fact a court,

22    exercising it's appropriate principles of judicial restraint,

23    should be cautious about taking hypotheticals.

24         So, that's what courts say when they say a statute is

25    not vague.  When they say a statute is vague, they oftentimes

1    focus on how it could be applied in other contexts and say

2    that's highly important.  How do I draw the line between not

3    getting lost in hypotheticals and, on the other hand, looking

4    at applications that, in fact, teachers could want to engage

5    in?  One of the things I thought was what is in the record

6    about evidence in this case of teachers who are actually

7    self-censoring or identifying conduct that they would like to

8    engage in but they are not engaging in because of the very

9    extraordinarily serious consequences of later being found in

10   violation?

11          So, first, how do I draw the line between those two

12   bodies of cases, which you're well aware of; and, second, do

13   you agree with me that it may be relevant to look at what the

14   evidence in the case shows about how plaintiffs or other

15   teachers are self-censoring out of fear that their conduct

16   might be later swept into the very wide net that these

17   amendments create?

18          MR. MOERDLER:  And that was the third lesson you

19   taught me at the outset, because we cited one hypothetical -- I

20   cited to you one hypothetical after another, and you made that

21   exact point at that time.  And you were right, because the

22   answer is what is the proof of the pudding?  But for this

23   discovery, I would still be out there on that limb.  This

24   discovery showed in plain and precise terms, and I'm going to

25   give you at the end three precise examples from this record of

1    where you draw the line, because you, better than most, better

2    than all that I've seen so far, can draw that line with

3    dispatch.

4         That line is essential.  It says to you one thing:

5    Not only in my gut, but in my mind I know that you have crossed

6    a line between what you shouldn't be doing hypothetically and

7    what you are on the verge of doing.  It is where it becomes

8    clear that you really have such flexibility as your rule that

9    you can do anything.  That's the difference.  That's the

10   demarcation line between arbitrary and enforceability.  If you

11   are empowered to make a decision flexibly, without constraints,

12   without the guidelines that Marshall spoke of and are spoken of

13   in Kolender and the other cases, absent the guidelines you have

14   a potential, a high potential, for arbitrary and capricious

15   action, and that is exactly what has happened with this

16   statute, and that is exactly what was predicted for it.  I

17   apologize, but that is the fact.

18        Your Honor, I have one more point or two more points

19   very quickly before I leave this.

20        The first one is to turn back to the statement of

21   facts.  I must compliment my friend, Bissonnette, for a superb

22   job in pulling those materials together.  It is comprehensive,

23   it touches the good, the bad and the ugly, and tells you the

24   story in plain terms.  That's why I was able to point you to

25   specifically number 85, to show you what the teachers wanted

1    before all of this started, before the litigation.

2           With respect to one more issue, and that is standards,

3    not standing, we have here, as you have observed, a First

4    Amendment issue abutting a vagueness issue, and the courts have

5    been very clear about the fact that, when those two abut there

6    is a heightened standard, a standard in some of the cases of

7    strict scrutiny.

8           There's another issue that abuts here that we have not

9    touched upon, we did in the briefs, but we have not touched

10   upon in argument before, and that is content.  Where you have

11   content, where you have content challenged because it is

12   content based --

13          THE COURT:  Can I stop you?  And I think that's a

14   point worthy of emphasis.  This statute -- and if Mr. Garland

15   has a different view, it's important for him to point this out

16   when he speaks.  I have no doubt about the fact that this

17   statute is a speech-restriction statute.  That is fundamentally

18   what it does.  It is speech restriction, it is content based,

19   and, even more powerfully, it is viewpoint based.  And so, when

20   we look at how the First Amendment treats speech, how do we

21   view viewpoint-based discriminations on speech?  It is with

22   very, very demanding standards before you can extend

23   viewpoint-based speech restrictions and validate them.

24          Now, here we have to acknowledge, though, there is

25   this overlay of the Garcetti doctrine, and you, respectfully,

1    will disagree with me on this, but I have marked out an area

2    that I believe is not subject to First Amendment protection.

3    It's still a speech restriction; it's just unprotected speech

4    in this area.  But to the extent it goes beyond what Garcetti

5    says is unprotected speech, the fact that it is a

6    viewpoint-based statute that discriminates on speech based on

7    viewpoint suggests that the court has to exercise special

8    caution in that area.  I assume you would agree.

9         MR. MOERDLER:  And, your Honor, I would make two

10   points in that regard.  The first is, because it is content

11   based, one looks as well as to whether it is overbroad, so that

12   Garcetti may protect it to a certain point; for, if you take

13   the king's shilling, you are required to adhere to the king's

14   command, but when the command is unlawful, when the command is

15   improper, when it is arbitrary, capricious, any one of those

16   things, it is no longer a command, and that is open under the

17   case law, as I will point out later.  I just wanted to focus on

18   the content-based one, because there are two cases, neither of

19   which have been cited to date, and both of which should be.

20        The Supreme Court touching on a content-based statute

21   in Reed against Gilbert, 576 U.S. 155 at 163-64 --

22        THE COURT:  I cited Reed -- I've found two state

23   statutes to be unconstitutional, in violation of First

24   Amendment grounds, in 30 years of doing this work.  One of them

25   was what's called the "ballot selfie" case in New Hampshire,

1   where I relied extensively on the <u>Reed</u> decision.  The First

2   Circuit did not think it needed to rely on that standard.  So,

3   I'm very familiar with that particular issue.

4          MR. MOERDLER:  And the other one, of course, is

5   Sorrell against ISM, reported at 564 --

6          THE COURT:  So, you know that decision -- I found the

7   identical statute unconstitutional.  The First Circuit said I

8   was wrong.  The Supreme Court said I was right and upheld the

9   -- excuse me -- invalidated the statute, an identical statute

10  in Vermont, and the State had to come back and agree that the

11  New Hampshire identical statute was now unconstitutional --

12         MR. MOERDLER:  So that I am not accused of plagiarism,

13  I did indeed trace your cases, but I do want to note for the

14  record that that is an issue that has not been touched upon

15  enough, because here you have the spectacle of a vague statute,

16  at least arguably so, you have a statute that is viewpoint

17  restrictive, and you have a statute that on its face is content

18  based, viewpoint based, and therefore strict scrutiny may not

19  even be enough if you read cases like <u>Reed</u>, which really say

20  don't do it.

21         And so, I would add one last point, and that is that

22  the vagueness challenge here can never get lost entirely as

23  being by itself because of the additional points I have just

24  made and the standards they force the Court, with respect, to

25  bring to bear in judging a statute like this.

1              And, with the Court's permission, I would ask the

2      Court to let Mr. Bissonnette deal with the vagueness point

3      directly.

4              THE COURT:  All right.  Thank you.

5              MR. MOERDLER:  And I thank the Court.

6              MR. BISSONNETTE:  Thank you, your Honor.  Again,

7      Gilles Bissonnette on behalf of the plaintiffs Andres Mejia,

8      Christina Kim Philibotte, who are present today, as well as

9      NEA-New Hampshire.

10             I want to get right to some of the points, your Honor,

11     that you raised at the outset:  the deposition testimony

12     concerning this kind of additional criteria of context; in

13     addition, I want to just add some elaborating points on

14     extrinsic evidence, if I may.  Is that appropriate?

15             THE COURT:  Yes.

16             MR. BISSONNETTE:  Thank you.  So, the notion of

17     context matters, which we heard time after time after time

18     again in the deposition, in addition to simply having the

19     statute recited back to us when we asked basic questions

20     concerning what was covered, educators need to know, at least

21     according to the State, what is barred by reading the statute,

22     but, by adding the notion that additional context matters, it

23     shows once again I think, your Honor, the subjective nature of

24     this inquiry, that a violation is in the eye of the beholder,

25     and that there are an infinite number of ways in which this law

1    may apply or may not apply.  Teachers are left with no answers

2    as to what context is okay and what context is not.

3          I want to get to both the practical problems with that

4    and the underlying legal issue which the State raises, which is

5    does any of that really matter, all of that deposition

6    testimony?

7          First off, I'm trying to ground this case and not make

8    this the law school exam problem that the State is trying to

9    present to this Court.  This is a real case, where hundreds, if

10   not thousands, of teachers are genuinely trying to figure out

11   what is covered and what is not.  Can I teach this particular

12   book?  If so, how can I teach it?  Are classroom discussions

13   covered?  Are read-alongs covered?  Can I assign multiple

14   perspectives to different students and have them have a

15   discussion or even debate a particular issue?  These aren't

16   hypotheticals.  These are vital questions for educators so they

17   can know and have some certainty that they're not violating the

18   statute, because, if they guess wrong, they can lose their

19   license.  So, I just want to just highlight that these aren't

20   just hypothetical questions; these are critical questions for

21   New Hampshire educators.

22         THE COURT:  Well, to the extent -- and I think you do

23   make some references in your brief, but if you want to draw to

24   my attention specific examples, that would be helpful, and I'll

25   hear Mr. Garland's argument that I should ignore that, but it

1      does seem to me relevant.  To the extent that you have evidence

2      that teachers are, in fact, changing the way they are teaching

3      now because of a concern that they may be swept into the net

4      that's cast by the amendments, that strikes me as worthy of

5      consideration, certainly.

6              MR. BISSONNETTE:  Yes.  I think that evidence was well

7      developed by the plaintiffs in this case, and it is the last

8      section of the Plaintiffs' Statement of Facts here.

9              But just to summarize, though, these weren't just

10     hypotheticals.  We asked -- in addition to whether certain

11     texts were covered, we asked questions like, What is teaching

12     under the statute?

13             But even setting that aside, we raised specific books

14     that the Department of Education actually asserted in the

15     public record were reasons for why the law was actually

16     necessary.

17             THE COURT:  Well, let me just -- I need to underscore

18     this point; this is so that Mr. Garland can be prepared to

19     address this:  When we look at the vagueness challenge here, I

20     think we have to look, and I think your brief makes this point,

21     but I want it to be quite clear to Mr. Garland that I see it as

22     significant, that the problem, from your perspective, is not

23     only a problem about what speech is banned, what concepts

24     cannot be spoken, what they mean.  There's also a concern about

25     what it means to teach --

1          MR. BISSONNETTE:  Yes.

2          THE COURT:  -- to inculcate, to instruct.  And so, you

3    have vagueness across two dimensions.  One is as to the content

4    of the banned concept, what is the banned concept, what is or

5    is not banned, and then what is teaching.  If a student raises,

6    Teacher, I'd like to talk about white privilege, is that

7    teaching if the teacher allows the student to talk about white

8    privilege, or is that not covered teaching, instruction,

9    inculcating?  So, there's a question about the vagueness of the

10   concepts, and there's a question about what is teaching.

11         MR. BISSONNETTE:  Yes.

12         THE COURT:  And if you go back to the old

13   anticommunist cases like Keyishian, that the Court, Justice

14   Brennan, makes that point in his discussion of teaching in that

15   case about a different subject, kind of communism or conduct

16   that is advocating the violent overthrow.  He makes the point,

17   in finding that statute unconstitutionally vague, that there's

18   a problem with these concepts of identifying when something is

19   teaching or not.  So, there's a need for guidance about that

20   that is -- I understand you to make the argument that that's

21   one of the reasons why it's unconstitutional.

22         If you think of it as -- and that also bears upon the

23   First Amendment vagueness argument, because, to the extent one

24   can encompass within this concept of inculcating, instructing,

25   teaching, communications between a teacher and a student in

1    contexts other than in the classroom, it starts to raise

2    questions about how that may infringe on protected conduct that

3    the teacher might want to engage in but that an administrator

4    of the statute might consider teaching, advising, inculcating,

5    I would use the term advocating.

6              MR. BISSONNETTE:  Yes.

7              THE COURT:  So, I just want to make that -- to me that

8    is very important, that this is not, in your view, only vague

9    because it doesn't explain, provide sufficient guidance as to

10   what concepts are or are not banned.

11             MR. BISSONNETTE:  Yes.

12             THE COURT:  It also is vague and it doesn't describe

13   adequately what kinds of behaviors by teachers in what contexts

14   are prohibited.

15             MR. BISSONNETTE:  And there's even disagreement I

16   think within the state as to what's covered.  Is it just

17   teaching?  Can it be by implication?  Does there have to be

18   knowing requirement?  I mean, I think the state is all over the

19   map.

20             But I do agree with you that I think the way that I

21   have looked at the statute is you break it down into its

22   component parts.  The first is the how, that is to say, what

23   constitutes teaching, what constitutes inculcating, what

24   constitutes compelling to express a belief in support of or

25   against something.  That is a key element of the statute, and

1    we asked multiple questions trying to get to the bottom of what

2    the enforcers think that means, and we couldn't get any

3    answers.  That's where the defendants kept saying, well,

4    context matters.

5         And they went even further to say, you know what?

6    That's just left for educators to decide.  That is an

7    exceedingly unhelpful response from the enforcers of the

8    statute, to just pawn it right back on educators who are trying

9    to figure out what's required of them so they don't

10   inadvertently break this law and end up getting hauled either

11   into court or before a DOE proceeding.  That is element one,

12   though, of the statute.

13        Element two is, of course, assuming there's been

14   teaching, assuming there's been inculcating or compelling to

15   express a belief and/or support for something, is was a banned

16   concept implicated, was a banned concept taught, assuming

17   something was taught?  And that's where, if you look at the

18   deposition testimony very carefully -- I'm going to be blunt.

19   I was incredibly frustrated by the responses, and that's

20   because I was saying throughout.  Let's assume there was

21   teaching, let's assume there was inculcating, and I want to

22   teach, using the words of the statute, teach, I want to teach

23   this particular book, or I want to teach this particular

24   sentence from Dr. Kendi, the very same sentence that the

25   Department of Education said was a reason why this law was

1    necessary in the first place.  Is it covered?  And I kept

2    getting, Context matters, context matters.  I am giving you the

3    context, I am teaching this particular sentence, but is it one

4    of the four banned concepts?  No answer.  So, if I can't get a

5    straight answer at a sworn deposition, how are educators

6    supposed to figure out what's covered or not, when it's either

7    punting it back to them or just plainly not answering direct

8    questions?

9            This wasn't a matter, your Honor, of just I'm trying

10   to figure out, like, what are the close cases in this

11   particular case.  I want any case so teachers can have at least

12   some guidance what the contours are of this particular statute.

13           THE COURT:  Well, let me ask you a related point that

14   I was wondering about.  You're focusing on the outer boundaries

15   of the amendment.  What about the core ideas that the amendment

16   is addressed to?  Can you identify evidence in the record of

17   either conduct prior to the adoption of the amendment that

18   legislative history demonstrates was clearly what was the

19   problem or conduct subsequent to the enactment of the

20   amendments that someone says is prohibited?

21           MR. BISSONNETTE:  Yes.

22           THE COURT:  Because evaluating vagueness can involve

23   not only a look at the outer boundaries but at the core, and to

24   the extent there's no core identified --

25           MR. BISSONNETTE:  Yeah.

1      THE COURT:  -- it's harder to determine the outer

2    boundaries.  So, do you have a thought about that?

3      MR. BISSONNETTE:  I do.  So, let's look at -- well,

4    first off, let me just say at deposition I asked that very

5    question of the enforcers, so, What is covered by this statute

6    that was taught before that would be banned?  And no one would

7    answer the question.  They said, you know, I don't know, or, I

8    can't point to any information.

9      So, let's just set that aside.  Not a very helpful

10   response.  Laws are supposed to mean something, they're

11   supposed to do something, and I can't even get the enforcers to

12   point at prior texts that have been taught that they think are

13   problematic, that they think now would be banned.

14     But setting that aside, we do know of two specific

15   texts that the Department of Education has referenced publicly

16   for why this law is necessary.  The first is a two-sentence

17   snippet from this book by Dr. Kendi, *How to Be an Antiracist,*

18   cited by the Commissioner of Education in an op-ed explaining

19   why these amendments were, quote, needed and necessary.

20   Setting that aside.

21     In addition, a second book --

22     THE COURT:  I can't remember.  Is the op-ed in the

23   record?

24     MR. BISSONNETTE:  Yes, the op-ed is in the record.

25     THE COURT:  So, are the two sentences you're talking

1    about identified in the op-ed?

2         MR. BISSONNETTE:  Yes.  Yes.  And, in fact, I would

3    just note at the outset, your Honor -- Exhibit 40 -- that the

4    two sentences that he cites, The only remedy to racist

5    discrimination is antiracist discrimination; the only remedy to

6    past discrimination is present discrimination; the only remedy

7    to present discrimination is future discrimination.

8         Now, you take that out of context, what does that

9    mean?  The very next portions of that same paragraph are citing

10   Linden B. Johnson in a 1965 speech as well as U.S. Supreme

11   Court Justice Harry Blackmun, who wrote -- was writing about

12   affirmative action.

13        So, your concern was does the statute sweep within its

14   scope statements concerning affirmative action?  We have proof

15   right here that it potentially would.  But let's set that

16   aside.

17        We also have a second book that the Department of

18   Education cited for why this law is necessary, Tiffany Jewell's

19   book, *This Book is Anti-Racist*, a book written by a woman of

20   color really designed to kind of empower students, particularly

21   students of color, to talk about injustices that they see in

22   the world, including racism.  This book, Commissioner of

23   Education says in a State Board of Education meeting, This

24   shows why -- that these things are happening in New Hampshire.

25   That was in July of 2021.

1          So, these aren't hypotheticals, right?  These are real

2     books, real texts that have been propounded by the Department

3     of Education to say this is why this law is necessary.

4          So, at deposition what do we do?  Is this book

5     covered?  If I were to teach this book that you referenced,

6     teach, using the words of the statute, would an educator be in

7     violation?  No answer.  If I were to teach those two sentences

8     in Dr. Kendi's book that you referenced in your op-ed, if I

9     were to teach it would I be in violation?  No answer.  Those

10    are specific examples of texts in the record that I just want

11    to --

12         THE COURT:  I will say Mr. Garland's thought resonates

13    with me, at least to this extent:  In interpreting the statute,

14    what the statute means, and my interpretation obviously is not

15    authoritative, it would be what the New Hampshire Supreme Court

16    ultimately says, I ordinarily wouldn't take into account

17    beliefs from people off the street or even administrators as to

18    what the statute means, but it does seem to me -- Mr. Garland,

19    when it comes to your turn, you'll tell me why I'm mistaken

20    about this -- that it is important to understand if the

21    administrator is unable to point out in a deposition whether

22    teaching that would be wrong but says in op-eds, as the chief

23    administrator of the statute ultimately -- and we'll get to

24    this issue of the relationship between the Human Rights

25    Commission and the Department -- tells the world of teachers,

1    These are the problems, but I won't tell you in a regulation,

2    or I won't tell you in a deposition, isn't that exactly the

3    kind of arbitrariness that is one of the two fundamental

4    concerns that vagueness law is trying to address?

5              MR. BISSONNETTE:  Yes.

6              THE COURT:  That's my initial thought on that, and

7    Mr. Garland can respond when his time comes.

8              MR. BISSONNETTE:  Well, that's my thought, too.  This

9    isn't a person off the street, your Honor, right?  This is the

10   Department of Education Commissioner.  He heads a misconduct

11   committee with other individuals.  He fields -- he has been

12   fielding complaints under this statute, and ultimately he is

13   tasked with enforcing it, including going so far as engaging in

14   license ramifications with respect to educators.  So, you know,

15   this a person whose opinion matters in evaluating this statute.

16             I would just note for the record that summary judgment

17   Exhibit 21 is Commissioner Edelblut's op-ed.

18             So, those are two specific texts.

19             But also in the trenches of the justice system --

20   excuse me -- the education system, pardon me, how have those

21   public statements from the DOE actually trickled down to

22   educators?  And they've had a real effect.

23             The Mejia declaration, Exhibit 15, paragraph 16, texts

24   like Tiffany Jewell's book, *This Book is Anti-Racist,* Jason

25   Reynolds, Dr. Kendi's 2020 book for individuals 12 and older

1  entitled *Stamped* have been removed from instruction.  Why?

2  Because we have the DOE talking about these books, and it's

3  only natural for educators, Oh, my gosh.  Are these going to be

4  violative?  So, they pull them from instruction, even when

5  there are plans to do so.

6         The O'Mara declaration, which is Exhibit 16 of the

7  summary judgment record, *Stamped* was expressly approved by at

8  least one school board for eighth graders only to never come

9  off the shelf in one district, following Commissioner

10  Edelblut's July 13, '21 public statements concerning Dr. Kendi.

11         Plaintiffs Ryan Richman and John Dube have also

12  curtailed and restrained their classroom discussion.

13         So, real-life ramifications for educators.

14         I would like to get to extrinsic evidence, though, as

15  well, just really brief on that.

16         THE COURT:  Okay.

17         MR. BISSONNETTE:  I think it might be appropriate to

18  turn it over to Attorney Garland.  I know I've been --

19         THE COURT:  Well, I've got a few questions for you,

20  though.

21         MR. BISSONNETTE:  Oh, sure.

22         THE COURT:  Whatever you need to do, finish up, and

23  then I'll ask my questions.

24         MR. BISSONNETTE:  Thank you.  On the extrinsic

25  evidence piece, we do think that defendants are wrong that

1    extrinsic evidence cannot be categorically considered in a

2    facial vagueness challenge.  You can consider this evidence,

3    you should.  But, even if you disagree, I think you reach the

4    same conclusion, that the law is vague on its face similar to

5    the conclusion at least at the 12(b)(6) stage that this Court

6    reached, which was just based on the contours of the particular

7    statute.

8            So, I think this is an important legal question.  At

9    the end of the day I don't think it matters with respect to the

10   ultimate end result.  I think the law is unconstitutional,

11   whether you consider the well-developed record or not.

12           So, I think the short of it is I don't think we need

13   to present extrinsic evidence, but we have it, and it confirms

14   that we're right.

15           And I want to just echo what my colleague,

16   Mr. Moerdler, said at the outset, that I think we start here

17   with the language in Grayned that says precedent allows

18   consideration in a facial challenge of, quote, the

19   interpretation of the statute given by those charged with

20   enforcing it.  We did that.  That was what the point of those

21   depositions were all about.  These are enforcers.  How do they

22   interpret and apply it in practice?

23           The cases that the defendants cite, in those cases the

24   courts concluded that extrinsic evidence did not render a law

25   vague where the law was otherwise sufficiently clear, and I

1     would submit that predicate just doesn't exist here, where the

2     text of the amendments is far from sufficiently clear; and we

3     know it's not clear, because there's already been two efforts

4     through guidance to try to reimagine or reframe or reinterpret

5     the particular statute.  So, I think we know right away that

6     this law isn't sufficiently clear.  It's appropriate to bring

7     in extrinsic evidence concerning how enforcers have interpreted

8     it not just through guidance but in application and as well the

9     trickle-down effect to educators themselves.

10         But I think here, of course, extrinsic evidence can

11    and should be a two-way street, because I think, of course, you

12    have the State saying, You can't consider extrinsic evidence,

13    but you can consider our extrinsic evidence, which is the two

14    guidance documents they've issued.  I think you have to look at

15    both.  You can't just say, You can consider my extrinsic

16    evidence but not the extrinsic evidence presented by the

17    plaintiffs.

18         Just with respect to some of the cases that have kind

19    of evaluated this question, we did cite the Carolina Youth

20    Action Project case.  I think that is a very powerful case on

21    this particular question.  So, there there was a challenge to a

22    school's disorderly conduct or disorderly action statute, and

23    there there was deposition testimony presented, there was

24    extrinsic evidence concerning disparities presented, and I just

25    think it's a very, very powerful case that shows the power and

1    importance of extrinsic evidence.  So, I just wanted to --

2         THE COURT:  What do you make of the defendants'

3    citation to Lachman, 387 F.3d 42, and I think Platt, 894 F.3d

4    251, which are two decisions that they cite for the proposition

5    that I really shouldn't consider the materials that you're

6    drawing to my attention?

7         MR. BISSONNETTE:  Sure.  I think there's two points

8    with respect to Lachman.  In Lachman that predicate was met,

9    the law sufficiently clear just on its face, I don't need to

10   evaluate extrinsic evidence.  We don't have that here.  The law

11   is unclear on its face.  We know, because we have all of these

12   extrinsic interpretations and reimaginings of the statute that

13   have been proffered by the State.

14        But also, too, that is a very different case.  I

15   actually think, when you read it very carefully, it's a federal

16   court case looking at the interpretation of a federal statute,

17   where there is more latitude, frankly, than there is here with

18   respect to how a federal judge interprets a state statute.

19   Grayned itself says, It is not within our power to construe and

20   narrow state laws.

21        The language that the defendants pull from Lachman

22   have to do with Chevron deference, have to do with in the

23   context of Chevron and the Administrative Procedures Act what

24   is the appropriate interpretation to evaluate.  That's not what

25   we're dealing with here.  We're dealing with a state statute

1    that, in our view, is sufficiently vague and ambiguous that it

2    can require -- or this Court can evaluate extrinsic evidence.

3    Carolina Products demonstrates that.

4            And why do we know that it's met that predicate for

5    this Court to be able to look at extrinsic evidence?  Because

6    they've already presented extrinsic evidence themselves in the

7    context of two guidance documents and, in addition, further

8    reimagining of the statute in their briefing.

9            THE COURT:  From your position, I at least understand

10   your argument, it is the defendants, Mr. Garland's boss, can

11   issue Attorney General opinions without notice, public notice

12   and comment, you can issue guidance documents, as many as you

13   want or as few as you want.  They aren't laws, they aren't

14   rules, they aren't subject to rulemaking, but I should consider

15   those, but I shouldn't consider anything else, and that gives

16   one party complete control over what kind of extrinsic evidence

17   to be considered.

18           MR. BISSONNETTE:  Yeah.  I think it's pretty unfair,

19   to be honest with you, your Honor.  But I think Carolina Youth

20   Action Project just has some really good language here.  That

21   is also a vagueness case, and there the court explicitly

22   rejected there the State's argument that the court shouldn't

23   consider statistics in the record, stating that the evidence

24   had, quote, value to confirm that the disorderly conduct law

25   fails to give sufficient guidance to prevent discrimination

1    enforcement.  So, I just think it's very powerful there, when

2    you have a law that is going to have broad-based application to

3    thousands of individuals, as the statute did in the Carolina

4    case, and could have broad application to a significant amount

5    of speech and conduct.  So, I think that's very informative.

6    The Hills (ph) case -- was it the _Platt_ or Hills case you

7    wanted me to address?

8            THE COURT:  _Platt_ was the one I had in my notes.

9            MR. BISSONNETTE:  Exactly.  _Platt_ really, I think the

10   focus in _Platt_ really is that, the thrust of why the State is

11   relying on it is because they think we're just using

12   hypotheticals throughout the deposition testimony, and I just

13   think these aren't hypotheticals; these are real examples,

14   using real books proffered by the Department of Education.  So,

15   I just don't think that that's --

16           THE COURT:  I know your colleague is going to want to

17   address overbreadth at some point, so I'm going to give him a

18   chance to do that, but I do have a couple of questions for

19   you --

20           MR. BISSONNETTE:  Oh, sure.  Of course.

21           THE COURT:  -- about how the statute is administered,

22   the amendments are being administered now, and that is, they

23   create this responsibility, some of which are assigned to the

24   Human Rights Commission, and some of which are assigned to the

25   Department of Education, and I expressed a view in my ruling on

1    the Motion to Dismiss as to how I understood that relationship

2    to work as a matter of law, but, in reading the briefs, it

3    seems like the defendants take the position that it doesn't

4    really work that way.  The defendants take the position that

5    the Department of Education basically takes a hands-off

6    approach to any allegation of a violation of the Educator Code

7    of Conduct, won't take any disciplinary action against any

8    teacher until and unless it has first been fully passed through

9    the Human Rights Commission and the Human Rights Commission has

10   found a violation.  I don't see anything in the statute that in

11   any way authorizes that, and in my order I can only look at

12   law.  So, I looked at the law, and the Department of

13   Education's own regulations don't contemplate anything like

14   that.

15        What am I missing there?

16        MR. BISSONNETTE:  You're not missing anything.  This

17   same argument was raised at the Motion to Dismiss.

18        THE COURT:  Yeah.  And I told people how I thought it

19   worked, and I didn't see anybody in their brief telling me, Oh,

20   you just overlooked something.

21        MR. BISSONNETTE:  No, no.  I think we are in the same

22   place we were a year ago, where it continues to be the

23   defendants' position that the DOE isn't involved in making

24   determinations under the amendments, and it's really a

25   question --

1          THE COURT:  There is nothing in the amendments or in

2    the regulations that prohibit the Commissioner from doing that

3    at any point, other than that he decides with the Commissioner

4    of the Human Rights Commission, Let's agree that you do

5    something first.

6          MR. BISSONNETTE:  I totally agree.  To be blunt, we

7    think that is a manufactured construction of the statute to try

8    to get at or address the arbitrary and discriminatory

9    enforcement concerns that we've raised in this case.  We don't

10   see any validity to the assertion raised by the State that, no,

11   the DOE doesn't have enforcement power.  The DOE has

12   enforcement power.  It was contemplated in 193:40, IV.  This is

13   a violation of the Educator Code of Conduct.  The whole point

14   behind that provision is to give the DOE enforcement --

15         THE COURT:  I read the regulations to obligate the

16   Commissioner --

17         MR. BISSONNETTE:  Absolutely.

18         THE COURT:  -- to enforce the Educator Code of Conduct

19   and not to simply stand back and say, Well, I'm not going to do

20   anything.

21         So, that was a concern of mine.  I've tried to use the

22   law to interpret the statute, but apparently the State is

23   taking a different view about what the law requires, or maybe

24   they agree, No, that's what the law requires, but we have

25   agreed amongst ourselves to do something different.

1          MR. BISSONNETTE:  I'll have to allow the State to

2     articulate their position there.  To me, I think the law is

3     very clear.  The four corners of the statute mandate that the

4     DOE has enforcement authority.  When you look at the Code of

5     Conduct rules, the DOE has to engage in investigations under

6     this particular statute.  It is everything that this Court said

7     we think is true, when you look at the very four corners of the

8     Code of Conduct and the statute at issue here.

9          I do want to say that there's I think, going back to

10     the extrinsic evidence, I know that they said that DOE doesn't

11     have enforcement power, even though we think that's wrong,

12     looking at the four corners of the statute.  I actually think

13     in the trenches the DOE is pretty active here, right?  They get

14     complaints under the amendments.  They have an obligation under

15     their own rules to engage in what are called initial inquiries.

16     These occur before there's even been a *prima facie* or initial

17     determination that there's a violation.  What do they do?  They

18     call superintendents up and they say, Hey, I got this

19     complaint.  This is something that maybe you should look into,

20     including complaints where the amendments are referenced.  And

21     I think what the State --

22          THE COURT:  That's in the record here?

23          MR. BISSONNETTE:  Yes.  And I would refer the Court to

24     Plaintiffs' Statement of Facts 138 to 141, where we documented

25     this extensively.  I mean, what the State is going to say --

1          THE COURT:  You never need to get to an actual

2     enforcement action if you can simply make someone aware, Hey,

3     something might happen if you continue to engage in that

4     conduct.

5          MR. BISSONNETTE:  I think it's probably subtler than

6     that, to be honest.  But you have the enforcer calling

7     superintendents up.  It would be like if the Attorney General's

8     Office called the ACLU up, Hey, I may be asking you questions

9     about your nonprofit status.  These are conversations.  These

10    are touches.

11         THE COURT:  I'll look at those things in the record.

12         MR. BISSONNETTE:   Thank you.

13         THE COURT:  The last question I have for you is about

14    Footnote 7 of my opinion.  I don't know if anybody paid any

15    attention to Footnote 7, but I laid out in Footnote 7 a concern

16    that I have that the way in which the amendments interact with

17    Chapter 354-A, that individual teachers can be exposed to

18    individual damage liability for violating the

19    antidiscrimination laws, and I laid that out in Footnote 7 very

20    specifically, because, if I'm wrong about that, somebody should

21    tell me.  I happen to know the case that the Supreme Court

22    worked on, <u>Fred Fuller Oil</u>, where the Court recognized aiding

23    and abetting individual liabilities.

24         MR. BISSONNETTE:  Yes.

25         THE COURT:  That was my case.

1              MR. BISSONNETTE:  Yes.

2              THE COURT:  They sent it to the New Hampshire Supreme

3      Court for an opinion, and they clarified and changed our view

4      of the statute.

5              MR. BISSONNETTE:  Yup.

6              THE COURT:  And I discussed the specific provisions in

7      the amendments that make certain things a violation of the

8      antidiscrimination law and explained my view that they appear

9      to subject individual teachers to damage actions for violation

10     of the antidiscrimination law.  So, if that's true, when I

11     consider the consequences of a teacher being deemed to be in

12     violation, they include not only potentially losing your

13     employment, losing your certification to teach, but they could

14     subject teachers to individual liability as to damages.

15             MR. BISSONNETTE:  Yes.

16             THE COURT:  Am I right or wrong about that?

17             MR. BISSONNETTE:  You're 100 percent right.  And this

18     is also germane to severance, which I know we'll get to at the

19     end of the argument, right?

20             THE COURT:  Yeah.

21             MR. BISSONNETTE:  If you sever 135:40 does that

22     address everything?  Not necessarily, because, as this Court

23     concluded, I think accurately summarized, there could be aider

24     and abettor liability.  I think this Court's interpretation is

25     right.  I also think the Attorney General's Office would have

1    to agree, because they just brought an aider and abetting civil

2    rights action against NSC-131 against actual individuals.

3            So, I think you are right.  I agree with Footnote 7.

4            THE COURT:  Well, let me ask Mr. Garland, have I

5    correctly interpreted the State's law on the possibility that a

6    teacher who teaches a banned concept, in violation of the

7    amendments, engages in an antidiscriminatory act which can

8    subject a teacher as an aider and abettor to their employer of

9    a violation of the antidiscrimination law and can expose that

10   teacher to liability for damages?

11           MR. GARLAND:  So, I disagree with that, your Honor.

12           THE COURT:  What is your argument, because you didn't

13   put it in your brief?

14           MR. GARLAND:  Yeah.

15           THE COURT:  But you understand the way I've set out

16   the law there?

17           MR. GARLAND:  Yes.

18           THE COURT:  What's wrong with it?

19           MR. GARLAND:  So, the big difference, right, is Fred

20   Fuller is focused on the interplay between three provisions.

21   It's 351-A:2, 351-A:7, which is limited to employment

22   discrimination, which isn't relevant here.  I guess it's maybe

23   four provisions, 354-A:21 and 21-a.  And I think the big

24   disconnect between Fred Fuller and this case here is that

25   354-A:21 and 354-A:21-a kind of set forth the general way that

1    violations under the law against discrimination are enforced.

2    They say you can go to the Human Rights Commission, and the

3    Supreme Court said and you can name an employee as part of the

4    HRC complaint.  21-a says then you can, based on certain time

5    frames, go to Superior Court.  There's no constraining language

6    in there.

7            And, as I read <u>Fred Fuller</u>, the Supreme Court was

8    saying, Well, you have the aiding and abetting provision in

9    A:2, and you have this -- nothing limiting it when you go into

10   court or to the HRC, and so, therefore, individual liability

11   works.

12           The big difference between that and here is we have

13   193:38 and 193:40, III, and those two provisions are the ones

14   that contemplate enforcement specifically of the

15   antidiscrimination provisions of the amendments, and they say

16   enforced against a school or school district in the HRC --

17           THE COURT:  But, although, the general

18   antidiscrimination laws say enforcement against employer, which

19   caused the federal courts in this District to uniformly say the

20   analogy to Title VII applies, and you can't bring claims

21   against individuals, and notwithstanding that fact the New

22   Hampshire Supreme Court made the determination that there can

23   be individual liability.  So, I don't think that cuts it at

24   all, because the antidiscrimination law is a law against

25   discrimination by employers, and yet it has been interpreted to

1    allow for discrimination claims to be brought against

2    individuals like Mr. Fuller.

3              MR. GARLAND:  So, I would just ask the Court to

4    compare A:21 and A:21-a versus 193:38, 193:40, III.  Excuse me.

5    I think I said IV before.  I think that's where the distinction

6    exists, because, if those general provisions can be enforced

7    against everybody, we have much more specific language in

8    193:38, 193:40, III, where the specific rules -- controls over

9    the general.

10             THE COURT:  I'll take a look at it, but it's just, as

11   I said, the antidiscrimination law is a law that on its face

12   only allows for actions against employers, just as this law

13   that you're talking about, the amendment to 354-A, deals with

14   school districts.  It works the same way.  I don't see how you

15   can say in one case it does and the other case it doesn't.

16             MR. GARLAND:  As I read Fred Fuller, your Honor, it

17   was very largely dependent upon those two provisions I keep

18   noting, A:21, A:21-a, which I do think are supplanted by the

19   provisions I'm mentioning here, and so I disagree that the

20   analysis works as cleanly as you're describing.  I would just

21   ask that you look at that.

22             THE COURT:  I will.  I will take a careful look at it.

23             At least there is a risk, unless the New Hampshire

24   Supreme Court comes up with a distinction that's not apparent

25   to me and says, Oh, don't worry about that, there's a risk that

1    teachers could be subjected to individual liability for

2    damages.  That's a concern here.  Do I think it was an intended

3    consequence of the legislation?  No, I don't, but that's what

4    happens when you put legislation like this onto an

5    appropriations bill and run it through without extensive

6    analysis.  But that is a real potential problem.  I'll look at

7    the statutes that you're talking to me about, but that is at

8    this point -- I didn't see in your brief any discussion that

9    took issue with that portion of Footnote 7.  That's why I'm

10   asking the question now.

11        MR. GARLAND:  And that's why I'm prepared for it

12   today, your Honor.

13        THE COURT:  All right.

14        MR. GARLAND:  Thank you.

15        MR. BISSONNETTE:  I just have one brief comment to

16   that, and I'll then cede my time to Attorney Garland.

17        193:40 and 354 are different statutes, right?  So, I

18   don't think you can kind of, like, well, if we merge them or

19   think about them in concert -- they're different statutes.

20   Now, educators are on the hook under both sections, right?

21   They're on the hook under 193:40.  But, even if you were to,

22   like, get rid of that statute, they're on the hook under

23   354-A:32, which deals with no government program shall teach,

24   advocate or advance.  Teachers, obviously, are part of

25   government programs, right?  And then you look, of course, at

1   RSA 354-A:31, no public employers, either directly or through

2   the use of an outside contractor, shall teach, advocate,

3   instruct.  Of course, teachers are part of public employers.

4   They are on the hook in both statutes.  They independently

5   impose liability.

6           And I would submit again Footnote 7 is correct, and I

7   would also submit again that in a different case that was filed

8   about a month ago the Attorney General's Office is seeking to

9   employ -- apply 354 to specific individuals that are part of

10  NSC-131.  So, they have a very broad application of that

11  statute here.

12          THE COURT:  NSC-131 --

13          MR. BISSONNETTE:  They're a horrible neo-Nazi group,

14  frankly, that has been protesting outside the Teatotaller in

15  Concord.

16          But I just think it's important context here that they

17  have a fairly broad, rightly or wrongly, your Honor, right,

18  they have a fairly broad interpretation of 354-A, including its

19  application to individuals which could and does apply to

20  teachers.

21          THE COURT:  But Mr. Garland's argument is, Don't worry

22  about it, because 193:40 is very different, right?  That seems

23  to be what you're suggesting.

24          MR. GARLAND:  Yeah, in a general sense, your Honor.

25  It's very different, because it supplants the more general

1   language, the more general enforcement language in 354-A.

2           THE COURT:  All right.  So, your argument is kind of,

3   to the extent that the Legislature provides a specific remedy

4   as to individuals, it impliedly displaces additional remedy.

5   But there's a provision in the statute that says none of these

6   remedies in any way limit a right of action that exists in any

7   way, shape or form against these people.  I don't have the

8   exact language in front of me, but there is a provision in the

9   amendments that essentially, if I'm remembering correctly, say

10  nothing displaces any remedy that may exist anywhere else by

11  common law or otherwise.

12          MR. BISSONNETTE:  354-A:34 is that statute.  Part of

13  the amendments:  Any person aggrieved by an act made unlawful

14  under this subdivision may pursue all of the remedies available

15  under RSA 354-A.  There are some more statutes:  RSA 491,

16  RSA 275-E, RSA 98-E, or any other applicable common law or

17  statutory cause of action.  It would be weird, I think, for the

18  language of 193 in this bill to somehow supersede or negate or

19  repeal earlier language in the same bill.  That doesn't make

20  any sense to me.

21          THE COURT:  Just a quick comment, Mr. Garland, and

22  then we'll move on.

23          MR. GARLAND:  I just would clarify that I'm not saying

24  it abrogates it, that it supersedes it.  If I used that word,

25  that probably was imprecise.  I'm saying that just under

1    general rules of construction it supplants it, that, when you

2    have a general provision with general enforceability, and then

3    in some other statute dealing with similar subject matter

4    there's something more specific, the New Hampshire Supreme

5    Court has time and again said the more specific language

6    controls.  So, that's the construction point I'm making.  I

7    appreciate you'll take a look at it.

8            THE COURT:  Okay.  I'll take a close look.

9            All right.  So, we're going to get close to a break.

10   Maybe I should hear your argument about overbreadth, and then

11   we'll take a break, and then we'll come to the defendants,

12   okay?  And then after we get the defendants,' I'm going to ask

13   the defendants to make their severance argument, and then the

14   plaintiffs to respond, and then we'll finish.  Okay?

15           MR. MOERDLER:  Your Honor, just one thought.  I do

16   need about five minutes to give you some testimony from the

17   record, that I can put it in the overbreadth, I can put it in

18   later, whatever your Honor please.

19           THE COURT:  You want to read it into the record

20   yourself?

21           MR. MOERDLER:  No, no.  I want to summarize.  It's a

22   summary of it.

23           THE COURT:  Oh, okay.  Yeah, you can do that now.

24           MR. MOERDLER:  Okay.

25           THE COURT:  Do that, and then we'll address your

1    overbreadth argument, and then we'll move on.  Is that

2    acceptable?

3            MR. MOERDLER:  Before I do that, may I do one other

4    thing?

5            THE COURT:  Yes.

6            MR. MOERDLER:  You asked three questions.  I'd like to

7    answer them, if I may.  All right?

8            THE COURT:  All right.

9            MR. MOERDLER:  The first question was on the issue of

10   explicit and the two cases cited by Mr. Garland.  I would rest

11   entirely on the following quotation of the Supreme Court, as

12   voiced by Justice Marshall.  In this situation, as Mr. Justice

13   Frankfurter put it:  We must extrapolate its allowable meaning.

14   Here, we are relegated to the words of the ordinance itself, to

15   the interpretations the court below has given to analogous

16   statutes.  Perhaps to some degree we must look to the

17   interpretation of the statute given by those charged with

18   enforcing it.

19           That is the point about using case law and practice to

20   interpret a statute and holding.  That language has been cited

21   in half a dozen cases that we will give you, including the

22   First Circuit.

23           THE COURT:  Okay.  Thank you.  That's helpful.

24           MR. MOERDLER:  The second point you made, or it was

25   really more than a second point, it was multiple, is also

1     answered by a quotation by a late, great jurist by the name of

2     Sandra Day O'Connor:  Although the doctrine, vagueness, focuses

3     both on actual notice to citizens and arbitrary enforcement, we

4     have recognized recently that the more important aspect of the

5     vagueness doctrine is not actual notice, but the other

6     principal element of the doctrine - the requirement that the

7     legislature establish minimal guidelines to govern law

8     enforcement.  And that's where the problem pops up.

9           From the standpoint of the teacher, in answer to a

10    question you put earlier, the concern is risk.  These are

11    content statute.  I run a risk.  If I teach it and it is wrong,

12    I can lose my license, and indeed that has been the testimony

13    on the depositions.

14          Number two, does it give one party complete control,

15    as you had indicated, of the process?  When it's vague, when,

16    as I shall show you, the Department of Education enforcement

17    mechanism says to a teacher, Look at the op-ed, look at the

18    op-ed to determine how you should conduct yourself, that's

19    about as vague an enforcement and lack of guidelines as you can

20    possibly imagine.  And, again, that's in this record, and I

21    shall get to it, although that's the part that has to be dealt

22    with separately.

23          And you asked, lastly, how does the system work?  The

24    system doesn't, because what works is what is said by the

25    administrator of that system.  If I can write an op-ed -- and

1   understand this op-ed is a little different from most.  It is

2   one that is in language relatively little, two pages, but on

3   the flip side there's a notation that attaches 72 pages of

4   photographs, documents and the like which are characterized in

5   that op-ed, Exhibit 40, are characterized as teachers going

6   beyond the pale.  When you have that, as I shall demonstrate,

7   in an actual case now pending, albeit *in camera* or wherever,

8   when you have that you have no guidelines, you have no system,

9   you have anarchy and dictatorship, and I apologize for saying

10  that.  I've lived through both.

11        When you can have someone say, *Stamped* is not a book I

12  like, and that means you cannot read it, you cannot have it in

13  a room, the teacher is prosecuted affirmatively for having had

14  books in a room, then you have a problem.  You don't have to

15  burn the book; you just ban the book.

16        So, having said that, your Honor, let me go, if I may,

17  to one last point on this.  You asked one last question:  What

18  is the intention of the bill in this regard?

19        My colleague, Mr. Goldman, gives me the following

20  quotation:  The bill is designed in part to ensure that the

21  minds of future generations of our state are not being unduly

22  influenced by advocacies for such toxins as critical race

23  theory, Senator Robert -- Bob Giuda, Statement of Facts number

24  70.

25        Now, with that said, your Honor, if I may go to the

1      overbreadth point, or should I wait?

2              THE COURT:  Yes.

3              MR. MOERDLER:  Your Honor ruled that Garcetti carved

4      out a whole exception in this area, saying the First Amendment

5      may not apply or be enforced in this area because, when you

6      take the king's shilling, you work for the king.  That's the

7      parent law.  But it doesn't say that everything you have that

8      comes from the king is a command that must be obeyed.  And

9      that's not what the courts say.

10             So, for example, following on Bremerton is the case of

11     Beathard against Lyons, 620 F. Supp. 3d 775, from the District

12     Court in Illinois.  It said as follows:  The replacement of a

13     Black Lives Matter poster with an All Lives Matter poster on an

14     office door is private speech and not covered by Garcetti.  It

15     is protected by the First Amendment, so that you have the

16     beginnings there.  And now let me, if I may, show you where

17     this case goes in the real world of the teacher.

18             THE COURT:  I don't want to get too far into

19     abstraction, but I am interested in your thinking about the

20     relationship between a First Amendment facial vagueness

21     challenge and a First Amendment overbreadth challenge, and I'll

22     tell you my view, and then you can explain to me, if yours

23     differs, why.

24             I find this area of law, as do most of the

25     commentators, if you read a constitutional law treatise, they

1    will say things like, Many courts treat the two as

2    interchangeable arguments, they're very difficult to untangle,

3    courts oftentimes don't talk about the differences between

4    them.  I do understand them to overlap in certain areas but to

5    be analytically distinct types of claims.  I draw some support

6    for that view from the Supreme Court's decision in <u>Holder</u>

7    <u>against Humanitarian Law Project</u>, a 2010 decision, where I

8    think the majority describes the relationship of a vagueness

9    and an overbreadth claim.  I'll just quote from a portion of it

10   for you and then explain my thinking so you can react to it:

11         The Court of Appeals contravened the rule that a

12   plaintiff who engages in some conduct that is clearly

13   proscribed cannot complain of the vagueness of the law as

14   applied to the conduct of others, citing to <u>Hoffman</u>, a case

15   we've all cited many times.  The rule makes no exception for

16   conduct in the form of speech.  Thus, even to the extent a

17   heightened vagueness standard applies, a plaintiff whose speech

18   is clearly proscribed cannot raise a successful vagueness claim

19   under the Due Process Clause of the Fifth Amendment for a lack

20   of notice, and he certainly cannot do so based on the speech of

21   others.  Such a plaintiff may have a valid overbreadth claim

22   under the First Amendment, but our precedents make clear that a

23   Fifth Amendment vagueness challenge does not turn on whether a

24   law applied to a substantial amount of protected expression.

25         In my mind, an overbreadth challenge does not require

1    vagueness.  You can have a successful overbreadth law challenge

2    to a statute that is not vague at all.  So, vagueness is not

3    required.  You can have overbreadth challenges that involve

4    statutes that are vague.

5         Another fundamental difference is, if you are being

6    prosecuted for violating a statute and it's agreed that you

7    violated the statute and the violation is one that is

8    Constitutionally permissible, overbreadth is a special

9    analytical method that the Court will entertain arguments that,

10   even though as applied to you, the person who is being

11   prosecuted, the statute is nevertheless invalid, because in a

12   substantial number of other applications it violates the First

13   Amendment.

14        So, I see overbreadth as being a very powerful

15   doctrine, but I'm not sure that in its application here it in

16   any way is distinguishable from what I consider the core claim

17   that both plaintiffs are really making, which is that this is

18   an overbroad statute, and it violates the First Amendment to

19   the extent it's overbroad in ways that could chill protected

20   speech, and it's overbroad in violation of the Due Process

21   Clause to the extent it doesn't give fair notice, allows for

22   arbitrary enforcement.

23        I don't see a distinct overbreadth claim in which

24   those claims fail but the overbreadth claim survives, because

25   this is not a case in which any of the named plaintiffs are

1    being charged with doing something that violates the statute.

2    So, they can bring a facial vagueness challenge, and it's not

3    necessary for them to bring an overbreadth challenge, and it

4    doesn't do any analytical work to bring a distinct argument

5    under an overbreadth theory.

6         I don't know if that's been clear enough for you, but

7    that's my sort of general thinking about it.  Your reaction?

8         MR. MOERDLER:  I would agree with you, but I would

9    take you to the next step, which is on this record, and it came

10   up in the course of the examination of the chief investigator

11   for the Department of Education.  He was asked a question:

12   What if a teacher was seen in the hallway wearing a Don't be a

13   Racist pin?  Now, in New York the courts have so far held the

14   attire that you may wear in the office, in school, may not

15   include pins.  It was because of that case, which I lost,

16   because of that case I focused on it here, because the

17   investigator said, Be careful; you don't know whether that pin

18   is going to be allowed to be worn.

19        When I read that, it brought it back as the

20   distinction of a separate area.  That person in New York would

21   have violated the New York code in terms of attire, and yet on

22   the speech side it's overbroad.  That was my point in trying to

23   say that on that issue you have that potential.

24        In this case you are 100 percent correct.  There is no

25   distinction here.  Whether you view this case as a First

1    Amendment case, unfortunately only in a narrow area, perhaps

2    larger, as you look at the overbreadth, and I will show you in

3    a moment it is really large, it is in that area that _Garcetti_

4    takes a backseat.  It's the area in which the teachers have a

5    concern.  Because let me, if I may, give you a quick series of

6    just the points that were made by the chief investigator, who

7    was, fortuitously, once a teacher --

8         THE COURT:  Can I just interrupt to make one other

9    quick point before it escapes me so that you understand my

10   thinking?  In saying that I don't think there is a meaningful

11   distinction between an overbreadth claim in this case and a

12   First Amendment facial vagueness claim in this case, that

13   argument -- that view of mine hinges on an earlier decision

14   that I have already made that the government doesn't agree

15   with, that you can maintain a facial vagueness claim even

16   though the statute is not vague in all applications.

17        And I will point out, Mr. Garland, there are now two

18   more Circuits, one a few days ago that agrees with my view on

19   this, it's now four to one, but, once you make that leap, as I

20   have done -- maybe the Circuit will disagree, but four Circuits

21   agree with me, one does not -- once you make that leap in the

22   context of this case there's no need to get into overbreadth as

23   a distinct claim, because the facial vagueness encompasses all

24   of the First Amendment concerns that we have in this particular

25   case, and someone is allowed to maintain that claim.

1              And I think of overbreadth as the unusual case where

2       someone has engaged in conduct that unquestionably is

3       sanctionable under the statute without violation of the First

4       Amendment, someone who is given a curricular guidance from the

5       district that, You shall teach X, and they say, I am not doing

6       it, I'm teaching Y, and they are subject to liability under

7       this provision, sanction under the Educator Code of Conduct,

8       they are allowed under an overbreadth rule to say, Strike it

9       down, because, even if it isn't unlawful as to me, it's

10      unlawful in a substantial number of other applications.  That's

11      where overbreadth gives you a special right, and I just don't

12      think it's necessary to get to in this case.

13             MR. MOERDLER:  Let me tell you why I do it, your

14      Honor.  The late Charles L. Brieant, former Chief Judge of the

15      United States District Court for the Southern District of New

16      York, and a close friend, was wont to say to me, Never, ever

17      assume that the Circuit goes along.  Put the argument on the

18      record.

19             THE COURT:  Wise advice.  Wise advice.  So, in any

20      event, just a last comment on that, and then we'll take our

21      break, okay?  Is there anything else you wanted to add on that

22      point?

23             MR. MOERDLER:  I just wanted to take you through a few

24      examples, because they make your point, but you need to have

25      them in, background in terms of this is this case.

1          THE COURT:  Let me do this:  I'm going to give my

2   reporter a break, and then I'll ask you to do that very briefly

3   in just a couple of minutes --

4          MR. MOERDLER:  I will do it very briefly, I promise.

5          THE COURT:  -- and then we'll turn to you,

6   Mr. Garland, and we will finish up.  Okay?  All right.  We'll

7   take a break.

8          THE COURT:  We'll take a break.

9          MR. MOERDLER:  I might add he referred to it as the

10  "circus," not the "circuit."

11         THE COURT:  I will not comment on that.

12          (Recess taken from 11:25 a.m. to 11:48 a.m.)

13         THE CLERK:  All rise for the Honorable Court.  Please

14  be seated.  This hearing is back in session.

15         THE COURT:  Okay.  Just take a couple of minutes, wrap

16  up, and then we'll hear from Mr. Garland.

17         MR. MOERDLER:  I will.  No more than a couple, I

18  promise.

19          Your Honor, let me just give you one point.  The

20  Court, the Supreme Court has made clear, quote, Vagueness leads

21  to overbreadth, and that you will find in the Coates case,

22  402 U.S. 611, and in Houston against Hill, 402 U.S. 451 and to

23  Judge Kennedy's dissent in Hill against Colorado, 530 U.S. --

24         THE COURT:  I was reading Hill over the weekend.  I

25  agree with that statement, but I don't think vagueness is

1     required for overbreadth.

2                MR. MOERDLER:  I agree with you.

3                THE COURT:  Okay.

4                MR. MOERDLER:  That was why my first question to

5     Farrell was about the pin, and his answer very simply was,

6     There are people who will argue that that is in violation of

7     the code.

8                Your Honor, I just want to go into some of these so

9     you can quickly see the flavor of this, and I promise you I

10    will not be long.

11               Mr. Farrell was asked if he was aware of any incident

12    where extracurricular activities were disrupted because a

13    teacher discussed a barred topic.  Answer:  No.  These are the

14    quick Garcetti questions that we put to him.  He was asked if

15    the teacher Code of Conduct applies outside of school property.

16    Answer:  Yes, depending, of course, on the conduct.  He was

17    asked:  What is the function of reporting up or reporting down

18    on violators?  He said:  The code requires you to report to the

19    next higher up and the higher ups to report as well, so that,

20    if they see somebody misbehaving or not reporting a violation,

21    they are themselves guilty of a violation.

22               THE COURT:  As I understand it, that works the same

23    way it does, and I'm more familiar, with the Code of

24    Professional Conduct, in which we, as lawyers, sometimes have

25    obligations to report violators of the Code of Professional

1    Conduct.  The teacher Code of Conduct works the same way.

2            MR. MOERDLER:  That's correct.

3            THE COURT:  So, not only the person who is actually

4    teaching the banned concept but the teacher who fails to report

5    the teaching of the banned concept can be in violation of the

6    code.

7            MR. MOERDLER:  I serve on the disciplinary committee,

8    so I know, but I will tell you it shows the breadth and the

9    reach of the problem and why for the teacher it's a risk issue.

10           And two more points.  Loss of license is a sanction,

11   again, Farrell's testimony.  And finally he said, Indeed, even

12   when teachers are off duty, the teacher is subject to the

13   educators' Code of Conduct, transcript 197 to 198.

14           Your Honor, I have two points, and then I'm done.

15           One is an example of where the breadth of this gets

16   out of sight and really does illustrate vagueness leads to

17   overbreadth.  There is in the packet of papers before the Court

18   an affidavit of a teacher by the name of Alison O'Brien.  She

19   was teaching a course in music and teaching the Harlem

20   Renaissance and taught by giving two videos of music,

21   commercially available videos.  Within moments a parent

22   complained to the Commissioner, the Commissioner signaled the

23   chief investigator, and he called the principal or

24   superintendent.  Within moments she was pulled out for the

25   first of three times, publicly out of the classroom, first to

1    report to the assistant principal, then to the principal, and

2    then to the superintendent at what she had done was so bad, and

3    in each instance they said, It's okay.  And then is the whole

4    point of this:  The chief investigator communicated through the

5    superintendent to that teacher, it's in that affidavit, that

6    declaration, Read the op-ed of April 22 of the Commissioner,

7    and it will provide you your guidance.

8              So, it isn't just FAQs, it isn't just opinions of the

9    Attorney General.  It's articles, op-eds, statements and quotes

10   by the Commissioner of Education, who can do it because the

11   statute is overbroad, who can do it because it's vague, and who

12   can enforce it because -- you asked a question, and here's the

13   answer:  Here are the teachers' affidavits, which show you how

14   they have had to change their scholastic programs.  Keefe,

15   English.  Changed the way that certain courses were taught.

16   Mejia, the plaintiff in one of the cases, no longer conducts

17   implicit bias classes and training.  Merrill, English, stopped

18   assigning articles about systemic racism and white privilege.

19   O'Brien, stopped assigning commercially available videos.

20   O'Mara, history, no more assignment of the book *Stamped* by

21   Kendi.  It was one of the books that was depicted in that

22   op-ed, which I'll just finish with in a second.  And

23   Philibotte, the Chief Equity Officer, no longer references

24   implicit bias and other concepts when conducting bias training.

25              This is the op-ed.  It's not very big, but attached to

1      it and part of it and keyed into it are 72 pages of thou shall

2      nots.

3              THE COURT:  I'm a little confused.  When you say

4      "attached to it," do you mean there is an electronic version of

5      the op-ed --

6              MR. MOERDLER:  Correct.

7              THE COURT:  -- that included hyperlinks to specific

8      materials you're talking about?

9              MR. MOERDLER:  Correct.  Yes.  72 pages of it.

10             THE COURT:  Okay.

11             MR. MOERDLER:  Your Honor, I have one last point,

12     which, at your convenience, I would like to do *in camera*, just

13     to be on the right side of the Protective Order, and that is a

14     specific case that I think teaches you, if you need it.

15             THE COURT:  Let's do that at the end so that we don't

16     have to clear the courtroom --

17             MR. MOERDLER:  I agree.

18             THE COURT:  -- and bring everybody back in.

19             MR. MOERDLER:  Fine.

20             THE COURT:  I'll give you a chance to do that right at

21     the end.

22             MR. MOERDLER:  And I thank the Court for its great

23     courtesy.  I much appreciate it.

24             THE COURT:  Thank you.

25             All right.  Mr. Garland, I heard a statement read to

1   me that teachers are subject to the Code of Conduct when off

2   duty.  Is that something you agree with?

3            MR. GARLAND:  You got me with the very first question,

4   your Honor, that I'm not --

5            THE COURT:  You heard what he just said.

6            MR. GARLAND:  I heard what he said.

7            THE COURT:  That was from an affidavit in --

8            MR. MOERDLER:  It was the deposition of Mr. Farrell,

9   the chief investigator.

10           THE COURT:  Okay.  Yeah.  And I just don't know -- I'm

11   catching you cold on that.  I don't want to throw you off your

12   stride, but that is interesting to me, because we are -- I know

13   you're going to be prepared for and I am going to be asking you

14   about how I should understand the limits of the prohibition on

15   teaching, instructing, inculcating, et cetera, and I was not

16   aware of that statement until it was read.  So, if you don't

17   have anything to say on it now, you can move on, but I am

18   interested in it.

19           MR. GARLAND:  I don't have anything to say right now.

20   I can understand your interest.  I'm happy to provide you --

21           THE COURT:  If I need clarification, I will ask for a

22   supplemental brief, but I will look at it in the record and

23   make what I will of it, and we can just move on.  But I don't

24   want to start questioning you before you say a word.  That was

25   just -- it just came up in his comments.

1          So, what do you want to say in support of your

2     position?

3          Let me ask one last question.  I think I have

4     understood you correctly that, in your view, nothing that has

5     been acquired during the discovery process should affect my

6     analysis in any way.  Do you agree with that?

7          MR. GARLAND:  I do, your Honor.  Yes.

8          THE COURT:  Okay.  And, since nothing that's been

9     learned in discovery should affect my analysis in any way,

10    you've also said, And the problem before you is a question of

11    law.  You agree with that?

12         MR. GARLAND:  I do, your Honor.

13         THE COURT:  Okay.  So, what you really are saying to

14    me is, to the extent you didn't rule in our favor on the Motion

15    to Dismiss, you should reconsider your ruling and now change

16    your mind and agree with us?

17         MR. GARLAND:  I would modify that slightly, and that's

18    only because, and I recall you mentioning this, your Honor, at

19    the February conference, that your order had lots of statements

20    in it that were couched with qualifiers like "plausible" and

21    things like that, and you identified some things that we hadn't

22    briefed, you identified some specific concerns you had that, as

23    I understood it, we were coming at a fairly high level of

24    generality, and you said, Well, wait a second, I've got X, Y

25    and Z concerns, and part of what we've tried to do in our

1    briefing is to identify why those concerns shouldn't result in

2    where you seemed to be leaning in your order.

3            THE COURT:  So, because we were at 12(b)(6), what is

4    the standard?  Plausibility.  Why would I use that language?

5    Because I try to use the standard of review that I'm supposed

6    to use.  But the analysis, absent some change, either a

7    correction of law or some additional evidence, would have led

8    to the conclusion on certain claims you prevailed.  I accepted

9    your view at least insofar as the right to dictate curriculum

10   is a right that the government has, and teachers don't have a

11   First Amendment right to teach contrary to curriculum

12   instruction, so you prevailed on that issue.  But on the

13   fundamental issues of vagueness, my order leads to the

14   conclusion that, unless what was plausible then is no longer

15   plausible now, that you lose on this particular issue.  You

16   understand that?

17           MR. GARLAND:  I do, your Honor.  And, if you'll

18   recall, I think at the February conference, too, we did resist

19   the notion that discovery was necessary.  We were prepared to

20   brief those issues then.  I think I -- I believe I was candid

21   on the record then, understanding what direction you were

22   leaning.

23           But we do think that, given the benefit of the ability

24   to refine our briefing on -- especially on the statutory

25   construction question, because that was largely absent from our

1    initial round of briefing, you identified some concerns as you

2    construed the statute, and we did try to take the opportunity

3    to explain why those concerns shouldn't lead you down the road

4    that I acknowledge you were going down in the earlier order.

5         THE COURT:  Yeah.  I just want to be clear I gave the

6    plaintiffs' arguments and your responses to them very careful

7    consideration.  Certain areas I agree I went into that the

8    parties had not explored with the same depth, and maybe now

9    there's an opportunity to, on reflection -- and one of my

10   purposes in doing that was to make sure everybody had a full

11   opportunity to point out any mistakes in the analysis, which is

12   what I'm understanding you're really trying to do now in a

13   respectful way, and I'm completely fine with that.  This is my

14   giving you an opportunity to tell me where I may have gone

15   wrong in my analysis.

16        I think you have adequately responded, I will reserve

17   judgment as to whether you're right, to the plaintiffs' use of

18   extrinsic evidence.  Unless you want to add something more to

19   that, I'll rely on what you've said now and on your briefs.

20        But I am interested in hearing anything you have to

21   tell me about why I didn't quite get it right the first time or

22   why, when I abandoned plausibility and simply rule, I should

23   rule differently than what I thought was plausible at the time.

24        MR. GARLAND:  Understood, your Honor.  I would just

25   like to make just a couple of points on the extrinsic evidence

1    that I think is reflected in our briefing, but to respond to

2    things I heard today.

3               THE COURT:  Go ahead.

4               MR. GARLAND:  The reason why, and I would dispute the

5    notion that there's a fairness concern around it that the Court

6    can consider things like an AG opinion or the FAQs, is because

7    that is part of the New Hampshire Supreme Court's statutory

8    constructional analysis, as I understand it, and our position

9    is that the Court really, when it's determining whether this

10   statute is vague, has to construe the statute, because it's a

11   state law, has to look at the rules of construction the New

12   Hampshire Supreme Court would use, and they don't have

13   authoritative weight, and you've identified that, and I don't

14   dispute it, but they are the sort of official guidance

15   documents that that court has looked at when construing a

16   statute, and in our mind that's very different from testimony

17   during a deposition, comments that are embedded in an op-ed or

18   something of those sorts or the sort of affirmative extrinsic

19   evidence, for lack of a better word, that the plaintiffs bring

20   in.

21              THE COURT:  Well, let me throw this at you and see

22   what your reaction is.  I'm inclined to agree with you that

23   with respect to -- when I am engaged in simply the task of

24   statutory construction I am not going to give significant

25   weight to what someone says.  To the extent New Hampshire says

1      give weight to an AG opinion, I'll, of course, do that, but

2      beyond that what legislators testify they think the statute

3      means or what the Commissioner thinks that he's not willing to

4      develop in terms of regulations that are put out for notice and

5      comment and are within the fair scope of implementing a statute

6      that may be under the New Hampshire version of Chevron should

7      be given some kind of deference, apart from that I'm not

8      inclined to attach weight when interpreting the statute.  But,

9      when trying to understand the way the statute applies gives

10     rise to the potential for arbitrariness and enforcement,

11     evidence about arbitrariness in the enforcer's viewpoint seem

12     to me to be entirely appropriate for consideration, and to the

13     extent there are deposition excerpts and inability or refusal

14     to provide any further guidance than what is in the actual text

15     of the statute does seem to be appropriate for consideration

16     when determining whether the statute, as I construe it, allows

17     for arbitrary enforcement by someone who is going to choose to

18     apply it here, not apply it there.  So, why isn't it relevant

19     at least for that purpose?

20              MR. GARLAND:  I don't find in the case law, your

21     Honor, anyplace where that is given dispositive weight.  It's

22     only ever given kind of confirmatory weight.  And so the

23     courts, even in the Carolina case that they've cited, and one

24     major distinction there is I think it's a class action where

25     you have class-based evidence and statistics, which is largely

1    absent here, and the court grappled with whether that's really

2    just a big as-applied challenge or a facial challenge, but

3    setting that distinction aside, even in the cases where courts

4    do consider it, courts start with looking at the text.

5          THE COURT:  I'm never going to give dispositive

6    weight.  I'm a totality of circumstances guy.  You learn one

7    thing when you do this job for a while that courts always want

8    to express things in terms of totality of relevant

9    circumstances, so I won't be doing that, I guarantee you.  I'm

10   just saying it may be relevant, not dispositive, to see

11   examples in which the people charged with enforcing are

12   expressing views about the statute which could support a claim

13   that, as construed, it permits arbitrariness and enforcement,

14   because that's one of the two principal concerns that you

15   address with the vagueness challenge.

16         MR. GARLAND:  Your Honor, my principal response to

17   that is I don't see that, as I read the cases, as something

18   courts are giving that sort of consideration to.  In a few of

19   the cases we've cited courts have actually rejected the notion

20   that, because people who are charged with enforcing it give

21   inconsistent statements that really is evidence of that.

22         THE COURT:  All right.  Let's turn from that and turn

23   to a second type of evidence that I see the plaintiffs

24   producing, and that is evidence about how behaviors are being

25   changed without enforcement actions ever having to be brought.

1     The case law on this is replete with references to when speech

2     regulations are vague one of the principal dangers is they can

3     chill protected speech because you impose a high enough

4     sanction to a vague speech regulation people will stay a mile

5     away from it so they don't end up getting killed.  You can go

6     back to the communist cases, the <u>Keyishian</u> case, and you'll see

7     it replete through case law.  It would seem that evidence that

8     in fact that's occurring here, to the extent there is evidence

9     of that fact, it would be relevant to the analysis.  Do you

10    disagree with that?

11          MR. GARLAND:  I do, your Honor, insofar as any of that

12    evidence would be evidence of ways that curricular choices are

13    being changed.  I don't think that the notion that people are

14    modifying their behavior in a realm where it isn't protected by

15    the First Amendment is evidence of vagueness at all.  We live

16    in a society that's largely governed by proscriptive statutes.

17    Every single day we have to make determinations whether we're

18    going to conduct ourselves in one way or another, Johnson

19    speaks of this, Williams speaks of this, and make judgment

20    calls, and where the concern really becomes one of

21    constitutional magnitude is if it is implicating First

22    Amendment protected conduct.

23          So, when we're talking about the core classroom

24    speech, and I know we have talk about extracurricular coming

25    up, I don't think that is evidence that shows anything with

1       respect to vagueness.  What I do think it might show is the

2       profound policy disagreements that exist around this statute.

3       I'm not disputing that, the idea that there are people of good

4       faith on both sides who have very strong disagreements about

5       what teachers should be doing in the context of curricular

6       speech, but that shouldn't inform whether the statute's vague.

7       I don't think that bears on that at all.

8              THE COURT:  All right.  Well, the last area I'd ask,

9       and then you can wrap up on this issue of what I can and cannot

10      consider, I noted at the outset that courts that find statutes

11      to be -- reject vagueness challenges speak critically about

12      hypotheticals, courts that find statutes vague often use

13      hypotheticals to address the potential vagueness.  I assume

14      you're in the camp of no hypotheticals should be allowed, I

15      shouldn't be allowed to ask you any.  Is that your position?

16             MR. GARLAND:  I wouldn't go so far as that, your

17      Honor.  I don't think that they ultimately control or really

18      persuasively inform the vagueness analysis.  As I read the

19      cases in I think the second camp you just identified, again,

20      it's really confirmatory.  It may well be a kind of artifact of

21      an attempted persuasive judicial writing, right?  There's

22      always attorneys who are trying to belt and suspenders their

23      positions, and I know judges very often will do that too.

24             I'm not in here saying, and I do want to make this

25      clear, that there is a case that clearly says in or out with

1   respect to hypotheticals with respect to extrinsic materials,

2   but if you look through both sides of the cases, and I think

3   the weight of authority is on our position on this, it is

4   always first a statutory construction, and then the remainder

5   of it, when courts do get into it, I think is largely

6   superfluous.  I don't see it as controlling the analysis.  I

7   don't really see it as putting a major thumb on the scales.

8           THE COURT:  I would say everything in moderation.

9   Hypotheticals are very important in trying to understand the

10   limits of a provision that is charged with being overly broad

11   or vague in its application.  So, I'm going to have a couple of

12   hypotheticals for you, whether you like it or not.  You can try

13   to answer them.  But what else did you want to say about the

14   scope of things I should and shouldn't consider?

15           MR. GARLAND:  Going back to one point, your Honor, I

16   was trying to make before with respect to the statements during

17   depositions, again, it's our position that you don't need to

18   look at any of that, that it's not relevant, but I would ask

19   the Court to consider, and you identified this I think when

20   Attorney Moerdler or Attorney Bissonnette was arguing, that the

21   one thing that all of those officials kept saying is context,

22   and I do think that's critical.  I don't think that's something

23   that could be swept aside, because it really is what will

24   inform whether any book, whether any subject falls --

25           THE COURT:  Certainly as someone who has to make

1    decisions about difficult things, context is always very

2    important, but that doesn't mean no answers can be given, no

3    guidance can be provided.  The statute might potentially

4    encompass anything, and we aren't going to tell you until and

5    unless we charge you with something.  That isn't consistent

6    with rule of law.  Rule of law requires a reasonable ability to

7    understand what you can do and can't do.  So, I'm not sure just

8    invoking the word "context" is sufficient if the statute in its

9    application doesn't provide sufficient guidance as to what is,

10    in fact, prohibited or not.

11          MR. GARLAND:  So, one kind of specific response to

12    that, and then I think it dovetails nicely with the more

13    general argument that I want to make with respect to the

14    language of the statute, I would ask that the Court, if it

15    hasn't already, and I think you may well have, take a close

16    look at the sort of questions that were being asked, because

17    you know that any deponent's going to be instructed, Don't

18    answer a question that isn't asked here, and the questions are

19    very specific, yes or no, can you teach it, can you not teach

20    it.

21          THE COURT:  Well, then, maybe I can ask you whether

22    something is covered or not, ask you, well, what context would

23    you like to know before you answer the question and then have

24    you answer the question, because that might help me in

25    understanding whether the plaintiffs' argument that the statute

1    potentially covers things that are subject to constitutional

2    protection or not, whether a concept is or is not banned,

3    whether a statement of a concept that is banned is unlawful

4    because it's teaching instruction.  To the extent you can

5    provide me your views as to those things, that might be

6    helpful, because I think that's where the problem is.

7          So, I get your point.  I'll be restrained in my

8    hypotheticals.  I understand the realities of deposition.

9    They're in a defensive crouch; they're not inclined to just

10   have an informative conversation.

11         But the problem remains how do we help teachers know

12   what they can and can't do?  I assume you're not trying to trap

13   people.  You want them to be able to clearly understand what

14   they can and can't do, and that's a legitimate interest that

15   you should share with the plaintiffs in this case.

16         MR. GARLAND:  For sure, your Honor, and we certainly

17   do, and I think that's where, if you look to the statutory

18   construction that we've articulated in our briefing, and I

19   think we've tried to address both of the potential areas of

20   vagueness that you've identified on the record today, the idea

21   of what does it mean to teach, to inculcate, the additional,

22   instruct, to compel, as embodying a question what does that

23   mean, and that's one question in this case, and then

24   ultimately, okay, what is prohibited under the statutes, under

25   the I(a), (b), (c), (d), is separate, and we've tried to break

1       it down in a way that allows for the Court to understand our

2       position on that.

3              We've largely turned to dictionary definitions with

4       respect to "teach," with respect to "instruct," with respect to

5       "inculcate" and "compel."  That's a common tool the New

6       Hampshire Supreme Court uses, and, when you look through the

7       dictionary definitions, they contemplate something that isn't

8       just the conveying information by inference or something along

9       those lines.  It's something more affirmative, it's something

10      more deliberate.

11             THE COURT:  Well, is the Socratic method a teaching

12      method?

13             MR. GARLAND:  For sure, your Honor, in the abstract.

14             THE COURT:  Are you teaching when you ask questions

15      using the Socratic method?

16             MR. GARLAND:  Yeah, I think you are, for sure.

17             THE COURT:  When you ask questions of your students

18      about white privilege, are you teaching it, even though you're

19      not taking a view about white privilege; you're trying to get

20      them to think about white privilege, what it means, is it real,

21      what is the extent of it?  If you ask questions, are you

22      teaching?

23             MR. GARLAND:  I think you are, your Honor, and I think

24      that falls within the definitions that we've identified, that,

25      still, it's some sort of affirmative and deliberate act

1      designed to convey information.  As I understood --

2            THE COURT:  So, let me try a hypothetical on you.  So,

3      suppose a high school teacher is teaching Thoreau's book

4      *Walden*, okay, a book near and dear to my heart, I grew up five

5      miles away from Walden Pond, and there's a famous statement

6      that Thoreau makes in that book:  It's never too late to give

7      up our prejudices.  Suppose a teacher writes that on the board,

8      and a student raises his hand and says, People can't give up

9      their prejudices; they're inherent.  What is the teacher

10     supposed to do in response to that to avoid losing their

11     teaching license?

12           MR. GARLAND:  I think a teacher may well have to

13     consider adding context or disclaimer to that sort of

14     statement, may have to identify that it is --

15           THE COURT:  That's wrong?  They have to affirmatively

16     tell the student, That's wrong; that isn't true?

17           MR. GARLAND:  I'm not saying that, your Honor.

18     Something more general in the sense of that's one particular

19     way of looking at it, and I think that's really where this

20     starts to, in my mind, blur the vagueness inquiry and the

21     policy inquiry.  A lot of people of very good faith profoundly

22     disagree that a teacher should have to do that.

23           THE COURT:  Nothing in my ruling -- I don't take any

24     position on whether any of the banned concepts are good or bad,

25     should be in the curriculum, should not be in the curriculum.

1       That's not my job.  I say it's the responsibility of the State.

2       I suggest that school boards are in a better position most

3       often to do that, in conjunction with public hearings and so

4       forth, but it's the State's responsibility, not mine, to

5       declare whether concepts are good.

6               So, I don't take any position on should there be,

7       should it allow, should it not be.  I'm concerned about the

8       vagueness of the statute and how teachers can lose their job,

9       lose their teaching license, potentially be subject to damages

10      for not responding to a comment from a student in a classroom

11      in the right way.  That's my concern.

12              What can you tell me about whether in that

13      hypothetical, what other context would you want to know that

14      could give a teacher guidance about how to respond to a student

15      that challenges Thoreau's statement that, It's never too late

16      to give up our prejudices?

17              MR. GARLAND:  I think the additional guidance that a

18      teacher would need can be found in the statutes, and I think

19      that goes down to Roman numeral I and the letter portions of

20      the statutes, which is, if the statement is coming back of the

21      kind you're describing, a teacher may well have to add a

22      caveat, may well have to add a disclaimer, not a rejection of

23      the notion, I don't think that's contemplated by the statutes,

24      but may well have to make clear how it fits within the larger

25      context of education.  I think the statutes provide sufficient

 1    guidance on this, and I do think this is where, when we're

 2    talking about cases, that I would posit around the margins the

 3    fact that a teacher has to make those judgment calls does not

 4    mean the statute is vague.

 5         THE COURT:  Could a teacher in a high school civics

 6    class assign to students -- and I'm picking up specifically on

 7    something from the plaintiffs' brief, where they were picking

 8    up on something I said in my opinion about the affirmative

 9    action case -- could a teacher assign and have a class

10    discussion about Justice Sotomayor's dissent in that case?

11         MR. GARLAND:  For sure, your Honor.

12         THE COURT:  And they could talk about affirmative

13    action and why reparations might be necessary, not just

14    diversity promotion?  They could talk about that, and that

15    wouldn't in any way endanger a teacher for teaching,

16    advocating, inculcating that one group should be preferred over

17    another?

18         MR. GARLAND:  No, I don't think it would run afoul of

19    it, because the statutes don't simply prohibit what you just

20    described, which is one group preferred over another.  They

21    prohibit the idea that --

22         THE COURT:  I don't know if the plaintiffs will agree

23    with you on that.

24         MR. GARLAND:  I doubt they will, your Honor.

25         THE COURT:  I don't think I'll agree with you on it

1    either.  I mean, I won't try to argue with you on it.  But I

2    think the banned concepts can be read to encompass that, that

3    one group should be -- it is wrong that one group should be

4    preferred over another based on their race, for example.

5          MR. GARLAND:  I don't agree with that, your Honor, but

6    the point that I -- the main point that I would make in

7    response to that focuses on the word "could" have that you just

8    used, because I do think a lot of what we're talking about and

9    part of the peril in hypotheticals is it is a question of

10   could, and it's a question of could in cases that are on the

11   margins, could this violate it.

12         You resisted the notion in the earlier argument, and I

13   remember it well, that you can rewrite the statute, and I'm not

14   advocating that you can, but what you can do, sitting in the

15   context of a federal judge looking at state law, is you can try

16   to divine what the Supreme Court, New Hampshire Supreme Court,

17   would do, again using its rules of construction, and one of its

18   rules of construction is construing language, if it is

19   susceptible of a reading that's broader that creates a

20   constitutional problem and susceptible to narrow

21   construction --

22         THE COURT:  I am very cautious about the doctrine of

23   constitutional avoidance.  I'm dealing with that in another

24   case right now in which Mr. Bissonnette is one of the litigants

25   involving the Zadvydas opinion, where Justice Breyer applied

1       the doctrine in a different context.

2              But I think the argument for a federal judge applying

3       the doctrine of constitutional avoidance to adopt a

4       construction of a New Hampshire statute is extremely

5       problematic, as a general rule, and I would be inclined,

6       frankly, rather than do that, to certify, because it would be

7       an assumption of power on my part that would be -- my job is I

8       would say is the statute constitutional or not?  If it's not

9       constitutional the way it's written, I'm done, it's

10      unconstitutional.  But to say, Well, it really is an important

11      constitutional principle, and it could be read that way, so I'm

12      going to avoid it, that should be up to the New Hampshire

13      Supreme Court, not to me, because I'm not the final interpreter

14      of New Hampshire law, as you know.

15             I also find the doctrine of constitutional avoidance

16      to be a very problematic concept that should be applied in only

17      very narrow circumstances, because it assumes -- it applies

18      judicial power to control over the legislative process that I

19      think courts should be very cautious about accepting.  We have

20      the power to say they're unconstitutional.  We don't have the

21      power to adopt -- we shouldn't ordinarily adopt reading A over

22      reading B because we think one reading might present

23      constitutional -- we're not sure, we are not saying it would,

24      but we think it might, and I would be using that as a

25      last-resort principle.  Certainly, I'd be cautious about

1    applying it to the state statutes.

2         MR. GARLAND:  Understood, your Honor, and we haven't

3    since our opening brief advocated certification here, but the

4    point -- the point I would make is there is a middle ground,

5    and it may well be certification, between -- sitting here

6    today, I can think of hypothetical ways that this language can

7    apply that would present constitutional problems, strike down

8    the statute or strike down an application of the statute

9    versus, well, the State's telling me there's a better way to

10   read it or a narrow way to read that saves the statute, and I

11   think it is that question, and I do think invalidating a

12   statute facially, state statute, presents many of the same,

13   I'll call them federalism concerns -- you didn't use that

14   word -- or comity concerns that would countenance making sure

15   we know how the New Hampshire Supreme Court would apply it.

16        I would say, too, the New Hampshire Supreme Court

17   applies its doctrine of constitutional avoidance, as I

18   understand it, a bit differently than I understand Federal

19   Courts do, and it may well be that, if it were presented with

20   competing readings of the statute.  Now, I'm not trying to

21   retreat from the notion that I think our reading based on the

22   definitions we've identified is the better reading and solves

23   the problem, but if there's a question there I do think that

24   that court would be the one that could provide some guidance

25   before kind of, root and stem, the whole statute falls.

1          THE COURT:  When you were last before me you agreed

2     that the amendments do not have a scienter standard.  Are you

3     backing away from that now?  Is that what you're doing?  I'm

4     trying to understand your position on that.

5          MR. GARLAND:  So, not backing away from that

6     statement, your Honor, and I tried to make clear in the

7     briefing that we're not backing away from it.  There isn't any

8     reference to knowing, to purposeful, even negligence or

9     something like that in the standard.

10         I do think, though, and this is really to some of the

11    initial points I was making something that was missing from our

12    initial briefing.  I don't think it's a difference from our

13    initial briefing.  We really didn't get into, because we didn't

14    understand that to be the main concern that the plaintiffs were

15    focused on, the kind of, the very close read of the language in

16    the statutes that we've now provided you, and so, I think when

17    you do that close read, sure, the word "knowing" is not in

18    there, the word "purposeful" is not in there.  I'm not backing

19    away from that.  I take that as it is, and how it fits into the

20    analysis is a matter that I know you've identified, but I do

21    think it contemplates and it fairly contemplates that you know

22    what you're doing.  You're not just tripping into a violation

23    of this statute but, rather, doing something affirmative,

24    something deliberate, and you're aware of what you're

25    conveying.

1          THE COURT:  So, you know, and I went into this in my

2     opinion, New Hampshire law requires teachers in Section 189 to

3     specifically teach -- and let me pull the actual language out

4     so we can talk about it.  189 requires teachers to teach, I'm

5     quoting now, how intolerance, bigotry, anti-Semitism, and

6     national, ethnic, racial or religious hatred and discrimination

7     have evolved in the past, which is not an issue here, can

8     evolve into genocide and mass violence, such as the Holocaust,

9     and how to prevent the evolution of such practices.  So, the

10    teachers, on the one hand, are required to talk about how

11    things can evolve in the future, and how does that not place

12    pressure on teachers to affirmatively teach, on the one hand,

13    while threatening them with loss of licensure on the other if

14    they stray, even unintentionally, into something that an

15    administrator later determines with context involves advocacy

16    of a banned concept?

17         MR. GARLAND:  I guess this is a place where I could

18    use a more specific example, because I think advocating

19    concepts like affirmative action, advocating concepts like --

20         THE COURT:  Well, how about the concept of structural

21    racism?  You understand what that term is understood to mean,

22    right?

23         MR. GARLAND:  Yes.

24         THE COURT:  Doesn't structural racism -- don't you,

25    engaging in discussions about structural racism, can they not

1    be discussions about how discrimination can evolve into

2    intolerance over time?

3        MR. GARLAND:  I would say they certainly can, your

4    Honor, but, as I understand the concept of structural racism,

5    it doesn't get into the sort of inherent

6    superiority/inferiority, inherent racism, sexism, et cetera,

7    that the statute contemplates.  That's something far narrower,

8    it's something biological, innate, not just simply something

9    that would be more cultural or learned behavior, and I think

10   that is reflected in the AG opinion, it's reflected in our

11   briefing, and that's the distinction.  You can certainly teach

12   about the concept.  I don't understand structural racism to say

13   person X is white and therefore was born racist, which I think

14   is where you would start to cross the line with the statute.

15       THE COURT:  And you would say teachers have no trouble

16   teaching implicit bias training in their classroom, implicit

17   bias, linking them to the famous website where you can engage

18   in questions and get an implicit bias score?  None of that

19   could in any way cross into the line of being impermissible, in

20   danger of violation of the statute?  Is that your view?

21       MR. GARLAND:  It may well, again, require a teacher to

22   identify what they're not providing the information to do, and

23   the teacher may well have to say, and this is, again, trying --

24       THE COURT:  What if a student says, The implicit bias

25   data tells us that we're inherently biased; we can't avoid our

1    discriminatory thinking?  That isn't my view of what the

2    implicit bias data suggests, but students are going to raise

3    those kinds of concerns.  Are you saying that, unless they give

4    what you call a disclaimer, they have to correct the student,

5    essentially; otherwise they will be in violation?

6              MR. GARLAND:  Well, I think it depends on how the

7    student raises it.  I think if a teacher were to provide

8    implicit bias training or to teach about implicit bias, and a

9    student were to run home and say, The teacher taught me that I

10   am inherently racist, I don't think that's a violation.  I

11   think that perhaps could result in a complaint, but that's the

12   sort of thing that would be weeded out based on the constraints

13   that are in the statute.  I think if a student, going back to

14   your initial hypothetical, were to bring it up to the teacher

15   in class, a teacher might have to consider how to contextualize

16   that statement.

17             But, again, I appreciate the fact that there are very

18   many people of good faith who do not think a teacher should

19   have to do that, but whether the statute provides sufficient

20   guidance to a teacher about how to do that, I think it does,

21   particularly when that sort of statement coming up in the

22   context of curricular speech would not, as I understand it,

23   impinge upon the First Amendment.

24             THE COURT:  You've had this on the books now for a

25   while.  Have you put in place any training from the Department

1     of Education for teachers about what they can and cannot do to

2     violate the statute?

3              MR. GARLAND:  I don't think there has been any -- I

4     know the record that you have had since the briefing happened

5     there was no training.  I don't believe there has been since.

6              THE COURT:  I think you will remember from my opinion

7     I understood the Commissioner and the Attorney General to take

8     the view that one can transgress the statute by implication.

9     Do you still stand by that position?  Do you think that that's

10    wrong?  And, if so, how do you respond to the analysis that I

11    provided of that?

12             MR. GARLAND:  I think the analysis you provided, your

13    Honor, and we've tried to address this in our briefing, too,

14    overstated or read too much into the word "imply" within the AG

15    opinion, because my recollection is of both your opinion and

16    our exchange at the last hearing was you were focused on that

17    statement within the AG opinion that's saying posting something

18    on the website and conveying on the website that this may be

19    beneficial to white people, or something along those lines,

20    could imply that they're inferior or in a way that would

21    violate the statute.  But that isn't what I understood the

22    general concern about implied violations to be, which is you

23    have no idea what you're doing, and you happen to make some

24    sort of offhand comment, and all of a sudden you are swooped up

25    into an enforcement action; but, rather, there's affirmative

1    deliberate acts there.  There is taking this information,

2    posting it on a website, and conveying out to the world that

3    this may be beneficial to white people because -- for whatever

4    reason, and then ultimately where that shakes out, what was the

5    purpose of putting it up there, what was the understanding when

6    it was posted on the website, or, if this were conveyed in a

7    classroom is -- as I read United States versus Williams, much

8    more within the realm of what Justice Scalia says there is the

9    sort of things courts or adjudicators have to deal with all the

10   time.  These are kind of the thoughts that are in people's

11   minds and the motivations for conduct, not what I understood

12   your concern to be, which is you can do something completely

13   accidentally and, based entirely upon how it's subjectively

14   taken --

15              THE COURT:  Right.

16              MR. GARLAND:  -- it could violate.

17              THE COURT:  Yeah, you don't say it directly, you don't

18   intend to say it, but someone later viewing your statement can

19   deem it to be in violation because it implies that a banned

20   concept is correct, and that seems to be what the AG is saying

21   there.

22              MR. GARLAND:  I disagree with that, your Honor.  I

23   think what the AG is saying there is taking -- affirmatively

24   putting this stuff on the website would be, and conveying the

25   statement, I can't remember it exactly --

1          THE COURT:  And he's not saying what the statement

2     itself is violates; they're saying it violates because it may

3     imply something.  That's the problem.  It suggests not only

4     what you actually say, but what implications can be drawn from

5     it can get you fired and lose your teaching license.  To the

6     extent that is what the statute potentially allows, it has

7     inherent vagueness problems.

8          MR. GARLAND:  So, what I think is not present in the

9     AG opinion, and where I would resist what you just said, is the

10    notion that *ipso facto* it is a violation of the statute.  I

11    think what would happen is, and you're well aware of this, I'm

12    sure, sitting in the position you're in, and we certainly are

13    in our office, is anyone can complain about anything at any

14    time, right, and whether it ultimately is a violation of a law

15    is part of the adjudicative process, and that's where arbitrary

16    or discriminatory enforcement --

17         THE COURT:  What do you say about, I don't know this

18    is true, this is what they're saying, that the Commissioner is

19    having communications with superintendents about things that

20    might be violations that never get to an adjudication; they're

21    just an informal communication from the Commissioner to a

22    superintendent that, Hey, you ought to be aware that this might

23    be a problem for you?  Isn't that completely divorced from this

24    kind of nuanced hearing process that you say I engage in?

25    Yeah, but I don't call people up who are potential litigants

1    and say, You know, you'd better not do that or you might end up

2    in trouble.  I adjudicate things.

3             Is the Commissioner doing what the plaintiffs say he's

4    doing?

5             MR. GARLAND:  So, I believe the plaintiffs have

6    identified in the record one example of that, and I guess I

7    have two responses, one specific direct response, and one more

8    general one.  The first direct response is that the

9    Commissioner isn't the adjudicator here, the Board of Education

10   is the adjudicator, and if you look within the State regs, the

11   Commissioner through his investigator can investigate whether

12   there's been a violation, but it still must go to the

13   adjudicator.  So, if the Commissioner thinks, right, wrong or

14   otherwise, something has happened and engages in an

15   investigation, that isn't a finding that there's been a

16   violation of the law that subjects somebody to a loss of their

17   licensure; there's still that process around it.

18            THE COURT:  Do you think that could potentially have a

19   chilling effect on a teacher if they get called into the

20   superintendent's office and told the Commissioner of Education

21   has raised a concern about something that you're doing in your

22   office, or a Department of Education investigator comes out to

23   the school and says, You know, we're just investigating this,

24   and we can't tell you whether it's a violation or not, but read

25   the op-ed?  I don't know if that's happening, but that's what

1    the plaintiffs suggest is happening.

2         MR. GARLAND:  The plaintiffs have, as I understand it,

3    identified one example of it happening or one example specific

4    to what you were just describing.  More generally, to the

5    extent the record's relevant, there haven't been widespread

6    investigations, there have been no Board of Education

7    enforcement actions, and so we really have one example.

8         THE COURT:  You seem to make something of the fact in

9    your brief that there have been no findings of violation and

10   few complaints under the -- what are you trying to make from

11   that?  What inference are you asking me to draw from that?

12        MR. GARLAND:  Well, I think, your Honor, as I read

13   your order, and as I've understood the plaintiffs' arguments

14   from the get-go, there was this concern that there would be a

15   widespread effect of teachers kind of facing potential loss of

16   their license in the face of a potentially vague law, and so I

17   guess the first point I'm making is I don't think you need to

18   consider that at all, because that's beyond the record that I

19   think you need to consider.

20        THE COURT:  You cite it, so I assume you think it

21   helps you, and I'm trying to figure out why you think it helps

22   you.

23        MR. GARLAND:  Because I think it pretty firmly

24   demonstrates a year and a half into this law, I guess, 2 1/2

25   years into this law being in effect that there isn't this

1    widespread threat of loss of licensure; it really isn't

2    happening.

3    THE COURT:  Well, I'm not sure that's an inference

4    that you can really draw.  There are several other inferences

5    one might draw, right?  You tell me why yours is a better one.

6    One inference might be the whole law is a solution in search of

7    a problem that doesn't exist, and so, since there were no

8    violations before, there aren't going to be any violations now.

9    That's certainly a plausible explanation, because no one has

10   produced evidence that this was a problem in New Hampshire

11   before the enactment of the statute.  I have not seen any

12   evidence that you've produced or anyone else has produced that

13   was, in fact, a real problem.  So, to the extent it's a

14   solution in search of a problem, that would explain why there

15   are few violations and not an argument that would be favorable

16   to your cause, because, to the extent there is no even core to

17   the statute that addresses a legitimate concern, the vagueness

18   problems of the statute are enhanced.

19   Another potential inference is because it's

20   accomplishing exactly what we want, which is chill as much

21   expression as we can; we don't need to enforce, we just need to

22   have the threat of enforcement.

23   A third explanation is we're all lying low until the

24   judge rules on the constitutionality of this statute.

25   Those are all possible explanations for the fact that

1    there are few, and the only one that's potentially helpful to

2    you, as I see it, is the one you're advocating, but those other

3    explanations are certainly at least plausible explanations as

4    well.  So, I'm not sure I can draw much one way or the other

5    from the absence of complaints.

6              MR. GARLAND:  I think that's fair, your Honor.  The

7    one way that I think all those inferences are, in fact, helpful

8    to us is that, if the Court is going to consider these

9    extrinsic materials, it's still in the context of a facial

10   claim, and I do have a hard time imagining, even with the

11   exacting standard you've identified, and even considering

12   extrinsic materials of this kind, that one example without any

13   additional explanation as to why there's only one example is

14   proof that this statute is facially unconstitutional.  And so,

15   I do think in that regard it certainly doesn't hurt us, but,

16   again, my principal argument on that is you don't need to worry

17   about it at all.

18             THE COURT:  I hear you.  Okay.  Let me ask you, you

19   alluded to this, you knew I was going to get into this one,

20   this curricular/extracurricular distinction, and I want to be

21   clear about this.  I drew on the existing body of case law to

22   conclude that, with respect to curricular speech, there is no

23   protected First Amendment right on the part of teachers or

24   students to demand a particular curriculum or the right to

25   teach their own curriculum contrary to the curriculum dictated

1    by the government.  In saying, though, drawing a distinction

2    between curricular and extracurricular, I am not suggesting

3    that there's a black-and-white end line between curricular and

4    extracurricular and _Garcetti_ only applies to curricular speech.

5    There is some, certainly in my view, some area beyond

6    curricular in which you are still doing what you are paid to

7    do, speaking the speech that you are paid to speak.  Okay?

8         So, I agree with you to that extent, but that doesn't

9    mean that this statute doesn't potentially reach beyond the

10   areas in which _Garcetti_ says the speech is entitled to no

11   constitutional value, and, given a statement like the one

12   quoted from the investigator that the Code of Conduct applies

13   when you're off duty, there's concern about the extent to which

14   the amendments apply when you're off duty.

15        Do you have a view about that particular issue?

16        MR. GARLAND:  So, with respect to the investigator's

17   statement, I may well have to take up your invitation, if it

18   comes to it, to address it separately, because that wasn't

19   something I had thought about in advance of today.  What I

20   would say, and I hope this is clear from our briefing, is with

21   respect to _Garcetti_ there may well be, and I'm not disputing

22   there may well be, some extracurricular speech, there certainly

23   is, that falls beyond the scope of what _Garcetti_ would apply

24   to.  But when making that determination --

25        THE COURT:  Right.  _Bremerton_ makes that clear.

1    Certainly, when you're doing prayer on school grounds, on the

2    football field right after the game, with your players gathered

3    around you, the Supreme Court didn't emphasize that fact, but

4    it is in the record below and not contradicted, that raises --

5    and the Court says that's not Garcetti unprotected speech,

6    that's protected speech, that suggests that there are many

7    things that teachers can do on school property while students

8    are around that is entitled to First Amendment protection.  You

9    would agree, wouldn't you?

10         MR. GARLAND:  I agree with that, your Honor, but what

11   I think Bremerton shows is that's not something that can be

12   done sitting here in the abstract on the record that we have,

13   that, if you look at the majority opinion in Bremerton, and I

14   believe it's the Ninth Circuit's majority opinion in the

15   underlying case, there are profoundly different views based on

16   the specific facts and contexts that existed there about

17   whether this was speech made pursuant to an official duty or

18   not.

19         THE COURT:  Right.  But when you have vagueness

20   problems, again, when you're imposing severe consequences like

21   loss of a -- you would agree with me, because the case law is

22   just so overwhelming, depriving people of employment,

23   particularly depriving teachers of employment who have

24   statutory protections and a due process property interest in

25   their jobs, taking away a license of somebody, those are very,

1    very serious consequences, can have very profound, chilling

2    effects.  So, I understand your point that it's sometimes

3    difficult to discern where the line of constitutional

4    protection is, but that's an argument that tends to reinforce

5    the vagueness problem rather than undermine it.

6            MR. GARLAND:  I don't think so, your Honor, because I

7    think it ultimately goes to the burden that the plaintiffs

8    would have -- what the plaintiffs have here with respect to a

9    facial claim, even if it is a facial claim subject to an

10   exacting standard.  I don't think you can say, well, there is

11   some category, we're not going to tell you exactly what that

12   is, we can't define it in the abstract, but there is some

13   category which none of us dispute that falls beyond Garcetti

14   and therefore takes the First Amendment and kind of overlay it

15   on the entire statute and the statute falls because of this

16   exacting standard.  I think what you need to have before you,

17   and I don't think this record reflects it, is what that speech

18   is, what that speech is that's beyond the scope of Garcetti

19   that there will be some First Amendment protection to, so that

20   we can actually do, once we get beyond there, a

21   Pickering-Connick balancing.  And, as I read the cases that

22   postdate Garcetti, including Bremerton, this isn't being done

23   in the abstract, it's not being done through facial challenges,

24   it's not being done whether they're overbreadth or they're

25   vagueness; it's being done on a case-by-case basis in the

1    context of an as-applied challenge where the record is

2    developed and the Court can say, I'm looking at this

3    nonexhaustive list of factors and these considerations, and

4    it's on this side of the line or that side of the line, a

5    question that I would posit is very close in some cases and may

6    well have been in <u>Bremerton</u> in light of the competing opinions.

7    So, that's really the point I'm trying to make with respect to

8    that.

9         THE COURT:  Look, I recognize trying to convince a

10   judge that he made a mistake is a challenging job, and you've

11   responded to my questions very well, and I appreciate that,

12   because it's a hard thing to do, to stand up and tell somebody

13   why you think they've got it wrong, and I'll give you a chance

14   to say anything else you want to say pretty much without

15   interruption, because you've addressed my questions, but I want

16   to then finish by talking about the severance argument that

17   you're presenting here.  So, before we get to that, is there

18   anything else you'd like to add or say to support your

19   position?

20        MR. GARLAND:  I don't think so, your Honor.  I think

21   the one other point that I would just like to make, it's in our

22   brief, is the concept of an as-applied challenge here.  We

23   don't think it exists.  We think it's really part and parcel --

24        THE COURT:  My own view, frankly, is that I resolved

25   that issue in my prior order.  These issues are -- these are

1    complicated questions, and the plaintiffs did try to assert

2    what I called an as-applied-to-teachers claim, which I say is

3    not an as-applied challenge, it's a facial challenge, because

4    they are not having a teacher come up in front of me and

5    identify, This is the behavior that I'm engaging in or want to

6    engage in, and I want you to tell me that it would be

7    unconstitutional to apply this statute to me.  I think some

8    courts have referred to that as a hybrid applied challenge.

9         And so, I get the point, but in terms of analysis I

10   analyze this -- they preserve their arguments for something

11   different -- I analyze this as a facial vagueness challenge,

12   which I believe they can maintain.  I believe they can maintain

13   it because the unlawful and all-application standard doesn't

14   govern here for the reasons I set forth in my prior order.

15        If I'm wrong about that and you appeal, as I expect

16   you will, and the Court of Appeals agrees, that will be the end

17   of the litigation, from my perspective, because there is no

18   as-applied challenge here the way I'm seeing it.

19        MR. GARLAND:  I think we're on the same page, your

20   Honor.  The only reason I bring it up and we tried to brief it

21   is, as you noted in your prior order, that we hadn't briefed it

22   earlier, and so I just wanted to make sure we were all on the

23   same page.

24        THE COURT:  Okay.  I concluded that it was not

25   appropriate as an as-applied challenge in that prior order.

1          MR. GARLAND:  So, shifting to severability, then, I

2     think we've made two different arguments, kind of depending on,

3     and I don't think they're inconsistent, but it depends on kind

4     of where the Court identifies, if it does identify, a problem

5     in the statute, and the first one is reflected in our opening

6     briefing, where we advocate striking 193:40, IV, and I want to

7     make very clear that I'm not advocating you do this, because I

8     don't think the statute is vague, but ultimately, if the Court

9     concludes it is, as I read your order and as I understand from

10    our exchange today, your big concern is the particularly

11    punitive repercussion of loss of licensure, and that is the

12    provision that triggers that.

13          THE COURT:  I think you may be underestimating what I

14    see as the problem here.  Certainly the sanction that is

15    involved focuses the mind about the problems associated with

16    vagueness.  To the extent that it intrudes into First Amendment

17    areas, the greater the sanction, the stronger the chilling

18    effect, the more obvious the violation, right?  So, that's

19    really important.  And with respect to even the due process

20    violation, the greater the sanction the more danger that is

21    attendant to allowing an overly vague statute to stand.  But

22    that doesn't mean that there are no concerns, when you restrict

23    teacher behavior, that could stray into First Amendment grounds

24    simply by eliminating the penalty.

25          More likely, I would be more receptive to the idea

1  that what I should do is strike 193:40 in its entirety and any

2  provision of 354-A that purports to subject teachers to

3  liability for advocating a banned concept, leaving other

4  portions of the statute alive.

5       So, do you want to respond to that as a response?

6       MR. GARLAND:  Yes, your Honor.  So, I think the case

7  law, particularly the U.S. Supreme Court case law, on this is

8  clear, that the Court should strike no more than is invalid,

9  and I do think -- I understand your point, but, as I view the

10 prism through which this claim is being analyzed, one of the

11 major thumbs on the scale for an exacting standard is 193:40,

12 IV.  We've made our Fred Fuller argument, and I'm not going to

13 repeat that argument here, but that's the basis for why it

14 really doesn't extend, the repercussions don't really extend

15 beyond 193, IV with respect to teachers.  So, the focus here is

16 on teachers, it's on the unique repercussions that teachers

17 face, and --

18      THE COURT:  Certainly there would be no basis for

19 striking 354-A:33, which nobody said anything that that affects

20 teachers in some adverse way.  Is anybody going to stand up and

21 argue that that should be stricken?  That's the no public

22 employee shall be subject to adverse employment action, warning

23 or discipline of any kind for refusing to participate in a

24 training.  That's a protection, to the extent it applies to

25 anybody, it isn't a restriction on anything a teacher can do,

1    so I wouldn't understand the plaintiffs, who are only teachers,

2    parents, students -- I wouldn't understand them to be seeking

3    that I strike that provision, and I wouldn't find any basis to

4    do it on this particular record.  I've had no argument.

5           I would understand an argument from the plaintiffs,

6    which I expect they will make, that 193:40 is so entangled with

7    354-A potential aider and abettor liability that you have to go

8    beyond 193:40 and also address 354-A to the extent it can

9    subject teachers, not employers, but teachers to liability,

10   because I think the concerns that public employers; that is,

11   one level of government interacting with another level of

12   government are much less problematic when they are done through

13   vague statutes, and I don't have any superintendent of schools

14   joining this litigation trying to say the State Department of

15   Education can't apply this vague statute to us.  We can leave

16   that for another day, if it should arise.

17          My concern is about teachers.  My concern is about how

18   people can be restricted in engaging in protected speech they

19   would otherwise feel free to engage in and not be chilled by a

20   vague statute.  My concern is that teachers not be subject to

21   punishment, loss of license, being fired based on an overly

22   vague statute.  That's my concern.  To the extent I can address

23   that by striking some portions of the statutes but not others,

24   I'm open to hearing that.

25          So, your starting point is just strike IV of 193:40.

1    If it's unconstitutional, that's all you need to do.

2         MR. GARLAND:  And the reason why that's our position,

3    your Honor, is twofold.  First, that gets rid of the specific

4    concerns you've identified with licensure being on the line.

5    That's the portion of it that authorizes it.  And so that, to

6    the extent there's a thumb on the scale of the vagueness

7    analysis because of that particular concern, that eliminates

8    it.

9         It's our position that the plaintiffs have failed just

10   as a matter of law with respect to their burden here to show

11   that this statue does, in fact, extend to speech that is beyond

12   the scope of Garcetti, and so I think that our pitch to you

13   here is, well, because they fail to do that, that First

14   Amendment thumb on the scales is no long there either.

15        To the extent the Court disagrees, and this gets kind

16   of into the second severability argument we've made in our

17   reply brief or our objection, and this goes more to the

18   remedies available under the Ayotte decision, I think the Court

19   can say, because of the severability clause here, it is invalid

20   insofar as it applies to teachers' extracurricular speech.  I

21   don't think that's rewriting the statute, and I think

22   ultimately what Ayotte says, when you're talking through the,

23   considering the concepts of --

24        THE COURT:  See, I don't draw that bright line that

25   you're talking about, curricular/extracurricular.  I think when

1   you get beyond curricular you start to have real concerns about

2   the vagueness of the scope of the statute.  So, you have

3   potential vagueness concerns as to what a banned concept means,

4   potential concerns about what it means to teach, instruct,

5   inculcate, et cetera, and potential concerns about the extent

6   to which it extends into behaviors by teachers that would be

7   protected First Amendment speech.  One thing, for example, and

8   this isn't hypothetical, this is true, back during the protests

9   following the George Floyd killing there were walkouts, and

10   teachers and students together marched in support of BLM, and

11   if there were discussions between teachers and students during

12   a march like that, it would arguably be teaching, and yet it

13   would clearly be entitled to constitutional protection of some

14   degree.

15          And so, that's where I start to see problems.  It's

16   not a bright-line curricular/extracurricular.  It is that it

17   isn't restricted to curricular speech and can extend to

18   anything that constitutes teaching, inculcating with a student.

19   I agree it doesn't apply to purely private conduct, but if a

20   teacher has a blog and they know the students are accessing the

21   blog, are they inculcating with their blog?  All those things

22   start to become real significant problems that aren't

23   hypothetical.  Teachers have blogs.  Teachers take positions on

24   things like BLM, and they've done it with students.

25          So, those are my concerns about the scope being too

1  broad.

2  MR. GARLAND:  And my reaction to that, your Honor, is,

3  setting aside my argument with respect to the merits that has a

4  First Amendment overlay, or if it's a separate First Amendment

5  claim, which I understand your view on it, and I do believe I

6  agree with that, what I understand Ayotte versus Planned

7  Parenthood to talk about is, when you have a statute that has

8  some scope, that reaches -- that would infringe upon the

9  constitutional right, the preference, based on considerations

10 of federalism, based on considerations of comity, is to

11 invalidate it only to the extent it's invalid.  I think the

12 Court can do that consistent with the --

13 THE COURT:  I think that is true when there's a

14 severance clause, as there is here, but not in ways that

15 distort the scope of the statute.  That is the concern I have,

16 is that judges can't change the meaning of statutes by picking

17 and choosing and striking out provisions of it.  That would be

18 a misuse of the judicial power, in my view.

19 MR. GARLAND:  And I think where we disagree is that it

20 would be ultimately rewriting the statute in some way to say

21 strike out IV and ultimately say it would be invalid insofar as

22 it reaches extracurricular speech based on the enhanced

23 vagueness concerns that you've identified with the First

24 Amendment overlay; and the two reasons for that are, first,

25 Ayotte versus Planned Parenthood, which I know you know, and I

1    don't want to belabor that, but also the severability clause

2    here doesn't just talk about provisions within the statute.

3    The Legislature was very clear that applications are also

4    something that should be kept out.  And here, because that

5    language is expressed in there, I have a hard time seeing how

6    the Legislature would have said you need to strike down all of

7    193:40 when -- I'm using "core" differently from how we've used

8    it in the vagueness --

9        THE COURT:  But if I only struck down 193:40 and those

10   portions of 354-A that dealt with teacher liability, the

11   prohibitions on programs and schools from teaching the banned

12   concepts would still be alive.  That would be consistent with

13   your view about how I should be cautious about severing.  It

14   still would be unlawful for a district to teach a banned

15   concept.  You just couldn't use the fact that teachers wouldn't

16   be subject to liability, they wouldn't be subject to discipline

17   for teaching it; it would be the responsibility of the school

18   district to make sure that it didn't happen, take whatever

19   steps that are required to do it.  If they start doing it in

20   ways that are unconstitutional, lawsuits might have to be

21   brought against them for doing it.  If the school district

22   thinks that it unconstitutionally restricts, they would

23   probably be better off bringing a lawsuit in state court to

24   adjudicate the relative responsibilities between school

25   districts and -- because the State usually speaks with one

1    voice, ultimately, on those issues.

2         So, that seems to me to be a measured response.  I get

3    your point I should be even more narrow, I shouldn't do

4    anything, but I can just strike that one sentence at the end of

5    193:40 and we're good to go, in your view.

6         MR. GARLAND:  And I would just point to our objection.

7    To the extent you have concerns when you get beyond curricular

8    speech, and I understand you're not drawing a bright line, but

9    where there are enhanced First Amendment concerns when you get

10   beyond the kind of core of Garcetti we've talked about here you

11   can issue an order that makes clear it's invalid with respect

12   to that application consistent with the severability clause.

13        We may not be saying very different things.  I think

14   it's just a question of what statutory language --

15        THE COURT:  Let me ask you one last question, and then

16   I'll turn to the plaintiffs for their response on severability.

17   In the very rare cases where I have found a state statute to be

18   unconstitutional, I have relied on case law where I have said

19   essentially, relying on this case law, I've declared this

20   statute to be unconstitutional in the following ways.  I assume

21   that I don't need to issue an injunction against the State,

22   because the State will comply with this order or seek to have

23   relief from it with the Court of Appeals or get the order

24   overturned in the Court of Appeals and I won't need to issue an

25   injunction as such.  Is that consistent with the State's

1   position, or would you require me to issue an injunction --

2   evaluate the applicability of the injunction standard, issue an

3   injunction and actually enjoin you from doing certain things?

4        MR. GARLAND:  I don't think you need to in this

5   context, your Honor.  I think a federal court order applying

6   the federal *Constitution* to say this portion of the statute or

7   these applications are invalid, subject to it being reversed on

8   appeal, I can't envision --

9        THE COURT:  That wouldn't bar you from seeking some

10  kind of order from the Court of Appeals to allow the statute to

11  continue to be implemented while it's on appeal.  I don't take

12  lightly the idea of enjoining the State from doing or not doing

13  things, and, as long as it's clear to me the State's going to

14  abide by my orders while they appeal, I don't think it's

15  necessary.

16       So, you can take a final view on that when the time

17  comes, if it comes, but I take your answer as you probably

18  don't think I will need to do that.  You'll respect the order,

19  appeal it, take whatever actions to undermine it you can, but

20  you'll bide by it until and unless you get a court to authorize

21  you to do otherwise.

22       MR. GARLAND:  So, I think it's more than probable that

23  that's the case, but I would propose doing it this way.  That's

24  not an issue I thought about coming in today.  No one really

25  briefed a question of an injunction.  I will take that back to

1    people who have the authority to be --

2         THE COURT:  Yeah.  Notify the Clerk if you're not in

3    agreement on that, and I'll set a briefing schedule and have

4    short five-page briefs and pick it up on the briefs without

5    further oral argument.

6         MR. GARLAND:  That's perfect.  That works for me.  I

7    have nothing further, your Honor.

8         THE COURT:  Thank you.  Who from the plaintiffs wants

9    to address severability?

10        MR. BISSONNETTE:  I'm happy to, your Honor.  I think

11   Attorney Moerdler might have follow-up.  I do need to use the

12   restroom, though.

13        THE COURT:  Okay.  I understand.  These marathon

14   hearings, you have to constantly think of that.  We are coming

15   to an end, we are going to end in a very few minutes, but I'm

16   going to just sit there.  Let's take a three-minute break for

17   anybody that needs to use the restroom.  We're going to finish

18   up very quickly, though, okay?

19        MR. BISSONNETTE:  I understand, your Honor.

20        MR. MOERDLER:  One quick footnote?

21        THE COURT:  Yes.

22        MR. MOERDLER:  I have some severe reservations with

23   respect to the severability.

24        THE COURT:  All right.  We'll hear both of you on it,

25   then, but very quickly, though.

1              MR. MOERDLER:  I can do that later.  That's no

2      problem.

3              THE COURT:  Okay.  Good.  All right.

4              (Recess taken from 1:00 p.m. to 1:03 p.m.)

5              THE COURT:  Let's reconvene.  All right.

6              So, Mr. Bissonnette, your response to what Mr. Garland

7      has said about severance and what I've said about severance.

8              MR. BISSONNETTE:  Sure.  So, I want to first start

9      with the severability argument raised by the State, which is

10     that you just kind of take out RSA 193:40, IV, and I don't

11     think that works for various reasons.  But I do want to say at

12     the outset here that the first question, of course, is what's

13     the violation of the statute, right?  That is going to

14     ultimately dictate what gets severed at the end of the day, if

15     anything can, in fact, be severed, absent wholesale striking of

16     the statute.

17             And I think, just to piggyback off of what Attorney

18     Garland is saying, I just want to be very clear that the

19     violations here exist far beyond any First Amendment-related

20     issues, right?  The concern here, the due process-related

21     concern here, à la vagueness, applies far beyond the

22     extracurricular speech that is protected under the First

23     Amendment that this Court found, right?  And that's because the

24     statute, even with respect to curricular speech, is incredibly

25     broad, and that's because, of course, the law can be violated

1    by implication, there's no *mens rea* requirement and, of course,

2    because of the severe penalties that exist even for curricular

3    speech that may not be protected under the First Amendment,

4    even though we've preserved that it is, but that is still an

5    independent violation, regardless of whether or not that type

6    of curricular instruction is protected under the First

7    Amendment.  So, I just wanted to be very clear.

8           Obviously, to the extent that any First Amendment

9    protected speech falls within the scope, that requires even

10   more heightened due process vagueness analysis, but we already

11   have that here, independent of the First Amendment, for all the

12   reasons that this Court flagged in its original order.

13          So, I just wanted to be very clear, because the

14   severability argument started kind of moving into, you know, is

15   it only limited to extracurricular speech.  I just want to be

16   very clear what our claim is about at the end of the day.

17          THE COURT:  I completely agree with you.  Where I

18   think I might disagree with you is the full extent of

19   severance, because my focus is on how this affects teachers.

20          MR. BISSONNETTE:  Yeah.

21          THE COURT:  Engage in a thought experiment with me.

22   Assume that the statutes had been enacted, the amendments were

23   enacted but they had no references to teachers at all, it was

24   purely programs, government agencies, the state government

25   telling local governments, Don't teach X in your schools, and,

1    if you do, we are going to make people who are aggrieved, give

2    them the right to sue you for damages.  The problems associated

3    with vagueness there are not nearly as severe, in my mind.  If

4    a school district then starts to fulfill its obligation by

5    threatening teachers, sanctioning teachers, then there would be

6    as-applied challenges that a teacher could make to any

7    potential discipline.  But one program -- one level of

8    government telling another level of government, Do this, don't

9    do that, are ordinarily not nearly as problematic as something

10   that addresses the freedoms of individuals.

11        MR. BISSONNETTE:  I still think it would be very

12   problematic.  But I first want to get to the license piece.

13   Even if you severed 193:40, IV, I actually think under the

14   Educator Code of Conduct there are still licensing

15   ramifications, so I just wanted to address that, even with that

16   severance.  And I can just point the Court to Exhibit 109,

17   which is the Code of Conduct, Sections 510.01(b)(1), Section

18   510.02(b)(1) -- sorry.  I just said that.  Sorry.

19   510.01(b)(1), 510.02(b)(1) and 510.03(b)(1).  And why those are

20   relevant is because, independent of 193:40, IV, those portions

21   of the Code of Conduct independently bootstrap any violation of

22   354-A, which would include the banned concepts law, even if you

23   struck 193:40, IV from the statute.  So, I just want to be very

24   clear.  You sever the statute, there are still licensing

25   ramifications, number one.

1          Number two, setting aside those licensing

2    ramifications, even if you were to leave teachers to the whim

3    of the HRC process and not the DOE disciplinary process, that

4    doesn't cure the infirmities of this law, because there are

5    still practical career ramifications for educators, right?

6    Setting aside that that's aider and abettor liability and they

7    still could be on the hook for administrative fines, which is

8    what the DOJ is seeking in that other case I referenced against

9    individuals, right, but if your district is brought in under a

10   claim made under 354-A alleging that the educator's conduct

11   violated the statute, that is still inevitably going to have

12   ramifications on your career.  It could very well mean internal

13   disciplinary ramifications, not with respect to licensure but

14   with respect to employment, which is the purview of local

15   school districts.

16          So, I think the notion that we can just get rid of

17   licensing and that cures the kind of penalty aspect of the

18   statute is really just incorrect, because, from a practical

19   reality perspective, it is the individual educator that is

20   still getting hauled through that process under 354-A, because

21   it is their instruction that is the subject of the complaint

22   and the ultimate adjudication.

23          THE COURT:  But if they're not subject to liability

24   for it, they may be a witness in the proceeding, but they're

25   not subject to liability.  We have a lot of experience, because

1      that's the way the employment discrimination laws work under

2      the federal system.  You're not subject to individual

3      liability.  You might be a witness, your employer might fire

4      you because you engaged in improper discrimination, but you

5      aren't exposed to personal liability.

6              MR. BISSONNETTE:  That's the key point, though.  I

7      want to just kind of lightly push back against that, your

8      Honor, because you might be a witness, sure.  You might still

9      also lose your job.  I mean, that is a real consequence of

10     this, even though that you may not be a direct party through

11     the 53, 54-A proceedings.  I just think that that is a very

12     real practical development here that we can't kind of detach

13     ourselves from.  That is a real issue that would confront an

14     educator going through the 354-A process.  And I just think

15     that really needs to be uplifted here and shows, again, that I

16     think we still have a law with vague provisions combined with

17     onerous penalties.  It may not be licensure, but it's still

18     being effectively hauled through a 354-A proceeding, maybe not

19     as a party, but as a witness, with the end result being that

20     your livelihood is still on the line; you can get fired at the

21     end of the day.

22              And I'll add one additional caveat, your Honor, that

23     you flagged.  Well, in a 354-A proceeding they may be a party

24     -- they may not be a party.  That is a problem as well, right,

25     one would think, because, if they're not a party to that

1   particular proceeding, are they going to have their own

2   counsel?  How are they going to be represented?  Is there

3   appropriate due process afforded to them at the end of the day?

4   And I think those are real questions and ones, as well, that

5   are raised in the information that's under seal in this case.

6           THE COURT:  So, you say strike the programmatic

7   language as well, not just -- so you have to start --

8           MR. BISSONNETTE:  Yeah.

9           THE COURT:  -- 193:40 in its entirety out.

10          MR. BISSONNETTE:  Absolutely.

11          THE COURT:  And you would say the 354-A provisions

12  that address the teaching or advocacy of a banned concept would

13  also go out, which would be the entirety of 354-A:31.

14          MR. BISSONNETTE:  And 32.

15          THE COURT:  And 32.  So, you would agree with me that

16  it wouldn't reach 33, right, because there's nothing you're

17  saying that --

18          MR. BISSONNETTE:  Yeah.  I think I'm inclined to

19  agree.  That's not something --

20          THE COURT:  If you, on reflection, disagree, you'll

21  notify the Court.

22          MR. BISSONNETTE:  I will.  I will, your Honor.  I

23  will, your Honor.

24          THE COURT:  Okay.  So, I get what you're saying.

25  Probably 354-A:34, to the extent it allows a remedy for

1      violating the antidiscrimination provisions of 354-A.

2              MR. BISSONNETTE:  This begs the question that what

3      you're doing still could end up being a rewrite, when you look

4      at the provisions of 354-A --

5              THE COURT:  The problem that's bothering me is,

6      whether I like it or not, I'm not taking any position on that,

7      it's not my province to do that, I do believe under the State

8      law that the Legislature has reserved certain power to give

9      instruction to school districts about what they can and cannot

10     teach.  I think my opinion suggests that a better way to do

11     that is to allow school boards to make decisions, but there's

12     no doubt that the State legislature has the power to do that,

13     and there's no First Amendment issue implicated in instructing

14     what can and can't be done in the curriculum because it's at

15     least my view that the politically accountable branches should

16     determine curriculum, not individual teachers.

17             And I've tried to draw what I think is an important

18     distinction between post-secondary education and primary and

19     secondary education.  Where I think academic freedom is

20     constitutionally protected with respect to state universities,

21     college, post-secondary instruction, I don't think it exists

22     with respect to primary and secondary instruction.

23             And so, I'm cautious about trying to interfere with

24     the State's effort to instruct lower governmental units what

25     they can and can't do, but I'm going to think about your

1    concern.  Your concern essentially is in the end of the day,

2    whether teachers can be disciplined under the code or can be

3    subject to damages, even if they aren't and they can't,

4    allowing this to be in place because of its vagueness will

5    inevitably cause lower school districts to overbroadly apply

6    it, and it will end up hurting teachers indirectly, because

7    school districts will come under pressure to apply this in the

8    arbitrary way that you think it could be applied and impose

9    restrictions, and then school districts will enforce those

10   against teachers in ways that will cause them the kind of harm

11   you're concerned about.

12          MR. BISSONNETTE:  There would still be a sanction,

13   maybe not as direct as licensure, but all kinds of other

14   direct, indirect --

15          THE COURT:  All right.  I'll have to think that one

16   through.  I haven't really focused on it.

17          MR. BISSONNETTE:  Yeah.  But, listen, with

18   severability, at the end the day, even if you were to take out

19   193:40, IV, it doesn't address the fact that the amendments

20   still lack a scienter requirement, it doesn't address the

21   infirmities in the text of the several banned concepts,

22   including the infirmities that the Court addressed in its prior

23   decision.  So, I think the notion that the licensing piece is

24   the only problem is just incorrect, including according to this

25   Court's prior analysis.  And, again, of course it is improper

1   through severance to rewrite a statute.  And I think the issues

2   with there not being a scienter requirement, the only way to

3   fix that is to rewrite the statute to impose a scienter

4   requirement that the Legislature clearly decided not to impose

5   in this particular piece of legislation, and we just don't

6   think that that's something that can be done.

7         So, that's my summary of severance.  I do have some

8   closing remarks.  Should I reserve those for a later period?

9         THE COURT:  We're getting done here.  So, I will say

10  your colleague wanted to say something on severance.  Let him

11  say it, and then you can wrap up, and we'll be done.  All

12  right.

13        MR. BISSONNETTE:  Thank you.

14        MR. MOERDLER:  Your Honor, I hate to be the gainsayer,

15  but I do have a problem.  I have it on several scores.  Let me

16  take the least concerning personally, but I think I have to, to

17  protect your Honor's record.  In Ayotte and in other cases we

18  have seen the courts make the point, the appellate courts, that

19  the legislative intent is a trump card.  The Legislature, when

20  you look at how this bill was passed in the first instance and

21  you look at subsequent attempts to change it, it is not of a

22  mind, at least the former Legislature, to do this piecemeal,

23  and so the question then you must add to your pile of woes is

24  are you now taking something that the Legislature wanted as

25  part of a whole and keep it as part of the whole?  I am less

1   concerned about the Legislature than anyone, but I think for

2   the record we need to know that the Legislature made it clear

3   in its deliberation it was going to be an all deal.  That was

4   the Committee discussion.  So, please bear that one in mind.

5          Now the more important one.  Teachers now are attuned

6   to the fact that there is risk.  They're not attuned to how

7   broad it is or what the penalties are fully, but they know

8   there's something here that's dangerous.  When virtually all of

9   them shy away from anything in the area, you know something is

10  wrong.  You also know it when you have private suits available

11  to you, that you can get sued from it.

12         And, lastly, hold that thought, if you will, until you

13  hear five minutes and no more of presentation which I want to

14  do so that I do not violate a code.

15         THE COURT:  All right.  We're going to do that.  We're

16  going to finish, close the courtroom, and I'll hear you on

17  that, and we'll end up then.

18         MR. MOERDLER:  All right.

19         THE COURT:  Good.  Thank you.

20         All right.  Mr. Bissonnette, any last remarks from you

21  before we deal with that process?  And then we'll hear anything

22  Mr. Garland wants to say; then we'll conclude the public

23  hearing, and I'll just address any *in camera* concerns that the

24  parties want to raise with me.

25         MR. BISSONNETTE:  Thank you, your Honor.  So, I'm just

1  getting my bearing here.  There's just a few kind of

2  housekeeping matters.

3       There's been discussion of op-eds in this case from

4  the Commissioner.  I just wanted to be clear there are two

5  op-eds, and I just wanted to kind of differentiate them.  Both

6  are incredibly important and I think critical to evaluate in

7  this case.

8       The first is the June 13th, 2021 op-ed, that's summary

9  judgment Exhibit 21; and the second is the April 15th, 2022

10  op-ed, and that's summary judgment Exhibit 40.  So, I know

11  we've been talking about op-eds.  I just wanted to be clear

12  that there's two of them in this case.

13       I want to just go to the interpretations that we heard

14  from Attorney Garland earlier, because I do think they're

15  important to kind of get in the weeds on, and I'm going to do

16  it incredibly briefly, because it is in our brief, but I just

17  think it's worth flagging.  I think kind of this effort to put

18  a knowledge requirement in through dictionary definitions just

19  doesn't work, and it doesn't work when you look at the very

20  definitions that the defendants are employing in this case.

21       So, their own cited dictionary definitions of "teach"

22  don't require that an educator has, quote, knowledge of what

23  information is being conveyed.  Rather, their own dictionary

24  definitions simply require that only the educator, quote,

25  provide knowledge.  So, just look carefully at their dictionary

1   definitions, because it doesn't create a mental state

2   requirement at all, even though I think they're kind of trying

3   to bootstrap it in.  What their definitions talk about is what

4   is knowledge being conveyed as a noun, not the mental state of

5   an educator when they're providing knowledge.  I think that

6   that may sound like an argument that only a lawyer can

7   appreciate, but I think it's incredibly important here when you

8   look at these definitions.

9            THE COURT:  I think they're doing the best they can

10   under difficult circumstances, because they recognize the

11   statute doesn't have any scienter associated with it, and so

12   they're trying to help me see that teaching, that those words

13   involve some volitional action, but I'm not sure that's

14   sufficient to say that you are knowingly advocating this

15   concept or that concept.  Those are different, and they exist

16   as requirements in the criminal law for very good reasons.  We

17   just don't have strict liability statutes.  Because the

18   consequences of a violation are so substantial, part of the

19   rule of law function is to impose some mental state requirement

20   for a criminal sanction, and this sanction is not criminal.

21   It's not so much as, like, removal from the United States when

22   you're a noncitizen who has entered illegally and is subject to

23   removal.  But short of that, it's about one of the most serious

24   sanctions that one can have, a loss of licensure, and that's a

25   loss of the ability to practice your livelihood.  It's about as

1    serious a sanction as you can impose short of a criminal

2    sanction, and that's why I think we have to be especially

3    careful about this.

4         MR. BISSONNETTE:  It's technical but vitally

5    important, given this Court's prior analysis, where it said the

6    lack of a scienter requirement was important in your thinking.

7    So, I did think that was important to uplift, but these new

8    dictionary definitions, we talk about extrinsic evidence, this

9    is the third piece of extrinsic evidence now that I think we've

10   received from the State concerning how to interpret or apply --

11        THE COURT:  They don't like your extrinsic evidence.

12        MR. BISSONNETTE:  Well, they don't like mine, but I

13   think this is really a third crack at the apple, and I think

14   all of this really demonstrates that this law is just a mess

15   from beginning to end and needs to be enjoined.  This

16   requirement, this knowing requirement, it's not in any of the

17   depositions, it's not really in any of the two prior iterations

18   of the guidance in this case, and I think, to me, that just

19   kind of tells us what we need to know, that this law is really

20   hopeless and needs to be enjoined.

21        And we can make one further point, which we will *in*

22   *camera*, about the current HRC docketed complaint.  The fact

23   that there is one docketed complaint is public; the context and

24   content of it is what's under a Protective Order in this case.

25        But you flagged as well, though, it's also

1     inconsistent, this knowing requirement, with the DOJ, Attorney

2     General opinion that says it could be violated by implication.

3     Listen, I know we could try to say that's not what he meant,

4     but that's what it says.  It's the Attorney General of the

5     State of New Hampshire trying to provide an example of what

6     could violate the statute.  Educators have to take that

7     seriously, superintendents have to take it seriously, and they

8     are.

9            And that gets to my second-to-last point, which is

10    what you raised at the outset, which is, well, you know, we've

11    seen a small number of complaints, according to the State.  I

12    just want to uplift what I think is really going on here in

13    this law.  The point of this law I don't really necessarily

14    think is to take a license away.  It's to use the threat of

15    loss of license and career ramifications to chill instruction

16    in schools by scaring them, and I think that is what is

17    happening; but I don't just think it, I know it, because that

18    is in the record in this case through the numerous declarations

19    that have been submitted by educators here.

20           And who loses at the end of the day in the face of all

21    of these ramifications and censorship of educators?  It's

22    students.  Students are the reason why teachers show up every

23    day, why they join the profession.  They're doing this work for

24    them.  Their instruction is chilled.  It's not just

25    instruction, it's not just the ability to link history to the

1   present day, which is how students learn.  They relate the past

2   to what's going on in their lives, their feelings, their views.

3   That is how you make education relatable.

4          It not only inhibits that type of instruction.  It

5   also inhibits statements that validate the lived experiences of

6   students, what they're thinking, what they're feeling, which

7   are critically important not just for every student but

8   students of color, trans students that suffer very high rates

9   of bullying and high incidents of depression and suicide, the

10   ability of an educator to say, You feel that way, I hear you,

11   I'm with you, you are not alone, and it is those types of

12   statements that have to be made clearly and unequivocally.

13          The Attorney General's Office says, Why don't you

14   caveat it to death or do a disclaimer?  That's not what these

15   students need.  They need to feel heard in the classroom, and

16   this law prevents that from happening.  Thank you.

17          THE COURT:  All right.  Thank you.

18          Mr. Garland, your final remarks before we do this *in*

19   *camera* session.

20          MR. GARLAND:  Very briefly, your Honor.  So, with

21   respect to the last point, I understand what Attorney

22   Bissonnette is saying.  It's throughout the briefs, it's

23   identified, and I think those points are all made in extremely

24   good faith.  There is no claim here on behalf of students.  The

25   plaintiffs had the opportunity to bring that claim.  It wasn't

1   amended.  And so, I do think that is starting to divorce what

2   is before this Court from kind of the claim that doesn't --

3          THE COURT:  Well, yeah.  Mr. Bissonnette makes a very

4   powerful point.  None of us are unmindful of that, not me, not

5   you, not him, but I want to make sure people understand the

6   difference, as I know you do, between what you do as a

7   policymaker, as a political person, as a citizen and what you

8   do as a judge.  I don't make decisions about the law based on

9   my personal policy preferences, what I would like the world to

10  be, what would be the most effective form of education, how we

11  can best reach students.  I have to address things in a

12  somewhat different way, and I know you all know that.  But I

13  certainly am not at all indifferent to or unmindful of the

14  problems that students face and how anything which leaves

15  teachers second-guessing themselves about whether they can

16  express empathy to their students, can try to understand their

17  students' predicaments is a real concern.  It's just my

18  analysis is this kind of constitutional analysis that I feel

19  I'm required to engage in.

20         I don't think we need to say more than that.  I

21  understand your views, Mr. Bissonette's views, all of that.

22         MR. GARLAND:  And so, really just two other points,

23  your Honor, and they're related.  I know there has been a

24  couple of references to the fact that we're trying to kind of

25  have our cake and eat it too with respect to what we think you

1   can consider versus what the plaintiffs think you can in terms

2   of extrinsic materials.  I reject that.  I think the things

3   that we're asking you to look at, including dictionary

4   definitions, are just core tools that courts use when they're

5   doing text-based analyses of statutes.  And so --

6           THE COURT:  They are extrinsic materials, but they're

7   the kinds of extrinsic materials that are used in statutory

8   interpretation.

9           MR. GARLAND:  That's my point, your Honor.  I know you

10   understand it.

11           And the last point I'd make is we think we've given

12   you a plausible reading of the statute based on our own

13   construction.  We think it is the better reading of the statute

14   based on our own construction.  I know from your past order and

15   your comments today you may not agree with that, but it's our

16   view that Federal Courts don't strike down statutes.  It really

17   only invalidates statutes or portions of statutes as a last

18   resort, and I don't think that it is necessary -- that the

19   statute is necessarily read in the way that creates the

20   concerns you've identified, creates the concerns the plaintiffs

21   identified, and that should inform your analysis for the

22   reasons in our briefing and what I've already said today.

23   Thank you.

24           THE COURT:  All right.  Thank you.

25           All right.  So, I want to just commend the parties.

1   Very helpful, very helpful arguments on all sides here.  I will

2   hear this matter *in camera* and otherwise take the matter under

3   advisement.

4        In a few instances I've identified for you, Here's

5   what I think you're saying.  If you, on reflection, take a

6   different view, you can notify the Clerk.  I don't want to

7   hear -- invite supplemental briefing.

8        I did allow plaintiffs' counsel to submit a list of

9   citations.  You can go ahead and do that through the Clerk,

10  make sure that opposing parties have a copy of it.  I

11  otherwise -- I don't want to delay to get supplemental briefs.

12  You've all been thinking about this for a year; I've been

13  thinking about it for a year.  I want to get working on it.

14       So, unless you are inclined to change a position or

15  feel that I've invited you to do something different to notify

16  the Clerk, I'm going to assume that I have the record in front

17  of me and I can make my decision, and I'm going to go about

18  making it.  If you should notify the Clerk about some issue,

19  I'll potentially hear you about why I should take additional

20  materials, but I'm ready to decide it, you're ready for me to

21  decide it.  I want to get it going.  So, don't come back and

22  ask to file something unless there's a real good reason.  Okay?

23  All right.

24       Yes.

25       MR. GARLAND:  Can I ask for one clarification on that,

1    your Honor?  Based on my notes, I think my homework is to let

2    you know, if you rule against us, whether a declaration would

3    be enough, or whether we're going to insist on an injunction.

4         THE COURT:  Yes.

5         MR. GARLAND:  And my understanding with respect to the

6    first question you asked me, which was about Investigator

7    Farrell's statement about the application of the Code of

8    Conduct --

9         THE COURT:  I don't think I invited you to make any

10   additional, but if you, on reflection, feel there is some

11   clarification that you could make that would be succinct and

12   submitted easily, you notify the Clerk that you want to do it,

13   and opposing counsel, and I'll make a decision about whether

14   I'll even allow you to do it.  I'm inclined to sort of take the

15   record as we've got it at this point, just because we've

16   already devoted so much time and effort to it.

17        MR. GARLAND:  Thank you.  Understood, your Honor.  I'm

18   not asking for the opportunity.  That was just the other point

19   I had in my notes.  Thank you.

20        THE COURT:  Okay.  Again, thank you, everybody.  That

21   concludes the public portion of the hearing.  I'd ask people

22   who are not here with a party -- if you are a party or employed

23   by a party and the lawyers want you to be able to be here, I

24   don't have any objection, but otherwise any member of the

25   public should exit now, because I need to seal the courtroom

1    for a brief proceeding.

2              MR. BISSONNETTE:  Your Honor, based on the record, I

3    believe under the Protective Order it is attorneys' eyes only.

4              THE COURT:  Oh, it is attorneys' eyes only?  Then, in

5    that case, just the attorneys.  Thank you.

6         (WHEREUPON, the proceedings adjourned at 1:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    knowledge, skill, ability and belief, a true and accurate

8    transcription of the within proceedings.

9

10

11

12

13   Date: ___6/2/24_____      /s/ Brenda K. Hancock
                                  Brenda K. Hancock, RMR, CRR
14                                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 109

Educator
Code of
Conduct



EXHIBIT 2

D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 2

New Hampshire
Code of Conduct
for
Educational
Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  Purpose.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d)  Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  Definitions.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

(1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

(2)  Meets at least one of the following qualifications:

a.  Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1) Pathway 4 certification as specified in Ed 505.04; or

(2) Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  Confidentiality of Credential Holder Certification Records.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1) The name of the credential holder;

(2) The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3) The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4) The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1) Informal or formal investigations; or

(2) Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1) A party in an adjudicatory proceeding when:

a. The credential holder is a party to the proceeding; and

b. The credential holder's credential record is relevant to the proceeding;

(2) A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3) A certifying agency of another jurisdiction for:

a. Purposes of credentialing the credential holder in the other jurisdiction; or

b. An investigation of the credential holder by the other jurisdiction, when:

1. The credential holder was the subject of a formal investigation under Ed 511; or

2. Disciplinary action was taken against the credential holder by the board under Ed 511;

(4) Board investigators or prosecutors; or

(5) Persons to whom the credential holder has given a release.

(d) The bureau shall report:

(1) Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

(2) Any reprimand to the credential holder's current superintendent of school in N.H.;

(e) The department shall maintain a list of all credential holders whose credentials has *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04 Emergency Authorization.

(a) The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b) The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

(1) Paid the applicable application fee, provided in Ed 508.06(c); and

(2) Filed with the bureau the information and documentation required in (c) and (e).

(c) An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

PL 00012

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13)  Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14)  Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15)  Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

   a.  American Indian;

   b.  Asian/Pacific;

   c.  African-American/Non-Hispanic;

   d.  White/Non-Hispanic;

   e.  Hispanic;

   f.  Multi-ethnic; and

   g.  Other/do not wish to specify.

(d)  If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e)  If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f)  An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a)  The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b)  If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

   (1)  Is in the process of certification;

   (2)  Has submitted a completed application for certification; and

(3) Has paid any applicable fees.

(c) An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01 Principle 1—Responsibility to the Education Profession and Educational Professionals.

(a) In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02 Principle 2—Responsibility to Students.

(a) In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

    a. Abuse, including, but not limited to physical and emotional abuse;

    b. Cruelty or any act of endangerment;

    c. Any sexual act with or from any student; and

    d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03   Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04   Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2)  Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)  Whether:

a. The communication made was covert in nature;

b. The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c. The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05   Duty to Report.

(a)  Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:-

(1)  When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2)  When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d)  If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e)  Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1)  His or her immediate supervisor, superintendent, or both; and

(2)  The department of health and human services, pursuant to RSA 169-C:29.

(f)  If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g)  The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01   Complaints, Cases and Investigations.

(a)  A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b)  After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c)  Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d)  Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

  (1) The department shall create a report which documents the results of the investigation;

  (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

    a. Suspension;

    b. Revocation; or

    c. Reprimand; and

  (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

  (4) The following shall be considered aggravating circumstances:

    a. The seriousness of the offense;

    b. The credential holder's prior disciplinary record;

    c. The credential holder's lack of willingness to cooperate with the department during an investigation;

    d. Potential harm to public health and safety; and

    e. The purpose of the rule violated;

  (5) The following shall be considered mitigating circumstances:

    a. Absence of a prior disciplinary record;

b. The credential holder's willingness to cooperate with the department during an investigation;

c. The credential holder's acknowledgment of his or her wrongdoing; and

e. The purpose of the rule or statute violated;

(6) The credential holder shall be notified in writing of any proposed discipline;

(7) If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k) Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2) If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a. A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b. A certifying agency of another jurisdiction for:

1. Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i) The credential holder was the subject of a formal investigation under Ed 5101; or

(ii) Disciplinary action was taken against the credential holder by the board pursuant to Ed 5101;

c. Other states' licensing board investigators or prosecutors; and

d. Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

(a) If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b) All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline. The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c) Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03 <u>Disciplinary Hearings</u>.

(a) If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1) Completion of an informal or formal investigation; and

(2) Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b) The provisions of Ed 200 shall apply to all disciplinary hearings and *such hearings* shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.04 <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

(a) When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b) The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c) In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 Grounds for Reinstatement After Suspension.

(a) A credential which has been suspended shall be reinstated for one of the following reasons:

(1) The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2) A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b) Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512 DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 Denial of Credential.

(a) A credential application shall be denied by the board based on the following grounds:

(1) Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b) An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision. If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

## APPENDIX I

| RULE | STATUTE |
|------|---------|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

**EXHIBIT 109**

Educator Code of Conduct



EXHIBIT 2

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 2

New Hampshire
Code of Conduct
for
Educational
Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  Purpose.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d) Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  Definitions.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

(1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

(2)  Meets at least one of the following qualifications:

a.  Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1)  Pathway 4 certification as specified in Ed 505.04; or

(2)  Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  Confidentiality of Credential Holder Certification Records.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1)  The name of the credential holder;

(2)  The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3)  The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4)  The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1)  Informal or formal investigations; or

(2)  Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1)  A party in an adjudicatory proceeding when:

a.  The credential holder is a party to the proceeding; and

b.  The credential holder's credential record is relevant to the proceeding;

(2) A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3) A certifying agency of another jurisdiction for:

    a. Purposes of credentialing the credential holder in the other jurisdiction; or

    b. An investigation of the credential holder by the other jurisdiction, when:

        1. The credential holder was the subject of a formal investigation under Ed 511; or

        2. Disciplinary action was taken against the credential holder by the board under Ed 511;

(4) Board investigators or prosecutors; or

(5) Persons to whom the credential holder has given a release.

(d) The bureau shall report:

    (1) Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

    (2) Any reprimand to the credential holder's current superintendent of school in N.H.;

(e) The department shall maintain a list of all credential holders whose credentials has *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04 Emergency Authorization.

(a) The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b) The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

    (1) Paid the applicable application fee, provided in Ed 508.06(c); and

    (2) Filed with the bureau the information and documentation required in (c) and (e).

(c) An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

PL 00012

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13)  Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14)  Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15)  Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a.  American Indian;

    b.  Asian/Pacific;

    c.  African-American/Non-Hispanic;

    d.  White/Non-Hispanic;

    e.  Hispanic;

    f.  Multi-ethnic; and

    g.  Other/do not wish to specify.

(d)  If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e)  If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f)  An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a)  The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b)  If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

    (1)  Is in the process of certification;

    (2)  Has submitted a completed application for certification; and

(3) Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01 Principle 1—Responsibility to the Education Profession and Educational Professionals.

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02   Principle 2—Responsibility to Students.

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

    a. Abuse, including, but not limited to physical and emotional abuse;

    b. Cruelty or any act of endangerment;

    c. Any sexual act with or from any student; and

    d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03    Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04   Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2)  Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)  Whether:

a. The communication made was covert in nature;

b. The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c. The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05  Duty to Report.

(a)  Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:

(1) When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2) When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d) If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e) Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1) His or her immediate supervisor, superintendent, or both; and

(2) The department of health and human services, pursuant to RSA 169-C:29.

(f) If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g) The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01   Complaints, Cases and Investigations.

(a) A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b) After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c) Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d) Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

    (1) The department shall create a report which documents the results of the investigation;

    (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

        a. Suspension;

        b. Revocation; or

        c. Reprimand; and

    (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

    (4) The following shall be considered aggravating circumstances:

        a. The seriousness of the offense;

        b. The credential holder's prior disciplinary record;

        c. The credential holder's lack of willingness to cooperate with the department during an investigation;

        d. Potential harm to public health and safety; and

        e. The purpose of the rule violated;

    (5) The following shall be considered mitigating circumstances:

        a. Absence of a prior disciplinary record;

b. The credential holder's willingness to cooperate with the department during an investigation;

c. The credential holder's acknowledgment of his or her wrongdoing; and

e. The purpose of the rule or statute violated;

(6) The credential holder shall be notified in writing of any proposed discipline;

(7) If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k) Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2) If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a. A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b. A certifying agency of another jurisdiction for:

1. Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i) The credential holder was the subject of a formal investigation under Ed 5101; or

(ii) Disciplinary action was taken against the credential holder by the board pursuant to Ed 5101;

c. Other states' licensing board investigators or prosecutors; and

d. Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 Reprimand, Suspension, or Revocation.

(a) If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b) All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline. The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c) Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03 Disciplinary Hearings.

(a) If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1) Completion of an informal or formal investigation; and

(2) Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b) The provisions of Ed 200 shall apply to all disciplinary hearings and *such hearings* shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.04 Status of a Credential Pending Completion of Disciplinary Proceeding.

(a) When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b) The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c) In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 Grounds for Reinstatement After Suspension.

(a) A credential which has been suspended shall be reinstated for one of the following reasons:

(1) The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2) A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b) Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512 DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 Denial of Credential.

(a) A credential application shall be denied by the board based on the following grounds:

(1) Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b) An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision. If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

## APPENDIX I

| RULE | STATUTE |
|------|---------|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |