# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

————————————

No. 24-1690

————————————

ANDRES MEJIA; CHRISTINA KIM PHILIBOTTE; NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE; LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO; JOCELYN MERRILL; KIMBERLY GREEN ELLIOT; RYAN RICHMAN; MEGHAN EVELYN DURDEN; JOHN DUBE,

Plaintiffs - Appellees,

v.

FRANK EDELBLUT, in their official capacity as Commissioner, New Hampshire Department of Education; JOHN M. FORMELLA, in their official capacity as New Hampshire Attorney General; AHNI MALA-CHI, in their official capacity as Executive Director, New Hampshire Commission for Human Rights; CHRISTIAN KIM, in their official capacity as Chairperson, New Hampshire Commission for Human Rights; KEN MERRIFIELD, in their official capacity as Commissioner, New Hampshire Department of Labor,

Defendants – Appellants.

————————————————————————

On Appeal from the United States District Court for the District of New Hampshire

————————————————————————

## APPENDIX TO THE BRIEF FOR DEFENDANTS – APPELLANTS

JOHN M. FORMELLA
NEW HAMPSHIRE
ATTORNEY GENERAL

and

ANTHONY J. GALDIERI
NEW HAMPSHIRE
SOLICITOR GENERAL

MARY A. TRIICK, No. 1213543
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H. 03301
(603) 271-0447

and

SAMUEL R.V. GARLAND, No. 1189913
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H. 03301
(603) 271-3650

# TABLE OF CONTENTS

USDC-NH Civil Docket ............................................................... 4

Notice of Appeal ..................................................................... 38

Mekia / Philibotte / NEA-NH Complaint and Exhibits ................. 43-588

AFT Complaint and Exhibits ...................................................... 589-642

Defendants' Motion to Dismiss Exhibits ............................................. 643

Plaintiffs' Motion to Dismiss Exhibits .................................................. 993

September 14th, 2022 Motion to Dismiss Hearing Transcript ........... 1079

February 15th, 2023 Status Conference Transcript............................ 1175

Plaintiffs' Statement of Undisputed Facts in Support of
Summary Judgement motion and public/redacted exhibits...... 1209-2610

Plaintiffs' Exhibit to Objection to Motion for Summary Judgment .. 2611

January 16th, 2024 Public Transcript of Summary Judgment
Motion Hearing .................................................................. 2666

Pls.' SJ Exhibit 109 – Educator Code of Conduct .............................. 2812

# U.S. District Court
## District of New Hampshire (Concord)
## CIVIL DOCKET FOR CASE #: 1:21-cv-01077-PB

Local 8027, AFT-New Hampshire, AFL-CIO et al v. NH
Department of Education, Commissioner et al
Assigned to: Judge Paul J. Barbadoro
Related Case: 1:21-cv-01063-JL
Case in other court: First Circuit Court of Appeals, #24-01690
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 12/20/2021
Date Terminated: 06/24/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**Andres Mejia**

represented by

**David A. Vicinanzo**
Nixon Peabody LLP
900 Elm St, 14th Flr
Manchester, NH 03101-2031
603 628-4000
Email: dvicinanzo@nixonpeabody.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris Erchull**
GLBTQ Legal Advocates & Defenders
(GLAD)
18 Tremont St, Ste 950
Boston, MA 02108
520-360-1846
Email: cerchull@glad.org
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY 10004
646 885-8331
Email: esykes@aclu.org
*ATTORNEY TO BE NOTICED*

**Henry Klementowicz**
American Civil Liberties Union of New
Hampshire
18 Low Ave
Concord, NH 03301
603 333-2201
Email: henry@aclu-nh.org
*ATTORNEY TO BE NOTICED*

**Jennifer A. Eber**
Disability Rights Center - NH
64 North Main Street

Suite 2, 3rd Floor
Concord, NH 03301
603-228-0432
Fax: 603-225-2077
Email: jennifere@drcnh.org
*ATTORNEY TO BE NOTICED*

**Kayla Jade Turner**
Disability Rights Center
64 N Main St, Ste 2
Concord, NH 03301-4913
603-410-5188
Email: kaylat@drcnh.org
*ATTORNEY TO BE NOTICED*

**Leah Watson**
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY 10004
404-717-3853
Email: lwatson@aclu.org
*ATTORNEY TO BE NOTICED*

**Morgan C. Nighan**
Nixon Peabody LLP
Exchange Place
53 State St
Boston, MA 02109-2835
617-345-1031
Fax: 855-451-6607
Email: mnighan@nixonpeabody.com
*ATTORNEY TO BE NOTICED*

**Pamela E. Phelan**
Disability Rights Center
64 N Main St, Ste 2
Concord, NH 03301-4913
603 228-0432
Email: pamelap@drcnh.org
*TERMINATED: 10/26/2022*

**Peter J. Perroni**
Peter J. Perroni, ESQ.
73 Princeton
Chelmsford, MA 01863
978-454-3800
Email: peter@nolanperroni.com
*ATTORNEY TO BE NOTICED*

**SangYeob Kim**
American Civil Liberties Union of New
Hampshire
18 Low Ave
Concord, NH 03301

603 224-5591
Fax: 603 617 7264
Email: SangYeob@aclu-nh.org
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY 10004
212-519-7882
Email: shinger@aclu.org
*ATTORNEY TO BE NOTICED*

**Sarah J. Jancarik**
Disability Rights Center
64 N Main St, Ste 2
Concord, NH 03301-4913
603-228-0432
Fax: 603-225-2077
Email: sarahj@drcnh.org
*TERMINATED: 10/26/2022*

**Suzanne Amy Spencer**
Nixon Peabody LLP
900 Elm St, 14th Flr
Manchester, NH 03101-2031
603-628-4000
Email: aspencer@nixonpeabody.com
*ATTORNEY TO BE NOTICED*

**William E. Christie**
Shaheen & Gordon
107 Storrs St
PO Box 2703
Concord, NH 03302-2703
603 225-7262
Email: wchristie@shaheengordon.com
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
American Civil Liberties Union of New
Hampshire
18 Low Ave
Concord, NH 03301
603 224-5591
Email: Gilles@aclu-nh.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christina Kim Philibotte**           represented by   **David A. Vicinanzo**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Chris Erchull**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry Klementowicz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer A. Eber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kayla Jade Turner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan C. Nighan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pamela E. Phelan**
(See above for address)
*TERMINATED: 10/26/2022*

**Peter J. Perroni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SangYeob Kim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah J. Jancarik**
(See above for address)
*TERMINATED: 10/26/2022*

**Suzanne Amy Spencer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William E. Christie**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**National Education Association-New Hampshire**     represented by     **Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esther Kane Dickinson**
NEA-New Hampshire
9 South Spring St
Concord, NH 03301
603-224-7751
Email: edickinson@nhnea.org
*TERMINATED: 02/28/2024*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Walta**
National Education Association
1201 16th St NW, 8th Flr
Washington, DC 20036
202-822-7035
Fax: 202-822-7033
Email: jwalta@nea.org
*ATTORNEY TO BE NOTICED*

**Lauren Snow Chadwick**
PO Box 713
New London, NH 03257
603-731-4296
Email: lchadwick@nhnea.org
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nathan Reed Fennessy**
Preti Flaherty Beliveau Pachios LLP
57 N Main St
PO Box 1318
Concord, NH 03302-1318
603 410-1528
Email: nfennessy@preti.com
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Rue Toland**
Preti Flaherty Beliveau Pachios LLP
57 N Main St
PO Box 1318
Concord, NH 03302-1318
603-410-1524
Fax: 603-410-1501
Email: rtoland@preti.com
*TERMINATED: 01/05/2023*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Suzanne Amy Spencer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Local 8027, AFT-New Hampshire, AFL-CIO**          represented by          **Harry Sandick**
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2723
Email: hsandick@pbwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000
Fax: 212-336-2222
Email: cmoerdler@pbwt.com
*ATTORNEY TO BE NOTICED*

**David Kahne**
Steptoe LLP
1114 Avenue of the Americas
Ste Floor 34
New York, NY 10036
212-506-3900
Email: dkahne@stroock.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
212-918-3000
Fax: 212-918-3100
Email: tina.milburn@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
Patterson Belknap Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000
Fax: 212-336-2222
Email: jgoldman@pbwt.com
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joceyln Merrill**                    represented by **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kimberly Green Elliot**                    represented by    **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ryan Richman**                    represented by   **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Meghan Evelyn Durden**                    represented by   **Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Dube**                    represented by   **Harry Sandick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter J. Perroni**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Moerdler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Kahne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Clarke Milburn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emerson J. Sykes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gilles R. Bissonnette**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joshua M. Goldman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leah Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Hinger**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**NH Department of Education, Commissioner**
*in his official capacity*
*other*
Frank Edelblut

represented by **Samuel R. V. Garland**
NH Attorney General's Office (Civil)
Civil Bureau
33 Capitol St
Concord, NH 03301-6397
603 271-3650
Email: samuel.rv.garland@doj.nh.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan W. Kenison-Marvin**
NH Attorney General's Office (DOJ)
Department of Justice
33 Capitol St
Concord, NH 03301
603-271-3650
Fax: 603-271-2110
Email: nathan.w.kenison-marvin@doj.nh.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**NH Attorney General**
*in his official capacity*
*other*
John M. Formella

represented by **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NH Commission for Human Rights,**
**Executive Director**
*in her official capacity*
*other*
Ahni Malachi

represented by **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NH Commission for Human Rights,**
**Chairperson**
*in his official capacity*
*other*
Christian Kim

represented by **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**NH Department of Labor, Commissioner**
*in his official capacity*
*other*
Ken Merrifield

represented by **Samuel R. V. Garland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Nathan W. Kenison-Marvin
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/20/2021 | 1 | NEW CASE/ COMPLAINT Filing fee $ 402, receipt number ANHDC-2197173 filed by National Education Association-New Hampshire, Christina Kim Philibotte, Andres Mejia. (Attachments: # 1 Exhibit 1 -- Text of Banned Concept Act, # 2 Exhibit 2 -- Educator Code of Conduct, # 3 Exhibit 3 -- LEACT Materials, # 4 Exhibit 4 -- DOJ Implicit Bias Training, # 5 Exhibit 5 -- Courts Implicit Bias Training, # 6 Exhibit 6 -- 9.22.20 Trump Executive Order, # 7 Exhibit 7 -- 9.28.20 Executive Order Enforcement Memo, # 8 Exhibit 8 -- HB544, # 9 Exhibit 9 -- Select HB544 Written Testimony Before House Committee, # 10 Exhibit 10 -- HB2 Materials, # 11 Exhibit 11 -- Rep. Itse Op-ed, # 12 Exhibit 12 -- Open Letter from Business Community, # 13 Exhibit 13 -- SAU70 Resolution Against HB544, # 14 Exhibit 14 -- Hopkinton School District Opposing HB544, # 15 Exhibit 15 -- Manchester School District Opposition to HB544, # 16 Exhibit 16 -- Edelblut Op-ed, # 17 Exhibit 17 -- GACDI Letters, # 18 Exhibit 18 -- 7.12.21 and 8.5.21 NEA-NH Letters, # 19 Exhibit 19 -- 7.21.21 Guidance, # 20 Exhibit 20 -- 9.7.21 Opinion, # 21 Exhibit 21 -- McLane Middleton Discussion of Banned Concepts Act, # 22 Exhibit 22 -- Drummond Woodsum Discussion of Banned Concepts Act, # 23 Exhibit 23 -- Department of Education Complaint Website, # 24 Exhibit 24 -- Moms for Liberty |

| | | |
|---|---|---|
| | | Bounty Tweet, # <u>25</u> Civil Cover Sheet, # <u>26</u> Summons - Waiver Summons (Edelblut), # <u>27</u> Summons - Waiver Summons (Formella), # <u>28</u> Summons - Waiver Summons (Malachi), # <u>29</u> Summons - Waiver Summons (Kim), # <u>30</u> Summons - Waiver Summons (Merrifield))(Bissonnette, Gilles) (Entered: 12/20/2021) |
| 12/20/2021 | <u>2</u> | NOTICE of Attorney Appearance by SangYeob Kim on behalf of Andres Mejia, Christina Kim Philibotte Attorney SangYeob Kim added to party Andres Mejia(pty:pla), Attorney SangYeob Kim added to party Christina Kim Philibotte(pty:pla).(Kim, SangYeob) (Entered: 12/20/2021) |
| 12/20/2021 | <u>3</u> | NOTICE of Attorney Appearance by Esther Kane Dickinson on behalf of National Education Association-New Hampshire Attorney Esther Kane Dickinson added to party National Education Association-New Hampshire(pty:pla).(Dickinson, Esther) (Entered: 12/20/2021) |
| 12/20/2021 | | Case assigned to Judge Paul J. Barbadoro. The case designation is: 1:21-cv-1077-PB. Please show this number with the judge designation on all future pleadings. (mc) (Entered: 12/20/2021) |
| 12/20/2021 | <u>4</u> | NOTICE of Attorney Appearance by Morgan C. Nighan on behalf of Andres Mejia, Christina Kim Philibotte Attorney Morgan C. Nighan added to party Andres Mejia(pty:pla), Attorney Morgan C. Nighan added to party Christina Kim Philibotte(pty:pla).(Nighan, Morgan) Modified on 12/20/2021 to remove: Appearance for National Education Association-New Hampshire (js). (Entered: 12/20/2021) |
| 12/20/2021 | <u>5</u> | NOTICE of Attorney Appearance by Nathan Reed Fennessy on behalf of National Education Association-New Hampshire Attorney Nathan Reed Fennessy added to party National Education Association-New Hampshire(pty:pla).(Fennessy, Nathan) (Entered: 12/20/2021) |
| 12/20/2021 | | NOTICE. This case has been designated for Electronic Case Filing. All further submissions shall be filed in compliance with the Administrative Procedures for Electronic Case Filing. Pro se litigants are not required to file electronically and may continue to file documents in paper format. Persons filing electronically are strongly encouraged to complete the interactive training modules available on the courts website. To access these modules, click <u>HERE</u>. (mc) (Entered: 12/20/2021) |
| 12/20/2021 | <u>6</u> | Summonses issued electronically as to NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. **NOTICE: Counsel shall print and serve the summonses <u>and</u> all attachments in accordance with Fed. R. Civ. P. 4.** (Attachments: # <u>1</u> Notice ECF)(mc) (Entered: 12/20/2021) |
| 12/20/2021 | | Corrective Entry to <u>4</u> Notice of Attorney Appearance by Morgan C. Nighan. Entry corrected by removing appearance with respect to the National Education Association-New Hampshire chosen mistakenly at filing. (js) (Entered: 12/20/2021) |
| 12/20/2021 | <u>7</u> | NOTICE of Attorney Appearance by Rue Toland on behalf of National Education Association-New Hampshire Attorney Rue Toland added to party National Education Association-New Hampshire(pty:pla).(Toland, Rue) (Entered: 12/20/2021) |
| 12/22/2021 | <u>8</u> | WAIVER OF SERVICE Returned Executed as to NH Department of Education, Commissioner by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |

| 12/22/2021 | 9 | WAIVER OF SERVICE Returned Executed as to NH Attorney General by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
|---|---|---|
| 12/22/2021 | 10 | WAIVER OF SERVICE Returned Executed as to NH Commission for Human Rights, Executive Director by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 11 | WAIVER OF SERVICE Returned Executed as to NH Commission for Human Rights, Chairperson by All Plaintiffs. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 12 | WAIVER OF SERVICE Returned Executed as to NH Department of Labor, Commissioner by National Education Association-New Hampshire, Christina Kim Philibotte, Andres Mejia. Served/Mailed on 12/20/2021. Answer Follow Up on 2/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 13 | NOTICE of Attorney Appearance by Chris Erchull on behalf of Andres Mejia, Christina Kim Philibotte Attorney Chris Erchull added to party Andres Mejia(pty:pla), Attorney Chris Erchull added to party Christina Kim Philibotte(pty:pla).(Erchull, Chris) (Entered: 12/22/2021) |
| 12/22/2021 | 14 | Assented to MOTION for Travis Hill to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198515.) filed by Andres Mejia, Christina Kim Philibotte.(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 15 | Assented to MOTION for Alice O'Brien to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198517.) filed by National Education Association-New Hampshire. (Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 16 | Assented to MOTION for Jason Walta to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198525.) filed by National Education Association-New Hampshire. (Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 17 | Assented to MOTION for Leah Watson to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2198526.) filed by Andres Mejia, Christina Kim Philibotte.(Bissonnette, Gilles) (Entered: 12/22/2021) |
| 12/22/2021 | 18 | NOTICE of Attorney Appearance by Henry Klementowicz on behalf of Andres Mejia, Christina Kim Philibotte Attorney Henry Klementowicz added to party Andres Mejia(pty:pla), Attorney Henry Klementowicz added to party Christina Kim Philibotte(pty:pla).(Klementowicz, Henry) (Entered: 12/22/2021) |
| 12/22/2021 | 19 | NOTICE of Attorney Appearance by William E. Christie on behalf of Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte Attorney William E. Christie added to party Andres Mejia(pty:pla), Attorney William E. Christie added to party National Education Association-New Hampshire(pty:pla), Attorney William E. Christie added to party Christina Kim Philibotte(pty:pla).(Christie, William) (Entered: 12/22/2021) |
| 12/23/2021 | 20 | NOTICE of Attorney Appearance by Suzanne Amy Spencer on behalf of Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte Attorney Suzanne Amy Spencer added to party Andres Mejia(pty:pla), Attorney Suzanne Amy Spencer added to party National Education Association-New Hampshire(pty:pla), |

| | | |
|---|---|---|
| | | Attorney Suzanne Amy Spencer added to party Christina Kim Philibotte(pty:pla). (Spencer, Suzanne) (Entered: 12/23/2021) |
| 12/28/2021 | | **ENDORSED ORDER granting 14 Motion Travis Hill to Appear Pro Hac ; granting 15 MOTION for Alice O'Brien to Appear Pro Hac Vice; granting 16 MOTION for Jason Walta to Appear Pro Hac Vice; granting 17 MOTION for Leah Watson to Appear Pro Hac Vice.** *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* **So Ordered by Judge Paul J. Barbadoro.** <br><br> **The clerks office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.**(vln) (Entered: 12/28/2021) |
| 12/29/2021 | 21 | NOTICE of Attorney Appearance by Sarah J. Jancarik on behalf of Andres Mejia, Christina Kim Philibotte Attorney Sarah J. Jancarik added to party Andres Mejia(pty:pla), Attorney Sarah J. Jancarik added to party Christina Kim Philibotte(pty:pla).(Jancarik, Sarah) (Entered: 12/29/2021) |
| 01/10/2022 | 22 | NOTICE of Attorney Appearance by Lauren Snow Chadwick on behalf of National Education Association-New Hampshire Attorney Lauren Snow Chadwick added to party National Education Association-New Hampshire(pty:pla).(Chadwick, Lauren) (Entered: 01/10/2022) |
| 01/12/2022 | 23 | Assented to MOTION for Sarah Hinger to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2204372.) filed by Andres Mejia, Christina Kim Philibotte. (Bissonnette, Gilles) (Entered: 01/12/2022) |
| 01/12/2022 | 24 | Assented to MOTION for Emerson Sykes to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2204382.) filed by Andres Mejia, Christina Kim Philibotte. (Bissonnette, Gilles) (Entered: 01/12/2022) |
| 01/12/2022 | | **ENDORSED ORDER granting 23 Motion for Sarah Hinger to Appear Pro Hac Vice; granting 24 Motion for Emerson Sykes to Appear Pro Hac Vice.** *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* **So Ordered by Judge Paul J. Barbadoro.** <br><br> **The clerks office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.**(vln) (Entered: 01/12/2022) |
| 02/18/2022 | 25 | Assented to MOTION to Consolidate Cases this case with 1:21-cv-01063-JL *(CONSOLIDATE INTO CASE NO. 1:21-CV-01077 AND TO CONDUCT A STATUS CONFERENCE DURING THE WEEK OF FEBRUARY 21, 2022 BEFORE ISSUANCE OF ANY FORM CONSOLIDATION ORDER)* filed by Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte.(Bissonnette, Gilles) (Entered: 02/18/2022) |
| 02/18/2022 | 26 | NOTICE of Attorney Appearance by Samuel R. V. Garland on behalf of NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH |

| | | |
|---|---|---|
| | | Department of Labor, Commissioner Attorney Samuel R. V. Garland added to party NH Attorney General(pty:dft), Attorney Samuel R. V. Garland added to party NH Commission for Human Rights, Chairperson(pty:dft), Attorney Samuel R. V. Garland added to party NH Commission for Human Rights, Executive Director(pty:dft), Attorney Samuel R. V. Garland added to party NH Department of Education, Commissioner(pty:dft), Attorney Samuel R. V. Garland added to party NH Department of Labor, Commissioner(pty:dft).(Garland, Samuel) (Entered: 02/18/2022) |
| 02/18/2022 | 27 | Assented to MOTION to Extend Time to Answer to March 14, 2022 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 02/18/2022) |
| 02/23/2022 | | NOTICE of Hearing re: 25 Assented to MOTION to Consolidate Cases this case with 1:21-cv-01063-JL. Status Conference set VIA VIDEO CONFERENCE for 2/28/2022 02:00 PM before Judge Paul J. Barbadoro.(js) (Entered: 02/23/2022) |
| 02/23/2022 | | **ENDORSED ORDER granting 27 Assented to MOTION to Extend Time to Answer to March 14, 2022.** *Text of Order: Motion to Extend Time to Answer is granted. For the reasons stated in the motion, the court finds good cause to extend the deadline for issuing the scheduling order pursuant to Fed. R. Civ. P. 16(b).* **So Ordered by Judge Paul J. Barbadoro.(js)** (Entered: 02/23/2022) |
| 02/23/2022 | 28 | NOTICE of Attorney Appearance by Jason Walta on behalf of National Education Association-New Hampshire Attorney Jason Walta added to party National Education Association-New Hampshire(pty:pla).(Walta, Jason) (Entered: 02/23/2022) |
| 02/25/2022 | 29 | Assented to MOTION to Continue (RESCHEDULE THE FEBRUARY 28, 2022 HEARING/STATUS CONFERENCE ON CONSOLIDATION) filed by Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte.Follow up on Objection on 3/11/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 02/25/2022) |
| 02/27/2022 | | **ENDORSED ORDER granting 29 Motion to Continue (RESCHEDULE THE FEBRUARY 28, 2022 HEARING/STATUS CONFERENCE ON CONSOLIDATION).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Status Conference set VIA VIDEO CONFERENCE for 3/8/2022 09:00 AM before Judge Paul J. Barbadoro.(js)** (Entered: 02/28/2022) |
| 03/08/2022 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. STATUS CONFERENCE held VIA VIDEO CONFERENCE on 3/8/2022. Court granted motion to consolidate 21-cv-1063-JL into this case. The clerk shall docket the complaint from Judge Laplante's case into this action. Case caption shall be updated to reflect the case caption from Judge Laplante's case. The parties shall meet and confer and file a proposed case management order within 14 days. (Court Reporter: Jan-Marie Glaze) (Pltfs Atty: Gilles R. Bissonnette, David A. Vicinanzo, Peter Perroni, Morgan C. Nighan, Chris Erchull, Esther Kane Dickinson, Jason Walta, Nathan Reed Fennessy, Emerson Sykes, Charles Moerdler, David J. Kahne) (Defts Atty: Samuel R. V. Garland)(Total Hearing Time: 45 minutes) (js) (Entered: 03/08/2022) |
| 03/08/2022 | 30 | COMPLAINT against NH Attorney General, NH Commission for Human Rights, Chairperson, NH Department of Education, Commissioner with Jury Demand filed by Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Kimberly Green Elliot, Ryan Richman, Meghan Evelyn Durden, John Dube. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Formella Summons, # 4 Kim Summons, # 5 Edelblut Summons) (js) (Entered: 03/08/2022) |

| | | |
|---|---|---|
| 03/08/2022 | | **ORAL ORDER granting 25 Assented to MOTION to Consolidate Cases this case with 1:21-cv-01063-JL (CONSOLIDATE INTO CASE NO. 1:21-CV-01077). 1:21-cv-01063-JL to be statistically closed. So Ordered by Judge Paul J. Barbadoro.(js)** (Entered: 03/15/2022) |
| 03/09/2022 | 31 | NOTICE of Attorney Appearance by Charles Moerdler on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Charles Moerdler added to party John Dube(pty:pla), Attorney Charles Moerdler added to party Meghan Evelyn Durden(pty:pla), Attorney Charles Moerdler added to party Kimberly Green Elliot(pty:pla), Attorney Charles Moerdler added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Charles Moerdler added to party Joceyln Merrill(pty:pla), Attorney Charles Moerdler added to party Ryan Richman(pty:pla). (Moerdler, Charles) (Entered: 03/09/2022) |
| 03/09/2022 | 32 | NOTICE of Attorney Appearance by David Kahne on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney David Kahne added to party John Dube(pty:pla), Attorney David Kahne added to party Meghan Evelyn Durden(pty:pla), Attorney David Kahne added to party Kimberly Green Elliot(pty:pla), Attorney David Kahne added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney David Kahne added to party Joceyln Merrill(pty:pla), Attorney David Kahne added to party Ryan Richman(pty:pla). (Kahne, David) (Entered: 03/09/2022) |
| 03/21/2022 | 33 | Joint Assented to MOTION for Entry of Case Management Order filed by Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte. Attorney Gilles R. Bissonnette added to party National Education Association-New Hampshire(pty:pla).(Bissonnette, Gilles) (Entered: 03/21/2022) |
| 03/21/2022 | 34 | NOTICE of Attorney Appearance by Pamela E. Phelan on behalf of Andres Mejia, Christina Kim Philibotte Attorney Pamela E. Phelan added to party Andres Mejia(pty:pla), Attorney Pamela E. Phelan added to party Christina Kim Philibotte(pty:pla).(Phelan, Pamela) (Entered: 03/21/2022) |
| 03/21/2022 | | **ENDORSED ORDER granting 33 Joint Assented to Motion for Entry of Case Management Order. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(js)** (Entered: 03/22/2022) |
| 03/25/2022 | 35 | Assented to MOTION to Exceed Page Limit filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 03/25/2022) |
| 03/25/2022 | 36 | MOTION to Dismiss for Failure to State a Claim filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.Follow up on Objection on 4/8/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Memorandum of Law, # 2 Exhibit HB 544 Docket, # 3 Exhibit HB 544 - As Introduced, # 4 Exhibit Amendment to HB 544, # 5 Exhibit HB 2 Docket, # 6 Exhibit Senate Finance Committee Minutes, # 7 Exhibit Amendment to HB 2, # 8 Exhibit Education FAQs, # 9 Exhibit Employer FAQs, # 10 Exhibit Attorney General Opinion)(Garland, Samuel) (Entered: 03/25/2022) |
| 03/25/2022 | 37 | MOTION to Dismiss for Failure to State a Claim filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of |

| | | |
|---|---|---|
| | | Labor, Commissioner.Follow up on Objection on 4/8/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Garland, Samuel) (Entered: 03/25/2022) |
| 03/28/2022 | | **ENDORSED ORDER granting <u>35</u> Assented to Motion to Exceed Page Limit. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 03/28/2022) |
| 03/29/2022 | <u>38</u> | MOTION for Elizabeth C. Milburn to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2231827.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman.Follow up on Objection on 4/12/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # <u>1</u> Exhibit (Affidavit))(Perroni, Peter) (Entered: 03/29/2022) |
| 03/29/2022 | | ACTION REQUIRED - NOTICE Nonconforming Document re <u>38</u> MOTION for Elizabeth C. Milburn to Appear Pro Hac Vice filed by Meghan Evelyn Durden, Kimberly Green Elliot, Joceyln Merrill, John Dube, Ryan Richman, Local 8027, AFT-New Hampshire, AFL-CIO.<br><br>The document fails to comply with LR 7.1- No statement of concurrence was included. File statement as addendum using the Other Documents/Addendum event and link filing(s) to document no. 38.<br><br>The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. **Compliance Deadline set for 3/30/2022.**(js) (Entered: 03/29/2022) |
| 03/29/2022 | <u>39</u> | Addendum/ to <u>38</u> MOTION for Elizabeth C. Milburn to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2231827.) *pursuant to L.R. 7.1* by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman. (Perroni, Peter) (Entered: 03/29/2022) |
| 03/31/2022 | | **ENDORSED ORDER granting <u>38</u> Motion for Elizabeth C. Milburn to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro.**<br><br>**The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.**(js) (Entered: 03/31/2022) |

| 04/04/2022 | <u>40</u> | NOTICE of Attorney Appearance by Sarah Hinger on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman Attorney Sarah Hinger added to party John Dube(pty:pla), Attorney Sarah Hinger added to party Meghan Evelyn Durden(pty:pla), Attorney Sarah Hinger added to party Kimberly Green Elliot(pty:pla), Attorney Sarah Hinger added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Sarah Hinger added to party Andres Mejia(pty:pla), Attorney Sarah Hinger added to party Joceyln Merrill(pty:pla), Attorney Sarah Hinger added to party National Education Association-New Hampshire(pty:pla), Attorney Sarah Hinger added to party Christina Kim Philibotte(pty:pla), Attorney Sarah Hinger added to party Ryan Richman(pty:pla). (Hinger, Sarah) (Entered: 04/04/2022) |
|---|---|---|
| 04/04/2022 | <u>41</u> | NOTICE of Attorney Appearance by Leah Watson on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman Attorney Leah Watson added to party John Dube(pty:pla), Attorney Leah Watson added to party Meghan Evelyn Durden(pty:pla), Attorney Leah Watson added to party Kimberly Green Elliot(pty:pla), Attorney Leah Watson added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Leah Watson added to party Andres Mejia(pty:pla), Attorney Leah Watson added to party Joceyln Merrill(pty:pla), Attorney Leah Watson added to party National Education Association-New Hampshire(pty:pla), Attorney Leah Watson added to party Christina Kim Philibotte(pty:pla), Attorney Leah Watson added to party Ryan Richman(pty:pla). (Watson, Leah) (Entered: 04/04/2022) |
| 04/04/2022 | <u>42</u> | NOTICE of Attorney Appearance by Elizabeth Clarke Milburn on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Elizabeth Clarke Milburn added to party John Dube(pty:pla), Attorney Elizabeth Clarke Milburn added to party Meghan Evelyn Durden(pty:pla), Attorney Elizabeth Clarke Milburn added to party Kimberly Green Elliot(pty:pla), Attorney Elizabeth Clarke Milburn added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Elizabeth Clarke Milburn added to party Joceyln Merrill(pty:pla), Attorney Elizabeth Clarke Milburn added to party Ryan Richman(pty:pla).(Milburn, Elizabeth) (Entered: 04/04/2022) |
| 04/18/2022 | | **ENDORSED ORDER.** *Text of Order: By May 16, 2022, the parties shall jointly file a Bates-stamped copy of the agreed-upon complete legislative history of the challenged state statute. All subsequent filings shall refer to the legislative history using the Bates-stamped version.* **So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 04/18/2022) |
| 05/16/2022 | <u>43</u> | THE PARTIES JOINT SUBMISSION OF LEGISLATIVE HISTORY by Andres Mejia, Christina Kim Philibotte (Attachments: # <u>1</u> Exhibit A -- Notice of Conventional Filing re HB544 Legislative History, # <u>2</u> Exhibit B -- Notice of Conventional Filing re HB2 Legislative History)(Bissonnette, Gilles) (Entered: 05/16/2022) |

| | | |
|---|---|---|
| 05/20/2022 | 44 | Assented to MOTION to Exceed Page Limit on Objections to Motion to Dismiss filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. Attorney Gilles R. Bissonnette added to party John Dube(pty:pla), Attorney Gilles R. Bissonnette added to party Meghan Evelyn Durden(pty:pla), Attorney Gilles R. Bissonnette added to party Kimberly Green Elliot(pty:pla), Attorney Gilles R. Bissonnette added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Gilles R. Bissonnette added to party Joceyln Merrill(pty:pla), Attorney Gilles R. Bissonnette added to party Ryan Richman(pty:pla). (Bissonnette, Gilles) (Entered: 05/20/2022) |
| 05/20/2022 | 45 | MEMORANDUM in Opposition re 37 MOTION to Dismiss for Failure to State a Claim , 44 Assented to MOTION to Exceed Page Limit on Objections to Motion to Dismiss , 36 MOTION to Dismiss for Failure to State a Claim *(Joint Opposition)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. Attorney Peter J. Perroni added to party Andres Mejia(pty:pla), Attorney Peter J. Perroni added to party National Education Association-New Hampshire(pty:pla), Attorney Peter J. Perroni added to party Christina Kim Philibotte(pty:pla). Follow up on Reply on 5/27/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit Exhibit A- No Left Turn Correspondence 2/7/22, # 2 Exhibit Exhibit B- Commissioner Edelblut Op-Ed 4/15/22)(Perroni, Peter) Modified on 5/23/2022 to add descriptions for exhibits as provided by counsel(js). (Entered: 05/20/2022) |
| 05/20/2022 | 46 | MEMORANDUM in Opposition re 36 MOTION to Dismiss for Failure to State a Claim , 37 MOTION to Dismiss for Failure to State a Claim , 44 Assented to MOTION to Exceed Page Limit on Objections to Motion to Dismiss filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill. Follow up on Reply on 5/27/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Perroni, Peter) (Entered: 05/20/2022) |
| 05/23/2022 | | **ENDORSED ORDER granting 44 Assented to Motion to Exceed Page Limit on Objections to Motion to Dismiss. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 05/23/2022) |
| 05/23/2022 | | NOTICE of ECF Filing Error re: 45 Memorandum in Opposition to Motion filed by Andres Mejia, Meghan Evelyn Durden, Kimberly Green Elliot, John Dube, Ryan Richman, Local 8027, AFT-New Hampshire, AFL-CIO, National Education Association-New Hampshire, Joceyln Merrill, Christina Kim Philibotte. No description of exhibit or attachment was included. Exhibit or attachment shall be followed by a short description of the document and shall not exceed five words. AP 2.5(a). See Properly Attach Exhibits to Pleadings in ECF. Please email description for exhibits to jennifer_sackos@nhd.uscourts.gov.(js) (Entered: 05/23/2022) |
| 06/10/2022 | 47 | Assented to MOTION to Extend Time to Reply and Surreply filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 06/10/2022) |

| 06/13/2022 | | **ENDORSED ORDER granting 47 Assented to Motion to Extend Time to Reply and Surreply.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. Follow up on Reply on 6/24/2022. Surreply due by 7/22/2022. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).** (js) (Entered: 06/13/2022) |
|---|---|---|
| 06/24/2022 | 48 | REPLY to Objection to Motion re 36 MOTION to Dismiss for Failure to State a Claim , 37 MOTION to Dismiss for Failure to State a Claim *(Reply to Joint Objection)* filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. Surreply due by 6/29/2022. (Garland, Samuel) (Entered: 06/24/2022) |
| 06/24/2022 | 49 | REPLY to Objection to Motion re 36 MOTION to Dismiss for Failure to State a Claim *(Reply to AFT Objection)* filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. Surreply due by 6/29/2022. (Garland, Samuel) (Entered: 06/24/2022) |
| 07/05/2022 | 50 | NOTICE of Attorney Appearance by Emerson J. Sykes on behalf of John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman Attorney Emerson J. Sykes added to party John Dube(pty:pla), Attorney Emerson J. Sykes added to party Meghan Evelyn Durden(pty:pla), Attorney Emerson J. Sykes added to party Kimberly Green Elliot(pty:pla), Attorney Emerson J. Sykes added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Emerson J. Sykes added to party Andres Mejia(pty:pla), Attorney Emerson J. Sykes added to party Joceyln Merrill(pty:pla), Attorney Emerson J. Sykes added to party National Education Association-New Hampshire(pty:pla), Attorney Emerson J. Sykes added to party Christina Kim Philibotte(pty:pla), Attorney Emerson J. Sykes added to party Ryan Richman(pty:pla). (Sykes, Emerson) (Entered: 07/05/2022) |
| 07/19/2022 | | NOTICE re: 36 MOTION to Dismiss for Failure to State a Claim, 37 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 9/14/2022 01:00 PM before Judge Paul J. Barbadoro.(js) (Entered: 07/19/2022) |
| 07/22/2022 | 51 | Assented to MOTION to Exceed Page Limit for Sur-replies Regarding Defendants' Motion to Dismiss filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Bissonnette, Gilles) (Entered: 07/22/2022) |
| 07/22/2022 | 52 | SURREPLY to Reply to 36 MOTION to Dismiss for Failure to State a Claim , 37 MOTION to Dismiss for Failure to State a Claim *(AFT Plaintiffs)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill. (Perroni, Peter) (Entered: 07/22/2022) |
| 07/22/2022 | 53 | SURREPLY to Reply to 35 Assented to MOTION to Exceed Page Limit , 36 MOTION to Dismiss for Failure to State a Claim *(All Plaintiffs Joint Surreply)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Perroni, Peter) (Entered: 07/22/2022) |
| 07/25/2022 | | **ENDORSED ORDER granting 51 Assented to Motion to Exceed Page Limit for Sur-replies Regarding Defendants' Motion to Dismiss.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 07/25/2022) |

| | | |
|---|---|---|
| 08/23/2022 | 54 | NOTICE of Supplemental Authority by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Supplemental Authority)(Perroni, Peter) (Entered: 08/23/2022) |
| 09/14/2022 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. MOTION HEARING held on 9/14/2022 re 36 MOTION to Dismiss for Failure to State a Claim, 37 MOTION to Dismiss for Failure to State a Claim. Order to issue. (Court Reporter: Brenda Hancock) (Pltfs Atty: Charles Moerdler, Gilles R. Bissonnette, Peter J. Perroni, Elizabeth Clarke Milburn, David Kahne)(Total Hearing Time: 2 hours 30 minutes) (js) (Entered: 09/14/2022) |
| 10/18/2022 | 55 | TRANSCRIPT of Proceedings for Motion Hearing held on September 14, 2022. Court Reporter: Brenda K. Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 11/8/2022. Redacted Transcript Follow Up 11/18/2022. Release of Transcript Restriction set for 1/13/2023.(js) (Entered: 10/18/2022) |
| 10/26/2022 | 56 | NOTICE of Attorney Withdrawal by Pamela E. Phelan on behalf of Andres Mejia, Christina Kim Philibotte(Phelan, Pamela) (Entered: 10/26/2022) |
| 10/26/2022 | 57 | NOTICE of Attorney Appearance by Jennifer Aimee Eber on behalf of Andres Mejia, Christina Kim Philibotte Attorney Jennifer Aimee Eber added to party Andres Mejia(pty:pla), Attorney Jennifer Aimee Eber added to party Christina Kim Philibotte(pty:pla).(Eber, Jennifer) (Entered: 10/26/2022) |
| 10/26/2022 | 58 | NOTICE of Attorney Withdrawal by Sarah J. Jancarik on behalf of Andres Mejia, Christina Kim Philibotte(Jancarik, Sarah) (Entered: 10/26/2022) |
| 11/08/2022 | 59 | NOTICE of Supplemental Authority by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. (Attachments: # 1 Exhibit Frese v. Formella Opinion)(Garland, Samuel) (Entered: 11/08/2022) |
| 11/09/2022 | 60 | RESPONSE re 59 Notice (Other), *of Supplemental Authority* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Bissonnette, Gilles) (Entered: 11/09/2022) |
| 11/18/2022 | 61 | NOTICE of Supplemental Authority (Second) by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Pernell Order)(Bissonnette, Gilles) (Entered: 11/18/2022) |

| 01/05/2023 | 62 | NOTICE of Attorney Withdrawal by Rue Toland on behalf of National Education Association-New Hampshire(Toland, Rue) (Entered: 01/05/2023) |
|---|---|---|
| 01/12/2023 | 63 | ///**MEMORANDUM & ORDER granting in part and denying in part 36 Motion to Dismiss for Failure to State a Claim; denying 37 Motion to Dismiss for Failure to State a Claim. So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 01/12/2023) |
| 01/13/2023 | | NOTICE OF PRETRIAL CONFERENCE. Pretrial Conference set VIA VIDEO CONFERENCE for 2/15/2023 04:00 PM before Judge Paul J. Barbadoro. Follow up on Discovery Plan 2/8/2023. (js) (Entered: 01/13/2023) |
| 01/26/2023 | 64 | Assented to MOTION to Extend Time to Answer to February 9, 2023 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 01/26/2023) |
| 01/27/2023 | | **ENDORSED ORDER granting 64 Assented to MOTION to Extend Time to Answer to February 9, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 01/27/2023) |
| 02/09/2023 | 65 | Assented to MOTION to Extend Time to File a Discovery Plan to Monday, February 13, 2023 filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 02/09/2023) |
| 02/09/2023 | | **ENDORSED ORDER granting 65 Assented to Motion to Extend Time to File a Discovery Plan to Monday, February 13, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 02/09/2023) |
| 02/09/2023 | 66 | Assented to MOTION to Extend Time to Answer to February 14, 2023 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 02/09/2023) |
| 02/13/2023 | | **ENDORSED ORDER granting 66 Assented to MOTION to Extend Time to Answer to February 14, 2023. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. (js)** (Entered: 02/13/2023) |
| 02/13/2023 | 67 | Proposed Discovery Plan *(Joint)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Bissonnette, Gilles) (Entered: 02/13/2023) |
| 02/14/2023 | 68 | ANSWER to 30 Complaint, filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Department of Education, Commissioner.(Garland, Samuel) (Entered: 02/14/2023) |
| 02/14/2023 | 69 | ANSWER to 1 Complaint - New Case,,,,,, filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.(Garland, Samuel) (Entered: 02/14/2023) |
| 02/15/2023 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. PRETRIAL CONFERENCE held on 2/15/2023. Discovery plan approved as proposed. Case to be decided on cross motions for summary judgment. 50 page limit on briefs. Oral Argument to be held. No reply or surreply shall be allowed. (Court Reporter: Liza Dubois) (Pltfs Atty: Charles Moerdler, Gilles R. Bissonnette, Peter J. Perroni, Elizabeth Clarke Milburn, |

| | | |
|---|---|---|
| | | David Kahne; Morgan C. Nighan, Chris Erchull, Esther Kane Dickinson; Henry Klementowicz; Jennifer Eber; Suzanne Amy Spencer; Nathan Reed Fennessy) (Defts Atty: Samuel Garland)(Total Hearing Time: 1 hour) (js) (Entered: 02/16/2023) |
| 02/15/2023 | | **ORAL ORDER approving 67 Discovery Plan. So Ordered by Judge Paul J. Barbadoro.(js) (Entered: 02/16/2023)** |
| 02/17/2023 | 70 | Assented to MOTION to Clarify Order on Discovery Plan *(and for Imposition of a Revised Discovery Plan)* filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 02/17/2023) |
| 02/21/2023 | 71 | NOTICE of Attorney Appearance by Kayla Jade Turner on behalf of Andres Mejia, Christina Kim Philibotte Attorney Kayla Jade Turner added to party Andres Mejia(pty:pla), Attorney Kayla Jade Turner added to party Christina Kim Philibotte(pty:pla).(Turner, Kayla) (Entered: 02/21/2023) |
| 02/21/2023 | | **ENDORSED ORDER granting 70 Motion to Clarify Order on Discovery Plan (and for Imposition of a Revised Discovery Plan).** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.(js) (Entered: 02/21/2023)** |
| 02/21/2023 | | NOTICE of Hearing. Oral Argument set for 8/14/2023 02:00 PM before Judge Paul J. Barbadoro.(js) (Entered: 02/21/2023) |
| 02/22/2023 | | NOTICE OF CANCELLATION: Oral Argument set for 8/14/2023 is CANCELLED. The hearing will be rescheduled after the court confers with the parties about a new date once the briefing is completed. (js) (Entered: 02/22/2023) |
| 03/22/2023 | 72 | TRANSCRIPT of Proceedings for STATUS CONFERENCE HELD VIA VIDEOCONFERENCE on February 15, 2023. Court Reporter: Liza Dubois, Telephone # 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number. **NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.** Redaction Request Follow Up 4/12/2023. Redacted Transcript Follow Up 4/24/2023. Release of Transcript Restriction set for 6/20/2023.(js) (Entered: 03/22/2023) |
| 03/24/2023 | 73 | NOTICE of Attorney Appearance by Nathan W. Kenison-Marvin on behalf of NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner Attorney Nathan W. Kenison-Marvin added to party NH Attorney General(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Commission for Human Rights, Chairperson(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Commission for Human Rights, Executive Director(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Department of Education, Commissioner(pty:dft), Attorney Nathan W. Kenison-Marvin added to party NH Department of Labor, Commissioner(pty:dft).(Kenison-Marvin, Nathan) (Entered: 03/24/2023) |

| 05/01/2023 | 74 | NOTICE of Attorney Withdrawal by Suzanne Amy Spencer on behalf of Andres Mejia, National Education Association-New Hampshire, Christina Kim Philibotte Attorney Suzanne Amy Spencer added to party National Education Association-New Hampshire(pty:pla).(Spencer, Suzanne) (Entered: 05/01/2023) |
| --- | --- | --- |
| 05/03/2023 | 75 | Joint Assented to MOTION for Protective Order filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit A -- Proposed Protective Order)(Bissonnette, Gilles) (Entered: 05/03/2023) |
| 05/04/2023 | | **ENDORSED ORDER granting 75 Motion for Protective Order. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 05/04/2023) |
| 05/04/2023 | 76 | **PROTECTIVE ORDER. So Ordered by Judge Paul J. Barbadoro.**(js) (Entered: 05/04/2023) |
| 05/22/2023 | 77 | Joint Assented to MOTION to Continue and Extend Deadlines ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Civil Form 3)(Bissonnette, Gilles) (Entered: 05/22/2023) |
| 05/24/2023 | | **ENDORSED ORDER granting 77 Joint Assented to MOTION to Continue and Extend Deadlines ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.** (js) (Entered: 05/24/2023) |
| 05/25/2023 | 78 | THE PARTIES ERRATUM REGARDING THEIR JOINT MOTION TO EXTEND DEADLINES ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER by National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman(Bissonnette, Gilles) (Entered: 05/25/2023) |
| 05/26/2023 | | **ENDORSED ORDER re: 78 THE PARTIES ERRATUM REGARDING THEIR JOINT MOTION TO EXTEND DEADLINES ESTABLISHED IN THE COURTS FEBRUARY 15, 2023 ORAL ORDER AND FEBRUARY 21, 2023 ORDER. *Text of Order: Reviewed.* So Ordered by Judge Paul J. Barbadoro.**(lw) (Entered: 05/26/2023) |
| 06/23/2023 | 79 | Assented to MOTION to Continue and Extend Deadlines ESTABLISHED IN THE COURTS MAY 24, 2023 ORDER filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Civil Form 3)(Bissonnette, Gilles) (Entered: 06/23/2023) |
| 07/10/2023 | | **ENDORSED ORDER granting 79 Motion to Continue and Extend Deadlines ESTABLISHED IN THE COURT'S MAY 24, 2023 ORDER. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 07/10/2023) |
| 07/19/2023 | 80 | NOTICE of Attorney Appearance by Suzanne Amy Spencer on behalf of Andres Mejia, Christina Kim Philibotte (Spencer, Suzanne) (Entered: 07/19/2023) |
| 08/07/2023 | 81 | Assented to MOTION to Extend Time to File Briefing Schedule filed by NH Attorney General, NH Commission for Human Rights, Chairperson. (Attachments: # 1 Exhibit Civil Form 3)(Garland, Samuel) (Entered: 08/07/2023) |

| 08/09/2023 | | **ENDORSED ORDER** granting [81] Motion to Extend Time to File Briefing Schedule. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro. Summary Judgment Motions due by 8/14/2023. Response deadline set for 9/18/2023.(jwb) (Entered: 08/09/2023) |
|---|---|---|
| 08/14/2023 | [82] | Joint Assented to MOTION to Exceed Page Limit for Memoranda of Law In Support of Motions for Summary Judgment filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 08/14/2023) |
| 08/14/2023 | [83] | MOTION for Summary Judgment filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. **HEARING REQUESTED.**Follow up on Objection on 9/13/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # [1] Memorandum of Law Notice of Provisional Filing Under Seal)(Bissonnette, Gilles) (Additional attachment(s) added on 8/16/2023: # [2] Memorandum of Law Redacted Public Version) (jwb). (Entered: 08/14/2023) |
| 08/14/2023 | [84] | MOTION for Summary Judgment filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. **HEARING REQUESTED.**Follow up on Objection on 9/13/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # [1] Memorandum of Law Memorandum of Law in Support of Defendants' Motion for Summary Judgment)(Kenison-Marvin, Nathan) (Entered: 08/14/2023) |
| 08/14/2023 | [85] | Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman (Attachments: # [1] Exhibit (Affidavit) Declaration of Attorney Gilles Bissonnette, # [2] Exhibit 1 -- The Amendments (Depo. Ex. 1), # [3] Exhibit 2 -- Edelblut Transcript (Redacted), # [4] Exhibit 3 -- Fenton Transcript (Redacted), # [5] Exhibit 4 -- Farrell Transcript (Redacted), # [6] Exhibit 5 -- Malachi Transcript (Redacted), # [7] Exhibit 6 -- Cohen Transcript (Redacted), # [8] Exhibit 7 -- Declaration of NEA-NH President Megan Tuttle, # [9] Exhibit 8 -- Declaration of AFT-NH President Deb Howes, # [10] Exhibit 9 -- Declaration of Plaintiff John Dube, # [11] Exhibit 10 -- Declaration of Kamren Munz, # [12] Exhibit 11 -- Declaration of Alison OBrien, # [13] Exhibit 12 -- Declaration of Patrick Keefe, # [14] Exhibit 13 -- Declaration of Plaintiff Christina Kim Philibotte, # [15] Exhibit 14 -- Declaration of Jennifer Given, # [16] Exhibit 15 -- Declaration of Plaintiff Andres Mejia, # [17] Exhibit 16 -- Declaration of Sean OMara, # [18] Exhibit 17 -- Declaration of Plaintiff Ryan Richman, # [19] Exhibit 18 -- Declaration of Plaintiff Jocelyn Merrill, # [20] Exhibit 19 -- July 26, 2021 email from DOE Commissioner Frank Edelblut, # [21] Exhibit 20 -- HRCs October 7, 2021 Commissioners meeting minutes (Depo. Ex. 56), # [22] Exhibit 21 -- DOE Commissioner Edelbluts June 13, 2021 op-ed (Depo. Ex. 4), # [23] Exhibit 22 -- Northwood Republican Town Committees CRT Parents Guide (Depo. Ex. 51), # [24] Exhibit 23 -- Depo. Ex. 32 (Sealed), # [25] Exhibit 24 -- HRC docketed charge (Depo. Ex. 62) (Sealed), # [26] Exhibit 25 -- Depo. Ex. 63 (Sealed), # [27] Exhibit 26 -- Depo. Ex. 64 (Sealed), # [28] Exhibit 27 -- Kathryn Borysenkos Aug. 19, 2022 article (Depo. Ex. 65), # [29] Exhibit 28 -- Depo. Ex. 66 (Sealed), # [30] Exhibit 29 -- August 2022 Actively Unwoke tweets (Depo. Ex. 67) (Conventionally Filed), # [31] Exhibit 30 -- Depo. Ex. 68 (Sealed), # [32] Exhibit 31 -- Depo. Ex. 69 (Sealed), # [33] Exhibit 32 -- Depo. Ex. 70 (Sealed), # [34] Exhibit 33 -- Depo. |

Ex. 71 (Sealed), # <u>35</u> Exhibit 34 -- Depo. Ex. 72 (Sealed), # <u>36</u> Exhibit 35 -- Depo. Ex. 73 (Sealed), # <u>37</u> Exhibit 36 -- Depo. Ex. 74 (Sealed), # <u>38</u> Exhibit 37 -- Depo. Ex. 75 (Sealed), # <u>39</u> Exhibit 38 -- Depo. Ex. 76 (Sealed), # <u>40</u> Exhibit 39 -- Depo. Ex. 77 (Sealed), # <u>41</u> Exhibit 40 -- DOE Commissioner Edelbluts April 15, 2022 op-ed and attachments (Depo. Ex. 14), # <u>42</u> Exhibit 41 -- September 22, 2021 email exchange between AFT and DOE Commissioner Edelblut (Depo. Ex. 9), # <u>43</u> Exhibit 42 -- NEA-NHs July 12, 2021 and August 5, 2021 letters (Depo. Ex. 11), # <u>44</u> Exhibit 43 -- Sept. 13, 2021 NEA-NH email to the HRC (Depo. Ex. 54), # <u>45</u> Exhibit 44 -- Oct. 18, 2021 email from R. Farrell to D. Fenton (Depo. Ex. 24), # <u>46</u> Exhibit 45 -- July 21, 2021 Guidance (Depo. Ex. 55), # <u>47</u> Exhibit 46 -- DOJs interrogatory responses, # <u>48</u> Exhibit 47 -- HRCs interrogatory responses (Depo. Ex. 58), # <u>49</u> Exhibit 48 -- DOEs interrogatory responses (Depo. Ex. 57), # <u>50</u> Exhibit 49 -- RCs website and questionnaire (Depo. Ex. 60), # <u>51</u> Exhibit 50 -- DOEs December 2021 presentation (Depo. Ex. 3), # <u>52</u> Exhibit 51 -- DOEs August 2021 presentation (Depo. Ex. 7), # <u>53</u> Exhibit 52 -- Nov. 24, 2021 J. McKim email chain, # <u>54</u> Exhibit 53 -- Attorney Generals 2021-02 Opinion dated Sept. 7, 2021 (Depo. Ex. 12), # <u>55</u> Exhibit 54 -- Excerpts of the 2019 book How to be an Anti-racist by Dr. Ibram X. Kendi (Depo. Ex. 50), # <u>56</u> Exhibit 55 -- Sept. 28, 2020 Executive Office of the Presidents Memorandum, # <u>57</u> Exhibit 56 -- Excerpts of the July 8, 2021 Board of Education meeting, # <u>58</u> Exhibit 57 -- Dec. 14, 2021 email chain with DOE Commissioner F. Edelblut, # <u>59</u> Exhibit 58 -- July 22, 2021 email from S. Gibson to A. Malachi (Depo. Ex. 47), # <u>60</u> Exhibit 59 -- Nov. 15, 2021 F. Edelblut/Northwood GOP Meeting email exchange (Depo. Exs. 37 and 52), # <u>61</u> Exhibit 60 -- Jan. 20, 2023 D. Fenton email exchange (Depo. Ex. 10), # <u>62</u> Exhibit 61 -- HRCs May 2, 2022 letter to NEA-NH, # <u>63</u> Exhibit 62 -- Nov. 15, 2021 R. Farrell email exchange (Depo. Ex. 34), # <u>64</u> Exhibit 63 -- Aug. 20, 2021 F. Edelblut email exchange (Depo. Ex. 45), # <u>65</u> Exhibit 64 -- Aug. 25, 2022 email to F. Edelblut (Depo. Ex. 48), # <u>66</u> Exhibit 65 -- Excerpts of the Mar 8, 2023 HB533 hearing (Depo. Ex. 6), # <u>67</u> Exhibit 66 -- Aug. 27, 2021 F. Edelblut email exchange, # <u>68</u> Exhibit 67 -- Oct. 21, 2021 F. Edelblut email exchange, # <u>69</u> Exhibit 68 -- Dec. 13, 2021 F. Edelblut email exchange (Depo. Ex. 15), # <u>70</u> Exhibit 69 -- Aug. 23, 2021 F. Edelblut email exchange (Depo. Ex. 19), # <u>71</u> Exhibit 70 -- Aug. 12, 2021 F. Edelblut email exchange, # <u>72</u> Exhibit 71 -- June 14, 2022 email to R. Farrell (Depo. Ex. 36), # <u>73</u> Exhibit 72 -- Nov. 15, 2021 DOE email exchange (Depo. Ex. 22), # <u>74</u> Exhibit 73 -- Nov. 15, 2021 F. Edelblut email exchange, # <u>75</u> Exhibit 74 -- Dec. 28, 2021 F. Edelblut email exchange (Depo. Ex. 43), # <u>76</u> Exhibit 75 -- HRCs March 4, 2022 letter (Depo. Ex. 53), # <u>77</u> Exhibit 76 -- Implicit Bias Training Hosted by the New Hampshire Attorney Generals Office on November 20, 2020, # <u>78</u> Exhibit 77 -- May 3, 2021 and May 4, 2021 Presentations to N.H. Court System, # <u>79</u> Exhibit 78 -- Sept. 22, 2020 Trump Executive Order, # <u>80</u> Exhibit 79 -- HB544 Docket and Language, # <u>81</u> Exhibit 80 -- Select Written Testimony from Public Supporting HB544, # <u>82</u> Exhibit 81 -- HB2/Budget Trailer Materials, # <u>83</u> Exhibit 82 -- Article Compromise Sought on Anti-Critical race Theory Bill from April 19, 2021, # <u>84</u> Exhibit 83 -- Rep. Daniel Itse, Taxpayers Money is Being Used to Promote Systemic Racism in NH,, # <u>85</u> Exhibit 84 -- Excerpt from the Jan. 11, 2022 HB1313 hearing, # <u>86</u> Exhibit 85 -- Feb. 1, 2022 F. Edelblut email exchange, # <u>87</u> Exhibit 86 -- Mar. 18, 2022 D. Fenton email exchange (Depo. Ex. 23), # <u>88</u> Exhibit 87 -- Drummond Woodsum August 5, 2021 Presentation, # <u>89</u> Exhibit 88 -- DOEs Nov. 10, 2021 website (Depo. Ex. 21), # <u>90</u> Exhibit 89 -- DOEs Nov. 10, 2021 press release (Depo. Ex. 25), # <u>91</u> Exhibit 90 -- Nov. 15, 2021 F. Edelblut email exchange (Depo. Ex. 41), # <u>92</u> Exhibit 91 -- Nov. 17, 2021 HRC email exchange (Depo. Ex. 61), # <u>93</u> Exhibit 92 -- Oct. 25, 2021 F. Edelblut email exchange (Depo. Ex. 33), # <u>94</u> Exhibit 93 -- Oct. 26, 2021 F. Edelblut email exchange (Depo. Ex. 38), # <u>95</u> Exhibit 94 -- Oct. 1, 2021 F. Edelblut email exchange, # <u>96</u> Exhibit 95 -- Oct. 26, 2021 F. Edelblut email exchange, # <u>97</u> Exhibit 96 -- Sept. 7, 2021 F. Edelblut email exchange (Depo. Ex. 16), # <u>98</u> Exhibit 97 -- Sept. 3, 2021 F. Edelblut email exchange (Depo. Ex. 17), # <u>99</u> Exhibit 98 -- Depo Ex. 31 (Sealed), # <u>100</u> Exhibit 99 -- Depo. Ex. 40 (Sealed), #

| | | |
|---|---|---|
| | | 101 Exhibit 100 -- Feb. 7, 2022 No Left Turn Letter (Depo. Ex. 26), # 102 Exhibit 101 -- Feb. 22, 2022 F. Edelblut email exchange (Depo. Ex. 27), # 103 Exhibit 102 -- Feb. 14, 2022 R. Farrell email exchange (Depo. Ex. 28), # 104 Exhibit 103 -- Apr. 7, 2022 DOE email exchange (Depo. Ex. 18), # 105 Exhibit 104 -- Depo. Ex. 46 (Sealed), # 106 Exhibit 105 -- Aug. 24, 2022 R. Farrell email exchange (Depo. Ex. 29), # 107 Exhibit 106 -- Sept. 21, 2021 F. Edelblut email exchange (Depo. Ex. 39), # 108 Exhibit 107 -- Jan. 7, 2022 email from Ann Marie Banfield opposing SB304, # 109 Exhibit 108 -- Feb. 18, 2021 email from D. Richards in HB544s legislative history (Depo. Ex. 49), # 110 Exhibit 109 -- Educator Code of Conduct)(Bissonnette, Gilles) (Additional attachment(s) added on 8/16/2023: # 111 Plaintiff's Statement Public Redacted) (jwb). (Entered: 08/14/2023) |
| 08/14/2023 | 86 | Assented to MOTION SEAL (I) THE UNREDACTED VERSION OF PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, (II) THE UNREDACTED VERSION OF PLAINTIFFS STATEMENT OF UNDISPUTED FACTS, (III) UNREDACTED COPIES OF FIVE DEPOSITION TRANSCRIPTS, AND (IV) 18 EXHIBITS ATTACHED TO PLAINTIFFS STATEMENT OF UNDISPUTED FACTS filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 08/14/2023) |
| 08/15/2023 | | **ENDORSED ORDER granting 86 Assented to MOTION SEAL (I) THE UNREDACTED VERSION OF PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, (II) THE UNREDACTED VERSION OF PLAINTIFFS STATEMENT OF UNDISPUTED FACTS, (III) UNREDACTED COPIES OF FIVE DEPOSITION TRANSCRIPTS, AND (IV) 18 EXHIBITS ATTACHED TO PLAINTIFFS STATEMENT OF UNDISPUTED FACTS.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | | **ENDORSED ORDER granting 82 Motion to Exceed Page Limit for Memoranda of Law In Support of Motions for Summary Judgment.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | 87 | SEALED PLAINTIFFS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT re: 83 Motion for Summary Judgment at Level I filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | 88 | SEALED PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND EXHIBITS 2-6, 23-26, 28, 30-39, 98, 99 AND 104 re: 85 Plaintiffs' Statement of Undisputed Facts at Level I filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit 2- Edelblut Transcript, # 2 Exhibit 3- Fenton Transcript, # 3 Exhibit 4- Farrell Transcript, # 4 Exhibit 5- Malachi Transcript, # 5 Exhibit 6- Cohen Transcript, # 6 Exhibit 23- Depo. Ex. 32, # 7 Exhibit 24- HRC docketed charge (Depo. Ex. 62), # 8 Exhibit 25- Depo. Ex. 63, # 9 Exhibit 26- Depo. Ex. 64, # 10 Exhibit 28- Depo. Ex. 66, # 11 Exhibit 30- Depo. Ex. 68, # 12 Exhibit 31- Depo. Ex. 69, # 13 Exhibit 32- Depo. Ex. 70, # 14 Exhibit 33- Depo. Ex. 71, # 15 Exhibit 34- Depo. Ex. 72, # 16 Exhibit 35- Depo. Ex. 73, # 17 Exhibit 36- Depo. Ex. 74, # 18 Exhibit 37- Depo. Ex. 75, # 19 Exhibit 38- Depo. Ex. 76, # 20 Exhibit 39- |

| | | |
|---|---|---|
| | | Depo. Ex. 77, # 21 Exhibit 98- Depo Ex. 31, # 22 Exhibit 99- Depo. Ex. 40, # 23 Exhibit 104- Depo. Ex. 46)(jwb) (Entered: 08/15/2023) |
| 08/15/2023 | | NOTICE OF CONVENTIONAL FILING re: 85 Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment- Exhibit 29 Filed Conventionally in Clerk's Office. (jwb) (Entered: 08/15/2023) |
| 08/24/2023 | 89 | MOTION for Daniel J. McNeil to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2413914.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill.Follow up on Objection on 9/7/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit AFFIDAVIT)(Perroni, Peter) (Entered: 08/24/2023) |
| 08/24/2023 | | ACTION REQUIRED - NOTICE Nonconforming Document re 89 MOTION for Daniel J. McNeil to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2413914.) filed by Andres Mejia, Meghan Evelyn Durden, Kimberly Green Elliot, Joceyln Merrill, John Dube, Local 8027, AFT-New Hampshire, AFL-CIO.<br><br>The document fails to comply with LR 7.1- No statement of concurrence was included. File statement as addendum using the Other Documents/Addendum event and link filing(s) to document no. 89.<br><br>The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. Compliance Deadline set for 8/29/2023.(jwb) (Entered: 08/24/2023) |
| 09/01/2023 | | SECOND NOTICE ISSUED- ACTION REQUIRED - NOTICE Nonconforming Document re 89 MOTION for Daniel J. McNeil to Appear Pro Hac Vice filed by Andres Mejia, Meghan Evelyn Durden, Kimberly Green Elliot, Joceyln Merrill, John Dube, Local 8027, AFT-New Hampshire, AFL-CIO.<br><br>The document fails to comply with LR 7.1-No statement of concurrence was included. File statement as addendum using the Other Documents/Addendum event and link filing(s) to document no. 89. The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. Compliance Deadline set for 9/6/2023.(jwb) (Entered: 09/01/2023) |
| 09/01/2023 | 90 | Addendum/ to 89 MOTION for Daniel J. McNeil to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2413914.) *Rule 7.1 Concurrence* by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill. (Perroni, Peter) (Entered: 09/01/2023) |
| 09/05/2023 | | **ENDORSED ORDER granting 89 Motion for Daniel J. McNeil to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro.**<br><br>**The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(jwb) (Entered: 09/05/2023)** |

| Date | No. | Description |
|------|-----|-------------|
| 09/07/2023 | 91 | Joint Assented to MOTION to Extend Time to Object/Respond to 84 MOTION for Summary Judgment , 83 MOTION for Summary Judgment to September 26, 2023 filed by Andres Mejia, Christina Kim Philibotte. (Attachments: # 1 Civil Form 3)(Bissonnette, Gilles) (Entered: 09/07/2023) |
| 09/12/2023 | | **ENDORSED ORDER granting 91 Joint Motion to Extend Time to Object/Respond to 83 Motion for Summary Judgment, 84 Motion for Summary Judgment to September 26, 2023.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro. (jwb)** (Entered: 09/12/2023) |
| 09/25/2023 | 92 | Assented to MOTION to Extend Time to Object/Respond to 84 MOTION for Summary Judgment , 83 MOTION for Summary Judgment to October 3, 2023 filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. (Attachments: # 1 Exhibit Completed Civil Form 3) (Kenison-Marvin, Nathan) (Entered: 09/25/2023) |
| 09/27/2023 | | **ENDORSED ORDER granting 92 Motion to Extend Time to Object/Respond RE 83 Motion for Summary Judgment, 84 Motion for Summary Judgment to October 3, 2023.** *Text of Order: Granted.* **So Ordered by Judge Paul J. Barbadoro.(jwb)** (Entered: 09/27/2023) |
| 10/03/2023 | 93 | Joint Assented to MOTION to Exceed Page Limit filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 10/03/2023) |
| 10/03/2023 | 94 | OBJECTION to 84 MOTION for Summary Judgment filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. Follow up on Reply on 10/10/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit A -- DOE Privilege Log)(Bissonnette, Gilles) (Additional attachment(s) added on 10/10/2023: # 2 REDACTED PLAINTIFFS JOINT OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT) (jwb). (Entered: 10/03/2023) |
| 10/03/2023 | 95 | Assented to MOTION SEAL THE UNREDACTED VERSION OF PLAINTIFFS JOINT OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Bissonnette, Gilles) (Entered: 10/03/2023) |
| 10/03/2023 | 96 | MEMORANDUM in Opposition re 83 MOTION for Summary Judgment filed by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner. Follow up on Reply on 10/10/2023. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Kenison-Marvin, Nathan) (Entered: 10/03/2023) |
| 10/03/2023 | 97 | SEALED PLAINTIFFS' JOINT OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT re: 94 Objection to Motion at Level I filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman(jwb) (Entered: 10/04/2023) |

| | | |
|---|---|---|
| 10/04/2023 | | ENDORSED ORDER granting 93 Motion to Exceed Page Limit. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(jwb) (Entered: 10/04/2023) |
| 10/04/2023 | | ENDORSED ORDER granting 95 Motion to SEAL THE UNREDACTED VERSION OF PLAINTIFFS JOINT OBJECTION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT. *Text of Order: Granted.* So Ordered by Judge Paul J. Barbadoro.(jwb) (Entered: 10/04/2023) |
| 10/10/2023 | | Document Added to 94 Objection to Motion: REDACTED PLAINTIFFS' JOINT OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. (jwb) (Entered: 10/10/2023) |
| 10/13/2023 | | NOTICE re: 83 MOTION for Summary Judgment, 84 MOTION for Summary Judgment. Motion Hearing set for 1/16/2024 10:00 AM before Judge Paul J. Barbadoro.(jwb) (Entered: 10/13/2023) |
| 01/10/2024 | 98 | Assented to MOTION for Harry Sandick to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2464122.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill. (Attachments: # 1 Exhibit (Affidavit))(Perroni, Peter) (Entered: 01/10/2024) |
| 01/10/2024 | 99 | Assented to MOTION for Joshua Goldman to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2464130.) filed by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill. (Attachments: # 1 Exhibit (Affidavit))(Perroni, Peter) (Entered: 01/10/2024) |
| 01/11/2024 | | ENDORSED ORDER granting 98 Motion for Harry Sandick to Appear Pro Hac Vice; granting 99 Motion for Joshua Goldman to Appear Pro Hac Vice. *Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.* So Ordered by Judge Paul J. Barbadoro. <br><br> The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(jwb) (Entered: 01/11/2024) |
| 01/12/2024 | 100 | NOTICE of Attorney Appearance by Harry Sandick on behalf of John Dube, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Harry Sandick added to party John Dube(pty:pla), Attorney Harry Sandick added to party Kimberly Green Elliot(pty:pla), Attorney Harry Sandick added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Harry Sandick added to party Joceyln Merrill(pty:pla), Attorney Harry Sandick added to party Ryan Richman(pty:pla).(Sandick, Harry) (Entered: 01/12/2024) |
| 01/12/2024 | 101 | NOTICE of Attorney Appearance by Joshua M. Goldman on behalf of John Dube, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Joceyln Merrill, Ryan Richman Attorney Joshua M. Goldman added to party John Dube(pty:pla), Attorney Joshua M. Goldman added to party Kimberly Green Elliot(pty:pla), Attorney Joshua M. Goldman added to party Local 8027, AFT-New Hampshire, AFL-CIO(pty:pla), Attorney Joshua M. Goldman added to party Joceyln Merrill(pty:pla), Attorney Joshua M. Goldman added to party Ryan Richman(pty:pla).(Goldman, Joshua) (Entered: 01/12/2024) |
| 01/16/2024 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. MOTION HEARING held on 1/16/2024 re 84 MOTION for Summary Judgment, 83 MOTION for Summary |

| | | |
|---|---|---|
| | | Judgment. Motions taken under advisement. Order to issue. (Court Reporter: Brenda Hancock) (Pltfs Atty: Gilles R. Bissonnette; Charles Moerdler; Joshua M. Goldman; Harry Sandick; Morgan C. Nighan; Chris Erchull) (Defts Atty: Samuel R. V. Garland; Nathan W. Kenison-Marvin)(Total Hearing Time: 3 hours 15 minutes) (jwb) (Entered: 01/16/2024) |
| 01/16/2024 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. IN CAMERA HEARING HELD UNDER SEAL on 1/16/2024. (Court Reporter: Brenda Hancock) (Pltfs Atty: Gilles R. Bissonnette; Charles Moerdler; Joshua M. Goldman; Harry Sandick; Morgan C. Nighan; Chris Erchull) (Defts Atty: Samuel R. V. Garland; Nathan W. Kenison-Marvin)(Total Hearing Time: 35 minutes) (jwb) Modified on 1/17/2024 to add UNDER SEAL(jwb). (Entered: 01/16/2024) |
| 01/18/2024 | 102 | NOTICE of Additional Authority Referenced at Rule 56 Hearing by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman.(Perroni, Peter) (Entered: 01/18/2024) |
| 02/28/2024 | 103 | NOTICE of Attorney Withdrawal by Esther Kane Dickinson on behalf of National Education Association-New Hampshire(Dickinson, Esther) (Entered: 02/28/2024) |
| 03/05/2024 | 104 | NOTICE of Supplemental Authority by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit 11th Circuit Honeyfund Decision)(Bissonnette, Gilles) (Entered: 03/05/2024) |
| 03/18/2024 | 105 | SEALED TRANSCRIPT of Proceedings for SEALED IN CAMERA HEARING held on January 16, 2024. Sealed at Level I. Court Reporter: Brenda Hancock, Telephone # 603-225-1454.(jwb) (Entered: 03/19/2024) |
| 05/09/2024 | 106 | NOTICE of Regarding Plaintiff Andres Mejia by Andres Mejia, Christina Kim Philibotte. (Bissonnette, Gilles) (Entered: 05/09/2024) |
| 05/14/2024 | 107 | NOTICE of Supplemental Authority by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman. (Attachments: # 1 Exhibit Tenn. Educ. Assn v. Reynolds, No. 3:23-cv-00751, 2024 U.S. Dist. LEXIS 80277 (M.D. Tenn. May 2, 2024))(Bissonnette, Gilles) (Entered: 05/14/2024) |
| 05/28/2024 | 108 | TRANSCRIPT of Proceedings for TWO EXCERPTS FROM MOTION HEARING BEFORE THE HONORABLE PAUL J. BARBADORO held on January 16, 2024. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/18/2024. Redacted Transcript Follow Up 6/28/2024. Release of Transcript Restriction set for 8/26/2024.(jwb) (Entered: 05/28/2024) |

| | | |
|---|---|---|
| 05/28/2024 | 109 | ///**MEMORANDUM AND ORDER granting** 83 **Motion for Summary Judgment; denying** 84 **Motion for Summary Judgment.** *For the reasons discussed, the plaintiffs' motion for summary judgment (Doc. 83) is granted as set forth herein. The defendants' cross-motion for summary judgment (Doc. 84) is denied.* **So Ordered by Judge Paul J. Barbadoro.**(jwb) (Entered: 05/28/2024) |
| 06/02/2024 | 110 | TRANSCRIPT of Proceedings for Hearing on Motions for Summary Judgment held on January 16, 2024. Court Reporter: Brenda Hancock, Telephone # 603-225-1454. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter at the above listed phone number.<br><br>**NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request.**<br><br>Redaction Request Follow Up 6/24/2024. Redacted Transcript Follow Up 7/3/2024. Release of Transcript Restriction set for 9/3/2024.(jwb) (Entered: 06/03/2024) |
| 06/12/2024 | | NOTICE of VIDEO Conference. Status Conference set VIA VIDEO CONFERENCE for 6/17/2024 03:00 PM before Judge Paul J. Barbadoro.(jwb) (Entered: 06/12/2024) |
| 06/12/2024 | | RESCHEDULING NOTICE of Hearing. Status Conference set VIA VIDEO CONFERENCE for 6/18/2024 10:00 AM before Judge Paul J. Barbadoro.(jwb) (Entered: 06/12/2024) |
| 06/18/2024 | | Minute Entry for proceedings held before Judge Paul J. Barbadoro. STATUS CONFERENCE held on 6/18/2024. (Court Reporter: Liza Dubois) (Pltfs Atty: Gilles R. Bissonnette, Charles Moerdler, Chris Erchull, Harry Sandick, Joshua M. Goldman, Kayla Jade Turner, Morgan C. Nighan, Nathan Reed Fennessy, Peter J. Perroni, Suzanne Amy Spencer) (Defts Atty: Samuel Garland)(Total Hearing Time: 15 min.) (lw) (Entered: 06/18/2024) |
| 06/18/2024 | | **ENDORSED ORDER -** *Text of Order: Within 14 days of the date a notice of appeal is filed or the appeal period has run, whichever occurs first, the parties shall file a joint status report proposing a schedule for the resolution of any issue concerning attorneys' fees.* **So Ordered by Judge Paul J. Barbadoro.**(lw) (Entered: 06/18/2024) |
| 06/24/2024 | 111 | **JUDGMENT is hereby entered in accordance with** 63 **Order on Motion to Dismiss for Failure to State a Claim,** 109 **Order on Motion for Summary Judgment. Signed by Daniel J. Lynch, Clerk of Court. APPROVED AS TO FORM: by Paul J. Barbadoro.** *(Case Closed)* (jwb) (Entered: 06/24/2024) |
| 07/24/2024 | 112 | NOTICE OF APPEAL as to 111 Judgment, by NH Attorney General, NH Commission for Human Rights, Chairperson, NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Department of Labor, Commissioner.( Filing fee $ 605, receipt number ANHDC-2534501.) [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF** |

| | | |
|---|---|---|
| | | Information section at **http://www.ca1.uscourts.gov/cmecf** (Garland, Samuel)[37] (Entered: 07/24/2024) |
| 07/24/2024 | <u>113</u> | Appeal Cover Sheet as to <u>112</u> Notice of Appeal filed by NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Commission for Human Rights, Chairperson, NH Attorney General, NH Department of Labor, Commissioner. (jwb) (Entered: 07/24/2024) |
| 07/24/2024 | <u>114</u> | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals documents numbered 63, 109, 111-114, re <u>112</u> Notice of Appeal. A copy of the Notice of Appeal electronically mailed to all parties this date.(jwb) (Entered: 07/24/2024) |
| 07/24/2024 | | Appellate Case Number: First Circuit Court of Appeals #24-1690 re <u>112</u> Notice of Appeal filed by NH Commission for Human Rights, Executive Director, NH Department of Education, Commissioner, NH Commission for Human Rights, Chairperson, NH Attorney General, NH Department of Labor, Commissioner.(jwb) (Entered: 07/24/2024) |
| 07/29/2024 | <u>115</u> | STATUS REPORT by John Dube, Meghan Evelyn Durden, Kimberly Green Elliot, Local 8027, AFT-New Hampshire, AFL-CIO, Andres Mejia, Joceyln Merrill, National Education Association-New Hampshire, Christina Kim Philibotte, Ryan Richman : (Joint) Regarding Attorneys' Fees(Bissonnette, Gilles) (Entered: 07/29/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/23/2024 11:51:56 | | |
| **PACER Login:** | garl0796 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01077-PB |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____
                                    )
LOCAL, 8027 AFT-NEW HAMPSHIRE,      )
AFL-CIO, et al.,                    )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )     Case No. 1:21-cv-1077-PB
                                    )
FRANK EDELBLUT, in his official     )
capacity only as the Commissioner   )
of the New Hampshire Department     )
of Education, et al.,               )
                                    )
          Defendants.               )
_____)

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that defendants Frank Edelblut, in his official capacity as Commissioner of the Department of Education; John M. Formella, in his official capacity as Attorney General of the State of New Hampshire; Ahni Malachi, in her official capacity as Executive Director of the New Hampshire Commission for Human Rights; Christian Kim, in his official capacity as Chair of the Commission for Human Rights; and Kenneth Merrifield, in his Official Capacity as Commissioner of the Department of Labor, hereby appeal to the United States Court of Appeals for the First Circuit from this Court's June 24, 2024 Judgment awarding the plaintiffs "declaratory relief that N.H. Rev. Stat. Ann. §§ 354-A:31, 354-A:32, and 193:40 are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment."

[Signature Page to Follow]

Respectfully submitted,

FRANK EDELBLUT, in his official capacity
as Commissioner of the Department of
Education,

JOHN M. FORMELLA, in his
official capacity only as Attorney General
of the State of New Hampshire,

AHNI MALACHI, in her official capacity as
Executive Director of the Commission for
Human Rights,

CHRISTIAN KIM, in his official capacity as
Chair of the Commission for Human Rights,

        *and*

KENNETH MERRIFIELD, in his official
capacity as Commissioner of the Department of
Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date: July 24, 2024                    */s/ Samuel Garland*
                                       Samuel R.V. Garland, Bar #266273
                                       Senior Assistant Attorney General
                                       Nathan Kenison-Marvin, Bar # 270162
                                       Assistant Attorney General
                                       Civil Bureau
                                       New Hampshire Dept. of Justice
                                       33 Capitol Street
                                       Concord, NH 03301
                                       (603) 271-3650
                                       Samuel.RV.Garland@doj.nh.gov
                                       Nathan.w.kenison-marvin@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

/s/ Samuel Garland
Samuel R.V. Garland

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ANDRES MEJIA, | ) |
| | ) |
| CHRISTINA KIM PHILIBOTTE, and | ) |
| | ) |
| NATIONAL EDUCATION | ) |
| ASSOCIATION-NEW HAMPSHIRE, | ) |
| | ) Civil No. _____ |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FRANK EDELBLUT, in his official | ) |
| capacity only as the Commissioner of the | ) |
| New Hampshire Department of Education, | ) |
| | ) |
| JOHN M. FORMELLA, in his official | ) |
| capacity only as the Attorney General of the | ) |
| State of New Hampshire, | ) |
| | ) |
| AHNI MALACHI, in her official capacity | ) |
| only as the Executive Director of the New | ) |
| Hampshire Commission for Human Rights, | ) |
| | ) |
| CHRISTIAN KIM, in his official capacity | ) |
| only as the Chairperson of the New | ) |
| Hampshire Commission for Human Rights, | ) |
| | ) |
| KEN MERRIFIELD, in his official capacity | ) |
| only as the Commissioner of the New | ) |
| Hampshire Department of Labor, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR INJUNCTIVE RELIEF

## **TABLE OF CONTENTS**

Introduction …………………………………………………………………………………1

Parties ………………………………………………………………………………………..8

    I.      Plaintiff Andres Mejia…………………………………………………………….8
    II.     Plaintiff Christina Kim Philibotte………………………………………………..10
    III.    Plaintiff National Education Association-New Hampshire………………………..12
    IV.    Defendants……………………………………………………………………...15

Jurisdiction and Venue……………………………………………………………………...19

Facts………………………………………………………………………………………...19

    I.      The 2020 Racial Justice Protests in New Hampshire, and the Recognition of the
           Importance of DEI Instruction Throughout the Granite State………………………...19
    II.     The Growing Need and Demand for DEI Instruction in Education—Including in New
           Hampshire—Following the 2020 Racial Justice Protests……………………………..23
    III.    The National Backlash, and President Trump's September 22, 2020 Executive
           Order………………………………………………………………………………27
    IV.    The New Hampshire Backlash and the Enactment of the Banned Concepts Act ….......29
           A.  The Banned Concepts Act in the New Hampshire House of Representatives…….29
           B.  The Banned Concepts Act in the New Hampshire Senate.....................................31
    V.     The Banned Concepts Act's Provisions Are Vague…………………………………33
           A.  The Act's Four Banned Concepts…………………………………………….33
                    (1) Banned Concept #1……………………………………………….34
                    (2) Banned Concept #2……………………………………………….35
                    (3) Banned Concept #3……………………………………………….37
                    (4) Banned Concept #4……………………………………………….38
           B.  The Act's Penalties and Reporting Requirement………...…………………….41
    VI.    The Defendants' Failure to Answer Specific Questions Concerning the Banned
           Concepts Act………………………………………………………………………43
    VII.   Even Education Lawyers Do Not Know What the Banned Concepts Act Actually
           Bans…………………………………………………………………………………51
    VIII.  Defendant Commissioner Edelblut's Website and the Moms for Liberty Bounty……53
    IX.    The Chill of the Banned Concepts Act……………………………………………..55
    X.     The Harm of Chilling DEI Instruction……………………………………………..57

Cause of Action……………………………………………………………………………..60

## INTRODUCTION

1.      Martin Luther King Jr. wrote in 1967 that "Whites, it must frankly be said, are not putting in a … mass effort to reeducate themselves out of their racial ignorance."  Martin Luther King Jr., *Where Do We Go From Here: Chaos or Community?* 24 (1967; 2010 ed.).  He added: "It is an aspect of their sense of superiority that the white people of America believe they have so little to learn."  *Id.*  Similarly, he said in an interview that "[t]he concept of supremacy is so imbedded in the white society that it will take many years for color to cease to be a judgmental factor."  Martin Luther King Jr., *A Testament of Hope: The Essential Writings of Martin Luther King Jr.* 375 (1986).  The teachings of Martin Luther King Jr. have been commonly taught in New Hampshire public schools for more than 50 years since his assassination.  However, under a recently enacted law at N.H. Rev. Stat. Ann. ("RSA") 354-A:29-34 and RSA 193:40 (hereinafter, the "Banned Concepts Act" or the "Act"), these words could only be taught in New Hampshire public schools and in trainings of public employees as an outdated historical relic with no application to either present-day society or participants' personal experiences.  And any educator or other public employee with the temerity to suggest otherwise risks investigation, public condemnation, and professional ruin.

2.      Plaintiffs—New Hampshire educators and two diversity, equity, and inclusion school administrators—seek a declaration that the Due Process Clause of the Fourteenth Amendment forbids enforcement of this Banned Concepts Act.  The vague provisions of the Act, which became effective June 25, 2021, leave New Hampshire educators and school administrators with an impossible and unconstitutional choice: either avoid important topics in classroom discussion and instruction related to race, gender, gender identity, sexual orientation, and disability—including topics like systemic racism and implicit bias—or risk losing their licenses

and livelihoods for violating the Act.  The full text of the Banned Concepts Act is attached as *Exhibit 1*.

3.      The Banned Concepts Act's vagueness creates a chill that effectively prevents teachers from doing what society needs them to do: teach.  While RSA 193:40, II ostensibly permits discussion of "the historical existence of ideas and subjects identified [in the Banned Concepts Act]," the Act may even forbid teachers from guiding students to apply the lessons of the past to the world of the present, their hopes for the future, and their own personal experiences.  Where instruction crosses the line between permissible instruction about the past existence of discrimination and present reality is impossible to discern.  Yet educators must bet their jobs every day on how that line might be drawn by every single person in New Hampshire—all of whom are empowered to file a lawsuit for any perceived transgression of the Act's illusory and opaque provisions.

4.      The very purpose of public education is to teach students the relevance of history and ideas to their lives and push students to use what they learn to form their own opinions and forge their own path.  This task of preparing students to thrive as citizens is so essential that it is recognized as one of the most fundamental duties of the state of New Hampshire by both the New Hampshire Constitution and the decisions of the New Hampshire Supreme Court.  As the New Hampshire Supreme Court has recognized, public education is the "cornerstone of our democratic system." *Claremont v. Governor*, 635 A.2d 1375, 1381 (N.H. 1993).  It serves to prepare students to thrive as "citizens who are able to participate intelligently in the political, economic and social functions" of our society. *Id.*

5.      Yet in New Hampshire today, because of the Act's vagueness, educators across the state are pulling books from the curriculum and avoiding discussing and instructing on concepts

that are necessary for students preparing to take their place as full participants in our increasingly complex and diverse society.  For example, the Banned Concepts Act has already led New Hampshire educators to temporarily postpone from either staff or classroom instruction books like *Stamped (For Kids): Racism, Antiracism, and You* (which was adapted by Sonja Cherry-Paul from the work of Dr. Ibram X. Kendi) and *This Book is Anti-Racist* by Tiffany Jewell—a book designed to empower 11-15-year-olds, including those of color—based on reasonable fears that such instruction may cross the murky line drawn by the Act and place educators' licenses and livelihood at risk.  The reasonableness of these fears is underscored by Defendant Commissioner of Education Frank Edelblut's own suggestion in a June 13, 2021 op-ed that Dr. Ibram X. Kendi's book *How to be an Anti-Racist* would be banned under the Act, and his subsequent suggestion at a July 8, 2021 State Board of Education meeting that Tiffany Jewell's *This Book is Anti-Racist* would also be banned.  Are any of these books banned under the Act's terms?  No one knows, the Defendants have not provided straight answers, and the Act's incomprehensible terms provide educators with no clarity in resolving these questions.  Simply put, thanks to the Act's vague commands and Commissioner Edelblut's public remarks, it appears that book banning is happening in New Hampshire.

6.     By its terms, the Act broadly prohibits public employees and government contractors from "teach[ing]," "train[ing]," "instruct[ing]" on a series of concepts, including:

- that "one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin";

- that "an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously";

- that "an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin"; or

- that "people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."

While one may teach the "historical existence of" these concepts—albeit only "as part of a larger course of academic instruction," whatever that may mean, *see* RSA 193:40, II—the ability to teach the continuing relevance of this history, and make it personally relevant, to students is unclear. Can one discuss the reasons why in our country's entire history only a single African American has ever been elected the President of the United States and no woman ever has? Can one teach about the proven fact that racial and other unconscious biases shut the doors of opportunity for so many? Can one teach Martin Luther King Jr.'s "I Have a Dream" speech and discuss whether that dream has been realized?

7.     When educators guess at the answers to these and other questions, they do so subject to severe penalties if they guess wrong. Any person may file suit in court or a complaint with the New Hampshire Commission for Human Rights for violations of the Banned Concepts Act. Significantly, "[a]ny person" claiming to be aggrieved by a violation of the Banned Concepts Act "may pursue all of the remedies available under" any applicable laws, *see* RSA 354-A:34, as well as file a complaint against a school or school district. RSA 193:40, III. And violations of the Banned Concepts Act "shall be considered a violation of the educator code of conduct that justifies disciplinary action by the state board of education." RSA 193:40, IV. Disciplinary action for violations of the code of conduct can lead to suspension and revocation of an educator's teaching

license, meaning not only the loss of their job, but also the loss of their ability to obtain another teaching job in the future.  *See* N.H. Admin. Code R. Ed 511.02.  Moreover, because a licensed educator's failure to report a suspected violation of the code of conduct is itself a violation of the same code, the Act presses educators into service as mandatory informants on their colleagues to enforce the Act's vague restrictions.  *See id.* 510.05.

8.     Further, even if an educator is ultimately found not to have violated the Banned Concepts Act, they nevertheless suffer harm because the educator is forced to expend time and resources defending themselves and is exposed to public scrutiny about their actions.  Educators now find their teaching being critiqued and their personal character being attacked on social media, in the news, and at school board meetings.

9.     In an unprecedented move, the Department of Education has published a complaint form on its website for anyone to make complaints about supposed violations of the Banned Concepts Act and send them to the New Hampshire Commission for Human Rights.  No such specific Department of Education complaint website exists for violations of other provisions of the Law Against Discrimination or RSA 193:38-39 that were added in 2019 to apply to public schools.

10.     The Department of Education's public complaint form was immediately seized on by the group "Moms for Liberty NH" by way of this November 12, 2021 tweet offering $500 for any person "catch[ing]" a teacher violating the Act:



11.    The impact of the vague and unclear provisions of the Banned Concepts Act—compounded by the sweeping enforcement dragnet that the Act and the Department of Education have set up—have had broad effects on the instruction that students are being provided.  Through the Act's chill, students are (and have been) robbed of the information, ideas, and instructional approaches that would prepare them to engage in the robust dialogue and analytical thinking necessary to effectively function as citizens in America's democratic system.  Our schools are "nurseries of democracy."  *See Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021).  As the United States Supreme Court has explained:

> The classroom is peculiarly the "marketplace of ideas."  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection."

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (alteration in original)).  By chilling instruction involving race, racism, and gender—as well as silencing discussion of and instruction on the perspectives of Black, Hispanic, Native American, and other communities—the Act prevents

students from being exposed to perspectives that are critical to enable them to be active participants in democracy.

12.     The chill and self-censorship of teaching practices created by the Banned Concepts Act also frustrate the competency-based approach to classroom instruction that is widely accepted by New Hampshire educators and promoted by the New Hampshire Department of Education.[1] Competency-based learning is designed to ensure that students have meaningful opportunities to achieve critical knowledge and skills, and then apply the same skill and knowledge as citizens. Students are robbed of such opportunities when their teachers are afraid to engage with them on topics which, while developing critical thinking and citizenship skills, may be perceived to touch on banned concepts under the Act.

13.     The Defendants are aware of the widespread chill that the Banned Concepts Act has had on educators.  However, despite repeated requests by Plaintiff NEA-New Hampshire, they have refused to clarify key points of the Act that would provide educators with certainty as to how to comply with it.  Accordingly, the NEA-NH, along with Andres Mejia and Christina Kim Philibotte—the only two full-time diversity, equity, and inclusion administrators employed by school districts in New Hampshire (collectively, "Plaintiffs")—come to this Court for relief from the unconstitutionally vague provisions of the Banned Concepts Act.  They bring a claim for declaratory and injunctive relief against officials of the State of New Hampshire who are charged with enforcing the Act.  Plaintiffs seek a ruling (i) declaring that the Banned Concepts Act violates the Due Process Clause of the Fourteenth Amendment both facially and as applied because it is unconstitutionally vague, and (ii) permanently enjoining these state officials from enforcing the

---

[1]     N.H. Dep't of Education, "Performance Assessment of Competency Education," https://www.education.nh.gov/who-we-are/division-of-learner-support/bureau-of-instructional-support/performance-assessment-for-competency-education.

Act.

In support of their claim, Plaintiffs further allege as follows:

## PARTIES

### I.    Plaintiff Andres Mejia

14.    Plaintiff Andres Mejia lives in Strafford County, New Hampshire.  Mr. Mejia is the Director of Diversity, Equity, Inclusion, and Justice for the Exeter Region Cooperative School District.  Mr. Mejia is the first person to hold this position, and he started on August 2, 2021.  The Exeter Region Cooperative School District—along with the Manchester School District—are the first school districts in New Hampshire to have full-time DEI ("diversity, equity, and inclusion") administrators.  Mr. Mejia brings this claim in his individual capacity, and not on behalf of the District.

15.    In his role, Mr. Mejia works closely with various stakeholders and is responsible for prioritizing and operationalizing DEI initiatives, especially those dealing with curriculum, cultural competency, faculty and staff recruitment and retention, and professional learning.[2]  Mr. Mejia has dedicated his entire professional life to DEI work because he believes that it is critical to create an education community where every student—including students who are less privileged and who may be from historically marginalized communities—feels like they belong.

16.    Prior to accepting this position with the Exeter Region Cooperative School District and after graduating from the University of New Hampshire, Mr. Mejia worked for four years as a program manager with New Hampshire Listens—a civic engagement initiative of the Carsey School of Public Policy at the University of New Hampshire.  New Hampshire Listens has a

---

[2] *See* "'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity," *Portsmouth Herald* (Aug. 2, 2021), https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

mission to "build, strengthen, and sustain civic infrastructure to support a sustainable democracy" by helping "communities talk, listen and act together so communities can work for everyone."

17.     In his role as Director of Diversity, Equity, Inclusion, and Justice, Mr. Mejia is directly impacted and harmed by the Banned Concepts Act.  As part of his duties, he conducts staff trainings within the District on concepts like implicit bias, institutional bias, race, racism, belonging, and inclusiveness.  Because of the Act's ambiguity, if he teaches these topics, he may be violating the Act, and potentially will subject himself to a complaint or lawsuit—even if such trainings are voluntary.  Accordingly, there is a substantial risk that Mr. Mejia will be prosecuted under the Act.  This risk is all the more credible where Defendant Commissioner Edelblut has set up a website to field complaints for prosecution under the Act.

18.     Mr. Mejia also routinely fields inquiries from teachers in Exeter as to whether certain books, video content, curriculum, materials, and information—as well as what a teacher would say—would be banned under the Banned Concepts Act.  Yet, given the Act's vagueness, he cannot answer basic questions as to what is covered under the Act.  As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences. For example, professional development around implicit bias, race, and racism has been put on hold.  Especially given Defendant Commissioner Edelblut's June 13, 2021 statements condemning Dr. Ibram X. Kendi's book *How to Be an Antiracist*, and his July 8, 2021 critique of Tiffany Jewell's book *This Book is Anti-Racist*[3]—Mr. Mejia is struggling to evaluate whether the concepts "anti-bias" and "anti-racism" can be used.  Perhaps even worse, the Act chills and causes teachers to second guess how to respond to incidents of racism and bullying against Black and LGBTQ+

---

[3] *See* N.H. State Board of Education Meeting (July 8, 2021),
https://us02web.zoom.us/rec/play/9LhY5d2K7pIYMFI_k_Y03oe4-
IAF2kBzSxqGiFW_AYoJCAwC_4FGOgkvueh7OsagTe0sVbKwPttCNONe.pDFAngwZ6nvzBFP1 (starting at
3:22:19).

children for fear that, if they take appropriate action, they will be accused of violating the Act and lose their licenses.

19.     Finally, as an agent of a "public employer" under RSA 354-A:30, III, as a conductor of government training programs, and as someone who advises teachers on how to comply with the Act, Mr. Mejia is also subjected to the restrictions imposed under the Banned Concepts Act at RSA 354-A:31-32 and RSA 193:40, including any applicable penalties.

## II.     Plaintiff Christina Kim Philibotte

20.     Plaintiff Christina Kim Philibotte lives in Merrimack County, New Hampshire. She grew up in Manchester and graduated from West High School.[4]  She is the Chief Equity Officer for the Manchester School District, which is the largest and most diverse school district in New Hampshire with over 40% of its students being of color.[5]  Ms. Philibotte is the first person to hold this position, and she started in July of 2021.  Ms. Philibotte brings this claim in her individual capacity, and not on behalf of the District.

21.     In her role, Ms. Philibotte is devoted to nurturing an equitable and inclusive school environment where all students feel seen, heard, and valued.  She brings to this role over 15 years of experience in public education advocating and applying anti-racist/anti-bias and culturally responsive teaching practices as a DEI educational consultant, English teacher, and Dance/Performing Arts Teacher/Director.  Through her work, she has led and designed (and

---

[4] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum; *see also* Manchester Proud, "Champion Spotlight: Tina Philibotte, MSD Chief Equity Officer," https://www.manchesterproud.org/champion-spotlight-tina-philibotte/.
[5] *See* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html ("The school district's population of 12,400 students is split almost equally between Whites and minorities.").

continues to lead and design) conversations about race and equity through teacher/leader workshops, presentations, and trainings.

22.     Ms. Philibotte previously was an English teacher and Director of the Dance Program at Goffstown High School for nearly 13 years.  In this role, she was a finalist for New Hampshire Teacher of the Year, as well as the recipient of the School Administrative Unit ("SAU") 19 Dreamkeeper award.

23.     Ms. Philibotte is a fellow with New Hampshire Listens.  She is also a two-time fellow of the National Writing Project—a network of teachers, university faculty, researchers, writers, and community educators working to advance writing and the teaching of writing.  She is in the current 2022 class of Leadership New Hampshire—a statewide program whose mission is to "build[] a community of informed and engaged leaders."  She is also an Advisory Group member of the Endowment for Health's Race & Equity Series—a series that holds important convenings of diverse stakeholders, as well as ongoing working groups, tackling racial justice and equity challenges in New Hampshire, including in civic engagement, economic development, education, government, health, and law enforcement/criminal justice.

24.     Ms. Philibotte is directly impacted by the Banned Concepts Act.  She conducts staff trainings within the District focusing on culturally responsive education—a student-centered practice of mindfully and intentionally incorporating the experiences, culture, and identity of students (including those from historically marginalized groups) to help expand their educational opportunities.  This includes developing strategies for how to relate and empathize with students, as well as developing curriculum consistent with these goals, so that each student is seen, heard, and valued.  Previously, in conducting DEI trainings before the Act, she would specifically use terms and concepts like "anti-racism" and "anti-bias."  Due to the chill from the Act, she has

stopped using these terms and concepts focusing on "anti-racism"—and advised others to avoid them as well—out of fear of the Act's penalties. Due to her work, there is a substantial risk that Ms. Philibotte will be prosecuted under the Act if she discusses these concepts. This risk is all the more credible where Defendant Commissioner Edelblut has set up a website to field complaints for prosecution under the Act.

25.     As one of only two full-time DEI school administrators in New Hampshire, Ms. Philibotte also routinely fields inquiries from teachers throughout New Hampshire as to whether certain books and information would be banned under the Banned Concepts Act. Yet, given the Act's vagueness, she cannot answer basic questions as to what is covered under the Act. As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences.

26.     Finally, as an agent of a "public employer" under RSA 354-A:30, III, as a conductor of government training programs, and as someone who advises teachers on how to comply with the Act, Ms. Philibotte is also subjected to the restrictions imposed under the Banned Concepts Act at RSA 354-A:31-32 and RSA 193:40, including any applicable penalties. Further, she is certified by the State Board of Education and, thus, is subject to the Educator Code of Conduct that is now embedded within the Banned Concepts Act's provisions in RSA 193:40. *See* RSA 193:40, V (defining "[a]dministrators" as an "educator").

### III.     Plaintiff National Education Association-New Hampshire

27.     Plaintiff National Education Association-New Hampshire ("NEA-NH") is located in Concord, New Hampshire and was founded in 1854—then as the New Hampshire State Teachers Association. It is suing on its behalf and on behalf of its members.

28.     The NEA-NH became one of the "founding ten" state education associations that formed the National Education Association ("NEA") in 1857.

29.     The NEA-NH is comprised of more than 17,000 member educators in New Hampshire representing the majority of all public-school employees in the state.  The NEA-NH's mission is to strengthen and support public education and serve their members' professional, political, economic, and advocacy needs.  The NEA-NH's members are public school educators in all stages of their careers, including classroom teachers and other certified professionals, education support personnel, instructors and staff at public higher education institutions, students preparing for a teaching career, and those retired from the profession.

30.     The NEA-NH has standing to pursue this action both in its own right and on behalf of its members.  The Banned Concepts Act has forced the NEA-NH to divert its organizational resources to identify and counteract the Act's impermissibly vague restrictions, and it has frustrated the NEA-NH's mission of advocating for public school employees and for the kind of robust public education that will prepare the children of New Hampshire as citizens and members of society.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (describing the requirements for direct organizational standing).  Moreover, NEA-NH members adversely affected by the Banned Concepts Act would have standing to sue, the interests at stake in this suit are germane to the NEA-NH's purpose, and neither the claims asserted nor the relief sought requires participation of the NEA-NH's individual members to adjudicate the claims.  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (describing the requirements for representational standing).

31.     The NEA-NH also provides a service to its members by assisting with collective bargaining of contracts with local school districts.  Job security, termination of employment,

discipline, evaluation, and academic freedom are all topics which can be bargained for.  The NEA-NH cannot properly advise its membership as to how to adjust their collective bargaining agreements to account for the Act's edicts due to its vague nature.

32.     Members of the NEA-NH also receive the benefit of extensive professional development programming by the organization.  The Banned Concepts Act's vague nature has made it impossible for the NEA-NH to provide meaningful professional development about the Act to its members despite the demand from its membership to do so.

33.     The NEA-NH also represents members in matters before the State Board of Education—both in licensure actions contesting alleged violations of the Educator Code of Conduct and in actions representing educators appealing the non-renewal of their teaching contracts.

34.     Members of the NEA-NH are directly subjected to the restrictions in the Banned Concepts Act (*see* RSA 354-A:31-32) not only as agents of "public employers" under RSA 354-A:30, III, and as the conductors of government programs, but also as certified educators who are subject to the Educator Code of Conduct, which now includes the restrictions in RSA 193:40.  *See* RSA 193:40, IV.  These members have been directly chilled under the Act.  For example:

- The book *Stamped (For Kids): Racism, Antiracism, and You* was planned for use in an interdisciplinary unit of study in a Cheshire County middle school, but the use of the book was placed on indefinite hold after the Act was passed.

- A complaint was made to the Department of Education regarding *Stamped (For Kids)* being taught by middle school social studies teachers in Hillsborough County.  When made aware of the complaint, the teachers and building administrators could not determine if the book was prohibited by the Act due to its vague provisions.  They did not receive any guidance from the Department of Education or any of the other Defendants after the complaint was made.

- A high school AP English teacher in Hillsborough County has changed their approach to teaching *Beloved*, the Pulitzer Prize winning book by Toni Morrison. While the teacher determined to teach the book despite uncertainty about whether it violates the

Act, they will no longer tie the book's theme of the traumatic, enduring legacy of slavery to current events or students' own experiences because they fear running afoul of the Act.

- A high school social studies teacher in Hillsborough County has disallowed students to pick their own topics for research papers for fear that topics chosen by students may lead to discussions in class that may violate the Act.

- A social studies teacher in Cheshire County had been undertaking a review of their curriculum to ensure that more experiences of Black, Indigenous, and other people of color were represented in their American history units and related materials.  However, these plans were curtailed because of passage of the Act.

- A widely understood best practice in teaching is applying the material to students' own experiences and interests. A high school social studies teacher in Hillsborough County has all but ceased that practice in their world history class.  Rather, this teacher feels that they must teach the material in a vacuum to limit the analogies students may draw to current events that could implicate one or more of the Act's banned concepts.

- A Cheshire County social studies teacher is spending countless hours finding factual citations for commonly understood historical facts in order to be prepared to field parent complaints that the teacher might be violating the Act simply by presenting accurate historical information on the founding of our country.

## IV.   Defendants

35.   Defendant Frank Edelblut is the Commissioner of the New Hampshire Department of Education.  He is named in his official capacity.  His office is located at 101 Pleasant Street, Concord, NH 03301.  Commissioner Edelblut has enforcement authority over the Banned Concepts Act's provisions located at RSA 193:40, I, which state that violations of the Act "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education."  *See* RSA 193:40, IV; *see also* *Exhibit 2* (New Hampshire Code of Conduct for Educational Professionals, codified at N.H. Code Admin. R. Ed 510.01 et seq.).  As the Department of Education's administrative rules make clear, the Commissioner and his Department have the authority to field complaints and conduct investigations—as well as impose sanctions—under the Educator Code of Conduct.  *See* *Exhibit 2* (N.H. Code Admin. R. Ed 511.01

entitled "Complaints, Cases and Investigations"; *id.* 511.02 entitled "Reprimand, Suspension, or Revocation"; *id.* 511.03 entitled "Disciplinary Hearings").

36.    Defendant John M. Formella is the Attorney General of the State of New Hampshire.  He is named in his official capacity.  His office is located at 33 Capitol Street, Concord, NH 03301.  The Attorney General is the chief legal officer and chief law enforcement officer of the State.  He "shall act as attorney for the state in all criminal and civil cases in the supreme court in which the state is interested …."  *See* RSA 7:6.  Independent of the Attorney General's supervisory authority over the enforcement of all laws in New Hampshire, the Attorney General also has specific enforcement authority over the Banned Concepts Act because portions of the Act were placed in the Law Against Discrimination at RSA ch. 354-A.  *See* RSA 354-A:29-33; *see also* RSA 354-A:34 (Banned Concepts Act further stating that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under RSA 354-A").  The Law Against Discrimination specifically gives the Attorney General the authority to "make, sign, and file [a] complaint" under the Law, which would include a complaint for an alleged violation of the Banned Concepts Act.  *See* RSA 354-A:21, I(a).  In connection with the filing of a complaint under the Law Against Discrimination, the Attorney General also is "authorized to take proof, issue subpoenas and administer oaths in the manner provided in the civil practice law and rules."  *See* RSA 354-A:21, I(b).  The Banned Concepts Act's provisions at RSA 193:40, III also state that the Attorney General "may initiate a civil action against a school or school district in superior court for legal or equitable relief" for a violation of RSA 193:40, I.  *See* RSA 193:40, III.  Finally, the Attorney General "shall have and exercise general supervision of the criminal cases pending before the supreme and superior courts of the state."   *See* RSA 7:6. The Attorney General's authority over criminal cases is material because a "willful" violation of

any order issued by the New Hampshire Commission for Human Rights under the Law Against Discrimination—including an order addressing the provisions of the Banned Concepts Act located at RSA 354-A:29-34—shall be a "misdemeanor if a natural person, or … a felony if any other person." *See* RSA 354-A:24.

37.     Ahni Malachi is the Executive Director of the New Hampshire Commission for Human Rights.  Christian Kim is the Chairperson of the New Hampshire Commission for Human Rights.  They are named in their official capacities.  The Commission for Human Rights is located at 2 Industrial Park Drive, Building One, Concord, NH 03301.  The Commission for Human Rights is the state agency established to enforce the Law Against Discrimination located at RSA ch. 354-A.  *See* RSA 354-A:5.  Director Malachi and Chairperson Kim, as the heads of the Commission for Human Rights, have enforcement authority over the Banned Concepts Act because portions of the Act were placed in the Law Against Discrimination at RSA ch. 354-A.  *See* RSA 354-A:29-33; *see also* RSA 354-A:34 (Banned Concepts Act further stating that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under RSA 354-A").  The Banned Concepts Act's provisions located at RSA 193:40, III also state that "[a]ny person claiming to be aggrieved by a violation of [RSA 193:40, I] … may initiate a civil action against a school or school district … with the New Hampshire commission for human rights as provided in RSA 354-A:34."  *See* RSA 193:40, III.  Accordingly, Director Malachi and Chairperson Kim have the power to receive, investigate, and make findings on complaints under the Banned Concepts Act, as well as to hold public hearings on alleged violations of the Act.  *See* RSA 354-A:5, VI (stating that the Commission has the power "[t]o receive, investigate and pass upon complaints alleging violations of this chapter"); RSA 354-A:5, VII (stating that the Commission has the power "[t]o hold hearings, subpoena witnesses, compel their attendance,

administer oaths, take the testimony of persons under oath, and, in connection therewith, require the production for examination of any books or papers relating to any matter under investigation or in question before the commission"). Director Malachi, Chairperson Kim, and their Commission also have the authority to engage in outreach, training, research, and education with respect to the Banned Concepts Act. *See* RSA 354-A:5, VIII (stating that the Commission has the power "[t]o create such advisory agencies and conciliation councils, local, regional or statewide, as in its judgment will aid in effectuating the purpose of this chapter, and the commission may empower them to … make recommendations to the commission for the development of … programs of formal and informal education which the commission may recommend to the appropriate state agency").

38.     Ken Merrifield is the Commissioner for the New Hampshire Department of Labor. He is named in his official capacity. His office is located at 95 Pleasant Street, Concord, NH 03301. The Department of Labor helps employers and insurance carriers operate successfully within New Hampshire's labor laws. Commissioner Merrifield has enforcement authority over the Banned Concepts Act. This is because the Banned Concepts Act specifically states that "[a]ny person aggrieved by an act made unlawful under [RSA 354-A:29-33] may pursue all of the remedies available under … RSA 275-E," which is New Hampshire Whistleblowers' Protection Act. Accordingly, an individual who alleges that a public employee has violated the Banned Concepts Act may file a complaint to the Department of Labor as a purported "whistleblower." The Department of Labor has the authority to investigate and hold hearings on complaints under RSA ch. 275-E. *See* RSA 275-E:4; RSA 275-E:8.

## JURISDICTION AND VENUE

39.     This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

40.     Declaratory relief is authorized by 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

41.     Defendants are public officials of the State of New Hampshire.  Defendants reside within this District and/or perform official duties within the State of New Hampshire.  This Court, accordingly, has personal jurisdiction over the Defendants.

42.     Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

## FACTS

**I.      The 2020 Racial Justice Protests in New Hampshire, and the Recognition of the Importance of DEI Instruction Throughout the Granite State.**

43.     On May 25, 2020, White Minneapolis police officer Derek Chauvin knelt on the neck and back of George Floyd—a Black man—for 9 minutes and 29 seconds while Mr. Floyd was handcuffed face down in the street.  Mr. Floyd died.[6]  Mr. Chauvin was later convicted of second-degree murder and sentenced to over 22 years in prison.[7]  On December 15, 2021, Mr. Chauvin pleaded guilty to a federal charge of violating Mr. Floyd's constitutional rights.[8]

44.     The killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and numerous other Black people in 2020 reinvigorated the decades long struggle against racism in America and elsewhere.  International protests erupted against systemic racism and police brutality.  These

---

[6] "George Floyd: What Happened in the Final Moments of his Life," *BBC* (July 16, 2020), https://www.bbc.com/news/world-us-canada-52861726.
[7] "George Floyd Murder: Derek Chauvin Sentenced to Over 22 Years," *BBC* (June 25, 2020), https://www.bbc.com/news/world-us-canada-57618356.
[8] Amy Forliti, "Chauvin Pleads Guilty to Federal Charge in Floyd's Death," *Associated Press* (Dec. 15, 2021), https://apnews.com/article/death-of-george-floyd-george-floyd-minneapolis-race-and-ethnicity-st-paul-a8b12b1e3e0fedc1270c659e3428134e.

protests, led by communities of color, are among the most significant mass movements in the country's history.

45.     These protests also erupted in New Hampshire, often spearheaded by young public school students of color and newly-formed local Black Lives Matter chapters.[9]  Protesters flooded cities like Manchester, Nashua, Concord, Dover, and Portsmouth as part of this civil rights movement.[10]

46.     These calls for racial justice reflected a larger shift across the country.  According to a 2020 study conducted by Monmouth University, a newfound majority of Americans agreed that "racism and discrimination is a 'big problem,'" and that "there's a lot of discrimination against black Americans in society."[11]

47.     The 2020 movement for racial justice was intersectional, reflecting an increasing understanding that other identities combined with race—including ethnicity, religion, sex, gender identity, and sexual orientation—are implicated in the disproportionate violence faced by people of color.  Other movements—including the "Me Too" and "Times Up" campaigns—shed light on the rampant discrimination and violence faced by women of color and LGBTQ+ people of color.

---

[9] Indeed, New Hampshire is not immune from such racial justice concerns.  For example, the most recent available data from 2019 compiled by The Sentencing Project shows that, in New Hampshire, the rate of Black people incarcerated is 742 per 100,000 Black people. *See* The Sentencing Project, New Hampshire Profile, https://www.sentencingproject.org/the-facts/#map. This compares to only 269 out of 100,000 White people. *Id.*  Thus, New Hampshire has a Black/White imprisonment disparity ratio of 2.8 to 1.  *See id.*  A 2016 New Hampshire Public Radio study further exposed racial disparities in arrests and jailing. *See* Emily Corwin, "Data Shows Racial Disparities Increase at Each Step of N.H.'s Criminal Justice System," *NHPR* (Aug. 10, 2016) https://www.nhpr.org/nh-news/2016-08-10/data-shows-racial-disparities-increase-at-each-step-of-n-h-s-criminal-justice-system.    Data from this study showed that Black people have a 5 times greater chance of being jailed compared to White people—a statistic that is well above the United States average where Black people are 3.5 times more likely to be in jail than White people. *Id.*  Equally disturbing is that Black people in New Hampshire have a 2.8 times greater chance of being arrested compared to White people.  And in Hillsborough County—the most populous and diverse county in New Hampshire—African Americans are nearly 6 times more likely to be in jail than White people. *Id.*

[10]     Wikipedia,      "George      Floyd      Protests      in      New      Hampshire," https://en.wikipedia.org/wiki/George_Floyd_protests_in_New_Hampshire.

[11] Nate Cohn & Kevin Quealy, "How Public Opinion Has Moved on Black Lives Matter," *N.Y. Times* (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matterattitudes.html.

The battle for LGBTQ+ civil rights crested in June of 2020 when the United States Supreme Court issued its momentous decision in *Bostock v. Clayton County*, holding that federal laws prohibiting sex discrimination apply equally to discrimination based on sexual orientation and transgender status. 140 S. Ct. 1731 (2020).[12]

48.     These social and legal shifts popularized discussions about how to dismantle racism and sexism and how to increase inclusivity, surfacing concepts such as "structural," "systemic," or "institutional" racism, and "racial privilege" or "white privilege."  Students in New Hampshire witnessed these events and participated in these conversations.  The largest of the protests in New Hampshire was a march of approximately 2,000 persons in Concord on June 6, 2020, and it was organized, in part, by students of color from Concord High School.[13]

49.     In response to these protests, New Hampshire Governor Chris Sununu signed an Executive Order on June 16, 2020 establishing the formation of a Commission on Law Enforcement Accountability, Community, and Transparency (hereinafter, "LEACT Commission") to, in part, "develop recommendations for reforms … necessary to enhance transparency, accountability, and community relations in law enforcement," including diversity training.  *See Exhibit 3* (June 16, 2020 Executive Order in LEACT Materials).

50.     After over 25 meetings, the LEACT Commission published its recommendations on August 31, 2020.  Many of the recommendations concerned implicit and racial bias training, including the following: (i) mandating that the New Hampshire Police Standards and Training Council ("PSTC")—the body that oversees the certification of police officers—conduct annual in-

---

[12] At the same time, at least 44 transgender and gender nonconforming people were murdered in the United States in 2020, marking the deadliest year on record.  *See* Human Rights Campaign, "Fatal Violence Against the Transgender and Gender Non-Conforming Community in 2020," https://www.hrc.org/resources/violence-against-the-trans-and-gender-non-conforming-community-in-2020.

[13] *See* Tony Schinella, "Nearly 2,000 March Against Racism in Concord: Watch," *Patch.com* (June 7, 2020), https://patch.com/new-hampshire/concord-nh/nearly-2-000-march-against-racism-concord-watch (noting that protest was organized by Concord High School students).

service training for at least two hours on implicit bias and cultural responsiveness; (ii) encouraging, beginning on January 1, 2021, that all law enforcement agencies require that their officers participate and receive at least two hours of training on implicit bias and cultural responsiveness; (iii) recommending that the PSTC add implicit bias to the police academy and in-service training curriculum; (iv) strongly encouraging implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges; (v) recommending that the Attorney General establish a system whereby all new prosecutor hires receive implicit bias and racial profiling training within 30 days of their start date; and (vi) recommending that the New Hampshire Supreme Court require one hour of yearly continuing legal education credit to be dedicated to implicit bias and racial profiling training.   *See id.* (Aug. 31, 2020 LEACT Recommendations in LEACT Materials).

51.     On September 17, 2020, Governor Sununu endorsed all the LEACT Commission recommendations, including those addressing implicit bias training for law enforcement.  *See id.* (Sept. 17, 2020 Press Release in LEACT Materials).   Consistent with this support, Governor Sununu signed an Executive Order on October 7, 2020 that implemented many of these recommendations, including the requirement of implicit bias training for law enforcement.  *See id.* (Oct. 7, 2020 Executive Order).  Following this Executive Order, the requirement for implicit bias training has largely been implemented.  *See id.* (LEACT implementation records); *see also Exhibit 4* (Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11-12, 33 of James McKim's presentation "Are You Your Implicit Bias?"); *Exhibit 5* (May 3, 2021 and May 4, 2021 Presentations to N.H. Court System; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 12-13 of James McKim's May

3, 2021 presentation "Introduction to Diversity, Equity, and Inclusion," and slides 18 and 26 of

James McKim's May 4, 2021 presentation "Race in NH").[14]

## II.      The Growing Need and Demand for DEI Instruction in Education—Including in New Hampshire—Following the 2020 Racial Justice Protests.

52.     Following George Floyd's murder, many schools increased efforts to expose

students to perspectives and experiences—both past and present—of Black, Hispanic, Native

American, and other students of color.  These efforts were part of a growing and widespread

consensus among educators that inclusive education practices that give voice and attention to the

experiences of all students provide students with the robust education necessary to prepare them

to function effectively as participants in our increasingly diverse and multi-racial democracy.  Such

efforts help all students and harm none.  By presenting a more informed and realistic portrayal of

topics such as slavery, Jim Crow, segregation, and racial discrimination[15]—and discussing with

students the legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or

"unconscious bias"[16]—educational opportunities for all students are expanded.  This expansion of

educational opportunity takes many forms but it is unified by the aim of ensuring equal access to

educational content for students of all backgrounds, and exposure to various perspectives that

reflect the diversity of New Hampshire and America.

---

[14] Of course, if such trainings to prosecutors and judges on implicit bias, white privilege, and structural/systemic discrimination reflected in *Exhibits 4 and 5* are permissible under the Banned Concepts Act, then this instruction also would be permissible to students in schools under the Act.  But, as explained below, Defendants have been mum on many of these important questions.

[15] Antonia L. Hill, Culturally Responsive Teaching: An Investigation of Effective Practices for African American Learners 23–24 (Dec. 2012) (Ph.D. dissertation, Loyola University Chicago), https://ecommons.luc.edu/cgi/viewcontent.cgi?article=1352&context=luc_diss; Dr. Chastity McFarlan, "Supporting Marginalized Students Through Culturally Relevant Pedagogy," *Renaissance* (Sept. 10, 2021), https://www.renaissance.com/2021/09/10/blogsupporting-marginalized-students-through-culturally-relevant-pedagogy/.

[16] NEA Ctr. for Soc. Just., *Implicit Bias, Microaggressions, and Stereotypes Resources* (Jan. 2021), https://www.nea.org/resource-library/implicit-bias-microaggressions-andstereotypes-resources.

53.     New Hampshire educators embraced this call and engaged in professional development opportunities to enhance their skills to teach both (i) to Black, Indigenous, Hispanic, Asian, and other students from historically marginalized groups, and (ii) about the experiences and perspectives of those groups.

54.     For example, in 2020, Misty Crompton, a member of the Plaintiff NEA-NH and an educator who teaches in Derry, was awarded the prestigious Christa McAuliffe Sabbatical from the New Hampshire Charitable Foundation for her project called "Promoting Just Schools."[17]  The sabbatical, created in 1986 in honor of the Concord High School teacher and astronaut, gives one exemplary New Hampshire teacher a year off with pay and a materials budget to bring a great educational idea to fruition. Ms. Crompton's project focused on educational equity—namely, levelling the playing field for students by recognizing how identity, race, and culture of students and teachers play out in the classroom.

55.     The importance of elevating the perspectives and histories of individuals of color was confirmed by the 2020 census, which indicated that New Hampshire is rapidly growing more racially diverse.  These results indicated that—while New Hampshire's population grew by a modest 4.6% during the past decade—the number of residents who are people of color increased by 74.4% to 176,900 in 2020.  Black, Hispanic, and other people of color now represent 12.8% (176,900) of the state's population compared to 7.5% (101,400) in 2010.[18]  This diversity is particularly prevalent in the southern part of New Hampshire.  For example, the population of Manchester and Nashua was 98% White in 1980.[19]  Manchester now is 84.8% White, 10.4%

---

[17]   N.H.   Charitable   Foundation,   "Misty   Crompton   Awarded   Christa   McAuliffe   Sabbatical," https://www.nhcf.org/what-were-up-to/misty-crompton-awarded-christa-mcauliffe-sabbatical/.

[18] Kenneth Johnson, "Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard," *Carsey School of Public Policy* (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.

[19]   *See* Census Data for 1980, *available at*   https://www.census.gov/content/dam/Census/library/working-papers/2005/demo/POP-twps0076.pdf (page 76).

Hispanic (approximate population 11,717), and 6.1% Black (approximate population 6,873).[20]
Nashua now is 82.6% White, 12.7% Hispanic (approximate population 11,348), and 4.1% Black
(approximate population 3,663).[21]

56.     As the Carsey School of Public Policy at the University of New Hampshire
explained, "children are at the leading edge of the state's growing diversity."[22]  The *Union Leader*
also recently reported that "more than 2 of every 5 children in Manchester and Nashua hail from
families of color," and that, "[i]n 30 years, Manchester's youngest generation has shifted from
94% White in 1990 to 57% last year."[23]  Students of color in Manchester are also more likely to
live in poorer areas of the city.[24]

57.     Consistent with these demographic trends, the Manchester School District—the
largest and most diverse school district in New Hampshire—hired a Chief Equity Officer, Plaintiff
Christina Kim Philibotte, in July 2021.  As she told *NHPR*, her role was created by the District to
help ensure that—especially given that dropout, detention, and suspension rates are high for
students of color—these students are supported and recognized for the institutional disadvantages
that they frequently experience.[25]  The goal of this work also is to train staff to understand the
needs of communities of color—an effort that, in concert with creating a better sense of belonging

---

[20] 2019 Census Data for Manchester,
https://www.census.gov/quickfacts/fact/table/manchestercitynewhampshire/PST045219.
[21] 2019 Census Data for Nashua, https://www.census.gov/quickfacts/fact/table/nashuacitynewhampshire/PST045219.
[22] Kenneth Johnson, "Modest Population Gains, but Growing Diversity in New Hampshire with Children in the
Vanguard," *Carsey School of Public Policy* (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-
gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.
[23] *See* Michael Cousineau, "NH Grows More Diverse, Faces Call For Change," *Union Leader* (Dec. 19, 2021),
https://www.unionleader.com/news/business/whats_working/nh-grows-more-diverse-faces-call-for-
change/article_8c1cfc2d-73c1-51f3-9a5d-939525c3c21e.html.
[24] *See* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021),
https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-
years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html.
[25] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR*
(Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-
turns-to-a-west-high-school-alum.

for these students, is aimed to address some of the systemic inequities that often exist in education. For example, a report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations—demonstrates that school discipline in New Hampshire is disproportionately harsh on students of color. During the 2014-2015 academic year, "[w]hile students of color made up 13.9 percent of the student population, they comprised approximately 22.7 percent of students receiving out-of-school suspensions."[26] In hiring Ms. Philibotte, the Manchester School District is taking proactive steps to tackle these important equity issues, including racial disparities in discipline and test scores.

58.    The Exeter Region Cooperative School District made a similar decision, hiring Plaintiff Andres Mejia on August 2, 2021 as the District's first Director of Diversity, Equity, Inclusion, and Justice. As the District's superintendent, Dr. David Ryan, stated in announcing the position: "The work around diversity, equity, inclusion and justice is critically important and is helping us create an educational community where every student, educator, parent, guardian and community member feels like they belong."[27] This work is also vital in Exeter, which has well over 800 residents of color—including over 350 Asian Americans and over 350 Hispanic Americans.[28] This work not only helps White students in Exeter learn about the growing diversity

---

[26] *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf. Concord High School also experienced similar racial disparities. *See* Eileen O'Grady, "Suspensions, Expulsions are Used Disproportionately to Discipline N.H. Students of Color," *Concord Monitor* (July 4, 2020), https://www.concordmonitor.com/Race-and-discipline-in-NH-schools-34921292 ("That data showed that in the 2015-16 school year at Concord High School, Black students made up 8% of the student body, but made up 22% of out-of-school suspensions."). The Concord School District is taking important steps in this area, including through its Racial Equity Advisory Committee.

[27] *See* "'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity," *Portsmouth Herald* (Aug. 2, 2021), https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

[28] 2019 Census Data for Exeter, https://www.census.gov/quickfacts/fact/table/exetertownrockinghamcountynewhampshire/HSG650219.

of their community, but also helps students of color in Exeter know that they are not alone and that they are welcome.

59.     The work of the Manchester School District, the Exeter Region Cooperative School District, and other New Hampshire school districts in creating a comprehensive inclusive curriculum is central to the promise in *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), of true integration in education. *Brown* explained that schools are "a principal instrument in awakening the child to cultural values, in preparing [the child] for later professional training, and in helping [the child] to adjust normally to his environment." *Id.* at 493. Moreover, the ability of students to access education equally impacts their "ability to study, to engage in discussions" and to "exchange views with other students." *Id.* (quoting *McLaurin v. Oklahoma State Regents*, 339 U.S. 637, 641 (1950)).

### III.     The National Backlash, and President Trump's September 22, 2020 Executive Order.

60.     As these reforms took hold, so did the backlash.

61.     On September 22, 2020, President Trump signed an Executive Order entitled "Combatting Race and Sex Stereotyping," which targeted diversity, equity, and inclusion trainings in federal government agencies, as well as in businesses contracting with the federal government. *See Exhibit 6* (Sept. 22, 2020 Trump Executive Order).

62.     The Executive Order sought to censor certain viewpoints and chill speech. The Executive Order, in part, banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on the following "divisive" concepts:

**(1) one race or sex is inherently superior to another race or sex;**

(2) the United States is fundamentally racist or sexist;

**(3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;**

**(4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;**

**(5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex;**

(6) an individual's moral character is necessarily determined by his or her race or sex;

(7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

[(10)] The term ''divisive concepts'' also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

*See id.* (Sept. 22, 2020 Trump Executive Order, with the bolded text reflecting those concepts that are substantially similar to the prohibited concepts in the Banned Concepts Act).

63.     The Executive Office of the President's September 28, 2020 memorandum implementing this Order specifically referenced the third banned concept—namely, that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously"—and made clear that it was targeting trainings that, for example, used the phrases "white privilege," "intersectionality," "systemic racism," "racial humility," and "unconscious bias."   *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum indicating that such phrases "may help to identify the type of training prohibited by the" Executive Order).

64.     On December 22, 2020, a federal court partially enjoined the Executive Order, in part, on the ground that the plaintiffs were likely to succeed on their vagueness challenge.  *See*

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020). The district court found that the Executive Order's banned concepts are "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited." *Id.*[29]

### IV.    The New Hampshire Backlash and the Enactment of the Banned Concepts Act.

65.    Despite the Court's decision in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, bills copying President Trump's Executive Order began spreading in state houses throughout the United States in an attempt to ban educators from teaching about gender and race discrimination, as well as concepts relating to racial equity and other forms of instruction aimed at acknowledging and addressing the past and present inequities facing historically marginalized communities.

### A.   The Banned Concepts Act in the New Hampshire House of Representatives.

66.    This included New Hampshire House Bill 544's "Propagation of Divisive Concepts Prohibited Act," which copied all ten banned concepts in President Trump's September 22, 2020 Executive Order and applied them not only to all government agencies and employees, but also to (i) private companies that contract with the state, and (ii) course instruction at New Hampshire public colleges and universities.  *See Exhibit 8* (HB544 Docket and Language).

67.    The chief sponsor of HB544 argued that this legislation was necessary to address "critical race theory" and, more specifically, to ban certain "diversity training or inclusion

---

[29] A separate lawsuit was filed by the NAACP Legal Defense Fund in October 2020 (amended complaint filed in January 2021), challenging the Executive Order on behalf of the National Urban League, the National Fair Housing Alliance, and the American Association for Access, Equity and Diversity.  *See National Urban League v. Trump*, 1:20-cv-03121-APM (D.D.C. Jan. 11, 2021), *available at* https://www.naacpldf.org/wp-content/uploads/Amended-Complaint-EO-AAAED.pdf.  The lawsuit raised three constitutional claims: vagueness, viewpoint discrimination, and equal protection. The Court did not issue any substantive orders in the case.  The plaintiffs filed a notice of dismissal with prejudice on June 15, 2021.

training[s]," which he described as "snake oil" that "propos[es] to cure a disease but in actuality it's even making it worse."[30]

68.    Other proponents of HB544 argued that the bill was necessary to eliminate discussion of and instruction on concepts like "implicit bias," "systemic racism," "white privilege," and "anti-racism" in schools and in government trainings, with many specifically calling such topics "Marxist" or "advancing Socialism," and identifying certain books as problematic. *See Exhibit 9* (Select Written Testimony From Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added).

69.    On April 7, 2021, as part of a legislative strategy to ensure the passage of HB544's language in the face of a threatened veto, the House of Representatives amended the budget trailer bill, HB2, to insert the operative provisions of HB544.  HB2 passed the House that same day. *See Exhibit 10* (HB2/Budget Trailer Materials, Docket Entry Approving Amendment 2021-1059h). The next day, having accomplished its mission in passing this legislation, the House of Representatives tabled the original version of HB544.  *See Exhibit 8* (HB544 Docket and Language).

70.    After this language was inserted in HB2, one legislator supporting HB544 explained that the legislation was needed to address, for example, a staff training in a school district that referenced "white privilege," as well as programs at one New Hampshire university where employers and managers discuss "unconscious bias." *See Exhibit 11* (Rep. Daniel Itse, "Taxpayers Money is Being Used to Promote Systemic Racism in NH," *Union Leader* (Apr. 28, 2021)).

---

[30]  *See* Executive Departments and Administration Hearing on HB 544 (Feb. 11, 2021), https://www.youtube.com/watch?v=ycrODcuaLDc (Rep. Keith Ammon's remarks starting at 1:31:50, with quotation at 1:37:20).

71.     In response to these claims, several school districts made clear that HB544's language, if enacted in HB2, would potentially deprive students of vital information.  For example, the Oyster River Cooperative School District and the Concord School District, along with other organizations, called the law "ambiguous" and "antithetical" to the principles of diversity and inclusion.  *See* *Exhibit 12* (Open Letter from Business Community).  The school district covering Hanover, Dresden, and Norwich, as well as the Hopkinton School District, also formally opposed the legislation.  *See* *Exhibit 13* (SAU70 Resolution Opposing HB544); *Exhibit 14* (Hopkinton School District May 6, 2021 Opposition to Divisive Concepts Language in HB2).  The Manchester School District similarly declared its opposition, announcing that "[w]e are opposed to any bill which will limit any school's ability to talk about race or gender, or to educate our students and staff about the historical discrimination against communities of color, women, and other marginalized groups, and the impacts this long standing racism and sexism has had on the American people."  *See* *Exhibit 15* (Manchester School Board Committee Meeting Agendas, Materials, and Minutes Concerning Opposition to HB544).

**B.  The Banned Concepts Act in the New Hampshire Senate.**

72.     When HB2 moved to the Senate, the Senate Finance Committee, on or about May 28, 2021, proposed an amendment to HB2's "divisive concepts" provisions.  *See* *Exhibit 10* (HB2/Budget Trailer Materials, Senate Finance May 28, 2021 2021-1799s amendments).  This amendment deleted six of the ten "divisive concepts" and made some cosmetic changes to the language.  In an effort to politically rebrand the restrictions as an "anti-discrimination law," the amendment also inserted its banned concepts in the Law Against Discrimination at RSA ch. 354-A and expanded the focus of the restrictions from "race or sex" to "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin."  Lastly, the amendment changed the restrictions to no longer apply to (i) private companies contracting with the State of New Hampshire, or (ii) course instruction at state colleges and universities *by faculty*.  *See* RSA 354-A:29, III.

73.    The Senate's effort to reframe the law also went even further than the original language in HB544 insofar as it now included the draconian penalty provisions specifically targeting certified educators by making violations of the law punishable under the Educator Code of Conduct.  *See* RSA 193:40, IV.

74.    On June 3, 2021, the Senate passed HB2, including the provisions constituting the Banned Concepts Act, by a vote of 14 to 9.  *See Exhibit 10* (HB2/Budget Trailer Materials).

75.    The House did not concur with the Senate's version of HB2.  As a result, a committee of conference was appointed.

76.    As this committee of conference process was getting underway, Defendant Commissioner Edelblut published an op-ed in which he claimed that the Banned Concepts Act was necessary to prevent concepts like those in Dr. Ibram X. Kendi's book *How to Be an Antiracist* from being taught in schools.  *See Exhibit 16* (Frank Edelblut, "Teach Children About Racism, Not to Be Racists," Union Leader (June 13, 2021)).

77.    In the meantime, the committee of conference ultimately agreed on a report recommending the language to be included in HB2, and it included the Senate's version of the Banned Concepts Act.  This report was filed on June 24, 2021, and it was approved in both chambers.

78.    The governor signed the Banned Concepts Act, along with all of HB2, into law on June 25, 2021.  The Banned Concepts Act immediately became effective.

79.     Following the Governor's signing of the Act into law, 10 of the 17 members of his Advisory Council on Diversity and Inclusion resigned in protest.  *See Exhibit 17* (Governor's Advisory Council on Diversity and Inclusion Correspondence Regarding Banned Concepts Act, June 29, 2021 Letter).

80.     Educators immediately began requesting assistance in understanding the Act. Plaintiff NEA-NH heard from members all over the state about their outrage and disappointment with the Act, their confusion about its meaning, and their fear about the consequences of violating it.[31]

## V.     The Banned Concepts Act's Provisions Are Vague.

### A.  The Act's Four Banned Concepts.

81.     The text of the Banned Concepts Act is ambiguous and confusing, leaving educators, DEI trainers, school districts, and government employees to guess what it means, chilling instruction and important trainings, and encouraging arbitrary and discriminatory enforcement.

82.     For example, the Act bans public employers—"either directly or through the use of an outside contractor"—and government programs from "teach[ing]," "train[ing]," or

---

[31] Consistent with this backlash against the 2020 racial justice protests and following up on the passage of the Banned Concepts Act, several New Hampshire legislators—including two of the sponsors of HB544—recently proposed HB1255, which states the following: "No teacher shall advocate any doctrine or theory promoting a negative account or representation of the founding and history of the United States of America in New Hampshire public schools which does not include the worldwide context of now outdated and discouraged practices.  Such prohibition includes but is not limited to teaching that the United States was founded on racism."  *See* Eileen O'Grady, "N.H. 'Teacher Loyalty' Bill Would Restrict How U.S. History, Especially Racism, Can Be Discussed in School," *NHPR* (Dec. 3, 2021), https://www.nhpr.org/nh-news/2021-12-03/teacher-loyalty-bill-would-restrict-how-u-s-history-especially-racism-can-be-discussed-in-school.  In response to a question from *WMUR* about how this bill would impact classroom discussion of the Three-Fifths Compromise which dehumanized Black Americans, sponsor Representative Erica Layon explained: "The three-fifth compromise actually made it so that the slaveholding south didn't have more of a voice in Congress.  They actually were worried that … [if] they counted each slave as a whole vote and a whole voter, that then there would be more slavery throughout the country, and that it would be unequal because a viewpoint that was on its way out would be overrepresented."  *See* https://twitter.com/AdamSextonWMUR/status/1466584833312710657.

"instruct[ing]" on any of four banned concepts.  RSA 354-A:31, RSA 354-A:32.  The Act also states that "[n]o pupil in any public school … shall be taught [or] instructed" on any of the four banned concepts.  *See* RSA 193:40.  Moreover, given the passive voice usage of the phrase "shall be taught," this language, though unclear, may even include discussion without an educator's input where students engage each other on these concepts.

83.     The four banned concepts themselves are vague and aimed at chilling classroom discussions, instruction, and course materials.  These four banned concepts are substantially similar to four of the ten banned concepts from former President Trump's September 22, 2020 Executive Order.  Although a federal court barred portions of the Executive Order from going into effect, in part, on vagueness grounds on December 22, 2020, *see Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020), the New Hampshire legislature enacted the Banned Concepts Act without curing the vague terminology.

### (1) Banned Concept #1.

84.     Under the Act's first banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *are inherently superior or inferior* to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(a); RSA 354-A:31, I; RSA 543-A:32, I; RSA 354-A:33, I (emphasis added).

85.     The Act does state that "[n]othing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."  RSA 193:40, II.  But the limitation that only the "historical

existence" of an idea may be discussed leaves impermissibly vague at what point the discussion of that history's relevance to students' lives crosses the line and is now prohibited.

86.     One of Plaintiff NEA-NH's members has given the example of being free to teach that the Declaration of Sentiments was written at the Seneca Falls women's rights convention of 1848, but wondering if students would misunderstand the lesson as the teacher critiquing White men.

### (2) Banned Concept #2.

87.     Under the Act's second banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat an individual, *by virtue of his or her* age, sex, gender identity, sexual orientation, race, creed, marital status, familial status, mental or physical disability, religion or national origin *is inherently racist, sexist, or oppressive, whether consciously or unconsciously*."  *See* RSA 193:40, I(b); RSA 354-A:31, II; RSA 543-A:32, II; RSA 354-A:33, II (emphasis added).

88.     This broad and vaguely worded second banned concept arguably deprives students, teachers, and other public employees of information about (among other things) "implicit bias" or "unconscious bias," which is a concept relevant to many academic fields and is a key portion of the instruction provided by professionals who specialize in diversity, equity, and inclusion.  While most commonly associated with race, these concepts are also integral to educating people about how to relate to individuals with disabilities and individuals who differ in some way from themselves.[32]

89.     The Court in *Santa Cruz Lesbian & Gay Cmty. Ctr.* specifically concluded that the analogous provision in President Trump's Executive Order was vague in the face of the plaintiffs'

---

[32] *See* Michigan State University, "The Unpopular Truth About Biases Toward People with Disabilities," *ScienceDaily* (July 18, 2019), www.sciencedaily.com/releases/2019/07/190718112453.htm.

allegations that "training on unconscious bias is critical" to their work, and plaintiffs "do not know whether they can continue with this critical training" under this language. *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543-44. As in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, Plaintiffs Andres Mejia and Christina Kim Philibotte—and educators throughout New Hampshire—have no idea whether this specific prohibition in the Act's text includes concepts like "unconscious" or "implicit bias" that have (i) become important components to trainings and education addressing diversity, equity, and inclusion, and (ii) been targeted by proponents of the law.

90. For example, it is unclear based on the Act's terms whether it goes so far as to potentially bar voluntary staff trainings addressing "implicit bias," "unconscious bias," "white privilege," "anti-racism," and "systemic racism," as well as instruction where all the students and their families are willing and eager to engage with this information. New Hampshire law already creates a process for students' families who object to certain course material to opt out of that instruction. *See* RSA 186:11, IX-c (stating that school districts shall implement a policy including "a provision requiring the parent or legal guardian to notify the school principal or designee in writing of the specific material to which they object and a provision requiring an alternative agreed upon by the school district and the parent, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area"). But the Act goes even further and bans any covered instruction even where there is no objection from a student or their family. The reasonableness of the fears that such instruction is barred is underscored by the fact that the Trump Administration construed its own Executive Order using nearly identical terms as rendering suspect the topics of "white privilege," "systemic racism" and "unconscious bias." *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum).

91.     The ban on this concept has chilled educators in their pursuit of professional development that would aid them in identifying their own biases which can impact their students. For example, an educator in Hillsborough County was brutally criticized by parents on social media and at a local school board meeting for attending a training that addressed bias and anti-racism instruction.  Colleagues who witnessed the backlash are unlikely to risk the same fate.

92.     The Act does add that it does not "prohibit racial, sexual, religious, or other workplace sensitivity training on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect."  *See* RSA 354-A:29, II.  But this proviso only adds to the Act's ambiguity, given that it provides no definition of "sensitivity training" that would allow educators or trainers to understand when concepts like implicit bias and systemic racism may be discussed.

### (3) Banned Concept #3.

93.     Under the Act's third banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat an individual *should be discriminated against or receive adverse treatment solely or partly* because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(c); RSA 354-A:31, III; RSA 543-A:32, III; RSA 354-A:33, III (emphasis added).

94.     This sweeping prohibition chills classroom discussion on and instruction of important contemporary topics, as educators fear the significant repercussions of making an erroneous guess as to what discussions are permissible and what discussions are forbidden. Further, this concept may demand race neutrality or color blindness, and thus potentially even implicates instruction on topics like affirmative action and other race-conscious remedies.

95.     This banned concept's ambiguity chills discussions with students about whether or how to rectify wrongs of the past—discussions that are essential because students will shape this country's future.  For example, because of this prohibition, educators may not know whether they can introduce materials where the authors debate or critique the concept of reparations for the descendants of enslaved people or affirmative action for Black Americans and other historically marginalized groups.  Although both are topics currently debated by policy makers and in the news, educators may fear that they cannot bring that type of discussion into their classroom because of the potential negative repercussions that could result for them professionally and personally.

### (4) Banned Concept #4.

96.     Under the Act's fourth banned concept, "[n]o pupil in any public school in this state shall be taught"—and "[n]o public employer … shall … train"—"[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *cannot and should not attempt to treat others equally and/or without regard to* age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."  *See* RSA 193:40, I(d); RSA 354-A:31, IV; RSA 543-A:32, IV; RSA 354-A:33, IV (emphasis added).

97.     The Act's contorted prohibition of the concept that people "cannot and should not attempt to treat others equally and/or without regard to" categories like age, race, sex, or disability is undecipherable.  It is unclear what it would mean to treat a person "without respect to" age, race, sex, or disability, and it is further unclear what it would mean to teach that a person "cannot and should not attempt" to do so.  Combining these phrases in one prohibition creates a confusing double negative.  Both state and federal laws and regulations addressing discrimination are well

established, but the New Hampshire legislature did not reference existing law to clarify its meaning or explain the intended operation of this concept in relation to these laws. While the New Hampshire legislature intended this banned concept to have some force and effect, it is not clear what it prohibits. As such, educators are left to guess at its meaning, violating their due process rights.

98.     Like the third banned concept, this fourth banned concept also may demand race neutrality or color blindness, and thus potentially implicates instruction on topics like affirmative action, reparations for descendants of enslaved African Americans, and other race-conscious remedies because of generations of discrimination—policies in which people are subjected to certain treatment "with regard to" race.

99.     Similarly, this banned concept may impact discussions and considerations required by state and federal law that entitle persons with disabilities to receive reasonable accommodations or modifications to ensure that they are treated equitably in society.  In other words, these laws require specific treatment "with regard to" disability. *See* RSA 354-A:7(VII)(a), 10, 12(III)(B), 17 (in employment, housing, and public accommodations, highlighting obligations to provide access and make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person with a disability an equal opportunity to such services); 42 U.S.C. §§ 12112(b), 12132, 12182(a) (federal Americans with Disabilities Act ("ADA") provisions proscribing discrimination on the basis of disability, and entitling persons with disabilities to reasonable accommodations or modifications to ensure that they are not denied employment, "the benefits of services, programs, or activities of a public entity," or "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation").

100.    Indeed, discussing the importance of equity for individuals with disabilities—including through the provision of reasonable accommodations "with regard to" disability that would not necessarily be provided to others—is critical to allowing students and other individuals with disabilities to exercise their civil rights and participate in their communities in ways that those without disabilities are able to do with no need to talk about accommodations. *See also* *Exhibit 5* (Disability Rights Center Presentation to N.H. Court System, The Disability Community and Access to Justice (May 3, 2021) (noting the need to "[i]dentify auxiliary aids/accommodations")).

101.    A report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations which includes the Disability Rights Center-New Hampshire—demonstrates that school discipline in New Hampshire is disproportionately harsh on students with disabilities.  During the 2014-2015 academic year, "while students with disabilities made up 20.3 percent of the student population, they comprised approximately 38 percent of students receiving out-of-school suspensions."[33]    Clear and honest discussions about disabilities, including discussions about accommodations and modifications, are essential to eliminate the isolation of persons with disabilities, as Congress intended to do when it enacted the ADA.  *See* 42 U.S.C. § 12101(a).

102.    This banned concept also seems to ignore the fact that the law specifically provides anti-discrimination protections "with regard to" age.  For example, the federal Age Discrimination in Employment Act of 1967 ("ADEA") protects certain applicants and employees 40 years of age and older from discrimination on the basis of age in hiring, promotion, discharge, compensation, or terms, conditions or privileges of employment.  Those under 40 years of age cannot avail

---

[33] *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf.

themselves of this law.  *See* 29 U.S.C. §§ 621-634.  Under this concept, can a teacher facilitate a discussion that the line drawn by this federal statute is appropriate?  This is unclear.

### B.  The Act's Penalties and Reporting Requirement.

103.    The Banned Concepts Act couples these ambiguities with strict penalties for violations, particularly for educators.

104.    One remedy for a perceived violation is a civil action in Superior Court against a government entity (including a school district)—and potentially even the employee—for damages and equitable relief, including an injunction to stop the instruction of or training on the banned concept.  *See* RSA 354-A:34 ("*Any person aggrieved* by an act made unlawful under this subdivision may pursue all remedies available under RSA 354-A, RSA 491 ….") (emphasis added); RSA 193:40 III ("Any person claiming to be aggrieved by a violation of this section [government teaching banned concepts in schools], including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief ….").  The private right of action afforded to "[a]ny person aggrieved by an act made unlawful" under the Banned Concepts Act will serve to compound the chilling effect of the law.  *See* RSA 354-A:34.  For example, under RSA 193:40 III, any parent, co-worker, or even neighbor that sees a teacher's lesson plan with the name of a book perceived as being prohibited by the Banned Concepts Act could file a Superior Court lawsuit against the teacher's school, school district, and potentially the teacher.

105.    Another remedy is a complaint against the government entity or its employee to the New Hampshire Commission on Human Rights, which has the power to receive, investigate, and pass upon complaints of illegal discrimination by teaching prohibited concepts.  RSA 193:40 III.

There does not appear to be any "qualified immunity" for a public employee who has violated the Act but done so reasonably or unintentionally.

106.    The Act also contemplates especially harsh and punitive sanctions for educators. In particular, the Act states that "[v]iolation of this section by an educator *shall* be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education."  RSA 193:40, III (emphasis added); *see also* RSA 193:40, V (establishing that this section extends to "[a]dministrators, specialists, and teachers").  Violations of the Educator Code of Conduct can lead to the occupational and professional "death penalty" of revoking an educator's license to work in the state.  *See Exhibit 2* (N.H. Code Admin. R. Ed 511.02 addressing sanctions). A teacher's entire professional life depends on interpreting a statute which is indecipherable.

107.    The Act also leverages the threat of professional sanctions to press educators into service as informants of their fellow colleagues and enforcers of the Act's vague restrictions.  That is because a licensed educator's failure to report a suspected violation of the Code of Conduct is itself punishable as a violation of the Code.  *See id*. 510.05(a) (stating that "[a]ny credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures"); *id.* 510.05(f) (stating that, "[i]f the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c)"). As a result, educators must risk their livelihood on their best guess of the Act's inscrutable restrictions—not only when it comes to their own teaching, but also in deciding whether to report and jeopardize the career of a fellow teacher.  Further, the prospect of an educator needing to file

a report will be constant considering that educators cannot parse the Act with enough specificity to be sure that they have no *suspicion* of any conduct which violates the Act.

108.     All of these remedies are costly and time consuming for educators to defend. Reputational harm and unwanted personal scrutiny will result even from complaints which are ultimately unfounded.  Even if a complaint in any of these venues is ultimately dismissed, the educator will still be subjected to the process of defending themselves.  The threat of lengthy legal proceedings and public scrutiny influences educator choices and causes them to shy away from any topic or material which could be misinterpreted.

## VI.     The Defendants' Failure to Answer Specific Questions Concerning the Banned Concepts Act.

109.     Immediately after passage of the Banned Concepts Act, Plaintiff NEA-NH began to hear from members that they were confused about what they could and could not teach under the Act, as well as scared of the repercussions for guessing wrong.

110.     On July 12, 2021, NEA-NH President Megan Tuttle, on behalf of more than 17,000 educator members, wrote to Defendant Attorney General Formella requesting clarification of the ambiguity of the Act.  *See Exhibit 18* (July 12, 2021 NEA-NH Letter).  The letter asked 12 specific questions which reflected the sentiments that the NEA-NH had been hearing from its members who are the vast majority of the state's educators impacted by the Act.

111.     Defendant Attorney General Formella did not respond to that letter even to acknowledge receipt.

112.     On July 21, 2021, Defendants Commissioner Edelblut, Attorney General Formella, and Director Malachi issued so-called "guidance" on the Banned Concepts Act.  *See Exhibit 19* (July 21, 2021 Guidance).

113.    As a threshold matter, New Hampshire state courts have independent enforcement authority over the Banned Concepts Act apart from any interpretation that the Attorney General may give to the Act's terms.  The Act provides for a private right of action for any individuals allegedly "aggrieved" by the Act.  *See* RSA 193:40, III (allowing "aggrieved" persons to "initiate a civil action against a school or school district in superior court for legal or equitable relief").  As a result, any interpretation from the Attorney General is not binding, as enforcement power under the Act is also delegated to a state judicial branch that is outside the Attorney General's control.

114.    In any event, this July 21, 2021 "guidance" barely scratches the surface of the Act's provisions.  The "guidance" fails to provide any extensive and concrete examples.  It does not explain what specific types of diversity, equity, and inclusion training are or are not covered under the Act.  The "guidance" also fails to directly answer all the questions posed by Plaintiff NEA-NH on behalf of its members.

115.    For example, the July 21, 2021 "guidance" for K-12 educational programs says, generically and without elaboration, that the Act does not "prohibit *discussions* related to current events including … efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups."  *See Exhibit 19* (July 21, 2021 Guidance) (emphasis added).  But it did so while explicitly omitting whether such efforts—including those that capture concepts like "implicit bias" or "white privilege"—can be "taught," "advocated for," "trained on" "advanced," or "instructed" in schools despite the Act's terms.  *See* RSA 354-A:31 (no public employer "either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train" on the banned concepts); RSA 354-A:32 ("[n]o government program shall teach, advocate, or advance" on the banned concepts); RSA 193:40, I (no pupil "shall be taught, instructed or compelled to express belief in" a banned concept).

116. The line between discussing (perhaps allowed under the "guidance") and teaching/advocating for/training on/advancing/instructing (perhaps prohibited) is so murky that enforcement of the Act poses a danger of arbitrary and discriminatory application. *See Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 544 ("The line between teaching or implying (prohibited) and informing (not prohibited) is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.") (internal citations omitted).

117. The July 21, 2021 "guidance" for K-12 educational programs also does not address fundamental questions like whether the Act specifically prohibits or allows classroom instruction to students on topics like "systemic racism," "implicit" or "unconscious bias," and "white privilege." This "guidance" for educational programs fails to address these questions despite the fact that the Trump Administration construed its own Executive Order using nearly identical terms as rendering suspect the topics of "white privilege," "systemic racism," and "unconscious bias." *See Exhibit 7* (Sept. 28, 2020 Executive Office of the President's Memorandum).

118. For educators, rather than clarifying the Act, the July 21, 2021 "guidance" only further confuses matters when read in conjunction with the Act's text and with the knowledge of what the legislature sought to do. For example, the guidance says that the Act does not prohibit "discussions related to current events including but not limited to: the Black Lives Matter movement." *See Exhibit 19* (July 21, 2021 Guidance). However, the Black Lives Matter movement's mission is, among other things, to "eradicate white supremacy and build local power to intervene in violence inflicted on Black communities by the state and vigilantes," and to work for a world "where Black lives are no longer systematically targeted for demise."[34] A teacher cannot, on one hand, have a "permissible" discussion about the Black Lives Matter movement in

---

[34] *See* Black Lives Matter, About, https://blacklivesmatter.com/about/.

the news and yet, on the other hand, completely ignore discussing white privilege, systemic racism, and unconscious bias—concepts that are foundational to understanding this movement.

119.    The July 21, 2021 "guidance" for public employers and government programs similarly is problematic.  While it is nominally more instructive in saying that the Act does not "prohibit implicit bias training" and allows public employers to have "trainings" and "programs" "to examine issues related to equity, diversity, inclusion, and equality," the guidance does not include or reference classroom instruction to students, nor does the "guidance" reference specific concepts like "systemic racism" and "anti-racism" that have become staples in DEI instruction, would benefit students in creating a more inclusive educational environment, and were specifically targeted by proponents of the Act.

120.    Given the deficiencies in the July 21, 2021 "guidance," Plaintiff NEA-NH wrote Defendants Attorney General Formella and Commissioner Edelblut on August 5, 2021 presenting a reasoned and plausible interpretation of the Banned Concepts Act and asking for confirmation that their interpretation of the guidance was correct before disseminating such advice to their concerned members prior to the 2021-2022 school year.  For example, the NEA-NH sought confirmation, among other things, that the following was appropriate:

(i) "[i]ntroducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group";

(ii) discussion of "Structural Racism (a.k.a Societal Racism, Systemic Racism) [which] describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government";

(iii) "[a]ssigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion"; and

(iv) discussion of "the subject of 'white privilege,' a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is 'inherent' or cannot be overcome."

*See Exhibit 18* (NEA-NH Aug. 5, 2021 Letter).

121.    The NEA-NH also sought confirmation that "[s]pecific books or works of certain authors are not 'banned' under the law." *Id.* This question was particularly important given that Defendant Commissioner Edelblut, in a June 13, 2021 op-ed in the *Union Leader*, left the distinct impression that Dr. Ibram X. Kendi's book *How to be an Anti-Racist* may not be read under the Act. *See Exhibit 16* (Frank Edelblut, "Teach Children About Racism, Not to Be Racists," *Union Leader* (June 13, 2021)). The NEA-NH added that, "if there are certain texts which your offices' believe are per se prohibited under this law, please provide a list so educators know that prior to making 2021-2022 lesson plans." *See Exhibit 18* (NEA-NH Aug. 5, 2021 Letter). The NEA-NH's concern was further realized when Commissioner Edelblut later raised a complaint about Tiffany Jewell's book for 11-15-year-olds entitled *This Book is Anti-Racist* at the July 8, 2021 State Board of Education meeting. At this meeting, the Commissioner read portions of Chapter 10 from this text, and strongly suggested that he believed that this book was banned under the Act.[35]

122.    Neither Attorney General Formella nor Commissioner Edelblut directly responded to these reasonable questions in Plaintiff NEA-NH's August 5, 2021 letter. *See* RSA 21-N:1, II(a) (noting that "[t]he department [of education] shall have the dual role of providing regulatory direction and instructional assistance to public elementary and secondary schools").

---

[35]    *See* N.H. State Board of Education Meeting (July 8, 2021), https://us02web.zoom.us/rec/play/9LhY5d2K7pIYMFI_k_Y03oe4-IAF2kBzSxqGiFW_AYoJCAwC_4FGOgkvueh7OsagTe0sVbKwPttCNONe.pDFAngwZ6nvzBFP1 (starting at 3:22:19).

123.     Rather than respond to the NEA-NH—the chosen representative of the vast majority of educators in New Hampshire—Defendant Commissioner Edelblut blithely suggested during an interview on *WMUR* in late August 2021 that, "if there are educators who are concerned about a particular curricular material or something like that, they can reach out to the Department [of Education] and we can take a look at that for them and provide feedback for them on that."[36]

124.     Further, in response to a specific question from *WMUR* as to whether under the Act "a teacher should lose their license if they teach that systemic racism exists in the United States," Commissioner Edelblut did not directly answer and, instead, said that the circumstance would have to be looked at individually.  He agreed that there is "not a bright line," but that the "bright line … that we all share is that we are not discriminating against one another, whether that is in the classroom or outside the classroom."[37]  Defendant Commissioner Edelblut also noted in a separate *NHPR* interview in late August 2021 that, "if educators believe that somehow this is providing a chilling effect—the conversations that they're having—they should consider what it is that they're talking about."[38]

125.     On September 7, 2021, Defendant Attorney General Formella issued "Attorney General Opinion No. 2021-01" entitled "Request for Attorney General's Opinion Regarding New Anti-Discrimination Protections."  *See Exhibit 20* (Sept. 7, 2021 Attorney General Opinion).  This opinion letter has no binding effect.  *See Hess v. Turner*, 529 A.2d 386, 387 (N.H. 1987) ("the way the attorney general chooses, in his discretion, to implement [the statute] does not determine for

---

[36] Adam Sexton, "CloseUp: Commissioner Expects to Fund 1000-1500 Education Freedom Accounts This Year," *WMUR* (Aug. 29, 2021), https://www.wmur.com/article/closeup-commissioner-expects-to-fund-1000-1500-education-freedom-accounts-this-year/37424825 (starting at 9:58).
[37] *Id.*
[38] "N.H. Education Commissioner: 'Divisive Concepts' Restrictions Won't Hinder Classroom Conversations," *NHPR* (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.

us what the statute compels the State to do").  And, far from resolving or narrowing the ambiguity and confusion over effect of the Banned Concepts Act, it only serves to add more.

126.    The opinion apparently was in response to a request from the New Hampshire Commission on Human Rights for an official opinion "concerning the scope and application of the" Banned Concepts Act.  *See Exhibit 20* (Sept. 7, 2021 Attorney General Opinion).  In responding to the Commission, the Attorney General's nine-page opinion effectively memorialized the July 21, 2021 "guidance," while acknowledging that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."  However, like the July 21, 2021 "guidance," this opinion fails to provide any extensive and concrete examples of what specific texts and types of diversity, equity, and inclusion trainings are (or are not) covered under the Act.

127.    Much of the confusion sewn by this non-binding September 7, 2021 opinion comes from Defendant Formella's argument that the Act's overall purpose is to prohibit teaching that racism and other biases are "natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging."  To begin with, virtually no one believes that racism is "natural, biological, or innate" in the kind of genetically-preordained sense suggested by Defendant Formella's opinion, thereby raising the question of why such time and effort would be devoted to restricting the teaching of concepts that are all but non-existent.  Likewise, no one would understand what is meant by the claim that teaching about racism and other bias is permissible so long as they are presented as being "accidental" or "apparent"—the idea is simply non-sensical.

128.    The confusion only grows when Defendant Formella attempts to provide further detail.  For example, Defendant Formella asserts that the Act's use of the term "inherently" in the prohibition on teaching that certain groups are "inherently racist, sexist, or oppressive, whether consciously or unconsciously" must be read to include "belonging by … settled habit."  Yet, at the same time, Defendant Formella's opinion states that the Act does not prohibit teaching that certain groups are biased or racist "because of external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging."  Educators unwilling to risk their livelihood have no way of reliably distinguishing between lessons that discuss racist beliefs acquired though "settled habit" (perhaps prohibited) and those that discuss racist beliefs due to "external action or external factors" (perhaps not prohibited).  (The opinion creates the same confusion and ambiguity for trainers of implicit bias: it declares that trainings cannot teach that certain groups are "racist, sexist, or oppressive, whether consciously or unconsciously" out of "settled habit," while at the same time claiming that the Act does not prohibit training that "recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources.").

129.    Finally, Defendant Formella's opinion exacerbates the vagueness and chilling effect of the Act by declaring that a violation may occur not just because of the content of a lesson or instructional material, but also because of implications and inferences that a student or trainee may subjectively draw from the material.  For example, the opinion explains that, while it may be permissible to provide "Anti-Racist Resources," those resources may not be offered in a way that "may imply that white people … are in need of anti-racist resources."

130.    In sum, Defendants have allowed the chill of the Act to persist.  The Defendants' refusal to answer specific questions as to what texts are covered under the Act is not only unhelpful

and indifferent, but also affirms the broadest and most variable interpretation of the Act and invites arbitrary and discriminatory enforcement.

131.    Moreover, the Human Rights Commission's need to ask for a formal opinion on the Act's scope and the Attorney General's need to issue two (albeit not specific and lacking in specificity themselves) "guidance" documents only highlight the Act's vagueness and lack of clarity.  And if Defendants cannot (or are unwilling to) answer basic questions as to what texts are specifically banned under the Act's text, educators cannot possibly be expected to decipher these vague prohibitions for themselves and comply.  Instead, educators have been left to "dangle in the wind" as they attempt to interpret how to comply with the Act's provisions in the face of dire penalties.

132.    As a result, the NEA-NH has not been able to confidently provide guidance to its members as to how they could comply with the vague prohibitions in the Act.  Educators still do not know what topics can be taught or trained.  If the Defendants know specific books, lessons, or materials which are prohibited, then they should just say so explicitly.

**VII.    Even Education Lawyers Do Not Know What the Banned Concepts Act Actually Bans.**

133.    Prominent education lawyers who give advice to educational institutions have highlighted the Act's ambiguity, and how this ambiguity creates a chilling effect given the Act's penalties—even in the face of Defendants' July 21, 2021 "guidance."

134.    For example, the Banned Concepts Act uses the passive voice, stating in part that "[n]o pupil in any public school in this state shall be taught, instructed, [or] inculcated" on any of the banned concepts.  RSA 193:40, I.  Thus, as Attorney David Wolowitz from McLane Middleton explained in a piece published in July/August 2021, this Act may even capture classroom discussion on banned topics where students are teaching one another:

> As drafted, the construction of sentence prohibits teaching or instruction of the prohibited concepts, regardless of whether the teaching or instruction inculcates or compels the students to believe in or support the concepts … Classroom discussions present a particular risk because a teacher cannot predict what students might say and because the definition of 'taught' is so broad …. [I]f a student were to assert that the prohibitions and penalties in the new law are motivated by racism or sexism, which some critics have argued, permitting such discussion to continue could be construed as a violation of the statute.

*See Exhibit 21* (David Wolowitz, "A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act," (July 6, 2021/Aug. 2, 2021)).

135.    Accordingly, even in the face of Defendants' July 21, 2021 "guidance," Attorney Wolowitz advised educators to exercise extreme caution, explaining that, "to protect themselves against potential professional conduct complaints, teachers should be prepared to immediately stop any classroom discussions on any and all topics potentially relating to the prohibited concepts." *Id.* He added—confirming the potential chill of the law—that, "[g]iven the extraordinarily high risk of teaching related to any of these topics, I recommend that teachers exercise caution even when they are confident their teaching does not violate the statutory prohibitions." *Id.*

136.    Similarly, attorneys Meghan S. Glynn, James A. O'Shaugnessy, and Milliana R. Zonarich of the law firm Drummond Woodsum—who represent school districts throughout New Hampshire—have conducted trainings of educators on behalf of their education institution clients. The attorneys' materials explained the Act's ambiguity.  For example, these lawyers highlighted as a "gray area" the following: (i) "[p]rograms that involve discussion of power structures or power imbalances in society"; and (ii) "programs that involve advocating for … [a]ffirmative action to promote equity, [r]eparations for past wrongs, [and] [w]hite privilege."  *See Exhibit 22* (Drummond Woodsum August 5, 2021 Presentation).  These lawyers also added that a "gray area" includes "[d]iscussions regarding power structures in present-day society," and "[d]iscussions of

cultural sensitivity." *Id.* These lawyers further explained that: (i) "The state guidance [issued on July 21, 2021], while helpful, does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law;" (ii) "The law is difficult to understand, often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions"; and (iii) "One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech." *Id.* Drummond Woodsum's trainings with this information are ongoing.

137.    In short, even lawyers who regularly advise school districts do not know what the Act means and cannot answer many fundamental questions as to what is covered under the Act—an uncertainty that only has scared and chilled educators further. If lawyers do not know where to draw the lines, then how can teachers? The (understandable) inability of experienced education lawyers to understand the Act means that school districts and those authorized to enforce the Act are likely to apply the Act in ways that are arbitrary and discriminatory.

138.    Moreover, some of Plaintiff NEA-NH's members report either no training on the Act at all by their school district or training which left them confused about what was permissible. These educators are being left to fend for themselves because of the vagueness of the Act and the Defendant's refusal to provide concrete, unambiguous guidance to them. Members have conveyed that they feel like the lack of clarity on the Act amounts to a trap being set, and educators fear that they are walking into it unwittingly and unavoidably.

**VIII.   Defendant Commissioner Edelblut's Website and the Moms for Liberty Bounty.**

139.    If the inherent chill of the Act was not enough, it was compounded when Defendant Commissioner Edelblut and the Department of Education, on or about November 10, 2021, published a website to invite members of the public to file complaints against teachers under the

Act.  *See Exhibit 23* (DOE Website as of Dec. 19, 2021).  The website contains a complaint form that can be sent directly to the Commission for Human Rights.

140.    The Department of Education's website (at least initially before it was later deleted) also included an email address of a Department of Education employee who could field complaints directly.  The Department of Education initially included a Department employee as a person to field complaints despite the fact that the Defendants' July 21, 2021 "guidance" said that complaints should be sent to the New Hampshire Commission for Human Rights or the New Hampshire Office of the Attorney General.  *See Exhibit 19* (July 21, 2021 Guidance).

141.    The Department of Education established and advertised this complaint website even though, to the best of Plaintiffs' knowledge, the Department of Education has not established a similar, specific website for violations of other provisions of the Law Against Discrimination or RSA 193:38-39 that were added in 2019 to apply to public schools.[39]

142.    In other words, the Department of Education set up this website to target teachers directly under the Banned Concepts Act.

143.    As of December 19, 2021, the Department of Education's complaint website, *see Exhibit 23*, also fails to mention or make reference to the Attorney General's September 7, 2021 opinion purporting to interpret the Act's provisions.

144.    Adding to this chill—and the underlying intent of the Act to cause teachers to self-censor with respect to important conversations on race and gender—the group "Moms for Liberty

---

[39]    *See* Department of Education, Complaints and Concerns, https://www.education.nh.gov/who-we-are/commissioner/complaints-and-concerns; *see also* RSA 354-A:27-28 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion or national origin, all as defined in this chapter"); RSA 193:38-39 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, or national origin, all as defined in RSA 354-A").

NH" published a tweet on November 12, 2021 in response to the Department of Education's complaint website.  The tweet stated the following:



*See* <u>Exhibit 24</u> (Bounty Tweet).[40]

### IX.    The Chill of the Banned Concepts Act.

145.    Through usage of vague terms with a harsh enforcement mechanism and draconian

---

[40] A similar "Moms for Liberty" group in Tennessee has alleged that the books being assigned to Second Graders in one county entitled *Martin Luther King Jr. and the March on Washington* by Frances E. Ruffin and *The Story of Ruby Bridges* by Robert Coles—which is about the Black 6-year-old who integrated a Louisiana public school in 1960— violate Tennessee's similar "divisive concepts" law.  *See* Gabriella Borter, "'Critical Race Theory' Roils a Tennessee School District," *Reuters* (Sept. 21, 2021), https://www.reuters.com/world/us/critical-race-theory-roils-tennessee-school-district-2021-09-21/; *see also* Moms for Liberty Letter (June 30, 2021), https://drive.google.com/file/d/16W9grkwSFsIPRQOSpQfnAHNJzvDH5Bkk/view.

penalties, the Act chills permissible instruction by teachers who are uncertain whether their instruction could lead students to inquire about a prohibited concept as described throughout this Complaint. As a result, teachers across New Hampshire have begun self-censoring certain texts and discussions on race and gender. This should hardly be surprising. The Act's ambiguities and penalties—coupled with the Department of Education's cultivation of a climate of fear—create strong incentives for school districts (even those who want to actively promote DEI work) to, upon fielding a parental complaint, immediately shelve books slated for classroom instruction to avoid liability.

146.    Similarly, educators fear that students, as well as parents, will respond to this Moms for Liberty "bounty" given its monetary reward. Teachers are already subject to students creating social media pages targeting them or clandestinely videoing their lessons and classroom interactions. Educators feel like they cannot freely engage with their students and, instead, have retreated to guarded lessons that do not serve these students as well as an honest education does.

147.    In addition to the examples in Paragraph 34, examples of this chill include the following:

- A group of teachers focused on diversity at a Rockingham County middle school received a grant to purchase Lisa Moore Ramée's book *A Good Kind of Trouble*—and a collection of other titles, including *So You Want to Talk About Race* by Ijeoma Oluo, *The New Jim Crow* by Michelle Alexander, *The Black Friend: On Being a Better White Person* by Frederick Joseph, *Ghost Boys* by Jewell Parker Rhodes, *Raising White Kids: Bringing Up Children in a Racially Unjust America* by Jennifer Harvey, *Me and White Supremacy* by Layla Saad, and *The Hate U Give* by Angie Thomas—as part of efforts to focus more on equity in schools. The group wanted to have these books used as resources and included in their classroom libraries, but those plans have been put on hold.

  In particular, *A Good Kind of Trouble* is for students ages 8-12 and tells the story of a 12-year-old Young African American girl who, after experiencing a powerful racial justice protest, starts getting more active in the Black Lives Matter movement. With respect to this book, a parent sent an email to Defendant Commissioner Edelblut in October 2021 demanding that the "so-called professionals that are allowing this in

school need to be disciplined!"  The parent also complained that the "book has an underlying tone that white people and police officers are against black people all the way down to how white people look at a black person."  Further, she objected to certain so-called "gender books" being read.  The parent concluded by asking Commissioner Edelblut, in part, "[w]hat disciplinary action will result?," and "[h]ow do we proceed? Do I need to get a lawyer?"

- Similarly, a Rockingham County middle school has temporarily set aside Tiffany Jewell's book entitled *This Book is Anti-Racist*, which was used by a teacher group for professional development.

### X.    The Harm of Chilling DEI Instruction.

148.    The Act's chill of education focusing on race, gender, and DEI concepts harms all Granite Staters because the inclusion of such concepts in classrooms provides a multitude of benefits for students and society at large.  Student body diversity—and the resultant diversity in views and perspectives that flows from such diverse students' participation—improves critical thinking and problem solving, increases cross-racial understanding, reduces stereotypes and prejudices, and develops leadership skills and many other skills necessary to thrive in an increasingly diverse society.[41]  Research also shows that a culturally inclusive education can increase graduation rates, school attendance, and standardized test scores.[42]  These benefits manifest for all students.

149.    While all Granite Staters are harmed by the Act, the Act's chill of instruction on race and gender inflicts disproportionate injury on students of color, with compounded harms for LGBTQ+, women, and girls of color.  Instruction on race and gender, including DEI concepts, serves to close existing opportunity gaps and inequalities faced by students of color and other historically marginalized groups.  Research demonstrates that increasing cultural proficiency

---

[41] *See, e.g.,* Roslyn Arlin Mickelson, *Research Brief: School Integration and K-12 Outcomes: An Updated Quick Synthesis of the Social Science Evidence* 5, Nat'l Coal. On Sch. Diversity (Oct. 2016), https://files.eric.ed.gov/fulltext/ED571629.pdf.

[42]   *See, e.g.,* Thomas Dee & Emily Penner, The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum, 54 Am. Educ. Res. J. 127, 217 (2017), https://files.eric.ed.gov/fulltext/EJ1132535.pdf.

among teachers and introducing culturally responsive teaching practices and pedagogy can provide effective support for students of color.[43]  Studies in brain science and education find that drawing on learners' background knowledge shapes comprehension.[44]  Research also illustrates that instructional materials, assignments, and texts that reflect students' backgrounds and experiences are critical to engagement and deep, meaningful learning.[45]  Additional research shows that enrollment in an ethnic studies course results in positive academic outcomes across a variety of indicators, including a 21% increase in ninth-grade attendance rates and average GPA increase of 1.4 grade points.[46]

150.    In addition, this type of instruction serves to break down stereotypes and prejudices that disproportionately inflict harm on students of color, both within the educational system and broader society across healthcare, the penal system, and workplaces.  For example, trainings on implicit bias help to counteract existing prejudice which research suggests results in educators disciplining Black students more harshly than their White peers for similar offenses.[47]

151.    Such barriers are compounded for students of color who have other marginalized identities, including LGBTQ+ students of color.  LGBTQ+ students are subject to bullying and harassment at much higher rates.  One 2019 state survey assessing school climate for LGBTQ+ youth in New Hampshire's secondary schools found that up to 63% of respondents reported verbal harassment based on sexual orientation, and up to 22% reported physical harassment based on

---

[43] *Id.* at 127–66.

[44] *See Understanding Culturally Responsive Teaching,* New Am., https://www.newamerica.org/education-policy/reports/culturally-responsiveteaching/understanding-culturally-responsive-teaching/ (discussing and citing studies).

[45] Alfred Tatum, *Black Males and Critical Literacy* 66, The Reading Teacher, 661–69. (2013).

[46] Dee & Penner, *supra* note 42, at 129.

[47] *See, e.g., "*Educator Bias is Associated with Racial Disparities in Student Achievement and Discipline," *Brookings* (July 20, 2020), https://www.brookings.edu/blog/browncenter-chalkboard/2020/07/20/educator-bias-is-associated-with-racial-disparities-instudent-achievement-and-discipline/.

sexual orientation, with 8% of those cases resulting in physical assaults.[48]  LGBTQ+ students of color face additional barriers, as surveys indicate that LGBTQ+ youth of color report a higher likelihood of dropping out of school due to hostile school climates as compared to their White LGBTQ+ peers.[49]  While instruction on sexual orientation, gender identity, and DEI serves to address these barriers, the Act's chill further deprives LGBTQ+ youth of color of anti-discrimination measures, educational supports, and engaging curricula.  Evidence shows that education policies that are inclusive of LGBTQ+ students aid student well-being and success by reinforcing a positive school climate.[50]  Likewise, LGBTQ+-inclusive curricula contribute to school safety for all students.[51]

152.    Women and girls of color also face a range of compounded barriers in the education context due to the intersections between their racial and gender identity.  For example, girls of color disproportionately face punitive disciplinary measures in school and sexual harassment.  DEI work in schools can serve to effectively address these intersectional barriers.

153.    Plaintiffs Andres Mejia and Christina Kim Philibotte have dedicated their professional lives to training on diversity, equity, and inclusion.  Their experiences confirm the findings that such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color.  This instruction has increased the engagement, participation, and sense of belonging for students of color in their districts.  And students of color have expressed to Mr. Mejia and Ms. Philibotte their desire to gain greater exposure to the perspectives of communities of color and theories related to race and gender

---

[48]    "School Climate for LGBTQ Students in New Hampshire," *GLSEN* (2019), https://www.glsen.org/sites/default/files/2021-01/New-Hampshire-Snapshot-2019.pdf.
[49]  "Educational Exclusion: Drop Out, Push Out, and the School-to-Prison Pipeline Among LGBTQ Youth," *GLSEN* (2013), https://www.glsen.org/sites/default/files/2019-11/Educational_Exclusion_2013.pdf.
[50]  The National Academies of Science, Engineering, and Medicine, Understanding the Well-Being of LGBTQI+ Populations, at 9-5 (2020).
[51]  *Id.* at 9-8.

because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities.  White students also have asked them to learn more about DEI, gender, LGBTQ+ race, racism, and other perspectives about marginalized identities.  These courageous conversations are essential for all students—especially those of color—as they build community where people feel seen and validated in a secure space, and thus more comfortable speaking and sharing their experiences on complex topics which, in turn, teaches other students.

## CAUSE OF ACTION

## COUNT ONE – FOURTEENTH AMENDMENT -- VAGUENESS

154.    The foregoing allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

155.    A law is "void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This principle applies to administrative, civil, and criminal prohibitions.  *See, e.g., FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).  A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

156.    The Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 is unconstitutionally vague on its face and as applied to Plaintiffs because it fails to provide fair notice of what educators can and cannot include in their courses, and because it invites arbitrary and discriminatory enforcement—up to and including the loss of teaching licenses.

157.    Educators and administrators, including Plaintiffs, at every level are confused about what they can legally teach and train, and they risk the loss of employment, licenses, and certifications if they unwittingly violate the Banned Concepts Act.

158.    The Banned Concepts Act is vague and violates the Fourteenth Amendment rights of Plaintiffs facially and as applied by Defendants Commissioner Frank Edelblut, Attorney General John Formella, Director Ahni Malachi, Chairperson Christian Kim, and Commissioner Ken Merrifield—all of whom have enforcement authority under the Banned Concepts Act.

159.    Because of the Banned Concepts Act's vagueness, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment right to due process.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief as follows:

A.    Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing the Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40;

B.    Declare that the Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 is unconstitutional facially and as applied under the Fourteenth Amendment's Due Process provisions to the United States Constitution;

C.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

D.    Award such other relief as the Court deems just and equitable.

ANDRES MEJIA AND CHRISTINA KIM PHILIBOTTE,

By and through their attorneys,

/s/ Gilles R. Bissonnette
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No.
    21177)
SangYeob Kim (N.H. Bar No. 266657)
AMERICAN CIVIL LIBERTIES UNION OF NEW
    HAMPSHIRE
18 Low Avenue, Concord, NH  03301
Tel.:  603.225.3080
gilles@aclu-nh.org
henry@aclu-nh.org
sangyeob@aclu-nh.org

Chris Erchull (N.H. Bar No. 266733)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org

Sarah J. Jancarik (N.H. Bar No. 272310)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
Sarahj@drcnh.org

William E. Christie (N.H. Bar No. 11255)
S. Amy Spencer (N.H. Bar No. 266617)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH  03302
Tel.: 603.225.7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com

/s/ David A. Vicinanzo
David A. Vicinanzo (N.H. Bar No. 9403)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com

Travis Hill*
NIXON PEABODY LLP
55 West 46th Street
New York, NY 10036-4120
Tel.: 212.940.3131
thill@nixonpeabody.com

Morgan C. Nighan (N.H. Bar No. 21196)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA  02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com

Emerson Sykes*
Speech, Privacy, and Technology Project
Leah Watson*
Sarah Hinger*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY  10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

NATIONAL EDUCATION ASSOCIATION-
NEW HAMPSHIRE,

By and through its attorneys,

*/s/ Esther K. Dickinson*
Esther K. Dickinson (N.H. Bar No. 20764)
Lauren Snow Chadwick (N.H. Bar No. 20288)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
    NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
edickinson@nhnea.org
lchadwick@nhnea.org

Nathan R. Fennessy (N.H. Bar No. 264672)
Rue K. Toland (N.H. Bar No. 269021)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
nfennessy@preti.com
rtoland@preti.com

Alice O'Brien*
Jason Walta*
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
aobrien@nea.org
jwalta@nea.org

*Certifications for admission *pro hac vice* to follow.

December 20, 2021

# EXHIBIT 1

Full text of
The Banned Concepts Act

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**

7Apr2021... 1059h
06/03/2021   1799s
06/03/2021   1816s
06/03/2021   1859s
06/03/2021   1842s
06/03/2021   1821s
06/03/2021   1827s
06/03/2021   1866s
06/03/2021   1884s
24Jun2021... 2040CofC
24Jun2021... 2048EBA

2021 SESSION

21-1082
08/10

HOUSE BILL        *2-FN-A-LOCAL*

AN ACT            relative to state fees, funds, revenues, and expenditures.

SPONSORS:         Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep.
                  Umberger, Carr. 2

COMMITTEE:        Finance

────────────────────────────────────────────────────────────────

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments from  the retirement system.

9.  Enables the supreme court to transfer funds.

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**

66.  Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

67.  Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

68.  Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

69.  Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

70.  Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

71.  Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

72.  Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

73.  Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

74.  Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

75.  Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

76.  Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

77.  Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

78.  Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

79.  Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

80.  Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

81.  Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 145 -**

91:297   New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

II.  Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect.

III.  Nothing in this subdivision shall be construed to limit the academic freedom of faculty members of the university system of New Hampshire and the community college system of New Hampshire to conduct research, publish, lecture, or teach in the academic setting.

354-A:30  Definitions.  In this subdivision:

I.  "Government program" means any activity undertaken by a public employer, both as an employer and in performance of its government function.

II.  "Public employee" means any person working on a full-time or part-time basis for the state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

III.  "Public employer" includes the state or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 146 -**

1  recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

2  following:

3      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

4  status, familial status, mental or physical disability, religion, or national origin, are inherently

5  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

6  color, marital status, familial status, mental or physical disability, religion, or national origin;

7      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

8  race, creed, color, marital status, familial status, mental or physical disability, religion, or national

9  origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10      III.  That an individual should be discriminated against or receive adverse treatment solely

11  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

12  status, familial status, mental or physical disability, religion, or national origin; or

13      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

14  marital status, familial status, mental or physical disability, religion, or national origin cannot and

15  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

16  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

17  or national origin.

18      354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

19  program shall teach, advocate, or advance any one or more of the following:

20      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21  status, familial status, mental or physical disability, religion, or national origin are inherently

22  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23  color, marital status, familial status, mental or physical disability, religion, or national origin;

24      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25  race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27      III.  That an individual should be discriminated against or receive adverse treatment solely

28  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29  status, familial status, mental or physical disability, religion, or national origin; or

30      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31  marital status, familial status, mental or physical disability, religion, or national origin cannot and

32  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34  or national origin.

35      354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse

36  employment action, warning, or discipline of any kind for refusing to participate in any training,

37  program, or other activity at which a public employer or government program advocates, trains,

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 147 -**

teaches, instructs, or compels participants to express belief in, or support for, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any other applicable common law or statutory cause of action.

91:298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after section 39 the following new section:

193:40  Prohibition on Teaching Discrimination.

I.  No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b)  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c)  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 148 -**

1   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

2   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

3   origin.

4   II.   Nothing in this section shall be construed to prohibit discussing, as part of a larger

5   course of academic instruction, the historical existence of ideas and subjects identified in this

6   section.

7   III.   Any person claiming to be aggrieved by a violation of this section, including the attorney

8   general, may initiate a civil action against a school or school district in superior court for legal or

9   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

10   A:34.

11   IV.   Violation of this section by an educator shall be considered a violation of the educator

12   code of conduct that justifies disciplinary sanction by the state board of education.

13   V.   For the purposes of this section, "educator" means a professional employee of any school

14   district whose position requires certification by the state board pursuant to RSA 189:39.

15   Administrators, specialists, and teachers are included within the definition of this term.

16   91:299  Severability.  If any provision of sections 297-298, or the application of any provision to

17   any person or circumstance is held to be invalid, the remainder of such sections, and their

18   application to any other persons or circumstances shall not be affected thereby.

19   91:300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



# EXHIBIT 2

New Hampshire
Code of Conduct
for
Educational
Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  <u>Purpose</u>.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d) Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  <u>Definitions</u>.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

> (1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

> (2)  Meets at least one of the following qualifications:

>> a. Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

>> b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1)  Pathway 4 certification as specified in Ed 505.04; or

(2)  Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  <u>Confidentiality of Credential Holder Certification Records</u>.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1)  The name of the credential holder;

(2)  The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3)  The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4)  The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1)  Informal or formal investigations; or

(2)  Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1)  A party in an adjudicatory proceeding when:

a.  The credential holder is a party to the proceeding; and

b.  The credential holder's credential record is relevant to the proceeding;

(2)  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3)  A certifying agency of another jurisdiction for:

    a.  Purposes of credentialing the credential holder in the other jurisdiction; or

    b.  An investigation of the credential holder by the other jurisdiction, when:

        1.  The credential holder was the subject of a formal investigation under Ed 511; or

        2.  Disciplinary action was taken against the credential holder by the board under Ed 511;

(4)  Board investigators or prosecutors; or

(5)  Persons to whom the credential holder has given a release.

(d)  The bureau shall report:

(1)  Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

(2)  Any reprimand to the credential holder's current superintendent of school in N.H.;

(e)  The department shall maintain a list of all credential holders whose credential~~s has~~ **have** been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04  <u>Emergency Authorization</u>.

(a)  The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b)  The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

(1)  Paid the applicable application fee, provided in Ed 508.06(c); and

(2)  Filed with the bureau the information and documentation required in (c) and (e).

(c)  An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13)   Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14)   Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15)   Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

     a.  American Indian;

     b.  Asian/Pacific;

     c.  African-American/Non-Hispanic;

     d.  White/Non-Hispanic;

     e.  Hispanic;

     f.  Multi-ethnic; and

     g.  Other/do not wish to specify.

(d)   If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e)   If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f)   An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05   In Process of Licensure Authorization (IPLA).

(a)   The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b)   If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

(1)   Is in the process of certification;

(2)   Has submitted a completed application for certification; and

(3)  Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01  <u>Principle 1—Responsibility to the Education Profession and Educational Professionals</u>.

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02  <u>Principle 2—Responsibility to Students</u>.

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4)  Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

> a.  Abuse, including, but not limited to physical and emotional abuse;
>
> b.  Cruelty or any act of endangerment;
>
> c.  Any sexual act with or from any student; and
>
> d.  Harassment as defined by state or federal law or regulations;

(5)  Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6)  Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03    Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1)  Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2)  Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4)  Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04   Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b) Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2) Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)  Whether:

a.  The communication made was covert in nature;

b.  The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c.  The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05  Duty to Report.

(a) Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:.

(1)  When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2)  When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d)  If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e)  Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1)  His or her immediate supervisor, superintendent, or both; and

(2)  The department of health and human services, pursuant to RSA 169-C:29.

(f)  If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an  investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g)  The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01    Complaints, Cases and Investigations.

(a)  A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b)  After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c)  Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d)  Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

    (1) The department shall create a report which documents the results of the investigation;

    (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

        a. Suspension;

        b. Revocation; or

        c. Reprimand; and

    (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

    (4) The following shall be considered aggravating circumstances:

        a. The seriousness of the offense;

        b. The credential holder's prior disciplinary record;

        c. The credential holder's lack of willingness to cooperate with the department during an investigation;

        d. Potential harm to public health and safety; and

        e. The purpose of the rule violated;

    (5) The following shall be considered mitigating circumstances:

        a. Absence of a prior disciplinary record;

       b.  The credential holder's willingness to cooperate with the department during an investigation;

       c.  The credential holder's acknowledgment of his or her wrongdoing; and

       e.  The purpose of the rule or statute violated;

    (6)  The credential holder shall be notified in writing of any proposed discipline;

    (7)  If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k)  Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

    (1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

    (2)  If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

       a.  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

       b.  A certifying agency of another jurisdiction for:

          1.  Purposes of certification of the credential holder in the other jurisdiction; or

          2. An investigation of the credential holder by the other jurisdiction when:

             (i)  The credential holder was the subject of a formal investigation under Ed 510l; or

             (ii)  Disciplinary action was taken against the credential holder by the board pursuant to Ed 510l;

       c.  Other states' licensing board investigators or prosecutors; and

       d.  Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

      Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

      (a)  If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

      (b)  All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline.  The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

      (c)  Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

      Ed 511.03  <u>Disciplinary Hearings</u>.

      (a)  If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

            (1)  Completion of an informal or formal investigation; and

            (2)  Filing of a written report and recommendation pursuant to Ed 511.01(h).

      (b)  The provisions of Ed 200 shall apply to all disciplinary hearings and ***such hearings*** shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

      Ed 511.0~~4~~  <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

      (a)  When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

      (b)  The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

      (c)  In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 <u>Grounds for Reinstatement After Suspension</u>.

(a)  A credential which has been suspended shall be reinstated for one of the following reasons:

(1)  The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2)  A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b)  Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512  DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 <u>Denial of Credential</u>.

(a)  A credential application shall be denied by the board based on the following grounds:

(1)  Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b)  An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision.  If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

**APPENDIX I**

| RULE | STATUTE |
|---|---|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

# EXHIBIT 3

Commission on Law
Enforcement Accountability,
Community, and Transparency
Materials



**STATE OF NEW HAMPSHIRE**
OFFICE OF THE GOVERNOR

CHRISTOPHER T. SUNUNU
Governor

**STATE OF NEW HAMPSHIRE**
**BY HIS EXCELLENCY**
**CHRISTOPHER T. SUNUNU, GOVERNOR**

**Executive Order 2020-11**

**An order establishing the New Hampshire Commission on Law Enforcement**
**Accountability, Community, and Transparency**

**WHEREAS,** in the wake of the tragic murder of George Floyd in Minneapolis, MN, our country is engaged in a nationwide conversation regarding law enforcement, social justice, and the need for reforms to enhance transparency, accountability, and community relations in law enforcement; and

**WHEREAS,** law enforcement in New Hampshire make daily sacrifices, serve our State admirably, and are a necessary and pivotal part of our communities; and

**WHEREAS,** the State of New Hampshire has an obligation to participate in the national conversation and engage in self-examination to identify any opportunities to improve the state of our law enforcement and the relationship between law enforcement and the communities they serve; and

**WHEREAS,** New Hampshire finds itself in a pivotal moment that demands prompt action to initiate important conversations and develop recommendations for reform.

**NOW, THEREFORE, I, CHRISTOPHER T. SUNUNU, GOVERNOR** of the State of New Hampshire, by the authority vested in me pursuant to part II, article 41 of the New Hampshire Constitution, do hereby order, effective immediately, that:

1. There is established the New Hampshire Commission on Law Enforcement Accountability, Community and Transparency (the "Commission"). The Commission shall consist of the following members:

   (a) The Attorney General, or designee, who shall chair the Commission
   (b) The Commissioner of the Department of Safety, or designee
   (c) The Executive Director of the New Hampshire Commission for Human Rights
   (d) The Director of the Police Standards and Training Council
   (e) The Chair of the Governor's Advisory Council on Diversity and Inclusion
   (f) The President of the Manchester, NH NAACP

(g) A current justice of the New Hampshire Superior or Circuit Court, appointed by and serving at the pleasure of the Governor

(h) A representative of the New Hampshire Police Association, appointed by and serving at the pleasure of the Governor

(i) The President of the New Hampshire Association of Chiefs of Police

(j) The Executive Director of the New Hampshire Chapter of the National Alliance on Mental Illness

(k) A representative from the New Hampshire ACLU, appointed by and serving at the pleasure of the Governor

(l) Two members of the public, appointed by and serving at the pleasure of the Governor

2. If any of the members named in Paragraph 1 become unable to serve for any reason, then the Governor shall appoint a new member to serve in their place.

3. The Commission shall engage all interested and relevant public, private, and community stakeholders and develop recommendations for reforms that the Commission deems necessary to enhance transparency, accountability, and community relations in law enforcement. To fulfill this charge, the Commission shall examine the following:

(a) Training curriculum, procedures and policies developed by State Police, local police departments, and the Police Standards and Training Council, and potential options for improving the same to better address certain areas which may include, but are not limited to, (i) de-escalation, (ii) use of deadly and non-deadly force force, and (iii) diversity training;

(b) State and local procedures related to the reporting and investigation of police misconduct, and potential reforms which may include, but are not limited to, development of a uniform statewide system for the reporting, investigation, and punishment of police misconduct;

(c) The current state of relationships between law enforcement and the communities they serve, and potential steps that can be taken to enhance these relationships; and

(d) Any other subject matter which the Commission deems relevant to the overall mission of enhancing transparency, accountability, and community relations in law enforcement.

4. For the purpose of this Order, the term "law enforcement" is intended to refer to individuals who are employed by a municipal, county, or state governmental agency in the State of New Hampshire; certified by the Police Standards and Training Council; responsible for the prevention, detection, or prosecution of crimes and the enforcement of the laws of the state and of its political subdivisions; and have full general arrest powers. Such individuals may include, but not necessarily be limited to, chiefs, police officers, sheriffs, deputy sheriffs, colonels, troopers, conservation officers, liquor commission inspectors, fire investigators/marshals, state troopers, forest rangers, and marine patrol officers.

5. The Commission shall meet at the call of the Chair, and as often as necessary to complete its work. A majority of the appointed Commission members shall constitute a quorum, and all official actions of the Commission shall require a majority vote of those present and voting.

6. All meetings and proceedings of the Commission shall comply with the requirements of RSA 91-A.

7. No later than 45 days from the date of this Order, the Commission shall submit a report containing its recommendations to the Governor, the Speaker of the House, and the President of the Senate. The Commission's report shall be posted publicly on the Governor's Office website.

Given under my hand and seal at the Executive Chambers in Concord, this 16th day of June, in the year of Our Lord, two thousand and twenty, and the independence of the United States of America, two hundred and forty-four.

**GOVERNOR OF NEW HAMPSHIRE**

# New Hampshire Commission on Law Enforcement Accountability, Community, and Transparency



# Report and Recommendations

## Submitted August 31, 2020

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ........................................................................................................................1

TRAINING CURRICULUM, PROCEDURES AND POLICIES ....................................................1
        Commission Recommendations.........................................................................................8

REPORTING AND INVESTIGATION OF POLICE MISCONDUCT ......................................10
        Commission Recommendations.......................................................................................17

CURRENT STATE OF RELATIONS BETWEEN LAW ENFORCEMENT AND THE
COMMUNITIES THEY SERVE ................................................................................................19
        Commission Recommendations.......................................................................................23

OTHER SUBJECT MATTERS CONSIDERED BY THE COMMISSION ...............................26
        Commission Recommendations.......................................................................................27

CONCLUSION............................................................................................................................28

COMPILATION OF COMMISSION RECOMMENDATIONS..................................................31

APPENDIX A ..............................................................................................................................41

APPENDIX B ..............................................................................................................................47

APPENDIX C ..............................................................................................................................51

APPENDIX D..............................................................................................................................58

APPENDIX E ..............................................................................................................................65

## I.        Introduction

On June 16, 2020, Governor Christopher T. Sununu established the Commission on Law Enforcement Accountability, Community and Transparency (LEACT) by Executive Order 2020-11 (on June 22, 2020, Executive Order 2020-13 amended the original Order).  Copies of these Orders appear at Appendix A.  The LEACT Commission was specifically charged with examining law enforcement training curriculum, procedures and policies throughout the State; procedures related to the reporting and investigation of police misconduct; the current state of relationships between law enforcement and the communities they serve; and any other subject matter the Commission deemed relevant.  Through the course of its work, the Commission deemed the following other subject matters relevant to the overall mission of enhancing transparency, accountability, and community relations in law enforcement: mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant New Hampshire Police Standards and Training Council Performance Audit.

Over the course of 10 weeks, the Commission met 26 times and heard testimony from 24 subject matter experts, including Commission members, and 25 members of the public.  Many individuals who testified before the Commission also submitted written testimony.  Additionally, the Commission received more than 50 written submissions from a variety of individuals who did not testify.  Oral and written testimony is part of the public record and is accessible at www.governor.nh.gov/accountability.  Commission members considered all written submissions and asked probative questions of witnesses in order to make the following comprehensive recommendations.

## II.       Training Curriculum, Procedures and Policies

Executive Order 2020-11 directs that the Commission shall examine: "[t]raining curriculum, procedures and policies developed by State Police, local police departments and the Police Standards and Training Council, and potential options for improving the same to better address certain areas which may include, but are not limited to, (i) de-escalation, (ii) use of deadly and non-deadly force, and (iii) diversity training."  Executive Order 2020-11, at ¶ 3 (a).

This section of the report describes the current state of training curriculum, procedures and policies with respect to the New Hampshire Police Standards and Training Council (NH PSTC), the New Hampshire State Police and local police departments; summarizes public testimony and recommendations on these subjects; discusses recent relevant legislative changes; and sets forth the Commission's recommendations with respect to training curriculum, procedures and policies.

### a.    Current State of Training, Curriculum and Policies

### i.    Police Standards and Training Council

The legislature has assigned the responsibility for the education and training of all law enforcement officers, state corrections officers and state probation-parole officers to NH PSTC. RSA 106-L:1 & 6.  By law, no person may serve as a law enforcement officer in New Hampshire "unless such person has satisfactorily completed a preparatory program of police, corrections, or probation-parole training appropriate to such person's position at a school approved by the council."  RSA 106-L:6, I.  NH PSTC oversees such a school, known informally as the police academy.[1]

NH PSTC is an executive branch agency, RSA 106-L:4, and it is comprised of 14 members, RSA 106-L:3.  Four Council members (the chancellor of the community college system, the director of the division of state police, the attorney general and the commissioner of the department of corrections) serve *ex officio*; the governor appoints the other members to two-year terms.  RSA 106-L:3, I & II.  NH PSTC has extensive enumerated powers including with respect to rulemaking, standard setting and the conduct of administrative hearings.  RSA 106-L:5.  NH PSTC is 100 percent funded by the General Fund.  Its total budget for the State Fiscal Year 2021 is $3,472,749.

NH PSTC also has authority to nominate and appoint a director of police standards and training.  RSA 106-L:5, XVIII.  On March 16, 2020, NH PSTC appointed John Scippa as the director.  Director Scippa serves as a member of this Commission.

The Police Academy is located at 17 Institute Drive, Concord.  It is formally known as the Arthur D. Kehas Law Enforcement Training Facility and Campus.  It contains lecture halls, classrooms, and a tactical training center.  There is adjacent dormitory space.

NH PSTC provides three academies: a full-time officer academy, a part-time officer academy and a corrections academy.  It also provides in-service training.  At present, the full-time academy lasts sixteen weeks.  There are three full-time officer academies per year.

Students, known as recruits, are hired and screened by their employing agency.  Criteria to qualify for employment as a law enforcement or corrections officer are set forth in the NH PSTC's administrative rules.  *See* N.H. Admin. R. Pol 300.  Those criteria include: a high school diploma or equivalent, fingerprints and a criminal record check, proof of United States citizenship, a physical examination, a background investigation, drug testing and psychological screening.  *See id.*  Employing agencies may have additional criteria.

---

[1] The legislature has also assigned to the Police Standards and Training Council the responsibility for the suspension or revocation of law enforcement officer certification "in the case of egregious misconduct or failure to comply with council standards."  RSA 106-L:5, V.  This responsibility is discussed in detail in § III.a, *infra*.

The academy is paramilitary in nature and the recruits live on-site, Monday through Friday, for the duration of the 16-week academy.  The current curriculum consists of 684 hours of instruction on various topics.  A copy of the current curriculum topics and hours appears at Appendix B.  There are both classroom and hands-on components to the curriculum.  Class exams are conducted during the course of an academy.

Director Scippa testified before the Commission and provided written materials that are part of the record.  His testimony focused on academy training with respect to three specific areas: diversity, de-escalation and use of force.  The current block of instruction regarding diversity lasts two hours.  It is classroom based and focuses on recognizing differences among cultures.  It advocates a "Stop, Look and Listen" approach to dealing with individuals from different cultures.  Very little time is devoted to defining and recognizing bias, including implicit bias, or overcoming and controlling the bias.

Recruits attend a six-hour block of instruction entitled "Communication Techniques" which deals generally with strategies relating to communication and de-escalation.  However, Director Scippa testified that communication and de-escalation are themes throughout the academy, including during use-of-force scenarios.  Recruits also receive 16 hours of instruction on "Mental Illness Dynamics," which consists of both lecture and practical exercises.

Use-of-force instruction includes classroom lectures and practical applications in the use of firearms, physical force, defensive tactics, oleoresin capsicum spray (otherwise known as "pepper spray"), and use of a baton.  The classroom lectures include discussion of the mechanics of each area as well as the law governing use of deadly and non-deadly force.[2]  Practical and physical skills comprise 93.25 hours.  Most recruits do not have experience in the use-of-force and repetitious practice is required to ensure competent and accurate use-of-force under stressful circumstances.  Toward the end of the academy, recruits participate in scenario-based training designed to replicate stressful and realistic situations recruits will likely face on the job.  The academy uses a VirTra use-of-force simulator.  The simulator can replicate up to 125 different scenarios which can be created by academy staff.  After a review, the simulated scenarios incorporate a fair cross-section of participants from various communities.

A chokehold is not a technique that is taught at the academy, however, there is no training that expressly prohibits it.[3]  There is no training on the duty to intervene when another officer engages in the use of inappropriate force or other misconduct.

The part-time officer academy is 200 hours.  All law enforcement officers are required to complete eight hours of in-service or refresher training annually.  N.H. Admin. R. Pol 403.01.

---

[2] RSA 627:5, captioned "Physical Force in Law Enforcement" sets forth the legal standards for the use of both non-deadly force, RSA 627:5, I, and deadly force, RSA 627:5, II, by law enforcement officers.

[3] The use of chokeholds by law enforcement officers is now prohibited by New Hampshire law.  *See* § II.a.iv., *infra.*

That is exclusive of firearms training, which requires a separate annual certification.  N.H. Admin. R. 404.04.

## ii.     New Hampshire State Police

The legislature established the New Hampshire State Police in 1937.  It is a division within the Department of Safety.  RSA 106-B:2.  It is comprised of approximately 350 sworn officers and is the largest law enforcement agency in New Hampshire.  In addition to field operations spread across seven troops, the State Police also engages in numerous highly specialized functions, such as the Major Crime Unit and the state's only Forensic Science Laboratory.  The director of the division of state police holds the rank of colonel.  RSA 106-B:4. Colonel Nathan Noyes was sworn into office on April 8, 2020.  Colonel Noyes testified before the Commission and provided written materials that are part of the record.

The legislature has assigned to the colonel, with the approval of the commissioner of safety, responsibility for the training of division members.  RSA 106-B:6.  The colonel is also ultimately responsible for policies and written directives governing the division's work.  *See id.*

New Hampshire State Troopers attend the police academy.  State Police receive in-service training that exceeds the eight-hour annual requirement.  Colonel Noyes testified that, in recent years, State Police training has focused on issues including unconscious bias, fair and impartial policing and mental and physical wellness and resilience.  Four times per year, troopers attend use-of-force training which encompasses review of relevant statutes, case law, recent events, internal policies as well as scenario-based training.  Other trainings include an emergency vehicle operators' course, search and seizure training, response to active shooters, as well as policy review for the division's Fair and Impartial Policing, discussed below.  In addition, when a new trooper is hired, he or she is required to spend at least one day at the New Hampshire Hospital, an experience intended to educate new troopers about appropriate responses with individuals in a mental health crisis.

Chokeholds are not an approved technique and are not taught by State Police in its use-of-force instructions. [4]

With respect to policies and procedures relating to race and bias, in February 2019, State Police issued General Order 100.04, captioned "Fair and Impartial Policing."  A copy of the policy appears at Appendix C.  Its purpose is to: "prevent and prohibit the practice of biased policing and other discriminatory practices in any law-enforcement related activity involving a member of the Division."  The policy states that: "[i]n the absence of any specific report or suspicious circumstances, the actual or perceived race, ethnic background, color, age, gender, sexual orientation, religion, economic status, cultural group or any other identifiable group of any person will not be the basis for the detention, interdiction or other disparate treatment of any

---

[4] The use of chokeholds by law enforcement officers is now prohibited by New Hampshire law.  *See* § II.a.iv., *infra.*

individual by any member of the Division of State Police." This policy was developed with the input of community leaders and the ACLU-NH and has become a standard for other New Hampshire law enforcement agencies.

### iii.  Local Police Departments

There are approximately 210 municipal law enforcement agencies in New Hampshire. They range in size from one law enforcement officer to over 200. The chief of police generally has control and direction of police within a jurisdiction. *See* RSA 48:10 (cities) and RSA 105:2-a (towns). Chiefs are generally appointed by municipalities' executive (e.g., selectmen, RSA 105:1, mayor or city manager).[5] Charlie Dennis is the Chief of Police in Hanover and currently serves as the President of the New Hampshire Association of Chiefs of Police. He is a member of the Commission. Chief Dennis testified before the Commission and provided written materials that are part of the record.

Each police department is responsible for writing, maintaining and enforcing its own policies and procedures, including with respect to training. There are no model statewide policies or standards. The Police Standards and Training Council has no role in developing or approving local policies and procedures. There is no statute or rule that governs local policies or procedures.

Because of the enormous variation in department sizes and resources, there is variation in policies, procedures and training. For example, the Manchester Police Department – the largest municipal law enforcement agency in New Hampshire – requires newly hired officers to undergo eight weeks of training, both before and after the academy.

The Commission on Accreditation for Law Enforcement Agencies (CALEA) was founded in 1979 as a joint effort of the International Association of Chiefs of Police (IACP), the National Organization of Black Law Enforcement Executives (NOBLE), the National Sheriffs Association and Police Executive Research Forum (PERF). Its purpose was to create policies and procedures for law enforcement based on best practices.

CALEA is expressly committed to procedural justice, ethical policing, community trust and engagement, transparency and service delivery, appropriate organizational culture, fairness in systems and processes, and consistency in what the public should expect from a law enforcement agency. Basic accreditation requires compliance with 181 standards. There are

---

[5] Police commissions exist in at least the following cities:  Manchester, Nashua, Portsmouth, Laconia and Berlin. The commissions are authorized by statute, *see* N.H. Laws of 1913, ch. 148, and city charters. They are comprised of three to five citizens. The roles and responsibilities vary among police commissions but, generally, they can be an important source of community input for the police department's leadership.

substantial costs to becoming accredited and to maintaining CALEA accreditation. At present, there are 14 law enforcement agencies in New Hampshire which have CALEA accreditation.[6]

### iv.    Recent Legislative Changes

Since the creation of the Commission on June 16, 2020, the legislature has passed and the governor has approved statutory changes that implicate matters within the Commission's charge. On July 16, 2020, Governor Sununu signed HB 1645 into law. Section 25 of that bill amends RSA 627:5 (addressing the use of physical force in law enforcement) by adding a new section to prohibit the use of chokeholds by any law enforcement officer. This provision, which took effect on July 16, 2020, defines "chokehold" as "the application of any pressure to the throat, windpipe, or neck, which prevents or reduces intake of air, or oxygen to the brain."

Another section of HB 1645 requires that it "shall be the duty of any law enforcement officer who observes misconduct by another law enforcement officer to notify the chief law enforcement officer in his or her department in writing immediately or as soon as practicable after observing such misconduct." Within seven days of such a notification, the chief must report the misconduct to the Police Standards and Training Council. The new statute defines misconduct as: "assault, sexual assault, bribery, theft, tampering with evidence, tampering with a witness, use of a chokehold, or excessive and illegal use of force as defined by the New Hampshire criminal code."

### b.    Summary of Public Testimony Received by the Commission



---

[6] The CALEA accredited agencies are: Claremont Police Department, Dover Police Department, Durham Police Department, Goffstown Police Department, Hollis Police Department, Hudson Police Department, Keene Police Department, Laconia Police Department, Manchester Police Department, Nashua Police Department, Pelham Police Department and Portsmouth Police Department. In addition, the Strafford County Sheriff's Office and the University of New Hampshire Police Department are CALEA accredited. Four other local law enforcement agencies are currently pursuing CALEA accreditation.



### c.   Commission Recommendations

The Commission makes the following recommendations for reforms and improvements with respect to training curriculum, procedures and policies:

**I.   Required Training to Maintain Law Enforcement Officer Certification**

1. As soon as practicable, NH PSTC, with input from all relevant law enforcement agencies, should pursue all actions necessary, including emergency rulemaking pursuant to RSA 541-A, to amend existing administrative rules to provide as follows:

   a. Increase the mandatory number of hours of annual in-service training for law enforcement officers on an incremental basis over the next three years.  By January 1, 2024, the total mandatory hours of annual in-service training should be a minimum of twenty-four (24) hours.

   b. Mandate that annual in-service training as approved by NH PSTC include, at a minimum, two (2) hours on each of the following topics:
      i.    Implicit bias and cultural responsiveness;
      ii.   Ethics; and
      iii.  De-escalation.

2. Beginning January 1, 2021, strongly encourage all law enforcement agencies to require their officers to participate and receive, at a minimum two (2) hours annually, of training in the following areas:

   a.    Implicit bias and cultural responsiveness;

    b.     Ethics; and

    c.     De-escalation.

**II.  NH Police Standards and Training Council General Recommendations**

3.  NH PSTC should arrange for a Job Task Analysis (JTA) for entry-level law enforcement officers and entry-level corrections officers, and based on those findings, conduct an overall review of the present academy curriculums.  Based on curriculum changes found by the JTA, an extension of the length of the police academy beyond its current 16 weeks may be warranted.

4.  NH PSTC needs to leverage technology and be allowed to purchase and deploy a robust database management system and on-line learning platform for the twofold purpose of: 1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from one agency to another and/or decertification, and 2) to develop and deliver standardized on-line training to all law enforcement officers in an efficient and economical way.

5.  NH PSTC, in collaboration with other law enforcement agencies, using nationally vetted best practices as set forth by IACP, CALEA, PERF, and NOBLE, shall create policy guidelines on the following topics that serve as a minimum standard with which all law enforcement agencies must comply:
    - Use of Force
    - Duty to Intervene
    - Code of Conduct
    - Duty to Report Misconduct
    - Prohibition of Chokeholds
    - Procedures to Guard Against Positional Asphyxia

6.  NH PSTC should increase the number of hours of scenario-based training in both academy and in-service settings.

7.  NH PSTC should improve and augment police academy training on diversity by conducting a review of the present lesson plan on cultural dynamics, and amend it to properly address the topic. Training to be developed with one or more community partner(s).

8.  NH PSTC should improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the IACP recognized Fair and Impartial Policing training or similar type training.

9.  NH PSTC should improve and augment police academy and in-service training on de-escalation techniques by adopting the PERF's Integrated Communication and Tactics training (ICAT) or similar training.

10. NH PSTC should improve and augment police academy training on police ethics by re-instituting the Ethics block of instruction.

11. NH PSTC should improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training, (formally known as EPIC training) or similar training.

12. NH PSTC should include in its instruction *State of New Hampshire v. Jones* (decided January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered while reaching its decision. These cases should be part of the lesson plan in those relevant topic areas that are already delivered.  An attorney from the Attorney General's Office will be dedicated to teach at NH PSTC and regularly update materials.

13. Recognizing that certain NH police agencies need to rely on part-time law enforcement officers, NH PSTC should re-evaluate the Part-Time Police Officer certification process upon receipt of the JTA and consider extending the length of such training and give certain consideration to what law enforcement functions part-time officers be allowed to perform.

14. NH PSTC should amend administrative rule POL 301.05 <u>Background Investigations</u> to mandate that background investigations specifically vet police recruit candidates in the area of having demonstrated outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources to help determine the overall fitness for duty the candidate possesses and to consider those findings in the overall decision to hire the candidate.

**III. Other Recommendation**

15. All law enforcement agencies should be encouraged to pursue CALEA accreditation.  In the absence of CALEA accreditation, agencies should continually review and maintain policies consistent with nationally accepted best practices.

████████████████████████████████████

### c.   Commission Recommendations

The Commission makes the following recommendations for reforms and improvements with respect to reporting and investigation of police misconduct:

1.   Support the establishment of a single, neutral and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers with the following components:

    a.   Staffed by full-time attorneys, paralegals, legal assistants and investigators;

    b.   Provide robust due process with multiple levels of review, including both sides having the right to appeal;

    c.   Members of the various committees and panels to be appointed by the Governor, consisting of community members, current or retired judges, law enforcement officers, attorneys; 3-year terms (initially staggered). Any committee or panel would be slightly weighted toward law enforcement;

    d.   Statewide, universal definition regarding what constitutes misconduct;[10]

    e.   Notice of complaint to the officer and an opportunity to be heard;

    f.   Initial screening of all complaints received by the entity to determine if an investigation is warranted;

    g.   Investigation following consistent and defined standards;

    h.   Statewide, universal standards to apply with respect to determination of whether misconduct occurred;

    i.   Executive summary of finding to be made available to the public with the full investigative report subject to disclosure upon in-camera review. Sustained findings publicly accessible in a database maintained by the entity;

---

[10] Definition of misconduct should take into consideration the policy guidelines regarding Code of Conduct to be developed by NH PSTC.  Discussed above at § II.c.II.5.

j.      Right of appeal to New Hampshire Supreme Court;

k.      Require all law enforcement agencies to report alleged misconduct to this entity; and

l.      Nothing in this recommendation would limit the ability of the hiring law enforcement agency or NH PSTC to investigate, discipline, or take any action consistent with their rules, regulations, and collective bargaining agreements; or would limit the ability of the Office of the Attorney General or County Attorney with jurisdiction to investigate or prosecute any criminal conduct.

2.      To promote a uniform approach to investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials, establish by statute, a dedicated Public Integrity Unit within the Attorney General's Office with permanent and sustainable resources, including full-time attorneys, paralegals, legal assistants, and investigators.

3.      To promote equal justice under the law in all aspects of the criminal justice system, the Commission strongly encourages implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges.

   a.      The Office of the Attorney General shall require such training for all attorneys, investigators, legal staff and victim/witness advocates in the Attorney General's Office; all County Attorney Offices; and all state agency attorneys.

   b.      The Office of the Attorney General shall facilitate and arrange for such trainings as described in 3(a) no later than April 1, 2021.

   c.      The Office of the Attorney General shall establish a system whereby all new prosecutor hires receive implicit bias and racial profiling training within 30 days of their start date.

   d.      Recommend the New Hampshire Supreme Court require one hour of yearly continuing legal education credit (CLE) to be dedicated to implicit bias and racial profiling training.

4.      Establish a community outreach position within the Attorney General's Office to facilitate communication between all state, county and local prosecution offices and New Hampshire's diverse communities.

5.      Amend RSA 33-A:3-a, CVIII to require "police, non-criminal-internal affairs investigations" to be retained, at a minimum, for a period of 20 years after retirement or separation.

6.      Encourage all law enforcement agencies to use body and/or dash cameras.

7.      Make the existing Exculpatory Evidence Schedule (EES) public subject to the following provisions:

   a.      The Office of the Attorney General will provide immediate written notice to all living persons on the current list that they are on the list with the following notifications that:

      i.      Six (6) months from date of notification to request a hearing in Superior Court to have his or her name removed from the EES.

      ii.      Six (6) months from date of notification, individual names on the list with a sustained finding shall be made public, except for any individual with a pending Superior or Supreme Court action in regard to removal from the EES.

   b.      The names of deceased former law enforcement officers shall be released once there has been a determination that the officer was afforded due process prior to placement on the list or the conduct subject to EES was previously provided as discovery in a criminal case.





### c.    Commission Recommendations

The Commission makes the following recommendations for reforms and improvements with respect to the current state of relationships between law enforcement and the communities they serve:

### I.   Data Collection

1. All law enforcement agencies should gather, analyze and make available to the public, at least annually, data on demographics (including, at a minimum, gender and race) for arrests, citations and motor vehicle and subject stops regardless of disposition.

2. New Hampshire Department of Motor Vehicles should include a person's race on NH Drivers' Licenses and Non-Drivers' Identification Cards, with the option for the person to opt out from answering the question.

3. All law enforcement agencies will comply with RSA 106-B:14-c by submitting crime reports to the Department of Safety, Division of State Police based on the specifications prescribed by the Federal Bureau of Investigation (FBI).

## II. Community Policing and Engagement

4. All law enforcement agencies should adopt the definition of Community Policing as set forth by IACP:

> "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties."

5. Encourage all law enforcement agencies, when practicable, to dedicate an officer or unit to community policing and engagement.

6. Encourage all law enforcement agencies to engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs. Models like New Hampshire Blue and You, the Mirror Project, Police Athletic Leagues (PALs), and citizen police academies serve as a guide for such efforts.

7. All law enforcement agencies should establish ongoing officer training at all levels to encourage a culture that empowers individual officers to engage in community policing and relationship building efforts.

8. All law enforcement agencies should publish/advertise community events and consider the use of social media and the establishment of Public Service Announcement (PSA) campaigns to educate the public about police officers and their work.

9. NH PSTC should maintain and publish a list of all currently CALEA accredited law enforcement agencies.

### III. School Resource Officers

10. NH PSTC should set forth mandated "certification" for SROs that would require the officer to complete National Association of School Resource Officers (NASRO) training, Mirror Project Train-the-Trainer and Effective Police Contact with Youth training prior to assignment.  Further, certain annual in-service hours to maintain SRO "certification" should be identified and mandated by NH PSTC.

11. NH PSTC should work with stakeholders and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SRO's role in student discipline for non-criminal matters.

12. Each law enforcement agency should have a field training program specifically for SROs.  A transition plan should be implemented over a course of weeks/months between each outgoing/incoming SRO so there is overlap, information exchange, and adjustment for the stakeholders.

13. MOUs between law enforcement agencies and SAUs should be made public.

### IV. Hiring/Recruitment of Officers

14. Recognizing the difficulty of hiring and recruiting qualified candidates, law enforcement agencies should continue efforts to recruit officers from minority communities to allow for a diverse law enforcement workforce.

15. All public entities should develop a comprehensive strategy to actively attract, recruit, and retain diverse law enforcement candidates, to include candidates from outside New Hampshire.

### V. Other

16. In order to advance relationships with the trans and gender non-conforming population, all law enforcement agencies should seek and provide training on pronoun inclusion.

17. In order to advance relationships with the deaf and hard of hearing community, law enforcement agencies should continue to seek a better understanding of, and communication with, members of that community, to include the greater use and dissemination of driver visor cards by law enforcement.

18. In order to advance a greater understanding of juvenile offenders, form a separate commission to review the present state of juvenile justice laws.  In particular, the commission should review the minimum age for juvenile prosecutions and the statute that creates a presumption of transfer to the adult criminal court.



**b.     Commission Recommendations**

The Commission makes the following recommendations for reforms and improvements with respect to mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit.

1.     Specially trained mental health professionals should be embedded in tactical response teams.  There should be a review to determine if such mental health professionals will be afforded protection from litigation stemming from their participation in such activities.

2.     Encourage partnerships between communities and local law enforcement to pursue services and resources dedicated to individuals with substance use disorders (SUDs) and mental illness and to make those services readily available in order to reduce the burden on law enforcement responding to issues stemming from SUDs as well as mental illness.

3.     Offer training regarding the mental well-being of law enforcement officers. Training should include information regarding the high rates of post-traumatic stress, depression and suicide among law enforcement officers and available resources for seeking help.  Enhance the availability and encourage the continued collaboration of law enforcement peer support programs in the state.

4.     NH PSTC should explore the issue of requiring mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and/or assist with referring officers for mental health treatment/support.

5.     The University of New Hampshire and other higher education institutions within New Hampshire are encouraged to collaborate with NH PSTC to develop specialized curriculum and/or graduate/post-graduate certificate programs dedicated:

       a.     To mental health providers who collaborate with law enforcement officers in responding to individuals experiencing a mental health crisis, in order to respond more effectively to critical incidents involving individuals who are a danger to themselves or others.

       b.     To address the special mental health needs of law enforcement officers/first responders including, trauma, depression, and substance misuse, in order to enhance the skills, understanding, and availability of

licensed mental health professionals in New Hampshire who can provide treatment/support and collaborate with our law enforcement community.

6.     Endorse the findings and recommendations of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit and ensure that sufficient funding is allocated to implement and sustain the recommendations.

7.     In order to enhance transparency, accountability, and community relations between law enforcement and the people they serve, the Commission strongly encourages the Governor and the legislature to allocate or re-allocate appropriate funding needed to implement and sustain the recommendations made by this Commission.  Stakeholders are encouraged to advocate for their funding needs before House Finance Committee or their local funding body.

8.     Extend, as needed, this Commission to assist with implementation of any recommendation.



⊕ Change Site Language    🔍 Search The Site

 

**OPEN MENU**

Home > News and Media > Governor Chris Sununu Endorses All LEACT Recommendations, Puts Forward Road Map for Implementation

# Press Release

For Immediate Release

### Contact

Communications Director
(603) 271-2121 | Sununu.Press@nh.gov

# Governor Chris Sununu Endorses All LEACT Recommendations, Puts Forward Road Map for Implementation

Concord, NH — Today, Governor Chris Sununu put forward a roadmap for the State of New Hampshire to implement all recommendations that arose from the New Hampshire Commission on Law Enforcement Accountability, Community, and Transparency (LEACT), which Governor Chris Sununu established through an Executive order in June after the murder of George Floyd.

LEACT released a report containing three parts which focused on training, reporting and investigation of police misconduct, and community relations. They detailed numerous reforms for the State of New Hampshire to take action on.

"Today I am endorsing every single recommendation from all three parts of the LEACT report," said Governor Chris Sununu. "Their charge was difficult — to come up with recommendations on how to improve Law Enforcement here in New Hampshire. As I have long said, New Hampshire has some of the best law enforcement in the country, but there is always room to improve, grow, and adapt. I cannot thank the members of the Commission enough for their tireless work. These issues are incredibly important and should not be political. I am confident these reforms, which received unanimous support from the Commission, will be enacted with bipartisan support. And, as I have long said, cost will not be a barrier to implementation."

The roadmap for these recommendations details the avenues that each reform will be implemented through.

- First, immediate reforms that can be accomplished through Executive Order.
- Second, immediate reforms that can be initiated through rulemaking
- Third, reforms that need to be taken up by the legislature
- Fourth, reforms which will be implemented by local law enforcement agencies through encouragement and assistance from the state.

Governor Chris Sununu will be issuing an Executive Order to take immediate action on many of these reforms within the next two weeks.

For reforms that require legislation, Governor Sununu has asked the Attorney General to lead the effort to craft legislation for the Legislature's consideration. Once a draft of that legislation is prepared, Governor Sununu will be asking the majority and minority leaders in both houses of the next Legislature to sponsor and shepherd this legislation through to passage.

A copy of the roadmap can be found here. 

 Portable Document Format (.pdf) . Visit nh.gov for a list of free .pdf readers for a variety of operating systems.



107 North Main Street | Concord, NH | 03301
(603) 271-2121 | TDD Access: Relay NH 1-800-735-2964

About Governor Sununu

News and Media

Contact Governor Sununu

NH Web Portal – NH.gov

NH Travel & Tourism

ReadyNH.gov

NH Government Careers

11/24/21, 10:36 AM
Governor Chris Sununu Endorses All LEACT Recommendations, Puts Forward Road Map for Implementation | Governor Christopher T. Sununu

154

**Hours:** Monday thru Friday | 8:30am - 5:00pm

Directions to the NH State House >

© 2021 State of New Hampshire • All rights reserved  |  Privacy Policy  |  Accessibility Policy  |  Webmaster

AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE

| Title of Recommendation | Implementation |
|---|---|
| **A. TRAINING** | |
| **I. Required Training to Maintain Law Enforcement Officer Certification** | |
| 1. As soon as practicable, NH PSTC, with input from all relevant law enforcement agencies, should pursue all actions necessary, including emergency rulemaking pursuant to RSA 541-A, to amend existing administrative rules to provide as follows: | |
| 1-A. Increase the mandatory number of hours of annual in-service training for law enforcement officers on an incremental basis over the next three years.  By January 1, 2024, the total mandatory hours of annual in-service training should be a minimum of twenty-four (24) hours. | Executive Order and Rulemaking |
| 1-B. Mandate that annual in-service training as approved by NH PSTC include, at a minimum, two (2) hours on each of the following topics:<br>i. Implicit bias and cultural responsiveness;<br>ii. Ethics; and<br>iii. De-escalation. | Executive Order and Rulemaking |
| 2. Beginning January 1, 2021, strongly encourage all law enforcement agencies to require their officers to participate and receive, at a minimum two (2) hours annually, of training in the following areas:<br>a. Implicit bias and cultural responsiveness;<br>b. Ethics; and<br>c. De-escalation. | Executive Order - Contracting |
| **II. NH Police Standards and Training Council General Recommendations** | |
| 3. NH PSTC should arrange for a Job Task Analysis (JTA) for entry-level law enforcement officers and entry-level corrections officers, and based on those findings, conduct an overall review of the present academy curriculums.  Based on curriculum changes found by the JTA, an extension of the length of the police academy beyond its current 16 weeks may be warranted. | Executive Order |
| 4. NH PSTC needs to leverage technology and be allowed to purchase and deploy a robust database management system and on-line learning platform for the twofold purpose of:    1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from one agency to another and/or decertification, and 2) to develop and deliver standardized on-line training to all law enforcement officers in an efficient and economical way. | Executive Order & potential legislation for funding |

| Title of Recommendation | Implementation |
|---|---|
| 5. NH PSTC, in collaboration with other law enforcement agencies, using nationally vetted best practices as set forth by IACP, CALEA, PERF, and NOBLE, shall create policy guidelines on the following topics that serve as a minimum standard with which all law enforcement agencies must comply: - Use of Force<br>- Duty to Intervene<br>- Code of Conduct<br>- Duty to Report Misconduct<br>- Prohibition of Chokeholds<br>- Procedures to Guard Against Positional Asphyxia | Executive Order and Rulemaking |
| 6. NH PSTC should increase the number of hours of scenario-based training in both academy and in-service settings. | Executive Order and Rulemaking |
| 7. NH PSTC should improve and augment police academy training on diversity by conducting a review of the present lesson plan on cultural dynamics, and amend it to properly address the topic. Training to be developed with one or more community partner(s). | Executive Order and Rulemaking |
| 8. NH PSTC should improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the IACP recognized Fair and Impartial Policing training or similar type training. | Executive Order and Rulemaking |
| 9. NH PSTC should improve and augment police academy and in-service training on de-escalation techniques by adopting the PERF's Integrated Communication and Tactics training (ICAT) or similar training. | Executive Order and Rulemaking |
| 10. NH PSTC should improve and augment police academy training on police ethics by re-instituting the Ethics block of instruction. | Executive Order and Rulemaking |
| 11. NH PSTC should improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training, (formally known as EPIC training) or similar training. | Executive Order and Rulemaking |
| 12. NH PSTC should include in its instruction State of New Hampshire v. Jones (decided January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered while reaching its decision. These cases should be part of the lesson plan in those relevant topic areas that are already delivered.  An attorney from the Attorney General's Office will be dedicated to teach at NH PSTC and regularly update materials. | Executive Order and Rulemaking |

| Title of Recommendation | Implementation |
|---|---|
| 13. Recognizing that certain NH police agencies need to rely on part-time law enforcement officers, NH PSTC should re-evaluate the Part-Time Police Officer certification process upon receipt of the JTA and consider extending the length of such training and give certain consideration to what law enforcement functions part-time officers be allowed to perform. | Executive Order and Rulemaking<br>Potential legislation for funding |
| 14. NH PSTC should amend administrative rule POL 301.05 Background Investigations to mandate that background investigations specifically vet police recruit candidates in the area of having demonstrated outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources to help determine the overall fitness for duty the candidate possesses and to consider those findings in the overall decision to hire the candidate. | Executive Order and Rulemaking |
| **III. Other Recommendation** | |
| 15. All law enforcement agencies should be encouraged to pursue CALEA accreditation.  In the absence of CALEA accreditation, agencies should continually review and maintain policies consistent with nationally accepted best practices under Section C:1-a-l. | Recommendation, and potential Executive Order related to State assistance |
| **B. REPORTING AND INVESTIGATION OF POLICE MISCONDUCT** | |
| 16. Support the establishment of a single, neutral and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers with the noted componets from the LEACT Report: | Legislation |
| 17. To promote a uniform approach to investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials, establish by statute, a dedicated Public Integrity Unit within the Attorney General's Office with permanent and sustainable resources, including full-time attorneys, paralegals, legal assistants, and investigators. | Executive Order<br>Legislation for addional funding |
| 18. To promote equal justice under the law in all aspects of the criminal justice system, the Commission strongly encourages implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges. | Executive Order for prosecutors and public defenders<br>Legislation for judges |
| 19. Establish a community outreach position within the Attorney General's Office to facilitate communication between all state, county and local prosecution offices and New Hampshire's diverse communities. | Executive Order<br>Legislation for addional funding |
| 20. Amend RSA 33-A:3-a, CVIII to require "police, non-criminal-internal affairs investigations" to be retained, at a minimum, for a period of 20 years after retirement or separation. | Legislation |

| Title of Recommendation | Implementation |
|---|---|
| 21.  Encourage all law enforcement agencies to use body and/or dash cameras. | Executive Order for State Police - with potential legislation for funding<br>Legislation for local law enforcement |
| 22. Make the existing Exculpatory Evidence Schedule (EES) public subject to the following provisions:a. The Office of the Attorney General will provide immediate written notice to all living persons on the current list that they are on the list with the following notifications that:<br>i. Six (6) months from date of notification to request a hearing in Superior Court to have his or her name removed from the EES.<br>ii. Six (6) months from date of notification, individual names on the list with a sustained finding shall be made public, except for any individual with a pending Superior or Supreme Court action in regard to removal from the EES.<br>b. The names of deceased former law enforcement officers shall be released once there has been a determination that the officer was afforded due process prior to placement on the list or the conduct subject to EES was previously provided as discovery in a criminal case. | Legislation |
| **C. COMMUNITY RELATIONS** | |
| **I. Data Collection** | |
| 23. All law enforcement agencies should gather, analyze and make available to the public, at least annually, data on demographics (including, at a minimum, gender and race) for arrests, citations and motor vehicle and subject stops regardless of disposition. | Legislation |
| 24. New Hampshire Department of Motor Vehicles should include a person's race on NH Drivers' Licenses and Non-Drivers' Identification Cards, with the option for the person to opt out from answering the question. | Legislation |
| 25. All law enforcement agencies will comply with RSA 106-B:14-c by submitting crime reports to the Department of Safety, Division of State Police based on the specifications prescribed by the Federal Bureau of Investigation (FBI). | Recommendation and communication push from State to remind local law enforcement agencies of statutory requirements |

| Title of Recommendation | Implementation |
|---|---|
| **II. Community Policing and Engagement** | |
| 26. All law enforcement agencies should adopt the definition of Community Policing as set forth by IACP: "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties." | Executive Order for State Police Recommendation for local law enforcement |
| 27. Encourage all law enforcement agencies, when practicable, to dedicate an officer or unit to community policing and engagement | Executive Order for State Police Recommendation for local law enforcement |
| 28. Encourage all law enforcement agencies to engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs.  Models like New Hampshire Blue and You, the Mirror Project, Police Athletic Leagues (PALs), and citizen police academies serve as a guide for such efforts. | Executive Order for State Police Recommendation for local law enforcement |
| 29. All law enforcement agencies should establish ongoing officer training at all levels to encourage a culture that empowers individual officers to engage in community policing and relationship building efforts. | Executive Order for State Police Recommendation for local law enforcement |
| 30. All law enforcement agencies should publish/advertise community events and consider the use of social media and the establishment of Public Service Announcement (PSA) campaigns to educate the public about police officers and their work. | Executive Order for State Police Recommendation for local law enforcement |
| 31. NH PSTC should maintain and publish a list of all currently CALEA accredited law enforcement agencies. | Executive Order |
| **III. School Resource Officers** | |
| 32. NH PSTC should set forth mandated "certification" for SROs that would require the officer to complete National Association of School Resource Officers (NASRO) training, Mirror Project Train-the-Trainer and Effective Police Contact with Youth training prior to assignment.  Further, certain annual in-service hours to maintain SRO "certification" should be identified and mandated by NH PSTC. | Executive Order and Rulemaking Potential legislation for funding |

| Title of Recommendation | Implementation |
|---|---|
| 33. NH PSTC should work with stakeholders and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SRO's role in student discipline for non-criminal matters. | Executive Order |
| 34. Each law enforcement agency should have a field training program specifically for SROs.  A transition plan should be implemented over a course of weeks/months between each outgoing/incoming SRO so there is overlap, information exchange, and adjustment for the stakeholders. | Recommendation |
| 35. MOUs between law enforcement agencies and SAUs should be made public. | Legislation |
| **IV. Hiring/Recruitment of Officers** | |
| 36. Recognizing the difficulty of hiring and recruiting qualified candidates, law enforcement agencies should continue efforts to recruit officers from minority communities to allow for a diverse law enforcement workforce. | Executive Order for State Police<br>Recommendation for local law enforcement<br>Legislation for funding for these efforts |
| 37. All public entities should develop a comprehensive strategy to actively attract, recruit, and retain diverse law enforcement candidates, to include candidates from outside New Hampshire. | Executive Order for State entities<br>Recommendation for public non-state entities |
| **V. Other** | |
| 38. In order to advance relationships with the trans and gender non-conforming population, all law enforcement agencies should seek and provide training on pronoun inclusion. | Executive Order for State Police<br>Recommendation for local law enforcement |
| 39. In order to advance relationships with the deaf and hard of hearing community, law enforcement agencies should continue to seek a better understanding of, and communication with, members of that community, to include the greater use and dissemination of driver visor cards by law enforcement. | Executive Order for State Police<br>Recommendation for local law enforcement |
| 40. In order to advance a greater understanding of juvenile offenders, form a separate commission to review the present state of juvenile justice laws.  In particular, the commission should review the minimum age for juvenile prosecutions and the statute that creates a presumption of transfer to the adult criminal court. | Legislation |

| Title of Recommendation | Implementation |
|---|---|
| **The Commission makes the following recommendations for reforms and improvements with respect to mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit.** | |
| 41. Specially trained mental health professionals should be embedded in tactical response teams. There should be a review to determine if such mental health professionals will be afforded protection from litigation stemming from their participation in such activities. | Recommendation |
| 42. Encourage partnerships between communities and local law enforcement to pursue services and resources dedicated to individuals with substance use disorders (SUDs) and mental illness and to make those services readily available in order to reduce the burden on law enforcement responding to issues stemming from SUDs as well as mental illness. | Recommendation and State assistance for local law enforcement agencies |
| 43. Offer training regarding the mental well-being of law enforcement officers.  Training should include information regarding the high rates of post-traumatic stress, depression and suicide among law enforcement officers and available resources for seeking help.  Enhance the availability and encourage the continued collaboration of law enforcement peer support programs in the state. | Executive Order for State Police Recommendation and State assistance for local law enforcement Potential legislation for funding |
| 44. NH PSTC should explore the issue of requiring mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and/or assist with referring officers for mental health treatment/support. | Executive Order |
| 45. The University of New Hampshire and other higher education institutions within New Hampshire are encouraged to collaborate with NH PSTC to develop specialized curriculum and/or graduate/post-graduate certificate programs dedicated: a. To mental health providers who collaborate with law enforcement officers in responding to individuals experiencing a mental health crisis, in order to respond more effectively to critical incidents involving individuals who are a danger to themselves or others. b. To address the special mental health needs of law enforcement officers/first responders including, trauma, depression, and substance misuse, in order to enhance the skills, understanding, and availability of licensed mental health professionals in New Hampshire who can provide treatment/support and collaborate with our law enforcement community. | Recommendation Governor conversation with the USNH and CCSNH boards |

| Title of Recommendation | Implementation |
|---|---|
| 46. Endorse the findings and recommendations of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit and ensure that sufficient funding is allocated to implement and sustain the recommendations. | Legislation - next biennal budget |
| 47. In order to enhance transparency, accountability, and community relations between law enforcement and the people they serve, the Commission strongly encourages the Governor and the legislature to allocate or re-allocate appropriate funding needed to implement and sustain the recommendations made by this Commission.  Stakeholders are encouraged to advocate for their funding needs before House Finance Committee or their local funding body. | Legislation - next biennal budget |
| 48. Extend, as needed, this Commission to assist with implementation of any recommendation. | Commission to re-convene to assess progress on recommendations after next legislative session |



# STATE OF NEW HAMPSHIRE
## OFFICE OF THE GOVERNOR

CHRISTOPHER T. SUNUNU
Governor

### STATE OF NEW HAMPSHIRE
### BY HIS EXCELLENCY
### CHRISTOPHER T. SUNUNU, GOVERNOR

**Executive Order 2020-19**

**An order regarding implementation of recommendations of the New Hampshire Commission on Law Enforcement Accountability, Community, and Transparency**

**WHEREAS,** in the wake of the tragic murder of George Floyd in Minneapolis, Minnesota, our country continues to engage in a nationwide conversation regarding law enforcement, social justice, and the need for reforms that enhance transparency, accountability, and community relations in law enforcement; and

**WHEREAS,** law enforcement in New Hampshire make daily sacrifices, serve our State admirably, and are a necessary and pivotal part of our communities; and

**WHEREAS,** the State of New Hampshire has an obligation to participate in the national conversation and engage in self-examination to identify opportunities to improve the state of our law enforcement and the relationship between law enforcement and the communities they serve; and

**WHEREAS,** New Hampshire finds itself in a pivotal moment that demands prompt action to initiate important conversations and develop recommendations for reform; and

**WHEREAS,** on June 16, 2020, the Governor issued Executive Order 2020-11, which established the New Hampshire Commission on Law Enforcement Accountability, Community and Transparency (the "LEACT Commission"); and

**WHEREAS,** on August 31, 2020, the LEACT Commission issued its final report, which included 48 recommendations for reforms that the Commission deemed necessary to enhance transparency, accountability and community relations in law enforcement; and

**WHEREAS,** on September 17, 2020, the Governor issued a statement endorsing all of the recommendations of the LEACT Commission and put forward a road map for implementation of each of the recommendations; and

**WHEREAS,** many of the recommendations of the LEACT Commission can be implemented in whole or in part by Executive Order and rulemaking.

107 North Main Street, State House - Rm 208, Concord, New Hampshire 03301
Telephone (603) 271-2121 • FAX (603) 271-7640
Website: http://www.governor.nh.gov/ • Email: governorsununu@nh.gov
TDD Access: Relay NH 1-800-735-2964

**NOW, THEREFORE, I, CHRISTOPHER T. SUNUNU, GOVERNOR** of the State of New Hampshire, by the authority vested in me pursuant to part II, article 41 of the New Hampshire Constitution, do hereby order, effective immediately, that:

<u>Certification - Training Requirements</u>

1. The Director of the Police Standards and Training Council (PSTC) shall take all necessary steps, including initiating appropriate rulemaking, to:

   (a) Increase the mandatory number of required hours of annual in-service training on an incremental basis over the next three years to ensure that, by January 1, 2024, the total mandatory number of hours of annual in-service training is no less than twenty-four hours.

   (b) Mandate that annual in-service training as approved by PSTC include, at a minimum, two hours on each of the following topics:

       i.   Implicit bias and cultural responsiveness
       ii.  Ethics
       iii. Descalation

   (c) Incentivize and encourage all law enforcement agencies to require their officers to receive at least two hours of training annually in the following areas:

       i.   Implicit bias and cultural responsiveness
       ii.  Ethics
       iii. Descalation

<u>Certification and Ongoing Training Curriculum</u>

2. The Director of PSTC shall conduct a review of academy and in-service training curriculum and take all necessary steps, including initiating appropriate rulemaking, to:

   (a) increase the number of hours or scenario based training in both academy and in-service settings by an amount which PSTC deems necessary after consultation with the Department of Justice, Department of Safety, local law enforcement agencies, and community partners;

   (b) in consultation with one or more community partners, amend the current lesson plan on cultural dynamics as necessary to ensure that the topic is properly addressed;

   (c) improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the International Association of Chiefs of Police (IACP) recognized Fair and Impartial Policing training or similar type training;

(d) improve and augment police academy and in-serving training on de-escalation techniques by adopting the Police Executive Research Forum's (PERF) Integrated Communication and Tactics training (ICAT) or similar training;

(e) improve and augment police academy training on police ethics by re-instituting the ethics block of construction in police academy training;

(f) improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training or similar training; and

(g) utilize an attorney from the Attorney General's Office to provide, during training on applicable topics, instruction on State of New Hampshire v. Jones (January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered when reaching its decision.

3. In addition to the specific steps outlined in Section 2 of this Order, the Director of PSTC shall take all necessary steps to initiate a Job Task Analysis for entry-level law enforcement officers and entry-level corrections officers and, based upon those findings, conduct an overall review of the present academy curriculums. Based upon this review, the Director shall, within 120 days from the date of this Order, submit a recommendation to PSTC and the Governor as to whether the current length of the police academy should be expanded beyond 16 weeks.

4. Upon completion of the Job Task Analysis conducted pursuant to Section 3 of this Order, the Director of PSTC shall conduct a review of the Part-Time Police Officer certification process. Based upon this review, the Director shall, within 120 days from the date of this Order, submit a recommendation to PSTC and the Governor as to whether changes should be made to (i) the length of the training period for part time officers and (ii) the scope of law enforcement functions that part-time officers are allowed to perform.

5. The Director of PSTC shall take all necessary steps, including but not limited to providing recommendations to the Governor on necessary funding in the next biennial budget, to develop and deploy a robust database management system and on-line learning platform for the twofold purpose of: 1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from agency to another, and decertification, and (2) developing and delivering standardized on-line training to all law enforcement officers in an efficient and economical way.

Reporting and Investigation of Misconduct

6. The Director of PSTC, in collaboration with other law enforcement agencies and using nationally vetted best practices as set forth by the IACP, PERF, Commission on Accreditation for Law Enforcement Agencies (CALEA), and National Organization of Black Law Enforcement Executives (NOBLE), shall create policy guidelines on the following topics:

a) Use of Force
b) Duty to Intervene
c) Code of Conduct
d) Duty to Report Misconduct
e) Prohibition of Chokeholds
f) Procedures to Guard Against Positional Asphyxia

7. The Director of PSTC shall initiate rulemaking to amend administrative rule POL 301.05 to mandate that background investigations for police recruit candidates specifically vet such candidates for demonstrations of outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources, and that these findings be considered in the overall decision to hire such candidates.

8. Within 30 days of the date of this Order, the Attorney General shall take the following actions:

a) Establish a Public Integrity Unit within the Department of Justice using existing resources within the Department. The purpose of the Public Integrity Unit shall be to promote a uniform approach to the investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials. Within 60 days of the date of this Order, the Attorney General shall submit recommendations to the Governor for additional necessary resources for the completion of the build out of the Unit, including estimated funding needs for inclusion in the next biennial budget.

b) Establish a community outreach position within the Department of Justice to facilitate communication between all state, county, and local prosecution offices and New Hampshire's diverse communities.

c) Take all necessary action to require or provide implicit bias and racial profiling training for all New Hampshire prosecutors, including city prosecutors and police prosecutors.

d) Take all necessary actions to require or provide implicit bias and racial profiling training for all attorneys, investigators, legal staff, and victim/witness advocates in the Attorney General's Office and County Attorney Officers, and for all State agency attorneys.

9. The Executive Director of the Judicial Council shall take all necessary steps, including initiating rulemaking or seeking contract amendments, to require implicit bias and racial profiling training for all New Hampshire public defenders.

10. The Commissioner of the Department of Safety and the Colonel of the State Police shall take all necessary steps to equip State Police with body worn cameras, including but not limited to either (i) identifying available funding in the Department of Safety's existing budget and seeking necessary approvals to utilize such funding for the purpose of equipping State Police with body worn cameras or (ii) providing recommendations to the Governor on necessary funding to be included in the next biennial budget. Once funding has been identified and

approved and the necessary equipment is obtained and ready for use, the use of body worn cameras shall be required for State Police in any circumstance where State Police interact with members of the public and use of body worn cameras is permitted by existing State or Federal law. Within 60 days of the date of this Order, the Commissioner of the Department of Safety shall submit a plan for implementation of this directive to the Governor. This plan shall include, at a minimum, identification of the necessary funding and a timeline for final implementation.

<u>Law Enforcement and Community Relations</u>

11. All State law enforcement agencies shall:

   a) Take all necessary steps, including initiating rulemaking, to adopt the following definition of "community policing" as set forth by IACP:

   "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties."

   b) Establish and dedicate a team to focus on community policing and engagement. This team shall, among other things, (i) engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs and (ii) identify opportunities to promote community events and use social media and Public Service Announcement (PSA) campaigns to educate the public about law enforcement officers and their work.

   c) Take all necessary steps, including initiating rulemaking, to require ongoing training for law enforcement officers that empowers and enables individual officers to engage in community policing and relationship building efforts.

12. The Director of PSTC shall ensure that PSTC maintains and publishes a list of all currently CALEA accredited law enforcement agencies within New Hampshire.

<u>School Resource Officers</u>

13. The Director of PSTC shall:

   a) Take all necessary steps, including initiating rulemaking, to mandate certification for school resource officers (SROs) that requires each SRO to complete, prior to assignment, both (i) National Association of School Resource Officers (NASRO) training and (ii)

Mirror Project Train-the-Trainer and Effective Police Contact with Youth training. If the Director determines that legislation is necessary to enable rulemaking on this topic, the Director shall submit recommended legislative language to the Governor within 30 days of this Order.

b) Take all necessary steps, including initiating rulemaking, to develop and implement mandatory annual in-service training requirements for SROs to maintain their certifications. If the Director determines that legislation is necessary to enable rulemaking on this topic, the Director shall submit recommended legislative language to the Governor within 30 days of this Order.

c) Work with stakeholders and the State Board of Education and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SROs's role in student discipline for non-criminal matters.

<u>Recruitment for State Law Enforcement Agencies</u>

14. All State law enforcement agencies shall establish a team to continue and enhance the each agency's efforts to recruit officers from minority communities. This shall include the development of a new comprehensive plan and strategy to actively attract, recruit, and retain diverse law enforcement candidates, including candidates from outside New Hampshire. Each State law enforcement agency shall submit this plan and strategy to the Governor within 60 days of the date of this Order, and upon submittal this plan and strategy shall be published on each agency's website and Governor's Office website.

<u>Gender Non-Conforming Community</u>

15. All State law enforcement agencies shall take all necessary steps, including initiating rulemaking, to require ongoing training for law enforcement officers that advances the relationship between officers and the gender non-conforming population including, but not limited to, training on pronoun inclusion.

<u>Deaf and Hard of Hearing Community</u>

16. Each law enforcement agency shall develop a plan to advance relationships with the deaf and hard of hearing community. The plan for the Division of State Police shall address, among other things, the potential for greater use and dissemination of driver viser cards by State Police.

<u>Mental Well-Being of Officers</u>

17. All State law enforcement agencies shall take all necessary steps, including initiating rulemaking, to require ongoing training regarding the mental well-being of officers. Such

training shall include information regarding the high rates of post-traumatic distress, depression and suicide among law enforcement officers and available resources for seeking help.

18. The Director of PSTC shall form a team to review whether to require mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and assist with referring officers for mental health treatment and support.

<u>Implementation of the Directives in this Order</u>

19. Within 60 days of the date of this Order, the Director of the PSTC, the Attorney General, the Executive Director of the Judicial Council, the Commissioner of the Department of Safety, and the head of each State law enforcement agency shall, as applicable, submit to the Governor an estimated timeline for implementation of the Directives contained in this Order.

20. On or before November 1, 2020, and the first day of every month thereafter until implementation of all directives in this Order is complete, the Director of the PSTC, the Attorney General, the Executive Director of the Judicial Council, the Commissioner of the Department of Safety, and the head of each State law enforcement agency shall, as applicable, submit monthly reports to the Governor summarizing the progress made on implementation of each of the directives in this Order. These reports shall be posted on the Governor's Office website on the LEACT Commission page.

21. All directives contained within this Order shall be fully implemented by July 1, 2021, unless otherwise provided in this Order. The Governor may approve extensions to this deadline on a case by case basis.

Given under my hand and seal at the Executive Chambers in Concord, this 7th day of October, in the year of Our Lord, two thousand and twenty, and the independence of the United States of America, two hundred and forty-four.

**GOVERNOR OF NEW HAMPSHIRE**

| LEACT Dashboard | Updated June 9, 2021 |
|---|---|
| **Title of Recommendation** | **Current Implementation Status** |
| **A. TRAINING** | |
| **I. Required Training to Maintain Law Enforcement Officer Certification** | |
| 1. As soon as practicable, NH PSTC, with input from all relevant law enforcement agencies, should pursue all actions necessary, including emergency rulemaking pursuant to RSA 541-A, to amend existing administrative rules to provide as follows: | |
| 1-A. Increase the mandatory number of hours of annual in-service training for law enforcement officers on an incremental basis over the next three years.  By January 1, 2024, the total mandatory hours of annual in-service training should be a minimum of twenty-four (24) hours. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. Presently the scenario training at the recruit academy is 76 hours as scheduled. We are in final stages of council approval to bring back live dosing labs to augment DWI detection class. Once full approved, recruits will have the ability to conduct SFSTs on dosed subjects. We anticipate further increases once the JTA is completed and a deeper review of the academy curriculum can be conducted. This will be an ongoing effort for the next 12 to 18 months.** |
| 1-B. Mandate that annual in-service training as approved by NH PSTC include, at a minimum, two (2) hours on each of the following topics:          i. Implicit bias and cultural responsiveness; ii. Ethics; and iii. De-escalation. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. The final adoption and anticipated completion date is dependent on the JLCAR process. All mandatory in-service training listed above is ready and we will be delivering each of the three classes at the NH Association of Chiefs of Police summer conference this year. Further, we will are offering these classes in a webinar style using Zoom technology to reach as many as possible. Each topic will be offered a number of times during a particular month. Finally, NH BET from the NH Department of Administrative has completed one of the three on-line learning modules so officers can take the training online. They have begun work on the remaining two classes.   This has been completed by the Liquor Commission. State Police completed additional training on de-escalation and is in progress on training on ethics and implicit bias.** |
| 2. Beginning January 1, 2021, strongly encourage all law enforcement agencies to require their officers to participate and receive, at a minimum two (2) hours annually, of training in the following areas: a. Implicit bias and cultural responsiveness; b. Ethics; and c. De-escalation. | **Completed.** |
| **II. NH Police Standards and Training Council General Recommendations** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 3. NH PSTC should arrange for a Job Task Analysis (JTA) for entry-level law enforcement officers and entry-level corrections officers, and based on those findings, conduct an overall review of the present academy curriculums.  Based on curriculum changes found by the JTA, an extension of the length of the police academy beyond its current 16 weeks may be warranted. | **JTA in progress. Anticipated completeion date prior to August 2021.** |
| 4. NH PSTC needs to leverage technology and be allowed to purchase and deploy a robust database management system and on-line learning platform for the twofold purpose of: 1) maintaining a full record over the course of an officer's career of his or her training completion, any incidents of sustained misconduct, movement from one agency to another and/or decertification, and 2) to develop and deliver standardized on-line training to all law enforcement officers in an efficient and economical way. | **PSTC has purchased software from Benchmark Analytics and is working to customize it. Anticipate that the training software will be operational by June 1, 2021. Record management system may take longer to implement.** |
| 5. NH PSTC, in collaboration with other law enforcement agencies, using nationally vetted best practices as set forth by IACP, CALEA, PERF, and NOBLE, shall create policy guidelines on the following topics that serve as a minimum standard with which all law enforcement agencies must comply: - Use of Force<br>- Duty to Intervene<br>- Code of Conduct<br>- Duty to Report Misconduct<br>- Prohibition of Chokeholds<br>- Procedures to Guard Against Positional Asphyxia | **Nationally vetted position papers developed by the IACP and PERF on each topic have been posted online. The Model Policy on the Use of Force has been drafted and is being reviewed by the NHDOJ, NH Chiefs of Police, and the NH Police Association.** |
| 6. NH PSTC should increase the number of hours of scenario-based training in both academy and in-service settings. | **Completed. PSTC has increased the number of scenario and deescalation training by 15 hours. These hours will further increase over the next 12-18 months.** |
| 7. NH PSTC should improve and augment police academy training on diversity by conducting a review of the present lesson plan on cultural dynamics, and amend it to properly address the topic. Training to be developed with one or more community partner(s). | **Completed for the January 2021 acadamy session.** |
| 8. NH PSTC should improve and augment police academy and in-service training on implicit bias and procedural justice by adopting the IACP recognized Fair and Impartial Policing training or similar type training. | **Completed. Increased training on Cultural Dynamics and Implicit Bias from 2 hours to 16 hours.** |
| 9. NH PSTC should improve and augment police academy and in-service training on de-escalation techniques by adopting the PERF's Integrated Communication and Tactics training (ICAT) or similar training. | **Completed.** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 10. NH PSTC should improve and augment police academy training on police ethics by re-instituting the Ethics block of instruction. | **Completed.** |
| 11. NH PSTC should improve and augment police academy and in-service training on the duty to intervene by adopting Georgetown University's Active Bystandership Law Enforcement (ABLE) training, (formally known as EPIC training) or similar training. | **Completed. A new course was added to the PSTC curriculum, making New Hampshire the first state to do so as a state-wide initiative.** |
| 12. NH PSTC should include in its instruction State of New Hampshire v. Jones (decided January 10, 2020) and any other State court decisions where race or protected class was a matter the court considered while reaching its decision. These cases should be part of the lesson plan in those relevant topic areas that are already delivered.  An attorney from the Attorney General's Office will be dedicated to teach at NH PSTC and regularly update materials. | **In progress. PSTC anticipates that the incoming NHAG will address this mandate and will be dependent on the availability of an attorney to review our present lesson plan on Search and Seizure.** |
| 13. Recognizing that certain NH police agencies need to rely on part-time law enforcement officers, NH PSTC should re-evaluate the Part-Time Police Officer certification process upon receipt of the JTA and consider extending the length of such training and give certain consideration to what law enforcement functions part-time officers be allowed to perform. | **In progress, awaiting JTA's completion prior to August 2021.** |
| 14. NH PSTC should amend administrative rule POL 301.05 Background Investigations to mandate that background investigations specifically vet police recruit candidates in the area of having demonstrated outward bias toward a protected group by way of past history, behavior, affiliation with a subversive group, social media posts and other objective sources to help determine the overall fitness for duty the candidate possesses and to consider those findings in the overall decision to hire the candidate. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. The final adoption and anticipated completion date is dependent on the JLCAR process.** |
| **III. Other Recommendation** | |
| 15. All law enforcement agencies should be encouraged to pursue CALEA accreditation.  In the absence of CALEA accreditation, agencies should continually review and maintain policies consistent with nationally accepted best practices under Section C:1-a-l. | **PSTC published a list of CALEA accredited law enforcement agencies.** |
| **B. REPORTING AND INVESTIGATION OF POLICE MISCONDUCT** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 16. Support the establishment of a single, neutral and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers with the noted componets from the LEACT Report: | **Legislation and funding proposed in the Governor's budget. (See HB 2)** |
| 17. To promote a uniform approach to investigation and prosecution of alleged criminal conduct by government officials, including law enforcement officials, establish by statute, a dedicated Public Integrity Unit within the Attorney General's Office with permanent and sustainable resources, including full-time attorneys, paralegals, legal assistants, and investigators. | **Completed. The Unit curretly is comprised of two attorneys. The Department has identified funding to fill two other positions within the unit and is taking steps to recruit and hire candidates to fill more positions.** |
| 18. To promote equal justice under the law in all aspects of the criminal justice system, the Commission strongly encourages implicit bias and racial profiling training for all prosecutors, including all police prosecutors, all criminal defense attorneys, and all judges. | **Completed/ongoing. On November 20, 2020 over 600 attorneys, prosecutors, and staff, including the entire NHDOJ, participated in an implicit bias training. Further trainings to be scheduled. All future hires at the NHDOJ will be required to view this recorded presentation within thirty days of hiring. The Judicial Council completed a training for all Public Defenders and has scheduled another training for early 2021.          Legislation introduced for judges. The Public Defender's office completed its training on April 16,  2021. (SB 96)** |
| 19. Establish a community outreach position within the Attorney General's Office to facilitate communication between all state, county and local prosecution offices and New Hampshire's diverse communities. | **On February 3, 2021, the Executive Council approved a request to reclassify a vacant, classified position  in order to create this position. The House Budget funded the position beginning January 1, 2023. In the meantime, the Department is continuing with the recruiting process contingent upon approval of funding. We will be monitoring the progress of the budget to see if the funding date changes.** |
| 20. Amend RSA 33-A:3-a, CVIII to require "police, non-criminal-internal affairs investigations" to be retained, at a minimum, for a period of 20 years after retirement or separation. | **Legislation introduced. (SB 96)** |
| 21.  Encourage all law enforcement agencies to use body and/or dash cameras. | **RFP issued for State Police and responses are due on February 26, 2021. Liquor Commission has identified funding and is developing a draft  RFP and anticipates implimentation prior to July 1, 2021.**<br>**Legislation introduced to establish a funding source for local agencies. (SB 96)** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 22. Make the existing Exculpatory Evidence Schedule (EES) public subject to the following provisions:a. The Office of the Attorney General will provide immediate written notice to all living persons on the current list that they are on the list with the following notifications that:<br>i. Six (6) months from date of notification to request a hearing in Superior Court to have his or her name removed from the EES.<br>ii. Six (6) months from date of notification, individual names on the list with a sustained finding shall be made public, except for any individual with a pending Superior or Supreme Court action in regard to removal from the EES.<br>b. The names of deceased former law enforcement officers shall be released once there has been a determination that the officer was afforded due process prior to placement on the list or the conduct subject to EES was previously provided as discovery in a criminal case. | **Legislation introduced. (Amendment to HB 471)** |
| **C. COMMUNITY RELATIONS** | |
| **I. Data Collection** | |
| 23. All law enforcement agencies should gather, analyze and make available to the public, at least annually, data on demographics (including, at a minimum, gender and race) for arrests, citations and motor vehicle and subject stops regardless of disposition. | **Legislation introduced. (SB 96)** |
| 24. New Hampshire Department of Motor Vehicles should include a person's race on NH Drivers' Licenses and Non-Drivers' Identification Cards, with the option for the person to opt out from answering the question. | **Legislation introduced. (SB 96)** |
| 25. All law enforcement agencies will comply with RSA 106-B:14-c by submitting crime reports to the Department of Safety, Division of State Police based on the specifications prescribed by the Federal Bureau of Investigation (FBI). | **In progress.Approximately 85% meet this requirement. State Police continues to work with Law Enforcement Agencies to bring them into compliance.** |
| **II. Community Policing and Engagement** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 26. All law enforcement agencies should adopt the definition of Community Policing as set forth by IACP: "Community policing is a comprehensive philosophy that guides policy and strategy aimed at achieving more effective and efficient crime control, reduced fear of crime, improved quality of life, and improved police services and police legitimacy through a proactive reliance on community resources that seeks to change crime causing conditions. This assumes a need for greater accountability of police, elected community leaders, and the community in general, along with greater public share in decision-making through the identification of service needs and priorities and a greater concern for civil rights and liberties." | **Completed. Recommendation for local law enforcement.** |
| 27. Encourage all law enforcement agencies, when practicable, to dedicate an officer or unit to community policing and engagement | **In progress for State Police.** **Recommendation for local law enforcement.** |
| 28. Encourage all law enforcement agencies to engage in community relationship building by working collaboratively with community liaisons, public agencies, non-profits, community stakeholders and existing community-based programs.  Models like New Hampshire Blue and You, the Mirror Project, Police Athletic Leagues (PALs), and citizen police academies serve as a guide for such efforts. | **Completed by State Police, Liquor Commission and Fish and Game Department. This will be an ongoing and continuing effort by the State. Recommendation for local law enforcement.** |
| 29. All law enforcement agencies should establish ongoing officer training at all levels to encourage a culture that empowers individual officers to engage in community policing and relationship building efforts. | **Completed by State Police, Liquor Commission and Fish and Game Department.                        Recommendation for local law enforcement.** |
| 30. All law enforcement agencies should publish/advertise community events and consider the use of social media and the establishment of Public Service Announcement (PSA) campaigns to educate the public about police officers and their work. | **Completed by State Police, Liquor Commission and Fish and Game Department. This will be an ongoing and continuing effort by State. Recommendation for local law enforcement.** |
| 31. NH PSTC should maintain and publish a list of all currently CALEA accredited law enforcement agencies. | **Completed.** |
| **III. School Resource Officers** | |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 32. NH PSTC should set forth mandated "certification" for SROs that would require the officer to complete National Association of School Resource Officers (NASRO) training, Mirror Project Train-the-Trainer and Effective Police Contact with Youth training prior to assignment.  Further, certain annual in-service hours to maintain SRO "certification" should be identified and mandated by NH PSTC. | **Proposed rules submitted to JLCAR. Proposed rules approved by PSTC on December 15, 2020. The final adoption and anticipated completion date is dependent on the JLCAR process.** |
| 33. NH PSTC should work with stakeholders and oversee the development of a model SRO Memorandum of Understanding (MOU) to be used by police departments and School Administrative Units (SAUs) that clearly defines the roles, expectations and prohibitions of the SRO's role in the school setting and specifically with regard to the SRO's role in student discipline for non-criminal matters. | **Completed. Sample MOU is posted on PSTC's website.** |
| 34. Each law enforcement agency should have a field training program specifically for SROs.  A transition plan should be implemented over a course of weeks/months between each outgoing/incoming SRO so there is overlap, information exchange, and adjustment for the stakeholders. | **Recommendation for local law enforcement agencies.** |
| 35. MOUs between law enforcement agencies and SAUs should be made public. | **Legislation introduced. (SB 96)** |
| **IV. Hiring/Recruitment of Officers** | |
| 36. Recognizing the difficulty of hiring and recruiting qualified candidates, law enforcement agencies should continue efforts to recruit officers from minority communities to allow for a diverse law enforcement workforce. | **Completed by the State Police Recruitment and Training Unit, and will require ongoing efforts. Recommendation for local law enforcement.** |
| 37. All public entities should develop a comprehensive strategy to actively attract, recruit, and retain diverse law enforcement candidates, to include candidates from outside New Hampshire. | **Completed by State Police,  Liquor Commission and NH Fish and Game Department. Recommendation for public non-state entities** |
| **V. Other** | |
| 38. In order to advance relationships with the trans and gender non-conforming population, all law enforcement agencies should seek and provide training on pronoun inclusion. | **In progress for State Police and NH Fish and Game Department. Completed by Liquor Commission. Recommendation for local law enforcement** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 39. In order to advance relationships with the deaf and hard of hearing community, law enforcement agencies should continue to seek a better understanding of, and communication with, members of that community, to include the greater use and dissemination of driver visor cards by law enforcement. | **Completed by State Police and Liquor Commission. Recommendation for local law enforcement** |
| 40. In order to advance a greater understanding of juvenile offenders, form a separate commission to review the present state of juvenile justice laws.  In particular, the commission should review the minimum age for juvenile prosecutions and the statute that creates a presumption of transfer to the adult criminal court. | **Based on feedback from community stakeholders, specific legislative changes were introduced in lieu of a commission. (SB 96)** |
| **The Commission makes the following recommendations for reforms and improvements with respect to mental health and well-being and the results of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit.** | |
| 41. Specially trained mental health professionals should be embedded in tactical response teams.  There should be a review to determine if such mental health professionals will be afforded protection from litigation stemming from their participation in such activities. | **In progress for State Police.** |
| 42. Encourage partnerships between communities and local law enforcement to pursue services and resources dedicated to individuals with substance use disorders (SUDs) and mental illness and to make those services readily available in order to reduce the burden on law enforcement responding to issues stemming from SUDs as well as mental illness. | **Recommendation** |
| 43. Offer training regarding the mental well-being of law enforcement officers.  Training should include information regarding the high rates of post-traumatic stress, depression and suicide among law enforcement officers and available resources for seeking help.  Enhance the availability and encourage the continued collaboration of law enforcement peer support programs in the state. | **In progress for PSTC. Completed by State Police and Liquor Commission. In progress for NH Fish and Game Department.** |

| Title of Recommendation | Current Implementation Status |
|---|---|
| 44. NH PSTC should explore the issue of requiring mandatory periodic psychological screenings of law enforcement officers, similar to what is currently required for physical fitness under Pol 404.07, to determine ongoing fitness for duty and/or assist with referring officers for mental health treatment/support. | **In progress for PSTC.** |
| 45. The University of New Hampshire and other higher education institutions within New Hampshire are encouraged to collaborate with NH PSTC to develop specialized curriculum and/or graduate/post-graduate certificate programs dedicated: a. To mental health providers who collaborate with law enforcement officers in responding to individuals experiencing a mental health crisis, in order to respond more effectively to critical incidents involving individuals who are a danger to themselves or others. b. To address the special mental health needs of law enforcement officers/first responders including, trauma, depression, and substance misuse, in order to enhance the skills, understanding, and availability of licensed mental health professionals in New Hampshire who can provide treatment/support and collaborate with our law enforcement community. | **In progress.** |
| 46. Endorse the findings and recommendations of the February 2019 Office of Legislative Budget Assistant NH PSTC Performance Audit and ensure that sufficient funding is allocated to implement and sustain the recommendations. | **Legislation proposed for the next biennal budget** |
| 47. In order to enhance transparency, accountability, and community relations between law enforcement and the people they serve, the Commission strongly encourages the Governor and the legislature to allocate or re-allocate appropriate funding needed to implement and sustain the recommendations made by this Commission.  Stakeholders are encouraged to advocate for their funding needs before House Finance Committee or their local funding body. | **Recommendation for future action.** |
| 48. Extend, as needed, this Commission to assist with implementation of any recommendation. | **Commission to re-convene to assess progress on recommendations after next legislative session** |

## LEACT Recommendations Completed & In Progress as of 9/2/21

| | |
|---|---|
| ***Completed By Legislative Action*** *(listed with recommendation number)* | |
| ✓ | 19. Establish a community outreach position within the Attorney General's Office. |
| ✓ | 20. Retain police, non-criminal-internal affairs investigations for 20 years following end of service. |
| ✓ | 21. Encourage all law enforcement agencies to use body and/or dash cameras. |
| ✓ | 22. Make the existing Exculpatory Evidence Schedule (EES) public with conditions. |
| ✓ | 35. MOUs between law enforcement agencies and SAUs to be made public. |
| ✓ | 40. Reformed juvenile justice laws based on stakeholder input. |
| ✓ | 47. Encourage Governor and the legislature to allocate funding to support recommendations. |
| ***Completed By Executive Action*** *(listed with recommendation number)* | |
| ✓ | 1-A. Increase NH PSTC in-service training hours.  (Pending JLCAR approval) |
| ✓ | 1-B. Mandate NH PSTC training on implicit bias and cultural responsiveness, ethics and de-escalation |
| ✓ | 2. Encourage all law enforcement agencies to require implicit bias and cultural responsiveness, ethics and de-escalation training. |
| ✓ | 3. NH PSTC perform Job Task Analysis (JTA) to evaluate training. |
| ✓ | 4. Purchase and upgrade NH PSTC technology and database management. |
| ✓ | 5. NH PSTC created nationally vetted best practices and model policy guidelines. |
| ✓ | 6. NH PSTC increase scenario-based training hours. |
| ✓ | 7. NH PSTC review and amend training on diversity. |
| ✓ | 8. NH PSTC developed 16 hours on the topics of IACP Fair and Impartial Policing training. |
| ✓ | 9. NH PSTC review and amend de-escalation techniques. |
| ✓ | 10. NH PSTC review and amend ethics instruction. |
| ✓ | 11. NH PSTC review and amend training related to duty to intervene. |
| ✓ | 14. NH PSTC amend background investigations for police recruits in reviewing fitness for duty. (Pending JLCAR approval) |
| ✓ | 15. All law enforcement agencies to pursue CALEA accreditation or accepted best practices. |
| ✓ | 17. Establish Attorney General's Public Integrity Unit with necessary resources. |
| ✓ | 18. Require implicit bias training for all prosecutors, criminal defense attorneys and judges. |
| ✓ | 23. All law enforcement agencies to collect and report data on demographics for NIBRS. |
| ✓ | 25. Law enforcement agencies to submit crime reports to DOS as prescribed by FBI. |
| ✓ | 26. Adopt the definition of Community Policing as set forth by IACP. |
| ✓ | 28. Encourage all law enforcement agencies to engage in community relationship building. |
| ✓ | 29. Training for law enforcement that empowers community policing and relationship building. |
| ✓ | 30. All law enforcement agencies to promote community events through social media or PSAs. |
| ✓ | 31. NH PSTC maintain a list of all currently CALEA accredited law enforcement agencies. |
| ✓ | 32. NH PSTC to require National Association of School Resource Officers (NASRO) training. (Pending JLCAR approval) |
| ✓ | 33. NH PSTC develop SRO MOU for police departments and SAUs. |
| ✓ | 34. Law enforcement agency field training for SROs. |
| ✓ | 36. Encourage the recruitment of qualified officers from minority communities. |
| ✓ | 37. Strategy for recruiting and retaining diverse law enforcement candidates. |
| ✓ | 38. Training to improve relationships with the trans and gender non-conforming communities. |
| ✓ | 39. Training to advance relationships with the deaf and hard of hearing including driver visor cards. |
| ✓ | 42. Encourage partnerships to support issues stemming from SUDs as well as mental illness. |
| ✓ | 43. Offer training regarding the mental well-being of law enforcement officers. |
| ✓ | 44. NH PSTC explore requiring mandatory periodic psychological screenings of law enforcement. |
| ✓ | 46. Endorse and Fund the February 2019 Office of LBA NH PSTC Performance Audit report. |
| ✓ | 48. Extend, as needed, this Commission to assist with implementation of any recommendation. |

| **Recommendations In Progress** *(listed with recommendation number)* |
| --- |
| ✓   12. NH PSTC include instruction by DOJ attorney on cases concerning race or protected classes. |
| ✓   13. NH PSTC to evaluate the Part-Time Police Officer certification process upon receipt of the JTA. |
| ✓   16. Establishment a statewide entity to receive and review misconduct complaints. |
| ✓   24. Provide opt-out race indication on NH Drivers' Licenses and Non-Drivers' Identification Cards. |
|       o     Study Commission passed in 2021. |
| ✓   27. Encourage all law enforcement agencies, to dedicate an officer or unit to community policing. |
| ✓   41. Embed specially trained mental health professionals in tactical response teams. |
| ✓   45. UNH and Higher Ed collaboration with NH PSTC to develop specialized mental health curriculum. |

# EXHIBIT 4

# Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on November 20, 2020

## New Hampshire
# Department of Justice
*Office of the Attorney General*

# 2020 Implicit Bias Training Hosted by the New Hampshire Attorney General's Office

*November 20, 2020 9 a.m. – 12:30 p.m.*

*Required for all attorneys, investigators, legal staff and victim/witness advocates in the Attorney General's Office, all County Attorney Offices, all state agency attorneys, and all prosecutors, including police prosecutors.*

## Presenters:

### Jarvis Parsons - District Attorney of Brazos County Texas

- Bias: What You Don't Know Can Hurt Others 

Currently serving his second term, District Attorney Parsons was an assistant D.A. for 10 years prior. A Louisiana native, Parsons graduated from McNeese State University in 1998 and graduated from the University Of Maine School Of Law in 2001. He was a judicial law clerk for a year in Warren County, New Jersey before becoming a Brazos County prosecutor in 2002, prosecuting everything from state jail felonies up to death penalty cases and everything in between.

Parsons is currently the chairman of the board for the Texas District and County Attorneys Association and has served on its Legislative Committee, Training Committee, and is one of the founding members of the Diversity Recruitment and Retention Committee.

He is on the Board of the TEEX Central Texas Police Academy, which guides the Police Academy leadership on needs specific to training and courses and establishes standards and methods to evaluate the effectiveness of training, equipment and facilities at the training academy.

### James McKim, PMP, ITIL - President of the Manchester NAACP

- Presentation: Are You Your Implicit Bias?

Mr. McKim is Founder and Managing Partner of Organizational Ignition, a management consulting firm. Prior to his current role, Mr. McKim was Chief of Staff of the Technical Training Division at Hewlett Packard Enterprise where he led the organization to deliver award-winning performance enhancement solutions. He has, also, held business and technology leadership roles in for-profit and non-profit organizations such as FIRST, Hawkeye Data, LLC, and Digital Equipment Corp.

Mr. McKim has facilitated startup and growth of statewide organizations such as the Economic Vitality New Hampshire and the Software Association of New Hampshire. He has played an active role in the shaping of public policy affecting the Technology industry. He serves, currently on several Boards playing leading roles as Vice-President of Membership a the Project Management Institute NH Chapter, Chair of the NH PBS Finance Committee, Chair of the Episcopal Church's National Executive Council Committee Anti-Racism, and President of the Manchester NAACP.

## Links:

- **[Register for Implicit Bias Training](https://nhgov.webex.com/mw3300/mywebex/default.do?nomenu=true&siteurl=nhgov&service=6&rnd=0.13424712364303681&main_url=https%3A%2F%2Fnhgov.webex.com%2Fec3300%2Feventcenter%2Fevent%2FeventAction.do%3FtheAction%3Ddetail%26%26%26EMK%3D4832534b00000004dacaad18d1077ec99dbcbbc64d287582dc9277bc4b1ed0dcae760fbaffe5513f%26siteurl%3Dnhgov%26confViewID%3D175086893217620704%26encryptTicket%3DSDSDJTSwAAAARZS9f3rBoMFJ_v1B4et_2m4n2dUMlng2m3lLOSmjTHFA2%26)**

- Certificate of Attendance

- Implicit Bias Training Itinerary

- Implicit Bias Training Video

Portable Document Format (.pdf). Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

New Hampshire Department of Justice
33 Capitol Street | Concord, NH | 03301
Telephone: 603-271-3658

# NEW HAMPSHIRE ATTORNEY GENERAL'S OFFICE IMPLICIT BIAS TRAINING

November 20, 2020

## AGENDA

**9:00 a.m.** – Welcome and Introduction

*Attorney General Gordon J. MacDonald*

*Senior Assistant Attorney General David Rotman*


**9:10 a.m.** – Presentation*

*Jarvis Parsons, District Attorney of Brazos County Texas*


**10:50 a.m.** – Presentation*

*James McKim, PMP, ITIL, President of the Manchester NAACP*


**12:25 p.m.** – Concluding Remarks

*Attorney General Gordon J. MacDonald*



*\*There will be a five minute break during each presentation.*

# BIAS: WHAT YOU DON'T KNOW CAN HURT OTHERS

## Jarvis Parsons,
## Brazos County District Attorney

# How I Became a Prosecutor



# #SQUAD GOALS

- To be intelligent as we can is a moral obligation—that if we haven't exhausted every opportunity to know whether what we are doing is right, it will be **no excuse** for us to say that we meant well.
  - John Erskine (1915)



# Prosecutorial Power

- Charging Decision
- Bond
- Jury Selection
- Plea Offer
- Closing Argument

# Cognitive Bias Defined

- A **cognitive bias** is a type of error in thinking that occurs when people are processing and interpreting information in the world around them.

- Cognitive biases are often a result of your brain's attempt to **simplify** information.



# Confirmation Bias

- The tendency to search for, interpret, focus on, and remember information in a way that confirms ones preconceptions/beliefs. **

- Also called the "Prosecutor's Bias".

- What you believe, you see.

# **Confirmation Bias**



# CONFIRMATION BIAS: REAL WORLD EXAMPLE



# TUNNEL VISION



# What You See Is All There Is



# % Of DV Victims Who Recant?

We presume they will recant…so we look to:

🎗 911 call, EMS record, Medical Records

🎗 Social Media, text messages, jail calls

🎗 Determine Primary Aggressor On Scene

🎗 Meet w/victim early in process, neighbors, family, friends, etc...

🎗 Look for prior victims

# Just World Theory



# Just World Theory

People have an automatic tendency to look for something or someone to blame for unfortunate events. But rather than simply attributing a bad turn of events to bad luck, people tend to look at the individual's behavior as a source of blame.

- What was she wearing?

- Why did she let him walk her home?

- How much she had to drink?

# Just World Theory



# Just World Theory



# Defensive Attribution



# Defensive Attribution

- The similarity of the witness to the person(s) involved in the misfortune – in terms of situation, age, gender, personality, etc. – changes the amount of blame one is ready to ascribe.

- This is related to the empathy response, which is more likely to be activated if the witness sees similarities between themselves and the person(s) involved.

# Defensive Attribution



20



# Michael Morton Act



# Implicit Bias:  How We See People 207



23

# Implicit Bias

We all have differences. We see age, gender and skin color. That's not bias.



# "Halo Effect"

- Research has shown that we automatically assign to good-looking individuals favorable traits such as talent, kindness, honesty, and intelligence –*Thorndike 1920*



# "Halo Effect"

- Physically attractive individuals are more likely to be…
  - Hired and less likely to be fired
  - More likely to get a call back for interviews
  - Higher wage earners (10-15%)
  - Less likely to get in trouble when they are children

# Sexual Harassment Study



# GENDER



# Gender Bias:
# Police Chief Edition

Michael vs. Michelle

- Michael—streetwise, worked tough neighborhoods, got along with fellow officers. Poorly educated and lacked administrative skills.

- Michelle—smart, well schooled and experienced in administration, family oriented, little street experience and didn't get along with officers.

29

# Gender Bias:
# Who Do You Hire?



# Gender Bias:
# Who Do You Hire?

When the male applicant had experience and no education, participants chose…

The Man

When the male applicant had no experience and was educated, participants chose…

The Man

31

# Gender Bias:
# Women's Studies Professor



# Implicit Racial Bias

- Researched for over two decades.
- A majority of Americans harbor negative implicit attitudes toward African-Americans

# Implicit Racial Bias

- Influenced by attitudes and stereotypes that we all hold based on our experiences.

- Guides how we act in a subconscious way, even if we renounce prejudice and stereotypes explicitly.





# Microaggression

**Prejudices that leak out in many interpersonal situations. A.K.A. Slights, insults, indignities and denigrating messages.**

# Microaggression Examples

- Can I touch your hair?

- You don't sound black.

- You look too white to be Hispanic/Arab/etc…

- When I look at you, I don't see color.

# Robbery In Black and White

- University of Hawaii Study, 66 participants
  - Japanese American, White, Chinese, Native Hawaiian, Pacific Islander, Korean American and Latino

# Robbery In Black and White



# **Ambiguous Crime Details**

- Prior drug addict, served with eviction notice
- Left handed
- Golden Gloves boxing champ in 2006
- NO License
- Owner Identifies defendant's voice
- Defendant had movie ticket stub for show that started 20 minutes before robbery

# Robbery In Black and White: Results

How Guilty Is The Defendant? Scale (0-100)

- Darker Skin Tone  66.97

- Lighter Skin Tone  56.37

# What About Victims?



# U. Nebraska at Lincoln: Harrison and Esqueda (2000)

- Police respond to anonymous phone call reporting a domestic dispute.

- Jeff Davis is a Black (White) male,

- Cindy Davis is a Black (White) female,

- Drinking and Non-drinking scenarios.

44

# Same Facts? Different Race? Different Results

- AA women who drank were perceived as **more blameworthy** than AA women who did not.

- **No distinction** between drinking and non-drinking white females.

- AA women received **more blame** in DV situations for the **same amount** of drinking as white women.

45

# Not Just Black Women...

- Black boys as young as 10 are seen as **more responsible** for their actions compared to their white counterparts.
  - Viewed as **older** (up to 4½ years) and less innocent.
    - *The Essence of Innocence: Consequences of Dehumanizing Black Children (Goff, 2014).*
- Black Girls are viewed as **less innocent** and need **less nurturing** than their white counterparts.
  - *Girl Interrupted: The Erasure of Black Girls Childhood (Epstein, Blake & Gonzalez, 2017)*

46

# But I'm Educated...



# Written in Black and White

Memo drafted by a hypothetical law student given to 60 partners in 22 law firms.

- 37 men, 23 women, 39 white,
- 21 racial/ethnic minorities
- Memo had **22** writing and analytical errors.
- Same memo. **Only** difference was race of the "writer".

48

# Results

- **White "Thomas Meyer" averaged 4.1/5.0.**

- **Black "Thomas Meyer" averaged <u>3.1</u>/5.0 scale, for the same memo.**

# Quantitative Results:
# Errors Spotted by Lawyers

**White Thomas Meyer:**

**10.2 errors found avg.**

**Black Thomas Meyer:**

**<u>14.6</u> errors found avg.**

# Qualitative Results: Opinion of the Students

**White Thomas Meyer:**

"good writer but needs to work on", "has potential", "good analytical skills".

**Black Thomas Meyer:**

"Needs lots of work", "can't believe he went to NYU", "average at best".

51

# Greg vs. Jamal

- Study of 1300 ads and over 5,000 resumes.

- White-sounding names like Emily or Greg get 50% more call backs for job interviews with the exact same resume.

- "A white-sounding name yields as many more callbacks as black sounding name with **eight** years of experience".

  - *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment in Market Discrimination. (Bertrand and Mullainathan, 2003)*

52

# The Implicit Association Test (IAT)

- **Designed to measure implicit bias**

- **https://implicit.harvard.edu/implicit/takeatest.html**

- **Flowers vs. Insects**

# My Story

- **Took the Implicit Association Test…**



implicit.harvard.edu

Study.



**Your result:**

**Your data suggest a slight automatic preference for White people over Black people.**

The sorting test you just took is called the Implicit Association Test (IAT). Half of you completed the task for African Americans and European Americans, whereas the other half completed the task for Black People and White people. You categorized good and bad words with images of African Americans (or Black People) and European Americans (or White People).

# My Story

- **About 50% of African-Americans show a preference toward whites.**
  - ***Nosek, Banaji, & Greenwald, 2002***.



# Attacking Implicit Bias

- Understand and acknowledge cognitive bias

- Start With Yourself And Just Begin

- Evidence/words that hits on a stereotype (misdemeanor murder).

# Blinding



# Other Disciplines Use Blinding

- Scholarly Journal editors routinely remove author names and institutions.
- Professors mask student names when grading
- Lineups (Double Blind Lineups)
- Federal Death Penalty Decisions

# Empirical Example



# Orchestra Blinding Results

- Using a Screen to conceal candidates from the raters increased the likelihood that a female would advance to the next round by
- 11%
- During the final round "blind" auditions increased the likelihood of female musicians being selected by
- **<u>30%</u>.**

# Outsmarting The Bias



# Collaboration



# Outsmarting The Bias: Group Decision Making

- **200 participants**

- **83% white, 17% Black**

- **Ages 18-78**

- **Created 29 juries of 6 people per jury (some alternates).**

# Outsmarting The Bias: Group Decision Making

- Viewed a video of a 30-minute Court TV summary of Black Male Defendant and White Female Victim.

- Heard testimony of 10 Witnesses (7 state & 3 defense)

# Outsmarting The Bias: Group Decision Making

**Recorded jury deliberations**

- **Looking for breadth of discussion**

- **Accuracy of statements**

- Corrected Inaccuracies

# Outsmarting The Bias: Group Decision Making

**Diverse Juries**

- **Discussed <u>more</u> facts**
- **Made <u>more accurate</u> statements of facts**
- **<u>Corrected</u> more inaccurate statements**

# IMPLICATIONS

The more you bring in <u>different perspectives</u>, the better your outcome will be.

# Any Questions?

# Jarvis Parsons

# [jparsons@brazoscountytx.gov](mailto:jparsons@brazoscountytx.gov)

# 979-361-4320

# Are You Your Implicit Bias?

## James McKim

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Introduction



What is the underlying issue in the photos?

# Objectives & Agenda

## Objectives

- Understand the depth of the problem with implicit bias
- Understand the 9 de-biasing techniques
- Understand how implicit bias & discrimination can be eliminated

## Non-Objective

- Make you an expert on Implicit Bias
- De-bias you

## Agenda

- Demographics
- 6 Key Concepts
- Manifestations of Implicit Bias – including in your own
- Forms/Types of Implicit Bias
- Eliminating Bias & Discrimination
- Wrap-up
- Homework

Copyright© 2020 Organizational Ignition

# Current NH Demographics By Age/Gender



# Current NH Demographics By

## Race and Ethnicity                                      #1

Percentage of the total population.

*Scope: population of the United States and New Hampshire*



**Percentage of Population by Racial or Ethnic Group**
*Estimates for 2014-2018, Hispanic Origin Included in Racial Groups*

■ New Hampshire    ■ Manchester    ■ Nashua

<- Margin of Error

Black or African American        Asian        Hispanic or Latino, of Any Race

**Racial or Ethnic Group**

Note: Margins of Error represent 90 percent confidence intervals
Source: U.S. Census Bureau, American Community Survey, 2014-2018

New Hampshire Fiscal Policy Institute                                    11

Copyright© 2020 Organizational Ignition

# 6 Key Concepts



# What is Race?



- Q: What word or phrase comes to mind after viewing this video?

VOX – "The myth of race, debunked in 3 minutes
https://www.youtube.com/watch?v=VnfKgffCZ7U

Copyright© 2020 Organizational Ignition

# Gender





Copyright© 2020 Organizational Ignition

# Diversity



*Diversity* is counting, and *inclusion* is cultivating… Diversity is being invited to the party, but inclusion is being asked to dance."

**VOL. 37, NO. 4**
ABA Bar Leader
"Beyond diversity: The bar leader's role in fostering inclusion"

Copyright© 2020 Organizational Ignition

9

# Equality Vs. Equity



266

# "isms"

Imagine...

**Structural/ Systemic Discrimination**

**Micro aggressions**

**White Privilege**

**Isms**
Using our power to reinforce our discrimination and prejudice in the institutions and groups to which we belong

**Discrimination**
taking an action on our prejudice

**Prejudice**
a value judgment based on our feelings associated with the stereotype

**Stereotype**
an incomplete or distorted picture in our head

**Generalization:** The process of formulating general concepts by abstracting common properties of instances



Unconscious Implicit Bias

# Structural/Systemic Discrimination



Copyright© 2020 Organizational Ignition

# The Cause of Discrimination…
# Unconscious Cognitive Implicit Bias



https://www.youtube.com/watch?v=KCgIRGKAbfc

Copyright© 2020 Organizational Ignition

269

# Examples of Implicit Bias on Individuals



A "Best"

B "Still Desirable"

C "Definitely Declining"

D "Hazardous"

Copyright© 2020 Organizational Ignition

# Interpersonal Examples of Implicit Bias

## Cases and deaths by race/ethnicity

| Race/ethnicity | Percentage of population | Percentage of cases | Percentage of deaths |
| --- | --- | --- | --- |
| Black or African American alone | 1% | 6% ◆ | 2% |
| Hispanic or Latino * | 4% | 13% ◆ | 3% |
| Asian alone | 3% | 3% | <1% |
| Native Hawaiian and Pacific Islander alone | <1% | 0% ① | 0% ① |
| American Indian or Alaska Native alone | <1% | 0% ① | 0% ① |
| Two or more races | 2% | 0% ① | 0% ① |
| White alone | 90% | 74% | 94% |
| Some other race alone | <1% | 4% ① | <1% ① |



- **Discrimination in every day life & the emotional toll it takes**
- **Special fear of life when pulled over by police – regardless of agency**

Copyright© 2020 Organizational Ignition

# Examples of Implicit Bias on Organizations (Employment Cycle)











# Understand Your Own Biases (Breakout)



- When and how did you first become aware that there was such a thing as racial/ethnic differences, and that people were treated differently on the basis of those differences?
- Growing up, what contact did you have with people whose racial and ethnic heritage was different from your own?

# 5 Minute Break



Copyright© 2020 Organizational Ignition

# Types of Implicit Biases

**Decision-making, Belief, and Behavioral/Confirmational (125+)**



- Automation bias
- Bias blind spot
- Dunning–Kruger effect
- Stereotyping
- Zero-sum bias

**Social /Attributional (220+)**



- Group attribution error
- In-group/Affinity
- Puritanical bias

**Memory Errors (40+)**



- Consistency bias
- Cross-race effect
- Stereotypical bias

# Bias Impact Context

- Information Overload
- Feelings Over Facts
- Need for Speed
- What to remember



**The Cognitive Bias Codex: A Visual Of 180+ Cognitive Biases**

# Eliminating Bias & Discrimination



# How We Think



## Which are You?

Copyright© 2020 Organizational Ignition                                    22

# Types of De-Biasing Techniques

## Countersterotype Training

- Dasgupta and Asagari (2004)

## Negation

- Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

## Perspective-taking

- Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

## Meditation/Lovingkindness meditation (LKM)

- Stell, A. J., & Farsides, T. (2016).

## Implicit bias workshops

- like the one we offer

Copyright© 2020 Organizational Ignition

# Critical Thinking/Decision-Making



Wasabi Learning Flow Charts     https://www.wabisabilearning.com/blog/5-useful-critical-thinking-flowcharts

Copyright© 2020 Organizational Ignition

24

# How We Behave



Communication

Difficult Conversations

Overview of the criminal process

Steps in Criminal Justice

Empathy

Rapport   Affinity   Emotion
          Communion

Compassion

Feelings   Sorrow

           Pity

Eliminating Discrimination

EQUITY LENS

EQ

# Emotional Intelligence

- Critical in understanding and dealing with diversity is **Emotional intelligence**
- The ability to manage your own **emotions**, as well as the **emotions** of others.
  - Self (our own feelings and how they impact our perceptions an behavior - aka Implicit Bias) "How do I feel?"
  - Others (the feelings of others and why they behave the way they behave - aka empathy) "Put yourself in their shoes."

**Empathy**

Rapport    Affinity
Communion    Emotion

Compassion

**Feelings**    Sorrow

**Pity**

Copyright© 2020 Organizational Ignition

# Understanding Communication Basics



*Shannon and Weaver Model*

*Dr. Albert Mehrabian's 7-38-55 Rule of Personal Communication*

Copyright© 2020 Organizational Ignition

27

# Rules for Difficult Conversations



- Who's right?
- What was the intent?
- Who's to blame?

- Uncontrollable urge

What happened

Feelings

Way forward: Shift to a learning stance

Identify

- Have your feelings or they will have you!
- Not who's right - understand each other's story
- Don't assume they meant it - disentangle intent from impact
- Abandon blame

- Am I competent?
- Am I a good person?
- Am I worthy of love?

Difficult Conversations by Douglas Stone, Bruce Patton, & Sheila Heen

Copyright© 2020 Organizational Ignition

28

# Criminal Justice Process



https://www.fbi.gov/resources/victim-services/a-brief-description-of-the-federal-criminal-justice-process

# Pulling It All Together



Justice mindful
of an equity lens

# Seeing Through an Equity Lens (Breakout)



- What decision is being made?
- Who is at the table?
- How is the decision being made?
- What assumptions are at the foundation of the issue?
- What is likely impact?
- What is your decision?



Overview of the criminal process

# Wrap-up






AN
INTRODUCTION TO
UNCONSCIOUS BIAS

An Introduction to Unconscious Bias






Communication

Empathy

Rapport   Affinity
Commotion
Compassion
Feelings   Emotion
Sorrow
Pity

EQUITY LENS

What will you do?




| | | |
|---|---|---|
| **Decision-making, Belief, and Behavioral/Confirmational (125+)** | **Social /Attributional (220+)** | **Memory Errors (40+)** |
| • Automation bias<br>• Bias blind spot<br>• Dunning–Kruger effect<br>• Stereotyping<br>• Zero-sum bias | • Group attribution error<br>• In-group/Affinity<br>• Puritanial bias | • Consistency bias<br>• Cross-race effect<br>• Stereotypical bias |

Mindset



How we
behave

How we
think

Actions

**Counterstereotype Training**
• Dasgupta and Asagari (2004)

**Negation**
• Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

**Perspective-taking**
• Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

**Meditation/Lovingkindness meditation (LKM)**
• Stell, A. J., & Farsides, T. (2016).

**Implicit bias workshops**
• like the one we offer

Copyright© 2020 Organizational Ignition

# Homework Assignment

- Record an example of microaggression and what caused it to happened
- Record an example of where you observed/experienced white privilege
- Record an example of discrimination in an institution or organization
- Record an example of discrimination through culture



Copyright© 2020 Organizational Ignition

# Contact

James McKim

Organizational Ignition

James.McKim@organizationalignition.com

http://www.organizationalignition.com

# EXHIBIT 5

May 3, 2021 and May 4, 2021 Presentations to N.H. Court System

# Week Three Agenda – Understanding the Communities We Serve

### May 3, 2021 – The Communities We Serve
### *1 Granite Place*
### Facilitator: Gina

9:00 – 10:00: Access to Justice: What do we mean?
- **Presenter(s):** Margaret Huang, Heather Kulp
- **Location:** In-person

10:00 – 11:00: New Hampshire's Diverse Communities
- **Presenter(s):** Dr. Jessica Carson, UNH Carsey School of Public Policy
- **Location:** WebEx

11:00 – 11:15: Break

11:15 – 12:45: Diversity, Equity, and Inclusion
- **Presenter(s):** James McKim, President, Manchester NAACP
- **Location:** WebEx

12:45 – 1:15 Lunch

1:15 – 2:15: Introduction to the Disability Community and Access to Justice (New Judge Education > Week 3 > Disability Community, Accessibility, and Access to Justice)
- **Presenter(s):** Pamela Phelan, Litigation Director, Disability Rights Center; Déodonné Bhattarai, Communications Specialist, Disability Rights Center
- **Location:** In-person

2:15 – 2:30: Break

2:30 – 3:30: Queer in the Granite State
- **Presenter(s):** Chris Erchull, Staff Attorney, GLBTQ Legal Advocates and Defenders (GLAD)
- **Location:** WebEx

3:30 – 4:15: Veterans Justice Outreach Program
- **Presenter(s):** Diane Levesque, Manchester VA; Daniel Bricker, Manchester VA
- **Location:** In-person

# Introduction to Diversity, Equity, & Inclusion

James McKim, Managing Partner
James.McKim@OrganizationalIgnition.com

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Imagine…

Copyright© 2020 Organizational Ignition

# Introduction



## What is the underlying issue in the photos?

# Objectives & Agenda

## Objectives

- Understand basic concepts in diversity
- Relate your experiences to the diversity challenge

## Non-Objective

- Make you an expert on diversity

## Agenda

- 8 Key Concepts
- Manifestations of Implicit Bias
- Wrap-up

Copyright© 2020 Organizational Ignition

# 8 Key Concepts



# What is Race?



- Q: What word or phrase comes to mind after viewing this video?

VOX – "The myth of race, debunked in 3 minutes
https://www.youtube.com/watch?v=VnfKgffCZ7U

Copyright© 2020 Organizational Ignition

6

# Gender





# Age

Characteristics of Generations

| | Traditionalists | Boomers | Gen X | Millennials |
|---|---|---|---|---|
| **Born** | 1922-1943 | 1943-1960 | 1960-1980 | 1980-2000 |
| **Influences** | Great Depression; military model; formality; patriotism; atomic bomb | Korean War; Civil, Women and Reproductive Rights and Ecology Movements; Woodstuck, Sputnik; TV; dual incomes | moon landing; Watergate; MTV; video games; AIDs; CNN; Web; latchkey; divorce | 9/11; Challenger; cell phones; pagers; computers; IM |
| **Values** | respect; security; loyalty; obedience | challenge; ambition; achievement; power | leadership; freedom; truth; independence | safety; loyalty; security; hope |
| **Work Preferences and Style** | hierarchical command and control; formal environment with dress code and strict conduct rules; one job, one employer | politically savvy; competitive environment; challenge authority for feedback; opportunity seekers; frequent job changers | work-life balance; skeptical of authority; self-reliant; oppose hierarchy; innovative; intentional, frequent job changing | diverse culture; collaborate; meaningful work; fun at work; flexibility |
| **Meeting Career Needs** | define and build legacy; annual feedback outlining contributions | define promotional opportunities; annual feedback on progress with documentation | define career path expectations; real time feedback on progress | define career path opportunities; real time feedback on progress and alignment |

# Neurodiversity

**Thinking  Styles**



**Neurodivergent**



James McKim - Copyright© 2020
Organizational Ignition

# Diversity



*Diversity* is counting, and *inclusion* is cultivating… Diversity is being invited to the party, but inclusion is being asked to dance."

**VOL. 37, NO. 4**
<u>ABA Bar Leader</u>
"Beyond diversity: The bar leader's role in fostering inclusion"

Copyright© 2020 Organizational Ignition

# Equality Vs. Equity



303

# "isms"

## Imagine...

**Structural/ Systemic Discrimination**

**Institutional Isms** — Using our power to reinforce our discrimination and prejudice in the institutions and groups to which we belong

**Micro aggressions**

**White Privilege**

**Discrimination** — taking an action on our prejudice

**Prejudice** — a value judgment based on our feelings associated with the stereotype

**Stereotype** — an incomplete or distorted picture in our head

**Generalization:** The process of formulating general concepts by abstracting common properties of instances



Unconscious Implicit Bias

Copyright© 2020 Organizational Ignition

12

# Structural/Systemic Discrimination [304]



Wealth

Media

Housing

## Cultural

"Culture is how our bodies retain and re-enact history through the foods we eat; the stories we tell; the things that hold meaning for us; the images that move us…Change culture and you change lives…. Social activism is necessary for changing the world in productive ways." – Resmaa Menakem

## Institutional

Best Practices /Policies /Procedures

### Legal

State*

Local

Education

Criminal Justice

Copyright© 2020 Organizational Ignition

13

# Institutional/Systemic Racism

"The complex interaction of culture, policy, and institutions that holds in place the outcomes we see in our lives."  - Glen Harris, President of the New Race Forward

"The collective failure of an organization to provide an appropriate and professional service to people because of their colour, culture, or ethnic origin. It can be seen or detected in processes, attitudes, and behavior that amounts to discrimination through prejudice, ignorance, thoughtlessness, and racist stereotyping which disadvantage minority ethnic people". - Sir William Macpherson

Copyright© 2020 Organizational Ignition

# The Cause of Discrimination…
# Unconscious Cognitive Implicit Bias



https://www.nytimes.com/video/us/100000004818663/peanut-butter-jelly-and-racism.html



# Cycle of Socialization

**Lens of Identity**

Socialized—Taught on a personal level by Parents, Relatives, Teachers, People We Love & Trust—Shapers of Expectations, Norms, Values, Roles, Rules, Models of Ways to Be, Sources of Dreams

**Lens of Socialization & Teaching**

1st Socialization

**Institutional & Cultural Socialization**

**The Beginning**

Born into a World with Mechanisms in Place
No Blame, No Consciousness
No Guilt, No Choice
Limited Information
No Information
Misinformation
Biases
Stereotypes
Prejudices
History
Habit
Tradition

Core

Reinforced/bombarded with messages from:
**Institutions**   **Culture**
Churches          Practices
Schools           Lyrics
Television         Language
Legal system       Media
Mental Health      Patterns of
Medicine          Thought
On Conscious and Unconscious levels

**Fear
Ignorance
Confusion
Insecurity**

Enforced
Sanctioned
Stigmatized

Do Nothing

Don't Make Waves

Promote Status Quo

**Actions**

Change
Interrupt
Educate
Take a Stand
Raised
Consciousness
Question
Reframe

**Lens of Experience**

Resulting in:
Dissonance, Silence, Anger,
Dehumanization, Guilt,
Collusion, Ignorance,
Self-hated, Stress,
Lack of Reality, Violence,
Horizontal Violence,
Inconsistency, Crime,
Internalization of
Patterns of Power

Rewards and Punishments

Privilege
Persecution

Discrimination
Empowerment

**Enforcements**

**Results**

**Direction for Change**

B. Harro (1982), in Teaching for Diversity and Social Justice: A Sourcebook. (1997). Adams, Bell, Griffin [Eds.].
Copyright© 2020 Organizational Ignition



# NH CIRCUIT COURT NEW JUDGE EDUCATION

CHRIS ERCHULL

MAY 3, 2021

CALL GLAD ANSWERS!!!
M-F, 1:30-4:30 PM



2

**Sexual orientation** refers to a person's emotional, romantic, or sexual attraction to people of the same sex, different sex, or any sex.

**Gender identity** is an individual's insistent, persistent, and consistent understanding of themselves as male, female, both, or neither. For most people, gender identity aligns with sex assigned at birth. E.g., person assigned male at birth identifies as a man. For many people, gender identity and assigned sex do not align.

**Gender expression/presentation** is an individual's external expression and/or perception of their gender, manifested through clothing, voice, mannerisms, names/pronouns, or even physical features.



**Sexual orientation** means having or being perceived as having an orientation for heterosexuality, bisexuality, or homosexuality. This definition is intended to describe the status of persons and does not render lawful any conduct prohibited by the criminal laws of this state or impose any duty on a religious organization. This definition does not confer legislative approval of such status, but is intended to assure basic rights afforded under this chapter.
RSA 354-A:2 (XIV-c)



**Gender Identity** means a person's gender-related identity, appearance, or behavior, whether or not that gender-related identity, appearance, or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth. Gender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity provided, however, that gender-related identity shall not be asserted for any improper purpose.
RSA 354-A:2 (XIV-e)



**Gender dysphoria** is a medical condition recognized in the DSM-5.

- Clinically significant distress caused by incongruence between a person's gender identity and assigned sex
- A serious but highly treatable medical condition
- Untreated or under-treated gender dysphoria can be disabling for some people



**Gender transition** is the ONLY widely accepted treatment for gender dysphoria, but the course of treatment is highly individualized.

- Social Transition
  - *Legal Transition*
- Hormone Therapy
- Surgical Treatment



- RSA 354-A (1965)
  - *Created the NH Commission on Human Rights*
  - *Bars discrimination in employment, housing, public accommodations*
  - *Sexual Orientation-1996 Gender Identity-2018*
- RSA 193:38-39 (2019)
  - *Prohibits discrimination in public schools*
- RSA 5-C:87 (2005)
  - *Corrections to birth records*



- "A judge shall perform the duties of judicial office impartially and diligently."
- Sexual Orientation & Gender Identity are listed with the protected classifications in parts (5) & (6)
- Applies to:
  - *Judges*
  - *Staff, court officials under the judge's direction*
  - *Lawyers before the judge*



- Respect preferred names and pronouns
  - *Avoid assumptions*
  - *Ask when uncertain*
- Avoid gendered terms and honorifics
  - *Use Attorney Jones instead of Mr./Ms. Jones*
  - *Use "the defendant" or "your client" instead of Mr./Ms. ___.*
- Generously allow motions to amend captions, etc., whenever possible



- Boston Straight Pride Parade: Aug. 31, 2019
  – *Counter-protesters significantly outnumbered the Straight Pride demonstrators*
  – *36 arrests, predominantly LGBTQ people*
- Boston Municipal Court Judge denies ADA's request to drop charges against 18 defendants
- Judge intentionally misgenders one transgender defendant and forces her to wait house under guise of clarifying her "alias"



- In Ohio, parents of a transgender teenage boy petition for name change
  - *Parents present evidence that the boy has been treated for over a year for gender dysphoria*
- Judge denies petition, claiming it is premature, against the advice of medical providers and the wishes of the young person's parents



- In Texas, parents disagree about young child's gender transition in the midst of custody dispute
- Jury verdict awarded legal custody to the mother
- Judge reverses jury verdict
  - *Judge made comment about case on Facebook*
  - *Judge removed from case*
  - *Jury verdict reinstated*
- Appeals still pending



- Jury selection in a civil trial
- Plaintiff's attorney exercises peremptory strike
  - *Defense counsel objects, claims improperly struck based on sexual orientation*
- Record demonstrates no basis for strike other than sexual orientation

How do you proceed with respect to the defense counsel's Batson objection?



# GLAD Answers:
# 1-800-455-GLAD

## Questions & Contact

CHRIS ERCHULL
CERCHULL@GLAD.ORG





# The Disability Community and Access to Justice

*Pamela E. Phelan, Litigation Director*

*Déodonné Bhattarai, Communications Specialist*

*Protection and Advocacy System for New Hampshire*

# Presentation outline

- About DRC-NH
- What is the 'disability community'?
- What is a 'disability'?
- Disability data
- Disability etiquette
- Discussion/Q&A



## About DRC-NH

- New Hampshire's designated *Protection and Advocacy* agency.

- Authorized by federal statute "to pursue legal, administrative and other appropriate remedies" on behalf of individuals with disabilities.

- Statewide organization independent from state government or service providers.



The disability rights movement's struggle for access [has shown] that the exclusion of persons with disabilities from the public sphere was not only the outcome of stigma, but also the product of an exclusionary environment that includes physical and structural barriers. In the absence of access, disabled people cannot benefit from the services and opportunities that are available to the public at large and are unable to exercise their rights as citizens of equal value and status.

Sagit Mor, *With Access and Justice for All*, Cardozo Law Review, Vol. 39, Issue 2 (2018).



DISABILITY RIGHTS
CENTER - NH

Ensuring equal access necessarily must encompass considerations of legal capacity, physical access to courts and other legal tribunals, access to legal proceedings and representation, communication, information, language barriers, socioeconomic barriers, structural biases within the legal process and more. *Id.*



# What is the 'disability community'?

- Only minority group anyone can join at anytime
- Plaintiff, defendant, witness, victim, lawyer, CASA volunteer, guardian, friend, family, court employee, or visitor





DISABILITY RIGHTS
CENTER - NH

# What is a 'disability' - Legal

The ADA defines a person with a disability as a person who has a physical or mental impairment that substantially limits one or more major life activity. This includes people who have a record of such an impairment, even if they do not currently have a disability. It also includes individuals who do not have a disability but are regarded as having a disability. The ADA also makes it unlawful to discriminate against a person based on that person's association with a person with a disability.
https://adata.org/faq/what-definition-disability-under-ada



DISABILITY RIGHTS
CENTER - NH

# What is a 'disability' – Lived

- Disability is a natural part of the human experience.

- Types of disabilities are as diverse as the individuals who experience them. Among other things, a disability may affect a person's mental health, vision, hearing, movement, ability to learn or communicate. Disabilities include substance abuse disorder.

- Disabilities affect people in different ways. Two people with the same diagnosis may experience it very differently.

- Disabilities are both visible (e.g., a wheelchair) and invisible (e.g., an intellectual disability). One individual may have multiple disabilities (27%).

DRC
DISABILITY RIGHTS
CENTER · NH

# Data – Disability by the numbers

- About 1 out of every 8 NH residents (**12.6%**) report having a disability

- Number of children and adults engaging in the state's public mental health system is increasing



| UNITED STATES | | NEW HAMPSHIRE | |
|---|---|---|---|
| **POPULATION** | | **POPULATION** | |
| ♿ | 39,792,082 | ♿ | 165,149 |
| 🧍 | 316,027,641 | 🧍 | 1,314,875 |
| **% OF TOTAL** | | **% OF TOTAL** | |
| ♿ | 12.6% | ♿ | 12.6% |
| 🧍 | 87.4% | 🧍 | 87.4% |

♿ WITH DISABILITY  🧍 WITHOUT DISABILITY



DRC
DISABILITY RIGHTS
CENTER - NH

# Data – Disability by the numbers

- Less likely to attend college
  - 19.2 percentage points
- Less likely to be employed
  - 40.2 percentage points
- Higher rates of poverty (19.6% v. 5.8%)
- More likely to have public insurance (50.1% v. 12.8%)





# Disability etiquette

- Everyone who works in or comes to court

- Dignity + Respect

- They're the experts about disabilities + needs

- People first language



Image credit: Disabled and Here



# Etiquette: Person-first language

| Preferred | Avoid |
|---|---|
| an individual who has a disability | disabled or special needs |
| an individual with a physical disability | crippled, handicapped; deformed; defective; lame |
| an individual who uses a wheelchair | wheelchair bound or confined to a wheelchair |
| an individual who is blind or has low vision | the blind |
| an individual who is deaf or hard of hearing | the deaf; deaf and dumb; mute; hearing impaired |
| an individual with an intellectual or a developmental disability | slow; retarded; dim-witted |
| an individual with a psychiatric disability or a mental health diagnosis | crazy; maniac; lunatic; demented; schizo; psycho; feeble-minded |

*Person-first language should be used unless an individual prefers identity-first language.*
*Best guideline when referring to people with disabilities is to ASK.*



DISABILITY RIGHTS
CENTER · NH

# Etiquette (continued)

- Ask before acting

- Assume competence and independence

- Identify auxiliary aids/accommodations

- May be hesitant to acknowledge a disability or need



Image credit: Lawrence Roffee



# Etiquette (continued)

- Be mindful of invisible disabilities

- Secondary trauma

- Implicit biases

- Appreciate barriers to services that may impact matters before the court



Image credit: autismspeaks.org





Pamela E. Phelan, Litigation Director
pamelap@drcnh.org

Déodonné Bhattarai, Communications Specialist
deodonneb@drcnh.org

*Protection and Advocacy System for New Hampshire*

# Data-The employment gap detail

In NH, the employment gap is 40.2 percentage points (national is 40.6 pts)





# Data-The education gap detail

In NH, the education gap is 19.2 percentage points (national is 19.8 pts)





**May 4, 2021 – Confronting the Twin Challenges of Poverty and Racism**
*WebEx*
**Facilitator: Ryan Guptill**


9:00 – 10:00: Understanding Immigrant and Refugee Experiences
- **Presenter(s):** Dawn Higgins, NHTI
- **Location:** WebEx


10:00 – 11:00: Race and Racial Justice in New Hampshire Presentation (New Judge Education >
Week 3 > Implicit Bias, Racism, and Racial Justice)
- **Presenter(s):** James McKim, President of Manchester NAACP
- **Location:** WebEx

11:00 – 11:15: Break

11:15 – 12:15: Race and Racial Justice in New Hampshire Panel
- **Presenter(s):** Joseph Lascaze, ACLU Smart Justice Organizer; Donna Brown,
  Manchester NAACP; Professor John DeJoie, UNH
- **Location:** WebEx

12:15 – 1:15 Lunch and Conversation on Bias and Judicial Decision-Making
- **Presenter(s):** Judge James Leary
- **Location:** WebEx

1:15 – 2:45: The Real Impact of Poverty
- **Presenter(s):** Professor Stephen Pimpare, UNH
- **Location:** WebEx

2:45 – 3:00: Break

3:00 – 4:00: Panel: Poverty, Homelessness, and New Hampshire Families
- **Presenter(s):** Stephanie Savard, Chief External Relations Officer, Families in Transition;
  Allie Reyes
- **Location:** WebEx

# Race in NH

James McKim, Managing Partner
James.McKim@OrganizationalIgnition.com

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Agenda



**Session Objective**
- Understand racism in NH

**Agenda**
- Recap
- Deeper Dive on Implicit Bias
- Microaggressions & White Privilege
- Racism in NH
- Putting It All Together

# Recap







EQUALITY VERSUS EQUITY





"isms"

Structural/ Systemic Discrimination

Micro aggressions

White Privilege

Unconscious Implicit Bias



Copyright© 2020 Organizational Ignition

19

# Big Picture View of Racism



Safehouse Progressive Alliance for Nonviolence (2005)
"Building a Multi-Ethnic, Inclusive & Antiracist Organization-Tools for Liberation Packet for Anti-Racist Activists, Allies, & Critical Thinkers")

Copyright© 2020 Organizational Ignition                    20

# Types of Implicit Biases

**Decision-making, Belief, and Behavioral/Confirmational (125+)**



- Automation bias
- Bias blind spot
- Dunning–Kruger effect
- **Stereotyping**
- **Zero-sum bias**

**Social /Attributional (220+)**



- **Group attribution error**
- **In-group/Affinity**
- **Puritanical bias**

**Memory Errors (40+)**



- Consistency bias
- **Cross-race effect**
- **Stereotypical bias**

Copyright© 2020 Organizational Ignition

# Bias Impact Context

- Information Overload
- Feelings Over Facts
- Need for Speed
- What to remember



**The Cognitive Bias Codex: A Visual Of 180+ Cognitive Biases**

Copyright© 2020 Organizational Ignition

# Micro-aggression Summary

| | | |
|---|---|---|
| Alien in own land | Ascription of Intelligence | Color Blindness |
| Denial of racism | Myth of meritocracy | Pathologizing cultural values/styles |
| Second class citizen | Environmental | Assumption of criminal status |

## 9 Flavors – 2 forms

# Verbal Micro-aggression Exercise

**"Where are you from? You speak good English!"**

"You are a credit to your race."
"You are so articulate."

"When I look at you, I don't see color."
"America is a melting pot."
"There is only one race, the human race."

A person asking an Asian American to teach them words in their native language.

Assuming everyone can read English

Everyone is the same.

You are not American.
You are a foreigner.

People of color are generally not as intelligent as Whites.
All Asians are intelligent and good in Math / Sciences.

Racial /ethnic experiences are don't matter. There is no value in them.

Copyright ©  Organizational Ignition 2020

# Behavioral Micro-aggression Exercise

PoC mistaken for a service worker.
Taxi cab passes a PoC – picks up a white person
PoC ignored at a store counter

College/University w/buildings with all white heterosexual upper class male names.
Media without PoC.
Overcrowding of public schools in communities of color.

White person clutching purse/wallet as PoC approaches/passes.
Store owner follows PoC around the store

PoC are servants to whites.
PoC are likely t cause trouble.
You don't belong. You are a lesser being.

You don't belong/won't succeed here.
You are an outsider./You don't exist.
PoC don't value education.
PoC are deviant and belong together in schools.

PoC are dangerous.
PoC are likely to cause trouble.

# What is White Privilege?



https://www.youtube.com/watch?v=ysj_8fqnNcY

# Current NH Demographics By Age/Gender



Percentage in each age cohort per year of age.[1] Gray areas represent percentile bands from the states.

*Scope: population of the United States, New Hampshire, and other states*

Count   number of people in age cohort
%   age cohort as a percentage of the total population
[1] normalized with respect to the number of years in each interval

Percentage in each age cohort per year of age.[1]
*Scope: population of the United States and New Hampshire*

Count   number of people in age cohort
%   age cohort as a percentage of the total population
[1] normalized with respect to the number of years in each interval

# Current NH Demographics By



## Race and Ethnicity                                          #1

Percentage of the total population.
Scope: population of the United States and New Hampshire

**Percentage of Population by Racial or Ethnic Group**
Estimates for 2014-2018, Hispanic Origin Included in Racial Groups

Legend: ■ New Hampshire   ■ Manchester   ■ Nashua

Y-axis: Percentage of Population (0% to 16%)

X-axis: Racial or Ethnic Group — Black or African American, Asian, Hispanic or Latino, of Any Race

<- Margin of Error

Note: Margins of Error represent 90 percent confidence intervals
Source: U.S. Census Bureau, American Community Survey, 2014-2018

New Hampshire Fiscal Policy Institute                                    11

Copyright© 2020 Organizational Ignition                                    28

# NH Examples of Implicit Bias – Part I



A ☐ "Best"

B ☐ "Still Desirable"

C ☐ "Definitely Declining"

D ☐ "Hazardous"

# NH Examples of Implicit Bias – Part II

## Cases and deaths by race/ethnicity

| Race/ethnicity | Percentage of population | Percentage of cases | Percentage of deaths |
|---|---|---|---|
| Black or African American alone | 1% | 6% ◆ | 2% |
| Hispanic or Latino * | 4% | 13% ◆ | 3% |
| Asian alone | 3% | 3% | <1% |
| Native Hawaiian and Pacific Islander alone | <1% | 0% ① | 0% ① |
| American Indian or Alaska Native alone | <1% | 0% ① | 0% ① |
| Two or more races | 2% | 0% ① | 0% ① |
| White alone | 90% | 74% | 94% |
| Some other race alone | <1% | 4% ① | <1% ① |



- **Discrimination in every day life & the emotional toll it takes**
- **Special fear of life when pulled over by police – regardless of agency**

Copyright© 2020 Organizational Ignition

# Criminal Justice Process

## Overview of the criminal process



https://www.fbi.gov/resources/victim-services/a-brief-description-of-the-federal-criminal-justice-process

# Seeing Through an Equity Lens (Breakout)



- What decision is being made?
- Who is at the table?
- How is the decision being made?
- What assumptions are at the foundation of the issue?
- What is likely impact?
- What is your decision?



Overview of the criminal process

# Wrap-up





AN INTRODUCTION TO UNCONSCIOUS BIAS

An Introduction to Unconscious Bias













**Countersterotype Training**
- Dasgupta and Asagari (2004)

**Negation**
- Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

**Perspective-taking**
- Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

**Meditation/Lovingkindness meditation (LKM)**
- Stell, A. J., & Farsides, T. (2016).

**Implicit bias workshops**
- like the one we offer

Copyright© 2020 Organizational Ignition                    33

# Eliminating Bias & Discrimination



# How We Think



Wasabi Learning Flow Charts    https://www.wabisabilearning.com/blog/5-useful-critical-thinking-flowcharts

Copyright© 2020 Organizational Ignition

35

# How We Behave



Difficult Conversations

Communication

Steps in Criminal Justice

Eliminating Discrimination

EQ

Copyright© 2020 Organizational Ignition

# Understanding Communication Basics



*Shannon and Weaver Model*

*Dr. Albert Mehrabian's 7-38-55 Rule of Personal Communication*

Copyright© 2020 Organizational Ignition

# Rules for Difficult Conversations



- Who's right?
- What was the intent?
- Who's to blame?

- Uncontrollable urge

- Have your feelings or they will have you!
- Not who's right - understand each other's story
- Don't assume they meant it - disentangle intent from impact
- Abandon blame

- Am I competent?
- Am I a good person?
- Am I worthy of love?

**What happened**

**Feelings**

**Way forward: Shift to a learning stance**

**Identify**

Difficult Conversations by Douglas Stone, Bruce Patton, & Sheila Heen

Copyright© 2020 Organizational Ignition

# Pulling It All Together



Justice mindful
of an equity lens

# References

Garcia, C. E. (2020). Belonging in a predominantly White institution: The role of membership in Latina/o sororities and fraternities. *Journal of Diversity in Higher Education, 13*(2), 181–193. https://doi.org/10.1037/dhe0000126

National Organization of Nurse Practitioner Faculties.  (2018, August).  *NONPF Calls for Greater Racial and Ethnic Diversity in Nurse Practitioner Education.*  Retrieved May 20, 2020 from https://cdn.ymaws.com/www.nonpf.org/resource/resmgr/docs/20180807_diversity_statement.pdf

Perez, R. J., Robbins, C. K., Harris, L. W., & Montgomery, C.  (2020). Exploring graduate students' socialization to equity, diversity, and inclusion.  *Journal of Diversity in Higher Education, 13*(2), 133-145. https://doi.org/10.1037/dhe0000115

# EXHIBIT 6

Sept. 22, 2020 Trump
Executive Order



**Federal Register**

Vol. 85, No. 188

Monday, September 28, 2020

# Presidential Documents

Title 3—

The President

## Executive Order 13950 of September 22, 2020

### Combating Race and Sex Stereotyping

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*, and in order to promote economy and efficiency in Federal contracting, to promote unity in the Federal workforce, and to combat offensive and anti-American race and sex stereotyping and scapegoating, it is hereby ordered as follows:

**Section 1.** *Purpose.* From the battlefield of Gettysburg to the bus boycott in Montgomery and the Selma-to-Montgomery marches, heroic Americans have valiantly risked their lives to ensure that their children would grow up in a Nation living out its creed, expressed in the Declaration of Independence: "We hold these truths to be self-evident, that all men are created equal." It was this belief in the inherent equality of every individual that inspired the Founding generation to risk their lives, their fortunes, and their sacred honor to establish a new Nation, unique among the countries of the world. President Abraham Lincoln understood that this belief is "the electric cord" that "links the hearts of patriotic and liberty-loving" people, no matter their race or country of origin. It is the belief that inspired the heroic black soldiers of the 54th Massachusetts Infantry Regiment to defend that same Union at great cost in the Civil War. And it is what inspired Dr. Martin Luther King, Jr., to dream that his children would one day "not be judged by the color of their skin but by the content of their character."

Thanks to the courage and sacrifice of our forebears, America has made significant progress toward realization of our national creed, particularly in the 57 years since Dr. King shared his dream with the country.

Today, however, many people are pushing a different vision of America that is grounded in hierarchies based on collective social and political identities rather than in the inherent and equal dignity of every person as an individual. This ideology is rooted in the pernicious and false belief that America is an irredeemably racist and sexist country; that some people, simply on account of their race or sex, are oppressors; and that racial and sexual identities are more important than our common status as human beings and Americans.

This destructive ideology is grounded in misrepresentations of our country's history and its role in the world. Although presented as new and revolutionary, they resurrect the discredited notions of the nineteenth century's apologists for slavery who, like President Lincoln's rival Stephen A. Douglas, maintained that our government "was made on the white basis" "by white men, for the benefit of white men." Our Founding documents rejected these racialized views of America, which were soundly defeated on the blood-stained battlefields of the Civil War. Yet they are now being repackaged and sold as cutting-edge insights. They are designed to divide us and to prevent us from uniting as one people in pursuit of one common destiny for our great country.

Unfortunately, this malign ideology is now migrating from the fringes of American society and threatens to infect core institutions of our country. Instructors and materials teaching that men and members of certain races, as well as our most venerable institutions, are inherently sexist and racist are appearing in workplace diversity trainings across the country, even in

components of the Federal Government and among Federal contractors. For example, the Department of the Treasury recently held a seminar that promoted arguments that "virtually all White people, regardless of how 'woke' they are, contribute to racism," and that instructed small group leaders to encourage employees to avoid "narratives" that Americans should "be more color-blind" or "let people's skills and personalities be what differentiates them."

Training materials from Argonne National Laboratories, a Federal entity, stated that racism "is interwoven into every fabric of America" and described statements like "color blindness" and the "meritocracy" as "actions of bias."

Materials from Sandia National Laboratories, also a Federal entity, for non-minority males stated that an emphasis on "rationality over emotionality" was a characteristic of "white male[s]," and asked those present to "acknowledge" their "privilege" to each other.

A Smithsonian Institution museum graphic recently claimed that concepts like "[o]bjective, rational linear thinking," "[h]ard work" being "the key to success," the "nuclear family," and belief in a single god are not values that unite Americans of all races but are instead "aspects and assumptions of whiteness." The museum also stated that "[f]acing your whiteness is hard and can result in feelings of guilt, sadness, confusion, defensiveness, or fear."

All of this is contrary to the fundamental premises underpinning our Republic: that all individuals are created equal and should be allowed an equal opportunity under the law to pursue happiness and prosper based on individual merit.

Executive departments and agencies (agencies), our Uniformed Services, Federal contractors, and Federal grant recipients should, of course, continue to foster environments devoid of hostility grounded in race, sex, and other federally protected characteristics. Training employees to create an inclusive workplace is appropriate and beneficial. The Federal Government is, and must always be, committed to the fair and equal treatment of all individuals before the law.

But training like that discussed above perpetuates racial stereotypes and division and can use subtle coercive pressure to ensure conformity of viewpoint. Such ideas may be fashionable in the academy, but they have no place in programs and activities supported by Federal taxpayer dollars. Research also suggests that blame-focused diversity training reinforces biases and decreases opportunities for minorities.

Our Federal civil service system is based on merit principles. These principles, codified at 5 U.S.C. 2301, call for all employees to "receive fair and equitable treatment in all aspects of personnel management without regard to" race or sex "and with proper regard for their . . . constitutional rights." Instructing Federal employees that treating individuals on the basis of individual merit is racist or sexist directly undermines our Merit System Principles and impairs the efficiency of the Federal service. Similarly, our Uniformed Services should not teach our heroic men and women in uniform the lie that the country for which they are willing to die is fundamentally racist. Such teachings could directly threaten the cohesion and effectiveness of our Uniformed Services.

Such activities also promote division and inefficiency when carried out by Federal contractors. The Federal Government has long prohibited Federal contractors from engaging in race or sex discrimination and required contractors to take affirmative action to ensure that such discrimination does not occur. The participation of contractors' employees in training that promotes race or sex stereotyping or scapegoating similarly undermines efficiency in Federal contracting. Such requirements promote divisiveness in the workplace and distract from the pursuit of excellence and collaborative achievements in public administration.

Therefore, it shall be the policy of the United States not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes. In addition, Federal contractors will not be permitted to inculcate such views in their employees.

Sec. 2. *Definitions.* For the purposes of this order, the phrase:

(a) "Divisive concepts" means the concepts that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "divisive concepts" also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

(b) "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

(c) "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

(d) "Senior political appointee" means an individual appointed by the President, or a non-career member of the Senior Executive Service (or agency-equivalent system).

Sec. 3. *Requirements for the United States Uniformed Services.* The United States Uniformed Services, including the United States Armed Forces, shall not teach, instruct, or train any member of the United States Uniformed Services, whether serving on active duty, serving on reserve duty, attending a military service academy, or attending courses conducted by a military department pursuant to a Reserve Officer Corps Training program, to believe any of the divisive concepts set forth in section 2(a) of this order. No member of the United States Uniformed Services shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to these concepts.

Sec. 4. *Requirements for Government Contractors.* (a) Except in contracts exempted in the manner provided by section 204 of Executive Order 11246 of September 24, 1965 (Equal Employment Opportunity), as amended, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

"During the performance of this contract, the contractor agrees as follows:

1. The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt

to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term ''race or sex stereotyping'' means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term ''race or sex scapegoating'' means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.

2. The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under the Executive Order of September 22, 2020, entitled Combating Race and Sex Stereotyping, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

3. In the event of the contractor's noncompliance with the requirements of paragraphs (1), (2), and (4), or with any rules, regulations, or orders that may be promulgated in accordance with the Executive Order of September 22, 2020, this contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246, and such other sanctions may be imposed and remedies invoked as provided by any rules, regulations, or orders the Secretary of Labor has issued or adopted pursuant to Executive Order 11246, including subpart D of that order.

4. The contractor will include the provisions of paragraphs (1) through (4) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States.''

(b) The Department of Labor is directed, through the Office of Federal Contract Compliance Programs (OFCCP), to establish a hotline and investigate complaints received under both this order as well as Executive Order 11246 alleging that a Federal contractor is utilizing such training programs in violation of the contractor's obligations under those orders. The Department shall take appropriate enforcement action and provide remedial relief, as appropriate.

(c) Within 30 days of the date of this order, the Director of OFCCP shall publish in the *Federal Register* a request for information seeking information from Federal contractors, Federal subcontractors, and employees of Federal contractors and subcontractors regarding the training, workshops, or similar programming provided to employees. The request for information should request copies of any training, workshop, or similar programing having to do with diversity and inclusion as well as information about the duration, frequency, and expense of such activities.

Sec. 5. *Requirements for Federal Grants.* The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the concepts that

(a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. Within 60 days of the date of this order, the heads of agencies shall each submit a report to the Director of the Office of Management and Budget (OMB) that lists all grant programs so identified.

**Sec. 6.** *Requirements for Agencies.* (a) The fair and equal treatment of individuals is an inviolable principle that must be maintained in the Federal workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. Accordingly:

(i) The head of each agency shall use his or her authority under 5 U.S.C. 301, 302, and 4103 to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming (for purposes of this section, "training") to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in section 2(a) of this order. Agencies may consult with the Office of Personnel Management (OPM), pursuant to 5 U.S.C. 4116, in carrying out this provision; and

(ii) Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by Federal law.

(b) The Director of OPM shall propose regulations providing that agency officials with supervisory authority over a supervisor or an employee with responsibility for promoting diversity and inclusion, if such supervisor or employee either authorizes or approves training that promotes the divisive concepts set forth in section 2(a) of this order, shall take appropriate steps to pursue a performance-based adverse action proceeding against such supervisor or employee under chapter 43 or 75 of title 5, United States Code.

(c) Each agency head shall:

(i) issue an order incorporating the requirements of this order into agency operations, including by making compliance with this order a provision in all agency contracts for diversity training;

(ii) request that the agency inspector general thoroughly review and assess by the end of the calendar year, and not less than annually thereafter, agency compliance with the requirements of this order in the form of a report submitted to OMB; and

(iii) assign at least one senior political appointee responsibility for ensuring compliance with the requirements of this order.

**Sec. 7.** *OMB and OPM Review of Agency Training.* (a) Consistent with OPM's authority under 5 U.S.C. 4115–4118, all training programs for agency employees relating to diversity or inclusion shall, before being used, be reviewed by OPM for compliance with the requirements of section 6 of this order.

(b) If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts set forth in section 2(a) of this order, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with

applicable law and regulations, and in consultation with the Interagency Suspension and Debarment Committee.

(c) Within 90 days of the date of this order, each agency shall report to OMB all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion, whether conducted internally or by contractors. Such report shall, in addition to providing aggregate totals, delineate awards to each individual contractor.

(d) The Directors of OMB and OPM may jointly issue guidance and directives pertaining to agency obligations under, and ensuring compliance with, this order.

**Sec. 8.** *Title VII Guidance.* The Attorney General should continue to assess the extent to which workplace training that teaches the divisive concepts set forth in section 2(a) of this order may contribute to a hostile work environment and give rise to potential liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* If appropriate, the Attorney General and the Equal Employment Opportunity Commission shall issue publicly available guidance to assist employers in better promoting diversity and inclusive workplaces consistent with Title VII.

**Sec. 9.** *Effective Date.* This order is effective immediately, except that the requirements of section 4 of this order shall apply to contracts entered into 60 days after the date of this order.

**Sec. 10.** *General Provisions.* (a) This order does not prevent agencies, the United States Uniformed Services, or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this order.

(b) Nothing in this order shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in section 2(a) of this order in an objective manner and without endorsement.

(c) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

(d) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(e) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**Federal Register**/Vol. 85, No. 188/Monday, September 28, 2020/Presidential Documents   **60689**

(f) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*September 22, 2020.*

[FR Doc. 2020–21534
Filed 9–25–20; 8:45 am]
Billing code 3295–F0–P

# EXHIBIT 7

Sept. 28, 2020 Executive Office of the President's Memorandum



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

September 28, 2020

M-20-37

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:      Russell T. Vought
           Director

SUBJECT:   Ending Employee Trainings that Use Divisive Propaganda to Undermine the
           Principle of Fair and Equal Treatment for All

On September 4, 2020, M-20-34 was issued at the President's direction, which states in part, "The President, and his Administration, are fully committed to the fair and equal treatment of all individuals in the United States."

M-20-34 alerted agencies that some Federal worker "training" sessions are being held – at taxpayer expense – that demonstrably undermine this core American principle by stereotyping and scapegoating specific groups of people. These divisive trainings constitute a malign <u>subset</u> of a larger pool of Federal agency trainings held to promote diversity and inclusiveness. The sort of training at issue does neither; it sows division among the workforce by attempting to prescribe and impose upon employees a conformity of belief in ideologies that label entire groups of Americans as inherently racist or evil (e.g., critical race theory).

On September 22, 2020, the President issued an Executive Order on Combating Race and Sex Stereotyping. The Executive Order encourages diversity and inclusion efforts consistent with principles of fair and equal treatment, and it defines the sort of divisive trainings the Administration seeks to end.

The President and the Administration believe the fair and equal treatment of individuals is an inviolable principle that must be maintained in the Federal workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. As stated previously in M-20-34, the Federal government is proud that as an employer we have employees of all races, ethnicities, and religions. Our commitment and efforts to welcome all individuals who seek to serve the American people remains, and our commitment to the fair and equal treatment of Federal employees is enduring. Taking the steps described in this memorandum will help ensure that all Federal workers are treated with the individual respect they deserve and that the Federal government continues to foster a workplace of respect for all. Agencies should take immediate and substantive action to begin this implementation, and complete implementation within the time frame required by the E.O.

Agency employees and contractors are not to engage in divisive training of Federal workers.  Noncompliance by continuing with prohibited training will result in consequences, which may include adverse action for Federal employees who violate the Order.

Federal contractors are to be required to represent that they will not conduct such trainings for their own employees, with potential sanctions for noncompliance.  Agencies are to review their grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the divisive concepts set forth in the E.O.

With respect to spending transparency, the EO states that, "Within 90 days of the date of this order, each agency shall report to OMB all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion, whether conducted internally or by contractors.  Such report shall, in addition to providing aggregate totals, delineate awards to each individual contractor."

In furtherance of the Executive Order on Combating Race and Sex Stereotyping and M-20-34, agencies must:

- Identify all agency training programs related to diversity and inclusion held during Fiscal Year 2020, including both those conducted by the agency's own employees and those conducted by others (e.g., outside vendors).  Determine the spending on each such session, and the aggregate spending on all such sessions. The data should be presented so that all awards to an individual contractor are viewable together. Since these trainings and the dollars spent on them may be difficult to track or identify, it is recommended that agency leadership consult with the heads of component offices that offer such trainings to obtain their assistance in identifying them and determining the sums obligated.

- Review these trainings to determine whether they teach, advocate, or promote the divisive concepts specified in the Executive Order on Combating Race and Sex Stereotyping (e.g., that the United States is fundamentally racist or sexist or that an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive). Reviews of specific training curriculum materials can be supplemented by a broader keyword search of agency financial data and procurements for terms including, but not limited to: "critical race theory," "white privilege," "intersectionality," "systemic racism," "positionality," "racial humility," and "unconscious bias." When used in the context of diversity training, these terms may help to identify the type of training prohibited by the E.O. Searching for these key words without additional review does not satisfy the review requirements of the E.O.

To prevent prohibited trainings going forward, except for those contracts specifically exempted by the E.O. (see Section 4 and FAR Subpart 22.807), every government contract must include the provisions required by Section 4 of the E.O.

Where diversity and inclusion training is to be provided to Federal employees by contractors, the following steps must be taken:

- Agencies must ensure that requirements are scoped consistent with the E.O. Existing contracts should be reviewed to ensure that training is consistent with this E.O. and any work identified as inconsistent is immediately removed, if necessary and permissible through a partial termination for convenience of the government.

- For future awards, agency solicitations or statements of work concerning Federal employee training shall include the provisions set forth in Section 4 of the E.O.

Contractors who are found to have provided a training for agency employees that teaches, advocates, or promotes the divisive concepts specified in the E.O. in violation of the applicable contract will be considered for suspension and debarment procedures consistent with the E.O. and in accordance with the procedures set forth in Part 9 of the Federal Acquisition Regulation.

For Federal financial assistance, as required by Section 5 of the E.O., Federal awarding agencies are required to identify all programs for which the agency may, as a condition of receiving Federal grants and cooperative agreements, require the recipient to certify that it will not use Federal funds to promote the concepts listed in Section 5 of the E.O. Additionally, although training and education for employee development may otherwise be an allowable cost under 2 CFR 200.472, training or education on the divisive concepts specified in the Executive Order is not an allowable cost unless otherwise provided by law.

As Federal awarding agencies are conducting their review of programs to identify those for which the agency may lawfully impose the condition described in Section 5 of the E.O., they must look at all Federal grant and cooperative agreement programs, not just those for the purposes of providing training. For those programs so identified, Federal awarding agencies must update their guidance, practices, and procedures to ensure that future notice of funding opportunities and the terms and conditions of Federal awards restrict the use of Federal funds, including funds to meet cost share requirements, from being used to promote the divisive concepts set forth in the E.O. (including by conducting research premised upon these concepts), to the extent consistent with the statute(s) governing the grant program and all other applicable law.

By November 20, 2020, Federal awarding agencies are required to report to OMB, through their RMO, those programs for which the agency may impose the conditions identified in Section 5 of the E.O.

The agency head shall designate at least one senior political appointee to review and approve in advance any expenditure on Federal employee diversity and inclusion training (via contract or SF-182), and the senior political appointee shall do so only after certifying that the curriculum meets the standard of fair and equal treatment of individuals.

Pursuant to Section 7 of the E.O. all training programs for agency employees relating to diversity or inclusion must be reviewed by the Office of Personnel Management (OPM) for compliance with the E.O. prior to the training program being used. OPM will issue guidance to agencies on the process for submitting training programs for review and the approval process.

Finally, agencies should take all appropriate actions to align their public-facing information with the requirements for training Federal employees outlined in the E.O. Agencies should encourage their employees to report to the agency Inspector General (IG) any agency-sponsored training session that violates the standard of fair and equal treatment of individuals set forth in the E.O., to support the IG reviews described in Section 6(c)(ii) of the E.O.

# EXHIBIT 8

# HB544 Docket and Language

# HB544

| Body | Description |
|------|-------------|
| H | Introduced (in recess of) 01/06/2021 and referred to Executive Departments and Administration **HJ 2** P. 53 |
| H | ==RECESSED== Public Hearing: 02/11/2021 11:30 am Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/91078617911 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | ==CONTINUED== Public Hearing: 02/18/2021 01:30 pm Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/97238685330 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | Majority Committee Report: Ought to Pass with Amendment # 2021-0611h (Vote 10-9; RC) **HC 18** P. 45 |
| H | Minority Committee Report: Inexpedient to Legislate |
| H | Lay on Table (Rep. Osborne): MA DV 347-18 04/08/2021 **HJ 6** P. 72 |

**HB 544  - AS INTRODUCED**

2021 SESSION

21-0732
05/04

HOUSE BILL        *544*

AN ACT            relative to the propagation of divisive concepts.

SPONSORS:         Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4

COMMITTEE:        Executive Departments and Administration

───────────────────────────────────────────────────────────────

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Explanation:       Matter added to current law appears in ***bold italics.***
                   Matter removed from current law appears [in brackets and struckthrough.]
                   Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.

**HB 544 - AS INTRODUCED**

21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT                 relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1   1  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after
2   chapter 10-B the following new chapter:

3   CHAPTER 10-C

4   PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

5   10-C:1  Definitions.  In this chapter:

6       I. "Contractor" means any and all persons, individuals, corporations, or businesses of any
7   kind that in any manner have entered into a contract, or perform a subcontract pursuant to a
8   contract, with the state of New Hampshire.

9       II. "Divisive concept" means the concept that:

10          (a) One race or sex is inherently superior to another race or sex;

11          (b) The state of New Hampshire or the United States is fundamentally racist or sexist;

12          (c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or
13   oppressive, whether consciously or unconsciously;

14          (d) An individual should be discriminated against or receive adverse treatment solely or
15   partly because of his or her race or sex;

16          (e)  Members of one race or sex cannot and should not attempt to treat others without
17   respect to race or sex;

18          (f) An individual's moral character is necessarily determined by his or her race or sex;

19          (g)  An individual, by virtue of his or her race or sex, bears responsibility for actions
20   committed in the past by other members of the same race or sex;

21          (h)   Any  individual  should  feel  discomfort,  guilt,  anguish,  or  any  other  form  of
22   psychological distress on account of his or her race or sex; or

23          (i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by
24   a particular race to oppress another race.

25          (j)  The term "divisive concepts" includes any other form of race or sex stereotyping or
26   any other form of race or sex scapegoating.

27       III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical
28   codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or
29   sex.

30       IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to
31   members of a race or sex because of their race or sex.  It similarly encompasses any claim that,

**HB 544  - AS INTRODUCED**
**- Page 2 -**

1  consciously or unconsciously, and by virtue of his or her race or sex, members of any race are

2  inherently racist or are inherently inclined to oppress others, or that members of a sex are

3  inherently sexist or inclined to oppress others.

4      V. "The state of New Hampshire" means all agencies and political subdivisions of the state

5  of New Hampshire, including counties, cities, towns, school districts, and the state university

6  system.

7      VI. "Student" means any and all students of any school district, school, college, or university

8  which receives grants, funds, or assets from the state of New Hampshire.

9      10-C:2  Unlawful Propagation of Divisive Concepts.

10      I. Requirements for the state of New Hampshire:

11      (a)  The state of New Hampshire shall not teach, instruct, or train any employee,

12  contractor, staff member, student, or any other individual or group, to adopt or believe any of the

13  divisive concepts defined in RSA 10-C:1, II.

14      (b)  No employee, contractor, staff member, or student of the state of New Hampshire

15  shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse,

16  embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

17      II. Requirements for government contractors:

18      (a)  All state contracts entered into on or after the effective date of this chapter shall

19  include the following provision:

20  "During the performance of this contract, the contractor agrees as follows:

21  The contractor shall not use any workplace training that inculcates in its employees any form of race

22  or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race

23  or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or

24  sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual

25  should be discriminated against or receive adverse treatment solely or partly because of his or her

26  race or sex; (d) members of one race or sex cannot and should not attempt to treat others without

27  respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race

28  or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed

29  in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt,

30  anguish, or any other form of psychological distress on account of his or her race or sex; or (h)

31  meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular

32  race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

33  values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual

34  because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault,

35  blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

36      (b)  The contractor shall send to each labor union or representative of workers with

37  which the contractor has a collective bargaining agreement or other contract or understanding, a

**HB 544  - AS INTRODUCED**
**- Page 3 -**

1  notice, to be provided by the agency contracting officer, advising the labor union or workers'
2  representative of the contractor's commitments under this section, and shall post copies of the notice
3  in conspicuous places available to employees and applicants for employment.

4  (c)  In the event of the contractor's noncompliance with the requirements of this section,
5  or with any rules, regulations, or policies that may be promulgated in accordance with this section,
6  the contract may be canceled, terminated, or suspended in whole or in part and the contractor may
7  be declared ineligible for further government contracts.

8  (d)  The contractor shall include the provisions of this section in every subcontract or
9  purchase order unless exempted by rules, regulations, or policies of the department of administrative
10  services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor
11  shall take such action with respect to any subcontract or purchase order as may be directed by the
12  department of administrative services as a means of enforcing such provisions including sanctions
13  for noncompliance.

14  III.  The department of administrative services, or an agency designated by the department
15  of administrative services, is directed to investigate complaints received alleging that a state
16  contractor is utilizing such training programs in violation of the contractor's obligations under the
17  binding provisions of this section.  The department shall take appropriate enforcement action and
18  provide remedial relief, as appropriate.

19  IV.  The heads of all agencies shall review their respective grant programs and identify
20  programs for which the agency may, as a condition of receiving such a grant, require the recipient to
21  certify that it will not use state funds or assets to promote any of the divisive concepts defined in
22  RSA 10-C:1, II.

23  V.  Requirements for agencies.

24  (a)  The fair and equal treatment of individuals is an inviolable principle that must be
25  maintained in the state workplace.  Agencies should continue all training that will foster a
26  workplace that is respectful of all employees.  Accordingly:

27  (1)  The head of each agency shall use his or her authority under to ensure that the
28  agency, agency employees while on duty status, and any contractors hired by the agency to provide
29  training, workshops, forums, or similar programming, for purposes of this section, "training", to
30  agency employees do not teach, advocate, act upon, or promote in any training to agency employees
31  any of the divisive concepts listed in RSA 10-C:1; and

32  (2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency
33  employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic
34  protected by federal or state law.

35  (b)  The commissioner of the department of administrative services, pursuant to RSA
36  541-A, shall develop regulations for the enforcement of the provisions of this statute.

37  (c)  Each agency head shall:

**HB 544  - AS INTRODUCED**
**- Page 4 -**

1    (1)    Issue a policy incorporating the requirements of this chapter into agency
2  operations, including by making compliance with the policy a provision in all agency contracts;

3    (2)    Request that the agency thoroughly review and assess not less than annually
4  thereafter, agency compliance with the requirements of the policy in the form of a report submitted
5  to the department of administrative services; and

6    (3)    Assign at least one senior political appointee responsibility for ensuring
7  compliance with the requirements of the policy.

8    VI.  Review of agency training.

9    (a)  All training programs for state agency employees relating to diversity or inclusion
10  shall, before being used, be reviewed by the department of administrative services for compliance
11  with the requirements of RSA 10-C:2, V.

12    (b)  If a contractor provides a training for agency employees relating to diversity or
13  inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and
14  such action is in violation of the applicable contract, the agency that contracted for such training
15  shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and
16  regulations.

17    10-C:3  General Provisions.

18    I.   Nothing in this chapter shall prevent agencies or contractors from promoting racial,
19  cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the
20  requirements of this chapter.

21    II.   Nothing in this chapter shall be construed to prohibit discussing, as part of a larger
22  course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner
23  and without endorsement.

24    III.  If any provision of this chapter, or the application of any provision to any person or
25  circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions
26  to any other persons or circumstances shall not be affected thereby.

27    2  Effective Date.  This act shall take effect January 1, 2022.

Rep. Ammon, Hills. 40
March 3, 2021
2021-0611h
05/04

Amendment to HB 544

1 Amend RSA 10-C:1, I as inserted by section 1 of the bill by replacing it with the following:

2

3   I. "Contractor" means any and all persons, individuals, corporations, or businesses of any

4 kind that in any manner have entered into a contract to perform a service for, or perform a

5 subcontract pursuant to a contract to perform a service for, or with the state of New Hampshire.

6

7 Amend RSA 10-C:2, V(a)(1) as inserted by section 1 of the bill by replacing it with the following:

8

9   (1) The head of each agency shall ensure that the agency, agency employees while on

10 duty status, and any contractors hired by the agency to provide training, workshops, forums, or

11 similar programming to agency employees do not teach, advocate, act upon, or promote in any

12 training to agency employees any of the divisive concepts listed in RSA 10-C:1, II; and

13

14 Amend RSA 10-C:3 as inserted by section 1 of the bill by inserting after paragraph II the following

15 new paragraph and renumbering the original paragraph III to read as paragraph IV:

16

17   III   Nothing in this chapter is meant to include as a "contract or subcontract" certain

18 government financial assistance, including but not limited to the taking or receiving of loans, tax

19 credits, tax incentives, tax abatements or gifts deriving from money sent from the federal

20 government or agency designed or meant to assist during or after a declared emergency, including

21 but not limited to health, weather, riot, civil disobedience or acts of foreign agents, or designed as

22 economic stimulus during economic emergency.



**State of
New Hampshire**

# HOUSE RECORD

### First Year of the 167th General Court

## Calendar and Journal of the 2021 Session

**Web Site Address:  www.gencourt.state.nh.us**

| Vol. 43 | Concord, N.H. | Friday, April 2, 2021 | No. 18 |

**Contains:  House Deadlines; House Bills Amended by Senate; Committee Reports;
Meetings and Notices; Revised Fiscal Notes**

# HOUSE  CALENDAR

**MEMBERS OF THE HOUSE:**

The House will meet in session on Wednesday, April 7th at 9:00 a.m., Thursday, April 8th, at 9:00 a.m., and Friday, April 9th at 9:00 a.m. in the NH Sportsplex facility at 68 Technology Dr. in Bedford, NH.

Session day logistics, including arrival times, parking, entry, materials and lunch distribution will be similar to the previous event, and where necessary, updates and modifications have been made. Those details appear in the back of this House Calendar. House members can expect an email with any further details early next week.

I have discussed with the Democratic and Republican Leaders our need to work together to manage our time wisely during the House session days. While there may be disagreement on many issues, we all agree that we can complete our business in a timely manner if we work together with mutual respect and understanding.

The House Finance committee will offer a budget briefing for House members on Monday April 5th at 1:00 p.m. via Zoom webinar. As in prior budget years, members of the public may watch a livestream via YouTube. A link to the YouTube stream is published in a notice in this House Calendar. House members will receive a link to the webinar by email so they may raise their hand and ask questions of the Finance Committee and Legislative Budget Assistant, if desired.

The amendment to House Bill 1 adopted by the majority of the House Finance Committee is one that replaces the entire bill and is over 700 pages long. Rather than print 400 copies of that amendment for next week, the Legislative Budget Assistant's Office has posted a link to that amendment here: http://www.gencourt.state.nh.us/LBA/Budget/Capital_Budget_House/Week%20of%203-29/HB_1_H_Finance_COMBINED_33021.pdf All other amendments to bills will be printed in two addendum calendars.

Additionally, if you are interested in the other documents used throughout the entire House budget process, the LBA has a webpage with those available to you found here:http://www.gencourt.state.nh.us/LBA/Budget/fy2022_2023_budget.aspx

The New Hampshire Automobile Dealers Association will be sponsoring one of our session day's lunches next week at session. Typically the NHADA hosts an annual Crossover reception for all legislators and staff, however in this unusual time, we have not been able to attend the usual social events that may exist for legislators. These receptions go a long way in terms of allowing members across the whole chamber to socialize and get to know their colleagues, and I know I speak for myself when I say this has been missed. We are thankful to the NHADA for sponsoring this lunch.

I am happy to announce that captioning for House sessions is now available. The link to access captions is a separate link from the session streaming link and will be available on the General Court website before the start of each session.

Sherman A. Packard, Speaker of the House

---

## NOTICE

The **Finance** Committee will hold **budget briefings** on *HB 1-A*, making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023, and *HB 2-FN-A-L*, relative to state fees, funds, revenues, and expenditures on April 5th at 1:00 pm. House members will receive secure Zoom links. Members of the public may attend using the following link: https://www.youtube.com/watch?v=MvMW6Lf-ltw.

Rep. Kenneth Weyler, Chairman
Finance Committee

Rep. John Sytek for Executive Departments and Administration. The last major expansion of the franchise – the right to vote and to hold office – occurred 50 years ago. That was the passage of the 26th amendment which granted that right to 18- to 21-year olds. Indeed, many in this chamber witnessed this history-making event. The committee felt that this bill commemorating the anniversary was fitting and appropriate. **Vote 18-0.**

**HB 345,** establishing a license for mushroom harvesters. **MAJORITY: OUGHT TO PASS WITH AMEND-MENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Sallie Fellows for the **Majority** of Executive Departments and Administration. This bill legalizes the sale of safe varieties of wild harvested mushrooms in restaurants and markets. The Food and Drug Administration Food Code explicitly prohibits the sale of wild harvested mushrooms unless an oversight agency establishes an approval process for licensed harvesters. Some wild mushrooms are poisonous. Licensing will ensure those sold in NH are safe. The Department of Health and Human Services (DHHS) will oversee training programs, testing and licensing of harvesters, and will specify the authorized varieties. Harvesters must have permission to take wild mushrooms from someone else's land. This bill doesn't apply to cultivated mushrooms or picking wild mushrooms for personal consumption. DHHS supports this bill and indicated they can absorb the operational cost. The amendment simply adds a definition of mushrooms. **Vote 12-7.**
Rep. Tony Lekas for the **Minority** of Executive Departments and Administration. This bill would license wild mushroom harvesters. Wild mushrooms have been harvested for sale in New Hampshire for many years. Up to now that has not caused enough trouble for there to have been a call for regulating the practice in our state. That would likely still be the case except that, unfortunately, the Department of Health and Human Services chose to adopt the 2017 Food and Drug Administration Food Code into New Hampshire rule and the legislature accepted that action. There are reasons that there are separate states. What is necessary and appropriate for one state may not be for another. We should end the practice of adopting standards without carefully considering if they are all really necessary for New Hampshire. We should not be licensing additional professions just to deal with an earlier error.

**HB 417,** relative to the powers of the governor during a renewal of a declared state of emergency. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill, as amended, changes the emergency powers laws in three ways. First, it extends a declared emergency to 30 days, rather than 21, so that the common weather-related emergencies are not affected. Second, if a state of emergency is renewed, the legislature must meet to approve the extension and any executive orders issued during the emergency. If the legislature cannot meet, the state of emergency and the orders continue in force and are extended in 14-day increments until the legislature can meet. Thirdly, any gifts, grants or other funds obtained for emergency purposes must be accepted by the Governor and Council, rather than the governor alone, which requires Fiscal Committee involvement from amounts over $100,000. These changes go into effect after the end of the current emergency, and so are prospective only. These changes address the most common concerns about the current emergency powers statute, which was updated after the terrorist attacks on September 11, 2001 and never used for an extended period of time until the COVID-19 outbreak. This emergency raised concerns about imposing too much responsibility on the governor alone, and so this bill presents a plan to share the responsibility and provide policy oversight. **Vote 16-2.**
Rep. Peter Schmidt for the **Minority** of Executive Departments and Administration. This bill seeks to address widespread objections to a number of aspects of the Governor's emergency order regime, which is currently in effect in New Hampshire. The minority of the ED&A Committee recognizes and shares many of the majority's concerns, and also supports a review and revision of the existing emergency statute. Nevertheless, the minority opposes passage of HB 417 at this time for the following reasons. First, the bill is entirely prospective; it cures none of the actual or supposed abuses of the Governor's authority at this time. Hence, it has no urgency and should not be substituted for a truly deliberative investigation of the deficiencies of the existing statute, nor of any instances of gubernatorial overreach. Second, instead of this bill, a blue ribbon committee should be empaneled, not to assess blame, but to lay the basis for a wisely revised statute to more perfectly protect the state and its citizens in the future. Third, the bill mistakenly conflates every living NH citizen's experience and expectations of a state of emergency with the fundamentally different duration and reality of this pandemic, which is, in addition, by no means fully understood or resolved. Further, the bill creates a legislative oversight and control structure which the minority believes would likely be in its own way in a typical emergency, in other words, unnecessary, and very likely to hamstring effective emergency management in the case of a future pandemic, or nuclear emergency, in other words, unworkable and counterproductive. For these reasons, this bill should be found Inexpedient to Legislate.

**HB 544,** relative to the propagation of divisive concepts. **MAJORITY: OUGHT TO PASS WITH AMEND-MENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill is an anti-racism piece of legislation that would prohibit the teaching racist ideology to students and employees of state schools.

It would also bar mandatory racist ideology training to employees of state agencies and businesses who contract with the state to provide services to or on behalf of the state. The committee heard testimony that these trainings and teachings do currently occur in New Hampshire and seem to be becoming more of a trend both here and nationwide. The committee also heard testimony that the teaching and training of the concepts prohibited by this bill cause disharmony, resentment and hatred. The majority agrees. The bill does not prohibit teaching about racism and its negative effects throughout history on the people of New Hampshire and the United States. The majority believes teaching about actual history including institutional racism that has existed and the steps we have taken to eradicate it are important aspects of a proper education and a healthy and diverse workplace. The bill, simply put, prohibits teaching that one race is at fault in perpetuity for challenges and disadvantages faced by another race. The majority acknowledges that racism still exists and that we must always be on guard against it to challenge it whenever it rears its ugly head but the majority also believes in the inherent good of each individual Granite State citizen and in the greatness of this state and of the United States of America. Of all the nations on Earth, it is the United States that provides the most opportunity and legal protections to minorities of every race, creed and religion. **Vote 10-9.**

Rep. Sallie Fellows for the **Minority** of Executive Departments and Administration. In 2020 we all saw George Floyd die, Black Lives Matter demonstrations, and white supremacists' counter protests. Public interest led to an exponential growth in books, documentaries, zoom seminars, and courses about racism and bias. The function of this bill is to suppress teaching about racism and sexism. It does so by banning discussion of any "form of race or sex stereotyping." This prohibition applies to state and municipal governments, and all public schools, private schools and colleges receiving state funding. The ban also applies to the internal operations of businesses with state contracts, which would likely result in fewer bidders and higher costs for state projects. In this time of heightened awareness about racism, this bill will tarnish the image of New Hampshire as a great place to live and work. The minority believes it also violates the First Amendment's protection of free speech, which is why we oppose this bill.

**HB 575,** relative to licensure of applicants for cosmetology, esthetics, and manicuring through apprenticeship programs. **OUGHT TO PASS.**

Rep. Tony Lekas for Executive Departments and Administration. This bill would permit an applicant for a license as a cosmetologist, manicurist, or esthetician to complete the training requirement either in an apprenticeship program or a school. While current statute does permit an applicant to complete the training requirement through an apprenticeship it requires twice as many hours in an apprenticeship program than in a school. If this bill is adopted, the number of training hours would be the same for a school or apprenticeship program. The bill also makes it clear that the apprenticeship program must be one approved by the board. In current statute, approval is not required for apprenticeship programs for cosmetologists although it is required for manicurists and estheticians. In either case, the applicant must pass an examination conducted by the board. This would especially benefit those who must work and/or raise a family while training for a new career. It is often not possible for such people to put their lives on hold in order to attend a school full time. An apprenticeship program can offer more schedule flexibility and changing the hours required in such a program the same as those required in a school would reduce the burden on such people. Another potential benefit to an apprenticeship program is that the applicant is likely to receive more hands on practical training than in a school. **Vote 10-9.**

**HB 606,** exempting services provided without renumeration from license requirements for barbering, cosmetology, and esthetics. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Mark Alliegro for the **Majority** of Executive Departments and Administration. Under current New Hampshire law, it is illegal to cut your daughter's hair or file your grandmother's fingernails. This bill remedies such regulatory overreach by stipulating that a person may provide barbering, cosmetology, or esthetics services without payment and not be in violation of the law. This bill does not affect licensure requirements for paid, professional service providers. Opponents warned that this change would put the public at risk from the unauthorized use of dangerous chemicals such as shampoo and hair coloring, or transmissible disease, but no evidence in support of this claim was presented during hearings or deliberation. It was also argued that selective law enforcement renders this bill unnecessary. It is not government's role to interfere with the highly personal acts mentioned in this summary. The adoption of HB 606 is a small step in restoring the inalienable right of caring for one another. **Vote 10-8.**

Rep. Jeffrey Goley for the **Minority** of Executive Departments and Administration. Supporters of this bill believe that under the current RSA a parent who cuts a child's hair or someone who helps a neighbor color their hair is breaking the law. But there is no documented evidence that this type of enforcement has ever been practiced. The bill as written would allow anyone to practice barbering, cosmetology, or esthetics provided they are is no remuneration. Testimony from professionals was that an untrained person doing these procedures may not be as conscientious about necessary sanitation or not trained in the possible dangers of chemicals involved and could subject the recipient to severe chemical burns or injuries. The minority believes this bill should be voted ITL as it is trying to solve a problem that does not exist.

**EXHIBIT 9**

Select Written
Testimony From Public
Supporting HB544 to
House Executive
Departments and
Administration
Committee, With
Highlights Added

My name is Dr. Karlyn Borysenko, I am an organizational psychologist and I reside in Merrimack New Hampshire.

I'm testifying today in strong support of HB544.

How did we get to a place where it would be necessary to have a bill specifying that individuals, by virtue of their race or sex, are not inherently racist, sexist, or oppressive?

It started with a fringe ideology that came out of academia starting in the late 1970s called Critical Race Theory. There are entire libraries of books written about this ideology, but the easiest way to understand it is this:

Martin Luther King, Jr. famously said "I look to a day when people will not be judged by the color of their skin, but by the content of their character."

Critical Race Theory teaches exactly the opposite of this: It says that the ONLY thing we should judge people by is the color of their skin RATHER THAN the content of their character.

Critical Race Theory starts with a simple assumption: That racism exists everywhere.

You and I might define racism as the belief that one race is inherently superior to all other races. I think we can all agree that is a fundamentally bad concept and an idea that should not be perpetuated in any form.

However, that is not how Critical Race Theory defines racism.

This is critical to understand, no pun intended.

Critical Race Theory changes the definition of common words in order to gain wider acceptance. After all, no one wants to be called a racist.

Critical Race Theory views race as a political construction that was invented by white people to give themselves power while excluding all other races from it.

It views racism as the ordinary state of affairs in society, present in all interactions and institutions. Anytime you hear the term "systemic racism," that is what they mean.

Think you're not racist? If you were born white, you would be wrong.

Critical Race Theory teaches that if you are white, you are inherently racist.

There is not a question of if you are a racist. That is assumed. There is only a question of how your racism manifests, and what work you are doing to stop it.

Don't believe me? The bestselling book White Fragility is one of the bibles of Critical Race Theory. In it, author Robin DiAngelo confesses that she has been racist since the womb, has been racist her entire life, and will always be a racist simply because she is white.

I have been working non-stop to understand this ideology and its impact for the last two years, and I have seen how detrimental it is to individuals, and to organizations. I'm currently authoring a book on the subject and have been blessed to receive guidance from some of the foremost experts in the world on the topic.

I encountered Critical Race Theory in organizations I was working with as a consultant, where it's commonly billed as diversity training to gain buy-in and support.

Now, I have to be very clear: Not all diversity training in organizations teaches people that they are inherently racist and sexist based on how they were born. It's important to note that this bill would not eliminate the good kinds of diversity and inclusion training related to exploring different cultures and life experiences.

However, in the aftermath of George Floyd's death, training that was grounded in Critical Race Training took over the corporate training industry. Organizations were suddenly requiring that their employees read texts like DiAngelo's White Fragility or Ibram X Kendi's How To Be An Anti-Racist, and forced white employees to go to internal struggle sessions where they were required to confess their inherent racism at risk of losing their job.

And it's even worse when you look at the school systems.

Right now, in schools all over the country, children as young as five are being taught this ideology.

School systems are integrating these ideas throughout their curriculums, and children who are white and/or male are being forced to confess to their classmates that they are oppressors. If they don't fit into one of the oppressor categories, they are taught they are a victim and will never get ahead in the world because of the oppressors.

And if you think it can't happen in New Hampshire, I have some bad news for you: It already has.

Over the summer, I know of teachers in schools in New Hampshire who read White Fragility as a part of "optional" training courses. In Critical Race Theory, "optional" very rarely means optional, because if you don't do it your colleagues will label you a racist and you could lose your job.

Being called a racist is one of the very worst things we can be called in our society. It is a scarlet letter that followers the wearer around, something they can never escape from.

There is absolutely still work to do with regards to making sure everyone in our society has access to opportunity regardless of the color of their skin or gender, and that everyone is treated fairly.

However, Critical Race Theory is not the way to get there. It is a regressive ideology that is going to lead to MORE racism and misogyny, not less.

I strongly encourage you to support the bill and protect the people of New Hampshire from this harmful ideology.

Additional information about Critical Race Theory can be found here: https://newdiscourses.com/2021/01/what-is-critical-race-theory/

**Archived:** Friday, April 16, 2021 12:52:12 PM
**From:** Thomas Petrucka
**Sent:** Thursday, March 4, 2021 2:50:16 AM
**To:** ~House Executive Departments and Administration
**Subject:** Support for proposal HB544
**Importance:** Normal

To whom it may concern,

I am extremely excited to see progress being made in resisting the inherently toxic ideology of critical race theory, and I wanted to applaud your state's proposal to ban it from publicly funded settings.

I grew up a white man in a predominantly white area; but as a child, race and gender have never been some to separate people over. My mother saw her mother's prejudices, and carefully taught me love and listen to everyone while growing up. I wouldn't say that I didn't "see" color, but even through high school--I tried to foster an environment where everyone can feel included and accepted. I did this as a founder of my school's improv troop, and leader in my school theatre program.

And then I went to college. After attending one semester at a local publicly funded university (in its theatre arts programs) I experienced three classes in which I was singled out as a white man, told I was inherently bigoted because of the color of my skin, and listen to performances that reinforced that ideology on repeat--in a required class for my particular program.

I was never very vocal about my moderate conservative viewpoints, but my previously conquered depression resurfaced. I never felt like I could comfortably share any of my opinions without igniting backlash or political debate, and so I stayed silent while my mental health (and subsequently my grades).

I support diversity, and there are plenty of inclusion trainings that have been verified for use, and are effective in uniting a classroom or workplace. *Critical Race Theory* (which this bill opposes) is divisively conceived. It assumes that people of color will always be oppressed. It requires white people to apologize for the acts of some (often imagined) ancestor. Every book or article I have found discussing *critical race theory* lists virtually no sources, and the few studies I see proving any systemic racism present a clear confirmation bias. I cannot thank you enough for leading the charge in combating this corrosive ideology.

I hope this letter may be received well, and I thank you for considering this bill. If someone is truly reading this, I thank you for your public service. Small steps HB544 will be crucial to preserving the American ideals that have allowed this nation to thrive in the past, and I hope the bill passes.

May God bless you,

~ Thomas Petrucka

**Archived:** Friday, April 16, 2021 12:52:12 PM
**From:** gem122782
**Sent:** Thursday, March 4, 2021 1:37:32 AM
**To:** ~House Executive Departments and Administration
**Subject:** SUPPORT for HB544 Bill!!!
**Importance:** Normal

Dear Committee members,

I am emailing you as a concerned parent of New Hampshire, to voice my SUPPORT for the HB544 Bill to ban Critical Race Theory. My daughter has already experienced forms of this at Pinkerton Academy and it is a form of racism. This is very harmful and dangerous rhetoric and should absolutely be banned from being taught in our NH schools. A person is not born automatically racist solely based on the color of their skin etc. As I mentioned above my daughter attends Pinkerton Academy and her American Government teacher Mrs. Diane Gioseffi is using her classroom (which is a required credit to graduate) as a platform to indoctrinate all her students during 90 minute classes. In this class my daughter has had lessons on Implicit Bias, White Privilege and been forced to watch The Peanut Butter, Jelly & Racism video and much more. This has no place in American Government class or any other class for that matter. Critical Race Theory is divisive, harmful to the childrens self esteem, mental and emotional well-being, causes racism and teaches children to hate themselves and their Parents. It is so sad to see what this is doing to our children and the future generation, it is a very powerless feeling as a parent. New Hampshire parents need your help in order for our children to have a brighter future! I implore you to please pass this bill and protect the children of New Hampshire's mental health and well-being. You have more support than you know!! Thank you for your time!

Sincerely,
Kristen M.

Sent from my Galaxy

**Archived:** Friday, April 16, 2021 12:52:14 PM
**From:** Lauren Smith
**Sent:** Wednesday, March 3, 2021 5:32:12 PM
**To:** ~House Executive Departments and Administration
**Subject:** I Support HB544
**Importance:** Normal

---

Good morning,

I am reaching out in support of HB544.

I understand many people will be contacting you to oppose this bill by stating it's the equivalent to banning diversity training. This is not the case and I am not opposed to diversity training. This bill targets race and gender scapegoating, which shouldn't be included in diversity training if your aim is a more inclusive and understanding society/workplace.

Critical race theory based training (or anti-racists training) segregates groups based on race (white and non-white). The white group is told they are the oppressor and made to confess to their sin of racism. I realize it sounds outlandish, but individuals in workplaces and colleges have been secretly recording these conversations for at least the last few years. When listening to these conversations there are eerie similarities to the struggle sessions during the cultural revolution in China. During these struggle sessions, a white individual that resists being told they are an oppressor or racists provides additional proof of their guilt. There is no way out for the individual. On the flip side, non-white individuals are grouped together and told they are oppressed by the white population. If a non-white individual resists, by reporting no sense of oppression, this proves they are complicit in systemic racism. Non-white individuals that resist can be ridiculed and labeled race traitors. Essentially this process is striping away individuality and placing everyone into collectives based on immutable characteristics.

Unfortunately it appears our country is forgetting MLK Jr.'s I have a dream speech. Individuals should be judged on the content of their character, not the color of their skin. I'm honestly worried this continued shift is going to increase actual racism in the country and teach a whole new generation of Americans to judge fellow citizens on their skin color (it's already being pushed on children as young as kindergarten). We must stand up for our liberal values and push back on this illiberal ideology.

Thank you for your time.
Lauren

**Archived:** Friday, April 16, 2021 12:52:15 PM
**From:** Scott Slone
**Sent:** Wednesday, March 3, 2021 3:47:38 PM
**To:** ~House Executive Departments and Administration
**Subject:** Live Free or Die, Vote Yes on HB544
**Importance:** Normal

---

Greetings to the House Executive Department,

My name is Scott, I'm a recent New Hampshirite, having moved to the state for work and opportunity in 2017. In the four years I've been here, I've grown in love with the state. It reminds me of my homeland in Alaska, both in culture and nature. I want to live here for years to come, I would like to make a life here, I would like to grow old here.

That being said, the infectious disease known as Critical Race Theory threatens to tear down all we hold dear. It ruins lives, solidarity with our friends, teaches us we are all evil and racist, with the end result being time and time again that all good folk give up all desire to be good, since what is the point? CRT destroys businesses, governments, societies, and the hate that is its source has no intention of peace or justice. It only wants more hate, whether that's through sayings like "Systemic Racism" and "Be Less White." These phrases drip with hatred for our fellow Man, when they should be the ones we love most.

I do know know if anyone in NH's legislative system will read this, but I hope you will. Vote Yes on ending the hatred. Vote Yes on HB544.

-Scott Slone

**Archived:** Friday, April 16, 2021 1:03:44 PM
**From:** Michael Maloney
**Sent:** Tuesday, March 2, 2021 11:09:35 PM
**To:** ~House Executive Departments and Administration
**Subject:** Voicing my support for HB544 [Relative to the propagation of divisive concepts]
**Importance:** Normal

---

I am writing in to voice my complete support for HB544 to ban the dissemination of divisive concepts in New Hampshire schools.

The Constitution of the United States under the First Amendment mandates the separation of church and state. While a common, myopic interpretation of this is that the state (and state schools) should be separate from any particular denomination of Christianity, the spirit of this Right should be understood in much broader terms, extending even to areas that would be widely considered secular.

Indeed, the rightful interpretation of the separation of church and state is that no man shall ever be compelled to believe any set of doctrines or principles by the state or any public institution. This should be understood to mean not only religion, classically understood, but also secular worldviews

But what we are experiencing right now, with this spreading of Critical Theory (CRT) (including related notions, such as Critical Race Theory, Intersectionality, or watered-down variations which often surround themselves with terms such as "Equity" and "Inclusion"), is several schools and other institutions mandating the belief in a particular secular worldview -- that of Critical Social Justice. Refusal of these ideas often put the student or employee at risk of their grades, their careers, and their future prospects. There is a serious threat of humiliation and ostracization for those who refuse to conform to these beliefs.

We would think it completely *absurd* in modern day America that a public school would ever tolerate a teacher who inquired into their students' belief in God. The belief in God is legitimate, but public schools are the wrong place in society for such inquiry. And moreover, it would be a scandal if any teacher were to do so *publicly* of a student, in front of the entire rest of the class. Such reckless abuse of teacher-parent trust would quickly land the school district in a barrage of costly lawsuits and would further erode trust in a public school system of whose public opinion has been in decline since the 1990s.

And even if the State of New Hampshire does not officially recognize this emerging "Wokeism" as a kind of pseudo-religion, as I and many other American taxpayers do, the above would hold just as firmly for secular beliefs. If a teacher were to publically interrogate their students on the "Failings of Capitalism" or the "Untrustworthiness of the Police" or of "the Importance of Free Love in Society", the religious connotations would not be there, but the sharp sense of a moral overstep on the part of the school system would remain. And this feeling becomes even more acute the younger the students are. Race and gender are important subjects. But the moral disgust felt by parents who feel revulsion at them being taught to (say) third graders is a force that the school systems, and ultimately, the state itself, will have to bear the cost of.

At the public hearing for HB544, there were dozens and dozens of arguments that were presented in support of the bill. It has precedent from the former presidential administration, as HB544 was closely modeled on the relevant executive order to ban "racial scapegoating" in the federal government. This executive order was received with wide support. James Lindsay gave a very

powerful, objective, and well-informed analysis of the underlying philosophy of Critical Theory. He brought up that these ideas have been implemented in several institutions already across the country, and in every case, they lead to decoherence of the social fabric. And, as James explains, this was what the Critical worldview was *designed* to do. Very similar ideas promoting "racial consciousness" have been tried abroad in other countries, including South Africa, with disastrous consequences. The result is more racial tension between students and faculty -- the exact opposite of the outcome Critical Race Theory purports to champion. As was in the very moving testimony by the older Chinese woman "Lily", despite the warm, fuzzy language used by the proponents of Critical Race Theory, the actual policies are disturbingly similar to those that were used in China during the 1960s during the Cultural Revolution under Mao.

Why would we tolerate such practices in our children's curricula?

Of the many testimonies *against* HB544, there were two types of arguments presented.

The first type of argument, presented by the vast majority of speakers, simply promoted Critical Racist Theory and "Anti-Racist" training as being social goods. These were moral arguments, offered by people who, in all likelihood, already subscribe to the Critical worldview. They claimed that HB544 would impede efforts to address racism in society. At a few points during the hearing, there were attempts to insinuate that certain people offering their testimony were, themselves, racist. The most notable example of this, again, was James Lindsay at the end of his testimony, where Rep. Kris Shultz tries several times to suggest that James is involved with white supremacist groups. James's response to her behavior was perhaps the most important part of the whole day's hearing:

Any opposition to Critical Social Justice will be met with animosity and an attempt to silence the dissenting voice.

This is what makes Critical Race Theory so dangerous. Rather than inviting open a conversation about race, it prescribes its interpretation (the so-called "Anti-Racist" approach) and fiercy attacks anyone who proposes alternative ideas.

But the truth is that for nearly 60 years, the United States has been engaging in an alternate interpretation of how to handle the issue of race in our society. Namely, the liberalist approach advocated by Dr. Martin Luther King, Jr. In what is perhaps the most important speech in the history of modern America, Dr. King articulated his belief so concisely that every American over 30 knows it: Judge people not by the color of their skin, but by the content of their character. Despite his hardships while he was alive, Dr. King's message was so powerful and so resonant with our society, that race relations had been objectively improving since the 1960s up until very recently. (And I will leave it to the reader to decide if it is coincidence -- until the last decade where the Critical worldview became prominent).

But sadly, Dr. King's message -- do not judge a person by their race -- is not only an alternative to Critical Race Theory, but it is antithetical to it. Critical Race Theory teaches that race is the *primary* factor on which to judge someone. The idea that all white people have an inherent "White Privilege" and that all black people suffer from "White Oppression" are basic tenets of Critical Race Theory. Although this language is often couched and softened, it is a short exercise in academic history to trace the more administrative dressings of these ideas back to their original sources. And even now, popular accounts of these ideas, such as the various books published in the last few years by Robin DiAngelo and Ibram X Kendi, are very explicit in their language about the problems of society stemming directly from "Whiteness".

It is an absurdity that we must indulge in the Marxist-derived notion of "Anti-Racism" lest our society succumb to racism.  As Americans and as lovers of liberty and equality, we all have a duty to uphold Dr. Martin Luther King, Jr.'s vision of America.

The second point I heard in the hearing for HB544 is also worth addressing here: that HB544 would infringe on the free speech of private companies contracted to create curricula for the New Hampshire school systems.

It's interesting that it is the First Amendment that both protects free speech and also excludes the state from mandated doctrine. That alone is enough to suggest that those presenting the "free speech" argument against HB544 bear just as much the burden of proof as do the proponents of it do.

In defense of the free speech of these companies, I do believe it is their right to design and produce curricula based on Critical Race Theory. This is despite my personal belief that Critical Social Justice is a danger to our society. To the credit of the opponents of HB544, the danger of advocating for state censorship is equally or more dangerous than CRT. And so let me state that I believe it is the right for these companies to sell these materials in the *private* sector, including to the private school system in New Hampshire. If parents want their children to receive an education based on Anti-Racism, they should have every right to do so.

Where I feel there are *limits* to the rights of those in favor of CRT is the teaching of it in *public* schools. This is precisely where we find the conflicting rights: that of the curriculum-writers to sell their product and that of parents and students to be free of indoctrination.

Perhaps to present a thought-experiment for the reader: In any school teaching Critical Race Theory as part of its curriculum, is it possible for a student to pass a class with full marks if they publicly denounce their belief in "Anti-Racism"? Is it possible to get full marks without ever being compelled to write affirmatively about ideas the student and his or her family may not believe in, such as "Privilege", "Systemic Racism", or "Oppression"? --- with all of these taken to mean the technical concepts, as they are written about in the peer-reviewed literature on the subject and not taken to mean the obviously extant notions we mean when these words are used in every-day speech. Is it possible for a student to pass such a class with full marks if they opt out of *all* activities where students are required to affirm or declare their Race, Privilege status, or Oppression status?

My belief is that these situations would not be tolerated by the schools. Students who refuse to affirm would be humiliated by their teachers and failed on the grounds that they were not compliant with the coursework.

To a careful observer, the hearing for HB544 was revealing in more ways that you could count. This bill isn't the result of a special interest lobby group. It is the result of a plurality of concerned parents and American citizens who want to make sure the next generation is able to get the education they deserve without being coerced into believing in a false Critical worldview. It is a concern not just to white parents, but to hispanic parents, asian parents, black parents, and others. The concerns raised against the teaching of Critical Race Theory are diverse and many. And the arguments, by and large, are not grounded in race or racism. While on the other side, those opposed to the bill are singularly preoccupied with both. And they would be content to see every other parent's children be preoccupied with them as well.

The public school system in America is a relatively young institution. The sentiment among a rapidly growing sector of the American public is that if schools are not serving the interests of their children, then they will find alternative ways to find their children succeed in life. It may feel

easy to succumb to the enormous pressures exerted by the activist-class pushing Critical Social Justice. But to vote against HB544 is an invitation to a decade of expensive litigation, with accusations of racial discrimination and violations of Title IX in the short-term --- and a collapse of the school system in the long-term, as Critical Social Justice does what it has a reputation for doing to institutions.

The HB544 bill is perhaps one of the most influential pieces of legislation in the country at the moment. Just as with Brown v. Board of Education in 1954, the great state of New Hampshire is being asked to make an enormously important choice which will affect the future of our the rest of America. Segregation was an evil in our country -- an ugly, residual after-effect of slavery. Today, we see a horrifying resurgence of advocates calling *for* the re-segregation of our society. It is unfathomable. And it is pernicious --- for these advocates have made use of purposefully obscuring language to pass these illiberal ideals off as social justice. Indeed, those pushing Critical Social Justice into our schools, use the Orwellian inversion, "de-segregation", to refer to the practice of creating racially separated spaces.

Thank you for taking the time to read this. Support HB544 and ban the teaching of divisive concepts based on the ideas of Critical Race Theory in public schools.

Michael Maloney

**Archived:** Friday, April 16, 2021 1:04:37 PM
**From:** Diane Champa
**Sent:** Tuesday, March 2, 2021 7:04:12 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Dear Committee Members,

I urge you to pass HB544 that would ban educators from teaching systemic racism and sexism in schools. It is the job of parents to teach their children moral values, not teachers or educators. As a teacher, my job is difficult enough teaching academic subjects, and our job just became more difficult with children out of school for an entire year. However, I do teach kindness and respect to my students, and so far, those simple values seem to work for most children.

Thank you for listening to an educator,

Diane Champa

**Archived:** Friday, April 16, 2021 1:05:11 PM
**From:** Annie Jung
**Sent:** Tuesday, March 2, 2021 5:49:38 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

Hello committee members,

I'm writing in support of HB544.
I'm not a resident of NH, but I've started to see critical race theory creep up in my home state of NY, which has disturbed me profoundly. And I'm not a white person. I'm Asian. I sincerely hope this does not bleed into NH and that's why I'm writing this email.

Below link shows a recent material that was distributed by a NYC public school to the parents of their students. A prime example of critical race theory in practice.
https://www.syracuse.com/state/2021/02/ny-principal-asks-students-parents-to-reflect-on-their-whiteness.html
It lays out "8 white identities", one of which is "white abolitionists".
I'm not a white person, but this is incredibly racist. If anyone reduced me down to 8 possible identities of "Asian" or if anyone did that to any other race, that person would be justifiably condemned and fired immediately .

I'm not writing this to complain. I'm writing to ask you to help stop this kind of racist rhetoric at our public schools, where kids are so impressionable. This only encourages people to see life through race, which is incredibly divisive and patronizing. Furthermore, I wonder if our schools are in fact racist since they are sending these things out. Is this an admission of guilt? They are proclaiming we are governed by whiteness (I'm assuming they mean their school, too, since they're sending it out). If that's the case, there should be an investigation and the staff, principles, and the school board should be fired for white supremacy/racism.

I spent a good part of my teens and early 20's being afraid that whatever I did was a reflection of my race and always feeling insecure about it. I learned this behavior from my family, not white people. It was my non-Asian friends  who helped me realize none of them were judging my actions through my race, but only as an individual. When I realized this, it was incredibly freeing. Critical race theory and materials like the one distributed by East Side Community High School does exactly the opposite. It only reinforces stereotypes, which helps no-one. Groups of people will grow up thinking their destiny is somehow fixed because of their skin color and that they are "oppressed" and will never achieve the same level of success as whites, which stunts them from the beginning. How will they ever achieve something if they don't aim for it because they are told they will never get there because of "systemic racism"? This is called the soft bigotry of low expectations. On the other hand, another group of people will grow up thinking they are bad racist people just because of the color of their skin and that they should live every aspect of their lives to atone for the sin that is the color of the skin - regardless of their beliefs or actions. This is racist. This is backwards. This isn't why my grandparents and father risked everything to come to this country.
Instead, we should be teaching our kids that while life is unfortunately unfair, hard work, persistence, and kindness will get them closer to their goals and a better community. Bashing a group of people for their supposed privilege is lazy, racist, and anything but kind.
Whether intentional or not, CRT is a way to skew the socio-economic class issue into a racial one to divide our communities, rather than unify to solve problems.

Racism is a problem, yes. I have been at the receiving end of racial slurs thrown at me. However, I realize that those who called me names are mentally ill or at such fringes of society that they practically don't matter in my life or the vast majority of my community members' lives, too. So they don't bother me at all. This is what we should be teaching our kids. Racism exists, but we need to be rational, tough, and persevere through the difficulties in life to make our own lives better through hard work and surrounding ourselves with those who uplift us.

I have told my councilmembers that this kind of rhetoric in the public space where my future children will attend has made me looking to other states to put down roots and pay taxes. I am not alone, and I'm sure I wouldn't be alone in NH. Please pass this bill.

Thank you for your time.

--
Annie Jung
anniejung90@gmail.com
661-714-7625

**Archived:** Friday, April 16, 2021 1:05:38 PM
**From:** Adrian Zavalza
**Sent:** Tuesday, March 2, 2021 5:12:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

To whom it may concern,

When I was young, I learned about the Civil Rights movement and the words of Dr. Martin Luther King. I remember being taught the concept of not judging a book by its cover. Being shown that no matter who you are or what you look like, working twice as hard as the person next to you leads to success. I grew up in a diverse neighborhood where skin color was never considered to create friendships.

Today, I see all of the amazing progress the people of this country have made is being forgotten. History rewritten. Critical Race Theory requires that a person view every aspect of society through the lens of race. If you're not white, somehow you have been oppressed by whites. If you are white, somehow you are inherently oppressive or a beneficiary of your immutable characteristic.

I'm not a college graduate or a renowned thinker, but it doesn't take a genius to see the irony in promoting a school of thought which peddles racist ideology in order to rid the world of racism. CRT is the antithesis of our nation's values. HB544 must pass before more unsuspecting citizens and even children are indoctrinated into this horrible ideology.

Proponents of CRT claim it is necessary to overcome systemic racism and to help minorities succeed. The reality is that CRT is just another scheme to support the false idea of systemic racism. It is simultaneously a detriment to society and a distraction from real solutions that would entail reforming or removing actual government policies that negatively impact minority communities.

I support HB544.

Thank you,

Adrian Zavalza

**Archived:** Friday, April 16, 2021 12:52:16 PM
**From:** Orlando Campa
**Sent:** Wednesday, March 3, 2021 3:32:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Good morning,

I am reaching out to you to bring to your attention why Critical Race Theory should not be supported by your State. As a Mexican-American immigrant who is racially of European descent, I take personal umbrage with this supposed "anti-racist" program telling any race that they are lesser than.

I am not "lesser than" because of my Caucasian blood, nor has "Whiteness" made me more arrogant. This type of reasoning may lead to more racial, social, cultural, and political division in your State, but worse, it may set a precedent to other States or even Federally that this kind of indoctrination is okay.

Please do as much research into Critical Race Theory as you can and realize that this is divisive, not unifying, speech.

Thank you for your time.

Orlando Campa

**Archived:** Wednesday, April 7, 2021 1:18:19 PM
**From:** D Hyde
**Sent:** Wednesday, March 3, 2021 9:38:58 AM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal
**Digitally Signed:** Yes

---

To whom it may concern

As an employer, we are committed to inclusion and diversity in the workplace. However, we have been very concerned about the popularity of Critical Race Theory based programmes being offer to us. We have banned any course or trainer that uses racist stereotyping, makes racial generalisations or promotes discrimination. We support this legislation to help protect all workplaces from racist training like this.

There has been extensive research into CRT based diversity programmes, including by the  United Kingdom government  and they are proven not to work, to promote racism and racial disunity as well as to increase inefficiencies and damage interpersonal dynamics. The programmes do not foster real anti-racist workplaces. The use of the term 'anti-racism', when used by these programmes does not mean against racism. Indeed it encourages it.

There are wonderful positive diversity and inclusion programmes such as Chloe Valdery's, which we use and is very successful.

In conclusio,n  I urge you not to be swayed by very load activists in this matter. There inteention is not to improve the culture, it is to dismanttle it including your own venerable institution.

Thank you for your attentions.

Yours sincerely,

Danielle Hyde

**Archived:** Friday, April 16, 2021 12:52:18 PM
**From:** austindpowers89@yahoo.com
**Sent:** Wednesday, March 3, 2021 11:57:20 AM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

To whom it may concern, I want to voice my support for HB544. Critical Race Theory is a disgusting and racist ideology that helps divide people along racial lines and antagonize them toward one another. It promotes using shame, intimidation and other bullying tactics in order to berate and belittle people of particular races and justify discriminating against them. Proponents use the guise of "anti-racism" and "social justice" to justify their racist actions and ideology, but while these concepts on their face may sound good, they are just names meant to conceal the racism and injustice they promote.

The critical race theorists believe the only solution for past discrimination is present discrimination. They just want to point the present discrimination in the opposite direction. They say these groups of people were discriminated against and marginalized in the past, and so now its your turn. "It's not enough to be not racist," they say, "you have to be anti-racist..." aka racist against white people. This ideology is directly antithetical to Dr. Martin Luther King Jr's dream where we are not judged by the color of our skin. Critical Race Theory wants people judged by the color of their skin in a racial hierarchy, telling white people to shut up and check their privilege, while promoting "diversity" to favor people of color.

This ideology is dangerous and divisive and has no place being endorsed, promoted or funded by state or federal government dollars. I hope you will support HB544 and help promote and ensure the continued strive toward both Dr. King's and the American dream.

**Archived:** Friday, April 16, 2021 12:52:18 PM
**From:** ellen
**Sent:** Wednesday, March 3, 2021 11:40:59 AM
**To:** ~House Executive Departments and Administration
**Subject:** HB544 - Please Support
**Importance:** Normal

---

Good morning,

I am reaching out in support of HB544. I understand many people will be contacting you to oppose this bill by stating it's the equivalent to banning diversity training. This is not the case and I am not opposed to diversity training. This bill targets race and gender scapegoating, which shouldn't be included in diversity training if your aim is a more inclusive and understanding society/workplace. Critical race theory based training (can also be called anti-racists training) segregates groups based on race (white and non-white). The white group is told they are the oppressor and made to confess to their sin of racism. I realize it sounds outlandish, but individuals in workplaces and colleges have been secretly recording these conversations for at least the last few years. When listening to these conversations there are eerie similarities to the struggle sessions during the cultural revolution in China. During these struggle sessions, a white individual that resists being told they are an oppressor or racists provides additional proof of their guilt. There is no way out for the individual. On the flip side, non-white individuals are grouped together and told they are oppressed by the white population. If a non-white individual resists, by reporting no sense of oppresson, this proves they are complicit in systemic racism. Non-white individuals that resist can be ridiculed and labeled race traitors. Essentially this process is striping away individuality and placing everyone into collectives based on immutable characteristics.

Unfortunately it appears our country is forgetting MLK Jr.'s I have a dream speech. Individuals should be judged on the content of their character, not the color of their skin. I'm honestly worried this continued shift is going to increase actual racism in the country and teach a whole new generation of Americans to judge fellow citizens on their skin color (it's already being pushed on children as young as kindergarten). We must stand up for our liberal values and push back on this illiberal ideology.

Thank you for your time.
Ellen

**Archived:** Friday, April 16, 2021 1:03:57 PM
**From:** Jason Walters
**Sent:** Tuesday, March 2, 2021 9:59:56 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544 Support
**Importance:** Normal

---

Hello all,

I'm writing to show my support for ending the funding of Critical Race Theory. I wanted to let you know that I'm in favor of ending the funding of this racist training. Don't be fooled by the manipulative word play they like to use. Critical Race Theory is what these racists want to make more people racist. Take a close look at the leaders and what they say. They asspose that they are racist and therefore all people of their race must be racist. They preach Anti-Racism but that is only a cover for being racist against those in the racial majority. These people only see you as a racial monolith. To think differently than your group is to be othered.

If you believe that you should be judged on actions, not words, then look at their actions. The people who are pushing Critical Race Theory have pushed to have minorities removed from common place media. You can see examples of this with the removal of positive black role models from store shelves with brands like Uncle Ben and Aunt Jamima, real people who worked hard and brought delight to many, while White faces are allowed to remain without issue. Dr. Suess books have been removed for depicting images of people in traditional ethnic outfits, further removing non-White European images from our cultural landscape.

This ideology pushes people into thinking of themselves as a racial group, and for those in the majority group to punish themselves and hate themselves for being born in the majority. This just breeds more belief that the majority is superior. They would have you believe that the homeless Majority man on the corner is better off than Former President Obama just because they have different skin color.

Don't be fooled by this racist ideology. Please lead the way on removing this cancerous ideology from our society.

Take care and have a nice day.
-Jason Walters
CA Resident hoping for NH to lead the way to MLK's dream.

**Archived:** Friday, April 16, 2021 1:04:43 PM
**From:** Joshua Sanders
**Sent:** Tuesday, March 2, 2021 6:46:33 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Dear Honorable New Hampshire Representative,

I support the passing of HB544 to restrict the usage of public funds teaching of Critical Race Theory (CRT). CRT or otherwise known as Anti-Racism is an Ideologically driven mindset that advocates its adheres to make moral judgements about people based upon their race. Which is the general understanding of the term Racism.

Our nation fought a war to combat institutionalized racism please do your part to prevent our nation from reversing course.

Sincerely,
Joshua Sanders

**Archived:** Friday, April 16, 2021 1:04:48 PM
**From:** Matt Malkan
**Sent:** Tuesday, March 2, 2021 6:32:16 PM
**To:** ~House Executive Departments and Administration
**Subject:** please vote FOR HB544
**Importance:** Normal

Having spent many good times in New Hampshire with the good people there,
I urge you to pass HB544. I stress that this is NOT a partisan issue.
Hardly anybody in either party wants schools or businesses to embrace
ideological indoctrination, whatever name it is called ("Critical Race Theory",
'Anti-Racism' or many other deliberately misleading euphemisms).
This indoctrination is  harmful because it is
founded on the factually incorrect assumption that your skin color
is the most important thing about you, determining your views,
attitudes, values and behavior. It falsely assumes that any differences
can only be explained by unconscious 'racism', and that heavy-handed
government intervention is then required to take away things some people
earned, and give them to others, SOLELY BASED ON THEIR SKIN COLOR.
this is utterly against everything our country stands for, from Dr. King
back to Lincoln.
Please support the passage of HB544.

Thank you for your consideration,
Sincerely
Matt Malkan
Distinguished Prof of Physics, UCLA

**Archived:** Friday, April 16, 2021 1:05:13 PM
**From:** Bob Danielson
**Sent:** Tuesday, March 2, 2021 5:47:48 PM
**To:** ~House Executive Departments and Administration
**Subject:** Please support HB544 and banish the divisive and racist critical race theory movement.
**Importance:** Normal

To whom it may concern,

Please support NH HB544 to ban critical race theory training.

Common sense should tell you that critical race theory and it's bedfellow; Anti-Racist and White Fragility training is a horrible political movement/development and will set back race relations and the continued advancement of black people in America.  The teaching from these initiatives is in itself RACIST and frankly bizarre.

You may not know this, but the foundation of critical race theory et al is an offspring of and backdoor to advancing Socialism. I kid you not. But even setting that aside, you do not minimize racism by pushing forward with racist training based in identity politics.

Please Please Please I beg of you... use your heads and do not buckle to the "woke" activists who have become a fixture in many once excellent media organizations (including PBS to my despair for Gods sake).

Thank you for helping put a stop to this madness.

Sincerely,
Robert Danielson

**Archived:** Friday, April 16, 2021 1:05:55 PM
**From:** James Lindsay
**Sent:** Tuesday, March 2, 2021 4:46:41 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

To whom it may concern,

I am writing as an expert and concerned American, though not a New Hampshire citizen, in unequivocal support of HB544 which bans the teaching of certain divisive tenets as though they are fact. I also testified in the committee hearing as an expert on Critical Race Theory, against which this bill is ultimately based, on February 18 of this year. Please give this important, necessary bill your full-throated endorsement and a positive recommendation.

I don't know that this is the time for lengthy written testimony, so I'll try to keep my remarks brief. The bill being proposed, it should immediately be noted, bans not only the divisive tenets that stem from the Critical Race Theory worldview and its related activism, which is very aggressive and very interested in achieving dominance in our schools, workplaces, and lives, but it also bans trainings and uncritical teaching of what would be the more commonly understood forms of unacceptable bias, behavior, and ideology, including both white supremacy and patriarchy. It prohibits recipients of state funding from the same things the Civil Rights Acts and the Fourteenth Amendment are already supposed to protect against, although these are failing. Namely, the bill would prohibit teaching as uncontested fact or mandating training in racial and sex stereotyping, scapegoating, and discrimination, as well as positioning the state, institutions, etc., as intrinsically racist in a "systemic" way, which has allowed them thus far to avoid being found in violation of either the Civil Rights Acts or Fourteenth Amendment despite openly and explicitly advocating, in the words of the theorist Ibram X. Kendi, "present discrimination," which is billed as a necessary remedy to past discrimination. While someone might argue that this bill is unnecessary because of the Civil Rights Act, in practice this has not been borne out, making a bill like this more necessary than not. Every American, and every New Hampshire citizen, should not want discrimination, stereotyping, and scapegoating to be a part of their workplace training modules or children's education. This bill helps support that fundamentally equal and fair treatment before the law, which is currently at risk.

It should also be noted that this bill has First Amendment relevance as well, and not in the way its opponents would explain. The essence of the First Amendment is that people have freedom of conscience, particularly with regard to matters of spiritual belief, and freedom of speech, such that the state can neither compel nor restrict speech. Opponents of this bill will say that the bill seeks to restrict speech, but this is not true. It explicitly leaves provision for workplace trainings and education that don't teach these already-illegal tenets as uncontested fact. Moreover, the situation is quite the opposite to that portrayed by the opponents to the bill who oppose it on free-speech grounds. These workplace trainings and educational programs violate for very many people both freedom of conscience and freedom of speech. Their freedom of speech is violated by compelling them to admit to complicity in racism and sexism, among other social violations that are unlikely to be true. It also compels them to adopt a particular approach to anti-racism and anti-sexism that is very narrow and to speak on its behalf. This latter example, then, not only violates freedom of speech but also the freedom of conscience implied by both the free-exercise and establishment clauses of the First Amendment. It is not the state's place to be dictating (or funding the dictators of) how one is to feel about the issue of racism and sexism. Citizens, the overwhelming majority of whom firmly reject racism and sexism, should be granted the freedom of conscience to oppose

those on terms they find recognizable, which in a free, liberal country like the United States will mostly likely be rooted in equality, colorblindness, individualism, and universal humanity, which are solidly American values. They may also do so from Judeo-Christian principles, for example the famous injunction from Paul that in Christianity there is "neither Jew nor Greek, slave nor free," etc. They should not be compelled to do so in the terms most often employed by so-called "anti-racist," "diversity," "racial sensitivity," and "culturally responsive" programs today, which are a specific ideology known as Critical Theory, which explicitly rejects virtually all of these values for others, sometimes termed "liberationist" and at other times rightly labeled "neo-Marxist," including in the words of the activists pushings these programs themselves. While the law may not bear out today that these trainings and pedagogical pursuits violate the First and Fourteenth Amendments, as well as existing Civil Rights legislation, it is likely that they will eventually. It is therefore better to get on the right side of this issue now and take proactive steps to strengthen a legal architecture that is failing citizens in their most fundamental rights.

For the sake of brevity, I will not elaborate at length on the theory underlying the overwhelming bulk of these trainings and relevant school curricula, which is Critical Race Theory, the same (neo-Marxist) Critical Theory mentioned above specifically made to take race as a category of difference upon which Marxian conflict theory (oppressors versus oppressed) is to be applied. I will simply remind the committee that in addition to this theory being one among many approaches to the issue of race and racism, it is one that is rooted specifically in making precisely the same mistake that made racism the problem it has been throughout our history as a nation, which is specifically placing social significance into racial categories and considering that significance determinant and in some ways relevant to one's social standing and access to power. This was a horrific thing to have done in the 16th century going forward, and it's no better to do in the 21st century. It didn't work out then, and it won't work out now, unless one's goal is to effect an American Cultural Revolution in mirror image to the one Mao perpetrated on China in the 1960s-1970s, which (as few people know) used many of the same arguments and ideas about race, applied to the Han Chinese race instead of "whiteness."

Critical Race Theory begins from the assumption, in its own words, that racism is the normal state of affairs of society, changing the question from "did racism take place?" to "how did racism manifest in that situation?" (for racism is assumed to be relevant to every situation), and it calls into question "the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and the neutral principles of constitutional law." That is, it is presumptive, divisive, and explicitly un-American, if not anti-American. Moreover, it is designed not to be able to be disagreed with, as all disagreement is framed as some variation of racial "fragility" or "privilege-preserving epistemic pushback," which is to say a cynical drive to maintain one's social dominance, not legitimate criticism of the genuinely bad arguments and cynical assumptions put forth by the theory itself. Because it cannot be disagreed with without accusations of bad intentions and motivations, it is divisive and very difficult to uproot once installed. Because it believes "there is no neutral" between "dominance" and "oppression" (Marxian conflict theory), it is again divisive and in fact polarizing. Because its issues are so sensitive and because it addresses them in such an accusatory way (everyone who doesn't agree with it is racist and white supremacist), it diverts incredible volumes of resources to dividing and polarizing every environment it can gain a foothold in. HB544 exists to minimize that destructive influence and colossal waste of (taxpayer-funded) resources. Even worse, not only is there no evidence supporting the application of this theory, there is evidence against its claims that it can generate that which it claims to generate, so it tears apart organizations and poisons minds (including those of children) with its divisive tenets while profiting off a fraudulent enterprise that robs the taxpayers while destroying their communities.

On these grounds, and possibly hundreds of pages more that I could write if needed, I again urge you in the strongest possible way to support and recommend HB544 as a step in the right

direction, away from these divisive teachings and in support of the fundamental inalienable rights this country has always recognized and strived to extend to all citizens, even the allegedly privileged ones. This bill is important for New Hampshire, and it sends a message to America, whose federal government has just unambiguously signaled it wants to take us in the opposite direction by rescinding a similar federal executive order. That opposite direction is back into racial and sex discrimination, stereotyping, and scapegoating, and its into things America has never been and has never been willing to become, namely whatever it is that Critical Theory (i.e., neo-Marxism) aims to make of it.

Thank you.
James Lindsay, Ph.D.

**Archived:** Friday, April 16, 2021 1:06:05 PM
**From:** Kyle Sherman
**Sent:** Tuesday, March 2, 2021 4:23:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

Hello,

I'm writing this email to express profound support for HB544, a desperately needed piece of legislation to combat the rise of dogma and pedagogy in our public institutions. There is no room for divisive and inherently discriminatory critical race theory or anti-racism doctrine within institutions formed to serve the interests of the American people, specifically the people of New Hampshire. We cannot afford to subvert the interests of citizens and students by allowing the this particularly pernicious dogma to infiltrate governance, one that is tantamount to a religion that preaches identarian discrimination, teaches minorities they are hated by the world, and tells youth of a certain skin color that they're inherently evil and born racists. We the people demand these divisive concepts to be outlawed as outlined in HB544.

Yours Truly,
Concerned Citizen

**Archived:** Friday, April 16, 2021 1:06:34 PM
**From:** Mike Breen
**Sent:** Saturday, February 20, 2021 7:41:39 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB 544
**Importance:** Normal

_____

I am contacting you regarding the potential for "Critical Race Theory" being taught in our schools. I have been a professional curriculum developer for the International Association of Chiefs of Police, the Department of State, and the Department of Justice. I have encountered these types of "theories" in the past and rejected their inclusion in curriculum I designed.

Why? "Theories" of this ilk pose as social science theories, presumably grounded in credible replicated research. However, they are not. They are scientifically illiterate radical false narratives sponsored by special interest groups promoting destructive agendas.

Please understand that at its core, "Critical Race Theory" (CRT) is not a Civil Rights Oriented belief system. Rather it asserts that White citizens are unavoidably and inherently racist and that the United States is a racist country. CRT is joined at the hip with a growing Afrocentric racial superiority belief system. Much of the racial scientific and historic illiteracy originates from an assertion that Black citizens are naturally superior to non-Black citizens "spiritually, physically, and intellectually" due to the greater level of melanin in their bodies.  Ironically, all this doublespeak gibberish is coined "anti-racism" by radicals sponsoring federally mandated instructions of this ilk to our children.  It in fact seeks to explain why all White citizens are inherently and unavoidably racist.

Just how mainstream are these racist beliefs? Despite the fact that claims of natural racial superiority are anathema to our civil rights movement, and the spirit and letter of our civil rights laws, Kristen Clark, [a current nominee for the office of the Assistant Attorney General for the Civil Rights Division of the Department of Justice] has publicly proliferated this widely discredited pseudoscience for decades.

Societies have been at these crossroads in the past. The world has not seen this level of race and ethnic hatred and suppression of genuine science since the rise of the Nazi Regime. Recall their teachings were based upon similar eugenic "science" of the day. The United States itself has not experienced this level of proliferated race pseudoscience since the rise of the Ku Klux Klan and has NEVER experienced mandatory racist teachings in local schools. Because history has clearly revealed the consequence of promulgating the hatred at the core of racial inferior "Theories" it will judge those making this mistake again harshly. To expose our children and their teachers to programs and tutelage which asserts that one race is inherently racist--thus inferior, and another is naturally superior is not simply scientifically illiterate. It is immoral on its face. Please protect our teachers and students from this societal cancer coined "Critical Race Theory" and the racist pseudoscience promoting beliefs of this ilk by making HB 544 the law in New Hampshire.

Michael D. Breen, MPA, Ph.D. 42 Marvin Road Moultonborough, NH 03254 Telephone: 603 253 9114

**Archived:** Friday, April 16, 2021 1:07:07 PM
**From:** Rachel Valk
**Sent:** Wednesday, February 17, 2021 12:08:21 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

Good Morning,
I am writing in support of Bill HB544. I am just a private citizen who has never been involved in politics but I am very concerned. I clearly see that our American rights and values are being stolen from us and it feels like no one is doing anything about it. These policies are all being promoted under the guise of love, anti-sexism and anti-racism and it's so evident to me when digging deeper that that is not true. Critical Race Theory is divisive and we as a state should not be promoting or mandating that. I for one believe that these social issues are things that should be taught at home not in a school. People are free to believe what they want. This is America. People are free to think and to research for themselves. This is America.


Thank you,
Rachel Valk

# EXHIBIT 10

## HB2/Budget Trailer Materials

# HB2-FN-A-L

| Body | Description |
|---|---|
| H | Introduced (in recess of) 02/25/2021 and referred to Finance HJ 4 P. 48 |
| H | Division III Work Session: 03/09/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division III Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Public Hearing: 03/16/2021 01:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | Division III Work Session: 03/12/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division I Work Session: 03/16/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| H | Division III Work Session: 03/19/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division III Work Session: 03/18/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/17/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/18/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division III Work Session: 03/15/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division I Work Session: 03/23/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| H | Division III Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | ==CANCELLED== Division III Work Session: 03/25/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | ==CANCELLED== Division III Work Session: 03/26/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/23/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/24/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/25/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | ==CANCELLED== Division II Work Session: 03/26/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Executive Session: 03/29/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | |

»«CANCELLED»« Executive Session: 03/30/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660

| H | »«TIME CHANGE»« Executive Session: 03/31/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | Majority Committee Report: Ought to Pass with Amendment # 2021-1059h (Vote 12-9; RC) **HC 18** P. 30 |
| H | Minority Committee Report: Inexpedient to Legislate |
| H | FLAM # 2021-1064h (Reps. Walz, Hatch): AF RC 175-203 04/07/2021 **HJ 5** P. 89 |
| H | FLAM # 2021-1065h (): AF RC 175-206 04/07/2021 **HJ 5** P. 92 |
| H | FLAM # 2021-1068h (Reps. Rogers, Nordgren, Wallner): AF RC 181-199 04/07/2021 **HJ 5** P. 94 |
| H | FLAM # 2021-1071h (Rep. McWilliams): AF RC 177-206 04/07/2021 **HJ 5** P. 96 |
| H | FLAM # 2021-1073h (Rep. Heath): AF RC 174-206 04/07/2021 **HJ 5** P. 99 |
| H | FLAM # 2021-1062h (Reps. Heath, K. Murray): AF RC 178-203 04/07/2021 **HJ 5** P. 101 |
| H | FLAM # 2021-1093h (Reps. Leishman, Buco): AF RC 186-197 04/07/2021 **HJ 5** P. 104 |
| H | FLAM # 2021-1094h (Reps. Hatch, Leishman, Buco, Walz): AF RC 176-208 04/07/2021 **HJ 5** P. 106 |
| H | FLAM # 2021-1063h (Rep. Hatch): AF RC 186-193 04/07/2021 **HJ 5** P. 109 |
| H | FLAM # 2021-1069h (Reps. Nordgren, Rogers, Wallner): AF RC 180-201 04/07/2021 **HJ 5** P. 115 |
| H | FLAM # 2021-1066h (Reps. Rogers, Nordgren, Wallner): AF RC 184-194 04/07/2021 **HJ 5** P. 117 |
| H | FLAM # 2021-1104h (Rep. Almy): AF RC 161-218 04/07/2021 **HJ 5** P. 120 |
| H | Ought to Pass with Amendment 2021-1059h: MA RC 200-181 04/07/2021 **HJ 5** P. 123 |
| H | Reconsider (Rep. Osborne): MF RC 175-204 04/07/2021 **HJ 5** P. 125 |
| S | Introduced 04/01/2021 and Referred to Finance; **SJ 11** |
| H | Amendment # 2021-1059h: AA RC 204-178 04/07/2021 **HJ 5** P. 87 |
| S | Remote Hearing: 05/04/2021, 01:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** |
| S | Remote Hearing: 05/04/2021, 06:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** |
| S | Committee Report: Ought to Pass with Amendment # 2021-1799s, 06/03/2021; **SC 26** |
| S | Sen. Soucy Moved to divide the Question on Committee Amendment 2021-1799s: on Sections 74-75; Sections 427-429, Sections 397-404; and Section 412; 06/03/2021; **SJ 18** |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| S | Sen. Bradley Moved to divide the Question on Committee Amendment 2021-1799s Sections 89-102 and then the Remainder; 06/03/2021; **SJ 18** |
| S | Committee Amendment # 2021-1799s, on Sections 89-102, RC 13Y-10N, AA; 06/03/2021; **SJ 18** |
| S | Committee Amendment # 2021-1799s, Remainder of the Committee Amendment, RC 14Y-10N, AA; 06/03/2021; **SJ 18** |
| S | Sen. Bradley Floor Amendment # 2021-1816s, RC 24Y-0N, AA; 06/03/2021; **SJ 18** |
| S | Sen. Whitley Floor Amendment # 2021-1862s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Kahn Floor Amendment # 2021-1855s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1850s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Kahn Floor Amendment # 2021-1863s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Bradley Moved to divide the Question on Floor Amendment 2021-1861s on Sections 89-102 of the Amending Language and then the Remainder of the Amendment; 06/03/2021; **SJ 18** |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| S | Floor Amendment #2021-1861s, Sections 89-102 of the Amending Language, RC 10Y-13N, AF; 06/03/2021; **SJ 18** |
| S | Floor Amendment 2021-1861s; on the Remainder of the Amendment RC 10Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1858s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |

S    Sen. Perkins Kwoka Floor Amendment # 2021-1859s, AA, VV; 06/03/2021; **SJ 18**

S    Sen. Rosenwald Floor Amendment # 2021-1847s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Birdsell Floor Amendment # 2021-1842s, RC 14Y-9N, AA; 06/03/2021; **SJ 18**

S    Sen. Soucy Floor Amendment # 2021-1874s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Kahn Floor Amendment # 2021-1876s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    The Chair ruled the Question Divisible; 06/03/2021; **SJ 18**

S    Sen. Whitley Floor Amendment # 2021-1883s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Sherman Floor Amendment # 2021-1878s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Rosenwald Floor Amendment # 2021-1875s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Kahn Floor Amendment # 2021-1852s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Whitley Floor Amendment # 2021-1867s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Soucy Floor Amendment # 2021-1815s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Rosenwald Floor Amendment # 2021-1882s, RC 9Y-14N, AF; 06/03/2021; **SJ 18**

S    Sen. Daniels Floor Amendment # 2021-1821s, AA, VV; 06/03/2021; **SJ 18**

S    Sen. Carson Floor Amendment # 2021-1827s, AA, VV; 06/03/2021; **SJ 18**

S    Sen. Giuda Floor Amendment # 2021-1838s, RC 8Y-15N, AF; 06/03/2021; **SJ 18**

S    Sen. Hennessey Floor Amendment # 2021-1866s, AA, VV; 06/03/2021; **SJ 18**

S    Sen. Bradley Moved to divide the Question on Ought To Pass with Amendment on Sections 89-102 and then the Remainder of the Bill; 06/03/2021; **SJ 18**

S    The Chair ruled the Question Divisible; 06/03/2021; **SJ 18**

S    Sen. Bradley Floor Amendment # 2021-1884s, AA, VV; 06/03/2021; **SJ 18**

S    Ought to Pass with Amendment on Sections 89-102, RC 13Y-9N, MA, 06/03/2021; **SJ 18**

S    Ought to Pass with Amendment on the Remainder of the Bill, RC 14Y-9N, MA, OT3rdg; 06/03/2021; **SJ 18**

S    Committee Amendment # 2021-1799s, on Sections 74-75 Sections 427-429 Sections 397-404 and Section 412, RC 24Y-0N, AA; 06/03/2021; **SJ 18**

S    Sen. D'Allesandro Floor Amendment # 2021-1861s; 06/03/2021; **SJ 18**

S    Without Objection, the Clerk is authorized to make technical and administrative corrections which are necessary to reflect the intent of the Senate, Relative to Bills and Amendments Passed Today, MA; 06/03/2021; **SJ 18**

H    House Non-Concurs with Senate Amendment 2021-1799s and 2021-1816s and 2021-1859s and 2021-1842s and 2021-1821s and 2021-1827s and 2021-1866s and 2021-1884s and Requests CofC (Reps. L. Ober, Weyler, Umberger, Turcotte, Packard) MA VV 06/04/2021 **HJ 9** P. 53

H    Speaker Appoints Alternates: Reps. Edwards, Leishman, Wallner, Major, Emerick 06/04/2021 **HJ 9** P. 53

S    Sen. Daniels Accedes to House Request for Committee of Conference, MA, VV; (In recess 06/03/2021); **SJ 19**

S    President Appoints: Senators Morse, Bradley, Rosenwald; (In Recess 06/03/2021); **SJ 19**

H    ==RECESSED== Conference Committee Meeting: 06/14/2021 11:00 am LOB 210-211

H    Conferee Change: Rep. Erf added as Alternate 06/10/2021 **HJ 10** P. 22

H    ==RECESSED== Conference Committee Meeting: 06/15/2021 01:00 pm LOB 210-211

H    ==RECESSED== Conference Committee Meeting: 06/16/2021 01:00 pm LOB 210-211

H    ==CONTINUED== Conference Committee Meeting: 06/17/2021 10:00 am LOB 210-211

S    Conferee Change; Senator Daniels Replaces Senator Rosenwald; **SJ 20**

H    Conferee Change: Rep. Edwards Replaces Rep. Turcotte 06/10/2021 **HJ 10** P. 23

H    Conferee Change: Rep. Emerick Replaces Rep. Packard 06/10/2021 **HJ 10** P. 23

S    Conference Committee Report Filed, # 2021-2040c; 06/24/2021

S    Conference Committee Report # 2021-2040c; RC 14Y-10N, Adopted; 06/24/2021; **SJ 20**

H    Reconsider (Rep. Osborne): MF DV 172-203 06/24/2021

H    Conference Committee Report 2021-2040c: Adopted, RC 198-181 06/24/2021

| S | Enrolled Bill Amendment # 2021-2048e Adopted, VV, (In recess of 06/24/2021); **SJ 20** |
|---|---|
| H | Enrolled Bill Amendment # 2021-2048e: AA VV (in recess of) 06/24/2021 |
| H | Enrolled (in recess of) 06/24/2021 |
| S | Enrolled Adopted, VV, (In recess 06/24/2021); **SJ 20** |
| H | Signed by Governor Sununu 06/25/2021; Chapter 91; Unless otherwise specified the remainder of this act shall take effect: 07/01/2021 |

# House

House Finance
March 31, 2021
2021-1059h
05/06

Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by replacing all after the enacting clause with the following:



**Amendment to HB 2-FN-A-LOCAL**
**- Page 155 -**

1 ████████████████████████████████████████████████

2 ███████████████████████████████████  █████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████

9 ████████████████████████████████████

10 ████████████████████████████████████

11    330  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after

12 chapter 10-B the following new chapter:

13                                        CHAPTER 10-C

14                      PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

15    10-C:1  Definitions.  In this chapter:

16    I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any

17 kind that in any manner have entered into a contract, or perform a subcontract pursuant to a

18 contract, with the state of New Hampshire.

19    II.  "Divisive concept" means the concept that:

20    (a)  One race or sex is inherently superior to another race or sex;

21    (b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

22    (c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or

23 oppressive, whether consciously or unconsciously;

24    (d)  An individual should be discriminated against or receive adverse treatment solely or

25 partly because of his or her race or sex;

26    (e)  Members of one race or sex cannot and should not attempt to treat others without

27 respect to race or sex;

28    (f)  An individual's moral character is necessarily determined by his or her race or sex;

29    (g)  An individual, by virtue of his or her race or sex, bears responsibility for actions

30 committed in the past by other members of the same race or sex;

31    (h)  Any individual should feel discomfort, guilt, anguish, or any other form of

32 psychological distress on account of his or her race or sex; or

33    (i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by

34 a particular race to oppress another race.

35    (j)  The term "divisive concepts" includes any other form of race or sex stereotyping or

36 any other form of race or sex scapegoating.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 156 -**

III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.  It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V.  "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI.  "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2  Unlawful Propagation of Divisive Concepts.

I.  Requirements for the state of New Hampshire:

(a)  The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b)  No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II.  Requirements for government contractors:

(a)  All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

1    values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual

2    because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault,

3    blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

4    (b)   The contractor shall send to each labor union or representative of workers with

5    which the contractor has a collective bargaining agreement or other contract or understanding, a

6    notice, to be provided by the agency contracting officer, advising the labor union or workers'

7    representative of the contractor's commitments under this section, and shall post copies of the notice

8    in conspicuous places available to employees and applicants for employment.

9    (c)   In the event of the contractor's noncompliance with the requirements of this section,

10    or with any rules, regulations, or policies that may be promulgated in accordance with this section,

11    the contract may be canceled, terminated, or suspended in whole or in part and the contractor may

12    be declared ineligible for further government contracts.

13    (d)   The contractor shall include the provisions of this section in every subcontract or

14    purchase order unless exempted by rules, regulations, or policies of the department of administrative

15    services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor

16    shall take such action with respect to any subcontract or purchase order as may be directed by the

17    department of administrative services as a means of enforcing such provisions including sanctions

18    for noncompliance.

19    III.  The department of administrative services, or an agency designated by the department

20    of administrative services, is directed to investigate complaints received alleging that a state

21    contractor is utilizing such training programs in violation of the contractor's obligations under the

22    binding provisions of this section.  The department shall take appropriate enforcement action and

23    provide remedial relief, as appropriate.

24    IV.  The heads of all agencies shall review their respective grant programs and identify

25    programs for which the agency may, as a condition of receiving such a grant, require the recipient to

26    certify that it will not use state funds or assets to promote any of the divisive concepts defined in

27    RSA 10-C:1, II.

28    V.  Requirements for agencies.

29    (a)   The fair and equal treatment of individuals is an inviolable principle that must be

30    maintained in the state workplace.  Agencies should continue all training that will foster a

31    workplace that is respectful of all employees.  Accordingly:

32    (1)   The head of each agency shall use his or her authority under to ensure that the

33    agency, agency employees while on duty status, and any contractors hired by the agency to provide

34    training, workshops, forums, or similar programming, for purposes of this section, "training," to

35    agency employees do not teach, advocate, act upon, or promote in any training to agency employees

36    any of the divisive concepts listed in RSA 10-C:1; and

1    (2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency
2    employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic
3    protected by federal or state law.

4    (b)  The commissioner of the department of administrative services, pursuant to RSA
5    541-A, shall develop regulations for the enforcement of the provisions of this statute.

6    (c) Each agency head shall:

7    (1)  Issue a policy incorporating the requirements of this chapter into agency
8    operations, including by making compliance with the policy a provision in all agency contracts;

9    (2)  Request that the agency thoroughly review and assess not less than annually
10   thereafter, agency compliance with the requirements of the policy in the form of a report submitted
11   to the department of administrative services; and

12   (3)  Assign at least one senior political appointee responsibility for ensuring
13   compliance with the requirements of the policy.

14   VI.  Review of agency training.

15   (a)  All training programs for state agency employees relating to diversity or inclusion
16   shall, before being used, be reviewed by the department of administrative services for compliance
17   with the requirements of RSA 10-C:2, V.

18   (b)  If a contractor provides a training for agency employees relating to diversity or
19   inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and
20   such action is in violation of the applicable contract, the agency that contracted for such training
21   shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and
22   regulations.

23   10-C:3  General Provisions.

24   I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial,
25   cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the
26   requirements of this chapter.

27   II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger
28   course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner
29   and without endorsement.

30   III.  If any provision of this chapter, or the application of any provision to any person or
31   circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions
32   to any other persons or circumstances shall not be affected thereby.

33   331  Effective Date.  Section 330 of this act shall take effect January 1, 2022.



**State of
New Hampshire**

# HOUSE RECORD

### First Year of the 167th General Court

## Calendar and Journal of the 2021 Session

#### Web Site Address: www.gencourt.state.nh.us

| Vol. 43 | Concord, N.H. | Friday, April 2, 2021 | No. 18 |

**Contains: House Deadlines; House Bills Amended by Senate; Committee Reports;
Meetings and Notices; Revised Fiscal Notes**

# HOUSE CALENDAR

**MEMBERS OF THE HOUSE:**

The House will meet in session on Wednesday, April 7th at 9:00 a.m., Thursday, April 8th, at 9:00 a.m., and Friday, April 9th at 9:00 a.m. in the NH Sportsplex facility at 68 Technology Dr. in Bedford, NH.

Session day logistics, including arrival times, parking, entry, materials and lunch distribution will be similar to the previous event, and where necessary, updates and modifications have been made. Those details appear in the back of this House Calendar. House members can expect an email with any further details early next week.

I have discussed with the Democratic and Republican Leaders our need to work together to manage our time wisely during the House session days. While there may be disagreement on many issues, we all agree that we can complete our business in a timely manner if we work together with mutual respect and understanding.

The House Finance committee will offer a budget briefing for House members on Monday April 5th at 1:00 p.m. via Zoom webinar. As in prior budget years, members of the public may watch a livestream via YouTube. A link to the YouTube stream is published in a notice in this House Calendar. House members will receive a link to the webinar by email so they may raise their hand and ask questions of the Finance Committee and Legislative Budget Assistant, if desired.

The amendment to House Bill 1 adopted by the majority of the House Finance Committee is one that replaces the entire bill and is over 700 pages long. Rather than print 400 copies of that amendment for next week, the Legislative Budget Assistant's Office has posted a link to that amendment here: http://www.gencourt.state.nh.us/LBA/Budget/Capital_Budget_House/Week%20of%203-29/HB_1_H_Finance_COMBINED_33021.pdf All other amendments to bills will be printed in two addendum calendars.

Additionally, if you are interested in the other documents used throughout the entire House budget process, the LBA has a webpage with those available to you found here:http://www.gencourt.state.nh.us/LBA/Budget/fy2022_2023_budget.aspx

The New Hampshire Automobile Dealers Association will be sponsoring one of our session day's lunches next week at session. Typically the NHADA hosts an annual Crossover reception for all legislators and staff, however in this unusual time, we have not been able to attend the usual social events that may exist for legislators. These receptions go a long way in terms of allowing members across the whole chamber to socialize and get to know their colleagues, and I know I speak for myself when I say this has been missed. We are thankful to the NHADA for sponsoring this lunch.

I am happy to announce that captioning for House sessions is now available. The link to access captions is a separate link from the session streaming link and will be available on the General Court website before the start of each session.

Sherman A. Packard, Speaker of the House

---

## NOTICE

The **Finance** Committee will hold **budget briefings** on **HB 1-A**, making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023, and **HB 2-FN-A-L**, relative to state fees, funds, revenues, and expenditures on April 5th at 1:00 pm. House members will receive secure Zoom links. Members of the public may attend using the following link: https://www.youtube.com/watch?v=MvMW6Lf-ltw.

Rep. Kenneth Weyler, Chairman
Finance Committee

HB 1 provides no funding to the Department of Transportation (DOT) to address the deficit in the Highway Fund and has left DOT with a vacancy level in staffing of 15%. The reduction in the equipment maintenance fund will cause delays in planned road and bridge repairs by about two years.

Four million was cut from the Department of Safety (DOS), resulting in the underfunding of over 50 positions which will likely cause delays in services, especially in the DMV. Constituents using other DOS agencies will find an increase in wait times and a delay in response times across all services due to cuts in almost every line item in the safety portion of HB 1. All of these cuts are compounded by huge lapses back to the general fund in 2021 due to COVID-19. This budget will leave the Department of Safety unable to fully staff its Forensic, CODIS, Toxicology Lab and unable to maintain its vehicle replacement plan.

HB 1 underfunds the Department of Health and Human Services (DHHS) in many areas. This budget fails to fund the gap in federal funding that is vital for family planning providers across the state who provide vital services such as STD testing and cancer screening that do not currently exist in traditionally underserved parts of the state.

The DHHS-Tobacco Prevention and Cessation Unit had requested and was denied in this budget an additional prioritized need of $440,000 to fully implement an adolescent tobacco helpline to address this critical need. Without this additional $440,000, DHHS will be unable to fully implement this program and meet the needs of addicted youth through cessation services. This additional funding is a drop in the bucket compared to the over $214 million New Hampshire generated in tobacco tax revenue in 2020.

The youth rapid rehousing program that addresses teen homelessness is not funded in this budget. The purpose of this program is to support youth 18-24 who are experiencing homelessness by providing two years of rental assistance and supportive services to successfully maintain housing.

This budget directs DHHS to cut $50 million in general funds; $30 million in the first year and $20 million in the second year in any area excluding a few services. At this time there is no way of knowing what services would be reduced since the Finance Committee handed this responsibility to the department. Also, since most general funds at DHHS are matched with federal funds, we stand to lose an additional $50 million in federal matching funds.

In addition to any other required reductions, DHHS is directed to reduce their personnel budget by $22.6 million, which represents 226 full-time positions. This budget also requires that at no time during the biennium shall DHHS exceed 3,000 full-time authorized positions, further restricting the department's ability to provide critical direct services to New Hampshire residents. Here we stand to lose up to an additional $22.6 million in federal matching funds.

This budget fails to fund valuable public health services supported home visiting programs that help strengthen young families in New Hampshire. These services include individualized support, parenting education, and access to resources like primary care, WIC, and early intervention to reduce stress and improve family life.

HB 1 dramatically underfunds protective preventive child care services for families who are under stress and involved with DCYF, helping to prevent abuse or neglect.

HB 1 does not fund the widely supported adult dental program that would require DHHS to provide critical adult dental care to residents under the Medicaid managed care program.

The minority finds that it cannot support HB 1 as amended by the Finance Committee due to the extensive underfunding of vital services, programs and positions throughout the state workforce.

**HB 2-FN-A-LOCAL,** relative to state fees, funds, revenues, and expenditures. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Kenneth Weyler for the **Majority** of Finance. HB 1 contains all the spread sheets and line items which are appropriated for spending. However, there are tax changes and reorganizations that are part of the appropriating process. These details are delineated in HB 2, sometimes called the trailer bill. This time HB 2 had more reorganization than normal. We from Finance, asked the policy committee chairmen to review the appropriate sections. The Governor proposed combining the university system with the community college system. The timeline seemed too short, so we stretched it out. Previous budgets funded development money for a 25 bed psychiatric hospital, but in HB 2 it became a 60 bed hospital. We had no warning of such a change, so we will remove that for further study. A 60 page reorganization of the Department of Energy was in the bill. After review by the Science, Technology and Energy Committee, that went forward. We need to not only remember that this is one of our most important votes, but that we all need to support it for the good of our citizens.

A Graphic Services Fund created to better manage Administrative Services, and Payment and Procurement Fund established to pay costs of procurement card collections. Several tax reductions, in Business Profits Tax, Business EnterpriseTax, Rooms and Meals, and Interest and Dividends. Reduction in Carry Forward Tax Credit changed. Historical Horse Racing was added to increase revenue. Some sections eliminated as no longer needed. A major reorganization of the Public Utilities Commission and the Department of Energy were reviewed before inclusion in the bill.

Due to increased revenue projections from Ways and Means and the reduction of the Public School Infrastructure program we were able to fund much needed programs in the Department of Transportation. As you saw in HB 1

we had reduced the highway fund by over $5 million. The extra revenue allowed us to put $19 million back into the highway fund to support the Highway Block Grants, betterment, winter maintenance and provide money for fleet equipment. In the Department of Education (DOE) we were able to put $19,836,000 into building aid and require schools to submit a 10 year plan to the state for building requirements. We also provided $8,000,000 to accelerate payments for current liabilities DOE owes on outstanding school bonds. We will also reduce the SWEPT (State-Wide Education Property Tax) to be collected from cities and towns by $100,000. This reduction to the local taxpayers will be reimbursed to the cities and towns from the state so all school districts will be made whole. We also funded dual and concurrent enrollment program at $1,500,000 per year and transferred the management from DOE to the Community College System of New Hampshire. We also increased the charter school lease cap to $50,000. Finally, several schools that began kindergarten in FY20/21 did not receive their start up grants so we allocated $1,906,313. The Governor had proposed a plan for the merger of the University System and the Community College System with one Board of Trustees starting in July 2021. We believed this action needed to slow down a little and we are recommending a commission to bring back to the legislature by January 22 their plan for merging the two systems. If approved, it will be effective in July 23. We outlined numerous areas that they should look at as well as providing $1.5 million to hire outside experts to assist them. We also approved, with the help of the Transportation Committee the definition of unmanned aircraft, and Fish and Game helped us sort through Wildlife Damage Control: damage by bears.

The legislature lent the Governor a large share of its powers under the state of emergency laws passed in 2002 with the image of 9/11 fresh in our minds. With this first use of those laws, it's become clear that the legislature made it easy for the Governor to declare an emergency and made it very difficult for the legislature to either be involved in crisis management policies, federal funding decisions, restriction of civil and constitutional rights, or in bringing the state of emergency to an appropriate end. The legislature gave up too much involvement and too much discretion and part of HB 2 addresses sharing power more appropriately to bring an emergency to a conclusion. We removed an authorization to build a 60-bed new forensic mental health hospital because the size grew from 25 to 60 and the funds being authorized appeared to circumvent standard capital budgeting processes. We removed $1.5 million from a well-intended program to help senior citizen centers with barrier materials to mitigate virus spread because over 800 centers were eligible and the program overhead costs would make an evaluation and award program ineffective. Family planning programs were fully funded with a $50,000 set-aside for new program awardees. This is intended to stimulate the full, fair and open competition as a restriction is added to prohibit abortion services from being provided at the same location as state funded family planning counseling. Opponents argue that it is impossible to separate abortion services from the seven existing centers offering family planning counseling due to costs. This argument does not recognize that the other seven centers have not been offering abortion and Pro-Choice advocates have often stated that "no family planning money is going to fund abortions." HB 2 helps that to be a true statement. The Department of Health and Human Services has been reluctant to provide alternatives to housing juveniles in the Sununu Youth Center in committed and detained statuses. The state spends about $1 million a year per person to maintain a census of 10-16. With new restrictions on who can be housed at the Center, that $13 million a year would go to a population expected to be less than half the current size. With a 60% recidivism rate, the current model is obviously broken and we are shutting it down in FY23. **Vote 12-9.**

Rep. Mary Jane Wallner for the **Minority** of Finance. The minority of the Finance Committee cannot support HB 2 as presented. Included are over $100 million in revenue cuts resulting from cuts to the Business Enterprise Tax, the Business Profits Tax, The Rooms and Meals Tax, and the Interest and Dividends Tax. The outcomes are dangerous reductions in essential services such as the elimination of water grants already awarded to communities throughout the state, likely causing an increase in local property tax burdens. Revenue sharing in the form of direct support to cities and towns across the state from the previous biennium is not continued. Various policies that have never had a public hearing are included. Specifically, HB 2 includes a very flawed creation of a new Department of Energy that expands government, guts the Public Utilities Commission, and is funded by having our citizens pay more in their electric, gas and water utility bills. It also includes the use of our limited public dollars to reimburse those who gambled their money in the Financial Resources Mortgage (FRM) Ponzi scheme. No state has ever used tax dollars to reimburse people for their own bad investments. HB 2 includes the language of HB 544 that prohibits teaching about "divisive concepts" such as unconscious bias, an ideological policy that should have no place in law, much less in a budget.

HB 2 proposes a merger of the University System of New Hampshire and the Community College System of New Hampshire without any public hearing or input from the major stakeholders, including faculty, students, unions and administration. While the idea may have merit, the timeline proposed is unrealistic and could lead to serious unforeseen and unintended consequences.

Additionally, instead of using $100 million to mitigate losses seen by school districts due to the pandemic, a late amendment was introduced to use that money for a one-time reduction of SWEPT (State-Wide Education Property Tax). This would only result in a very small tax reduction to property owners, while using that money to shore up stressed school budgets would benefit all children in all school districts throughout the state.

This budget unfunds any family planning health care clinic that offers abortion services by requiring that no state funds shall be awarded to any "reproductive health facility" unless the state funded family planning program project is physically and financially separate from a reproductive health facility as defined in RSA 132:37, I. In addition to severely restricting abortion service in the Granite State, language in HB 2 will also make receiving health care services for lower income families extremely difficult. Family planning health care clinics provide the vast majority of STD testing, breast exams and pap tests across the state. This budget puts at risk vital health services and basic care to some of our most vulnerable residents.

This budget only partially funds the implementation of the recommendations of a review conducted by Alvarez & Marsal to increase efficiencies and accountability within DHHS. In particular the report recommends bringing back to New Hampshire, and developing adequate care options, for 38 individual adults with developmental disabilities who are currently receiving services in Florida due to lack of appropriate facilities in New Hampshire. By bringing these individuals home, they would be near their families and existing support networks. This implementation also has the potential for cost savings by providing more appropriate care in-state.

A last minute policy addition to HB 2 dramatically alters the powers of the Governor relating to declaring a state of emergency. Similar policy proposals have been introduced and thoroughly addressed in policy committees. HB 2 is not the appropriate place for additions such as this.

The minority finds that it cannot support HB 2 as amended by the Finance Committee due to the significant underfunding of vital services, programs and positions throughout the state workforce as well as the inclusion of wide reaching and controversial matters that we think should have been worked out with public input in policy committees.

# WEDNESDAY, APRIL 7
# REGULAR CALENDAR - PART TWO
## CHILDREN AND FAMILY LAW

**HB 139,** relative to the submission of evidence in divorce proceedings. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Josh Yokela for the **Majority** of Children and Family Law. This bill addresses the current problem of evidence submitted on the day of court, which is in violation of current court rules that are not always enforced. The bill allows for the opposing party to request a continuance if evidence was submitted 5 days prior to the hearing, allowing for preparation of a rebuttal. It also allows for a judge to declare evidence as de minimis and to record reasoning for not granting a continuance. **Vote 8-7.**

Rep. Debra Altschiller for the **Minority** of Children and Family Law. This bill is well-intentioned, but will undermine current NH Family Division rules which actually provide for submissions of evidence up to five days before a hearing, as set forth in the bill. The committee heard testimony from both the NH Judicial branch and from NH Legal Assistance that this bill would have the opposite effect than is intended. The testimony reinforced that current rules already provide the mechanisms necessary to exclude evidence that is not submitted in a timely fashion. The bill seeks to undermine the judicial rules process where there is already legislative representation and is potentially harmful to an already stressed court.

**HB 142,** relative to causes for divorce. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Debra DeSimone for the **Majority** of Children and Family Law. The current NH statute, reflected in section 458:7, is more than 20 years old and does not reflect societal changes such as same gender marriage and serious drug and alcohol addiction problems. This bill simply updates the law to encompass these issues. **Vote 8-7.**

Rep. Gaby Grossman for the **Minority** of Children and Family Law. This bill is attempting to revise fault-based grounds for divorce to include adultery for same-sex marriage and habitual alcohol and drug abuse. The Supreme Court of NH is currently addressing the issue of adultery in same-sex situations and a finding from the courts related to this matter is expected. The bill text lacks specific language related to alcohol and drug abuse Substance Use Disorder (SUD) treatment may not always be consecutive and recovery from SUD can be a fluid situation which, due to vague language in this legislation, may result in more problems for someone actively seeking treatment.

**HB 161,** relative to the calculation of child support. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Josh Yokela for the **Majority** of Children and Family Law. The majority believes that the calculation of child support is overdue for an update and this bill adopts the recommendations of the last child support study which is required by law to happen every four years. The amendment clarifies that the court can make adjustments to child support for the best interest of the child. The bill raises the self-support reserve so people are not put into homelessness by child support. It updates to the percentages in the child support calculation and adds a credit for shared parenting which causes most of the deviations from the current formula. This bill will smooth the process in the courts with a more predictable and just outcome. **Vote 8-7.**

Rep. Hatch, Coos 6
March 31, 2021
2021-1063h
12/08

Floor Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by deleting sections 330 and 331 relative to the dissemination of divisive concepts.

2021-1063h

AMENDED ANALYSIS

Delete:

76.  Defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**

7Apr2021... 1059h

**2021 SESSION**

21-1082
08/10

HOUSE BILL          *2-FN-A-LOCAL*

AN ACT          relative to state fees, funds, revenues, and expenditures.

SPONSORS:          Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:          Finance

─────────────────────────────────────────────

AMENDED ANALYSIS

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the retirement system.

9.  Enables the supreme court to transfer funds.

10.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11.  Enables the sale of the lakes region facility in Laconia.

12.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

13.  Repeals provisions relative to the senior volunteer grant program.

14.  Establishes the emergency services for children, youth, and families fund.

15.  Eliminates certain parental reimbursements.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 155 -**

330  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:

CHAPTER 10-C

PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

10-C:1  Definitions.  In this chapter:

I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.

II.  "Divisive concept" means the concept that:

(a)  One race or sex is inherently superior to another race or sex;

(b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

(c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(d)  An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(e)  Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(f)  An individual's moral character is necessarily determined by his or her race or sex;

(g)  An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h)  Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j)  The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

1     III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical
2  codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or
3  sex.

4     IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to
5  members of a race or sex because of their race or sex.  It similarly encompasses any claim that,
6  consciously or unconsciously, and by virtue of his or her race or sex, members of any race are
7  inherently racist or are inherently inclined to oppress others, or that members of a sex are
8  inherently sexist or inclined to oppress others.

9     V.  "The state of New Hampshire" means all agencies and political subdivisions of the state
10  of New Hampshire, including counties, cities, towns, school districts, and the state university
11  system.

12     VI.  "Student" means any and all students of any school district, school, college, or university
13  which receives grants, funds, or assets from the state of New Hampshire.

14  10-C:2  Unlawful Propagation of Divisive Concepts.

15     I.  Requirements for the state of New Hampshire:

16     (a)  The state of New Hampshire shall not teach, instruct, or train any employee,
17  contractor, staff member, student, or any other individual or group, to adopt or believe any of the
18  divisive concepts defined in RSA 10-C:1, II.

19     (b)  No employee, contractor, staff member, or student of the state of New Hampshire
20  shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse,
21  embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

22     II.  Requirements for government contractors:

23     (a)  All state contracts entered into on or after the effective date of this chapter shall
24  include the following provision:

25  "During the performance of this contract, the contractor agrees as follows:

26  The contractor shall not use any workplace training that inculcates in its employees any form of race
27  or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race
28  or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or
29  sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual
30  should be discriminated against or receive adverse treatment solely or partly because of his or her
31  race or sex; (d) members of one race or sex cannot and should not attempt to treat others without
32  respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race
33  or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed
34  in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt,
35  anguish, or any other form of psychological distress on account of his or her race or sex; or (h)
36  meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular
37  race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 157 -**

values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)  The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)  In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)  The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.  The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.  The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.  Requirements for agencies.

(a)  The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.  Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)  The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training," to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 158 -**

1    (2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency
2    employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic
3    protected by federal or state law.

4    (b)  The commissioner of the department of administrative services, pursuant to RSA
5    541-A, shall develop regulations for the enforcement of the provisions of this statute.

6    (c)  Each agency head shall:

7    (1)  Issue a policy incorporating the requirements of this chapter into agency
8    operations, including by making compliance with the policy a provision in all agency contracts;

9    (2)  Request that the agency thoroughly review and assess not less than annually
10   thereafter, agency compliance with the requirements of the policy in the form of a report submitted
11   to the department of administrative services; and

12   (3)  Assign at least one senior political appointee responsibility for ensuring
13   compliance with the requirements of the policy.

14   VI.  Review of agency training.

15   (a)  All training programs for state agency employees relating to diversity or inclusion
16   shall, before being used, be reviewed by the department of administrative services for compliance
17   with the requirements of RSA 10-C:2, V.

18   (b)  If a contractor provides a training for agency employees relating to diversity or
19   inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and
20   such action is in violation of the applicable contract, the agency that contracted for such training
21   shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and
22   regulations.

23   10-C:3  General Provisions.

24   I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial,
25   cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the
26   requirements of this chapter.

27   II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger
28   course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner
29   and without endorsement.

30   III.  If any provision of this chapter, or the application of any provision to any person or
31   circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions
32   to any other persons or circumstances shall not be affected thereby.

33   331  Effective Date.  Section 330 of this act shall take effect January 1, 2022.

34   ████████████████████████████

35   ███████████████████████████████████████████████████

36   ████████████████████████████████████████████████████████

37   ███████████████████████████████████████████████████████

# Senate

Senate Finance
May 28, 2021
2021-1799s
08/10

Amendment to HB 2-FN-A-LOCAL

1   Amend the bill by replacing all after the enacting clause with the following:



**Amendment to HB 2-FN-A-LOCAL**
**- Page 144 -**



297     New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

Amendment to HB 2-FN-A-LOCAL
- Page 145 -

1    II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or

2 other workplace sensitivity training based on the inherent humanity and equality of all persons and

3 the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4    III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty

5 members of the university system of New Hampshire and the community college system of New

6 Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7    354-A:30  Definitions.  In this subdivision:

8    I.  "Government program" means any activity undertaken by a public employer, both as an

9 employer and in performance of its government function.

10    II.  "Public employee" means any person working on a full-time or part-time basis for the

11 state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,

12 water districts, school districts, school administrative units, or quasi-public entities.

13    III.  "Public employer" includes the state or any subdivision thereof, including, but not

14 limited to counties, cities, towns, precincts, water districts, school districts, school administrative

15 units, or quasi-public entities.

16    354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the

17 use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

18 recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

19 following:

20    I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21 status, familial status, mental or physical disability, religion, or national origin, are inherently

22 superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23 color, marital status, familial status, mental or physical disability, religion, or national origin;

24    II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25 race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26 origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27    III.  That an individual should be discriminated against or receive adverse treatment solely

28 or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29 status, familial status, mental or physical disability, religion, or national origin; or

30    IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31 marital status, familial status, mental or physical disability, religion, or national origin cannot and

32 should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33 orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34 or national origin.

35    354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

36 program shall teach, advocate, or advance any one or more of the following:

## Amendment to HB 2-FN-A-LOCAL
### - Page 146 -

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any other applicable common law or statutory cause of action.

298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after section 39 the following new section:

193:40  Prohibition on Teaching Discrimination.

I.  No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b)  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c)  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.

III.  Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV.  Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

V.  For the purposes of this section, "educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are included within the definition of this term.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 148 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



**Important Notice**

<span style="color:red">Due to the COVID-19 pandemic, the General Court is conducting legislative activities remotely with the exception of publicly noticed sessions in the House or Senate Calendar. During this time, the State House and Legislative Office Building remain closed to visitors.</span>

May  28,  2021
No.  26

# STATE  OF  NEW  HAMPSHIRE

**Website Address: http://gencourt.state.nh.us**

**NH Senate Digital Calendar Website Address:**
**http://gencourt.state.nh.us/senate/schedule/dailyschedule.aspx**



# First Year of the 167ᵗʰ Session of the
# New Hampshire General Court

# SENATE  CALENDAR

4 **Important Notice**

**Due to the COVID-19 pandemic, the General Court is conducting legislative activities remotely with the exception of publicly noticed sessions in the House or Senate Calendar. During this time, the State House and Legislative Office Building remain closed to visitors.**

Senate Finance
May 28, 2021
2021-1799s
08/10

### Amendment to HB 2-FN-A-LOCAL

The Senate Amendment to HB 2-FN-A-LOCAL is contained in a separate document labeled as Senate Calendar 26-Supplement 2, Dated May 28, 2021.

Capital Budget
May 27, 2021
2021-1785s
10/04

### Amendment to HB 25-A

Amend the bill by replacing all after the enacting clause with the following:

1 Capital Appropriations. The sums hereinafter detailed are hereby appropriated for the projects specified to the departments, agencies, and branches named:

I. Department of Administrative Services

A. Court Facilities

| | |
|---|---|
| 1. Hillsborough County South - Cooling And Controls | 975,000 |
| 2. Lebanon Circuit Courthouse - Remove And Replace Underground Fuel Storage Tank | 310,000 |
| 3. Portsmouth And Dover Circuit Court Boilers | 570,000 |
| 4. Statewide Courthouse Roof Replacements | 2,100,000 |

B. Facilities and Asset Management

| | |
|---|---|
| 1. Life Safety Upgrades | 570,000 |
| 2. Main Building Rewiring Phase 1 | 800,000 |
| 3. Philbrook Building - Sewer Line Replacement | 300,000 |
| 4. Thayer Building - Replace Roof | 650,000 |
| 5. Tunnel System: Repair And Abandonment Plan | 620,000 |

C. Financial Data Management

| | |
|---|---|
| 1. NH First Migration To Information Cloud Environment | 5,100,000 |

D. General Services

| | |
|---|---|
| 1. HHS Roof Replacement | 2,385,000 |
| 2. HHS/DES Mechanical Replacements And Controls | 1,200,000 |
| 3. Morton, Johnson, HHS Underground Tank Removal | 700,000 |
| 4. Safety Mechanical Replacements And Repairs | 3,125,000 |
| 5. Coos County New Parking Lot and Concrete Plaza Entrance | 442,750 |
| 6. Hillsborough County Courthouse North Cooling Tower | 189,750 |
| 7. Annex 1 - Bancroft ADA Connector | 400,000 |

Sen. Soucy, Dist 18
Sen. Cavanaugh, Dist 16
Sen. D'Allesandro, Dist 20
Sen. Kahn, Dist 10
Sen. Perkins Kwoka, Dist 21
Sen. Rosenwald, Dist 13
Sen. Sherman, Dist 24
Sen. Watters, Dist 4
Sen. Whitley, Dist 15
Sen. Prentiss, Dist 5
June 1, 2021
2021-1815s
11/04

## Floor Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by deleting sections 297-300.

2021-1815s

### AMENDED ANALYSIS

Delete:

70.  Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**

7Apr2021... 1059h
06/03/2021   1799s
06/03/2021   1816s
06/03/2021   1859s
06/03/2021   1842s
06/03/2021   1821s
06/03/2021   1827s
06/03/2021   1866s
06/03/2021   1884s

2021 SESSION

21-1082
08/10

HOUSE BILL          *2-FN-A-LOCAL*

AN ACT             relative to state fees, funds, revenues, and expenditures.

SPONSORS:          Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:         Finance

───────────────────────────────────────────────────────────────

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the retirement system.

9.  Enables the supreme court to transfer funds.

10. Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11. Enables the sale of the lakes region facility in Laconia.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 144 -**



297    New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 145 -**

1      II.  Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or

2  other workplace sensitivity training based on the inherent humanity and equality of all persons and

3  the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4      III.  Nothing in this subdivision shall be construed to limit the academic freedom of faculty

5  members of the university system of New Hampshire and the community college system of New

6  Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7      354-A:30  Definitions.  In this subdivision:

8      I.  "Government program" means any activity undertaken by a public employer, both as an

9  employer and in performance of its government function.

10      II.  "Public employee" means any person working on a full-time or part-time basis for the

11  state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,

12  water districts, school districts, school administrative units, or quasi-public entities.

13      III.  "Public employer" includes the state or any subdivision thereof, including, but not

14  limited to counties, cities, towns, precincts, water districts, school districts, school administrative

15  units, or quasi-public entities.

16      354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the

17  use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

18  recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

19  following:

20      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21  status, familial status, mental or physical disability, religion, or national origin, are inherently

22  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23  color, marital status, familial status, mental or physical disability, religion, or national origin;

24      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25  race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26  origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27      III.  That an individual should be discriminated against or receive adverse treatment solely

28  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29  status, familial status, mental or physical disability, religion, or national origin; or

30      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31  marital status, familial status, mental or physical disability, religion, or national origin cannot and

32  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34  or national origin.

35      354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

36  program shall teach, advocate, or advance any one or more of the following:

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 146 -**

1      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

2  status, familial status, mental or physical disability, religion, or national origin are inherently

3  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

4  color, marital status, familial status, mental or physical disability, religion, or national origin;

5      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

6  race, creed, color, marital status, familial status, mental or physical disability, religion, or national

7  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8      III.  That an individual should be discriminated against or receive adverse treatment solely

9  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

10  status, familial status, mental or physical disability, religion, or national origin; or

11      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

12  marital status, familial status, mental or physical disability, religion, or national origin cannot and

13  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

14  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15  or national origin.

16      354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse

17  employment action, warning, or discipline of any kind for refusing to participate in any training,

18  program, or other activity at which a public employer or government program advocates, trains,

19  teaches, instructs, or compels participants to express belief in, or support for, any one or more of the

20  following:

21      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

22  status, familial status, mental or physical disability, religion, or national origin are inherently

23  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

24  color, marital status, familial status, mental or physical disability, religion, or national origin;

25      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

26  race, creed, color, marital status, familial status, mental or physical disability, religion, or national

27  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28      III.  That an individual should be discriminated against or receive adverse treatment solely

29  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

30  status, familial status, mental or physical disability, religion, or national origin; or

31      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

32  marital status, familial status, mental or physical disability, religion, or national origin cannot and

33  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

34  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

35  or national origin.

1    354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may
2    pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any
3    other applicable common law or statutory cause of action.

4    298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after
5    section 39 the following new section:

6    193:40  Prohibition on Teaching Discrimination.

7         I.  No pupil in any public school in this state shall be taught, instructed, inculcated or
8    compelled to express belief in, or support for, any one or more of the following:

9              (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital
10   status, familial status, mental or physical disability, religion or national origin is inherently superior
11   to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,
12   familial status, mental or physical disability, religion, or national origin;

13             (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual
14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
15   or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16             (c)  That an individual should be discriminated against or receive adverse treatment
17   solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,
18   marital status, familial status, mental or physical disability, religion, or national origin; or

19             (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
20   marital status, familial status, mental or physical disability, religion, or national origin cannot and
21   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,
22   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
23   origin.

24        II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger
25   course of academic instruction, the historical existence of ideas and subjects identified in this
26   section.

27        III.  Any person claiming to be aggrieved by a violation of this section, including the attorney
28   general, may initiate a civil action against a school or school district in superior court for legal or
29   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-
30   A:34.

31        IV.  Violation of this section by an educator shall be considered a violation of the educator
32   code of conduct that justifies disciplinary sanction by the state board of education.

33        V.  For the purposes of this section, "educator" means a professional employee of any school
34   district whose position requires certification by the state board pursuant to RSA 189:39.
35   Administrators, specialists, and teachers are included within the definition of this term.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 148 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.

# Committee of Conference

June 17, 2021
2021-2040-CofC
08/04

1   Committee of Conference Report on HB 2-FN-A-LOCAL, relative to state fees, funds, revenues, and

2   expenditures.

3

4   Recommendation:

5       That the House recede from its position of nonconcurrence with the Senate amendment, and

6   concur with the Senate amendment, and

7       That the Senate and House adopt the following new amendment to the bill as amended by the

8   Senate, and pass the bill as so amended:

9

10  Amend the bill by replacing all after the enacting clause with the following:

11



**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 145 -**



297    New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

Committee of Conference Report on HB 2-FN-A-LOCAL
- Page 146 -

II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect.

III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty members of the university system of New Hampshire and the community college system of New Hampshire to conduct research, publish, lecture, or teach in the academic setting.

354-A:30  Definitions.  In this subdivision:

I.  "Government program" means any activity undertaken by a public employer, both as an employer and in performance of its government function.

II.  "Public employee" means any person working on a full-time or part-time basis for the state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

III.  "Public employer" includes the state or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:32  Prohibition on the Content of Government Programs and Speech.  No government program shall teach, advocate, or advance any one or more of the following:

Committee of Conference Report on HB 2-FN-A-LOCAL
- Page 147 -

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 148 -**

1    354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may

2    pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any

3    other applicable common law or statutory cause of action.

4        298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after

5    section 39 the following new section:

6        193:40  Prohibition on Teaching Discrimination.

7        I.  No pupil in any public school in this state shall be taught, instructed, inculcated or

8    compelled to express belief in, or support for, any one or more of the following:

9            (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital

10   status, familial status, mental or physical disability, religion or national origin is inherently superior

11   to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

12   familial status, mental or physical disability, religion, or national origin;

13           (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual

14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15   or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16           (c)  That an individual should be discriminated against or receive adverse treatment

17   solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

18   marital status, familial status, mental or physical disability, religion, or national origin; or

19           (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

20   marital status, familial status, mental or physical disability, religion, or national origin cannot and

21   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

22   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

23   origin.

24       II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger

25   course of academic instruction, the historical existence of ideas and subjects identified in this

26   section.

27       III.  Any person claiming to be aggrieved by a violation of this section, including the attorney

28   general, may initiate a civil action against a school or school district in superior court for legal or

29   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

30   A:34.

31       IV.  Violation of this section by an educator shall be considered a violation of the educator

32   code of conduct that justifies disciplinary sanction by the state board of education.

33       V.  For the purposes of this section, "educator" means a professional employee of any school

34   district whose position requires certification by the state board pursuant to RSA 189:39.

35   Administrators, specialists, and teachers are included within the definition of this term.

**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 149 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 212 -**

The signatures below attest to the authenticity of this Report on HB 2-FN-A-LOCAL, relative to state fees, funds, revenues, and expenditures.

Conferees on the Part of the Senate

_____
Sen. Morse, Dist. 22


_____
Sen. Bradley, Dist. 3


_____
Sen. Daniels, Dist. 11

Conferees on the Part of the House

_____
Rep. L. Ober, Hills. 37


_____
Rep. Weyler, Rock. 13


_____
Rep. Umberger, Carr. 2


_____
Rep. Edwards, Rock. 4


_____
Rep. Emerick, Rock. 21

# EXHIBIT 11

Rep. Daniel Itse,
"Taxpayers Money is
Being Used to Promote
Systemic Racism in
NH," Union Leader
(Apr. 28, 2021)

Daniel Itse: Taxpayers money is being used to promote systemic racism in NH | Op-eds | unionleader.com

https://www.unionleader.com/opinion/op-eds/daniel-itse-taxpayers-money-is-being-used-to-promote-systemic-racism-in-nh/article_e81b9b26-e3f5-5e03-8276-742475a3968c.html

# Daniel Itse: Taxpayers money is being used to promote systemic racism in NH

Apr 28, 2021



Daniel Itse

IT IS IMPORTANT to understand what is happening around us. In the name of anti-racism, our schools and institutions are engaging in racist education.

Here are a few examples:

The University of New Hampshire has a webinar for employees that said the role of White people was to "shut up" and "school yourself."

Southern New Hampshire University has a 5-year plan that involves employees having conversations with their managers about their unconscious bias.

Case 1:21-cv-01077-PB   Document 14   Filed 12/06/21   Page 2 of 5

Manchester schools mandated anti-Whiteness training for employees, including a webinar called "what is White privilege really?"

Exeter schools have emailed parents information to educate themselves about anti-racism teaching that Whites are inherently racist.

Holderness has on their website that they are integrating social justice, socialism, into the curriculum: that traditional American values are evil.

Concord is doing "anti-racism" training with teachers, teaching that Whites are inherently racist

These teachings are an attack on what it has traditionally meant to be an American. They are an attempt to make every American subjects rather than citizens. The proposed cure is to transfer wealth from the "oppressor" to the "oppressed". The inevitable result is Marxism. They ignore the fact that American governments are the creations of the people, and the creator is always greater than the creation.

In 1974, the people of New Hampshire amended their Bill of Rights Article 2 by adding a second sentence. "Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin." This may seem intuitively obvious to us, but not to everyone. Importantly, this amendment puts a particular burden not upon you and me, but upon the State of New Hampshire, and by extension its political subdivisions: counties, towns and ... school districts.

Case 1:21-cv-01077-PB   Document 11   Filed 12/20/21   Page 2 of 5

Daniel Itse: Taxpayers money is being used to promote systemic racism in NH | Op-eds | unionleader.com

This amendment makes it patently unconstitutional for any part of our state or local governments to assign a quality or characteristic upon any person based upon their race (including Caucasian), their creed (including Jewish and Christian), their color (including White), their sex (including male), or national origin (including American). Unfortunately, some of our school districts have been violating this principle by teaching controversial topics such as Critical Race Theory — the theory that White males are inherently oppressors of everyone else. As government officials, our teachers, school administrators and school board members are prohibited from delving into these subjects.

When they took office, our representatives, senators and the governor all took an oath to uphold the Constitution of the state of New Hampshire. That means that they have the duty to enact laws that enforce the Constitution; particularly to prevent members of government from violating the Constitution, such as by teaching Critical Race Theory and similar topics.

Fortunately, Article 38 of our Bill of Rights gives you, the people, the right to enforce the Constitution upon those in public office. It says, in part: And they (the people) have a right to require of their lawgivers (representatives and senators) and magistrates (governor, school administrators, and teachers), an exact and constant observance of them (the principles of the constitution), in the formation and execution of the laws necessary for the good administration of government.

The purpose of House Bill 544 is to enforce the Bill of Rights, Article 2, of the Constitution of the state of New Hampshire upon the government of New Hampshire. Unfortunately, the House of Representatives has laid HB 544 on the table. That means that though it is not dead, neither will it likely go forward.

You, the people of New Hampshire, have the opportunity to lobby your state representatives and senators, and tell them to protect your children from the malfeasance of their teachers and school administrators. You can find your state senator online here — **http://gencourt.state.nh.us**. Tell them what to do.

If the House of Representatives, the Senate and the governor do not take this opportunity to enforce the Constitution, your Constitution, with the school administrators and teachers of this state, then they are declaring war on you and your children.

Daniel Itse served 18 years in the New Hampshire House of Representatives and as vice chair of the Children and Family Law Committee. He lives in Fremont.

# EXHIBIT 12

Open Letter from
Business Community

Case 1:21-cv-01077-PB   Document 112   Filed 12/20/24   Page 2 of 6



## Your Cart

Your shopping cart is empty.

Search NHBSR.org    Search

Home    About NHBSR    Programs & Services    Our Members    Join NHBSR    News & Events    Blog    Contact Us

## Programs & Services

- ▾ Advocacy
  - Sustainable Economic Development Vision
  - Business Values DEI
  - NH Clean Energy Principles
  - NH Sensible Housing Principles
- Cornerstone Award
- ▸ Just One Thing
- ▸ Measure What Matters NH
- Member Socials
- NH Workplace Racial Equity Learning Challenge
- NH Sustainability Awards
- Partnership for Innovation Award
- Spring Conference
- Sustainability Roundtables
- ▸ Sustainability Slam
- The Art of Conscious Leadership
- Webinars

# Workplaces Value DEI

**New Hampshire Businesses for Social Responsibility stands in opposition to language of House Bill 544**, An Act Relative to the propagation of divisive concepts, **which is now amended to the budget in HB 2**.  Our vision, *New Hampshire will thrive when we engage the power of business and our people to build a sustainable and prosperous state for all*, inspires us to stand together to achieve our best.  The ambiguous language of HB 544 included in the budget amendment may appear to be supportive of diversity, equity and inclusion (DEI), but its intent is to restrict businesses that contract with the state and organizations receiving funding from the state, from offering DEI training to employees as they deem appropriate.

We know that diversity and inclusion build workplace cultures that thrive because of the innovative ideas and supportive environment that are built on inclusion. We invite **businesses, nonprofits and educational institutions** around the state to sign onto this letter and raise your voice in support of open and honest exploration of racism and sexism, and in **opposition** to the restrictions within HB 544's language and its inclusion in the House Budget.

## **Add your business or organization as a signatory to the following letter ...**

An Open Letter Opposing the Language of House Bill 544 to:

State Representatives

State Senators

Governor Christopher T. Sununu

New Hampshire businesses have been challenged on many levels throughout the pandemic, but the resiliency, loyalty and creativity of our employees have been the critical factors in our ability to survive. We believe that if enacted HB 544, An Act Relative to the propagation of divisive concepts, will have a chilling impact on our workplaces and on the business climate in New Hampshire, and we raise our voices in opposition to it. Our experience has shown that:

- Diverse and inclusive work environments support innovative thinking and problem solving. We value the opportunities that arise from different perspectives and open-minded inquiry. The success of New Hampshire businesses depends on the ability to attract diverse generational, gender and racial employee groups at all levels within our organizations, and we must constantly work to create an environment that makes all employees feel empowered in their roles.

- Our businesses, large and small, have seen that inclusive work environments dramatically increase employee retention, which directly impacts our financial bottom line. Inclusive work environments must be fostered, including enabling open and honest discussions about racism and sexism, implicit bias and how we can eliminate structural racism.

- As a geographically small state, we constantly compete with neighboring states to attract the best talent. Creating the image that New Hampshire is regressive and intolerant puts us at an economic disadvantage.

- We value each of our employees and their diverse backgrounds. We strive to foster an environment that lifts the human spirit and helps individuals to achieve their fullest potential within our workplaces and our communities. This bill would diminish our ability to do so.

House Bill 544 is antithetical to all of these principles. The now-rescinded federal executive order that this bill seems to emulate was rightly opposed by business groups including the US Chamber of Commerce. HB 544 would not only harm the ability of New Hampshire businesses to be competitive, it would severely harm the state's image as business-friendly, since it stifles the ability of organizations who do business with the state to foster diverse workforces as they see fit.

It is important to explore, inquire and learn from our past as we move to the future. We cannot shy away from Diversity, Equity and Inclusion training. It is critical to our understanding and ability to build strong workplaces.

We believe that New Hampshire is poised to thrive as we emerge from the pandemic. HB 544's language will stymy the brand image of our businesses as well as the state's innovative spirit and economic opportunities. We believe that HB 544 disadvantages our businesses and tarnishes New Hampshire's future.

We strongly urge you, our elected representatives, to protect the state, its people, and its businesses from this dangerous and damaging legislation.

**Bolded text indicates >100 employees**

| | | | |
|---|---|---|---|
| 36 Creative | Dimentech, LLC | Meredith Village Savings Bank | Racial Unity Team |
| 350 New Hampshire | Disability Rights Center - NH | Meridan Congregational | Ragged Mountain Equipment |

603 Forward
900 Degrees

ABLE NH

**Adimab, LLC**

AGG Consulting

AHEAD, Inc.

Aileen Dugan State Farm Insurance

Alexandra Chan Photography

Allgood Strategies LLC

Altus Engineering

American Friends Service Committee - NH Program

Ammonoosuc Conservation Trust

**Amoskeag Health**

Amy Conley Music
Anastasia's Table, LLC

**Appalachian Mountain Club**

Arts in Reach

Ascentria Care Alliance

Atlantic Media Productions

Backyard Concept, LLC

Ballantine Partners, LLC

BCM Environmental & Land Law, PLLC

Beechleaf Design

**Bernstein Shur**

Bi-State Primary Care Association

Bill Maddocks Consulting

Blasty Bough Brewing Company

**Boloco**

DMS Remodelers

Dover Children's Home

**Easterseals NH, VT, ME & Farnum**

Economic Justice Mission Group, NH Conference Church of Christ

EcoPhotography LLC

Educating for Good

Erin McCabe Wellness

**Families in Transition**

Fat Peach Farm, LLC

**Fidelity Investments**

Flamingos Coffee Bar

Foothills Physical Therapy

Forteng Designs

Frontyard Law, PLLC
Gale River Motel

Garland Mill

Gateways Community Services

Gibson's Bookstore

Global Citizens Circle

Global Round Table Leadership

GoodWork

Granite Backcountry Alliance

Granite Bay Connections

Granite Outdoor Association

**Granite State College**

**Granite State Independent Living**

Granite State Oral Surgery, PLLC

Granite State Organizing Project

Mindful Making & Design
MLK and Company

Molan Law Offices, PLLC

Monadnock Conservancy

**Monadnock Food Co-op**

Monadnock Interfaith Project

Morneau Law

Mountain Shadow Adventures

NAMI New Hampshire

Nashua Soup Kitchen & Shelter, Inc.

Natural Dharma Fellowship

Naturesource Communications

Neighborhood Access

NeighborWorks Southern NH
NEMO Equipment

New Directions Collaborative

New Fellowship Baptist Church

New Futures

New Hampshire Alliance for Healthy Aging

New Hampshire Audubon

New Hampshire Business Committee for the Arts

New Hampshire Businesses for Social Responsibility

New Hampshire Center for Nonprofits

New Hampshire Charitable Foundation

New Hampshire Coalition to End Homelessness

New Hampshire College and University Council

New Hampshire Community Action Partnerships

New Hampshire Community Loan Fund

Rain for the Sahel and Sahara
Rakowsky Meditation

READ TO ME Literary Arts

Reaching Higher NH

Resilient Buildings Group, LLC

**ReVision Energy**

Reis & Kirkland PLLC

Resilient Buildings Group, Inc.

Revolution

Richardson Media Group

Rights & Democracy NH

Rippleffect Consulting LLC

Rocket Science Rowing

Rooted by Stacey, LLC
RSG

**Saint Anselm College**

Sarah K. Benning Studios

Savings Bank of Walpole

School Administrative Unit 50

Seacoast NH Permaculture

Shaheen & Gordon, P.A.

**Sheehan Phinney**

Sheldon Pennoyer Architects

Shire Digital

Shtudy

Slingshot Ent.

Society for the Protection of New Hampshire Forests

SOS Recovery Community Organization

Bona Fide Green Goods

Brewbakers

**Brewster Academy**

Brown & Company Design

Bruss Construction Management

Burton Strategies

Business Decision Services

**C & S Wholesale Grocers, Inc.**

Caldwell Law

Campus Compact for New Hampshire

Centerbury Center Bed and Breakfast LLC

Canterbury Shaker Village

Capitol Area Public Health Network

Carroll County Coalition for Public Health

Carsey School of Public Policy, UNH

Cayena Capital Management, LLC

Center for Women & Enterprise

Centrus Digital

Chapel+Main Brewpub

Cheshire County TV

Cheshire Garden

Cheshire Housing Trust

**Cheshire Medical Center**

City Year New Hampshire

Clean Water Action

Granite United Way

Greater Nashua Area Branch NAACP

**Greater Seacoast Community Health**

**Hanover Co-op Food Stores & Auto Service Centers**

**Harvard Pilgrim Health Care Foundation**

Heartwood Media

Henry Whipple House

Homefree, LLC

HR State Council of New Hampshire

Hvizda Realty Group

Hypersoft, Inc.

**Hypertherm, Inc.**

Image 4

ISR with Deb Rossetti

JLA Analytics, LLC

JSA Design

John Benford Photography LLC

Kate Johnson, Consultant

**Keene State College**

Kieschnick Consulting Services

Kilwins Portsmouth

**Kimball Union Academy**

Lakes Region Community Developers

Lamprey Health Care

League of Conservation Voters

New Hampshire Council on Developmental Disabilities

New Hampshire Land Trust Coalition

New Hampshire Legal Assistance

New Hampshire Mutual Bancorp

New Hampshire News Views & Blues

New Hampshire Peace Action

New Hampshire Psychiatric Society

New Hampshire Public Health Association

New Hampshire Rivers Council

New Hampshire Trust Company

New Hampshire Womens Foundation

New Hampshire Youth Movement

New Sky Productions

**NFI North**

**Nixon Peabody**

**Norris Cotton Cancer Center**

North Country Climbing Center

**Northeast Delta Dental**

Northeast Organic Farming Association of New Hampshire

Northroad Wood Signs

Northwood Congregational Church

Organizational Ignition

Owl & Pen LLC

**Oyster River Cooperative School District**

Partnered Success College & Life Skills Coaching

South Central Public Health Network

**Southern New Hampshire University**

Square Properties

**St. Joseph Hospital**

**St. Paul's School**

Sterndale Strategic LLC

Stibler Associates

**Stonyfield Organic**

Stratus Telecom LLC

**Sunrise Labs**

Sunset Hill Educational Institute

Sustainable Futures Consulting

Sweaty Turtle Entertainment

Synchrony Advisors, LLC

The Black History Trail of New Hampshire

The Cohen Center for Holocaust & Genocide Studies

The Collector's Eye

**The Duprey Companies**

The Edgewood Centre

The Front Door Agency

The Nature Conservancy

The Nutrition Counseling Center

**The University of New Hampshire**

Throwback Brewery

**Timberland**

**Colby-Sawyer College Community Action Partnership of Strafford County**

Littleton Food Co-op

Live Free Heating & Cooling

Concord Food Co-op

Lucky's Coffee Garage

**Concord School District**

Luminta, LLC

Conservation Law Foundation

MacDowell

Contract Support Group

Mack Hill Riding Academy LLC

Convergent Technical Solutions LLC

MAKE Architects

Cornerstone Financial Planning

Manchester Community Action Coalition

Cornerstone Tree Care

**Mascoma Bank**

CUP OF JOE

MasterPeace Massage

Darkfin Studios

MAYO Design

**Dartmouth College Dartmouth-Hitchcock Health**

**McLane Middleton, PA**

McLean Communications

David Baum Associates

**MegaFood**

Davis Pinney Inc.

Deep Blue Compass

Penumbra

PeopleSense Consulting

Perform Well

Performance Imaging, Inc.

Persimmon Consulting, LLC

**Pete & Gerry's Organics**

Petersen Engineering

**Pierce Atwood, LLP**

Placework

**Plymouth State University**

Portsmouth Music and Arts Center

Portsmouth School Board

**Prime Buchholz**

Prince Communications

Proximity Lab

T.L. Hill Group

TOP Wellness Inc.

**Tufts Health Plan & Tufts Health Plan Foundation**

United Way of Greater Nashua

University of New Hampshire Franklin Pierce School of Law

Upper Merrimack Watershed Association

**Velcro USA Inc**

Vida Cantina

W.S. Badger & Company

Watson International Consulting

West Central Behavioral Health

Wheelhouse Web Solutions

**Worthen Industries**

Yahso Jamaican Grille

Yankee Publishing

YWCA New Hampshire

**[Add your company or organization to this letter](#)**

*carnevale*

© **New Hampshire Businesses for Social Responsibility, all rights reserved.**
P.O. Box 3562, Concord, NH 03302-3562. Phone: 603.391.7437

[Terms of Use](#) | [Privacy Policy](#) | [Site Map](#)



# EXHIBIT 13

SAU70 Resolution
Opposing HB544

476



**School Administrative Unit 70**

41 Lebanon Street, Suite 2
Hanover, New Hampshire
*03755-2147*

Hanover High School
Frances C. Richmond Middle School
Bernice A. Ray School
Marion W. Cross School

---

Whereas HB 544 promotes an unconstitutional restriction on free speech that is harmful to all residents of New Hampshire;

Whereas HB 544 severely impinges upon the concept of local control - the governing and management of public schools by communities through their locally-elected school boards;
Whereas HB 544 prevents our public-school teachers, staff and administrators from receiving Diversity, Equity and Inclusion training designed to address unconscious bias and disparities based on systemic racism and sexism;

Whereas HB 544 denies New Hampshire public school students of all races and genders the opportunity to think critically, openly and inclusively about systemic racism and sexism;

Whereas HB 544 threatens the mental and emotional health of our families and students who identify as black, indigenous, people of color, and LGBTQ+ — protected groups that experience the effects of systemic racism and sexism and its present-day impacts on their daily lives;

Whereas HB 544 threatens to violate our schools' mission and core values of honoring a common vision of equality, empowering students to examine the impact their actions have on themselves, others, and the environment, and of having its students use their hearts and minds to respect and care for the emotional and physical well-being of themselves and others;

Whereas HB 544 places an undue burden on our teachers, staff and administrators by requiring that they adhere to conflicting legislation in two states, as our schools are members of an interstate school district; now, therefore, be it

*Resolved,* the members of the SAU 70, Dresden, Hanover, and Norwich School Boards:

1. affirm our commitment to providing all families and students in our district communities with a supportive, safe, and equitable educational opportunity in our schools;

2. affirm our belief that the freedom to engage in dialogue around topics such as racism and sexism is central to the work of our dedicated staff, teachers, and administrators;

3. oppose New Hampshire HB 544;

4. respectfully request that the New Hampshire Legislature vote no on HB 544; and

5. respectfully request that Governor Sununu veto HB 544 should it pass in the New Hampshire Legislature.

| Jon Hunt | Rick Johnson | Brittany Joyce | Garrett Palm |
| Lisa Christie | Marcela Di Blasi | Kim Hartmann | Kelly McConnell |
| Neil Odell | Tom Candon | Ben Keeney | Kelley Hersey |

# EXHIBIT 14

Hopkinton School
District May 6, 2021
Opposition to Divisive
Concepts Language in
HB2



# HOPKINTON SCHOOL DISTRICT
## School Administrative Unit 66

204 MAPLE STREET · CONTOOCOOK, NH 03229
TEL: (603) 746-5186   FAX: (603) 746-5714

*Above All, Care*

May 6, 2021

Hon. Gary Daniels
Chair, Senate Finance Committee
Concord, NH  03301

### RE: Propagation of Divisive Concepts Prohibited Language in HB 2

Dear Senator Daniels and members of the Senate Finance Committee:

Thank you for the opportunity to provide comment on language contained within the House passed state budget. The Hopkinton School Board met on May 6th and voted unanimously to register its strong opposition to the embedding of the language in what was HB 544 into the state budget currently being discussed in the Senate Finance Committee.

The Hopkinton School Board agrees with Governor Sununu's stated position that he would likely veto such legislation, as he believes that it infringes on the free speech of NH citizens.  Further, because the HB 544 language is a close model of President Donald Trump's Executive Order 13590, which was struck down in the courts for constitutional violations; and because it is already opposed by numerous prominent NH businesses, organizations, and civil rights groups; it can be expected that such language in the NH budget would be subject to numerous court challenges, with the NH taxpayers footing the legal bills.

Pedagogically, the passage of the current HB 544 language would restrict local control of education and be a hindrance to the proper education of our students.

The mission of the Hopkinton School District is "Above All Care."   Earlier this school year, the Hopkinton School Board passed an updated anti-discrimination policy and plan. We are committed to preventing discrimination by working with students, staff, and families to create an educational and working environment supportive of our diverse school community; by reflecting upon and updating our pedagogy, curriculum, and traditions; and by proactively intervening, responding to and speaking out against discrimination in our community.

Like many school districts and businesses across the state, we are very concerned that our efforts to advance the important work of diversity, equity, inclusion and justice would be undermined by the limitations imposed by the inclusion of this language in the state budget.

| Steven M. Chamberlin | Michelle R. Clark | Mandie Hibbard | Matthew P. Stone |
|---|---|---|---|
| *Superintendent* | *Business Administrator* | *Director of Student Services* | *Director of Technology* |
| schamberlin@hopkintonschools.org | mclark@hopkintonschools.org | mhibbard@hopkintonschools.org | mstone@hopkintonschools.org |

If passed, the language contained in the House budget proposal would fundamentally take away decision making authority on important educational matters and personnel management from the Hopkinton School Board. New Hampshire has traditionally prided itself on a tradition of allowing school districts the latitude to make decisions and set priorities deemed in the best interest of their staff, students and communities. As local elected officials, we take this responsibility seriously — actively engaging with students, families and the greater Hopkinton community to deliver an education that reflects the values of our community. The language contained in the House passed budget seeks to undermine this tradition and make unlawful certain conversations about race, gender and privilege that some members of the Legislature find offensive. We strongly believe that this is the wrong approach.

Aside from political ideology, we fail to understand why the Legislature would undertake this unprecedented action to censor local school districts. It is striking that the House, rather than focus on providing students and communities with the resources needed to provide an adequate education, or address the educational funding gap associated with COVID-19, has instead used the budget process to interfere with local control of education and free speech. We hope that the Senate Finance Committee will use its budget process to focus on providing resources to support student learning and provide local property tax relief, rather than fighting a fictitious culture war — our students and communities deserve better.

Our sincere hope is that rather than use the state budget process to censor certain discussions within our schools, we can instead support the efforts of local decision makers to provide students with the critical thinking skills they need to succeed in the 21st century.

Thank you for your time and consideration of this important issue.

On behalf of the Hopkinton School Board,

Jim O'Brien, Chair
jobrien@sau66.org

2

# EXHIBIT 15

Manchester School Board
Committee Meeting
Agendas, Materials, and
Minutes Concerning
Opposition to HB544

## AGENDA

## MEETING OF THE
## BOARD OF SCHOOL COMMITTEE
## MANCHESTER SCHOOL DISTRICT SAU #37

**May 24, 2021**
**Mayor and all School Board Members**

**6:00 p.m.**
**Remote Meeting of Board**
**Accessible at MPTV – Channel 22**

**Student Representative:** Nycole Spencer (MST)

**Call in Phone Number for public: (978) 990-5000 Access code: 761615#**

**1.**      Mayor Craig calls the regular meeting to order.

As Mayor of the City of Manchester and Chair of the Board of School Committee, I find that due to the State of Emergency declared by the Governor as a result of the COVID-19 pandemic and in accordance with the Governor's Emergency Order #12 pursuant to Executive Order 2020-04, this public body is authorized to meet electronically.

Please note that there is no physical location to observe and listen contemporaneously to this meeting, which was authorized pursuant to the Governor's Emergency Order. However, in accordance with the Emergency Order, I am confirming that we are:

a)   Providing public access to the meeting by telephone, with additional access possibilities by video or other electronic means:

We are utilizing Manchester Public Television, Channel 22 for this electronic meeting. All members of the Board have the ability to communicate contemporaneously during this meeting through google meets, and the public has access to contemporaneously listen and, if necessary, participate in this meeting through dialing the following phone # 978-990-5000 and password 761615#.

b)   Providing public notice of the necessary information for accessing the meeting:

We previously gave notice to the public of the necessary information for accessing the meeting, including how to access the meeting telephonically, located on the website of the Board at: https://sites.google.com/a/mansd.org/bosc/.

c)   Providing a mechanism for the public to alert the public body during the meeting if there are problems with access: If anybody has a problem, please call 715-5280 or email at: publiccomment@mansd.org.

d)   Adjourning the meeting if the public is unable to access the meeting:

In the event the public is unable to access the meeting, the meeting will be adjourned and rescheduled. Please note that all votes that are taken during this meeting shall be done by roll call vote. Let's start the meeting by taking a roll call attendance. When each member states their presence, please also state whether there is anyone in the room with you during this meeting, which is required under the Right-to-Know law.

**EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.**

May 24, 2021 Board of School Committee
Page 2 of 5

**2.**     The Clerk calls the roll.

**PUBLIC FORUM**

**3.**     Mayor Craig advises that the purpose of the public forum is to give the residents of Manchester
        the opportunity to address the board on items of concerns affecting the community; each
        person will be allowed only one submission; comments shall be submitted via email
        to publiccomment@mansd.org and **shall be limited to 400 words or less**.  Your email **MUST**
        include your **name and address** and must be submitted to the email by 5:00 on the date of the
        meeting.  The submitted public comments will be read at the meeting by the clerk.
        Submissions should be regarding items on this agenda.  Submission of comments shall not be
        to make complaints of school personnel or complaints against any person connected with the
        District, other channels are provided for Board consideration and disposition of legitimate
        complaints involving individuals which should be referred to the superintendent.

**4.**     Mayor Craig advises that if there was no one else present wishing to speak, a motion would be
        in order to take all comments under advisement and further to receive and file any written
        documentation presented.

**5.**     Response to Public Comment
        *(Note:  Motions limited to sending items to Committees only.)*

**6.**     **RECOGNITION/PRESENTATIONS**

**7.**     Manchester West NJROTC 50th Anniversary
        https://drive.google.com/file/d/11hj-ky9KjgcJouP3DKGymYDBzxLUGI9b/view

**8.**     Davis Demographics Presentation                                                    **1 – 30**

**9**.     **ACTION AGENDA**

**10.**    New Hampshire Department of Education (NHDOE) Program              **31 – 72**
        Assurances for Fiscal Year 2022
        **Ladies and Gentlemen, what is your pleasure?**

EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.

**11.**   Ratification of the Phone poll approving the submission of the letter to     **73 – 84**
State Legislators in opposition of HB544
**Ladies and Gentlemen, what is your pleasure?**

**12.**   Approval of Job Descriptions and Reorganization of HR and Network     **85 – 102**
Directors

        a.   Elimination of three (3) Network Directors   *85 – 93*

            • Replaced with two (2) Executive Directors of School Leadership and
Performance

        b.   Budgetary savings from elimination of one Network Director used for new
position: Chief Talent Officer     *94 – 102*

            • Director of Human Resources job description change

**Ladies and Gentlemen, what is your pleasure?**

**13.**   <u>**CONSENT AGENDA (ITEMS 13 – 20)**</u>

**14.**   Mayor Craig advises if you desire to remove any of the following items from the Consent
Agenda, please so indicate.  If none of the items are to be removed, one motion only will be
taken at the conclusion of the presentation.

**15.**   Approval of minutes, if available:  Minutes of the May 10, 2021 Special and Regular Meeting;
and both of the May 17, 2021 special meetings

**16.**   Report(s) of the Committee of Policy, if available.

        a.   Fiscal Policy 130: Federal Funds Policies and Procedures     **103 – 136**

**17.**   Report(s) of the Committee of Teaching and Learning, if available.

**18.**   Report(s) of the Committee of Finance and Facilities, if available.     **137 – 259**

| | | |
|---|---|---|
| a. | SmartShopper Renewal | 137 – 174 |
| b. | Financial Reports | 175 – 191 |
| c. | Treasurer's Report | 192 – 197 |
| d. | City Services Invoices ($909,387.86) | 198 – 200 |
| e. | Manifest of Authorized Expenditures ($19,152,580.89) | 201 – 203 |
| f. | Grant, Gifts and Donations Report ($161,559.91) | 204 – 207 |
| g. | Anthem 2020 New Hampshire Legislative Mandates ($25,000.00) | 208 – 210 |
| h. | RFP Results – Stop Loss Health Insurance ($947,158.00) | 211 – 213 |

**EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.**

    i.  Facilities Projects          214 – 216

    j.  RFP Results – Competency-Based Education – School Implementation Training and Consulting Services ($261,000.00)    218 – 219

    k.  RFP Results – 2021 Request for Fall Supplies, Equipment and  220 – 226 Uniforms ($28,941.06)

    l.  RFP Results – Art Supplies ($36,000.00)    227 – 230

    m.  RFP Results – Music Supplies ($9,000.00)    231 – 235

    n.  RFP Results – Copy/Printer Paper ($102,298.00)    236 – 238

    o.  RFP Results – School and Office Supplies ($179,728.00)    239 – 243

    p.  RFP Results – Elevator and Chair Lift Maintenance and Inspection Services  244 – 251

    q.  Southern New Hampshire University (SNHU) ESY MOU  252 – 255

    r.  Southern New Hampshire University (SNHU) and MSD Aspire 256 – 259 Program Continuation

**19.**    Report(s) of the Special Committee on Education Legislation, if available.

**20.**    Report(s) of the Committee of Student Conduct, if available.

**LADIES AND GENTLEMEN, HAVING DULY READ THE CONSENT AGENDA, A MOTION WOULD BE IN ORDER THAT THE CONSENT AGENDA BE APPROVED.**

## **COMMUNICATIONS**

**21.**    Superintendent's Communications.

    a)  Covid Update

      1.  Mask Use in Schools      **260**
      **Ladies and Gentlemen, what is your pleasure?**

    b)  Teaching and Learning Update    **261 – 262**

      1.  Graduation Numbers

    c)  Athletics: Approval for change in mask requirements and Summer Sports Training -  by Amy Allen, Assistant Superintendent of Teaching, Learning and Leading and Christine Pariseau-Telge, Athletic Director
      **Ladies and Gentlemen, what is your pleasure?**    **263 – 264**

EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.

May 24, 2021 Board of School Committee
Page 5 of 5

    d)  Update on the Chief Equity Officer Position

    e)  Discussion on in-person meetings

**22.**    Board of School Committee Members' Communications.

**23.**    Personnel Report.
    **Ladies and Gentlemen, what is your pleasure?**    **CONFIDENTIAL**    **265 – 269**

**24.**    **TABLED ITEMS**
    *(A motion would be in order to remove any item from the table.)*

**25.**    **NEW BUSINESS**

**26.**    A motion is in order to go into non-public session under the provisions of RSA 91-A:3 II *(a, b, and c)* for the dismissal, promotion or compensation of any public employee or the hiring of any person as a public employee; and, for matters, which if discussed in public, would likely affect adversely the reputation of any person.

    **A roll call is required on the motion.**    **CONFIDENTIAL**

**27.**    A motion is in order to call the meeting back to order.
    **If the board so desires, a motion is in order to seal the minutes of the non-public session.**

**ADJOURNMENT**

**28.**    If there is no further business, a motion is in order to adjourn.

It is the policy of the Manchester Board of School Committee, in its actions, and those of its employees, that there shall be no discrimination on the basis of age, sex, race, color, marital status, physical or mental disability, religious creed, national origin or sexual orientation for employment in, or operation and administration of any program or activity in the Manchester School District.  The Title IX Coordinator is Mary Steady for staff and students.  Please see above for contact information.

**EXCELLENCE AND EQUITY.  EVERY CLASSROOM.  EVERY DAY.**

# 2020-2022
# Board of School Committee

## Yeas and Nays

**Meeting:** Board of School Committee - PHONE POLL

**Date:** 5/13/2021

**Motion:** r                                      r

d  d

| Committee Member | Yea | Nay | Abstain | Absent |
|---|---|---|---|---|
| Cmt. Member Turner | | | | |
| Cmt. Member Kelley Arnold | | | | |
| Cmt. Member Soule | | | | |
| Cmt. Member Want | | | | |
| Cmt. Member Dobson | | | | |
| Cmt. Member Bergeron | | | | |
| Cmt. Member Shea | | | | |
| Cmt. Member Perich | | | | |
| Cmt. Member Dion | | | | |
| Cmt. Member Beaulieu | | | | |
| Cmt. Member Leapley | | | | |
| Cmt. Member Thomas | | | | |
| Cmt. Member Lachance | | | | |
| Cmt. Member O'Connell | | | | |
| Mayor Craig | | | | |
| **Total:** | **13** | **1** | **1** | **0** |

TO:          Board of School Committee

FROM:        Committee on Policy
             Committee Members Want, Dion, O'Connell, Perich and Leapley

DATE:        May 24, 2021

RE:          Letter opposing HB544


At the May 11, 2021, Committee on Policy meeting, it was moved to approve the submission of the letter to State Legislation in opposition of HB544, as amended, allow the Vice Chair to request a phone poll be done on the approval and forward this item to the full Board of School Committee for approval.

Committee Members Want, Dion, O'Connell, Perich and Leapley were in favor.



Respectfully submitted,

*Angela M Carey*

Angela Carey

Clerk of the Board of School Committee

**Amendments made at 5/11/2021 Policy Committee are in red.**

May 10, 2021

Dear **Governor Sununu**, House, Senate, and Executive Council members,

The Manchester Board of School Committee would like to voice its **opposition to House Bill 544 and the inclusion of its language in current budget proposals**. This bill seeks to define and prohibit  the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.   In reality, this bill is an attempt to silence dialogue and restrict speech.

We are opposed to any bill which will limit any school's ability to talk about race or gender, or to educate our students and staff about the historical discrimination against communities of color, women, and other marginalized groups, and the impacts this long standing racism and sexism has had on the American people.

As a board we have looked at disaggregated data and have identified stark disparities in outcomes for our students of color, students from lower socio-economic backgrounds, as well as, our special needs students. These are national trends. To quote former President George W. Bush they are often the result of "the soft bigotry of lower expectations"[1]. In order to overcome the biases that hold some of our students back from reaching their fullest potential, we believe it is critical for teachers and students to examine the outcome disparities that exist in our society and understand their root causes. Unfortunately, there are long term consequences of slavery and sexism in this country, and while our current laws might mean that such discrimination is illegal today, millions of Americans still experience the effects of that history. We cannot pretend this history does not exist or that it does not affect our present and future. We believe our students should learn to think critically about their world, so that they can not only thrive in it, but work to improve it for themselves and others.

This Board recently passed a policy aimed at creating an equitable education experience for the students in the Manchester school district. This policy acknowledges that students in the Manchester school district do experience the negative impacts of racism and sexism, and this policy aims to study data regarding the real educational hurdles that racism creates for many students. Specifically, this policy seeks to provide "all employees and students opportunities to develop critical racial, ethnic, and cultural competence to understand the contexts in which they teach, work, and learn." This goal is only attainable if the District is (a) able to study data regarding the negative impact of biases against certain students; and (b) work to meaningfully train and educate everyone in the district s community on the nature of implicit bias and how it negatively impacts many students in the district by limiting their access to the same education as their peers. The goal is to provide the same educational access to each student in Manchester, regardless of the student s race or ethnicity. The reach of this policy is wide, as we hope to address not only race and ethnicity, but also those impacted by discrimination due to language, gender identity, special education status, sexual orientation, socioeconomic background, and mobility. Many students in Manchester fall into one of those categories, and to pass a bill such as

**Amendments made at 5/11/2021 Policy Committee are in red.**

this one would severely hamper the ability of our district to move forward in our goal of providing equitable access to education for all our students.

We MUST be able to talk about these issues and not simply pretend they don t exist because they make some of us feel uncomfortable talking about them. We MUST all be able to sit with the discomfort and have real conversations about how we can all work together to create environments in our schools that promote each child s abilities and interests to help them reach their fullest potential.

The Board of School Committee is responsible for working with our community to set expectations of awareness around equal opportunity for all of our students with an understanding that race and gender can impact outcomes if not addressed in an open honest manner.

Manchester is New Hampshire s most diverse community and this bill would harm the Manchester School District students by limiting our freedom of speech and local control. We ask you to vote NO on HB544.

Thank you for taking the time to understand our opposition to HB544.

Sincerely,
The Manchester Board of School Committee

*1 Quote from President George W. Bush in speech to NAACP that marked the launch of the <u>No Child Left Behind Act of 2000</u>.*

# MANCHESTER SCHOOL DISTRICT

**TITLE**: HB544-Letter from the Board

**COMMITTEE ON __Policy_____ MEETING OF: _____5/11/21_____**

ACTION: ____x__          CONSENT:                    INFORMATION:

**BACKGROUND:  Attached please find the following policy:**

**HB544-Letter from the Board of School Committee**


                                                    FISCAL VERIFICATION: _____

**RECOMMENDATION**:

That the Committee on Policy moves to approve this letter and send it to the full Board of School
Committee for approval and submission to the NH State legislature.


Prepared by:                              Presented by:

_____                     _____
Katie Cox Pelletier                       Leslie Want
                                          Committee Chair


                                          _____
                                          Leslie Want
                                          Committee Chair

May 10, 2021

Dear House, Senate, and Executive Council members,

The Manchester Board of School Committee would like to voice its objection to HB544. This bill seeks to define and prohibit "the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs." In reality, this bill is an attempt to silence dialogue and restrict speech.

We are opposed to any bill which will limit any school's ability to talk about race or gender, or to educate our students and staff about the historical discrimination against communities of color, women, and other marginalized groups, and the impacts this long standing racism and sexism has had on the American people.

As a board we have looked at disaggregated data and have identified stark disparities in outcomes for our students of color, students from lower socio-economic backgrounds, as well as, our special needs students. These are national trends. To quote former President George W. Bush they are often the result of "the soft bigotry of lower expectations"[1]. In order to overcome the biases that hold some of our students back from reaching their fullest potential, we believe it is critical for teachers and students to examine the outcome disparities that exist in our society and understand their root causes. Unfortunately, there are long term consequences of slavery and sexism in this country, and while our current laws might mean that such discrimination is illegal today, millions of Americans still experience the effects of that history. We cannot pretend this history does not exist or that it does not affect our present and future. We believe our students should learn to think critically about their world, so that they can not only thrive in it, but work to improve it for themselves and others.

This Board recently passed a policy aimed at creating an equitable education experience for the students in the Manchester school district. This policy acknowledges that students in the Manchester school district do experience the negative impacts of racism and sexism, and this policy aims to study data regarding the real educational hurdles that racism creates for many students. Specifically, this policy seeks to provide "all employees and students opportunities to develop critical racial, ethnic, and cultural competence to understand the contexts in which they teach, work, and learn." This goal is only attainable if the District is (a) able to study data regarding the negative impact of biases against certain students; and (b) work to meaningfully train and educate everyone in the district's community on the nature of implicit bias and how it negatively impacts many students in the district by limiting their access to the same education as their peers. The goal is to provide the same educational access to each student in Manchester, regardless of the student's race or ethnicity. The reach of this policy is wide, as we hope to address not only race and ethnicity, but also those impacted by discrimination due to language, gender identity, special education status, sexual orientation, socioeconomic background, and mobility. Many students in Manchester fall into one of those categories, and to pass a bill such as this one would severely hamper the ability of our district to move forward in our goal of providing equitable access to education for all our students.

We MUST be able to talk about these issues and not simply pretend they don't exist because they make some of us feel uncomfortable talking about them. We MUST all be able to sit with the discomfort and have real conversations about how we can all work together to create environments in our schools that promote each child's abilities and interests to help them reach their fullest potential.

The Board of School Committee is responsible for working with our community to set expectations of awareness around equal opportunity for all of our students with an understanding that race and gender can impact outcomes if not addressed in an open honest manner.

Manchester is New Hampshire's most diverse community and this bill would harm the Manchester School District students by limiting our freedom of speech and local control. We ask you to vote NO on HB544.

Thank you for taking the time to understand our opposition to HB544.

Sincerely,
The Manchester Board of School Committee


*1 Quote from President George W. Bush in speech to NAACP that marked the launch of the <u>No Child Left Behind Act of 2000</u>.*

Case 1:21-cv-01077-PB   Document 4-5   Filed 10/08/21   Page 14 of 21

493



# Bill Text: NH HB544 | 2021 | Regular Session | Introduced
# New Hampshire House Bill 544

**Bill Title:** Relative to the propagation of divisive concepts.

**Spectrum:** Partisan Bill (Republican 3-0)

**Status:** *(Introduced)* 2021-04-08 - Lay on Table (Rep. Osborne): Motion Adopted DV 347-18 04/08/2021 [HB544 Detail]

**Download:** New_Hampshire-2021-HB544-Introduced.html

**HB 544 - AS INTRODUCED**

2021 SESSION

21-0732
05/04

HOUSE BILL **544**

AN ACT relative to the propagation of divisive concepts.

SPONSORS: Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4

COMMITTEE: Executive Departments and Administration

-------------------------------------------------------------------

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

Explanation: Matter added to current law appears in **bold italics.**
Matter removed from current law appears [in brackets and struckthrough.]
Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.
21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:
CHAPTER 10-C
PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED
10-C:1  Definitions.  In this chapter:
I. "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.
II.  "Divisive concept" means the concept that:
(a) One race or sex is inherently superior to another race or sex;
(b) The state of New Hampshire or the United States is fundamentally racist or sexist;
(c) An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
(d) An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;
(e) Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

5/4/2021  Case 1:21-cv-01077-PB  Document 21-2  Filed 10/22/21  Page 15 of 21
Bill Text: NH HB544 | 2021 | Regular Session | Introduced | LegiScan

494

(f) An individual's moral character is necessarily determined by his or her race or sex;

(g) An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h) Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i) Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j) The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

III. "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV. "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V. "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI. "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2 Unlawful Propagation of Divisive Concepts.

I. Requirements for the state of New Hampshire:

(a)  The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b)  No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II.  Requirements for government contractors:

(a)  All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)  The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)  In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)  The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.  The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.  The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.  Requirements for agencies.

(a)  The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.  Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)  The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training", to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

(2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by federal or state law.

(b)  The commissioner of the department of administrative services, pursuant to RSA 541-A, shall develop regulations for the enforcement of the provisions of this statute.

(c)  Each agency head shall:

Case 1:21-cv-01077-PB   Document 1-6   Filed 12/20/21   Page 16 of 21

495

(1)  Issue a policy incorporating the requirements of this chapter into agency operations, including by making compliance with the policy a provision in all agency contracts;

(2)  Request that the agency thoroughly review and assess not less than annually thereafter, agency compliance with the requirements of the policy in the form of a report submitted to the department of administrative services; and

(3)  Assign at least one senior political appointee responsibility for ensuring compliance with the requirements of the policy.

VI.  Review of agency training.

(a)  All training programs for state agency employees relating to diversity or inclusion shall, before being used, be reviewed by the department of administrative services for compliance with the requirements of RSA 10-C:2, V.

(b)  If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and regulations.

10-C:3  General Provisions.

I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this chapter.

II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner and without endorsement.

III.  If any provision of this chapter, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions to any other persons or circumstances shall not be affected thereby.

2  Effective Date.  This act shall take effect January 1, 2022.

FO  NDATIONS 101 DISTRICT       ITY  OLICY

The Manchester School District is committed to equity and the success of every student. This commitment means that student success will not be predicted based on race, ethnicity, family economics, mobility, gender, sexual orientation, disability, or initial proficiencies. Equity in education is about inclusiveness. Equity is achieved when there is sufficient evidence that each child has a high quality educational experience, and outcomes and successes are not predicted by student subgroup membership.

In order to break the predictive link between student demographics and student achievement, the District must apply the principle of equity to all policies, programs, operations, and practices and ensure all students have access and opportunity to high quality education.

To assure equity, the District will:

- Use data, disaggregated by race: ethnicity, language, special education, gender, sexual orientation, socioeconomic background, and mobility (when available) to inform all district decision-making and report on the district website and to the BOSC annually;

- Create and nurture an inclusive and welcoming environment for all students, families, and staff; provide a report to the BOSC annually which reports student, parent and staff complaints.

- Provide students with equitable access to a high quality curriculum, effective teachers and principals, support, facilities, and sufficient support services; report results of student surveys annually.

- Aspire to recruit, hire and retain high quality personnel that reflect student demographics at all organizational levels; report to the BOSC annually.

- Support personnel at all organizational levels to engage in culturally responsive practices and high quality professional engagement; include evidence of professional development in the district professional development Plan.

- Identify and mitigate culturally biased instructional materials, assessments, and pedagogies that result in achievement disparities;

- Incorporate the voice and perspectives of students, families and communities that reflect student demographics into decisions that benefit student success;

- Assure all students have access to the college planning handbook;

- Translate documents for families so that they have equitable access to information.

First Reading Coordination: 7/11/16
Second Reading and Approval BOSC: 8/8/16

**BOARD OF SCHOOL COMMITTEE**
**MANCHESTER SCHOOL DISTRICT SAU #37**

**May 24, 2021**                                                                                    **6:00 p.m.**

**1.**      Mayor Craig calls the regular meeting to order.

As Mayor of the City of Manchester and Chair of the Board of School Committee, I find that due to the State of Emergency declared by the Governor as a result of the COVID-19 pandemic and in accordance with the Governor's Emergency Order #12 pursuant to Executive Order 2020-04, this public body is authorized to meet electronically.

**2.**      The Clerk calls the roll.

Present:          Committee Members Turner, Kelley Arnold, Soule, Want, Dobson, Perich, Dion, Beaulieu, Leapley, Thomas, Lachance, O'Connell, Mayor Craig and Student Representative Mahindru.

Late:   Committee Members Bergeron and Shea.

**PUBLIC FORUM**

**3.**      Mayor Craig advises that the purpose of the public forum is to give the residents of Manchester the opportunity to address the board on items of concerns affecting the community; each person will be allowed only one submission; comments shall be submitted via email to publiccomment@mansd.org and **shall be limited to 400 words or less**.  Your email **MUST** include your **name and address** and must be submitted to the email by 5:00 on the date of the meeting.  The submitted public comments will be read at the meeting by the clerk.  Submissions should be regarding items on this agenda.  Submission of comments shall not be to make complaints of school personnel or complaints against any person connected with the District, other channels are provided for Board consideration and disposition of legitimate complaints involving individuals which should be referred to the superintendent.

**1.  Terese Aguirre, 65 Tibbetts Hill Road, Goffstown NH:**

To Whom It May Concern,  I have been a teacher at Hillside for 8 years.  I was not ready to work in the Middle School environment and I went in feeling like a small fish in a big pond.  I was overwhelmed walking into such a big school.  That feeling quickly changed.  I was put on a wonderful Hillside team and everyone made me feel like I have known them for years.  From the start, it was clear that I was never just a number.  I was Therese, with all of my strengths and weaknesses.  I felt comfortable that learning from my mistakes was okay, while at the same time being called on to share my strengths.  Teachers and administrators are always the first to say, "The only mistake is not to try,"

We have talked about consolidating buildings and making beautiful buildings that are high tech.  It was stated that the city needs to do something big to attract families back to the district.

19. It was stated that previous numbers were based on students from outside of the district with no significant changes in programming and we need to create a reason for students to want to come to the district.

**9**.   **ACTION AGENDA**

**10.**   New Hampshire Department of Education (NHDOE) Program Assurances for Fiscal Year 2022

*ere   ere no   estions or comments on t  is item.*

*n motion o*  **Committee Member Soule,** *d  ly seconded by* **Committee Member Beaulieu,** *it   as mo  ed to a   ro e t e Ne   am s ire  e artment o   d cation  rogram  ss rances or  iscal  ear   .*

*oll Call:     Committee Members   rner,  elley  rnold,  o le,  ant,  obson,  ergeron,   ea, eric  ,  ion,  ea lie ,  ea ley,  ac ance,    Connell and Mayor Craig  oted yay.  Committee Member   omas   as absent. Motion   assed.*

**11.**   Ratification of the Phone poll approving the submission of the letter to State Legislators in opposition of HB544

*ere   ere no   estions or comments on t  is item.*

*n motion o*  **Committee Member Want,** *d  ly seconded by* **Committee Member O'Connell,** *it   as mo  ed to rati y t e   one  oll and a   ro e t e s bmission o  t e letter to t e  tate  egislators in o   osition o       .*

May 24, 2021 Board of School Committee
Page 29 of 42

*oll Call:     Committee Members    rner,  elley  rnold,  o  le,   ant,   obson,   ergeron,    ea,   eric  ,   ion,   ea lie  ,   ea ley,    Connell and Mayor Craig   oted yay. Committee Member   ac ance   oted nay. Committee Member    omas   as absent. Motion   assed.*

12.    Approval of Job Descriptions and Reorganization of HR and Network Directors
        a.    Elimination of three (3) Network Directors
           • Replaced with two (2) Executive Directors of School Leadership and Performance
        b.    Budgetary savings from elimination of one Network Director used for new position: Chief Talent Officer
           • Director of Human Resources job description change

*n motion o  **Committee Member O'Connell,** d  ly seconded by **Committee Member Lachance,** it   as mo  ed to send item    to t  e Committee on   eac ing and   earning or   rt er st dy.*

*oll Call:     Committee Members    rner,  elley  rnold,  o  le,   obson,   ergeron,  eric  ,   ion,   ea lie  ,   ea ley,  ac ance,    Connell and Mayor Craig   oted yay. Committee Members    ant and   ea  oted nay. Committee Member    omas   as absent. Motion   assed.*

13.    **CONSENT AGENDA (ITEMS 13 – 20)**

14.    Mayor Craig advises if you desire to remove any of the following items from the Consent Agenda, please so indicate.  If none of the items are to be removed, one motion only will be taken at the conclusion of the presentation.

**Committee Member Dobson** removed item 18-i.
**Committee Member Want** removed item 18-b.

The balance of the consent agenda was as follows:

15.    Approval of minutes, if available:  Minutes of the May 10, 2021 Special and Regular Meeting; and both of the May 17, 2021 special meetings

16.    Report(s) of the Committee of Policy, if available.

        a.   Fiscal Policy 130: Federal Funds Policies and Procedures

17.    Report(s) of the Committee of Teaching and Learning, if available.

# EXHIBIT 16

Frank Edelblut, "Teach Children
About Racism, Not To Be Racists,"
Union Leader (June 13, 2021)

12/2/21, 8:26 PM
Teach children about racism, not to be racists | Department of Education
502
Case 1:21-cv-01077 Document 28-9 Filed 12/20/21 Page 1 of 4

 **ALERT** **Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**

 New Hampshire
# Department of Education


☰ **OPEN MENU**

Home > Teach children about racism, not to be racists

## In the News

For Immediate Release
June 13, 2021

### Contact

New Hampshire Department of Education
(603) 271-0448 | Comms@doe.nh.gov

# Teach children about racism, not to be racists

## By Frank Edelblut





# NEW HAMPSHIRE
# UNION LEADER

THE RIGHT TO FREEDOM WITHOUT DISCRIMINATION legislation recently passed by the New Hampshire Senate is an important, and needed, contribution to our education system. It helps ensure that our students learn about the evils of racism without teaching them to be racists.

This legislation lays out some important instructional boundaries that, with increasing frequency, have been crossed. These guardrails will help instill confidence in parents that our basic values are not being compromised. It will also help educators who increasingly find themselves in uncomfortable training and teaching circumstances that are contrary to their instructional mission.

The Legislation states that no pupil shall be taught:

That one's immutable characteristics (defined as age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) are inherently superior to immutable characteristics of another;

That an individual, by virtue of his or her immutable characteristics, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her immutable characteristics; or

That people of one immutable characteristic cannot and should not attempt to treat others without regard to these immutable characteristics.

One would think that these are common sense concepts that we can all agree on. After all, who wants to teach children that, for example, one race is superior to another?

However, for those who promote Critical Race Theory or similar concepts, their thinking is not built on a foundation of common sense, but on ideology diametrically opposed to the truths found in our Declaration of Independence, that we are all created equal.

In Ibram Kendi's "How to Be an Antiracist" — a prominent text in support of Critical Race Theory — he states, "[t]he only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination ... The only remedy to present discrimination is future discrimination." This idea is, of course, in complete opposition to the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution. As Justice John Marshall Harlan stated in his dissension to Plessy v. Ferguson, "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens."

And the concepts of Critical Race Theory actually contradict the very premises of the civil rights movement and Dr. Martin Luther King himself.

One New Hampshire high school offers an enrichment class entitled, "Exploring Whiteness and becoming an Antiracist Activist." In this course, a "Race Literacy Quiz" identifies the Declaration of Independence as the idea tied most directly to the rise of White supremacy.

This notion is completely contradictory to the very words of Dr. King. Speaking at the centennial celebration of the Emancipation Proclamation, Dr. King described the Declaration of Independence as follows, "If our nation had done nothing more in its whole history than to create just two documents, its contribution to civilization would be imperishable. The first of these documents is the Declaration of Independence."

Those opposing Right to Freedom From Discrimination legislation assert that supporters do not want to teach children the complete history of the United States. They assert that there is an attempt to limit speech and academic freedom. They assert that legislation will limit diversity and inclusivity.

Of course, it is Critical Race Theory that would distort our history, limit our speech through its cancel culture and divide us up by immutable characteristics, ignoring the inherent humanity of each individual.

In fact, Right to Freedom From Discrimination legislation can help ensure that students get the whole history, and not a limited or biased view of that history. We should ensure that Title VI of the Civil Rights Act of 1964, which protects all students from being treated differently based on their race, color or national origin, is being followed.

All of us should continue to believe in the dream Dr. King gave us, that children "will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character."

Our education system aspires to teach students about socialism, not to be socialists and about communism, not to be communists. Supporters of Right to Freedom From Discrimination legislation want to make sure that children are taught about racism, but not to be racists, as Kendi seems to advocate.

The guardrails outlined in the legislation recently passed by the New Hampshire Senate help us do just that.

—

Frank Edelblut is commissioner of the New Hampshire Department of Education. He lives in Wilton.



New Hampshire

# Department of Education

**101 Pleasant Street | Concord, NH | 03301-3860**

(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 |

info@doe.nh.gov

Directions to NHDOE ❯          Subscribe to e-news ❯

NH Career and Technical
Education

NH Schools

iPlatform

myNHDOE

Educator Search

NH Government Careers

NH Travel & Tourism

NH Web Portal - NH.gov

ReadyNH.gov

Transparent NH

© 2021 State of New Hampshire • All rights reserved  |  Accessibility Policy  |  Privacy Policy          AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE



# EXHIBIT 17

Governor's Advisory
Council on Diversity and
Inclusion Correspondence
Regarding Banned
Concepts Act



**CHRISTOPHER T. SUNUNU**
Governor

**Governor's Advisory Council on Diversity and Inclusion**

March 9, 2021

Ahni Malachi, Chair
Dr. Dottie Morris, Vice Chair
Sean Locke, Secretary
Devon Chaffee
Chief Charlie Dennis
Maria Devlin
Sharon Harris
Ann Landry
James Maggiore
Dr. Salman Malik
Commissioner Ken Merrifield
Dr. James Morse
Pawn Nitichan
Commissioner Robert Quinn
Marianne Rechy
Sheriff Eliezer Rivera
Allyson Ryder

His Excellency Christopher T. Sununu
Governor of the State of New Hampshire
State House
107 North Main Street
Concord, NH 03301

Dear Governor Sununu,

The Governor's Council on Diversity and Inclusion ("the Council") has several concerns about the pending bill, HB 544 "relative to the propagation of divisive concepts." Although the fate of this bill is uncertain, its passage carries the potential to impact both: (1) the ability of people working within and on behalf of the state to engage in honest, robust discussions on matters of pressing concern to Granite Staters and (2) ongoing efforts to create an environment in New Hampshire that is deeply rooted in principles of equity, diversity, and inclusion.

By its own terms, HB 544 would prohibit state actors and contractors with the state from teaching, instructing, or training "any employee, contractor, staff member, student, or any other individual or group" divisive concepts. This could include purely elective educational offerings within the state's university system.

The Council believes that the definition of "divisive concepts" and the prohibitions HB 544 endeavor to create carry the potential to undermine all of the work done within the Granite State over the past few years to promote diversity and inclusion and address the continued harms of racism. This includes efforts that you have championed over the past several years, such as the work done by and recommendations given by the Commission on Law Enforcement Accountability, Community, and Transparency ("LEACT"), the COVID-19 Equity Response Team, and this Council.

Additionally, the controlling nature of the bill could significantly impede important work by educators in this state and our institutions of higher learning. Critical Race Theory, implicit bias, and other concepts, ideas, and theories are a part of academic disciplines. For example, implicit bias is a concept discussed in Social Psychology courses. If this bill is enacted, the interpretation of the bill could extend to these courses.

Governor's Advisory Council on Diversity and Inclusion
Letter to Gov. Sununu re HB 544
Page 2 of 2

The Council believes honest, robust discussion on significant issues such as racism and sexism is important and limiting conversations amongst all citizens of New Hampshire is not reflective of our state's embrace of freedom of speech and freedom of expression. The Council also believes that to ensure educational conversations relative to historical events dealing with race, racial identity, racism, gender, sex, or sexism are not hampered whether they take place in a scholastic or workplace setting.

The Council believes that to address harmful behavior, we must face our past, learn from it, and move forward with a clearer vision. Because of the work and research of genocide and other crimes against humanity by individuals, such as Dr. James Waller at Keene State College, we know the impact of creating repressive measures like those outlined in HB 544. Once language and dialogue are controlled, the path has been laid for other forms of repression to become normalized.

The Council respectfully urges you to continue to consistently speak up in support of equity, diversity, and inclusion efforts. You have demonstrated your commitment by creating committees and task forces to examine how our state is performing and to discover places where there is need for improvement to make the Granite State a more welcoming and inclusive state. You have championed the work and recommendations of this Council, LEACT, and the COVID-19 Equity Task Force in the past; to protect that work, the Council recommends that you to act against HB 544.

We look forward to continuing to work with you to make the State of New Hampshire a model for the positive impact of having equity, diversity, and inclusion as core values. Most of all, we want to work to continue protecting the rights of all Granite Staters to engage in open and honest dialogue to learn to live together.

Sincerely,


The Governor's Advisory Council on
Diversity and Inclusion



**CHRISTOPHER T. SUNUNU**
Governor

**Governor's Advisory Council on Diversity and Inclusion**

June 2, 2021

Ahni Malachi, Chair

Dr. Dottie Morris, Vice Chair

Sean Locke, Secretary

Devon Chaffee

Sarah Burke Cohen

Jeremy Denlea

Chief Charlie Dennis

Maria Devlin

Sharon Harris

Ann Landry

James Maggiore

Dr. Salman Malik

Dr. James Morse

Pawn Nitichan

Commissioner Robert Quinn

Marianne Rechy

Sheriff Eliezer Rivera

Allyson Ryder

His Excellency Christopher T. Sununu
Governor of the State of New Hampshire
State House
107 North Main Street
Concord, NH 03301

Dear Governor Sununu,

The Governor's Advisory Council on Diversity and Inclusion ("the Council") writes to express our grave concerns regarding section 330 of the Senate Finance Committee's amendment to HB 2 ("Section 330"), replacing the section on "divisive concepts." The ambiguous and contradictory language and enhanced penalties in this new provision threaten to censor New Hampshire schools, police, and other government agencies from having important conversations about race, gender, sex, and ability. As such, the provision is likely to chill honest, frank, and robust discussions that are central to ongoing efforts to make New Hampshire a more equitable, diverse, and inclusive place.

The language in Section 330 presents many of the same serious concerns the Council expressed in its previous letter recommending you act against HB 544.[1] We greatly appreciate your strong leadership in opposing that standalone bill—publicly and definitively. As you rightly stated, HB 544's restrictions would have censored local school districts, encroached upon local control, and prevented local communities from making their own decisions about how to address difficult topics. We recognize the Senate Finance Committee's attempt to address these concerns. Unfortunately, however, Section 330 does not resolve the Council's concerns and would likely have the same detrimental impact as HB 544.

By its own terms, Section 330 would prohibit state employers and programs from teaching, instructing, or training "any employee, student, service recipient, contractor, staff members, inmate or any other individual or group" three enumerated concepts. Section 330 also targets local public schools with explicit prohibitions that threaten to censor how those local institutions address sensitive issues of race, sex, gender, and ability. These prohibitions include disciplinary sanctions and civil action for violations, including lawsuits brought under RSA chapter 345-A.

---

[1] https://www.governor.nh.gov/sites/g/files/ehbemt336/files/inline-documents/sonh/20210309-hb544-_1.pdf

Governor's Advisory Council on Diversity and Inclusion
Letter to Gov. Sununu re HB 544
Page 2 of 2

The prohibited concepts seem to target the use of theories critical to most diversity, equity, and inclusion training. For example, the second of these prohibited concepts appears designed to prohibit the discussion of "unconscious" biases. Social psychologists have long demonstrated, through extensive research, the detrimental impact of implicit or unconscious bias; particularly, when a person lacks the tools to make the unconscious conscious. This concept is central to many trainings used by New Hampshire agencies—including the New Hampshire Council on Police Standards and Training. To prohibit such trainings would undermine years of local and state diversity and inclusion efforts.

Although Section 330 includes exceptions for certain types of "sensitivity training" and university activities in an academic setting, these ambiguous allowances add to the confusion over what is permitted and what is prohibited. In the absence of clarity, schools, police departments, and other agencies are likely to self-censor out of fear of potential civil liability.

Our concern here is not hypothetical. Multiple New Hampshire agencies—including the New Hampshire Business and Industry Association, the Municipal Association, the Office of the Child Advocate, and multiple school districts—have expressed their opposition to the Section 330's language, making clear how it would negatively impact their constituencies. Several Council members have witnessed the distress experienced by local educators and agencies who fear having to operate under the proposed restrictions.

The Council believes that Section 330 continues to carry the potential to undermine your administration's recent work to promote diversity and inclusion--including the work done by and recommendations given by the Commission on Law Enforcement Accountability, Community, and Transparency, the COVID-19 Equity Response Team, and this Council.

Honest, robust discussion on significant issues such as racism, sexism, and ableism is important. The Council reiterates its belief that limiting conversations amongst all citizens of New Hampshire is not reflective of our state's embrace of freedom of speech and freedom of expression. The chilling effect that Section 330 threatens to create will harm the Granite State's ability to best understand and meet the needs of all its residents. To protect your administration's work and New Hampshire values, the Council recommends that you act against Section 330, and continue to champion equity, diversity, and inclusion efforts.

As always, we look forward to continuing to work with you to make the State of New Hampshire a more equitable, diverse, and inclusive state, and to protect the rights of all Granite Staters to engage in open and honest dialogue to learn to live together. To that end, the Council would like an opportunity to sit down with you to discuss these issues and more so together we can pursue this important work.

Sincerely,


The Governor's Advisory Council on
Diversity and Inclusion

June 29, 2021

Governor Chris Sununu
107 N. Main St.
Concord, NH 03301

Dear Governor Sununu,

We are writing to inform you of our collective resignation from the Governor's Advisory Council on Diversity and Inclusion, effective immediately.

On June 25, 2021 you signed into law a provision that aims to censor conversations essential to advancing equity and inclusion in our state, specifically for those within our public education systems, and all state employees. This will directly impact those who are working with some of our state's most vulnerable populations, including educators, child welfare workers, and law enforcement.

This is in direct conflict with the stated purpose of the Council laid out in your 2018 Executive Order instructing us to identify ways to "combat discrimination and advance diversity and inclusion." We accepted your appointment to this council out of commitment and love for this state and your stated desire to advance diversity and inclusion. Given your willingness to sign this damaging provision and make it law, we are no longer able to serve as your advisors.

As members of the Council on Diversity and Inclusion, we have spent hundreds of hours in conversation with over a dozen New Hampshire communities over the past three years. We have heard the stories of struggle from individuals who have experienced racism, sexism, ableism and other forms of systemic discrimination right here in the Granite State. We have also heard uplifting stories of growth and learning from local leaders, police departments, and educators coming together to collectively address implicit bias and bias incidents. We have a responsibility to those community members to uplift their truth and ensure their voices are heard over the growing din of politically motivated fear mongering currently dominating the public discourse.

Governor, we feel obligated to inform you that—contrary to your recent public statements—systemic racism does in fact exist here in New Hampshire. You appointed us to explore these issues, and we have reported our findings to you in detail every step of the way. The pain that we heard in the voices of those who came to the meetings to convey their truths and lived experiences served as a call to action. The only way to truly serve all Granite Staters is to acknowledge what is true for some of the citizens, continue to implement many of the strategies suggested by teams and councils you appointed to examine discrimination, and heal from the wounds of the past so we can create a brighter future for our children.

We sent you two letters urging you to oppose this damaging legislative proposal, both in its original form and as passed by the Senate, and requested a chance to meet with you to seek a solution that didn't derail the important efforts underway in New Hampshire. The Council has continuously worked to deliver to you our findings, sent you our opinion that this would weaken—not strengthen—the state's anti-discrimination laws, and urged you to oppose this provision. Your disregard of this work makes clear that we are no longer able to fulfill the Council's mandate.

It should not be taken lightly that nearly every member of the Council that is not part of your administration is resigning today, as we collectively see no path forward with this legislation in place.

Despite our resignation from this Council, we are more committed than ever to advancing the real work that is needed to build a more equitable and inclusive Granite State. Separate from the Council, we will find ways to support local educators, municipal employees, and community leaders as they grapple with the corrosive impact of this legislation, which we are already seeing at a local level throughout the state. We look forward to many future honest and difficult conversations about race, gender, and other forms of discrimination and bias. We also hope that, in time, you will come to understand the true damage that this legislation has caused to the fabric of New Hampshire's communities.


Sincerely,

Dr. Dottie Morris
Devon Chaffee
Maria Devlin
Sharon Harris
James Maggiore
Dr. Salman Malik
Dr. James Morse
Pawn Nitichan
Sheriff Eliezer Rivera
Allyson Ryder

# EXHIBIT 18

NEA-NH July 12, 2021 and August 5, 2021 Letters



July 12, 2021
**<u>First Class U.S. Mail</u>**

John M. Formella, Esq.
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Re:  Implementation Guidance for Public School Districts Regarding House Bill 2

Dear Attorney General Formella:

As President of NEA-NH, which represents 17,000 educators in our state, I write to request the issuance of formal guidance on the implementation of HB 2 within public school districts and public institutions of higher education across the State of New Hampshire.  More specifically, the statutory language passed, under the section entitled: "Right to Freedom from Discrimination in Public Workplaces and Education," contains ambiguity requiring clarification.  Such clarification is particularly important for certified educators given that the statutory language provides: "IV.  Violation of this section by an <u>educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction</u> by the state board of education." (emphasis added).

Therefore, please issue detailed guidance to be followed by educators, administrators and school boards covering, at a minimum, the following subject areas:

1.  What types of academic instruction regarding inherent and/or institutional bias or discrimination are prohibited;

2.  What it means to permissibly teach prohibited "subjects identified in this section" as a "larger course of academic instruction" as included in section RSA 193:40, II;

3.  Which topics related to racial and/or social justice are specifically prohibited from academic teaching and dialogue within public schools;

4.  Whether or not academic instruction regarding historical racism, including, without limitation, in relation to slavery, segregation, the civil rights movement and affirmative

action, may still be taught in public school classrooms.  If so, how a violation of RSA 193:40 can be avoided when discussing these topics;

5.  What specific categories of literature or written subject matters are prohibited from assignment or dissemination to students;

6.  What are the parameters educators must follow when answering questions from students about current events that touch the topic areas in the law, e.g. the protests surrounding police reform, the Black Lives Matter movement, and news stories about the passage of this law;

7.  What may be taught about historical systems and practices which led to discriminatory outcomes. For example, what is permissible to be taught about "redlining" by the Federal Housing Administration in the 1930's that led to racially segregated neighborhoods throughout the United States;

8.  Is teaching about the existence of implicit bias or other similar social sciences prohibited. If not, what are the guideposts for discussing this kind of theory in classrooms;

9.  What are the best practices for public school districts, administrators and public educators to avoid a violation of the new provisions enacted by HB 2 regarding the education of public school students;

10.  What, if any, discretion remains with the New Hampshire Board of Education to not issue discipline where it is found that a teacher or district allowed students to hear or be taught prohibited information, which, in accordance with RSA 193:40, IV, "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education;"

11.  How does the law apply to higher education <u>staff</u> as the law only mentions the academic freedom of faculty members. Are their prohibitions on what staff members can discuss, teach, or provide to students;

12.  What are the guideposts for academic freedom provided to University System Faculty. HB2 states the law shall not limit academic freedom to "research, publish, lecture, or teach in the academic setting" does this mean their freedom on these topics is absolute?

Once we have received guidance from the Department of Justice, we will swiftly disseminate that much-needed information to our members. As we approach the 2021-22 academic year, time is of the essence.  The current state of confusion caused by HB 2 as it relates to public education will likely lead to unnecessary legal disputes and action if clarification is not provided. If we can be of assistance to you in forming your analysis and/or producing guidance, please do not hesitate to contact us for that purpose.

Thank you for your attention to this important and time-sensitive matter.  We look forward to hearing from you soon.

Sincerely,

Megan Tuttle
President
NEA-NH



August 5, 2021
**EMAIL**

John M. Formella, Esq. (attorneygeneral@doj.nh.gov)
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Frank Edelblut
Commissioner (frank.edelblut@doe.nh.gov)
Department of Education
101 Pleasant Street
Concord, NH 03301

Re:  Request for Further Clarification Concerning Implementation Guidance on House Bill 2 for Public School Districts

Dear Attorney General Formella and Commissioner Edelblut:

I write to you as the President of NEA-NH, an organization representing approximately 17,000 educators in New Hampshire, every single one of whom are impacted by the "Right to Freedom From Discrimination in Public Workspaces and Education" law signed by Governor Sununu on June 25, 2021. It is because of this vast impact to our membership that I am following up with a further communication after our letter of July 12, 2021, has thus far been unanswered by your offices.

NEA-NH has reviewed the 2½ -page FAQ guidance issued on Wednesday July 21, 2021 (your Guidance). We appreciate the time and effort expended by your offices in developing this guidance, which answers a number of questions that our members have had about the new law. Additional questions remain, however, on which we seek clarification.  Because the licenses, careers, professional reputations, and livelihoods, of our members are at stake for any violation of the law, it is imperative that they have a detailed understanding of what conduct and/or teaching practices are prohibited by the law and constitute "a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." With the 2021-2022 school year quickly approaching, we need your assistance in making the full scope of the law clear.

As we understand the law, as construed though the lens of your July 21st Guidance, we understand it to permit the teaching and discussions described below. If we are mistaken in our legal analysis, please respond in detail to correct our understanding. Given the high stakes for our members, it is imperative for our members to be provided with reliable, detailed guidance that will allow them to clearly avoid the severe consequences of violating this amorphous law.

We understand as follows:

1.      Discussing with students[1] incidents of racism or other prejudices exhibited and experienced by them or others in the school community or elsewhere is permitted.

2.      Engaging in conversations about racism or other prejudices students, or others known to them, may have exhibited in the past is not prohibited provided the educator does not instruct students that they exhibited those behaviors because of inherent characteristics.

3.      It is permissible to draw attention to the language, behavior, or writing of a student that might be sexist, racist, or otherwise prejudicial. The law does not prohibit educators from referring for discipline students for such behavior or comments provided it is done in accordance with school policy and procedure and state law.  In fact, in order to comply with requirements of the "Bullying Law" educators are required to recognize and report such conduct in accordance with the school board policy implementing the law. *See* NH RSA 193-F.

4.      Introducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group. Implicit bias training and education specifically pertaining to states of mind which are learned, assumed, or reinforced by society and not "inherent," is permitted.

5.      Structural Racism (a.k.a Societal Racism, Systemic Racism) describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government. It does not contemplate that persons or groups are naturally, biologically, or innately racist. Therefore, including the concept of Structural Racism in instruction and conversation with students is permitted. [2]

6.      Specific books or works of certain authors are not "banned" under the law. [3] Assigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator

---

[1] "Students," encompasses both K-12 students and higher education students. "Educators," are those teaching and non-teaching employees in both K-12 and public higher education institutions.
[2] For example, students could be taught, not only about the racist historical practice of "redlining," but also about the lasting inequalities and structural barriers it has created for generations of African Americans.
[3] On June 13, 2021 Commissioner Edelblut wrote an Op-Ed in the Union Leader leaving the distinct impression that Dr. Ibram Kendi's book, *How to be an Anti-Racist* may not be assigned under the new law. He raised the same proposition at the July 8, 2021 State Board of Education meeting. The Guidance is not consistent with his statements. Please address this contradiction. Additionally, if there are certain texts which your offices' believe are *per se* prohibited under this law, please provide a list so educator's know that prior to making 2021-2022 lesson plans.

conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion. For example, the works of James Baldwin are not *per se* prohibited from instruction or discussion in accordance with the above.

7.      The law permits teaching novels, non-fiction works, or other approved texts by instructing students on, and discussing, the historical context surrounding the works. Such permitted instruction and discussion includes information on racism or other prejudices which were expressed in both overt and subtle ways by systems, individuals, and government actors.

8.      The law permits instruction on, and discussion of, racism and oppression in teaching historical events and contemporary events, so long as students are not instructed that the individual actors were inherently racist.  For example, educators may explain the racism carried out systematically, collectively and individually by southern slave owners in the United States, prior to the American Civil War.  Educators may also explain the collective and large-scale societal discrimination and genocide carried out by Nazi Germany against Jewish populations in several countries. These historical issues can be connected to the modern era to explain the danger of racism and neo-Nazi groups that exist today.

9.      Teaching historically accurate lessons is permissible under the law, even if that history challenges students' notions of history as they previously understood it, provided the educator does not assign racist or prejudicial actions to the historical actors as inherent to them. For example, accurately teaching about the genocidal impact on Native Americans of the arrival of colonial Americans to the United States, and the subsequent western expansion of the United States, is permitted.

10.      The use of the historical primary sources (original documents) in coursework is permitted provided the use of sources is part of a larger course of academic instruction. This is the case even if the sources may contain an author's assertion that one race or group is inherently inferior to another, for example Thomas Jefferson's *Notes on the State of Virginia.*

11.      Similarly, it is permissible to assign reading of fiction and non-fiction works where character(s) may express discriminatory beliefs or engage in discriminatory acts against other characters or persons, for example *To Kill a Mockingbird* or *Huckleberry Finn*. Discussion about the actions of those characters, their discriminatory beliefs, or intent is not prohibited.

12.      It is permissible under the law to use teaching techniques which probe a student's understanding of their current reality, push them to think critically and analytically about social and historical contexts, and asks them to empathize with others or consider a different perspective then the one they currently have, provided the educator does not require that the student adopt a view that racism is inherent to some individuals.

13.      It is permissible to discuss the subject of "white privilege," a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is "inherent" or cannot be overcome.

14.  It is permissible to engage with students in discussion of gender non-conformity, acknowledging different gender identities of students and colleagues, and curriculum which contains characters and story lines which discuss or highlight gender non-conforming, or LGBTQ individuals provided the text does not promote discrimination of such individuals.

15.     The law permits the exhibiting and sharing of art, music, dance, or other artistic expressions that comment on racism, sexism, or other prejudices provided it is age appropriate and relevant to the curriculum approved by the School Board or higher education institution. It is also permitted for artists, writers, and historians to address students or for students to read about the artist's motivation for the work.

The paragraphs above do not purport to exhaustively describe all of the instruction and discussion that is permitted under the law but are illustrative of the types of discussion and instruction that we understand remain permitted.  We appreciate your prompt response to confirm that these examples are consistent with your understanding of the law, so that educators may plan accordingly for the upcoming year.

We expect that as the implementation of the law moves forward, we may encounter scenarios requiring further analysis.  We are hopeful that your offices, as the chief law enforcement and educational agencies of the Granite State, will have continual open dialogue with us about these issues as they arise.

Sincerely,

Megan Tuttle
President, NEA-New Hampshire

# EXHIBIT 19

July 21, 2021
Guidance



From: **Giaquinto, Kate** <Kate.M.Giaquinto@doj.nh.gov>
Date: Wed, Jul 21, 2021 at 4:45 PM
Subject: NH AG NEWS RELEASE: State Issues Guidance
Regarding New Anti-Discrimination Laws
To: Giaquinto, Kate <Kate.M.Giaquinto@doj.nh.gov>

### <u>NEWS RELEASE</u>

Released by:          Frank Edelblut,
Commissioner, Department of Education
Ahni Malachi, Executive Director,
Commission for Human Rights
John M. Formella, Attorney General
Subject:          State Issues Guidance
Regarding New Anti-Discrimination Laws
Date:          July 21, 2021
Contact:          Kate Giaquinto,
Directory of Communications

kate.m.giaquinto@doj.nh.gov | (603) 573-6103

Concord, NH – Attorney General John M. Formella, Department of
Education Commissioner Frank Edelblut, and Commission for
Human Rights Executive Director Ahni Malachi announce the release
of guidance related to Sections 297 and 298 of House Bill 2.
The guidance for public employers and government programs is
available at: https://www.doj.nh.gov/civil-rights/documents/faq-
public-government.pdf
The guidance for public schools is available at:
https://www.doj.nh.gov/civil-rights/documents/faq-educational-
programs.pdf
Any person who believes that they have been subjected to
discrimination may file a complaint with the New Hampshire
Commission for Human Rights, nh.gov/hrc/howto.html, or the
Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-
rights/.

### ###

12/19/21, 10:35 AM                    State Issues Guidance Regarding New Anti-Discrimination Laws | News Releases | NH Department of Justice

Case 1:21-cv-01077-PB   Document 40-10   Filed 12/20/21   Page 2 of 3          522

**New Hampshire**

# Department of Justice

*Office of the Attorney General*

## News Release

**For Immediate Release**
July 21, 2021

**Contact:**
Kate Giaquinto, Director of Communications
kate.giaquinto@doj.nh.gov | 603-573-6103

## State Issues Guidance Regarding New Anti-Discrimination Laws

Concord, NH – Attorney General John M. Formella, Department of Education Commissioner Frank Edelblut, and Commission for Human Rights Executive Director Ahni Malachi announce the release of guidance related to Sections 297 and 298 of House Bill 2.

The guidance for public employers and government programs is available at: https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf]**

The guidance for public schools is available at: https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf]**

Any person who believes that they have been subjected to discrimination may file a complaint with the New Hampshire Commission for Human Rights, nh.gov/hrc/howto.html **[https://www.nh.gov/hrc/howto.html]** , or the Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-rights/ **[https://www.doj.nh.gov/civil-rights/index.htm]** .

New Hampshire Department of Justice
33 Capitol Street | Concord, NH | 03301
Telephone: 603-271-3658



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1.    What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist.  Teach and treat all equally and without discrimination.**

### 2.    What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

**3.   Does the law prohibit teachers from teaching U.S. history?**

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

**4.   Are schools allowed to teach students historical concepts related to discrimination?**

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

**5.   A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?**

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

**6.   Can parents or guardians refuse to allow their children to participate in specific course material?**

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

**7.   Does the law apply to public schools?**

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

**8.   Does this law apply to all school activities or just teaching?**

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

**9.      Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.     Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes.  For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.     What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.     Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.     Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A, that impact public employers and government programs. Please see separate document that addresses changes to schools and educational programs contained in RSA chapter 193.

### Changes Regarding Public Employers and Government Programs

1.   **What are public employers and government programs prohibited from training and advocating?**

Public employers and government programs are prohibited from training and advocating that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not train or advocate that a person or a group is inherently oppressive, superior, inferior racist, or sexist.  Train and treat all equally and without discrimination.**

2.   **What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?**

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

**3.    Are these the same prohibitions as those contained in the "divisive concepts" bill, HB 544?**

No. HB 544 did not become law and therefore, does not apply or impact public employers, government programs, or schools in New Hampshire. The term "divisive concepts" is not found anywhere in the new law.

**4.    Can public employers and government programs undertake efforts designed to examine issues related to equity, diversity, inclusion, equality, and other related topics?**

Yes. Nothing in this new law prohibits public employers or government programs from taking steps to examine issues related to equity, diversity, inclusion, equality and other related topics.

**5.    Can trainings address practices or ideas that have harmed or continue to harm certain identified groups?**

Yes. Nothing prohibits trainings geared toward educating participants about practices or ideas that may disproportionately affect certain identified groups.

**6.    Can public employers and government programs conduct trainings designed to improve diversity, equity, and inclusion, such as implicit bias training?**

Yes. Nothing prohibits trainings geared towards diversity, equity, equality and inclusion.

Nor does anything prohibit implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally.

The new law expressly permits public employers and government programs to provide and require "sensitivity training" based on the "inherent humanity and equality of all persons" and the "ideal that all persons are entitled to be treated with equality, dignity, and respect."

**7.    A public employee has claimed that a required diversity training has made them uncomfortable. Has the public employer or government program discriminated against that employee?**

No. It is important to note that trainings that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make participants uncomfortable. These trainings may encourage or prompt participants to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequence.

**8.**     **What remedies are available to public employees or program participants who believe that a public employer or government program has violated one of the new anti-discrimination statutes?**

A person who believes that they have been subject to discrimination, may file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**9.**     **Can a public employee file a claim based upon a training that occurred in 2020?**

No. Complaints alleging a violation of the new laws may only be considered for conduct that occurred after the enactment of those laws on June 25, 2021.

**10.**   **If I am an individual or group simply using a public facility for non-government use, for example a private event or activity at a school building or town hall, does this new law apply to me?**

No.

# EXHIBIT 20

Attorney General
Opinion No. 2021-01
(Sept. 7, 2021)

**ATTORNEY GENERAL**

**DEPARTMENT OF JUSTICE**

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

JOHN M. FORMELLA
ATTORNEY GENERAL



JANE E. YOUNG
DEPUTY ATTORNEY GENERAL

**ATTORNEY GENERAL OPINION NO. 2021-01**

September 7, 2021

Doug Palardy, Chair
Ahni Malachi, Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Building One
Concord, NH  03301

RE:    Request for Attorney General's Opinion regarding new anti-discrimination
protections

Dear Chair Palardy and Director Malachi:

You requested, on behalf of the New Hampshire Commission for Human Rights, that this office provide an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 ("Sections 297 and 298"),[1] to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40. These statutes collectively comprise a subdivision in RSA chapter 354-A titled "Right to Freedom from Discrimination in Public Workplaces and Education" and new section in RSA chapter 193 titled "Prohibition on Teaching Discrimination."

Some have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions. *See* Governor's Advisory Council on Diversity and Inclusion, *Letter to Gov. re HB 544* (June 2, 2021). To help address these concerns, the Department of Justice, Commission for Human Rights, and the Department of Education released guidance shortly after the new anti-discrimination laws took effect. Recognizing the important need for public employers, government programs, and school systems to engage in sensitivity training that may include frank and candid discussions of the historical aspects of oppression and its contemporary effects, you requested that this office provide an official Attorney General Opinion.

The Commission for Human Rights (the "Commission") was created with the power to eliminate and prevent discrimination in employment, places of public accommodation, housing,

---

[1] Before final passage by the legislature, this legislation was included in HB 2 as Section 330 and 330-a. The final version of HB 2 includes the legislation at Section 297 and 298.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 2 of 9

and, effective in 2019, public education. The Commission is charged with receiving, investigating, and adjudicating complaints related to violations of RSA chapter 354-A that may be filed by members of the public or the Commission and holding hearings as required to execute the Commission's duties. Section 297 prohibits certain public sector activities and expands the Commission's jurisdiction to address such activities. Section 298 prohibits the teaching of certain subjects in elementary and secondary schools and it also places review of violations within the Commission's jurisdiction.

The Attorney General's duties include advising "any state board, commission, agent or officer as to questions of law relating to the performance of their official duties, and he shall, under the direction of the governor and council, exercise a general supervision over the state departments, commissions, boards, bureaus, and officers, to the end that they perform their duties according to law." RSA 7:8. In situations where requests for legal advice are significant to the operation of the state board, commission, or agency and are likely to be of continuing importance, the advice may be issued by an official Attorney General Opinion. In such situations, the questions posed are researched and an opinion drafted by a group of attorneys. The draft opinion is also subject to multiple layers of review, including by the Associate Attorney General for the Division of Legal Counsel and the Solicitor General. The Attorney General provides a final review and approval.

Given the importance of your questions to the education and training of your staff to best serve New Hampshire residents, I am providing an official Attorney General Opinion as set forth below.

## QUESTIONS PRESENTED

1.  What is the scope of Sections 297 and 298 and what types of education and training activities do those sections prohibit and permit?

2.  Do the new sections of RSA chapter 354-A prohibit trainings or programs designed to promote diversity and inclusion or to educate participants about concepts such as implicit bias?

3.  Does RSA 193:40 prohibit education on the historical concepts related to discrimination or oppression?

## CONCLUSION

1.  The new sections added to RSA chapter 354-A prohibit trainings or programs that teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. The new sections added to RSA chapter 354-A also prohibit trainings or programs that teach participants that any identified group can or should be treated unequally to

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 3 of 9

any other identified group and that one identified group should be discriminated against or treated adversely.

Similarly, RSA 193:40 prohibits teaching students that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 also prohibits teaching students that any identified group can or should be treated unequally to any other identified group and that one identified group should be discriminated against or treated adversely.

2.  No. The new sections added to RSA chapter 354-A **explicitly permit** public employers and government programs to provide sensitivity training, which RSA 354-A:29 defines as "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Implicit bias training, for example, is premised on teaching people about biases they may have of which they are not consciously aware and helping people become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training does not violate Section 297. Similarly, the new sections added to RSA chapter 354-A do not prohibit other diversity, equity, inclusion, and equality trainings. Section 297 prohibits trainings if and only if they include concepts of group superiority or inferiority based on inherent or innate group characteristics or advocate for less than equal treatment of identified groups.

3.  No. RSA 193:40 does not prohibit discussion of historical concepts related to discrimination. RSA 193:40 prohibits education related to solely the four subjects identified in Short Answer 1. Specifically, it prohibits teaching that one or more identified groups are: (1) inherently superior or inferior to people of another identified group; (2) inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) should be discriminated against or receive adverse treatment; or (4) should not treat members of other identified groups equally. It is important to note that although education related to racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40.

## BACKGROUND

On June 25, 2021, the Governor signed into law House Bill 2, which added, in Section 297, new provisions to RSA chapter 354-A entitled, "Right to Freedom from Discrimination in Public Workplaces and Education." Specifically, Section 297 adds six new sections to RSA chapter 354-A: (1) RSA 354-A:29, "Right to Freedom from Discrimination in Public Workplaces and Education"; (2) RSA 354-A:30, "Definitions"; (3) RSA 354-A:31, "Prohibition on Public Employers"; (4) RSA 354-A:32, "Prohibition on the Content of Government Programs and Speech"; (5) RSA 354-A:33, "Prohibition on Public Employees"; and (6) RSA 354-A:34, "Remedies."

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 4 of 9

Section 297 is part of the amended progeny of House Bill 544, which was commonly known as the "divisive concepts" bill. The House of Representatives voted to table House Bill 544 but to incorporate its language into House Bill 2. During its review, the Senate Finance Committee stripped the language of House Bill 544 out of House Bill 2 and added the language that is now Sections 297 and 298. The House of Representatives acceded to these changes during the Committee of Conference.

The major provisions of Section 297, codified as RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33, prohibit training, education, or other state-sponsored speech that incorporates any of the following four concepts:

1. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

2. That an individual by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

3. That an individual should be discriminated against or receive adverse treatment solely or partly because of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; and

4. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.[2]

These four new statutory provisions combine to limit the types of training and education public employers may introduce to their employees, and protects employees who object to participating in training programs inconsistent with the new statutory provisions. RSA 354-A:31 prohibits public employers from teaching, advocating, instructing, or training anyone any of the above listed concepts. RSA 354-A:32 prohibits "government programs," which it defines as any

---

[2] This Opinion will use the term "identified group" to mean age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. With this inclusive of a definition, every resident and visitor to New Hampshire is a member of one or more identified groups.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 5 of 9

activity undertaken by a public employer including in the performance of its government function, from teaching, advocating, or advancing any of the above listed concepts. RSA 354-A:33 prohibits a public employer from disciplining a public employee for refusing to participate in any training, program, or other activity that advocates for or compels the employee to express support for any of the above listed concepts.

Section 298 is the remainder of the amended progeny of HB 544. This section creates a new statute, RSA 193:40: "Prohibition on Teaching Discrimination." RSA 193:40 prohibits teaching students in an elementary or secondary education program any of the four concepts that the new sections in RSA chapter 354-A prohibit.

The statutory changes within Sections 297 and 298 are legislation of limited reach. The new statutes do not prohibit racial, sexual, religious, or other workplace sensitivity training "based on the inherent humanity and equality of all persons." They do not prohibit workplace trainings based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." These statutes explicitly exclude such sensitivity trainings from the scope of the new prohibitions created by RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33. Nor do they prohibit discussing or teaching students about the historical existence of ideas related to the four prohibited subjects, such as the history of discrimination.

## ANALYSIS

The scope of Sections 297 and 298's prohibitions hinges on the meaning of the language those sections employ. When interpreting a statute, a court or agency charged with such interpretation must first look to the language of the statute itself. *Conduent State & Local Solutions, Inc. v. N.H. Dep't of Transportation*, 171 N.H. 414, 419 (2018). In doing so, the agency must begin with the plain meaning of the words used. *Union Leader Corp. v. Town of Salem*, 173 N.H. 345, 350 (2020); *see also* RSA 21:2 (2012) ("Words and phrases shall be construed according to the common and approved usage of the language."). The agency must confine itself to the statute as written and not consider what the legislature might have said or add language the legislature did not include. *Conduent State & Local Solutions, Inc.*, 171 N.H. at 420. The agency must look at the statute as a whole and should construe the statute to avoid absurd or unjust results.[3] *Id.* Absent an ambiguity[4] examination of any legislative record beyond the actual text of the statutes is inappropriate.

---

[3] Examples of absurd results include, but are not limited to, situations where the interpretation of one statute negates another. *See Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005) ("When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other."). The goal of statutory interpretation is to strive to read statutes in harmony with one another rather than in dissonance with one another. *See id.* ("[W]e do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme.").

[4] In this context, ambiguity is a legal term of art that applies only if two or more reasonable interpretations of a statute exist after the agency considers the plain meaning of the words in the statute. *Attorney General v. Loreto Publications, Inc.*, 169 N.H. 68, 74 (2016).

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 6 of 9

<u>Prohibitions Related-to Inherent Traits</u>

The scope of Section 297 and 298's first two prohibitions derives substantially from the meaning of the term "inherent." In the first prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently superior or inferior" to another identified group. In the second prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently racist, sexist, or oppressive, whether consciously or unconsciously." Neither section defines the term "inherent," nor are we aware of any other relevant statutory provisions that define "inherent" as the Legislature used it in Sections 297 and 298. When the Legislature does not specifically define a term within a statute, the Legislature is presumed to have used that term as it is commonly understood. *Franciosa v. Hidden Pond Farm, Inc.*, 171 N.H. 350, 359 (2018). In such situations, the New Hampshire Supreme Court will consult a standard dictionary to discern the common understanding of any given term. *Id.* As an adjudicatory body, the Human Rights Commission should also consult a standard dictionary to discern the common understanding of any given term.

"Inherent" means "structural or involved in the constitution or essential character of something : belonging by nature or settled habit : intrinsic, essential." *Webster's Third New International Dictionary* 1163 (unabridged ed. 2002). The definitions of "intrinsic" and "essential" further illuminate the meaning of "inherent." "Intrinsic" means "belonging to the inmost constitution or essential nature of a thing : essential or inherent and not merely apparent, relative, or accidental." *Id.* at 1186. "Essential" means "forming or constituting the essence of something: making up or being the constituent or intrinsic character or very nature of a thing . . . belonging to or being part of the essence of something: belonging to the constituent fundamental character of a thing: not accidental to something." *Id.* at 777.

The common thread that runs through these definitions is that an inherent characteristic is natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging.

"Inherent," therefore, is properly viewed as a limitation of the scope of Sections 297 and 298's first two prohibitions. With respect to the first, Sections 297 and 298 proscribe training, advocacy, or education that teaches participants that, solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, superior or inferior to members of other identified groups. With respect to the second, Sections 297 and 298 proscribe training, advocacy, or education that informs participants that solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, consciously or unconsciously racist, sexist, or oppressive.

<u>Prohibitions Related-to Promoting Discrimination</u>

Interpreting Sections 297 and 298's third and fourth prohibitions does not turn on the meaning of key terms that define the scope of the prohibition. The statutory language makes

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 7 of 9

plain that a public employer or government program may not provide training or education that informs participants that members of an identified group should be discriminated against or receive adverse treatment. Nor may a public employer or government program provide training or education that informs participants that members of one identified group should not treat members of other identified groups equally.

Permitted Trainings, Activities, and Education

Separate from its prohibitions, Section 297 expressly permits certain trainings and programming within the category of "sensitivity training." This is defined as training "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Sensitivity training consistent with the provisions of Section 297 readily encompasses trainings and programming that promote concepts of equality and the equal, respectful, and dignified treatment of all persons—particularly as they relate to the interactions of members of those identified groups with public employers or government programs.

"Sensitivity training" includes implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources. Implicit bias training does not violate Section 297 unless it includes concepts of group superiority or inferiority based on inherent or innate group characteristics or concepts that an identified group should be treated unequally or discriminated against.

"Sensitivity training" is not limited to implicit bias training, however. For example, a public employer or government program may create a web-based resource entitled, "Anti-Racist Resources," and include information designed to promote a better understanding of racism and how to combat racism. But, if that web-based resource stated that it was designed to "serve as a resource to white people" or to "serve as a resource for our white employees," then it could violate Section 297 because it may imply that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.

Section 298 expressly permits schools to educate about and discuss the historical existence of ideas and subjects that are otherwise prohibited under Section 298. Section 298 does not prohibit schools from teaching about discrimination or how discrimination has existed throughout history. Nor does Section 298 prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups. Similar to Section 297, Section 298 does not prohibit teaching students about implicit biases nor does it prohibit schools from creating web-based resources designed to promote a better understanding of racism, sexism, or other forms of oppression. Section 298 is violated only when a school educates about concepts of group superiority or inferiority based on inherent or innate group

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 8 of 9

characteristics divorced from history or educates that an identified group should be treated unequally or discriminated against.

Section 298 applies to educational instruction in K-12 schools only. Nothing in Section 298 limits instruction by educators in post-secondary schools. Section 297's prohibitions, however, do apply to the teaching and training of employees and volunteers in public, post-secondary educational institutions.

Construing the Prohibited Activities Together with the Permitted Activities

Construing these new statutes harmoniously, Sections 297 and 298 allow public employers, government programs, and schools to train and educate in a manner that promote concepts of equality and the equal, respectful, and dignified treatment of all persons. Both sections permit public employers, government programs, and schools to train and educate about concepts such as implicit bias. Public employers, government programs, and schools violate Sections 297 and 298 only when trainings or education programs advocate that identified groups are either: (1) oppressive by their nature and not simply oppressive by accident, apparently oppressive, or oppressive because of external action or external factors; (2) consciously or unconsciously biased by their nature and not simply biased (racist or sexist) by accident, apparently biased (racist or sexist), or biased (racist or sexist) because of external action or external factors; (3) deserving of discrimination or adverse treatment; or (4) deserving of unequal treatment.[5]

This construction comports with traditional definitions of racism and sexism. For example, "racism" means, among other things, "the assumption that psychocultural traits and capacities are determined by biological race and that races differ decisively from one another, which is usually coupled with a belief in the inherent superiority of a particular race and its right to domination over others." *Webster's Third New International Dictionary* at 1870. This construction also strikes a harmonious balance between expressly permitted "sensitivity training" or programming and prohibited programming that exacerbates discrimination.

For the reasons set forth above, the new sections added to RSA chapter 354-A and RSA 193:40 prohibit only those trainings or educational programs that: (1) teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to characteristics which are apparent, accidental, or based on external action or external factors, that make them superior or inferior to other identified groups, or that those inherent characteristics make one identified group consciously or unconsciously racist, sexist, or oppressive or (2) teach participants that one identified group should be discriminated against or treated adversely. The new sections added to RSA chapter 354-A and RSA 193:40 do not prohibit trainings or educational programs that teach participants about disparities that may

---

[5] Like many discrimination claims, review of a claimant's allegations will involve a fact-intensive, case-by-case analysis of the training or programming at issue to determine whether the training or programming violated Sections 297 or 298's prohibitions.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 9 of 9

exist among different identified groups, the current or historical practices that may have
contributed to those disparities, or about concepts such as implicit bias.

Sincerely,

John M. Formella
Attorney General

#3293122

# EXHIBIT 21

David Wolowitz, "A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act," (July 6, 2021/Aug. 2, 2021)

11/24/21, 9:59 AM        A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act - McLane Middleton

540

EDUCATION

# A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act



**David Wolowitz**
Director, Litigation Department and Co-chair of Education Law Group

Published: McLane.com
July 6, 2021



*updated August 2, 2021*

On June 25, 2021, N.H. RSA 354-A:29, the Right to Freedom from Discrimination in Public Workplaces and Education Act, became law. The statute is only five paragraphs. Despite its brevity, or perhaps because of it, it creates a legal minefield for New Hampshire public school teachers and school administrators.

It states as follows:

11/24/21, 9:59 AM                    A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act - McLane Middleton

541

*"The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants."*

The section on the "Prohibition on Teaching Discrimination" enumerates four prohibited concepts:

*"No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:*

*(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;*

*(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;*

*(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or*

*(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."*

The statute permits discussion of the prohibited concepts only under the following circumstances:

*"Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."*

I will leave it to others to address the merits of the statute and the possible constitutional issues raised by the statute. Rather, my focus is the specific, and very real, risk the statute creates to the livelihoods of teachers and administrators.

The statute provides for multiple remedies for a violation of the statute. One remedy is a civil action against a school or school district for legal or equitable relief, most likely an injunction to stop the instruction of prohibited concepts. Another remedy is a complaint to the N.H. Commission on Human Rights which has the power to receive, investigate and pass upon complaints of illegal discrimination by teaching prohibited concepts.

While these remedies are significant, the greatest risk to teachers and administrators is the remedy specifically directed at them: *"Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education."* To avoid any doubt about who is covered by this penalty, the statute provides: *"Administrators, specialists, and teachers are included within the definition of this term."* In my opinion, the effect of this penalty is to make teachers and administrators sitting ducks in the shooting gallery of the culture wars.

Sadly, we live in a time when society is so divided that one of the few areas of agreement is on how divided we are. Among the topics most hotly debated are issues related to discrimination or oppression based on sex, gender identity, sexual orientation, race, religion, and national origin. Teachers who teach any topic, give any assignment, or engage in any classroom discussion that might touch on these issues now face the very real possibility of being reported for violating the educator code of conduct. Violations of the educator code of conduct can lead to serious adverse employment consequences, including the loss of one's license and therefore one's livelihood.

The statutory prohibition may appear at first glance to only prohibit teaching with inculcates or compels students to express belief in or support for a prohibited concept. As drafted, the construction of sentence prohibits teaching or instruction of the prohibited concepts, regardless of whether the teaching or instruction inculcates or compels the students to believe in or support the concepts. This reading of the statute is consistent with the FAQ issued by the N.H. Department of Education, Commission For Human Rights, and Department of Justice. Thus, any parent who believes a teacher or administrator has "taught" or "instructed" any of the prohibited concepts can file a complaint with the Department of Education. No lawyer is needed; it is simply a matter of filling out a form. For a teacher, the process of defending oneself from a professional conduct complaint is stressful, time consuming, and potentially expensive. Moreover, even if the teacher prevails, the fact of having been the subject of a professional conduct complaint can adversely impact one's career as most employers require disclosure of past complaints, regardless of the outcome.

Classroom discussions present a particular risk because a teacher cannot predict what students might say and because the definition of "taught" is so broad. Merriam-Webster has multiple definitions for "teach," including "to guide the studies of." If a student begins discussing a prohibited concept and the teacher permits the discussion to continue, the students are arguably being "taught" or "instructed" about a prohibited concept. For example, if a student were to assert that the prohibitions and penalties in the new law are motivated by racism or sexism, which some critics have argued, it is possible the teacher permits such discussion to continue could be construed as a violation of the statute. The teacher could potentially be subject to a

11/24/21, 9:59 AM          A Proposal to Mitigate the Risk to Public School Teachers' Careers From New Hampshire's Right to Freedom from Discrimination in Public Workplaces and Education Act - McLane Middleton

542

professional misconduct charge that by permitting students to engage in a classroom discussion on the topic he or she guided the study of the prohibited concept that an individual is inherently racist and thereby "taught" it. As this topic is a current issue, it would not fall under the limited statutory exception which permits the discussion only of "the historical existence of ideas and subjects." Only by stopping the discussion can the teacher make it unambiguously clear that he or she is not instructing in support of the prohibited concept.

Therefore, to protect themselves against potential professional conduct complaints, teachers should be prepared to immediately stop any classroom discussions on any and all topics potentially relating to the prohibited concepts. Given the high personal and professional risk under the statute, teachers should consider alerting students in advance of classes and events in which prohibited concepts could potentially be discussed that such discussions will not be permitted in order to comply with the law.

The risk of being reported is not only from parents. Under the administrative rules for the N.H. Department of Education, teachers and administrator are required to report any suspected violation of the code of conduct. The rules state: *"Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures."*

Failure to report a suspected violation by a colleague is itself a violation of the code of conduct. *"If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder."* Section Ed 510.05 – Duty to Report.

Imagine a teacher trying to decide on a daily basis whether an assignment or lesson plan could prompt a discussion about discrimination based on sex, gender identity, sexual orientation, race, religion, or national origin which might possibly be interpreted by a student or parent as teaching a prohibited concept. Given the high stakes, many teachers will likely consult with an administrator. Many administrators may choose to err on the side of caution and advise against addressing the topic to avoid the risk of a possible professional conduct complaint. Consequently, the statute may have a substantial chilling effect on the teaching of subjects that could possibly engender discussion, or even contemplation, of topics relating to sex, gender identity, sexual orientation, race, religion, or national origin.

Given the extraordinarily high risk of teaching related to any of these topics, I recommend that teachers exercise caution even when they are confident their teaching does not violate the statutory prohibitions. Specifically, I propose that teachers alert parents and students in advance of classes, assignments, and classroom discussions of the statute's purpose, its limitations on teaching prohibited concepts, and what the statute permits. Teachers could then assure parents and students that they have reviewed the teaching content and determined that it is in compliance with the statute.

Such a notice is not a guarantee that a complaint will not be filed with the Board of Education. Parents may assert that a professional conduct violation for teaching prohibited concepts should not be determined by the teacher's intent or the content of the course material, but rather by the subjective reaction of a parent who believes their child was "taught" a prohibited concept. Nonetheless, the notice will be substantial evidence that the educator was aware of the law, took meaningful efforts to comply with it, and did not willfully violate it.

Such a notice could take many forms. I include below a basic sample notice which simply recites the statute as a starting point. Notice could be provided prior to a class, an assignment, or a classroom discussion that has the potential of raising concerns about teaching a prohibited concept. I recommend keeping records of having provided the notice, so that they can be provided in the event of a professional conduct complaint.

It is my hope that no teacher will face a professional conduct complaint unfairly alleging a violation of the new law. However, given the realities of the times we live in, my proposal is intended to help teachers protect themselves so that they can continue to perform their important, underappreciated, and increasingly risky, work.

*Note: This is not intended to constitute legal advice. For advice on complying with the new statute, consult with your legal counsel.*

[Sample Notice]

**To: Students and Parents**

**Re: 354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education Act**

On June 25, 2021, N.H. RSA 354-A:29, the Right to Freedom from Discrimination in Public Workplaces and Education Act, became law. It states as follows:

*"The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants."*

This is to inform you that nothing in the [class, course materials, assignment, classroom discussion] is intended to teach, instruct, inculcate or compel to express belief in, or support of, any of the following:

*"(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;*

*(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;*

*(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or*

*(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."*

The statute permits the following:

*"Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section."*

# Related Insights





EDUCATION

## Defining the Standard of Care

By    David Wolowitz

EDUCATION

## The Importance Of Understanding And Fulfilling The Duty Of Reasonable Care When Re...

By    David Wolowitz

July 12, 2021

May 13, 2020

See more insights

# EXHIBIT 22

# Drummond Woodsum August 5, 2021 Presentation



**DrummondWoodsum**

# Another Brick in the Wall?

## Thursday, August 5, 2021

9:00-11:00 AM | Live Online via Zoom

**Presented by Drummond Woodsum Attorneys:**

**Meghan S. Glynn**
mglynn@dwmlaw.com

**James A. O'Shaughnessy**
joshaughnessy@dwmlaw.com

**Milliana R. Zonarich**
mzonarich@dwmlaw.com

---

800.727.1941 | dwmlaw.com | SchoolLaw.com | ServingSchools.com

© Copyright 2021 Drummond Woodsum.  All rights are expressly reserved.

546



# CERTIFICATE OF ATTENDANCE

This is to certify that _____ has successfully completed 2 contact hours of continuing education at the program, **"Another Brick in the Wall?"** presented by Drummond Woodsum, held on Thursday, August 5, 2021.

_____
*James A. O'Shaughnessy*
603.792.7411 Direct
joshaughnessy@dwmlaw.com

*This form denotes attendance at entire program.*
*If you arrive late or leave prior to the program ending time, it is your responsibility to adjust hours accordingly.*

*Thank you for attending!*

Adriana Grimes, Events Coordinator
Drummond Woodsum
800.727.1941 Ext. 232
agrimes@dwmlaw.com

548

# ZOOM LOGIN

Topic: **Another Brick in the Wall?**
Time: **Aug 5, 2021 09:00 AM** Eastern Time (US and Canada)

Join Zoom Meeting
https://dwmlaw.zoom.us/j/82437490390?pwd=TGxqeG1PN2tRaDM1aW9xK0tFbE1yQT09

**Meeting ID: 824 3749 0390**
**Passcode: 281510**

One tap mobile
+19294362866,,82437490390#,,,,*281510# US (New York)
+13017158592,,82437490390#,,,,*281510# US (Washington DC)

Dial by your location
        +1 929 436 2866 US (New York)
        +1 301 715 8592 US (Washington DC)
        +1 312 626 6799 US (Chicago)
        +1 669 900 6833 US (San Jose)
        +1 253 215 8782 US (Tacoma)
        +1 346 248 7799 US (Houston)
Find your local number: https://dwmlaw.zoom.us/u/kYlv7rSx

550



## INTRODUCTION

- Topics Covered Today:
    - Prohibition on particular mandated employer trainings
    - Prohibition on teaching "prohibited concepts"
    - Jurisdiction and remedies
    - Protections for public employees
- NOT Covered
    - Critical Race Theory – CRT

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum    2

## PROTECTED CLASSES: RSA 354-A

- Age
- Sex
- Gender identity
- Sexual orientation
- Race
- Color

- Marital status
- Familial status
- Disability
- Religion
- National origin

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

3

## NEW HAMPSHIRE'S DIVISIVE CONCEPTS BILL

- Originally considered in the Legislature as House Bill 544

  - The early versions of this bill had a much broader definition of "divisive concepts" – i.e. there were lots more concepts that were considered to be divisive that educators would have had to avoid.

  - HB 544 was NOT enacted into law.

  - However, certain amendments to the New Hampshire Human Rights Act (RSA 354-A) and RSA 193 (Pupils) were appended to the 2022 budget bill, also known as House Bill 2. These amendments include a prohibition on teaching certain divisive concepts. This bill DID pass and is now the law in all New Hampshire school districts.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

4

2

## "DIVISIVE CONCEPTS" (1 OF 4)

- That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, **are inherently superior or inferior** to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin

- ***Inherent***: *existing in someone or something as a permanent and inseparable element, quality, or attribute (www.dictionary.com)*

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

5

## "DIVISIVE CONCEPTS" (2 OF 4)

- That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin **is inherently racist, sexist, or oppressive, whether consciously or unconsciously**

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

6

## "DIVISIVE CONCEPTS" (3 OF 4)

- That an individual **should be discriminated against or receive adverse treatment** solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin

## "DIVISIVE CONCEPTS" (4 OF 4)

- That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin **cannot and should not attempt to treat others equally and/or without regard to** age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

## EQUITY VS. EQUALITY

- **Equity:** treating individuals based on their individual needs and requirements. Equity involves trying to understand and provide people with what they actually need to function on the same level as others.

- **Equality:** treating individuals equally and in the same manner, regardless of their individual needs or requirements. Equality aims to ensure that everyone receives the same opportunities and that individuals and groups are not treated differently or less favorably.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                9

## PROHIBITION: PUBLIC EMPLOYERS

- No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group [any prohibited concept].

  - Note that K-12 students are covered under this provision, as are volunteers.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                10

## PROHIBITION: TEACHING IN PUBLIC SCHOOLS

- **RSA 193:40**

  - No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any [prohibited concept].

    - <u>Inculcate</u>: "to teach and impress by frequent repetitions or admonitions…. Implies persistent or repeated efforts to impress on the mind."
      – *Merriam-Webster* (*https://www.merriam-webster.com/dictionary/inculcate*).

    - <u>Compel</u>: "to drive or urge forcefully or irresistibly…. to cause to do or occur by overwhelming pressure."
      – *Merriam-Webster* (*https://www.merriam-webster.com/dictionary/compel*).

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

11

## REMEDIES AND PENALTIES

- **People asserting that a school district has violated RSA 354-A (NH Law Against Discrimination) can bring claims in:**

  - Superior Court:

    RSA 354-A and other causes of action; Whistleblower Protection Act; RSA 98-E:3 (Public Employee Freedom of Expression)

  - NH Commission for Human Rights: RSA 354-A

    - These remedies include compensatory damages, administrative fines, reinstatement, back-pay, unpaid wages, liquidated damages, attorney's fees, criminal penalties, equitable damages, injunctive relief, and declaratory judgment.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

12

6

## PENALTIES FOR EDUCATORS

- **For violations of RSA 193:40** (i.e., teaching or training on "divisive concepts"):

  - "Any person" claiming to be aggrieved by this section (including the Attorney General) may:

    - File a civil action against a school **or** school district in Superior Court for legal or equitable relief

    - File a complaint with the NH Commission for Human Rights

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                    13

## CODE OF CONDUCT VIOLATION

- **Educator Code of Conduct**

  - Violation of RSA 193:40 by an educator (including any professional employee whose position requires certification by the state board under RSA 189:39) is considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

- <u>Duty to Report – Ed 510.05</u>

  - Every credential holder also has a duty to report <u>any suspected violation</u> of the code of conduct in accordance to local procedures (usually to their principal)

    - Every Principal shall report when the principal <u>has been notified</u> or <u>is personally aware</u> that a credential holder has violated the code of conduct (usually to the Superintendent).

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                    14

## REPORT TO DEPARTMENT OF EDUCATION

- <u>Duty to Report – Ed 510.05</u>
  - Superintendent must report violations to the Office of Credentialing at the NH Department of Education when:
    - The superintendent <u>has knowledge</u> that a credential holder has violated the code of conduct

- If a credential <u>has made a report</u> and believes the local reporting procedures have not been followed, the reporting credential holder <u>shall</u> notify the department directly.
  - *Note: at the time of the training, Ed 510 has not yet been amended to incorporate the new law.*

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

15

## PROTECTIONS FOR PUBLIC EMPLOYEES

- A public employee may refuse to participate in any training, program, or other activity at which the public employer "advocates, trains, teaches, instructs, or compels participants to express belief in or support for" a prohibited concept.
  - Such an action may fall under the Whistleblower Protection Act.

- The public employer may not take adverse action against the employee for this refusal.

- Per the NH Department of Education, the NH Commission for Human Rights, and the NH Department of Justice ("State Guidance"), the law does not prohibit employers from mandating attendance at training programs that comply with the law.

- Employees cannot refuse to attend or walk out simply because the training makes them uncomfortable.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum

16

8

## SCHOOL EMPLOYERS: PROHIBITED

- Retaliation or adverse action resulting from a good-faith refusal to participate in a program that violates the new provisions of RSA 354-A

- Programs stating that people:

  - Are inherently superior or inferior,

  - Are inherently racist, sexist, or oppressive (consciously or unconsciously),

  - Should be discriminated against or receive adverse treatment, or

  - Cannot or should not treat others equally and/or without regard to a protected characteristic

  On the basis of a protected characteristic.

## SCHOOLS AS EMPLOYERS: PERMITTED

- Trainings in compliance with federal and state civil rights laws

  - Title IX

  - Title VII

  - The IDEA

  - The ADA/Section 504

  Notwithstanding language in the statute, employers and public entities still have an obligation under federal law to provide accommodations and other differential treatment to individuals with disabilities.

## SCHOOLS AS EMPLOYERS: GRAY AREA

- Programs that involve discussion of power structures or power imbalances in society
  - Depending on how the topic is approached…
    - Safe harbor: discussion of concepts and ideas, rather than compelling a person to adopt a belief or even agree with the concept or idea.
    - Exposure to ideas and viewpoints, rather than asking or requiring acceptance or agreement with the ideas or viewpoints.
- Programs that involve advocating for these concepts will be more problematic:
  - Affirmative action to promote equity
  - Reparations for past wrongs
  - White privilege

## STATE GUIDANCE FOR SCHOOL EMPLOYERS

- According to State Guidance, employers may:
  - Take steps to examine issues related to "equity, diversity, inclusion, equality, and other related topics"
  - Conduct trainings "geared towards diversity, equity, equality and inclusion" including implicit bias training
  - Conduct trainings "that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups," even if it makes participants uncomfortable
- Practice Pointers:
  1) Review training materials in advance for compliance
  2) Notify employees that training conforms with RSA 354-A
  3) Add disclaimer to materials: "the Districts/School has reviewed the content of this training program and can confirm that it is in compliance with RSA 354-A."

## SCHOOLS AS EDUCATORS: PROHIBITED

- Programs, including classroom instruction, stating that people:

  - Are inherently superior or inferior,

  - Are inherently racist, sexist, or oppressive (consciously or unconsciously),

  - Should be discriminated against or receive adverse treatment, or

  - Cannot or should not treat others equally and/or without regard to a protected characteristic

  On the basis of a protected characteristic.

## SCHOOLS AS EDUCATORS: PERMITTED

- Discussing, as a part of a larger course of academic instruction, the historical existence of facts, topics, and subjects identified in the new law (including the prohibited concepts)

- Compliance with the ADA/Section 504 and the Individuals with Disabilities Education Act (IDEA), which require accommodation and other differential treatment for certain students with disabilities

- Teaching about the existence of racism, sexism, and other forms of discrimination

## CLASSROOM TEACHING: GRAY AREA

- Discussions regarding power structures in present-day society
  - These discussions could include debate about possible solutions to social problems, some of which may involve treating some groups differently than others.
  - Again, consider the difference between presenting ideas and concepts vs. compelling belief or agreement.
- Discussions of cultural sensitivity
  - Again, these discussions could involve recommendations about how to treat others in accordance with how *they* wish to be treated, which may not always be "without regard to" their protected characteristics.
- Caution:
  - Testing on controversial subjects
  - Requiring students to adopt belief in or to agree with certain ideas, viewpoints, concepts, or values.
  - Remember that students have first amendment rights in the classroom where the teacher opens up a discussion. Teachers can shut down students' comments only where they cause a "substantial disruption" to the school environment.

## SCHOOLS AS EDUCATORS: STATE GUIDANCE

- According to **guidance** from the NH Department of Education, NH Commission for Human Rights, and the NH Department of Justice, public schools may:
  - Continue to teach historical subjects such as: slavery, treatment of Native American populations, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights Movement.
    - This may include discussion about the lingering impact of historical practices upon different identified groups.
  - Continue to have discussions related to current events, including the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups
  - Present lessons, subjects, or areas of discussion that make students, faculty, or parents uncomfortable

## CLASSROOM TEACHING: BEST PRACTICES

- Train staff at the beginning of this school year on this new law

- Review lesson plans that related to controversial subjects

- Principals should work with teachers have specific concerns on how to adapt or modify their curriculum and lesson plans if necessary

- Review and prepare for pushback related to "divisive concepts"

- Consider the joint state guidance, as it provides insight into how the Department of Education interprets the law and how it will likely review allegations of teacher misconduct under this statute.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum

25

## FREE SPEECH: STUDENTS

- Free speech – students in the classroom:

  - Schools and the teachers in the classrooms have significant control over student expression in the classroom. Classrooms are not open forums for expression. Teachers can exercise control over student speech to assure that participants learn whatever lessons the activity is designed to teach.

  - Accordingly, teachers should continue to regulate classroom discussions to maintain control of the discussion and to ensure compliance with the law.

  In general, remember that students maintain some free speech rights under the *Tinker* standard, which protects speech that does not create a substantial disruption to the school environment.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum

26

## ACADEMIC FREEDOM: TEACHERS

- Free speech – teachers in the classroom:

  - While teachers retain some limited free speech rights at work, courts have consistently held that primary and secondary school teachers really do not have academic freedom while engaged in teaching.

  - Teachers lack the same kind of freedom that professors enjoy to express their personal views and opinions.

  - Translation: teachers have the freedom in the classroom to discuss the assigned subject matter in the manner they deem appropriate, but must ensure that their comments are directly related to the curriculum established by the Board and do not delve into unlawful topics.

  - Collective bargaining agreements – some CBAs contain provisions titled, "Academic Freedom" which, for the most part, do not permit teachers to express their own views and opinions. However, if you have such a provision, teachers should be cautioned that state law now sets limits on what can be taught in the classroom.

## SCHOOL BOARD POLICIES

- Every school district in NH should have board policies which provide a process for:

  - Parents to object to objectionable course material

  - Parents and students to challenge the instructional materials and library resources used in the school's educational program on the basis of appropriateness.

- Familiarize yourself with these policies, ask your policy committee to review and update, and direct the pubic to follow the processes contained therein if they have complaints or issues:

  - IJL - Library and Instructional Materials

  - IGE/IGC - Objectionable Course Material

## OBJECTIONABLE CLASSROOM MATERIAL

- **RSA 186:11, IX-c (board policy IGC/IGE)**

  - Requires school districts to adopt a policy allowing for an exception to objectionable course material.

  - Parent notifies the school principal in writing of the specific material to which they object

  - Principal and parents agree upon an alternative program, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area.

  - Instruction on human sexuality and sexual education – schools must also provide parents and legal guardians not less than 2 weeks advance notice of curriculum course material used for instruction of human sexuality or human sexual education.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum

29

## OBJECTION TO LIBRARY AND INSTRUCTIONAL MATERIALS

- American Library Association Positions:

  - Freedom to Read Statement

  - Library Bill of Rights – American Library Association believes that libraries are forums for information and ideas, and that the following basic policies should guide their services (partial list only):

    I.   Books and other library resources should be provided for the interest, information, and **enlightenment of all people of the community** the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation.

    II.  Libraries should provide materials and information presenting **all points of view on current and historical issues.** Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

    III. Libraries should **challenge censorship** in the fulfillment of their responsibility to provide information and enlightenment.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum

30

## STUDENT AND STAFF CODE OF CONDUCT

- School districts as both employers and educators should continue to follow and enforce their code of conduct.

- This law does not provide an opportunity for students or staff to engage in discriminatory conduct and such misconduct must continue to be addressed through appropriate methods.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum    31

## CLOSING THOUGHTS

- The state guidance, while helpful, does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law.

- The law is difficult to understand,  often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions.

- We know from recent US Supreme Court decisions that it is challenging for schools to regulate student conduct without infringing on student's First Amendment rights to free speech.

- One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum    32



**Contact Us**

670 N. Commercial Street, Suite 207
Manchester, NH 03101
603.716.2895  Main
603.716.2899  Fax

78 Bank Street
Lebanon, NH 03766
603.433.3317  Main
603.433.5384  Fax

84 Marginal Way, Suite 600
Portland, Maine 04101
207.772.1941  Main
207.772.3627  Fax

800.727.1941 | dwmlaw.com
© Copyright 2021 Drummond Woodsum.  All rights are expressly reserved.

# EXHIBIT 23

# Department of Education Banned Concepts Act Complaint Website as of Dec. 19, 2021

 ALERT **Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**

 New Hampshire
# Department of Education



🌐 Change Site Language    🔍 Search The Site

☰ **OPEN MENU**

Home ❯ Who We Are ❯ Deputy Commissioner's Office ❯ Office of Governance ❯ Right to Freedom from Discrimination in Public Workplaces and Education

# Right to Freedom from Discrimination in Public Workplaces and Education

*The department of education wants to ensure that all students have the opportunity to learn in a safe and encouraging environment that instills hope and promise for a bright future. One aspect of that environment, both for students and teachers alike, is that it is free from discrimination.*

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

This web page is being offered in support of the New Hampshire Commission for Human Rights (Commission) for those who believe that they, or their child, was discriminated against because their child's school was teaching and/or advocating that one identified group is:

- Inherently superior or inferior to people of another identified group
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously
- Should be discriminated against or receive adverse treatment
- Should not treat members of other identified groups equally

Completion of a Public Education Intake Questionnaire does not constitute a formal charge of discrimination, but the first step in making such a determination.

## Filing a Public Education Intake Questionnaire

Please complete and submit the Public Education Intake Questionnaire form below. Before submitting, ensure all contact information provided on the form is as current and up to date as possible. Once the completed questionnaire is received, it will be reviewed by the Commission's Intake Coordinator. The Coordinator may need to reach out to gather more information to determine if the individual filing has grounds to file a formal complaint. Once review is complete, the Intake Coordinator will provide information to explain the next steps in filing a formal complaint or to explain why there is no basis to file a charge of discrimination. We recommend saving or printing a copy of the completed questionnaire for your personal records.

The below form can be submitted to the Commission directly by using the submit button when opened in Adobe. If Adobe is unavailable, please complete the form and submit it via email to humanrights@hrc.nh.gov.

Public Education Intake Questionnaire Form 

## Resources and Links

- New Hampshire Commission for Human Rights Case Processing Procedure and Summary Fact Sheet 
- Frequently asked Questions: New Discriminatory practice prohibitions applicable to k-12 public educational programs
- Frequently asked Questions: New Discriminatory practice prohibitions applicable to public employers and government programs
- State Issues Guidance Regarding New Anti-Discrimination Laws
- Chapter 91: HB 2-FN-A-LOCAL Final Version
- NH RSA 354-A
- Educator Code of Conduct and Ethics

## Contact

New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301
Telephone: (603) 271-2767
Fax: (603) 271-6339
E-mail: humanrights@hrc.nh.gov

## To Voice Other Complaints or Concerns

Members of the public who would like to contact a representative from the New Hampshire Department of Education to voice a concern or complaint that is unrelated to alleged discrimination in a school setting are encouraged to find the appropriate staff member here.

 Portable Document Format (.pdf) . Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

 **New Hampshire**
# Department of Education

**101 Pleasant Street | Concord, NH | 03301-3860**
(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 |
info@doe.nh.gov

NH Career and Technical Education

NH Schools

iPlatform

NH Government Careers

NH Travel & Tourism

NH Web Portal - NH.gov

ReadyNH.gov

Directions to NHDOE ›    Subscribe to e-news ›    myNHDOE    Transparent NH

Educator Search

© 2021 State of New Hampshire • All rights reserved  |  Accessibility Policy  |  Privacy Policy

AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE

# EXHIBIT 24

Bounty Tweet

 **Moms for Liberty NH**
@Moms4LibertyNH

We've got $500 for the person that first successfully catches a public school teacher breaking this law.

Students, parents, teachers, school staff... We want to know! We will pledge anonymity if you want.

> **The Free State** 🦔 @FreeStateNH · 1d
>
> Public school teachers that teach critical race theory in New Hampshire will now lose their jobs and licenses.
>
> Show this thread
>
> # N.H Education Department launches system for parents to lodge discrimination complaints against teachers
>
> New Hampshire Public Radio | By Sarah Gibson

Tweet your reply

    

Students, parents, teachers, school

staff... We want to know! We will
pledge anonymity if you want.

 **The Free State**  @FreeStateNH · 1d

Public school teachers that teach critical race
theory in New Hampshire will now lose their jobs
and licenses.

Show this thread

# N.H Education Department launches system for parents to lodge discrimination complaints against teachers

New Hampshire Public Radio | By Sarah Gibson

Published November 10, 2021 at 4:31 PM EST

9:28 AM · 11/12/21 · Twitter for Android

**30** Retweets  **12** Quote Tweets  **106** Likes

**Moms for Liberty NH** @Moms4Li... · 7h  ···

Tweet your reply

**The Free State** 🦔
@FreeStateNH

Public school teachers that teach critical race theory in New Hampshire will now lose their jobs and licenses.

## N.H Education Department launches system for parents to lodge discrimination complaints against teachers

New Hampshire Public Radio | By Sarah Gibson

Published November 10, 2021 at 4:31 PM EST

3:12 PM · 11/11/21 · Twitter Web App

**90** Retweets  **26** Quote Tweets  **611** Likes

  

**The Free State** 🦔 @FreeStateNH · 1d



Tweet your reply

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NEA-NH

**DEFENDANTS**

Frank Edelblut, Commissioner of Education, et al.

**(b)** County of Residence of First Listed Plaintiff    Strafford
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Merrimack
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gilles R. Bissonnette, ACLU of New Hampshire, 18 Low Avenue, Concord, NH 03301, 603.225.3080

Attorneys *(If Known)*

New Hampshire Department of Justice
33 Capitol Street
Concord, NH 03301

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☒ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| | | | | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 2201 (declaratory relief); 42 USC 1983 (civil rights act)

Brief description of cause:
Constitutional challenge to Banned Concepts Act located at RSA 354-A:29-34 and RSA 193:40 on 14th Amendment Due Process vagueness grounds.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*    JUDGE    Laplante, J.    DOCKET NUMBER    1:21-cv-01063-JL

DATE    12/20/21

SIGNATURE OF ATTORNEY OF RECORD    /s/ Gilles Bissonnette (NH Bar 265393)

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV. **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

V. **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | | |
|---|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE | ) ) ) ) | |
| _Plaintiff(s)_ | ) ) | |
| v. | ) ) | Civil Action No. |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. | ) ) ) ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Frank Edelblut
Commissioner of Education
Department of Education
101 Pleasant Street, Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____        _____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE<br><br>*Plaintiff(s)*<br>v.<br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al.<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   John Formella
Attorney General
Department of Justice
33 Capitol Street
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____, a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____, who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE _____ *Plaintiff(s)* v. FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. _____ *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Ahni Malachi
Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE <br><br> *Plaintiff(s)* <br><br> v. <br><br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    Christian Kim
Chair
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | |
|---|---|
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE <br><br> *Plaintiff(s)* <br><br> v. <br><br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, et al. <br><br> *Defendant(s)* | ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Action No. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Ken Merrifield
Commissioner of Labor
Department of Labor
95 Pleasant Street
Concord, NH 03301

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Gilles R. Bissonnette (N.H. Bar No. 265393)
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
Tel. 603.227.6678

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-      :
CIO, RYAN RICHMAN, JOHN DUBE and         :
JOCEYLN MERRILL, teachers in the New     :
Hampshire Public Schools, and KIMBERLY   :
GREEN ELLIOTT and MEGHAN EVELYN          :
DURDEN, parents or guardians of children in the :
New Hampshire public schools.            : No. _____
                                         :
                        Plaintiffs,      :
                                         :
             - against -                 :
                                         :
FRANK EDELBLUT, in his Official Capacity as :
Commissioner of the DEPARTMENT OF        :
EDUCATION ("DOE"), CHRISTIAN KIM in his  :
Official Capacity as the Chair of the NEW :
HAMPSHIRE COMMISSION ON HUMAN            :
RIGHTS, and JOHN FOMELLA in his Official  :
Capacity as ATTORNEY GENERAL of the State :
of New Hampshire.                        :
                        Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **COMPLAINT**

Plaintiffs, LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN,

JOHN DUBE, AND JOCELYN MERRILL, individual teachers in the New Hampshire Public

Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVEYLN DURDEN, individual

parents of children in the New Hampshire public schools, through their attorneys Nolan Perroni,

P.C., Stroock & Stroock & Lavan LLP, Phillips, Richard & Rind, P.C., David Strom, Esq., and

Selendy & Gay PLLC, for their complaint against Commissioner Frank Edelblut, in his official

capacity as Commissioner of DOE, Christian Kim in his Official Capacity as Chair of the New

Hampshire Commission on Human Rights and John Fomella in his Official Capacity as Attorney

General of the State of New Hampshire allege as follows:

**NATURE OF THE ACTION**

1.     This action for declaratory and injunctive relief challenges the constitutionality and legality of recently enacted New Hampshire statutory provisions 297 and 298 of 2021 House Bill 2 ("297 and 298" "HB 2"), codified at N.H. REV. STAT. ANN. ("RSA") 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354A:34; and RSA 193:40, all enacted June 25, 2021, which together have come to be known as the "Divisive Concepts Statute" (*see infra*, n.12-13).

2.     Concisely put, the Divisive Concepts Statute was designed to limit teaching in New Hampshire of ideas and societal concerns not to their liking, thereby curtailing speech, limiting the free exchange of ideas within our classrooms and depriving New Hampshire students of their constitutionally and statutorily guaranteed right to an adequate education.  The resulting enactment is at once unconstitutionally vague in violation of the Fourteenth Amendment of the United States Constitution, chills teacher speech in violation of the First Amendment and conflicts with and compels abridgment of New Hampshire's Constitution and laws, thereby creating further vagueness, fear and uncertainty as to what New Hampshire teachers may teach and as a result hurts New Hampshire's students.

3.     The Divisive Concepts Statute invites partisanship into our schools and deputizes private, politically-motivated individuals to enforce its vague proscriptions.  Indeed, in recent weeks, the Divisive Concepts Statute has been seized upon by radical political groups to rationalize an offer of an economic "bounty" for informers who lodge, on a recently created State-established and Department of Education maintained website, complaints about public school teachers.  This threat of a "bounty" looms large in addition to obvious reputational consequences and penalties, including firing, that the Defendant Education Commissioner may thereafter seek to impose, underscoring the Statute's chilling effect not just on teachers' constitutionally

protected rights but, as a result, on the education students must have to prepare for life, college, careers and citizenship.  Indeed, teachers, including a Plaintiff in this action, have been made the subject of online harassment, obscenities and vicious attacks as a direct result of the climate of political intimidation created by and with the facilitation of various Defendants.

4.      The "culture wars" have no place in New Hampshire's classrooms.  Our public school teachers and support staff are dedicated public servants who have stepped up and devoted themselves beyond measure during the pandemic to continue to teach our children.  Yet, they are being politically targeted and threatened with public shaming and undeserved disciplinary proceedings (not to mention the cost of defending themselves) for doing their jobs in accordance with the curriculum formally adopted by the state.  New Hampshire parents, too, are entitled to send their children to school, expecting a full and robust exchange of ideas in the classroom, uncorrupted by censorship and extremist partisanship.

5.      Because it is hopelessly and unconstitutionally vague on its face, the State and its agencies have on at least two separate occasions since its passage weighed in to attempt to clarify the meaning and scope of the Divisive Concepts Statute.  In July 2021, the Commission for Human Rights, Department of Justice and Department of Education issued a guidance document entitled "*Frequently Asked Questions*: *New discriminatory practice prohibitions applicable to public prohibitions applicable to k-12 educational programs*"[1], (the "FAQ"), in an attempt to define certain ambiguous words in the statute and identify what teachers may (and may not) teach.  After it became clear that the attempted clarification had fallen woefully short, on September 7, 2021, in response to a request from the Human Rights Commission (the same State agency that previously issued the FAQ), the Attorney General again attempted in a formal opinion

---

[1] Dep't of Educ., Comm'n for Human Rights and Dep't of Justice, *Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs*, https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf (last accessed Dec. 10, 2021).

to resolve the confusion and identify what is and what is not prohibited by the Statute.[2]  The need

for repeated clarification and restatement by each of these state entities underscores the law's

vagueness and the unquestionable difficulty public school teachers have in understanding it, much

less complying with it while, at the same time, adhering to conflicting state laws and mandated

curriculum.

6.     While the Attorney General's September 7th Opinion (together with the July 21st

FAQ's) make strides towards interpreting, and seemingly limiting some of the unconstitutional

educational restrictions imposed on teachers by the Divisive Concepts Statute, it does not fully

cure the statute's defects—particularly as to the unbridled claims of third party bounty hunters or

the cadre of informers assembled through the Department of Education's website.  Nor is it

comprehensive or binding authority.  And while the Attorney General's opinion is dated

September 7, 2021, as of the date of this complaint (December 13, 2021), the Department of

Education does not even reference it much less include it as part of its purported governing

interpretations listed on the Department of Education website.  Thus, teachers now are placed in

the impossible position of interpreting a statute that the Attorney General, the State Human Rights

Commission and even the Department of Education agree is confusing and one that on its face

conflicts with state education laws and curriculum mandates and, which, if the teachers'

interpretation as non-lawyers is in error, subjects them to reputational injury, disciplinary

procedures and potentially the loss of their livelihoods, not to mention the vengeance of bounty

hunters empowered by the Divisive Concepts Statute to maintain harassing litigation.  The

intervention and imprimatur of this Court through declaratory relief thus is necessary (a) to clarify

the Divisive Concepts Statute, and correct it's infirmities, starting with, but not limited to, the

---

[2] Attorney General Dep't of Justice, Attorney General Opinion No. 2021-01, Request for Attorney General's Opinion regarding new anti-discrimination protections (Sept. 7, 2021), https://www.doj.nh.gov/public-documents/documents/opinion-2021-01-hb2-anti-discrimination.pdf.

direction recognized as essential by the Attorney General in his formal Opinion, or (b) invalidate it, particularly because the statute authorizes private individuals in this highly charged political environment to bring private suits against individual teachers to enforce its ambiguous provisions, regardless of any limiting language from the Attorney General, or otherwise.

### THE PARTIES

7.      Plaintiff Ryan Richman is a high school World History teacher at Timberlane, Regional High School.  Since the start of the school year, the Divisive Concepts Statute has had the effect of chilling Mr. Richman's ability to provide his students with the nature, content and quality of education guaranteed and mandated by the New Hampshire Constitution and laws.  His interaction with his students has been materially curtailed given Mr. Richman's uncertainty as to what he can and cannot teach and what questions he can and cannot answer.  As a result, his students – along with the students of all other New Hampshire teachers in this complaint – are put at a competitive disadvantage as they are not receiving the comprehensive education to which they are entitled under New Hampshire law, and which other students in the United States are receiving.

8.      Plaintiff John Dube is a high school U.S. History and AP U.S. History teacher at Timberlane Regional High School.  After the Divisive Concepts Statute was passed, Mr. Dube signed an online petition promising to teach "honest" history.  A New Hampshire rightwing group published all of the names of teachers who signed the petition, pledging to "shame" them.  Mr. Dube was subject to online harassment, threats and obscenities for simply doing his job in the classroom – requiring federal and local law enforcement intervention.  He continues to fear for his own personal safety and, in fact, has had to install personal security and safety equipment at his home in light of the threats.  *See* Exhibit A.

9.      Plaintiff Jocelyn Merrill is a ninth grade English teacher at Nashua High School North.  She has been teaching for 10 years.  Since the Divisive Concepts Statute was passed, Ms. Merrill has limited her classroom discussion of race to specific passages in assigned literature and has avoided any discussion of racism's systemic impact with her students.

10.      Plaintiff Kimberly Green Elliott is a Reading Specialist at Fairgrounds Middle School and lives in Merrimack, New Hampshire.  Ms. Elliot has two children, a daughter who graduated from Merrimack public schools and is now in college, and a son, who currently attends Merrimack High School.  Ms. Elliott believes the Divisive Concepts Statute will prevent her son from receiving a full and robust education for, among other reasons, those highlighted in paragraph 6, *supra*.  In fact, since the Divisive Concepts Statute was passed, Ms. Elliott has observed a noticeable difference in the breadth of the education her son has received and has even seen one of her son's teachers self-censor on certain controversial topics.

11.      Plaintiff Meghan Evelyn Durden is an Art Teacher at Charlotte Avenue Elementary School. Her daughter is in public elementary school in Nashua.  As described in paragraph 6, *supra*, Ms. Durden believes the Divisive Concepts Statute will prevent Ms. Durden's daughter from receiving a full and robust education for, among other reasons.

12.      Plaintiff Local 8027, AFT-New Hampshire, AFL-CIO is a labor union representing approximately 3,400 public school teachers, school support staff, city and town employees, police officers, library employees, and higher education faculty.  Local 8027 is a member of the New Hampshire AFL-CIO, and is the state affiliate for the American Federation of Teachers with more than 3,000 local affiliates nationwide, 43 state affiliates, and more than 1.7 million members.

13.      Defendant New Hampshire Education Commissioner Frank Edelblut, in his Official Capacity as Commissioner of DOE, is tasked under RSA § 21-N:4 with "[e]stablishing the organizational goals of the department and representing *the public interest* in the administration of the functions of the department of education and being responsible to the governor, the general court, and the public for such administration."  (Emphasis added).

14.      Defendant Christian Kim, in his Official Capacity as Chair of the New Hampshire Commission for Human Rights, is tasked with enforcing the law against discrimination and to "receiv[ing], investigat[ing] and mak[ing] findings" on complaints.  Relevant here, the Commission for Human Rights is empowered under the Divisive Concepts Statute to enforce its provisions.

15.      Defendant John Fomella is the Attorney General of the State of New Hampshire and is the chief legal officer in the State. His duties and responsibilities include, among others, addressing challenges to New Hampshire statutes and related constitutional challenges, the subject of these proceedings.

## JURISDICTION AND VENUE

16.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Constitution and the laws of the United States.

17.      Venue is proper in this District under 28 U.SC. § 1391(b) because at least one Defendant resides within this District, all Defendants reside in the State in which this District is located, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

18.      The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 1983.

19.    The Court has jurisdiction of claims viewed as being cognizable only under state law as a matter of supplemental jurisdiction. 28 U.S.C. § 1367.

## BACKGROUND

20.    Education is a vital function of state and local governments.  Public education is the lifeblood of our democracy and enables our children to be prepared for their lives, for college and career, as well as for civic participation.  As the Supreme Court famously put it, "[i]t is the very foundation of good citizenship."  *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954), supplemented sub nom, *Brown v. Bd. Of Educ. of Topeka, Kan,* 349 U.S. 294 (1955).

21.    Within our free and diverse educational system, broad exposure and the freedom to explore and examine areas of scholarship, art, history and science, together with the development of critical basic skills, are essential to training our young citizens for the privileges and responsibilities necessary for full participation in a democratic society.  Any attempt to diminish public education through misinformation, selective teaching or censorship directly threatens both our young citizens and our democracy.  Critical thinking and the ability to independently and freely evaluate ideas exchanged in public debate are core skills at the foundation of all educational training.

22.    Aside from being a country devoted to freedom, democracy, opportunity and justice for all, what sets our great nation apart is its unique diversity – of race, ethnicity, religion, viewpoint, among many others – and our steadfast commitment to celebrate that diversity rather than muzzle it.

23.    Politically-driven censorship (reminiscent of the 1933 book burnings here, or in Germany or in Austria) has no place in a vital and vibrant America, and is especially unwelcome in American classrooms.  Our judiciary understands the anathema that censorship represents and the need to protect against it.  Nearly a century ago, the United States Supreme Court recognized

that "[m]ere knowledge" of concepts, perspectives, and events "cannot reasonably be regarded as harmful" when taught in public schools. *Meyer v. Nebraska*, 262 U.S. 390, 399-400 (1923). That is particularly true today, when students, armed with the internet and other technological advances, have free and unfiltered access to more information than at any other time in history. The public school classroom – the cornerstone of a sound education and educational system – must be a safe forum for the free exchange of ideas and information. It is a young American's initial and foundational exposure to the importance of independent thought and expression, and a critical first component for the cultivation of democratic ideals.

24.     New Hampshire has long been a beacon of American public education, with a rich history of preparing well-rounded students for successful participation in our ever changing society. These basic precepts have been acknowledged and practiced in New Hampshire's public education system for decades. Indeed, the need for a diverse and well-rounded educational experience is enshrined in the New Hampshire Constitution which guarantees a minimally "adequate education," and in case law explaining the touchpoints of such an education. Thus, New Hampshire's highest court has made clear that:

> Given the complexities of our society today, the State's constitutional duty [to provide a constitutionally adequate education] extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas.

*Claremont Sch. Dist. v. Governor*, 138 N.H. 183, 192 (1993) (*Claremont I*). Indeed, in the progeny of *Claremont I* the principles of curricular openness have consistently been strengthened and reiterated.

25.     New Hampshire's uniform state educational standards contemplate that students will be engaged and challenged on a diversity of topics even in those instances where confronting

certain materials or topics may cause discomfort (*e.g.*, historical events such as the Cocheco

Massacre and its aftermath[3]) but at the same time teach vital lessons.  For example, New

Hampshire has long mandated by statute that in all public and private schools, there shall be

courses teaching about "intolerance, bigotry, antisemitism, and national, ethnic, racial, or

religious hatred and discrimination *[that] have evolved in the past, and can evolve, into genocide*

*and mass violence"* and *"to prevent the evolution of such practices"* in the future.[4]  (Emphasis

added).  New Hampshire law thus requires students to examine – and it follows that teachers shall

provide the instruction for students to learn – controversial events from multiple perspectives and

ideologies and learn to defend and challenge differing views on a wide variety of topics.  In short,

New Hampshire state law promises to develop students into well-rounded, well-educated young

adults who are prepared to embrace all the challenges, complexities, privileges and

responsibilities of American citizenship, who are prepared to live in an increasingly diverse

world, and who can compete successfully in the New Hampshire, national and global economies.

The accomplishment of that goal has long been a hallmark of New Hampshire and of its

educational system.  Parents rely on New Hampshire's public schools to educate their children

consistent with those standards.  And every year, high school seniors seek their degrees to prepare

them for the workforce, college, and whatever else may lay ahead of them, assured, consistent

with those standards, that they have acquired the necessary knowledge and skills to survive and

thrive in a complex, ever-changing, competitive world.

  A.  *The Divisive Concepts Statute*

  26.  On June 25, 2021, New Hampshire lawmakers launched a devastating blow to the

education New Hampshire parents have come to expect and thrust upon New Hampshire's

---

[3] *See* The Dover, N.H. Public Library, Dover History, https://www.dover.nh.gov/government/city-operations/library/history/the-cochecho-massacre.html (last accessed Dec. 10, 2021).
[4] *See* RSA § 189:11(i)(j).

teachers an impossible predicament.  Rather than uphold the longstanding tradition of educational excellence, New Hampshire legislators, as part of a political arrangement necessitated by a deadline for the timely enactment of the biennial state budget, accepted a falsely-premised national political narrative of opposition to "political correctness" by enacting the statute that is the subject of this litigation, RSA § 193:40.

27.    They did so in the wake of nationwide efforts to politicize and censor education.[5] As his term in office drew to a close, President Trump established the "1776 Commission," a group created to "promote patriotic education,"[6] defined by its opposition to a controversial theorem, The Critical Race Theory ("CRT"), which they termed  "toxic propaganda"[7], the *New York Times*' 1619 Project, and the late Howard Zinn, author of *A People's History of the United States.*  President Trump also issued a November 2020 Executive Order prohibiting federal institutions from providing diversity and inclusion training and discussing topics about systemic racism, white privilege and other race and gender bias issues.[8]  Willingness to pursue such mandates for thinking, learning and teaching became for some the political litmus test for educational existence.

28.    Nonprofit organizations challenged the above Executive Order in federal court, arguing that it violated their free-speech rights and hampered their ability to conduct their businesses, including their ability to conduct training for their workforce on topics such as "implicit bias."  A federal judge agreed, enjoining *on a nationwide basis* the enforcement of the Executive Order restraining the education and training of federal employees respecting "divisive

[5] Adam Harris, *The GOP's 'Critical Race Theory' Obsession*, THE ATLANTIC (May 7, 2021), https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixation-explained/618828/.
[6] Olivia B. Waxman, *Echoing Decades of Fighting Over U.S. History Classrooms, President Trump Announces a Push for 'Patriotic Education,'* TIME (Sept. 17, 2020), https://bit.ly/3xs1qHX.
[7] *Id.*
[8] Establishing the President's Advisory 1776 Commission, Pres. Exec. Order No. 13958, 85 Fed. Reg. 70951 (Nov. 2, 2020).

concepts" (*i.e.*, race and gender), as violative of the First Amendment.[9] With bipartisan support, President Biden rescinded the order shortly after taking office,[10] thus mooting the litigation.

29.     Nevertheless, as one commentator aptly put it, the rebranding of the "critical race theory was already a part of the conservative lexicon" by that point.[11] Supporters of the "divisive concepts" ban rushed to generate a rash of proposed state legislative measures in various states designed to replicate, if not expand, the federal constraints that had just been enjoined based on serious constitutional concerns.

30.     Spurred on by committed ideological zealots who wanted to re-write history, some New Hampshire politicians were persuaded to follow suit. After unsuccessfully attempting to pass stand-alone legislation explicitly banning the teaching of "divisive concepts" related to race and gender, the Legislature included prohibitions against teaching in order to gain the requisite votes to timely pass the biannual $13.5 billion state budget bill (an acutely time sensitive measure which if not enacted precisely in accordance with sensitive timelines would cripple the state).

31.     The new bill created sections 297 and 298, and to conceal its true meaning and purpose, was entitled "Right to Freedom From Discrimination in Public Workplaces and Education" (June 25, 2021) (the "Teaching Discrimination Statute"). It was joined with contemporaneously enacted amendments to RSA § 354-A:30-34 (the "Contemporaneous Amendments"),[12] into a single bill (HB 2), skillfully crafted to conceal through ambiguity the true censorship purposes of its architects.[13]

---

[9] *See Santa Cruz Lesbian and Gay Community Center v. Trump,* 508 F. Supp. 3d 521 (N.D. Cal. 2020).
[10] Harris, *supra* n.5.
[11] *Id.*
[12] The Contemporaneous Amendments include: "354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education;" "354-A:31 Prohibition on Public Employers;" "354-A:33 Protection for Public Employees," and "354-A:34 Remedies").
[13] The full text of the operative provisions of HB 2, the Budget Bill which added the above-cited provisions as adopted, is attached hereto as Appendix A. For convenience, that portion which is the focus of these proceedings and is captioned "*Prohibition on Teaching Discrimination*" is in full text as follows:

32.     In their effort to legislate around expressly banning CRT and related topics, the legislative sponsors drafted the Divisive Concepts Statute with language that is vague beyond comprehension and is one that flies squarely in the face of the United States Constitution and New Hampshire statutory and constitutional law.  The Divisive Concepts Statute was broadly couched as seemingly aimed at prohibiting teaching that "an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously."

33.     Similarly, the measure was cast as also prohibiting teaching that (i) "people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status,

"91:298 New Section; Prohibition on Teaching Discrimination. Amend RSA 193 by inserting after section 39 the following new section:
193:40 *Prohibition on Teaching Discrimination*. I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:
(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or
(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.
II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the *historical existence* of ideas and subjects identified in this section.
III. Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.
IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.
V. For the purposes of this section," educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are included within the definition of this term. 91:299 Severability. If any provision of sections 297-298, or the application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby.
91:300 Effective Date. Sections 297-299 of this act shall take effect upon passage.

mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard [sic] to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin" or (ii) that one's "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."

34.    Importantly, the statute authorizes "*[a]ny person* claiming to be aggrieved by a violation of the [Divisive Concepts Statute]" to "initiate a civil action against a school or school district in superior court for legal or equitable relief..." (Emphasis added).

35.    The overbreadth and ambiguity of the statute makes it impossible for teachers to follow and highly susceptible to arbitrary and discriminatory enforcement, particularly by State enabled private citizen "bounty hunters" and informers.

36.    What does it mean, for example, to prohibit teaching that people of one particular group "cannot and should not attempt to treat others without regard" for their age, sex, gender, mental or physical disabilities?  Indeed, our laws *mandate* the accommodation of certain groups of people, including those with mental and physical disabilities, and purposefully treat individuals *with regard* for their chronological age.  What does it mean to prohibit teaching that an individual, by virtue of one's age, cannot make one "inherently superior" or "inherently inferior" to a younger individual?  Here, too, our laws recognize and plainly differentiate "by virtue of one's age."  A 12 year-old cannot get a chauffeur's license in most jurisdictions.  A 90-year old cannot get a paragliding permit or train operating engineer's license in most jurisdictions.  Additional examples concretely illustrate the ambiguities:

- Can a teacher discuss, debate, or answer questions in their classroom about the policy of affirmative action, a policy that necessarily treats members of certain identified groups differently and *with regard* for their identification? Can a teacher discuss for example, programs such as the Small Business Association's affirmative action programs for the treatment of disabled individuals, which necessarily treats disabled applicants differently?

- Can a teacher discuss or debate New Hampshire's mandatory retirement age (since 1792) for judges attaining 70 years of age and whether the law ought to force retirement at a certain age in the judiciary or elsewhere?

- Can a teacher discuss or debate the Americans with Disabilities Act and whether the law should accommodate, and *not treat equally*, those who need or require special accommodation?

- Can a teacher discuss the failure of all states to ratify the Equal Rights Amendment, and whether other measures should be taken to ensure women are treated equally with their male counterparts? Perhaps more simply, can a teacher posit that women today, by virtue of their gender, are inappropriately paid less than men?

- Can a teacher discuss why the midnight thrill of a Crawford Notch first vote is a greater testament to democracy than a poll tax, or the limitation on the number of polling places or like constraints on voting? Or that these constraints on voting are impairing democracy or discriminatory to marginalized communities?

The statutory provisions arguably proscribing the foregoing remain on the books, providing a basis for the politically motivated to terrorize or intimidate teachers. As set forth in greater detail below, with the Department and Commissioner of Education permitting, and tacitly encouraging, the formation and deployment of a cadre of informers and bounty hunters to report violations of the statute using the simple expedient of an online complaint, thereby triggering inquiry, and perhaps discipline, the chilling effect of that prospect will have the desired result in many cases, with those fearful of job loss, possible investigation and reputational harm becoming ready prey.

37. Moreover, the Divisive Concepts Statute's constraining mandates squarely collide with long-standing provisions of New Hampshire's law directing what shall be taught. Consequently, New Hampshire's teachers face a situation that is impossible to navigate: if they

attempt to comply with the statute's substantive prohibitions, they could run afoul of New Hampshire's mandatory educational standards; but if they attempt to comply with New Hampshire's long-standing educational standards, they could run afoul of the substantive prohibitions in the Divisive Concepts Statute.[14]

38.     This is not simply a "theoretical conflict."  It is a Hobson's choice that teachers in New Hampshire now are asked to face every day.  Since the start of the school year, teachers across New Hampshire have struggled to understand the scope of what they can and cannot teach and what questions they can and cannot answer under the Divisive Concepts Statute.

39.     Plaintiff Ryan Richman, for example, who teaches world history class at Timberlane Regional High School, in Plaistow, N.H, is facing this dilemma.  He often asks his students to "[f]ind an event in the news, bring it to class, and be prepared to discuss its connections with the past."[15]  "Nine times out of 10, they are stories about oppression.  They're stories about exclusionism. They're about the Rohingya genocide, they're about the Uyghur genocide, which are going on right second. They're about Black Lives Matter."[16]  He, like many other teachers, is now left wondering whether the Divisive Concepts Statute "will affect his class, or that instruction."[17]

40.     For example, the Divisive Concepts Statute prohibits teaching that an individual, by virtue of his religion or race is "oppressive, whether consciously or unconsciously."  Mr. Richman teaches genocide studies.  In discussions of the expanding influence of China, can Mr. Richman teach about Chinese claims of racial and religious superiority and oppression of Uyghur

---

[14] See infra, ¶¶ 63-75.
[15] Ethan DeWitt, NH teachers consider how 'divisive concepts' law will affect lesson plans, VALLEY NEWS (July 14, 2021), https://www.vnews.com/teachers-respond-to-divisive-concepts-legislation-from-41432485.
[16] See id.
[17] See id.

Muslim women who are raped as part of a supposed re-indoctrination program?[18]  Can he discuss

Russia's oppressive treatment of the Chechen people?  While teaching about genocide and the

Holocaust, which are expressly mandated by the New Hampshire State curriculum, Mr. Richman

worries what he can teach about Nazism, Aryan supremacy philosophy generally, and how white

supremacy still exists today.  Mr. Richman also teaches constitutional law to his high school

students.  He worries whether he can teach about affirmative action, the Voting Rights Act and

the Equal Rights Amendment and whether protections are still needed today, without running

afoul of the Divisive Concepts Statute.

41.     Elizabeth Dubrelle, who trains teachers on how to teach civics and social studies at

the New Hampshire Historical Society, says it's a blow to an area of education that already lacks

robust standards.  She said that "[s]ocial studies was already hanging on by its fingernail."  She

added, "My concern is that schools will decide that since it's already in peril, it's not worth the

risk and they'll just do the bare minimum."[19]

42.     Moreover, under New Hampshire law, public school teachers have a five-year

waiting period before they can achieve tenure.  Before a teacher reaches that threshold, school

districts can choose not to renew their contract without strongly stated reasons.  Many believe that

"[t]eachers that are newer, that are more concerned about making sure that they have their jobs

and they have a livelihood, are going to feel the most pressure to kowtow to this political

manipulation of curriculum," Richman said, "not talking about anything that could potentially

ruffle any feathers at the expense of the students."[20]

---

[18] *See* Matthew Hill et al., *'Their goal is to destroy everyone': Uighur camp detainees allege systematic rape,* BBC
NEWS (Feb. 2, 2021), https://www.bbc.com/news/world-asia-china-55794071.

[19] Sarah Gibson, *Despite New State Law, Debate Continues Over Discussing Race And Equity in N.H. Schools,* NEW
HAMPSHIRE PUBLIC RADIO (July 8, 2021), https://www.nhpr.org/nh-news/2021-07-08/despite-new-state-law-debate-
continues-over-discussing-race-and-equity-in-n-h-schools.

[20] DeWitt, *supra* n.15.

43.     New Hampshire's Divisive Concepts Statute is not aimed at any existing teaching practice: teachers do not indoctrinate their students or seek to have their students agree or disagree with any particular political viewpoint; rather, they want only to retain the professional integrity and freedom that they have traditionally been afforded under New Hampshire law.  They endeavor to open their students' minds by exposing them to a wide variety of materials, viewpoints and challenging concepts, without risking their careers or their district's funding. They seek to help children learn *how* to think, not *what* to think. The statute's vague and broad language unfairly chills teachers' attempts to do their jobs and teach a wide range of materials and viewpoints.

44.     And the consequences for a teacher for violating the Divisive Concepts Statute's broad prohibitions are stark.  They include disciplinary proceedings that can lead to dismissal and reputational disgrace.  *See* RSA § 193: 40 (IV).  Strict enforcement of the State's mandate permitting only a single interpretation of American history with these consequences is directly analogous to the actions, past and present, of totalitarian states.[21]   Certainly this is not consistent with a free society or the principles that underlie "Live Free or Die."

45.     Sadly, there is today no shortage of culture warriors – politically-charged groups and individuals – who remain laser focused on persecuting public school teachers and preventing them from teaching accurate history.  In fact, just this month "Moms for Liberty NH," a group devoted to the nonexistent problem of critical race theory in public schools, announced a bounty,

---

[21] The Nuremberg Laws, though initially focused on Jews, applied with equal force to Blacks and other minorities. *See The Nuremberg Race Laws,* Holocaust Encyclopedia, United States Holocaust Memorial Museum, https://encyclopedia.ushmm.org/content/en/article/the-nuremberg-race-laws (2021) (last accessed Dec. 10, 2021). *Cf.,* James Q. Whitman, *Hitler's American Model,* PRINCETON UNIV. PRESS (Feb. 21, 2017) (Discussing the impact of America's Jim Crow laws on the Nuremberg laws and Nazi Germany). *See also* Austin Ramzy & Chris Buckley, *The Xingiang papers: 'Absolutely No Mercy': Leaked files expose How China Organized Mass Detention of Muslims,* N.Y. TIMES (Nov. 16, 2019), https://www.nytimes.com/interactive/2019/11/16/world/asia/china-xinjiang-documents.html.

a $500 reward, for any individual who reports a teacher violating the ban on "divisive concepts",

thereby triggering Department of Education inquiry, and perhaps more.[22]



The Moms for Liberty NH "bounty" came hand-in-hand with Commissioner Edelblut's and the

Department of Education's effort to create an avenue for informants to inform on public school

teachers.  Indeed, the Twitter "bounty" followed just two days after Commissioner Edelblut

created a website and form to report complaints against teachers.[23]  Shades of the authoritarianism

of totalitarian states are inescapable.  These parallel efforts will  undoubtedly chill responsible and

ethical teaching about our nation's history.  Public school teachers now have a target on their

backs, and Commissioner Edelblut and the Department of Education have opened a pathway for

political extremists to instigate ideologically-motivated investigations that may lead to the

---

[22] Paul Blest, *An Anti-CRT Group Is Offering People $500 to Snitch on Teachers,* VICE NEWS (Nov. 15, 2021), https://www.vice.com/en/article/y3vga5/anti-crt-group-offering-teachers-money-new-hampshire.

[23] New Hampshire Dep't of Educ., *Right to Freedom from Discrimination in Public Workplaces and Education*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination (last accessed Dec. 10, 2021).

discipline and possible loss of professional credentials of teachers and administrators across the State.

46.     The Divisive Concepts Statute has brought partisanship into our classrooms and ignited the fires of confrontation and discord in New Hampshire communities.  To illustrate, that conflagration has been kindled, of all places, on an official website created and controlled by the Defendant New Hampshire Commissioner of Education.  Indeed, the Commissioner's website demonstrates how the Divisive Concepts Statute's alleged neutrality and overbreadth can be used for political purposes to target teachers directly.  Under the Divisive Concepts Statute, complaints for violations of the statute may be brought by the aggrieved as a formal civil action in superior court or with the New Hampshire Commissioner of Human Rights against a school or school district.  RSA § 193:40(III).  The Department of Education website provides a link to facilitate the filing of complaints against teacher "…for those who believe that they, or their child, was discriminated against because their child's school was teaching and/or advocating …" matter in violation of the Statute[24].  It then lists a series of reference works.

47.     Studiously omitted however, is the Attorney General's September 7, 2021 formal opinion No. 2021-01, which expressly states that the Statute was viewed as "…confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."[25]  As set forth in greater detail below, the Opinion makes clear that in the view of the Attorney General the Divisive Concepts Statute required some 9-pages of non-binding clarification because vague and confusing.  Significantly, however, that attempt at clarity is wholly omitted from the Education Department's website months after issuance of the Opinion (*i.e.*, at the time of filing of this Complaint) despite the citation of other reference works. One result is to facilitate the

---

[24] *See supra*, n.23.
[25] Attorney General Opinion No. 2021-01, *supra,* n.2.

improper filing of complaints asserting supposed violations alleging conduct and stimulating investigation, reputational harm and burden through the Department of Education, with the attendant dangers of arbitrary and discriminatory application.

  *B.*  *The FAQs and Attorney General's Opinion*

  48.  Since its passage, the State has attempted on at least two occasions, in an FAQ document issued in July and in a September 7, 2021 Attorney General's opinion, Opinion No. 2021-01, to clarify the language and narrow the meaning of the uncontrovertibly vague and confusing Divisive Concepts Statute.

  49.  The mere fact that the initial guidance was immediately needed and, two months after it was provided, one of the authors of the initial clarification (the July FAQ's)—the Department of Human Rights – acknowledged it was confused and required clarification as to the very nature and scope of the Divisive Concepts Statute, highlights not only the ambiguity of the Statute, but also the perception that, in its quest to stifle speech and ban important and difficult discussions of race, even an enforcer of the Statute finds it inherently "fuzzy."  Significantly, however, while both efforts to try to remedy the flaws in the legislation seemingly move the needle towards a more comprehensible (albeit redundant) law, the FAQ and Attorney General Opinion still leave ambiguity and have no dispositive legal force.  Indeed, it is as if the Attorney General (and even those who lent their names to initial FAQ's) are saying to those who read and rely on these successive restatements of the Statement "*the Legislators really did not mean what they enacted*"; yet, the law, as they enacted it, is still the law and is being used by the DOE and its Commissioner, as well as their cadre of informers and bounty hunters, to confuse, intimidate and bully teachers who have no idea if and when they teach according to the educationally-prescribed curriculum, or answer forthrightly a student's question, they will be pilloried, shamed or fired. Until substantially recast or nullified, the Divisive Concepts Statute remains the vague law of

New Hampshire, largely unintelligible by those intended to be affected and in direct conflict with the United States Constitution and New Hampshire's education laws. A few examples of the FAQ's attempt to seemingly correct the defective legislation emphasize the point.

50.     First, the FAQ sets out to define certain terms of the statute. In a section entitled, "What do the phrases 'inherently superior or inferior'" or 'inherently racist, sexist, or oppressive' mean?,'" the FAQ tries to clarify this ambiguity, explaining that ""[i]nherent' means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors."[26]

51.     Second, in a section entitled "Does the law prohibit teachers from teaching U.S. history," the FAQ seeks to temper the impact of the Divisive Concepts Statutes, stating that nothing therein precludes teachers from teaching historical subjects (like slavery or Jim Crow) or discussions relating to current events (like the Black Lives Matter movement), or even efforts to promote equality and inclusion, or other contemporary events that impact "certain identified groups."[27]  It also indicates that topics relating to racism, sexism or other beliefs that make students, faculty or parents uncomfortable will not *automatically* violate the statute.[28] The use of the term "*automatically*" is telling. How is a teacher to know what topics will violate the statute if it is not "automatically" enforceable?  Who or what triggers enforceability?  If, for example, a student asks about current policies that attempt to correct for historical racism, sexism or other oppression, such as affirmative action, may the teacher respond by providing examples of the appropriateness or inappropriateness of such measures?

52.     Finally, while the statute indicates that it should not be construed to prohibit discussing, "as part of a larger course of academic instruction, the *historical existence* of ideas

[26] *See* FAQ.
[27] *See id.*
[28] *See id.*

and subject[s]" such as discrimination and racism, the FAQ suggests that discussion of historical practices may also include a discussion about how these practices "continue to harm certain identified groups" and "their lingering impact." Again, the line between teaching or describing the "lingering impact" or "continue to harm" of racism and sexism in our country versus how or whether these issues can or should be affirmatively addressed appears to be intentionally blurred, so as to leave teachers in grave doubt regarding what they can and cannot say or teach in their classrooms.[29]

53.    The FAQ's did not resolve the all of the inherent flaws in the Divisive Concepts Statute and neither has the September 7, 2021 Opinion of the Attorney General. In response to the request from the Chair and Executive Director of the Commission for Human Rights to clarify the "scope and application" of the Divisive Concepts Statute, the Attorney General framed his own set of questions issued a series of questions regarding ambiguities in the law and attempted to address them. The Attorney General frankly admits that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."

54.    Importantly, as previously noted, the Attorney General's September 7th Opinion has seemingly been wholly ignored by the Department of Education, the entity that directly interacts with teachers and administers potential discipline. The refusal to even cite it is telling, especially because the Opinion makes clear that the Statute must be recast in fundamental respects and provides the beginning of a roadmap to fundamental interpretative restatement of the fatally flawed Divisive Concepts Statute that this Court may employ through Declaratory Relief.

---

[29] It should not go unnoticed that in the same FAQ that attempted to "address[] questions that may arise regarding the changes to schools and educational programs," the Department of Education tacitly encouraged informers, pointing out that any "student or parent" may file a complaint with the New Hampshire Commission for Human Rights, Attorney General or file a civil claim in superior court for damages or injunctive relief.

55.     In stark contrast with the Divisive Concept Statute, the Attorney General's Opinion expands the permissible scope of teaching, advising, for example, that, while the statute is silent on the matter, the Divisive Concepts Statute should not be viewed as prohibiting and does not "prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups."  The Attorney General also suggests that educational programs may teach "participants about disparities that may exist among different identified groups, the current or historical practices that may have contributed to those disparities, or about concepts such as implicit bias."  That small but significant substantive step forward does not however make the statute as a whole readily understandable neither, we must stress, is it enforceable, especially in the private actions seemingly encouraged by the DOE.

56.     The Attorney General's Opinion itself  makes clear that even after the FAQ restatement, ambiguities remain that are unresolved.  What does it mean to teach about "disparities that may exist among different identified groups" and "historical practices" that may have led to the disparities?  Can teachers in New Hampshire teach not only the historical existence of segregation and Jim Crow and its impact on America, even today, but also remedial proposals to address ongoing racial inequity?  Can Mr. Richman, for example, teach or have his students debate whether certain voting rights laws that restrict voting for certain groups constitute racially charged "modern day Jim Crow" laws?  Can his students debate affirmative action or question whether race pays a role in police shootings today? Can those students be permitted to discuss voter registration or reinstatement laws and procedures?  Certainly, the Attorney General's Opinion moves in the direction of statutory clarity, but it does not provide enforceable guidance or cure the statute's facial infirmities.

57.     Moreover, regardless of how the FAQ or the Attorney General's Opinion seek to explain how the statute *ought* to be enforced, the statute provides for *a private right of action* for any person , who may initiate a civil action against a school or school district, for their individual dissatisfaction with curricular choices.  "Any person"—not even limited to someone with a child in a public school—may "initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights." Such a delegation of enforcement power is troubling insofar as it turns citizen on citizen, and encourages a culture of surveillance and vigilantism. But even more worrisome is the likelihood that in response to such actions, the Divisive Concepts Statute will undoubtedly be enforced in arbitrary ways—leaving teachers unable to predict what lesson plans or classroom discussion is tolerated by the statute and which ones run afoul of it.

58.     When enforcement power is dispersed and privatized in this manner, there is no consistency in how a law is enforced, which heightens the harm attributable to the unconstitutional vagueness of the Divisive Concept Statute. No single, publicly-accountable body sets enforcement priorities.  Instead, individuals are left to determine, without any prior approval or oversight, when a complaint should be prosecuted and why. Individuals have maximum discretion—and minimal oversight. The problem with such private delegation of power is exacerbated when a statute has no fixed meaning, like the Divisive Concepts Statute here. Individuals will have unchecked authority to bring cases under their interpretation of the statute. They will not have to abide by or even read (or have ready access) to the conflicting policies set by the Department of Education or the Attorney General, flouting the guardrails of due process. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (describing the risk of

"frivolous complaints" when the "universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations").

59.     And while the courts may rebuff the most extreme interpretations put forward, the mere fact that individuals can enter court with those interpretations in the first place does damage enough: it will chill the speech of teachers who do not want themselves, their schools or their school districts hailed to court on their behalf, and who worry about the reputational harm that would undoubtedly result. Moreover, every day that debate is stifled, the students of New Hampshire suffer, and are put at a competitive disadvantage in a complex, multi-cultural world.

60.     The private delegation of enforcement authority—combined with the vagaries of the statute—will simply embolden those with the most polarizing views, who will seek to use this new power that they have been granted to put pressure on teachers. Teachers will teach with the eyes of these extremists on them, and will no doubt feel compelled to change their lesson plans accordingly.  Simply put, the guidance set forth in the FAQ or the Attorney General's Opinion will not stop the white nationalists, for example, who have bombarded New Hampshire school board meetings,[30] or "Moms for Liberty NH," from attempting to use the statute's vague and easily adaptable language to serve their own political purposes.  It has not stopped the bounty hunters from accessing the Commissioner of Education's newly established website and offering 500 pieces of silver to those who point the finger of accusation, merited or not.

61.     Time and again, history has demonstrated that the first effort of advocates of totalitarianism is to censor education and understanding.  The failure, as exemplified by the initiators and facilitators of the Divisive Concepts Statute, to learn that lesson, would, to paraphrase the noted philosopher Santayana, condemn us all to relive the darkest hours of history.

---

[30] *N.H. Education Commissioner: 'Divisive Concepts' Restrictions Won't Hinder Classroom Conversations,* NEW HAMPSHIRE PUBLIC RADIO (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.

62.     In reality, the broadly drawn Divisive Concepts Statute was designed to prohibit forthright and balanced teaching by limiting New Hampshire's students and future generations' awareness and understanding of our shared history, along with the broadest spectrum of philosophies, viewpoints and approaches.  This, in turn, deprives New Hampshire students of the well-rounded and competitive ability to critically analyze and confront effectively facts and ideas that are in broad circulation in the modern economy. The Divisive Concepts statute is an imprecise and overwrought effort to cabin the teaching of our country's history of racism, sexism, homophobia and the like to static, historical events rather than a continuing struggle for justice. This "Big Brother" approach directly interferes with the competent functioning of public school classrooms.  This suppressive measure seeks to conceal our historical flaws such as the ill-treatment of certain groups of people in this country (whether the Quakers in early New England or African Americans in the Deep South or Asians-Americans during World War II and other victims of blind intolerance), thereby attempting to create ill-educated students unaware of our national commitment and struggle towards equality for all.  In the process, it deprives New Hampshire students of understanding and appreciating the heroic measures undertaken to secure positive change and the arguments advanced both in favor of and against change.

63.     Plaintiffs thus call upon this Court to resolve an issue of significant constitutional import: to declare the Divisive Concepts Statute constitutionally void for vagueness or otherwise invalid, or, alternatively, to declare in simple declaratives what curriculum – the basic legislatively outlined curriculum historically adopted or some constitutionally acceptable modification thereof – teachers may safely employ so that they do not violate the Divisive Concepts Statute's vague strictures. Without this Court's specific declaratory guidance, teachers, including Plaintiffs, have no fair notice of what curriculum is acceptable in practice.  And it

merits emphasis that that declaration will in no way diminish or adversely impact the nature, scope or enforceability of New Hampshire's longstanding and sweeping laws, regulations and enforcement structure aimed at proscribing discrimination in the schools, the workplace and in society in general.

64.     Accordingly, Plaintiffs invoke this Court's Declaratory Judgment jurisdiction to declare that the Divisive Concepts Statute is void for vagueness, violative of the U.S. and New Hampshire constitutions and invalid under New Hampshire state law or, alternatively, to build upon the Attorney General's interpretation a substantially recast version that eliminates those fatal flaws and permits New Hampshire teachers to teach and its students to learn the lessons they require for their future careers, lives and civic participation.

## SPECIFIC FACTUAL ALLEGATIONS

*A.*     *Teaching American History, Social Studies, and Current Events in New Hampshire's Schools*

65.     New Hampshire courts have a long history of ensuring that New Hampshire schools are properly educating its children.

66.     In a series of cases going back to 1993, the New Hampshire Supreme Court has held that the State has an obligation to provide and fund a constitutionally adequate elementary and secondary education for all and that it is for the legislature and the Governor to define the parameters of the education mandated by the State Constitution. *Claremont Sch. Dist. v. Governor*, 138 N.H. 183 (1993) (*Claremont I*); *Claremont Sch. Dist. v. Governor*, 142 N.H. 462 (1997) (*Claremont II*); *Claremont Sch. Dist. v. Governor*, 147 N.H. 499 (2002) (*Claremont III*).

*Accord Contoocook Valley Sch. Dist. v. State,* 174 N.H. 154 (2021)[31]; *Londonderry Sch. Dist. SAU No. 12 v. State,* 154 N.H. 153 (2006).

67.     Consistent with those rulings, the Legislature has statutorily codified the parameters of an adequate education.  The State's overarching policy is to "provide all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come."  *See* RSA § 193–E:1(I).  The legislature views "[a] well-educated populace [a]s essential for the maintenance of democracy, the continued growth of our economy, and the encouragement of personal enrichment and development."  RSA § 193–C:1.

68.     As set forth in New Hampshire's state law, the criteria for an "Adequate Public Education," includes: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens."  *See* RSA § 193–E:2(IV).  It also includes "Grounding in . . . literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas."  *See* RSA § 193–E:2(V).

---

[31] "The State does not contest the underlying law applicable to the issues in this case. Under our education funding jurisprudence, Part II, Article 83 of the State Constitution 'imposes a duty on the State to provide a constitutionally adequate education to every educable child in the public schools in New Hampshire and to guarantee adequate funding.'  *Claremont School Dist. v. Governor*, 138 N.H. 183, 184, 635 A.2d 1375 (1993).

To comply with that duty the State must "*define an adequate education, determine the cost, fund it with constitutional taxes, and ensure its delivery through accountability.*"  *Londonderry Sch. Dist. v. State*, 154 N.H. 153, 155-56, 907 A.2d 988 (2006) (quotation omitted).  The plaintiffs do not challenge the constitutionality of the definition of an adequate education set forth in RSA §193-E:2-a (Supp. 2020).  Rather, the plaintiffs' grievance is that the State is not fulfilling its constitutional duty because local school districts require substantially more funding than the State currently provides under RSA 198:40-a, II(a) in order for them to deliver the opportunity for a constitutionally adequate education, as defined in RSA 193-E:2-a, to the public school children in New Hampshire."

*Contoocook Valley Sch. Dist. v. State*, 174 N.H. at 274 (Donovan, J. Opinion).

69.     Indeed, New Hampshire's Legislature sets forth minimum standards for

"Instruction in National and State History and Government."  RSA § 189:11.  New Hampshire

law requires that "[i]n all public and private schools in the state there shall be given regular

courses of instruction in the history, government and constitutions of the United States and New

Hampshire. . . ."  *See* RSA § 189:11(I).  Specifically, *at a minimum*, courses must include

instruction on:

> (b) Skills to effectively participate in civic affairs.
>
> ….
>
> (j) How intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination *have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices.*

*See* RSA § 189:11(I)(j) (Emphasis added[32]).

70.     In furtherance of the above-stated educational goals and advancing its underlying

objectives, the State's public policy has long demanded that discrimination of any kind be barred

from its public schools, mandating instead that schools and education are neither the vehicles for

nor a means by which discrimination may lawfully be advanced.

71.     Accordingly, the New Hampshire legislature has barred:

> discrimination in public schools because of . . . age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, or national origin.

RSA § 354-A:27.

72.     Moreover, Chapter Ed 300 of New Hampshire's Education laws addresses the

"Administration Of Minimum Standards In Public Schools."[33]  As stated by the legislature, social

---

[32] The Divisive Concepts Statute by its terms limits such teaching as is permitted to the teaching of "existence" not, as mandated by law, its past, present and prospect evolution into "genocide or mass violence."  By so doing, the Divisive Concepts Statute in critical terms stands squarely in conflict with RSA § 189:11(I)(j).

studies programs should give students an opportunity "to acquire the knowledge, skills, and attitudes necessary for effective participation in the life of the community, the state, the nation, and the world."[34]  Middle schoolers must therefore receive "[s]ystemic instruction and activities designed to enable students to . . . [a]cquire and use information to clarify issues and seek solutions to societal problems. . . ."[35]  High schoolers must "acquire knowledge and modes of inquiry in the areas of civics, economics, geography, world history, and United States and New Hampshire history. . . ."[36]

73.    Specifically, New Hampshire promulgated a "k-12 Social Studies New Hampshire Curriculum Framework"[37] (last approved by the N.H. DOE in July 2006), setting forth specific topics ("Strands") in Civics, Economics, Geography, New Hampshire and United States History, and World History and Contemporary Issues, that must be taught for each grade level.  The framework sets forth a set of standards for teaching social studies to different grade levels so that students have "knowledge and skills needed to participate intelligently and responsibly in our ongoing democratic experiment and in an interdependent world."  To that end, the New Hampshire guide states that "[a]n effective study of social studies must focus on conceptual frameworks and themes rather than solely an examination of facts."[38]

74.    These Standards and Benchmarks encourage, among other things, the development of research and inquiry skills, critical thinking and analysis, the ability to discern between fact and opinion, the use of primary and secondary sources, and a deep understanding of the unvarnished

---

[33] Chapter Ed. 300, Administration of Minimum Standards in Public Schools, http://www.gencourt.state.nh.us/rules/state_agencies/ed300.html (last accessed Dec. 10, 2021).
[34] *Id.* at 306.46(a)(4).
[35] *Id.* at 306.46(b)(4)(a).
[36] *Id.* at 306.46(c)(1).
[37] K-12 Social Studies New Hampshire Curriculum Framework, https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf?2 (June 2006) (last accessed Dec. 10, 2021).
[38] *Id.* at 5.

story of our nation's history, as well as that of the world.  They highlight ten curricular themes as creative approaches to social studies to encourage higher-order thinking in students.[39]  The first theme is "Patterns of Social and Political Interaction," which includes: "human rights issues, the changing role of women in the economy, immigration issues, and slavery."[40]  Themes for U.S. History topics include: "slavery; racism; 'Jim Crow'; Darwinism; eugenics."[41]  For grades 9-12, students should be analyzing the impact of various labor systems, including "slavery, the medieval guilds, or wage labor" or how "suffrage expanded to various groups of citizens" (like African Americans and women).[42]  An understandable and robust education program thus is outlined and can be followed to benefit our children now and in the future.

     75.     Consistent with these standards, on December 14, 2017, Governor Sununu also established an Advisory Council on Diversity and Inclusion pursuant to Executive Order 2017-09.[43]  The Council is charged with working cooperatively with the New Hampshire Commission for Human Rights, the Civil Rights Unit of the New Hampshire Department of Justice, and any other relevant State entities to:

- Review and analyze New Hampshire laws, regulations, and agency policies and procedures, and recommend changes or amendments, where necessary, to further combat discrimination and advance the ends of diversity and inclusion;

- Identify and recommend ways in which the State can support local and community efforts, through educational programs or otherwise, to combat discrimination and advance diversity and inclusion;

- Identify and recommend ways in which the State can partner with non-governmental organizations to combat discrimination and advance diversity and inclusion; and

---

[39] *Id.* at 7.
[40] *Id.* at 9.
[41] *Id.* at 11.
[42] *Id.* at 62; 100.
[43] Gov. Chris Sununu, Governor's Advisory Council on Diversity and Inclusion, https://www.governor.nh.gov/diversity (last accessed Dec. 10, 2021).

- Identify and recommend revisions to RSA 354-A and the scope of the duties of the Commission for Human Rights to combat discrimination and advance diversity and inclusion.[44]

76.     Taken together, these Standards, Benchmarks and diversity initiatives are intended to teach students in New Hampshire public schools to be educated, informed, inclusive, critically thinking and engaged public citizens.

77.     To be clear, despite the misinformed political rallying cry, none of the lessons and activities outlined in New Hampshire curricular law require the teaching of CRT to primary and secondary school students.  CRT is "a practice of interrogating the role of race and racism in society that emerged in the *legal academy* and spread to other fields of scholarship."[45]  CRT developed from the Critical Legal Studies (CLS) movement, "which argued that the law was not objective or apolitical" in the 1970s, and expanded its reach to examination in law schools in the 1980s and 1990s.[46]  As Kimberlé Williams Crenshaw, one of the leading scholars of CRT, notes, CRT "is considered to be an evolving and malleable practice [that] critiques how the social construction of race and institutionalized racism perpetuate a racial caste system that relegates people of color to the bottom tiers."[47]

  B.     *The Legislature Promulgates A Sweeping, Politically-Motivated, and Vague Ban on Teaching So-Called Divisive Concepts Such as Gender, Age, Sexual and Racial Discrimination*

78.     It is in the context of New Hampshire's longstanding judicial and legislative commitment to a well-rounded public education and emphasis on diversity and inclusion that

---

[44] *Id.*

[45] Janel George, *A Lesson on Critical Race Theory*, ABA (Jan. 12, 2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/civil-rights-reimagining-policing/a-lesson-on-critical-race-theory/ (emphasis added).

[46] *Id; see also* Kimberlé Williams Crenshaw, *Twenty Years of Critical Race Theory: Looking Back to Move Forward*, 43 Conn. L. Rev. 1253 (2011), https://scholarship.law.columbia.edu/faculty_scholarship/2864 (last accessed Dec. 10, 2021).

[47] Janel George, *A Lesson on Critical Race Theory*.

makes the Legislature's sudden obeisance to the extremist political winds of the day in the Divisive Concepts Statute so jarring.

79.     On January 12, 2021, Keith Ammon, a majority member of the House of Representatives introduced New Hampshire House Bill HB 544, titled an act "relative to the propagation of divisive topics."[48]  Disingenuously framed under the banner of national "unity," the bill's introducing sponsor unapologetically indicated at the legislative hearing for the bill that he did not believe in systemic racism and likened individuals who conduct diversity and inclusion trainings to "snake oil salesman."[49]  The bill prohibited the teaching of so-called "divisive concepts" and threatened to financially penalize public employees, private businesses and current and prospective state contractors for teaching or training on supposed "divisive concepts" related to race and sex.  Divisive concepts were defined as claims that individuals in New Hampshire or the United States were "fundamentally racist or sexist" or that "by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others."  Governor Sununu threatened to veto HB 544 if it was enacted, so the bill was ultimately tabled.

80.     Meanwhile, the 2022-23 State Biennial Budget had to be adopted before July 1, 2021—the commencement of the new fiscal year—in order to avert a shutdown of all state operations.  The House and Senate each adopted separate budget bills, requiring reconciliation by a Joint Conference Committee chaired by the Chairman of the House Finance Committee.  The Chairman went on record stating that the "divisive concepts" provision needed to be included in the budget bills as a prerequisite to getting House votes for passage of HB1 (the budget measure).

---

[48] NH House Bill 544 (May 7, 20201), https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixation-explained/618828/.
[49] Eileen O'Grady, "*N.H. lawmakers debate banning schools from teaching about systemic racism and sexism*," CONCORD MONITOR, (Feb. 18, 2021), https://www.concordmonitor.com/Education-bill-would-ban-teaching-racism-sexism-38821767.

81.    With the deadline for adoption of HB 1 looming, and the specter of mandatory shutdown of State operations present, a *quid quo pro* solution suddenly "materialized." The Senate re-wrote HB 544 to expand its scope. The new bill created RSA § 193:40 (June 25, 2021) (the "Teaching Discrimination Statute"), which was included (by way of amendment) as part of HB2, the Budget Bill's companion measure calculated to force adoption of a Biannual Budget and avoid shutting down State operations.

82.    On June 24, 2021, HB1 and HB 2 were enacted just before expiration of the budgetary deadline and signed by the Governor on June 25, 2021. HB2 was trumpeted as an anti-discrimination measure and righteously captioned "193:40 Prohibition on Teaching Discrimination."

83.    By its terms, HB 2 includes a provision on "Prohibition on Teaching Discrimination," which applies only to public employees. It provides that:

*Prohibition on Teaching Discrimination.*

    I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

        (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

        (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

        (c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

        (d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical *existence* of ideas and subjects identified in this section.

III. Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education. (Emphasis added).

84.    More than half of Gov. Chris Sununu's Advisory Council on Diversity and Inclusion, including both local members, resigned in protest of Sununu's decision to sign into law the Divisive Concepts Statute.[50]  They wrote that the law "aims to censor conversations essential to advancing equity and inclusion in our state, specifically for those within our public education systems, and all state employees.  This will directly impact those who are working with some of our state's most vulnerable populations, including educators, child welfare workers, and law enforcement."[51]

85.    The Advisory Council on Diversity and Inclusion also maintained that the Divisive Concepts Statute was "in direct conflict with the stated purpose of the Council laid out in your 2018 Executive Order instructing us to identify ways to "combat discrimination and advance diversity and inclusion."[52]

---

[50] Caleb Symons, "*10 resign from state's diversity over 'divisive concepts' law*, SENTINEL (June 29, 2021), https://www.sentinelsource.com/news/local/10-resign-from-states-diversity-panel-over-divisive-concepts-law/article_c7c08f8e-e7a2-5a12-ba8a-7f5f3b43d33a.html.
[51] *Resignation letter*, (June 29, 2021) https://www.aclu-nh.org/sites/default/files/gacdi-resignation-letter.pdf.
[52] *See id.*

86.     Lest there be any doubt that the Divisive Concepts Statute was meant to be a solution for the non-existent problem of mandatory teaching of CRT, New Hampshire's public figures have repeatedly reaffirmed it.

87.     Defendant Frank Edelblut advanced the charge, stating that "our basic values are at risk if teachers claim that racism played a critical role in American History."[53]  He stated in a tweet:



> **Frank Edelblut** ✔
> July 8 at 6:58 AM · 🌐
>
> SOME IN MEDIA ARE EXPRESSING CONCERN ABOUT OUR NEW NH LAW STOPPING DIVISIVE CRITICAL RACE THEORY FROM BEING TAUGHT IN OUR SCHOOLS. As you may know, I support this new legal language in New Hampshire. Here is how public radio recently described the new law. I would like to know - doesn't this make sense to you?  Public radio: "So, the law is called the Right to Freedom From Discrimination in Public Workplaces and Education. Basically, it bans advocating or teaching that certain groups of people are inherently racist, sexist or otherwise oppressive, even if unconsciously. And it also promotes teaching that people should treat others without regards to their differences. So, basically equal treatment of everyone, regardless of race, gender, disability, any other category." ... Well this certainly makes sense to me.
>
> 👍 224                                              438 Comments  68 Shares

88.     Rep. Ken Weyler (R-Kingston), House Finance Chair, who supported the Divisive Concepts Statute, considered CRT to be a "Marxist, anti-American, anti-White" program.[54]

89.     And since passage of the Divisive Concepts Statute, New Hampshire Governor Sununu has tried to distance himself from CRT:

- "The ideas of Critical Race Theory and all of this stuff, I personally don't think there's any place for that in schools. . . .";[55]

- He "doesn't like Critical Race Theory as much as anyone";[56]

[53] David Scannell, *Much ink has already been spilled about HB 544, the so-called 'divisive concepts' bill – here's some more* (June 15, 2021), https://manchesterinklink.com/much-ink-has-already-been-spilled-about-hb-544-the-so-called-divisive-concepts-bill-heres-some-more/.
[54] Damien Fisher, *Compromise Sought on Anti-Critical Race Theory Bill,* NH JOURNAL (April 19, 2021) https://nhjournal.com/compromise-sought-on-anti-critical-race-theory-bill/.
[55] Michael Graham, *Sununu: I Don't Like Critical Race Theory, But I Won't Ban It, Either,* NH J. (April 8, 2021) https://nhjournal.com/sununu-i-dont-like-critical-race-theory-but-i-wont-ban-it-either/.
[56] *See id.*

90.    New Hampshire has a long and rich history, particularly in the field of public education.  The first publicly funded school was opened in Hampton, N.H. some 372 years ago, on May 31, 1649.  The sole qualification for admission was that girls and boys be "capable of learning."[57]  New Hampshire also has a well-established constitutional, legislative, and administrative regimen ensuring that as a matter of public policy:

> [P]ublic elementary and secondary education shall provide all students with the opportunity to acquire the knowledge and skills necessary to prepare them for successful participation in the social, economic, scientific, technological, and political systems of a free government, now and in the years to come. . . .

RSA § 193-E:1.  However, as one of only six states to pass a law restricting certain kinds of teaching on race and gender, the law has had its intended purpose of thrusting New Hampshire to the forefront of the culture wars, questioning a noble educational heritage.

91.    Reopen NH, which organized against COVID restrictions and masks during lockdown, has been posting about Critical Race Theory and urging people to attend school board meetings. So have some white nationalist groups.[58]  As noted, Moms for Liberty NH has offered a bounty on public school educators who the informant believes have strayed by "breaking this law" (*see supra*, ¶ 45).

---

[57] Higher education has also long been a hallmark of the Granite State.  Dartmouth College has since 1769 been one of the nation's most respected institutions of learning.  The University of New Hampshire, a public land grant college and research university, was founded in 1893.

[58] Sarah Gibson, *Despite New State Law, Debate Continues Over Discussing Race and Equity in N.H. School,* NEW HAMPSHIRE PUBLIC RADIO (July 8, 2021), https://www.nhpr.org/nh-news/2021-07-08/despite-new-state-law-debate-continues-over-discussing-race-and-equity-in-n-h-schools.



92.     HB 2 was not a law passed to end discrimination in New Hampshire public schools, nor was it viewed as such – those laws clearly already exist; indeed it merits emphasis that at best, to the extent HB 2 effects any proper proscription against discrimination it is unnecessarily confusing, wholly redundant of and in a number of instances conflict with long-established and well enforced New Hampshire laws and regulations.  The passage of HB 2, in its watered-down form, was intended to inject partisan politics into New Hampshire's educational regimen by adding New Hampshire and its far right-leaning legislators to the political map and the national conversation surrounding the manufactured and contrived political controversy of critical race theory.  It is, however, unconstitutional and should be invalidated unless the court construes it exceedingly narrowly and substantially recasts it along the lines of the roadmap provided by New Hampshire's Attorney General.

C.     *The Legislature Implemented the Divisive Concepts Statute to Threaten Plaintiffs'*
       *Ability to Teach Freely, Sowing Confusion and Inflaming Tensions*

93.     While the CRT issue is a politically manufactured problem employed by partisan zealots without any basis in reality, teachers face the very real possibility of losing their jobs on account of the Divisive Concepts Statute.  Should a "bounty hunter" or Department of Education informant simply chose to identify a teacher as having allegedly violated the Divisive Concepts Statute, an inquisition begins, legal fees become a reality, and a teacher's character, reputation and occupation are jeopardized.

94.     In the FAQ, the New Hampshire Department of Education explained that students and parents that believe their school has violated the Divisive Concepts Statute may simply reach for their computer and file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or a civil claim in the superior court to seek damages or declaratory relief.[59]  An educator can also individually face disciplinary sanction by the state board of education for violating the educator code of conduct.[60]

95.     To enforce the Divisive Concepts Statute, Commissioner Edelblut has now created a website to report complaints of teachers allegedly violating the statute and indicated that he will investigate any such claim as educator misconduct, placing a teacher's livelihood in jeopardy. And, as noted, it is Commissioner Edelblut's state-funded website that will be the forum for the proclaimed bounty prize from the Moms for Liberty NH for informers (identified or anonymous).

96.     Thus, any individual – anonymously, if they wish – can report a teacher for teaching history, economics or civics that does not conform to their own personal views of the

---

[59] *See id.*
[60] Pursuant to New Hampshire's Education Law, the state board of education is tasked with adopting rules for disciplinary proceedings, including procedures assuring due process.  See RSA § 193–D:2.  It also gives the state board of education discretion to adopt "[a] complaint procedure for those asserting that a provision of this chapter has been violated, and possible sanctions and penalties for such violation. . . ."  *See id.*

world.  Just two days after the website and complaint form was published, the Moms of Liberty

NH announced their "bounty" on teachers.  To put it more concretely, the teacher who assigns a

student or a class an oral report on race in America or New Hampshire and receives student work

that includes reference to systemic discrimination, could implicate a rush to collect the bounty or

file a complaint.  If a current events question is raised concerning the nature and circumstances

under which affirmative action was directed in a given circumstance and the teacher explains

what was involved, whether it is merited and what other remedies are available, they too could be

subject to "bounty hunters."  To most, such debates, even if controversial, are part of a robust and

well-rounded education; but now in New Hampshire, teachers must think twice before engaging

in these discussions, particularly if teaching is the sole basis for their livelihood.  Mr. Richman's

teaching of ethnic and racial genocide is now fraught with danger.  And all of this is the result of

partisan political crusade to resuscitate a constitutionally flawed Presidential Executive Order that

was judicially enjoined.  Simply by continuing to teach lesson plans about history as they have

always been taught in accordance with New Hampshire's education laws, teachers in New

Hampshire now risk professional discipline and severe reputational harm.

> D. _It Is Impossible for New Hampshire Teachers to Comply with the Vague Statutory
> Proscriptions and Universal State Education Standards_

97.    The Divisive Concepts Statute is incompatible with New Hampshire's

Constitution, Education Law and curriculum requirements, rendering it impossible for teachers to

teach and follow state-mandated Standards and Benchmarks and still comply with the political

manifesto.  Part II, Article 83 requires the State to "provide a constitutionally adequate education

to every educable child in the public schools in New Hampshire and to guarantee adequate

funding."  The Supreme Court of New Hampshire considers an "adequate public education" to be

a fundamental right.

98. Thus, an adequate education must include the following curricular subjects:

(b) Skills to effectively participate in civic affairs.

….

(j) How intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices.

RSA § 189:11.

99. Yet, the Divisive Concepts Statute's prohibition against teaching racial superiority or age discrimination—while also limiting teachers to instruction on the "historical existence of [proscribed] ideas and subjects"—is internally inconsistent with the Education Law's mandate to teach on the evolution of intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination, and importantly, potential preventive measures.  Section 189 requires teachers to teach more substantive history than just the mere "existence" of genocide or mass violence directed by the Divisive Concepts Statute.  They are commanded by law to make clear to students "…how to prevent the evolution of such [discriminatory] practices," what solutions or measures have been proposed, their rationale and alternatives  And they should.

100. Take, for example, Jim Crow.  Section 189:11 requires public schools to teach about its evolution: its roots in slavery, its worldwide negative impact, that it was an acknowledged precursor to Hitler's Nuremberg Laws and has frequently been cited by totalitarian states as indicative of this nation's lack of moral fiber.  However, the Divisive Concepts Statute *on its face* would directly limit discussion of Jim Crow, permitting teachers to only discuss the "*historical existence*" of Jim Crow.  A teacher in American History in New Hampshire cannot tell whether he or she is permitted to take that discussion further to include, for example, how the laws worked and who it benefited, how it impacted the lives of generations past and present and,

in turn, has had a continuing impact on our society and nation, much less what options have been proposed for rectifying it.  True, the Attorney General has opined that there is a re-interpretive path to surgically erase and restate certain portions of the Statute, but that does not carry the force of law or bind the private citizens who are empowered under the Statute to enforce it.

101.    In June 2006, the New Hampshire Department of Education promulgated "*New Hampshire  K-12 Social Studies Curriculum Framework,"*(N.H. Department of Education, 2006)[61].  Among the prescribed educational themes were the following:

> Theme I: Patterns of Social and Political Interaction
>
> This theme focuses on the changing patterns of class, ethnicity, race, and gender in social and political relations.
>
> Examples of these patterns are human rights issues, the changing role of women in the economy, immigration issues, and slavery.

*Id.* at 9.  The Divisive Concepts Statute therefore violates Part II, Article 83 and the Education laws and curricular standards promulgated thereunder by diminishing through censorship students' ability to examine how important the history of our country – and recurring issues related to class, ethnicity, race and gender – continue to have a lasting impact on our country— and the proposals for change.

### COUNT I
### VIOLATION OF THE DUE PROCESS CLAUSE AS VOID FOR VAGUENESS AGAINST ALL DEFENDANTS

102.    The allegations in paragraphs 1 through 101 are incorporated herein by reference.

103.    The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.  It is a basic tenet of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.

---

[61] *New Hampshire K-12 Social Studies Curriculum Framework,* NH DEPT. OF EDUCATION (June 2006), https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf?2.

104. The Divisive Concepts Statute is inherently contradictory and fails to provide adequate notice and a reasonable opportunity to teachers to know what, precisely, is prohibited.

105. It forbids teaching the concept that one race or sex is inherently oppressive, "whether consciously or unconsciously," but specifically carves out from the ban discussing "as part of a larger course of academic discussion, the *historical existence*" of these ideas and subjects. Teachers are permitted to teach about historical "existence" of racism, sexism and other biases. – *i.e.*, that they existed – but they are *forbidden* to discuss their nature, scope and their impacts both historically and today, much less proposals on how they can be prevented, an explicit requirement of the Education Law.

106. All of the provisions of the Divisive Concepts Statute require highly personal and amorphous value judgments that are incompatible with the requirement that laws provide clear notice and due process to those impacted. The Attorney General's opinion provides some basis towards statutory clarity but is not binding on this Court nor any citizen individual bringing suit under the private right of action authorized by the Divisive Concepts Statute.

107. Plaintiffs have been prevented and chilled from exercising their due process rights by the vagueness of the Divisive Concepts Statute, its punitive opportunities ranging from censure, dismissal by their local school board and complete loss of their teaching license by the State Commissioner of Education, who appears politically motivated to enforcing the law in a biased and improper fashion.

108. The overbreadth and vagueness of the law will lead to its arbitrary and capricious enforcement (whether in governmental enforcement proceedings or private actions by citizens) and chill constitutionally protected speech.

109.    The vagueness of the law will also lead politically-motivated groups and individuals to use the law to lodge complaints to suit their agendas.

110.    In the absence of injunctive relief, Plaintiffs are threatened with irreparable harm as a result of the violation of their Due Process rights.

111.    As a result, Plaintiffs seek a judgment compelling Defendants to cease and desist from engaging in an unconstitutional impairment of their due process rights and a declaration that the Divisive Concepts Statute is void for vagueness.

## COUNT II
## THE CONFLICT BETWEEN THE DIVISIVE CONCEPT STATUTE AND NEW HAMPSHIRE LAW ADDS TO AND UNDERSCORES THE UNCONSTITUTIONAL  VAGUENESS OF THE STATUTE

112.    The allegations in paragraphs 1 through 111 are incorporated herein by reference.

113.    The Divisive Concepts Statute conflicts with existing New Hampshire law.   Thus, teachers are placed in an unacceptable quandary: if they comply with New Hampshire law, they can be charged with violation of the Divisive Concept Statute and if they comply with the latter they violate New Hampshire Law and the mandated curriculum. That conflict of itself renders the Statute void for vagueness.

114.    The New Hampshire Constitution Part II, Article 83 provides every citizen with a fundamental right to an education.

115.    In *Londonberry Sch. Dist. v. State*, 154 N.H. 153, 155-56 (2006), the New Hampshire Supreme Court tasked the Legislature with setting the parameters for a constitutionally adequate education.

116.    The Legislature subsequently enacted N.H. Rev. State 193-E:2 setting forth a substantive educational program to deliver the opportunity for an adequate education for kindergarten through twelfth grade.  It provided that students shall have "[k]nowledge of civics,

and government, economics, geography, history and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens."  While it left specific curricular choices to local school boards, by statute, the legislature mandated that New Hampshire schools statewide must, at a minimum, instruct on "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, *and how to prevent the evolution of such practices*."  RSA 189:11(j) (emphasis added).

117.    The Divisive Concepts Statute rebuffs the New Hampshire Constitution and the Legislature's educational enactments by diminishing through censorship students' explanatory knowledge base.  It permits teachers to teach about the historical existence of a topic, not the substantive concerns, facts, theories and policies surrounding critical events in history, let alone any proposals for ultimate resolution or amelioration of resultant concerns.  *See* N.H. Rev. State 193.40 (I) (a) (precluding any teaching that one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin).  It even casts doubt upon, if not entirely precludes, teaching both or many of the expressed sides of any issues involving the basic matters detailed in N.H. Rev. Sta. 193.40(I)(a). Teachers cannot, among other things, teach about how bigotry and intolerance has evolved and how to prevent the evolution of these practices.

118.    In construing the Divisive Concepts Statute's constitutionality "strict scrutiny" is the applicable test. The Statute prohibits teachers from teaching distinct matter pertaining to

recognized "suspect classifications (*e.g.*, "age, sex, gender identity sexual orientation, race...").
Thus construed, and given the absence of any contrary compelling state interest, the Divisive
Concepts Statute fails to pass muster.

119.    Further, New Hampshire law contains a "Freedom of Expression" Act, RSA
Chapter 98-E, that reaches broader than the federal First Amendment and allows every public
employees "a full right to publicly discuss and give opinions as an individual on all matters
concerning any government entity and its policies."  RSA 98-E:1.  By curtailing and chilling
teacher speech, the Divisive Concept Statute violates RSA 98-E.

120.    At the very least, because of the litany of state laws that conflict with the Divisive
Concepts Statute, it is impermissibly vague and therefore violates Plaintiffs' constitutional right to
due process under the New Hampshire Constitution (N.H. Const. pt. 1, art. 12), as well as the
Fourteenth Amendment of the U.S. Constitution.

121.    Plaintiffs seek a judgment compelling Defendants to cease and desist from
engaging in the enforcement or in any application of the unconstitutionally vague Divisive
Concept Statute which simultaneously unconstitutionally impairs New Hampshire citizens' rights
and violates New Hampshire law.

**COUNT III**
**VIOLATION OF THE FIRST AMENDMENT**
**AGAINST ALL DEFENDANTS**

122.    The allegations in paragraphs 1 through 121 are incorporated herein by reference.

123.    As a direct and proximate result of the Divisive Concepts Statute, Defendants have
violated the established rights of Plaintiffs to freedom of speech under the First Amendment of
the United States Constitution as applied to the states and their political subdivisions by the
Fourteenth Amendment, in that Defendants have censored Plaintiffs' speech by restricting
Plaintiffs' proper curricular discretion.  Indeed, it broadly precludes any teaching that relies on

concepts that certain members of the New Hampshire legislature deem offensive, including the idea that individuals may possess implicit or unconscious biases.

124.    As a direct and proximate result of the Divisive Concepts Statute, Defendants have also violated the established rights of Plaintiffs under the Free Speech Clause, Part I, Article 22 of the New Hampshire Constitution and abridged the public policy of New Hampshire concerning the right of public employees to "publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies" as mandated by RSA Chapter 98-E:1.

125.    Plaintiffs have been prevented and chilled from exercising their rights by threat of disciplinary action, private suit or the loss of their teaching license for violation of the Divisive Concepts Statute.

126.    By its plain terms, violation of the Divisive Concepts Statute is considered a violation of the educator code of conduct, which may result in disciplinary or state licensure action, potentially depriving teachers of their livelihood.

127.    The creation of the Commissioner of Education's website as a recognized vehicle for the filing of formal complaints against teachers for alleged violation of the Divisive Concepts Statute– accessible to anyone with a political agenda, personal grudge or worse – subjects teachers to arbitrary and capricious enforcement of the Divisive Concepts Statute and its draconian consequences.

128.    Plaintiff teachers under threat of Department of Education or private citizen complaint are justifiably forced to self-censor their own free speech to avoid these severe and draconian threats.

129.    The subject matter of the restraint on speech and the issues herein tendered are such to mandate invocation of "strict scrutiny."  Defendants have failed to establish a compelling

state interest that would justify such censorship and the Divisive Concepts Statute cannot and does not survive the "strict scrutiny" test.

130.    In the absence of injunctive relief, Plaintiffs are threatened with irreparable harm as a result of the violation of their First Amendment rights.

131.    Plaintiffs have no adequate remedy at law for the loss of their First Amendment Rights.

132.    As a result, Plaintiffs seek a judgment compelling Defendants to cease and desist from engaging in an unconstitutional impairment of their first amendment rights to freedom of speech.

<div align="center">

**COUNT IV**
**DECLARATORY JUDGMENT INTERPRETING THE RULE**
**AGAINST ALL DEFENDANTS (DECLARATORY RELIEF)**

</div>

133.    The allegations in paragraphs 1 through 132 are incorporated herein by reference.

134.    28 U.S.C. § 2201 empowers the Court to "declare the rights and other legal relations of any other interested party seeking such declaration, whether or not further relief is or could be sought."

135.    The Constitution of New Hampshire likewise accords the judiciary the right to declare the rights of interested parties respecting the validity and scope of state statutes and rules and regulations promulgated thereunder (*See, e.g.*, N.H. Const., Part 2, Art. 72-a).

136.    The Divisive Concepts Statute broadly prohibits teachers from teaching distinct matter pertaining to the recognized "suspect classifications (*e.g.*, "age, sex, gender identity sexual orientation, race..."). To illustrate, the Teacher Discrimination Statute prohibits instruction concerning claims of racial superiority (*id.* at (a)) or age discrimination (*id.* at (b)).  However, the Divisive Concepts Statute also requires teachers to comply with New Hampshire's Constitution (*e.g.* Part II, Art 83 of the State Constitution as construed and applied by the Supreme Court of

New Hampshire[62]) as well as statewide educational standards that have been in place for decades. This includes N.H. Rev. Stat. Ann. § 189:11 and the statewide "*New Hampshire K-12 Social Studies Curriculum Framework,*" (N.H. Department of Education, 2006), which mandate that students be taught (among other things) about the evolution of intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination and patterns of class, ethnicity, race, and gender in social and political relations.  The Divisive Concepts Statute thus is not only void for vagueness, but it also poses an irreconcilable conflict with state educational provisions, which must be resolved for the sake of New Hampshire's teachers and students.

137.    Giving broad meaning to the Divisive Concepts Statute—such that it could prohibit the teaching of materials that otherwise would be in accord with state educational standards—would raise serious questions about whether it violates the New Hampshire Constitution, and accordingly such an interpretation should be avoided.

138.    The Divisive Concepts Statute must be limited and construed in a manner that preserves New Hampshire's teachers' abilities to teach the wide variety of materials and concepts mandated by state law.  Interpreting the Divisive Concepts Statute to give full force and effect to its broad prohibition, on the other hand, would run afoul of the New Hampshire's Constitution's free speech guarantee because it would be a non-viewpoint-neutral prior restraint on protected speech.

139.    Plaintiffs therefore seek a declaratory judgment that:

    a)  the Teaching Discrimination Statute is void for vagueness, and

    b)  the Teaching Discrimination Statute and any Regulations promulgated thereunder, as well as, RSA §§ 354-A:30-34, to the extent applicable, are invalid and void under the Constitutions of the State of New Hampshire and of the United States, or, in the alternative,

---

[62]  *See, e.g.*, *Claremont School Dist. v. Governor*, 138 N.H. 183, 184 (1993).

c) clarifying that, in accordance with subdivision II of the Teaching Discrimination Statute and the applicable principles and provisions of the Constitution and laws of the State of New Hampshire and of the United States, nothing contained in the Teaching Discrimination Statute, or in. the Contemporaneous Amendments, precludes or limits, nor may the State or any agent or instrumentality thereof, including, without limitation, the New Hampshire Commissioner of Education, employ same to bar or deter, teachers from teaching or students from learning the nature, substance, history, relevant theories and/or existence of ideas, subject matter, events and concerns relating or pertaining to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, past or present;

d) the Teaching Discrimination Statute and any Regulations promulgated thereunder are in conflict with the public policy of the State of New Hampshire,

e) the Teaching Discrimination Statute and the Contemporaneous Amendments are invalid under Part 2, Article 18-a, of the New Hampshire Constitution because an invalid addition to a Budget Bill.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

First, an order declaring the Divisive Concepts Statute unconstitutionally vague in violation of Fourteenth Amendment and First Amendments of the United States Constitutions and New Hampshire Constitutions Part 1, Arts. 12 and 22 (speech and vagueness);

Second, preliminary and permanent injunctions prohibiting Defendants from enforcing the Divisive Concepts Statute against any teacher;

Third, in the alternative, an order declaring the Divisive Concepts Statute must be narrowly construed in order to avoid infirmity under the free speech and due process guarantees of the New Hampshire and United States Constitutions, and therefore, among other things, does not prohibit any New Hampshire teacher from utilizing materials and promoting concepts mandated by or permitted under any New Hampshire law.

And any additional relief this court deems just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable as a matter of right.

Dated: December 13, 2021

Respectfully submitted,

_____/s/ Peter J. Perroni_____
NOLAN PERRONI PC
NH Bar. No. 16250
73 Princeton Street
North Chelmsford, MA 01863
(978) 454-3800
peter@nolanperroni.com

STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.
David J. Kahne, Esq.
(*pro hac vice* pending)
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cmoerdler@stroock.com

SELENDY & GAY PLLC
Faith Gay, Esq.
(*pro hac vice* pending)
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

AMERICAN FEDERATION OF TEACHERS
David J. Strom
(*pro hac vice* pending)
555 New Jersey Ave. NW
Washington DC 20001
(202) 393-7472
dstrom@aft.org

PHILLIPS, RICHARD & RIND, P.A.
Mark Richard
(*pro hac vice* pending)
9360 S.W. 72nd Street, Suite 283
Miami, FL 33137
(305) 412-8322

*Co-Counsel for Plaintiff Local 8027, AFT-New Hampshire, AFL-CIO and individual teachers and parents*

# Exhibit A

642



**Keith Butterz**

Facebook

You're not friends on Facebook

1 mutual friend: Melissa Marr

**VIEW PROFILE**

9:33 AM

Whats up homo? I heard your teaching Marxist commie CRT in your classrooms....

You can fuck right off you garbage human!

If you reply, Keith Butterz will also be able to call you and see info like your Active Status and when you've seen messages.

**Block**     **Delete**

Aa

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____
                                        )
LOCAL, 8027 AFT-NEW HAMPSHIRE,          )
AFL-CIO, et al.,                        )
                                        )
              Plaintiffs,               )
                                        )
       v.                               )     Case No. 1:21-cv-1077-PB
                                        )
FRANK EDELBLUT, in his official         )
capacity only as the Commissioner       )
of the New Hampshire Department         )
of Education, et al.,                   )
                                        )
              Defendants.               )
_____)

## MOTION TO DISMISS AFT-NH COMPLAINT (ECF Doc. No. 30)

Frank Edelblut, in his official capacity as Commissioner of the Department of Education, John M. Formella, in his official capacity as Attorney General of the State of New Hampshire, Ahni Malachi, in her official capacity as Executive Director of the Commission for Human Rights, Christian Kim, in his official capacity as Chair of the Commission for Human Rights, and Kenneth Merrifield, in his official capacity as Commissioner of the Department of Labor (the "defendants"), by and through the Office of the New Hampshire Attorney General, move to dismiss the complaint filed by Local 8027, AFT-New Hampshire, AFL-CIO, Ryan Richman, John Dube, Jocelyn Merrill, Kimberly Green Elliott, and Meghan Eveyln Durden (ECF Doc. No. 30) (the "AFT-NH complaint"). The AFT-NH complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for the reasons set forth in the memorandum of law filed contemporaneously with this motion. **Sections I**, **II**, and **III** of the argument section of the defendants' memorandum of law pertain to the claims asserted in the AFT-NH complaint. *See* Defs.' Mem. Law at 11–37.

WHEREFORE, the defendants respectfully request that this Honorable Court:

A.      Dismiss the AFT-NH complaint (ECF Doc. No. 30) for the reasons set forth in
        **Sections I**, **II**, and **III** of the memorandum of law filed contemporaneously with this
        motion; and

B.      Grant such other relief as the Court deems just and equitable.

                                        Respectfully submitted,

                                        FRANK EDELBLUT, in his official capacity
                                        as Commissioner of the Department of
                                        Education,

                                        JOHN M. FORMELLA, in his
                                        official capacity only as Attorney General
                                        of the State of New Hampshire,

                                        AHNI MALACHI, in her official capacity as
                                        Executive Director of the Commission for
                                        Human Rights,

                                        CHRISTIAN KIM, in his official capacity as
                                        Chair of the Commission for Human Rights,

                                                *and*

                                        KENNETH MERRIFIELD, in his official
                                        capacity as Commissioner of the Department of
                                        Labor

                                        By their attorney,

                                        JOHN M. FORMELLA
                                        ATTORNEY GENERAL

Date:  March 25, 2022                   */s/ Samuel Garland*_____
                                        Samuel R.V. Garland, Bar #266273
                                        Assistant Attorney General
                                        Civil Bureau
                                        New Hampshire Dept. of Justice
                                        33 Capitol Street
                                        Concord, NH 03301
                                        (603) 271-3650
                                        Samuel.RV.Garland@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

*/s/ Samuel Garland*
Samuel R.V. Garland

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____ )
LOCAL, 8027 AFT-NEW HAMPSHIRE, )
AFL-CIO, et al., )
 )
 Plaintiffs, )
 )
 v. )    Case No. 1:21-cv-1077-PB
 )
FRANK EDELBLUT, in his official )
capacity only as the Commissioner )
of the New Hampshire Department )
of Education, et al., )
 )
 Defendants. )
_____ )

## MEMORANDUM OF LAW IN SUPPORT OF MOTIONS TO DISMISS

### Introduction

The primary questions before this Court are whether recently enacted antidiscrimination provisions violate, on their face, the Due Process Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment. During the 2021 legislative session, after months of debate, negotiation, and amendments, the state legislature passed and Governor Christopher Sununu signed into law new antidiscrimination provisions that prohibit public employees and government programs, including primary and secondary public education programs, from teaching, advocating, or advancing the following:

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
>
> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical

disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

N.H. Rev. Stat. Ann. § ("RSA") 193:40; *see also* RSA 354-A:31; RSA 354-A:32; RSA 354-A:33.

In this consolidated action, two groups of plaintiffs seek a declaration that the new antidiscrimination provisions are unconstitutional. They also seek to permanently enjoin the enforcement of those provisions. The first group of plaintiffs consists of Local 8027 AFT-New Hampshire, AFL-CIO and four educators (the "AFT plaintiffs"). The second group of plaintiffs consists of the National Education Association-New Hampshire, the Director of Diversity, Equity, Inclusion, and Justice for the Exeter Region Cooperative School District, and the Chief Equity Officer for the Manchester School District (the "NEA-NH plaintiffs").

All of the plaintiffs allege that the new antidiscrimination provisions, on their face, violate the Due Process Clause of the Fourteenth Amendment because they are unconstitutionally vague. ECF Doc. No. 30 ¶¶ 102–111; ECF Doc. No. 1 ¶¶ 154–159. The AFT plaintiffs also allege that: (1) the conflict between existing New Hampshire law and the new antidiscrimination provisions renders those new provisions unconstitutionally vague, ECF Doc. No. 30 ¶¶ 112–121; and (2) the new antidiscrimination provisions constitute a general violation of the AFT plaintiffs' constitutional rights protected by the First Amendment, ECF Doc. No. 30

¶¶ 122–132. The AFT plaintiffs further argue that the new antidiscrimination provisions violate state law. *See* ECF Doc. No. 30 ¶¶ 112–139.

All of the plaintiffs have asked this Court to declare that the new antidiscrimination provisions are unconstitutional and enjoin their enforcement. ECF Doc. No. 30, p. 51 (Prayers 1 and 2); ECF Doc. No. 1, p. 61. (Prayers A and B). The AFT plaintiffs appear to recognize, however, that a constitutional construction of the new antidiscrimination provisions exists, grounded in Attorney General John Formella's interpretation of the statutes. ECF Doc. No. 30 ¶¶ 6, 47, 49–64, 100, & p. 51. They therefore alternatively ask that this Court construe the new antidiscrimination provisions narrowly. ECF Doc. No. 30, p. 51 (Prayer 3).

For the reasons set forth below, all of the plaintiffs' claims fail as a matter of law. To the extent the AFT plaintiffs' claims arise under state law, they are barred by the Eleventh Amendment. The AFT plaintiffs have likewise failed to state a viable First Amendment claim, as the curricular and pedagogical speech upon which they premise that claim is not constitutionally protected. The plaintiffs' vagueness claims fail because the new antidiscrimination provisions not vague on their face. The language of the provisions, particularly when coupled with guidance issued by the Department of Education, the Commission for Human Rights, and the Department of Justice, demonstrates that the new antidiscrimination provisions provide a discernible, objective standard for what conduct is proscribed. The robust process available under the provisions further protects against arbitrary and discriminatory enforcement. The plaintiffs have accordingly failed to state a viable claim for relief, and their complaints should be dismissed in their entirety.

## Standard of Review

When analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court assumes the truth of the plaintiffs' well-pleaded facts and draws all reasonable inferences in the plaintiffs' favor. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018). "Well-pleaded facts must be non-conclusory and non-speculative." *Id.* (citation and quotation marks omitted). Thus, the Court need not assume the truth of a plaintiff's "legal conclusions and characterizations." *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 750 (1st Cir. 2016) (same omissions). Nor need it credit "bald conclusions, unrelieved rhetoric, and pejorative epithets." *Vigueira v. First Bank*, 140 F.3d 12, 15 (1st Cir. 1998). Dismissal is appropriate if the well-pleaded facts, when assumed true, fail to state a claim for relief. *Barchock*, 886 F.3d at 48. Put differently, "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to `remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Id.* (same omissions). This same standard applies when, as here, a defendant also challenges a court's subject-matter jurisdiction under Rule 12(b)(1) on the basis of pleading sufficiency. *See Gordo-Gonzalez v. United States*, 873 F.3d 32, 35 (1st Cir. 2017).

## Background

### A.    House Bill 544 in the New Hampshire House of Representatives.

On January 6, 2021, the New Hampshire House of Representatives introduced House Bill 544, "An Act relative to the propagation of divisive concepts," and referred the bill to the Executive Departments and Administration committee. *See* Docket of HB544, General Court of New Hampshire – Bill Status System (attached as **Attachment A**).[1] As introduced, the bill added

---

[1] A court ruling on a motion to dismiss may consider "documents the authenticity of which are not disputed by the parties"; "official public records"; "documents central to the plaintiffs' claims"; and "documents sufficiently referred to in the complaint." *Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017) (citation and quotation marks omitted).

a chapter prohibiting the propagation of "divisive concepts." *See* HB 544 – As Introduced, 2021 Session, 21-0732 (attached as **Attachment B**). The original text of the bill defined "divisive concept" to include the following concepts:

a) One race or sex is inherently superior to another race or sex;

b) The state of New Hampshire or the United States is fundamentally racist or sexist;

c) An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

d) An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

e) Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

f) An individual's moral character is necessarily determined by his or her race or sex;

g) An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

h) Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

i) Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

j) The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

**Attachment B** at 1–2.

Among other things, House Bill 544 proposed prohibiting the following: (1) the State of New Hampshire from "teach[ing], instruct[ing], or train[ing] any employee, contractor, staff member, student, or any individual or group, to adopt or believe any of the divisive concepts defined" in the new statutes; (2) any contractor with the State of New Hampshire from "us[ing] any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating" including training on the divisive concepts; and (3) any

grantee of the State of New Hampshire from "us[ing] state funds or assets to promote any of the divisive concepts." *See* **Attachment B** at 2–3.

The House of Representatives' Executive Departments and Administration committee heard testimony in support of and in opposition to House Bill 544 across two days of hearings. *See* **Attachment A**. On March 24, 2021, the committee voted with ten in favor and nine opposed to recommend that House Bill 544 pass with an amendment that clarified the definition of contractor and what it means to be a contractor or grantee. *See* **Attachment A**; *see also* Amendment to HB 544, March 3, 2021, 2021-0611h (attached as **Attachment C**).

At the House of Representatives' April 8, 2021 session, that body voted to table House Bill 544 with 347 members voting to table and eighteen opposing the motion to table. *See* **Attachment A**. Before the motion to table occurred, however, the House of Representative's Finance committee voted to amend House Bill 2, the biennial budget's trailer bill, to incorporate, among other things, the text of House Bill 544. *See* Docket of HB2, General Court of New Hampshire – Bill Status System (attached as **Attachment D**). House Bill 2, including the text of House Bill 544, passed through the House of Representatives by a vote of 200 in favor and 181 opposed. **Attachment A** at 2.

**B.      Removal of House Bill 544's language in the New Hampshire Senate and introduction of new antidiscrimination provisions into House Bill 2.**

House Bill 2, including the language of House Bill 544, was introduced in the New Hampshire Senate on April 1, 2021, and referred to the Senate's Finance committee. **Attachment D** at 3. The Senate Finance committee held hearings on all of House Bill 2, including House Bill 544's language, on May 4, 2021. *Id*. Many testified in opposition to including House Bill 544 in the budget trailer bill, including the New Hampshire affiliate of the American Civil Liberties Union, which expressed many of the same arguments made in both

complaints here. *See* Senate Finance Committee, Minutes, May 4, 2021 Hearing (attached as

**Attachment E**). Thereafter, the Senate Finance committee removed House Bill 544's language

entirely and replaced it with new antidiscrimination provisions. Amendment to HB 2-FN-A-

Local, Senate Finance, May 28, 2021, at 144–147 (attached as **Attachment F**). The new

legislation would prohibit public employees and government programs, including primary and

secondary public education programs, from teaching, advocating, or advancing the following:

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

> (c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

> (d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**Attachment F** at 147.

The new legislation abandoned the prohibition of "divisive concepts," ceased to apply to

contractors and grantees, and did not limit the academic freedom of professors and scholars at

public colleges and universities. *See* **Attachment F** at 144–147. The new legislation also

narrowed its proscriptions to permit "sensitivity trainings" grounded in the "inherent humanity

and equality of appall persons and the ideal that all persons are entitled to be treated with

equality, dignity, and respect," to permit "discussing, as part of a larger course of academic

instruction, the historical existence of ideas and subjects identified in this section," and to apply only to public employees performing work in their official capacities. *Id*. at 145.

In addition to removing House Bill 544's broad prohibition on "divisive concepts," in favor of a narrow set of antidiscrimination provisions, House Bill 2 provided for an enforcement system. It permitted those aggrieved by an alleged violation to file a complaint with the New Hampshire Commission for Human Rights or the superior court alleging that the school, school district, or government agency violated the new antidiscrimination provisions. *Id*. at 147. It also empowered the Board of Education to discipline licensees who had violated the new antidiscrimination provisions. *Id*.

On June 3, 2021, the Senate considered the amended version of House Bill 2, including the new antidiscrimination provisions, and voted in favor of passage with fourteen voting in favor of the bill and nine voting in opposition. **Attachment D** at 3–4. Because of the amendments made to House Bill 2 by the Senate, the House of Representatives sought a committee of conference. *Id*. at 4–5 The committee of conference made some changes to House Bill 2, but kept the new antidiscrimination provisions intact. *Id*. at 5. House Bill 2 passed both chambers of the state legislature and, on June 25, 2021, Governor Christopher Sununu signed it into law. *Id*.

C.     **Guidance produced by the Department of Education, Department of Justice, and the Commission for Human Rights.**

In part based on concerns expressed by groups like NEA-NH, *see*, *e.g.*, ECF Doc. No. 1-18 at 2–4, the Department of Education, Commission for Human Rights, and Department of Justice (the "enforcing agencies") produced guidance regarding the scope and effect of the new antidiscrimination provisions. The enforcing agencies produced two sets of guidance documents, framed as "frequently asked questions." *See* Frequently Asked Questions: New discriminatory

practice prohibitions applicable to K-12 educational programs, Department of Education, Commission for Human Rights, and Department of Justice (hereinafter "Education FAQs") (attached as **Attachment G**); Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs, Department of Education, Commission for Human Rights, and Department of Justice (hereinafter "Employer FAQs") (attached as **Attachment H**). One set of frequently asked questions was designed to address the concerns of educators in K-12 programs and the other was designed to address the concerns of public employers and government programs.

In anticipation of complaints being filed with the Commission for Human Rights at the start of the school year, the Attorney General Formella also issued an opinion in relation to the new antidiscrimination provisions. Attorney General Opinion No. 2021-01, New Hampshire Department of Justice, Sept. 7, 2021 ("Attorney General Opinion 2021-01") (attached as **Attachment I**). That opinion elaborated on the guidance that had previously been issued and provided the Commission for Human Rights, which is the state agency charged with investigating and adjudicating complaints under the new antidiscrimination provisions, with a foundation upon which it could build any investigation of alleged violations or rule on any alleged violations. *See generally id.*

Additionally, to avoid the danger of two separate agencies reaching two different conclusions regarding the existence of discrimination, the enforcing agencies developed a protocol for evaluating complaints alleging a violation of the new antidiscrimination provisions by public educators. Consistent with the statutory language, the first step is for the aggrieved individual to either: (1) file a complaint with the Commission for Human Rights and avail themselves of that agency's processes or (2) file a lawsuit in the superior court. RSA 193:40, III.

In either circumstance, the complaint would be filed against the school or school district, not the individual teacher or administrator. *Id.* Only after the final determination, including the exhaustion of all appellate rights by the parties, that a violation of the antidiscrimination laws had occurred could the matter proceed to the second step. RSA 351-A:21, :21-a, :22. At that step, the Department of Education could commence disciplinary proceedings before the Board of Education to determine what sanction, if any, to impose upon the licensee. RSA 193:40, IV.

   **D.   Procedural history.**

   The AFT-NH plaintiffs initiated this action on December 13, 2021, by filing a 52-page complaint against the Commissioner of Education, the Chair of the Commission for Human Rights, and the Attorney General. ECF Doc. No. 30. The AFT-NH complaint contained the four counts identified above. *See id.* One week later, the NEA-NH plaintiffs filed their own 65-page complaint, naming the same three defendants as the AFT-NH complaint, plus the Executive Director of the Commission for Human Rights and the Commissioner of the Department of Labor. ECF Doc. No. 1. Despite its length, the NEA-NH complaint asserts a single count of vagueness. *See id.*

   On January 12, 2022, the plaintiffs filed assented-to motions in both dockets seeking consolidation. *See, e.g.*, ECF Doc. No. 25. The Court held a hearing on the motion on March 8, 2022. During the hearing, the Court granted the motion to consolidate and directed the parties to file a case management order setting deadlines to brief the defendants' anticipated motion to dismiss. The parties filed a joint motion for entry of a case management order on March 21, 2022, which the Court granted in a margin order. Consistent with the deadline in that order, the defendants now move to dismiss both complaints in their entirety.

## Argument

**I.    The Eleventh Amendment bars the AFT plaintiffs' claims to the extent they assert violations of or seek declarations under state law.**

"As a general matter, states are immune under the Eleventh Amendment from private suit in federal courts, absent their consent." *Wojcik v. Mass State Lottery Comm.*, 300 F.3d 92, 99 (1st Cir. 2002) (citation and quotation marks omitted). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation omitted). "As such, it is no different from a suit against the State itself." *Id.* (citations omitted). Accordingly, "neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action." *Fantini v. Salem State Coll.*, 557 F.3d 22, 33 (1st Cir. 2009) (citation, quotation marks, and bracketing omitted).

The *Ex parte Young* doctrine provides "an important limit on the state sovereign-immunity principle." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). *Ex parte Young* "permits suits to proceed against state officers in their official capacities to compel them to comply with federal law." *Vaquieria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 478 (1st Cir. 2009) (citation omitted). But the doctrine stands as a "narrow" exception to Eleventh Amendment immunity, *see P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993), "limited to [the] precise situation" where "a federal court commands a state official to do nothing more than refrain from violating federal law," *Va. Office for Prot. & Advocacy*, 563 U.S. at 255 (citations omitted). It

does not allow for claims based on purported violations of state, rather than federal, law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).[2]

Three of the AFT plaintiffs' claims appear to arise at least in part under New Hampshire law. In Count II, the AFT plaintiffs contend that the new antidiscrimination provisions conflict with or otherwise violate: Part I, Article 12 and Part II, Article 83 of the New Hampshire Constitution; RSA 193-E:2; RSA 189:11, I(j); and RSA chapter 98-E. ECF Doc. No. 30 ¶¶ 114, 116, 117, 119, 121. The AFT plaintiffs ask this Court to order the defendants to "cease and desist from engaging in the enforcement or any application of" the new antidiscrimination provisions, which they contend "simultaneously unconstitutionally impairs New Hampshire citizens' rights and *violates New Hampshire law*." ECF Doc. No. 30 ¶ 121 (emphasis added). Similarly, the AFT plaintiffs contend in Count III that the new antidiscrimination provisions violate, *inter alia*, "the established rights of Plaintiffs under the Free Speech Clause, Part I, Article 22 of the New Hampshire Constitution[,] and abridge the public policy of New Hampshire concerning the right of public employees to 'publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies' as mandated by RSA Chapter 98-E:1." ECF Doc. No. 30 ¶ 124. They also contend that the challenged provisions are "considered a violation of the educator code of conduct." ECF Doc. No. 30 ¶ 126. In Count IV, the AFT plaintiffs seek a declaration—seemingly under the New Hampshire Constitution, ECF Doc. No. 30 ¶ 135—that the challenged provisions "pose[] an irreconcilable conflict with state educational provisions,

---

[2] Additionally, *Ex parte Young* "permits equitable relief against only those officials who possess authority to enforce a challenged state law." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534, 536 (2021); *see id.* at 540–41 (Thomas, J., concurring in part and dissenting in part); *id.* at 544–45 (Roberts, C.J., concurring in part and dissenting in part); *id.* at 547–50 (Sotomayor, J., concurring in part and dissenting in part); *see also Ex parte Young*, 209 U.S. at 157, 161. At this stage in the proceedings, the defendants do not press an argument that one or more of them lacks authority to enforce the antidiscrimination provisions. If, however, this case survives dismissal, the defendants reserve the right to pursue such an argument.

which must be resolved for the sake of New Hampshire's teachers and students," ECF Doc. No.

30 ¶ 137. They further request a declaration that the new antidiscrimination provisions "are

invalid and void under the Constitutions *of the State of New Hampshire* and the United States, or,

in the alternative," that the challenged provisions "are in conflict with the public policy of the

State of New Hampshire" and "are invalid under Part 2, Article 18-a, of the New Hampshire

Constitution because [they are] an invalid addition to a Budget Bill." ECF Doc. No. 30 ¶ 139(b),

(d), (e).

To the extent these arguments are intended to be freestanding claims or requests for

relief, they are barred under *Pennhurst*. A federal court may not, consistent with *Pennhurst*,

enjoin the enforcement of a state statute because it "violates" another provision of state law.

*Pennhurst*, 465 U.S. at 106. Indeed, the Court observed in *Pennhurst* that "it is difficult to think

of a greater intrusion on state sovereignty than when a federal court instructs state officials on

how to conform their conduct to state law." *Id.* If the AFT plaintiffs believe that the new

antidiscrimination provisions violate the State Constitution or one or more state statutes, or that

there is some other state-law-based reason why those provisions should be invalidated, they are

free to bring an action in state court. Under the *Ex parte Young* doctrine, they may only proceed

in this forum based on purported violations of *federal* law. Counts II, III, and IV of the AFT

plaintiffs' complaint should accordingly be dismissed to the extent they are premised on state-

law theories.

## II.    The AFT plaintiffs have failed to state a First Amendment claim because the new antidiscrimination provisions do not implicate protected speech.

In Count III of their complaint, the AFT plaintiffs bring what purports to be a

freestanding First Amendment claim. They do not identify under what First Amendment theory

they seek relief, and Count III is arguably deficient for this reason alone. *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (observing that a complaint should "give the defendant fair notice of what the claim is and the grounds upon which it rests" (citation, quotation marks, and ellipsis omitted)). Ultimately, however, Count III fails for a more fundamental reason: the AFT plaintiffs do not identify any protected speech implicated by the new antidiscrimination provisions.

In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006). In reaching this holding, the Court observed that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at 421–22. Rather, such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created" because "[w]hen [the employee] went to work and performed the tasks [the employee] was paid to perform, [the employee] acted as a government employee." *Id*. "The fact that [the employee's] duties sometimes require[] [the employee] to speak or write does not mean [the employee's] supervisors were prohibited from evaluating [the employee's] performance." *Id*.

The threshold question under *Garcetti* is whether the speech at issue is "made pursuant to the employee's official duties." *Id.* at 413. If the answer is yes, then the speech is not protected by the First Amendment. *See id.* at 421. The First Circuit has adopted a "two-step, context-specific inquiry" to assist in making this determination. *Decotiis v. Whittemore*, 635 F.3d 22, 31 (1st Cir. 2011) (quotation omitted). "First, a court must ask, 'what are the employee's official responsibilities?'" *Id.* In resolving this question, "the proper inquiry is practical rather than

formal, focusing on the duties an employee is actually expected to perform, and not merely those formally listed in the employee's job description." *Id.* (citation and quotation marks omitted). Second, a court must ask "'was the speech at issue made pursuant to those responsibilities?'" *Id.* The First Circuit has identified "several non-exclusive factors" that "are instructive" when resolving this question: (1) "whether the employee was commissioned or paid to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [the employee's] place of employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [the employee] spoke (lending it 'official significance')"; (6) "whether the employee's speech derived from special knowledge obtained during the course of . . . employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id.* at 32 (citations omitted).

Applying this two-step inquiry to the allegations in the AFT complaint demonstrates that AFT plaintiffs' First Amendment claim is premised on speech "made pursuant to [their] official duties." *Garcetti*, 547 U.S. at 421. Each of the individual AFT plaintiffs is a public employee. *See* ECF Doc. No. 30 ¶¶ 7, 8, 9, 10, 11. The institutional AFT plaintiff—Local 8027, AFT, AFL-CIO ("Local 8027")—alleges that it represents "approximately 3,400 public school teachers, school support staff, city and town employees, library employees, and higher education faculty," ECF Doc. No. 30 ¶ 12, all of whom are likewise public employees. Local 8027 does not purport to bring a First Amendment claim on its own behalf; rather, the AFT plaintiffs collectively allege that the new antidiscrimination provisions violate the First Amendment by "restricting [their] proper curricular discretion." ECF Doc. No. 30 ¶ 123. They contend that they have been "chilled from exercising their rights by threat of disciplinary action, private suit or loss of their teaching

license for violation of" the new antidiscrimination provisions. ECF Doc. No. 30 ¶ 125. In

particular, three of the individual AFT plaintiffs express concerns about what they are allowed to

teach under the new antidiscrimination provisions. *See* ECF Doc. No. 30 ¶¶ 7, 8, 9, 39, 40, 42,

56, 96.[3] The AFT complaint makes clear that these concerns are premised on RSA 193:40. ECF

Doc. No. 30 ¶¶ 1, 26, 44, 46, 81, 82.

As discussed previously, RSA 193:40 prohibits an "educator"—meaning "a professional

employee of any school district whose position requires certification by the state board [of

education]," RSA 194:40, V—from "[t]eaching [d]iscrimination" as set forth in RSA 193:40,

I(a) through (d). A "[v]iolation of this section by an educator shall be considered a violation of

the educator code of conduct that justifies disciplinary sanction by the state board of education."

RSA 193:40, IV. It is also under RSA 193:40 that "any person" may "initiate a civil action

against a school or school district in superior court for legal or equitable relief, or with the New

Hampshire commission for human rights as provided in RSA 354-A:34." RSA 193:40, III. These

potential outcomes, the AFT plaintiffs contend, "chill [them] from exercising their rights" to

"proper curricular discretion." ECF Doc. No. 30 ¶¶ 123, 125.

If an educator has such rights, they are not protected by the First Amendment. The

allegations in the AFT complaint (as well as common sense) dictate that teaching is

---

[3]While the other two individual AFT plaintiffs identify as educators, they appear to base their claims
entirely on conclusory assertions in the "parties" section of the complaint about what their children will
be taught under the new antidiscrimination provisions. ECF Doc. No. 30 ¶¶ 10, 11. They do not otherwise
provide any factual basis for their claims. It is far from clear how a parent's conclusory concerns about
the education his or her child might receive confers that parent with standing to maintain a First
Amendment claim based on "curricular discretion." ECF Doc. No. 30 ¶ 123. The defendants do not press
this issue now, however, because "[i]t is sufficient for the case to proceed if at least one [plaintiff] has
standing." *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 55 (1st Cir. 2001) (citation omitted).
Nevertheless, "standing is 'an indispensable part of the plaintiff's case [and] each element must be
supported with the manner and degree of evidence required at successive stages of the litigation.'" *People
To End Homelessness, Inc. v. Develco Singles Apartments Assocs.*, 339 F.3d 1, 8 (1st Cir. 2003) (ellipsis
omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The defendants therefore
reserve the right to press standing, as may be appropriate, in the future.

quintessentially one of "the duties [an educator] is actually expected to perform" such that it would constitute an "official responsibilit[y]." *Decotiss*, 635 F.3d at 32. To the extent teaching involves speech, it is speech that an "educator" is "commissioned or paid to make," typically occurring at the educator's "place of employment," and relating to the specific "subject matter" that the educator is authorized to teach. *See id.* Because an educator's curriculum is set by a combination of state statute, *see, e.g.*, RSA 193-E:2-a, Board of Education regulation, *see, e.g.*, N.H. Admin. R. Ed 306.26, 306.27, and the local education unit, *see, e.g.*, N.H. Admin. R. Ed 302.01, 302.02, 303.01, an "objective observer[]" would be hard-pressed to believe that an educator's speech in the classroom is made the capacity as a "citizen" rather than "pursuant to their official duties," *Decotiss*, 635 F.3d at 32. It is also apparent that an educator's speech in the classroom—which is often subject-matter specific—can derive from "special knowledge obtained during the course of [an educator's] employment," *Decotiss*, 634 F.3d at 32. And there is no clear "citizen analog" to the act of teaching in a public-school classroom, *see id.*; indeed, educators have to be certified by the State Board of Education and hired by their schools to perform their official roles, *see* RSA 189:39. In short, nearly all of the factors set forth in *Decotiis* weigh in favor of the conclusion that an educator's curricular choices are "made pursuant to [that educator's] official duties." *Garcetti*, 547 U.S. at 413, 421. Those choices are not entitled to First Amendment protection. *Id.* at 421.

This conclusion finds significant support in the decisions of several courts of appeals. For instance, in *Evans-Marshall v. Board of Education of Tipp City Exempted Village School District*, the Sixth Circuit held that "the First Amendment does not protect primary and second school teachers' in-class curricular speech[.]" 624 F.3d 332, 342 (6th Cir. 2010). In reaching this holding, the court observed that, "[a]s with any other individual in the community, [teachers

have] no more free-speech right to dictate the school's curriculum than [they have] to obtain a platform—a teaching position—in the first instance for communicating [their] preferred list of books and teaching methods." *Id*. at 340. For this reason, the court observed, "no relevant analogue exists between [a teacher's] in-class curricular speech and speech by private citizens." *Id.* at 340–41 (citation, quotation marks, and bracketing omitted). The court further recognized that, under state law, curriculum-related decisions are prescribed by elected officials, which provides a degree of public accountability with regard to those decisions. *Id.* at 341. The court noted that teachers may speak or write routinely during the course of their work but that fact alone does not make them "sovereigns unto themselves" when it comes to making curriculum-related decisions for their classrooms. *Id*. (quotation and brackets omitted). The court thus concluded that in light of *Garcetti*, the First Amendment does not "insulate" teachers from employer discipline, "even discipline prompted by [the teacher's] curricular and pedagogical choices." *Id*.

Similarly, in *Mayer v. Monroe County Community School Corporation*, the Seventh Circuit held that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." 474 F.3d 477, 480 (7th Cir. 2007). The Seventh Circuit emphasized that a case involving a teacher's curricular choices is "easier [to resolve] than *Garcetti*" because "teachers hire out their own speech and must provide the service for which employers are willing to pay." *Id.* at 479. While the court acknowledged that "[m]ajority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination," it observed that "if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers." *Id.*

at 479–80. The court noted that the teacher was permitted under the school's policy to "draw[] out arguments from all perspectives, as long as she kept her opinion to herself." *Id.* at 480. The court emphasized, however, that "[t]he Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Id.*

As the Sixth Circuit observed in *Evans-Marshall*, several other circuits have applied pre-*Garcetti* precedents to conclude that "[a] teacher's curricular and pedagogical choices are categorically unprotected" by the First Amendment. 625 F.3d at 342; *see id.* at 642–43 (citing *Panse v. Eastwood*, 303 F. App'x 933, 935 (2d Cir. 2008); *Lee v. York County Sch. Div.*, 484 F.3d 687, 694 n.11, 695, 697 (4th Cir. 2007); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.)). Several circuits have likewise concluded that *Garcetti* applies to elementary- and secondary-school employees in other contexts, including: to a school teacher's speech about curriculum, *see Brammer-Hoetler v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007); to the filing of union grievances related to student discipline, *see Weintraub v. Board of Educ. Of City School Dist. of New York*, 593 F.3d 196, 201–02 (2d Cir. 2010); to writing memoranda requesting information about the use of funds, *see Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693–94 (5th Cir. 2007); and to placing signs or banners in the classroom or on school bulletin boards, *see*, *e.g.*, *Johnson v. Poway Unified School Dist.* 658 F.3d 954, 970 (9th Cir. 2011); *Lee v. York County School Div.*, 484 F.3d 687, 698-99 (4th Cir. 2007). As the Sixth Circuit noted, "[t]he common thread through all of these cases is that, when it comes to in-class curricular speech at the primary and secondary school level, no other court of appeals has held that such speech is protected by the First Amendment." *Evans-Marshall* 624 F.3d at 343. The defendants have not identified any decision post-dating *Evans-Marshall* that reaches a contrary conclusion.

In sum, the AFT plaintiffs' First Amendment claim is premised upon speech that is not entitled to First Amendment protection. Count III of the AFT complaint accordingly fails regardless of what First Amendment theory it is brought under. The Court should therefore dismiss Count III for failure to state a claim.

### III.    The plaintiffs' vagueness claims fail as a matter of law because the new antidiscrimination provisions set forth a discernible standard of conduct and protect against arbitrary or discriminatory enforcement.

Both sets of plaintiffs contend that the new antidiscrimination provisions are void for vagueness. Because the plaintiffs contend their vagueness claims are "virtually identical," ECF Doc. No. 25 ¶ 4, the defendants address them together. The defendants further address these claims as facial vagueness challenges. While the NEA-NH complaint contains four stray references to an "as applied" vagueness claim, ECF Doc. No. 1 ¶¶ 13, 156, 158, Prayer B, the defendants do not take this to be a standalone claim. These references appear to have been added to the complaint as an afterthought, and the NEA-NH plaintiffs make no attempt to explain how the new antidiscrimination provisions have been applied to them in an unconstitutional manner. See *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." (cleaned up)). "[B]ecause this is a pre-enforcement challenge, [an as-applied] claim would indeed be inappropriate." *Worman v. Healey*, 293 F. Supp. 3d 251, 268 (D. Mass. 2018), *aff'd* 922 F.3d 26 (1st Cir. 2019).

Moreover, the Supreme Court has made clear that when determining whether a claim is facial or as applied, "[t]he label is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). Rather, the question is whether the "plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs." *Id.* (citation omitted). If they do, then the plaintiffs must "satisfy [the] standards for a facial challenge to the extent of that reach."

*Id.* Here, the plaintiffs seek "injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing" the new antidiscrimination provisions. ECF Doc. No. 1, Prayer A. This is quintessential facial relief. *See John Doe No. 1*, 561 U.S. at 194 (noting that "an injunction barring the secretary of state from making referendum petitions available to the public" was a request for facial relief (quotation marks omitted)).[4]

### A.    The vagueness standard.

"Vague laws offend several important values." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "First, because [courts] assume that man is free to steer between lawful and unlawful conduct, [they] insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id*. "Vague laws may trap the innocent by not providing fair warning." *Id*. "Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id*. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id*. at 108–09. "To comport with the strictures of due process, a law must define an offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13–14 (1st Cir. 2011) (quotation omitted).

Because the plaintiffs bring facial vagueness challenges, they must "demonstrate that the [new antidiscrimination provisions are] impermissibly vague in *all* of [their] applications."

---

[4] The defendants also take at face value the plaintiffs' representation that consolidation was appropriate in this case because both vagueness claims are "virtually identical." ECF Doc. No. 25 ¶ 4. Notably, the AFT plaintiffs do not purport to bring their vagueness claim as an as-applied challenge. *See generally* ECF Doc. No. 30.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)

(emphasis added). To prevail, the plaintiffs must show "that the enactment is vague 'not in the

sense that it requires a person to conform his conduct to an imprecise by comprehensible

normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Id.* at

495 n.7 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). A unconstitutionally

vague provision "'simply has no core.'" *Id.* (quoting *Smith v. Goguen*, 415 U.S. 566, 578

(1974)). In the context of civil, as opposed to criminal, statutes, the Supreme Court has been

more tolerant of imprecision in statutory language. *See Village of Hoffman*, 455 U.S. at 498–99

("The Court has also expressed greater tolerance of enactments with civil rather than criminal

penalties because the consequences of imprecision are qualitatively less severe.").

  "In evaluating a facial challenge to a state law, a federal court must, of course, consider

any limiting construction that a state court or enforcement agency has proffered." *Kolender v.

Lawson*, 461 U.S. 352, 354 (1983) (quotation omitted). The reviewing court may also turn to

dictionary definitions to determine the plain meaning of statutory terms and resolve any

ambiguity challenges. *Village of Hoffman Estates*, 455 U.S. at 501. So long as the "language of

proscription . . . 'conveys sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices,'" the statute is not deficient. *Precious Metals

Associates, Inc. v. Commodity Futures Trading Commission*, 620 F.2d 900, 907 (1st Cir. 1980)

(quoting *Jordan v. DeGeorge*, 341 U.S. 223, 231–32 (1951)).

  **A.**  **The new antidiscrimination provisions provide ample notice of what conduct
they prohibit.**

  The plaintiffs first contend that the new antidiscrimination provisions are vague because

they provide insufficient notice of the conduct they proscribe. Under this type of vagueness

challenge, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult

to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). "[W]ords are rough-hewn tools, not surgically precise instruments. Consequently, some degree of inexactitude is acceptable in statutory language." *URI Student Senate*, 631 F.3d at 14. "The Constitution does not require impossible standards; all that is required is that the language conveys sufficient[l]y definite warning as to the proscribed conduct when measured by common understanding and practices." *Roth v. United States*, 354 U.S. 476, 491 (1957) (quotations and brackets omitted). "[L]ack of precision is not itself offensive to the requirements of due process," *id.*, and "'the fact that a statute requires some interpretation does not perforce render it unconstitutionally vague," *URI Student Senate*, 631 F.3d at 14 (quoting *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 61 (1st Cir. 2008)).

The new antidiscrimination provisions set forth an objectively discernible standard of conduct. RSA 193:40 describes four categories of information that "[n]o pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in or support for[.]" RSA 193:40, I. While this language is worded in the passive voice, the New Hampshire Supreme Court has made clear that, when interpreting a New Hampshire statute, a court must "not consider words and phrases in isolation, but rather within the context of the statute as a whole, which enables [the court] to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme." *Doe v. Comm'r of N.H. Dep't of Health & Hum. Servs.*, 174 N.H. 239, 261 A.3d 968, 974 (2021). RSA 193:40 goes on to provide that "[v]iolation of this section *by an educator* shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the board of education." RSA 193:40, IV (emphasis added). Read in context, then, it

is clear that RSA 193:40 prohibits an educator from teaching, instructing, or inculcating any public school student, or otherwise compelling any public school student to express belief in, one or more of the proscribed categories of information.

The language of the other challenged provisions supports this reading. "When interpreting two statutes that deal with similar subject matter, [the New Hampshire Supreme Court] construe[s] them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes." *Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005). RSA 354-A:31 provides that "[n]o public employer . . . shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group" the same information prohibited under RSA 193:40, IV. RSA 354-A:32 provides that "[n]o government program shall teach, advocate, or advance any one or more" of those same categories. RSA 354-A:33 provides that "[n]o public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," one or more of the same categories. The use of active voice in each of these provisions confirms that the focus of the new antidiscrimination provisions is on the conduct of the person or entity conveying the information in question, not on the subjective belief of the person receiving it.

This construction finds further support in the guidance the enforcing agencies have issued with respect to the new antidiscrimination provisions. The Education FAQs expressly state that "[t]he mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the [new antidiscrimination provisions." Education FAQs

(**Attachment G**) at 2. Similarly, the Employer FAQs state that "[t]he mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequences." Employer FAQs (**Attachment H**) at 2. And Attorney General Opinion 2021-01 states: "It is important to note that although education related to racism, sexism, and other practices or ides that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40." Attorney General Opinion 2021-01 (**Attachment I**) at 3. These statements further demonstrate that a violation of the new antidiscrimination provisions is determined by the actions of the educator or trainer, not the subjective beliefs of the student or trainee.

The enforcing agencies' guidance documents further resolve any ambiguity with respect to the word "inherent" as it used in the new antidiscrimination provisions. Although the enforcing agencies recognized that the plain meaning of the language in the new antidiscrimination provisions is clear on its own, they provided additional guidance on the term "inherent" because the legislature did not define that term. *See* Attorney General Opinion 2021-01 (**Attachment I**) at 6–7; Education FAQs (**Attachment G**) at 1–2; Employer FAQs (**Attachment H**) at 1–2. In doing so, the enforcing agencies consulted a standard dictionary and concluded that for the purposes of the new antidiscrimination provisions, "inherent" refers to characteristics that are "natural, biological, or innate, as opposed to being apparent accidental, or a characteristic created by extern action or external factors." Attorney General Opinion 2021-01 (**Attachment I**) at 6; *see also* Education FAQs (**Attachment G**) at 1; Employer FAQs (**Attachment H**) at 1. Notably, this understanding of "inherent" is reflected in the fact that RSA

193:40 does not prohibit "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in [RSA 193:40, I]." RSA 193:40, II. It is likewise reflected in the fact that RSA 354-A:29 does not "prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect." RSA 354-A:29, II.

The statutory language, FAQs, and Attorney General Opinion 2021-01 make unambiguously clear that the new antidiscrimination provisions *do not prohibit* education and training that: (1) discusses historic or current events; (2) discusses topics that may make people uncomfortable; (3) discusses how historical events or acts have effects that linger into the present day; (4) discusses how psychological development, messaging, or other phenomena may create implicit biases; or (5) discusses any other concepts so long as those concepts promote equality and the equal, respectful, and dignified treatment of all people. Attorney General Opinion 2021-01 (**Attachment I**) at 7–8; Education FAQs (**Attachment G**) at 2; Employer FAQs (**Attachment H**) at 2. The Education FAQs explicitly state:

> Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

Education FAQs (**Attachment G**) at 2. Attorney General Opinion 2021-01 and the FAQs also explicitly state that nothing prohibits training or education geared towards diversity, equity, equality, and inclusion, including implicit bias training. Attorney General Opinion 2021-01 (**Attachment I**) at 7; Employer FAQs (**Attachment H**) at 2. Attorney General Opinion 2021-01

further recognizes that government programs or schools may create resources to combat racism and that schools may teach about discrimination, its historical existence, and its role in creating disparities among different identified groups. Attorney General Opinion 2021-01 (**Attachment I**) at 7–8.

The plain language of the statutes coupled with the enforcing agencies' combination of general guidance and specific examples provides more than sufficient notice to the public of what does and does not constitute a violation of the new antidiscrimination provisions. *Williams*, 553 U.S. at 306; *Kolender*, 461 U.S. at 358. Under RSA 193:40, an educator may not teach, instruct, or inculcate a public school student, or otherwise compel any public school student to express the belief, that one identified group possesses natural, biological, or innate characteristics (as opposed to apparent or accidental characteristics) that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 further prohibits an educator from teaching, instructing, or inculcating a public school student, or otherwise compelling a public school student to express the belief, that any identified group can or should be treated unequally to any other identified group or that one identified group should be discriminated against or treated adversely. RSA 354-A:31 and :32 place similar prohibitions on public employers and government programs. These are "comprehensible normative standard[s]," *Village of Hoffman Estates*, 455 U.S. at 495 n.7, that "convey[] sufficient[l]y definite warning as to the proscribed conduct when measured by common understanding and practices," *Roth*, 354 U.S. at 491. In short, they are not vague.

The plaintiffs nonetheless profess confusion in their pleadings about whether the new antidiscrimination provisions prohibit various types of conduct. The AFT plaintiffs wonder whether a teacher can discuss subjects like affirmative action, New Hampshire's mandatory

retirement age for judges, the Americans with Disabilities Act, the Equal Rights Amendment and pay disparities, and how midnight voting in Crawford Notch fits within the larger historical narrative of voting rights. *See* ECF Doc. No. 30 ¶ 36. The AFT complaint further identifies a teacher who purports not to know whether the new antidiscrimination provisions prohibit teaching about the Rohingya and Uighur genocides, the Holocaust, the Black Lives Matter movement and "its connection to the past," and issues such as affirmative action, the Voting Rights Act, and the Equal Rights Amendment. *Id.* ¶¶ 39–40. The NEA-NH plaintiffs suggest they have received concerns from a teacher who "second guesses" responding to incidents of racism and bullying against Black and LGBTQ+ students, ECF Doc. No. 1 ¶ 18; an administrator who avoids using terms such as "anti-racist" or "anti-bias" during trainings with staff, *id.* ¶ 24; a teacher who will no longer allow students to "pick their own topics for research papers," *id.* ¶ 34; a teacher who abandoned a plan to ensure that "more experiences of Black, Indigenous, and other people of color were represented in their American history units and related materials," *id.* ¶ 34; and a teacher who now teaches world history "in a vacuum" rather than applying the material to the experiences and interests of the students "to limit the analogies students may draw to current events," *id.* The NEA-NH plaintiffs also express concerns about whether teachers or schools may continue to teach certain books. *Id.* ¶¶ 19, 34.

The statutory language, the FAQs, and Attorney General Opinion 2021-01 provide ample guidance with respect to these questions. RSA 193:40, II provides that "[n]othing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in [RSA 193:40, I]." RSA 354-A:29, II provides that "[n]othing in this subdivision shall be construe to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons

and the ideal that all persons are entitled to be treated with equality, dignity, and respect." The

Education FAQs provide:

> Nothing [in the new antidiscrimination provisions] prohibits the teaching of
> historical subjects including, but not limited to, slavery, treatment of the Native
> American population, Jim Crow laws, segregation, treatment of women, treatment
> of LGBTQ+ people, treatment of people with disabilities, treatment of people
> based on their religion, or the Civil Rights movement. Nor does anything prohibit
> discussions related to current events including, but not limited to: the Black Lives
> Matter movement, efforts to promote equality and inclusion, or other
> contemporary events that impact identified groups.

Education FAQs (**Attachment G**) at 2. The Education FAQs further provide that "[n]othing

prohibits schools from teaching about discrimination, including the historical existence of these

ideas." *Id.*

Likewise, Attorney General Opinion 2021-01 reiterates that the new antidiscrimination

provisions allow for "sensitivity training" that "promote[s] concepts of equality and the equal,

respectful, and dignified treatment of all persons—particularly as they relate to the interactions

of members of those identified groups with public employers and government programs."

Attorney General Opinion 2021-01 (**Attachment I**) at 7. These trainings, the opinion makes

clear, may include "implicit bias training" that "recognizes that biases develop over time through

such means as personal experiences, messaging people may receive from the media, and other

sources," may provide "Anti-Racist Resources," and may "include information designed to

promote a better understanding of racism and how to combat racism." *Id.* The opinion further

makes clear that the new antidiscrimination provisions do not prohibit schools from "(1) teaching

about discrimination or how discrimination has existed throughout history" or "the role that

discrimination may play in creating disparities among different identified groups," or "(2)

creating web-based resources designed to promote a better understanding of racism, sexism, or

other forms of oppression." *Id.*

Given the statutory language and the agency guidance, it is hard to conceive how the plaintiffs still harbor the confusion they profess in their pleadings. Indeed, many of their questions have been *directly* answered. For those that are not directly addressed, the plaintiffs (and, more generally, the public) have been provided a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Precious Metals Associates, Inc.*, 620 F.2d 907 (quoting *Jordan*, 341 U.S. 231–32). Again, "[w]hat renders a statute vague is not the possibility it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of what precisely that fact is." *Williams*, 553 U.S. at 306. Even if the plaintiffs think some of their examples present close cases—a point the defendants would not concede—it is a "basic mistake" to conclude "that the mere fact that close cases can be envisioned renders a statute vague." *Id.* at 305. As the Second Circuit has observed, when a statute is "sufficiently clear to satisfy the Due Process Clause, [the] inability to supply precise answers regarding its hypothetical application is insufficient to render that [statute] unconstitutionally vague." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 38 (2d Cir. 2015).

The plaintiffs' contention that the new antidiscrimination provisions are vague insofar as they conflict with other state statutes and regulations is similarly misplaced. In preparing their guidance, the enforcing agencies recognized that they must endeavor to construe and enforce the statutes such that the new antidiscrimination provisions exist in harmony with existing statutes regarding mandatory curriculum in New Hampshire public schools, the State's anti-bullying laws, and other relevant state and federal laws. *See Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872, 890 (1st Cir. 1979) ("Common sense dictates that two statutes be read, insofar as possible, in harmony with one another."); *Soraghan*, 152 N.H. at 405 ("When interpreting two

statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes."). The Attorney General's Opinion reflects this well-established canon of construction by explicitly noting that any agency attempting to determine whether challenged conduct violated the new antidiscrimination provisions must construe the new provisions in a manner that avoids creating absurd or unjust results, such as unnecessarily negating the effect of other statutes. *See* Attorney General Opinion 2021-01 (**Attachment I**) at 5 n.3.

While the AFT plaintiffs contend that the new antidiscrimination provisions inhibit teachers from meeting the requirements of RSA 193-E:2, ECF Doc. No. 30 ¶¶ 63-73, both the statutory language, *see, e.g.*, RSA 193:40, II, and the enforcing agencies' guidance, *see* Employer FAQs (**Attachment H**) at 2; Education FAQs (**Attachment G**) at 2; Attorney General Opinion 2021-01 (**Attachment I**) at 3, 5–8, make clear that nothing in those provisions prevents or prohibits providing students with "[k]nowledge of civics and government, economics, geography, history, and Holocaust and genocide education" or, more generally, with an education that enables them "to participate in the democratic process and to make informed choices as responsible citizens." RSA 193-E:2, IV. Similarly, nothing in the statutory language or agency guidance prohibits a school district from providing instruction in "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices." RSA 189:11, I(j). Consistent with the New Hampshire Supreme Court's established canons of construction, the new antidiscrimination provisions must also be read so as not to prohibit enforcement of the state's anti-bullying laws or the obligation of schools and school districts to prevent discrimination against students. *See* RSA

193:38 (Discrimination in Public Schools); RSA 193-F:4 (Pupil Safety and Violence

Prevention); RSA 354-A:27 (Opportunity for Public Education Without Discrimination a Civil

Rights). The enforcing agencies' guidance likewise reflects that the new antidiscrimination

provisions must be read in a manner consistent with state and federal laws prohibiting

discrimination against disabled individuals. *See, e.g.* Education FAQs (**Attachment G**) at 2.[5]

Nor do the new antidiscrimination provisions conflict with RSA chapter 98-E. That

chapter provides that "a person employed as a public employee in any capacity shall have the full

right to publicly discuss and give opinions as an individual on all matters concerning any

government entity and its policies." RSA 98-E:1. By its plain terms, the protections under RSA

chapter 98-E are limited to when a public employee speaks "as an individual." *Id.* Under New

Hampshire Supreme Court precedent, "the relevant distinction [is] whether the [employee] spoke

as an individual or as a spokesperson for [the government], rather than whether he spoke as a

citizen or as a citizen who happens to be an employee of [the government]." *Appeal of Booker*,

139 N.H. 337, 341 (1995). For the reasons discussed in Section II above, an educator or other

public employee is not speaking "as an individual" when they are teaching in a public school

classroom or providing training on behalf of a government employer. Any restrictions the new

antidiscrimination provisions impose on what a public employee may say therefore do not

conflict with RSA chapter 98-E.

For all of these reasons, the new antidiscrimination provisions provide sufficient notice of

the conduct they proscribe to survive a facial vagueness challenge. The plaintiffs' vagueness

claims therefore fail as a matter of law to the extent they are based on a lack-of-notice theory.

[5] This interpretation would also be consistent with the new antidiscrimination provisions' plain language,
which contains a section that prohibits teaching or advocating that "an individual should be discriminated
against or receive adverse treatment solely or partly because of his or her . . . mental or physical
disability." *See*, *e.g.*, RSA 193:40, I(3); RSA 354-A:32, III.

### B.       The new antidiscrimination provisions do not encourage arbitrary or discriminatory enforcement.

The plaintiffs also contend that the new antidiscrimination provisions are unconstitutionally vague because they encourage arbitrary or discriminatory enforcement. This contention, too, fails as a matter of law. This second type of vagueness challenge arises out of "the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Unsubstantiated fears that a statutory scheme "might be used to harass individuals with alternative lifestyles and views" are insufficient to support a claim that a statute creates a risk of discriminatory enforcement. *Village of Hoffman*, 455 U.S. at 503. When administrative regulations and processes exist to place checks upon arbitrary enforcement, there is no basis to sustain a complaint of vagueness. *See id.* at 504 (crediting the potential for administrative regulations and checks on the arbitrary enforcement of the law as a basis for rejecting a vagueness challenge).

As an initial matter, the plaintiffs' contention that the new antidiscrimination provisions encourage arbitrary or discriminatory enforcement fails for the same reasons that their lack-of-notice argument does. The statutory language and agency guidance "provide[] specific guidance that would allow individuals and . . . enforcement officials alike to determine" what conduct violates the statutes. *United States v. Zhen Zhou Wu*, 711 F.3d 1, 14 (1st Cir. 2013). For this reason alone, any arbitrary-enforcement-based argument fails.

But that argument also fails because the new antidiscrimination provisions embed multiple layers of adjudicatory review that *protects against* arbitrary and discriminatory enforcement. An individual who seeks to make a complaint under the new antidiscrimination provisions must begin just as any other individual wishing to make a discrimination complaint: with the Commission for Human Rights. RSA 354-A:34. The complaint is lodged against the

school or school district, not the teacher, administrator, or other staff person. RSA 193:40, III. The complainant must provide a signed, verified complaint to begin the process. RSA 354-A:21, I(a). After this occurs, one of the commissioners, with the assistance of staff, will investigate the allegations, encourage the parties to resolve the dispute, and ultimately determine whether probable cause supports the allegations or not. RSA 354-A:21, II(a). Throughout this stage of the process, the complaint, the opposing party, and the allegations remain confidential. *Id*.

If the commissioner finds that probable cause exists, the complaint becomes public and the parties may proceed to a public hearing before the entire commission or remove the case for a *de novo* trial in superior court. *Id*. After the matter is adjudicated, there is a right to appeal to the New Hampshire Supreme Court to redress claims of legal error or other matters that warrant appellate review. RSA 354:A:22, III. If the commissioner finds that probable cause is lacking, then the process ends, subject to a deferential, judicial-review process that the complainant may wish to pursue in the superior court. RSA 354-A:21, II(a). Only after an allegation of discrimination has been deemed to be supported by probable cause, subjected to an administrative hearing or civil trial, and, unless an appeal is waived, ruled upon by the New Hampshire Supreme Court, does the finding of discrimination become final. RSA 354-A:22, III. This process is identical should a complainant wish to initiate their case in the superior court rather than the Commission for Humans Rights, save that the complaint would not be subject to the confidentiality provisions accorded to parties in the Commission for Human Rights. RSA 354-A:21-a, I & II..

It is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted. RSA 193:40, IV. This enforcement

proceeding also brings with it a panoply of procedural safeguards. The process begins with a formal complaint, notice to the educator, an investigation, a formal report, and notification in writing of any proposed discipline. *See* N.H. Admin. R. Ed 511.01. An educator who does not agree with the proposed disciplinary finding is entitled to an adjudicatory hearing. *See* N.H. Admin. R. Ed 511.03. The adjudicatory hearing is a multi-level process with procedural protections akin to a judicial proceeding. *See* N.H. Admin. R. Ed 202–212. An educator is entitled to seek a rehearing of any adverse ruling and then take an appeal directly to the New Hampshire Supreme Court under RSA chapter 541. *See* N.H. Admin. R. Ed 213.02. This process provides further robust protection against arbitrary or discriminatory enforcement of the new antidiscrimination provisions.

In their complaints, the plaintiffs contend that the new antidiscrimination provisions are susceptible of arbitrary or discriminatory enforcement because politically motivated individuals and groups might use those provisions to target or harass educators with whose views they disagree. *See* ECF Doc. No. 30 ¶¶ 35, 47, 57, 108; ECF Doc. No. 1 ¶¶ 81, 116, 137. The Supreme Court has made clear, however, that a vagueness challenge does not turn on whether a law "might be used to harass individuals with alternative lifestyles and views." *Village of Hoffman Estates*, 455 U.S. at 503. A "speculative danger of arbitrary enforcement does not render [a law] void for vagueness." *Id.* The plaintiffs here do not provide any non-speculative basis to conclude that process described above—which involves two separate adjudicatory proceedings, the first of which is not brought against the educator at all—would fail to weed out the types of harassing or spurious complaints they appear to be concerned with.

In short, the plaintiffs cannot demonstrate that the new antidiscrimination provisions are vague because they encourage arbitrary and discriminatory enforcement. They have accordingly also failed to state a viable vagueness claim under such a theory. *Kolender*, 461 U.S. at 358.

    **C.**    **If the Court believes questions of state statutory construction bear on the vagueness inquiry, then it should resolve those questions to avoid any constitutional problem or otherwise certify them to the New Hampshire Supreme Court.**

As previously noted, a federal court is required to "consider any limiting construction that a state court or enforcement agency has proffered" when assessing whether a state statute is facially vague. *Kolender*, 461 U.S. at 354 (quotation omitted). Here, as explained, the statutory language and agency guidance sufficiently demonstrate that the new antidiscrimination provisions are not vague on their face. The complaints should accordingly be dismiss.

If, however, the Court believes that the vagueness inquiry turns on an unresolved question of state law, then it should take one of two courses of action. First, the Court can "make an informed prophecy of what [the New Hampshire Supreme Court] would do in the same situation." *Galvin v. EMC Mort. Corp.*, 27 F. Supp. 3d 224, 227 (D.N.H. 2014). In doing so, the Court should apply the New Hampshire Supreme Court's well-established rule that it "will construe a statute to avoid conflict with constitutional rights wherever reasonably possible." *Doe*, 261 A.3d at 976 (citation and quotation marks omitted). Second, this Court is "permitted to certify questions of law to the New Hampshire Supreme Court when questions of New Hampshire law are determinative of the case, and there is no controlling precedent from the New Hampshire Supreme Court." *Old Republic Ins. Co. v. Stratford Ins. Co.*, 777 F.3d 74, 86 (1st Cir. 2015) (citing N.H. Sup. Ct. R. 34). This course of action is arguably preferable, as it would allow for a definitive construction of New Hampshire law from the State's highest court.

Again, the Court need not take either course of action because there is nothing unconstitutionally vague about the new antidiscrimination provisions. But if the Court has any doubts about vagueness, then it must refrain striking down the new antidiscrimination provisions before conclusively determining that "no construction can save [the provisions] from this claim of unconstitutionality[.]" *Screws v. United States*, 325 U.S. 91, 100 (1945).

### Conclusion

To the extent the AFT plaintiffs bring claims arising under state law, those claims are barred by the Eleventh Amendment. The AFT plaintiffs have likewise failed to state a freestanding First Amendment claim because they have not identified any protected speech implicated by the new antidiscrimination provisions. And both sets of plaintiffs have failed to state viable vagueness claims because the statutory text and the guidance produced by the enforcing agencies confirm that the new antidiscrimination provisions set forth a discernible standard of conduct and do not encourage arbitrary and discriminatory enforcement. For all of these reasons, and those stated above, the plaintiffs' respective complaints should be dismissed in their entirety.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity
as Commissioner of the Department of
Education,

JOHN M. FORMELLA, in his
official capacity only as Attorney General
of the State of New Hampshire,

AHNI MALACHI, in her official capacity as
Executive Director of the Commission for
Human Rights,

CHRISTIAN KIM, in his official capacity as
Chair of the Commission for Human Rights,

    *and*

KENNETH MERRIFIELD, in his official
capacity as Commissioner of the Department of
Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date:  March 25, 2022

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

*/s/ Samuel Garland*
Samuel R.V. Garland



685

**General Court of New Hampshire – Bill Status System**

# Docket of HB544

Docket Abbreviations

**Bill Title:** relative to the propagation of divisive concepts.

*Official Docket of* **HB544.**:

| Date | Body | Description |
|------|------|-------------|
| 1/12/2021 | H | **Introduced** (in recess of) 01/06/2021 and referred to Executive Departments and Administration **HJ 2** P. 53 |
| 2/3/2021 | H | ==RECESSED== Public Hearing: 02/11/2021 11:30 am Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/91078617911 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| 2/11/2021 | H | ==CONTINUED== Public Hearing: 02/18/2021 01:30 pm Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/97238685330 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| 3/24/2021 | H | Majority Committee Report: Ought to Pass with Amendment **#2021-0611h** (Vote 10-9; RC) **HC 18** P. 45 |
| 3/24/2021 | H | Minority Committee Report: Inexpedient to Legislate |
| 4/8/2021 | H | Lay on Table (Rep. Osborne): MA DV 347-18 04/08/2021 **HJ 6** P. 72 |
| 1/6/2022 | H | Died on Table, Session ended 01/05/2022 |

NH House                                        NH Senate

686



**HB 544  - AS INTRODUCED**

2021 SESSION

21-0732
05/04

HOUSE BILL *544*

AN ACT relative to the propagation of divisive concepts.

SPONSORS: Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4

COMMITTEE: Executive Departments and Administration

-----------------------------------------------------------------

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Explanation: Matter added to current law appears in ***bold italics.***
Matter removed from current law appears [in brackets and struckthrough.]
Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.
21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:

CHAPTER 10-C

PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

10-C:1  Definitions.  In this chapter:

I. "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.

II. "Divisive concept" means the concept that:

(a) One race or sex is inherently superior to another race or sex;

(b) The state of New Hampshire or the United States is fundamentally racist or sexist;

(c) An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(d) An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(e) Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(f) An individual's moral character is necessarily determined by his or her race or sex;

(g) An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h) Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i) Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j) The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

III. "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV. "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V. "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI. "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2 Unlawful Propagation of Divisive Concepts.

I. Requirements for the state of New Hampshire:

(a)  The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b)  No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II.  Requirements for government contractors:

(a)  All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)  The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)  In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled,

terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)   The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.   The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.   The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.   The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.   The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.   Requirements for agencies.

(a)   The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.   Agencies should continue all training that will foster a workplace that is respectful of all employees.   Accordingly:

(1)   The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training", to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

(2)   Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by federal or state law.

(b)   The commissioner of the department of administrative services, pursuant to RSA 541-A, shall develop regulations for the enforcement of the provisions of this statute.

(c)   Each agency head shall:

(1)   Issue a policy incorporating the requirements of this chapter into agency operations, including by making compliance with the policy a provision in all agency contracts;

(2)   Request that the agency thoroughly review and assess not less than annually thereafter, agency compliance with the requirements of the policy in the form of a report submitted to the department of administrative services; and

(3)   Assign at least one senior political appointee responsibility for ensuring compliance with the requirements of the policy.

VI.   Review of agency training.

(a)   All training programs for state agency employees relating to diversity or inclusion shall, before being used, be reviewed by the department of administrative services for compliance with the requirements of RSA 10-C:2, V.

(b)   If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and regulations.

10-C:3   General Provisions.

I.   Nothing in this chapter shall prevent agencies or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this chapter.

II.   Nothing in this chapter shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner and without endorsement.

III.   If any provision of this chapter, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions to any other persons or circumstances shall not be affected thereby.

2   Effective Date.   This act shall take effect January 1, 2022.



Rep. Ammon, Hills. 40
March 3, 2021
2021-0611h
05/04

Amendment to HB 544

1    Amend RSA 10-C:1, I as inserted by section 1 of the bill by replacing it with the following:
2
3        I. "Contractor" means any and all persons, individuals, corporations, or businesses of any
4    kind that in any manner have entered into a contract to perform a service for, or perform a
5    subcontract pursuant to a contract to perform a service for, or with the state of New Hampshire.
6
7    Amend RSA 10-C:2, V(a)(1) as inserted by section 1 of the bill by replacing it with the following:
8
9        (1)  The head of each agency shall ensure that the agency, agency employees while on
10   duty status, and any contractors hired by the agency to provide training, workshops, forums, or
11   similar programming to agency employees do not teach, advocate, act upon, or promote in any
12   training to agency employees any of the divisive concepts listed in RSA 10-C:1, II; and
13
14   Amend RSA 10-C:3 as inserted by section 1 of the bill by inserting after paragraph II the following
15   new paragraph and renumbering the original paragraph III to read as paragraph IV:
16
17       III   Nothing in this chapter is meant to include as a "contract or subcontract" certain
18   government financial assistance, including but not limited to the taking or receiving of loans, tax
19   credits, tax incentives, tax abatements or gifts deriving from money sent from the federal
20   government or agency designed or meant to assist during or after a declared emergency, including
21   but not limited to health, weather, riot, civil disobedience or acts of foreign agents, or designed as
22   economic stimulus during economic emergency.


**EXHIBIT**

# D

**General Court of New Hampshire - Bill Status System**
# Docket of HB2

Docket Abbreviations

**Bill Title:** relative to state fees, funds, revenues, and expenditures.

*Official Docket of* **HB2.**:

| Date | Body | Description |
|------|------|-------------|
| 3/2/2021 | H | **Introduced** (in recess of) 02/25/2021 and referred to Finance **HJ 4** P. 48 |
| 3/8/2021 | H | Division III Work Session: 03/09/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/9/2021 | H | Division III Work Session: 03/12/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/12/2021 | H | Division III Work Session: 03/15/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/10/2021 | H | Division I Work Session: 03/16/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| 3/10/2021 | H | Division II Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/8/2021 | H | Division III Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/16/2021 | H | Public Hearing: 03/16/2021 01:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 3/12/2021 | H | Division II Work Session: 03/17/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/11/2021 | H | Division III Work Session: 03/18/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/12/2021 | H | Division II Work Session: 03/18/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/11/2021 | H | Division III Work Session: 03/19/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | Division II Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/17/2021 | H | Division III Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | Division II Work Session: 03/23/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/15/2021 | H | Division I Work Session: 03/23/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |

| | | |
|---|---|---|
| 3/17/2021 | H | Division II Work Session: 03/24/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/17/2021 | H | ==CANCELLED== Division III Work Session: 03/25/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | Division II Work Session: 03/25/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/17/2021 | H | ==CANCELLED== Division III Work Session: 03/26/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| 3/17/2021 | H | ==CANCELLED== Division II Work Session: 03/26/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| 3/25/2021 | H | Executive Session: 03/29/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 3/25/2021 | H | ==CANCELLED== Executive Session: 03/30/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 3/25/2021 | H | ==TIME CHANGE== Executive Session: 03/31/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| 4/1/2021 | H | Majority Committee Report: Ought to Pass with Amendment **#2021-1059h** (Vote 12-9; RC) **HC 18** P. 30 |
| 4/1/2021 | H | Minority Committee Report: Inexpedient to Legislate |
| 4/7/2021 | H | Amendment **#2021-1059h**: AA **RC** 204-178 04/07/2021 **HJ 5** P. 87 |
| 4/7/2021 | H | FLAM **#2021-1064h** (Reps. Walz, Hatch): AF **RC** 175-203 04/07/2021 **HJ 5** P. 89 |
| 4/7/2021 | H | FLAM **#2021-1065h** (): AF **RC** 175-206 04/07/2021 **HJ 5** P. 92 |
| 4/7/2021 | H | FLAM **#2021-1068h** (Reps. Rogers, Nordgren, Wallner): AF **RC** 181-199 04/07/2021 **HJ 5** P. 94 |
| 4/7/2021 | H | FLAM **#2021-1071h** (Rep. McWilliams): AF **RC** 177-206 04/07/2021 **HJ 5** P. 96 |
| 4/7/2021 | H | FLAM **#2021-1073h** (Rep. Heath): AF **RC** 174-206 04/07/2021 **HJ 5** P. 99 |
| 4/7/2021 | H | FLAM **#2021-1062h** (Reps. Heath, K. Murray): AF **RC** 178-203 04/07/2021 **HJ 5** P. 101 |
| 4/7/2021 | H | FLAM **#2021-1093h** (Reps. Leishman, Buco): AF **RC** 186-197 04/07/2021 **HJ 5** P. 104 |
| 4/7/2021 | H | FLAM **#2021-1094h** (Reps. Hatch, Leishman, Buco, Walz): AF **RC** 176-208 04/07/2021 **HJ 5** P. 106 |
| 4/7/2021 | H | FLAM **#2021-1063h** (Rep. Hatch): AF **RC** 186-193 04/07/2021 **HJ 5** P. 109 |
| 4/7/2021 | H | FLAM **#2021-1069h** (Reps. Nordgren, Rogers, Wallner): AF **RC** 180-201 04/07/2021 **HJ 5** P. 115 |
| 4/7/2021 | H | FLAM **#2021-1066h** (Reps. Rogers, Nordgren, Wallner): AF **RC** 184-194 04/07/2021 **HJ 5** P. 117 |
| 4/7/2021 | H | FLAM **#2021-1104h** (Rep. Almy): AF **RC** 161-218 04/07/2021 **HJ 5** P. 120 |
| 4/7/2021 | H | **Ought to Pass with Amendment** 2021-1059h: MA **RC** 200-181 04/07/2021 **HJ 5** P. 123 |

| 4/7/2021 | H | Reconsider (Rep. Osborne): MF **RC** 175-204 04/07/2021 **HJ 5** P. 125 |
|---|---|---|
| 4/7/2021 | S | Introduced 04/01/2021 and Referred to Finance; **SJ 11** |
| 4/22/2021 | S | Remote **Hearing:** 05/04/2021, 01:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** |
| 4/22/2021 | S | Remote **Hearing:** 05/04/2021, 06:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** |
| 5/28/2021 | S | Committee Report: Ought to Pass with Amendment **#2021-1799s**, 06/03/2021; **SC 26** |
| 6/3/2021 | S | Sen. Soucy Moved to divide the Question on Committee Amendment 2021-1799s: on Sections 74-75: Sections 427-429, Sections 397-404; and Section 412; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Committee Amendment **#2021-1799s**, on Sections 74-75 Sections 427-429 Sections 397-404 and Section 412, **RC** 24Y-0N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Moved to divide the Question on Committee Amendment 2021-1799s Sections 89-102 and then the Remainder; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Committee Amendment **#2021-1799s**, on Sections 89-102, **RC** 13Y-10N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Committee Amendment **#2021-1799s**, Remainder of the Committee Amendment, **RC** 14Y-10N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Floor Amendment **#2021-1816s**, **RC** 24Y-0N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Whitley Floor Amendment **#2021-1862s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1855s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1850s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1863s**, **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. D'Allesandro Floor Amendment **#2021-1861s**; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Moved to divide the Question on Floor Amendment 2021-1861s on Sections 89-102 of the Amending Language and then the Remainder of the Amendment; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Floor Amendment **#2021-1861s**, Sections 89-102 of the Amending Language, **RC** 10Y-13N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Floor Amendment 2021-1861s; on the Remainder of the Amendment **RC** 10Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1858s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Perkins Kwoka Floor Amendment **#2021-1859s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1847s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Birdsell Floor Amendment **#2021-1842s**, **RC** 14Y-9N, AA; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Soucy Floor Amendment **#2021-1874s**, **RC** 9Y-14N, AF; |

| | | |
|---|---|---|
| | | 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1876s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Whitley Floor Amendment **#2021-1883s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Sherman Floor Amendment **#2021-1878s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1875s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Kahn Floor Amendment **#2021-1852s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Whitley Floor Amendment **#2021-1867s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Soucy Floor Amendment **#2021-1815s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Rosenwald Floor Amendment **#2021-1882s**, **RC** 9Y-14N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Daniels Floor Amendment **#2021-1821s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Carson Floor Amendment **#2021-1827s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Giuda Floor Amendment **#2021-1838s**, **RC** 8Y-15N, AF; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Hennessey Floor Amendment **#2021-1866s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Floor Amendment **#2021-1884s**, AA, VV; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Sen. Bradley Moved to divide the Question on **Ought to Pass with Amendment** on Sections 89-102 and then the Remainder of the Bill; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | **Ought to Pass with Amendment** on Sections 89-102, **RC** 13Y-9N, MA, 06/03/2021; **SJ 18** |
| 6/3/2021 | S | **Ought to Pass with Amendment** on the Remainder of the Bill, **RC** 14Y-9N, MA, OT3rdg; 06/03/2021; **SJ 18** |
| 6/3/2021 | S | Without Objection, the Clerk is authorized to make technical and administrative corrections which are necessary to reflect the intent of the Senate, Relative to Bills and Amendments Passed Today, MA; 06/03/2021; **SJ 18** |
| 6/9/2021 | H | House Non-Concurs with Senate Amendment 2021-1799s and 2021-1816s and 2021-1859s and 2021-1842s and 2021-1821s and 2021-1827s and 2021-1866s and 2021-1884s and Requests CofC (Reps. L. Ober, Weyler, Umberger, Turcotte, Packard): MA VV 06/04/2021 **HJ 9** P. 53 |
| 6/9/2021 | H | Speaker Appoints Alternates: Reps. Edwards, Leishman, Wallner, Major, Emerick 06/04/2021 **HJ 9** P. 53 |
| 6/10/2021 | S | Sen. Daniels Accedes to House Request for Committee of Conference, MA, VV; (In recess 06/03/2021); **SJ 19** |
| 6/10/2021 | S | President Appoints: Senators Morse, Bradley, Rosenwald; (In Recess 06/03/2021); **SJ 19** |
| 6/10/2021 | H | ==RECESSED== Conference Committee Meeting: 06/14/2021 11:00 am LOB 210-211 |

| 6/14/2021 | H | Conferee Change: Rep. Erf added as Alternate 06/10/2021 **HJ 10** P. 22 |
| 6/15/2021 | H | ==RECESSED== Conference Committee Meeting: 06/15/2021 01:00 pm LOB 210-211 |
| 6/16/2021 | H | ==RECESSED== Conference Committee Meeting: 06/16/2021 01:00 pm LOB 210-211 |
| 6/17/2021 | H | ==CONTINUED== Conference Committee Meeting: 06/17/2021 10:00 am LOB 210-211 |
| 6/17/2021 | S | Conferee Change; Senator Daniels Replaces Senator Rosenwald; **SJ 20** |
| 6/17/2021 | H | Conferee Change: Rep. Edwards Replaces Rep. Turcotte 06/10/2021 **HJ 10** P. 23 |
| 6/17/2021 | H | Conferee Change: Rep. Emerick Replaces Rep. Packard 06/10/2021 **HJ 10** P. 23 |
| 6/17/2021 | S | Conference Committee Report Filed, **#2021-2040c**; 06/24/2021 |
| 6/24/2021 | S | Conference Committee Report **#2021-2040c**; **RC** 14Y-10N, Adopted; 06/24/2021; **SJ 20** |
| 6/24/2021 | H | Conference Committee Report 2021-2040c: Adopted, **RC** 198-181 06/24/2021 |
| 6/24/2021 | H | Reconsider (Rep. Osborne): MF DV 172-203 06/24/2021 |
| 6/25/2021 | S | Enrolled Bill Amendment **#2021-2048e** Adopted, VV, (In recess of 06/24/2021); **SJ 20** |
| 6/25/2021 | H | Enrolled Bill Amendment **#2021-2048e**: AA VV (in recess of) 06/24/2021 |
| 6/25/2021 | S | Enrolled Adopted, VV, (In recess 06/24/2021); **SJ 20** |
| 6/25/2021 | H | Enrolled (in recess of) 06/24/2021 |
| 6/28/2021 | H | Signed by Governor Sununu 06/25/2021; Chapter 91; Unless otherwise specified the remainder of this act shall take effect: 07/01/2021 |

| NH House | NH Senate |



# Senate Finance Committee
*Deb Martone  271-4980*

**HB 2-FN-A-LOCAL,** relative to state fees, funds, revenues, and expenditures.

**HB 1-A,** making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023.

**Hearing Date**:     May 4, 2021

**Time Opened**:     1:00 p.m.          **Time Closed**:     10:20 p.m.

**Members of the Committee Present**:     Senators Daniels, Reagan, Giuda, Hennessey, Morse, Soucy and Rosenwald

**Bill Analysis**:     1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

  2.  Makes a transfer of unexpended funds to the state heating system savings account.

  3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

  4.  Establishes the graphic services fund in the department of administrative services.

  5.  Consolidates human resources and payroll functions in the department of administrative services.

  6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

  7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

  8.  Directs the payment of state employee medical benefits payments  from  the retirement system.

  9.  Enables the supreme court to transfer funds.

  10.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11.  Enables the sale of the lakes region facility in Laconia.

12.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

13.  Repeals provisions relative to the senior volunteer grant program.

14.  Establishes the emergency services for children, youth, and families fund.

15.  Eliminates certain parental reimbursements.

16.  Prohibits the distribution of state funds awarded by the department of health and human services to a reproductive health care facility for provision of abortion services.

17.  Makes an appropriation to the department of health and human services for streamlining agency operations.

18.  Requiring the commissioner of the department of health and human services to submit an amendment to the Centers for Medicare and Medicaid Services to suspend all catastrophic aid payments to hospitals for the biennium.

19.  Enables the department of military affairs and veterans services to provide support for veterans' mental health and preventing social isolation.

20.  Transfers the controlled drug prescription health and safety program to the department of health and human services.

21.  Suspends revenue sharing with cities and towns for the biennium.

22.  Enables the liquor commission to process merchant cards.

23.  Enables the department of education to accept gifts, contributions, and bequests for the New Hampshire scholars program.

24.  Changes the calculation for pupils eligible for a free or reduced price meals.

25.  Makes transfers to the education trust fund.

26.  Authorizes expenditures for energy efficient school buses.

27.  Establishes the position of director of intergovernmental affairs in the department of business and economic affairs.

28.  Repeals the bureau of film and digital media.

29.  Suspends the crediting of meals and rooms tax revenue to the division of travel and tourism.

30.  Enables the department of corrections to transfer funds.

31.  Changes the approval threshold for contracts set by the governor and council manual of procedures.

32.  Prohibits the dispersing of state aid grants for certain new infrastructure projects in the department of environmental services unless the state general fund unrestricted revenues as reported by the department of administrative services are above the revenue plan.

33.  Renames the divisions of the office of professional licensure and certification and establishes pharmacy compliance investigator positions within the office.

34.  Renames the divisions of the office of professional licensure and certification and establishes pharmacy compliance investigator positions within the office.

35.  Makes an appropriation to the New Hampshire Internet crimes against children fund.

36.  Transfers funds from the investors education fund and the department of justice consumer protection escrow account to the FRM victims recovery fund and removes the prospective repeal of the fund.

37.  Makes an appropriation to the department of health and human services for the purpose of funding one-time maintenance of the Medicaid management information system.

38.  Amends the powers of the governor relating to declaring a state of emergency and authorizes the creation of a nominal state of emergency for the purpose of continuing a state of emergency for financial reasons.

39.  Provides for transfer of funds from the revenue stabilization reserve account to the general fund surplus account based the most recent fiscal biennium rather than fiscal year.

40.  Reduces the tax rate of, and in 2027 eliminates, the interest and dividends tax.

41.  Reduces the tax rate of the meals and rooms tax.

42.  Increases the filing threshold for the business enterprise tax and reduces the rate of the tax; and reduces the rate of the business profits tax.

43.  Limits the amount of the credit allowed against overpayment of the business profits tax and the business enterprise tax and establishes a commission to study limiting the business tax credit carry over.

44.  Allows the New Hampshire veterans' home to transfer funds within accounting units for the biennium ending June 30, 2023.

45.  Revises the procedure for compensation for loss of agricultural products or livestock due to bears.

46.  Establishes the New Hampshire higher education merger assessment commission.

47.  Authorizes the department of information technology to fill unfunded positions.

48.  Modifies the composition and operation of the adult parole board and permits remote meetings during a pandemic or other declared state of emergency.

49.  Requires employer pro rata payments to the workers' compensation administration fund to be based on the preceding calendar year ratios and amends the payment of per diems to workers' compensation appeals board members.

50.  Makes various changes to the apprenticeship programs in trade and industry.

51.  Amends the unemployment compensation fund balance necessary to trigger increases or decreases in employer contributions to the fund and repeals the emergency surcharge power of the commissioner of the department of employment security.

52.  Imposes strict liability on any person who renders any highway unsuitable for public travel, including full and current replacement cost.

53.  Provides that proceeds from a sale that results from money provided by the highway fund for payback of real property purchased with federal funds shall be credited to the department of transportation for the purpose of meeting federal obligations or reimbursing the highway fund for payment of federal obligations.

54.  Adds definitions relating to small unmanned aircraft and small unmanned aircraft systems to the New Hampshire aeronautics act.

55.  Amends an appropriation to the department of transportation for the 2018 fiscal year and provides that it lapse to the highway fund and be expended for the purpose of funding state red list bridge projects.

56.  Appropriates funds to the department of cultural and natural resources for state park and recreational area projects.

57.  Establishes a body-worn and dashboard camera fund and makes an appropriation to the fund; establishes a classified business administrator I position in the department of safety; and establishes a commission to develop recommendations for legislation to establish a single, neutral, and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers.

58.  Requires the department of safety, in collaboration with the department of administrative services, to establish standards for radio infrastructure-related hardware, computers, software, related licenses, media, documentation, support and maintenance services.

59.  Establishes within the department of justice an unclassified position of director of diversity and community outreach.

60.  Authorizes the judicial council to request additional funding expenditures for termination of parental rights services that are greater than amounts appropriated in the operating budget.

61.  Moves the governor's scholarship program and fund from the office of strategic initiatives to the college tuition savings plan and authorizes the college tuition savings plan advisory commission to transfer funds between the governor's scholarship fund and the New Hampshire excellence in higher education endowment trust fund.

62.  Transfers the regulation of audiologists and hearing aid dealers to the governing board of speech language pathology.

63.  Establishes the department of energy, to govern energy and utilities matters, and have oversight on matters under the public utilities commission.

64.  Administratively attaches the public utilities commission to the department of energy and makes corresponding changes to existing laws relating to the organization and duties of the public utilities commission to reflect this change.

65.  Transfers certain duties from the public utilities commission to the department of energy.

66.  Adds the commissioner of the department of energy to the New Hampshire site evaluation committee.

67.  Requires that the department of energy advocate for New Hampshire in regional activities concerning competitive electricity suppliers.

68.  Requires that the department of energy require electric and gas utilities to operate an online energy data platform and, in conjunction with the public utilities commission, implement a statewide electric utility restructuring plan.

69.  Requires the bank commissioner to charge the public deposit investment pool for actual costs incurred by the banking department to operate the pool.

70.  Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

71.  Delays the enactment of the single sales factor for determining apportionment under the business profits tax and the business enterprise tax and extends and amends the legislative committee on apportionment.

72.  Defines and regulates pari-mutuel pools on historic horse racing.

73.  Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

74.  Makes changes to liquor license fees for agency licenses and retail tobacco licenses and clarifies certain other liquor license fee provisions.

75.  Renames the enforcement and licensing division in the liquor commission as education and licensing and renames liquor investigators as liquor license specialists.

76.  Defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

77.  Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

78.  Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

79.  Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

80.   Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

81.   Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

82.   Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

83.   Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

84.   Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

85.   Makes an appropriation to the education trust fund.

86.   Makes an appropriation to the department of transportation for federal and state highway aid, the highway and bridge betterment program, the acquisition of fleet vehicles, and for winter maintenance operations.

87.   Makes an appropriation to the department of education to accelerate remaining school building aid payments to school districts.

88.   Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

89.   Requires the department of health and human services to fund employment-related child care services without a wait list.

90.   Addresses the criteria for secure detention pending adjudication and the circumstances in which a minor may be committed to the department of health and human services for the remainder of his or her minority.

91.   Requires the closure of the Sununu youth services center and the transfer of all children committed or detained at the facility.

92.   Establishes a commission to study the closure of the Sununu youth services center.

93.   Makes an appropriation to the department of health and human services for the general purpose of closing the Sununu youth services center and related activities.

94.  Makes an appropriation to the department of health and human services for job training and incentive programs for state workers with priority given to employees displaced by the closure of the Sununu youth services center.

95.  Directs the department of administrative services to take possession of the Sununu youth services center (SYSC) property.

96.  Limits further expansion of the closed loop referral system by the department of health and human services pending review of the system by the legislative oversight committee on health and human services.

**Sponsors**:

Rep. Weyler                    Rep. L. Ober                    Rep. Edwards

Rep. Umberger

_____

**Who supports the bill**:  Please refer to Public Hearing Sign-In Sheets.

**Who opposes the bill**:  Please refer to Public Hearing Sign-In Sheets.

**Who is neutral on the bill:**  Please refer to Public Hearing Sign-In Sheets.

**Summary of testimony presented**:

**Maria Camerlengo:**
- Ms. Camerlengo is the Director of the nonprofit Silverthorne Adult Day Program in Salem.
- This program is important but unaffordable to many seniors.
- The current rate for Medicaid reimbursement is $54.44 per day.  The cost to run the program is over $100 per day.
- Due to COVID, her 2020 losses amounted to over $85,000.
- The VA has increased their rates to $113 per day, covering two days per week for Silverthorne's veterans.
- They need more help to keep the doors open.
- Medicare does not cover adult day care.
- Many seniors fall between the cracks.
- The monthly rate to run the program is $1,700.
- They are looking for more help so that they may help more families.

**Lori Breen:**
- Please support the developmental services budget, and those that carry out the work.
- Her 22 yr. old son, Jake, is supported by Gateway Services in Nashua.
- He wants to be independent, have his own place, and be a valued member of the community.  He is willing to work and have meaningful employment.

- Jake participated in an internship program through St. Joseph Hospital, "Project Search", learning transferable job skills. He is now working at Five Guys Burgers and Fries.
- A fully funded developmental services budget secured Jake's participation in Project Search. He is learning necessary skills to thrive as an adult. Full funding offers a good quality of life for Jake, as well as the remainder of his family. This allows Lori to continue to work full-time and secure the health care benefits she needs for her family.
- Fully funding is a major factor in the success of the community as a whole.

**Lisa Beaudoin, ABLE NH:**
- Fully support the budget for the developmental disability community, and go beyond it.
- Include full funding for a Medicaid adult dental benefit, which is listed as a "priority need" in the State office of Medicaid.
- Support the In-Home Supports Waiver, the Choices for Independence Waiver and the acquired Brain Disorder Waiver.
- Now is the time to reverse "penny-wise and pound-foolish" health care policies which significantly contribute to people with disabilities experiencing the poorest health outcomes of any identified population in America.
- If NH is interested in raising rates of employment as well as improving health outcomes and lowering health care costs for people with disabilities, we must finally provide the funds for fiscally sound and comprehensive oral health care in NH.
- RSA 171-A mandates the New Hampshire Legislature fully fund the adult developmental disability service system. People with disabilities must have the support they are entitled to in order to participate in the American dream.

**Katherine Goodwin:**
- Katherine is a Program Director at the Kimi Nichols Center in Plaistow.
- They support over 64 developmentally disabled adults both residential and day care.
- If these programs were not fully funded, it would be a great disadvantage to the people they are serving.
- Dental hygiene is not necessarily a top priority.
- The Kimi Nichols Center cares for the whole person.
- Southern New Hampshire area agencies continue to close their doors.
- The cost of caring for a person who truly cannot care for themselves is skyrocketing. Without these supports more people will end up in nursing home facilities, hospitals and in medical crises.

**Forrest Beaudoin-Friede:**
- Fully fund the developmental services budget, as well as a Medicaid adult dental benefit.
- Forrest receives supports and services through the DD Waiver. He is a Medicaid recipient as well.

- It is extremely important these priorities are funded.
- With these supports, Forrest lives independently in his own apartment.  He works part-time.
- Oral health is an important part of overall health.

## Gail Brown:
- Gail is the Director of the NH Oral Health Coalition.
- Include funding for a Medicaid adult dental benefit in support of responsible management of scarce resources.  This request supports the opportunity for integrated health delivery of medical and dental care by funding the inclusion of oral health and dental services for adults into a Medicaid managed care program.
- This is the opportunity for New Hampshire to fund that benefit allowing for integrated cost-effective medical/dental care that supports:  (a) dental treatment in the right setting at the right time; (b) readiness for employment and education of Medicaid expansion enrollees; and (c) the opportunity for successful substance abuse treatment and extended recovery.
- Over 100 medical conditions are associated with dental diseases and conditions that can result in increased chronic care costs, avoidable hospitalizations, and emergency room visits that provide antibiotics and pain relief but no dental repair, at a very high cost drawn from scarce Medicaid funds.

## Amy Moore:
- Ms. Moore is the Director of Ascentria In-Home Care, which provides personal care services for over 400 people through CFI.
- Thousands of Granite Staters depend on the CFI program.  These are medically vulnerable individuals ages 18 to 100 who qualify for nursing homes, but who choose to remain in their own homes.  Home and community-based care costs a fraction of what a nursing home does.
- These programs have been underfunded for over a decade--so badly that New Hampshire ranks 50th in the amount of Medicaid funding it spends on home and community-based care.
- CFI is failing our most vulnerable citizens.  Rates are so low that providers cannot hire the workers they need to care for these individuals.  You can go to work at Market Basket, McDonalds or Walmart and receive a much higher wage than currently working for a CFI program.
- We hail these caregivers and health care workers as heroes during this pandemic, but we won't pay them a livable wage.
- Based on DHHS data, the entire CFI appropriation is rarely spent.  This is not because the budget is too large; it's because agencies can't provide the services.  Funds are being left on the table that could enhance rates and eliminate gaps in care.
- "We're not asking you to put more money into the budget.  We're asking you to direct the Department of Health and Human Services to put the money that is there into rate increases."
- We must strengthen our home and community-based care system NOW.

**Matthew Houde:**
- Matt is VP-Government Relations for Dartmouth-Hitchcock.
- The pandemic has highlighted gaps in our system that are designed to provide for people in their time of need.
- We need to rebuild a robust continuum of behavioral health care, supported by ancillary community services, that will help avoid institutional care by providing prevention and early intervention, integrate behavioral health with physical health, and ensure adequate crisis care is available and accessible when necessary--as well as transitions for patients after institutional care so as to avoid further hospitalization.
- Both the Governor and the House budgets recognized the 3.1 percent Medicaid provider rate increase authorized in the prior budget as well as the Medicaid Enhancement Tax and the Medicaid Disproportionate Share Hospital Agreement reached by the State of New Hampshire and providers several years ago. Dartmouth-Hitchcock Health requests the Senate Finance Committee maintain those provisions in HB 1-A.
- The line item for indirect and direct graduate medical education in the DHHS budget has been suspended for at least a decade. As the state's only academic medical center, Dartmouth-Hitchcock Health is ever hopeful that New Hampshire will resume support for the work of training the medical workforce of the future.
- As a contractor with the state, Dartmouth-Hitchcock is concerned that their efforts to advance diversity, equity and inclusion could be undermined by the limitations imposed by the divisive concepts policy. This policy provision should be removed from HB 2-FN-A-LOCAL.
- DHHS entered into a contract with UniteUs to implement a closed loop referral system. This referral system will enable social service organizations to coordinate services, which in turn will allow for the efficient use of limited resources. The policy provision in HB 2-FN-A-LOCAL pertaining to the closed loop referral system should be removed.

**Jeff Dickinson:**
- Jeff is the Advocacy Director for Granite State Independent Living.
- CFI services Jeff utilizes are personal care services at his home in Franklin. He is 50 yrs. old and has a form of Muscular Dystrophy. He uses a power wheelchair, and at times a ventilator. He needs full help with all activities of daily living, such as showering, dressing and eating. These services allow Jeff to remain at home in his community.
- Please continue to make CFI a priority.

**Arthur Gardiner:**
- Fully fund the initiatives in the 10-Year Mental Health Plan adopted in January 2019. Folks in the Upper Valley in Hanover are particularly concerned that adequate funding be provided to permit the initiation and successful operation of a mobile crisis support facility in this part of the state. Legislative

support is needed to ensure an adequate budget for that greatly needed treatment facility.

- Mr. Gardiner has a family member who is burdened with mental illness. He has direct experience with the serious consequences of the emergency room boarding crisis.
- The long wait in a very busy emergency room, unable to cope in a humane way with a serious attack of fear and paranoia, has contributed in a major way to delusional memories of trauma. With every good motivation, a system designed to protect and cure has a harmful rather than helpful effect. The emergency room boarding crisis has to be addressed and eliminated.
- The emergency boarding problem is the result of a much broader issue--an overburdened mental health care system stretched beyond its limit. There are not enough first contact crisis support facilities to provide needed treatment and to separate more serious from less serious mental problems. People sufficiently ill to visit an emergency room face the waiting time that so prominently evidences the system's lack of sufficient capacity. Those who finally reach a Designated Receiving Facility receive treatment from a caring and competent, but frantically busy staff. Many beds there are used by patients who could successfully be treated in transition facilities offering less intensive support but there are not enough available. And the entire care structure suffers from a wage structure that is really inadequate for its needs.
- We need to be aware that the spectrum of mental illness includes a large cohort of people just as impaired by illness as those suffering from melanoma or arteriosclerosis. An adequate health care system must be available to treat such illness every time and on time.
- Regarding "divisive concepts," our history is what it is--both its tremendous achievements and its difficulties. We must realistically fashion our future from our history--viewed from all perspectives.

**Leslie Want:**
- Leslie is the Vice-Chair of the Manchester Board of School Committee.
- HB 1-A and HB 2-FN-A-LOCAL do not meet the needs of Manchester students and taxpayers. While cutting corporate taxes it underfunds public schools in New Hampshire. Its contribution to public schools is last in the nation. We can do better than that.
- Manchester stands to lose $5.2 million in adequacy aid, due to low enrollment and fewer free and reduced-lunch applications.
- The New Hampshire Retirement System increase leaves Manchester with a $7.4 million shortfall, after receiving a tax cap increase from city aldermen, assuming they get that increase.
- Please fund education so our students can recover from their learning losses and go on to meet their fullest potential.
- Do not let the budget include HB 544. It would harm Manchester students, the largest and most diverse community in the state.
- Ms. Want urged the committee to pass HB 135 with Rep. Luneau's amendments.

**David Chandler:**
- Mr. Chandler volunteers at both the Community Kitchen and the Senior Center in Keene.
- Make funds available for disabled people deeply in need.

**Owen Houghton:**
- Increase adult care rates.
- Mr. Houghton's personal belief in the value of adult medical daycare comes from his past need for relief from caregiving.  The Alzheimer's Disease diagnosis in 2010 of his wife, Norma, a 30-yr. RN at Monadnock Community Hospital, required his full-time attention for over six years.  During those difficult years the Monadnock Family Services Adult Care Center Program came to his rescue, and provided quality medical, emotional and social care for both him and his wife.  After she died, Mr. Houghton learned of the financial costs of her care at the Adult Care Center.  Mr. Houghton wondered how they could have provided such support with a full staff and services on a daily reimbursement fixed rate of $54.44.
- The inequity with nursing home rates nearly four times the current adult daycare rate is clear.
- An increase to $75 per day is needed to keep our Adult Care Center open.

**Kristine Stoddard:**
- Kristine is the Director of Public Policy at Bi-State Primary Care Association.
- Bi-State represents 14 New Hampshire community health centers, which are located in areas of the state with limited access to health care services.  New Hampshire's community health centers are nonprofit organizations that provide integrated substance use disorder treatment, behavioral health, primary care, and oral health services to nearly 120,000 patients, including approximately 20 percent of Medicaid expansion enrollees.
- In 2019 the Legislature and the Governor overwhelmingly supported a non-lapsing $6.5 million appropriation to the State Loan Repayment Program because of the health care workforce shortage.  This program provides partial payment towards educational loans of health care professionals in exchange for a commitment of three years to serve in a medically underserved area.  The program is an invaluable recruitment tool for community health centers, community mental health centers, critical access hospitals, and other community-based health care providers.
- There should be approximately $5.1 million of this 2019 appropriation still available.  The Senate should ensure the funding be made available to expand access to this program as intended.
- The family planning program should have $1.2 million appropriated so there is no gap in service due to impending federal changes  Please provide General Funds so that no gap occurs.
- Section 34 of HB 2-FN-A-LOCAL, Reproductive Health Facilities, should be removed.  It would require the physical separation of health care services,

making the provision of these services by New Hampshire's family planning providers impossible.

- The "divisive concepts" language should be removed from HB 2-FN-A-LOCAL. Health care providers are required to provide culturally competent care.

**Jennifer Smith, MD:**
- Dr. Smith is a retired family physician who worked at community health centers for many years.
- Oral health has been neglected. It is very important.
- Strip out language that would prevent Planned Parenthood from being able to access state funds for their important reproductive health work because a small amount of their work includes pregnancy terminations, a necessary service.
- Divisive language is inappropriate for the state budget. We shouldn't want to stop good discussion of what our history is with respect to minorities. It is impacting public health currently.
- There is a much higher rate of maternal death from people of color. We need to discuss how we remedy problems from the past. That includes why they happened in the past.
- DHHS is the most important part of our budget in many, many ways, in terms of protecting people's health and wellness. In light of the recent pandemic, "back of the budget" cuts should never have been suggested.

**Marianne Jackson, MD:**
- Dr. Jackson is the Executive Director of the Gibson Center for Senior Services.
- They have a very vibrant senior center, and are asking support of the $1.5 million appropriation in the budget for senior centers.
- They provide nutritious meals, transportation to necessary activities of normal living, and resources for older adults in the community.
- They are a family, a social, caring web of people who need and serve each other.
- Senior centers have stayed connected to their patrons even if the doors were locked due to COVID. It has been grueling.
- They have sponsored vaccination clinics for RSVP and Meals on Wheels drivers, Meals on Wheels recipients and other elders.
- They have provided computer literacy training and free laptops to give people a chance to connect with email, Zoom and Telehealth. They made phone calls, wrote cards, created online programs and made every effort to leave no one behind.
- All of this takes effort and funds. Last year and this year, due to COVID, the Gibson Center for Senior Services was unable to hold its annual fundraising events, resulting in a 5 percent loss. Grant funding has been almost completely diverted to emergency efforts creating an additional 10 percent loss of expected revenue.

**Audrey Gerkin:**
- Ms. Gerkin is seeking support of the developmental services budget. Her family and daughter, Lexi, is one of the 15,000 families supported by the area agencies.

She receives assistance through One Sky's Family Support Program as she moves towards transitioning to adult services.

- Lexi is almost 20 years old and attends the Monarch School of New England. She has worked at the Dover Children's Museum.  For Lexi to continue seamlessly to be a part of the community as she turns 21, it is very important the budget be fully funded, and the waitlist continue to be nonexistent.
- Fully fund the Medicaid adult dental program.  Lexi will benefit from this service, as well.  She has many medical complications, and a trip to the dentist for even only a cleaning, typically, means anesthesia will be involved.  By funding the Medicaid adult dental benefit it would ensure this basic care will be covered.
- Also, they rely heavily on Lexi's two full-time home nurses.  They know how lucky they are to have that coverage.  However, their three overnight shifts remain uncovered.
- Work to strengthen home and community-based services.

**Alyssa Antman:**
- Alyssa is a patient of the Equality Health Center.
- The language in HB 2-FN-A-LOCAL defunds essential reproductive health care providers during a pandemic.  Should it become law, thousands of Granite Staters, such as Alyssa, would be at risk of losing access to the critical lifesaving health care that they rely on.
- Alyssa shared with committee members her experience at the Equality Health Center with what turned out to be not such a routine change in her birth control.  She was also given a cancer screening.
- She is forever grateful for the care she received at the health center.
- By requiring an unnecessary physical and financial separation, this budget is designed to force reproductive health care providers out of the program. Blocking funding for reproductive health providers could result in patients like Alyssa delaying or going without necessary care.
- Funding preventative services such as cancer screenings and birth control is good for the health of our communities and the overall economy.
- We should be working on expanding access to these services, not stripping them away.

**Jennifer Bertrand:**
- Please fully fund DD services and the Medicaid adult dental benefit.
- Her 21 yr. old daughter, Chloe, has been diagnosed with autism.  She needs assistance with all activities of daily living.  But with supports she has achieved monumental tasks such as attending high school, and was able to open her own shredding business during the pandemic.
- Raising Chloe has definitely presented some challenges.  The family has had to navigate multiple systems.
- The support of the DD Waiver has helped their family stay together.
- As parents, Jennifer and her husband will continue to provide wraparound services for Chloe in her adult years, but they cannot do it alone.  No one can.

- Hardworking families need the State of New Hampshire to do their part and fully fund DD services.

**Heidi Marandos:**
- Fully fund DD services and the Medicaid oral health care benefit.
- Heidi and her husband adopted two special needs children out of foster care. They receive supports from Pathways, the area agency. Their older son has a cognitive impairment and is medically complex. And he is loved by everyone in their community. He is transitioning to adult community supports, which will aid him in accessing employment and personal care. He will need a day program so that Heidi and her husband can continue to work.
- Their son also suffers from a congenital tooth enamel issue and needs comprehensive, ongoing dental work.
- Heidi worries that once her son reaches adulthood, shortages and supports for personal care needs and a lack of good oral health could lead to serious complications for the vibrant son who brings joy to everyone he meets.

**Ken Barnes:**
- Mr. Barnes supports the removal of school voucher language from the budget. It is a terrible idea. It discriminates against our public school children.
- Remove HB 544 from the budget; it doesn't belong there. It turns freedom of speech and thought on its head. It attempts to censor teaching in an effort to make our society more inclusive and fair.
- Fully fund DHHS. Restore the back-of-the-budget cuts and the vacant positions.
- Support the Medicaid adult dental benefit, DD services, home and community-based care and community health centers. Those supports are very necessary and important for those who must rely on those types of services, as well as address health care disparities.
- It will be very costly for the state to defend the large number of lawsuits that will, no doubt, be filed against the constitutionality of HB 544. Training to make our society better would be illegal under HB 544. Take that language out of the budget.

**Christopher Becker:**
- Mr. Becker is a public charter school employee.
- The language of HB 544 limits academic judgment through censorship.
- There is a shift in the ways Social Studies and English are being taught.
- The wording of the bill makes it seem like teachers are teaching to hate others; to regard those of particular races and genders as inferior.
- It is suggested that the way history is being taught paints a picture of males and white people as apparently sexist and racist, and therefore inferior.
- Students are able to separate their personal identities from the historical deeds that we study much more so than adults. High school students are uniquely suited to grapple with challenging and complex historical topics in nuanced ways. They actually don't need any interpretation or interjection from their teacher, since the primary sources speak for themselves. Students are able to

perceive racism and sexism and where it exists in the historical record because they are intelligent and compassionate, not because their instructor instructs them to do so.  They can recognize bias on their own.

- Western civilization has a long history of discriminatory practices and policies.

### Maureen Meletis:

- Maureen is an advocate with the Alzheimer's Association MA/NH Chapter, which currently supports 26,000 people living with Alzheimer's in the Granite State.
- Support the Governor's budget request to include critical increases in three Medicaid services under the Choices for Independence Waiver:  personal care, homemaker and case management.
- Invest in adult medical day services by adding $4 million to the state budget.
- Restore the Governor's funding for senior centers to provide essential services.
- Over 57,000 individuals in New Hampshire are a caregiver to a loved one living with Alzheimer's, creating a total of 82 million hours of unpaid care for a total value of $1.5 billion.
- Eighty percent of older adults with Alzheimer's/dementia receive help with a daily personal care activity such as bathing, dressing and grooming. Unfortunately, services that could help these families like the CFI program have been underfunded for years with the health care workforce continuing to decline, and putting more pressure on a loved one serving as the primary caregiver.
- COVID-19 has played a significant role in adding additional strain on family caregivers due to the reduction of outside support and resources.
- Please provide our families with the support they need to keep their loved ones at home.

### Ann Sanok:

- Ann has a 26 yr. old son, Alex, who has been supported by One Sky.  He presently lives in a group home which is qualified to provide intensive behavioral services.  These supports are needed for individuals who may engage in extreme behaviors, such as prone to aggression or violence, breaking things, excessive rocking or noises.  Some individuals may be non-verbal or physically impaired.  Some have extreme OCD or anxiety.  They typically cannot tolerate much stimulation and need one-on-one supervision.  They are unable to drive, many can't read or write, and most of the more challenged population will never work.
- Autism is a nightmare for many, the ones with the most profound disabilities. It's a life sentence for the child and the parent.  It can be crippling physically, emotionally and financially.
- The number one issue of overwhelming concern to parents of autistic children is what happens when the parents die.
- Do not forget the forgotten.  Support this budget and support the cause and lives of these citizens.  They deserve the same liberties and freedoms but need a

helping hand to live a life that is going to be very different, but which will be safe, meaningful and rich in its own way.

- New Hampshire can do better.  Fully fund the developmental services budget, and learn more about this system and the unique, loving people you will help by doing so.

**Devon Chaffee:**
- Devon is the Executive Director of ACLU NH.
- The divisive concepts provision attempts to censor concepts that are used in diversity training to educate individuals on discrimination that people of color face.
- Diversity trainings are currently used by law enforcement, schools, state and local agencies and private employers.  Most often they're used because these entities want to create workplaces and communities that are more equitable and inclusive.
- This language was taken directly from a federal Executive Order that was stayed by a federal judge and is now defunct.  Identical language is now being pushed in a number of states across the country by D.C.-based think tanks.
- For schools, this provision is an attack on parents and communities to come together and address difficult topics.
- "Do you want this Legislature to start down the road of issuing state government mandates about what can and can't be discussed in our local schools?  Is it the role of this Legislature to begin censoring local school districts?  Or do you trust the local families and communities in your district to work with your local schools to best identify the way forward on difficult topics."
- This provision would bar the implementation of the recommendations made by the Governor's Commission on Law Enforcement, Accountability, Community and Transparency, often referred to as "LEACT".  These recommendations include annual training on implicit bias and cultural responsiveness.
- Agencies see these trainings as important opportunities for public servants to learn how stereotypes impact behavior.
- Remove the divisive concepts provision from HB 2-FN-A-LOCAL.

**Rep. Tony Caplan:**
- This budget cuts childcare and K-12 education.  It defunds health care by close to $100 million.  At the same time it provides tax giveaways to corporations and the wealthiest in our state.
- The definition of "divisive concepts" in HB 2-FN-A-LOCAL is vague and general. It is guaranteed to increase divisions in our society.
- This is government weighing in on race and gender.  These issues remain relevant today.
- The attempt to limit speech and conversation on these issues is unconstitutional, and infringes on free speech.  It usurps local control on education.  Most importantly, it interrupts the free flow of ideas that we depend on as free people.  In a democracy it disrupts the "free marketplace of ideas". Remove this provision from the budget where it does not belong.

- Education freedom accounts would neither improve our education or increase our freedom.  New Hampshire families for generations have relied on public schools to educate their children, and set us up for success as a society.
- Yes, there are problems with our public schools that we need to work on.  But the answer is not taking money away from the public school system and sending it to private schools.  This will inevitably increase local property taxes.  This goes against our separation of church and state.
- New Hampshire's public school system is one of the finest in the country. Remove this provision from the budget, as well.

**Lyn Schollett:**
- Lyn is the Executive Director at the New Hampshire Coalition Against Domestic and Sexual Violence.
- Maintain the $1.26 million appropriation that was part of the domestic violence prevention program.  This would adequately fund the lifesaving services provided by their 12-member programs to address domestic violence and sexual assault across the state.
- In the last two years the New Hampshire Coalition has provided free and confidential services to nearly 30,000 victims, including providing shelter to over 1,000 adults and children in their 12 emergency domestic violence shelters.
- During this same timeframe, they were forced to turn away over 1600 adults and over 740 children seeking emergency shelter.
- The state has worked tirelessly to respond to the opioid crisis, the lack of mental health services, and to improve child protection.  We need to respond earlier and more comprehensively to those who suffer from domestic and sexual violence.
- The essential role our crisis centers play in responding to trauma is becoming increasingly apparent during the pandemic.  Imagine the terror when being forced to shelter at home with the person who is continually raping and assaulting you.  In spite of the pandemic, our emergency crisis centers have received well over 100,000 calls in the last year.
- They were forced to shelter victims in hotels during the pandemic, not an optimal place.  They've worked with the courts to change the process for seeking a protective order.  They've hosted support groups on Zoom.  Advocates can now reach victims through text and chat.
- The long term effects of trauma manifest in many ways, including chronic and physical and mental health issues, depression, suicide, substance abuse disorders, and difficulty maintaining employment.

**Cathy Spinney:**
- Cathy is the parent of an almost 40 yr. old daughter, Kelly, who has significant developmental disabilities.
- Please support and add to the DD budget.
- Kelley needs help with almost everything, including all of her personal care. She uses a wheelchair and cannot speak.  Cathy, 63 yrs. old, is still an active participant in her daughter's caregiving team.  But it is getting physically harder for Cathy to do so.  Imagine picking up your 40 yr. old daughter and carrying them around.

- We have a shortage of staff wanting to do this type of work. It doesn't pay well. Most do not receive health insurance. And it is too expensive to afford out-of-pocket.
- We need to offer these direct support individuals a wage that is competitive with McDonalds, and provide them decent health care insurance.
- Get rid of the divisive concepts language.

**Lindsey Collins:**
- Lindsey opposes the divisive concepts in HB 2-FN-A-LOCAL.
- The state has no business restricting important conversations about race, gender or antisemitism. These conversations are essential to building a multiracial democracy.
- Lindsey is a proud Jewish mother to a kindergartner, and was disgusted by Rep. Dawn Johnson, a Laconia School Board member, who on multiple occasions promoted antisemitism and white supremacy on her own social media with no repercussions.
- How is it going to benefit our children if we allow racism, white supremacy and hate to be upheld in our schools?
- Marginalized children need our support the most.

**Carolyn Virtue:**
- Carolyn owns and operates Granite Case Management. She provides elderly and adult services.
- She thanked those who worked on bringing the case management rate into compliance with federal law in this budget.
- Any other CFI services that do not have parity should be looked at.
- We have tremendous shortages in many of our services.
- PCSP is reimbursed at a higher rate.
- We need to address the access to care issues that are occurring in the CFI Waiver.

**Kyle Worth:**
- Kyle is the Executive Director at Nashua Adult Day Health.
- He strongly urges the increase of adult medical day reimbursement to $75.
- Approximately 800 seniors attend adult daycare centers in this state. They have Alzheimer's, dementia, or need complete assistance with toileting or eating; strictly nursing home-level care.
- Even at that increased rate it is the best bang for your buck in terms of senior services. No other services can compare to that price. We are one of the lowest, if not the lowest, in the nation for adult day reimbursement.
- Many adult day programs have, and many will go out of business and no longer serve patients if there is not a raise increase. Hundreds of patients would be in need of nursing home-level care. That would roughly cost four times what adult daycare services cost.
- It's a great program that keeps people living in their communities rather than in institutions.

- The majority of Kyle's business is Medicaid.

**Marianne Baxter:**
- Marianne is the Executive Director of Merrimack Valley Daycare and Blueberry Express.
- Please reinstate the funds from the childcare scholarship budget to their previous levels.
- Low income families cannot afford childcare.
- The scholarship programs enable families to become self sufficient, increase their wages, spend time in a work setting and increase their personal wealth to the point where they can get off all state assistance.
- Coming off the pandemic, this is just not the year to try and cut this budget.

**David Doherty:**
- David is opposed to SB 130's inclusion into the budget.  It has not been afforded the same scrutiny that SB 193 in 2018 or HB 20 this session has received.  It contains many problems that have not been addressed.  Those bills included complex challenges, including constitutional, historical, educational, organizational, public, private and financial issues, that were identified as needing working.  Experts testified about the intricacies of special education funding, transportation issues and many other issues that intersected with the plan of SB 193.  A bipartisan majority of the committee ultimately decided the bill wasn't ready to be enacted as unresolved issues remained.
- All of those issues and more remain unresolved, and appear in SB 130.
- Such a complex bill should not be wrapped into HB 2-FN-A-LOCAL, with all its potential for unintended consequences, until a deep dive can be done into the specifics, as was done in 2018 and fix it.

**Mayor Jim Donchess, Nashua:**
- Restore the lost school aid which is resulting from the COVID-19 pandemic impact on the school aid formula for all public schools across New Hampshire.
- School aid for all cities and towns is projected to be down because there are fewer free and reduced lunch students, and a lower census in public schools. These numbers are artificially low due to the pandemic.
- The federal government has made all lunches free to all students due to the pandemic.  So there is no longer an incentive for free and reduced lunch families to complete the paperwork necessary to qualify and be certified.  School districts are working hard to get the families to complete the paperwork, but have been only partially successful.
- For this coming year, consider equalizing school aid for all districts to the levels they received in the current fiscal year, so that we do not suffer next year a big decline as the result of these pandemic impacts.
- A big reduction in school aid will result in a big increase in taxes.  It will impact Nashua's tax rate by approximately four percent.

**Linda Bundy:**

- The divisive concepts in HB 2-FN-A-LOCAL would not be taught in diversity or inclusive trainings.  Nor would they be a part of school instruction.
- The systemic racism that has evolved during our country's 400-year history does need to be discussed.  The conversations are difficult but essential.
- This provision would block the ability for businesses and schools to discuss, explore and to think critically about our past, our present, and our vision about how to move forward.
- By rejecting this provision, New Hampshire can set an example for the country.
- Please remove the divisive concepts provision.

**Maggie Fogarty:**
- Maggie is with the American Friends Service Committee, and the grassroots Coalition for a People's Budget.  They include faith leaders, advocates for health care, housing, environmental sustainability, racial justice.
- These budget documents fall short of what New Hampshire people deserve.
- Dream bigger and demand better when it comes to our state budget.
- We've been told we have to accept scarcity as the norm, and to beg for crumbs.
- What people are pleading for should be guaranteed in a wealthy state in a wealthy country.
- Affordable housing for everyone.  High quality education for everyone, no matter where you live.  Good health care for everyone, including mental health care, addiction treatment, disability and developmental services.  Clean water and air for everyone.  Public transportation in rural communities.  Caring for our elders and our little ones.  Keeping young adults in our state.  Making sure our state workers earn a dignified wage and benefits, and that none of them are making less than $15 per hour.  New beginnings for people coming out of incarceration and non-police alternatives when there a crises in our communities so that we don't send so many people to incarceration.
- We will do this by raising taxes on the wealthiest New Hampshire people and corporations
- Our budgets are moral documents.  Show that we really care for all communities in New Hampshire with a budget that invests in all of us.

**Bonnie Dunham:**
- Bonnie is the mother of a wonderful 40 yr. old son who experiences complex mental disabilities.
- Shawn is determined and a hard worker.  He works at Wendy's and leads a full and active life.  However, that life is not guaranteed.  His continued quality of life is dependent upon the services he receives through Gateways Community Services.
- Shawn needs full-time one-on-one support.  He receives that support from a direct support provider.  That provider is committed to Shawn and makes far less than she could make in the private sector.  The low pay for these providers has resulted in a shortage of staff, with devastating consequences for families with disabilities.
- The need for adequate staff and funding will become even more critical.

- Families desperately need the services that area agencies provide.  High quality and cost effective services that change lives.
- Please include funding for oral health care for adults with disabilities on Medicaid.
- Fully fund the developmental services budget.
- Don't include the language for other unnecessary legislation such as SB 130 and HB 544.  Don't let these bills hold the budget hostage.  Let them pass or fail on their own merits.

### Asma Elhuni:
- Asma is the Movement Politics Director for Rights and Democracy.  She supports the "People's Budget".
- The inclusion of the divisive language amendment bans state agencies, K-12 schools, public colleges and universities and state contractors from learning about and addressing systemic racism and sexism, which is critical to overcoming barriers to a healthy and equitable community.
- If we can't talk about it, we will never address the issues that plague all of our communities.
- The language has a foreseeable chilling effect on our most important state-funded institutions.
- Why do all statistics point to a rise in hate crimes?  Why are COVID-19 victims disproportionately people of color?
- Recently, two currently serving state representatives have used harmful antisemitic rhetoric on their personal social media pages and have claimed they were unaware of the antisemitic history of these items.  Another state representative was accused of being Islamophobic.
- Remove this language from the budget.

### Carol Conforti-Adams:
- Reinstate the Governor's budget which called for funding essential programs and staffing for DHHS.  The House cut the budget for individuals living with disabilities and older adults.
- State revenues are far exceeding projections.  Why cut these critical services?
- Carol is a quadriplegic and paralyzed.  She needs morning and evening personal care services.  Once placed in her power wheelchair, she can live independently.  She works three part-time jobs, drives, pays state and federal taxes, and actively participates in her community.
- If there were no programs, Carol would have been placed in a nursing home.
- Increases do not provide living wages for workers providing daily home care services.  These low wages have resulted in a 40 percent vacancy rate in home personal care workers, and a 60 percent turnover rate due to the competitive job market.

### Steve Boczenowski:
- Steve's son, Jeffrey, took his own life eleven years ago.  His life changed that day, and he is not the same person he was.

- Jeffrey was 21 yrs. old when he died; a 4th year college student. He struggled with mental illness. He had depression and substance abuse issues. He was a hard-working and responsible young man.
- Suicide is a rare event, but lots more people live with mental illness, and they struggle each and every day.
- If there were more robust treatment options, Jeffrey would be alive today.
- People with mental illness create a drag on our economy. People with untreated mental illness cost more money to treat their physical illnesses. And these people put a burden on law enforcement.
- Fully fund the 10-Year Mental Health Plan and look favorable upon mental health considerations in the budget.

**Marcela DiBlasi:**
- HB 2-FN-A-LOCAL contains far too many cuts at a time Granite Staters need more support from the government.
- As it currently stands, the budget will effectively be defunding abortion, guaranteed by Roe v. Wade.
- Remove all language of HB 544. It is a manipulative attack on the attempt to meaningfully educate about race and gender in our state. Fundamentally, the bill is rife with faulty logic. Learning about difference is not the same as teaching divisiveness.
- The provision is hugely influenced by Donald Trump's 1776 Commission, whose report was a response to George Floyd and the subsequent human rights protests.
- This bill isn't about free and open dialog. Please remove this harmful language from HB 2-FN-A-LOCAL.

**Jackie Cowell:**
- Jackie is with Early Learning New Hampshire.
- Employment related childcare allows families that qualify for their income to receive assistance affording the childcare they need to keep working.
- Approximately $15.2 million would be removed over the biennium, specifically for that program.
- Demand has decreased for this program, so DHHS decreased the appropriation.
- This also supports those who are job searching to have childcare while they job search.
- These funds should be restored and level-funded. The current appropriation is far too low.
- This can really help families move ahead.

**Shannon MacLeod:**
- Ms. MacLeod testified on behalf of the Mayor of Manchester, Joyce Craig. She referenced the April 14, 2021 letter written by 13 city mayors of the state outlining the impacts New Hampshire's state budgets have had on municipal governments and local property taxpayers over the last decade.

- These budgets have resulted in significant losses of revenue to municipalities, contributing to property tax increases and delays in needed infrastructure improvements.
- There are always competing priorities, finite resources and a need to reinvest for growth in balancing a budget.
- In the last decade the state has failed to prioritize funding for local municipalities, resulting in heavy financial burden on local taxpayers, particularly retired Granite Staters on fixed incomes.
- One of the most significant losses in revenue to municipalities was the reduction in the Meals and Rooms Tax distribution.  Since 2011, the local municipalities' share has been trending downward, while the overall revenue collected has increased by 60 percent.  Manchester alone has lost out on over $41 million over the last decade due to the failure of the state to live up to its commitment.
- Revenue sharing has been suspended since FY 2009, resulting in a loss of over $300 million to municipalities and counties.
- From state pension costs to state aid grants, the State of New Hampshire continues to renege on its commitments to municipalities and local taxpayers.
- Cities and towns will continue to provide all the necessary services to residents.
- Please put an end to unsustainable downshifting.

**Jim Doremus:**
- Mr. Doremus is the CEO of the Concord Family YMCA, and the YMCA Alliance, comprising the nine YMCAs in New Hampshire.
- The "Y" is the largest provider of childcare and summer camps in the Granite State.
- The Alliance opposes the cut in the childcare scholarship program in HB 1.  The program offers critical support for thousands of New Hampshire children.  More than 2/3 of "Y" families benefit from this program.

**Rev. John Gregory-Davis:**
- Reverend Gregory-Davis represents the Meriden Congregational Church and the New Hampshire United Church of Christ Economic and Racial Justice Ministry Team.
- They support the "People's Budget".
- The major difference between HB 1-A, HB 2-FN-A-LOCAL and the "People's Budget" is their underlying morality.
- Budgets express the values of those proposing them.
- The proposed BPT and BET tax cuts will primarily benefit 76 large, multi-national corporations that do business in this state, while depleting state revenue and downshifting costs to municipal property taxes to fund essential infrastructure and public education.  In doing so, it bails out the wealthiest and further adds to the struggles of Granite Staters.
- It is simply not true that we cannot do better.
- Remove the divisive concepts language from HB 2-FN-A-LOCAL.

**Claudia Istel:**

- Claudia is a retired public high school teacher, and adjunct to CCSNH.
- Funding for education is inadequate.  The state is once again reneging on its responsibility to provide an adequate education.
- Placing school vouchers in the budget is forcing Granite Staters to accept vouchers and their financial burden on school districts without the usual scrutiny a standalone bill would receive.  Public school districts will have to provide all the same services at the same level of quality and standards with less money.  Public schools cannot afford money taken out of their limited budgets.  Local property taxpayers cannot afford to pay more.
- The divisive concepts language has no place in the state budget.  Education, knowledge and thoughtful discussion are the ways to make change for the better.  The intent of the language is to promote more division and hardship to the most vulnerable members of our communities.
- Please read the demands of the "People's Budget".  It is a moral document.  It will raise up the wellbeing of all.
- The proposed budget takes more from those who have the least to give.

**Marcia Hayward:**
- Keep the school voucher bill out of the budget.
- There has been a lack of vetting of the educational service provider in SB 130.  There are no guidelines, certifications or licensing provided for.
- The scholarship organization would work on a commission basis.  This is a conflict of interest, as there is a built-in incentive to approve any request.

**Christina Darling:**
- Christina has two sons who both receive the childcare scholarship.  The program has allowed her to find full-time employment and keep her apartment.  Her children are safe and cared for while she is gone during the day.
- Christina has a sister who had to leave her job as a nursing assistant due to childcare difficulties.
- Which costs more, the childcare benefit or state welfare?

**Judy Lundahl:**
- Judy spoke on behalf of the Monadnock Interfaith Project ("MIP") in Keene.
- MIP opposes HB 544 that seeks to prohibit teaching about systemic racism and sexism in public schools and state-funded programs.  The intent of the language contradicts MIP's mission for community understanding and mutual respect.
- Collectively, we need to face head on the present racism and sexism, existing virtually in every system in our lives--education, criminal justice, housing, economy and religion.
- Instead of limiting discussion, let's commit to deep reflection, hard conversations, and changing practices and policies in all of our institutions to move beyond racism and sexism.

**Kim Memmesheimer:**

- Support the Governor's budget request regarding critical increases to three Medicaid services under the Choices for Independence Waiver: personal care, homemaker and case management services.
- Increase the budget by $4 million for adult day services.
- Restore the Governor's funding for senior centers.
- Kim is an attorney in the area of elder care. She works with clients who either desire for themselves or their loved ones to stay in their homes. Choices for Independence is critical to that goal. Allowing people with dementia to stay at home longer will save money for the state in the long run. Funding home health care and personal services is vital to protecting the state's budget.
- All of these budget items provide vital resources to the unsung heroes for our communities--the unpaid family caregiver. Twice as many caregivers of those with dementia indicate substantial financial, emotional, and physical difficulties compared with caregivers of people without dementia. Dementia caregivers also report lower quality of life than non-caregivers, and they are more likely than non-caregivers or other caregivers to report that their health is fair or poor.
- Unfortunately, services that could help these families, like the CFI program and adult daycare, have been underfunded for years. The decline of the heath care workforce puts more pressure on family members to become the primary caregiver. Adult day services and senior centers have also been underfunded, which reduces families' ability to keep their loved ones at home. This can result in needing to utilize long-term care services earlier than a family would like to, which can be incredibly expensive at both the public and private levels.
- In addition to the failure to fund these vital programs, COVID-19 has added strain to the burden of family caregivers. Many senior centers are not able to provide in-person services and programs due to limited staff and volunteers. Isolation over the past 14 months has hit those living with Alzheimer's and other dementia especially hard, and it has also been an incredible strain on family caregivers who have lost access to outside supports and other resources during this time.
- Please provide our families the supports they need to keep their loved ones at home.

**Jeff McLynch:**
- Jeff is Project Director of the NH School Funding Fairness Project.
- While the focus of the proposed budget is the provision of public services in each of the next two years, it is important to acknowledge at the outset that, when it comes to school funding, two fundamental injustices have been allowed to persist in New Hampshire for at least several decades. Despite a clear constitutional mandate, far too many of our children continue to face deep and enduring inequities in the educational opportunities available to them, diminishing not only their futures, but that of the Granite State as a whole. At the same time, enormous disparities in the property taxes paid by residents and businesses in different communities pose oftentimes barriers to economic security and development.

- Unless the committee acts to improve HB 1-A and HB 2-FN-A-LOCAL, the challenges before this state's public schools--and the students, families and communities they serve--will be even more severe in the coming biennium. More specifically, according to data from the Office of the Legislative Budget Assistant and the Department of Education, due to the pandemic and the termination of additional aid and fiscal capacity disparity aid, state education aid is expected to fall, in total, by roughly $90 million between FY 2021 and FY 2022.
- The versions of HB 1-A and HB 2-FN-A-LOCAL before the committee today failed not only to begin to rectify the school funding injustices that have plagued for so long, but also to respond appropriately to the difficulties created by the pandemic and by expiring law.  While HB 2-FN-A-LOCAL in its current form does contain provisions intended to mitigate the effect on school finances of temporarily lower numbers of students completing the paperwork for free and reduced price meals, it only does part of the job, closing just $17 million of the expected $90 million gap in FY 2022.
- Although HB 2-FN-A-LOCAL identifies an additional $100 million for use by the Education Trust Fund in FY 2023, it devotes those funds to a reduction in the statewide education property tax ("SWEPT"), rather than targeting greater assistance to those communities most in need.
- The committee is urged to strengthen the proposed budget significantly before it is considered by the full Senate.  In particular, remove the proposed $100 million reduction in the SWEPT.
- New Hampshire has long fallen hundreds of millions of dollars short, on an annual basis, of meeting its obligations to provide an adequate education to every child in the state.  Solving the problem at hand is urgent and necessary, but the time to recast the system as a whole, so that all Granite State families are treated more equitably, is well past due.
- The NH School Funding Fairness Project stands ready to work with all Senators to build a more just school funding and property tax system in the year ahead.

**Peter Miller:**
- School vouchers, education savings accounts, divisive concepts are all included in the budget.  Mr. Miller opposes same.
- This budget is inadequate for school funding.
- SB 130 is a major policy issue, establishing the most expansive school voucher program in the United States.  It should be debated and considered on its own merits, not hidden in the state budget.  In 2018 the Legislature decided not to implement a much smaller school voucher program after concluding many issues remained unresolved.  The same issues remain unresolved in the much bigger SB 130.
- Public funds diverted from our public schools will be used for school vouchers.  Public schools are highly accountable for meeting students needs.  Will voucher schools be as responsible?
- School vouchers have been used inappropriately throughout the country.

- Hiding major policy inside the budget, shielding it from debate, is a bad way to adopt major policy changes.

### Rep. David Luneau:
- The impact of the $100 million appropriation to the Education Trust Fund is felt most significantly in towns that have the lowest property tax rates in the state, and the highest property wealth.  This just doesn't make any sense.
- A far better use of this appropriation would be to extend the equitable grants to school districts that were funded in the FY 2021 budget, and are offered by HB 623 and the amendments to SB 135.  These grants have significant impacts for students and taxpayers in towns with the highest property tax rates, lowest property values and higher incidences of poverty.  They provide meaningful school funding and property tax relief to cities like Manchester, and towns like Charlestown, Haverhill, Claremont, Pittsfield, and so many others.
- HB 623 has a fiscal note and a town-by-town analysis prepared by the LBA, making it easy to see how these equitable grants benefit our communities, students, taxpayers, and the state as a whole.

### Ken Norton, NAMI New Hampshire:
- During Governor Sununu's budget address in February, he once again stated New Hampshire is in a mental health crisis.  Fully fund mental health services as proposed in the Governor's budget.
- It's important we prioritize mental health funding to address the mental health crisis and the anticipated long-term impact of the pandemic it will have on mental health.  That is evidenced by the significant increase in stress, anxiety and depression we are seeing across all ages.  In particular, it is impacting children and young adults.
- During the last several months we have exceeded previous highs of the numbers of people being boarded in emergency departments, with 51 children being boarded on February 14, 2021, and a combined high of 89 children and adults being boarded during several days.  Many of these people were experiencing suicidal intensity.
- Suicide continues to be a significant public health issue in our state.  It is the second leading cause of death in New Hampshire for those ages 10-34.
- While Emergency Department Boarding is the tip of the iceberg relative to timely access to mental heath care, there are long waits for outpatient treatment.
- We need to continue the work done in the 2019 Legislative session in fully funding the 10-Year Mental Health Plan by building out community-based services for mental health crisis response, step-up and step-down services, inpatient and outpatient capacity, supported housing, peer support, suicide prevention and substance use disorder services.
- NAMI NH supports moving ahead with building a new forensic hospital in order to end the practice of people with mental health conditions who have not been charged with crimes being transferred to the Department of Corrections and the

Secure Psychiatric Unit.  It opposes the back of the budget cut to DHHS currently contained in the House budget.

- As a member of the Governor's Law Enforcement Accountability, Community and Transparency Commission ("LEACT"), Mr. Norton urges strong support for fully funding Police Standards and Training as included in the Governor's Budget.

- Mr. Norton, as a member of the LEACT Commission, personally opposes the divisive concepts language currently included in the House budget.  It would undermine much of the work done by the commission to address implicit bias and related recommendations for law enforcement, as well as the courts.

### Rep. Mel Myler:
- Rep. Myler is the ranking member of the House Education Committee.
- That committee reviewed HB 20, which is almost identical to SB 130. Ultimately, they decided it was not ready to be considered by the House.  They voted 20-0 to retain HB 20, based on the inadequacies of the language in the bill.
- Remove SB 130 from the budget.  There is much opposition to it.

### William Maddocks:
- HB 2-FN-A-LOCAL is woefully inadequate to meet the health, educational and other human needs of Granite Staters.
- HB 544 attacks widespread efforts to diversify the state.  Enforcing this law will be a daunting task.
- There are hundreds of New Hampshire corporations carrying out inclusion work.
- "Drop a dime on diversity"--the new ad campaign?
- Mr. Maddocks gave examples of books which could be read for their "instruction" on divisive concepts.
- This is a crazy piece of legislation.  It is unenforceable and offensive.
- Embrace the courageous conversations on diversity.

### Kayla Montgomery:
- Ms. Montgomery is VP of Public Affairs for Planned Parenthood New Hampshire Action Fund and Planned Parenthood of Northern New England.
- They strongly oppose the language of Section 34 of HB 2, requiring the physical and financial separation of services.
- There are currently 10 providers in the New Hampshire family planning program.  With the requirement of a physical separation, the entire program would be dismantled.
- New Hampshire's family planning program provides funding for STD tests and treatment, birth control and cancer screenings, and breast exams and PAP tests. It does not and cannot fund abortion care.  For patients to access abortion care, they must pay out-of-pocket or private insurance.  It has never covered abortions.
- The dismantling of the program would affect statewide access to free or low cost

services.  These services are offered on a sliding scale based on income.
- This program provides care for the uninsured and low income, and provides coverage in rural areas.
- Please keep the New Hampshire family planning program whole.

### Virginia Nossiff:
- Ginny is opposed to cuts in mental health services in HB 1-A.
- Implement a mental health system that works for all of our citizens, especially those in the North Country.
- In 2018 her son, a sophomore engineering student at UNH, came home one weekend and began to hallucinate, the beginning episodes of psychosis.  It is a severe mental health condition.  He was confused, frightened, and said things that made no sense.  Having no other options they brought him to Memorial Hospital in North Conway, where he laid in a windowless room, on a mattress on the floor for 2.5 weeks, with no psychiatric care provided.  There was no room at New Hampshire Hospital.  Everyone told them it was someone else's responsibility, and that the system was broken.  How had mental health care come to this in our state?
- Had there been a mobile crisis unit that could have traveled to their home, or had there been a facility that could provide the proper treatment, or had there even been staff that was trained in psychiatric care.
- For all those affected by mental illness and their families, oppose the cuts made to mental health services in HB 1-A.

### Linda Mattlage:
- Linda strong opposes the inclusion of SB 130 in HB 2-FN-A-LOCAL.  This bill has many problems.
- Now, in the middle of a pandemic, is not the time to take on the major change of vouchers, also known as Education Freedom Accounts.  School districts are already grappling with losing students due to the pandemic, demographic changes, and the doubling of charter school seats that we'll see shortly due to the federal grant Gov. Sununu accepted.  This grant requires the state to double the number of charter school seats in the state by expanding some existing charter schools and adding some new ones.  It is estimated that doing this will cost the state between $57 million and $104 million in the first ten years.
- If people are concerned about kids not getting what they need in public school, aren't charter schools created for just that reason?
- We should see how the expansion of charter schools works before spending additional state funds for a whole new parallel structure and funding system.
- Remove SB 130 language from the budget.

### Jim O'Connell:
- Mr. O'Connell is a Manchester School Board member.
- The state's budget reduces educational funding by $90 million.  It is hard to understand and justify.

- Manchester is looking at a $7.4 million dollar shortfall.  Of the $90 million being saved by the state, close to ten percent is coming out of Manchester.
- Manchester already spends less than practically every other school district in the state in terms of per student expenditures.
- The budget will have a very serious effect.  It is not addressing some key issues.
- The Commission on School Funding spent almost one year looking at adequacy and how the state spends its money on education.
- Ten percent of the education budget will be spent on administration.
- The divisive concepts provision would become an embarrassment to the state should it become law.  It would have a detrimental effect on the way we are viewed by other states.
- Take a second look at the funding for education in this bill.

**Deborah Opramolla:**
- As a disability organizer and advocate, Deborah opposes the language of HB 544.  It is unacceptable.  Disability justice requires everyone to realize having a disability is a normal part of life.  What is not is being embarrassed or ashamed of family members that experience a disability.  What is not normal is to become silent.
- The People's Budget demands investment in services such as fully funding the waitlist and dental care for those who experience a disability.  This must be an investment that not only takes individuals off the waitlist and provides dental care, but allows them all the services an individual needs to partake in the community.
- Silencing our ability to have discussions on our culture, history, and training of our workforce sends the message we are not welcome in this state.
- Daily there are between 25 and 30 children waiting in emergency rooms in urgent need of mental health care.
- The State House budget closes the Sununu Youth Services Center, but where will these children go?
- Appropriations to solve the mental health crisis in our hospital emergency rooms must be developed.  Fully fund DHHS, as it provides vital services to the disabled community.  It is the moral and legal obligation of the state to continue to provide these services.

**Charyl Reardon:**
- Charyl is President of the White Mountains Attractions Association.
- Add back into the budget the funding the House eliminated in the Division of Travel and Tourism Development budget.  These dollars are not only an investment in our future tourism economy, but supplement the state's overall revenue which helps fund some of the additional and important needs of our citizens.
- Tourism is the second largest industry and economic driver in the state of New Hampshire.  Every dollar spent on marketing on our great state has a significant return,

- Governor Sununu's budget seeks to fund the Travel and Tourism Division by $9.5 million approximately, each fiscal year.  This is just shy of the 3.15 percent net income earned from the Meals and Rooms tax.
- Tourists to New Hampshire leave behind an economic impact that drives billions of dollars to the bottom line.
- Tourism supports essential services such as public safety, education, parks, roads and infrastructure.  Without tourism, each household in New Hampshire would have to pay additional taxes every year to make up the difference that comes from visitor spending.
- According to independent researcher SMARInsights, in 2019 over 600,000 trips to New Hampshire were influenced by Travel and Tourism advertising campaigns, contributing $371 million in travel spending, and collecting $33 million in Rooms and Meals taxes from visitor spending--about 10 percent of the state's General Fund.  Not only does the promotion drive traffic to this state, we have seen it achieve a return on investment of $13 for every $1 spent.
- We understand the need to adjust the budget to address the shortfalls caused by the pandemic.  But consider the proven track record that additional spending has had on our businesses and taxes.  Investing in tourism marketing yields positive results, and is not only critical to growth, but also to recapture and maintain our market share.   The investment of $9.5 million in tourism promotion for each of the next two years could shorten the tourism industry's timeline for recovery by 2-3 years.

**Paul Reuland:**
- Mr. Reuland is the Board Chair of Media Power Youth.
- Please reinstate the $50,000 Department of Justice grant to Media Power Youth that has been removed from the proposed budget.  Without the grant funds, our organization will struggle to continue to employ a full-time program manager, and be unable to service many youth organizations as it has in previous years.
- They intend to launch a new program this fall with the grant funds.  It would teach social and emotional learning skills necessary for the healthy youth and social media.  This particular program is preventative in nature, and designed to address issues in children of school age before they arise.
- Mr. Reuland has both a son and a daughter.  His desire is to equip his children with the tools they need to handle the emotional challenges they will face as they grow.
- Changes in the technological landscape have been so vast and distinct, that it inhibits his ability to help his children.
- The social media they consume impacts the way in which they see themselves, the world, and their peers.
- It's critically important that programs like these continue to receive the support of state government.

**Angela Pape:**
- Angela had close friends experience racism.  She shared a number of her friends' experiences with committee members.

- Having friends that were multi-cultured made Angela think she was not racist. Her own biases were very revealing to her.
- Racism exists consciously and unconsciously, and in all of our systems. We need to grapple with it and make real changes.
- HB 544 shuts down conversation. If we don't talk about a problem, how can we begin to solve it?
- It is uncomfortable for those of color to endure racism day in and day out.
- American ideals are for equality and opportunity. We must stand up for all of us.

**Laura Pelletier:**
- Interlakes Daycare Center in Meredith is celebrating its 50th anniversary this year.
- They stayed open last year during the pandemic for families of essential workers.
- Forty percent of the children they care for are from low income families, to qualify for the state childcare scholarship.
- The need for families to access affordable childcare may be greater than it was pre-pandemic.
- The scholarship program helps families get ahead. They grow in their jobs and contribute to the economy.
- Please support this worthwhile program, which enable parents to get ahead.

**Susan Richman:**
- Susan has been a public school teacher for over 30 years.
- There is no accountability for home school instruction.
- Some students who receive an educational voucher will require special services-- reading, speech, help with autism--not provided by their private school or in-home schooling. They are entitled to attend their local public school up to 50 percent of the school day, to receive those special services and more. But the $4,000-$8,000 of adequacy and differentiated funds allocated for that child's educational voucher would remain with the private school or the home schooling. That money could have paid for a paraeducator to work with a group of special needs students.
- Money equals the ability to offer services to students. That voucher student is removing money from the public school, while receiving services. After nine years, that child's public school will have lost approximately $50,000 in adequacy and differentiated aid.
- Services are finite; they cost money.
- SB 130 needs more consideration to enable learning what happens when these educational dollars are taken from our public schools.

**Susan Stearns:**
- Please fully fund mental health services originally included in Governor Sununu's budget and ensure the budget you pass fully funds critically needed mental health services accessible to all Granite Staters.

- Yesterday there were 43 adults and 7 children experiencing a mental health crisis waiting in emergency departments for an inpatient psychiatric bed. We all know this emergency department boarding crisis has been going on, unabated, for over 8 years in our state.
- Susan has an adult child who lives with a serious mental illness. Two years ago while traveling and going through a recent medication change, her son was in crisis, fearing he would hurt himself. He asked her if he should go to the emergency room. Susan did not know how to answer her son.
- Susan has been her son's advocate since he was first diagnosed with an emotional disorder at age five. She has been a mental health advocate for over 20 years. It is what she does. But faced with her son in crisis--over 500 miles away, Susan was terrified. She was afraid for his safety should he wind up boarding in the emergency department without an advocate at his side.
- Susan's son is 6'6", not violent at all, but highly sensitive and emotional. He had never had an inpatient psychiatric admission. She knew he would become despondent at being held for days with nothing to do, and likely very emotional. She thought he might prove frightening to the staff because of his size. She was afraid he could wind up injured by security or placed in the county jail.
- In one of the hardest decisions of her life, Susan told her son not to go to the emergency room. She was able to access family support for her son. He returned home the next day. They successfully managed his crisis with his doctor.
- We have not yet seen the impact of this pandemic on Granite Staters. Those numbers of folks waiting in emergency departments are just the tip of the iceberg.
- Increase funding for mental health services and ensure full funding for NH's 10-Year Mental Health Plan.

**Louise Spencer:**
- Louise is a co-founder of the Kent Street Coalition.
- Let the principles of the People's Budget guide the committee's work as you craft a budget that meets the needs of Granite Staters.
- On the House side of the budget process we saw a lack of transparency, and a process that failed to give the public real and substantial opportunities for meaningful input. The budget was dramatically amended after public testimony had concluded, with the public then not given any additional opportunity to comment on those changes.
- One day of public testimony hardly seems sufficient to speak to the myriad of needs and concerns that a fair and humane budget must address.
- The majority has taken the opportunity to advance social policies in formulating the budget.
- Remove SB 130 and HB 544 from the budget, and hold additional hearings for the public to comment, should you change the budget substantially.

**Rep. Joshua Query:**

- Representative Query is a Planned Parenthood patient.  He knows how critical the services they provide are.
- Last year he was unknowingly exposed to the HIV virus.  He was uninsured and unemployed.  So many health care providers were closed due to the pandemic.  But he knew he needed to see a doctor quickly.  He received a telehealth appointment, with the first portion of the appointment via the phone.  They let him share what happened in a way that made Rep. Query feel more comfortable.  He was told he needed to go to the health center to receive an instant HIV test.  He had indeed been exposed.  They attempted to determine through blood work if he was HIV-positive.  He immediately began post-exposure treatment, which slows the chance of contracting the disease.  A 30-day supply of these pills cost over $12,000, which Rep. Query did not have.
- Planned Parenthood worked with him and the drug manufacturer to ensure he qualified for the reduced cost.  Rep. Query started the treatment at no cost to himself.
- The treatment lasted 90 days, which would have cost almost $40,000.
- Rep. Query was tested monthly at Planned Parenthood.  His third HIV test confirmed he was HIV-negative.
- Planned Parenthood saved Rep. Query's life.  He continues to go to the health center every 90 days to maintain the HIV-negative status.  For all these visits the health center charged him based on his income, instead of a flat rate.
- Rep. Query represents so many people in this state who lost insurance coverage or are under-insured.  He represents people who face astronomical medical costs, who need to decide either the debt or the disease is the harder battle.  He represents people who rely on community health centers or Planned Parenthood, who offer care based on a patient's circumstances for preventative health care.
- Remove the language about physical and financial separation requirements on reproductive health facilities to ensure trusted providers like Planned Parenthood can continue providing critical and lifesaving care to Granite Staters like himself.

**Leah Quimby:**
- Leah is another former patient of Planned Parenthood.
- Planned Parenthood has been there for Leah when she needed them for many stages of her life.
- There were times in her life when she had no health insurance and needed birth control.  She received regular reproductive health care checks.
- All the health center workers were kind and helpful.  Leah trusts Planned Parenthood to listen and support her.
- Blocking funding for Planned Parenthood and abortion providers could result in patients facing interruptions in necessary care.
- Make it more possible for people like Leah to receive the care and important cancer screenings they need.

**Anthony Poore:**

- Anthony believes issues of diversity, equity and inclusion are the defining issues of our time.  If we are to achieve the hopes and aspirations that came before us, we must work collectively towards comprehensive, enduring, equitable solutions.
- There is undeniable evidence that diversity, equity and inclusion in business and government leads to heightened levels of innovation, customer service, citizen engagement, and long-term economic growth.
- When legislative leaders create environments where everyone is encouraged to bring their differences to work and school, organizations and governments thrive.
- If your goal is to achieve social and economic justice for all, then diversity, equity and inclusion efforts are some of the most powerful tools legislators can leverage to improve the upward mobility of historically marginalized populations.
- The divisive concepts amendment is an attempt to ban racial and gender equity efforts in government by silencing any conversation or effort that recognizes the existence of white supremacy or systemic racism.  It refers to unifying racial justice and equity efforts as "divisive" and prohibits any training that would create anguish or guilt, with the intended effect of shutting down all conversation about race and gender in government, by government contractors, or in publicly funded schools and universities.
- As a parent of two multi-racial school age children, Anthony can personally appreciate the challenges children of color face when confronted with the consistent and pervasive bigotry of low expectations, and appreciate a community where all students have the chance to gift New Hampshire with their potential and fulfill their destiny.

**Allan Reetz:**
- Mr. Reetz represents the Hanover Co-op Food Stores and Auto Service Centers.  They stand opposed to HB 544 and its inclusion in the state's budget.  They are aligned with the 240 other businesses and entities that signed the anti-HB 544 letter sent by New Hampshire Businesses for Social Responsibility.  Those businesses represent over 60,000 workers and are some of the largest employers in the state of New Hampshire.  A look at the list of signatories will show a vibrant portion of the state's economy that this legislation will turn away.
- The unwieldy intent of HB 544 seeks to legislate against corporate free speech.  Proposed restrictions extend to subcontractors and vendors, all because they do business with our state or were hired to help.
- The provision contains directives that, at first glance, seem benign, but onerous upon a second reading.  It begs the question, "What successful legislation is this modeled on, and what problems does it seek to solve?"  Supporters might state that its language seeks to unite, not to divide.  Yet, how is that not evident to business leaders across the state?
- We live in a civil society where constructive debate is encouraged and necessary.  The effort to legislate away the risk of hurt feelings or the assignment of blame

will not work in business any better than it would in the New Hampshire House and Senate.
- Let us never silence the past or prevent discussion of our future. The wise voice of New Hampshire history still has much to teach us.

**Steve Ahnen:**
- Steve is President of the New Hampshire Hospital Association.
- New Hampshire's hospitals and the heath care heroes who work in them are driven by a mission to provide high quality health care and improve the health and well-being of the communities they serve. That is true every day, and that resolve has certainly been demonstrated throughout the past year, however hospitals have been challenged as they have responded to the COVID-19 pandemic.
- The pandemic has challenged us all and, working together, we believe we can emerge from this crisis, but it will take great care and diligence to ensure that New Hampshire does so and that we are able to serve citizens across the state and help everyone return to what we all hope will be a much more normal, vibrant and healthy New Hampshire.
- It is absolutely essential that we have a robust and effective Medicaid program that helps to ensure recipients are getting the right care, at the right time, and in the right place. Resolution of the many challenges just a few years ago over the Medicaid Enhancement Tax and the Medicaid Disproportionate Share Hospital payment program was an important step forward to creating stability in the Medicaid program for patients, providers and the State of New Hampshire.
- We are very appreciative that the Medicaid rate increases that were included in the last budget are maintained in the current budget before the Senate.
- There is no more urgent and pressing priority than addressing the behavioral health crisis facing New Hampshire. We appreciate the tremendous amount of work and effort that is being done in this area up-to-date, but it is imperative that this budget, as well as other legislative and regulatory efforts, collectively design a plan forward and articulate how it will be funded and carried out in the months and years ahead.
- The 10-Year Mental Health Plan was built as a blueprint for rebuilding a behavioral health system across the full continuum of care and services for those suffering a mental health issue. The ongoing crisis of patients waiting in hospital emergency departments until they can be transferred to New Hampshire Hospital or other appropriate settings for their care continues to be all too common. The waitlist is truly a symptom of a broader, systemic problem. We simply do not have adequate resources across our entire system to care for those with a mental health issue.
- This is our time to resolve these issues once and for all, so that patients with a mental health issue can get the care they need and deserve, when and where they need it.
- We are very concerned about the addition of non-budgetary policy provisions that were added to HB 2-FN-A-LOCAL during the House phase of the budget,

specifically that which seeks to incorporate HB 544 related to divisive concepts. Our hospitals and the dedicated caregivers who serve their patients every day strive to do so with the utmost care and respect for every patient. And they work to foster a culture of diversity, equity and inclusion within their organizations to attract and retain a workforce to deliver the highest quality of care to all of their patients. Inclusion of HB 544 will have a chilling effect on the important work that is occurring throughout the health care system to better serve all patients. We ask the Senate to remove this provision.

### Ed Robbins:

- Mr. Robbins is opposed to the language of HB 544 that was incorporated into HB 2-FN-A-LOCAL. It is a tenuous connection that such legislation has to the state's budget. Including the language of HB 544 in HB 2-FN-A-LOCAL is just a way to bypass a process in which support is not widespread.
- New Hampshire prides itself as the "Live Free or Die" state, the place where we believe that the individual is responsible enough to do right and not be burdened by state supervision, and yet here we are discussing just that.
- Others have testified regarding the potential and financial effects that may befall the state should the divisive concepts language be included. I'll appeal to that Yankee pragmatism and simply say that this legislation is a solution in search of a problem, and as such it should not be included in HB 2-FN-A-LOCAL.

### Sarah Aiken:

- Sarah represents Community Bridges, one of ten area agencies that support those with developmental disabilities and acquired brain disorders and their families.
- Please support the developmental services budget.
- Sarah is the parent of a young man with a disability. Her son was served by the disability system for years. The services and skills he learned within the system were nothing short of miraculous. Diagnosed on the autism spectrum, in addition to having cancer and a rare genetic diagnosis, Sarah was unsure of her son's survival, never mind if he would work or go to school. Through Community Bridges he learned to walk, talk and be social.
- Sarah's son no longer needs services. He is no longer on Medicaid and he will never be on the waitlist. Not every child, however, has the same experience. Some need services throughout their lives.
- The services provided by the area agencies and their vendors allow for inclusion, skill building, access to the community, work, and all that encompasses a good life.
- We attribute the system's successes to the many thousands of wonderful people who work with the individuals that we serve, and the training they are able to provide staff.
- As a state contracted agency, it is for this reason that Community Bridges encourages the committee to review the divisive concept language, and how that language would change the availability of the trainings they provide.

- We've come a long way since the closure of the Laconia State School and Training Center.
- Fully fund the developmental services budget, reconsider the divisive concepts language, and increase wages for those who are front line workers, such as case managers and direct support personnel.

**Karen Trudel:**
- Fully fund the mental health budget as put forth in Governor Sununu's budget.
- Medicaid reimbursement needs to increase so we can retain staff.
- The mobile crisis units need to be fully funded and implemented, especially in the North Country.  Karen has utilized the mobile crisis units a number of times, and has found it to be an extremely useful tool.
- Peer supports need additional funding, as well.  Again, staffing is an issue.

**Rep. Amanda Toll:**
- This budget irresponsibly cuts the Business Enterprise Tax, the Business Profits Tax, the Rooms and Meals Tax, and the Interest and Dividends tax resulting in revenue decline for the state.  Consequently, there will be massive cuts to social services and education.  Costs will shift to towns, likely forcing them to increase property taxes, which will disproportionately harm folks on fixed incomes.
- The people of New Hampshire deserve a state budget that invests in the health, education, recovery, opportunity and vitality of our communities.
- Rep. Toll endorses the NH People's Budget, which was drafted by a coalition of social justice organizations.  This should be the budget before you today.  The People's Budget demands we invest in our recovery from the COVID-19 pandemic, in real economic security, in our state workers, in adequately funding education, in our young adults, in people with disabilities and their families, in our children, parents, caregivers, elders, and in comprehensive health care including but not limited to mental health, reproductive health and dental health.
- To have the language of HB 544 in this budget is an abomination.  The proposal is absurd.  We must reckon with systemic injustices in order to move forward towards a compassionate and just future together.
- As one of the many citizens of New Hampshire who has utilized our reproductive health care centers, I also find it utterly shameful that this budget will be used to strip funding from necessary reproductive health care centers. Patients visit Planned Parenthood for many reasons; primarily, it is to access affordable health care.  Stripping funding from Planned Parenthood and other reproductive health care centers will impact low income folks the most, and will have negative impacts on health outcomes for the most vulnerable.

**Joan Ascheim:**
- Joan is testifying on behalf of the New Hampshire Public Health Association.
- Part III of SB 104 sought funding for a community health worker at each public health network in the state, but it was removed.  The deployment of community

health workers was a recommendation from the Governor's COVID-19 Equity Response Team as an effort to lift up some of our most vulnerable citizens during the pandemic and beyond.

- Please add $1.2 million to the state budget to support a community health worker in each of the state's 13 public health networks. There is a large body of research now relative to community health worker effectiveness in improving health outcomes, reducing health care costs and bridging gaps in health disparities.
- SB 140 sought funding for several programs for families including community collaborations, family connections, home visiting and family resource centers to eliminate funding gaps for these programs. As families continue to recover from the economic and social effects of COVID and strive to balance the ongoing daily challenges of work, school and parenting, these programs are more important than ever.
- Please add $1.37 million to the budget to fully fund these primary prevention programs for families.
- The language of HB 544 seeks to prevent New Hampshire state agencies, contractors, and schools from teaching concepts relative to diversity, equity and inclusion. At a time when our country is trying to confront the injustices of systemic racism, hate crimes, and health inequities that have been illuminated through the pandemic, this bill is dangerous and does not reflect the values of the people of this state. If we in public health cannot educate students, public health professionals and policy makers about such inequities, we only perpetuate them.
- Remove the language of HB 544 from HB 2-FN-A-LOCAL.

### Rep. Joe Shapiro:

- Do not fold SB 130, education freedom accounts, into the state budget.
- Starting with a $90 million shortfall from the last biennium and extending to COVID-related decreases in enrollment and resources, and the unpredictable effects of planned increases in charter school placements, the funding picture for our local school districts is very much in flux and very much in jeopardy.
- Now is not the time to add a new and largely unknown element into the mix.
- Education freedom accounts will further eat into our school budgets.
- Keene schools will lose more than one-half million dollars during the next five years.
- The full future damage to our public education system through unintended consequences is largely unknown.
- Education freedom accounts are like a time bomb. Once you put them in place and the fuse is lit, we will have little to no ability to limit the damage to our schools.
- Further erosion to public school funding will expand the disparity between wealthy and poor communities.
- In Keene, where the property tax rate is five times the rate of the wealthiest New Hampshire communities, taxes will likely increase. This will further the

burden on homeowners and increase the obstacles to new economic development.  Others will be forced to make drastic cuts.
- Leave education freedom accounts for another day.

**Gina Balkus:**
- Gina is CEO of the Granite State Home, Health and Hospice Association.
- Direct DHHS to increase home health provider rates for the Choices for Independence program to realistic levels.
- The current reimbursement rates fail to cover the cost of reasonable wages, travel time, mileage, supervision, training, background checks, benefits and other business costs.  Because of this, home care agencies can't fully staff all the services that CFI enrollees need.
- People who are lucky enough to get care generally get about 65 percent of the home care services they are authorized to receive.
- It is close to impossible for new enrollees to receive any services at all.
- This means that vulnerable adults and elders who qualify for nursing home level of care are at risk of illness, injury and neglect in their own homes.
- Between 2017 and 2020 DHHS underspent the CFI home health services line between $11 million and $15 million each year.  These funds could have been deployed to rate increases so that home health agencies could offer competitive wages or benefits.  That is what DHHS did several years ago in the Title III-B and Title XX programs funded through the Older Americans Act.  The Department should do the same for CFI, and bring the rates to parity with the Title programs and close to Medicare cost levels and close to private market rates.
- We believe there are sufficient funds in the line to significantly increase rates and reduce gaps in care.
- The Department's lapse should not be borne by vulnerable adults and elders.
- CFI enrollees are in a desperate situation.  Many providers will no longer participate in the CFI program.
- Amend HB 2-FN-A-LOCAL or attach a budget footnote to direct DHHS to make meaningful rate increases for CFI home health providers so people can get the care and the support they need to live in their homes.

**Mary Schiavoni:**
- Mary is speaking on behalf of Adimab, LLC, a global biotechnology company headquartered in Lebanon.  Adimab strongly opposed HB 544 before it was rightly tabled in the NH House of Representatives, and they continue to firmly oppose its back door incarnation as the divisive concepts amendment to budget bill HB 2-FN-A-LOCAL.
- This amendment tramples on First Amendment rights to free speech, represents government overreach, and will impede the ability of New Hampshire businesses to attract and retain top talent.
- Adimab has a highly diverse workforce of discerning scientists, engineers and researchers for whom inquiry and debate are essential drivers of success in the workplace and in their industry.

- Adimab competes with research centers across the country and the globe to recruit the best talent to New Hampshire. This is a challenge that will become immeasurably harder if our state is viewed as a regressive and intolerant place to live and work, as is sure to be the case if the divisive concepts amendment is passed into law.
- Vote down the divisive concepts amendment, and in doing so maintain New Hampshire's standing as a business-friendly state that supports inclusive and empowered work environments unencumbered by restrictive legislation.

### Rep. Tim Horrigan:
- Rep. Horrigan represents Durham, the home of the University System. He sees no point in merging USNH with the Community College System at this time.
- Durham is also the home of the Small Business Development Center. The House increased the SBDC's funding from $50,000 to $450,000 over the biennium, but the increase was merely an increase over the Governor's original proposal.
- The House Finance Committee took $400,000 from the Travel and Tourism budget, which shows how shortsighted state government is.
- The budget contains some very small tax cuts, which will supposedly attract businesses from other states. No one is going to move their business here from out of state, however, just because our business taxes went down a fraction of a percentage point. The secret to growing our economy is to grow the businesses which are already here. The tax cuts in the budget will accomplish nothing aside from lowering state revenues, which is not a good thing.
- The budget includes an abortion "gag-rule" provision, which would almost certainly shut down every reproductive health facility in the state.
- Craft a budget that the House, Senate and the Governor can sign.

### Heather Carroll:
- Heather represents the NH Alliance for Healthy Aging.
- Investing in home and community-based services is a cost effective way to build infrastructure to support older adults who live here.
- New Hampshire needs a home and community system that works for all of us.
- Currently, there is a patchwork of services which leads to significant gaps and unmet needs. The result is that too many older adults end up in more expensive institutionalized care, when they truly want to remain in their homes and communities.
- There are cost effective measures the Senate can take now to improve home and community-based services. Support budget requests that include critical increases to 3 Medicaid services under the Choices for Independence Waiver. They are personal care, homemaker services and case management.
- Presumptive eligibility should be fully funded.
- The gap in adult medical day services should be looked at, and raise the daily rate to $75. This investment of state dollars over the biennium is a cost effective way to keep older adults in their communities longer. It also encompasses those

who truly need to have caregiver support for folks who are still in the working world.

- They would like to see the $1.5 million for senior centers to support services for older adults struggling with mental health and social isolation. During the pandemic, senior centers helped many seniors with telehealth services and with the social isolation for those folks who live alone.

**Guy Chapdelaine:**

- Guy is a member of the NH AARP/Capital City Taskforce.
- CFI is a cost effective program for seniors or adults with disabilities.
- In a typical year a significant portion of the funding for CFI goes unused because the number of visits made falls far short of those funded. This has occurred repeatedly over a number of recent bienniums.
- In FY 2020, between 31 percent and 45 percent of the funded visits were not made for skilled nursing home visits, home health aide short and long visits, personal care visits and homemaker services. This shortfall resulted in at least $11 million in appropriated funds not being spent and lapsing to the General Fund.
- This money should be used to increase the availability of services that can help people remain safely at home
- One of the primary reasons for the shortfall in the various types of visits is the low level of reimbursement funded by the state through Medicaid. It's extremely difficult to hire staff to perform these services when the rate of reimbursement is so low in comparison to compensation paid for far less skilled positions in other businesses.
- Greater transparency in rate setting is needed to ensure that rates cover the cost of services to be performed.
- Ensure that rates for services for seniors and adults with physical disabilities are set comparably to rates for services to other groups receiving similar services.
- Expedite eligibility determinations for these services so that seniors and adults with disabilities receive their services in a timely manner.

**Kate Frey:**

- There are several harmful provisions included in the House budget including: 1) abolishing the Enforcement Division of the NH State Liquor Commission, jeopardizing the safe operation of alcohol establishments; 2) banning dissemination of certain "divisive concepts" like unconscious bias related to sex and race that are critical to addressing public health disparities across New Hampshire; 3) defunding essential health reproductive health care providers during a pandemic; and 4) eliminating $50 million and 226 positions from DHHS in "back-of-the-budget" cuts that could limit our ability to overcome COVID-19 and respond to future public health crises.
- New Futures' Five-Point Plan for a Health State Budget is comprised of 5 initiatives, if fully funded in the NH state budget, will go far to address issues resulting from the pandemic, overcome health disparities for historically

marginalized groups, and prevent adverse health impacts on NH's children and families. These initiatives include: 1) supporting critical local and state public health programs and services; 2) ensuring access to health care by supporting a strong health care workforce; 3) supporting efforts to sustain and grow behavioral health services; 4) sustaining investments that help mitigate and prevent childhood trauma to help Granite State children and families thrive; and 5) protecting children's behavioral health programs and services to ensure coordinated and timely care for Granite State youth.

- Investments are needed in community health workers, the state's health care workforce, youth prevention programs and family supports.
- Include $1.2 million over the biennium to support a community health worker position in each of the 13 public health networks.
- Increase funding for the student loan repayment program or make unspent SLRP funds in the current budget nonlapsing.
- Fully fund DHHS' request of $220,000 per year to fund tobacco cessation services directed at youth trying to quit vaping.
- Restore $1.37 million for family resource centers and primary prevention programs within the department.

**Emily Johnson:**
- Emily is the state manager for Save the Children Action Network.
- They oppose cuts to employment-related childcare funding in the state budget.
- Employment-related childcare funds grant assistance to hard working families with young children. Parents are income-eligible for the assistance benefit by having the ability to continue to work and earn a living while their children receive high quality care and education. Without this assistance, New Hampshire children would miss out on that high quality care and foundational education, while their parents would likely miss out on earnings or career advancement, and would be forced to stay home with the kids.
- Employment-related childcare assistance is essential not only for child wellbeing but for working parents and their ability to earn money for basic costs for survival.
- It's not unlikely for income-eligible families to wind up qualifying for increased state aid assistance when denied a childcare scholarship.
- More families will require childcare assistance in the coming years.
- Provide at least level funding for employment-related childcare in FY 2022/2023.

**Megan Tuttle:**
- Meagan is President of NEA New Hampshire.
- Refrain from including a school voucher plan like SB 130, which downshifts costs onto local taxpayers.
- Pass a public school funding formula that is more equitable and accounts for the pandemic effects on school budgets.
- Remove entirely and without replacement the harmful language of HB 544.

- Regarding SB 130, do we really want to make things worse for local property taxpayers?  To date, there has been no financial analysis completed from the LBAO on this bill.
- We appreciate our teachers for many things, including their ability to spark our young peoples' minds with critical thinking skills; the language from HB 544 would stifle that.
- Our country is at a crossroads with respect to racial and gender equity and inclusion.  These discussions in the classroom and in the workplace are tools we use in this country to combat systemic racism and gender inequality.
- This budget can be a better representation of the priorities the people of New Hampshire hold.
- Support a strong public education for all by funding our schools and striving to be a more inclusive and just community.

**Michelle Veasey:**
- Michelle is the Executive Director of New Hampshire Businesses for Social Responsibility.
- The divisive concepts language in the budget is grossly out of step with New Hampshire's workplace culture.  It will have a chilling impact on our workplaces and on our state.  It is a bill that is intended to hold us back and maintain the structure which will allow racism and sexism to flourish.
- These 243 businesses value their employees, and are not afraid to do the hard work to erase the structural racism and sexism in our organizations, schools and businesses.
- Many of the state's largest employers have signed on to the testimony submitted.
- We strongly urge you to protect the state, its people, and its businesses from this dangerous and damaging legislation.
- Diversity helps us to approach challenges with an innovated lens.
- An inclusive environment helps all employees to share their ideas and know they are valued.
- This language will make New Hampshire less attractive to potential employees.
- Remove HB 544 from HB 2-FN-A-LOCAL.

**Esperanza Rivera:**
- Support the developmental services budget in HB 1-A and the people that carry out the work.
- Ms. Rivera has family members and friends who have been supported by the Moore Center for several years.  The Moore Center is the lifeline to people with intellectual and developmental disabilities.
- If you don't fund this program it would threaten the essential services that people with disabilities rely on to maintain their health and independence.
- Fully fund the developmental services budget.

**Michael Kiess:**
- Michael testified on behalf of Vital Communities, whose top priority is housing.

- Make a significant investment in the Affordable Housing Fund.
- Currently, there are not enough places to live to meet the needs of our seniors, working families or our youth.
- The current market is not meeting their individual and shared needs.
- This is a shared challenge.  We cannot solve this alone.  We need to enable and create solutions.
- Your leadership is essential.  Public investment in the Affordable Housing Fund leverages private capital and town and federal resources.  Investors can help shape a new housing future for our communities based on low interest funds available from the Affordable Housing Fund.
- It is time to act together.

**Janet Ward:**
- Janet is opposed to SB 130, a bill which should have serious independent review.
- By directing public tax dollars to a private scholarship organization rather than requiring taxpayers to send their tax dollars directly toward home schooling, religious or private schools, which taxpayers might not wish to support, the bill's sponsors are trying to avoid our state constitution's prohibition regarding the use of public tax dollars to support schools.
- New Hampshire's scholarship organization will be working on commission, and can be paid up to ten percent of every dollar it provides.  This is an obvious conflict of interest.
- The bill's legislative oversight commission can only recommend legislative changes should it detect a problem.
- Your attention to these concerns is essential.

**Douglas McNutt:**
- Douglas is the Associate State Director for Advocacy at AARP NH.
- We need to do a better job providing home care services.  We need a broad based array of services.
- The adult medical daycare program allows working people to keep their loved ones at home, which is critical.
- With the Medicare rates being as low as they are, many of these services have closed.  It not only removes the service from Medicaid residents, it also takes it away from private payors who also need the same service.
- DHHS has suggested the presumptive eligibility be suspended.  Rather, it should be fully funded.  We need to get these services to people who need them in their homes as quickly as possible to avoid unnecessary institutionalization.

**Mary Roberge:**
- Fully fund all services for everyone receiving waivered services.
- It is less expensive to allocate funds for adequate home care than to pay for institutionalized and/or nursing home care.  Home care provides a healthy and safe living environment for those receiving services under the Choices for Independence and disability waivers.  The current pandemic emphasizes the

importance of ensuring New Hampshire residents, especially the elderly and physically disabled adults, continue to receive services and home care that provides for their wellbeing, safety and independence.

- It is important that services for our seniors and adults with physical disabilities are transparent in the rates that are established. It is equally important our seniors and adults with physical disabilities become eligible for these services in a timely manner.

### Jonathan Weinberg:
- Mr. Weinberg is a member of the Concord School Board. The board opposes both SB 130 and HB 544.
- Most of the burden of the NH Retirement System has been shifted to the local taxpayers. Municipalities are carrying the brunt of these costs.
- We are not serving the needs of New Hampshire or the needs of its students with HB 544. If we want to attract young people to this state, HB 544 would not be the mechanism to retain these young folks. Remove this language from the budget.

### Rev. Jason Wells:
- Rev. Wells is the Executive Director of the NH Council of Churches.
- Adopting a budget is essentially a moral and value-based process, rather than a strictly fiduciary one.
- Reject the HB 544 provisions placed into HB 2-FN-A-LOCAL. The sins of racism, sexism, genocide and more continue to wound our nation. Many of our churches are already having the needed, honest conversations on these and other difficult topics.
- Our budget must prioritize public education for all.
- The Legislature should adopt the "People's Budget".

### Nancy Vaughn:
- The American Heart Association asks for the Senate's support in funding two of the most impactful ways to help improve health. Fund a food assistance program to help under-resourced and struggling citizens, and provide tobacco cessation recourses to help youth stop vaping and adults trying to quit smoking.
- New Hampshire's food assistance program is a lifeline for thousands of Granite Staters, including children, the elderly and people with disabilities, who at times struggle to put food on their tables. A modest investment of $200,000 each year will create a dollar-for-dollar match of state funds to Federal Supplemental Nutrition Assistance Program (SNAP) benefits spent on healthy produce at farmers markets and participating NH grocery stores. This will help increase food access, make diets healthier, and lessen chronic illnesses. The money spent on fruit and vegetables produces economic benefits for local farmers and communities, as well.
- One third of youth in our state are using tobacco products and many are now addicted to nicotine, caused largely by electronic cigarettes. The DHHS Tobacco Prevention and Cessation Program has prioritized a cessation initiative

specifically tailored for those under age 18.  More people, including those on Medicaid, can be helped to quit smoking with additional funding.  An investment of $300,000 per year would support programs and help youth and adults quit tobacco and live healthier lives.

- Please remove a provision included in the House budget which repeals the enforcement authority of the NH Liquor Commission.  The section abolishes 21 enforcement positions within the Division of Liquor Enforcement.
- Pull the language concerning divisive concepts.

**John Willis:**
- Remove from the budget Section 330 in HB 2-FN-A-LOCAL, "Propagation of Divisive Concepts".
- School cirricula and staff training programs would become chaotic.
- There is no mechanism for defense against false accusations, and no provision for due process.
- The provisions contain expensive requirements for state agencies, contractors and subcontractors.

**Matthew Gerding:**
- Matthew is a middle school teacher and city councilor in Somersworth.
- Cities and towns throughout New Hampshire have been losing funding from the state year after year.  These repeated gaps in funding are causing dramatic rises in local property taxes, as well as harmful cuts to essential services in our public schools.
- NH schools and communities have advocated for decades the state is not performing its constitutional duty to fund public schools and yet they continue to be neglected.
- The Commission to Study School Funding examined equitable and adequate solutions to the school funding crisis and drafted a proposal that would alleviate the burden on local taxpayers and help provide a stronger education to students.  These proposals were intended to be incorporated into the state's budget.
- New Hampshire's education funding system remains extremely regressive, utilizes inaccurate funding models, is providing fewer resources to needier communities, and produces decreased educational outcomes for less-advantaged communities.
- Most importantly, the commission determined that the responsibility for these faults is due to the lack of funding by the state.
- The commission's recommendations will result in a true and complete reduction in local property taxes for the vast majority of New Hampshire's cities and towns.  The commission's proposals are glaringly absent from HB 1-A and HB 2-FN-A-LOCAL.
- Local property taxes are forced to rise in response to anemic state funding.
- The state needs to take dramatic efforts to reform the ways in which we fund public education.

**Teresa Moler:**

- Teresa is in remission from mental health problems.
- Providers and mental health facilities need funds from the government to provide treatment.
- On occasion, Teresa finds herself in need of emergency treatment.  She wants to see 24/7 access to mental health treatment for all.

**Rep. Mary Heath:**
- This is not a budget that is good for New Hampshire citizens.  It will result in higher property taxes.
- Do not promote SB 130.  Vouchers are wrong for New Hampshire.  They undermine public education and will put additional burdens on our education trust funds.  Existing states that have adopted voucher programs are fraught with problems, fraud and lack of accountability for student learning.
- Remove the $1 million SWEPT reduction and apply those dollars to our local schools based on the 20/21 formula.  The SWEPT reduction is frivolous and benefits only property-rich towns, and leaves districts like Manchester significantly underfunded.  It will result in higher property taxes, and the money that is spent will not benefit our schools.
- Incorporate SB 135 into the school funding portion of the budget to address the impact of COVID on the enrollment and free and reduced lunch cuts that cities and towns have experienced.

**Deborah Nelson:**
- Ms. Nelson is a member of the Coalition for a People's Budget.
- As a prior school teacher, she dealt with multiple complex issues such as slavery, native removal, reconstruction, the many amendments to the Constitution, economics and equality, civil rights and women's movements.  Students came to understand the complexity of America's past.  She never had a student damaged by a greater understanding of racism and sexism.  The language of HB 544 does our young people a great disservice.  Her students care deeply about this state and this country.
- Remove the language of HB 544 from the budget.
- Please support public education and educators by funding public schools adequately.

**Sonia Prince:**
- SB 130 is bad for our public schools.
- New Hampshire tends to spend the least amount of money on education.  We need to change that.
- It will cost our state a ton of money.
- Planned Parenthood has helped many women who are in need.
- Regarding HB 544, history can't be whitewashed.  This is just an attempt to try and stop talking about racism.  It is real and exists everywhere.  We need to educate people to check their biases.

**Janet Perkins-Howland:**

- Ms. Perkins-Howland is an OB GYN and is passionate about issues surrounding reproductive equity.
- When times are the toughest, birth control and preventative care become even more essential.
- When people find themselves poor, their lives chaotic, when they're struggling that's time they need help with reproductive care.
- She is a big believer in preventionism.  Pap smears and mammograms can catch small problems before they become big or deadly.
- We need to fund these programs to help people take care of themselves and prevent more deadly and costly interventions in the future.
- Don't undercut funding for reproductive services in New Hampshire.  It is good public policy.
- Passage of HB 544 would effectively suspend inquiry and dialog to improve patient outcomes based on bias.

**Maris Toland:**
- Ms. Toland is a resident physician at Dartmouth-Hitchcock.
- She is concerned about the physical and financial separation link, and how it affects the ability of providers to deliver the care our state's low income, uninsured families rely on.
- As a provider of reproductive health services, she is repeatedly told by patients how much they rely on family planning to receive cancer screenings, birth control, STD screenings and testing and treatment, as well as patients who have lifesaving diagnoses.  Without that service, they could have lost their lives.
- This budget disproportionately marginalizes people in communities.  It is poor public policy planning.
- What purpose does the divisive concept language serve?  It sensors speech on things that have value.   We should be expanding our language, our understanding and our discourse on systemic racism and gender inequality.

**Dr. Marie Ramas:**
- Dr. Ramas is President-elect of the NH Academy of Family Physicians.
- She has witnessed firsthand the challenges communities face as they strive to achieve the American dream of life, liberty and the pursuit of happiness.
- Adding non-budgetary language into the language of HB 2-FN-A-LOCAL removes the focus on the important work our state faces as we emerge from the pandemic.
- She is deeply concerned her ability to practice medicine will be affected in an unethical manner in caring for both rural and urban patients.
- Community health centers in which she works receive both state and federal funds.
- Allowing divisive concepts into the budget will interfere with clinicians' ability to provide appropriate care that recognizes and validates the lived experiences of our patients.

**Carrie Duran:**

- She is a single mom of three articulate, smart, young ladies.
- Her youngest daughter, Katie, experiences Down Syndrome.  She currently receives in-home supports through their area agency.  The help of this amazing program helps Katie access her community safely and engage in developing skills she will need to live her best life.  Carrie is very grateful for this program.
- Fully fund developmental services in the budget.
- Equity, inclusion and diversity is talked about in the Duran household.  Having a child with a disability makes you become an activist and advocate from the moment your child is born.
- Speak up about injustice.
- Remove the divisive concept language.

**Abigail Carey:**
- Abigail is a current patient at the Derry Health Center.
- She accessed Planned Parenthood to secure safe birth control measures.
- She felt welcome in the health center.  They helped her apply for affordable health care insurance.
- Experiencing the compassionate care of Planned Parenthood helped her refer them to others.
- By requiring providers who offer abortion services to physically and financially separate abortion services from other types of care, makes it more difficult for people like Abigail.  This requirement is unnecessary and impossible for providers to comply with.  It places undue burden on someone looking to make the best option for themselves.
- Without Planned Parenthood people would go without essential care, just because it is too expensive.

**Carolyn Dever:**
- Divisive concepts is not a New Hampshire idea.  It is not a New Hampshire solution to a New Hampshire problem.  It is identical to bills across the country that mirror the previous administration's efforts to censor conversations about complex issues of history, identity and equality.  As employers across the state have made clear, the proposed legislation is regressive and, if passed, will do significant harm to New Hampshire's economy.
- Her son, Noah, is eager to learn all about the world around him.  He is one of only a few Black children in his school.  It is crucial not only for him but for all of his classmates to find ways to understand each other, to work together, to build our future together, in the context of their differences.
- We strengthen our communities when we recognize our differences and use them to work together.  We are stronger together; we are weakened when we fear each other.  When New Hampshire gives voice to all of its citizens, the state stands ready for future prosperity.
- Remove the divisive concepts bill from the state budget.  Demonstrate that freedom of speech still means something to the "Live Free or Die" state.

**Michael Claflin:**

- Michael is the Executive Director of HEAD, a nonprofit housing developer in Littleton.
- There are obvious moral and ethical issues contained in the language of HB 544, as well as potential, economical ramifications to our state.  It should be debated based on its language and its merits.  It should not be attached to or included in the budget.

**Lucas Meyer:**
- Lucas is Chair of 603 Board, which looks to give voice and power to young working people in this state.
- He supports the "Save Our Granite Stages" Act.  This is a new fund dedicated to some of the smaller music venues in our state which have been exceptionally hard hit by the pandemic, and face a long road towards recovery.
- A lack of culture and loneliness plague New Hampshire's young workers.
- This bill will bolster our live musical venues and bolster the cultural sector in our state, which is a huge economic driver.  It is also a tool in our state's toolbox to attract and retain young people.
- Keep this fund intact in the budget.

**Deb Howes:**
- Mrs. Howes is Vice-President of the Nashua Teachers' Union and a member of the Executive Council of the NH AFL-CIO.
- School vouchers or as some might call them, "Education Freedom Savings Accounts", do not belong in the state budget.  New Hampshire has a longstanding problem with underfunding its public schools, as witnessed by numerous lawsuits, i.e., Claremont and Claremont II.  Currently, the state is being sued by a group of school districts lead by Con-Val.  The voucher program envisioned by SB 130 does nothing to solve the problem of the disparate ability to fund an adequate education through local property taxes.  In fact, it exacerbates it.  Vouchers would drain $70-$90 million of limited education funding over three years to help students who are already in private schools or being homeschooled.
- A school like Ms. Howes' school in Nashua with 300 students, could potentially lose a classroom's worth of students in 2.5 years, and the funding that goes with them.
- With students leaving public schools under a voucher program, local districts will have to choose between raising property taxes or looking for program cuts that seem like extras such as arts, music, gifted programs, or consolidating classrooms or schools.  This will force already struggling public schools to eliminate those markers of a quality education that every parent values most for their children.
- If adopted on its own or part of the budget, the voucher program envisioned in SB 130 would further disadvantage all public schools and do the most damage to those in property poor towns and cities.

**Thomas Gaumont:**

- Divisive concept is an undemocratic concept.  If allowed to stay in the budget, it could set a precedent for creating an authoritarian form of education.
- John Dewey, who is viewed by many as the father of modern democratic education in the US, argued that curriculum should be relevant to students' lives, and include open discussions of current events and develops critical thinking skills.  Most teachers support and advocate for continued democratic educational practices.
- Do you want to support democratic educational practices in our state or would you rather support an anti-democratic step as manifested in the divisive concept provision of the current budget being developed?

**Coral Hampe:**
- Coral is President of the Timberlane Teachers Association.
- Schools in our state are compared to schools nationwide and worldwide.  Having a voucher program hurts the students who attend public schools.  Even as funding is drained away, overhead costs remain.  Districts will be forced to make cuts to programs like art, music, languages or sports.
- If we reallocate funding away from public schools, how do we give our students a well-rounded education that can compete worldwide?
- Do not include SB 130 in the budget.  Let's give our public school students the best opportunities possible.  Public dollars should stay with public schools.

**Kate Hilton:**
- One thing Kate loves about New Hampshire is our commitment to local control.  HB 544 is the state government's direct control of the speech of state employees and contractors.  We cannot live freely if we cannot speak freely.
- This legislation is not who we are.  Its language is not from New Hampshire.  This same bill is being proposed in ten other states.
- There are real budget implications and costs to the state to enforce this legislation, and to defend the lawsuits that will be filed on First Amendment grounds; to pursue litigation against those who will be morally justified to defy it.
- It is the ultimate irony that we need look no further than the language of HB 544 to see what state-perpetuated systemic racism and sexism looks like.
- Kate's son, Hans, expressed the importance of being able to speak openly with his teachers about systemic racism and sexism.
- HB 544 cancels New Hampshire's culture of local control, and our business communities' diversity, inclusion and equity efforts.  It also cancels our teachers and students' freedom of speech.

**Gary Cahoon:**
- Mr. Cahoon is the owner and administrator of Friendship Manor in New Ipswich.
- DHHS has suggested the suspension of the presumptive eligibility statute be continued for another two years.  Presumptive eligibility is a process to fast track eligibility for home and community-based services for those in desperate

need of these services, who upon review are deemed highly likely to qualify for them.

- Studies in several states have indicated presumptive eligibility does not increase costs, but rather reduces them overall by reducing unnecessary nursing home placements.
- The median time to determine financial eligibility for the state is 65 days, and in many cases require more than 90 days. This means elderly and disabled citizens go without services when they critically need them. Further, the time to determine eligibility has been significantly and negatively impacted by the pandemic. The entire process has become much more cumbersome.
- Please allow presumptive eligibility to work as intended.
- Unmet needs are not easily determined in residential care because services are not authorized until a client finds a bed. Mr. Cahoon receives 2-3 referrals per week for the 3-4 beds he has per year.
- The rates are too low. As a result, people are often forced to go without services, or are unnecessarily sent to nursing homes. These CFI rates need to be addressed.

**Mary Carlson:**
- Mary is in support of the developmental services budget.
- Her family is connected to the Gateway Services agency in Nashua. Her adult daughter has developmental disabilities, being on the autistic spectrum, and suffers from mental health challenges including significant anxiety. She is bright but learns painfully slow. Teaching her requires a great deal of patience and knowledge. Anything she learns needs to be broken down into chunks.
- Mary's daughter benefits from her interactions with her service providers, who work very hard for very little pay. In recent years it has not always been easy to attract and retain staff to provide her services.
- During the early months of COVID visits were minimal and Mary's daughter suffered.
- If funding is eliminated or reduced, those who receive services will suffer the most, including our most vulnerable individuals.
- Fully fund services for those who cannot advocate for themselves. Our society will be judged on how we treat our most vulnerable individuals.

**Julie Hilliard:**
- Julie has spent the last 30 years struggling to keep the teeth of her 30 yr. old son, Cameron, healthy. He is a difficult case and requires an OR certified dentist. The Hilliards, therefore, are unable to seek low cost or income based dental services. These specialists are hard to find and do not accept payment plans. Many times they are forced to travel out of state to find him dental care.
- Every couple of years Julie starts the process of coming up with funding and grants to pay for the procedure. Payment has to be guaranteed before an appointment will be booked, and then it is usually several months to get an appointment.

- Cameron routinely goes without dental care for long periods due to the difficulty of getting care and finding a dentist willing to take him as a patient.
- What New Hampshire provides for Cameron currently under Medicaid is to wait until he has painful abscesses, and then have the teeth removed on a strictly emergency basis. The dentist can't even clean the teeth or do any other dental work during the procedure. That means Cameron would suffer unbearable pain indefinitely, and have his teeth pulled out one by one until he has no teeth. This is shameful and seems deliberately cruel.
- New Hampshire Medicaid can't even authorize exceptions for special cases like Cameron.
- Cameron has many challenges but Julie wants him to have healthy teeth for as long as possible, and she works very hard to make sure he will.

**Elaine Fagga:**
- Elaine has a son who is transitioning this year into adult services, and she is very concerned about the staffing issues in Sullivan County. Pathways has been unable to staff her son's in-home support program for the last 3 years. When his school program ends in August, Elaine is afraid her son will end up back home with her full-time. She will be forced to place him in a residential program, as she is unable to take care of him full-time.
- Elaine has a ward that is currently living out of state, and will turn 21 in January, and transitioning into adult services as well. Her ward lives out-of-state as there are no programs in New Hampshire to meet her needs.
- The lack of housing services for people with dual diagnoses are nonexistent for the most part in this state.
- Pathways has helped with financing for Elaine's van, transportation being a vital service.
- Currently, no adult members of Elaine's family have access to dental care.
- The low funding reimbursement rates of CFI impacts the ability to hire and train staffing. New Hampshire needs to step up their Medicaid reimbursement rates.

**Regan Lamphier:**
- Regan has close ties with the disability community in New Hampshire. Her son, Ethan, had a major stroke when he was 3 years old. That is when they qualified for a direct support, which allowed her to keep her job, insurance and her home. She supports her family financially.
- Ethan had serious developmental disabilities, and was medically complex. He passed away suddenly at the age of 8. If he had reached adulthood, their need for home and community-based service would have continued.
- Regan cares deeply for those with disabilities, including many of our seniors.
- Currently there is a dire workforce shortage in this state. The Choices for Independence program is essential to keeping these individuals in their homes and out of institutions.

- The pandemic has exposed the gaping holes in our state safety net.  It doesn't benefit anyone when individuals fall through the cracks.  There are children and families in dire need across New Hampshire.  The crisis is real and growing.
- We have a moral and legal obligation to fully fund DHHS.  If the department is funded properly, our families and communities will be stronger and more successful.  That means a brighter future for everyone in New Hampshire.

**Courtney Lawson:**
- Courtney is currently on CFI.  There is a major issue with staffing.  She is receiving only half of her services, due to the low wages being paid.
- These rates must be raised.
- They deserve to be able to live independent lives.
- At the age of 40, Courtney does not want to go into a nursing home.

**Kayla Berry:**
- Kayla works for Courtney Lawson and assists her on the night shift.  Courtney is a complete quadraplegic.  Without the CFI funding there would be no way for Courtney to get out of bed.  There have been times previously when Courtney has been left in bed for 4 days.
- Courtney is unable to access mental health services.
- Kayla has, at times, worked 2 weeks straight, morning and night as there were no other available aides.  She has a full-time job elsewhere as well.
- Courtney's brother even helps out with her personal care.
- Many of the caregivers Courtney has had in the past left due to low wages.  They've gone to work at McDonald's, which pays more.

**Louisa Ledbetter:**
- Louisa is the parent of a 22 year-old with developmental disabilities who is supported by Pathways.
- Finding support staff who have experience with or understanding of the disabled across a wide spectrum of disabilities is difficult when the highest hourly wage is much less than a school paraprofessional.  The job itself is much more difficult than a paraprofessional as they are responsible for those they support out in the community as well as in the home.  They are entirely on their own when they provide this support.  They should be entitled to a wage competitive for what they do.  Parents entrust them with the physical, social and emotional support of their child, as well as helping to build functional life skills.
- It is hard to get the best quality when the wage offered is so low.  When you find dedicated staff who are willing to train and learn how to best care and support for your child, you want to be able to keep them.  A fair wage is one way to do that.  Not being able to offer a fair wage also significantly reduces the pool of candidates from which we can choose support staff for our children.
- Fully fund the developmental services budget to allow for a more competitive wage for support staff to work with the disabled in New Hampshire.

**Annie Johnson:**
- If this budget becomes law, thousands of Granite Staters like Annie would be at risk of losing access to critical, lifesaving health care.
- For thousands of people, under-insured or uninsured, there are no other viable options waiting in the wings to do this work.
- The average hospital ER, in a pandemic, cannot take on the task of providing these thousands of people with routine testing, early intervention for HIV exposure, checkups and providing birth control and free contraception.  These people will either take on astronomical debt or go without care.
- Preventative health care saves taxpayer dollars at a rate of one dollar spent for every seven dollars saved.
- Planned Parenthood serves a huge community, literally 72 percent of the entire family planning program, and their services throughout New Hampshire ensure that anyone can access birth control, cancer screenings, checkups and STD testing.

**Dr. Sue Kim:**
- As a psychologist, Dr. Kim is obligated to speak up against HB 544 as it violates three of her profession's ethical principles and code of conduct.
- Her ethics code requires her to operate with integrity.  For decades, psychology research has found that systemic racism, institutional, interpersonal and internalized racism all exist, and need to be discussed and addressed in order for people and our society at large to heal.  If HB 544 passes, it would be illegal in the state for psychologists to present accurate, honest and truthful information about racism and sexism, information supported by empirical data.
- Dr. Kim's ethics code also requires her to uphold justice.  If HB 544 passes, psychologists in this state would not be permitted to offer workshops, training and seminars designed to help people understand how unconscious bias operates, strategies to cope with psychological distress and discomfort related to discussing racism, and ways to become resilient rather than avoiding these important topics.  Avoiding discussing something often makes things much worse than just learning how to talk about it.
- Dr. Kim's ethics code requires her to operate with respect for people's rights and dignity.  As a psychologist, she must be aware of and respect people's differences, and attempt to eliminate her own biases.  HB 544 would outlaw the training she would need in assessing and monitoring her hidden biases.
- Remove HB 544 from the budget bill.

**Nirav Kapadia:**
- Mr. Kapadia is a person of color, a father and a husband.  He is a cancer doctor who serves in an underserved, rural, almost entirely white population in the North Country.
- To defund Planned Parenthood would devastate his patients.  Many of them have their cancer screenings and detection through Planned Parenthood.
- Racism hurts white people as well.

- Black people are twice as likely to be ignored when having a heart attack, severe back pain or a migraine.  To be able to talk about these things lets us understand these things.  If we can understand these things, only then can we fix them.
- HB 544 is government overreach at its worse.  How will it be funded?

**Rev. Dr. Gail Kinney:**
- Dr. Kinney represents the Economic Justice Team of the United Church of Christ.
- A state budget conveys what we value.  The budget the House delivered to the Senate is not a People's Budget, nor a moral budget.  The House does not value health and human services based on the proposed back-of-the-budget cuts to an absolutely essential state agency.  The House doesn't seem to value safe and accessible reproductive and related health services for women in New Hampshire.  The House doesn't value providing needed adequacy support for public schools.   But, apparently, the House does give priority to shifting adequacy costs downward to local property taxpayers, with the low income and municipalities being hurt the most.
- HB 544 calls for the censoring of public agencies, state contractors and public educational institutions when it comes to training or teaching about systemic racism or sexism and implicit bias, all things which are still among us.  This language has no business in the budget trailer bill, and in New Hampshire statute period.  It is breathtakingly vague, it calls for censorship, it mandates that certain topics can be discussed only "without endorsement".  It calls upon the Department of Administrative Services to become the "thought police".  It is incredibly frightening in its scope, and is completely unworkable.   If this language becomes law, it will become a national story, and it won't be a positive story for New Hampshire.  It will bring shame and economic consequences.
- Crafting HB 2-FN-A-LOCAL is not a game.  Remove this language entirely from the budget trailer bill.

**Alex Koutroubas:**
- Dennehy & Bouley have many clients with strong interests in the state budget.
- Fully support long-term supports and services under DHHS.
- We also need to support our state's hospitals, assisted living homes, senior centers, Meals on Wheels, and our fellow citizens with disabilities.
- They are strongly opposed to the divisive concepts language in HB 2-FN-A-LOCAL.
- Dennehy & Bouley represents ACEC-NH, an engineering firm in this state.  Many of these clients work for state agencies.  New Hampshire's engineers oppose contractual language that is unreasonable and overly burdensome to comply with.
- We will put important state contracts at risk if we go down this road.  Remove the language from HB 2-FN-A-LOCAL.
- Restore the state aid grant program for our cities and towns.
- Fully fund DOT's budget to continue to keep the traveling public safe.

**Dr. Clare O'Grady:**
- Dr. O'Grady is a family medicine resident physician. She practices medicine in a rural clinic. Bucolic landscapes, fresh farm produce and neighborly waves unfortunately mask the health care disparities her rural patients face.
- In the past year of her practice, Dr. O'Grady has listened to her patients' stories about newfound poverty as the few local businesses in town closed their doors. She's witnessed retrogression in their mental health at the hands of pandemic-induced seclusion atop the physical seclusion they already possess simply by being a rural resident. Most tragically, she has watched them decline lifesaving treatments because they can no longer afford the gas to drive the forty miles to specialty clinics.
- New Hampshire is a state that is comprised of an expansive and proud rural population that already struggles with access. Ultimately, limiting availability to medically-proven, safe, family planning programs, as is suggested in HB 2-FN-A-LOCAL, will further widen this gap. This will be true especially for Dr. O'Grady's rural patients, for rural women, and for herself.
- This goes against the very autonomy that this state boasts and promises to its residents.

**Janine Lademan:**
- Janine is opposed to any cuts to the mental health services budget. She has a 19 yr. old son and is desperately seeking mental health services for him. He has been experiencing delusions and has been hallucinating. She was able to admit him to the ER department, but he needed hospitalization. He stayed in the ER for one week while his mental health unraveled. He was finally transferred to a stabilization unit in Manchester, where he was placed on medication. After five days he was sent home.
- Janine cannot get an appointment for her son until mid-July. His medication is running out and she can't find anyone to manage his refills.
- In the meantime she has called every psychiatrist, counselor, hospital and counseling center in New Hampshire and Massachusetts. Most places don't bother to return a call.
- Just today they went back to a different ER but her son was turned away. Apparently, her son is not psychotic enough for hospitalization and services.
- What will it take to get help? Where are the services in this state? The lack of mental health resources in this state is shameful.
- Dedicate and prioritize funds and resources to provide mental health services to those who so desperately need it.

**Anna Shultz:**
- Anna is a home health social worker and a private geriatric care manager. She supports the proposed rate increases for the CFI program. Many of the individuals she assists are in dire need of more hours to meet the assigned hours by the state.

- Should she report CFI to the state Adult Protective Services program for neglect? How can she help these patients get the services they need? If they received the appropriate level of care, most of them would be able to stay in their own home.
- The rate increase would help secure consistent staff, have a regular schedule of living and ensure the type of help needed to the CFI recipients is available day, night and weekends. The proposed rate increases are needed to make sure people on the CFI program are assisted in their home in order to stay in their home.
- Support the rate increase to CFI in this budget as it will directly impact your constituents and is the economically, sound choice over more costly institutionalized care.

**William Rescsanski:**
- Property-poor towns like Charlestown will not receive adequate aid for school funding.
- Property-rich towns like Newington pay $2.70 per thousand dollars of property value for school funding. Charlestown pays $24.89 per thousand dollars of property value as it is a property-poor town. This is nine times more than Newington's.
- Charlestown spends so much money on school funding that it always looks for ways to cut or constrain municipal spending. The town cannot grow or do fun things like hire a recreation director. It struggles to maintain existing assets. Residents like William cannot afford to retire in Charlestown.
- Every year Charlestown has at least 20 properties with delinquent taxes. Ten were sold last weekend.
- It is hopeful the Con-Val lawsuit will solve these problems.
- Charlestown's tax rate would be much lower if the state provided adequate funding for students.
- Please increase aid for school funding for property-poor towns with low equalized value per pupil. HB 623 would have done this. Include this bill, or something like it in the state's budget.
- According to the NH School Funding Fairness Project, 4.4 percent of the SWPT reduction flows to 20 most property poor towns in New Hampshire.
- The New Hampshire Constitution requires taxes to be proportionate and reasonable.

**Ilyssa Sherman:**
- The current budget makes it impossible for reproductive health centers to be part of the New Hampshire family planning program because of unnecessary requirements designed to defund abortion care providers.
- This language is clearly only intended to make it impossible for reproductive health centers to participate in the family planning program, even though 79 percent of patients in the program are cared for at reproductive health centers. Ilyssa has been one of those patients.

- Ilyssa's father passed away two months prior to her wedding.  She had just turned 26 and was relying on her father for health insurance until her wedding.  Her only option was to go on COBRA, but with the waiting period Ilyssa went without insurance for two weeks.  During this time period she had a flare up with endometriosis, and had been seeing a specialist to manage her condition.  However, she could not afford to see the specialist without insurance.
- Ilyssa made an appointment at her local Planned Parenthood health center, where she received the patient-centered care she needed at the time.  In a time in her life when she felt so incredibly broken, the staff at Planned Parenthood helped her start the process of picking up the pieces.
- Four years later Ilyssa is a sexual and reproductive health nurse.  She now speaks as both a former patient and as a caregiver to this population.  Many of her patients have low incomes or are uninsured and rely on the low or no-cost services provided through the family planning program.  They deserve access to preventative care.  Don't take this care away, especially during a time when accessibility is already an incredibly large barrier.
- Reproductive health services are so greatly needed for people all across New Hampshire.  It is completely unacceptable that this budget prioritizes slashing access to preventative health care, especially in the midst of a pandemic.
- If finalized, this budget will cause an undue physical and psychological burden on people all across New Hampshire, and will result in a public health disaster for this state.

**Laura Vincent:**
- SB 130, Education Freedom Accounts, should be omitted from HB 2-FN-A-LOCAL.
- There is a lack of accountability in this bill for student outcomes in the language about EFAs.  Although the language has been amended to include three choices to measure student progress, a large loophole remains.  The three choices listed to assess student progress are:  (1) using the NH state assessment used in public schools; (2) using another standardized test; and (3) using an evaluation of a portfolio of student work.  This assessment by portfolio evaluation is where the loophole lies.
- For instance, a student being homeschooled could have their portfolio evaluated by any "teacher" selected by the parent.  The teacher doing the evaluation, perhaps a relative or friend of the family, does not have to be certified and does not have to have experience at the student's grade level, such as a non-certified teacher working in a private kindergarten evaluating a high school student's portfolio.
- There is no language requiring this portfolio evaluation to be reported to the state or school district, only to the scholarship organization.  The scholarship organization is not authorized or required to do anything further with the portfolio, and is not authorized or required to terminate an EFA even if the student shows no progress year after year.
- Although this situation may not occur frequently, when it does occur, there is no recourse for addressing the student's unmet needs.

- This issue could be considered under the increased scrutiny of a stand-alone bill.

**Mary Wilke:**
- It is critical the entire $89 million funding loss that school districts are facing be restored to the budget.  Even with this money, many of our districts will remain grossly underfunded.  This is a bare minimum.
- Don't included SB 130, the voucher bill, in the budget.  The bill needs the kind of close scrutiny it can only get as a stand-alone bill.  SB 130 has many problems associated with it.
- The private nonprofit and for-profit educational service providers that would be paid with our money are not required to have any particular credentials, licenses or certification, or even to conduct criminal background checks on employees who would be working with children.
- Nothing in the bill prevents employees of the scholarship organization or their family members from setting up their own for-profit tutoring service or therapy center, steering parents to those providers, and then paying them with our taxpayer dollars.
- Why does the bill grant the scholarship organization immunity from legal liability?  They won't be held to the usual standard of reasonable care that applies to the rest of us.  We the taxpayers have the right to expect them to use reasonable care if they are going to handle tens of millions of dollars of our collective money.
- The LBAO has not issued a detailed fiscal analysis of the impact of this bill.  Meanwhile, the DOE has made some fiscal predictions that need more scrutiny.
- If a child took an EFA, the associated public school would lose the adequacy money and differentiated aid it would otherwise receive on the child's behalf.  Yet the child could continue to attend public school for up to 50 percent of each week for the remainder of the child's school life.
- If the child had special needs the public school would remain responsible for addressing all of the special needs, which can be very expensive, without receiving any of that state assistance.  The money would be going to the private school which would have no obligation to provide special ed services.
- Don't place SB 130 into the budget.

**Morgan Wilson:**
- The House budget defunds Planned Parenthood of Northern New England  and independent abortion providers.  It defunds essential health care providers during a pandemic.
- As a former patient of Planned Parenthood, Morgan knows firsthand the importance of the reproductive health services they offer.  She has the knowledge she can always return to Planned Parenthood for understanding, compassionate care.  They offer high quality care while making it affordable for those under-insured or uninsured.
- Many are only able to access vital reproductive health care through Planned Parenthood.
- This program is greatly needed for people like Morgan all across the state.

- This budget will cause significant harm to public health in New Hampshire, and reduce the access residents have to affordable health care services.
- Please oppose this language in the budget.

### James Bomersbach:
- Mr. Bomersbach is a licensed psychologist in New Hampshire.
- HB 544 is based on factual falsehoods.  The claims made about Critical Race Theory and other theories are not based in reality.
- We should be focused on increasing discussion of bias, in all of its forms, across this state.  That is how we are going to do as much as we can to eliminate these from society.  That should be our goal.
- This bill puts us in the wrong direction.
- In consideration of the practical side of this, there are costs associated with this that are not included in the bill, including enforcement and the inevitable legal challenges.
- New Hampshire could lose out on important infusions of money to the state because we will become one of the few states who has passed this type of hateful rhetoric.

### Rep. Larry Welkowitz:
- As the Chair of the Psychology Department at Keene State College, disgusting, divisive concepts are at the heart of academics.  Classroom conversations are essential to breaking down core issues.
- They talk about institutional racism in professional psychology.  Why are there so few blacks in psychology?
- In New Hampshire there is no public program for doctoral level education in clinical psychology.  We may be the only state in the country without one.
- Can we talk about differential impacts on people with different economic status? We must.
- We can't simply avoid divisive concepts if we are to effectively review and discuss all these types of topics.
- A vote for this bill is a strike against the academic process.  The language won't be followed in academia.
- There will be an immediate First Amendment challenge in court, that will sadly have to be paid for by the citizens of New Hampshire.
- Oppose this section of the budget.

### Dan Weeks:
- Dan is a Director and Co-Owner of ReVision Energy.
- Their business is always concerned with bringing their employees back, particularly female employees.
- Keep the budget level funded so that families experiencing hardship during the pandemic can afford childcare they need to keep working, or get back to work. This will ensure equity in the workforce.
- ReVision Energy has been awarded many public sector contracts to install energy systems for different municipalities and school districts.  It's not the

state's business what internal trainings they offer their employees to support an inclusive workplace.
- They struggle to meet their workforce needs.  They need to retain young people and attract new workers out of state to New Hampshire.
- Passing the language of HB 544 will be a black eye for our state.  It will attract a lot of national negative attention.
- It will make it harder to create the kind of diverse, productive, inclusive workforce that is good for their business and for our state.
- The requirements of HB 544 are onerous.

**Crystal Paradis:**
- Crystal was diagnosed with menorrhagia.  The symptoms leave her unable to work or do any usual tasks a few days each month.  She was uninsured and reached out to Planned Parenthood for help.
- As Crystal was uninsured and low-income, the services Planned Parenthood provided her were 100 percent covered by family planning funding.
- This access to timely, compassionate care changed Crystal's life.
- Everyone is aware of the potential gap in Title X funding for family planning services here in New Hampshire.  Cutting this critical gap funding would be unnecessarily cruel as we recover from the biggest health crisis in generations.
- Amend HB 1-A to include funding for this 9-month gap for family planning.

**Hunter Porter:**
- The Nashua High School South Democrats oppose HB 2-FN-A-LOCAL because of the horrendous inclusion of HB 544.  The bill would prohibit students from truly learning the history of our country.  Teachers would be unable to fully discuss the racism and sexism that colors the past and present of this country.
- As can be seen in the police killings that engulf our news, police officers have a clear bias against people of color.  This bias has fatal consequences.  Bias training is a necessary and extremely important part of police training.  Prohibiting the state from providing bias training opens the door to racism and sexism in many workplaces.
- Racial sensitivity training helps people of color and women from experiencing micro-aggressions that white people may not have been aware of before the training.  This is extremely harmful to marginalized groups because they will not feel completely safe in their workplaces.
- People should not expect to experience racism and sexism in their workplaces.  Some may say if people feel uncomfortable in their workplace, they should leave.  This is not a choice for many New Hampshire citizens.

**Nicolette Gallibrano:**
- Private schools are often more well funded, and can offer exciting opportunities that our public schools have been forced to cut by repeated reductions in state funding.
- The private school and the scholarship organization benefit from education freedom accounts, not the family.

- When private schools give students scholarships based on need, they ask to see what resources the family has available to them, including any other grants and scholarships. They take these resources into account.
- There are much better uses for state funds for education. This is just one of the many flaws and gaps in SB 130 that need to be considered and addressed. It's unlikely in a budget year the Legislature will have the capacity to do so.
- SB 130 should not be rolled into the budget.

### Dennis Calcutt:
- Dennis is the Director of Connected Families NH. They have benefited from children's mental health services. They are a care management entity for the state.
- If HB 544 remains in the budget, they would be in direct conflict of its provisions. They would probably have to return grant money to the federal government, and cease the work they are doing. This would hamper the progress they have made around the system of care work, as well as children's mental health.

### Katrina Miamis:
- Katrina suffers from endometriosis, which made her physically incapable of going to work  Her pain was greatly reduced by having an IUD inserted at the Lovering Health Center in Greenland. She no longer misses work due to pain.
- A cut in funding will be a reduction in resources, and women like Katrina will go untreated.
- Don't exclude the Lovering Health Center from the state's family planning program.

### Former Sen. Melanie Levesque:
- No one should be blamed or made to feel guilty for the acts of the past.
- What may seem divisive to one person, may be a life experience of another.
- Sen. Levesque's own parents were unable to purchase a home as the realtor would not sell it to them. Their neighbors voted on whether to allow them to move into the neighborhood.
- Unbiased information is very difficult to find these days. Public institutions are defunded and speech is stifled. Neighbors turn against neighbors.
- Our government puts divisive language such as HB 544 into our laws.
- Remove the divisive language from the state budget. Produce a budget that allows all of our people in New Hampshire not just to survive, but to thrive.

### Rep. Matt Wilheim:
- Rep. Wilheim's legislative district encompasses the heart of downtown Manchester and the historic Millyard.
- He supports the Save our Granite Stages Act.
- Downtown Manchester is home to a number of small to mid-size performance venues.

- The live music industry was the first to close during the pandemic, and will be among the last to reopen.
- It's been heartbreaking to see how the pandemic has impacted the livelihood of Rep. Wilheim's friends and former coworkers.
- There was a clear, direct increase in direct economic activity on nights when there was a show in town.
- It's critical we do what we can to support these economic drivers for communities across our state.
- Include Save our Granite Stages Act in the state budget.

**Karen Blake:**
- Fully fund all the line items for developmental disabilities services in the budget, and the people who carry out the work, such as direct support professionals.
- Support the adult dental benefit, as well as funding for the 10-Year Mental Health Plan.
- Her 14 yr. old son has been diagnosed with autism and ADHD, and is currently supported by Northern Human Services through the In-Home Supports Waiver.
- They have also received family-centered supports and services in the past.
- They consider themselves lucky having been able to find a provider for their son. It took them two years to find one.  These services are helping their son to work on social interaction, using money and beginning to cook using the microwave. Someday, likely, he will need support to be a successful adult.
- As a Medicaid recipient he will need adult dental benefits and employment support to live as independently as possible.  He may need mental health services and support as well.

**Rep. Maria Perez:**
- We need to work at diversity inclusion.
- HB 544 doesn't belong in the budget.
- More people in our communities are suffering from mental illness due to the pandemic.  We are losing many lives.  We need to provide more of these services.

**David Docken:**
- David has a sister who has been on the CFI program for a number of years.
- This program helps her and is essential.
- There is not enough money to pay caregivers to come into the home and provide the services required.
- There should be more oversight to guarantee these services are actually performed, and the caregivers are trained.
- Without this funding costs will increase for the state on many different levels.

dm
Date Hearing Report completed:  May 23, 2021



Senate Finance
May 28, 2021
2021-1799s
08/10

Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by replacing all after the enacting clause with the following:

2

3    1  Reimbursement of Sheriff's Offices.  Amend RSA 104:31, X-XI to read as follows:

4    X.  ***The judicial branch shall incorporate remote technology whenever possible to***

5    ***minimize the amount of physical transportation and security time associated with court***

6    ***hearings.***

7    ***XI.***  The [~~state~~] ***judicial branch*** shall reimburse the sheriff's office for court security,

8    within available funds appropriated by the legislature, $80 for each full day and $40 for each half

9    day, plus traveling expenses to attend any official business, for any person employed as a bailiff by

10    the sheriff's office.  For the purpose of this paragraph, a half day shall be defined as a day in which a

11    bailiff works 4 hours or less.  The [~~state~~] ***judicial branch*** shall reimburse the counties, within

12    available funds appropriated by the legislature, for all costs associated with employing court bailiffs,

13    if those costs are the result of job requirements imposed by federal and state governments.

14    [~~XI~~] ***XII***.  The [~~state~~] ***judicial branch*** shall reimburse the sheriff's office for prisoner

15    custody and control, within available funds appropriated by the legislature, $65 for each full day and

16    $35 for each half day, plus traveling expenses to attend any official business, for any person

17    employed as a sheriff for prisoner custody and control.  For the purpose of this paragraph, a half day

18    shall be defined as a day in which a sheriff works 4 hours or less.  The [~~state~~] ***judicial branch*** shall

19    reimburse the counties, within available funds appropriated by the legislature, for all costs

20    associated with employing sheriffs, if those costs are the result of job requirements imposed by

21    federal and state governments.  Billing for reimbursement of costs associated with video

22    arraignments shall not be allowed under this paragraph.  Custody and control of prisoners for the

23    purpose of video arraignments shall be the responsibility of the county in which the video

24    arraignment occurs, and such custody and control may be exercised by county correctional officers.

25    2  State Heating System Savings Account.  Amend RSA 21-I:19-ff to read as follows:

26    21-I:19-ff  State Heating System Savings Account.  There is hereby established the state heating

27    system savings account for the transfer of unexpended state heating system appropriations due to

28    reduced heating system costs resulting from the 26 state buildings served by the Concord Steam

29    project authorized in 2017, 2.  Notwithstanding RSA 21-I:19-e, at the end of each state fiscal year,

30    the commissioner of administrative services shall identify the unexpended appropriations in the

31    accounts and class lines for the 26 state buildings served by the replacement of the Concord Steam

32    facility.  The commissioner shall deposit such sums into the account established by this section.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 2 -**

1    Funds in the state heating system savings account shall be nonlapsing and appropriated to the

2    department of administrative services for the biennium ending June 30, [2019] *2021,* and the fiscal

3    year ending [2020] *June 30, 2022* and may be used to pay principal and interest on bonds and notes

4    issued to fund the capital project for the heating of state facilities located at the Governor Hugh J.

5    Gallen state office park and state-owned buildings in downtown Concord.

6        3   Divisions of Procurement and Support Services; Planning and Management Functions.

7    Amend RSA 21-I:11,I(c)(4) to read as follows:

8            (4)   Supervising the [activities and functions of the bureau of] planning and

9    management *functions of* [under] RSA 21-I:12, II(a).

10       4   New Subparagraph; Graphic Services Fund Established; Department of Administrative

11   Services.    Amend RSA 21-I:12, I by inserting after subparagraph (e) the following new

12   subparagraph:

13           (f)(1)   There is hereby established in the state treasury a graphic services fund, which

14   shall be a revolving fund administered by the department of administrative services.  The fund shall

15   be nonlapsing and continually appropriated to the department of administrative services.  Revenue

16   received by the bureau of graphic services shall be deposited into this fund.

17           (2)   The graphic services fund shall be maintained at such a level as to cover the

18   necessary costs of the administration, management, operations, activities, positions, capital, or other

19   needs of the bureau of graphic services.  The department of administrative services may use any

20   excess amounts in the fund to fund the administration, management, operations, positions,

21   activities, capital, or other needs of the department or any of its divisions, bureaus, units, or

22   subunits.

23       5  Division of Plant and Property; Planning and Management.  Amend RSA 21-I:12, II to read as

24   follows:

25           II.  The division of plant and property shall [include the following internal organizational

26   units and functions]:

27           (a)   [A bureau of planning and management under the supervision of a classified

28   administrator of planning and management who shall be] Be responsible for the following functions

29   *relative to planning and management*, in accordance with applicable laws:

30           (1)   Recommending assignment of office and office-related space, including rented

31   space, or space under consideration for rental, to the director, who shall report such

32   recommendations to the commissioner.

33           (2)   Preparing and maintaining an inventory of all physical space in real property

34   rented or leased for use by the state.  This inventory shall be made available to the comptroller in

35   order to assist the comptroller to comply with accounting principles.

36           (3)   Planning for any additional office space needs of the state in consultation with

37   the division of public works design and construction.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 3 -**

1       (4)  Planning for any major renovation to state office buildings in consultation with
2  the division of public works design and construction.

3       (5)  Centrally managing all space rented by, or all proposed rentals of space by, state
4  agencies, and providing central administration and management of the processes by which space is
5  rented by state agencies, except as is otherwise provided by law.  Unless otherwise allowed by law,
6  agencies seeking to rent space shall do so only in consultation with the bureau of planning and
7  management.  The central management and administration provided by the bureau shall include
8  assisting agencies in their selection of property, in the formulation of rental documents, in the
9  preparation of notices, in agencies' solicitation of bids or proposals and selection of lessors, in space
10  planning, in office layout, and in such other matters as are necessary for effective central planning
11  and management relative to rented space but shall not include the power to enter into rental
12  agreements on behalf of an agency.

13      (b) ***Include the following internal organizational units and functions:***

14      ***(1)***  A bureau of general services under the supervision of a classified administrator
15  of general services who shall be responsible for the following functions, in accordance with applicable
16  laws:

17      [(1)] ***(A)***  Providing support services, including but not limited to, mailing and
18  messenger services to state government.

19      [(2)] ***(B)***  Providing for the general maintenance of state-owned buildings and
20  grounds, except as otherwise provided by law.

21      [(c)] ***(2)***  A bureau of court facilities under the supervision of a classified administrator
22  who shall be responsible for the following functions, in accordance with applicable laws:

23      [(1)] ***(A)***  Providing suitable court facilities for the conduct of all court sessions held
24  within each judicial district and county, subject to the availability of appropriated funds, in
25  accordance with RSA 490-B.

26      [(2)] ***(B)***  Providing for the general maintenance of state-owned court buildings and
27  grounds, except as otherwise provided by law.

28      [(d)] ***(C) Be responsible for*** the department's functions relating to energy management,
29  managed by such personnel as may be assigned by the commissioner.

30      [(e)] ***(D) Be responsible for*** the department's support of facilities of the department of
31  health and human services managed by such personnel as may be assigned by the commissioner.

32  6  Department of Administrative Services; Payment and Procurement Card Fund.  Amend RSA
33  9-D:3, III to read as follows:

34      III.  All funds accumulated from rebates under RSA 9-D:2, I(a) or (b) shall be deposited in the
35  fund established in paragraph I.  Expenditures from the fund shall be restricted to the following
36  purposes:

Amendment to HB 2-FN-A-LOCAL
- Page 4 -

(a)   Paying the necessary costs of administration and management of the credit, payment, or procurement card programs handled by the department of administrative services and maintaining a working capital reserve in an amount, not to exceed $25,000, which is deemed sufficient by the division of procurement and support services to cover the costs of the programs and to pay amounts under [subparagraph] *subparagraphs* (b)(1) *and (2)*.

(b)   After deducting the foregoing amounts, making such payments, if any, that the department of administrative services concludes are appropriately payable:

(1)   By an entity which is part of the state to any credit, payment, or procurement card issuer under contracts secured by the division of procurement and support services pursuant to RSA 21-I, including but not limited to payments for purchases and payments which must be made in order for the state to obtain available rebates, or to avoid incurring, or to pay, interest, penalties, or other costs imposed on the state by issues of credit, payment, or procurement cards.

(2)   [To the state's general fund or any federal, highway, turnpike, or liquor fund, as a share of rebates obtained on credit card contracts under RSA 9-D:2.  The] *To the* department of administrative services [shall pay any remaining] *to address its procurement-related needs or expenses.  The department may use* rebate amounts to [the general] fund *its administration, management, operations, positions, activities or capital, or other needs, or the needs of any of its divisions, bureaus, units or subunits, relating to the procurement of goods or services*.

7   New Subparagraph; Graphic Services Fund.   Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

(365)   Moneys received by the department of administrative services, division of procurement and support services, bureau of graphic services which shall be credited to the graphic services fund established in RSA 21-I: 12, I (f).

8   Department of Administrative Services; Consolidation of Human Resources and Payroll Functions.

I.   Notwithstanding any law or administrative rule to the contrary, the commissioner of administrative services, with the prior approval of the fiscal committee of the general court and the governor and council, may make such transfers of appropriation items and changes in allocations of funds available for operational purposes to the department of administrative services from any other agency necessary to effectuate the efficient consolidation or deconsolidation of human resources, payroll, and business processing functions within state government.   Such business processing functions shall include:

(a)  Accounts receivable;

(b)  Accounts payable;

(c)  Collection of fines, penalties, fees, restitution, remittances, and other moneys due to the state; and

1    (d)  Such additional finance, accounting, and other functions and transactions that the
2    commissioner of administrative services determines may potentially achieve substantial efficiencies
3    from consolidation.

4    II.  The commissioner of administrative services may establish the number of total personnel
5    required for human resources, payroll, and business processing functions in the executive branch of
6    state government and, with the prior approval of the governor and council, may eliminate
7    unnecessary positions and may transfer positions to or from the department of administrative
8    services to or from any other agency if the commissioner of administrative services concludes that
9    such transfers or eliminations are necessary to effectuate the efficient consolidation or
10   deconsolidation of human resources, payroll, or business processing functions within state
11   government.  Such transfers may, if deemed appropriate by the commissioner of administrative
12   services, include the transfer of all associated books, papers, records, personnel files, and equipment,
13   including, but not limited to, work station and information technology equipment, and may, if
14   deemed appropriate by the commissioner of administrative services, include the transfer of any
15   unexpended appropriations for any of the foregoing, and any unexpended appropriations for salary,
16   payroll, benefits, support costs, or any other costs associated with the transferred personnel.  The
17   department of administrative services may also establish new full-time temporary positions within
18   the department, if the commissioner of administrative services deems it necessary to effectuate the
19   efficient consolidation or deconsolidation of human resources, payroll, or business processing
20   functions.

21   III.  The commissioner of administrative services may locate personnel whose positions have
22   been transferred in such work spaces as the commissioner determines will efficiently effectuate the
23   consolidation or deconsolidation of functions.  Such work spaces may include either space currently
24   owned or rented by the state, or space which may be rented by the commissioner utilizing amounts
25   which may be saved by the state as the result of the consolidation or deconsolidation of functions.

26   IV.  If the commissioner of administrative services consolidates, deconsolidates or, pursuant
27   to 2015, 276:2 or other law, has consolidated or deconsolidated, any human resources, payroll, or
28   business processing function and subsequently determines that such consolidation or deconsolidation
29   is not cost effective or beneficial to the interests of the state, the commissioner may, with the prior
30   approval of the fiscal committee of the general court, deconsolidate or reconsolidate, fully or
31   partially, any human resources, payroll, or business processing function within the executive branch
32   of state government.  As part of a deconsolidation, the commissioner, after consultation with the
33   heads of such executive branch agencies as may be affected, shall determine positions to be
34   transferred to another agency, shall determine positions to be transferred elsewhere within the
35   department of administrative services, or shall determine positions to be eliminated.

36   V.  Any unspent balance remaining of the $250,000 appropriation made by 2011, 224:86 to
37   the department of administrative services for the biennium ending June 30, 2013, for the purpose of

Amendment to HB 2-FN-A-LOCAL
- Page 6 -

selecting and retaining an independent business processing consultant to evaluate and make recommendations relative to the consolidation of business processing functions within state government, shall not lapse until June 30, 2023.  The department of administrative services may use this balance to fund such projects, functions, or activities as the commissioner of administrative services may direct relating to the efficiency of state government, including, but not limited to, the selection and retention of an independent business processing consultant and/or other projects, functions, or activities relating to the consolidation or deconsolidation of human resource, payroll, and business processing functions.

9  New Paragraphs; Department of Administrative Services; State Employee Health Plan; Application.  Amend RSA 21-I:30 by inserting after paragraph XVI the following new paragraphs:

XVII.  The cost sharing and plan design for unrepresented active state employees who participate in the health plans offered by the state shall be the same as those for individuals covered by the collective bargaining agreement between the state of New Hampshire and the State Employees' Association of New Hampshire, Inc.  Changes to the above plan design cost sharing provisions consistent with RSA 21-I:30, I are permitted with the prior approval of the fiscal committee of the general court.  The cost sharing and plan designs for represented active state employees who participate in the health plans offered by the state shall be in accordance with the provisions of the collective bargaining agreements between the state and the employee organizations representing those employees.

XVIII.  Agencies may use funds in existing class 60 budgets to pay any penalties imposed under the employer shared responsibility for health coverage under section 4980H of the Internal Revenue Code.

10  All Agencies; Electronic Mail.  Unless restricted by law or administrative rule, upon request of an intended recipient, an agency may provide documents by electronic mailing in lieu of mail.

11  Department of Administrative Services; Funding and Staffing Resource Limitations.

I.  Due to inadequate funding and staffing resources at the department of administrative services, the commissioner of the department of administrative services may suspend the obligations or requirements under RSA 21-I:7-c as it applies to addressing performance and financial legislative budget assistant audit findings from 2006, 2011, and 2014 regarding management of the employee and retiree health benefit program, including establishing rules and operational policies for the program, for each fiscal year of the biennium ending June 30, 2023.

II.  Due to inadequate funding and staffing resources at the department of administrative services, the commissioner of the department of administrative services may suspend the following requirements or obligations of the department for each fiscal year of the biennium ending June 30, 2023:

(a)  The provisions relating to identification and implementation of energy efficiency projects in compliance with the governor's executive order 2016-03.

(b)  The provisions relating to data analysis and the development of performance metrics for buildings and vehicles to monitor energy and water usage, use of fossil fuels, and greenhouse gas emissions in compliance with governor's executive order 2016-03.

(c)  Rulemaking required by RSA 21-I:14, V, standards for the provision of graphic services which will ensure efficiency and high quality work; RSA 21-I:14, VI, standards governing the purchasing and continuing ownership of graphic services equipment by agencies not exempted by RSA 21-I:12, I(e); RSA 21-I:14, VII, standards governing the allocation and use of state photocopiers by the agencies not exempted by RSA 21-I:12, I(e); RSA 21-I:14, XIII, management of the state employees and retiree group insurance program authorized by RSA 21-I:26 through 36 and the programs established in RSA 21-I:44-a and RSA 21-I:44-b; and RSA 21-I:14, XVI, public works services, including bidding for major projects as described in RSA 21-I:78, as authorized by RSA 21-I:80; RSA 21-I:81, and RSA 21-I:82, bidder qualifications, agency requests for public works services, charges and fees, selection of persons or entities to perform public works projects, public works construction and design, dispute resolution, and such other requirements or procedures relating to public works as are necessary for the division of public works design and construction to properly perform its duties and functions in accordance with applicable law.

12  Repeal.  2005, 291:3, V(c), relative to the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services, is repealed.

13  Appropriation; Department of Administrative Services.  Any remainder of the sum of $1,300,000 appropriated for the fiscal year ending June 30, 2020 to the department of administrative services for the purpose of obtaining scheduling software under 2019, 346:244 shall not lapse until June 30, 2023.  The governor is hereby authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

14  Retirement System; Medical Benefits.  Amend RSA 100-A:52, III-III-a to read as follows:

III.  In the case of group II members retired from state employment before July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall pay not less than the amounts provided in paragraph II* on account of such persons *and* shall [be paid] *pay those amounts* over to the state. [and] *Such payments shall be* used to pay for all or part of the medical benefits provided under RSA 21-I:26-36 for such persons, and the balance shall be paid by the state as provided in RSA 21-I:26-36.

III-a.  In the case of group II members retired from state employment on or after July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall pay not less than the amounts provided in paragraph II* on account of such persons *and* shall [be paid] *pay those amounts* over to the state. [and] *Such payments shall be* used to pay for all or part of the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 8 -**

1 medical benefits provided under RSA 21-I:26-36 for such persons, and the state shall pay its portion

2 as provided in RSA 21-I:26-36.  If the cost of the premium for any retired group II member and

3 spouse, surviving spouse, or any other person entitled to benefits under paragraph I shall exceed the

4 maximum under paragraph II, and the state does not elect to pay the excess cost above the amount

5 to be paid under RSA 21-I:26-36, the excess cost shall be paid by the retiree or qualified surviving

6 spouse and may be deducted from retirement benefits as provided in RSA 100-A:51.  The state may

7 require, as a condition for coverage, that the retiree or surviving spouse apply for deduction of such

8 excess cost from retirement benefits as provided in RSA 100-A:51.

9    15  Retirement System; Medical Benefits.  Amend RSA 100-A:52-b, V and VI to read as follows:

10    V.  As of July 1, 2001, in the case of group I members retired from state employment before

11 July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and also

12 under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall pay*

13 *not less than the amounts provided in paragraph III* on account of such persons *and* shall [be

14 paid] *pay those* over to the state*.* [and] *Such payments shall be* used to pay for all of part of the

15 medical benefits provided under RSA 21-I:26-36 for such persons, and the balance shall be paid by

16 the state as provided in RSA 21-I:26-36.

17    VI.  As of July 1, 2001, in the case of group I members retired from state employment on or

18 after July 1, 1991, and their beneficiaries who are eligible for coverage under this subdivision and

19 also under the provisions of RSA 21-I:26-36, [the amount payable by] the retirement system *shall*

20 *pay not less than the amounts provided in paragraph III* on account of such persons *and* shall

21 [be paid] *pay those amounts* over to the state*.* [and] *Such payments shall be* used to pay for all or

22 part of the medical benefits provided under RSA 21-I:26-36 for such persons, and the state shall pay

23 its portion as provided in RSA 21-I:26-36.  If the cost of the premium for any retired group I member

24 and spouse, surviving spouse, or any other person entitled to benefits under paragraph I shall exceed

25 the maximum under paragraph III, and the state does not elect to pay the excess cost above the

26 amount to be paid under RSA 21-I:26-36, the excess cost shall be paid by the retiree or qualified

27 surviving spouse and may be deducted from retirement benefits as provided in RSA 100-A:51.  The

28 state may require, as a condition for coverage, that the retiree or surviving spouse apply for

29 deduction of such excess cost from retirement benefits as provided in RSA 100-A:51.

30    16  Retirement System; Medical Benefits.  Amend RSA 100-A:54, III(c) to read as follows:

31    (c)  The department of administrative services shall provide information as to the total

32 monthly premium cost for each participant to the retirement system for purposes of calculating this

33 deduction.  Deducted amounts, which shall be in addition to and notwithstanding any amounts

34 payable by the retirement system pursuant to RSA 100-A:52, RSA 100-A:52-a, and RSA 100-A:52-b,

35 shall be deposited in the employee and retiree benefit risk management fund.  *The deductions*

36 *pursuant to subparagraphs (a) and (b) shall be made prior to any payments made by the*

37 *retirement system pursuant to RSA 100-A:52, RSA 100-A:52-a and RSA 100-A:52-b.*  In the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 9 -**

1    event the retiree's monthly allowance is insufficient to cover the certified contribution amount, the
2    retirement system shall so notify the department of administrative services, which shall invoice and
3    collect from the retiree and/or each applicable spouse the remaining contribution amount.  Failure to
4    remit payment of the contribution amount in full within 30 days of billing shall be grounds for
5    terminating benefits, effective from the beginning of the billing period.   Reenrollment shall be
6    dependent upon payment of any outstanding contribution or other amounts within 6 months of the
7    termination date.  The department of administrative services shall provide notice of the termination
8    of benefits as provided in RSA 21-I:30, III.

9    17  Judicial Branch; Transfer Among Accounts and Classes.  Notwithstanding any provision of
10    law to the contrary, and subject to approval of the fiscal committee of the general court, for the
11    biennium ending June 30, 2023, the supreme court may transfer funds within and among all
12    accounting units within the judicial branch as the supreme court deems necessary and appropriate
13    to address budget reductions or to respond to changes in federal laws, regulations, or programs, and
14    otherwise as necessary for the efficient management of the judicial branch.  If the supreme court
15    intends to transfer funds which would otherwise meet the transfer requirements as set forth in RSA
16    9:17-d, prior approval of the fiscal committee of the general court shall be required for transfers of
17    $100,000 or more.

18    18  Judicial Branch; Reimbursement of Sheriff's Office for Court Security.  For the biennium
19    ending June 30, 2023, the state shall reimburse the sheriff's office for court security at the rates
20    provided in the collective bargaining agreement applicable to per diem court security officers
21    employed by the judicial branch to attend any official business, for any person employed as a bailiff
22    by the sheriff's office.

23    19  New Section; Sale of Lakes Region Facility.  Amend RSA 10 by inserting after section 10 the
24    following new section:

25    10:11  Sale of Lakes Region Facility.

26         I.  In this section, "lakes region facility" means all land, easements, buildings, structures,
27    and appurtenances owned or controlled by the state of New Hampshire in the city of Laconia
28    formerly known as the Laconia State School.

29         II.  Notwithstanding any other provision of law, the governor, with approval of the executive
30    council, shall have the sole authority to sell, convey, lease, rent, exchange, transfer, abandon, or
31    otherwise dispose of any of the property, whether tangible or intangible, at the lakes region facility
32    on such terms and conditions as the governor and executive council deem appropriate and without
33    regard to any other provision of law affecting or restricting the sale, conveyance, lease, rental,
34    exchange, transfer, abandonment or other disposal of state property.

35    20  Lakeshore Redevelopment Planning Commission; Definitions; Lakes Region Facility.  Amend
36    RSA 10:5, II to read as follows:

II.    In this subdivision, "commission" means the lakeshore redevelopment planning commission, and "lakes region facility" means the former Laconia state school land and buildings and training center property*, excluding the separate parcel identified as Ahern State Park, formerly Governor's State Park, which was transferred to the division of parks and recreation in November 1994 and preserved as a state park in perpetuity pursuant to RSA 216-H*.

21  Commissioner of Health and Human Services; Quarterly Reports.  During the biennium ending June 30, 2023, the commissioner of health and human services shall make quarterly reports to the governor, the speaker of the house of representatives, and the senate president on the status of estimated Medicaid payments in relation to actual costs.  Further contents of such reports shall be as specified by the governor.

22    Department of Health and Human Services; Unfunded Positions; Authorization. Notwithstanding any other provision of law to the contrary, the department of health and human services may fill unfunded positions during the biennium ending June 30, 2023, provided that the total expenditure for such positions shall not exceed the amount appropriated for personal services.

23    Department of Health and Human Services; Bureau of Adult and Elderly Services; Congregate Housing and Services.  Congregate housing provided for under the Medicaid waiver pursuant to RSA 151-E and congregate services provided for in RSA 161-F:37 are suspended for the biennium ending June 30, 2023.

24    Department of Health and Human Services; Foster Grandparent Program.    The reimbursements to the foster grandparent program through the senior volunteer grant program, established in RSA 161-F:40, are hereby suspended for the biennium ending June 30, 2023.

25  Department of Health and Human Services; Social Services Block Grant Cost of Living Adjustment to Income Levels.  Notwithstanding any other provision of law, for the biennium ending June 30, 2023, the department of health and human services shall raise the income eligibility for elderly and adult clients under the social services block grant program each January, by the percentage amount of the cost of living increase in social security benefits on a yearly basis provided such amount is consistent with federal law and regulations relative to the social services block grant income eligibility.

26  County Reimbursement of Funds; Limitations on Payments.  Amend RSA 167:18-a to read as follows:

167:18-a  County Reimbursement of Funds; Limitations on Payments.

I.  These expenditures shall in the first instance be made by the state, but each county shall make monthly payments to the state for the amounts due under this section within 45 days from notice thereof.

(a)  Counties shall reimburse the state for expenditures for recipients for whom such county is liable who are eligible for nursing home care and are receiving services from a licensed

**Amendment to HB 2-FN-A-LOCAL**
**- Page 11 -**

1  nursing home, or in another New Hampshire setting as an alternative to a licensed nursing home
2  placement and are supported under the Medicaid home and community-based care waiver for the
3  elderly and chronically ill, as such waiver may be amended from time to time, to the extent of 100
4  percent of the non-federal share of such expenditures.  *If at any point the Federal Medical*
5  *Assistance Percentage increases, the counties' portion of the non-federal share shall be*
6  *reduced by the amount of the increased federal percentage, if allowable under federal law*
7  *and subject to any conditions on the funding.*  Expenditures shall not include payments made
8  for skilled care.

9        (b)  Counties shall not be liable for Medicaid recipients in state institutions, the Crotched
10  Mountain Rehabilitation Center, and intermediate care facilities (ICF) approved by the department
11  of health and human services and servicing developmentally impaired persons.

12      II.(a)  The total billings to all counties made pursuant to this section shall not exceed the
13  amounts set forth below for state fiscal years [2020-2021] *2022-2023*:

14          (1) State fiscal year [2020] *2022*, [$123,372,750] *$129,362,411*.

15          (2) State fiscal year [2021] *2023*, [$126,923,933] *$131,849,659*.

16      (b)  The caps on total billings for fiscal years after fiscal year 2015 shall be established by
17  the legislature at least on a biennial basis.

18      III.(a)  *The cap in total billings shall not exceed an annual increase of 2 percent in*
19  *any year of the biennium.*

20      *(b)*  The counties shall have an aggregate credit of $5,000,000 against amounts due
21  under this section for each fiscal year beginning July 1, 2008.  The credit shall be allocated as
22  follows:

23          (1)  For fiscal year 2009, $4,000,000 shall be allocated among the counties based upon
24  the proportion each paid for such expenditures in the prior fiscal year, and $1,000,000 shall be
25  allocated among the counties based upon their relative proportions of residents age 65 or older who
26  are Medicaid recipients.

27          (2)  For fiscal year 2010, $2,000,000 shall be allocated among the counties based upon
28  the proportion each paid for such expenditures in the prior fiscal year, and $3,000,000 shall be
29  allocated among the counties based upon their relative proportions of residents age 65 or older who
30  are Medicaid recipients.

31          (3)  For fiscal year 2011 and for each fiscal year thereafter, $5,000,000 shall be
32  allocated among the counties based upon their relative proportions of residents age 65 or older who
33  are Medicaid recipients.

34          *(4)  For fiscal year 2021, in addition to the $5,000,000 allocated pursuant to*
35  *subparagraph III(b)(3), a credit of $9,721,305 shall be allocated among the counties based*
36  *upon their relative proportions of residents aged 65 years of age or older who are Medicaid*
37  *recipients.*

**Amendment to HB 2-FN-A-LOCAL**
**- Page 12 -**

[(b)] *(c)*  The credit shall be made available as soon as possible after the start of the fiscal year.  The department shall adopt county credit criteria in consultation with the county-state finance commission and in accordance with the provisions of RSA 541-A.  The total aggregate obligation of the counties shall be reduced by the amount of the credit in each fiscal year.

IV.  *Budgeted general funds shall be applied to the funding of Medicaid long-term services and supports after the allocation of the credit and prior to any county funds.*

*V.*  Notwithstanding the procedures of paragraphs I-III of this section, no county shall be liable for total billings in fiscal year 2009 or fiscal year 2010 in an amount which would be greater than the amount of liability projected for that fiscal year using the methodology for determining county payments in former RSA 167:18-a, 167:18-b, and 167:18-f prior to its repeal together with the amount of liability projected for that fiscal year using the repealed methodology for determining county payments in RSA 169-B, 169-C, and 169-D.

[V.] *VI.*(a)  Any shortfall between the state audited Medicaid allowances incurred by the state's county operated nursing homes and amounts otherwise reimbursed by federal 50 percent Medicaid matching funds or other income, shall be certified as a public expenditure and be eligible for additional federal funding match.

(b)  The department of health and human services shall seek federal Medicaid assistance match for any state audited county nursing home Medicaid expense which is not fully reimbursed through rates.  Any revenue realized through such a match shall be paid to the nursing homes which incurred the unreimbursed expense.

27  Department of Health and Human Services; Prospective Repeal Regarding the Exemption from Certain Transfer Procedures Extended.  Amend 2018, 163:11, IV, as amended by 2019, 346:64 to read as follows:

IV.  Section 10 of this act shall take effect [June 30, 2021] *June 30, 2023*.

28  Effective Date.  Section 27 of this act shall take effect June 30, 2021.

29  The New Hampshire Granite Advantage Health Care Trust Fund.  Amend RSA 126-AA:3, I(e)-(g) to read as follows:

(e)  Funds received from the assessment under RSA 404-G; [and]

(f)  *Revenue from the Medicaid enhancement tax to meet the requirements provided in RSA 167:64; and*

*(g)*  Funds recovered or returnable to the fund that were originally spent on the cost of coverage of the granite advantage health care program.

30  New Subparagraph; Emergency Services for Children, Youth and Families Fund.  Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

(365)  Moneys deposited in the emergency services for children, youth and families fund established in RSA 170-G:4-h.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 13 -**

1      31   New Section; Department of Health and Human Services; Establishing the Emergency
2   Services for Children, Youth, and Families Fund.   Amend RSA 170-G by inserting after section 4-g
3   the following new section:

4      170-G:4-h   Establishing the Emergency Services for Children, Youth, and Families Fund.   There
5   is hereby established in the state treasury the emergency services for children, youth, and families
6   fund.   The funds shall be used by the department to meet the immediate needs of children and
7   families as required to ensure the department is making reasonable efforts to avoid the removal of
8   children and support reunification.   The use of these funds shall be limited to instances when there
9   are no other supports or services available to meet the immediate need in a timely manner.   The
10   funds may be comprised of public funds, gifts, grants or donations or any other source of funds.   The
11   fund shall be non-lapsing and shall be continually appropriated to the department for purposes
12   funding emergency services administered by the department, or its providers, under RSA 169-B,
13   RSA 169-C, RSA 169-D or under this chapter.

14      32   Parental Reimbursement; Child Services.   Amend 2020, 26:57, II-III to read as follows:

15      II.   Sections *12-29,* 30, 32, 33, 35, 44, 51-53 and 55 of this act shall take effect July 1, 2020.

16      III.   Sections 1-8, [12-29,] and RSA 169-C:12-f, III as inserted by section 54 of this act of shall
17   take effect January 1, 2021.

18      33   New Hampshire Department of Health and Human Services; Elimination of Parental
19   Reimbursement.   The department of health and human services shall be authorized to motion the
20   court to terminate any court orders for parental reimbursement either for on-going repayment or
21   arrears pursuant to implementation of 2020, 26:12 through 2020, 26:29 in existence as of the
22   effective date of any court order rendered pursuant to this act.

23      34   Department of Health and Human Services; Program Eligibility; Additional Revenues.   For
24   the biennium ending June 30, 2023, the department of health and human services shall not
25   authorize, without prior consultation with the house health, human services and elderly affairs
26   committee and the senate health and human services committee and the approval of the fiscal
27   committee of the general court and governor and council, any change to program eligibility
28   standards or benefit levels that might be expected to increase or decrease enrollment in the program
29   or increase expenditures from any source of funds; provided, however, that no such prior approval
30   shall be required if a change to a federal program in which the state is participating as of the
31   effective date of this section is required by federal law.

32      35   Department of Health and Human Services; Change in Federal Match Revenue.   During the
33   biennium ending June 30, 2023 any item submitted to the fiscal committee of the general court
34   which increases a draw on federal funds, as a result of miscalculation of or change in the state's
35   share of a federal match program in excess of $100,000 in an accounting unit, shall include an
36   explanation stating if any general funds have been supplanted, and if so, for what purpose those

**Amendment to HB 2-FN-A-LOCAL**
**- Page 14 -**

1  supplanted general funds will be used, and the amount of supplanted general funds anticipated to
2  lapse.

3  36  Reproductive Health Facilities.  No state funds awarded by the department of health and
4  human services to a reproductive health care facility, as defined in RSA 132:37, I, shall be used to
5  provide abortion services.  This section shall not apply to funding available from the state pursuant
6  to Title XIX of the Social Security Act to the minimum extent necessary to comply with federal
7  conditions for the state's participation in the Medicaid program.

8  37  Title.  Sections 38-39 of this act may be known and cited as the "Fetal Life Protection Act."

9  38  Legislative Findings and Purpose.

10  I.  The general court finds that:

11  (a)  The prohibition of late-term abortion is supported by history and the common law.
12  The Hippocratic Oath as Literary Text:  A Dialogue Between Law and Medicine, 2 Yale J. Health
13  Policy L. & Ethics 299, 308 (discussing the Hippocratic Oath's prohibition on abortion); Digest of
14  Justinian:  Digest 4.48.8.8 (classifying abortion as a form of homicide); 2 Bracton on Laws and
15  Customs of England 341 (S. Thorne trans. 1968) (classifying abortion as a form of homicide
16  "especially if [the fetus] is quickened"); 1 W. Blackstone, Commentaries on the Law of England 125
17  (1773) (stating that the common law has historically prohibited abortion "as soon as an infant is able
18  to stir in the mother's womb.").  The New Hampshire supreme court has observed that "The common
19  law has always been most solicitous for the welfare of the fetus in connection with its inheritance
20  rights as well as protecting it under the criminal law." *Poliquin v. Donald*, 101 N.H. 104, 107 (1957).

21  (b)  The United States Supreme Court, in holding that the United States Constitution
22  protects abortion, also stated that "The pregnant woman cannot be isolated in her privacy.  She
23  carries an embryo and, later, a fetus… The situation therefore is inherently different from marital
24  intimacy [etc.]… it is reasonable and appropriate for a State to decide that at some point in time
25  another interest, that of… [fetal] life, becomes significantly involved.  The woman's privacy is no
26  longer sole and any right of privacy she possesses must be measured accordingly." *Roe v. Wade*, 410
27  U.S. 113, 159 (1973).

28  (c)  The *Roe* Court specifically rejected the view that "the woman's right is absolute and
29  that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever
30  reason she alone chooses." *Roe v. Wade*, 410 U.S. 113, 153 (1973).

31  (d)  The *Roe* Court affirmed that "For the stage subsequent to viability, the State in
32  promoting its interest in the potentiality of human life may, if it chooses, regulate, and even
33  proscribe, abortion except where it is necessary, in appropriate medical judgment, for the
34  preservation of the life or health of the mother." *Roe v. Wade*, 410 U.S. 113, 164-165 (1973).

35  (e)  The United States Supreme Court, in rejecting the trimester framework of *Roe*,
36  reaffirmed "the State's power to restrict abortions after fetal viability, if the law contains exceptions
37  for pregnancies which endanger the woman's life or health" and stated that "the State has legitimate

## Amendment to HB 2-FN-A-LOCAL
### - Page 15 -

interests from the outset of the pregnancy in protecting... the life of the fetus that may become a child." *Planned Parenthood v. Casey*, 505 U.S. 833, 846 (1992).

(f)  Already in 1973, the Supreme Court had observed that "Viability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." *Roe v. Wade*, 410 U.S. 113, 160 (1973).  Since that time, however, there has been "dramatic improvement in survival for infants born at the border of viability (≤24 weeks)." Barbara Luke and Morton B. Brown, The changing risk of infant mortality by gestation, plurality, and race: 1989-1991 versus 1999-2001, Pediatrics, Dec. 2006, 118 (6): 2488-2497.

(g)  The Supreme Court has observed that "In some broad sense it might be said that a woman who fails to act before viability has consented to the State's intervention on behalf of the developing child." *Planned Parenthood v. Casey*, 505 U.S. 833, 870 (1992).

(h)  New Hampshire has historically seen the fetus as a separate entity from the mother with distinct legal interests. *Bennett v. Hymers*, 101 N.H. 483, 485 (1958) ("We adopt the opinion that the fetus from the time of conception becomes a separate organism and remains so throughout its life."); N.H. Rev. State. Ann § 630:1-a: IV (stating that "the meaning of 'another' shall include a fetus" under specified criminal laws).

(i)  "[R]espect for the dignity of human life" is a legitimate state purpose. *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007).  The United States Supreme Court has said that "Respect for human life finds an ultimate expression in the bond of love the mother has for her child... While we find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained." Id. at 159.

(j)  In addition, there is substantial medical evidence that a fetus by at least 20 weeks' gestation has the capacity to feel pain during an abortion. K. Anand and P. R. Hickey, Pain and its effects in the human neonate and fetus, N.E.J.M., 1987, 317:1321.

II.  Based on the findings in paragraph I, the general court's purposes in promulgating this act are:

(a)  Based on the state's interest in protecting fetal life, to prohibit abortions at or after 24 weeks gestation, except in cases of a medical emergency.

(b)  To define "medical emergency" to encompass "significant health risks," namely those circumstances in which a pregnant woman's life or a major bodily function is threatened. *Gonzales v. Carhart*, 550 U.S. 124, 161 (2007).

39  New Subdivision; Fetal Life Protection Act.  Amend RSA 329 by inserting after section 42 the following new subdivision:

Fetal Life Protection Act

329:43  Definitions.  In this subdivision:

I.  "Abortion" means the act of using or prescribing any instrument, medicine, drug, or any other substance, device, or means with the intent to terminate the clinically diagnosable pregnancy

of a woman with knowledge that the termination by those means will with reasonable likelihood cause the death of the fetus.  Such use, prescription, or means is not an abortion if done with the intent to:

(a)  Save the life or preserve the health of the fetus;

(b)  Remove a dead fetus caused by spontaneous abortion; or

(c)  Remove an ectopic pregnancy.

II.  "Attempt to perform" means an act or omission of a statutorily required act that, under the circumstances as the actor believes them to be, constitutes a substantial step in a course of conduct planned to culminate in the performance or inducement of an abortion.

III.  "Conception" means the fusion of a human spermatozoon with a human ovum.

IV.  "Gestational age" means the time that has elapsed since the first day of the woman's last menstrual period.

V.  "Major bodily function" includes, but is not limited to, functions of the immune system, normal cell growth, and digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

VI.  "Medical facility" means any public or private hospital, clinic, center, medical school, medical training institution, health care facility, physician's office, infirmary, dispensary, ambulatory surgical treatment center, or other institution or location wherein medical care is provided to any person.

VII.  "Health care provider" means any person who provides health care services.  The term includes but is not limited to medical doctors, doctors of osteopathy, nurses, or any employee of a medical facility.

VIII.  "Pregnant" or "pregnancy" means the female reproductive condition of having one or more developing embryos or fetuses implanted in the uterus or elsewhere in the female body.

IX.  "Probable gestational age" means what, in reasonable medical judgment, will with reasonable probability be the gestational age of the fetus at the time the abortion is considered, performed, or attempted.

X.  "Reasonable medical judgment" means that medical judgment that would be made by a reasonably prudent physician in the community, knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved.

XI.  "Fetus" means an unborn offspring, from the embryo stage which is the end of the twentieth week after conception or, in the case of in vitro fertilization, the end of the twentieth week after implantation, until birth.

329:44  Prohibition.

I.  Except in the case of a medical emergency as specifically defined in paragraph III, no abortion shall be performed, induced, or attempted by any health care provider unless a physician has first made a determination of the probable gestational age of the fetus.  In making such a

**Amendment to HB 2-FN-A-LOCAL**
**- Page 17 -**

1 determination, the physician shall make such inquiries of the pregnant woman and perform or cause

2 to be performed all such medical examinations, imaging studies, and tests as a reasonably prudent

3 physician in the community, knowledgeable about the medical facts and conditions of both the

4 woman and the fetus involved, would consider necessary to perform and consider in making an

5 accurate diagnosis with respect to gestational age, provided, however, that the physician shall

6 conduct an obstetric ultrasound examination of the patient for the purpose of making the

7 determination.

8   II.  Except in a medical emergency as specifically defined in paragraph III, no health care

9 provider shall knowingly perform, induce, or attempt to perform an abortion upon a pregnant

10 woman when the probable gestational age of her fetus has been determined to be at least 24 weeks

11 or in the absence of a determination by a physician pursuant to paragraph I as to the fetus' probable

12 gestational age.

13   III.  For the purposes of this subdivision only, "medical emergency" means a condition in

14 which an abortion is necessary to preserve the life of the pregnant woman whose life is endangered

15 by a physical disorder, physical illness, or physical injury, including a life-endangering physical

16 condition caused by or arising from the pregnancy itself, or when continuation of the pregnancy will

17 create a serious risk of substantial and irreversible impairment of a major bodily function, as defined

18 in RSA 329:43, V, of the pregnant woman.

19 329:45  Reporting.

20   I.  Any health care provider who performs an abortion under this subdivision shall report, in

21 writing, to the medical facility in which the abortion is performed the reason for the determination

22 that a medical emergency existed.  The health care provider's written report shall be included in a

23 written report from the medical facility to the department of health and human services.  If the

24 abortion is not performed in a medical facility, the health care provider shall report, in writing, the

25 reason for the determination that a medical emergency existed to the department of health and

26 human services as part of the written report made by the health care provider to the department.

27 The health care provider and the medical facility shall retain a copy of the written reports required

28 under this section for not less than 5 years.

29 329:46  Criminal Penalties.

30   I.  Any health care provider who fails to perform the determination required in RSA 329:44,

31 I, under circumstances where the probable gestational age is less than 24 weeks, shall be guilty of a

32 misdemeanor.

33   II.  Any health care provider who knowingly performs or induces an abortion in violation of

34 any other provision of this subdivision shall be guilty of a class B felony and, in addition to any other

35 penalties the court may impose, be fined not less than $10,000 nor more than $100,000.

36 329:47  Civil Remedies.

Amendment to HB 2-FN-A-LOCAL
- Page 18 -

I.  The woman, the father of the fetus if married to the mother at the time she receives an abortion in violation of this subdivision, and/or, if the mother has not attained the age of 18 years at the time of the abortion, the maternal grandparents of the fetus may in a civil action obtain appropriate relief, unless the pregnancy resulted from the plaintiff's criminal conduct or, if brought by the maternal grandparents, the maternal grandparents consented to the abortion.

II.  Such relief shall include monetary damages for all psychological and physical injuries caused by the violation of this subdivision.

329:48  Review by New Hampshire Board of Medicine.

I.  A defendant health care provider accused of violating this subdivision may seek a hearing before the board of medicine as to whether the health care provider's conduct was necessary to save the life of the mother whose life was endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself; and/or as to whether the continuation of the pregnancy would have created a serious risk of substantial and irreversible impairment of a major bodily function, as defined in RSA 329:43, V, of the pregnant woman.

II.  The findings on this issue are admissible at the criminal and civil trials of the defendant. Upon a motion of the defendant, the court shall delay the beginning of the trial for not more than 30 days to permit such a hearing to take place.

329:49  Construction.  Nothing in this subdivision shall be construed as creating or recognizing a right to abortion.

329:50  Severability.  If any provision of this subdivision or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the subdivision which can be given effect without the invalid provision or application, and to this end the provisions of this subdivision are declared to be severable.

40  Effective Date.  Sections 37-39 of this act shall take effect January 1, 2022.

41  Appropriation; Department of Health and Human Services.  There is hereby appropriated to the department of health and human services the sum of $3,300,000, for the biennium ending June 30, 2023, for the purpose of implementing certain recommendations, from a financial review conducted by Alvarez & Marsal, to streamline certain agency operations resulting in greater efficiencies and accountability, and involving certain transformation projects over a 4-year period. Additionally, the department may accept and expend any applicable federal funds, and any gifts, grants, or donations that may be available for the purposes of this section.  This appropriation shall not lapse until June 30, 2023.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

42   Health and Human Services; Suspension of Catastrophic Aid Payment to Hospitals.  The commissioner of the department of health and human services shall submit a Title XIX Medicaid

**Amendment to HB 2-FN-A-LOCAL**
**- Page 19 -**

1  state plan amendment to the federal Centers for Medicare and Medicaid Services to suspend all

2  catastrophic aid payments to hospitals effective for the biennium ending June 30, 2023.

3  43  Appropriation; Department of Military Affairs and Veterans Services; Support for Veterans

4  Mental Health and Social Isolation.  There is hereby appropriated to the department of military

5  affairs and veterans services the sum of $1,500,000 for the fiscal year ending June 30, 2021 for the

6  purposes of supporting services to combat struggles with mental health and social isolation.  This

7  appropriation shall not lapse until June 30, 2023.  The governor is authorized to draw a warrant for

8  said sum out of any money in the treasury not otherwise appropriated.

9  44  Effective Date.  Section 43 of this act shall take effect June 30, 2021.

10  45  New Subdivision; Controlled Drug Prescription Health and Safety Program.  Amend RSA

11  126-A by inserting after section 88 the following new subdivision:

12                        Controlled Drug Prescription Health and Safety Program

13  126-A:89  Definitions.  In this subdivision:

14      I.(a)  "Chronic pain" means a state in which pain persists beyond the usual course of an acute

15  disease or healing of an injury, or that might or might not be associated with an acute or chronic

16  pathologic process that causes continuous or intermittent pain over months or years.  It also includes

17  intermittent episodic pain that might require periodic treatment.

18          (1)  For the purpose of this subdivision, chronic pain does not cover or in any way

19  determine treatment for pain from terminal disease.

20          (2)  For the purpose of this subdivision, chronic pain includes but may not be limited

21  to pain defined as "chronic," "intractable," "high impact," "chronic episodic," and "chronic relapsing."

22      (b)  A diagnosis of chronic pain made by a practitioner licensed in any of the states in the

23  United States or the District of Columbia and supported by written documentation of the diagnosis

24  by the treating practitioner shall constitute proof that the patient suffers from chronic pain.

25      II.  "Commissioner" means the commissioner of the department of health and human

26  services.

27      III.  "Controlled substance" means controlled drugs as defined in RSA 318-B:1, VI.

28      IV.  "Department" means the department of health and human services, established in RSA

29  126-A:4.

30      V.  "Dispense" means to deliver a controlled substance by lawful means and includes the

31  packaging, labeling, or compounding necessary to prepare the substance for such delivery.

32      VI.  "Dispenser" means a person or entity who is lawfully authorized to deliver a schedule II-

33  IV controlled substance, but does not include:

34      (a)  A licensed hospital pharmacy that dispenses less than a 48-hour supply of a schedule

35  II-IV controlled substance from a hospital emergency department or that dispenses for

36  administration in the hospital;

37      (b)  A practitioner, or other authorized person who administers such a substance;

Amendment to HB 2-FN-A-LOCAL
- Page 20 -

1    (c)  A wholesale distributor of a schedule II-IV controlled substance or its analog;

2    (d)  A prescriber who dispenses less than a 48-hour supply of a schedule II-IV controlled

3    substance from a hospital emergency department to a patient; or

4    (e)  A veterinarian who dispenses less than a 48-hour supply of a schedule II-IV

5    controlled substance to a patient.

6    VII.  "Patient" means the person or animal who is the ultimate user of a controlled substance

7    for whom a lawful prescription is issued and for whom a controlled substance or other such drug is

8    lawfully dispensed.

9    VIII.  "Practitioner" means a physician, dentist, podiatrist, veterinarian, pharmacist, APRN,

10    physician assistant, naturopath, or other person licensed or otherwise permitted to prescribe,

11    dispense, or administer a controlled substance in the course of licensed professional practice.

12    "Practitioner" shall also include practitioners with a federal license to prescribe or administer a

13    controlled substance.

14    IX.  "Prescribe" means to issue a direction or authorization, by prescription, permitting a

15    patient to lawfully obtain controlled substances.

16    X.  "Prescriber" means a practitioner or other authorized person who prescribes a schedule

17    II, III, or IV controlled substance.

18    XI.  "Program" means the controlled drug prescription health and safety program that

19    electronically facilitates the confidential sharing of information relating to the prescribing and

20    dispensing of controlled substances listed in schedules II-IV, established by the department

21    pursuant to RSA 126-A:90.

22    126-A:90  Controlled Drug Prescription Health and Safety Program Established.

23    I.  The department shall design, establish, and contract with a third party for the

24    implementation and operation of an electronic system to facilitate the confidential sharing of

25    information relating to the prescribing and dispensing of schedule II-IV controlled substances, by

26    prescribers and dispensers within the state.

27    II.  The department may establish fees for the establishment, administration, operations and

28    maintenance of the program.  The program may also be supported through grants and gifts.  The fee

29    charged to individuals requesting their own prescription information shall not exceed the actual cost

30    of providing that information.

31    III.  Prescription information held by the program relating to any individual shall be deleted

32    3 years after the initial prescription was dispensed.  All de-identified data may be kept for statistical

33    and analytical purposes in perpetuity.

34    IV.  The commissioner shall establish an advisory council, as provided in RSA 126-A:96.

35    126-A:91  Controlled Drug Prescription Health and Safety Program Operation.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 21 -**

I.  The department shall develop a system of registration for all prescribers and dispensers of schedule II-IV controlled substances within the state.  The system of registration shall be established by rules adopted by the department, pursuant to RSA 541-A.

II.  All prescribers and dispensers authorized to prescribe or dispense schedule II-IV controlled substances within the state shall be required to register with the program as follows:

(a)  Practitioners who prescribe but do not dispense schedule II-IV controlled substances shall register with the program as a prescriber;

(b)  Practitioners who dispense but do not prescribe schedule II-IV controlled substances shall register with the program as a dispenser unless exempted pursuant to RSA 126-A:89, VI; and

(c)  Practitioners who prescribe and dispense schedule II-IV controlled substances shall register with the program as both a prescriber and a dispenser unless exempted pursuant to RSA 126-A:89, VI.

III.  Only registered prescribers, dispensers, or their designees, and federal health prescribers and dispensers working in federal facilities located in New Hampshire, Massachusetts, Maine, and Vermont shall be eligible to access the program.

IV.  The chief medical examiner and delegates may register and access the program.

V.  Each dispenser shall submit to the program the information regarding each dispensing of a schedule II-IV controlled substance.  Any dispenser located outside the boundaries of the state of New Hampshire and who is licensed and registered by the pharmacy board, established in RSA 318:2, shall submit information regarding each prescription dispensed to a patient who resides within New Hampshire.

VI.  Each dispenser required to report under paragraph V of this section shall submit to the program by electronic means information for each dispensing that shall include, but not be limited to:

(a)  Dispenser's Drug Enforcement Administration (DEA) registration number.

(b)  Prescriber's DEA registration number.

(c)  Date of dispensing.

(d)  Prescription number.

(e)  Number of refills granted.

(f)  National Drug Code (NDC) of drug dispensed.

(g)  Quantity dispensed.

(h)  Number of days supply of drug.

(i)  Patient's name.

(j)  Patient's address.

(k)  Patient's date of birth.

(l)  Patient's telephone number, if available.

(m)  Date prescription was written by prescriber.

1    (n)  Whether the prescription is new or a refill.

2    (o)  Source of payment for prescription.

3    VII.(a)   Except as provided in subparagraphs (b) and (c), each dispenser shall submit the
4    required information in accordance with transmission methods daily by the close of business on the
5    next business day from the date the prescription was dispensed.

6        (b)  Veterinarians shall submit the information required under subparagraph (a) no more
7    than 7 days from the date the prescription was dispensed.

8        (c)  Dispensers who have a federal Drug Enforcement Administration license, but who do
9    not dispense controlled substances may request a waiver from the requirements of subparagraph (a)
10   from the department.

11       VIII.  The program administrator may issue a waiver to a dispenser that is unable to submit
12   prescription information by electronic means.  Such waiver may permit the dispenser to submit
13   prescription information by paper form or other means, provided all information required by
14   paragraph VI is submitted in this alternative format and within the established time limit.

15       IX.  The program administrator may grant a reasonable extension to a dispenser that is
16   unable, for good cause, to submit all the information required by paragraph V within the established
17   time limits.

18       X.  Any dispenser who in good faith reports to the program as required by paragraphs V and
19   VI shall be immune from any civil or criminal liability as the result of such good faith reporting.

20   126-A:92  Confidentiality.

21       I.  Information contained in the program, information obtained from it, and information
22   contained in the records of requests for information from the program, is confidential, is not a public
23   record or otherwise subject to disclosure under RSA 91-A, and is not subject to discovery, subpoena,
24   or other means of legal compulsion for release and shall not be shared with an agency or institution,
25   except as provided in this subdivision.  This paragraph shall not prevent a practitioner from using or
26   disclosing program information about a patient to others who are authorized by state or federal law
27   or regulations to receive program information.

28       II.  The department shall establish and maintain procedures to ensure the privacy and
29   confidentiality of patients and patient information.

30       III.  The department may use and release information and reports from the program for
31   program analysis and evaluation, statistical analysis, public research, public policy, and educational
32   purposes, provided that the data are aggregated or otherwise de-identified at all levels of use.  The
33   department shall not acquire, use or release information from the program for these purposes unless
34   all patient-specific protected health information has been de-identified in accordance with section
35   164.514(b)(2) of the HIPAA Privacy Rule.

36   126-A:93  Providing Controlled Drug Prescription Health and Safety Information.

1      I.  The program administrator may provide information in the prescription health and safety

2 program upon request only to the following persons:

3      (a)  By electronic or written request to prescribers, dispensers, and the chief medical

4 examiner and delegates within the state who are registered with the program:

5      (1)  For the purpose of providing medical or pharmaceutical care to a specific patient

6 with whom the requester has a practitioner-patient relationship.  This shall not include department

7 staff seeking to access the program for state, federal or private agency purposes, or on behalf of the

8 department or other requesting agency;

9      (2)  For reviewing information regarding prescriptions issued or dispensed by the

10 requester; or

11      (3)  For the purpose of investigating the death of an individual.

12      (b)  By written request, to:

13      (1)  A patient who requests his or her own prescription monitoring information.

14      (2)  The board of dentistry, the board of medicine, the board of nursing, the board of

15 registration in optometry, the board of podiatry, the board of veterinary medicine, and the pharmacy

16 board;  provided, however, that the request is pursuant to the boards' official duties and

17 responsibilities and the disclosures to each board relate only to its licensees and only with respect to

18 those licensees whose prescribing or dispensing activities indicate possible fraudulent conduct.

19      (3)  Authorized law enforcement officials on a case-by-case basis for the purpose of

20 investigation and prosecution of a criminal offense when presented with a court order based on

21 probable cause.  No law enforcement agency or official shall have direct access to query program

22 information.

23      (4)  A practitioner or consultant retained by the state to review the system

24 information of an impaired practitioner program participant or a referral who has agreed to be

25 evaluated or monitored through the program and who has separately agreed in writing to the

26 consultant's access to and review of such information.

27      (c)  By electronic or written request on a case-by-case basis to:

28      (1)  A controlled prescription drug health and safety program from another state;

29 provided, that there is an agreement in place with the other state to ensure that the information is

30 used or disseminated pursuant to the requirements of this state.

31      (2)  An entity that operates a secure interstate prescription drug data exchange

32 system for the purpose of interoperability and the mutual secure exchange of information among

33 prescription drug monitoring programs, provided that there is an agreement in place with the entity

34 to ensure that the information is used or disseminated pursuant to the requirements of this state.

35      II.  The program administrator shall notify the appropriate regulatory board listed in

36 subparagraph I(b)(2) and the prescriber or dispenser at such regular intervals as may be established

37 by the department if there is reasonable cause to believe a violation of law or breach of professional

1 standards may have occurred.  The program administrator shall provide prescription information
2 required or necessary for an investigation.

3    III.  The program administrator shall review the information to identify information that
4 appears to indicate whether a person may be obtaining prescriptions in a manner that may
5 represent misuse or abuse of schedule II-IV controlled substances.  When such information is
6 identified, the program administrator shall notify the practitioner who prescribed the prescription.

7    IV.  The program administrator shall make a report, at least annually, commencing on
8 November 1, 2021, to the senate president, the speaker of the house of representatives, the oversight
9 committee on health and human services, established in RSA 126-A:13, the advisory council
10 established in RSA 126-A:96 and the licensing boards of all professions required to use the program
11 relative to the effectiveness of the program.

12 126-A:94  Unlawful Act and Penalties.

13    I.  Any dispenser or prescriber who fails to submit the information required in RSA 126-A:91
14 or knowingly submits incorrect information shall be subject to a warning letter and provided with an
15 opportunity to correct the failure.  Any dispenser or prescriber who subsequently fails to correct or
16 fails to resubmit the information may be subject to discipline by the appropriate regulatory board.

17    II.  Any dispenser or prescriber whose failure to report the dispensing of a schedule II-IV
18 controlled substance that conceals a pattern of diversion of controlled substances into illegal use
19 shall be guilty of a violation and subject to the penalties established under RSA 318-B:26 and the
20 department's and appropriate regulatory board's rules as applicable.  In addition, such dispenser or
21 prescriber may be subject to appropriate criminal charges if the failure to report is determined to
22 have been done knowingly to conceal criminal activity.

23    III.  Any person who engages in prescribing or dispensing of controlled substances in
24 schedule II-IV without having registered with the program may be subject to discipline by the
25 appropriate regulatory board.

26    IV.  Any person, including department staff, authorized to receive program information who
27 knowingly discloses such information in violation of this subdivision shall be subject to discipline by
28 the appropriate regulatory board and to all other relevant penalties under state and federal law.

29    V.  Any person authorized to receive program information who uses such information for a
30 purpose in violation of this subdivision shall be subject to disciplinary action by the appropriate
31 regulatory board and to all other relevant penalties under state and federal law.

32    VI.  Unauthorized use or disclosure of program information shall be grounds for disciplinary
33 action by the relevant regulatory board.

34    VII.  Any person who knowingly accesses, alters, destroys, or discloses program information
35 except as authorized in this subdivision or attempts to obtain such information by fraud, deceit,
36 misrepresentation, or subterfuge shall be guilty of a class B felony.

Amendment to HB 2-FN-A-LOCAL
- Page 25 -

1    126-A:95  Rulemaking.  The department shall adopt rules, pursuant to RSA 541-A, necessary to
2    implement and maintain the program including:

3         I.  The criteria for registration by dispensers and prescribers.

4         II.  The criteria for a waiver pursuant to RSA 126-A:91, VIII for dispensers with limited
5    electronic access to the program.

6         III.  The criteria for reviewing the prescribing and dispensing information collected by the
7    program.

8         IV.  The criteria for reporting matters to the applicable health care regulatory board for
9    further investigation.

10        V.  The criteria for notifying practitioners of individuals that are engaged in obtaining
11   controlled substances from multiple practitioners or dispensers.

12        VI.  Content and format of all forms required under this subdivision.

13   126-A:96  Advisory Council Established.

14        I.  There is hereby established an advisory council to carry out the duties under this
15   subdivision.  Members of the council shall not be compensated for serving on the council, or serve on
16   the council for more than one 5-year term except for the attorney general, or designee, or the
17   commissioner of the department of health and human services, or designee.  The members of the
18   council shall be as follows:

19        (a)  A member of the board of medicine, appointed by such board.

20        (b)  A member of the pharmacy board, appointed by such board.

21        (c)  A member of the board of dental examiners, appointed by such board.

22        (d)  A member of the New Hampshire board of nursing, appointed by such board.

23        (e)  A member of the board of veterinary medicine, appointed by such board.

24        (f)  A physician appointed by the New Hampshire Medical Society.

25        (g)  A dentist appointed by the New Hampshire Dental Society.

26        (h)  A chief of police appointed by the New Hampshire Association of Chiefs of Police.

27        (i)  A community pharmacist appointed jointly by the New Hampshire Pharmacists
28   Association, the New Hampshire Independent Pharmacy Association, and the New Hampshire
29   Association of Chain Drug Stores.

30        (j)  Two public members appointed by the governor's commission on alcohol and drug
31   abuse prevention, treatment, and recovery, one of whom may be a member of the commission.

32        (k)  A hospital administrator appointed by the New Hampshire Hospital Association.

33        (l)  A nurse practitioner appointed by the New Hampshire Nurse Practitioner
34   Association.

35        (m)  A veterinarian appointed by the New Hampshire Veterinary Medical Association.

36        (n)  The attorney general, or designee.

37        (o)  The commissioner of the department of health and human services, or designee.

1    (p)  A member of the senate, appointed by the president of the senate.

2    (q)  Two members of the house of representatives, appointed by the speaker of the house

3    of representatives.

4    II.  The council shall:

5    (a)  Make recommendations to the department relating to the design, implementation,

6    and maintenance of the program, including recommendations relating to:

7        (1) Rules.

8        (2) Legislation.

9        (3)  Sources of funding, including grant funds and other sources of federal, private, or

10   state funds;

11   (b)  Review the program's annual report and make recommendations to the department

12   regarding the operation of the program.

13   (c)  Provide ongoing advice and consultation on the implementation and operation of the

14   program, including recommendations relating to:

15       (1) Changes in the program to reflect advances in technology and best practices.

16       (2) Changes to statutory requirements.

17       (3)  The design and implementation of an ongoing evaluation component of the

18   program.

19   (d)  Advise the commissioner regarding the implementation of this subdivision.

20   (e)  Adopt rules necessary for the operation of the council.

21   (f)   Develop a mission statement for the program and strategic goals for its

22   implementation, develop metrics in conjunction with the legislative budget assistant to measure the

23   program's efficient operation, review the performance of the program against the metrics, and make

24   recommendations to the program and ensure they are incorporated.

25   III.  The council shall meet at least quarterly to effectuate its goals.  A chairperson shall be

26   elected by the members.  A majority of the members of the council constitutes a quorum for the

27   transaction of business.  Action by the council shall require the approval of a majority of the

28   members of the council.

29   IV.  Members of the advisory council, previously established in RSA 318-B:38, shall be

30   appointed as members of the advisory council established under this section to the extent possible.

31   126-A:97  Competency Requirements.  Except for veterinarians who shall complete continuing

32   education requirements in accordance with RSA 332-B:7-a, XV, all prescribers required to register

33   with the program who possess a United States Drug Enforcement Administration (DEA) license

34   number shall complete 3 contact hours of free appropriate prescriber's regulatory board-approved

35   online continuing education or pass an online examination, in the area of pain management and

36   addiction disorder or a combination, as a condition for initial licensure and license renewal.

37   Verification of successful completion of the examination or of the required continuing education shall

be submitted to the prescriber's regulatory board with the licensee's application for initial licensure or renewal.  A list of the prescriber's regulatory boards' approved continuing education courses and online examinations in pain management and addiction disorder, shall be available on the department of health and human service's Internet website.

46  Repeal.   OPLC; Controlled Drug Prescription Health and Safety Program.   RSA 318-B:31-38, relative to the controlled drug prescription health and safety program, are repealed.

47  Reference Corrected.  Veterinary Board.  Amend RSA 332-B:3, I (b) to read as follows:

(b)   Representing the board on the advisory council established in RSA [318-B:38] *126-A:96*;

48  Revenue Sharing; Suspension.  RSA 31-A, relative to revenue sharing with cities and towns shall be suspended for the biennium ending June 30, 2023.

49  Liquor Commission; Processing of Merchant Cards.  For the biennium ending June 30, 2023, the liquor commission, for purposes of supporting merchant card activity, may:

I.   Implement necessary business strategies in the event of a disaster or loss of services to insure the continuity of the commission's business operations, including the processing of merchant cards, which includes the ability to transfer funds from accounting unit 01-03-03-030010-7677 in consultation with the commissioner of the department of information technology.  The commissioner shall report to the fiscal committee of the general court within 30 days any instances where it would need to implement such business strategies, including any costs and loss of revenue associated with the disaster or loss of services and the implementation of such business strategies.

II.   Enter into contracts for technical and hosting services to support retail operations and merchant card processing.  The commission shall comply with RSA 176:18 for any contracts entered into to support retail operations and merchant card processing.

III.   Hire information technology technical support personnel to support its merchant card activity and related technical support operations in retail stores.

50  Department of Education; Acceptance of Gifts.  For the biennium ending June 30, 2023, the department of education may, subject to the approval of the governor and council, accept gifts, contributions, and bequests of unrestricted funds from individuals, foundations, corporations, and other organizations or institutions for the purpose of funding appropriations for New Hampshire scholars made in accounting unit 06-56-56-562010-7534.

51  Certain Differential Aid Calculations; Fiscal Year 2022.

I.   Average Daily Membership in Attendance; Fiscal Year 2022.  The commissioner of the department of education shall compare the average daily membership in attendance (ADMA), defined in RSA 198:38, for each district and town for school year 2019-2020 and school year 2020-2021.  The greater enrollment shall be used to calculate the cost of an opportunity for an adequate education under RSA 198:40-a and relief funding under RSA 198:40-e for the fiscal year ending June 30, 2022.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 28 -**

II.  When determining ADMA for third grade pupils scoring below proficiency on the reading component of the state assessment as required by RSA 198:40-a, II(e) for the fiscal year ending June 30, 2022, the commissioner of the department of education shall compare the ADMA for this category of differentiated aid in school year 2018-2019 and school year 2020-2021.  The greater ADMA shall be used to calculate the cost of an opportunity for an adequate education under RSA 198:40-a, II(e) for the fiscal year ending June 30, 2022.

52  Conditional Differential Aid Calculation For Pupils Eligible for a Free or Reduced Price Meal; Fiscal Year 2023.

I.  If, as of any of the dates set forth in RSA 198:41, V, VI, or VII, either (a) the state of New Hampshire is in a declared state of emergency pursuant to RSA 4:45 as it relates to the COVID-19 pandemic or (b) the U.S. Department of Agriculture has not rescinded the Child Nutrition Covid-19 Waivers enacted in response to the pandemic, or both, then the department of education shall, in consultation with the governor, determine whether the alternative differential aid calculation set forth in paragraph II is required for fiscal year 2023 when making the required estimate or final determination described in RSA 198:41, V, VI, or VII as applicable.

II.  Upon making a determination that the alternative differential aid calculation applies pursuant to paragraph I, the department of education shall divide each pupil in the ADMA who is eligible for a free or reduced price meal by the average daily member in attendance (ADMA), defined in RSA 198:38, for each district and town for school year 2019-2020.  The percentage shall be applied to the ADMA for school year 2021-2022 to establish a new calculation of ADMA for who is eligible for a free or reduced price meal.  The greater of the ADMA of pupils who are eligible for a free or reduced price meal for school year 2021-2022 and the new calculation based on the 2019-2020 school year percentage shall be used to calculate the differential aid under RSA 198:40-a, II(b) and relief aid under RSA 198:40-e.

53  New Section; Relief Funding.  Amend RSA 198 by inserting after section 40-d the following new section:

198:40-e  Relief Funding.

I.  In a school district in which 48 percent or more of the ADMA is eligible to receive a free or reduced-priced meal, an additional $600 for each pupil in the ADMA who is eligible for a free or reduced-priced meal.

II.  In a school district in which at least 12 percent but less than 48 percent of the ADMA is eligible to receive a free or reduced-priced meal, an amount equal to $150 plus $0.1250 for each 0.01 percent that its free or reduced-priced meal eligibility rate exceeds 12 percent, for each pupil in the ADMA who is eligible for a free or reduced-priced meal.

III.  A school district in which less than 12 percent of the ADMA is eligible to receive a free or reduced-priced meal shall receive no additional aid under this section.

Amendment to HB 2-FN-A-LOCAL
- Page 29 -

IV.  The department of education shall adjust aid to each district calculated under this section to the statewide total of $17,500,000.  Adjustments under this paragraph shall be made on a pro-rata basis.

54  Additional Aid to Education.  The governing body of a school district may call a special meeting pursuant to RSA 197:3-a to determine how any adjustment in education aid shall be budgeted.

55  Transfer; Education Trust Fund.  At the close of the fiscal year ending June 30, 2021, the state treasurer shall transfer the sum of $35,000,000 from the education trust fund surplus to a restricted account under the department of education for purposes of providing relief funding pursuant to RSA 198:40-e for fiscal years 2022 and 2023.

56  Effective Date.  Section 55 of this act shall take effect June 30, 2021.

57  New Subparagraph.  Amend RSA 198:41, I by inserting after subparagraph (c) the following new subparagraph:

(d)  Add the municipality's additional aid for relief funding pursuant to RSA 198:40-e.

58  Department of Education; State Maintenance of Equity; Biennium Ending June 30, 2023.

I.  For the biennium ending June, 30, 2023, the department of education shall determine, in consultation with the governor, whether the state of New Hampshire is compliant with the state maintenance of equity requirements of Section 2004(b) of the American Rescue Plan Act of 2021.  If it is determined that the high-need and highest poverty local educational agencies as referenced in Section 2004(b) and defined in Section 2004(d) of the American Rescue Plan Act of 2021 have experienced a greater reduction in state aid per pupil than the state maintenance of equity requirements permit under the American Rescue Plan Act for either fiscal year 2022 or 2023, the department of education, with the approval of the fiscal committee of the general court, shall increase state aid to such agencies to bring the state into compliance.

II.  If state aid is increased pursuant to paragraph I to achieve compliance with Section 2004(b) of the American Rescue Plan Act of 2021, the department of education shall determine if the increase brings the state into compliance by eliminating an overall per-pupil reduction in state funds, in which case the department shall issue the state aid on a prorated basis to the local educational agency or agencies needing an increase in state aid in order to achieve compliance.

III.  Any state aid distributed under this section shall be an education grant in addition to the state grant calculated under RSA 198:41 and shall be distributed to school districts accordingly.  Depending on how the United States Department of Education allows states to define "pupil" as it relates to determining state aid per pupil under Section 2004(b) of the American Rescue Plan Act of 2021, the department of education may experience delays in accurately collecting pupil data to meet the definition as defined by the United States Department of Education, thereby delaying the calculation of the grant award.  If such delay occurs, the department of education may issue the

Amendment to HB 2-FN-A-LOCAL
- Page 30 -

1   grants described in this section up to 120 days after the end of the applicable fiscal year being
2   assessed for compliance with federal law.

3        IV.   In seeking fiscal committee approval and establishing grants under this section, the
4   department of education may calculate the grants in manner that increases the likelihood of
5   compliance with Section 2004(b) of the American Rescue Plan Act of 2021 while utilizing the
6   minimum amount of state resources.  The department of education may also make minor rounding
7   adjustments to the grant awards under the condition all rounding adjustments are applied in a
8   consistent and uniform manner.

9        V.   In the event grants are required to be disbursed to districts, the commissioner of
10  education may request the fiscal committee of the general court to authorize additional funding.
11  Funds requested and approved shall be a charge to the education trust fund.  Such warrants for
12  payment shall be issued regardless of the balance of funds available in the education trust fund.  If
13  the balance in the education trust fund, after the issuance of any such warrant, is less than zero, the
14  comptroller shall transfer sufficient funds from the general fund to eliminate such deficit.  The
15  commissioner of the department of administrative services shall inform the fiscal committee and the
16  governor and council of such balance.  This reporting shall not in any way prohibit or delay the
17  distribution of any grant or transfer of funds authorized under this chapter.

18  59  Appropriation; Department of Education.  For the biennium ending June 30, 2023, the sum of
19  $3,000,000 is hereby appropriated to the department of education for the purpose of funding
20  operating costs for a state student data collection and reporting system.  Said appropriation shall be
21  a charge against the education trust fund.

22  60  Education Trust Fund Created and Invested.  Amend RSA 198:39, I to read as follows:

23        I.  The state treasurer shall establish an education trust fund in the treasury.  Moneys in
24  such fund shall not be used for any purpose other than to distribute adequate education grants to
25  municipalities' school districts and to approved charter schools pursuant to RSA 198:42, to provide
26  low and moderate income homeowners property tax relief under RSA 198:56-198:61, *to distribute*
27  *school building aid to school districts and approved chartered public schools pursuant to*
28  *RSA 198:15-b, to distribute tuition and transportation funds to school districts for students*
29  *attending career and technical education programs pursuant to RSA 188-E:9, to distribute*
30  *special education aid to school districts pursuant to RSA 186-C:18, to fund department of*
31  *education operating costs for a state student data collection and reporting system,* and to
32  fund kindergarten programs as may be determined by the general court.  The state treasurer shall
33  deposit into this fund immediately upon receipt:

34        (a)  Funds certified to the state treasurer by the commissioner of revenue administration
35  pursuant to RSA 77-A:20-a, relative to business profits taxes.

36        (b)  Funds certified to the state treasurer by the commissioner of revenue administration
37  pursuant to RSA 77-E:14, relative to business enterprise tax.

Amendment to HB 2-FN-A-LOCAL
- Page 31 -

1       (c)  Funds collected and paid over to the state treasurer by the commissioner of revenue
2 administration pursuant to RSA 78-A:26, III relative to the tax on motor vehicle rentals.

3       (d)  Funds collected and paid over to the state treasurer by the department of revenue
4 administration pursuant to RSA 78:24, relative to tobacco taxes.

5       (e)  Funds certified to the state treasurer by the commissioner of revenue administration
6 pursuant to RSA 78-B:13, relative to real estate transfer taxes.

7       (f)  Funds collected and paid over to the state treasurer by the department of revenue
8 administration pursuant to RSA 83-F:7, I, relative to the utility property tax.

9       (g)  [Repealed.]

10       (h)  All moneys due the fund in accordance with RSA 284:21-j, relative to sweepstakes
11 and the lottery.

12       (i)  Tobacco settlement funds in the amount of $40,000,000 [annually] or, ***for any year***
13 ***in which the total tobacco settlement funds received by the state is less than $40,000,000,***
14 ***the total amount of tobacco settlement funds received by the state***.

15       (j)  The school portion of any revenue sharing funds distributed pursuant to RSA 31-A:4
16 which were apportioned to school districts in the property tax rate calculations in 1998.

17       (k)  Funds collected and paid over to the state treasurer by the lottery commission
18 pursuant to RSA 284:44, RSA 284:47, and RSA 287-I.

19       (l)  Any other moneys appropriated from the general fund.

20     61  Transfer; Education Trust Fund.  The comptroller shall transfer the following amounts from
21 the education trust fund to the public school infrastructure fund established in RSA 198:15-y:
22 $1,000,000 on July 1, 2021 and $1,000,000 on July 1, 2022.

23     62  Public School Infrastructure Fund.  Amend RSA 198:15-y to read as follows:

24     198:15-y  Public School Infrastructure Fund.

25       I.  The general court recognizes that there is a need to provide funding for infrastructure
26 projects for public elementary and secondary schools.  Therefore, it is the intent of this chapter to
27 designate certain surplus funds in the 2016-2017 biennial budget to provide grants to fund select
28 school infrastructure projects in accordance with this chapter.

29       II.   There is hereby established in the office of the state treasurer the public school
30 infrastructure fund which shall be kept distinct and separate from all other funds and which shall be
31 administered by the department of education.  After transferring sufficient funds to the revenue
32 stabilization reserve account to bring the balance of that account to $100,000,000, the state treasurer
33 shall transfer the remainder of the general fund surplus for fiscal year 2017, as determined by the
34 official audit performed pursuant to RSA 21-I:8, II(a), to the fund.  Any earnings on fund moneys
35 shall be added to the fund.  All moneys in the fund shall be nonlapsing and continually appropriated.
36 The department of education may retain up to 3 percent of the total annual appropriation of the
37 public school infrastructure fund on or after July 1, 2019, to be used to administer the public school

1  infrastructure program.  [Any unexpended or unencumbered balance as of June 30, 2021 shall be
2  transferred to the general fund.]

3      III.  The governor, in consultation with the public school infrastructure commission, may
4  authorize fund expenditures with approval of the fiscal committee of the general court and the
5  executive council.  Funds may be expended for the following purposes:

6      (a)  A school building or infrastructure proposal in which the condition of such school
7  building or portion thereof constitutes a clear and imminent danger to the life or safety of occupants
8  or other persons and requires remediation as soon as practicable.

9      (b)  A school building or infrastructure proposal in which a structural deficiency in the
10  function or operation of a school building or portion thereof presents a substantial risk to the life or
11  safety of the occupants or other persons and is more than a technical violation of the fire code, and
12  requires remediation as soon as practicable.

13      (c)  Support of fiber optic connections for schools to enhance and improve reliance on
14  Internet technology tools, provided matching funds are available.

15      (d)  Funding for the department of safety, division of homeland security and emergency
16  management's school emergency readiness program to improve security in public schools, after the
17  completion of a security assessment, and in consultation with municipal officials.

18      (e)  A school building or infrastructure proposal which is necessary to comply with
19  Americans with Disabilities Act (ADA) regulations.

20      (f)  ***Energy efficient school buses or other vehicles used for transportation of***
21  ***students.***

22      ***(g)***  Other school building or infrastructure needs the governor, in consultation with the
23  public school infrastructure commission, may identify, except for school building aid projects that are
24  otherwise prohibited by law.

25      ***IV.  In order for a school to be eligible for a grant from the public school***
26  ***infrastructure fund, the public school infrastructure commission in consultation with the***
27  ***department of education shall determine that the school has a need unmet by federal***
28  ***stimulus funds for the project.***

29  63  Repeal.  2017, 156:72, relative to the prospective repeal of the public school infrastructure
30  fund and commission, is repealed.

31  64  Department of Agriculture, Markets, and Food; Integrated Pest Management Program.
32  Amend RSA 430:50, II to read as follows:

33      II.  There is established a nonlapsing fund to be known as the integrated pest management
34  fund.  Twenty-five percent of the pesticide registration fees collected under RSA 430:38, III shall be
35  deposited in the fund.  The fund shall only be used to support the purposes of the integrated pest
36  management program ***and the division of pesticide control***.  The state treasurer may invest
37  moneys in the fund as provided by law and all interest received on such investment shall be credited

1   to the fund.  The commissioner shall be authorized to accept grants, gifts, and donations from any

2   public or private sources for deposit in the fund.

3       65  Department of Business and Economic Affairs; New Hampshire Economic Development

4   Fund.  Amend RSA 12-O:21 to read as follows:

5       12-O:21  New Hampshire Economic Development Fund.

6          I.  There is hereby established the New Hampshire economic development fund which shall

7   be administered by the commissioner of the department of business and economic affairs.  Said fund

8   shall be for the purpose of providing funds for grants, loans and other economic development

9   initiatives which shall be generally considered to be beneficial to the state's overall economy as

10  provided for in paragraph II.

11       II.  Said fund shall be distributed or expended by the commissioner with prior approval of

12  the fiscal committee of general court and the governor and council for any of the following purposes:

13         (a)  Business financing and expansion initiatives.

14         (b)  [Job] *Workforce recruitment* retention and creation.

15         (c)  International trade.

16         (d)  Research and development activities.

17         (e)  Other projects or programs recognized as being beneficial to business activity in New

18  Hampshire.

19       III.  To maximize the economic impact of expenditures from this fund, and to leverage

20  additional funding from other sources, the commissioner may contract with such organizations as,

21  but not limited to, the following:

22         (a)  [New Hampshire Business Development Corporation] *Chambers of commerce*.

23         (b)  [Small Business Investment Corporation] *Regional economic development or*

24  *planning organizations*.

25         (c)  Innovation Research Center.

26         (d)  Small Business Development Center.

27       IV.  All moneys *appropriated to the fund as well as moneys* returned to the department

28  as a result of contracts between the commissioner and any other party as authorized shall be

29  redeposited into the New Hampshire economic development fund.  In addition, the department may

30  accept gifts, grants, donations or other moneys for the purposes of this section.  Said moneys shall be

31  deposited into the New Hampshire economic development fund.

32       66  New Section; Department of Business and Economic Affairs; Director of Intergovernmental

33  Affairs.  Amend RSA 12-O by inserting after section 5 the following new section:

34       12-O:5-a  Director of Intergovernmental Affairs.

35         I.  There is established in the office of the commissioner the unclassified position of director

36  of intergovernmental affairs.  The director shall be qualified to hold that position by reason of

1 education and experience and shall perform such duties as the commissioner from time to time may
2 authorize.

3     II.  The commissioner shall nominate for appointment by the governor, with the consent of
4 the council, this unclassified director of intergovernmental affairs who shall serve for a term of 4
5 years.

6     III.  The salary of the director of intergovernmental affairs shall be determined after
7 assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for
8 the position which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

9     IV.  Upon completion of the appointment of the first director of intergovernmental affairs,
10 position number 40049 shall be abolished to allow for the transition of this classified position with
11 its available appropriations into the unclassified position of director of intergovernmental affairs.
12 Funding shall be transferred into a new expenditure class number 11 within accounting unit 03-22-
13 22-220010-2007.

14     67  Repeal.  RSA 12-O:11-a, relative to the bureau of film and digital media, is repealed.

15     68  Reference Deleted.  Department of Business and Economic Affairs.  Amend RSA 12-O:2, I
16 to read as follows:

17     I.  There shall be a department of business and economic affairs under the executive
18 direction of a commissioner of business and economic affairs, consisting of a division of economic
19 development which shall include but not be limited to a bureau of workforce development, and a
20 division of travel and tourism development which shall include but not be limited to a bureau of
21 visitor service [and a bureau of film and digital media].  The department's purpose shall be to ensure
22 the efficient coordinated function of the department, economic development policies of the state of
23 New Hampshire and the collaborative participation of all related state departments, agencies, and
24 authorities.

25     69  Distribution of Meals and Rooms Tax; Division of Travel and Tourism Development.  The
26 provisions of RSA 12-O:11-b, crediting a portion of meals and rooms tax revenue to the division of
27 travel and tourism development, are hereby suspended for the biennium ending June 30, 2023.

28     70  Department of Corrections; Transfer Authority.  The following classes within the department
29 of corrections shall be exempt from the transfer restrictions in RSA 9:17-a, 9:17-c, classes 10-
30 personal services-perm classified, 11-personal services unclassified, 12-personal services-
31 unclassified, 18-overtime, 19-holiday pay, 50-personal service-temp/appointed and 60-benefits.  The
32 department is authorized to transfer funding in these classes within and amongst all accounting
33 units provided that any transfer of $100,000 or more shall require prior approval of the fiscal
34 committee of the general court and governor and council.  The provisions in this paragraph shall
35 remain in effect for the biennium ending June 30, 2023.

36     71  Equipment Purchases.  Amend RSA 622:28-a,V to read as follows:

Amendment to HB 2-FN-A-LOCAL
- Page 35 -

V.  All purchases of materials, supplies, and equipment into the inventory account shall be made in accordance with the provisions of RSA 21-I:11 and any equipment purchase in excess of [$5,000] *the approval threshold for contracts set by the governor and council manual of procedures*, and made under the provisions of this section, shall require the prior approval of both the fiscal committee of the general court and the governor and council.

72  Department of Environmental Services; Appropriation Extended.  Amend 2019, 346:304, I to read as follows:

I.  The sum of $6,000,000 for the fiscal year ending June 30, 2020 is hereby appropriated to the department of environmental services for the purpose of studying, investigating, and testing for contamination caused by perfluorinated chemicals, and the preliminary design for a treatment system for such contamination.  This appropriation shall not lapse until June 30, [2021] *2023*.  Such appropriation shall be a charge against the drinking water and groundwater trust fund established in RSA 6-D:1.

73  Effective Date.  Section 72 of this act shall take effect June 30, 2021.

74  State Aid Grants; Department of Environmental Services.

I.  Notwithstanding RSA 486, for the biennium ending June 30, 2023, no state aid grants shall be made for any new infrastructure projects that would have otherwise been eligible for state aid grants under RSA 486, RSA 486-A, or RSA 149-M, except that infrastructure projects that have achieved substantial completion by December 31, 2019, shall be eligible for state aid grants, subject to availability of funding and in accordance with other provisions of current law.  Nothing in this section shall affect the provision of the future water supply land protection grants under RSA 486-A if funding is available for such purposes.

II.  The sum of $15,576,939 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of environmental services for the purpose of funding payments on existing grants.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.  Said appropriation shall not lapse until  June 30, 2023.

75  Effective Date.  Section 74 of this act shall take effect June 30, 2021.

76  Office of Professional Licensure and Certification; Renaming and Reorganizing of Divisions.  Amend RSA 310-A:1-a to read as follows:

310-A:1-a  Office of Professional Licensure and Certification; Division of [Technical Professions] *Licensing and Board Administration* and Division of [Health Professions] *Enforcement* Established.  There shall be an office of professional licensure and certification that shall consist of the division of [technical professions] *licensing and board administration* and the division of [health professions] *enforcement*.

I.  The [division of technical professions] *office of professional licensure and certification* shall consist of each of the boards, councils, and commissions of:

(a)  Professional engineers under RSA 310-A:3.

1      (b)  Architects under RSA 310-A:29.

2      (c)  Land surveyors under RSA 310-A:55.

3      (d)  Natural scientists under RSA 310-A:81.

4      (e)  Foresters under RSA 310-A:100.

5      (f)  Professional geologists under RSA 310-A:120.

6      (g)  Landscape architects under RSA 310-A:142.

7      (h)  Court reporters under RSA 310-A:163.

8      (i)  Home inspectors under RSA 310-A:186.

9      (j)  Accountants under RSA 309-B:4.

10     (k)  Manufactured housing installers under RSA 205-D:2.

11     (l)  Real estate appraisers under RSA 310-B:4.

12     (m)  Electricians under RSA 319-C:4.

13     (n)  Board of manufactured housing under RSA 205-A:25.

14     (o)  Guardians ad litem under RSA 490-C:1.

15     (p)  Family mediators under RSA 328-C:4.

16     (q)  Real estate commission under RSA 331-A:5.

17     (r)  Septic system evaluators under RSA 310-A:206.

18     [II.  The division of health professions shall consist of each of the boards, councils,

19     commissions, and practices of:

20     [(a)] *(s)*  Hearing care providers under RSA [137-F:3] *326-F and RSA 328-F*.

21     [(b)] *(t)*  Examiners of nursing home administrators under RSA 151-A:3.

22     [(c)] *(u)*  Podiatry under RSA 315:1.

23     [(d)] *(v)*  Chiropractic examiners under RSA 316-A:2.

24     [(e)] *(w)*  Dental examiners under RSA 317-A:2.

25     [(f)] *(x)*  Registration of funeral directors and embalmers under RSA 325:2.

26     [(g)] *(y)*  Midwifery council under RSA 326-D:3.

27     [(h)] *(z)*  Licensed dietitians under RSA 326-H:7.

28     [(i)] *(aa)*  Optometry under RSA 327:2.

29     [(j)] *(bb)*  Naturopathic board of examiners under RSA 328-E:7.

30     [(k)] *(cc)*  Licensed allied health professionals under RSA 328-F:3.

31     [(l)] *(dd)*  Acupuncture licensing under RSA 328-G:3.

32     [(m)] *(ee)*  Psychologists under RSA 329-B:3.

33     [(n)] *(ff)*  Mental health practice under RSA 330-A:3.

34     [(o)] *(gg)*  Licensing for alcohol and other drug use professionals under RSA 330-C:3.

35     [(p)] *(hh)*  Electrologists under RSA 314:2-a.

36     [(q)] *(ii)*  Body art practitioners under RSA 314-A.

37     [(r)] *(jj)*  Ophthalmic dispensers under RSA 327-A:2.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 37 -**

1       [(s)] *(kk)*  Reflexology, structural integrators, and Asian bodywork therapists under RSA

2 328-H:6.

3       [(t)] *(ll)*  Massage therapists under RSA 328-B:5.

4       [(u)] *(mm)*  Medicine under RSA 329:2.

5       [(v)] *(nn)*  Nursing under RSA 326-B:3 and nursing assistant registry under RSA 326-

6 B:26.

7       [(w)] *(oo)*  Pharmacy under RSA 318:2.

8       [(x)] *(pp)*  Barbering, cosmetology, and esthetics under RSA 313-A:2.

9       [(y)] *(qq)*  Medical technicians under RSA 328-I:2.

10       [(z)] *(rr)*  Medical imaging and radiation therapists under RSA 328-J:1.

11       *(ss)*  *Board of veterinary medicine under RSA 332-B.*

12       *(tt)*  *Mechanical licensing board under RSA 153:27-a.*

13     [III.] *II.*  Administrative rules adopted pursuant to RSA 541-A governing the licensing

14 boards, commissions, and councils set forth in [paragraphs I and II] *paragraph I* shall remain in

15 effect until amended, expired, or repealed.

16     77  Temporary Licensing Process; Reference Change.  Amend RSA 310-A:1-f, I to read as follows:

17     I.  Health care professionals shall [be defined as] *include* those individuals licensed by the

18 boards, councils, and commissions within the [division of health professions] *office of professional*

19 *licensure and certification* as set forth in RSA 310-A:1-a, [II, with the exception of those licensed

20 pursuant to RSA 314, RSA 314-A, RSA 313, RSA 328-B, and RSA 328-H] *who perform specified*

21 *medical or ancillary services within the scope of his or her authority, as determined by the*

22 *executive director*.

23     78  Telemedicine; Reference Change.  Amend RSA 310-A:1-g, IV to read as follows:

24     IV.  Notwithstanding any provision of law to the contrary, an out-of-state healthcare

25 professional providing services by means of telemedicine or telehealth shall be required to be

26 licensed, certified, or registered by the appropriate licensing board within the [division of health

27 professions] *office of professional licensure and certification*.  This paragraph shall not apply to

28 out-of-state physicians who provide consultation services pursuant to RSA 329:21, II.

29     79  Office of Professional Licensure and Certification; Division Directors; Unclassified Positions

30 Established.  Amend RSA 310-A:1-c to read as follows:

31     310-A:1-c  Division Directors*; Pharmacy Compliance Investigators*.

32     I.  There is established in the office of professional licensure and certification 2 unclassified

33 directors:  The director of the division of [technical professions] *licensing and board*

34 *administration* and director of the division of [health professions] *enforcement*.  Each director

35 shall be qualified to hold that position by reason of education and experience and shall perform such

36 duties as the executive director from time to time may authorize.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 38 -**

II.  The executive director shall nominate for appointment by the governor, with the consent of the council, each unclassified division director, each of whom shall serve for a term of 4 years.

*III.  There are established in the office of professional licensure and certification the unclassified position of chief pharmacy compliance investigator and 2 unclassified pharmacy investigator positions.  Each investigator shall be qualified for the position by reason of education and experience, shall be nominated by the executive director for appointment by the governor and council, and shall serve at the pleasure of the executive director.  The chief pharmacy compliance investigator shall oversee pharmacy compliance and investigations, shall supervise the pharmacy compliance investigators, and shall perform such duties as the executive director from time to time may authorize.*

80  Office of Professional Licensure and Certification; Classified Positions Abolished; Funding Transfered to Unclassified Positions.

I.  Upon the appointment of a chief pharmacy compliance investigator and 2 pharmacy investigators to the office of professional licensure and certification, the following positions shall be abolished to allow for the transition of these classified positions with their available appropriations into the unclassified positions established in RSA 310-A:1-c, III.  Funding shall be transferred into expenditure class 011, within accounting unit 01-21-21-216010-33020000.  The incumbents in the abolished classified positions shall be offered the opportunity to seek the executive director's nomination for the unclassified positions:

(a)  Pharmacy Board Compliance Investigator, 22008.

(b)  Pharmacy Board Compliance Investigator, 14337.

(c)  Program Specialist I/Assistant Pharmacy Inspector, 17094.

II.  The salary of the unclassified positions shall be determined after assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the positions which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

81  Office of Professional Licensure and Certification; Fees.  Amend RSA 310-A:1-e, I to read as follows:

I.(a)  The executive director of the office of professional licensure and certification shall assess annual or biennial license, certification, and renewal fees, as well as any necessary administrative fees for each professional regulatory board, council, or commission administered by the office.  *Such fees shall be sufficient to produce estimated revenues up to 125 percent of the total operating expenses for the office, as determined by averaging the operating expenses for the office for the previous 2 fiscal years.*

(b)  There is hereby established the office of professional licensure and certification fund into which the fees collected under subparagraph (a) shall be deposited.  After paying all costs and salaries associated with the office, moneys in this fund shall lapse to the general fund at the close of each [fiscal year] *biennium*.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 39 -**

82  Mechanical Licensing Board; Transfer to Office of Professional Licensure and Certification. Amend the introductory paragraph of RSA 153:27-a to read as follows:

153:27-a  Mechanical Licensing Board.  There is hereby established as a unit within the [division of fire safety a mechanical licensing board] *office of professional licensure and certification*. The term of office for the members appointed to the board shall be 3 years and until a successor is appointed.  The initial appointed members of the board shall serve staggered terms.  Vacancies shall be filled in the same manner and for the unexpired terms.  No member of the board shall be appointed to more than 2 consecutive terms.  A member of the board shall serve as the board secretary.

83  Appropriation; Internet Crimes Against Children Fund.  The sum of $250,000 for the fiscal year ending June 30, 2022, and the sum of $250,000 for the fiscal year ending June 30, 2023, are hereby appropriated to the New Hampshire Internet crimes against children fund established in RSA 21-M:17.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

84  Attorney/Administrator.  Amend RSA 359-P:4 to read as follows:

359-P:4  Attorney/Administrator.  The director shall [hire/appoint a private] *hire an* attorney or administrator who shall [collect gifts and contributions,] review applications for assistance submitted pursuant to this chapter, make awards of assistance in accordance with the procedures of this chapter, and report annually to the director commencing on February 1, [2017] *2022* and each February 1 thereafter.  The director shall negotiate the attorney's or administrator's [compensation which in any calendar year shall be no more than 10 percent of any private sector contributions received in that calendar year] *salary and benefit level in accordance with similar levels within the department*.

85  Appropriation; FRM Victims' Contribution Recovery Fund.  For the purpose of awarding recovery assistance to victims of the FRM fraud, there is hereby appropriated the sum of $5,000,000 for the fiscal year ending June 30, 2022, and the sum of $5,000,000 for the fiscal year ending June 30, 2023, to the FRM victims' contribution recovery fund established in RSA 359-P:2.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

86  Repeal of the Prospective Repeal of FRM Fund.  2016, 293:6, relative to the July 1, 2023 repeal of the FRM victims' contribution recovery fund in RSA 359-P:2, is repealed.

87  Revenue Stabilization Account; Cap.  Amend RSA 9:13-e, V to read as follows:

V.  If, after the requirements of paragraphs II-IV have been met and the balance remaining in the revenue stabilization reserve account is in excess of an amount equal to 10 percent of the actual general fund unrestricted revenues for the most recently completed fiscal [year] *biennium*, then such excess, less any amounts deposited pursuant to RSA 7:6-e, shall be transferred, without further action, to the general fund surplus account.

1   88   Appropriation; Department of Health and Human Services.   The sums of $12,401,552 in

2   fiscal year 2022 and $13,031,765 in fiscal year 2023 are hereby appropriated to the department of

3   health and human services for the purpose of funding one-time maintenance of the legacy Medicaid

4   management information system as the department transitions to new modular information

5   technology systems.   The department may accept and expend matching federal funds without prior

6   approval of the fiscal committee.   The governor is authorized to draw a warrant for said sum out of

7   any money in the treasury not otherwise appropriated.

8   89   Rate.   Amend RSA 77:1 to read as follows:

9   77:1   Rate.

10   *I.*   The annual tax upon incomes shall be levied at the rate of 5 percent *for all taxable*

11   *periods ending before December 31, 2023.*

12   *II.   The annual tax upon incomes shall be levied at the rate of 4 percent for all*

13   *taxable periods ending on or after December 31, 2023.*

14   *III.   The annual tax upon incomes shall be levied at the rate of 3 percent for all*

15   *taxable periods ending on or after December 31, 2024.*

16   *IV.   The annual tax upon incomes shall be levied at the rate of 2 percent for all*

17   *taxable periods ending on or after December 31, 2025.*

18   *V.   The annual tax upon incomes shall be levied at the rate of 1 percent for all*

19   *taxable periods ending on or after December 31, 2026*.

20   90   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 14-B:8, III(q) to read as

21   follows:

22   (q)   New Hampshire taxes, specifying if business profits tax[,] *or* business enterprise

23   tax[, or interest and dividends tax].

24   91   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 15-A:5, I(d)(17) to read

25   as follows:

26   (17)   New Hampshire taxes, specifying if business profits tax[,] *or* business

27   enterprise tax[, or interest and dividends tax].

28   92   Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:31 to read as

29   follows:

30   21-J:31   Penalty for Failure to File.   Any taxpayer who fails to file a return when due, unless an

31   extension has been granted by the department, shall pay a penalty equal to 5 percent of the amount

32   of the tax due or $10, whichever is greater, for each month or part of a month during which the

33   return remains unfiled.   The total amount of any penalty shall not, however, exceed 25 percent of

34   the amount of the tax due or $50, whichever is greater.   This penalty shall not be applied in any

35   case in which a return is filed within the extended filing period as provided in [RSA 77:18-b,]

36   RSA 77-A:9, RSA 77-E:8, RSA 83-C:6, RSA 83-E:5, RSA 84-A:7, or RSA 84-C:7, or the failure to file

37   was due to reasonable cause and not willful neglect of the taxpayer.   The amount of the penalty is

Amendment to HB 2-FN-A-LOCAL
- Page 41 -

1    determined by applying the percentages specified to the net amount of any tax due after crediting

2    any timely payments made through estimating or other means.

3        93  Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:33-a, I to read as

4    follows:

5        I.  If there is a substantial understatement of tax imposed under [RSA 77,] RSA 77-A,

6    RSA 77-E, RSA 78-A, RSA 78-C, RSA 82-A, RSA 83-C, RSA 83-E, or RSA 84-A for any taxable

7    period, there shall be added to the tax an amount equal to 25 percent of the amount of any

8    underpayment attributable to such understatement.

9        94  Reference to Interest and Dividends Tax Deleted; 2027.   Amend RSA 21-J:46, III to read as

10    follows:

11        III.  This section shall apply only to tax returns and associated payments under [RSA 77,]

12    RSA 77-A[,] and RSA 77-E.

13        95  References to Interest and Dividends Tax Deleted; 2027.   Amend RSA 71-C:4, I and II to

14    read as follows:

15        I.  On or before December 15 of every fiscal year the commissioner of the department of

16    revenue administration shall certify in a report to the general court and the governor an analysis of

17    each of the past fiscal year's tax expenditures as identified in RSA 71-C:2, and other credits allowed

18    under [RSA 77,] RSA 77-A, RSA 77-E, RSA 77-G, RSA 78, RSA 78-A, 78-B, RSA 82-A, RSA 83-E,

19    RSA 84-A, RSA 84-C, and RSA 400-A.

20        II.  The report shall be divided into the following parts:

21        (a)   Tax expenditures as determined by the joint committee on tax expenditure review

22    under RSA 71-C:3;

23        (b)   Potential liabilities against the state's revenues, specifically:

24        (1)   Other credits allowed under [RSA 77,] RSA 77-A, RSA 77-E, RSA 77-G, RSA 78,

25    RSA 78-A, RSA 78-B, RSA 82, RSA 82-A, RSA 83-E, RSA 84-A, RSA 84-C, and RSA 400-A against

26    the business profits tax imposed by RSA 77-A; and

27        (2)   Credit carryovers from overpaid taxes.

28        96  Education Tax Credit Scholarship Organizations; 2027.   Amend RSA 77-G:3 to read as

29    follows:

30    77-G:3    Contributions to Scholarship Organizations.    For each contribution made to a

31    scholarship organization, a business organization, business enterprise, or individual may claim a

32    credit equal to 85 percent of the contribution against the business profits tax due pursuant to RSA

33    77-A, against the business enterprise tax due pursuant to RSA 77-E, [against the tax on interest and

34    dividends under RSA 77,] or apportioned against each provided the total credit granted shall not

35    exceed the maximum education tax credit allowed.   Credits provided under this chapter shall not be

36    deemed taxes paid for the purposes of RSA 77-A:5, X.   The department of revenue administration

37    shall not grant the credit without a scholarship receipt.    No business organization, business

1   enterprise, or individual shall direct, assign, or restrict any contribution to a scholarship
2   organization for the use of a particular student or nonpublic school.   No business organization,
3   business enterprise, or individual shall receive more than 10 percent of the aggregate amount of tax
4   credits permitted in RSA 77-G:4.

5       97  Education Tax Credit Scholarship Organizations; 2027.   Amend RSA 77-G:5, I, (i)(2) to read
6   as follows:

7               (2)   Not knowingly award a scholarship to any lineal descendant or equivalent step-
8   person of any proprietor, partner, or member of any business organization, business enterprise, or
9   individual making a contribution to a scholarship organization and claiming a credit against the
10   business profits tax[,] *or* business enterprise tax, [or tax on interest and dividends,] nor any lineal
11   descendant or equivalent step-person of any officer, director, or owner of more than a 5 percent
12   interest in any business organization, business enterprise, or individual making a contribution to a
13   scholarship organization and claiming a credit against the business profits tax[,] *or* business
14   enterprise tax, [or tax on interest and dividends,] nor any employee who is among the highest-paid
15   20 percent of paid employees in any business organization, business enterprise, or individual making
16   a contribution to a scholarship organization and claiming a credit against the business profits tax[,]
17   *or* business enterprise tax[, or tax on interest and dividends].

18       98  Issuance of Electric Rate Reduction Bonds; 2027.   Amend RSA 369-B:5, VI to read as follows:

19               VI.   The exercise of the powers granted by this chapter shall be in all respects for the benefit
20   of the people of this state, for the increase of their commerce, welfare, and prosperity, and as the
21   exercise of such powers shall constitute the performance of an essential public function, neither any
22   electric utility, any affiliate of any electric utility, any financing entity, nor any collection or other
23   agent of any of the foregoing shall be required to pay any taxes or assessments upon or in respect of
24   any revenues or property received, acquired, transferred, or used by any electric utility, any affiliate
25   of any electric utility, any financing entity, or any collection or other agent of any of the foregoing
26   under the provisions of this chapter or upon or in respect of the income therefrom, and any rate
27   reduction bonds shall be treated as notes or bonds of a political subdivision of the state [for purposes
28   of RSA 77].

29       99  Repeals; Interest and Dividends Taxation; 2027.   The following are repealed:

30               I.   RSA 21-J:45, I(c), relative to reports on status of requested interest and dividends tax
31   refunds.

32               II.   RSA 77, relative to taxation of incomes.

33               III.   RSA 77-A:4-c, II(c), relative to the duty of a committee to study the taxation of
34   distributions received by investment organizations under the interest and dividends tax.

35               IV.   RSA 77-A:4, I, relative to an adjustment to the business profits tax for taxes under
36   RSA 77.

1      V.   RSA 195-H:10, relative to exemption from RSA 77 for income and distributions from
2 qualified tuition programs.

3      VI.   RSA 195-K:4, relative to exemption from RSA 77 for income and distributions in the
4 ABLE savings account program.

5      VII.   RSA 261:52-a, relative to notice that the interest and dividends tax may be due.

6      VIII.   RSA 391:3, relative to the taxation of common trust funds under RSA 77.

7      100   Returns for Interest and Dividends Taxes; 2027.   All persons who are liable for a tax under
8 RSA 77 as of December 31, 2026, who thereafter are no longer liable for a tax under RSA 77 because
9 of the passage of this act shall make a return of such taxes due the commissioner of revenue
10 administration in such manner and on such forms as the commissioner shall prescribe in rules
11 adopted under RSA 541-A.   The administrative provisions of RSA 77 shall remain in effect to permit
12 the audit and collection of taxes upon income taxable under RSA 77 which is received by persons
13 subject to taxation under that chapter through December 31, 2026, and to permit the distribution of
14 that revenue.   Persons who are liable for a tax under RSA 77 who do not report the payment of
15 federal income taxes on a calendar year basis are entitled to such proportion of the exemptions
16 allowed in RSA 77 as the reporting period bears to their taxable year.

17      101   Application; Repeal of RSA 77.   Paragraph II of section 99 shall apply to taxable periods
18 beginning after December 31, 2026.

19      102   Effective Date.

20      I.   Section 89 this act shall take effect January 1, 2022.

21      II.   Sections 90-100 of this act shall take effect January 1, 2027.

22      103   Imposition of Tax.   Amend RSA 78-A:6 to read as follows:

23      78-A:6   Imposition of Tax.

24      I.   A tax of [9] *8.5* percent of the rent is imposed upon each occupancy.

25      II.   A tax is imposed on taxable meals based upon the charge therefor as follows:

26      (a)   Four cents for a charge between $.36 and $.37 inclusive;

27      (b)   Five cents for a charge between $.38 and $.50 inclusive;

28      (c)   Six cents for a charge between $.51 and $.62 inclusive;

29      (d)   Seven cents for a charge between $.63 and $.75 inclusive;

30      (e)   Eight cents for a charge between $.76 and $.87 inclusive;

31      (f)   Nine cents for a charge between $.88 and $1.00 inclusive;

32      (g)   [Nine] ***Eight and a half*** percent of the charge for taxable meals over $1.00, provided
33 that fractions of cents shall be rounded up to the next whole cent.

34      II-a.   A tax of [9] *8.5* percent is imposed upon the gross rental receipts of each rental.

35      III.   The operator shall collect the taxes imposed by this section and shall pay them over to
36 the state as provided in this chapter.

1    104  Applicability.  RSA 78-A:6, as amended by section 103 of this act, shall be applicable to

2    taxable periods beginning on or after October 1, 2021.

3    105  Effective Date.  Sections 103-104 of this act shall take effect upon its passage.

4    106  Business Enterprise Tax; Returns.  Amend RSA 77-E:5, I to read as follows:

5          I.  Every business enterprise having gross business receipts in excess of [$200,000] *$250,000*

6    as defined by RSA 77-E:1, X, during the taxable period or the enterprise value tax base of which is

7    greater than [$100,000] *$250,000* shall, on or before the fifteenth day of the third month in the case

8    of enterprises required to file a United States partnership tax return, and the fifteenth day of the

9    fourth month in the case of all other business enterprises, following expiration of its taxable period,

10   make a return to the commissioner.  For tax years beginning January 1, 2015, the commissioner

11   shall biennially adjust these threshold amounts rounding to the nearest $1,000 based on the 2-year

12   (24-month) percentage change in the Consumer Price Index for All Urban Consumers, Northeast

13   Region as published by the Bureau of Labor Statistics, United States Department of Labor using the

14   amount published for the month of June in the year prior to the start of the tax year.  All returns

15   shall be signed by the business enterprise or by its authorized representative, subject to the pains

16   and penalties of perjury and the penalties provided in RSA 21-J:39.

17   107  Applicability.  RSA 77-E:5, I, as amended by section 106 of this act, shall be applicable to

18   taxable periods ending on or after December 31, 2022.

19   108  Effective Date.  Sections 106-107 of this act shall take effect January 1, 2022.

20   109  Business Enterprise Tax; Rate Reduced.  Amend RSA 77-E:2 to read as follows:

21   77-E:2  Imposition of Tax.

22         I.  For all taxable periods ending on or after December 31, 2019, a tax is imposed at the rate

23   of 0.6 percent upon the taxable enterprise value tax base of every business enterprise.

24         II.  For all taxable periods ending on or after December 31, [2021] *2022*, a tax is imposed at

25   the rate of [0.675] *0.55* percent upon the taxable enterprise value tax base of every business

26   enterprise.

27         [III.  For all taxable periods ending on or after December 31, 2021, a tax is imposed at the

28   rate of 0.5 percent upon the taxable enterprise value tax base of every business enterprise.

29         IV.  Upon completion of the audited comprehensive annual report performed pursuant to

30   RSA 21-I:8, II(a), the commissioner of the department of revenue administration shall report the

31   total amount of combined unrestricted general and education trust fund revenue collected for the

32   fiscal year ending June 30, 2020, as reported in the schedule of undesignated/unassigned fund

33   balance for the general fund and education fund, to the secretary of state with copies to the governor,

34   speaker of the house of representatives, the senate president, the fiscal committee of the general

35   court, and the director of the office of legislative services.  If the combined amount of general and

36   education trust fund revenue collected, not including sums appropriated to the education trust fund

37   in section 386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more below the

1    ~~official revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph II~~
2    ~~and the rate in paragraph III shall not take effect.  If the combined amount of general and education~~
3    ~~trust fund revenue collected, not including sums appropriated to the education trust fund in section~~
4    ~~386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more above the official~~
5    ~~revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph III and the~~
6    ~~rate in paragraph II shall not take effect.  If the combined amount of general and education trust~~
7    ~~fund revenue collected, not including sums appropriated to the education trust fund in section 386 of~~
8    ~~this act, for the fiscal year ending June 30, 2020 is not 6 percent or more below or above the official~~
9    ~~revenue estimates for said fiscal year, the tax shall continue to be imposed at the rate in paragraph~~
10   ~~I, and the rates in paragraphs II and III shall not take effect.]~~

11       110  Business Profits Tax; Rate Reduced; Contingency Deleted.  Amend RSA 77-A:2 to read as
12   follows:

13       77-A:2  Imposition of Tax.

14           I.  For all taxable periods ending on or after December 31, 2019, a tax is imposed at the rate
15   of 7.7 percent upon the taxable business profits of every business organization.

16           II.  [~~For all taxable periods ending on or after December 31, 2021, a tax is imposed at the~~
17   ~~rate of 7.9 percent upon the taxable business profits of every business organization.~~

18           ~~III.~~]  For all taxable periods ending on or after December 31, [~~2021~~] *2022*, a tax is imposed at
19   the rate of [~~7.5~~] *7.6* percent upon the taxable business profits of every business organization.

20           [~~IV.  Upon completion of the audited comprehensive annual report performed pursuant to~~
21   ~~RSA 21-I:8, II(a), the commissioner of the department of revenue administration shall report the~~
22   ~~total amount of combined unrestricted general and education trust fund revenue collected for the~~
23   ~~fiscal year ending June 30, 2020, as reported in the schedule of undesignated/unassigned fund~~
24   ~~balance for the general fund and education fund, to the secretary of state with copies to the governor,~~
25   ~~speaker of the house of representatives, the senate president, the fiscal committee of the general~~
26   ~~court, and the director of the office of legislative services.  If the combined amount of general and~~
27   ~~education trust fund revenue collected, not including sums appropriated to the education trust fund~~
28   ~~in section 386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more below the~~
29   ~~official revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph II~~
30   ~~and the rate in paragraph III shall not take effect.  If the combined amount of general and education~~
31   ~~trust fund revenue collected, not including sums appropriated to the education trust fund in section~~
32   ~~386 of this act, for the fiscal year ending June 30, 2020 is 6 percent or more above the official~~
33   ~~revenue estimates for said fiscal year, the tax shall be imposed at the rate in paragraph III and the~~
34   ~~rate in paragraph II shall not take effect.  If the combined amount of general and education trust~~
35   ~~fund revenue collected, not including sums appropriated to the education trust fund in section 386 of~~
36   ~~this act, for the fiscal year ending June 30, 2020 is not 6 percent or more below or above the official~~

1 revenue estimates for said fiscal year, the tax shall continue to be imposed at the rate in paragraph

2 I, and the rates in paragraphs II and III shall not take effect.]

3     111  Effective Date.  Sections 109-110 of this act shall take effect upon its passage.

4     112   New Section; Business Profits Tax; Clarification of PPP Loans.   Amend RSA 77-A by

5 inserting after section  3-b the following new section:

6     77-A:3-c   Clarification of Tax Treatment of Paycheck Protection Program (PPP) Loans.   In

7 determining gross business profits for any period, before net operating loss and special deductions,

8 notwithstanding any other provision of law, a business organization shall apply the provisions of the

9 United States Internal Revenue Code consistent with the following adjustments:

10     I.   No amount shall be included in the gross business income of the eligible recipient by

11 reason of forgiveness of indebtedness issued or created under the federal Paycheck Protection

12 Program (PPP) which was first established under the federal Coronavirus Aid, Relief, and Economic

13 Security Act (P.L. 116-136, enacted March 3, 2020) or issued or created under the federal PPP

14 Second Draw Loan Program established under the federal Consolidated Appropriations Act, 2021

15 (P.L. 116-260, enacted December 27, 2020).

16     II.   No deduction shall be denied, no tax attribute shall be reduced, and no basis increase

17 shall be denied, by reason of the exclusion from gross business income provided by paragraph I.

18     III.   This section shall apply to taxable years ending after March 3, 2020, corresponding with

19 the date of the enactment of the federal Coronavirus Aid, Relief, and Economic Security Act.

20     113   Meals and Rooms Tax; Disposition of Revenue; Fund Established.   Amend RSA 78-A:26 to

21 read as follows:

22     78-A:26  Disposition of Revenue.

23     I.  Beginning on July 1, 1995, and for each fiscal year thereafter, the department shall pay

24 over all revenue, except revenues identified in [paragraph III] *paragraphs II and III* of this

25 section, collected under this chapter to the state treasurer.  On or before September 15 of each year,

26 the department shall determine the cost of administration of this chapter for the fiscal year ending

27 on the preceding June 30, and it shall notify the state treasurer of these costs by a report certified by

28 them as to correctness.   After deducting the cost of administration of the chapter from the total

29 income, the state treasurer shall distribute the net income as follows:

30     (a)   The amount necessary to provide payments of principal and interest on the bonds

31 and notes authorized under RSA 198:15-a, II for the fiscal years ending June 30, 2009 through June

32 30, 2030; *and*

33     [(b)  [Repealed];

34     (c)  Forty percent of the net income under the introductory paragraph of paragraph I of

35 the most recent fiscal year to the unincorporated towns, unorganized places, towns, and cities.  The

36 amount to be distributed to each such town, place, or city shall be determined by multiplying the

37 amount to be distributed by a fraction, the numerator of which shall be the population of the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 47 -**

1  unincorporated town, unorganized place, town or city and the denominator of which shall be the

2  population of the state.  The population figures shall be based on the latest resident population

3  figures furnished by the office of strategic initiatives; and

4  [(d)] *(b)*  The remainder to the general fund.

5  II.  [Each fiscal year, the amount to be distributed shall be equal to the prior year's

6  distribution plus an amount equal to 75 percent of any increase in the income received from the

7  meals and rooms tax for the fiscal year ending on the preceding June 30, not to exceed $5,000,000,

8  until such time as the total amount distributed annually is equal to the amount indicated in

9  subparagraph I(c).

10  III.]  Beginning on July 1, 1999, and for each fiscal year thereafter, the department shall pay

11  over all revenue collected pursuant to RSA 78-A:6, II-a to the state treasurer for deposit in the

12  education trust fund established by RSA 198:39.

13  ***III.  On or before December 1, 2021 and each December 1 thereafter, 30 percent of the***

14  ***net income determined under the introductory paragraph of paragraph I of the most recent***

15  ***fiscal year, after deductions for the cost of administration and revenues deposited in the***

16  ***education trust fund pursuant to paragraph II, shall be deposited into the meals and***

17  ***rooms municipal revenue fund for distribution to the unincorporated towns, unorganized***

18  ***places, towns, and cities.  The amount to be distributed to each such town, place, or city***

19  ***shall be determined by multiplying the total amount to be distributed by a fraction, the***

20  ***numerator of which shall be the population of the unincorporated town, unorganized***

21  ***place, town, or city and the denominator of which shall be the population of the state.  The***

22  ***population figures shall be based on the latest resident population figures furnished by the***

23  ***office of strategic initiatives.***

24  ***IV.   There is hereby established in the treasury the meals and rooms municipal***

25  ***revenue fund.  Any money deposited into the meals and rooms municipal revenue fund***

26  ***shall be nonlapsing and continually appropriated to the state treasurer for distribution to***

27  ***the unincorporated towns, unorganized places, towns, and cities pursuant to paragraph***

28  ***III***.

29  114  New Subparagraph; Treasury; Application of Receipts.  Amend RSA 6:12, I(b) by inserting

30  after subparagraph (364 ) the following new subparagraph:

31  (365)  Moneys deposited in the meals and rooms municipal revenue fund established

32  in RSA 78-A:26, IV.

33  115  Reference Changed; Education Trust Fund.  Amend RSA 198:39, I(c) to read as follows:

34  (c)  Funds collected and paid over to the state treasurer by the commissioner of revenue

35  administration pursuant to RSA 78-A:26, [HH] *II* relative to the tax on motor vehicle rentals.

36  116   Business Profits Tax; Credit Carry-forward Limited; Payments Due With Returns and

37  Estimates.  Amend RSA 77-A:7, I(b) to read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 48 -**

1    (b)  If the return required by RSA 77-A:6, I shows an additional amount to be due, such
2    additional amount is due and payable on the prescribed payment date.  If such return shows an
3    overpayment of the tax due, the commissioner shall refund or credit the overpayment to the
4    taxpayer in accordance with RSA 21-J:28-a*, except that:*

5            *(1)  For taxable periods ending on or after December 31, 2022 a credit shall*
6    *only be allowed in an amount up to 500 percent of the total tax liability for the taxable*
7    *period and the remainder of the overpayment shall be refunded;*

8            *(2)  For taxable periods ending on or after December 31, 2025 a credit shall*
9    *only be allowed in an amount up to 250 percent of the total tax liability for the taxable*
10   *period and the remainder of the overpayment shall be refunded; and*

11           *(3)  For taxable periods ending on or after December 31, 2027 a credit shall*
12   *only be allowed in an amount up to 100 percent of the total tax liability for the taxable*
13   *period and the remainder of the overpayment shall be refunded.*

14   117  Business Enterprise Tax; Credit Carry-forward Limited; Payments Due With Returns.
15   Amend RSA 77-E:6, II to read as follows:

16       II.  If the return required by RSA 77-E:5, I shows an amount to be due, such amount is due
17   and payable on the prescribed payment date.  If such return shows an overpayment of the tax due,
18   the commissioner shall refund [such] *or credit the* overpayment to the business enterprise [or shall
19   allow the enterprise a credit against a subsequent payment or payment due, to the extent of the
20   overpayment, at the enterprise's option] *in accordance with RSA 21-J:28-a, except that:*

21           *(a)  For taxable periods ending on or after December 31, 2022 a credit shall only*
22   *be allowed in an amount up to 500 percent of the total tax liability for the taxable period*
23   *and the remainder of the overpayment shall be refunded;*

24           *(b)  For taxable periods ending on or after December 31, 2025 a credit shall only*
25   *be allowed in an amount up to 250 percent of the total tax liability for the taxable period*
26   *and the remainder of the overpayment shall be refunded; and*

27           *(c)  For taxable periods ending on or after December 31, 2027 a credit shall only*
28   *be allowed in an amount up to 100 percent of the total tax liability for the taxable period*
29   *and the remainder of the overpayment shall be refunded.*

30   118  New Section; Commission to Study Limiting the Business Tax Credit Carry Over.  Amend
31   RSA 77-A by inserting after section 7-a the following new section:

32   77-A:7-b  Commission to Study Limiting the Business Tax Credit Carry Over.

33       I.  There is a established a commission to study limiting the business tax credit carry over.
34   The members of the commission shall be as follows:

35           (a)  Four members of the house of representatives, appointed by the speaker of the house
36   of representatives with at least 2 members from the ways and means committee and one member
37   from the finance committee.

1       (b)  One member of the senate, appointed by the president of the senate.

2       (c)  The treasurer for the state of New Hampshire, or designee.

3       (d)  The comptroller for the state of New Hampshire, or designee.

4       (e)  The commissioner for the department of revenue administration, or designee.

5       (f)  One member representing the accounting or auditing industry, appointed by the
6  governor.

7       II.  Legislative members of the commission shall receive mileage at the legislative rate when
8  attending to the duties of the commission.

9       III.  The commission's study shall include, but not be limited to, examining the credit carry
10  over for the business profits tax and business enterprise tax, the liability associated with the credit
11  carry over, and the impact of limiting the credit carry over may have on cash flow and liquidity, and
12  make recommendations on future limitations of the credit carry over.  The commission shall also
13  examine whether a business tax credit or other type of credit could be made available to those
14  entities using their credit carry over refund to invest in affordable housing development in New
15  Hampshire and make recommendations on how this type of program would be implemented.

16       IV.  The commission may solicit input from any person or entity the commission deems
17  relevant to its study.

18       V.  The members of the commission shall elect a chairperson from among the members.  The
19  first meeting of the commission shall be called by the first-named house member.  The first meeting
20  of the commission shall be held as soon as practical but not later than 30 days of the effective date of
21  this section.  Five members of the commission shall constitute a quorum.

22       VI.  The commission shall submit a report including its findings and any recommendations
23  for proposed legislation on or before November 1, 2021 to the speaker of the house of representatives,
24  the president of the senate, the house clerk, the senate clerk, the governor, and the state library.

25    119  Repeal.  RSA 77-A:7-b, relative to the commission to study limiting the business tax credit
26  carry over, is repealed.

27    120  Effective Date.

28       I.  Sections 116-118 of this act shall take effect upon its passage.

29       II.  Section 119 of this act shall take effect November 1, 2021.

30    121  New Hampshire Veterans' Home; Unfunded Positions; Authorization.  Notwithstanding any
31  other provision of law to the contrary, the New Hampshire veterans' home may fill unfunded
32  positions during the biennium ending June 30, 2023, provided that the total expenditure for such
33  positions shall not exceed the amount appropriated for personal services.

34    122  New Hampshire Veterans' Home; Transfer Among Accounts and Classes.  Notwithstanding
35  any provision of law to the contrary, for the biennium ending June 30, 2023, the commandant of the
36  New Hampshire veterans' home is authorized to transfer funds within and among all accounting
37  units within the home and to create accounting units and expenditure classes as required and as the

1    commandant deems necessary and appropriate to address present or projected budget deficits, or to

2    respond to changes in federal law, regulations, or programs, and otherwise as necessary for the

3    efficient management of the home, including funding of unfunded positions, provided that if a

4    transfer does not include new accounting units or expenditure classes, only such transfers of

5    $100,000 or more shall require prior approval of the fiscal committee of the general court and the

6    governor and council.  The New Hampshire veterans' home shall be exempt from RSA 9:17-a, I and

7    RSA 9:17-c, subject to approval by the fiscal committee of the general court of any transfer of

8    appropriations from permanent personal services or employee benefits to any other use or purpose.

9        123  Wildlife Damage Control; Limitations for Persons Posting Property.  Amend RSA 207:22-a

10   to read as follows:

11       207:22-a  Limitations for Persons Posting Property.

12       *I.*  Any person whose land is posted pursuant to RSA 635:4 to prohibit hunting shall forfeit

13   the right to participate in the wildlife damage control program established pursuant to RSA 207:22-

14   c, or to receive payment pursuant to RSA 207:23-a, except that this limitation shall not apply in the

15   following circumstances:

16       [I.] *(a)*  To a person who posts only the person's land lying within 100 yards of a dwelling or

17   other farm or outbuildings contiguous to the person's dwelling and used regularly by the person, or

18   the person's family or tenant.

19       [II.] *(b)*  To any person whose land is posted for the protection of crops only during the closed

20   season for the type of game birds or animals for which the person seeks assistance from the wildlife

21   damage control program.

22       [III.] *(c)*   To any person who posts such person's land "Hunting by Permission Only",

23   provided that the names and addresses of the hunters who have received permission to hunt that

24   land in that year shall be furnished when requested by the executive director, and that in the

25   judgment of the executive director, the history of hunter access and hunter density represents a

26   good-faith effort by the landowner to allow hunting.

27       ***II.  Any person who has received payment pursuant to RSA 207:23-a shall forfeit the***

28   ***right to receive payment in a future year or growing season unless such person implements***

29   ***measures to prevent or mitigate future conflicts with bear that have been recommended in***

30   ***writing by the executive director or the executive director's agent.***

31       124  Damage by Bears.  Amend RSA 207:23-a to read as follows:

32       207:23-a  Damage by Bears [or Mountain Lions].

33       *I.*  [A person] ***Any person engaged in the husbandry and sale of at least $1,000 in***

34   ***agricultural products as defined in RSA 21:34-a*** who suffers loss or damage to livestock, bees,

35   orchards or growing crops, ***in an amount of $250 or more at the current wholesale value of the***

36   ***items,*** by bear [or mountain lion,] shall, if he ***or she*** claims damage therefor, notify the executive

37   director of fish and game in writing of such damage ***within 30 days of the discovery of such***

1  *damage*.  The executive director or [his] *the executive director's* agent shall investigate such

2  claim within 30 days from the receipt [by him] of notice of such damage, and [within one year] *in*

3  *accordance with RSA 541-A:29,* determine whether such damage was caused by bear [or mountain

4  lion], and appraise the amount to be paid*, and notify the claimant in writing of the*

5  *determination*.

6      *II.  If the person sustaining the damage claimed under this section is dissatisfied*

7  *with the finding of the executive director, such person shall notify the executive director in*

8  *writing, and an adjudicative proceeding shall be commenced pursuant to RSA 541-A:31.*

9      *III.  If the person sustaining the damage is dissatisfied with the decision of the*

10  *executive director following the adjudicative proceeding, a further appeal shall be*

11  *available in accordance with RSA 541.*

12      *IV.*  The executive director, [immediately upon making any appraisal of damage thereof]

13  *upon reaching final agreement with the claimant, or after the conclusion of an appeal*,

14  shall present [his] *a* certificate of the amount of appraisal to the governor, who is authorized to draw

15  [his] *a* warrant upon any money in the treasury not otherwise appropriated in payment therefor.

16      *V.   The executive director shall, in accordance with RSA 541-A, adopt rules to*

17  *administer this provision, to include:*

18      *(a)  Criteria to determine whether a person engaged in the husbandry and sale*

19  *of agricultural products as defined in RSA 21:34-a qualifies to be a claimant hereunder,*

20  *provided that any such person who shall document gross sales of any qualifying crop of at*

21  *least $1,000 in a calendar year shall be deemed to qualify as a claimant.*

22      *(b)  Procedures used to receive and document claims of damage by bear from*

23  *claimants, to include when the damage occurred, which qualifying crop is affected, and*

24  *what losses may be fairly attributed to action by such bear;*

25      *(c)  A method to determine the current wholesale value of items covered by this*

26  *section, to be used in the process of investigating and adjudicating any claim;*

27      *(d)  Procedures to be used in the conduct of adjudicative proceedings hereunder;*

28  *and*

29      *(e)   Criteria to be used to recommend preventive measures and mitigating*

30  *measures that claimants may use to prevent future harm, and that will be used to*

31  *determine whether claims in future years shall be allowed for payment.*

32  125  Repeal.  RSA 207:24, relative to an appeal from the executive director, is repealed.

33  126  Department of Information Technology; Unfunded Positions.  Notwithstanding any other

34  provision of law to the contrary, the department of information technology may fill unfunded

35  positions during the biennium ending June 30, 2023, provided that the total expenditure for such

36  positions shall not exceed the amount appropriated for personnel services.

37  127  Adult Parole Board; Establishment.  Amend RSA 651-A:3 to read as follows:

1    651-A:3  Adult Parole Board; Establishment; Procedures.

2        I.  There shall be an adult parole board with [9] *5* members, ***2 of which shall be attorneys***

3    ***with active licenses***.  The members of the board shall be appointed by the governor with the

4    consent of the council for staggered terms of 5 years or until their successors are appointed.  No

5    member shall serve more than 2 consecutive terms.  A vacancy on the board shall be filled for the

6    unexpired term.

7        ***II.  The composition of the board shall be as follows:***

8        ***(a)  One member as chairman.***

9        ***(b)  Four additional members, to include:***

10           ***(1)  One member with law enforcement or corrections experience, either***

11   ***current or former.***

12           ***(2)  One member with criminal justice experience, which may be direct***

13   ***employment experience, current or former, in some capacity within the criminal justice***

14   ***system, or post-secondary school teaching, scholarship, and research pertaining to the***

15   ***criminal justice system.***

16           ***(3)  One at-large member who is either an attorney with an active New***

17   ***Hampshire license or a mental health professional with an active New Hampshire license;***

18           ***(4)  One at-large member without any categorical designation.***

19       ***III.***  The governor shall designate one member as chairman [and the chairman shall

20   designate one other member to serve as chairman in his absence].  ***The salary of the chairman***

21   ***shall be that established in RSA 94:1-a as grade GG, with appropriate step to be***

22   ***determined in accordance the provisions of RSA 94:1-d.  The chairman shall designate one***

23   ***other member to serve as temporary designee chairman in his or her absence, however, the***

24   ***designated chairman shall not receive the chairman's salary or employee status while***

25   ***serving in the chairman's absence.***  In the case of a revocation hearing an attorney of the board

26   shall be present at the hearing.  Board members shall be paid [$100 a day plus mileage at the state

27   employee rate while engaged in parole hearings or administrative meetings.] ***an annual stipend of***

28   ***$20,000 for each member, to be paid in equal installments on each state employee pay***

29   ***period date.  Board members shall be paid mileage at the state employee rate while***

30   ***engaged in parole hearings or administrative meetings.***

31       [II] ***IV.***  The board shall hold at least [24] ***36 days*** of parole hearings and ***36 days of parole***

32   ***revocation hearings*** each year and may hold more hearings as necessary.  Each parole ***and***

33   ***parole revocation*** hearing shall be held by a hearing panel consisting of exactly 3 members of the

34   board.  The board shall establish operating procedures which provide for rotation of board members

35   among hearing panels.

36       ***V.  In the event of a pandemic or other extraordinary occurrence declared an***

37   ***emergency by the governor that results in restricted movement or quarantining of inmates***

1 *at any New Hampshire state prison facility, the parole board may conduct all hearings via*
2 *teleconference or other video conference technology.*

3     128  Applicability.  On the effective date of section 127 of this act, the current chairman of the
4 adult parole board shall remain chairman and designate 4 current members who fit the criteria
5 outlined in RSA 651-A:3, II(b)(1)-(4) as inserted by section 127 of this act, to remain members of the
6 parole board according to their current terms.  In the event that there are not 4 members on the
7 existing board who meet the criteria outlined in RSA 651-A:3, II(b)(1)-(4), the chairman may
8 designate an existing member to temporarily occupy any open member vacancy until a new
9 appointment for the vacancy is nominated by the governor and confirmed by the executive council.
10 Any current members who remain on the board, including the current chairman, shall serve until
11 the expiration of their current terms or until a successor is appointed and qualified.

12     129  Workers' Compensation; Administration Fund.  Amend RSA 281-A:59, III to read as follows:

13     III.  Each insurance carrier and self-insurer, including the state, shall make payments to the
14 fund of its pro rata share of one fiscal year's costs to be appropriated out of the fund.  The governor is
15 authorized to draw a warrant for any sum payable by the state under this paragraph out of any
16 money in the treasury not otherwise appropriated.  The pro rata share shall be computed on the
17 basis which the total workers' compensation benefits, including medical benefits, paid by each
18 insurance carrier and self-insurer bore to the total workers' compensation benefits, including
19 medical benefits, paid by all insurance carriers and self-insurers in the [fiscal year ending in the]
20 preceding calendar year; provided, however, that no insurance carrier or self-insurer shall pay an
21 assessment of less than $100.  The commissioner shall assess each insurance carrier and self-insurer
22 as soon as possible after July 1 of each year.  Total assessments shall not exceed the amount
23 appropriated for the fund, which shall include the budget of the workers' compensation division of
24 the department of labor for the fiscal year in which the assessment is made and all other costs of
25 administering this chapter.  The balance in the fund at the beginning of the new fiscal year shall
26 proportionately reduce the assessments under this section.  The commissioner shall have the
27 authority to adopt rules, pursuant to RSA 541-A, relative to the manner in which such payments are
28 to be made.

29     130  Workers' Compensation; Special Fund for Second Injuries.  Amend RSA 281-A:55, III to
30 read as follows:

31     III.  Each insurance carrier and self-insurer shall, pursuant to rules adopted by the
32 commissioner, make payments to the fund in an amount equal to that proportion of 115 percent of
33 the total obligation of the fund during the preceding 12 months, less the amount of the net assets in
34 the fund as of March 31 of the current year, which the total workers' compensation benefits,
35 including medical benefits, paid by each insurance carrier and self-insurer bore to the total workers'
36 compensation benefits, including medical benefits, paid by all insurance carriers and self-insurers in
37 the [fiscal year ending in the] preceding calendar year.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 54 -**

1     131  Workers' Compensation; Hearings and Awards.  Amend RSA 281-A:43, I(a) to read as
2    follows:

3     I.(a)  In a controversy as to the responsibility of an employer or the employer's insurance
4    carrier for the payment of compensation and other benefits under this chapter, any party at interest
5    may petition the commissioner in writing for a hearing and award.  The petition shall be sent to the
6    commissioner at the department's offices in Concord and shall set forth the reasons for requesting
7    the hearing and the questions in dispute which the applicant expects to be resolved.  The
8    commissioner or the commissioner's authorized representative shall schedule a hearing, either in
9    Concord or at a location nearest the employee as determined by the commissioner, by fixing its time
10   and place and giving notice at least 14 days prior to the date for which it is scheduled.  The hearing
11   date shall be set for a time not to exceed 6 weeks from the date the petition was received.  In those
12   instances where an expedited hearing is requested, the petition for hearing shall set forth the facts
13   in sufficient detail to support the request for an expedited hearing.  The commissioner, or his or her
14   authorized agent shall, in his or her discretion, determine whether the need exists for an expedited
15   hearing.  Any requests for an expedited hearing shall be periodically reviewed by the commissioner
16   to determine whether such requests are given proper attention.  The commissioner shall also identify
17   any overutilization by the requesting parties and responses given to such requests by the
18   commissioner.  An annual report of the expedited requests, responses, the number of continuances,
19   the reasons for such continuances, the number of requests for hearing, and the time within which
20   the hearings were held shall be made annually to the advisory council established in RSA 281-A:62.
21   The notice may be given in hand [or by certified mail, return receipt requested], ***via first class***
22   ***mail, or, upon consent of the parties, by electronic transmission***.  Continuances of any hearing
23   are discouraged; however, should a continuance be necessary, the parties requesting such
24   continuance shall file with the department a written petition for such continuance at least 7 days
25   prior to the hearing.  Failure to file such a petition shall bar any right to a continuance.  Thereafter,
26   a continuance may only be granted upon the commissioner's finding that a compelling need exists so
27   as to require a continuance.  At such hearing, it shall be incumbent upon all parties to present all
28   available evidence and the person conducting the hearing shall give full consideration to all evidence
29   presented.  In addition, the person conducting the hearing shall freely and comprehensively examine
30   all witnesses to determine the merits of the matter.  Also, the person conducting the hearing may
31   recess the hearing to a date certain and direct the parties, or either of them, to provide such further
32   information that may be necessary to decide the matter.  No later than 30 days after the hearing, the
33   commissioner or the commissioner's authorized representative shall render a decision and shall
34   forthwith notify the parties of it.  When appropriate, the commissioner, or his or her authorized
35   representative, may render a decision at the hearing.  Unless excused for good cause shown, ***or a***
36   ***party has not received notice,*** failure of any or all parties at interest to appear at a duly scheduled
37   hearing or to petition for a continuance shall bar such parties from any further action concerning an

Amendment to HB 2-FN-A-LOCAL
- Page 55 -

1    adverse decision, a decision by default, or a dismissal of a petition for hearing and award.  ***The***
2    ***commissioner, or his or her authorized representative, shall serve notice of a pending***
3    ***default, default decision, or dismissal of a petition for hearing and award on the***
4    ***defaulting party via certified mail, return receipt requested.  Upon receipt of undeliverable***
5    ***certified mail, the commissioner, or his or her authorized representative, shall stay the***
6    ***proceedings for up to one year from the date of the receipt of undeliverable certified mail***
7    ***during which time the commissioner, or his or her authorized representative, shall make***
8    ***all reasonable attempts to provide notice to the defaulting party.  If notice cannot be***
9    ***provided within one year, the commissioner, or his or her authorized representative, shall***
10   ***render a decision in favor of the non-defaulting party.***

11       132  Unemployment Compensation; Contributions; Minimum Rate.  Amend RSA 282-A:82, II-III
12   to read as follows:

13       II.  There shall be subtracted in any calendar quarter from every employer's contribution
14   rate one percent whenever the unemployment compensation fund equals or exceeds [$275,000,000]
15   ***$350,000,000*** throughout the next preceding calendar quarter.

16       III.  There shall be subtracted in any calendar quarter from every employer's contribution
17   rate 1.5 percent whenever the unemployment compensation fund equals or exceeds [$300,000,000]
18   ***$400,000,000*** throughout the next preceding calendar quarter.

19       133  Unemployment Compensation; Contributions; Inverse Minimum Rate.  Amend RSA 282-
20   A:82-a, II-III to read as follows:

21       II.  There shall be added in any calendar quarter to every such employer's contribution rate
22   one percent whenever the unemployment compensation fund fails to equal or exceed [$275,000,000]
23   ***$350,000,000*** throughout the next preceding calendar quarter.

24       III.  There shall be added in any calendar quarter to every such employer's contribution rate
25   .5 percent whenever the unemployment compensation fund fails to equal or exceed [$300,000,000]
26   ***$400,000,000*** throughout the next preceding calendar quarter.

27       134  Repeal.  The following are repealed:

28       I.  RSA 282-A:84, relative to emergency power of the commissioner of the department of
29   unemployment security.

30       II.  RSA 282-A:84-a, relative to the emergency surcharge power of the commissioner of the
31   department of unemployment security.

32       135  Liability for Obstruction or Injury to Highway; Civil Liability.  Amend RSA 236:39 to read
33   as follows:

34       236:39  Civil Liability.

35       ***I.***  If any person, without authority, shall place any obstruction in a highway, or cause any
36   defect, insufficiency, or want of repair of a highway which renders it unsuitable for public travel, he
37   or she shall be liable to the state for all damages to the highway, including ***full and current***

Amendment to HB 2-FN-A-LOCAL
- Page 56 -

1    replacement costs of protective barriers, ***and any structure or device that is part of the***
2    ***highway or turnpike system,*** when maintained by the state, or to the municipality for all damages
3    to a highway, including ***full and current*** replacement costs of protective barriers ***and any***
4    ***structure or device that is part of the highway***, when maintained by the municipality, and for
5    all damages and costs which the state or municipality shall be compelled to pay to any person
6    injured by such obstruction, defect, insufficiency, or want of repair as established through an
7    appropriate contribution claim or under the rules of joint and several liability.

8        ***II.   "Full and current replacement cost" as used in this section means actual or***
9    ***reasonable  estimates  of  labor,  including  contracted  labor,  material,  equipment,  and***
10    ***overhead.   Such costs shall not be reduced for depreciation.***

11        136  Repeal.  1959; 286, relative to the Sandwich Notch and Dale Road in the towns of Sandwich
12    and Thornton, is repealed.

13        137  Department of Transportation; Disposal of Highway or Turnpike Funded Real Estate.
14    Amend the section heading for RSA 4:39-c to read as follows:

15    4:39-c  Disposal of Highway***, Federal,*** or Turnpike Funded Real Estate.

16        138  Department of Transportation; Disposal of Highway or Turnpike Funded Real Estate.
17    Amend RSA 4:39-c, III to read as follows:

18        III.   The proceeds from a sale, conveyance, transfer, or lease under this section shall be
19    credited to either the highway fund, ***restricted federal fund,*** or the turnpike fund, whichever fund
20    provided money for the original purchase.  ***Proceeds from a sale that results from money***
21    ***provided by the highway fund for payback of real property purchased with federal funds***
22    ***shall be credited to the department and shall be nonlapsing and continually appropriated***
23    ***to the department for the purposes of meeting federal obligations or reimbursing the***
24    ***highway fund for payment of federal obligations.***

25        139  New Paragraphs; New Hampshire Aeronautics Act; Definitions.   Amend RSA 422:3 by
26    inserting after paragraph XXVII the following new paragraphs:

27        XXVII-a.   "Small unmanned aircraft" means an unmanned aircraft as defined in federal
28    regulations, as amended.

29        XXVII-b.   "Small unmanned aircraft system" means a small unmanned aircraft and its
30    associated elements as defined in federal regulations, as amended.

31        140  New Paragraph; New Hampshire Aeronautics Act; Definitions.   Amend RSA 422:3 by
32    inserting after paragraph XXIX the following new paragraph:

33        XXX.  "Unmanned aircraft" means an aircraft as defined in federal regulations, as amended.

34        141  New Hampshire Aeronautics Act; Duties of the Commissioner.   Amend RSA 422:4, VI to
35    read as follows:

36        VI.   Effecting uniformity in the regulations pertaining to the operation of aircraft by
37    adopting uniform rules consistent with federal regulations and making noncompliance with federal

1  regulations a violation of state law, thereby enabling the law enforcement agencies of the state to
2  enforce the laws regulating the operation of aircraft.   For the purposes of this paragraph, aircraft
3  shall include ultralight vehicles [as defined in 14 C.F.R. part 103] *as defined in federal*
4  *regulations, as amended, and small unmanned aircraft systems as defined in RSA 422:3,*
5  *XXVII-b*.

6  142  Department of Transportation; Appropriation Amended.  Amend 2018;162:25, I to read as
7  follows:

8  I.  The sum of $20,000,000 is hereby appropriated to the department of transportation for the
9  fiscal year ending June 30, 2018, which shall be [nonlapsing and] expended for the purposes of
10  funding state red list bridge projects *and shall lapse to the highway fund on June 30, 2021*.
11  The governor is authorized to draw a warrant for said sum out of any money in the treasury not
12  otherwise appropriated.

13  143  Effective Date.  Section 142 of this act shall take effect on June 30, 2021.

14  144  Department of Safety; Fund Transfer; Unfunded Positions; Authorization.

15  I.  Notwithstanding the provisions of RSA 9:16-a, for the biennium ending June 30, 2023, the
16  department of safety may transfer funds between accounting units in classes 027-transfers to the
17  department of information technology, 028-transfers to general services, 064-retiree pension benefit
18  health insurance compensation, and 211-property and casualty insurance, upon approval of the
19  department of administrative services' budget office.

20  II.  Notwithstanding any other provision of law to the contrary, the department of safety may
21  fill unfunded positions during the biennium ending June 30, 2023, provided that the total
22  expenditure for such positions shall not exceed the amount appropriated for personal services.

23  145  New Section; Body-Worn Cameras.  Amend RSA 105-D by inserting after section 2 the
24  following new section:

25  105-D:3  Body-Worn and Dashboard Camera Fund.

26  I.  There is hereby established the body-worn and dashboard camera fund within the
27  department of safety for the purpose of encouraging local law enforcement agencies to equip officers
28  with body-worn cameras and agency vehicles with dashboard cameras.  All moneys in the fund shall
29  be nonlapsing and continually appropriated to the department of safety.

30  II.(a)  The fund shall provide matching grants to local law enforcement agencies to assist
31  agencies with the purchase, maintenance, and replacement of body-worn and dashboard cameras
32  and ongoing costs related to the maintenance and storage of data recorded by body-worn and
33  dashboard cameras.

34  (b)  The commissioner of the department of safety may also use the fund to pay for the
35  classified position of business administrator I established in the department of safety, division of
36  administration.

37  III.  All local law enforcement agencies shall be eligible to apply for grants from the fund.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 58 -**

1    IV.   The fund shall be overseen by the commissioner of the department of safety and the

2    attorney general who shall, within 180 days of the effective date of this section, jointly establish a

3    process for the application for matching grants from the fund.  Such process shall be established in

4    rules adopted jointly by the commissioner of safety and attorney general in accordance with RSA

5    541-A.

6    V. The commissioner of the department of safety may charge administrative costs related to

7    this section to the fund.

8    146  Body-Worn and Dashboard Camera Fund; Appropriation.  The sum of $1,000,000 for the

9    fiscal year ending June 30, 2022 is hereby appropriated to the body-worn and dashboard camera

10   fund established in RSA 105-D:3.  The governor is authorized to draw a warrant for said sum out of

11   any money in the treasury not otherwise appropriated.

12   147  Body Worn Cameras Purchase; Appropriation; Department of Corrections.  There is hereby

13   appropriated to the department of corrections the sum of $720,000 for the fiscal year ending June 30,

14   2021 to fund the purchase of body worn cameras for corrections and probation and parole officers.

15   The governor is authorized to draw a warrant for said sum out of any money in the treasury not

16   otherwise appropriated.   This appropriation shall not lapse until June 30, 2023.

17   148  Effective Date.  Section 147 of this act shall take effect June 30, 2021.

18   149  Department of Safety; Position Created.  There is hereby established in the department of

19   safety, division of administration, the full-time classified position of business administrator I.  The

20   commissioner of the department of safety may use the body-worn and dashboard camera fund

21   established in RSA 105-D:3 to fund the position.

22   150  New Section; Complaints Alleging Law Enforcement Misconduct; Commission Established.

23   Amend RSA 105-D by inserting after section 2 the following new section:

24   105-D:2-a  Statewide Entity to Receive Complaints Alleging Misconduct Regarding Sworn and

25   Elected Law Enforcement Officers; Commission Established.

26   I. There is hereby established a commission to develop recommendations for legislation to

27   establish a single, neutral, and independent statewide entity to receive complaints alleging

28   misconduct regarding all sworn and elected law enforcement officers pursuant to recommendation

29   #16 in the final report issued by the New Hampshire commission on law enforcement accountability,

30   community and transparency.  The commission shall be composed of the following members:

31   (a) The attorney general, or designee, who shall be the chairperson of the commission.

32   (b) One member of the house of representatives, appointed by the speaker of the house.

33   (c) One member of the senate, appointed by the president of the senate.

34   (d)   The director of the New Hampshire police standards and training council, or

35   designee.

36   (e) The commissioner of safety, or designee.

1    (f)  Four additional members from the New Hampshire commission on law enforcement
2    accountability, community and transparency established in Executive Order 2020-11, appointed by
3    the attorney general.  Two of these members shall be law enforcement members and 2 of these
4    members shall not be law enforcement members.

5    II.  Legislative members of the commission shall receive mileage at the legislative rate when
6    attending to the duties of the commission.

7    III.  The chairperson of the commission shall call the first meeting within 30 days of the
8    effective date of this section.  Five members of the commission shall constitute a quorum.

9    IV.  The commission shall submit a report containing its recommendations for legislation to
10   the governor, the speaker of the house of representatives, the president of the senate, and the state
11   library no later than November 1, 2021.

12   151  Appropriation; Statewide Entity to Receive Complaints of Misconduct.  The sum of $100,000
13   for the fiscal year ending June 30, 2023 is hereby appropriated the department of administrative
14   services which shall be available to fund an independent statewide entity to receive complaints
15   alleging misconduct regarding all sworn and elected law enforcement officers established pursuant
16   to recommendation #16 in the final report issued by the New Hampshire commission on law
17   enforcement accountability, community and transparency.  Any unexpended amount of said
18   appropriation shall lapse to the general fund on June 30, 2023.  The governor is hereby authorized to
19   draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

20   152  Contingency.  If an independent statewide entity to receive complaints alleging misconduct
21   regarding all sworn and elected law enforcement officers as a result of recommendation #16 in the
22   final report issued by the New Hampshire commission on law enforcement accountability,
23   community, and transparency becomes law by July 1, 2022, then section 151 of this act shall take
24   effect July 1, 2022.  If such an entity does not become law by July 1, 2022, then section 151 of this
25   act shall not take effect.

26   153  Effective Date.  Section 151 of this act shall take effect as provided in section 152 of this act.

27   154  Department of Safety; Radio Infrastructure Equipment Purchases; Procurement.

28   I.  The department of safety shall, in collaboration with the department of administrative
29   services, establish standards for radio infrastructure-related hardware, computers, software, related
30   licenses, media, documentation, support and maintenance services, and other related services.

31   II.  Prior to an agency's issuance of a solicitation for the purchase of radio infrastructure-
32   related computer or radio hardware, software, related licenses, media, documentation, support and
33   maintenance services, and other related services including a request for proposal, request for
34   purchase, or other procurement documentation, the agency shall consult with and seek approval
35   from the department of safety, division of emergency services and communications.

1     III.  The department of safety, division of emergency services and communications, shall

2     annually review and set dollar, or other, limits for purchases and contracts that require approval

3     from the director of the division of emergency services and communications before proceeding.

4     IV.  For purposes of this section, "agency" shall have the same meaning as in RSA 21-I:11,

5     II(b), but shall not include:

6     (a) The university system of New Hampshire.

7     (b) The court systems.

8     (c) The legislature, secretary of state, and the state reporter.

9     (d) The retirement system.

10     (e) The community college system of New Hampshire.

11     155  New Paragraph; Office of the Chief Medical Examiner; Definitions.  Amend RSA 611-B:1 by

12     inserting after paragraph II the following new paragraph:

13     II-a.  "Associate medical examiner" means the licensed physician certified by the American

14     Board of Pathology as a qualified pathologist and appointed pursuant to RSA 611-B:3-a.

15     156  New Section; Office of the Chief Medical Examiner; Associate Medical Examiner.  Amend

16     RSA 611-B by inserting after section 3 the following new section:

17     611-B:3-a  Associate Medical Examiner.  There is hereby established within the office of the chief

18     medical examiner the position of associate medical examiner.  The associate medical examiner shall

19     be appointed in the same manner as the chief medical examiner as provided in RSA 611-B:2, and

20     shall be a licensed physician, certified by the American Board of Pathology as a qualified pathologist,

21     with training and experience in forensic medicine.  The associate medical examiner shall serve under

22     the professional direction and supervision of the chief medical examiner and deputy chief medical

23     examiner and shall act as the chief medical examiner whenever the chief medical examiner and

24     deputy chief medical examiner are absent, or unable to act for any cause.

25     157  Office of the Chief Medical Examiner; Acting Chief Medical Examiner.  Amend RSA 611-B:4

26     to read as follows:

27     611-B:4  Acting Chief Medical Examiner.  The chief medical examiner may designate in writing

28     an acting chief medical examiner who shall be a licensed physician, certified by the American Board

29     of Pathology as a qualified pathologist with training and experience in forensic medicine.  The acting

30     chief medical examiner shall act as the chief medical examiner whenever the chief medical

31     examiner*, [and the] deputy chief medical examiner, **and the associate medical examiner** are

32     absent, or unable to act [from] *for* any cause.

33     158    Department of Justice; Director of Diversity and Community Outreach; Position

34     Established.  There is established within the department of justice an unclassified position of

35     director of diversity and community outreach.  The director of diversity and community outreach

36     shall be qualified to hold the position by reason of education and experience, and shall be appointed

37     to serve for a term of 5 years.  The position shall assist the attorney general and deputy attorney

**Amendment to HB 2-FN-A-LOCAL**
**- Page 61 -**

1    general to establish goals and milestones towards creating a more diverse, inclusive, and culturally

2    aware law enforcement community through efforts that increase equity and cultural awareness

3    among state, county, local prosecution, law enforcement and diverse communities to foster positive

4    relationships, understanding and respect.  The salary of the director of diversity and community

5    outreach shall be determined after assessment and review of the appropriate letter grade allocation

6    in RSA 94:1-a, I for positions which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.

7    Funding shall be appropriated from expenditure class 014 within accounting unit 02-20-20-200010-

8    2601.

9    159  New Paragraph; Department of Justice; Attorney General Position Established.  Amend

10   RSA 21-M:3 by inserting after paragraph XII the following new paragraph:

11        XIII.  The attorney general, subject to the approval of the governor and council, may appoint

12   a permanent director of diversity and community outreach, within the limits of the appropriation

13   made for the appointment, who shall hold office for a term of 5 years.  Any vacancy in such position

14   may be filled for the unexpired term.  The director of diversity and community outreach may be

15   removed only as provided by RSA 4:1.

16   160  Effective Date.  Sections 158-159 of this act shall take effect January 1, 2023.

17   161  Judicial Council; Expenditures for Termination of Parental Rights Services.  In the event

18   that expenditures for termination of parental rights services are greater than amounts appropriated

19   in the operating budget, the judicial council may request, with prior approval of the fiscal committee

20   of the general court, that the governor and council authorize additional funding.  For funds

21   requested and approved, the governor is authorized to draw a warrant from any money in the

22   treasury not otherwise appropriated.

23   162  College Tuition Savings Plan; Advisory Commission.  Amend the introductory paragraph in

24   RSA 195-H:2, I(a) to read as follows:

25        I.(a)   There is established the New Hampshire college tuition savings plan advisory

26   commission which shall ensure the proper administration and management of the savings plan.  The

27   advisory commission shall ensure that the savings plan complies with the requirements of section

28   529 of the Internal Revenue Code of 1986, as amended, and any related federal law applicable to the

29   savings plan.  The commission shall also be responsible for ensuring the proper administration,

30   implementation, and management of the New Hampshire excellence in higher education endowment

31   trust fund established in RSA 6:38, and the governor's scholarship program and fund established in

32   [RSA 4-C:31-34] *RSA 195-H:11-14.  The commission, by a majority vote, may transfer funds*

33   *between the New Hampshire excellence in higher education endowment trust fund and the*

34   *governor's scholarship fund.*  The commission shall consist of the following members:

35   163  New Subdivision; Governor's Scholarship Program and Fund.  Amend RSA 195-H by

36   inserting after section 10 the following new subdivision:

37        Governor's Scholarship Program and Fund

1    195-H:11  Definitions.  In this subdivision:

2    I.  "Eligible institution" means a postsecondary educational institution or training program

3    within the university system of New Hampshire as defined in RSA 187-A, a postsecondary

4    educational institution within the community college system of New Hampshire as defined in RSA

5    188-F, or a private postsecondary institution approved to operate in this state that:

6    (a)  Is approved by the higher education commission pursuant to RSA 21-N:8-a and

7    accredited by the New England Commission of Higher Education; and

8    (b)  Is a not-for-profit organization eligible to receive federal Title IV funds.

9    II.  "Eligible student" means a first-year, full-time, Pell Grant-eligible student who meets the

10   eligibility and residency requirements of RSA 195-H:13.  "First-year" means a student who has never

11   enrolled in an eligible institution.

12   III.  "Full-time" means an enrolled student who is carrying an academic course load that is

13   determined to be full-time by the eligible institution based on a standard applicable to all students

14   enrolled in a particular educational program.   The student's course load may include any

15   combination of courses, work, research, or special studies that the eligible institution considers

16   sufficient to classify the student as full-time.

17   195-H:12  Governor's Scholarship Program and Fund Established.

18   I.   There is hereby established the governor's scholarship program and the governor's

19   scholarship fund.  The program and fund shall be administered by the commission.  The fund shall

20   be kept distinct and separate from all other funds and shall be used to provide scholarships which a

21   recipient shall apply to the costs of an education at an eligible institution.   The funds shall be

22   distributed to an eligible institution based on the number of eligible students awarded a scholarship

23   and  upon  receipt  of  a  request  for  reimbursement  for  such  scholarship  funds  accompanied  by

24   appropriate documentation.

25   II.  The state treasurer shall credit to the fund any appropriation relating to the governor's

26   scholarship fund made in each fiscal year to the commission.  The state treasurer shall invest the

27   fund in accordance with RSA 6:8.  Any earnings shall be added to the fund.

28   III.   All  moneys  in  the  fund  shall  be  nonlapsing  and  continually  appropriated  to  the

29   commission for the purposes of this subdivision.

30   IV.  The commission may institute promotional programs and solicit and receive cash gifts or

31   other  donations  for  the  purpose  of  supporting  educational  scholarships  from  the  fund.   The

32   commission shall not solicit or accept real property.

33   V. All gifts, grants, and donations of any kind shall be credited to the fund.

34   195-H:13  Eligibility.

35   I.  Any person who meets the following requirements shall be an eligible student:

36   (a)  A person shall meet the residency requirements of RSA 193:12; be a graduate of a

37   New  Hampshire  high  school,  public  academy,  chartered  public  school,  New  Hampshire  private

1  preparatory high school, a high school-level home education program as defined in RSA 193-A; have

2  received a New Hampshire high school equivalency certificate; have completed at least 3 years of

3  high school in this state; be pursuing a certificate, associate, or bachelor degree at an eligible

4  institution in this state; and be eligible to receive a Pell grant; or

5  (b)  A person shall be a graduate of a preparatory high school outside of this state while a

6  dependent of a parent or legal guardian who is a legal resident of this state and who has custody of

7  the dependent; or

8  (c)  A person shall have a parent or guardian who has served in or has retired from the

9  United States Army, Navy, Air Force, Marine Corps, or Coast Guard within the last 4 years and is a

10  resident of this state; or

11  (d)  A person shall be a graduate of a high school, public academy, chartered public high

12  school, or a high school-level home education program outside of this state but have maintained his

13  or her primary residence in this state for not less than 5 years preceding the date of application for a

14  scholarship.

15  II.  A person shall meet the qualifications for academic performance or work experience as

16  established by the commission.

17  III.  A person shall not have been adjudicated delinquent or convicted or pled guilty or nolo

18  contendere to any felonies or any second or subsequent alcohol or drug-related offenses under the

19  laws of this or any other state, or under the laws of the United States, except that an otherwise

20  eligible person who has been adjudicated delinquent or has been convicted or pled guilty or nolo

21  contendere to a second or subsequent alcohol or drug-related misdemeanor offense shall be eligible

22  or continue to be eligible for a scholarship after the expiration of one academic year from the date of

23  adjudication, conviction, or plea.

24  195-H:14  Procedures.

25  I.  All scholarship funds shall be distributed to the eligible student by the eligible institution.

26  The institution shall include the scholarship in the student's financial aid package and may seek

27  subsequent reimbursement.  The state shall provide the reimbursements twice per year to each

28  eligible institution for the number of eligible students enrolled in the current semester or term who

29  are receiving a scholarship.  The institution shall submit the list of scholarship recipients to the

30  commission or its designee no later than November 30 and April 30 of each academic year, and shall

31  be reimbursed within 30 days of submission.

32  II.  An eligible student may receive a scholarship in the amount of $1,000 per year provided

33  he or she maintains at least a 2.0 grade point average.  An eligible student who earned the New

34  Hampshire scholar designation at the time of high school graduation may receive a scholarship in

35  the amount of $2,000 per year provided he or she maintains at least a 2.5 grade point average.  The

36  eligible institution shall not reduce any merit or need-based grant aid that would have otherwise

**Amendment to HB 2-FN-A-LOCAL**
**- Page 64 -**

1   been provided to the eligible student.  An eligible student may receive an annual scholarship for a
2   maximum of 4 years.

3       III.  In the event the state does not reimburse the eligible institution for scholarship amounts
4   paid to an eligible student receiving an award, the eligible institution shall agree not to seek
5   additional payments from the eligible student and to absorb the loss of funds without any
6   consequence to the eligible student.

7       IV.  The commission shall adopt rules, pursuant to RSA 541-A, relative to awarding and
8   disbursing scholarship funds to an eligible student enrolled in an eligible institution.

9       V.  An eligible student, who initially attends a community college and transfers directly to an
10  eligible institution, without a break in attendance, shall remain an eligible student for a maximum
11  of 4 years of total eligibility.

12      VI.  The commission may hire staff or enter into a contract for services or personnel
13  necessary to administer the program.

14  164   Application of Receipts; Governor's Scholarship Program and Fund.  Amend RSA 6:12,
15  I(b)(336) to read as follows:

16          (336)  Moneys deposited into the governor's scholarship fund established in [RSA 4-
17  C:32] *RSA 195-H:12*.

18  165   Allied Health Professionals; Re-ordering of Definitions.   RSA 328-F:2 is repealed and
19  reenacted to read as follows:

20  328-F:2   Definitions.  In this chapter:

21      I.  "Athletic training" means "athletic training" as defined in RSA 326-G:1, III.

22      II.   "Board of directors" means the chairpersons or their appointees of all the governing
23  boards which shall be responsible for the administrative operation of the office of licensed allied
24  health professionals.

25      III.  "Genetic counseling" means genetic counseling as defined in RSA 326-K:1.

26      IV.   "Governing boards" means individual licensing boards of athletic trainers, occupational
27  therapy assistants, occupational therapists, recreational therapists, physical therapists, physical
28  therapist assistants, respiratory care practitioners, speech-language pathologists and hearing care
29  providers, and genetic counselors.

30      V.  "Hearing care providers" mean audiologists and hearing aid dealers as defined in RSA
31  326-F:1.

32      VI.  "Occupational therapy" means "occupational therapy" as defined in RSA 326-C:1, III.

33      VII.   "Office of licensed allied health professionals" means an agency of multiple governing
34  boards in professions of the allied health field.

35      VIII.   "Physical therapy" or "physiotherapy" means "physical therapy" or "physiotherapy" as
36  defined in RSA 328-A:2, IX.

37      IX.  "Recreational therapy" means "recreational therapy" as defined in RSA 326-J:1, III.

Amendment to HB 2-FN-A-LOCAL
- Page 65 -

1      X.   "Respiratory care" means "respiratory care" as defined in RSA 326-E:1, X.

2      XI.   "Speech-language pathology" means "speech-language pathology" as defined in RSA
3  326-F:1.

4  166   Allied Health Professionals; Governing Boards; Hearing Care Providers.   Amend RSA 328-
5  F:3, I to read as follows:

6      I.  There shall be established governing boards of athletic trainers, occupational therapists,
7  recreational therapists, respiratory care practitioners, physical therapists, speech-language
8  pathologists*, hearing care providers,* and genetic counselors.

9  167   Allied Health Professionals; Governing Boards; Membership.   Amend RSA 328-F:4, I to
10  read as follows:

11      I.   Each governing board shall be composed of 5 persons, each to be appointed by the
12  governor with the approval of the council, to a term of 3 years*, except the speech-language*
13  *pathology and hearing care provider governing board which shall be composed of 6*
14  *members, each to be appointed by the governor with the approval of the council, to a term*
15  *of 3 years.*   Members shall serve until the expiration of the term for which they have been
16  appointed or until their successors have been appointed and qualified.   No board member shall be
17  appointed to more than 2 consecutive terms, provided that for this purpose only a period actually
18  served which exceeds 1/2 of the 3-year term shall be deemed a full term.   Any professional members
19  of all governing boards shall maintain current and unrestricted New Hampshire licenses.

20  168   Speech Language Pathology and Hearing Care Provider Governing Board; Membership.
21  Amend RSA 328-F:4, VIII to read as follows:

22      VIII.   The speech-language pathology *and hearing care provider* governing board shall
23  consist of 4 licensed speech-language pathologists who have actively engaged in the practice of
24  speech-language pathology in this state for at least 3 years*, one licensed individual in the field*
25  *of hearing care who has actively engaged in the practice,* and one public member.   At least
26  one speech-language pathologist shall be employed in an educational setting and at least one
27  employed in a clinical setting.

28  169   New Paragraph; Allied Health Professionals; Governing Boards; Duties; Registration.
29  Amend RSA 328-F:5 by inserting after paragraph I-a the following new paragraph:

30      I-b.   Issue initial registrations, conditional initial registrations, renewed registrations,
31  conditionally renewed registrations, reinstated registrations, and conditionally reinstated
32  registrations to businesses who are eligible if authorized to do so by the board's practice act.

33  170   New Paragraph; Allied Health Professionals; Governing Boards; Duties; Businesses.
34  Amend RSA 328-F:5 by inserting after paragraph II the following new paragraph:

35      II-a.   Investigate registered businesses and take necessary disciplinary action against them.

36  171   New Paragraph; Allied Health Professionals; Governing Boards; Rulemaking; Hearing Aid
37  Dealers.   Amend RSA 328-F:11 by inserting after paragraph II the following new paragraph:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 66 -**

1      III.   The speech-language pathology and hearing care provider governing board shall adopt

2      rules on eligibility requirements and procedures for the issuance of registrations to hearing aid

3      dealers.

4      172  Allied Health Professionals; Governing Board; Fees.   Amend RSA 328-F:15, I to read as

5      follows:

6      I.  The board of directors shall establish fees for:

7      (a)   The processing of applications for initial and reinstatement of licensure, [or]

8      certification*, or registration*.

9      (b)  Initial licenses, [and] certifications*, and registrations*.

10     (c)  Renewal of licenses, [and] certifications*, and registrations*.

11     (d)  Late filing of applications for license renewal and renewal of certification.

12     (e)  Reinstatement of licenses, [and] certifications*, and registrations*.

13     (f)  Transcribing and transferring records.

14     (g)   The costs of a hearing by any governing board at which the issue is denial of, or

15     imposition of conditions on, an initial license or certification, including the per diem and mileage of

16     board members attending the hearing and the cost of a shorthand court reporter if one is used to

17     record the hearing.

18         ***(h)  The registration of hearing aid dealers.***

19     173   Allied Health Professionals; Governing Boards; Initial Licenses, Certifications, and

20     Registrations.  Amend RSA 328-F:18, IV to read as follows:

21     IV.   Initial licenses*, certifications, and registrations*, including conditional licenses*,*

22     ***certifications, and registrations*** that are the first license*, certificate, or registration* issued to

23     the individual ***or hearing aid dealer***, and provisional licenses*, certifications, and registrations*

24     shall be:

25     (a)   Signed and dated by the chairperson of the governing board issuing them ***or his or***

26     ***her designee***.

27     (b)  Numbered consecutively and recorded.

28     174  Allied Health Professionals; License Provisions; Renewal.  Amend RSA 328-F:19 to read as

29     follows:

30     328-F:19  Renewal.

31     I.   Initial licenses and renewals shall be valid for 2 years, except that timely and complete

32     application for license renewal by eligible applicants shall continue the validity of the licenses being

33     renewed until the governing board has acted on the renewal application.  Licenses issued pursuant

34     to RSA 328-A, RSA 326-G, and RSA 326-J shall expire in even-numbered years and licenses issued

35     pursuant to RSA 326-C, RSA 326-E, RSA 326-F, and RSA 326-K shall expire in odd-numbered years.

36     ***I-a.  A license issued to a hearing care provider shall expire at 12:01 a.m. on July 1***

37     ***of the odd-numbered year next succeeding its date of issuance.  The governing board shall***

1    ***notify the licensee, on or before May 1 of the renewal year, but failure of any licensee to***
2    ***receive this notification shall not relieve him or her of the obligation to comply with the***
3    ***rules of the governing board and this section.   Timely submission of renewal applications***
4    ***shall be evidenced by postmark or, for applications delivered by hand, by date stamp or***
5    ***other record made at the time of delivery.***

6    II.   Each governing board shall renew the licenses of applicants who meet the eligibility
7    requirements and complete the application procedure.

8    III.   Applicants ***whose licenses expire on December 31 of the renewal year*** shall submit
9    completed applications for renewal on or before December 1 of the renewal year.   Completed
10    renewal applications submitted between December 2 and December 31 of the renewal year shall be
11    accompanied by a late filing fee.   Licenses shall lapse when completed renewal applications have not
12    been filed by December 31 of the renewal year, and their holders are not authorized to practice until
13    the licenses have been reinstated.

14    IV.   The governing boards shall provide licensees ***whose licenses expire on December 31***
15    ***of the renewal year***, on or before November 1 of their renewal years, with materials needed to
16    complete their renewal applications, but failure of any licensees to receive these materials shall not
17    relieve them of the obligation to comply with the rules of the governing boards and this section.
18    Timeliness of submission of renewal applications shall be evidenced by postmark or, for applications
19    delivered by hand, by date stamp or other record made at the time of delivery.

20    V.   Upon the request of a licensee who is a member of any reserve component of the armed
21    forces of the United States or the national guard and is called to active duty, the governing board
22    shall place the person's license on inactive status.   The license may be reactivated within one year of
23    the licensee's release from active status by payment of the renewal fee and with proof of completion
24    of the most current continuing education requirement unless still within the renewal period.

25    175  Allied Health Professionals; License Provisions; Obligation to Report.   Amend RSA 328-
26    F:25, I and II to read as follows:

27    I.   Persons and entities regulated by the state, including but not limited to, licensees,
28    certified individuals, ***registrants,*** insurance companies, health care organizations, and health care
29    facilities shall report to the board of directors and the appropriate governing board any criminal
30    conviction of a licensee, [or] certified individual, ***registered hearing aid dealer,*** or any
31    determination by a regulatory agency indicating that a licensee, [or] certified individual, ***or***
32    ***registered hearing aid dealer*** has violated this chapter or the practice act of his or her governing
33    board.   Persons and entities so reporting shall be immune from civil liability if the report is made in
34    good faith.

35    II.   Every individual, agency, facility, institution or organization regulated by the state and
36    employing licensed allied health professionals ***or using the services of a registered hearing aid***
37    ***dealer*** within the state shall report to the appropriate governing board within 30 days any act by an

1 individual licensed or certified by the board that appears to constitute misconduct. Persons and

2 entities so reporting shall be immune from civil liability if the report is made in good faith.

3     176 Allied Health Professionals; Unauthorized Practice. Amend RSA 328-F:27, II to read as

4 follows:

5        II. Practice of an allied health profession by any person who is not licensed [or], certified, *or*

6 *registered* to practice such profession shall constitute unauthorized practice. A business which

7 holds itself out, through advertising or in any other way, as providing an allied health service but

8 does not have available to supervise its services an allied health professional licensed [or], certified,

9 *or registered* to provide the services which the business purports to offer, is engaged in

10 unauthorized practice.

11     177 Speech Language Pathology Practice. Amend the chapter heading of RSA 326-F to read as

12 follows:

13                     CHAPTER 326-F

14       SPEECH-LANGUAGE PATHOLOGY *AND HEARING CARE PROVIDERS* PRACTICE

15     178 Speech-Language Pathology and Hearing Care Providers Practice; Definitions. RSA 326-

16 F:1 is repealed and reenacted to read as follows:

17     326-F:1 Definitions. In this chapter and RSA 328-F:

18       I. "Audiologist" means any person who renders or offers to render to the public any service

19 involving the application of principles, methods, and procedures for the measurement of testing,

20 identification, appraisal, consultation, counseling, instruction, and research related to the

21 development and disorders of hearing and vestibular function for the purpose of diagnosing,

22 designing, and implementing programs for the amelioration of such disorders and conditions.

23       II. "Audiology" means the application of principles, methods, and procedures related to the

24 development and disorders of human communication, which disorders shall include any and all

25 conditions whether of organic or nonorganic origin, that impede the normal processes of human

26 communication and balance including, but not limited to, disorders of hearing, vestibular function,

27 and central auditory processing.

28       III. "Board" means the governing board of speech-language pathologists and hearing care

29 providers established in RSA 328-F.

30       IV. "Hearing aid" means any wearable instrument or device designed for or offered for the

31 purpose of or represented as aiding or compensating for impaired human hearing and any parts or

32 attachments, including ear molds, but excluding batteries and cords or accessories thereto, or

33 equipment, devices, and attachments used in conjunction with services provided by a public utility

34 company.

35       V. "Hearing aid dealer" means any person engaged in the testing of human hearing for the

36 purpose of selecting, fitting, or otherwise dealing in hearing aids.

Amendment to HB 2-FN-A-LOCAL
- Page 69 -

1      VI.  "Otolaryngologist" means a physician licensed in the state of New Hampshire who

2  specializes in medical problems of the ear, nose, and throat, and is eligible for qualification by the

3  American Board of Otolaryngology as an otolaryngologist.

4      VII.  "Practice of audiology" means, but shall not be limited to:

5         (a)   Screening, identifying, assessing, interpreting, diagnosing, rehabilitating, and

6  preventing hearing disorders.

7         (b)   Rendering to individuals or groups of individuals, who are suspected of having

8  hearing disorders, basic and comprehensive audiological and vestibular site-of-lesion tests, including

9  otoscopic examinations, electrophysiologic test procedures, and auditory evoked assessment.

10       (c)   Rendering basic and comprehensive auditory and vestibular habilitative and

11  rehabilitative services, including aural rehabilitative assessment and therapy, vestibular

12  rehabilitative assessment and therapy, and speech and language screening.

13       (d)   Providing basic and comprehensive audiological and psychoacoustic evaluations for

14  the purpose of determining candidacy for amplification or assistive alerting/listening devices;

15  providing tinnitus evaluations and therapy; providing hearing aid fitting and orientation; taking ear

16  impressions; and providing hearing aid product dispensing, repair, and modification.

17       (e)   Providing preoperative evaluation and selection of cochlear implant candidacy and

18  post-implant rehabilitation.

19       (f)   Providing occupational hearing conservation.

20      VIII.  "Practice of speech-language pathology" means, but shall not be limited to:

21       (a)   Screening, identifying, assessing, interpreting, diagnosing, rehabilitating, and

22  preventing disorders of speech and language.

23       (b)   Screening, identifying, assessing, interpreting, diagnosing, and rehabilitating

24  disorders of oral-pharyngeal function and related disorders.

25       (c)   Screening, identifying, assessing, interpreting, diagnosing, and rehabilitating

26  cognitive communication disorders.

27       (d)   Assessing, selecting, and developing augmentative and alternative communication

28  systems and providing training in their use.

29       (e)   Providing aural rehabilitation and related counseling services to deaf or hard of

30  hearing individuals and their families.

31       (f)   Enhancing speech-language proficiency and communication effectiveness.

32       (g)   Screening of hearing and other factors for the purpose of speech-language evaluation

33  or the initial identification of individuals with other communication disorders.

34      IX.  "Rental or selling of hearing aids" means the selection, adaptation, and sale or rental of

35  hearing aids.  Also included is the making of impressions for ear molds and instruction pertaining to

36  the use of hearing aids.

1    X.  "Sell" or "sale" means any transfer of title or of the right of use by sale, conditional sales
2    contract, lease bailments, hire-purchase or any other means, excluding wholesale transactions of
3    dealers and distributors.

4    XI.  "Speech-language assistant" means any person certified by the board who meets
5    minimum qualifications established by the board which are less than those established by this
6    chapter as necessary for licensing as a speech-language pathologist, and who does not act
7    independently but works under the direction and supervision of a speech-language pathologist
8    licensed under this chapter.

9    XII. "Speech-language pathologist" means any person who renders or offers to render to the
10   public any service involving the application of principles, methods, and procedures for the
11   measurement of testing, identification, appraisal, consultation, counseling, instruction and research
12   related to the development and disorders of speech, voice, or language for the purpose of diagnosing,
13   designing, and implementing programs for the amelioration of such disorders and conditions.

14   XIII.  "Speech-language pathology" means the application of principles, methods, and
15   procedures related to the development and disorders of human communication, which disorders shall
16   include any and all conditions whether of organic or nonorganic origin, that impede the normal
17   process of human communication including, but not limited to, disorders and related disorders of
18   speech, articulation, fluency, voice, verbal and written language, auditory comprehension, cognition,
19   communication, swallowing, and oral, pharyngeal or laryngeal sensorimotor competencies.

20   179   New Paragraph; Speech Language Pathology and Hearing Care Providers Practice;
21   Eligibility for Initial Licensure.   Amend RSA 326-F:3 by inserting after paragraph II the following
22   new paragraph:

23   III.  To be eligible for initial licensure as an audiologist an applicant shall:

24   (a)   Demonstrate sufficient evidence of good professional character and reliability to
25   satisfy the board that the applicant shall faithfully and conscientiously avoid professional
26   misconduct and otherwise adhere to the requirements of this chapter.

27   (b)   Possess at least a master's degree in audiology from an educational institution
28   approved by the board which consists of course work approved pursuant to rules adopted by the
29   board pursuant to RSA 541-A.

30   (c)   Complete a supervised postgraduate professional experience at an educational
31   institution or its cooperation programs, approved pursuant to rules adopted by the board pursuant to
32   RSA 541-A.

33   (d)  Pass an examination specified by the board in rules adopted under RSA 541-A.

34   (e)  Complete a supervised postgraduate professional experience.

35   (f)   If applicable, submit proof of licensure in another state in which the licensure
36   requirements are equivalent to or greater than those in this chapter.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 71 -**

1    180  New Paragraph; Speech Language Pathology and Hearing Care Providers Practice;

2    Rulemaking.  Amend RSA 326-F:5 by inserting after paragraph VII the following new paragraph:

3        VIII.  The sale and fitting of hearing aids.

4    181  Speech Language Pathology and Hearing Care Providers Practice; Eligibility for Renewal of

5    Licenses.  Amend RSA 326-F:6, I to read as follows:

6        I.  ***For speech-language pathologists,*** have completed 30 hours of continuing education

7    which meet the requirements established by the board through rulemaking pursuant to RSA 541-A

8    and at least 50 percent of which are directly related to the practice of speech-language pathology.

9    ***For audiologists, have completed 20 hours of continuing education which meet the***

10    ***requirements established by the board through rulemaking pursuant to RSA 541-A.***

11    182  New Paragraphs; Speech-Language Pathology and Hearing Care Providers Practice;

12    Professional Identification.  Amend RSA 326-F:8 by inserting after paragraph IV the following new

13    paragraphs:

14        V.  No person shall practice audiology or represent oneself as an audiologist in this state,

15    unless such person is licensed in accordance with the provisions of this chapter.

16        VI.  No person shall represent oneself or use the following words to represent oneself:

17    audiologist, audiology, audiometry, audiometrist, audiological, audiometrics, hearing therapy,

18    hearing therapist, hearing clinic, hearing aid audiologist, or any other variation or synonym which

19    expresses, employs, or implies these terms or functions unless the person has been duly licensed as

20    an audiologist.

21    183  New Sections; Registration of Hearing Aid Dealers; Temporary Licensure for Audiologists;

22    Audiologists From Other Jurisdictions; Disclosure to Customers; Unsolicited Home Sales Prohibited;

23    Return of Hearing Aid; Deceptive Advertising Prohibited.  Amend RSA 326-F by inserting after

24    section 8 the following new sections:

25    326-F:9  Registration of Hearing Aid Dealers Required.  No person shall engage in the business

26    of selling or offering for rent hearing aids unless such person is registered in accordance with this

27    chapter and unless the registration of such person is current and valid.  The fee for an initial

28    registration under this section shall not exceed $300.  This section includes the selling or renting of

29    hearing aids by mail in this state by a person outside the state.  Registration certificates shall be

30    renewed biennially on or before June 30 upon payment of a renewal fee.

31    326-F:10  Temporary Licensure for Audiologists.

32        I.  A temporary license may be granted for up to 120 days to a person who has moved to this

33    state from another jurisdiction, if the person holds an audiologist's license in the other jurisdiction

34    and the other jurisdiction's requirements for licensure are greater than or equal to the requirements

35    in this state, and the person has applied for a license under this chapter.

36        II.  A temporary license issued under this section shall expire no later than 120 days after

37    issuance.  The date shall be stated on the license.

Amendment to HB 2-FN-A-LOCAL
- Page 72 -

1    326-F:11   Audiologists From Other Jurisdictions; Licensure.   The board may waive licensure

2 requirements for an applicant who:

3      I.   Is licensed by another jurisdiction where the requirements for licensure are greater than

4 or equal to those required in this state; and

5      II.   Is practicing audiology 20 days or less in New Hampshire in any calendar year.

6    326-F:12   Hearing Aid Dealer and/or Audiologist Disclosure to Customers.

7      I.   No hearing aid dealer or audiologist shall sell a hearing aid without presenting the

8 purchaser an itemized receipt, which shall include the following:

9      (a)   The name and address and signature of the purchaser.

10      (b)   The date of the sale.

11      (c)   The name and the regular place of business of the hearing aid dealer or dealer's

12 registration number or of the audiologist or audiologist's license number, and signature of the

13 registrant or licensee.

14      (d)   The make, model, serial number, and purchase price of the hearing aid and the

15 terms of the warranty.

16      (e)   An itemization of the total purchase price, including but not limited to the cost of the

17 aid, ear mold, and batteries and other accessories and any other services.

18      (f)   A statement as to whether the hearing aid is "new," "used" or "reconditioned."

19      (g)   The complete terms of the sale, including a clear and precise statement of the 30-day

20 money back guarantee required under RSA 326-F:14.

21      (h)   The name, address and telephone number of the consumer protection and antitrust

22 bureau, division of public protection, department of justice, with a statement that complaints which

23 arise with respect to the transaction may be submitted in writing to the consumer protection and

24 antitrust bureau.

25      (i)   The following statements in 10 point type or larger:   1) "This hearing aid will not

26 restore normal hearing nor will it prevent further hearing loss;" 2) "You have the right to cancel this

27 purchase or rental for any reason within 30 days after receiving the hearing aid."

28      II.   Each registrant or licensee shall keep records of every customer to whom such person

29 renders services or sells hearing aids, including a copy of the receipt as specified under paragraph I,

30 a record of services provided, any correspondence to or from a customer and any records required

31 under the rules for the hearing aid industry as promulgated by the United States Federal Trade

32 Commission on July 20, 1965, or as amended, or any rules for the hearing aid industry promulgated

33 by the United States Food and Drug Administration.   These records shall be preserved for at least 3

34 years after the date of transaction.

35    326-F:13   Unsolicited Home Sales Prohibited.   No hearing aid dealer or audiologist, employee or

36 agent thereof, shall canvass either in person or by telephone from house to house for the purpose of

Amendment to HB 2-FN-A-LOCAL
- Page 73 -

1    selling or renting a hearing aid without prior request from the prospective customer, a relative or

2    friend of the prospective customer.

3    326-F:14   Return of Hearing Aid; Cancellation Fee.   No hearing aid shall be sold to any person

4    unless accompanied by a 30-day written money back guarantee that if the person returns the

5    hearing aid in the same condition, ordinary wear and tear excluded, as when purchased, within 30

6    days from the date of delivery, the hearing aid dealer or audiologist may be entitled to a cancellation

7    fee of 5 percent of the purchase price.  In computing the actual purchase price, all rebates, discounts,

8    and other similar allowances provided to the seller shall be considered.  For the purpose of this

9    section, any consumer who initiates the return of a hearing aid within said 30-day period shall be in

10   compliance with this section.  The addressing of any claimed deficiency or return shall be resolved

11   within 90 days from date of delivery.

12   326-F:15   Deceptive Advertising Prohibited.

13       I.   No hearing aid dealer or audiologist, or employee or agent thereof, shall use or cause to be

14   used or promote the use of any advertising matter, promotional literature, testimonial, guarantee,

15   warranty, label, brand, insignia, or other representation, however disseminated or published, which

16   is misleading, deceptive, or untruthful.   All advertising by mail which offers free hearing testing or

17   other services by a hearing aid dealer or audiologist shall clearly state in such advertising that the

18   offers are made by a hearing aid dealer or audiologist.

19       II.   No hearing aid dealer, or employee or agent thereof, shall represent that the services or

20   advice of an individual licensed to practice medicine or of an individual certified as an audiologist

21   will be used or made available in the selection, fitting, adjustment, maintenance, or repair of hearing

22   aids where that is not true; or use or incorporate in any title or designation the words, "doctor,"

23   "otologist," "clinic," "clinical audiologist," "audiologist," "state licensed clinic," "state certified," "state

24   approved," "state registered," "certified hearing aid audiologist," or any term, abbreviation, or symbol

25   which would give the false impression that one is being treated medically or audiologically or that

26   the registrant's services have been recommended by the state.

27       III.   No hearing aid dealer or audiologist, or employee or agent thereof, shall use any

28   advertisement or any other representation which has the effect of misleading or deceiving

29   purchasers or prospective purchasers in the belief that any hearing aid or device, or part or

30   accessory thereof, is a new invention or involves a new mechanical or scientific principle when such

31   is not a fact.

32       IV.   No hearing aid dealer or audiologist, or employee or agent thereof, shall state or imply

33   that the use of any hearing aid will restore hearing to normal, or preserve hearing, or prevent or

34   retard the progression of a hearing impairment or make any false or misleading or medically or

35   audiologically unsupportable claims regarding the efficacy or benefits of hearing aids.

V.   No hearing aid dealer or audiologist, or employee or agent thereof, shall advertise a particular model, type, or kind of hearing aid when the offer is not a bona fide effort to sell the product so offered as advertised.

VI.   No hearing aid dealer or audiologist, or employee or agent thereof, shall advertise that a hearing aid will be beneficial to persons with hearing loss, regardless of the type of loss.   No such dealer, employee, or agent shall advertise that a hearing aid will enable persons with hearing loss to consistently distinguish and understand speech sounds in noisy situations.

VII.   No hearing aid shall be sold to any person unless the packaging containing the hearing aid carries the following disclaimer in 10 point type or larger:   "This hearing aid will not restore normal hearing nor will it prevent further hearing loss."

326-F:16  Out-of-State Sales Regulated.

I.   No person shall conduct or operate a business outside of the state for the sale at retail of hearing aids to individuals within the state unless such business is registered with a permit issued by the board.

II.   The board shall issue a permit to such out-of-state business if the business discloses and provides proof:

(a)   That the business is in compliance with all applicable laws and rules in the state in which the business is located;

(b)   Of the operating locations and the names and titles of all principal corporate officers;

(c)   That the business complies with all lawful directions and requests for information from the board of all states in which it conducts business; and

(d)   That the business agrees in writing to comply with all New Hampshire laws and rules relating to the sale or dispensing of hearing aids.

III.   The board shall assess fees as established by rules adopted by the board, pursuant to RSA 541-A, for out-of-state hearing aid sales companies.

184  General Administration of Regulatory Boards and Commissions; Reciprocity Information.   Amend the introductory paragraph of RSA 332-G:12, I to read as follows:

I.  All boards or commissions[, including the board of hearing care providers established in RSA 137-F:3,] shall post information on their website relative to reciprocal licensure or certification for persons holding a current and valid license or certification for the practice of the regulated profession in another state.   Such information shall include a list of the states which the board or commission has determined to have license or certification requirements equal to, or greater than, the requirements of this state.   The posting shall also list states with which the board or commission has:

185  Repeals.   The following are repealed:

I.  RSA 137-F, relative to hearing care providers.

II.  RSA 310-A:1-a, II(a), relative to hearing care providers.

1    186  Transition; Rules; Hearing Care Providers.

2        I.  The rules adopted for hearing care providers under the former RSA 137-F in effect on the

3    effective date of this act shall, to the extent practicable, continue and be effective and apply to

4    hearing care providers until they expire or are amended or repealed.

5        II.  Registrations or licenses of hearing care providers under the former RSA 137-F shall be

6    valid until they expire or are revoked or suspended as provided in RSA 326-F as amended by section

7    183 of this act.

8    187  New Chapter; Department of Energy.  Amend RSA by inserting after chapter 12-O the

9    following new chapter:

10                      CHAPTER 12-P

11                 DEPARTMENT OF ENERGY

12    12-P:1  Definitions.  In this chapter:

13    I. "Commission" means the public utilities commission.

14    II.  "Commissioner" means the commissioner of energy.

15    III.  "Department" means the department of energy

16    12-P:2  Establishment; Purpose.

17        I.  There shall be a department of energy under the executive direction of a commissioner of

18    energy and consisting of the divisions of administration, policy and programs, enforcement, and

19    regulatory support.

20        II.  The purpose of this chapter is to improve the administration of state government by

21    providing unified direction of policies, programs, and personnel in the field of energy and utilities,

22    making possible increased efficiency and economies from integrated administration and operation of

23    the various energy and utility related functions of the state government.

24        III.  In addition to its other functions, it shall be the duty of the department of energy to

25    provide all necessary administrative support to the public utilities commission to assist the

26    commission in carrying out its regulatory and adjudicative functions.

27        IV.  The department shall have the authority to investigate any matter that may come before

28    the public utilities commission and to appear before the commission to advocate for the department's

29    position and for the purposes of providing a complete record for consideration by the commission.

30    12-P:3  General Provisions.

31        I.  Upon the recommendation of the commissioner after consultation with division directors

32    concerned, the governor and council are authorized to approve revisions in internal administrative

33    departmental organization as the governor and council find from time to time may improve or make

34    more economical the administration of the department.

35        II.  The department of energy is authorized to work with the department of business and

36    economic affairs and the department of administrative services to coordinate the implementation of

37    the establishment of the department, and to transfer appropriations and create the proper

**Amendment to HB 2-FN-A-LOCAL**
**- Page 76 -**

1    expenditure lines, if needed, for the establishment of their respective operations, including but not
2    limited to the relocation of personnel, work stations, books, papers, personnel record files, and
3    equipment, with the approval of the governor and council and of the director of personnel.

4    12-P:4  Commissioner; Deputy Commissioner; Directors

5        I.  The commissioner of the department of energy shall be appointed by the governor, with
6    the consent of the council, and shall serve for a term of 4 years.  The commissioner shall be qualified
7    to hold that position by reason of education and experience.  Directors of departmental divisions
8    shall be subject to the supervisory authority of the commissioner, which authority shall include
9    power to establish department and divisional policy as well as to control the actual operations of the
10   department and all divisions therein.  The commissioner is authorized to establish any advisory
11   committees and programs which the commissioner may deem necessary to carry out the mission and
12   operations of the department.

13       II.  The commissioner of energy shall nominate a deputy commissioner of energy for
14   appointment by the governor and council.  The deputy commissioner shall hold office for 4 years and
15   until a successor has been appointed and qualified.  The deputy commissioner shall be qualified to
16   hold that position by reason of education and experience.  The deputy commissioner shall perform
17   such duties as the commissioner may assign.  The deputy commissioner shall perform the duties of
18   the commissioner if for any reason the commissioner is unable to do so.

19       III.  Division directors shall be appointed to initial terms as stated below, and then
20   subsequently to terms of 4 years.  Terms notwithstanding, each division director shall serve until a
21   successor has been appointed and qualified.

22           (a)  The commissioner shall nominate for appointment by the governor and council a
23   director of the division of policy and programs for an initial term of one year.  All subsequent terms
24   shall be 4 years.  The director of the division of policy and programs shall be qualified to hold that
25   position by reason of education and experience.

26           (b)  The commissioner shall nominate for appointment by the governor and council a
27   director of the division of administration for an initial term of 2 years.  All subsequent terms shall be
28   4 years.  The director of the division of administration shall be qualified to hold that position by
29   reason of education and experience.

30           (c)  The commissioner shall nominate for appointment by the governor and council a
31   director of the division of enforcement for an initial term of 3 years.  All subsequent terms shall be 4
32   years.  The director of the division of enforcement shall be qualified to hold that position by reason of
33   education and experience.

34           (d)  The commissioner shall nominate for appointment by the governor and council a
35   director of the division of regulatory support for an initial term of 3 years.  All subsequent terms
36   shall be 4 years.  The director of the division of regulatory support shall be qualified to hold that
37   position by reason of education and experience.

1      IV.  The salaries of the commissioner, the deputy commissioner, and each division director
2      shall be as specified in RSA 94:1-a.

3      12-P:5  Duties of Commissioner.  In addition to the powers, duties, and functions otherwise
4      vested by law in the commissioner of the department of energy, the commissioner, except as
5      otherwise provided in this chapter, shall:

6      I.  Represent the public interest in the administration of the functions of the department of
7      energy and be responsible to the governor, the general court, and the public for such administration.

8      II.  Provide for, in consultation with the commissioner of the department of administrative
9      services and the state treasurer, a system of accounts and reports which will ensure the integrity
10     and lawful use of all fees, funds, and revenues collected by the department, the use of which is
11     restricted by state or federal law.

12     III.  Have the authority to receive, administer, and internally audit all present and future
13     federal and state energy-related grant programs.

14     IV.  Have the authority to adopt rules, pursuant to RSA 541-A, necessary to assure the
15     continuance or granting of federal funds or other assistance intended to promote the administration
16     of this chapter, not otherwise provided for by law, and to adopt all rules necessary to implement the
17     specific statutes administered by the department or by any division or unit within the department,
18     whether the rulemaking authority delegated by the legislature is granted to the commissioner, the
19     department, or any administrative unit or subordinate official of the department.

20     V.  Have the authority to reorganize rules of the department to conform to the requirements
21     of RSA 541-A and the uniform drafting and numbering system adopted by the division of
22     administrative rules, office of legislative services.  Reference changes shall be limited to title,
23     chapter, part, and section designations and numbers and substitution of terms reflecting
24     reorganization of the department to the existing statutory structure, and shall be made subject to
25     review by the division of administrative rules, office of legislative services for consistency and
26     accuracy of such changes.  Such reference changes shall be integrated into the rules and such
27     amendments to the rules shall become effective when notice of these reference changes is published
28     by the director of legislative services in the rulemaking register.  Reference changes made prior to
29     July 1, 2022, shall be exempt from the procedures and requirements of RSA 541-A.  Changes
30     authorized under this section shall not affect the adoption or expiration date of rules changed under
31     this section.

32     VI.  Collect and account for all fees, funds, taxes, or assessments levied upon any person
33     subject to the jurisdiction of the department of energy and the public utilities commission.

34     VII.  Ensure that the department provides all necessary support to the public utilities
35     commission, the site evaluation committee, office of the consumer advocate, and any other entity
36     that is administratively attached to the department, provided that, other than for administrative
37     functions, department employees shall not communicate with the public utilities commission and its

1   staff in connection with any issue in a matter pending before the commission or the department,

2   except upon notice and opportunity for all parties to participate.

3      12-P:6  Division of Administration.  There is established within the department the division of

4   administration, under the supervision of an unclassified director of the division of administration.

5   The division, through its officials, shall be responsible for all functions, duties, and responsibilities

6   which may be assigned to it by the commissioner or laws enacted by the general court.

7      12-P:7  Division of Policy and Programs.  There is established within the department the division

8   of policy and programs, under the supervision of an unclassified director of the division of policy and

9   programs.  The division, through its officials, shall be responsible for all functions, duties, and

10   responsibilities which may be assigned to it by the commissioner or laws enacted by the general

11   court.  In addition, the division shall administer fuel assistance contracts and weatherization

12   contracts.  In administering fuel assistance and weatherization contracts, the division shall ensure

13   that when an individual applies for fuel assistance or weatherization, the individual shall be

14   provided with application forms and information about the Link-Up New Hampshire and Lifeline

15   Telephone Assistance programs, and shall be provided assistance in applying for these programs.

16      12-P:7-a  State Energy Strategy.

17      I.  The division of policy and programs, with approval of the commissioner, and with

18   assistance from an independent consultant and with input from the public and interested parties,

19   shall prepare a 10-year energy strategy for the state.  The division shall review the strategy and

20   consider any necessary updates in consultation with the senate energy and natural resources

21   committee and the house science, technology and energy committee, after opportunity for public

22   comment, at least every 3 years starting in 2021.  The state energy strategy shall include, but not be

23   limited to, sections on the following:

24         (a)  The projected demand for consumption of electricity, natural gas, and other fuels for

25   heating and other related uses.

26         (b)  Existing and proposed electricity and natural gas generation and transmission

27   facilities, the effects of future retirements and new resources, and consideration of possible

28   alternatives.

29         (c)  Renewable energy and fuel diversity.

30         (d)  Small-scale and distributed energy resources, energy storage technologies, and their

31   potential in the state.

32         (e)  The role of energy efficiency, demand response, and other demand-side resources in

33   meeting the state's energy needs.

34         (f)  The processes for siting energy facilities in the state and the criteria used by the site

35   evaluation committee in giving adequate consideration to the protection of the state's ecosystems

36   and visual, historic, and aesthetic resources in siting processes.

1  (g)  The relationship between land use and transportation policies and programs on
2  electricity and thermal energy needs in the state.

3  (h)  New Hampshire's role in the regional electric markets, how the regional market
4  affects the state's energy policy goals, and how the state can most effectively participate at the
5  regional level.

6  II.  The strategy shall include a review of all state policies related to energy, including the
7  issues in paragraph I, and recommendations for policy changes and priorities necessary to ensure
8  the reliability, safety, fuel diversity, and affordability of New Hampshire's energy sources, while
9  protecting natural, historic, and aesthetic resources and encouraging local and renewable energy
10  resources.  The strategy shall also include consideration of the extent to which demand-side
11  measures including efficiency, conservation, demand response, and load management can cost-
12  effectively meet the state's energy needs, and proposals to increase the use of such demand resources
13  to reduce energy costs and increase economic benefits to the state.

14  III.  The strategy development process shall include review and consideration of relevant
15  studies and plans, including but not limited to those developed by the independent system operator
16  of New England (ISO-NE), the public utilities commission, the energy efficiency and sustainable
17  energy board, legislative study committees and commissions, and other state and regional
18  organizations as appropriate.  The strategy shall also include consideration of new technologies and
19  their potential impact on the state's energy future.

20  12-P:7-b  Office of Offshore Wind Industry Development Established.

21  I.  There is established in the department of energy the office of offshore wind industry
22  development.  The office shall be under the supervision of a classified director of the office of offshore
23  wind industry development, who shall serve under the supervision of the commissioner.  The
24  director shall provide administrative oversight and ensure that the responsibilities of the office
25  described in this section are fulfilled.

26  II.  The office of offshore wind industry development shall:

27  (a)  Support the work of the New Hampshire members of the Intergovernmental
28  Renewable Energy Task Force administered by the federal Bureau of Ocean Energy Management
29  (BOEM).

30  (b)  Support the work of the offshore wind commission established in RSA 374-F:10.

31  (c)  Assist the offshore wind commission to develop and implement offshore wind
32  development strategies including:

33  (1)  Assessment of port facilities.

34  (2)  Economic impact analyses.

35  (3)  Supply chain analyses.

36  (4)  Outcome and performance measurements.

1       (d)    Collaborate with key state agencies and partners on offshore wind industry
2 development initiatives.

3       (e)  Coordinate offshore wind industry economic development policy, including:

4          (1)  Development of workforce.

5          (2)  Identification of and recruitment of offshore wind development employers.

6          (3)  Identification and recruitment of offshore wind supply chain employers.

7          (4)  Promotion of New Hampshire's benefits to the various components of the offshore
8 wind industry.

9          (5)  Provide updates and guidance to the general court with regard to policy and
10 funding.

11    12-P:8  Division of Enforcement.  There is established within the department the division of
12 enforcement, under the supervision of an unclassified director of the division of enforcement.  The
13 division, through its officials, shall be responsible for all functions, duties, and responsibilities which
14 may be assigned to it by the commissioner or laws enacted by the general court.

15    12-P:9  Division of Regulatory Support.  There is established within the department the division
16 of regulatory support, under the supervision of an unclassified director of the division of regulatory
17 support.  The division, through its officials, shall be responsible for all functions, duties, and
18 responsibilities which may be assigned to it by the commissioner or laws enacted by the general
19 court.  The division shall automatically be a party to all proceedings before the public utilities
20 commission.

21    12-P:10  Specific Answers.  The department or the commission may require any public utility or
22 entity subject to its jurisdiction to make specific answers to questions upon which the department or
23 commission may need information.

24    12-P:11  Transfer of Functions, Powers, Duties.  All of the functions, powers, duties, records,
25 personnel, and property of the public utilities commission incorporated in the statutes establishing
26 the department of energy and which replace the authority of the commission with the authority of
27 the department of energy, are hereby transferred, as of July 1, 2021, to the department of energy.

28    12-P:12  Prohibited Service.  No member of the commission shall render any professional service
29 for any public utility in this state, or any affiliate thereof, or act as attorney or render professional
30 service against any such public utility or affiliate; nor shall he or she be a member of a firm which
31 renders any such service; nor shall he or she directly or indirectly be a party to any contract with
32 any such public utility, except a contract for the transportation of telephone or telegraph messages,
33 or a contract for the purchase of water, gas, or electricity or for other similar service.

34    12-P:13  Pipeline Operation Safety.

35       I. The department of energy shall apply annually to the Pipeline and Hazardous Materials
36 Safety Administration of the United States Department of Transportation for authorization to take

Amendment to HB 2-FN-A-LOCAL
- Page 81 -

1   such actions on its behalf to oversee pipeline operation safety, security, monitoring, and compliance
2   through an inspection process.

3       II.   The department of energy shall report annually to the house science, technology, and
4   energy committee prior to October 1 on the status of pipeline safety, new and proposed projects, any
5   deficiency in state law that limits the department's ability to oversee interstate pipelines, or state
6   regulations for pipelines that do not meet the minimum federal standard.

7       12-P:14   Transfer of Rules, Orders, Approvals.   Existing rules, orders, and approvals of the
8   public utilities commission which are associated with any functions, powers, and duties, transferred
9   to the department of energy pursuant to RSA 12-P:11 or any other statutory provision, shall
10  continue in effect and be enforced by the commissioner of the department of energy until they expire
11  or are repealed or amended in accordance with applicable law.

12      12-P:15   Suppliers of Natural Gas and Aggregators of Natural Gas Customers; Rulemaking.

13      I.   The department is authorized to adopt rules, pursuant to RSA 541-A, establishing
14  requirements for suppliers of natural gas and the aggregators of natural gas customers, including
15  registration of such suppliers and aggregators before soliciting or doing business in the state,
16  registration fees, disclosure of information to customers, standards of conduct, submission to
17  commission jurisdiction for mediation and resolution of disputes, imposition of penalties for failure
18  to comply with commission requirements, and consumer protection and assistance requirements.

19      II.   The department of energy shall adopt rules under RSA 541-A which require all natural
20  gas companies to report to the department, the senate president, and the speaker of the house of
21  representatives, in a uniform manner, lost and unaccounted for gas for each year.

22      (a)   Such rules shall include a method using operational and billing data to determine the
23  total amount of lost and unaccounted for gas and to identify and measure each of its components.

24      (b)   The department may grant waivers from the rules as necessary for the development
25  of innovative projects to reduce lost and unaccounted for gas.   Such innovative projects shall be
26  intended to reduce costs to ratepayers and to reduce greenhouse gas emissions.   An application for a
27  waiver shall include the goals of the innovative project, the expected cost, the expected benefit to
28  ratepayers and the expected reduction in greenhouse gas emissions.

29      (c)   For the purposes of this paragraph, "lost and unaccounted for gas" shall mean an
30  amount of gas that is the difference between the total gas purchased by a gas company and the sum
31  of: (1) total gas delivered to customers; and (2) total gas used by a gas company in the conduct of its
32  operations.

33      III.   This section shall not in any way affect the utility or non-utility status of any supplier of
34  natural gas or aggregator of natural gas customers, nor shall it be construed to limit the
35  commission's and the department of energy's existing authority with regard to the regulation of gas
36  utilities or the scope of the commission's and the department's authority in considering whether to

Amendment to HB 2-FN-A-LOCAL
- Page 82 -

1    expand the availability of competitive natural gas supplies through the distribution system of gas

2    utilities.

3        188  Department of Energy; Interim Commissioner.  Until appointment of a commissioner under

4    RSA 12-P:4, the governor may initially designate an interim commissioner to serve for up to 60 days

5    from the effective date of this section.

6        189  Repeals.  The following are repealed:

7            I.  RSA 4-C, relative to the office of strategic initiatives; the governor's scholarship program

8    and fund, and state demography.

9            II.  RSA 4-E, relative to the state energy strategy.

10           III.  RSA 12-O:51 and 52, relative to the office of offshore wind industry development.

11       190  Office of Strategic Initiatives; Revolving Funds; Reference Change.  Amend RSA 6:12, I(b)

12   (79) to read as follows:

13           (79) Moneys deposited in the publications revolving fund under **RSA 12-O:60, I** [RSA

14   4-C:9-a].

15       191  Office of Strategic Initiatives; Revolving Funds; Reference Change.  Amend RSA 6:12,

16   I(b)(169)

17           (169)  Moneys deposited in the municipal and regional training fund under **RSA 12-**

18   **O:60, II** [RSA 4-C:9-a, II].

19       192  Organization of the Executive Branch.  Amend RSA 21-G:6-b, II to read as follows:

20       II.  The executive departments are as follows:

21           (a)  The department of administrative services.

22           (b)  The department of agriculture, markets, and food.

23           (c)  The department of banking.

24           (d)  The department of business and economic affairs.

25           (e)  The department of corrections.

26           (f)  The department of education.

27           (g)  The department of employment security.

28           **(h)  The department of energy.**

29           [(h)] **(i)**  The department of environmental services.

30           [(i)] **(j)**  The department of health and human services.

31           [(j)] **(k)**  The department of information technology.

32           [(k)] **(l)**  The department of insurance.

33           [(l)] **(m)**  The department of labor.

34           [(m)] **(n)**  The department of military affairs and veteran services.

35           [(n)] **(o)**  The department of natural and cultural resources.

36           [(o)] **(p)**  The department of revenue administration.

37           [(p)] **(q)**  The department of safety.

1 [(q)] *(r)* The department of transportation.

2 193  Department of Energy; Unclassified Positions Established.

3 I.   The following positions are hereby established in the department of energy, shall be
4 qualified by reason of education or experience or both, and shall be appointed by the commissioner
5 and perform assigned duties according to applicable law.   Each position shall be temporarily
6 assigned to its respective unclassified salary letter grade, as follows:

| Labor Grade | Title | Job Code | Position # |
|---|---|---|---|
| GG | Director of Regulatory Support | 9U9962 | GV008 |
| GG | Director of Enforcement | 9U9963 | GV009 |
| GG | Director of Policy & Programs | 9U9964 | GV010 |
| GG | Director of Administration | 9U9966 | GV012 |
| HH | Deputy Commissioner of Energy | 9U9967 | GV013 |
| II | Commissioner of Energy | 9U9968 | GV020 |

14 II.   The permanent salaries of these positions shall be determined after assessment and
15 review of the appropriate letter grade allocation in RSA 94:1-a, I(b) for the positions which shall be
16 conducted pursuant to RSA 94:1-d and RSA 14:14-c.

17 194  Public Utilities Commission; Unclassified Positions Established.

18 I.   The following positions are hereby established in the public utilities commission, shall be
19 qualified by reason of education or experience or both in one or more of the following areas:
20 engineering, economics, accounting, finance, or law; and shall be appointed by the agency head and
21 perform assigned duties according to applicable law.   Each position shall be temporarily assigned to
22 its respective unclassified salary letter grade, as follows:

| Labor Grade | Title | Job Code | Position # |
|---|---|---|---|
| GG | Senior Advisor | 9U9969 | GV014 |
| GG | Senior Advisor | 9U9970 | GV015 |
| GG | Senior Advisor | 9U9971 | GV016 |
| GG | Senior Advisor | 9U9972 | GV017 |
| GG | Senior Advisor | 9U9973 | GV018 |
| GG | Senior Advisor | 9U9974 | GV019 |

30 II.   The permanent salaries of these positions shall be determined after assessment and
31 review of the appropriate letter grade allocation in RSA 94:1-a, I(b) for the positions which shall be
32 conducted pursuant to RSA 94:1-d and RSA 14:14-c.

33 195  New Subdivision; Department of Business and Economic Affairs; Office of Planning and
34 Development.  Amend RSA 12-O by inserting after section 52 the following new subdivision:

35 Office of Planning and Development

36 12-O:53  Office of Planning and Development.

Amendment to HB 2-FN-A-LOCAL
- Page 84 -

1    I.  There is established the office of planning and development within the department of

2    business and economic affairs.  The office of shall be under the supervision of a classified director of

3    the office of planning and development, who shall serve under the supervision of the commissioner.

4    II.  The office of planning and development shall:

5        (a)  Plan for the orderly development of the state and the wise management of the state's

6    resources.

7        (b)    Compile, analyze, and disseminate data, information, and research services as

8    necessary to advance the welfare of the state.

9        (c)  Encourage and assist planning, growth management, and development activities of

10   cities and towns and groups of cities and towns with the purpose of encouraging smart growth.

11       (d)   Encourage the coordination and correlation of state planning by agencies of state

12   government.

13       (e)  Participate in interstate, regional, and national planning efforts.

14       (f)  Administer federal and state grant-in-aid programs assigned to the office by statute

15   or executive order.

16       (g)   Participate and advise in matters of land use planning regarding water resources

17   and floodplain management.

18       (h)  Take a leadership role in encouraging smart growth and preserving farmland, open

19   space land, and traditional village centers.

20       (i)  Administer the following programs:  the statewide comprehensive outdoor recreation

21   plan, the national flood insurance program, and the land conservation investment program.  The

22   office shall employ necessary personnel to administer these programs.

23       (j)  Perform such other duties as the commissioner may assign.

24   12-O:54  State Development Plan.

25   I.  The office of planning and development, under the direction of the commissioner, shall:

26       (a)  Assist the commissioner in preparing, publishing, and revising the comprehensive

27   development plan required under RSA 9-A.

28       (b)    Coordinate and monitor the planning efforts of various state agencies and

29   departments to ensure that program plans published by such agencies are consistent with the

30   policies and priorities established in the comprehensive development plan.

31       (c)  Coordinate and monitor the planning efforts of the regional planning commissions to

32   ensure that the plans published by the commissions are consistent, to the extent practical, with the

33   policies and priorities established in the state development plan.

34   II.  In preparing the state development plan, the office of planning and development shall

35   consult with the chief executive officers of the various departments and agencies of state

36   government.  The office shall also consult with officials of regional planning commissions and

regional and local planning and development agencies, local officials, representatives of the business and environmental community, and the general public.

III.  All state agencies and departments shall provide the office of planning and development with information and assistance as required by the office to fulfill its responsibilities under paragraph I.  The office shall maintain the confidentiality of any information which is protected by law.

12-O:55  Data and Information Services.  The office of planning and development shall:

I.  Gather, tabulate, and periodically publish information on the location and pace of development throughout the state, including, but not limited to, population, housing, and building permit data.

II.  Initiate data coordination procedures as the state agency responsible for coordinating data collection and dissemination among the state, the private sector, and the various political subdivisions.

III.  Gather information for storage in a data bank concerning the data which is currently available within all state agencies.  This data shall be used to provide information which is useful in measuring growth and its impact and for statewide planning purposes in general.   The data available for dissemination shall include, but shall not be limited to, information for determining future demands for state services and demographic and economic statistics.  Any other state agency or department which initiates a data collection program shall inform the office of planning and development of its efforts so that the office may utilize that information for planning purposes in its dissemination program.

IV.  Cooperate with the department of environmental services in identifying potential sites for hazardous waste facilities.

V.  Develop and maintain a computerized geographic information system in support of state, regional, or local planning and management activities.

VI.  Cooperate with the Bureau of the Census and other federal agencies with the objective of improving access to the statistical products, data, and information of the federal government.

VII.  Annually estimate the resident population for all cities and towns of the state pursuant to RSA 78-A:25.

12-O:56  Policies and Plans.

I.  The office of planning and development shall formulate policies and plans for consideration by the commissioner and the governor which serve to integrate and coordinate resource and development activities affecting more than one state agency, level of government, or governmental function.  Such activities may include, but shall not be limited to, the following subject areas:

(a)  Water resources.

(b)  Transportation.

1 (c) Recreation and natural resources.

2 (d) Solid waste and hazardous waste management.

3 (e) Off-shore, coastal, and estuarine resources.

4 (f) Housing.

5 (g) Economic development.

6 (h) Energy.

7 (i) Shoreland protection.

8 (j) Smart growth.

9 12-O:57 Program Established. The director of the office of planning and development shall
10 establish a program of regional and municipal assistance within the office of planning and
11 development.  This program shall coordinate state, regional, and local planning efforts with the goal
12 of assuring delivery of efficient and effective assistance to local governments in areas related to
13 growth management and resource protection.

14 12-O:58 Responsibilities for Assistance. The office of planning and development shall:

15 I. Provide technical assistance and, within the limits of biennial legislative appropriations,
16 financial grants to regional planning commissions established under RSA 36:45-36:53 in support of:

17 (a) Planning assistance to local units of government.

18 (b) Preparation of regional plans.

19 (c) Contributions to and coordination with statewide planning and management
20 activities, including the formulation and updating of the comprehensive state development plan
21 prepared pursuant to RSA 12-P:54.

22 II. As requested and in cooperation with regional planning commissions, provide technical
23 assistance and information in support of the planning and growth management efforts of local units
24 of government, including training requested under RSA 673:3-a.  The office shall encourage
25 municipalities to first seek assistance from established regional planning commissions.

26 III. Provide computer interface capability among and between each regional planning
27 commission, the office of strategic initiatives, and state data collection and storage sources.  The
28 computer interface capability shall be used by regional planning commissions to respond to
29 municipal requests for assistance in the preparation and amending of master plans and in the
30 evaluation of municipal infrastructure needs.  The computer interface capability shall also be used
31 by regional planning commissions to develop and update regional master plans, as provided in RSA
32 36:47.  The computer equipment used for the purposes of this paragraph shall be compatible and
33 able to interface with the office of planning and development's geographic information system, as
34 well as with other similar state computerized data collection and storage sources.

35 IV. Provide technical assistance and information to municipalities with the cooperation of
36 other state and regional planning agencies in the following areas:

Amendment to HB 2-FN-A-LOCAL
- Page 87 -

1       (a)   Use and application of geographic data available in the state's geographic
2 information system (GIS) for local planning and growth management purposes.

3       (b)   Recommending standard procedures for the establishment of accurate, large-scale
4 base mapping to support municipal administrative functions such as tax assessment, public facility
5 management and engineering.

6   12-O:59  Coordination at State Level.  The office of planning and development shall coordinate
7 efforts by state agencies to provide technical assistance to municipal governments in areas related to
8 growth management and resource protection.

9   12-O:60  Revolving Funds.  In order to enhance its ability to provide education and training
10 assistance to municipalities and regional agencies, the following nonlapsing revolving funds, which
11 shall not exceed $20,000 on June 30 of each year, shall be established in the office of planning and
12 development:

13       I. A revolving fund known as the publications revolving fund.

14       (a)   The moneys in this fund shall be used for the purposes of printing materials for
15 distribution.  A reasonable charge shall be established for each copy of a document.  This charge
16 shall be only in the amount necessary to pay the cost of producing such document.

17       (b)   The amount in the nonlapsing publications revolving fund shall not exceed $20,000,
18 on June 30 of each year and any amounts in excess of $20,000 on June 30 of each year shall be
19 deposited in the general fund as unrestricted revenue.

20       II. A revolving fund known as the municipal and regional training fund.

21       (a)   The moneys in this fund shall be used for the purpose of providing training to local
22 and regional officials.  A reasonable charge shall be established for such training.  This charge shall
23 be fixed to reflect the cost of payments to experts to provide the training, the cost of written training
24 material, rental of facilities, advertising and other associated costs.  Such training shall be
25 conducted in a geographically dispersed manner and scheduled with the convenience of part-time
26 officials in mind.

27       (b)   The amount in the nonlapsing municipal and regional training revolving fund shall
28 not exceed $20,000 on June 30 of each year and any amounts in excess of $20,000 on June 30 of each
29 year shall be deposited in the general fund as unrestricted revenue.

30   196  State Development Plan.  Amend RSA 9-A:2 to read as follows:

31   9-A:2  [Office of Strategic Initiatives] *Office of Planning and Development*.  The office of
32 [strategic initiatives] *planning and development*, under the direction of the [governor]
33 *commissioner of business and economic affairs*, shall:

34       I.  Assist the [governor] *commissioner* in preparing, publishing and revising the
35 comprehensive development plan.

36       II.  Develop and maintain a technical data base of information to support statewide policy
37 development and planning.

Amendment to HB 2-FN-A-LOCAL
- Page 88 -

1       III.   Coordinate and monitor the planning efforts of various state agencies and departments

2    to ensure that program plans published by such agencies are consistent with the policies and

3    priorities established in the comprehensive development plan.

4       IV.   Coordinate and monitor the planning efforts of the regional planning commissions.

5    197  State Development Plan; References Changed.  Amend RSA 9-A:4 to read as follows:

6    9-A:4  Consultation With Other Agencies.

7       I.  In preparing the state development plan, the office of [strategic initiatives] *planning and*

8    *development* shall consult with the chief executive officers of the various departments and agencies

9    of state government with responsibilities which are relevant to economic development.

10       II.  The office may also consult with officials of regional and local planning and development

11    agencies and representatives of business and industry.

12       III.   All state agencies and departments shall provide the office of [strategic initiatives]

13    *planning and development* with such information and assistance required by the office to fulfill

14    its responsibilities under RSA 9-A:2.  The office shall maintain the confidentiality of any information

15    which is protected by law.

16    198   Name Change; Office of Planning and Development.   Amend the following RSAs by

17    replacing "office of strategic initiatives" with "office of planning and development":  RSA 4-F:1; 12-

18    G:13;  17-M:2;  21-O:5-a;  21-P:48;  36:45;  36:46;  36:47;  36-B:1;  78-A:25;  78-A:26;  125-O:5-a;  126-A:4;

19    162-L:15; 162-L:19; 204-C:8; 216-A:3-c; 216-F:5; 217-A:3; 227-C:4; 227-G:2; 227-M:4; 233-A:2; 235:23;

20    238:20; 270:64; 270:71; 432:19; 482-A:32; 483:8; 483:10; 483-A:6; 483-A:7; 483-B:5; 483-B:12; 483-

21    B:16; 483-B:22; 485-A:4; 673:3-a; 674:3; 675:9.

22    199   Council on Resources and Development; Membership.   Amend RSA 162-C:1 to read as

23    follows:

24    162-C:1   Council Established.   There is established a council on resources and development

25    which shall include the following members:

26       I.  [The director or assistant director of the office of strategic initiatives who shall serve as

27    chairperson of the council.

28       II.]  The commissioner or appropriate division director, department of business and economic

29    affairs, or designee*, who shall serve as chairperson of the council*.

30       [III.]  *II.*    The commissioner or assistant commissioner, department of environmental

31    services, or designee.

32       [IV.]  *III.*   The commissioner or appropriate division director, department of agriculture,

33    markets, and food, or designee.

34       [V.]  *IV.*   The executive director or appropriate division director, fish and game department,

35    or designee.

36       [VI.]  *V.*   The commissioner or assistant commissioner, department of safety, or designee.

[VII.] *VI.*  The commissioner of the department of health and human services or a member of the senior management team, or designee.

[VIII.] *VII.*   The commissioner or assistant commissioner, department of education, or designee.

[IX.] *VIII.*   The commissioner or assistant commissioner, department of transportation, or designee.

[X.] *IX.*   The commissioner or appropriate division director, department of natural and cultural resources, or designee.

[XI.] *X.*   The commissioner or appropriate division director, department of administrative services, or designee.

[XII.] *XI.*   The executive director or chairman of the New Hampshire housing finance authority, or designee.

200  Name Change; Department of Energy.  Amend the following RSAs by replacing "office of strategic initiatives" with "department of energy":  RSA 9-E:5; 12-K:2; 12-K:3; 12-K:6; 12-K:8; 12-K:9; 38-D:6; 147-B:4; 162-H:10; 167:4-c; 369-B:2; 374:22-j.

201  Reference Changed: State Energy Strategy; Offshore Wind Commission.  Amend RSA 374-F:10, I to read as follows:

I.  There is established a commission to investigate, in parallel with the work of the Gulf of Maine Intergovernmental Renewable Energy Task Force established by the Bureau of Ocean Energy Management (BOEM) study, the economic development opportunities for New Hampshire in supply chain needs, port capabilities, workforce development, energy procurement, transmission and storage, and fisheries and marine environment, to ensure the success of offshore wind in the Gulf of Maine.  The commission may consider, at an appropriate time, in relation to the New Hampshire state energy strategy, outlined in RSA [4-E] *12-P*, if contracts with developers and utilities can deliver lower costs to ratepayers.  The commission may coordinate with the advisory boards established in Executive Order 2019-06 as to assist the commission in reaching its recommendations.

202  Reference Changed; State Energy Policy; Least Cost Energy Planning.  Amend RSA 378:38, VII to read as follows:

VII.  An assessment of plan integration and consistency with the state energy strategy under RSA [4-E:1] *12-P*.

203  Reference Changed; Motor Vehicle Waste Fee.  Amend the introductory paragraph of RSA 261:153, V to read as follows:

V.  Beginning July 1, 1989, in addition to each registration fee collected under paragraph I, there may be collected an additional fee for the purposes of a town reclamation trust fund as established in RSA 149-M:18.  Of this amount, $.50 shall be retained by the city official designated by the city government or by the town clerk for administrative costs and the remaining amount shall

1 be deposited into the reclamation trust fund established by the town for the purpose of paying

2 collection and disposal fees for the town's motor vehicle waste and paying for the recycling and

3 reclamation of other types of solid waste.  For the purposes of this paragraph, "motor vehicle waste"

4 means "motor vehicle waste" as defined in RSA 149-M:18.  A town which collects such additional fees

5 shall not charge a disposal fee for motor vehicle waste at the town's solid waste disposal facility.  If a

6 town finds the additional fee is not sufficient to cover fees for collection and disposal of town motor

7 vehicle waste, it shall notify the office of [strategic initiatives] *planning and development*.  The

8 office shall study the fee in accordance with RSA [4-C:1] *12-O:53* and make recommendations, if

9 necessary, for increases in the fee.  The additional fee schedule shall be graduated by class of vehicle

10 as follows:

11  204  Public Utilities Commission; Prohibition on Future Employment.  Amend RSA 363:12-b to

12 read as follows:

13  363:12-b  Prohibition on Future Employment.  No commissioner, *or former* executive director,

14 finance director, *or* general counsel[, or chief engineer] of the commission shall accept any

15 employment with any utility under the control of the commission until one year after he or she shall

16 become separated from the commission.

17  205  Repeal.  RSA 363:4-a, relative to duties of commissioners of the public utilities commission,

18 is repealed.

19  206  Public Utilities Commission; Prohibition on Future Employment.  Amend RSA 363:12-b to

20 read as follows:

21  363:12-b  Prohibition on Future Employment.  No commissioner, *or former* executive director,

22 finance director, *or* general counsel[, or chief engineer] of the commission shall accept any

23 employment with any utility under the control of the commission until one year after he or she shall

24 become separated from the commission.

25  207  Public Utilities Commission; Quorum.  Amend RSA 363:16 to read as follows:

26  363:16  Quorum.  A majority of the commission shall constitute a quorum to issue orders [or

27 adopt rules], and any hearing [or investigation] may be held or conducted by 2 commissioners or by a

28 single commissioner.

29  208  Public Utilities Commission; Request for Full Commission.  Amend RSA 363:17 to read as

30 follows:

31  363:17  Request for Full Commission.  No hearing [or investigation], except in accident cases,

32 shall be held or conducted by a single commissioner if any party whose interests may be affected

33 shall, 5 days before the date of hearing, file a request in writing that the same be held or conducted

34 by the full commission, or a majority thereof.  If no such request is filed, the commission may assign

35 one of its members or appoint a qualified member of its staff as examiner to hear the parties, report

36 the facts, and make recommendations to the commission.

37  209  Repeal.  The following are repealed:

## Amendment to HB 2-FN-A-LOCAL
## - Page 91 -

1        I.  RSA 363:18-a, relative to the authority of the public utilities commission to contract for

2 power.

3        II.  RSA 363:22-a, relative to pipeline operation safety.

4    210  Public Utilities Commission; Staff.  Amend RSA 363:27 to read as follows:

5    363:27  Staff[; Separation of Functions].

6        I.  In the exercise of the jurisdiction and performance of the duties prescribed by law, the

7 commission shall have the power, subject to the state personnel regulations and within the limits of

8 the appropriation for such purpose, to employ and fix the compensation of such regular staff,

9 including experts, as it shall deem necessary.  Notwithstanding any other provision of law, if the

10 expenditure of additional funds over budget estimates is necessary for the proper functioning of the

11 public utilities commission, the governor and council, with the prior approval of the fiscal committee

12 of the general court, upon request from the commission, may authorize an additional assessment

13 pursuant to RSA 363-A for such purpose.

14        II.  The staff of the commission shall be organized as the [commission] *chairperson*

15 determines best achieves its statutory responsibilities.

16        III.  [Executive Director and General Counsel.  The commission shall appoint an executive

17 director, who shall serve for a term of 4 years.  The commission shall also appoint a general counsel,

18 who shall serve for a term of 4 years and until a successor is appointed and qualified.]  *"Staff"*

19 *means the employees of the commission and any consultants and other contractors*

20 *retained by the commission for the purpose of assisting the commission and its employees*

21 *in providing advice or information, or for the purpose of supplementing the work of the*

22 *commission and its employees.*

23        [IV.  Director of Safety and Security.  The commission shall appoint a director of safety and

24 security, who shall serve a term of 4 years.  The director of safety and security shall be qualified to

25 hold that position by reason of education and experience and shall perform such duties as are

26 assigned by the chairman of the commission.]

27    211  Office of the Consumer Advocate; Attachment to Department of Energy.  Amend the

28 introductory paragraph of RSA 363:28, I to read as follows:

29        I.  The office of the consumer advocate shall be an independent agency administratively

30 attached to the [public utilities commission] *department of energy* pursuant to RSA 21-G:10.  The

31 office shall consist of the following:

32    212  Office of the Consumer Advocate; Attachment to Department of Energy.  Amend RSA

33 363:28, III to read as follows:

34        III.  The consumer advocate shall have authority to contract for outside consultants within

35 the limits of funds available to the office.  With the approval of the fiscal committee of the general

36 court and the governor and council, the office of the consumer advocate may employ experts to assist

37 it in proceedings before the public utilities commission, and may pay them reasonable compensation.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 92 -**

The [public utilities commission] *department of energy* shall charge a special assessment for any such amounts against any utility participating in such proceedings and shall provide for the timely recovery of such amounts for the affected utility.

213  Repeal.  RSA 363:30 through RSA 363:36, relative to participation of staff of the public utilities commission in adjudicative proceedings, are repealed.

214  Public Utilities Commission; Complaints.  Amend RSA 363:39 to read as follows:

363:39  Complaints [to the Commission].  When complaints to the [public utilities commission] *department of energy* are initiated by residential customers, the [commission] *department* shall provide to the consumer advocate access to the complaint, by paper or electronically, with the customer name blocked out, at the same time as the [commission] *department* forwards the complaint to the utility in compliance with [commission] *department* rules.

215  Electric Vehicle Charging Stations Infrastructure Commission; Membership.  Amend RSA 4-G:1, II(a)(1) to read as follows:

(1)  [Office of strategic initiatives] *Department of energy*.

216  Electric Vehicle Charging Stations Infrastructure Commission; Duties.  Amend RSA 4-G:1, III(f) to read as follows:

(f)  Changes needed to state laws, rules, and practices, including building codes*, department of energy rules,* and public utilities commission rules, to further the development of zero emission vehicle technology and infrastructure.

217  Maintenance of Funds Collected Pursuant to Electric Utility Restructuring Orders.  Amend RSA 6:12-b to read as follows:

6:12-b  Maintenance of Funds Collected Pursuant to Electric Utility Restructuring Orders.  On request of the [public utilities commission] *department of energy*, the state treasurer shall maintain custody over funds collected by order of the public utilities commission consisting of only that portion of the system benefits charge directly attributable to programs for low income customers as described in RSA 374-F:4, VIII(c).  All funds received by the state treasurer pursuant to this section shall be kept separate from any other funds and shall be administered in accordance with terms and conditions established by the [public utilities commission] *department of energy*.  Plans for the administration of such funds shall be approved by the fiscal committee of the general court and the governor and council prior to submission to the [public utilities commission] *department of energy*.  Appropriations and expenditures of such funds in fiscal years 2002 and 2003 shall be approved by the fiscal committee of the general court and the governor and council prior to submission to the [public utilities commission] *department of energy*.  For each biennium thereafter, appropriations and expenditures of such funds shall be made through the biennial operating budget.

218  Energy Efficiency and Clean Energy Districts.  Amend RSA 53-F:6, I to read as follows:

1     I.  Improvements financed pursuant to an agreement under this chapter shall be based upon

2     an audit performed by a person who has been certified as a building analyst by the Building

3     Performance Institute or who has obtained other appropriate certification as determined by the

4     [public utilities commission] *department of energy* or another appropriate New Hampshire-based

5     entity.  The audit shall identify recommended energy conservation and efficiency and clean energy

6     improvements; provide the estimated energy cost savings, useful life, benefit-cost ratio, and simple

7     payback or return on investment for each improvement; and provide the estimated overall difference

8     in annual energy costs with and without recommended improvements.  Financed improvements

9     shall be consistent with the audit recommendations.  The cost of the audit may be included in the

10     total amount financed under this chapter.

11     219  Enhanced 911 Commission; Membership.  Amend the introductory paragraph of RSA 106-

12     H:3, I(a) to read as follows:

13     (a)  There is hereby established an enhanced 911 commission consisting of 19 members,

14     including the director of the division of fire standards and training and emergency medical services

15     or designee, the [chairman of the public utilities commission] *commissioner of the department of*

16     *energy* or designee, the commissioner of the department of safety or designee, a public member, a

17     police officer experienced in responding to emergency calls, a representative of the disabled

18     community, and one active member recommended by each of the following organizations, nominated

19     by the governor with the approval of the council:

20     220  Energy Efficiency and Sustainable Energy Board; Membership.  Amend RSA 125-O:5-a,

21     II(b) to read as follows:

22     II.  The members of the board shall be as follows:

23     (a)  The chairman of the public utilities commission, or designee.

24     (b)  The [director of the office of strategic initiatives] *commissioner of the department*

25     *of energy*, or designee.

26     (c)  The consumer advocate, or designee.

27     (d)  The commissioner of the department of environmental services, or designee.

28     (e)  The commissioner of the department of business and economic affairs, or designee.

29     (f)  The president of the Business and Industry Association of New Hampshire, or

30     designee.

31     (g)  The executive director of the New Hampshire Municipal Association, or designee.

32     (h)  The executive director of New Hampshire Legal Assistance, or designee.

33     (i)  The president of the Homebuilders ampersand Remodelers Association of New

34     Hampshire, or designee.

35     (j)  Two members of the house science, technology and energy committee appointed by

36     the speaker of the house of representatives.

1    (k) One member of the senate energy, environment and economic development
2 committee, appointed by the president of the senate.

3    (l) Three representatives from not-for-profit groups representing energy, environmental,
4 consumer, or public health issues and knowledgeable in energy conservation policies and programs,
5 appointed by the [chairman of the public utilities commission] *commissioner of the department of*
6 *energy*.

7    (m) The commissioner of the department of administrative services, or designee.

8    (n) The state fire marshal, or designee.

9    (o) The executive director of the New Hampshire housing finance authority, or designee.

10   III. The board shall include, as nonvoting participants, the following:

11    (a) One representative from each utility-administered electric and natural gas energy
12 efficiency program appointed by the [chairman of the public utilities commission] *commissioner of*
13 *the department of energy*.

14    (b) A representative of energy services companies delivering energy efficiency services to
15 residential and business customers, appointed by the [chairman of the public utilities commission]
16 *commissioner of the department of energy*.

17    (c) A representative of a business or association of businesses selling or installing
18 sustainable or renewable energy systems, appointed by the [chairman of the public utilities
19 commission] *commissioner of the department of energy*.

20    (d) A representative from the investment community with expertise in efficiency
21 investments and financing, appointed by the [chairman of the public utilities commission]
22 *commissioner of the department of energy*.

23   IV. The chairman of the public utilities commission shall call the first meeting of the board.
24 The board shall elect a chairperson from among its members. Seven members of the board shall
25 constitute a quorum. The board shall make an annual report on December 1 to the governor, the
26 speaker of the house of representatives, the president of the senate, the house science, technology
27 and energy committee, the senate energy, environment and economic development committee, *the*
28 *department of energy,* and the public utilities commission, to provide an update on its activities
29 and recommendations for action including possible legislation.

30   V. The board shall be administratively attached to the [public utilities commission]
31 *department of energy* under RSA 21-G:10.

32   221 State Building Code Review Board; Membership. Amend RSA 155-A:10, I(k) to read as
33 follows:

34    (k) One representative from the New Hampshire [public utilities commission]
35 *department of energy*, nominated by the [chairman of the commission] *commissioner of the*
36 *department of energy*.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 95 -**

1    222  Nuclear Decommissioning Financing Committee; Membership.  Amend RSA 162-F:15, II to

2  read as follows:

3        II.  Each committee shall consist of one person who is a resident of the town or city in which

4  the facility is located and who shall be appointed by the selectmen of the town or the mayor and

5  council of the city, the chairman of the public utilities commission, *the commissioner of the*

6  *department of energy,* one senator, to be appointed by the senate president, one house member, to

7  be appointed by the speaker of the house of representatives, the state treasurer or designee, the

8  commissioner of the department of health and human services or designee, *and* the commissioner of

9  the department of safety or designee[, and the director of the governor's office of energy and

10  community services or designee].

11    223  Conduct of Studies Concerning Changes in Laws and Regulations with a View to Atomic

12  Development.  Amend RSA 162-B:3, IV to read as follows:

13        IV.  The public utilities commission *and the department of energy*, particularly as to the

14  transportation of special nuclear materials and by-product materials by common carriers or public or

15  private air carriers not in interstate commerce and as to the participation by public utilities subject

16  to [its] *their* jurisdiction in projects looking to the development of production or utilization facilities

17  for industrial or commercial use.

18    224  New Hampshire Building Code; Energy Code Compliance Form.  Amend RSA 155-A:10-a to

19  read as follows:

20    155-A:10-a  Energy Code Compliance Form.  The state building code review board shall prescribe

21  by rule and make available to the public, in electronic formats, a simplified residential energy code

22  compliance form based upon the energy provisions in the International Residential Code and the

23  International Energy Conservation Code identified in RSA 155-A:1.  The correctly completed form

24  shall be accepted by all code enforcement authorities within the state of New Hampshire as one

25  method of verification that the applicable project meets the code requirements.  Completed

26  compliance forms shall be submitted to the building official in those municipalities that have

27  adopted an enforcement mechanism under RSA 674:51. For municipalities without an adopted code

28  enforcement mechanism, completed compliance forms shall be submitted to the New Hampshire

29  [public utilities commission] *department of energy*, on behalf of the building code review board, for

30  verification that the applicable project meets the code requirements.  The [public utilities

31  commission] *department of energy* shall then forward the reviewed compliance forms to the

32  municipality for retention in property records.

33    225  Organization of Nuclear Decommissioning Financing Committees.  Amend RSA 162-F:17, I

34  to read as follows:

35        I.  The temporary chairman of each committee formed, who shall be the [chairman of the

36  public utilities commission] *commissioner of the department of energy*, shall call an

37  organizational meeting within 90 days of formation.  At the organizational meeting, the committee

**Amendment to HB 2-FN-A-LOCAL**
**- Page 96 -**

1  shall select a chairman to serve for a 3-year term, elect such other officers as the members shall
2  determine, and establish a schedule of meetings for determining the requirements of the
3  decommissioning fund.

4  226  Decommissioning of Nuclear Electric Generating Facilities; Report; Public Hearing.  Amend
5  RSA 162-F:21, III-IV to read as follows:

6       III.  Each committee shall rely on all available data and experience in determining the
7  amount of such fund including, but not limited to, information from the Nuclear Regulatory
8  Commission; the public utilities commission; *the department of energy,* the owner or owners of the
9  facility; municipal and regional planning commissions and municipal governing bodies; and relevant
10  construction cost indices.  The committee shall publish a transcript of all proceedings during which
11  information was presented or offered into testimony, and a detailed analysis of the facts and figures
12  used in determining the amount of the fund.

13       IV.  Following the committee's deliberation and prior to final hearing, the plan for scheduled
14  payments into the fund and relevant evidence, including the transcripts and analysis published
15  pursuant to RSA 162-F:21, III, shall be available for public review in the clerk's office of the city or
16  town where the facility is located and in the office of the [public utilities commission] *department of*
17  *energy* at least 30 days prior to the one or more public hearings on the committee's proposed plan.
18  At least one hearing shall be held in the city or town where the facility is located.  A notice of the
19  time and place of each hearing shall be posted in 2 appropriate public places in the city or town
20  where the facility is located and shall be printed at least twice in a newspaper of general circulation
21  for that city or town and in a newspaper of state-wide circulation 2 weeks prior to each hearing.
22  Testimony presented at the hearings held pursuant to this paragraph shall be taken into
23  consideration by the committee when it formalizes the payment schedule plan.  All testimony shall
24  be transcribed and made a permanent record.

25  227  Site Evaluation Committee; Membership; Administrative Attachment.  Amend RSA 162-
26  H:3, IV to read as follows:

27       IV.  The committee shall be administratively attached to the [public utilities commission]
28  *department of energy* pursuant to RSA 21-G:10.

29  228  Committee Established.  There is established a committee to study necessary revisions to
30  the site evaluation committee.

31       I. The members of the committee shall be as follows:

32           (a)  Two members of the senate, appointed by the president of the senate.

33           (b)  Three members of the house of representatives, at least one of whom shall be a
34  member of the science, technology, and energy committee, one of whom shall be a member of the
35  finance committee, and at least one of whom shall be a member of the minority party, appointed by
36  the speaker of the house of representatives.

Amendment to HB 2-FN-A-LOCAL
- Page 97 -

1      II.  Members of the committee shall receive mileage at the legislative rate when attending to
2  the duties of the committee.

3      III.  The committee shall:

4      (a)  Evaluate the current structure, processes, authorities, funding, and functions of the
5  site evaluation committee and whether the statutory purpose and original legislative intent of the
6  site evaluation committee is being achieved.

7      (b)  Review the structure, processes, authorities, funding, and functions of public bodies
8  with jurisdiction over siting large energy facilities that have been established by other states.

9      (c)  Consider the site evaluation committee's relationship to the department of energy
10  and other state agencies.

11      (d)  Review the timeliness of site evaluation committee decisions, the on-going
12  enforcement of certificates issued by the site evaluation committee, public input to the orderly siting
13  of energy infrastructure, and any changes required to minimize delays siting energy infrastructure.

14      (e)  Make recommendations for legislation to restructure the site evaluation committee
15  no later than October 1, 2021.

16      IV.  The members of the study committee shall elect a chairperson from among the members.
17  The first meeting of the committee shall be called by the first-named senate member.  The first
18  meeting of the committee shall be held within 45 days of the effective date of this section.  Three
19  members of the committee shall constitute a quorum.

20      V.  The committee shall report its findings and any recommendations for proposed legislation
21  to the president of the senate, the speaker of the house of representatives, the senate clerk, the
22  house clerk, the governor, and the state library on or before October 1, 2021.

23      229  Minimum Energy Efficiency Standards for Certain Products; Definitions.  Amend RSA 339-
24  G:1, II to read as follows:

25      II.  [~~"Commission" means the public utilities commission.~~] ***"Department" means the***
26  ***department of energy.***

27      230  Reference Change; Minimum Energy Efficiency Standards for Certain Products;
28  Department.  Amend the following RSA provisions by replacing the term "commission" with
29  "department":  339-G:3, III(b), 339-G:4, II, 339-G:5, 339-G:6, 339-G:7, 339-G:8, 339-G:9.

30      231  Gas Companies; When Public Utilities.  Amend RSA 362:4-b, III to read as follows:

31      III.  Nothing in this section prevents the [~~commission~~] ***department of energy*** from
32  monitoring or enforcing the provisions of federal pipeline safety standards relative to liquefied
33  petroleum gas systems pursuant to the Natural Gas Pipeline Safety Act.

34      232  New Paragraph; Limited Electrical Energy Producers Act; Definitions.  Amend RSA 362-
35  A:1-a by inserting after paragraph II-d the following new paragraph:

36      II-e.  "Department" means the New Hampshire department of energy.

1    233  Reference Change; Net Energy Metering; Department of Energy.  Amend the following RSA

2    provisions by replacing the term "commission" with "department": 362-A:9, X-XII.

3    234  Net Energy Metering.  Amend RSA 362-A:9, XIV to read as follows:

4        XIV.(a)  A customer-generator may elect to become a group host for the purpose of reducing

5    or otherwise controlling the energy costs of a group of customers who are not customer-generators.

6    The group of customers shall be located within the service territory of the same electric distribution

7    utility as the host.  The host shall provide a list of the group members to the commission and the

8    electric distribution utility and shall certify that all members of the group have executed an

9    agreement with the host regarding the utilization of kilowatt hours produced by the eligible facility

10    and that the total historic annual load of the group members together with the host exceeds the

11    projected annual output of the host's facility.  The [commission] *department* shall verify that these

12    group requirements have been met and shall register the group host.  The [commission] *department*

13    shall establish the process for registering hosts, including periodic re-registration, and the process by

14    which changes in membership are allowed and administered.  Net metering tariffs under this section

15    shall not be made available to a customer-generator group host until such host is registered by the

16    [commission] *department*.

17        (b)  Except as provided in subparagraph (c), the provisions of this section shall apply to a

18    group host as a customer-generator.

19        (c)  Notwithstanding paragraph V, a group host shall be paid for its surplus generation at

20    the end of each billing cycle at rates consistent with the credit the group host receives relative to its

21    own net metering under either subparagraph IV(a) or (b) or alternative tariffs that may be

22    applicable pursuant to paragraph XVI.  Alternatively, a group host may elect to receive credits on

23    the customer electric bill for each member and the host, with the utility being allowed the most cost-

24    effective method of doing so according to an amount or percentage specified for each member on PUC

25    form 909.09 (Application to Register or Re-register as a Host), along with a 3 cent per kwh addition

26    from July 1, 2019 through July 1, 2021 and a 2.5 cent per kwh addition thereafter for low-moderate

27    income community solar projects, as defined in RSA 362-F:2, X-a.  On or before July 1, 2022, the

28    [commission] *department* shall report on the costs and benefits of such an addition and the

29    development of the market for low-moderate income community solar projects, and provide a

30    recommendation on whether the addition shall be increased or decreased.  The [commission]

31    *department* shall report on the costs and benefits of low-moderate income community solar projects,

32    as defined in RSA 362-F:2, X-a on or before June 1, 2020.  The [commission] *department* shall

33    authorize at least 2 new low-moderate income community solar projects, as defined in RSA 362-F:2,

34    X-a, each year in each utility's service territory beginning January 1, 2020.  On an annual basis, for

35    all group host systems except for residential systems with an interconnected capacity under 15

36    kilowatts, the electric distribution utility shall calculate a payment adjustment if the host's surplus

37    generation for which it was paid is greater than the group's total electricity usage during the same

1  time period.  The adjustment shall be such that the resulting compensation to the host for the
2  amount that exceeded the group's total usage shall be at the utility's avoided cost or its default
3  service rate in accordance with subparagraph V(b) or paragraph VI or alternative tariffs that may be
4  applicable pursuant to paragraph XVI.  The utility shall pay or bill the host accordingly.

5          (d)  [Repealed.]

6          (e)  The *department is authorized to petition the* commission [is authorized] to assess
7  fines against, revoke the registration of, and prohibit from doing business in the state, any group
8  host which violates the requirements of this paragraph and rules adopted pursuant to this
9  paragraph.  *The commission is authorized to grant or deny such petitions.*

10     235  Repeal.  RSA 362-F:2, IV, relative to the definition of "commission" as it pertains to electric
11  renewable portfolio standards, is repealed.

12     236  Electric Renewable Energy Classes; Reference Changed.  Amend RSA 362-F:4, I(i)-(k) to
13  read as follows:

14          (i)  The incremental new production of electricity in any year from an eligible biomass or
15  methane source or any hydroelectric generating facility licensed or exempted by Federal Energy
16  Regulatory Commission (FERC), regardless of gross nameplate capacity, over its historical
17  generation baseline, provided the [commission] *department of energy* certifies demonstrable
18  completion of capital investments attributable to the efficiency improvements, additions of capacity,
19  or increased renewable energy output that are sufficient to, were intended to, and can be
20  demonstrated to increase annual renewable electricity output.  The determination of incremental
21  production shall not be based on any operational changes at such facility but rather on capital
22  investments in efficiency improvements or additions of capacity.

23          (j)  The production of electricity from a class III or IV source that has begun operation as
24  a new facility by demonstrating that 80 percent of its resulting tax basis of the source's plant and
25  equipment, but not its property and intangible assets, is derived from capital investment directly
26  related to restoring generation or increasing capacity including department permitting requirements
27  for new plants.  Such production shall not qualify for class III or IV certificates.  Commencing July 1,
28  2013, a class III source eligible as a class I source under this subparagraph or subparagraph (i) may
29  submit a notice to the [commission] *department of energy* electing to be a class III source instead
30  of a class I source.  Once such notice is given, the production from such a source shall qualify for
31  class III certificates, provided the source meets the other requirements of a class III eligible biomass
32  technology.

33          (k)  The production of electricity from any fossil-fueled generating facility that originally
34  commenced operation prior to January 1, 2006, if after January 1, 2012 such facility co-fires with
35  class I eligible biomass fuels to displace the combustion of an amount of fossil fuels.  The portion of
36  the total electrical energy output that qualifies as class I from a facility in a given time period shall
37  be the fraction of electrical production derived from the combustion of biomass fuels based on the

1  heat input at the facility in that time period as determined by the [commission] *department of*
2  *energy* in consultation with the department.   To qualify under this paragraph, the electricity
3  generation facility that co-fires with biomass fuels shall:

4  (1)  Either have a quarterly average nitrogen oxide (NOx) emission rate, as measured
5  and verified under RSA 362-F:12, of less than or equal to 0.075 pounds/million British thermal units
6  (lbs/Mmbtu) or be a participant in a plan approved by the department for reductions in NOx from
7  other emission sources.   The quantity of reductions required shall be the fraction of electrical
8  production derived from the combustion of biomass fuels, as determined under this paragraph,
9  multiplied by the difference between the generation unit's NOx emissions rate and the 0.075
10  lbs/Mmbtu rate.   The plan shall contain reductions, in the aggregate or individually, in NOx
11  emissions from other emission sources under the jurisdiction of the department and demonstrate
12  that the reductions will be quantifiable.   The department shall expeditiously review the plan and, if
13  approved, provide such information as it deems relevant to the [commission] *department of energy*.
14  The application submitted to the [commission] *department of energy* under RSA 362-F:11 shall
15  inform the [commission] *department of energy* of the plan and the [commission] *department of*
16  *energy* shall certify the source in accordance with the plan approved by the department; and

17  (2)  Either have an average particulate emission rate, as measured and verified
18  under RSA 362-F:12, of less than or equal to 0.02 lbs/Mmbtu or be a participant in a plan approved
19  by the department for reductions in particulate matter emissions from emission sources owned by or
20  affiliated with the co-firing entity.   The quantity of reductions required shall be the fraction of
21  electrical production derived from the combustion of biomass fuels, as determined under this
22  paragraph, multiplied by the difference between the generation unit's particulate matter emissions
23  rate and the 0.02 lbs/Mmbtu rate.   The plan shall contain reductions, in the aggregate or
24  individually, in particulate matter emissions from other emission sources under the jurisdiction of
25  the department and demonstrate that the reductions will be quantifiable.   The department shall
26  expeditiously review the plan and, if approved, provide such information as it deems relevant to the
27  [commission] *department of energy*.   The application submitted to the [commission] *department*
28  *of energy* under RSA 362-F:11 shall inform the [commission] *department of energy* of the plan and
29  the [commission] *department of energy* shall certify the source in accordance with the plan
30  approved by the department.

31  237  Electric Renewable Energy Classes; Reference Change.  Amend RSA 362-F:4, IV-VI to read
32  as follows:

33  IV.(a)  Class IV (Existing Small Hydroelectric) shall include the production of electricity from
34  hydroelectric energy, provided the facility:

35  (1)  Began operation prior to January 1, 2006;

36  (2)  When required, has documented applicable state water quality certification
37  pursuant to section 401 of the Clean Water Act for hydroelectric projects; and

**Amendment to HB 2-FN-A-LOCAL**
**- Page 101 -**

1        (3)  Either:

2        (A)  Has a total nameplate capacity of 5 MWs or less as measured by the sum of

3 the nameplate capacities of all the generators at the facility and has actually installed both

4 upstream and downstream diadromous fish passages and such installations have been approved by

5 the Federal Energy Regulatory Commission, or;

6        (B)  Has a total nameplate capacity of one MW or less as measured by the sum of

7 the nameplate capacities of all generators at the facility, is in compliance with applicable Federal

8 Energy Regulatory Commission fish passage restoration requirements, and is interconnected with

9 an electric distribution system located in New Hampshire.

10        (b)(1)  Notwithstanding subparagraph (a), the [commission] ***department of energy*** shall

11 re-certify as class IV renewable energy sources the facilities named in ***public utilities*** commission

12 order numbers 24,940 and 24,952.  These facilities are:

13        (A)  The Canaan, Gorham, Hooksett, and Jackman hydroelectric facilities [owned

14 by Public Service Company of New Hampshire], which had been previously certified by the ***public***

15 ***utilities*** commission on September 23, 2008; and

16        (B)  The North Gorham and Bar Mills projects owned by FPL Energy Maine

17 Hydro, LLC which had been previously certified by the ***public utilities*** commission on October 30,

18 2008.

19        (2)  These facilities shall not qualify or be certified as class IV renewable energy

20 sources after March 23, 2009, unless they meet the requirements of subparagraph (a).  Such

21 facilities shall be eligible for class IV renewable energy certificates for all electricity generated

22 between the effective date of each facility's original certification by the ***public utilities*** commission

23 through March 23, 2009.  Such certificates shall have the same validity as any other class IV

24 certificate issued under RSA 362-F, and may be sold, exchanged, banked, and utilized accordingly.

25        V.  For good cause, and after notice and hearing, the commission may accelerate or delay by

26 up to one year, any given year's incremental increase in class I or II renewable portfolio standards

27 requirement under RSA 362-F:3.

28        VI.  After notice and hearing, the [commission] ***department of energy*** may modify the class

29 III and IV renewable portfolio standards requirements under RSA 362-F:3 for calendar years

30 beginning January 1, 2012 such that the requirements are equal to an amount between 85 percent

31 and 95 percent of the reasonably expected potential annual output of available eligible sources after

32 taking into account demand from similar programs in other states.

33        238  Renewable Energy Certificates.  Amend RSA 362-F:6, V to read as follows:

34        V.  A qualified producer of useful thermal energy shall provide for the metering of useful

35 thermal energy produced in order to calculate the quantity of megawatt-hours for which renewable

36 energy certificates are qualified, and to report to the [public utilities commission] ***department of***

37 ***energy*** under rules adopted pursuant to RSA 362-F:13.  Monitoring, reporting, and calculating the

**Amendment to HB 2-FN-A-LOCAL**
**- Page 102 -**

1   useful thermal energy produced in each quarter shall be expressed in megawatt-hours, where each

2   3,412,000 BTUs of useful thermal energy is equivalent to one megawatt-hour.

3   239  Electric Renewable Portfolio Standard; Information Collection; Reference Change.  Amend

4   RSA 362-F:8 to read as follows:

5   362-F:8  Information Collection.

6       I.  By July 1 of each year, each provider of electricity shall submit a report to the

7   [commission] *department of energy*, in a form approved by the [commission] *department of*

8   *energy*, documenting its compliance with the requirements of this chapter for the prior year.  The

9   [commission] *department of energy* may investigate compliance and collect any information

10  necessary to verify and audit the information provided to the [commission] *department of energy*

11  by providers of electricity.

12      II.  The [commission] *department of energy* shall adopt rules governing the reporting

13  requirements under paragraph I that are designed to minimize the administrative costs and burden

14  on electricity providers.

15      III.  Beginning October 1, 2019 and by October 1 of each subsequent year, the [commission]

16  *department of energy* shall disclose the information collected under paragraph I as public

17  information in the [commission's] *department of energy* annual report pursuant to RSA 362-F:10,

18  IV.  No information shall be disclosed to the public that is confidential as defined by [public utilities

19  commission] *department of energy* or NEPOOL Generation Information System rules.

20      IV.  The [commission] *department of energy* shall provide as part of the annual renewable

21  energy fund report, pursuant to RSA 362-F:10, IV, renewable portfolio standard compliance costs

22  and  average  electric  rate  impact;  renewable  energy  certificate  versus  alternative  compliance

23  payments comparison; and alternative compliance payments by class and provider of electricity.  The

24  report shall also include the number of renewable energy certificates that were purchased during the

25  prior compliance year by class.

26      V.  The [commission] *department of energy* shall complete the rulemaking process and

27  submit requests to the administrator of the NEPOOL Generation Information System that are

28  necessary to implement this section no later than April 1, 2019.

29  240  Electric Renewable Portfolio Standard; Renewable Energy Fund.  Amend RSA 362-F:10 to

30  read as follows:

31  362-F:10  Renewable Energy Fund.

32      I.  There is hereby established a renewable energy fund.  This *nonlapsing* special fund shall

33  be [nonlapsing] *continually appropriated to the commission to be expended in accordance*

34  *with this section*.  The state treasurer shall invest the moneys deposited therein as provided by

35  law.  Income received on investments made by the state treasurer shall also be credited to the fund.

36  All payments to be made under this section shall be deposited in the fund.  Any remaining moneys

37  paid into the fund under paragraph II of this section, excluding class II moneys, shall be used by the

[commission] *department of energy* to support thermal and electrical renewable energy initiatives. Class II moneys shall primarily be used to support solar energy technologies in New Hampshire. All initiatives supported out of these funds shall be subject to audit by the [commission] *department of energy* as deemed necessary. All fund moneys including those from class II may be used to administer this chapter, but all new employee positions shall be approved by the fiscal committee of the general court. No new employees shall be hired by the [commission] *department of energy* due to the inclusion of useful thermal energy in class I production.

II. In lieu of meeting the portfolio requirements of RSA 362-F:3 for a given year if, and to the extent sufficient certificates are not otherwise available at a price below the amounts specified in this paragraph, an electricity provider may, at the time of report submission for that year under RSA 362-F:8, make payment to the [commission] *department of energy* at the following rates for each megawatt-hour not met for a given class obligation through the acquisition of certificates:

(a) Class I-$55, except for that portion of the class electric renewable portfolio standards to be met by qualifying renewable energy technologies producing useful thermal energy under RSA 362-F:3 which shall be $25 beginning January 1, 2013.

(b) Class II-$55.

(c) Class III-$31.50.

(d) Class IV-$26.50.

III.(a) Beginning in 2013, the [commission] *department of energy* shall adjust these rates by January 31 of each year using the Consumer Price Index as published by the Bureau of Labor Statistics of the United States Department of Labor for classes III and IV and 1/2 of such Index for classes I and II.

(b) In lieu of the adjustments under subparagraph (a) for class III in 2015 and 2016, the class rate in each of those years shall be $45. In lieu of the adjustments under subparagraph (a) for class III in 2017, 2018, and 2019, the class rate in each of those years shall be $55.

(c) By January 31, 2020 the [commission] *department of energy* shall compute the 2020 class III rate to equal the rate that would have resulted in 2020 by the application of subparagraph (a) to the 2013 rate and each subsequent year's rate to 2020.

(d) In 2021 and thereafter, the class III rate shall be determined by application of subparagraph (a) to the prior year's rate.

IV. The [commission] *department of energy* shall make an annual report by October 1 of each year, beginning in 2009, to the legislative oversight committee to monitor the transformation of delivery of electric services established under RSA 374-F:5, the house science, technology and energy committee, and the senate energy and natural resources committee detailing how the renewable energy fund is being used and any recommended changes to such use. The report shall also include information on the total peak generating capacity that is net energy metered under RSA 362-A:9 within the franchise area of each electric distribution utility, and the percentage this represents of

1   the amount that is allowed to be net metered within each franchise area.  Information shall be

2   provided on net metered group host registrations and the associated customer groups, including

3   number and location of group host facilities, generation by renewable source and size of facility, and

4   group load served by such facilities.

5        V.  The [public utilities commission] ***department of energy*** shall make and administer a

6   one-time incentive payment of $3 per watt of nominal generation capacity up to a maximum

7   payment of $6,000, or 50 percent of system costs, whichever is less, per facility to any residential

8   owner of a small renewable generation facility, that would qualify as a Class I or Class II source of

9   electricity, begins operation on or after July 1, 2008, and is located on or at the owner's residence.

10       VI.  Such payments shall be allocated from the renewable energy fund established in

11   paragraph I, as determined by the [commission] ***department of energy*** to the extent funding is

12   available up to a maximum aggregate payment of 40 percent of the fund over each 2-year period

13   commencing July 1, 2010.

14       VII.  The [commission] ***department of energy*** shall, after notice and hearing, by order or

15   rule establish an application process for the incentive payment program established under

16   paragraph V.  The application process shall include verification of costs for parts and labor,

17   certification that the equipment used meets the applicable safety standards of the American

18   National Standards Institute (ANSI) or Underwriters Laboratory (UL) or similar safety rating

19   agency, and that the facility meets local zoning regulations, and receives any required inspections.

20       VIII.  The [commission] ***department of energy*** may, after notice and hearing, by order or

21   rule, establish additional incentive or rebate programs and competitive grant opportunities for

22   renewable thermal and electric energy projects sited in New Hampshire.

23       IX.  For good cause the [commission] ***department of energy*** may, after notice and hearing,

24   by order or rule, modify the program, including reducing the incentive level, created under RSA 362-

25   F:10, V.

26       X.  Consistent with RSA 362-F:10, VI, the [commission] ***department of energy*** shall, over

27   each 2-year period commencing July 1, 2010, reasonably balance overall amounts expended,

28   allocated, or obligated from the fund, net of administrative expenditures, between residential and

29   nonresidential sectors.  Funds from the renewable energy fund awarded to renewable projects in the

30   residential sector shall be in approximate proportion to the amount of electricity sold at retail to that

31   sector in New Hampshire, and the remaining funds from the renewable energy fund shall be

32   awarded to projects in the nonresidential sector which include commercial and industrial sited

33   renewable energy projects, existing generators, and developers of new commercial-scale renewable

34   generation in New Hampshire, provided no less than 15 percent of the funds shall annually benefit

35   low-moderate income residential customers, including, but not limited to, the financing or leveraging

36   of financing for low-moderate income community solar projects in manufactured housing

37   communities or in multi-family rental housing.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 105 -**

XI.  The [commission] *department of energy* shall issue requests for proposals that provide renewable projects in the nonresidential sector, which include commercial and industrial sited renewable energy projects, existing generators, and developers of new commercial-scale renewable generation in New Hampshire, with opportunities to receive funds from the renewable energy fund established under RSA 362-F:10.  The requests for proposals shall provide such opportunities to those renewable energy projects that are not eligible to participate in incentive and rebate programs developed by the [commission] *department of energy* under RSA 362-F:10, V and RSA 362-F:10, VIII.  The [commission] *department of energy* shall issue a request for proposals no later than March 1, 2011 and annually thereafter, and select winning projects in a timely manner.

241  References Change; Electric Renewable Portfolio Standards; Department of Energy.  Amend the following RSA provisions by replacing "commission" with "department of energy":  362-F:5, 362-F:6, I-IV, 362-F:9, 362-F:11, 362-F:12, 362-F:13, 362-F:14.

242  Expenses of the Public Utilities Commission Against Certain Utilities.  Amend RSA 363-A:1 to read as follows:

363-A:1  Ascertainment of Expenses.  The [public utilities commission] *department of energy* shall annually, after the close of the fiscal year, ascertain the total of its expenses *attributable to support of the public utilities commission and to performance of all duties and responsibilities transferred to the department from the public utilities commission, in addition to the total of the public utilities commission's expenses* during such year incurred in the performance of its duties relating to public utilities as defined in RSA 362 and other entities subject to its regulatory and enforcement authority and relating to the office of the consumer advocate.  In the determination of such expenses there shall be excluded the expenses which have been or may be charged and recovered under the provisions of RSA 365:37, RSA 365:38, and RSA 374-F:7, I.

243  Expenses of Public Utilities Commission Against Certain Utilities; Assessment.  Amend RSA 363-A:2, III-IV to read as follows:

III.  Each entity described in subparagraph I(e) shall be assessed the sum of $10,000 on an annual basis and shall pay such assessed sum to the [commission] *department of energy*.  Each electric load aggregator, and each aggregator of natural gas customers shall be assessed the sum of $2,000 on an annual basis and shall pay such assessed sum to the [commission] *department of energy*.  Each telecommunications carrier voluntarily registered with the commission shall be assessed the sum of $1,000 on an annual basis and shall pay such sum to the [commission] *department of energy*.

IV.  The expenses of the [commission] *department of energy and the public utilities commission, and the office of the consumer advocate*, less the total of the assessed sums paid [to the commission] pursuant to paragraph III, shall be allocated to each utility and other assessed entity in direct proportion as the revenue calculation for such utility or other assessed entity relates

1    to the total of all such revenue calculations as a whole, except as otherwise provided in paragraph V.

2    Each such expense allocation shall be assessed against each public utility and other assessed entity

3    in an amount equal to its proportionate share as determined under this section, except that the

4    expense allocation attributed to each entity described in subparagraph I(e) shall be imputed to and

5    included in the expense allocation to each electric or natural gas distribution utility or rural electric

6    cooperative for which a certificate of deregulation is on file with the commission, in correspondence

7    to the revenue portion reported pursuant to paragraph II as having been received from the

8    distribution customers of such distribution utility or the members of such rural electric cooperative

9    for which a certificate of deregulation is on file with the commission.

10    244   Expenses of Public Utilities Commission Against Certain Utilities; Certification of

11    Assessment; Collection.  Amend RSA 363-A:3 and RSA 363-A:4 to read as follows:

12    363-A:3  Certification of Assessment.  It shall be the duty of the [public utilities commission]

13    ***department of energy*** to calculate the amount to be assessed against each such public utility and

14    each other entity subject to assessment in accordance with RSA 363-A:1 and RSA 363-A:2.  At the

15    beginning of each fiscal year, the [public utilities commission] ***department of energy*** shall estimate

16    [its] ***the*** total expenses for the fiscal year, and then, based on such estimate, shall calculate the

17    amount to be assessed quarterly on August 10, October 15, January 15, and April 15 of that fiscal

18    year, against each such public utility and other assessed entity in accordance with RSA 363-A:1 and

19    RSA 363-A:2.  The [public utilities commission] ***department of energy*** shall then make a list

20    showing the amount due on August 10, October 15, January 15, and April 15 of that fiscal year from

21    each of the several public utilities and other entities assessed under the provisions hereof, and,

22    together with a statement of the full name and mailing address of each such public utility and other

23    assessed entity, shall certify the same.  After the close of each fiscal year, the [public utilities

24    commission] ***department of energy*** shall ascertain [its] ***the*** actual total expenses in accordance

25    with RSA 363-A:1 and RSA 363-A:2, and then shall adjust the assessment for the first quarterly

26    payment of the new fiscal year for each such public utility or other assessed entity for any

27    underpayment or overpayment by each such public utility or other assessed entity for the prior fiscal

28    year.

29    363-A:4  Collection.  Upon the completion of each such list, on or before August 10, October 10,

30    January 10, and April 10 of each fiscal year, the [public utilities commission] ***department of energy***

31    shall bill each public utility and each other entity subject to assessment for the quarterly amount

32    assessed against it within 10 working days.  Such bill shall be sent registered mail, and shall

33    constitute notice of assessment and demand for payment.  Payment shall be made to the [public

34    utilities commission] ***department of energy*** within 30 days after the receipt of the bill.  After the

35    expiration of 30 days from the receipt of an original bill, the [public utilities commission]

36    ***department of energy*** may add to the assessment a late penalty fee and may commence an action

37    at law for the recovery of the assessment.  Within 30 days of the assessment for the first quarterly

1 payment, each public utility or other assessed entity which has any objection to the amount assessed

2 against it for the prior fiscal year shall file with the [commission] *department* its objection in

3 writing, setting out in detail the grounds upon which it is claimed that said assessment is excessive,

4 erroneous, unlawful, or invalid.  If such objections are filed, the [commission] *department*, after

5 reasonable notice to the objecting public utility or other assessed entity, shall hold a hearing on such

6 objections, and if the [commission] *department* finds that said assessment or any part thereof is

7 excessive, erroneous, unlawful, or invalid, the [commission] *department* shall reassess the amount

8 to be paid by such public utility or other assessed entity, and shall order that an amended bill be

9 sent to such public utility or other assessed entity in accordance with such reassessment.  The

10 [public utilities commission] *department of energy* shall not commence an action at law for

11 recovery of any assessment for the first quarterly payment until any such objection has been

12 resolved.

13 245  Public Utility Recovery of Assessment Costs.  Amend RSA 363-A:6, I to read as follows:

14      I.  Assessment amounts determined with reference to the revenues of competitive electric

15 power suppliers and all assessments against regulated electric distribution utilities and electric

16 cooperatives for which a certificate of deregulation is on file with the [commission] *department*

17 shall be collected from electric customers through the distribution rates of the respective electric

18 distribution utility or rural electric cooperative for which a certificate of deregulation is on file with

19 the [commission] *department*; provided that an amount equal to the amount assessed directly to a

20 competitive electric power supplier under RSA 363-A:2, III shall be collected from the energy service

21 or default service customers of each electric distribution utility or rural electric cooperative for which

22 a certificate of deregulation is on file with the [commission] *department*.

23 246  Complaints to and Proceedings Before the Department of Energy and the Commission.

24 Amend the chapter title of RSA 365 to read as follows:Amend the chapter title of RSA 365 to read as

25 follows:

26               COMPLAINTS TO[,] *THE DEPARTMENT OF ENERGY*

27               AND PROCEEDINGS BEFORE[,] THE COMMISSION

28 247  Complaint Against Public Utilities.  Amend RSA 365:1 to read as follows:

29      365:1  Complaint Against Public Utilities.  Any person may make complaint to the [commission]

30 *department of energy* by petition setting forth in writing any thing or act claimed to have been

31 done or to have been omitted by any public utility in violation of any provision of law, or of the terms

32 and conditions of its franchises or charter, or of any order of the commission.

33 248  Complaints to the Department of Energy and Proceedings Before the Commission.  Amend

34 RSA 365:2 through RSA 365:7 to read as follows:

35      365:2  Order.  Thereupon the [commission] *department of energy* shall cause a copy of said

36 complaint to be forwarded to the public utility complained of, which may be accompanied by an

Amendment to HB 2-FN-A-LOCAL
- Page 108 -

1    order, requiring that the matters complained of be satisfied, or that the charges be answered in

2    writing within a time to be specified by the [commission] *department*.

3    365:3   Reparation.   If the public utility complained of shall make reparation for any injury

4    alleged and shall cease to commit or to permit the violation of law, franchise, or order charged in the

5    complaint, and shall notify the [commission] *department of energy* of that fact before the time

6    allowed for answer, the [commission] *department* shall not be required to take any further action

7    upon the charges.

8    365:4   Investigation.   If the charges are not satisfied as provided in RSA 365:3, and it shall

9    appear to the [commission] *department of energy* that there are reasonable grounds therefor, it

10   shall investigate the same in such manner and by such means as it shall deem proper[, and, after

11   notice and hearing, take such action within its powers as the facts justify]. *After investigation, the*

12   *department of energy may bring proceedings on its own motion before the public utilities*

13   *commission, with respect to any complaint or violation of any provision of law, rule, terms*

14   *and conditions of its franchises or charter, or any order of the commission.*

15   365:5   Independent Inquiry.   The commission, on its own motion or upon petition of a public

16   utility, *and the department of energy* may investigate or make inquiry in a manner to be

17   determined by it as to any rate charged or proposed or as to any act or thing having been done, or

18   having been omitted or proposed by any public utility; and [the commission or] shall make such

19   inquiry in regard to any rate charged or proposed or to any act or thing having been done or having

20   been omitted or proposed by any such utility in violation of any provision of law or order of the

21   commission *or the department*.

22   365:6   Inspection.   [The] *Both the* commission *and the department of energy* may at any time

23   personally, or by its experts or agents, inspect the property, works, system, plant, devices, appliances

24   and methods used by any public utility, or its books, papers and records.

25   365:7   Authority to Inspect.   Any expert or agent of the *department of energy or the*

26   commission, who shall make a demand on behalf of the commission *or the department* to be

27   allowed to inspect as provided in RSA 365:6, shall produce written authority to make such inspection

28   signed by the [secretary or assistant secretary or some member] *chairperson* of the commission *or*

29   *the commissioner of the department of energy*.

30   249   Proceedings Before the Public Utilities Commission.   Amend RSA 365:8, I(j) to read as

31   follows:

32        (j)   Standards and procedures for determination and recovery of rate [case] *proceedings*

33   expenses.

34   250   Proceedings Before the Public Utilities Commission.   Amend RSA 365:8, II to read as

35   follows:

36        II.   Where the commission has adopted rules in conformity with this section, [complaints to

37   and] proceedings before the commission shall not be subject to RSA 541-A:29 or RSA 541-A:29-a.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 109 -**

251  Repeal.  The following are repealed:

I.  RSA 365:8-a, relative to suppliers of natural gas an aggregators of natural gas customers.

II.  RSA 374-F:4, III, relative to certain compliance filings filed with the public utilities commission.

252  Complaints to Department of Energy and Public Utilities Commission; Expense of Investigations; Rate Proceeding.  Amend RSA 365:37 and 365:38 to read as follows:

365:37  Expense of Investigations.

I.  Whenever any investigation *by the commission or the department of energy* shall be necessary to enable the commission to pass upon any petition for authority to issue stocks, bonds, notes, or other evidence of indebtedness, for authority to operate as a public utility or to expand operations as a public utility, to make extensions into new territory, to discontinue service, to condemn property for flowage rights and dam construction, or for authority to sell, consolidate, merge, transfer, or lease the plant, works, or system of any public utility, or any part of the same, or for any other matter which requires the [commission's] approval *of the commission or the department of energy*, the petitioner shall pay to the [commission] *department of energy* the expense involved in the investigation of the matters covered by said petition, including the amounts expended for experts, accountants, or other assistants.  Such expense shall not include any part of the salaries or expenses of the commissioners or of employees of the commission or *department of energy or*, unless the proceeding is being conducted pursuant to RSA 38, the fees of experts testifying as to values in condemnation proceedings.

II.  Whenever the commission institutes a proceeding, or when more than one utility subject to the jurisdiction of the commission shall be involved in a proceeding in which the commission *or the department of energy* requires the assistance of experts, accountants or other assistants, regardless of whether they petitioned the commission in the first instance, the commission *and the department of energy* may assess the costs of experts, accountants or other assistants hired by the commission *or the department of energy* against the utilities and any other parties to the proceeding.  The commission *and the department of energy* shall not, however, assess any such costs against the office of the consumer advocate or against any voluntary corporation, not-for-profit organization, or any municipality unless the municipality is involved in a proceeding before the commission pursuant to RSA 38.  In the case of a utility, the assessment of those costs shall be based on the annual revenues of the participating utilities in the same manner as issued in assessing the annual operating expenses of the commission *and the department of energy*, or as appropriate and equitable on a case by case basis.  In the case of a party who is not a utility, the assessment of those costs shall be as appropriate and equitable on a case by case basis.  Such expenses shall not include any part of the salaries or expenses of the commissioners or of employees of the commission *or of employees of the department of energy* or, unless the proceeding is being conducted pursuant to RSA 38, the fees of experts testifying as to values in condemnation proceedings.

Amendment to HB 2-FN-A-LOCAL
- Page 110 -

III.  For investigations or proceedings involving the acquisition, merger, transfer, sale, or lease of the works or system of a public utility, the commission *and the department of energy* shall not enter into a contract with experts, accountants, or other assistants in an amount greater than [$250,000] *$10,000*, including any contract extension, without the approval of the governor and council.  For all other investigations or proceedings, the commission *and the department of energy* shall not enter into a contract with experts, accountants, or other assistants in an amount greater than [$100,000] *$10,000*, including any contract extension, without the approval of governor and council.

365:38  Rate Proceeding.  Whenever any investigation *or proceeding* shall be necessary to enable the commission to pass upon the reasonableness of the rates or charges by a public utility, the utility[, upon order of the commission,] shall pay to the [commission its] *department of energy the* expenses involved in the investigation, including the amounts expended by [it] *the commission and the department of energy* for attorneys, experts, accountants, or other assistants, but not including any part of the salaries or expenses of the commissioners or of employees of the commission *or department of energy*; provided, that the amount charged to the utility [by the commission] in any such case shall not exceed 3/4 of one percent of the existing valuation of the utility investigated, such expenses with 6 percent interest to be charged by the utility to operating expenses and amortized over such period as the commission shall deem proper and allowed for in the rates to be charged by the utility.

253  Complaints to Department of Energy and Public Utilities Commission; Penalty Against Utility.  Amend RSA 365:41 to read as follows:

365:41  Penalty Against Utility.  Any public utility which shall violate any provisions of this title, or fails, omits or neglects to obey, observe or comply with any order, direction or requirement of the commission *or the department of energy*, shall be subject to a civil penalty, as determined by the commission, not to exceed $250,000 or 2.5 percent of the annual gross revenue that the utility received from sales in the state, whichever is lower.  Such penalties shall be applied to the benefit of the utility's ratepayers through a credit to bills, or, if the credit is of an amount determined by the commission to be insignificant on a per customer basis, to programs that benefit low income ratepayers.  No portion of any fine, nor any costs associated with an administrative or court proceeding which results in a fine pursuant to this section, shall be considered by the commission in fixing any temporary, permanent, or emergency rates or charges of such utility.

254  Affiliates of Public Utilities; Department of Energy.  Amend RSA 366:2 through 366:9 to read as follows:

366:2  Sale of Securities to or by Employees.  No public utility shall, without the approval of the [commission] *department of energy*, permit any employee to sell, offer for sale, or solicit the purchase of any security issued by an affiliate during such hours as such employee is engaged to perform any duty of such public utility; nor shall any public utility by any means or device

**Amendment to HB 2-FN-A-LOCAL**
**- Page 111 -**

1    whatsoever require any employee to purchase or contract to purchase any of its securities or those of
2    any other person or corporation; nor shall any public utility require any employee to permit the
3    deduction from his wages or salary of any sum as a payment or to be applied as a payment on any
4    purchase or contract to purchase any security of such public utility or of any other person.

5        366:3  Filing of Contracts.  The original or a verified copy of any contract or arrangement and of
6    any modification thereof or a verified summary of any unwritten contract or arrangement, the
7    consideration of which exceeds $500, hereafter entered into between a public utility and an affiliate
8    providing for the furnishing of managerial, supervisory, construction, engineering, accounting,
9    purchasing, financial, or any other services either to or by a public utility or an affiliate shall be filed
10   by the public utility with the [commission] *department of energy* within 10 days after the date on
11   which the contract is executed or the arrangement entered into.  The [commission] *department* may
12   also require a public utility to file in such form as the [commission] *department* may require full
13   information with respect to any purchase from or sale to an affiliate, whether or not made in
14   pursuance of a continuing contract or arrangement.

15       366:4  Failure to File.  Any contract or arrangement not filed with the [commission] *department*
16   *of energy* pursuant to RSA 366:3 shall be unenforceable in any court in this state and payments
17   thereunder may be disallowed by the [commission] *department* unless the later filing thereof is
18   approved in writing by the [commission] *department*.  *The commission shall disallow payment*
19   *if recommended by the department.*

20       366:5  Investigation and Proof.  The [commission] *department of energy* shall have full power
21   and authority to investigate any such contract, arrangement, purchase, or sale and[, if] *initiate a*
22   *proceeding related thereto before the commission.  If* the commission after notice and hearing
23   shall find any such contract, arrangement, purchase, or sale to be unjust or unreasonable, the
24   commission may make such reasonable order relating thereto as the public good requires.  In any
25   such investigation, the burden shall be on the public utility and affiliate to prove the reasonableness
26   of any such contract, arrangement, purchase, or sale with, from, or to an affiliate.  If the public
27   utility shall fail to satisfy the commission of the reasonableness of any such contract, arrangement,
28   purchase, or sale, the commission may disapprove the same and disallow payments thereunder or
29   such part of any such payment as the commission shall find to be unjust or unreasonable.  No
30   payment disallowed by the commission shall be capitalized or included as an operating cost of the
31   public utility in the fixing of rates or as an asset in fixing a rate base.  If in any such investigation
32   the public utility or affiliate shall unreasonably refuse to comply with any request of the commission
33   *or the department* for information with respect to relevant accounts and records, whether of such
34   public utility or any affiliate, any portion of which may be applicable to any transaction under
35   investigation, so that such parts thereof as the commission *or the department* may deem material
36   may be made part of the record, such refusal shall justify the commission in disapproving the
37   transaction under investigation and disallowing payments in pursuance thereof.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 112 -**

366:6  Summary Order in Certain Cases.  If as a result of an investigation *or proceeding* in accordance with RSA 366:5 the commission shall find that any public utility is making any payment or about to make any payment or doing or about to do any other thing which substantially threatens or impairs the ability of the public utility to render adequate service at reasonable rates or otherwise to discharge its duty to the public, the commission may apply to the superior court for an order directing the public utility to cease making any such payment or doing such other thing; and, thereupon, the court shall make such order as the public good may require.

366:7  Disallowance of Charges Under Existing Contracts.  In any proceeding whether upon the *department's initiation or* commission's own motion or upon complaint involving the rates or practices of any public utility, the commission may disallow the inclusion in the accounts of a public utility of any payments or compensation to an affiliate for any services rendered, or property furnished, under existing contracts or arrangements with an affiliate unless such public utility shall establish the reasonableness of such payment or compensation.

366:8  Annual Reports.  Every public utility annually reporting to the commission *or department of energy* under RSA 374 shall also annually report the name and address of, and the number of shares held by, its officers and directors and each holder of one percent or more of the voting capital stock of the reporting public utility according to its records.

366:9  Information Concerning Control.  The commission *or department of energy* may also require such other information as to the direct or indirect control of a public utility or affiliate from a public utility, affiliate, or other person as may be reasonably required for the effective enforcement of this chapter.

255  References Change; Service Equipment of Public Utilities; Department of Energy.  Amend the following RSA provisions by replacing "commission" with "department of energy":  370:2, 370:8, 370:9.

256  Service Equipment of Public Utilities; Units of Service.  Amend RSA 370:1 to read as follows:

370:1  Units of Service.  The [public utilities commission] *department of energy* may ascertain, determine and fix, for each kind of public utility, suitable and convenient standard commercial units of service, product or commodity, which units shall be lawful units for the purposes of this chapter.

257  Service Equipment of Public Utilities; Department of Energy.  Amend RSA 370:3 through 370:7 to read as follows:

370:3  Meters.  The [commission] *department of energy* may ascertain, determine and fix reasonable rules, regulations, specifications and standards to secure the accuracy of all meters and appliances for measurement, and every public utility is required to carry into effect all orders issued by the [commission] *department* relative thereto.

370:4  Service Inspections.  The [commission] *department of energy* may provide for the inspection of the manner in which every public utility conforms to the reasonable regulations

1    prescribed by the [commission] *department* for examination and testing of its service, product or
2    commodity, and for the measurement thereof, and may supplement such inspections by
3    examinations and testing.

4       370:5  Inspection of Meters.  The [commission] *department of energy* may provide for the
5    inspection of the manner in which every public utility has carried into effect the reasonable rules,
6    regulations, specifications and standards fixed by [orders of the commission] *rules adopted by the*
7    *department* relative thereto, and may examine and test any meters and appliances for
8    measurements under such reasonable rules and regulations as it may prescribe.

9       370:6  Testing Appliances.  The [commission] *department* may provide for the examination and
10   testing of any appliances used for the measuring of any service, product or commodity of a public
11   utility.

12      370:7  At Consumer's Request.  Any consumer or user may have any such appliance tested by the
13   [commission] *department of energy*.  The [commission] *department* may declare and establish
14   reasonable fees to be paid for examining and testing such appliances on the request of consumers or
15   users, the fee to be paid by the consumer or user at the time of his request; but, if the measuring
16   appliance be found unreasonably defective or incorrect to the disadvantage of the consumer or user,
17   the [commission] *department* shall repay such fee to the consumer or user and collect the same
18   from the public utility.

19      258  Rights in Public Waters and Lands; License by Notification of New Attachments on Existing
20   Utility Poles.  Amend RSA 371:17-a to read as follows:

21      371:17-a  License by Notification of New Attachments on Existing Utility Poles.  Whenever it is
22   necessary, in order to meet the reasonable requirements of service to the public, that any public
23   utility other than electric or gas should construct a cable, conduit, or wires and fixtures upon an
24   existing line of poles or towers over, under, or across any of the public waters of this state, or over,
25   under, or across any of the land owned by this state, the public utility shall file written notification
26   with the [commission] *department of energy* for a license to construct and maintain such cable,
27   conduit, or wires and fixtures.  In this section, "public waters" means all ponds of more than 10
28   acres, tidewater bodies, and such streams or portions thereof as the commission may prescribe.
29   Every corporation and individual desiring to cross any public waters or land for the purposes of this
30   section shall file written notification in the same manner prescribed for a public utility.  The
31   notification shall include a description of the specific geographic and pole locations of the crossing
32   and verification that there is a valid pole attachment license or that an application for a pole
33   attachment license has been submitted to the utility or utilities that own such poles or towers.  The
34   notification shall include an affidavit signed by the responsible officer confirming that the crossing
35   shall be completed in compliance with such pole attachment license and the National Electrical
36   Safety Code.  Upon receipt of such notification, no further inquiries or investigations by the
37   [commission] *department of energy* shall be required in granting the requested license.

1    259  Rights in Public Waters and Lands; Hearing; Order.  Amend RSA 371:20 to read as follows:

2    371:20  Hearing; Order.  ***Whenever a hearing shall be necessary,*** the commission shall hear

3    all parties interested; and, in case it shall find that the license petitioned for, subject to such

4    modifications and conditions, if any, and for such period as the commission may determine, may be

5    exercised without substantially affecting the public rights in said waters or lands, it shall render

6    judgment granting such license.   Provided, however, that such license may be granted ***by the***

7    ***department of energy*** without hearing when all interested parties are in agreement and in cases

8    involving filings made under RSA 371:17-a and RSA 371:17-b.  [The executive director of the

9    commission may issue licenses under RSA 371:17-a and RSA 371:17-b.]

10   260  References Changed; Proceedings to Acquire Property or Rights; Rights in Public Waters

11   and Lands; Department of Energy.  Amend the following RSA provisions by replacing "commission"

12   with "department of energy": 371:17, 371:18, 371:19.

13   261  Extent of Power.  Amend RSA 374:3 to read as follows:

14   374:3  Extent of Power.  The public utilities commission ***and department of energy*** shall have

15   the general supervision of all public utilities and the plants owned, operated or controlled by the

16   same so far as necessary to carry into effect the provisions of this title.

17   262  Supervisory Power of Department of Energy and Public Utilities Commission.  Amend the

18   subdivision heading following RSA 374:3-b to read as follows:

19                    Supervisory Power of Department of [Transportation]

20                    ***Energy and Public Utilities Commission***

21   263  Duties.  Amend RSA 374:4-374:5-a to read as follows:

22   374:4  Duty to Keep Informed.  The commission ***and the department of energy*** shall have

23   power, and it shall be [its] ***their*** duty, to keep informed as to all public utilities in the state, their

24   capitalization, franchises and the manner in which the lines and property controlled or operated by

25   them are managed and operated, not only with respect to the safety, adequacy and accommodation

26   offered by their service, but also with respect to their compliance with all provisions of law, orders of

27   the commission and charter requirements.

28   374:5  Additions and Improvements.  For the purpose of enabling the commission ***and the***

29   ***department of energy*** to perform [its] ***their*** duty to keep informed as provided in RSA 374:4, every

30   public utility, before making any addition, extension, or capital improvement to its fixed property in

31   this state, except under emergency conditions, shall report to the commission ***and the department***

32   ***of energy*** the probable cost of such addition, extension, or capital improvement whenever the

33   probable cost thereof exceeds a reasonable amount to be prescribed by general or special order of the

34   commission.  For this purpose, the commission may classify public utilities according to the amount

35   of their respective fixed capital accounts, and prescribe a reasonable limitation for each such

36   classification.  In no case shall the minimum amount prescribed be less than 1/4 of one percent of

37   such fixed capital account as of December 31 of the preceding year, or $10,000, whichever is the

1    smaller amount.  Reports shall be filed in writing [with the commission] within such reasonable time

2    as may be prescribed by the commission before starting actual construction on any addition,

3    extension, or improvement.  The commission shall have discretion to exclude the cost of any such

4    addition, extension, or capital improvement from the rate base of said utility where such written

5    report thereof shall not have been filed in advance as herein provided.

6    374:5-a  Power to Hire Consultants Firm.  The commission ***and the department of energy*** may

7    utilize and employ a consultant firm to provide it with technical assistance in evaluating cost factors

8    relating to the effective use of substantial investments of utilities regulated by the commission.

9    264  Investigation of Other Utilities; Orders; Violation.  Amend RSA 374:7-374:7-a to read as

10    follows:

11    374:7  Investigation of Other Utilities; Orders.  The commission ***and the department of energy***

12    shall have power to investigate and ascertain, from time to time, the quality of gas supplied by

13    public utilities and the methods employed by public utilities in manufacturing, transmitting or

14    supplying gas or electricity for light, heat or power, or in transmitting telephone and telegraph

15    messages, or supplying water, and, after notice and hearing thereon, shall have power to order all

16    reasonable and just improvements and extensions in service or methods.

17    374:7-a  Violation.

18       I.  Any person who knowingly or willfully violates any provision of RSA 370:2 or any

19    standards or rules adopted under it by the public utilities commission ***or the department of***

20    ***energy***, relative to gas pipelines and liquefied petroleum gas systems pursuant to the Natural Gas

21    Pipeline Safety Act, shall be subject to a civil penalty not to exceed the maximum civil penalty under

22    49 U.S.C. section 60122(a), as amended.

23       II.  Any person who otherwise violates any provision of RSA 370:2 or any standards or rules

24    adopted under it by the public utilities commission ***or the department of energy***, relative to gas

25    pipelines and liquefied petroleum gas systems pursuant to the Natural Gas Pipeline Safety Act,

26    shall be subject to a civil penalty not to exceed the maximum civil penalty under 49 U.S.C. section

27    60122(a), as amended.

28       III.  ***The department of energy shall assess and enforce civil penalties related to this***

29    ***section.***  Any civil penalty assessed under this section may be [compromised] ***appealed to the***

30    ***public utilities commission, and the commission may uphold, reverse, or compromise such***

31    ***civil penalty*** [by the public utilities commission].  In determining the amount of the penalty, ***the***

32    ***outcome of an appeal,*** or the amount agreed upon in compromise, the appropriateness of the

33    penalty to the size of the business of the person charged, the gravity of the violation, the good faith of

34    the person charged in attempting to achieve compliance, after notification of a violation, the degree

35    of culpability of the person, the history of prior violations, the effect of the penalty on the person, and

36    any other identifiable factor related to the circumstances of the person and the nature and

37    circumstances of the violation, shall be considered.  The amount of the penalty, when finally

Amendment to HB 2-FN-A-LOCAL
- Page 116 -

1    determined, or the amount agreed upon in compromise, may be deducted from any sums owing by

2    the state to the person charged or may be recovered in a civil action in the state courts.

3    265  Public Utilities; Reports; Filing.  Amend RSA 374:15 to read as follows:

4    374:15   Filing.   Every public utility shall file with the commission **and the department of**

5    **energy** reports at such times, verified by oath in such manner, and setting forth such statistics and

6    facts, as may be required by the commission **or the department of energy**.

7    266  Public Utilities; Reports.  Amend RSA 374:17-374:19 to read as follows:

8    374:17  Neglect to Report.  If any public utility shall neglect or refuse to make and file any report

9    within a time specified by the commission **or the department of energy**, or shall neglect or refuse

10   to make specific answer to any question lawfully asked by the commission **or the department of**

11   **energy**, it shall forfeit to the state the sum of $100 for each day it shall continue to be in default with

12   respect to such report or answer, unless it shall be excused [by the commission] from making such

13   report or answer, or unless the time for making the same shall be extended [by the commission].

14   374:18  Production of Books, Etc.  The commission, by order, **or the department of energy,** may

15   require any public utility to produce within the state, at such time and place as it may designate,

16   any accounts, records, memoranda, books**,** or papers kept in any office or place without the state, or

17   verified copies thereof, in order that an examination thereof may be made by **or under the**

18   **direction of** the commission or [under its direction] **the department of energy**.

19   374:19  False Statements, Etc.  No public utility shall willfully make any false statement or false

20   entry in any report to the commission **or the department of energy**, or in any answer to any

21   question lawfully asked by the commission **or the department of energy**.

22   267  Service Territories; Department of Energy Jurisdiction.  Amend RSA 374:22-e to read as

23   follows:

24   374:22-e  Service Territories; [Commission] **Department of Energy** Jurisdiction.

25        I.  If 2 or more telephone utilities find that they provide the same service in the same area or

26   that existing maps create overlapping service territories, the [commission] **department of energy**,

27   upon application by one or both of the affected utilities, shall define, alter, or establish service

28   territories.  In establishing or altering service territories, the [commission] **department of energy**

29   shall consider the following:

30        (a)  Existing service areas;

31        (b)   Any voluntary agreements between or among 2 or more such telephone utilities

32   which define the service territories of those utilities;

33        (c)  Consistency with the orderly development of the region;

34        (d)  Natural geographical boundaries;

35        (e)  Compatibility with the interests of all consumers; and

36        (f)  All other relevant factors.

II.  The [commission] *department of energy* shall have power to exercise the jurisdiction conferred in this section only after due notice to all interested parties and hearing.  After consideration of the factors established by paragraph I of this section, and after making findings that the service territories established or altered are consistent with the public good, the [commission] *department of energy* shall establish the service territory of each telephone utility.  The service territory thus established shall be sufficiently definite and precise so that its boundaries may be accurately determined.

268  Service Territories Served by Certain Telephone Utilities.  Amend RSA 374:22-g to read as follows:

374:22-g  Service Territories Served by Certain Telephone Utilities.

I.  To the extent consistent with federal law and notwithstanding any other provision of law to the contrary, all telephone franchise areas served by a telephone utility that provides local exchange service, subject to the jurisdiction of the [commission] *department of energy*, shall be nonexclusive.  The [commission] *department of energy*, upon petition or on its own motion, shall have the authority to authorize the providing of telecommunications services, including local exchange services, and any other telecommunications services, by more than one provider, in any service territory, when the [commission] *department of energy* finds and determines that it is consistent with the public good unless prohibited by federal law.

II.  In determining the public good, the commission shall consider the interests of competition with other factors including, but not limited to, fairness; economic efficiency; universal service; carrier of last resort obligations; the incumbent utility's opportunity to realize a reasonable return on its investment; and the recovery from competitive providers of expenses incurred by the incumbent utility to benefit competitive providers, taking into account the proportionate benefit or savings, if any, derived by the incumbent as a result of incurring such expenses.

III.  The *department of energy* shall adopt rules, pursuant to RSA 541-A, relative to the enforcement of this section.

269  Shared Tenant Services Authorized; Limited Regulation; Rulemaking.  Amend RSA 374:22-l and m to read as follows:

374:22-l  Shared Tenant Services Authorized; Limited Regulation.

I.  The [public utilities commission] *department of energy* shall authorize the provision of shared tenant services by providers meeting the minimum requirements established by the [commission] *department of energy* to operate shared tenant services networks.

II.  Providers of shared tenant services shall be subject to the following limited regulation by the [commission] *department of energy*:

(a)  Providers of shared tenant services shall disclose to tenants and prospective tenants all pricing information relative to their services in the manner prescribed by the [commission] *department of energy*.

1     (b)  Providers of shared tenant services shall disclose to tenants and prospective tenants

2 that they can at their option obtain basic exchange and other service from an authorized local

3 telephone utility rather than from the shared tenant services provider.

4     (c)  Without penalty and in accordance with the rules of the [commission] *department of*

5 *energy*, telephone number retention and access to telecommunications services shall be permitted by

6 providers of shared tenant services and authorized local telephone utilities into and out of shared

7 tenant services properties.

8     (d)  The [commission] *department of energy* shall have jurisdiction to hear matters

9 pertaining to the unauthorized provision of shared tenant services, violations of [commission]

10 *department* rules relating to shared tenant services, and customer complaints against shared

11 tenant services providers.

12     374:22-m  Rulemaking.  The [public utilities commission] *department of energy* shall adopt

13 rules, pursuant to RSA 541-A, relative to:

14     I.  Minimum requirements for shared tenant services, including disclosure of available

15 options and terms and prices of shared tenant services.

16     II.  Customer access to services of authorized local telephone utilities.

17     III.  Telephone number retention and recovery of costs, if any, associated with number

18 retention.

19     IV.  The charges a local telephone utility establishes for a shared tenant services provider to

20 purchase services for use by the provider's tenants.

21     V.  Procedures for complaints to the [commission] *department* regarding shared tenant

22 services.

23     270  Regulation of Competitive Telecommunications Providers Limited; Affordable Telephone

24 Service; Public Interest Payphones.  Amend RSA 374:22-o-374:22-p to read as follows:

25     374:22-o  Regulation of Competitive Telecommunications Providers Limited.  Any person or

26 business entity authorized by the [commission] *department of energy* to engage in business as a

27 competitive local exchange carrier and any competitive toll provider having less than a 10 percent

28 share of toll revenue in New Hampshire shall not be required to seek prior [commission]

29 *department* approval of financings or corporate organizational changes, including, without

30 limitation, mergers, acquisitions, corporate restructurings, issuance or transfer of securities, or the

31 sale, lease, or other transfer of assets or control.  Nothing in this section shall exempt any such

32 competitive telecommunications service provider from such advance notice as the [commission]

33 *department* may prescribe or from the requirements of RSA 374:28-a or RSA 378:46.

34     374:22-p  Affordable Telephone Service; Rulemaking; Standards.

35     I.(a)  For the purposes of this section, "Federal Telecommunications Act" means the federal

36 Telecommunications Act of 1996, Public Law 104-104, 110 Stat. 56.

37     (b)  For purposes of this section "basic service" means:

1 (1)  Safe and reliable single-party, single line voice service;

2 (2)  The ability to receive all noncollect calls, at telephone lines capable of receiving

3 calls, without additional charge;

4 (3)  The ability to complete calls to any other telephone line, which is capable of

5 receiving calls, in the state;

6 (4)  The opportunity to presubscribe to interLATA toll carriers;

7 (5)  The opportunity to presubscribe to intraLATA toll carriers;

8 (6)  Dialing parity;

9 (7)  Number portability;

10 (8)  Enhanced 911, pursuant to the requirements of the department of safety, bureau

11 of emergency communications, or its successor agency;

12 (9)  Access to statewide directory assistance;

13 (10)  Telecommunications relay service (TRS);

14 (11)  A published directory listing, at the customer's election;

15 (12)  A caller identification blocking option, on a per-call basis;

16 (13)  A caller identification line blocking option that is available to all customers

17 without a recurring charge and is provided upon customer request without charge to customers who

18 have elected nonpublished telephone numbers and is available without a nonrecurring charge to

19 customers who certify that caller identification threatens their health or safety and is available

20 without a nonrecurring charge when requested with installation of basic service;

21 (14)  A blocking option for pay-per-call calls, such as blocking all 900 or all 976 area

22 code calls;

23 (15)  The ability to report service problems to the customer's basic service provider on

24 a 24-hour basis, 7 days a week; and

25 (16)  Automatic Number Identification (ANI) to other carriers which accurately

26 identifies the telephone number of the calling party.

27 (c)  Any combination of basic service along with any other service or feature offered by

28 the telecommunications service provider is nonbasic service and shall not be regulated by the

29 commission.

30 (d)  Any telecommunications service provider which is not an incumbent local exchange

31 carrier shall not be required to provide basic service.

32 II.  Subject to RSA 362:6, the [commission] *department of energy* shall require every

33 provider of intrastate telephone service to participate in outreach programs designed to increase the

34 number of low-income telephone customers on the network through increased participation in any

35 universal service program approved by the [commission] *department* and statutorily established by

36 the legislature.  Statewide outreach programs shall continue until further order of the [commission]

37 *department*.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 120 -**

1   III.   The [commission] *department of energy* shall seek to ensure that affordable basic
2   telephone services are available to consumers throughout all areas of the state at reasonably
3   comparable rates.

4   IV.(a)   The [commission] *department of energy* shall [develop draft] *maintain and*
5   *update* rules to implement this section and shall, after the statutory establishment of a universal
6   service fund, require every provider of intrastate telephone services to contribute to a state universal
7   service fund to support programs consistent with the goals of applicable provisions of this title and
8   the Federal Telecommunications Act.

9   (b)   If the [commission] *department of energy*, upon statutory establishment of a
10  universal service program, establishes a state universal service fund pursuant to this section, the
11  [commission] *department* shall contract with an appropriate independent fiscal agent that is not a
12  state entity to serve as administrator of the state universal service fund.  Program administration
13  shall be designed in the most cost-effective manner possible.  Funds contributed to a state universal
14  service fund are not state funds and therefore are not subject to provisions of law relating to the
15  general fund.  Rules and any state universal service fund requirements established by legislative
16  enactment and by the [commission] *department* pursuant to this section shall:

17  (1)   Be reasonably designed to maximize federal assistance available to the state for
18  universal service purposes.

19  (2)   Meet the state's obligations under the Federal Telecommunications Act.

20  (3)   Be consistent with the goals of the Federal Telecommunications Act.

21  (4)   Ensure that any requirements regarding contributions to a state universal
22  service fund be nondiscriminatory and competitively neutral.

23  (5)   Require explicit identification on customer's bills of contributions to and in the
24  event of fund termination, refunds from, any state universal service fund established pursuant to the
25  section.

26  (6)   Allow consideration in appropriate rulemaking proceedings of contributions to
27  and in the event of fund termination, refunds from, any state universal service fund established
28  pursuant to this section.

29  (c)   For purposes of this section, "providers of intrastate telephone services" includes
30  providers of radio paging service and, subject to the provisions of the Federal Communications Act as
31  amended and codified at 47 U.S.C. sec. 332(c)(3)(A), mobile telecommunications services.

32  (d)   Prior to requiring that providers of intrastate telephone service contribute to a state
33  universal service fund and prior to statutory establishment of a universal service fund, the
34  [commission] *department of energy* shall report to the general court its determination of the
35  expected program costs, the amount and type of the funding mechanism, the number of people
36  proposed to be served, the level of proposed service, and the administrative design of the proposed
37  fund.

V.  The [commission] *department of energy*, annually, shall assess the penetration rate of basic telephone services.  If this penetration rate ever falls below the national average penetration rate, the [commission] *department* shall commence an investigation and take steps to enhance telephone market penetration.  The [commission] *department*, annually, shall assess the success of any action taken by the [commission] *department* to achieve the purpose of this section.  The public policy goal should be to raise the low income penetration level as close as reasonably possible to the statewide average.

VI, VII.  [Repealed.]

VIII.  Notwithstanding the provisions of RSA 374:1-a:

(a)  Incumbent local exchange carriers, whether qualified as an excepted local exchange carrier or otherwise, may not discontinue residential basic service, regardless of technology used, in any portion of their franchise area unless the [commission] *department of energy* determines that the public good will not be adversely affected by such withdrawal of service;

(b)  Rates for basic service of incumbent local exchange carriers which qualify as excepted local exchange carriers may not increase by more than 5 percent for Lifeline Telephone Assistance customers and by more than 10 percent for all other basic service customers in each of the 8 years after the effective date of this paragraph or the effective date of an existing alternative plan of regulation, except for additional rate adjustments, with [public utilities commission] *department of energy* review and approval, to reflect changes in federal, state, or local government taxes, mandates, rules, regulations, or statutes; and

(c)  Incumbent local exchange carriers which qualify as excepted local exchange carriers shall report the rates for basic service to the [commission] *department of energy* within 60 days of the effective date of this paragraph and upon any changes to the rates.

271  Pole Attachments.  Amend RSA 374:34-a to read as follows:

374:34-a  Pole Attachments.

I.  In this subdivision, a "pole" means any pole, duct, conduit, or right-of-way that is used for wire communications or electricity distribution and is owned in whole or in part by a public utility, including a rural electric cooperative for which a certificate of deregulation is on file with the commission pursuant to RSA 301:57.

II.  Whenever a pole owner is unable to reach agreement with a party seeking pole attachments, the commission shall regulate and enforce rates, charges, terms, and conditions for such pole attachments, with regard to the types of attachments regulated under 47 U.S.C. section 224, to provide that such rates, charges, terms, and conditions are just and reasonable.  This authority shall include but not be limited to the state regulatory authority referenced in 47 U.S.C. section 224(c).

III.  The [commission] *department of energy* shall adopt rules under RSA 541-A to carry out the provisions of this section, including appropriate formula or formulae for apportioning costs.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 122 -**

IV.   In exercising its authority under this subdivision, the [commission] *department of energy* shall consider the interests of the subscribers and users of the services offered via such attachments, as well as the interests of the consumers of any pole owner providing such attachments.

V.   Nothing in this subdivision shall prevent parties from entering into pole attachment agreements voluntarily, without commission approval.

VI.   Any pole owner shall provide nondiscriminatory access to its poles for the types of attachments regulated under this subdivision.   A pole owner may deny access to its poles on a nondiscriminatory basis where there is insufficient capacity and for reasons of safety, reliability, and generally applicable engineering purposes.

VII.   The commission shall have the authority to hear and resolve complaints concerning rates, charges, terms, conditions, voluntary agreements, or any denial of access relative to pole attachments.

VIII.   The [commission] *department of energy* shall retain its authority to regulate the safety, vegetation management, emergency response, and storm restoration requirements for poles, conduits, ducts, pipes, pole attachments, wires, cables, and related plant and equipment of public utilities and other private entities located within public rights-of-way and on, over, or under state lands and water bodies.

272  Repeals.  The following are repealed:

I.  RSA 374:35, relative to transmitting electricity out of the state.

II.  RSA 374:36, relative to investigations and orders.

273  Investigation of Accidents.  Amend RSA 374:37-374:40 to read as follows:

374:37   By [Commission] *Department*.   The [commission] *department of energy* shall investigate the causes of all accidents in connection with the operation of public utilities in the state, which, in the opinion of the commission *or the department of energy*, ought to be investigated.

374:38  Manner.  Any such investigation may be made by the [full commission] *department of energy* [, or by a single commissioner, or by an agent of the commission,] in such manner as the [commission] *department of energy* may determine.

374:39  Reports.  Every public utility shall report to the ***department of energy and the*** commission accidents occurring in connection with the operation of its business wherein loss of life occurs or any person is injured, or of such a nature as to endanger the safety, health or property of its consumers or the public, as and whenever directed by such rules and regulations as the ***department of energy and the*** commission may prescribe.

374:40   Publicity.   Reports of accidents filed under RSA 374:39 shall not be made public otherwise than in the published reports of the commission *or the department of energy*.

274  New Paragraph; Definitions.  Amend RSA 374:48 by inserting after paragraph II the following new paragraph:

1    II-a.  "Department" means the department of energy.

2    275  Rulemaking.  Amend the introductory paragraph of RSA 374:50 to read as follows:

3    The [commission] *department* shall adopt rules, pursuant to RSA 541-A, relative to:

4    276  Civil Penalty.  Amend RSA 374:55 to read as follows

5    374:55  Civil Penalty.

6        I.  Proof that an excavation has been made without compliance with the notice requirement

7    of RSA 374:51 and that damage to an underground facility has occurred shall be prima facie

8    evidence in any court or administrative proceeding that the damage was caused by the negligence of

9    the excavator.

10       II.  Any excavator who does not give notice of or identify the proposed excavation area as

11   required by RSA 374:51 or rules of the [commission] *department* regarding tolerance zones and

12   marking procedures shall be subject to the penalties in paragraph VIII, in addition to any liability

13   for the actual damages.

14       III.  Any operator which does not mark the location of its underground facilities as required

15   by RSA 374:53 or rules of the [commission] *department* regarding tolerance zones and marking

16   procedures shall be subject to the penalties in paragraph VIII.

17       IV.  If underground facilities are damaged because an operator does not mark its

18   underground facilities as required by RSA 374:53, the operator shall be subject to the penalties in

19   paragraph VIII, liable for damages sustained to its facilities and, in addition, shall be liable for any

20   damages incurred by the excavator as a result of the operator's failure to mark such facilities.

21       V.  If marked underground facilities are damaged, the excavator shall be subject to the

22   penalties in paragraph VIII and liable for the cost of repairs for the damage.

23       VI.  Any excavator who damages an underground facility and fails to notify the operator, or

24   backfills the excavation without receiving permission, as required by RSA 374:54, shall be subject to

25   the penalties in paragraph VIII.

26       VII.  The [commission] *department* or any [commission] *department* employee, involved in

27   an underground facility damage prevention program approved by the [commission] *department* and

28   designated by the [commission] *department*, may enforce violations of this subdivision.  Any

29   excavator or operator that violates this subdivision shall be subject to the penalties in paragraph

30   VIII.  In addition, the [commission] *department* may assess the excavator for expenditures made to

31   collect the civil penalty.  Any excavator or operator which suffers damage resulting from violation of

32   this subdivision may petition the [commission] *department* to initiate an enforcement action.

33       VIII.  Any excavator or operator that does not comply with RSA 374:51 through 374:54 shall

34   be required either to complete an underground facility damage prevention program approved by the

35   [commission] *department*, or to pay a civil penalty of up to $500.  The civil penalty may be up to

36   $5,000 if the excavator or operator previously violated RSA 374:51 through 374:54 within the prior

37   12 months or if the violation results in bodily injury or property damages exceeding $50,000,

1  excluding utility costs.  This paragraph shall not apply to a homeowner excavating on his or her own

2  property or to a legal occupant of residential property excavating on the property of his or her

3  primary residence with the permission of the owner.

4  277  Telephone Number Conservation and Area Code Implementation Policy Principles.  Amend

5  RSA 374:59 to read as follows:

6  374:59  Telephone Number Conservation and Area Code Implementation Policy Principles.

7  I. In this section:

8  (a) ["Commission"] "*Department*" means the [public utilities commission] *department*

9  *of energy*.

10  (b)  "Geographic split" means the division of an area code into typically 2 areas each

11  served by its own area code.

12  (c)  "Overlay" means the addition of a new area code serving the same geographic area as

13  the existing area code.

14  II. The [commission] *department* should promote and adopt telephone number conservation

15  measures to the maximum extent allowed by federal law for area code 603 and any subsequently

16  assigned New Hampshire area codes.

17  III.  The [commission] *department* should adopt measures, to the maximum extent

18  allowable by federal law and availability of technology, to provide that all customers of all suppliers

19  have equitable access to all currently available unassigned telephone numbers and equitable access

20  to numbers that have not been assigned to a customer which are available for porting to a second

21  supplier.  Blocks of telephone numbers that are currently assigned but may be retrievable if

22  thousands number block pooling becomes available should be assigned on an equitable basis to all

23  suppliers.

24  IV.  The [commission] *department* should adopt measures, to the maximum extent

25  allowable by federal law and availability of technology, to provide for local number portability by all

26  suppliers of local exchange service.

27  V.  To the extent that any one competitor is responsible for managing a pool of numbers

28  which is to be assigned to customers of that competitor and other competitors, the [commission]

29  *department* should adopt policies to require that the assignment and management of the numbers

30  be kept segregated from the marketing portion of that competitor.

31  VI. When determining whether to implement a new area code via geographic split or overlay

32  the [commission] *department* should consider, but not be limited to, the following criteria when

33  determining the public interest:

34  (a)  Which method best minimizes customer disruption from having to change numbers;

35  (b)  Which method is the least costly for business and residents;

36  (c)  Which method best minimizes customer confusion;

37  (d)  Which method is the least costly for providers to implement;

1        (e)  Which method most effectively conserves the total pool of telephone numbers once a

2 new area code is created;

3        (f)  Which method minimizes geographic controversy;

4        (g)  Which method is most equitable to every resident and business in New Hampshire;

5        (h)  Which method minimizes repeating the disruption of area code changes in the future;

6        (i)  Which method best ensures public safety;

7        (j)  Which method is more competitively neutral; and

8        (k)     Which method utilizes best available technology and comprehensive

9 telecommunications planning.

10     278  Renewable Energy and Energy Efficiency Project Loan Programs.  Amend RSA 374:61 to

11 read as follows:

12     374:61  Renewable Energy and Energy Efficiency Project Loan Programs.  A public utility may

13 seek [commission] authorization ***from the department of energy***, either individually or in

14 combination with other public utilities, to establish loan, financing, or cost amortization programs

15 for owners and tenants of residential, public, nonprofit, and business property to finance or

16 otherwise amortize cost effective fuel neutral renewable energy and energy efficiency investments

17 and improvements to the owner's or tenant's premises.  The total amount loaned in such programs

18 shall not exceed $5,000,000.  The [commission] ***department*** shall authorize terms, conditions, and

19 tariffs for the repayment of such loans and financed or underwritten investments and improvements

20 through charges billed through and that run with the meter or meters assigned to the location where

21 the investments are located, provided that such investments or improvements to a tenant's premises

22 are only made with the written consent of the owner or the owner's authorized management

23 representative.  Pursuant to RSA 477:4-h, the owner, seller, lessor, or transferor of any real property

24 subject to unamortized or ongoing charges under such a tariff shall disclose such fact to a prospective

25 buyer, lessee, or occupant who might be responsible for paying such charges as a condition of utility

26 service.  A public utility may not finance these loan, financing, or cost amortization programs

27 through its rate base, nor earn its regulated rate of return on such program investments and

28 improvements to the owner's or tenant's premises, unless such investment is approved as part of a

29 strategy for minimizing transmission and distributions costs pursuant to RSA 374-G.

30     279  Electric Utility Restructuring; Purpose.  Amend RSA 374-F:1, III to read as follows:

31        III.  The following interdependent policy principles are intended to guide the New

32 Hampshire public utilities commission ***and the department of energy*** in implementing a statewide

33 electric utility industry restructuring plan, in establishing interim stranded cost recovery charges, in

34 approving each utility's compliance filing, in streamlining administrative processes to make

35 regulation more efficient, and in regulating a restructured electric utility industry.  In addition,

36 these interdependent principles are intended to guide the New Hampshire general court and the

Amendment to HB 2-FN-A-LOCAL
- Page 126 -

1   department of environmental services and other state agencies in promoting and regulating a
2   restructured electric utility industry.

3   280   New Paragraph; Definitions.   Amend RSA 374-F:2 by inserting after paragraph I-a the
4   following new paragraph:

5   I-b. "Department" means the department of energy.

6   281   Restructuring Policy Principles; Implementation.   Amend RSA 374-F:3 and 374-F:4 to read
7   as follows:

8   374-F:3   Restructuring Policy Principles.

9   I. System Reliability.   Reliable electricity service must be maintained while ensuring public
10   health, safety, and quality of life.

11   II.   Customer Choice.   Allowing customers to choose among electricity suppliers will help
12   ensure fully competitive and innovative markets.   Customers should be able to choose among options
13   such as levels of service reliability, real time pricing, and generation sources, including
14   interconnected self generation.   Customers should expect to be responsible for the consequences of
15   their choices.   The [commission] ***department*** should ensure that customer confusion will be
16   minimized and customers will be well informed about changes resulting from restructuring and
17   increased customer choice.

18   III.   Regulation and Unbundling of Services and Rates.   When customer choice is introduced,
19   services and rates should be unbundled to provide customers clear price information on the cost
20   components of generation, transmission, distribution, and any other ancillary charges.   Generation
21   services should be subject to market competition and minimal economic regulation and at least
22   functionally separated from transmission and distribution services which should remain regulated
23   for the foreseeable future.   However, distribution service companies should not be absolutely
24   precluded from owning small scale distributed generation resources as part of a strategy for
25   minimizing transmission and distribution costs.   Performance based or incentive regulation should
26   be considered for transmission and distribution services.   Upward revaluation of transmission and
27   distribution assets is not a preferred mechanism as part of restructuring.   Retail electricity suppliers
28   who do not own transmission and distribution facilities, should, at a minimum, be registered with
29   the [commission] ***department***.

30   IV.   Open Access to Transmission and Distribution Facilities.   Non-discriminatory open
31   access to the electric system for wholesale and retail transactions should be promoted.
32   Comparability should be assured for generators competing with affiliates of groups supplying
33   transmission and distribution services.   Companies providing transmission services should file at the
34   FERC or with the commission, ***or with the department of energy,*** as appropriate, comparable
35   service tariffs that provide open access for all competitors.   The commission ***and the department***
36   should monitor companies providing transmission or distribution services and take necessary
37   measures to ensure that no supplier has an unfair advantage in offering and pricing such services.

1      V.  Universal Service.

2          (a)  Electric service is essential and should be available to all customers.  A utility

3  providing distribution services must have an obligation to connect all customers in its service

4  territory to the distribution system.  A restructured electric utility industry should provide adequate

5  safeguards to assure universal service.  Minimum residential customer service safeguards and

6  protections should be maintained.  Programs and mechanisms that enable residential customers

7  with low incomes to manage and afford essential electricity requirements should be included as a

8  part of industry restructuring.

9          (b)  As competitive markets emerge, customers should have the option of stable and

10  predictable ceiling electricity prices through a reasonable transition period, consistent with the near

11  term rate relief principle of RSA 374-F:3, XI.  Upon the implementation of retail choice, transition

12  service should be available for at least one but not more than 5 years after competition has been

13  certified to exist in at least 70 percent of the state pursuant to RSA 38:36, for customers who have

14  not yet chosen a competitive electricity supplier.  Transition service should be procured through

15  competitive means and may be administered by independent third parties.  The price of transition

16  service should increase over time to encourage customers to choose a competitive electricity supplier

17  during the transition period.  Such transition service should be separate and distinct from default

18  service.

19          (c)  Default service should be designed to provide a safety net and to assure universal

20  access and system integrity.  Default service should be procured through the competitive market and

21  may be administered by independent third parties.  Any prudently incurred costs arising from

22  compliance with the renewable portfolio standards of RSA 362-F for default service or purchased

23  power agreements shall be recovered through the default service charge.  The allocation of the costs

24  of administering default service should be borne by the customers of default service in a manner

25  approved by the commission.  If the commission determines it to be in the public interest, the

26  commission may implement measures to discourage misuse, or long-term use, of default service.

27  Revenues, if any, generated from such measures should be used to defray stranded costs.

28          (d)  The commission should establish transition and default service appropriate to the

29  particular circumstances of each jurisdictional utility.

30          (e)  Notwithstanding any provision of subparagraphs (b) and (c), as competitive markets

31  develop, the commission may approve alternative means of providing transition or default services

32  which are designed to minimize customer risk, not unduly harm the development of competitive

33  markets, and mitigate against price volatility without creating new deferred costs, if the commission

34  determines such means to be in the public interest.

35          (f)(1)  For purposes of subparagraph (f), "renewable energy source" (RES) means a source

36  of electricity, as defined in RSA 362-F:2, XV, that would qualify to receive renewable energy

Amendment to HB 2-FN-A-LOCAL
- Page 128 -

1  certificates under RSA 362-F, whether or not it has been designated as eligible under RSA 362-F:6,
2  III.

3  (2)  A utility shall provide to its customers one or more RES options, as approved by
4  the commission, which may include RES default service provided by the utility or the provision of
5  retail access to competitive sellers of RES attributes.  Costs associated with selecting an RES option
6  should be paid for by those customers choosing to take such option.  A utility may recover all
7  prudently incurred administrative costs of RES options from all customers, as approved by the
8  commission.

9  (3)  RES default service should have either all or a portion of its service attributable
10  to a renewable energy source component procured by the utility, with any remainder filled by
11  standard default service.  The price of any RES default service shall be approved by the commission.

12  (4)  Under any option offered, the customer shall be purchasing electricity generated
13  by renewable energy sources or the attributes of such generation, either in connection with or
14  separately from the electricity produced.  The regional generation information system of energy
15  certificates administered by the ISO-New England and the New England Power Pool (NEPOOL)
16  should be considered at least one form of certification that is acceptable under this program.

17  (5)  A utility that is required by statute to provide default service from its generation
18  assets should use any of its owned generation assets that are powered by renewable energy for the
19  provision of standard default service, rather than for the provision of a renewable energy source
20  component.

21  (6)  Utilities should include educational materials in their normal communications to
22  their customers that explain the RES options being offered and the health and environmental
23  benefits associated with them.  Such educational materials should be compatible with any
24  environmental disclosure requirements established by the [commission] ***department***.

25  (7)  For purposes of consumer protection and the maintenance of program integrity,
26  reasonable efforts should be made to assure that the renewable energy source component of an RES
27  option is not separately advertised, claimed, or sold as part of any other electricity service or
28  transaction, including compliance with the renewable portfolio standards under RSA 362-F.

29  (8)  If RES default service is not available for purchase at a reasonable cost on behalf
30  of consumers choosing an RES default service option, a utility may, as approved by the commission,
31  make payments to the renewable energy fund created pursuant to RSA 362-F:10 on behalf of
32  customers to comply with subparagraph (f).

33  (9)  The commission shall implement subparagraph (f) through utility-specific filings.
34  Approved RES options shall be included in individual tariff filings by utilities.

35  (10)  A utility, with commission approval, may require that a minimum number of
36  customers, or a minimum amount of load, choose to participate in the program in order to offer an
37  RES option.

Amendment to HB 2-FN-A-LOCAL
- Page 129 -

VI.   Benefits for All Consumers.   Restructuring of the electric utility industry should be implemented in a manner that benefits all consumers equitably and does not benefit one customer class to the detriment of another.   Costs should not be shifted unfairly among customers.   A nonbypassable and competitively neutral system benefits charge applied to the use of the distribution system may be used to fund public benefits related to the provision of electricity.   Such benefits, as approved by regulators, may include, but not necessarily be limited to, programs for low-income customers, energy efficiency programs, funding for the electric utility industry's share of commission ***and department*** expenses pursuant to RSA 363-A, support for research and development, and investments in commercialization strategies for new and beneficial technologies. Legislative approval of the New Hampshire general court shall be required to increase the system benefits charge.   This requirement of prior approval of the New Hampshire general court shall not apply to the energy efficiency portion of the system benefits charge if the increase is authorized by an order of the commission to implement the 3-year planning periods of the Energy Efficiency Resource Standard framework established by commission Order No. 25,932 dated August 2, 2016, ending in 2020 and 2023, or, if for purposes other than implementing the Energy Efficiency Resource Standard, is authorized by the fiscal committee of the general court; provided, however, that no less than 20 percent of the portion of the funds collected for energy efficiency shall be expended on low-income energy efficiency programs.   Energy efficiency programs should include the development of relationships with third-party lending institutions to provide opportunities for low-cost financing of energy efficiency measures to leverage available funds to the maximum extent, and shall also include funding for workforce development to minimize waiting periods for low-income energy audits and weatherization.

VII.  Full and Fair Competition.  Choice for retail customers cannot exist without a range of viable suppliers.  The rules that govern market activity should apply to all buyers and sellers in a fair and consistent manner in order to ensure a fully competitive market.

VIII.  Environmental Improvement.   Continued environmental protection and long term environmental sustainability should be encouraged.  Increased competition in the electric industry should be implemented in a manner that supports and furthers the goals of environmental improvement.   Over time, there should be more equitable treatment of old and new generation sources with regard to air pollution controls and costs.  New Hampshire should encourage equitable and appropriate environmental regulation, based on comparable criteria, for all electricity generators, in and out of state, to reduce air pollution transported across state lines and to promote full, free, and fair competition.   As generation becomes deregulated, innovative market-driven approaches are preferred to regulatory controls to reduce adverse environmental impacts.   Such market approaches may include valuing the costs of pollution and using pollution offset credits.

IX.   Renewable Energy Resources.   Increased future commitments to renewable energy resources should be consistent with the New Hampshire energy policy as set forth in RSA 378:37

Amendment to HB 2-FN-A-LOCAL
- Page 130 -

1   and should be balanced against the impact on generation prices.  Over the long term, increased use
2   of cost-effective renewable energy technologies can have significant environmental, economic, and
3   security benefits.  To encourage emerging technologies, restructuring should allow customers the
4   possibility of choosing to pay a premium for electricity from renewable resources and reasonable
5   opportunities to directly invest in and interconnect decentralized renewable electricity generating
6   resources.

7        X.   Energy Efficiency.   Restructuring should be designed to reduce market barriers to
8   investments in energy efficiency and provide incentives for appropriate demand-side management
9   and not reduce cost-effective customer conservation.  Utility sponsored energy efficiency programs
10   should target cost-effective opportunities that may otherwise be lost due to market barriers.

11        XI.   Near Term Rate Relief.  The goal of restructuring is to create competitive markets that
12   are expected to produce lower prices for all customers than would have been paid under the current
13   regulatory system.   Given New Hampshire's higher than average regional prices for electricity,
14   utilities, in the near term, should work to reduce rates for all customers.  To the greatest extent
15   practicable, rates should approach competitive regional electric rates.  The state should recognize
16   when state policies impose costs that conflict with this principle and should take efforts to mitigate
17   those costs.  The unique New Hampshire issues contributing to the highest prices in New England
18   should be addressed during the transition, wherever possible.

19        XII.   Recovery of Stranded Costs.

20        (a)   It is the intent of the legislature to provide appropriate tools and reasonable
21   guidance to the commission in order to assist it in addressing claims for stranded cost recovery and
22   fulfilling its responsibility to determine rates which are equitable, appropriate, and balanced and in
23   the public interest.  In making its determinations, the commission shall balance the interests of
24   ratepayers and utilities during and after the restructuring process.  Nothing in this section is
25   intended to provide any greater opportunity for stranded cost recovery than is available under
26   applicable regulation or law on the effective date of this chapter.

27        (b)   Utilities should be allowed to recover the net nonmitigatable stranded costs
28   associated with required environmental mandates currently approved for cost recovery, and power
29   acquisitions mandated by federal statutes or RSA 362-A.

30        (c)  Utilities have had and continue to have an obligation to take all reasonable measures
31   to mitigate stranded costs.  Mitigation measures may include, but shall not be limited to:

32        (1)  Reduction of expenses.

33        (2)  Renegotiation of existing contracts.

34        (3)  Refinancing of existing debt.

35        (4)  A reasonable amount of retirement, sale, or write-off of uneconomic or surplus
36   assets, including regulatory assets not directly related to the provision of electricity service.

1      (d)  Stranded costs should be determined on a net basis, should be verifiable, should not
2 include transmission and distribution assets, and should be reconciled to actual electricity market
3 conditions from time to time.  Any recovery of stranded costs should be through a nonbypassable,
4 nondiscriminatory, appropriately structured charge that is fair to all customer classes, lawful,
5 constitutional, limited in duration, consistent with the promotion of fully competitive markets and
6 consistent with these principles.  Entry and exit fees are not preferred recovery mechanisms.
7 Charges to recover stranded costs should only apply to customers within a utility's retail service
8 territory, except for such costs that have resulted from the provision of wholesale power to another
9 utility.  The charges should not apply to wheeling-through transactions.

10      XIII.  Regionalism.  New England Power Pool (NEPOOL) should be reformed and efforts to
11 enhance competition and to complement industry restructuring on a regional basis should be
12 encouraged.  New Hampshire should work with other New England and northeastern states to
13 accomplish the goals of restructuring.  Working with other regional states, New Hampshire should
14 assert maximum state authority over the entire electric industry restructuring process.  While it is
15 desirable to design and implement a restructured industry in concert with the other New England
16 and northeastern states, New Hampshire should not unnecessarily delay its timetable.  Any pool
17 structure adopted for the restructured industry should not preclude bilateral contracts with pool and
18 non-pool services and should not preclude ancillary pool services from being obtained from non-pool
19 sources.

20      XIV.  Administrative Processes.  The commission ***and the department*** should adapt [its]
21 ***their*** administrative processes to make regulation more efficient and to enable competitors to adapt
22 to changes in the market in a timely manner.  The market framework for competitive electric service
23 should, to the extent possible, reduce reliance on administrative process.  New Hampshire should
24 move deliberately to replace traditional planning mechanisms with market driven choice as the
25 means of supplying resource needs.

26      XV.  Timetable.  The commission should seek to implement full customer choice among
27 electricity suppliers in the most expeditious manner possible, but may delay such implementation in
28 the service territory of any electric utility when implementation would be inconsistent with the goal
29 of near-term rate relief, or would otherwise not be in the public interest.

30      374-F:4  Implementation.

31      I.  The commission is authorized to require the implementation of retail choice of electric
32 suppliers for all customer classes of utilities providing retail electric service under its jurisdiction.
33 The commission shall require such implementation at the earliest date determined to be in the
34 public interest by the commission.  However, in no event may the implementation be delayed beyond
35 July 1, 1998 without legislative approval or a finding of public interest by the commission that delay
36 is required due to events beyond the control of the commission or that implementation of retail
37 choice within the service territory of any electric utility would be inconsistent with the goal of near-

**Amendment to HB 2-FN-A-LOCAL**
**- Page 132 -**

1   term rate relief or would otherwise not be in the public interest.  In the event that implementation of
2   retail choice is delayed in the service territory of an electric utility, the electric utility shall continue
3   to provide reliable retail service at the lowest reasonable cost in accordance with state law.   In
4   addition, at the earliest practical date, the commission should make effective the unbundling of
5   components of rates into at least distribution, transmission, and generation for each jurisdictional
6   utility.

7        II.   Upon the effective date of this chapter, the commission shall undertake a generic
8   proceeding to develop a statewide industry restructuring plan in accordance with the above
9   principles, and shall, after public hearings, issue a final order no later than February 28, 1997.  In
10   its order, the commission shall establish the interim stranded cost recovery charge for each electric
11   utility as provided in paragraph VI.

12        III.  The commission shall require all electric utilities subject to its jurisdiction to submit
13   compliance filings *to the department of energy*, which shall include open access tariffs and such
14   other information as the commission may require, no later than June 30, 1997.  The [commission]
15   *department* shall investigate and *the commission* shall approve utility compliance filings, subject
16   to modification by the commission if necessary, after public hearing and subject to a finding that the
17   filings are in the public interest and substantially consistent with the principles established in this
18   chapter.

19        IV.  A utility having less than a 50 percent share of statewide retail electric distribution
20   sales (measured in kilowatt hours per year) may seek a ruling by the commission that it is in the
21   public interest that implementation of such utility's compliance filing be deferred until compliance
22   filings representing 70 percent of retail electric sales have been or are being implemented.

23        V.  The commission is authorized to allow utilities to collect a stranded cost recovery charge,
24   subject to its determination in the context of a rate case or adjudicated settlement proceeding that
25   such charge is equitable, appropriate, and balanced, is in the public interest, and is substantially
26   consistent with these interdependent principles.  The burden of proof for any stranded cost recovery
27   claim shall be borne by the utility making such claim.

28        VI.(a)   In order to facilitate the rapid transition to full competition, the commission is
29   authorized, in its generic restructuring order as provided in paragraph II, to set, without a formal
30   rate case proceeding, an interim stranded cost recovery charge for each electric utility.  Such interim
31   stranded cost recovery charges shall be effective for not more than 2 years from the implementation
32   of utility compliance filings and shall be based on the commission's preliminary determination of an
33   equitable, appropriate, and balanced measure of stranded cost recovery that takes into account the
34   near term rate relief principle, is in the public interest, and is substantially consistent with these
35   interdependent principles.  The commission shall also consider the potential for future rate impacts
36   due to possible differences between interim stranded cost recovery charges and charges that may
37   finally be approved for stranded cost recovery.

1       (b)  Any utility may seek adjustment of the interim stranded cost recovery charge at any

2 time based on severe financial hardship, as determined by the commission.  The setting of an interim

3 stranded cost recovery charge shall establish no legal, factual, or policy precedent with respect to the

4 final determination of stranded cost recovery by the commission in any subsequent administrative or

5 judicial proceeding.

6       VII.   The interim stranded cost recovery charge established for a utility as provided in

7 paragraph VI may also be adjusted based upon the outcome of rate case proceedings to adjudicate

8 claims for stranded cost recovery pursuant to paragraph V of this section.  Any amounts approved by

9 the commission for stranded cost recovery shall be net of amounts previously collected through

10 interim stranded cost recovery charges.

11       VIII.(a)  The commission is authorized to order such charges and other service provisions and

12 to take such other actions that are necessary to implement restructuring and that are substantially

13 consistent with the principles established in this chapter.  The commission is authorized to require

14 that distribution and electricity supply services be provided by separate affiliates.

15       (b)  [Repealed.]

16       (c)  The portion of the system benefits charge due to programs for low-income customers

17 shall not exceed 1.5 mills per kilowatt hour.  If the commission determines that the low-income

18 program fund has accumulated an excess of $1,000,000 and that the excess is not likely to be

19 substantially reduced over the next 12 months, it shall suspend collection of some or all of this

20 portion of the system benefits charge for a period of time it deems reasonable.

21       (d)  [Repealed.]

22       (e)   Targeted conservation, energy efficiency, and load management programs and

23 incentives that are part of a strategy to minimize distribution costs may be included in the

24 distribution charge or the system benefits charge, provided that system benefits charge funds are

25 only used for customer-based energy efficiency measures, and such funding shall not exceed 10

26 percent of the energy efficiency portion of a utility's annual system benefits charge funds.  A proposal

27 for such use of system benefits charge funds shall be presented to the commission for approval.  Any

28 such approval shall initially be on a pilot program basis and the results of each pilot program

29 proposal shall be subject to evaluation by the commission.

30       (f)  Beginning in 2000, the commission ***and the department*** shall submit a report to the

31 legislative oversight committee to monitor the transformation of delivery of electric services by

32 October 1 of each year.  The report shall concern the results and effectiveness of the system benefits

33 charge.

34       (g)  [Repealed.]

35       VIII-a.  Any electric utility that collects funds for energy efficiency programs that are subject

36 to the commission's approval, shall include in its plans to be submitted to the commission program

37 design, and/or enhancements, and estimated participation that maximize energy efficiency benefits

**Amendment to HB 2-FN-A-LOCAL**
**- Page 134 -**

1    to public schools, including measures that help enhance the energy efficiency of public school
2    construction or renovation projects that are designed to improve indoor air quality.  The report
3    required under RSA 374-F:4, VIII(f) shall include the results and effectiveness of the energy
4    efficiency programs for schools and, in addition to other requirements, be submitted to the
5    commissioner of the department of education.

6        IX.   An electricity supplier shall be eligible to compete, subject to necessary limitations
7    established by the commission, for open access customers only if affiliated utilities file comparable
8    open access transmission and distribution rates with the FERC or the commission, or both as
9    appropriate, for all of their transmission facilities in New Hampshire and to the extent practicable,
10   all of their distribution facilities in New Hampshire.

11       X.   Nothing in this chapter shall be construed to prohibit the commission from otherwise
12   exercising its lawful authority under title 34, in proceedings which relate to the introduction of
13   competition in the retail electric utility industry including the retention of experts and consultants to
14   assist the commission in its investigations and the assessment of such costs against utilities and any
15   other parties to the proceedings, consistent with RSA 365:37 and RSA 365:38.

16       XI.   Any administrative or adjudicative proceeding or public hearing relating to this chapter
17   shall be subject to the provisions of RSA 541-A.

18       XII.   To the extent that the provisions of this chapter are applicable to rural electric
19   cooperatives for which a certificate of deregulation is on file with the commission, the commission
20   shall exercise its authority with regard to such deregulated rural electric cooperatives only when and
21   to the extent that the commission finds, after notice and hearing, that such action is required to
22   ensure that such deregulated rural electric cooperatives do not act in a manner which is inconsistent
23   with the restructuring policy principles of RSA 374-F:3.  The commission shall have the authority to
24   require that such deregulated rural electric cooperatives participate in proceedings, answer
25   commission ***and department*** for information and file such reports as may be reasonably necessary
26   to permit the commission to make an informed finding concerning the relevant restructuring policy
27   principle actions of such deregulated rural electric cooperatives.  Absent such a finding by the
28   commission, the active role of assuring that the restructuring policy principles are appropriately
29   addressed within their service territories shall be reserved to the deregulated rural electric
30   cooperatives.  Notwithstanding the foregoing, deregulated rural electric cooperatives shall be subject
31   to the commission's jurisdiction with regard to those provisions of RSA 374-F pertaining to stranded
32   cost recovery, customer choice, open access tariffs, default service, energy efficiency, and low income
33   programs to the same extent as other public utilities.

34       282   Electric Utility Restructuring; Ratepayer Protection.  Amend RSA 374-F:4-b to read as
35   follows:

36       374-F:4-b  Ratepayer Protection.

Amendment to HB 2-FN-A-LOCAL
- Page 135 -

1    I.   Within 60 days of the effective date of this section, the commission shall initiate a

2    proceeding to develop rules to allow residential and small commercial customers to choose how they

3    receive communication from competitive electric suppliers and to implement the provisions of this

4    section.  Where the commission has adopted rules in conformity with this section, complaints to and

5    proceedings before the commission shall not be subject to RSA 541-A:29 or RSA 541-A:29-a.

6    II.   [Within 120 days of the effective date of this section, the commission shall redesign its

7    website to] *The department of energy shall* enable residential and small commercial customers to

8    compare standard pricing policies and charges and to require competitive electric suppliers to input

9    such information *on the department's website*.  Such information shall be input no less frequently

10   than once per month, unless there is no change in such information.  [Such redesign shall:

11        (a)  Reflect the best practices of similar commission websites in other states and develop

12   a process for removal of a competitive electric supplier's listings from such Internet website based on

13   protocols established by the commission to ensure compliance with this section and to address

14   customer complaints.

15        (b)  Emphasize:

16        (1)  Uniformity in the way competitive electric suppliers provide information for each

17   category on the commission's website.

18        (2)  Ease of use by customers.

19        (3)  Ease of selecting and purchasing a specific contract from a competitive electric

20   supplier shown on the commission's website.

21        (c)  Include separate input boxes for the following information:

22        (1)  A link to the provider's web page.

23        (2)  Contract durations.

24        (3)  Whether the contract has variable or fixed rates, or both, and when such rates

25   apply.

26        (4)  Cancellation charges.

27        (5)  Rates.

28        (6)  Other relevant information.]

29   III.   [On or before July 1, 2017, and every 2 years thereafter, the commission] *The*

30   *department of energy* shall review its website *every 2 years* and ensure that the site remains an

31   efficient tool for the comparison of pricing policies and charges among competitive electric suppliers.

32   IV.   Unless the contract specifies a month-to-month variable rate, no competitive electric

33   supplier shall charge a residential customer a variable rate, including during a contract term or

34   following the expiration of a contract, without first providing written notification in a form approved

35   by the commission of the nature of such variable rate 45 days prior to the commencement of the

36   variable rate.  The residential customer shall select the method of written notification at the time

1   the contract is signed.  Such customer shall have the option to change the method of notification at

2   any time during the contract.

3       V.  Competitive electric suppliers shall retain records of any of the notices required in this

4   section for a period of not less than 2 years and shall make such records available to the commission

5   upon its request.

6       283  Oversight Committee; Report.  Amend RSA 374-F:5, III to read as follows:

7       III.  The committee shall provide an interim report on or before April 1, and an annual report

8   on or before November 1 to the governor, the speaker of the house, the senate president, the state

9   library, [and] the public utilities commission*, and the department of energy* on activities before

10   the public utilities commission and other cognizant state agencies in regard to evolving changes in

11   the provision of electric services to New Hampshire customers, including modernization of the

12   electric grid, development of technologies for electric storage, electrification of transportation, the

13   growth of distributed generation, the commission's role in a deregulated market, and such matters

14   as may arise that may present opportunities to improve the delivery of electric services or to reduce

15   cost.

16       284  Competitive Electricity Supplier Requirements; Participation in Regional Activities.  Amend

17   RSA 374-F:7 and 374-F:8 to read as follows:

18       374-F:7  Competitive Electricity Supplier Requirements.

19       I.  Competitive energy suppliers are not public utilities pursuant to RSA 362:2, though a

20   competitive energy supplier may seek public utility status from the [commission] *department* if it

21   so chooses.  Notwithstanding a competitive energy supplier's non-utility status, the [commission]

22   *department* is authorized to establish requirements, excluding price regulation, for competitive

23   electricity suppliers, including registration, registration fees, customer information, disclosure,

24   standards of conduct, and consumer protection and assistance requirements.  Unless electing to do

25   so, an electricity supplier that offers or sells at retail to consumers within this state products and

26   services that can lawfully be made available to such consumers by more than one supplier shall not,

27   because of such offers or sales, be deemed to be a public utility as defined by RSA 362:2.  These

28   requirements shall be applied in a manner consistent with the restructuring principles of this

29   chapter to promote competition among electricity suppliers.

30       II.  Aggregators of electricity load that do not take ownership of power or other services and

31   do not represent any supplier interest are not public utilities pursuant to RSA 362:2, but shall notify

32   the [commission] *department* of their intent to do business.  Municipalities that aggregate electric

33   power or energy services for their citizens pursuant to RSA 53-E are not public utilities pursuant to

34   RSA 362:2 and are not subject to the provisions of paragraph III and RSA 374-F:4-b.

35       III.  The *department may investigate and petition the* commission [may] *to* assess fines

36   against, revoke the registration of, order the rescission of contracts with residential customers of,

order restitution to the residential customers of, and prohibit from doing business in the state any competitive electricity supplier, including any aggregator or broker, which is found to have:

(a)   Engaged in any unfair or deceptive acts or practices in the marketing, sale, or solicitation of electricity supply or related services;

(b)   Violated the requirements of this section or any other provision of this title applicable to competitive electricity suppliers; or

(c)  Violated any rule adopted by the [commission] *department* pursuant to paragraph V and RSA 374-F:4-b.

IV.  As a condition of operation, for a 2-year interim period from the date that competition is implemented in one or more areas of the state, competitive energy suppliers and load aggregators shall submit to the jurisdiction of the commission for mediation and resolution of disputes between customers and competitive energy suppliers or aggregators.  Municipalities that aggregate electric power or energy service for their citizens pursuant to RSA 53-E are not subject to this paragraph.

V.  The [commission] *department* shall adopt rules, under RSA 541-A, to implement this section.  Where the [commission] *department* has adopted rules in conformity with this section, complaints to and proceedings before the commission shall not be subject to RSA 541-A:29 or RSA 541-A:29-a.

374-F:8  Participation in Regional Activities.  The [commission] *department* shall advocate for New Hampshire interests before the Federal Energy Regulatory Commission and other regional and federal bodies.  The commission shall participate in the activities of the New England Conference of Public Utility Commissioners, *and* the National Association of Regulatory Utility Commissioners, and the *department shall participate in the activities of the* New England States Committee on Electricity, or other similar organizations, and work with the New England Independent System Operator and NEPOOL to advance the interests of New Hampshire with respect to wholesale electric issues, including policy goals relating to fuel diversity, renewable energy, and energy efficiency, and to assure nondiscriminatory open access to a safe, adequate, and reliable transmission system at just and reasonable prices.  The [commission] *department* shall advocate against proposed regional or federal rules or policies that are inconsistent with the policies, rules, or laws of New Hampshire.  In its participation in regional activities, the commission *and the department* shall consider how other states' policies will impact New Hampshire rates and work to prevent or minimize any rate impact the commission *or department* determines to be unjust or unreasonable.

285  Offshore Wind and Port Development; Commission Established; Membership.  Amend RSA 374-F:10, II(c) to read as follows:

(c)  The [director of the office of strategic initiatives] *commissioner of the department of energy*, or designee.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 138 -**

1    286  Reference Changed; Office of Offshore Wind Industry Development.  Amend RSA 374-F:10,

2    VI to read as follows:

3        VI.  The commission shall receive staff support and other services, including research and

4    facilities assessments, from the department of [business and economic affairs] *energy*, office of

5    offshore wind industry development established in RSA [12-O:51 ] *12-P:7-b*.

6    287  Definitions  Amend RSA 374-H:1, I to read as follows:

7        I.  ["Commission"] *"Department"* means the [public utilities commission] *department of*

8    *energy*.

9    288  Investigation of Energy Storage.  Amend RSA 374-H:2 to read as follows:

10    374-H:2  [Commission] *Department* Investigation of Energy Storage.

11        I.  Within 30 days of the effective date of this chapter, the [commission] *department* shall

12    [initiate a proceeding to investigate] *conduct an investigation into* ways to enable energy storage

13    projects to receive compensation for avoided transmission and distribution costs, including but not

14    limited to avoided regional and local network service charges, while also participating in wholesale

15    energy markets.  The [commission] *department* shall investigate how this might be done for both

16    utility-owned and non-utility-owned energy storage projects, as well as for both behind-the-meter

17    storage and front-of-the-meter storage.

18        II.    The  [commission's  investigative  proceeding]  *department's  investigation*  shall

19    specifically consider the following:

20        (a)  How public policy can best help establish accurate and efficient price signals for

21    energy storage projects that value their ability to avoid transmission and distribution costs while

22    simultaneously reducing wholesale electricity market prices.

23        (b)  How to compensate energy storage projects that participate in wholesale electricity

24    markets for avoided transmission and distribution costs in a manner that provides net savings to

25    consumers.

26        (c)  How best to encourage both utility and non-utility investments in energy storage

27    projects.

28        (d)  The costs and benefits of a potential bring your own device program; how such a

29    program might be implemented; any statutory or regulatory changes that might be needed to create,

30    facilitate,  and  implement  such  a  program;  and  whether  such  a  program  should  include  all

31    distributed energy resources or be limited to distributed energy storage projects.

32        (e)  Any statutory changes the general court should implement, including but not limited

33    to changes to or exceptions from RSA 374-F or RSA 374-G, to enable energy storage projects to

34    receive  appropriate  compensation  for  avoided  transmission  and  distribution  costs  while  also

35    participating in wholesale energy markets.

36        (f)  Any other topic the [commission] *department* reasonably believes it should consider

37    in order to diligently conduct the proceeding.

1     III.  The [commission] *department* shall report its findings and recommendations to the

2     standing committees of the house of representatives and senate with jurisdiction over energy and

3     utility matters no later than 2 years after initiating the proceeding.  The report shall identify ways

4     any recommended statutory changes can minimize any potential conflict with the restructuring

5     policy principles of RSA 374-F.

6     289  Fixing of Rates by Commission; Energy Policy Act Standards.  Amend RSA 378:7 and 378:7-

7     a to read as follows:

8     378:7  Fixing of Rates by Commission.  Whenever the commission shall be of opinion, after a

9     hearing had upon its own motion *or on motion of the department of energy* or upon complaint,

10     that the rates, fares or charges demanded or collected, or proposed to be demanded or collected, by

11     any public utility for service rendered or to be rendered are unjust or unreasonable, or that the

12     regulations or practices of such public utility affecting such rates are unjust or unreasonable, or in

13     any wise in violation of any provision of law, or that the maximum rates, fares or charges chargeable

14     by any such public utility are insufficient, the commission shall determine the just and reasonable or

15     lawful rates, fares and charges to be thereafter observed and in force as the maximum to be charged

16     for the service to be performed, and shall fix the same by order to be served upon all public utilities

17     by which such rates, fares and charges are thereafter to be observed.  The commission shall be under

18     no obligation to investigate *or hear* any rate matter which it has investigated within a period of 2

19     years, but may do so within said period at its discretion.

20     378:7-a  Energy Policy Act Standards.  [The commission] ***Consistent with their statutory***

21     ***authority, the commission and the department of energy*** may establish requirements for net

22     metering, fuel diversity, fossil fuel generation efficiency, advanced metering, time-based rates, and

23     interconnection with on-site generation facilities of customers in a manner not inconsistent with

24     section 111 of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. Chapter 46) as amended

25     by the Energy Policy Act of 2005.

26     290  Contracts for Advertising.  Amend RSA 378:24 to read as follows:

27     378:24  Contracts for Advertising.  All advertising contracts of public utilities shall be made at

28     regular, established, commercial advertising rates; and such contracts shall be open to inspection by

29     the commission ***and the department of energy*** at all times.

30     291  Filing; Inspection; Temporary Rates.  Amend RSA 378:26 and 378:27 to read as follows:

31     378:26  Filing; Inspection.  A copy of such list for the preceding year shall be filed with the

32     commission ***and the department of energy***, in such form and under such regulations as [the

33     commission] *they* may prescribe.  Such list, together with the books, records and papers of the

34     carrier so far as relevant, shall be open at all times to the inspection of the commission, who shall

35     examine the same whenever they deem it necessary to the due enforcement of this title.

36     378:27  Temporary Rates.  In any proceeding involving the rates of a public utility brought either

37     upon motion of the commission ***or the department of energy*** or upon complaint, the commission

Amendment to HB 2-FN-A-LOCAL
- Page 140 -

1    may, after reasonable notice and hearing, if it be of the opinion that the public interest so requires,

2    immediately fix, determine, and prescribe for the duration of said proceeding reasonable temporary

3    rates; provided, however, that such temporary rates shall be sufficient to yield not less than a

4    reasonable return on the cost of the property of the utility used and useful in the public service less

5    accrued depreciation, as shown by the reports of the utility filed with the commission **and the**

6    **department of energy**, unless there appears to be reasonable ground for questioning the figures in

7    such reports.

8    292  Multi-use Data Energy Platform.  Amend RSA 378:50-378:52 to read as follows:

9    378:50  Definitions.  In this subdivision:

10    I. "Data sharing" means providing data and accessing data provided by others.

11    II. "Individual customer data" means the customer's name, address, opt-in status pursuant

12    to RSA 374:62, energy usage as recorded by meters supplied by electric and natural gas utilities, and

13    other data segments established and authorized by the [commission] **department of energy**.

14    III. "Third party" means:

15    (a) Any service provider within the meaning of RSA 363:37, II other than a utility; and

16    (b) The office of the consumer advocate established pursuant to RSA 363:28.

17    378:51  Online Energy Data Platform Established.

18    I. The [commission] **department of energy** shall require electric and natural gas utilities to

19    establish and jointly operate a statewide, multi-use, online energy data platform.  The data platform

20    shall:

21    (a)  Consist of a common base of energy data for use in wide range of applications and

22    business uses.

23    (b) Adhere to specific and well-documented standards.

24    (c) Provide a user-friendly interface.

25    (d)  Adhere to a common statewide logical data model that defines the relationships

26    among the various categories of data included in the platform.

27    (e) Allow for sharing of individual customer data consistent with the opt-in requirements

28    for third-party access specified in RSA 363:38.

29    (f) Protect from unauthorized disclosure the personally identifying information of utility

30    customers in a manner that advances applicable constitutional and statutory privacy rights,

31    including the protections of RSA 363:38.

32    (g)  Provide for the voluntary participation of municipal utilities and deregulated rural

33    electric cooperatives in data sharing and the operation of the online energy data platform, subject to

34    terms, conditions, and cost sharing which are reasonable and in the public interest.

35    II.  The commission shall open an adjudicative proceeding within 90 days of the effective

36    date of this subdivision, to which all electric and natural gas utilities shall be mandatory parties, to

37    determine:

Amendment to HB 2-FN-A-LOCAL
- Page 141 -

1    (a)  Governance, development, implementation, change management, and versioning of

2    the statewide, multi-use, online energy data platform.

3    (b)  Standards for data accuracy, retention, availability, privacy, and security, including

4    the integrity and uniformity of the logical data model.

5    (c)  Financial security standards or other mechanisms to assure compliance with privacy

6    standards by third parties.

7    III.  The [commission] *department of energy* shall defer the implementation of the

8    statewide, multi-use, online energy data platform pursuant to paragraph I if [it] *the commission*

9    determines that the cost of such platform to be recovered from customers is unreasonable and not in

10   the public interest.

11   IV.  The [commission] *department of energy* may adopt *additional* rules pursuant to RSA

12   541-A as necessary to implement this section.

13   378:52  Platform Requirements.  The utilities shall:

14   I.  Design and operate the energy data platform to provide opportunities for utilities, their

15   customers, and third parties to access the online energy data platform and to participate in data

16   sharing.

17   II.  Require, as a condition of accessing the online energy data platform, that a third party

18   complete a qualification and registration process to ensure that any customer data downloaded from

19   the platform remains in a safe, secure environment according to data privacy standards established

20   by the [commission] *department of energy*.

21   III.  Administer the online energy data platform in a manner consistent with RSA 363:38.

22   293  Regional Greenhouse Gas Initiative; Energy Efficiency Fund and Use of Auction Proceeds.

23   Amend RSA 125-O:23 to read as follows:

24   125-O:23  Energy Efficiency Fund and Use of Auction Proceeds.

25   I.  There is hereby established an energy efficiency fund.  This nonlapsing, special fund shall

26   be continually appropriated to the [commission] *department of energy* to be expended in

27   accordance with this section.  The state treasurer shall invest the moneys deposited therein, as

28   provided by law.  Income received on investments made by the state treasurer shall also be credited

29   to the fund.  All programs supported by these funds shall be subject to audit by the [commission]

30   *department of energy* as deemed necessary.  A portion of the fund moneys shall be used to pay for

31   [commission] *department of energy* and department *of environmental services* costs to

32   administer this subdivision, including contributions for the state's share of the costs of the RGGI

33   regional organization.  No fund moneys shall be used by the [commission] *department of energy* or

34   the department *of environmental services* to contract with outside consultants.  The *department*

35   *of energy* [commission] shall transfer from the fund to the department *of environmental services*

36   such costs as may be budgeted and expended, or otherwise approved by the fiscal committee of the

1 general court and the governor and council, for the department's cost of administering this
2 subdivision.

3      II.  All amounts in excess of the threshold price of $1 for any allowance sale shall be rebated
4 to all retail electric ratepayers in the state on a per-kilowatt-hour basis, in a timely manner to be
5 determined by the commission.

6      III.  All remaining proceeds received by the state from the sale of allowances, excluding the
7 amount used for [commission] *department of energy* and department *of environmental services*
8 administration under paragraph I, shall be allocated by the commission as follows:

9          (a)  At least 15 percent to the low-income core energy efficiency program.

10          (b)  Beginning January 1, 2014, up to $2,000,000 annually to utility core programs for
11 municipal and local government energy efficiency projects, including projects by local governments
12 that have their own municipal utilities.  Funding elements shall include, but not be limited to,
13 funding for direct technical and project management assistance to identify and encourage
14 comprehensive projects and incentives structured to assist municipal and local governments funding
15 energy efficiency projects.  In calendar years 2014, 2015, and 2016, any unused funds allocated to
16 municipal and local government projects under this paragraph remaining at the end of the year shall
17 roll over and be added to the new calendar year program funds and continue to be made available
18 exclusively for municipal and local government projects.  Beginning in calendar year 2017, and all
19 subsequent years, funds allocated to municipal and local government projects under this paragraph
20 shall be offered first to municipal and local governments as described in this paragraph for no less
21 than 4 full calendar months.  If, at the end of this time, municipal and local governments have not
22 submitted requests for eligible projects that will expend the funds allocated to municipal and local
23 government projects under this paragraph within that program year, the funds shall be offered on a
24 first-come, first-serve basis to business and municipal customers who fund the system benefits
25 charge.

26          (c)  The remainder to all-fuels, comprehensive energy efficiency programs administered
27 by qualified parties which may include electric distribution companies as selected through a
28 competitive bid process.  The funding shall be distributed among residential, commercial, and
29 industrial customers based upon each customer class's electricity usage to the greatest extent
30 practicable as determined by the commission.  Bids shall be evaluated based on, but not limited to,
31 the following criteria:

32              (1)  A benefit/cost ratio analysis including all fuels.

33              (2)  Demonstrated ability to provide a comprehensive, fuel neutral program.

34              (3)  Demonstrated infrastructure to effectively deliver such program.

35              (4)  Experience of the bidder in administering energy efficiency programs.

36              (5)  Ability to reach out to customers.

37              (6)  The validity of the energy saving assumptions described in the bid.

1    IV.   The [electric] division of **policy and programs of** the [commission] **department of**
2  **energy** shall conduct a competitive bid process for the selection of programs to be funded under
3  subparagraph III(c), with such funding to begin January 1, 2015.  The [commission] **department of**
4  **energy** may petition the governor and council to extend existing contracts until such time as the
5  competitive bids are approved by the governor and council, but in no event later than July 1, 2015.
6  The competitive bid process shall be repeated every 3 years thereafter.   Before extending any
7  existing program, public comment on the proposed extension shall be accepted.

8    V.   Each entity receiving funding under subparagraph III(c) shall file an annual report on
9  the performance of the entity's program.  The [commission] **department of energy** shall establish
10  the format, content, and the methodologies used to provide the content of the reports.   The
11  [commission] **department of energy** shall make use of, as applicable and appropriate, the
12  monitoring and verification requirements used in the natural gas and electric utility core programs.
13  The annual reports shall be delivered to the governor, the president of the senate, the speaker of the
14  house of representatives, the chairmen of the senate and house standing committees with
15  jurisdiction over energy matters, **the commissioner of the department of energy** and the
16  [chairman] **chairperson** of the public utilities commission.  The reports shall include, but not be
17  limited to, the following:

18    (a)  Program expenditures, including direct customer installation costs.

19    (b)   Resulting actual and projected energy savings by fuel type and associated $CO_2$
20  emissions reductions.

21    (c)  Any measurement and verification data that corroborate projected savings.

22    (d)  The number of customers served by the programs.

23    (e)   Other data as required by the commission in order to determine program
24  effectiveness.

25    294  New Paragraph; Bank Commissioner; Public Deposit Investment Pool.  Amend RSA 383:22
26  by inserting after paragraph IV the following new paragraph:

27    V.   The commissioner shall charge the public deposit investment pool any actual costs
28  incurred by the department for the operation of the pool as well as any expenses of department
29  personnel assisting in the operation of the pool.  The cost for personnel assisting in the operation of
30  the pool shall be determined in accordance with the per diem examination charge established in RSA
31  383:11, I, provided that the requirement that no entity shall be charged or pay less than one full day
32  shall not apply.  The private investment advisor retained under paragraph II shall be responsible for
33  processing any invoice submitted for the actual costs incurred by the department and the expenses of
34  department personnel under this paragraph.

35    295  Tax Expenditure Report; Weighted Apportionment Factors Removed.  Amend RSA 71-C:2 to
36  read as follows:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 144 -**

71-C:2  Tax Expenditures Specified.  Tax expenditures include, but may not be limited to, the community development finance authority investment tax credit as computed in RSA 162-L:10; the economic revitalization zone tax credit as computed in RSA 162-N:6; the research and development tax credit under RSA 77-A:5, XIII; the Coos county job creation tax credit under RSA 77-E:3-c; the education tax credit as computed in RSA 77-G:4; [the weighted apportionment factors under RSA 77-A:3, II(a);] *the regional career and technical education center tax credit pursuant to RSA 188-E:9-a;* and the exemption for qualified regenerative manufacturing companies allowed under RSA 77-A:1, I and RSA 77-E:1, III.

296  New Paragraph; Unemployment Compensation; Fraud Detection.  Amend RSA 282-A:118 by inserting after paragraph VII the following new paragraph:

VIII.  That for the purpose of preventing and detecting fraud in the unemployment compensation system as well as efficiently coordinating and streamlining integrity improvement efforts, the commissioner of the department of employment security may enter into an agreement with the National Association of State Workforce Agencies' Center for Employment Security Education and Research, Inc. (CESER) as agent for the United States Department of Labor (USDOL) for participation in the Integrity Data Hub (IDH).  The department's participation in IDH and any resulting use of confidential data by USDOL and CESER shall be in accordance with all state laws, federal laws as well as state and federal regulations pertaining to prevention and detection of fraud, waste, and abuse in the unemployment compensation system.  The information thus provided by the department to the IDH shall be used solely for administration of state and federal unemployment compensation laws.  Information under this paragraph shall only be provided upon a finding by the commissioner that sufficient guarantees of continued confidentiality are in place.

297  New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

Amendment to HB 2-FN-A-LOCAL
- Page 145 -

1    II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or
2    other workplace sensitivity training based on the inherent humanity and equality of all persons and
3    the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4    III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty
5    members of the university system of New Hampshire and the community college system of New
6    Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7    354-A:30  Definitions.  In this subdivision:

8    I.   "Government program" means any activity undertaken by a public employer, both as an
9    employer and in performance of its government function.

10   II.   "Public employee" means any person working on a full-time or part-time basis for the
11   state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,
12   water districts, school districts, school administrative units, or quasi-public entities.

13   III.   "Public employer" includes the state or any subdivision thereof, including, but not
14   limited to counties, cities, towns, precincts, water districts, school districts, school administrative
15   units, or quasi-public entities.

16   354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the
17   use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service
18   recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the
19   following:

20   I.   That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
21   status, familial status, mental or physical disability, religion, or national origin, are inherently
22   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
23   color, marital status, familial status, mental or physical disability, religion, or national origin;

24   II.   That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
25   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
26   origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27   III.   That an individual should be discriminated against or receive adverse treatment solely
28   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
29   status, familial status, mental or physical disability, religion, or national origin; or

30   IV.   That people of one age, sex, gender identity, sexual orientation, race, creed, color,
31   marital status, familial status, mental or physical disability, religion, or national origin cannot and
32   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
33   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
34   or national origin.

35   354-A:32  Prohibition on the Content of Government Programs and Speech.  No government
36   program shall teach, advocate, or advance any one or more of the following:

1       I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
2      status, familial status, mental or physical disability, religion, or national origin are inherently
3      superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
4      color, marital status, familial status, mental or physical disability, religion, or national origin;

5      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
6      race, creed, color, marital status, familial status, mental or physical disability, religion, or national
7      origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8      III.  That an individual should be discriminated against or receive adverse treatment solely
9      or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
10     status, familial status, mental or physical disability, religion, or national origin; or

11     IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
12     marital status, familial status, mental or physical disability, religion, or national origin cannot and
13     should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
14     orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
15     or national origin.

16     354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse
17     employment action, warning, or discipline of any kind for refusing to participate in any training,
18     program, or other activity at which a public employer or government program advocates, trains,
19     teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
20     following:

21     I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
22     status, familial status, mental or physical disability, religion, or national origin are inherently
23     superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
24     color, marital status, familial status, mental or physical disability, religion, or national origin;

25     II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
26     race, creed, color, marital status, familial status, mental or physical disability, religion, or national
27     origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28     III.  That an individual should be discriminated against or receive adverse treatment solely
29     or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
30     status, familial status, mental or physical disability, religion, or national origin; or

31     IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
32     marital status, familial status, mental or physical disability, religion, or national origin cannot and
33     should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
34     orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
35     or national origin.

354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any other applicable common law or statutory cause of action.

298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after section 39 the following new section:

193:40  Prohibition on Teaching Discrimination.

I.  No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b)  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c)  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.

III.  Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV.  Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

V.  For the purposes of this section, "educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are included within the definition of this term.

Amendment to HB 2-FN-A-LOCAL
- Page 148 -

1     299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2 person or circumstance is held to be invalid, the remainder of such sections, and their application to

3 any other persons or circumstances shall not be affected thereby.

4     300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.

5     301  Application of Emergency Orders.

6        I.  The state hereby recognizes that the issuance of multiple executive orders may have

7 created undue hardship or confusion and contributed to the stressful environment for business

8 operations, particularly small business entities.  The penalties associated with violations of these

9 orders, while issued in the interest of public health, should not unduly penalize law-abiding

10 businesses.

11        II.  Notwithstanding any provision of law to the contrary, state, county, and local

12 jurisdictions shall not enforce, and shall reverse, any violation of the governor's emergency orders

13 regarding the COVID-19 pandemic.

14        III.  Any business fines issued under executive or emergency orders issued in response to

15 COVID-19 or in accordance with RSA 4:47 shall be refunded.  The governor is hereby authorized to

16 draw a warrant for up to $10,000 for this purpose out of any money in the treasury not otherwise

17 appropriated.

18        IV.  The attorney general shall request that the court dismiss any pending enforcement

19 action related to violation of an emergency order issued by the governor in response to the COVID-19

20 pandemic.

21        V.  Any record of violation or written warning for such violations shall be expunged if

22 requested in writing, and such records shall not be admissible in any subsequent or future court

23 proceeding.  Notwithstanding the provisions of RSA 651:5, IX, there shall be no charge to the

24 petitioner for expungement of these records.

25     302  New Sections; Animal Records Database.  Amend RSA 437 by inserting after section 8 the

26 following new sections:

27     437:8-a  Animal Records Database Established.

28        I.  The department of agriculture, markets, and food shall design, establish, and contract

29 with a third party for the implementation and operation of an electronic system to facilitate the

30 handling of animal records.

31        II.  The department shall maintain a reporting system capable of receiving electronically

32 transmitted records from veterinarians.  The commissioner shall adopt rules under RSA 541-A to

33 govern methods of obtaining, compiling, and maintaining such information he or she deems

34 necessary to manage such database including procedures for providing authorized access.  The

35 commissioner shall also ensure that the database is secure from unauthorized access or use.

36        III.  The commissioner may issue a waiver to a veterinarian who is unable to submit

37 information by electronic means.  Such waiver may permit the veterinarian to submit information by

1   paper form or other means, provided all information required by RSA 437:8 is submitted in this
2   alternative format and within the established time limit.

3       IV.  The commissioner may grant a reasonable extension to a veterinarian who is unable, for
4   good cause, to submit all the information required by RSA 437:8 within the established time limits.
5   Any veterinarian who in good faith reports to the program as required by RSA 437:8 shall be
6   immune from any civil or criminal liability as the result of such good faith reporting.

7       V.  There is established a nonlapsing fund to be known as the animal records database fund
8   in the department of agriculture, markets, and food which shall be kept distinct and separate from
9   all other funds.  All moneys in the animal records database fund shall be nonlapsing and continually
10  appropriated to the commissioner, and except as otherwise provided in law, shall be used for the
11  purpose of administering and maintaining the animal records database established in this section.
12  The database fund shall draw moneys only from grants and appropriations.

13      VI.  Notwithstanding paragraph V, the fund shall be initiated by transfers from the
14  agricultural product and scale testing fund established under RSA 435:20, IV, as provided in RSA
15  435:20, V.

16  437:8-b  Confidentiality.

17      I.  Information submitted to the animal records database is exempt from public disclosure,
18  and shall not be subject to discovery, subpoena, or other means of legal compulsion for release.
19  Disclosure to local, state, and federal officials is not public disclosure.  This exemption shall not
20  affect the disclosure of information used in official local, state, or federal animal health
21  investigations or pet vendor license investigations under this chapter.   Database records,
22  information, or lists may be made available pursuant to a court order on a case-by-case basis.  Any
23  information, record, or list received pursuant to this paragraph shall not be transferred or otherwise
24  made available to any other person or listed entity not authorized under this paragraph.

25      II.  The department shall establish and maintain procedures to ensure the privacy and
26  confidentiality of animal and animal owner information.

27      III.  The department may use and release information and reports from the program for
28  program analysis and evaluation, statistical analysis, public research, public policy, and educational
29  purposes, provided that the data are aggregated or otherwise de-identified.

30      IV.  No animal records database records, information, or lists shall be sold, rented,
31  transferred, or otherwise made available in whole or in part, in any form or format, directly or
32  indirectly, to another person.

33      V.  Certificates of transfer shall be removed from the animal records database after 4 years.

34      VI.  Any person who knowingly accesses, alters, destroys, publishes, or discloses animal
35  records database information except as authorized in this section or attempts to obtain such
36  information by fraud, deceit, misrepresentation, or subterfuge shall be guilty of a class B felony.

1    VII.   Nothing in this section shall limit the right of a person damaged by a violation to
2    pursue any other appropriate cause of action.

3    303   Certificates of Transfer for Dogs and Cats.   RSA 437:8 is repealed and reenacted to read as
4    follows:

5    437:8   Certificates of Transfer for Dogs, Cats, and Ferrets.

6        I.   For purposes of this chapter, an official certificate of transfer means an electronic record
7    electronically submitted to the animal records database by a licensed veterinarian, containing the
8    name and address of the entity transferring ownership of the dog, cat, or ferret, the age, gender,
9    breed, microchip number, tattoo number, ear tag number, or physical description of the dog, cat, or
10   ferret, and the certification by the veterinarian that the dog, cat, or ferret is free from evidence of
11   communicable diseases or internal or external parasites.   A list of all vaccines and medication
12   administered to the dog, cat, or ferret shall be included in or attached to the certificate.   An official
13   certificate of transfer is distinct from a federal certificate of veterinary inspection and is not
14   interchangeable with a certificate of veterinary inspection .

15       II.   The electronically submitted certificate of transfer shall be considered the official
16   certificate of transfer.   A copy of the certificate of transfer of the dog, cat, or ferret offered for
17   transfer by a licensee shall be kept on the premises where dogs, cats, and ferrets are displayed, and
18   made available for inspection by the department, local officials, or a member of the public upon
19   request up to one year after the animal has left the facility.   The public shall be informed of their
20   right to inspect a copy of the certificate of transfer for each dog, cat, or ferret offered for transfer by a
21   sign prominently displayed in the area where dogs, cats, or ferrets are displayed.   Upon transfer of a
22   dog, cat, or ferret, a copy of that animal's certificate of transfer shall be given to the transferee in
23   addition to any other documents which are customarily delivered to the transferee.

24       III.   For purposes of this chapter, an official certificate of transfer waiver means an electronic
25   record electronically submitted to the animal records database provided in lieu of an official
26   certificate of transfer for a dog, cat, or ferret that has failed the examination for an official certificate
27   of transfer because of a non-contagious illness, feline leukemia, or feline immunodeficiency virus.
28   The waiver shall contain the name and address of the entity transferring ownership of the dog, cat,
29   or ferret; the age, gender, breed, microchip number, tattoo number, ear tag number, or physical
30   description of the dog, cat, or ferret; the reason for failure of the examination for the official
31   certificate of transfer; and the signature of the transferee indicating that the transferee has
32   knowledge of the dog's, cat's, or ferret's non-contagious medical condition.   A list of all vaccines and
33   medication administered to the dog, cat, or ferret shall be included in or attached to the certificate of
34   transfer waiver.   The waiver shall be submitted electronically to the animal records database by a
35   New Hampshire licensed veterinarian.

36       IV.   No person, firm, corporation, or other entity shall ship or bring into the state of New
37   Hampshire, to offer for transfer in the state of New Hampshire, any cat, dog, or ferret less than 8

Amendment to HB 2-FN-A-LOCAL
- Page 151 -

1  weeks of age.  No person, firm, corporation, or other entity shall offer for transfer any cat, dog, or

2  ferret less than 8 weeks of age.

3  V.  Once a dog, cat, or ferret intended for transfer has entered the state, it shall be held at

4  least 48 hours at a facility licensed under RSA 437 or at a facility operated by a licensed veterinarian

5  separated from other animals on the premises before being offered for transfer.

6  VI.  No animal shelter shall transfer any dog, cat or ferret that is received from outside of the

7  state until the quarantine requirements in 437:8, V have been met and without an official transfer

8  certificate.  Animal shelter facilities, as defined in RSA 437:1, I, are exempt from the requirements of

9  this section relative to transferring dogs, cats, and ferrets except that:

10  (a)  All animal shelter facilities shall have on premises a microchip scanner and shall

11  maintain a file of recognized pet retrieval agencies, including but not limited to national tattoo or

12  microchip registries.

13  (b)  Where an owner is not known, all animal shelter facilities shall inspect for tattoos,

14  ear tags, or other permanent forms of positive identification and shall scan for a microchip upon

15  admission of an unclaimed or abandoned animal as defined in RSA 437:18, IV and prior to

16  transferring ownership of an unclaimed or abandoned animal.

17  VII.  No dog, cat, or ferret shall be offered for transfer by a licensee or by any individual

18  without first being protected against infectious diseases using vaccines approved by the state

19  veterinarian.  No dog, cat, or ferret shall be offered for transfer by a licensee or by any individual

20  unless accompanied by a copy of the official certificate of transfer or official certificate of transfer

21  waiver issued by a licensed veterinarian within the prior 14 days.  No transfer shall occur unless the

22  transferred animal is accompanied by a copy of the official certificate of transfer or official certificate

23  of transfer waiver.  The official certificate of transfer or official certificate of transfer waiver shall

24  reside in the animal records database.  Copies shall be provided to the veterinarian, transferor, and

25  the transferee, who shall retain copies for their records.  The transferor shall retain a copy for his or

26  her records.  If an official certificate of transfer or official certificate of transfer waiver is produced, it

27  shall be prima facie evidence of transfer.

28  304  New Subparagraph; Animal Records Database Fund.  Amend RSA 6:12, I(b) by inserting

29  after subparagraph (364) the following new subparagraph:

30  (365)  Moneys deposited in the animal records database fund established in RSA

31  437:8-a, V.

32  305  New Paragraph; Agricultural Product and Scale Testing Fund; Transfer Authority.  Amend

33  RSA 435:20 by inserting after paragraph IV the following new paragraph:

34  V.  The commissioner shall transfer funds from the agricultural product and scale testing

35  fund established under RSA 435:20, IV to the animal records database fund established in RSA

36  437:8-a to develop and make operational the animal records database.  The commissioner shall

37  certify to the secretary of state and the director of the office of legislative services the date on which

Amendment to HB 2-FN-A-LOCAL
- Page 152 -

the animal records database is operational. For 2 years after such certification, if needed for database operation and maintenance, the commissioner may continue to transfer additional funds from the agricultural product and scale testing fund to the animal records database fund for this purpose.

306  Repeal.  RSA 435:20, V, relative to the authority of the commissioner of the department of agriculture, markets, and food to transfer funds from the agricultural product and scale testing fund, is repealed.

307  Applicability; Effective Dates.

I.  Section 303 of this act shall take effect 90 days after the commissioner of the department of agriculture, markets, and food certifies to the secretary of state and the director of the office of legislative services that the animal records database established in RSA 437:8-a is operational.

II.  Section 306 of this act shall take effect 2 years from the date on which the commissioner of the department of agriculture, markets, and food certifies to the secretary of state and the director of the office of legislative services, that the animal records database established in RSA 437:8-a is operational.

308  Appropriation.  The sum of $250,000 for the fiscal year ending June 30, 2023 is hereby appropriated to the department of agriculture, markets, and food for the maintenance of the animal records database.  These appropriations are in addition to any other funds appropriated to the department of agriculture, markets, and food.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

309  Position Established.  The classified position of IT manager III is established in the department of information technology to develop and administer the animal records database established in RSA 437:8-a.

310  Effective Date.

I.  Section 302 of this act shall take effect upon its passage.

II.  Section 303 of this act shall take effect as provided in paragraph I of section 307 of this act.

III.  Section 306 of this act shall take effect as provided in paragraph II of section 307 of this act.

311  Community College System of New Hampshire; Dual and Concurrent Enrollment Program. Amend RSA 188-E:25 through 188-E:29 to read as follows:

188-E:25  Definitions.  In this subdivision:

I. ***"CCSNH" means the community college system of New Hampshire.***

***II.*** "Concurrent enrollment" means courses taught at the high school by high school teachers approved by [the community college system of New Hampshire (CCSNH)] *CCSNH* in which high school students earn both high school and college or university credit while students are still attending high school or a career technical education center.

1       [H.] ***III.***  "Dual enrollment" means college courses taught by instructors from [the community

2    college system of New Hampshire (CCSNH)] ***CCSNH*** in which high school students earn college

3    credit while students are still enrolled in high school or a career technical education center.

4       188-E:26  Program Established.  There is established a dual and concurrent enrollment program

5    in [the department of education] ***CCSNH***.  Participation in the program shall be offered to high

6    school and career technical education center students in grades 10 through 12.  The program shall

7    provide opportunities for qualified New Hampshire high school students to gain access and support

8    for dual and concurrent enrollment in STEM (science, technology, engineering, and mathematics)

9    and STEM-related courses that are fundamental for success in postsecondary education and to meet

10   New Hampshire's emerging workforce needs.

11      188-E:27  Enrollment Requirements.

12       I.  An interested high school student in grades 10 through 12 may enroll in a course that is

13   designated by [the] CCSNH as part of the dual and concurrent enrollment program.

14      II.  A student in the program shall be provided funding for enrollment in no more than 2 dual

15   or concurrent enrollment courses taken in grade 10, no more than 2 dual or concurrent enrollment

16   courses taken in grade 11, and no more than 2 dual or concurrent enrollment courses taken in grade

17   12.  A student may take more than 2 dual or concurrent enrollment courses per year at his or her

18   own expense.

19      III.(a)  The state shall pay the current rate of concurrent enrollment tuition, which is

20   established at $150 per course, to the CCSNH institution where a high school or career and technical

21   education student successfully completes the concurrent enrollment course.

22      (b)  The state shall pay the current rate of dual enrollment tuition, which is established

23   at 1/2 the regular cost of the course, to the CCSNH institution where a high school or career and

24   technical education student successfully completes a dual enrollment course and [the] CCSNH shall

25   accept such amount as full payment for course tuition.

26      IV.  Each high school should provide a designated individual to serve as the point of contact

27   on matters related to the program, including but not limited to, student counseling, support services,

28   course scheduling, managing course forms and student registration, program evaluation, course

29   transferability, and assisting with online courses.  Each high school shall annually notify all high

30   school students and their parents of dual and concurrent enrollment opportunities.

31      188-E:28  School Board Policy.

32      I.  No later than July 1, 2018, the school board of each school district shall develop and adopt

33   a policy permitting students residing in the district who are in grade 11 or 12 to participate in the

34   dual and concurrent enrollment program.  The policy shall, at a minimum, include compliance with

35   measurable educational standards and criteria approved by [the] CCSNH and that meet the same

36   standard of quality and rigor as courses offered on campus by [the] CCSNH.  The policy shall also

37   comply with the standards for accreditation and program development established by the National

**Amendment to HB 2-FN-A-LOCAL**
**- Page 154 -**

1　Alliance for Concurrent Enrollment Partnerships.  The policy shall include, but not be limited to,
2　student eligibility criteria, standards for course content, standards for faculty approval, program
3　coordination and communication requirements, tuition and fees, textbooks and materials, course
4　grading policy, data collection, maintenance, and security, revenue and expenditure reporting, and
5　process for renewal of the agreement.

6　　　　II.  The department of education and [the] CCSNH shall develop and approve a model dual
7　and concurrent enrollment agreement that shall be used by the CCSNH and the school board of a
8　school district participating in the dual and concurrent enrollment agreement program.  The model
9　agreement shall include standards established by [the] CCSNH, shall include elements, standards,
10　and criteria that have been approved by the department of education and CCSNH, and shall serve as
11　the framework for the development, implementation, and administration of the dual and concurrent
12　enrollment program in each school district by clearly defining the procedures related to concurrent
13　and dual enrollment of high school students in college classes.  [The department] *CCSNH* shall
14　further develop guidelines for the program relating to reporting, accountability, and payment of
15　available funds to [the] CCSNH.

16　　　　188-E:29  Budget Requests.

17　　　　*I*.  The [commissioner of the department of education] *chancellor of CCSNH, or his or her*
18　*designee,* shall submit expenditure requests in accordance with RSA [9:4] *9:4-e* to fund the dual and
19　concurrent enrollment program established in this subdivision.

20　　　　*II.  In the event expenditures by CCSNH for the dual and concurrent enrollment*
21　*program exceed amounts appropriated by the state, the chancellor, or his or her designee,*
22　*may request the fiscal committee of the general court authorize additional funding.*
23　*Amounts requested under this paragraph shall be limited to direct program costs and*
24　*shall not include costs relative to program administration.  For funds requested and*
25　*approved, the governor is authorized to draw a warrant from any money in the treasury*
26　*not otherwise appropriated.*

27　　　　312  Dual and Concurrent Enrollment Program; Appropriation.  The sums of $1,500,000 for the
28　fiscal year ending June 30, 2022, and $1,500,000 for the fiscal year ending June 30, 2023, are hereby
29　appropriated to community college system of New Hampshire for the purpose of funding and
30　administering the dual and concurrent enrollment program under RSA 188-E:26.  This
31　appropriation shall be in addition to any other funds appropriated to the community college system
32　of New Hampshire.  The governor is authorized to draw a warrant for said sums out of any money in
33　the treasury not otherwise appropriated.  Said appropriation shall not lapse.

34　　　　313  School Building Aid; Annual Grant for Leased Space.  Amend the introductory paragraph of
35　RSA 198:15-hh, I to read as follows:

36　　　　I.  The amount of the annual grant for a lease to any school district duly organized, any city
37　maintaining a school department within its corporate organization, any cooperative school district as

**Amendment to HB 2-FN-A-LOCAL**
**- Page 155 -**

1    defined in RSA 195:1, or any receiving district operating an area school as defined in RSA 195-A:1,

2    shall be a sum equal to 30 percent of the amount of the annual payment of the lease incurred, for the

3    cost of leasing permanent space in a building or buildings not owned by the school district or school

4    administrative unit which is used for the operation of a high school vocational technical education

5    program, to the extent approved by the state board of education.  For the purposes of this section,

6    the amount of the annual grant for a lease to a vocational technical education center shall be

7    calculated in the same manner as a cooperative school district.  The amount of the annual grant for a

8    chartered public school authorized under RSA 194-B:3-a shall be a sum equal to 30 percent of the

9    annual lease payment incurred for the cost of leasing space; provided that no annual grant for leased

10    space provided to a chartered public school in accordance with this section shall exceed [$30,000]

11    *$50,000* in any fiscal year.  The total amount of grants to schools pursuant to this section shall not

12    exceed the state appropriation for leased space.  If the amount appropriated is insufficient therefor,

13    the appropriation shall be prorated proportionally among the schools eligible for a grant.  Such lease

14    agreements shall be eligible for grants under this section, provided all of the following conditions

15    apply:

16    314  New Paragraph; Ten Year Plan for Grant Projects.  Amend RSA 198:15-a by inserting after

17    paragraph IV the following new paragraph:

18    V.  The department of education shall develop and maintain a 10-year school facilities plan of

19    potential school building grant projects.  Potential projects shall include, but not be limited to,

20    criteria pursuant to RSA 198:15-c, II(b).  The 10-year plan is intended to create a method to identify

21    and enhance school facilities in a safe, healthy, and efficient manner while providing adequate

22    learning environments for New Hampshire's students.  The 10-year plan shall be updated every

23    biennium to provide the department a summary of projects and school facility capital expenditures

24    that are anticipated for the next 10 years.  The state board of education shall adopt rules pursuant to

25    RSA 541-A relative to this paragraph.  The plan shall identify new construction, renovation, and

26    emergency projects, and describe the overall condition of projects contained in the plan.

27    315  New Paragraph; Kindergarten Adequate Education Grants.  Amend RSA 198:48-b by

28    inserting after paragraph II the following new paragraph:

29    III.  For the fiscal year ending June 30, 2021, and every fiscal year thereafter, the amount

30    necessary to fund the grants under this section is hereby appropriated to the department from the

31    education trust fund established in RSA 198:39.  If the balance in the education trust fund is less

32    than zero, the governor is authorized to draw a warrant for sufficient funds to eliminate such deficit

33    out of any money in the treasury not otherwise appropriated.  The commissioner of the department

34    of administrative services shall inform the fiscal committee and the governor and council of such

35    balance.  This reporting shall not in any way prohibit or delay the distribution of kindergarten

36    adequate education grants.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 156 -**

1    316  Appropriation; Department of Education.  The sum of $1,906,313 for the fiscal year ending

2    June 30, 2021 is hereby appropriated to the department of education for the purpose of funding and

3    distributing additional adequate education grants under RSA 198:48-b, I and II.   Of this

4    appropriation, $840,039 shall be for payments for those districts that would have been eligible for

5    said grants had the provisions of RSA 198:48-b, I and II, been in effect for the fiscal year ending

6    June 30, 2020.  Said appropriation shall be a charge against the education trust fund and shall not

7    lapse.

8    317  Effective Date.  Sections 315 and 316 of this act shall take effect June 30, 2021.

9    318  School Planning Committees; Vacancies.  Amend RSA 671:33 to read as follows:

10   671:33  Vacancies.

11       I.  Vacancies among members of cooperative or area school planning committees shall be

12   filled by the moderator for the unexpired term.

13       II.(a)  The school board shall fill vacancies occurring on the school board, except as provided

14   in subparagraph (b), and in all other district offices for which no other method of filling a vacancy is

15   provided.  Appointees of the school board shall serve until the next district election when the voters

16   of the district shall elect a replacement for the unexpired term.  In the case of a vacancy of the entire

17   membership of the school board, or if the remaining members are unable, by majority vote, to agree

18   upon an appointment, the selectmen of the town or towns involved shall appoint members by

19   majority vote in convention.

20           (b)  In a cooperative school district, the remaining school board members representing

21   the same town or towns as the departed member shall fill a vacancy on the school board, provided

22   that there are at least 2 such members.  ***A member-at- large shall also be included as a***

23   ***representative of the same town.***  If there are less than 2 remaining members on the cooperative

24   school board representing the same town or towns as the departed member, or if the remaining

25   members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or

26   towns involved shall fill the vacancy by majority vote in convention.  If the selectmen are unable to

27   fill the vacancy then the cooperative school district moderator shall make the appointment.   A

28   member appointed to fill a vacancy under this subparagraph shall serve until the next district

29   election when the voters of the district shall elect a replacement for the unexpired term.

30       III.  Vacancies in the office of moderator shall be filled by vote at a school meeting or election,

31   provided that, until a replacement is chosen, the school district clerk shall serve as moderator or

32   shall appoint a moderator pro tempore.

33       IV.  In a cooperative school district, the remaining budget committee members representing

34   the same town or towns as the departed member shall fill a vacancy on the budget committee,

35   provided that there are at least 2 such members.  ***A member-at- large shall also be included as***

36   ***a representative of the same town.***  If there are less than 2 remaining members on the budget

37   committee representing the same town or towns as the departed member, or if the remaining

Amendment to HB 2-FN-A-LOCAL
- Page 157 -

1    members are unable, by majority vote, to agree upon an appointment, the selectmen of the town or

2    towns involved shall fill the vacancy by majority vote in convention.  If the selectmen are unable to

3    fill the vacancy then the cooperative school district moderator shall make the appointment.  If the

4    vacancy is for the cooperative school board representative to the cooperative school district budget

5    committee, such vacancy shall be filled by the cooperative school board.  A member appointed to fill a

6    vacancy under this subparagraph shall serve until the next district election when the voters of the

7    district shall elect a replacement for the unexpired term.

8    319  Appropriation; Department of Transportation.

9    I.  There is hereby appropriated to the department of transportation the sum of $11,000,000

10    for the biennium ending June 30, 2023, which shall be expended pursuant to this section.  The

11    governor is authorized to draw a warrant for said sum out of any money in the treasury not

12    otherwise appropriated.

13    II.  The sum appropriated in this section shall be allocated as follows:

14    (a)  $5,000,000 for the highway and bridge betterment program established in RSA

15    235:23-a.

16    (b)  $6,000,000 for the acquisition of fleet vehicles and equipment.

17    320  Appropriation; Department of Education.

18    I.  There is hereby appropriated to the department of education the sum of $30,000,000, for

19    the fiscal year ending June 30, 2021, for school building aid on new projects under RSA 198:15-a.

20    This appropriation shall be a charge against the education trust fund and shall not lapse until June

21    30, 2023.

22    II.  The $50,000,000 cap on school building aid grants for construction or renovation projects

23    approved by the department of education under RSA 198:15-a, IV shall be suspended for the

24    biennium ending June 30, 2023.

25    321  Section 320 of this act shall take effect June 30, 2021.

26    322  Education Tax Revenue; Fiscal Year 2023.  For the fiscal year ending June 30, 2023, and

27    notwithstanding RSA 76:3, the commissioner of the department of revenue administration shall set

28    the education tax rate at a level sufficient to generate revenue of $263,000,000 when imposed on all

29    persons and property taxable pursuant to RSA 76:8, except property subject to tax under RSA 82 and

30    RSA 83-F.  The education property tax rate shall be effective for tax periods beginning on or after

31    April 1, 2022.  The rate shall be set to the nearest 1/2 cent necessary to generate the revenue

32    required in this section.

33    323  Supplemental Education Payment; Fiscal Year 2023.  The commissioner of education, in

34    consultation with the commissioner of the department of revenue administration, shall determine if

35    any municipality's total education grant pursuant to RSA 198:41, including all statewide education

36    property tax raised and retained locally, is decreased due to the statewide education property tax

37    reduction in  section 322 of this act.  Any amounts identified shall be paid to impacted municipalities

**Amendment to HB 2-FN-A-LOCAL**
**- Page 158 -**

1   pursuant to the distribution schedule under RSA 198:42.  The governor is authorized to draw a

2   warrant from the education trust fund to satisfy the state's obligation under this section.

3   324  Effective Date.  Sections 322 and 323 of this act shall take effect July 1, 2021.

4   325  Department of Health and Human Services; Child Care Services.  The commissioner of the

5   department of health and human services shall be responsible for determining, on an ongoing basis

6   through June 30, 2023, whether there is sufficient funding in account 05-95-42-421110-2977, class

7   536, to fund employment-related child care services to avoid a wait list.  If at any time the

8   commissioner determines that funding is insufficient, he or she shall, to the extent allowed by

9   applicable federal regulations, utilize available federal Temporary Assistance to Needy Families

10  reserve funds to cover the amount of the shortfall.  The department shall report quarterly to the

11  fiscal committee of the general court on any funds expended on employment-related child care

12  services, including funds budgeted in account 05-95-42-421110-2977 as well as federal Temporary

13  Assistance to Needy Families funds authorized by this section.  The department shall provide

14  enrollment-based reimbursement, rather than attendance-based payment, to child care providers

15  who accept child care scholarships through the Child Care and Development Fund (CCDF) for the

16  fiscal year ending June 30, 2022 using, to the extent allowable by applicable federal regulations,

17  federal recovery funds.  No state general funds shall be used to make enrollment-based

18  reimbursement payments to providers.

19  326  Statement of Findings.  The general court finds that:

20  I.  Placement in corrections settings can be harmful to children and lead to increased

21  delinquency and adult criminal behavior.  It should therefore be reserved for those circumstances in

22  which the safety of a child or of the community requires such confinement.

23  II.  Placement of children who are not serious violent offenders in settings other than the

24  Sununu Youth Services Center (SYSC) complies with The Families First Act, PL 115-123, and the

25  New Hampshire system of care established pursuant to 2019; 44 (SB 14), which prioritize

26  community-based treatment of children.

27  III.  This act is in furtherance of these goals.

28  327  Appropriation; Department of Health and Human Services; Sununu Youth Services Center.

29  The sum of $10,400,000 for the fiscal year ending June 30, 2022 and the sum of $9,922,157 for the

30  fiscal year ending June 30, 2023, are hereby appropriated to the department of health and human

31  services for the purpose of operating the Sununu youth services center as the department transitions

32  to an replacement facility.  Of the amount appropriated for the fiscal year ending June 30, 2022,

33  $9,000,000 shall be state general funds and $1,400,000 shall be other funds. Of the amount

34  appropriated in the fiscal year ending June 30, 2023, $9,000,000 shall be state general funds and

35  $922,157 shall be other funds.  Such funds shall not lapse until June 30, 2023.  The governor is

36  authorized to draw a warrant for the sums out of any money in the treasury not otherwise

37  appropriated.

Amendment to HB 2-FN-A-LOCAL
- Page 159 -

328  Transfer of Funds for Operation of the Sununu Youth Services Center.  Notwithstanding RSA 9:16-a and RSA 9:16-c, for the biennium ending June 30, 2023, prior approval of the fiscal committee of the general court shall be required for any transfer of funds required for the operation of the Sununu youth services center.

329  Findings; Sununu Youth Services Center.  The general court finds that the current Sununu youth services center shall be closed no later than March 1, 2023 and the opening of a replacement facility shall occur no later than March 1, 2023.

330  Committee Established.

I.  There is established a committee to develop a plan for the closure and replacement of the Sununu youth services center.  The members of the committee shall be as follows:

(a)  Three members of the house of representatives, each of whom shall be from a standing committee having jurisdiction over juvenile justice, appointed by the speaker of the house of representatives.

(b)  Two members of the senate, appointed by the president of the senate.

II.  In addition, the legislative members of the committee shall seek input and expert advice from, but not limited to, the following:

(a)  The department of health and human services.

(b)  The office of the child advocate.

(c)  The Disabilities Rights Center.

(d)  The National Alliance on Mental Illness.

(e)  New Futures.

(f)  Any other group or organization the committee deems necessary.

III.  Legislative members of the committee shall receive mileage at the legislative rate when attending to the duties of the committee.

IV.  The committee shall develop a plan for the closure and replacement of the Sununu youth services center, including cost estimates for the construction and operation of a new facility.  The committee's plan for a replacement facility shall meet the following requirements:

(a)  It shall be operated by the department of health and human services.

(b)  It shall be designed to meet the unique needs of up to 18 youth at a time who are at the facility pursuant to RSA 169-B:14, detention; RSA 169-B:19, commitment; RSA 169-B:24, transfer to superior court, RSA 169-B:32; RSA 651:17-a, service of adult sentence of incarceration at the youth development center, and 169-A, interstate compact on juveniles.

(c)  It shall accommodate requirements to separate youth by gender, treatment needs, court order, safety, and security.  The facility shall include 3 separate residential spaces, each including capacity for 6 youth.

(d)  It shall have capacity to provide services to meet the medical, physical, and behavioral health needs of all potentially eligible youth.

1        (e)  It shall have space for 18 beds, including space for flexibility to meet the needs of all

2  genders, safety and security, crisis stabilization and admissions and discharges.

3        (f)  It shall have adequate space to meet the educational needs of all youth potentially

4  eligible, including youth with special education needs.

5        (g)  It shall have adequate space for indoor and outdoor recreation.

6        (h)  It shall have the capacity to meet the nutritional needs of all youth.

7        (i)  It shall have necessary elements to be architecturally secure and equipped with video

8  surveillance.

9        (j)  The opening of the replacement facility shall be no later than March 1, 2023.

10       V.   The committee shall prepare legislation relative to the implementation of the plan

11  developed in paragraph IV for submission for the 2022 legislative session.

12       VI.  The members of the study committee shall elect a chairperson from among the members.

13  The first meeting of the committee shall be called by the first-named senate member.  The first

14  meeting of the committee shall be held within 30 days of the effective date of this section.  Four

15  members of the committee shall constitute a quorum.

16       VII.  The committee shall issue their final report to speaker of the house of representatives,

17  the senate president, the senate clerk, the house clerk, the governor, and the state library on or

18  before November 1, 2021 and submit the plan to the joint fiscal committee for approval.

19       331    Department of Health and Human Services;  Closed Loop Referral System.

20  Notwithstanding any other provision of the law to the contrary, there shall be no further expansion

21  of the "closed loop referral" system by the department of health and human services beyond that

22  which has been or will be implemented pursuant to the sole source grant agreement to Unite USA

23  Inc. of Nashua in the amount of $700,000 dated October 19, 2020.   Before the department

24  undertakes any further utilization of the closed loop referral system beyond that authorized by the

25  preceding sentence, the legislative oversight committee on health and human services, established in

26  RSA 126-A:13, shall conduct a comprehensive review of the information intended to be stored in the

27  master index file or accessed using the master indexes within and between the closed loop referral

28  system and other interconnected systems.  Further, the oversight committee shall assess the privacy

29  protections and access/release limitations afforded by this system, and the adequacy of the

30  procedures utilized by the system to insure that persons using it have given informed consent to the

31  ("opt-in") release of their personally identifiable information available through the system of

32  systems.  The department shall provide all requested data and information regarding the closed loop

33  referral system and systems with which it is intended to interconnect within one week of the request

34  by the oversight committee. The oversight committee shall report its findings and recommendations,

35  if any, to the legislature, the governor, and the department of health and human services by

36  November 1, 2021.  The department of health and human services is prohibited from accessing an

37  individual's information from the closed loop referral system who is not receiving services funded

through a department of health and human services program.  Within 48 hours of becoming aware of a data breach, Unite USA Inc. shall begin the process of notification by first class mail to all individuals impacted by the data breach.  Any individual whose information is intended to be included in the closed loop referral shall retain the right to opt in to the system on each referral and retain the right to revoke consent to be in the system at any time.

332  American Rescue Plan Act; Unanticipated Revenue.  Funds received by municipalities from the American Rescue Plan Act of 2021 may be considered unanticipated revenue under RSA 31:95-b and may be accepted and expended pursuant to RSA 31:95-b, II-IV whether or not a political subdivision has adopted the provisions of RSA 31:95-b.

333  Salary Schedules.  RSA 99:1-a is repealed and reenacted to read as follows:

99:1-a   Salary Schedules.  The department of administrative services shall develop and implement for the executive branch such salary schedules as authorized by collective bargaining agreements between the state and an employee organization and subject to appropriation.  The department shall apply the appropriate salary schedules to all unrepresented employees.  The department shall post base salary schedules on its public Internet website.

334  Corrections Officers' Salaries.

I.  Effective July 2, 2021, part-time corrections officers and corrections officer corporals shall be compensated in accordance with the salary schedule applicable to full-time corrections officers and corrections officer corporals.

II.  Effective July 2, 2021, corrections officer majors shall be compensated in accordance with the salary schedule applicable to corrections officer lieutenants, sergeants and captains.

335  Parking; Concord.  The department of administrative services is authorized to spend such funding as appropriated for additional parking for full-time and part-time employees who are assigned to the downtown Concord area and who are not provided a state-provided parking space for their personal vehicle.

336  Compensation for Certain State Officers; Unclassified State Employees; July 2, 2021.  RSA 94:1-a, I (a) is repealed and reenacted to read as follows:

I.(a)  The following salary ranges shall apply to the following grades:

| GRADE | STEP 01 | STEP 02 | STEP 03 | STEP 04 | STEP 05 | STEP 06 | STEP 07 |
|-------|---------|---------|---------|---------|---------|---------|---------|
| AA | 56,082.00 | 59,748.00 | 63,388.00 | 67,054.00 | 70,694.00 | 74,360.00 | 78,026.00 |
| BB | 58,318.00 | 62,114.00 | 65,910.00 | 69,732.00 | 73,528.00 | 77,324.00 | 81,120.00 |
| CC | 61,022.00 | 65,000.00 | 68,978.00 | 72,982.00 | 76,960.00 | 80,938.00 | 84,942.00 |
| DD | 64,246.00 | 68,432.00 | 72,644.00 | 76,830.00 | 81,042.00 | 85,228.00 | 89,414.00 |
| EE | 68,042.00 | 72,488.00 | 76,934.00 | 81,406.00 | 85,852.00 | 90,298.00 | 94,744.00 |
| FF | 72,748.00 | 77,506.00 | 82,264.00 | 87,048.00 | 91,806.00 | 96,564.00 | 101,322.00 |
| GG | 78,520.00 | 83,668.00 | 88,816.00 | 93,964.00 | 99,112.00 | 104,260.00 | 109,408.00 |
| HH | 85,514.00 | 91,104.00 | 96,720.00 | 102,336.00 | 107,952.00 | 113,568.00 | 119,184.00 |

**Amendment to HB 2-FN-A-LOCAL**
**- Page 162 -**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | II | 90,402.00 | 96,330.00 | 102,284.00 | 108,212.00 | 114,166.00 | 120,094.00 | 126,048.00 |
| 2 | JJ | 95,290.00 | 101,556.00 | 107,822.00 | 114,088.00 | 120,354.00 | 126,620.00 | 132,886.00 |
| 3 | KK | 97,734.00 | 104,156.00 | 110,578.00 | 117,026.00 | 123,448.00 | 129,870.00 | 136,318.00 |
| 4 | LL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140,634.00 |
| 5 | MM | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 145,392.00 |
| 6 | NN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150,956.00 |
| 7 | OO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 157,482.00 |
| 8 | PP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 165,282.00 |
| 9 | QQ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 174,668.00 |

10   337  Salary Wages for Councilors and Commissioners; July 2, 2021.  RSA 94:1-a, II is repealed

11   and reenacted to read as follows:

12           II.  The salary wages for the positions set forth below shall be as follows commencing July 2,

13   2021:

14                                                                                     Maximum

15           Governor's councilors                                          $17,732.00

16           Racing and charitable gaming commissioners       $13,754.00

17           Sweepstakes commission, chairman                     $19.994.00

18           Sweepstakes commission, members                      $11,258.00

19   338  Compensation for Certain State Officers; Unclassified State Employees; July 1, 2022.  RSA

20   94:1-a, I (a) is repealed and reenacted to read as follows:

21           I.(a)  The following salary ranges shall apply to the following grades:

| | GRADE | STEP 01 | STEP 02 | STEP 03 | STEP 04 | STEP 05 | STEP 06 | STEP 07 |
|---|---|---|---|---|---|---|---|---|
| 22 | GRADE | STEP 01 | STEP 02 | STEP 03 | STEP 04 | STEP 05 | STEP 06 | STEP 07 |
| 23 | AA | 56,732.00 | 60,424.00 | 64,142.00 | 67,834.00 | 71,526.00 | 75,218.00 | 78,936.00 |
| 24 | BB | 58,994.00 | 62,842.00 | 66,690.00 | 70,538.00 | 74,386.00 | 78,234.00 | 82,082.00 |
| 25 | CC | 61,724.00 | 65,754.00 | 69,784.00 | 73,814.00 | 77,844.00 | 81,874.00 | 85,904.00 |
| 26 | DD | 65,000.00 | 69,238.00 | 73,476.00 | 77,740.00 | 81,978.00 | 86,216.00 | 90,454.00 |
| 27 | EE | 68,822.00 | 73,320.00 | 77,844.00 | 82,342.00 | 86,840.00 | 91,338.00 | 95,862.00 |
| 28 | FF | 73,580.00 | 78,416.00 | 83,226.00 | 88,062.00 | 92,872.00 | 97,682.00 | 102,518.00 |
| 29 | GG | 79,430.00 | 84,630.00 | 89,856.00 | 95,056.00 | 100,256.00 | 105,482.00 | 110,682.00 |
| 30 | HH | 86,502.00 | 92,170.00 | 97,838.00 | 103,532.00 | 109,200.00 | 114,894.00 | 120,562.00 |
| 31 | II | 91,442.00 | 97,448.00 | 103,454.00 | 109,460.00 | 115,492.00 | 121,498.00 | 127,504.00 |
| 32 | JJ | 96,408.00 | 102,726.00 | 109,070.00 | 115,414.00 | 121,758.00 | 128,102.00 | 134,446.00 |
| 33 | KK | 98,852.00 | 105,352.00 | 111,878.00 | 118,378.00 | 124,878.00 | 131,378.00 | 137,878.00 |
| 34 | LL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 142,272.00 |
| 35 | MM | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 147,082.00 |
| 36 | NN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 152,724.00 |
| 37 | OO | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 159,302.00 |

Amendment to HB 2-FN-A-LOCAL
- Page 163 -

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | PP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 167,206.00 |
| 2 | QQ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 176,696.00 |

3   339  Salary Wages for Councilors and Commissioners; July 1, 2022.  RSA 94:1-a, II is repealed
4   and reenacted to read as follows:

5         II.  The salary wages for the positions set forth below shall be as follows commencing July 1,
6   2022:

| | Maximum |
|---|---|
| 7 | |
| 8 Governor's councilors | $17,940.00 |
| 9 Racing and charitable gaming commissioners | $13,910.00 |
| 10 Sweepstakes commission, chairman | $20,228.00 |
| 11 Sweepstakes commission, members | $11,388.00 |

12   340  Department of Justice; Attorney Salaries; July 2, 2021.  RSA 94:1-a, I(c) is repealed and
13   reenacted to read as follows:

14         I.(c)  For attorney positions in the department of justice, except for the attorney general and
15   deputy attorney general, the following shall apply commencing on July 2, 2021:

| | Minimum | Market anchor | Maximum |
|---|---|---|---|
| 16 | | | |
| 17 | $54,617 | | $126,532 |
| 18 Attorney | | $65,838 | |
| 19 Assistant attorney general | | $89,682 | |
| 20 Senior assistant attorney general | | $110,722 | |
| 21 Associate attorney general | | $121,943 | |

22   341  Department of Justice; Attorney Salaries; July 1, 2022.  RSA 94:1-a, I(c) is repealed and
23   reenacted to read as follows:

24         I.(c)  For attorney positions in the department of justice, except for the attorney general and
25   deputy attorney general, the following shall apply commencing on July 1, 2022:

| | Minimum | Market anchor | Maximum |
|---|---|---|---|
| 26 | | | |
| 27 | $55,252 | | $128,001 |
| 28 Attorney | | $66,603 | |
| 29 Assistant attorney general | | $90,723 | |
| 30 Senior assistant attorney general | | $112,007 | |
| 31 Associate attorney general | | $123,359 | |

32   342  Legislative Employees; July 2, 2021.  Legislative employees shall receive 1.16 percent salary
33   increases effective July 2, 2021, if such increases are approved by the appointing authority.

34   343  Legislative Employees; July 1, 2022.  Legislative employees shall receive 1.16 percent salary
35   increases effective July 1, 2022, if such increases are approved by the appointing authority.

36   344  Judicial Salaries; July 2, 2021.  RSA 491-A:1 is repealed and reenacted to read as follows:

37   491-A:1  Salaries Established.  The salaries for the positions set forth below shall be as follows:

| | | |
|---|---|---|
| 1 | Chief justice, supreme court | $183,394 |
| 2 | Associate justices, supreme court | $177,878 |
| 3 | Chief justice, superior court and administrative | |
| 4 | judges appointed pursuant to supreme | |
| 5 | court rule 54 | $177,878 |
| 6 | Associate justices, superior court | $166,825 |
| 7 | District court justices prohibited | |
| 8 | from practice pursuant to | |
| 9 | RSA 502-A:21 | $166,825 |
| 10 | Probate judges prohibited from | |
| 11 | practice pursuant to RSA 547:2-a | $166,825 |

12     345  Judicial Salaries; July 1, 2022.  RSA 491-A:1 is repealed and reenacted to read as follows:

13     491-A:1  Salaries Established.  The salaries for the positions set forth below shall be as follows:

| | | |
|---|---|---|
| 14 | Chief justice, supreme court | $185,522 |
| 15 | Associate justices, supreme court | $179,942 |
| 16 | Chief justice, superior court and administrative | |
| 17 | judges appointed pursuant to supreme | |
| 18 | court rule 54 | $179,942 |
| 19 | Associate justices, superior court | $168,761 |
| 20 | District court justices prohibited | |
| 21 | from practice pursuant to | |
| 22 | RSA 502-A:21 | $168,761 |
| 23 | Probate judges prohibited from | |
| 24 | practice pursuant to RSA 547:2-a | $168,761 |

25     346  Judges; State Employee Health Plan; Application.  The cost sharing and plan design for

26     judges who participate in the health plans offered by the state shall be the same as those for

27     individuals covered by the collective bargaining agreement between the state of New Hampshire and

28     the State Employees' Association of New Hampshire, Inc.

29     347  Judicial Employees; July 2, 2021.  All unrepresented judicial employees shall receive 1.16

30     percent salary increases on July 2, 2021.

31     348  Judicial Employees; July 1, 2022.  All unrepresented judicial employees shall receive 1.16

32     percent salary increases on July 1, 2022.

33     349  Appropriations.

34        I.  The following sums are appropriated from the following sources for the purposes of

35     sections 333 -352 of this act for the fiscal year ending June 30, 2022:

36                                FY 2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 37 | All | Liquor | General | Federal | Highway | Turnpike | Fish & Game | Other |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $12,592,000 | $400,000 | $5,750,000 | $1,773,000 | $1,265000 | $235,000 | $99,000 | $3,070,000 |

II.   The following sums are appropriated from the following sources for the purposes of sections 333-352 of this act for the fiscal year ending June 30, 2023:

FY 2023

| All | Liquor | General | Federal | Highway | Turnpike | Fish & Game | Other |
|---|---|---|---|---|---|---|---|
| $23,208,000 | $800,000 | $10,250,000 | $3,484,000 | $2,486,000 | $455,000 | $183,000 | $5,550,000 |

III.   The department of administrative services is authorized to make any rounding adjustments of up to +$.01 per hour as needed to properly process the employee's payroll within the currently designed human resources/payroll system (NH FIRST).

350  Longevity Pay.  Amend RSA 94:4 to read as follows:

94:4  Longevity Pay.  Any state official who has completed 10 years of service for the state shall be paid, in addition to his or her statutory salary the sum of [$300] *$350* annually and an additional [$300] *$350* for each additional 5 years of state service.  Any state official who transfers, without a break in service, to a position in the classified system may transfer all time served for purposes of longevity pay.

351  Longevity Pay for Regular Classified Employees.  Amend RSA 99:5 to read as follows:

99:5  Longevity Payment for Regular Classified Employees.  Any regular classified employee of the state who has completed 10 years of continuous service for the state other than a law enforcement employee, shall be paid, in addition to the salary to which he or she is entitled by the classification plan, the sum of [$300] *$350* annually and an additional [$300] *$350* for each additional 5 years of continuous state service.  The additional compensation provided by the provisions of this section shall not affect the maximums set by the classification plan and the receipt of said long service payments shall not prohibit the recipient from receiving the yearly increments to which he or she may be otherwise entitled within his or her classification ranges.  Any regular classified employee who transfers, without a break in service, to a position in the unclassified system may transfer all time served for purposes of longevity pay.

352  Longevity Pay for New Hampshire State Troopers.  Amend RSA 99:5-a to read as follows:

99:5-a  Longevity Payments for New Hampshire State Troopers and State Trooper Command Staff.  Any state trooper or eligible state trooper command staff member who has completed 10 years of continuous service for the state shall be paid, in addition to the salary to which he or she is entitled by the classification plan, the sum of [$300] *$350* annually and an additional [ $300] *$350* for each additional 5 years of continuous law enforcement service.  The additional compensation provided by the provisions of this section shall not affect the maximums set by the classification plan and the receipt of said long service payments shall not prohibit the recipient from receiving the yearly increments to which he or she may be otherwise entitled within his or her classification ranges.  Any state trooper or eligible state trooper command staff member who transfers, without a

1  break in service, to a position in the unclassified system may transfer all time served for purposes of
2  longevity pay.

3  353  Repeals.  The following are repealed:

4      I.  RSA 99:1-b, relative to New Hampshire state trooper salaries.

5      II.  RSA 99:3, relative to increases in salary.

6  354  Effective Date.

7      I.  Sections 336, 337, 340, 342, 344, and 347 of this act shall take effect July 2, 2021.

8      II.  Sections  338, 339, 341 343, 345 and 348 of this act shall take effect July 1, 2022.

9  355  Department of Administrative Services; Rehiring of Laid Off Classified State Employees.

10     I.  For purposes of this section, "laid off" means any person in a classified position as
11  described in RSA 21-I:49 who receives written notice of the state's intent to lay him or her off or who
12  is laid off between July 1, 2021 and June 30, 2023, as a result of reorganization or downsizing of
13  state government.

14     II.  It is the intent of the general court that any classified position which becomes available
15  in a department or establishment, as defined in RSA 9:1, shall be filled, if possible, by a state
16  employee laid off, as defined in paragraph I, if such person is not currently employed by the state of
17  New Hampshire, if he or she meets the minimum qualifications for the position, and if he or she does
18  not receive a promotion as a result of the rehire.

19     III.  The head of each department or agency shall submit the name and classification of any
20  individual laid off between July 1, 2021 and June 30, 2023, to the director of the division of
21  personnel within 10 days of the layoff.

22  356  New Subdivision; Granite State Paid Family Leave Plan.  Amend RSA 21-I by inserting
23  after section 95 the following new subdivision:

24                          Granite State Paid Family Leave Plan

25  21-I:96  Granite State Paid Family Leave Plan.  There is hereby established the granite state
26  paid family leave plan, which shall be implemented under this subdivision and as provided in RSA
27  282-B and RSA 77-E.

28  21-I:97 Purpose and Policy.  The purpose of this subdivision is to leverage the purchasing power
29  and economies of scale available to the state when it is acting as purchaser on behalf of state
30  employees and to align this purchasing initiative with a business tax incentive in order to make
31  available to all other public and private employers in the state, on a voluntary basis, advantageously
32  priced family and medical leave insurance (FMLI) wage replacement benefits.  By purchasing FMLI
33  coverage for state employees through the medium of commercial insurance, by linking that contract
34  with a contract to make the same coverage available statewide, by acting as premium aggregator for
35  individuals whose employers do not sponsor such coverage, and by introducing a new business tax
36  incentive, the state will position itself to create a market for advantageously priced FMLI benefits.
37  It is the intent of this subdivision to significantly increase the number of employees in the state who

receive FMLI wage replacement benefits.  The social benefits of increasing the rate of FMLI coverage include attracting and retaining workers, including younger workers, to the state, enabling parents to bond with biological, adopted, or foster children, helping to meet the needs of an aging population, promoting workplace stability, and enhancing worker retention and productivity.  While many larger employers provide paid FMLI benefits through self-insurance, this is not feasible for most mid-sized and smaller businesses.  The general court therefore finds that it is in the public interest for the state to strategically use its purchasing power and tax expenditure authority to establish a marketplace in the state for advantageously priced FMLI wage replacement benefits.

21-I:98  Definitions.  In this subdivision:

I. "Child" has the same meaning as "son or daughter" in 29 U.S.C. section 2611(12).

II. "Commissioner" means the commissioner of the department of administrative services.

III. "Department" means the department of administrative services.

IV. "Family and medical leave" means leave from work:

(a)  Because of the birth of a child of the employee, within the past 12 months;

(b)  Because of the placement of a child with the employee for adoption or fostering within the past 12 months;

(c)  Because of a serious health condition of a family member; or

(d)  Because of any qualifying exigency arising from foreign deployment with the armed forces, or to care for a service member with a serious injury or illness as permitted under the federal Family and Medical Leave Act, 29 U.S.C. section 2612(a)(1)(E) and 29 C.F.R. section 825.126(a)(1)-(8), as they existed on October 19, 2017, for family members as defined in paragraph VI.

V.  "Family and Medical Leave Act" means the federal Family and Medical Leave Act of 1993, Pub.L. 103-3, 29 U.S.C. section 2601 et seq.

VI.  "Family member" means a "child" as defined in paragraph I, a biological, adoptive, or foster parent, stepparent, or legal guardian of the child or the child's spouse or domestic partner, a biological, adoptive, or foster grandparent or step grandparent, or a spouse or domestic partner.

VII. "FMLI" means family and medical leave insurance providing wage replacement benefits under specified conditions.

VIII. "Serious health condition" means any illness of a family member covered by the Family and Medical Leave Act including treatment for addiction as prescribed by a treating clinician, consistent with American Society of Addiction Medicine criteria, as well as treatment for a mental health condition, consistent with American Psychiatric Association criteria.

IX. "State rate" means the per employee premium amount that is charged by the successful bidder for the state contract for FMLI coverage for state government employees as provided in this subdivision.  The state rate shall be expressed as a percentage of wages.

21-I:99  Contracting and Administrative Authority.

Amendment to HB 2-FN-A-LOCAL
- Page 168 -

1    I.  The commissioner may solicit information about, seek proposals for, negotiate, enter into,
2  and administer group insurance contracts with duly authorized accident and life insurance carriers
3  as necessary and appropriate to provide to qualifying state employees, at state expense and at no
4  cost to such employees, an FMLI plan of wage replacement as described in this subdivision.  The
5  provision of this coverage shall be considered a matter of legislatively established public policy that
6  is designed to benefit all employers and employees in the state and that is "confined exclusively to
7  the public employer by statute" as provided in RSA 273-A:1, XI and shall not be subject to collective
8  bargaining.  Nothing in this subdivision shall be construed to invalidate any portion of a collective
9  bargaining agreement entered into by the state.

10    II.  The state shall provide to all permanent state employees wage replacement coverage for
11  qualified leave, which shall be available for the same types of leave as protected under the Family
12  and Medical Leave Act except leave for a health condition of the employee.  This shall include leave
13  for:

14        (a)  The birth of a child and the care of the newborn child within one year of birth;

15        (b)  The placement with the employee of a child for adoption or foster care and the care of
16  the newly placed child within one year of placement;

17        (c)  Caring for the employee's spouse, child, or parent who has a serious health condition;
18  or

19        (d)  Any qualifying exigency arising out of the fact that the employee's spouse, child, or
20  parent is a covered military member on covered active duty, or caring for a covered service-member
21  with a serious injury or illness if the eligible employee is the service-member's spouse, child, parent,
22  or next of kin.

23    III.  Subject to any changes authorized under RSA 21-I:103, the wage replacement benefits
24  under this FMLI plan shall be structured as follows:

25        (a)  Eligible employees shall receive 60 percent of their average weekly wage.

26        (b)  The maximum duration of wage replacement shall be 6 weeks per year, with no
27  minimum duration required.

28        (c)  Wages used to determine the 60 percent FMLI coverage shall be capped at the
29  amount of the Social Security taxable wage maximum as amended from time to time.

30    IV.  Except as provided in RSA 21-I:100, III regarding individual pool coverage, the
31  commissioner shall establish, through his or her discretionary authority in administering the
32  request for information and the request for proposals process, the following additional elements of
33  the benefit structure consistent with the purposes and policy of this subdivision:

34        (a)  The base period by which the average weekly wage shall be determined.

35        (b)  The tenure requirement, expressed in terms of months of work, before an employee is
36  eligible to be covered provided, however, that no tenure requirement shall apply to an employee who
37  has already met the requirement and then changes jobs.

1  (c) A waiting period or elimination period provided, however, that a waiting or
2 elimination period shall not be a required element of the benefit structure, and the commissioner
3 shall have authority to implement a plan with no such requirement.

4 21-I:100 State Employee Coverage Linked to Coverage Offerings for Other Employers and for
5 Individual Employees. The commissioner shall include in the request for proposals for FMLI
6 benefits for state employees a requirement that the winning bidder shall, as a condition of the state
7 contract, also offer the same FMLI coverage to other public employers, private employers with more
8 than 50 employees, and individual employees on the following terms:

9  I. Private and public non-state employers shall receive a rate that is derived from the state
10 rate through the application of rating factors that are actuarially justified and specified in the bid
11 response.

12  II. Employers with more than 50 employees who choose to sponsor coverage for their
13 employees shall contract directly with the winning bidder.

14  III. Individuals who work for employers who choose not to offer FMLI coverage under this
15 subdivision or who fail to meet minimum participation requirements and who do not offer an FMLI
16 benefit that is at least equivalent to the granite state paid family leave plan shall have the
17 opportunity to contract indirectly with the winning bidder through the purchasing pool for family
18 and medical leave insurance authorized under RSA 282-B and administered by the department of
19 employment security. The pool may be experience rated. Coverage through the pool shall include a
20 7-month waiting period, a one-week elimination period, and a 60-day annual open enrollment period
21 as established by the commissioner in the procurement process. Premiums for individual pool
22 coverage shall not exceed $5 per subscriber per week.

23  IV. The commissioner shall establish, through his or her discretionary authority in
24 administering the request for information and the request for proposals process, the following
25 additional elements of the benefit structure and plan administration specifically for employees of
26 sponsoring non-state employers consistent with the purposes and policy of this subdivision:

27  (a) The minimum participation requirement.

28  (b) The parameters for open enrollment periods.

29  (c) Procedures for contributory plans, partially contributory plans, and non-contributory
30 plans.

31  (d) Procedures for payroll deduction and premium remittance for employers with more
32 than 50 employees.

33 21-I:101 Conditions of Non-State Employer Participation. Participation in the plan by non-state
34 employers shall be voluntary. In addition, non-state employers may choose to provide FMLI at no
35 cost to their employees or on a contributory or partially contributory basis.

36 21-I:102 Procurement Process. The commissioner may issue a request for information or a
37 request for proposals to secure FMLI coverage for all eligible employees of the state of New

1 Hampshire and to make advantageously priced coverage available to all other private employers
2 with more than 50 employees and public employers in the state as provided in this subdivision. The
3 department, the department of employment security, and the department of insurance shall jointly
4 evaluate the proposals received in response to the request for proposals. The department shall
5 contract with an insurance carrier or carriers to provide FMLI coverage. The contract with the
6 winning bidder shall be subject to governor and council approval. The selected insurance carrier
7 shall be licensed by the state of New Hampshire and in good standing. The selected insurance
8 carrier shall be subject to all applicable insurance laws and regulations of the state of New
9 Hampshire, and the rates and forms for the FMLI contracts shall be filed for approval with the
10 insurance commissioner.

11 21-I:103  Commissioner Discretion to Adjust Initial FMLI Benefit Structure.  In exercising
12 authority under this subdivision to contract for FMLI coverage for state employees and also for the
13 availability of advantageously priced FMLI coverage for employees of all non-state employers, the
14 commissioner shall have discretionary authority in initiating this program to make changes to the
15 benefit structure of the FMLI plan under RSA 21-I:99, III and may retain a consulting actuary or
16 other benefit advisors in support of this discretionary determination. This discretionary authority
17 shall be exercised in consideration of the stated purposes and policy goals of this subdivision and of
18 the counsels of the FMLI advisory board established in RSA 21-I:104. Any such changes made under
19 this paragraph shall be subject to approval by the governor and council and the legislative fiscal
20 committee prior to implementation and shall be offered by the legislative fiscal committee as an
21 amendment to this subdivision in the next regular session of the general court.

22 21-I:104  Family and Medical Leave Insurance Advisory Board. There is hereby established the
23 family and medical leave insurance advisory board, which shall be administratively attached to the
24 department, and which shall hereinafter be called the FMLI advisory board. The FMLI advisory
25 board shall consist of 9 members to be appointed, with the exception of the legislative members, by
26 the governor. Three of the appointees shall be persons who, because of their vocations, employment,
27 or affiliations, shall represent employers; 3 shall be persons who, because of the vocations,
28 employment, or affiliations, shall represent employees; one shall be a senator appointed by the
29 senate president; one shall be a representative appointed by the speaker of the house of
30 representatives; the remaining appointee, who shall be appointed as chairman, shall be a person
31 whose training and experience qualify her or him to successfully resolve the problems of FMLI
32 procurement, eligibility, benefit design, and program administration. The advisory board shall meet
33 no later than 45 days after each calendar quarter and aid the commissioner in formulating policies
34 and discussing problems related to the implementation and administration of this subdivision and
35 RSA 282-B and in assuring impartiality and freedom from political influence in the solution of such
36 problems.  Advisory board meetings shall provide opportunity for public comment.

37 21-I:105  Report and Outreach.

1    I.  Working in coordination with the commissioner of administrative services as provided in
2    RSA 282-B:6, I, the department shall produce, on an annual basis, a summary report on the granite
3    state paid family leave plan.  This report shall be made public and delivered to the governor, the
4    senate president, and the speaker of the house of representatives.  It shall include, but not be limited
5    to, a description of progress in carrying out the processes contemplated under this subdivision,
6    progress in improving the rate of FMLI coverage of employees in the state, and recommendations for
7    more fully achieving the purposes and policy goals of this subdivision.

8    II.  Working in coordination with the department of employment security as provided in RSA
9    282-B:6, II, the department shall develop and implement an outreach program to ensure that
10   employers who might benefit from sponsoring FMLI coverage for their employees and individuals
11   who may be eligible to receive FMLI coverage under this subdivision are made aware of this
12   program.   Outreach information shall explain in an easy to understand format, eligibility
13   requirements, benefit structures, and the process for accessing coverage, enrolling individuals, and
14   qualifying for the business tax credit provided for in RSA 77-E:3-d.

15   21-I:106  Rulemaking.  The commissioner may adopt rules, pursuant to RSA 541-A, as deemed
16   necessary for the implementation of this chapter.

17   21-I:107  Appropriation and Funding Transfer.  The state treasurer shall transfer funds from the
18   general fund to the department of administrative services for payment of the administrative and
19   implementation costs associated with this chapter.

20   21-I:108  Program Start-up.  The request for proposals for FMLI coverage as described in this
21   subdivision shall be issued no later than January 1, 2022.  The FMLI coverage shall be in place for
22   state government employees and available for purchase by other public and private employers with
23   more than 50 employees and individuals by October 1, 2022.

24   357  Insurance; Allocation of State Premium Tax.  Amend RSA 400-A:32, III to read as follows:

25   III.(a)   Except as provided in [subparagraph (b)] *subparagraphs (b) and (c)*, the taxes
26   imposed in paragraphs I and II of this section shall be promptly forwarded by the commissioner to
27   the state treasurer for deposit to the general fund.

28        (b)   Taxes imposed attributable to premiums written for medical and other medical
29   related services for the newly eligible Medicaid population as provided for under RSA 126-AA shall
30   be deposited into the New Hampshire granite advantage health care trust fund established in RSA
31   126-AA:3.  The commissioner shall notify the state treasurer of sums for deposit into the New
32   Hampshire granite advantage health care trust fund no later than 30 days after receipt of said taxes.
33   The moneys in the trust fund may be used for the administration of the New Hampshire granite
34   advantage health care program, established in RSA 126-AA.

35        *(c)   Taxes imposed on premiums written by duly authorized insurance*
36   *companies for family and medical leave insurance written in connection with the*
37   *administration of RSA 21-I:96 through RSA 21-I:108 or RSA 282-B shall be deposited into*

**Amendment to HB 2-FN-A-LOCAL**
**- Page 172 -**

1    *the FMLI premium stabilization trust fund established in RSA 282-B:5.  The commissioner*
2    *shall notify the state treasurer of sums for deposit into the FMLI premium stabilization*
3    *trust fund no later than 30 days after receipt of said taxes.*

4    358  New Chapter; Purchasing Pool for Family and Medical Leave Insurance.  Amend RSA by
5    inserting after chapter 282-A the following new chapter:

6    CHAPTER 282-B

7    PURCHASING POOL FOR FAMILY AND MEDICAL LEAVE INSURANCE

8    282-B:1  Purpose.  The purpose of this chapter is to establish a group purchasing mechanism
9    whereby individuals who work for employers with more than 50 employees who do not to offer either
10   family and medical leave insurance (FMLI) coverage under the granite state paid family leave plan
11   as authorized under RSA 21-I:96 through RSA 21-I:108 or an FMLI benefit that is at least
12   equivalent to such coverage will have the opportunity to purchase granite state paid family leave
13   plan coverage through a mechanism established by the state in conjunction with the state
14   government employee FMLI plan.

15   282-B:2  Definitions.  In this chapter:

16   I. "Child" has the same meaning as "son or daughter" in 29 U.S.C. section 2611(12).

17   II. "Commissioner" means the commissioner of the department of employment security.

18   III. "Department" means the department of employment security.

19   IV.  "Employer" has the same definition as relevant provisions of RSA 282-A:8, except as
20   provided in RSA 282-A:9.

21   V. "Employment" means wages paid for services by an employer that is covered by this
22   chapter.

23   VI. "Family and medical leave" means leave from work:

24   (a) Because of the birth of a child of the employee, within the past 12 months;

25   (b)  Because of the placement of a child with the employee for adoption or fostering
26   within the past 12 months;

27   (c) Because of a serious health condition of a family member; or

28   (d)  Because of any qualifying exigency arising from foreign deployment with the armed
29   forces, or to care for a service member with a serious injury or illness as permitted under the federal
30   Family and Medical Leave Act, 29 U.S.C. section 2612(a)(1)(E) and 29 C.F.R. section 825.126(a)(1)
31   through (8), as they existed on October 19, 2017, for family members as defined in paragraph VIII.

32   (e) A serious health condition of the employee that isn't related to employment and their
33   employer does not offer Short Term Disability insurance.

34   VII.  "Family and Medical Leave Act" means the federal Family and Medical Leave Act of
35   1993, Pub.L. 103-3, 29 U.S.C. section 2601 et seq.

VIII.  "Family member" means a child, a biological, adoptive, or foster parent, stepparent, or legal guardian of the child or the child's spouse or domestic partner, a biological, adoptive, or foster grandparent or step grandparent, or a spouse or domestic partner.

IX.  "FMLI" means family and medical leave insurance providing wage replacement benefits under specified conditions.

X.  "Individual Pool" means the pooled purchasing mechanism established in this chapter for the purpose of providing individual employees of employers who do not sponsor qualifying FMLI coverage the option to purchase such coverage on an individual basis.

XI.  "Serious health condition" means any illness covered by the federal family and medical leave act including treatment for addiction as prescribed by a treating clinician, consistent with American Society of Addiction Medicine criteria, as well as treatment for a mental health condition, consistent with American Psychiatric Association criteria.

282-B:3  Employer and Employee Rights and Responsibilities.

I.  Individuals who are employed by private employers with more than 50 employees who do not  offer either FMLI coverage under the granite state paid family leave plan under RSA 21-I:96 - RSA 21-I:108 or an FMLI benefit that is at least equivalent to such coverage will have the opportunity to purchase granite state paid family leave plan coverage through the individual pool. The individual pool shall operate by payroll deduction for employees of employers with more than 50 employees whereby premiums are paid into an FMLI premium fund administered by the department as provided in this chapter and established in coordination with the commissioner of administrative services under RSA 21-I:96 through RSA 21-I:108.

II.  Individuals employed by employers with more than 50 employees opting into the individual pool shall be required to make their premium remittances by payroll deduction.  All private employers with more than 50 employees who have employees who have individually opted into this pooled purchasing mechanism shall remit FMLI premium payments to the department in a manner as directed by the commissioner.

III.  Employers with fewer than 50 employees who wish to purchase FMLI coverage through the granite state paid family leave plan shall have the opportunity to purchase such coverage by making premium remittances into an FMLI premium fund administered by the department as provided in this chapter and established in coordination with the commissioner of administrative services acting pursuant to RSA 21-I:96.

282-B:4  FMLI Premium Fund Established.  There is established the FMLI premium fund for deposits of insurance premium payments paid pursuant to RSA 282-B:3 and for remittance of such premiums to the FMLI carrier or carriers participating in the twin state voluntary leave plan.  The department shall develop standard enrollment procedures in coordination with participating carriers and shall transmit enrollment and eligibility information to such carriers on a timely basis.  The department shall establish procedures and mechanisms for the billing and collection of premiums

from employers.  The department shall specify in contracts with participating carriers how all premiums shall be transmitted and the frequency of that transmission and how penalties and grace periods on late payments of premiums shall be calculated.  The department may contract with qualified, independent vendors for the services necessary to carry out some or all of the duties under this paragraph.

282-B:5  FMLI Premium Stabilization Trust Fund Established.

I.  There is established the FMLI premium stabilization trust fund which shall be held and accounted for separately from all other funds.  Interest, dividends, and other earnings of the fund shall be added to the fund.  Deposits into the fund shall be limited exclusively to:

(a)  Premium taxes imposed on premiums written by duly authorized insurance companies for family and medical leave insurance written in connection with the administration of RSA 21-I:96 through RSA 21-I:108 or RSA 282-B as provided in RSA 400-A:32, III(c); and

(b)  Gifts, grants, and donations.  The moneys in the fund shall not be subject to any state taxes and shall not be subject to any federal taxes to the extent allowed by applicable federal law.

II.  The moneys in the fund shall constitute a premium stabilization reserve and shall be used exclusively for the purpose of assuring that the premiums charged to participants in the individual pool remain stable from year to year and do not exceed 5 dollars per subscriber per week. The fund shall be administered by the commissioner, who shall be authorized to make such periodic payments to participating FMLI carriers as are necessary to meet the purposes of this paragraph. The department is authorized to contract with qualified, independent vendors for the services necessary to carry out some or all of the duties under this paragraph.

282-B:6  Report and Outreach.

I.  Working in coordination with the commissioner of administrative services as provided in RSA 21-I:105, I the department shall produce, on an annual basis, a summary report on the granite state paid family leave plan.  The report shall be made public and delivered to the governor, the senate president, and the speaker of the house of representatives.  It shall include but not be limited to, a description of progress in implementing the provisions of this chapter, payments into and out of the fund, the number of employees in the state participating in the purchasing mechanism, and recommendations for improvement of the program and for further increasing the rate at which New Hampshire employees have FMLI coverage.

II.  Working in coordination with the department of administrative services as provided in RSA 21-I:105, II, the department shall develop and implement an outreach program to ensure that individuals who may be eligible to receive FMLI benefits under this chapter or under RSA 21-I:96 through RSA 21-I:108 are made aware of these benefits.  Outreach information shall explain in an easy to understand format, eligibility requirements, benefit structures, and the process for accessing coverage and enrolling.

Amendment to HB 2-FN-A-LOCAL
- Page 175 -

282-B:7  Rulemaking.  The commissioner may adopt rules, pursuant to RSA 541-A, as deemed necessary for the implementation of this chapter.

282-B:8  Appropriation and Funding Transfer.  The state treasurer shall transfer funds from the general fund to the department of employment security for payment of the administrative and implementation costs associated with this chapter.

282-B:9  Implementation.  The individual pool shall be operational and available for use by individuals on a timetable that is sufficient to ensure that FMLI coverage shall be available for purchase by January 1, 2022.

282-B:10  Application; Employers with Fewer than 50 Employees.  No provision of this chapter shall require employers with fewer than 50 employees to offer family medical leave or process payroll deductions on behalf employees choosing to participate in the program as individuals.

359  New Section; Family Medical Leave Insurance; Discrimination in the Workplace.  Amend RSA 275 by inserting after section 37-c the following new section:

275:37-d  Family and Medical Leave Insurance.  If an employer has 50 or more employees and sponsors family and medical leave insurance pursuant to RSA 21-I:96, then any employee of that employer who takes family or medical leave and accesses wage replacement benefits under such family and medical leave insurance coverage shall be restored to the position she or he held prior to such leave or to an equivalent position by her or his employer consistent with the job restoration provisions of the federal Family and Medical Leave Act of 1993, Public Law 103-3, 29 U.S.C. section 2601 et seq.  Such employers shall continue to provide health insurance to employees during the leave.  However, employees shall remain responsible for any employee-shared costs associated with the health insurance benefits.  Such employers shall not discriminate or retaliate against any employee for accessing family or medical leave wage replacement benefits.  Employers of employees participating in the granite state paid family leave plan may require that paid leave taken under this program be taken concurrently or otherwise coordinated with leave allowed under the terms of a collective bargaining agreement or other established employer policy or the Family and Medical Leave Act, as applicable.

360  New Subparagraphs; Application of Receipts.  Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraphs:

(365)  Moneys deposited in the FMLI premium fund established in RSA 282-B:4.

(366)  Moneys deposited in the FMLI premium stabilization trust fund established in RSA 282-B:5.

361  New Section; Business Enterprise Tax; Granite State Paid Family Leave Plan Tax Credit.  Amend RSA 77-E by inserting after section 3-d the following new section:

77-E:3-e  Granite State Paid Family Leave Plan Tax Credit.  There shall be a tax credit allowed against the tax due under this chapter in an amount equal to 50 percent of the premium paid by a

1  sponsoring employer for family and medical leave insurance coverage offered to employees pursuant

2  to RSA 21-I:100 for the taxable period in which the premium is paid.

3  362  Annual and Sick Leave; Executive Branch.  Amend RSA 94:3-a to read as follows:

4  94:3-a  Annual and Sick Leave for Unclassified Legislative Employees *and Executive Branch*

5  *Unclassified and Nonclassified Employees*.

6  I.  Annual Leave.  All full-time, nonelective unclassified legislative officials and employees

7  shall accumulate annual or biennial leave to the extent authorized for each position by the

8  appointing authority.  If, at the time of his separation from service, such an official or employee has

9  credit for unutilized annual leave time, he shall be paid for such time at the same rate he was

10  receiving at the time of his separation.

11  II.  Sick Leave.  All full-time, nonelective unclassified legislative officials and employees,

12  shall accumulate sick leave credit to the extent authorized for each position by the appointing

13  authority.  All unutilized sick leave credit shall lapse at the time of separation from service, except

14  that should such an official or employee die while in service, his estate shall be paid for any

15  unutilized sick leave credit at the same rate the official or employee was receiving at the time of his

16  death.

17  III.  Transfer of Credit*; Legislative*.  Any official or employee who transfers without a break

18  in service, from the classified service to a full-time, nonelective, unclassified legislative position may

19  transfer all the days of sick leave credit and annual leave credit that he has accumulated in the

20  classified service.  Any full-time, nonelective unclassified legislative official or employee who

21  transfers, without a break in service, to the classified service may transfer all the days of sick leave

22  credit and annual leave credit that he has accumulated in the unclassified service pursuant to this

23  section.  The rate of accrual for all sick and annual leave shall be the same as the rate immediately

24  prior to the transfer.

25  ***III-a.  Transfer of Credit; Executive.  Any official or employee who transfers without***

26  ***a break in service, from the classified service to an unclassified or nonclassified executive***

27  ***branch position shall retain all annual leave, sick leave, longevity pay, and bonus leave***

28  ***already accumulated in the classified system.  Such leave, longevity pay, and bonus time***

29  ***shall not be paid out until the employee's cessation of employment and shall be carried***

30  ***forward if the employee again transfers into the classified service.***

31  IV.  The appointing authority may deny compensation to any legislative official or employee

32  for any annual leave time or sick leave time taken in excess of annual leave time or sick leave time

33  accumulated pursuant to this section.

34  363  Terminal Pay.  RSA 94:9 is repealed and reenacted to read as follows:

35  94:9  Terminal Pay.

36  I.  Any full-time state official or employee other than those in the state classified system who

37  retires, resigns, dies in office, or is terminated as a result of not being reappointed, shall receive

1   upon such cessation of employment 3 days' salary for each year of employment in nonclassified or

2   unclassified service.

3        II.  Terminal Pay; Leave Time and Longevity Pay.  Any full-time state official or employee

4   other than those in the state classified system who retires, resigns, dies in service, or is terminated

5   shall receive termination pay that includes any unused annual leave, bonus leave, or longevity pay

6   accumulated from their service as member of the classified system.

7        III.  Terminal Pay; Sick Time.  Any full-time state official or employee other than those in

8   the state classified system who retires shall receive termination pay that includes unused sick leave

9   accumulated while a member of the classified system.  The calculation of such unclassified sick leave

10   payout shall be according to the calculations of sick leave upon termination of service of a

11   confidential classified employee as specified in the rules of the division of personnel.

12        IV.  The governor is authorized to draw warrants for the sums necessary to make the

13   payments under this section, which shall be a charge against the general fund or such special fund

14   as may be appropriate.

15        364  New Paragraph; Administrative Services; Rulemaking; Executive Branch Employees.

16   Amend RSA 21-I:14 by inserting after paragraph XVII the following new paragraph:

17        XVIII.  Employees serving in executive branch unclassified positions relating to:

18        (a)  Annual Leave;

19        (b)  Sick Leave;

20        (c)  Transfers between positions within the executive branch and across branches of state

21   government; and

22        (d)  Termination and payouts upon termination of employment.

23        365  Report; Executive Branch Employees.  The commissioner of the department of

24   administrative services shall report to the fiscal committee of the general court on the progress of

25   the adoption of administrative rules under RSA 21-I:14, XVIII, relating to employees serving in

26   executive branch unclassified positions, not later than April 30, 2022.

27        366  Abolished Positions.  All classified full-time positions which were vacant prior to July 1,

28   2018 and remain vacant as of July 1, 2021 shall be abolished on September 30, 2021.  Executive

29   branch agencies, as defined in RSA 9:1, shall identify such positions using the last vacancy report

30   from the state human resources system produced before June 30, 2021.  Positions on such report

31   that have been filled as of July 1, 2021, or for which and offer has been extended and accepted, shall

32   not be abolished.  Each executive agency shall prepare a list of positions to be abolished for

33   submission to the department of administrative services on or before September 1, 2021.  For each

34   position the list shall include the amounts appropriated by fiscal year for salary and benefits and the

35   source of funds for such appropriations.  The department of administrative services shall transfer

36   the unexpended general fund appropriations for the abolished positions to the salary adjustment

37   fund in RSA 99:4 and the benefit adjustment account in RSA 9:17-c.  The department of

Amendment to HB 2-FN-A-LOCAL
- Page 178 -

1　administrative services shall submit a report of the abolished positions and transferred
2　appropriations to the legislative fiscal committee by December 31, 2021.  Individual exceptions to
3　these provisions may be requested by any department in writing to the governor, and any such
4　exception granted by the governor shall be transmitted to the fiscal committee of the general court.
5　This section shall not apply to any positions at the department of health and human services which
6　the department intends to use toward meeting required budget reductions.

7　367  Appropriation: Department of Agriculture, Markets, and Food; Cost of Care Fund.  The sum
8　of $100,000 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of
9　agriculture, markets, and food to fund the cost of care fund established in RSA 437-B:1.  The
10　governor is authorized to draw a warrant for said sums out of any money in the treasury not
11　otherwise appropriated.

12　368  Effective Date.  Section 367 of this shall take effect on June 30, 2021.

13　369　Department of Agriculture, Markets, and Food; Disease Data Manager; Position
14　Established; Appropriation.

15　　　I.  There is hereby established with the department of agriculture, markets, and food, a Word
16　Processor I position.  Such position shall enter and compile test data needed to demonstrate to the
17　USDA that the state is performing adequate testing in order to maintain its status as a TB and
18　Brucellosis-free state.

19　　　II.  The sum of $53,000 for the fiscal year ending June 30, 2022, and the sum of $58,000 for
20　the fiscal year ending June 30, 2023, are hereby appropriated to the department of agriculture,
21　markets, and food for the purpose of funding the position in paragraph I.  The governor is authorized
22　to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

23　370  Department of Justice; Positions Established and Reclassified.

24　　　I.  Position Reclassification; Department of Justice.  The position of attorney II, position
25　#14956, transferred to the department of justice in fiscal year 2021 from the department of health
26　and human services accounting unit 05-95-95-952010-5680 to the department of justice accounting
27　unit 02-20-20-201010-2620 and fully funded by the department of health and human services, shall
28　be designated as an unclassified position.

29　　　II.  There is established within the department of justice the unclassified position of
30　assistant attorney general.  The salary for the position shall be set forth in RSA 94:1-c.

31　　　III.  Upon reclassification of the position and appointment of the assistant attorney general,
32　position #14956 shall be abolished to allow for the transition of its available appropriations into the
33　unclassified position of assistant attorney general.  Funding shall be transferred into the proper
34　unclassified expenditure class for the civil law accounting unit.  The incumbent in the abolished
35　position shall be offered the opportunity to seek the attorney general's nomination for the
36　unclassified position of assistant attorney general.

1    371  National Guard Enlistment Incentive Program.  The subdivision heading before RSA 160-

2    B:60 is repealed and reenacted to read as follows:

3                         National Guard Enlistment Incentive Program

4    372   National Guard Enlistment Incentive Program.   RSA 110-B:60-62 are repealed and

5    reenacted to read as follows:

6    110-B:60  New Hampshire National Guard Enlistment Incentive Program Established.  For the

7    purpose of encouraging enlistment in the national guard there is hereby established a New

8    Hampshire national guard enlistment incentive program.  This program authorizes a cash incentive

9    up to $500 to current members of the New Hampshire national guard in the pay grades of E-1 to O-3

10   or any former member of the New Hampshire national guard for each new or prior service recruit

11   that they bring into the New Hampshire national guard.

12   110-B:61  Revenue for Enlistment Incentive Program.

13        I.  There is hereby established a fund to be known as national guard enlistment incentive

14   program fund.  Any appropriations received shall be deposited in the fund.  Moneys in the fund and

15   any interest earned on the fund shall be used for the purpose of encouraging enlistment in the

16   national guard and shall not be used for any other purpose.  The adjutant general shall oversee

17   expenditures from the fund.  The moneys in the fund shall be nonlapsing.

18        II.  In addition to any moneys appropriated, the New Hampshire national guard enlistment

19   incentive program fund may consist of an annual appropriation, as determined by the general court,

20   to be awarded in accordance with written policies promulgated by the adjutant general under RSA

21   110-B:62.

22   110-B:62  Oversight and Administration.  The adjutant general shall adopt rules pursuant to

23   RSA 541-A relative to the administration of the enlistment incentive program and relative to its

24   execution by the New Hampshire Army and Air National Guard recruiting offices in coordination

25   with the department of military affairs and veterans services.

26   373  New Subparagraph; National Guard Enlistment Incentive Program Fund.  Amend RSA

27   6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

28        (365)  Moneys deposited in the national guard enlistment incentive program fund

29   established in RSA 110-B:61.

30   374  Reference to National Guard Scholarship Fund Removed.  Amend RSA 110-B:55, I to read

31   as follows:

32        I.  Fines may be paid to a military court or to an officer executing its process.  The amount of

33   any fine imposed may be noted upon any state roll or account for pay of the delinquent and deducted

34   from any pay or allowance due or thereafter to become due them, until said fine is liquidated; or the

35   same may be collected with lawful costs of collection, as in the case of executions issued in action

36   founded upon torts.  [Fines shall be paid over to the state treasurer and credited to the New

37   Hampshire national guard recruitment and retention scholarship fund under RSA 110-B:60.]

375  Reference to National Guard Scholarship Fund Removed.  Amend RSA 110-B:29 to read as follows:

110-B:29  Use of Armories or Other National Guard Facilities.

[I.]  All New Hampshire national guard facilities shall be primarily for the military duty, instruction, and training of the national and state guard and for the storage and maintenance of military property.  Other use of national guard facilities may be authorized by the adjutant general and shall be governed by rules and regulations promulgated under this section.

[II.  Rental fees for the use of national guard facilities shall be fixed by the adjutant general and shall be declared as revenue and paid to the adjutant general subject to the provisions of RSA 110-B:61.]

376  Repeal.  RSA 110-B:63, relative to the national guard scholarship program, is repealed.

377  Appropriation: Department of Military Affairs and Veterans Services; National Guard Enlistment Incentive Fund.  The sum of $25,000 for the fiscal year ending June 30, 2021 is hereby appropriated to the department of military affairs and veterans services to fund the national guard enlistment incentive fund established in RSA 110-B:61.  Such appropriation shall be nonlapsing.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

378  Effective Date.  Section 377 of this act shall take effect June 30, 2021.

379  Insurance Department; Positions Established.

I.  There is established within the insurance department the unclassified position of director of life and health.  The director of life and health shall be qualified to hold that position by reason of education and experience and shall perform such duties and exercise such powers as the commissioner may authorize.

II.  The salary of the director of life and health shall be determined after assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the position which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.  Upon completion of this action and appointment of the director of life and health, position #16733 shall be abolished to allow for the transition of this classified position within its available appropriations into the unclassified position of director of life and health.  Funding shall be transferred into a new expenditure class 011, within accounting unit 02-24-24-240010-2520.  The incumbent in the abolished position shall be offered the position of director of life and health.

III.  There is established within the insurance department the position of director of property and casualty.  The director of property and casualty shall be qualified to hold that position by reason of education and experience and shall perform such duties and exercise such powers as the commissioner may authorize.

IV.  The salary of the director of property and casualty shall be determined after assessment and review of the appropriate temporary letter grade allocation in RSA 94:1-a, I(b) for the position

1    which shall be conducted pursuant to RSA 94:1-d and RSA 14:14-c.  Upon completion of this action

2    and appointment of the director of property and casualty, position #19998 shall be abolished to allow

3    for the transition of this classified position with its available appropriations into the unclassified

4    position of director of property and casualty.  Funding shall be transferred into a new expenditure

5    class 011, within accounting unit 02-24-24-240010-2520.  The incumbent in the abolished position

6    shall be offered the position of director of property and casualty.

7        380  Insurance Department; Department Positions.  Amend RSA 400-A:6, VII to read as follows:

8        VII.  The commissioner shall appoint, as the commissioner's assistants, a director of financial

9    regulation, *a director of life and health,* a director of health economics, a director of health care

10    analytics, a general counsel, an insurance fraud director, a senior insurance fraud investigator, *a*

11    *director of property and casualty,* a property and casualty actuary, a chief property and casualty

12    actuary, a workers' compensation analyst, a chief life, accident and health actuary, a compliance and

13    enforcement counsel, a chief financial examiner, a communications director, and a health reform

14    coordinator, each of whom shall serve at the pleasure of the commissioner.  The director of financial

15    regulation, *director of life and health,* director of health economics, director of health care

16    analytics, general counsel, insurance fraud director, senior insurance fraud investigator, *director of*

17    *property and casualty,* property and casualty actuary, chief property and casualty actuary,

18    workers' compensation analyst, chief life, accident and health actuary, compliance and enforcement

19    counsel, chief financial examiner, communications director, and health reform coordinator, shall

20    perform such duties and exercise such powers as the commissioner may authorize.

21        381  Appropriation; Business Finance Authority; Grants to Regional Economic Development

22    Corporations.  The sum of $200,000 is hereby appropriated for the fiscal year ending June 30, 2022,

23    and the sum of $200,000 is hereby appropriated for the fiscal year ending June 30, 2023 to the

24    business finance authority for the purpose of providing equal grants to regional economic

25    development corporations in furtherance of the objectives set forth in RSA 162-A:1.  The governor is

26    authorized to draw a warrant for said sums out of any money in the treasury not otherwise

27    appropriated.  Funds appropriated to the authority under this section shall be excluded from the

28    repayment provisions of RSA 162-A:30.

29        382  Appropriation; Affordable Housing Fund.  The sum of $25,000,000 for the fiscal year ending

30    June 30, 2021, is hereby appropriated to the housing finance authority for deposit in the affordable

31    housing fund established in RSA 204-C:57, for the purpose of providing financing or state matching

32    funds for affordable housing.  The appropriation shall be in addition to any other funds appropriated

33    to the housing finance authority.  The governor is authorized to draw a warrant for said sum out of

34    any money in the treasury not otherwise appropriated.

35        383  Effective Date.  Section 382 of this act shall take effect June 30, 2021.

36        384  Department of Natural and Cultural Affairs; Bureau of Trails; Grant in Aid.

1      I.   For the biennium ending June 30, 2023 and notwithstanding any provision of law or

2  administrative rule to the contrary, the limitations on percentages of grant-in-aid administered by

3  the bureau of trails, division of parks and recreation, for the development and maintenance of OHRV

4  trails on private, state, federal, or municipal lands for the grant period of June 1, 2021 to May 31,

5  2022 shall be as follows:

6      (a)  90 percent of the cost of renting equipment required to complete a project.

7      (b)  90 percent of the cost of purchasing trail grooming equipment.

8      (c)  90 percent of the cost of reconditioning trail grooming equipment.

9      (d)  90 percent of the cost of operations for summer trail grading.

10     II.   Except as expressly provided above, all other administrative rules regarding the

11  administration of this grant in aid program remain in full force and effect.

12    385  Appropriation; Hampton Beach Area Commission.  The sum of $20,000 for the fiscal year

13  ending June 30, 2021 is hereby appropriated to the Hampton Beach area commission to be credited

14  to the Hampton Beach master plan fund under RSA 216-J:5 for the purpose of updating the

15  environmental components of the master plan.  The governor is authorized to draw a warrant for

16  said sum out of any money in the treasury not otherwise appropriated.

17    386  Effective Date.  Section 385 of this act shall take effect June 30, 2021.

18    387  Substance Abuse Enforcement Program; Appropriations.

19     I.  The sum of $587,700 for the fiscal year ending June 30, 2021 is hereby appropriated to the

20  department of safety.  This sum shall be expended as follows:

21      (a)  $171,600 shall be expended for the purpose of funding overtime at the state forensic

22  laboratory as a result of increased caseloads attributable to narcotics related enforcement and

23  investigations, with no more than 50 percent of the appropriation expended in each fiscal year of the

24  biennium ending June 30, 2023.

25      (b)  $416,100 shall be expended for the purpose of funding overtime at the state police for

26  narcotics related enforcement and investigations, with no more than 50 percent of the appropriation

27  expended in each fiscal year of the biennium ending June 30, 2023.

28     II.  The sum of $2,400,000 for the fiscal year ending June 30, 2021 is hereby appropriated to

29  the department of safety to disburse grants to county and local law enforcement agencies for the

30  purpose of funding overtime costs for county and local law enforcement officers performing law

31  enforcement activities attributable to the substance abuse enforcement program established in RSA

32  21-P:66.  No more than 50 percent of the appropriation shall be expended in each fiscal year of the

33  biennium ending June 30, 2023.

34     III.  The governor is authorized to draw a warrant for said sums out of any money in the

35  treasury not otherwise appropriated.

36     IV.  No appropriation made in this section shall lapse until June 30, 2023.

37    388  Effective Date.  Section 387 of this act shall take effect June 30, 2021.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 183 -**

389  Fire Standards and Training and Emergency Medical Services Fund; Appropriation.  There is hereby appropriated to the fire standards and training and emergency medical services fund established under RSA 21-P:12-d, the sums of $300,000 for the fiscal year ending June 30, 2022 and $300,000 for the fiscal year ending June 30, 2023.  The governor is authorized to draw a warrant for said sums out of any money in the treasury not otherwise appropriated.

390  Department of Safety; Appropriation.  There is hereby appropriated to the department of safety, division of fire standards and training and emergency medical services, the sums of $200,000 for the fiscal year ending June 30, 2022 and $200,000 for the fiscal year ending June 30, 2023.  Such sums shall be used for the purpose of funding additional part-time instruction or increasing the tuition discount provided to New Hampshire emergency service personnel for certain programs through administrative rulemaking.   Such appropriations shall be a charge against the fire standards and training and emergency medical services fund established pursuant to RSA 21-P:12-d.

391  General Fund Transfer to Highway Fund.  The sum of $50,000,000 for the fiscal year ending June 30, 2022, is hereby appropriated to the highway fund.  This appropriation shall not lapse.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

392  Appropriation; Department of Transportation.   There is hereby appropriated to the department of transportation the sum of $7,000,000 for the fiscal year ending June 30, 2021, for the purpose of the Conway Bypass right-of-way payback to the federal highway administration, understanding the department will continue to negotiate with the federal highway administration on a specific payback plan.  This appropriation shall not lapse.  The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

393  Effective Date.  Section 392 of this act shall take effect June 30, 2021.

394  Department of Transportation; Removal of Toll Booths.  Notwithstanding any provision of law to the contrary, the commissioner of the department of transportation shall remove the northbound and southbound toll booths on exit 10 on the F.E. Everett turnpike in the town of Merrimack.

395  Department of Transportation; Town of Tilton; Appropriation.

I.  The project named Tilton, project number 29753, to reconstruct and re-classify 1.97 miles of Calef Hill Road shall be added to the 10-year transportation improvement plan with engineering totaling $350,000 in fiscal year 2022 and construction totaling $2,900,000 for the biennium ending June 30, 2023.

II.  There is hereby appropriated $3,250,000 in the fiscal year ending June 30, 2022, to the department of transportation for funding the project identified in paragraph I.   The governor is authorized to draw a warrant for said sum out of any money in the treasury not otherwise appropriated.  Amounts appropriated under this section shall not lapse.

1    396   Appropriation; Department of Transportation.  There is hereby appropriated to the
2    department of transportation the sum of $5,000,000 for the fiscal year ending June 30, 2022 for the
3    purpose of leveraging federal discretionary grants on transportation projects with required state
4    cash match.  Such appropriation shall not lapse.  The governor is authorized to draw a warrant for
5    said sum out of any money in the treasury not otherwise appropriated.

6    397   Appropriation to the Department of Health and Human Services for Child Welfare
7    Behavioral Health Services.  Lapse Extension.  Amend 2019, 346:347 to read as follows:

8    346:347  Appropriation; Department of Health and Human Services; Child Welfare Behavioral
9    Health Services.  The sum of $6,084,000 for the fiscal year ending June 30, 2020, and the sum of
10    $13,164,000 for the fiscal year ending June 30, 2021, are hereby appropriated to the department of
11    health and human services for the purposes of sections 330-346 of this act.  ***The $13,164,000***
12    ***appropriation for fiscal year 2021 shall not lapse until June 30, 2022.***  Notwithstanding RSA
13    14:30-a, VI, the department may accept and expend any federal fund match to the appropriation in
14    this section without prior approval of this fiscal committee of the general court.  The governor is
15    authorized to draw a warrant for said sums out of any money in the treasury not otherwise
16    appropriated.

17    398  Effective Date.  Section 397 of this act shall take effect June 30, 2021.

18    399  Annual Report on State Mental Health Plan; Child Welfare Component.  Amend RSA 126-
19    A:5, XXXIII to read as follows:

20    XXXIII.***(a)***  On or before September 1, 2019, the commissioner shall submit a report on the
21    New Hampshire 10-year mental health plan of 2018 containing the priorities for implementation of
22    the plan to the oversight committee on health and human services, established under RSA 126-A:13,
23    the chairpersons of the house and senate policy committees with jurisdiction over health and human
24    services matters, the president of the senate, the speaker of the house of representatives, [and] the
25    governor***, and the office of the child advocate established in RSA 21-V***.  The commissioner
26    shall submit a report on or before September 1, 2020 and annually thereafter on the status of the
27    implementation of the 10-year mental health plan including, but not limited to, unmet benchmarks
28    and recommendations for any necessary barrier resolution or necessary adjustments or modifications
29    to the plan to better serve New Hampshire citizens, to the oversight committee on health and human
30    services and the chairpersons of the house and senate policy committees with jurisdiction over
31    health and human services matters.  The annual report shall include any recommendations by the
32    commissioner for legislation as needed or appropriate in achieving important benchmarks in fully
33    implementing the 10-year mental health plan.

34    ***(b)  As part of the annual report required by this paragraph, the commissioner***
35    ***of the department of health and human services, in conjunction with the commissioner of***
36    ***the department of education, shall issue a joint report on the implementation of 2019, 44***
37    ***(SB 14), relative to child welfare.  This portion of the report shall address in detail the***

1   *implementation status of each section of 2019, 44 (SB 14) and include all information*

2   *related to progress toward full implementation of a system of care under RSA 135-F.  The*

3   *report shall also address the following:*

4       *(1)   The total cost of children's behavioral health services.*

5       *(2)   The identification of barriers and service gaps in the array of children's*

6   *behavioral health services, along with a description of efforts and plans to fill those gaps.*

7       *(3)   The availability of mobile crisis and stabilization services in each part of*

8   *the state and plans to fill any gaps.*

9       *(4)   Changes to statutes, administrative rules, policies, practices, and*

10  *managed care and provider contracts which will be necessary to fully implement the*

11  *system of care.*

12      *(5)   Shortfalls in workforce sufficiency affecting full implementation of the*

13  *system of care as well as efforts and plans for addressing those shortfalls.*

14      *(6)   Numbers of children and youth awaiting services in various categories.*

15      *(7)   Plans to coordinate the system of care with existing efforts addressing*

16  *early childhood interventions, primary prevention, and primary care integration.*

17      *(8)   Plans to develop and/or coordinate a cross-system assessment tool and*

18  *data collection system to measure outcomes, including but not limited to status upon exit*

19  *from the system of care, measured treatment results, recidivism, and other returns to the*

20  *service system.*

21  400  Repeal.  RSA 135-F:6, relative to reporting requirements on the system of care for children's

22  mental health, is repealed.

23  401  System of Care for Children's Mental Health; Duties of the Commissioner of Health and

24  Human Services; Reference Change.  Amend the introductory paragraph of RSA 135-F:4, II to read

25  as follows:

26      II.  Develop a plan for full establishment and maintenance of a system of care.  Such plan

27  shall be reviewed and amended annually.  It shall include sufficient detail to allow compliance with

28  the reporting requirements of RSA [135-F:6] *126-A:5, XXXIII*, and shall address at least the

29  following elements:

30  402   System of Care for Children's Mental Health; Duties of the Commissioner of the

31  Department of Education; Reference Change.  Amend the introductory paragraph of RSA 135-F:5, II

32  to read as follows:

33      II.  Develop a plan for full support and participation of the department of education in the

34  establishment and maintenance of a system of care.  Such plan shall be reviewed and amended

35  annually.  It shall include sufficient detail to allow compliance with the reporting requirements of

36  RSA [135-F:6] *126-A:5, XXXIII*, and shall address at least the following elements:

**Amendment to HB 2-FN-A-LOCAL**
**- Page 186 -**

1     403   Department of Health and Human Services; Contracts and Procurement Unit; Positions
2 Established.  There are hereby established within the department of health and human services for
3 the biennium ending June 30, 2023, 8 full-time, classified positions in the office of business
4 operations, contracts and procurement unit.

5     404   Appropriation; Department of Health and Human Services; Contracts and Procurement
6 Unit.  The sum of $644,260 for the fiscal year ending June 30, 2022, and the sum of $810,607 for the
7 fiscal year ending June 30, 2023, are hereby appropriated to the department of health and human
8 services for the purpose of funding positions in the office of business operations, contracts and
9 procurement unit.  The governor is authorized to draw a warrant for said sums out of any money in
10 the treasury not otherwise appropriated.

11     405   Duties of the Department of Health and Human Services; Administration of State Food
12 Stamp Program; Reference to SNAP (Supplemental Nutrition Assistance Program) Added.  Amend
13 RSA 161:2, XIII to read as follows:

14     XIII. Food Stamp Program.  Develop and administer a food stamp program within the state*,*
15 ***also known as SNAP, the Supplemental Nutritional Assistance Program,*** under the
16 provisions of the Federal Food Stamp Act of 1964, as amended, and in accordance with Federal
17 Regulations duly promulgated by the United States Department of Agriculture and the United
18 States Department of Health, Education and Welfare.

19     ***XIII-a.  SNAP Incentive Programs.  Implement SNAP incentive programs enabling***
20 ***beneficiaries of the federal Supplemental Nutrition Assistance Program to receive a dollar-***
21 ***for-dollar match for fresh fruits and vegetables, with an emphasis on locally grown, at***
22 ***participating farmer's markets, farm stands, mobile markets, community supported***
23 ***agriculture sites, grocery stores, or other participating direct food retailers.***

24     406   New Paragraph; Department of Health and Human Services; Rulemaking.  Amend RSA
25 161:4-a by inserting after paragraph XI the following new paragraph:

26     XI-a. The implementation of SNAP incentive programs under RSA 161:2, XIII-a.

27     407   Department of Health and Human Services; Appropriation.  The sum of $150,000 for the
28 biennium ending June 30, 2023 is hereby appropriated to the department of health and human
29 services for the SNAP incentive programs under RSA 161:2, XIII-a.  The governor is authorized to
30 draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

31     408   Prospective Repeal Regarding Eligibility for Services Extended.  Amend 2011, 209:6, I, as
32 amended by 2013, 140:1, I, as amended by 2015, 276:41, I, as amended by 2017, 156:85, I, as
33 amended by 2019, 346:61, I, to read as follows:

34     I. Section 5 of this act shall take effect July 1, [2021] ***2023***.

35     409   New Paragraph; Rulemaking; Exception Added; Cost-of-living Adjustment.  Amend RSA
36 541-A:21 by inserting after paragraph III-a the following new paragraph:

1    III-b.  Rules adopted relative to the cost of living adjustment in social security benefits
2  contained within the Social Services Block Grant program shall be exempt from the provisions of
3  RSA 541-A:5 through RSA 541-A:14, provided that recipients receive proper notice that the income
4  level has been adjusted.

5    410  Eligibility for Home and Community-Based Services; Suspension.  RSA 151-E:18, regarding
6  presumptive eligibility for home and community-based services, shall be suspended for the biennium
7  ending June 30, 2023.

8    411  Social Security Act Waiver Programs; Committee Established.

9    I.  There is established a committee to study achieving parity in reimbursement among
10  organizations that provide Social Security Act Section 1915(c) waiver programs.  The members of the
11  committee shall be as follows:

12        (a)  Two members of the senate finance committee, one of whom shall be from the
13  majority party and one of whom shall be from the minority party, appointed by the president of the
14  senate.

15        (b)  Two members of the house of representatives finance committee, one of whom shall
16  from the majority party and one of whom shall be from the minority party, appointed by the speaker
17  of the house of representatives.

18    II.  Members of the committee shall receive mileage at the legislative rate when attending to
19  the duties of the committee.

20    III.(a)  The committee shall examine the issue of achieving parity in reimbursement among
21  organizations that provide services under Social Security Act Section 1915(c) waiver programs and
22  the potential solutions and impact of such reimbursement parity on the state and its counties, the
23  contracting organizations, and clients.

24        (b)  The study shall include a comparison between all Social Security Act Section 1915(c)
25  waiver reimbursements, including reimbursement for providers in the following program areas:
26  choices for independence, developmental services, in-home support, and acquired brain disorder
27  services.

28    IV.  The committee shall meet in duly noticed public meetings, take testimony when the
29  committee determines it is appropriate, and may accept and solicit information from any person or
30  entity the committee deems relevant to its study.

31    V.  The members of the study committee shall elect a chairperson from among the members.
32  The first meeting of the committee shall be called by the first-named senate member.  The first
33  meeting of the committee shall be held within 45 days of the effective date of this section.  Three
34  members of the committee shall constitute a quorum.

35    VI.  The committee shall report its findings and any recommendations for proposed
36  legislation to the president of the senate, the speaker of the house of representatives, the senate
37  clerk, the house clerk, the governor, and the state library on or before November 15, 2022.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 188 -**

1     412   Appropriation; Department of Health and Human Services; Transitional Housing Beds.
2 There is hereby appropriated to the department of health and human services the sum of $6,000,000
3 for the fiscal year ending June 30, 2021, which shall be nonlapsing until June 30, 2023, for the
4 purposes of increasing rates paid for transitional housing beds and for funding new transitional
5 housing beds for forensic patients and/or patients with complex behavioral health conditions
6 including those transitioning from the New Hampshire hospital.  In addition, any unspent funds
7 from the appropriation made under 2019, 346:221 may be used for the purposes of this section.  The
8 governor is authorized to draw a warrant for said sum out of any money in the treasury not
9 otherwise appropriated.

10     413   Effective Date.  Section 412 of this act shall take effect June 30, 2021.

11     414   Health and Human Services; State Loan Repayment Program.  Of the funds appropriated to
12 account 05-95-90-901010-7965, Rural Health & Primary Care, class 103 for the biennium ending
13 June 30, 2021, $1,533,566 shall not lapse until June 30, 2023 and shall be treated as restricted
14 revenue for the purpose of funding the state loan repayment program.  The department of health
15 and human services is authorized to accept and expend any matching federal funds for the purposes
16 of this section without prior approval of the fiscal committee of the general court.

17     415   Effective Date.  Section 414 of this act shall take effect June 30, 2021.

18     416   Department of Health and Human Services; Division of Medicaid Services.  Any funds
19 appropriated to activity 05-95-47-470010, division of medicaid services, for the biennium ending
20 June 30, 2021 shall not lapse until June 30, 2023, and shall be treated as restricted revenue for the
21 purpose of funding expenditures in account 05-95-47-470010-7948, medicaid care management.  The
22 department of health and human services is authorized to accept and expend any matching federal
23 funds for the purposes of this section without prior approval of the fiscal committee of the general
24 court.

25     417   Effective Date.  Section 416 of this act shall take effect June 30, 2021.

26     418   Appropriation; Department of Health and Human Services.  There is hereby appropriated to
27 the department of health and human services the sum of $30,000,000 for the fiscal year ending June
28 30, 2021 for the purpose of constructing a 24-bed forensic psychiatric hospital.   The sum
29 appropriated shall be nonlapsing, provided that any unexpended amount following construction shall
30 lapse to the general fund.  The governor is authorized to draw a warrant for said sum out of any
31 money in the treasury not otherwise appropriated.

32     419   Effective Date.  Section 418 of this act shall take effect June 30, 2021.

33     420   Waiver/Nursing Facility Payments.

34        I.  Notwithstanding RSA 167:18-a or any other provision of law to the contrary, any funds
35 appropriated to activity 05-95-48-482010, waiver and nursing facilities, for the biennium ending
36 June 30, 2021 shall not lapse until June 30, 2023, and shall be treated as restricted revenue for the
37 purpose of funding expenditures contained in the operating budget for the fiscal year ending June

1    30, 2022  in account 05-95-48-482010-2152, waiver/nursing facility payments – county participation.
2    The department of health and human services is authorized to accept and expend any matching
3    federal funds for the purposes of this section without prior approval of the fiscal committee of the
4    general court.

5    421  Effective Date.  Section 420 of this act shall take effect June 30, 2021.

6    422  Home Visiting Program.  Amend RSA 167:68-a to read as follows:

7    167:68-a  Home Visiting Programs.  Home visiting programs for children and their families
8    established pursuant to this subdivision shall be made available to all Medicaid eligible [children
9    and] pregnant women*, infants, and families with children up to age one,* without restriction.
10   The commissioner shall adopt rules, pursuant to RSA 541-A, relative to administering this section.

11   423  Rulemaking; Home Visiting Program.  Amend RSA 167:3-c, XV to read as follows:

12   XV.  Procedures for making the home visiting program available to all Medicaid eligible
13   [children and] pregnant women*, infants, and families with children up to age one* pursuant to
14   RSA 167:68, II(e).

15   424  Graduate Medical Education Payments Suspended.  The commissioner of the department of
16   health and human services shall submit a Title XIX Medicaid state plan amendment to the federal
17   Centers for Medicare and Medicaid Services to suspend the provision of direct and indirect graduate
18   medical education payments to hospitals as provided in 42 C.F.R. section 413.75 for the biennium
19   ending June 30, 2023.  Upon approval of the state plan amendment, and as of the effective date of
20   the state plan amendment, any obligations for payment of direct and indirect graduate medical
21   education shall be suspended for the biennium ending June 30, 2023.

22   425  Department of Health and Human Services; Juvenile Diversion; Supplemental
23   Appropriation.  The sum of $300,000 for the fiscal year ending June 30, 2022, and the sum of
24   $300,000 for the fiscal year ending June 30, 2023 are hereby appropriated to the department of
25   health and human services for the purpose of extending existing grants to the certified juvenile
26   diversion providers who provide diversion services pursuant to RSA 169-B:10.  Any unexpended
27   funds remaining from the appropriation made in 2019, 346:371 shall not lapse and may be used for
28   the purposes of this section.  The governor is authorized to draw a warrant for said sums out of any
29   money in the treasury not otherwise appropriated.

30   426  New Paragraph; Delinquent Children; Juvenile Diversion.  Amend RSA 169-B:10 by
31   inserting after paragraph II-a the following new paragraph:

32   II-b.  Consistent with the referral procedures established pursuant to paragraph II-a, the
33   department of health and human services, division for children, youth and families, shall have the
34   authority establish procedures for the state-funded diversion programs.

35   427  Statement of Purpose.  To improve overall health, promote savings in the state's Medicaid
36   managed care program, and prevent future health conditions caused by oral health problems, and
37   based on the recommendation of the working group convened pursuant to 2019, 346:225, the general

Amendment to HB 2-FN-A-LOCAL
- Page 190 -

1    court hereby determines that it is in the best interest of the state of New Hampshire to extend

2    dental benefits under the Medicaid managed care program to individuals 21 years of age and over.

3         428  New Paragraph; Medicaid Managed Care Program; Dental Benefits.  Amend RSA 126-A:5

4    by inserting after paragraph XIX the following new paragraph:

5         XIX-a.(a)(1)  The commissioner shall pursue contracting options to administer the state's

6    Medicaid dental program with the goals of improving access to dental care for Medicaid populations,

7    improving health outcomes for Medicaid enrollees, expanding the provider network, increasing

8    provider capacity, and retaining innovative programs that improve access and care through a value-

9    based care model.

10         (2)  The commissioner shall issue a request for information to assist in selecting the

11    administrative model for the state's Medicaid dental program.  Such model shall be either a model

12    administered by a dental managed care organization or a model administered by the state's current

13    medical managed care organizations.  The commissioner shall obtain the requested information from

14    both the current medical managed care organizations and any interested dental managed care

15    organization.  The administrative model selected shall demonstrate the greatest ability to satisfy the

16    state's need for value, quality, efficiency, innovation, and savings.  The request for information shall

17    be released no later than November 1, 2021.  The request for information shall address improving

18    health outcomes, expanding the provider network, increasing capacity of providers, integrating a

19    value-based care model, and exploring innovative programs for children and adults.

20         (3)  If the model administered by a dental managed care organization is selected, the

21    commissioner shall issue a 2-year request for proposals, with 2 optional one-year extensions, to enter

22    into contracts with the vendor that demonstrates the greatest ability to satisfy the state's need for

23    value, quality, efficiency, innovation, and savings.  The state plan amendment shall be submitted to

24    the Centers for Medicare and Medicaid Services (CMS) within the quarter of the program effective

25    date.  Implementation of a procured contract shall begin January 1, 2023 for the adult benefit.  The

26    department, in consultation with oral health stakeholders, will determine the value of

27    implementation of the pediatric dental benefit in a value-based benefit plan.  Implementation of the

28    pediatric benefit will occur on a date that follows the successful implementation of the adult dental

29    benefit.  The commissioner shall establish a capitated rate for the appropriate model for the contract

30    that is full risk to the vendor.  In contracting for a dental managed care model and the various rate

31    cells, the department shall ensure no reduction in the quality of care of services provided to enrollees

32    in the managed care model and shall exercise all due diligence to maintain or increase the quality of

33    care provided.  The department shall seek, with the review of the fiscal committee of the general

34    court, all necessary and appropriate state plan amendments and waivers to implement the

35    provisions of this paragraph.  The program shall not commence operation until such state plan

36    amendments or waivers have been approved by CMS.  All necessary state plan amendments and

37    waivers shall be submitted within the quarter of the program effective date.

1        (4)   The commissioner shall adopt rules, pursuant to RSA 541-A, if necessary, to
2   implement the provisions of this paragraph.

3        (b)   Any vendor awarded a contract pursuant to this paragraph shall provide the
4   required dental services to children with an implementation date to be determined by the
5   department after the successful implementation of the adult benefit and the following dental
6   services to individuals 21 years of age and over, reimbursed under the United States Social Security
7   Act, Title XIX, or successors to it:

8        (1)   Preventive dental services including examinations, necessary x-rays or other
9   imaging, prophylaxis, topical fluoride, oral hygiene instruction, behavior management and smoking
10   cessation counseling, and other services as determined by the commissioner.

11        (2)  Restorative treatment to restore tooth form and function.

12        (3)   Periodontal treatment and oral and maxillofacial surgery to relieve pain,
13   eliminate infection, or prevent imminent tooth loss.

14        (4)  Removable prosthodontics to replace missing teeth subject to medical necessity.

15        (c)   In this paragraph, "dental managed care organization" means any dental care
16   organization, dental service organization, health insurer, or other entity licensed under Title
17   XXXVII, that provides, directly or by contract, dental care services covered under this paragraph
18   rendered by licensed providers and that meets the requirements of Title XIX or Title XI of the
19   federal Social Security Act.

20   429  Dental Benefit; Appropriation.  The sum of $1,460,000 is hereby appropriated to the
21   department of health and human services for the fiscal year ending June 30, 2023 for the purposes of
22   implementing the dental benefit described in section 428 of this act.  The governor is authorized to
23   draw a warrant for said sum out of any money in the treasury not otherwise appropriated.  The
24   department is authorized to accept and expend matching federal funds for the purposes of this
25   program without prior approval of the fiscal committee of the general court.

26   430  Home Visiting Programs; Limitation.  The home visiting programs available to all Medicaid
27   eligible children and pregnant women as required by RSA 167:68-a, shall be subject and limited to
28   available appropriations for the biennium ending June 30, 2023.

29   431  Department of Health and Human Services; Income Eligibility for "In and Out Medical
30   Assistance;" Suspension.  Chapter 39:1 Laws of 2020 requiring the department of health and human
31   services to amend the income standard used for eligibility for the "in and out medical assistance"
32   policy, shall be suspended for the biennium ending June 30, 2023.

33   432  Medicaid to Schools Program; Fiscal Committee Approval of Supplemental Funding.  For
34   the biennium ending June 30, 2023, in the event funds appropriated in accounting unit 05-95-47-
35   0010-7207 Medicaid to schools are insufficient, the department of health and human services may
36   accept and expend additional federal funds with the prior approval of the fiscal committee of the
37   general court.  Any request to the fiscal committee shall include a detailed explanation of the types

1  of assistance the department is providing to school districts to ensure eligibility for reimbursement

2  under the Medicaid to schools program.

3      433   Appropriation; Department of Health and Human Services; Grants to Support Senior

4  Centers; Supports for Mental Health and Social Isolation.   There is hereby appropriated to the

5  department of health and human services the sum of $1,500,000, for the fiscal year ending June 30,

6  2021, for the purpose of providing grants to senior centers or other organizations serving senior

7  citizens for purposes of supporting services to combat struggles with mental health and social

8  isolation.  This appropriation shall not lapse until June 30, 2023.   The governor is authorized to

9  draw a warrant for said sum out of any money in the treasury not otherwise appropriated.

10      434  Effective Date.  Section 433 of this act shall take effect June 30, 2021.

11      435   New Hampshire Veterans' Home; Appropriation.   The sum of $80,000 for the fiscal year

12  ending June 30, 2021 is hereby appropriated to the veterans' home for the purpose of funding the

13  veterans' home master plan update.  The governor is authorized to draw a warrant for said sums out

14  of any money in the treasury not otherwise appropriated and the appropriation shall not lapse until

15  June 30, 2023.

16      436  Effective Date.  Section 435 of this act shall take effect June 30, 2021.

17      437  Appropriation; Lottery Commission.  There is hereby appropriated to the lottery commission

18  the sum of $2,715,000 for the fiscal year ending June 30, 2021 for the purpose of paying the total

19  principal balance on the commercial mortgage on its headquarters building.   The governor is

20  authorized to draw a warrant for said sum out of any money in the treasury not otherwise

21  appropriated.  Any unexpended amount of the appropriation shall lapse to the general fund on June

22  30, 2022.

23      438  Effective Date.  Section 437 of this act shall take effect June 30, 2021.

24      439  Keno License; Fee.  Amend RSA 284:44, I to read as follows:

25      I. The license fee for a commercial premises keno license issued under RSA 284:46 shall be

26  [$500] *$100* per year.   Such fee shall be submitted to the lottery commission at the time the

27  application is made and shall be refunded if the application is denied.

28      440   Pari-Mutuel Pools on Historic Horse Races; Date Change to May 1, 2021.  Amend RSA

29  284:22-b, II to read as follows:

30      II.  In order to be eligible for a license to sell pari-mutuel pools on historic races, an applicant

31  shall have been game operator employer licensed under RSA 287-D as of May 1, [2020] *2021* and

32  still licensed as of the effective date of this section, provided such sales are within the enclosure of a

33  facility at which the licensee holds its licensed activities under RSA 287-D, and that such facility is

34  located within the city or town in which the licensee held its license on May 1, [2020] *2021*.   An

35  application that is approved by the lottery commission, and a license that is granted shall not be

36  permitted to be transferred or sold.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 193 -**

1    441  Applicability.  Section 440 of this act shall take effect one minute after the effective date of

2    HB626-FN of the 2021 regular legislative session.  If HB626-FN does not become law, section 440 of

3    this act shall not take effect.

4    442  Effective Date.

5        I.  Section 440 of this act shall take effect as provided in section 441 of this act.

6        II.  Section 441 of this act shall take effect upon its passage.

7    443  Governor's Scholarship Fund; Appropriation.  The sum of $6,000,000 for the fiscal year

8    ending June 30, 2021 is hereby appropriated to the governor's scholarship fund established under

9    RSA 195-H:12.  Such funds shall not lapse.  The governor is authorized to draw a warrant for said

10    sum out of any money in the treasury not otherwise appropriated.

11    444  Effective Date.  Section 443 of this act shall take effect June 30, 2021.

12    445  New Chapter; Education Freedom Accounts.  Amend RSA by inserting after chapter 194-D

13    the following new chapter:

CHAPTER 194-E

EDUCATION FREEDOM ACCOUNTS

16    194-E:1  Definitions.  In this chapter:

17        I.  "Adequate education grant" means the grant calculated under RSA 198:41.

18        II.  "Curriculum" means the lessons and academic content taught in a specific course,

19    program, or grade level.

20        III.  "Department" means the department of education.

21        IV.  "Education freedom account" or "EFA" means the account to which funds are allocated

22    by the scholarship organization to the parent of an EFA student in order to pay for qualifying

23    education expenses to educate the EFA student under this chapter.

24        V.  "Education service provider" means a person or organization that receives payments from

25    education freedom accounts to provide educational goods and services to EFA students.

26        VI.  "Eligible student" means a resident of this state who is eligible to enroll in a public

27    elementary or secondary school and whose annual household income at the time the student applies

28    for the program is less than or equal to 300 percent of the federal poverty guidelines as updated

29    annually in the Federal Register by the United States Department of Health and Human Services

30    under 42 U.S.C. section 9902(2).  No income threshold need be met in subsequent years, provided the

31    student otherwise qualifies.  Students in the special school district within the department of

32    corrections established in RSA 194:60 shall not be eligible students.

33        VII.  "EFA student" means an eligible student who is participating in the EFA program.

34        VIII.  "Full-time" means more than 50 percent of instructional time.

35        IX.  "Remote or hybrid" shall mean any public school that is not providing instruction in-

36    person where the student or the educator are both not physically present in the traditional

37    classroom due to full-time or part-time classroom closure.

X. "Parent" means a biological or adoptive parent, legal guardian, custodian, or other person with legal authority to act on behalf of an EFA student.

XI. "Program" means the education freedom account program established in this chapter.

XII. "Scholarship organization", means a scholarship organization approved under RSA 77:G, that administers and implements the EFA Act.

194-E:2  Program.

I.  The commissioner of the department of education shall transfer to the scholarship organization the per pupil adequate education grant amount under RSA 198:40-a, plus any differentiated aid that would have been provided to a public school for that eligible student.  The transfers shall be made in accordance with the distribution of adequate education grants under RSA 198:42.

II.  Parents of an EFA student shall agree to use the funds deposited in their student's EFA only for the following qualifying expenses to educate the EFA student:

(a)  Tuition and fees at a private school.

(b)  Tuition and fees for non-public online learning programs.

(c)  Tutoring services provided by an individual or a tutoring facility.

(d)  Services contracted for and provided by a district public school, chartered public school, public academy, or independent school, including, but not limited to, individual classes and curricular activities and programs.

(e)  Textbooks, curriculum, or other instructional materials, including, but not limited to, any supplemental materials or associated online instruction required by either a curriculum or an education service provider.

(f)  Computer hardware, Internet connectivity, or other technological services and devices, that are primarily used to help meet an EFA student's educational needs.

(g)  Educational software and applications.

(h)  School uniforms.

(i)  Fees for nationally standardized assessments, advanced placement examinations, examinations related to college or university admission or awarding of credits and tuition and/or fees for preparatory courses for such exams.

(j)  Tuition and fees for summer education programs and specialized education programs.

(k)  Tuition, fees, instructional materials, and examination fees at a career or technical school.

(l)  Educational services and therapies, including, but not limited to, occupational, behavioral, physical, speech-language, and audiology therapies.

(m)  Tuition and fees at an institution of higher education.

(n)  Fees for transportation paid to a fee-for-service transportation provider for the student to travel to and from an education service provider.

(o)  Any other educational expense approved by the scholarship organization.

III.  The funds in an EFA may only be used for educational purposes in accordance with paragraph II.

IV.  EFA funds shall not be refunded, rebated, or shared with a parent or EFA student in any manner.  Any refund or rebate for goods or services purchased with EFA funds shall be credited directly to the student's EFA.

V.  Parents may make payments for the costs of educational goods and services not covered by the funds in their student's EFA.  However, personal deposits into an EFA shall not be permitted.

VI.  Funds deposited in an EFA shall not constitute taxable income to the parent or the EFA student.

VII.  An EFA shall remain in force, and any unused funds shall roll over from quarter-to-quarter and from year-to-year until the parent withdraws the EFA student from the EFA program or until the EFA student graduates from high school, unless the EFA is closed because of a substantial misuse of funds.  Any unused funds shall revert to the education trust fund established in RSA 198:39 and be allocated to fund other EFAs.

VIII.  Nothing in this chapter shall be construed to require that an EFA student must be enrolled, full- or part-time, in either a private school or nonpublic online school.

IX.  A home education program pursuant to RSA 193-A:5 is terminated upon the commencement of a student's participation in an EFA program.  A parent shall provide notification pursuant to RSA 193-A:5 when a student starts participating in an EFA program.

194-E:3  Application for an Education Freedom Account.

I.  A parent may apply to the scholarship organization to establish an EFA for an eligible student.  The scholarship organization shall accept and approve applications for the fall and spring semesters each year and shall establish procedures for approving applications in an expeditious manner.

II.  The scholarship organization shall create a standard form that parents can submit to establish their student's eligibility for the EFA program and shall ensure that the application is publicly available and may be submitted through various sources, including the Internet.

III.  The scholarship organization shall approve an application for an EFA if:

(a)  The parent submits an application for an EFA in accordance with application procedures established by the scholarship organization.

(b)  The student on whose behalf the parent is applying is an eligible student.

(c)  Funds are available for the EFA.

(d)  The parent signs an agreement with the scholarship organization:

(1)  To provide an education for the eligible student in the core knowledge domains that include science, mathematics, language, government, history, health, reading, writing, spelling,

1    the history of the constitutions of New Hampshire and the United States, and an exposure to and

2    appreciation of art and music.

3             (2)  Not to enroll the eligible student as a full-time student in their resident district

4    public school while participating in the EFA program.

5             (3)  To provide an annual record of educational attainment by:

6             (A)  Having the student take a nationally-standardized, norm-referenced

7    achievement test and to provide the results to the scholarship organization by the end of each school

8    year which the scholarship organization shall make available to the department as aggregate scores;

9    or

10             (B)  Having the student take the statewide student assessment test pursuant to

11    RSA 193-C:6; or

12             (C)  Maintaining a portfolio including, but not limited to, a log which designates

13    by title the reading materials used; samples of writings, worksheets, workbooks, or creative

14    materials used or developed by the student.  The parent shall have a certified teacher or a teacher

15    currently teaching in a nonpublic school, who is selected by the parent, evaluate the student's

16    educational progress upon review of a portfolio and discussion with the parent or student.

17             (4)  To use the funds in the EFA only for qualifying expenses to educate the eligible

18    student as established by the EFA program.

19             (5)  To comply with the rules and requirements of the EFA program.

20        IV.  The signed agreement between the parent and the scholarship organization shall satisfy

21    the compulsory school attendance requirements of RSA 193:1.

22        V.  The scholarship organization shall annually renew a student's EFA if funds are available.

23        VI.  Upon notice to the scholarship organization, an EFA student may choose to stop

24    receiving EFA funding and enroll full-time in a public school.

25        (a)  Enrolling as a full-time student in the resident district public school shall result in

26    the immediate suspension of payment of additional funds into the student's EFA.  However, an EFA

27    that has been open for at least one full school year shall remain open and active for the parent to

28    make qualifying expenditures to educate the student from funds remaining in the EFA.  When no

29    funds remain in the student's EFA, the scholarship organization may close the EFA.

30        (b)  If an eligible student decides to return to the EFA program, payments into the

31    student's existing EFA may resume if the EFA is still open and active.  A new EFA may be

32    established if the student's EFA was closed.

33        194-E:4  Authority and Responsibilities of the Scholarship Organization.  The scholarship

34    organization shall have the following additional duties, obligations, and authority:

35        I. The scholarship organization shall maintain an updated list of education service providers

36    and shall ensure that the list is publicly available through various sources, including the Internet.

II.   The scholarship organization shall provide parents with a written explanation of the allowable uses of EFA funds, the responsibilities of parents, the duties of the scholarship organization, and the role of any financial management firms that the scholarship organization may contract with to administer any aspect of the EFA program.

III.   The scholarship organization shall ensure that parents of students with disabilities receive notice that participation in the EFA program is a parental placement under 20 U.S.C. section 1412, Individuals with Disabilities Education Act (IDEA), along with an explanation of the rights that parentally placed students possess under IDEA and any applicable state laws.

IV.   The scholarship organization shall, in cooperation with the department, determine eligibility for differentiated aid subject to any applicable state and federal laws.

V.   The scholarship organization may withhold from deposits or deduct from EFAs an amount to cover the costs of administering the EFA program, up to a maximum of 10 percent annually.

VI.  The scholarship organization shall implement a commercially viable system for payment of services from EFAs to education service providers by electronic or online funds transfer.

(a)   The scholarship organization shall not adopt a system that relies exclusively on requiring parents to be reimbursed for out-of-pocket expenses, but rather shall provide maximum flexibility to parents by facilitating direct payments to education service providers.  Scholarship organizations may pre-approve requests for reimbursements for qualifying expenses, including expenses pursuant to RSA 194-E:2, II, but shall not disperse funds to parents without receipt that such pre-approved purchase has been made.

(b) A scholarship organization may contract with a private institution or organization to develop the payment system.

VII.  The scholarship organization may also seek to implement a commercially viable system for parents to publicly rate, review, and share information about education service providers, ideally as part of the same system that facilitates the electronic or online funds transfers.

VIII.  If an education service provider requires partial payment of tuition or fees prior to the start of the academic year to reserve space for an EFA student admitted to the education service provider, such partial payment may be paid by the scholarship organization, if funds are available, prior to the start of the school year in which the EFA is awarded and deducted in an equitable manner from subsequent quarterly EFA deposits to ensure adequate funds remain available throughout the school year; but if an EFA student decides not to use the education service provider, the partial reservation payment shall be returned to the scholarship organization by such education service provider and credited to the student's EFA.

IX. The scholarship organization shall continue making deposits into a student's EFA until:

(a)   The scholarship organization determines that the EFA student is no longer an eligible student.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 198 -**

1    (b)  The scholarship organization determines that there was substantial misuse of the
2  funds in the EFA.

3    (c)  The parent or EFA student withdraws from the EFA program.

4    (d)  The EFA student enrolls full-time in the resident district public school.

5    (e)  The EFA student graduates from high school.

6    X.  The scholarship organization may conduct or contract for the auditing of individual EFAs,
7  and shall at a minimum conduct random audits of EFAs on an annual basis.

8    XI.  The scholarship organization may make any parent or EFA student ineligible for the
9  EFA program in the event of intentional and substantial misuse of EFA funds.

10    (a)  The scholarship organization shall create procedures to ensure that a fair process
11  exists to determine whether an intentional and substantial misuse of EFA funds has occurred.

12    (b)  If an EFA student is free from personal misconduct, that student shall be eligible for
13  an EFA in the future if placed with a new guardian or other person with the legal authority to act on
14  behalf of the student.

15    (c)  The scholarship organization may refer suspected cases of intentional and
16  substantial misuse of EFA funds to the attorney general for investigation if evidence of fraudulent
17  use of EFA funds is obtained.

18    (d)  A parent or EFA student may appeal the scholarship organization's decision to deny
19  eligibility for the EFA program to the department.

20    XII.  The scholarship organization may bar an education service provider from accepting
21  payments from EFAs if the scholarship organization determines that the education service provider
22  has:

23    (a)  Intentionally and substantially misrepresented information or failed to refund any
24  overpayments in a timely manner.

25    (b)  Routinely failed to provide students with promised educational goods or services.

26    XIII.  The scholarship organization shall create procedures to ensure that a fair process
27  exists to determine whether an education service provider may be barred from receiving payments
28  from EFAs.

29    (a)  If the scholarship organization bars an education service provider from receiving
30  payments from EFAs, it shall notify parents and EFA students of its decision as quickly as possible.

31    (b)  Education service providers may appeal the scholarship organization's decision to bar
32  them from receiving payments from the EFA to the department.

33    XIV.  The scholarship organization may accept gifts and grants from any source to cover
34  administrative costs, to inform the public about the EFA program, or to fund additional EFAs.

35    XV.  The department shall adopt rules that are necessary for the administration of this
36  chapter.

XVI.  The scholarship organization shall adopt policies or procedures that are necessary for the administration of this chapter.  This may include policies or procedures:

(a)  Establishing or contracting for the establishment of an online anonymous fraud reporting service.

(b)  Establishing an anonymous telephone number for fraud reporting.

(c)  Requiring a surety bond for education service providers receiving more than $100,000 in EFA funds.

(d)  Refunding payments from education service providers to EFAs.

(e)  Ensuring appropriate use and rigorous oversight of all funds expended under this program.

XVII.  The scholarship organization shall not exclude, discriminate against, or otherwise disadvantage any education provider with respect to programs or services under this section based in whole or in part on the provider's religious character or affiliation, including religiously based or mission-based policies or practices.

194-E:5  Parent and Education Service Provider Advisory Commission.

I.  There is established the parent and education service provider advisory commission to assist the scholarship organization by providing recommendations about implementing, administering, and improving the EFA program.

II.  The commission shall consist of 7 members who shall be parents of EFA students or education service providers and shall represent no fewer than 4 counties in the state.  The members shall be appointed by the director of the scholarship organization and serve at the director's pleasure for one calendar year after which they may be reappointed.  The director of the scholarship organization, or designee, shall serve as a non-voting chairperson of the commission.  The commissioner of the department of education, or designee, shall serve as a non-voting member of the commission.

III.  The scholarship organization may request the commission to meet, in person or virtually, to review appeals of education service provider denials pursuant to RSA 194-E:4, XI and to provide a recommendation to the scholarship organization as to whether an education service provider should be allowed to receive, or continue receiving, payments from EFAs.

194-E:6  Requirements for Education Service Providers.

I.  The scholarship organization may approve education service providers on its own initiative, at the request of parents, or by notice to the scholarship organization provided by prospective education service providers.

II.  A prospective education service provider that wishes to receive payments from EFAs shall:

(a)  Submit notice to the scholarship organization that it wishes to receive payments from EFAs.

Amendment to HB 2-FN-A-LOCAL
- Page 200 -

(b)  Agree not to refund, rebate, or share EFA funds with parents or EFA students in any manner, except that funds may be remitted or refunded to an EFA in accordance with procedures established by the scholarship organization.

(c)  Comply with all state and federal anti-discrimination laws.

194-E:7  Independence of Education Service Providers.

I.  Nothing in this chapter shall be deemed to limit the independence or autonomy of an education service provider or to make the actions of an education service provider the actions of the state government.

II.  Education service providers shall be given maximum freedom to provide for the educational needs of EFA students without governmental control.

III.  Nothing in this chapter shall be construed to expand the regulatory authority of the state, its officers, or any school district to impose any additional regulation of education service providers beyond those necessary to enforce the requirements of the EFA program.

IV.  Any education service provider that accepts payment from an EFA under this chapter is not an agent of the state or federal government.

V.  An education service provider shall not be required to alter its creed, practices, admissions policy, or curriculum in order to accept payments from an EFA.

194-E:8  Responsibilities of Public Schools and School Districts.  A public school, or school district, that previously enrolled an EFA student shall provide a private school that is also an education service provider and that has enrolled an EFA student with a complete copy of the ESA student's school records, in a timely manner, while complying with 20 U.S.C. section 1232g, the Family Educational Rights and Privacy Act of 1974.

194-E:9  Legal Proceedings.

I.  In any legal proceeding challenging the application of this chapter to an education service provider, the state bears the burden of establishing that the law is necessary and does not impose any undue burden on the education service provider.

II.  No liability shall arise on the part of the scholarship organization or the state or of any public school or school district based on the award of or use of an EFA pursuant to this chapter.

III.  If any part of this chapter is challenged in a state court as violating either the state or federal constitutions, parents of eligible and/or EFA students shall be permitted to intervene as of right in such lawsuit for the purposes of defending the EFA program's constitutionality.  However, for the purposes of judicial administration, a court may require that all parents file a joint brief, so long as they are not required to join any brief filed on behalf of any named state defendant.

IV.  If any provision of this chapter, or the application thereof to any person or circumstances, is held invalid, such invalidity shall not affect other provisions or applications of this chapter which can be given effect without the invalid provision or application, and to this end the provisions of this chapter are declared to be severable.

1    194-E:10 Phase-Out Grants.

2    I.  For each school district, the commissioner shall calculate the amount of the reduction in

3    adequate education grants pursuant to RSA 194-E:2, I for each student receiving an EFA under this

4    chapter.  In the first year of the grant reduction, the commissioner shall calculate 50 percent of the

5    reduction for each student and shall disburse that amount to the district as a district funding

6    phaseout grant.  In the second year of the grant reduction, the commissioner shall calculate 25

7    percent of the reduction for each student and shall disburse that amount to the district as a district

8    funding phase-out grant.  All district funding phase-out grants shall be included in the September 1

9    disbursement required pursuant to RSA 198:42.

10    II.  The phase-out grants will terminate for new EFA students receiving an EFA effective

11    July 1, 2026.

12    194-E:11  Appropriation From Education Trust Fund.  The amount necessary to fund any grants

13    or transfers of funds authorized under this chapter is hereby appropriated to the department from

14    the education trust fund created under RSA 198:39.  The governor is authorized to draw a warrant

15    from the education trust fund to satisfy the state's obligation under this section.  Such warrant for

16    payment shall be issued regardless of the balance of funds available in the education trust fund.  If

17    the balance in the education trust fund, after the issuance of any such warrant, is less than zero, the

18    comptroller shall transfer sufficient funds from the general fund to eliminate such deficit.  The

19    commissioner of the department of administrative services shall inform the fiscal committee and the

20    governor and council of such balance.  This reporting shall not in any way prohibit or delay the

21    distribution of any grant or transfer of funds authorized under this chapter.

22    194-E:12  Legislative Oversight Committee Established.  There is established an education

23    freedom savings account oversight committee.

24    I. The members of the committee shall be as follows:

25    (a)  Two members of the senate, one of whom shall be a member of the majority party

26    and one of whom shall be a member of the minority party, appointed by the president of the senate.

27    (b)  Three members of the house of representatives, one of whom shall be a member of

28    the majority party and one of whom shall be a member of the minority party, appointed by the

29    speaker of the house of representatives.

30    II.  Members of the committee shall receive mileage at the legislative rate when attending to

31    the duties of the committee.

32    III.  The committee shall monitor the implementation of RSA 194-E, including the impact of

33    state education funding to local district schools, and make recommendations for any legislative

34    changes to the education freedom savings account program.

35    IV.  The members of the study committee shall elect a chairperson from among the members.

36    The first meeting of the committee shall be called by the first-named senate member.  The first

1    meeting of the committee shall be held within 45 days of the effective date of this section.  Three
2    members of the committee shall constitute a quorum.

3          V.   The committee shall submit a report on or before November 30, 2022, and each year
4    thereafter, to the general court including findings, recommendations, and any corrective or technical
5    improvements that the education freedom account program may require.

6          446  Duty of Parent; Compulsory Attendance by Pupil.  Amend RSA 193:1, I(g) and (h) to read as
7    follows:

8               (g)   The pupil has been accepted into an accredited postsecondary education program;
9    [or]

10              (h)   The pupil obtains a waiver from the superintendent, which shall only be granted
11   upon proof that the pupil is 16 years of age or older and has an alternative learning plan for
12   obtaining either a high school diploma or its equivalent.

13              (1)   Alternative learning plans shall include age-appropriate academic rigor and the
14   flexibility to incorporate the pupil's interests and manner of learning.  These plans may include, but
15   are not limited to, such components or combination of components of extended learning opportunities
16   as independent study, private instruction, performing groups, internships, community service,
17   apprenticeships, and on-line courses.

18              (2)   Alternative learning plans shall be developed, and amended if necessary, in
19   consultation with the pupil, a school guidance counselor, the school principal and at least one parent
20   or guardian of the pupil, and submitted to the school district superintendent for approval.

21              (3)   If the superintendent does not approve the alternative learning plan, the parent
22   or guardian of the pupil may appeal such decision to the local school board.  A parent or guardian
23   may appeal the decision of the local school board to the state board of education consistent with the
24   provisions of RSA 21-N:11, III; *or*

25              *(i)   The pupil is enrolled in the education freedom account program pursuant to*
26   *RSA 194-E and is therefore exempt from this requirement*.

27         447  Effective Date.  Sections 445 and 446 of this act shall take effect 60 days after its passage.

28         448  Town of Haverhill; Woodsville Fire District.  Amend 1887, 204:3, as amended by 1899,
29   196:2; 1990, 37:1; and 2009, 147:1 to read as follows:

30         SECT. 3.  Said district at each annual meeting shall elect by ballot a moderator, a clerk, one
31   auditor, a treasurer, and three commissioners.  All of said officers shall be elected by a majority vote
32   of all the voters present and voting at the annual meeting.  Said officers shall exercise in relation to
33   district meetings the like powers to those of moderator, clerk, and selectmen of towns.  The
34   commissioners shall have within the district all the powers of the mayor and aldermen of any city
35   respecting highways, sidewalks, and sewers.  They shall control and direct the expenditure of all
36   moneys raised under authority of the district and by the town of Haverhill for expenditure in the
37   district.  They shall have sole authority to appoint a highway surveyor in said district, and in default

1    of such appointment shall themselves perform the duties of that office.   The surveyor or

2    commissioners performing the duties of highway surveyor in the district shall give bond to the town

3    to account for all money coming into their hands, and for the proper care and custody of the property

4    of the town or district which may come into their custody or control, and shall be deemed officers of

5    the town.  Nothing in this act shall be construed to impose any distinct or special liability upon the

6    district respecting highways within its limits.   ***Nothing in this section shall preclude the***

7    ***Woodsville fire district from maintaining the roads within the precinct at its own expense***.

8    Vacancies that may occur in the office of commissioner in the district shall be filled by appointment

9    of the remaining commissioners or commissioner, but any commissioner appointed to fill a vacancy

10    shall hold office only until the next annual district meeting.  Commissioners shall be residents of the

11    district.   [~~The money appropriated for the distribution of highway funds in the district which is~~

12    ~~attributable to the town of Haverhill shall be determined by a fraction, the numerator of which shall~~

13    ~~be the assessed valuation of the properties in the district, and the denominator of which shall be the~~

14    ~~assessed valuation of the properties in the entire town of Haverhill as determined annually from the~~

15    ~~town MS-1 form.   The town of Haverhill shall appropriate the percentage represented by such~~

16    ~~fraction for distribution to the highway fund in care of the Woodsville fire district commissioners.~~]

17    ***Highway block grant funds shall be distributed in accordance with the department of***

18    ***transportation formula.   Any appropriations to the Woodsville fire district shall be as***

19    ***directed by warrant articles duly voted by the voters present and voting at each annual***

20    ***Haverhill town meeting.***

21    449  Financial Audit Requirement.  No later than one year after the effective date of section 448

22    of this act, the Woodsville fire district shall provide financial audits by a certified public accountant

23    approved by the department of revenue administration that is compliant with generally accepted

24    accounting practices (GAAP), of all funds received from the town of Haverhill and all other sources

25    including state and federal funds, and of all funds expended by the fire district, for each calendar

26    year commencing January 1, 2015 to the effective date of section 448 of this act, as directed by the

27    department of revenue administration.  The department of revenue administration shall approve the

28    scope of the audit and shall receive monthly updates from the certified public accountant and the

29    Woodsville fire district on the status of the audit while it is in progress.  The results of the audit

30    shall be published on the town of Haverhill website within 60 days of delivery by the certified public

31    accountant to the Woodsville fire district and the department of revenue administration.  The audit

32    shall be at the expense of the Woodsville fire district.  Reimbursement of any expenses related to the

33    audit incurred by the department of revenue administration shall be in accordance with the

34    provisions of RSA 21-J:22.  The department of revenue administration may levy a fine of $250 per

35    day against the Woodsville fire district for every day of noncompliance with section 448 of this act

36    beyond one year from the effective date of section 448 of this act.  The commissioner may waive such

**Amendment to HB 2-FN-A-LOCAL**
**- Page 204 -**

1   fine at his or her discretion, subject to the good faith efforts of the Woodsville fire district to comply

2   with all relevant laws and the provisions of section 448 of this act.

3      450  Effective Date.  Sections 448 and 449 of this act shall take effect upon its passage.

4      451  Findings.

5         I.  On March 13, 2020, the governor signed the first declaration of a state of emergency due

6   to COVID-19.  As of January 1, 2021, this order has been extended 14 times.

7         II.  Between March 26, 2020 and June 16, 2020, a "Stay at Home" order had been in-place

8   under the authority of the governor as measure to prevent the spread of COVID-19.  This order

9   included the closing of schools, prohibited gatherings of 10 or more people, and limited business

10  operations that were not considered essential.

11        III.  Between March and August of 2020, 449 New Hampshire business closed temporarily or

12  permanently, with 280 remaining closed.

13        IV.  New Hampshire began "reopening" on May 11, 2020 with restrictions, some of which

14  remain in place today and continue to impact the micro enterprise sector, those businesses with

15  between 1 and 5 employees including the proprietor.  According to the Small Business

16  Administration, Office of Advocacy, there are 25,478 business with between 1-19 employees and

17  101,795 non-employer businesses.

18        V.  It is incumbent upon the state government to take prompt, proactive, and continuing

19  action to protect the economic health of New Hampshire communities through building out the

20  infrastructure and sustainability of micro enterprises.

21     452  New Subdivision; COVID-19 Micro Enterprise Relief Fund.  Amend RSA 12-O by inserting

22  after section 52 the following new subdivision:

23                       COVID-19 Micro Enterprise Relief Fund

24  12-O:53  COVID-19 Micro Enterprise Relief Fund.

25        I.  There is established in the office of the state treasurer a fund to be known as the COVID-

26  19 micro enterprise relief fund.  Notwithstanding RSA 4:45, RSA 4:47, RSA 21-P:43, or any other law

27  to the contrary, to the extent permissible under federal law $1 of any federal funds received by the

28  state in response to the COVID-19 public health emergency shall be deposited into the fund,

29  provided that at no time shall the balance of the fund exceed $1 in any fiscal year.

30        II.  Funds shall be disbursed at the discretion of the commissioner to the 10 New Hampshire

31  regional economic development corporations to be awarded to local or regional micro enterprises.

32  Each regional development corporation shall receive up to $1.  Each regional development economic

33  council shall be authorized to assess an administrative fee up to 10 percent of the funds received

34  through the state to manage this grant program.  Any regional economic development corporation

35  that does not award all of the funds received in grants to local micro enterprises shall return the

36  funds to micro enterprise relief fund at the department of business and economic affairs for

37  redistribution at the discretion of the commissioner.

III.  With each award, an agreement for technical assistance shall be put in place between the regional development corporation, the New Hampshire small business development center, and the micro enterprise to support the implementation of the funds.  18 months after the implementation of the program, the regional economic development councils will prepare and submit reports to the commissioner, that include the number of grants and the amounts, and the use of each grant by the recipient.  The commissioner shall compile these reports and submit a compiled report to the speaker of the house of representatives, the senate president, the house clerk, the senate clerk, the state library, and the governor.

IV.  Regional economic development corporations shall award one-time grants of up to $1 to support one or more areas of need, including development of e-commerce capabilities, upgrading business practices, or maintaining storefront presence.  The regional economic development corporations shall ensure micro enterprises awarded grants pursuant to this subdivision are provided such assistance as may be necessary to support implementation of any grants awarded.

V.  For purposes of this subdivision, "micro enterprise" shall mean an entity with 10 or fewer employees, including any proprietor, that has been in business prior to March 13, 2020, when the governor signed the first declaration of a state of emergency due to COVID-19 and that has demonstrated a financial impact during the COVID-19 public health emergency, such as temporary closure, reduction in workforce, or loss of revenue of 50 percent or greater when compared to the same time period during the previous year.  Financial statements demonstrating losses, closures, or reduction in workforce shall be supplied as part of the application process.

453  New Subparagraph; Application of Receipts; COVID-19 Micro Enterprise Relief Fund. Amend RSA 6:12, I(b) by inserting after subparagraph (364) the following new subparagraph:

(365)  Moneys deposited into the COVID-19 micro enterprise relief fund established in RSA 12-O:53.

454  Purpose Statement.  Independent live venues are important entertainment hubs and economic multipliers for New Hampshire's local economies.  They serve as critical tax bases as employers and tourism destinations and as revenue generators for neighboring businesses such as restaurants, hotels, and retail.  The cultural impact of New Hampshire's independent live venues is difficult to calculate and serves as an important draw for young people to the state.  Unfortunately, these businesses were among the first to close as COVID-19 spread across the country, will likely be the last to reopen, and will take years to recover if they can stay in business at all.  Smaller venues with a capacity of 300 or less are being impacted the most by the COVID-19 economic and public health crisis.  Sections 455-458 of this act provides targeted assistance and long-term planning support and recognizes the importance of independent live venues to New Hampshire's economy.

455  Council on the Arts; Declaration of Policy.  Amend RSA 19-A:1 to read as follows:

19-A:1  Declaration of Policy.  It is hereby found that many of our citizens lack the opportunity to view, enjoy or participate in living theatrical performances, musical concerts, operas, dance and

1    ballet recitals, art exhibits, examples of fine architecture, and the performing and fine arts

2    generally.  It is hereby further found that, with increasing leisure time, the practice and enjoyment

3    of the arts are of increasing importance and that the general welfare of the people of the state will be

4    promoted by giving further recognition to the arts as a vital aspect of our culture and heritage and as

5    a valued means of expanding the scope of our educational programs.  *It is hereby further found*

6    *that arts organizations and businesses are important entertainment hubs and economic*

7    *multipliers for New Hampshire's local economies.  They serve as critical tax bases as*

8    *employers and tourism destinations and as revenue generators for neighboring businesses*

9    *such as restaurants, hotels, and retail.  The cultural impact of New Hampshire's creative*

10    *sector is difficult to calculate and serves as an important draw for young people to the*

11    *state.*  It is hereby declared to be the policy of the state to join with private patrons and with

12    institutions and professional organizations concerned with the arts to insure that the role of the arts

13    in the life of our communities will continue to grow and will play an ever more significant part in the

14    welfare and educational experience of our citizens.   It is further declared that all activities

15    undertaken by the state in carrying out this policy shall be directed toward encouraging and

16    assisting rather than in any ways limiting the freedom of artistic expression that is essential for the

17    well-being of the arts.

18    456  Council on the Arts; Report.  Amend RSA 19-A:7 to read as follows:

19    19-A:7 Reports.  The council shall make biennial reports to the governor and council.  *The*

20    *council's strategic plan and biennial report under this section shall address the activities*

21    *related to the save our granite stages fund created under RSA 19-A:15.*

22    457  New Subdivision; Council on the Arts; Save Our Granite Stages Fund.  Amend RSA 19-A by

23    inserting after section 14 the following new subdivision:

24                    Save Our Granite Stages Fund

25    19-A:15  Save Our Granite Stages Fund.  There is hereby established the save our granite stages

26    fund, which shall be appropriated for fiscal year 2022 to the New Hampshire state council on the

27    arts for the purpose of providing grants to both non-profit and for-profit live venues that did not

28    receive a grant from the federal Shuttered Venue Operators (SVO) program, which was established

29    by Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act (P.L. 116-260).  The fund

30    shall be nonlapsing and kept separate and distinct from all other funds.  Notwithstanding any other

31    provision of law, $1 of any discretionary federal funds received by the state in response to the

32    COVID-19 public health emergency shall be deposited into the fund.   In addition to state

33    appropriations, the council may accept grants, gifts, and donations for deposit in the fund.

34    458  New Subparagraph; Dedicated Funds; Save our Granite Stages Fund.  Amend RSA 6:12,

35    I(b) by inserting after subparagraph (364) the following new subparagraph:

36            (365)  Moneys deposited in the save our granite stages fund under RSA 19-A:15.

Amendment to HB 2-FN-A-LOCAL
- Page 207 -

1    459  Repeal.  RSA 19-A:15 and RSA 6:12, I(b)(365), relative to the save our granite stages fund,

2    as inserted by sections 457 and 458 of this act, respectively, are repealed.

3    460  Effective Date.

4        I. Section 459 of this act shall take effect June 30, 2023.

5        II.  Sections 451 through 458 of this act shall take effect upon its passage.

6    461  Effective Date.  Unless otherwise specified, the remainder of this act shall take effect July 1,

7    2021.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 208 -**

2021-1799s

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the retirement system.

9.  Clarifies the administration of the retirement system of payments made for medical benefits of state retirees.

10.  Enables the supreme court to transfer funds.

11.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

12.  Enables the sale of the lakes region facility in Laconia.

13.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

14.  Suspends congregate housing and services and the foster grandparent program for the biennium ending June 30, 2023.

15.  Establishes the emergency services for children, youth, and families fund and eliminates certain parental reimbursements.

16.  Prohibits the distribution of state funds awarded by the department of health and human services to a reproductive health care facility for provision of abortion services, and prohibits a health care provider from performing an abortion if the gestational age of the fetus is at least 24 weeks unless there is a medical emergency.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 209 -**

17.  Makes an appropriation to the department of health and human services for streamlining agency operations.

18.  Requiring the commissioner of the department of health and human services to submit an amendment to the Centers for Medicare and Medicaid Services to suspend all catastrophic aid payments to hospitals for the biennium.

19.  Enables the department of military affairs and veterans services to provide support for veterans' mental health and preventing social isolation.

20.  Transfers the controlled drug prescription health and safety program to the department of health and human services.

21.  Suspends revenue sharing with cities and towns for the biennium.

22.  Enables the liquor commission to process merchant cards.

23.  Enables the department of education to accept gifts, contributions, and bequests for the New Hampshire scholars program.

24.  Provides for increased education grants to bring the state into compliance with the American Rescue Plan Act of 2021 .

25.  Makes transfers to the education trust fund.

26. Makes an appropriation from the education trust fund to the department of education to fund operating costs for a student data collection and reporting system.

27.  Authorizes expenditures for energy efficient school buses.

28.  Establishes the position of director of intergovernmental affairs in the department of business and economic affairs.

29.  Repeals the bureau of film and digital media.

30.  Suspends the crediting of meals and rooms tax revenue to the division of travel and tourism.

31.  Enables the department of corrections to transfer funds.

32.  Changes the approval threshold for contracts set by the governor and council manual of procedures.

33.  Prohibits the dispersing of sate aid grants for certain new infrastructure projects in the department of environmental services.

34.  Renames the divisions of the office of professional licensure and certification and establishes pharmacy compliance investigator positions within the office.

35.  Makes an appropriation to the New Hampshire Internet crimes against children fund.

36.  Makes an appropriation to the FRM victims recovery fund and removes the prospective repeal of the fund.

37.  Provides for transfer of funds to the revenue stabilization reserve account  based on the most recently completed fiscal biennium.

38.  Makes an appropriation to the department of health and human services for the purpose of funding one-time maintenance of the Medicaid management information system.

39.  Reduces the tax rate of, and in 2027 eliminates, the interest and dividends tax.

40.  Reduces the tax rate of the meals and rooms tax.

41.  Establishes the meals and rooms municipal revenue fund for the distribution of meals and rooms tax revenues by the state treasurer to towns, cities, and places.

42.  Increases the filing threshold for the business enterprise tax and reduces the rate of the tax; and reduces the rate of the business profits tax.

43.  Limits the amount of the credit allowed against overpayment of the business profits tax and the business enterprise tax and establishes a commission to study limiting the business tax credit carry over.

44.  Excludes under the business profits tax the  business income of a taxpayer received by reason of forgiveness of indebtedness issued or created under the federal Paycheck Protection Program (PPP).

45.  Allows the New Hampshire veterans' home to transfer funds within accounting units for the biennium ending June 30, 2023.

46.  Revises the procedure for compensation for loss of agricultural products or livestock due to bears.

47.  Authorizes the department of information technology to fill unfunded positions.

48.  Modifies the composition and operation of the adult parole board and permits remote meetings during a pandemic or other declared state of emergency.

49.  Requires employer pro rata payments to the workers' compensation administration fund to be based on the preceding calendar year ratios and amends the payment of per diems to workers' compensation appeals board members.

50.  Amends the unemployment compensation fund balance necessary to trigger increases or decreases in employer contributions to the fund and repeals the emergency surcharge power of the commissioner of the department of employment security.

51.  Imposes liability on any person who renders any highway unsuitable for public travel, including full and current replacement cost.

52.  Provides that proceeds from a sale that results from money provided by the highway fund for payback of real property purchased with federal funds shall be credited to the department of transportation for the purpose of meeting federal obligations or reimbursing the highway fund for payment of federal obligations.

53.  Adds definitions relating to small unmanned aircraft and small unmanned aircraft systems to the New Hampshire aeronautics act.

54.  Amends an appropriation to the department of transportation for the 2018 fiscal year and provides that it lapse to the highway fund and be expended for the purpose of funding state red list bridge projects.

55.   Establishes a body-worn and dashboard camera fund and makes appropriations; establishes a classified business administrator I position in the department of safety; and establishes a commission to develop recommendations for legislation to establish a single, neutral, and independent statewide entity to receive complaints alleging misconduct regarding all sworn and elected law enforcement officers.

56.   Requires the department of safety, in collaboration with the department of administrative services, to establish standards for radio infrastructure-related hardware, computers, software, related licenses, media, documentation, support and maintenance services.

57.   Establishes within the department of justice an unclassified position of director of diversity and community outreach.

58.   Authorizes the judicial council to request additional funding expenditures for termination of parental rights services that are greater than amounts appropriated in the operating budget.

59.   Moves the governor's scholarship program and fund from the office of strategic initiatives to the college tuition savings plan and authorizes the college tuition savings plan advisory commission to transfer funds between the governor's scholarship fund and the New Hampshire excellence in higher education endowment trust fund.

60.   Transfers the regulation of audiologists and hearing aid dealers to the governing board of speech language pathology.

61.   Establishes the department of energy, to govern energy and utilities matters, and have oversight on matters under the public utilities commission.

62.   Administratively attaches the public utilities commission to the department of energy and makes corresponding changes to existing laws relating to the organization and duties of the public utilities commission to reflect this change.

63.   Transfers certain duties from the public utilities commission to the department of energy.

64.   Adds the commissioner of the department of energy to the New Hampshire site evaluation committee.

65.   Requires that the department of energy advocate for New Hampshire in regional activities concerning competitive electricity suppliers.

66.   Requires that the department of energy require electric and gas utilities to operate an online energy data platform and, in conjunction with the public utilities commission, implement a statewide electric utility restructuring plan.

67.   Requires the bank commissioner to charge the public deposit investment pool for actual costs incurred by the banking department to operate the pool.

68.   Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

69.   Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

Amendment to HB 2-FN-A-LOCAL
- Page 212 -

70.  Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

71.  Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

72.  Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

73.  Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

74.  Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

75.  Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

76.  Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

77.  Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

78.  Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

79.  Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

80.  Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

81.  Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

82.  Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

83.  Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

84.  Establishes a committee to develop a plan for the closure and replacement of the Sununu youth services center.

85.  Limits further expansion of the closed loop referral system by the department of health and human services pending review of the system by the legislative oversight committee on health and human services.

86.  Allows political subdivisions to treat funds received pursuant to the American Rescue Plan Act of 2021 as unanticipated revenue under RSA 31:95-b.

87.  Established salaries and salary schedules for certain state officers, and classified and unclassified state employees.

88.  Provides that positions in state government which become available as a result of reorganization or downsizing of state government be filled, if possible, by laid off state employees.

89.  Establishes the granite state paid family leave plan.

90.  Establishes procedures and rulemaking for executive branch employee annual leave, sick leave, transfer credit, and terminal pay.

91.  Abolishes classified full-time positions which were vacant prior to July 1, 2018 and remain vacant as of July 1, 2021.

92.  Makes an appropriation to the department of agriculture, markets, and food to fund the cost of care fund; establishes a disease data manager position in the department and makes an appropriation for the position.

93.  Establishes the unclassified position of assistant attorney general in the department of justice.

94.  Creates the National Guard enlistment incentive program and makes an appropriation therefor.

95.  Establishes the positions of director of life and health and director of property and casualty within the insurance department.

96.  Makes an appropriation to the business finance authority to provide grants to regional economic development corporations.

97.  Makes an appropriation to the affordable housing fund.

98.  Makes limitations on the grant in aid program administered by the bureau of trails, division of parks and recreation, in the department of natural and cultural affairs for OHRV trails.

99.  Makes an appropriation to the Hampton Beach area commission for environmental master plan updates.

100.  Appropriates funds to the department of safety for overtime costs at the state forensic laboratory; to the state police for narcotics-related enforcement; and to disburse grants to county and local law enforcement agencies for the purpose of funding overtime costs for county and local law enforcement officers performing law enforcement activities attributable to the substance abuse enforcement program.

101.  Appropriates funds to the fire standards and training and emergency medical services fund for the 2022 and 2023 fiscal years, and to the department of safety, division of fire standards and training and emergency medical services, to fund additional part-time instruction or increase the tuition discount for certain emergency service personnel.

102.  Transfers funds from the general fund to the highway fund.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 214 -**

103.  Appropriates $7,000,000 to the department of transportation for the Conway Bypass right-of-way payback to the federal highway administration.

104.  Directs the commissioner of the department of transportation to remove toll booths on exit 10 in Merrimack.

105.  Appropriates $3,250,000 to the department of transportation for a project in Tilton.

106.  Makes an appropriation to the department of transportation for matching grants.

107.  Extends a prior appropriation to the department of health and human services for child welfare behavioral health services.

108.  Requires that the New Hampshire 10-year mental health plan include a report on implementation of 2019, 44 (SB 14), relative to child welfare.

109.  Establishes positions in the department of health and human services contracts and procurement unit and makes an appropriation for this purpose.

110.  Requires the department of health and human services to implement SNAP health incentive programs and makes an appropriation to the department for this purpose.

111.  Extends the prospective repeal relative to the waitlist for community mental health services.

112.  Adds an exception for rulemaking by the department of health and human services for cost of living adjustments in social security benefits contained within the Social Services Block Grant program.

113.  Continues the suspension of RSA 151-E:18, regarding presumptive eligibility for long-term care home and community-based services, from HB 4, Chapter 346:69 Laws of 2019.

114.  Establishes a committee to study parity in reimbursement among organizations that provide Social Security Act waiver programs.

115.  Makes an appropriation to fund transitional housing beds and to increase rated paid for transitional housing beds, and allows funds appropriated in 2019 to be used to for these purposes.

116.  Restricts a portion of rural health & primary care funding for the state loan repayment program.

117.  Changes the lapse period for certain funds appropriated to the department of health and human services, division of medicaid services and requires such funds to be treated as restricted revenue.

118.  Makes an appropriation to the department of health and human services for the construction of a forensic psychiatric hospital.

119.  Provides that certain waiver/nursing facility funds shall be treated as restricted revenue for funding expenditures for waiver/nursing facilities-county participation.

120.  Provides that the home visiting program shall be available to all Medicaid eligible pregnant women, infants, and families with children up to age one.

121.  Suspends graduate medical education payments for the biennium ending June 30, 2023.

122.   Makes a supplemental appropriation to the department of health and human services for juvenile diversion programs and provides that the department of health and human services shall establish procedures for administration of the state-funded programs.

123.   Requires the commissioner of the department of health and human services to solicit information and to contract with dental managed care organizations to provide dental care to persons under the Medicaid managed care program and makes an appropriation for the dental benefit for 2023 fiscal year.

124.   Limits the home visiting program to available appropriations for the biennium ending June 30, 2023.

125.   Suspends certain income eligibility standards for in-and-out medical assistance for the biennium ending June 30, 2023.

126.   Allows the department of health and human services to accept and expend additional federal funds with the prior approval of the fiscal committee for the Medicaid to schools program.

127.   Makes an appropriation to the department of health and human services to provide grants to senior centers or other organizations serving senior citizens.

128.   Makes an appropriation to the lottery commission for the purpose of paying off the commercial mortgage on the building serving as the lottery commission's headquarters.

129.   Lowers Keno license fees.

130.   Makes an appropriation from the education trust fund to the department of education to fund operating costs for a student data collection and reporting system.

131.   Makes an appropriation to the governor's scholarship fund.

132.   Establishes the education freedom account program which permits the treasurer to transfer adequate education grants, plus any differentiated aid that would have been provided to a public school, to a scholarship organization for disbursement to parents to be used for certain educational purposes; appropriates the funds authorized under this program from the education trust fund; and authorizes the comptroller to transfer funds from the general fund to eliminate any deficit in the education trust fund created by the payment of grants or transfers of funds under the program.

133.   Modifies the law on the operation and funding of the Woodsville fire district and directs that appropriations to the Woodsville fire district shall be as directed by warrant articles duly voted at each annual Haverhill town meeting.

134.   Establishes a COVID-19 micro enterprise relief fund.

135.   Provides for the support and promotion of New Hampshire's live performance industry by the council on the arts.





# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1.    What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist.  Teach and treat all equally and without discrimination.**

### 2.    What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

### 3.    Does the law prohibit teachers from teaching U.S. history?

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

### 4.    Are schools allowed to teach students historical concepts related to discrimination?

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

### 5.    A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

### 6.    Can parents or guardians refuse to allow their children to participate in specific course material?

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

### 7.    Does the law apply to public schools?

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

### 8.    Does this law apply to all school activities or just teaching?

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

**9.      Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.      Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes.  For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.      What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they have been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.      Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.      Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.

EXHIBIT

H

981



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A, that impact public employers and government programs. Please see separate document that addresses changes to schools and educational programs contained in RSA chapter 193.

## Changes Regarding Public Employers and Government Programs

1. **What are public employers and government programs prohibited from training and advocating?**

Public employers and government programs are prohibited from training and advocating that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not train or advocate that a person or a group is inherently oppressive, superior, inferior racist, or sexist. Train and treat all equally and without discrimination.**

2. **What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?**

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

### 3. <u>Are these the same prohibitions as those contained in the "divisive concepts" bill, HB 544?</u>

No. HB 544 did not become law and therefore, does not apply or impact public employers, government programs, or schools in New Hampshire. The term "divisive concepts" is not found anywhere in the new law.

### 4. <u>Can public employers and government programs undertake efforts designed to examine issues related to equity, diversity, inclusion, equality, and other related topics?</u>

Yes. Nothing in this new law prohibits public employers or government programs from taking steps to examine issues related to equity, diversity, inclusion, equality and other related topics.

### 5. <u>Can trainings address practices or ideas that have harmed or continue to harm certain identified groups?</u>

Yes. Nothing prohibits trainings geared toward educating participants about practices or ideas that may disproportionately affect certain identified groups.

### 6. <u>Can public employers and government programs conduct trainings designed to improve diversity, equity, and inclusion, such as implicit bias training?</u>

Yes. Nothing prohibits trainings geared towards diversity, equity, equality and inclusion.

Nor does anything prohibit implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally.

The new law expressly permits public employers and government programs to provide and require "sensitivity training" based on the "inherent humanity and equality of all persons" and the "ideal that all persons are entitled to be treated with equality, dignity, and respect."

### 7. <u>A public employee has claimed that a required diversity training has made them uncomfortable. Has the public employer or government program discriminated against that employee?</u>

No. It is important to note that trainings that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make participants uncomfortable. These trainings may encourage or prompt participants to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequence.

**8.** **What remedies are available to public employees or program participants who believe that a public employer or government program has violated one of the new anti-discrimination statutes?**

A person who believes that they have been subject to discrimination, may file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**9.** **Can a public employee file a claim based upon a training that occurred in 2020?**

No. Complaints alleging a violation of the new laws may only be considered for conduct that occurred after the enactment of those laws on June 25, 2021.

**10.** **If I am an individual or group simply using a public facility for non-government use, for example a private event or activity at a school building or town hall, does this new law apply to me?**

No.

EXHIBIT

I

# ATTORNEY GENERAL
# DEPARTMENT OF JUSTICE

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

JOHN M. FORMELLA
ATTORNEY GENERAL



JANE E. YOUNG
DEPUTY ATTORNEY GENERAL

## ATTORNEY GENERAL OPINION NO. 2021-01

September 7, 2021

Doug Palardy, Chair
Ahni Malachi, Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Building One
Concord, NH  03301

RE:   Request for Attorney General's Opinion regarding new anti-discrimination
protections

Dear Chair Palardy and Director Malachi:

You requested, on behalf of the New Hampshire Commission for Human Rights, that this office provide an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 ("Sections 297 and 298"),[1] to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40. These statutes collectively comprise a subdivision in RSA chapter 354-A titled "Right to Freedom from Discrimination in Public Workplaces and Education" and new section in RSA chapter 193 titled "Prohibition on Teaching Discrimination."

Some have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions. *See* Governor's Advisory Council on Diversity and Inclusion, *Letter to Gov. re HB 544* (June 2, 2021). To help address these concerns, the Department of Justice, Commission for Human Rights, and the Department of Education released guidance shortly after the new anti-discrimination laws took effect. Recognizing the important need for public employers, government programs, and school systems to engage in sensitivity training that may include frank and candid discussions of the historical aspects of oppression and its contemporary effects, you requested that this office provide an official Attorney General Opinion.

The Commission for Human Rights (the "Commission") was created with the power to eliminate and prevent discrimination in employment, places of public accommodation, housing,

---

[1] Before final passage by the legislature, this legislation was included in HB 2 as Section 330 and 330-a. The final version of HB 2 includes the legislation at Section 297 and 298.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 2 of 9

and, effective in 2019, public education. The Commission is charged with receiving, investigating, and adjudicating complaints related to violations of RSA chapter 354-A that may be filed by members of the public or the Commission and holding hearings as required to execute the Commission's duties. Section 297 prohibits certain public sector activities and expands the Commission's jurisdiction to address such activities. Section 298 prohibits the teaching of certain subjects in elementary and secondary schools and it also places review of violations within the Commission's jurisdiction.

The Attorney General's duties include advising "any state board, commission, agent or officer as to questions of law relating to the performance of their official duties, and he shall, under the direction of the governor and council, exercise a general supervision over the state departments, commissions, boards, bureaus, and officers, to the end that they perform their duties according to law." RSA 7:8. In situations where requests for legal advice are significant to the operation of the state board, commission, or agency and are likely to be of continuing importance, the advice may be issued by an official Attorney General Opinion. In such situations, the questions posed are researched and an opinion drafted by a group of attorneys. The draft opinion is also subject to multiple layers of review, including by the Associate Attorney General for the Division of Legal Counsel and the Solicitor General. The Attorney General provides a final review and approval.

Given the importance of your questions to the education and training of your staff to best serve New Hampshire residents, I am providing an official Attorney General Opinion as set forth below.

## QUESTIONS PRESENTED

1.      What is the scope of Sections 297 and 298 and what types of education and training activities do those sections prohibit and permit?

2.      Do the new sections of RSA chapter 354-A prohibit trainings or programs designed to promote diversity and inclusion or to educate participants about concepts such as implicit bias?

3.      Does RSA 193:40 prohibit education on the historical concepts related to discrimination or oppression?

## CONCLUSION

1.      The new sections added to RSA chapter 354-A prohibit trainings or programs that teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. The new sections added to RSA chapter 354-A also prohibit trainings or programs that teach participants that any identified group can or should be treated unequally to

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 3 of 9

any other identified group and that one identified group should be discriminated against or treated adversely.

Similarly, RSA 193:40 prohibits teaching students that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 also prohibits teaching students that any identified group can or should be treated unequally to any other identified group and that one identified group should be discriminated against or treated adversely.

2.       No. The new sections added to RSA chapter 354-A **explicitly permit** public employers and government programs to provide sensitivity training, which RSA 354-A:29 defines as "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Implicit bias training, for example, is premised on teaching people about biases they may have of which they are not consciously aware and helping people become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training does not violate Section 297. Similarly, the new sections added to RSA chapter 354-A do not prohibit other diversity, equity, inclusion, and equality trainings. Section 297 prohibits trainings if and only if they include concepts of group superiority or inferiority based on inherent or innate group characteristics or advocate for less than equal treatment of identified groups.

3.       No. RSA 193:40 does not prohibit discussion of historical concepts related to discrimination. RSA 193:40 prohibits education related to solely the four subjects identified in Short Answer 1. Specifically, it prohibits teaching that one or more identified groups are: (1) inherently superior or inferior to people of another identified group; (2) inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) should be discriminated against or receive adverse treatment; or (4) should not treat members of other identified groups equally. It is important to note that although education related to racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make some parents, students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA 193:40.

## BACKGROUND

On June 25, 2021, the Governor signed into law House Bill 2, which added, in Section 297, new provisions to RSA chapter 354-A entitled, "Right to Freedom from Discrimination in Public Workplaces and Education." Specifically, Section 297 adds six new sections to RSA chapter 354-A: (1) RSA 354-A:29, "Right to Freedom from Discrimination in Public Workplaces and Education"; (2) RSA 354-A:30, "Definitions"; (3) RSA 354-A:31, "Prohibition on Public Employers"; (4) RSA 354-A:32, "Prohibition on the Content of Government Programs and Speech"; (5) RSA 354-A:33, "Prohibition on Public Employees"; and (6) RSA 354-A:34, "Remedies."

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 4 of 9

Section 297 is part of the amended progeny of House Bill 544, which was commonly known as the "divisive concepts" bill. The House of Representatives voted to table House Bill 544 but to incorporate its language into House Bill 2. During its review, the Senate Finance Committee stripped the language of House Bill 544 out of House Bill 2 and added the language that is now Sections 297 and 298. The House of Representatives acceded to these changes during the Committee of Conference.

The major provisions of Section 297, codified as RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33, prohibit training, education, or other state-sponsored speech that incorporates any of the following four concepts:

1. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

2. That an individual by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

3. That an individual should be discriminated against or receive adverse treatment solely or partly because of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; and

4. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.[2]

These four new statutory provisions combine to limit the types of training and education public employers may introduce to their employees, and protects employees who object to participating in training programs inconsistent with the new statutory provisions. RSA 354-A:31 prohibits public employers from teaching, advocating, instructing, or training anyone any of the above listed concepts. RSA 354-A:32 prohibits "government programs," which it defines as any

---

[2] This Opinion will use the term "identified group" to mean age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin. With this inclusive of a definition, every resident and visitor to New Hampshire is a member of one or more identified groups.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 5 of 9

activity undertaken by a public employer including in the performance of its government function, from teaching, advocating, or advancing any of the above listed concepts. RSA 354-A:33 prohibits a public employer from disciplining a public employee for refusing to participate in any training, program, or other activity that advocates for or compels the employee to express support for any of the above listed concepts.

Section 298 is the remainder of the amended progeny of HB 544. This section creates a new statute, RSA 193:40: "Prohibition on Teaching Discrimination." RSA 193:40 prohibits teaching students in an elementary or secondary education program any of the four concepts that the new sections in RSA chapter 354-A prohibit.

The statutory changes within Sections 297 and 298 are legislation of limited reach. The new statutes do not prohibit racial, sexual, religious, or other workplace sensitivity training "based on the inherent humanity and equality of all persons." They do not prohibit workplace trainings based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." These statutes explicitly exclude such sensitivity trainings from the scope of the new prohibitions created by RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33. Nor do they prohibit discussing or teaching students about the historical existence of ideas related to the four prohibited subjects, such as the history of discrimination.

## ANALYSIS

The scope of Sections 297 and 298's prohibitions hinges on the meaning of the language those sections employ. When interpreting a statute, a court or agency charged with such interpretation must first look to the language of the statute itself. *Conduent State & Local Solutions, Inc. v. N.H. Dep't of Transportation*, 171 N.H. 414, 419 (2018). In doing so, the agency must begin with the plain meaning of the words used. *Union Leader Corp. v. Town of Salem*, 173 N.H. 345, 350 (2020); *see also* RSA 21:2 (2012) ("Words and phrases shall be construed according to the common and approved usage of the language."). The agency must confine itself to the statute as written and not consider what the legislature might have said or add language the legislature did not include. *Conduent State & Local Solutions, Inc.*, 171 N.H. at 420. The agency must look at the statute as a whole and should construe the statute to avoid absurd or unjust results.[3] *Id*. Absent an ambiguity[4] examination of any legislative record beyond the actual text of the statutes is inappropriate.

---

[3] Examples of absurd results include, but are not limited to, situations where the interpretation of one statute negates another. *See Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005) ("When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other."). The goal of statutory interpretation is to strive to read statutes in harmony with one another rather than in dissonance with one another. *See id*. ("[W]e do not construe statutes in isolation; instead, we attempt to do so in harmony with the overall statutory scheme.").

[4] In this context, ambiguity is a legal term of art that applies only if two or more reasonable interpretations of a statute exist after the agency considers the plain meaning of the words in the statute. *Attorney General v. Loreto Publications, Inc.*, 169 N.H. 68, 74 (2016).

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 6 of 9

<u>Prohibitions Related-to Inherent Traits</u>

The scope of Section 297 and 298's first two prohibitions derives substantially from the meaning of the term "inherent." In the first prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently superior or inferior" to another identified group. In the second prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently racist, sexist, or oppressive, whether consciously or unconsciously." Neither section defines the term "inherent," nor are we aware of any other relevant statutory provisions that define "inherent" as the Legislature used it in Sections 297 and 298. When the Legislature does not specifically define a term within a statute, the Legislature is presumed to have used that term as it is commonly understood. *Franciosa v. Hidden Pond Farm, Inc.*, 171 N.H. 350, 359 (2018). In such situations, the New Hampshire Supreme Court will consult a standard dictionary to discern the common understanding of any given term. *Id.* As an adjudicatory body, the Human Rights Commission should also consult a standard dictionary to discern the common understanding of any given term.

"Inherent" means "structural or involved in the constitution or essential character of something : belonging by nature or settled habit : intrinsic, essential." *Webster's Third New International Dictionary* 1163 (unabridged ed. 2002). The definitions of "intrinsic" and "essential" further illuminate the meaning of "inherent." "Intrinsic" means "belonging to the inmost constitution or essential nature of a thing : essential or inherent and not merely apparent, relative, or accidental." *Id.* at 1186. "Essential" means "forming or constituting the essence of something: making up or being the constituent or intrinsic character or very nature of a thing . . . belonging to or being part of the essence of something: belonging to the constituent fundamental character of a thing: not accidental to something." *Id.* at 777.

The common thread that runs through these definitions is that an inherent characteristic is natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging.

"Inherent," therefore, is properly viewed as a limitation of the scope of Sections 297 and 298's first two prohibitions. With respect to the first, Sections 297 and 298 proscribe training, advocacy, or education that teaches participants that, solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, superior or inferior to members of other identified groups. With respect to the second, Sections 297 and 298 proscribe training, advocacy, or education that informs participants that solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, consciously or unconsciously racist, sexist, or oppressive.

<u>Prohibitions Related-to Promoting Discrimination</u>

Interpreting Sections 297 and 298's third and fourth prohibitions does not turn on the meaning of key terms that define the scope of the prohibition. The statutory language makes

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 7 of 9

plain that a public employer or government program may not provide training or education that informs participants that members of an identified group should be discriminated against or receive adverse treatment. Nor may a public employer or government program provide training or education that informs participants that members of one identified group should not treat members of other identified groups equally.

Permitted Trainings, Activities, and Education

Separate from its prohibitions, Section 297 expressly permits certain trainings and programming within the category of "sensitivity training." This is defined as training "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Sensitivity training consistent with the provisions of Section 297 readily encompasses trainings and programming that promote concepts of equality and the equal, respectful, and dignified treatment of all persons—particularly as they relate to the interactions of members of those identified groups with public employers or government programs.

"Sensitivity training" includes implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources. Implicit bias training does not violate Section 297 unless it includes concepts of group superiority or inferiority based on inherent or innate group characteristics or concepts that an identified group should be treated unequally or discriminated against.

"Sensitivity training" is not limited to implicit bias training, however. For example, a public employer or government program may create a web-based resource entitled, "Anti-Racist Resources," and include information designed to promote a better understanding of racism and how to combat racism. But, if that web-based resource stated that it was designed to "serve as a resource to white people" or to "serve as a resource for our white employees," then it could violate Section 297 because it may imply that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.

Section 298 expressly permits schools to educate about and discuss the historical existence of ideas and subjects that are otherwise prohibited under Section 298. Section 298 does not prohibit schools from teaching about discrimination or how discrimination has existed throughout history. Nor does Section 298 prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups. Similar to Section 297, Section 298 does not prohibit teaching students about implicit biases nor does it prohibit schools from creating web-based resources designed to promote a better understanding of racism, sexism, or other forms of oppression. Section 298 is violated only when a school educates about concepts of group superiority or inferiority based on inherent or innate group

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 8 of 9

characteristics divorced from history or educates that an identified group should be treated unequally or discriminated against.

Section 298 applies to educational instruction in K-12 schools only. Nothing in Section 298 limits instruction by educators in post-secondary schools. Section 297's prohibitions, however, do apply to the teaching and training of employees and volunteers in public, post-secondary educational institutions.

Construing the Prohibited Activities Together with the Permitted Activities

Construing these new statutes harmoniously, Sections 297 and 298 allow public employers, government programs, and schools to train and educate in a manner that promote concepts of equality and the equal, respectful, and dignified treatment of all persons. Both sections permit public employers, government programs, and schools to train and educate about concepts such as implicit bias. Public employers, government programs, and schools violate Sections 297 and 298 only when trainings or education programs advocate that identified groups are either: (1) oppressive by their nature and not simply oppressive by accident, apparently oppressive, or oppressive because of external action or external factors; (2) consciously or unconsciously biased by their nature and not simply biased (racist or sexist) by accident, apparently biased (racist or sexist), or biased (racist or sexist) because of external action or external factors; (3) deserving of discrimination or adverse treatment; or (4) deserving of unequal treatment.[5]

This construction comports with traditional definitions of racism and sexism. For example, "racism" means, among other things, "the assumption that psychocultural traits and capacities are determined by biological race and that races differ decisively from one another, which is usually coupled with a belief in the inherent superiority of a particular race and its right to domination over others." *Webster's Third New International Dictionary* at 1870. This construction also strikes a harmonious balance between expressly permitted "sensitivity training" or programming and prohibited programming that exacerbates discrimination.

For the reasons set forth above, the new sections added to RSA chapter 354-A and RSA 193:40 prohibit only those trainings or educational programs that: (1) teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to characteristics which are apparent, accidental, or based on external action or external factors, that make them superior or inferior to other identified groups, or that those inherent characteristics make one identified group consciously or unconsciously racist, sexist, or oppressive or (2) teach participants that one identified group should be discriminated against or treated adversely. The new sections added to RSA chapter 354-A and RSA 193:40 do not prohibit trainings or educational programs that teach participants about disparities that may

---

[5] Like many discrimination claims, review of a claimant's allegations will involve a fact-intensive, case-by-case analysis of the training or programming at issue to determine whether the training or programming violated Sections 297 or 298's prohibitions.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 9 of 9

exist among different identified groups, the current or historical practices that may have
contributed to those disparities, or about concepts such as implicit bias.

Sincerely,

John M. Formella
Attorney General

#3293122

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

_____
                                   )
LOCAL, 8027 AFT-NEW HAMPSHIRE,  )
AFL-CIO, et al.,                      )
                                   )
          Plaintiffs,         )
                                   )
         v.                  )     Case No. 1:21-cv-1077-PB
                                   )
FRANK EDELBLUT, in his official    )
capacity only as the Commissioner   )
of the New Hampshire Department   )
of Education, et al.,              )
                                   )
         Defendants.       )
_____)

## <u>MOTION TO DISMISS NEA-NH COMPLAINT (ECF Doc. No. 1)</u>

Frank Edelblut, in his official capacity as Commissioner of the Department of Education, John M. Formella, in his official capacity as Attorney General of the State of New Hampshire, Ahni Malachi, in her official capacity as Executive Director of the Commission for Human Rights, Christian Kim, in his official capacity as Chair of the Commission for Human Rights, and Kenneth Merrifield, in his official capacity as Commissioner of the Department of Labor (the "defendants"), by and through the Office of the New Hampshire Attorney General, move to dismiss the complaint filed by Andres Mejia, Christina Kim Pilibotte, and the National Education Association–New Hampshire (ECF Doc. No. 1) (the "NEA-NH complaint"). The NEA-NH complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for the reasons set forth in the memorandum of law filed contemporaneously with this motion. **Section III** of the argument section of the defendants' memorandum of law pertains to the sole claim asserted in the NEA-NH complaint. _See_ Defs.' Mem. Law at 20–37

WHEREFORE, the defendants respectfully request that this Honorable Court:

A.      Dismiss the NEA-NH complaint (ECF Doc. No. 1) for the reasons set forth in **Section III** of the memorandum of law filed contemporaneously with this motion; and

B.      Grant such other relief as the Court deems just and equitable.

Respectfully submitted,

FRANK EDELBLUT, in his official capacity as Commissioner of the Department of Education,

JOHN M. FORMELLA, in his official capacity only as Attorney General of the State of New Hampshire,

AHNI MALACHI, in her official capacity as Executive Director of the Commission for Human Rights,

CHRISTIAN KIM, in his official capacity as Chair of the Commission for Human Rights,

*and*

KENNETH MERRIFIELD, in his official capacity as Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date:  March 25, 2022

*/s/ Samuel Garland*
Samuel R.V. Garland, Bar #266273
Assistant Attorney General
Civil Bureau
New Hampshire Dept. of Justice
33 Capitol Street
Concord, NH 03301
(603) 271-3650
Samuel.RV.Garland@doj.nh.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing was served on all counsel of recording using the Court's electronic-filing service.

*/s/ Samuel Garland*
Samuel R.V. Garland

# Exhibit A



**NO LEFT ████ RN**
*in ████████*

No Left Turn in Education
New Hampshire Chapter
P.O. Box 1101
Moultonborough, NH 03254

February 7, 2022

Superintendent Garth J. McKinney
Nashua SAU Office
141 Ledge Street
Nashua, N.H. 03061-0687

      RE:    Probable violation of New Hampshire's Educator Codes of Conduct by educators
                Samantha Leone, Paul Menard, Jocelyn Merrill and Stephanie Cassidy of SAU #42

Superintendent McKinney:

No Left Turn in Education (NLTE) is a national education advocacy organization in which I serve as the director of the New Hampshire Chapter. We write today to present SAU #42 with evidence that four educators in your district are engaged in ongoing violation of New Hampshire's Educator Codes of Conduct.

As you know, on June 25, New Hampshire enacted a Prohibition on Teaching Discrimination. This law prohibits teaching that any person or group of people is inherently racist, sexist, or oppressive, or that any person or group of people should be discriminated against on the basis of their race or sex.

New Hampshire's Department of Education, Department of Justice, and Commission for Human Rights have issued a joint memorandum summarizing this law in the following words: "In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination."[1]

As acknowledged in the joint memorandum, New Hampshire law also makes any violation of the Prohibition on Teaching Discrimination a breach of the Educators Code of Conduct. The statute says that "[v]iolation of this section by an educator *shall be considered a violation* of the educator code of conduct that justifies disciplinary sanction by the state board of education."

---

[1] https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf

On August 11, in explicit response to the Prohibition on Teaching Discrimination—along with eleven analogous bills introduced in other states—the Marxist organization Zinn Education Project called upon educators around the country to sign a pledge (the "Zinn Pledge") promising to openly violate any such prohibitions should they become law. The organization claims to base this pledge upon the principle that "one has a moral responsibility to disobey unjust laws."[2]

The Zinn Pledge and its signatories are publicly available online. Sadly, at present, 4educators in SAU #42 have openly promised to violate the Prohibition on Teaching Discrimination. These teachers are Samantha Leone, Paul Menard, Jocelyn Merrill and Stephanie Cassidy.  By signing this pledge, these educators have promised not only to violate their ethical obligations and the law, but, more importantly, to promote racism or sexism in their classrooms.

This is not an overstatement. In its own words, the Zinn Pledge says it opposes banning education which "identifies people or groups of people… as inherently, immutably, or systemically sexist, racist, anti-LGBT, bigoted, biased [or] privileged." All of the signatories of the Zinn Pledge can be assumed to have read the public document to which they signed their names.

Some educators signed the Zinn Pledge before New Hampshire's law was passed. However, to downplay the pledge for that reason would be to ignore the pledge's clear words. The pledge's signatories explicitly anticipated the passage of New Hampshire's current law and promised to break that law after it was enacted.

At a minimum, these teachers' decision to sign the Zinn Pledge is evidence that they are potentially violating the Educators Code of Conduct and, more importantly, using their positions as educators to instill racism, sexism, and other forms of invidious prejudice in their students.

It is also more than enough evidence for SAU #42 to investigate these educators—and to trigger the district's ethical duty to act. 510.05 of the Educator Codes, entitled "Duty to Report," states that "*[a]ny credential holder shall report* any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures."[3] The Prohibition on Teaching Discrimination is the law of New Hampshire and states directly that "[v]iolation of this section by an educator *shall be considered a violation* of the educator code of conduct."

Moreover, the Educator Code itself states that "the department [of education] shall undertake an investigation" of any educator if it merely "has reason to suspect" that the educator knowingly *failed to report* a violation of the Codes.[4]

In addition to educators' universal duty to report, superintendents have specific duties under the Codes. 510.05(c) states that a superintendent "*shall report…* to the office of credentialing" when "a superintendent has knowledge that a credential holder has violated the code of conduct."

---

[2] https://www.zinnedproject.org/news/pledge-to-teach-truth
[3] Ed. 510.05(a).
[4] Ed. 510.05(f).

While this provision cites Ed. 510.01 and the following sections, all of these sections state that unprofessional conduct "shall... not be limited to" the offenses those section expressly enumerate. More importantly, New Hampshire statute directly provides that any violation of the Prohibition on Teaching Discrimination "shall be considered a violation of the educator code of conduct."

Accordingly, we urge that the district protect our children by investigating these signatories for potential violations of their ethical obligations and the law.

The names and school district of the signatories in SAU #42 were derived from the Zinn Pledge itself and other publicly available information. We encourage the district to verify the information in this letter directly by viewing the Zinn Pledge online at https://www.zinnedproject.org/news/pledge-to-teach-truth.

Sincerely,

Michael D. Breen, Ph.D.
Director
NH Chapter, No Left Turn in Education

# Exhibit B

Skip to main content

scroll to top

A A A Change Text Size
Change Site Language
Search The Site
CLOSE

| MAKE TEXT SMALLER |

| MAKE TEXT LARGER |

CLOSE

Select Language

Powered by Google Translate Translate

Powered by:

Reset Language to English
CLOSE

Search entire site by keyword or topic  Search by keyword or topic...

| SEARCH |

ALERT

**Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**

# New Hampshire
# Department of Education

- 
- 
- 
- 

# Main navigation

☐ OPEN MENU CLOSE MENU

- Home
- Education Pathways
  - Local District Schools
  - Public Charter Schools
  - Private/Nonpublic Schools
  - Home Education
  - Adult and Continuing Education
  - Education Outside the Classroom
  - Higher Education in New Hampshire
  - Bureau of Special Education Support
  - Career and Technical Education
  - Section 504
- Parents and Students
  - My Local School District
  - Services for my child
  - Appeals and Mediation
  - School Safety
  - Transportation
- Educators
  - Bureau of Credentialing
  - Resources for Teachers
  - Grants and Funding
  - Rules and Regulations
  - Bureau of Student Wellness

- Data Reports
- Partners
- Who We Are
- Careers
- Contact Us
  - NHDOE Email Distribution List

- Home
- Education's Sacred Trust

# In the News

For Immediate Release
April 15, 2022

## Contact

Kim Houghton, Communications Administrator
(603) 513-3030 | kimberly.c.houghton@doe.nh.gov

# Education's Sacred Trust

***Op-ed written by Commissioner Frank Edelblut of the New Hampshire Department of Education***

Educators and the public education system are custodians of a sacred trust.

When children come to school, they arrive reflecting the value systems of the families responsible for raising them. Those value systems are as different as the children themselves.

Recent revelations from educators around the country, mostly on social media platforms like TikTok, reveal a number of educators who believe that it is their responsibility to weigh in on and influence the value systems of the children toward a particular goal. This impulse to influence a child's value system is not limited to educators. As was recently revealed, Disney also wants to weigh in. It is not good enough to simply allow parents and caregivers the responsibility to instill a value system they believe is right for the child. Whether it is a rogue educator or a corporation trying to impose a value system on impressionable youngsters, that is not their job. That is the job of parents and caregivers.

Fortunately, parents can choose to turn off Disney. They can't, however, easily escape the efforts of activist educators who might be knowingly dismantling the foundations of a value system they are attempting to build.
That means that families, when they send their children to school, entrust the educators to respect the value systems that the family is building. This is the sacred trust that educators have.

To be fair, most educators do not engage in such practices, and effective educators know that blatant displays of bias are not necessary. They can teach challenging and sometimes controversial topics without allowing their personal preferences to seep through to the children. A student may never even know a teacher's opinion on a topic, particularly a sensitive topic like sexuality and gender, or perspectives on political systems, whether capitalism or socialism, or an ideological engagement of race and diversity.

Rather, these teachers provide instruction that is developmentally appropriate to the child, and parents are left to determine how, and when, to explain the benefits and consequences of adopting beliefs that align with one side of an argument or another.

But when educators overstep, it weakens the ability for parents to achieve the values they believe to be best for their children, and it squanders the credibility of the profession as a whole.

For the most part, New Hampshire has avoided many of the problems seen on a national level. But, that does not mean that we are immune to them.
Recent experiences in New Hampshire show that some of these biases are beginning to seep into our own institutions. This document.pdf exemplifies actual instructional material from New Hampshire schools that parents have identified as conflicting with their values.

One example includes messaging to children as young as 8 and 9 year "that there are totally more than two genders! Some people identify as a gender that is not male or female, some identify as more than one gender, and some people don't identify as any gender." Not only can this be confusing for a child, but it might conflict with – or worse, undermine – the value system of many of the families.

Children in New Hampshire need to learn about capitalism and socialism. And, when those subjects are taught, the teaching needs to be factually accurate. The goal, however, is not to persuade children to become socialists through a biased or subtle affirmation of the tenants of socialism, even if the educator holds a personal belief in that system. Again, for an effective teacher, those beliefs do not seep through. But, when walls of one New Hampshire classroom are adorned with posters extoling the virtues of socialism, the educators undermine the values of families.

Parents of students taking an art class should have a reasonable expectation that they will be learning about, well, art. They should not be concerned, as occurred in another New Hampshire classroom, that the introduction to art will begin with a lesson in pronouns and links to Black Lives Matters for kids and LGBTQ+ for kids.

For a very long time, educators were a highly trusted partner for parents, and in that role, they were given great latitude. With that latitude came great responsibility. Responsibility to support the parents and not undermine their values.

The actions of some educators, which have become increasingly apparent through social media as a result of the pandemic, are undermining the sacred trust that educators hold. Educators have a position of influence over children. The correct use of that influence will support and not compromise the values of families.

Good educators have always recognized that.



.pdfViewer

 Portable Document Format (.pdf) . Visit nh.gov for a [list of free .pdf readers](#) for a variety of operating systems.

 # New Hampshire
# Department of Education

*25 Hall Street | Concord, NH | 03301-3860*
*(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 | info@doe.nh.gov*
Directions to NHDOE Subscribe to e-news

## Footer - Agency Links

- NH Career and Technical Education
- NH Schools
- iPlatform
- myNHDOE
- Educator Search

## Footer - State Links

- NH Government Careers
- NH Travel & Tourism
- NH Web Portal - NH.gov
- ReadyNH.gov
- Transparent NH

© 2022 State of New Hampshire • All rights reserved

- Accessibility Policy
- Privacy Policy

An official NEW HAMPSHIRE government website



# Original text

Contribute a better translation

# Topic One

**EdChange**
informing ourselves
reforming our schools
transforming our world
www.EdChange.org

# Equity & Diversity in the U.S.
# A Re-Perception Quiz

1. 57% of people in state prisons for drug offenses in the US are African American. What percentage of illicit drug users in the US are African American?
   a. 14%
   b. 28%
   c. 42%
   d. 56%

2. According to the Southern Poverty Law Center, 34 anti-Muslim organizations were operating in the US in 2015. How many were operating in the US in 2016?
   a. 21
   b. 34
   c. 101
   d. 146

3. According to GLSEN, what percentage of students who report an incident of homophobia at school say the school did nothing in response or told them to ignore it?
   a. 18%
   b. 31%
   c. 48%
   d. 64%

4. US Census data show that African American and Latina women earn how much for every dollar a White man earns?
   a. one dollar and one dollar, respectively
   b. 81 cents and 79 cents respectively
   c. 64 and 56 cents, respectively
   d. 54 cents and 49 cents, respectively

The Service Women's Action Network has reported that women serving in Iraq and Afghanistan are less likely to have been killed by an enemy than they are to have been:
a. raped by a colleague
b. dishonorably discharged
c. promoted in rank

6. According to the Center for American Progress, compared with schools attended by at least 90% white students, those attended by at least 90% students of color spend how much less per pupil annually?
   a.  $312
   b.  $733
   c.  $1,028

7. About 5% of the world's people live in the United States. About what percentage of people currently in prison live in the United States?
   a.  5%
   b.  25%
   c.  45%
   d.  65%

8. In a study conducted by the National Bureau of Economic Research, researchers replied to help-wanted ads by sending résumés from fictitious applicants. Each applicant had the same qualifications, but some had stereotypically African American sounding names while others had stereotypically White sounding names. How much more likely were applicants with stereotypically White names to get a callback regarding their applications than applicants with stereotypically Black names?
   a.  15% more likely
   b.  26% more likely
   c.  39% more likely
   d.  50% more likely

9. Identify the source of this quote: "We have deluded ourselves into believing the myth that capitalism grew and prospered out of the Protestant ethic of hard work and sacrifices. Capitalism was built on the exploitation of black slaves and continues to thrive on the exploitation of the poor, both black and white, both here and abroad."
   a.  bell hooks
   b.  Michael Moore
   c.  Martin Luther King, Jr.

10. The median household income in the US has increased 16% since 1980. During the same period, corporate profits after taxes increased 182%, the average income for the wealthiest 1% of families increased 190%, and the average income for the wealthiest 0.01% of families grew 322%. What happened to the average income of the poorest 90% during that time?
   a.  increased 16%
   b.  increased 0.03%
   c.  decreased 16%

*For a list of references as well as other quizzes and answer keys, please visit the Multicultural Pavilion Web site at http://www.edchange.org/multicultural/quizzes.html.*

© EdChange and Paul C. Gorski, 2017
http://www.EdChange.org

a. $312
b. $733
c. $1,028

7. About 5% of the world's people live in the United States. About what percentage of people currently in prison live in the United States?

a. 5%
b. 25%
c. 45%
d. 65%

8. In a study conducted by the National Bureau of Economic Research, researchers replied to help-wanted ads by sending résumés from fictitious applicants. Each applicant had the same qualifications, but some had stereotypically African American sounding names while others had stereotypically White sounding names. How much more likely were applicants with stereotypically White names to get a callback regarding their applications than applicants with stereotypically Black names?

a. 15% more likely
b. 26% more likely
c. 39% more likely
d. 50% more likely

9. Identify the source of this quote: "We have deluded ourselves into believing the myth that capitalism grew and prospered out of the Protestant ethic of hard work and sacrifices. Capitali was built on the exploitation of black slaves and continues to thrive on the exploitation of the poor, both black and white, both here and abroad."

a. bell hooks
b. Michael Moore
c. Martin Luther King, Jr.

2. According to the Southern Poverty Law Center, 34 anti-Muslim organizations were operating in the US in 2015. How many were operating in the US in 2016?

   a.  21
   b.  34
   c.  101
   d.  146

3. According to GLSEN, what percentage of students who report an incident of homophobia at school say the school did nothing in response or told them to ignore it?

   a.  18%
   b.  31%
   c.  48%
   d.  64%

4. US Census data show that African American and Latina women earn how much for every dollar a White man earns?

   a.  one dollar and one dollar, respectively
   b.  81 cents and 79 cents respectively
   c.  64 and 56 cents, respectively
   d.  54 cents and 49 cents, respectively

5. The Service Women's Action Network has reported that women serving in Iraq and Afghanistan are less likely to have been killed by an enemy than they are to have been:

   a.  raped by a colleague
   b.  dishonorably discharged
   c.  promoted in rank



Thank you

That student told me
Parent pulled him aside
today and asked if he was
given an assignment that
made him
"uncomftorable"

Im not sure how he even
know who it was that
shared that info. Parent
said that teacher had
them fill out permission
slips? But even with a slip,
i would think its still not
allowed.





Verizon LTE          8:06 AM          @ 31%

3 People

Probably they pinpointed
him because he was at
the meeting I did put in a
call to the principal
because I've never
spoken to him before and
I wanted to bring up
about the fact that the
comfort of the students
should be in the forefront



I figured it was because
he was sitting with us last
night



iMessage

6





That's harassment

Did ▮ say yes?

Im not sure

Either way i thought it was wrong of parent to do. That makes the student feel like ▮ did something wrong

I think a complaint needs to be filed against parent. I can't imagine being in that students shoes and



engaging with ▮ in the middle of
the hallway. ▮ yelled that ▮
talking to me. Loudly. Said it loudly
not exactly yelling but said it
loudly.
I told ▮ I had zero trust in
anything, I told ▮ that as well.
▮ said we had the department of
education emailing them and they

▮ reached out to
someone ▮ trusted, in an
uncomftorable situation,
and they want to punish
▮ ▮ for it. Disgusting.

Oh boy.  Please find a
way to acknowledge and
thank this student

I already did. And
reminded ▮ very
brave

9

students mom because said
student stuck up for what's right
that will benefit future grades.
Absolutely insane. I couldn't
believe that. ▊▊▊ was so
rude and I told ▊▊ I lost all
respect for ▊▊ understood
that because ▊ not very nice
after school board meetings,
apparently, that's what ▊ said.
▊▊ gonna "fix it" 🙄 yeah I'm
not talking to that ▊ ever again.

What did ▊▊ say to you

Wanted to know who I told (didn't
tell ▊ - all of this at 7:15 am
WHILE i was walking to my A
period class. Questioned me and I
walked away because I wasn't
engaging with ▊ in the middle of
the hallway. ▊ yelled that ▊
talking to me. Loudly. Said it loudly
not exactly yelling but said it
loudly.
I told ▊ I had zero trust in
anything, I told ▊ that as well.
▊ said we had the department of
education emailing them and they
were scrambling to fix it. The fact
that ▊ just assumed it was me no
questions asked says enough.



**Edelblut, Louis (Frank)**

| | |
|---|---|
| **From:** | Farrell, Richard |
| **Sent:** | Tuesday, April 12, 2022 9:00 AM |
| **To:** | Edelblut, Louis (Frank) |
| **Subject:** | FW█ |
| **Attachments:** | Human Relations Course Syllabus.pdf |

Please review the attachment.
Rich

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

*The contents of this message are <u>CONFIDENTIAL</u> Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is <u>PROHIBITED</u>. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** █████████████████
**Sent:** Thursday, April 7, 2022 9:34 AM
**To:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Cc:** █████████████████████████████████
████████████
**Subject:** █████████████

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Good morning Rich.
We have had an opportunity to review the material that you'd sent and have the following information for you in response to the inquiry.
First and foremost, the activities identified are from the Human Relations Course at ███ After review with the principal, curriculum coordinator, and assistant superintendent, we have determined that these activities do fall within the scope of the course. For your information, I have attached a copy of the syllabus. You'll also notice that this syllabus includes a form for parental notification, as well as an invitation for parents to review class assignments on Google Classroom at any time. I'm told that all participants in the class have submitted signed acknowledgements. Furthermore, neither the teacher nor school administrators have received any complaints to date regarding the course content. Should any such objection be received, the district will handle it in accordance with our Policy IGE – Exceptions to Use of Specific Course Material(s). We have also reviewed this material through the lens of the new Divisive Concepts law, and find that the subject of these activities do not apply.

I have copied the school staff involved in this matter on this email – please feel free to let us know if you require further information.
Regards,
█████████

# Human Relations with ███████

room: ███     email: ███████████          phone: ████████████

## Class Description

Students will develop knowledge, skills, and behaviors to create a greater understanding of themselves, other individuals, families and society. The course will proceed by way of class activities and development of skills to contribute to positive relationships, families and an understanding of our society.

## Class Competencies

**Personal Development:** Students will analyze functions and expectations of personal needs, characteristics and the effects on interpersonal relationships.

**Communication Skills:** Students will demonstrate communication skills that contribute to positive relationships in all aspects of life.

**Leadership & Teamwork:** Students will demonstrate leadership and teamwork.

# Responsibility and Preparation

Come to class on time and prepared. You should be in your seat by the time the bell rings.

## CLASS EXPECTATIONS = LIVE THE LANCER WAY!

1. **Be Positive & Respectful**
2. **Be Prepared & Organized**
3. **Be Present & On-time**
4. **Be Proud**

Situations disregarding our classroom expectations will be handled on a case-by-case basis to emphasize the importance of being our best.

### Cell Phone Policy

Please be respectful with the use of personal devices and keep them away during instructional time. Your device should not be preventing you from doing your work.

# Google Classroom

All lesson materials and assigned work (including papers that are handed out in class) will be posted on Google Classroom for reference and review purposes, or in the event that you are absent. You are encouraged to invite your parent/guardian to our Google Classroom so that they may stay informed about what we are doing in class.



Course Competencies-
Competency 1 - Communication and Collaboration in the classroom
Competency 2 - Critical Thinking, Creativity and Problem Solving
Competency 3 - Self- Directed Learners
Competency 4 - Engaged Citizens in our communities

## CLASSROOM WORK/GRADING

Assessments will be done in multiple ways. Bell ringers, quizzes, class activities, exit tickets and reflections will be used in the classroom to formatively assess the students' learning. Performance tasks, projects, presentations and reflective writing will be used to summatively assess a student's work.

**Summative work counts for 80% of your grade.**
**Formative work counts for 20% of your grade.**

## ATTENDANCE-

Students are expected to be in class, on time, every day. Attendance will be taken at the beginning of each class and absences will be noted. **Students who miss more than 5 classes per quarter are in danger of failing** the course. In addition, those students who arrive late (without proper documentation) will also be noted and marked as tardy. **3 tardy arrivals count as 1 absence.** REMEMBER..... Most of our course assignments are completed in class so it is in your best interest to be in class to complete the work.

## MATERIALS
Folder
Pencil/Pen
Notebook or paper (guided note sheets will be provided for some lessons)
Laptop/device to access Google Classroom and online assignments



## MAKE UP WORK & REMEDIATION PLANS-

#### Make-Up-
If you are absent---it will be **YOUR** responsibility to do the following-
- Check the **Google Classroom** and your **Weekly Overview**
- Initiate communication with me on how to complete any missing formative or summative work
- All make-up work must be completed within one week after returning to school unless an alternative plan is made with your teacher according to the Student Handbook page 9.

#### Late work -
I understand that life happens and assignments will be accepted late. However if arrangements were not approved in advance and the assignment is more than 1 day late, 5 points will be taken off. If assignments are repeatedly turned in late additional points may be taken off. If you are completing an assignment late that is an online assignment, it will be your responsibility to notify me to check the online assignment for your work (send an email, comment on classroom assignment or discuss in person).

#### Remediation-
If you are not satisfied with your success on a summative assignment and you would like to create a plan to improve, you must make arrangements with me to create a remediation plan. Plans will be created based on the assessment, the competencies addressed and the area of need for the student. Remediation must be completed within the same quarter as the original assignment.

#### Extra help -
For extra help, to make up work or just to talk about life, please see me either before school (7:05-7:15) or during my prep period (C period) or lunch (F period). If you need a longer time period I am happy to schedule one with you.

I am looking forward to the opportunity to work with you throughout the semester.   LET'S GET GOING! ☺

# Human Relations Units of Study

**Values, Goals & Self**
- Values
- Goal-Setting
- Self-Concept
- Self-Esteem

**Media & Technology**
- Social Media
- The Evolution of Dating
- Digital Drama & Cyberbullying

**Stress Management**
- What is stress?
- Managing Stress
- Lifestyle, Attitude & Gratitude
- Time Management

**Relationships**
- Love
- Friendship
- Healthy Relationships
- Ending Unhealthy Relationships
- Partnership & Marriage
- Family & Parenting Styles
- Family Stressors

**Communication**
- "I" Messages
- Levels of Communication
- Handling Conflict
- Communication Styles
- Complaints & Difficult Conversations

**Community**
- Leadership & Teamwork
- Community Resources
- Building Confidence
- Community Service

**Diversity**
- Celebrating our Differences
- Equity vs. Equality
- Race & Privilege
- Gender & Sexuality
- Microaggression



  

## Welcome to ███████ Class

### ALL ABOUT RELATIONSHIPS

**███████ High School---Family & Consumer Sciences Department**

Teacher ███████   E-Mail- ███████   Phone- ███████

If you need assistance please see me in class or send me an email to set up an appointment.

By signing the course agreement, you are stating you understand the requirements of the course and the expectations.  Please have your parent/guardian sign so they are aware of the requirements and expectations of the course as well.

## HUMAN RELATIONS COURSE AGREEMENT

### Please read and sign:

I have read and understood the expectations and requirements of Human Relations course..

**Student Name (please type or print):** _____

**Student Signature:** _____

**Please list any food allergies:** _____

Since our class is held in our foods classroom I would like to be aware of any food allergies to ensure classroom safety.

**Parent/Guardian Signature:** _____ **Date:** _____

Parents/Guardians:

- If you have any special skill/experience in relation to the class topics, please feel free to call or email me to set up a time to discuss, or write your phone number below for me to contact you.

- You are welcome to join our Google Classroom to stay up to date on what we are covering in class and review any assignments with your student.
  - Google Classroom code – Human Relations – _____

- Please feel free to contact me if you have any concerns/suggestions about the class or your child.  I look forward to working with you and your child(ren) this semester!

# Topic Two



!! !! !! !! !! !! Today !! !! !!

11:58 AM ⏱

A friend has a 6th grader at [redacted]
that came home and said that in
their 'debate' class they were
debating a sexual
Relationship between two men.
the sixth grader came home and
said their debate was very
uncomfortable and was about S E
X (spelled out because they are
too young to even want to say the
word!!).  not an appropriate topic
for 6th...maybe towards the end
of high school but not right
around puberty...and we are to
trust the 'experts' in education
have designed the curriculum and
have done their due diligence on
what is best for kids and age
appropriateness??? This has to
stop.  My friend is still processing
it before deciding how to address
it with the school.          12:27 PM ⏱

😮 3   🤬

1

1023

# Topic Three



March 16, 2022

Dear Families of Fourth Graders:

The Life Science unit will begin prior to spring break this year.  This unit focuses on body development and puberty.  This unit can be a way of gathering answers to questions students have been curious about, but frequently it can be an uncomfortable topic for some children.  I hope that with support from both home and school, we will be able to help students learn accurate information about their bodies in a way that encourages them to be respectful and accepting of themselves and others. I will work with all fourth grade students together in an open teaching format.  There will be a focus on basic scientific facts explaining how everyone will go through adolescent changes at their own body's pace.  Now is the perfect opportunity for you to take some time to begin a conversation with your child prior to the school lessons to let them know you are there to answer any questions they may have.

Topics covered:

- Anatomy and physiology of the reproductive system
- Emotional and physical changes that begin with puberty
- Health and hygiene
- Personal safety including strangers, safe phone/internet use
- Peer pressure & respect for self and others

If you would like to review the materials that will be used in teaching please feel free to connect with me. Here is a great website if you are looking for information: Amaze.org  There are also many other sites, some better than others, so be sure to review beforehand if you want to use it with your child!

Here are some books you might find helpful:

"The Care and Keeping of You" –American Girl Library

"On Your Mark, Get Set, Grow" –Lynda & Andrea Madaras

**Thank you for your help!  Please call anytime if you have questions.**

using some of the following:



Speak with your child when you're both relaxed, like over dinner or in the car

Bring these issues up when you hear someone is getting married

If your child says a friend's sister or a teacher is getting married, you can say, "That's fantastic! Is she marrying a man or a woman?"

If you hear your child or one of their friends say, "That's so gay," address it

What's important to remember is that people deserve to express themselves in ways that feels right for them and to be respected no matter how they identify, look or dress



Are there more genders than "boy" and "girl"?

Yes, there are totally more than two genders! Some people identify as a gender that is not male or female, some identify as more than one gender, and some people don't identify as any gender.

How can I tell a person's gender?

What should I do if I don't feel like either a boy or girl, or if how I feel doesn't match my body?

Related Videos

know if I am?

## How do I figure out my sexual orientation and identity?

Your sexual orientation refers to the gender(s) of who you're attracted to or who you fall in love with. While sexual orientation is not a choice, it can shift over time for some people. It also may be difficult to understand and make sense of your feelings. Separately, your identity is what you decide to call yourself, which is a decision that can only be made by you. You get to figure out which sexual identity best suits you and what that identity means. Some of these identities are gay, pansexual, lesbian, demisexual, heterosexual, bisexual, asexual and more! It's also all right if your identity changes over time or doesn't exactly match up with your sexual orientation or sexual behaviors. There is no need to feel pressured into identifying a certain way.

# Related Videos




# VIDEO TOPICS

## Gender Identity

What Are Pronouns?

Challenging Male Gender Stereotypes With Jason Rogers

Sex Assigned at Birth and Gender Identity: What Is The Difference?

Range of Gender Identities

Puberty and Transgender Youth

Gender Identity: Gender Roles and Stereotypes

How To Be A LGBTQIA+ Ally

My Friend Is Transgender

Being Female, Male, Transgender or Fluid

Expressing Myself. My Way.

## Healthy Relationships

# Topic Four



1030

1031

# Who is Mx. ?

## HELLO! I'm...



My name is Mx. ▮▮▮▮

Mx. is pronounced just like the word "mix." It is a gender-neutral prefix/honorific (like Dr. or Professor or Coach) instead of using Ms., Mrs., or Mr.

Click here for more info!

SLIDESMAMA.COM

1032

# My pronouns are they/them/theirs

Pronouns are what people use to refer to you without using your name. For example, "This is Mx. ███████ They are my ███ teacher! I like them as a teacher. Their favorite color is peacock blue."

Common pronouns:

She/her/hers

He/him/his

They/them/theirs  ⬅ Click the pronouns for more info on "they"

3

# What else should we know about Mx. ▮▮▮▮▮?



Click here for more info
on BLM for kids

Click here for more info
on how to make safer
spaces for LGBTQ+ kids

SLIDESMANIA.COM

4

# Topic Five

1035



Poster reads:

Socialism

An Economic Ideology

Economic system where the basic means of production is primarily owned and regulated by the government

All for one and one for all

"Socialism is workable only in heaven where it isn't needed and hell where they've got it" Cecil Palmer

A few examples: Socialist Republic of Vietnam 1976-Present, Laos 1975-Present

Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.

1

1036



Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.

TEACHER'S Discovery









Black Lives Mo[...]

-Black sav-
e-nothing.
ack people
rsonalities
e ego that

f a Black

ie. Chil-
and vig-
. Police
like in
ts push
esident

ometi
racist
minds
hom
ified

teaming with
antiracist decl
ocial media o
at antiracist pr
protesters reject

that Black lives don't matter. #BlackLivesMatter quickly transformed from an antiracist love declaration into an antiracist movement filled with young people operating in local BLM groups across the nation, often led by young Black women. Collectively, these activists were pressing against discrimination in all forms, in all areas of society, and from a myriad of vantage points. And in reaction to those who acted as if Black male lives mattered the most, antiracist feminists boldly demanded of America to #SayHerName, to shine light on the women who have also been affected by the hands and feet of racism. Perhaps they, the antiracist daughters of Davis, should be held up as symbols of hope, for taking potential and turning it into power. More important, perhaps we should all do the same.



*OJ Simpson Trial*

*Kind of Skimmed over this . . . .*

on? Not at the Million Man March, that's for sure. He was in Texas, pleading to evangelicals for racial healing. Instead of listening to the people dealing with it, he went to beg people not dealing with it to ask God to fix it. And, of course, it slipped into *pray God fixes Black people*. Even though a year later, affirmative action was banned in California, making the playing field, especially as it pertained to higher education.



Doms Perspective Racism (according)

Everything was now fine (to whites)

By $73

How whites
blame blacks
for their circumstances
. blacks should get over it,
  work harder etc.
. whites claimed they were
  now the victims

Nonetheless, the Civil Rights Act of 1964
first important civil rights legislation since
Rights Act of 1875. Hours after President
signed it into law, on July 2, 1964, he hit the
to play up the whole American i

8



Whenev...

BSUs o...

and dem...

historica...

All s...

Separatists, pan-Africanists, and everything in betwee

Black Power even appealed to the face of the civil righ

movement. That's right, even Dr. King, in 1967, was tur

ing away from assimilationist thought in the same w

W. E. B. Du Bois had later in his life. Dr. King had n

realized that desegregation was good only for elite Bl

9

BOOKRAGS

Answer

8. Who do Reynolds and Kendi claim was the world's first racist?

Gomes Eanes de Zurara. A loyal commander in Prince Henry's Army. He was the first person to write about + de Black human ownership

9. Who did the world's first racist write a biography about, according to Reynolds and Kend

Prince Henry.

10. What was the book that the world's first racist wrote titled, according to Reynolds and Kendi?

1450

The Chronicle of the Discovery and Conquest of Guinea. in 1450

11. How was the world's first racist's book received by the public?

It was a bestseller.

12. How did the world's first racist depict Africans in his book, according to Reynolds a Kendi?

As savages that needed training. Africans needed slavery in ord fed and taught Jesus.

13. What did the Climate Theory say about Africans?

They were savages because of the hot weather where they came from and th become white if they moved.

14. What did the Curse Theory say about Africans?

10

# Original



1046

12

Recreation

8th Grade                     2021-22

Competency 1: I can demonstrate an understanding of conflict and compromise

| Date: | Monday: 9/20 | Tuesday: 9/21 | Wednesday: 9/22 | Thursday: 9/23 | Friday: 9/24 |
|---|---|---|---|---|---|
| Learning Target | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States |
| Essential Question | What are the causes of Racial Tension? | | | | |
| Formative | US History Formatives: Who was the first Racist? What did he accomplish? | | US History Formatives: Blank Map of New England | | |
| Classwork | Hand out Stamped. Read Aloud chapters 2-4 Answer questions | Hand out Stamped. Read aloud chapters 2-4 Answer questions in packet Slave Trade packet Exit Ticket | Read aloud Chapters 3 and 4 and answer questions together. Slave Trade packet | Read to P. 78 and answer questions together. Review: Slave Trade packet Do exit Ticket | Worksheet: Historical Background: The Development of Race-Based Theory |
| Hw | | | | | |

# Topic Six

# Get to Know You!

Answer the Google Form below to help me get to know you!

---

What is your first and last name? *

Liam Elliott

---

What is your preferred name? *

Liam

---

Who can I use this name in front of? *

☑ I can use this name in front of other students

☑ I can use this name when contacting parents/guardians

☑ I can use this name with other teachers, including substitutes

☐ Any other comments:

☐ Other:

What are your preferred pronouns? *

◉ He/him/his

◯ She/her/hers

◯ They/them/theirs

My preferred learning style is... *

◯ Visual-- maps, graphs, diagrams, charts, etc.

◯ Auditory-- speaking and listening

◉ Kinesthetic-- experience, practice, examples, simulations (hands-on)

◯ Reading and writing

I like when my teacher... *

Gives me A's

One thing you should know about me as a student is... *

I'm a pain

One thing you should know about me in general is... *

I have red hair

Any thing else you would like me to know? *

Pronouns are the same ones i got in the womb

This form was created inside of ███████████████

Google Forms

1051

# Algebra 2 Getting to Know You

Please answer the following questions, so that I can better assist you this semester.

1. Email *



2. Name (First and Last) *



3. Name you want me to call you in class. *

 or _____ whatever you want

4. Pronouns (ex: he/him, she/her, they/them): *

She/her

5. May I use these pronouns in front of the class? *

*Mark only one oval.*

 Yes

○ No

4

1052

6. May I use these pronouns when I contact home? *

*Mark only one oval.*

Yes

No

7. May I use these pronouns in front of other teachers? *

*Mark only one oval.*

Yes

No

8. Would you like to follow up with me (in a private conversation) about your pronouns? *

*Mark only one oval.*

Yes

No

9. Are you taking another math class this semester? If so, what is it? *

No

10. What math classes have you taken and at what level? *

Algebra 1 pt 1 &2 (E)
Geometery (H)
Consumer Science (H)

5

11.  Why did you take this particular class? *

Because I need the Credit

12.  What grade do you expect to earn in this class? *

*Mark only one oval.*

◯ A

⊘ B

◯ C

13.  Tell me about your past math experiences. *

I can grasp Concepts very well, but I do
tend to overthink equations and end up overwhelming
myself.

14.  Tell me three things about yourself. This could be a hobby (or hobbies), interesting
facts, or anything you want me to know about you? *



- I write/sing songs
- I play the Piano
- I'm a host at ████ in ████

15. What would you like to ask me about myself or this class?

If you could teach another class what would it be and why?

This content is neither created nor endorsed by Google.

Google Forms

# Topic Seven



Social Identity Wheel

LSA

Ethnicity

Socio-Economic Status

Race

Gender

Religious or Spiritual Affiliation

1. Identities you think about most often

2. Identities you think about least often

3. Your own identities you would like to learn more about

Sex

Age

4. Identities that have the strongest effect on how you perceive yourself

5. Identities that have the greatest effect on how others perceive you

Sexual Orientation

Physical, Emotional, Developmental (Dis)Ability

First Language

National Origin

...pted for use by the Program on Intergroup Relations and the Spectrum Center, University of Michigan.

...urce hosted by LSA Inclusive Teaching Initiative, University of Michigan (http://sites.lsa.umich.edu/inclusive-teaching/).

1057

## DIVERSITY BINGO

Directions: Find someone in the class to fill each square and ask them to write their name in that square. Each person can only fill ONE square on your card. The first goal is to get Bingo: a row across, down or diagonally. When you do, yell: "BINGO!"

| Knows what Diwali is | Has memorized a poem | Has travelled to South America | Is a vegetarian | Has a quote that inspires them |
|---|---|---|---|---|
| mes from an nterracial family | Celebrates Yom Kippur or knows what it is | Is a twin or triplet | Has a family member who has a service animal | Has travelled to Europe |
| musical ment | Speaks more than one language (fluently) | Lives on the planet Earth | Is a first generation American (both parents were born in another country) | Was born in another country |
| a ts | Has travelled to Canada | Celebrates Kwanzaa or knows what it is | Sent a handwritten 'thank you' note recently | Does NOT have SnapChat |
| Is of Native American heritage | Does not use binary gender pronouns | Has lived in more than one state | Has a cause they are passionate about | |

2





## Definitions as a Starting Point

Key definitions and concepts associated with anti-racist pedagogy

## Readings to further your understanding

This button links to an anti-racist pedagogy annotated bibliography maintained by CRLT

## Disrupting White Supremacy on Campus

Learn about the historical legacy of racism and activism at U-M

## LSA DEI and Anti-Racism Initiatives

Learn about LSA DEI and anti-racism initiatives

# Practicing Anti-Racism and Anti-Racist Pedagogy: An Overview

9:46



🔒 sites.lsa.umich.edu



# LSA INCLUSIVE TEACHING
UNIVERSITY OF MICHIGAN

| **Social Identity Wheel** | |
|---|---|
| Overview | The Social Identity Wheel worksheet is an activity that encourages students to identify social identities and reflect on the various ways those identities become visible or more keenly felt at different times, and how those identities impact the ways others perceive or treat them. The worksheet prompts students to fill in various social identities (such as race, gender, sex, ability disability, sexual orientation, etc.) and further categorize those identities based on which matter most in their self-perception and which matter most in others' perception of them. The Social Identity Wheel can be used in conjunction with the Personal Identity Wheel to encourage students to reflect on the relationships and dissonances between their personal and social identities. The wheels can be used as a prompt for small or large group discussion or reflective writing on identity by using the Spectrum Activity Questions on Identity. |
| Goals | 1) To encourage students to consider their identities critically and how identities are more or less keenly felt in different social contexts. The classroom and the university can be highlighted as a context as a way to approach questions on barriers to inclusion.

2) To illuminate how privilege operates to normalize some identities over others. For example, a student who speaks English as their first language can reflect on why they rarely need to think about their language as an aspect of their identity while some of their peers may identify language as the aspect of their identity they feel most keenly in the classroom.

3) To sensitize students to their shared identities with their classmates as well as the diversity of identities in the classroom, building community and encouraging empathy. |
| Implementation | 1) View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom.

2) There are three ways you can approach this activity:
   a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion.

   b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity.

   c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |

4

| Implementation | 1) View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom. |
| | 2) There are three ways you can approach this activity: |
| |    a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion. |
| |    b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity. |
| |    c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |

| | 3) If you are choosing Option B or Option C/B, place the social identity categories around the room before class. |
| Challenges | 1) The students may not perceive the activity as relevant to the course and thus may exhibit resistance. |
| | 2) Students may not be familiar with particular concepts, or they may have different assumptions about those concepts that the activity assumes. For example, they may not know the difference between the terms "sex" and "gender," or they may be resistant to the distinction between the two. |
| | 3) If the wheel is used as a discussion prompt or if students are in close quarters and are able to see what their peers have written on their worksheets, this exercise may feel especially vulnerable to students with invisible identities that they may not want to disclose to the class. Disclosure in verbal or written form should be voluntary and discussion questions should be broad enough that students can opt to not talk about more vulnerable aspects of their identities while still leaving space for them to share if |



# Topic Eight

1062



## CHOOSING MY PATH

### 10

## DISRUPT!

**HOW DO I STAND UP? AND SPEAK OUT? WHAT HAPPENS IF I DON'T SAY ANYTHING?**

*YOU CAN DO IT. YOU CAN DISRUPT RACISM AND CHANGE THE "NORMAL."*

You are now able to see the world in a way you didn't always notice before. You are building a new lens to see yourself and the world around you. You know more history (the parts you are told about and what has been left out). You are more conscious of the ways people interact with one another. You are attuned to microaggressions and are aware of their impact. You see the work institutions have put in over hundreds of years to maintain the structure of racism. Your school may have rules around how students can wear their hair or what folx can wear on their head and you understand how this is affirming the dominant culture. You notice that, still, most of the shows and movies you watch have a nearly all-white cast and how every time there is a terrorist that person is Western Asian and speaks Arabic. You see how stereotypes are created and sustained. You have the tools to seek out more knowledge and gain a deeper understanding.

What do you do next?

You have a voice. Use it. Speak the truth. Share it with others. Choosing silence is not an option. Audre Lorde, an American feminist, writer, and activist said,

**"MY SILENCES HAD NOT PROTECTED ME. YOUR SILENCE WILL NOT PROTECT YOU."**

*YOU CANNOT HEAR SILENCE. INACTION CANNOT BE SEEN. WE CANNOT FEEL THE MOMENTUM OF CHANGE IF NOTHING HAPPENS.*

Use your voice to speak the truth about injustice and share the history we are often not told. Talk to your family, your friends, your classmates, anyone and everyone who will listen. Write and write and write and share. Create art and share it. Take risks. You can do this.

I wish I had used my voice when my teacher was so continually awful to us. I wish I had stood up to my teacher. And to our school administration that allowed her to remain there.

What would I do today if I were in that classroom?

I'd physically stand up to her (in my small nine-year-old self). I'd get out of my seat, stand up, and tell her, "You can't talk to him like that. It's not okay."

Then, I'd walk out of that classroom, bringing my friend with me and anyone else who wanted and needed to come. I would walk down the stairs to the office, where I'd ask the school secretary or the principal to file a complaint against that teacher. I'd tell them what happened. I'd tell them she verbally abused my friend. And I'd file that complaint. I would ask the office to call my friend's parents. He shouldn't have to sit another minute in the classroom with our teacher who assaulted him with her racist words. No one should.

I'd tell my mom. (I did.) We'd talk to his parents. I'd ask all our classmates to share what happened with their families. Our parents

and caregivers would help our voices to be heard. We would be louder than just my own voice. They, too, would file complaints and show up at school the next morning. They'd ask for the resignation of our teacher because she should not be teaching us if she couldn't keep us safe. And she couldn't keep us safe because she was the one causing the harm.

We would all attend the next school board meeting to demand our schools be a place where we can learn, free from racial violence, both verbal and physical.

I think about that day so often and wish I had had the tools to go beyond recognizing what was happening. I wish I had created a plan and spoken up. I wish I had resisted my teacher and everything that kept her in place.

*THIS IS WHY I SHARE WITH YOU. YOU CAN RESIST NOW. YOU CAN DISRUPT NOW.*

What if it's something beyond your daily interactions at school? What if it's something outside of the comfort of what is familiar?

What if you and your family or friends are driving through town, and you see four police officers surrounding two young Black men? Maybe you recognize them, maybe you don't. Maybe one of them was in chorus with you last year. Maybe you've seen them at the store. Or maybe you don't know them at all. It doesn't matter if you know them or not.

You may be able to see if the police are armed. You may not. (While some police

Case 1:21-cv-01077-PB   Document 45-2   Filed 05/20/22   Page 65 of 79

carry guns and others do not, we do know that they all carry power in their role as law enforcement.) You can see the young Black men are not armed, that they look confused, and that their hands are up.

You've seen the news over and over again; you know history. You think of Eric Garner, Sandra Bland, Philando Castile, Michael Brown, and all the others. You know this happens every day and today can be the day you change that. Here is where you can make a plan so you'll know what you can do if this does come up in your life. **NOTE:** You must make sure YOU are safe and out of harm's way. Talk to a trusted adult BEFORE taking any action.



*Activity:*

First, grab your notebook. Let's start writing!

You've observed what's happening and have examined the situation. You know the folx being held by the police look frightened. They don't want to be there. You don't want these two young Black men to become new hashtags and statistics.

So, there are a bunch of things you can do—take a few minutes and make a list of **every possible outcome** you can think of.

Here's my list:

- Ask the person who is driving the car to stop. We get out and walk over to the situation so we can stand witness.

- Record what is happening with my phone. I can. This is my right to do so. In the United States, the UK, and many other countries I cannot get arrested for recording if I take photos or video of public spaces. The police cannot take my phone from me. (They need a warrant to do so.) They may ask me to stop recording, but I don't have to stop.

If I am inside a store, private property, etc. the owner sets the rules and it is their choice whether I can record or not. This is not the decision of the police.

- Stay in the car and record.

- Stay in the car and shout out to the two being held by the police, "I see this."

- Standing near the police and the young men, I can ask the two Black men if there's anything I can do... if there's anyone I can call for them. (The adults I'm with can stand with me too.)

- Stop other people walking by and ask them to stand witness too. (There is strength and power in numbers.)

- Ask the adult I'm with to intervene while I stay in the car.

- Ignore this and keep driving.

What else?

Do our lists look similar? What am I missing? What are you missing? There's more we can add and we'll look at this in the next couple of chapters! You will continue to build your plan for taking action.

*my choice*

Some of your choices will require you to take risks. Some may not. Understanding your privilege and the power you have—or do not have—is important. It will determine how you approach everything. This situation with the police is one where, especially if you are white and cisgender, you can use your privilege to speak up. **If you are a Black, Brown, or Indigenous Person of the Global Majority, you will need to decide how each outcome could end for you**. White people, this is not something you need to do because you are at the center of the system: taking a risk with any of these choices will, most likely, not have you end up in jail or harmed.

# Topic Nine

# Homework:
## Defining Sexual Orientation

Name: _____          Date: _____

**Instructions:** View the short animated video from Amaze.org called, "Talking Sexual Orientation with Jane" available here: http://amaze.org/video/talking-sexual-orientation-with-jane/. Once you have watched the video, please write down your own definition of sexual orientation. Then, think of an adult you know well and trust who you could share this definition with. This could be a parent or other adult family member, a friend's parent, someone at school, etc. Tell this person what we discussed in class and share your definition so that they also know what sexual orientation is. See if they agree with your definition, or whether they have another take and add that to what you have. Make sure they sign below!

**1) Sexual orientation is:**

(What I say):

(What the adult I asked says):

**2) Did you learn about sexual orientation when you were growing up?: If so, what did you learn?**

(What the adult I asked said):

Name of adult:            _____

Their signature:          _____

Relationship to you:   _____

Advocates
for Youth
Rights. Respect. Responsibility.
www.advocatesforyouth.org

1

# Topic Ten

## Exploring Whiteness and Becoming an Anti-Racist Activist

INSTRUCTORS ██████████████████████
LOCATION ██ Classroom Room ██
READINGS TBD
TIME Full Day     MAX ENROLLMENT 16     STUDENT COST $0

DESCRIPTION Students will join in honest, frank, and respectful examination of what it means to be a white person in 21st century America. We will explore many topics on race including: personal identity and power, white privilege, guilt, and fragility, and taking anti-racist action. We will learn how whiteness and race were invented in the early years of our country's formation, further sustained through government programs, and how this has played out in our own community. Students will learn how to take anti-racist action by meeting with college students who currently are engaged in national and local anti-racism work, including where anti-racist work intersects with gun safety, climate change, and LGBTQ rights. This MI is open to all students, and we hope that we will have a diverse group. The course will be designed to be a dynamic and interactive experience based at ██ but also involving field trips off campus. Tentative plans include interaction with Dartmouth students/staff members and other local community members involved with anti-racism work and correspondence with students from Ashley Hall School in Charleston SC to discuss how we perceive race and each other in New England and the South.



Tuesday 3/10
8:00-8:30 Introductions/Rules of Engagement/ Race Literacy Quiz ████████
8:30-9:00 Equity and Inclusion Terms, Language, and Definitions ███████████
9:00-9:45 The Invention of Whiteness/ Race the Power of an Illusion ██
9:45-10:00 Break
10:00-11:00 Action Plan Design planning (Group led by ██████████
11:00-12:00 Lunch
12:00-1:00 "Understanding Racism and Systemic Oppression " Brian Cook/Groundswell Change  OK
1:00-1:30 Discussion on Brian Cook's Presentation
1:30-1:45 Break    OK
1:45-2:45 iPod walk-around
2:45-3:00 Journaling ██ prompts)

Wednesday 3/11
8:00-9:00 How we got here: Jim Crow, Redlining, Racial Wealth Gap ██████
9:00-9:30 Shadows Fall North film excerpt ████████
9:30 -10:00 Citrus Preview █████████
10:00-10:30 Brunch
10:30-1:30 (including travel time) Citrus at Northern Stage
1:30-2:00 Citrus Discussion and Journaling ████████ prompts)

Thursday 3/12
8:00-9:00 White Privilege/ White Fragility ███████ (with selected video)
9:00-9:45 Intro to Kendi: Anti-racism/ in-class reading █████████
9:45-10:00 Break
10:00-10:30 Action Plan Design planning (Group/ ██████████
10:30-11:30 "Carol Street" Being a Person of Color in an All White Environment (film maker Demetrius Borge)

11:30-12:30 Lunch (can shift later 15 minutes if needed)
12:30- 1:00 walk to Rauner
1:00-2:30 "Ties That Bind" Slavery at Dartmouth Tour and discussion Dr. King
2:30-3:00 Downloading and Journaling

Friday 3/13
8:00-9:00 /Case Studies on Activism Brian Cook/Groundswell Change
9:00-10:00 Anti-Racism Activism Kendi section on activism/in class reading/discussion
██████████████████
10:00-10:15 Break
10:15-11:00 Teaching Tolerance: Speaking up! ████████████
11:00-12:00 Lunch
12:00-12:30 Action Plan Prep for Asma Elhuni ██████████████████████
12:30-1:30 Preparing for Activism Asma Elhuni/Activist and Organizer
1:30-3:00 Action Plan Design/ Closing/ Goals/ Action Steps

*First Draft of Daily Schedule Topics*
*Speakers/video/presentations/discussion TBD*

## Tuesday 3/10
**Introductions/ / Rules of Engagement/ Opening Exercises**

> *http://www.pbs.org/race/002_SortingPeople/002_00-home.htm*
> *race literacy quiz*
> *http://newsreel.org/guides/race/quiz.htm*

**Language and Definitions**

> **The Invention of Race and Whiteness**
> *Tim Wise:what is race  invention of whiteness*
> *https://www.youtube.com/watch?v=jBUnziGqN4o*   *1:53-2:01*
> *Race the Power of an Illusion*
> *Ep 1 The difference between us ... segments*
> *https://www.youtube.com/watch?v=OXEV0tgox9k&t=2s*
> *Discussion Guide pages 7&8 http://newsreel.org/guides/race/race-guide-lores1.pdf*
> *The Other Race (Mixed Race)  Documentary...segments*
> *https://www.youtube.com/watch?v=GfM-F172548*

**White Privilege**

> The advantages of wealth and whiteness  10 question walk/race
> **https://www.youtube.com/watch?v=4K5fbQ1-zps**
> **https://www.nasponline.org/resources-and-publications/resources-and-podcasts/diversity/social-justice/social-justice-lesson-plans/talking-about-race-and-privilege-lesson-plan-for-middle-and-high-school-students**
> **https://www.huffpost.com/entry/explaining-white-privilege-to-a-broke-white-person_b_5269255**
> *"White Immunity": Working through the pitfalls of "privilege" discourse*
> *https://www.youtube.com/watch?v=JtLpAfB-DEc*  segments

**Affirmative Action**

> A Long History of Affirmative Action - For Whites
> http://newsreel.org/guides/race/whiteadv.htm

**Black Lives Matter**

> *NYT A conversation with police*
> **https://www.nytimes.com/video/opinion/100000004027684/a-conversation-with-police-on-race.html?module=inline**    **1:59-2:30**
> Tim Wise  Black Lives Matter/All Lives Matter
> https://www.youtube.com/watch?v=jBUnziGqN4o  42:06

**Wednesday 3/11**

**How we got here: Jim Crow, Redlining, Racial Wealth Gap**

    *Race the Power of An Illusion - ep3 The House We Live*
    *https://www.youtube.com/watch?v=QHo8AKNfB68*
    *https://www.youtube.com/watch?v=mW764dXEI_8*
    *THE POWER OF AN ILLUSION How the Racial Wealth Gap Was Created*
    *https://www.youtube.com/watch?v=QHo8AKNfB68&t=4s*
    *Discussion Guide pages 11-13 http://newsreel.org/guides/race/race-guide-lores1.pdf*

**Being a Person of Color in an all white environment**

    **Documentary film maker speaker**

**White Fragility/ White Guilt**

    **Robin DiAngelo lecture**
    **https://www.youtube.com/watch?v=45ey4jgoxeU&t=1230s**

        **https://www.nytimes.com/video/opinion/100000003773643/a-conversation-with-white-people-on-race.html?module=inline**

**Thursday 3/12**

**Anti-racism**

**Dartmouth Student Leaders and others**

**Skype with school in South Carolina  North/South perspectives on race**

**Friday 3/13**

**Becoming and activist**

**Dartmouth Student Leaders and others**

**Closing/ Goals/ Action Steps**


**CALIFORNIA NEWSREEL**

ORDER TRACKING    CONTACT US

◀ **close**   **home**   **go to** *Race - The Power of an Illusion*

### RACE LITERACY QUIZ
#### What differences make a difference?

The Race Literacy Quiz was developed by California Newsreel, in association with the Association of American Colleges and Universities. The myths and misconceptions it raises are explored in the documentary series *RACE - The Power of an Illusion*, available on video from California Newsreel at <u>Newsreel.org</u> or 1-415-284-7800. For more information and background, visit the companion Web site at <u>racepowerofanillusion.org</u>.

<u>JUMP TO ANSWER KEY></u>

**1. Humans have approximately 30,000 genes. On average, how many genes separate all members of one race from all members of another race?**

A. None
B. 1
C. 23
D. 142
E. 1008
F. We don't know

**2. Which characteristic did the ancient Greeks believe most distinguished them from "barbarians"?**

A. Religion
B. Skin color
C. Language
D. Dress
E. Hairiness

**3. In Medieval Europe (circa 1300-1400), Ethiopians were looked upon as:**

A. Savages
B. Saviors
C. Barbarians
D. Infidels
E. Negroes

**4. Members of a race can be identified by their:**

A. Blood group
B. Skin color
C. Ancestry
D. Genes
E. None of the above
F. All of the above

**5. Skin color correlates most closely with:**

A. Hair form
B. IQ
C. Risk for sickle cell, Tay Sachs and other genetic diseases
D. Geographic latitude
E. Continent of ancestral origin
F. Jumping and sprinting ability

**6. When Jamestown colonist John Rolfe and his new wife Pocahontas traveled to the Court of London in 1619, it caused a scandal because:**

A. An Englishman had married an Indian
B. John Rolfe had cuckolded General John Smith, the leader of the colony
C. Pocahontas, a princess, married beneath her station by wedding a commoner
D. Londoners had never seen an Indian before
E. A Christian had married a heathen

**7. The rise of the idea of white supremacy was tied most directly to:**

A. Indian removal
B. Slavery
C. The Declaration of Independence
D. The U.S. Constitution
E. Ancient Greece

**8. Which group has the most genetic variation?**

A. Humans
B. Chimpanzees
C. Penguins
D. Fruit flies
E. Elephants

**9. Which two populations are most likely, on average, to be genetically similar?**

A. Italians and Ethiopians
B. Senegalese and Kenyans
C. Italians and Swedes
D. Chinese and Lakota (Sioux)
E. Saudi Arabians and Ethiopians

**10. Most human genetic variation can be found:**

A. Within any local population, for example, among Zulus, or among Hmong
B. Between two populations on the same continent, for example between Irish and Poles
C. Between two populations on different continents, for example between Koreans and Zulus
D. Between any two continents, for example, between Africa and Asia
E. Between tall people and short people

**11. Which continent has the greatest human genetic diversity?**

A. Europe
B. Asia
C. Africa
D. North America
E. South America

**12. Who was the first American public figure to suggest, albeit "as a suspicion only," that black people might be inherently inferior to whites?**

A. Thomas Jefferson
B. Sir Walter Raleigh
C. George Washington
D. Robert E. Lee
E. Capt. John Smith, founder of the Jamestown colony

**13. Which of the following was NOT an important reason why African slavery first took root in North America:**

A. As non-Christians, they had no legal protections
B. They were skilled semi-tropical farmers
C. The supply of indentured servants from Europe was becoming unreliable
D. They were deemed innately inferior
E. They couldn't easily run away

**14. Which was NOT introduced to Indians by whites?**

A. An Indian identity
B. Democracy
C. Identity by "blood quantum"
D. Horses
E. Measles

**15. Of the $120 billion in home loans underwritten by the federal government between 1933 and 1962, what percentage went to white homeowners?**

A. 45 percent
B. 64 percent
C. 75 percent

D. 88 percent
E. 98 percent

## 16. Which of the following is not a result of federal government policies?

A. Redlining
B. Urban renewal
C. Deterioration of inner cities
D. Affirmative action quotas
E. The wealth gap between black and white families

## 17. Today, the net worth of the average white family is how much compared to the average black family?

A. Three times as much
B. Eight times as much
C. Half as much
D. Twice as much
E. The same

## 18. When white and black families of similar incomes are compared, what is the difference in their net worth?

A. No difference
B. Black net worth is slightly greater
C. White net worth is more than eight times greater
D. White net worth is more than two times greater
E. Black net worth is twice as great

## 19. According to a 1993 study, 86% of suburban whites lived in a community where the black population was:

A. Less than 5%
B. Less than 10%
C. Less than 1%
D. More than 10%
E. More than 15%

## 20. Which is NOT an example of a government racial preference program?

A. 1964 Civil Rights Act
B. 1862 Homestead Act
C. 1790 Naturalization Act
D. 1934 Federal Housing Administration
E. 1935 Social Security Act

## ANSWER KEY

### 1. A. None

There are no characteristics, no traits, not even one gene that distinguish all members of one so-called race from all members of another race.

### 2. C. Language

The word barbarian comes from the Greek word "bar-bar," for someone who stutters, is unintelligible, or does not speak Greek. The Greeks, like most ancient peoples, did not attribute much meaning to physical appearance. In ancient Greece, language was the difference that mattered, because it indicated who was not Greek. Some historians believe that the first to be labeled barbarian were the Scythians of circa 500 B.C., who lived northeast of the Black Sea and were very fair skinned. Ideas of 'race' did not exist during antiquity.

### 3. B. Saviors

In medieval Europe, religion mattered most, not physical appearance. At the time, Christian Europe was at war with the Moslem Empire. Europe looked towards a mythical Christian Ethiopian kingdom, led by the fabled priest-king Prester John, to rescue them from the infidels. Theories of race didn't emerge until the late 18th and early 19th centuries.

### 4. E. None of the above

There are no traits, no characteristics, not even one gene that is present in all members of one so-called race and absent in another. The A, B, and O blood groups can be found in all the world's peoples (the percentage of Estonians and Papua New Guineans with A, B, and O blood are almost exactly identical). Skin color tends to correlate with the earth's geographic latitude not race; sub-Saharan Africans, the Dravidians and Tamils of southern Asia, and Melanesians from the Pacific all have very dark skin. Ancestry is difficult to trace; we all have two parents, four grandparents, etc. If you could trace your family back 30 generations, slightly more than 1,000 years, you'd find one billion ancestors.

### 5. D. Geographic latitude

Skin color tends to correspond with ultra-violet radiation from the sun and hence latitude. People with ancestors from the tropics typically have darker skin while those further north have lighter skin. Sub-Saharan Africans, Asian Indians, Aboriginal Australians and Melanesians all have dark skin. But skin color really is only skin deep. Most traits are inherited independently from one another. The genes influencing skin color have nothing to do with those influencing hair form, eye shape, and blood type, let alone the very complex traits we value such as intelligence, musical ability or athletic ability. Genetic diseases are inherited through families, not race. Sickle cell, for example, confers resistance to malaria. It occurs in people whose ancestors came from where malaria was once common: the Mediterranean, Arabia, Turkey, southern Asia and western and central Africa - but not southern Africa. The presence of sickle cell is not an indicator of race but of having an ancestor from a malarial region.

### 6. C. Pocahontas, a princess, married beneath her station by wedding a commoner

17th century England was a very hierarchical, feudal society where people's class status was fixed at birth. Status was so important that laws regulated the clothing people could wear so they couldn't "pass" as another class. When John Rolfe took his new bride Pocahontas (who had converted to Christianity) back with him to London in 1617, the English had not yet developed the racial ideology that later justified their taking of Indian lands. But it was unthinkable that royalty would marry a commoner.

### 7. C. The Declaration of Independence

Ironically, it was freedom, not slavery, that gave rise to modern theories of race. Until the Revolutionary period, slavery was an unquestioned "fact of life." It was only when Americans proclaimed the radical new idea that "all men are created equal" that slavery was first challenged as immoral. As historian Barbara Fields notes, the new idea of race helped explain why some people could be denied the rights and freedoms that others took for granted.

### 8. D. Fruit flies

Fruit flies have been around for a very long time but they also have a short life span, so lots of genetic mutations have accumulated over many generations. In contrast, modern humans are one of the most genetically similar of all species. On average, only one of every 1,000 nucleotides (the "letters" that make up our DNA) differ one individual from another. This is because we are a relatively young species (approximately 150,000 - 200,000 years old). We simply haven't been around long enough to accumulate much genetic variation. Also, humans have always moved, mixed and mated, further homogenizing our gene pool. Beneath the skin, we're all very similar.

### 9. E. Saudi Arabians and Ethiopians

Populations that live near each other geographically tend to be genetically more alike than populations that live far apart. That's because they are more likely to have intermixed in the recent past and therefore share more genes. So even though Senegalese and Kenyans or Italians and Swedes are traditionally placed in the same "races," they live farther apart from each other and have had less contact and intermixing than Saudis and Ethiopians.

### 10. A. Within a local population

85%, or almost all human variation, can be found within any single local population, whether it's Malay, Irish, Zulus or Koreans. There is FAR more variation within groups than between groups. This means that there may be as many - or more - genetic differences between two random Koreans as between a random Korean and a Zulu. On average, approximately 94% of all genetic variation can be found within any continental area.

### 11. C. Africa

We are all Africans. Modern humans (Homo sapien sapiens) originated in Africa, and we spent most of our evolution as a species together there. Some modern humans first left Africa 50,000 - 70,000 years ago and spread out around the world. All the other populations of the world can be seen as a subset of Africans. Every human genetic trait found elsewhere can also be found in Africa, with the exception of relatively few recent variations favored by the environment, genetic drift, or sexual selection - such as light skin.

### 12. A. Thomas Jefferson

Thomas Jefferson was the first prominent American to speculate that black people might be innately inferior to Europeans. Until then, most Enlightenment figures believed that differences between groups were not inborn but due to environmental factors. It wasn't until Jefferson introduced the radical new ideas of liberty and equality that slavery had to be justified and prejudices against the enslaved began to crystallize into a doctrine of white supremacy. American freedom and the idea of innate racial difference were born together. Historian Barbara Fields calls them "Siamese twins."

### 13. D. They were deemed innately inferior

Throughout much of history, societies have enslaved people, often as a result of conquest, war or even debt. People were not enslaved because they were first deemed inferior. African slaves were well-suited to labor in North America: unlike the Indians, they were resistant to European diseases; they couldn't easily run away; they were not Christians (and hence unprotected by English law); and they were skilled semi-tropical farmers. Finally, in the late 17th century, African slaves became available in large numbers just as the original labor force on Virginia's tobacco plantations - English indentured servants - began to rebel and immigration from England slowed. Over time, the degradation of slavery became identified with blackness, giving white Americans the idea that Africans were a fundamentally different kind of people.

### 14. B. Democracy

United States' representative democracy drew upon the traditions of the Iroquois Confederacy. Indians didn't think of themselves as Indians when European settlers arrived, but rather as members of separate tribes or nations, divided by language, custom and religion. The idea of "blood quantum," i.e., the determination of Indian identity by ancestry, was imposed by the federal government. In contrast, tribal membership traditionally was open to anyone, even Europeans, as long as they accepted tribal customs and authority. There were no horses in the New World until they were brought over by Europeans. Measles, small-pox and other communicable diseases were also unknown in the Americas prior to European exploration. Some historians estimate that up to 90% of all Atlantic coast Indians died from diseases contracted from European traders and explorers by the time of the first Plymouth settlement.

### 15. E. 98 percent

Beginning in the 1930s and 1940s, the federal government created programs that subsidized low-cost home loans, opening up home ownership to millions of Americans for the first time. At the same time, government underwriters introduced a national appraisal system tying property value and loan eligibility to race, inventing "redlining," and effectively locking nonwhites out of home-buying just as most middle class white Americans were beginning to purchase homes.

### 16. D. Affirmative action quotas

Federal affirmative action guidelines specifically prohibit quotas. Beginning in the 1930, the Federal Housing Administration and related programs made it possible for millions of average white Americans to own a home for the first time and set off the post-WWII suburban building boom. The government established a national neighborhood appraisal system, explicitly tying mortgage eligibility to race, a policy known today as "redlining." The FHA and other government policies made possible the post-World War II all-white suburbs, while people of color and in central cities were denied loans. Government policies and practices helped create two legacies that are still with us today: segregated communities and a substantial wealth gap between whites and nonwhites, much of which can be traced to the differential value of their homes.

### 17. B: Eight times as much

Probably no one statistic better captures the cumulative disadvantage of past discrimination than wealth. Even at the same income levels, whites still have, on average, twice as much wealth as nonwhites. Much of this difference is due to the different rates of home ownership and the different values of homes in white and Black neighborhoods. But wealth is not only the end point, it's the starting line for the next generation - helping finance your children's education, helping them through hard times, or helping with the down payment of their own home. Economists estimate 50-80% of one's lifetime wealth accumulation can be traced to this head start. As wealth gets passed down from generation to generation, the legacy of past discrimination accumulates, giving whites and nonwhites vastly different life chances.

### 18. D. White net worth is more than two times greater

See above (Question #17) for explanation.

### 19. C. Less than 1%

According to the 2000 Census, whites are more likely to be segregated than any other group. This is largely a result of past housing discrimination, but it is perpetuated today by unfair practices such as predatory lending, racial steering and a substantial wealth gap between black and white families. Today, 71% of whites own their own home, compared to 44% of African Americans. Black and Latino mortgage applicants are 60% more likely than whites to be turned down for loans, even after controlling for employment, financial, and neighborhood characteristics. On average, nonwhites who are approved for mortgages still pay higher rates.

**20. A. 1964 Civil Rights Act**

The Civil Rights Act made racial discrimination in public places illegal. The other programs are all examples of racial preferences - for white people. Over a 40-year period, the Homestead Act gave away, for free, 270 million acres of what had been Indian Territory, almost all of it to white people. The Naturalization Act allowed only "free white persons" to adopt citizenship, thus opening our doors to European immigrants, but barring Asians and other groups. Racial barriers to citizenship were not removed until 1952. The Federal Housing Administration made it possible for millions of average white Americans - but not others - to own a home for the first time. (see #16 above). And the Social Security Act specifically exempted two occupations from coverage: farm-workers and domestics, both largely non-white.

<BACK TO TOP

▲ back to top

Home     Titles A-Z     New Releases     Shopping Cart     Order Tracking     Contact Us



1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW HAMPSHIRE
2

3   * * * * * * * * * * * * * * * * *
                                    *
4   LOCAL, 8027 AFT-NEW HAMPSHIRE,  *
    AFL-CIO, ET AL.,                *
5                                   *
                    Plaintiffs.     *
6                                   *
            v.                      *  No. 1:21-cv-1077-PB
7                                   *  September 14, 2022
                                    *  1:00 p.m.
8   FRANK EDELBLUT, IN HIS OFFICIAL *
    CAPACITY ONLY AS THE            *
9   COMMISSIONER OF THE NEW         *
    HAMPSHIRE DEPARTMENT OF         *
10  EDUCATION, ET AL.,              *
                                    *
11                  Defendants.     *
                                    *
12  * * * * * * * * * * * * * * * * *

13          TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE PAUL J. BARBADORO

14

    APPEARANCES:
15

    For the Plaintiffs:      Charles Moerdler, Esq.
16                           David Kahne, Esq.
                             Elizabeth Clarke Milburn, Esq.
17                           Stroock Stroock & Lavan LLP

18                           Gilles R. Bissonnette, Esq.
                             American Civil Liberties Union
19                           of New Hampshire

20                           Peter J. Perroni, Esq.
                             Nolan Perroni, P.C.
21

    For the Defendants:      Samuel R. V. Garland, Esq.
22                           N.H. Attorney General's Office (Civil)

23  Court Reporter:          Brenda K. Hancock, RMR, CRR
                             Official Court Reporter
24                           United States District Court
                             55 Pleasant Street
25                           Concord, NH 03301
                             (603) 225-1454

1                         P R O C E E D I N G S

2              THE CLERK:  All rise for the Honorable Court.  Please

3    be seated.

4              This Court is in session and has for consideration

5    hearings on Motions to Dismiss in civil matter 21-cv-1077-PB,

6    Local 8027, et al. versus New Hampshire Department of Education

7    Commissioner, et al.

8              THE COURT:  All right.  Welcome, everybody.  It's a

9    big courtroom.  This is the first day I've had my courtroom

10   restored to normalcy after two years of pandemic construction

11   work in here.  I actually can see the people who are going to

12   be arguing in front of me, which is great, because part of the

13   time I'm, like, looking around barriers to see if I can see the

14   advocates when they're talking.

15             So, my thanks to everybody who has worked to put the

16   courtroom back together today.  This is a good a day for it,

17   because there are some other people here, which usually is not

18   the case.

19             So, let me lay out for you how I want to proceed.  As

20   the litigants know, there are two lawsuits here.  One of the

21   lawsuits asserts only a vagueness claim.  The other lawsuit has

22   two vagueness counts, a First Amendment count and another count

23   that I don't think does anything that's really distinct.

24             The way I want to proceed is to address the vagueness

25   claim first.  I want to give the defendant an opportunity to

1    outline their argument with respect to vagueness.  I note that

2    one of the complaints includes two counts on vagueness.  I will

3    let you know that I don't construe those as setting forth

4    distinct causes of action.  Rather, I see them as asserting

5    additional theories as to why the statute is vague.

6           So, when your turn comes you should feel free to argue

7    either of those two counts on vagueness; and the Attorney

8    General's Office, to the extent it wants to in its initial

9    presentation, can present on that count as well.  So, Count One

10   in the first complaint and Count One and Two of the second

11   complaint.

12          So, I'll hear the Attorney General's Office.

13          Perhaps it makes sense for whoever is going to

14   advocate for the party that just has the one-count complaint to

15   go next, unless you've internally arranged for a different

16   order, and then have the other plaintiffs' counsel say anything

17   they want to say to supplement.  I'll give the Attorney

18   General's Office a brief opportunity to reply.

19          People who know me know I also ask questions to people

20   out of order, so just be ready for that.

21          And then we'll go into the First Amendment claim that

22   is only asserted in one of the two actions.  I'll hear the

23   Attorney General's Office as to why that should be dismissed

24   and hear the response from the other side.  So, we'll go that

25   way.

1       So, Counsel, you're up, and tell me why you believe

2   the vagueness counts in the two complaints should be dismissed.

3       MR. GARLAND:  Thank you, your Honor.  I was planning

4   to treat them together as well, so that's a helpful

5   clarification.

6       So, under U.S. Supreme Court case law, First Circuit

7   case law and case law this court has also applied frequently,

8   the real threshold question or, really, the thrust of a

9   vagueness claim is, when it's brought as a facial matter, is,

10  is there no discernible standard of conduct in the statute.

11      THE COURT:  Wow, you're going to start right up and

12  get questioned really closely about that assertion.

13      MR. GARLAND:  I anticipated I would be, your Honor.

14      THE COURT:  You make that claim in your initial brief.

15  The defendants respond and say, Whoa, you've forgotten Johnson

16  and Dimaya in which the --

17      Folks can come in.  Can we -- there's a bunch of

18  people that want to come in.

19      THE CLERK:  There is an overflow courtroom.

20      THE COURT:  Oh.  If there are not seats here, there is

21  another courtroom where things will be broadcast.

22      THE CLERK:  Courtroom 1.

23      THE COURT:  But if you can find a seat, you're welcome

24  to come and sit.

25      So, as I was saying, the defendants say you've

1    completely ignored more recent Supreme Court case law in

2    Johnson and Dimaya which specifically rejects the theory on

3    which you're basing your motion, and in your reply you don't

4    even address that argument.

5         So, now is your chance.  Tell me why you've left me in

6    suspense as to why the plaintiffs are wrong in claiming that in

7    Johnson and Dimaya the Supreme Court expressly said, This is

8    not our test for vagueness challenges.

9         MR. GARLAND:  Understood, your Honor.  It was

10   certainly not my intention to leave you in suspense.

11        But I think Johnson and Dimaya are kind of, my

12   understanding of them is they are largely one-off cases that

13   dealt with the categorical rule that was being challenged in

14   those cases, and that subsequent to those cases this court, the

15   First Circuit as well, has applied the general standard to

16   vagueness challenges, facial vagueness challenges, that don't

17   implicate criminal statutes or sentencing laws that have kind

18   of that, the unique categorical approach --

19        THE COURT:  Well, you're saying two things that I'm

20   hearing:  Johnson and Dimaya are one-off cases, they only apply

21   to Johnson and Dimaya and nothing else, but then it seems like

22   you're suggesting a categorical distinction between criminal

23   and civil?  Is that what you're saying?

24        MR. GARLAND:  I'm not, your Honor.  Forgive me.  I may

25   be misusing the term, but I was referencing the specific

1    provisions that _Johnson_ and _Dimaya_ concern which -- I'm

2    forgetting the term of art for the sentencing and the felony --

3    forgive me.

4         I'm not trying to draw a categorical distinction, your

5    Honor, no.  But I do think when you're dealing with a statute

6    that has civil application the First Circuit and this court

7    have continued to apply the no-discernible-standard test.  I

8    think I would have to identify the specific --

9         THE COURT:  I don't think -- I've searched, because

10   you didn't give me anything in your brief.  I can find no First

11   Circuit case that squarely takes on the _Johnson_ and _Dimaya_

12   statements and concludes that, oh, those cases are limited to

13   civil -- criminal, or those cases are limited to their facts.

14   If you've got one, tell me which one I should look at, because

15   I didn't find one of those.

16        MR. GARLAND:  It may be true, your Honor, and I will

17   defer to you, unless I can find one otherwise, that they

18   haven't specifically conducted that analysis.  I do believe,

19   and I'm going to have to find a case for you, and so forgive

20   me, and I'll certainly correct the record if I'm wrong about

21   this, that the First Circuit has applied the general vagueness,

22   the pre-_Johnson_ and _Dimaya_ vagueness test, and I'm certain that

23   this Court has.  I know that it's not binding on you, but Judge

24   Laplante did recently in a case that both Attorney Bissonnette

25   and I were --

1    THE COURT:  I mean, I have unlimited respect for Judge

2    Laplante, but this is not a court that has the ability to bind

3    other judges.  I have to make my own independent determination

4    on that.

5         Okay.  And I think you're aware that other courts have

6    rejected the view that -- other Circuits have rejected the view

7    that you're advancing, that that standard survives Johnson and

8    Dimaya.  Do you disagree with that?

9    MR. GARLAND:  I don't dispute that, your Honor.  I

10   believe also that the D.C. Circuit has applied the previous

11   standard post Johnson and Dimaya.

12   THE COURT:  But without taking on the Johnson and

13   Dimaya statement, yeah.  The problem is -- I mean, let's go

14   back and just revisit Johnson briefly.  Johnson, as you know,

15   is an opinion by Justice Scalia, who's always quite clear in

16   what he says and what he means, and he specifically says, I'm

17   quoting now:

18        In all events, although statements in some of our

19   opinions could be read to suggest otherwise, our holdings

20   squarely contradict the theory that a vague provision is

21   constitutional merely because there is some conduct that

22   clearly falls within the provision's reach.

23        He then goes on to cite two prior Supreme Court cases

24   for that proposition, and he says, These decisions refute any

25   suggestion that the existence of some obviously risky crimes

1    establishes the residual clause's constitutionality.

2            I mean, that isn't a statement saying that <u>Johnson</u> and

3    <u>Dimaya</u> are -- these are unique cases to which this standard

4    doesn't apply but it applies to others.  It simply says, Our

5    prior holdings do not hold that something -- and, as the court

6    goes on to explain, and this is the problem I'm having, I think

7    you will agree with this, if that is the standard, then the

8    only facial vagueness challenge that a court could ever sustain

9    to a statute is to a statute that is incomprehensible in all of

10   its possible applications.  It's essentially a statute that is

11   nonsensical, because, as the Court acknowledges, every statute

12   is going to have some applications that will be not vague, and

13   this statute has applications that would not be vague.

14           So, if you're right about the standard, I think you

15   win.  Maybe they can explain why I'm wrong about that.  But I

16   think you're wrong about the standard, so that's why you need

17   to really defend this proposition, because I think, if you're

18   right about it, it's hard for me to see how this statute is

19   vague in all possible applications.

20           For example, if a teacher decided to put up White

21   nationalist posters in her classroom and teach White

22   nationalism, that White people are inherently superior to Black

23   people, does anybody say it's unclear that that statute would

24   prohibit that?  I mean, it clearly prohibits that.

25           So, there are applications of the statute that would

1    be not vague.  So, if you're right about the standard, it seems

2    you win, but it seems like, to me, like you're wrong about the

3    standard.

4           So, what would you like to say?

5           MR. GARLAND:  Understood, your Honor.  I think my

6    response to that would be we had presented a particular legal

7    argument in our motion, and we haven't briefed the other one,

8    and I don't want to do that in an abstract sense, and I

9    understand we received the invitation to do so and maybe missed

10   the mark.

11          What I would say, though, is I do not read Johnson and

12   Dimaya for the proposition that a law that can be read as a

13   matter of statutory construction subject to guidance from the

14   enforcing agencies in a way that is understandable, largely

15   understandable, can be defeated by coming up with hypothetical

16   examples where it's inapplicable.

17          THE COURT:  I agree with you that -- so facial

18   challenges like this one are much harder to establish than an

19   as-applied challenge, and the plaintiffs have not elected to

20   present me with an as-applied challenge, but that is a -- it

21   would be much easier for the Court to look at a case in which a

22   plaintiff seeks pre-enforcement review and says, I want to

23   teach implicit bias, and this is how I teach implicit bias, and

24   I can't tell whether the statute would subject me to losing my

25   teaching credential if I taught it, and for that reason it's

1   unconstitutional as applied in this context.

2          The typical as-applied challenge is much easier for a

3   court to address.  A facial challenge, I agree with you the

4   plaintiffs cannot win merely by positing kind of bizarre

5   hypotheticals and saying it might be vague in that context.

6          One example that strikes me as kind of bizarre that is

7   a fifth-grade teacher who explains to her students that, Well,

8   you're not mature enough to drive; you have to develop maturity

9   to reach a driving age.  That would be a violation of the

10  statute.  That seems to be pretty far-fetched, and I don't

11  think I need to take on every hypothetical that the plaintiffs

12  could possibly think up because lawyers have unlimited

13  creativity, and I'm not going to engage in 45 hypothetical

14  situations.

15         But we have more than that here.  We have some real

16  significant issues, like implicit bias, which is something that

17  is clearly of concern to the teachers here, to the

18  administrators here, it was of concern to the -- obviously of

19  concern to the drafters of the legislation, because they talk

20  about unconscious bias.  It was a concern to the drafters of

21  the comments.

22         So, I think we have to -- we say, yes, I'm not going

23  to address and resolve every hypothetical.  A statute is not

24  vague if it is vague in a single application that has no real

25  bearing to the core issues that the statute addresses, but it

1   doesn't have to be vague in all applications if I follow the

2   direction of Justice Scalia in <u>Johnson</u> and, I believe, Justice

3   Kagan in <u>Dimaya</u>.  And so, that's why I think the foundational

4   principle on which your motion rests is at least concerning to

5   me because of the argument that the plaintiffs present.

6          MR. GARLAND:  Understood, your Honor.  One additional

7   point I'd make on that, and I'm happy to address some of what

8   may be closer hypotheticals, is, I also don't read <u>Johnson</u> and

9   <u>Dimaya</u> to contemplate that this is anything other than a legal

10   issue, and so if the -- your criticism is well taken, and if

11   you determine, You haven't presented me with the right

12   argument, I can't grant your motion, I understand that, but I

13   don't think it means that this case proceeds on into full-blown

14   discovery.  I think the question still is, is the text of this

15   statute sufficient, and, though I would have to ask it with my

16   tail between my legs, I think it's still something susceptible

17   to briefing.

18          THE COURT:  No, you should proceed with your argument.

19   I'm just saying that's a theoretical, a foundational concern

20   that I have that I've struggled with when I've tried to make

21   sense of the argument.  But you clearly maintain that argument

22   for purposes of pressing your case, and you're entitled to

23   develop it further if the case proceeds further.  But I still

24   have to decide whether the statute is unconstitutionally vague

25   on its face, so I still have to engage in this.

1    So, let me ask you do you agree that cases like one of

2    the cases you rely most heavily on, Hoffman, talk about factors

3    that can affect a facial vagueness challenge?  The Flipside

4    case, Hoffman, do you remember that one?

5          MR. GARLAND:  Yes, I do.

6          THE COURT:  So, that case identifies things like, if a

7    statute could be applied in ways that impinge upon First

8    Amendment protected rights, that is more likely to be a statute

9    that is going to be found unconstitutionally vague, right?

10   Vague in all of its application standard doesn't apply in that

11   context.  Do you agree with that?

12         MR. GARLAND:  I do agree with that, your Honor.

13         THE COURT:  Do you also agree that that case says that

14   whether a statute has a *scienter* requirement can be important

15   in determining whether something is vague or not?

16         MR. GARLAND:  I agree with that, your Honor, yes.

17         THE COURT:  Okay.  Do you agree that this statute,

18   these statutes -- when I say "statute" I mean all of the

19   sections in 354-A, the educational provision, in particular --

20   that none of those statutes have a *scienter* requirement

21   attached to them?

22         MR. GARLAND:  They don't have a -- yes, your Honor, I

23   agree with that insofar as it doesn't say "knowing," it doesn't

24   say "purposely," et cetera.

25         THE COURT:  So, let's get to what -- I understand your

1    concern, because some of the plaintiffs' briefing is to, like,

2    spin out 30 different hypotheticals, and some of them seem to

3    me quite far-fetched, but I can let you know of my core

4    concern.  This statute doesn't have a *scienter* requirement

5    attached to it, and it seems to me that the Attorney General's

6    Office is asserting that the statute can be violated even if

7    you don't expressly advocate a banned concept, if you advocate

8    in a way that implies that a banned concept is true.  Do you

9    think the statute could be construed to be violated if an

10   educator in teaching implies that a banned concept is true?

11            MR. GARLAND:  That certainly is not my understanding

12   of it, your Honor.

13            THE COURT:  Okay.  Let me show you what I'm concerned

14   about here.  So, your office, your boss, issued a formal AG's

15   opinion interpreting the statute, right?

16            MR. GARLAND:  Yes, your Honor.

17            THE COURT:  Okay.  And if we go and look at that

18   provision, and we look specifically at the provision that

19   discusses the sensitivity training safe harbor -- do you know

20   what I'm talking about?  It's at page 7 of 9.

21            MR. GARLAND:  Yes.  I'm familiar, your Honor, yes.

22            THE COURT:  Okay.  So, if we go halfway down the page

23   I'll read the key portions of it slowly, just so you'll

24   understand my concern.

25            "'Sensitivity training' includes implicit bias

1    training.  Implicit bias training is premised on teaching

2    people about biases they may have of which they are not

3    consciously aware and helping them become aware of those biases

4    so as to encourage treating others with dignity and respect and

5    to avoid treating others less equally.  Implicit bias training

6    recognizes that biases develop over time through such means as

7    personal experiences, messaging people may receive from media

8    and other sources.  Implicit bias training does not violate

9    Section 297 unless it includes concepts of group superiority or

10   inferiority based on inherent or innate group characteristics

11   or concepts that an identified group should be treated

12   unequally or discriminated against."

13          And then in the second paragraph it goes on to talk

14   about the sensitivity training safe harbor in the statute, and

15   what concerns me is the final couple of sentences in that

16   paragraph.  But if someone -- I guess I have to read the

17   sentence above.

18          "For example, a public employer or government program

19   may create a web-based resource entitled, 'Anti-Racist

20   Resources,' and include information designed to promote a

21   better understanding of racism and how to combat racism.  But,

22   if that web-based resource stated that it was designed to

23   'serve as a resource to white people' or to 'serve as a

24   resource for our white employees,' then it could violate

25   Section 297 because it may imply that White people

1    specifically, and for no other reason, are in need of

2    anti-racist resources-resources that could benefit people from

3    all backgrounds."

4            That suggests the Attorney General is saying to

5    people, educators or people who offer sensitivity training,

6    that if you do something that implies that a banned concept is

7    true you could be subject to discipline for violating the

8    statute.  Now, the statute doesn't say that by its terms, but

9    that's how the Attorney General interprets the statute, and

10   that seems to broaden quite expansively, especially when you

11   note that there's no *scienter* requirement.  So, a person could

12   unknowingly teach something that does not expressly advocate a

13   banned concept but that could be understood to imply, even

14   though they do it unknowingly, and they could be disciplined

15   for violating the teacher ethics code.

16           That's where my core concern is.  I think a lot of the

17   things the plaintiffs say, lawyers do what lawyers do, but I

18   think that is -- the core concern I have is, to the extent that

19   the statute can be read and the Attorney General appears to

20   read it to prohibit conduct that does not expressly advocate a

21   banned concept, since there's no *scienter* requirement to the

22   statute, that leaves educators in great doubt as to whether

23   their conduct may comply or not.

24           That's my core concern.  Please feel free to take

25   whatever time you need to answer it.

1    MR. GARLAND:  Absolutely, your Honor.  I have a number

2    of responses to that.  I want to engage with it head on, but

3    then also I have a couple of other points I'd like to make with

4    respect to it.

5         The first is I do not understand, based on my

6    representation to you as a Department of Justice official, that

7    that statement is designed to expand the scope of the statute

8    at all to a world where people who perceive or this subjective

9    perception would be what governs the conduct.  I think our

10   view, as we've laid out hopefully fairly clearly in our

11   briefing, and that the FAQs and the Attorney General's Opinion

12   otherwise identified, is the affirmative act.  It is the

13   affirmative act of doing this.  You use the word "advocate" I

14   think as a fine way to put it.  And so, to the extent that

15   specific portion of this opinion --

16        THE COURT:  Yeah, if you read the statute narrowly and

17   literally, what it bans is -- I want to use the term "advocate"

18   because different statutes use a different litany of things,

19   but I think "advocating" is a good way to describe it, that

20   something is, that something is not, that something should or

21   should not be, and then it makes those statements about what

22   that is or that should be or should not be, et cetera.

23        And if that's all and only what they did it's quite a

24   very narrow statute, but if it could encompass within its sweep

25   conduct that is unintentional but that is deemed by someone to

1    imply the advocacy of a concept, it becomes quite problematic.

2         That's where I'm concerned, and, since the Attorney

3    General issues an official legal opinion in which he states

4    that there can be violations by conduct that does not state but

5    that implies, doesn't that give teachers good reason to fear

6    that it might be applied in that way to them?

7         MR. GARLAND:  Your point is well taken, your Honor.  I

8    do not understand that to have been the intent at all of this

9    Opinion, and it certainly isn't the position I'm here

10   advocating today.

11        THE COURT:  I think what we do have to make clear

12   today is not the day in which this issue would be necessarily

13   resolved.  If I were to grant your motion in its entirety, the

14   case would be resolved.  If I were to deny your motion, it

15   would be only to say that this states a plausible claim that it

16   is unconstitutionally vague, and it's possible that, as things

17   develop, we would probably next revisit it on cross-motions for

18   summary judgment after some limited discovery has occurred.

19        So, it doesn't necessarily follow.  That's my concern.

20   Whether you've addressed it sufficiently as to justify

21   dismissal at the 12(b)(6) stage is one thing.  If you haven't,

22   we just go on to the next stage.

23        MR. GARLAND:  Understood, your Honor, and I think I

24   have two specific responses to that.  They're related.  The

25   first one is we haven't presented this to you as largely a

1    legal question, there's no cross-motion seeking judgment on it,

2    but we present it to you as a matter of statutory construction,

3    and we've used our Guidance documents and the Attorney

4    General's Opinion to put in front of you a construction that we

5    believe survives a facial challenge as a matter of law.

6          But, as a federal judge or any other judge that's

7    considering this, you are able to, it is certainly within your

8    power to say, You know what?  I agree with everything you said,

9    but I don't agree with that statement.  To the extent that

10   statement could be read in the manner that you've expressed

11   concern about, that creates problems and as a matter --

12         THE COURT:  Well, we all agree that, I think we would

13   all agree, that I do not have the power to rewrite the statute

14   to save it, and I wouldn't try to do that.  But I do agree with

15   you to the extent that you're suggesting in order to address

16   their vagueness challenge you have to construe the statute,

17   right?  And so what you're saying is, if you adopted a

18   sufficiently narrow construction, then you wouldn't have the

19   vagueness problem that you're raising.

20         MR. GARLAND:  I think that's right, your Honor, and I

21   think what you could very well do in a memorandum order would

22   be to say, you know, I have acknowledged at oral argument or I

23   brought up at oral argument that this particular provision in

24   the AG's Guidance could create a problem as a matter of

25   statutory construction, based on the verbs that are used in the

1    statute, consistent with the doctrine of constitutional

2    avoidance, I reject that that is a plausible construction or is

3    an appropriate construction because it creates issues that,

4    frankly, judges don't create when they're construing statutes.

5         THE COURT:  Right.  But, again, we have to draw the

6    line.  A judge can't and shouldn't try to save a statute --

7    this isn't a constitutional avoidance kind of claim where I

8    have some duty to construe the statute to try to save it.  It's

9    either vague or it isn't.  I just have to say what it means.

10   And I agree with you, if I said that it meant only conduct that

11   expressly advocates and not anything by implication it would be

12   a far narrower statute and probably of far less concern to the

13   plaintiffs.  But that's not what the statute says.  I would

14   have to give it that construction, and certainly I shouldn't

15   disregard an official Attorney General opinion that construes

16   the statute more broadly than I think it should be -- that I

17   would have to think it's construed to adopt your argument here.

18   See what I'm saying?

19        MR. GARLAND:  I do, your Honor, but I do think it is

20   within your power, and I believe there's a good deal of Supreme

21   Court case law that supports the proposition that facial

22   invalidation is strong medicine; that you aren't required to

23   read it in a way that the language doesn't support, but, to the

24   extent there are plausible readings one way or the other, you

25   can elect the narrower one.  You can also certify the question,

1    which we've raised the specter of, but I think ultimately it's

2    well within your power sitting in this proceeding.

3          THE COURT:   Yeah.   The problem with me is that my

4    construction would not be authoritative.   It might be helpful

5    for people to know what I think about it, but what ultimately

6    matters is what the New Hampshire Supreme Court thinks about

7    it.   They have the final word on what the statute means, not

8    me.

9          If you wanted to go on, I did have another question

10   for you on a different topic, but do you have anything else you

11   want to say in support of the vagueness argument?   Of course,

12   I'll give you a chance to reply after the other side's

13   argument.

14         MR. GARLAND:   I have two very relatively small points

15   on what we were just discussing.   The first is that I think the

16   language of the statute itself does support the proposition --

17   this is really dealing with, as you term it, advocacy, and if

18   you look at 193:40 it talks about the express belief in or

19   support for, which I do think contemplates an affirmative act.

20   It doesn't say "knowingly," it doesn't say "purposefully," and

21   I acknowledge that, but I do think it contemplates some

22   affirmative act, not some perception or inference from the act.

23         And so, I do think the construction you've identified

24   that creates fewer problems, which I -- the construction I

25   intended to advocate today is one that is supported by the

1    explicit statutory text, so I don't think you'd be rewriting

2    the statute to adopt that in an order.

3            THE COURT:  You say that I could -- I just want to be

4    sure that I've got your position.  You believe that I have the

5    power to, and you would not object if I were to, construe that

6    statute to say it only applies to advocacy written broadly to

7    encompass all the various kinds of things that expressly

8    advocates one of the banned concepts, and that it cannot be

9    violated based on someone advocating a banned concept by

10   implication; they have to do it expressly.

11           MR. GARLAND:  Yes, your Honor, and I think that's

12   consistent with 99 percent of the argument I've tried to make.

13           THE COURT:  That would require me to reject that

14   portion of the Attorney General's Opinion when he says

15   something different from that.

16           MR. GARLAND:  I understand, your Honor.

17           THE COURT:  Okay.  All right.  So, what else do you

18   have?

19           MR. GARLAND:  The only other point I would make with

20   respect to that portion of vagueness, your Honor, is that, to

21   the extent there were some concern kind of around the margins,

22   understanding you've identified Johnson and Dimaya as from a

23   standard standpoint about whether implied conduct could violate

24   it, I still am not sure that makes the statute facially vague.

25   I think that's a question that could get resolved really

1    through an as-applied challenge, to the extent it were ever

2    enforced in that manner.

3         And so, I disagree, and I've said today and I'm saying

4    this explicitly, that it should get to inferred conduct or

5    implied conduct, but, to the extent that were a concern, I'm

6    not sure it's a concern that couldn't be sufficiently resolved

7    on a case-by-case basis that would require you to reject the

8    statute outright.

9         THE COURT:  Yeah.  The problem is what is the standard

10   against which you identify when something crosses the line into

11   implying, especially when there's no requirement for *scienter*.

12   You can cross the line unknowingly and be subject to

13   discipline.  So, that's where you would want to have some kind

14   of guidance as to when something is deemed to imply versus not

15   imply something.  That's, I think, the principal problem.

16        I doubt any of the plaintiffs are going to get up and

17   say, I want permission to advocate one of the banned concepts

18   expressly and literally.  What they're concerned about is, I'm

19   afraid in doing my ordinary teaching someone's going to haul me

20   up on charges by implying that I've advocated a banned concept.

21   I think that's got to be what their core concern is.

22        Maybe the plaintiffs have some -- they want to

23   advocate specifically some banned concept, but it doesn't sound

24   like that's what's taught in the schools to me, and so I'm not

25   sure anybody is going to stand up and say, Well, that's what I

1    want to teach.  They want to teach things that someone might

2    argue by implication strays into a banned concept, such as --

3    you're well aware of what implicit bias training is like, and

4    my understanding of implicit bias training is that it teaches

5    that people are prone to stereotypical thinking, they're prone

6    to in-group and out-group stereotyping, and that that can cause

7    people to unconsciously treat people differently based on their

8    race.  Well, you say implicit bias training is fine, but when

9    does it stray into something that is a banned concept if a

10   banned concept can include everything that implies?  So, that's

11   my concern.

12          But let me ask you about -- I'd ask you, since you've

13   asked me to interpret the statute, let me ask you to put on

14   your statutory construction hat and construe the fourth banned

15   concept for me, because that's the one that I have the most

16   difficulty with.  I've spent several days kind of parsing it

17   and trying to think about what it means, and I'm interested in

18   what you say it means.

19          So, you can pick any -- the banned concepts are the

20   same in all of the statutes, I think, but if you want to take

21   the education provision, the specific education provision, you

22   can do that, if you want to do one of them, but just help me

23   understand what you think the fourth concept discusses.

24          MR. GARLAND:  Yes, your Honor.  And I acknowledge that

25   I believe in the Honeyfund case the judge identified really the

1    triple negative in a comparable Florida statute as creating a

2    problem.  How I would read it, and this is actually taken

3    directly from part one of I think both sets of Frequently Asked

4    Questions, is that advocacy that persons in one of the

5    identified groups should not treat members of another -- other

6    identified group equally.  So, it isn't saying -- it's not

7    advocating for a --

8            THE COURT:  Well, let's separate -- it does two

9    things.  It says "cannot," and it says "should not," right?

10   Let's focus on "cannot" first, because you can violate it by

11   advocating that -- and I'll use -- for clarity sake I'll just

12   focus on race, okay?

13           So, the fourth banned concept with respect to "cannot"

14   says, as I'm understanding it, that people of one race cannot

15   treat others without regard to their race, and that seems to be

16   starting to implicate -- if we put in the words "can have

17   difficulty in treating people," that sounds like the core of

18   what implicit bias is.  So, I wouldn't say that, at least the

19   implicit bias training that I'm familiar with doesn't say that

20   someone cannot do it, but they try to teach you about implicit

21   bias so that you can become aware of the potential and

22   hopefully avoid engaging in that kind of stereotypical

23   thinking.

24           But that statute appears -- that provision, the fourth

25   concept on "cannot" seems, if anything, to be even broader than

1    the second concept, because the second concept has a limiting

2    term "inherently" in it.  "Inherently" is important, because

3    that is not my understanding of what implicit bias is.  It's

4    not an inherent characteristic of being White that produces

5    implicit bias.  So, the third concept at least has another

6    limiting term in it, but that term is not in the fourth concept

7    at all.

8          So, if it teaches that something cannot, a White

9    person cannot treat a Black person equally and cannot may imply

10   that they cannot because they're teaching that it often happens

11   that they have difficulty in doing it, then someone who is

12   trying to teach implicit bias the way it's supposed to be

13   taught and the way, according to your Frequently Asked

14   Questions, you want it to be taught, could still result in

15   charges being brought against somebody.  That's the concern.

16         MR. GARLAND:  I understand the concern, your Honor.  I

17   think the race example is probably a good one, because my

18   understanding, and the position that I'm here taking today, is

19   this is basically -- I'm sure the Court is familiar with the

20   concept of colorblindness, as kind of a -- that you shouldn't

21   treat anybody differently because -- like you should

22   functionally be blind to the race of a person.  And my

23   understanding of this provision is it's saying you can't tell

24   someone they can't do that.  That's it, that it's not requiring

25   that somebody do anything beyond that, that it prohibits only

1    that sort of conduct, that this idea of this theory that --

2           THE COURT:  All right.  Students come into the

3    classroom and ask the teacher, Can we talk about reparations as

4    an issue?  Can the teacher talk about reparations, talk about

5    the thinking behind it, and if they were to advocate that

6    reparations is a good thing, wouldn't that violate the fourth

7    concept?  And if they advocate -- even if they don't advocate,

8    if they discuss the reparations movement in ways that could

9    imply agreement with that concept, then they might violate it,

10   right?

11          MR. GARLAND:  I don't think so, your Honor.  I think

12   that that, frankly, has the prohibition backwards; that it's

13   not prohibiting conversations where something raising conscious

14   would be -- you know, affirmative action I think is another

15   example.

16          THE COURT:  Reparations -- doesn't reparations involve

17   treating people differently because of their race?

18          MR. GARLAND:  And I don't think this prohibits a

19   discussion around that topic, your Honor.

20          THE COURT:  It prohibits advocating that they should

21   not be treated differently because of their race, doesn't it?

22          MR. GARLAND:  I'm going to think about how you phrased

23   that.

24          THE COURT:  See, that you and I are having so much

25   trouble even communicating about the fourth concept may tell us

1    something about the challenge.  First, we're both lawyers, and

2    we do statutory interpretation for a living, but if we're

3    having this much trouble about it, do you think a person of

4    ordinary intelligence looking at it with no special skills in

5    the law could clearly discern what that provision means or

6    doesn't mean?

7              MR. GARLAND:  I understand the point you're making,

8    your Honor.  I do think the guidance we provided does provide

9    that clarification.  You may disagree, but I think it really is

10   the idea that it's not prohibiting --

11             THE COURT:  So, I appreciate your effort with

12   Frequently Asked Questions, but those aren't regulations, those

13   aren't law.  That's just informal guidance that the issuer

14   could withdraw at any time, disregard, change, without any

15   consequence, really, right?

16             MR. GARLAND:  Yes, your Honor.

17             THE COURT:  Okay.  So, that's different from a

18   regulation.  If an agency -- like if the Human Rights

19   Commission issued regulations interpreting this provision, then

20   arguably it would have some force of law if it was a

21   permissible interpretation of an otherwise vague statute, but I

22   can't really attach too, too much weight to the Frequently

23   Asked Questions responses, because they don't have the force of

24   law.

25             MR. GARLAND:  You can certainly attach persuasive

1   value, your Honor, and I think there are a number of cases

2   that, you know, if you were grappling between two plausible

3   constructions, again, that's all you'd be able to do, and you

4   say this one creates a problem and this one doesn't, I think

5   you can turn to the Guidance to find that plausible

6   construction, if you agree that it's plausible.

7          The other point I'd make with respect to this, and I

8   don't want to go too far down this road, but I do want to make

9   a point that we should have made in our briefing, and I

10  apologize for not.  There is a severance provision in the

11  statute.  So, they're asking for a strong remedy of striking

12  down the entire law.  They are not asking for any sort of

13  targeted relief, but the law itself has one.  We haven't

14  briefed that.

15         THE COURT:  Okay.  So, fair point to this extent:

16  I've been looking at the severance provision, but you did not

17  argue that that -- you might have argued that, even if the

18  first section is invalid, the second section survives, but the

19  plaintiffs haven't had a chance at this stage to engage with

20  you on that, and I would not grant, in part, dismissal at this

21  stage, because the plaintiffs haven't had any chance to brief a

22  specific argument about severance.

23         We may have to confront severance down the road later

24  on, and you've perfectly preserved that argument for later, but

25  I don't want the plaintiffs to feel that they have to respond

1    to something you throw out in oral argument like this, because

2    that would be a very complicated set of briefing that would

3    have to be used.  The appropriate time to invoke that would be

4    after I -- if I didn't dismiss the case in whole, to then,

5    after appropriate briefing, hear argument about, Well, even if

6    you didn't dismiss it entirely you should dismiss it in part,

7    and then they would have a chance to engage.

8            So, you've preserved the issue, but I'm not going to

9    take it up on the current motion.

10           MR. GARLAND:  And I apologize.  I wasn't advocating

11   that, your Honor.  We've moved to dismiss the case in its

12   entirety, and that's what we've asked you for.  And I do think,

13   in light of the Frequently Asked Questions, which I do believe

14   are a plausible basis to read the statute and resolve the

15   ambiguity you're identifying, that provides a basis for the

16   relief we're asking for.

17           THE COURT:  Okay.  Thank you.  I appreciate it.

18           MR. GARLAND:  Thank you.

19           THE COURT:  So, let me hear from plaintiffs, whichever

20   plaintiff wants to go first.

21           MR. MOERDLER:  May it please the Court, my name is

22   Charles Moerdler.  I am from the firm of Stroock & Stroock &

23   Lavan.  I'm here with Peter Perroni, my colleagues David Kahne

24   and Elizabeth Milburn, and we represent the AFT plaintiffs.

25           First, I would apologize to the Court if I sound a

1    little raspy and confused, but it's that time of year for

2    colds.

3            THE COURT:  That's fine.  That's fine.

4            MR. MOERDLER:  Your Honor, let me tell you, if I may,

5    the areas I would like to touch upon --

6            THE COURT:  Mm-hmm.

7            MR. MOERDLER:  And the questions I would like to

8    address, including each and every one of those that you put to

9    my adversary, because they were as if you had read my outline

10   in some --

11           THE COURT:  Well, I read your brief.

12           MR. MOERDLER:  That's it.  Your Honor, let me, if I

13   may, make two points at the outset.

14           The first is this is the third case in the District

15   Courts passing upon these four bans.  The first, of course, was

16   Santa Cruz.  Each of these bans *in haec verba* were in Santa

17   Cruz.  The second was Honeyfund, decided just a few weeks ago

18   in the State of Florida, and, again, the same four bans, with

19   one word difference.  So that you have here potentially,

20   potentially, an issue as to the weight that ought appropriately

21   to be given to those decisions if *stare decisis* survives after

22   recent decisions of another court.  But, to the extent it does,

23   then it is clear here that what must happen is some weight has

24   to be given to them, and I'm sure the Court will do what it

25   thinks appropriate.

1    THE COURT:  To the extent it's persuasive.  But we

2    trial judges have busy dockets, and we do the best we can

3    sitting alone, and we make our decisions, and I don't expect my

4    colleagues to give much weight to what I do, and I tend to look

5    at what other people do only to the extent it's persuasive.

6    The Courts of Appeals have months to study issues, they have

7    three-judge panels, so I tend to look more closely to Circuit

8    and Supreme Court precedent.

9    MR. MOERDLER:  I understand.

10   THE COURT:  But I, of course, will read them and give

11   them the weight they're due for their persuasiveness.

12   MR. MOERDLER:  All right.  The second point I wanted

13   to make to you is a standard on this motion.  This is simply a

14   motion to dismiss.  We did not seek a preliminary injunction

15   for two reasons.  The first reason, the most important one, is

16   the issue here is of critical importance to the educational

17   system of the United States, no ifs, no ands, no buts, no

18   maybes; there are no reservations on that statement.  Because

19   of that, we believe a complete record is indispensable and can

20   only be had by limited discovery followed either by a bench

21   trial or summary judgment at which your Honor can have a full

22   record to make a decision.

23   THE COURT:  You probably spoke to Mr. Bissonnette at

24   some point, since he's litigated in front of me on preliminary

25   injunctions, and he also knows that I tend to be very cautious

1   about granting preliminary relief, and what I ordinarily do is

2   let's have an accelerated discovery period and combine the

3   preliminary and the permanent, because I don't like to make

4   decisions on the fly without having a chance to think through

5   them, and I don't like people coming to me and making

6   dispositive arguments without them having a full opportunity to

7   develop.  So, I certainly grant preliminary relief on occasion,

8   but on an important issue like this I would have insisted that

9   we all take the time we need to think about it before we make

10   any decisions.

11         MR. MOERDLER:  Let me just, so that the record is

12   complete for your Honor, call to your Honor's attention a First

13   Circuit rule which I've not seen really repeated too much.  It

14   was in the Asociacion case decided in 2004.  A dismissal on the

15   pleadings will be upheld only if it appears beyond doubt that

16   plaintiff cannot prove any set of facts in support of its

17   claims which would entitle it to any relief.  And against that

18   background, the discussion that just preceded mine raises the

19   question in direct proportion.

20         I wanted those preliminaries before I go to this

21   issue.

22         THE COURT:  Can I ask you, so I have put the case to

23   your opponent that the foundational argument -- the foundation

24   for his vagueness argument is based on a standard that the

25   Supreme Court appears to have rejected in Johnson and Dimaya.

1          MR. MOERDLER:  It's done it in three cases, your

2     Honor.

3          THE COURT:  Okay, so maybe three.  I got two of them.

4     But of the two or three where they rejected it, and I'm going

5     to carefully consider what Mr. Garland said to me today about

6     this, and there are other Circuit Court cases that have

7     explored this issue that I will address, even though they

8     weren't in the parties' briefing, but I would ask you, that

9     standard -- and part of the reason why I doubt that that is the

10    standard is because, in my view, that's a standard that, except

11    in cases where constitutional conduct is implicated or the

12    exact facts of Johnson, it would be impossible to bring a

13    facial vagueness challenge, because every statute that I can

14    think of that might be challenged on vagueness grounds has at

15    least one application that's not vague, and this statute

16    appears to have one or more applications that would not be

17    vague.

18         Lawyers don't like to concede anything.  Maybe you

19    will refuse to do it, but would you agree that this statute has

20    some applications that would not be vague such as --

21         MR. MOERDLER:  Your Honor, I don't get to that point,

22    if I may.

23         THE COURT:  I know, but I'm entitled to ask you to get

24    to that point.

25         MR. MOERDLER:  You certainly are, and you're certainly

1    entitled to an answer from me.  But, if I may, let me get first

2    to what the basic -- the premise of the three cases is.

3          The third case was in 2019.  It's a lengthy opinion by

4    Judge Gorsuch, concurred in by six members of the Court.  It's

5    United States against Davis, reported at 139 Supreme Court

6    2319, and if I may read just one sentence from his opinion.  I

7    think it's only one.

8          When Congress passes a vague law, the role of the

9    courts under our *Constitution* is not to fashion a new or

10   clearer law *in haec verba* or otherwise.

11         THE COURT:  I'm with you on that.  I think Mr. Garland

12   agrees.

13         MR. MOERDLER:  But the problem is there are two ways

14   of fashioning a newer and clearer law, and those who have

15   clerked for the Court understands that.  One is by rewriting

16   it, and the other is by interpreting it, and so this case can

17   very easily raise that question in full frame:  Can you, by an

18   interpretation that -- I'm going to prove that in terms of

19   their interpretation of a section of this law, two sections, in

20   fact, that you can actually rewrite the law through

21   interpretation.

22         Let me give you an example, if I may.  You search this

23   law anywhere, and you do not see the words, *in haec verba* or

24   otherwise, of it being extended beyond the classroom.  To the

25   contrary, the first few words of this statute are, A pupil in

1    any, any state --

2          THE COURT:  Well, the Attorney General's Office agrees

3    that it applies outside of the classroom.

4          MR. MOERDLER:  And I say it does not.

5          THE COURT:  They say it can be construed to cover

6    conduct outside of the classroom.

7          MR. MOERDLER:  And that's exactly where we come to

8    part, because I don't believe, maybe I am wrong, that by

9    construction you can turn "yes" into "no," "stop" into "go."

10   The idea --

11         THE COURT:  Where do you find the limiting language

12   that would render the statute inapplicable to a coach, say, or

13   coaching a football team in an away game and having

14   communications with students there?  What is there in the

15   statute that you say makes it inapplicable to that conduct?

16         MR. MOERDLER:  If I may, the first four words come

17   right down to the point.  Let me, if I may:  "No pupil in any

18   public school..."  If it were written to be anything outside of

19   the public school it would read, No public school pupil in this

20   state shall be taught...  That's the English language.  Pause

21   it again, if I may --

22         THE COURT:  You mean physically on school grounds?

23         MR. MOERDLER:  Correct.  It's classroom.

24         THE COURT:  Okay.  There's certainly another way to

25   read that term.  I don't think that's the only way.

1    MR. MOERDLER:  May come into vagueness.

2    THE COURT:  Okay.  That it could be read narrowly to

3    apply only on school property?

4    MR. MOERDLER:  No, no.  I'm in the classroom.  I'm

5    even beyond the property.  It's in the classroom.  It's a

6    classroom definition.  Yes, maybe the hallways and maybe a

7    study hall as in -- it is curriculum intended.

8    THE COURT:  Well, if that's true -- I don't know if

9    you're making the First Amendment argument.

10   MR. MOERDLER:  No.

11   THE COURT:  Whoever is making that will then have to

12   deal with the argument that, Oh, if it's only limited to

13   curricular work, that's very clear, Garcetti applies, it's

14   government speech, the First Amendment doesn't apply.

15   So, whoever you delegate that task to, get ready

16   because your colleague is telling me it only applies in the

17   classroom, so it's only curricular and we all, you know,

18   courts, multiple Circuits have said Garcetti applies, it's not

19   First Amendment.

20   But you made your point.  I understand it.  So, why

21   don't you go on with --

22   MR. MOERDLER:  If I may, your Honor, I will deal with

23   precisely that issue when I get to the First Amendment.

24   THE COURT:  Okay.  Go ahead.

25   MR. MOERDLER:  But here I was trying to parse language

1   for a purpose, and I did not wish to give any offense in doing

2   so.  It was simply and solely to show that rewriting a statute

3   doesn't mean adding or deleting words.  It can be how it is

4   interpreted.

5          Let me give you one that's a little clearer.  All

6   right?

7          There is nothing in here that says extracurricular

8   activities are covered, and yet the opinion of the Attorney

9   General says that.  Now, let me go to that point, because it

10   becomes very important.

11          Johnny is on the swimming team.  Johnny is swimming.

12   He comes out of the pool and a teacher -- let's make it even

13   more ridiculous -- a teacher, not his own, he sees and says,

14   Hey, by the way, did you see the story on the Ukraine?  What's

15   the story between the Russians being oppressive and anti-human

16   in oppressing the Ukrainians?  Now you have the superiority

17   clause of the statute coming into play.  If it were done in the

18   courtroom, I mean, in the schoolhouse you're within the words

19   of the statute, but is it intended to be there?  I think not.

20   And if one reads --

21          THE COURT:  You're giving heavy weight to the word

22   "in," right?

23          MR. MOERDLER:  Yes.

24          THE COURT:  And you say it can only be read one way,

25   and that means physically on the school grounds.  But the issue

1    you raise seems to me to have greater potency when talking

2    about First Amendment, because, even if Garcetti applies,

3    Garcetti doesn't apply to every word that a teacher could speak

4    to a pupil, and so if they run into the pupil at the grocery

5    store with their parent and say something, that is unlikely to

6    be deemed not First Amendment speech.  So, it does have bearing

7    on that issue, but I don't think it's of central importance to

8    the particular vagueness argument we're discussing now.

9          MR. MOERDLER:  Let me, then, deal with the second part

10   of the presentation in that regard.  The focus has been on this

11   being a facial challenge.  At the time the complaint was filed,

12   both complaints, neither of us had any particular documents

13   that would tell us what the position of the State was, what the

14   position of the public was, et cetera.  Let me pause on that

15   sentence.

16         With respect, I do not believe that I, the lawyer who

17   has gone to law school for the purpose of understanding the

18   law, am the right person whose interpretation should at the end

19   of the day carry how it is to be construed, vaguely or

20   otherwise, as contrasted with the ordinary public.  In about

21   two minutes I will show you that since the complaint was filed

22   we now have a beginning of a peek as to how the ordinary public

23   regards it and thereby underscoring the absolute need for

24   discovery and the absolute need for understanding our point in

25   our brief that this is also as applied.

1    THE COURT:  I'm less interested, frankly, in how the

2    public, what they may deem a violation of the statute.  I'm

3    very interested in what the people who enforce the statute say.

4    And so, if you've got -- has the Human Rights Commission passed

5    on this?  Has a court passed on this?  Has the Department of

6    Education -- you in one of your complaints note that one of the

7    named plaintiffs had someone complain about the fact that they

8    signed a petition.  Now, you and I know, and I doubt

9    Mr. Garland would disagree, that that conduct is

10   constitutionally protected, it is not conduct for which they

11   can be disciplined under the statute, and it is completely

12   unreasonable to suggest otherwise.

13        You would agree with that, right, Mr. Garland?

14        MR. GARLAND:  Absolutely, your Honor.

15        THE COURT:  So, that some person thinks that that's

16   complainable under the statute doesn't really tell me anything.

17   What matters is the people who actually have to enforce the

18   statute.

19        MR. MOERDLER:  But you cannot leave without weight the

20   chilling effect that it has on any human being.  For example,

21   if Johnny asks the teacher a question, What is implicit bias?,

22   and the teacher has seconds to answer that question, clearly

23   the statute will have, certainly on all the publicity it's

24   attracted, some significant effect on the teacher being able to

25   respond, being able to deal with it and deal with learning.

1    And the complaint calls attention to the fact that there have

2    been those instances already where teachers feel that they

3    cannot teach adequately.

4            Can I respond to a question, What was Brown against

5    the Board of Education?, or am I violating the statute?

6            THE COURT:  With respect to you folks, I understand

7    your lawyers have to advocate, but some of that stuff seems to

8    me to be completely farfetched.  No teacher could be subject to

9    discipline under the statute for talking about Brown v. Board

10   of Education.  I think I've identified what my core concern is.

11   Maybe you have others.

12           But the problem is not that they won't be able to talk

13   about the Civil Rights Movement or something like that.  The

14   problem is that, to the extent they engage in conduct that

15   could be understood by somebody other than them to imply

16   advocacy of one of the banned concepts, that they could be

17   subject to dismissal for conduct that they don't intend to

18   engage in that they can't know by reading the statute is

19   clearly barred, that's where it starts to have problems.

20           MR. MOERDLER:  And so, let me take what you have just

21   said and take it to one step further as to the problem.

22           By statute in this state the teachers are required to

23   teach how bias came into being, intolerance, discrimination and

24   the like.  What it was by statute and how can we prevent it,

25   that in and of itself is a direct conflict with the statute.

1    And to make that point, because you obviously

2   frequently are called upon to resolve conflicting statutes, let

3   me point out to you that as recently as July of this year that

4   mandate was expanded as to what they have to teach.  Now put

5   myself in the position.  Can I teach and comply with the

6   statute; can I not teach and comply with the other statute?

7        THE COURT:  Again, let's go back to some of my

8   threshold concerns, because, to the extent I have a concern --

9        MR. MOERDLER:  All right.

10        THE COURT:  -- it's really a good idea for you to try

11   to address my concerns.

12        MR. MOERDLER:  I agree.

13        THE COURT:  Okay.  So, I come back to the standard,

14   the standard about vague in all of its applications.  Do you

15   agree that this statute is not vague in all of its

16   applications, and, if you don't agree with that, how do you

17   answer my hypothetical, which it seems to me to be clear and

18   not vague that you can't advocate White supremacy in the

19   classroom without violating the statute?  If you disagree with

20   that and say, Oh, no, somebody could advocate White supremacy

21   and not violate the statute, show me how that's so.  Put on

22   your statutory construction hat and tell me how -- but if you

23   agree with me, just tell me first.  Do you agree or not --

24        MR. MOERDLER:  I do not totally agree.

25        THE COURT:  -- that if the statute is vague -- that if

1     the standard is vague in all of its applications then the

2     vagueness claim fails?

3               MR. MOERDLER:  No.  It's the exact opposite.  If it's

4     vague in all of its applications, it falls.

5               THE COURT:  No.

6               MR. MOERDLER:  And if it's vague in some it falls.

7     That's what Johnson precisely says.

8               THE COURT:  Okay.  Well, you won't answer it.  That's

9     okay.  You want to move on to the next point?

10              MR. MOERDLER:  Well, I'd like to answer the balance of

11    that, Judge.  I'm going to make the assumption that the theory

12    is that, if it's vague in all of its applications or if it's

13    not vague in all of its applications, again I have to say to

14    you what do you tell the teacher when the statute says you must

15    teach precisely the subject you're barred?

16              THE COURT:  If the statute requires you to teach

17    something that you're barred from teaching, that would be a

18    problem.

19              MR. MOERDLER:  That's the point I'm making.  That was

20    the point I was making.

21              THE COURT:  I understand.  All right.  What else have

22    you got?

23              MR. MOERDLER:  All right.  Your Honor, let me, if I

24    may, talk to you about the second aspect of the statute that

25    has not been touched upon today, and that is enforcement.  The

1   statute in plain and precise terms, in terms of its application

2   by the Supreme Court and by all of the courts, focuses very

3   heavily on enforcement.  If you do not have guardrails that

4   limit how it can be enforced, why it can be enforced, when it

5   can be enforced and what can be enforced, according to two

6   United States Supreme Court cases -- pardon me -- three,

7   according to all of them a law must be sufficiently explicit,

8   but it must be stated in such terms and with sufficient

9   guardrails as to limit arbitrary and discriminatory

10   enforcement.  And that is <u>Kolender against Lawson</u> and <u>City of

11   Chicago against Morales</u> decided in 1999.

12          And in cases subsequent to those in the Circuits that

13   has been a major element, more so than the language, because,

14   as I believe it was Justice Kagan recently pointed out, it is

15   not in our province to leave to the policeman one

16   interpretation of the law and leave to the judge another.  It

17   is our requirement that they both look at it and know what they

18   can enforce and how.  Most of the time this has come up in the

19   loitering context or in the reliable identification --

20          THE COURT:  I get it.  That's one of the important

21   considerations in the vagueness doctrine, is you want to have a

22   law that gives fair notice and then a law that is not prone to

23   selective enforcement left entirely to the unfettered

24   discretion of the enforcer.  I'm well aware of those concepts.

25          MR. MOERDLER:  Let me, then, go back to adding a third

1    piece to this, which your Honor touched on in another context,

2    and that is three Supreme Court cases.

3              THE COURT:  Can I just stop you, though?

4              Mr. Garland, on remedy you made an assertion, and I

5    may have misinterpreted you, but I think the plaintiffs

6    disagree with, that is, you seem to say this statute disallows

7    a complaint to the Department of Education until someone has

8    complied with the Human Rights Commission review process.  Are

9    you making that claim?

10             MR. GARLAND:  So, your Honor, in reading my reply we

11   may have overstated, and I apologize for that, and I would

12   certainly retract the statement that it is required by the

13   statute to operate that way.  I can tell you it is operating

14   that way.  The Department of Education is not proceeding with

15   anything until the Human Rights Commission has passed on the

16   conduct --

17             THE COURT:  Because I have looked at your regulations

18   on the Department of Education, and I do not see anything in

19   those regulations that permits the Department of Education to

20   refuse to entertain a teacher misconduct allegation simply

21   because the person making the complaint has not first gone to

22   the Human Rights Commission.

23             So, are you saying that the Department of Education as

24   a matter of practice is simply declining to consider any

25   allegation that these statutes are being violated by any

1    teacher until and unless that person making the complaint has

2    gone to the Human Rights Commission?

3         MR. GARLAND:  Your Honor, as a matter of practice,

4    yes, that's what's happening.

5         THE COURT:  But you understand that only aggrieved

6    people can go to the Human Rights Commission.  So, if you're

7    just a citizen who has read about Ms. Smith teaching prohibited

8    concepts in the school and you want to complain, you can make a

9    complaint to the Department of Education, but you're not an

10   aggrieved person under 354-A who has standing to bring suit.

11   The New Hampshire Supreme Court has rejected that in other

12   contexts.  You're not an aggrieved person.  You can't sue

13   because you've read in the newspaper that Ms. Smith is teaching

14   prohibited concepts.  You can complain to the Department of

15   Education, but you can't sue.

16        And you're telling me the Department of Education

17   simply would not consider that kind of complaint?

18        MR. GARLAND:  I'm telling you -- no, certainly the

19   Department of Education can receive those complaints.  It won't

20   act as a matter of investigative and enforcement authority

21   until the HRC --

22        THE COURT:  That's a matters of their discretionary

23   judgment, not that the statute requires it.

24        MR. GARLAND:  Your Honor, yes.  May I make one more

25   point?

1    THE COURT:  Yes.

2    MR. GARLAND:  That is how as a matter of practice,

3    candidly to the Court, it is operating.  I don't think it's

4    crucial to the vagueness, resolving the --

5    THE COURT:  I don't think it's crucial, but I did

6    think you had over-claimed the actual process, so I wanted to

7    clarify it.

8    MR. GARLAND:  I apologize for that.

9    THE COURT:  No.  No apology needed.

10   Counsel, go ahead.

11   MR. MOERDLER:  Your Honor, I must respectfully point

12   out that the Attorney General is misinformed.  I am now going

13   to tell you that we were able to look behind the curtain and

14   get our first piece of information, and it's in this record

15   that shows they do investigate them, they do comment on them.

16   THE COURT:  Why don't you show me the exhibit number

17   so I can look at it.

18   MR. MOERDLER:  Here it is (indicating).

19   THE COURT:  Okay.  What exhibit?

20   MR. MOERDLER:  It is -- the Department of Education's

21   own website has on it a report, an op-ed article by the

22   Commissioner, and in that article he refers to a bunch of

23   documents that he has attached to it.  So, you go behind that

24   and you look at the documents, and they are 72 pages in number.

25   The first one is a quiz that discusses how teachers -- pardon

1    me -- how people --

2            THE COURT:  Just for the record -- Counsel, you guys

3    know where in the record it is?

4            MR. MOERDLER:  It's an exhibit.

5            MR. KAHNE:  Exhibit B.

6            THE COURT:  Exhibit B to?

7            MR. KAHNE:  To the joint memorandum.

8            THE COURT:  The joint memorandum.  Okay.

9            MR. KAHNE:  It's ECF 45-1.

10           THE COURT:  So, the other side has this?

11           MR. KAHNE:  Yes.

12           MR. GARLAND:  I do, your Honor.

13           THE COURT:  All right.  Good.  Thank you.

14           MR. MOERDLER:  It discusses -- this is a quiz.  It's a

15   survey or a quiz:  "U.S. Census data shows that

16   African-American and Latina women earn how much more (sic) for

17   every dollar that a White man earns?"  And then they give them

18   a whole bunch of choices.

19           "Identify the source of this quote:  We have deluded

20   ourselves into believing the myth that capitalism grew and

21   prospered out of the protestant ethic of hard work and

22   sacrifices.  Capitalism was built on the exploitation of black

23   slaves and continues to thrive on the exploitation of the poor,

24   both black and white, both here and abroad."  And then it says

25   who is the author, and it gives you names.

1    It goes on and on in these veins for four pages of

2    those kind of questions, touching upon implicit bias and every

3    other thing that you've talked about so far.

4    Then it attaches a confidential report of the Chief

5    Investigator of the Department of Education named Mr. Richard

6    Farrell, dated April 22 -- 2022.  Now, understand that's long

7    after the complaint, and that's what we thought was going to be

8    found, and we thought that it would show what they were doing

9    and how they were doing it.  And this is only one that we have

10   found so far that the State put on a website, a state-funded

11   website, and let me read to you a beginning of that.

12   Good morning, Rich.  We've had an opportunity to

13   review the material that you sent, that includes those

14   questionnaires, and have the following information for you in

15   response to your inquiry:  First and foremost, the activities

16   identified are from the Human Relations Course at, redacted

17   school name.  After review with the principal, curriculum

18   coordinator and assistant superintendent, we have determined

19   that these activities do fall within the scope of the course.

20   And, For your information, we have attached a copy of

21   the syllabus.  You'll also notice that this syllabus includes a

22   form for parental notification as well as an invitation for

23   parents to review class assignments...

24   And it goes on and on and then concludes with the

25   following statement:

1         Should any further such objections be received the

2    District will handle them in accordance with our policy, IGE --

3    I have no idea what that one is.

4         THE COURT:  Are you reading this to me because you

5    want me to assume that they are investigating?

6         MR. MOERDLER:  They say so.

7         THE COURT:  Okay.  Do you agree that that's evidence

8    that they're investigating?

9         MR. GARLAND:  Your Honor, I don't.  I would ask that

10   you take a look at it.

11        THE COURT:  I can't absorb something he read to me.

12   I'll have to read it.  I'm going to take a break in a minute,

13   but I want to -- is the other side, the other plaintiff

14   presenting any vagueness argument, or are you just going to

15   rest on theirs?

16        MR. BISSONNETTE:  Yes, your Honor.

17        THE COURT:  Okay.  So, I'll give you, Counsel, another

18   ten minutes, and then I'm going to give the other side an

19   opportunity to argue vagueness, and then I will a take a break.

20        MR. MOERDLER:  Your Honor, I'm going to truncate it so

21   that you do not -- but I want you to know it concludes with a

22   statement:  We have reviewed this material through the lens of

23   the Divisive Concepts law.

24        Now, this was a report to the Chief Investigator, who

25   then sends it on to the Commissioner of Education and asks him

1   to review what to do.  If that isn't an investigation, I don't

2   know what is.

3          THE COURT:  Okay.  Good.

4          MR. MOERDLER:  All right.  Now, I have two other

5   points I'd like to make to you on enforcement.  It starts, I

6   believe, with an FAQ in the Guidelines, because I do want to

7   focus on the Guidelines briefly.

8          The Guidelines pertaining in Exhibit 19 state in FAQ

9   Number 8:  Does this law apply to all activities or just

10  teaching?  And it answers that question as follows:  The

11  prohibitions apply to all school activities carried out by the

12  public in their role as public schools, including those that

13  are part of the public school's work.

14         This foundational confusion caused the result that you

15  mentioned earlier of four teachers being the subject of a

16  complaint, having signed a petition outside of the school.  It

17  is the one that Mr. Bissonnette will address in connection with

18  another one of these document revelations and why we have said

19  to you from the outset and believe most sincerely this case

20  cries out for discovery of the documents behind it.

21         The history of this, and that's why I wanted to

22  mention this, when you have the author of the bill, when you

23  have the Chairman of the Committee both stating its purpose was

24  to address issues that involve CTR and a whole bunch of other

25  things that are disguised behind the background of this, that

1    it was the purpose of it, that we will end it by this statute,

2    tells you where they're going.  And then, when you see the

3    Commissioner direct that path by putting on his website right

4    next to this kind of a report the complaint form so that people

5    can complain to him or to the Human Rights Commission, with

6    respect, enforcement is, at the very least, vague and unclear.

7         Mr. Garland, a highly respected, totally principled

8    lawyer, says to you in a brief, We have a protocol as to how

9    it's to be enforced.  There is no protocol that we have seen.

10   They may have had conversations, but, if they have, the

11   Department of Education is investigating them every day; and,

12   as Mr. Bissonnette will show you, he has written to Human

13   Rights to find out what they've turned down, and Human Rights

14   won't even answer him, even though the law explicitly directs

15   it, allows it to put out all of the complaints to dismiss.

16        Your Honor, there is much more I could say, but

17   there's only one thing that I think I would like to stress

18   again, and, in doing so, let me make a point.  I say it not to

19   give any kind of controversial aspect to it.

20        This statute has a counterpart which one cannot forget

21   either in the First Amendment context but here now in this

22   context.  The other statute, 189:11, is what an explicit

23   statute does.  It says -- and, by the way, these same kind of

24   words were used in the July guidance from the Department of

25   Education.  They are how intolerance, bigotry, et cetera have

1    evolved in the past, can evolve, and how do you prevent it

2    under the statute as construed by the Guidance, assuming that

3    the Guidance has weight, and we will need not press that beyond

4    the briefs, because it's laid out there.  But how do you

5    possibly say I can prevent all forms of bias by the following

6    course of action, whether it be training, education or the

7    like, in order to comply with 189:11 without immediately

8    violating the precise language of 193?

9          And I thank the Court for its courtesy.

10         THE COURT:  All right.  Thank you.  Let me ask my

11   reporter.

12         (The Court conferred with the court reporter)

13         THE COURT:  Mr. Bissonnette, go ahead.

14         MR. BISSONNETTE:  Thank you, your Honor.

15         THE COURT:  So, let me ask you the same question I

16   asked your counterpart to see if you are willing to give me an

17   unequivocal answer on it.

18         MR. BISSONNETTE:  Yes, your Honor.

19         THE COURT:  I've explained my concerns about the

20   standard that the State's brief is based on, the vagueness in

21   all respects, all-applications test, but if that test applies,

22   it would seem that this statute is not vague under that test,

23   because there is at least one application on which it's not

24   vague, and I've pointed to what I think is a pretty clear

25   application, I can't imagine any of your clients would disagree

1    with this, that it's a problem if a teacher tries to promote

2    White supremacy as a part of their curriculum, and that would

3    violate the statute, and that's a clear violation, and if

4    vagueness, facial vagueness and its challenges fail unless it's

5    vague in all applications, then it would appear this case would

6    -- I'm not going to force you to make that concession, but if

7    you're not willing to make it, just give me some kind of

8    understanding of why I might be misguided.

9        MR. BISSONNETTE:  Your Honor, I see exactly where

10    you're going with this, and I completely understand.  I think

11    there probably is one application of the statute in which it

12    would not be vaguely applied, and that is if a teacher said,

13    and I'm looking at Banned Concept 1, a White person is

14    inherently superior or inferior to some other category.  That

15    is really probably the only application, a literal textual

16    application of the statute in which perhaps this statute

17    could -- is not --

18        THE COURT:  I raise this with you, because it points

19    out the problem with this standard of vagueness.  The vague in

20    all application standard eviscerates facial challenges.  Now,

21    maybe as a matter of policy the Court will want to do that,

22    because Justice Thomas, for example, continues to say that's

23    the right standard, and what that really means is only

24    incomprehensible statutes can be challenged on their face; and

25    there still will be opportunities to challenge on vagueness

1   grounds, but it is only in applied challenges, which you

2   haven't brought.

3          MR. BISSONNETTE:  Well, two points I would like to

4   make on that.  So, obviously, to echo some of the prior

5   argument that you heard this afternoon, the standard is not the

6   standard, in our view, that the State has proffered in this

7   particular case.  It is not in all its applications.  The

8   Johnson versus United States, the United States case, squarely

9   addresses -- Honeyfund, in fact, tangentially addresses it,

10  where that court says defendants may be right that some of the

11  prohibited concepts are not vague, but some certainly are, and

12  then presume to enjoin, preliminarily enjoin the statute in its

13  entirety.  And I think that is, frankly, the same analysis

14  here, assuming we were even asking this Court today to enjoin

15  the statute, which we are not.  We are asking this Court simply

16  for the opportunity to proceed to discovery on some discrete

17  things that I would like to explain to this Court why we think

18  it's essential.

19          As to your question, though, about are you making an

20  as-applied challenge in this case, we are, and I want to

21  explain the contours of that as-applied challenge.  So, setting

22  aside that we believe certainly at this pleading stage that we

23  meet the standard for a facial challenge, our as-applied

24  challenge particularly applies to educators with respect to the

25  unique enforcement regime that applies to them that actually

1    doesn't apply, necessarily, to other public officials.

2          THE COURT:  Well, in a typical as-applied enforcement

3    challenge, and you may have brought these in front of me,

4    certainly others have, I have held that a pre-enforcement

5    challenge can be ripe in certain circumstances, and it

6    typically involves someone who has a real threat of having some

7    serious consequence apply to them.  They made clear to the

8    Court, This is what I want to do, and this is why I have a

9    legitimate fear that this is going to happen to me if I do it,

10   and I need you to tell me whether this statute is

11   unconstitutionally vague as applied so that I can do it without

12   fear of losing my teaching license.  That's a typical

13   as-applied challenge.

14         You say you presented that here?  I didn't see it in

15   your complaint.

16         MR. BISSONNETTE:  Yes.  The complaint that the Mejia,

17   Philibotte and NEA plaintiffs have brought have said that this

18   is a facial and as-applied challenge.

19         THE COURT:  They use the word.

20         MR. BISSONNETTE:  And I understand that, and in

21   responding to the critique of the State that, Hey, you're only

22   bringing a facial challenge, we finesse that with a little bit

23   more clarity, wanting to explain that, unlike the types of

24   cases that you're kind of referring to here, our as-applied

25   challenge here is focusing on the unique application to

1   educators, not from a text perspective that you're referring to

2   here, I have a fear that this is going to be applied to me

3   because I want to teach a certain book, but because of the

4   unique prospect for arbitrary or discriminatory enforcement

5   that apply to teachers in particular, and that is because of

6   the issue that you just flagged just a few minutes ago, which

7   is the fact that the Department of Education has unique and

8   inherent enforcement power under this particular statute.

9          Setting aside the lack of a *scienter* requirement,

10  setting aside the fact that there's also a duty-to-report

11  obligation that exists within the Department of Education

12  rules, the department of obligation (sic) is obligated to take

13  up any complaint that comes to its office.  The department of

14  obligation (sic) is obligated to investigate, and the

15  Department of Education is obligated to take action if it

16  believes that a violation has occurred.

17         So, again, the chief ambiguity problem in this case as

18  applies to teachers and more broadly, to some extent, is the

19  fact that you have vague terms.  But it's not just vague terms;

20  it's combined with the prospect of the career death penalty for

21  educators, and I don't mean that to be hyperbolic.

22         THE COURT:  I agree with you that that's highly

23  relevant to the vagueness challenge.  The Supreme Court has

24  made clear that vagueness challenges can be brought to civil

25  statutes, but I think, and Justice Gorsuch in his concurring

1    opinion in <u>Dimaya</u> and perhaps in the majority opinion your

2    colleague referenced, has suggested that there shouldn't be any

3    different standard from a criminal to a civil vagueness

4    challenge, but I think it continues to matter what kind of

5    vagueness challenge.  If you have a regulation that applies, an

6    economic regulation to big business, such as the Sherman

7    Antitrust Act, that bars unreasonable restraints and trade,

8    that sounds on the surface really, really vague, but it is not

9    unconstitutionally vague.

10           MR. BISSONNETTE:  Sure.

11           THE COURT:  Businesses can plan and can do their

12   research, but where individual teachers face career death if

13   they're deemed to be in violation of this provision, not just

14   loss of job but loss of certification, that is a very severe

15   consequence that makes it much more like a criminal statute

16   that should justify a higher level of review on terms of

17   vagueness.  I think that's the most important point to make,

18   that the teacher statute is different from the other provisions

19   which don't apply potentially to educators directly; they apply

20   to government programs.

21           MR. BISSONNETTE:  Yes.

22           THE COURT:  And those statutes, to the extent they're

23   applied outside of the educator context, are arguably less

24   concerning.  It's the attempt to threaten the livelihoods of

25   offending teachers that is the particular problem.

1    MR. BISSONNETTE:  Absolutely, your Honor, and I think

2    that the standard on vagueness is critical here.  And not only,

3    your Honor, did you highlight the lack of a *scienter*

4    requirement and how the Hoffman case, in particular, says,

5    Gosh, if you don't have a *scienter* requirement we need to be

6    really careful here and really conscious of --

7    THE COURT:  I referenced that one, because that's one

8    that the AG's Office relies on.

9    MR. BISSONNETTE:  Absolutely.  But Hoffman actually

10   says something else that I think is material and where the

11   career death penalty kind of component comes in here.  The

12   court there also essentially says that the seriousness of the

13   penalty is a consideration, and that's the issue that we have

14   here in the Sessions case, the case that we've been referring

15   to.  There you didn't have a criminal penalty, necessarily, you

16   had a criminal statute but with civil deportation consequences,

17   and what the Supreme Court there says is, Oh, boy that is such

18   a severe penalty that we need to engage in a more robust

19   vagueness analysis.

20   The same is true here.  We have a statute that lacks a

21   *scienter* requirement, we have a statute with drastic career

22   ramifications, pursuant to a regime where the DOE is obligated

23   to take action and respond to every complaint that goes through

24   its office.

25   And this is why, your Honor, I think the order of

1   operations piece I don't want to gloss over.  I actually think

2   it's incredibly important in this case.  You have the

3   Department of -- much respect for Department of Justice, by the

4   way.  I litigate against them all the time, and they do a great

5   job, but they have represented publicly in pleadings before

6   this Court, Don't worry about this, don't worry about the

7   unique Department of Education enforcement capability of the

8   statute, because we have essentially manufactured a regime

9   where they don't look at it, even though that regime conflicts

10  with the very regulations that the Department of Education is

11  obligated to --

12          THE COURT:  Just to save time, I wanted to clarify

13  that the State was over-claiming the way that regime worked,

14  but the way it actually works I don't attach significance to it

15  from the government's perspective, because it's essentially at

16  the sufferance of the head of the Education Department.  To the

17  extent you don't want to do that anymore, you just stop.  So,

18  even if they have some unofficial practice of not entertaining

19  anything, they could change that any time they wanted.  They

20  just could decide, Well, today we're doing it differently.

21          MR. BISSONNETTE:  I think that's right.  At the

22  statute's core, your Honor, and I'll close the loop on

23  enforcement and arbitrary enforcement, which is an independent

24  component of vagueness, is that you really have five bodies

25  that can adjudicate complaints under the statute.  You have the

1   Department of Education, Department of Labor, Department of

2   Justice, Human Rights Commission, and independent of that

3   Superior Court, the State Super Court.  So, to me, again, all

4   of this highlights --

5           THE COURT:  Am I correct in assuming, so that we don't

6   overstate this, that individual educators, the only enforcement

7   that they experience directly is at the Department of Education

8   complaint level?  They can't be sued individually in the Human

9   Rights Commission.

10          MR. BISSONNETTE:  No.

11          THE COURT:  They can't be sued in Super Court

12  individually.  They can't get damages awarded against them.

13  You think they can.

14          MR. BISSONNETTE:  Absolutely, your Honor.

15          THE COURT:  Tell me how that is so.

16          Do you disagree with that?

17          MR. GARLAND:  I disagree, your Honor.

18          THE COURT:  Yeah, okay.

19          MR. BISSONNETTE:  I have never, frankly, heard that

20  position from the Department of Justice.

21          THE COURT:  I'll explain to you why.  So, the Human

22  Rights Commission -- there's a Supreme Court, New Hampshire

23  Supreme Court case, the case is Cooper against -- no, I don't

24  have it in front of me.  I'll find it at the break.

25          There is a New Hampshire Supreme Court case that

1    defines what an aggrieved person is, and so that limits who can

2    bring the claim, and then there's nothing in the statute that

3    allows for liability for a Human Rights Commission violation

4    against an individual teacher.  It's a liability against the

5    school district that you can bring.  If I've got that wrong,

6    you'll let me know.

7         So, the case about whether you can be -- thank you.  I

8    thank my clerk for bringing it to my attention.

9         The case in which the Supreme Court has defined what

10   an aggrieved party is for purposes of 354-A is State versus

11   Hynes, 159 New Hampshire at 187.  Oh, wait a minute.  I'm

12   sorry.  I've got the wrong case here.  Let me check.

13                        (Pause)

14        THE COURT:  This is the case, yeah, State against

15   Hynes, 159 New Hampshire 187.

16        But then I turn to the -- where in the language of the

17   statute, we'll call it the banned concept statute, does it say

18   a Human Rights Commission complaint can be brought against an

19   individual teacher?

20        MR. BISSONNETTE:  Well, the statute says that, you

21   know, all rights and remedies that exist under the Human Rights

22   Commission statute apply in this particular instance.  I'm

23   going to look at your case to make sure I don't want to

24   overstate the law.

25        But here is one potential concern:  Even if -- sorry.

1    THE COURT:  You don't litigate in this area, but I've

2    spent a lifetime dealing with employment discrimination cases,

3    and, in fact, until the New Hampshire Supreme Court decided the

4    Fuller case, the Fuller Ford case, the Federal Court here

5    recognized you couldn't bring claims against individual people

6    under 354-A, and the New Hampshire Supreme Court disagreed with

7    that in one of my cases that I certified to them, that's the

8    Fuller case, and said those individuals can be liable under an

9    aiding and abetting theory, which is in the statute, but the

10   aiding and abetting theory doesn't apply to this particular

11   provision.

12       So, I do not think at least -- I do not see anything

13   in 354-A that allows a claim to be maintained against an

14   individual teacher, and the statute itself talks about -- the

15   education statute says you can bring a claim against a school

16   district but not the teacher in the Human Rights Commission.

17   So, I don't know how you could possibly get relief against an

18   individual teacher except through a Department of Education

19   complaint.  I don't diminish that, I think that's hugely

20   significant, but your briefing suggested that it could, and I'm

21   just not sure how that's so.

22       MR. BISSONNETTE:  Sure.  The guidance itself, the July

23   FAQ guidance, basically makes clear that, if you think there is

24   a violation, you could file a complaint with the Human Rights

25   Commission.  You can file a complaint --

1          THE COURT:  Against the school district, yes, you can.

2          MR. BISSONNETTE:  And the department of -- well, the

3     Human Rights Commission.  You could file a lawsuit with the

4     Human Rights Commission.  You could file a lawsuit in court.

5          But, regardless of who the defendant is, I actually

6     think, to get really practical here, because I think being

7     practical here is really important, the teacher becomes the

8     subject of that complaint regardless of who the defendant is.

9     Let's say the defendant is the school district.  The school

10    district gets sued because of how a teacher behaved.  The

11    teacher is getting wrapped up into that litigation.

12         THE COURT:  I agree with that.

13         MR. BISSONNETTE:  And so, I actually -- I'm trying to

14    kind of think from a practical perspective.  A teacher's

15    behavior does implicate enforcement, regardless of who the

16    defendant is, in five separate forums, and I think that's

17    critical, because at its core it's that nature of the

18    enforcement, regardless of who the defendant is, that creates

19    this chill.

20         I want to kind of ground this case a little bit into

21    the practical reality of what is occurring, and I know, your

22    Honor, that either you're skeptical of hypotheticals -- I've

23    been in cases before where you've told me that, and I'm well

24    aware of that.

25         THE COURT:  Well, no.  Judges love to ask

1  hypotheticals.  They don't like hypotheticals being put to
2  them.
3         MR. BISSONNETTE:  I know.  I hear you.  I hear you.
4         But I want to explain, actually, why hypotheticals
5  matter, and actually in Santa Cruz and in Honeyfund the courts'
6  posturing of questions was actually part of those courts'
7  analyses in concluding that the statutes are ambiguous.
8         But why kind of this asking of questions is key,
9  because these incidents come up in a million different factual
10 circumstances in schools every day across the State of New
11 Hampshire:  Is this book covered, is that covered?
12        THE COURT:  Do any of your clients -- are they seeking
13 permission to expressly teach any of the banned concepts?
14        MR. BISSONNETTE:  No.  What they're asking, your
15 Honor, is --
16        THE COURT:  Their concern is that it will be
17 interpreted broadly to potentially encompass legitimate conduct
18 that they want to engage in and do engage in every day.
19        MR. BISSONNETTE:  Yes.
20        THE COURT:  I get that completely.  I don't have any
21 sense that any teacher wants to expressly advocate a banned
22 concept.  What I do get is they want to teach history, they
23 want to teach the Civil Rights Movement, they want to teach
24 about racism, they want to teach about sexism, they want to
25 teach about implicit bias, the administrators want to do

1    sensitivity training.  They want to do all those things without

2    expressly advocating any banned concept, and if the statute

3    made it absolutely clear that they could not be subject to

4    discipline unless they expressly and intentionally engaged in

5    teaching those concepts, we might have a very different case.

6    The problem is the statute doesn't -- it allows people to be

7    found liable even though they've acted unintentionally, and it,

8    at least according to the Attorney General, allows people to be

9    liable not because they say something, because they imply

10   something.

11            MR. BISSONNETTE:  Mm-hmm.

12            THE COURT:  You combine those two things together, and

13   it creates a problem.  That's what I see is the --

14            MR. BISSONNETTE:  I'm not going to disagree with you

15   at all, but I do think the harm is a little bit greater than

16   that.

17            There have been specific questions raised of the

18   Department of Justice, the Department of Education, Hey, we got

19   your guidance, and this is actually attached to the Mejia

20   complaint, but we have specific questions, you know, in

21   concrete terms, because this is the way the statute comes up in

22   the classroom every day, you know?  And let me just give you

23   another example.

24            THE COURT:  Give me an example.

25            MR. BISSONNETTE:  Sure.

1    THE COURT:  And then you construe the statute and tell

2    me how the statute can be construed to prohibit that.

3    MR. BISSONNETTE:  A complaint has been filed against

4    the Exeter School District for their collaboration with the

5    Racial Unity Team that is discussing issues like power,

6    privilege, implicit bias, work that's central to school's work

7    to help --

8    THE COURT:  But give me an example of what they did.

9    MR. BISSONNETTE:  One of the complaints that was

10   raised, in addition to just the sheer fact that privilege is

11   being discussed in schools, is that the book *To Kill a*

12   *Mockingbird* was being taught with a focus on underrepresented

13   characters.  This is what we're --

14   THE COURT:  Show me how that could be deemed to -- I

15   know *To Kill a Mockingbird*.  I thought you were going to bring

16   a more contemporary example --

17   MR. BISSONNETTE:  I have them, too, your Honor.

18   THE COURT:  -- like *How to Be an Anti-Racist* and say,

19   Okay, that's a subject of a violation.

20   But if you want to do *To Kill a Mockingbird*, show me

21   how you could construe the statute to make the teaching of *To*

22   *Kill a Mockingbird* unlawful under the banned concept statute.

23   MR. BISSONNETTE:  It's not just the teaching of the

24   book; it's how you talk about it, particularly if you talk

25   about it in connection to contemporary events.  Tom Robinson --

1    THE COURT:  Show me how it could -- you're now charged

2    with construing the statute.

3    MR. BISSONNETTE:  Sure.

4    THE COURT:  How could it be construed to make that

5    conduct unlawful?

6    MR. BISSONNETTE:  It could be construed that way

7    because a complainant has basically said that it could be

8    construed that way.

9    THE COURT:  No.  I'm sorry.

10   MR. BISSONNETTE:  Sure.

11   THE COURT:  We can't give statutory construction power

12   to whatever citizen in the state, because there are people that

13   have very unusual views about things.  So that somebody thinks

14   something violates a statute is not evidence that it violates a

15   statute.

16   MR. BISSONNETTE:  Can I challenge you on that just

17   very briefly?

18   THE COURT:  Yes.

19   MR. BISSONNETTE:  I understand you feel strongly on

20   that, your Honor, but one of the problems with the statute is

21   that --

22   THE COURT:  People who think -- the average person on

23   the street does not have the power to give force to a

24   construction.  It's the governmental agencies that apply it and

25   courts that interpret it that have that power.  They don't have

1   any power, and they have strange views.  I've had many unusual

2   statutory construction views propounded, sometimes by lawyers,

3   but they don't mean anything unless and until somebody adopts

4   that construction.  So, that's why I'm asking you --

5            MR. BISSONNETTE:  No, I understand.

6            THE COURT:  -- tell me how you would construe it to

7   ban the teaching -- I can't see how somebody could ever say

8   credibly it violates the statute to teach *To Kill a*

9   *Mockingbird*.

10           MR. BISSONNETTE:  It's not just -- again, your Honor,

11  it's not just teaching it.  We have to kind of, I think, get a

12  little bit more granular, and I'll get to that, but just to

13  kind of push back ever so slightly, the problem with the

14  statute --

15           THE COURT:  I have a vigorous, very explicit memory of

16  sixth grade when *To Kill a Mockingbird* was taught in my class

17  and we were discussing it together in class, so I actually

18  remember from sixth grade that particular discussion.  I just

19  don't know, though, that -- I can't in any way see how it would

20  have violated the statute.

21           MR. BISSONNETTE:  The concern, though, your Honor, and

22  why the perception of the public matter, and this is why I'm

23  just slightly pushing back, is because it's not just the

24  Department of Education, Department of Justice, the Human

25  Rights Commission and Department of Labor that enforce it.  It

1   is State courts that have an independent obligation to evaluate

2   the text and hear complaints.  So, this regime falls outside

3   the enforcement authority of those that issue the guidance in

4   this case; so the public perception, in my view, actually is

5   really important because individuals essentially have the

6   ability to bring private rights of action independent of any

7   guidance that has been issued.

8           THE COURT:  Yeah.  I do think, though, again, I want

9   to emphasize this, there's a tone in your briefs that this

10  statute is very different from what it is.  This is not a

11  bounty statute.  This is not a statute where the Legislature

12  has purported to give standing to the average citizen to go

13  after people that they think are violating the law.  This

14  statute does not do that.  It allows aggrieved parties to sue.

15  Aggrieved parties have a definition under the human rights

16  statute, and they have a definition under standing law in

17  Superior Court, and they do not entitle people to be bounty

18  hunting.

19          So, to the extent you say that, I say back it up,

20  because that's not what I understand the statute does.  It does

21  many things, but it doesn't do that.

22          MR. BISSONNETTE:  Fair enough, your Honor.  I think

23  the only point that I was trying to make is that individuals

24  have the ability to go to court outside the enforcement

25  mechanisms that have been put forth by the State, which we may

1    disagree on that, but I actually think that's incredibly

2    important in this particular case.

3              And I actually can present to you, again, if the Court

4    is interested, the *To Kill a Mockingbird* reference, a complaint

5    that actually has been filed, it was publicly put out on

6    Twitter, and why I think this example has meaning.  So, I'd be

7    happy to present it to the Court.

8              THE COURT:  Do you have any evidence yet of anyone

9    being disciplined for violating the statute, anyone having been

10   the subject of a successful Human Rights Commission case or a

11   lawsuit for violating the statute?  I haven't seen that, but it

12   may exist.  Do you have any of that?

13             MR. BISSONNETTE:  So, we do know of, and it's very

14   spotty, because I only have what's been voluntarily produced, I

15   have examples of at least three complaints, including this one,

16   that's not part of the record that I could present to the

17   Court.

18             The Human Rights Commission has publicly represented

19   that it hasn't docketed any complaints into, like, the active

20   prosecutorial stage.  But this is all the more reason, your

21   Honor, why discovery is necessary in this particular case,

22   particularly where an element or a factor of vagueness is the

23   notion of enforcement.  So, here I actually think the

24   complaints are vital to learn about in discovery, because we

25   get to learn, we should be able to learn, whether or not the

1    Human Rights Commission is interpreting the statute consistent

2    with its own guidance.  And we also --

3            THE COURT:  I'm going to ask you to wrap up.

4            MR. BISSONNETTE:  Sure.

5            THE COURT:  And then I'm going to let Mr. Garland have

6    a brief response, and then we'll take a break, come back and

7    deal with the First Amendment argument.

8            I'm sorry to cut you off.

9            MR. BISSONNETTE:  No, I understand.  I've been talking

10   for a while.  I think we're fine your Honor.  Thank you very

11   much.  I appreciate it.

12           THE COURT:  Okay.  Mr. Garland, briefly, and then

13   we'll take a break.

14           MR. GARLAND:  I'll be very brief, your Honor, and I'll

15   speak from here, if that's okay.  We believe we've put forth a

16   construction that saves the statute from any facial vagueness

17   challenge.  You have indicated some reservations that appear to

18   be reservations as a matter of statutory construction.  To the

19   extent you are uneasy with whether it's within -- either

20   consistent with the statute to construe away the problem you've

21   identified, or whether that would have any sort of binding

22   effect and really resolve the problem, there is a clear

23   solution short of discovery.  I don't see what discovery does

24   here.

25           New Hampshire Supreme Court can say what the statute

1    means; it can resolve any ambiguity.  We put that as an

2    alternative argument in our brief.  I don't think it's

3    necessary, in light of the arguments I've presented, but it

4    exists as an option.

5         THE COURT:  Okay.  I appreciate that.  Thank you for

6    the good argument you guys have presented so far, and we'll

7    take about a 15-minute break, come back, and we'll finish up

8    with the First Amendment arguments.

9         THE CLERK:  All rise.

10             (Recess taken from 2:43 p.m. to 3:02 p.m.)

11        THE CLERK:  All rise for the Honorable Court.  Please

12   be seated.  This hearing is back in session.

13        THE COURT:  All right.  Did you want to say something,

14   sir?

15        MR. MOERDLER:  Yes, your Honor.  I think we were

16   supposed to speak to the First Amendment claim.

17        THE COURT:  Yeah.  I was going to ask Mr. Garland to

18   go first.  He's the moving party.

19        MR. MOERDLER:  Oh, I'm so sorry.  I apologize.

20        THE COURT:  No.  I'm sorry if I wasn't clear.  That's

21   okay.  As the moving party, I thought I would give him his shot

22   and then hear your response.

23        So, Mr. Garland, what do you want to say?

24        MR. GARLAND:  Thank you, your Honor.  I think, just

25   based upon the colloquy during the vagueness portion of this,

1    you understand our position.  We think Garcetti sets forth the

2    standard.  We think that, as long as the speech is a speech

3    that's being governed as speech pursuant to an official

4    capacity, it is not subject to protection.

5         THE COURT:  So, you know what the question is for you,

6    right?  The plaintiffs make no secret in their brief.  Their

7    brief is that this case's First Amendment claim is governed by

8    the First Circuit's decision in Ward, Garcetti does not provide

9    the controlling standard, Ward does, and under Ward they have a

10   viable First Amendment claim.

11        Your argument is that Ward should not govern, that

12   Garcetti has displaced it, and under the Garcetti framework, at

13   least to the extent that the plaintiffs are seeking relief with

14   respect to speech they undertake in their capacity as

15   government employees, they have no First Amendment right, and

16   the claim fails.  That argument hinges on your contention that

17   Ward doesn't provide the correct standard, Garcetti does.

18        So, tell me why Ward provides the correct standard.

19        MR. GARLAND:  Ward doesn't, your Honor, is our

20   position.

21        THE COURT:  Ward doesn't.  Excuse me.

22        MR. GARLAND:  So, I think we set this forth in our

23   reply, and I don't want to belabor it; I know we've been going

24   on for a while.  I understand that First Amendment precedent is

25   usually binding on this Court almost always, especially on

1    related facts.  We've had cases -- I've had cases before you

2    where that issue has come up.

3           But older precedent or precedent that has been called

4    into question can be displaced by subsequent developments, and

5    Ward really did not address this threshold question.  It

6    assumed that the speech was protected to the extent that it

7    occurred in a classroom, as did Pickering previously and really

8    all of the other cases that predated Garcetti has set forth the

9    balancing framework.

10          Garcetti came along and really was a sea change, in my

11   view.  It said, wait a second, there is a threshold question

12   here; we do not get to balancing until you've answered that

13   question.

14          THE COURT:  So, the real issue, though, is I assume

15   that the plaintiffs are going to say to me that teachers are

16   different from other government employees; they have a measure

17   of academic freedom, even when they are teaching their

18   students; and that academic freedom, the extent to which

19   Garcetti restricts academic free speech was left open expressly

20   by the court in Garcetti, and so Ward remains good law.

21          What do you say to that?

22          MR. GARLAND:  I have two responses to that, your

23   Honor.  The first is that I think most of the academic freedom

24   discussion in Garcetti, if my memory serves me, was

25   post-secondary, and this law doesn't reach that.

1     THE COURT:  Well, I would say specifically the

2   majority in Garcetti was responding to Justice Souter's

3   comment.  Justice Souter's comment was expressly limited to

4   colleges and universities.  Justice Souter did not in any way

5   raise a concern about the application of Garcetti to secondary

6   or elementary schools.

7     And so, one way to read this would be to say, at most,

8   the Court left open the question of its applicability to

9   colleges and universities in order to address what they

10   identified as Justice Souter's concern.  Right?

11     MR. GARLAND:  I think that's right, your Honor.  And I

12   do think -- I'm not aware of anything that doesn't allow you to

13   look at how other Courts of Appeals have considered this, and

14   we've briefed it, and you've already identified Judge Sutton's

15   Sixth Circuit opinion and Judge Easterbrook's Seventh Circuit

16   opinion, and I don't have much more to add beyond the fact that

17   those decisions, admittedly, are as-applied challenges but

18   appear to support our position explicitly that Garcetti extends

19   to teachers.

20     THE COURT:  Yes, you've identified the Sixth and the

21   Seventh Circuit I think most strongly and directly have taken

22   this issue on and said that Garcetti does apply to elementary

23   and secondary school teachers, and teachers in elementary and

24   secondary school do not have a First Amendment right to teach

25   something that is inconsistent with the curriculum; they have

1    to teach what's in the curriculum.  They have no First

2    Amendment right to teach something that they're not allowed to

3    teach under the established curriculum.  That's your view.

4         Okay.  Let's assume that Ward applies.  Even if Ward

5    applies, the school board at the local level and the Department

6    of Education at the statewide level have unlimited ability to

7    impose any speech restriction that they choose on teaching as

8    long as it serves a legitimate pedagogical purpose and the

9    school gives notice before disciplining, right?

10        MR. GARLAND:  Yes, your Honor.

11        THE COURT:  Do you contend that this statute serves a

12   legitimate pedagogical purpose?

13        MR. GARLAND:  Yes, your Honor.

14        THE COURT:  Okay.  So, to the extent that it does and

15   it's not vague, you would say that ends the First Amendment

16   inquiry, even if Ward is the standard?

17        MR. GARLAND:  That's precisely the argument we've made

18   in reply.  Yes, your Honor.

19        THE COURT:  All right.  So, that's your position:

20   first, Ward doesn't apply at all; second, if Ward does apply,

21   Ward gives only limited discretion to teachers, that is, only

22   to teach -- they have to teach any restriction or any

23   requirement, as long as it has a legitimate pedagogical

24   purpose, which is a very low threshold, and there's notice.

25   Here you say it's notice.  If it's not vague, then you're

1    probably right; if it is vague, you're probably not right, and

2    that's how you would dispose of that.

3         All right.  Here's my question to you; this is

4    something your opponent referenced with respect to the

5    vagueness challenge:  You know Garcetti only -- you know that

6    government employees under Garcetti do not completely surrender

7    their First Amendment rights, right?

8         MR. GARLAND:  Yes, your Honor.

9         THE COURT:  Okay.  They retain First Amendment rights,

10   although limited by Pickering, to the extent they are engaging

11   in speech on a matter of public concern as a citizen, right?

12        MR. GARLAND:  Yes, your Honor.

13        THE COURT:  And the opposite of that is

14   quintessentially government speech.  To the extent they are

15   instructed to engage in speech as a part of their government

16   duties or to refrain from certain speech as a part of their

17   government duties, you would say no First Amendment protection,

18   but otherwise they do retain First Amendment protection.

19        To the extent this statute applies beyond the

20   classroom and extends to other interactions that could be

21   construed as teaching or advocacy directed at a pupil, that

22   could implicate First Amendment behavior, even under Garcetti,

23   couldn't it?

24        MR. GARLAND:  It could, your Honor, sure.  I accept

25   the premise.  I have a further response, though.

1    THE COURT:  Okay.  I'm interested in your response,

2    but I wondered if you thought about the Supreme Court's

3    decision in Bremmerton, which you're well aware of that recent

4    case involving a high school principal that the Supreme Court

5    said was allowed to engage in prayer at the 50-yard line after

6    a game with students.  And the Court there actually discussed

7    the Garcetti standard in that case and said that that principal

8    -- or excuse me -- that coach, even though he was on school

9    property with his students that he was charged with coaching

10   and engaging in prayer with them at the 50-yard line, that that

11   was non-governmental speech that would be judged -- if it was a

12   non-religious-type speech it would, therefore, be judged under

13   the broader standard, not under Garcetti, right?

14        So, if that's true, then one could envision a great

15   deal of speech that a teacher might engage in with a pupil

16   outside of the teaching of the classroom that could be swept

17   within the scope of this statute.  Now, they seem to argue

18   otherwise, but, to the extent that that's true, couldn't that

19   preserve a First Amendment claim, at least a limited First

20   Amendment claim, for teachers who might fear that -- say, for

21   example -- I don't know.

22        Do schools have after-school clubs where teachers

23   volunteer to supervise students?  If they're supervising as a

24   volunteer an after-school program, a chess club or something,

25   and someone engages in a discussion with them about racial

1   issues and they are to make a statement about that, they would

2   arguably have First Amendment rights on that issue, even under

3   Garcetti; and, if that's true, that, even if you're right about

4   the Garcetti framework, wouldn't that preserve a limited First

5   Amendment claim at least at the 12(b)(6) level for teachers

6   that are concerned that -- because, frankly, I think the

7   plaintiffs' argument that teachers retain academic freedom to

8   disregard the curriculum set by the school board, that's a very

9   troubling proposition that I don't think finds much support in

10  the case law.  But, to the extent that teachers have First

11  Amendment rights notwithstanding their role as teachers when

12  they do things like the coach in the program in Bremmerton,

13  that they might have First Amendment rights that would be

14  curtailed if they were subject to discipline for advocating one

15  of these banned concepts in a situation like that.

16          So, what's your response?

17          MR. GARLAND:  Thank you, your Honor.  I have a couple

18  of responses to that specific question.

19          First off, I think what you're getting at is the

20  concept of an overbreadth challenge, and that's how I

21  understand this First Amendment challenge, too.  But the

22  plaintiffs here are bringing a facial claim, and the standard

23  for a facial overbreadth challenge requires both that the text

24  of the statute sweep in, as you say, protected speech and that

25  actual fact demonstrate it at the pleading stage; presumably

1     that's the allegations in the complaint.

2          I would think the text of the statute contemplates the

3     circumstances that they are reaching here, that the text really

4     does tether the proscription to things folks are doing in their

5     official capacities.  It does so I think explicitly -- the

6     language in our guidance I think further clarifies that.  I

7     think reading it in conjunction with RSA 98-E as a matter of

8     State statutory construction further confirms it, because 98-E

9     protects in a similar manner.

10          THE COURT:  98-E specifically gives government

11     employees, recognizes the right that they have to speech

12     notwithstanding the fact that they are government employees.  I

13     agree with you on that.

14          MR. GARLAND:  Exactly, your Honor.  And so, I think as

15     a matter of how this statute must be construed as a matter of

16     statutory construction, it does not on its face extend to

17     speech that would be protected by the First Amendment.

18          THE COURT:  Maybe the plaintiff agrees with you.  I

19     thought he was making that argument.  I'm not inclined to agree

20     with that.  I think the statute seems to prohibit any advocacy

21     directed at a pupil, and so I think it sweeps broadly enough to

22     encompass that, or at least that's my concern.

23          Now, do you have a different reading of the statute?

24          MR. GARLAND:  I do, your Honor.  Forgive me.  I just

25     want to run back to my desk.

1       THE COURT:  Sure.

2       MR. GARLAND:  So, your Honor, my reading is, once

3   again, consistent with the FAQs, and I don't want to read too

4   much into the record here, but the statute reaches conduct of

5   people who work to administer programs on behalf of the State

6   of New Hampshire, including teachers in an educational setting.

7   I think as a matter of facial construction that only reaches a

8   governmental speech under the Garcetti framework.  I would

9   point the Court to --

10      THE COURT:  Yeah, but let's focus on the -- I don't

11  have it in front of me now, I have so many papers, but the

12  actual statute itself is directed at pupils, right?  And it

13  says, Pupils shall not be, and it's phrased in that kind of

14  confusing way.  I mean, it's not the ideal way to write a

15  statute, but it says, No pupil shall be, and taught is one of

16  the things.  But it goes quite beyond taught."  It includes

17  more advocacy.  And it doesn't say "in the classroom" or

18  anything like that, "in school," which could be a club,

19  after-school club for which a teacher is doing work, or in

20  lower grades, if a teacher stays on in an after-school program

21  and supervises the kids while they're on the playground waiting

22  for parents to come and pick them up or something.  Those are

23  activities that, arguably, are not governmental speech.  The

24  employer, the school district is not dictating what they may

25  say and not say, except to the extent they impose these banned

1    concepts on them, and they would retain some First Amendment

2    rights.

3              So, my concern is I think, to the extent the

4    plaintiffs assert that there is this First Amendment right to

5    academic freedom for elementary and secondary school teachers,

6    I have trouble squaring that with many cases, but, to the

7    extent that they are saying, We're afraid even when we're not

8    teaching the curriculum that we're subject to the statute and

9    could be disciplined for engaging in conduct that we have a

10   First Amendment right, it would require a Pickering balance

11   test.  Do you know what I mean?

12             Because this statute, if it were applied privately,

13   if, like, the Legislature adopted it and said, No person shall,

14   it would be unconstitutional in a second, because it's a

15   viewpoint-based discrimination that can't be -- speech

16   restriction that can't be justified and is not narrowly

17   tailored.

18             But what Pickering says is governmental employees who

19   engage in speech, even if they're not engaged in government

20   speech, they have First Amendment rights, but they're not the

21   same as everybody else's; they're subject to balancing in a

22   different way.

23             So, that's my concern, is, is there that space left

24   for a First Amendment claim, even if I am persuaded by your

25   contention that under Garcetti the core curricular teaching

1   that's done has to be done the way the school tells the teacher

2   to do it; they're not like university professors that arguably

3   have academic freedom that gives them greater First Amendment

4   protection.

5        Are the plaintiffs really advocating that teachers can

6   disregard the instructions on curriculum from the school board?

7   That somehow seems wrong to me.

8        MR. GARLAND:  Your point is well taken, your Honor.

9   My response to that, again, is, as a matter of construction,

10  which does require I think that this Court look to 98-E, it

11  shouldn't preserve that sphere.  It really couldn't without

12  conflicting, I think, with the speech protections that exist

13  under State law.

14       I point the Court to, and this isn't cited in our

15  brief, and I apologize for that, but United States versus

16  National Treasury Employees Union.  It's 513 U.S. 454.  I'm

17  going to characterize it.  I know you're going to read it.  But

18  all nine justices in that case have dealt with honoraria for

19  federal employees, and it was blanket ban on them.  All nine

20  justices in that case appeared to contemplate that, if there

21  were a sufficient nexus between the ban and the governmental --

22  the role as a governmental employee, that would survive a

23  facial challenge.  It was really a dispute in that case between

24  whether this ban could be saved because insofar as, you know,

25  could the private speech be severed from the public speech.

1    Justice O'Connor thought it could, five-justice majority

2    thought it couldn't, and then the three justices then took a

3    slightly different view and thought the whole thing survived.

4         But the point being that there is a pretty long

5    dialogue in that case about if a statute is connecting the

6    proscriptive conduct to governmental activity that's probably

7    okay, and I think that's reflected as well both in Honeyfund

8    and in Santa Cruz, where -- in Honeyfund, at least, it's really

9    just a footnote.  The footnote says, There's no dispute this

10   reaches private speech, so we're not going to get into that.

11        But in Santa Cruz Judge Freeman made the point that,

12   if this were limited to contract --

13        THE COURT:  Slow down.

14        MR. GARLAND:  I apologize.  If that case were limited

15   just to contractors doing work pursuant to their federal

16   contracts, it would be a different case.  Her concern was what

17   they're doing in private and it extending to private trainings

18   given by contractors unrelated to it.  The same view with

19   grantees there.  And I do think those cases support the notion

20   that, at least as a facial matter, if as a matter of statutory

21   construction the statute is tethered just to the sort of speech

22   that Garcetti would say isn't protected by First Amendment, the

23   facial challenge fails.  There may well be an as-applied

24   challenge if the concern that you have addressed comes to pass.

25        And I would note that I haven't been able to find any

1    facial challenge, at least at a U.S. Court of Appeals level, I

2    don't want to make a representation for District Courts, post

3    Garcetti that allowed a case to go forward based on the sort of

4    overbreadth theory that you've identified.  Every challenge

5    I've found has been an as-applied challenge.  Bremmerton was an

6    as-applied challenge.  The Sixth Circuit and Seventh Circuit

7    cases were as-applied challenges, too.

8            So, our position is as a matter of statutory

9    construction this does not sweep in enough protected conduct,

10   we don't think it sweeps in any, that it wouldn't be remedied

11   through that sort of challenge if it were misapplied, is our

12   position.  Thank you.

13           THE COURT:  Okay.  Good.  Anything else?

14           MR. GARLAND:  That's all, your Honor.

15           THE COURT:  Okay.  Thank you.  I'll hear plaintiffs on

16   the First Amendment issue.

17           MR. MOERDLER:  Your Honor, I have taken perhaps much,

18   too much time, but I would ask you to indulge me for a few

19   moments.

20           THE COURT:  I will.  It's an important issue.  I'll

21   hear you.

22           MR. MOERDLER:  And let me make very clear I doubt that

23   there was a single statement you just made that I would

24   disagree with, and yet I would say to you that First Amendment

25   protections are very much here.

1       Let me tell you why we pled a First Amendment claim.

2   The Supreme Court of the United States in three cases has said,

3   in words or substance that I'll give the Court in a moment, the

4   Court has said that the standard for First Amendment challenges

5   is more exacting where a void for vagueness challenge, not

6   determination, void for vagueness challenge is presented,

7   thereby suggesting to those on the <u>FCC against Fox</u> case and

8   also <u>Baggett against Bullitt</u> and <u>Grayned</u>, all three of those

9   Supreme Court cases.

10       Now that can be interpreted many, many ways.  One way

11   in which it is interpreted is the two interact, and you nailed

12   me on that in my main presentation when I talked about 189:11,

13   because what that does, it says to you the following:  I am

14   applying <u>Garcetti</u> because you are required to teach the

15   subject, but I'm not going to let you get off the hook on that,

16   because you're barred from doing it under this statute.

17       Put vagueness aside.  How do I know what speech is

18   chilled here?

19       Now, that isn't a total answer, and it cannot be until

20   there is discovery, which is what we said right from the

21   get-go, and that is exactly the point.  We reserved the right

22   to make an as-applied challenge depending on discovery.  If

23   there isn't a discovery here that shows it's there, I cannot

24   under Rule 11 allege it any further, but very clearly the

25   indicators are there, as I showed you in one of the documents

1    that was an exhibit.

2           Let me go a couple of steps further, if I may.  You

3    pointed out, quite correctly, and, as I said, I agree with

4    substantially everything you said to my adversary, that we seem

5    to argue otherwise from what the Court does.  We don't.

6           THE COURT:  Maybe you can help me with this, because

7    this is the struggle I have:  I read the case law, including

8    Ward, including Griswold, a number of other cases from outside

9    the Circuit that draw a distinction for First Amendment

10   purposes, academic freedom purposes between school teachers in

11   the elementary and secondary schools and college professors,

12   and that the concern that Justice Souter was expressing in

13   Garcetti, which I think is a very well-taken concern, that if

14   you simply say if you're engaging in government speech for your

15   employer, say at the University of New Hampshire, that you have

16   no First Amendment protection right would be very problematic

17   in a college or university setting.

18          On the other hand, it seems to me quite problematic to

19   suggest that that academic freedom extends in the same way to a

20   high school teacher, and I don't find support in the case law

21   for that.  But what I do find support for is that they don't

22   lose their First Amendment rights entirely.  They can't teach

23   something the school says they can't teach as long as the

24   school tells them clearly what it is they can't teach, but they

25   outside of the school might have -- outside of the classroom

1    doing their teaching duties might have a number of interactions

2    with pupils for which they could retain some residuum of First

3    Amendment protection.

4            So, I'm drawing that distinction.  If you think it's a

5    bad one, tell me --

6            MR. MOERDLER:  No, I don't.

7            THE COURT:  -- between curriculum control --

8            MR. MOERDLER:  I don't think it's a bad one.

9            THE COURT:  -- and speech outside of the curriculum.

10           You think that's a legitimate way to --

11           MR. MOERDLER:  I do not think it's a bad one.

12           THE COURT:  Okay.

13           MR. MOERDLER:  I suggest to you, however, the

14   following, and it is one that the case law has tended to go,

15   but I think it's the wrong test for the case law, and I believe

16   this case shows me why.

17           I keep coming back to 189, because there is a lengthy

18   dissertation by the Department of Education, which is also part

19   of the record, as to what you're allowed to teach and supposed

20   to teach.  You're supposed to teach genocide.  That's

21   superiority.  Take a look at Russia.  Can I teach the pupil by

22   saying that the Ukrainians were not of the match to the

23   Russians, that there's superiority there?  I'm required to

24   teach it.

25           I think what you get to is a principle which I can't

1   fully articulate but I will point to.  It's a waiver principle.

2   It's a principle that when government tells you to do it, it's

3   waived the protections of Garcetti, number one.

4           Number two, I have to take you back to one of my very

5   favorite quotes and why I have this case.  It's by Frankfurter

6   and John Marshall Harlan in Sweezy against New Hampshire.  It

7   is as follows:

8           I say that in these matters of the spirit inroads on

9   legitimacy must be resisted at their incipiency.  This kind of

10  evil grows by what it is allowed to feed on.  The admonition of

11  the Court in another context is applicable here.  It may be

12  that it is the least of the obnoxious thing in its mildest and

13  least repulsive form; but the illegitimate and unconstitutional

14  practices get their first footing in that way, namely, by

15  silent approaches and slight deviations from the legal modes of

16  procedure.

17          Now, I say to you that this is an as-applied case

18  because I believe that when we get into it, just based on the

19  statements of the legislators who introduced it, and based on

20  Edelblut's statement, based on those you're going to see that.

21  You're going to see partisan that's already been shown.

22          What about Pico, which specifically says in the

23  Supreme Court that if it is --

24          THE COURT:  Pico is a very important case, as you

25  know, a plurality decision --

1    MR. MOERDLER:  Right.

2    THE COURT:  -- that dealt with a very specific and a

3    highly First Amendment-ly sensitive issue of removal of books

4    from a school library, and I think Justice Souter's decision,

5    when writing for the Circuit in Griswold, made a very big

6    distinction.  He specifically talks about should a curriculum

7    decision be subject to the Pico review, or should it be subject

8    to our decisions about curricular control and concluded it

9    isn't a Pico case.

10    So I'm, frankly, reluctant to take that case, which

11    deals with a very important concept of library and what can be

12    removed from a library, and say, no, that wouldn't necessarily

13    apply in our case.

14    MR. MOERDLER:  I understand that, and I fully would

15    join in it if it were not, again, for the same fact, how do you

16    tell me what the curriculum is, when as recently as a few

17    months ago you're told to do it?

18    THE COURT:  Okay.  So, I think you have done a good

19    job of sensitizing me and to make me very carefully look at

20    your claim in your second count and maybe insofar as it relates

21    to your First Amendment claim as well, this argument that

22    you've expounded on in different ways that there are

23    requirements to teach X and prohibitions on teaching Y, and,

24    when you look at the two together, they leave a teacher with an

25    impossible burden.  That's your point?

1    MR. MOERDLER:  Yes, and I leave it there.

2    THE COURT:  And lend support to vagueness and First

3    Amendment.  I hear you on that.  I'll study it carefully before

4    I make any decision on the issue.

5    MR. MOERDLER:  I have one more point, two more points,

6    if I may.

7    THE COURT:  Go ahead.

8    MR. MOERDLER:  The first is, there is in the guidance

9    an explicit statement under Guidance Number 8 issued in the

10   name of the Department of Education and Human Rights and

11   Justice, which specifically says extracurricular activities are

12   part of the public school's work.

13   Now, that plays into the following question.  Let's

14   take Bremmerton a different way.  What is the difference if

15   that coach -- it's a high school football game.  What is the

16   difference if that coach assembles the kids in the break in

17   between the first and the second half and teaches religion,

18   pointing out, as the Supreme Court did, that freedom of speech

19   is in precisely the same provision of the *Constitution* as

20   freedom of religion?  And what if he wears a T-shirt that says,

21   Ukraine is right?  What is the difference between --

22   THE COURT:  I think maybe a more applicable problem

23   is, say, while the Black Lives Matter protests are going on,

24   and before that, when a professional football player is

25   criticized for kneeling at the *National Anthem* and a coach who

1   has a multi-racial staff of students is approached by students

2   after practice and say, We need to -- want to talk about this.

3   And, now, the coach may not be an educator under the standard,

4   but a lot of coaches are educators under the standard.  If he's

5   an educator under the standard and talks to pupils in ways that

6   could be -- that might not be governmental speech to which the

7   coach has no First Amendment right, and to the extent they

8   retain a First Amendment right it requires a balancing under

9   the more First Amendment protective standard that preceded

10  _Garcetti_, and under that, you know, combine that with the

11  vagueness argument you have, and you have a potential First

12  Amendment overbreadth argument.

13          MR. MOERDLER:  Exactly.

14          THE COURT:  I think you've made that point well.

15          MR. MOERDLER:  That is my point, and I add one last --

16  two words.

17          THE COURT:  Okay.

18          MR. MOERDLER:  Prior restraint.  Now, you add that to

19  the mix, and where are you?  You are in a situation, with

20  respect, your Honor, you are in a situation where you have

21  State action in the 189, you have specific counseling in the

22  FAQs that this is barred, you have a prior restraint, you have

23  no idea what is and isn't covered, and you have a prior

24  restraint that you can be brought up on charges right then and

25  there.  How do you do that?

1           THE COURT:  Okay.  All right.  I hear you on that,

2    although the words "prior restraint" do not appear in any of

3    the briefs that I've read.

4           MR. MOERDLER:  Your Honor, you are absolutely right.

5    I must confess to you that it is something I did in the

6    preparation of this argument.

7           THE COURT:  All right.  Well, I appreciate it.

8           So, let me just make clear to you, I have a very large

9    workload burden at the moment, and I'm trying to finish several

10   other very significant cases.  I don't expect I'll have a

11   decision for you until at least 60 days.  It won't be longer

12   than 90, but it will probably be about 60 days.

13          If the case survives the motion, then I will convene a

14   pretrial conference, and we can discuss the scope of any

15   discovery.  If the case, obviously, does not survive, then I'll

16   issue the order, the case will end, and appeal rights can be

17   preserved.  But as soon as I can get to a decision I'll issue

18   it, and then, if the case survives, we'll meet and talk about

19   the scope of discovery.

20          MR. MOERDLER:  Your Honor, I have no wish to give

21   offense in what I am about to say to anyone, least of all

22   Mr. Garland and his office.  I do hope that they and the

23   Department of Education and the other agencies have in mind the

24   preservation of all documents during that period.

25          THE COURT:  Well, you can send a preservation letter

1    to him.  He's probably done something already.

2           What do you want to say?

3           MR. GARLAND:  As a matter of course, your Honor, we

4    send document preservation notices.  I have no reason to

5    believe that one wasn't sent, but I will confirm when I get

6    back.

7           MR. MOERDLER:  Oh, that's fine.  Thank you.

8           THE COURT:  Okay, good.

9           I did not give the other side -- you're not raising a

10   First Amendment issue, but if you wanted to add anything, I'll

11   let you do it.

12          MR. BISSONNETTE:  My only addition, your Honor, is not

13   on the First Amendment claim, is to say, to the extent that

14   this claim survives, we probably will be seeking expedited

15   discovery.  We have the school year underway here.  There's a

16   lot of anxiety.

17          THE COURT:  Yeah.  I think, to the extent it survives,

18   now, I want to be -- I think we could envision an expedited

19   discovery regime but also a tightly focused discovery regime.

20   This is not a case where we need 200 depositions and 3 million

21   documents.  We can be targeted, and we can be expedited, and we

22   can be focused, and we can get the discovery done in a matter

23   of months, and we can get cross-motions for summary judgment,

24   which is where these cases ordinarily sort out if they don't

25   end up in a dismissal at the 12(b)(6) stage.  So, that would be

1    my intention:  fast, efficient, fair, narrow, get us to summary

2    judgment and then get a ruling one way or the other, if the

3    case survives the 12(b)(6) issue.

4            Okay.  All right.  I appreciate the good quality of

5    argument.  Thank you for your help.

6            THE CLERK:  All rise.

7        (WHEREUPON, the proceedings adjourned at 3:37 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3

C E R T I F I C A T E

4        I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   skill and ability, a true and accurate transcription of the

8   within proceedings.

9
10
11
12

13   Date: ___10/17/22          /s/ Brenda K. Hancock
                                 Brenda K. Hancock, RMR, CRR
14                               Official Court Reporter

15
16
17
18
19
20
21
22
23
24
25

*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 20, 2023

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
LOCAL 8027 AFT-N.H.,                *
AFL-CIO, ET AL                      *
                                    *
              Plaintiffs,           *   1:21-cv-1077-PB
                                    *   February 15, 2023
         v.                         *   4:00 p.m.
                                    *
FRANK EDELBLUT, COMMISSIONER, N.H.  *
DEPARTMENT OF EDUCATION, ET AL      *
                                    *
              Defendants.           *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF STATUS CONFERENCE
HELD VIA VIDEOCONFERENCE
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Plaintiff:        Charles Moerdler, Esq.
                          David Kahne, Esq.
                          Strook, Strook & Lavan LLP

                          Gilles R. Bissonnette, Esq.
                          American Civil Liberties Union of NH

For the Defendant:        Samuel R.V. Garland, Esq.
                          NH Attorney General's Office

Also Present:             Peter J. Peronni, Esq.
                          Elizabeth Clark Milburn, Esq.
                          Morgan C. Nighan, Esq.
                          Esther Kane Dickinson, Esq.
                          Henry Klementowicz, Esq.
                          Jennifer A. Eber, Esq.
                          Suzanne Amy Spencer, Esq.
                          Nathan Reed Fennessy, Esq.

Court Reporter:           Liza W. Dubois, RMR, CRR
                          Official Court Reporter
                          U.S. District Court
                          55 Pleasant Street
                          Concord, New Hampshire 03301
                          (603) 225-1442

```
 1                  P R O C E E D I N G S

 2             THE CLERK:  Good afternoon, Judge.

 3             We're here in the matter of Local 8027, et al vs.

 4    New Hampshire Department of Education, et al, for a preliminary

 5    pretrial conference, 21-cv-1077-PB.

 6             THE COURT:  All right.  So I've read the submission.

 7    It seems like both parties believe that this case is resolvable

 8    on cross motions for summary judgment.

 9             The plaintiffs would like expedited discovery.  The

10    defendant contends that while discovery isn't necessary, they

11    agree that what discovery can be had should be expedited.

12             I'll start with each plaintiff, whichever one wants

13    to go first.  What -- what else would you like to tell me about

14    how you'd like the case to proceed from here?

15             MR. MOERDLER:  If I may, unless Mr. Bissonnette

16    wishes to go first, Charles Moerdler, Strook, Strook & Lavan in

17    New York for AFT.

18             Judge, I think I need to give you a little bit of

19    additional background.

20             Over the course of the past few weeks, we have been

21    trying to deal with the Attorney General's Office to see if we

22    can find a way of resolving even more of this and having even

23    less of a burden on both lawyers and the Court.  Our thinking

24    had been that your Honor's decision was clear as a bell,

25    explicit, and it resolved, for all purposes, those things I
```

1   won, those things I lost; better stated, those things I won and

2   Gilles lost.

3           THE COURT:  I guess I have to admire your sense of

4   self-confidence, sir.

5           MR. MOERDLER:  I'm so sorry, Judge.

6           THE COURT:  That's all right.  I know you couldn't

7   resist.  Just go ahead.

8           MR. MOERDLER:  You're absolutely right.

9           So the -- what we were thinking of doing was trying

10  to do the following, or we had proposed it.

11          If we could reduce the findings that we thought the

12  Court or the conclusions that the Court had reached into the

13  form of a finding which was a final finding that could be a

14  judgment and that -- in that event, we would then have a final

15  order.  Various portions, including my leave to amend, then

16  going out the window, being dismissed and gone, and thereby be

17  able if they wish to go up, as I understand they do, they would

18  have a final order.  We would then be able to dispense with

19  discovery and go to the First Circuit, if that is their wish,

20  on that basis.

21          Unfortunately, that didn't seem to work too well and

22  the Attorney General's Office thought that it was more

23  appropriate for them to have -- go another round and

24  additionally to raise two what I call new but they're certainly

25  different issues, one of which you specifically commented on in

1     the opinion.

2                          (Technical difficulties.)

3               THE COURT:  Did I lose counsel?  I think I did.

4               Let's hope that he logs on again.

5               And maybe -- Mr. Bissonnette, maybe you can fill us

6     in on your client's position while we're waiting.

7               MR. BISSONNETTE:  Sure.  Thank you, your Honor.

8               And I think the -- one of the common themes, I

9     think, between kind of my side and AFT'S side represented by

10    Attorney Moerdler is just the concern about any kind of further

11    delay that would prevent us from getting to final judgment and

12    final resolution.

13              And so Attorney Moerdler is correct that we've been

14    having some discussions with the State to try to see if there

15    was some sort of way, some sort of mechanism, to get to final

16    judgment as quickly as possible, obviously with them reserving

17    their appellate rights.

18              You know, because -- you know, I agree with Attorney

19    Moerdler that it seems like your order was pretty close to

20    final on a lot of these issues recognizing, of course, it was

21    in the posture of a motion to dismiss, but it really wasn't

22    clear to us that there was much left with respect to the

23    analysis.

24              And so that did, as Attorney Moerdler said, led to

25    multiple discussions.  One was in the form of a potential

1   stipulation that would, you know, get this case to final

2   judgment quickly, preserving appellate rights; the other was

3   potentially the option, and this is mentioned in the discovery

4   plan, of foregoing discovery, you know, with the -- with there

5   being a preliminary injunction, agreed-upon preliminary

6   injunction in place, that would serve to provide our clients

7   with the protection that they're entitled to while briefing,

8   summary judgment briefing, occurs.

9           So these are kind of various permutations that we've

10  all discussed to try to get there.

11          Where Moerdler left off, and I know it's a little

12  bit of a cliffhanger, we have -- in the purpose -- as we've

13  been having these discussions with the State, it does seem that

14  there are two other issues that the State, you know, may want

15  to raise.  I'll let Attorney Garland, you know, present those.

16  But I think from where we stand --

17          THE COURT:  I have to acknowledge I'm a little bit

18  confused because when I read the filing, I thought it was you

19  guys that wanted to do discovery and the State said it was a

20  pure legal question --

21          MR. BISSONNETTE:  Sure.

22          THE COURT:  -- that didn't need discovery.  Now I'm

23  hearing you want to do it as a pure legal question and the

24  State wants the chance to do discovery?

25          MR. BISSONNETTE:  Yeah.

1    THE COURT:  I --

2    MR. BISSONNETTE:  Well, I think the concern that we

3    have, I -- I see that.  I think that one of the things that

4    we're struggling with, all of us here, is, you know, discovery

5    could be necessary.  We certainly presented that at the

6    hearing, right, the notion that even in the context of a facial

7    claim there could be issues, important issues, that this Court

8    may think need to be addressed in discovery germane to the

9    facial claim; for example, complaints, how the relevant

10   agencies interpret the law in question, the order of

11   operations.

12   And so I think that certainly are germane, but, you

13   know, there have been questions raised by the State as to

14   whether or not that discovery is necessary for the facial

15   claim.  I think I'm very interested in your thoughts, your

16   Honor, on that because we don't want to forgo something when

17   your Honor may think it's critical to your analysis to reach

18   final judgment.  So I think that kind of, to some extent,

19   explains, you know, the position that we took in the discovery

20   plan.

21   I think where I am at at the end of the day

22   representing my side is however your Honor wants to approach

23   this case, you know, we're amenable, but we are very concerned

24   about delay because --

25   THE COURT:  Yeah.  And I -- I understand that.  Let

1    me offer a couple of comments and then I'll turn to Mr. Garland

2    for his views about the additional issues.

3            I do want -- and you acknowledge this,

4    Mr. Bissonnette.  I was present with a Rule 12(b)(6) motion.

5    The standard in a Rule 12(b)(6) motion, as we all know, is a

6    plausibility standard.  I cannot, in ruling on a 12(b)(6)

7    motion, decide the case for the plaintiffs.  I can only decide

8    whether claims should be dismissed.  And there were certain

9    claims that were dismissed and the remaining claims were not

10   dismissed.

11           Now, because of the complexity of the legal issues

12   that you presented to me, I felt it would be helpful for this

13   case going forward to give you a full-throated, carefully

14   considered explanation of how I viewed the relevant law and I

15   took the extra time to do that so that it would be my best

16   effort to tell you how I think the law works in this particular

17   case.

18           That does not mean that I've decided the case.  I

19   was not in a position to decide it and I'm sure those of you

20   that undertook a close reading would find the word plausible or

21   plausibly interspersed with a lot of my conclusions, first.

22           Second, I left certain issues open because they

23   weren't reached by Mr. Garland, at least to my satisfaction.

24   One of the principal issues was in resolving ATF (sic)

25   plaintiff's First Amendment claim, I concluded that the

1  plaintiffs do not have a First Amendment right to control

2  curricular speech.  And so I found that claim to be deficient

3  as to how it applied to curricular speech.  I -- and that

4  ruling has been made.

5       But I made clear that implicit in their argument,

6  your -- the ATF plaintiff's argument, was an argument that even

7  if there is not a First Amendment protected right on the part

8  of teachers over curricular speech that the laws, arguably, I

9  emphasize arguably, reached beyond curricular speech and dealt

10 with let's call it extracurriculars such as the prayers that

11 were recently decided were not curricular speech and were

12 entitled to First Amendment protection in the recent Supreme

13 Court decision.

14      Now, that issue, I -- ATF asserts that the law can

15 be read broadly enough to encompass a wide range of

16 extracurricular speech.  Under *Garcetti*, government employees

17 may retain certain First Amendment rights with respect to their

18 speech even though they are government employees and I simply

19 was trying to make clear on that issue, the issue has not been

20 fully joined and I certainly can't dismiss the claim in its

21 entirety.

22      So that's important to note as an example of the

23 case where I said there is an issue here, the -- the

24 defendants' briefing does not warrant complete dismissal of the

25 claim and there may be a remnant of protection, but that

1    doesn't mean I know the outer boundaries of that remnant of

2    protection.  I -- it doesn't mean I've explained to you how I

3    would resolve the issue if I determined that there was

4    extracurricular speech that could potentially be encompassed by

5    the rule because then I would not be doing an all-or-nothing

6    *Garcetti* analysis; I would be doing a more nuanced balancing

7    analysis that would have been required under pre-*Garcetti* case

8    law.

9            So that's an example of an area where my order was

10   not dispositive.  And I -- I would -- while I have tried to be

11   as clear as I possibly can about my views on the relevant law,

12   and I recognize particularly with respect to the vagueness

13   claim I have outlined my views about how a vagueness -- a

14   facial vagueness challenge should be raised.  I have identified

15   various problems with the vagueness of the statute, but I

16   haven't made a definitive ruling and nobody should count their

17   chickens here.  Okay?

18           As to -- and I'll turn now to Mr. Garland.

19           And, Mr. Garland, things seem to have flipped.  It

20   seems like you want discovery delay and they want an immediate

21   ruling.  Tell me about your thinking.

22           MR. GARLAND:  I don't know if that's quite right,

23   your Honor.  Our position still, our default position, is that

24   we can do additional briefing on the First Amendment issue you

25   just identified.  We've identified a few areas where I think we

1    feel we need to -- particularly given the posture in the

2    briefing on the 12(b)(6) motion -- certainly need to preserve

3    arguments with respect to vagueness, if not persuade you that

4    the statute is not, in fact, vague.

5              And so we couldn't agree to a stipulation based on

6    the framework of your order though we do very much appreciate,

7    you know, the effort you put into it.  It's very helpful to

8    see, you know, the framework and your views on the law.  That's

9    been very useful for our analysis.

10             And so my default position is we can brief those

11   remaining issues in cross motions now.  I think they're legal

12   issues.  No discovery is necessary.  But understanding that --

13   you know, my understanding is the plaintiffs didn't agree to

14   that, short of us agreeing to a PI, which I'm not authorized to

15   do, or agreeing to a stipulation, which I'm not authorized to

16   do, we tried to find some middle ground of compromise --

17             THE COURT:  Let me stop you because I need to

18   understand.

19             I get it, PI, to the extent they wanted a PI to

20   leave in place while we do something, you aren't able to agree

21   to that.  I understand.  I'm not sure what this stipulation

22   that you both are talking about would entail.  And what, if

23   anything, can you tell me about this idea of a stipulation?

24             MR. GARLAND:  Yeah, absolutely, your Honor.

25             So after your order came out, we -- we talked within

1   a few days, I think Attorney Moerdler and Attorney Bissonnette

2   and myself, about, you know, what your order said and kind of

3   the road map that we all saw from it and I think we all agreed

4   that it was a very thorough order that gave us a lot of clarity

5   on where you view -- view the case in terms of, you know, the

6   legal analysis.

7           My proposal then was further briefing, just as I

8   just suggested to you.  The response that I got from -- to

9   that, and understandably, was that the plaintiffs were

10  resistant to that, but if we were willing to agree to some sort

11  of stipulation of final judgment along the terms of your order

12  that would end the district court matter, we would preserve our

13  right to appeal, and that would be something that they would

14  entertain.  And I certainly -- I brought it back to my clients

15  and it was not something we could agree to.

16          And so.

17          THE COURT:  Are you saying a stipulation that given

18  the Court's rulings that judgment should enter for the

19  plaintiff but the defendant wants to preserve its rights to

20  challenge on appeal?  Is that your position?

21          MR. GARLAND:  Exactly, your Honor.  And we

22  weren't --

23          THE COURT:  That's the stipulation that was being --

24          MR. GARLAND:  Yes.

25          THE COURT:  Okay.  And you couldn't do that is what

1    it comes down to.

2            MR. GARLAND:  I think we -- there are issues that we

3    need to at a very least preserve, if not -- if not, you know,

4    kind of -- there's no --

5            THE COURT:  Testify what those issues would be.

6            MR. GARLAND:  Yes, your Honor.

7            So I think one issue that you've already identified

8    is the scope of the -- kind of the application of this law to

9    speech and whether that implicates extracurricular speech at

10   all.  And if it does, whether under the Pickering Connick

11   standard it violates the Constitution.  And so I think that

12   issue is certainly still out there, it's not something that

13   we've briefed, and we acknowledge that.

14           Another issue that I think we need to provide some

15   clarification on, because your order pointed out, in your view,

16   inconsistencies are what I said in court to you during the

17   hearing versus what the Attorney General's opinion says.

18   And -- and, you know, I've gone back and read the hearing

19   transcript and I think I could have certainly been clearer on

20   that with you at that time.

21           And so --

22           THE COURT:  That's a nice way of saying that I got

23   it wrong in describing your position; is that --

24           MR. GARLAND:  I don't want to go so far as to say

25   that, your Honor.  Certainly not that.

1    But in terms of there being detention there, I think

2    that's something that we've given additional thought to in

3    light of your order and the way that certainly it's framed

4    there.

5    And then I think also there's a question of

6    severability.  You correctly noted we never briefed that.  I

7    think there is an important question around that, particularly

8    insofar as you've identified the penalties really being a

9    significant factor in your -- in your analysis.  And we think

10   there's some briefing we could do around that.

11   There may well be --

12   THE COURT:  There definitely could be a severability

13   argument presented here because there is a -- as you well

14   know -- a severability provision in the statute.  And although

15   Mr. Bissonnette tried to characterize his claim as an as

16   applied claim as to teachers, what I really think it is is a

17   facial challenge by teachers' groups about the way in which the

18   statute affects teachers.  And that was the focus of my

19   analysis because that was the -- what the plaintiffs were

20   presenting to me.

21   And it would not necessarily follow that the

22   entire statute would fall root and branch even if it is a --

23   my ultimate conclusion that the claims presented by teachers,

24   that the claim can -- that the statute cannot be

25   constitutionally applied to teachers because of the sanction

1   provisions which affect them in unique ways and leave them

2   particularly vulnerable in ways that require greater notice to

3   satisfy fair notice concepts.

4            And that was at the heart of my analysis about the

5   way I think facial challenges work and about the way vagueness

6   challenges work when there are aspects of the law that are

7   particularly problematic in that they impose very, very serious

8   career-ending sanctions on teachers.  And it does not follow

9   that every other provision in the statute, it applies much more

10  broadly than teachers, and for which there are not comparable

11  penalties.

12           And so I think that's something that definitely is

13  the case and certainly I would fully understand if any

14  stipulation you were being asked to enter into would be a

15  stipulation only as to the vagueness of the statute as it

16  applies to educators.  And I use the term educators as that's

17  the statutory term there which is broader than what we think of

18  as just teachers but encompasses a variety of people that

19  require certifications for their ability to practice their

20  profession.

21           So I -- I understand your concern about that.  I

22  understand your desire to be able to weigh in on the Pickering

23  Connick standard and how it might apply to speech by teachers

24  outside of the classroom which really hasn't been addressed.

25  But that's fine.  Nobody can make you enter into a stipulation

1    or a preliminary injunction.

2           I understand -- I -- look.  I -- I am sufficiently

3    humble that I understand the reality of my situation.  It is

4    highly, highly likely that however this case is resolved at my

5    level, it will be appealed.  And it is highly, highly likely

6    that the Court of Appeals will be the -- the final voice on

7    this particular issue.  And why not get it to them as soon as

8    we possibly can.  That -- that is a sensible thing.

9           But I can tell you, having sat with appellate panels

10   many, many times, that's great, but an appellate panel doesn't

11   want to issue a definitive case-resolving decision on less than

12   a complete record.  They would rather have me make sure that I

13   develop a complete record before they have to weigh in on these

14   issues.

15          And so I -- I think we have to be somewhat cautious

16   on simply saying, oh, Barbadoro in the 12(b)(6) order told us

17   clearly about what he thinks.  Yeah, I've told you what I think

18   about the way vagueness law works, for example, the way facial

19   challenges to vague statutes work, and those are unresolved

20   issues.  They have not been authoritatively resolved by the

21   First Circuit.  So the First Circuit might well take a

22   different view on that matter and if they do, it could end the

23   litigation right there because this is a facial vagueness

24   challenge.

25          So I understand the parties wanting to get it to the

1  Court of Appeals and I would be happy to have the Court of

2  Appeals hear it.  I just want to be sure I don't let the Court

3  of Appeals down here and I develop a record that is sufficient

4  so that that court will be comfortable in resolving those

5  issues.

6           And so you asked me about, you know, are there

7  things that could -- if I were an appellate judge, for example,

8  reviewing a record in this case, one of the things I might want

9  to know more about, for example, is exactly what kinds of

10 extracurricular speech do teachers have with their students.

11          We had some discussion of that, but there's no

12 evidence in the record about what kinds of extracurricular

13 speech teachers actually have with their students.

14          It might be useful to know during the ensuing months

15 since this case has been filed, have there been any complaints

16 about violations of the statute by teachers or educators more

17 broadly.

18          It could be valuable to know what -- whether there

19 have been further expressions of opinion by implementers of

20 the -- the statute between now and then.

21          If the parties -- but it is up to the parties to

22 develop their cases, not me.  I'm here to respond to what you

23 do, not sit -- try to set up the case the way I would want it

24 to be set up.  But I do think that those are a couple of things

25 the Court of Appeals, a judge on the Court of Appeals, might

1    want to know something about and I could see a question being

2    asked, well, why shouldn't we just remand that to the trial

3    judge here, let him develop a record.  And that then delays the

4    case by another year.

5            So you don't want to bring it up prematurely and

6    then it takes -- because this -- these raise -- these are very

7    important and complex and unresolved issues.  I guarantee you

8    the Court of Appeals will want to carefully consider these

9    issues before it writes an opinion.

10           It will take many, many months.  It'll be well over

11   a year before the Court of Appeals likely responds on it.  So

12   the last thing you want is to push it up prematurely to the

13   Court of Appeals, only to be told that it has to be -- certain

14   issues have to be developed on remand and we're now three years

15   into the process.

16           So I will not -- it's up to you to build the record

17   that you both want to build.  I'm here to help you do that.

18   But those are a couple of thoughts that I have.  And then --

19           MR. BISSONNETTE:  Sure.

20           THE COURT:  -- one thought that I almost always do,

21   and there may just be nothing on this point, is I like to have

22   a full indexed copy of the legislative history of a statute

23   like this in the record.  And it may be that my brief summary

24   of that legislative history is all that there is and if that's

25   so, fine.  But if there were any statements on the floor, if

1     there were any statements in committee of which there's a

2     record, it probably is worthwhile to collect and include it in

3     the record --

4             MR. BISSONNETTE:  Yes.

5             THE COURT:  -- so that the Court of Appeals doesn't

6     have to go hunting around in it -- for it if they think it is.

7             So those are, I guess, three things that -- three or

8     four things that if I were an appellate judge potentially I

9     might need to see something in the record about before I could

10    finally resolve the matter.

11           So I -- I understand.  I don't fault the Attorney

12    General for not agreeing to a stipulation.  I -- I don't fault

13    the Attorney General for not agreeing to a PI.

14           It remains if the -- if the plaintiffs -- and I

15    think the plaintiffs made absolutely the right choice in not

16    seeking a PI initially because, again, I think Mr. Bissonnette

17    has enough experience with me to know that I don't rush into

18    making difficult decisions on the constitutionality of state

19    statutes and I don't do that lightly and it would have taken me

20    several months before I could feel comfortable giving you the

21    analysis I gave here.

22           So I don't fault anybody here, but it -- if -- if

23    you are unable to agree on either a stipulation or a -- the

24    entry of a PI, the plaintiffs certainly could ask for a

25    preliminary injunction.  Again, I would want to be sure that

1   the record was sufficiently developed so the Court of Appeals

2   could finally resolve the case, but it might make more sense to

3   simply do some limited expedited discovery on a targeted set of

4   issues and have a schedule for cross motions, where both

5   parties agree now the record is fully complete, we've had a

6   chance to build our record, we're satisfied, we both believe

7   the Court has everything it needs to resolve all issues in the

8   case, and then I can take my crack at it and then you can go

9   back -- go to the Court of Appeals.

10                  MR. BISSONNETTE:  Yup.

11                  THE COURT:  You know, so if after -- you know,

12  unlike at the current stage, where I have only issued a ruling

13  denying a motion to dismiss, if I conclude after a fully

14  developed record that the plaintiffs are entitled to summary

15  judgment, at that point I would either enter the preliminary --

16  the permanent injunction or I would say to the State Attorney

17  General's Office what I have said in the very few times I have

18  ever held a state statute unconstitutional:  Oh, by the way,

19  I've given you this explanation, I don't expect you to be

20  enforcing this thing against anybody while you're on appeal and

21  if you're feeling otherwise, tell me, you know.  Because

22  normally state officials are presumed to follow rules of

23  federal courts and -- rulings of federal courts and unless you

24  ask for my permission to stay the effect of my order, I'd

25  expect you to abide by it, you know.

1    MR. BISSONNETTE:  Yeah.

2    THE COURT:  So -- so that's where I am.  I

3  understand your positions now.

4    Counsel, I'm sorry we lost you for a minute, but you

5  have an able colleague in Mr. Bissonnette who was able to, I

6  believe, fully describe your position.  You must have other AFT

7  counsel here on the file -- or in the hearing.  If you want any

8  of them to speak or if you want to say anything else, go ahead,

9  but where I am is this.

10    It sounds like the parties undertook reasonable

11  efforts to get an expedited decision by way of the entry of a

12  PI that could be appealed or a stipulation for judgment

13  reserving the right to appeal.  Those are both legitimate

14  things to do for legitimate reasons.  The Attorney General is

15  not prepared to enter into a stipulation or agreed-upon PI and

16  so we are then left with how do we proceed.

17    Mr. Garland acknowledges there are a couple of

18  issues that he needs to do supplemental briefing on based on my

19  order.  Even if there were no facts in dispute, he'd need to do

20  briefing on that.  Mr. Bissonnette said, you know, we want a

21  fast ruling, we want to get this thing moving, but, you know,

22  if there are particular concerns the Court has, we would

23  obviously want to listen to that.  My response to that,

24  paraphrasing again, is it's up to you guys to build the record

25  that you want.

 1          I don't -- that's not my role.  But I tried to

 2   identify a handful of issues on which it might be helpful to a

 3   Court of Appeals judge reviewing this case and I -- I -- I

 4   think I identified what some -- some discovery or record

 5   stipulations could maybe do it about what teachers do in their

 6   interactions with students that could be characterized as

 7   extracurricular in a way that would entitle them to Pickering

 8   Connick First Amendment protection even if they have no First

 9   Amendment protection as to curricular speech.

10          Another issue that -- that I identified was it could

11   be helpful to know what, if any, complaints have, in fact, been

12   made between now -- the time of the statute's effectiveness and

13   now that weren't provided to me and, finally, to the extent

14   there have been enforcer interpretation in addition to what I

15   had available to me, those would be potentially relevant to

16   know.

17          And then the last thing I referenced was if there is

18   any substantial legislative history that wasn't in front of me,

19   I didn't go out and try to do it myself.  The preferred way, at

20   least for me, is for the parties to collect it, stipulate it,

21   index it, Bates stamp it, and submit it as an exhibit so that

22   no -- no other law clerk or Court of Appeals judge has to send

23   somebody up to the New Hampshire Archives to try to dig out

24   obscure legislative history.

25          Some judges think it's relevant.  Some don't.  I

 1   have used it on occasion.  I don't -- I'm cautious about using

 2   it.  But generally when the constitutionality of a statute is

 3   challenged, I like to see the legislative history.

 4          So in response to Mr. Bissonnette's question, those

 5   are some things that you might want to consider.  But if you're

 6   just ready to file your motions and you agreed to file them,

 7   I'll rule on what I -- what you've given.

 8          Okay?  So, Mr. Bissonnette, do you want to follow up

 9   and then --

10          MR. BISSONNETTE:  I do.

11          THE COURT:  Okay.  Go ahead.

12          MR. BISSONNETTE:  I just want to say I think this

13   has been really helpful for me just -- to learn just how to --

14   how we as litigants in the parties here should interpret your

15   order in this case.  And what I was struggling with in reading

16   this order is that, you know -- and obviously I saw all the

17   Rule 12(b)(6) caveats, but, you know, one of the questions that

18   was really presented in my brain is is this kind of an unusual

19   case where maybe there were legal rulings kind of embedded

20   within that 12(b)(6).

21          Clearly you made clear to us that I shouldn't over

22   read that and I appreciate that very much.  And I think, two,

23   our discovery plan really was designed to reflect what we

24   talked about at the inception of this case at the motion to

25   dismiss argument which is if it was denied -- it was denied,

1    then we do expedited discovery and cross motions in the normal

2    course but on an expedited basis, recognizing that at least in

3    the plaintiff's view there is exigence here and harm the longer

4    this law moves forward without some sort of relief.

5              So I just want to say that this has been very

6    helpful to me, I'm sure to all of my colleagues here.  We are

7    prepared to move forward on an expedited basis as reflected in

8    the discovery plan, a truncated 90-day discovery window with

9    various discovery topics that we've specified in the discovery

10   plan, much of which you've already covered during this status

11   conference.

12             So I just -- I want to just be very clear we're

13   ready to move forward.  We're ready to move forward quickly.

14   We're ready to move forward now on these limited issues.  You

15   know, because -- and we really do not want this to go beyond

16   90 days.  We're all going to have to work fast and quickly in

17   order to get that brief -- get that -- those briefs on file.

18             I would say that I do believe the legislative

19   history may already be part -- may have already been docketed.

20   I'd have to go and check that.  But on those --

21             THE COURT:  I just wanted to be sure we had it --

22             MR. BISSONNETTE:  Yeah, I'll agree.  I'll check that

23   again, your Honor.  I don't want to misspeak.

24             But we're prepared to move forward along the lines

25   that you've conveyed to us.

```
 1              THE COURT:  All right.  So I -- I do think,
 2   Mr. Garland, so you have some legal issues that you want to be
 3   able to brief.  We've talked about those.  I think they're
 4   appropriate to raise in a -- in the cross motions for summary
 5   judgment practice.  I -- I think if the discovery is narrow and
 6   focused and it will require some work on each side to get this
 7   record fully developed, there's a reasonable possibility that
 8   you can get the discovery done in this kind of expedited way.
 9   I would take, at most, a handful of depositions.  A lot of it
10   would be, you know, paper discovery.  A lot of it -- and it
11   is -- we're not talking hundreds of thousands of pages here.
12   We're talking a very limited subset of pages.
13              But I'm thinking, for example, to the extent
14   Mr. Bissonnette decides that it's important to have in the
15   record how teachers interact with students on an
16   extracurricular basis, he's got to come forward with some
17   evidence on that particular point and you should be entitled to
18   interrogate that evidence in order to make sure the issue is
19   fairly represented.
20              And so I think a relatively small subset of
21   depositions with lawyers working together -- Mr. Moerdler, one
22   thing we did not -- we talked about while you were
23   unfortunately offline was -- and I'm not sure, it looks like
24   your screen's frozen, but if you're hearing me -- there's also
25   a severance question here because at least my order was
```

1  targeted at the relief that the two groups of plaintiffs were

2  seeking, which was really targeted at teachers who, in my view,

3  are in the most vulnerable position as a result of this statute

4  and who face unique problems that make the State's position far

5  less tenable.

6          And so there's a reasonable likelihood here that I

7  would do nothing more by way of final judgment than determine

8  that any application of the statute -- that the provision --

9  the only provision that I'm saying are unconstitutionally

10 vague are those provisions that bear directly on what educators

11 are -- how they affect educators and leaving potentially other

12 for further development perhaps in other cases those provisions

13 which have no bearing on educators.

14         So that -- unless the parties posture the case in a

15 different way, there is a severability provision.  I would be

16 inclined to focus any ruling I make on those provisions which

17 have been litigated in front of me and not on sweeping

18 wholesale invalidation of the statute, even if I'm persuaded by

19 the plaintiffs' position.

20         And, you know, I understand, Mr. Bissonnette, I -- I

21 could have written a 15-page order that just would have denied

22 in part and granted in part, but I felt that the legal issues

23 are complex enough that as you go forward you ought to at least

24 know my position so that you can, in the final set of briefing,

25 stake out your reasoning why I'm right on this and wrong on

1    that and give me one last chance to correct any mistakes and

2    then -- then the Court of Appeals can have it.

3           So that's why I did what I did.  And I understand

4    it.  I mean, there -- on certain issues like how -- how should

5    a vagueness challenge be viewed and what does fair notice

6    require, and what do the kind of penalty provisions -- how do

7    these provisions operate and what are the challenges they

8    present when -- in the face of a vagueness challenge, those are

9    my views.  They're not likely to change because I spent a lot

10   of time thinking about them.  And other people -- other judges

11   might have different views and the Court of Appeals might well

12   correct me on those views.  But I'm unlikely to change them

13   between now and then unless you present me with some obvious

14   legal analysis on a point that I've overlooked and I didn't

15   think through.

16          So I think we're -- we've got a path going forward.

17   It seems like that path involves this expedited discovery and I

18   do think in the long run, Mr. Bissonnette, what your clients

19   want is not just a quick ruling that gets -- that ends up with

20   three years of delay; you want a ruling that can form a basis

21   for a successful appellate challenge, as does Mr. Garland

22   because both sides have an interest in having the final

23   authoritative determination on the constitutionality of this

24   statute, which we all know isn't going to come from me.

25          So let's -- let's do this.  Let's get the expedited

1  discovery done.  Let's follow the briefing schedule you've

2  negotiated.

3         Mr. Moerdler, I'll give you a chance in just a

4  second.

5         Let's get the cross motions for summary judgment

6  filed.

7         The one thing, you know, I -- Mr. Garland served as

8  a law clerk on this court.  He knows well our law clerk

9  changing schedule.  I was -- I was saddened to see that you're

10 proposing a schedule that doesn't let me decide the case until

11 I have a turnover of law clerks because that means a very

12 substantial reeducation campaign with some relatively new law

13 school graduates.  But, you know, I -- as valuable as my law

14 clerks are on this, is my work, I fully know the law in this

15 area, so I'll have to make the most of my experience and

16 educate them quickly.

17        But, you know, again, it'll be a new crop of law

18 clerks in September trying to struggle with whatever happens at

19 oral argument.  And it may take me a few months to get a final

20 order out although I really hope that that order of mine is

21 clear enough and is careful enough in a legal analysis that at

22 least it sets forth my position that should enable all of us to

23 do our work more efficiently, at least at this level.

24        So, Mr. Moerdler, I'm sorry.  You were cut off and I

25 just didn't want to wait until we got you back on.  I hope

1   there's another representative of AT that was on the line that

2   can brief you.  In any event, I have a court reporter here and

3   if you need a transcript, you can order one.  But I think I've

4   summarized what -- where we were on this.

5           But what else would you like to say, sir?

6           I'm sorry, I'm not hearing you now.

7           Who's local counsel for Mr. Moerdler?

8           MR. KAHNE:  I can -- Chuck, it sounds like you might

9   be muted.

10          This is David --

11          THE COURT:  Yeah, you're muted.  So let me turn to

12  your cocounsel and just, sir, what would you like to say?

13          MR. KAHNE:  Thank you, Judge.  There's just one

14  point I wanted to make and I think it's just sort of for

15  clarification purposes.

16          The stipulation that we were contemplating, I think

17  it did not -- it wasn't so expansive as to get into the area of

18  the First Amendment.  It was really supposed to be sort of

19  narrowly focused on the facial -- and not even the as applied

20  challenge, only the facial vagueness challenge.  Because as you

21  pointed out, I think your opinion in that area was particularly

22  clear.

23          So -- but we fully understand your -- your point

24  about you're developing an entire record as opposed to going

25  up piecemeal, but I just wanted to make clear that the part of

1  the -- of the stipulation and that the expedition that we were

2  seeking was just on that portion of the facial vagueness, to

3  get that up to the First Circuit as quickly as possible.

4       THE COURT:  And I get that, because that's the

5  portion of my order which is the most definitive.  It does turn

6  largely on legal issues and facts that are either undisputed or

7  language in the statute itself.

8       And you could do that, but, again, suppose you had a

9  one judge on a three-judge panel that said, you know, I'm not

10  sure that a facial vagueness challenge should be subject to --

11  to review, but maybe there's a First Amendment claim here that

12  is sufficient to justify a -- a more exacting vagueness review

13  standard, but we can't answer that question.

14       So you never know what a panel on the Court of

15  Appeals would be interested in knowing and since there is that

16  issue hanging out there, if, for example, there -- you were to

17  persuade me that there is First Amendment-protected speech that

18  is affected by this statute, that would bolster your vagueness

19  challenge because, as we know, First Amendment vagueness

20  challenges are subject to a quite rigorous standard of review

21  and it might give the -- the Court of Appeals an alternative

22  path if the Court did not want to take up the issue that I took

23  up about how *Johnson* affects facial vagueness challenges; they

24  might want to focus on the First Amendment as an alternative

25  route to getting to the same standard of review.

1    So you could -- so I -- I understand your concern,

2    but the absolute worst thing we could have is a remand here.

3    Okay?  We need to get it done with me and so that the court

4    that really will decide the case can decide it.  And that's the

5    quickest path to answering the question for both sides, which

6    is so important.

7    So I think you just have to bear with us.  The

8    reality is federal courts, appropriately, are very deferential

9    to state and federal legislative bodies.  We don't lightly

10   entertain constitutional challenges to state or federal

11   legislation.  There are only, really, two cases in 30 years

12   where I've found a state statute unconstitutional.

13   In both cases, I was ultimately upheld.  The -- one

14   by Mr. Bissonnette in the First Circuit and one by the Supreme

15   Court in the Vermont case that affirmed my decision after the

16   First Circuit reversed me on it.  But they're very important,

17   serious challenges that you don't resolve lightly.  And I have

18   great respect for the New Hampshire Legislature and I'm going

19   to carefully consider any constitutionality challenge to a

20   state statute.  It just takes time.  It's too important to do

21   it quickly.

22   So I'll get it done as fast as I can, but it's going

23   to take a little bit of time.

24   I don't know, Mr. Moerdler.  Are you back online?

25   Oh, no, sorry.  I -- I'm sorry, Mr. Moerdler.  We'll

1    just try to get you next time.  And I -- you, fortunately, have

2    a very good team of lawyers here who can speak for your client

3    as well as for the coplaintiff.

4              So I think we've about covered it.

5              Mr. Bissonnette, anything more from you?

6              MR. BISSONNETTE:  No, your Honor.  Thank you.

7              THE COURT:  Mr. Garland, anything from you?

8              MR. GARLAND:  No.  The only thing I want to flag,

9    your Honor, is I think -- you're probably aware of it -- is the

10   only real dispute in terms of the discovery plan that we've

11   generally agreed to in our -- is with respect to the

12   presumptive limits on the number of depositions, the number of

13   interrogatories, et cetera.

14             So there -- I just want to flag there's a dispute

15   there.  I don't want to -- I don't need to advocate anything,

16   but --

17             THE COURT:  Here's what I would say.  You guys have

18   been good at working together.  Meet and confer and try to

19   reach reasonable agreements.  If somebody thinks someone else

20   is going too far -- we don't want to delay the case.

21   Somebody -- if there's a dispute, the proponent of the

22   deposition is going to have to make a strong case that -- and

23   explain specifically what they could get from the deposition.

24             Otherwise, I wouldn't -- these are not just general

25   fishing expedition kind of discovery here.  We're going to move

1   quickly.  And I'm confident that you will.  We've got good

2   lawyers all around on this case, so I think you can work

3   through those things.

4           So I won't make any ruling on it now.  We'll --

5   we'll approve the plan as proposed, enter the deadlines that

6   have been proposed.  If you need to modify them, if you can

7   agree, I'll agree to reasonable modifications.  If you run into

8   discovery disputes, I don't like to engage on those matters,

9   but I will in this case.  Just ask for a conference and I'll --

10  I'll help you resolve it quickly.

11          I -- the parties I don't think have asked for this,

12  but I -- I recognize that the briefing limitations are probably

13  not sufficient here, so we ought to use a 50-page limit on

14  briefs rather than our limit in the rule and a -- I -- I

15  think -- I can't remember whether you envisioned this, but we

16  could have a 50-page on the briefs and I'm going to set it for

17  oral argument.  I don't think we need reply and surreply briefs

18  because we'll do oral argument.  All right?  So that will save

19  us a couple of weeks while we wait for replies and surreplies.

20          So give you a good, full briefing opportunity for

21  opening briefs and then we'll set oral argument and we should

22  be able to get through the case like that.  Okay?

23          MR. BISSONNETTE:  Your Honor, I appreciate that.  In

24  the spirit of expediting this, I appreciate that.  That's

25  helpful.  Thank you.

1    THE COURT:  Anything else, Mr. Garland?

2    MR. GARLAND:  Not at all.  Thank you very much, your

3  Honor.

4    THE COURT:  Mr. Kahne, anything from the AT

5  plaintiffs?

6    MR. KAHNE:  No.  Thank you, Judge.

7    THE COURT:  Okay.  Thanks, folks.  I'll look for

8  your -- for your briefs and let me know if you need anything

9  before then.

10    MR. BISSONNETTE:  Thank you, your Honor.

11    MR. GARLAND:  Thank you.

12    THE COURT:  Thank you.  That concludes the hearing.

13    (Proceedings concluded at 4:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


         I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 3/22/23              /s/  Liza W. Dubois
                               LIZA W. DUBOIS, RMR, CRR

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                          Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that   Plaintiffs                                           has
conventionally filed the following attachment or exhibit: Plaintiffs' Statement of Facts in
Support of Their Motion for Summary Judgment.

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                    /s/  Gilles Bissonnette
                                          Gilles Bissonnette
                                          265393
                                          ACLU of New Hampshire
                                          18 Low Avenue
                                          Concord, NH 03301
                                          603-224-5591
                                          gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette
Gilles Bissonnette
265393
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
603-224-5591
gilles@aclu-nh.org

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. <br>           Plaintiffs, <br>              v. <br> FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION, CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. <br>           Defendants. <br> ------------------------------------------------------------------------- <br> ANDRES MEJIA, <br> CHRISTINA KIM PHILIBOTTE, and <br> NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, <br>           Plaintiffs, <br>              v. <br> FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, <br> JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, <br> AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, <br> CHRISTIAN KIM, in his official capacity <br> only as the Chair of the New Hampshire Commission for Human Rights, <br> KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, <br>           Defendants. | Civil No. 1:21-cv-01077-PB |

## DECLARATION OF GILLES BISSONNETTE, ESQ.
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Gilles Bissonnette, Esq., declare as follows:

I am the Legal Director for the American Civil Liberties Union of New Hampshire and co-counsel for Plaintiffs Christina Kim Philibotte and Anders Mejia in this case.  I am an active member of the New Hampshire bar.  I make this declaration in support of Plaintiffs' Motion for Summary Judgment.

1.       Attached as Exhibit 1 is a true and correct copy of the full text of the Amendments (Depo. Ex. 1).

2.       Attached as Exhibit 2 is a true and correct copy of the deposition transcript of Department of Education Commissioner Frank Edelblut.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

3.       Attached as Exhibit 3 is a true and correct copy of the deposition transcript of Department of Education Attorney Diana Fenton.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

4.       Attached as Exhibit 4 is a true and correct copy of the deposition transcript of Department of Education Investigator Richard Farrell.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

5.       Attached as Exhibit 5 is a true and correct copy of Human Rights Commission Director Ahni Malachi.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

6.       Attached as Exhibit 6 is a true and correct copy of Human Rights Commission Assistant Director Sarah Burke Cohen.  A redacted version has been filed publicly, and an unredacted version has been filed under seal.

7.      Attached as Exhibit 7 is a true and correct copy of the declaration of NEA-NH President Megan Tuttle.

8.      Attached as Exhibit 8 is a true and correct copy of the declaration of AFT-NH President Deb Howes.

9.      Attached as Exhibit 9 is a true and correct copy of the declaration of Plaintiff John Dube.

10.     Attached as Exhibit 10 is a true and correct copy of the declaration of Kamren Munz.

11.     Attached as Exhibit 11 is a true and correct copy of the declaration of Alison O'Brien.

12.     Attached as Exhibit 12 is a true and correct copy of the declaration of Patrick Keefe.

13.     Attached as Exhibit 13 is a true and correct copy of the declaration of Plaintiff Christina Kim Philibotte.

14.     Attached as Exhibit 14 is a true and correct copy of the declaration of Jennifer Given.

15.     Attached as Exhibit 15 is a true and correct copy of the declaration of Plaintiff Andres Mejia.

16.     Attached as Exhibit 16 is a true and correct copy of the declaration of Sean O'Mara.

17.     Attached as Exhibit 17 is a true and correct copy of the declaration of Plaintiff Ryan Richman.

18.     Attached as Exhibit 18 is a true and correct copy of the declaration of Plaintiff Jocelyn Merrill.

19.     Attached as Exhibit 19 is a true and correct copy of a July 26, 2021 email from DOE Commissioner Frank Edelblut.

20.     Attached as Exhibit 20 is a true and correct copy of the HRC's October 7, 2021 Commissioners' meeting minutes (Depo. Ex. 56).

21.     Attached as Exhibit 21 is a true and correct copy of DOE Commissioner Edelblut's June 13, 2021 op-ed (Depo. Ex. 4).

22.     Attached as Exhibit 22 is a true and correct copy of the Northwood Republican Town Committee's "CRT Parents' Guide" (Depo. Ex. 51).

23.     Attached as Exhibit 23 is a true and correct copy of Depo. Ex. 32.  This has been filed under seal.

24.     Attached as Exhibit 24 is a true and correct copy of the HRC docketed charge (Depo. Ex. 62).  This has been filed under seal.

25.     Attached as Exhibit 25 is a true and correct copy of Depo. Ex. 63.  This has been filed under seal.

26.     Attached as Exhibit 26 is a true and correct copy of Depo. Ex. 64.  This has been filed under seal.

27.     Attached as Exhibit 27 is a true and correct copy of Kathryn Borysenko's Aug. 19, 2022 article (Depo. Ex. 65).

28.     Attached as Exhibit 28 is a true and correct copy of Depo. Ex. 66.  This has been filed under seal.

29.     Attached as Exhibit 29 is a true and correct copy of the August 2022 "Actively Unwoke" tweets (Depo. Ex. 67).

30.     Attached as Exhibit 30 is a true and correct copy of Depo. Ex. 68.  This has been filed under seal.

31.     Attached as Exhibit 31 is a true and correct copy of Depo. Ex. 69.  This has been filed under seal.

32.     Attached as Exhibit 32 is a true and correct copy of Depo. Ex. 70.  This has been filed under seal.

33.     Attached as Exhibit 33 is a true and correct copy of Depo. Ex. 71.  This has been filed under seal.

34.     Attached as Exhibit 34 is a true and correct copy of Depo. Ex. 72.  This has been filed under seal.

35.     Attached as Exhibit 35 is a true and correct copy of Depo. Ex. 73.  This has been filed under seal.

36.     Attached as Exhibit 36 is a true and correct copy of Depo. Ex. 74.  This has been filed under seal.

37.     Attached as Exhibit 37 is a true and correct copy of Depo. Ex. 75.  This has been filed under seal.

38.     Attached as Exhibit 38 is a true and correct copy of Depo. Ex. 76.  This has been filed under seal.

39.     Attached as Exhibit 39 is a true and correct copy of Depo. Ex. 77.  This has been filed under seal.

40.     Attached as Exhibit 40 is a true and correct copy of DOE Commissioner Edelblut's April 15, 2022 op-ed and attachments (Depo. Ex. 14).

41.     Attached as Exhibit 41 is a true and correct copy of a September 22, 2021 email exchange between AFT and DOE Commissioner Edelblut (Depo. Ex. 9).

42.     Attached as Exhibit 42 is a true and correct copy of the NEA-NH's July 12, 2021 and August 5, 2021 letters (Depo. Ex. 11).

43.     Attached as Exhibit 43 is a true and correct copy of a Sept. 13, 2021 NEA-NH email to the HRC (Depo. Ex. 54).

44.     Attached as Exhibit 44 is a true and correct copy of an Oct. 18, 2021 email from R. Farrell to D. Fenton (Depo. Ex. 24).

45.     Attached as Exhibit 45 is a true and correct copy of the July 21, 2021 Guidance (Depo. Ex. 55).

46.     Attached as Exhibit 46 is a true and correct copy of the DOJ's interrogatory responses.

47.     Attached as Exhibit 47 is a true and correct copy of the HRC's interrogatory responses (Depo. Ex. 58).

48.     Attached as Exhibit 48 is a true and correct copy of the DOE's interrogatory responses (Depo. Ex. 57).

49.     Attached as Exhibit 49 is a true and correct copy of the HRC's website and questionnaire (Depo. Ex. 60).

50.     Attached as Exhibit 50 is a true and correct copy of the DOE's December 2021 presentation (Depo. Ex. 3).

51.     Attached as Exhibit 51 is a true and correct copy of the DOE's August 21 presentation (Depo. Ex. 7).

52.     Attached as Exhibit 52 is a true and correct copy of a Nov. 24, 2021 J. McKim email chain.

53.     Attached as Exhibit 53 is a true and correct copy of the Attorney General's 2021-02 Opinion dated Sept. 7, 2021 (Depo. Ex. 12).

54.     Attached as Exhibit 54 is a true and correct copy of excerpts of the 2019 book *How to be an Anti-racist* by Dr. Ibram X. Kendi (Depo. Ex. 50).

55.     Attached as Exhibit 55 is a true and correct copy of the Sept. 28, 2020 Executive Office of the President's Memorandum.

56.     Attached as Exhibit 56 is a true and correct copy of excerpts of the July 8, 2021 Board of Education meeting.

57.     Attached as Exhibit 57 is a true and correct copy of a Dec. 14, 2021 email chain with DOE Commissioner F. Edelblut.

58.     Attached as Exhibit 58 is a true and correct copy of a July 22, 2021 email from S. Gibson to A. Malachi (Depo. Ex. 47).

59.     Attached as Exhibit 59 is a true and correct copy of the Nov. 15, 2021 F. Edelblut/Northwood GOP Meeting email exchange (Depo. Exs. 37 and 52).

60.     Attached as Exhibit 60 is a true and correct copy of a Jan. 20, 2023 D. Fenton email exchange (Depo. Ex. 10).

61.     Attached as Exhibit 61 is a true and correct copy of the HRC's May 2, 2022 letter to NEA-NH.

62.     Attached as Exhibit 62 is a true and correct copy of a Nov. 15, 2021 R. Farrell email exchange (Depo. Ex. 34).

63.     Attached as Exhibit 63 is a true and correct copy of an Aug. 20, 2021 F. Edelblut email exchange (Depo. Ex. 45).

64.     Attached as Exhibit 64 is a true and correct copy of an Aug. 25, 2022 email to F. Edelblut (Depo. Ex. 48).

65.     Attached as Exhibit 65 is a true and correct copy of excerpts of the Mar 8, 2023 HB533 hearing (Depo. Ex. 6).

66.     Attached as Exhibit 66 is a true and correct copy of an Aug. 27, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

67.     Attached as Exhibit 67 is a true and correct copy of an Oct. 21, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

68.     Attached as Exhibit 68 is a true and correct copy of a Dec. 13, 2021 F. Edelblut email exchange (Depo. Ex. 15).  This has been redacted to omit personally identifiable information.

69.     Attached as Exhibit 69 is a true and correct copy of an Aug. 23, 2021 F. Edelblut email exchange (Depo. Ex. 19).  This has been redacted to omit personally identifiable information.

70.     Attached as Exhibit 70 is a true and correct copy of an Aug. 12, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

71.     Attached as Exhibit 71 is a true and correct copy of a June 14, 2022 email to R. Farrell (Depo. Ex. 36).  This has been redacted to omit personally identifiable information.

72.     Attached as Exhibit 72 is a true and correct copy of a Nov. 15, 2021 DOE email exchange (Depo. Ex. 22).

73.     Attached as Exhibit 73 is a true and correct copy of an Nov. 15, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

74.     Attached as Exhibit 74 is a true and correct copy of true and correct copy of a Dec. 28, 2021 F. Edelblut email exchange (Depo. Ex. 43).

75.     Attached as Exhibit 75 is a true and correct copy of the HRC's March 4, 2022 letter (Depo. Ex. 53).

76.     Attached as Exhibit 76 is a true and correct copy of an Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on November 20, 2020.

77.     Attached as Exhibit 77 is a true and correct copy of May 3, 2021 and May 4, 2021 Presentations to N.H. Court System.

78.     Attached as Exhibit 78 is a true and correct copy of Sept. 22, 2020 Trump Executive Order.

79.     Attached as Exhibit 79 is a true and correct copy of HB544 Docket and Language.

80.     Attached as Exhibit 80 is a true and correct copy of Select Written Testimony from Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added.

81.     Attached as Exhibit 81 is a true and correct copy of HB2/Budget Trailer Materials.

82.     Attached as Exhibit 82 is a true and correct copy of the article "Compromise Sought on Anti-Critical race Theory Bill" from April 19, 2021.

83.     Attached as Exhibit 83 is a true and correct copy of Rep. Daniel Itse, "Taxpayers Money is Being Used to Promote Systemic Racism in NH," Union Leader (Apr. 28, 2021).

84.     Attached as Exhibit 84 is a true and correct copy of an excerpt from the Jan. 11, 2022 HB1313 hearing.

85.     Attached as Exhibit 85 is a true and correct copy of a Feb. 1, 2022 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

86.     Attached as Exhibit 86 is a true and correct copy of a Mar. 18, 2022 D. Fenton email exchange (Depo. Ex. 23).   This has been redacted to omit personally identifiable information.

87.     Attached as Exhibit 87 is a true and correct copy of Drummond Woodsum August 5, 2021 Presentation

88.     Attached as Exhibit 88 is a true and correct copy of the DOE's Nov. 10, 2021 website (Depo. Ex. 21).

89.     Attached as Exhibit 89 is a true and correct copy of the DOE's Nov. 10, 2021 press release (Depo. Ex. 25).

90.     Attached as Exhibit 90 is a true and correct copy of a Nov. 15, 2021 F. Edelblut email exchange (Depo. Ex. 41).

91.     Attached as Exhibit 91 is a true and correct copy of a Nov. 17, 2021 HRC email exchange (Depo. Ex. 61).

92.     Attached as Exhibit 92 is a true and correct copy of an Oct. 25, 2021 F. Edelblut email exchange (Depo. Ex. 33).   This has been redacted to omit personally identifiable information.

93.     Attached as Exhibit 93 is a true and correct copy of an Oct. 26, 2021 F. Edelblut email exchange (Depo. Ex. 38).   This has been redacted to omit personally identifiable information.

94.     Attached as Exhibit 94 is a true and correct copy of an Oct. 1, 2021 F. Edelblut email exchange.  This has been redacted to omit personally identifiable information.

95.     Attached as Exhibit 95 is a true and correct copy of an Oct. 26, 2021 F. Edelblut email exchange that was redacted by the DOE under RSA ch. 91-A.

96.     Attached as Exhibit 96 is a true and correct copy of a Sept. 7, 2021 F. Edelblut email exchange (Depo. Ex. 16).   This has been redacted to omit personally identifiable information.

97.     Attached as Exhibit 97 is a true and correct copy of a Sept. 3, 2021 F. Edelblut email exchange (Depo. Ex. 17).   This has been redacted to omit personally identifiable information.

98.     Attached as Exhibit 98 is a true and correct copy of Depo. Ex. 31.  This has been filed under seal.

99.     Attached as Exhibit 99 is a true and correct copy of Depo. Ex. 40.  This has been filed under seal.

100.    Attached as Exhibit 100 is a true and correct copy of the Feb. 7, 2022 No Left Turn Letter (Depo. Ex. 26).

101.    Attached as Exhibit 101 is a true and correct copy of a Feb. 22, 2022 F. Edelblut email exchange (Depo. Ex. 27).

102.    Attached as Exhibit 102 is a true and correct copy of a Feb. 14, 2022 R. Farrell email exchange (Depo. Ex. 28).

103.    Attached as Exhibit 103 is a true and correct copy of an Apr. 7, 2022 DOE email exchange (Depo. Ex. 18).  This has been redacted to omit personally identifiable information.

104.    Attached as Exhibit 104 is a true and correct copy of Depo. Ex. 46.  This has been filed under seal.

105.    Attached as Exhibit 105 is a true and correct copy of an. Aug. 24, 2022 R. Farrell email exchange (Depo. Ex. 29).

106.    Attached as Exhibit 106 is a true and correct copy of a Sept. 21, 2021 F. Edelblut email exchange (Depo. Ex. 39).   This has been redacted to omit personally identifiable information.

107.    Attached as Exhibit 107 is a true and correct copy of a Jan. 7, 2022 email from Ann Marie Banfield opposing SB304.

108.    Attached as Exhibit 108 is a true and correct copy of a Feb. 18, 2021 email from D. Richards in HB544's legislative history (Depo. Ex. 49).

I hereby declare under penalties of perjury that the foregoing is true and accurate.

*/s/ Gilles Bissonnette*_____
Gilles Bissonnette

August 14, 2023

# EXHIBIT 1

Full text of
The Amendments

1224



**EXHIBIT 1**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 1

# Full text of
# The Banned Concepts Act

## CHAPTER 91
## HB 2-FN-A-LOCAL - FINAL VERSION

7Apr2021... 1059h
06/03/2021  1799s
06/03/2021  1816s
06/03/2021  1859s
06/03/2021  1842s
06/03/2021  1821s
06/03/2021  1827s
06/03/2021  1866s
06/03/2021  1884s
24Jun2021... 2040CofC
24Jun2021... 2048EBA

### 2021 SESSION

21-1082
08/10

HOUSE BILL    *2-FN-A-LOCAL*

AN ACT          relative to state fees, funds, revenues, and expenditures.

SPONSORS:       Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:      Finance

---

### AMENDED ANALYSIS

This bill:

1. Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2. Makes a transfer of unexpended funds to the state heating system savings account.

3. Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4. Establishes the graphic services fund in the department of administrative services.

5. Consolidates human resources and payroll functions in the department of administrative services.

6. Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7. Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8. Directs the payment of state employee medical benefits payments from the retirement system.

9. Enables the supreme court to transfer funds.

## CHAPTER 91
## HB 2-FN-A-LOCAL - FINAL VERSION

66. Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

67. Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

68. Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

69. Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

70. Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

71. Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

72. Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

73. Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

74. Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

75. Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

76. Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

77. Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

78. Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

79. Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

80. Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

81. Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

1
2
3
4
5
6
7
8

9    91:297    New Subdivision; State Commission on Human Rights; Right to Freedom From
10   Discrimination in Public Workplaces and Education. Amend RSA 354-A by inserting after section 28
11   the following new subdivision:

12                    Right to Freedom from Discrimination in Public Workplaces and Education

13       354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education.

14       I. The general court hereby finds and declares that practices of discrimination against any
15   New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed,
16   color, marital status, familial status, mental or physical disability, religion, or national origin are a
17   matter of state concern, that discrimination based on these characteristics not only threatens the
18   rights and proper privileges of New Hampshire inhabitants but menaces the institutions and
19   foundation of a free democratic state and threatens the peace, order, health, safety and general
20   welfare of the state and its inhabitants.

21       II. Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or
22   other workplace sensitivity training based on the inherent humanity and equality of all persons and
23   the ideal that all persons are entitled to be treated with equality, dignity, and respect.

24       III. Nothing in this subdivision shall be construed to limit the academic freedom of faculty
25   members of the university system of New Hampshire and the community college system of New
26   Hampshire to conduct research, publish, lecture, or teach in the academic setting.

27       354-A:30 Definitions. In this subdivision:

28       I. "Government program" means any activity undertaken by a public employer, both as an
29   employer and in performance of its government function.

30       II. "Public employee" means any person working on a full-time or part-time basis for the
31   state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,
32   water districts, school districts, school administrative units, or quasi-public entities.

33       III. "Public employer" includes the state or any subdivision thereof, including, but not
34   limited to counties, cities, towns, precincts, water districts, school districts, school administrative
35   units, or quasi-public entities.

36       354-A:31 Prohibition on Public Employers. No public employer, either directly or through the
37   use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

1   recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the
2   following:

3       I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
4   status, familial status, mental or physical disability, religion, or national origin, are inherently
5   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
6   color, marital status, familial status, mental or physical disability, religion, or national origin;

7       II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
8   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
9   origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10       III. That an individual should be discriminated against or receive adverse treatment solely
11   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
12   status, familial status, mental or physical disability, religion, or national origin; or

13       IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color,
14   marital status, familial status, mental or physical disability, religion, or national origin cannot and
15   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
16   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
17   or national origin.

18       354-A:32  Prohibition on the Content of Government Programs and Speech.  No government
19   program shall teach, advocate, or advance any one or more of the following:

20       I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
21   status, familial status, mental or physical disability, religion, or national origin are inherently
22   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
23   color, marital status, familial status, mental or physical disability, religion, or national origin;

24       II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
25   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
26   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27       III. That an individual should be discriminated against or receive adverse treatment solely
28   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
29   status, familial status, mental or physical disability, religion, or national origin; or

30       IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
31   marital status, familial status, mental or physical disability, religion, or national origin cannot and
32   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
33   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
34   or national origin.

35       354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse
36   employment action, warning, or discipline of any kind for refusing to participate in any training,
37   program, or other activity at which a public employer or government program advocates, trains,

CHAPTER 91
HB 2-FN-A-LOCAL - FINAL VERSION
- Page 147 -

1   teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
2   following:

3       I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
4   status, familial status, mental or physical disability, religion, or national origin are inherently
5   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
6   color, marital status, familial status, mental or physical disability, religion, or national origin;

7       II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
8   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
9   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10      III. That an individual should be discriminated against or receive adverse treatment solely
11  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
12  status, familial status, mental or physical disability, religion, or national origin; or

13      IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color,
14  marital status, familial status, mental or physical disability, religion, or national origin cannot and
15  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
16  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
17  or national origin.

18      354-A:34 Remedies. Any person aggrieved by an act made unlawful under this subdivision may
19  pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any
20  other applicable common law or statutory cause of action.

21      91:298 New Section; Prohibition on Teaching Discrimination. Amend RSA 193 by inserting
22  after section 39 the following new section:

23      193:40 Prohibition on Teaching Discrimination.

24      I. No pupil in any public school in this state shall be taught, instructed, inculcated or
25  compelled to express belief in, or support for, any one or more of the following:

26          (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital
27  status, familial status, mental or physical disability, religion or national origin is inherently superior
28  to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,
29  familial status, mental or physical disability, religion, or national origin;

30          (b) That an individual, by virtue of his or her age, sex, gender identity, sexual
31  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
32  or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

33          (c) That an individual should be discriminated against or receive adverse treatment
34  solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,
35  marital status, familial status, mental or physical disability, religion, or national origin; or

36          (d) That people of one age, sex, gender identity, sexual orientation, race, creed, color,
37  marital status, familial status, mental or physical disability, religion, or national origin cannot and

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 148 -**

1   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,
2   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
3   origin.

4       II. Nothing in this section shall be construed to prohibit discussing, as part of a larger
5   course of academic instruction, the historical existence of ideas and subjects identified in this
6   section.

7       III. Any person claiming to be aggrieved by a violation of this section, including the attorney
8   general, may initiate a civil action against a school or school district in superior court for legal or
9   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-
10   A:34.

11       IV. Violation of this section by an educator shall be considered a violation of the educator
12   code of conduct that justifies disciplinary sanction by the state board of education.

13       V. For the purposes of this section, "educator" means a professional employee of any school
14   district whose position requires certification by the state board pursuant to RSA 189:39.
15   Administrators, specialists, and teachers are included within the definition of this term.

16   91:299 Severability. If any provision of sections 297-298, or the application of any provision to
17   any person or circumstance is held to be invalid, the remainder of such sections, and their
18   application to any other persons or circumstances shall not be affected thereby.

19   91:300 Effective Date. Sections 297-299 of this act shall take effect upon passage.



**EXHIBIT 2**

DOE Commissioner
Frank Edelblut
Deposition
Transcript
Redacted, Publicly-
filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

FRANK EDELBLUT

May 23, 2023



AVICORE REPORTING

15 Constitution Drive, Suite 1A · Bedford, NH 03110 · (603) 666-4100
info@avicorereporting.com · www.avicorereporting.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

CERTIFIED
ORIGINAL

Local 8027, AFT-New Hampshire, et al.,

Plaintiff,

v.

Frank Edelblut, Commissioner, et al,

Defendants.

No. 1:21-cv-01077-PB

DEPOSITION OF FRANK EDELBLUT

taken on behalf of the Plaintiffs

at New Hampshire Department of

Education, Concord, New Hampshire,

on May 23, 2023, at 10:20 a.m.

Court Reporter:

Cynthia Foster, LCR

LCR #14 (RSA 310-A:161-181)

---

**2**

```
1   APPEARANCES:
2        On behalf of the Plaintiffs, Local 8027, AFT-New
         Hampshire, AFL-CIO:
3        STROOCK & STROOCK & LAVAN LLP
         By: Charles Moerdler, Esq.
4            Elizabeth C. Milburn, Esq.
             David Kahne, Esq., by Zoom
5        180 Maiden Lane
         New York, NY  10038
6        212-806-5648
         cmoerdler@stroock.com
7        ecmilburn@stroock.com
8        On behalf of the Plaintiffs, Christina
         Philibotte, Andres Mejia, NEA-New Hampshire:
9        ACLU OF NEW HAMPSHIRE
         By: Gilles Bissonnette, Esq.
10       18 Low Avenue, Unit 12
         Concord, NH  03301
11       603-225-3080
         gilles@aclu-nh.org
12
         On behalf of the Defendants, Frank Edelblut,
13       Ahni Malachi, John Formella, et al:
         NH DEPARTMENT OF JUSTICE
14       By: Nathan W. Kenison-Marvin, Esq.
         33 Capitol Street
15       Concord, NH  03301
         603-271-1292
16       nathan.w.kenison-marvin@doj.nh.gov
17       Also present:
         Elizabeth A. Brown, Attorney
18       Department of Education
         Office of the Commissioner
19
         By Zoom:
20       Peter Perroni, Esq.
         Nathan Fennessy, Esq., nfennessy@preti.com
21       Morgan Nighan, Esq., mnighan@nixonpeabody.com
         Jennifer Eber, Esq.
22       Kayla Turner, Esq., kaylat@drcnh.org.
         Esther Dickinson, Esq., edickinson@nhnea.org
23
```

---

**3**

```
1                        INDEX
2               Deposition of Frank Edelblut
3   Examination by Mr. Moerdler:                7
4   Examination by Mr. Bissonnette:           115
5                      EXHIBITS
6   38    Email, Edelblut to Farrell, Oct 26, 2021,
7         DOE-00710-713                         23
8   39    Email, Edelblut to Farrell, Sept 21, 2022,
9         DOE-09896-09898                       35
10  40    Email, DOE Communications Office to Edelblut,
11        Oct 5, 2021, with attachments         91
12  41    Email, Edelblut to m41 hillsboroughnh, 15 Nov
13        2021, DOE-00871                      112
14  42    Email, Edelblut to SAU 5, 17 Nov 2021,
15        DOE-00866-868                        113
16  43    Email, Edelblut to Breen, 28 Dec 2021,
17        DOE-00848-849                        113
18  44    Email, Andrus to Edelblut, 15 May 2022,
19        DOE-01136                            114
20  45    Email, Sanborn to Edelblut, 20 Aug 2021,
21        DOE-00067-69                         126
22  46    Email, Farrell to Fenton, 19 Aug 2022,
23        DOE-009900-9901, 10298-10299         129
```

---

**4**

```
1   47    Email, Gibson to Malachi, 22 Jul 2021,
2         DOE-00308                            133
3   48    Email, Huyett to Edelblut, 25 Aug 2022,
4         DOE-07694-95                         134
5   49    Richards to House Executive Departments and
6         Administration, February 18, 2021,
7         HB544 0203, 0296, 0297, 0241, 0243, 0244   136
8   50    How To Be An Antiracist, pages 18-20  146
9   51    CRT Parents Guide, PL00787-788       175
10  52    Email, Edelblut to Dean, 15 Nov 2021,
11        DOE-00869-870                        175
12        (Original exhibits retained by reporter)
13        (Scanned copies provided to all counsel)
14
15
16
17
18
19
20
21
22
23
```

---

**5**

1                   REQUESTS

2 Page 11    Emails reviewed by Commissioner Edelblut

3             in preparation of the deposition

4 Page 94    Responsive material to Exhibit 40

5 Page 107   Communications

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

---

**6**

1            S T I P U L A T I O N S

2                It is agreed that the deposition shall

3 be taken in the first instance in stenotype and when

4 transcribed may be used for all purposes for which

5 depositions are competent under New Hampshire

6 practice.

7                Notice, filing, caption and all other

8 formalities are waived.  All objections except as to

9 form are reserved and may be taken in court at trial.

10                It is further agreed that if the

11 deposition is not signed within thirty (30) days

12 after submission to counsel, the signature of the

13 deponent is waived.

14                It is further agreed that exhibits may

15 be retained by counsel until the time of trial.

16

17

18

19

20

21

22

23

---

**7**

1    MR. MOERDLER:  Good morning, Commissioner.

2 My name is Charles Moerdler.  I'm a member of

3 the firm of Stroock & Stroock & Lavan in New

4 York, and we represent the American Federation

5 of Teachers.  To my right is my colleague,

6 Elizabeth Milburn, and she, too, is from Stroock

7 & Stroock & Lavan, and she, too, represents the

8 AFT.

9    COMMISSIONER EDELBLUT:  Welcome to New

10 Hampshire.

11    MR. MOERDLER:  I spent many a happy year in

12 New Hampshire and indeed in Concord, just

13 outside of it.

14     FRANK EDELBLUT, DULY SWORN

15    MR. KENISON-MARVIN:  We can do the same

16 stipulations with respect to objections and

17 reserving rights as we've done in the prior two

18 depositions.

19    MR. MOERDLER:  Agreed.

20    MR. KENISON-MARVIN:  And also just putting

21 on the record the parties' agreement and

22 acknowledgement that there is a video recording

23 this morning so that counsel of record can

---

**8**

1 participate by being here live to view the

2 deposition as it proceeds today, and that the

3 video is for that limited purpose and the

4 parties have agreed that no recording shall be

5 made of the video.

6    MR. BISSONNETTE:  I can confirm that

7 agreement.

8    MR. EDELBLUT:  Can you just clarify?  You

9 said there's a video recording.  There's not a

10 video.  There's video transmission, but there's

11 not video recording.

12    MR. KENISON-MARVIN:  Correct.  Thank you.

13 I meant just video recording in the sense of

14 video running.  So thank you.  The court

15 reporter, Cindy, has informed me that she is

16 taking an audio recording for her own quality

17 assurance purposes, and she uses that strictly

18 for her own quality assurance in creating the

19 transcript and that when she's done creating the

20 transcript, that work product is permanently

21 destroyed.  My understanding is consistent with

22 your practice?

23    COURT REPORTER:  Yes.

---

9

1  BY MR. MOERDLER:

2  Q   Have you been deposed before, Commissioner?

3  A   I have.

4  Q   Can you tell us under what circumstances and how

5      often if you can remember approximately?

6  A   Yes.  I was deposed about a month ago.  For

7      another lawsuit involving the State.

8  Q   And that is the only time?

9  A   No.  I was deposed many, many years ago in

10     another party associated with a corporation.

11  Q   You know that this is going to be a question and

12     answer session where your answers are sworn and

13     recorded.  You have the same duty to tell the

14     truth as if you were in court.  You understand

15     that, sir?

16  A   I do.

17  Q   I must go through this.

18  A   I do know.

19  Q   It's obligatory.  Would you only provide verbal

20     answers to questions rather than shaking your

21     head which is what most of us do most of the

22     time, but would you try and be responsive orally

23     and verbally rather than just by motion?

10

1  A   I will.

2  Q   And if you do not answer, if you do not

3      understand a question, please ask, and we'll be

4      happy to try and oblige.  If you do not ask to

5      have a question reread, we will assume that you

6      have understood it at least to the best of your

7      ability and are prepared to answer it; is that

8      correct?

9  A   That's correct.

10  Q   Please do something I fail to do too often, and

11     that is let me finish the question before you

12     answer it even though you know where I'm going.

13     Is that all right?

14  A   That's all right.

15  Q   And if you need any breaks we'll do whatever we

16     can to oblige you and accommodate that.

17         Do you understand these requests or

18     instructions, sir?

19  A   I do.

20  Q   And is there any reason you are unable to

21     testify truthfully or completely today?

22  A   Not that I'm aware of.

23  Q   What did you do to prepare for this deposition

11

1      today?

2  A   So I met with my counsel.

3  Q   Putting that aside, anything else?

4  A   I did not.

5  Q   Did you look at any documents?

6  A   I did.

7  Q   And can you tell us what they are?

8  A   I was provided by my counsel a series of emails.

9  Q   Do you have a list of those emails?

10  A   I do not.

11     MR. MOERDLER:  Nate, can I get a list of

12     the emails, please?

13     MR. KENISON-MARVIN:  To the extent there

14     are documents that you reviewed specifically.

15     MR. MOERDLER:  Yes.

16     MR. KENISON-MARVIN:  I'm not committing

17     that he reviewed the entire list of emails.  I

18     can talk to the witness about the emails that he

19     reviewed prior to the deposition today.

20     MR. MOERDLER:  Can you do that, please?

21     MR. KENISON-MARVIN:  We can talk about

22     that.

23     MR. MOERDLER:  What I would like to know is

12

1      what he reviewed as contrasted necessarily with

2      what you've given him.  He may not have had a

3      chance to read all of them.

4      MR. KENISON-MARVIN:  I can represent to you

5      that he has only been provided with documents

6      that are Bates stamped and have been provided to

7      Plaintiff's counsel.

8      MR. MOERDLER:  Perfect.  If you could

9      provide us the list though I would appreciate

10     it.

11  Q   Okay.  Would you please tell us your educational

12     background, sir?

13  A   Sure.  I have a bachelor of science degree and a

14     master's degree.

15  Q   In what subject?

16  A   Bachelor of science degree in business

17     administration with an emphasis in accounting,

18     and I have a master's degree in theology.

19  Q   And they are from?

20  A   The University of Rhode Island is my

21     undergraduate degree, and my graduate degree is

22     from the Greek Orthodox School of Theology.

23  Q   And would you tell us your work background?  If

**13**

1   you can.  As completely as you can.  In other
2   words, your employment background prior to
3   becoming Commissioner?
4 A   Sure.  I was initially out of college so I'll
5   start there.  I'm sure you don't want to know
6   when I start working or before that.
7      I was an accountant for the firm of
8   PriceWaterhouseCoopers.  I left there.  I was
9   the Chief Financial Officer for a company called
10  Niagara Corporation.  I left there.  I started a
11  company called Control Solutions.  I exited that
12  company and was a member of an early stage
13  investing group called Common Angels which then
14  ultimately changed its name to Converge Systems.
15  And so that's my professional career.
16 Q   And then did there come a point where you ceased
17  to be primarily occupied in a professional
18  career?  In other words, I believe I'm correct
19  in stating you became at some point in time a
20  member of the New Hampshire House of
21  Representatives.  Am I right?
22 A   That's correct.
23 Q   So was that your first, as somebody who's been

**14**

1   down this road, your first adventure into the
2   world of politics and government?
3 A   So what I would say is that in New Hampshire
4   participation as a State Representative is not a
5   vocational calling such that it would be the
6   professional career in the sense that State
7   Representatives in New Hampshire earn only $100
8   per year so it would be difficult to make that a
9   vocational endeavor.
10 Q   So were you doing that at the same time that you
11  were engaged in some other occupation?
12 A   Yes.
13 Q   And what was the other occupation while you were
14  doing that?
15 A   I was a member with Common Angels.
16 Q   And when did you first become a member of the
17  House of Representatives?
18 A   I believe in the 2014 time frame.
19 Q   And you then became Commissioner directly from
20  your service as a member of the House of
21  Representatives; is that correct?
22 A   That's correct.
23 Q   And were you appointed?

**15**

1 A   I'm nominated, and then I go through a
2   confirmation process with the Governor and
3   counsel.
4 Q   Who nominated you?
5 A   The Governor.
6 Q   The Governor nominated you, and then you go to
7   the confirmation process; is that correct?
8 A   That's correct.
9 Q   That was as of when?
10 A   In March of 2017, I believe.
11 Q   And you have been the Commissioner of Education
12  since that time?
13 A   That's correct.
14 Q   Could you describe your responsibilities as the
15  Commissioner of Education for New Hampshire?
16 A   Sure.  So I have oversight responsibility for
17  the agency that comprises the New Hampshire
18  Department of Education.  Many of those
19  responsibilities are enumerated in statute.
20 Q   Would you tell us in your own words what are
21  those responsibilities, whether they are
22  oversight of the agency or individually,
23  separately and apart?

**16**

1 A   I'm not sure I understand the question.
2 Q   Tell me what it is that you are charged with
3   actually doing in the area of education.
4      MR. KENISON-MARVIN:  Objection.  Calls for
5   a local contention, you can answer.
6      MR. MOERDLER:  Sorry?
7      MR. KENISON-MARVIN:  Object to the extent
8   it calls for a legal contention.  He can answer.
9      MR. MOERDLER:  All I want to know is what
10  he does.
11 A   So I have oversight responsibility for the
12  agency.
13 Q   And what does the agency do?
14 A   So the agency has a variety of activities.
15  Probably one of the easiest places to understand
16  many of those is in statute.  Particularly in
17  RSA 21:10 I believe is the statute.
18 Q   Does your agency have responsibility for the
19  public school system in the State of New
20  Hampshire?
21 A   I'm not sure I understand what you mean by
22  responsibility for them.
23 Q   Does it have any responsibility for the public

17

1  school system?
2      MR. KENISON-MARVIN:  Objection.  Vague and
3  legal contention.  You can answer.
4  A   So the New Hampshire Department of Education has
5      responsibility for administering the statutes,
6      many of which govern aspects of the education
7      system in New Hampshire, both public, nonpublic
8      and other educational programs.
9  Q   So you do have responsibility, for example, of
10     the charter schools.
11 A   I don't know what you mean by "responsibility."
12 Q   You have some jurisdictional responsibilities.
13 A   We have certain statutes that effect charter
14     schools, and we're responsible, some of those
15     statutes are our responsibility that we
16     administer.
17 Q   All right.  Now, in terms of private schools, do
18     you have the same kind of areas of
19     responsibilities?
20 A   We have areas of responsibility, but they are
21     not the same.  They as well, you know, are
22     enumerated in statute and rule and we administer
23     the statutes and the rules.

18

1  Q   Do you try to stay jurisdictionally within the
2      four Corners of those statutes that govern your
3      responsibilities?
4      MR. KENISON-MARVIN:  Objection, vague and
5      legal contention.
6  Q   Let me restate it then.  You've indicated in
7      your testimony that your responsibilities are
8      essentially those that are within the four
9      corners of a variety of statutes, correct?
10 A   I'm not sure I understand the question at this
11     point.
12 Q   I'll restate it again.  You've testified that in
13     response to my question as to what is your
14     responsibility, what are your responsibilities
15     as Commissioner, you've said they are oversight
16     of those areas as to which statute defines
17     responsibilities; is that correct?
18 A   So statute and rule.
19 Q   Statute and rule.  Now, within that area, do you
20     try to keep your activities within the confines
21     of that statutory scheme or rule scheme,
22     regulatory scheme?
23 A   So I'm not sure I understand the premise of the

19

1  question.  The Department is responsible for
2  administrating those statutes and rules as
3  they're enumerated.
4  Q   And when you act in an official capacity, do you
5      make a conscious effort to do no more than the
6      statute authorizes you as Commissioner to do?
7  A   So we as an agency attempt to act consistent
8      with the statutes and the rules which govern our
9      activities.
10 Q   And do you have anyone who counsels you as to
11     whether something is within or not within the
12     scope of those statutes?
13 A   We do as an agency.
14 Q   And that is?
15 A   It's a variety of people.
16 Q   And they are?
17 A   So we have legal counsel, we have an Attorney
18     General's office, we have legislators, and there
19     may be others in the agency who observe a
20     particular statute and may weigh in on whether
21     or not the activities of the agency are within
22     the scope of those.
23 Q   And you make a conscious effort to stay within

20

1  those areas; is that correct?
2      MR. KENISON-MARVIN:  Objection.  Vague.
3  A   The agency administers the statutes and not
4      beyond the statutes.
5  Q   Right.  That's all I wanted to know.
6      Now, you meet with parents from time to
7      time, do you not?
8  A   I do.
9  Q   And --
10 A   Can you just define what you mean by "meet"?
11     Just so that we understand.
12 Q   That's the expression you've used in a number of
13     the emails.
14 A   So I'm just trying to understand what you mean
15     by that.
16 Q   I think I use the English language pretty well,
17     sir.  Have you been trained in it.  Do you get
18     together with them?
19 A   So physically present, on a Zoom call, on a
20     telephone, can I just understand what you mean
21     by meet.
22 Q   Do you communicate in an oral capacity with
23     parents from time to time?

21

1   A   I do.
2   Q   Do you communicate with parents in writing from
3       time to time?
4   A   I do.
5   Q   Is there any other means by which you
6       communicate with parents?
7   A   I'm not sure, again, what you mean by
8       communication.  If I'm communicating with
9       someone --
10  Q   Sir, all I'm trying to do is get an answer to a
11      very simple question.  You've pointed me down
12      this road by telling me you didn't comprehend
13      the word "meet" so I'm going to take all the
14      component parts of the word "meet," and I'm
15      going to ask you those.
16  A   Thank you.
17  A   I do try to do it as politely as I know how.
18  A   Yes.  So I communicate with parents.
19  Q   All right.  Do you communicate with school
20      officials?
21  A   I do.
22  Q   Superintendents?
23  A   Yes.

22

1   Q   Principals?
2   A   Yes.
3   Q   People in the administrative area of schools?
4   A   Yes.
5   Q   When you do that, do you prepare some form of
6       written report for yourself or reminder or memo
7       as a matter of course in what you did or what
8       you're going to do?
9   A   As a matter of course, no.
10  Q   Now, do you meet with political party officials?
11  A   I have.
12  Q   All right.  Give me just a moment.  I'm trying
13      to find a document.  I do apologize, sir.
14          So I'm going to show you a document that
15      has been Bates numbered by the Attorney
16      General's office in producing it to us.  It's
17      document numbered 0711.  It is a portion of the
18      production covering additional pages to that.
19      If you'll look at page 0711 it is led by 0700 as
20      a memo or an email from you to a man by the name
21      of ████████ with a copy to Diana Fenton.
22          MR. KENISON-MARVIN:  Objection.
23      Foundation.  Can we mark this?

23

1           MR. MOERDLER:  I'm sorry.
2           MR. KENISON-MARVIN:  We're up to 38, I
3       think.
4           (Exhibit 38 marked for identification)
5   Q   I will come back to the specifics of that
6       meeting in a moment.  My question to you is here
7       is --
8   A   Might I read through the document first?
9   Q   Oh, sure.  Please.  Perhaps you'll read through
10      to 0713.
11  A   Okay.  So your question, sir?
12  Q   ████████████████████
        ████████████████████████████████
        ████████████████████████████████████
15  Q   Who is she?  Do you know that?
16          MR. KENISON-MARVIN:  Objection.  Compound.
17      You can answer.
18          MR. MOERDLER:  I'm sorry?
19          MR. KENISON-MARVIN:  Compound.  Form.
20  Q   Do you know her?
21  A   I've spoken to her.
22  Q   Have you met with her?
23  A   No.  I've not met with her.

24

1   Q   Now, what I would like to just go through with
2       you is this apparently, I say apparently, if you
3       look at page 0712, ████████████████
4       communicated with you concerning an issue at
5       Kensington Elementary SAU 16, and you indicated
6       at the top of page 0712 that your memory was
7       refreshed, and you know the issue and spoke with
8       the superintendent.
9           Can you give us your best present
10      recollection of what that issue was?
11  A   Sure.  So my memory was refreshed because I did
12      not recall what SAU she was involved in, and I
13      believe that ████, the parent of a student as
14      she expressed in the initial email dated
15      September 30th, was concerned about the content
16      of a reading book in her daughter's classroom.
17  Q   And upon receiving this information, you spoke
18      to the superintendent of SAU 16?
19  A   That's correct.
20  Q   And do you have any recollection at all as to
21      what you said to the superintendent and what he
22      said to you or she said to you?
23  A   I don't have specifics in terms of what the

25

1   content of that conversation was.  I can try
2   to --
3  Q   Give me your best present recollection.
4  A   Yes.  So my recollection would be that I would
5      point out that there is a parent of a student in
6      the district who is concerned about a particular
7      reading material in her classroom.
8  Q   And you communicated to that superintendent that
9      concern; am I correct?
10 A   I believe so.
11 Q   Did you give the superintendent any counsel as
12     to what he or she should or shouldn't do in
13     regard thereto?
14 A   I don't recall any specific counsel.
15 Q   Do you know what the superintendent said to you?
16 A   I don't recall what the superintendent said to
17     me.
18 Q   And do you remember reading the book?
19 A   I do.
20 Q   Do you know what the book was?
21 A   I may be able to recollect from --
22 Q   Perhaps I can help you, sir.
23 A   Okay.

26

1  Q   This is a book called A Good Kind of Trouble.
2  A   Okay.
3  Q   And do you remember reading it?
4  A   I do recall reading it.  I read a number of
5      books.  I don't remember the details of the
6      book.
7  Q   What I'm really trying to get at, sir, and I'm
8      trying to simplify it, if not I can go back into
9      the depths of it, would it be fair to say that
10     you are an activist Commissioner, hands-on
11     Commissioner, who believes in dealing with those
12     people in those areas that you have
13     responsibility either by oversight or otherwise
14     responsibility for?  Is that a fair statement?
15         MR. KENISON-MARVIN:  Objection.  Vague.
16 A   So I would say that I am a Commissioner who
17     tries to execute his responsibilities with
18     fidelity to the law and the rule.
19 Q   Do you do that on an active basis or delegative
20     basis?
21         MR. KENISON-MARVIN:  Same objection.
22 A   So again, I would say that I am a Commissioner
23     who tries to execute his responsibilities with

27

1      fidelity to the law.
2  Q   Do you do it personally or do you delegate it?
3         MR. KENISON-MARVIN:  Same objection.
4  A   I would say as a Commissioner I am both doing
5      activities as well as delegating activities.
6  Q   Now, here is a parent who has complained about a
7      book, and I will go into that book in a little
8      while.  What is your normal reaction, if there
9      is a normal reaction, when a parent complains
10     about a book, do you pick up the book and try
11     and read it?  Do you find out what the issue is?
12     What is she norm?
13 A   So it would depend on the circumstances of the
14     individual inquiry into the Department.
15 Q   Let's take a look at the query.
16 A   Okay.
17 Q   The query is on page 713.  What was it in that
18     query that triggered you to read the book?
19 A   Because I had a concerned parent.
20 Q   So that was my question.  When you have a
21     concerned parent, do you then try and get to the
22     bottom of the concern, communicate the concern,
23     and try and find out exactly what's involved?

28

1         MR. KENISON-MARVIN:  Objection.  Compound.
2      You can answer.
3  A   So --
4  Q   I'm happy to break it down.
5         MR. KENISON-MARVIN:  I guess I would ask
6      that we do it one question at a time if we can
7      as a matter of course.
8  Q   I'm trying to do that.
9  A   So again, depending on the individual inquiry to
10     me, I might take different pathways in terms of
11     trying to understand the context of the concern
12     of the parent.
13 Q   So let me take you to that concern as expressed
14     on 0713.
15 A   Okay.
16 Q   What was it in that concern that triggered you
17     to read the book?
18 A   Because the parent had reached out to me.
19 Q   So when a parent reaches out to you and says
20     that he or she has a concern about a book and
21     gives you some details as here, is it your
22     practice to then read the book?
23 A   I do read quite a lot of content, yes.

29

1  Q    And where in the statutes that you said marked
2      your responsibility is there one that says you
3      have a duty to read books?
4  A    So my duty is to support my customers to the
5      agency which include a variety of
6      constituencies.  Parents are one of them.  So I
7      try to be as prepared as possible to support my
8      constituencies.
9  Q    And then what was it that you did in terms of
10      calling and scheduling an appointment with the
11      superintendent?
12  A    I'm sorry.  Can you -- I'm not sure I understand
13      the question.
14  Q    Well, let me take you over to document number
15      DOE 70.
16          MR. BISSONNETTE:  Fenton Exhibit 19 that
17      was previously marked.  Nate will hold the
18      exhibits.
19  Q    Who is David Ryan, sir?
20  A    Can I just read the email first?
21  Q    Oh, please do.
22  A    Okay.  I've read the email.
23  Q    If you will go back and look at the document

30

1      that was 711 which is in front of you, you will
2      see that the date of your first email in there
3      is in the month of October, but that there are
4      emails going back for a little while before
5      that.  So, for example, if we look at the
6      document that is Exhibit 19 you will see it goes
7      back to August.  So would it be fair to say that
8      this query spanned a period of several months?
9  A    So I just want to correct.  You mentioned that
10      my first email was in October, but it's actually
11      September 30th.
12  Q    That's all right.  That's all right.
13  A    Okay.  So it does seem that there have been,
14      there's issues related to the Exhibit 38 which
15      are specifically enumerated in that email.  In
16      the Exhibit 19 which you provided to me, it
17      seems that there are a number of concerns that
18      this parent is raising.
19  Q    And you tried to get hold of the superintendent
20      there?
21  A    That's correct.
22  Q    And to discuss it with the superintendent?
23  A    That's correct.

31

1  Q    And what if you can recall was the general gist
2      because you said you could not remember
3      specifics, and I understand that.  What was the
4      general gist of your communication with the
5      superintendent?
6  A    That he had a parent who was concerned about the
7      content of a reading book in the classroom.
8  Q    And you have read the book, I take it, at this
9      point?
10  A    I did.
11  Q    Did you form an impression concerning the book?
12  A    I don't know what that means.
13  Q    Well, normally when you read a book, you either
14      like it, you dislike it, it's a tough book, it's
15      a not tough book.  Did you form any impression
16      concerning the book?
17  A    The recollection that I have from reading the
18      book in particular was that it was very poorly
19      written.
20  Q    And did you do anything beyond communicating the
21      concern of the parent to the superintendent?
22  A    At that time, that was the extent of it.
23  Q    Did you thereafter do anything concerning that

32

1      book?
2  A    So with respect to this book, subsequent, I
3      don't recall the date, the school invited me to
4      an event, and when I was at that event, then
5      they asked me to meet with the superintendent,
6      the two assistant superintendents, and the
7      principal to talk about that book.
8  Q    Do you have a recollection of what was said by
9      whom including yourself at that meeting?
10  A    I think it was the same conversation that I had
11      expressed to the superintendent, assuming that I
12      had connected to him.  I don't recall
13      specifically.  But that there was a parent who
14      was concerned about the content of this book.  I
15      believe that the school also shared information
16      about this parent.
17  Q    Was the book a book that was read in class; is
18      that what you said?
19  A    So my understanding from the email from ███ is
20      that this is a book that, it says in her email
21      this book was read aloud to my daughter's entire
22      class.  And so Read-Aloud is a pedagogical
23      technique where a teacher will actually read a

---

**33**

1  book to a group of students.
2 Q And do teachers also assign books to read at
3  home as homework or otherwise?
4 A Some teachers may.
5 Q And do teachers say to students in these reading
6  type of courses go select a book and tell us
7  what you think of it?
8 A Some teachers may.
9 Q And do they give them areas in respect of which
10  those books to be read should fall?
11 A They may do that or not.  That would not be part
12  of a Read-Aloud though.
13 Q What would be?
14 A So a Read-Aloud is where --
15 Q No, no.  What would that be?
16 A What would what be?
17 Q When you assign a subject matter to a student to
18  find a book, read it and report on it?
19 A That would be a pedagogical exercise that the
20  teacher assigns to the student.
21 Q All right.  Now, do you have any recollection
22  you were asked to look at a book that had been
23  selected by a student in that regard?

**34**

1 A You mean any time or in this context?
2 Q Any time.
3 A Any time.  So I have been on school visits where
4  students are participating in the pedagogy that
5  you've described, and the students may be in an
6  independent reading time, and so the educators
7  have encouraged me, and I've encouraged myself
8  as well to sit down with students and ask them
9  what are you reading about.  So that probably
10  has happened many times at that point in time.
11 Q Do they to the best of your knowledge,
12  information, belief have in the New Hampshire
13  school system a reading club in various of the
14  schools?
15   MR. KENISON-MARVIN:  Objection.  Vague.
16 A Yeah.  I'm not sure what you mean by "reading
17  club."
18 Q Do they have clubs where students are encouraged
19  to read books of one kind or another?
20   MR. KENISON-MARVIN:  Same objection.
21 A I have no knowledge of a specific club, but I
22  would assume that there probably are clubs, but
23  I have no knowledge of them.

**35**

1   (Discussion off the record)
2 Q Let me see if we can move to another area and
3  come back to this.
4   (Exhibit 39 marked for identification)
5 A Okay.  So your question.  I've read the email.
6 Q Now, you have before you a document that bears
7  Bates numbers 09896 and running through 09898,
8  Bates marked numbers having been affixed by your
9  counsel.
10   Have you had a chance to read this?
11 A I have.
12 Q Now, do you know Betsi Harrington?
13 A I do.
14 Q How long have you known Ms. Harrington?
15 A Since she contacted the agency.
16 Q Not before that?
17 A No.
18 Q And when you received the email from Ms.
19  Harrington dated September 20, 2022, did you
20  read the book?
21 A I did not.  Actually which book was this?  Let
22  me just see what book is that?  Yeah, so I was
23  not able to because it was on the Sora app, and

**36**

1  I didn't have access to that.
2 Q So you've not seen or consulted the Sora app?
3 A So can you correct that?  Rephrase that
4  question?
5 Q Have you ever consulted or looked at the Sora
6  app?
7 A So I've only seen screen shots of it because I
8  didn't have access to it --
9 Q All right.
10 A -- at this time.
11 Q It's an app according to Ms. Harrington that's
12  used in many of the schools in the state.
13 A That's correct.
14 Q Do you have occasion to check the various apps
15  that are used by the schools in the state?
16   MR. KENISON-MARVIN:  Objection.  Vague.
17 A I do not.
18 Q Does your Department?
19 A It would depend upon the nature of the checking
20  what an agency might have access to.  Sora would
21  not be one of those applications that we would
22  have access to.
23 Q Is it not a commonly used application?

37

1  A    It's in many of our schools.
2  Q    Why wouldn't you have access to it?
3  A    Because that would constitute in most cases
4       curricular material, and the curricular material
5       is the domain of the school, and it is not
6       inside the jurisdiction of the agency.
7  Q    Let me see if I understand what you just said to
8       me.
9  A    Okay.
10 Q    Your agency does not have oversight jurisdiction
11      of matters relating to curricular; is that what
12      you're saying?
13 A    That's correct.
14 Q    And you do not look into that or inquire into
15      that?
16 A    Well, so I mean, again, the inquiries would
17      happen, we saw in an example here where someone
18      brought curricula material to our attention.  We
19      are seeing here where a parent is bringing
20      curricula material to our attention.  So that is
21      how the curricula material comes to our
22      attention.
23 Q    And does that happen frequently, infrequently,

38

1       just periodically?  What is your best
2       recollection?
3  A    I would describe it as periodically.
4  Q    All right.  And when you received this email
5       from Ms. Harrington --
6  A    Yes.
7  Q    -- and she had some concerns about the app and
8       what it showed and what it led to, you asked
9       that she give you a call to discuss it?
10 A    Yes.
11 Q    Why?
12 A    So that I could understand the details of the
13      problem that she understood there to be.
14 Q    And what did you do by way of followup, if
15      anything?
16 A    Well, when I'm looking at this particular email
17      I sent that to Rich Farrell.
18 Q    And what did you ask him to do?
19 A    I didn't ask him to do anything.
20 Q    Why did you send it to him?
21 A    Because this would fall within his domain at the
22      agency as something that needed to be looked at.
23 Q    So let me get this straight, and if I'm being

39

1       clumsy in it, I apologize.  If you send an email
2       to Mr. Farrell, does it presuppose that he will
3       look at it?
4  A    It would depend upon the nature of the email
5       that was sent to Rich, but when I send an email
6       to someone I do understand that they will look
7       at it, but I don't have, I guess it depends on
8       what the email is and their reaction to that,
9       but that was the assumption.
10 Q    You don't intend it to be a deadend street, you
11      just sent it to him?
12 A    No.  I assume that he will take the appropriate
13      action.
14 Q    All right.  Now, what kind of action would you
15      expect him to take?
16 A    That would depend upon the nature of the email
17      that I send to him.
18 Q    All right.  Let's take this one as an example.
19 A    Okay.
20 Q    What would you expect him to do?
21 A    Well, so this particular email has a number of
22      different pieces of content so there may be a
23      number of different aspects of this that Rich

40

1       may or may not take a look at.
2  Q    And do you have any expectation when you send
3       this one, for example, to Mr. Farrell that he
4       would inquire into what was involved here,
5       whether the claim was correct or not correct?
6  A    Again, I assume he would take whatever the
7       appropriate action is with respect to this
8       information.
9  Q    Would you expect a report back from him on it?
10 A    So he would probably report back not specific to
11      this but in a more general context of reporting
12      on activities that his particular bureau is
13      working on.
14 Q    You have a periodic meeting of a misconduct
15      committee?
16 A    We do.  That would be incorrect.  It's not a
17      committee.
18 Q    It's a grouping of three people, correct?
19 A    There are personnel.  Okay.
20 Q    I apologize.  Is that where you would expect
21      this to be reported on?
22 A    If there was something that needed to be brought
23      to my attention, that would be the format and

41

1       the forum whereby it would be brought to my
2       attention, correct.
3   Q   All right. If you haven't heard back from Mr.
4       Farrell on, hypothetically, this issue, do you
5       follow up? Is that your practice?
6   A   It would depend upon the nature of the issue.
7   Q   On issues such as is here tendered.
8   A   So in this particular case, you know, I would
9       assume that he would explain that to me in one
10      of my educator misconduct meetings and bring
11      that to my attention. If not, I may have
12      brought it up or I may not have. I don't know
13      the answer to that.
14  Q   Fair enough. And would you expect to see some
15      sort of a written report from him on the
16      subject?
17  A   Generally, I don't review written reports.
18  Q   So you deal primarily with him in terms of oral
19      communications?
20  A   Well, we have the meeting where he's describing
21      and explaining things, correct.
22  Q   Now, am I correct that there are three people
23      who attend these meetings; they are Ms. Fenton,

42

1       Mr. Farrell, and you usually; is that correct?
2   A   Generally, and sometimes occasionally the Deputy
3       Commissioner might sit in as well.
4   Q   Does Mr. Berwick sit in?
5   A   Generally, he does not participate.
6   Q   And are there any notes, memoranda or the like
7       maintained at those meetings?
8   A   So I don't maintain any notes or memoranda.
9   Q   Do you know if anyone does?
10  A   I don't know the answer to that.
11  Q   Are they recorded?
12  A   They're not to my knowledge.
13  Q   Let's assume hypothetically that he reported on
14      something concerning this, and that he said that's
15      nothing, don't worry about it. Is that the end
16      of it?
17      MR. KENISON-MARVIN: Objection. Vague.
18      I'm trying to just understand the process.
19  A   So it may be that he comments, and that's the
20      end of it or it may be that I say had you
21      considered this or, you know, just in my typical
22      supervisory role I may inquire about it or I may
23      assume that he's done whatever he needs to do

43

1       with it, and I have no further inquiry.
2       And the other thing that sometimes happens
3       is maybe you have this inquiry followed by other
4       inquiry by the same family. You know.
5   Q   Does there come a point in time or has there
6       ever come a point in time when there is a
7       question in your mind that this ought to be
8       examined further, investigated formally or
9       reported to the Human Resources or Rights
10      Commission? Has that ever happened?
11      MR. KENISON-MARVIN: Objection. Vague and
12      compound.
13  A   That's a little bit compound. If you would
14      break that down.
15  Q   Sure.
16  A   Because you escalated considerably in that
17      conversation.
18  Q   Please understand, I have nothing about the
19      utmost respect for you as an activist,
20      purposeful, and proper Commissioner in any way,
21      shape or form. And so what I'm trying to do is
22      to phrase my questions so I can get through this
23      as fast as I can.

44

1   A   Very well.
2   Q   To your benefit and mine. Does there ever come
3       a time that any of these misconduct committee
4       meetings, I'm calling it a committee but it is
5       not a formal committee, I understand that.
6   A   Just a meeting in the Department.
7   Q   Well, I should tell you your colleagues have
8       referred to it as the misconduct committee.
9       When there is an issue raised that is
10      elevated in your mind to being a matter of
11      further concern --
12  A   So I just want to go on the record. You
13      referred to me as an activist, and I think
14      that's an incorrect characterization of the role
15      that I play.
16  Q   It was intended as a compliment, sir.
17  A   But as a role that I play as the Commissioner.
18      So then can you please repeat the questions?
19  Q   Please understand I have served as a
20      Commissioner of the State of New York and of the
21      City of New York, and I think of nothing higher
22      in deserving of respect and I still serve as one
23      than an activist Commissioner who does his job.

45

1    So I meant that has a compliment, sir.
2  A    If you may repeat the question for me?
3  Q    Madame reporter?
4      (Requested portion read back by court reporter)
5  A    Certainly.
6  Q    And what do you do then, if I may?  If there is
7      a practice or general procedure.
8        MR. KENISON-MARVIN:  Objection.  Compound.
9  A    There is conversation in the meeting until we
10      determine what the next steps should be, if any.
11  Q    And at the end of the day, who makes the
12      decision, you?
13  A    Well, I mean we all are collaborating around
14      what would happen next.  So it would depend on
15      the individual case.
16  Q    And to coin a phrase, does the buck stop with
17      you, sir?
18        MR. KENISON-MARVIN:  Objection.  Vague.
19  A    The buck does stop at Commissioner.
20  Q    I'm quoting Mr. Farrell, sir.
21      All right.  Now, what I'd like to
22      ascertain, this email that is Exhibit 39 raises
23      a number of questions about the propriety of the

46

1      materials that one can get through the Sora app.
2  A    That's correct.
3  Q    Did you at this point in time, September of
4      2022, have a view as to whether or not this was
5      something that would constitute a potential
6      violation of or concern with respect to what is
7      known as HB 2 and what's been referred to in
8      these depositions as HB 2?
9        MR. KENISON-MARVIN:  Objection, vague,
10      foundation, compound.
11  Q    Let's see if we can agree.  Exhibit 1 is the
12      full text of the so-called Banned Concepts Act.
13      I show it to you, sir.
14        MR. KENISON-MARVIN:  Exhibit 1.  I'll
15      provide it to the witness.
16        MR. BISSONNETTE:  I would note for the
17      record that the cover page of this document that
18      I created as this was affixed as Exhibit 1
19      attached to the Philibotte and Mejia Complaint
20      filed in this case.
21  A    So I have a document in front of me, you know,
22      referencing Chapter 91, HB 2.  It has several,
23      an Amended Analysis, and then it goes to page

47

1      145.  It has redacted content.  I don't know
2      what that is.  And then it has what is
3      referenced as 91:297 and other sections of law,
4      and then it's further redacted.  So you're
5      saying that this is?
6  Q    We have been using in the depositions thus far
7      the phrase HB 2.
8  A    To refer to this document.
9  Q    For discussion purposes, for simplicity, I can
10      refer to as the material in Exhibit 1 if you
11      prefer.  I can do it in any way that is most
12      convenient for you.
13  A    Okay.  I'm comfortable, have the document, and I
14      have, without going to the state statutory rule
15      I wouldn't know if this is the exact language or
16      not, but I have the document presented to me.
17  Q    Did you form an opinion to the best of your
18      recollection that the claims that here were
19      made, referring to Exhibit 39, rose to the level
20      of a potential questionable violation of HB 2?
21        MR. KENISON-MARVIN:  Objection.  Vague.
22  A    Yes.  So with respect to this particular
23      complaint, my recollection is that the direction

48

1      we took was not concern over a specific piece of
2      content so much as it was the Sora app and what
3      students may or may not be able to access using
4      that particular application and whether schools
5      had configured correct security parameters in
6      that application to prevent students from
7      accessing content that may not be
8      developmentally appropriate for them.
9  Q    Is this app available to students outside of the
10      classroom context?
11  A    These are part of the inquiries that we were
12      trying to make and to understand how does a
13      student access it, what are the protections that
14      are afforded relative to this application.
15      You know, my recollection from the various
16      conversations I had both with Ms. Harrington as
17      well as other school personnel relative to this
18      is that generally if the application is
19      configured correctly, in the school setting,
20      that we are able to limit students to
21      appropriate levels of content or the application
22      itself possesses the ability to limit students
23      to developmentally appropriate content.

49

1       But there was concern that when a student
2   is outside of the school environment and outside
3   of the school's either devices or firewall that
4   there may be an opportunity for that student to
5   use a third party device to use their log-in to
6   access the app and access material that may be
7   developmentally inappropriate for those
8   students.
9   Q   And what, if anything, did you do about that?
10  A   So we had a number of conversations. We spoke
11      with the individuals at this particular school.
12      I believe it was the superintendent, it may have
13      been the librarian, to explain, and we had
14      conversations with Sora to understand what the
15      controls are in place. There's the ability to
16      in Sora to allow certain materials to be
17      accessible to different age levels based on
18      developmentally appropriate content and make
19      sure that this particular School District was
20      able to configure those controls and implement
21      those. I believe in this case that those times
22      of controls had not been configured.
23  Q   And was the application available to or used by,

50

1   and I know that's compound but I can break it
2   down if you wish, any other school to the best
3   of your knowledge?
4   A   I believe it's in a number of schools.
5   Q   A number of them.
6   A   That's correct.
7   Q   And did you have that communication with the
8       other schools also?
9   A   So we had that communication with a number of
10      the schools where that issue took place just
11      informally. It may have been the content of a
12      broader communication. We do calls with our
13      school leaders, and we may have notified them in
14      that call that if you're using Sora, there are
15      certain configuration aspects that need to be
16      done.
17          We did speak with Sora to make sure that
18      they as the vendor were able to work with their
19      customers who are the school districts to make
20      sure that Sora communicated to the districts
21      that these access controls are available to
22      them.
23  Q   To what extent did you find that they were

51

1   available, the application, to students outside
2   of the school setting? In other words,
3   extracurricular like?
4   A   I'm not sure I understand the question.
5   Q   You indicated that the application is available
6       to students outside of the school setting,
7       correct?
8   A   Well, so again, depending upon how it was
9       configured.
10  Q   So it's the configuration rather than the
11      application, right?
12  A   Those are the same things. You have an
13      application that is configured. So how you
14      configure the application is what determines
15      your ability to access it in various modalities.
16  Q   And if it had been inappropriately or not
17      configured at all, would this type of conduct
18      have risen to the level where you would have had
19      some concerns respecting HB 2?
20          MR. KENISON-MARVIN: Objection. Vague.
21  A   I'm not sure I understand the --
22  Q   Well, let me be specific. You have before you
23      Exhibit 39, and you have specific claims there

52

1   of it being inappropriately configured from the
2   standpoint of Ms. Harrington, and you indicated
3   that on the basis of what you had been given by
4   way of information that the application as used
5   in one or more of the schools had not been
6   properly configured when made available to
7   students. And my question is -- did you view
8   the application, by the way, at any point?
9   A   So ultimately, I had Sora provide me with access
10      to the application, but this was much later down
11      the process.
12  Q   Okay. Did you at any point form an opinion,
13      howsoever limited, as to whether when not
14      properly configured or not configured at all
15      information such as that as appears in Exhibit
16      39 would rise to the level of a potential
17      violation of HB 2 or the document before you?
18          MR. KENISON-MARVIN: Objection. Vague and
19      to the extent this question is based on premises
20      leading up to this question that misstates prior
21      testimony. You can answer.
22  A   So my recollection of this particular incident
23      is that it was focused on the issue of access to

53

1  the Sora content.  I don't recall that there was
2  an educator misconduct aspect discussed relative
3  to this.  I don't have that recollection.
4       What I do recall relative to this is
5  principally the issue of the Sora application
6  and access to developmentally inappropriate
7  materials.
8  Q    Did you think the information it gleaned as
9  determined on page 09898 by Ms. Harrington would
10  be information that would be violative of HB 2
11  or would warrant checking whether it was?
12       MR. KENISON-MARVIN:  Objection, vague,
13  compound, legal contention.
14  A    I have not actually gone through that exercise
15  at this point in time.
16  Q    Have you ever looked at a complaint through the
17  lens of --
18  A    Can I just correct something?  I just want to be
19  clear about that.  So I'm not sure that I'm
20  understanding your question.  Can you just
21  repeat that last question?  I want to make sure
22  I answer it precisely.
23  Q    Sure.  Looking at what Ms. Harrington believed

54

1  the Sora application permitted someone to see,
2  if she was correct in her analysis, would you
3  say that is elevated to the level of raising
4  concerns under HB 2?
5       MR. KENISON-MARVIN:  I'm going to object to
6  the extent that that question is different than
7  the prior one so it's unclear the prior
8  question.
9  Q    Have you ever looked at a complaint such as is
10  in Exhibit 39 through the lens of whether or not
11  cause for concern under HB 2 is present?
12       MR. KENISON-MARVIN:  Objection.  Vague.
13  A    So the responsibility of the agency is to
14  incorporate all laws in all of the actions that
15  it follows, whether it is, you know, the 193:40
16  or whether it is some other law, you know,
17  whether it's dealing with student privacy or
18  some other matter.  So we bring all of those to
19  the table.  The thing that I was trying to
20  clarify --
21  Q    Before you go further if I may.  Bringing all of
22  those to the table as you put it.
23  A    Yes.

55

1  Q    Have you ever had occasion to look at whether
2  something like this would be elevated to raising
3  a concern under all of those as you defined it?
4       MR. KENISON-MARVIN:  Same objection.
5  A    So I would say no.  This particular email is
6  dealing with content, and it's not dealing with
7  educator actions per se where, you know, so I'm
8  having difficulty creating the nexus to the
9  statute so I would say I'm not sure I understand
10  that.
11  Q    Let's see if we can take you there.
12  A    Okay.
13       MR. KENISON-MARVIN:  Whenever there's a
14  good point for a break I have to use the
15  restroom.
16       (Discussion off the record)
17       (Recess taken 11:26 - 11:34 a.m.)
18  Q    Commissioner, let me ask you again to put before
19  you Exhibit 19.  You indicated earlier that when
20  you talked to the superintendent you conveyed
21  various complaints; is that correct?
22  A    So you're referring to Exhibit 19?
23  Q    Let's take that one as an example.

56

1  A    So with respect to Exhibit 19, I would have
2  expressed the concern about that the parent had
3  expressed to me that they were concerned about
4  the content of the particular Read-Aloud.
5  Q    And what would you expect that the
6  superintendent would do about that?
7  A    So I would assume as the superintendent they
8  would want to know if they have a parent who is
9  upset about something happening in their
10  instructional environment so I'm trying to bring
11  that to their attention.
12  Q    And would you expect that the superintendent
13  would have a conversation with the teacher?
14  A    I would expect that the superintendent would do
15  whatever is appropriate given the nature of the
16  specific complaint.
17       MR. BISSONNETTE:  I'm accepting Esther
18  Dickerson from NEA into the Zoom.  She's counsel
19  of record as well.
20       COMMISSIONER EDELBLUT:  Do we need to
21  notice her about the recording aspect of this?
22       MR. BISSONNETTE:  She's aware of it, but I
23  can convey to all lawyers that are present,

57

1    including Attorney Dickinson, just want to make
2    sure that everyone is aware that there will be
3    no record of the deposition per the agreement of
4    counsel.
5         COMMISSIONER EDELBLUT:  Thank you.
6  Q   If you will look at the first page of Exhibit 19
7    which is also marked as DOE 70 Bates stamped,
8    you'll see at the bottom ███████████
9    copies not only you but the superintendent; do
10   you see that?
11 A   I see that ████ has copied a number of people.
12 Q   Correct.  Copies the teacher, correct?
13 A   I don't know who the teacher is.
14 Q   Teacher is mentioned in the second line in the
15   bottom paragraph.  ████████████
16 A   Okay.  So we can stipulate that, that's fine.  I
17   notice that the Governor as well is copied.
18 Q   Understood.  And do you have any view as to what
19   impact that has on the teacher?
20        MR. KENISON-MARVIN:  Objection.  Vague.
21 A   I don't know the answer to that, but I would
22   assume that bringing this to the attention of
23   the superintendent would help them to manage

58

1    that well.
2  Q   And what impact would it have on the teacher?
3         MR. KENISON-MARVIN:  Same objection.
4  A   So again I would hope that, I have no idea what
5    the impact would be on the teacher.  My hope
6    would be that the teacher would recognize that
7    they, too, have a parent who is uncomfortable
8    with some of the matters that are taking place
9    in the school, and they would work with that
10   parent to try to resolve those.
11 Q   So they would be guided accordingly.
12 A   Well, now there's a number of different
13   guidance, right?  So the teacher is aware of it,
14   the superintendent is aware of it.
15 Q   All right.  Now, other than the code of conduct
16   under what we've termed or I've termed as HB 2,
17   if a complaint is filed or a proceeding is
18   brought by either the Attorney General or the
19   Human Rights Commission, does the remedy include
20   any punishment for the teacher or is it only the
21   school?
22        MR. KENISON-MARVIN:  Objection.
23 A   I'm not sure I understand the question.

59

1         MR. KENISON-MARVIN:  Objection.  Vague,
2    compound, legal contention, assumes facts not in
3    evidence.  You can answer.
4  Q   Do you know what the remedies are, putting
5    complete aside the Code of conduct, what other
6    remedies that are capable of being assessed
7    under HB 2 for a violation and proceeding
8    brought either by an aggrieved party or by the
9    Attorney General or anybody else?
10        MR. KENISON-MARVIN:  Same objections.
11 Q   I just want to know his knowledge.
12 A   So I believe you're making reference to PL
13   00007, paragraph III.  "Any person claiming to
14   be aggrieved by a violation of the section
15   including the Attorney General may initiate a
16   civil action against a school or school district
17   in superior court for legal or equitable relief,
18   or with the New Hampshire commission for human
19   rights as provided under RSA 354-A-34.
20 Q   Doesn't that relief run against the school?
21   Look at Section III.  Against a school or a
22   School District, correct?
23 A   Those are the words of that statute.  I've not

60

1    had to legally interpret this so --
2  Q   I have no problem with that.  It doesn't provide
3    any remedy as against the teacher, does it?
4    Does it mention the teacher?
5         MR. KENISON-MARVIN:  Objection.  Compound,
6    legal contention.
7  A   It does not mention the teacher.
8  Q   What impact do you think it has upon the School
9    District, the superintendent or the School
10   District or the principal of the school when
11   there's a complaint that a teacher has done
12   something wrong?
13        MR. KENISON-MARVIN:  Objection.  Vague,
14   compound.
15 A   I think it would depend on the nature of the
16   complaint.
17 Q   Have you at any time formed an opinion as to
18   whether or not a book, let's take A Good Kind of
19   Trouble as an example.
20 A   So are we on a certain exhibit?
21 Q   No.  I'm not on an exhibit.
22 A   Okay.
23 Q   Whether a book raises concerns within the

61

1    parameters of HB 2?
2         MR. KENISON-MARVIN:  Objection.
3    Q    I'll repeat that.  Would you repeat it, please,
4    Madame Reporter?
5         (Requested portion read back by court reporter)
6         MR. KENISON-MARVIN:  Objection.  Vague and
7    compound.
8    A    So again, like the previous example, I'm not
9    sure I understand the nexus between specific
10   content and as I understand RSA 193:40 which
11   talks about, you know, teaching and instruction
12   and so on.
13   Q    See if I understand what you've just said.  If a
14   teacher reads out loud a paragraph or more of a
15   book, do you now understand the context?
16   A    I know what reading out loud means so I'm not
17   sure I understand the question.
18   Q    Have you ever formed an opinion as to whether
19   any material that, in my first example, a
20   teacher reads automatic out loud or is asserted
21   to have read out loud from a book rises to a
22   level of concern under HB 2?
23        MR. KENISON-MARVIN:  Objection.  Compound,

62

1    vague.
2    A    So it would be incomplete information to make
3    that determination because a teacher could read
4    many different parts of content that are not
5    connected to as I understand 193 about the
6    activities of the educator.
7    Q    What if the book is in the curriculum?
8    A    So I'm not sure I understand.  What is the
9    question?
10   Q    The question is simply this.  Have you ever
11   formed an opinion as to whether any content read
12   aloud from a book by a teacher in a classroom
13   rises to the level of concern with respect to HB
14   2?
15   A    So with all due respect, content is not the
16   subject of the purported HB 2 or 193:40.  The
17   activities, as I understand the law, you know,
18   no pupil in any public school in this state
19   shall be taught, instructed, inculcated, or
20   compelled to express belief in or support for
21   one or more of the following.
22        So an educator could use a wide variety of
23   content that doesn't then violate A, B, C or D.

63

1    I'm trying to understand what you're -- you've
2    created this nexus, and I'm not sure where
3    you're going.
4    Q    I have no problem with that.
5    A    Okay.
6    Q    I'll just ask you this question.
7         Is it your understanding just reading the
8    content, any content you'd like, stuff that Ms.
9    Harrington called to your attention, reading it
10   out loud is not teaching; is that what your
11   position is?
12   A    So it's not that it's not teaching.  You have to
13   go to A, B, C and D so you would say not
14   teaching A, if that teaching includes that one's
15   age, sex, gender identity, sexual orientation,
16   race, creed, color, marital status, familial
17   status, mental or physical disability, religion
18   or national origin is inherently superior to
19   people of another age, sex, gender identity,
20   sexual orientation, race, creed, color, marital
21   status, familial status, mental or physical
22   disability, religion or national origin as an
23   example, so if that is what is being taught, but

64

1    content itself doesn't do that.  Content is
2    neutral relative to the actions.
3    Q    So you bifurcate the term "teaching" from the
4    subject matter of the teaching.  Is that what
5    you're saying?
6    A    It is possible that someone could use content,
7    that the content itself is potentially
8    problematic relative to this statute, and the
9    teacher may use that content to demonstrate how
10   it's inappropriate to, you know, to assert that
11   one's, you know, age, sex is inherently superior
12   to another.
13        So in other words, the content is not, I'm
14   having trouble creating nexus to the content.
15   Q    Would teaching the subject of affirmative action
16   violate HB 2 under that hypothesis?
17        MR. KENISON-MARVIN:  Objection.
18   A    You'd have to give me more context around the
19   teaching of affirmative action.
20   Q    Affirmative Action is a wonderful thing now.  Is
21   that good?
22   A    So what I would --
23        MR. KENISON-MARVIN:  Same objection.  And

65

1 vague.  You can answer.

2 A    No pupil in any public school of this state
3 shall be taught, instructed, inculcated or
4 compelled to express a belief in or support for
5 any one or more of the following.  That one's,
6 you know, affirmative action, so that one's
7 race, you know, is inherently superior to the
8 people of another race, and so the adjudication
9 of that is something that would be made by the
10 Human Rights Commission.

11 Q    Putting aside the adjudication, I'm seeking your
12 opinion.  Would a teacher saying we need to have
13 more affirmative action because it is a good
14 thing be raised to the level of concern under HB
15 2?

16 A    I would need to have more context than the
17 simple statement that you provided to me.  Is
18 the context of the totality of the pedagogical
19 instruction one that teaches, instructs,
20 inculcates, compels, express belief in or
21 support for that one's race is inherently
22 superior.

23        So simply Title IX itself, at least my

66

1 limited understanding of it, does not state that
2 one race is inherently superior to another race
3 is my understanding of that.  So I would need to
4 have more context to understand the actions of
5 the educator.

6 Q    I'd like to take you for a moment to just jump
7 ahead.  Let me take you back to Exhibit 19 and
8 to what I believe is the third page of that
9 document.  First word on that page being trust.

10 A    Okay.

11 Q    And take you down to the third paragraph?

12 A    Which begins with regarding?

13 Q    Regarding.

14 A    Okay.

15 Q    I'd ask you to read that, please.

16 A    Okay.  So your question?

17 Q    Question, turning to that paragraph starting
18 with the word "regarding," let me just read two
19 sentences I'm interested in.  Regarding the
20 book, quote, "A Good Kind of Trouble," it is a
21 terrible book that shames, quote, "white"
22 children into thinking they are the oppressors
23 in society.  This book talks about gunshots,

67

1 rioting, looting, burning down buildings.  It
2 also made our daughter very uncomfortable and
3 scared," unquote.

4        Would you think that, did you form any
5 opinion as to whether or not that would raise a
6 level of concern under HB 2?

7 A    So again --

8        MR. KENISON-MARVIN:  Objection.  Vague.
9 Compound.  You can answer.

10 A    My response is not to adjudicate whether or not
11 they are violations of the particular law.  When
12 I read that paragraph, and even just reading it
13 now, I saw a number of concerns that the parent
14 had with respect to their child, and so that is
15 really what I focused in on in terms of I have a
16 child who's in school who is scared relative to
17 some of that content and wanted to make sure
18 that we try to support that child.

19 Q    Is it your testimony that when you read
20 something like this you exclude from your
21 consideration the provisions of HB 2?

22        MR. KENISON-MARVIN:  Objection.  Vague.

23 A    So my responsibility is not to adjudicate.

68

1 Q    I didn't ask you about adjudicating.  Put aside
2 adjudicating.  Is it your position that when you
3 read something like this, material I just
4 quoted, you exclude from your consideration any
5 concern with respect to HB 2?

6        MR. KENISON-MARVIN:  Same objection.

7 A    So again, when I read a paragraph like this, my
8 concern is all of the statutes which we are
9 responsible for administering.

10 Q    Okay.  That's fine.  I'd like to take you now to
11 a copy of your OpEd piece captioned, "Teach
12 children about racism, not to be racists."  All
13 right?  Exhibit 4.  This is a copy of an OpEd
14 piece in the Union Leader.  Correct?  And you
15 wrote that; is that correct?  That's the
16 question.  Please read it.

17 A    So my question --

18 Q    I have a clearer copy of the text if that's what
19 you want.

20 A    I have to put my glasses on for this one because
21 it's so tiny.

22 Q    I have one that was taken from the online --

23 A    That's okay.  I can read it here.  I've got my

---

69

1    glasses on.

2  Q   Sir, this is a copy of it, if this helps you.

3  A   No.  This is fine.  I can read it right here.

4      Okay.

5  Q   I will take you to the paragraph that is Exhibit

6      4, paragraph 10.

7  A   Okay.

8  Q   Starts with the words, In Ibram Kendi's "How to

9      be an Antiracist."

10 A   That's correct.

11 Q   Do you see that paragraph, sir?

12 A   I do.

13 Q   Would you say reading just the following would

14     raise concerns for you under HB 2.  Quote, "In

15     Ibram Kendi's "How to Be an Antiracist," a

16     prominent text in support of Critical Race

17     Theory, he states, quote, "the only remedy to

18     racist discrimination is antiracist

19     discrimination.  The only remedy to past

20     discrimination is present discrimination...The

21     only remedy to present discrimination is future

22     discrimination," close the quote within the

23     quote and close the main quote.

---

70

1        If a teacher were to teach that, would that

2      raise concerns under HB 2?

3          MR. KENISON-MARVIN:  Objection.  Vague.

4      Legal contention.

5  A   Again, depending on how the teacher was teaching

6      content.  Content itself.  Ibram Kendi's

7      material itself is not the subject as I

8      understand it to 193:40.  If the teacher, you

9      know, believes that we should teach students to

10     discriminate against others based on, from

11     193:40-I, you know, age, sex, gender identity,

12     sexual orientation, race, creed, color, then I

13     think that that would be a problem.

14         Again, I don't have adjudicatory

15     responsibility for that so these are my

16     opinions, but the intent of the OpEd is to say

17     we do not want discrimination in our New

18     Hampshire schools.

19 Q   And if a teacher were to say I want you to read

20     that book and focus on that paragraph, would

21     that raise concerns?

22 A   So again --

23         MR. KENISON-MARVIN:  Objection.

---

71

1  A   This is a book that is used in schools in New

2      Hampshire, and even if a teacher were to focus

3      on the book, the question would be you need the

4      broader context.  How is it that the teacher is

5      focusing on that particular passage.  If the

6      teacher were to focus on that passage with the

7      idea that we do not want to discriminate against

8      individuals based upon their age, sex, gender

9      identity, sexual orientation, race, creed,

10     color, marital status, familial status, mental

11     and physical disability, religion or natural

12     origin, it might be a very compelling lesson.

13 Q   And would that disclaimer that you have just

14     quoted from be sufficient to take it out of your

15     areas of concern under HB 2?

16         MR. KENISON-MARVIN:  Same objections.

17 A   I'm not sure I understand the question.

18 Q   Very simple.  If the teacher were to recite just

19     the first material I quoted without in any way

20     adding the material you just quoted, would that

21     raise a matter of concern?

22 A   So --

23         MR. KENISON-MARVIN:  Same objection.

---

72

1  A   I would need to see it in its complete context.

2  Q   That's the complete context.

3  A   There is no circumstance where that's the

4      context.

5  Q   That's it.

6  A   So the purpose of the OpEd is that we want to

7      teach students about racism but not to be

8      racists.  So the determination of whether or not

9      a teacher is discriminating against someone or

10     teaching students that one group is inherently

11     superior to another would be a determination by

12     the Human Rights Commission.

13 Q   Now my question.  Please read it back.

14         (Requested portion read back by court reporter)

15 Q   I repeat my question.

16         MR. KENISON-MARVIN:  Same objection.

17 A   I just think it's a fallacious hypothetical.

18 Q   Forget whether it's fallacious, wrong, anything

19     you like.  I'm asking you would it raise concern

20     in your mind.

21 A   I can't adjudicate it because I don't have

22     enough information.

23 Q   That's all the information there is.

---

73

1  A    I can't adjudicate it then.  I don't have enough
2       information.
3  Q    So you would not form an opinion based on that?
4  A    I don't believe that I would ever be faced with
5       a set of circumstances that are limited to one
6       sentence out of context.
7  Q    Are you incapable of forming an opinion based on
8       that?
9  A    No.  I think it's very easy to form opinions
10      about things, and my opinion is that you have
11      provided insufficient context in your
12      hypothetical to be able to form an accurate
13      opinion.
14 Q    I didn't ask you whether it was accurate or
15      inaccurate.  I asked you if you could form an
16      opinion.
17 A    I'm not able to form an opinion based on that
18      limited --
19 Q    Fair enough.  Can a teacher say they agree with
20      Kendi?
21 A    I don't understand why they would not be able to
22      agree with Kendi.  The question that would come
23      back are they teaching, instructing,

74

1       inculcating or compelling to express belief in
2       or support for any one or more of the following.
3       That one's age, sex, gender identity, sexual
4       orientation race, creed, color, marital status,
5       any of these immutable characteristics is
6       inherently superior to those of another.  That
7       is the salient question.
8  Q    No, it isn't, sir.  My question is very simply
9       this.
10         Can a teacher say I agree with the
11      quotation by Kendi that is as follows and no
12      more.  "How to Be an Antiracist, a prominent
13      text in support of Critical Race Theory states
14      the only remedy to racist discrimination is
15      antiracist discrimination.  The only remedy to
16      past discrimination is present discrimination.
17      The only remedy to present discrimination is
18      future discrimination," unquote.  Can a teacher
19      say I agree with that premise?
20         MR. KENISON-MARVIN:  Same objection.
21 A    So there's insufficient information to
22      adjudicate that.
23 Q    I'm not asking you to adjudicate, sir.  I'm just

75

1       asking --
2  A    So I don't have the context.  So a teacher may
3       say I agree with Kendi as a rhetorical device to
4       stimulate conversation among students.
5  Q    So you would have no problem then, for example,
6       in allowing a teacher to put forward -- hear my
7       question, please.  You would have no problem
8       with a teacher putting forward Mr. Kendi's book
9       and focusing on that paragraph.
10         MR. KENISON-MARVIN:  Objection.  Vague.
11 A    So the teacher themselves would be in the best
12      position to know if they are teaching,
13      instructing, inculcating or compelling to
14      express a belief in or support for any one or
15      more of the following, as I've repeated, that
16      one's age, you know or this immutable
17      characteristic is inherently superior to another
18      one.  The teacher themselves have clarity of the
19      action that they are doing at that time.  I have
20      a hypothetical construct that is really limited.
21 Q    Let me ask you this question.  Do you have any
22      concern that Kendi's book with all of the
23      content in it is shown to students in class?

76

1  A    So it would depend on the context of how that
2       material was used in the class.
3  Q    Read the book.  That's the context.  The sole
4       context.  I'd like to you read the book, and we
5       will discuss it.
6  A    So now there's more context.  It would depend on
7       what that discussion is, and I would go back to
8       the statute, and I would say that the educator
9       themselves would have clarity if they are
10      teaching, instructing, inculcating or compelling
11      to express a belief in or support for one or
12      more of these following things.
13 Q    Have you ever read the book Stabbed?
14 A    I have not.
15 Q    Would you have any concern if a teacher said I'd
16      like you as an extracurricular activity to read
17      anyone of the following books:  Stamped, Kendi's
18      How to Be an Antiracist, or the book that I
19      mentioned earlier, A Good Kind of Trouble.
20      Would you have any problem with that?  Read any
21      one of those books in your free time.
22 A    So again --
23         MR. KENISON-MARVIN:  Objection.  Compound.

77

1  A    The jurisdiction of the Department is not on the
2       curricular materials in the school.  Right?  So
3       that's not in the scope of my responsibility to
4       administer the various materials that are used
5       in curriculum.
6  Q    If a complaint came in saying that the Kendi
7       book, the Stamped book, or the A Good Kind of
8       Trouble have been listed by a teacher as books
9       that kids should read in their free time, would
10      you have any problem in terms of how to handle
11      that complaint?
12 A    Again, the curricular materials that a school is
13      choosing are not within the domain of the
14      Department of Education.
15 Q    Then why is it that you went to the
16      superintendent and talked to them about A Good
17      Kind of Trouble?
18 A    Because they had a parent who was upset, and I
19      would assume if I were a superintendent and I
20      had an upset parent that I would want to know
21      about that trying to help them support their
22      families.
23 Q    But you just said that's not within your domain.

78

1       MR. KENISON-MARVIN:  Objection.
2  A    What is within the domain of the Department is
3       to make sure that the system is able to function
4       well, and part of functioning well is to make
5       sure that the constituencies are being served.
6       So as I support my superintendents, if I
7       have a complaint from a parent, I bring that to
8       the attention of the superintendent so they can
9       manage it appropriately.
10 Q    And that's because you believe it's within your
11      responsible area as the Commissioner of
12      Education, correct?
13 A    To support them, correct.
14 Q    And so in doing that, do you in any manner, way,
15      shape or form tell them that there are issues
16      concerning the prescription of any of the three
17      books I've just mentioned?
18 A    So --
19      MR. KENISON-MARVIN:  Objection.  Vague.
20      Legal contention.  You can answer.
21 A    I mean, if I have a conversation with the
22      superintendent, in a particular conversation
23      hypothetically I may express like I don't think

79

1       that's a very good book.  In fact, I think I
2       shared with you earlier the conversation that I
3       had with the superintendent, two assistant
4       superintendents and their principal, and I
5       expressed my perspective to them about the
6       literary quality of the particular book, but it
7       remains their determination whether or not
8       they're going to use that book.  So that is
9       purely an opinion that I have shared with them.
10 Q    That's exactly what I want.  And now tell me, if
11      you will, do you think that would have any
12      persuasive impact upon them?
13 A    I don't know the answer to that.
14 Q    Do you think it would have any persuasive impact
15      upon the teacher if that were communicated by
16      the superintendent to the teacher the
17      Commissioner of Education has said he doesn't
18      think that's a very good book.
19      MR. KENISON-MARVIN:  Objection.  Vague.
20      Calls for speculation.
21 A    I think it would depend on how the
22      superintendent communicated that to the teacher.
23 Q    You just said the Commissioner of Education has

80

1       told us that's not a very good book.  Do you
2       think that would have a persuasive impact on the
3       teacher?
4       MR. KENISON-MARVIN:  Same objection.
5       Vagueness, speculation.  You can answer.
6  A    So I will speculate we have very capable
7       superintendents in the State of New Hampshire
8       who would take a piece of information like that
9       and they would manage it well to provide
10      constructive feedback to any of their educators.
11 Q    Thank you.  Give me just two minutes if I may.
12      One more question about this OpEd.  Did
13      anybody assist you or work with you in the
14      drafting of Exhibit 4?
15 A    I don't have any specific recollection, but
16      normally when I'm writing an OpEd it could be
17      that my Public Information Officer would be
18      assisting me and proofreading it.
19 Q    Anyone else?
20 A    I don't recall.
21 Q    Now, sir, I would like to show you a document I
22      don't think has yet been marked.
23      I ask you to take a look at Exhibit 14,

81

1    please.
2        Now, the second page of Exhibit 14 is an
3    OpEd that you wrote captioned Education's Sacred
4    Trust.
5  A    That's correct.
6  Q    If you prefer I can give you a blownup version
7    unless you can read that with ease.
8  A    I'll put my glasses on.  Okay.  I've read the
9    OpEd.  Not the attachments.
10 Q    Did anyone assist you in writing that OpEd?
11 A    Again, it may be that my Public Information
12    Officer reviewed a draft of it, but otherwise I
13    don't know.
14 Q    Anyone else?  You don't remember.
15 A    Not that I recall.
16 Q    Now, you'll see that in that document there is a
17    link to some external materials.  Correct?
18 A    Correct.
19 Q    Who compiled those materials?
20 A    I did.
21 Q    Pardon me?
22 A    I did.
23 Q    Okay.  And did you read them before you referred

82

1    to them?
2  A    I did.
3  Q    And you referred to those as, quote,
4    "exemplifying," quote, "actual instructional
5    material from New Hampshire schools that parents
6    have identified as conflicting with their
7    values."
8  A    That's correct.
9  Q    Now, what I would ask you is a couple of very
10    quick preliminary questions.  Where were the
11    materials obtained by you?
12 A    So generally they would have come into me via an
13    email or perhaps they came in directly to Rich
14    or Diana, and they were brought to my attention
15    or they may have come in to Stephen Berwick or
16    someone else in the organization.  So some place
17    here they came to my attention.
18 Q    And did you ask whether consents had been
19    obtained from either the person who photographed
20    the photographs that are part of it or any of
21    the materials that are in there to
22    republication?
23 A    I don't believe so.

83

1  Q    You saw, of course, that there are photographs
2    in there, correct?
3  A    Correct.  In the exhibit.
4  Q    And did you ask whether consents had been
5    obtained from the people who were photographed?
6  A    I did not.
7  Q    I'm going to show you a document that's been
8    Bates marked DOE 07053, and ask if you have seen
9    it before, and then I'm going to ask that it be
10    marked as an exhibit.
11       MR. BISSONNETTE:  For simplicity, this has
12    been previously marked as Exhibit 31.
13 Q    Have you seen that document before?
14 A    Let me just read it real quickly.
15 Q    For the record, I said 053 so it's 054.
16       Look at Exhibit 32, Nate.  I'm going to
17    give you 32 as well.
18       MR. KENISON-MARVIN:  Would you like me to
19    hand him 32?
20       MR. MOERDLER:  Yes.
21       MR. KENISON-MARVIN:  This one is marked
22    yellow, but all the others are gray.  It's not
23    the --

84

1        MR. BISSONNETTE:  Yes.  The reason is I
2    copied that internally, not externally, because
3    it is marked Confidential under Protective
4    Order.
5        (Discussion off the record)
6        MR. BISSONNETTE:  32 is marked
7    confidential.  Not 31.  I comply with protective
8    orders.
9  A    So your question.
10 Q    All right.  Now, my first question is did you
11    see this document before?
12 A    32?
13 Q    31.
14 A    I have seen 31.
15 Q    And 32 is the attachments to 31.
16 A    Sorry.  32 is?
17 Q    Yes.
18 A    So not all of 32.
19 Q    I believe --
20 A    32 has an email that's not associated with it so
21    what you're asserting is the attachments to 31
22    are pages 2 through the end but not the first
23    page of 32 because that's something different.



85

1  Q    Not the first page.  That's absolutely correct.

2  A    Okay.  So I'll stipulate that if you think these

3      are the attachments I don't know because I don't

4      have these.

5      ██████████████████████████████████

       ██████████████████████████████

       ██████████████████████████████████████

       ███████████████████████████████████

       █████████████████████████████████

       ███████████████████████████

13  Q    Let me go off the record for a moment.

14        (Discussion off the record)

15  Q    If you will take a look at Exhibit 14, the

16      document --

17        MR. KENISON-MARVIN:  Is this for me or the

18      witness?

19  Q    Both of you.  It's on the record.

20        Look at the document that's marked, it's

21      already part of the court record, I might add.

22      The document that's marked at the bottom PL

23      00696.

86

1  A    Just that page, 696?  Then your question?

2  Q    ███████████████████████████

       ███████████████████████████████████

       █████████████████████████████

       ██████████████████████████████████

       ██████████

       ██████████

       ██████████████████████████████

       █████████████████████████████████

       ███████████████████████████████████

       ███████████████████

       ██████████████████████████████

       ███████████████████████████████████

       ████████████████████████

       ███████████████

       ████████████████████████████████

       ███████████████████████████████████

       ████████████████████████

       █████████████████████

87

1      █████████████████

2  A    There's topic dividers in there, and the topic

3      that you initially referred to was Topic One and

4      now we're on Topic Five which begins on page PL

5      00714.

6  Q    So let me take this piece by piece if I may.

7  A    Okay.

8  Q    That's the only way I can do it rationally.  You

9      have seen Exhibit 31 before, correct?

10  A    31, I've now read that and I believe I've seen

11      31 before, yes.

12  Q    And you have seen Exhibit 32 before.

13  A    I have not seen Exhibit 32.  I've seen the

14      attachments to Exhibit 32.

15  Q    And you had not previously seen 32.

16  A    No.

17  Q    If you will look at Exhibit 32 so we complete

18      it, other than the -- may I see 32 for a moment,

19      please?  Other than the top 2, 4, 6, 8 lines, it

20      is Exhibit 31.  Is it not?

21  A    It's not because Exhibit 31 includes content at

22      the top as well that's not part --

23  Q    That's what I said.  That's what I said.

88

1  A    Actually you referenced the header at the top of

2      32 but Exhibit 31 similarly has information.

3      ██████████████████████████████████

       █████████████████████████████████████

       █████████████████████████████████

7  Q    Right.

8  A    The content of that email appears to be --

9  Q    Included in.

10  A    -- consistent between Exhibits 31 and 32.

11  Q    And so are the attachments, are they not?

12  A    So there are no attachments on 31.  There are

13      just references to attachments.

14  Q    Right.  Okay.

15        MR. MOERDLER:  Nate, I'm going to ask that

16      you produce for us a copy of the full text of

17      ███████████████████████████████████

       ██████████████.  That means including the exhibits,

19      not just the references.

20        MR. KENISON-MARVIN:  31 exhibits?

21        MR. MOERDLER:  Yes.

22        MR. KENISON-MARVIN:  I'll look at and see

23      if that's been done or not.  I'll take your

1255

89

1  request.  I will represent to you that I will
2  look.  I can do it during a break as well.
3      MR. MOERDLER:  Okay.
4      MR. BISSONNETTE:  I didn't mean to
5  interrupt.  I can just say that I'm on
6  Relativity right now and have looked at the
7  documents after Bates stamped DOE 7054 in
8  Exhibit 31 and just haven't seen the exhibits.
9      MR. KENISON-MARVIN:  I'll take a look.  I
10  can do it now.  I can do it during a break later
11  and see.
12      MR. MOERDLER:  Let's do it so we know we're
13  talking about the same things as apples and
14  apples.
15  A   The other thing that I will stipulate is that
16  you put on the record there was an email from
17  ███████ to Commission Edelblut, and that's not
18  the case.
19  Q   Say that again?
20  ████████████████████████████
   ███████████████████████████████
   ██████████████████████████████

90

1  ██████████████████
2  A   Thank you.  Just trying to be precise.
3  Q   I stand corrected.
4  A   If you wanted to stipulate that these may be the
5  attachments --
6      MR. KENISON-MARVIN:  I want to take an
7  opportunity to look and see what's going on.
8      MR. MOERDLER:  I'm going to make the
9  assumption that they are, although they haven't
10  been produced, just for simplicity's sake, all
11  right, without prejudice to you're saying they
12  weren't attached, all right?
13      MR. KENISON-MARVIN:  If you're comfortable
14  going forward on that basis.  I'm also happy to
15  take a look now and get you an answer.
16      MR. MOERDLER:  Go ahead.
17      MR. KENISON-MARVIN:  If we want to go off
18  the record.
19  Q   Sure.
20      (Lunch recess taken 12:31 - 1:15 p.m.)
21  Q   Madam reporter, I'm going to mark a document,
22  portions of which have previously been referred
23  to albeit they were not complete.  So I'm now

91

1  going to ask that you mark as a separate number
2  a copy of a communication from DOE
3  Communications Office to Commissioner Edelblut
4  with a series of 11 attachments as a separate
5  exhibit; is that correct?  Is that stipulated?
6  Those are the attachments.
7      MR. KENISON-MARVIN:  That the document that
8  you're holding, it has, the email on top is the
9  email that is document --
10  Q   This document is complete; is that correct?
11  Both as to the document itself and the
12  attachments?
13      MR. KENISON-MARVIN:  It has all of these
14  attachments.
15      MR. MOERDLER:  Correct.
16      MR. BISSONNETTE:  Is that, this document,
17  Exhibit 40?
18      (Exhibit 40 marked as an exhibit)
19      MR. MOERDLER:  Mr. Attorney General,
20  Mr. Bissonnette, we are agreed, are we not, that
21  Exhibit 40 is subject to the same protective
22  order that has previously been entered into
23  respecting confidentiality of documents.

92

1      MR. KENISON-MARVIN:  Yes, I'll agree with
2  that.  Thank you for bringing it up.
3      MR. BISSONNETTE:  Yes.  Plaintiffs
4  Philibotte and Mejia are on board.
5  Q   Commissioner, I ask you to place before you
6  Exhibit 40, and I ask you to note a couple of
7  things.  ██████████████████
   ██████████████████████
   █████████████████████████████████
   ████████████████████████████
   ███████████████████████████████████
   ██████████████████████████████
   █████████████████████████████
   █████████████████
17  Q   Okay.  Now, did you at some point become aware
18  of Exhibit 32?
19  A   So the first time I've seen this is today.
20  Q   Were you aware there was such a document without
21  seeing the document itself?
22  A   I was not aware of it.
23  Q   █████████████████████████████



93

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓   ▓▓▓▓▓▓

4        Now, would you tell me, your OpEd was
5        written in April of 2021, correct?
6   A    That would be Exhibit 4?  What exhibit am I
7        referring to?
8   Q    It's 14.
9   A    Okay.  14.  Got it.  Okay.
10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12  A    So your question is when was that OpEd written?
13  Q    I didn't ask the question.
14  A    Oh.  You had mentioned a date.
15  Q    I know.
16  A    I'm trying to understand what the question was.
17  Q    When was that OpEd written?  I have April 15,
18       2022.
19  A    That's when it looks like it was released on the
20       Department of Education's website.  I don't know
21       when I was actually published.
22  Q    Okay.  It was separately published in the Union
23       Leader at some point?

94

1   A    Correct.
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓
16  Q    Fine.  Now, would you tell us what you did with
17       Exhibit Number 40 upon receipt?
18  A    I don't recall exactly.  I imagine that I
19       somehow got the content of that information to
20       Rich Farrell.
21  Q    Did you get any report from Rich Farrell with
22       respect to that document?
23  A    If I did, I don't recall what that was.

95

1        MR. MOERDLER:  Nate, for the record, would
2   you please check the files to see if there's any
3   responsive material at all to Exhibit 40?  In
4   other words, when the Commissioner received it,
5   what did he do with it, are there any documents,
6   I'm looking for documents.
7        MR. KENISON-MARVIN:  I understand.  I'll
8   look.
9        MR. MOERDLER:  Is it logged, was it sent to
10  Farrell, if it was sent to somebody, did that
11  person report?  On his end it ends with the
12  receipt here.
13       MR. KENISON-MARVIN:  Understood.  I'll
14  look, and there are privilege logs forthcoming.
15  That's been something as we try to work through
16  discovery that we are getting to them as we've
17  indicated as quickly as we can.
18       MR. MOERDLER:  Do you have a sense it was
19  privileged?  Farrell's?
20       MR. KENISON-MARVIN:  There have been, there
21  are documents that are being withheld from being
22  delivered on process privileged grounds with
23  respect to communications amongst Department

96

1        members about deliberating with respect to
2        issues that the Department is deciding.  So that
3        will all be logged.  I can't tell you right now
4        if there's one that relate to this series of
5        emails, but I can look specifically.
6   Q    Let me ask a question.  If you object, you'll
7        object.
8        MR. KENISON-MARVIN:  Sure.
9   Q    Do you recall either your communicating or your
10       asking someone else to communicate with
11       Mr. ▓▓▓▓ that he should communicate with
12       HRC?
13  A    So I don't, I don't have any recollection of
14       communicating directly with Mr. ▓▓▓▓ on this
15       matter.
16  Q    Do you have any recollection of having asked
17       somebody else to do so?
18  A    And I don't have any recollection of asking
19       somebody else to do so.
20  Q    Do you have any recollection somebody else did
21       so even without asking you?
22  A    I don't know if they have or have not.
23  Q    Just completing the circle.



97

1 ████████████████

████████████████████

███████████████████

███████████

5 Q    Exhibit 14 was published on the 15th of April of

6      the year 2022.

7 A    Yes.

8 Q    ████████████████████

9 ██████████████████

███████████████

██████████████████████

██████████

██████████████

██████████████

███████████████

██████████

████████████████████

████████

█████████

████████████████████

███████████████

98

1 A   ████████████████

████████████████

3 Q    All right.  And if you did, do you have any

4      recollection as to why you picked these items

5      bearing in mind this is some six months after

6      publication some six months after receipt?  Do

7      you have any recollection as to had you marked

8      it as something to follow up on or what?

9          MR. KENISON-MARVIN:  Objection.

10         MR. MOERDLER:  I know it's multiple,

11     compounded, and I acknowledge that.  I can do it

12     piece by piece.  Correct?

13         MR. KENISON-MARVIN:  Objection.  Vague.

14     Compound and calls for speculation.

15         MR. MOERDLER:  I know it's compound.  We'll

16     do it slowly.

17 ████████████████████

██████████████████

████████████████████

██████████

█████████████

████████████████

████████████████████

99

1          You have acknowledged that you did the

2      compilation of the materials that are in Exhibit

3      14.

4 A    Okay.

5 ████████████████

██████████████████

██████████

8 ██████████████████████

████████████████

███████████

11 ████████████████████████

███████████████████████

████████████████████

████████████████████

█████████████████████████

██████████████

██████████

████████████████████████████

██████████████████

100

1 ████████████████████

████████████████████

██████████████████████

███████████████████

██████████████████████

████████████████████

9          MR. KENISON-MARVIN:  Objection.  Assumes

10     facts not testified to.  Misstates prior

11     testimony.

12         MR. MOERDLER:  I'm sorry?

13         MR. KENISON-MARVIN:  Assumes facts not

14     testified to and misstates prior testimony.

15         MR. MOERDLER:  All right.  We'll go through

16     it.

17         MR. KENISON-MARVIN:  I can explain my basis

18     if you want me to.

19         MR. MOERDLER:  No, it's going to take too

20     long.  Let's do it again.

21 ████████████████████████

█████████████████████████

██████████



101

16 Q    And you did not have a separate memorandum or
17      notation, this is important, we'll take a look
18      at it down the road?
19 A    No.  I have nothing like that.
20 Q    Do you know whether Exhibit 40 was the subject
21      of discussion at the misconduct, I call it
22      committee or group?
23 A    I don't have any recollection of this being part

102

1      of that conversation.
2 Q    Do you have any recollection that Exhibit 40 was
3      the subject of any conversation in or about
4      October of 2021 between you and either
5      Mr. Farrell or Ms. Fenton?
6 A    Yes.  So I have to assume it was part of some
7      kind of a conversation that took place.
8 Q    All right.  You testified, I believe, that you
9      did not communicate at any point with
10     Mr. [redacted].
11 A    I don't believe I have, no.
12
16 Q    Do you have any reason to believe that anyone
17      associated with DOE communicated with
18      Mr. [redacted] prior to the publication in Exhibit
19      14?
20 A    I don't know the answer to that.
21 Q    Do you have any knowledge, information or
22      belief, and I'd like you to take a look at
23      Exhibit 40 as I ask that.

104

12          MR. BISSONNETTE:  That's Bates stamped
13      00321.
14          MR. MOERDLER:  Not on my copy.
15          MR. BISSONNETTE:  Oh, I'm sorry.  Carry on.



**105**

**106**

16  Q      Do you have any assumption concerning whether
17           either/or any of the principal, superintendent,
18           were notified of these claims?
19  A      So I don't have any knowledge as to what the
20           further action our agency would have taken with
21           regard to that.
22  Q      Are there any records that are maintained in the
23           ordinary course of business where your agency

**107**

1      notes that they have had a communication with a
2      superintendent and/or a principal concerning
3      these kind of matters?
4  A    It would depend upon the nature of the matter.
5  Q    Who would do that?
6  A    So it would depend on who is having the
7      conversation with the superintendent and what
8      the nature of the conversation was.
9         MR. MOERDLER:  Nate, if there have any
10      communication -- (cell phone ringing).
11         (Discussion off the record)
12         MR. MOERDLER:  Are there are any records
13      that show that there were any communications, A,
14      within the Department of this, this being 40; B,
15      whether there are any communications within the
16      Department showing who they communicated with in
17      the school or the school district.  If you wish
18      to assert some form of privilege as to that I
19      would like to at least know that such occurred
20      without putting the comment on the content.
21         MR. KENISON-MARVIN:  I can represent to you
22      that in review of the documents, to the extent
23      there was a communication not within the

**108**

1   Department but a communication out to a school
2   official, documents have not been withheld.  We
3   have limited our search to the email
4   communications of the individuals we'd
5   identified at the beginning of discovery.  So to
6   the extent there would be communications that
7   wouldn't be within the emails of some other
8   individual, I can't rule out that possibility a
9   hundred percent, but to the extent there's a
10   communication that any of the individuals that
11   we've agreed to search, I can represent that to
12   the extent one of those individuals had a
13   communication regarding this matter with an
14   individual outside of the Department, I wouldn't
15   have withheld that document on the basis of
16   privilege.
17      MR. MOERDLER:  And could you just check if
18   there has been any communication with Messrs.
19   Farrell and Fenton in any way on this document?
20      MR. KENISON-MARVIN:  Just the question of
21   whether there was a communication.
22      MR. MOERDLER:  You know what will happen if
23   the answer is yes so you may as well save some

---

**109**

1    time.
2        MR. KENISON-MARVIN:  I mean, I'm happy to
3    look to, and you will, that would be logged,
4    too, you would see that in a privileged log.  So
5    I'm happy to, I think that that's fair question
6    for you to ask.
7        MR. MOERDLER:  And the last question is
8    since Mr. Berwick has said in writing he logs
9    everything that passes his desk, that's an
10   exaggeration, but would you check with him as
11   well?
12       MR. KENISON-MARVIN:  Who did you ask about?
13       MR. MOERDLER:  Berwick.
14       MR. KENISON-MARVIN:  Berwick.
15       MR. MOERDLER:  All right?
16       MR. KENISON-MARVIN:  So that we can keep
17   things moving here, I'll make sure that we're on
18   the same page.  Let's talk about this when we're
19   all wrapped up just to make sure we're on the
20   same page.
21       MR. MOERDLER:  Okay.  Good.
22  Q  Now, would you tell me, please, referring to
23   Exhibit 14, why these materials were included in

---

**110**

1    the article?  I know you said that you wanted to
2    use them as illustrative of something, and I'm
3    trying to understand what it is that you're
4    trying to communicate as the bottom line
5    message --
6  A  So I think that the OpEd is fairly
7    self-explanatory.  "When children come to school
8    they arrive reflecting the value systems of the
9    families responsible for raising them.  Those
10   value systems are as different as the children
11   themselves."  I'm going to -- if I continue on.
12       "Recent revelations from educators around
13   the country, mostly on social media platforms
14   like TikTok, reveal a number of educators who
15   believe that it is their responsibility to weigh
16   in on and influence the value systems of
17   children towards a particular goal.  This
18   impulse to influence a child's value system is
19   not limited to educators."
20       And -- then we talk about, I'll just keep
21   reading.  "As was recently revealed, Disney also
22   wants to weigh in.  It is not good enough simply
23   to allow parents and caregivers the

---

**111**

1    responsibility to install a value system they
2    believe is right for the child.  Whether it is a
3    rogue educator or a corporation trying to impose
4    a value system on impressionable youngsters,
5    that is not their job.  That is the job of
6    parents and caregivers.
7        "Fortunately, parents can choose to turn
8    off Disney.  They can't, however, easily escape
9    the efforts of activist educators who might be
10   knowingly dismantling the foundations of the
11   value system they're attempting to build.  That
12   means that families, when they send their
13   children to school, entrust educators to respect
14   the value systems that the family is building,
15   that this is the sacred trust that educators
16   have."
17       So the point of these examples is really to
18   flag or highlight content that individuals among
19   my constituencies have brought to our attention
20   that they believe may conflict with value
21   systems of the families of the children that are
22   in the schools.
23  Q  Do you within that framework believe it is not

---

**112**

1    the responsibility of teachers to influence the
2    value systems of the children toward a
3    particular goal such as "thou shalt not steal"?
4  A  So I believe that it is the responsibility of
5    the educators to support parents and support the
6    value systems of parents in the education of
7    children.
8  Q  And those values being whatever the parent deems
9    appropriate?
10  A  Well, so we have content standards that they
11   teach to students, and those content standards
12   are broad in terms of the content that they
13   have.  So for example, in our social studies
14   content standards, we talk about the importance
15   of law abiding, and stealing would not be law
16   abiding.  So the parents would know in advance
17   that this is the content that their children
18   might learn which is thou shalt not steal.  So
19   that would be a value system that the parent
20   understands entering into the system, that that
21   is a value system of our historical context that
22   will be presented to their children.
23  Q  I'm going to ask you, if I may, simply to

---

113

1    identify a couple of documents.  I'm going to
2    show you a document which has the Bates stamp
3    871, and we'll mark that as an exhibit.  It's a
4    document from you to "m41 hillsboroughnh."
5         (Exhibit 41 marked for identification)
6  Q   You've seen that before?
7  A   Hang on.  I'm just finishing reading it, if I
8    may.  Okay.  So I'm familiar with this email.
9  Q   This is an authentic copy of it?
10 A   I believe so.
11 Q   I'm going to show you a document that's been
12   Bates stamped DOE 00866 and ask you if you are
13   familiar with this document.
14        (Exhibit 42 marked for identification)
15 A   Let me just read this.  Okay.  I'm familiar with
16   Exhibit 42 now.
17 Q   That is a document that you --
18 A   I believe I'm familiar with it, yes.
19 Q   One more and we'll ask the question.  Same
20   question will apply on this document, your
21   familiarity with it.
22        (Exhibit 43 marked for identification)
23 A   So I'm familiar with all three of these.

114

1  Q   One more document.
2         I'll show you one more document and ask you
3    if you recall receiving this document from
4    Representative Louise Andrus on or about May 15,
5    2022.
6         (Exhibit 44 marked for identification)
7  A   I've reviewed all four documents.
8  Q   And do you recall receiving the document that
9    would be Exhibit 44?
10 A   I believe I did.
11 Q   Do you have any recollection of having responded
12   to it?
13 A   I do believe I had a conversation with
14   Representative Andrus.
15 Q   What did you say to her and what did she say to
16   you if you remember?
17 A   If I recall correctly, I encouraged her to talk
18   to the superintendent and indicate that the
19   titles of the books would be subject probably to
20   a Right-to-Know request and that collaboration
21   and cooperation might make it easier for both
22   parties to be able to satisfy the needs that Ms.
23   Andrus was seeking.

115

1  Q   I have one last question.
2  A   I believe as well I called the superintendent
3    and indicated to him that Representative Andrus
4    was inquiring about this matter also.
5  Q   One last question.  Do you have any recollection
6    of having suggested to Ms. Fenton and/or
7    Mr. Farrell at any point in time that they
8    should steer questions relating to possible
9    misconduct areas away from you or handle it
10   themselves?
11 A   I don't recall such a conversation.
12 Q   Would you have had such a conversation?  Would
13   you have suggested they take them away from you,
14   they should handle them without you?
15 A   So I don't believe so, and that would be
16   contradictory to our operation and function as
17   an agency.
18 Q   Thank you.  I thank you for your cooperation.
19        EXAMINATION
20 BY MR. BISSONNETTE:
21 Q   Thank you, Commissioner.  I know we have an hour
22   left, and I'm going to be as brief as I can.
23        Again, to introduce myself, I'm Gilles

116

1    Bissonnette with the ACLU.  I'm here on behalf
2    of the Plaintiffs Mejia and Philibotte.
3         Cindy, would you mind just reading back
4    that last response?  I just wanted to ask a
5    followup question.
6         (Requested portion read back by court reporter)
7  Q   Why would it be contradictory to how your agency
8    functions?
9  A   Because when the "committee" to use the
10   attorney's comment but basically when the Bureau
11   of governance meets to review various matters
12   associated with their work they're going to
13   bring to me anything that they think is
14   important for me to look at.
15 Q   And you are involved in the decision-making
16   process concerning whether something may
17   constitute a violation of the Code of conduct?
18 A   So I think I've described before how in that
19   meeting there's a presentation of various
20   matters in various stages of development, and
21   there is generally a recommendation from the
22   team in terms of if there was some type of an
23   action that we would take including gathering

117

1  additional information or something else, then I
2  would weigh in in that conversation on that.
3  Q    Do you view your role in those meetings as
4  accepting or rejecting the recommendations that
5  are presented to you?
6  A    No.  I review it as supervisory of a function in
7  the agency.
8  Q    But you're involved in the final approval
9  process then it sounds like; is that fair to
10  say?
11 A    Yes.  Can I just clarify that?
12 Q    Of course.
13 A    I'm involved in the final approval process when
14  it reaches a point of a final action that may be
15  taken.  It is possible that there are matters
16  that are resolved that either I have forwarded
17  over or have come in in other places that they
18  may take, act on, and it never rises to the
19  level of attention that they believe I need to
20  be part of that conversation.
21 Q    Is something that would reach your level of
22  attention included in the Department's
23  determination as to whether or not there's been

118

1  a violation of the Code of conduct?
2  A    Generally, if there's a violation of the code of
3  conduct, then I would know about it.
4  Q    Would you be involved in the final approval
5  process in determining whether, in the
6  Department's determination as to whether there's
7  a violation?
8  A    Yes.  So the way that most -- and quite frankly,
9  I'm going to conjecture a bit, speculate a
10  little bit, outside of my realm I would need to
11  confer with others in my agency relative to
12  this, but the work I'm involved with mostly is
13  oftentimes when there is a code of conduct
14  violation that's being evaluated by the
15  governance team, they are working with the
16  educator, generally the educator's legal
17  counsel, and reaching what I inartfully refer to
18  as kind of a plea bargain, an agreement in terms
19  of what action should be taken.  If no agreement
20  can be reached, then it's really not a
21  Department's action.  I believe at that point in
22  time it goes to a hearings officer and to the
23  State Board of Education.

119

1       So it's really my involvement is in that
2  process where there's some type of an agreement
3  reached with an educator and then I would sign
4  that settlement agreement.
5  Q    What if there's not an agreement reached and the
6  Department thinks there's a violation, how are
7  you involved in that process?
8  A    So generally not, I mean, I may have been
9  involved leading up to the point where there's
10  no agreement that's reached.  It's only ever
11  happened twice I think since I've been here.
12  And those matters then fall to Diana, and they
13  arrange for a Hearing Officer to hear it, and
14  then it goes before the State Board of
15  Education.  But my role, I'm no longer part of
16  that process.
17 Q    I don't mean to beat a dead horse --
18 A    No, no.  That's okay.
19 Q    But what I'm trying to understand is are you
20  involved in essentially what I'm going to call
21  like the charging decision.  That may not be the
22  right term for it, but that's what I'm really
23  trying to get at.  So I don't know if you can

120

1  describe your involvement in that piece.
2  A    So most of the time the way that it works is
3  that there's a recommendation made to me by my
4  governance team, and then we discuss how they
5  arrived there and if that seems like it's an
6  appropriate place.
7  Q    That's helpful.  Thank you.  I don't know
8  anything about this so I appreciate it, besides
9  what I've learned in this case.
10      I want to direct your attention,
11  Commissioner, to two exhibits that are already
12  before you that have been previously marked.
13  Exhibits 18 and 14.  So if you can just have
14  those in front of you.  I know you may already
15  have Exhibit 14 in front of you.
16 A    I don't know if I have 18.
17 Q    18 might be a new one for you.  Thank you.
18 A    Trying to keep track here.  And 14 is the other
19  one I do have.  Yes.
20 Q    Commissioner, this is the exhibit we talked
21  about.  So if you do need assistance, please let
22  me know in reviewing it.
23      So I'd just ask you, so my question which

121

1   is not a question is I just ask you to review
2   Exhibit 18 and let me know when you're done,
3   please.
4   A   So your question?
5   Q   I'm just going to direct your attention to the
6   page 10287 on Exhibit 18 with the line, can you
7   look into this.  Do you see the language?
8   A   Yes.  Well, I can't see it now, but now I can.
9   Q   Fair enough.  So that's the portion of the chain
10  that you are on; is that correct?
11  A   Correct.  I am on that portion of the chain.
12  Q   And if I direct your attention to the bottom of
13  that page on 10287, there is an email from Ms.
14  ███████ to you saying, "This was brought to my
15  attention today.  A Human Relations teacher at
16  the Londonderry High School gave these
17  worksheets out to students.  Is this allowed."
18  Do you see the language?
19  A   That's the very first string of the email.
20  Q   Exactly.  And the last two pages are those
21  worksheets.  Correct?
22  A   I can assume that they are, but I don't know.
23  I'd have to go back and look at the original

122

1   email.
2   Q   Okay.  I'm going to -- do you recall seeing
3   those worksheets on or around April 4th, 2022?
4   A   I mean, I may have.  I'd have to go back and
5   refresh my memory because I see a lot of
6   content.
7   (Court reporter admonition re simultaneous talking)
8   Q   I'm trying to cut to the chase.  All I'm really
9   trying to get at is demonstrating that that
10  attachment was in your April 2022 OpEd.
11  So now I'm going to direct your attention
12  to Exhibit 14 on Topic Seven, Bates stamped PL
13  735 to 737.  Do you see those?
14  A   I see those.
15  Q   Are those the same worksheets that are in
16  Exhibit 18?
17  A   They appear to be, yes.
18  Q   And in fact, did you get those worksheets --
19  A   So the only thing I would correct is that the,
20  on PL 00737 there are, in Exhibit 14 there's
21  redactions of responses, and those are not
22  redacted in 10289.
23  Q   Gotcha.  So thank you for that, and that's an

123

1   important clarification.  Are the pages in
2   Exhibit 14, Topic Seven, Bates stamped 736 to
3   737, the same worksheets that you received on
4   April 4th?
5   A   I believe they probably are, but without going
6   back to the original email, right?  But I
7   believe they probably are.
8   Q   Gotcha.  So your understanding is that these
9   worksheets in Exhibit 14 that we just
10  referenced, you received those about a little
11  over a week prior to the publication of your
12  April 15th OpEd receiving them from a Ms.
13  ███████, correct?
14  A   I believe so.
15  Q   We're done with that.  Thank you.  I just have a
16  couple other, well, few other questions.
17  There's a duty to report under the educator
18  Code of conduct, correct?
19  A   I believe there's a duty to report for every
20  citizen in the State of New Hampshire.
21  Q   What do you mean by that?
22  A   If someone believes that a child is being
23  abused, then they have a duty to report.

124

1   Q   Fair enough.  You're referring to New Hampshire
2   abuse and neglect statute?
3   A   Correct, which is a duty to report.
4   Q   Fair enough.  What I'm referring to, though, is
5   the duty to report in the Educator Code of
6   conduct.  Would you agree with me that there's a
7   duty to report under the Educator Code of
8   conduct?
9   A   Yes, I believe there is.
10  Q   And there's a specific provision in the
11  Education administrative rules governing the
12  contours of that duty to report obligation,
13  correct?
14  A   I believe so.  I haven't looked at that portion
15  of the rules in some time, but I believe that
16  there is a duty to report for educators relative
17  to misconduct.
18  Q   Fair enough.  That would include violations of
19  HB 2, correct?  Because HB 2 is part of the
20  Educator Code of conduct?
21  MR. KENISON-MARVIN:  Objection.  Vague and
22  legal contention.
23  A   So can you repeat the question?

125

1 Q    Could you read it back?

2       (Requested portion read back by court reporter)

3 A    So I believe, and I haven't looked at the

4       Educator code of conduct of recent, but I

5       believe that the code of conduct refers to RSA

6       354-A. I don't know if it makes reference to

7       193:40.

8 Q    I'd just refer you to Exhibit 1.

9 A    Which one?

10 Q    Exhibit 1.

11 A    Yes, I do. Okay.

12 Q    I'm just going to direct your attention to page

13      Bates stamped 07.

14 A    Okay.

15 Q    IV.

16 A    Yes.

17 Q    That says violation of this section by an

18      educator shall be considered a violation of the

19      educator code of conduct that justifies

20      disciplinary sanction by the state board of

21      education. Do you see that?

22 A    I do.

23 Q    So is a violation of HB 2 a violation of the

126

1       educator code of conduct?

2       MR. KENISON-MARVIN: Same objection.

3 A    So your initial question was is HB 2 part of the

4       code of conduct. I responded that RSA 354-A is

5       part of the educator code of conduct. This

6       states clearly that the violation of this

7       section by an educator shall be considered a

8       violation of the educator code of conduct that

9       justifies disciplinary sanction by the state

10      board of education.

11 Q    And that section is RSA 193:40, correct?

12 A    Correct.

13 Q    Okay. Sorry. I now understand why you said

14      what you said. Thank you for that.

15 A    Okay.

16 Q    Fair enough. No, I've got you. I'm going to

17      mark an exhibit here, and I do not know where we

18      are.

19      (Exhibit 45 marked for identification)

20 Q    When you're done reviewing Exhibit 45, just let

21      me know, please.

22 A    Okay. So I've read it.

23 Q    I'm just going to submit to you, Commissioner,

127

1       this looks like this is an exchange between you

2       and an individual named Kyle Sanborn who is a

3       member of the Gilford School Board. Is that an

4       accurate reflection of Exhibit 45?

5 A    He asserts that he is a member of the Gilford

6       School Board. I'm not intimately familiar with

7       that.

8 Q    Any reason to disbelieve --

9 A    No.

10 Q    There's reference here on the bottom of page 67

11      of Exhibit 45 that there is a section that you

12      will be referencing. Do you see that language?

13 A    I do.

14 Q    Where would you have referenced this -- strike

15      that.

16      I'll go back to that question. What

17      context would you have been referencing the

18      language at the bottom of page 67 of Exhibit 45?

19 A    So from the email and my recollection of the

20      conversation is he believed that there was, he

21      states in his email to me, and I think, I don't

22      see it in that email, but I believe it was part

23      of the conversation about a duty to report and

128

1       so I was trying to reference back to him this

2       duty to report.

3 Q    I guess what I'm interested in is the language

4       "that I will be referencing."

5 A    Yes.

6 Q    Where would you be referencing this is what I'm

7       trying to get at. Was there a presentation, a

8       speaking engagement? Is that what you were

9       referring to there?

10 A    I'm not certain. Because the email is a little

11      bit kind of chopped up as well. You'll see like

12      there's a certain font and is this correct and

13      it pastes something in then I have a statement

14      down below that says, and there's an aberrant

15      parentheses floating around in there, any

16      credential holder shall report any suspected

17      violation of code of conduct following the

18      school, the school district or the SAU reporting

19      procedures.

20      So I'm referencing this in this

21      conversation is what I believe I'm doing.

22 Q    Do you recall anything else about your

23      communications with Mr. Sanborn you haven't

129

1    testified to?

2  A    I believe that Mr. Sanborn was concerned about

3       the new law, and he was concerned whether or not

4       educators were following that.

5  Q    Did you ever have a communication with Mr.

6       Sanborn outside of what exists in Exhibit 45?

7  A    So the only the thing is I did, I met him at an

8       event up in Gilford.  Might have been the

9       Belknap County meeting and had a conversation

10      with him there.  That was the conversation I had

11      that I recall.

12 Q    Did you talk about the duty to report at that

13      meeting?

14 A    I don't recall that.

15 Q    Do you recall talking about HB 2?

16 A    I don't recall if I did what I might have said.

17 Q    We can move on from that document.  I promised

18      to be efficient.

19         The next exhibit is 46.

20         (Exhibit 46 marked for identification)

21 Q    So Commissioner, I'm actually, before you read

22      that, I'd also just ask you to pull Exhibit 29.

23      These two documents go hand in hand.  I don't

130

1    want to hide the ball here.

2  A    Do I have 29?  I don't recall having 29 yet.  We

3       just need to get that.

4  Q    Just let me know when you have both exhibits in

5       front of you.

6  A    Which one should I read first?

7  Q    I'm not going to have you read any right now,

8       but I'm sure that I'm going to have you to refer

9       to them.  Are you aware of a woman named Karlyn

10      Borysenko?

11 A    Maybe the name is vaguely familiar.  It's an

12      unusual name, but that's the extent that I have

13      for that.

14 Q    Okay.  So maybe I will direct your attention now

15      to the exhibits.  Your name is not on either of

16      them so that's why I hesitated to officially

17      direct your attention to them.

18         So first I'm going to direct your attention

19      to Exhibit 29 in the email from Mr. Farrell to

20      Karlyn Borysenko.  Do you see that email?  I

21      haven't asked you to read it yet, but do you see

22      the email I'm referencing?

23 A    So I see an email that says on August 24 at 9:37

131

1    Richard Farrell wrote.  It's unclear who that

2       was sent to although the respondent at the top

3       is Karlyn Borysenko.

4  Q    I know you're not on this email.  Have you seen

5       Exhibit 29 before?

6  A    Let me just read it?

7  Q    Of course.  Please do.

8  A    So I've read 29.

9  Q    So the bottom of page 29, Mr. Farrell tells Ms.

10      Borysenko, Commissioner Edelblut has forwarded

11      your inquiry directly to Ahni Malachi on 19

12      August 2022 for her review.

13         So my question is do you recall ever

14      sending an inquiry from Ms. Borysenko to

15      Director Malachi in August of 2022?

16 A    I don't have that recollection.

17 Q    Now I'm going to have to direct your attention

18      to Exhibit 46.

19 A    Okay.

20 Q    So exhibit, I would just represent to you

21      Exhibit 46, also a document you are not on, is

22      an email from Ms. Borysenko to the Human Rights

23      Commission but also copying Department of

132

1    Education.  What I'm referring to there is the

2       email at the bottom of page 9900 in Exhibit 46.

3       Do you see that?

4  A    I see an email from Karlyn to the Human Rights

5       Commission with a cc to DOE info and Rich

6       Farrell.

7  Q    So there are to two attachments to this email.

8       Exeter Regional School District Violation and

9       Exeter Regional School District Violation Data.

10      I'm going to submit to you on the version that

11      you have in Exhibit 46 you only have one of

12      those attachments.  We're sorting that out with

13      your counsel, but I wanted to flag this is not a

14      full and complete document with all the

15      attachments.

16         But my question to you is do you recall of

17      seeing this email on page 9901 of Exhibit 46 and

18      the HRC form that Ms. Borysenko completed also

19      in Exhibit 46?

20 A    Yes, I have no recollection of seeing either of

21      these.

22 Q    So you, I presume then it's fair to say you have

23      no recollection of ever forwarding this August

133

1  19th, 2022, complaint to Director Malachi?
2  A   Correct.
3  Q   Do you ever send complaints under HB 2 to
4     Director Malachi directly?
5  A   I don't believe I ever have.
6  Q   Okay.  Do you have any -- let me go back to
7     Exhibit 29.
8       Mr. Farrell represents that you forwarded
9     Ms. Borysenko's inquiry directly
10    Mr. Commissioner Malachi.  Would you have any
11    reason to think that Mr. Farrell is mistaken?
12  A   Or it could be that Mr. Farrell is referring to
13    the fact that it's possible that either he or
14    Diana forwarded something representing the
15    agency, and so maybe that's what he's referring
16    to when he's referring to that.
17  Q   Do you know one way or the other sitting here
18    today though?
19  A   No.
20      (Exhibit 47 marked for identification)
21  Q   Commissioner Edelblut, I'd just ask you to
22    review Exhibit 47 and let me know when you've
23    finished your review.

134

1  A   So your question?
2  Q   My question is you're on this email chain,
3     correct?
4  A   Correct.
5  Q   Did your Department ever respond to this press
6     inquiry?
7  A   I don't know the answer to that.
8  Q   Did you respond to this press inquiry?
9  A   I don't know the answer to that.
10  Q   Do you know if any of your colleagues at the
11    Department responded to this inquiry?
12  A   I don't know the answer to that.
13  Q   You can set it aside.
14      (Exhibit 48 marked for identification)
15  Q   After you've reviewed Exhibit 48, commissioner,
16    just let me know that you're done.
17  A   Yes.  Okay.  I've read it.
18  Q   Do you recall receiving this email from Ian
19    Huyett on Thursday, August 25th, 2022?
20  A   I do.
21  Q   Did you respond in writing to this email?
22  A   I believe I forwarded this to Diane.
23  Q   Do you recall Attorney Fenton responding to this

135

1  email?
2  A   I don't know what Attorney Fenton's actions were
3     with respect to this.  I believe she may have
4     had conversations with the Attorney General's
5     office.
6  Q   I guess my question is do you know whether or
7     not the Department had any communications with
8     Mr. Hewitt about this email after it was sent on
9     August 25, 2022?
10  A   I don't believe I've had any email
11    correspondence.
12  Q   Anyone from the Department have email
13    correspondence with Mr. Huyett?
14  A   Not to my knowledge.
15  Q   Anyone from the Department have verbal
16    communication with Mr. Huyett concerning the
17    contents of this August 25th email?
18  A   So I believe that Mr. Huyett followed up in a
19    conversation with me and asked me about it and I
20    indicated to him that I had referred it to my
21    attorney.
22  Q   Do you recall anything else about that
23    conversation sitting here today?

136

1  A   No.  I don't.  That was the gist of
2     conversation.
3  Q   How long did that conversation last?
4  A   I don't recall.
5  Q   So I'm going to ask you -- you can set that
6     aside, Commissioner, and I'm moving quickly as
7     you can see since I know we're getting close.
8       I'm going to have you again put before you
9     Exhibit 14 which are the topics to your April
10    2022 OpEd.  Do you have that in front of you?
11  A   I do.
12  Q   I'm going to direct your attention to Topic Ten
13    on Exhibit 14 which is Bates stamped 748 to 758.
14    Do you see that?
15  A   I do.
16  Q   What is Topic Ten?
17  A   So I believe that this is content that we
18    received from a parent that was about Exploring
19    Whiteness and Becoming an Anti-Racist, and I
20    believe that it takes place in a school district
21    as kind of an extra class.
22  Q   Was that parent Dan Richards?
23  A   I believe it was.

137

1  Q    I'm just going to, just closing the loop, so I'm
2       going to mark another exhibit.
3            (Exhibit 49 marked for identification)
4  Q    So do you have Exhibit 49 before you,
5       Commissioner?
6  A    Yes.
7  Q    I'm just going to represent to you what this is.
8       So this is portions of the legislative history
9       of HB 544 in which Mr. Richards submitted some
10      written testimony to the House Executive
11      Departments and Administration Committee, and
12      this is a reflection of what his testimony is.
13 A    Okay.
14 Q    Okay?  And I would just note that on Exhibit 49
15      Mr. Richards attaches a document entitled on
16      page 544 241, Exploring Whiteness and Becoming
17      an Anti-Racist Activist.  Do you see those
18      pages?
19 A    I do.
20 Q    241 to 244.  Correct?
21 A    Yes.  I'm just pointing out that they're
22      different than in 14.
23 Q    I was just about to do that.  So it looks to me

138

1       like --
2  A    Part of the syllabus was cut off at some point.
3  Q    Yes.  Page 241 in Exhibit 49 is the same thing
4       as page 749 in Exhibit 14.  Correct?
5  A    That's what it looks like other than there is a
6       notation on 00749 that's not on 0241.
7  Q    Those notations are, in addition to redactions
8       in page 749, you also have two handwritten
9       comments that say okay.  Am I correct?
10 A    Correct.  Those are the notations.
11 Q    Those redactions on page 749 are the Department
12      redactions, I presume?
13 A    Correct.
14 Q    Also going to turn your attention on Exhibit 14
15      to page 72 of 79 in the upper right.  Do you see
16      that?
17 A    Yes.
18 Q    Same page as page 243 in Exhibit 49.  Correct?
19 A    That looks correct.
20 Q    And it's the same for the next pages of those
21      documents, correct?  They're the same?
22 A    They appear to be.
23 Q    So I just want to make sure I understand that

139

1       the documents, the syllabus on Exhibit 49 that
2       Mr. Richards submitted to the House Executive
3       Department's Administration Committee is the
4       same document that you received from
5       Mr. Richards, a portion of which you attached as
6       Topic Ten to Exhibit 14; is that correct?
7  A    Correct.
8  Q    You can set that aside.
9            MR. KENISON-MARVIN:  Can I use the
10      restroom?
11           MR. BISSONNETTE:  Of course.
12           (Recess taken 2:33 - 2:38 p.m.)
13 Q    Commissioner, before you you should have two
14      exhibits, Exhibits 12 and 13.  Are they in front
15      of you?
16 A    They are.
17 Q    So I'm just going to represent to you that
18      Exhibit 12 is an Attorney General Memorandum
19      directed to the HRC.  Exhibit 13 looks to be
20      information, a reflection of a meeting that may
21      have occurred on September 8th, 2021, right
22      after the date that Exhibit 12 was issued.
23           So my question is do you remember a meeting

140

1       that took place on September 8, 2021, between
2       you and Director Malachi?
3  A    I don't remember specific -- I mean, I've had
4       various meetings with Ahni Malachi over the
5       years.  I don't remember a specific meeting on
6       that day.  To be clear as well, I don't actually
7       book my calendar.  That's done by a scheduler.
8  Q    Fair enough.  Fair enough.  I just noticed
9       because this is the date right after the AG memo
10      was issued so do you recall any meeting with
11      Director Malachi about Exhibit 12?
12 A    I don't.
13 Q    Okay.
14 A    In fact, I don't even recall a conversation with
15      Ahni Malachi about this AG memo.
16 Q    Fair enough.  When you typically meet with
17      Director Malachi on issues is it usually you two
18      that are present or are there other individuals
19      also that participate or does it depend?
20 A    It depends on what the issue is.  So Ahni
21      Malachi is also on the Board of Directors of one
22      of our charter schools.  So I see her in that
23      context, and I see her in a professional

141

1       context.  Generally if I'm meeting with Ahni
2       Malachi relative to any matter like this,
3       there's probably an Attorney General individual
4       who would be present.
5   Q   Okay.  You tell me if this isn't fair to say,
6       but I'm relying directly on your OpEd on Exhibit
7       4 just to not hide the ball, but is it fair to
8       say --
9   A   Exhibit 4.  Which one is that.  I do a lot of
10      OpEds.
11  Q   Teach children about racism.
12  A   Okay.
13  Q   So what I want to make sure is is it fair to say
14      that you supported HB 2?
15  A   So what I support is to make sure that children
16      and educators in New Hampshire are not
17      discriminated against in any way, shape or form.
18  Q   And in your view, as reflected in Exhibit 4,
19      they would be protected by HB 2 in your view,
20      right?
21  A   So can you repeat that question?
22  Q   Strike that.  I'm just going to refer you to the
23      bottom of Exhibit 4, page 398, quote, "The

142

1       guardrails outlined in this legislation recently
2       passed by the New Hampshire Senate help us to do
3       just that.  "Do just that" is the language that
4       precedes that sentence in the OpEd.  Do you see
5       that language?
6   A   I mean, it's all of the preceding language like
7       a summarizing sentence.
8   Q   I agree with that.  My question is you're
9       referring to HB 2 in that sentence, correct?
10  A   I quote aspects of that legislation in there
11      that are, I believe, excerpts from RSA 193:40,
12      and so I do believe that that law will help
13      protect our teachers and our students from being
14      discriminated against.
15  Q   And, in fact, you say on the opening sentence of
16      this OpEd it's important, correct?
17  A   I think it's important to make sure that our
18      students are not discriminated against and our
19      teachers are not discriminated against.
20  Q   So you think it's important.
21  A   I think not discriminating is important.
22  Q   When you say "not discriminating," what you're
23      referring to are the provisions that refer to HB

143

1       2, right?
2   A   I believe those are contributing to that.
3       Clearly, I've not in this OpEd excerpted the
4       entire content of Exhibit 1.
5   Q   Um-hum.
6   A   But I think that these are components that help
7       us toward that mission.
8   Q   I'm not trying to hide the ball here.  What I'm
9       just trying to get is, Commissioner, you say
10      twice in this OpEd, the last line and the first
11      line, "legislation recently passed by the New
12      Hampshire Senate."  That's HB2 as reflected in
13      Exhibit 1, correct?
14  A   Say that again?
15  Q   Sure.  You say in the first line and the last
16      line of your OpEd as reflected in Exhibit 4,
17      you're referring to legislation recently passed
18      by the New Hampshire Senate.  You see both of
19      those references?
20  A   Yes.
21  Q   In there you're referring to HB 2, right?
22  A   I'm referring to specifically the components of
23      193:40, but I believe that the other parts of HB

144

1       2 potentially are contributory to that, but this
2       OpEd is focused on those elements of 193:40.
3   Q   I got you.  That's fair.  I see what you're
4       saying.  So the language though that you're
5       referring to on both the first sentence and the
6       last sentence on Exhibit 4 is if I now turn your
7       attention to Exhibit 1 the provisions of RSA
8       193:40.
9   A   Well, so not all of 193:40, but specifically
10      193:40-I(a), (b), (c), and (d) which are in my
11      mind the provisions that the legislation passed
12      in order to try and not result in
13      discrimination.
14  Q   In those provisions that you just referenced, is
15      it fair to say based on the language in your
16      OpEd that you supported that language?
17  A   So I believe as I have indicated in this OpEd
18      that that will help avoid discrimination against
19      our educators and our students in New Hampshire.
20  Q   You're saying something a little bit different
21      from what I'm asking which is did you support
22      that language?
23  A   So I don't know what you mean by "support that

145

1 language."
2 Q   Did you oppose it?  Did you oppose the language?
3 A   So I don't have an opportunity to vote yes or no
4     on any particular piece of legislation, and so
5     in this OpEd I'm reflecting my opinion that
6     those aspects of RSA 193:40 that are referenced
7     and summarized in this OpEd are important
8     towards avoiding discrimination of our students
9     and our students in New Hampshire.
10 Q  And in your view they're also needed, correct?
11 A  Well, I believe that those provisions will help
12    avoid discrimination of students and educators
13    in the state of New Hampshire.  Whether or not
14    they're needed is a determination that the
15    legislature has to make.
16 Q  I'm just using your language, Commissioner.  I
17    don't mean to fight you on this, but you say in
18    the opening sentence of Exhibit 4 that it's
19    needed.  That was your position, correct?
20 A  Yes, it is.
21 Q  Okay.  So I'm just going to ask you again.  Is
22    it fair for me to characterize Exhibit 4 as
23    reflecting the Department of Education's support

146

1     for the provisions of HB 2 reflected in RSA
2     193:40 that you mentioned just moments ago?
3 A   I think the better way to understand this OpEd
4     is that I as the Commissioner of Education
5     believe that we do not want to, and as the
6     title, states, right?  We want to teach our
7     children about racism and not to be racist so
8     that is the intent of this OpEd.
9 Q   And the portions that you referenced before in
10    RSA 193:40 would do that in your view, correct?
11 A  I believe that they will contribute to that.
12 Q  And therefore in your view that language is
13    important and needed, correct?
14 A  So I believe that that language is needed in the
15    context of being helpful towards making sure
16    that our teachers and our students are not
17    discriminated against.
18 Q  Okay.
19          (Exhibit 50 marked for identification)
20 Q  Before I direct your attention to Exhibit 50,
21    does the Department of Education take positions
22    on legislation?
23 A  We do not take positions on legislation.  We

147

1     simply provide legislators with either the
2     benefits or the negative consequences as we
3     understand them associated with proposed
4     legislation.
5 Q   You're familiar with the parental bill of rights
6     legislation?
7 A   I am.
8 Q   Did the Department of Education take a position
9     on that piece of legislation?
10 A  We did not.
11 Q  Did the Department of Education tweet about the
12    outcome of that bill this week?
13 A  I believe it did.
14 Q  Do you recall a statement, quote, "The New
15    Hampshire Department of Education is
16    disappointed with the indefinite postponement of
17    SB 272 by the House and is hopeful that this
18    conversation will continue since it is possible
19    to simultaneously support students, educators,
20    and parents."  Do you recall that?
21 A  So I believe that that is a partial reflection
22    of a statement that this Department put out.
23 Q  You don't think that that tweet reflects the

148

1     Department's support for SB 272?
2 A   So similar to the OpEd which was put out after
3     the legislature acted on the legislation and
4     that tweet which was put out after the
5     legislature acted on it, we are simply
6     reflecting what we believe are the benefits or
7     detrimental effects of certain legislation.
8 Q   So I just want to make sure I understand your
9     testimony.  You don't believe that tweet that
10    was published last week to reflect the
11    Department's support for that bill?  You don't
12    interpret it that way?
13 A  So what I would understand that to be is it's
14    not possible to support something that is no
15    longer a bill and is indefinitely postponed.
16 Q  Okay.  I may have misheard this, Commissioner.
17    I apologize if I did, but there was some
18    reference before to the book, How to be
19    Antiracist, by Ibram X. Kendi.  Do you remember
20    generally talking about that book earlier today?
21 A  I believe it came up in your line of
22    questioning.
23 Q  I believe it did.  So I want to just direct your

149

| | |
|---|---|
| 1 | attention to page 19 of what's been photocopied. |
| 2 | The language that is underlined.  I just want to |
| 3 | make sure that's the language that you quoted in |
| 4 | your OpEd on Exhibit 4.  Correct? |
| 5 A | I can go look. |
| 6 Q | Okay. |
| 7 A | So I, the language looks similar.  I do note |
| 8 | that there's a "dot dot dot" in my quotation in |
| 9 | my OpEd so it could be that my quotation, I |
| 10 | don't recall exactly where I got it from, but it |
| 11 | could be from a presentation that Mr. Kendi |
| 12 | provided some place as opposed to quoting |
| 13 | directly out of that text, but he may have been |
| 14 | quoting the text himself, and I quoted that. |
| 15 Q | Where did you get that quote then in Exhibit 4? |
| 16 | Do you recall? |
| 17 A | I don't recall where I got it. |
| 18 Q | Have you read the book How to be an Antiracist |
| 19 | by Ibram Kendi, portions of which are reflected |
| 20 | in Exhibit 50? |
| 21 A | I have not, and I think I represented that |
| 22 | already. |
| 23 Q | Before you were given Exhibit 50 moments ago, |

150

| | |
|---|---|
| 1 | had you seen the language around the underlying |
| 2 | portions of Exhibit 50 before today? |
| 3 A | So can you repeat that question? |
| 4 Q | Could you read it back?  See if I can do a |
| 5 | better job.  I might not be able to. |
| 6 | (Requested portion read back by court reporter) |
| 7 A | So to be precise, I've not seen the language in |
| 8 | the text of the book.  I've seen the language |
| 9 | from other presentations made by Mr. Kendi, and |
| 10 | they are similar. |
| 11 Q | They're similar.  Did those other references |
| 12 | that you've seen of Dr. Kendi's quotes, did it |
| 13 | include contextual language like the contextual |
| 14 | language that surrounds the underlined quote on |
| 15 | page 19 of Exhibit 50? |
| 16 A | I don't recall. |
| 17 Q | I'm going to -- my notes are all over the place. |
| 18 | This is what happens when you bat cleanup.  So |
| 19 | I'm going to come back to this, but I want to |
| 20 | probe a little bit more into your testimony with |
| 21 | respect to kind of what teaching means, and so |
| 22 | I'm going to direct your attention back to |
| 23 | Exhibit 1, and in particular the language on PL |

151

| | |
|---|---|
| 1 | 00006 that says on line 24 to line 25, "No pupil |
| 2 | in any public school shall be taught, |
| 3 | instructed, inculcated or compelled to express |
| 4 | belief in, or support for, any one or more of |
| 5 | the following."  Do you see that language? |
| 6 A | I do. |
| 7 Q | So here I'm not talking about the four concepts |
| 8 | below.  I just have some questions about that |
| 9 | specific phrase.  So that's what I want to get |
| 10 | at. |
| 11 | So is there written criteria that the |
| 12 | Department has that defines what it means to |
| 13 | teach, instruct, inculcate or compel to express |
| 14 | belief in or support for something? |
| 15 A | I would need to make reference to other people |
| 16 | in the agency to get a more specific response to |
| 17 | that question. |
| 18 Q | We have done that, in fairness, but I just want |
| 19 | to ask you are you aware of any written criteria |
| 20 | that defines those terms on page 00006 of |
| 21 | Exhibit 1, lines 24 to 25? |
| 22 A | So I'm not familiar with them. |
| 23 Q | So is there any written criteria that you're |

152

| | |
|---|---|
| 1 | aware of in the Department that explains whether |
| 2 | or not a read-along would constitute teaching, |
| 3 | instructing, inculcating or compelling to |
| 4 | express a belief in? |
| 5 A | I don't know the answer to that. |
| 6 Q | You mentioned rhetorical devices as a possible |
| 7 | device that teachers may use.  Is there any |
| 8 | criteria within the Department that explains |
| 9 | what rhetorical devices a teacher may use that |
| 10 | would or would not constitute teaching, |
| 11 | instructing, inculcating or compelling to |
| 12 | express a belief in? |
| 13 A | So I'm not aware of that. |
| 14 Q | Is there any criteria within the Department that |
| 15 | explains whether assigning a book to students to |
| 16 | read constitutes teaching, instructing, |
| 17 | inculcating or compelling to express a belief? |
| 18 A | I would have to make reference to others in the |
| 19 | agency. |
| 20 Q | Sitting here today, are you aware of any? |
| 21 A | Am I aware of any?  Could you repeat that? |
| 22 Q | Could you just restate my last question? |
| 23 | (Requested portion read back by court reporter) |

153

1  A    So I would have to reach further into the agency
2       to determine that.
3  Q    But sitting here today, are you aware?
4  A    I'm not aware of what those might be.
5  Q    So now I want to go back to now Exhibit 50, and
6       I want you to just assume for, and I'm
7       referencing the underlying language on Exhibit
8       50 that's also in your OpEd. I want you to
9       assume that a teacher has taught, instructed,
10      inculcated that underlined language. If that's
11      true, would that underlined language fall under
12      any of the four concepts lines 26 to the next
13      page on line 3.
14           MR. KENISON-MARVIN: I'll object to the
15      legal contention, and you can answer.
16 A    So I will start with the fact that it's not my
17      job, it's not within the purview of my
18      responsibility to adjudicate whether or not
19      certain actions by an educator would be some
20      type of an action under 193:40. So I can
21      speculate if that's where you want me to go.
22 Q    I would like you to speculate. How would you
23      speculate?

154

1  A    So the question then again is?
2  Q    The question then is if a teacher taught or
3       instructed, those two sentences that are
4       underlined on page 50, would it fall in your
5       view under any of the four concepts that are
6       listed on page 6 of Exhibit 1, line 26, to line
7       3 on page 7?
8  A    Am I allowed to write on this one?
9  Q    I can give you a copy.
10 A    I want to just go through and underline all the
11      principals and run each of them through my head.
12 Q    Please do. This can be your copy.
13 A    The question is with respect to this underlined
14      language in Exhibit 50?
15 Q    Um-hum.
16 A    So to your question, I think it would depend
17      upon the context of the instruction. The
18      content of Exhibit 50, again, content being
19      being neutral, it's what you do with that
20      content.
21 Q    So my question is a little different, and I'll
22      explain why. So what I'm trying to do is parse
23      out teaching, instruction, and inculcating which

155

1       is kind of element one of the statute with
2       element 2 of the statute which is whether that
3       teaching, instruction or inculcating fits within
4       one of the four concepts. So what my question
5       is trying to do is assume that this would meet
6       the definition of teacher inculcate. So I'm
7       going to now reframe my question.
8            If a teacher taught, instructed or
9       inculcated students along the lines of what's
10      been underlined on Exhibit 50 that you also
11      quote in your OpEd on Exhibit 4, would that fit
12      any of the four concepts that are listed at the
13      bottom of page 6 and go on to the beginning
14      of 07?
15           MR. KENISON-MARVIN: I'll make the same
16      objection. Vagueness. Legal contention and
17      compound. And it represents the nature of the
18      first elements of the statute. You can answer.
19 A    So I think that it would be most clear in the
20      mind of an educator to determine whether or not
21      in teaching the text that you refer to in
22      Exhibit 50 if they are teaching that, one, a
23      group in this list of things is inherently

156

1       superior, that one group is inherently racist,
2       that one group receives adverse treatment or
3       should receive adverse treatment and should be
4       discriminated against or receive adverse
5       treatment solely because of those
6       characteristics or that they cannot and should
7       not attempt to treat others without regard to
8       those items.
9            So those are the four salient questions
10      that I think an educator would ask relative to
11      any content. Am I teaching that the inherent
12      superiority, the inherently racist, the adverse
13      treatment, and to not attempt to treat others
14      without regard to.
15 Q    I hear you. My question is a little different.
16           My question is would a teacher if they
17      taught that underlined language be teaching a
18      banned concept under the statute?
19 A    So there's not enough knowledge to know what the
20      question is. Is that teacher when they are
21      teaching this part of the context, are they
22      teaching that there is an inherently superior
23      group, an inherently racist, a group that should

---

157

1    receive adverse treatment solely or probably
2    because of these characteristics or that they
3    cannot and should not attempt to be treated
4    without regard to these characteristics.  So
5    that is really, you have to see the context of
6    what's taking place.
7  Q    Here though the context is, as I'm saying, they
8    are teaching or inculcating, that language
9    that's underlined.  So my question is if they
10   are teaching or inculcating that principle that
11   is underlined, would that fit any of the
12   concepts?
13 A    So again, you'd have to have its bigger context.
14   Right?  So you can't --
15 Q    I'm sorry.  Go on.
16 A    You have to have the full context of what is
17   being discussed.  I mean, in other words and I
18   think we ran into the same problem here.  You're
19   constructing a hypothetical with one sentence
20   and that's not how instruction takes place.
21        So you would have to put it in context and,
22   again, the individual who is doing the educating
23   would be very clear if they are inculcating or

---

158

1    teaching or instructing students that one's age,
2    sex, gender, et cetera, you know, is inherently
3    superior to another age, sex, gender or that an
4    individual by virtue of their age, sex, gender,
5    et cetera, is inherently racist or sexist or
6    oppressive or that an individual should be
7    discriminated against or receive adverse
8    treatment because of their age, sex, gender, et
9    cetera or that the people of one age, sex,
10   gender cannot and should not attempt to treat
11   others without regard to those things.  So that
12   is the context that you need.
13 Q    So you can't answer the question without that
14   context; is that correct?
15 A    So what I say is I don't have any instruction in
16   New Hampshire that is one sentence long.
17 Q    What if a teacher had the very question I just
18   asked you, how would you respond to that
19   teacher?  Can I teach page 19 of Exhibit 50.
20   Give me guidance.  What would your response be?
21        MR. KENISON-MARVIN:  Objection.
22 A    I'm sorry.  Did you --
23        MR. KENISON-MARVIN:  Objection.  Vague.

---

159

1  A    My response would be to go to the statute, go to
2    the Q & A which enumerates what you can and
3    can't do and ask yourself educator, am I
4    teaching, instructing or inculcating a student.
5    That seems very clear to the person who's doing
6    it that one's age, sex, gender, et cetera, is
7    inherently superior to another or that -- et
8    cetera.  I don't want to --
9  Q    No, that's fine.  Just reciting.
10 A    Exactly.  I've done it a couple times.  So this
11   is if you're an educator seems like very
12   straight forward that you would be able to just
13   look at these things.  Is my instruction doing
14   that, and it's not, the concept here keeps
15   coming back to the content.
16 Q    Even with that, if an educator still had a
17   question and thought it was maybe a little bit
18   less clear than you seem to think it is, could
19   they come to you for advice with respect to how
20   to comply with HB 2?
21 A    So right now we're in the midst of a lawsuit
22   with HB 2.  So most of the questions that we
23   would have would probably end up as a question

---

160

1    for perhaps the Human Rights Commission to
2    answer.
3  Q    Okay.  Based on your quotation of Dr. Kendi in
4    your OpEd on Exhibit 4, do you think it would be
5    reasonable for an educator to think they
6    couldn't assign Dr. Kendi's book under HB 2?
7        MR. KENISON-MARVIN:  Objection.
8    Speculation.  You can answer.
9  A    So if they were to have reached that conclusion,
10   and I would have to speculate relative to that,
11   my observation really would be, one, that and
12   this is which exhibit?  Let me get that right.
13   Let me get the right OpEd in front of me.  Is
14   that they have not read the OpEd in its
15   totality.  Because really the, if you look at
16   the rhetorical device associated with that,
17   there is a list of contradictory things the
18   paragraph before.  Right?  "For those who
19   promote Critical Race Theory or similar concepts
20   their thinking is not built on a foundation of
21   common sense, but on ideology, but on ideology
22   diametrically opposed to the truths found in our
23   Declaration of Independence, that we are all

---

161

1  created equal."

2      And then I use another counter argument to

3  that, and then I present another argument.

4  "This idea of is, of course, in complete

5  opposition to the Equal Protection clause of the

6  Fourteenth Amendment to the US Constitution.  As

7  Justice John Marshall Harlan stated in his

8  dissent of Plessy v. Ferguson, our Constitution

9  is color-blind and neither knows nor tolerates

10  classes among citizens."

11      I then go on to elaborate.  "And the

12  concepts of Critical Race Theory actually

13  contradict the very premises of the civil rights

14  movement and Dr. Martin Luther King himself."

15      And so what I would encourage my educators

16  to do if they were teaching this, so I myself

17  have used that contents, and I have used it in

18  the context of the Declaration of Independence

19  in the context of the Fourteenth Amendment, in

20  the context of Plessy v. Ferguson, in the

21  context of Martin Luther King so it seems to me

22  that the particular text that we're referring to

23  is quite rich in terms of the opportunity for

162

1      instruction of students.

2  Q    But I believe your prior testimony said if an

3      educator has questions about whether specific

4      instruction violates the statute they can't get

5      those answers from the DOE right now, it's

6      because of this litigation, is that your

7      position?

8  A    So if an educator comes to me, we provide

9      information to them, we provide guidance to

10      them, and that guidance includes a combination

11      of a Q & A document that we have published to

12      provide them specific guidance relative to that,

13      and it is specific reference to RSA 193:40,

14      prohibition of teaching of discrimination which

15      in my mind are quite clear in terms of

16      clarifying what can and can't happen.

17          Our educators are professionally educated.

18      They mostly have master's degrees.  And so I

19      don't think that the guidance that we are

20      providing to them is obscure to them or

21      unattainable in terms of understanding for

22      individuals who are highly educated.

23  Q    That's true, but I believe your prior testimony

163

1      is that while you think it's clear you're unable

2      to tell me whether if a teacher taught the

3      underlined language on Exhibit 4, you're unable

4      to tell me whether that's covered under HB 2

5      without context.  Correct?

6  A    So let me clarify.

7          MR. KENISON-MARVIN:  Objection.  Still

8      vague.

9  Q    Please do.

10  A    So then let me clarify.  So my question answer

11      is that if a teacher were to ask me a question,

12      I would provide them with what we believe is a

13      large body of guidance for them to be able to

14      make a determination or not.

15  Q    Is any of that guidance in the context of

16      specific books that they can or cannot teach

17      under the statute?

18  A    So the premise to your question is about

19      content.

20  Q    Yeah.

21  A    And that's not, my law says no pupil in any

22      public school shall be taught, instructed,

23      inculcated relative to that one's sex, et

164

1      cetera, is inherently superior, inherently

2      racist, received adverse treatment or cannot and

3      should not attempt to treat others without

4      regard.  It's not content specific.  So the

5      indicator should not be asking themselves what

6      is the content but what is the context of the

7      instruction that I'm providing to students.

8  Q    But you agree with me that you cite content in

9      your OpEd, correct, in the form of Dr. Kendi's

10      book, right?

11  A    I cite a number of pieces of content.  I cite

12      the Declaration of Independence --

13  Q    Not my question.  You cite Dr. Kendi as content,

14      correct?

15  A    So my OpEd cites the Declaration of

16      Independence, it cites Dr. Kendi, it cites the

17      Fourteenth Amendment, it cites Plessy v.

18      Ferguson, it cites Dr. Martin Luther King.  So

19      my OpEd has a number of citations in that

20      context.

21  Q    Thank you.  You cite Dr. Kendi as content,

22      correct?

23  A    I have cited Dr. Kendi as content --

165

1  Q    Thank you.
2  A    -- in this OpEd.
3  Q    All I'm asking.  Not trying to trick you.
4        I'm going to refer you to Exhibit 9.  After
5  you've reviewed Exhibit 9, just let me know when
6  you're ready.  Thank you.
7        MR. KENISON-MARVIN:  Gilles, I don't
8  know what your plan is --
9        MR. BISSONNETTE:  I have five more minutes.
10       MR. KENISON-MARVIN:  Okay.  5.
11       MR. BISSONNETTE:  Five more minutes from
12  when he says he's reviewed it.
13 A    So your question?
14 Q    My question is this is an email between you and
15  the President of AFT New Hampshire; is that
16  correct?
17 A    That's correct.
18 Q    There's a line in here that says, this is the
19  second part of a sentence, but I'm just trying
20  to streamline things.  We also want to reiterate
21  our offer to try to work through individual
22  circumstances that may be unclear to teachers.
23  In these cases the best approach is for them to

166

1  reach out directly and share the specific facts
2  and circumstances so that we can provide them
3  with clear guidance.
4        Is that a reflection of the Department of
5  Education's policy?
6  A    So I would hope that it is a reflection of the
7  Department of Education's policy.  I can tell
8  you that this email came together with input
9  from a variety of places within the agency to be
10  able to support the educators at a time when I
11  believe there were either lawsuits or threats of
12  lawsuits pending.
13 Q    So if a teacher has questions about whether
14  specific instruction is covered by the law, they
15  could come to the Department and work through
16  individual circumstances that may be unclear to
17  them; is that still something that could occur
18  today?
19 A    Correct, and the guidance that we would provide
20  them today would be in the form of a Q & A
21  guidance and questionnaire as well as reference
22  to the statute.
23 Q    Is that the only guidance that they would be

167

1  provided to a teacher if they were confused, the
2  Q & A from July 2021 and the statute?  Is that
3  all you'd give them?
4        MR. KENISON-MARVIN:  Objection.  Vague and
5  scope.
6  A    And I believe pending this lawsuit that that
7  would be the extent of the guidance that we
8  would provide to them.
9  Q    So you wouldn't answer if they had a followup
10  question, is Dr. Kendi's book, if I teach it, is
11  that covered under the statute, you wouldn't be
12  able to answer that question?
13       MR. KENISON-MARVIN:  Objection.  Vague.
14 A    So I would, and I would answer that question for
15  the educator principally by looking at the Q & A
16  but principally coming back to RSA 913:40, and I
17  would say are you teaching, inculcating, or are
18  you compelling to express a belief in or support
19  for any one or more of the following; that one's
20  immutable characteristics are inherently
21  superior, that an individual by virtue of these
22  immutable characteristics is inherently racist,
23  sexist or oppressive or that an individual

168

1  should be discriminated against because of these
2  immutable characteristics and that people cannot
3  and should not attempt to treat others without
4  regard to these immutable characteristics, and I
5  believe in that conversation with an educator
6  given the highly educated state and status of
7  our educators that they would be able to
8  understand that and apply that to their
9  pedagogy.
10 Q    I'm asking for your opinion though.
11 A    Yes.
12 Q    What is your opinion as to whether or not those
13  two sentences in your OpEd fall under the four
14  concepts in Exhibit 1.  I want to know what your
15  opinion is.  Could you tell me that?
16 A    So I think I've made that clear that content is
17  not what falls under the RSA 193:40.  Behavior
18  and how we treat other people including
19  instructing, teaching, inculcating or compelling
20  to express belief in or support for, the fact of
21  inherent superiority, inherently racist, receive
22  adverse treatment solely because of these
23  immutable characteristics or they cannot and

169

1    should not attempt to treat others without
2    regard to these immutable characteristics.  So I
3    think that I've asked and answered that several
4    times now.
5  Q    I don't think you've answered it, but I'm going
6       to move on.
7  A    Okay.
8  Q    Exhibit 14?
9  A    Yes, I have it in front of me.
10  Q    There's a reference here if I could find it, and
11       I'm expediting this considerably.  Topic Eight,
12       page 742 to 745.  Do you see that?  It's a
13       chapter of Tiffany Jewell's book, This Book is
14       Anti-Racist.
15  A    Okay.
16  Q    Do you see that chapter?
17  A    I do.
18  Q    Have you read it before?
19  A    I have.
20  Q    Did you read it to the Board of Education on
21       July 8th, 2021?
22  A    I believe I did.  Or at least excerpts.
23  Q    Why did you read it to the Board on July 8th,

170

1       2021?
2  A    Because I needed to make sure that the Board
3       understood some of the concerns that parents
4       were raising to the Department.
5  Q    Were those concerns justification for why HB 2
6       was necessary?
7       MR. KENISON-MARVIN:  Objection.  Legal
8       contention.
9  A    Can you repeat the question?
10       (Requested portion read back by court reporter)
11  A    So again, HB 2 or really it's RSA 193:40 in
12       particular I believe are helpful to ensure that
13       our teachers and our students in the State of
14       New Hampshire are not discriminated against.
15  Q    Are you aware of that chapter being used
16       anywhere in the State of New Hampshire in
17       school?
18  A    I believe it is.  Or it was.
19  Q    What was your understanding at the time as to
20       how it was being used in New Hampshire?
21  A    I only know that a parent brought it to our
22       attention and said that it was being used.
23  Q    Besides that parent bringing it to your

171

1       attention, any other complaints about that book?
2  A    There may have been more than one.  I don't
3       recall.
4  Q    Is that parent ▮▮▮▮▮▮▮▮?
5  A    I don't recall if it was her.  I believe it was
6       in the Exeter School District.
7  Q    Given that you referenced that text during the
8       July 8, 2021, Board of Education meeting, if I
9       taught that chapter, if I'm a middle school
10       teacher in Exeter, would I be violating HB 2?
11       MR. KENISON-MARVIN:  Objection.
12  A    So that would depend on whether you are
13       teaching, instructing, inculcating or compelling
14       to express a belief in or support for any one or
15       more of the following.  That one's age, sex,
16       gender identity, sexual orientation, et cetera,
17       are inherently superior to other, that they are
18       inherently racist, that they receive adverse
19       treatment solely or partly because of or that
20       they cannot or should not attempt to treat
21       others without regard to these immutable
22       characteristics.
23  Q    Besides reading that statue though, you can't

172

1       tell me whether if I taught that I'm violating
2       the law, right?
3  A    I would have to see how it's being used in this
4       context.  When you say "if I taught that," there
5       is not a content standard.  There is an activity
6       standard.  So I would have to see it in this
7       context, and again, I think that the best person
8       to know if they're violating these statutes
9       really are the individuals who are actually
10       doing the teaching.
11  Q    But if I taught that chapter.
12  A    Um-hum.
13  Q    If I taught it.
14  A    Yes.
15  Q    You can't answer today whether I'd be violating
16       the statute --
17  A    Because I don't know what your --
18       (Court reporter admonition - simultaneous talking)
19       MR. KENISON-MARVIN:  Objection.  Stop.
20       Stop.  It's misstating what the statute says,
21       first of all, and second, I'm just going to
22       instruct him not to answer anymore.  Let's talk
23       about if we have a basis to continue or not

173

1 because we've well over.
2     MR. BISSONNETTE:  I'd like an answer to
3 that, and I have one last question.
4     MR. KENISON-MARVIN:  Well, I'm going to
5 instruct -- don't answer the question.  We can
6 talk about it.  I do think that misrepresents
7 what the statute says at least and the question
8 is very vague the way it's asked right now.  So
9 I'm happy to talk about it.  If we want to do it
10 outside of the witness's presence, I can tell
11 you specifically my problem is, but we're well
12 over.  I'm happy to talk about how we're going
13 to proceed from this moment, but I've been
14 pretty liberal in allowing this to go on beyond
15 our agreed time, and I'm happy to talk about
16 continuing to keep questions on the table.  I
17 just, think we need to slow down here and talk
18 about where we're at and where we're going.
19     MR. BISSONNETTE:  Off the record.
20         (Discussion off the record)
21         (Recess taken 3:20 - 3:25 p.m.)
22 (Requested portion read back by court reporter)
23     MR. BISSONNETTE:  Strike that.  I'm going

174

1         to withdraw the question.
2 Q    Can you identify, Commissioner, an incident of
3       instruction that occurred in New Hampshire
4       before HB 2 that would violate HB 2 had it been
5       in effect at the time the instruction occurred?
6         MR. KENISON-MARVIN:  Objection.  Vague.
7       Calls for legal contention.
8 A    I'm not familiar with any.
9 Q    The Exploring Whiteness syllabus that's on
10      Exhibit 14, Topic Ten.  I just wanted you to
11      describe to me --
12 A    Just give me the page.
13 Q    Yes, of course.  It's page 749, Topic Ten, of
14      Exhibit 14.
15 A    Okay.
16 Q    Do you have the context of this class?  I
17      believe it was in Hanover.
18 A    I believe it was in Hanover, and I believe it
19      was an elective class that students signed up
20      for in a specials week that they have.
21 Q    Was it a class that students were required to go
22      to; do you know?
23 A    I think I indicated it was an elective class.

175

1 Q    Sorry.  I didn't understand the terminology.  I
2      appreciate that.
3         Just going through my note.  I might be
4      done.
5         I'm introducing an exhibit and my question
6      is just going to be whether you've seen it
7      before.
8         (Exhibit 51 marked for identification)
9 A    I don't think I've seen this before.
10 Q    Do you recall ever speaking to the Northwood
11     GOP?
12        MR. KENISON-MARVIN:  Objection.  Vague.
13 A    Can you put a time frame on that?
14 Q    November 2021.
15 A    I don't recall that.  I have spoken to the
16     Northwood GOP years ago.
17 Q    This would be to refresh your recollection.  So
18     I've just marked as Exhibit 52 an email.
19        (Exhibit 52 marked for identification)
20 Q    Does Exhibit 52 refresh your recollection as to
21     whether or not you've ever spoken to the
22     Northwood GOP?
23 A    So it refreshes my recollection that I was

176

1      invited.  I don't recall if I ever went out and
2      spoke to them or not.  I don't have recollection
3      of that.  I do speak to many groups though.
4 Q    You've spoken to political groups before, fair
5      to say?
6 A    I speak to all kinds of groups.
7 Q    I know.  I get that.  I'm just asking political
8      groups.  Have you spoken to political groups
9      before?
10 A    All kinds of groups.
11 Q    Which includes political groups, correct?
12 A    That would include political groups.
13 Q    And in those political groups, have you
14      referenced HB 2 before?
15 A    I may have answered a question on it or have
16      spoken about various aspects of education.
17 Q    You ever speak about why it was necessary in
18      those group meetings?
19 A    I don't have any specific recollection of the
20      type of content that I would have shared on
21      that.
22 Q    Okay.
23        MR. BISSONNETTE:  We'll all reserve,

**177**

1  obviously, and I want to thank the Commissioner
2  for his time.  Thank you, Elizabeth.  Thank you,
3  Nate, and thank you, Cindy, very much.
4      MR. KENISON-MARVIN:  I want to speak with
5  the Commissioner briefly about any areas for
6  followup before we recess for the day.  Give me
7  five minutes.
8      (Recess taken 3:30 - 3:40 p.m.)
9      MR. KENISON-MARVIN:  We don't have any
10  questions for the witness, and I just want to
11  reserve our right to read and sign the
12  transcript.
13      MR. BISSONNETTE:  We'll reserve as well,
14  and just thank you everyone very much.
15      (Deposition suspended at 3:40 p.m.)
16
17
18
19
20
21
22
23

**178**

1          I have carefully read the foregoing
2      deposition, and the answers made by me are true.
3
4
5                          _____
                            FRANK EDELBLUT
6
7
8  STATE OF _____
9  _____, SS.
10
11      At_____on the
12      _____ day of _____ A.D.
13  2023, personally appeared the above-named FRANK
14  EDELBLUT and made oath that the foregoing answers
15  subscribed by him are true.
16                          Before me,
17
18
19
20                          _____
                            Notary Public
21
22
23

**179**

1          C E R T I F I C A T E
2      I, Cynthia Foster, Registered Professional
3  Reporter and Licensed Court Reporter, duly authorized
4  to practice Shorthand Court Reporting in the State of
5  New Hampshire, hereby certify that the foregoing
6  pages, numbered 7 through 177, are a true and
7  accurate transcription of my stenographic notes of
8  the deposition of FRANK EDELBLUT who was first duly
9  sworn by me on May 23, 2023, for use in the matter
10  indicated on the title sheet, as to which a
11  transcript was duly ordered;
12      I further certify that I am neither
13  attorney nor counsel for, nor related to or employed
14  by any of the parties to the action in which this
15  transcript was produced, and further that I am not a
16  relative or employee of any attorney or counsel
17  employed in this case, nor am I financially
18  interested in this action.
19
20
21                          Cynthia Foster, LCR
22
23

**180**

1          E R R A T A
2      I, the undersigned, FRANK EDELBLUT, have read
   the transcript of my deposition held on May 23, 2023,
3  in the matter of Local 8027, AFT-New Hampshire,
   AFL-CIO v. Frank Edelblut, Commissioner, et al; and
4  the same is true and correct, to the best of my
   knowledge, with the exception of the following
5  changes noted below, if any:
6  PAGE/LINE  CORRECTION AND REASON FOR CORRECTION
7  _____
8  _____
9  _____
10  See attached sheet(s) for additional information:
11  ___Yes___No
12
                            _____
13                          FRANK EDELBLUT
14  STATE OF _____)
                       ) ss.:
15  COUNTY OF _____)
16
17      Subscribed and sworn to before me this _____ day
   of _____, 2023.
18
19                          _____
                            Notary Public
20
   My commission expires:
21
   _____
22
23

```
 1              I have carefully read the foregoing

 2       deposition, and the answers made by me are

         true.[1]

 3

 4                                    _____

 5                                    FRANK EDELBLUT

 6

 7

 8    STATE OF New Hampshire

 9    _____, SS.

10

11              At 25 Hall St, Concord on the

12    __29__ day of June _____ A.D.

13    2023, personally appeared the above-named FRANK

14    EDELBLUT and made oath that the foregoing answers

15    subscribed by him are true.

16                              Before me,

17

18

19                              _____

20                              Notary Public

21

22

      [1] Subject to the exception of the changes identified in the accompanying errata sheet and the

23    attachment thereto.
```

```
 1              E R R A T A

 2       I, the undersigned, FRANK EDELBLUT, have read
    the transcript of my deposition held on May 23, 2023,
 3  in the matter of Local 8027, AFT-New Hampshire,
    AFL-CIO v. Frank Edelblut, Commissioner, et al; and
 4  the same is true and correct, to the best of my
    knowledge, with the exception of the following
 5  changes noted below, if any:

 6  PAGE/LINE   CORRECTION AND REASON FOR CORRECTION

 7   P9 / L10        See attachment
    _____

 8   P15 / L3        See attachment
    _____

 9   P16 /L17        See attachment
    _____

10  See attached sheet(s) for additional information:

11  ▪ Yes___No

12                                _____
                                  FRANK EDELBLUT
13

14  STATE OF  NH        )
                        ) ss.:
15  COUNTY OF Merrimack )

16

17       Subscribed and sworn to before me this  29  day
    of  June        , 2023.
18

19                                _____
                                  Notary Public
20

21  My commission expires:

22  May 31, 2028

23
```

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner, et al. (No. 1:21-cv-01077-PB)

FRANK EDELBLUT

# ERRATA SHEET

## ATTACHMENT

Page 9, Line 10, Change:

Replace "party" with "matter" such that the transcript states:

"I was deposed many, many years ago in another _**matter**_ associated with a corporation."

Reason: Transcription error.

Page 15, Line 3, Change:

Replace "counsel" with "Council" such that the transcript states:

"I'm nominated, and then I go through a confirmation process with the Governor and _**Council**_."

Reason: Transcription error.

Page 16, Line 17, Change:

Replace "RSA 21:10" with "RSA 21-N" such that the transcript states:

"Particularly in _**RSA 21-N**_ I believe is the statute."

Reason: Transcription error.

*[intentionally blank; continued on next page]*

Page 40, Lines 16–17, Change:

>   After "We do" add "have a periodic meeting";
>   Before "That would be incorrect" add "But"; and
>   After "That would be incorrect" add "to characterize it as a 'committee'"

>   With these changes, the transcript states:

>   "We do ***have a periodic meeting***.  ***But*** that would be incorrect ***to characterize it as a 'committee.'***  It's not a committee."

>   <u>Reason</u>: To clarify testimony.


Page 47, Line 22, Change:

>   After "Yes" add ", I agree with the objection that the question is vague, but I will try to answer it" such that the transcript states:

>   "Yes***, I agree with the objection that the question is vague, but I will try to answer it***. So with respect to this particular complaint, my recollection is that the direction we took was not concern over a specific piece of content so much as it was the Sora app and what students may or may not be able to access using that particular application and whether schools had configured correct security parameters in that application to prevent students from accessing content that may not be developmentally appropriate for them."

>   <u>Reason</u>: To clarify testimony.


Page 49, Line 21, Change:

>   Replace "times" with "types" such that the transcript states:

>   "I believe in this case that those ***types*** of controls had not been configured."

>   <u>Reason</u>: Transcription error.


*[intentionally blank; continued on next page]*

Page 133, Line 20, Change:

After "Yes" add ", I understand." such that the transcript states:

"Yes, *I understand.* I have no recollection of seeing either of these."

Reason: To clarify testimony.

Page 161, Line 17, Change:

Replace "contents" with "content" such that the transcript states:

"And so what I would encourage my educators to do if they were teaching this, so I myself have used that *content*, and I have used it in the context of the Declaration of Independence in the context of the Fourteenth Amendment, in the context of Plessy v. Ferguson, in the context of Martin Luther King so it seems to me that the particular text that we're referring to is quite rich in terms of the opportunity for instruction of students."

Reason: Transcription error.

Page 164, Line 5, Change:

Replace "indicator" with "educator" such that the transcript states:

"So the *educator* should not be asking themselves what is the content but what is the context of the instruction that I'm providing to students."

Reason: Transcription error.

[*end*]

**EXHIBIT 3**

DOE Attorney
Diana Fenton
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)



# Transcript of Diana Fenton

**Date:** May 17, 2023
**Case:** Local 8027, AFT-New Hampshire, et al. -v- Edelblut, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF NEW HAMPSHIRE
 3
 4   LOCAL 8027, AFT NEW HAMPSHIRE,   )
 5   et al.,                          )
 6              Plaintiffs,           )
 7   v.                               )
 8   FRANK EDELBLUT, in his official  )
 9   capacity as Commissioner of the  )
10   Department of Education ("DOE"), )
11              Defendant             )
12   ------------------------------ C.A. 1:21-cv-01077-PB
13   ANDRES MEJIA, et al.,            )
14              Plaintiffs,           )
15   v.                               )
16   FRANK EDELBLUT, in his official  )
17   capacity as Commissioner of the  )
18   Department of Education ("DOE"), )
19              Defendant.            )
20   ------------------------------)
21
22              DEPOSITION OF DIANA FENTON
23
24
25
```

## Page 2

```
 1              DEPOSITION OF DIANA FENTON
 2
 3        THIS DEPOSITION TAKEN PURSUANT TO NOTICE OF DEPOSITION
 4   AT NEW HAMPSHIRE DEPARTMENT OF JUSTICE, 33 CAPITOL STREET,
 5   CONCORD, NEW HAMPSHIRE, ON WEDNESDAY, MAY 17, 2023,
 6   COMMENCING AT 10:10 A.M.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                      APPEARANCES
 2
 3   For Plaintiffs Local 8027, AFT New Hampshire:
     STROOCK & STROOCK & LAVAN, LLP
 3   David J. Kahne, Esq.
     Elizabeth C. Milburn, Esq.
 4   Charles Moerdler, Esq. (via videoconference)
     180 Maiden Lane
 5   New York, New York 10038-4982
     (212) 806-6419
 6   dkahne@stroock.com
     emilburn@stroock.com
 7   cmoerdler@stroock.com

 8   For Plaintiffs Andres Mejia and Christina Philibotte:
     AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
 9   Gilles Bissonnette, Esq.
     18 Low Avenue
10   Concord, New Hampshire 03301
     (603) 224-5591
11   gilles@aclu-nh.org

12    - and -

13   DISABILITY RIGHTS CENTER - NEW HAMPSHIRE
     Kayla Turner, Esq. (via videoconference)
14   64 North Main Street, Suite 2
     Concord, New Hampshire 03301
15   (603) 228-0432
     kaylat@drcnh.org

16    - and -

17   GLBTQ LEGAL ADVOCATES & DEFENDERS
18   Chris Erchull, Esq. (via videoconference)
     18 Tremont Street, Suite 950
19   Boston, Massachusetts 02108
     (617) 426-1350
20   cerchull@glad.org

21    - and -

22   NIXON PEABODY, LLP
     Morgan C. Nighan, Esq. (via videoconference)
23   Exchange Place
     53 State Street
24   Boston, Massachusetts 02109
     (617) 345.1031
25   mnighan@nixonpeabody.com
```

## Page 4

```
 1                   APPEARANCES (Cont'd)
 2
     For Defendants Frank Edelblut, Christian Kim, John
 3   Formella, Ahni Malachi, and Ken Merrifield:
     NEW HAMPSHIRE DEPARTMENT OF JUSTICE
 4   Civil Bureau
     Nathan W. Kenison-Marvin, Esq.
 5   33 Capitol Street
     Concord, New Hampshire 03301
 6   (603) 271-1292
     nathan.w.kenison-marvin@doj.nh.gov
 7
     For Defendants National Education Association - New
 8   Hampshire:
     NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE
 9   Esther K. Dickinson, Esq. (via videoconference)
     9 South Spring Street
10   Concord, New Hampshire 03301
     (603) 224-7751
11   edickinson@nhnea.org

12   For Plaintiff American Federation of Teachers:
     NOLAN PERRONI, P.C.
13   Peter J. Perroni, Esq. (via videoconference)
     73 Princeton Street
14   North Chelmsford, Massachusetts 01863
     (978) 454-3800
15   peter@nolanperroni.com

16   For Defendant Department of Education:
     DEPARTMENT OF EDUCATION
17   Elizabeth A. Brown, Esq. (via videoconference)
     101 Pleasant Street
18   Concord, New Hampshire 03301
     (603) 271-6338
19   elizabeth.a.brown@doe.nh.gov

20   Court reporter:
     Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR
21
22
23
24
25
```

---

**5**

STIPULATIONS

1
2      It is agreed that the deposition shall be taken in the
3  first instance in stenotype and when transcribed may be used
4  for all purposes for which depositions are competent under
5  Federal law.
6      Notice, filing, caption and all other formalities are
7  waived.  All objections, except as to form, are reserved and
8  may be taken in court at time of trial.
9      It is further agreed that if the deposition is not
10  signed within thirty (30) days after submission to counsel,
11  the signature of the deponent is waived.

---

**6**

INDEX

WITNESS                                              PAGE
Diana Fenton
  By Mr. Bissonnette                                   8
  By Mr. Kahne                                       143

EXHIBITS

NUMBER   DESCRIPTION                                 PAGE
1        Full Text of The Banned Concepts Act          11
2        New Hampshire Code of Conduct for
         Educational Professionals                     15
3        Overview of the Department of Education's
         Educator Misconduct Practices                 18
4        Frank Edelblut, Teach Children About Racism,
         Not to be Racists                             34
5        1/26/23 House Judiciary Hearing Transcript    77
6        3/08/23 House Judiciary Hearing Transcript    77
7        8/17/21 Email with Attachment                 92
8        1/18/21 Email                                 99
9        9/21/22 Email with Attachment                102
10       1/20/23 Email with Attachment                107
11       NEA-NH 7/12/21 and 8/05/21 Letters           110
12       Attorney General Opinion No. 2021-01         114
13       9/08/21 Email                                115
14       NH Department of Education Website            116

---

**7**

EXHIBITS (Cont'd)

NUMBER   DESCRIPTION                                 PAGE
15       12/13/21 Email                               123
16       9/03/21 Email Chain                          126
17       5/24/21 Email Chain                          126
18       4/07/22 Email                                137
19       8/23/21 Email with Attachments               148
20       2/22/22 Email                                154
21       Right to Freedom from Discrimination in
         Public Workplaces and Education               159
22       11/15/21 Email Chain                         162
23       3/18/22 Email                                165

(Original exhibits were returned to Attorney Bissonnette.)
(Electronic copies of the exhibits are attached to the
transcript.)

---

**8**

1         DIANA FENTON,
2    having been duly sworn by Ms. Saalfield,
3    was deposed and testified as follows:
4         EXAMINATION
5     MR. BISSONETTE:  Good morning, Ms. Fenton.
6    THE WITNESS:  Good morning.
7     MR. BISSONETTE:  It's nice to see you again.
8   My name is Gilles Bissonnette.  I'm one of several
9   lawyers that represent the plaintiffs in this case.
10   And thank you for coming in for a deposition.
11        I just wanted to say at the outset that
12   counsel in the case have conferred and have agreed to
13   the normal stipulations which is that all objections,
14   except those to the form of the question, shall be
15   reserved to the time of trial.  Of course, that
16   stipulation excludes privilege, which can be raised as
17   well in this particular case by defense counsel.
18        And you had a -- you wanted to make sure you
19   preserved ability to read and sign?
20        MR. KENISON-MARVIN:  Just make it clear on
21   the record that we do request that our right to --
22   we'll exercise our right to do that under the rules.
23        MR. BISSONETTE:  Sure.
24   BY MR. BISSONETTE:
25 Q.  Attorney Fenton, have you been deposed before?

**9**

1  A.  No.
2  Q.  No.  So just some kind of -- I know you're an attorney,
3      but just some common ground rules, roadmap for the
4      deposition today.  There's no intention here to ask you
5      any trick questions.  If you have any questions or
6      concerns about the language I'm using in asking the
7      question, please let me know.  Obviously, the goal here
8      of all of us is to make sure we have a clear record
9      where you understand the question being asked so you
10     can answer to the best of your abilities.  Does that
11     make sense to you?
12 A.  It does.  Thank you.
13 Q.  Sure.  And, of course, if you need to take a break at
14     any point, just let me know.  We'll, of course, do
15     that.  I think we'll take breaks on the hour.  My only
16     request is that if you are asking for a break, that we
17     just close out a particular question before we do so.
18     Of course, no objection if there's a privilege concern
19     prior to answering a question if you want to confer
20     with your counsel on that, okay?
21 A.  Yes.  Thank you.
22 Q.  And do you know as well -- I just want to make sure
23     that you understand that the court may read portions of
24     this transcript, correct?
25 A.  Yes.

**10**

1  Q.  Okay.  And you know that you're under oath, correct?
2  A.  Yes.
3  Q.  Will anything prevent you from giving truthful and
4      accurate testimony today?
5  A.  I don't believe so.
6  Q.  Okay.  Throughout this deposition, I just want to make
7      sure we agree on terminology just so there's no
8      confusion and so the record is clean.  I know that in
9      the lawsuit, and in communications related to the
10     lawsuit, there's been various names for the statute
11     that's being challenged here, the banned concepts,
12     divisive concepts.
13         To avoid any kind of wrangling over terminology,
14     when I'm talking about the challenged law in this
15     deposition, I'm just going to use the phrase "HB 2."
16     Is that something we can agree on from a terminology
17     term?  I won't be talking about the other portions of
18     HB 2, but just limiting it to the challenged law.  So
19     if I use the term "HB 2" for the challenged law, will
20     we have a common understanding?
21         MR. KENISON-MARVIN:  Just object on the
22     foundation.
23         MR. BISSONETTE:  You can still answer the
24     question.
25         THE WITNESS:  If you could clarify what you

**11**

1      mean by "other portions," I believe that's a phrase you
2      used.  Other portions of the law?
3          MR. BISSONETTE:  Sure, sure.  So why don't we
4      introduce an exhibit.
5          (Exhibit 1 marked for identification.)
6  BY MR. BISSONETTE:
7  Q.  So, Ms. Fenton, I would just ask you to review Exhibit
8      1 and just let me know when you're done reviewing it,
9      please.
10 A.  I'm all set.
11 Q.  All set?  Thank you.  What is Exhibit 1?
12 A.  Exhibit 1 is House Bill 2.
13 Q.  Okay.  I'm going to refer you to pages Bates stamped
14     PL04 to PL07.  Are those the provisions of House Bill 2
15     that are being challenged in this particular lawsuit?
16 A.  That is my understanding, yes.
17 Q.  So if I were, throughout this deposition, to describe
18     those challenged provisions between PL04 and PL07 as HB
19     2, would we have just a common understanding on the
20     terminology?
21 A.  Yes.
22 Q.  Okay.  Are you a licensed attorney?
23 A.  Yes.
24 Q.  Before your role with the Department of Education,
25     which we're going to get into, what was your prior

**12**

1      position?
2  A.  I worked for the New Hampshire Attorney General's
3      office.
4  Q.  What was your role there at the time?
5  A.  I worked in the criminal bureau.
6  Q.  How long did you work in the criminal bureau?
7  A.  I worked for the New Hampshire Attorney General's
8      office from the spring of 2007 until the fall of
9      2015.
10 Q.  What were your general responsibilities in your role in
11     the criminal bureau between 2007 and 2015?
12 A.  My role was -- my position, I should say, was
13     grant-funded by the National Traffic Safety -- I forget
14     the last word.  National Traffic Safety Association.
15     It was a federal grant.
16 Q.  Okay.
17 A.  I focused on traffic fatalities.  That included
18     training law enforcement.  I did appellate work and I
19     did file work.
20 Q.  And is it fair to say in the fall of 2015, is that when
21     you moved to Department of Education, around that
22     time?
23 A.  That is accurate, yes.
24 Q.  And when you joined the Department of Education in
25     what was your role?

Transcript of Diana Fenton
Conducted on May 17, 2023

---

**13**

1  A.  My role was to oversee legislative matters, rulemaking
2     that came from newly enacted legislation, and to work
3     on educator misconduct issues.
4  Q.  And you've been with the Department of Education since
5     the fall of 2015; is that correct?
6  A.  That's correct, yes.
7  Q.  And those responsibilities that you just listed, are
8     those still your current responsibilities?
9  A.  There are some additional ones, but, yes, those are —
10 Q.  What would those be?  Thank you.  Sorry to cut you off.
11 A.  That's okay.  I oversee special ed complaints, and I
12    oversee the individual who handles our constituent
13    concerns.
14 Q.  Okay.  Is your job -- is one of your jobs as well
15    overseeing investigations under the code of conduct?
16 A.  Yes.
17 Q.  What does it mean to oversee an investigation under the
18    code of conduct?  How would you describe that
19    responsibility?
20       MR. KENISON-MARVIN:  Objection.
21       MR. BISSONETTE:  I'll rephrase.
22    BY MR. BISSONETTE:
23 Q.  What does it mean to oversee investigations under the
24    code of conduct?
25 A.  I work with and supervise Richard Farrell, who is the

---

**14**

1     investigator for the Department of Education.
2  Q.  Any other responsibilities that you have in this
3     oversight function concerning investigations under the
4     code of conduct?
5  A.  Can you clarify the question?
6  Q.  Sure.  When you're overseeing investigations under the
7     code of conduct, in addition to working with
8     Mr. Farrell, are there any other things that you do in
9     that oversight role?
10 A.  I work with the union attorneys who are representing
11    educators.
12 Q.  Anything else that you do?
13 A.  I work with the school districts that might be involved
14    in the situation.
15 Q.  Okay.  Would it also -- would this responsibility in
16    overseeing investigations under the code of conduct
17    also involve interpreting the code of conduct and what
18    may be a violation?
19 A.  Can you clarify your question?
20 Q.  Sure.  In overseeing investigations under the code of
21    conduct, is one of your responsibilities to interpret
22    under the code of conduct what could constitute a
23    violation?
24 A.  Yes.
25 Q.  In addition to working with school districts as part of

---

**15**

1     this oversight role -- strike that.
2        As part of this oversight role, when you're
3     working with school districts, would you also request
4     documents from school districts?
5  A.  Yes.
6  Q.  And when -- strike that.
7        I'm going to introduce one more exhibit.  It's the
8     code of conduct.  I just need to identify it.  Let me
9     find it here.  It's right here.
10       (Exhibit 2 marked for identification.)
11    BY MR. BISSONETTE:
12 Q.  Before I ask you just to identify Exhibit 2, in your
13    oversight role with respect to overseeing
14    investigations under the code of conduct, does that
15    also include having communications with school district
16    superintendents?
17 A.  Yes.
18 Q.  Would that also include having communications with
19    teachers directly?
20 A.  It could, yes.
21 Q.  Could you identify -- strike that.
22       Could you just review Exhibit 2 and let me know
23    when you've completed your review of it, please?  Thank
24    you.
25       Have you finished reviewing Exhibit 2?

---

**16**

1  A.  Yes.
2  Q.  Thank you.  What is Exhibit 2?
3  A.  It is more expansive than the code of conduct.  It
4     starts with Administrative Rule Ed 501.01.  It goes
5     into Ed 502, which is public information to include the
6     confidentiality of credential holders, certification
7     records.  Ed 504.04, emergency authorization.  And then
8     it goes into Ed 510, which is entitled code of conduct.
9     It also includes Ed 511, which is investigations and
10    disciplinary proceedings.  And it includes Ed 512,
11    denial of certifications.
12 Q.  The code of conduct begins on the page Bates stamped
13    PL00015, correct?
14 A.  Yes.
15 Q.  What is the code of conduct?
16 A.  The code of conduct is for licensed educators in the
17    state of New Hampshire.
18 Q.  And what is the code of conduct -- strike that.
19       When was the code of conduct created?
20 A.  It was created in 2018.  It was adopted by the state
21    board in November of 2018.
22 Q.  And why was the code of conduct created in 2018?
23 A.  The code of conduct was created in 2018 in response to
24    a statute that had passed.
25 Q.  Did that statute require the creation of a code of

**Page 17**

1    conduct?
2  **A.  Yes.**
3   Q.   Is that a statute that the Department of Education
4      supported?
5  **A.  As a public agency, as a state agency, the Department**
6   **of Education does not support or oppose legislation.**
7   Q.   Did the Department of Education testify on the
8      legislation that authorized the creation of a code of
9      conduct?
10 **A.  I do not recall.**
11  Q.   So the legislature mandated the creation of the code of
12      conduct; is that correct?
13 **A.  Yes.  That is what I testified to.**
14  Q.   Do you know why -- why did the legislature -- do you
15      know why the legislature required the creation of a
16      code of conduct?
17 **A.  I can't speculate as to why the legislature passed that**
18 **bill.**
19  Q.   Were you involved in discussions with legislators with
20      respect to the bill requiring the creation of a code of
21      conduct?
22 **A.  I'm sure I was.  I don't recall the details of those**
23 **conversations.**
24  Q.   Did you have any internal communications with
25      Department of Education employees at or around 2018

**Page 18**

1    about the need for a code of conduct?
2  **A.  Sitting here today, I do not recall if I had —**
3   Q.   I'm sorry, I didn't mean to interrupt.
4      Do you have any understanding why the code of
5      conduct was created?
6  **A.  My understanding was the code of conduct was created**
7   **pursuant to the law that had passed.**
8   Q.   Do you have any understanding why that law was
9      passed?
10 **A.  I think that question would cause me to speculate on**
11 **legislative intent.**
12      MR. BISSONETTE:  Okay.  I'm going to mark
13   this exhibit.  This will be Exhibit 3.
14      (Exhibit 3 marked for identification.)
15   BY MR. BISSONETTE:
16  Q.   So, Attorney Fenton, I'd just ask you to review Exhibit
17      3.  Just let me know when you're done.
18 **A.  I don't think you meant to give this to me at this**
19 **time.**
20  Q.   You're right.  I don't think so.  My apologies.
21      There's too many documents.
22      Have you finished reviewing Exhibit 3?
23      MR. KENISON-MARVIN:  Let the record reflect
24   that the witness handed the paper back to Attorney
25   Bissonnette.

**Page 19**

1      MR. BISSONETTE:  It is reflected.  Thank you.
2   BY MR. BISSONETTE:
3   Q.   So before you, you have Exhibit 3, correct?
4  **A.  Yes.**
5   Q.   What is Exhibit 3?
6  **A.  Exhibit 3 is — appears to be printouts of a PowerPoint**
7   **presentation, the title of which is "Overview of the**
8   **Department of Education's Educator Misconduct Practices**
9   **and Conducting Effective Investigations."**
10  Q.   Did you prepare Exhibit 3?
11 **A.  Yes.**
12  Q.   Okay.  Did you get any assistance from other Department
13      of Education employees in preparing Exhibit 3?
14 **A.  I might have.  Sitting here today, I do not recall.**
15  Q.   I'm just going to refer you to page two of Exhibit 3,
16      which is Bates stamped DOE5650.
17      The first bullet point says, "The reason behind
18      the COC."
19      Did you write those words?
20 **A.  I believe I did, yeah.**
21  Q.   Do you give presentations about the code of conduct and
22      the reasons behind the code of conduct?
23 **A.  That's a compound question.**
24      MR. BISSONETTE:  I'll strike that.
25   BY MR. BISSONETTE:

**Page 20**

1   Q.   Do you give presentations on the code of conduct?
2  **A.  I do.**
3   Q.   Who do you give presentations to?
4  **A.  I give presentations on the code of conduct to**
5   **educators, and I give presentations on the code of**
6   **conduct to administrators, and most recently was asked**
7   **to present on the code of conduct to noncertified**
8   **school staff.**
9   Q.   And, as part of those presentations, do you explain the
10      reasons behind the code of conduct?
11 **A.  Yes.**
12  Q.   And, in those presentations, what do you say when you
13      discuss the reasons behind the code of conduct?
14 **A.  Can you clarify your question, please?**
15      MR. BISSONETTE:  Can you read the question
16   back, please?
17      (Court reporter read back question.)
18      THE WITNESS:  Are we just referring to the
19   presentation I give that is labeled as Exhibit 3, or
20   other presentations?
21   BY MR. BISSONETTE:
22  Q.   Why don't we limit it to the one that's on Exhibit 3
23      dated December 2021.  Fair enough.
24 **A.  Okay.  So I believe in this particular presentation,**
25 **this was for superintendents or administrators, and I**

---

**21**

1    wanted to address the role of the code of conduct and
2    how it intersects with the administrator's role in
3    handling employment issues.
4  Q.  What do you recall saying when you discussed the reason
5    behind the code of conduct in this presentation,
6    Exhibit 3?
7  A.  I think it's set out on DOE05650, what was discussed.
8  Q.  And what was that?
9  A.  That handling issues of educator misconduct as an
10    employment issue only does not solve what is a
11    statewide issue.
12  Q.  Do you recall at this presentation discussing any other
13    reasons behind the code of conduct?
14  A.  Again, referencing exhibit -- DOE05650, which I am sure
15    I referenced in giving the presentation, it states that
16    child safety is not a ZIP code issue, which seems to
17    tie into local control does not solve what is a
18    statewide issue of educator misconduct.
19  Q.  Beyond what's on page 5650 of Exhibit 3, are there any
20    other reasons that you're aware of why the code of
21    conduct exists?
22  A.  The code of conduct exists because it was required
23    pursuant to the legislation that was passed.
24  Q.  Do you think the code of conduct is important for the
25    state of New Hampshire?

**22**

1    MR. KENISON-MARVIN:  Objection.  Vague.
2    MR. BISSONETTE:  You can answer.
3    THE WITNESS:  I do.
4  BY MR. BISSONETTE:
5  Q.  Why?
6  A.  The code of conduct helps to protect children in the
7    state of New Hampshire.
8  Q.  How does it help them?
9  A.  When educators who are having an inappropriate
10    relationship with a child are released from employment
11    in one district, and they go to another district and
12    reoffend, the code of conduct helps to prevent that.
13  Q.  Are there any other scenarios in which you think the
14    code of conduct is important to have in the state of
15    New Hampshire?
16  A.  Not that I can recall at this moment sitting here.
17  Q.  With respect to the code of conduct back on Exhibit 2,
18    again, starting on page 0015, is this something that
19    you were involved in drafting?
20  A.  And are you referring to it in its entirety from
21    0015 --
22  Q.  No, that's a great question.  I'm referring to the
23    pages starting at section Ed 510.01 to page 23 -- 22.
24    So were you involved in drafting any portions of
25    those pages?

**23**

1  A.  There appear to be two administrative rules within the
2    pages you've referenced.  Can we address them
3    individually?
4  Q.  What's the first administrative rule you're referring
5    to?
6  A.  So administrative rule Ed 510.
7  Q.  And the second is 511?
8  A.  Yes.
9  Q.  Great.  No, I appreciate that clarification.
10    Why don't we just focus now on 510?  Are you
11    involved in drafting that provision of those
12    administrative rules?
13  A.  Are you referring to all of them, 510.01 through
14    510.05?
15  Q.  I am.  Any portion of those provisions.
16  A.  Yes.
17  Q.  And which portions?
18  A.  I participated in the drafting of Ed 510.01, Ed 510.02,
19    Ed 510.03, Ed 510.04, and Ed 510.05.
20  Q.  Okay.  And now on to section 511.  Were you involved in
21    the drafting of any portions of that administrative
22    rule?
23  A.  I was involved in drafting Ed 511.01.  I was involved
24    in drafting Ed 511.02.  I was involved in drafting Ed
25    511.03.  I was involved in drafting Ed 511.04.  And I

**24**

1    was involved in drafting Ed 511.05.
2  Q.  Thank you.  With respect to those provisions, section
3    511 and 510, was there any other DOE employees involved
4    in the drafting of those provisions?
5  A.  You're referring to Ed 510 and 511?
6  Q.  Yes.
7  A.  In their entirety?
8  Q.  Yes.
9  A.  Yes.
10  Q.  And who would those individuals be?
11  A.  These are individuals from the Department of Education?
12  Q.  Yes.
13  A.  Nicole Highmark, Amanda Phelps.  There were probably
14    others, but, sitting here today, I can't recall other
15    than those exact individuals.
16  Q.  It was five years ago.  Who enforces -- strike that.
17    Does the Department of Education enforce the code
18    of conduct?
19  A.  What do you mean by "enforce"?
20  Q.  Bear with me.  So the definition of "enforce," as I
21    understand it, is "compelling compliance with."  So is
22    that your understanding of what "enforcement" means?
23  A.  I can agree to that term, yes.
24  Q.  Okay.  So does the Department of Education enforce the
25    code of conduct?

25

1  A.  Yes.
2  Q.  Okay.  Does any other entity enforce the code of
3      conduct in the state of New Hampshire?
4  A.  **My understanding is that there are school districts**
5      **that have adopted the code of conduct into their school**
6      **policies, so I'm not sure if that falls within your**
7      **vision of the question.**
8  Q.  So beyond school districts that have independently
9      placed the code of conduct in their policies, is there
10     any other entity in the state of New Hampshire that
11     enforces the code of conduct that's in Exhibit 2?
12  A.  **To the best of my knowledge, no.**
13  Q.  Okay.  So would it be fair to say then if the
14     Department of Education enforces the -- strike that.
15     I'm going to move on.
16     With respect to Exhibit 1, which is the -- which
17     is HB 2, I just want to direct your attention to page
18     07, Roman numeral IV, that says, "A violation of this
19     section by an educator shall be considered a violation
20     of the Educator Code of Conduct that justifies
21     disciplinary sanction by the State Board of Education."
22     Do you see that language?
23  A.  **I do.**
24  Q.  Is it fair to say that the language -- that language in
25     HB 2 makes clear that the prohibitions in HB 2 are in

26

1      the Educator Code of Conduct?
2      MR. KENISON-MARVIN:  Objection to the extent
3      it calls for a legal opinion.
4      MR. BISSONETTE:  You can answer if you can.
5      MR. KENISON-MARVIN:  Also object under Rule
6      106, completeness, with the redaction at the bottom of
7      the page not being -- you can provide the witness with
8      a -- but if that information is --
9      MR. BISSONETTE:  I can submit that that
10     redacted information is a separate portion of HB 2 that
11     has no bearing on the challenged statute in this case.
12     MR. KENISON-MARVIN:  Okay.  Do you have an
13     unredacted copy just so that I can see that?
14     MR. BISSONETTE:  I can submit it on the
15     record.  You know, we can -- at a break, I can show it
16     to you.
17     MR. KENISON-MARVIN:  Okay.
18     MR. BISSONETTE:  Again, I'm not --
19     MR. KENISON-MARVIN:  I think that's -- I
20     think that's correct.
21     MR. BISSONETTE:  I'm not trying to slip one
22     past anyone.  This was filed as an exhibit to the
23     lawsuit in this particular case as Exhibit 1.  The
24     redactions exist just so individuals can differentiate
25     the portions of the challenged law and the challenged

27

1      law at issue in this case, differentiate that from the
2      other provisions of the HB 2 trailer bill that have no
3      bearing on this case, and, in many instances, reflect
4      issues that are totally unrelated to the topics in this
5      case.
6      MR. KENISON-MARVIN:  I would just preserve an
7      objection to the extent if there were information
8      that's redacted, it would be responsive to the
9      question.  I preserve that.
10     MR. BISSONETTE:  Fair enough.  Can I get the
11     question read back, please?
12     (Court reporter read back question.)
13     THE WITNESS:  I don't think it makes clear
14     that a violation is in the code of conduct, no.  That's
15     not how I read that.
16  BY MR. BISSONETTE:
17  Q.  Was the Department of Education involved in drafting
18     that section, Roman numeral IV?
19  A.  **When you ask about the Department of Education, I can't**
20     **speak to the entire office.  I can speak to my role.**
21  Q.  Did you have a role with respect to the language in
22     paragraph four on page 07 of Exhibit 1?
23  A.  **No, I did not.**
24  Q.  Reading Roman numeral IV, do you believe that the
25     provisions of HB 2 are in the code of conduct?

28

1      MR. KENISON-MARVIN:  Objection.  Vague.  You
2      can answer.  Also object to the extent it calls for a
3      legal opinion.
4      THE WITNESS:  I assume I can answer?
5      MR. BISSONETTE:  If you can.
6      THE WITNESS:  Can you read back the question?
7      (Court reporter read back question.)
8      THE WITNESS:  The exact provisions of HB 2 in
9      the code of conduct?  No, I do not.
10  BY MR. BISSONETTE:
11  Q.  Is that reflective of the Department of Education's
12     positions since the enactment of HB 2 in June 2021?
13  A.  **I can't speak for the entire department.**
14  Q.  What's your role as the individual that oversees
15     investigations in the code of conduct?
16  A.  **I'm involved in imposing discipline, when appropriate,**
17     **on an educator's license if there's a confirmed**
18     **violation of the code of conduct.**
19  Q.  Do you know if anyone in the Department of Education
20     was involved in the drafting of paragraph four?
21     MR. KENISON-MARVIN:  Objection to the extent
22     information calls -- responsive information talks about
23     legislative privilege and relates to conversations that
24     anyone at DOE would have had with legislators in
25     creating the statute -- the bill that was presented to

**29**

1  the legislature.  We would take the position that those
2  conversations are a legislative act for which the
3  legislative privilege would apply.
4      MR. BISSONETTE:  I just want to make sure I
5  understand the objection.  Are you instructing her not
6  to answer to the extent it implicates communications
7  that occurred between the Department of Education and
8  legislators?
9      MR. KENISON-MARVIN:  Can I hear the question
10  one more time?
11      (Court reporter read back question.)
12      MR. KENISON-MARVIN:  So the substance of
13  communications.  I would maintain the objection.
14      MR. BISSONETTE:  Okay.
15      MR. KENISON-MARVIN:  To the extent the
16  question is "Do you know if anyone was involved," you
17  can answer that question.  The substance of their
18  communications, to the extent you are aware of any, I
19  would instruct you not to answer those on the basis
20  that it's protected by legislative privilege.
21      THE WITNESS:  I am not aware of anyone at the
22  Department of Education who was directly involved in
23  drafting paragraph four on lines 11 and 12.
24  BY MR. BISSONETTE:
25  Q.  Did the Department of Education support the inclusion

**30**

1  of paragraph four?
2  **A.  I've testified previously that the Department of**
3  **Education is a state agency, and it does not support or**
4  **oppose legislation.**
5  Q.  Did the commissioner of education support HB 2?
6      MR. KENISON-MARVIN:  Objection.  Vague.
7      THE WITNESS:  I cannot speak --
8  BY MR. BISSONETTE:
9  Q.  Do you recall ever reading an op-ed published by the
10  commissioner of education in which he articulated his
11  support for HB 2?
12  **A.  I think you asked me a question, I didn't get a chance**
13  **to fully answer it, and then you asked another**
14  **question.  If we could pick those apart so I could**
15  **fully answer them?**
16  Q.  Sure.
17  **A.  I apologize.**
18  Q.  Sure.  I believe your testimony is that the Department
19  doesn't take -- doesn't support or oppose legislation;
20  is that correct?
21  **A.  That's correct.**
22  Q.  Okay.
23  **A.  The state agency only provides what we refer to as**
24  **technical assistance.**
25  Q.  Got you.  It's true, though, that the commissioner of

**31**

1  education will take positions on legislation, right?
2  **A.  I'm not here to testify on behalf of Commissioner**
3  **Edelblut.**
4  Q.  That's not my question.  You work with Commissioner
5  Edelblut, correct?
6  **A.  Yes, I do.**
7  Q.  Are you aware of the positions that he takes on
8  legislation?
9  **A.  All legislation?  Can you clarify your question?**
10  Q.  Generally.  Generally.  Are you aware of positions that
11  the commissioner of education takes on legislation?
12  **A.  You're going to have to clarify your question.  It's a**
13  **very broad question.**
14  Q.  Sure.  Are you aware of any instance in which the
15  commissioner of education has conveyed his support for
16  legislation?
17      MR. KENISON-MARVIN:  I guess I will state --
18  instruct the witness not to answer to the extent there
19  were conversations that the legislative privilege would
20  protect with respect to the commissioner's knowledge of
21  conversations between commissioner and a legislator.
22  I'm not sure if you're asking for that, but I would
23  assert that privilege.
24      MR. BISSONETTE:  I think that objection
25  doesn't come close to the question, frankly, that I've

**32**

1  asked.  So I'd just ask that it be read back just so
2  the witness is aware of it.  Thank you.
3      (Court reporter read back question.)
4      THE WITNESS:  Would it be possible to narrow
5  the time frame?  I've worked in this role overseeing
6  the legislative affairs -- as you, yourself, said, it
7  was five years ago -- since 2015.  I believe
8  Commissioner Edelblut began in 2017.  You probably
9  would know better than I would.  So that's a big chunk
10  of time over which we've had a lot of bills come
11  forward.  Is it possible for you to narrow your
12  question?
13  BY MR. BISSONETTE:
14  Q.  Sure.  I just want to -- I'm not trying to hide the
15  ball here.  Really, what I'm trying to get at is your
16  testimony that the Department doesn't support or oppose
17  bills.
18  **A.  Yes.**
19  Q.  And I'm trying to flush that out.  So my question is
20  are you aware of any instance in which the commissioner
21  of education, on behalf of the Department of Education,
22  has conveyed support publicly for legislation?  Are you
23  aware of any instance?
24      MR. KENISON-MARVIN:  Objection.  Vague.
25      THE WITNESS:  Support publicly, or

Transcript of Diana Fenton
Conducted on May 17, 2023

**33**

1  conversations that he and I have had or we have had as
2  a legislative team?
3  BY MR. BISSONETTE:
4  Q.  That's a fair clarification.  Public support.  Can you
5    answer the question with that caveat?
6  **A.  So just so I'm clear, Commissioner Edelblut, speaking**
7  **publicly, supporting or opposing a particular bill?**
8  Q.  Yes.
9  **A.  Do I have personal knowledge of it?  I have heard of**
10 **it.  I am not aware of -- I can't think of a particular**
11 **instance in which that has occurred.**
12 Q.  With respect to that situation in which you've heard of
13   it, do you recall the context?
14   MR. KENISON-MARVIN:  Objection.  Vague.
15 Misstating prior testimony as well.
16   THE WITNESS:  Is it possible to clarify the
17 question?
18   MR. BISSONETTE:  Can you read back her prior
19 response, please?
20   (Court reporter read back answer.)
21 BY MR. BISSONETTE:
22 Q.  When you said you have heard of it, what were you
23   referring to?
24 **A.  I have heard of other people saying to me there was an**
25 **op-ed or Commissioner Edelblut attended an event, but I**

**34**

1  **have not personally read the op-eds or attended those**
2  **events with Commissioner Edelblut.**
3  Q.  What Commissioner Edelblut writes an op-ed, do you know
4    if he's writing on behalf of the Department of
5    Education or himself in an individual capacity?  Do you
6    have any knowledge of that?
7    MR. KENISON-MARVIN:  Objection.  Vague.
8  Calls for a legal conclusion.
9    THE WITNESS:  Do I still answer the question?
10   MR. KENISON-MARVIN:  You can answer to the
11 extent you know.  I maintain the objection.
12   THE WITNESS:  I am not aware.  That's a
13 question better posed to Commissioner Edelblut.
14   MR. BISSONETTE:  I'm going to mark the next
15 exhibit, which I think is Exhibit 4, if I'm not
16 mistaken.
17   (Exhibit 4 marked for identification.)
18   MR. KENISON-MARVIN:  We're running up on the
19 hour.  I don't know if you want to do this?
20   MR. BISSONETTE:  Yes, we'll finish Exhibit 4.
21   MR. KENISON-MARVIN:  Okay.
22 BY MR. BISSONETTE:
23 Q.  Are you finished reviewing Exhibit 4?
24 **A.  I have.  Thank you.**
25 Q.  What is Exhibit 4?

**35**

1  **A.  Exhibit 4 is entitled Frank Edelblut, "Teach Children**
2  **About Racism, Not To Be Racist."  Union Leader.  And**
3  **then in parentheses it has the date of June 13th, 2021.**
4    **It appears to be what's referred to as an op-ed**
5  **written by Commissioner Edelblut.**
6  Q.  Have you seen this before your deposition today?
7  **A.  No.**
8  Q.  So this is the first time you've seen this document?
9  **A.  First time.**
10 Q.  And did you just read it just moments ago?
11 **A.  I did.**
12 Q.  Do you think it would be correct based on this op-ed to
13   say that Commissioner Edelblut supported HB 2?
14 **A.  I'm not here to testify on behalf of Commissioner**
15 **Edelblut.  Based on your question and my interpretation**
16 **of the op-ed, I think the op-ed is pretty clear.  It**
17 **speaks for itself that he is in support of it, yes.**
18 Q.  I want to go back if I may, Attorney Fenton, just to
19   Exhibit 1, paragraph four again, that states,
20   "Violation of this section by an educator shall be
21   considered a violation of the Educator Code of
22   Conduct."
23     As someone who enforces the code of conduct, under
24   this provision, is a violation of HB 2 a violation of
25   the code of conduct?

**36**

1    MR. KENISON-MARVIN:  Objection to the extent
2  it calls for a legal opinion.  You can answer.
3    THE WITNESS:  Based on my plain reading of
4  the -- of this statute -- and, again, referencing
5  section IV, which is lines 11 and 12 -- yes, it would
6  be a violation of the Educator Code of Conduct.
7  BY MR. BISSONETTE:
8  Q.  Do you know -- do you know of anyone at the Department
9    of Education was involved in drafting this language?  I
10   think I asked that, but I just wanted to make sure I
11   have the answer correct.
12 **A.  I can only speak to what my actions were.  I think my**
13 **testimony was clear.  I was not involved.  To the best**
14 **of my recollection, sitting here today, I was not an**
15 **active participant in crafting paragraph four, which is**
16 **lines 11 and 12.**
17 Q.  My question is a little different, though.  Do you know
18   if anyone else at the Department of Education was
19   involved in drafting section four?  I know you weren't,
20   but was anyone else?
21   MR. KENISON-MARVIN:  Well, asked and
22 answered.  You can answer.
23   THE WITNESS:  To the best of my knowledge, I
24 don't know of anyone who was directly involved in
25 drafting section four, no.

**37**

1  BY MR. BISSONETTE:
2  Q.  Were you ever in meetings at or around June 2021 in
3  which this section was discussed by your DOE
4  colleagues?
5        MR. KENISON-MARVIN: Objection. Vague. You
6  can answer.
7        THE WITNESS: To the best of my recollection,
8  I do not recall being in a meeting where this
9  provision, section IV of HB 2, was discussed.
10       MR. BISSONETTE: Is now a good time for a
11  break? We've been going for an hour. Is that good?
12       MR. KENISON-MARVIN: Yes.
13       MR. BISSONETTE: Great.
14       (Recess taken.)
15  BY MR. BISSONETTE:
16  Q.  You're still under oath, Attorney Fenton. I want to
17  just go now to Exhibit 2, and I'm going to be asking
18  you some questions on the code of conduct provisions.
19  Again, the provisions start on the page Bates stamped
20  PL00015.
21  A.  Before we do that, may I clarify —
22  Q.  Absolutely.
23  A.  — some testimony I gave prior to the break on what is
24  marked as Exhibit 4? It's Commissioner Edelblut's
25  op-ed. I believe my testimony, when asked if I was

**38**

1  familiar with this document, was no. I would like to
2  clarify that to the best of my recollection, I had not
3  seen that or read that document in its entirety until
4  today.
5  Q.  Okay. Before today, had you seen portions of the
6  op-ed?
7  A.  I don't believe I'd seen portions of it.
8  Q.  Okay.
9  A.  Again, to the best of my recollection —
10  Q.  Okay.
11  A.  — this was the first time that I had read it in —
12  certainly in its entirety.
13  Q.  Okay. Were you aware it existed before today?
14  A.  Was I aware of this exact op-ed? No. Am I aware that
15  Commissioner Edelblut writes op-eds? Yes, I am.
16  Q.  Did you have -- even though you hadn't read it in full
17  until just moments ago, did you have any awareness of
18  the contents of the op-ed?
19       MR. KENISON-MARVIN: Objection. Vague.
20       THE WITNESS: Is it possible to clarify that
21  question?
22  BY MR. BISSONETTE:
23  Q.  So I know that you haven't read it. I guess what I'm
24  trying to --
25  A.  Well, I did read it before the break.

**39**

1  Q.  Yes, of course. I know that you didn't read it in full
2  until today, correct?
3  A.  That is correct.
4  Q.  Were you a party to any Department of Education
5  communications about the contents of this op-ed before
6  today?
7  A.  To the best of my knowledge, sitting here today, I do
8  not recall being involved in any such discussions.
9  Q.  Before you read it in full today, did you have any
10  understanding as to any portions of this op-ed?
11       MR. KENISON-MARVIN: Objection. Vague. You
12  can answer.
13       THE WITNESS: Would it be possible to clarify
14  that, what you mean by "understanding any portions"?
15       (Court reporter read back question.)
16  BY MR. BISSONETTE:
17  Q.  Before you read it in full today, did you have any
18  awareness of any portion of this op-ed?
19       MR. KENISON-MARVIN: Same objection. You can
20  answer.
21       THE WITNESS: I apologize for being
22  difficult. I think the question is very broad.
23  BY MR. BISSONETTE:
24  Q.  Do you have any ability to answer that question?
25  A.  I'll refer back to my prior testimony that I was aware

**40**

1  that Commissioner Edelblut likes to write op-eds about
2  a variety of topics. Was I directly aware of this
3  op-ed marked as Exhibit 4? No, I was not.
4  Q.  And I believe your testimony, just so I'm clear, was
5  that you don't recall being a party to any internal
6  Department of Education communications in which this
7  op-ed was discussed, correct?
8  A.  That is correct. Sitting here today, I do not recall
9  being involved in any internal discussions about this
10  particular op-ed.
11  Q.  So I'm going to go back now to just Exhibit 2 kind of
12  where we left off moments ago.
13  A.  Thank you for the opportunity to clarify.
14  Q.  No, that's important, and it's part of the process, so,
15  no, I appreciate that.
16       The code of conduct, again, it starts on Exhibit 2
17  at Bates stamp PL00015. I'm not going to ask you any
18  questions about specific provisions right now, but,
19  just generally, can anyone make a complaint under the
20  code of conduct?
21       Why don't I ask it this way? Strike that.
22       Who can make a complaint under the code of
23  conduct?
24  A.  Pursuant to the code of conduct, superintendents have
25  an obligation to report any time there is belief that

41

1 there has been a violation of the code of conduct. I
2 believe you'll find that in Ed 510.05.
3 Q. Is there any language that you're aware of in the code
4 of conduct in Exhibit 2 that limits who can make a
5 complaint under the code?
6 A. No. I'm not aware of any language that would limit
7 that.
8 Q. And just so as to not hide the ball, I'm looking, in
9 particular, at section 511.01 (A) which is on page 18.
10 And that language says, in subsection A, "A case shall
11 be opened when a complaint of possible misconduct
12 against a credential holder has come to the attention
13 of the Department either through direct reporting or
14 other means."
15 Do you see that language?
16 A. I do, yes.
17 Q. And, just so I'm clear, anyone can make a complaint
18 under that language, right?
19 A. Yes.
20 Q. And, again, so as to not hide the ball, I'm still on
21 that section, 511.01 (A). Would you agree with me that
22 the Department of Education is required to open a case
23 when a complaint of possible misconduct against a
24 credentialed teacher has come to the attention of the
25 Department?

42

1 A. I want to clarify that you had referenced the code of
2 conduct. My reading of this document, we are now in Ed
3 511, which is investigations and disciplinary
4 proceedings. That's a separate section from the code
5 of conduct.
6 Q. That's a great clarification. So when you look at
7 subsection A, and it says "possible misconduct," is
8 that -- does that include violations of the code of
9 conduct?
10 A. Yes.
11 Q. Okay. So kind of going back now to my original
12 question. Would you agree with me that the Department
13 of Education is required to open a case when a
14 complaint of possible misconduct against a credentialed
15 teacher has come to the attention of the Department?
16 A. Yes.
17 Q. So what does "opening a case" mean?
18 A. The Department's practice is to document what is
19 reported.
20 Q. And how does the Department document what is reported
21 when it opens a case?
22 A. I would refer most of these questions to Richard
23 Farrell, who is the investigator who does most of the
24 paperwork piece of this.
25 Q. I definitely will ask him that, but I want your

43

1 understanding, the best you possibly can.
2 MR. BISSONETTE: So could I just have that
3 question read back for me, please?
4 (Court reporter read back question.)
5 BY MR. BISSONETTE:
6 Q. So what's your understanding?
7 A. How does it document what is reported?
8 Q. Yes. I believe your testimony was, when I asked what
9 does it mean to open a case, and you said the
10 Department documents what is reported. And what I want
11 to know is how does the Department document what is
12 reported, based on your understanding?
13 A. We document -- the Department, rather, would make note
14 of the allegation, the person who is reporting it, the
15 person involved, and their -- depending on the
16 circumstance, there could be other information gathered
17 as well.
18 Q. In deciding whether to open a case -- strike that.
19 In determining whether there's possible misconduct
20 which would require the Department to open a case, does
21 the Department reach out to the complaining party?
22 A. I guess I'm confused by your question. A complaining
23 party would be the person who's reporting it.
24 Q. So I guess my question is you receive a complaint.
25 Would there be follow-up by the Department with the

44

1 complaining party as the Department decides when to
2 open a case or if to open a case?
3 A. Depending upon the facts, there could be that
4 additional follow-up, yes.
5 Q. So let me kind of get to the heart of this, then. So
6 in looking at this language in 511.01 (A) which states
7 that "a case shall be opened when a complaint of
8 possible misconduct against a credential holder has
9 come to the attention of the Department either through
10 direct reporting or other means," what is the process
11 that is used to determine whether -- what is a
12 complaint of possible misconduct that would trigger a
13 case opening?
14 A. Some of the initial criteria that the Department of
15 Education considers is whether or not the individual
16 that is being reported is, in fact, a licensed
17 educator.
18 Q. If I may? If the person is, in fact, a licensed
19 educator, is there any other criteria that's used in
20 determining whether or not the complaint consists of
21 possible misconduct that would trigger opening a case?
22 A. The process would include getting some facts that would
23 support the allegation to determine if the allegation
24 does, in fact, fall within the code of conduct or if it
25 falls outside of the code of conduct.

45

1    Q. Got you. So I know this happens before you open a
2       case. So in determining whether the case should be
3       opened, and when you're gathering those facts, how
4       would the Department go about gathering those facts?
5    A. **Your question is very broad. Every case is different,**
6       **as I think you well know. In general terms, those**
7       **facts are gathered during that initial conversation.**
8    Q. Okay. Are facts gathered by reaching out to school
9       superintendents at this stage in deciding whether to
10      open a case?
11   A. **That could be done, yes.**
12   Q. Are documents requested?
13   A. **That request could be made, yes.**
14   Q. Who's involved in the Department in the decision to
15      decide whether to open a case?
16   A. **Typically, the decision is a discussion between myself**
17      **and Richard Farrell.**
18   Q. Is the commissioner involved in those decisions in
19      deciding whether to open a case?
20   A. **No.**
21   Q. Has he ever been involved in that decision to decide
22      whether to open a case?
23   A. **When the Department of Education opens a case, it's**
24      **just in receipt of information. There's no**
25      **decision-making position at that point in time.**

46

1    Q. But in reading -- I just want to make sure my
2       understanding is correct here. In looking at 511.01
3       (A), my reading of that is that a case is opened when a
4       complaint of possible misconduct occurs. So is it
5       inaccurate to say that the Department makes a
6       determination as to whether or not possible misconduct
7       occurred before opening a case?
8    A. **I think that Ed 511.01 (A) has to be read in**
9       conjunction with Ed 511.01 (B).
10   Q. Okay. Is there a difference between opening a case and
11      an investigation within the Department?
12   A. **Based upon my understanding of the code of conduct and**
13      **Ed 511, yes, there is.**
14   Q. So that's really what I'm trying to parse out here. So
15      going back to subsection A. Does the Department make a
16      determination as to whether possible misconduct may
17      have occurred in deciding whether to open a case?
18   A. **No.**
19   Q. So how do you -- how would you then explain the process
20      in deciding whether to open a case, just so I
21      understand the process clearly.
22   A. **My understanding of the code of conduct in Ed 511.01**
23      **and the Department of Education's practice as it**
24      **relates to this area is that a case is opened when**
25      **information is received.**

47

1    Q. Would you open a case if a complaint was made but you
2       couldn't identify any potential violation of the code
3       of conduct in the complaint?
4          MR. KENISON-MARVIN: Can I object?
5       Vagueness. Can you clarify when you're saying "you"?
6       Some of your questions have been DOE. Can you just
7       clarify that?
8          MR. BISSONETTE: I'm asking -- she oversees
9       these investigations, so I'm asking what she knows.
10         THE WITNESS: Can you read the question back?
11         (Court reporter read back question.)
12         THE WITNESS: So opening a case would be
13      getting enough information to decide if there was a
14      possible violation or there wasn't. It's the initial
15      fact-finding, if you will, fact gathering.
16   BY MR. BISSONETTE:
17   Q. Got it. So, just so I'm clear, a case will be opened
18      before a determination has been made that there's
19      possible misconduct. Is that an accurate understanding
20      of how the Department proceeds?
21   A. **In terms of documenting information received, yes.**
22   Q. Okay. Gotcha. Okay. I'm going to move on now to
23      paragraph B here that says, "After an initial review,
24      if the Department determines that a possible violation
25      of the code" -- I'm going to delete the as-specified

48

1       language -- "has occurred, an investigation shall be
2       opened."
3          Do you see that language?
4    A. **Yes.**
5    Q. So I just want to make sure it's accurate to say that
6       an investigation shall be opened by the Department
7       after an initial review if the Department determines
8       there's a possible violation, right?
9    A. **Yes, that is what Ed 511.01 (B) says, yes.**
10   Q. So if the Department concludes that there has been a
11      possible violation, the Department is obligated to open
12      an investigation, right?
13         MR. KENISON-MARVIN: Objection to the extent
14      it calls for a legal conclusion. You can answer.
15         THE WITNESS: Can you read the question back?
16         (Court reporter read back question.)
17         THE WITNESS: That is my understanding of Ed
18      511.01 (B), yes.
19   BY MR. BISSONETTE:
20   Q. So in determining whether there has been a possible
21      violation, I want to make sure I understand your
22      testimony correct. That would also include reaching
23      out to gather information from school districts,
24      correct?
25   A. **It could.**

49

1  Q.  What else could it include?

2  A.  **We could talk to other individuals that might be**

3  **administrators. Depends on the nature of the facts.**

4  Q.  And it could include requesting documents from school

5  districts, right?

6  A.  **I believe I've already testified to that, yes.**

7  Q.  I just wanted to confirm.

8  And, under subsection B, it is only the Department

9  that makes this determination as to whether a possible

10  violation of the code of conduct has occurred,

11  correct?

12  A.  **That is my reading of Ed 511.01 (B), yes.**

13  Q.  In practice, is that how this works?

14  A.  **Yes.**

15  Q.  Okay. Now kind of moving on to the duty to report. I

16  know there was some testimony before a little bit about

17  that. That is on page PL00017 of Exhibit 2.

18  Can you explain to me how the duty to report works

19  under the code of conduct?

20  MR. KENISON-MARVIN: Objection. Vague. You

21  can answer.

22  THE WITNESS: Can you specify which section

23  of Ed 510.05 your question pertains to?

24  MR. BISSONETTE: Subsection A.

25  THE WITNESS: Ed 510.05 (A) states that "any

50

1  credential holder or licensed educator in the state of

2  New Hampshire has an obligation to report a suspected

3  violation of the code of conduct in accordance with

4  their school reporting procedures."

5  BY MR. BISSONETTE:

6  Q.  And that's how this applies in practice, just pursuant

7  to those very terms, correct? Strike that.

8  The Department enforces those provisions in

9  subsection A, correct?

10  Let me ask it another way. I'm not trying to

11  trick you.

12  The duty to report language in subsection A,

13  that's enforced by the Department, right?

14  A.  **I can't think of an instance in which the Department**

15  **has enforced that particular subparagraph. Is that**

16  **your question?**

17  Q.  No, no. I'm sorry. I see the confusion. My question

18  is a little different. This is -- subsection A in

19  510.05, that applies to educators in the state of New

20  Hampshire, right?

21  MR. KENISON-MARVIN: Objection. Vague.

22  THE WITNESS: No, it does not.

23  BY MR. BISSONETTE:

24  Q.  Okay. Why doesn't it?

25  A.  **Well, you said "educator." It doesn't apply to a**

51

1  **nonlicensed individual.**

2  Q.  Does the Department of Education believe that section

3  510.05 (A) is enforceable?

4  MR. KENISON-MARVIN: Objection to the extent

5  it calls for a legal opinion. You can answer.

6  THE WITNESS: I suppose it could be

7  enforceable.

8  BY MR. BISSONETTE:

9  Q.  Does the Department enforce it? It may not have cited

10  an educator for it, but is it something that it

11  enforces?

12  MR. KENISON-MARVIN: Objection. Vague.

13  THE WITNESS: It's difficult to say that the

14  Department enforces a particular provision, in this

15  instance, Ed 510.05 (A), if the Department has not done

16  so.

17  BY MR. BISSONETTE:

18  Q.  Does the Department of Education expect credential

19  holders to comply with section 510.05 (A)?

20  A.  **Yes.**

21  Q.  Okay. Is a credential holder's failure to comply with

22  section 510.05 (A) an independent violation of the code

23  of conduct?

24  MR. KENISON-MARVIN: Objection to the extent

25  it calls for a legal conclusion, and it's a

52

1  hypothetical.

2  THE WITNESS: Recognizing that it's a

3  hypothetical question, I suppose the Department could

4  take action in that instance under 510.05 (A), yes.

5  BY MR. BISSONETTE:

6  Q.  I believe your earlier testimony is that you were

7  involved in the drafting of this section. Can you

8  describe what you recall about your involvement in the

9  drafting of this section?

10  MR. KENISON-MARVIN: Object and instruct the

11  witness not to answer the question to the extent that

12  the question calls for specific details as to

13  conversation -- pre-decisional deliberations with

14  respect to the finality.

15  I don't know if you want me to say any more,

16  Gilles?

17  MR. BISSONETTE: Yeah, let me -- can you just

18  read back the question? Thank you for that. I just

19  want to make sure we're all in the same direction here.

20  (Court reporter read back question.)

21  MR. BISSONETTE: Is there a deliberative

22  process objection to that?

23  MR. KENISON-MARVIN: Yeah, I think that

24  question calls for information that would be

25  pre-decisional before this was final, and was

**53**

1  deliberative as to what it would be.
2  BY MR. BISSONETTE:
3  Q.  Going back to your earlier testimony that you were
4  involved in this drafting.  Who else was involved in
5  the drafting of this section besides you?
6  **A.  As to this particular section?**
7  Q.  Yes.
8  **A.  Ed 510.05 (A).  Sitting here today, I do not recall all**
9  **of the individuals who were involved in the drafting.**
10 Q.  Do you recall why this language was put in the code?
11       MR. KENISON-MARVIN:  Again, instruct the
12  witness not to answer to the extent the responsive
13  information would be -- involve pre-decisional
14  conversations about purposes of the code -- purposes of
15  this provision.
16       MR. BISSONETTE:  So I think my question was
17  just do you recall why?
18       MR. KENISON-MARVIN:  Okay.
19       MR. BISSONETTE:  So I think what I would just
20  do is ask yes or no, and, based on your response, I'll
21  decide the extent to which I probe.
22       Does that make sense, Nate?
23       MR. KENISON-MARVIN:  Yeah, I just want to
24  instruct the witness not to --
25       MR. BISSONETTE:  Fair enough.  No, I see

**54**

1  where you're going.
2       THE WITNESS:  Can you repeat the question?
3       (Court reporter read back question.)
4       THE WITNESS:  The code of conduct was created
5  by a stakeholder group, and the general sense was
6  wanting certified educators to report any instances of
7  misconduct.  I cannot recall any exact discussions that
8  were had back when the code was created as it pertains
9  to Ed 510.05 section A, in particular, sitting here
10  today, anyway.
11  BY MR. BISSONETTE:
12 Q.  In evaluating a -- in evaluating the duty to report
13  violation -- sorry, strike that.
14       In evaluating a duty to report potential
15  violation, can the Department investigate an educator
16  for failing to comply with that duty as well as the
17  other educator who may have actually violated the code?
18  Can those investigations happen at the same time, is my
19  question.
20       MR. KENISON-MARVIN:  I will object to it
21  being compound.
22       THE WITNESS:  Is it possible to break out
23  those questions?
24       MR. BISSONETTE:  Yeah, sure.
25  BY MR. BISSONETTE:

**55**

1  Q.  In evaluating the duty to report, the Department can
2  conduct investigations concerning whether an educator
3  has complied with that duty, right?
4  **A.  You're referring to 510.05 (A), right?**
5  Q.  Mm-hm.
6  **A.  I believe my testimony previous was yes.**
7  Q.  Okay.
8  **A.  The Department would have that authority.**
9  Q.  So my question is can the Department investigate
10  simultaneously a potential duty to report violation
11  alongside an investigation into the educator whose
12  conduct substantively violated the code?
13 **A.  I suppose that the Department could do that, yes.**
14 Q.  Are you aware of any educator who has been found in
15  violation of the duty to report since the code -- since
16  the code's enactment?
17 **A.  When you use the term "educator," can you clarify what**
18 **you mean?**
19 Q.  What I mean is credential holder.
20 **A.  Thank you.  Can you repeat the question?**
21       (Court reporter read back question.)
22       THE WITNESS:  As it pertains to Ed 510.05
23  (A), to the best of my recollection sitting here today,
24  I am not aware of any action taken under that
25  particular provision, 510.05 (A).

**56**

1  BY MR. BISSONETTE:
2  Q.  Gotcha.  Thank you.  And I'm going to just refer you to
3  page 10 which is actually Bates stamped PL18,
4  subsection F in particular.  I just want to make sure I
5  have a handle on that section.  I want to flag it for
6  you just so I'm not hiding the ball, but I just want to
7  make sure I understand it.
8       Is it fair to say that under these sections, the
9  Department must investigate a duty to report violation
10  where they have -- strike that.  Let me make sure I
11  have this language correct.
12       What's your understanding of subsection F?
13 **A.  My understanding of Ed 510.05 (F) is that the**
14 **Department has the ability to undertake an**
15 **investigation, as it's stated in the rule, if there is**
16 **a reason to believe that a licensed educator failed to**
17 **report a violation of the code of conduct.**
18 Q.  And the language in subsection F says "shall," correct?
19  "Shall undertake an investigation"?
20 **A.  Yes, it uses the word "shall undertake an**
21 **investigation," yes.**
22 Q.  So just so I understand.  So if the Department has
23  reason to suspect that a violation of the code of
24  conduct was known by a credential holder and not
25  reported, the Department must undertake an

**57**

1  investigation, right?
2  　　　MR. KENISON-MARVIN: Objection to the extent
3  it calls for a legal conclusion. You can answer.
4  　　　THE WITNESS: Can you read the question back?
5  　　　(Court reporter read back question.)
6  　　　THE WITNESS: I think that's an accurate
7  interpretation of Ed 510.05 (F), yes.
8  BY MR. BISSONETTE:
9  Q. An accurate?
10 A. An accurate.
11 Q. Inaccurate?
12 A. No. Accurate.
13 Q. It is accurate?
14 A. It is accurate, yes.
15 Q. Okay. Thank you. Sorry. I wasn't trying to belabor
16 the point.
17 A. I should have been clearer.
18 Q. I just wanted to make sure.
19 A. That's all right.
20 Q. Thank you.
21 　　　MR. KENISON-MARVIN: I missed where we left
22 off with that.
23 　　　MR. BISSONETTE: It is accurate.
24 　　　MR. KAHNE: Yes.
25 　　　MR. BISSONETTE: It is accurate.

**58**

1  　　　MR. KENISON-MARVIN: Can you -- can we just
2  clarify?
3  　　　MR. BISSONETTE: Do you want to read the
4  question back? I'm sure the people on Zoom are
5  chuckling right now.
6  　　　(Court reporter read back testimony.)
7  BY MR. BISSONETTE:
8  Q. So we just had that answer read back. Is that an
9  accurate reflection of your testimony?
10 A. Yes.
11 Q. Okay.
12 A. I think so.
13 Q. Yes. I think we're good.
14 　　　MR. BISSONETTE: Are we good?
15 　　　MR. KENISON-MARVIN: I'm good.
16 　　　MR. BISSONETTE: Okay. Thank you.
17 BY MR. BISSONETTE:
18 Q. I want to just pivot now to penalties under the code of
19 conduct. What are the penalties that exist if the
20 Department concludes that there's been violation of the
21 code?
22 A. Is there a particular section of the code of conduct
23 that you're referring to?
24 Q. Sure. I believe the language is in PL19 of Exhibit 2,
25 so I could direct your attention to, particularly, the

**59**

1  language in subsection J.
2  A. According to this document, which is Ed 511.01 (J)(2),
3  the potential discipline would be either a suspension
4  or revocation, or a reprimand.
5  Q. Okay. I know you said "potential." Based on my
6  reading of this, is it fair to say that under
7  subsection J, if there is -- if a credential holder is
8  deemed in violation of the code, that there has to be a
9  form of discipline? Is that an accurate reading of
10 this?
11 　　　MR. KENISON-MARVIN: Objection to the extent
12 it calls for a legal opinion, and under 106 for
13 completeness with respect to other parts of the code,
14 and the administrative rules. You can answer.
15 　　　THE WITNESS: Looking at 511.01 (J)(2), it
16 reads that the "Department shall propose a form of
17 discipline as follows."
18 BY MR. BISSONETTE:
19 Q. So I guess my question is -- I'm going to ask about the
20 code and then in practice.
21 　　　So, under the code, is it your position that if
22 there is a violation, that discipline has to be
23 proposed?
24 　　　MR. KENISON-MARVIN: Same objections. You
25 can answer.

**60**

1  　　　THE WITNESS: Based upon the plain reading of
2  511.01 (J)(2), I would agree with that interpretation,
3  yes.
4  BY MR. BISSONETTE:
5  Q. Is that consistent with the Department's practice, that
6  interpretation?
7  A. The Department's practice does not look at 511.01
8  (J)(2) in isolation. It would incorporate all of the
9  other provisions that follow it in its entirety.
10 Q. And are those provisions -- what provisions are you
11 referring to?
12 A. (J)(3) and (J)(4), (J)(5).
13 Q. Is it correct to say, though, that those provisions
14 give criteria for the Department in deciding what
15 discipline to implement, but they don't allow the
16 Department to not impose discipline? Is that a correct
17 reading of the code?
18 A. I disagree with that, actually.
19 Q. Okay. Explain why.
20 A. I'm looking at 511.01 (J)(7), which is on PL00020.
21 Seven says, "If no disciplinary sanction is proposed,
22 the Department shall notify the credential holder in
23 writing that the investigation is closed."
24 Q. So your -- I just want to make sure I understand with
25 respect to section seven. You read that to mean even

61

1 if a violation was found, there could be a situation in
2 which no disciplinary sanction is proposed, correct?
3 **A. That is my interpretation looking at (J) in its**
4 **totality, not just in isolation of certain**
5 **subparagraphs, yes.**
6 Q. In practice, is that the practice of the Department?
7 **A. That's a very broad question.**
8 Q. Well, getting back to the specifics. It seems that the
9 Department, or at least you, read the rule to suggest
10 that even if there's been a violation, that no
11 disciplinary -- it's possible for no disciplinary
12 sanctions to be proposed. Is that a position that you
13 have as you are overseeing investigations under the
14 code of conduct?
15 MR. KENISON-MARVIN: Objection. Vague and
16 compound.
17 THE WITNESS: I believe that we have followed
18 that practice. Sitting here today, to the best of my
19 recollection, I cannot think of a particular
20 instance.
21 BY MR. BISSONETTE:
22 Q. Okay. So just so I'm clear, sitting here today, you
23 can't think of a particular instance in which there's
24 been a finding that the code of conduct has been
25 violated, but where no disciplinary sanction was

62

1 proposed, right?
2 **A. To the best of my recollection, sitting here today, I**
3 **cannot think of a particular case that would fall**
4 **within that fact pattern, but that doesn't mean it**
5 **doesn't exist.**
6 Q. Okay. Besides the three sanctions that we talked about
7 before, suspension, revocation, and reprimand, are
8 there other sanctions that the Department may oppose --
9 may propose if it concludes that there's been a
10 violation of the code of conduct?
11 **A. To the best of my knowledge, no.**
12 MR. BISSONETTE: I'm going to finish my line
13 with the code of conduct then maybe we can take a break
14 for a half an hour lunch. Does that make sense.
15 MR. KENISON-MARVIN: Fine with me.
16 MR. BISSONETTE: Okay. I want to -- and then
17 I can promise we won't talk as much about the code of
18 conduct after we eat.
19 BY MR. BISSONETTE:
20 Q. I want to just turn your attention, Attorney Fenton, to
21 page 18 on Exhibit 2. I'm going back to the language
22 in 511.01.
23 The Department determines that a possible
24 violation of the code has occurred, an investigation
25 shall be opened. We had a discussion about that

63

1 language.
2 Can you walk me through what those investigations
3 look like after there's been that threshold
4 determination of a possible violation of the code?
5 **A. Pursuant to Ed 511.01 (B), if the Department of**
6 **Education opens an investigation against a credentialed**
7 **educator, that individual is notified via a certified**
8 **letter.**
9 **I'll rephrase. It's a letter sent via certified**
10 **mail. Copies of that letter are sent to the respective**
11 **union, who is representing that individual, and the**
12 **employing superintendent. And those letters to the**
13 **union and the superintendent are sent via regular**
14 **mail.**
15 Q. And, after that process occurs, is there anything else
16 the Department does as part of its investigation to
17 decide whether there has been an actual violation of
18 the code?
19 **A. Depending upon the facts of the particular case,**
20 **additional steps could be taken, yes.**
21 Q. Could you just walk me through what those -- some of
22 those steps could be?
23 **A. Those steps could be receiving additional documentation**
24 **from the school district. Those steps could be meeting**
25 **with the educator. Those steps could include**

64

1 **interviewing other witnesses. Those steps could**
2 **include speaking with the union attorney representing**
3 **the individual.**
4 MR. BISSONETTE: Can I just have one minute?
5 MR. KENISON-MARVIN: Yes.
6 MR. BISSONETTE: I think can we go off, Nate?
7 MR. KENISON-MARVIN: I'm good with that.
8 (Recess taken.)
9 BY MR. BISSONETTE:
10 Q. Thank you, Attorney Fenton. I hope everyone had a good
11 lunch. I do have some -- a few follow-up questions
12 on the code of conduct. I know I promised I wouldn't,
13 but, I do, and then we're going to quickly pivot to
14 some other topics, thankfully.
15 So I'm going to just again go back to Exhibit 2,
16 direct your attention -- you have it in front of you.
17 Great. I'm looking, in particular, at Bates stamp PL21
18 in section 511.02. When you've identified that, just
19 let me know. I'm not asking you to read it, but just
20 when you're at that page.
21 Are you at that page?
22 **A. Yes, I'm at the page. Could you remind me what --**
23 Q. 511.02.
24 **A. Okay.**
25 Q. So I'm just looking at subsection A. I'm just going to

**65**

1    read the first clause. "If the Department determines
2    that a credential holder has violated the code of
3    conduct."
4         My question is who, at the Department, makes the
5    decision that a credential holder has violated the code
6    of conduct?
7    **A.   There is no one person at the Department of Education**
8    **who makes that determination.**
9    Q.   So who are the individuals that are involved in that
10   decision?
11   **A.   Again, your question is very broad, keeping in mind**
12   **that each case is fact dependent.**
13   Q.   So I believe your testimony that there's no one
14   individual. So who would be the individuals that would
15   be involved in that decision?
16   **A.   The individuals who could be involved, depending on the**
17   **nature of the case, would be myself, Richard Farrell,**
18   **the commissioner, the deputy commissioner, and there**
19   **could be others, depending upon the nature of the**
20   **case.**
21   Q.   What's the criteria used in deciding -- strike that.
22        What's the criteria that the Department uses in
23   determining whether a credential holder has violated
24   the code of conduct?
25   **A.   That determination would be made based on the facts of**

**66**

1    **the individual case.**
2    Q.   So it would depend on the facts. Would it depend on
3    anything else?
4    **A.   Are you referring to whether or not there's been a**
5    **violation of the code of conduct?**
6    Q.   Yeah.
7    **A.   Or are you referring to 511.02 (A), which is broader**
8    **than just determining whether the code of conduct has**
9    **been violated?**
10   Q.   That's a good question. I think really what I'm just
11   trying to get at is that determination that a violation
12   has been occurred, and the process the Department goes
13   through in making that decision.
14        So I'll kind of reiterate my question. I know
15   that you said that decision is based on the facts of
16   the individual case. Is there any other criteria -- my
17   question, is there any other criteria that's used by
18   the Department in deciding whether a credential holder
19   has violated the code of conduct?
20   **A.   In large part, that determination is made based on the**
21   **individual facts of the case. However, there could be**
22   **instances in which other criteria, other information is**
23   **taken into account.**
24   Q.   Any idea what that criteria would be just beyond the
25   individual facts of each case?

**67**

1    **A.   Sitting here today, I can't thank of a particular for**
2    **instance.**
3    Q.   Is there any criteria in the code of conduct in Exhibit
4    2 that articulates how the Department decides whether a
5    credential holder has violated the code?
6    **A.   I'd have to review the document.**
7    Q.   Please do. Having looked at the document, do you have
8    a response?
9    **A.   Not that I can see.**
10   Q.   Okay. I know that you listed many people who could be
11   involved in the decision -- the decision as to whether
12   there's been a violation. Are there regular meetings
13   that occur within the Department to make those
14   determinations?
15   **A.   To explicitly make those determinations, no, but we do**
16   **have regular meetings, yes.**
17   Q.   So are there meetings that occur within the Department
18   where these determinations are made?
19   **A.   Yes.**
20   Q.   Do they just depend on when the need arises, or are
21   they regularly scheduled meetings?
22   **A.   In most part, they are regularly scheduled meetings.**
23   Q.   Do you know how frequently those meetings occur?
24   **A.   Generally, monthly.**
25   Q.   And who would be at those meetings?

**68**

1    **A.   I believe the individuals that I previously testified**
2    **to. I will reiterate. Myself, Richard Farrell, the**
3    **commissioner, and the deputy commissioner.**
4    Q.   Gotcha. Thank you. Are these group decisions or --
5    sorry, strike that.
6         Is the decision as to whether or not a violation
7    has occurred a group decision, or does one person in
8    those meetings have the final say?
9    **A.   Whether or not there's been a violation of the code of**
10   **conduct is based upon the facts as presented.**
11   Q.   No, I understand. I think my question is a little
12   different, though. I'm just trying to figure out who
13   makes the decision based on the facts presented that
14   there's been a violation.
15        So kind of to reiterate my question, is the
16   decision as to whether or not a violation has occurred
17   based on the facts presented a group decision, or a
18   decision that's made by one person in that meeting?
19   **A.   I apologize if I'm being difficult, but it's -- it's**
20   **not an individual or a group of people who decide**
21   **whether or not there's been a violation of the code of**
22   **conduct. It's, again, based upon the facts as**
23   **presented.**
24   Q.   Yeah, but you'd agree with me that someone's making the
25   decision based upon the facts presented that there's

---

**69**

1  been a violation, right?
2  **A. I disagree with how you're phrasing it.**
3  Q.  Okay. I'm going to try to phrase it again.
4      So you have monthly meetings, approximately, in
5  which there are discussions concerning whether
6  violations have occurred under the code of conduct,
7  correct?
8  **A. That is not the purpose of those meetings, no.**
9  Q.  But during those meetings, those discussions occur,
10  correct?
11  **A. Those discussions can occur at that meeting. They**
12  **don't always occur at that meeting.**
13  Q.  Okay. So I guess my question is during those meetings,
14  I know who's present, but who makes the final decision
15  that there has been a violation? Whose decision is
16  that, is the question I'm asking.
17  **A. And I'm not able to attribute that decision to any one**
18  **individual. The decision is based, again, as I've**
19  **testified, upon the facts of the case.**
20  Q.  Would you describe it as a group decision then? I'm
21  not trying to be difficult here.
22  **A. No, neither am I.**
23  Q.  I'm just trying to understand. Is it a group decision
24  that's made by all the participants in that meeting?
25  Is that how you would frame it, describe it?

**70**

1  **A. Again, I'm not able to attribute the decision-making as**
2  **it pertains to whether there's been a violation of the**
3  **code of conduct to any one individual. It is fact**
4  **dependent.**
5  Q.  Okay. So you can't attribute it to any individual.
6  Can you attribute it to a group of individuals? Would
7  it be to everyone in that room? Who makes -- strike
8  that.
9      Who, in that room, makes the decision?
10  **A. As I've testified to, I'm unable to attribute the**
11  **decision of whether there's been a violation of the**
12  **code of conduct to any one individual or a group of**
13  **individuals as that determination is pursuant to the**
14  **facts of the individual case.**
15  Q.  So I just want to make sure I understand. So you're
16  not able to testify as to who makes the decision within
17  the Department that a violation has occurred; is that
18  correct?
19  **A. That is correct. It is a fact-dependent**
20  **determination.**
21  Q.  Would there be -- ever be a series of facts in which
22  you make the final decision as to whether or not
23  misconduct occurred?
24  **A. Whether or not there's a violation of the code of**
25  **conduct is based upon the facts of the case. It is not**

**71**

1  **attributable to any one individual.**
2  Q.  I hear you. I think that's where my question was a
3  little different.
4      Would there ever be a set of facts in which you
5  were the final decision-maker in deciding whether
6  misconduct occurred?
7  **A. I suppose there could be. I can't think of a**
8  **particular for instance when that has occurred.**
9  Q.  Okay. Has there been a situation -- strike that.
10      Has there been a time in which a determination has
11  been made that there was a violation under the code of
12  conduct in which you were the final decision-maker?
13  **A. As I've testified to previously, a determination of**
14  **whether or not there's a code of conduct violation is**
15  **determined by the facts. It's not attributable to any**
16  **one person. That would include myself.**
17  Q.  Is it attributable -- it's attributable to the
18  Department, I assume? The Department's making the
19  decision?
20  **A. Again, I will refer you to my prior testimony. It's**
21  **based upon the facts of the individual case.**
22  Q.  Are you aware of a scenario, based on the facts of an
23  individual case, in which you made the decision that a
24  violation had occurred?
25  **A. Sitting here today, I do not recall such an instance.**

**72**

1  I will refer to my prior testimony that that decision
2  is based upon the facts.
3  Q.  Okay. Has there ever been a series of facts in a case
4  in which a determination of misconduct -- a
5  determination that there's been a violation of the code
6  of conduct -- let me strike that again. There's a lot
7  there.
8      Has there been a situation in which there's been a
9  determination made in which -- that there's been a
10  violation, and that the commissioner was the
11  decision-maker in determining that there was a
12  violation?
13  **A. I will refer you to my prior testimony that the**
14  **determination of whether there's been a violation of**
15  **the code of conduct is not attributable to any one**
16  **individual. Sitting here today, I'm not -- I do not**
17  **recall a situation in which the commissioner made the**
18  **determination that there was a violation of the code of**
19  **conduct.**
20  Q.  If it's not attributable to any one individual, is it
21  attributable to the people in the meeting in which that
22  decision is made?
23  **A. Again, and I apologize for being difficult. I think**
24  **we're getting into the world of asked and answered, but**
25  **I won't play the role of the lawyer here.**

73

1    **I will refer you to my prior testimony. The**
2    **decision as to whether there's been a violation of the**
3    **code of conduct is based upon the facts. It is not**
4    **attributable to any one individual.**
5    Q.  I just want to -- the problem I'm having is that you're
6    using passive voice. I'm trying to use active voice.
7    So what I'm just trying to get at is who individually
8    makes these decisions based on the facts of each case?
9    That's it. Is that something that you feel comfortable
10   answering?
11 A.  **To the best of my ability, I feel I've already answered**
12   **that question.**
13   MR. BISSONETTE: Well, it's your -- it's your
14   lawyer that makes the decision whether to instruct you
15   not to answer. You don't have that prerogative,
16   regrettably, so I would just ask your counsel, is that
17   instruction being made? And, if not, I would ask that
18   it be answered. It's that simple.
19   So if that instruction's being made, we can
20   log it, have a conversation with the judge. There's no
21   privilege assertion. It's clearly relevant to this
22   case. Just trying to get at one of the core aspects of
23   this case as to who makes the decision. It's that
24   simple. So unless there's an instruction not to
25   answer, I would ask that the witness answer it.

74

1    MR. KENISON-MARVIN: Do you mind if we take a
2    break?
3    MR. BISSONETTE: Sure.
4    MR. KENISON-MARVIN: And I just talk with her
5    real fast? We can leave. We'll go.
6    (Recess taken.)
7    (Court reporter read back question.)
8    BY MR. BISSONETTE:
9    Q.  Is that something that you can answer?
10 A.  **In large part, keeping in mind that each case is fact**
11   **dependent, the information that is provided to the**
12   **Department of Education comes through from a report, an**
13   **investigative report, that is done by the district, or**
14   **the district hires outside counsel to do that**
15   **investigation, and that investigation already makes the**
16   **finding.**
17   **That is why my testimony was that it's not**
18   **attributable to one individual because the**
19   **determination has already been made by an independent**
20   **report that was provided by the school district. Where**
21   **the Department will have discussions is when we decide**
22   **whether a particular fact pattern should be dealt with**
23   **as an employment issue or if it rises to the level of a**
24   **code of conduct.**
25   Q.  So on the question as to whether it rises to the level

75

1    of a code of conduct violation, that's really the
2    decision that I'm interested in.
3    A.  Okay.
4    Q.  So I just -- my question is is that decision a group
5    decision, or is there any person at the DOE that has
6    final decision-making authority over that decision?
7    A.  **Again, keeping in mind that each case is individual and**
8    **fact-dependent, in large part, we reach those decisions**
9    **as a group.**
10   Q.  What happens if there's disagreement among individuals
11   in the group as to whether or not something reaches the
12   level of a code of conduct violation?
13 A.  **Again, keeping in mind that every case is individual**
14   **and fact-dependent, we will discuss our respective**
15   **views.**
16   Q.  And who makes the decision?
17 A.  **I hate to use the old lawyer answer, it depends, but it**
18   **depends.**
19   Q.  Okay. Have there been situations in which you have
20   made that decision in the event of a disagreement?
21 A.  **I imagine that there have been, yes.**
22   Q.  Have there been circumstances in which, in the event of
23   a disagreement, the commissioner that made that
24   decision?
25 A.  **I would imagine that there have been, yes.**

76

1    Q.  Have there been situations where there's disagreement
2    and Mr. Farrell has made the decision in determining
3    whether or not something has been a code of conduct
4    violation?
5    A.  **I would imagine that there have been, yes.**
6    Q.  Okay.
7    MR. BISSONETTE: Real quick.
8    (Discussion off record.)
9    BY MR. BISSONETTE:
10   Q.  Thank you for that. I'm going to kind of move on, I
11   know, as promised from the code of conduct.
12   So as to not hide of ball, what I'm going to be
13   talking a little bit about and asking you some
14   questions on is kind of this DOE referral process to
15   the Human Rights Commission. I know there was some
16   legislative testimony on that so I just want to just
17   kind of name where we'll be going there.
18 A.  **I appreciate that. Thank you.**
19   Q.  Not trying to hide the ball here.
20   I'm happy to present this as an exhibit, Attorney
21   Fenton, but I know that in your -- there was discussion
22   on January 26th in your testimony on HB33 that there
23   have been instances in which the Department says --
24 A.  **I'm sorry, HB33 or --**
25   Q.  I got it wrong. Let me start over.

77

1 A.  Okay.
2       MR. BISSONETTE:  You know, I'm just going to
3 introduce it.  It makes things easier.  We'll do
4 Exhibit 5.
5       (Exhibits 5 and 6 marked for identification.)
6 BY MR. BISSONETTE:
7 Q.  I'm just pausing to find the language I'm referring to.
8 I'm sorry, just bear with me.
9 A.  Take your time.
10 Q.  So, Attorney Fenton, I'm just going to refer you to
11 Exhibit 5 which I would represent is a portion of the
12 hearing, not the complete hearing, on HB33.  HB533.
13      And just directing your attention to the page
14 Bates stamped 795, on the bottom right, the language
15 stating, and I quote, "And imbedded within that fact
16 pattern there have been instances in which the
17 Department says there might be more here, there might
18 be something for the Human Rights Commission to look
19 at, and we have tried to refer that matter over."
20      Do you see that language?
21 A.  I do.
22 Q.  What instances were you referring to in your testimony
23 to the House Judiciary Committee there?
24 A.  Understanding the language of House Bill 2, that
25 matters that fall within HB 2 are to be adjudicated or

78

1 reviewed by the Human Rights Commission and/or the
2 Attorney General's office, there have been times in
3 which matters were brought to the Department's --
4 Department of Education's attention which the
5 Department then wanted to refer to the Human Rights
6 Commission for their review and adjudication if
7 appropriate.
8 Q.  And so that testimony dealt with code of conduct issues
9 with respect to HB 2 in particular, or more broadly?
10 A.  I would say issues that may or may not fall within HB
11 2.
12 Q.  Do you recall what those specific instances were that's
13 referenced on page 795, page eight, line 21?
14 A.  I believe what I was referring to there was an instance
15 that the Department of Education was in receipt of
16 information about actions that an educator took which
17 may or may not have been a violation of HB 2.
18 Q.  In that particular instance, had the -- I won't get
19 into the facts of it, but had the Department made a
20 decision on its own that there was a violation of HB
21 2?
22 A.  Absolutely not.
23 Q.  Okay.  Did the Department think it could have been a
24 possible violation?
25 A.  No.

79

1 Q.  Do you recall what the specific complaint was about, or
2 complaints?  Let me strike that.
3      When you say "instances," were you referring to
4 one instance or multiple instances?
5 A.  In this particular reference that you've made,
6 referring to Bates stamp 0795, page eight, I believe
7 what I was referring to in that instance was a matter
8 which had been brought to the Department of Education's
9 attention by a superintendent pursuant to the code of
10 conduct.
11 Q.  Do you recall what the nature -- strike that.
12      Do you recall what the substance of the report was
13 by the superintendent to the Department?
14 A.  Yes.
15 Q.  What was it?
16 A.  The nature of the report that was brought to the
17 Department of Education's attention via the code of
18 conduct was that a licensed educator had used a racial
19 slur in her classroom.  It was not in reference to any
20 one individual, but had used it more than one time.
21 Q.  Do you recall the SAU that was involved?
22 A.  I do not recall the number of the SAU.
23 Q.  Do you recall the -- where that school was located?
24 A.  Without being coy, I think so.  I'm not entirely
25 certain.

80

1 Q.  Recognizing that you may not be 100 percent certain, we
2 can caveat answers like that -- without being 100
3 percent sure, do you have an idea as to what the
4 municipality is, recognizing, again, that you're not a
5 hundred percent sure?
6 A.  I believe it was in the Sullivan County area.
7 Q.  Do you have an idea as to what the municipality was of
8 where this occurred?
9 A.  Might have been Newport.  Might have been
10 Charlestown.
11 Q.  Okay.  Besides this potential Sullivan County instance,
12 because I hear what you're saying, were there any other
13 instances that you were referring to when you used the
14 term "have been instances" on page 795 of Exhibit 5?
15 A.  That is the instant that really comes to my mind.
16 Q.  Okay.
17 A.  Were there other issues that were brought to the
18 Department's attention that may or may not have fallen
19 within the purview of House Bill 2?  Yes.
20 Q.  Bear with me for one moment, please.
21 A.  Take your time.
22 Q.  So I think, Attorney Fenton, at least, I'm going to ask
23 you to set those aside.  We can kind of move on from --
24 oh, that's not true.  I'm sorry.  You can set aside
25 Exhibit 5, but I am going to have a question about

**81**

1    Exhibit 6. My apologies.
2        And, in full disclosure, this is going to be the
3    line of questions asking about the standard operating
4    procedure, so I just want to define that for everyone.
5  A. **I appreciate that. Thank you.**
6  Q. No problem. Again, not trying to hide the ball.
7        I'm going to refer you, Attorney Fenton, to
8    Exhibit 6, in particular, PL806. And the language at
9    the bottom of page 19 in 806 that starts with -- I'm
10   going to quote, "And in working with Representative
11   Lynn and in working with the Attorney General's office
12   on the original bill, 533, we have since worked with
13   the AG's office to come up with an SOP as to how we
14   transfer those cases to the Human Rights Commission and
15   AG's office."
16       Attorney Fenton, do you see that language that I
17   just referred you to on PL806?
18 A. **I do.**
19 Q. Okay. Is there currently a standard operating
20   procedure in place with respect to how cases are
21   transferred from the DOE to the Human Rights
22   Commission?
23 A. **No.**
24 Q. So why did you make that statement to the
25   legislature -- excuse me, to the House Judiciary

**82**

1    Committee?
2  A. **I had met with --**
3        MR. KENISON-MARVIN: I'm going to object to
4    the extent that the question calls for communications
5    related to legislative acts, and it would be subject to
6    legislative privilege.
7        So to the extent your answer would include
8    communications that you had about the bill with
9    representatives or -- legislators or their aids, I
10   instruct you not to state that information in response
11   to the question.
12       MR. BISSONETTE: Without getting into too
13   many lawyerly diatribes, I would argue that this is a
14   public statement, and to the extent any privilege
15   exists, that it's been waived, but I -- in the spirit
16   of not getting bogged down in the weeds, I'll just
17   rephrase the question.
18   BY MR. BISSONETTE:
19 Q. Your testimony is that there is no current SOP in place
20   as to how cases are transferred from the HRC --
21   sorry -- from the DOE to the HRC, correct?
22 A. **That is correct, yes.**
23 Q. Okay. Is it fair to say, without getting into the
24   nature of those discussions, that there were
25   discussions with legislators about that?

**83**

1  A. **Yes.**
2  Q. Were there -- excluding discussions in which
3    legislators were involved, have there been -- and
4    without getting into the substance, have there been
5    internal Department of Education discussions concerning
6    an SOP?
7  A. **Yes.**
8  Q. Okay. Has there been any discussion about -- has
9    anything changed since January -- strike that.
10       Has anything changed since January 2023 when HB533
11   was introduced with respect to how cases can be
12   transferred from the Department of Education to the
13   HRC?
14       MR. KENISON-MARVIN: Objection.
15       MR. BISSONETTE: I'm just asking what the
16   current process is.
17       MR. KENISON-MARVIN: Vague and assuming facts
18   not testified to.
19       You can answer to the extent you know.
20       THE WITNESS: As it relates to the Department
21   of Education's ability to transfer cases to the Human
22   Rights Commission --
23       MR. BISSONETTE: Yes.
24       THE WITNESS: -- to the best of my knowledge,
25   nothing has changed. I should say, directly to the

**84**

1    Human Rights Commission, nothing has changed.
2    BY MR. BISSONETTE:
3  Q. I understand. Has anything changed with how these --
4    strike that.
5        Are you aware of statements that Representative
6    Glenn Cordelli made in March 2023 when he said that the
7    Attorney General's office has been more cooperative
8    with respect to getting cases referred to the Human
9    Rights Commission? Are you aware of that statement?
10 A. **Do you have it?**
11 Q. No. I'm just -- it's my -- are you aware of
12   Representative Cordelli having said that publicly? Is
13   that something that you're aware of?
14 A. **I wasn't -- to the best of my knowledge, I wasn't**
15   **present when he said that.**
16 Q. Would you agree with the statement that the Attorney
17   General's office has been more cooperative with getting
18   cases referred to the Human Rights Commission since
19   January 2023?
20 A. **Yes.**
21 Q. Okay. How have they -- how has the Attorney General's
22   office been more cooperative?
23 A. **That's a pretty broad question. Is there a way to**
24   **narrow that down?**
25 Q. I'm afraid not. You said that you agreed with that

---

85

1  statement, and I'm just trying to get at how the
2  Attorney General's office has been more cooperative
3  since January 2023.
4  **A.  Since January of 2023, I had a meeting with Attorney**
5  **Sean Locke of the Attorney General's office, and**
6  **Attorney Luke Brown, and we discussed procedural**
7  **mechanisms by which the Department of Education could**
8  **refer cases that may or may not fall within the purview**
9  **of HB 2 to the Attorney General's office for review.**
10 Q.  And was a decision made during that meeting as to what
11 new process to implement?
12 **A.  We agreed to terms as to what that procedural mechanism**
13 **would look like, and those terms were outlined and**
14 **written down.**
15         MR. BISSONETTE:  Okay.  Can I go off the
16 record?
17         (Recess taken.)
18         (Court reporter read back answer.)
19 BY MR. BISSONETTE:
20 Q.  What was the structure of that agreement?
21 **A.  Not to be difficult, but what do you mean by**
22 **"structure"?**
23 Q.  What was that agreement?  I'll just say that.  What was
24 the agreement?
25 **A.  It's difficult for me to go into the details of it**

---

86

1  **because I don't have it in front of me, but, based upon**
2  **my recollection, what we had agreed to was that there**
3  **would be a procedural mechanism in place by which the**
4  **Department of Education could transfer cases that could**
5  **or could not fall within HB 2 -- that is not a**
6  **determination for the Department of Ed to make -- to**
7  **the Attorney General's office for their review.  And**
8  **each party agreed to what each agency's role would**
9  **play, and it was Sean Locke who wrote down an outline**
10 **of what that would look like.**
11 Q.  Was that outline written during that meeting or after
12 that meeting?
13 **A.  The outline that I referred to was written during that**
14 **meeting.**
15 Q.  And was that outline during that meeting circulated to
16 the meeting's participants?
17 **A.  The three of us in that meeting all participated**
18 **verbally in the creation of it, so when you say**
19 **"circulate," I envision each of us holding it,**
20 **reviewing it.  Liz Brown was on a Zoom call, so that**
21 **would not be possible.**
22 Q.  Gotcha.
23 **A.  But did we all work collaboratively?  Yes.**
24 Q.  I just want to make sure I understand who the
25 participants were.  It was obviously you, Attorney

---

87

1  Locke, Liz Brown.  Were there any others in that
2  meeting?
3  **A.  To the best of my recollection --**
4  Q.  Okay.
5  **A.  -- there were not.**
6  Q.  And that outline that you were referencing, that's
7  something that all three of those participants -- I
8  want to make sure I understand.  Did all three of those
9  participants in that meeting have access to that
10 outline during that meeting?
11 **A.  What do you mean by "access"?**
12 Q.  When was that outline prepared?
13 **A.  I've already testified to that.**
14 Q.  Can you remind me?  I'm sorry.  Because I don't
15 remember it, so forgive me.  When was the outline
16 prepared?
17 **A.  The outline was prepared during the meeting.**
18 Q.  Okay.  And then everyone had access to it during the
19 meeting; is that correct?
20 **A.  I'm not sure what you mean by the term "access."**
21 Q.  I'm just trying to just get to the heart of this.  Can
22 you describe the process by which that outline was
23 created and given to the participants of that
24 meeting?
25 **A.  The three of us discussed what the issue -- the**

---

88

1  **underlying issue was, and that is having the ability**
2  **for the Department of Education to transfer matters**
3  **which may or may not fall within the purview of House**
4  **Bill 2 to the Attorney General's office for review.**
5  **The three of us worked collaboratively, and it was**
6  **Attorney Sean Locke who wrote down the outline as to**
7  **that procedural mechanism.  It was -- so all three of**
8  **us contributed to it.  We did not take turns writing**
9  **it.**
10        **As I mentioned before, Attorney Brown was on a**
11 **Zoom -- Zoom function.  But it was collaborative in**
12 **nature, and it was a very strong working draft that**
13 **Sean then said he would type up and send to me and Liz**
14 **Brown for review and final steps.**
15 Q.  That's helpful.  Thank you.  Did he prepare -- he
16 prepared that outline during the meeting again; is that
17 accurate to say?
18 **A.  So I think I've testified to this previously.  Sean**
19 **Locke wrote an outline during that meeting --**
20 Q.  Okay.
21 **A.  -- that we all contributed to.  It was verbal.  I**
22 **cannot testify whether or not he wrote a different**
23 **outline at a different time, but there was an outline**
24 **produced during that meeting.**
25 Q.  Okay.  Is the process that was agreed -- I know that

---

**89**

1  it's still being written up, but is the process that
2  was agreed to during that meeting the process that
3  existed now with respect to whether and how cases can
4  be transferred from the DOE to the HRC?
5  A.  **You'll have to clarify your question. My understanding**
6  **is that the Department of Education is not able to**
7  **transfer matters that may or may not fall within the**
8  **purview of House Bill 2 to the Human Rights**
9  **Commission.**
10 Q.  I guess my question is a little bit more simpler, I
11  think, which is, is the agreement that was reached
12  during that meeting that we just discussed, are the
13  terms of that agreement currently in effect with
14  respect to the transfer of cases from the DOE to the
15  HRC?
16         MR. KENISON-MARVIN: Object as vague and
17  asked and answered. If you want me to explain what I'm
18  thinking, I'm happy to.
19         MR. BISSONETTE: Do you want to do it on or
20  off the record?
21         MR. KENISON-MARVIN: I can do it on.
22         MR. BISSONETTE: Okay.
23         MR. KENISON-MARVIN: I'm just referring to
24  the first question about the standard operating
25  procedure. You'd asked if there was one, and the

**90**

1  answer, I believe, was no. So if you want to just
2  clarify when you're talking about process, if you're
3  distinguishing that from standard operating procedure?
4         MR. BISSONETTE: I got you. I got you.
5  That's fair. That's fair. So I'll strike the last
6  question.
7  BY MR. BISSONETTE:
8  Q.  My question is the agreement that was reached during
9  the meeting that you previously testified to, are the
10  terms of that agreement the process that currently
11  exists with respect to how cases can be transferred
12  from the DOE to the HRC?
13 A.  **The agreement that was reached in that meeting that I**
14  **testified to talked about transfer of matters that may**
15  **or may not fall within the purview of House Bill 2 from**
16  **the Department of Education to the Attorney General's**
17  **office.**
18 Q.  I see. I got you. Is --
19 A.  **I'm not trying to be difficult.**
20 Q.  No, no. You're right. The way that I framed that was
21  not fully reflective of that caveat, so I'll kind of go
22  back and kind of try to find a way to just be more
23  direct.
24         Is the agreement that was reached during that
25  meeting the way the process currently works with

**91**

1  respect to DOE referrals under HB 2?
2  A.  **Prior to that meeting, which occurred on or about**
3  **February 14th, '23, just so we have a reference point,**
4  **prior to that meeting with the Attorney General's**
5  **office, my understanding was that the Department of**
6  **Education was not in a position, nor was it allowed to**
7  **transfer any matters which may or may not fall within**
8  **the purview of House Bill 2 to the Human Rights**
9  **Commission for review. And it was -- it had been**
10  **unclear -- prior to my testimony on House Bill 533, it**
11  **was unclear that the Department of Education was able**
12  **to transfer those matters which may or may not fall**
13  **within HB 2 to the Attorney General's office.**
14 Q.  And so after -- I guess my question is the agreement
15  that was reached during that meeting that may have
16  occurred on or about February 14th, has that agreement
17  been in effect since that meeting?
18 A.  **Yes.**
19         MR. BISSONETTE: Okay. I'm going to just
20  switch gears a bit now that we've avoided the sticky
21  wicket of the SOP. Let me just express my thanks,
22  Attorney Kenison, for the dialogue that we've been able
23  to have on this.
24  BY MR. BISSONETTE:
25 Q.  We talked a little bit before about trainings, a

**92**

1  presentation on the code of conduct. Have you
2  conducted trainings on HB 2 in particular, the
3  challenged law in this case?
4  A.  **I have not done trainings exclusive to House Bill 2.**
5  Q.  Okay.
6  A.  **I have included information -- limited information**
7  **about House Bill 2 in some of the trainings that I've**
8  **done on the code of conduct, yes.**
9  Q.  Okay. So I think I know what you're referring to, but
10  to not hide the ball, I'll just mark it as my next
11  exhibit. Fair enough?
12 A.  **I appreciate that. Thank you.**
13         MR. BISSONETTE: That's how I try to operate.
14  So this next exhibit will be Exhibit 7.
15         (Exhibit 7 marked for identification.)
16  BY MR. BISSONETTE:
17 Q.  So I'd just ask you to -- you don't need to read it
18  word for word, but just take a quick scan of Exhibit 7.
19  Just let me know when you're done.
20         What is Exhibit 7?
21 A.  **Exhibit 7 starts off with an email from myself to**
22  **Richard Farrell, who is the investigator for the**
23  **Department of Education. The subject is code of**
24  **conduct. The date is August 17th of 2021. And behind**
25  **that email is a printout of the PowerPoint of the code**

93

1 of conduct presentation.
2 Q. Is this the type of presentation you were referring to
3 in your prior testimony?
4 A. Which part of my testimony?
5 Q. I believe you testified that you've given presentations
6 in which -- that haven't been exclusive to HB 2 but in
7 which HB 2 was referenced. That's a ballpark of what I
8 understood your testimony to be. Is that accurate? Is
9 my rendition of your prior testimony accurate?
10 A. I hope not.
11 Q. Tell me how it's wrong.
12 A. So I believe my testimony was this is a code of conduct
13 presentation. My presentations concern the code of
14 conduct, and I had included some limited information
15 about HB 2.
16 Q. And I just want to make sure I understand. Is the
17 limited information that you're referring to pages on
18 Exhibit 7 Bates stamped DOE 10079 to 10081?
19 A. Yes.
20 Q. Okay. Do you recall how many times you've given this
21 presentation that include those pages I just referenced
22 on HB 2?
23 A. In exact number, I do not.
24 Q. Do you have an estimate, a ballpark, that you can
25 provide?

94

1 A. Certainly less than 10 times. Probably not more than
2 five.
3 Q. Okay.
4 A. But I hesitate to lock myself in that much.
5 Q. I understand. Your caveat lays that out. I
6 understand. I've been in that situation.
7 Do you recall, during these presentations in which
8 you've used these slides, have you received direct
9 questions about what might be covered under HB 2?
10 A. I do not recall any instances in which I received
11 questions as it pertained to what HB 2 entailed or what
12 HB 2 covered. Any such questions I would have liked to
13 think I would refer to the Attorney General's office.
14 I would not have felt comfortable answering them.
15 Q. So you don't recall, just so I'm clear, in these --
16 strike that.
17 In these approximate five to 10 presentations,
18 recognizing that is not a number that you could
19 commit to, even, but during those presentations, who
20 would be the audience, for the most part?
21 A. Generally, for the presentation that you've given to me
22 which is marked as Exhibit 7, this is typically
23 provided to or presented to educators.
24 Q. I just want to button this up. So you don't recall any
25 specific questions by educators at the time you've

95

1 given these presentations about what's covered under HB
2 2?
3 A. No, I do not.
4 Q. Okay. The slides that we referenced before in
5 exhibit --
6 A. May I just --
7 Q. Yes, of course.
8 A. What you were looking at is not what Exhibit 7 is.
9 Q. Exactly. I just realized that. That's why I was
10 trying to find the page numbers.
11 A. So if we could just make sure we're on the same --
12 Q. We are on the same page.
13 A. Okay. Those are different trainings.
14 Q. Yeah.
15 A. So you're asking me questions about Exhibit 7, and I'm
16 looking at Exhibit 7, and you're looking at a different
17 exhibit.
18 Q. I'm looking at, for the record, Exhibit 3, because I'm
19 planning out where I'm going to be going.
20 A. Okay.
21 Q. So don't worry too much about what I'm looking at. But
22 you're right, the questions that I was asking were
23 tailored to Exhibit 7 to educators, the presentation
24 that we were just talking about. Okay.
25 Was there ever a discussion within the Department

96

1 of Education on making a list of reading materials or
2 books that could potentially be violative of HB 2?
3 MR. KENISON-MARVIN: Object to the extent
4 that -- I instruct you not to answer to the extent
5 there's responsive information about internal
6 discussions, predecisional discussions, regarding that
7 subject on the basis that it's protected under the
8 deliberative process privilege.
9 MR. KAHNE: Predecisional to what?
10 MR. BISSONETTE: Sorry. I didn't mean to
11 have two lawyers arguing against you.
12 MR. KAHNE: Sorry.
13 MR. BISSONETTE: There would need to be an
14 actual decision, though, at some point, so...
15 MR. KENISON-MARVIN: I think the case law is
16 clear that that's not the case. There can be
17 circumstances of discussions involving nondecisions and
18 I have some case law to cite if you'd like me to. I
19 think some courts have, in fact, made it clear that you
20 don't need a final decision. There can be --
21 essentially, to fulfill the purpose of the privilege,
22 which is to encourage discussions about something that
23 might be done in the event that people want to have a
24 discussion, government workers want to have a
25 discussion about something to do with the policy behind

**97**

1  the privilege, is to encourage them to have that
2  discussion. If they decide not to take a final action,
3  that's okay. So I think I would stand behind the
4  objection.
5      MR. BISSONETTE: Okay.
6      MR. KENISON-MARVIN: Whatever the answer is,
7  if there's a final decision of something or not, I
8  don't think a final decision is necessary for that
9  privilege to apply.
10      MR. KAHNE: Just if I could just add? If the
11  decisional process privilege applied to all
12  communications within an agency without the need for
13  any final determination, that could potentially cover
14  all communications within an agency, so I don't think
15  that's contemplated by the privilege. So you've said
16  your point.
17      MR. BISSONETTE: I'm going to let that
18  question stand and just see what the instruction will
19  be.
20      MR. KENISON-MARVIN: I forget what the
21  question is.
22      MR. BISSONETTE: Why don't we start over? If
23  you could read the question and I just -- I mainly
24  interested in just what the instruction is. And I'm
25  sure for the witness, she'd probably like to know what

**98**

1  the instruction is, too.
2      (Court reporter read back question.)
3      MR. KENISON-MARVIN: I guess -- I think,
4  Gilles, the question, to the extent it calls for a yes
5  or no, I'm happy to let that answer go.
6      MR. BISSONETTE: I appreciate it.
7      MR. KENISON-MARVIN: And then we'll go from
8  there.
9      MR. BISSONETTE: Okay.
10      THE WITNESS: To the best of my recollection,
11  no.
12      MR. BISSONETTE: Bear with me. I'm just
13  trying to find a document.
14      BY MR. BISSONETTE:
15  Q. So beyond these -- the presentations that we just
16  discussed, outside that context, have you ever been
17  asked by an educator about whether specific texts are
18  covered by HB 2?
**19 A. Do you have a document you'd like to show me?**
20  Q. Just based on your recollection.
**21 A. I believe there was a communication from an**
**22  administrator, superintendent, to me, asking what HB 2**
**23  covered potentially in terms of what could be taught**
**24  and what couldn't be taught.**
25  Q. Aside from that communication, do you recall any other

**99**

1  administrators or educators that asked you what may be
2  covered under HB 2?
**3 A. I do not recall having those discussions with**
**4  administrators or educators. To the extent those**
**5  occurred, I would refer them to the Attorney General's**
**6  office. I did have them with attorneys, however.**
7      MR. BISSONETTE: Okay. I'm going to mark
8  this. I can't find my other copies. That's what's
9  been driving me crazy over here. So I'm just going to
10  give you both of them.
11      MR. KENISON-MARVIN: Do you want me to go
12  make any copies or anything for you?
13      MR. BISSONETTE: No, I'm happy to. That way,
14  we can know what we're looking at.
15      MR. KENISON-MARVIN: Do you want me to --
16      MR. BISSONETTE: Do you mind? Okay, maybe
17  we'll go off the record and do it.
18      (Exhibit 8 marked for identification.)
19  BY MR. BISSONETTE:
20  Q. Have you had an opportunity, Attorney Fenton, to look
21  at Exhibit 8?
**22 A. Yes.**
23  Q. Have you seen Exhibit 8 before?
**24 A. Yes.**
25  Q. And I apologize. It's not Bates stamped. I'm unclear

**100**

1  how that occurred. But with respect to Exhibit 8, in
2  which you're having a conversation with the
3  superintendent of SAU 4, is that the communication that
4  you're referencing in your earlier testimony?
**5 A. It was, yes.**
6  Q. Okay. Great. And I note that your response above that
7  quote, divisive topics, is handled by the Human Rights
8  Commission, et cetera. Is that -- that's the statement
9  that you made before that you would have referred them
10  to the Human Rights Commission?
**11 A. Yes.**
12  Q. And had you been asked by other individuals, educators,
13  as to what's covered by HB 2, is that the typical
14  response that you would be likely to give?
**15 A. Can you clarify the question?**
16  Q. Yeah. You know, I believe your testimony is you only
17  recalled specifically this one superintendent reaching
18  out with questions about what might be covered. If you
19  were asked by others, would this be the similar
20  response that you would give under -- today, sitting
21  here today?
**22 A. Before looking at this document, my testimony was that**
**23  I had referred — I had believed that I had referred**
**24  Pierre Couture to the Attorney General's office, and I**
**25  see, now that I've had an opportunity to review this, I**

101

1  suggested that he perhaps reach out to the
2  superintendents' association to see if they have any
3  guidance.
4      Your question, as it pertains to individual
5  educators, which I cannot think of a time where I've
6  had that conversation with an individual indicator, I
7  would not necessarily refer that person to the
8  superintendents' association. That would not be the
9  appropriate place to send them.
10 Q. Are you aware of the superintendents' association
11 having created guidance on HB 2 at all?
12 A. I, myself, am not aware of what the superintendents'
13 association did as it pertains to HB 2.
14 Q. Okay. Do you know if the superintendents' association
15 has ever reached out to the Department of Education
16 about guidance concerning HB 2?
17 A. I personally have not had a discussion with the
18 superintendents' association as it pertains to HB 2,
19 but they have reached out to the Department of
20 Education. They could have, and spoken to individuals
21 other than myself.
22 Q. Gotcha. Fair enough. Are you aware of statements
23 made -- strike that.
24     I'm reading from a document. You're not on it,
25 okay? But I'm -- I just want to ask you about it.

102

1      Are you aware of statements made by the
2  commissioner of education to AFT that -- in which the
3  commissioner said, "Recognizing that a wide variety of
4  situations may arise, we also want to reiterate our
5  offer to try to work through individual circumstances
6  that may be unclear to teachers. In these cases, the
7  best approach is for them to reach out directly and
8  share the specific facts and circumstances so that we
9  can provide them with clear guidance."
10     Are you aware of statements made by the
11 commissioner of education to educators that they should
12 contact the DOE if they have -- if they want to work
13 through individual circumstances that may be unclear to
14 teachers?
15 A. May I see that document?
16 Q. Sure.
17 A. Thank you.
18     MR. BISSONETTE: We'll mark it.
19     (Exhibit 9 marked for identification.)
20     MR. BISSONETTE: When you're done reviewing
21 Exhibit 9, just let me know.
22     THE WITNESS: Okay. I will do that. Thank
23 you.
24     MR. KENISON-MARVIN: Object on 106,
25 completeness, with respect to this being -- it appears

103

1  to be a response to an email. Do you have the email
2  that this responds to that the witness can also review?
3      MR. BISSONETTE: I do not. I mean, I'm
4  looking at the bottom of Bates stamp 7231 and I don't
5  see a chain. It is a complete version of this
6  document. Had there been a chain, I would have,
7  obviously, included in the exhibit.
8  BY MR. BISSONETTE:
9  Q. So my question, though --
10     MR. KENISON-MARVIN: Let me stop you there.
11     MR. BISSONETTE: Of course. Of course.
12     MR. KENISON-MARVIN: Do you know if you --
13 maybe we need to look through and see if there is a
14 chain with this.
15     MR. BISSONETTE: My question is just going to
16 be have you seen this document before?
17     MR. KENISON-MARVIN: Okay.
18 BY MR. BISSONETTE:
19 Q. Have you seen this document before?
20 A. So as it pertains to Exhibit 9, because Exhibit 9 is
21 made up of the email and then the frequently asked
22 questions, new discriminatory practice prohibitions
23 which was created by the Attorney General's office, I
24 have to bifurcate this.
25     To the best of my recollection, I have not seen

104

1  this email that is the start of Exhibit 9. However, I
2  am familiar with, and have reviewed, the Attorney
3  General's office frequently asked questions. I refer
4  to it as a technical advisory. I think I put that in
5  my slide, in fact.
6  Q. So I think my question has to do with recognizing you
7  haven't seen this document, but I want to -- I'm trying
8  to understand what DOE policy is. So in this
9  particular document from the commissioner to AFT,
10 there's a statement that, "We also want to reiterate
11 our offer to try to work through individual
12 circumstances that may be unclear to teachers. In
13 these cases, the best approach is for them to reach out
14 directly and share the specific facts and circumstances
15 so that we can provide them with clear guidance."
16     Is that the policy of the Department of Education
17 currently?
18 A. I'm not sure if that policy still stands. I think, as
19 a state agency, we are very open to having people
20 contact us on a general basis, yes.
21 Q. But it sounds like, based on Exhibit 8, when at least
22 one superintendent has reached out to you, your
23 approach has been to refer them to the Human Rights
24 Commission, correct?
25 A. I don't think that's a fair statement of Exhibit 8.

105

1  Q.  How is it unfair?
2  A.  Well, what I stated was that these issues, which fall
3       within the purview of HB 2, is handled by the Human
4       Rights Commission and the Attorney General's office.
5       The Department, meaning the Department of Education,
6       has not issued much information on that topic. And
7       then I said to perhaps reach out to the
8       superintendents' association to see if they have any
9       guidance.
10 Q.  If an educator reached out to you with individual
11      circumstances that they thought was unclear, and they
12      reached out to try to obtain clear guidance from the
13      Department, would they currently get it?
14          MR. KENISON-MARVIN: Objection. Vague. You
15      can answer.
16          THE WITNESS: If they reached out to me
17      personally, I would refer them to another agency.
18          MR. BISSONETTE: Okay.
19          THE WITNESS: I believe HB 2 is very clear
20      that any matters falling within HB 2 are to be handled
21      by the Human Rights Commission, and it was the Attorney
22      General's office that put out this frequently asked
23      questions. If anything, I would refer that individual
24      to this document, meaning the frequently asked
25      questions created by the Attorney General's office.

106

1       What other people in the Department of Education would
2       do, I'm not in a position to testify to.
3       BY MR. BISSONETTE:
4  Q.  Gotcha. And it looks like, in this instance, the
5       commissioner is saying that we'll provide guidance
6       based on the individual circumstances of your case if
7       you find it unclear, right?
8  A.  Yes.
9  Q.  I'm just going to -- I just want to be clear. Back on
10      Exhibit 9, just the attachment to Exhibit 9. This is
11      issued by both the HRC, the Department of Justice, and
12      the Department of Education, right?
13 A.  Yes, that's what it says. But to be clear —
14 Q.  Of course. Please.
15 A.  — I did not — I was not an active participant in
16      creating this document. This document was created by,
17      obviously, the entities listed there, but my
18      understanding is that Attorney Chris Bond was perhaps
19      an active participant in this document. I want my
20      testimony to be clear. I was not. So I read it when
21      everybody else read it, when it was made public.
22 Q.  We all want it to be clear. That's helpful. When you
23      say "the document," I just want to be clear, you mean
24      the attachment to Exhibit 9, Bates stamped 7232 to
25      7234? That's what you're referring to?

107

1  A.  That is correct. And, as you've already noted, I was
2       not included on the email that is 07231.
3          MR. BISSONETTE: I'm going to mark for
4       Exhibit 10 -- this is to close the loop on Exhibit 8,
5       because I found it.
6          (Exhibit 10 marked for identification.)
7       BY MR. BISSONETTE:
8  Q.  So once you've finished reviewing Exhibit 10, Attorney
9       Fenton, just let me know.
10 A.  Yes.
11 Q.  So I'm now potentially concerned that Exhibit 8 may be
12      a draft and not something that was actually sent, so I
13      want to just close the loop on this.
14          So just kind of comparing Exhibit 8 and Exhibit
15      10, it looks like Exhibit 10 is a reflection of what
16      you may have actually sent Superintendent Pierre
17      Couture. I want to just get your confirmation on that,
18      if you know.
19 A.  So it does — I believe Exhibit 10, Bates stamped
20      DOE807808 is clear on its face. It's an email that I
21      sent to Pierre Couture, superintendent of SAU 4, and I
22      referred him to the Attorney General's website and the
23      frequently asked question document that is part of
24      Exhibit 9. I think that's consistent with my prior
25      testimony that I would refer people to this document,

108

1       being the frequently asked questions from the Attorney
2       General's office.
3  Q.  I agree. I just wanted to make sure because I noticed
4       that there was some -- a difference between Exhibit 8
5       and 10, so I was just trying to close the loop on it.
6          My understanding of the document -- I just want to
7       make sure that you agree with me -- is that the version
8       of this email that was sent by you to Mr. Couture is
9       the version in Exhibit 10.
10 A.  I don't know what Exhibit 8 is. I don't know if that's
11      a — it looks to be a draft, and I will tell you why I
12      think that —
13 Q.  Please do. Please do.
14 A.  – if I may? Because, again, I'm not trying to hide
15      the ball on you.
16          When I look at this, starting after that last
17      hyphen there, "Maybe reach out to the superintendents'
18      association and see if they have any guidance, or the
19      school," I would assume what I meant was the school
20      boards association, and that's not completed. And,
21      typically, knowing my style, I usually say a thank you
22      or a — what have you. So it would appear to be a
23      draft, Exhibit 8. I cannot testify with all certainty
24      that it is.
25 Q.  That's helpful. I appreciate that. As soon as I saw

**109**

1 both versions, I realized we were -- may have been
2 operating and doing questioning on a draft. I kind of
3 panicked. So I think we figured it out there. Thank
4 you for your testimony on that. I appreciate it.
5     MR. BISSONETTE: I have one more set of
6 questions that'll just take a few minutes and we can
7 take a two-minute break.
8     MR. KENISON-MARVIN: Can I just note
9 something for the record?
10     MR. BISSONETTE: Yeah.
11     MR. KENISON-MARVIN: To the extent that
12 goes -- not understanding that it was a draft, we'd put
13 on the record now we reserve our right to call that
14 back. Based on the discussion there, it sounds like
15 that's probably the case and it was inadvertent.
16     MR. BISSONETTE: Understood.
17     THE WITNESS: And it's not Bates stamped.
18     MR. KAHNE: That's just a printing issue, I
19 think.
20     MR. BISSONETTE: Is it?
21     MR. KAHNE: If we have it, it should have
22 been Bates stamped, I believe.
23     MS. MILBURN: I can check.
24     MR. KAHNE: Yeah.
25     MR. BISSONETTE: Here we go. Sorry. You can

**110**

1 set that aside, Attorney Fenton. Thank you. The next
2 exhibit will be Exhibit 10 (sic).
3     (Discussion off record.)
4     (Exhibit 11 marked for identification.)
5 BY MR. BISSONETTE:
6 Q. I'm just going to have you review Exhibit 11. Just let
7 me know when you're done reviewing it. My question is
8 going to be -- without the need for you necessarily to
9 read it all -- you certainly can -- is have you seen
10 these documents before?
11 A. To the best of my knowledge, sitting here today, this
12 is the first time I've seen these documents, and they
13 are not addressed to me.
14 Q. Were you ever involved in any meetings with your fellow
15 Department of Education employees about potential
16 responses to these letters?
17 A. To the best of my knowledge, sitting here today, my
18 knowledge and recollection, no, I was not involved in
19 any such meetings --
20 Q. Okay.
21 A. -- as it pertained to these letters.
22     MR. BISSONETTE: Okay. So we're just going
23 to take just a two-minute break to use the restroom.
24 Does that sound good?
25     MR. KENISON-MARVIN: Yes.

**111**

1     (Recess taken.)
2 BY MR. BISSONETTE:
3 Q. Attorney Fenton, you're still under oath. Thank you.
4     I want to just direct your attention to Exhibit 1
5 again, which is the text of HB 2. I'm just going to
6 refer you to page six. It's lines 24 to 25.
7 A. Oh, the Bates stamp number?
8 Q. Yes, I'm sorry, yes. PL0006. Yes.
9 A. Yes.
10 Q. So the language I'm just going to read into the record
11 says, "No people in any public school in the state
12 shall be taught, instructed, inculcated or compelled to
13 express a belief in or support for any one or more of
14 the following."
15     My question is does the Department of Education
16 have any criteria or policies that define what it means
17 to "teach, instruct, inculcate, or compel to express a
18 belief in or support for"?
19 A. To the best of my knowledge, sitting here today, I do
20 not believe so, other than the frequently asked
21 questions document that is on the Attorney General's
22 website. I preface that because, as pointed out to me,
23 it does say -- and I may refer to it?
24 Q. Absolutely. And you're referring to the exhibit on --
25 the attachment to Exhibit 9?

**112**

1 A. Yes. So it is issued by the Department of Education,
2 Commission for Human Rights, and Department of Justice.
3 So to the extent that this document addresses that
4 portion of the statute, I will tell you I refer to this
5 document, the frequently asked questions. I refer to
6 it as an Attorney General document.
7 Q. So beyond the FAQ that's the attachment to Exhibit 9,
8 is there any other criteria that you're aware of that
9 the Department uses in determining what "teach,
10 instruct, inculcate, or compel to express a belief in"
11 means?
12 A. To the best of my knowledge, no.
13 Q. Okay. Does the Department have a position on whether
14 HB 2 can be violated if a student makes a comment in
15 teacher-facilitated group discussion?
16 A. Does the Department have a position on that?
17 Q. Yeah.
18 A. To the best of my knowledge, no.
19 Q. Does the Department have a position on whether that
20 provision I'm referring to, "taught, instructed
21 inculcate, or compel to express a belief in," that that
22 would include playing devil's advocate, including a
23 teacher presenting two sides of a controversial
24 subject?
25 A. I'm sorry, can you repeat the question?

113

1  Q. Sure. I'm really just trying to get at how the
2     Department construes that provision, "shall be taught,
3     instructed, inculcated, or compelled to express a
4     belief in," lines 24 to 25 on Exhibit 1, Bates stamped
5     006.
6        So does that language in -- does the Department
7     have a position on whether that language includes a
8     teacher playing devil's advocate, including presenting
9     two sides of a controversial subject?
10       MR. KENISON-MARVIN: Objection. You can
11    answer.
12       THE WITNESS: To the best of my knowledge,
13    no, the Department does not have a position on that.
14    BY MR. BISSONETTE:
15 Q. With respect to that same language on Bates stamp 06,
16    does the Department have a position as to whether it
17    includes assigning -- a teacher assigning to a student
18    a point of view to argue?
19 **A. To the best of my knowledge, I'm not aware that the**
20    **Department has a position on that provision.**
21 Q. Again, with respect to that same language on PL006,
22    does the Department have a position as to whether or
23    not that language includes a teacher assigning a book
24    for general discussion in class?
25       MR. KENISON-MARVIN: Objection. It's vague,

114

1     and it's calling for application of fact to law.
2        MR. BISSONETTE: I'm just asking if they have
3     a position.
4        MR. KENISON-MARVIN: Maintain the same
5     objection. You can answer.
6        THE WITNESS: To the best of my knowledge,
7     the Department does not have a position on that.
8        MR. BISSONETTE: I'm going to close the loop
9     on Exhibit 1. I have another exhibit. I'm so sorry.
10    Are we on Exhibit 12?
11       THE REPORTER: Yes.
12       MR. BISSONETTE: Thank you.
13       (Exhibit 12 marked for identification.)
14    BY MR. BISSONETTE:
15 Q. So, Attorney Fenton, please do take a look at Exhibit
16    12. My question to you will be have you seen this
17    document before, after you've reviewed it.
18 **A. Okay.**
19 Q. So my question is just have you seen this document
20    before?
21 **A. I have, yes.**
22 Q. Okay. Does this memo in any way govern the DOE's
23    enforcement of HB 2?
24       MR. KENISON-MARVIN: Object as vague and
25    misstating prior testimony.

115

1        MR. BISSONETTE: You know, I can ask a better
2     question, actually.
3        MR. BISSONETTE:
4  Q. Does the DOE at all use the memo that's in Exhibit 12
5     with respect to how it enforces HB 2?
6        MR. KENISON-MARVIN: Same objection. You can
7     answer.
8        THE WITNESS: I can only answer that I have
9     not utilized this document. In fact, I was not aware
10    of it until very recently, so I have not used it. How
11    the Department uses it, I'm not in a position to
12    testify on behalf of the Department as a whole.
13       (Exhibit 13 marked for identification.)
14    BY MR. BISSONETTE:
15 Q. Attorney Fenton, I've just put before you what's been
16    marked as Exhibit 13. You are not on this document,
17    but I wanted to put it before you to ask the question
18    are you aware of a meeting between the Department of
19    Education and the Human Rights Commission that occurred
20    after the issuance of the memo that's at Exhibit 12?
21 **A. I do not recall this meeting exactly, no.**
22       MR. BISSONETTE: Okay. We're going to plow
23    through some documents, hopefully efficiently. The
24    next exhibit is going to be Exhibit --
25       THE REPORTER: 14.

116

1        (Exhibit 14 marked for identification.)
2     BY MR. BISSONETTE:
3  Q. Again, I'm not going to ask you to view every page
4     because we would be here until tomorrow, Attorney
5     Fenton. I'm just going to just ask for a particular
6     focus on Bates stamped PL682 and 683. Obviously, you
7     can read the whole thing, but my only question is going
8     to be, you know, have you seen this op-ed before?
9  **A. Is there a date on that op-ed?**
10 Q. I can represent that it is April 2022, but I'm --
11       MR. KAHNE: 15.
12       MR. BISSONETTE: Oh, there it is, Attorney
13    Fenton. It's on page two, right below, "In the news.
14    For immediate release, April 15, 2022."
15       THE WITNESS: Okay. Thank you.
16       MR. BISSONETTE: Of course.
17       THE WITNESS: Do you have the document that
18    it's referencing?
19       MR. BISSONETTE: I do, in fact. Those are
20    the attachments.
21       THE WITNESS: Those are the attachments.
22    Okay.
23       MR. BISSONETTE: Yes, yes. And, again, I'm
24    not entirely sure if I'll go through them. I'm not
25    asking you to review them right now, just those two

**117**

1  pages.
2        THE WITNESS: I understand.
3        MR. BISSONETTE: Okay.
4  BY MR. BISSONETTE:
5  Q.  Have you seen this op-ed before, those two pages, PL682
6      to 683?
7  A.  I was aware of this op-ed. I think this is the first
8      time I've read it in its entirety, but I was aware of
9      the general premise of it, if you will.
10 Q.  So it's fair to say you didn't read any drafts of this
11     before it was published?
12 A.  To the best of my knowledge, I did not read any drafts
13     of this op-ed before it was published, no.
14 Q.  Before this op-ed was published, did you have --
15     actually, strike that.
16       I am now just going to just refer on page 682, the
17     line that says, "This document.PDF exemplifies actual
18     instruction material from New Hampshire schools that
19     parents have identified as conflicting with their
20     values."
21       Have you seen -- you may need to go page by page,
22     but have you seen these topics before that were
23     attached to this press release?
24       MR. KENISON-MARVIN: I'll object as vague.
25     If you want to go through them one by one just so it's

**118**

1  clear what you're asking?
2        MR. BISSONETTE: Why don't we -- why don't I
3  withdraw that question and do it more individually. I
4  think that's fair.
5  BY MR. BISSONETTE:
6  Q.  I wanted to close -- before I get into some individual
7      complaints, I wanted to close the loop on two questions
8      on some of the prior exhibits, so I'm going to refer
9      you to Exhibit 3. And my question is hopefully a
10     simple one. I'm trying to differentiate this
11     presentation on Exhibit 3 from the presentation on
12     Exhibit 7. And so my question is with respect to
13     Exhibit 3, who the audience was for that
14     presentation?
15 A.  To the best of my recollection, Exhibit 3 was a
16     presentation that was given to superintendents or
17     administrators.
18 Q.  Gotcha. And with respect to -- how would that audience
19     be different from the presentation that's attached to
20     Exhibit 7?
21 A.  The presentation contained in Exhibit 3 -- give Nate a
22     minute to catch up here. We're leaving him in the
23     dust. Slow it down.
24       THE WITNESS: Are we good?
25       MR. KENISON-MARVIN: Thank you. Go for it.

**119**

1        THE WITNESS: The presentation that's
2  contained within Exhibit 3 -- give me a minute while I
3  just quickly review it -- does not appear to go through
4  the particular provisions of the code of conduct as it
5  does in Exhibit 7, and Exhibit 7 is the code of conduct
6  for educators.
7        Exhibit 7 really sets out what those
8  particular provisions are, what they entail, what the
9  expectation for individual credentialed educators is,
10 whereas in Exhibit 3, it's really focusing more on the
11 Department of Education's relationship with
12 superintendents and how when we -- when we look at
13 instances of educator misconduct, they have to be
14 worked on as a partnership between the Department of
15 Education and the individual districts.
16 BY MR. BISSONETTE:
17 Q.  That's helpful. I'm just -- one of these slides,
18     5665 on Exhibit 3, there's a reference that the
19     Department does not adjudicate these matters. It's
20     under HB 2. And then there's a question, "So why the
21     website?"
22       And I'm just kind of curious in this presentation
23     what you verbally told the superintendents as to why a
24     website was necessary?
25 A.  To the best of my recollection, sitting here today,

**120**

1      your question is what I told the superintendents?
2  Q.  During this presentation, yes.
3  A.  Understood.
4  Q.  Yes, yeah.
5  A.  To the best of my recollection, what I told the
6      superintendents, or other administrators who were in
7      the audience, was the website was there to facilitate
8      the transfer of these issues, which may or may not fall
9      within the purview of House Bill 2, to the HRC for
10     determination. It goes to assist parents, largely, but
11     other citizens as well, not just parents.
12 Q.  Do school -- strike that.
13       Do school districts have an obligation to conduct
14     their own investigations under the code of conduct?
15     How does that work?
16       I guess my question is how does that work when a
17     school district conducts its own investigation? Are
18     there requirements?
19       Now that I've given you three questions at once,
20     I'm going to withdraw all of them and just ask a very
21     clear question --
22 A.  Do you want to break that down for me?
23 Q.  -- which is does the code of conduct require school
24     districts to conduct their own investigations as to
25     potential violations?

Transcript of Diana Fenton
Conducted on May 17, 2023

---

**121**

1  A.  **To the best of my understanding of the code of conduct,**
2      **it does not.**
3  Q.  Okay.  So what's the scenario to which a school
4      district would be conducting an investigation under the
5      code of conduct?
6          MR. KENISON-MARVIN: Objection.  Vague.  You
7      can answer.
8          THE WITNESS: Recognizing that all cases are
9      different and unique based upon the individual facts,
10     typically, a school district would undertake an
11     investigation, whether that's done by an administrator
12     in-house or they hire a private firm to do that
13     investigation.  They would do that because, presumably,
14     a code of conduct -- a violation of the code of conduct
15     would also be an employment matter, so the district
16     would undertake it for employment purposes.
17         BY MR. BISSONETTE:
18 Q.  Gotcha.  Do school districts themselves have an
19     obligation to conduct investigations under HB 2?
20         MR. KENISON-MARVIN: Objection.  Vague.
21     Calls for legal opinion.  You can answer.
22         THE WITNESS: Can you reread the question?
23         (Court reporter read back question.)
24         THE WITNESS: I am not aware of any such
25     obligation.

**122**

1      BY MR. BISSONETTE:
2  Q.  Have there been any discussions within the Department
3      of Education that you're aware of about whether Ibram
4      Kendi's How to Be an Antiracist violates HB 2?  To not
5      hide the ball, I only ask because it's in Exhibit 4
6      which is Commissioner Edelblut's op-ed.
7  A.  **Exhibit 4.**
8          MR. KENISON-MARVIN: Same issue we had
9      earlier.  I'll -- I'm fine with a yes or no answer
10     there, and to the extent further information would be
11     privileged under deliberative, I instruct the witness
12     not to provide that information in response to this
13     question.
14         THE WITNESS: Can you restate the question?
15         (Discussion off record.)
16         (Court reporter read back question.)
17         THE WITNESS: I'm not aware of any such
18     discussions.
19         BY MR. BISSONETTE:
20 Q.  Have you ever read that book?
21 A.  **I have not.**
22 Q.  Have you read any portion of it?
23 A.  **I don't think so.**
24         MR. BISSONETTE: Thank you.  We're going to
25     mark another exhibit.

---

**123**

1          (Exhibit 15 marked for identification.)
2      BY MR. BISSONETTE:
3  Q.  I'll just ask you to review it and just let me know
4      when you're done.
5          MR. BISSONETTE: And also, while the witness
6      is reviewing, for the record, I know that there are
7      attachments.  I do not have them.  I'm not entirely
8      sure why.  Maybe they didn't follow sequentially in the
9      Bates stamp, or maybe I missed it, but, I just want to
10     make sure the witness and everyone knows that the
11     attachments are not affixed to the exhibit that is
12     being reviewed.
13         BY MR. BISSONETTE:
14 Q.  Have you seen Exhibit 15 before?
15 A.  **I have, yes.**
16 Q.  Okay.  What is Exhibit 15?
17 A.  **Exhibit 15 is an email from Commissioner Edelblut to**
18     **myself, cc'd to Richard Farrell and Christopher Bond.**
19     **It's in regards to an issue from SAU 29, which is in**
20     **Cheshire County.  And the email below is from a**
21     **gentleman by the name of ▮▮▮▮▮ to Frank Edelblut**
22     **as a concerned parent.**
23 Q.  And I see that this email was forwarded to you with a
24     message.  What did you do when you received this email
25     in response to Mr. ▮▮▮▮ s (sic), for lack of a better

**124**

1      word, complaint?
2          MR. KENISON-MARVIN: I'd just instruct the
3      witness to the extent the question is calling for
4      predecisional processes, discussions about what to do,
5      that we would assert deliberative process privileges to
6      that, discussions with any counsel within the DOE or
7      AG's office, and assert attorney/client privilege as to
8      that information.  So --
9          MR. BISSONETTE: I hear you on that.  Can I
10     just rephrase the question?  That's fair.
11         BY MR. BISSONETTE:
12 Q.  Did -- was there an investigation in response to this,
13     this complaint from Mr. ▮▮▮▮ (sic)?
14 A.  **So I will begin by saying the first part of the email**
15     **was brought for Chris Bond's attention.  The second**
16     **part of the email was for my review and Rich Farrell's**
17     **review.  And I believe that referred to the student**
18     **threatening to shoot up the school.**
19     **Are you referring to an investigation pursuant to**
20     **the code of conduct?**
21 Q.  Yes.  Let me just direct your attention to the bottom
22     of page 9586 where there's a complaint with respect to
23     a film called White Like Me by Tim Rise (sic).  And
24     then the email goes on to say, "This film emphasizes
25     white privilege and equates conservatism with white

---

Transcript of Diana Fenton
Conducted on May 17, 2023

---

125

1  supremacy.  The film should not be shown at all as it
2  is clearly CRT and in direct violation of New Hampshire
3  Bill HB 2, Sections 297 and 298, right to freedom from
4  discrimination and workplaces in education."
5       So my question is what, if anything, after you
6  received this email, did you do in response to that
7  specific complaint?
8       MR. KENISON-MARVIN:  Same objections under
9  the deliberative process and attorney/client
10  privileges.  I'll instruct you not to answer to the
11  extent you had conversations with other folks within
12  the Department about what to do in response to this
13  prior to making a decision about what would be done in
14  response to -- what, if anything, would be done in
15  response to receiving this email from this individual.
16       THE WITNESS:  To the best of my recollection,
17  based on my interpretation of the email, that portion
18  that you referenced, the film emphasizing white
19  privilege, was directed to Chris Bond.
20       MR. BISSONETTE:  Okay.
21       THE WITNESS:  To the best of my knowledge.
22  To the best of my recollection, sitting here today, I
23  do not recall taking any action as it pertained to
24  anything dedicated to the film, any reference to the
25  film.

---

126

1       BY MR. BISSONETTE:
2  Q.  That's helpful.  Do you know if anyone else in the
3      Department took action with respect to the film White
4      Like Me?
5  A.  Since Commissioner Edelblut said the first part of this
6      email, which I interpret to be reference to the film,
7      is for Chris, I can't speak for Attorney Bond, what
8      action he did or did not take as it pertains to any
9      reference to that film.
10 Q.  Without getting into the substance, were you involved
11     in any internal meetings concerning the film White Like
12     Me by Tim Wise, which that was discussed?
13 A.  To the best of my recollection, sitting here today, no,
14     I was not.
15 Q.  Okay.  We'll just set that aside.
16       (Exhibit 16 marked for identification.)
17       BY MR. BISSONETTE:
18 Q.  I'd just ask you to take a look at Exhibit 16.  Just
19     let me know when you're done, please.
20       MR. BISSONETTE:  In the interest of
21     completeness, I'm going to couple this with another
22     related exhibit, if you don't mind.
23       (Exhibit 17 marked for identification.)
24       BY MR. BISSONETTE:
25 Q.  You are not on that second email, but I have a question

---

127

1  about it and I don't want to hide the ball.  So just --
2  I'm sorry.  You're still reading, Attorney Fenton.
3       I'm sorry.  I think I just kicked you.  I'm sorry.
4  My apologies.
5  A.  You're fine.  I probably deserve to be kicked at some
6      point.
7  Q.  I don't know how that that'll come out in the
8      transcript.
9  A.  Hopefully, it was amusing for all our Zoom viewers
10     here.  Okay.
11 Q.  Thank you.  So with respect to -- what is Exhibit 16?
12 A.  Exhibit 16 is an email to me from Commissioner
13     Edelblut.  Wait, no.  I'm sorry.  Okay.  The top of
14     it -- all right.  The top of it is from me to
15     Commissioner Edelblut and Richard Farrell, the
16     investigator, and cc'd to the deputy commissioner in
17     response to the email that Commissioner Edelblut had
18     sent to myself and Richard Farrell and the deputy.
19       In that email he says, "I think we need to look
20     into this.  The events happened prior to the
21     anti-discrimination law, but, if true, certainly would
22     be considered unprofessional."
23       And then below that is an email from ▮▮▮▮▮▮▮
24     ▮▮▮▮▮▮ to a long string of people that I will just
25     let the exhibit speak for itself on that.

---

128

1  Q.  Sure.
2  A.  And it contains a forwarded message that was sent to
3      Superintendent Corey from a concerned Hollis parent.  I
4      can only assume Superintendent Corey is the
5      superintendent of Hollis school district.  I don't know
6      off the top of my head.
7  Q.  Thank you.  So my -- I take it you've seen Exhibit 16
8      before?
9  A.  I have, yes.  And I believe I testified to that, yes.
10 Q.  Thank you.  Sorry if I made you repeat that.
11       Just with respect to your -- your email to
12     Commissioner Edelblut, "Thank you.  We will look into
13     it."
14       My question is did you look into it?
15 A.  I would like to think if I told my boss I would do
16     something, that I did it.  To the best of my
17     recollection, I did.
18 Q.  Do you recall what you did in response to this email
19     from the commissioner on September 3rd, 2021?
20       MR. KENISON-MARVIN:  Same objection.
21     Deliberative process privilege.  I'd instruct you not
22     to answer to the extent it's calling for discussions
23     you had prior to making any decision about what to do
24     in looking -- "looking into" the process by anything --
25     discussions you had related to what you would do.  I

---

---

129

1  instruct you not to provide that in responding to this
2  question.
3       Same with attorney/client privilege.  So to
4  the extent you spoke with attorneys to seek legal
5  advice about what to do, same instruction.
6       THE WITNESS:  I don't recall the exact steps
7  that were taken in this particular instance.  In
8  general, if you would like me to --
9       MR. BISSONETTE:  Absolutely.
10      THE WITNESS:  -- set that out?
11      MR. BISSONETTE:  Please do.
12      THE WITNESS:  And, again, this is to the best
13 of my recollection without being able to say exactly
14 what steps I took as it pertains to this exact matter.
15 My typical process would be to have Richard Farrell
16 call the superintendent and find out more information
17 about the underlying issue.  In this instance, it looks
18 like the time frame might have been an issue.
19 BY MR. BISSONETTE:
20 Q.  Do you recall ever having conversations with
21 Ms. ▇▇▇▇ about the email she sent on September
22 3rd?
23 A.  **To the best of my recollection, as I sit here today, I**
24 **do not recall having any such conversations with**
25 **Ms. ▇▇▇▇.**

---

130

1  Q.  With respect to that process that you generally
2  articulated, recognizing that you don't remember the
3  specifics of this particular, again, complaint, for
4  lack of a better term, that would occur before -- would
5  that come before any, like, case is formally opened
6  under the Educator Code of Conduct?
7  A.  **This matter -- and I'm going to speak in somewhat**
8  **general terms.  This would not rise to the level of a**
9  **code of conduct issue.**
10 Q.  But before that determination is made, there would
11 still be outreach to the superintendent, potentially to
12 the complainant, generally, right?
13 A.  **I think that's a fair statement, yes.**
14 Q.  I'm just going to refer you to the first page of
15 Exhibit 17.  Recognizing that you are not on this
16 email, but Commissioner Edelblut responds to
17 Ms. ▇▇▇▇ by saying, "If I open an inquiry on the
18 referenced educators, would this woman be willing to
19 provide testimony to our investigator?"
20      Can the commissioner unilaterally open an inquiry
21 on educators under the code of conduct?
22 A.  **This is the first I'm seeing of this email.  I'm --**
23 Q.  I'm sorry, go on.  I interrupted you.
24 A.  **I'm not aware that there was any inquiry opened as it**
25 **pertains to this issue that was brought to the**

---

131

1       **attention of the Department of Education.**
2  Q.  Generally, though, I guess my question is outside the
3  context of this specific complaint that Ms. ▇▇▇▇
4  lodged, does the commissioner have the ability to
5  unilaterally open an inquiry on an educator?
6       MR. KENISON-MARVIN:  Objection to the extent
7  it calls for a legal conclusion.
8       THE WITNESS:  In general, again, recognizing
9  that all cases are fact dependent, no.
10 BY MR. BISSONETTE:
11 Q.  And why is that?
12      MR. KENISON-MARVIN:  Same objection.
13      THE WITNESS:  When the Department places an
14 individual under investigation -- and by "individual,"
15 I mean a licensed credential holder -- those letters go
16 out with the deputy commissioner's signature on them.
17 They're not approved by the commissioner.  They are
18 created by myself and Richard Farrell, and signed by
19 their deputy.
20      I think that's not directly answering your
21 question.  You asked for an inquiry.  I answered about
22 the investigation, which are two separate things.
23 Q.  Got you.  So pivoting now.
24 A.  Sure.
25 Q.  You spoke about investigation.  That's helpful.

---

132

1  A.  Sure.
2  Q.  And I think a distinction seems meaningful under the
3  code.
4       So with respect to -- I want to ask the same
5  question, but with respect to -- strike that.
6       I want to make sure I understand your testimony.
7       So going back to the code of conduct on Exhibit 2,
8  page 18, 511.01 (B).  Is the process that you were just
9  referring to subsection B?
10 A.  Yes.
11 Q.  Okay.  So your testimony is the commissioner doesn't
12 have the ability to unilaterally open an investigation
13 under 511.01 (B), correct?
14 A.  **I am not aware of any instance in which the**
15 **commissioner has initiated that process.  He might --**
16 **let me clarify.  He might express to me that he wants**
17 **me to look into it or flush it out, perhaps, but the**
18 **formal process of placing an educator under**
19 **investigation pursuant to Ed 511.01 (B), that process,**
20 **the mechanics of it, do not involve the commissioner.**
21 **He doesn't create the letter.  He doesn't approve the**
22 **letter.  He might know it's going out, but, in large**
23 **part, he's not a direct participant in that process, if**
24 **that helps.**
25 Q.  That does.  Is that process with respect to the

---

**133**

1  mechanics of how an investigation shall be opened, is
2  that memorialized in a formal policy, procedure,
3  anywhere within your Department?
4  **A.  That process and procedure might be in draft form.  I**
5  **don't think there's a formal document.  But that is the**
6  **process that has been established when -- not**
7  **necessarily when Commissioner Edelblut started, but,**
8  **more importantly, when the deputy commissioner started,**
9  **because she has that direct oversight in those**
10 **matters.**
11 Q.  Now, it seems like the commissioner doesn't have a lot
12 of involvement in the mechanics of opening the
13 investigation, but does he have unilateral authority to
14 commence the investigation?  They're sort of different
15 kind of things.  So is that a distinction that's
16 meaningful to you in your practice?
17         MR. KENISON-MARVIN:  Objection.  Compound.
18         THE WITNESS:  There are questions on the
19 table right now, too.
20         MR. BISSONETTE:  Do you want to give that
21 back?  And I'll separate my two bad questions into
22 maybe one good one.
23         (Court reporter read back question.)
24 BY MR. BISSONETTE:
25 Q.  So does the commissioner have the unilateral ability to

**134**

1  decide under 511.01 (B) that an investigation shall be
2  opened?  The decision is what I'm referring to.
3         MR. KENISON-MARVIN:  Objection.  Legal
4  conclusion.  You can answer.
5         THE WITNESS:  Does he have the authority?  I
6  suppose an argument could be made that he does, based
7  on how the rules are written.  I can tell you, as a
8  matter of practice, I am not familiar with an instance
9  where he has initiated an investigation.  He might tell
10 me, as he did in that email, "Please review it.  Take a
11 look at it," but as I've previously testified, the
12 mechanics of that don't involve him.
13 BY MR. BISSONETTE:
14 Q.  Gotcha.  Just referring to 511.01 (A) on Exhibit 2 --
15 **A.  Yes.**
16 Q.  -- can the commissioner unilaterally open a case?
17         MR. KENISON-MARVIN:  Same objection.
18         THE WITNESS:  That would not be my
19 interpretation of that particular rule.
20 BY MR. BISSONETTE:
21 Q.  I'm just curious why you don't read it that way?
22         MR. KENISON-MARVIN:  Same objection.
23         THE WITNESS:  If we take Exhibit 16, for
24 example, it's not uncommon for the commissioner to
25 refer matters, or issues, or information that he has

**135**

1  received in his capacity to myself and Richard Farrell,
2  and we will then address it as we deem appropriate.
3         We will reach out to the superintendent or
4  the complainant and determine -- and then I think we
5  fall within the purview of 511.01 (A) where we take
6  down that information and go through our process, which
7  I've previously testified to.  Some of the things we
8  consider are whether or not the individual is a
9  certified educator.  If it is, in fact, an issue that's
10 enumerated in the code of conduct, things of that
11 matter.  Frank is, in large part, not an active
12 participant in that process.  He might refer a matter
13 to me, as I mentioned, as highlighted in Exhibit 16,
14 and then Rich and I review it, and the process moves
15 from there.
16 BY MR. BISSONETTE:
17 Q.  That's helpful.  What I'm really trying to do, not to
18 hide the ball, is mirror Exhibit 16 in just how this,
19 in real life, kind of falls within the Educator Code of
20 Conduct.
21         So I guess my question is assuming you looked into
22 it with respect to Exhibit 16, where would that have
23 fallen as to where the DOC was in its process?
24 **A.  The --**
25 Q.  The DOE in its process under 511.01.

**136**

1  **A.  Again, without being able to recollect the exact steps**
2  **taken as it pertains to Exhibit 16, I believe that it**
3  would fall within Ed 511.01 (A), and it would not -- it
4  would not have fallen within 511.01 (B).  It would not
5  have risen to a code of conduct.  And to the extent
6  that actions are deemed unprofessional, as is stated in
7  Commissioner Edelblut's email, those, in large part,
8  are employment matters.  They're not code of conduct
9  issues.
10 Q.  Gotcha.  That's helpful.  I don't do this work every
11 day, so trying to relate these principles to what's
12 happening, that's helpful for me.
13 **A.  If it -- if I may?**
14 Q.  Yes, please.  Of course.  Absolutely.
15 **A.  The code of conduct is narrowly tailored, and it, in**
16 **large part, addresses actions in which children are**
17 **being physically harmed.  There are some other things**
18 **in there about falsifying professional qualifications,**
19 **things of that nature.  But I have stated on many**
20 **occasions that the code of conduct should be narrowly**
21 **construed, and it was written by the stakeholder group**
22 **to be narrowly tailored to address those issues I just**
23 **related.**
24 Q.  That's helpful.  I was involved tangentially in the
25 Concord school district case, so I have some connection

Transcript of Diana Fenton
Conducted on May 17, 2023

---

137

1  to what you just said.
2  **A.  I'm sorry to hear that.**
3  Q.  Well, it was as an advocate, not in a personal
4  capacity.
5      The next exhibit here is going to be 18.
6      (Exhibit 18 marked for identification.)
7      THE WITNESS:  And I do have a time by which I
8  have to leave.
9      MR. BISSONETTE:  What would that be?
10     THE WITNESS:  4:00.  I could push it to 4:30.
11     MR. BISSONETTE:  We did not expect that.  I
12 think we expected to going to 5:00 at this rate.
13     Off the record.
14     (Recess taken.)
15 BY MR. BISSONETTE:
16 Q.  Exhibit 18, Attorney Fenton, after you've had an
17 opportunity to review it, I'm just going to ask whether
18 you've seen this document before.
19 **A.  Okay.**
20 Q.  Thank you.  I'm going to just quickly go to page 10287,
21 which is page two of the document.  And there's an
22 email from you to Mr. Farrell that says, "Can you look
23 into this?"
24     Do you see that email?
25 **A.  Mm-hm.**

---

138

1  Q.  What were you asking Mr. Farrell to look into?
2  **A.  Just to -- well, let me preface.  I am familiar with**
3  **this document.  I do not recall all the exact details,**
4  **but my expectation in saying that to Richard Farrell**
5  **would be to better understand what this matter entails.**
6  **This apparently was brought to us by a citizen, perhaps**
7  **a parent, and sent to -- looks like it was sent to**
8  **Commissioner Edelblut.**
9      **And my expectation in saying to Rich Farrell, "Can**
10 **you look into this," would be that he would reach out**
11 **to the superintendent and get more information as it**
12 **pertains to what was brought to our attention.**
13 Q.  Had you made a determination when you asked Mr. Farrell
14 to do this that there may have been a violation under
15 the code of conduct?
16 **A.  No.**
17 Q.  Okay.  So you made this request -- strike that.
18     Was this a -- do you have any understanding at the
19 time you wrote the email, "Can you look into this,"
20 that this was a complaint under HB 2?
21 **A.  I do not recall if I -- if that was my understanding of**
22 **it.**
23 Q.  Okay.  Do you know whether or not this complainant,
24 Ms. ████, has filed separately a Human Rights
25 Commission complaint?

---

139

1      It's okay if you don't know.  I'm just asking if
2  you have any understanding whether or not she's done
3  anything with the HRC.
4  **A.  What Ms. ████ might or might not have done with the**
5  **Human Rights Commission, I am not aware of.**
6  Q.  Is there a criteria that you use when you decide to ask
7  Mr. Farrell to look into something?
8      MR. KENISON-MARVIN: Objection.  Vague.
9      THE WITNESS:  I can answer in general
10 terms --
11     MR. BISSONETTE:  Sure.
12     THE WITNESS:  -- not necessarily as it
13 relates to what's identified in Exhibit 18.
14     Generally, in these instances, we get
15 information from a concerned citizen or a parent, and I
16 ask Rich to reach out to the superintendent so that we
17 can get some additional information so that we can
18 determine what the next steps may or may not be.
19 BY MR. BISSONETTE:
20 Q.  Gotcha.  That's helpful.  Do you recall if Mr. Farrell
21 did reach out to the superintendent in this instance?
22 **A.  Based upon Exhibit 18, it looks that he did.  Scott**
23 **Laliberte who is, if the superintendent or**
24 **Londonderry, or was at the time.**
25 Q.  And then kind of back on page one of Exhibit 18, Bates

---

140

1  stamped 10286, Mr. Farrell writes to the commissioner,
2  you, and two other DOE employees, "Please review the
3  responses from Londonderry."
4      Did you review those responses from Londonderry?
5  **A.  To the best of my recollection, sitting here today, I**
6  **believe that I did.**
7  Q.  Okay.  Was this discussed in any meeting?  Strike that.
8      Looking at the email from Commissioner Edelblut to
9  Mr. Farrell to you and two other DOE employees, there's
10 a statement, "Can we discuss in our next meeting?"
11     Was there a discussion at a meeting about this
12 Londonderry complaint?
13 **A.  Sitting here today, I don't recall if there was a**
14 **meeting as it pertained to this particular instance.**
15 **Based on the email, I would assume there was, or it**
16 **more likely than not was an issue that Commissioner**
17 **Edelblut discussed with Attorney Christopher Bond.**
18 Q.  The last -- the first portion, Mr. Farrell to you, "You
19 should review the text messages," did you review the
20 text messages?
21 **A.  I'm -- can we clarify what the text messages -- is that**
22 **what's attached to this document?**
23 Q.  I can't clarify.  I think these attachments are what I
24 believe followed the email as it was produced, so...
25 **A.  If the premise is -- if the text messages are the**

141

1  images that are attached to Exhibit 18, then -- and
2  there are only two images -- the third page is cut
3  off -- then, yes, based on my recollection, I believe
4  that I did review those, yes.
5  Q.  And, again, do you recall any discussion that you were
6  involved in about those attachments?
7  A.  I do not recall any particular meeting or exact
8  discussion --
9  Q.  Okay.
10 A.  -- as it would pertain to those exact attachments.
11 Q.  To close the loop on this, and then I am done, I just
12 want to have you pull up exhibit -- I think it's 14.
13 It's the big stack of documents.  I'm going to refer
14 you to -- if you could just look at 696 to 700?  And
15 when you're done reviewing those, I'll have two other
16 pages.
17 A.  Okay.
18 Q.  Do you recognize the pages 697 to 700?
19 A.  I do not recall them sitting here today.  I do not
20 recall them.  I would imagine that I saw them at some
21 point, but I don't recall seeing this exact document,
22 no.
23 Q.  Do you know whether or not these are documents that
24 would be associated with the email that's referenced in
25 Exhibit 18?

142

1  A.  I would not have any knowledge of that, no.
2  Q.  So now I'm just going to turn your attention to 736 and
3  737.
4  A.  Okay.
5  Q.  I just want to make sure that we're on the same page,
6  that those are --
7  A.  These -- these two documents, yes.  736 and 737 --
8  Q.  Are the same documents attached --
9  A.  -- are the -- appear to be the documents that were
10 attached to Exhibit 18.
11 Q.  Okay.
12 A.  However, there's been -- it's been redacted in Exhibit
13 14.
14 Q.  Do you know how the Department ultimately responded to
15 this complaint on April 7th?
16 A.  To the best of my knowledge, sitting here today, this
17 matter would not have prompted an investigation to have
18 been opened, nor would it have been a violation of the
19 code of conduct as set out in exhibit -- what's the
20 exhibit?
21 MR. KAHNE:  2.
22 MR. BISSONETTE:  2.
23 THE WITNESS:  Oh, thank you.  Exhibit 2.
24 BY MR. BISSONETTE:
25 Q.  When you say -- sorry, go on.  I was about to cut you

143

1  off.  So you don't recall anything being done?
2  A.  Done in terms of --
3  Q.  Enforcement.
4  A.  Enforcement under the code of conduct?  No, I do not.
5  Q.  You said that you didn't view it as necessarily
6  violating the code of conduct.  Did you have a view at
7  the time as to whether or not it violated HB 2?
8  A.  It was --
9  Q.  I'm sorry?
10 A.  -- not my decision to make.  Those matters pursuant to
11 the law are to be referred to the Human Rights
12 Commission for determination.
13 Q.  So when you say "code of conduct," I just want to make
14 sure what you were referencing was the code of conduct
15 in Exhibit 2, but you were excluding the provisions of
16 HB 2?
17 A.  Yes.
18 MR. BISSONETTE:  Okay.  Thank you.
19 EXAMINATION
20 BY MR. KAHNE:
21 Q.  Attorney Fenton, my name is David Kahne.  I represent
22 the American Federation of Teachers in this action, and
23 I'm going to ask you a few questions, some follow-up
24 questions.  Same rules apply as for -- what we went
25 over from the beginning.  And I'll try to be as

144

1  efficient as possible because I understand that you
2  have some time constraints.
3  Why don't we stay on Exhibit 18?  If you look at
4  the bottom, the last email on the bottom of what's been
5  marked DOE10286, there's an email from Scott Laliberte,
6  who presumably is the superintendent of Londonberry
7  (sic), to Richard Farrell.  The last sentence -- or,
8  sorry, I should say the second to last sentence says,
9  "We have also reviewed this material through the lens
10 of the new divisive concepts law and find that the
11 subject of these activities do not apply."
12 Do you see that?
13 A.  I do.
14 Q.  My first question for you, Attorney Fenton, is why
15 wasn't this complaint referred to the HRC?
16 A.  I'm not sure if it wasn't referred to the HRC.
17 However, notwithstanding this instance, my
18 understanding is that the Department of Education is
19 not in a position to refer matters which may or may not
20 fall within House Bill 2 to the Human Rights Commission
21 for consideration.  That's what I have been told on
22 another matter.
23 Q.  So let's break that down.  Do you have knowledge of
24 Commissioner Edelblut ever forwarding complaints that
25 he receives to Commissioner Malachai?

**145**

1   A.   I am not here to testify on behalf of Commissioner
2        Edelblut.  He might have.  He might not have.  I don't
3        have any personal information as it pertains to that.
4   Q.   You don't -- do you know personally whether any
5        complaints have been received by the DOE and
6        transferred or referred to the HRC?
7   A.   I do not have personal information as it pertains to
8        referring cases to the Human Rights Commission.  I can
9        speak from my own personal experience in a case that I
10       referenced earlier during my testimony where I, through
11       the Department of Education, tried to refer a case to
12       the Human Rights Commission and was told that they
13       could not take that as a referral.
14  Q.   And I believe we've seen documents today, have we not,
15       where you instruct individuals to file a complaint with
16       the HRC, that that is the appropriate venue for those
17       complaints, right?
18           MR. KENISON-MARVIN:  Objection.  Compound.
19       BY MR. KAHNE:
20  Q.   Is that a fair characterization of documents that we've
21       seen?
22  A.   Could you specify which document?
23  Q.   Exhibit 10.  So in Exhibit 10, you refer Pierre Couture
24       to the Human Rights Commission.  You say that because
25       divisive concepts is handled by the Human Rights

**146**

1        Commission and the AG's office.  Do you see that?
2   A.   I do.
3   Q.   Okay.  So my question is, in the case of Londonberry,
4        why wasn't the superintendent of Londonberry referred
5        to the HRC?
6   A.   Well, getting back to Exhibit 10, I'm not necessarily
7        referring Pierre Couture to the Human Rights
8        Commission.  I'm just informing him that this issue is
9        handled by the Human Rights Commission and the Attorney
10       General's office.  Therefore, the Department has not
11       issued much information on this topic, and so then I
12       referred him to the Attorney General's website where
13       they had that FAQ.  I don't read this email in Exhibit
14       10 as me referring him to the Human Rights
15       Commission.
16  Q.   Okay.  I'm not talking about a formal referral.  I'm
17       just talking about telling an individual, who has a
18       complaint, that the proper place to bring a complaint
19       is with the Human Rights Commission.
20  A.   And going back to Exhibit 18, that conversation could
21       have occurred.  I am not -- I do not have any personal
22       information, as I'm sitting here today, to say whether
23       or not that was done or not.
24  Q.   Has the commissioner of education ever asked you to
25       investigate potential violations of HB 2?

**147**

1   A.   The law is clear that the Department of Education does
2        not adjudicate matters that may or may not fall within
3        HB 2.
4   Q.   I understand your testimony.  My question, though, is
5        has the commissioner of education ever asked you to
6        investigate potential violations of HB 2?
7           MR. KENISON-MARVIN:  I'll instruct the
8        witness with respect to any information the
9        commissioner sought from you that would have been a
10       privileged attorney/client communication where he's
11       seeking advice from you about whether or not to do
12       that, to not -- that that information is privileged and
13       to not provide it in response to that question.
14           THE WITNESS:  So I don't feel I can answer
15       that question without violating a potential privilege.
16       BY MR. KAHNE:
17  Q.   What privilege are you violating?
18  A.   Possible attorney/client.
19  Q.   Is the commissioner consulting you in your capacity as
20       his attorney?
21  A.   Generally, his attorney was Christopher Bond, and
22       Christopher Bond would advise him on those matters.
23  Q.   I'm also not asking you for the substance.  I'm asking
24       you if it has occurred.
25           Has the commissioner asked you to investigate

**148**

1        potential violations of HB 2?
2   A.   To the best of my recollection, sitting here today, he
3        has not.  And to the extent that he ever has, I would
4        have told him that we do not have the authority to do
5        so.
6           MR. KAHNE:  Okay.  Let's look at document --
7        what are we up to?
8           MR. BISSONETTE:  This will be 19.
9           (Exhibit 19 marked for identification.)
10       BY MR. KAHNE:
11  Q.   You don't need to read the entire thing, but does this
12       refresh your recollection of this series of emails that
13       occurred on or about August 23rd, 2021?
14  A.   Yes, I recall this email.  Yes.
15  Q.   Okay.  And what -- Commissioner Edelblut says on
16       Friday, August 20th, at 8:15 a.m., "I did call David
17       Ryan to ask for and about the book.  Can you get a
18       copy?  He has not returned my call."
19           Do you see that?
20  A.   I do, yes.
21  Q.   And what was Commissioner Edelblut referring to
22       there?
23  A.   I believe there was a book being referenced.  Perhaps
24       it was within this email.
25  Q.   Okay, so -- I'm sorry.  Go ahead.

149

1    A.  I believe if you look -- oh, the Bates number is cut
2       off, but I believe they're referencing the book A Good
3       Kind of Trouble.
4    Q.  Okay.  And so am I correct that Commissioner Edelblut
5       was asking you to find a copy of A Good Kind of
6       Trouble?
7    A.  That was my interpretation of his request, yes, and I
8       was going to go on Amazon and buy him a copy of the
9       book.
10   Q.  And I asked you earlier whether the commissioner had
11      ever asked you to investigate into potential violations
12      of HB 2.  Do you not understand this document to be a
13      complaint relating to a potential violation of HB 2?
14   A.  I took his request, the commissioner's request, as
15      simply wanting a copy of the book.
16   Q.  Right, but he could have asked his secretary for the
17      book, right?
18   A.  Well, I think, in this instance, I became the
19      secretary.  That's -- that was my limited role in this.
20      It might be silly, but I was going to go on Amazon and
21      get him a copy of the book, so I interpreted his email
22      as being that limited.  He wanted to see what it was
23      all about.
24   Q.  Okay.  And getting back to 18, which is the Londonberry
25      email, that was -- that complaint was about course

150

1       conduct, too, right?  Course content, I should say.
2       Excuse me.
3    A.  Yes.
4    Q.  Okay.
5    A.  That is my understanding, yes.
6    Q.  There is a discussion at the DOE about this particular
7       course conduct, wasn't there?
8    A.  I don't have any particular recollection of any exact
9       meeting, but, I would assume, based on the nature of
10      the emails, that there was further discussion, and I
11      would believe that it would involve Chris Bond.
12      Attorney Bond, in large part, advised Commissioner
13      Edelblut as it pertained to matters that fell within HB
14      2.
15   Q.  And but you said -- it says here, you say to
16      Commissioner Edelblut, "Yes, we need to discuss at our
17      next ed misconduct meeting in further detail."
18   A.  Yes.
19   Q.  That suggests to me that it was not just a conversation
20      with Attorney Bond and the commissioner, right?
21   A.  Yes, but I included Christopher Bond about that string.
22      And, in large part, Christopher Bond would not be part
23      of our routine educator misconduct meeting, so he's
24      included here because, to the extent it involves or may
25      involve HB 2, I would have deferred to Attorney

151

1       Christopher Bond to guide Commissioner Edelblut as to
2       the next step.
3    Q.  Okay.  But fair to say that course content was
4       discussed at the board of ed at an educator misconduct
5       meeting?
6    A.  I don't recall having that at an official educator
7       misconduct meeting, but I -- I would imagine that, yes,
8       it was discussed in some context.  It might have been
9       an informal meeting between me and Christopher Bond and
10      the commissioner.
11   Q.  Including whether it violates HB 2?
12   A.  We didn't make a determination as to whether or not it
13      violated HB 2.  We would make a determination as to
14      this is not within our purview.  It should be referred
15      or have someone contact the Human Rights Commission.
16      It needs to be reviewed by the Human Rights Commission.
17   Q.  But there is a certain amount of groundwork that gets
18      done at the DOE to determine whether it rises to the
19      level of a potential violation of HB 2, right?
20   A.  I disagree with how you phrased that.  It's not
21      determining whether it violates HB 2.  It's determining
22      whether it falls within the Department of Education's
23      jurisdiction or it falls outside the Department of
24      Education's jurisdiction.
25   Q.  Department of Education's jurisdiction is the code of

152

1       conduct, right?
2    A.  Yes.
3    Q.  And violations of HB 2 are violations of the code of
4       conduct, are they not?
5    A.  That is what the law says.
6           MR. KENISON-MARVIN:  Objection.  Vague.
7    BY MR. KAHNE:
8    Q.  The complaint process that you spoke about earlier
9       that's referenced in the Educator Code of Conduct which
10      is Exhibit 2, subdivision A, which says, "The case
11      shall be opened when a complaint of possible misconduct
12      against a credential holder has come to the attention
13      of the department either through direct reporting or
14      other means," those complaints can come in through
15      emails, right?
16   A.  I would imagine, yes.
17   Q.  Calls?
18   A.  Yes.
19   Q.  Direct calls to the commissioner?
20   A.  Yes.
21   Q.  Direct emails to the commissioner?
22   A.  Yes.
23   Q.  And when it says "a case shall be opened," can you
24      describe for me what it means for a case to be
25      opened?

153

1  A.  I've already testified to that.
2  Q.  Well, you said that things get documented, but you
3     didn't specify how they get documented.
4  A.  I believe I did go into detail as to what that means.
5  Q.  I don't recall.  Can you refresh my recollection?
6  A.  In large part, it would be the investigator, Richard
7     Farrell, and he would document the name of the person
8     the allegation is against, the name of the person
9     making the allegation, the school district, any other
10    facts which might be relevant.
11 Q.  Where does that get documented?
12 A.  That's probably a question best directed to Richard
13    Farrell.  He has his notes, and then he creates — and
14    again, this is to the best of my knowledge.  I would
15    refer your question to Richard Farrell.  He has folders
16    where he writes down that information.
17 Q.  Folders?
18 A.  Mm-hm.
19 Q.  When a case is opened about a particular credential
20    holder, does that go into a credential holder's
21    personnel file?
22 A.  No, it does not.
23 Q.  Is it only when a formal investigation is opened?
24 A.  So we do not have personnel files.  Personnel files are
25    employment.  We do not govern employment.

154

1  Q.  So you've testified, I believe, that a formal letter
2     goes out to an educator or licensed credential holder
3     when an investigation is opened; is that right?
4  A.  That's correct.  That's my testimony.
5  Q.  Other than Richard Farrell documenting in a folder, is
6     there anything else that happens in connection with a
7     case being opened?
8  A.  I will defer your questions to Richard Farrell.  He can
9     better detail what he — the information he takes and
10    what he opens.  If your question is about what is
11    logged in our EIS system, there is nothing logged in
12    our EIS system when a case is opened in accordance with
13    511.01 (A).
14 Q.  So let me show you what's been marked DOE10010.
15       MR. KAHNE:  What are we up to?  21?
16       THE REPORTER:  20.
17       (Exhibit 20 marked for identification.)
18    BY MR. KAHNE:
19 Q.  Do you see this, the document that's — that I've —
20    that's Exhibit 20?
21 A.  I do.
22 Q.  Okay.  Do you see — who's Stephen Berwick?
23 A.  Stephen Berwick is — oversees our constituent concerns
24    and complaints.
25 Q.  Okay.  Do you see it says, "Diana — here you go!  By

155

1     the way, don't forget, anything that comes in as a
2     complaint to me does get logged -- I do get some
3     discrimination and refer to HRC... however, great
4     responses to their questions."
5        Do you see that?
6  A.  Yes, I do.
7  Q.  Why is he saying that anything that comes in to him as
8     a complaint gets logged?
9  A.  So Stephen handles all of our constituent concerns that
10    come in, and he logs them in a database which is shared
11    with myself and the commissioner and the deputy, and I
12    believe the governor's office.  Those are — that's his
13    database.  He does not oversee, nor is he involved in
14    educator misconduct cases.  So while he will log it
15    because it's a call that he got, he will document it in
16    his own database, he will then ultimately refer any
17    educator misconduct cases to Richard Farrell.  And, as
18    stated, anything that he feels might be HB 2, or not HB
19    2, he refers to the Human Rights Commission.
20 Q.  Are complaints that are opened made public?
21 A.  No.
22 Q.  Investigations?
23       MR. KENISON-MARVIN:  Objection.  Vague.
24       THE WITNESS:  Could you clarify your
25    question, please.

156

1     BY MR. KAHNE:
2  Q.  Are investigations that are opened by the Department of
3     Education made available to the public?
4  A.  In what sense?
5  Q.  In any sense.
6  A.  That's pretty broad.
7        MR. KENISON-MARVIN:  I will object to that as
8     being vague.
9        THE WITNESS:  Could you clarify?
10    BY MR. KAHNE:
11 Q.  Can a member of the public find out whether an educator
12    has had an investigation opened with respect to their
13    conduct?
14 A.  No.
15 Q.  You testified earlier that -- about your meeting, your
16    investigative meeting.  You testified about receiving
17    an investigative file from a superintendent.  Do you
18    remember that, from superintendents?  And reviewing
19    them?
20 A.  Yes, we have received investigation reports or files
21    from superintendents, depending on the case, yes.
22 Q.  And do superintendents, are they authorized to conduct
23    those investigations on their own?
24       MR. KENISON-MARVIN:  Objection.  Calls for a
25    legal conclusion.  You can answer.

157

1    THE WITNESS:  I believe that falls within the
2  purview of their role as superintendent, yes.
3  BY MR. KAHNE:
4  Q.  And within that investigation that superintendents can
5    conduct, can they also conduct -- can they conduct
6    investigations relating to potential violations of the
7    code of conduct?
8    MR. KENISON-MARVIN:  Same objection.
9    THE WITNESS:  To the extent that the code of
10   conduct has been incorporated within their district
11   policies, I believe that they can, yes.
12  BY MR. KAHNE:
13  Q.  Okay.  I want to draw your attention to Exhibit 3 which
14   is the training that you spoke about with Attorney
15   Bissonnette.  I wanted to cut out some time, direct
16   your attention directly to DOE05665.
17  **A.  Oh, okay.  Exhibit 3.  Got it.  It's on the top of the**
18   **pile.  Which one?  Which number?**
19  Q.  3.  It's 3.  It's 5665.
20  **A.  Okay.**
21  Q.  By the way, before we talk about this, you testified
22   earlier that you've included in your training now
23   sections on HB 2, right, since its passage?
24  **A.  I have done that.  I don't know if that's my current**
25   **practice as I do code of conduct training.**

158

1  Q.  Okay.  Why did you incorporate it?
2  **A.  I incorporated it at the time into my trainings that**
3   **we've referenced because it seemed to me there was a**
4   **lot of confusion in the field.  I received calls from**
5   **attorneys that had some confusion as to the**
6   **Department's role under HB 2, and I wanted to take an**
7   **opportunity to clarify that.**
8  Q.  So there was confusion among attorneys, you said; is
9   that right?
10  **A.  Yes.**
11  Q.  Confusion among superintendents, too, in your view?
12  **A.  In my view, yes.**
13  Q.  Among parents as well?
14  **A.  I would expect so, but my -- when I say there was**
15   **confusion in the field, I am referring to educators,**
16   **attorneys for school districts, and union attorneys,**
17   **and superintendents.**
18  Q.  Fairly educated people, right?
19  **A.  In my experience, yes.**
20  Q.  So the last bullet, "So why the website," is what you
21   were asked about before.  I just want to sort of close
22   the loop here.  Is the website here referring to the
23   Department of Education website?
24  **A.  Yes, I think that is what I was referring to.**
25  Q.  And is that because there was a -- there was

159

1    information on the Department of Education website
2   concerning HB 2?
3  **A.  No.**
4  Q.  Okay.  So what does this mean, "So why the website?"
5  **A.  So the website, at least when I wrote this, was in**
6   **reference to the --**
7  Q.  Sorry.  Go ahead.
8  **A.  So the reference to the website, when I wrote this, was**
9   **really a reference to the link by which complaints**
10   **could be filed that were sent directly to the Human**
11   **Rights Commission.**
12  Q.  Okay.  I'm going to show you a document that actually
13   does not have a Bates number on it.  It says, "Right to
14   freedom from discrimination in public workplaces and
15   education."
16    And it is, and I will represent on the record,
17   that it is a snapshot of the Department of Education
18   from November 10th, 2021.
19    (Exhibit 21 marked for identification.)
20  BY MR. KAHNE:
21  Q.  So does this refresh your recollection as to what the
22   Department of Education website said about HB 2 on or
23   around November of 2021?
24  **A.  It does, yes.**
25  Q.  Okay.  And I think you mentioned earlier a link to

160

1    public -- you mentioned a link on the website, right?
2  **A.  Yes, it's the filing of public education intake**
3   **questionnaire.**
4  Q.  Right.  Right.
5  **A.  That's -- that was what I was referring to in that**
6   **slide in Exhibit 3.**
7  Q.  So why the website is that -- you saying why --
8  **A.  Why that link, that page?**
9  Q.  Why is the link on the DOE website?
10  **A.  Yes, that's what I was referring to.**
11  Q.  And why was it on the DOE website?  Go ahead.  I'm
12   listening.
13  **A.  I was not directly involved in the creation of that**
14   **link.  I believe that was worked on by Attorney Chris**
15   **Bond and the commissioner, but it was not worked on**
16   **directly by me.**
17    **My understanding, as kind of being peripheral to**
18   **those discussions, was that there was so much**
19   **information that was coming into the Department of**
20   **Education, which, again, may or may not have fallen**
21   **within the purview of HB 2, that the Department of**
22   **Education wanted to provide a resource, for lack of a**
23   **better term, by which individuals could directly file**
24   **those complaints with the Human Rights Commission,**
25   **noting that the Department of Education was not able to**

161

1    refer those matters to the Human Rights Commission for
2    review.
3  Q.  Do you recall whether there was press about the
4    launching of a website relating to these complaints?
5  A.  I would imagine there was.  I don't have any personal
6    knowledge as to what that encompassed.
7  Q.  Before we get to that, do you see where it say under --
8    the intake form, it says, "If you believe an educator
9    may have violated the code of conduct, such a complaint
10    can be filed to the Department of Education by email to
11    Kate Walker.  Kate.a.walker2@doe.nh.gov."
12       Do you see that?
13  A.  Mm-hm.
14  Q.  Who is Kate Walker?
15  A.  So Kate Walker worked within my unit for a short period
16    of time.  She was -- her role was to assist me with
17    legislative affairs but also to help myself and Rich
18    with just keeping track of any allegations of code of
19    conduct cases that came in.
20  Q.  Okay.  And so her name -- and she's a DOE employee --
21    is listed within the same paragraph as filing a public
22    education intake questionnaire, right?  Or within the
23    same section, I should say.
24  A.  Yes.
25  Q.  Okay.  Do you think this added to the confusion about

162

1    where to file complaints?
2  A.  I'm not in a position to say one way or the other.
3  Q.  Did the DOE continue to receive complaints regarding HB
4    2 after this website was launched?
5       MR. KENISON-MARVIN:  Objection.  Misstates
6    prior testimony.
7       THE WITNESS:  Could you clarify your
8    question?
9       BY MR. KAHNE:
10  Q.  Did complaints relating to HB 2 continue to come in to
11    the Department of Education after the launch of this
12    website?
13       MR. KENISON-MARVIN:  Same objection.
14       THE WITNESS:  To the best of my knowledge,
15    yes, they did.
16       MR. KAHNE:  I want to mark a new exhibit.
17       (Exhibit 22 marked for identification.)
18       BY MR. KAHNE:
19  Q.  Have you had a chance to review Exhibit 22?
20  A.  Yes, yes.
21  Q.  And what is this?
22  A.  It appears to be an email from Richard Farrell, who is
23    the investigator for the Department, to me.  The
24    subject is "New Hampshire Moms for Liberty chapter
25    offers $500 to anyone who can catch teachers breaking a

163

1    new discrimination law."
2       Rich sends that to me saying "An anti-LGBTQ group
3    is also offering $500."
4       And then, below that, still the same subject --
5    and below that, there's a reference to an article from
6    Business Insider Australia.
7  Q.  And this email is from November 15th, 2021, right?
8  A.  Yes.
9  Q.  And the document I showed you earlier about the launch
10    of the new website was November 12th, I believe, 2021,
11    right?  Or, I'm sorry, November 10th, 2021.
12  A.  So that appears to be the date at the very top that's
13    circled, and then it's written "11/10/21 Wayback
14    Machine."  I'm not sure what that's in reference to.
15  Q.  Do you recall a bounty being offered for violations of
16    the new discrimination law on or around this time?
17  A.  I recall receiving this email.
18  Q.  Is that all you recall about it?
19  A.  I might have viewed the article that's referenced here.
20    As I say, I saw that when I was talking with Chris
21    earlier today, but I don't recall becoming very
22    familiar with this bounty that was being offered, no.
23  Q.  Do you recall having any conversations with anyone at
24    the DOE regarding the bounty?
25  A.  I would infer from my email that I talked to Chris

164

1    about it.
2  Q.  Do you recall that conversation?
3  A.  I don't recall the exact details of it.
4  Q.  Do you recall having any conversations with the
5    commissioner about the bounty?
6  A.  No, I do not.
7  Q.  Richard Farrell says to you, "An anti-LGBTQ group is
8    also offering $500."
9       Do you know which group he's referring to there?
10  A.  I do not.
11  Q.  Did you have any further conversations with Mr. Farrell
12    about bounties being offered for violation of the new
13    discrimination law?
14  A.  I do not recall any detailed discussions I had with
15    Richard.  I do recall, I think, the extent of it was
16    that I found it very upsetting.
17  Q.  Why was it upsetting?
18  A.  I just find it very upsetting that people are putting
19    out bounties on educators.  But that's a personal -- my
20    mom was a New Hampshire educator.  I found that very
21    upsetting.  But that had more to do with my personal
22    views rather than my professional views.  But to the
23    extent I had any conversation with Richard Farrell
24    about it, I'm sure that was the tone of it.
25  Q.  Did he feel the same way, to your recollection?

---

**165**

1 A. That question is probably better directed to Richard
2 Farrell.
3 Q. Is it your understanding that the subject matter of HB
4 544 was put into HB 2 and then passed into law? I'm
5 switching gears. Sorry.
6 A. Thank you. Do you have HB 554 (sic)?
7 Q. I don't have the text.
8     MR. BISSONETTE: I actually do, if you think
9 it'd be useful.
10    BY MR. KAHNE:
11 Q. Actually, just based on your own recollection of what
12 it was. Is it your understanding that 544 became HB
13 2?
14 A. I would have to look at that time if I could.
15 Q. I'll just show you the email, DOE812.
16     (Exhibit 23 marked for identification.)
17 A. Okay.
18 Q. Do you see where it says -- it's an email from you to
19 Kayla Page, March 18th, 2022, and it says, "Richard
20 Farrell forwarded the email that you sent to him. You
21 are correct that the subject matter of HB 544 was put
22 into HB 2 and was passed into law last year."
23     Do you see that?
24 A. I do, yeah.
25 Q. And to the best of your recollection, is that the way

**166**

1 that you thought --
2 A. Apparently.
3 Q. -- about both bills?
4 A. Yes, apparently.
5 Q. Okay. Any reason to doubt why you would put that in an
6 email?
7 A. I would think the younger 2022 version of me would.
8 Q. Would know more?
9 A. Would have recollected that probably a little better.
10 So, yes, I will stand by what I wrote in the email. I
11 wish that I had more context as to the email that I was
12 responding to, but I stand by what I wrote, yes.
13 Q. Okay. Before I move on, I had shown you the website
14 before, the DOE website, the snapshot, which was
15 Exhibit 21. And I showed you that it had Kate Walker's
16 email address on it.
17 A. Yes.
18 Q. An employee of the DOE, an investigator, right?
19 A. She's not an investigator, no.
20 Q. I'm sorry. What is her position at DOE?
21 A. Well, she's no longer with the Department of Education,
22 and we never replaced her.
23 Q. What was --
24 A. She was really just an administrative assistant to me
25 and to Rich Farrell. And, to be clear, that section

**167**

1 also has a link to the Educator Code of Conduct and
2 Ethics.
3 Q. Right. And to your knowledge, do you know whether
4 the -- whether her name was eliminated -- was removed
5 from the website?
6 A. I believe that it was, yes.
7 Q. Why was it removed?
8 A. I know that Kate had expressed some hesitation of
9 having her name on there. Other than that, I don't
10 know ultimately why that decision was made. I know I
11 advocated for her because she reported to me.
12 Ultimately why that decision was made would probably be
13 with the commissioner.
14 Q. And so the commissioner made the ultimate decision to
15 do that, to remove her name?
16 A. I would -- I would think so.
17 Q. And it was strictly based on her own personal desire
18 not to be on the website?
19 A. No. My testimony is that she expressed to me
20 hesitation in having her name on the website. I
21 understood why she was hesitant, and I advocated on
22 behalf of her either to the commissioner directly or
23 more likely to the deputy commissioner. That is who I
24 directly report to.
25 Q. And you didn't have any conversations about it being

**168**

1 confusing to have a DOE employee listed near the
2 complaint intake form?
3 A. I don't recall that level of detail. That might have
4 occurred. I'm telling you what I recall, sitting here
5 today, and, what I recall, sitting here today, is that
6 it was expressed to me by someone who reports to me,
7 Kate Walker, that she was uncomfortable with that, and
8 I shared that with the deputy commissioner and/or the
9 commissioner, more likely than not the deputy
10 commissioner since I directly report to her.
11 Q. You testified earlier about -- well, switching gears.
12 Let's go to exhibit -- I think it's 5, which is your
13 testimony.
14     THE WITNESS: I apologize for being rude.
15 Can we do a time check? I do have to leave at 5:00,
16 and that was our agreement.
17     MR. KENISON-MARVIN: I have 5:00. How much
18 longer do you think you have?
19     MR. KAHNE: Is it 5:00?
20     MR. KENISON-MARVIN: Yeah.
21     MR. BISSONETTE: How much more? Do you want
22 to debrief real quick?
23     MR. KAHNE: Yeah.
24     (Recess taken.)
25 BY MR. KAHNE:

169

1   Q.   Attorney Fenton, you previously testified, and I don't
2        want to get into the details of it, but there was an
3        SOP regarding when DOE transfers matters to the AG's
4        office, right?
5   A.   Yes, that was my testimony.
6   Q.   Is there a difference between transferring for the DOE
7        transferring matters to the AG's office versus the
8        HRC?
9   A.   I was told numerous times that the Department of
10       Education could not refer any issue, any matters, to
11       the Human Rights Commission for review and
12       determination, and -- can you repeat the question? I'm
13       sorry.
14  Q.   I'm just trying to understand whether there's a
15       procedure in place as to how the DOE can refer matters
16       to the HRC versus the Attorney General's office.
17  A.   I'm not aware of the Department of Education being able
18       to refer matters to the Human Rights Commission other
19       than the link on the website which allows the complaint
20       to go directly to the Human Rights Commission, which is
21       why there was a need for the SOP, for the Department to
22       refer these matters to the Attorney General's office
23       for review.
24  Q.   Did the DOE seek legislation in the form of an
25       amendment to HB 2 to allow it to file complaints

170

1        directly with the HRC?
2   A.   To HB 2?
3   Q.   To HB 2.
4        MS. MILBURN: An amendment.
5        BY MR. KAHNE:
6   Q.   An amendment to HB 2. Sorry. Let me strike that.
7        Did the DOE seek an amendment to HB 2 to allow it
8        to file complaints with the HRC?
9   A.   The only legislation I'm aware of is House Bill 533,
10       which was brought forth this session.
11  Q.   Right. And the DOE supported that bill?
12  A.   So, as I testified previously, a state agency doesn't
13       support or oppose. We provide technical assistance.
14       And I didn't -- I didn't see House Bill 533 as being an
15       amendment to HB 2.
16  Q.   Okay. But it was going to add a section to HB 2,
17       didn't it?
18  A.   It would add a section to the law that HB 2 created.
19       But, just so we're clear, I don't -- I didn't think of
20       HB 533 as amending House Bill 2, but I understand what
21       you're saying. It amended the law, the 354 (A), yes.
22  Q.   Did you speak with the commissioner about HB 533?
23  A.   I'm sure that I -- I'm sure that I did because we talk
24       about all legislative affairs.
25  Q.   Do you know whether he was in favor of HB 533?

171

1   A.   I'm not in a position to testify on what Commissioner
2        Edelblut likes or doesn't like.
3   Q.   Did he ever express to you that he was in favor of HB
4        533?
5   A.   Sitting here today, I do not recall, but I can tell you
6        in general terms he knows my position on the state
7        agency and testimony that we don't support or oppose.
8        We provide technical assistance.
9   Q.   You testified earlier that the code of conduct is
10       narrowly tailored, right?
11  A.   Yes.
12  Q.   Does the incorporation of HB 2 into the code of conduct
13       expand the code of conduct?
14       MR. KENISON-MARVIN: Objection. Vague.
15       Calls for a legal conclusion. Misstates prior
16       testimony. You can answer.
17       THE WITNESS: I'll have to refer back to my
18       prior testimony. I don't -- I don't believe, looking
19       at the section -- when I read HB 2, I don't think I
20       interpreted it as expanding the code of conduct.
21       BY MR. KAHNE:
22  Q.   You're saying this was already covered in the code of
23       conduct?
24  A.   No. I saw it as being separate from the code of
25       conduct. The code of conduct is a document that was

172

1        created by a different law. It was created pursuant to
2        rulemaking. This does not allow for any rulemaking for
3        the code of conduct.
4   Q.   But it expands the categories of conduct that is
5        prohibited under the code of conduct?
6   A.   I can understand your interpretation of that. That
7        wasn't my interpretation of it.
8   Q.   Okay. You've had a chance to review HB 2, right?
9   A.   Yes.
10  Q.   Okay. Do you have an understanding of what is
11       prohibited from being taught now in schools that was
12       not previously prohibited?
13  A.   Based on my review of the law?
14  Q.   Yeah.
15  A.   Yes.
16  Q.   Okay. So what? What is prohibited now that was not
17       previously prohibited?
18       MR. KENISON-MARVIN: Objection. Vague.
19       Calls for a legal conclusion. You can answer.
20       THE WITNESS: I would just refer you back to
21       HB 2.
22       BY MR. KAHNE:
23  Q.   How about specific books? Are there books that you
24       know of that were -- could have previously been taught
25       and now cannot be taught because of HB 2?

173

1    MR. KENISON-MARVIN:  Same objection.  You can
2  answer.
3    THE WITNESS:  I'm not aware of any exact
4  books, no.
5    BY MR. KAHNE:
6  Q.  Any material at all?  Instructional material?
7    MR. KENISON-MARVIN:  Same objections.
8    THE WITNESS:  No, I am not aware of any books
9  or instructional material.
10    BY MR. KAHNE:
11  Q.  Your testimony is that violations of HR -- HB 2 are
12  for the HRC to make; is that right?
13  A.  Yes.
14  Q.  Is it your view that if there's a finding by the HRC of
15  discrimination, it's automatically a violation of the
16  code of conduct?
17    MR. KENISON-MARVIN:  Same objections.
18    THE WITNESS:  So looking at HB 2, section
19  four, which we've testified to previously, says,
20  "Violations of this section by an educator shall be
21  considered a violation of the Educator Code of Conduct
22  that justifies disciplinary sanction by the State Board
23  of Education."
24    So, yes, it could -- yes.  It could warrant
25  disciplinary sanction.

174

1    BY MR. KAHNE:
2  Q.  Could warrant or does warrant?
3  A.  Well --
4    MR. KENISON-MARVIN:  Same objections.
5    THE WITNESS:  We have not yet had one of
6  these cases adjudicated by the HRC, so it's speculation
7  at best.
8    BY MR. KAHNE:
9  Q.  But is it your view, if there were a determination, is
10  there still discretion within the DOE to determine
11  whether it's been a violation of the code of conduct?
12    MR. KENISON-MARVIN:  Same objections.
13    THE WITNESS:  Well, as I look at what is
14  marked as Exhibit 2, Ed 511.01 (J)(7), "If no
15  disciplinary sanction is proposed, the department shall
16  notify the credential holder in writing that the
17  investigation is closed."
18    BY MR. KAHNE:
19  Q.  So you've just read the code of conduct?
20  A.  Yes.
21  Q.  What's the answer to the question?
22  A.  Well, I think, if you look at 511.01 (J) in its
23    entirety, it sets out what the form of discipline can
24    be, the suspension, revocation, reprimand, but, in my
25    reading of subsection seven, the Department could

175

1    propose no disciplinary sanction.
2  Q.  So if an educator violates HB 2, they could have their
3    credentials revoked, right?
4  A.  Yes.
5  Q.  Okay.  Under the SOP, does the DOJ have to make a
6    referral to the HRC for complaints that it receives?
7  A.  Sitting here today, I'm not aware of that level of
8    detail.  I can't testify to that.  I don't have the
9    document in front of me.
10    MR. KAHNE:  One second.
11    BY MR. KAHNE:
12  Q.  The op-ed that you were shown earlier, Exhibit 12, I'm
13    not going to make you look through it.
14    I guess you could look through it.
15  A.  I think I was shown a couple of op-eds.
16  Q.  With the topics, topic one, topic two, topic three,
17    topic four, that op-ed, do you recall that?
18    THE WITNESS:  I just messed up your nice
19    pile.  I apologize.
20    MR. KAHNE:  I think it's Exhibit 14.
21    THE WITNESS:  Is it 14?  Oh, okay.
22    BY MR. KAHNE:
23  Q.  Did you -- and you don't have to look through every
24    single --
25  A.  Sure --

176

1  Q.  -- piece of paper.  Did you have any role in providing
2    the commissioner with the topics that are annexed to
3    the op-ed that is reflected in Exhibit 14?
4    MR. KENISON-MARVIN:  Let the record reflect
5    that Attorney Bissonnette has left the room.  I guess,
6    at this point, just to interrupt, I will say I think
7    we're taking the position that this will be the last
8    question, where one of the attorneys for plaintiffs has
9    needed to leave.  I think it's appropriate that we end
10    on this question.  I'll instruct the witness to not
11    answer any further questions after her answer to this
12    question.
13    THE WITNESS:  To the best of my recollection,
14    sitting here today, I did not personally provide the
15    commissioner with any of those attachments.
16    MR. KAHNE:  Thank you.  Before we close the
17    record, I don't believe Attorney Fenton has gone for
18    seven hours.  We have a few -- a few lines of
19    questioning that we just want to -- that we've spoken
20    to Nate about and we think that we can do it likely
21    next week by Zoom to lessen any inconvenience to you.
22    THE WITNESS:  Thank you.
23    MR. KAHNE:  I don't believe it'll last more
24    than half hour, 45 minutes at the most.
25    MR. KENISON-MARVIN:  And I haven't agreed to

177

1  that yet.  I'd just let the record reflect that I want
2  to discuss it more with plaintiff's counsel.
3        And could the record just also reflect that
4  when Attorney Bissonnette left, he indicated to me that
5  he was -- I'm not sure if it already captures this, but
6  that he had something to the effect of childcare
7  responsibilities and that he needed to leave the
8  deposition for that purpose.
9        (Whereupon, the deposition was suspended at
10  5:21 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

178

1        C E R T I F I C A T E
2        I, Sharon G. Saalfield, a Licensed Shorthand
3  Reporter for the State of New Hampshire, Certified Shorthand
4  Reporter for the Commonwealth of Massachusetts, Registered
5  Diplomate Reporter and Certified Realtime Reporter, do
6  hereby certify that the foregoing is a true and accurate
7  transcript of my stenographic notes of the proceeding taken
8  at the place and on the date hereinbefore set forth to the
9  best of my skill and ability under the conditions present at
10  the time.
11        I further certify that I am neither attorney or
12  counsel for, nor related to or employed by any of the
13  parties to the action in which this proceeding was taken,
14  and further that I am not a relative or employee of any
15  attorney or counsel employed in this case, nor am I
16  financially interested in this action.
17        Before completion of the deposition, review of the
18  transcript was requested.
19        The foregoing certification of this transcript
20  does not apply to any reproduction of the same by any means
21  unless under the direct control and/or direction of the
22  certifying reporter.
23
24
25  Sharon G. Saalfield | Lic. No. 147, CSR, RDR, CRR

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner, et al. (No. 1:21-cv-01077-PB)

Diana Fenton

## ERRATA

    I, the undersigned, DIANA FENTON, have read the transcript of my deposition held on May 17, 2023, in the matter of Local 8027, AFT-New Hampshire, et al. v. Edelblut, et al.; and the same is true and correct, to the best of my knowledge, with the exception of the changes noted below on Page 2 of 2 of this Errata:

_Diana E. Fenton_
Diana Fenton

STATE OF ___NH___ )
                  ) ss.:
COUNTY OF _Merrimack_ )

    Subscribed and sworn to before me this __3__ day of __July__, 2023.

_Brendan O'Donnell_
Notary Public

My commission expires:

__10|17|2023__



*[intentionally blank; continued on next page]*

Page **1** of **2**

<u>Changes to Transcript</u>

Page 12, Line 19, Change:

Replace "file" with "trial" such that the transcript states:

"I did appellate work and I did ***trial*** work."

<u>Reason</u>: Transcription error.

Page 24, Line 13, Change:

Replace "Highmark" with "Heimarck" such that the transcript states:

"Nicole ***Heimarck***, Amanda Phelps."

<u>Reason</u>: Transcription error.

Page 85, Line 6, Change:

Replace "Luke" with "Liz" such that the transcript states:

"Since January of 2023, I had a meeting with Attorney Sean Locke of the Attorney General's office, and Attorney ***Liz*** Brown, and we discussed procedural mechanisms by which the Department of Education could refer cases that may or may not fall within the purview of HB 2 to the Attorney General's office for review."

<u>Reason</u>: Transcription error.

Page 101, Line 6, Change:

Replace "indicator" with "educator" such that the transcript states:

"Your question, as it pertains to individual educators, which I cannot think of a time where I've had that conversation with an individual ***educator***, I would not necessarily refer that person to the superintendent's association."

<u>Reason</u>: Transcription error.

*[end]*

**EXHIBIT 4**

DOE Investigator
Richard Farrell
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)



# Transcript of Richard Farrell

**Date:** May 18, 2023
**Case:** Local 8027, AFT-New Hampshire, et al. -v- Edelblut, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## 1

```
1              UNITED STATES DISTRICT COURT
2                 DISTRICT OF NEW HAMPSHIRE
3
4   LOCAL 8027, AFT NEW HAMPSHIRE,    )
5   et al.,                          )
6                 Plaintiffs,        )
7   v.                               )
8   FRANK EDELBLUT, in his official  )
9   capacity as Commissioner of the  )
10  Department of Education ("DOE"), )
11                Defendant          )
12  ----------------------------------  C.A. 1:21-cv-01077-PB
13  ANDRES MEJIA, et al.,            )
14                Plaintiffs,        )
15  v.                               )
16  FRANK EDELBLUT, in his official  )
17  capacity as Commissioner of the  )
18  Department of Education ("DOE"), )
19                Defendant.         )
20  ----------------------------------)
21
22              DEPOSITION OF RICHARD FARRELL
23
24
25
```

## 2

```
1              DEPOSITION OF RICHARD FARRELL
2
3       THIS DEPOSITION TAKEN PURSUANT TO NOTICE OF DEPOSITION
4   AT NEW HAMPSHIRE DEPARTMENT OF JUSTICE, 33 CAPITOL STREET,
5   CONCORD, NEW HAMPSHIRE, ON THURSDAY, MAY 18, 2023,
6   COMMENCING AT 10:13 A.M.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 3

```
1                      APPEARANCES
2
   For Plaintiffs Local 8027, AFT New Hampshire:
   STROOCK & STROOCK & LAVAN, LLP
3  David J. Kahne, Esq.
   Elizabeth C. Milburn, Esq.
4  Charles Moerdler, Esq. (via videoconference)
   180 Maiden Lane
5  New York, New York 10038-4982
   (212) 806-6419
6  dkahne@stroock.com
   emilburn@stroock.com
7  cmoerdler@stroock.com

   For Plaintiffs Andres Mejia and Christina Philibotte:
8  AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
   Gilles Bissonnette, Esq.
9  18 Low Avenue
   Concord, New Hampshire 03301
10 (603) 224-5591
   gilles@aclu-nh.org
11
     - and -
12
   DISABILITY RIGHTS CENTER - NEW HAMPSHIRE
13 Kayla Turner, Esq. (via videoconference)
   64 North Main Street, Suite 2
14 Concord, New Hampshire 03301
   (603) 228-0432
15 kaylat@drcnh.org

16   - and -

   GLBTQ LEGAL ADVOCATES & DEFENDERS
17 Chris Erchull, Esq. (via videoconference)
   18 Tremont Street, Suite 950
18 Boston, Massachusetts 02108
   (617) 426-1350
19 cerchull@glad.org

   For Defendants National Education Association - New
20 Hampshire:
   NATIONAL EDUCATION ASSOCIATION - NEW HAMPSHIRE
21 Esther K. Dickinson, Esq. (via videoconference)
   9 South Spring Street
22 Concord, New Hampshire 03301
   (603) 224-7751
23 edickinson@nhnea.org
24
25
```

## 4

```
1                 APPEARANCES (Cont'd)
2
   For Defendants Frank Edelblut, Christian Kim, John
3  Formella, Ahni Malachi, and Ken Merrifield:
   NEW HAMPSHIRE DEPARTMENT OF JUSTICE
4  Civil Bureau
   Nathan W. Kenison-Marvin, Esq.
5  33 Capitol Street
   Concord, New Hampshire 03301
6  (603) 271-1292
   nathan.w.kenison-marvin@doj.nh.gov
7
   For Plaintiff American Federation of Teachers:
8  NOLAN PERRONI, P.C.
   Peter J. Perroni, Esq. (via videoconference)
9  73 Princeton Street
   North Chelmsford, Massachusetts 01863
10 (978) 454-3800
   peter@nolanperroni.com
11
   For Defendant Department of Education:
12 DEPARTMENT OF EDUCATION
   Elizabeth A. Brown, Esq. (via videoconference)
13 101 Pleasant Street
   Concord, New Hampshire 03301
14 (603) 271-6338
   elizabeth.a.brown@doe.nh.gov

   Court reporter:
16 Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR
17
18
19
20
21
22
23
24
25
```

**5**

STIPULATIONS

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under Federal law.

Notice, filing, caption and all other formalities are waived. All objections, except as to form, are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

**6**

INDEX

| WITNESS | PAGE |
|---|---|
| Richard Farrell | |
| By Mr. Kahne | 7 |
| By Mr. Bissonnette | 145 |
| By Ms. Milburn | 171 |
| By Mr. Kenison-Marvin | 203 |
| By Mr. Kahne | 204 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1-23 | Marked previously | |
| 24 | 10/18/21 Email Chain with Attachments | 53 |
| 25 | 11/10/21 Department of Education Press Release | 63 |
| 26 | 2/07/22 Letter with Attachments | 72 |
| 27 | 2/22/22 Email Chain | 76 |
| 28 | 2/09/22 Email Chain | 79 |
| 29 | 8/24/22 Email | 86 |
| 30 | 9/17/21 Email Chain | 92 |
| 31 | 10/04/21 Email Chain | 152 |
| 32 | 10/04/21 Email Chain | 152 |
| 33 | 9/30/21 Email Chain | 156 |
| 34 | 11/11/21 Email Chain | 172 |
| 35 | 4/01/21 Email Chain | 189 |
| 36 | 6/14/22 Email Chain | 194 |
| 37 | 11/15/21 Email Chain | 198 |

**7**

RICHARD FARRELL,
having been duly sworn by Ms. Saalfield,
was deposed and testified as follows:
EXAMINATION
BY MR. KAHNE:

Q. Good morning, Mr. Farrell.

A. Good morning.

MR. KAHNE: Nate, before we start, we'll do the same stipulations that we did yesterday with Ms. Fenton?

MR. KENISON-MARVIN: Correct. And I'll also put on the record now that we'll reserve our right to read and sign in accordance with the rules.

BY MR. KAHNE:

Q. Mr. Farrell, can you state your name and address for the record?

A. Sure. Richard J. Farrell, F-A-R-R-E-L-L, Junior. My address is 36 Arrow, A-R-R-O-W, Lane, in Nashua, New Hampshire.

Q. Thank you, Mr. Farrell. My name is David Kahne. I represent one of the plaintiffs in this action, the American Federation of Teachers. Have you ever been deposed before?

A. I have.

Q. When were you deposed?

**8**

A. It was while I was a member of the New Hampshire State Police, so it's a number of years ago.

Q. You were deposed once?

A. Several times.

Q. In connection with more than one case?

A. Oh, yes.

Q. And what were the cases concerning?

A. Some of them were civil actions regarding motor vehicle accidents; others were criminal — depositions in criminal cases.

Q. Okay. So you have some experience here with depositions. So, you know, this is just sort of a question and answer session, but your answers are sworn, and so you have the same duty to tell the truth as you would in court. You understand that?

A. I do.

Q. Okay. Please provide only verbal responses to my questions. You shouldn't shake your head so that the transcript can accurately reflect your answers. Do you understand that?

A. I do.

Q. Okay. If you don't understand a question, just ask me for clarification. If you do answer a question, the record and I will both assume that you heard the question, that you understood it, and that you've

**9**

1  provided me with your best recollection in the answer.
2  Do you understand that?
3  **A. I do.**
4  Q. Please, to the best of your ability, let me finish my
5  questions completely even if you think you might know
6  what I am asking, okay?
7  **A. Yes.**
8  Q. If you need any breaks during the course of the
9  deposition, we're happy to accommodate. The only thing
10  I do ask you is that you answer a question and don't
11  try to leave in the middle of a question. But if you
12  need to take a break, we're happy to accommodate,
13  okay?
14  **A. Yes.**
15  Q. Any reason you're unable to testify truthfully today?
16  **A. No.**
17  Q. Any medications that would impair your ability to
18  testify truthfully?
19  **A. No.**
20  Q. What did you do to prepare for this deposition?
21  **A. I consulted with this gentleman. That's about it.**
22  Q. Okay. Did you have a meeting?
23  **A. Yes.**
24  Q. Okay. How long did the meeting last?
25  **A. Approximately one hour.**

**10**

1  Q. Did you review any documents with --
2  **A. What type of documents? I don't know what you mean.**
3  Q. Any documents at all. Did you look at any documents in
4  preparation for this?
5  **A. Yes.**
6  Q. Okay. What documents were those?
7  **A. I looked at the code of conduct and I looked at the**
8  **administrative rules supporting the code of conduct.**
9  Q. Anything else?
10  **A. No.**
11  Q. Did you discuss your deposition testimony with anyone
12  other than counsel today?
13  **A. My testimony? No.**
14  Q. Did you discuss the substance of this litigation with
15  anyone other than counsel?
16  **A. Yes.**
17  Q. And who did you discuss it with?
18  **A. Well, "discuss." I talked with Attorney Fenton. I**
19  **talked with my wife.**
20  Q. Okay. Let's start with Attorney Fenton. What did you
21  discuss with Attorney Fenton about this case?
22  **A. Times, locations, dates, duration of the deposition.**
23  **Not anything of substance. Just logistics.**
24  Q. Did you speak to her after her testimony yesterday?
25  **A. I have not.**

**11**

1  Q. And I assume the same thing with your wife? Discussing
2  this case was just logistics as well?
3  **A. Yes.**
4  Q. Are you familiar with the nature of this action?
5  MR. BISSONNETTE: Objection. Vague. You can
6  answer.
7  MR. KAHNE: You can answer.
8  THE WITNESS: Generally, yes.
9  BY MR. KAHNE:
10  Q. Okay. What do you generally know about it?
11  **A. I understand, and I could be wrong, that the action is**
12  **related to a piece of legislation that might be**
13  **unconstitutional, and what my role in that might be.**
14  Q. And what piece of legislation are you referring to?
15  **A. The so-called HB 2 --**
16  Q. Okay.
17  **A. -- legislation.**
18  Q. Okay. And do you have an understanding of why it's
19  being challenged?
20  **A. I think I do.**
21  Q. What is that understanding?
22  **A. Not being an attorney, I think it is that the law**
23  **itself may be somewhat vague.**
24  Q. Okay. So, for the purposes of this deposition, you've
25  already referred to the legislation as "HB 2." And is

**12**

1  it okay -- it's also been referred to as the divisive
2  concepts ban, the banned concept statute. But if I
3  refer to HB 2, you understand that I'm talking about
4  the legislation that's challenged in this action,
5  right?
6  **A. As a general concept, yes.**
7  Q. Okay. Can you tell me a little bit about your
8  educational background?
9  **A. How far back do you want to go?**
10  Q. You can give me college.
11  **A. Okay. I attended the University of Notre Dame,**
12  **attended the University of Lowell, which is now the**
13  **University of Massachusetts at Lowell. Undergraduate**
14  **degree there. I also was a licensed educator upon**
15  **graduating from the University of Massachusetts. And**
16  **then multiple trainings of various types including the**
17  **FBI training, NEA, national academy, things like that,**
18  **when I was within law enforcement.**
19  Q. Okay. And you mentioned -- am I right that you were an
20  English teacher?
21  **A. I was.**
22  Q. And for how long were you an English teacher?
23  **A. About three -- well, just three years. I was two years**
24  **at Bishop Guertin High School, one year in Lowell,**
25  **Massachusetts school system, and I was Prop**

**13**

1     two-and-a-halfed, so we all lost our jobs on the same

2     day.

3        When I retired from the state police in 2012, I

4     worked for the Nashua school district for a period of

5     2012 and for the entire 2013 – 2012-2013 school year

6     as an at-will substitute teacher, long-term substitute

7     teacher.

8 Q.  Okay. I want to make sure I have the sequence here.

9     After you graduated, was the first job that you had as

10    an educator?

11 A.  Yes.

12 Q.  And how long was that?

13 A.  That was two years at Bishop Guertin High School in

14     Nashua, would have been year in the Lowell school

15     district, and then 30 years in the state police, and

16     then more or less one year working in the Nashua school

17     district.

18 Q.  Okay. And what did you do for -- what grade did you

19    teach English?

20 A.  High school.

21 Q.  High school English? And what did do you for the state

22    police?

23 A.  It depends on when it was.

24 Q.  So starting at the beginning.

25 A.  Uniform patrol. I went from uniform patrol to

**14**

1     detective. Detective to – I was appointed first court

2     officer the state police ever had in the Manchester

3     District Court. And then from there, the pilot program

4     included five different district courts where I was the

5     court officer and prosecutor for that. From there, I

6     went to the auto theft unit. I was in the major crime

7     unit. Promoted back to uniform, was a supervisor in

8     two different capacities. I got promoted a second

9     time, and then spent the last 10 years of my career at

10    the Attorney General's office. I was the operations

11    officer for the New Hampshire Drug Task Force.

12 Q.  And your current position is as -- is investigator for

13    the Department of Education; is that right?

14 A.  That's correct.

15 Q.  And when did you start that?

16 A.  July 1st of 2013.

17 Q.  Is the investigator -- is it an appointed position?

18 A.  Well, that's a different type of question. At first.

19     The first eight years, it was a contract position. So

20     I had four two-year contracts as an independent

21     contractor working here, and then it was determined

22     that the Department wanted me to become an employee

23     here, so for the past two years ending this coming July

24     1st, I've been an actual employee for the State of New

25     Hampshire again.

**15**

1 Q.  And who made the decision to hire you to the Department

2    of Education?

3 A.  That was Dr. Judith Fillion. F-I-L-L-I-O-N.

4     Dr. Fillion interviewed me and she recommended to the

5     then commissioner, Dr. Barry, that I be awarded the

6     first contract.

7 Q.  Okay. Now you are an employee of the Department of

8    Education; is that right?

9 A.  That's correct.

10 Q.  Okay. Can you describe your responsibilities as an

11    investigator for the Department of Education?

12 A.  My responsibilities?

13 Q.  What are your job duties?

14 A.  My job duties. I investigate allegations of code of

15     conduct violations for the Department of Education.

16 Q.  Is it only code of conduct violations?

17 A.  There are times when I have performed trainings for the

18     code of conduct. I have done some basic and cursory

19     background investigations, worked with superintendents

20     to walk with them through the criminal background

21     checks process. So kind of a jack-of-all-trades, but

22     my primary mission is the code of conduct and

23     investigating violations, or alleged violations, of the

24     code of conduct.

25 Q.  So I want to understand how you investigate alleged

**16**

1     violations of the code of conduct. Is the first step

2     when the Department of Education receives a

3     complaint?

4 A.  That's one of the ways we get information about

5     allegations of code of conduct violations. That's one

6     of several different sources.

7 Q.  Okay. So starting with complaints. How do you receive

8    those complaints?

9 A.  The complaints could be from – excuse me – an

10     individual parent. They could come from a

11     self-reporting through the superintendent or a member

12     of the superintendent's staff. We've received them

13     from law enforcement. We've received them from the

14     DCYF, Department of Children, Youth, and Families. I'm

15     sure there are others, but...

16 Q.  So, fair to say you received complaints from parents, I

17    think you said, right?

18 A.  Yes.

19 Q.  From superintendents?

20 A.  Yes.

21 Q.  From principals?

22 A.  Yes.

23 Q.  Do you receive those complaints by email?

24 A.  Some.

25 Q.  Do you receive some complaints by phone call?

17

1   A.   Yes.
2   Q.   Do those complaints come in to you directly?
3   A.   **Sometimes.**
4   Q.   Do they sometimes come directly to the commissioner?
5   A.   **Sometimes.**
6   Q.   Do they come to anybody else at the Department of
7        Education?
8   A.   **Sure.  They can go to the commissioner.  They can go to**
9        **the deputy commissioner.  Many superintendents contact**
10       **Attorney Fenton directly.  They can come through the**
11       **Bureau of Credentialing.  They can come from, as I**
12       **said, parents, superintendents, principals.**
13       **I'm sure there are others, but those are the**
14       **primary areas of -- those are the primary places we get**
15       **reports.**
16  Q.   Okay.  And now when you receive one of these
17       complaints, can you describe what you do as the
18       investigator for the Department of Education?
19  A.   **The first thing that I would do is determine -- back**
20       **up.  I will gather facts and circumstances from the**
21       **complainant.**
22  Q.   Does that include reaching out to superintendents?
23  A.   **Occasionally.**
24  Q.   Does that include speaking to principals?
25  A.   **Occasionally.**

18

1   Q.   Does that include speaking to other educators at the
2        school?
3   A.   **Sometimes.**
4   Q.   Does that include requesting documents?
5   A.   **Sometimes.**
6   Q.   When you receive a complaint, do you document that
7        complaint in any way?
8   A.   **It depends on whether it actually falls within my**
9        **jurisdiction.**
10  Q.   And your jurisdiction is possible violation of the code
11       of conduct?
12  A.   **Correct.**
13  Q.   Okay.  Now, assume that a case falls within your
14       jurisdiction.  Do you document that complaint in any
15       way?
16  A.   **Initially, no.**
17  Q.   Okay.  You qualified with "initially, no."  So does
18       that mean eventually, yes?
19  A.   **Eventually, if it meets the criteria necessary for an**
20       **actual violation, then we would document the fact that**
21       **it was received.**
22  Q.   Okay.  Do you have a folder where you mark down
23       complaints with the name of the complainant and
24       other -- other information like that?
25  A.   **A folder?**

19

1   Q.   Yeah.
2   A.   **I don't know what that means.**
3   Q.   So we heard testimony yesterday from Attorney Fenton,
4        I'll represent to you, that there's an intake process
5        and you receive information, that you document that
6        information in a folder which includes information such
7        as the complainant's name, the school that it relates
8        to, the alleged violator of the code of conduct.
9             Does that -- is that something that you do?
10            MR. KENISON-MARVIN:  I'll object to the
11       extent it misrepresents testimony yesterday.  You can
12       answer.
13            THE WITNESS:  If the information received
14       from the source, whatever that source might be, reaches
15       a level of a potential code of conduct violation, then
16       we will document it.  If it doesn't, we won't.
17            BY MR. KAHNE:
18  Q.   Who decides whether it reaches the level of a potential
19       code of conduct violation?
20  A.   **Everything I do goes through my supervisor, who would**
21       **be Attorney Diana Fenton.**
22  Q.   Okay.  Now, assume -- what criteria do you use to
23       decide whether a complaint possibly violates the code
24       of conduct?
25  A.   **You read the code of conduct, you examine the contents**

20

1        **of the complaint, and you determine whether or not we**
2        **have jurisdictional standing.**
3   Q.   And is that a decision that's made with you and
4        Attorney Fenton?
5   A.   **Attorney Fenton makes the final decision.  I provide**
6        **her with facts, and a decision is made.**
7   Q.   Now, assume that Attorney Fenton has decided that a
8        complaint rises to the level of a possible code of
9        conduct violation.  How do you document that?
10  A.   **I draw a case number.  The case number then relates to**
11       **a -- the name of the educator or the name of the**
12       **individual.  I create a folder, a file, and then I go**
13       **about the business of finding facts.**
14  Q.   And, again, could you just describe how you go about
15       finding facts?
16  A.   **It depends on the case.  Every case is different.  So**
17       **perhaps you could give me an idea of what you're**
18       **looking for.  I'm not sure.**
19  Q.   If you could give me some examples of what -- how you
20       factually investigate complaints?
21  A.   **Well, again, every case is different.  If the case**
22       **involves an alleged sexual assault of a child, we would**
23       **collect facts from a number of stakeholders -- law**
24       **enforcement, parents, staff -- and go in that**
25       **direction.**

**21**

1  If it's something less than that, something that's
2  not criminal, we do go in a different direction,
3  gaining facts from documents, emails, interviews, that
4  type of thing.
5  Q.  And interviews are with superintendents, for example?
6  A.  Potentially.
7  Q.  Principals?
8  A.  Possibly.
9  Q.  Okay.  You spoke before about the decision as to
10  whether something rises to the level of a possible code
11  of conduct complaint.  Do you remember that?
12  A.  Yes.
13  Q.  And you said Attorney Fenton was involved in that?
14  A.  Yes.
15  Q.  Is the commissioner involved in that decision?
16  A.  At that stage?  I don't — I don't recall right now
17  whether there's an individual case where he was
18  involved in that triage process.
19  Q.  Is the commissioner ever involved in the factual
20  investigation of a case?
21  A.  To the extent that he receives direct emails or
22  correspondence from complainants, yes.  To the extent
23  that he actually interjects himself into actual
24  investigations, no.
25  Q.  After he receives a complaint, do you speak with him

**22**

1  about the factual gathering in a complaint?
2  A.  I try not to.
3  Q.  Why?
4  A.  I think that at that stage of the investigation, the
5  facts should be facts.
6  Q.  Why would having the commissioner involved in the
7  factual investigation not -- make it not about facts?
8  A.  Because the commissioner has a different role than I
9  do.
10  Q.  What's the commissioner's role?
11  A.  Well, you'd have to ask him.
12  Q.  What's your view of his role?
13  A.  I can tell you what my role is.  My role is gathering
14  facts, being an independent gatherer of facts, and
15  providing those to Attorney Fenton.
16  Q.  Does the commissioner ever ask you to request documents
17  from the superintendent?
18  A.  He may.  He may have.  He may have suggested that.  I
19  don't recall an instance where he has, but anything is
20  possible.  That's possible.
21  Q.  Has he asked you to talk to complainants directly?
22  A.  He has sent me emails, and I have, on occasion, spoken
23  to complainants.
24  Q.  Do you understand those emails from the commissioner to
25  be requests that you talk to complainants?

**23**

1  A.  No.
2  Q.  What do you understand those emails to be?
3  A.  Those are intake of a complaint, and we would then
4  refer to -- or defer to our usual practice.
5  Q.  Which is gathering factual information?
6  A.  Right.
7  Q.  Okay.  What we've been talking about thus far is
8  strictly about opening a case; isn't that right?
9  A.  Define "case."
10  Q.  Well, so the Educator Code of Conduct says that "a case
11  shall be opened when a complaint of possible misconduct
12  against a credential holder has come to the attention
13  of the department, either through direct reporting or
14  other means."
15  A.  Good definition.
16  Q.  And what we've been just talking about is the opening
17  of a case, right?
18  A.  Correct.
19  Q.  And all the factual investigation that goes -- that
20  comes after the opening of a case?
21  A.  Yes.
22  Q.  Okay.  And this is before the Department of Education
23  determines whether to open a formal investigation,
24  right?
25  A.  Yes.

**24**

1  Q.  Okay.  And that involves issuing a certified letter and
2  other procedures, right?
3  A.  Correct.
4  Q.  Okay.  So you spoke about criteria for deciding whether
5  something rises to the level of a possible code of
6  conduct violation.  Do you remember that?
7  A.  I do.
8  Q.  Okay.  What is the criteria that you and Attorney
9  Fenton use for moving from documenting and opening a
10  folder versus not opening a folder?
11  MR. KENISON-MARVIN:  Objection to the extent
12  it misstates prior testimony.  You can answer.
13  THE WITNESS:  Ask the question again, please.
14  BY MR. KAHNE:
15  Q.  Yeah, that's fair.  I think what you were -- what you
16  said is you just decide whether it's within your
17  jurisdiction, right?
18  A.  The case.
19  Q.  The case?
20  A.  Correct.
21  Q.  And if it is within your jurisdiction, you open a case
22  file?
23  A.  Correct.
24  Q.  And how do you determine whether something is within
25  your jurisdiction?

**25**

1  A.  I look at the complaint, the facts of the complaint,
2     and determine whether or not the code of conduct
3     applies.
4  Q.  Okay.  So it's just based on what the facts are and
5     whether you think it could potentially violate the code
6     of conduct?
7  A.  No, it's not what I think.  It is whether the
8     collection of data and facts support an allegation of a
9     code of conduct violation, and that's done in
10    consultation with Attorney Fenton.
11 Q.  Okay.  And the only things that you're looking at when
12    you're making that determination are the code of
13    conduct and the facts that you've gathered?
14 A.  That is absolutely correct.
15 Q.  Okay.  Can a school district independently investigate
16    possible violations of the code of conduct?
17 A.  Of course.
18       MR. KENISON-MARVIN:  Objection to the extent
19    it calls for a legal conclusion.  You can answer.
20       THE WITNESS:  Yes.
21    BY MR. KAHNE:
22 Q.  In your experience, can a superintendent independently
23    investigate possible violations of the code of
24    conduct?
25 A.  A superintendent can authorize an investigation at his

**26**

1     level for code of conduct violations.
2  Q.  And that includes -- that's an investigation that
3     includes talking to teachers.  That includes fact
4     gathering.  The same type of fact gathering
5     investigation that you were just talking about?
6        MR. KENISON-MARVIN:  Objection.  Compound.
7     You can answer.
8        THE WITNESS:  Slowly.
9     BY MR. KAHNE:
10 Q.  In your experience, how do superintendents conduct
11    those types of investigations?
12 A.  Every superintendent is different.  Some
13    superintendents -- almost all superintendents in the
14    larger districts will delegate to subordinates.  Other
15    superintendents will ask for an independent
16    investigation.  They'll hire an attorney or a fact
17    finder.  There's any number of ways they conduct their
18    business.  But, again, that's their business, not
19    mine.
20 Q.  And they can conduct investigations for any possible
21    code of conduct violation?
22 A.  They conduct investigations that, generally speaking,
23    are policy, individual school district policies and
24    procedures.  Some of those bleed over into code of
25    conduct.  Some of them do not.

**27**

1  Q.  Do they refer the results of their investigation to the
2     DOE?
3  A.  If we ask them to.  Many times they conduct
4     investigations that have nothing to do with us.
5  Q.  How would you know about those investigations?
6  A.  We wouldn't.
7  Q.  I think you just testified, "If we ask them for the
8     investigation."
9        How would that come to your attention?
10 A.  I don't understand the question.
11 Q.  I'm just trying to understand how an investigation that
12    a superintendent independently conducts arrives at the
13    DOE.
14 A.  Well, if we have received a complaint, either
15    self-reporting from the superintendent or other
16    sources, we would then reach out to the district, the
17    charter school, for example, the head of school, the
18    superintendent's office, and ask them for supporting
19    documents and factual data during our triage process.
20 Q.  Are you -- strike that.
21       Are you aware of superintendents conducting
22    investigations into violations of HB 2?
23 A.  I have no idea.
24 Q.  You have no idea whether that is occurring or is not
25    occurring?

**28**

1  A.  Correct.
2  Q.  Do you have meetings with Attorney Fenton and
3     Commissioner Edelblut and the deputy commissioner,
4     periodic meetings, to discuss investigations?
5  A.  Yes.
6  Q.  How often do those meetings occur?
7  A.  They're supposed to occur once a month.
8  Q.  Why do you say they're supposed to occur once a
9     month?
10 A.  Sometimes schedules, conflicts, vacations, illnesses
11    put them off, so every four weeks become every six
12    weeks.  Sometimes we skip a month.  It all depends.
13    There's no rule.  There's no requirement.  It all
14    depends on scheduling.
15 Q.  Is there a name for that meeting?
16 A.  Educator misconduct meeting.
17 Q.  And can you describe what occurs during that meeting?
18       MR. KENISON-MARVIN:  I'll just instruct
19    the -- Mr. Farrell to not answer with respect to
20    specific discussions and deliberations that occur
21    during those meetings, but to the extent the question
22    calls for generalized process during the meeting and
23    how the meeting proceeds, you can answer the question.
24       THE WITNESS:  There is a discussion about
25    individual cases.  Those cases are either progress

29

1  reports or determinations as to whether or not an
2  investigation should occur. And progress reports also
3  lead to proposed possible sanctions that might be
4  involved.
5  BY MR. KAHNE:
6  Q. What are the sanctions that the code of conduct
7  provides for?
8  A. There are four things that would occur: One, there is
9  no sanction; two, there's a letter of reprimand; three,
10  there's a suspension; four, the revocation of
11  license.
12  Q. And in your education misconduct meeting, are
13  determinations made as to what penalty, if any, to
14  impose?
15  A. Those general discussions do occur, yes.
16  Q. Well, general discussions, but is there a final
17  decision made during those meetings?
18  A. Sometimes.
19  Q. Do you vote?
20  A. Do I vote? I have no vote, no. No. There's no
21  vote.
22  Q. So who is -- who is the decision-maker in that
23  meeting?
24  A. It's a collaborative effort. I think, ultimately, the
25  buck stops with the commissioner, but the effort itself

30

1  is a collaborative effort.
2  Q. Okay. Is it possible to make a finding of educator
3  misconduct but determine that there is no sanction?
4  MR. KENISON-MARVIN: Objection to the extent
5  it calls for a legal conclusion. You can answer.
6  THE WITNESS: I don't understand the
7  question. I'm sorry.
8  BY MR. KAHNE:
9  Q. Under the -- in your experience, under the Educator
10  Code of Conduct, can there be a finding of educator
11  misconduct without the imposition of a sanction?
12  MR. KENISON-MARVIN: Same objection. You can
13  answer.
14  THE WITNESS: I don't remember that type of
15  resolution. I just don't remember that.
16  BY MR. KAHNE:
17  Q. Okay. But, to your knowledge, is that possible?
18  A. I don't think it's possible, but I'm -- again, I've
19  never seen that.
20  Q. Certainly very unlikely?
21  A. It's unlikely.
22  Q. So fair to say that when there's a violation of the
23  code of conduct, there's going to be the imposition of
24  a sanction?
25  MR. KENISON-MARVIN: Objection to the extent

31

1  it misstates the testimony. It's also a legal
2  conclusion, but you can answer.
3  BY MR. KAHNE:
4  Q. In your experience --
5  A. So rephrase that for me, please.
6  Q. -- is it fair to say that if there's been a violation
7  of the Educator Code of Conduct, that the Department of
8  Education will impose a sanction?
9  A. No, that's not fair to say.
10  Q. Why not?
11  A. There are times when we identify a code of conduct
12  violation, and we work with the individual school or
13  school district, and the imposition of sanction is left
14  at the employment -- in the employment world and not in
15  the license world.
16  Q. Okay, but separate that out. I understand there's two
17  separate lines: There's the employment line and
18  there's the credentialing line.
19  A. Yes.
20  Q. With respect to the credentialing line, have you ever
21  had the experience where there's been a violation of
22  the code of conduct and there has not been the
23  imposition of a sanction, to your recollection?
24  A. So my recollection, I think the answer to that is
25  yes.

32

1  Q. Okay. When do you recall that happening?
2  A. I don't recall specifically, but I can tell you that
3  there are instances where code violation has occurred
4  and we do not take formal sanction against the licensed
5  educator.
6  Q. Okay. Would it be fair to say that the vast majority
7  of the time there is an imposition of a sanction?
8  MR. KENISON-MARVIN: Objection to the extent
9  it misstates testimony. You can answer.
10  THE WITNESS: More likely than not, yes.
11  BY MR. KAHNE:
12  Q. Okay. Are there any other meetings that you -- are
13  there any other scheduled meetings that you have
14  regarding investigations on a periodic basis?
15  A. With whom?
16  Q. With Attorney Fenton and others at the DOE.
17  A. I meet with Attorney Fenton, either in person or
18  virtually, every day. With respect to the
19  commissioner, the deputy commissioner, those meetings
20  are, generally speaking, once a month.
21  Q. Okay.
22  A. The educator misconduct meetings.
23  Q. Okay. So you have educator misconduct meetings once a
24  month. You speak with Attorney Fenton every day. Is
25  there any other type of formal meeting that you have on

**33**

1  a periodic basis at the DOE?
2  **A. I do not think so.**
3  Q. Is there a duty to report in the Educator Code of
4  Conduct?
5        MR. KENISON-MARVIN: Objection. Legal
6  conclusion.
7        THE WITNESS: There is.
8  BY MR. KAHNE:
9  Q. What do you understand about the duty to report?
10 **A. First of all, there is a duty to report provision**
11 **within the code of conduct. That's question one.**
12 Q. The answer is yes?
13 **A. Yes.**
14 Q. Now, my question is what do you understand the duty to
15 report -- the duty to report to encompass?
16 **A. If -- I think it's a threefold area. The duty to**
17 **report pertains to individual educators, individual**
18 **administrators, and superintendents. And each of those**
19 **groups of people have duties to report violations of**
20 **code of conduct that they're aware of. So I think that**
21 **answers the question.**
22 Q. Okay. So -- and is failing to report a code of conduct
23 violation an independent violation of the code of
24 conduct?
25        MR. KENISON-MARVIN: Same objection. Legal

**34**

1  conclusion. You can answer.
2        THE WITNESS: That's not a fair question.
3        MR. KAHNE: Okay.
4        THE WITNESS: Because, for example, a
5  teacher's responsibility under reporting is limited, so
6  if the teacher goes to a supervisor and makes a report,
7  then the teacher is perfectly fine.
8        If it's an individual administrator makes the
9  report up the chain to command to their next superior,
10 they've covered their responsibility and duty. It is
11 only when the chain is broken where a person is aware
12 of a code of conduct violation and either refuses to
13 make the report or fails to make the report.
14       So it's a loaded question. It all depends on
15 what level and in which -- if a teacher tells her boss,
16 she's all set. He's all set. Done. The boss, in the
17 administrative level, makes the report. All done. It
18 then goes --
19 BY MR. KAHNE:
20 Q. I think I understand your testimony. So let me start
21 at the base level. If a teacher that knows of a code
22 of conduct violation and does not report that anywhere,
23 is that a violation of the code of conduct?
24       MR. KENISON-MARVIN: Objection. Legal
25 conclusion.

**35**

1        THE WITNESS: My understanding is
2  potentially, yes. Potentially, yes.
3  BY MR. KAHNE:
4  Q. Why do you say "potentially, yes"?
5  **A. Well, we don't know what the facts and circumstances**
6  **are, what she knew, when she knew it. Who did she**
7  **speak to? What was her understanding of the code of**
8  **conduct? There are any number of reasons why that type**
9  **of report would not be made.**
10 **So it's -- I'm a fact-based guy. So it's**
11 **potentially, but it's not clear until you get the facts**
12 **supporting it.**
13 Q. Do they have to know of an actual violation of the code
14 of conduct, or do they have to report a possible
15 violation of the code of conduct?
16       MR. KENISON-MARVIN: Same objection.
17       THE WITNESS: That's an interesting question.
18 I think that if they -- that's one of the things that
19 we would do in the triage process to see whether
20 misconduct has occurred. What did they know? When did
21 they know it? What was their understanding? What were
22 their duties and responsibilities? And you mix that up
23 not only with the code of conduct at the state level,
24 and licensure, but you also look at it at the policy
25 level at the individual school district.

**36**

1        So it's a very loaded question and it has
2  many nuances. So I'm not going to tell you yes or no.
3  It's not going to happen.
4  BY MR. KAHNE:
5  Q. But it is possible that you would open an investigation
6  or you would -- sorry -- you would open a case to look
7  into a failure to report for a teacher that didn't
8  report a possible violation of the code of conduct?
9  **A. It is possible.**
10 Q. Okay. Same question with respect to superintendents.
11 Superintendents have a duty to report possible
12 violations of the code of conduct?
13 **A. They do.**
14 Q. Okay. And if they do not report a possible code of
15 conduct violation, that is a -- that could be a
16 violation of the code of conduct?
17 **A. Depending on the fact pattern, yes.**
18 Q. Okay. And I just -- loss of teaching credentials is
19 one of the potential sanctions in the code of
20 conduct?
21 **A. Well, let's talk about the term "credential." What do**
22 **you mean?**
23 Q. Well, a credential -- the credential, the ability to
24 teach, for example, within the state of New Hampshire.
25 I'm looking at the code of conduct. It says

**37**

1   "suspension, revocation, or reprimand." And I
2   assume -- I was referring to revocation. So what do
3   you understand revocation to be?
4   **A. Revocation for New Hampshire is the permanent removal**
5   **of a license.**
6   Q. Okay. So it is possible to have -- for the Department
7   of Education to permanently remove the license of a
8   teacher for violation of the code of conduct?
9        MR. KENISON-MARVIN: Objection. Legal
10  conclusion. But you can answer.
11       THE WITNESS: Is it possible? Repeat for me.
12  BY MR. KAHNE:
13  Q. Yeah. So one of the sanctions that the Department of
14  Education can impose for a violation of the code of
15  conduct is revocation of teaching credentials?
16  **A. Yes. Credential, though. I like to talk about**
17  **licenses and endorsements, which are, you know, part**
18  **and parcel of the overall term "credential."**
19       **So I prefer to use the term "license" and, within**
20  **license, "endorsement." Credential is — my**
21  **understanding of credential is any piece of paper this**
22  **agency produces for an educator. So I prefer, if we're**
23  **going to talk about sanctions, I'd prefer to use the**
24  **term "license."**
25  Q. Okay.

**38**

1   **A. And endorsement. I think it's a better way to talk**
2   **about what we do.**
3   Q. Okay. And revocation would mean the loss of a license,
4   right?
5   **A. Correct.**
6   Q. Okay. I want to talk about your role in conducting
7   trainings, which I think you referred to earlier.
8        MR. KAHNE: One second.
9        (Discussion off record.)
10  BY MR. KAHNE:
11  Q. All right. Is it your understanding that a violation
12  of HB 2 would be a violation of the code of conduct?
13       MR. KENISON-MARVIN: Same objection.
14       THE WITNESS: That's not my understanding.
15       MR. KENISON-MARVIN: Legal grounds. You can
16  answer.
17       BY MR. KAHNE:
18  Q. I'm going to show you what's been previously marked --
19  I think it's 1. Exhibit 1.
20  **A. Thanks. What do you want me to do with this?**
21  Q. I'd like you to turn to page PL007.
22  **A. Okay, do you mind if I take a look at the page first?**
23  Q. Yeah, yeah. Please do. Please do.
24  **A. I think you said 007?**
25  Q. That's right.

**39**

1   **A. I'm there now.**
2   Q. Okay. And I'm specifically looking at Roman numeral
3   IV.
4   **A. "Violation of this section by an educator shall be**
5   **considered a violation of the Educator Code of Conduct**
6   **that justifies disciplinary sanction by the State Board**
7   **of Ed." Yes.**
8   Q. Okay. So I'm just -- what I was asking before is
9   whether a violation of -- do you understand this to be
10  HB 2, or what we've been discussing?
11  **A. Yeah.**
12  Q. Okay. And what I was asking before is whether a
13  violation of HB 2 is a violation of the code of
14  conduct?
15  **A. Based upon the Attorney General — Department of**
16  **Justice, the Attorney General's office, their**
17  **determination. Also the determination made here at the**
18  **Department of Education. We would only be — involve**
19  **ourselves after the Human Rights Commission process is**
20  **over.**
21       **So, for example, in this case, if the Human Rights**
22  **Commission determines, through their investigative**
23  **process, not ours, that they have a finding, then it**
24  **would be reported to us and a decision to examine that**
25  **set of facts would be determined. We don't — I don't**

**40**

1   involve myself with these investigations at all.
2   Q. Where does it say that? What you just described, that
3   process, where does it say that?
4   **A. My understanding, it's in the Department of Justice**
5   **memo that went out to the field and to us, and that's**
6   **my marching orders from my supervisors.**
7   Q. Okay. I want to get back for a second to the meetings
8   that you talked about with Attorney Fenton, the
9   commissioner, and the deputy commissioner, the monthly
10  educator misconduct meetings.
11  **A. Yes, sir.**
12  Q. I just want to be clear. The commissioner is involved
13  in the decision as to whether there's been a violation
14  of the code of conduct, right?
15  **A. He is — the meetings have different levels within the**
16  **meetings and different stages of the investigation, so**
17  **to the extent that he — we conduct those meetings and**
18  **he asks questions, he is involved in the process. But**
19  **it's not until a decision is made that he then becomes**
20  **in agreement or disagreement with the recommendation.**
21  Q. Right. And I think you said the buck stops with him,
22  right?
23  **A. Correct.**
24  Q. So he's thumbs up, thumbs down?
25  **A. At the end of the day.**

41

1  Q. Okay. And do you ever recall during those meetings
2     discussing course materials of teachers in those
3     educator misconduct meetings?
4  A. **Almost likely.**
5  Q. Almost likely?
6  A. **Yeah.**
7  Q. So you think -- you think you recall that?
8  A. **Maybe. But I don't know in what term do you mean? I**
9     **mean, does it come up in conversation? Does it come**
10    **related to an investigation?**
11 Q. Yeah, either way. Either way.
12 A. **I'm sure it has.**
13 Q. Okay.
14 A. **I don't recall a specific instance, but I'm sure it**
15    **has.**
16 Q. Okay. And what do you recall about that?
17 A. **I don't recall anything about it.**
18 Q. But you do have a recollection that discussions of
19    educator material has come up in those meetings?
20 A. **Sure.**
21 Q. Okay. Frequently?
22 A. **No, not frequently. And -- no, not frequently.**
23 Q. And does the commissioner -- do you recall ever -- the
24    commissioner speaking about educator materials during
25    those meetings?

42

1  A. **Specifically or generally?**
2  Q. Take one and then the other.
3  A. **Specifically, I don't recall.**
4  Q. Okay.
5  A. **Generally, I'm almost certain that there have been**
6     **general discussions.**
7  Q. And what do you recall -- what general discussions do
8     you recall about course material with the
9     commissioner?
10    MR. KENISON-MARVIN: I just instruct --
11    object under the deliberative process privilege
12    grounds. To the extent there were discussions of
13    particular materials and discussions about what to do,
14    if anything, with respect to particular materials, I
15    would instruct you not to provide that information in
16    response to this question. To the extent the answer
17    calls for generalized information about discussions,
18    you can provide a generalized answer, but nothing
19    specific as to particular deliberations of any issue.
20    THE WITNESS: I don't know what any of that
21    means. Let's try again.
22    MR. KAHNE: Okay. Yeah.
23    BY MR. KAHNE:
24 Q. Have you ever discussed course materials with -- this
25    can be a yes or no -- with the commissioner during an

43

1     educator misconduct meeting?
2  A. **Course materials? You mean curriculum?**
3  Q. Sure.
4  A. **I mean, generally. Maybe. I don't have a direct**
5     **recollection of a specific instance, but, generally,**
6     **maybe.**
7  Q. Have you ever discussed HB 2 during those educator
8     misconduct meetings?
9  A. **I haven't discussed HB 2 with the commissioner or**
10    **anybody else in this building for a long time.**
11 Q. When was the last time you remember discussing?
12 A. **Shortly after it was passed.**
13 Q. Okay. And what do you remember about those
14    conversations?
15 A. **What is -- what is our -- I was curious as to what my**
16    **role would be.**
17 Q. Okay. And did you have -- so you were curious as to
18    what your role would be, and so did you have
19    conversations with people at the DOE about that?
20    MR. KENISON-MARVIN: I'll instruct the
21    witness not to answer specifics as to conversations
22    with the -- to the extent the question calls for "did
23    you have conversations," you can answer.
24    THE WITNESS: I'm certain we had
25    conversations, and I am also certain that the

44

1     Department of Justice solved the problem for me.
2     BY MR. KAHNE:
3  Q. Did you have conversations with the commissioner?
4  A. **I don't remember. Generally. Perhaps, but I don't**
5     **remember.**
6  Q. Do you have an understanding as to whether the
7     commissioner supported the passage of HB 2?
8  A. **You'll have to ask him. I have no idea.**
9  Q. Okay. I started to talk about your trainings that you
10    conduct.
11 A. **Yes.**
12 Q. Do I have it correct that you conduct trainings on both
13    the code of conduct and the code of ethics?
14 A. **Well, code of conduct, not the code of ethics. Code of**
15    **ethics is not in my realm.**
16 Q. Okay.
17 A. **Code of conduct is the enforceable action. Therefore,**
18    **I would only -- code of ethics is theoretical and**
19    **guidance. Code of conduct is actually enforceable. So**
20    **the trainings that I would -- that I have conducted in**
21    **the past have centered on code of conduct as opposed to**
22    **the code of ethics.**
23 Q. Who do you give those trainings to?
24 A. **It depends on who asks, and it depends on whether I go**
25    **individually, whether I go with Attorney Fenton, or**

45

1  whether Attorney Fenton handles them. So it depends.
2  Q. Okay. So break down those scenarios. When you go with
3     Attorney Fenton, is it usually to a certain type of
4     audience?
5  A. No, no. We've — Attorney Fenton and I, together, have
6     conducted those trainings for small — very small
7     groups, and very large groups. Generally, the issue as
8     to who provides the training has to do with what the
9     schedule looks like and whether, you know, we're
10    available, who's available. And that's how — that's
11    what determines which one of us goes or whether we both
12    go.
13 Q. I'm interested in who the -- like, who the audience is.
14 A. Oh. Audiences could be — we have done trainings for
15    individual charter schools. We've done trainings for
16    individual schools. We've done training for train the
17    trainer, where administrators for a large district
18    would come together and provide the training to
19    administrators who then go out and provide the training
20    to their subordinates. We've — in smaller districts,
21    we have provided training for the entire district.
22       So it depends. We're pretty responsive to the
23    people asking us to come in. I try to be very
24    responsive. So I've done trainings for 10 people, and
25    I've done trainings for several hundred.

46

1  Q. So -- and the audience can be comprised of
2     superintendents?
3  A. Oh, we've done superintendent meetings, yeah, sure.
4  Q. Teachers themselves? Educators?
5  A. Teachers, yeah. Yeah.
6  Q. All right. Let's do Exhibit 7.
7  A. Do you want this one back?
8  Q. Sure. Yeah. Thank you.
9  A. Okay. How can I help you?
10 Q. So looking at Exhibit 7, it's DOE10057. This appears
11    to be an email from Diana Fenton to you. The subject
12    is "code of conduct." And the subject -- the email
13    itself says, "I updated it to include section 297 or HB
14    2. Please review."
15       Do you see that?
16 A. I do.
17 Q. Do you remember receiving this email?
18 A. I do.
19 Q. And the attachment, which, if you look, appears to be
20    your presentation, right?
21 A. It's the Department of Education presentation.
22 Q. Okay, but a presentation that you deliver along with
23    Attorney Fenton?
24 A. I have. I have done this presentation.
25 Q. Okay. My question is why was it updated to include

47

1  section 295 for HB 2?
2  A. Do you mind if I take a look at it to make sure?
3  Q. Sure, sure. Go ahead.
4  A. Thanks. This looks like the PowerPoint.
5  Q. It looks like the PowerPoint that you delivered to
6     superintendents?
7  A. Anybody that asks.
8  Q. So that could include superintendents?
9  A. Yeah.
10 Q. Could include teachers?
11 A. Sure.
12 Q. Okay. So what I was going to ask you is why was this
13    presentation updated to include section 297?
14 A. Well, the field was asking a great deal of questions
15    about the so-called HB 2 and our role in it. And I
16    thought, as well as Attorney Fenton thought, it would
17    be very important to let the field know exactly how
18    that would work for us, and what to expect from us. So
19    I think it was only fair to tell the field — make the
20    field aware of our position and alleviate some of their
21    concerns.
22       There was a great amount of concern when this was
23    first put into place, so I think adding it was the very
24    appropriate thing to do.
25 Q. So I want to -- you used the term "the field." Who is

48

1  "the field"?
2  A. Teachers, administrators. Educators.
3  Q. So there was a great deal of concern from teachers,
4     educators, superintendents, too?
5  A. Everybody including me.
6  Q. About HB 2?
7  A. Yes.
8  Q. Okay. Why was there concern?
9  A. What was — what did it mean? What was their role?
10    What was a violation? How would the process work? And
11    would there actually be sanctions on the license, which
12    basically you're talking about people's livelihood.
13    And what would the process be?
14       So we included that in our presentation.
15 Q. And you were concerned, too, you said?
16 A. Sure.
17 Q. And why were you concerned?
18 A. Because I'm the one that has to investigate this stuff,
19    and I wanted it to be as crystal clear as possible. I
20    don't like murky. I like clear.
21 Q. And fair to say when it was first passed, there was a
22    good deal of murkiness?
23 A. There was a perception of murkiness. What would we do?
24    How would we do it? I'm not talking about anybody
25    or — anybody, anything in particular. I'm just

**49**

1  looking at what was the role of this agency going to
2  be? And there was a lot of rumor, innuendo, murkiness,
3  and I wanted -- I'm a guy that likes clear. So I
4  thought it was important to add this in.
5  Q.  When you delivered this -- and it looks like this is
6  August 2021, so pretty soon after the passage of HB
7  2 -- did you receive questions at these trainings
8  regarding HB 2?
9  A.  I'm sure I did.
10 Q.  Okay. And what types of questions did you get?
11 A.  Well, again, I'm just reviewing. Questions. What
12 would happen if this? What do you do? What does the
13 department do? And the answers, basically, were what
14 was in the PowerPoint presentation.
15 Q.  Well, so let's look at that. So what's in the
16 PowerPoint presentation, it appears to be, if you look
17 at -- I think it's starting on DOE10079, I believe it's
18 the three pages concerning HB 2, so it looks like the
19 presentation has the actual statute?
20 A.  That's what it looks like, yep. Yep.
21 Q.  Okay. But were you asked questions about what was
22 covered by the statute?
23 A.  I don't know.
24 Q.  What types of material was -- is prohibited under the
25 statute?

**50**

1  A.  No, I think -- my recollection is most of the questions
2  would center around what would we, as an agency, do for
3  complaints? And that's what I limited it to.
4  Q.  And what was your answer when that was asked?
5  A.  Technical advisory by the Attorney General's office,
6  and that we wouldn't be investigating those. They
7  would go to the human rights -- HRC or to the
8  Department of Justice. And it would only occur after a
9  finding was made in those places.
10     So the idea that we were out conducting these
11 investigations, I wanted it clear that we did not until
12 such time as there was a finding with the -- with the
13 Human Rights Commission and with the Department of
14 Justice.
15 Q.  And, again, the fact that you were not going to conduct
16 those investigations, where did you get that
17 instruction from?
18 A.  Attorney Fenton and the leadership in this building.
19 Q.  And is there a writing about that?
20 A.  I don't recall, but I know what -- I know what my
21 mission is.
22     MR. KAHNE: Okay. And to the extent that
23 there is a writing, Nate, we would call for the
24 production of that.
25 BY MR. KAHNE:

**51**

1  Q.  Was there -- were you asked questions about what the
2  statute means during these trainings?
3  A.  I may have been, but I wouldn't have answered those
4  questions. I would have said this is our process, and
5  the process is refer to the Human Rights Commission,
6  Department of Justice. The finding occurs, then it
7  comes back to us.
8  Q.  Do you have an understanding of what's prohibited under
9  the statute?
10 A.  I try not to.
11 Q.  Why do you try not to?
12 A.  It's just not my role. It just isn't my role. My role
13 is if HRC or the Department of Justice has a finding
14 that there is a violation of HB 2, then my role begins.
15 Nothing before that.
16 Q.  Do you understand the words -- the way the statute
17 operates?
18 A.  I understand.
19     MR. KENISON-MARVIN: Objection to the extent
20 it's calling for legal analysis.
21 BY MR. KAHNE:
22 Q.  Just do you understand it?
23 A.  I've read it.
24 Q.  Okay. You've read it, but do you understand what's
25 prohibited under it?

**52**

1  A.  I'm not an attorney. I read it. I think I understand
2  it, but it's irrelevant to me. It's completely
3  irrelevant to me because my mission, my goal, occurs
4  only after there's a finding with the HRC.
5  Q.  You were a teacher?
6  A.  I was.
7  Q.  Right? Do you -- having read the statute, do you have
8  a sense of what you couldn't teach as a teacher?
9  A.  I was a teacher 30 -- 40 years ago.
10 Q.  Assume you're a teacher now.
11 A.  I don't want to do that.
12 Q.  Okay. Well, I'm asking you. Just assume. What would
13 you not be able to teach under the statute?
14     MR. KENISON-MARVIN: Same objection, to the
15 extent it calls for a legal conclusion.
16 BY MR. KAHNE:
17 Q.  If you know?
18 A.  I don't.
19 Q.  You don't know. Okay. You referenced, I believe, a
20 DOJ memo out to the field regarding the DOE's role in
21 HB 2?
22 A.  No, not the DOE memo. It would be the DOJ memo.
23 Q.  What memo?
24 A.  The technical advisory.
25 Q.  Is that the FAQ? Is that what you're talking about?

**53**

1    Don't know?  Let's go to exhibit -- this is a
2  new -- this is a new exhibit.  Exhibit 24.
3    (Exhibit 24 marked for identification.)
4  BY MR. KAHNE:
5  Q.  And take a moment.  I don't want to --
6  **A.  Okay.  What am I looking at?**
7  Q.  So what I've just put in front of you is a document
8    that bears Bates number DOE09644, and it appears to be
9    an email from you to Diana Fenton regarding code of
10   ethics training dated October 18th, 2021.
11     And the email from you reads, "I have been asked
12   to schedule this training and perhaps do the
13   presentation.  Please find attached documents for
14   dissemination to your staff.  Is it possible to provide
15   a laptop and a PowerPoint for use?"
16     And it goes on.  Do you see that?
17 **A.  I do.**
18 Q.  First of all, is there a code of ethics training versus
19   a code of conduct training?
20 **A.  I don't do code of ethics training, so it would be code**
21   **of conduct training.**
22 Q.  So it just says code of ethics because it's a
23   mistake?
24 **A.  I have no idea why it says that.**
25 Q.  Okay.  Do you recall doing this training that's

**54**

1    referenced in Exhibit 24?  Compass Classic Academy.
2  **A.  I don't recall doing that training.**
3  Q.  Okay.  Attached to this email is a document that I just
4    referred to as "FAQ."  What I meant by that is
5    frequently asked questions.
6  **A.  Yes.**
7  Q.  Did you circulate this in connection with the
8    presentation to Compass Classic Academy?
9  **A.  I don't recall doing a presentation at Compass**
10   **Academy.**
11 Q.  Okay.
12 **A.  So if this was generated, it wasn't generated by me.**
13 Q.  Okay.  Did you, from time to time, in advance of your
14   presentations, circulate the frequently asked questions
15   document?
16 **A.  I don't recall sending that document related to the**
17   **code of conduct training.**
18 Q.  You mentioned -- you talked about a memo, a DOJ memo.
19   Is this the DOJ memo that you were talking about, or is
20   there another one?
21 **A.  What I'm referring to is the technical advisory.  So if**
22   **this is the technical advisory, that's what I'm talking**
23   **about.**
24 Q.  Have you ever seen the -- is this the technical
25   advisory?

**55**

1  **A.  I don't know.**
2  Q.  Do you recall ever speaking with training participants
3    about this document?
4  **A.  No.**
5  Q.  Have you reviewed this document before?
6  **A.  Yes.**
7  Q.  Okay.  So you know sort of in substance what it says?
8  **A.  I do.**
9  Q.  And is it your testimony that you would not answer
10   questions about what was and was not prohibited under
11   the statute at these trainings?
12 **A.  I stayed away from that.  I talked about our role and**
13   **our process in general because that's what the code of**
14   **conduct is.**
15 Q.  Did Attorney Fenton discuss what is and was not
16   prohibited?
17 **A.  You know, in the past year anyway, Attorney Fenton has**
18   **done more of these trainings than I have, so I can't**
19   **answer that question.  In many instances, I wasn't**
20   **there.**
21 Q.  Okay.  But in the ones that you were with Attorney
22   Fenton, do you recall any questions about what could
23   not be taught under the statute?
24 **A.  If there were such questions, I would have deferred to**
25   **her.  She's -- she's the legal person and she's my**

**56**

1    **boss.**
2  Q.  And do you have any recollections of what she said?
3  **A.  I don't.**
4  Q.  Okay.
5  **A.  I honestly don't.**
6  Q.  Do you recall those questions coming?
7  **A.  I don't.**
8      MR. KENISON-MARVIN:  Are we on a good spot to
9    take five?
10     MR. KAHNE:  Sure, sure.  We've been going a
11   while.
12     (Recess taken.)
13   BY MR. KAHNE:
14 Q.  Investigator Farrell, when we talked before the break,
15   you mentioned a technical advisory?
16 **A.  Yes.**
17 Q.  And can you describe for me what the technical advisory
18   is, to the best of your understanding?
19 **A.  To the best of my understanding, technical advisory**
20   **basically outlines how HB 2, compliance with HB 2,**
21   **would take place.**
22 Q.  Okay.  And we were just looking at -- I think it's 24.
23 **A.  Yep.**
24 Q.  And the second page of that is a frequently asked
25   questions document.  My question for you is do you know

57

1  whether this is the technical advisory you were
2  referring to?
3  **A. I believe it is.**
4  Q. You believe it is?
5  **A. Yeah.**
6  Q. Okay. And I believe you testified that the technical
7  advisory indicates that complaints are to be filed with
8  the Human Rights Commission?
9  **A. HRC or the Department of Justice.**
10 Q. Okay. Where does it say that?
11 **A. I haven't read it today.**
12 Q. Okay. So can you take a look at it?
13 **A. Okay.**
14 Q. Okay. So do you have -- where, in the technical
15 advisory, does it say that complaints are supposed to
16 be filed with the Commission for Human Rights?
17       MR. KENISON-MARVIN: Objection. Misstates
18 prior testimony. You can answer.
19       THE WITNESS: I think it's under 11 and 12.
20 At least that's my understanding of it.
21 BY MR. KAHNE:
22 Q. Does it say anywhere here that a complaint can be filed
23 for a code of conduct violation with the Department of
24 Education?
25 **A. It doesn't say that, nor does it say it can be.**

58

1  Q. So it doesn't either -- it doesn't say either way,
2  right?
3  **A. That's correct.**
4  Q. And, in addition to the Human Rights Commission, it
5  does also say that a complaint can be filed with the
6  Attorney General's office, right?
7  **A. Correct.**
8  Q. And it says that a civil claim can be filed in superior
9  court. Do you see that?
10 **A. I do.**
11 Q. Okay. Do you understand those to be other avenues for
12 filing a complaint?
13 **A. Yes.**
14 Q. You testified, I believe, that your understanding of
15 the procedure was that complaints about HB 2 were
16 supposed to go to HRC; is that right?
17 **A. HRC, and I said Department of Justice and the Attorney**
18 **General's office.**
19 Q. All right. Is that right? Is that all complaints
20 about HB 2?
21       MR. KENISON-MARVIN: Objection to the extent
22 it calls for a legal conclusion. You can answer.
23 BY MR. KAHNE:
24 Q. I'm interested in what your understanding of the
25 Department's policy is with respect to complaints filed

59

1  about HB 2.
2  **A. My understanding --**
3        MR. KENISON-MARVIN: Objection. Vague. You
4  can answer.
5        THE WITNESS: My understanding is that my
6  marching orders are that those complaints go to HRC,
7  Department of Justice. They don't come to me.
8  BY MR. KAHNE:
9  Q. All complaints?
10 **A. For human -- for HB 2.**
11 Q. Right. Okay. I'd like to use -- I'm going to show you
12 a document that's been previously marked Exhibit 3.
13 Just take a quick -- if you want to take a quick look?
14 Does this look familiar to you?
15 **A. Yes.**
16 Q. Okay. And what is this?
17 **A. It's a PowerPoint presentation that was created by**
18 **Attorney Fenton regarding practices and our**
19 **investigations.**
20 Q. Did you play any role in drafting this?
21 **A. I reviewed it, I think -- if I recall correctly, I**
22 **think I made a couple of spelling corrections, things**
23 **like that, but Attorney Fenton is the -- is the**
24 **architect.**
25 Q. Okay. First, if you go to DOE05656, there's a slide

60

1  that says, "Who do I call?"
2  **A. Yes.**
3  Q. It says, "All reports of educator misconduct are made
4  to Richard Farrell," with your contact information, and
5  Diana Fenton with her contact information. Do you see
6  that?
7  **A. Yes. Yes, sir.**
8  Q. And is that true?
9  **A. It's true because it's here. And, in practice, they**
10 **come to me and they come to Attorney Fenton.**
11 Q. And this presentation, like the previous presentation
12 we were looking at, was updated to include the new HB
13 2. And I'm looking specifically at DOE05665.
14       MR. KENISON-MARVIN: To the extent there's a
15 question, I'll object to it being vague.
16       MR. KAHNE: There's no question yet.
17       THE WITNESS: What's the number again? I'm
18 sorry.
19       MR. KAHNE: 05665.
20       THE WITNESS: Yeah, there were -- I see them.
21 BY MR. KAHNE:
22 Q. Okay. And so does this -- does it appear here that
23 this training was updated to include a section on HB
24 2?
25 **A. There were two -- there were two additions. First one**

61

1    was HB 1240, and the second addition was HB 2.
2  Q.  Okay.  Speaking specifically about the page on HB 2.
3     There's text about an allegation of violation of HB 2,
4     how it's to be adjudicated.  The third bullet on this
5     page says, "So why the website?"
6        Do you have an understanding as to why it says
7     that?
8  A.  I think I do, but that's just an opinion.
9  Q.  Okay.  What is your opinion?
10 A.  There was a --
11       MR. KENISON-MARVIN:  I'm just going to
12    instruct the witness not to answer to the extent that
13    your opinion would involve testimony about discussions,
14    deliberations about why a website exists, or something
15    related to a website existing.  Deliberative
16    discussions about why the website.  If you want to hear
17    the question again, I can make that more specific.
18    BY MR. KAHNE:
19 Q.  The question is what is your understanding of why this
20    bullet, "So why the website?" is there?
21 A.  My understanding is there is a reference to a website
22    where complaints can be filed.  It was posted on the
23    Department of Education website.  I think that's what
24    it is, but I don't know.
25 Q.  Okay.  There was a -- your understanding is that there

62

1     was a website where complaints could be filed on the
2     Department of Education website?
3  A.  It's in the Department of Education website, I
4     believe.
5  Q.  What is the answer to this question:  So why the
6     website?
7  A.  I don't have an answer to the question.  This is --
8     this training is generally conducted by Diana Fenton.
9     I don't know why it's there, and if I were conducting
10    the training, I don't know that I would have an answer
11    for it.
12 Q.  Do you have an understanding as to whether there was
13    confusion about where members of the public could file
14    complaints?
15 A.  Ask it again, please.
16 Q.  Was there confusion about where members of the public
17    could file complaints after the passage of HB 2?
18       MR. KENISON-MARVIN:  Objection.  Vague and
19    compound to the extent it's a different question to the
20    one that was asked and asked to be repeated.
21       MR. KAHNE:  That's not really --
22       MR. KENISON-MARVIN:  What I mean is the first
23    question is "Do you understand," and the second one is
24    "Is there."
25    BY MR. KAHNE:

63

1  Q.  So my question is was there confusion after the passage
2     of HB 2 as to where people could file complaints?
3  A.  My recollection is that there were -- there was a lack
4     of mechanism, period.
5  Q.  What do you mean by "lack of mechanism"?
6  A.  Well, I think -- there was no place identified for
7     people to go.
8  Q.  And do you recall on or about November of 2021 there
9     being the launch of a DOE website for the filing of
10    complaints?
11 A.  I don't have an independent recollection of that.
12 Q.  Okay.
13 A.  If you have something?
14 Q.  Yeah, I do.
15       MR. KAHNE:  This is going to be Exhibit 25.
16       (Exhibit 25 marked for identification.)
17    BY MR. KAHNE:
18 Q.  So does that refresh your recollection as to the DOE
19    launching a website for the reporting of complaints?
20 A.  I remember this press release.
21 Q.  Okay.  What do you remember about it?
22 A.  I remember that it was issued.
23 Q.  Okay.  Do you remember Diana Krol building a website
24    for individuals to use to report incidences of
25    discrimination?

64

1  A.  I don't know what Diana Krol did.
2  Q.  Okay.  Do you recall having discussions with the
3     commissioner about the launching of the web page?
4  A.  Define "discussions."
5  Q.  Any conversations.
6  A.  I think I recall that there was a website that was
7     going to be launched.  Other than that, that was the
8     extent of the discussion.
9  Q.  Do you know why the DOE launched a website?
10       MR. KENISON-MARVIN:  Objection.  I instruct
11    you not to answer to the extent the answer calls for
12    deliberations as to why something was being done.
13       THE WITNESS:  No idea.
14    BY MR. KAHNE:
15 Q.  Do you know who, at the DOE, wanted the website?
16 A.  I don't.
17 Q.  Do you know whether it was the commissioner?
18 A.  I don't.
19 Q.  I want to show you -- do you know whether there was
20    contact information for DOE employees on the website?
21 A.  I do not.
22 Q.  Who is Kate Walker?
23 A.  Oh, Kate Walker no longer works here.  She was a staff
24    person here.
25 Q.  A what?

---

65

1  A.  A staffer here.
2  Q.  And what were her job responsibilities?
3  A.  I really don't know.
4  Q.  Did she have any role in investigations?
5  A.  There was a period of -- no, not in investigations,
6     no.
7  Q.  You were about to say there was a period?
8  A.  There was a period of time where she was trying to
9     create a dashboard, but that never got off the ground.
10    So in terms of active role in investigations, she had
11    none.
12 Q.  Let me show you a document that was previously marked
13    Exhibit 21.  And I'm going to represent to you that
14    this is a snapshot of the DOE website from November
15    10th, 2021.
16       MR. BISSONNETTE:  Could I just also add to
17    the record that there is handwriting at the top of the
18    document.  That is my handwriting, just to more visibly
19    reflect my understanding that this is an extraction of
20    the website as of November 10th, 2021.  I just wanted
21    to make that clear because I didn't yesterday.
22       THE WITNESS:  The Wayback Machine?
23       MR. KENISON-MARVIN:  We can have a
24    discussion --
25       THE WITNESS:  Brings back memories.

---

66

1        MR. KENISON-MARVIN:  We can have a discussion
2     off the record about what the Wayback Machine is.  But
3     I did want to explain where that handwriting came from,
4     that it is mine.
5     BY MR. KAHNE:
6  Q.  So is this the Department of Education's website, to
7     your knowledge?
8        MR. KENISON-MARVIN:  I'm going to object on
9     106.  It was represented that this is a portion of, so
10    to the extent --
11    BY MR. KAHNE:
12 Q.  Okay.  So is it your understanding this is a portion of
13    the Department of Education's website?
14 A.  Sure.
15 Q.  And is this the -- we previously looked at a Exhibit
16    25, which was a press release about the launching of a
17    website.  Is it your understanding that this is the
18    website that was launched in November 2021?
19       MR. KENISON-MARVIN:  Same objection on
20    completeness under Rule 106.
21       MR. KAHNE:  You can answer.
22       THE WITNESS:  I had virtually nothing to do
23    with this.
24    BY MR. KAHNE:
25 Q.  Ever go to the website?

---

67

1  A.  No.
2  Q.  Do you know -- have any knowledge about whether DOE --
3     whether Kate Walker's name was removed from the website
4     at any point?
5  A.  I have no idea.
6  Q.  Let me show you a document that's been previously
7     marked Exhibit 22.  Have you had a chance to look at
8     that?
9  A.  I did.
10 Q.  What do you recall about Exhibit 22?
11 A.  Nothing.
12 Q.  This appears to be an email from you to Diana Fenton on
13    November 15th, 2021, and the subject line is "New
14    Hampshire Moms for Liberty chapter offers $500 to
15    anyone who can catch teachers breaking a new
16    discrimination law."
17       Do you see that?
18 A.  I do.
19 Q.  And it looks like you forwarded an email to Diana
20    Fenton from Business Insider Australia.  Do you see
21    that, too?  Do you see that?
22 A.  I do.
23 Q.  What do you recall about forwarding this article to
24    Diana Fenton?
25 A.  Absolutely nothing.

---

68

1  Q.  What do you recall about the Moms for Liberty bounty?
2  A.  I knew it was out there.  That's it.
3  Q.  Well, what did you -- how did I find it?
4  A.  Someone sent it to me, I think.  But, again, that's
5     speculation.  I don't know.  I became aware of it.  I
6     sent it to my supervisor.
7  Q.  Why did you send it to your supervisor?
8  A.  I think it potentially was germane to the topic.
9  Q.  Germane to what topic?
10 A.  Our involvement in HB 2.
11 Q.  Okay.  And why was -- why was the moms -- I'm just
12    trying to unpack this.  Why was Moms for Liberty bounty
13    germane to your involvement in HB 2?
14 A.  I wanted --
15       MR. KENISON-MARVIN:  Objection to the extent
16    it doesn't represent the testimony.  You can answer if
17    you understood the question.
18       THE WITNESS:  I provide Attorney Fenton with
19    anything that I think is relevant to our ongoing
20    process.  So this -- and I'm speculating because I
21    don't see the initial email because there had to have
22    been an initial email.  I don't know why I sent it to
23    her other than it was a timely topic and I wanted her
24    to be aware of it.
25    BY MR. KAHNE:

**69**

1  Q.  Why did you want her to be aware of it?
2  **A.  Seriously?**
3  Q.  Yeah.
4  **A.  Because it was germane to the topic of the day, meaning**
5  **HB 2.  So I saw it and I sent it to her.**
6  Q.  Were you concerned by it?
7  **A.  Not particularly.**
8  Q.  Why not?
9  **A.  I think it speaks for itself.**
10 Q.  You say here, "An anti-LGBT group is also offering
11 $500."
12     Do you know what LGBT group?
13 **A.  Anti.**
14 Q.  Sorry.  Anti-LGBT group.
15 **A.  And I don't recall.**
16 Q.  Do you recall conversations with Attorney Fenton about
17    the bounties?
18 **A.  I'm sure we had discussions, but I don't recall that.**
19 Q.  You don't recall anything about them?
20 **A.  I just -- no, I honestly don't.  I sent it up.  It was**
21    **timely.  And that's the end of it.**
22 Q.  And was it timely because -- it was timely because of
23    the passage of HB 2 and DOE's role in enforcing HB 2?
24 **A.  I think it was just timely in that it involved**
25    **teachers, and education, and the education field, so I**

**70**

1     think it was timely in that respect.
2  Q.  This -- the article is from November 15th, 2021.  Do
3     you see that?
4  **A.  I see that.**
5  Q.  Okay.  And the website I showed you was from November
6     10th, 2021.
7  **A.  Okay.**
8  Q.  Do you see any connection between those two things?
9  **A.  I don't.**
10 Q.  Did you see an increase in complaints to the DOE after
11    the establishment of the website, the launch of the
12    website?
13 **A.  I don't think we got an increase in complaints because**
14    **there were no complaints before HB 2 regarding HB 2, so**
15    **any complaint would be more than what we had before HB**
16    **2.**
17 Q.  Well, sure.  But HB 2 was passed in June of 2021,
18    right?  And then the website launched in November of
19    2021?
20 **A.  Let's think about the timing here.  June.  Summer**
21    **vacation.  Kids aren't in school.**
22 Q.  Okay.
23 **A.  There's a practical application here.  So before HB 2,**
24    **there were no HB 2 complaints.  After HB 2, it happened**
25    **in the summer.  There's -- kids aren't in school.**

**71**

1     There's a lot of other things happening.  And then the
2     fall comes in, and one complaint under HB 2 would be
3     more than we had in May of 2021.
4  Q.  So but fair to say that you received more HB 2
5     complaints after November of 2021?
6  **A.  No, that's not fair to say.  I don't -- I never said**
7     **that, and I don't recall.**
8  Q.  Do you think that the passage of HB 2 impacted teachers
9     in the field?
10 **A.  You're asking me for an opinion?**
11 Q.  Yeah.
12 **A.  You'd have to ask the teachers in the field.**
13 Q.  Did you observe any -- in your investigations, any
14    difference in the way things were being reported to the
15    DOE?
16    MR. KENISON-MARVIN:  Objection.  Vague.  You
17    can answer.
18    THE WITNESS:  No, the same types of
19    misconduct when things came in at the same relative
20    rate regarding code of conduct violations.
21 BY MR. KAHNE:
22 Q.  But then you would also receive complaints relating to
23    HB 2?
24 **A.  I don't know that we received a great deal of**
25    **complaints, to be honest with you.  And, if we did, I**

**72**

1     didn't deal with them.
2  Q.  Did the commissioner ever ask you to look into course
3     material after the passage of HB 2?
4     MR. KENISON-MARVIN:  I'll just instruct the
5     witness to not answer to the extent you would say --
6     information about conversations, deliberations about
7     what that means.  It's a yes-or-no question.  You can
8     answer to the extent the question calls for that.
9     THE WITNESS:  Okay.  So one more time?
10 BY MR. KAHNE:
11 Q.  Did the commissioner ever ask you to look into course
12    material after the passage of HB 2?
13 **A.  Course material?**
14 Q.  Instructional material, curriculums.
15 **A.  I honestly don't recall him asking me to look into**
16    **instruction materials.  He may have.  I don't -- just**
17    **don't recall.**
18    MR. KAHNE:  I'm going to show you a new
19    document that is Bates number 000068 and it will be a
20    new document number 26.
21    (Exhibit 26 marked for identification.)
22 BY MR. KAHNE:
23 Q.  Okay.  Do you recall receiving this letter?
24 **A.  I remember reading it, yes.**
25 Q.  Okay.  What is "No Left Turn," to your knowledge?

73

1  A. I have absolutely no idea.
2  Q. Okay. Well, the first line says, "No Left Turn in
3     Education is a national education advocacy
4     organization."
5        Any reason to believe that's not true?
6  A. If that's what they say they are, I guess it's true.
7  Q. Okay. What is your recollection of receiving this --
8     receiving this letter?
9  A. I don't know what you mean.
10 Q. What do you remember about receiving this letter?
11 A. I received it.
12 Q. Anything -- the circumstances surrounding your receipt
13    of this letter?
14 A. No.
15 Q. Okay. If you look at the second page, the second to
16    last paragraph says, "It is" -- so I should say, the
17    paragraph before says, "While some educators signed the
18    same pledge before New Hampshire's law was passed, they
19    did so anticipating passage of New Hampshire's law and
20    promising to break it after enactment."
21       Then the next paragraph says, "It is more than
22    enough evidence for this board to act and for the
23    bureau to open investigations into all New Hampshire's
24    Zinn pledge signatories. The educator code itself
25    states that the Department of Education shall undertake

74

1     an investigation of an educator if the department
2     merely has reason to suspect that any educator
3     knowingly failed to report a violation of the codes."
4        Do you see that?
5  A. I see it.
6  Q. Do you agree with it?
7  A. Do I agree with what?
8  Q. With that characterization of the educator code.
9        MR. KENISON-MARVIN: Objection to the extent
10    it calls for a legal conclusion.
11       BY MR. KAHNE:
12 Q. Do you agree with that characterization of that -- is
13    that an accurate reflection of what the educator code
14    says?
15 A. No.
16 Q. It doesn't say that it shall undertake an
17    investigation?
18       MR. KENISON-MARVIN: Objection to the extent
19    there's a completeness issue about what the code says.
20    And the entire code is not in front of him.
21       MR. KAHNE: You can answer.
22       THE WITNESS: Try again.
23       BY MR. KAHNE:
24 Q. Why is that incorrect?
25       MR. KENISON-MARVIN: Same objections. You

75

1     can answer.
2        THE WITNESS: They took on the pieces of the
3     code. They didn't take out the entire code, nor did
4     they take any technical advisory, nor did they take in
5     our policies and procedures. This is their opinion.
6     It's some character named Michael Green. Because he
7     says it doesn't make it so.
8        BY MR. KAHNE:
9  Q. He attached a list of teachers to this letter?
10 A. Yes.
11 Q. Did you see that?
12 A. I did.
13 Q. Okay. And did you look into any of these teachers that
14    is attached to this letter?
15 A. I don't remember. I remember that we got the letter.
16    It went to Drew Cline, the board chair. I believe
17    that's who he is. And I don't know that we looked into
18    or conducted an investigation into any of these
19    teachers.
20 Q. You don't know if you did?
21 A. I don't remember doing it.
22 Q. But you may have?
23 A. I don't know.
24       MR. KAHNE: That's a new document, Exhibit
25    27.

76

1        (Exhibit 27 marked for identification.)
2        BY MR. KAHNE:
3  Q. So this is a document dated February 22nd, 2022. It is
4     from Diana Krol to Commissioner Edelblut. Do you see
5     that?
6  A. I do.
7  Q. And if you look all the way at the bottom, there is a
8     series of media inquiries --
9  A. Yes, sir.
10 Q. -- including one involving the New Hampshire chapter of
11    No Left Turn in Education. Do you see that?
12 A. Where is that?
13 Q. So there's an email from Kimberly Houghton to
14    Commissioner Edelblut, and it says, "I have some media
15    inquiries from over the weekend."
16 A. I'm reading that, yep.
17 Q. Okay. And then if you look to the next page, DOE06882,
18    at the bottom, there's a press release from the New
19    Hampshire chapter of No Left Turn in Education. Do you
20    see that?
21 A. Got it.
22 Q. Okay. And the press release appears to relate to the
23    letter and the signing of the Zinn pledge that's
24    reflected in the letter. Do you see that?
25 A. I do.

**77**

1  Q.  Okay.  Now, at the top of this email chain, Diana Krol
2  says to the commissioner, "I have Rich doing some
3  digging as well.  Below is the link to the contact
4  section on their website, if all else fails," and it
5  appears to have the No Left Turn website.
6  Do you see that?
7  A.  I see it.
8  Q.  Does it refresh your recollection as to what digging
9  you did regarding the No Left Turn letter?
10  A.  It doesn't.
11  Q.  Do you have any reason to believe that you didn't do
12  the digging that's reflected here?
13  A.  Well, you have to look at who wrote the email.  And
14  Diana Krol -- I don't work for Diana Krol, so I don't
15  know where she would represent to the commissioner that
16  I did anything.
17  Q.  So she would have no reason to know if you were
18  investigating?
19  A.  I'm not sure, but she's not my boss.  I wouldn't be
20  responding to her.
21  Q.  Did you communicate with superintendents about the No
22  Left Turn letter?
23  A.  I think some superintendents communicated with us.
24  Q.  Okay.  And what do you recall about that?
25  A.  That they saw some of the media attention to No Left

**78**

1  Turn and were concerned about it.
2  Q.  Why were they concerned about it?
3  A.  Because they have educators that work for them on the
4  list, so, of course, they would be concerned.
5  Q.  Okay.  And do you know whether educator --
6  superintendents also received the same No Left Turn
7  letter?
8  A.  I believe.  I believe many of them did, but, again,
9  that's an independent recollection.  I can't say yes,
10  but I believe that some of them, or many of them,
11  did.
12  Q.  And then your recollection is they contacted you?
13  A.  I think there was some contact between some
14  superintendents and me.
15  Q.  And what do you recall about those communications that
16  you had?
17  A.  The only thing I can remember -- and I think there
18  might be some emails where I said -- where this is not
19  our thing.
20  Q.  Why was it not your thing?
21  A.  Because HB 2 isn't my thing.  HB 2 violations are not
22  my thing.  And many of the -- many of the allegations
23  made in the No Left Turn stuff just were factually not
24  true.
25  Q.  Well, which is it?  Was it not your thing, or was it

**79**

1  the -- that the allegations were not true?
2  A.  Well, so it was really easy for me because I'm not
3  doing HB 2 investigations.  So that was very easy for
4  me.  In reading, independently reading the documents,
5  some of what they wrote in their documents just weren't
6  factual.
7  Q.  What wasn't factual that you remember?
8  A.  Well, let me review some of this stuff.
9  In Exhibit 26, they make their decision that
10  there's more than enough evidence for us to open an
11  investigation, when, in fact, that's not true.
12  Q.  Okay.  It's not true because there was not enough
13  evidence to open an investigation?
14  A.  It's not true because we don't investigate these
15  allegations.
16  Q.  Okay.
17  (Exhibit 28 marked for identification.)
18  BY MR. KAHNE:
19  Q.  Okay.  So are you familiar with this email?
20  A.  Yeah, I sent it to Garth McKinney.
21  Q.  And who is Garth McKinney?
22  A.  The former interim superintendent of the Nashua school
23  district.
24  Q.  And it appears from this email that Mr. McKinney is
25  asking if you should investigate the No Left Turn

**80**

1  letter, right?
2  A.  No, he's asking if he should.
3  Q.  Yeah.  Sorry.  If he should investigate?
4  A.  Yeah.
5  Q.  And so he's one of the superintendents that also
6  received the No Left Turn letter then?
7  A.  Yes, sir.
8  Q.  And you responded, "I wanted to give you an update
9  regarding the No Left Turn letter.  I received a
10  similar letter with all the names on it.  Additionally,
11  Drew Cline, state board chair, and the state board
12  members, got the same letter.  Every school district
13  with an identified teacher received the same letter
14  specific to the identified educator.  I have consulted
15  with the Assistant Attorney General assigned to our
16  office, Chris Bond, and Attorney Diana Fenton.  Neither
17  of these lawyers feel we have an interest in the
18  allegations."
19  What is your understanding of why you wrote, "We
20  do not have an interest in the allegations"?
21  MR. KENISON-MARVIN:  Object and instruct --
22  on deliberative process and attorney/client privilege
23  grounds.  To the extent your answer would include
24  information regarding advice or legal -- legal advice
25  or interpretations provided by lawyers and

**81**

1  deliberations about why anybody has an interest in
2  anything, I instruct the witness not to answer the
3  question.
4  BY MR. KAHNE:
5  Q.  I'm just asking what you meant by -- did you think that
6  you didn't have an interest in the allegations?
7  A.  What do you mean?
8  Q.  Well, you wrote that "we don't" -- "none of the lawyers
9  feel we have an interest in the allegations."
10  Did you feel you didn't have an interest in the
11  allegations?
12  A.  That's not my job to make that decision. I went to my
13  supervisors who expressed their concerns and their
14  interest.
15  Q.  Okay.
16  A.  And I responded to Garth.
17  Q.  Okay. And it looks like the next sentence says that
18  they reviewed the list back in the summer, right?
19  "Attorney Fenton and Chris Bond reviewed the list back
20  in the summer, and the decision was the same, and the
21  day of action in New Hampshire took place on June 12th,
22  2021. Therefore, it is believed that the signatures,
23  if confirmed, were affixed to the pledge prior to HB 2
24  becoming law."
25  Do you see that?

**82**

1  A.  Mm-hm.
2  Q.  Is that your understanding of why there was no
3  investigation into the No Left Turn letter?
4  MR. KENISON-MARVIN: Objection. Vague.
5  THE WITNESS: Well --
6  MR. KAHNE: You can answer.
7  THE WITNESS: In the summer, there was no --
8  there was no possible violation of the code of conduct.
9  After the bill was passed, there was still no -- we
10  still didn't have an interest because we didn't
11  investigate HB 2.
12  So before the day of -- what is it called?
13  The day of action? So there was no HB 2 on the day --
14  on the day of action, so there wouldn't have been any
15  violation of anything. And nothing changed at the date
16  of this email.
17  BY MR. KAHNE:
18  Q.  But do you read this email as saying that Chris Bond
19  and Ms. Fenton did not have an interest in the
20  allegations because it's an HB 2 investigation?
21  MR. KENISON-MARVIN: Objection. Vague and
22  compound.
23  BY MR. KAHNE:
24  Q.  Where does it say that here?
25  A.  That's the -- that's what I -- that was the intent of

**83**

1  my email.
2  Q.  It looks like -- to me, it looks like the timing of the
3  signing of the pledge is the reason for not
4  investigating. Do you disagree with that?
5  A.  No, I disagree with that. There are two things that
6  are at play: One, the initial reports came to us and
7  there was no HB 2, so how could there be a violation of
8  HB 2 if there was none?
9  Second, there's new allegations with this letter
10  that was republished or reprinted, and nothing had
11  changed. There was still no Department of Education
12  interest in the case.
13  So one was there was no HB 2. Second one was we
14  still don't have an interest. There's no code of
15  conduct interest here.
16  Q.  Do you know whether the -- did the DOE refer this to
17  HRC?
18  A.  No.
19  Q.  They did not?
20  A.  We can't.
21  Q.  Why can't you?
22  A.  We were told that we didn't have standing to file with
23  HRC; that individuals would have standing, but we did
24  not.
25  Q.  Who told you that?

**84**

1  A.  Attorney Fenton told me that that was the response she
2  got, and that's what we do.
3  Q.  To your knowledge, is there a writing that reflects
4  that the DOE cannot refer matters to the HRC?
5  A.  You'd have to ask Diana Fenton.
6  Q.  Have you ever seen a writing?
7  A.  Again, you'd have to ask Diana. My understanding is
8  very simple.
9  Q.  What is your understanding?
10  A.  We don't -- we don't refer to HRC.
11  Q.  Why wasn't No Left Turn told to file a complaint with
12  the Department of Justice or HRC?
13  A.  Not my job. You'd have to ask Diana.
14  Q.  Aren't there occasions where you tell complainants that
15  the proper way to file a complaint is with the HRC?
16  A.  Yes. Individual parents.
17  Q.  Okay. So individual parents you tell that the
18  proper -- that they should file a complaint with the
19  HRC, but No Left Turn is different than that?
20  A.  They're not an individual parent with standing.
21  They're an entity. So I left it with Diana Fenton and
22  the legal team. There's no —
23  Q.  I'm trying to understand the process here as to how you
24  decide to direct somebody to HRC versus not -- just not
25  conducting an investigation. How does that happen?

85

1  A.  I don't know what that question means.
2  Q.  In certain instances, a complaint comes in and the
3     Department of Education refers that complainant to the
4     HRC, right?
5  A.  Okay.  That has happened.
6  Q.  In other instances, they do not?
7  A.  That has also not happened.
8  Q.  Why -- why do you or do you not refer a complainant to
9     HRC?
10 A.  You'd have to ask Attorney Fenton.
11 Q.  You have no role in that decision?
12 A.  She's the decider.  She is my boss.  I provide her the
13    information.  She turns around and makes the decision
14    and we go with what her decision is.
15 Q.  Does the commissioner have any role in that decision?
16 A.  Once again, you'd have to ask Diana Fenton.
17 Q.  I'd have to ask Diana Fenton if the commissioner has a
18    role?
19 A.  Yes.
20 Q.  To your knowledge, does the commissioner have a role in
21    referring complainants to HRC?
22 A.  Himself?
23 Q.  Yeah.
24 A.  I have no idea.
25 Q.  When a complaint comes in, how do you decide whether or

86

1     not it implicates HB 2?
2        MR. KENISON-MARVIN:  Objection.  Vague.
3        THE WITNESS:  Ask the question again, please.
4     BY MR. KAHNE:
5  Q.  When a complaint comes in, how do you decide whether
6     the complaint concerns a potential violation of HB 2?
7  A.  You listen to the complainant and determine what the
8     complaint is.  And if it falls in that realm, I would
9     then pass it off to Attorney Fenton and say, "Here we
10    have a complainant.  I think this is HB 2.  What's your
11    position?"  And that's where we go.
12 Q.  Do you do any investigation to see whether or not it
13    concerns HB 2?
14 A.  Well, if it's anything remotely associated with the
15    provisions of HB 2, I immediately send it over to my
16    supervisor.  A decision is made to refer the parent
17    elsewhere, I think.
18 Q.  What do you mean, "I think"?
19 A.  That's my general recollection of how the process
20    works.
21 Q.  Let me show you a document which is 29.
22       (Exhibit 29 marked for identification.)
23    BY MR. KAHNE:
24 Q.  Do you recall this email exchange?
25 A.  Yes.

87

1  Q.  Okay.  This appears to be an email that you received
2     from Karlyn Borysenko dated August 24th, '22, and
3     appears to relate to a complaint that she filed or that
4     she was seeking to file.  Do you agree with that?
5  A.  The entire thing is not here.
6  Q.  But what do you recall about receiving information from
7     Karlyn Borysenko of Actively Unwoke?
8        MR. KENISON-MARVIN:  Based on the witness's
9     testimony, I will object to 106 and completeness to the
10    extent the email is not here, but you can answer.
11       THE WITNESS:  So the complaint itself isn't
12    here, so I would assume that it's an HB 2-related
13    complaint, and this is my response to her, and then her
14    unhappiness with her response to me.
15    BY MR. KAHNE:
16 Q.  Do you recall this complaint?
17 A.  I honestly -- I don't recall the complaint.
18 Q.  I want to direct your attention to -- you say in the
19    one, two, three, four, five, six -- "This agency
20    reviews the license status of New Hampshire educators.
21    The current complaint does not allege the violation of
22    any portion of the code of conduct by individual
23    educators within SAU 16."
24       Do you see that?
25 A.  I do.

88

1  Q.  And then she provided the names of specific educators,
2     right?
3  A.  She did.
4  Q.  Okay.  And were you saying that the reason for not
5     reviewing this was because individuals had not been
6     named?
7  A.  No, I'm saying it's -- I'm not investigating it because
8     it's outside of my jurisdiction.  It's an HB 2 issue.
9     And I gave her recourse to contact the Human Rights
10    Commission.
11 Q.  On the bottom, it says, "Commissioner Edelblut has
12    forwarded your inquiry directly to Ahni Malachi on
13    August 19th, 2022, for her review."
14       Do you see that?
15 A.  I do.
16 Q.  Do you recall Commissioner Edelblut forwarding this
17    complaint directly to the commissioner of the HRC?
18 A.  If I wrote that he did, then he did.
19 Q.  And has he done that before?
20 A.  I don't remember.
21 Q.  Is that the protocol for the commissioner to forward
22    directly to the HRC?
23 A.  Commissioner does what the commissioner wants to do.
24    I'm not his boss.
25 Q.  But can he do anything he wants, or is there a protocol

**89**

1  in place for these complaints to be --
2  **A.  You'd have to ask the commissioner.**
3  Q.  Did you have any conversations with the commissioner
4  about Actively Unwoke?
5  **A.  I don't recall whether I did or did not.**
6  Q.  Anything that would refresh your recollection as to
7  whether you had a conversation with him about that?
8  **A.  What does that mean?**
9  Q.  Are there any -- sitting here today, you do not
10  remember.  Is there anything I could show you?
11  **A.  Sure.  If you have something, show it to me, but I**
12  **don't recall.**
13  Q.  Does the commissioner typically receive direct emails
14  from parents?
15  **A.  Yes.**
16  Q.  And does he respond to them directly?
17  **A.  Sometimes.**
18  Q.  And does sometimes he forward emails he receives to
19  you?
20  **A.  Yes.**
21  Q.  What types of emails does he forward to you from
22  parents?
23  **A.  Any number of unhappy parents filing complaints about a**
24  **school district or an individual employee or a policy.**
25  **He gets a lot of stuff, and that -- those**

**90**

1  **communications, he sends them to me.  He sends them to**
2  **Diana Fenton.  He sent them to Chris Bond when he was**
3  **here.  He sent them to Attorney Brown when she was**
4  **here.**
5  Q.  Do you know how he decides whether to send an email to
6  you?
7  **A.  I have no idea.**
8  Q.  Or to Commissioner Malachi?
9  **A.  I have absolutely no idea how he decides, what he**
10  **decides, or what his thought process is.**
11  Q.  Is there -- do you know of a procedure in place for how
12  he triages those complaints from parents?
13  **A.  I have no idea.  You'd have to ask him.**
14  Q.  We looked earlier at a technical advisory that had a
15  series of numbers.  Do you know why that was issued?
16  **A.  Which one?**
17  Q.  The -- it was attached to your presentation.
18  **A.  The FAQs?**
19  Q.  Yeah, the FAQs.  Why was that issued?
20  **A.  You'd have -- that was issued by the Department of**
21  **Justice, correct?**
22  Q.  Well, that's a good question, because it looks like it
23  says it's issued by the Department of Education, the
24  Commission for Human Rights, and the Department of
25  Justice?

**91**

1  **A.  You'd have to ask who wrote it.  I have no idea who**
2  **wrote it.  None whatsoever.**
3  Q.  Do you have an understanding of whether it's a
4  Department of Education document?
5  **A.  I don't.  I thought it was a Department of Justice**
6  **document.  That was my understanding.  I could very**
7  **well be wrong, but I don't know who wrote it.  I just**
8  **know that it's there.**
9  Q.  And do you know what the impetus for that document
10  was?
11  **A.  You'd have to ask the people that wrote it.  I can only**
12  **speculate.**
13  Q.  Fair to say that there needed to be clarification as to
14  HB 2?
15      MR. KENISON-MARVIN:  Objection.  Vague.
16      THE WITNESS:  Again, you'd have to ask the
17  people that wrote it.
18  BY MR. KAHNE:
19  Q.  So on the email that I was showing you, the Actively
20  Unwoke one, it says, "Pursuant" -- the second line
21  says, "Pursuant to guidance from the Office of the
22  Attorney General, Department of Justice, this complaint
23  should first be reviewed by the Human Rights
24  Commission, HRC."
25      Do you see that?

**92**

1  **A.  I do.**
2  Q.  What guidance were you talking about?
3  **A.  I would imagine the FAQs, as well as Attorney Fenton,**
4  **Attorney Chris Bond.**
5  Q.  Well, but you're saying "pursuant to guidance from the
6  Office of the Attorney General."  I'm just trying to
7  understand, is it the FAQ?
8  **A.  I would imagine it's a combination of the FAQ and**
9  **attorney -- Assistant Attorney General Chris Bond and**
10  **Attorney Fenton.**
11  Q.  But when we looked at the FAQ, we didn't see anything
12  that said a complaint couldn't be filed with the --
13  could or couldn't be filed with the DOE?
14  **A.  That's it.  Correct.**
15  Q.  That's correct?
16  **A.  Yeah.**
17  Q.  Here's another.
18      MR. KAHNE:  What document are we up to?
19      THE REPORTER:  30.
20      (Exhibit 30 marked for identification.)
21  BY MR. KAHNE:
22  Q.  Have you had a chance to review this?
23  **A.  I just did, yeah.**
24      MR. KENISON-MARVIN:  Can I have it?
25      MR. BISSONNETTE:  Oh, I'm sorry.

**93**

1           MR. KENISON-MARVIN:  That's okay.
2      BY MR. KAHNE:
3      Q.  On Exhibit 30 appears to be an email dated -- starts
4          with an email dated Friday, September 17th, 2021.  It
5          is from -- it says it's from a Plaistow resident.  Am I
6          saying that right?
7      A.  Plaistow, yeah.
8      Q.  Plaistow resident who removed both of his kids from the
9          school district "because of indoctrination and other
10         problems happening in the Timberlane district.  There
11         are many problems swept under the rug and not much
12         accountability.  Many times emails and complaints go
13         nowhere."
14             Do you see that?
15     A.  I do.
16     Q.  And then the commissioner responds directly, right?
17     A.  Yes.
18     Q.  And you say the commissioner does that a fair amount?
19     A.  He does.
20     Q.  He says, "Any time we receive a complaint, we take it
21         very seriously and conduct an investigation where
22         warranted and within our scope of jurisdiction."
23             Do you see that?
24     A.  I do.
25     Q.  He says, "When we have a finding, we take appropriate

**94**

1          action against an educator's license.  That action
2          ranges from reprimand to suspension to revocation.
3          Under the new anti-discrimination law, we will also
4          investigate and take investigation although that also
5          falls under the Human Rights Commission as the first
6          line of intervention."
7              Do you see that?
8      A.  I do.
9      Q.  So he's saying -- do you understand him to be saying
10         that the DOE is also going to be investigating and
11         taking action under the new anti-discrimination law?
12     A.  You'd really have to ask Frank.
13     Q.  Okay.  But then it gets forwarded to you by Stephen
14         Berwick, and he says, "Heads-up my, friend.  May come
15         your way"?
16     A.  Yes.
17     Q.  Why would he have said that?
18     A.  I've got to know who Stephen Berwick is.
19     Q.  Okay.  So tell me who Stephen Berwick is.
20     A.  Stephen is -- he was wears many hats and he deals with
21         a lot of complaints.  A lot of complaints come his way.
22         He does a lot of stuff with bullying, things like that.
23         And he got the cc and sent it to me.
24     Q.  But your testimony previously was that HB 2 is not
25         your -- not your -- you don't do any investigations

**95**

1          related to HB 2?
2      A.  I do not.
3      Q.  So why would Stephen Berwick, on this complaint, which
4          is plainly HB 2-related, say, "Head's-up, my friend.
5          May come your way"?
6      A.  Well, I don't know that it's -- I don't know that it's
7          all only about HB 2.  If you read the original email --
8          and I bet you there's more than just this original
9          email, but read it carefully.
10             He says, "Both of my kids are" -- "I removed my
11         kids from school because of indoctrination and other
12         problems happening in the district.  There are many
13         problems swept under the rug and not much
14         accountability."
15             That tells me he's talking about more than one
16         thing.  He went to Berwick.  Berwick sent it to me
17         saying, "Hey, this might come your way."
18             He -- this person who was writing the email has
19         said multiple things in two sentences, or three.  So to
20         say that's all HB 2 related is a slanted view of
21         what he wrote.  He's talking about different things.
22         And Berwick looked at it and said, "Hey, this may come
23         your way."
24     Q.  Heads-up?
25     A.  Yeah.

**96**

1      Q.  But it's possible that there was a component of this
2          complaint that was related to HB 2, right?
3      A.  Sure.
4      Q.  Okay.  And that could get forwarded to you to
5          investigate?
6      A.  No.  It could get forwarded to me, and I'm not
7          investigating it.  I go to Attorney Fenton.  I say,
8          "Look, this is HB 2.  I'm not doing this."
9              But, in this instance, there were other things.
10         This is just one email in a vacuum.  What else was he
11         talking about?  I don't know.
12             And read -- if you want to read that three-line --
13         that three-line paragraph, you can read it your way
14         that it's all about HB 2, or you can read it my way,
15         that there's more than one thing happening here.
16     Q.  Okay.  But it does seem like, would you agree with me,
17         that the commissioner is saying under the new
18         discrimination law, we will investigate and take
19         action, although that also falls under the Human Rights
20         Commission?
21     A.  First -- first, I'm not going to agree with you at all
22         because we have different visions of what was just read
23         to us.  That's number one.
24             Number two, ask the commissioner.
25     Q.  I'm just -- I just want to understand what your -- if

Transcript of Richard Farrell
Conducted on May 18, 2023

**97**

1    you -- what you believe the commissioner's position to
2    be.
3  A.  **Ask him.**
4  Q.  I will.  We will.  We certainly will.
5  A.  **I can't --**
6  Q.  But have you had conversations with the commissioner
7    about investigating complaints related to HB 2?  Any
8    conversations at all?
9  A.  **The conversations that I've had with him and with**
10   **Attorney Fenton and Attorney Bond and now Attorney**
11   **Brown is that we don't investigate.  It goes to the**
12   **Human Rights Commission or the Department of Justice.**
13   **Period.**
14 Q.  And what did the commissioner say to you in response to
15   that?
16 A.  **I have no idea.**
17 Q.  You don't have any recollection of --
18 A.  **I don't.**
19 Q.  -- specific conversations you've had with him?
20 A.  **I really don't.  I know what my position is and what I**
21   **believe my job is.**
22 Q.  Did the commissioner ever ask you to collect
23   information for an op-ed that he was writing?
24 A.  **I -- no.  I didn't even know he wrote an op-ed.  I**
25   **don't -- I don't pay a lot of attention to some of that**

**98**

1    **stuff.  If he did, and it was sent to me, I probably**
2    **read it.  But in terms of providing him stuff...**
3  Q.  Let's do Exhibit 18.
4        MR. KENISON-MARVIN:  Can we do this one, take
5    a break after this?
6        MR. KAHNE:  After this one, sure.
7        THE WITNESS:  Okay.  So, unfortunately, I'm
8    completely challenged here.
9    BY MR. KAHNE:
10 Q.  With the size of the type?
11 A.  **I can't read it.  I mean, if you have a magnifying**
12   **glass or something, or maybe blow it up?**
13 Q.  I'll read --
14 A.  **Or you can read it.**
15 Q.  I'll read it to you.
16 A.  **Okay.  Thanks.**
17 Q.  So, if you look at the bottom, if you go to the second
18   page of this, which is DOE10287, there's an email from
19   ████████  The subject line is "Londonberry
20   (sic)."  It says -- and it's to the commissioner.
21   "Good evening.  This was brought to my attention
22   today.  A human relations teacher at the Londonberry
23   High School gave these worksheets out to students.  Is
24   this allowed?"
25       Do you see that?

**99**

1  A.  **I believe you.**
2  Q.  Okay.
3  A.  **I can't read it.**
4        MR. KENISON-MARVIN:  One, he can't read it.
5    And this -- I would make a completeness 106 objection
6    to the extent we need to take a break to blow this up
7    so he can see it.  If he can't see it, I think it's not
8    completely in front of him, practically, and he's
9    entitled to have the whole thing in front of him and
10   look at it when you're presenting it to him.  So we
11   might need to take a break and figure out a way to get
12   this in the size and font that he can see it --
13       MR. KAHNE:  Okay.
14       MR. KENISON-MARVIN:  -- if you want to ask
15   questions about it.
16       MR. KAHNE:  That's fine.  Do you want to take
17   a break and try to blow it up?
18       MS. MILBURN:  I can blow it up on the
19   computer.
20       MR. KAHNE:  But we need to print it out, too,
21   right?
22       MR. KENISON-MARVIN:  I'm wondering if there's
23   a way to project it, if we could do a projection
24   format, or some way so that he can see it.  Otherwise,
25   I think it's unfair to ask him questions about it.

**100**

1        MR. KAHNE:  Can we pull up it on a computer
2    and zoom in?
3        MR. KENISON-MARVIN:  As long as he can read
4    it.
5        THE WITNESS:  As long as I can read it.
6    That's fine.
7        MR. KENISON-MARVIN:  Do you want to use mine?
8        MS. MILBURN:  I can blow it up.
9        THE WITNESS:  I'm sorry, the 65-year-old eyes
10   are --
11       MR. KAHNE:  You don't have to apologize.
12       MR. BISSONNETTE:  I've got the same issue.
13       MR. KENISON-MARVIN:  Now I'm confused where
14   we left things.  Is Gilles doing something with respect
15   to this?
16       MS. MILBURN:  I think he may have went to the
17   bathroom.
18       MR. KENISON-MARVIN:  I have to go to the
19   bathroom.
20       MR. KAHNE:  Yeah, sure.
21       (Recess taken.)
22   BY MR. KAHNE:
23 Q.  Mr. Farrell, before we get into that, and I do want you
24   to look at that exhibit -- in prior exhibits, you have
25   said that certain complaints that have come in have

Transcript of Richard Farrell
Conducted on May 18, 2023

---

101

1  included both HB 2 content and other content, right?
2  A. Yes, yes.
3  Q. And so that happens from time to time, right, that a
4     complaint comes in and it doesn't just have a safety
5     issue. It doesn't just have an HB 2 issue; it can be
6     combined, right?
7  A. It can.
8  Q. Okay. If that happens, do you investigate the entire
9     file, or do you somehow wall off the HB 2 aspects of
10    the investigation?
11 A. I'll either do one of two things: I'll either refer
12    the entire matter to the Human Rights Commission, or
13    I'll wall off the additional misconduct allegation.
14    It's really hard to do that because the parent, or the
15    complainant, it just weaves in and out, and it's very
16    hard.
17       So, generally speaking, I will refer the entire
18    matter. And then once HRC is finished, we'll come back
19    and look at whether or not there's still an existing
20    child safety or code of conduct violation.
21 Q. Has that happened before, or you're just saying this is
22    how you would do it?
23 A. It's only one time that I can recall we did it, and we
24    sent the whole thing to HRC, and then it came back to
25    us, and then we looked at only the minimal piece of the

102

1     educator misconduct.
2  Q. That was not related to HB 2?
3  A. Correct.
4  Q. Is there any protocols in place for how you sort of
5     segregate one versus the other?
6  A. That was a unique circumstance. There's no protocol.
7     And I would run it by Attorney Fenton for her approval
8     to determine which way we're going to go.
9        So we'd take the facts, review, send it to —
10    bring it to her, determine which way we're going to go,
11    whether we send the whole thing off or piecemeal it.
12 Q. And is Attorney Fenton the sole decider as to whether
13    something touches HB 2?
14       MR. KENISON-MARVIN: Objection. Vague. You
15    can answer.
16       THE WITNESS: Really, you'd have to ask Diana
17    that. I take the complaints. I'm the
18    boots-on-the-ground guy. I take the complaints, get
19    the facts, review with her. What she does with them,
20    how she does it, who else she speaks to, you'll have to
21    ask her.
22 BY MR. KAHNE:
23 Q. Well, let's look at 18 then.
24 A. Okay. 18.
25 Q. And before we do that, you said there was — I'm going

103

1     to call it a hybrid complaint with both HB 2 and
2     other -- and other concerns, code of conduct concerns.
3     What district was that from?
4  A. I think -- and, again, it's a recollection, but I
5     thought it was Exeter.
6  Q. Exeter. Okay.
7  A. I think.
8  Q. Okay. Turning to Exhibit 18 which I've been -- I'm
9     told is regarding Londonderry. I had mispronounced it
10    before. If you look at the second page, which is DOE
11    10287?
12       MR. KENISON-MARVIN: Let me add, let the
13    record reflect he's viewing this on the monitor and not
14    the marked exhibit.
15       We pressed a button and it's now bringing up
16    a URL, so we might need a little --
17       MS. MILBURN: Here, let me try.
18       MR. KENISON-MARVIN: The mouse would be
19    better. We can go to the mouse for more precision.
20       THE WITNESS: Yeah, let's use the mouse.
21       MS. MILBURN: Hopefully that works.
22       THE WITNESS: Okay. Where am I looking?
23 BY MR. KAHNE:
24 Q. So go to the -- I mean, the first email in the chain
25    appears to be dated April 4th, 2022, from ▮▮▮▮

104

1     ▮▮▮▮ to Frank Edelblut. Do you see that?
2  A. I'm looking. April 4th?
3  Q. Yeah.
4  A. ▮▮▮▮▮▮ to Frank Edelblut on the 4th.
5  Q. It says, "Good evening."
6  A. Yes.
7  Q. It says, "Good evening. This was brought to my
8     attention today. A human relations teacher at the
9     Londonderry High School gave these worksheets out to
10    students. Is this allowed?"
11       Do you see that?
12 A. I do.
13 Q. Okay. And if you keep going, it looks like she
14    attaches the worksheets that the human relations
15    teacher at Londonderry High School distributed.
16 A. Yes.
17 Q. Okay. And there's Diversity Bingo and there's another
18    worksheet on sexual orientation, national origin. Do
19    you see that?
20 A. I do.
21 Q. So it appears as though the commissioner is receiving
22    this complaint from a parent, right?
23 A. Yes.
24 Q. Okay. And then the commissioner forwards it on to
25    Diana Fenton, right?

Transcript of Richard Farrell
Conducted on May 18, 2023

---

105

1  A.  Let me see.  Okay.  "Attorney Fenton, can you look into
2      this?"
3  Q.  Before you even get there, the commissioner is sending
4      it to Diana Fenton?
5  A.  Yes.
6  Q.  He just forwards it.  No email.  Then Diana sends it to
7      you and says, "Can you look into this?"
8      So the first question I have for you is why did
9      Attorney Fenton ask you to look into this if it just
10     concerns a human relation teacher's worksheets in
11     Londonderry?
12 A.  Okay.  Now, again, this is my guess is that this
13     wasn't -- Diana made a triage decision that it wasn't
14     an HB 2 matter, but, rather, what's called a
15     nonacademic survey matter, which there's a nonacademic
16     survey statute in New Hampshire.
17     So my guess is, and my recollection of this case
18     is, that it was deemed not to be a House Bill 2 issue,
19     but, rather, a nonacademic survey, which has
20     requirements within a nonacademic -- I'm sorry,
21     nonacademic survey that talk about parental opt-outs --
22     I'm sorry, parental opt-in notification of the content,
23     and permission slips, per se.
24     That's my guess, that she made that decision that
25     it was not an HB 2 matter, but, rather, a matter

106

1      falling under nonacademic surveys.  That's what I'm
2      remembering.
3  Q.  So nonacademic surveys you're saying has to do with
4      whether parents can opt out of curricular --
5  A.  Opt in.
6  Q.  Opt in, or whether they're required to get parental
7      opt-ins for certain material; is that right?
8  A.  That's the only thing that makes sense, because she --
9      that's my recollection that this was.
10 Q.  But there --
11 A.  This was -- this had nothing to do with House Bill 2.
12     It had more to do with nonacademic surveys.  And that's
13     just my remembrance.  I could be totally wrong.  Again,
14     you'd have to ask Diana that, but that's my
15     recollection.
16 Q.  Okay.  There could be a lot of overlap, though,
17     couldn't there, between these nonacademic surveys and
18     what's covered by HB 2?
19     MR. KENISON-MARVIN:  Objection.  Vague.  You
20     can answer.
21     BY MR. KAHNE:
22 Q.  So material that you're saying is -- this material,
23     which you're not sure may have to do with the opt-out
24     or opt-in of a parent, concerns educational materials,
25     right?  Curricular materials?  Isn't it the case that

---

107

1      HB 2 also covers curricular materials?
2      MR. KENISON-MARVIN:  Objection.  Compound.
3      THE WITNESS:  My answer is based on the
4      emails and her -- what you asked me, why would she send
5      it to me?  That's the only logical explanation for me.
6      BY MR. KAHNE:
7  Q.  Aside from Londonderry, now -- because you've raised
8      this opt-in issue that I was not aware of previously.
9      I'm curious as to whether there would be overlap
10     between the opt-in issue and the HB 2 prohibitions?
11 A.  No, because one has to do with nonacademic survey.  The
12     rest would be totally separate from that.
13 Q.  Okay.  But if you look here -- well, first, it does
14     look like you investigated this, right?  That you --
15 A.  You'd have to -- let me finish.
16 Q.  It looks like in the next one you contacted the
17     superintendent, Scott Laliberte?
18 A.  Laliberte.
19 Q.  Laliberte, right?  And you say -- you're asking about
20     ████████████  "Is she on your radar?"  What did you
21     mean by that?
22 A.  Is this educator someone that you've dealt with before?
23 Q.  Well, it's not an educator, right?  ████████████  is
24     a --
25 A.  That's what I don't --

108

1  Q.  Is a parent?
2  A.  I don't recall.  Okay.
3  Q.  So do you remember this now?
4  A.  I remember talking to Laliberte.  I remember that it
5      was determined to be a survey issue, and not House Bill
6      2.  I sent it to the commissioner to review Laliberty's
7      response.  Again, he talks about opt-in content.
8  Q.  But you see at the -- Scott Laliberte, on April 7th,
9      "reviewed the material through the lens of the new
10     divisive concepts law and find that the subject of
11     these activities do not apply," right?
12 A.  Well, that's what his response was.
13 Q.  Right, and so he was looking -- he was also looking at
14     the material through the lens of HB 2, right?
15 A.  That's what he was looking at.
16 Q.  Okay.  And then you got that response, and then you
17     forwarded it to the commissioner?
18 A.  Correct.
19 Q.  And then you discussed that at your next meeting, which
20     presumably is the educator misconduct meeting?
21 A.  Correct.
22 Q.  And so you discussed this material that's attached,
23     which is about Diversity Bingo and "identities that you
24     most often associate with."  You discussed that at an
25     educator misconduct meeting with the commissioner?

109

1  A.  No, I didn't discuss the content.  I discussed strictly
2     looking at the opt-out/opt-in content.  I would say the
3     content of the material may not match the relatively
4     benign syllabus.
5        So I wasn't looking at HB 2 there, nor was -- nor
6     was -- that was my intent.  We met at the educator
7     misconduct meeting, and the topic was not HB 2; it was
8     nonacademic surveys and parental opt-in.
9  Q.  But did you review the material itself?
10  A.  I reviewed the -- what I reviewed wasn't necessarily
11     the material.  What I reviewed was whether or not the
12     policy -- I'm sorry, the statute was followed regarding
13     parental review and parental opt-in.
14  Q.  Did anybody else in the meeting review this course
15     material?
16  A.  I think the commissioner, Attorney Fenton, and the
17     deputy -- whoever was there reviewed the material, not
18     under the guise of HB 2, but under the guise of was
19     this an academic or nonacademic survey, and were
20     parents offered the opt-out -- I'm sorry, the opt-in
21     provision, and were they notified?  And that's the
22     extent of my involvement in this case.
23  Q.  Do you know whether or not this material made its way
24     to any op-ed that the commissioner published with
25     material that he found objectionable?

110

1  A.  I remember the op-ed you're talking about, and it was
2     about Londonderry, but I don't know that it was about
3     this.  I'm not sure.  I think -- you may be conflating
4     some other issues.
5  Q.  So if you want to take a look at Exhibit 14?
6        THE WITNESS:  Do you have it?
7        MR. KENISON-MARVIN:  I do.
8        THE WITNESS:  Are we done with the emails?
9        MR. KAHNE:  I would keep that up.
10        THE WITNESS:  Thanks.
11     BY MR. KAHNE:
12  Q.  Before we get there, that opt-in -- opt-out/opt-in
13     context, is that a provision of the code of conduct?
14  A.  It is a statute, and it's -- it has been deemed to be a
15     possible violation of the code of conduct.
16  Q.  So a violation of the opt-in/opt-out statute is
17     considered a violation of the code of conduct?
18  A.  Possibly.
19        MR. KENISON-MARVIN:  Objection.  Calls for a
20     legal conclusion.
21     BY MR. KAHNE:
22  Q.  It could possibly be?
23  A.  Yeah.
24  Q.  Same way a violation of HB 2 could be a violation of
25     the code of conduct?

111

1        MR. KENISON-MARVIN:  Same objection.
2        THE WITNESS:  No.
3        MR. KAHNE:  You can answer.
4        THE WITNESS:  Two different things that are
5     apples and oranges.  HB 2 has a process that goes
6     through another filter that requires a finding before
7     it gets to us, whereas the opt-in provision is, in
8     itself, a violation of state law.
9     BY MR. KAHNE:
10  Q.  But the opt-in provision is a violation of state law.
11     The violation of HB 2 is a violation of state law?
12  A.  We don't know that at the outset.
13  Q.  Well, but that's just these procedures that have sort
14     of -- right?
15  A.  Well, procedures are important.
16  Q.  Okay.  But the only thing separating them, those two
17     things, is the technical advisory, or whatever other
18     procedures that are unwritten?
19        MR. KENISON-MARVIN:  Objection.  Vague and
20     calls for a legal conclusion.  Legal analysis.
21     BY MR. KAHNE:
22  Q.  You're reviewing opt-in, right, under the code of
23     conduct?
24  A.  Correct.
25  Q.  Because a violation of the opt-in is a violation of the

112

1     code of conduct?
2        MR. KENISON-MARVIN:  Same objection.
3     BY MR. KAHNE:
4  Q.  Can be?
5        MR. KENISON-MARVIN:  Legal analysis.
6        THE WITNESS:  It's possible that it's a
7     violation of the code of conduct.
8     BY MR. KAHNE:
9  Q.  Right.  And I'm just trying to understand.  The thing
10     that makes HB 2 different is this other procedure that
11     you're talking about?
12        MR. KENISON-MARVIN:  Same objection.
13     BY MR. KAHNE:
14  Q.  Right?
15  A.  I think there's a huge difference.
16  Q.  I'm not saying if it's big or small.  I'm just saying
17     that is the difference.
18  A.  Yeah.
19        MR. KENISON-MARVIN:  Same objection.
20     BY MR. KAHNE:
21  Q.  By the way, is a -- is a failure to report a violation
22     of HB 2 a violation of the code of conduct?
23        MR. KENISON-MARVIN:  Same objection.
24        THE WITNESS:  I don't know.
25     BY MR. KAHNE:

---

113

1  Q.  Could it be?
2        MR. KENISON-MARVIN:  Same objection.
3        THE WITNESS:  That's not my decision to make.
4  BY MR. KAHNE:
5  Q.  Well, whose decision --
6        MR. KENISON-MARVIN:  Same objection.
7        THE WITNESS:  I guess I'm not really
8    understanding the whole question, but any decision
9    would be made by my superiors, not by me.
10  BY MR. KAHNE:
11  Q.  Well, I'm not saying you personally.  I'm saying under
12    your understanding of the code of conduct, which
13    contains a duty to report provision, right, a failure
14    of a teacher to report a violation of HB 2 would be a
15    violation of the code of conduct, right?
16        MR. KENISON-MARVIN:  Same objection.
17        THE WITNESS:  I don't think I'm qualified to
18    answer that question.
19  BY MR. KAHNE:
20  Q.  Why not?
21  A.  It's a trap question, I think.
22  Q.  I'm not trying to trap you.
23  A.  Yeah, you are.
24      No, I honestly don't believe that I'm qualified to
25    answer that question.  A teacher -- you're asking me to

114

1    assume that a teacher, A, knows what the statute is;
2    and, B, that that said teacher understands the
3    statute.
4  Q.  Which is hard.
5  A.  And then knowingly fails to report.  That's a lot of
6    ifs.
7  Q.  And if all of those ifs line up --
8  A.  I just don't see it.  I don't see them all lining up.
9  Q.  Why couldn't they all line up?
10  A.  I've never seen it.
11  Q.  Is it because the statute is hard to understand?
12        MR. KENISON-MARVIN:  Same objection.
13        THE WITNESS:  I have no idea.  All I know is
14    that I've never seen it.
15  BY MR. KAHNE:
16  Q.  This op-ed, April 15th, 2022.  And if you look at -- if
17    you look back at Exhibit 18, that is April 7th, 2022.
18    So about eight days later, right?
19  A.  Okay.
20  Q.  Are you familiar with this op-ed written by the
21    commissioner about Education Sacred Trust?
22  A.  I'll have to read it.
23  Q.  Okay.
24  A.  Okay.
25  Q.  Okay.  So you've had a chance to read this?

---

115

1  A.  Mm-hm.
2  Q.  How would you characterize the content of this op-ed?
3    What is it about?
4        MR. KENISON-MARVIN:  Objection.  Vague.  You
5    can answer.  And compound.
6  BY MR. KAHNE:
7  Q.  What is this op-ed about, to you?
8  A.  My opinion?
9  Q.  Yes.
10  A.  I think he's talking about parental rights.
11  Q.  Where does it say he's talking about parental rights?
12  A.  I think that's what I just received from reading it.  I
13    think he's talking about parental rights.
14  Q.  If you look here at topic -- it's PL00696.
15  A.  Okay.
16  Q.  This appears to be part of -- the same email chain that
17    we looked at in Exhibit 18 is part of the topics that
18    are covered under Commissioner Edelblut's op-ed; isn't
19    that right?
20  A.  Say that again, please.
21  Q.  The email on 00696, the bottom one, is the same email
22    chain -- is from the same email chain as Exhibit 18?
23  A.  Okay.
24  Q.  So the superintendent, Scott Laliberte, found that the
25    material did not violate the divisive concepts law.  He

116

1    said, "We've reviewed this material through the new
2    divisive concepts law and find the subject of these
3    activities do not apply."  And yet the commissioner
4    included this in his op-ed, right?
5  A.  Where did he do that?
6  Q.  Well, if you keep looking, the human relations course
7    is -- the next couple of pages are the -- and if you
8    look at 7736, it's Diversity Bingo again, and
9    Identities You Think About Most Often, the same
10    material that was the subject of the complaint from
11    ███████████
12  A.  Okay.
13  Q.  Why did the commissioner include this in his op-ed, to
14    your knowledge?
15  A.  You would have to ask him.
16  Q.  Did he ask you to send materials to him for inclusion
17    in this op-ed?
18  A.  No.
19  Q.  He did this all on his own?  Do you know if he did this
20    all on his own?
21  A.  I don't know.  I honestly don't know.
22  Q.  It looks like he's including --
23        MR. KENISON-MARVIN:  I'm sorry, I'm confused
24    as to document numbers.  There's some in here that
25    don't have a Bates stamp, and there's some where the

**117**

1  Bates stamp has been crossed out at the end, so I'm not
2  able to keep up at the moment. 7736.
3      MR. KAHNE: 7736.
4      MR. KENISON-MARVIN: There's documents in
5  here that don't have a Bates stamp.
6      MR. KAHNE: They do. They're just on the
7  side.
8      MR. BISSONNETTE: It's either on the bottom
9  right or upper right.
10     MR. KENISON-MARVIN: Oh, here. And the two
11 that are at issue, sorry, 7736, and what was the other
12 one that you referenced?
13     MR. KAHNE: Oh. Well, 736, 737.
14     MR. KENISON-MARVIN: Okay.
15     MR. KAHNE: And then Mr. Farrell's email, 696
16 through 700.
17     MR. KENISON-MARVIN: I have those. Okay.
18 I'm good. Thank you.
19     BY MR. KAHNE:
20 Q.  You sent the -- you sent the human relations core
21     syllabus to the commissioner, right?
22 **A.  Where is that?**
23 Q.  That is at 00696 at the top, Richard Farrell to
24     Commissioner Edelblut.
25 **A.  So I sent him Laliberty's email, right?**

**118**

1  Q.  This looks like it's different from the email chain.
2      It looks like, "Please review" -- the attachment is
3      separate from Exhibit 18 when you say, "Please review
4      the responses from Londonderry."
5  **A.  But what is the attachment?**
6  Q.  The attachment is what comes after. It's the syllabus.
7  **A.  Okay. So it starts with the human relations?**
8  Q.  That's right.
9  **A.  Okay.**
10 Q.  And that occurred five days after --
11     MR. KENISON-MARVIN: I'll object just to the
12     extent, like, can you -- on foundation. Can you ask
13     him if that was the attachment?
14     MR. KAHNE: Okay, sure.
15     MR. KENISON-MARVIN: And we'll get some
16     foundation.
17     BY MR. KAHNE:
18 Q.  Is that an accurate reflection of what was attached to
19     your email, to your knowledge?
20 **A.  Perhaps.**
21 Q.  Perhaps? But this email to the commissioner comes
22     after Exhibit 18. It's April 12th, not April 7th. Do
23     you see that?
24 **A.  Okay.**
25 Q.  So my question is did the commissioner ask you to send

**119**

1      this material in connection with his preparation of the
2      op-ed?
3  **A.  I had no idea he was doing an op-ed.**
4  Q.  Do you have a recollection of him asking you to send
5      this in April?
6  **A.  No, I do not.**
7  Q.  Can you look through the topics here and see whether
8      any of the communications, including the text messages
9      that are here, were to or from you?
10 **A.  Where?**
11 Q.  In the attachments. In the attachments to Exhibit 14.
12     Attachments to the op-ed, Education Sacred Trust.
13     Topic one. Topic two.
14 **A.  Okay. So there's a screenshot.**
15 Q.  Where is that?
16 **A.  702.**
17 Q.  Yeah. "A friend has a 6th grader at"?
18 **A.  Yeah.**
19 Q.  Is that your phone?
20 **A.  No.**
21 Q.  Okay. Yes, so I'm asking you to review this document
22     to see whether any of this information came from you.
23     MR. KENISON-MARVIN: I still say that
24     question's vague.
25     BY MR. KAHNE:

**120**

1  Q.  None of this is your -- your phone -- your text
2      messages or anything?
3  **A.  I don't think. See, I don't have a State-issued phone,**
4     **so that cell phone number that you had was -- is my**
5     **personal cell phone number, so I try never to use my**
6     **personal cell phone for this stuff. And I honestly**
7     **don't know really what you're talking about.**
8  Q.  I'm just asking whether you provided any of these
9      materials to the commissioner in connection with his
10     authoring that op-ed.
11 **A.  Absolutely not.**
12 Q.  Okay.
13 **A.  If I -- if I provided anything, background information**
14    **regarding a complaint, possible, but did I -- I didn't**
15    **even know he wrote an op-ed until after the op-ed was**
16    **written, so I have no idea what you're talking about**
17    **there.**
18 Q.  Did you -- in the Londonderry complaint, do you recall
19     whether you sent the materials to the superintendent,
20     Scott Laliberte?
21 **A.  Laliberte?**
22 Q.  Laliberte.
23 **A.  What do you mean by that?**
24 Q.  So if you look at 18, at Exhibit 18 -- I'm jumping.
25     Sorry. So Thursday, April 7th, 2022, it says, "Good

Transcript of Richard Farrell
Conducted on May 18, 2023

---

**121**

1   morning, Rich." This is from Scott Laliberte?
2  **A.  What page number is that?**
3  Q.  It's the top page of the last email.  "We have had an
4   opportunity to review the material that you'd sent and
5   have the following information for you in response to
6   the inquiry."
7  **A.  Okay. Okay.**
8  Q.  So you sent the superintendent material, right?
9  **A.  Yeah. I sent him the material that was -- that I got**
10  **from -- that Ms.      provided, I think.**
11  Q.  So let me just understand the chain of events here.
12   Ms.     provides information to the commissioner?
13  **A.  Yes.**
14  Q.  The commissioner forwards it to Diana Fenton?
15  **A.  Yes.**
16  Q.  Diana Fenton forwards the information to you?
17  **A.  Yes.**
18  Q.  And you forward the information to a superintendent,
19   Scott Laliberte, right?
20  **A.  Yes.**
21  Q.  Who views the material, among other things, through the
22   lens of the divisive concepts law?
23  **A.  That's how he did it. I can't control that.**
24  Q.  But that is what happened, just as a matter of fact.
25  **A.  Okay.**

---

**122**

1  Q.  Okay. Yes. Okay.
2  **A.  Wait a minute now. I sent it to him and said, "Please**
3  **review," correct.**
4  Q.  Yeah, yeah.
5  **A.  Okay. So I didn't say, "Please review under HB 2," or**
6  **anything else. He reviewed it under his own guise. I**
7  **reviewed it under something else.**
8  Q.  All I'm saying is that the superintendent reviewed the
9   material that you had sent to him under the lens, in
10   his words, of the new divisive concepts law?
11  **A.  Well, that's his interpretation of what I sent.**
12  Q.  But he did that?
13  **A.  Yes, that's fine.**
14  Q.  Did you talk on the phone with him about this?
15  **A.  Probably, yeah.**
16  Q.  Okay. So you had conversations with him before sending
17   him the material?
18  **A.  No. No. I think I sent him -- what I traditionally**
19  **do, will send an email to the superintendent and say,**
20  **"Please review attached and give me a call," and then**
21  **we have communications or additional emails.**
22  Q.  Okay. So what do you remember about your conversation
23   with Scott Laliberte?
24  **A.  I don't.**
25  Q.  Nothing?

---

**123**

1  **A.  No. We've talked a couple of times. I know he**
2  **reviewed the material. He had his position. We**
3  **didn't -- I mean, I didn't do anything with the**
4  **material in terms of educator misconduct. I provided**
5  **it to him, talked to him about it, got additional**
6  **information, I think, and then we met and discussed the**
7  **matter with Attorney Fenton.**
8  Q.  Why wasn't this referred to the HRC?
9  **A.  As I said before, the view from our -- our vantage**
10  **point was this was about a survey issue under the**
11  **statute regarding nonacademic surveys, and not House**
12  **Bill 2.**
13  Q.  Yeah, I just want to understand the nonacademic
14   surveys. Explain what that means again.
15  **A.  So if a teacher asks questions, or questionnaires, or**
16  **surveys of students, and, in this case, there was the**
17  **divisive concept ring and then there were questions,**
18  **like a Bingo sheet where questions were asked, the**
19  **determination was that that was potentially a**
20  **nonacademic survey as opposed to an HB 2 issue. So**
21  **that was my lens. What Laliberte looked at is -- you'd**
22  **have to ask Laliberte what his lens was.**
23  Q.  This -- how does something become a survey or not? How
24   is it a survey or not a survey?
25  **A.  Which is, again, why you conduct an investigation to**

---

**124**

1  **determine if it's a survey. Does it fall within the**
2  **statute? Was there an opt-in? Was there a syllabus?**
3  **Parents know what was being distributed? Those are the**
4  **kinds of questions that we would ask.**
5  Q.  And so it seems as though Laliberte was viewing this as
6   a survey that touched on HB 2 topics?
7  **A.  That is up -- that's his --**
8  Q.  Yes?
9  **A.  -- vision. I have no control over that. My vision and**
10  **my lens was strictly not HB 2. My lens was did the**
11  **teacher engage in a nonacademic survey? And, if so,**
12  **did it violate the statute? That's the sole lens that**
13  **I had.**
14  Q.  And did you make that threshold determination?
15  **A.  I don't make that threshold determination. We work it**
16  **through Attorney Fenton. She makes the determination.**
17  **As you can see, there was "Let's talk about this at our**
18  **next meeting."**
19  **    I don't recall -- I don't believe anything**
20  **happened in terms of sanctions at all.**
21  Q.  Have you been asked to investigate any complaints
22   relating to books being taught in a classroom?
23  **A.  Have I been asked to investigate books being taught?**
24  Q.  Have you been asked to look into further books --
25   certain books being taught in a classroom?

125

1  A.  Well, we've had complaints by parents, in particular,
2      that object to certain books being used in school
3      libraries and school -- and schools, and in
4      classrooms.
5  Q.  And what do you do with those complaints?
6  A.  I immediately run to Diana Fenton and say, "Hey, we
7      have this complaint," and "What do you want do?"
8  Q.  And has there been occasions where she says, "Look at
9      the book"?
10 A.  There's been occasions where it's "Look at the book."
11     There's been occasions where she's asked, "Can you see
12     if these books are there?  Can you determine if
13     it's" -- and it gets very complicated because it's not
14     just the book being in the library.  There's the --
15     there are other issues regarding electronic books and
16     electronic libraries.  So it gets very confusing.  And
17     parents are very creative when it comes to complaining
18     about the books.  So you have to -- you have to cut
19     through the nonsense and determine whether or not
20     there's actually a code of conduct violation.
21 Q.  Do you remember specific books that you've looked at?
22 A.  Sure.  There's -- the one that keeps popping up that
23     everybody likes to hate is Gender Queer.
24 Q.  And so there's a complaint about Gender Queer.  And you
25     look -- do you read the book?

126

1  A.  I've read the book, sure.
2  Q.  Okay.  And you read the book to see whether the
3      inclusion of that book violates the -- or providing
4      that book violates the code of conduct?
5  A.  No.  I read the book because I want to be educated as
6      to what the complaint is about, and then I will go over
7      and talk to Attorney Fenton about that.
8  Q.  Any other books that you remember?
9  A.  If you gave me a list, I could tell you.  There are
10     other books that have been -- people have complained
11     about.  But that's the one that seems to be the one
12     that people object to a lot.
13 Q.  How about A Good Kind of Trouble?
14 A.  Yeah, that.  That's been there.
15 Q.  So have you read that one?
16 A.  I have not.
17 Q.  But people have complained about that, and you've
18     gotten those complaints?
19 A.  Yes.
20 Q.  And have you spoken -- in connection with, you know,
21     let's say A Good Kind of Trouble, have you spoken with,
22     like, superintendents or principals or teachers as part
23     of your looking into it?
24     MR. KENISON-MARVIN:  Objection.  Vague.  You
25     can answer.

127

1      THE WITNESS:  If we get to the complaint
2  where we're doing triage, I might -- I don't talk to
3  teachers about this.  I go way above their pay grade
4  because teachers don't make policy decisions.  So I
5  would go to the superintendent.  I don't even talk to
6  the building principals.  I go right to the
7  superintendent and say, "Hey, we have a complaint from
8  a parent.  This is the book they're complaining about.
9  Is it in your library?"
10     So that's a fact-based inquiry.  I'm not
11 making a judgment one way or the other.  I'm just
12 gaining facts so I can then go to Attorney Fenton and
13 say, "Okay.  I contacted SAU whatever.  This is the
14 book that's been complained about.  The book is in the
15 library.  What do you want to do?"
16 BY MR. KAHNE:
17 Q.  And that's happened more than once?
18 A.  Oh, sure.
19 Q.  And it's happened for multiple books?
20 A.  Multiple books.  Multiple school districts.
21 Q.  And each time you go and you speak with the
22     superintendent about the book being where it was
23     complained of, something similar?
24 A.  Yeah.  You know, is it in the high school library?  Is
25     it the middle school library?  Is it in the elementary

128

1  school library?  Those have bearings.  You know, those
2  are important facts to know.  Or is it even in the
3  building at all?  And is it in the SORA app?
4      So it's a fact-based question.  Is it there?
5  Isn't it there?  Once I get the facts, I provide it to
6  Diana Fenton for her review.
7  Q.  And just in the stage of, you know, sort of from the
8      code of conduct, what you're describing is not a formal
9      investigation, but it's when a complaint -- a case has
10     been opened because of a complaint?
11 A.  It's even before the case has been opened.  I mean, so
12     a parent is angry and upset about a book being in a
13     library.  So let's collect the data and determine
14     whether or not we even go to the triage phase.
15 Q.  Okay.  Has that happened with the commissioner
16     forwarding material, too, like, where the commissioner
17     forwards not A Good Kind of Trouble, but a commissioner
18     forwards some material and you then, to the
19     superintendent, say, "Is this book in your library?"
20     That kind of thing?
21 A.  Sure.
22     MR. KENISON-MARVIN:  Objection.  Vague,
23     compound.  You can answer.
24     THE WITNESS:  Okay.  We get them -- the
25     commissioner could forward it.  I could get it from a

**129**

1   parent. We can get them from grandparents. I mean, we
2   get them from all sorts of different places. And
3   before you even do the triage phase of this, you
4   determine what are the facts? And the facts are
5   important. And once the facts are presented, the
6   decision is made to leave the -- not even leave the
7   inquiry phase; go to triage or open a case. And so
8   it's a multi-step process. And when it comes to books,
9   you just get the facts.
10  BY MR. KAHNE:
11  Q.   Two more things, and I think we can wrap for your
12  non-lunch. The first is I just want to show you the
13  code of conduct, which I'm sure you're familiar with.
14       Actually, I'm going to give you two documents.
15  One is the code of conduct, which has been marked
16  Exhibit 2, and the other is Attorney General Opinion
17  which has been marked Exhibit 12.
18       MR. KENISON-MARVIN: Can we bring the
19  computer back?
20       MR. KAHNE: Oh, yes. Sorry. Sorry.
21       MS. MILBURN: Thank you.
22       MR. KENISON-MARVIN: Thank you.
23  BY MR. KAHNE:
24  Q.   So on the code of conduct piece, I just want to
25  understand this opt-in -- the subject matter of opt-in

**130**

1   and how it relates to the code of conduct. Does the
2   code of conduct have a provision relating to opt-in?
3   **A.   Not specifically.**
4   Q.   So how is that within -- you've testified that your
5   jurisdiction is the code of conduct, so I'm trying to
6   understand how do we know that opt-in is part of the
7   code of conduct?
8   **A.   The statute -- there's a statutory requirement that**
9   **there be parental notification and an opt-in. If that**
10  **doesn't occur, then the determination by my superiors**
11  **is that it's a possible code of conduct violation.**
12  Q.   Which -- which provision of the code would that
13  violate?
14       MR. KENISON-MARVIN: Objection. Legal
15  conclusion.
16       THE WITNESS: Well, again, you'd have to ask
17  my superior that. I just -- my bottom line is that
18  I've been told if there is a question about opting into
19  a nonacademic survey, we will investigate it as a
20  possible code of conduct violation.
21  BY MR. KAHNE:
22  Q.   Where does that instruction come from?
23  **A.   From Attorney Fenton, my direct supervisor.**
24  Q.   Is there any writing about that?
25  **A.   What do you mean?**

**131**

1   Q.   Is there a policy that says if there's an issue
2   relating to opt-in -- there's a violation of opt-in,
3   such violation will be considered a violation of the
4   code of conduct?
5   **A.   There's nothing in writing that I'm aware of.**
6   Q.   Have you had any conversations with the commissioner
7   about investigating -- about opt-in being a violation
8   of the code of conduct?
9   **A.   Yes.**
10  Q.   And what are the nature of those conversations that you
11  had?
12  **A.   Just he would --**
13       MR. KENISON-MARVIN: Objection. Vague.
14       THE WITNESS: Oh, yeah.
15       MR. KENISON-MARVIN: Deliberative process
16  objection to the extent it's asking for specifics about
17  deliberation.
18       MR. KAHNE: All right. Strike that.
19  BY MR. KAHNE:
20  Q.   Do you know whether this is a policy of the
21  commissioner's to look into the opt-in -- opt-in
22  violations as a violation of the code of conduct?
23  **A.   You'd have to ask the commissioner. I take my orders**
24  **at that -- at that level from Attorney Fenton. However**
25  **we get the complaint, we look to see whether or not**

**132**

1   **there's an opt-in. If there isn't, why not? Many**
2   **times it's resolved without any sanction.**
3   Q.   Exhibit 12. Yeah, Exhibit 12.
4   **A.   Okay.**
5   Q.   Just take a second to look at it. You don't have to
6   read the whole thing.
7   **A.   Okay.**
8   Q.   My question is have you seen this document before?
9   **A.   I don't know whether I have or haven't.**
10  Q.   What do you understand it to be?
11  **A.   Well, I didn't finish reading it, so...**
12  Q.   Okay. Do you use this opinion in any way in your
13  day-to-day work?
14  **A.   Since I don't believe I've read it before, I guess the**
15  **answer would be no.**
16  Q.   When you were referring earlier to the technical
17  advisory, I just want to be sure that this is not what
18  you were talking about.
19  **A.   I don't think this is what I was talking about. I**
20  **think what I was talking about was the FAQ sheet.**
21  Q.   Before when you were talking about books, you talked
22  about A Good Kind of Trouble. I think Queer -- what
23  was it? Queer?
24  **A.   Gender Queer.**
25  Q.   Gender Queer. Have you looked into Stamped?

133

1  A.  You know, I'm not sure.
2  Q.  You can't recall?
3  A.  I can't recall.
4  Q.  Possible?
5  A.  Possible.  Sure.
6  Q.  How to Be an Antiracist?
7  A.  I've seen that.
8  Q.  Have you looked into it, like --
9  A.  No.  I've seen it in a list of banned books.
10 Q.  Okay.  And is it a list of banned books that were part
11     of a fact gathering that you were doing?
12 A.  No, it's from the American Library Association most
13     banned books in the United States, and they list them.
14     So I've seen that title from the American Library
15     Association.
16 Q.  Okay.  But you haven't spoken to any superintendents
17     about it or anything?
18 A.  I don't believe so.
19         MR. KAHNE:  Okay.  Would now be a good time
20     to maybe break?  Is that good?
21         MR. KENISON-MARVIN:  Fine with me.
22         (Recess taken.)
23     BY MR. KAHNE:
24 Q.  I first want to ask you about the procedure for
25     referring complaints received by the Department of

134

1      Education to the Attorney General's office, okay?
2  A.  Sure.
3  Q.  Are you aware of any standard operating procedure for
4      complaints that come in for the -- to the DOE to be
5      referred to the Attorney General's office?
6  A.  No.
7  Q.  Are you aware of any agreement between the Attorney
8      General's office and the DOE regarding what types of
9      complaints can get referred?
10 A.  No.
11 Q.  Have you ever spoken to Attorney Fenton about such
12     standard operating procedure?
13 A.  Yes.
14 Q.  Okay.  What have you discussed with her?
15 A.  Be more specific.
16 Q.  So I just asked if you've discussed a standard
17     operating procedure for transferring complaints from
18     the DOE to the Attorney General's office with Attorney
19     Fenton.  Have you ever had conversations about that?
20 A.  We've had conversations, but there is no SOP that I'm
21     aware of.  Nothing formal.  There's no policy or
22     procedure regarding this agency notifying that agency.
23         Now, I know that there's been discussions about
24     that, but I don't know -- I don't believe there's been
25     any policy decision made.

135

1  Q.  And I think we discussed this earlier, but there is no
2      standard operating procedure for when a complaint gets
3      referred from the DOE to the HRC?
4  A.  We don't refer anything to DOE to HRC in my -- to the
5      best of my knowledge, we don't do that.
6  Q.  And why is that important?
7  A.  My understanding is that we don't have -- the HRC
8      doesn't believe that we have standing to do so, that
9      the individual complainant has standing, but that we,
10     as an agency, do not.
11 Q.  Does the commissioner have the power to unilaterally
12     open a case under the code of conduct?
13         MR. KENISON-MARVIN:  Objection.  Legal
14     conclusion.  You can answer.
15     BY MR. KAHNE:
16 Q.  Can Commissioner Edelblut open a case under the code of
17     conduct?
18         MR. KENISON-MARVIN:  Same objection.
19         THE WITNESS:  He has never done that.
20     BY MR. KAHNE:
21 Q.  And -- okay.  If -- in your view, if HRC makes a
22     determination that there's been a violation of HB 2, is
23     that an automatic violation of the code of conduct?
24         MR. KENISON-MARVIN:  Same objection.
25         THE WITNESS:  I don't believe so, but we

136

1      haven't conducted an investigation.  So if HRC comes
2      back with a finding, we would then determine is the
3      person involved a licensed educator?  If the person
4      involved is not a licensed educator, we have no
5      jurisdiction.  No standing.  No case.
6          We would do our process to determine if it's
7      a code of conduct violation, the finding that was made,
8      and, if there was a code of conduct violation, what
9      would the sanctions potentially be.  So that's a big
10     hypothetical situation that, by the way, has never
11     happened.
12     BY MR. KAHNE:
13 Q.  So you're saying after HRC would make a determination,
14     your understanding is that the Department of Education
15     would make an independent decision about whether that
16     violates the code of conduct?
17         MR. KENISON-MARVIN:  Same objection.
18         THE WITNESS:  I'm sorry.
19         MR. KAHNE:  Go ahead.
20         THE WITNESS:  The facts would -- the fact
21     would be, A, that they made a finding.  Now, what is
22     that finding?  B, let's look at the finding in light of
23     the code of conduct, determine through our process
24     whether it meets the criteria.  If so, what would any
25     sanction be?

137

1        So it would be -- they refer to us. Who
2    knows what their determination was? They've just made
3    a determination. We would then decide, investigate,
4    gather facts to determine is it, in fact, a code of
5    conduct violation.
6    BY MR. KAHNE:
7    Q. And is that because the DOE has exclusive jurisdiction
8    to decide whether there's been a violation of the code
9    of conduct?
10        MR. KENISON-MARVIN: Same objection.
11        THE WITNESS: I think that a better way to
12    phrase it is that we have jurisdiction and control over
13    license status.
14    BY MR. KAHNE:
15    Q. Is any other agency able to determine whether a license
16    holder has violated the code of conduct?
17        MR. KENISON-MARVIN: Same objection.
18        THE WITNESS: Well, I would -- again, this
19    is -- I'm not an attorney. However, I would say other
20    agencies would have a standing when it comes to Section
21    5 violations.
22        So, for example, if a police agency arrests a
23    teacher for one of the 20 identified Section 5
24    violations, they -- that alone would be enough for us
25    to take an immediate sanction on the license.

138

1        So they don't have jurisdiction over the
2    license, but their actions would have a direct bearing
3    on a required sanction by this agency.
4    BY MR. KAHNE:
5    Q. Right, but the only agency that can actually issue
6    those penalties to the license holder is the Department
7    of Education?
8    A. Well, again, that's not actually accurate. The
9    Department of Education doesn't take action or
10    sanctions. The state board of education ultimately
11    takes the sanction. So it's a common mistake, but the
12    Department of Education doesn't issue sanctions. The
13    state board ultimately issues sanctions.
14    Q. So does it propose those sanctions?
15    A. No, the Department of Education -- in the protracted
16    practice, the hearings officer will make a
17    recommendation based upon a hearing with the Department
18    of Education, me, Attorney Fenton, and witnesses, and
19    they would make a proposal to the state board after
20    that hearing for sanction. So the state board takes
21    the action.
22    Q. Okay. Did there come a time when the Department of
23    Education sought subpoena power -- to grant subpoena
24    power to you as investigator?
25    A. Yes.

139

1    Q. When did that occur?
2    A. This -- very recently.
3    Q. It was in March?
4    A. Yeah, I think I testified in front of the House
5        Judiciary Committee.
6    Q. Why was that -- was the legislation supported by the
7        Department of Education?
8    A. I guess.
9    Q. Okay. And why was the subpoena power sought?
10    A. I've been here 10 years, and everything I do here is
11        based on relationships and good faith working
12        relationships with superintendents and other
13        stakeholders, the union representatives, AFT. Attorney
14        Donovan's awesome to work with. The attorneys for NEA
15        are great.
16        So everything is about good faith and trust. And,
17        at a given point, all of that good faith and trust and
18        working relationships comes -- in the legal process
19        comes to an end. And we've been looking for -- I've
20        been looking for some level of subpoena power since
21        shortly after I arrived here. And it's not so much
22        that the field generally is obstructive. They're not.
23        Everybody wants to cooperate with these things because
24        my goal is to keep kids safe. But it's a practical
25        application.

140

1        And I'll give you some examples. Let's say a
2    local police department gets involved in a sexual
3    assault, and a teacher is involved in a sexual assault,
4    and there's an action. There's an arrest. There's a
5    conviction. And we are going to have a contested
6    hearing regarding that educator. The educator doesn't
7    want to surrender the licensing. We want the police to
8    come in and testify to what they did, what they saw,
9    and they're more than willing to do that.
10        However, as a practical matter, police officers
11    have days off. They work nights. They work weekends.
12    And the police chief will say to us, "Hey, I'm happy to
13    help, but my guy, he can't be there on Tuesday because
14    it's his day off. If you give me a subpoena, I can pay
15    him."
16        No subpoena, you're not going to get paid. So
17    it's a practical application.
18        Think about this also as an example. You have a
19    teacher in classroom 1, and that teacher is accused of
20    misconduct of some form or fashion, and teacher number
21    2 is a material witness to that action. Both of them
22    are represented by the American Federation of Teachers,
23    for example. And I have no subpoena power to have the
24    teacher in classroom 2 come in and testify at a
25    hearing. They can just tell me, "Sorry. No subpoena?

141

1  Sorry."
2      Now, it's a material witness and there's
3  absolutely nothing I can do to prevent that or to
4  change it.
5      There are sometimes documents involved and police
6  reports. They say, "Happy to help. You need to
7  generate a subpoena."
8      So far, I've been very fortunate because people
9  know me. I think most people trust that I'm doing the
10  right thing and they're cooperative. But there are
11  times when they're not. And I don't have the ability
12  to subpoena documents or persons. So it's a practical
13  matter as opposed to some nefarious evil, you know,
14  desire to go after teachers.
15 Q.  Sure. So I think you testified before the House
16  Judiciary Committee -- at the House judiciary hearing
17  that your subpoena power, while not limited in words,
18  would be limited to enforcing the code of conduct?
19 A.  Stay in my lane. Code of conduct.
20 Q.  Stay in your lane. Code of conduct.
21 A.  Correct.
22 Q.  Okay. And that would include using the subpoena for
23  any potential violations of the code of conduct by a
24  teacher?
25 A.  Yeah.

142

1 Q.  Yeah. Okay. When you were talking about that, you
2  said that you have to be careful that people weaponize
3  the code of conduct. Parents weaponize it on occasion.
4  School districts, perhaps. "We don't want to weaponize
5  the code. We want to stay within the bounds of the
6  code, and weaponizing it is a really bad idea."
7      Do you remember that?
8 A.  I stand by every word.
9 Q.  Okay. What did you mean by weaponizing the code of
10  conduct?
11 A.  I think that speaks for itself. I can give you
12  examples if you'd like.
13 Q.  Sure. Parents that are in the IEP process and -- or a
14  504, a combination process, and they're unsuccessful in
15  their efforts to change an IEP, get an IEP, or make
16  accommodation changes. In their zeal to protect their
17  child, they will then turn around and become aware of
18  the code of conduct and allege misconduct because the
19  door for due process in the IEP, for example, process,
20  has closed. So we can open a door alleging misconduct.
21      That's what weaponizing the code of conduct is.
22  And I don't think we should weaponize the code of
23  conduct. We have educators -- I'll give you a very
24  good example. You understand the code of conduct
25  didn't exist until 2018, and, for all intents and

143

1  purposes, January 1st of 2019. Prior to that, if a
2  teacher broke their contract with a school district,
3  that was actually a possible code of conduct violation.
4  It no longer is.
5      Currently, because of the circumstances with
6  teacher shortages, superintendents have contacted this
7  agency and said, "Teacher X has violated the contract.
8  I want to file a code of conduct violation." That's
9  weaponizing the code. It doesn't exist any longer.
10      So I don't want superintendents weaponizing it. I
11  don't want teacher-on-teacher weaponizing it. I don't
12  want parents weaponizing it. And I don't want anybody
13  at the Department of Education to do that, either.
14  Stay within the bounds of what the code talks about.
15 Q.  What about parents who disagree with curricular
16  decisions? Would that -- and lodge a code of conduct
17  violation? Would that be weaponizing the code of
18  conduct?
19 A.  It depends on what the complaint is. I mean, every
20  complaint's different. You'd have to give me a fact
21  pattern. But, I mean, potentially, sure. Parents
22  could weaponize the code of conduct. Parents -- by --
23  because of curriculum. They could weaponize the code
24  of conduct because of books in libraries. They can do
25  anything they want. That's why I think it's critically

144

1  important to narrow the scope and really work against
2  weaponizing that code.
3 Q.  Give me a second here.
4      So I've previously showed this to you. It's sort
5  of what we've been discussing a lot of today. And I
6  just want you to look at it for a minute, review it.
7      What I'm specifically going to refer to is on
8  00005.
9 A.  Okay.
10 Q.  Sorry, give me one second. Okay. I'm sorry. 000006.
11  And 91:298 says, "New section. Prohibition on teaching
12  discrimination."
13      Do you see it?
14 A.  I do.
15 Q.  And you've reviewed this before? Have you seen it
16  before?
17 A.  I have.
18 Q.  Okay. I just want your understanding as to what this
19  banned concept -- these are four banned concepts, A, B,
20  C, and D? Have you heard it referred to as four banned
21  concepts?
22 A.  I have.
23 Q.  Okay. If you look at banned concept four, which is in
24  D, could you read that and tell me what you believe is
25  prohibited under subsection D?

145

1    A.   Beginning with that "People of one age, sex, gender,
2         identity, sexual orientation, race, creed, color,
3         marital status, familial status, mental, physical
4         disability, religion or national origin cannot/should
5         not attempt to treat others with regard to age, sex,
6         gender," et cetera.  Okay.
7    Q.   What does that mean to you?
8              MR. KENISON-MARVIN:  Objection to the legal
9         conclusion.  You can answer.
10             THE WITNESS:  What exactly are you asking me?
11   BY MR. KAHNE:
12   Q.   What can't a teacher teach under that subdivision?
13   A.   I have no idea.  I have no idea.
14             MR. KAHNE:  All set.  Yeah.  I'm going to
15        turn it over to --
16             MR. BISSONNETTE:  Thank you, Mr. Farrell.
17                  EXAMINATION
18   BY MR. BISSONNETTE:
19   Q.   I know that we've met once or twice before, but my name
20        is Gilles Bissonnette, and I'm counsel to a separate
21        plaintiff's group in this case against two individuals,
22        Andres Mejia and Tina Philibotte.
23             Thank you again for coming in today.  I know we're
24        at the tail end of this, but we all do appreciate it.
25             I'm going to ask you some questions.  I'm going to

146

1         do my absolute best to not duplicate anything that's
2         been covered, I think.
3    A.   Okay.
4    Q.   That's only fair to you and to everyone in this room.
5              So I just have a few topics that I want to cover
6         in addition to just a few additional documents that I
7         want to present to you.  So can I begin?
8    A.   Sure.
9    Q.   I want to just kind of close the loop on some of the
10        questions you've received about the standard operating
11        procedure.  So what I would like to do, if it's okay
12        with you, is just turn your attention to Exhibit 6,
13        please.
14             If you have Exhibit 6, I'm going to turn your
15        attention to the page that's Bates stamped PL806.
16             Let me just say at the outset, Mr. Farrell, that
17        I'm going to represent to that you this is a transcript
18        of the House Judiciary Committee hearing on HB 533 that
19        took place on March 8, 2023.  I believe you were in
20        attendance at that hearing, correct?
21   A.   Correct.
22   Q.   And what Exhibit 6 is is just a transcript, not of the
23        complete hearing, but just certain portions.
24   A.   Okay.
25   Q.   Okay?  So I would like to direct your attention to page

147

1         806.  And in the bottom left portion of the document,
2         page 19 of the quadrants on the page, Attorney Fenton
3         publicly stated, "And in working with Representative
4         Lynn and in working with the Attorney General's office
5         on the original House Bill 533, we have since worked
6         with the AG's office to come up with an SOP as to how
7         we'd transfer those cases to the Human Rights
8         Commission and the AG's office."
9              Do you see that?
10   A.   I do.
11   Q.   That statement?
12   A.   I do.
13   Q.   Are you aware of a meeting that took place in February
14        of 2023 before this hearing about a procedure by which
15        complaints would get transferred to the Human Rights
16        Commission and the AG's office?
17   A.   I was not aware.  I'm not sure what you're talking
18        about, but I wasn't part of any of that type of a
19        meeting.
20   Q.   So you weren't involved in a meeting with Attorney
21        Fenton and Sean Locke with the Department of Justice
22        about a procedure that would exist to transfer cases to
23        the Human Rights Commission and Department of
24        Justice?
25   A.   I was not involved in that meeting at all.

148

1    Q.   So you never saw, on or about February 14th, 2023, any
2         document that was prepared by Attorney Locke
3         memorializing and understanding among all of those
4         offices about how cases would be transferred?
5    A.   I don't believe I was, no.
6    Q.   Okay.  Do you have any -- just so I understand your
7         testimony, you have no knowledge of that meeting?
8    A.   I knew about the meeting after it happened, but I was
9         not a participant in the meeting.
10   Q.   Who did you -- who talked to you about that meeting
11        after it occurred?
12   A.   I would imagine -- the only person I would have talked
13        to is Diana Fenton.
14   Q.   What did Ms. Fenton say about that meeting?
15   A.   I don't recall directly.  I don't know that there was a
16        resolution.  I still don't know whether there's a
17        resolution.
18   Q.   Okay.  Besides that conversation that you had after
19        that meeting with Ms. Fenton, have you had any other
20        internal conversations within the Department about any
21        agreement that may have been reached at that meeting?
22   A.   To the best of my knowledge, no.
23   Q.   How long did that discussion with Ms. Fenton occur
24        about that February meeting?
25   A.   Well, it wasn't a meeting.  It was -- it was a brief

149

1    conversation.
2    Q.  Brief conversation.  Couple minutes?
3    A.  Couple minutes.
4    Q.  Okay.  Thank you.  I appreciate that.  I'm going to
5        move on.  I can play the video if you want -- and I'm
6        switching gears.  Well, strike that.  I'm just going to
7        ask this question.
8            If I'm a teacher, and I want to sign a book, and
9        I'm unsure if it's covered under HB 2, could I call the
10       Department of Education and get an answer as to whether
11       a book is covered or not?
12   A.  I don't know the answer.  I know I have never taken
13       such a call.
14   Q.  Okay.
15   A.  And in terms of whether they can, or can't, or if they
16       have, I don't know.  I've never been involved in
17       that.
18   Q.  If you received a call about whether this book, this
19       antiracist, is covered under the law, and I'm thinking
20       about teaching it, how would you respond today to that
21       type of inquiry?
22   A.  A teacher calls me?
23   Q.  Yes, sir.
24   A.  My first -- the first thing I think I would do is refer
25       her or him back to the superintendent because it was --

150

1        it'd be more of a curriculum question.
2    Q.  So what if that superintendent called you and said, "A
3        teacher has reached out to me about whether a book is
4        covered under HB 2, and I'm looking for guidance from
5        the Department as to whether it's covered or not," how
6        would you respond to that question?
7    A.  I would do probably two things:  I would say, "You have
8        an attorney that you hired.  Get a hold of your
9        attorney."
10           And the second thing I would do is "Perhaps you
11       should talk directly to my attorney, Attorney
12       Fenton."
13   Q.  So besides inviting that superintendent to reach out to
14       his district counsel, your other likely response would
15       be to talk to your supervisor?
16   A.  Correct.
17   Q.  Any other potential responses you think you'd give
18       beyond those two referrals?
19   A.  That's it.
20   Q.  I'm just going to refer you as well, Mr. Farrell, to --
21       let me just try to identify the exhibit.  Exhibit 10.
22       And I'll just freely acknowledge, Mr. Farrell, you are
23       not on this email.
24   A.  Thanks.
25   Q.  But I would like you to take a look because I just have

151

1        some questions about Department procedure.
2    A.  Okay.
3    Q.  Take a look at it, and when you're done, please let me
4        know.
5    A.  Okay.
6    Q.  So I would just submit that this is an email from
7        someone from SAU 4 asking Attorney Fenton as to whether
8        or not there's someone at the DOE who can speak with a
9        teacher and principal here in Newfound with specifics
10       about what she can say or not say regarding issues that
11       might pertain to divisive concepts.
12           Do you see that at the bottom of the document --
13       document 807 of Exhibit 10?
14   A.  Yeah.  Pierre Couture talks to Diana Fenton, who
15       responds.
16   Q.  Yeah.  Have you ever seen this email before?
17   A.  No.
18   Q.  Were you ever aware that Attorney Fenton had a
19       conversation with Pierre Couture, the superintendent of
20       Newfound area school district?
21   A.  Say it again?
22   Q.  Are you aware that Ms. Fenton had a conversation with
23       the superintendent in SAU 4?
24   A.  No.
25   Q.  Okay.  Were you aware that Ms. Fenton told the

152

1        superintendent -- expressing thanks for reaching out
2        but that divisive concepts is handled by the Human
3        Rights Commission?
4    A.  That --
5    Q.  I'm just asking are you aware --
6    A.  No, no.
7    Q.  I'll say it again just so we can have a clean record.
8    A.  I've got it now.  No, I am not aware that she had this
9        conversation with Pierre and that Pierre was referred
10       to the HRC.
11   Q.  Okay.
12           MR. BISSONNETTE:  I'll mark two additional
13       exhibits.
14           (Exhibits 31 and 32 marked for
15       identification.)
16       BY MR. BISSONNETTE:
17   Q.  Can I just ask you to read just the cover emails on the
18       top of both Exhibits 31 and 32 and just let me know
19       when you're done, please?
20   A.  You want me to do what now?
21   Q.  Sorry.  Just read the front pages of Exhibits 31 and
22       32.
23   A.  Oh, okay.
24   Q.  Thank you.
25   A.  Okay.



153

1  Q.  My question is have you seen either of these documents
2      before?  I know you're not on there, but have you seen
3      them before?
4  A.  I've seen 31 before.
5  Q.  And with respect to 31, Exhibit 31, I know that there
6      are not attachments on Exhibit 31, but if I refer you
7      to the attachments to Exhibit 32.
8  A.  Yes.
9  Q.  Would those attachments have been the attachments that
10     would have been affixed to Exhibit 31?
11 A.  I think so.
12 Q.  Okay.  Not a trick question.  I thought so, I just -- I
13     just wanted to confirm.
14         When did you see Exhibit 31?
15         Maybe I'll ask it this way.  Withdraw that
16     question.
17
18
19
20
21
22
23
24
25

154

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20 Q.  Okay.  Do you recall any investigation being conducted
21     by the Department in response to this complaint?
22 A.  I do not believe any investigation was conducted.
23 Q.  Setting aside the term "investigation."  Do you recall
24     any specific contact that you may have had with anyone
25     within that school district about the complaint?

155

1
2
3
4
5
6
7
8
9
10
11
12
13 Q.  Anything else that you recall about -- anything else
14     that you can recall that you haven't testified to today
15     with respect to how the Department has handled the
16     complaint in Exhibit 31 and 32?
17 A.  I have nothing more to give.
18         MR. KENISON-MARVIN:  I don't want to
19     interrupt.  Maybe we can do this later.  I'm just
20     forgetting the exact provisions of the protective order
21     with respect to information -- if we're marking it
22     confidential for purposes of the deposition.  We can do
23     that later.
24         MR. BISSONNETTE:  I have to look at the
25     provision.  Can we go off the record?

156

1         (Discussion off record.)
2         MR. BISSONNETTE:  I'm going to introduce an
3     exhibit.  What number are we at?
4         THE REPORTER:  33 is next.
5         (Exhibit 33 marked for identification.)
6  BY MR. BISSONNETTE:
7  Q.  Mr. Farrell, I'll just ask you to take a look at
8      Exhibit 33.  Just let me know when you're done.
9          And after you reviewed that -- again, so as to not
10     hide The ball, I'm also going to ask you to look at
11     Exhibit 19, so I don't know if you have that.
12         So no need for you to read all of this, but my
13     reading of Exhibits 19 and 33 suggest that there's a
14     complaint about a book A Good Kind of Trouble.  And so
15     my question to you is were you familiar with a
16     complaint that a parent submitted concerning the book A
17     Good Kind of Trouble?
18 A.  I don't remember the first one -- the first complaint
19     was September 30th, yes?  From Ms. _____.  Mr.?
20     I was not involved in any of that email chain at all.
21     I don't know what --
22 Q.  What I'm referring to, if you can just look on Exhibit
23     19, page 72?  I recognize that you're not on this
24     email, but I don't want my questions to be viewed as
25     shots in the dark here as to why I'm asking them.

Transcript of Richard Farrell
Conducted on May 18, 2023

157

1    But there's language on Exhibit 19, page 72, where
2  an individual is complaining about the book A Good Kind
3  of Trouble. Do you see that language beginning with
4  the paragraph regarding the book A Good Kind of
5  Trouble?
6  **A. Yes. I'm looking at it now.**
7  Q. Gotcha. And this is an email lodging a complaint
8  arising out of SAU 16; is that correct?
9  **A. SAU 16?**
10 Q. Yes.
11 **A. Yeah.**
12 Q. So I guess my question to you is were you aware --
13 setting these emails aside, were you aware of a
14 specific complaint in SAU 16 concerning the book A Good
15 Kind of Trouble?
16 **A. I honestly -- this is new to me.**
17 Q. Okay.
18 **A. Unless you can show me somewhere where these were**
19 **forwarded to me, this is brand-new to me.**
20 Q. I cannot. And so what I'm asking is did you --
21 **A. No.**
22 Q. Were you involved in any investigation concerning the
23 book A Good Kind of Trouble?
24 **A. No.**
25 Q. Okay. That's all I'm trying to get at.

158

1  **A. I'm actually kind of surprised my name isn't on some of**
2  **that stuff.**
3  Q. With respect to Exhibit 33, if you just look at page
4  one, Commissioner Edelblut writes to Ms. ████████
5  saying, "I met with the school last week on October
6  25th, 2021."
7    Do you know what Commissioner Edelblut is
8  referring to in that email?
9  **A. I have no idea.**
10 Q. He also says, "Know that I have read the book and we
11 are taking appropriate action."
12   Do you know any action that Commissioner Edelblut
13 has taken in response to this complaint?
14 **A. No.**
15 Q. Thank you. I'm going to refer you to Exhibit 16. This
16 is an email that you were on, but I'd just ask you to
17 take a look at it and let me know when you've finished
18 reading it.
19 **A. Okay.**
20 Q. So this is an email. The bottom portion of page 59 is
21 an email from Ms. ████ to various individuals
22 concerning a complaint arising out of Hollis. And
23 Commissioner Edelblut elevates this to Ms. Fenton who
24 then responds, "Thank you. We will look into it."
25   Is that -- did I accurately describe generally

159

1  what Exhibit 16 is?
2  **A. Yes.**
3  Q. Okay. Do you know what, if anything, the Department
4  did in response to this complaint from Ms. ████████?
5  **A. I do not.**
6  Q. Did you ever speak to Ms. ████ about this Hollis
7  complaint?
8  **A. No.**
9  Q. Did you ever engage -- did you ever have a
10 communication with anyone that works for a public
11 school in Hollis about this complaint?
12 **A. I don't remember communicating with anybody about this**
13 **complaint.**
14 Q. Okay. Do you have any internal communications within
15 the Department about this complaint?
16 **A. If I did, it would have been with Attorney Fenton, but**
17 **I don't recall.**
18 Q. When Ms. Fenton says, "We will look into it," do you
19 know what Ms. Fenton did in response to this
20 complaint?
21 **A. That's a pretty standard response --**
22 Q. Okay.
23 **A. -- that Diana would give, I mean, with any kind of**
24 **communication.**
25 Q. Gotcha.

160

1  **A. So what she did after this email, I have no idea.**
2  Q. You don't know. Okay. Thank you. Done with that.
3  I'm also going to refer you to Exhibit 15.
4    So, Mr. Farrell, just take a look at Exhibit 15.
5  When you're done reviewing it, let me know.
6  **A. Okay.**
7  Q. And I would just represent to you, and correct me if
8  you think this is inaccurate, that what Exhibit 15 is
9  is an email from Matt Carney to Commissioner Edelblut
10 articulating various concerns, and Commissioner
11 Edelblut then forwards that email with a sentence of
12 commentary on his part. He sent it to Diana Fenton,
13 copies you and Christopher Bond; is that correct?
14 **A. Correct.**
15 Q. Okay. I want to refer you to the line at the bottom of
16 page 9586 on Exhibit 15 in which a complaint is made
17 about the film White Like Me by Tim Wise. And then the
18 email goes on to say, "This film emphasizes white
19 privilege and equates conservativism with white
20 supremacy. The film should not be shown at all as it's
21 clearly CRT and in direct violation of NH Bill HB 2,
22 sections 237 and 298, right to freedom from
23 discrimination in public workplaces in education."
24   Do you see that language at the bottom of the
25 page?

161

1  A.  I do.
2  Q.  Do you recall what, if anything, the Department did in
3     response to that specific concern that was raised?
4  A.  I don't recall anything that was done regarding
5     paragraph two.
6  Q.  Do you recall any communications that you were a party
7     to within the Department about the film White Like Me
8     by Tim Wise?
9  A.  No.
10 Q.  Did you -- with respect to the complaint about that
11    film, did you ever have any conversations with anyone
12    in Keene employed by that school district about that
13    film?
14 A.  About paragraph two, or the film?
15 Q.  Yes, sir.
16 A.  No.
17 Q.  With respect to that email in its entirety that
18    Mr. Carey submitted to Commissioner Edelblut, did you
19    have a conversation with anyone employed within the
20    Keene school district?
21 A.  We -- I had discussions with Rob Malay, the
22    superintendent, and I had conversations with Cindy
23    Gallagher. She's the principal. But it didn't -- I
24    didn't address paragraph two. It was more about the
25    allegations of violence and fights and fight clubs and

162

1     filming violence in the school.
2  Q.  Do you recall -- in speaking with Superintendent Malay,
3     do you recall any reference to the film?
4  A.  I, honestly, focused on the allegations about violence
5     in the school and classrooms.
6  Q.  So do you recall asking any questions about the film?
7  A.  I don't recall.
8  Q.  Did Ms. Gallagher -- same question. Do you recall
9     asking any questions about the film White Like Me?
10 A.  No, I was focused on the rest of the complaint.
11 Q.  Okay.
12        MR. BISSONNETTE: Can I go off the record for
13    just one minute, please?
14        (Discussion off record.)
15 BY MR. BISSONNETTE:
16 Q.  I am going to refer you to an exhibit that was
17    previously marked as Exhibit 4. And I know that you're
18    taking a look, Mr. Farrell, at this exhibit. I can
19    just tell you that it was an op-ed published by the
20    commissioner on June 13th, 2021. My question just will
21    be before today, had you read this op-ed before?
22 A.  Have I read it before? Yes.
23 Q.  When did you read this op-ed?
24 A.  After it was published.
25 Q.  Okay. So I'm going to just direct your attention to a

163

1     provision of the op-ed that says -- that references the
2     book by Ibram Kendi How to Be an Antiracist. Do you
3     see that?
4  A.  Whereabouts? Oh, I see.
5  Q.  Sure. It's in -- you got it? Okay.
6  A.  Yep.
7  Q.  My question is is that -- have you read that book
8     before?
9  A.  I've read portions of the book and reviews of it, but I
10    haven't read the entire book.
11 Q.  Did you read the portion of the book in which Mr. Kendi
12    states -- and this is quoted by Commissioner
13    Edelblut -- "The only remedy to racist discrimination
14    is antiracist discrimination."
15 A.  Yeah, I think so.
16 Q.  Why did you read the book?
17 A.  It was -- the book itself is circulating in the agency.
18    It had been talked about before. And, as I said
19    earlier --
20        MR. KENISON-MARVIN: I am going to object and
21    just instruct him not to answer that question on the
22    basis that he was asked to review it for some sort of
23    deliberative purpose to have a discussion with other
24    agency staff about an issue related to the book.
25        So to the extent your answer calls for that

164

1     deliberative type of information about why you're doing
2     something, I would instruct you not to answer.
3        MR. BISSONNETTE: Let me just ask a question
4     about that.
5        MR. KENISON-MARVIN: Sure.
6  BY MR. BISSONNETTE:
7  Q.  When did you read the book?
8  A.  I didn't read the entire book.
9  Q.  Sorry. When did you read portions of the book? Thank
10    you for your correction.
11 A.  So I read portions of the book because it was -- it
12    came up in the agency, and I wanted to educate myself
13    as to what the book was about.
14 Q.  When did it come up in the agency? Before or after the
15    op-ed was published?
16 A.  I honestly don't remember.
17 Q.  Did it come up in the context of a specific complaint
18    that was made to the department?
19 A.  I don't think so.
20        MR. BISSONNETTE: Okay. So I'm actually
21    going to ask that question again because I don't think
22    that deliberative process privilege now applies in
23    light of those responses.
24 BY MR. BISSONNETTE:
25 Q.  So do you remember specifically why you read the book?

165

1    Was it just because it was being discussed within the
2    Department?
3    A.  Yeah.  I try to -- I try to educate myself on things
4    that are coming into the agency.
5    Q.  Who was discussing this book within the Department?
6    A.  I honestly don't recall.
7    Q.  Were you involved in discussions with -- strike that.
8        Were you a party to discussions in which the
9    commissioner referenced How to Be an Antiracist?
10   A.  I'm trying to recall if that -- if the author came up
11   during an educator misconduct meeting, but not related
12   to a complaint, but related to a misconduct meeting
13   generally.
14   Q.  Do you know one way or the other --
15   A.  No.
16   Q.  -- sitting here today?
17   A.  No.
18   Q.  Do you think the portions of the book that you read of
19   Dr. Kendi's How to Be an Antiracist would be covered
20   under HRC?
21        MR. KENISON-MARVIN:  Objection to legal
22   conclusion.  You can answer.
23        THE WITNESS:  That the book itself was an HB
24   2 violation?
25        MR. BISSONNETTE:  Well, start with the

166

1    portions that you read.
2        THE WITNESS:  I didn't have a complaint.
3        MR. BISSONNETTE:  Okay.
4        THE WITNESS:  So I don't know that I would
5    have ever made that inquiry.
6        BY MR. BISSONNETTE:
7    Q.  Okay.  If I were a teacher, though, and I read
8    Commissioner Edelblut's op-ed, and I read the book How
9    to Be an Antiracist, and I thought I would want to
10   include it in a high school class, how would I get an
11   answer as to whether that book is covered or not?
12   A.  Well, I think I would begin at the local level.
13   Q.  Okay.
14   A.  I would go to my principal or my department head,
15   principal, curriculum director, superintendent, and the
16   local elected school board.
17        I think it's important to note that New Hampshire
18   is a local-control state, and I would think that that
19   would be my first series of steps.
20   Q.  And if I were a teacher and I couldn't get that answer
21   from my superintendent, could I get that answer from
22   the Department of Education as to whether or not this
23   particular book is covered under HB 2?
24   A.  I think that that question would ultimately go to Diana
25   Fenton.

167

1    Q.  Okay.
2    A.  And I would defer to her expertise in answering the
3    question.  I certainly wouldn't answer the question.
4    Q.  Okay.  Do you think it would be reasonable for an
5    educator reading this op-ed to think that the book How
6    to Be an Antiracist is covered under HB 2?
7        MR. KENISON-MARVIN:  Objection.  Vague and
8    legal conclusion.  You can answer.
9        THE WITNESS:  I honestly -- I couldn't put
10   myself in that position right now.  Maybe 30 years ago,
11   maybe I could, being a teacher, but, right now, I don't
12   think I could answer that question honestly.
13   BY MR. BISSONNETTE:
14   Q.  Okay.  I know that you testified before that you were
15   unsure whether this book came up in the context of a
16   misconduct meeting.  My question is why would it
17   potentially have come up in a misconduct meeting?
18   A.  These meetings -- the meeting themselves talk about
19   current cases, status of the current cases, direction,
20   conclusions, and then they devolve into other topics of
21   discussion.  And so it's not -- those monthly meetings
22   are not limited to the ongoing cases that we have.
23   They kind of devolve into other things.
24   Q.  Are you aware of this book ever having been used in a
25   public school, whether at the instruction level or the

168

1    staff training level?
2    A.  I do not.
3    Q.  Okay.  I'm going to direct your attention as well --
4    thank you for that, Mr. Farrell -- to Exhibit 14 which
5    is the thick document that I know was before you
6    before.  And I am going to direct your attention to the
7    pages Bates stamped 741 to 745.
8    A.  Topic eight?
9    Q.  Yes.  Yes, sir.
10   A.  Okay.
11   Q.  I would just represent to you, Mr. Farrell, that this
12   is, you know, one of the topics that was attached to
13   Commissioner Edelblut's April 15, 2022, op-ed.  And I'd
14   also represent to you that what those pages are, they
15   are chapter 10 of a book, This Book is Antiracist by
16   Tiffany Jewell.
17        I just have it right here.  My question to you is
18   have you seen this chapter before?
19   A.  I don't remember seeing this chapter, no.
20   Q.  So you don't recall reading it before?
21   A.  No.
22   Q.  Okay.  Have you been involved in any Department of
23   Education meetings in which this chapter was
24   discussed?
25   A.  I never read it and I don't remember being involved in

169

1  a discussion about it.
2  Q.  Do you attend board of education meetings?
3  A.  I try not to.
4  Q.  Okay.
5  A.  I attend one a year for sure.
6  Q.  Fair enough.  So what I'm going to represent to you is
7      that portions of this chapter were read by the
8      commissioner during a July 8, 2021, board of education
9      meeting.  So my question is did you attend that
10     meeting?
11 A.  I did not.
12 Q.  Okay.  Thank you.  I appreciate it.  I just have one
13     last question.  Have you ever had any communications
14     with your Department of Education colleagues about
15     instruction that had occurred in New Hampshire that
16     would be banned by HB 2?
17 A.  You know, I don't believe we've ever had that direct
18     conversation.  With me, anyway.
19 Q.  Sure.  Have you been involved in any communications
20     within the Department of Education about specific books
21     that were taught before HB 2 but now couldn't be taught
22     because of HB 2?
23 A.  I've never had a conversation.
24 Q.  Okay.  Have there been any discussions about books that
25     were taught before HB 2 that potentially now could be

170

1  banned under HB 2?
2  A.  No.
3  Q.  Do you know -- you read exhibit -- Exhibit 16 which is
4      Commissioner Edelblut's op-ed?
5  A.  Yes.
6  Q.  Fair to say that he supported HB 2, correct?
7  A.  You really have to ask him.  I mean, you could read and
8      make assumptions, but you'd have to ask him.
9  Q.  I'm asking what your assumption is after having read
10     Exhibit 4.
11 A.  I don't think he's opposed to HB 2.  I really don't
12     know.  He's an interesting person, so I don't really
13     know what -- I just -- I can't answer that question.
14 Q.  I'm not trying to hide the ball.  What I'm --
15 A.  I know.
16 Q.  -- trying to get at specifically are the types of
17     instruction that HB 2 was trying to get at that now can
18     no longer be implemented in New Hampshire.  So that's
19     really what I'm trying to get at.
20     So based on your communications with Commissioner
21     Edelblut, are you aware of any instruction that
22     previously occurred in New Hampshire before HB 2 that
23     now could not occur in New Hampshire?
24 A.  I don't know of any.
25     MR. KENISON-MARVIN:  I'm going to object on

171

1  legal conclusion grounds.  You can answer.
2      THE WITNESS:  Yeah, I honestly don't know of
3  any.
4  BY MR. BISSONNETTE:
5  Q.  You don't know one way or the other?
6  A.  No.
7      MR. BISSONNETTE:  Okay.  I'm going to turn it
8  over to my colleague who's going to address another
9  segment of the case and then, hopefully, we'll be
10 done.
11     MR. KENISON-MARVIN:  Depending on how long, I
12 do need to run to the restroom at some point unless
13 you're going to be a couple minutes.
14     MS. MILBURN:  Yeah, let's take a break.
15     (Recess taken.)
16         EXAMINATION
17 BY MS. MILBURN:
18 Q.  Hi, Mr. Farrell.
19 A.  Hi.
20 Q.  My name is Tina Milburn, and I represent one of the
21     plaintiffs in this case, the American Federation of
22     Teachers, along with David Kahne.
23     I know it's been a long day, so I'm going to try
24     and be brief, but I'm going to be asking you some
25     follow-up questions on your testimony from earlier, and

172

1  also some questions specifically related to the claims
2      that the AFT has brought in this case.  The same rules
3      that applied with Mr. Bissonnette and Mr. Kahne apply
4      with respect to my questions.
5  A.  Okay.
6  Q.  Okay.  Great.  So if I understood your testimony from
7      earlier today, you stated that the DOE does not
8      formally investigate teachers for violations of HB 2
9      until there's been a finding by the HRC; is that fair
10     to say?
11 A.  Yes.
12 Q.  I want to show you a new exhibit.
13     (Exhibit 34 marked for identification.)
14 BY MS. MILBURN:
15 Q.  So I want to direct your attention to DOE705.  This is
16     an email chain between you and Terri Donovan.  Do you
17     know who Terri Donovan is?
18 A.  Oh, sure.
19 Q.  Who is Terri Donovan?
20 A.  Terri Donovan is an attorney for the American
21     Federation of Teachers.  She's a sweetheart.  I'm going
22     to a training for her on June the 7th.
23 Q.  So Terri Donovan asks, "I'm curious how many complaints
24     over the new law have been received."  And that's at
25     the bottom of the DOE 705.

173

1    And then your response is that "I have not
2  undertaken any formal investigation related to the
3  divisive concepts."
4    Do you see that?
5  A.  Let's start again.
6  Q.  The bottom of the first page, 705.
7  A.  Okay.  Terri Donovan says, "I understand the HRC part."
8  Q.  Right.  She says, "I'm curious how many complaints over
9    the new law have been received."
10 A.  All right.  And my response is above, correct.
11 Q.  Correct.  And in your response, you say, "I have not
12   undertaken any formal investigation related to divisive
13   content."
14 A.  Correct.
15 Q.  Is that right?
16 A.  Yeah.
17 Q.  Were there any informal investigations related to the
18   divisive content?
19 A.  No.
20 Q.  That's it with this.
21 A.  Okay.
22 Q.  So you previously testified that you were a high school
23   English teacher; is that right?
24 A.  Was, yes.
25 Q.  And how many teachers -- or is it fair to say that you

174

1  have a good understanding about what a teacher's
2  day-to-day work looks like based off of that
3  experience?
4  A.  Sure.
5  Q.  They interact with students outside of the classroom?
6  A.  Yes.
7  Q.  Is that correct?  In hallways?  In the hallway --
8  A.  Yeah.
9  Q.  -- for example?  In a schoolyard?  Lunch room?
10 A.  Yes.
11 Q.  In a library?
12 A.  Yes.
13 Q.  What do you consider to be part of the school
14   curriculum, in your view?
15 A.  I don't understand the question.
16 Q.  There -- schools have curriculums; is that right?
17 A.  Yes.
18 Q.  What do you consider that to entail?
19 A.  A curriculum meaning subjects taught, the way they're
20   taught.  Curriculum would deal with credit hours,
21   requirements for graduation, and the subsets in each --
22   in each field.  So that would be curriculum.
23 Q.  I'm going to show you what's been previously marked as
24   Exhibit 24.
25 A.  Okay.

175

1  Q.  If you could turn to the second page?  Do you recognize
2    this document?
3  A.  The FAQ?
4  Q.  Correct.
5  A.  Yeah.
6  Q.  If you could go to item number eight?
7  A.  Yes.
8  Q.  It discusses that this law applied to all school
9    activities, or just teaching?
10 A.  Okay.
11 Q.  And it says, "The prohibitions apply to all activities
12   carried out by public schools in their role as public
13   schools, including extracurricular activities that are
14   part of the public school's work," correct?
15 A.  Correct.
16 Q.  How would you define "extracurricular activities"?
17 A.  Extracurricular activities could be anything from
18   sporting situations, coaching, dance, plays.  Anything
19   that happens -- better way to put it.  Anything that
20   happens within the confines of the definition of the
21   Safe Schools Act.  So anything -- if it's defined as a
22   safe school, the property of the Safe Schools, anything
23   that happens within the confines of that Safe Schools
24   Act would apply.
25 Q.  Okay.  I'm not familiar with the Safe Schools Act.

176

1  A.  Safe schools basically says that Safe Schools -- the
2    Safe Schools Act talks about where -- what is a school?
3    What is the definition of the curtilage of the school?
4    So, for example, under the Safe Schools Act, a
5    teacher on a bus to and from a field trip, that's Safe
6    Schools.  That's covered.  A teacher that's becoming a
7    coach and working as a coach, theater, drama.  Anything
8    within the curtilage or the extended portion of a
9    school.
10   It gets kind of creative because many hockey
11   programs -- for example, hockey rinks are not --
12   they're private facilities, but if a hockey team for a
13   high school is playing and/or practicing on that
14   facility, it becomes an extension of Safe Schools.
15   So I would say the answer to that would be
16   anything that falls within the curtilage of the Safe
17   Schools definition.
18 Q.  Understood.  So just to provide some clarification, an
19   after-school debate club, for example, would be
20   considered an extracurricular activity?
21 A.  Sure, yes.
22 Q.  Discussion with a student in the library?
23 A.  Yeah.
24 Q.  Any activity after school hours?
25 A.  Yes.

177

1  Q.  Anything outside of school property?
2  A.  **As long as it's covered under the Safe Schools, yes.**
3  Q.  Understood.
4       Okay.  Does the statute apply -- does the HB 2
5  apply to a teacher's expression of their personal
6  beliefs in the classroom, in your view?
7       MR. KENISON-MARVIN:  Objection.  Legal
8  conclusion.  You can answer.
9       THE WITNESS:  Say it again now?
10 BY MS. MILBURN:
11 Q.  If a teacher is expressing their own personal beliefs
12 on a particular subject in the classroom, could HB 2
13 apply to what they're saying?
14      MR. KENISON-MARVIN:  Same objection.
15      THE WITNESS:  I don't think I have enough
16 information to give you a reasonable response.
17      MS. MILBURN:  I'll give you an example.
18      THE WITNESS:  Okay.
19 BY MS. MILBURN:
20 Q.  Let's say a teacher says that they like the book How to
21 Be an Antiracist in the classroom.  Could that be
22 covered by the statute?
23      MR. KENISON-MARVIN:  Same objection.
24      THE WITNESS:  I don't think I'm qualified to
25 make that -- to answer that question properly.

178

1  BY MS. MILBURN:
2  Q.  Okay.  Just going back to the FAQs.  It says the law
3  does not apply to all activities that may occur on a
4  public school's property.  Do you see that at the
5  bottom of the --
6  A.  **Yes.**
7  Q.  What activities would occur in a public school that are
8  not covered by HB 2 under your interpretation of these
9  FAQs?
10      MR. KENISON-MARVIN:  Same objection.
11      THE WITNESS:  Well, many schools -- I live in
12 Nashua, and there are two beautiful theaters and two
13 high schools.  The middle school, the Elm Street Middle
14 School, has the lovely O'Keefe auditorium.  It's a
15 beautiful theater.  And that rent that space out
16 routinely to other types of third-party groups.
17      I don't think any of this provision, although
18 it's in a school, I don't think it covers any of those
19 activities.  They're not licensed educators.  They're
20 third parties.  They're not employees.  It's nothing to
21 do with HB 2, in my view.  I could be wrong, certainly.
22 I'm not an attorney.  But that kind of thing wouldn't
23 be covered.
24 BY MS. MILBURN:
25 Q.  So fair to say, like, if you're contracting out to a

179

1  third-party vendor, and a third party is involved,
2  that's when HB 2 would not apply?
3       MR. KENISON-MARVIN:  Same objection.
4       THE WITNESS:  I just don't think it applies
5  to anyone that's not a licensed educator, that's not an
6  employee of a school district.
7  BY MS. MILBURN:
8  Q.  So we've previously discussed that you were a high
9  school teacher.  I'd like to ask you some questions
10 about HB 2 and what is and is not covered under the
11 statute.  Are you familiar with affirmative action?
12 A.  **Yes.**
13 Q.  And you have previously said that a debate club would
14 be covered under the statute; is that correct?
15 A.  **Possibly.**
16 Q.  Possibly?
17      MR. KENISON-MARVIN:  That does misstate the
18 prior testimony.  I'll object to that.  And legal
19 conclusion.
20 BY MS. MILBURN:
21 Q.  You previously said that a debate club was an
22 extracurricular activity; is that right?
23 A.  **Yes.**
24 Q.  If a teacher discussed affirmative action during the
25 debate club, in your view, would that violate HB 2?

180

1       MR. KENISON-MARVIN:  Objection.  Legal
2  conclusion.
3       THE WITNESS:  I don't think it's a fair
4  question for me because I don't know the context.  I
5  mean, are you talking about "Here's a debate topic.
6  We're going to talk about affirmative action today and
7  we're going to debate the merits of it."
8       I mean, that's one question.  If it's a
9  unilateral discussion or presentation by the teacher,
10 it's a different discussion.  So what are you talking
11 about?
12      MS. MILBURN:  Let's keep your former example.
13      THE WITNESS:  Okay.
14 BY MS. MILBURN:
15 Q.  So the teacher asked the students to debate the merits
16 of affirmative action during debate club.  Would you
17 view that as a violation of HB 2?
18      MR. KENISON-MARVIN:  Same objection.
19      THE WITNESS:  I'm not an attorney.  So, as a
20 former teacher, I think it would be a useful debate
21 tool.
22 BY MS. MILBURN:
23 Q.  As a former teacher, would you -- and understanding the
24 statute, HB 2, would you view that as a violation of
25 the statute if you made that a debate question?

**181**

1  MR. KENISON-MARVIN: Objection. Vague and
2 legal conclusion.
3  THE WITNESS: Again, this is -- you're asking
4 me personally?
5  MS. MILBURN: Your personal opinion.
6  THE WITNESS: I think utilizing that topic as
7 a debate topic doesn't violate anything.
8 BY MS. MILBURN:
9 Q. Going to another example. If a teacher in the hallway
10 wore a pin that said "America is Racist," would you
11 view that in your own personal view as being a
12 violation of HB 2?
13  MR. KENISON-MARVIN: Same objection. Legal
14 conclusion.
15  THE WITNESS: I think there are people that
16 would make that allegation.
17 BY MS. MILBURN:
18 Q. What about in your personal opinion?
19  MR. KENISON-MARVIN: Same objection.
20  THE WITNESS: In my personal capacity or in
21 my professional capacity?
22  MS. MILBURN: Personal capacity.
23  THE WITNESS: Personal capacity? I mean, I
24 don't think it's the best idea for a teacher to do a
25 number of things because it impacts other students.

**182**

1 But is it their right? I suspect it probably is.
2 BY MS. MILBURN:
3 Q. Switching to another example. What if during -- would
4 you consider an after-school film club to be an
5 extracurricular activity?
6  MR. KENISON-MARVIN: Objection. Vague and
7 legal conclusion.
8  THE WITNESS: Again, it comes down to is it
9 approved by the school board? Is it approved by the
10 school superintendent? Is it an approved program? If
11 it's an approved program, sure.
12 BY MS. MILBURN:
13 Q. And what if a teacher showed students during the
14 after-school film club the movie that we were
15 previously discussing, White Like Me by Tim Wise?
16 Would that be a violation of HB 2?
17  MR. KENISON-MARVIN: Same objection.
18  THE WITNESS: I don't know. I haven't seen
19 the film.
20  MS. MILBURN: Okay.
21  THE WITNESS: So I can't -- I can't answer
22 that question.
23 BY MS. MILBURN:
24 Q. You previously testified, I think, that you had read
25 portions of How to Be an Antiracist; is that right?

**183**

1 A. Yes.
2 Q. If a teacher recommended to a student in the library
3 that they read that book, would you view that as being
4 a violation of HB 2?
5  MR. KENISON-MARVIN: Same objection.
6  THE WITNESS: Under what context?
7 BY MS. MILBURN:
8 Q. A student comes to a teacher and asks, "What do you
9 think I should read in my own free time?" And the
10 teacher recommends that book. Do you think that's a
11 violation of HB 2?
12  MR. KENISON-MARVIN: Same objection.
13  THE WITNESS: I honestly don't know. I don't
14 know the answer to the question.
15 BY MS. MILBURN:
16 Q. Is there any public guidance beyond these FAQs that
17 would help teachers understand answers to the questions
18 that I just posed to you?
19 A. From this agency?
20 Q. From the DOE or from any other agency.
21 A. I'm not aware of any.
22 Q. So, just in your work for the DOE, I get the sense that
23 you're concerned with children's safety. That's
24 important to you; is that right?
25 A. That's my number one priority.

**184**

1 Q. And it's fair to say that you stay informed of whether
2 or not there are any safety concerns in schools at any
3 time; is that fair to say?
4  MR. KENISON-MARVIN: Objection. Vague.
5  THE WITNESS: That's fair.
6 BY MS. MILBURN:
7 Q. And you're concerned with whether or not children are
8 being put at risk by teachers; is that fair to say?
9 A. Yes.
10 Q. Are you aware of any incidents at any school where
11 extracurricular activities were disrupted because a
12 teacher discussed a topic that was banned under HB 2?
13 A. No.
14 Q. And we previously talked about a teacher wearing a pin
15 that says "America is Racist"; is that right?
16 A. We talked about that, yeah.
17 Q. Would you consider that to be disruptive behavior?
18  MR. KENISON-MARVIN: Objection. Vague.
19  THE WITNESS: Does it potentially have the
20 ability to disrupt? Certainly.
21 BY MS. MILBURN:
22 Q. But you're not aware of any instance where --
23 A. None that I'm aware of, no.
24 Q. What about recommending the book that we were
25 previously discussing, How to Be an Antiracist, to a

---

**185**

1  student? Would you consider that to be disruptive
2  behavior?
3      MR. KENISON-MARVIN: Same objection.
4      THE WITNESS: Context.
5  BY MS. MILBURN:
6  Q. What if, in response to a student's question like we
7  discussed before about what they would recommend for
8  outside-of-class reading, they recommended that book?
9  Is that disruptive?
10      MR. KENISON-MARVIN: Same objection.
11      THE WITNESS: Disruptive to whom?
12      MS. MILBURN: To the school in general.
13      THE WITNESS: I don't know.
14  BY MS. MILBURN:
15  Q. So we've previously discussed the Moms for Liberty
16  bounty. Do you remember that?
17  A. Yes.
18  Q. Did you ever discuss any concerns with teachers about
19  Moms for Liberty?
20  A. Individual teachers?
21  Q. Yes.
22  A. I don't recall doing that.
23  Q. Did you ever have any conversations with anyone who was
24  concerned about Moms for Liberty in general, about
25  being reported on by Moms for Liberty, or because of

---

**186**

1  the Moms for Liberty bounty?
2      MR. KENISON-MARVIN: Objection. Vague and
3  compound.
4      THE WITNESS: I don't have direct
5  recollection of having that kind of a discussion with
6  anyone here.
7  BY MS. MILBURN:
8  Q. And we previously discussed the No Left Turn group?
9  A. Yes.
10  Q. Is that right? I'm going to show you another document.
11      (Discussion off record.)
12      MR. BISSONNETTE: Exhibit 28.
13  BY MS. MILBURN:
14  Q. So if we could show Exhibit 28?
15  A. Okay.
16  Q. So you're familiar with the No Left Turn in
17  Education --
18  A. Yes.
19  Q. -- group? Did you ever discuss No Left Turn with any
20  teacher?
21  A. With a teacher?
22  Q. With any teachers.
23  A. Not that I recall, no.
24  Q. And do you remember any teacher ever expressing
25  concerns about potentially violating HB 2 in response

---

**187**

1  to No Left Turn?
2  A. I don't believe I ever communicated with any of the
3  teachers identified on that list, so, no.
4  Q. What about any teachers --
5  A. No.
6  Q. -- that were not on the list?
7  A. I wouldn't have any reason to. These are confidential
8  matters, so I wouldn't talk about that outside.
9  Q. Are you aware of any teachers who were found to have
10  violated HB 2 because they signed the pledge?
11  A. Absolutely not.
12  Q. This email says, "We reviewed the same list back in the
13  summer, and the decision was the same. Moreover, the
14  day of action in New Hampshire took place on June 12,
15  2021. Therefore, it is believed that the signatures,
16  if confirmed, were affixed to the pledge prior to HB 2
17  becoming law."
18      Do you see that?
19  A. I see.
20  Q. In your view, would a teacher have violated the statute
21  if they had signed the pledge after the law was
22  passed?
23  A. I think that was clear --
24      MR. KENISON-MARVIN: Objection. Legal
25  conclusion. You can answer.

---

**188**

1      THE WITNESS: I think that's clear. And the
2  email speaks for itself. One, it was -- the day of
3  action was before; and, two, no. So I think that
4  speaks for itself.
5  BY MS. MILBURN:
6  Q. So, no, they would not have violated the statute if
7  they had signed the pledge after the law was passed?
8  A. That's what the email says, yeah.
9  Q. Is it your understanding that the Zinn pledge was
10  signed by teachers outside of the school grounds?
11  A. I have no idea where they signed it.
12  Q. Teachers have social media platforms; is that right?
13  A. Yes. Yes, they do.
14  Q. And they're friends with students on those platforms,
15  right?
16  A. Oh, yes, indeed, they are.
17  Q. You sound concerned with the social media platforms.
18  A. Oh, I wish teachers could live in my shoes for a few
19  minutes, and they would have a different opinion, I
20  think, at the end of spending a day in my shoes.
21  Q. And so teachers can share content with students on
22  these platforms; is that right?
23  A. Oh, I would assume so, yeah.
24  Q. In your view, would public postings that a teacher
25  makes on their social media platform be covered under

189

1  HB 2?
2       MR. KENISON-MARVIN: Objection. Legal
3  conclusion.
4       THE WITNESS: The question is too broad for
5  me. I mean, is it while they were working? Was it a
6  sanctioned website? Was it on their email account?
7  Was it text messages? Was it a Facebook or Instagram?
8  When did it occur? Under what context?
9       MS. MILBURN: So I'll show you a document.
10      (Exhibit 35 marked for identification.)
11  BY MS. MILBURN:
12 Q.  So if you could turn your attention to the second page,
13  which is DOE00909?
14 A.  Yes.
15 Q.  It's an email from James Laboe to Edelblut. You're not
16  on this email. He says, "Frank, I'm not sure if you've
17  had a chance to view Kate LeClaire's Twitter feed in
18  relation to the study guide materials that she was
19  circulating to teachers. Because of our presentation
20  Tuesday night, she is now restricted access, i.e. her
21  Twitter feed is no longer open to the public."
22      So taking a look at this email, if a teacher is
23  circulating study guide materials on their Twitter
24  feed, is there a possibility that they would violate HB
25  2?

190

1       MR. KENISON-MARVIN: Same objection. Legal
2  conclusion.
3       THE WITNESS: I can't answer that question
4  because I don't know what the study guide is. I have
5  no idea what's being provided. As a general rule,
6  Twitter accounts and Instagram, Facebook, communicating
7  with kids outside of the normal structured email for
8  the district is never a good idea, which leads to
9  things like this. So I can't answer your question
10  because I don't know what the study guide says or what
11  it provides.
12  BY MS. MILBURN:
13 Q.  Is the code of conduct covered outside of school
14  property? Does the code of conduct apply outside of
15  school property?
16 A.  If you take a look at Ethical Use of Technology, which
17  I think is principle four, yes, it does, depending on
18  what the content is and what's been transmitted. I
19  mean, the cases that I like to work on, almost
20  invariably with educator misconduct, in some form or
21  fashion, has a social media component to it.
22      So in terms of your question, I can't answer
23  because I don't know what, hypothetically, you're
24  talking about.
25 Q.  Is it fair to say that the code of conduct would apply

191

1  to a teacher's social media account?
2 A.  Depending on what the social media is doing. We've had
3  teachers grooming kids. We've had teachers going onto
4  certain websites and trying to groom kids or connect
5  with them sexually. So, yeah, it certainly could be a
6  violation of the code of conduct.
7 Q.  In your view, would a teacher violate HB 2 if they said
8  "America is a racist country" on their Twitter feed and
9  shared that content with students?
10      MR. KENISON-MARVIN: Objection. Legal
11  conclusion.
12      THE WITNESS: I'd have to see the full
13  context.
14  BY MS. MILBURN:
15 Q.  Have you heard of any instances where a teacher removed
16  a post from their social media platform because they
17  thought it might violate HB 2?
18 A.  No. I'm not familiar with any specific instance that
19  you've described.
20 Q.  Let's assume in my hypothetical that a teacher's
21  Twitter feed did violate HB 2.
22 A.  Well, that would be -- that would be a process after it
23  goes to the Human Rights Commission, the Department of
24  Justice. It's a long process.
25 Q.  Let's assume that it went through that process. It was

192

1  determined that the content violated the statute.
2  Would the Twitter feed be covered under the statute?
3       MR. KENISON-MARVIN: Same objection, and
4  vague.
5       THE WITNESS: I'm not sure I -- I'm not
6  following what you mean. So let me just understand
7  your question. There's been a full investigation
8  referred to the Human Rights Commission. There's been
9  a finding, and the finding has been referred to us.
10      MS. MILBURN: Correct.
11      THE WITNESS: Okay. Now, what's your
12  question?
13  BY MS. MILBURN:
14 Q.  In your view, after it's reached that point, would the
15  Twitter feed violate the statute?
16      MR. KENISON-MARVIN: Objection.
17  BY MS. MILBURN:
18 Q.  In your --
19 A.  You've already said it did.
20      MR. KENISON-MARVIN: Same objection. Vague
21  and legal conclusion.
22      MS. MILBURN: Sorry. Let me take that back.
23  BY MS. MILBURN:
24 Q.  Would the DOE, in your opinion, take the position that
25  it violates the Educator Code of Conduct?

193

1    MR. KENISON-MARVIN: Same objections.
2    THE WITNESS: Well, again, we talked about
3  this earlier. It's the process.
4    MS. MILBURN: Correct.
5    THE WITNESS: So once it comes back with a
6  finding, there would be an investigation at the DOE
7  level to determine if there is code of conduct
8  violation. So you're asking me a question that I can't
9  answer.
10  BY MS. MILBURN:
11 Q.  Just taking my scenario one last time. Once the HRC
12  has determined that there was a violation of the
13  statute, what would be left for the DOE to investigate
14  in that instance?
15 A.  **Well, what's left is what is the pleading? What are**
16  **the facts? Does it form within the code of conduct?**
17  **And, if so, what would any sanction be? I think that's**
18  **what our role would be after the finding.**
19 Q.  And is it possible that a teacher's posting on Twitter
20  could be found to be a violation of the code of
21  conduct?
22 A.  **Well, you've already — this is a strange question.**
23  **You've already told me that the Human Rights Commission**
24  **has had a finding that it violated the statute.**
25 Q.  Correct.

194

1 A.  **Correct?**
2 Q.  Correct.
3 A.  **Okay. So then it comes to us to review, and does it**
4  **violate the code of conduct? And, if so, what's the**
5  **sanction? We're not reinventing the wheel. There's**
6  **already been a finding. So Twitter account, social**
7  **media, drawing of the blackboard. It's all the same.**
8  **They've made a finding. We now investigate and**
9  **determine sanctions.**
10 Q.  So it's your testimony that the posting on Twitter
11  could be sanctionable?
12    MR. KENISON-MARVIN: Objection. Misstates
13  the testimony. Asked and answered.
14    THE WITNESS: That's not what I said.
15  There's already been a finding.
16    MS. MILBURN: Correct.
17    THE WITNESS: So we go over, we do our work,
18  and determine the sanction. We're not reinventing
19  anything.
20    MS. MILBURN: Got it. Okay. I'm going to
21  show you a new document.
22    (Exhibit 36 marked for identification.)
23  BY MS. MILBURN:
24 Q.  Do you recall this email between you and Brian Taylor
25  on June 14th, 2022?

195

1 A.  **Okay. I don't recall getting it. I got it.**
2 Q.  So you don't -- do you recall Rachael Blansett?
3 A.  **So Rachael Blansett, I think the first thing that I**
4  **would have done in receiving this email would be to**
5  **determine whether Rachael Blansett is a licensed**
6  **educator. And if she was a licensed educator, I would**
7  **go one way. If she's not a licensed educator, I have**
8  **no jurisdictional involvement, so I'd go a different**
9  **way.**
10   **And if this is the only email correspondence, my**
11  **guess is -- and I could be wrong -- that she's not a**
12  **licensed educator. Therefore, I have no say in it at**
13  **all.**
14 Q.  Do you recall -- you don't recall what happened with
15  this complaint?
16 A.  **Well, I can tell you nothing happened with the**
17  **complaint, because I have a pretty good memory, and**
18  **this is recent. And this name does not register with**
19  **me as a sanctionable -- a person with any kind of**
20  **sanction or investigation.**
21 Q.  If a teacher posted this same content that you've had a
22  chance to review here in the email online, on a blog
23  post, would you view that as violating HB 2?
24    MR. KENISON-MARVIN: Objection. Legal
25  conclusion.

196

1    THE WITNESS: Well, it didn't, so...
2  BY MS. MILBURN:
3 Q.  I understand. But if it was a teacher or they posted
4  this same content, would you view that as violating HB
5  2?
6    MR. KENISON-MARVIN: Same objection.
7    THE WITNESS: Well, to whom was it posted?
8  There are too many unanswered questions. I mean, it's
9  a social media post. It's off work. It's wherever.
10  She's a teacher. She does it in July, on the 4th of
11  July. School's not in session. Who was her audience?
12  I have no idea. I don't have enough facts to make that
13  kind of a determination.
14  BY MS. MILBURN:
15 Q.  What if they were sharing this content with students on
16  the blog?
17 A.  **I'd have to look at the facts. My guess is send it off**
18  **to Human Rights Commission.**
19 Q.  Based off of what you see in this email, would a parent
20  have legitimate grounds to file a complaint against a
21  teacher with the Human Rights Commission?
22    MR. KENISON-MARVIN: Same objection.
23    THE WITNESS: Say it again.
24  BY MS. MILBURN:
25 Q.  Based off the facts that you have in this email --

Transcript of Richard Farrell
Conducted on May 18, 2023

197

1  A. Yep.
2  Q. -- would a parent have legitimate grounds to file a
3     complaint against the teacher with the HRC?
4         MR. KENISON-MARVIN: Same objection, and
5     vague. You can answer.
6         THE WITNESS: A parent can file a legitimate
7     complaint about anything; whether there's a finding is
8     a different story. So could a parent take this stuff
9     and file a complaint? Anybody can file a complaint.
10    BY MS. MILBURN:
11 Q. Do you think it would be reasonable, based off of these
12    set of facts, to file a complaint?
13        MR. KENISON-MARVIN: Same objections.
14        THE WITNESS: Reasonable for whom? The
15    parent or the --
16        MS. MILBURN: Reasonable for the parent.
17        THE WITNESS: Sure. A parent can file
18    anything they want. It's more than reasonable to file.
19    Whether there's any substance to it is a different
20    story.
21    BY MS. MILBURN:
22 Q. And we previously touched on this, but I just want to
23    clarify. Just to confirm the Educator Code of Conduct
24    does apply to educators or credential holders when
25    they're off duty?

198

1  A. It can.
2  Q. Are you aware of any private citizens who have
3     investigated teachers when they're off duty for
4     violating HB 2?
5  A. I have no idea what you're talking about. No.
6  Q. Has the DOE received any complaints from private
7     citizens in investigating teachers when they're off
8     duty for violating HB 2?
9  A. So say it again one more time, please.
10 Q. Sure. Has the DOE received any complaints from private
11    citizens who are investigating teacher conduct off duty
12    that violates HB 2?
13        MR. KENISON-MARVIN: Objection. Vague.
14        THE WITNESS: So what you're asking me is
15    they're conducting their own investigation? I have no
16    idea. I've never heard of that, to tell you the truth.
17        MS. MILBURN: I'm going to show you one more
18    document. I think this is 37.
19        (Exhibit 37 marked for identification.)
20    BY MS. MILBURN:
21 Q. Again, you're not copied on this email, but let me know
22    once you've had a chance to read it.
23 A. Okay.
24 Q. Are you familiar with Cheryl Dean?
25 A. I have no idea who she is.

199

1  Q. Are you aware of any private hotlines that had been
2     created to report on teachers?
3  A. First I've seen. No, I don't.
4  Q. Any other efforts that have been taken by private
5     citizens to report on teachers?
6  A. You mean as an organization? No.
7  Q. The last document I am going to show you is -- I think
8     it's Exhibit 31.
9  A. I've got it, I think. Yep. Okay.



10
11
12
13
14
15
16
17
18     Do you see that?
19 A. I do.
20 Q. Have you received any complaints about books that
21    teachers have on their shelves in their classrooms?



22
23
24
25

200

1
2  Q. In your personal view, do you believe that books that
3     teachers have in their classrooms are covered under HB
4     2?
5         MR. KENISON-MARVIN: Objection. Legal
6     conclusion and vague.
7         THE WITNESS: You'd have to provide me
8     context for it. I mean, is the teacher reading the
9     book and it's in her book bag and it's not being used
10    for curriculum purposes as opposed to something else?
11    The question is -- I can't answer that question.
12    BY MS. MILBURN:
13 Q. Let's assume that it's just out on their bookshelf for
14    students to see, but they're not using it as part of
15    their instruction.
16 A. And that's the question? Is that --
17 Q. Could that violate HB 2?
18        MR. KENISON-MARVIN: Same objections.
19        THE WITNESS: I'd have to know the context.
20    And even if it did, or we thought it did, I would refer
21    to the Human Rights Commission anyway. I wouldn't be
22    involved until the very end of the process.
23        MS. MILBURN: Could we just take a two-minute
24    break?
25        (Recess taken.)

---

**201**

1      MS. MILBURN: I just have one final question.

2      BY MS. MILBURN:

3   Q.  Is there any scenario in which a teacher's social media

4      platform could be covered under HB 2?

5          MR. KENISON-MARVIN: Objection. Legal

6      conclusion and vague.

7          THE WITNESS: I would have to see the case.

8      I don't know.

9      BY MS. MILBURN:

10  Q.  Are there any set of facts where it's possible that it

11     could be covered?

12         MR. KENISON-MARVIN: Same objection.

13         THE WITNESS: I mean, that would be a

14     decision made by the Human Rights Commission, so we

15     would, if we got an intake like that, refer, and let

16     them do their work. So I really can't answer that

17     question.

18         MS. MILBURN: Thank you.

19         MR. BISSONNETTE: Attorney Kenison and I did

20     have a discussion off the record that I'll place on the

21     record with respect to Exhibit 32 which is a document

22     that was produced by the Human Rights Commission, not

23     the Department of Education, which is Bates stamped 53

24     to 64. It's been designated confidential subject to

25     protective order. That is Exhibit 32 in its entirety.

---

**202**

1      The parties agree that discussion with

2   respect to Exhibit 2 in the deposition transcript will

3   also be designated as confidential subject to

4   protective order.

5      And, in addition, because the witness

6   reviewed and had placed before him Exhibit 32, that

7   there would also -- there's an understanding among the

8   parties that the witness will sign the acknowledgment

9   form at the back end of the protective order in order

10  to ensure the confidentiality of Exhibit 32.

11     Of course, the plaintiffs aren't waiving

12  their rights with respect to challenging that

13  designation at any point, particularly in advance of

14  the filing of a public pleading, but this is to

15  maintain, in the interim, that designation if, and

16  until, any party elects to challenge that designation

17  subject to the terms of the protective order.

18     Did I get that right? I think.

19         MR. KENISON-MARVIN: It sounded eloquent.

20         MR. BISSONNETTE: With that, I mean, I think

21  on behalf of all of us, I think we wanted to express

22  our thanks.

23         MR. KENISON-MARVIN: I do have a few

24  redirects.

25         MR. BISSONNETTE: Oh, of course. Of course.

---

**203**

1          MR. KENISON-MARVIN: I think I do, but I'd

2      like to take another break just to speak shortly with

3      Mr. Farrell.

4          (Recess taken.)

5              EXAMINATION

6      BY MR. KENISON-MARVIN:

7   Q.  I'm just going to have -- I intend one or two short

8      questions for you just to follow up on the testimony

9      you gave today. Try to be brief.

10         I want to have you look at Exhibit 1, cover page

11     titled "Full Text of the Banned Concepts Act."

12         And earlier today you were asked to look at the

13     page marked PL0006, particularly the provision 193:41D.

14     Do you see where I'm looking?

15  A.  Yes. Line 36.

16  Q.  Correct. And it continues onto the next page, that

17     whole provision. I think Attorney Kahne had read that

18     provision and asked you something to the effect of if

19     you knew what it meant. Do you remember giving that

20     testimony?

21         MR. KAHNE: Objection.

22         MR. KENISON-MARVIN: Can you tell me what

23     the --

24         MR. KAHNE: Objection. Mischaracterizes my

25     question, and I didn't read the section.

---

**204**

1      BY MR. KENISON-MARVIN:

2   Q.  Do you remember looking at this section earlier?

3   A.  I do.

4   Q.  Okay. And do you remember being asked something to the

5      effect of if you knew what that meant?

6   A.  Yes.

7   Q.  And do you remember giving testimony to the effect of

8      "I have no idea"?

9   A.  Yes.

10  Q.  Can you explain that testimony and what you meant when

11     you said "I have no idea"?

12  A.  I obviously can read the language, but I had -- I have

13     no idea because this would all go to the Human Rights

14     Commission and it has no bearing on me. So when I -- I

15     was answering the question badly. I should have said I

16     understand what it means: One group of people can't

17     harm another group of people. And I understand what

18     that means, but it has no bearing on me because these

19     will all be referred to HRC for their findings. So I

20     misspoke.

21         MR. KENISON-MARVIN: I don't have anything

22     else.

23         MR. KAHNE: Just one follow-up here.

24              EXAMINATION

25      BY MR. KAHNE:

205

1  Q.  Mr. Farrell, I understand your testimony now is that
2      you understand what these words mean, but I believe my
3      question earlier was do you understand what it
4      prohibited under subsection D?  And so my question is
5      do you know what materials are prohibited under
6      subsection D?
7          MR. KENISON-MARVIN:  Objection as to legal
8      conclusion.
9      BY MR. KAHNE:
10 Q.  From instruction.  From educational instruction.
11         MR. KENISON-MARVIN:  Objection as to -- it
12     calls for a legal conclusion.
13         THE WITNESS:  So, in reading it, first of
14     all, the complaint would be forwarded.  I would not be
15     involved in this until a finding is made.  But what it
16     seems to me to mean is that one group of people or one
17     group of thoughts can't be imposed to another group of
18     people based on the prerequisites:  Race, religion,
19     creed, color, et cetera.
20     BY MR. KAHNE:
21 Q.  Okay.  But the language here says that one group of
22     people cannot and should not attempt to treat others
23     without regard to age, sex, gender identity.  Do you
24     see that?
25 A.  I do.

206

1          MR. KENISON-MARVIN:  Objection to the extent
2      it misstates what the language says.
3          MR. KAHNE:  Well, how have I misstated it?
4          MR. KENISON-MARVIN:  Sorry.  I'm looking for
5      the language where it says "one group of people."
6      BY MR. KAHNE:
7  Q.  Would affirmative action be covered under subsection
8      D?
9          MR. KENISON-MARVIN:  Objection.  Legal
10     conclusion.  Asked and answered.
11     BY MR. KAHNE:
12 Q.  Do you know?
13 A.  I don't.
14 Q.  Do you know if reparations would be covered under
15     subsection D?
16         MR. KENISON-MARVIN:  Objection.  Same.  Same
17     objections.
18         THE WITNESS:  Again, I don't, and that would
19     be a decision made by the Human Rights Commission, and
20     not me.
21     BY MR. KAHNE:
22 Q.  So, fair to say you have no idea whether those topics
23     would be covered?
24 A.  No.
25         MR. KENISON-MARVIN:  Same objections.

207

1      BY MR. KAHNE:
2  Q.  And are you aware of any book covered under -- that
3      would be prohibited under the law?
4          MR. KENISON-MARVIN:  Objection.  Vague.
5      BY MR. KAHNE:
6  Q.  Are you aware of any book that is prohibited under the
7      prohibition on teaching discrimination?
8          MR. KENISON-MARVIN:  Same objection.  And I
9      think that goes beyond the scope of what I was
10     redirecting him on, to the extent you're asking about
11     the law and not subsection D.  I just asked about
12     subsection D.
13         MR. KAHNE:  So subsection D.
14         THE WITNESS:  The question is?
15     BY MR. KAHNE:
16 Q.  Are you aware of any book that is prohibited from being
17     taught in New Hampshire public schools under subsection
18     D of the law?
19 A.  I am not.
20         MR. KAHNE:  Okay.
21         (Whereupon, the deposition was concluded at
22     4:39 p.m.)
23
24
25

208

1          C E R T I F I C A T E
2      I, Sharon G. Saalfield, a Licensed Shorthand
3  Reporter for the State of New Hampshire, Certified Shorthand
4  Reporter for the Commonwealth of Massachusetts, Registered
5  Diplomate Reporter and Certified Realtime Reporter, do
6  hereby certify that the foregoing is a true and accurate
7  transcript of my stenographic notes of the proceeding taken
8  at the place and on the date hereinbefore set forth to the
9  best of my skill and ability under the conditions present at
10 the time.
11     I further certify that I am neither attorney or
12 counsel for, nor related to or employed by any of the
13 parties to the action in which this proceeding was taken,
14 and further that I am not a relative or employee of any
15 attorney or counsel employed in this case, nor am I
16 financially interested in this action.
17     Before completion of the deposition, review of the
18 transcript was requested.
19     The foregoing certification of this transcript
20 does not apply to any reproduction of the same by any means
21 unless under the direct control and/or direction of the
22 certifying reporter.
23
24  _____
25     Sharon G. Saalfield,
       Lic. No. 147, CSR, RDR, CRR

**EXHIBIT 5**

HRC Director
Ahni Malachi
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

AHNI MALACHI

May 24, 2023



AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

**3**

1

2                                    INDEX

3                         Deposition of Ahni Malachi

4   Examination by Mr. Bissonnette:                    5

5                                  EXHIBITS

6   53   Letter, Malachi to DiLorenzo,

7        March 4, 2022, DOE-10269-72            19

8   54   Email, BurkeCohen to Malachi,

9        20 Sep 2021, HRC-00379-380            49

10  55   Exhibit 19, July 21, 2021,

11       Guidance, PL 00415-423               77

12  56   NH Commission for Human Rights,

13       Minutes, October 7, 2021,

14       HRC-00391-394                        94

15  57   Commissioner Edelblut's Objections

16       and Responses to the Plaintiffs'

17       First Set of Interrogatories         99

18  58   Christian Kim and Ahni Malachi's

19       Objections and Responses to the

20       Plaintiffs' First Set of

21       Interrogatories                     101

22       (Original exhibits retained by reporter)

23       (Scanned copies provided to all counsel)

---

**1**

                        UNITED STATES DISTRICT COURT

                        DISTRICT OF NEW HAMPSHIRE

                                 CERTIFIED
                                 ORIGINAL

        Local 8027, AFT-New Hampshire, et al.

                        Plaintiff,

        v.

        Frank Edelblut, Commissioner, et al

                        Defendants.

                        No. 1:21-cv-01077-PB

                        VOLUME I

                        DEPOSITION OF AHNI MALACHI

                        taken on behalf of the Plaintiffs

                        at the New Hampshire Commission

                        for Human Rights, Concord, NH,

                        on May 24, 2023, at 11:15 a.m.

        Court Reporter:

        Cynthia Foster, LCR

        LCR #14 (RSA 310-A:161-181)

---

**2**

1

2   APPEARANCES:

3        On behalf of the Plaintiffs, Local 8027, AFT-New
         Hampshire, AFL-CIO:

4   STROOCK & STROOCK & LAVAN LLP
    By: Charles Moerdler, Esq.

5        Elizabeth C. Milburn, Esq.
         David Kahne, Esq., by Zoom

6   180 Maiden Lane
    New York, NY  10038

7   212-806-5648
    cmoerdler@stroock.com

8   ecmilburn@stroock.com

9        On behalf of the Plaintiffs, Christina
         Philibotte, Andres Mejia, NEA-New Hampshire:

10  ACLU OF NEW HAMPSHIRE
    By: Gilles Bissonnette, Esq.

11  18 Low Avenue, Unit 12
    Concord, NH  03301

12  603-225-3080
    gilles@aclu-nh.org

13

         On behalf of the Defendants, Frank Edelblut,

14  Ahni Malachi, John Formella, et al:
    NH DEPARTMENT OF JUSTICE

15  By: Nathan W. Kenison-Marvin, Esq.
    33 Capitol Street

16  Concord, NH  03301
    603-271-1292

17  nathan.w.kenison-marvin@doj.nh.gov

18  By Zoom:
    Peter Perroni, Esq.

19  Nathan Fennessy, Esq., nfennessy@preti.com
    Morgan Nighan, Esq., mnighan@nixonpeabody.com

20  Jennifer Eber, Esq.
    Kayla Turner, Esq., kaylat@drcnh.org.

21  Esther Dickinson, Esq., edickinson@nhnea.org

22

23

---

**4**

1

2                        S T I P U L A T I O N S

3            It is agreed that the deposition shall

4   be taken in the first instance in stenotype and when

5   transcribed may be used for all purposes for which

6   depositions are competent under New Hampshire

7   practice.

8            Notice, filing, caption and all other

9   formalities are waived.  All objections except as to

10  form are reserved and may be taken in court at trial.

11           It is further agreed that if the

12  deposition is not signed within thirty (30) days

13  after submission to counsel, the signature of the

14  deponent is waived.

15           It is further agreed that exhibits may

16  be retained by counsel until the time of trial.

17

18

19

20

21

22

23

5

1          AHNI MALACHI, DULY SWORN
2              EXAMINATION
3   BY MR. BISSONNETTE:
4   Q    Thank you, and I just want to make clear for the
5        record that we have the same stipulations as
6        yesterday.  I think we're all in an agreement,
7        and there's obviously going to be no recording
8        of this deposition today.  We're all in
9        agreement there.
10          MR. KENISON-MARVIN:  I agree.
11  Q    Director Malachi, I know we've met before.  My
12       name is Gilles Bissonnette.  I represent Tina
13       Philibotte and Andres Mejia in this case.  Thank
14       you so much for coming in today.  I'm just going
15       to kind of walk you through kind of what the
16       deposition process looks like, the common
17       understandings and agreements that we have amid
18       this process.  So before I kind of go through
19       that, I just want to ask you have you ever been
20       deposed before?
21  A    No.
22  Q    Okay.  So the way this works, obviously, is
23       we're in a room, a reporter is going to be

6

1        recording everything that we say to one another.
2        So I think it's important that we don't talk
3        over each other.  That's more an issue for the
4        lawyers as opposed to the witnesses so I can
5        promise you I will do my best to let you finish
6        your answers before I ask another question, and
7        reciprocally, I would just ask that you wait to
8        provide an answer until I finish my question.
9        Does that make sense?
10  A    Yes.
11  Q    And if you don't understand a question, please
12       tell me, and I'll be happy to rephrase or make
13       an effort to reclarify.  If you don't do that
14       and you respond to the question, I'm going to
15       assume that you have understood the question.
16       Okay?
17  A    Okay.
18  Q    And as well, I would just ask you given the fact
19       that we have a court reporter here transcribing
20       the deposition that I'd ask that you just avoid
21       nonverbal cues so just make sure your responses
22       are verbal and are loud enough to be heard by
23       both the folks in this room and the reporter.

7

1        Okay?
2   A    Yes.
3   Q    And this is especially important.  I know this
4        isn't always, you know, a fun process going
5        through a deposition, you can take breaks at any
6        time.  Typically, we do them on the hour.  If
7        you need them sooner, that's totally fine.
8        Whatever makes you the most comfortable if you
9        need a break.  My only kind of caveat would be
10       if there's a pending question that we just
11       answer that question before we take that break.
12          There's one exception to that.  If there's
13       a privilege assertion or a privilege question
14       being raised either by you or by counsel, of
15       course, I think then it would be appropriate to
16       take a break even if we don't yet have an answer
17       to that question.  Okay?
18  A    Yes.
19          (Discussion off the record re Zoom)
20  Q    If the Zoom component of this deposition becomes
21       a distraction visually, I can move myself so
22       it's less in sight so that is an option I just
23       want to make you aware of as well.

8

1          Obviously, you were just sworn in.  You do
2        know that you're under oath, correct?
3   A    Yes.
4   Q    Okay.  And I'm going to just kind of represent
5        to you that there is a chance in this case that
6        the deposition today, either in whole or in
7        part, would be made available to the judge in
8        this case.  Is that something that you're aware
9        of?
10  A    Yes.
11  Q    Will anything prevent you from giving truthful
12       and accurate testimony today?
13  A    I don't understand the question.
14  Q    Is there anything that would prevent you from
15       giving truthful testimony today at this
16       deposition?  Medications, family issues, is
17       there anything kind of in your life that would
18       prevent you from giving truthful testimony.
19  A    No.
20  Q    Okay.  I assume that you know that this is a
21       lawsuit that challenges portions of what the
22       Plaintiffs have called the Banned Concepts Act.
23       Do you understand that's what's being litigated

**9**

1    in this case?

2  A    I would push back against the title of that.

3  Q    Please do.  Yes.  How so?

4  A    So if you are talking about RSA 354-A:29 through

5      34, is that what you're asking me?

6  Q    That is.  Do you understand that those are the

7      provisions of New Hampshire law that are being

8      challenged in this case?

9  A    Yes.

10  Q    If I were to call those provisions that are

11      being challenged "HB 2," and I wouldn't be

12      referencing the entire bill of HB 2, but if I

13      were to use the term "HB 2" to reference those

14      provisions 354-A:29 to 34, do we have a common

15      understanding on just the title of the

16      challenged law?

17  A    The preference would be the freedom from

18      discrimination in public workplaces and

19      education because that's the name of the amended

20      section.

21  Q    Would you prefer that I call it the Freedom from

22      Discrimination Law?  I just want to make sure we

23      have a common understanding on terminology.

**10**

1      That's all.  Would that be your preference?

2  A    I can agree to that portion of the exact title.

3      Yes.

4  Q    Okay.  So if I were to use the term the Freedom

5      from Discrimination Law in the course of this

6      deposition, you would understand that what I'm

7      referring to are the provisions in New Hampshire

8      law RSA 354-A:29 to 34.

9  A    Yes.

10  Q    Okay.  I'm just going to just so again we have a

11      common understanding on terminology, I'm just

12      going to put before you what's been previously

13      marked as Exhibit 1, and I am going to ask you

14      to just review this, Director Malachi, briefly,

15      but I do want to represent to you that that

16      first page is a page created by me as Exhibit 1

17      to the lawsuit that Majia/Philibotte Plaintiffs

18      filed in this case.

19          So setting that cover page aside, I would

20      just ask you to review pages marked PL 004 to PL

21      007 and my question is going to be when you're

22      done reviewing that is this the law that you

23      understand to be challenged in this case and

**11**

1      that we are calling the Freedom from

2      Discrimination Law in this deposition.

3  A    PL 004 through?

4  Q    004 to 007.

5  A    Okay.  So to answer your question, there's a bit

6      of a discrepancy.  So are you asking me if pages

7      4 through 7 are relative to 354-A and the

8      section entitled Right to Freedom from

9      Discrimination in Public Workplaces in Education

10      or is there an additional question that you're

11      asking?

12  Q    Sure.  I guess my opening question is is it your

13      understanding that the unredacted language on

14      pages 4 and 7 of Exhibit 1 contain the statutory

15      language that's being challenged by the

16      Plaintiffs in this case?

17  A    So my specific answer would be in part, yes.

18      There are other statutes that are listed there.

19  Q    Okay.  When I use the phrase in this case, the

20      "Freedom from Discrimination Law" which is the

21      common terminology we discussed, the law being

22      challenged in this case, is it your

23      understanding that we're referring to the

**12**

1      language on pages 4 through 7 on Exhibit 1?

2  A    As it relates to 354-A, subsections 29 through

3      34?

4  Q    Okay.

5  A    Yes.

6  Q    And I'm going to just direct your attention to

7      just page 6 which deals with RSA 193:40.  Do you

8      see that language?

9  A    193:40.  I see that.

10  Q    Yes.  I would just, I don't know if you know

11      this, but I will just represent to you again so

12      we have a common understanding that that portion

13      which is not in 354-A is also being challenged

14      by the Plaintiffs.  So is that something that

15      you knew before today?

16  A    I have knowledge about 354-A and subsections

17      dealing with :29 through :34.

18  Q    Do you have any knowledge with respect to

19      193:40?

20  A    That's not the statute that I work with.

21  Q    Okay.  We'll get to that.  That's good to know

22      though.  Thank you.

23          Director Malachi, what's your current

13

1    position?
2  A   I'm Executive Director of the New Hampshire
3      Commission on Human Rights.
4  Q   How long have you been in that role?
5  A   Five years.  Little over.
6  Q   What are your duties in that role?
7  A   They're a variety of duties.  I could certainly,
8      maybe faster to give you my job description in
9      writing.
10 Q   Well, I think maybe just give me a summary of
11     how you would describe those duties.
12 A   I'm in charge of the New Hampshire Commission
13     for Human Rights.  The staff, media liaison,
14     legislative liaison, budgeting, liaison to the
15     Governor's office, other duties as assigned.
16 Q   When you say "other duties as assigned," who
17     would be doing the assigning?
18 A   It could be the legislature could, the Governor
19     could, the Commissioners could.
20 Q   When you say "Commissioners," who are you
21     referring to?
22 A   The Commissioners of the Commission.
23 Q   For Human Rights?

14

1  A   Yes.
2  Q   How many are there?
3  A   There are 7.
4  Q   How would you describe how your role interacts
5      with the role of the Commissioners within the
6      Commission of Human Rights?
7  A   Could you be more specific?
8  Q   Within the structure of the Commission for Human
9      Rights Commission, do you report to
10     Commissioners, do they supervise you, how would
11     you describe that relationship?
12 A   I communicate with all of the Commissioners, but
13     primarily the Chair of the Commission, and it
14     could be day to day, it could be -- we have a
15     meeting every month.  The Commission meets
16     monthly.
17 Q   Okay.  And outside the meetings that occur, what
18     are the general topics of conversation that you
19     have with the Chair of the Commission?
20 A   We talk about the status of affairs with the
21     Commission.  So caseload, legislation, budgets,
22     other topics.
23 Q   I know that you said that the Commission meets

15

1      every month.  What are the general topics of
2      agenda items that are covered by the Commission
3      when they meet monthly?
4  A   Those are the topics, the ones I just mentioned,
5      those are the topics that we cover.
6  Q   Okay.  Is the actual Commission involved in the
7      processing and handling of complaints that come
8      into the office or is that outside their
9      responsibilities?
10 A   Are you asking me if the Commission or the
11     Commissioners?
12 Q   What would be the difference?
13 A   The Commission would be staff in this office.
14     The Commissioners would be the individuals.
15 Q   Thank you.  I appreciate that.
16 A   So I wasn't clear.
17 Q   I appreciate that.  Are the Commissioners
18     involved in processing complaints that come into
19     the office?
20 A   If I understand your question, are you asking me
21     if they have any involvement in charges that
22     come in?
23 Q   Yes.

16

1  A   Okay.  They do.
2  Q   Could you describe that involvement generally?
3          MR. KENISON-MARVIN:  Objection.
4      Foundation.  You can answer.
5  A   The Commissioners upon completion of an
6      investigation, there's an Investigating
7      Commissioner that's assigned to a charge who
8      would then make a finding of probable cause or
9      no probable cause.
10 Q   So I just want to be clear.  We'll get into kind
11     of what that process looks like in just a few
12     minutes, but I just want to make sure I
13     understand the Investigating Commissioner is a
14     Commissioner on the Commission for Human Rights;
15     is that fair to say?
16 A   Yes.
17 Q   Okay.  I kind of zoomed a little bit too far
18     forward.  I did want to get to your tenure, your
19     work history before you took this job with the
20     HRC five years ago.  So what was your place of
21     employment before you took this position at the
22     Human Rights Commission?
23 A   Hearst, Inc.

17

1  Q    What was your role at Hearst, Inc.?
2  A    So specifically I worked for WMUR, and I was
3       the, what it's called, Public Service Manager.
4  Q    And could you give me the approximate duration
5       of that employment using years?  You don't have
6       to give me months.
7  A    Approximately six years.
8  Q    Could you give me the years, that six-year
9       range?  Was that 2000 when to when?
10 A    I believe it was 2012 to 2018.
11 Q    Okay.  Is 2018 when you assumed this role at the
12      Human Rights Commission?
13 A    Yes.
14 Q    What were your responsibilities in that role at
15      Hearst, Inc.?
16 A    Producing Public Service Announcements for
17      charities, and other nonprofits.  Responsibility
18      for public-facing events where the TV station
19      was involved and other duties.
20 Q    I'm now going to kind of go back into our
21      discussion with complaints.
22          Could you just describe how the Human
23      Rights Commission processes complaints?

18

1          MR. KENISON-MARVIN:  Objection.  Foundation
2       and vague.
3  Q    Let me ask this.  Does the Human Rights
4       Commission process complaints made by members of
5       the public under the law against discrimination?
6          MR. KENISON-MARVIN:  Objection.  Vague.
7  A    Is there something more specific that you can
8       offer --
9  Q    I'm afraid not.
10 A    -- to allow me to answer?
11 Q    My question is pretty direct.  Yes or no, does
12      the New Hampshire Commission for Human Rights
13      process complaints made by the public under the
14      law against discrimination?
15         MR. KENISON-MARVIN:  Freedom from
16      Discrimination Law?
17 Q    I'm actually just talking about 354-A here
18      generally.  So I could, maybe I'll clarify my
19      question.  I'm not getting into HB 2 right now,
20      and we will get there, but just generally with
21      respect to 354-A, does the Human Rights
22      Commission process complaints made by the public
23      under RSA Chapter 354-A?

19

1  A    Yes.
2  Q    Can you describe for me what that process looks
3       like?
4  A    Someone who believes they've been discriminated
5       against will make a call, and if the context of
6       what they're alleging meets prima facie then a
7       charge is docketed, the other party is noticed,
8       and then there would be an investigation of the
9       charge.
10 Q    Okay.  I'm going to mark Exhibit 53.
11         (Exhibit 53 marked for identification)
12 Q    I put before you a document that's marked as
13      Exhibit 53.  Do you have Exhibit 53 in front of
14      you?
15 A    It looks like that's what it says here.
16 Q    Okay.  So I would just ask you to just review
17      Exhibit 53.  I'm just going to have some
18      questions about it so let me know when you're
19      finished reviewing it.
20         Have you reviewed Exhibit 53?
21 A    I have looked at it, yes.
22 Q    Great.  Thank you.  Have you seen Exhibit 53
23      before?

20

1  A    Exhibit 53?
2  Q    Yes.
3  A    No.
4  Q    Exhibit 53 at least to me looks like a letter
5       from you dated March 4th, 2022, to
6       Representative DiLorenzo.  Have I accurately
7       described Exhibit 53?
8  A    As it appears here, yes, but I'm not sure unless
9       I compare it to something that I wrote to know
10      if this is exactly the same thing.
11 Q    Well, I can submit to you that this is a
12      document that it seems that you copied to
13      Commissioner Frank Edelblut and that was
14      produced to us by the Department of Education.
15      Any reason to think this is not an accurate
16      reflection of a letter that you wrote on March
17      4th to Representative DiLorenzo?
18 A    Based on what this looks like here?  Yes.
19      However, if I'm not comparing it to the signed
20      copy that I have, then I'm assuming that this is
21      the same thing.
22 Q    Okay.
23 A    But without comparing it, I can't say that it

| | | 21 |
|---|---|---|
| 1 | | is. |
| 2 | Q | I'm just going to refer you to the last page of |
| 3 | | the document, page 10272. Does that look like |
| 4 | | your signature? |
| 5 | A | Yes, it does. |
| 6 | Q | So I just want to make sure that we have a |
| 7 | | common understanding. Any reason for you to |
| 8 | | believe sitting here today without you having |
| 9 | | cross-referenced this with a copy of your files |
| 10 | | that this is not a true and accurate copy of a |
| 11 | | letter that you wrote on March 4th, 2022, to |
| 12 | | Representative DiLorenzo? |
| 13 | A | As I sit here today, it looks like it. |
| 14 | Q | Okay. |
| 15 | A | Without having the opportunity to |
| 16 | | cross-reference. |
| 17 | Q | Okay. I'm just going to direct your attention |
| 18 | | on page 2 of this document, Bates stamped 10270, |
| 19 | | the language that states, that begins with "To |
| 20 | | fully answer your question," and goes on to the |
| 21 | | next page and ends in paragraph (d) ending with |
| 22 | | the language "to appeal in a public forum, New |
| 23 | | Hampshire Superior Court." |

| | | 22 |
|---|---|---|
| 1 | | Do you see the language that I just |
| 2 | | referred to you in Exhibit 53? |
| 3 | A | So where specifically are you on page 2? So I |
| 4 | | make sure I'm in the same place with you. |
| 5 | Q | Subsection 5(a) begins with "to fully answer |
| 6 | | your question." Do you see that language? |
| 7 | A | I do. |
| 8 | Q | And now the box of text that I'm just wanting to |
| 9 | | direct your attention to would end in subsection |
| 10 | | (d) on the next page which begins with "both |
| 11 | | parties are afforded." Do you see that? |
| 12 | A | I do. |
| 13 | Q | My question is just that an accurate |
| 14 | | reflection of how the complaint process works |
| 15 | | within the Human Rights Commission? |
| 16 | A | I will need to read this section. |
| 17 | Q | Please do. |
| 18 | A | Okay. |
| 19 | Q | Director Malachi, have you reviewed the language |
| 20 | | that we just referenced moments ago, subsections |
| 21 | | (a) through (d) on pages 10270 to 10271 on |
| 22 | | Exhibit 53? |
| 23 | A | I did. |

| | | 23 |
|---|---|---|
| 1 | Q | Is it an accurate reflection at the time it was |
| 2 | | written on March 4th, 2022, of how the complaint |
| 3 | | process works within the Human Rights |
| 4 | | Commission? |
| 5 | A | As I sit here today reading this, it does appear |
| 6 | | to be an accurate reflection of the |
| 7 | | Commissioner's process. |
| 8 | Q | Sitting here today on May 24th, 2023, is this |
| 9 | | still an accurate reflection of how the |
| 10 | | complaint process works within the Human Rights |
| 11 | | Commission? |
| 12 | A | Yes. |
| 13 | Q | Okay. You mentioned earlier in your testimony |
| 14 | | that a complaint could come in through a call. |
| 15 | | I guess my question for you is what are the ways |
| 16 | | in which complaints come into the office? |
| 17 | A | Can you clarify by what you mean regarding a |
| 18 | | complaint? |
| 19 | Q | Well, you use the term on Exhibit 53, bottom of |
| 20 | | page 10270, use the phrase "understanding of the |
| 21 | | complaint process." So what did you mean there |
| 22 | | when you said "complaint process"? |
| 23 | A | So the Commission, regarding the word complaint, |

| | | 24 |
|---|---|---|
| 1 | | complaint for the Commission means a docketed |
| 2 | | charge. So is that the question that you're |
| 3 | | asking? |
| 4 | Q | Well, my question just was just what did you |
| 5 | | mean when you said complaint process? So I want |
| 6 | | to make sure I understand that your definition |
| 7 | | of complaint as it was used on the bottom of |
| 8 | | 10270 is a docketed complaint; is that what |
| 9 | | you're saying? |
| 10 | A | Correct. |
| 11 | Q | So what I'm going to, my question here is going |
| 12 | | to be a little bit different, but I appreciate |
| 13 | | that definition you provided. |
| 14 | | What are the forms in which predocketed |
| 15 | | complaints come into your office? |
| 16 | A | So a complaint is only something that's |
| 17 | | docketed. So that's why I'm asking for clarity. |
| 18 | Q | What if I just used the phrase "allegations of |
| 19 | | discrimination," would that be an easier phrase |
| 20 | | to use? |
| 21 | A | Are you using allegation as something that's not |
| 22 | | docketed versus a complaint that is? |
| 23 | Q | I am in part because that's the language that's |

25

1  used at the bottom of 10270 where you state
2  investigate and pass upon allegations of
3  discrimination.
4      So I think my question to you is going to
5  be what are the forms in which allegations of
6  discrimination are made that come to your
7  office?
8  A  A person who believes they've been discriminated
9     against can make a phone call and talk to us
10    about it.  They can email us.  They could drop
11    something off.
12 Q  Okay.  The language at the bottom of 10270 says
13    that an assessment is made to ensure the
14    complainant has a prima facie case.  Do you see
15    that language?
16 A  Yes.
17 Q  And then the second sentence, the next page or
18    additional sentence on the next page says, "If
19    this is the determination, the allegation of
20    discrimination is verified," there's some
21    bracketed language, then "submitted to the
22    Commission, and becomes a docketed charge of
23    discrimination whereby both parties are notified

26

1  in writing."  Do you see that language?
2  A  Yes.
3  Q  Is there a form a complaint needs to be
4     submitted in for it to be docketed?
5      MR. KENISON-MARVIN:  Objection.  Vague.
6  Mischaracterizes prior testimony.
7  Q  Let me ask the question more directly.  Can a
8     complaint be documented if it's oral?
9      MR. KENISON-MARVIN:  Same objections.
10 A  I'm unclear as to the question.
11 Q  I'm afraid I don't really know how to ask it
12    more directly.  Are there criteria -- let me ask
13    it this way.  Are there criteria for how a
14    complaint must be submitted for it to be
15    docketed?
16     MR. KENISON-MARVIN:  Same objections.
17 A  Could you ask the question again, please?
18 Q  Could you read it back, please?
19     (Requested portion read back by court reporter)
20     MR. KENISON-MARVIN:  Same objections.
21 A  That question is confusing.
22 Q  Why is it confusing?
23 A  So I'm unclear if you're asking about, because

27

1  we've talked about allegations, we've talked
2  about complaints.  So --
3  Q  Gotcha.
4  A  The Commission language has bearing.  So in
5     order to answer the question I need clarity on
6     what you're asking.
7  Q  Yes.  I see the confusion now.  So my question
8     is going to be for an allegation of
9     discrimination to be docketed, does the Human
10    Rights Commission have criteria -- strike that.
11     For an allegation of discrimination to be
12    docketed, does the Commission have requirements
13    as to the form in which the allegation is
14    submitted to the Commission?
15 A  Are you ultimately asking about people
16    communicating with us or a docketed charge?
17 Q  Why don't you read the question back just so
18    we're all rowing in the same direction.
19     (Requested portion read back by court reporter)
20 Q  So that question is I'm referring to predocketed
21    allegations, and all I'm trying to get at is is
22    there a requirement for them to be in writing,
23    can they be oral, that's what I'm getting at.

28

1  That's a compound question, and I'm only
2  providing that for context.  I'm going to reask
3  the question again.
4      For an allegation of discrimination to be
5  docketed, does the Commission have requirements
6  as to the form in which the allegations are
7  submitted to the Commission?
8  A  To answer your question, in reading 5(a), it
9     clearly states that it must be verified and
10    verification is a notary seal.
11 Q  Okay.  Can you refer that page to me?
12 A  It is -- so if you're looking at the document,
13    the number 5 starts on page 2, and then (a) is
14    on page 2, and towards the end of (a) which is
15    now on page 3 at the very top.
16 Q  Thank you.  So just so I'm clear, for an
17    allegation of discrimination to be docketed, is
18    it your testimony that it would need to be in a
19    writing, signed by the complainant, and
20    witnessed by a notary and submitted to the
21    Commission; is that correct?
22 A  That is correct.
23 Q  Okay.  For an allegation of discrimination to be

29

1    docketed, does the complainant have to use a
2    form provided by the Human Rights Commission or
3    can they use any other form of writing that is
4    verified and signed by the Complainant and
5    witnessed by a notary?
6    A    The complainant would need to use a form by the
7         Commission.
8    Q    Okay.  Did anyone assist you in writing the
9         letter marked as Exhibit 53?
10   A    There's always legal review.
11   Q    Fair.  Do you recall there being legal review
12        with respect to Exhibit 53?
13   A    As I sit here today, I'm unsure.
14   Q    Okay.  I know you haven't been deposed before.
15        I want to say that depositions are not a memory
16        test.  So if you can't remember, it's fine and
17        understandable especially if we're talking about
18        events years ago.  So I understand.
19            With respect to the language on page 2 and
20        beginning on page 3, Bates stamped 10270, "an
21        assessment is made to ensure that the
22        complainant has a prima facie case, i.e., "at
23        first sight" the claim meets the legal standard

30

1    to file a charge with the Commission."  Do you
2    see that language?
3    A    Yes.
4    Q    Who makes that decision within the Commission as
5         to whether a prima facie case has been made?
6    A    Staff and/or legal assistance.
7    Q    Who would be just the names of the staff and/or
8         legal assistants that would be involved in that
9         decision?
10   A    The actual name or the position name?
11   Q    You know, actually, let's do positions.  That's
12        probably easier.  Thank you for the
13        clarification.
14   A    So the intake coordinator is the first step with
15        the Commission, and that would be in
16        consultation with the Assistant Director.  And
17        if there was additional consultation needed,
18        then we would speak with our client services
19        representative in the Department of Justice.
20        Civil Bureau, Department of Justice.
21   Q    Okay.  Is the client services representative at
22        the Department of Justice right now, who would
23        that be?

31

1    A    Sean Locke.
2    Q    The intake coordinator.  Do you have one intake
3         coordinator or multiple intake coordinators?
4    A    Usually there is one, but if they're not in, it
5         could be someone else.
6    Q    Who would that other person would be if that
7         intake coordinator is not in?
8    A    It varies.  It could be the Assistant Director.
9         Could be an investigator.
10   Q    Who is the Assistant Director currently?
11   A    Sarah Burke Cohen.
12   Q    And you just mentioned the investigator moments
13        ago.  Does the Commission have one investigator,
14        multiple investigators?
15   A    Multiple.
16   Q    How many?
17   A    Five.
18   Q    How does an intake coordinator decide when to
19        consult with the Assistant Director about
20        whether to docket an allegation of
21        discrimination?
22            MR. KENISON-MARVIN:  Objection.
23        Foundation.  Vague.  Asks for speculation.  You

32

1    can answer.
2    Q    You can answer it if you can.
3    A    The Assistant Director is the supervisor of the
4         intake coordinator.
5    Q    Does the intake, what I'm just trying to get at
6         is how these decisions are made.  That's it.  So
7         I guess what I'm trying to figure out is are
8         there standards that exist with respect to when
9         the intake coordinator consults with the
10        Assistant Director making this decision?  Are
11        there policies in place concerning when that
12        consultation occurs?
13            MR. KENISON-MARVIN:  Objection.  Compound.
14        You can answer.
15   A    Broadly speaking.  There are for all of the
16        areas of jurisdiction that the Commission has
17        there are legal standards.
18   Q    Um-hum.
19   A    So the prima facie is based on the legal
20        standard.
21   Q    Do you know how frequently the intake
22        coordinator consults with the Assistant Director
23        with respect to decisions as to when to docket

33

1    an allegation of discrimination that's been
2    made?
3  A    I do not.
4  Q    Are there periodic meetings that occur within
5    the intake coordinator and the Assistant
6    Director with respect to whether to docket
7    allegations of discrimination?
8  A    I believe they meet weekly, but I'm unsure.
9  Q    Okay.  Are those meetings that you're present
10   for?
11 A    I am not.
12 Q    Who is present at those meetings in which
13   decisions are made as to whether or not to
14   docket an allegation of discrimination?
15        MR. KENISON-MARVIN:  Objection.
16   Foundation.  You can answer.
17 A    I would want to clarify something.
18 Q    Please do.  Of course.
19 A    Those are weekly meetings that take place,
20   generally speaking.
21 Q    Okay.
22 A    It's not always whether to docket or not to
23   docket.

34

1  Q    Gotcha.
2  A    The initial step in docketing is the legal
3    standard.
4  Q    I'm just trying to get at how that decision is
5    made.  That's all.  So in these weekly meetings
6    is it fair to say that there are agenda items
7    that exist independent of decisions whether to
8    docket allegations of discrimination?
9  A    I would be making an assumption because I don't
10   attend those meetings.
11 Q    Without guessing, what's your knowledge of
12   what's discussed during those weekly meetings,
13   the generally topics of discussion?
14 A    Generally speaking, I think it would depend.  If
15   the intake coordinator is a new person, then
16   you're still in the process of training and
17   looking at the legal standard to make sure
18   there's understanding.
19        If they're someone that's more seasoned,
20   then there could be potentially a clarification
21   on something.  It could be any number of things.
22 Q    Okay.  Now, I know that this docketing decision
23   is done by the intake coordinator in

35

1    consultation with the Assistant Director.  Does
2    the Assistant Director ever bring you in to the
3    decision as to whether or not to docket an
4    allegation of discrimination?
5  A    Could you ask that again?
6  Q    Could you read that back, please?
7        (Requested portion read back by court reporter)
8  A    To answer the first part of your question, the
9    intake coordinator is not always meeting with
10   the Assistant Director to make a determination
11   of whether or not to docket a charge.
12 Q    Is it fair to say that sometimes the intake
13   coordinator is making that decision without
14   consulting the Assistant Director, right?
15 A    It would be fair to say that the intake
16   coordinator may not need the assistance of the
17   Assistant Director to make that determination.
18 Q    Have you ever been consulted by members of your
19   staff about a decision whether or not to docket
20   an allegation of discrimination?
21 A    I'm unsure how to answer that question.
22 Q    What about the question kind of gives you pause?
23 A    It's very broad.  Could you ask it again?

36

1  Q    I'm happy to ask the court reporter to state the
2    question again.
3        (Requested portion read back by court reporter)
4  A    So that's a very broad question.  The best
5    answer that I could give you sitting here today
6    would be if there were a question, we would
7    speak with an attorney if there was an issue
8    that could not be resolved.
9  Q    Has a member of your staff ever asked for your
10   feedback as to whether or not the Commission
11   should docket an allegation of discrimination?
12 A    Maybe.
13 Q    Do you recall any instances sitting here today
14   where that may have occurred?
15 A    Sitting here today, I can't give you a
16   definitive answer.
17 Q    Okay.  So you don't recall sitting here today a
18   specific example in the context of a specific
19   allegation where you were asked to provide
20   feedback as to whether or not that allegation
21   should be docketed, correct?
22 A    That is correct.
23 Q    I just want to go back again to the kind of the

37

1    format of these allegations of discrimination.
2    Besides being in writing, verified, signed by
3    the complainant and witnessed by a notary, are
4    there any other requirements for allegations of
5    discrimination to become docketed complaints?
6  A  I'm sorry.  Are there other requirements?
7  Q  Yes.  Beyond meeting the prima fascia legal
8    standard, are there any other format
9    requirements that exist within the Commission
10   for those allegations to become docketed?
11 A  Can you just go over your list again to make
12   sure that I'm --
13 Q  Absolutely.  In writing, verified, signed by the
14   complainant, and witnessed by the notary.
15     MR. KENISON-MARVIN:  Let me just object to
16   the extent it calls for a legal contention, but
17   you can answer.
18 A  I'm unaware of any other bases.  It must be
19   verified which means it's on paper, and it has
20   to have a signature which the notary is
21   verifying.
22 Q  Just referring to the last line of paragraph (a)
23   that is on page 271, there's language that

38

1    states whereby both parties are notified in
2    writing.  Do you see that?
3  A  Yes.
4  Q  So I just want to make sure I understand the
5    process.  Once an allegation of discrimination
6    becomes a docketed complaint, a notice is
7    submitted to the complaining party and the
8    individual alleged to have violated the law; is
9    that correct?
10 A  Yes.
11 Q  What does that writing look like actually?  What
12   is the format in which that notice is provided?
13     Why don't I ask one good question instead
14   of two compound questions.  So what is the
15   format in which that notice is provided to the
16   complaining party and the individual alleged to
17   have engaged in discrimination?
18 A  The parties receive a cover letter from the
19   Commission.  Enclosed with that is a copy of the
20   charge made by the Complainant.
21 Q  Is that docketed complaint once it is docketed,
22   is it something that becomes a public record at
23   all?

39

1  A  No.  It's confidential.
2  Q  Referring to now subsection (b), "The complaint
3    is investigated, and a determination is made by
4    the Investigating Commission whether the charge
5    has a Probable Cause (PC) or No Probable Cause
6    (NPC) finding."  Do you see that language I just
7    referenced?
8  A  Yes.
9  Q  How are docketed complaints investigated?
10   What's that process?
11 A  The investigation process is the investigator
12   reviews any documentation that has already been
13   submitted by either parties and/or requests
14   additional documentation from the parties.  Has
15   interviews with the parties.
16 Q  Is the investigator here a member of the
17   Commission?
18 A  I'm unclear about the question.
19 Q  I believe in earlier testimony we talked about
20   Commission investigators.  Do I have that
21   recollection correct?
22     Let me ask this.  Who is doing the
23   investigating with respect to "the complaint is

40

1    investigated" language in paragraph B of page
2    10271 in Exhibit 53?
3  A  There's a staff member that is an
4    anti-discrimination investigator.
5  Q  Is that staff member a Commissioner or someone
6    who's on staff?
7  A  It is not a Commissioner.
8  Q  Okay.  How is that investigator assigned?
9    What's that process?  Strike that.
10     How is the investigator assigned?
11     MR. KENISON-MARVIN:  Objection.
12   Foundation.
13 A  The Assistant Director will assign new cases
14   each month to the investigators.
15 Q  Are you involved in that assignment process?
16 A  No.
17 Q  Am I correct -- I didn't write this down, but I
18   want to make sure I have this crystal clear.  I
19   believe you earlier said that there's around
20   five investigators.  Am I accurately remembering
21   your testimony?
22 A  Yes.
23 Q  After that investigation is completed, what does

41

1    the investigator do next?
2        MR. KENISON-MARVIN:  Objection.  Vague,
3    foundation, speculation.  You can answer.
4  Q    Why don't I ask you it this way.  I'm not trying
5    to hide the ball.  I'm trying to streamline this
6    process.
7        Paragraph (b) says that the complaint is
8    investigated and then a determination is made by
9    the Commissioner as to whether or not there's
10   probable cause or no probable cause.  Is that an
11   accurate reflection of the current process?
12 A   Yes.
13 Q    Why don't we take just a short break.
14       (Recess taken at 12:23 - 12:37 p.m.)
15 Q   Director Malachi, there is one background
16   question that I actually just forgot to ask so
17   I'm going to go back into my introductory line
18   of questions, and I just wanted to describe
19   your educational background for me.  My
20   apologies for forgetting to ask that.
21 A   How far back are you asking?
22 Q    Why don't you start post high school.
23 A   I have a degree in journalism.  Are you asking

42

1    for the school or just the degrees?
2  Q    Yes.  School, degrees and approximate dates.
3  A   Ooh.
4  Q    Approximate dates.
5  A   Long time ago.  Degree in journalism.  Georgia
6    State University.  1989 maybe.  Master's degree
7    in human services counseling, Liberty University
8    maybe 2017.  You're asking completed programs?
9  Q    Yes.  If you have programs that you didn't
10   complete as well, that would be helpful, too.
11 A   Currently enrolled in a doctoral program.  I
12   don't know if you're --
13 Q    Oh.  I didn't know that.  Where is that
14   occurring?
15 A   Liberty University as well.  That would be a
16   doctorate of strategic leadership when
17   completed.
18 Q    Any idea when you'll complete it?  I know that's
19   a hard question to ask for any doctoral program.
20 A   It is a very tough question to answer.  A couple
21   of years.
22 Q    Okay.
23 A   Not exactly sure.  Could be less, could be more.

43

1  Q    Okay.
2  A   You know how that goes.
3  Q    I sure do.  I sure do.  Thank you.  That's
4    helpful.
5        I have a few kind of followup questions on
6    just the general complaint process, and then I
7    promise that we are going to move on.
8        Do allegations of discrimination before
9    they're docketed, do they have to come from the
10   person who has -- strike that.
11       Can allegations of discrimination, can they
12   be forwarded by other state agencies to be
13   considered by the Commission for docketing?
14 A   I am unclear on what, how to answer that
15   question.  Is there a way to be more specific so
16   I can --
17 Q    Sure.  If an allegation of discrimination comes
18   in from the Department of Education, can the
19   Department of Education forward that allegation
20   of discrimination to the Human Rights Commission
21   for consideration?
22 A   To clarify --
23 Q    For consideration as to whether it would be

44

1    docketed?
2  A   On whether to docket?
3  Q    Yes.
4  A   So that's a little tough to answer, but I will
5    try my best.
6  Q    Please do.
7  A   Ultimately, a docketed charge has to be
8    completed by the complainant.  So there isn't a
9    way, other than a complainant's attorney.
10   Outside of the complainant themselves signing
11   and swearing under the pains and penalties of
12   perjury, then their attorney could do that on
13   their behalf.  That is the only way to docket a
14   charge.
15 Q    Before an allegation of discrimination is
16   docketed, do staff members at the HRC ever
17   consult with other state agencies?
18 A   Could you clarify?
19 Q    I believe your testimony before is that as part
20   of the docketing decision process there will
21   sometimes be consultation with your attorney
22   representative of the Department of Justice; is
23   that fair to say?

45

1  A    Relatively speaking.  So it's not an everyday
2       thing to do that.  If something is different,
3       then we would consult.
4  Q    It would depend on the circumstances, right?
5  A    Context.
6  Q    Exactly.  I understand what you're saying.  I
7       guess my question is whether when a complaint
8       is -- strike that.
9            When an allegation of discrimination comes
10      into your office, excluding the Department of
11      Justice, is there any other state agency that
12      would be consulted as part of the
13      decision-making process as to whether to docket
14      an allegation of discrimination?
15  A    As I sit here today, I'm unaware of another
16      agency that we would consult.
17  Q    Okay.
18  A    If I'm understanding your term.
19  Q    You are.  I think you are.
20           Has there ever been an instance that you're
21      aware of in which an allegation of
22      discrimination has been brought forward to your
23      office in which members of your staff have had

46

1       conversations with Department of Education about
2       whether to docket that allegation?
3  A    Clarification.  Are you asking ever in the
4       history, ever?
5  Q    Since you've been here.
6  A    Relative to?
7  Q    Sorry.  Relative to any allegation of
8       discrimination with the time frame being since
9       you've been Executive Director of the
10      organization.
11  A    Okay.  As of 2019 is when education meaning K
12      through 12 public education which covers public
13      schools, public charter schools as well as
14      public academies, that is when education was
15      added to the statute for the Commission so prior
16      to that there were no education charges.
17           Since then as far as I know sitting here
18      today I mean I could certainly confer with
19      staff, but I am unaware of a time that there was
20      consultation with the Department of Education
21      relative to a docketed charge.
22  Q    Okay.  That's helpful.
23           I'm going to refer you back, Director

47

1       Malachi, on Exhibit 53 to the language 5(a) to
2       5(d).  Do you see that language?
3  A    Yes.
4  Q    I just want to confirm.  Is that the same
5       process that exists with respect to allegations
6       of discrimination that are brought under the
7       Freedom from Discrimination statute we
8       referenced before in 354-A:9 to 354-A:34?
9  A    A-29 through A-34?
10  Q    Yes.  The question is is it the same process.
11      That's all.
12  A    Okay.  So to specifically answer your question,
13      what's described in the section that you
14      mentioned on the document on Exhibit 53 is the
15      process for the Commission full stop.
16  Q    And that would include how allegations of
17      discrimination are handled under the Freedom
18      from Discrimination Law in Exhibit 1 located at
19      RSA 354-A:29 to 34.  Correct?  And I'm excluding
20      from that question 193:40, to be clear.
21  A    So to be specific, what's mentioned in Exhibit
22      53 is the Commission's process which is no
23      different relative to any part of how the

48

1       Commission is looking at a charge.  So anything
2       that's assigned to the Commission to look at as
3       a potential allegation or I should say as a
4       docketed charge, (a) through (d).
5  Q    And just trying to close the loop on that.  So
6       that would include allegations made under the
7       right to freedom from discrimination statute in
8       RSA 354-A:29 to 34.  Right?
9  A    It includes the entire statute, yes.
10  Q    I want to direct your attention also on Exhibit
11      53 to (e) on page 10271.  The language that says
12      "Finally, the Department of Education (DOE)
13      would be the arbiters of "educator discipline"
14      according to RSA 193:40 (IV), and as "educator"
15      as defined by RSA 193:40 (V)."  Do you see that
16      language?
17  A    Yes.
18  Q    Just to be clear, that was your understanding as
19      of March 4th, 2022.  Correct?
20  A    Yes.
21  Q    Is that still your understanding of the law?
22  A    Yes.
23  Q    Since the Freedom from Discrimination Law was

49

1    passed, and I want to be very clear, just
2    talking now about RSA 354-A:29-34. Okay? Have
3    you or members of the Commission conducted any
4    trainings on those provisions, public trainings?
5  A    No.
6  Q    So there have been no trainings from the Human
7    Rights Commission to educators; is that correct?
8  A    Correct.
9  Q    Have there been requests for the Human Rights
10    Commission to provide such trainings by any
11    member of the public?
12  A    I'm unsure. I would have to confer.
13  Q    Okay.
14        (Exhibit 54 marked for identification)
15  Q    So Director Malachi, I've put before you what's
16    been marked as Exhibit 54 and just ask you to
17    review Exhibit 54 and let me know when you're
18    done.
19  A    Okay.
20  Q    Have you seen Exhibit 54 before?
21  A    Maybe.
22  Q    I would just note that the top of Exhibit 54 is
23    an email from Sarah Burke Cohen who I believe is

50

1    the, I want to get the title, Assistant
2    Director, to you dated Monday, September 20th,
3    2021, forwarding an email chain from Irv
4    Richardson of New Hampshire NEA to the Human
5    Rights Commission email address.
6        So do you recall seeing this email,
7    Director Malachi, on or about September 20th,
8    2021?
9  A    Maybe. I mean that was multiple years ago. So
10    lots of emails.
11  Q    I would just note that at the bottom of Exhibit
12    54 is a request made from Mr. Richardson of NEA
13    New Hampshire stating do you have someone
14    associated with the Human Rights Commission that
15    might provide further clarification on the law
16    and answer questions from educators using a
17    virtual platform? I have reached out to the New
18    Hampshire Department of Education, and they
19    indicated that I should make such a request to
20    you.
21        Do you recall how the Human Rights
22    Commission responded to this request from NEA
23    New Hampshire?

51

1  A    I don't recall.
2  Q    Do you recall you or any member of your staff
3    ever speaking to NEA New Hampshire about
4    clarifications on the law, sections 297 and 298
5    of House Bill 2?
6  A    I do not recall.
7  Q    Do you recall any internal communications about
8    whether or not to accept this invitation from
9    NEA New Hampshire?
10  A    I don't recall.
11  Q    Any communications externally with the
12    Department of Education about whether to accept
13    this invitation?
14  A    I don't recall.
15  Q    I want to go back to a series of questions I
16    asked about whether complaints can be referred
17    by other agencies. Are you aware of any
18    standard operating procedure or agreement that
19    exists between the Department of Education and
20    the Department of Justice with respect to how
21    complaints the Department of Education receives
22    under RSA Chapter 354-A can be referred to the
23    Human Rights Commission?

52

1  A    Ask that again? Because I'm unsure how to
2    answer that.
3  Q    I'm not entirely sure what I asked.
4        (Requested portion read back by court reporter)
5        MR. KENISON-MARVIN: I'll object as
6    compound.
7  Q    Is that a question you can answer?
8  A    Is there a more specific part of that question
9    that you're asking?
10  Q    I'm going to try to ask it a better way, and I'm
11    going to pull up a document to just assist me in
12    asking the question.
13        I'm just going to refer you to Exhibit 6.
14        MR. BISSONNETTE: Nate, is that something
15    that you could just pull? Thank you.
16  Q    So what I'm going to direct your attention to,
17    you've never seen this before is my assumption,
18    Director Malachi, but in the interest of
19    streamlining this inquiry, I'm going to direct
20    you to Bates stamped 806 on Exhibit 6. If you
21    go to the bottom left quadrant, page 19, on page
22    806, there's language from Ms. Diana Fenton that
23    begins with, and this is in the middle of a

---

**53**

1    sentence, quote, "we have since worked with the
2    AG's office to come up with an SOP as to how we
3    transfer those cases to the Human Rights
4    Commission and to the AG's office."
5         Do you see, my question only right now is
6    do you see the language that I just referenced?
7  A   No.
8  Q   Okay.
9  A   What line are you on?
10 Q   Absolutely.  Page 19 begins on the bottom left
11     quadrant beginning on line 25.  I'll just read
12     it just once more just so we're on the same
13     page.  "We have since worked with the AG's
14     office to come up with an SOP as to how we
15     transfer those cases to the Human Rights
16     Commission and the AG's office."  Do you see
17     that language?
18 A   I do.
19 Q   Okay.  Do you know who Diana Fenton is?
20 A   Yes.
21 Q   Who is Diana Fenton?
22 A   She's an attorney.
23 Q   Okay.  And I just represent to you that this is

---

**54**

1    a portion of the hearing testimony that occurred
2    on March 8, 2023, before the House Judiciary
3    Hearing.  So that's why I asked that prior
4    question to you.  So I'm just trying to get at
5    what your understanding is of this SOP.  So I'm
6    going to reask the question.
7         Are you aware of any standard operating
8    procedure that exists that governs how cases
9    that the Department of Education receives under
10   RSA 354-A can be referred to the Human Rights
11   Commission?
12 A   How allegations are referred?
13 Q   Allegations of discrimination.  Yes.
14 A   That would be between the AG's office and the
15     Department of Education.
16 Q   Okay.  I'm just asking about what you're aware
17     of.  Are you though sitting here today aware of
18     any standard operating procedure?
19 A   Sitting here today, I'm unclear.  You would have
20     to speak with the AG's office to understand what
21     that process is.
22 Q   Have you ever had any communications with the
23     Department of Education about a standard

---

**55**

1    operating procedure that would refer allegations
2    of discrimination to your office that were
3    received by the Department of Education?
4  A   I'm sorry.  Say that again?
5      (Requested portion read back by court reporter)
6  A   I'm sorry.  Read it one more time.
7      (Requested portion read back by court reporter)
8  A   So the question is unclear because, generally
9      speaking, the Commission covers education.
10 Q   Um-hum.
11 A   Which is separate from HB 2 or 354-A:29 through
12     34.  So are you asking, so could you clarify the
13     question that you're asking?
14 Q   Sure.  What I was asking is about any provision
15     of 354-A which would include the provisions that
16     have been challenged in this case in
17     354-A:29-34.  So with that I'll just, I'll kind
18     of reframe my question.
19         Have you been a party to any communications
20     with the Department of Education concerning a
21     standard operating procedure that would allow
22     for the referral of allegations of
23     discrimination under RSA chapter 354-A to the

---

**56**

1    Commission from the Department of Education?
2  A   Okay.  If I understand your question -- I'm,
3      okay.  Have I ever been a party to conversations
4      regarding an SOP for transferring allegations
5      from the Department of Education to the
6      Commission.
7  Q   Precisely.
8  A   Okay.  Thank you.
9  Q   No.  No.  It's fine.  I want to make sure we're
10     on the same page.  I understand.
11 A   Have there ever been conversations between
12     myself and the Department of Education?  Broadly
13     speaking, yes.  To the specifics that you're
14     asking, it is not my understanding that I have
15     been.
16 Q   Okay.  When you say "broadly speaking," you're a
17     party to those communications, when would those
18     communications have occurred and with whom?
19 A   In 2019.  Somewhere thereabouts because that was
20     when education was included in the statute so it
21     would have been with my agency attorney and with
22     Diana Fenton to have an understanding of some of
23     the specific kinds of education cases we could

---

57

1  get.  So to further answer the question, 504 and
2  IEP, the Commission would not have experience in
3  that area.  However, if a student was not
4  receiving that assistance due to discrimination,
5  then there would have to be a further
6  conversation to address how to move that case
7  forward regarding our confidentiality which is
8  different from other agencies and so there could
9  need to be a conversation.
10 Q   That makes sense in light of those changes in
11     2019.
12         After the enactment of the Freedom from
13     Discrimination Law memorialized in 354-A:29 to
14     34, did you ever have a similar conversation as
15     to how cases could be referred from the DOE to
16     the Human Rights Commission under those new
17     provisions?
18 A   I believe there may have been some general
19     conversation and to be specific about the
20     generalization, the individual who is
21     potentially aggrieved has to file a charge.
22 Q   Okay.
23 A   In order for the Commission to take action.

58

1  Q   Okay.  So you said general conversations?  Do
2      you recall when those general conversations
3      occurred and with whom?
4  A   I don't.  I mean, certainly it would have been
5      after the act was signed.  So some time after --
6      I believe it went into effect in 2021.  So it
7      would have been some time after June of 2021.
8      More specifically, I can't tell you.
9  Q   Okay.  If you had those communications with the
10     Department of Education do you know whether or
11     not Diana Fenton would have been a participant
12     in those discussions?
13 A   Yes.  I believe she would have been.
14 Q   Do you also believe that Elizabeth Brown would
15     have been a party to those communications?
16 A   I don't know.
17 Q   Do you know who Elizabeth Brown is?
18 A   I do not know who that is.
19 Q   Fair enough.  Would an attorney from the
20     Department of Justice also have been a party to
21     those communications?
22 A   I need a moment.
23 Q   Please do.  Just for the record I'm not asking

59

1  for the substance of those communications, just
2  whether the attorney would have been a party,
3  but I'm happy to give you a minute.
4  A   Yes.
5        (Director Malachi and Atty. Kenison-Marvin
6         leave the conference room and return)
7  (Requested portion read back by court reporter)
8  A   Okay.  That's a lot.  So the question was
9      generally speaking conversations with the
10     Department of Education relative to the Freedom
11     from Discrimination Law act.
12 Q   No.  Relative to whether and how referrals could
13     be made of complaints that the Department of
14     Education receives under RSA 354-A:29 to 34, how
15     and if those referrals could be made by the
16     Department of Education to the Human Rights
17     Commission.
18 A   Okay.  Now that I'm clear, I would not have been
19     a party to conversations between the Department
20     of Education and the AG's office relative to the
21     referral of cases or allegations or -- it could
22     only be an allegation.
23 Q   Okay.  I want to make sure that I now understand

60

1  your prior testimony.  After the enactment of
2  the, let me just say the challenged law in this
3  case, have you had conversations with Attorney
4  Fenton about how allegations of discrimination
5  under the Freedom from Discrimination Law could
6  be referred by the Department of Education to
7  the Human Rights Commission?
8  A   That actually needs a little more clarity.  If
9      you're asking if it was made clear that there
10     has to be someone to sign a charge, meaning a
11     complainant, then there was a conversation
12     relative to that.
13 Q   Okay.
14 A   Outside of that, meaning that general charges,
15     general, no, not that I can recall.
16 Q   That meeting that you just referenced, who was a
17     participant in that meeting?
18 A   So the meeting that I referenced was in larger
19     context of the new amendment.  It was not
20     specific to an agreement or a standard operating
21     procedure between the Department of Education
22     and the Department of Justice to be clear.
23 Q   That's helpful.  Do you know when this meeting

61

1    occurred?

2  A   Which meeting?

3  Q   The meeting that you just referenced that was

4      part of a larger context in which there was a

5      discussion that someone has to sign a charge for

6      the Commission to accept it.  That meeting.

7  A   I do not recall.

8         MR. KENISON-MARVIN:  I want to object.  I

9      think that mischaracterizes the testimony.

10        MR. BISSONNETTE:  I was just trying to get

11     at that meeting.  Whatever that was discussed at

12     that meeting.

13        MR. KENISON-MARVIN:  I don't want to make a

14     speaking objection, but I want to try to cut to

15     the chase if I can be helpful.

16        MR. BISSONNETTE:  Please do.

17        MR. KENISON-MARVIN:  Maybe I'm wrong in my

18     misunderstanding, whether there's a distinction

19     between the general meeting and the conversation

20     with Diana Fenton.

21        MR. BISSONNETTE:  Okay.

22        MR. KENISON-MARVIN:  That's where my

23     objection is based.

62

1  Q   May I have, Cindy, I'm sorry to burden you.  Can

2      I just have read back to me the portion of

3      Director Malachi's response in which she talks

4      about the larger context.

5      (Requested portion read back by court reporter)

6  Q   So my question is what do you remember about

7      that meeting in which that larger context was

8      referenced and who participated in that meeting?

9  A   The meeting would have been some time ago.  I am

10     not a hundred percent clear on all of the

11     individuals that may have been there.

12  Q   Okay.  What do you recall, is there anything you

13     could recall sitting here today about the

14     substance of that meeting that was part of a

15     larger context?

16  A   Generally speaking, my recollection, I believe

17     we may have talked about the case processing

18     process.

19  Q   Okay.

20  A   I know that attorneys were present.

21  Q   Okay.  When you refer to "case processing," do

22     you recall any specifics about that?

23        MR. KENISON-MARVIN:  I'll state a limited

63

1      objection.  To the extent that you have a

2      recollection of conversations that anyone was

3      asking attorneys for legal advice or how law

4      would apply, that information we would claim a

5      privilege to and I would instruct you not to

6      provide the details of those conversations as

7      well as any decisions that were being made,

8      deliberations related to decisions to be made,

9      substance of those conversations.  So I would

10     instruct you not to provide those details on the

11     basis of those privileges.  To the extent you

12     can answer the question without providing,

13     there's information in response to the question

14     that you could provide that's not what I

15     described, you can answer it.

16        MR. BISSONNETTE:  I'm going to withdraw the

17     question real quickly in light of that

18     objection.

19  Q   Back to this meeting I would, though, in an

20     effort to try to probe that privilege a bit,

21     just try to get a handle on who all the

22     participants were in that meeting if you could

23     remember.  Just if you could list them all out.

64

1  A   As I stated, that was several years ago so I

2      don't have a complete recollection of everyone

3      that was in the room.

4  Q   Okay.  Do you know if Attorney Sean Locke was in

5      the room?  Any recollection?

6  A   I do not recall.

7  Q   Okay.  Were other state agencies represented at

8      that meeting?

9  A   Could you be more specific?

10  Q   Sure.  Did the Department of Education have a

11     representative at that meeting?

12  A   Yes.

13  Q   Who was that representative?

14  A   In my hazy recollection I believe their attorney

15     was there which would have been Chris Bond I

16     believe at the time.

17  Q   Okay.  And do you recall anyone else that was

18     present during this meeting?

19  A   The Commissioner might have been there, but I am

20     not a hundred percent sure.

21  Q   You may have answered this and I forget the

22     response and I apologize, but obviously we know

23     that the challenged law in this case was enacted

65

1  in June 2021.  Do you recall when this meeting
2  occurred after June 2021?
3  A   I do not recall.
4  Q   Okay.  Do you recall whether any decisions were
5  made during this meeting about how to process
6  claims of discrimination that are made under
7  354-A:29 to 34?
8  A   I don't recall the full context or content of
9  the conversations.
10 Q   I want to kind of now pivot from that meeting,
11  Director Malachi.  I know that you said earlier
12  that there was a discussion or statement made
13  where you said that for a case to be docketed by
14  the HRC that someone has to sign a charge.  Am I
15  accurately remembering your testimony?
16 A   I would hope I would have stated that the
17  complainant has to sign a charge.
18 Q   Yes, please.  I'm sorry.
19 A   Or their attorney.
20 Q   Thank you.  Was that something that was
21  discussed in a separate conversation with
22  Attorney Fenton?
23 A   I don't recall.

66

1  Q   Aside from the meeting that you just referenced
2  moments ago that was part of a larger context,
3  do you recall any other communications with any
4  other state officials outside of the HRC about
5  how allegations of discrimination could be
6  referred from the Department of Education to the
7  Human Rights Commission?
8  A   Could you ask that again, please?
9  Q   Sure.  Excluding the meeting that we just
10  referenced that was part of a larger context, do
11  you recall having any other discussions with
12  state officials outside of the Human Rights
13  Commission about how allegations of
14  discrimination could be referred by the
15  Department of Education to the Human Rights
16  Commission?
17 A   Are you asking if it's an allegation or are you
18  asking if it's a charge?
19 Q   Allegation of discrimination.  Hasn't been
20  docketed, it comes to the Department of
21  Education, Department of Education may think
22  that that could constitute a violation under
23  Exhibit 1, the challenged law in this case, and

67

1  conversations about whether the Human Rights
2  Commission could accept that as an allegation
3  and then proceed to make a determination as to
4  whether or not it should be docketed.
5  A   I'm unsure of any -- I don't recall any
6  conversations.
7  Q   Okay.  I don't want to know the contents, but I
8  do have to ask the question.  Did you ever
9  receive a document from Attorney Sean Locke that
10  generally discussed how allegations of
11  discrimination that the DOE may receive could be
12  referred to the Human Rights Commission?  Just
13  asking whether you received a document along
14  those lines.
15 A   I don't recall.
16 Q   Okay.  Last question along these lines, and I'm
17  going to wrap up this inquiry.  I'm just going
18  to submit to you that Representative Glenn
19  Cordelli stated in March 2023 that the Attorney
20  General's office has, quote, "been more
21  cooperative," end quote, with respect to, quote,
22  "getting cases referred to the Human Rights
23  Commission."  This was stated around March 2023.

68

1  Do you know what Representative Cordelli is
2  talking about there?
3  A   You would have to ask him.
4  Q   But you've never had communications with the
5  Department of Education, the Department of
6  Justice about the Attorney General's office
7  becoming more cooperative with respect to
8  getting cases referred to the Human Rights
9  Commission; is that true?
10 A   I don't recall any conversations of that type.
11 Q   Okay.  With respect to the challenged law in
12  this case in Exhibit 1, was your office ever
13  involved in drafting the language of Exhibit 1
14  when HB 2 was in the Senate, to be considered in
15  the Senate?
16 A   Could I see Exhibit 1?
17 Q   Yes.  Of course.
18 A   Could you ask me your question again, please?
19  (Requested portion read back by court reporter)
20 A   No.
21 Q   Were you ever asked for feedback while Exhibit 1
22  was being considered in the Senate by
23  legislators concerning the language in Exhibit

69

1       1?
2   A   No.
3   Q   You can set that aside.  Thank you, Director
4       Malachi.
5           I just did have a couple followup questions
6       about this referral business, and I'm sorry to
7       belabor the point.
8           Besides yourself, and I know we went over
9       the conversations that you may or may not have
10      been involved in with respect to whether
11      allegations could be referred, are you aware of
12      any communications that Commissioners within the
13      Human Rights Commission may have had with the
14      Department of Justice or the DOE about how
15      allegations of discrimination could be referred
16      by the DOE to the HRC?
17  A   I don't recall having any knowledge.
18  Q   Have there been any writings issued by either
19      you or the Commissioners to staff about whether
20      to accept allegations of discrimination under
21      the challenged law from the Department of
22      Education?
23  A   Could you be more specific on the writings?

70

1   Q   Sure.  By writing, what I mean are any
2       directive, policies, or guidance.
3   A   No.
4   Q   The communication that you had as part of a
5       larger context that we referenced before, did
6       you brief your fellow Commissioners about that
7       conversation?  Strike that.
8           That conversation that you referenced in
9       your earlier testimony that was part of a larger
10      context, did you brief the Commissioners about
11      that communication?
12  A   Sitting here today, I don't recall.
13  Q   I'm going to switch gears here.  Okay?  Director
14      Malachi, there was a statement made by the
15      Attorney General's office at the Motion to
16      Dismiss hearing in this case, quote, "The
17      Department of Education as a matter of practice
18      is simply declining to consider any allegation
19      that these statutes are being violated by any
20      teacher until and unless that person making the
21      complaint has gone to the Human Rights
22      Commission."  And I think I can go back to make
23      sure I'm accurately reflecting that, but I

71

1       believe the Attorney General's office confirmed
2       that during the hearing, but my question to you
3       is is that your understanding of the process
4       with respect to when the Department of Education
5       under their code of conduct can pursue a charge
6       under the challenged law?
7   A   Could you reread the part that you'd like me to
8       answer.
9   Q   Sure.  Quote, "The Department of Education as a
10      matter of practice is simply declining to
11      consider any allegation that these statutes are
12      being violated by any teacher until and unless
13      that person making the complaint has gone to the
14      Human Rights Commission."
15          My question to you is is that your
16      understanding as well of when the Department of
17      Education can pursue action against an educator
18      under the challenged law?
19  A   If I'm understanding the question, the answer
20      would be statutorily someone has to come to the
21      Commission first.
22  Q   Okay.
23  A   And then once we have completed our process and

72

1       any appeals that the person may have, then it
2       moves on to wherever it goes after that.
3   Q   Okay.  Where does that understanding come from?
4       Is that in a writing, in a document?  What's the
5       basis of your statement that someone first has
6       to come to the HRC?
7           MR. KENISON-MARVIN:  Objection to the
8       extent it calls for a legal contention.  You can
9       answer.
10  A   Statutorily to file a charge of discrimination
11      under 354-A a Complainant has to come to the
12      Commission, whether it's employment, public
13      accommodation, housing, or K through 12
14      education, and as such unless outlined
15      differently there would be any other amended
16      section based on the statute.
17  Q   Do you have any other basis for that besides
18      what's in the statute?
19          MR. KENISON-MARVIN:  Same objection.
20  Q   Any other basis for believing that?
21  A   I'm sorry?  Restate?
22  Q   Besides what's in the statute, do you have any
23      other reason for believing that a complainant

73

1   must first seek relief before the Human Rights
2   Commission before action can be taken against an
3   educator?
4   A   The statute is the guidance.
5   Q   Okay.  I'm just going to direct your attention
6       back to Exhibit 1, and page PL 006 starting at
7       line 23.  It goes on to page 7, line 15.  So
8       this is the statute RSA 193:40, and when you see
9       that language just let me know.
10  A   I'm sorry.  Line 23 through?
11  Q   I'm sorry.  Line 23 to the next page, line 19,
12      and it's RSA 193:40 on Exhibit 1.
13  A   I see it.
14  Q   Okay.  Do you have any authority in enforcing
15      that statute?
16      MR. KENISON-MARVIN:  Objection.  Legal
17      contention.  You can answer.
18  A   The Commission does not have jurisdiction over
19      193:40.
20  Q   So if someone brought a claim to the Human
21      Rights Commission under RSA 193:40, your view is
22      you would have no jurisdiction to adjudicate it;
23      is that correct?

74

1       MR. KENISON-MARVIN:  Same objection.
2   A   The Commission has jurisdiction over 354-A.
3   Q   And RSA 193:40 is not within RSA 354-A so is it
4       fair to say in your view you do not believe the
5       Commission has jurisdiction to hear a claim
6       under RSA 193:40?
7       MR. KENISON-MARVIN:  Same objection.
8   A   As I sit here today it would be my understanding
9       that the Commission only has authority over
10      354-A.
11  Q   Do you know sitting here today who would have
12      jurisdiction over a complaint made exclusively
13      under 193:40?
14      MR. KENISON-MARVIN:  Same objection.
15  A   I do not have expertise in 193 so whose RSA that
16      belongs to would be the body that has authority
17      over 193:40.
18  Q   Okay.  Besides the statute has there been
19      written guidance that explains that a person
20      must first go to the Human Rights Commission
21      before action could be taken against the
22      teacher?
23      MR. KENISON-MARVIN:  Same objection.

75

1   A   Could you clarify which statute?
2   Q   I'm going to withdraw the question.
3       I would like to direct your attention,
4       Director Malachi, back to Exhibit 1.  I'm just
5       going to direct your attention in particular to
6       page 004, line 37.  Bear with me one second,
7       please.
8       On line 36 on page PL 004 of Exhibit 1
9       there's language there that states, quote, "no
10      public employer, either directly or through the
11      use of an outside contractor, shall teach,
12      advocate, instruct or train any employee,
13      student, service recipient, contractor, staff
14      member, inmate or any other individual group,
15      any one or more of the following."  Do you see
16      that language?
17  A   Yes.
18  Q   What I'm going to just kind of focus you on is
19      the language "shall teach, advocate, instruct or
20      train" in the statute.  Okay?  So that's the
21      language that I'm targeting right now in my next
22      line of questions on line 37 on page PL 004 of
23      Exhibit 1.

76

1       So my question is does the Human Rights
2       Commission have any internal policy or guidance
3       as to what the terms mean, "teach, advocate,
4       instruct or train" under that statute?
5   A   No.
6   Q   Is there any internal guidance within the
7       Commission explaining whether or not the phrase
8       "teach, advocate, instruct or train" would
9       include teacher-facilitated group instruction in
10      a classroom?
11  A   No.
12  Q   Is there any written guidance or policy that
13      would explain whether or not the phrase "teach,
14      advocate, instruct or train" would include
15      assigning a book to students in a classroom?
16  A   I'm sorry.  Internal policy or the FAQ?
17  Q   Any internal policy -- that's a fair question.
18      So any internal policy excluding the FAQ as
19      to whether the phrase "teach, advocate, instruct
20      or train" includes assigning a book to students?
21  A   I'm sorry.  Is there a policy, no.
22  Q   You just referenced guidance.  Were you
23      referring to the July 2021 guidance that was

77

1  issued with respect to the challenged law?
2  A  I don't know the date.  If you're asking about
3  the FAQ provided by the Attorney General, that
4  is what I'm speaking of.
5  Q  I'm just going to direct your attention to --
6     MR. BISSONNETTE:  If you wouldn't mind just
7  pulling out real quick, Nate, just Exhibit 24.
8     MR. KENISON-MARVIN:  For the witness?
9     MR. BISSONNETTE:  You know what?  Pull that
10  one back.  I'm sorry.
11     (Exhibit 56 marked for identification)
12  Q  So my question to you is going to be, after
13  you've reviewed it, are these the FAQs that you
14  just referenced that are in Exhibit 55.
15  A  Sitting here today without comparing to any
16  notes I might have, it does appear that this is
17  most likely the Frequently Asked Questions
18  guidance.
19  Q  That's all I wanted to know.  So setting aside
20  the contents of Exhibit 55, is there any other
21  internal policy or procedure that exists within
22  the Commission that defines what it means to
23  "teach, advocate, instruct or train" under the

78

1  provisions of RSA 354-A:31 in Exhibit 1?
2  A  No.
3  Q  I'm sorry to bounce around, Director Malachi.  I
4  know moment a ago you said you're not an expert
5  on 193:40 in Exhibit 1.  Is there anyone at the
6  Human Rights Commission that would be an expert
7  in RSA 193:40 and what it means and how it
8  operates?
9  A  No.
10  Q  With respect to how an allegation of
11  discrimination is docketed, and the prima facie
12  determination that's made, are there any
13  internal policies or procedures within the
14  Commission as to when a prima facie case has
15  been made under RSA 354-A:29-34?
16  A  Specifically speaking, no.
17  Q  Do you know sitting here today how decisions are
18  made as to whether a prima facie case has been
19  satisfied under the provisions in RSA
20  354-A:29-34?
21  A  Generally speaking, there's a legal standard and
22  so when that legal standard is met, then the
23  allegation can then become a charge, provided

79

1  the complainant is pursuing a charge.
2  Q  Okay.  So the reference "legal standard."  I
3  just want to make sure.  Is what you're
4  referring to just the language of the statute in
5  RSA 354-A:29-34?
6  A  To that I understand, yes.
7  Q  Are there any other standards that you're using
8  in deciding whether or not an allegation of
9  discrimination brought under RSA 354-A:29-34
10  should be docketed?
11     MR. KENISON-MARVIN:  Objection to the
12  extent it misstates prior testimony.
13  A  Could you be a little more specific?
14  Q  How about this.  Beyond the FAQs that we just
15  presented to you in Exhibit 54, and beyond the
16  language of the statute in RSA 354-A:29-34, is
17  there any other policy or guidance that the
18  Commission uses in deciding whether an
19  allegation of discrimination under RSA
20  354-A:29-34 should be docketed?
21  A  No.
22  Q  Can we take a two-minute break?
23     (Discussion off the record)

80

1     (Lunch recess taken 1:51 - 2:32 p.m.)
2  Q  So we're back on.  I'm just going to have your
3  attorney put before you what's been previously
4  marked as Exhibits 12 and 13.  I'd just ask you
5  to review Exhibits 12 and 13 briefly and just to
6  let me know when you finish.
7     Thank you, Director Malachi.  With respect
8  to Exhibit 12, I would just represent to you
9  that the cover page to Exhibit 12 is a document
10  I created just as a cover sheet to the September
11  7, 2021, AG memo that was affixed to the Mejia
12  and Philibotte complaint in this case.  So I
13  just wanted to flag that for you.
14     But with respect to PL 425 to 433 on
15  Exhibit 12, have you seen this document before?
16  A  To the extent that this is the Attorney
17  General's opinion, without comparing it to the
18  actual copy that I have, I can't state that this
19  is exactly it.  However, if this is the Attorney
20  General's opinion, then I've seen his opinion.
21  Q  Okay.  Any reason though to believe sitting here
22  today that this document that I've put before
23  you at PL 425 to 433 is not the Attorney

81

1    General's opinion from September 7, 2021?
2  A    I don't have, I don't have my copy and I'm just
3        looking at this copy.  So without comparing,
4        then I would say I can't be a hundred percent
5        sure.  However, if you're stating that it's the
6        Attorney General's opinion that I have a copy
7        of, then it's probably that.
8  Q    Do you have a copy handy in your office?
9  A    I'm not sure.
10 Q    Okay.
11 A    It might be in a file.
12 Q    I guess my question is without having looked at
13       the copy in your office, do you have any reason
14       to believe having reviewed Exhibit 12 that this
15       would not be the version of the Attorney General
16       memo that you have in your office?
17 A    Specifically to answer your question, I don't
18       have it memorized so I couldn't say that this is
19       the exact copy.
20 Q    I just want to close the loop without having to
21       send you on a fishing expedition so I do need an
22       answer to this.
23       Do you have any reason to believe after

82

1        having reviewed the pages affixed to Exhibit 12
2        that this is not the version of the September
3        7th, 2021, version that's in your office?
4  A    As I stated, I don't have it in front of me.
5  Q    Okay.
6  A    If you're stating that you have made no changes,
7        then I guess I have to trust you.
8  Q    Okay.  I'm going to have to, in light of that
9        testimony I'm going to have to ask her to go get
10       a copy.  Sorry.
11       MR. KENISON-MARVIN:  She said maybe, I
12       think.
13       MR. BISSONNETTE:  Can we go off the record?
14       (Discussion off the record)
15       (Director Malachi and Atty. Kenison-Martin
16       leave the conference room and return
17       2:39 - 2:46 p.m.)
18 Q    Director Malachi, without having seen the
19       version of Exhibit 12 that resides in the
20       offices of the Commission, do you have any
21       reason to believe that the document following
22       Exhibit 12 is not an accurate depiction of the
23       September 7, 2021, AG memo?

83

1  A    As I sit here today I don't have a specific
2        reason to think this isn't it.  However, I'm not
3        a hundred percent sure, but I don't have a
4        specific objection or question or issue.
5  Q    Thank you.  I appreciate that.  My question is
6        without getting into -- strike that.
7        Does this memo govern how the Human Rights
8        Commission enforces RSA 354-A:29 to 34?
9        MR. KENISON-MARVIN:  Objection.  Vague.
10       Legal contention.  You can answer.
11 A    When you say "govern," could you be more clear?
12 Q    Maybe I'll just ask the question more generally.
13       Does Exhibit 12 have any impact on how the
14       Human Rights Commission enforces RSA 354-A:29 to
15       34?
16       MR. KENISON-MARVIN:  Same objection.  You
17       can answer.
18 A    I'm not still a hundred percent certain that I
19       understand your question.  However, all of 354-A
20       is governed by the statute as it's written as
21       well as the legal standard.
22 Q    So direct your attention to the first page of
23       Exhibit 12 Bates stamped PL 00425.  This is

84

1        directed to Chairman Palardy and to you,
2        Director Malachi, and the first sentence states,
3        "You requested, on behalf of the New Hampshire
4        Commission for Human Rights, that this office
5        provide an official Attorney General opinion
6        concerning the scope and application of the
7        recently passed sections 297 and 298 of House
8        Bill 2."  Do you see that language?
9  A    I do.
10 Q    Did the Commission request an official Attorney
11       General opinion concerning the scope and
12       application of Sections 297 and 298 of House
13       Bill 2?
14 A    I'm not sure that that, your question, I think
15       it may speak to privilege.
16 Q    I think with respect to that particular question
17       I'm just referencing confirmation as to what's
18       in a public document.
19       MR. KENISON-MARVIN:  Object to maybe
20       compound question.  Just clarify now what the
21       question is on the table?
22 Q    Sure.  I just want to confirm whether it is
23       accurate that the Commission for Human Rights

85

1    requested that the Attorney General's office
2    provide an official Attorney General opinion
3    concerning the scope and application of the
4    recently passed Sections 297 and 298?
5        MR. KENISON-MARVIN:  I'll object on
6    attorney-client privilege to the extent the
7    question relates to not what's stated in the
8    document but with respect to specific requests
9    or communications made to the Attorney General
10   by the HRC.
11       MR. BISSONNETTE:  And I am not, just to be
12   very clear because I understand the objection, I
13   am not asking for communications beyond seeking
14   confirmation that there was a request from the
15   Human Rights Commission to the Attorney
16   General's office along the lines of the first
17   sentence on page 425 of Exhibit 12.
18       MR. KENISON-MARVIN:  Mind if we step out
19   for just a second?
20       (Director Malachi and Atty. Kenison-Marvin
21        leave the conference room and return
22        2:50 - 3:42 p.m.)
23   Q    So Director Malachi, I'm just going to obviously

86

1    reference the first sentence on Exhibit 12
2    beginning with the statement you requested on
3    behalf of the New Hampshire Commission for Human
4    Rights that this office provide an official
5    Attorney General opinion concerning the scope
6    and application of the recently passed Sections
7    297 and 298 of House Bill 2.  Do you see that
8    language in Exhibit 12?
9    A    Yes.
10   Q    So my question is did the Commission for Human
11       Rights request that the Attorney General's
12       office provide an official opinion concerning
13       the scope and application of Section 297 and 298
14       of House Bill 2?
15   A    As it relates specifically to me, did I go to
16       the AG and request an opinion, no.  However, I
17       think it would be fair to say that the
18       Commission requested an opinion.
19   Q    Okay.  Excluding any communications that the
20       Commission may have had with its lawyers at the
21       Department of Justice, can you explain to me why
22       the Commission sought an opinion?
23   A    I'm sorry.  Could you say that again?

87

1    Q    Yes.  Excluding the contents of any
2        communications that the Commission may have had
3        with its lawyers at the Department of Justice,
4        could you explain why the Commission sought the
5        opinion?
6            MR. KENISON-MARVIN:  Objection to the
7        extent it misstates the witness's answer to the
8        prior question.
9    Q    Can I withdraw the question?  I'd just like to
10       hear back exactly what the witness said.  Thank
11       you.
12       (Requested portion read back by court reporter)
13   Q    Excluding any communications that the Commission
14       had with its lawyers at the New Hampshire
15       Department of Justice, can you explain why the
16       Commission requested an opinion?
17   A    I'm unclear if that's privileged communication.
18           MR. KENISON-MARVIN:  The question doesn't
19       include any information that was discussed with
20       attorneys.  I believe I understand it to be
21       attorneys at DOJ, but to the extent there was
22       counsel not only with DOJ attorneys but any
23       attorney representing HRC that was a privileged

88

1    communication seeking advice to do something or
2    whether or not to do something, that would be
3    privileged, but I understand the question not to
4    ask for that information about content of
5    communications with attorneys that were
6    representing the HRC; is that correct?
7        MR. BISSONNETTE:  That is.  Yes.
8    A    With that clear, could you, I'm sorry, could you
9        ask the question one more time so I could
10       answer?
11   Q    Understood.  Just going to have it read back.
12       Thank you, Cindy.
13       (Requested portion read back by court reporter)
14   A    The Commission was aware of concern from the
15       public about Sections 297 and 298 and requested
16       the opinion.
17   Q    Okay.  And do you recall the specific concerns
18       from the public that were raised?
19   A    No.  I don't remember.  I don't recall the
20       specifics.
21   Q    Okay.  Were those specific concerns that you're
22       referencing, did they reflect the general
23       concern that the law was confusing?

89

1 A    I couldn't speak to my recollection of the
2      conversation.  It would be reflected in whatever
3      the opinion was.
4 Q    Is that reflected, just to be clear, I'm not
5      getting into communications with lawyers here,
6      but are those concerns reflected on the first
7      sentence of the second paragraph on page 1 in
8      which the memo states, "Some have voiced
9      concerns that these new statutes are confusing
10     and that public employers in schools will
11     struggle to understand the scope of the new
12     prohibitions"?
13 A   That could be.
14 Q   Sitting here today, can you recall anything more
15     specific about the concerns that are referenced
16     in Exhibit 12 and that were a reason for why the
17     Commission requested an opinion?
18 A   Sitting here today, no.
19 Q   I'm just going to refer you to you to Exhibit
20     13, Director Malachi, that's been placed in
21     front of you.  I would just submit to you this
22     is a document produced not by the HRC but by the
23     Department of Education.  That seems to suggest

90

1      an accepted meeting, I'm not sure by whom,
2      concerning Review and Discuss Procedure/Process
3      for Incidences of Anti-Discrimination in which
4      there potentially were as attendees you and
5      Commissioner Edelblut.
6      Have I accurately described at least what
7      Exhibit 13 reflects?
8 A    I don't have a recollection of this.
9 Q    Do you recall a meeting with Commissioner
10     Edelblut on or about September 8, 2021?
11 A   I don't recall a specific meeting.
12 Q   Okay.  Does the fact that this September 8 date
13     on Exhibit 13, does the fact that that's one day
14     after the September 7, 2021, AG memo in Exhibit
15     12 refresh your recollection at all about
16     whether a meeting occurred and what may have
17     been discussed?
18 A   No.
19 Q   Sitting here today, you have no recollection,
20     just to be clear, you have no recollection of
21     any meeting with Commissioner Edelblut on or
22     about September 8, 2021, correct?
23 A   No.

91

1 Q    You can set those aside.
2      I did have another question on Exhibit 12.
3      My apologies.  How does this memo impact if at
4      all how the Commission enforces RSA 354-A:29 to
5      34?
6      MR. KENISON-MARVIN:  Objection.  Compound
7      and foundation.
8 Q    I'm going to withdraw.  I'm not going to use the
9      term "impact."  I'm trying to figure out if this
10     is a memo you use in enforcing RSA 354-A:29-34
11     so I'm just going to ask the question that way.
12     Does Exhibit 12 guide how the Commission
13     for Human Rights enforces RSA 354-A:29 to 34?
14 A   So I'm a bit unclear on the question.  Are you
15     asking me specifically this document?  Or does
16     an AG opinion affect how the Commission does its
17     work?
18 Q   No, good question.  I'm simply referring to
19     Exhibit 12 and whether it guides how the
20     Commission applies specifically RSA 354-A:29 to
21     34?
22 A   If I understand your question, insomuch as it is
23     information from the Attorney General of the

92

1      State of New Hampshire, then yes.  However, it
2      doesn't change our process.
3 Q    Okay.  I guess my question is how do you use
4      this document?  How does the Commission use
5      Exhibit 12?
6 A    If you're asking do we use it in our day-to-day
7      work, is that what you're asking?
8 Q    How does the Commission use Exhibit 12 with
9      respect to its duties in enforcing RSA 354-A:29
10     to 34?
11     MR. KENISON-MARVIN:  Objection.
12     Foundation.
13 A   Please ask the question again?
14 Q   Cindy, would you mind reading the question back?
15     (Requested portion read back by court reporter)
16 A   Respective of this document we don't.
17 Q   Does it in any way guide how the Commission
18     applies RSA 354-A:29 to 34?
19 A   Are you asking additionally?  Outside of the
20     statute?
21 Q   Yes.  I'm just trying to figure out how this
22     memo is used by your office.  So we've
23     established, correct, that the Commission

93

1   requested an AG memo, right?

2   A   Yes.

3   Q   We've established that the Commission received

4       an AG memo, right?

5   A   That would be fair.

6   Q   So my question is having requested it and

7       received it, does Exhibit 12 guide in any way

8       the Commission's application of RSA 354-A:29 to

9       34?

10      MR. KENISON-MARVIN:  Objection.

11      Foundation.

12  A   Insomuch as the document was requested by the

13      Commission, it was requested for the public.

14  Q   Okay.  So this wasn't requested with the intent

15      to assist the Commission in enforcing the

16      statute?  Do I understand your testimony

17      correctly?

18  A   Correct.

19  Q   Has the Commission since the issuance of the

20      September 7, 2021, opinion used this opinion in

21      interpreting the provisions of RSA 354-A:29 to

22      34?

23  A   Could you clarify relative to what?

94

1   Q   Relative to any allegation of discrimination

2       that has been received by the Commission under

3       the challenged law in this case.

4   A   No.

5   Q   I'm going to set that aside.  I'm going to have

6       one more exhibit.

7       (Exhibit 56 marked for identification)

8   Q   So Director Malachi, just as you read this, I'm

9       only going to have you look at one particular

10      paragraph, and that's the paragraph on the

11      bottom of page 2 of Exhibit 56 that's Bates

12      stamped HRC 00392, and that has been

13      highlighted, and I will submit that that

14      highlighting has been done by Plaintiffs'

15      counsel in this case.

16      So I think just to kind of streamline this

17      process I think what I would just ask you to do

18      is read that entire paragraph beginning with

19      "Director Malachi discussed the impact of HB 2,"

20      and when you finish that paragraph on page 2,

21      just let me know when you're done, please.

22  A   Okay.

23  Q   So I'm going to just direct your attention to

95

1       the language again that Plaintiffs' counsel has

2       highlighted in this document.  Director Malachi

3       explained -- strike that.

4       I want to direct your attention to the

5       language that's been highlighted by Plaintiffs'

6       counsel, "Assistant Director Burke Cohen and

7       Director Malachi explained that the likely

8       inspiration was that there have been instances

9       in which information has been presented in

10      trainings and K - 12 classrooms that states

11      directly and/or impliedly that inherent traits

12      establish a person's inferiority/superiority."

13      Do you see that language?

14  A   Yes.

15  Q   Is that an accurate reflection of what was said

16      during the October 7, 2021, meeting of the Human

17      Rights Commissioners?

18  A   I don't have a recollection.

19  Q   Okay.  Any reason to think that that isn't an

20      accurate reflection of what was said at the

21      meeting?

22  A   No.

23  Q   Sitting here today, do you continue to believe

96

1       that the likely inspiration for HB 2 was that

2       there been instances in which information has

3       been presented in trainings in K through 12

4       classrooms that states directly and/or impliedly

5       that inherent traits establish a person's

6       inferiority or superiority?

7   A   I'm sorry.  Ask the first part of the question

8       again?

9   Q   Sure.  I know that you have no reason to believe

10      this was an inaccurate reflection of what you

11      said at the meeting.  My question to you is that

12      is this still your present understanding that

13      the likely inspiration by the supporters of the

14      challenged law, quote, "was that there have been

15      instances in which information has been

16      presented in trainings in K through 12

17      classrooms that states directly and/or impliedly

18      that inherent traits establish a person's

19      inferiority/superiority?

20  A   I'm not having an opinion one way or the other.

21  Q   I just want to short-circuit this.  All I'm

22      asking for is you had an opinion at the time as

23      to what the likely inspiration was for HB 2.  So

97

1  my question is sitting here today, does the
2  opinion on page 2 that you had on October 7th,
3  2021, continue to be your opinion sitting here
4  today.  That's all.
5       MR. KENISON-MARVIN:  Objection to the
6  extent it mischaracterizes and misstates prior
7  testimony.
8  A  Sitting here today I haven't given much thought
9  to this statement two years ago.
10 Q  But you had an opinion obviously on October 7,
11 2021, correct?
12      MR. KENISON-MARVIN:  Objection.
13 Misrepresents prior testimony.
14 Q  Are you able to answer that question?
15 A  Oh, if I had an opinion?
16 Q  Then.
17 A  Then?
18 Q  Yes.
19 A  This is part of a discussion so I'm reading
20 what's written here.
21 Q  I understand that.  It seems to me based on the
22 minutes that this is a summary of at least an
23 explanation provided by Assistant Director Burke

98

1  Cohen and Director Malachi which is you.  So I
2  guess what I'm trying to get at is you had this,
3  this is an explanation -- strike that.
4       Do you know what is being referenced when
5  the language states in this explanation that,
6  quote, "there have been instances in which
7  information has been presented in trainings in K
8  through 12 classrooms that states directly
9  and/or impliedly that inherent traits establish
10 a person's inferiority/superiority?
11 A  I'm sorry.  Are you asking if I have --
12 Q  What were the instances being referred to.
13 That's what I'm trying to forget at.
14      MR. KENISON-MARVIN:  Objection.
15 Foundation.
16 A  I don't have a recollection.
17 Q  So you don't know what was being referred to
18 with respect to the specific instances that are
19 on the bottom of page 2 HRC-00392?
20 A  I do not have a specific recollection.
21 Q  Do you have any recollection of this discussion
22 that took place on October 7, 2021, that's
23 referenced in the highlighted language on page

99

1  2, HRC-00392?
2  A  I do not.
3  Q  I'm going to also introduce another exhibit.
4       (Exhibit 57 marked for identification)
5       MR. BISSONNETTE:  And I am also going to,
6  if it's okay, Nate, I'm going to have before the
7  witness the exhibit previously marked Exhibit 32
8  as well.  I'm just going to use these in
9  conjunction with each other.  Thank you.
10      (Discussion off the record)
11 Q  Director Malachi, Exhibit 57 are Christian Kim's
12 and your objections and responses to the
13 Plaintiff's First Set of Interrogatories,
14 correct?
15 A  You said 57?
16 Q  There should be two exhibits in front of you.
17 The first is 57.
18      MR. KENISON-MARVIN:  Just clarify the title
19 of the document versus caption.
20 Q  So I'll strike my last question.
21      I want to just to confirm that in this case
22 in which Commissioner Edelblut and other state
23 actors are Defendants, can you confirm that

100

1  Exhibit 57 consists of the Objection and
2  Responses to the Plaintiff's First set of
3  Interrogatories submitted to Chairperson
4  Christian Kim and you, Executive Director Ahni
5  Malachi?
6  A  I would have to look through this and speak with
7  counsel to give you an answer to that question.
8  Q  Take as much time as you need.  I do need you to
9  confirm that.
10      MR. KENISON-MARVIN:  Off the record for
11 just a second.
12      (Director Malachi and Atty. Kenison-Marvin
13      leave the room and return
14      4:09 - 4:21 p.m.)
15 Q  If you could just reread the last question?
16      (Requested portion read back by court reporter)
17 A  Okay.  I'm very unclear in looking and this
18 document which is noticed as Exhibit 57, these
19 are questions for the Commissioner of Education.
20 This is an Interrogatory for him specifically.
21 So I can't answer or attest to anything for the
22 Commissioner of Education.  Am I looking at the
23 wrong document?

101

1   Q   Are you referring to the caption that says Local
2       8027 versus Frank Edelblut?  Is that what you're
3       referring to?
4   A   So I'm referring to Exhibit 57 that has that
5       caption, and in looking through this document it
6       talks about the Commissioner objecting and
7       carries through on the Commissioner's
8       objections, and it states the Human Rights
9       Commission in some of the objections as part of
10      Commissioner's answer.
11          MR. KENISON-MARVIN:  I do have a different
12      document than her, I think.
13  A   It is not for the Human Rights Commission if you
14      look at the signatures.  Verification pages.
15  Q   So you have the wrong document?  That's my
16      fault.
17          MR. KENISON-MARVIN:  I can just look at
18      everything, but yeah, it's captioned the
19      Commissioner Frank Edelblut.
20          (Exhibit 58 marked for identification)
21          MR. BISSONNETTE:  Thank you for flagging
22      that, and I apologize.  So that's on me.  Thank
23      you.

102

1   Q   So while you're reviewing that, Director
2       Malachi, I'll have the same question with the
3       caveat now is whether Exhibit 58 consists of
4       Chairperson Christian Kim's and your objections
5       and responses to the Plaintiffs' First Set of
6       Interrogatories in this case.
7   A   Okay.  For the 13th time, your question again?
8           (Discussion off the record)
9   Q   Is Exhibit 58 the Interrogatory Responses of
10      both Chairman Kim and you in response to the
11      Plaintiffs' First Set of Interrogatories in this
12      case?
13  A   That is a fair assessment.
14  Q   Okay.  And you reviewed these responses before
15      they were submitted to Plaintiffs' counsel in
16      this case, I assume?
17  A   That's fair.
18  Q   And you signed a verification on page 15 of
19      Exhibit 58, correct?
20  A   That would be my electronic signature.
21  Q   I'm only going to direct your attention to page
22      10 and the response to Interrogatory number 6.
23      There's a statement, quote, "The HRC Defendants

103

1       can confirm that the HRC has docketed one
2       complaint made under the amendments," end quote.
3       Do you see that sentence?
4   A   Where are you on the page?
5   Q   Sure.  I'm on page 10.
6   A   Yes.
7   Q   Above paragraph 7, the statement, quote, "The
8       HRC Defendants can confirm that the HRC has
9       docketed one complaint made under the
10      amendments."
11  A   I see that.
12  Q   Sure.  I've also put before you a document
13      that's been previously marked as Exhibit 32.  Do
14      you see, I'm not asking you to read it yet but
15      do you see is Exhibit 32 in front of you?
16  A   Yes.
17  Q   So my question is and you can take time to
18      answer this, is Exhibit 32 the docketed
19      complaint referenced on page 10 of your
20      Interrogatory responses in Exhibit 58?  And if
21      we need a minute to go off the record I'm happy
22      to do so as well.
23  A   So Exhibit 32 is not a docketed response or not

104

1       a docketed charge.
2   Q   Okay.  What is that sentence on page 2, what is
3       the complaint that it is referencing
4       specifically?
5   A   Which document are you on?
6   Q   I'm on Exhibit 58.
7   A   Okay.
8   Q   Quote, "The HRC Defendants can confirm that the
9       HRC has docketed one complaint made under the
10      amendments," end quote.  Do you see that
11      language?
12  A   I do.
13  Q   What is the Commission referring to in that
14      statement?
15  A   It's referring to a docketed charge, a docketed,
16      so it's an allegation and then it becomes,
17      potentially becomes docketed and so it is
18      referring to a docketed charge.
19  Q   Okay.  And was that docketed charge produced in
20      this litigation, do you know?
21  A   I would need to confer with my attorney because
22      once we take a charge, well, anything, so
23      conversations, questionnaires, charges are all

105

1  confidential.
2  Q   Um-hum.  Okay.  Is the complaint in Exhibit 32,
3      talking about the contents of the complaint, let
4      me start again.
5          Is the contents of the complaint from
6      Mr. ████ in Exhibit 32 the same contents of
7      the complaint that was docketed and that is
8      reflected on page 10 of Exhibit 58?
9  A   I may need to confer with my attorney.  I'm
10     unsure of what I can share based on
11     confidentiality of the Commission.
12         MR. KENISON-MARVIN:  I'm happy to do this
13     just off the record quickly.
14         (Discussion off the record)
15     (Requested portion read back by court reporter).
16 A   So I need clarification.  Are you asking if
17     Mr. ████ completed one of our forms?  Are
18     you asking if just this information is a charge?
19     I'm not clear on what you're asking.
20 Q   I'm a little bit at a disadvantage because I
21     only have what the Commission produced to us in
22     litigation.  The only documents with respect to
23     Mr. ████'s complaint that have been produced

106

1  in this litigation is what's reflected in
2  Exhibit 32.  That's all we've received.  In
3  addition, there's been a representation made to
4  us by counsel that this complaint has been
5  docketed.
6      So all I'm just trying to get at is are the
7  contents of Mr. ████ s complaint in his
8  email in Exhibit 32 the contents of the
9  complaint that has been docketed by the HRC as
10 reflected on page 10 of Exhibit 58?
11 A  Okay.  So the answer to the question is a
12 docketed charge is on a specific form with the
13 Commission.  That form is then verified.  Any
14 additional information that a complainant wishes
15 to add to that, whatever that is, at the time of
16 filing the charge they are welcome to do that.
17 They are not required to do that.  All that is
18 required is their sworn affidavit that the
19 events that they are discussing or the events
20 that they are alleging have happened and then
21 that form is verified.  So their signature and
22 then their signature is witnessed by a notary.
23 So all charges, regardless of type, are on

107

1  official documents with the commission.  So it
2  has to be on that form which is signed by the
3  Complainant and verified by a notary.  So I'm
4  not sure if that answers your question.
5  Q  It's difficult for me because all I have with
6     respect to Mr. ████'s allegation is what's
7     reflected in Exhibit 32.  I don't have anything
8     else produced with respect to that allegation,
9     but there's been an indication made to me that
10    this is a docketed complaint.  There's been a
11    statement under oath from the Human Rights
12    Commission that there's one docketed complaint
13    under the amendments, and I'm trying to get at
14    what that docketed complaint is.  What are its
15    contents.
16        So that's going to be my question to you.
17    I'm referring you back, Director Malachi, to the
18    statement, quote, "The HRC Defendants can
19    confirm the HRC has docketed one complaint made
20    under the amendments," end quote.  What is the
21    substance of that complaint that has been
22    docketed?
23 A  So the substance of the docketed complaint would

108

1  be whatever the individual is alleging took
2  place, that information is put on a specific
3  form that they would then sign and that
4  signature is verified and that becomes the
5  docketed complaint.
6  Q  So I haven't received that form.  So I guess my
7     question is can you sitting here today, can you
8     recall what the allegation was in the form that
9     was docketed and led to a docketed complaint
10    made under the amendments?  What was the
11    complaint about?  That's all I'm trying to get
12    at.
13 A  To my recollection -- I'll stay that.  Question
14    again, please?
15    (Requested portion read back by court reporter)
16 A  Without having the exact complaint document in
17    front of me, I cannot tell you with a hundred
18    percent certainty what is in the complaint.
19    However, it would allude to something that is in
20    this email to the Commission, but I don't have
21    the exact language in front of me.
22 Q  Can we go off the record?  Can I just speak with
23    you?

109

```
1              (Counsel leave the conference
2         room and return 4:43 - 4:49 p.m.)
3         MR. BISSONNETTE:  After conferring with
4    counsel, we are going to suspend this deposition
5    and reconvene at a later time to cover just a
6    few of the outstanding issue areas, and I
7    believe there's agreement between counsel on
8    that.
9         MR. KENISON-MARVIN:  Yes.  Before we go off
10   the record, I'll put on the record officially
11   that we will be reserving the right to read and
12   sign once everything is concluded.
13            (Deposition suspended at 4:49 p.m.)
14
15
16
17
18
19
20
21
22
23
```

111

```
1            C E R T I F I C A T E
2         I, Cynthia Foster, Registered Professional
3    Reporter and Licensed Court Reporter, duly authorized
4    to practice Shorthand Court Reporting in the State of
5    New Hampshire, hereby certify that the foregoing
6    pages, numbered 5 through 109, are a true and
7    accurate transcription of my stenographic notes of
8    the deposition of AHNI MALACHI who was first duly
9    sworn by me on May 24, 2023, for use in the matter
10   indicated on the title sheet, as to which a
11   transcript was duly ordered;
12        I further certify that I am neither
13   attorney nor counsel for, nor related to or employed
14   by any of the parties to the action in which this
15   transcript was produced, and further that I am not a
16   relative or employee of any attorney or counsel
17   employed in this case, nor am I financially
18   interested in this action.
19
20
21                      Cynthia Foster, LCR
22
23
```

110

```
1         I have carefully read the foregoing
2    deposition, and the answers made by me are true.
3
4
5                AHNI MALACHI
6
7
8    STATE OF _____
9    _____, SS.
10
11        At_____on the
12   _____ day of _____ A.D.
13   2023, personally appeared the above-named AHNI
14   MALACHI and made oath that the foregoing answers
15   subscribed by her are true.
16                     Before me,
17
18
19
20                     Notary Public
21
22
23
```

112

```
1             E R R A T A
2         I, the undersigned, AHNI MALACHI, have read the
     transcript of my deposition held on May 24, 2023, in
3    the matter of Local 8027, AFT-New Hampshire, et al v.
     Frank Edelblut, Commissioner, et al; and the same is
4    true and correct, to the best of my knowledge, with
     the exception of the following changes noted below,
5    if any:
6    PAGE/LINE   CORRECTION AND REASON FOR CORRECTION
7    _____
8    _____
9    _____
10   See attached sheet(s) for additional information:
11   ___Yes___No
12
                          _____
                          AHNI MALACHI
13
14   STATE OF _____)
                         ) ss.:
15   COUNTY OF _____)
16
          Subscribed and sworn to before me this _____ day
17   of _____, 2023.
18
19                        _____
                          Notary Public
20
     My commission expires:
21
     _____
22
23
```

```
 1              I have carefully read the foregoing

 2         deposition, and the answers made by me are

    true.¹
 3

 4                              Ahni Mal
 5                        AHNI MALACHI

 6

 7

 8    STATE OF  New Hampshire

 9    Merrimack            , SS.

10

11         At Merrimack County on the

12    17th    day of   July          A.D.

13    2023, personally appeared the above-named AHNI

14    MALACHI and made oath that the foregoing answers

15    subscribed by her are true.

16                              Before me,

17

18

19

20                         Notary Public

21

22

23    ¹ Subject to the changes indicated on the accompanying errata and
      attachment thereto.
```

1

E R R A T A

2   I, the undersigned, AHNI MALACHI, have read the
transcript of my deposition held on May 24, 2023, in

3 the matter of Local 8027, AFT-New Hampshire, et al v.
Frank Edelblut, Commissioner, et al; and the same is

4 true and correct, to the best of my knowledge, with

5 the exception of the following changes noted below,

6 if any:

7 PAGE/LINE   CORRECTION AND REASON FOR CORRECTION

8  P23 / L7   See attachment

9  P27 / L4   See attachment

10

11 See attached sheet(s) for additional information:

12 X  Yes___No

        _Ahni Mal_____

      AHNI MALACHI

13

14 STATE OF New Hampshire)
        ) ss.:

15 COUNTY OF Merrimack )

16

17   Subscribed and sworn to before me this 17th day

18 of _July_____, 2023.

19

       Notary Public

20

21 My commission expires:

22  Kelly A. Mederos, Esq
  Notary Public, State of New Hampshire
  My Commission Expires December 21, 2027

23

Local 8027, AFT-New Hampshire, et al., Plaintiffs vs. Frank Edelblut, Commissioner, et al., Defendants (D.N.H. Case No. 1:21-cv-01077-PB)

Ahni Malachi

# ERRATA SHEET

## ATTACHMENT

Page 23, Line 7, Change:

Replace "Commissioner's" with "Commission's" such that the transcript states:

"As I sit here today reading this, it does appear to be an accurate reflection of the ***Commission's*** process."

Reason: Likely transcription error; otherwise, to clarify testimony.

Page 27, Line 4, Change:

Replace "bearing" with "meaning" such that the transcript states:

"The Commission language has ***meaning***."

Reason: Likely transcription error; otherwise, to clarify testimony.

[*end*]

# EXHIBIT 6

HRC Assistant
Director
Sarah Cohen
Deposition
Transcript
Redacted,
Publicly-filed

(Unredacted
version has been
filed under seal)

Local 8027

vs

Frank Edelblut

Docket No. 1:21-cv-01077-PB

SARAH COHEN

June 26, 2023



AVICORE REPORTING

15 Constitution Drive, Suite 1A · Bedford, NH 03110 · (603) 666-4100
info@avicorereporting.com · www.avicorereporting.com

|  |  |
|---|---|
| UNITED STATES DISTRICT COURT | 3 |

```
                UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW HAMPSHIRE




        Local 8027, AFT-New Hampshire, et al.

                       Plaintiff,

        v.                        [CERTIFIED ORIGINAL]

        Frank Edelblut, Commissioner, et al

                       Defendants.

                  No. 1:21-cv-01077-PB




                  DEPOSITION OF SARAH BURKE COHEN

                  taken on behalf of the Plaintiffs

                  at the New Hampshire Attorney

                  General's Office, Concord, NH,

                  on June 26, 2023, at 10:08 a.m.




        Court Reporter:

        Cynthia Foster, LCR

        LCR #14 (RSA 310-A:161-181)
```

```
                                                          3

1                          INDEX

2            Deposition of Sarah Burke Cohen

3  Examination by Mr. Bissonnette:              5

4  Examination by Mr. Kahne:                    96

5  Examination by Mr. Kenison-Marvin:          119

6

7                        EXHIBITS

8  59   Complaint                              10

9  60   Commission for Human Rights website    26

10 61   Email BurkeCohen to Sheldon, 17 Nov 2021,

11      HRC-00413-415                           26

12 62   Charge of Discrimination, [redacted]

13      HRC-00416-420                           37

14 63   Public Education Questionnaire,

15      HRC-00065-00067, 00067.1, 00068.1       63

16 64   Fax from Perroni to Borysenko,

17      Borysenko R.45 Response, 000001-17      72

18 65   Exeter Regional Cooperative School

19      District article by Karlyn Borysenko    72

20 66   Email, Malachi to [redacted], 31 Aug 2022,

21      HRC-00709-713                           72

22 67   Unwoke Army Tweet Thread and Related

23      Documents, PL 00576-677                 73
```

```
                                                          2

1  APPEARANCES:

2      On behalf of the Plaintiffs, Local 8027, AFT-New
       Hampshire, AFL-CIO:

3  STROOCK & STROOCK & LAVAN LLP
   By: David Kahne, Esq., by Zoom

4  180 Maiden Lane
   New York, NY  10038

5  212-806-5648
   dkahne@stroock.com

6

       On behalf of the Plaintiffs, Christina

7      Philibotte, Andres Mejia, NEA-New Hampshire:
   ACLU OF NEW HAMPSHIRE

8  By: Gilles Bissonnette, Esq.
   18 Low Avenue, Unit 12

9  Concord, NH  03301
   603-225-3080

10 gilles@aclu-nh.org

11     On behalf of the Defendants, Frank Edelblut,
   Ahni Malachi, John Formella, et al:

12 NH DEPARTMENT OF JUSTICE
   By: Nathan W. Kenison-Marvin, Esq.

13 33 Capitol Street
   Concord, NH  03301

14 603-271-1292
   nathan.w.kenison-marvin@doj.nh.gov

15

   By Zoom:

16 Peter Perroni, Esq.
   Jennifer Eber, Esq.

17 Kayla Turner, Esq., kaylat@drcnh.org.
   Esther Dickinson, Esq., edickinson@nhnea.org

18

19

20

21

22

23
```

```
                                                          4

1                (EXHIBITS - continued)

2  68   Email, BurkeCohen to Malachi, 18 Nov

3       2021, [redacted], HRC-00359-360, 00046-49,

4       HRC-00930                               77

5  69   Email, BurkeCohen to Malachi, [redacted],

6       18 Nov 2021, HRC-00039-50                78

7  70   Email, BurkeCohen to Malachi, [redacted],

8       18 Nov 2021, HRC-00042-45, HRC-00932     80

9  71   Public Education Intake Questionnaire,

10      [redacted], HRC-00343-344,

11      HRC-00936                               81

12 72   Email, BurkeCohen to Malachi, [redacted],

13      HRC-00036-00038, HRC-965-966            82

14 73   Email, BurkeCohen to Malachi, [redacted],

15      HRC-000178-186, HRC-00213               82

16 74   Email, [redacted] to HRC, HRC-01003-09   83

17 75   Email, HRC to [redacted], 15 Apr 2022,

18      HRC-00086-87                            85

19 76   Email, HRC to Malachi, 22 Apr 2022,

20      [redacted], HRC-00340-341                86

21 77   Email, [redacted] to Malachi, 7 Dec 2022,

22      HRC-00187-212                           87

23
```

**5**

1    EXHIBITS (continued)

2    78    Email, BurkeCohen to Malachi, 18 Nov

3         2021, ███████, HRC-00977-988         88

4         (Original exhibits retained by court reporter

5         and returned to Attorney Bissonnette)

6         (Scanned copies provided to all counsel)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**6**

1         S T I P U L A T I O N S

2              It is agreed that the deposition shall

3    be taken in the first instance in stenotype and when

4    transcribed may be used for all purposes for which

5    depositions are competent under New Hampshire

6    practice.

7              Notice, filing, caption and all other

8    formalities are waived.  All objections except as to

9    form are reserved and may be taken in court at trial.

10              It is further agreed that if the

11   deposition is not signed within thirty (30) days

12   after submission to counsel, the signature of the

13   deponent is waived.

14              It is further agreed that exhibits may

15   be retained by counsel until the time of trial.

16

17

18

19

20

21

22

23

**7**

1         SARAH BURKE COHEN, DULY SWORN

2         MR. BISSONNETTE:  I know, Attorney Kenison,

3    we have the same agreement with respect to prior

4    stipulations. Just confirming that.

5         MR. KENISON-MARVIN:  Yes.

6              EXAMINATION

7    BY MR. BISSONNETTE:

8    Q    Assistant Director Cohen, my name is Gilles

9         Bissonnette.  I'm the Legal Director of the ACLU

10        of New Hampshire.  I'm not sure we've met before

11        in fact.

12   A    I'm not sure.

13   Q    But it's a pleasure to meet you today, and my

14        role in this case is I represent a client group

15        in this case, in particular Andres Mejia and

16        Tina Philibotte with respect to a challenge to

17        kind of what we have all kind of called either

18        HB 2 or the amendments.

19   A    Okay.

20   Q    In this case.  So that's my role and it's a

21        pleasure to meet you.

22             I'm just going to start off by just asking

23        whether or not you've ever been deposed before.

**8**

1    A    I have not.

2    Q    So the way this process works, I'm not trying to

3         trick you.  There are no trick questions here.

4         So if you don't understand a question, please

5         tell me.  If you don't understand wording, you

6         know, please let me know.  Otherwise, I will

7         assume that you understand the question.  Okay?

8    A    Okay.

9    Q    And please as well just try to avoid nonverbal

10        cues.  As you know, we have a stenographer here

11        today.  Her role is to record in full our

12        conversation, but what you cannot do is record

13        nonverbal communication.  So I'd just ask that

14        you communicate orally.  Okay?

15   A    Okay.

16   Q    If you need a break at any time, absolutely ask

17        me.  It will absolutely be accommodated.  The

18        only caveat there is that if there's a pending

19        question I would just ask that that question be

20        answered before we break, but I want to make

21        sure that you feel comfortable, as comfortable

22        as one can be amidst this process so if you need

23        to use the restroom, grab a drink of water, just

9

1    mentally take a break for a couple minutes, I
2    understand.  Just let me know at any time.
3  A    Okay.
4  Q    Will anything prevent you from giving truthful
5    and accurate testimony today?
6  A    No.
7  Q    You're aware that this lawsuit is about a
8    challenge to what some have called or the
9    Plaintiffs have called the banned concepts law?
10 A    Yes.
11 Q    Just so we have the same kind of terminology, I
12    I'm either going to use the term "the
13    amendments" or "HB 2" to refer to the challenged
14    legislation in this case, and I just want to
15    make sure that when we both use that terminology
16    that we're referring to the same thing.  Does
17    that make sense?
18 A    It does.
19 Q    Okay.  Have you spoken to anyone at the Human
20    Rights Commission about your deposition today?
21 A    No.
22 Q    I'm just going to mark Exhibit 59.
23        (Exhibit 59 marked for identification)

10

1  Q    So I'm just going to ask to you review Exhibit
2    59, Assistant Director Cohen.  Just let me know
3    when you're finished reviewing.
4  A    Okay.
5  Q    Have you reviewed Exhibit 59 --
6  A    I have.
7  Q    -- Assistant Director Cohen?  And I just want to
8    make sure that you understand that you're
9    testifying on behalf of the Human Rights
10    Commission with respect to the topics that are
11    designated in Schedule A of Exhibit 59.  Do you
12    understand that to be the case?
13 A    I do.
14 Q    Okay.  And you're prepared today to testify on
15    those topics, correct?
16 A    I am.
17 Q    And I also just want to make clear that you
18    understand that to the extent a question falls
19    outside of these topics that you'll be
20    testifying in your individual capacity; is that
21    correct?
22 A    I understand that to be correct.
23 Q    What is your role at the Human Rights

11

1    Commission?
2  A    I am the Assistant Director.
3  Q    And how long have you been in that role?
4  A    Since 2018.
5  Q    And what are your responsibilities in that role?
6  A    I am the direct supervisor for the intake
7    coordinator and investigators.
8  Q    How do you supervise the intake coordinators?
9  A    We meet, the intake coordinators and I meet
10    bi-weekly, and we discuss any questions the
11    intake coordinator has about intakes that are
12    coming in.
13 Q    Are decisions made in those meetings about
14    whether to docket an allegation of
15    discrimination?
16 A    Not always.
17 Q    Sometimes, though; is it fair to say?
18 A    Sometimes.
19 Q    What's the standard that's used in determining
20    whether or not an allegation of discrimination
21    should be docketed?
22        MR. KENISON-MARVIN:  Objection.  Scope.
23    You can answer.

12

1  A    So answering in my personal capacity, not as the
2    Commission, we look at the jurisdiction, what
3    the statute reads, right?  So we determine in a
4    light most favorable to the intake inquiry
5    whether we'll take it or not.  We base it on
6    jurisdiction of number of employees, whether it
7    substantively falls within the scope of 354-A.
8  Q    Okay.  I think you also said that in your role
9    you are direct supervisor of investigators as
10    well.
11 A    Correct.
12 Q    Can you explain to me how that role functions?
13 A    I meet with the investigators once a month.  We
14    discuss their caseload, we discuss any questions
15    they have moving cases along legal standard
16    wise, any research that we need to do relative
17    to a specific case, and I review their reports
18    before they go up to the Commissioners to ensure
19    they are complete.
20 Q    Are these cases that have already been docketed
21    by the Human Rights Commission that are being
22    investigated by the investigators?
23 A    Correct.

13

1  Q    When you say review reports that are completed
2       by the investigators, is a report completed in
3       every case that is docketed by the Human Rights
4       Commission?
5             MR. KENISON-MARVIN:  Objection, scope.  You
6       can answer.
7  A    Answering in my, personally, so there are a
8       number of different ways cases move through the
9       Commission for Human Rights.  You have cases
10      that we go through what we call a full
11      investigation so they get to the point where
12      there is a finding issued by an investigating
13      commissioner of either probable cause or no
14      probable cause.
15            However, there are other times that a case
16      can sort of be resolved at the Commission.
17      Complainants have the ability to remove the case
18      to court.  There's also potential of settlement
19      of the cases.  So if there's a resolution of
20      settlement, then it gets closed.  Or there are
21      times where complainants decide they do not want
22      to pursue their charge at the Commission any
23      longer.

14

1  Q    Okay.  So with the exception of those cases in
2       which there's been a settlement or withdrawal or
3       removal to Superior Court, in all other cases
4       are reports completed by investigators?
5             MR. KENISON-MARVIN:  Same objection.
6  A    Answering for myself personally, yes.
7  Q    Thank you.  I know we got into the weeds pretty
8       quickly there, but I'm going to take a little
9       bit of a step back.  Before 2018, what were you
10      doing before 2018?
11 A    I was --
12 Q    Before your role here.  Sorry.  To be specific.
13      Professionally.
14 A    So I have been with the Commission since 2015.
15 Q    Okay.  What was your role between 2015 and 2018
16      at the Commission?
17 A    I started in 2015 as the intake coordinator.
18 Q    How long were you in that role?
19 A    I was in that role, so I was promoted to a
20      full-time investigator in 2016.  However,
21      because of staffing I was still completing the
22      position of intake coordinator.
23 Q    Understand.  Okay.

15

1  A    Until about probably close to the end of 2016.
2  Q    Okay.  What does it mean to be a -- I know you
3       supervise intake coordinators, but describe to
4       me what that role entails.
5             MR. KENISON-MARVIN:  Objection.  Scope.
6       You can answer.
7  A    Answering with my personal knowledge, the intake
8       coordinator's role is receive calls that come
9       in, inquiries that come into the Commission.
10      These inquiries come in both orally via the
11      phone or via someone coming, a walk-in.  Or they
12      come in in written form via email or regular
13      mail.
14            The intake coordinator role is to sort of
15      look at the jurisdictional components, and if
16      the intake meets the jurisdictional components,
17      to send out an intake questionnaire to that
18      person, and then from there the intake
19      questionnaire comes in and if it still meets the
20      jurisdictional components for a charge of
21      discrimination, the intake coordinator for those
22      who are pro se or unrepresented as a courtesy
23      assist them with drafting a charge of

16

1       discrimination.
2  Q    Okay.  Once that charge of discrimination comes
3       in, what's the intake coordinator's role at that
4       point in evaluating it?
5             MR. KENISON-MARVIN:  Same objection.
6  A    Answering for my personal knowledge is once, so
7       charge comes in as docketed, it has to be signed
8       and verified by the Complainant.  That is
9       considered a docketed charge.  The intake
10      coordinator's role is also to be the keeper of
11      the cases that are unassigned, that they have
12      not been assigned to an investigator.
13 Q    Okay.  Is part of the role of an intake
14      coordinator in assessing whether or not there's
15      a prima facie claim of discrimination?
16            MR. KENISON-MARVIN:  Same objection.
17 A    For my personal knowledge, yes.
18 Q    What is the criteria used in determining whether
19      the prima facie standard has been met by a
20      person alleging discrimination?
21            MR. KENISON-MARVIN:  Same objection.
22 A    From my personal experience, evaluating an
23      inquiry is looking at the statutory jurisdiction

17

1   of the Commission for Human Rights pursuant to
2   354-A which looks at number, looking at what
3   type of claim it is, public accommodation,
4   public education, housing, or employment, and
5   looking at the statutory requirements depending
6   on that from there.
7       If it's employment you look at the number
8   of employees to ensure that there are the
9   requisite number of employees.  From there you
10  also look to see if the allegations actually
11  fall within what our statute says we can
12  investigate.
13  Q   Gotcha.  Okay.  Thank you.  That's helpful.
14  A   Um-hum.
15  Q   I just want to make sure I understand your
16  background.  You were promoted in 2016 to, how
17  did you frame it?  Full-time intake coordinator?
18  A   No.  That is not what I said.
19  Q   What did you say?
20  A   So in 2015 intake coordinator was part-time.
21  Q   Okay.
22  A   2015.  So I was part-time in 2015.  I was
23  promoted in 2016 to full-time investigator.

18

1   Q   Full-time investigator.  I'm sorry.  Okay.
2       How long were you in that full-time
3   investigator role?
4   A   From 2016 until my promotion to Assistant
5   Director in 2018.
6   Q   Okay.  So approximately two years.  Could you
7   describe to me what your role was as a full-time
8   investigator between 2016 and 2018?
9   A   So describing, I'm describing it from my
10  personal experience.
11  Q   Um-hum.
12  A   That an investigator's role is to investigate
13  the cases that are docketed, right?  So part of
14  that is requesting information, document
15  information, it can be, it is also interviewing
16  complainants and individually named parties and
17  any other witnesses that would have relevant
18  information for the case.
19  Q   Before you joined the Human Rights Commission in
20  2015, what were you doing professionally?
21  A   I was a staff attorney at New Hampshire Legal
22  Assistance.
23  Q   I didn't know that.

19

1   A   Um-hum.
2   Q   Great organization.  How long were you a staff
3   attorney at NHLA?
4   A   I was a staff attorney at NHLA starting in 2011.
5   Q   Okay.  What was your role as a staff attorney at
6   NHLA at that time?
7   A   I worked in the Fair Housing project.
8   Q   With Elliott Barry?
9   A   With Elliott.
10  Q   One of my heroes.  Okay.  As an attorney in the
11  Fair Housing project, what generally were your
12  day-to-day responsibilities?
13  A   That's going back a bit.  Generally, so I was,
14  working in this project I was also the testing
15  coordinator for the Fair Housing program.  So
16  some of that was scheduling Fair Housing
17  testing, some of it was representing clients.
18  Some of it was preparing reports for the federal
19  government as it is a federal grant that they
20  have.
21  Q   Okay.  Did you have any employment positions
22  prior to 2011?
23  A   I was with New Hampshire Legal Assistance from

20

1   2008.
2   Q   Okay.  What was your role at NHLA generally
3   between 2008 and 2011?
4   A   I was considered a paralegal.
5   Q   Okay.  You went to law school, I know.
6   A   I did.
7   Q   When did you graduate law school?
8   A   I graduated law school in 2004.
9   Q   Where did graduate from?
10  A   Suffolk University Law School.
11  Q   And after you graduated, what was your first
12  position of employment?
13  A   I believe I was working at RiverStone Claims
14  Management.
15  Q   And how long were you there?
16  A   Let's see.  I was there I believe a couple of
17  years.  Honestly, I can't remember.
18  Q   That's a long time ago, I know.
19  A   It is.
20  Q   And just to kind of short circuit this and close
21  the loop kind of on your background, I'm just
22  curious, kind of what were you doing
23  professionally between 2004 when you graduated

21

1 and 2008 before you joined NHLA?

2 A   So I was -- I took the bar exam.  I took some

3 time off from, I worked.  During law school I

4 worked for MetLife Auto and Homes in-house

5 counsel.  I took some time off after I graduated

6 to study for the bar exam. ████████████████

████████████████████████ I started working at

8 RiverStone Claims Management as a legal

9 assistant/paralegal.  I can't remember exactly

10 what the title was.  And I was processing or

11 doing sort of the background of processing

12 general liability claims for the attorneys that

13 worked for RiverStone.

14 Q   Are you currently licensed in New Hampshire?

15 A   I am.

16 Q   When did you obtain your license?

17 A   2011.

18 Q   Do you personally assign cases to investigators

19 after a case is docketed?

20 A   Yes.

21 Q   How is that decision made as to who a case gets

22 assigned to?

23       MR. KENISON-MARVIN:  Objection.  Scope.

22

1 You can answer.

2 A   So we assign cases in order of the way they've

3 been received.

4 Q   Okay.  Is your supervisor, the Director, ever

5 involved in determining whether or not an

6 allegation of discrimination should be docketed?

7 A   Yes.

8 Q   Okay.  Under what circumstances would the

9 Director be involved in that docketing decision?

10       MR. KENISON-MARVIN:  Same scope objection.

11 A   So from my personal knowledge, it could be, if

12 it's a case, so some of it is if I'm not

13 available.

14 Q   Okay.

15 A   Sometimes it's if it's something that we are

16 doing that's newer.  Like when public education,

17 straight-up public education was added to the

18 statute.  We also had discussions, would have

19 been revolving around RSA 354:29 through 34 when

20 it was added to the statute.

21 Q   Could I have that last response just read back

22 to me just so I make sure I heard it correctly?

23       (Requested portion read back by court reporter)

23

1 Q   With respect to allegations of discrimination

2 that are made under RSA 354-A:29 to 34, are

3 those cases in which the Director would always

4 be involved in determining whether it's

5 docketed?

6       MR. KENISON-MARVIN:  Same objection.

7 A   From my personal knowledge, I believe so.

8 Q   Okay.  And I believe you testified earlier that

9 there are meetings that occur between you and

10 intake coordinators about how to handle

11 allegations of discrimination including whether

12 to docket them, correct?

13 A   Correct.

14 Q   Okay.  And at least in some instances during

15 those meetings there's determinations made as to

16 whether or not the prima facie standard has been

17 met, correct?

18 A   Correct.

19 Q   Is the Director involved in those meetings as

20 well or present during those meetings?

21       MR. KENISON-MARVIN:  Same objection.

22 A   Sometimes.  Depending on her schedule.

23 Q   I was going to ask kind of what determines that.

24

1 So it's scheduling issues would dictate whether

2 or not she's there or not there; is that

3 correct?

4 A   Correct.

5 Q   Just so we have a common understanding, I'm

6 actually just going to put before you a document

7 that's been previously marked Exhibit 1.

8       I'm going to ask you to review Exhibit 1,

9 but I'm going to give you my question in advance

10 before you read it and simply going to be is it

11 your understanding that this is the law being

12 challenged in this case.  So that's the

13 question, and I'd just ask you to review it, and

14 let me know when you're done with your review.

15       I know, Assistant Director Cohen, that

16 you're still reviewing this document, but I just

17 wanted to flag the operative text on Exhibit 1

18 is PL 004 to PL 007.  Thank you.

19 A   I'm sorry.  What was the question?

20 Q   Sure.  So the question is I just want to make

21 sure we have a common understanding that the

22 language in Exhibit 1 from PL 004 to PL 007 is

23 the text of the legislation that's being

25

1    challenged in this case.
2  A    So the text that I am familiar with that I am
3    here to, my understanding is what I'm here to
4    testify under would be PL 004 to PL 006.  I can
5    only testify as to 354-A.  The remaining
6    sections of 006 and 007 are not the statute that
7    I am familiar with.
8  Q    Okay.
9  A    So with that caveat, it is my understanding that
10    it appears that the document that you provided
11    has the statutory addition to 354-A.
12  Q    Okay.  So I just want take make sure I
13    understand your testimony that you're prepared
14    to, you're prepared to talk about with respect
15    to complaints in particular those made under
16    354-A:29 to 34.  Correct?
17  A    That is correct.
18  Q    And that's not the case with respect to RSA
19    193:40.  Is that fair to say?
20  A    That is correct.
21  Q    And I just want to make sure I understand your
22    testimony that is not a statute that you're
23    familiar with, correct?

26

1  A    Correct.
2  Q    Okay.  That's helpful.  I appreciate that, and
3    again, it's just to make sure that we're on the
4    same page when we talk about the challenged law
5    and the amendments so I appreciate that
6    clarification.
7    I am going to mark a new exhibit.
8    (Exhibit 60 marked for identification)
9    (Exhibit 61 marked for identification)
10  Q    I've put two exhibits before you.  Exhibit 60 is
11    a printout of the HRC's website stating How to
12    File a Complaint, and also attached to Exhibit
13    60 is a blank Public Education Intake
14    Questionnaire Form for RSA 354-A:29 to 34 that I
15    can represent to you that I printed out from the
16    HRC's website.
17    So I'd ask you to review Exhibit 60 and
18    confirm whether or not this is an accurate
19    reflection of the HRC's website with respect to
20    how to file a complaint and an accurate
21    reflection of the Public Intake Questionnaire
22    Form under RSA 354-A:29-34.
23    MR. KENISON-MARVIN:  Objection on scope and

27

1    compound.
2  A    Answering personally, it appears that this is
3    the Commission's website.  It appears that this
4    is the intake questionnaire that is available on
5    the Commission's website.
6  Q    Okay.  I'm going to refer you to the front page
7    of the blank questionnaire form on Exhibit 60.
8    Do you see that?
9  A    Yes.
10  Q    And the language states, Was the offered
11    program/training part of an extracurricular
12    activity, question mark.  Do you see that?
13  A    I do.
14  Q    Were you involved in the creation of this
15    questionnaire or the form questionnaire on
16    Exhibit 60?
17  A    Personally, yes.
18  Q    How were you involved in its creation?
19  A    I typed it into the system.
20  Q    I guess my -- maybe I could ask a question a
21    little bit more generally.  Who took a stab at
22    the first draft of the questionnaire that's
23    attached to Exhibit 60?

28

1    MR. KENISON-MARVIN:  Objection.  Scope and
2    vague.  You can answer.
3  A    I don't recall.
4  Q    Okay.  Were you involved in reviewing drafts of
5    this form questionnaire?
6  A    Yes.
7  Q    Do you recall providing feedback or comments on
8    any provisions of the form?
9  A    I do not recall specifically.
10  Q    Okay.  I'm just going to refer you now to
11    Exhibit 61 which I'll just submit is an email
12    from you to it seems like several other New
13    Hampshire employees copied Director Ahni Malachi
14    dated November 17, 2021.
15    I'll just ask you to review Exhibit 61 and
16    let me know when you're completed your review.
17    Have you finished reviewing Exhibit 61?
18  A    I have.
19  Q    What is Exhibit 61?
20  A    It appears to be an email.
21  Q    Okay.  And it seems to me at least that this is
22    an email exchange in mid-November 2021 that's
23    discussing how to modify the HRC's complaint

29

1   website to reflect the passage of the
2   amendments.  Is that a correct characterization
3   of what this email chain is?
4  A   It appears to be an email to, yes, Department of
5   Information Technology to update the
6   commission's website with the specified updates.
7  Q   When was the Human Rights Commission's website
8   updated to reflect the fact that members of the
9   public can file allegations of discrimination
10   under the amendments?
11       MR. KENISON-MARVIN:  Objection.  Scope.
12  A   I'm not sure.
13  Q   Would it have been -- what I'm trying to get at
14   is timing.  Would it have been around November
15   of 2021?
16  A   I don't recall.
17  Q   Okay.  Bear with me.  I just wanted to ask a
18   followup question with respect to the role of
19   investigators.  Is there a scenario in which an
20   investigation concerning an allegation of
21   discrimination can occur before it is docketed?
22       MR. KENISON-MARVIN:  Objection.  Scope.
23  A   I'm sorry.  Can you ask that again?

30

1  Q   Sure.  Of course.  My question is are there
2   circumstances in which an allegation of
3   discrimination could be investigated before it's
4   actually docketed by the Human Rights
5   Commission?
6       MR. KENISON-MARVIN:  Same objection.
7  A   I'm not sure I can answer that.
8  Q   Is it because of the term "investigation"?
9  A   Yes.
10  Q   So I'll try not to use that word because I can
11   see how that could complicate things.
12       Is there any fact gathering that the HRC
13   conducts with respect to allegations of
14   discrimination before a determination is made
15   that it meets the prima facie threshold and is
16   docketed?  And if so, just what does that look
17   like?
18       MR. KENISON-MARVIN:  Objection.  Scope.
19   Compound.  You can answer.
20  A   I'm going to say potentially, and then I need
21   you to, I would prefer you be more specific
22   about any other further questions on that.
23  Q   Sure.  So what if any fact gathering does the

31

1   Human Rights Commission do in evaluating whether
2   an allegation of discrimination meets the prima
3   facie threshold?  And what I mean by fact
4   gathering is just external factual
5   investigations of the claim.
6       MR. KENISON-MARVIN:  Objection.  Scope.
7   Vague.  Compound.  You can answer.
8  A   It may not seem like it is, but that is a
9   complicated question.
10  Q   I'm not familiar with this process.
11  A   I'm struggling with answering, you know, that
12   question.
13   It's probably because just being an outsider to
14   this process I'm using terms that may not make
15   as much sense to you.  So what's complicated,
16   why is that question kind of hard to answer from
17   your perspective?
18  A   So answering this personally --
19  Q   Um-hum.
20  A   -- an intake comes in and an inquiry is made.
21   An intake questionnaire is requested of the
22   inquirer, I would say, if that person hasn't
23   already submitted one.  So that would be

32

1   gathering evidence.
2  Q   Okay.
3  A   Or gathering information.  So I'm not sure,
4   that's why I'm struggling with understanding
5   what you're looking for.
6  Q   Okay.  So I guess that's helpful so beyond kind
7   of reaching out to the complainant and asking
8   them to submit a questionnaire, is there any
9   other fact gathering that the Human Rights
10   Commission would do before it's decided to
11   docket a complaint?
12       MR. KENISON-MARVIN:  Same objection.
13   Scope.
14  A   Not generally.
15  Q   Okay.  Thank you.  You can set both of those
16   aside.
17  A   I put them over here.
18  Q   You already did it.  Great.
19       I'm going to direct your attention to
20   Exhibit 56.
21       So I'd just ask you to review Exhibit 56,
22   Assistant Director Cohen, and let me know when
23   you've done your review.

---

33

1    While you review that, Assistant Director
2  Cohen, so as to not hide the ball what I'm going
3  to be referring you to and asking you about is
4  the text that's highlighted on page 28 of
5  Exhibit 56, HRC-00392.  So I just wanted to
6  highlight that before you review, and just let
7  me know when you've completed it.
8  A   Okay.
9  Q   So what is Exhibit 56?
10 A   Exhibit 56 appears to be the New Hampshire
11     Commission for Human Rights Commissioners'
12     Meeting minutes from October 7th, 2021.
13 Q   Okay.  And on the bottom of page 2, on the page
14     Bates stamped HRC-00392, there is a sentence
15     that states, "Assistant Director Burke Cohen and
16     Director Malachi explained that the likely
17     inspiration was that there have been instances
18     in which information has been presented in
19     trainings in K through 12 classrooms that states
20     directly and/or impliedly that inherent traits
21     establish a person's inferiority/superiority."
22         Do you see that language?
23 A   I do.

---

34

1  Q   Is that an accurate reflection of what was
2      stated during the October 7, 2021, HRC
3      Commissioner's meeting?
4         MR. KENISON-MARVIN:  Objection.  Scope.
5  A   I can say that it's in the meeting minutes.
6  Q   Do you recall this being stated during the
7      October 2021 meeting?
8  A   I do not recall specifically.
9  Q   Do you know what's being referenced on page 2
10     when the document states that the inspiration
11     was that there have been instances in which
12     information has been presented in trainings and
13     K through 12 classrooms that states directly
14     and/or impliedly that inherent traits establish
15     a person's inferiority/superiority?
16        MR. KENISON-MARVIN:  Same objection.
17 A   Answering personally, and looking at the
18     document, it says in the first paragraph, I mean
19     in that earlier paragraph the impact of HB 2.
20 Q   Um-hum.  There's a reference here to, quote,
21     "have been instances" on page 2 of this exhibit.
22     Do you recall with any specificity what those
23     instances are that are referred to?

---

35

1       MR. KENISON-MARVIN:  Same objection.
2  A   Answering from my personal recollection, no.
3  Q   Okay.  You can set that aside.
4       I recognize that the limits of your
5  testimony here are kind of with respect to HSA
6  354-A:29-34 so that's what I'm going to be
7  referring to in this next series of questions,
8  but my question is do you know what types of
9  instruction that has occurred in New Hampshire
10     that the amendments in RSA 354-A:29-34 were
11     intended to ban?
12        MR. KENISON-MARVIN:  Objection.  Scope.
13     Vague.
14 A   Could you ask that question again, please?
15 Q   Sure.  I guess what I'm trying to figure out is
16     could you identify, are you aware of any
17     instruction that occurred by an educator in New
18     Hampshire before the enactment of the amendments
19     that would have violated the amendments had the
20     amendments been in effect during that time of
21     instruction?
22        MR. KENISON-MARVIN:  Same objections.
23 A   No.

---

36

1  Q   Okay.  I'm going to move on to just some of the
2      complaints now that I know are in the topics of
3      Exhibit 59.  So I'm just going to direct your
4      attention, if you go back, Assistant Director
5      Cohen, to Exhibit 59?  I'm trying to find a way
6      to streamline this so we're not here all day.
7      So if you look at the Schedule A to Exhibit 59?
8         (Discussion off the record)
9         (Recess taken 10:57 - 11:01 a.m.)
10 Q   Thank you, Assistant Director Cohen.  I'm going
11     to direct your attention to Exhibit 59 and in
12     particular on the Schedule A at the bottom of
13     page 1 of the Schedule A on to page 2 of the
14     Schedule A there are a list of kind of
15     complaints as defined in that Schedule A made
16     under the amendments based on at least my review
17     of the documents that have been produced by the
18     Human Rights Commission.
19        So my question to you is are the complaints
20     that are listed on the bottom of page 1 and 2 in
21     the Schedule A the complete list of complaints
22     or allegations of discrimination that have been
23     made under the amendments to the Human Rights

---



37

1    Commission?

2    A    Yes.

3    Q    Okay.  Are you aware of any other complaints or

4    allegations of discrimination made under the

5    amendments that are not listed on pages 1 and 2

6    of the Schedule A in Exhibit 59?

7    A    No.

8    Q    Okay.  Thank you.  You can set that aside.

9         Now what I'm going to do is pull out a few

10   documents, and this is with respect to the ████

███████████ complaint so just bear with me for one

12   moment.

13        MR. BISSONNETTE:  Would you mind, Nate,

14   pulling out Exhibit 32?

15   Q    So I'm going to have you review 32 along with a

16   new exhibit that we are going to mark as Exhibit

17   62.

18        (Exhibit 62 marked for identification)

19   Q    I just want to make sure everyone is settled

20   with respect to Exhibits 32 and 62.  I'll let

21   Nate get settled here.

22        MR. KENISON-MARVIN:  Go for it.

23   Q    Assistant Director Cohen, I'm just going to have

38

1    you review Exhibit 32 and Exhibit 62 ████████

████████████████████████████████████████████

█████████, and I'd ask

4    you to review both of those exhibits and just

5    let me know when your review is complete.

6         (Discussion off the record)

7    A    I'm ready.

8    Q    Assistant Director, Cohen have you reviewed

9    Exhibit 62 and 32?

10   A    I have.

39

12   Q    Can I interrupt you?  I want to be very clear

13   that here are you testifying on behalf of the

14   Human Rights Commission.

15        MR. KENISON-MARVIN:  As to the specific

16   order as to what you did next I would take the

17   position that HRC is not here to be deposed

18   about each specific item in response to a

19   complaint.  I don't think that was contemplated

20   that level of specificity.

21        MR. BISSONNETTE:  You can respond how you

22   see fit.



41

12  A    Answering from my personal knowledge of
13        generally how charges are drafted, there is a
14        template form obviously for the charge part of
15        it with filling in the boxes.
16  Q    Um-hum.
17  A    And then using information supplied by the
18        complainant, the intake coordinator drafts the
19        charge of discrimination for the complainant's
20        review.

42

8   A    Complaints are formally docketed by the
9        Commission upon receipt of a verified, signed
10       and verified charge.



45

1

47

1

2  A   So every investigator has a caseload of 25.
3      When they finish up a case, it's a continual 25
4      cases, they get a new case assigned.

8       As I previously testified, the intake
9   coordinator is the keeper of the cases that are
10   unassigned.

46

1

48

1



49

1

15

50

1

18        MR. KENISON-MARVIN:  Recognizing you don't
19    want to lose momentum, there's a part of the
20    back of my brain thinks if we take a quick break
21    right now we could get past this.
22        MR. BISSONNETTE:  Okay.
23        MR. KENISON-MARVIN:  At the risk of

51

1        potentially that not working out.  Let us review
2    it real quick.
3            (Recess taken 11:26 - 11:31 a.m.)
4        (Requested portion read back by court reporter)
5   Q    We're back.  Thank you.  I'm going to withdraw
6    the last question and just reask it just for the
7    clarity of the record.
8

52



53

1

55

1

4   Q    I don't want to get into the nature of that
5         meeting, but I do want to know whether it's
6         typical for the Department of Justice to be
7         consulted when an allegation of discrimination
8         is made under 354-A generally.  How typical is
9         it?
10          MR. KENISON-MARVIN:  Objection.  Scope.
11        You can answer.
12   A    It really depends on the complexity of the case.

54

1

56



57

59

I have kind of two kind of
6    cleanup questions on process that I neglected to
7    ask, and then we'll go through the rest of the
8    complaints.
9        With respect to on Exhibit 1, the
10   amendments that have been challenged in this
11   case, with respect to RSA 193:40 on the page
12   Bates stamped 006 to 007, I believe your
13   testimony earlier was you're not familiar with
14   that section; is that correct?
15 A   Not familiar.  Have I read it before, yes.  Am I
16   familiar with it, not particularly.
17 Q   Is it the Department of Education that's tasked
18   with enforcing those provisions?
19       MR. KENISON-MARVIN:  Objection.  Scope.
20   Calls for legal conclusion.  You can answer.
21 A   It appears that is what RSA 193 does.
22 Q   Okay.  With respect to, now I'm going to turn
23   your attention to other provisions of Exhibit 1.

58

60

1    In particular, RSA 354-A:31 on page PL 0004.  Do
2    you see that?
3 A   Starts on line 36 of PL 0004?
4 Q   Yes.  And in particular the statute says no
5    public employer.  Do you see that language?
6 A   Yes.
7 Q   Is it correct that under RSA 354-A:31 it is only
8    a public employer and not an individual employee
9    that would be held liable under this section?
10       MR. KENISON-MARVIN:  Objection.  Scope.
11   Calls for legal conclusion.
12 A   Did you want me to answer?  Okay.
13 Q   Yes.  If you can.
14 A   I thought you didn't want me to answer.  I'm
15   sorry.  I was confused by that.  I'm sorry.  Now
16   we have to go back.
17 Q   Let me just ask it a different way.  I'm not
18   trying to trick you here.
19 A   No.
20 Q   What I'm trying to get at is under RSA 354-A:31,
21   can an individual public employee be sued?
22       MR. KENISON-MARVIN:  Same objection.
23 Q   Or is that statute limited to public employers?



61

1    That's really the question that I'm trying to
2    get at.
3         MR. KENISON-MARVIN:  Same objections.
4    A    It appears from the writing of 354-A:31 and the
5    definition of what a public employer means at
6    354-A:30 that a public employer includes the
7    state or any subdivision, does not include
8    individuals in that definition.
9    Q    Okay.  I'm going to move on now to some of the
10   other complaints.  Thank you, by the way.
11   ████████████████████████████████
     ███████████ It's going to require
13   Exhibit 14.
14        So I put before you, Exhibit 14, Assistant
15   Director Cohen.  Please do not read the entire
16   document because it is long, and I'm only going
17   to direct your attention to a few pages.
18   A    Okay.
19   Q    Exhibit 14 before you is an OpEd that I'll
20   submit to you in an effort to streamline things
21   an OpEd published by the Commissioner of
22   Education dated April 25th, 2022, and attached
23   to that OpEd hyperlinked in the OpEd are a

62

1    series of documents that the Commissioner put
2    together, and I'm going to direct your attention
3    to the following pages Bates stamped.  Okay?
4    And they start at PL 00714.
5    A    Um-hum.
6    Q    To 725.  I'd ask you to review those pages
7    quickly.  So it's 714 to 725 on Exhibit 14.
8    A    Okay.
9    ████████████████████████████████
21        We're going to mark a new exhibit.  I
22   believe this is Exhibit 63.
23        (Exhibit 63 marked for identification)



11  Q      Okay.  I'm going to refer you back now to
12         Exhibit 14 that I know you had before you a few
13         minutes ago.  It's that thick document there.
14              I'm going to refer you to on Exhibit 14
15         which again just for the clarity sake in the
16         record is an OpEd that Commissioner Edelblut
17         published on April 2022 embedded within which is
18         are various attachments.  One of those
19         attachments I'm going to refer to is on PL 736
20         to 737.
21              My question is have you seen these two
22         pages before which is a worksheet with a circle
23         on it that talks about various identities and



69

1   another, this is for the record, and a worksheet
2   with the phrase "Diversity Bingo."
3       My question is have you seen those two
4   worksheets before?
5   A   I don't recall.
6

70

1

71

1

4   Q   Okay.  All right.  So we're going to move now on
5       to another complaint, and then we're going to
6       plow ahead.  I'm doing the ones that I'm likely
7       to ask more questions first.  Can we just pause
8       for one second?
9           (Discussion off the record)
10  Q   So before you, Assistant Director Cohen, I know
11      that you have I believe five exhibits, and I
12      think these all pertain to a complaint that was
13      submitted by                              , and
14      so kind of in the interest of not hiding the
15      ball and just making sure that all the documents
16      are in one place, I just wanted to present them
17      all before you at once.
18          So I'm just going to kind of list off for
19      people on Zoom and for clarity in the record
20      just what these              exhibits are and I'll
21      just go exhibit by exhibit.
22          So the first is an exhibit previously
23      marked as Exhibit 46 that's actually in this

72

1   instance produced by the Department of
2   Education, and at the bottom of Exhibit 46
                                                       .  That's Exhibit
6   46.
7       Exhibit 64 is the complete set of documents
8   that were presented by Ms. Borysenko in response
9   to a subpoena that was served in this case.
10  Those documents are Bates stamped Borysenko 01
11  to 17.
12      In addition, in Exhibit 65 I have a website
13  article published by Ms. Borysenko on August
14  19th, 2022.  Incidentally, that website is
15  referenced by Ms. Borysenko in Exhibit 46 in her
16  email to the Human Rights Commission dated
17  August 19th of 2022.
18      Exhibit 66 is an email chain Bates stamped
19  HRC 709 to 713 that
                              .



73

1    And lastly, on Exhibit 67 is a series of
2    tweets from Ms. Borysenko published on Twitter
3    on or about August 19th, 2022, that I compiled
4    from Twitter reflecting what Ms. Borysenko said
5    publicly on Twitter concerning her complaint
6    that was submitted in August.
7

75

1
2

14

20

74

1
2    Q    Oh, okay.  How long were you on maternity leave
3        for?  Approximate dates if you don't mind me
4        asking.
5    A    July 14th through October 15th, we'll just say.
6    Q    Okay.  First, congratulations.
7    A    Thank you.
8    Q    I hope your child which would now be what, a
9        year?
10   A    Almost a year.
11   Q    Hope it's sleeping.
12   A    Mostly.  Mostly.
13   Q    I know the troubles there.  Nate and I were just
14       talking about that incidentally.  I recognize
15       you don't have personal knowledge.  You were on
16       maternity leave or parental leave at that time.
17       Do you recall though how the Commission
18       responded?  Do you have knowledge about how the
19       Commission responded to this complaint?
20   A

76

1



77

1
2          (Exhibit 68 marked for identification)
3   Q

79

1

78

20         (Exhibit 69 marked for identification)

80

1

8   Q     Okay.  You can set that aside.
9           (Exhibit 70 marked for identification)
10



81

83

14          (Exhibit 74 marked for identification)

21          (Exhibit 72 marked for identification)

82

1

14          (Exhibit 73 marked for identification)

84



**85**

14  Q     Okay.  You can set it aside.
15          (Exhibit 75 marked for identification)
16          (Discussion off the record)

**86**

12          (Exhibit 76 marked for identification)
13

**87**

10          (Exhibit 77 marked for identification)
11

**88**

6           (Exhibit 78 marked for identification)
7   Q     Before you in Exhibit 78 is what I'm going to
8   call the ▮▮▮▮▮▮ complaint.  It's Bates stamped
9   HRC-977 to 988.
10          Now, this is kind of more of a complaint
11   against the law to some extent than anything
12   else, but I wanted to just ask you whether or
13   not Exhibit 78 is a complete reflection of how
14   the Human Rights Commission responded to the
15   concerns raised by Mr. ▮▮▮▮▮ .
16  A     It appears to be.
17  Q     Okay.  You can set that aside as well.  One
18   minute, please.
19



89

91

1 Q    So I'm going to start with Exhibit 4 which you
2      haven't yet seen in this case and this is an
3      OpEd that was published by the Commissioner of
4      Education in June of 2021 as this law was being
5      processed by the legislature.
6 A    Um-hum.
7 Q    You are welcome to read this entire thing and
8      you probably should, but I'm going to in
9      particular direct your attention to a paragraph
10     that talks about Ibram Kendi.  So why don't you
11     just read this OpEd and tell me when you're
12     done, and I'll direct your attention
13     specifically to the Kendi provision of the OpEd.
14     Okay?
15 A   Um-hum.  Okay.
16 Q   Have you seen Exhibit 4 before today?
17 A   I may have read it when it came out.  I don't
18     remember.
19 Q   Okay.  I'm just going to refer you, there's a
20     paragraph here about a book written by Dr. Kendi
21     in which Commissioner Edelblut quotes a portion
22     of that book with a quote being, "The only
23     remedy to racist discrimination is antiracist

90

92

10 Q   Okay.  It's fair then to say even before the
11     docketing which didn't occur in this instance
12     there was no engagement between the Human Rights
13     Commission and the School District, correct?
14 A   It appears that way from what you've presented
15     to me.
16 Q   Okay.  Let me just go over my notes.  I have a
17     couple questions.  Probably five minutes left.
18 A   If you want to go over your notes, I'm going to
19     go to the ladies room.
20        (Recess taken 12:51 - 12:57 p.m.)
21 Q   I'm going to put before you Exhibit 4 and
22     Exhibit 14.
23 A   Okay.

1  discrimination.  The only remedy to past
2  discrimination is present discrimination.  The
3  only remedy to present discrimination is future
4  discrimination."
5      So my question is if a teacher taught those
6  quoted sentences in a New Hampshire school, does
7  the Human Rights Commission have an opinion as
8  to whether or not that would violate RSA
9  354-A:29-34?
10     MR. KENISON-MARVIN:  Objection.  Scope.
11 Legal conclusion.  Vague.  You can answer from
12 your personal knowledge.
13 A   My personal knowledge would be you would have to
14 have an intake questionnaire.
15 Q   So I guess my question is -- I understand that.
16 I suppose if a teacher had this concern, you
17 know, hey, the Commissioner of Education wrote
18 this in an OpEd, I want to use this book and
19 teach this book, and they're concerned that
20 doing so may violate RSA 354-A:29 to 34, could
21 they call the Human Rights Commission and get an
22 answer to that question?
23     MR. KENISON-MARVIN:  Objection.  Scope.

93

1 A   The Human Rights Commission is open to answer
2      questions about the statute to either party to a
3      charge.  Right?  To either a complainant calling
4      with questions about whether they have a charge
5      or a respondent calling with questions about,
6      you know, the law itself.
7 Q   Sure.  So if an educator called and said I want
8      to teach this book, I don't know whether it's
9      covered by the law or not, especially because
10     Commissioner Edelblut cited it in an OpEd, would
11     they be able to get an answer from the Human
12     Rights Commission as to whether or not teaching
13     that book would be covered under the law or not?
14        MR. KENISON-MARVIN:  Objection.  Scope.
15 A   In my personal opinion, there's a lot more to,
16     as you may know or may not know, when you're
17     teaching a course there's a lot more to whether
18     you're teaching a book or not teaching a book
19     and what goes along with that course.  It's a
20     complicated question because you have to look at
21     the context of things.  Are you mentioning the
22     book?  I mean, there's a lot to it.  You know,
23     that's what I'll say.

94

1 Q   Sure.  So I guess I'll try to put a finer point
2      on it because we have in Exhibit 4 three
3      sentences that the Commissioner of Education
4      cites as being potentially problematic.
5        So if a teacher taught the following
6      sentences in a classroom, quote, "the only
7      remedy to racist discrimination is antiracist
8      discrimination, the only remedy to past
9      discrimination is present discrimination, the
10     only remedy to present discrimination is future
11     discrimination," if that was taught in a public
12     school would that violate RSA 354-A:29 to 34?
13        MR. KENISON-MARVIN:  Objection, scope.
14 A   I'm not sure I would ever, people call and ask
15     us advice about the law there's a fine line
16     between us telling them what the law says and
17     giving them legal advice.  I could not give a
18     teacher or complainant legal advice on whether
19     them teaching that would make a charge or not.
20 Q   Okay.
21 A   That would be something they would have to talk
22     to an attorney about.
23 Q   Okay.  You can set that aside.  I'm going to

95

1      refer you now to Exhibit 14.
2        So on Exhibit 14 I'm just going to refer
3      you to what's listed as Topic Eight, PL 741 to
4      745.  This is a chapter of a book by Tiffany
5      Jewell, Chapter 10.  The book is called This
6      Book is Anti-Racist.  I would submit to you that
7      it's for 11 to 15 year olds.  And I'd also
8      submit to you that it's a book that was
9      referenced by the Commissioner of Education with
10     respect to the amendments during a July 2021
11     Board of Education meeting.
12        So my question to you is if an educator in
13     light of the Department of Education's reference
14     to this book had a concern about whether the
15     teaching of this book violated RSA 354-A:29-34,
16     your recommendation would be that they would
17     reach out to District Counsel as to get an
18     answer as to whether or not this complied with
19     the law?
20 A   Correct.
21 Q   Any other recommendation for an educator wanting
22     to know whether or not teaching this book would
23     violate the law?

96

1        MR. KENISON-MARVIN:  Objection.  Scope.
2      106.
3 A   What?
4        MR. KENISON-MARVIN:  Rule of completeness.
5      You can answer.
6 A   I would suggest that the educator read the law,
7      read the FAQs that are available as well as the
8      opinion issued by the Attorney General's office.
9 Q   And what if they after reading the law, reading
10     the FAQ, and reading the September 21 AG opinion
11     still had questions about whether certain
12     instructions were covered, what would that
13     educator do?
14        MR. KENISON-MARVIN:  Same objection on
15     scope.
16 A   I would suggest they contact their legal counsel
17     for legal advice.
18 Q   Okay.  You can set those aside.
19        MR. BISSONNETTE:  Attorney Kahne, I'm done
20     with my examination.
21            EXAMINATION
22 BY MR. KAHNE:
23 Q   I'm sorry I'm doing this virtually, Assistant

97

1    Director Burke Cohen.  It's better to be there
2    in person, but hopefully, I'll ask Gilles to
3    assist me with some of the documents.  There
4    shouldn't be very many documents, and I also
5    shouldn't be very long.  So I think we can do
6    this pretty efficiently if that's okay.
7  A    Okay.
8  Q    My name is David Kahne.  I am an attorney for
9    the American Federation of Teachers.  In this
10   lawsuit the same rules that Gilles went over
11   with you will apply to my questioning.  Do you
12   understand that?
13 A    I do.
14 Q    Okay.  There's a few areas I'd like to ask you
15   about, some of which you covered with Gilles.
16   I'd just like to ask a few followup questions.
17       The first is the process about docketing
18   complaints.  If I understand your testimony
19   correctly, allegations of discrimination that
20   are brought to the HRC can become a docketed
21   complaint; is that right?
22 A    Yes.
23 Q    And they become a docketed complaint after there

98

1    has been a finding that the prima facie elements
2    of discrimination have been met?
3        MR. KENISON-MARVIN:  Objection to scope.
4    Go ahead.
5  A    Personally, from my personal experience, yes.
6  Q    Okay.  And after there is a docketed complaint,
7    is it your testimony that after that occurs then
8    a factual investigation takes place?
9        MR. KENISON-MARVIN:  Objection, scope.  You
10   can answer.
11 A    Yes.  An investigation occurs after -- I'm
12   sorry.  Not directly after.  Once an
13   investigator is assigned to the case, an
14   investigation commences.
15 Q    Okay.  And you testified that you previously
16   were an investigator; is that right?
17 A    I was.
18 Q    Okay.  And so I'm interested in your describing
19   the investigation process and particularly in
20   the context of public schools.
21 A    Okay.  From my personal experience as an
22   investigator, if you've reviewed our Commission
23   rules you can see what tool kit, like tools we

99

1    have available to us.
2        So an investigation starts with often we
3    request information in our notice letter from
4    the respondent which is their answer to the
5    charge as well as any affirmative defenses that
6    they are putting forward.
7        From there we ask for additional
8    information as we need it.  We interview
9    complainants or witnesses or respondents
10   depending on the case and depending on the fact
11   pattern.  It's hard to make a generalized
12   outline of what an investigation looks like
13   because I don't know the facts of each specific
14   case.
15       But generally speaking, collect
16   information, documentation, that may or may not,
17   you know, help with the case, right?  Sometimes
18   you get documentation from parties that is not
19   super helpful, but we also use our tools of
20   interviewing people so that we can gather that
21   information and make a recommendation to the
22   Investigating Commissioner.
23 Q    And as part of that investigation has it, in

100

1    your experience, has it been contacting school
2    principals?
3  A    In my experience, yes, that can be part of an
4    investigation.
5  Q    How about contacting district superintendents?
6  A    It can be part of an investigation.
7  Q    Are there any protocols in place as to when a
8    superintendent should be contacted?
9        MR. KENISON-MARVIN:  Objection.  Scope.
10 Q    Or is it at the discretion of the investigator?
11       MR. KENISON-MARVIN:  Same objection.
12 A    It would be -- again, each case is different.
13   No case that we have is the same.  So it would
14   be sort of at the discretion of the
15   investigator.  You can see that how that's
16   outlined in the rules.  The investigator
17   determines the relevancy of interviews with
18   parties, interviews with witnesses, and
19   collection of documents.
20       So if a superintendent was part of that
21   case fact pattern and needed to be contacted for
22   investigation, that would happen.  Generally by
23   the time a case is assigned to an investigator,

101

1    the respondent is represented by counsel.  So
2    any contact with the school would be through
3    counsel.
4  Q    Do investigators contact other state agencies in
5    your experience during the investigation phase
6    like the Department of Education?
7  A    I suppose it could.  We could.
8  Q    Who makes the ultimate determination as to
9    whether or not a complaint gets docketed?
10        MR. KENISON-MARVIN:  Objection.  Scope.
11  A    The ultimate decision essentially would be from
12    the Executive Director, I mean, but with the
13    caveat on that of it's determined by whether
14    there's jurisdiction of the Commission.  If
15    there is a prima facie case, it is docketed.  If
16    there is not a prima facie case, then it's not
17    docketed.
18  Q    But the determination as to whether or not
19    there's been as prima facie case is made by the
20    Executive Director?
21  A    I mean, that would be the ultimate decision
22    maker.  Yes.
23  Q    Are allegations of discrimination referred to

102

1    the HRC from other state agencies?
2        MR. KENISON-MARVIN:  Objection.  Scope.
3  A    In my experience they can be, yes.
4  Q    And under what circumstances have you had
5    complaints referred to the HRC?
6  A    In my experience, we have had complaints
7    referred from the New Hampshire Employment
8    Security Office for employment-related
9    complaints that they receive from their clients
10    during unemployment filings, and we've received
11    them on occasion from the Department of Labor as
12    well.
13  Q    How about from the Department of Education?
14  A    We have received referrals from the Department
15    of Education.  Generally we ask that the
16    referring agency tell the person to contact us
17    directly.
18  Q    So generally that's what you do, but there have
19    been instances in which the Department of
20    Education has referred cases to the HRC?
21        MR. KENISON-MARVIN:  Objection.  Scope.
22  A    So when cases are referred to us from any
23    agency, we generally tell the agency to suggest

103

1    to that person that they contact us directly.
2  Q    Has there been a case that the HRC opened where
3    the Department of Education simply referred it
4    the HRC without an individual filing an intake
5    questionnaire?
6        MR. KENISON-MARVIN:  Objection.  Scope.
7  A    I'm not sure.  For my personal experience.
8  Q    You spoke earlier about your client service
9    representative, right?
10  A    Yes.
11  Q    I'm not familiar with that so can you explain,
12    the client service representative is an attorney
13    at the Department of Justice; is that right?
14  A    That is correct.
15  Q    Is there one particular attorney that's assigned
16    to the Human Rights Commission?
17  A    Yes.
18  Q    Who is that attorney?
19  A    During the time period of these, during the time
20    period of this, I guess the complaints that
21    we've discussed today, we've had two client
22    service representatives.  Assistant Attorney
23    General Jill Perlow and Assistant Attorney

104

1    General Sean Locke.
2  Q    And who is the person from HRC that decides
3    whether to consult with your client service
4    representative?
5  A    That would be the Director.
6  Q    Are there policies/procedures in place for when
7    that request should be made for a consultation?
8        MR. KENISON-MARVIN:  Objection.  Scope.
9  A    No specific procedures, no.
10  Q    So in this particular case, Attorney Bissonnette
11    was referring to the ███████ complaints.  Do
12    you remember his series of questions about that?
13  A    I do.



19  Q    Okay.  And you said that the reason that you did
20    so was because, I believe this is your
21    testimony, that it was a relatively new
22    statutory amendment; is that right?
23  A    That is correct.



**105**

1  Q    Is it because you were looking for clarity on
2       how to apply the new amendments?
3             MR. KENISON-MARVIN: Objection. Scope.
4  A    I would say yes.
5

**106**

20  Q    Are there any processes or procedures, written
21       processes or procedures involved describing how
22       a complaint under the new amendment could be
23       referred to the HRC from the DOE?

**107**

1             MR. KENISON-MARVIN: Objection. Scope.
2  A    I believe there is something on their website.
3       Well, it's not referred from -- I believe there
4       is a page on their website that tells people how
5       to file a complaint with the Commission, the
6       HRC.
7  Q    In your view was there -- shortly after the
8       passage of the amendments, in your view was
9       there confusion amongst the public as to where
10      to file a complaint?
11            MR. KENISON-MARVIN: Objection. Scope.
12      Calls for speculation. Vague. You can answer.
13  A   In my opinion, I suppose.
14  Q   Why do you say that?
15            MR. KENISON-MARVIN: Same objections.
16  A   Because I believe it was in the newspapers, the
17      press.
18  Q   Aside from the ▮▮▮▮▮ complaint, am I correct
19      that there was one other complaint that Attorney
20      Bissonnette referred to where you also consulted
21      your client services representative?
22            MR. KENISON-MARVIN: Objection. Scope.
23  A   Without you specifying, I'm not --

**108**

1  Q    You don't recall?
2  A    Sorry. No.
3  Q    How often do you consult with the DOJ regarding
4       allegations of a complaint that come into the
5       HRC?
6             MR. KENISON-MARVIN: Objection. Scope.
7  A    In my experience, you know, it really depends on
8       the complexity of the complaint or other issues
9       that may be involved in a complaint that we are
10      not specialists in. For example, I can use, my
11      example would be bankruptcy cases. We have
12      respondents that are bankrupt sometimes. I am
13      not a specialist in bankruptcy. Neither is
14      anyone on my staff. So we consult with the
15      Attorney General's office to understand what
16      Chapter 11, Chapter 9, and how that relates to
17      our ability to investigate a case.
18  Q   Does it also have to do with the complexity of
19      the law that you're applying?
20            MR. KENISON-MARVIN: Objection. Scope.
21  A   In my opinion, I would say yes.
22



**111**

1    objection?

2        MR. KENISON-MARVIN:  Putting all the

3    documents that relate to your question that

4    you're making representation --

5  Q    Okay.  Then Let's look at the Borysenko intake

6    questionnaire if you don't mind, Gilles.

7        MR. BISSONNETTE:  That's going to be

8    Exhibit 64.  So just for the record, everyone,

9    we're now referring to the one of the Borysenko

10    exhibits.  Exhibit 64, Bates stamped 000011.

11  A    Okay.

12  Q    So if you compare those two documents, the

13    Borysenko intake questionnaire?

14  A    Um-hum.

19  Q    Okay.  Do you have any knowledge as to why that

20    question was added to the questionnaire?

21        MR. KENISON-MARVIN:  Objection.  Scope.

22  A    I don't recall sitting here right now.

23  Q    Do you recall anything about that question?

**110**

16  Q    That question does not appear on all of the

17    intake questionnaire forms that I have reviewed.

18    I'll represent that to you.  Do you know whether

19    that question was added to the intake

20    questionnaire form?

21        MR. KENISON-MARVIN:  Objection.  Scope.

22    Completeness, 106.

23        MR. KAHNE:  What's the completeness

**112**

1        MR. KENISON-MARVIN:  Objection.  Scope.

2  A    I mean, I would have added the boxes, but I

3    don't have any memory of why we put it on there

4    or what the purpose was.

5  Q    Okay.  And when you added the boxes, NH DOE

6    refers to, I assume, the New Hampshire

7    Department of Education?

8  A    That is my assumption as well.

9  Q    Okay, and so you would have added that for the

10    complainant to indicate whether they filed a

11    complaint with the New Hampshire Department of

12    Education.  Is that fair?

13        MR. KENISON-MARVIN:  Same objection.

14  A    Yes.

15  Q    What would the nature of that complaint be if

16    you know?

17        MR. KENISON-MARVIN:  Same objection.

18  A    I assume the nature of that complaint would be

19    under whatever the part of the statute that was

20    added that's under what, RSA 193?

21  Q    Okay.  Do you have any recollection whether, I

22    should say, I don't, based on the, we'd have to

23    look at the dates, but do you have an

113

1    understanding as to whether or not it was added
2    or deleted from the intake questionnaire.
3         MR. KENISON-MARVIN:  Same scope objection.
4         MR. BISSONNETTE:  If it would assist the
5    witness, I would just say that the current
6    version of the questionnaire is Exhibit 60.
7  A   Okay.  Thank you.
8  Q   Thank you, Gilles.
9         MR. BISSONNETTE:  Yes.
10 A   So it appears that it was deleted using Exhibit
11   60 as the current iteration.
12 Q   Does that refresh your recollection as to why it
13   was deleted from the intake questionnaire form?
14 A   I don't know why it was deleted.
15 Q   Have you had any conversations with Commissioner
16   Edelblut about the amendments?
17 A   No.
18 Q   How about Richard Farrell?
19 A   No.
20 Q   You testified to a conversation that you
21   understand Commissioner Malachi had with
22   Investigator Farrell about one particular
23   complaint.  Do you know whether Commissioner

114

1    Malachi has had other conversations with
2    Investigator Farrell about other complaints?
3  A   Director Malachi?  And Investigator Farrell?  I
4    do not know.
5  Q   Do you know how frequently she speaks with the
6    Department of Education?
7  A   I do not know.
8  Q   You testified, Attorney Bissonnette went through
9    some of the complaints and asked whether or not
10   certain content would violate the statute.  I
11   think you testified in sum and substance that it
12   would depend on certain circumstances.
13        My question is does the HRC have any
14   guidance as to whether any particular
15   educational materials violate RSA 354?
16        MR. KENISON-MARVIN:  Objection to scope.
17 A   I would say the guidance we have was issued by
18   the Attorney General's office in his opinion and
19   our FAQ on the statutes.
20 Q   Do you know whether anyone at the HRC uses the
21   Attorney General's opinion or the FAQs?
22        MR. KENISON-MARVIN:  Objection to form.
23 A   Uses it for what?

115

1  Q   Applies it to complaints that come in through
2    the complaint process.
3  A   Yes.
4  Q   Do you have any particular examples of that?
5  A   I do not.
6  Q   Do you know why the HRC requested that the
7    Attorney General issue an opinion on the
8    amendments?
9         MR. KENISON-MARVIN:  Objection.  Scope.
10 A   I do not specifically, no.
11 Q   Does the HRC have any obligation to notify the
12   Department of Education when there's been a
13   docketed complaint?
14 A   No.
15 Q   How about when there's been a finding of
16   probable cause for discrimination?
17 A   No.
18 Q   Ultimately, do the Commissioners vote once a
19   complaint has gone through the docketed
20   complaint phase, there's been an investigation,
21   there's an Investigative Commissioner, can you
22   just take me through the process after there's
23   been a docketed complaint what else has to

116

1    happen?
2         MR. KENISON-MARVIN:  Objection.  Scope.
3    Vague.
4  A   In accordance with RSA 354-A, if you read the
5    statute, the way the Commission's process works
6    is an Investigating Commissioner following the
7    investigation makes a finding of either probable
8    cause or no probable cause.  If a case is found
9    to be no probable cause, it is dismissed with
10   appeal rights.  If the case is found to be
11   probable cause, it moves on in the process
12   towards the public hearing.  In between the
13   public hearing and moving it from probable cause
14   to public hearing, the parties meet for a
15   conciliation and a prehearing, and then it moves
16   to public hearing.  After probable cause is
17   found, both parties have the ability to remove
18   the case to Superior Court.
19 Q   When Attorney Bissonnette showed you Exhibit 1,
20   he asked you a question about who the, I don't
21   know if it's respondent or charged party,
22   typically is in these cases, and you looked at
23   the definition of public employer and saw that

## 117

1  it listed counties, cities, towns, precincts,
2  districts, school administrative units, et
3  cetera, and you said that it appeared from the
4  text of the statute that that's who the, it was
5  a prohibition on public employers.
6      Aside from the text of the statute, in
7  these cases have you ever seen a case that was
8  not brought against one of these entities?
9      MR. KENISON-MARVIN:  Objection.  Scope.
10  Vague.
11 A  In the text -- I'm sorry.  Can you clarify that
12  question?
13 Q  Yes.  So you were looking at 354-A:31?
14 A  Yes.
15 Q  Which is the prohibition on public employers.
16 A  Okay.
17 Q  And I believe the question was regarding who the
18  charged or responding party is in these cases.
19 A  Correct.
20 Q  And your testimony was that it lists who the
21  public employers are, and I'm just asking in
22  your experience has it been the case in these
23  cases that the charged party is school

## 118

1  districts, school administrative units or
2  quasi-public entities?
3 A  ███████████████████████████████████████
   ███████████████████████
5 Q  How about allegations of discrimination?
6 A  The intake inquiries have been generally from
7  the documentation the School Districts with the
8  exception I think as I recall one is naming the
9  Commissioner of Education directly.
10 Q  Are you aware of a bounty that was put on
11  teachers by Moms for Liberty as a result of the
12  passage of the amendments?
13      MR. KENISON-MARVIN:  Objection.  Scope.
14 A  I am.
15 Q  And what is your understanding of that?
16      MR. KENISON-MARVIN:  Same objection.
17 A  My understanding is whatever was, I think it was
18  WMUR had an article on it.  So I believe, my
19  understanding is that this group put a bounty
20  for and would pay for a docketed charge.
21 Q  Did you have any conversations with anyone at
22  HRC about that article?
23 A  Maybe.  I don't remember specifically.

## 119

1 Q  Just give me a couple more seconds here.  Okay.
2  I think that's all I have.
3      MR. KENISON-MARVIN:  I think I might have a
4  few quick followups, but I need to run to the
5  restroom quickly.
6      (Recess taken 1:37 - 1:53 p.m.)
7      MR. KENISON-MARVIN:  First, before I do one
8  quick area of followup, I just wanted to put on
9  the record our right to read and sign and
10  reserving that.
11      MR. BISSONNETTE:  Yes.  So we've agreed
12  that hopefully we can get it done shorter than
13  the 30-day deadline because of briefing
14  purposes.  Okay.  Thank you.
15      MR. KENISON-MARVIN:  I don't think we have
16  a final agreement as to date because we'll work
17  to get that done in accordance with the briefing
18  date.
19      MR. BISSONNETTE:  So long as it's a few
20  days before the briefing deadline.
21      MR. KENISON-MARVIN:  That's our intention.
22          EXAMINATION
23  BY MR. KENISON-MARVIN:

## 120

1  ████████████████████████████████████████
   ██████████████████████████████
   ██████████████████████████████████
   █████████████████████████████████████
   ████████████████████████████████████████
   █████████████████████████████████████████
   ███████████████████████████
   █████████████████████████████████████
   ████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████
   █████████████████████████████████
   ███████████████████████████████████
   █████████████████████████████████████
   ██████████████████████████████████
   █████████████████████████
18 Q  Okay.  I don't have anything else.
19      MR. BISSONNETTE:  Okay.  I'm good if
20  Attorney Kahne is good?
21      MR. KAHNE:  I'm good.
22      MR. BISSONNETTE:  Okay.  Thank you.
23          (Deposition ended at 1:54 p.m.)

### 121

```
1        I have carefully read the foregoing
2    deposition, and the answers made by me are true.
3
4                    _____
5                    SARAH BURKE COHEN
6
7
8  STATE OF _____
9  _____, SS.
10
11        At_____on the
12  _____ day of _____ A.D.
13  2023, personally appeared the above-named SARAH BURKE
14  COHEN and made oath that the foregoing answers
15  subscribed by her are true.
16                    Before me,
17
18
19                    _____
20                    Notary Public
21
22
23
```

### 123

```
1              E R R A T A
2        I, the undersigned, SARAH BURKE COHEN, have read
   the transcript of my deposition held on June 26,
3  2023, in the matter of Local 8027, AFT-New Hampshire,
   et al v. Frank Edelblut, Commissioner, et al, and the
4  same is true and correct, to the best of my
   knowledge, with the exception of the following
5  changes noted below, if any:
6  PAGE/LINE  CORRECTION AND REASON FOR CORRECTION
7          _____
8          _____
9          _____
10  See attached sheet(s) for additional information:
11  ___Yes___No
12          _____
                    SARAH BURKE COHEN
13
14  STATE OF _____)
                       ) ss.:
15  COUNTY OF _____)
16
        Subscribed and sworn to before me this _____ day
17  of _____, 2023.
18
19                    _____
                    Notary Public
20
   My commission expires:
21  _____
22
23
```

### 122

```
1              C E R T I F I C A T E
2        I, Cynthia Foster, Registered Professional
3  Reporter and Licensed Court Reporter, duly authorized
4  to practice Shorthand Court Reporting in the State of
5  New Hampshire, hereby certify that the foregoing
6  pages, numbered 7 through 120, are a true and
7  accurate transcription of my stenographic notes of
8  the deposition of SARAH BURKE COHEN who was first
9  duly sworn by me on June 26, 2023, for use in the
10  matter indicated on the title sheet, as to which a
11  transcript was duly ordered;
12        I further certify that I am neither
13  attorney nor counsel for, nor related to or employed
14  by any of the parties to the action in which this
15  transcript was produced, and further that I am not a
16  relative or employee of any attorney or counsel
17  employed in this case, nor am I financially
18  interested in this action.
19
20
21                    Cynthia Foster, LCR
22
23
```

1          I have carefully read the foregoing

2      deposition, and the answers made by me are true.

3

4

5                      SARAH BURKE COHEN

6

7

8   STATE OF _New Hampshire_

9   _Merrimack_, SS.

10

11          At _Merrimack County_ on the

12  _21st_ day of _July_ A.D.

13  2023, personally appeared the above-named SARAH BURKE

14  COHEN and made oath that the foregoing answers

15  subscribed by her are true.

16                    Before me,

17

18

19

20                Notary Public

21

22             Kelly A. Mederos, Esq
            Notary Public, State of New Hampshire

23          My Commission Expires December 21, 2027

# EXHIBIT 7

Declaration of
NEA-NH President
Megan Tuttle

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. )

   Plaintiffs, )

    v. )

FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. )

   Defendants. )

------------------------------------------------------------------------- )

 Civil No. 1:21-cv-01077-PB

ANDRES MEJIA, )
CHRISTINA KIM PHILIBOTTE, and )
NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, )

   Plaintiffs, )

    v. )

FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, )

JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, )

AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, )

CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, )

KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, )

   Defendants. )

## <u>DECLARATION OF MEGAN TUTTLE</u>

  I, Megan Tuttle, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Merrimack County, New Hampshire.

2.      I am the President of NEA-NH, a union of more than 16,000 public school educators, the majority of public-school employees in the state.

3.      Prior to becoming president, I was a middle school social studies teacher in New Hampshire.

4.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

5.      I am offering this Declaration in my capacity of President of NEA-NH.

6.      In the wake of George Floyd's May 25, 2020 murder, many New Hampshire educators have engaged in professional development opportunities to enhance their skills to teach both (i) to Black, Indigenous, Hispanic, Asian, and other students from historically marginalized groups, and (ii) about the experiences and perspectives of those groups.  This not only includes the decision of the Manchester, Exeter Region Cooperative, Concord, and Oyster River school districts to hire diversity, equity, and inclusion professionals, but it also includes educators themselves exploring how they can adjust their teaching methods to provide a more inclusive education.

7.      For example, in 2020, Misty Crompton, a member of the Plaintiff NEA-NH and an educator who teaches in Derry, was awarded the prestigious Christa McAuliffe Sabbatical from the New Hampshire Charitable Foundation for her project called "Promoting Just Schools."  The sabbatical, created in 1986 in honor of the Concord High School teacher and astronaut, gives one exemplary New Hampshire teacher a year off with pay and a materials budget to bring a great educational idea to fruition. Ms. Crompton's project focused on educational equity—namely, levelling the playing field for students by recognizing how identity, race, and culture of students and teachers play out in the classroom.

8.      Since the passage of the Banned Concepts Act, we have received information from our members that they are confused about what is and is not permissible under the law.

9.      On two occasions, I wrote to the Attorney General and the Department of Education on behalf of our members asking for specific examples of texts, curriculum, instruction, or other materials which our members could no longer teach.  I received no response from either the DOJ or the DOE.

10.     On September 13, 2021, Irv Richardson—the Coordinator for Public Education and School Support for the NEA-NH—also asked the Human Rights Commission in an email whether the HRC "had someone … who might provide further clarification on the [Act] and answer questions from educators using a virtual platform."  He added in the email to the Human Rights Commission that "our next conference [is] scheduled for October 8th but this topic is so important, we can accommodate any time that would be convenient for the presenter you recommend."  The HRC did not respond to this email or accept this speaking invitation.

11.     By virtue of their membership in NEA-NH, members receive access to extensive professional development programming.  The Act by its vague nature has made it impossible for NEA-NH to provide meaningful professional development about the Act to its members despite demand from its membership to do so.

12.     One particular source of confusion is that while the Act was being considered, there were no examples offered of materials, lessons, books, or instruction that were actually being taught in New Hampshire that would be outlawed by the Act. Without these examples, and due to the lack of concrete information offered by the DOJ, DOE or HRC, our members have nothing they can compare their own actions to in order to understand if they may be violating the law.

13.     We encouraged members to ask their school administration for assistance with training and clarifying the law. However, we have found that school administration also does not know what is impermissible under the law and therefore cannot provide this necessary training or guidance.

14.     I also hear from members that they are nervous about violating the law because they don't want to be investigated by the Department of Education and they don't want to lose their teaching licenses.

15.     Since the Act was passed, I have heard of a marked increase in stress of our members worried about licensure actions and parent complaints.

16.     The climate created by the Act- one of uncertainty and fear- has led to deep frustration by our members who cannot understand why the enforcement agencies will not assist them in not violating the law.

17.     Since the Act passed, I have heard from numerous members that they feel targeted, scared, and that they are considering leaving the profession.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of July, 2023

/s/ Megan Tuttle
Megan Tuttle

# EXHIBIT 8

# Declaration of
# AFT-NH President
# Deb Howes

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.<br>　　　　　Plaintiffs,<br>　　　　　　　v.<br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.<br>　　　　　Defendants.<br>---------------------------------------------------------------------------- | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ANDRES MEJIA,<br>CHRISTINA KIM PHILIBOTTE, and<br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,<br>　　　　　Plaintiffs,<br>　　　　　　　v.<br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,<br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,<br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,<br>CHRISTIAN KIM, in his official capacity<br>only as the Chair of the New Hampshire Commission for Human Rights,<br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil No. 1:21-cv-01077-PB

## <u>DECLARATION OF DEBRAH HOWES</u>

I, Debrah Howes, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      My name is Debrah Howes.  I am the President of the American Federation of Teachers-NH ("AFT-NH").  AFT-NH represents 3,500 teachers, paraeducators and school support staff, public service employees, and higher education staff across New Hampshire.

2.      Prior to serving as President of AFT-NH, I was a reading and math intervention teacher with the Nashua Public School District since 2003.  I spent 17 of those years teaching at the same school in Nashua, Amherst Street School, a K-5 Elementary school receiving Title 1 support, where between 62 and 78% of the families meet federal poverty guidelines in any given year and many students are English Language Learners.  According to US Census data, the majority of the students enrolled at Amherst Street School are from recognized minority groups, with Hispanic being most numerous. Amherst Street School also serves a number of refugee families from Africa and Asia.

3.      I first heard of a proposed bill HB544, a bill that would ban teaching on and discussion of certain divisive concepts related to sex and race (among other things) from public schools in January of 2021.  At the time I was Vice-President of AFT-NH and active with our Legislative Committee, which follows legislation that could have an impact on the day-to-day work of our members.

4.      Our first analysis of the legislation was that the bill, if it passed, would be extremely problematic. The language was hopelessly vague and, among other things, it prohibited teaching or discussions that explicitly or implicitly taught that any race or sex was superior to another or inferior to another or even made someone feel guilty about their race or sex.  The bill only had three sponsors out of 400 members of the NH House, which is not many. In a year when a new state budget needed to be written and more than 600 other bills needed to be heard and considered, we were not sure this was anything more than an extremist reaction to

the widespread calls for more and better discussion, including in public schools, about longstanding racial inequities in our country and systemic racism that were brought to mainstream attention by the death of George Floyd and the Black Lives Matter protests in the summer of 2020.

5.     When it came to the public hearing – held over zoom because vaccines were still not available to most – I was astonished to hear claims from a small group of supporters of the bill, who claimed that kids were being taught to hate themselves for being white and that schools were teaching students they could not be friends with people of other races and that kids were coming home in tears because of it.  This is not what we do in New Hampshire public schools!  I know because I teach in one and I lead a union of teachers and paraeducators who work in other schools across the state! Let me be clear: in my experience, I have never seen or heard of any of these things happening at the school where I worked, or in the Nashua public schools.  Nor have any of the members of AFT-NH seen it, done it, or heard of it happening.

6.     The public hearing on HB544 overwhelmingly consisted of people speaking *against* the adoption of the "Divisive Concepts" bill including teachers, university professors, faith leaders, community leaders even business leaders. We thought this bill would be put to rest because it was simply not actually happening in our public schools, but also was a really badly worded piece of legislation which left educators unsure of what exactly they could and could not talk about in the classroom. When the bill was tabled by the House instead of passed, we believed that would be the end of the legislation.  However, the bill language was inserted within the massive annual budget, without further hearings, which was then passed.

7.     When the budget including the "Divisive Concepts" language was signed into law on June 25, 2021, I had recently become president of AFT-NH after the sudden death of our

previous President (who was also a NH legislator.)  Members were concerned about what the

"Divisive Concepts" language would mean in practical terms for them.  From my own

colleagues there were questions about how to approach teaching the necessary background

knowledge for students to understand a biography of Harriet Tubman commonly read by 5th

graders.  How much can you explain about the conditions of slavery and its impact on our

country before you would break the law? Could we still read "The Story of Ruby Bridges" in

2nd or 3rd grade?  How about "Martin's Big Words?"  These books require honest and factual

conversations about US history with students, so they have sufficient background to understand

the events in the story including what segregation was, how it hurt people and that there were

some people who fought to keep it from ending.

     8.     A 2nd grade teacher in another AFT-NH local wanted to know how they would

teach about Native Americans and still be honest about the historical facts. A middle school

teacher wondered if she could still assign a classic American novel "To Kill A Mockingbird."

How careful would she have to be about the conversations she was having around it and what a

student might subjectively infer?

     9.     A high school teacher wondered if the newly adopted law requiring the teaching

about the Holocaust was in conflict with the new "Divisive Concepts" law. A member who

teaches high school in another district was concerned that the "Divisive Concepts" language

would be used to eliminate the ability of teachers to express support for LGBTQ students by

designating their classrooms as a safe or welcoming place because expressing any support could

lead to an inference that you are discriminating against others.

     10.     With the law newly in effect, but most schools on summer recess, I joined other

education leaders in July 2021 in asking NH Commissioner of Education Frank Edelblut for

clarification on what exactly we were allowed to teach, say and do in the classroom and in school and what would run afoul of the new law.  His response was that there would be a frequently asked questions ("FAQ") document that would clarify everything. That FAQ put out by the NH Department of Education, NH Department of Justice and the NH Commission on Human Rights repeated much of the same vague language from the bill without really clarifying it. We could teach history and current events, but if a student or parent ever felt that the lesson or teacher was directly stating or even somehow implying that the student was racist, sexist, or anti-LGBTQ then the teacher could be disciplined: up to and including loss of license.  It is this subjective nature of what a student infers, or at a further remove, what a parent who isn't even in the classroom, infers about a lesson or classroom discussion (even what a teacher may be implying) that makes this hard to clearly define and incredibly frustrating.

11.     These subjective inferences from students and parents not only impacts what happens in the classroom under the law, but it also impacts extra-curricular activities. The FAQs made clear that the "Divisive Concepts" bill applies to extra-curricular activities and, in fact, all teacher speech when interacting with students.  Teachers interact with students throughout the day in innumerable touchpoints – in hallways, on sports fields, in after-school clubs, traveling to competitions, in teachers offices and in a myriad of other ways.  The bill broadly reaches all discussions in all of these every day activities.

12.     I surveyed the AFT-NH locals to find out what advice they were getting from their district administration on handling "Divisive Concepts" as school was getting ready to reopen for fall of 2021.  Most were not hearing anything from their district administration.  One district administration did have a legal presentation from a law firm that handles education cases. They were advised that if their curriculum guide was available so parents could exercise their opt

out rights for students, and if they were thoughtful about what they said in spontaneous

conversations in response to events or to other student remarks and tied things back to content

that is covered in the curriculum, they should be within the boundaries of the law.  Yet, in

another district, teachers were advised to take down all classroom rainbow flags and signs that

stated "You Are Welcome Here."  The lack of clear, uniform guidance was creating disparity

between the working and learning conditions in different New Hampshire school districts.

13.    Knowing that most of my members started the school year with no guidance,

other than those FAQs, on how to handle this "Divisive Concepts" law, I started planning a

virtual Town Hall on the topic for October.  I invited Commissioner of Education Edelblut to

come have talk about the law and answer members questions about what they could and could

not teach.  Commissioner Edelblut declined the invitation.  He referred us to the FAQs, which he

called "straightforward and clear" and offered to meet one on one with any member who wanted

to discuss individual circumstances.  We had our Town Hall without him. While we weren't able

to add any clarification from the NH Department of Education, we did have informative

presentations on First Amendment Rights and their limits under the US and NH Constitutions as

well as similar "Divisive Concepts" laws that were showing up in other states.  Members were

able to share their experiences from the first 6 weeks of school.  Mostly members expressed

some level of concern that they might be perceived by a student or parent as crossing a line

because of an inference, especially because that line had not been made clear.

14.    By far the biggest fear was that the "Divisive Concepts" law would be

weaponized – that the same people who showed up at our school board meetings calling

teachers, school administrators and school board members "child abusers" for having students

wear masks during the COVID pandemic, would now be coming after teachers because they

somehow thought we had made a student feel labeled as racist, sexist or anti-LGBTQ. And that is more or less what happened.  An online extremist group "Moms for Liberty" Hillsborough County (NH) offered a $500 reward for the first person who caught a teacher violating the "Divisive Concepts" law.  Another group called "No Left Turn" reported teachers to the Department of Education for signing a pledge to teach "honest" history.

15.      The day after the Moms for Liberty "bounty," the NH Commissioner of Education announced he was adding a page to the NH Department of Education website to make it easier for parents, students, families, other teachers  or even members of the public to report teachers for what they consider violations of this law.  AFT-NH had been looking at challenging the legality of the "Divisive Concepts" law, but adopting a wait and see attitude while it rolled out until the webpage encouraging complaints was put up.  At that point we decided that it was time to move forward with the lawsuit challenging the law before our members started losing their jobs for doing something no one could clearly define or give examples of, and that rested mostly on subjective perceptions of what someone might have meant.

16.      Since the commencement of the lawsuit, in my role as President of the AFT-NH, I have been made aware that members have been complained about simply for promising to teach "honest" history and for trying to make their classrooms inclusive for all.  Without clear guidance, the "Divisive Concepts" law has operated as a black cloud over educators, who are fearful that its vague language will be weaponized for political purposes.  It has chilled their ability to have open discussions in their classrooms and to teach and prepare our New Hampshire public school students to be critical thinkers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023.

*/s/ Debrah Howes*
Debrah Howes

# EXHIBIT 9

Declaration of
Plaintiff John Dube

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.<br>　　　　　　Plaintiffs,<br>　　　　　　　　v.<br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.<br>　　　　　　Defendants.<br>---------------------------------------------------------------------- | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ANDRES MEJIA,<br>CHRISTINA KIM PHILIBOTTE, and<br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,<br>　　　　　　Plaintiffs,<br>　　　　　　　　v.<br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,<br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,<br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,<br>CHRISTIAN KIM, in his official capacity<br>only as the Chair of the New Hampshire Commission for Human Rights,<br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,<br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil No. 1:21-cv-01077-PB

## <u>DECLARATION OF JOHN DUBE</u>

I, John Dube, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I was a U.S. History teacher in New Hampshire public schools for 38 years.  For 34 of those years, I taught in the Timberlane School District.

2.      Most recently, I was a high school history teacher at Timberlane Regional High School, teaching U.S. History and Advanced Placement (AP) U.S. History.

3.      From 2000-2005, I was the History Department Chair at Timberlane Regional High School.

4.      Throughout my career I worked on writing the U.S. History curriculum, both for Timberland Regional High School as well for the entire district.

5.      As a history teacher, I have always encouraged my students to debate and learn, to inquire and analyze, and to learn from our history and compare it to our current world circumstances.  History is about patterns and parallels.

6.      Allowing students to debate topics such as woman's suffrage, affirmative action, reparations and the criminal justice system is vital to understanding the impact of our nation's past on our present.  It is also instrumental in fostering critical thinking for our students and creating a full and robust exchange of ideas in our classroom.

7.      Shortly before and after HB2 ("the Divisive Concepts Law") was passed in June 2021, I read about the legislation in some of the local news outlets.  Needless to say, I was troubled.

8.      I also reviewed the language of the statute, and the prohibited concepts, which I continue to find hopelessly vague.  It seemed to me that the statute is a "word salad."   I did not understand (and still do not understand), what is and is not prohibited.

9.      I did not receive any clarifying guidance from my school district as to what could and could not be taught in my U.S. History courses after the Divisive Concepts Law was passed.

10.     Yet, the consequences of such a difficult to understand and abstract law, particularly without appropriate clarifying guidance on what content is proscribed, are very concrete for public school teachers in New Hampshire.

11.     For me, and teachers like me teaching U.S. History, a vague statute like the Divisive Concepts Law, and the risk of potentially losing my license, has chilled important discussions of in the classroom.

12.     In the Spring of 2021, because I felt the new law hindered my ability to teach U.S. History as I had for 38 years, I signed an online petition created by the Zinn Project that was circulated to me in which I promised to teach "honest" history.

13.     By the start of the next school year, I learned that a political group in New Hampshire published the names of all of the teachers in New Hampshire who had signed the pledge.

14.     Shortly thereafter, I was subject to severe online harassment, threats and obscenities.

15.     For example, I received a text message that read "Whats up homo? I heard your teaching Marxist commie CRT in your classrooms…You can fuck right off you garbage human!"

16.     Facebook posts directed at me contained similar obscenities and threats.

17.     Shortly after Labor Day, the Plaistow Police Department came to my house. They were sent by the FBI in response to the threats I was receiving.  The Police Department explained that right-wing groups had been targeting the teachers who signed the online pledge.

18.     The Police Department sent patrols by our house periodically for a few weeks, and we were forced to install security cameras and safety equipment at our home in light of the threats.

19.     My wife and I feared for our personal safety, particularly because my wife works from home.

20.     I finished the 2021-2022 school year at Timberlane Regional High School, but decided to retire at the end of the year, despite feeling that I have more to give to my students.

21.     In light of the Divisive Concepts Law and the climate of political intimidation created by it, I did not feel I could teach in New Hampshire any longer.

22.     I also did not feel I could live in New Hampshire any longer.  My wife and I moved to another community in Vermont.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023

_____
*/s/ John Dube*
John Dube

# EXHIBIT 10

# Declaration of Kamren Munz

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. )
           Plaintiffs, )
               v. )
FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. )
           Defendants. )

-----------------------------------------------------------------------) Civil No. 1:21-cv-01077-PB

ANDRES MEJIA, )
CHRISTINA KIM PHILIBOTTE, and )
NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, )
           Plaintiffs, )
               v. )
FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, )
JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, )
AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, )
CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, )
KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, )
           Defendants. )

## <u>DECLARATION OF MX. KAMREN MUNZ</u>

I, Mx. Kamren Munz, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.     My name is Mx. Kamren Munz. I am a New Hampshire resident and taught in Nashua, New Hampshire as an art educator for eleven years, from 2011-2022.

2.     Elm Street Middle School in Nashua was my home for eight out of my 11 total years teaching. I loved my job and was a proud public educator. During my tenure at Elm Street I created and advised the Photography Club, created and advised the Pride Squad Club, was an assistant Softball Coach for five years, painted two murals in the school, and volunteered my time on various committees.  I worked closely with the school administration, guidance departments, and my fellow educators to do the best I could to support all of my students.

3.     In 2017, I was awarded Nashua's Art Educator of the Year Award by the Nashua Education Foundation.

4.     Following passage of HB2 ("the Divisive Concepts Law") in 2021, teaching became painfully scripted, lacking in the "teachable moments" that educators dream of.  It was, quite frankly, terrifying.  In my view, the politicized atmosphere created by the Divisive Concepts Law, and its severe consequences for educators, has damaged the relationship between public educators and the communities they serve.

5.     The effects are felt heavily in the classroom.  In my experience, students see and hear guardians at home challenging educators' professionalism and curriculum, contributing to an astronomical increase in student disengagement, disrespect, and apathy. Student behavior has driven educators and students alike to feel uninspired, unheard, and unsafe. The lack of educator support is palpable.

6.     After the passage of the Divisive Concepts Law, I felt like I was taking a risk as a transgender educator whenever I introduced myself to students, staff, or community members

saying, "Hi, my name is Mx. Munz. My pronouns are they/them".  Not many middle school students, or adults, know that "Mx." is a gender neutral title.  In the past, I would use students' questions asking "What is Mx.?" to facilitate discussion and create teachable moments about gender neutral pronouns.  Some middle school students, and adults, lacked an accurate education on using singular "They" (despite it being Merriam-Webster's 2019 Word of the Year).  Again, teachable moments typically occurred through this discussion.

7.      In March 2022, despite the fear in schools created by the Divisive Concepts Law, I handed out my ungraded, not-mandatory, "Welcome to Art!" get-to-know-you form to my classes, as I usually did. This form asked what students were excited to learn in Art class, what their favorite medium in Art is, something good that happened recently, and other similar questions.

8.      In addition to asking students' "name" as it appears on their student account, the form also asked the name they would like me to call them in class, and their pronouns.  I had started each of my classes this way for the previous four years, about 430 students per year, with zero complaints (and only thanks from students, guardians, and staff).

9.      Yet, on March 31, 2022, I was pulled into my Principal's office to discuss an email sent by a parent angered that I was "inquiring [about] students' pronouns."  In the email, my title Mx. was placed in parentheses.  I immediately thought that this person intended to be disrespectful and transphobic.

10.     Around the same time, this same parent posted on social media, along with a screenshot of her email, "We picked a bad generation to start WWIII…they can't even fight anxiety from being called by the wrong pronoun."

11.     I felt threatened professionally and personally.  Around this time I was also aware that the "Mom's for Liberty" NH group had a $500 "bounty" they would pay for anyone who was successful in "catching" an educator breaking the Divisive Concepts Law.

12.     After the meeting with my Principal, in April 2022, I found out that someone had supplied Commissioner Edelblut with my teaching materials.  The materials contained my name, pronouns, the subject I teach, and a picture of me (an introduction I gave to my students, and emailed to adults at home).

13.     Commissioner Edelblut included these materials, along with materials from other educators across the state, in his op-ed article, *Education's Sacred Trust*. The op-ed included damaging accusations like, "activist educators who might be knowingly dismantling the foundations of a value system," and "squanders the credibility of the profession as a whole."

14.     In what I perceived as a direct criticism of me, Edelblut wrote, "Parents of students taking an art class should have a reasonable expectation that they will be learning about, well, art. They should not be concerned, as occurred in another New Hampshire classroom, that the introduction to art will begin with a lesson in pronouns…"

15.     This article can still be found on the NH Department of Education website with an attached word document containing teaching materials, including mine.  The document has a photo of me (with my face obscured, but not my tattoos or other personally identifiable information).

16.     My last name was redacted, but my title Mx. and my pronouns were displayed. This outs me as a Trans educator to anyone who happens upon this article painting me in a very negative light.  My identity can easily be determined whether or not my name appears.  In the

state of New Hampshire I am likely the only Art teacher, with the title Mx., they/them pronouns, and certainly the only one at Elm Street in Nashua with a full forearm tattoo (which was pictured in the op ed). In addition, every other educator's full name, including title, in the op-ed was redacted. I could not help but think that the Commissioner's decision to keep my title listed was deliberate.

17.     I finished the school year feeling disrespected, afraid, and targeted after giving all of myself to Nashua's students for over a decade.

18.     Because of these events, after serving the Nashua School District as a full time Art Educator for 11 years, I decide to resign in July 2022. The decision to resign was not made lightly. The state of public education in New Hampshire has led me to seek employment out of the classroom entirely. I left teaching feeling squeezed out by the actions of trans/homophobic individuals that were given a social and political platform to question my professionalism, reputation, and cause fear for my profession and my person because of the Divisive Concepts Statute and the politically charged environment it created.

19.     Today, I still fear for my safety and I am still negatively impacted emotionally, despite no longer being a NH Public Educator.

20.     Laws like the Divisive Concepts Law written to directly undermine an educator's ability to educate truthfully is disastrous to a functioning society and to Trans educators like me, trying to teach inclusion and tolerance for all in the classroom.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023



/s/ Mx. Kamren Munz

Mx. Kamren Munz

# EXHIBIT 11

Declaration of
Alison O'Brien

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) |
| Defendants. | ) |
| -------------------------------------------------------------------------- | )   Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) |
| Defendants. | ) |

## <u>DECLARATION OF ALISON R. O'BRIEN</u>

I, Alison R. O'Brien, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Rockingham County, New Hampshire.

2.      I am a high school Social Studies teacher at Windham High School in Windham, New Hampshire. I teach College Preparation American Studies ("C.P. Am. Studies") and Advanced Placement United States History ("AP US History").  I have been a teacher for 14 years, the past 9 of which have been at Windham High School.

3.      I am a member of NEA-NH and the Windham Education Association.

4.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

5.      I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.

6.      I have been directly impacted and harmed by the Banned Concepts Act. In the spring of 2022, I was subject to an "investigation" by the New Hampshire Department of Education into one of the lessons I taught to my 10th grade C.P. Am. Studies class.

7.      On April 19, 2022, the Social Studies Department Director (my direct administrative supervisor) and the English Department Director ("the Directors") came to my classroom to inform me that a parent had complained to a Windham School Board member that I had shown a video that was, in their opinion, "offensive" and that my class focused too much "on the oppression of just one group and was not a balanced view of history." The school board member had contacted the Superintendent's office. The Social Studies Department Director was also the acting Assistant Superintendent and had come to discuss the lesson with me as part of her investigation into this complaint.

8.      The parent complaint concerned two music videos that I showed: "Formation" by Beyoncé (I only show a section of this video) and "This is America" by Childish Gambino. I assumed the parent complained that I had violated the newly passed Banned Concepts Act given the comments made about the focus I was placing on "oppression" of one group.

9.      I show these videos as part of a unit on the Harlem Renaissance. In the same lesson we also listen to Strange Fruit by Billie Holiday, read poetry, and study paintings by Harlem Renaissance artists. I then ask students if they see any connections between these two modern music videos and the art and culture of the Harlem Renaissance. We explore their analysis as a class.

10.     In this lesson I tell students that the point of the exercise is not to decide if we agree or disagree with the message of the artist, nor do I require them to agree with the message. Instead, students are asked to look for historical connections between these modern artists and those of the Harlem Renaissance.

11.     Using modern examples of artists that students are aware of helps them to make connections to historical events such as the Harlem Renaissance in a manner that is relevant to them so they can better understand, analyze, and critique the information. This technique is known as Semantic Encoding as it gives the students a frame of reference to understand the historical context. Throughout my career I have used this technique with many other materials as it helps students be successful.

12.     I have received praise for using these techniques in formal administrative observations and in feedback from numerous students. This technique is also supported by the New Hampshire Curriculum Framework for Social Studies. Specifically:

    a.  SS:HI:3: World Views and Value systems and their Intellectual and Artistic Expressions includes SS:HI:12:3.2: which states that students will "[a]nalyze how the arts and science often reflect and/or influence major ideas, values and conflicts of particular time periods, e.g., the impact of the Enlightenment on the founding of our nation or the Harlem Renaissance. (Themes: A: Conflict and Cooperation, E: Cultural Development, Interaction, and Change, A0: Human Expression and Communication)";

    b.  SS:HI:12:3.3: which states that students will "Critique how the art, music and literature of our nation have been influenced by groups, e.g., the Spanish colonists in the Southwest or the 60s counter culture movement. (Themes: E: Cultural Development, Interaction, and Change, A0: Human Expression and Communication)"; and

    c.  SS:HI:12:3.4: which states that students will "Analyze the spread of American ideas and culture around the world using examples, e.g., the Bill of Rights or popular music. (Themes: B: Civic Ideals, Practices, and Engagement, E: Cultural Development, Interaction, and Change, F: Global Transformation)".

13.     When they inquired about the videos, I explained the lesson to the Directors and neither said I had violated the Banned Concepts Act. They said they did not intend to do any further investigation or issue any discipline.  My impression from the meeting was that they both

understood the point of the lesson and respected the teaching technique.  I was not directed to cease teaching the lesson nor was I told to stop showing the particular material. At that point I believed there would be nothing more that would come of the complaint.

14.     Around 12:15 p.m. that same day, I was visited by the Windham High School Assistant Principal ("A.P.") while I was teaching my class. I was asked to leave the class to speak with him in the hall. This is a conspicuous event which students and staff members take note of when it happens, particularly when it interrupts instruction. The Assistant Principal asked me if I had shown the "This is America" music video to the class. He showed me his phone which had a text message showing and the link to the music video had been texted to him. I did not see who the text was from.

15.     I told the Assistant Principal that I had met with the Directors that morning on the same issue and asked if he would speak with them as I wanted to return to my ongoing class, which had been left without instruction as I had been so suddenly removed.

16.     While I was teaching another class later in the day, I was summoned to the Principal's office. I received this call around 1:45 pm and our school day ends at 2:17 pm. When I asked if I could come down at the end of the day instead so I could finish the instruction, I was told no, I had to come immediately and that the Assistant Principal was coming to cover my class. Again, this is a conspicuous event which was not lost on my students or colleagues who observed it.

17.     Both the Principal and the Social Studies Department Director were there when I arrived. They told me that the SAU office had been contacted by Richard Farrell, an Investigator from the Department of Education who conveyed that he was "investigating" me based on complaints the Department had received from parents regarding the two videos.

18.     Since the Social Studies Department Director was also the Assistant Superintendent, she had spoken to Investigator Farrell when he called the office of the Superintendent. Investigator Farrell asked her if she had read Commissioner of Education Frank Edelblut's most recent Op Ed in the *New Hampshire Union Leader.*[1]  He told her "she might want

---

[1]Commissioner Edelblut authored an Op-Ed called "Education's Sacred Trust" on April 15, 2022 where he criticized "activist educators who might be knowingly dismantling the foundations of a value system [parents] are attempting to build," provided 68 pages of "actual instructional material from New Hampshire schools that parents have identified as conflicting with their values," and said the materials demonstrated "biases [which] are beginning to seep into our own institutions."

to look at it so she could understand the context of his investigation." She had brought a copy of the Op Ed to the meeting for me to look at.

19.     As I had already provided the background information about the videos to the administration, the purpose of the meeting appeared to be to tell me I was being "investigated" by the Department, to relay Investigator Farrell's comments to me about the Commissioner's Op-Ed, and to give me a copy of the Op-Ed.

20.     I felt confused and concerned when I heard the Department of Education Investigator was investigating my teaching lesson. I was confused because I did not believe I had taught anything contrary to the Act, or the Educator Code of Conduct broadly, and yet the Department was taking an active interest in my actions. I didn't understand what I could have done wrong that would have necessitated an investigation. I was concerned because I know that the Department has the ability to take action which can lead to revoking my teaching license.

21.     This episode became known to my fellow teachers at the High School. It is extremely rare for a teacher to be interrupted three times throughout the day by administrators. Prior to them knowing the substance of the complaint, my colleagues certainly knew something serious was going on.

22.     My colleagues later learned that the Department was investigating my actions. I had multiple colleagues tell me they did not want the same thing to happen to them and that they were scared it would.

23.     One colleague decided not to show a clip from a popular TV show because she did not want to face the same kind of scrutiny and stress that I had faced.

24.     Another teacher was looking to incorporate some modern data about how race impacted business practices in a relevant course and decided against it due to this incident.

25.     Ultimately, even though this episode was very disruptive to my work and personal life, and caused me much concern and stress, I never heard anything more from the Department of Education.  The Department of Education never formally opened an investigation and I later learned this was just a "background inquiry" that was done prior to a formal investigation being opened. I was never told directly that I was not being "investigated."

26.     The Department of Education never made a public statement or retraction of the original statement that I was being "investigated."

27.     The Department of Education never clarified for me, the administration, or my colleagues what might have been the specific cause for concern.

28.      I was left to only make assumptions as to those concerns. This means that to this day, I don't know if I could be subject to investigation again regarding teaching this same lesson.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of July, 2023

*/s/ Alison R. O'Brien*
Alison R. O'Brien

# EXHIBIT 12

# Declaration of
# Patrick Keefe

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| --------------------------------------------------------------------- | ) | Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) | |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) | |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) | |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) | |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) | |
| Defendants. | ) | |

## DECLARATION OF PATRICK KEEFE

I, Patrick Keefe, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Merrimack County, New Hampshire.

2.      I am a high school teacher at Campbell High School in Litchfield, New Hampshire. I teach Advanced Placement English Literature and Composition ("AP English"), Honors Senior English, and Grade 9 English.  I have been a teacher for 22 years.

3.      I am a member of NEA-NH and the Litchfield Education Association.

4.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

5.      I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.

6.      I have been directly impacted and harmed by the Banned Concepts Act (the "Act") as I have been forced to change my teaching practices for fear that it might violate the Act.

7.      As an AP English teacher my course is designed to prepare students for college level courses and also the Advanced Placement Exam which focuses on reading, analyzing, and writing about imaginative literature, poetry, and drama.  As they read, students consider a work's structure, style, and themes as well as its use of figurative language, imagery, and symbolism. Writing assignments include expository, analytical, and argumentative essays that require students to analyze and interpret literary works.

8.      AP English teachers select literary works that require students to read and evaluate complex text by identifying, analyzing, and applying those aforementioned literary devices as well as a plethora of other literary elements. The AP exam does not require students to have read any specific texts, but certain literary texts are often present on the exam.

9.      In recent years I have assigned *Heart of Darkness* by Joseph Conrad. This is a well-known literary work which often shows up on the AP exam.  It has been equally criticized and celebrated for its depiction of race and 19th Century European imperialism. It remains a staple of AP and college English courses not only in the United States but across Europe.

10.     AP English and Composition requires students to also study poetry. Because of its thematic similarity to *Heart of Darkness*, I also assign *The White Man's Burden,* a poem by

Rudyard Kipling. This poem was written and takes place in the same time period as *Heart of Darkness* and shares similar themes such as colonialism, imperialism, and racism.

11.     Reading these works together is a good opportunity for students to think analytically about language, imagery, symbolism, and theme within the works. They can also practice analytical skills by comparing and contrasting the works and critiquing them.

12.     Before the Banned Concepts Act, in order for students to practice the skills they would see on the AP exam, I would ask them to take argumentative positions, write persuasive essays, and critique the author's style and substance.

13.     Both of these writings have long histories of being critiqued which serve to inform students of how these works have been perceived through the lens of history and by various other cultures. Students could be successful in this assignment not by taking a particular position, but by showing analytic skill, persuasive writing, and thorough research. However, I cannot ask students to explore the notion of white supremacy in Kipling's *The White Man's Burden*, why he wrote it, what he may have been thinking, what his motivations were, or explore his perspective, because doing so could easily be misconstrued as teaching, instructing, inculcating or compelling my students to express belief or support for either Kipling's white supremacist ideas and writings. Conversely, condemning his writing also seems fraught since it requires first explaining why he thought what he did and in doing so, my comments could be misconstrued to be excusing or explaining away his racist views.

14.     I assign *Heart of Darkness* and *The White Man's Burden* because they often appear on the AP exam but recognize that given the time period and setting they depict, they may not feel particularly relevant to students in 2023.

15.     Prior to the Banned Concepts Act I would have asked students to draw on things they saw in the news, popular culture, or their own experiences and use these frameworks to inform their analysis. I do this because the state standards require students to be able to write about experiences (both their own and others), understand different cultures and experiences other than their own, and critically examine the information they receive in the media every day.[1] However, I am concerned about doing that now.

16.     For example, a technique I might have used in the past in the unit on *Heart of Darkness* and *The White Man's Burden* is to ask students to identify and analyze contemporary forms of imperialism, colonialism, and/or racism. However, in light of the Act, I am no longer comfortable asking students to freely identify instances of racism or colonialism, or the movements opposing those ideologies, in contemporary society for fear that it will be perceived that I am teaching that these ideas or movements opposing them are either good or bad or somehow correct or incorrect or an answer I am requiring them to give.

17.     I have the same concerns with another classic book I assign. *Beloved* by Toni Morrison is a fictional account of an African American woman's experience as an enslaved person and her life afterward. The theme of the book is how the destructive legacy of slavery impacts this character.

18.     Prior to the Act's passage, a technique I would use while assigning this book would be to ask students to identify whether the legacy of slavery is evident in the modern world. Could they connect any of the characters' stories to their own experiences or observations?

19.     Given the Act's restrictions, I feel less comfortable placing these books in a contemporary framework and asking students, for example, if they think the Black Lives Matter movement could be considered a result of the destructive legacy of slavery or asking, "does the legacy of slavery continue and if so, how?" The Act keeps me from engaging in that discussion

---

[1] Common Core State Standards For English Language Arts & Literacy in History/Social Studies, Science, and Technical Subjects. https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-ela.pdf Accessed July 21, 2023. *See also*: Ed306.37 English/Language Arts and Reading Program.
      (c)  "Pursuant to Ed 306.27, the local school board shall require that an English/language arts program in each high school provides":
            (2) "Opportunities for students to develop proficiency and control in the use of language, an appreciation of a variety of literary forms, an understanding and appreciation of various aspects of past and present cultures as expressed in literature, and interests for lifelong learning";
            (4) Systematic instruction and activities designed to enable students to:
                  (k):  Develop study skills which contribute to academic success, such as using the dictionary, note taking, locating information, distinguishing good sources of information from bad sources, and applying information in solving of real-life problems.(emphasis added).

because I know it could easily be misunderstood as me "requiring" students to agree with the question I have posed or that there is a "correct" answer to my question. Some students will understand that I am simply "throwing it out there" for discussion while others may go home and say "my teacher told us BLM is good because it is counteracting the effects of slavery."

20.     Our students need to learn critical thinking skills such as taking in material, analyzing it, finding their own conclusions, and then formulating and defending an argument based on their conclusions. I don't tell my students what to think because that is not teaching.  I hope they will formulate their own arguments and draw their own conclusions. But in the wake of the Banned Concepts Act being passed, my job is more challenging because I am concerned a complaint will be made to the state that I have attempted to indoctrinate my students to the notion that white people are inherently racist. I do not believe this to be true in the least, but the Act is written so that any contemporary investigation of race invites a claim the Act has been violated.

21.     I fear my students are losing valuable analytical training and will be ill-prepared at the college level if they cannot practice generating their own opinions on challenging works from our past and connecting them to their world today.

22.     I have found that the Act is particularly limiting because parents and students misunderstand instruction techniques, such as using the Socratic method, playing devil's advocate, or seemingly agreeing or disagreeing with a student in order to draw out analytical thinking.This misunderstanding of how teaching works and the authority of what I say while teaching is very limiting for me because it means a parent could easily misunderstand a classroom exercise and file a complaint based on their perception of what I have said.

23.     I have also served as the union president for my local teacher's union for the past three years. In this capacity, I had asked our administration for more professional development on how teachers and professional staff should avoid violating the Banned Concepts Act and I was told there was none available other than the Attorney General's Frequently Asked Questions.


 I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st  day of July, 2023


/s/ Patrick Keefe
Patrick Keefe

# EXHIBIT 13

Declaration of
Plaintiff Christina
Kim Philibotte

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.<br>Plaintiffs,<br>v.<br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.<br>Defendants.<br>-----------------------------------------------------------------------<br>ANDRES MEJIA,<br>CHRISTINA KIM PHILIBOTTE, and<br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,<br>Plaintiffs,<br>v.<br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,<br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,<br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,<br>CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights,<br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,<br>Defendants. | Civil No. 1:21-cv-01077-PB |

## DECLARATION OF CHRISTINA KIM PHILIBOTTE

I, Christina Kim, Philibotte, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Merrimack County, New Hampshire. I grew up in Manchester and graduated from West High School.[1]

2.      I am the Chief Equity Officer for the Manchester School District, which is the largest and most diverse school district in New Hampshire.  Approximately 49% of the District's students were of color as of the 2021-2022 school year.[2]  I am the first person to hold this position, and I started in July 2021.  The Manchester Board of School Committee approved my position on June 28, 2021—three days after the Amendments went into effect.

3.      This position was created following robust community engagement, and this creation was part of the Manchester School District's February 2020 strategic plan. This position was crafted to help ensure that—especially given the disproportionate rates of graduation, reading and math proficiency, as well as suspension rates among students of color—institutional systems are created that support and rectify the hardship that many of students of color experience because of systemic racism.[3] As stated in the February 2020 strategic plan, the goal was to do the following:

> Hire an Equity Director to Oversee Alignment of All Equity Work—This role would prioritize the district's focus on issues of diversity, equity, and inclusion (DEI). This is a cross-cutting role that will support work across the entire organization. The director would work to coordinate multiple coherent streams of DEI work across the system including aligned professional development, curricular support, disciplinary actions, hiring and retention of people from diverse backgrounds throughout MSD, and systems improvement, as well as grant-funded projects. A key focus would be to adopt tools, resources, and concepts within MSD that bring an equity lens.

4.      One of the goals of my position is to train teachers and faculty to understand the needs of students of color and those with marginalized identities.  This effort is aimed at creating a more culturally fluent teaching staff so that this staff can better connect with their learners.  This

---

[1] *See also* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum; *see also* Manchester Proud, "Champion Spotlight: Tina Philibotte, MSD Chief Equity Officer," https://www.manchesterproud.org/champion-spotlight-tina-philibotte/.
[2] *See also* Michael Cousineau, "Manchester Schools' Diversity Efforts Will Take Years," *Union Leader* (Dec. 19, 2021),  https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html ("The school district's population of 12,400 students is split almost equally between Whites and minorities.").
[3] *See* Sarah Gibson, "In an Effort to Improve Equity, Manchester School District Turns to a West High Alum," *NHPR* (Sept. 21, 2021), https://www.nhpr.org/nh-news/2021-09-21/in-effort-to-improve-equity-manchester-school-district-turns-to-a-west-high-school-alum ("Manchester's overall test scores are lower than the state average. According to analysis by the community group Manchester Proud, scores for low-income, Black and Latino students are even lower — in some cases, half of the average Manchester score.  Dropout rates are also higher in the district, as are detention and suspension rates for students of color and students with disabilities. Many families of all ethnic backgrounds are disconnected from school.").

effort reinforces the creation of a sense of belonging for these students where these students would now feel more connected to, and better represented in, the books they read and the discussions they have in the classroom.

5.      In my role, I am taking proactive steps to tackle important equity issues, including the need to create frameworks to engage and enhance student voice, as well as improve family engagement.  This engagement helps make sure that students feel like they are agents in their own learning.

6.      The Manchester School District—along with School Administrative Unit ("SAU") 16—are the first school districts in New Hampshire to have full-time DEI administrators. Two additional DEI administrators have since been employed by the Oyster River Cooperative School District and the Concord School District since the filing of this December 2021 lawsuit.

7.      Indeed—following George Floyd's murder on May 25, 2020—these districts have created these positions in an increased effort to expose students to the lived experiences, contributions, and history—both past and present—of BIPOC (Black, Indigenous, and People of Color) individuals. These efforts are part of a growing and widespread consensus among educators that inclusive education practices that give voice and attention to the experiences of all students are critical.  Students must see themselves in the books they read and in the classroom discussions they have to become contributing participants in our increasingly diverse and multi-racial democracy.

8.      For example, by presenting a more informed and truthful portrayal of topics such as the empowering experiences and achievements of BIPOC and marginalized communities in the face of African enslavement, Jim Crow, segregation, and racial discrimination—and discussing with students the existing legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or "unconscious bias"—educational opportunities for all students are expanded.  This expansion of these educational opportunities takes many forms, but is unified by the aim of ensuring equal access to educational content for students of all backgrounds, and exposure to various perspectives that reflect the diversity of New Hampshire and America.

9.      In my role, I am devoted to nurturing an equitable and inclusive school environment where all students feel seen, heard, and valued.  I bring to this role over 15 years of experience in public education advocating and applying anti-racist/anti-bias and culturally responsive teaching practices as a DEI educational consultant, English teacher, and Dance/Performing Arts Teacher/Director. Through my work, I have led and designed (and continue to lead and design)

conversations about race and equity through teacher/leader workshops, presentations, and trainings.

10.     I previously was an English teacher and Director of the Dance Program at Goffstown High School for nearly 13 years. In this role, I was a 2019 finalist for New Hampshire Teacher of the Year, as well as the recipient of the 2019 SAU19 Dreamkeeper award.

11.     I am a fellow with New Hampshire Listens. I am also a two-time fellow of the National Writing Project—a network of teachers, university faculty, researchers, writers, and community educators working to advance writing and the teaching of writing. I was in the 2022 class of Leadership New Hampshire—a statewide program whose mission is to build a community of informed and engaged leaders.  I was also an Advisory Group member of the Endowment for Health's Race & Equity Series—a series that holds important convenings of diverse stakeholders, as well as ongoing working groups, tackling racial justice and equity challenges in New Hampshire, including in civic engagement, economic development, education, government, health, and law enforcement/criminal justice.  I have received the 2022 NAACP Manchester Excellence in Education award, as well as the Martin Luther King Jr. Coalition's 2023 Social Justice award.

12.     I have dedicated my professional life to training and instruction on DEI concepts. Such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color. This instruction has increased the engagement, participation, and sense of belonging for students in my District. And students have expressed to me their desire to gain greater exposure to the perspectives of communities of color through the books they read and through course curriculum.

13.     For example, students have come to several Manchester Board of School Committee meetings stating their desire to have cultural studies in the curriculum, and they have given testimony before the Board that they want to feel more represented in the curriculum.  And students have told me that they want to talk about their own personal experiences in the classroom and how these experiences relate to course materials.  For these students, having these conversations is essential to help them process their own lived experiences where literature and history are used as a tool to help the students navigate the current world around them.  If we do not provide thoughtful and safe environments where students can connect the curriculum to their own lives with caring adults—and where teachers can affirm their students' lived experiences— then students are not meaningfully learning, they are robbed of a full education, and they feel

uncared for.  Learning does not happen in the abstract.  It happens when teachers and students can ask questions and acknowledge both the flawed and joyous world that has a direct impact on students, and where students can talk about their lives in the context of the course material.

14.      I am directly impacted by the Amendments challenged in this case.  I conduct staff trainings within the Manchester School District focusing on culturally-responsive education—a student-centered practice of mindfully and intentionally incorporating the experiences, culture, and identity of students (including those from historically marginalized groups) to help expand their educational opportunities. This includes developing strategies for how to relate and empathize with students, as well as developing curriculum consistent with these goals, so that each student is seen, heard, and valued.

15.      Previously, in conducting DEI trainings before the Amendments and before I assumed the role of Chief Equity Officer for the Manchester School District, I would specifically use terms and concepts like "anti-racism" and "anti-bias."  Because of the Amendments and their penalties, I now rarely use terms and concepts focusing on "anti-racism" in staff trainings—and have advised others to avoid them as well.

16.      For example, I now rarely use the term "anti-bias" in Manchester staff trainings because of the Amendments, and I have limited reference to implicit bias or "unconscious bias" in these trainings.  I have also told educators to avoid references to implicit bias or "unconscious bias."  Instead of being explicit and referencing "anti-bias" concepts directly, I now have to resort to using terms that are less precise, including now using the term "self-awareness" as an alternative—a different concept that involves understanding one's emotions and personal identity based on self-definition and others' perceptions, as well as recognizing how we are socialized.

17.      Also, instead of directly using the term "anti-racism," I now "dance around" this concept if I ever have the opportunity to address it—which is less often given the fear that exists around the Amendments.  Instead, if given the opportunity, I now talk more about my own personal experience as a South Korean adoptee to try to make connections for students and educators that could much more easily be accomplished if I felt that I was able to use the term "anti-racism."  I rarely use the term "anti-racism" because of its connection to Ibram X. Kendi's 2019 book *How to be an Antiracist*, which the Commissioner of Education cited as a reason why the Amendments are necessary.

18.      As one of only four current full-time DEI school administrators in New Hampshire, I also routinely field inquiries from teachers throughout New Hampshire as to whether certain

books and information would be banned under the Amendments. Yet, given the Amendments' vagueness, I cannot answer basic questions as to what is covered under the Amendments. As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences.

19.     Teachers throughout New Hampshire regularly ask me for validation if certain books or concepts related to race are covered under the Amendments.  I cannot answer because the Amendments are unclear, and I ask the teachers to think through scenarios if they are challenged about what they are teaching.  I explain that I cannot insulate them if they are challenged by a parent or member of the public.  For example, in these conversations, I have recommended that teachers omit reciting during a "read aloud" certain lines of text in Jewell Parker Rhodes's 2018 book *Ghost Boys*—a book that follows the story of Jerome, a 12-year-old Black boy, who is shot and killed by a White police officer before coming back as a ghost.  The lines of text in this book that I have recommended be omitted from a "read aloud" reference unconscious racial bias, particularly during the courtroom scene on pages 85-87 where the prosecutor asks the officer who shot Jerome the following: "Have you heard of racial bias?"; [Have you] heard prejudice can affect your thoughts, actions?  Whether consciously. Knowing. Or unconsciously?"; and "Possibly you were responding to unconscious stereotypes of black men as large, threatening, dangerous?"  I have told the teacher that, at most, if these portions are to be presented at all during the class, it should come from the audiobook, not from the teacher.  Portions of *Ghost Boys* are attached to this declaration.

20.     When I explain to these teachers that the Amendments exist and that I cannot provide validation that certain instruction or reading material are exempt from the Amendments, the teacher often has an emotional response where they now feel that they have to make a choice between talking about a text in a culturally relevant way or being subjected to scrutiny from a principal or, even worse, potentially having their license impacted.  These educators are scared.

21.     I have also spoken to public school students about issues concerning race at events in my individual capacity.  For example, in around the Fall of 2021, I had conversations with Concord public school students while volunteering for that school district about "anti-racism" and the fact that there are few teachers of color in New Hampshire, as well as the Amendments.  These issues were of public concern to the students, and I was speaking as a private person.  I also spoke to public school students at a superintendents' conference on or about Tuesday, November 9, 2021 where I told these students my personal experiences of racism, as well as acknowledged the racism

that these students have experienced.  These issues were of public concern to the students, and I was speaking as a private person in these examples.

22.     I am certified by the State Board of Education and, thus, am subject to the Educator Code of Conduct that is now embedded within the Amendments' provisions in RSA 193:40.

23.     I am bringing this lawsuit in my individual capacity, and not on behalf of the Manchester School District that employs me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of August, 2023.


*/s/ Christina Kim Philibotte*
Christina Kim Philibotte



*"TIME TO WAKE UP."*

I SPIN AROUND. WHO SAID THAT?

ACROSS THE STREET, I SEE HIM.
WISPY LIKE SOFT RAIN. *A GHOST?*

LIKE ME?

. . . . . . . . . . . . . . . .

Praise for

# GHOSt BOYs

★ "Rhodes beautifully weaves together the fictional and the historical...
in this gripping and all-too-necessary novel about police brutality, injustice,
and the power of bearing witness to the stories of those who are gone."
—*Booklist*, starred review

"*Ghost Boys* gently walks readers through the minefield of young black boys who
have been killed due to racism, dating back to the murder of Emmett Till. By
exploring the fear that is at the core of these murders, Jewell Parker Rhodes
suggests ways the living can crack that fear and, eventually,
end this epidemic of death."

—Nikki Grimes, *New York Times*–bestselling and award-winning author of
*Garvey's Choice* and *One Last Word*

"The voice of *Ghost Boys* is nothing less than prophetic:
It rings out in its plot lines, in its characters, in its tones, in its images.
And here is what that voice says: *Bear witness.*"
—Gary D. Schmidt, award-winning author of *The Wednesday Wars*

"Haunting, heartbreaking, and timely, this is a book that will start
important conversations."
—Kate Messner, author of *The Seventh Wish*



ISBN 978-0-316-26228-6

51799

9 780316 262286

EAN

$17.99 U.S.
$22.99 CAN.

## ONLY THE LIVING CAN MAKE THE WORLD BETTER. LIVE AND MAKE IT BETTER

Twelve-year-old Jerome is shot by a police officer who mistakes his toy gun for a real threat. As a ghost, he observes the devastation that's been unleashed on his family, his friend Carlos, and his community in the wake of what they see as an unjust and brutal killing.

Jerome meets another ghost: Emmett Till. Emmett helps Jerome process what has happened, on a journey toward recognizing how historical racism may have led to the events that ended his life. Jerome also meets Sarah, the daughter of the police officer, who grapples with her father's actions.

Once again Jewell Parker Rhodes deftly weaves historical, social, and political layers into a gripping and poignant story about how children and families face the complexities of today's world—and how one boy, in particular, who never had a chance to grow up, comes to understand American blackness in the aftermath of his own death.



# Jewell Parker Rhodes

is the author of *Ninth Ward*, a Coretta Scott King Honor Book, *Sugar*, winner of the Jane Addams Children's Book Award, *Bayou Magic*, and *Towers Falling*. She has also written many award-winning books for adults.



VISIT US AT **LBYR.COM**
**#GHOSTBOYS**

Also available from



H hachette
AUDIO

Jacket illustration © 2018 Shadra Strickland
Jacket design by Marcie Lawrence
Jacket © 2018 Hachette Book Group, Inc.
Printed in the U.S.A.

7.99 U.S.
2.99 CAN.

# GHOSt BOYs

Jewell Parker Rhodes



LITTLE, BROWN AND COMPANY
New York  Boston

This book is a work of fiction. Names, characters, places, and incidents are the product of the author's imagination or are used fictitiously. Any resemblance to actual events, locales, or persons, living or dead, is coincidental.

Copyright © 2018 by Jewell Parker Rhodes
Interior illustrations copyright © 2018 by Shutterstock.com

Cover art copyright © 2018 by Shadra Strickland.
Cover design by Marcie Lawrence.
Cover copyright © 2018 by Hachette Book Group, Inc.

Hachette Book Group supports the right to free expression and the value of copyright. The purpose of copyright is to encourage writers and artists to produce the creative works that enrich our culture.

The scanning, uploading, and distribution of this book without permission is a theft of the author's intellectual property. If you would like permission to use material from the book (other than for review purposes), please contact permissions@hbgusa.com. Thank you for your support of the author's rights.

Little, Brown and Company
Hachette Book Group
1290 Avenue of the Americas, New York, NY 10104
Visit us at LBYR.com

First Edition: April 2018

Little, Brown and Company is a division of Hachette Book Group, Inc. The Little, Brown name and logo are trademarks of Hachette Book Group, Inc.

The publisher is not responsible for websites (or their content) that are not owned by the publisher.

Library of Congress Cataloging-in-Publication Data
Names: Rhodes, Jewell Parker, author.
Title: Ghost boys / by Jewell Parker Rhodes.
Description: First edition. | New York ; Boston : Little, Brown and Company, 2018. | Summary: "After seventh-grader Jerome is shot by a white police officer, he observes the aftermath of his death and meets the ghosts of other fallen black boys including historical figure Emmett Till"— Provided by publisher.
Identifiers: LCCN 2017019240| ISBN 9780316262286 (hardcover) | ISBN 9780316262255 (ebook) | ISBN 9780316262248 (library edition ebook)
Subjects: | CYAC: Police shootings—Fiction. | Racism—Fiction. | Death—Fiction. | African Americans—Fiction. | Family life— Illinois—Chicago—Fiction. | Till, Emmett, 1941–1955—Fiction. | Chicago (Ill.)—Fiction.
Classification: LCC PZ7.R3476235 Gho 2018 | DDC [Fic]—dc23
LC record available at https://lccn.loc.gov/2017019240

ISBNs: 978-0-316-26228-6 (hardcover); 978-0-316-26225-5 (ebook)

Printed in the United States of America

LSC-C

Printing 20, 2021

## Preliminary Hearing
## Chicago Courthouse

*April 18*

"Were you surprised you shot a child?"

"Asked and answered, Your Honor," says the defending lawyer.

"I'll rephrase. Why were you surprised?" asks the lawyer calmly. "Can't you tell the difference between a boy and a man?"

"Yes, of course. I mean … it was dark."

"Daylight."

The judge's face is like a mask; her hair, silver. She peers at Officer Moore.

Officer Moore swallows. "Yes, daylight. He was big."

"More than any other twelve-year-old?"

"Yes. Bigger."

"Are you prejudiced?"

Jewell Parker Rhodes

"No."

"Liar," someone shouts.

"Quiet," the judge warns, tapping her gavel once.

I look across the courtroom at Sarah. Eyes wide, her elbows on her knees, her palms cupped over her head. I'm standing next to her father, studying him.

"Have you heard of racial bias?"

"No."

"Heard prejudice can affect your thoughts, actions? Whether consciously. Knowing. Or unconsciously?"

"I'm not racist."

"Possibly you were responding to unconscious stereotypes of black men as large, threatening, dangerous?"

"No. I acted with just cause."

"How tall is your daughter?"

"Objection," says the seated lawyer.

"Sustained," answers the judge.

"I'll ask another way. Would it surprise you if I told you Jerome Rogers, the child you killed, was no taller than five feet, ninety pounds?"

Officer Moore is surprised.

Her palms pressed tight against her ears, Sarah bows her head. She can't see her father squirm. I can.

86

·ker Rhodes

s, tapping her gavel once.
room at Sarah. Eyes wide,
er palms cupped over her
her father, studying him.
al bias?"

fect your thoughts, actions?
ing. Or unconsciously?"

nding to unconscious ste-
e, threatening, dangerous?"
se."
er?"
ted lawyer.
judge.
uld it surprise you if I told
d you killed, was no taller
s?"
d.
t against her ears, Sarah
her father squirm. I can.

Then, it's my turn to be surprised. The ghost boy sits beside her. He tries to hold Sarah's hand. She doesn't flinch. Neither hand meets. They can't. He's dead; she's alive.

Sarah sees us both.

Ghost boy extends his hand toward me. Like I'm supposed to hold it? Be grateful?

I flinch. *What am I supposed to do? What does it mean?*

Officer Moore's plump-faced lawyer asks for a lunch break.

The judge agrees. For a few seconds, she closes her eyes. I think it doesn't matter if Sarah can see me and the ghost boy. It only matters that the judge sees Sarah's dad is lying.


People file out of the courtroom. Pop is steadying both Ma and Grandma. Officer Moore guides his wife, hand on her back.

I don't move. Sarah and the ghost boy walk out of the courtroom, turning once to look back at dead me.

# EXHIBIT 14

# Declaration of Jennifer Given

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) ) |
| Defendants. | ) |
| ------------------------------------------------------------------------ | ) Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) |
| Defendants. | ) |

## <u>DECLARATION OF JENNIFER GIVEN</u>

I, Jennifer Given, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Hillsborough County, New Hampshire.

2.      Until the end of the 2022 school year, I was a high school social studies teacher at the Hollis/Brookline High School in Hollis, New Hampshire.  I taught AP World History, United States History and World History.  I was a teacher for 19 years.

3.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

4.      I am offering this Declaration in my individual capacity and not on behalf of any school district that I worked for or my current employer.

5.      When I was teaching, I was directly impacted and harmed by the Banned Concepts Act.  In fact, I have left teaching out of frustration because of the frustrating conditions that public school teachers are subjected to, like the Banned Concepts Act.

6.      While I was still teaching, even though I may not have been violating the Act, I had to change my teaching methods significantly out of fear that I would be accused of doing so.  The Act's language is so vague that it led to constant confusion with students and parents.  It is my belief that my students' learning suffered because of this, and I found it so ethically troubling that I had to leave the classroom.

7.      For example, I went from using assessments such as essay questions and open-ended short answer questions to using only multiple-choice assessments.  I taught units on various political movements and historical figures as part of the World History curriculum. My concern was that essay questions or short answer prompts would be misinterpreted as students believing that they had to agree with a certain position to score well on the assessment.  Of course, how they scored on the test had nothing to do with whether they agreed with a certain position, only whether their response was analytically sound and historically accurate.  However, this nuance was lost on many students, and it became too fraught to offer these kinds of opportunities for learning and I switched to more controlled multiple-choice tests.

8.      I significantly reduced open discussion and debate of ideas in my classroom out of fear that these discussions would be misinterpreted as teaching or inculcating one of the opinions or concept the students were arguing about.  For example, our World History units cover Marxism, Stalinism, Naziism and other dictatorship regimes.  Instead of allowing students to analyze and critique these dictatorships, I lectured on the topic instead. It seemed to me that an open discussion

where students may offer their own personal support for Marxism or Communist ideas, or even Nazi ideas, was too fraught regardless of the tremendous amount students can learn while hearing their peers exhibit critical thinking skills.

9.      Another example is that I began offering guided notes for lessons. These are essentially fill-in the blank notes to assist students with notetaking.  I made this change because I was concerned that students would misinterpret a historical example or political idea from history as my own and I wanted to make sure it was clear what I was "teaching."  However, guided notes are not the best preparation for college-level courses or the best way for students to learn or retain information.

10.      Often, I felt as though I could not accurately answer students' questions because I did not feel comfortable making any commentary other than simply the historical context and facts relevant to their inquiry. For example, in our unit about dictatorships, if a student asked whether I saw any comparisons to current United States leaders or policies, I had to ignore the question or creatively deflect rather than engage in a robust discussion with students about current events.

11.      I disallowed students from picking their own topics for research papers for fear the topics chosen by students might lead to discussions in class that would violate the Act.  Instead, I chose the topics and assigned them unilaterally, so they were less "controversial." Unfortunately, this also meant they were not as interesting or relevant for students.  I saw a decline in student interest and participation when they could not work on topics they wanted to know more about.

12.      A widely understood best practice in teaching is analogizing material to students' own experiences and interests so that they can identify material and relate it to their own lives. This is particularly important in social studies curriculums and historical courses where students can easily believe historical events only happened in the past and not readily see the relevancy to the current time.   However, because of the Act I severely limited my use of this technique even though my class was replete with events from the past which have relevant analogies in the present that would have helped the students understand these events.  I limited class discussion where students could raise their own experiences or make connections to current events for fear that those discussions could lead to a complaint being filed against me with the Department of Education and that my license, and therefore my livelihood, pension and health insurance could be put into jeopardy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of June, 2023

_/s/ Jennifer Given_
Jennifer Given

# EXHIBIT 15

Declaration of
Plaintiff Andres
Mejia

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools.<br>　　　　　Plaintiffs,<br>　　　　　　　v.<br>FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire.<br>　　　　　Defendants.<br>-----------------------------------------------------------------------<br>ANDRES MEJIA,<br>CHRISTINA KIM PHILIBOTTE, and<br>NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE,<br>　　　　　Plaintiffs,<br>　　　　　　　v.<br>FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education,<br>JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire,<br>AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights,<br>CHRISTIAN KIM, in his official capacity<br>only as the Chair of the New Hampshire Commission for Human Rights,<br>KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor,<br>　　　　　Defendants. | Civil No. 1:21-cv-01077-PB |

## DECLARATION OF ANDRES MEJIA

　　I, Andres Mejia, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Strafford County, New Hampshire.

2.      I am the Director of Diversity, Equity, Inclusion, and Justice for SAU16.  SAU16 consists of several school districts, including the Exeter Region Cooperative School District and school districts in Exeter, Stratham, Newfields, Brentwood, East Kingston, and Kensington. SAU16 is headquartered in Exeter.

3.      I started in this role on August 2, 2021, but only on behalf of the Exeter Region Cooperative School District.  My role expanded to the entire SAU16 on July 1, 2022.  My role expanded because board members representing SAU16's various communities recognized that my work was so important that it needed to be a resource in all of SAU16's schools.

4.      I am the first person to hold this position.  The Exeter Region Cooperative School District (and later the entire SAU16)—along with the Manchester School District—are the first school districts in New Hampshire to have full-time DEI ("diversity, equity, and inclusion") administrators.  Two additional DEI administrators have been hired by the Oyster River Cooperative School District and the Concord School District since the filing of this lawsuit in December 2021.

5.      In my role, I work closely with various stakeholders and am responsible for prioritizing and operationalizing DEI initiatives, especially those dealing with curriculum, cultural competency, faculty and staff recruitment and retention, and professional learning.[1]  I have dedicated my entire professional life to DEI work because I believe that it is critical to create an education community where every student—including students who are less privileged and who may be from historically marginalized communities—feels like they belong.  Such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color.

6.      For example, as of the 2022-2023 academic year, SAU16 has 4,779 students, with at least 425 students of color.  Approximately 153 students identify as Asian, approximately 53 identify as Black/African American, approximately 124 identify as Hispanic or Latino, approximately 28 identify as Native American/Alaska Native, approximately 10 identify as Native Hawaiian/Pacific Islander, and approximately 59 identify as belonging to two or more races.

---

[1] *See* "'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity," *Portsmouth Herald* (Aug. 2, 2021), https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

7.      This DEI work not only helps White students in SAU16 learn about the growing diversity of their community, but also helps students of color in SAU16 know that they are not alone and that they are welcome.

8.      This DEI instruction has increased the engagement, participation, and sense of belonging for students in SAU16.  Students have told me that, since DEI concepts have become a focus of SAU16's work, they feel more welcome.

9.      In particular, students of color have expressed to me their desire to gain greater exposure to the perspectives of communities of color and theories related to race and gender because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities.  White students also have asked me to learn more about DEI, gender, LGBTQ+ issues, race, racism, and other perspectives about marginalized identities.  These courageous conversations are essential for all students—especially those of color—as these conversations build community where students feel seen and validated in a secure space, and thus become more comfortable speaking and sharing their experiences on complex topics which, in turn, helps teach other students.

10.      Prior to starting my position with the Exeter Region Cooperative School District on August 2, 2021—and after graduating from the University of New Hampshire—I worked for four years as a program manager with New Hampshire Listens, which is a civic engagement initiative of the Carsey School of Public Policy at the University of New Hampshire.  New Hampshire Listens has a mission to build, strengthen, and sustain civic infrastructure to support a sustainable democracy by helping communities talk, listen, and act together so communities can work for everyone.

11.      In my current role as Director of Diversity, Equity, Inclusion, and Justice for SAU16, I am directly impacted and harmed by the Amendments challenged in this case.  As part of my duties, I conduct staff trainings within SAU16 on concepts like implicit bias, institutional bias, race, racism, belonging, and inclusiveness.  Because of the Amendments' ambiguity, if I teach some or all of these topics, I may be violating the Amendments, and potentially will subject myself to a complaint or lawsuit—even if such trainings are voluntary.

12.      I also routinely field inquiries from teachers in SAU16 as to whether certain books, video content, curriculum, materials, and information—as well as what a teacher would say— would be banned under the Amendments.  Yet, given the Amendments' vagueness, I cannot answer basic questions as to what is covered under the Amendments.

13.     As a result of this uncertainty, instructional choices have been chilled in order to avoid enforcement consequences.  Professional development around implicit bias, race, and racism has either been put on hold or modified in ways that prevent or dilute a full discussion of these concepts.

14.     For example, when I now discuss "implicit bias," I avoid discussing how individuals may have this form of bias, and instead focus the discussion on how systems and institutions create bias.  This modification removes individuals from the personal responsibility of recognizing their own bias and privilege.  As a result, we are not doing these concepts justice and, instead, are allowing individuals to back away from taking responsibility for their own bias.  I fear that if I discuss individual bias because of one's race or privilege, then this may directly implicate the Amendments—particularly the second banned concept.  When I am employed by private entities to talk about implicit bias, I am freer to talk in ways that more accurately reflect these concepts.

15.     Perhaps even worse, the Amendments chill and cause teachers to second guess how to respond to incidents of racism and bullying against students of color and LGBTQ+ students for fear that, if they take appropriate action, they will be accused of violating the Amendments by "discriminating" against a person's beliefs.  During the 2022-2023 academic year in SAU16, bias incidents implicating racism increased to 25 from 15 in the prior academic year.  SAU16 also has seen an increase in antisemitism bias incidents during the 2022-2023 academic year.

16.     Because of the Amendments, educators feel like they cannot freely engage with their colleagues and students and, instead, have often retreated to guarded lessons and trainings that do not fully serve the needs of SAU16.  For example:

- A group of teachers focused on diversity at the Cooperative Middle School in Stratham received a grant in approximately 2020 to purchase a series of books on diversity, equity, and inclusion to help teachers better understand the need for equity in schools. These books included *A Good Kind of Trouble* by Lisa Moore Ramée, *So You Want to Talk About Race* by Ijeoma Oluo, *The New Jim Crow* by Michelle Alexander, *The Black Friend: On Being a Better White Person* by Frederick Joseph, *Ghost Boys* by Jewell Parker Rhodes, *Raising White Kids: Bringing Up Children in a Racially Unjust America* by Jennifer Harvey, *Me and White Supremacy* by Layla Saad, and *The Hate U Give* by Angie Thomas.  The group wanted to have these books used as resources and included in their classroom libraries, but those plans were put on hold in the Fall of 2021 out of a concern by these teachers that these books could be covered under the Amendments.  These purchased books are in my office, and I have no ability to know whether these books are covered under the Amendments because the Amendments are unclear.

Portions of *A Good Kind of Trouble* by Lisa Moore Ramée are attached to this declaration.

- Similarly, the Cooperative Middle School in Stratham has temporarily set aside Tiffany Jewell's 2020 book entitled *This Book is Anti-Racist* and Beverly Daniel Tatum's 2017 book *Why are All the Black Kids Sitting Together in the Cafeteria (Revised and Updated edition)* which were to be used by a teacher group for professional development.  Boxes of these books were bought by the 2020-2021 principal of that middle school, but were then set aside by SAU16 in the Fall of 2021 after the enactment of the Amendments.  These books remain in my office, and I have no ability to know whether they are covered under the Amendments because the Amendments are unclear. Tiffany Jewell's book was especially set aside because some Exeter Region Cooperative School District community members cited this book in public meetings as evidence of why DEI work should not occur in schools.

- In addition, teachers have asked me to look at the wordings of lesson plans and slides implicating race and LGBTQ+ issues to see if they conflict with the Amendments.  The Amendments are so vague that my advice to them often was to remove or modify certain words and slides implicating race and LGBTQ+ issues to avoid the prospect of punishment under the Amendments.  Teachers have also removed LGBTQ+ flags and other inclusive stickers and paraphernalia in response to the fear caused by the Amendments.

17.     I am bringing this lawsuit in my individual capacity, and not on behalf of SAU16 that employs me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of August, 2023


*/s/ Andres Mejia*
Andres Mejia



# A
# Good
# Kind of
# Trouble

"Full of heart
and truth."
—ANGIE THOMAS,
#1 *New York Times*
bestselling author of
*The Hate U Give*

## Lisa Moore
## Ramée

## Advance praise for *A Good Kind of Trouble*



"Shay's voice is so genuine—
she practically walks off the page.
This is an important book, and an incredible debut."

—ERIN ENTRADA KELLY,
Newbery Medal–winning author of *Hello, Universe*



"Gripping from the opening line,
*A Good Kind of Trouble* is a tender, insightful, and
unique look at what it means to stand up for
what you believe in and be brave."

—JAY COLES,
author of *Tyler Johnson Was Here*

"Full of heart and truth, *A Good Kind of Trouble* has all of the
makings to be this generation's *Roll of Thunder, Hear My Cry*.
Much like Cassie Logan's, Shayla's experiences, pitfalls, and
triumphs will inspire young people for years to come.
It is a well-written page-turner with a voice that stays with
you long after you put the book down."

—ANGIE THOMAS,
#1 *New York Times* bestselling author of *The Hate U Give*

★ "A timely, funny, and unforgettable debut about friendship,
facing your fears, and standing up for what's right."

—*KIRKUS REVIEWS* (starred review)




harpercollinschildrens.com

US $16.99 / $21.00 CAN
ISBN 978-0-06-283668-7


51699



9 780062 836687

Ages 8–12

Twelve-year-old Shayla is allergic to trouble. All she wants to do is to follow the rules. (Oh, and she'd also like to make it through seventh grade with her best friendships intact, learn to run track, and have a cute boy see past her giant forehead.) But in junior high, it's like all the rules have changed. Now she's suddenly questioning who her best friends are, and some people at school are saying she's not black enough. Wait, *what?*

Shay's sister, Hana, is involved in Black Lives Matter, but Shay doesn't think that's for her. After experiencing a powerful protest, though, Shay decides some rules are worth breaking. She starts wearing an armband to school in support of the Black Lives movement. Soon everyone is taking sides. And she is given an ultimatum.

Shay is scared to do the wrong thing (and even more scared to do the right thing), but if she doesn't face her fears, she'll be forever tripping over the next hurdle. Now, that's trouble, for real.

BALZER + BRAY
An Imprint of HarperCollinsPublishers

0319



Jordan Ramée

## Lisa Moore Ramée

was born and raised in Los Ange-
les and now lives in the Bay Area of
California with her husband, two
kids, and two obnoxious cats. This is
her first novel.

You can visit her online at
www.lisamooreramee.com.

Also available as an ebook.

Jacket art © 2019 by Alleanna Harris
Jacket design by Aurora Parlagreco

# A
# Good
# Kind of
# Trouble

## Lisa Moore Ramée

Balzer + Bray

*An Imprint of* HarperCollins*Publishers*

Balzer + Bray is an imprint of HarperCollins Publishers.

A Good Kind of Trouble
Copyright © 2019 by Lisa Moore Ramée
Emoji icons provided by EmojiOne
All rights reserved. Printed in the United States of America.
No part of this book may be used or reproduced in any manner
whatsoever without written permission except in the case of brief
quotations embodied in critical articles and reviews. For information
address HarperCollins Children's Books, a division of HarperCollins
Publishers, 195 Broadway, New York, NY 10007.
www.harpercollinschildrens.com
ISBN 978-0-06-283668-7

Typography Aurora Parlagreco
20 21 22 23   PC/LSCH   15 14 13 12
❖
First Edition





# 1

# First Slide

I'm allergic to trouble. It makes my hands itch. But today in science, when Mr. Levy starts calling out lab-partner assignments, I don't get even the lightest tingle. I just sit there, barely breathing, waiting for him to assign me to the perfect partner. He's been promising we'd start science labs since the first day of school, but it's been *weeks*. Lots of time for me to decide on the perfect partner.

Mr. Levy has been teaching science at Emerson Junior High for centuries, and he looks like a mad scientist. For real. He has wild, frizzy gray hair and even wears a lab coat every day.

He fluffs his hair and adjusts his thick black glasses. I start rubbing my hands against my legs, which isn't a good sign, but I don't pay attention. Any second he will get to my name.

"Shayla and . . ." Mr. Levy pauses a few seconds, like he is really thinking about it. Like he doesn't already have the list in front of him. "And Bernard," he says.

No. And I mean, *no*. This is the opposite of perfect.

I sneak a peek behind me. Bernard sits in the back, slouching low in his seat. Junior-high desks weren't made for Bernard. He's not kid sized. He's grown-up sized. And grown-up *big*.

He catches me looking at him, and his mouth shifts into a mean grimace. I gulp and look away.

My sister, Hana, would say I'm being just like *those people* who take one look at a Black person and think they need to clutch their purse tight or lock their car doors. I have no problem with Bernard being Black. *Obviously.* I'm Black too. It's him being huge and mean and scary.

Bernard went to the same elementary school as me and my best friends, Isabella and Julia. We're all terrified of him. Everyone I *know* is terrified of him. Even in kindergarten he would scowl at everybody. And he'd yell. A *lot*.

In second grade he yelled at me because I got to the *Star Wars* Legos before he did. He grabbed those storm-troopers right out of my hands, and if you've ever had

2

y pauses a few seconds, like
it. Like he doesn't already
. "And Bernard," he says.
is is the opposite of perfect.
ie. Bernard sits in the back,
Junior-high desks weren't
t kid sized. He's grown-up

at him, and his mouth shifts
and look away.
l say I'm being just like *those*
a Black person and think they
tight or lock their car doors.
rnard being Black. *Obviously.*
ng huge and mean and scary.
ame elementary school as me
lla and Julia. We're all terri-
*now* is terrified of him. Even
scowl at everybody. And he'd

lled at me because I got to the
did. He grabbed those storm-
hands, and if you've ever had

someone snatch Legos from you, you know how much
it hurts. And he didn't say sorry.

I told him I *needed* the stormtroopers. But Bernard
looked at me like he wouldn't have minded squashing
me right underneath one of his big shoes.

Bernard was a bully then, and he's a bully now.

*Please, oh, please don't let us be doing lab work today.*

"Find your partners, everyone!" Mr. Levy claps his
hands together. I just bet partnering me with Bernard
is some devious experiment: what happens if we mix
trouble-hating girl with bully boy?

*Kaboom.* That's what.

"Shayla!" Bernard hollers.

He sounds mad. I guess he's not happy that we're
partners either.

I walk to the back of the room to the lab tables, and
my feet feel like they weigh six hundred pounds.

"I got the first slide!" Bernard's voice is like a bunch
of bowling balls all being dropped at the same time. The
glass in one of his big paws snaps in two.

"Oh," I say. He could probably snap one of my fin-
gers just like that.

Bernard shakes his hand and starts sucking a finger.

3

I'm sure that is a bad idea. Mr. Levy comes over and sets some new slides next to our microscope. He doesn't even ask Bernard if he's okay.

Bernard doesn't look okay; he looks angry, which is basically saying he looks like Bernard.

"Stop messing around," Mr. Levy tells Bernard.

"I wasn't!" Bernard booms.

Mr. Levy shakes his head and walks away.

After that, Bernard won't even look in the microscope. He shoves the stack of slides at me, like it's *my* fault he broke the first one.

The top slide has a tiny green-brown thing on it, and when I peer through the microscope, I can see it's a bug leg. I think it's from a grasshopper and write some notes about it and try *not* to study Bernard. I don't know if I should say anything to him. I don't want to make him even more mad.

When class is over, he gets up so fast, he knocks his desk to its side, and instead of picking it up, he storms out of the room.

You bet Mr. Levy frowns real hard at that.

I pick up Bernard's desk before leaving class. Maybe since Mr. Levy didn't have to pick it up, no one will get in trouble, but my hands itch anyway.

4

# EXHIBIT 16

# Declaration of
Sean O'Mara

**(UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) |
| Defendants. | ) |
| ------------------------------------------------------------------------- | ) |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) |
| Defendants. | ) |

Civil No. 1:21-cv-01077-PB

## DECLARATION OF SEAN M. O'MARA

I, Sean M. O'Mara, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I live in Cheshire County, New Hampshire.

2.      I am an eighth grade Social Studies teacher at Keene Middle School in Keene, New Hampshire.  I have been a teacher for 24 years.

3.      I am a member of NEA-NH and the Keene Education Association.

4.      I am certified by the State Board of Education, and thus, am subject to the "Educator Code of Conduct" (N.H. Admin. Code R. Ed. 510-512) that is now embedded within N.H. Rev. Stat. Ann. ("RSA") 193:40 (hereinafter, the "Banned Concepts Act" or the "Act").  *See* RSA 193:40, V.

5.      I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.

6.      As an eighth-grade social studies teacher I teach units on early American history from the Revolutionary War through the Civil War and Reconstruction.

7.      Before the Act was passed, in the 2020-2021 school year there was discussion among teachers in our school about embarking on coordinated curriculum planning. We wanted to work across all subject matter areas to coordinate materials and topics so that students would experience a throughline in all of their classes. We hoped the result would be better retention and connection with the material.

8.      Because our students learn early American history, including slavery, the Civil War, and Reconstruction, we determined that part of instruction would need to address the history of racism in America.

9.      *Stamped Racism, Antiracism, and You- A Remix of the National Book Award-winning Stamped from the Beginning* by Jason Reynolds and Dr. Ibram X. Kendi ("*Stamped (Remix)*") was a book identified as age appropriate for our students, relevant to our course of study, and authored by credible and knowledgeable scholars.[1] Jason Reynolds was particularly known to our students and teachers because of his other young adult works which were held in high regard. We thought his involvement in the book might encourage our students' learning and participation.

10.    After approval by the School Board, 250 copies of this book were purchased with the intent that all eight graders would read the book. Many subject areas would interweave it into their curriculum. For example, Reading and English classes would engage in the portions of the book that relate to the Jim Crow and Civil Rights eras.  Social Studies classes would use the

---

[1] An example selection of *Stamped (Remix)* is appended to this Declaration.

portions of the book that deal with the origins of race as a social construct, its codification, the development of race-based chattel slavery in the Americas, and the Abolition movement.

11.     After the Act was passed there was a lot of confusion among me and my colleagues about what kinds of teaching could take place and what kind of materials could be used. We did not know whether a book like *Stamped (Remix)* would be prohibited by the Act.

12.     Further fueling this confusion, Commissioner Frank Edelblut published an Op-Ed in the *New Hampshire Union Leader* on June 13, 2021, entitled "Teach Children About Racism, Not to be Racists." The Op-Ed was in support of the recently Banned Concepts Act and it explained why the Commissioner believed the law was necessary.

13.     This Op-Ed specifically named *How to Be an Anti-Racist* as a problematic book which "support[s] Critical Race Theory." *How to Be an Anti-Racist* is written by Dr. Ibram X. Kendi who also wrote *Stamped from the Beginning (*which *Stamped (Remix)* was adapted from). These books are all drawn from Dr. Kendi's scholarly "anti-racist" work and have similarities.

14.     The Commissioner wrote that "supporters of Right to Freedom From Discrimination legislation want to make sure that children are taught about racism, but not to be racists, as Kendi seems to advocate."

15.     As a New Hampshire educator who has to follow the law, I never received specific list of materials, lessons plans, or texts that were impermissible. The only guidance I had access to was the Attorney General's FAQ about the law. The Department of Education and the Commissioner provided no other guidelines despite their ability to sanction my license for violations of the Act.

16.     This left me and others to piece together publicly available comments from the Commissioner to aid our understanding of what was permissible.

17.     From this Op-Ed, it seemed that the Commissioner believed the work of Dr. Kendi violated the Act given that he said Dr. Kendi teaches students to be racist and that the Commissioner made this comment in the context of praising the Act because it would keep this kind of material from being taught.

18.     My colleagues and I understood that violations of the Act could lead to the revocation of our teaching licenses through a process which the Commissioner oversees. We did not want to violate the Act.

19.     Additionally, as we headed into the following school year, I understood that our school administration had asked us to set the project aside due to this uncertainty and that we should not make further plans for grade-wide engagement with *Stamped (Remix)*.

20.     Over the next school year, the planned grade-wide reading of *Stamped (Remix)* was not implemented. The books sat on the shelf untouched.

21.     I understand that now a few students at my school have decided to read the book independently, but we have never embarked on a school-wide reading project of this book as we originally planned.

22.     I don't know if assigning the book would in fact violate the Act. The law is not clear enough for me to determine that.

23.     Relatedly, I have spoken to many colleagues who teach the same subject matter as me. Because we must discuss racism, slavery, and oppression of Black Americans they are nervous that what they may say would be misunderstood and weaponized against them. They feel more nervous to teach this material now than they ever did before the Act was passed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of July, 2023

*/s/ Sean O'Mara*
Sean M. O'Mara

THE #1 *NEW YORK TIMES* BESTSELLER

# JASON REYNOLDS

# IBRAM X. KENDI

# STAMPED

## RACISM, ANTIRACISM, AND YOU

A **REMIX** of the National Book Award–winning
*STAMPED FROM THE BEGINNING*

$18.99 U.S.
$23.99 CAN.

# THE THIEF KNOWN AS RACISM IS ALL AROUND.

The construct of race has always been used to gain and keep power, to create dynamics that separate and silence. Racist ideas are woven into the fabric of this country, and the first step to building an antiracist America is acknowledging America's racist past and present. This book takes you on that journey, showing how racist ideas started and were spread, and how they can be discredited.

Through a gripping, fast-paced, and energizing narrative, *Stamped* shines a light on the many insidious forms of racist ideas—and on ways **YOU** can identify and stamp out racist thoughts, leading to a better future.



Nathan Bajar

## JASON REYNOLDS

is a #1 *New York Times* bestselling author, a Newbery Medal honoree, a Printz Award honoree, a National Book Award finalist, a Kirkus Prize winner, a two-time Walter Dean Myers Award winner, an NAACP Image Award winner, and the recipient of multiple Coretta Scott King Honors. He was the American Booksellers Association's 2017 and 2018 spokesperson for Indies First, and his many books include *When I Was the Greatest*, *The Boy in the Black Suit*, *All American Boys* (cowritten with Brendan Kiely), *As Brave as You*, *For Every One*, the Track series (*Ghost*, *Patina*, *Sunny*, and *Lu*), *Long Way Down*, which received both a Newbery Honor and a Printz Honor, and *Look Both Ways*. He lives in Washington, DC. He invites you to visit him online at JasonWritesBooks.com.



Stephen Voss

## IBRAM X. KENDI

is the Andrew W. Mellon Professor in the Humanities at Boston University and the founding director of the BU Center for Antiracist Research. He is a contributing writer at *The Atlantic* and a CBS News correspondent. He is the author of many books, including *Stamped from the Beginning: The Definitive History of Racist Ideas in America*, which won the National Book Award for Nonfiction, and three #1 *New York Times* bestsellers: *How to Be an Antiracist*; *Stamped: Racism, Antiracism, and You*, coauthored with Jason Reynolds; and *Antiracist Baby*, illustrated by Ashley Lukashevsky. He invites you to visit him online at IbramXKendi.com.

**Visit us at LBYR.com | theNOVL.com | #StampedBook**

Also available from 🅷 hachette AUDIO

Jacket art © 2020 by Erin Robinson | Title and author lettering © 2020 by Dirty Bandits
Jacket design by Karina Granda; based on the original adult cover design by the Book Designers | Jacket © 2020 Hachette Book Group, Inc. | Printed in the U.S.A.

# STAMPED

## RACISM, ANTIRACISM, AND YOU



A **REMIX** of the National Book Award-winning
*Stamped from the Beginning*

Written by

## JASON REYNOLDS

Adapted from *Stamped from the Beginning* by and with an introduction from

## IBRAM X. KENDI

Ⓛ Ⓑ

LITTLE, BROWN AND COMPANY
NEW YORK  BOSTON

*Stamped: Racism, Antiracism, and You* was written by Jason Reynolds. It is based on *Stamped from the Beginning: The Definitive History of Racist Ideas in America* by Ibram X. Kendi, published by Bold Type Books.

Copyright © 2020 by Ibram X. Kendi and Jason Reynolds

Cover art copyright © 2020 by Erin Robinson. Title and author lettering copyright © 2020 by Dirty Bandits. Cover design by Karina Granda based on design by the Book Designers. Cover copyright © 2020 by Hachette Book Group, Inc.

Hachette Book Group supports the right to free expression and the value of copyright. The purpose of copyright is to encourage writers and artists to produce the creative works that enrich our culture.

The scanning, uploading, and distribution of this book without permission is a theft of the author's intellectual property. If you would like permission to use material from the book (other than for review purposes), please contact permissions@hbgusa.com. Thank you for your support of the author's rights.

Little, Brown and Company
Hachette Book Group
1290 Avenue of the Americas, New York, NY 10104
Visit us at LBYR.com

First Edition: March 2020

Little, Brown and Company is a division of Hachette Book Group, Inc. The Little, Brown name and logo are trademarks of Hachette Book Group, Inc.

The publisher is not responsible for websites (or their content) that are not owned by the publisher.

Library of Congress Cataloging-in-Publication Data
Names: Reynolds, Jason, author. | Kendi, Ibram X., author.
Title: Stamped : racism, antiracism, and you / Jason Reynolds and Ibram X. Kendi.
Description: First edition. | New York : Little, Brown and Company, 2020. | "An Adaptation of the National Book Award–winning *Stamped from the Beginning*." | Includes bibliographical references and index. | Audience: Ages 12 and up. | Summary: "A history of racist and antiracist ideas in America, from their roots in Europe until today, adapted from the National Book Award winner *Stamped from the Beginning*." —Provided by publisher.
Identifiers: LCCN 2019033917 | ISBN 9780316453691 (hardcover) | ISBN 9780316453707 (ebook) | ISBN 9780316453677
Subjects: LCSH: Racism—United States—History—Juvenile literature. | United States—Race relations—History—Juvenile literature.
Classification: LCC E184.A1 K346 2020 | DDC 305.800973—dc23
LC record available at https://lccn.loc.gov/2019033917

ISBNs: 978-0-316-45369-1 (hardcover), 978-0-316-45370-7 (ebook)

Printed in the United States of America

LSC-C

Printing 18, 2021

# CONTENTS

INTRODUCTION .......................................................... IX

## SECTION 1: 1415–1728

1. The Story of the World's First Racist ........................... 1
2. Puritan Power............................................................. 11
3. A Different Adam....................................................... 21
4. A Racist Wunderkind ................................................ 29

## SECTION 2: 1743–1826

5. Proof in the Poetry ................................................... 41
6. Time Out .................................................................. 49
7. Time In ................................................................... 53
8. Jefferson's Notes ....................................................... 55
9. Uplift Suasion........................................................... 65
10. The Great Contradictor ............................................. 69

## SECTION 3: 1826–1879

11. Mass Communication for Mass Emancipation.......... 83
12. Uncle Tom................................................................ 91
13. Complicated Abe ...................................................... 99
14. Garrison's Last Stand ............................................... 107

................ IX

.................. 1
................ 11
................ 21
................ 29

................ 41
................ 49
................ 53
................ 55
................ 65
................ 69

:ion.......... 83
................ 91
................ 99
.............. 107

## SECTION 4: 1868–1963

15. Battle of the Black Brains ...............................117
16. Jack Johnson vs. Tarzan............................... 129
17. Birth of a Nation (and a New Nuisance) ................ 135
18. The Mission Is in the Name ................................... 139
19. Can't Sing and Dance and Write It Away................147
20. Home Is Where the Hatred Is ................................ 155

## SECTION 5: 1963–TODAY

21. When Death Comes .................................................169
22. Black Power.............................................................179
23. Murder Was the Case ........................................... 191
24. What War on Drugs?............................................. 203
25. The Soundtrack of Sorrow and Subversion.............. 211
26. A Million Strong.................................................... 219
27. A Bill Too Many .................................................... 227
28. A Miracle and Still a Maybe.................................. 235

AFTERWORD .........................................................245
ACKNOWLEDGMENTS ........................................251
FURTHER READING ............................................257
SOURCE NOTES.....................................................263
INDEX......................................................................287

IOLDS
s bestsell-
ry Medal
vard hon-
ok Award
e winner,
ean Myers
AACP Im-
and the
e Coretta
ers Asso-
First, and
, The Boy
h Brendan
es (Ghost,
eived both
oth Ways.
him online

ENDI
n Professor
oston Uni-
g director
Antiracist
ntributing
and a CBS
He is the
, including
nning: The
h won the
l New York
ed: Racism,
nolds; and
. He invites

oadBook

1 by Cory Rondin
r design by the
d .. the U.S.A.

18.99 U.S.
23.99 CAN.

# INTRODUCTION

DEAR READER,

To know the past is to know the present. To know the present is to know yourself.

I write about the history of racism to understand racism today. I want to understand racism today to understand how it is affecting me today. I want you to understand racism today to understand how it is affecting you and America today.

The book you're holding is a remix of my book, *Stamped from the Beginning*, a narrative history of racist and antiracist ideas. A racist idea is any idea that suggests something is wrong or right, superior or inferior, better or worse about a racial group. An antiracist idea is any idea that suggests that racial groups are equals. Racist and antiracist ideas have lived in human minds for nearly six hundred years. Born in western Europe in

9 U.S.
9 CAN.

. to colonial America
from its beginning. I
*ed from the Beginning.*

ted *Stamped from the*
I wish I learned this
. no books telling the
ie books told parts of
them, though. Most
uld not relate to. But
son is one of the most
time. I don't know of
ter at connecting the
s a great writer in the
ies the human eye in
itches the human ear,
vn. It is hard to stop
r makes my head bob
when the book is open.
er like Jason, but I do
rote *Stamped from the*
with my television on,
—always thinking on
untelevised life of the

INTRODUCTION

shooting star of #Black Lives Matter during America's stormiest nights. I watched the televised and untelevised killings of unarmed Black human beings at the hands of cops and wannabe cops. I somehow managed to write *Stamped from the Beginning* between the heartbreaking deaths of seventeen-year-old Trayvon Martin and seventeen-year-old Darnesha Harris and twelve-year-old Tamir Rice and sixteen-year-old Kimani Gray and eighteen-year-old Michael Brown, heartbreaks that are a product of America's history of racist ideas as much as a history of racist ideas is a product of these heartbreaks.

Meaning, if not for racist ideas, George Zimmerman would not have thought the hooded Florida teen who liked LeBron James, hip-hop, and *South Park* had to be a robber. Zimmerman's racist ideas in 2012 transformed an easygoing Trayvon Martin walking home from a 7-Eleven holding watermelon juice and Skittles into a menace to society holding danger. Racist ideas cause people to look at an innocent Black face and see a criminal. If not for racist ideas, Trayvon would still be alive. His dreams of becoming a pilot would still be alive.

Young Black males were *twenty-one times* more likely to be killed by police than their White counterparts between 2010 and 2012, according to federal statistics.

INTRODUCTION

The under-recorded, under-analyzed racial disparities between female victims of lethal police force may be even greater. Black people are *five times* more likely to be incarcerated than Whites.

I'm no math whiz, but if Black people make up 13 percent of the US population, then Black people should make up somewhere close to 13 percent of the Americans killed by the police, and somewhere close to 13 percent of the Americans sitting in prisons. But today, the United States remains nowhere close to racial equality. African Americans make up 40 percent of the incarcerated population. These are racial inequities, older than the life of the United States.

Even before Thomas Jefferson and the other founders declared independence in 1776, Americans were arguing over racial inequities, over why they exist and persist, and over why White Americans as a group were prospering more than Black Americans as a group. Historically, there have been three groups involved in this heated argument. Both segregationists and assimilationists, as I call these racist positions in *Stamped from the Beginning*, think Black people are to blame for racial inequity. Both the segregationists and the assimilationists think there is something wrong with Black people and that's why

xii

inalyzed racial disparities
ethal police force may be
*five times* more likely to be

Black people make up 13
then Black people should
13 percent of the Ameri-
omewhere close to 13 per-
in prisons. But today, the
re close to racial equality.
0 percent of the incarcer-
cial inequities, older than

ion and the other founders
6, Americans were argu-
why they exist and persist,
s as a group were prosper-
s as a group. Historically,
involved in this heated
and assimilationists, as I
*amped from the Beginning,*
e for racial inequity. Both
similationists think there
k people and that's why

Black people are on the lower and dying end of racial inequity. The assimilationists believe Black people as a group can be changed for the better, and the segregationists do not. The segregationists and the assimilationists are challenged by *antiracists*. The antiracists say there is nothing wrong or right about Black people and everything wrong with racism. The antiracists say racism is the problem in need of changing, not Black people. The antiracists try to transform racism. The assimilationists try to transform Black people. The segregationists try to get away from Black people. These are the three distinct racial positions you will hear throughout *Stamped: Racism, Antiracism, and You*—the segregationists, the assimilationists, and the antiracists, and how they each have rationalized racial inequity.

In writing *Stamped from the Beginning*, I did not want to just write about racist ideas. I wanted to discover the *source* of racist ideas. When I was in school and first really learning about racism, I was taught the popular origin story. I was taught that ignorant and hateful people had produced racist ideas, and that these racist people had instituted racist policies. But when I learned the motives behind the production of racist ideas, it became obvious that this

folktale, though sensible, was not true. I found that the need of powerful people to defend racist policies that benefited them led them to produce racist ideas, and when unsuspecting people consumed these racist ideas, they became ignorant and hateful.

Think of it this way. There are only two potential explanations for racial inequity, for why White people were free and Black people were enslaved in the United States. Either racist policies forced Black people into enslavement, or animalistic Black people were fit for slavery. Now, if you make a lot of money enslaving people, then to defend your business you want people to believe that Black people are fit for slavery. You will produce and circulate this racist idea to stop abolitionists from challenging slavery, from abolishing what is making you rich. You see the racist policies of slavery arrive first and then racist ideas follow to justify slavery. And these racist ideas make people ignorant about racism and hateful of racial groups.

When I began writing *Stamped from the Beginning*, I must confess that I held quite a few racist ideas. Yes, me. I'm an African American. I'm a historian of African Americans. But it's important to remember that racist ideas are ideas. Anyone can produce them or consume

e. I found that the
st policies that ben-
st ideas, and when
: racist ideas, they

only two potential
why White people
aved in the United
Black people into
le were fit for slav-
r enslaving people,
t people to believe
You will produce
abolitionists from
hat is making you
ery arrive first and
y. And these racist
ism and hateful of

*om the Beginning,*
r racist ideas. Yes,
storian of African
member that racist
them or consume

them, as this book shows. I thought there were cer-
tain things wrong with Black people (and other racial
groups). Fooled by racist ideas, I did not fully realize that
the only thing wrong with Black people is that we think
something is wrong with Black people. I did not fully
realize that the only thing extraordinary about White
people is that they think something is extraordinary
about White people. There are lazy, hardworking, wise,
unwise, harmless, and harmful *individuals* of every race,
but no racial *group* is better or worse than another racial
group in any way.

Committed to this antiracist idea of group equality,
I was able to discover, self-critique, and shed the racist
ideas I had consumed over my lifetime while I uncovered
and exposed the racist ideas that others have produced
over the lifetime of America. The first step to building
an antiracist America is acknowledging America's rac-
ist past. By acknowledging America's racist past, we can
acknowledge America's racist present. In acknowledging
America's racist present, we can work toward building
an antiracist America. An antiracist America where no
racial group has more or less, or is thought of as more or
less. An antiracist America where the people no longer
hate on racial groups or try to change racial groups. An

INTRODUCTION

antiracist America where our skin color is as irrelevant as the colors of the clothes over our skin.

And an antiracist America is sure to come. No power lasts forever. There will come a time when Americans will *realize* that the only thing wrong with Black people is that they think something is wrong with Black people. There will come a time when racist ideas will no longer obstruct us from seeing the complete and utter abnormality of racial disparities. There will come a time when we will love humanity, when we will gain the courage to fight for an equitable society for our beloved humanity, knowing, intelligently, that when we fight for humanity, we are fighting for ourselves. There will come a time. Maybe, just maybe, that time is now.

In solidarity,

*Ibram X. Kendi*

# EXHIBIT 17

Declaration of Plaintiff Ryan Richman

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. ) ) ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. ) ) ) ) ) ) ) ) | |
| Defendants. ) | |
| ----------------------------------------------------------------------- ) | Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, ) ) ) | |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, ) ) | |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, ) ) ) | |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, ) ) ) | |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, ) ) | |
| Defendants. ) | |

## <u>DECLARATION OF RYAN RICHMAN</u>

I, Ryan Richman, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      My name is Ryan Richman.  I am a high school World History teacher at Timberlane Regional High School, in Plaistow, New Hampshire where I have taught for the past 21 years.

2.      Since the passage of the Divisive Concepts Law, I have felt reticent about teaching certain material in the classroom.

3.      In my World History class, I often ask students to find an event in the news, bring it to class, and be prepared to discuss its connections with the past.  Nine times out of 10, they are stories about oppression. They are stories about exclusionism. They are about the Rohingya and Uyghur genocides, which are going on right this second. They are about Black Lives Matter and similar political movements.

4.      I also teach constitutional law to my high school students.  I teach on affirmative action, the Voting Rights Act, and the Equal Rights Amendment.  We discuss whether similar protections are still needed today.

5.      When these topics are discussed in my classroom, I am nervous and guarded in my discussions.  I worry that I will receive a call from my principal or an administrator as to whether there has been a complaint about my lessons.

6.      Aside from not knowing what is and is not prohibited under the Divisive Concepts Law, I find that the legislation has brought the culture wars into my classroom and to extra-curricular activities.

7.      In the classroom, I have noticed a rise in hostility and, frankly, antisemitism, as a gay and Jewish educator.  For example, one student asked during discussions about the Holocaust whether people still espouse the views of Hitler.  I mentioned certain hate groups, white supremacy, neo-Nazis, and politicians who have openly spoken out as Holocaust deniers.

Another student in my class stated that he would rather vote for the Holocaust denier than me, a reference to a prior unsuccessful run I made for local office.

8.     In an end of the year project where I have students create "memes," a student created one with the accompanying phrase "this is my final solution."

9.     The same politically charged and dangerous hate-filled atmosphere now exists outside the classroom.  For example, last school year, the Gay-Straight Alliance, a group for which I was previously the faculty advisor, organized a school dance.  Shortly thereafter, one of the district's state representatives, Debra DeSimone, went to the Timberlane District School Board meeting, announcing that the LGBTQ community put on a dance, applied for by the Gay-Straight Alliance.  She said that it was "not right" for a small, segregated group of kids to have a school-sponsored dance that was not open to everyone (despite it being open to all).  In her view, "if you're not gay, you're not showing up" for fear of being ridiculed by other students.   She insisted that the School Board "stop this from happening" in the future.

10.     I am also the faculty advisor for the school's Model United Nations team. Despite the importance of differing views and perspectives that the club normally values, these past two years, I have had to be restrained in what I can say around the students in their research for competitions, on the way to competitions, and in everyday interactions.  I worry that if controversial topics such as the war in Ukraine are made topics at Model UN competitions, I will not be able to speak freely about the conflict and my views on the war, including the various views being espoused in the United States.

11.     Next year, I will be teaching civics and economics at Timberlane.  Normally, I would be excited about teaching this course during a primary year and would incorporate current events and the election process into the classroom learning experience.  But my colleagues do

not want to speak about politics or the primary and, in fact, do not want to teach anything beyond what is contained in the curriculum.  I am uncertain whether I will teach about the primaries that are occurring.

12.     Because of the Divisive Concepts Law and the political environment it has created, I am constantly worried that there will be a complaint about my teaching and that I will be subject to investigation, charges, or worse.

13.     While I still feel that I have much to give as a teacher, sadly this may be my final year teaching in Timberlane High School.  I do not feel that I can teach honestly under the current legislative and political circumstances.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023


*/s/ Ryan Richman*
Ryan Richman

# EXHIBIT 18

# Declaration of Plaintiff Jocelyn Merrill

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION ("DOE"), CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| ------------------------------------------------------------------------- | ) | Civil No. 1:21-cv-01077-PB |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, | ) ) ) | |
| JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, | ) ) | |
| AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, | ) ) ) | |
| CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, | ) ) ) | |
| KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) | |
| Defendants. | ) | |

## DECLARATION OF JOCELYN MERRILL

I, Jocelyn Merrill, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      My name is Jocelyn Merrill.  I am a ninth grade English and Journalism teacher at Nashua High School North.  I have been teaching in New Hampshire public schools for 12 years, most recently as a ninth grade English teacher.

2.      The Divisive Concepts Law has impacted how I teach.  I have taken certain articles and material out of my curriculum .  For example, I no longer share articles that I previously used in connection with the book "To Kill A Mockingbird" to discuss systemic racism and "white privilege."  I have also refrained from showing certain videos, such as "White Like Me," for fear that using these materials would be considered a violation of the Divisive Concepts Law.

3.      I also do not know whether simply discussing these topics, even if brought up by students in my class, would subject me to investigation under the Divisive Concepts Law. Teachers in my school worry that curricular material could be photographed by students and brought to their parents to file complaints.

4.      I attended an AFT Townhall after the Divisive Concepts Law was passed to try to understand what was prohibited under the new law.  The AFT did not have answers from the DOE on what could and could not be taught, and we never heard from any representatives at the Department of Education or Human Rights Commission about the law.

5.      In fact, I recall specifically that students in my journalism class discussed the Divisive Concepts Law when it was first passed amongst themselves.  One particular student suggested, in sum or substance, that the law was "just another way to pit parents and teachers against each other and not trust the students."

6.       In my experience, teachers are informed and professional.  They know how to appropriately teach their curriculum.  The law interferes with their ability to educate freely and

hampers one of the most essential parts of a high school education – guiding students to be critical thinkers.

7.      HB 544 and the Divisive Concepts Law has also had an impact outside the classroom.  After the COVID-19 pandemic I was part of an afterschool diversity and inclusion group – initiated by students – comprised of both students and faculty.  The mission of the group was to try to find ways to make our school more culturally responsive and inclusive.

8.      As the legislature moved forward with HB 544 and eventually the Divisive Concepts Law, the meetings stopped and the group was ultimately disbanded.  My belief is that the Divisive Concepts Law and HB 544 were responsible for the group's demise.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of August, 2023


_/s/ Jocelyn Merrill_
Jocelyn Merrill

# EXHIBIT 19

July 26, 2021 Email
from DOE
Commissioner
Frank Edelblut

1559

**From:** Lois Bixby <loisbixby@hotmail.com>
**To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: HB2
**Date:** Wed, 28 Jul 2021 12:23:55 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Yes, thank you.  That was helpful.  Interesting how the use of the double negative tones down the assertion of a statement.

Sincerely,
Lois Bixby

---

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Monday, July 26, 2021 7:38 PM
**To:** 'Lois Bixby' <loisbixby@hotmail.com>
**Cc:** Lynne Ober <lynne.ober@comcast.net>
**Subject:** RE: HB2

Lois,

Sorry for the delayed reply. I have been out of the office/state.

We want to treat people as the person that they are, without regard to individual characteristics that, in many cases, cannot be changed.

The double negative is confusing (welcome to legislative language). If you go back to the beginning of this section in "I" you have yet another negative, 'no pupil shall be taught' not to attempt to treat people without regard to these individual characteristics, e.g., they should be taught to treat people without regard to these characteristics.

I hope that helps.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

---

**From:** Lynne Ober <lynne.ober@comcast.net>
**Sent:** Tuesday, July 20, 2021 1:57 PM

1560

**To:** 'Lois Bixby' <loisbixby@hotmail.com>; Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** RE: HB2

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Commissioner Edelblut,
I am forwarding Ms. Bixby's email to you as I believe she is asking for examples found in teaching.   Since you are the DOE Commissioner, I believe you should provide the response.

Respectfully,
Lynne Ober
State Representative

**From:** Lois Bixby <loisbixby@hotmail.com>
**Sent:** Tuesday, July 20, 2021 1:35 PM
**To:** lynne.ober@comcast.net
**Subject:** HB2

To whom it may concern:

I confess to having a difficult time in understanding a section of HB2.   I just can't wrap my head around all the double negatives.  Perhaps you could be so kind as to provide an example of the following in practice?

193:40 Prohibition on Teaching Discrimination.

"(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin - should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin."

Thanks so much,

Lois Bixby
Hollis, NH

"To know and not to know, to be conscious of complete truthfulness while telling carefully constructed lies, to hold simultaneously two opinions which cancelled out knowing them to be contradictory and believing in both of them, to use logic against logic, to repudiate morality while laying claim to it" -- George Orwell, 1984

DOE-00332

# EXHIBIT 20

# Oct. 7, 2021 HRC Commissioners' Meeting Minutes (Depo. Ex. 56)

# New Hampshire Commission for Human Rights

**COMMISSIONERS**
CHRISTIAN KIM, CHAIR
DOUGLAS PALARDY
HARVEY KEYE
ALEX SAMUEL
NANCY LEROY
BASRA MOHAMED
ELIZABETH ASCH



2 INDUSTRIAL PARK DR.
CONCORD, NEW HAMPSHIRE 03301-8501
TEL (603) 271-2767
TDD Access: Relay NH 1-800-735-2964
FAX (603) 271-6339
E-MAIL: humanrights@nh.gov
www.nh.gov/hrc

**EXECUTIVE DIRECTOR**
AHNI MALACHI

**ASSISTANT DIRECTOR**
SARAH E. BURKE COHEN, ESQ.

**INVESTIGATORS**
KATRINA E. TAYLOR
NICOLE LEMELIN
DANIEL DEYERMOND
KATE MULLEAVEY
LURA SEAVEY

**INTAKE COORDINATOR**
JOHANNA "JONNA" ALLARD

**PARALEGAL**
KELLY MEDEROS

## NEW HAMPSHIRE COMMISSION FOR HUMAN RIGHTS COMMISSIONERS' MEETING

### October 7, 2021 at 5:00 PM

### MINUTES

**ATTENDANCE:**   Commissioners present: Basra Mohamed (Acting chair), Douglas Palardy (by phone – home, alone), Alex Samuel, Elizabeth Asch, and Harvey Keye

 Commission Staff:   Executive Director, Ahni Malachi and Assistant Director, Sarah Burke Cohen

 Others:   Michael Worsley

EXHIBIT 56
WIT: Malachi
DATE: 5-24-23
Cynthia Foster, RPR, LCR #14

Commissioner Mohamed called the meeting to order at 5:16 PM.

### 1.   PUBLIC COMMENT

Commissioner Mohamed asked if anyone from the public was present and wished to make public comment. There was no one present.

### 2.   APPROVAL OF AUGUST MEETING MINUTES

Commissioner Asch moved and Commissioner Samuel seconded a motion to approve the minutes. Roll call: Commissioner Samuel – Aye; Commissioner Palardy – aye; Commissioner Asch – aye; Commissioner Keye – aye; Commissioner Mohamed – aye. The motion carried.

Commissioner Samuel moved and Commissioner Keye seconded a motion to approve the non-public meeting minutes. Roll call: Commissioner Samuel – Aye; Commissioner Palardy – aye; Commissioner Asch – aye; Commissioner Keye – aye; Commissioner Mohamed – aye.
The motion carried.

1

### 3.   OFFICE UPDATES

Director Malachi introduced Michael Worsley. Mr. Worsley presented an Ethnic and
Cross Cultural Skill Development Training ("ECCSDT") to the Department of Justice.
He has trained Director Malachi and Assistant Director Burke Cohen to be trainers of this
program. Director Malachi stated the NHCHR staff are scheduled to have this training
and we believe it would be beneficial for the Commissioners to also complete this
training. Mr. Worsley discussed that this training was developed as a training to unite
based on the fact that we all have unique ethnic background rather than a traditional
diversity training that has the potential to divide. It helps a participant develop skills to
help individuals interact with others who have different ethnic backgrounds. This training
also takes into consideration the historical background of using race as an identifier.
Commissioner Keye asked about the objective of the training as it relates to the NHCHR.
Mr. Worsley responded and explained and concurred with Commissioner Keye that race
may be a social construct. Commissioner Mohamed asked what the overall goal is. Mr.
Worsley replied the goal of the training would be to assist Commissioners with a broader
sense of achieving ethnic and cross cultural skill and understanding application in
NHCHR cases and in real world experience. Commissioner Asch is looking forward to
the training as it is an interesting and positive concept to move away from race to
ethnicity and culture. Director Malachi added that importance of this training as a good
educational resource and exposure to new themes and information.

Assistant Director Burke Cohen discussed the EEOC's Models of Proof. The EEOC sent
the NHCHR copies for distribution. Assistant Director Burke Cohen explained that these
Models of Proof lay out well the burden shifting of cases that fall within the jurisdiction
of the EEOC and NHCHR.

Director Malachi discussed the impact of HB2 on the NHCHR. Director Malachi
explained how it came to be and the guidance issued by the NHDOJ. She added that HB2
gives an outlet for those covered by the statutory change to make a claim of
discrimination if they believe a training/class, etc. was discriminatory in nature. Director
Malachi said because the statute was complex and there were no precedents, the NHDOJ
issued guidance and an opinion explaining the impact of the law and how the NHCHR
should apply the law. AAG Perlow will attend the next meeting to further discuss the new
language and answer any questions. Commissioner Mohamed asked what Director
Malachi thought inspired the changes to the statute. Assistant Director Burke Cohen and
Director Malachi explained that the likely inspiration was that there have been instances
in which information has been presented in trainings and K-12 classrooms that states
directly and/or impliedly that inherent traits establish a person's inferiority/superiority.
Commissioner Samuel asked if the Legislators came to the NHCHR to discuss this prior
to introduction. Director Malachi stated this did not occur and generally does not.
Commissioner Keye concurred that from his experience the Legislators would not
approach an agency.

HRC-00392

Director Malachi discussed that per the audit conducted, a recommendation was made that the NHCHR set a fee schedule. Director Malachi explained the components of the presented fee schedule. She stated the below for vote by the Commissioners:

**Fee Schedule:**

    **Copies:**

        **Documents:**

            **$30.00 – Administrative Fee**
            **$0.25/page – (There is no charge for requests under 25 pages.)**

        **Recordings:**

            **$5.00 – (Recordings are copied onto a DVD.)**

    **Trainings:**

        **Ethnic & Cross-Cultural Skill Development Training**

            **$800.00 (Full day/6 hours)**

        **All Other Trainings**

            **$200.00/hour**

Commissioner Asch moved to accept the presented fee schedule and Commissioner Mohamed seconded. Roll call: Commissioner Samuel – Aye; Commissioner Palardy – aye; Commissioner Asch – aye; Commissioner Keye – aye; Commissioner Mohamed – aye.
The motion carried and the fee schedule was adopted.

Director Malachi asked for the Commissioners to determine a date to complete the Ethnic & Cross Cultural Skills Development Training. The consensus was to schedule the training on a Saturday/Sunday possibly in November.

Director Malachi stated the *Catano* decision has been published and is available on the NHCHR's website. The Complainant's counsel has filed a Motion for Reconsideration, which needs to be ruled on.

Director Malachi stated the Legislative Session for 2022 has opened. She discussed how the process works and gave an overview of the legislation that could impact the NHCHR. Commissioner Keye proposed that the NHCHR add the following language to RSA 354-A that "New Hampshire does not allow discriminatory practices." Director Malachi explained that the proposed statement is more like a preamble. Commissioner Asch stated the statement sounds like a mission statement. Commissioner Keye stated that he would like to add this statement, but will not pursue if the rest of the Commissioners do not want to.

3

**4.     REVIEW OF INVESTIGATOR CASE LOAD**

Assistant Director Burke Cohen stated the NHCHR staff completed closures to meet our EEOC contract of 200 cases. Director Malachi and Assistant Director Burke Cohen continued to be impressed and grateful to the staff for processing NHCHR cases efficiently and effectively. The Commissioners wanted to send their gratitude to the staff for all their hard work to ensure cases move forward and the EEOC contract fulfillment.

**5.     HEARING SCHEDULE UPDATE**

Assistant Director Burke Cohen discussed the hearing scheduling and updated it. She explained that there likely will be no upcoming hearing due to settlements or removals to court. There is a possible hearing scheduled for January. Assistant Director Burke Cohen will assign Commissioners to the hearing schedule for 2022 prior to the next meeting.

**6.     OTHER BUSINESS**

Director Malachi stated Commissioner Kim has been appointed chair of the NHCHR following Commissioner Palardy stepping down as chair.

Commissioner Samuel stated his commission expires on November 1 and he will not be seeking renewal.

Director Malachi stated she will start sending spreadsheets/updates about legislation that pertains to the NHCHR. Director Malachi also stated she is hoping to do a presentation to some of the Legislative Committees that potentially will hear legislation that pertains to the NHCHR, to give the Committee background and information about the NHCHR. Director Malachi explained that she generally goes to the hearings on bills to be present for informational purposes or to make comment to clarify or explain the jurisdiction/process at the NHCHR. Commissioner Asch asked about the time involved with attending hearings. Director Malachi explained it can be time consuming on occasion. Director Malachi also talked about completing fiscal notes for legislation. Director Malachi stated she generally requests additional staff when statutory changes would likely require additional work. Commissioner Asch asked if all current positions are full. Director Malachi stated all funded positions are full, but there are 2 unfunded positions that remain unfilled. Director Malachi said Commissioners are welcome to contact her to discuss legislation and/or legislative process.

**7.     NON-PUBLIC SESSION**

None.

**8.     ADJOURNMENT**

Commissioner Keye moved for adjournment and Commissioner Asch seconded. The Commissioner's meeting adjourned at 7:02 PM.

4

HRC-00394

1566

# EXHIBIT 21

DOE Commissioner
Edelblut June 13,
2021 Op-ed
(Depo. Ex. 4)



1567
EXHIBIT 4

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 16

Frank Edelblut, "Teach Children About Racism, Not To Be Racists," Union Leader (June 13, 2021)

Pl. 00396

 Change site Language   Q Search The Site

**A** ALERT   **Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**

 New Hampshire
**Department of Education**



≡ OPEN MENU

Home  >  Teach children about racism, not to be racists

## In the News

For Immediate Release
June 13, 2021

### Contact

New Hampshire Department of Education
(603) 271-0448 | Comms@doe.nh.gov

## Teach children about racism, not to be racists

**By Frank Edelblut**



# UNION LEADER
NEW HAMPSHIRE

THE RIGHT TO FREEDOM WITHOUT DISCRIMINATION legislation recently passed by the New Hampshire Senate is an important, and needed, contribution to our education system. It helps ensure that our students learn about the evils of racism without teaching them to be racists.

This legislation lays out some important instructional boundaries that, with increasing frequency, have been crossed. These guardrails will help instill confidence in parents that our basic values are not being compromised. It will also help educators who increasingly find themselves in uncomfortable training and teaching circumstances that are contrary to their instructional mission.

The Legislation states that no pupil shall be taught:

That one's immutable characteristics (defined as age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) are inherently superior to immutable characteristics of another;

That an individual, by virtue of his or her immutable characteristics, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her immutable characteristics; or

That people of one immutable characteristic cannot and should not attempt to treat others without regard to these immutable characteristics.

One would think that these are common sense concepts that we can all agree on. After all, who wants to teach children that, for example, one race is superior to another?

However, for those who promote Critical Race Theory or similar concepts, their thinking is not built on a foundation of common sense, but on ideology diametrically opposed to the truths found in our Declaration of Independence, that we are all created equal.

In Ibram Kendi's "How to Be an Antiracist" — a prominent text in support of Critical Race Theory — he states, "[t]he only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination ... The only remedy to present discrimination is future discrimination." This idea is, of course, in complete opposition to the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution. As Justice John Marshall Harlan stated in his dissension to Plessy v. Ferguson, "[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens."

And the concepts of Critical Race Theory actually contradict the very premises of the civil rights movement and Dr. Martin Luther King himself.

One New Hampshire high school offers an enrichment class entitled, "Exploring Whiteness and becoming an Antiracist Activist." In this course, a "Race Literacy Quiz" identifies the Declaration of Independence as the idea tied most directly to the rise of White supremacy.

This notion is completely contradictory to the very words of Dr. King. Speaking at the centennial celebration of the Emancipation Proclamation, Dr. King described the Declaration of Independence as follows, "If our nation had done nothing more in its whole history than to create just two documents, its contribution to civilization would be imperishable. The first of these documents is the Declaration of Independence."

Those opposing Freedom From Discrimination legislation assert that supporters do not want to teach children the complete history of the United States. They assert that there is an attempt to limit speech and academic freedom. They assert that legislation will limit diversity and inclusivity.

Of course, it is Critical Race Theory that would distort our history, limit our speech through its cancel culture and divide us up by immutable characteristics, ignoring the inherent humanity of each individual.

In fact, Right to Freedom From Discrimination legislation can help ensure that students get the whole history, and not a limited or biased view of that history. We should ensure that Title VI of the Civil Rights Act of 1964, which protects all students from being treated differently based on their race, color or national origin, is being followed.

All of us should continue to believe in the dream Dr. King gave us, that children "will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character."

Our education system aspires to teach students about socialism, not to be socialists and about communism, not to be communists. Supporters of Right to Freedom From Discrimination legislation want to make sure that children are taught about racism, but not to be racists, as Kendi seems to advocate.

The guardrails outlined in the legislation recently passed by the New Hampshire Senate help us do just that.

—

Frank Edelblut is commissioner of the New Hampshire Department of Education. He lives in Wilton.



New Hampshire
**Department of Education**

101 Pleasant Street | Concord, NH | 03301-3860
(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 |
info@doe.nh.gov

Directions to NHDOE >          Subscribe to e-news >

NH Career and Technical
Education

NH Schools

iPlatform

myNHDOE

Educator Search

NH Government Careers

NH Travel & Tourism

NH Web Portal - NH.gov

ReadyNH.gov

Transparent NH

New Hampshire | All rights reserved | Accessibility Policy | Privacy Policy          AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE



# EXHIBIT 22

Northwood
Republican Town
Committee's "CRT
Parents' Guide"
(Depo. Ex. 51)

Paid Political Advertisement

# CRT PARENTS' GUIDE

## Northwood Republican Town Committee

**Critical Race Theory as defined by Britannica.com**

Critical race theory is an intellectual movement and a framework of legal analysis according to which (1) race is a culturally invented category used to oppress people of colour and (2) the law and legal institutions in the United States are inherently racist insofar as they function to create and maintain social, political, and economic inequalities between white and nonwhite people.

You are not alone in your concern that CRT has morphed into the shaming of white children for the sins of their ancestors, which has engulfed the education system. NH legislators passed strong anti-discrimination language this year to supplement current civil rights legislation for the protection of all children.   https://nhjournal.com/new-hampshire-joins-national-fight-against-crt/

You are not alone in your concern that CRT is a back door political ideology for indoctrination of Socialism or worse Marxism in our schools. The word **equity outcome** is common language used with systemic racism as the catalyst to propagandize Socialism/Marxism. Our Constitutional Democratic Republic stands for **equal opportunity**. Talk with local parents and your children about what is being discussed in the classroom. Inform your child/children that they should never let a teacher tell them to lie to you about what is said in the classroom.

Educate yourself on CRT. The link below is a toolkit to get you started.

https://media4.manhattan-institute.org/sites/default/files/woke-schooling-toolkit-for-concerned-parents.pdf

Watch the Northwood School Board Meetings on Livestream to stay informed. Do not rely on second-hand information. Livestream meetings link can be found at www.northwoodnh.org

Make sure the school is aware you want your child taught the lessons of math, reading, writing science and history along with civics without shame and injecting their political indoctrination. Your child's success is dependant upon receiving a great education in the fundamentals not political ideology and government dependence. The following page gives you a sample letter for you to copy and/or edit and send to the school. Contact us for an electronic copy.

Support teachers, administrators and elected officials who do not support injecting racism where none exists and who do not support political indoctrination. Support each other and stand together. There is strength in numbers.

Be positive. We all want history taught and an end to racism where it still exists.

CRT concern is not Republican or Democrat. Northwood Republican Town Committee has filed Right-to-Know (RTK) requests on Northwood Elementary School curriculum and will continue to monitor and file additional requests as needed. Follow conservative media and social outlets that will keep you informed. Links:
 www.truthinamericaneducation.com and statewide follow www.granitgrok.com .

**Northwood Republican Town Committee  Meets the 2nd Monday of Each Month**

**At The Northwood Community Center 135 Main Street  6:30pm**

**Cheryl Dean, Chairperson  603.344.2190**

**CRT Tip Line 603.932.6184 Call or Text**          PL00787

EXHIBIT 51
WIT: Edel blut
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

**This sample letter was in a Grantite Grok article by Anne Marie Banfield as a plan of action for concerned parents. Please contact our committee for an electronic copy.**

"Here is a template to help you write a letter to the teachers who are assigned to your kids in the fall. Feel free to tweak your letter to reflect your own thoughts and concerns. I recommend that you send it as soon as you find out who the teachers are, even before the first day of school. You might especially want to send it to your kid's History, English, and SEL / SEEL / Employability Skills teachers. Let me know what sort of response you get, whether favorable or unfavorable. My hope is that this template will help parents to retain their authority to raise their own kids according to their own values. Let me also especially emphasize how important it is to send letters of support and encouragement to the many teachers from all across the political spectrum who do a fantastic job."



Dear **[teacher's name]**,

My **[son/daughter]**, **[name]**, is in your [subject] class this term. I'm really glad, I'm looking forward to seeing **[him/her]** grow this year, and I'm confident **[he/she]** will learn a lot from you. Thanks for all you do for our kids!

I'm sure you're aware that there have been concerns recently in the community about political advocacy in the schools. Because of that, I and many other concerned parents are sending this letter to our kids' teachers this year. I want to make sure that you know how much I support you and how much I want to help you achieve a high level of academic excellence. I also want to open a clear line of communication about my expectations related to controversial topics, and especially politics, in the classroom.

Here are my expectations:

• Please provide a lesson plan for my review if there will be class content, discussion, or assignments related to:
• Race
• Gender identity, or LGBT issues
• Sexuality
• Equity
• Please do not ask my child for **[his/her]** preferred pronouns, either verbally or on informational forms; instead, I suggest that you ask the students whether there is anything you should know about how they wish to be addressed
• Please try to approach controversial topics in class along the lines of the article linked here
• Please remove any signs or symbols of political advocacy from your classroom (e.g., a MAGA hat, a BLM flag, a rainbow flag, a Red for Ed shirt, etc.). My child is there to learn, not be indoctrinated to anyone's personal views.
• If any of these things will be a problem for you, don't hesitate to inform me and we will have my child moved out of your class.
If there is anything I can do to help you, please let me know. I'm eager to see you and all of your students succeed this year, and I would be very happy if there were any way I could contribute to that or provide support for you as you navigate this difficult season.

Thanks again for all you do.

Sincerely,
**[Your Name]**

**Northwood Republican Town Committee**
**Cheryl Dean, Chairman**
**363 First NH Turnpike**
**Northwood NH 03261**

**PRSRT STD**
**ECRWSS**
**U.S.POSTAGE**
**PAID**
**EDDM Retail**

# POSTAL CUSTOMER

PL00788

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

                    v.                                Case No.   1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

        Please take notice that  Plaintiffs                                                  has
conventionally filed the following attachment or exhibit: _____
Exhibit 23 to Plaintiffs' Statement of Material Facts (Depo. Ex. 32)                        .

        This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                    /s/ Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                          Case No.   1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that  Plaintiffs                                        has
conventionally filed the following attachment or exhibit:  _____
Exhibit 24 to Plaintiffs' Statement of Material Facts (Depo. Ex. 62)             .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023              /s/  Gilles Bissonnette
                                   Gilles Bissonnette
                                   265393
                                   ACLU of New Hampshire
                                   18 Low Avenue
                                   Concord, NH 03301
                                   603-224-5591
                                   gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                    Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs                                    has
conventionally filed the following attachment or exhibit: _____
Exhibit 25 to Plaintiffs' Statement of Material Facts (Depo. Ex. 63)              .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                    /s/  Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette
Gilles Bissonnette
265393
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
603-224-5591
gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

                    v.                                      Case No.   1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)


**NOTICE OF CONVENTIONAL FILING**

        Please take notice that Plaintiffs                                                      has
conventionally filed the following attachment or exhibit: _____
Exhibit 26 to Plaintiffs' Statement of Material Facts (Depo. Ex. 64)                        .

        This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.


Date: August 14, 2023                    /s/ Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023          /s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

# EXHIBIT 27

Aug. 19, 2022
Kathryn
Borysenko' Article
(Depo. Ex. 65)

6/13/23, 4:28 PM    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 2 of 20

1583

# The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

The state Department of Education should investigate.



**KARLYN BORYSENKO**

AUG 19, 2022



EXHIBIT _65_
WIT: _S Bouke Cohen_
DATE: _6-26-23_
Cynthia Foster, RPR, LCR

♡ 6    💬 1        Share   •••



This article is part of Schools Exposed by the **Unwoke Army**, which means that everything in this article is public information that anyone can find. If you appreciate my work, I hope you'll consider ordering **my book** and supporting my work on **Patreon**, **Locals**, or **through a Substack subscription**.

6/13/23, 4:28 PM          The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 3 of 20
1584

*"Part of our educational mission is to awaken our students' awareness of **their power and privilege** so that they may view the world through a lens of equity and help eliminate unjust systems and practices."*

And in that simple sentence, one taken from a document called "**Diversity, Equity, Inclusion, and Justice in SAU16**" the Exeter Region Cooperative School District landed itself in open violation of New Hampshire's HB2, otherwise known as the divisive concepts bill or the anti-CRT law.

That's not the only thing that may land them in trouble. And they're doing it completely publicly, where everyone can see it if they take the time to look.

## Let me explain.

In the Exeter Regional School District, their equity office is called Diversity, Equity, Inclusion and Justice, or DEIJ for sure. So, I went to **their website** and searched for DEIJ. Here's what came up.



6/13/23, 4:28 PM                The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 4 of 20

1585

Right in the middle was the "About DEIJ in SAU16" page. Perfect! I clicked on that link and ended up looking **at this document**, a missions statement of sorts:

> **Diversity, Equity, Inclusion and Justice in SAU 16**
>
> Our effort to create and expand space for living under social justice ideals in SAU 16 engages all community members from the organization's seven school districts. Collectively, we aim to ensure that our school system is an enterprise whose growth is undeterred by bias or discrimination, where individuals of all backgrounds and experiences are welcomed and where personal narratives are heard, included and valued. Part of our educational mission is to awaken our students' awareness of their power and privilege so that they may view the world through a lens of equity and help eliminate unjust systems and practices. Our vision is that all students will grow with confidence, empathy and understanding of what is right so that they may advocate for these ideals in their world.

(document backed up here for posterity, just in case something happens to
the one on their website)

Actively Unwoke is a reader-supported
publication. To receive new posts and support
my work, consider becoming a free or paid
subscriber.

| Type your email... | Subscribe |

**Here's the problem SAU16 now has**: On June 15, 2021, New Hampshire's divisive concepts bill was signed into law as a part of HB2. It is not a perfect bill, by any means. Governor Chris Sununu and his cronies watered it down before he signed it, which makes it less effective. However, it did include the following language:

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 5 of 20

1586

354-A:32 Prohibition on the Content of Government Programs and Speech. No government program shall teach, advocate, or advance any one or more of the following:

I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

The law specifically and unequivocally says that the government cannot teach that individuals are inherently racist, sexist, and oppressive, whether consciously or unconsciously.

If **this** is still the mission of the Diversity, Equity, Inclusion and Justice program at SAU16 today *(and we have no reason to believe it's not because it's on their website)*, then the Exeter Region Cooperative School District is in open and flagrant violation of the law for this reason:

## You CANNOT teach students "awareness of their power and privilege" without also teaching them that some people are inherently oppressive and some people are inherently oppressed.

If some people have "power and privilege", that means that other people do not have power and privilege.

People with power and privilege are oppressive and people without power and privilege are oppressed.

That is inherent to the argument of power and privilege.

That means you cannot teach this as a part of a public high school curriculum in the state of New Hampshire without violating the law. It is not possible.

So, either this is the true and current mission of the SEIJ program in SAU16 and they are breaking the law, or it is not and they are in compliance. But if it's not the current mission, then what replaced it? And why is this one still on their website?

6/13/23, 4:28 PM          The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 6 of 20
1587

This alone is enough to prove they're breaking the law. But, there's more weird stuff.

# Let's meet the "Racial Unity Team"

In researching something else that was going on at Exeter High School, I came across something called the Racial Unity Team. I came across an event listed **on Facebook** for the Racial Unity Team of New Hampshire, which I had seen mentioned on the SAU16 website. They were holding an event (almost two weeks AFTER the divisive concepts bill was signed into law) and said they had received a $7500 grant from the state of New Hampshire.



That $7,500 grant means that the state of New Hampshire may be funding a program that is breaking state law by teaching this content in schools.

I recognized it because "Racial Unity Team" was all over the "**DEIJ Happenings**" website:

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 7 of 20

1588



They had done **this video** in which students performed songs and read essays about racial justice. Again, note that this was posted on July 16, 2021, one month **AFTER** the divisive concepts bill was signed into law, and seems to have been taken from a live stream.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 8 of 20

1589

In that video was a few weird things.

There was this clip of one of the co-founders of the Racial Unity Team, Sylvia Foster, talk about getting funded by the state, and how she came to work with Exeter High School after she was brought in by ELO coordinator Adam Krauss (more on him in a moment) because there were "passionate teachers who would share their curriculum on justice."

*(I found myself asking "Why do teachers have a curriculum on justice?")*

She went on to say "We became part of the DNA of the classroom."

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 9 of 20
1590

Exeter Clip - Racial Unity Team part of classroom DNA



Now, I've seen enough videos like this to know exactly what it means when a group called "Racial Unity Project" becomes "part of the DNA of the classroom." And sure enough, I found what I knew I would.

Later in this video, I found this student discussing a project she did in conjunction with Racial Unity Project staff called "Bookshelf Diversity" that they even brag about on their website.

In this video, the student says:

> "If we can think about our identity as well, we can check our privilege and maybe think about some ways we've been unfairly treated based on things we can't change."

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 10 of 20
1591

exeter student clip 1



The student in this video did nothing wrong - they are repeating the things that adults have told them to say. But it is very clear that they have been taught about power and privilege because there would be no need for her to say "check your privilege" if someone hadn't taught her that.

And in this clip a little later on in the video, a student says

> *"Racism is a belief ingrained in the systems and minds of white Americans."*

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 11 of 20
1592

Exeter student clip 2



Again, the teaching that anyone is inherently racist based on their skin color violates New Hampshire state law. If she didn't learn this in school, then where did she learn it?

## To Kill a Mockingbird is Racist

But, that's not the only odd thing about the Racial Unity Project. They also worked with Exeter High School's ELO Coordinator Adam Krauss (mentioned earlier) and English Teachers Dennis Magliozii and Kristina Peterson to **disrupt the way they teach To Kill a Mockingbird** because the normal way was deemed a little too racist.

> *"This year, one of the goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those who stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race the equity."*

6/13/23, 4:28 PM
The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB Document 85-28 Filed 08/14/23 Page 12 of 20
1593

**To Kill a Mockingbird 60 years later – refocusing the lens on DEIJ in 2021**

*An Interview with EHS English teachers Dennis Magliozzi and Kristina Peterson and ELO Coordinator Adam Krauss*



The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16 has recently taken on more focus, structure and form. Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform how they perceive and teach the classic novel written by Harper Lee, *To Kill a Mockingbird*. The Pulitzer Prize-winning novel has been the subject of conversation in countless classrooms for six decades. Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well. This year, one of their goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those whose stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race and equity.

This PDF is backed up here for posterity, just in case the file is removed from SAU16's website.

## You've read this far. Why not subscribe?

Actively Unwoke is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 13 of 20

1594

Type your email...                                    Subscribe

**On their website**, they go into greater detail about the changes they made to the curriculum with a "DEIJ lens". Here are some quotes:

> *"Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind."*

> *"Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well."*

6/13/23, 4:28 PM    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB  Document 85-28  Filed 08/14/23  Page 14 of 20

1595

─────────────── **Phase II** ───────────────

### Curriculum Adjustment – refocusing the lens on DEIJ

An Interview with EHS English teachers Dennis Magliozzi and Kristina
Peterson and ELO Coordinator (Courtesy SAU-16)
Adam Krauss



The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16
has recently taken on more focus, structure and form. Three teachers have
collaborated to reset their lenses and ask the tough questions about how
and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform
how they perceive and teach the classic novel written by Harper Lee, To Kill
a Mockingbird. The Pulitzer Prize-winning novel has been the subject of
conversation in countless classrooms for six decades. Magliozzi and
Peterson, both English Teachers, have been working with Mockingbird for
10 years at Exeter High School. Despite their best efforts, they could not
find a way they felt cast the discussion about issues of race and equity in a
way they felt worked well. This year, one of their goals when reading
Mockingbird is to critically examine why Harper Lee focuses on certain
characters and round out those whose stories are not told. This move to
look at the novel through the lens of underrepresented characters in the
book has served as an entry point into critical conversations about race
and equity.

Instead of studying the book, they appeared to make it into a character study of Atticus
Finch as a white man and a lesson for students in how they can be activists:

> ~~action research.~~
> Their approach became to study Atticus Finch's world view by asking
> students questions such as these:
> • Have we realized his vision for justice in the United States?
> • If so, how?
> • If not, what changes can we make to get there?
> • What change do you want to see in the world?
> • How can you affect that change?

Once they did that, the students did an art project about what it's like to be black in
America with the goal of creating art for social change.

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 15 of 20

1596

From there, students are invited to create art as a form of expression to further their impact. That's where Adam Krauss, ELO Coordinator in the school, joined the mission. Krauss helped Peterson and Magliozzi join forces with several mentor artists from The Racial Unity Team. This partnership allowed students to hear from individuals who shared how they and others use art to make an impact on the world, and how they grapple with the realities of being Black in America. Working side by side with these artists, students are learning to govern their voices and use art to inspire others. The final component of the student work is – with the help of the mentor artists – to turn their research for social change into art for social change.

The teachers concluded that their work on revamping how To Kill A Mockingbird is taught achieved a level of justice that Atticus Finch could not have aspired to.

Krauss, Magliozzi, and Peterson are trying hard not to send the message that one voice is the end all be all. "Our students have just as much agency in this project and conversation as we do as their guide on the side," said Krauss. Students have just as much power to criticize, challenge, and change their world – our shared world – as everyone else involved in their education. That's equity and inclusion at work. It's a vision for justice Atticus couldn't attain. But lifting up voices, ensuring people from all backgrounds and experiences are welcomed and their stories are heard – that is a vision for justice that all teachers can champion.

## It's all very incestuous.

I'm sure it's just a coincidence that Adam Krauss, Dennis Magliozzi, and Kristina Peterson are also listed as members on the Racial Unity Team's Leadership Team website:

6/13/23, 4:28 PM    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 16 of 20

1597

board member, 2020 -2021



Adam Krauss
Member Since 2021

Nancy Zajano
Member since 2021

Dory Polanco
Member since 2021

Kristen Deshaies
Member since 2021

Cynthia Bradley Young
Member since 2021

Dennis Magliozzi
Member since 2021

Courtney Skerritt
Member Since 2021

Kristina Peterson
Member since 2021

Erin Luckern
Member Since 2021

Shawna Coppola
Member Since 2022

Julia Lavine
Member Since 2022

Monica Chiu
Member Since 2022

Julia Lanter

Steve Boczenowski

And not only that, but **David Ryan**, the Superintendent of the Exeter Region
Cooperative School District is on the Board Of Directors:

6/13/23, 4:28 PM          The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 17 of 20

1598



# Does the Racial Unity Team, and their members working for the Exeter Regional Cooperative School District, know they are breaking the law?

Yes, they do.

And we know that because **they have a public statement on their website denouncing the divisive concepts bill** and saying they will lobby in favor of its repeal.

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.
Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 18 of 20
1599

for all available evidence.

The Racial Unity Team supports educators in their efforts to address issues around diversity, equity, inclusion, and justice in the classroom. This includes, but is certainly not limited to, teaching about our complex history. While sections of the "Right to Freedom from Discrimination in Workplaces and Education" (297-298, NH House Bill 2) do not prohibit this work, the narrative among conservative groups and in some of the mainstream media is that they do. Despite what is actually written in the law, the reality is that these provisions discourage the careful examination of historical and current discriminatory practices within our schools and society.

What HB2 does prohibit is the teaching that any *individual or group of individuals are inherently superior or inferior to people of another group*. While this is not taught in our public schools, the prohibitions in HB2, alongside the inaccurate narrative perpetuated by those who wish to delegitimize public schools, have led to fear and confusion among educators about how and what they may teach, while encouraging complaints against them that jeopardize their licenses and careers. The Racial Unity Team expressly denounces the actions of those, including those at the State level, which have created an atmosphere of fear and intimidation among educators. In turn, teachers are responding by removing from their classrooms concepts and conversations that shed light on harmful historical policies and practices. This atmosphere creates a barrier to providing students with a school experience that reflects DEIJ principles as well as a full education for protected classes of people.

We support efforts to **reverse** these legislative actions.

Ken Mendis, President, Racial Unity Team

They claim that they are not breaking the law…but the problem is they didn't read the whole law. They just cherry-picked one of the components of it that they are not breaking, while ignoring the clear component of the law that they are breaking.

You cannot teach what the Racial Unity Group and the Exeter Regional Cooperative School District are teaching students without breaking this part of the law. It is not possible.

6/13/23, 4:28 PM — The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 19 of 20

1600

354-A:32 Prohibition on the Content of Government Programs and Speech. No government program shall teach, advocate, or advance any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

# The State of New Hampshire must investigate if these practices and partnerships are still in place today.

Superintendent David Ryan has some explaining to do. Particularly since he's on the Board of Directors of the group operating within his school district that seems to be in open violation of New Hampshire State law.

Thank you for reading Actively Unwoke. This post is public so feel free to share it.

## Fight back against the woke and support my work

I believe the woke - on the left and the right - are an existential threat to our values as Americans. Some of them know it, most of them are just useful idiots. Regardless, fighting back against this cultural revolution is my full-time job. I'm dedicated to exposing the woke ideology in our country, helping people to understand what's going on, and providing spaces for non-woke people to connect, support each other, and plan ways to fight back.

Here's how you can help.

6/13/23, 4:28 PM                    The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

Case 1:21-cv-01077-PB   Document 85-28   Filed 08/14/23   Page 20 of 20
1601

- **Order my book:** Actively Unwoke: The ultimate guide to fighting back against woke insanity in your life.
- **Support my work**:
  - Sponsor my work on Patreon
  - Become a supporter in Locals
  - Support my work through a Substack subscription

Actively Unwoke is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.

| Type your email... | Subscribe |

 6 Likes

## 1 Comment

 Write a comment...

 **WoZBee**  Aug 19, 2022

This is a great find. I'm working on this in CA, and unfortunately, state law backs the groomers. All the stuff we're warned about in regard to transing the kids behind parents' backs is *recommended* by the CA CDC. Must keep digging.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                          Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)


**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs has
conventionally filed the following attachment or exhibit:
Exhibit 28 to Plaintiffs' Statement of Material Facts (Depo. Ex. 66) .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.


Date: August 14, 2023            /s/  Gilles Bissonnette
                                 Gilles Bissonnette
                                 265393
                                 ACLU of New Hampshire
                                 18 Low Avenue
                                 Concord, NH 03301
                                 603-224-5591
                                 gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023        /s/ Gilles Bissonnette
                             Gilles Bissonnette
                             265393
                             ACLU of New Hampshire
                             18 Low Avenue
                             Concord, NH 03301
                             603-224-5591
                             gilles@aclu-nh.org

# EXHIBIT 29

"Actively Unwoke"
August 2022
Tweets
(Depo. Ex. 67)

EXHIBIT 1605
WIT: Spankuchun
DATE: 6-26-23
Cynthia Foster, RPR, LCR

# "Unwoke Army" Tweet Thread and Related Documents

**https://twitter.com/ ActivelyUnwoke/ status/1560691632344690688 (last visited Sept. 1, 2022)**

# Tweet 1



**Actively Unwoke**
@ActivelyUnwoke

This morning, I filed a complaint with the NH Department of Education (@NHEdCommr) and Human Rights Commission regarding the Exeter School District violating the Educator Code of Conduct by teaching divisive concepts.

Under state law the DOE must investigate this. #NHPolitics

---

Exeter Region Cooperative School District Violation of Educator Code of Conduct

To: humanrights

Cc: @doe.nh.gov · RICHARD.J.FARRELL1@

Bcc:

Subject: Exeter Region Cooperative School District Violation of Educator Code of Conduct

From: Karlyn Borysenko                                        Signature: None

Message Size: 237 KB

Hello,

I'm writing to report the Exeter Region Cooperative School District for a violation of New Hampshire's **Educator Code of Conduct and HB2.**

This report is in reference to the Exeter Region Cooperative School District (SAU16) openly violating HB2 and the Educator Code of Conduct in their practices throughout the district.

The Exeter Region Cooperative School District has a team called Diversity, Equity, Inclusion and Justice which specifically states the following:

"Part of our educational mission is to awaken our students' awareness of their power and privilege"

This is a violation. The law specifically states that they cannot teach that individuals are inherently racist, sexist, or oppressive, whether consciously or unconsciously. Therefore, any discussion regarding helping students to become aware of THEIR power and privilege is inherently discriminatory towards every child who experienced it, because it implies that students have power (which means the same thing as being oppressive) by virtue of their immutable characteristics and they need to take measures to check that privilege. You cannot teach students to "awaken awareness of their power and privilege" without teaching that they are inherently oppressive. This is a clear and obvious violation.

Their statement is available here and is publicly available by searching the SAU 16 website:
https://drive.google.com/file/d/1jPCqPWhqNZhBQncGkMw2VbZnqkat7ioB/view

I have documented additional evidence that the school district is implementing these ideas in Exeter High School and is coordinating with a group called Racial Unity Team - which is funded by a state grant - to openly violate the law. All of this evidence is publicly available on the school's own website as of today: https://karlyn.substack.com/p/the-exeter-region-cooperative-school

Under the law, all of this is a violation of the Educator Code of Conduct. Because the school district is openly violating the Educator Code of Conduct, I am requesting an investigation by the Department of Education into the matter. Under state law, the Department of Education is required to investigate suspected violations of the Educator Code of Conduct.

📄

Exeter Regional School
District Violation.pdf
214 KB

---

2:14 PM · Aug 19, 2022 · Twitter Web App

PL 00578

12 Retweets   1 Quote Tweet   32 Likes



To:    humanrights

Cc:    @doe.nh.gov ▾   RICHARD.J.FARRELL1@

Bcc:

Subject: Exeter Region Cooperative School District Violation of Educator Code of Conduct

From: Karlyn Borysenko                                                   Signature:   None

Message Size: 237 KB

Hello,

I'm writing to report the Exeter Region Cooperative School District for a violation of New Hampshire's **Educator Code of Conduct** and HB2.

This report is in reference to the Exeter Region Cooperative School District (SAU16) openly violating HB2 and the Educator Code of Conduct in their practices throughout the district.

The Exeter Region Cooperative School District has a team called Diversity, Equity, Inclusion and Justice which specifically states the following:

"Part of our educational mission is to awaken our students' awareness of their power and privilege"

This is a violation. The law specifically states that they cannot teach that individuals are inherently racist, sexist, or oppressive, whether consciously or unconsciously. Therefore, any discussion regarding helping students to become aware of THEIR power and privilege is inherently discriminatory towards every child who experienced it, because it implies that students have power (which means the same thing as being oppressive) by virtue of their immutable characteristics and they need to take measures to check that privilege. You cannot teach students to "awaken awareness of their power and privilege" without teaching that they are inherently oppressive. This is a clear and obvious violation.

Their statement is available here and is publicly available by searching the SAU 16 website:
https://drive.google.com/file/d/15PCqPWhgNZhB0ncGkMw2VoZngkat7lgB/view

I have documented additional evidence that the school district is implementing these ideas in Exeter High School and is coordinating with a group called Racial Unity Team - which is funded by a state grant - to openly violate the law. All of this evidence is publicly available on the school's own website as of today: https://karlyn.substack.com/p/the-exeter-region-cooperative-school

**Under the law, all of this is a violation of the Educator Code of Conduct. Because the school district is openly violating the Educator Code of Conduct, I am requesting an investigation by the Department of Education into the matter. Under state law, the Department of Education is required to investigate suspected violations of the Educator Code of Conduct.**



Exeter Regional School
District Violation.pdf                                                  PL 00579
214 KB

# Tweet 2

PL 00580



**Actively Unwoke** @ActivelyUnwoke · Aug 19 · · ·

Replying to @ActivelyUnwoke

Last night I published this article outlining how @sau16supt_ryan is violating the Educator Code of Conduct and HB 2: karlyn.substack.com/p/the-exeter-r...

Every parent with students in this school district should be filing complaints with the state.

Let's walk through the information.



# The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

The state Department of Education should investigate.

Karlyn Borysenko
11 hr ago

♡ 3

PL 00581

🗩 1    ↻ 5    ♡ 17    ⬆

# The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

The state Department of Education should investigate.



**Karlyn Borysenko**
11 hr ago

···  ♡ 3  ◯  ⇧  ◻

EXETER HIGH SCHOOL

PL 00582

# Tweet 3

PL 00583

← **Thread**



**Actively Unwoke** @ActivelyUnwoke · Aug 19 ···
SAU16 has a team in their district called the Diversity, Equity, Inclusion and Justice Team, or DEIJ for short.

A search of the @sau16supt_ryan brings up this statement about the mission of the DEIJ team in the Exeter Region Cooperative School District.

drive.google.com/file/d/15PCqPW...

---

**SAU16 SAU 16**
**EXETER NH**

▾ Language

🔍

Filter results by: **District**  School  Pages  Classrooms  **Files/Folders**  **Staff**

To make your searching most effective, we've included results from your Google Drive account. No one else can see these same results.

| DEIJ SAU 16 - Exeter NH | DEIJ SAU 16 - Exeter NH | DEIJ Happenings SAU 16 - Exeter NH |
|---|---|---|
| ▾ **DEIJ Information Session** <br> ○ DEIJ Information Session Presentation <br> ○ DEIJ Information Session Q&A's | ▾ **2021 DEIJ Introduction** <br> ○ About DEIJ in SAU 16 <br> ○ Exeter schools hire new director to focus on diversity and equity <br><br> ▾ **About DEIJ in SAU16** <br> ○ Aug. 21, 2021 Information Session Video | ▾ **To Kill a Mockingbird 60 years later** <br> ○ To Kill a Mockingbird 60 years later – refocusing the lens on DEIJ in 2021 <br><br> ▾ **EHS Students Unveil Mural Representing Community** <br> ○ EHS Students Unveil "You Belong Here" Mural <br><br> ▾ **DEIJ Work Inspires Staff &** |

| DEIJ Happenings SAU 16 - Exeter NH | DEIJ SAU 16 - Exeter NH | DEIJ SAU 16 - Exeter NH |
|---|---|---|
| SAU 16 2022 Racial Art & Unity Winners <br><br> 2020 Racial Unity Art & Poetry Winners | ▾ **Willing to be Disturbed** <br> ○ Willing to be Disturbed By Margaret J. Wheatley | **ANDRES MEJIA, DIRECTOR DEIJ** |

RL-00584

💬 1  🔁 3  ♡ 7  ↑

**SAU16 SAU 16 EXETER NH**

▾ Language

Filter results by: **District** School Pages Classrooms Files/Folders **Staff**

To make your searching most effective, we've included results from your Google Drive account. No one else can see these same results.

---

**DEIJ**
SAU 16 - Exeter NH

> DEIJ Information Session
  ○ DEIJ Information Session Presentation
  ○ DEIJ Information Session Q&A's

---

**DEIJ**
SAU 16 - Exeter NH

> 2021 DEIJ Introduction
  ○ About DEIJ in SAU 16
  ○ Exeter schools hire new director to focus on diversity and equity

> About DEIJ in SAU16
  ○ Aug. 21, 2021 Information Session Video

---

**DEIJ Happenings**
SAU 16 - Exeter NH

> To Kill a Mockingbird 60 years later
  ○ To Kill a Mockingbird 60 years later – refocusing the lens on DEIJ in 2021

> EHS Students Unveil Mural Representing Community
  ○ EHS Students Unveil "You Belong Here" Mural

> DEIJ Work Inspires Staff &

---

**DEIJ Happenings**
SAU 16 - Exeter NH

SAU 16 2022 Racial Art & Unity Winners

2020 Racial Unity Art & Poetry Winners



---

**DEIJ**
SAU 16 - Exeter NH

> Willing to be Disturbed
  ○ Willing to be Disturbed By Margaret J. Wheatley

---

**DEIJ**
SAU 16 - Exeter NH

**ANDRES MEJIA, DIRECTOR DEIJ**

# Tweet 4

# Thread

**Actively Unwoke** @ActivelyUnwoke · Aug 19

Their mission statement clearly says "Part of our educational mission is to awaken our students' awareness of their power and privilege"

That is a violation of New Hampshire state law and the Educator Code of Conduct.

## sity, Equity, Inclusion and Justice in SAU 16

ffort to create and expand space for living under social justice ideals in SAU 16 engages unity members from the organization's seven school districts. Collectively, we aim to that our school system is an enterprise whose growth is undeterred by bias or mination, where individuals of all backgrounds and experiences are welcomed and when al narratives are heard, included and valued. Part of our educational mission is to awake dents' awareness of their power and privilege so that they may view the world through f equity and help eliminate unjust systems and practices. Our vision is that all students w with confidence, empathy and understanding of what is right so that they may advocate f ideals in their world.

$\bigcirc$ 1   $\uparrow\downarrow$ 2   $\heartsuit$ 8

## Diversity, Equity, Inclusion and Justice in SAU 16

Our effort to create and expand space for living under social justice ideals in SAU 16 engages all community members from the organization's seven school districts. Collectively, we aim to ensure that our school system is an enterprise whose growth is undeterred by bias or discrimination, where individuals of all backgrounds and experiences are welcomed and where personal narratives are heard, included and valued. Part of our educational mission is to awaken our students' awareness of their power and privilege so that they may view the world through a lens of equity and help eliminate unjust systems and practices. Our vision is that all students will grow with confidence, empathy and understanding of what is right so that they may advocate for these ideals in their world.

PL 00588

# Tweet 5

PL 00589

# Thread



← 

**Actively Unwoke** @ActivelyUnwoke · Aug 19 · · ·

The law says schools can't teach individuals are inherently racist, sexist, and oppressive, whether consciously or unconsciously.

It's not possible to teach students to have "awareness of their power and privilege" without teaching some people are inherently oppressive.

---

...ion on the Content of Government Programs and Speech. No government program shall teach, advoc...

following:

... one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status...

...or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexu...

...al status, familial status, mental or physical disability, religion, or national origin;

...ual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital sta...

...disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or ...

...idual should be discriminated against or receive adverse treatment solely or partly because of his or h...

...entation, race, creed, color, marital status, familial status, mental or physical disability, religion, or natio...

...of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status...

...or national origin cannot and should not attempt to treat others equally and/or without regard to age...

...race, creed, color, marital status, familial status, mental or physical disability, religion, or national origi...

♡ 1    ⟲ 2    ♡ 9    ⬆

354-A:32 Prohibition on the Content of Government Programs and Speech. No government program shall teach, advocate, or advance any one or more of the following:

I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

PL 06591

# Tweet 6

PL 00592

# Thread



**Actively Unwoke** @ActivelyUnwoke · Aug 19

This fact by itself is enough to merit an investigation into the school district from the state.

But wait, there's more!

Let's meet the Racial Unity Team, an organization that was given a grant by the state to partner with @sau16supt_ryan. They are all over the website

PL 00593

# Tweet 7

# Thread



**Actively Unwoke** @ActivelyUnwoke · Aug 19

In this clip, Racial Unity Team Co-Founder Sylvia Foster talks about how she worked with Exeter High School ELO Coordinator Adam Krauss to integrate their work into the existing curriculum.

She says specifically "We became part of the DNA of the classroom"

0:26 / 2:15

▶ 140 views

💬 1    🔁 4    ♡ 8

PL 00595

# Tweet 8

PL 00596

# Thread

←



Actively Unwoke @ActivelyUnwoke · Aug 19

In the next two clips, we see the result of this work.

This student says "we can check our privilege and maybe think about some ways we've been unfairly treated based on things we can't change."

Racial Unity Project takes credit for this: racialunityteam.com/bookshelf

110 views

♡ 1    ⇄ 2    ♡ 6    ⬆

https://racialunityteam.com/bookshelf

0:31 / 2:03

PL 00597

# Tweet 9

# Thread



**Actively Unwoke** @ActivelyUnwoke · Aug 19

And in this clip, this student says:

"Racism is a belief ingrained in the systems and minds of white Americans."

Teaching that anyone is inherently racist based on their skin color violates NH state law. If she didn't learn this in school, then where did she learn it?

0:21  131 views

○ 1          ⇆ 2          ♡ 10          ⬆

PL 00399

# Tweet 10

# ← Thread



**Actively Unwoke** @ActivelyUnwoke · Aug 19                                        ...

Exeter High School English Teachersalso worked with Racial Unity Team to revamp how they taught To Kill A Mockingbird:

"This move to look at the novel through the lens of underrepresented characters...served as an entry point into critical conversations about race and equity."

---

**To Kill a Mockingbird 60 years later – refocusing the lens on DEIJ in 2021**

*An Interview with EHS English teachers Dennis Magliozzi and Kristina Peterson and ELO Coordinator Adam Krauss*

  

The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16 has recently taken on more focus, structure and form. Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform how they perceive and teach the classic novel written by Harper Lee, *To Kill a Mockingbird*. The Pulitzer Prize-winning novel has been the subject of conversation in countless classrooms for six decades. Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well. This year, one of their goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those whose stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race and equity.

PL 00601

 2           6          ♡ 10          

# To Kill a Mockingbird 60 years later – refocusing the lens on DEIJ in 2021

*An Interview with EHS English teachers Dennis Magliozzi and Kristina Peterson and ELO Coordinator Adam Krauss*



The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16 has recently taken on more focus, structure and form. Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform how they perceive and teach the classic novel written by Harper Lee, *To Kill a Mockingbird*. The Pulitzer Prize-winning novel has been the subject of conversation in countless classrooms for six decades. Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well. This year, one of their goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those whose stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race and equity.

PL 00602

# Tweet 11

PL 00603

← **Thread**



**Actively Unwoke** @ActivelyUnwoke · Aug 19    · · ·

Racial Unity Project posted a case study of this work on their website:
racialunityteam.com/arts-in-action

"Three teachers have collaborated to reset their lenses and ask the tough
questions about how and what they teach with DEIJ in mind."

——————————————— Phase II ———————————————

### Curriculum Adjustment – refocusing the lens on DEIJ

An interview with EHS English teachers Dennis Magliozzi and Kristina
Peterson and ELD Coordinator (Courtesy SAU-16)
Adam Krauss



The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16
has recently taken on more focus, structure and form. Three teachers have
collaborated to reset their lenses and ask the tough questions about how
and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform
how they perceive and teach the classic novel written by Harper Lee, To Kill
a Mockingbird. The Pulitzer Prize-winning novel has been the subject of
conversation in countless classrooms for six decades. Magliozzi and
Peterson, both English Teachers, have been working with Mockingbird for
10 years at Exeter High School. Despite their best efforts, they could not
find a way they felt cast the discussion about issues of race and equity in a
way they felt worked well. This year, one of their goals when reading
Mockingbird is to critically examine why Harper Lee focuses on certain
characters and round out those whose stories are not told. This move to
look at the novel through the lens of underrepresented characters in the
book has served as an entry point into critical conversations about race
and equity.

PL 00604

💬 1          🔁 2          ♡ 7          

# Phase II

## Curriculum Adjustment – refocusing the lens on DEIJ

An Interview with EHS English teachers Dennis Magliozzi and Kristina Peterson and ELO Coordinator (Courtesy SAU-16)

Adam Krauss

The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16 has recently taken on more focus, structure and form. Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform how they perceive and teach the classic novel written by Harper Lee, To Kill a Mockingbird. The Pulitzer Prize-winning novel has been the subject of conversation in countless classrooms for six decades. Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well. This year, one of their goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those whose stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race and equity.



Read what they have to say.
Exeter High School Teachers

· Kristina Peterson
· Adam Krauss
· Dennis Magliozzi

# Tweet 12

PL 00606



**Actively Unwoke** @ActivelyUnwoke · Aug 19 ···

But there's more! It seems that the three teachers in this case study - two English teachers and an ELO coordinator at Exeter High School - work directly with the Racial Unity Project.

They are listed as "members" on their leadership team website:
racialunityteam.com/leadership-team

Board Member 2020-2021

Adam Krauss
Member Since 2021

Nancy Zajano
Member since 2021

Dory Polanco
Member since 2021

Kristen Deshaies
Member since 2021

Cynthia Bradley Young
Member since 2021

Dennis Magliozzi
Member since 2021

Courtney Skerritt
Member Since 2021

Kristina Peterson
Member since 2021

Erin Luckern
Member Since 2021

Shawno Coppola
Member Since 2022

Julia Lavine
Member Since 2022

Monica Chiu
Member Since 2022

**R**acial Unity Team
Julia Larner

**R**acial Unity Team
Steve Boczenowski

PL 00607

♡ 1        ⇄ 3        ♡ 10        ⬆

# Tweet 13

PL 00608



**Actively Unwoke** @ActivelyUnwoke · Aug 19 ・・・

They aren't the only ones in the school district involved directly with the organization.

SUPERINTENDENT David Ryan - @sau16supt_ryan is on Racial Unity Team's Board of Directors: racialunityteam.com/leadership-team





HOME   WHO WE ARE   PROJECTS   SPONSORS   CONTACT US   ART AND POETRY CHALLENGE   MORE ·

## Board of Directors

**Ken Mendis**



Stratham NH
Founding Member
Chair
Term Expires Dec 31, 2023

**Sylvia Foster**



Durham NH
Founding Member
Vice Chair
Term Expires Dec 31, 2023

**Jonathan Ring**



Exeter NH
Treasurer
Term Expires Dec 31, 2023

**Joy Meiser Mendis**



Stratham NH
Founding Member
Secretary
Term Expires Dec 31, 2022

**David Ryan**



Hooksett NH
Term Expires Dec 31, 2022

**Mark Whitney**



Newfields NH
Term Expires Dec 31, 2022

PL 00609

◯ 1        ⇄ 3        ♡ 8         

# Tweet 14

PL 00610

← **Thread**



**Actively Unwoke** @ActivelyUnwoke · Aug 19    ...

Does the Racial Unity Team, and their members working for the Exeter
Regional School District, know they are breaking the law?

Yes, they do.

And we know that because they have a public statement on their website
denouncing the divisive concepts bill: racialunityteam.com/public-
stateme...

for all available evidence.

The Racial Unity Team supports educators in their efforts to address issues
around diversity, equity, inclusion, and justice in the classroom. This
includes, but is certainly not limited to, teaching about our complex
history. While sections of the "Right to Freedom from Discrimination in
Workplaces and Education" (297-298, NH House Bill 2) do not prohibit this
work, the narrative among conservative groups and in some of the
mainstream media is that they do. Despite what is actually written in the
law, the reality is that these provisions discourage the careful examination
of historical and current discriminatory practices within our schools and
society.

What HB2 does prohibit is the teaching that any *individual or group of
individuals are inherently superior or inferior to people of another group.*
While this is not taught in our public schools, the prohibitions in HB2,
alongside the inaccurate narrative perpetuated by those who wish to
delegitimize public schools, have led to fear and confusion among
educators about how and what they may teach, while encouraging
complaints against them that jeopardize their licenses and careers.
The Racial Unity Team expressly denounces the actions of those, including
those at the State level, which have created an atmosphere of fear and
intimidation among educators. In turn, teachers are responding by
removing from their classrooms concepts and conversations that shed
light on harmful historical policies and practices. This atmosphere creates a
barrier to providing students with a school experience that reflects DEIJ
principles as well as a full education for protected classes of people.

We support efforts to *reverse* these legislative actions.

Ken Mendis, President, Racial Unity Team

PL 00611

 2       2       7      

PL 00612

for all available evidence.

The Racial Unity Team supports educators in their efforts to address issues around diversity, equity, inclusion, and justice in the classroom. This includes, but is certainly not limited to, teaching about our complex history. While sections of the "Right to Freedom from Discrimination in Workplaces and Education" (297-298, NH House Bill 2) do not prohibit this work, the narrative among conservative groups and in some of the mainstream media is that they do. Despite what is actually written in the law, the reality is that these provisions discourage the careful examination of historical and current discriminatory practices within our schools and society.

What HB2 does prohibit is the teaching that any *individual or group of individuals are inherently superior or inferior to people of another group.* While this is not taught in our public schools, the prohibitions in HB2, alongside the inaccurate narrative perpetuated by those who wish to delegitimize public schools, have led to fear and confusion among educators about how and what they may teach, while encouraging complaints against them that jeopardize their licenses and careers. The Racial Unity Team expressly denounces the actions of those, including those at the State level, which have created an atmosphere of fear and intimidation among educators. In turn, teachers are responding by removing from their classrooms concepts and conversations that shed light on harmful historical policies and practices. This atmosphere creates a barrier to providing students with a school experience that reflects DEIJ principles as well as a full education for protected classes of people.

We support efforts to *reverse* these legislative actions.

Ken Mendis, President, Racial Unity Team

# Tweet 15

PL 00613

# Thread



**Actively Unwoke** @ActivelyUnwoke · Aug 19

They claim that they are not breaking the law...but the problem is they didn't read the whole law.

They just cherry-picked one of the components of it that they are not breaking, while ignoring the clear component of the law that they are breaking.



...ion on the Content of Government Programs and Speech. No government program shall teach, advoc following:

one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexu al status, familial status, mental or physical disability, religion, or national origin;

dual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital sta disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or idual should be discriminated against or receive adverse treatment solely or partly because of his or h entation, race, creed, color, marital status, familial status, mental or physical disability, religion, or natio of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, or national origin cannot and should not attempt to treat others equally and/or without regard to age, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origi

PL 00614

♡ 1    ⇄ 3    ♡ 9    ⬆

354-A:32 Prohibition on the Content of Government Programs and Speech. No government program shall teach, advocate, or advance any one or more of the following:

I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

PL 0061S

1644

# Tweet 16

# Thread

**Actively Unwoke** @ActivelyUnwoke · Aug 19

Again, you cannot teach what the Racial Unity Group and the Exeter Regional Cooperative School District are teaching students without breaking this part of the law. It is not possible.

I strongly recommend all parents in Exeter report them to the state #NHPolitics

○ 1          ⟲ 2          ♡ 10

PL 00617

# Tweet 17

PL 00618

# Thread



**Actively Unwoke** @ActivelyUnwoke · Aug 19

This article is part of Schools Exposed by the Unwoke Army:
unwokearmy.com

If you appreciate my work, I hope you'll consider supporting it:
activelyunwoke.com/support

## SCHOOLS EXPOSED
### CROWDSOURCED JOURNALISM ON TAXPAYER FUNDED INDOCTRINATION

PL 00619

↻  ♡ 12  ⇄ 2  ○

# Article Referenced in Tweet 2

# The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law.

The state Department of Education should investigate.



**Karlyn Borysenko**
Aug 19



*This article is part of Schools Exposed by the **Unwoke Army**, which means that everything in this article is public information that anyone can find. If you appreciate my work, I hope you'll consider ordering **my book** and supporting my work on **Patreon**, **Locals**, or **through a Substack subscription**.*

PL 00621

*"Part of our educational mission is to awaken our students' awareness of **their power and privilege** so that they may view the world through a lens of equity and help eliminate unjust systems and practices."*

And in that simple sentence, one taken from a document called "**Diversity, Equity, Inclusion, and Justice in SAU16**" the Exeter Region Cooperative School District landed itself in open violation of New Hampshire's HB2, otherwise known as the divisive concepts bill or the anti-CRT law.

That's not the only thing that may land them in trouble. And they're doing it completely publicly, where everyone can see it if they take the time to look.

## Let me explain.

In the Exeter Regional School District, their equity office is called Diversity, Equity, Inclusion and Justice, or DEIJ for sure. So, I went to **their website** and searched for DEIJ. Here's what came up.



PL 00622

Right in the middle was the "About DEIJ in SAU16" page. Perfect! I clicked on that link and ended up looking **at this document**, a missions statement of sorts:

**Diversity, Equity, Inclusion and Justice in SAU 16**

Our effort to create and expand space for living under social justice ideals in SAU 16 engages all community members from the organization's seven school districts. Collectively, we aim to ensure that our school system is an enterprise whose growth is undeterred by bias or discrimination, where individuals of all backgrounds and experiences are welcomed and where personal narratives are heard, included and valued. Part of our educational mission is to awaken our students' awareness of their power and privilege so that they may view the world through a lens of equity and help eliminate unjust systems and practices. Our vision is that all students will grow with confidence, empathy and understanding of what is right so that they may advocate for these ideals in their world.

(document backed up here for posterity, just in case something happens to the one on their website)

Actively Unwoke is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.

Type your email...        Subscribe

**Here's the problem SAU16 now has**: On June 15, 2021, New Hampshire's divisive concepts bill was signed into law as a part of HB2. It is not a perfect bill, by any means. Governor Chris Sununu and his cronies watered it down before he signed it, which makes it less effective. However, it did include the following language:

PL 00623

354-A:32 Prohibition on the Content of Government Programs and Speech. No government program shall teach, advocate, or advance any one or more of the following:

I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

The law specifically and unequivocally says that the government cannot teach that individuals are inherently racist, sexist, and oppressive, whether consciously or unconsciously.

If **this** is still the mission of the Diversity, Equity, Inclusion and Justice program at SAU16 today *(and we have no reason to believe it's not because it's on their website)*, then the Exeter Region Cooperative School District is in open and flagrant violation of the law for this reason:

## You CANNOT teach students "awareness of their power and privilege" without also teaching them that some people are inherently oppressive and some people are inherently oppressed.

If some people have "power and privilege", that means that other people do not have power and privilege.

People with power and privilege are oppressive and people without power and privilege are oppressed.

That is inherent to the argument of power and privilege.

That means you cannot teach this as a part of a public high school curriculum in the state of New Hampshire without violating the law. It is not possible.

So, either this is the true and current mission of the SEIJ program in SAU16 and they are breaking the law, or it is not and they are in compliance. But if it's not the current mission, then what replaced it? And why is this one still on their website?

This alone is enough to prove they're breaking the law. But, there's more weird stuff.

PL 00624

# Let's meet the "Racial Unity Team"

In researching something else that was going on at Exeter High School, I came across something called the Racial Unity Team. I came across an event listed **on Facebook** for the Racial Unity Team of New Hampshire, which I had seen mentioned on the SAU16 website. They were holding an event (almost two weeks AFTER the divisive concepts bill was signed into law) and said they had received a $7500 grant from the state of New Hampshire.



That $7,500 grant means that the state of New Hampshire may be funding a program that is breaking state law by teaching this content in schools.

I recognized it because "Racial Unity Team" was all over the "**DEIJ Happenings**" website:

PL 00625



They had done **this video** in which students performed songs and read essays about racial justice. Again, note that this was posted on July 16, 2021, one month **AFTER** the divisive concepts bill was signed into law, and seems to have been taken from a live stream.



In that video was a few weird things.

PL 00626

There was this clip of one of the co-founders of the Racial Unity Team, Sylvia Foster, talk about getting funded by the state, and how she came to work with Exeter High School after she was brought in by ELO coordinator Adam Krauss (more on him in a moment) because there were "passionate teachers who would share their curriculum on justice."

*(I found myself asking "Why do teachers have a curriculum on justice?")*

She went on to say "We became part of the DNA of the classroom."



Now, I've seen enough videos like this to know exactly what it means when a group called "Racial Unity Project" becomes "part of the DNA of the classroom." And sure enough, I found what I knew I would.

Later in this video, I found this student discussing a project she did in conjunction with Racial Unity Project staff called "Bookshelf Diversity" that they even brag about on their website.

In this video, the student says:

> *"If we can think about our identity as well, we can check our privilege and maybe think about some ways we've been unfairly treated based on things we can't change."*

PL 00627



exeter student clip 1

The student in this video did nothing wrong - they are repeating the things that adults have told them to say. But it is very clear that they have been taught about power and privilege because there would be no need for her to say "check your privilege" if someone hadn't taught her that.

And in this clip a little later on in the video, a student says

> *"Racism is a belief ingrained in the systems and minds of white Americans."*



Exeter student clip 2

PL 00628

Again, the teaching that anyone is inherently racist based on their skin color violates New Hampshire state law. If she didn't learn this in school, then where did she learn it?

## To Kill a Mockingbird is Racist

But, that's not the only odd thing about the Racial Unity Project. They also worked with Exeter High School's ELO Coordinator Adam Krauss (mentioned earlier) and English Teachers Dennis Magliozii and Kristina Peterson to **disrupt the way they teach To Kill a Mockingbird** because the normal way was deemed a little too racist.

> *"This year, one of the goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those who stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race the equity."*

PL 00629

**To Kill a Mockingbird 60 years later – refocusing the lens on DEIJ in 2021**

*An Interview with EHS English teachers Dennis Magliozzi and Kristina Peterson and ELO Coordinator Adam Krauss*



The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16 has recently taken on more focus, structure and form. Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform how they perceive and teach the classic novel written by Harper Lee, *To Kill a Mockingbird*. The Pulitzer Prize-winning novel has been the subject of conversation in countless classrooms for six decades. Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well. This year, one of their goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those whose stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race and equity.

This PDF is backed up here for posterity, just in case the file is removed from SAU16's website.

You've read this far. Why not subscribe? Actively Unwoke is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.

Type your email                    Subscribe

PL 00630

Type your email...        Subscribe

**On their website**, they go into greater detail about the changes they made to the curriculum with a "DEIJ lens". Here are some quotes:

> *"Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind."*

> *"Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well."*

--------------------- Phase II ---------------------

### Curriculum Adjustment – refocusing the lens on DEIJ

An Interview with EHS English teachers Dennis Magliozzi and Kristina Peterson and ELO Coordinator (Courtesy SAU-16)
Adam Krauss



The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16 has recently taken on more focus, structure and form. Three teachers have collaborated to reset their lenses and ask the tough questions about how and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform how they perceive and teach the classic novel written by Harper Lee, To Kill a Mockingbird. The Pulitzer Prize-winning novel has been the subject of conversation in countless classrooms for six decades. Magliozzi and Peterson, both English Teachers, have been working with Mockingbird for 10 years at Exeter High School. Despite their best efforts, they could not find a way they felt cast the discussion about issues of race and equity in a way they felt worked well. This year, one of their goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those whose stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race and equity.

PL 00631

Instead of studying the book, they appeared to make it into a character study of Atticus Finch as a white man and a lesson for students in how they can be activists:

> action research.
>
> Their approach became to study Atticus Finch's world view by asking students questions such as these:
> - Have we realized his vision for justice in the United States?
> - If so, how?
> - If not, what changes can we make to get there?
> - What change do you want to see in the world?
> - How can you affect that change?

Once they did that, the students did an art project about what it's like to be black in America with the goal of creating art for social change.

> From there, students are invited to create art as a form of expression to further their impact. That's where Adam Krauss, ELO Coordinator in the school, joined the mission. Krauss helped Peterson and Magliozzi join forces with several mentor artists from The Racial Unity Team. This partnership allowed students to hear from individuals who shared how they and others use art to make an impact on the world, and how they grapple with the realities of being Black in America. Working side by side with these artists, students are learning to govern their voices and use art to inspire others. The final component of the student work is – with the help of the mentor artists – to turn their research for social change into art for social change.

The teachers concluded that their work on revamping how To Kill A Mockingbird is taught achieved a level of justice that Atticus Finch could not have aspired to.

PL 00632

Krauss, Magliozzi, and Peterson are trying hard not to send the message that one voice is the end all be all. "Our students have just as much agency in this project and conversation as we do as their guide on the side," said Krauss. Students have just as much power to criticize, challenge, and change their world – our shared world – as everyone else involved in their education. That's equity and inclusion at work. It's a vision for justice Atticus couldn't attain. But lifting up voices, ensuring people from all backgrounds and experiences are welcomed and their stories are heard – that is a vision for justice that all teachers can champion.

## It's all very incestuous.

I'm sure it's just a coincidence that Adam Krauss, Dennis Magliozzi, and Kristina Peterson are also listed as members on the Racial Unity Team's Leadership Team website:

PL 00633



And not only that, but **David Ryan**, the Superintendent of the Exeter Region Cooperative School District is on the Board Of Directors:

PL 00634



**Does the Racial Unity Team, and their members working for the Exeter Regional Cooperative School District, know they are breaking the law?**

Yes, they do.

And we know that because **they have a public statement on their website denouncing the divisive concepts bill** and saying they will lobby in favor of its repeal.

PL 00635

for all available evidence.

The Racial Unity Team supports educators in their efforts to address issues around diversity, equity, inclusion, and justice in the classroom. This includes, but is certainly not limited to, teaching about our complex history. While sections of the "Right to Freedom from Discrimination in Workplaces and Education" (297-298, NH House Bill 2) do not prohibit this work, the narrative among conservative groups and in some of the mainstream media is that they do. Despite what is actually written in the law, the reality is that these provisions discourage the careful examination of historical and current discriminatory practices within our schools and society.

What HB2 does prohibit is the teaching that any *individual or group of individuals are inherently superior or inferior to people of another group.* While this is not taught in our public schools, the prohibitions in HB2, alongside the inaccurate narrative perpetuated by those who wish to delegitimize public schools, have led to fear and confusion among educators about how and what they may teach, while encouraging complaints against them that jeopardize their licenses and careers. The Racial Unity Team expressly denounces the actions of those, including those at the State level, which have created an atmosphere of fear and intimidation among educators. In turn, teachers are responding by removing from their classrooms concepts and conversations that shed light on harmful historical policies and practices. This atmosphere creates a barrier to providing students with a school experience that reflects DEIJ principles as well as a full education for protected classes of people.

We support efforts to *reverse* these legislative actions.

Ken Mendis, President, Racial Unity Team

They claim that they are not breaking the law…but the problem is they didn't read the whole law. They just cherry-picked one of the components of it that they are not breaking, while ignoring the clear component of the law that they are breaking.

You cannot teach what the Racial Unity Group and the Exeter Regional Cooperative School District are teaching students without breaking this part of the law. It is not possible.

PL 00636

354-A:32 Prohibition on the Content of Government Programs and Speech. No government program shall teach, advocate, or advance any one or more of the following:

I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

# The State of New Hampshire must investigate if these practices and partnerships are still in place today.

Superintendent David Ryan has some explaining to do. Particularly since he's on the Board of Directors of the group operating within his school district that seems to be in open violation of New Hampshire State law.

Thank you for reading Actively Unwoke. This
post is public so feel free to share it.

## Fight back against the woke and support my work

I believe the woke - on the left and the right - are an existential threat to our values as Americans. Some of them know it, most of them are just useful idiots. Regardless, fighting back against this cultural revolution is my full-time job. I'm dedicated to exposing the woke ideology in our country, helping people to understand what's going on, and providing spaces for non-woke people to connect, support each other, and plan ways to fight back.

PL 00637

Here's how you can help.

- **Order my book:** Actively Unwoke: The ultimate guide to fighting back against woke insanity in your life.
- **Support my work**:
    - Sponsor my work on Patreon
    - Become a supporter in Locals
    - Support my work through a Substack subscription

Actively Unwoke is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.

| Type your email... | Subscribe |
|---|---|

---

## 1 Comment



Write a comment...



**WoZBee**   Aug 19

This is a great find. I'm working on this in CA, and unfortunately, state law backs the groomers. All the stuff we're warned about in regard to transing the kids behind parents' backs is *recommended* by the CA CDC. Must keep digging.

♡ 1    Reply    Gift a subscription    Collapse

---

PL 00638

© 2022 Karlyn Borysenko · Privacy · Terms · Collection notice

Substack is the home for great writing

## Document Referenced in Tweets 3 and 4

**Diversity, Equity, Inclusion and Justice in SAU 16**

Our effort to create and expand space for living under social justice ideals in SAU 16 engages all community members from the organization's seven school districts. Collectively, we aim to ensure that our school system is an enterprise whose growth is undeterred by bias or discrimination, where individuals of all backgrounds and experiences are welcomed and where personal narratives are heard, included and valued. Part of our educational mission is to awaken our students' awareness of their power and privilege so that they may view the world through a lens of equity and help eliminate unjust systems and practices. Our vision is that all students will grow with confidence, empathy and understanding of what is right so that they may advocate for these ideals in their world.

SAU 16 holds as a core value the respect and celebration of all human differences. We believe it is our moral responsibility to share with our students and families their power to pursue justice for all people, especially people from historically marginalized communities. We are committed to taking risks and making mistakes, learning how to try on new ideas and perspectives and being vulnerable to opportunities in which we have no experience.

Operating under the umbrella of social justice, each SAU 16 school now has a DEIJ Team that works to advance the values of the organization in their school communities. Representatives from each school team collaborate on organizational goals that are developed to advance this work, and just recently the Exeter Region Cooperative School District hired a new director of these efforts to formally lead these teams. Andres Mejia brings impressive experience to his role as director of diversity, equity, inclusion, and justice, and soon will be facilitating community conversations that seek to inform, educate, and answer questions about how we are moving forward.

SAU 16 also addresses systems and structures through the Anti-Discriminatory Task Force (ADTF). The ADTF, established at the end of the 2018-2019 school year, is a collaboration of school system staff and community members from the Greater Exeter area who respond to cases of alleged discrimination in our schools. While not the primary investigators of school incidents, the ADTF reviews redacted information from school cases to determine root causes and makes recommendations for corrective action. Further, the ADTF is currently reviewing prevailing SAU 16 school board policies using a framework of bias and discrimination to offer suggestions and revisions accordingly.

These are a few of the examples of the steps we are taking to support our mission around DEIJ. They are initial building blocks that we will add to and expand upon in the coming months. Please continue to visit the SAU 16 website for updates and ways to engage in this critical discussion.

**Referenced in Tweet 8**

⚡ PUBLIC STATEMENT ⚡

# Racial Unity Team

HOME   WHO WE ARE   PROJECTS   SPONSORS   CONTACT US   ART AND POETRY CHALLENGE   MORE ∨

## Our Financial Partners

Eastern Bank

Kennebunk Savings

---

## Bookshelf Diversity 2022



### Project - Bookshelf Diversity



The "Bookshelf Diversity" project grew out of the RUT partnership **Arts in Action** with Exeter High School ninth grade English teachers in their unit on justice, equity, and social change. In her class presentation, student **Ingrid Janicki's project "Bookshelf Diversity"** emphasized bringing more voices to our students' worlds/ perspectives and not in tokenism through performative diversity, but instead, healthy readings that honor natural inclusiveness versus reading diverse books on Chinese holidays or celebrations of progress for under-represented groups. Ingrid advocated for reading books as if most stories could have people of any identities playing out the plot lines as well.

The topic "Bookshelf Diversity" endorsed by the Racial Unity Team was introduced for the first time in 2021 at the UNH Summer Literacy Institutes. Here is Ingrid's essay <u>Schools Need To Reexamine The Common English Curriculum</u>, or visit the link to hear Ingrid Janicki's talk and her teacher's praise of her work following at the end of her talk.

Every year the Racial Unity Team hopes to celebrate Bookshelf Diversity and for 2022 our theme is Stronger Together. This highlights how together with the support of our sponsors, donors, and teachers we can make Granite children and young adults stronger and more connected with each other through project like "Bookshelf Diversity" in their respective classrooms.

**WATCH THE VIDEO**

PL 00643

PL 00644

## Announcement

**Opening Call: Win $500 to diversify your classroom library!**

Racial Unity Team is now accepting submissions (explained below).

**Deadline** Friday, 8/31/2022 by 11:59 p.m.

**Prompt** Why is bookshelf diversity important to your classroom library and/or philosophy of teaching?

**Criteria** Answer the prompt in 450 words (or fewer) in a style of your choosing.

**Eligibility** Applicant must be a full-time pre K-12 classroom teacher in a New Hampshire public school.

**Submission link** Click to access submission entry form.

## Guidelines

Applicant must have a working classroom library.

Applicant must be willing to be included in Racial Unity Team promotional materials, e.g., social media posts/news articles and be willing to participate in research into the effectiveness of diverse classroom libraries on student outcomes in reading.

We will select one winner from each of the five New Hampshire state Executive Council Districts. Find your district by city or town name.

We see this as a growing partnership beyond the immediate opportunity and, therefore, envision applicants to be interested in working together on future endeavors.

The books are given to you to support your work as a classroom teacher - not to your school/ school district. Please be sure this is clear to your administrators before you apply. If you leave the district to teach elsewhere, the books go with you. If you leave teaching, we encourage you to gift the books to a teacher and classroom that you feel these books would benefit.

Applicants must be willing to be contacted about books read and favorites among the selections to assist us in creating an ongoing list of recommended books.

## Share

Don't keep it to yourself, let other teachers know. Share this link: https://racialunityteam.com/bookshelf/

## FAQs

Do you have questions bring it to our attention besides providing you with the answers, we will display the most frequently asked questions, so everybody benefits. **Questions? Email** racialunityteam1@gmail.com

Site Content

## Winner of the 2021 Bookshelf Diversity Award

Congratulate Jennifer McCall, Thetford, the winner of the *Bookshelf Diversity 2021* award. Your voice expressed precisely what the author of the project, student Ingrid Janicki, desired would come forth: your wish that your students will "discover . . . things they might want to change and your hope that their reading will help foster empathy with the result of making a generation of people who are better than those who came before them."

We're excited to deliver a set of books to you and invite your input so that we may bring books you most want (and do not already have) for your classroom library. Please see the list at the end of this email of books suggested by Ingrid. We welcome your list of levels, genres and exact titles you would like to add to your library, and we'll begin our work to deliver your award.

Thank you for enriching this program with your entry.
*Ingrid Janicki, Kristine Petersen, Dennis Magliozzi and Adam Krauss*

The project *Bookshelf Diversity*, supported by the Racial Unity Team may be reviewed by reading Ingrid's *New York Times* editorial here Schools Need To Reexamine The Common English Curriculum or by visiting presentations found on  https://racialunityteam.com/

### 2021 Recommended Books Grades 9-12

The Round House by Louise Erdrich
Salvage the Bones by Jesmyn Ward
Another Brooklyn by Jacqueline Woodson
We Are Not From Here by Jenny Torres Sanchez At the Mountain's Base by Traci Sorrell
Frankly in Love by David Yoon
What Lane by Torrey Maldonado
Antiracist Baby by Ibram X. Kendi
Before the Ever After by Jacqueline Woodson
Darius the Great is Not Okay by Adib Khorram
Juliet Takes a Breath by Gabby Rivera
Patron Saints of Nothing by Randy Ribay

PL 00945

The project ... ... ... ... be reviewed by reading Ingrid's **New York Times** editorial here. Schools Need To Reexamine The Common English Curriculum or by visiting presentations found on https://racialunityteam.com/

**2021 Recommended Books Grades 9-12**
The Round House by Louise Erdrich
Savage the Bones by Jesmyn Ward
Another Brooklyn by Jacqueline Woodson
We Are Not From Here by Jenny Torres Sanchez
At the Mountain's Base by Traci Sorrell
Frankly in Love by David Yoon
What Lane by Torrey Maldonado
Antiracist Baby by Ibram X. Kendi
Before the Ever After by Jacqueline Woodson
Darius the Great is Not Okay by Adib Khorram
Juliet Takes a Breath by Gabby Rivera
Patron Saints of Nothing by Randy Ribay

---

## 2021 Photo Gallery






---

HOME   CONTACT US   LEADERSHIP TEAM   CALENDAR

**Racial Unity Team**
603-263-6511

Copyright © 2022 Racial Unity Team - All Rights Reserved.
HEADING ART: Unity by Richard Haynes

Powered by GoDaddy Website Builder

**Referenced in Tweet 11**

 PUBLIC STATEMENT 



# Arts in Action

## RŪT in the classroom

## RŪT in the community

## Resources



PL 00648



**Arts in Action**

A SCHOOL TO COMMUNITY
PARTNERSHIP

# Arts In Action

*"This is precisely the time when artists go to work.
There is no time for despair, no place for self-pity,
no need for silence, no room for fear. We spea*

*write, we do language. That is how civilizations heal."*
**Toni Morrison**



RŪT in the classroom

## Additional Information

Often the students want to know how to get people to listen to them. The students are impressed by mentors who have applied the arts to address the struggles that they are discussing in class, presented to them by authors of novels and poetry. These exchanges help students process the often-first-time study of racism, and the mentors' inviting words make it okay to have difficult conversations. The mentors we host for the classroom also teach the value of listening to others about experie. that differ from their own. Our experience in working with the

artists/mentors, is that they also coach the students to learn how to ask

questions and inspire conversations about differences while using art to inspire change.

As racism poses a significant threat to our public health, RUT introduces new voices to the classroom to advance difficult conversations. Our artists/mentors reveal their histories facing bias and how the arts have healed them, thus changing both personal and community histories. These remembrances make words on the page come alive and the students become immersed in 1) a multidisciplinary study of the history of the treatment of racialized and other marginalized/oppressed peoples; 2) the value of multicultural literature that inspires feelings of empathy; 3) skill-building for communicating solutions to social problems; and 4) ways that relationships with people of racial and other identities different from their own increases understanding and stops bias.

*Arts in Action* amplifies the voices of these youth as they then express the values of equity and fairness, often through the arts. Our target audience is first- and second-year high school students. Following a unit on slam poetry and visits from poets in the New Hampshire guild "Slam Free or Die" and the visit of nationally renowned poet and author-activist Clint Smith, schools watched the artist videos from the pilot year. Then High School's ninth grade English classes studied books like *To Kill A Mockingbird*, or *A Raisin in the Sun* or something similar. Each book explores the subject of inequity and its consequences to all people in a society. "With black characters being relegated to the margins even in a story about their own oppression" (O.R. James) in *To Kill A Mockingbird*, the study of slam poetry and the novel become the entry points to critical conversations and action research.

## Learn More

Arts in Action broadens student access to multicultural artistic and cultural experiences by introducing a diverse body of artists in a broad spectrum of disciplines to build courageous spaces for students to explore, create, and express non-euro-centric art forms. We want to help students develop their sense of place, their sense of self, and a sense of agency: to see themselves as change-makers and culture-makers for our state.

**FIND OUT MORE**

## Phase I of the Project

## Let's visit a classroom at Exeter High School



PL 00652

Greetings to you from Project Team **Spoken Word and Song Writing for Social Change.** Here is an update on the project currently underway with students of EHS ninth grade English classes. After students watched four video productions specifically designed for the class unit, we find students are making references in class to things they've learned from the mentors. RUT now can proudly claim to be part of the DNA of the course. We're hearing student ideas for creative projects percolating. We are making plans to offer students coaching on creative project production – to assist them in developing their ideas. Watch the videos to get a better understanding of students' comments; it adds more depth to their words. We hope that this segment brings you into the classroom and we would love to hear from you about this project as we look to expand its scope to other Seacoast area School Administrative Units (SAUs). Send us an **Email** or include your comments in the Comment section of the **Contact Us** form.

# Doug Holzapfel

Provides an introduction to the program - The Arts Are About Connection - and what each student may expect by getting involved in the project.

**WATCH DOUG'S VIDEO**

# Reggie Harris - Racial Equity Intro

This video introduces his background and work he is presently doing to further the conversation on race. He gets us thinking about the meaning that our culture assigns to the skin we're in and how our art has th power to change a culture of bias to one of equity and inclusion fo The material is copyrighted and meant for use in connection with those

Racial Equity program in Exeter, NH.

**WATCH REGGIE'S VIDEO**

# Courtney Marshall

You're invited into the space she occupies, one surrounded by art, social change and protest posters - to hear how this space influences her and the work she does. She states the historical fact that it was once, for a prolonged period in U.S. history, a punishable crime for a black person to learn to read or write. Courtney asks us, "How did people keep their sparks of creativity alive in that world of exclusions? What if Beyonce were not allowed to sing today? " She ends with suggestions for opening doors to creating - imagining the better future we all know is possible.

**WATCH COURTNEY'S VIDEO**

# Kevin Writer

You'll watch singer-songwriter Bob Marley inviting oppositional leaders to join in establishing peace in Jamaica during a time of violence that had been ravaging their streets. Kevin shows us the arts' place in changing history and encourages us to experiment to find our best method and style of expression to speak up for freedom - still being negotiated in 2021 for black U.S. citizens.

**WATCH KEVIN'S VIDEO**

# Commentary from Exeter High School English Teacher Kristina Peterson



PL 00654

*"The project is already a success in my mind, and we're only halfway through. I've never seen my students so inspired to research and write about topics they are truly passionate about. The artist mentors have not only helped show my students that they have a voice, but they've also inspired my students to use their voices in powerful and purposeful ways".*

## Student Reactions to the Course Material

### Exeter High School 9th-grade student comments:

*Everything that I have learned in this unit has made me really reflect back on my own history and provoked me to be more aware of how racism is happening so often that is going unnoticed, and after watching these videos I feel inspired to do something about it.*

*This whole unit has changed my thinking, since it has broadened my horizons and helped me understand different perspectives and opinions that I hadn't thought about before.*

*This unit has made me think more about the world around me and how I can make it better.*

### How has everything we've read and talked about during this unit changed or challenged your thinking?

*. . . it has challenged me to think about how much I am learning about today's issues, and not just issues, but those who have seen those issues first-hand and experienced them from a lens I will never see through no matter how hard I read. I've realized that I have not read or looked at, consciously or unconsciously, many pieces of art from black people or many people  either.*

PL 00655

*I've been looking at my education through the years, the people painted out to be heroes, and villains and written all over it is the "European vision" that Reggie and others talked about with us. Another thing I've been enlightened by watching these videos is how important art is to our culture, our lives, and even things that can be as harsh and violent as politics. Art at our school and at many others in the US, is one of the things least acknowledged and praised as a subject. People look for our GPAs and As, Bs, and Cs but never any deeper than those numbers, and that makes it harder for students to see the importance of art in all its different forms.*

*I think a lot that we read brought to my attention how bad it really was and still is for many black people. I feel like before this year I was ignorant toward that aspect, but now I'm trying to educate myself more and learn about the struggles.*

*I've also realized the power of literature. I didn't realize that songs, books, and poems could make such a difference, but they can. One thing that really stood out to me was the Bob Marley concert where he got the two political rivals to stand up there and hold hands. I realize that art can help bring ideas and inspire people to make positive change. Another thing I realize is . . . that I don't read that many novels or poems by people of color. That is one thing I would like to change.*

# Final Phase Results



PL 00656

# Video of the Final Event

Racial Unity Team's Spoken Word and Song Writing for Social Change aka Arts In Action project brought artists into the classroom to tell their stories

of using the arts to heal and to advocate for justice. The artists then mentored youth in creative expressions of a future without racism, where everyone has opportunities to thrive and participate in civic life. Songwriting • Poetry • Spoken Word • Editorial. Eight teens from Exeter High School will share their creative expressions from this incredible collaboration at this unique CreativeMornings Portsmouth event.

If you like the work, we are doing please donate towards the work we will do during the 2021-2022 school year. Another school will be selected for the program to donate visit our website racialunityteam.com

**WATCH THE VIEDEO**



PL 00657

# What does fairness and justice look like? - Listen to what three students have to say

This question made the shift to students' finding their voices and learning how to apply them in their creative expressions.

**WATCH THE VIDEO**

## Ingrid Janicki's Bookshelf Diversity

The "Bookshelf Diversity" project grew out of the RUT partnership **Arts in Action** with Exeter High School ninth grade English teachers in their unit on justice, equity, and social change. In her class presentation, student **Ingrid Janicki's project "Bookshelf Diversity"** emphasized bringing more voices to our students' worlds/ perspectives and not in tokenism through performative diversity, but instead, healthy readings that honor natural inclusiveness versus reading diverse books on Chinese holidays or celebrations of progress for under-represented groups. Ingrid advocated for reading books as if most stories could have people of any identities playing out the plot lines as well.

**FIND OUT MORE**

<p style="text-align:center;">Phase II</p>



# Curriculum Adjustment – refocusing the lens on DEIJ

An Interview with EHS English teachers Dennis Magliozzi and Kristina
Peterson and ELO Coordinator (Courtesy SAU-16)
Adam Krauss

The DEIJ - diversity, equity, inclusion, and justice - initiative across SAU 16
has recently taken on more focus, structure and form. Three teachers
have collaborated to reset their lenses and ask the tough questions about
how and what they teach with DEIJ in mind.

This year, they have partnered with Racial Unity Team (RUT) to transform
how they perceive and teach the classic novel written by Harper Lee, To
Kill a Mockingbird. The Pulitzer Prize-winning novel has been the subject
of conversation in countless classrooms for six decades. Magliozzi and
Peterson, both English Teachers, have been working with Mockingbird for
10 years at Exeter High School. Despite their best efforts, they could
find a way they felt cast the discussion about issues of race and equity in a

PL 00659

way they felt worked well. This year, one of their goals when reading Mockingbird is to critically examine why Harper Lee focuses on certain characters and round out those whose stories are not told. This move to look at the novel through the lens of underrepresented characters in the book has served as an entry point into critical conversations about race and equity.

When aligning this approach to a world view in 2021 versus one from a small Alabama town in 1960, it is clear there are real shortcomings in the book as a solo unit. It didn't do what the teachers hoped it to do by itself, but there was great potential to leverage it. "In some ways, we can see Harper Lee's novel as her attempt at using art to change the world," Peterson said, "and we want our students to do the same." That's when the lightbulb went off in terms of curriculum – the teachers began to team up to use Mockingbird as a piece from which to launch their students into action research.

Their approach became to study Atticus Finch's world view by asking students questions such as these:

• Have we realized his vision for justice in the United States?

• If so, how?
• If not, what changes can we make to get there?
• What change do you want to see in the world?
• How can you affect that change?

From there, students are invited to create art as a form of expression to further their impact. That's where Adam Krauss, ELO Coordinator in the school, joined the mission. Krauss helped Peterson and Magliozzi join forces with several mentor artists from The Racial Unity Team. This partnership allowed students to hear from individuals who shared how they and others use art to make an impact on the world, and how they grapple with the realities of being Black in America. Working s side with these artists, students are learning to govern their voices and

PL_00860

use art to inspire others. The final component of the student work is – with the help of the mentor artists – to turn their research for social change into art for social change.

Power opens up doors or prevents doors from opening. In this work three central things play out in this project: the injection of these professionals and their voices empowers students to claim voices of their own; the initial collaboration between these three teachers has led to collaboration among other colleagues and members of the community; and the resulting creative expression, which can be through art, music and/or the written or spoken word.

Krauss, Magliozzi, and Peterson are trying hard not to send the message that one voice is the end all be all. "Our students have just as much agency in this project and conversation as we do as their guide on the side," said Krauss. Students have just as much power to criticize, challenge, and change their world – our shared world – as everyone else involved in their education. That's equity and inclusion at work. It's a vision for justice Atticus couldn't attain. But lifting up voices, ensuring people

from all backgrounds and experiences are welcomed and their stories are heard – that is a vision for justice that all teachers can champion.

# Letter of Support for the work of the Racial Unity Team

## by ADAM KRAUSS, EXETER HIGH SCHOOL EXTENDED LEARNING OPPORTUNITY

I write this letter of support after a semester of working with 110 students as our school and the Racial Unity Team partner on a NHSCA pilot project initiative. At least three things are clear: 1. students are hooked - learning, reflecting and hungry for change; 2. we're growing professionally while

PL 00662

our school enhances culturally; 3. the success from the past few months has us in a position to partner with neighboring schools in the service of expanded justice studies, equitable outcomes, and the creation of a student-centered network focused on agency and social change.

I'd like to elaborate on the point about students. Today I was talking with one of our students about what she enjoys about school, and she remarked how surprised she was to be doing such an "official" project. I asked what she meant, and she explained she wasn't used to school work involving real-world topics with professional artists and leaders in a way that put her voice and ambition at the center of the experience.

That's what this project has been about: connecting students not only to the world and people around them, but also, to the fires brewing in them - the fires that make them want to ask our artist-mentors how young people can find and use their voices. That a curriculum existed to support this and that there were teachers open to adapting and innovating where needed and possible to ensure we fan those flames is another facet that we will not overlook. Equally compelling is the institutional backdrop that this has played out as our district bolsters our work around diversity, equity, inclusion, and justice.

As a result we have students getting peers to think about constitutional quandaries found in the Pledge of Allegiance, wanting to change the uniform standards governing female athletes, pushing for social-media "fasts" in service of improved personal and social well-being, as well as considering the impacts of "cancel culture," re-imagining the current

structure and goals of public education, and asking others to consider their word choice in everyday interactions.

Thanks to your support, we have identified the various nexus points

PL 00663

between these ideas and pedagogical strands and are excited to share what we have learned with colleagues and learners in another district. That is, after all, the purpose of education: to share our passions and knowledge so that more people tomorrow benefit from what we learned today.

With this experience as the focal point, we bring practiced perspective, vetted resources, shared ideals and devotion to working together toward them, along with what happily feels like a bottomless well of commitment and enthusiasm to doing the work it takes to make it happen. Thank you to all who have been involved and to you for considering our re-application.

Sincerely, Adam Krauss, CAGS, Exeter High SchoolExtended Learning Opportunities, Coordinator and Class of 2024

May 14, 2021

# Program Content



PL 00664

**Click here to hear from Doug Holzapfel professional musician and composer.**

# Additional Information

The Racial Unity Team of NH has been granted $7,500 by the New **Hampshire State Council on the Arts** to deliver a program that gives youth support in creating songs of community. The **Kennebunk Savings Bank** has also contributed to the Team's project at the level of Official Sponsor. Participants may apply the genres of spoken word, rap, hip hop, or lyrics to songs in a creation of their own to express the value of our racially diverse population.  We're also pleased to join **Exeter High School** as "artists in residence" to begin working in the classroom on this exciting collaborative project.

As with community and protest songwriters of the past, the young composers will critique what needs repair, then use music as a uni non-threatening language through which to share what they know their own stories and what they see happening around them. The course

PL 00565

seeks their creative vision of a world without racism.

Students will be asked to add new lines to classic songs to adapt them to today's oppressions and the changes they want to see. Then they'll be asked, "What has stood in your way or your friend's way to becoming the best you/they can be? What would the road to justice and fairness look like?"

Creative visioning in the project "Spoken Word and Song Writing for Social Change" will counter current racist commentary heard in newscasts. Student truths revealed in lyrics and poetry have the potential to tear down stereotypes, open our hearts and imaginations toward understanding the ways we under-serve black and brown citizens. This "Arts in Health NHSCA Project Grant" can open eyes to see how we grow stronger with equitable resources, how we all benefit when everyone is given the chance to grow and thrive in school, workplace, town and neighborhood.

Those interested in hearing more about the class and/or having interest in joining this class should email us at racialunityteam1@gmail.com

* Logo Designer:_ehasan at Fiverr.com

# Project Team Members

## Sylvia Foster



PL 00666

As a musician and social justice advocate, Sylvia served as manager of

"Culture Keepers | Culture Makers," a project team that created an art show and panel discussion on how art changes lives. The works were displayed at the Racial Unity Day gallery and Seacoast NH libraries to build awareness of racism and to envision our communities without racism. Recently retired from UNH's Office of Community, Equity, and Diversity, Sylvia designed programs to build self-awareness, inspire policy changes, and honor diversity as a community value across campus—in classroom, curriculum, and campus life. She teaches in the *Women's and Gender Studies* Program at UNH.

# Kristina Peterson



PL 00667

Kristina Peterson has been teaching English at Exeter High School since

2008.

Kristina has a Masters degree in teaching. She also teaches in the UNH Writers Academy, mentors future and current teachers, writes SEL curriculum for the Emozi program, and is the Secretary of the New Hampshire Council of Teachers of English.

# Dennis Magliozzi

Dennis Magliozzi has been teaching English at Exeter High School since

2008.

He has an MFA in poetry and is currently enrolled in the Philosophy of Education program at UNH.

# Kevin Writer



PL 00668

[https://www.imdb.com/name/nm3836060/](https://www.imdb.com/name/nm3836060/)

A fresh and innovative voice in music and digital content, Kevin Writer is Los Angeles-based as a music supervisor and producer. With a keen ear for musical color and the ability to redesign structural elements from popular music into symphonic idiom, Kevin brings dedication to the producer's intent, respect for his musician colleagues, and a spirit of collaboration with each
composer and filmmaker he meets.

# Reggie Harris



**https://reggieharrismusic.com/test-page/**

**Listen to his work athttps://www.youtube.com/watch?**
**v=8ryXm8byxW0**

Reggie Harris generates courageous conversations, getting us to do deep
thinking on issues, build our self-awareness, and use our voices to
advocate for peace and justice.

A master storyteller, musician, and educator, he is affiliated with The John
F. Kennedy Center's "Partners in Education" program. His impressive work
over decades with students and teachers has aided in the expansion and
enhancement of curriculum standards for all grade levels. Mentored by
the foremost authority on the Underground Railroad, Dr. Charles
Blockson, Reggie is one of the premier interpreters of the use of music in
historical movements for social change.


# Doug Holzapfel


**http://www.youtube.com/watch?v=leAW2g5O3tk**

**Samples of work:  www.facebook.com/dougandthebugs**

Doug Holzapfel immersed himself in the music industry in Los Angeles
a songwriter and music producer. He has worked with numerous

PL 00670

recording artists and major labels creating works in styles ranging from pop and hip hop to rock and jazz. He scored TV shows for DreamWorks and Netflix and earned a platinum record for his contributions to the DreamWorks' feature film*Trolls.*

# Courtney Marshall

Courtney Marshall, PhD, posted on her Facebook page: "I am a Black

feminist fitness instructor and high school English teacher. Let's get free!" Courtney leads dialogues on race, gender, and social justice issues and is an advocate for—and writer on—prison reform. She was a facilitator for the UNH MLK Leadership Summit for students and has run literacy groups at the Berlin, NH Correctional Facility in hopes of improving prison life by bringing literature to inmates. Over the years she has taught as a professor of English and Women's and Gender Studies at UNH and as an English teacher at Phillips Exeter Academy.

# Adam Krauss



Adam Krauss is the Extended Learning Opportunity (ELO) Coordinator at

Exeter High School, following several years teaching U.S. history and government. He is active with the Seacoast Educators for Equity and N.H. Leaders for Just Schools.

## Randy Armstrongt

**re.ntml**

Randy Armstrong is a renowned performer and recording artist. He was the director of the African Drumming and World Percussion Ensemble and faculty instructor.

https://www.youtube.com/watch?v=vFmtWF6l03I&feature=emb_logo



PL 00673



PL 00674

# Community to School Event
## 2022

## Additional Information

Dr. Clint Smith, bestselling author of "Counting Descent", spoke to a group of 215 high school students at the Exeter High School on February 2, 2022, as part of the Racial Unity Team's Community to School Arts in Action project. This was also an occasion for many to celebrate Black heroes and events throughout history that advocates for equity and inclusion through poetry.  Before the start of the event he reflected on his childhood "When I was in school, we didn't read a lot of books written by people who looked like me or about characters who looked like me. So I wrote Counting Descent for that kid who needed a book that represents him. And to think that my book might now be in the hands of one of your students who really needs it, makes everything come full circle for me." He told Kristina Peterson English teacher at the Exeter High School.  During his conversation with the students he said, "A poem is a time capsule of who you were when you wrote it, and my poems are a reminder to myself of who I want to be - my north star - posing the question, 'Am I the person I want to be? If not, what do I do to align myself with my values?'"  Clint also spoke of the history of literature saying, "Slam poetry isn't always taken seriously by those who call themselves intellectuals. That's because the genre of slam poetry originated with black and brown people. Slam poetry isn't always found on a page, but we need to remember that Homer and Shakespeare, and a host of other writers lived in a time of oral traditions through storytellers and actors on the stage. The printing press wasn't used until the mid-fifteenth century. Slam poetry needs to be acce      the literary canon.

# Learn More

To learn more about the Racial Unity Team's community-to-school projects and how your school can become part of this movement contact us.

**FIND OUT MORE**

HOME

CONTACT US

LEADERSHIP TEAM

CALENDAR

**Racial Unity Team**

603-263-6511

Copyright © 2022 Racial Unity Team - All Rights Reserved.

HEADING ART: Unity, by Richard Haynes

Powered by GoDaddy Website Builder



PL 00676

**Referenced in Tweets 12 and 13**

PL 00677

1707

PL 00078

← PUBLIC STATEMENT →

HOME  WHO WE ARE  PROJECTS  SPONSORS  CONTACT US  GET INVOLVED  CHALLENGE  MORE...

# Racial
### Unity Team

## Board of Directors




Ken Mendis
Founding Member
Chair
Term Expires Dec 31, 2023

Sylvia Foster
Southern NH
Founding Member
Vice-Chair
Term Expires Dec 31, 2023

Jonathan Ring
Greater NH
Treasurer
Term Expires Dec 31, 2023




Joy Marzec Mendis
Southern NH
Founding Member
Secretary
Term Expires Dec 31, 2022

David Ryan
Hooksett NH
Term Expires Dec 31, 2022

Mark Whitney
Newfields NH
Term Expires Dec 31, 2022










Cora Quisumbing-King
Exeter NH
Term Expires Jun 30, 2024

Lowell (Chris) Matthews
Manchester NH
Term Expires Dec 31, 2024

Kamilann Blake
Exeter NH
Term Expires Feb 15, 2024




PL 00679

## Members

1709

PL 00060

## Staff

Project Assistant

We also owe so much to all our...

Volunteer opportunities

Administrative Director

---

## Committees - Leadership Teams - Projects

**Education Committee**

**Art & Poetry Challenge**

**Arts in Action Project**

**Program Committee**

**AAPI Advisory Group**

**Grants & Fundraising Committee**

**Strategic Planning Committee**

**Executive Committee**

**Finance Committee**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                      Case No. 1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Plaintiffs have conventionally filed the following attachment or exhibit:

Exhibit 29 to Plaintiffs' Statement of Material Facts entitled Actively Unwoke Aug 2022 Tweets
(Depo. Ex. 67                     .

This attachment or exhibit has not been filed electronically because:

It exceeds the file size.

Date: August 14, 2023                /s/ Gilles Bissonnette
                                     Gilles Bissonnette
                                     265393
                                     ACLU of New Hampshire
                                     18 Low Avenue
                                     Concord, NH 03301
                                     603-224-5591
                                     gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023          /s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                                      Case No.   1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that  Plaintiffs                                                         has
conventionally filed the following attachment or exhibit: _____
Exhibit 30 to Plaintiffs' Statement of Material Facts (Depo. Ex. 68)                          .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                    /s/  Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                              Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs                                    has
conventionally filed the following attachment or exhibit:
Exhibit 31 to Plaintiffs' Statement of Material Facts (Depo. Ex. 69).

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023              /s/  Gilles Bissonnette
                                   Gilles Bissonnette
                                   265393
                                   ACLU of New Hampshire
                                   18 Low Avenue
                                   Concord, NH 03301
                                   603-224-5591
                                   gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                              Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)


**NOTICE OF CONVENTIONAL FILING**


Please take notice that Plaintiffs                                                has conventionally filed the following attachment or exhibit: _____
Exhibit 32 to Plaintiffs' Statement of Material Facts (Depo. Ex. 70)                     .


This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART Hum 219.04(a), or it contains personal identifying information.


Date: August 14, 2023               /s/  Gilles Bissonnette
                                    Gilles Bissonnette
                                    265393
                                    ACLU of New Hampshire
                                    18 Low Avenue
                                    Concord, NH 03301
                                    603-224-5591
                                    gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette
265393
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
603-224-5591
gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                              Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs                                    has
conventionally filed the following attachment or exhibit:
Exhibit 33 to Plaintiffs' Statement of Material Facts (Depo. Ex. 71)         .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023               /s/  Gilles Bissonnette
                                    Gilles Bissonnette
                                    265393
                                    ACLU of New Hampshire
                                    18 Low Avenue
                                    Concord, NH 03301
                                    603-224-5591
                                    gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

 All counsel of record

Date: August 14, 2023          /s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                                  Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs has
conventionally filed the following attachment or exhibit: _____
Exhibit 34 to Plaintiffs' Statement of Material Facts (Depo. Ex. 72).

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                    /s/  Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                    Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs                                    has
conventionally filed the following attachment or exhibit: _____
Exhibit 35 to Plaintiffs' Statement of Material Facts (Depo. Ex. 73)                    .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023          /s/  Gilles Bissonnette
                               Gilles Bissonnette
                               265393
                               ACLU of New Hampshire
                               18 Low Avenue
                               Concord, NH 03301
                               603-224-5591
                               gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023                    /s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                            Case No.   1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that _Plaintiffs_ has
conventionally filed the following attachment or exhibit: _____
_Exhibit 36 to Plaintiffs' Statement of Material Facts (Depo. Ex. 74)_.

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                    /s/  Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette
Gilles Bissonnette
265393
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
603-224-5591
gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                      Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)


**NOTICE OF CONVENTIONAL FILING**


Please take notice that Plaintiffs has
conventionally filed the following attachment or exhibit:
Exhibit 37 to Plaintiffs' Statement of Material Facts (Depo. Ex. 75).


This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.


Date: August 14, 2023                  /s/  Gilles Bissonnette
                                       Gilles Bissonnette
                                       265393
                                       ACLU of New Hampshire
                                       18 Low Avenue
                                       Concord, NH 03301
                                       603-224-5591
                                       gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

                              v.                                    Case No.   1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)


**NOTICE OF CONVENTIONAL FILING**

          Please take notice that  Plaintiffs                                                                has
conventionally filed the following attachment or exhibit:  _____
Exhibit 38 to Plaintiffs' Statement of Material Facts (Depo. Ex. 76)                           .

          This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.


Date: August 14, 2023                   /s/  Gilles Bissonnette
                                        Gilles Bissonnette
                                        265393
                                        ACLU of New Hampshire
                                        18 Low Avenue
                                        Concord, NH 03301
                                        603-224-5591
                                        gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                          Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)


**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs has conventionally filed the following attachment or exhibit: Exhibit 39 to Plaintiffs' Statement of Material Facts (Depo. Ex. 77).

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART Hum 219.04(a), or it contains personal identifying information.


Date: August 14, 2023                  /s/ Gilles Bissonnette
                                       Gilles Bissonnette
                                       265393
                                       ACLU of New Hampshire
                                       18 Low Avenue
                                       Concord, NH 03301
                                       603-224-5591
                                       gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

# EXHIBIT 40

DOE Commissioner
Edelblut April 15,
2022 Op-ed and
Attachments

(Depo. Ex. 14)

EXHIBIT 14

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

Skip to main content
scroll to top
A A A Change Text Size
Change Site Language
Search The Site
CLOSE
MAKE TEXT SMALLER
MAKE TEXT LARGER
CLOSE
Select Language ⌄
Powered by Google Translate Translate

Powered by:
Reset Language to English
CLOSE
Search entire site by keyword or topic  Search by keyword or topic...
SEARCH
ALERT

**Get the latest Coronavirus COVID-19 update at https://www.covid19.nh.gov**



New Hampshire
# **Department of Education**

- •
- •
- •
- •



## **Main navigation**

☐ OPEN MENU CLOSE MENU

- Home
- Education Pathways
    - Local District Schools
    - Public Charter Schools
    - Private/Nonpublic Schools
    - Home Education
    - Adult and Continuing Education
    - Education Outside the Classroom
    - Higher Education in New Hampshire
    - Bureau of Special Education Support
    - Career and Technical Education
    - Section 504
- Parents and Students
    - My Local School District
    - Services for my child
    - Appeals and Mediation
    - School Safety
    - Transportation
- Educators
    - Bureau of Credentialing
    - Resources for Teachers
    - Grants and Funding
    - Rules and Regulations
    - Bureau of Student Wellness

- o Data Reports
- Partners
- Who We Are
- Careers
- Contact Us
  - o NHDOE Email Distribution List

-
-
-
-

- Home
- Education's Sacred Trust

# In the News

For Immediate Release
April 15, 2022

**Contact**

Kim Houghton, Communications Administrator
(603) 513-3030 | kimberly.c.houghton@doe.nh.gov

# Education's Sacred Trust

*\*Op-ed written by Commissioner Frank Edelblut of the New Hampshire Department of Education*

Educators and the public education system are custodians of a sacred trust.

When children come to school, they arrive reflecting the value systems of the families responsible for raising them. Those value systems are as different as the children themselves.

Recent revelations from educators around the country, mostly on social media platforms like TikTok, reveal a number of educators who believe that it is their responsibility to weigh in on and influence the value systems of the children toward a particular goal. This impulse to influence a child's value system is not limited to educators. As was recently revealed, Disney also wants to weigh in. It is not good enough to simply allow parents and caregivers the responsibility to instill a value system they believe is right for the child. Whether it is a rogue educator or a corporation trying to impose a value system on impressionable youngsters, that is not their job. That is the job of parents and caregivers.

Fortunately, parents can choose to turn off Disney. They can't, however, easily escape the efforts of activist educators who might be knowingly dismantling the foundations of a value system they are attempting to build.

That means that families, when they send their children to school, entrust the educators to respect the value systems that the family is building. This is the sacred trust that educators have.

To be fair, most educators do not engage in such practices, and effective educators know that blatant displays of bias are not necessary. They can teach challenging and sometimes controversial topics without allowing their personal preferences to seep through to the children. A student may never even know a teacher's opinion on a topic, particularly a sensitive topic like sexuality and gender, or perspectives on political systems, whether capitalism or socialism, or an ideological engagement of race and diversity.

Rather, these teachers provide instruction that is developmentally appropriate to the child, and parents are left to determine how, and when, to explain the benefits and consequences of adopting beliefs that align with one side of an argument or another.

But when educators overstep, it weakens the ability for parents to achieve the values they believe to be best for their children, and it squanders the credibility of the profession as a whole.

For the most part, New Hampshire has avoided many of the problems seen on a national level. But, that does not mean that we are immune to them.

Recent experiences in New Hampshire show that some of these biases are beginning to seep into our own institutions. This document.pdf 📄 exemplifies actual instructional material from New Hampshire schools that parents have identified as conflicting with their values.

One example includes messaging to children as young as 8 and 9 year "that there are totally more than two genders! Some people identify as a gender that is not male or female, some identify as more than one gender, and some people don't identify as any gender." Not only can this be confusing for a child, but it might conflict with – or worse, undermine – the value system of many of the families.

Children in New Hampshire need to learn about capitalism and socialism. And, when those subjects are taught, the teaching needs to be factually accurate. The goal, however, is not to persuade children to become socialists through a biased or subtle affirmation of the tenants of socialism, even if the educator holds a personal belief in that system. Again, for an effective teacher, those beliefs do not seep through. But, when walls of one New Hampshire classroom are adorned with posters extoling the virtues of socialism, the educators undermine the values of families.

PL 00682

Parents of students taking an art class should have a reasonable expectation that they will be learning about, well, art. They should not be concerned, as occurred in another New Hampshire classroom, that the introduction to art will begin with a lesson in pronouns and links to Black Lives Matters for kids and LGBTQ+ for kids.

For a very long time, educators were a highly trusted partner for parents, and in that role, they were given great latitude. With that latitude came great responsibility. Responsibility to support the parents and not undermine their values.

The actions of some educators, which have become increasingly apparent through social media as a result of the pandemic, are undermining the sacred trust that educators hold. Educators have a position of influence over children. The correct use of that influence will support and not compromise the values of families.

Good educators have always recognized that.



.pdfViewer

 Portable Document Format (.pdf) . Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

# New Hampshire
# Department of Education

*25 Hall Street | Concord, NH | 03301-3860*
*(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 | info@doe.nh.gov*
Directions to NHDOE Subscribe to e-news

## Footer - Agency Links

- NH Career and Technical Education
- NH Schools
- iPlatform
- myNHDOE
- Educator Search

## Footer - State Links

- NH Government Careers
- NH Travel & Tourism
- NH Web Portal - NH.gov
- ReadyNH.gov
- Transparent NH

© 2022 State of New Hampshire • All rights reserved

PL 00883

5/20/22, 1:56 PM       Case 1:21-cv-01077-PB   Document 85-41   Filed 08/14/22   Page 5 of 79

- Accessibility Policy
- Privacy Policy

An official NEW HAMPSHIRE government website



# Original text

Contribute a better translation

# Topic One

PL 00685

**EdChange**
informing ourselves
reforming our schools
transforming our world
www.EdChange.org

# Equity & Diversity in the U.S.
# A Re-Perception Quiz

1. 57% of people in state prisons for drug offenses in the US are African American. What percentage of illicit drug users in the US are African American?
   a. 14%
   b. 28%
   c. 42%
   d. 56%

2. According to the Southern Poverty Law Center, 34 anti-Muslim organizations were operating in the US in 2015. How many were operating in the US in 2016?
   a. 21
   b. 34
   c. 101
   d. 146

3. According to GLSEN, what percentage of students who report an incident of homophobia at school say the school did nothing in response or told them to ignore it?
   a. 18%
   b. 31%
   c. 48%
   d. 64%

4. US Census data show that African American and Latina women earn how much for every dollar a White man earns?
   a. one dollar and one dollar, respectively
   b. 81 cents and 79 cents respectively
   c. 64 and 56 cents, respectively
   d. 54 cents and 49 cents, respectively

The Service Women's Action Network has reported that women serving in Iraq and ghanistan are less likely to have been killed by an enemy than they are to have been:
a. raped by a colleague
b. dishonorably discharged
c. promoted in rank

6. According to the Center for American Progress, compared with schools attended by at least 90% white students, those attended by at least 90% students of color spend how much less per pupil annually?

   a.  $312
   b.  $733
   c.  $1,028

7. About 5% of the world's people live in the United States. About what percentage of people currently in prison live in the United States?

   a.  5%
   b.  25%
   c.  45%
   d.  65%

8. In a study conducted by the National Bureau of Economic Research, researchers replied to help-wanted ads by sending résumés from fictitious applicants. Each applicant had the same qualifications, but some had stereotypically African American sounding names while others had stereotypically White sounding names. How much more likely were applicants with stereotypically White names to get a callback regarding their applications than applicants with stereotypically Black names?

   a.  15% more likely
   b.  26% more likely
   c.  39% more likely
   d.  50% more likely

9. Identify the source of this quote: "We have deluded ourselves into believing the myth that capitalism grew and prospered out of the Protestant ethic of hard work and sacrifices. Capitalism was built on the exploitation of black slaves and continues to thrive on the exploitation of the poor, both black and white, both here and abroad."

   a.  bell hooks
   b.  Michael Moore
   c.  Martin Luther King, Jr.

10. The median household income in the US has increased 16% since 1980. During the same period, corporate profits after taxes increased 182%, the average income for the wealthiest 1% of families increased 190%, and the average income for the wealthiest 0.01% of families grew 322%. What happened to the average income of the poorest 90% during that time?

   a.  increased 16%
   b.  increased 0.03%
   c.  decreased 16%

*For a list of references as well as other quizzes and answer keys, please visit the Multicultural Pavilion Web site at http://www.edchange.org/multicultural/quizzes.html.*

© EdChange and Paul C. Gorski, 2017
http://www.EdChange.org

a. $312
b. $733
c. $1,028

7. About 5% of the world's people live in the United States. About what percentage of people currently in prison live in the United States?

a. 5%
b. 25%
c. 45%
d. 65%

8. In a study conducted by the National Bureau of Economic Research, researchers replied to help-wanted ads by sending résumés from fictitious applicants. Each applicant had the same qualifications, but some had stereotypically African American sounding names while others had stereotypically White sounding names. How much more likely were applicants with stereotypically White names to get a callback regarding their applications than applicants with stereotypically Black names?

a. 15% more likely
b. 26% more likely
c. 39% more likely
d. 50% more likely

9. Identify the source of this quote: "We have deluded ourselves into believing the myth that capitalism grew and prospered out of the Protestant ethic of hard work and sacrifices. Capitalism was built on the exploitation of black slaves and continues to thrive on the exploitation of the poor, both black and white, both here and abroad."

a. bell hooks
b. Michael Moore
c. Martin Luther King, Jr.

PL 00688

1741

2. According to the Southern Poverty Law Center, 34 anti-Muslim organizations were operating in the US in 2015. How many were operating in the US in 2016?

a. 21
b. 34
c. 101
d. 146

3. According to GLSEN, what percentage of students who report an incident of homophobia at school say the school did nothing in response or told them to ignore it?

a. 18%
b. 31%
c. 48%
d. 64%

4. US Census data show that African American and Latina women earn how much for every dollar a White man earns?

a. one dollar and one dollar, respectively
b. 81 cents and 79 cents respectively
c. 64 and 56 cents, respectively
d. 54 cents and 49 cents, respectively

5. The Service Women's Action Network has reported that women serving in Iraq and Afghanistan are less likely to have been killed by an enemy than they are to have been:

a. raped by a colleague
b. dishonorably discharged
c. promoted in rank

PL 00689



Verizon LTE          8:06 AM          29%

3 People

Thank you

That student told me
Parent pulled him aside
today and asked if he was
given an assignment that
made him
"uncomftorable"

Im not sure how he even
know who it was that
shared that info. Parent
said that teacher had
them fill out permission
slips? But even with a slip,
i would think its still not
allowed.





Verizon  LTE          8:06 AM              31%

3 People

Probably they pinpointed him because he was at the meeting I did put in a call to the principal because I've never spoken to him before and I wanted to bring up about the fact that the comfort of the students should be in the forefront

I figured it was because he was sitting with us last night



iMessage







.ıl Verizon LTE                8:08 AM                    @ 36% ⚡

< ⑨                          3 People

engaging with ▮ in the middle of
the hallway. ▮ yelled that ▮
talking to me. Loudly. Said it loudly
not exactly yelling but said it
loudly.
I told ▮ I had zero trust in
anything, I told ▮ that as well.
▮ said we had the department of
education emailing them and they

▮ reached out to
someone ▮ trusted, in an
uncomftorable situation,
and they want to punish
▮ for it. Disgusting.

Oh boy.  Please find a
way to acknowledge and
thank this student

I already did. And
reminded ▮ very
brave

iMessage

Verizon LTE                8:08 AM                    36%

Done                **14 of 16**

students mom because said student stuck up for what's right that will benefit future grades. Absolutely insane. I couldn't believe that. ███ was so rude and I told ███ lost all respect for ███ understood that because ███ not very nice after school board meetings, apparently, that's what ███ said. ███ gonna "fix it" 😑 yeah I'm not talking to that ███ ever again.

> What did ███ say to you

Wanted to know who I told (didn't tell ███ - all of this at 7:15 am WHILE i was walking to my A period class. Questioned me and I walked away because I wasn't engaging with ███ in the middle of the hallway. ███ yelled that ███ talking to me. Loudly. Said it loudly not exactly yelling but said it loudly.

I told ███ I had zero trust in anything, I told ███ that as well. ███ said we had the department of education emailing them and they were scrambling to fix it. The fact that ███ just assumed it was me no questions asked says enough.



PL 00695    10

## Edelblut, Louis (Frank)

**From:**        Farrell, Richard
**Sent:**        Tuesday, April 12, 2022 9:00 AM
**To:**          Edelblut, Louis (Frank)
**Subject:**     FW███████████
**Attachments:** Human Relations Course Syllabus.pdf

Please review the attachment.
Rich

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

*The contents of this message are CONFIDENTIAL Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is PROHIBITED. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ███████████████████
**Sent:** Thursday, April 7, 2022 9:34 AM
**To:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Cc:** █████████████████████████
**Subject:** ██████████████

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Good morning Rich.
We have had an opportunity to review the material that you'd sent and have the following information for you in response to the inquiry.
First and foremost, the activities identified are from the Human Relations Course at ███ After review with the principal, curriculum coordinator, and assistant superintendent, we have determined that these activities do fall within the scope of the course. For your information, I have attached a copy of the syllabus. You'll also notice that this syllabus includes a form for parental notification, as well as an invitation for parents to review class assignments on Google Classroom at any time. I'm told that all participants in the class have submitted signed acknowledgements. Furthermore, neither the teacher nor school administrators have received any complaints to date regarding the course content. Should any such objection be received, the district will handle it in accordance with our Policy IGE – Exceptions to Use of Specific Course Material(s). We have also reviewed this material through the lens of the new Divisive Concepts law, and find that the subject of these activities do not apply.

I have copied the school staff involved in this matter on this email – please feel free to let us know if you require further information.
Regards,
█████████████

1

# Human Relations with

room:          email:                                    phone:

## Class Description

Students will develop knowledge, skills, and behaviors to create a greater understanding of themselves, other individuals, families and society. The course will proceed by way of class activities and development of skills to contribute to positive relationships, families and an understanding of our society.

## Class Competencies

**Personal Development:** Students will analyze functions and expectations of personal needs, characteristics and the effects on interpersonal relationships.

**Communication Skills:** Students will demonstrate communication skills that contribute to positive relationships in all aspects of life.

**Leadership & Teamwork:** Students will demonstrate leadership and teamwork.

# Responsibility and Preparation

Come to class on time and prepared. You should be in your seat by the time the bell rings.

## CLASS EXPECTATIONS = LIVE THE LANCER WAY!

1.  **Be Positive & Respectful**
2.  **Be Prepared & Organized**
3.  **Be Present & On-time**
4.  **Be Proud**

Situations disregarding our classroom expectations will be handled on a case-by-case basis to emphasize the importance of being our best.

### Cell Phone Policy

Please be respectful with the use of personal devices and keep them put away during instructional time. Your device should not be preventing you from doing your work.

# Google Classroom

All lesson materials and assigned work (including papers that are handed out in class) will be posted on Google Classroom for reference and review purposes, or in the event that you are absent. You are encouraged to invite your parent/guardian to our Google Classroom so that they may stay informed about what we are doing in class.



Course Competencies-
Competency 1 - Communication and Collaboration in the classroom
Competency 2 - Critical Thinking, Creativity and Problem Solving
Competency 3 - Self- Directed Learners
Competency 4 - Engaged Citizens in our communities

# Classroom Work/Grading

Assessments will be done in multiple ways. Bell ringers, quizzes, class activities, exit tickets and reflections will be used in the classroom to formatively assess the students' learning. Performance tasks, projects, presentations and reflective writing will be used to summatively assess a student's work.
**Summative work counts for 80% of your grade.**
**Formative work counts for 20% of your grade.**

## Attendance-

Students are expected to be in class, on time, every day. Attendance will be taken at the beginning of each class and absences will be noted. **Students who miss more than 5 classes per quarter are in danger of failing** the course. In addition, those students who arrive late (without proper documentation) will also be noted and marked as tardy. **3 tardy arrivals count as 1 absence.** REMEMBER..... Most of our course assignments are completed in class so it is in your best interest to be in class to complete the work.

## Materials
Folder
Pencil/Pen
Notebook or paper (guided note sheets will be provided for some lessons)
Laptop/device to access Google Classroom and online assignments

## Make Up Work & Remediation Plans-

**Make-Up-**
If you are absent---it will be **YOUR** responsibility to do the following-
- Check the **Google Classroom** and your **Weekly Overview**
- Initiate communication with me on how to complete any missing formative or summative work
- All make-up work must be completed within one week after returning to school unless an alternative plan is made with your teacher according to the Student Handbook page 9.

**Late work -**
I understand that life happens and assignments will be accepted late. However if arrangements were not approved in advance and the assignment is more than 1 day late, 5 points will be taken off. If assignments are repeatedly turned in late additional points may be taken off. If you are completing an assignment late that is an online assignment, it will be your responsibility to notify me to check the online assignment for your work (send an email, comment on classroom assignment or discuss in person).

**Remediation-**
If you are not satisfied with your success on a summative assignment and you would like to create a plan to improve, you must make arrangements with me to create a remediation plan. Plans will be created based on the assessment, the competencies addressed and the area of need for the student. Remediation must be completed within the same quarter as the original assignment.

**Extra help -**
For extra help, to make up work or just to talk about life, please see me either before school (7:05-7:15) or during my prep period (C period) or lunch (F period). If you need a longer time period I am happy to schedule one with you.

I am looking forward to the opportunity to work with you throughout the semester. LET'S GET GOING! 

# Human Relations Units of Study

## Values, Goals & Self
- Values
- Goal-Setting
- Self-Concept
- Self-Esteem

## Stress Management
- What is stress?
- Managing Stress
- Lifestyle, Attitude & Gratitude
- Time Management

## Communication
- "I" Messages
- Levels of Communication
- Handling Conflict
- Communication Styles
- Complaints & Difficult Conversations

## Diversity
- Celebrating our Differences
- Equity vs. Equality
- Race & Privilege
- Gender & Sexuality
- Microaggression

## Media & Technology
- Social Media
- The Evolution of Dating
- Digital Drama & Cyberbullying

## Relationships
- Love
- Friendship
- Healthy Relationships
- Ending Unhealthy Relationships
- Partnership & Marriage
- Family & Parenting Styles
- Family Stressors

## Community
- Leadership & Teamwork
- Community Resources
- Building Confidence
- Community Service



Welcome to ▬▬▬ Class

ALL ABOUT RELATIONSHIPS

## ▬▬▬ High School---Family & Consumer Sciences Department

Teacher ▬▬▬ E-Mail- ▬▬▬ Phone- ▬▬▬

If you need assistance please see me in class or send me an email to set up an appointment.

By signing the course agreement, you are stating you understand the requirements of the course and the expectations. Please have your parent/guardian sign so they are aware of the requirements and expectations of the course as well.

## HUMAN RELATIONS COURSE AGREEMENT

### Please read and sign:

I have read and understood the expectations and requirements of Human Relations course..

Student Name (please type or print): _____

Student Signature: _____

Please list any food allergies: _____

Since our class is held in our foods classroom I would like to be aware of any food allergies to ensure classroom safety.

Parent/Guardian Signature: _____ Date: _____

Parents/Guardians:

- If you have any special skill/experience in relation to the class topics, please feel free to call or email me to set up a time to discuss, or write your phone number below for me to contact you.

- You are welcome to join our Google Classroom to stay up to date on what we are covering in class and review any assignments with your student.
  - Google Classroom code - Human Relations - _____

- Please feel free to contact me if you have any concerns/suggestions about the class or your child. I look forward to working with you and your child(ren) this semester!

# Topic Two

PL 00701



**Today**

11:58 AM

A friend has a 6th grader at ▮▮▮▮ that came home and said that in their 'debate' class they were debating a sexual Relationship between two men. the sixth grader came home and said their debate was very uncomfortable and was about S E X (spelled out because they are too young to even want to say the word!!). not an appropriate topic for 6th...maybe towards the end of high school but not right around puberty...and we are to trust the 'experts' in education have designed the curriculum and have done their due diligence on what is best for kids and age appropriateness??? This has to stop. My friend is still processing it before deciding how to address it with the school.

12:27 PM

# Topic Three

PL 00703



March 16, 2022

Dear Families of Fourth Graders,

The Life Science unit will begin prior to spring break this year. This unit focuses on body development and puberty. This unit can be a way of gathering answers to questions students have been curious about, but frequently it can be an uncomfortable topic for some children. I hope that with support from both home and school, we will be able to help students learn accurate information about their bodies in a way that encourages them to be respectful and accepting of themselves and others. I will work with all fourth grade students together in an open teaching format. There will be a focus on basic scientific facts explaining how everyone will go through adolescent changes at their own body's pace. Now is the perfect opportunity for you to take some time to begin a conversation with your child prior to the school lessons to let them know you are there to answer any questions they may have.

Topics covered:

- Anatomy and physiology of the reproductive system
- Emotional and physical changes that begin with puberty
- Health and hygiene
- Personal safety including strangers, safe phone/internet use
- Peer pressure & respect for self and others

If you would like to review the materials that will be used in teaching please feel free to connect with me. Here is a great website if you are looking for information. amaze.org There are also many other sites, some better than others, so be sure to review beforehand if you want to use it with your child!

Here are some books you might find helpful

"The Care and Keeping of You" –American Girl Library

"On Your Mark, Get Set, Grow" –Lynda & Andrew Madaras

**Thank you for your help!  Please call anytime if you have questions**

using some of the following:

Speak with your child when you're both relaxed, like over dinner or in the car 

Bring these issues up when you hear someone is getting married 

If your child says a friend's sister or a teacher is getting married, you can say, "That's fantastic! Is she marrying a man or a woman?"

If you hear your child or one of their friends say, "That's so gay," address it 

What's important to remember is that people deserve to express themselves in ways that feels right for them and to be respected no matter how they identify, look or dress

Are there more genders than "boy" and "girl"?  ∧

Yes, there are totally more than two genders! Some people identify as a gender that is not male or female, some identify as more than one gender, and some people don't identify as any gender.

How can I tell a person's gender?  ∨

What should I do if I don't feel like either a boy or girl, or if how I feel doesn't match my body?  ∨



## Related Videos

know if I am?

## How do I figure out my sexual orientation and identity?



Your sexual orientation refers to the gender(s) of who you're attracted to or who you fall in love with. While sexual orientation is not a choice, it can shift over time for some people. It also may be difficult to understand and make sense of your feelings. Separately, your identity is what you decide to call yourself, which is a decision that can only be made by you. You get to figure out which sexual identity best suits you and what that identity means. Some of these identities are gay, pansexual, lesbian, demisexual, heterosexual, bisexual, asexual and more! It's also all right if your identity changes over time or doesn't exactly match up with your sexual orientation or sexual behaviors. There is no need to feel pressured into identifying a certain way.

# Related Videos



# VIDEO TOPICS

## Gender Identity

What Are Pronouns?

Challenging Male Gender Stereotypes With Jason Rogers

Sex Assigned at Birth and Gender Identity: What Is The Difference?

Range of Gender Identities

Puberty and Transgender Youth

Gender Identity: Gender Roles and Stereotypes

How To Be A LGBTQIA+ Ally

My Friend Is Transgender

Being Female, Male, Transgender or Fluid

Expressing Myself. My Way.

## Healthy Relationships

# Topic Four

PL 00709



PL 00710

Art with Mx.

SLIDESMANIA.COM

SLIDESMANIA.COM

PL 00711

# Who is Mx.?

My name is Mx.

Mx. is pronounced just like the word "mix."
It is a gender-neutral prefix/honorific
(like Dr. or Professor or Coach) instead of
using Ms., Mrs., or Mr.

Click here for more info!



2

PL 00712

# My pronouns are they/them/theirs

Pronouns are what people use to refer to you without using your name. For example, "This is Mx. ████ They are my ████ teacher! I like them as a teacher. Their favorite color is peacock blue."

Common <u>pronouns</u>:

She/her/hers

He/him/his

<u>They/them/theirs</u>



"Click the pronouns for more info on "they"

SLIDESMANIA.COM

3



What else should we know about

Mx.

this teacher believes
**BLACK LIVES MATTER**

I support my LGBT STUDENTS

Click here for more info on BLM for kids

Click here for more info on how to make safer spaces for LGBTQ+ kids

SLIDESMANIA.COM

P. 0078

4

# Topic Five

PL 00714



Poster reads:

Socialism

An Economic Ideology

Economic system where the basic means of production is primarily owned and regulated by the government

All for one and one for all

"Socialism is workable only in heaven where it isn't needed and hell where they've got it" Cecil Palmer

A few examples: Socialist Republic of Vietnam 1976-Present, Laos 1975-Present

Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.

1768

PL 00716



Socialism also has another meaning. It refers to the kind of economic system most European nations have today. In this kind of socialism the government owns or helps out the major businesses but allows individual ownership of small businesses. Most European governments are parliamentary democracies paired with economic socialism. They are not fascist governments.



PL 00718



PL 00719





Black L...

meaning with ...
antiracist decl...
social media of ...
antiracist pr...
protesters reject ...

that Black lives don't matter. #BlackLivesMatter quickly transformed from an antiracist love declaration into an antiracist movement filled with young people operating in local BLM groups across the nation, often led by young Black women. Collectively, these activists were pressing against discrimination in all forms, in all areas of society, and from a myriad of vantage points. And in reaction to those who acted as if Black male lives mattered the most, antiracist feminists boldly demanded of America to #SayHerName, to shine light on the women who have also been affected by the hands and feet of racism. Perhaps they, the antiracist daughters of Davis, should be held up as symbols of hope, for taking potential and turning it into power. More important, perhaps we should all do the same.



OJ Simpson Trial

Kind of Skimmed
over this

his com-
ath Row.
ecause of
e stay of

vas going
...n² Not at the Million Man March, that's for sure. He
was in Texas, pleading to evangelicals for racial healing.
Instead of listening to the people dealing with it, he went
to beg people not dealing with it to ask God to fix it.
And, of course, it slipped into *pray God fixes Black people*.
Even though a year later, affirmative action was banned
in California, making the playing field, especially as it
pertained to higher education

PL 00721

7





Desegregation is
good for only
elite backs
p 185

Where

BSU...

and ...

hormon...

53 ...

Separation, ... and everything in service

Back Power even appealed to the face of the civil righ

... That's right, even Dr. King, in 1967, was tur

... from assimilationist thought in the same w

E. B. Du Bois had later in his life. Dr. King had n

... that desegregation was good only for elite Bl



BOOK

Answer

8. Who do Reynolds and Kendi claim was the world's first racist?

Gomez Eanes de Azara  A royal commander of Prince Henry Army. He was the first person to write about the Black human ownership

9. Who did the world's first racist write a biography about, according to Reynolds and Kendi?

Prince Henry

10. What was the book that the world's first racist wrote titled, according to Reynolds and Kendi?

The Chronicle of the Discovery and Conquest of Guinea.

11. How was the world's first racist's book received by the public?

It was a bestseller.

12. How did the world's first racist depict Africans in his book, according to Reynolds and Kendi?

As savages that needed training. Africans needed slavery in order to fed and taught Jesus

13. What did the Climate Theory say about Africans?

They were savages because of the hot weather where they came from and the brome white if they moved

14. What did the Curse Theory say about Africans?

PL 00724

10

1777



Original

Case 1:21-cv-01077-PB   Document 45-2   Filed 05/20/22   Page 47 of 79

# Recreation

## 8th Grade

2021-22

Competency 1: I can demonstrate an understanding of conflict and compromise

| Date: | Monday: 9/20 | Tuesday: 9/21 | Wednesday: 9/22 | Thursday: 9/23 | Friday: 9/24 |
|---|---|---|---|---|---|
| Learning Target | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States | Learning Target 1.5: I can explain the causes and results of racial tension in the United States |
| Essential Question | What are the causes of Racial Tension? | | | | |
| Formative | US History Formatives: Who was the first Racist? What did he accomplish? | | US History Formatives: Blank Map of New England | | |
| Classwork | Hand out Stamped. Read Aloud chapters 2-4 Answer questions | Hand out Stamped. Read aloud chapters 2-4 Answer questions in packet Slave Trade packet Exit Ticket | Read aloud Chapters 3 and 4 and answer questions together. Slave Trade packet | Read to P. 78 and answer questions together. Review: Slave Trade packet Do exit Ticket | Worksheet: Historical Background: The Development of Race-Based Theory |
| HW | | | | | |

PL 00726

# Topic Six

PL 00727

# Get to Know You!

Answer the Google Form below to help me get to know you!

What is your first and last name? *

Liam Elliott

What is your preferred name? *

Liam

Who can I use this name in front of? *

☑ I can use this name in front of other students

☑ I can use this name when contacting parents/guardians

☑ I can use this name with other teachers, including substitutes

☐ Any other comments:

☐ Other:

What are your preferred pronouns? *

⦿ He/him/his

◯ She/her/hers

◯ They/them/theirs

My preferred learning style is... *

◯ Visual-- maps, graphs, diagrams, charts, etc.

◯ Auditory-- speaking and listening

⦿ Kinesthetic-- experience, practice, examples, simulations (hands-on)

◯ Reading and writing

I like when my teacher... *

Gives me A's

One thing you should know about me as a student is... *

I'm a pain

One thing you should know about me in general is... *

I have red hair

Any thing else you would like me to know? *

Pronouns are the same ones i got in the womb

This form was created inside of ▮▮▮▮▮▮

Google Forms

# Algebra 2 Getting to Know You

Please answer the following questions, so that I can better assist you this semester.

1. Email *



2. Name (First and Last) *



3. Name you want me to call you in class. *

 or _____ Whatever you want

4. Pronouns (ex: he/him, she/her, they/them): *

She/her

5. May I use these pronouns in front of the class? *

*Mark only one oval.*

 Yes

◯ No

4

6.  May I use these pronouns when I contact home? *

    *Mark only one oval.*

    ☑ Yes

    ◯ No

7.  May I use these pronouns in front of other teachers? *

    *Mark only one oval.*

    ☑ Yes

    ◯ No

8.  Would you like to follow up with me (in a private conversation) about your pronouns? *

    *Mark only one oval.*

    ◯ Yes

    ☑ No

9.  Are you taking another math class this semester? If so, what is it? *

    No

10. What math classes have you taken and at what level? *

    Algebra 1 pt 1 & 2 (E)
    Geometry (H)
    Consumer Science (H)

5

PL 00732
2/4

11. Why did you take this particular class? *

Because I need the Credit

12. What grade do you expect to earn in this class? *

*Mark only one oval.*

◯ A
⊘ B
◯ C

13. Tell me about your past math experiences. *

I can grasp Concepts very well, but I do
tend to overthink equations and end up overwhelming
myself.

14. Tell me three things about yourself. This could be a hobby (or hobbies), interesting facts, or anything you want me to know about you? *

- I write/sing songs
- I play the Piano
- I'm a host at ███████ in ███████

15. What would you like to ask me about myself or this class?

If you could teach another Class
What would it be and why?

This content is neither created nor endorsed by Google.

Google Forms

Case 1:21-cv-01077-PB   Document 45-2   Filed 05/20/22   Page 56 of 79

# Topic Seven

PL 00735



ipted for use by the Program on Intergroup Relations and the Spectrum Center, University of Michigan.

urce hosted by LSA Inclusive Teaching Initiative, University of Michigan (http://sites.lsa.umich.edu/inclusive-teaching/).

## DIVERSITY BINGO

Directions: Find someone in the class to fill each square and ask them to write their name in that square. Each person can only fill ONE square on your card. The first goal is to get Bingo: a row across, down or diagonally. When you do, yell: "BINGO!"

| Knows what Diwali is | Has memorized a poem | Has travelled to South America | Is a vegetarian | Has a quote that inspires them |
|---|---|---|---|---|
| mes from an nterracial family | Celebrates Yom Kippur or knows what it is | Is a twin or triplet | Has a family member who has a service animal | Has travelled to Europe |
| musical ment | Speaks more than one language (fluently) | Lives on the planet Earth | Is a first generation American (both parents were born in another country) | Was born in another country |
| a ts | Has travelled to Canada | Celebrates Kwanzaa or knows what it is | Sent a handwritten 'thank you' note recently | Does NOT have SnapChat |
| Is of Native American heritage | Does not use binary gender pronouns | Has lived in more than one state | Has a cause they are passionate about | |

9:41   .ıl 🕾 ▮



⌂ sites.lsa.umich.edu



### Definitions as a Starting Point

Key definitions and concepts associated with anti-racist pedagogy

### Readings to further your understanding

This button links to an anti-racist pedagogy annotated bibliography maintained by CRLT

### Disrupting White Supremacy on Campus

Learn about the historical legacy of racism and activism at U-M

### LSA DEI and Anti-Racism Initiatives

Learn about LSA DEI and anti-racism initiatives

# Practicing Anti-Racism and Anti-Racist Pedagogy: An Overview

9:46                                                    .ıll 🤔 🔋


🔒 sites.lsa.umich.edu                    ⟳


**LSA** INCLUSIVE TEACHING
UNIVERSITY OF MICHIGAN

| | **Social Identity Wheel** |
|---|---|
| **Overview** | The Social Identity Wheel worksheet is an activity that encourages students to identify social identities and reflect on the various ways those identities become visible or more keenly felt at different times, and how those identities impact the ways others perceive or treat them. The worksheet prompts students to fill in various social identities (such as race, gender, sex, ability disability, sexual orientation, etc.) and further categorize those identities based on which matter most in their self-perception and which matter most in others' perception of them. The Social Identity Wheel can be used in conjunction with the Personal Identity Wheel to encourage students to reflect on the relationships and dissonances between their personal and social identities. The wheels can be used as a prompt for small or large group discussion or reflective writing on identity by using the Spectrum Activity Questions on Identity. |
| **Goals** | 1) To encourage students to consider their identities critically and how identities are more or less keenly felt in different social contexts. The classroom and the university can be highlighted as a context as a way to approach questions on barriers to inclusion.<br><br>2) To illuminate how privilege operates to normalize some identities over others. For example, a student who speaks English as their first language can reflect on why they rarely need to think about their language as an aspect of their identity while some of their peers may identify language as the aspect of their identity they feel most keenly in the classroom.<br><br>3) To sensitize students to their shared identities with their classmates as well as the diversity of identities in the classroom, building community and encouraging empathy. |
| **Implementation** | 1) View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom.<br><br>2) There are three ways you can approach this activity:<br>   a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion.<br><br>   b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity.<br><br>   c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |

4

PL 00739

| Implementation | 1) View this video (at the 6:46 mark) to see how to facilitate this activity in your classroom. |
|---|---|
| | 2) There are three ways you can approach this activity: |
| |    a. Option A: This can be done as an independent activity where students answer the questions on their own and then you lead a whole-class discussion. |
| |    b. Option B: You can post the different social identity categories around the room and have students go through the questions on the handout, moving to the identity that best answers the question. Students can then discuss with other students who chose the same identity. You can then lead a debrief after the activity. |
| |    c. Option C: In combination with Option A or B, have students complete the Personal Identity Wheel as well. |

| | 3) If you are choosing Option B or Option C/B, place the social identity categories around the room before class. |
|---|---|
| Challenges | 1) The students may not perceive the activity as relevant to the course and thus may exhibit resistance. |
| | 2) Students may not be familiar with particular concepts, or they may have different assumptions about those concepts that the activity assumes. For example, they may not know the difference between the terms "sex" and "gender," or they may be resistant to the distinction between the two. |
| | 3) If the wheel is used as a discussion prompt or if students are in close quarters and are able to see what their peers have written on their worksheets, this exercise may feel especially vulnerable to students with invisible identities that they may not want to disclose to the class. Disclosure in verbal or written form should be voluntary and discussion questions should be broad enough that students can opt to not talk about more vulnerable aspects of their identities while still leaving space for them to share if |

5

PL 00740

# Topic Eight

PL 00741

"MY SILENCES
HAD NOT
PROTECTED ME.
YOUR SILENCE
WILL NOT
PROTECT YOU."

You have a voice. Use
it. Speak the truth.
Share it with others.
Choosing silence is
not an option.
Audre Lorde,
an American
feminist, writer,
and activist
said.

PL 00742

## CHOOSING MY PATH

## 10

### DISRUPT!

### HOW DO I STAND UP? AND SPEAK OUT? WHAT HAPPENS IF I DON'T SAY ANYTHING?

*YOU CAN DO IT: YOU CAN DISRUPT RACISM AND CHANGE THE "NORMAL."*

You are now able to see the world in a way you didn't always notice before. You are building a new lens to see yourself and the world around you. You know more history (the parts you are told about and what has been left out). You are more conscious of the ways people interact with one another. You are attuned to microaggressions and are aware of their impact. You see the work institutions have put in over hundreds of years to maintain the structure of racism. Your school may have rules around how students can wear their hair or what folx can wear on their head and you understand the dominant culture. You notice that, still, most of the shows and movies you watch have a nearly all-white cast and how every time there is a terrorist that person is Western Asian and speaks Arabic. You see how stereotypes are created and sustained. You have the tools to seek out more knowledge and gain a deeper understanding.

What do you do next?

1

86

# YOU CANNOT HEAR SILENCE. INACTION CANNOT BE SEEN. WE CANNOT FEEL THE MOMENTUM OF CHANGE IF NOTHING HAPPENS.

Use your voice to speak the truth about injustice and share the history we are often not told. Talk to your family, your friends, your classmates, anyone and everyone who will listen. Write and write and write and share. Create art and share it. Take risks. You can do this.

I wish I had used my voice when my teacher was so continually awful to us. I wish I had stood up to my teacher. And to our school administration that allowed her to remain there.

What would I do today if I were in that classroom?

I'd physically stand up to her (in my small nine-year-old self). I'd get out of my seat, stand up, and tell her, "You can't talk to him like that. It's not okay."

Then, I'd walk out of that classroom, bringing my friend with me and anyone else who wanted and needed to come. I would walk down the stairs to the office, where I'd ask the school secretary or the principal to file a complaint against that teacher. I'd tell them what happened. I'd tell them she verbally abused my friend. And I'd file that complaint. I would ask the office to call my friend's parents. He shouldn't have to sit another minute in the classroom with our teacher who assaulted him with her racist words. No one should.

I'd tell my mom. (I did.) We'd talk to his parents. I'd ask all our classmates to share what happened with their families. Our parents

and caregivers would help our voices to be heard. We would be louder than just my own voice. They, too, would file complaints and show up at school the next morning. They'd ask for the resignation of our teacher because she should not be teaching us if she couldn't keep us safe. And she couldn't keep us safe because she was the one causing the harm.

We would all attend the next school board meeting to demand our schools be a place where we can learn, free from racial violence, both verbal and physical.

I think about that day so often and wish I had had the tools to go beyond recognizing what was happening. I wish I had created a plan and spoken up. I wish I had resisted my teacher and everything that kept her in place.

# THIS IS WHY I SHARE WITH YOU. YOU CAN RESIST NOW. YOU CAN DISRUPT NOW.

What if it's something beyond your daily interactions at school? What if it's something outside of the comfort of what is familiar?

What if you and your family or friends are driving through town, and you see four police officers surrounding two young Black men? Maybe you recognize them, maybe you don't. Maybe one of them was in chorus with you last year. Maybe you've seen them at the store. Or maybe you don't know them at all. It doesn't matter if you know them or not.

You may be able to see if the police are armed. You may not. (While some police

PL 00743

2

Case 1:21-cv-01077-PB   Document 85-2   Filed 05/20/22   DISRUPT!

carry guns and others do not, we do know that they all carry power in their role as law enforcement.) You can see the young Black men are not armed, that they look confused, and that their hands are up.

You've seen the news over and over again: you know history. You think of Eric Garner, Sandra Bland, Philando Castile, Michael Brown, and all the others. You know this happens every day and today can be the day you change that. Here is where you can make a plan so you'll know what you can do if this does come up in your life. **NOTE:** You must make sure YOU are safe and out of harm's way. Talk to a trusted adult BEFORE taking any action.

3

## Activity:

First, grab your notebook. Let's start writing!

You've observed what's happening and have examined the situation. You know the folx being held by the police look frightened. They don't want to be there. You don't want these two young Black men to become new hashtags and statistics.

So, there are a bunch of things you can do—take a few minutes and make a list of **every possible outcome** you can think of.



Here's my list:

- Ask the person who is driving the car to stop. We can get out and walk over to the situation so we can stand witness.

- Record what is happening with my phone. I can. This is my right to do so. In the United States, the UK, and many other countries I cannot get arrested for recording if I take photos or video of public spaces. The police cannot take my phone from me. (They may ask me to do so.) They may ask me to stop recording, but I don't have to stop.

If I am inside a store, private property, etc, the owner sets the rules and it is their choice whether I can record or not. This is not the decision of the police.

PL 00744



What else?

Do our lists look similar? What am I missing? What are you missing? There's more we can add and we'll look at this in the next couple of chapters! You will continue to build your plan for taking action.

my choice

Some of your choices will require you to take risks. Some may not. Understanding your privilege and the power you have—or do not have—is important. It will determine how you approach everything. This situation with the police is one where, especially if you are white and cisgender, you can use your privilege to speak up. **If you are a Black, Brown, or Indigenous Person of the Global Majority, you will need to decide how each outcome could end for you.** White people, this is not something you need to do because you are at the center of the system: taking a risk with any of these choices will, most likely, not have you end up in jail or harmed.

- Stay in the car and record.

- Stay in the car and shout out to the two being held by the police, "I see this."

- Standing near the police and the young men, I can ask the two Black men if there's anything I can do... if there's anyone I can call for them. (The adults I'm with can stand with me too.)

- Stop other people walking by and ask them to stand witness too. (There is strength and power in numbers.)

- Ask the adult I'm with to intervene while I stay in the car.

- Ignore this and keep driving.

4

PL 00745

# Topic Nine

PL 00746

## Homework:
## Defining Sexual Orientation

Name: _____   Date: _____

**Instructions:** View the short animated video from Amaze.org called, "Talking Sexual Orientation with Jane" available here: http://amaze.org/video/talking-sexual-orientation-with-jane/. Once you have watched the video, please write down your own definition of sexual orientation. Then, think of an adult you know well and trust who you could share this definition with. This could be a parent or other adult family member, a friend's parent, someone at school, etc. Tell this person what we discussed in class and share your definition so that they also know what sexual orientation is. See if they agree with your definition, or whether they have another take and add that to what you have. Make sure they sign below!

1) Sexual orientation is:

(What I say):

(What the adult I asked says):

**2) Did you learn about sexual orientation when you were growing up?: If so, what did you learn?**

(What the adult I asked said):

Name of adult:  _____

Their signature:  _____

Relationship to you:  _____

Advocates
for Youth
Rights. Respect. Responsibility.
www.advocatesforyouth.org

1

# Topic Ten

PL 00748

## Exploring Whiteness and Becoming an Anti-Racist Activist

WE WILL STUDY
LOCATION ████ Classroom Room ████
READINGS TBD
TIME Full Day    MAX ENROLLMENT 16   STUDENT COST $0

DESCRIPTION Students will join in honest, frank, and respectful examination of what it means to be a white person in 21st century America. We will explore many topics on race including: personal identity and power, white privilege, guilt, and fragility, and taking anti-racist action. We will learn how whiteness and race were invented in the early years of our country's formation, further sustained through government programs, and how this has played out in our own community. Students will learn how to take anti-racist action by meeting with college students who currently are engaged in national and local anti-racist work, including where anti-racist intersects with gun safety, climate change, and LGBTQ rights. This MI is open to all students, and we hope that we will have a diverse group. The course will be designed to be a dynamic and interactive experience based at ████ but also involving field trips off campus. Tentative plans include interaction with Dartmouth students/staff members and other local community members involved with anti-racism work and correspondence with students from Ashley Hall School in Charleston SC to discuss how we perceive race and each other in New England and the South.

Tuesday 3/10
8:00-8:30 Introductions/Rules of Engagement/ Race Literacy Quiz ████
8:30-9:00 Equity and Inclusion Terms, Language, and Definitions ████
9:00-9:45 The Invention of Whiteness/ Race the Power of an Illusion ████
9:45-10:00 Break
10:00-11:00 Action Plan Design planning (Group led by ████
11:00-12:00 Lunch
12:00-1:00 "Understanding Racism and Systemic Oppression " Brian Cook/Groundswell Change  OK
1:00-1:30 Discussion on Brian Cook's Presentation
1:30-1:45 Break   OK
1:45-2:45 iPod walk-around
2:45-3:00 Journaling ████ prompts)

Wednesday 3/11
8:00-9:00 How we got here: Jim Crow, Redlining, Racial Wealth Gap ████
9:00-9:30 Shadows Fall North film excerpt ████
9:30 -10:00 Citrus Preview ████
10:00-10:30 Brunch
10:30-1:30 (including travel time) Citrus at Northern Stage
1:30-2:00 Citrus Discussion and Journaling ████ prompts)

Thursday 3/12
8:00-9:00 White Privilege/ White Fragility ████ (with selected video)
9:00-9:45  Intro to Kendi: Anti-racism/ in-class reading ████
9:45-10:00 Break
10:00-10:30 Action Plan Design planning (Group/ ████
10:30-11:30 "Carol Street" Being a Person of Color in an All White Environment (film maker Demetrius Borge)

11:30-12:30 Lunch (can shift later 15 minutes if needed)
12:30- 1:00 walk to Rauner
1:00-2:30 "Ties That Bind" Slavery at Dartmouth Tour and discussion Dr. King
2:30-3:00 Downloading and Journaling

Friday 3/13
8:00-9:00 /Case Studies on Activism Brian Cook/Groundswell Change
9:00-10:00 Anti-Racism Activism Kendi section on activism/in class reading/discussion

10:00-10:15 Break
10:15-11:00 Teaching Tolerance. Speaking up!
11:00-12:00 Lunch
12:00-12:30 Action Plan Prep for Asma Elhuni
12:30-1:30 Preparing for Activism  Asma Elhuni/Activist and Organizer
1:30-3:00 Action Plan Design/ Closing/ Goals/ Action Steps

*First Draft of Daily Schedule Topics*
*Speakers/video/presentations/discussion TBD*

## Tuesday 3/10

### Introductions/ / Rules of Engagement/ Opening Exercises

*http://www.pbs.org/race/002_SortingPeople/002_00-home.htm*
*race literacy quiz*
*http://newsreel.org/guides/race/quiz.htm*

### Language and Definitions

#### The Invention of Race and Whiteness

*Tim Wise:what is race  invention of whiteness*
*https://www.youtube.com/watch?v=jBUnziGgN4o*    *1:53-2:01*
 *Race the Power of an Illusion*
*Ep 1 The difference between us ... segments*
*https://www.youtube.com/watch?v=OXEV0tqox9k&t=2s*
*Discussion Guide pages 7&8 http://newsreel.org/guides/race/race-guide-lores1.pdf*
*The Other Race (Mixed Race)  Documentary...segments*
*https://www.youtube.com/watch?v=GfM-F172548*

### White Privilege

The advantages of wealth and whiteness  10 question walk/race
**https://www.youtube.com/watch?v=4K5fbQ1-zps**
**https://www.nasponline.org/resources-and-publications/resources-and-podcasts/d
iversity/social-justice/social-justice-lesson-plans/talking-about-race-and-privilege-l
esson-plan-for-middle-and-high-school-students**
**https://www.huffpost.com/entry/explaining-white-privilege-to-a-broke-white-perso
n_b_5269255**
*"White Immunity": Working through the pitfalls of "privilege" discourse*
*https://www.youtube.com/watch?v=JtLpAfB-DEc  segments*

### Affirmative Action

A Long History of Affirmative Action – For Whites
http://newsreel.org/guides/race/whiteadv.htm

### Black Lives Matter

#### *NYT A conversation with police*

**https://www.nytimes.com/video/opinion/100000004027684/a-conversation-with-poli
ce-on-race.html?module=inline**    **1:59-2:30**
Tim Wise  Black Lives Matter/All Lives Matter
https://www.youtube.com/watch?v=jBUnziGgN4o  42:06

**Wednesday 3/11**

**How we got here: Jim Crow, Redlining, Racial Wealth Gap**

*Race the Power of An Illusion - ep3 The House We Live*
*https://www.youtube.com/watch?v=QHo8AKNfB68*
*https://www.youtube.com/watch?v=mW764dXEl_8*
*THE POWER OF AN ILLUSION How the Racial Wealth Gap Was Created*
*https://www.youtube.com/watch?v=QHo8AKNfB68&t=4s*
*Discussion Guide pages 11-13 http://newsreel.org/guides/race/race-guide-lores1.pdf*

**Being a Person of Color in an all white environment**

**Documentary film maker speaker**

**White Fragility/ White Guilt**

**Robin DiAngelo lecture**

https://www.youtube.com/watch?v=45ey4jgoxeU&t=1230s

https://www.nytimes.com/video/opinion/100000003773643/a-conversation-with-white-people-on-race.html?module=inline

**Thursday 3/12**

**Anti-racism**

**Dartmouth Student Leaders and others**

**Skype with school in South Carolina  North/South perspectives on race**

**Friday 3/13**

**Becoming and activist**

**Dartmouth Student Leaders and others**

**Closing/ Goals/ Action Steps**



### RACE LITERACY QUIZ
### What differences make a difference?

The Race Literacy Quiz was developed by California Newsreel, in association with the Association of American Colleges and Universities. The myths and misconceptions it raises are explored in the documentary series *RACE - The Power of an Illusion*, available on video from California Newsreel at Newsreel.org or 1-415-284-7800. For more information and background, visit the companion Web site at racepowerofanillusion.org.

JUMP TO ANSWER KEY>

**1. Humans have approximately 30,000 genes. On average, how many genes separate all members of one race from all members of another race?**

A. None
B. 1
C. 23
D. 142
E. 1008
F. We don't know

**2. Which characteristic did the ancient Greeks believe most distinguished them from "barbarians"?**

A. Religion
B. Skin color
C. Language
D. Dress
E. Hairiness

**3. In Medieval Europe (circa 1300-1400), Ethiopians were looked upon as:**

A. Savages
B. Saviors
C. Barbarians
D. Infidels
E. Negroes

**4. Members of a race can be identified by their:**

A. Blood group
B. Skin color
C. Ancestry
D. Genes
E. None of the above
F. All of the above

**5. Skin color correlates most closely with:**

A. Hair form
B. IQ
C. Risk for sickle cell, Tay Sachs and other genetic diseases
D. Geographic latitude
E. Continent of ancestral origin
F. Jumping and sprinting ability

**6. When Jamestown colonist John Rolfe and his new wife Pocahontas traveled to the Court of London in 1619, it caused a scandal because:**

A. An Englishman had married an Indian
B. John Rolfe had cuckolded General John Smith, the leader of the colony
C. Pocahontas, a princess, married beneath her station by wedding a commoner
D. Londoners had never seen an Indian before
E. A Christian had married a heathen

PL 00755

7. The rise of the idea of white supremacy was tied most directly to:

A. Indian removal
B. Slavery
C. The Declaration of Independence
D. The U.S. Constitution
E. Ancient Greece

8. Which group has the most genetic variation?

A. Humans
B. Chimpanzees
C. Penguins
D. Fruit flies
E. Elephants

9. Which two populations are most likely, on average, to be genetically similar?

A. Italians and Ethiopians
B. Senegalese and Kenyans
C. Italians and Swedes
D. Chinese and Lakota (Sioux)
E. Saudi Arabians and Ethiopians

10. Most human genetic variation can be found:

A. Within any local population, for example, among Zulus, or among Hmong
B. Between two populations on the same continent, for example between Irish and Poles
C. Between two populations on different continents, for example between Koreans and Zulus
D. Between any two continents, for example, between Africa and Asia
E. Between tall people and short people

11. Which continent has the greatest human genetic diversity?

A. Europe
B. Asia
C. Africa
D. North America
E. South America

12. Who was the first American public figure to suggest, albeit "as a suspicion only," that black people might be inherently inferior to whites?

A. Thomas Jefferson
B. Sir Walter Raleigh
C. George Washington
D. Robert E. Lee
E. Capt. John Smith, founder of the Jamestown colony

13. Which of the following was NOT an important reason why African slavery first took root in North America:

A. As non-Christians, they had no legal protections
B. They were skilled semi-tropical farmers
C. The supply of indentured servants from Europe was becoming unreliable
D. They were deemed innately inferior
E. They couldn't easily run away

14. Which was NOT introduced to Indians by whites?

A. An Indian identity
B. Democracy
C. Identity by "blood quantum"
D. Horses
E. Measles

15. Of the $120 billion in home loans underwritten by the federal government between 1933 and 1962, what percentage went to white homeowners?

A. 45 percent
B. 64 percent
C. 75 percent

PL 00756

D. 88 percent

E. 98 percent

## 16. Which of the following is not a result of federal government policies?

A. Redlining

B. Urban renewal

C. Deterioration of inner cities

D. Affirmative action quotas

E. The wealth gap between black and white families

## 17. Today, the net worth of the average white family is how much compared to the average black family?

A. Three times as much

B. Eight times as much

C. Half as much

D. Twice as much

E. The same

## 18. When white and black families of similar incomes are compared, what is the difference in their net worth?

A. No difference

B. Black net worth is slightly greater

C. White net worth is more than eight times greater

D. White net worth is more than two times greater

E. Black net worth is twice as great

## 19. According to a 1993 study, 86% of suburban whites lived in a community where the black population was:

A. Less than 5%

B. Less than 10%

C. Less than 1%

D. More than 10%

E. More than 15%

## 20. Which is NOT an example of a government racial preference program?

A. 1964 Civil Rights Act

B. 1862 Homestead Act

C. 1790 Naturalization Act

D. 1934 Federal Housing Administration

E. 1935 Social Security Act

## ANSWER KEY

### 1. A. None

There are no characteristics, no traits, not even one gene that distinguish all members of one so-called race from all members of another race.

### 2. C. Language

The word barbarian comes from the Greek word "bar-bar," for someone who stutters, is unintelligible, or does not speak Greek. The Greeks, like most ancient peoples, did not attribute much meaning to physical appearance. In ancient Greece, language was the difference that mattered, because it indicated who was not Greek. Some historians believe that the first to be labeled barbarian were the Scythians of circa 500 B.C., who lived northeast of the Black Sea and were very fair skinned. Ideas of 'race' did not exist during antiquity.

### 3. B. Saviors

In medieval Europe, religion mattered most, not physical appearance. At the time, Christian Europe was at war with the Moslem Empire. Europe looked towards a mythical Christian Ethiopian kingdom, led by the fabled priest-king Prester John, to rescue them from the infidels. Theories of race didn't emerge until the late 18th and early 19th centuries.

### 4. E. None of the above

There are no traits, no characteristics, not even one gene that is present in all members of one so-called race and absent in another. The A, B, and O blood groups can be found in all the world's peoples (the percentage of Estonians and Papua New Guineans with A, B, and O blood are almost exactly identical). Skin color tends to correlate with the earth's geographic latitude not race; sub-Saharan Africans, the Dravidians and Tamils of southern Asia, and Melanesians from the Pacific all have very dark skin. Ancestry is difficult to trace; we all have two parents, four grandparents, etc. If you could trace your family back 30 generations, slightly more than 1,000 years, you'd find one billion ancestors.

### 5. D. Geographic latitude

Skin color tends to correspond with ultra-violet radiation from the sun and hence latitude. People with ancestors from the tropics typically have darker skin while those further north have lighter skin. Sub-Saharan Africans, Asian Indians, Aboriginal Australians and Melanesians all have dark skin. But skin color really is only skin deep. Most traits are inherited independently from one another. The genes influencing skin color have nothing to do with those influencing hair form, eye shape, and blood type, let alone the very complex traits we value such as intelligence, musical ability or athletic ability. Genetic diseases are inherited through families, not race. Sickle cell, for example, confers resistance to malaria. It occurs in people whose ancestors came from where malaria was once common: the Mediterranean, Arabia, Turkey, southern Asia and western and central Africa - but not southern Africa. The presence of sickle cell is not an indicator of race but of having an ancestor from a malarial region.

### 6. C. Pocahontas, a princess, married beneath her station by wedding a commoner

17th century England was a very hierarchical, feudal society where people's class status was fixed at birth. Status was so important that laws regulated the clothing people could wear so they couldn't "pass" as another class. When John Rolfe took his new bride Pocahontas (who had converted to Christianity) back with him to London in 1617, the English had not yet developed the racial ideology that later justified their taking of Indian lands. But it was unthinkable that royalty would marry a commoner.

### 7. C. The Declaration of Independence

Ironically, it was freedom, not slavery, that gave rise to modern theories of race. Until the Revolutionary period, slavery was an unquestioned "fact of life." It was only when Americans proclaimed the radical new idea that "all men are created equal" that slavery was first challenged as immoral. As historian Barbara Fields notes, the new idea of race helped explain why some people could be denied the rights and freedoms that others took for granted.

### 8. D. Fruit flies

Fruit flies have been around for a very long time but they also have a short life span, so lots of genetic mutations have accumulated over many generations. In contrast, modern humans are one of the most genetically similar of all species. On average, only one of every 1,000 nucleotides (the "letters" that make up our DNA) differ one individual from another. This is because we are a relatively young species (approximately 150,000 - 200,000 years old). We simply haven't been around long enough to accumulate much genetic variation. Also, humans have always moved, mixed and mated, further homogenizing our gene pool. Beneath the skin, we're all very similar.

### 9. E. Saudi Arabians and Ethiopians

Populations that live near each other geographically tend to be genetically more alike than populations that live far apart. That's because they are more likely to have intermixed in the recent past and therefore share more genes. So even though Senegalese and Kenyans or Italians and Swedes are traditionally placed in the same "races," they live farther apart from each other and have had less contact and intermixing than Saudis and Ethiopians.

### 10. A. Within a local population

85%, or almost all human variation, can be found within any single local population, whether it's Malay, Irish, Zulus or Koreans. There is FAR more variation within groups than between groups. This means that there may be as many - or more - genetic differences between two random Koreans as between a random Korean and a Zulu. On average, approximately 94% of all genetic variation can be found within any continental area.

### 11. C. Africa

We are all Africans. Modern humans (Homo sapien sapiens) originated in Africa, and we spent most of our evolution as a species together there. Some modern humans first left Africa 50,000 - 70,000 years ago and spread out around the world. All the other populations of the world can be seen as a subset of Africans. Every human genetic trait found elsewhere can also be found in Africa, with the exception of relatively few recent variations favored by the environment, genetic drift, or sexual selection - such as light skin.

### 12. A. Thomas Jefferson

PL 00756

Thomas Jefferson was the first prominent American to speculate that black people might be innately inferior to Europeans. Until then, most Enlightenment figures believed that differences between groups were not inborn but due to environmental factors. It wasn't until Jefferson introduced the radical new ideas of liberty and equality that slavery had to be justified and prejudices against the enslaved began to crystallize into a doctrine of white supremacy. American freedom and the idea of innate racial difference were born together. Historian Barbara Fields calls them "Siamese twins."

### 13. D. They were deemed innately inferior

Throughout much of history, societies have enslaved people, often as a result of conquest, war or even debt. People were not enslaved because they were first deemed inferior. African slaves were well-suited to labor in North America: unlike the Indians, they were resistant to European diseases; they couldn't easily run away; they were not Christians (and hence unprotected by English law); and they were skilled semi-tropical farmers. Finally, in the late 17th century, African slaves became available in large numbers just as the original labor force on Virginia's tobacco plantations - English indentured servants - began to rebel and immigration from England slowed. Over time, the degradation of slavery became identified with blackness, giving white Americans the idea that Africans were a fundamentally different kind of people.

### 14. B. Democracy

United States' representative democracy drew upon the traditions of the Iroquois Confederacy. Indians didn't think of themselves as Indians when European settlers arrived, but rather as members of separate tribes or nations, divided by language, custom and religion. The idea of "blood quantum," i.e., the determination of Indian identity by ancestry, was imposed by the federal government. In contrast, tribal membership traditionally was open to anyone, even Europeans, as long as they accepted tribal customs and authority. There were no horses in the New World until they were brought over by Europeans. Measles, small-pox and other communicable diseases were also unknown in the Americas prior to European exploration. Some historians estimate that up to 90% of all Atlantic coast Indians died from diseases contracted from European traders and explorers by the time of the first Plymouth settlement.

### 15. E. 98 percent

Beginning in the 1930s and 1940s, the federal government created programs that subsidized low-cost home loans, opening up home ownership to millions of Americans for the first time. At the same time, government underwriters introduced a national appraisal system tying property value and loan eligibility to race, inventing "redlining," and effectively locking nonwhites out of home-buying just as most middle class white Americans were beginning to purchase homes.

### 16. D. Affirmative action quotas

Federal affirmative action guidelines specifically prohibit quotas. Beginning in the 1930, the Federal Housing Administration and related programs made it possible for millions of average white Americans to own a home for the first time and set off the post-WWII suburban building boom. The government established a national neighborhood appraisal system, explicitly tying mortgage eligibility to race, a policy known today as "redlining." The FHA and other government policies made possible the post-World War II all-white suburbs, while people of color and in central cities were denied loans. Government policies and practices helped create two legacies that are still with us today: segregated communities and a substantial wealth gap between whites and nonwhites, much of which can be traced to the differential value of their homes.

### 17. B: Eight times as much

Probably no one statistic better captures the cumulative disadvantage of past discrimination than wealth. Even at the same income levels, whites still have, on average, twice as much wealth as nonwhites. Much of this difference is due to the different rates of home ownership and the different values of homes in white and Black neighborhoods. But wealth is not only the end point, it's the starting line for the next generation - helping finance your children's education, helping them through hard times, or helping with the down payment of their own home. Economists estimate 50-80% of one's lifetime wealth accumulation can be traced to this head start. As wealth gets passed down from generation to generation, the legacy of past discrimination accumulates, giving whites and nonwhites vastly different life chances.

### 18. D. White net worth is more than two times greater

See above (Question #17) for explanation.

### 19. C. Less than 1%

According to the 2000 Census, whites are more likely to be segregated than any other group. This is largely a result of past housing discrimination, but it is perpetuated today by unfair practices such as predatory lending, racial steering and a substantial wealth gap between black and white families. Today, 71% of whites own their own home, compared to 44% of African Americans. Black and Latino mortgage applicants are 60% more likely than whites to be turned down for loans, even after controlling for employment, financial, and neighborhood characteristics. On average, nonwhites who are approved for mortgages still pay higher rates.

PL 00759

### 20. A. 1964 Civil Rights Act

The Civil Rights Act made racial discrimination in public places illegal. The other programs are all examples of racial preferences - for white people. Over a 40-year period, the Homestead Act gave away, for free, 270 million acres of what had been Indian Territory, almost all of it to white people. The Naturalization Act allowed only "free white persons" to adopt citizenship, thus opening our doors to European immigrants, but barring Asians and other groups. Racial barriers to citizenship were not removed until 1952. The Federal Housing Administration made it possible for millions of average white Americans - but not others - to own a home for the first time. (see #16 above). And the Social Security Act specifically exempted two occupations from coverage: farm-workers and domestics, both largely non-white.

<BACK TO TOP

▲ back to top

**Home    Titles A-Z    New Releases    Shopping Cart    Order Tracking    Contact Us**

1811

**EXHIBIT 41**

Sept. 22, 2021
AFT/Edelblut Email
Exchange

(Depo. Ex. 9)

**EXHIBIT 9**

D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "president@aft-nh.org" <president@aft-nh.org>
**Bcc:** "Bond, Christopher" <Christopher.G.Bond@doe.nh.gov>
**Subject:** AFT Invitation
**Date:** Wed, 22 Sep 2021 16:59:38 -0000
**Importance:** Normal
**Attachments:** Anti-Discrimination_faq-educational-programs.pdf
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

Deb,

Thank you for the invitation to join you on the 14th to discuss "Freedom from Discrimination in Public Education."

The department has worked closely with the department of justice and with the human rights commission to craft straight-forward and clear question and answer style guidance for the application of the new legislation. I am attaching a copy of the guidance for your reference.

This guidance gives educators the direction needed to work with the law in their individual education settings. Recognizing that a wide variety of situations may arise, we also want to reiterate our offer to try to work through individual circumstances that may be unclear to teachers. In these cases, the best approach is for them to reach out directly and share the specific facts and circumstances so that we can provide them with clear guidance. Toward that end, if there are specific questions you are seeking guidance on, I would encourage you to submit those to the department and we can provide you with additional information, as appropriate.

In our view, the key here is to not overly complicate the application of the law so that we can ensure all of our students and educators can have a discrimination-free learning environment.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
New Hampshire Department of Education
101 Pleasant Street | Concord, NH 03301
Phone: 603-271-3144

🐦 @ ⊞

New Hampshire
**Department of Education**



Case 1:21-cv-01077-PB   Document 85-42   Filed 08/14/23   Page 3 of 5



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1.     What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist.  Teach and treat all equally and without discrimination.

### 2.     What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32; RSA 354-A:33; RSA 354-A:34; RSA 193:40.

DOE-07232

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

**3.    Does the law prohibit teachers from teaching U.S. history?**

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

**4.    Are schools allowed to teach students historical concepts related to discrimination?**

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

**5.    A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?**

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

**6.    Can parents or guardians refuse to allow their children to participate in specific course material?**

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

**7.    Does the law apply to public schools?**

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

**8.    Does this law apply to all school activities or just teaching?**

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

**9.   Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.   Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes. For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.   What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they have been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.   Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.   Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.

# EXHIBIT 42

NEA-NH July 12,
2021 and August
5, 2021 Letters
(Depo. Ex. 11)



EXHIBIT 171

D. Fenton

5/17/2023

Reporter: Sharon Saulfield
RDR, CRR

# EXHIBIT 18

NEA-NH July 12,
2021 and August
5, 2021 Letters



July 12, 2021
**First Class U.S. Mail**

John M. Formella, Esq.
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Re: Implementation Guidance for Public School Districts Regarding House Bill 2

Dear Attorney General Formella:

As President of NEA-NH, which represents 17,000 educators in our state, I write to request the issuance of formal guidance on the implementation of HB 2 within public school districts and public institutions of higher education across the State of New Hampshire. More specifically, the statutory language passed, under the section entitled: "Right to Freedom from Discrimination in Public Workplaces and Education," contains ambiguity requiring clarification. Such clarification is particularly important for certified educators given that the statutory language provides: "IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." (emphasis added).

Therefore, please issue detailed guidance to be followed by educators, administrators and school boards covering, at a minimum, the following subject areas:

1. What types of academic instruction regarding inherent and/or institutional bias or discrimination are prohibited;

2. What it means to permissibly teach prohibited "subjects identified in this section" as a "larger course of academic instruction" as included in section RSA 193:40, II;

3. Which topics related to racial and/or social justice are specifically prohibited from academic teaching and dialogue within public schools;

4. Whether or not academic instruction regarding historical racism, including, without limitation, in relation to slavery, segregation, the civil rights movement and affirmative

1

action, may still be taught in public school classrooms. If so, how a violation of RSA 193:40 can be avoided when discussing these topics;

5. What specific categories of literature or written subject matters are prohibited from assignment or dissemination to students;

6. What are the parameters educators must follow when answering questions from students about current events that touch the topic areas in the law, e.g. the protests surrounding police reform, the Black Lives Matter movement, and news stories about the passage of this law;

7. What may be taught about historical systems and practices which led to discriminatory outcomes. For example, what is permissible to be taught about "redlining" by the Federal Housing Administration in the 1930's that led to racially segregated neighborhoods throughout the United States;

8. Is teaching about the existence of implicit bias or other similar social sciences prohibited. If not, what are the guideposts for discussing this kind of theory in classrooms;

9. What are the best practices for public school districts, administrators and public educators to avoid a violation of the new provisions enacted by HB 2 regarding the education of public school students;

10. What, if any, discretion remains with the New Hampshire Board of Education to not issue discipline where it is found that a teacher or district allowed students to hear or be taught prohibited information, which, in accordance with RSA 193:40, IV, "shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education;"

11. How does the law apply to higher education staff as the law only mentions the academic freedom of faculty members. Are their prohibitions on what staff members can discuss, teach, or provide to students;

12. What are the guideposts for academic freedom provided to University System Faculty. HB2 states the law shall not limit academic freedom to "research, publish, lecture, or teach in the academic setting" does this mean their freedom on these topics is absolute?

Once we have received guidance from the Department of Justice, we will swiftly disseminate that much-needed information to our members. As we approach the 2021-22 academic year, time is of the essence. The current state of confusion caused by HB 2 as it relates to public education will likely lead to unnecessary legal disputes and action if clarification is not provided. If we can be of assistance to you in forming your analysis and/or producing guidance, please do not hesitate to contact us for that purpose.

2

PL 00409

Thank you for your attention to this important and time-sensitive matter.  We look forward to hearing from you soon.

Sincerely,

Megan Tuttle

Megan Tuttle
President
NEA-NH

PL 00410



**NEA New Hampshire**
*Shaping the Future, One Student at a Time*

August 5, 2021
**EMAIL**

John M. Formella, Esq. (attorneygeneral@doj.nh.gov)
Attorney General
N.H. Dept. of Justice
33 Capitol Street
Concord, NH 03301

Frank Edelblut
Commissioner (frank.edelblut@doe.nh.gov)
Department of Education
101 Pleasant Street
Concord, NH 03301

Re:  Request for Further Clarification Concerning Implementation Guidance on House Bill 2for
Public School Districts

Dear Attorney General Formella and Commissioner Edelblut:

I write to you as the President of NEA-NH, an organization representing approximately 17,000
educators in New Hampshire, every single one of whom are impacted by the "Right to Freedom
From Discrimination in Public Workspaces and Education" law signed by Governor Sununu on
June 25, 2021. It is because of this vast impact to our membership that I am following up with a
further communication after our letter of July 12, 2021, has thus far been unanswered by your
offices.

NEA-NH has reviewed the 2½ -page FAQ guidance issued on Wednesday July 21, 2021 (your
Guidance). We appreciate the time and effort expended by your offices in developing this
guidance, which answers a number of questions that our members have had about the new law.
Additional questions remain, however, on which we seek clarification. Because the licenses,
careers, professional reputations, and livelihoods, of our members are at stake for any violation
of the law, it is imperative that they have a detailed understanding of what conduct and/or
teaching practices are prohibited by the law and constitute "a violation of the educator code of
conduct that justifies disciplinary sanction by the state board of education." With the 2021-2022
school year quickly approaching, we need your assistance in making the full scope of the law
clear.

As we understand the law, as construed though the lens of your July 21st Guidance, we understand it to permit the teaching and discussions described below. If we are mistaken in our legal analysis, please respond in detail to correct our understanding. Given the high stakes for our members, it is imperative for our members to be provided with reliable, detailed guidance that will allow them to clearly avoid the severe consequences of violating this amorphous law.

We understand as follows:

1.    Discussing with students[1] incidents of racism or other prejudices exhibited and experienced by them or others in the school community or elsewhere is permitted.

2.    Engaging in conversations about racism or other prejudices students, or others known to them, may have exhibited in the past is not prohibited provided the educator does not instruct students that they exhibited those behaviors because of inherent characteristics.

3.    It is permissible to draw attention to the language, behavior, or writing of a student that might be sexist, racist, or otherwise prejudicial. The law does not prohibit educators from referring for discipline students for such behavior or comments provided it is done in accordance with school policy and procedure and state law. In fact, in order to comply with requirements of the "Bullying Law" educators are required to recognize and report such conduct in accordance with the school board policy implementing the law. *See* NH RSA 193-F.

4.    Introducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group. Implicit bias training and education specifically pertaining to states of mind which are learned, assumed, or reinforced by society and not "inherent," is permitted.

5.    Structural Racism (a.k.a Societal Racism, Systemic Racism) describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government. It does not contemplate that persons or groups are naturally, biologically, or innately racist. Therefore, including the concept of Structural Racism in instruction and conversation with students is permitted.[2]

6.    Specific books or works of certain authors are not "banned" under the law.[3] Assigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator

---

[1] "Students," encompasses both K-12 students and higher education students. "Educators," are those teaching and non-teaching employees in both K-12 and public higher education institutions.

[2] For example, students could be taught, not only about the racist historical practice of "redlining," but also about the lasting inequalities and structural barriers it has created for generations of African Americans.

[3] On June 13, 2021 Commissioner Edelblut wrote an Op-Ed in the Union Leader leaving the distinct impression that Dr. Ibram Kendi's book, *How to be an Anti-Racist* may not be assigned under the new law. He raised the same proposition at the July 8, 2021 State Board of Education meeting. The Guidance is not consistent with his statements. Please address this contradiction. Additionally, if there are certain texts which your offices' believe are *per se* prohibited under this law, please provide a list so educator's know that prior to making 2021-2022 lesson plans.

2

conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion. For example, the works of James Baldwin are not *per se* prohibited from instruction or discussion in accordance with the above.

7.     The law permits teaching novels, non-fiction works, or other approved texts by instructing students on, and discussing, the historical context surrounding the works. Such permitted instruction and discussion includes information on racism or other prejudices which were expressed in both overt and subtle ways by systems, individuals, and government actors.

8.     The law permits instruction on, and discussion of, racism and oppression in teaching historical events and contemporary events, so long as students are not instructed that the individual actors were inherently racist. For example, educators may explain the racism carried out systematically, collectively and individually by southern slave owners in the United States, prior to the American Civil War. Educators may also explain the collective and large-scale societal discrimination and genocide carried out by Nazi Germany against Jewish populations in several countries. These historical issues can be connected to the modern era to explain the danger of racism and neo-Nazi groups that exist today.

9.     Teaching historically accurate lessons is permissible under the law, even if that history challenges students' notions of history as they previously understood it, provided the educator does not assign racist or prejudicial actions to the historical actors as inherent to them. For example, accurately teaching about the genocidal impact on Native Americans of the arrival of colonial Americans to the United States, and the subsequent western expansion of the United States, is permitted.

10.     The use of the historical primary sources (original documents) in coursework is permitted provided the use of sources is part of a larger course of academic instruction. This is the case even if the sources may contain an author's assertion that one race or group is inherently inferior to another, for example Thomas Jefferson's *Notes on the State of Virginia.*

11.     Similarly, it is permissible to assign reading of fiction and non-fiction works where character(s) may express discriminatory beliefs or engage in discriminatory acts against other characters or persons, for example *To Kill a Mockingbird* or *Huckleberry Finn*. Discussion about the actions of those characters, their discriminatory beliefs, or intent is not prohibited.

12.     It is permissible under the law to use teaching techniques which probe a student's understanding of their current reality, push them to think critically and analytically about social and historical contexts, and asks them to empathize with others or consider a different perspective then the one they currently have, provided the educator does not require that the student adopt a view that racism is inherent to some individuals.

13.     It is permissible to discuss the subject of "white privilege," a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as the privilege is not discussed in such a way as to indicate that the racial favoritism at the core of white privilege is "inherent" or cannot be overcome.

3

14. It is permissible to engage with students in discussion of gender non-conformity, acknowledging different gender identities of students and colleagues, and curriculum which contains characters and story lines which discuss or highlight gender non-conforming, or LGBTQ individuals provided the text does not promote discrimination of such individuals.

15. The law permits the exhibiting and sharing of art, music, dance, or other artistic expressions that comment on racism, sexism, or other prejudices provided it is age appropriate and relevant to the curriculum approved by the School Board or higher education institution. It is also permitted for artists, writers, and historians to address students or for students to read about the artist's motivation for the work.

The paragraphs above do not purport to exhaustively describe all of the instruction and discussion that is permitted under the law but are illustrative of the types of discussion and instruction that we understand remain permitted. We appreciate your prompt response to confirm that these examples are consistent with your understanding of the law, so that educators may plan accordingly for the upcoming year.

We expect that as the implementation of the law moves forward, we may encounter scenarios requiring further analysis. We are hopeful that your offices, as the chief law enforcement and educational agencies of the Granite State, will have continual open dialogue with us about these issues as they arise.

Sincerely,

Megan Tuttle

Megan Tuttle
President, NEA-New Hampshire

4

# EXHIBIT 43

## Sept. 13, 2021
## NEA-NH Email to
## HRC

## (Depo. Ex. 54)

EXHIBIT 54
1826
WIT: Malachi
DATE: 5-24-23
Cynthia Foster, RPR, LCR #14

**From:** "BurkeCohen, Sarah" <Sarah.E.BurkeCohen@hrc.nh.gov>
    **To:** "Malachi, Ahni" <Ahni.N.Malachi@hrc.nh.gov>
**Subject:** Requesting a workshop or Webinar to further clarify Sections 297 and 298 of HB 2
    **Date:** Mon, 20 Sep 2021 15:08:31 -0000
**Importance:** Normal

---

See below.

*Sarah E. Burke Cohen, Esq.*
Assistant Director
NH Commission for Human Rights
2 Industrial Park Drive
Concord, New Hampshire 03301
Phone: (603) 271-6840
Fax: (603) 271-6339

## **\*\*PLEASE NOTE MY NEW EMAIL ADDRESS AND UPDATE YOUR ADDRESS BOOK\*\***
## **Sarah.E.BurkeCohen@hrc.nh.gov**

### Statement of Confidentiality

The information contained in this electronic message and any attachments to this message may contain confidential or privileged information and is intended for the exclusive use of the addressee(s). Please notify the Human Rights Commission immediately at (603) 271-6840 or reply to Sarah.E.BurkeCohen@hrc.nh.gov if you are not the intended recipient and destroy all copies of this electronic message and any attachments.

**From:** Irv Richardson <irichardson@nhnea.org>
**Sent:** Monday, September 13, 2021 11:02 AM
**To:** HRC: Human Rights Commission <humanrights@nh.gov>
**Cc:** Irv Richardson <irichardson@nhnea.org>
**Subject:** Requesting a workhop or Webinar to further clarify Sections 297 and 298 of HB 2

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

---

Good morning,

My name is Irv Richardson and I am the Coordinator for Public Education and School Support for NEA-New Hampshire. One of the responsibilities of my role is to provide professional development for educators in New Hampshire — particularly the 17,000 educators who are members of our organization. Many of the licensed educators who teach Social Studies in New Hampshire's public school are seeking clarification on Sections 297 and 298 of House Bill 2. We have shared the guidance on your website with members but many of our members still have questions and want to better understand the law.

Do you have someone associated with the Human Rights Commission who might provide further clarification on the law and answer questions from educators using a virtual platform? I have reached out to the New Hampshire

1827

Department of Education and they indicated that I should make such a request to you. We have our next conference scheduled for October 8th but this topic is so important, we can accommodate any time that would be convenient for the presenter you recommend.

I look forward to hearing from you.

Sincerely,

Irv Richardson, Ed.D.
Coordinator for Public Education and School Support, NEA-New Hampshire

HRC-00380

# EXHIBIT 44

Oct. 18, 2021
Email from R.
Farrell to D.
Fenton

(Depo. Ex. 24)

**From:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
**To:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
**Subject:** RE: Code of Ethics training
**Date:** Mon, 18 Oct 2021 16:26:56 -0000
**Importance:** Normal
**Attachments:** continued_excellence--HB2.pptx; Ed_511.pdf;
Crimes_Which_Bar_Employment_in_Education.pdf; AG_guidance_HB_2.pdf

EXHIBIT 24
R. Farrell
5/18/2023
Reporter: Sharon Saalfield
RDR, CRR

Good Morning,
I have been asked to schedule this training and, perhaps, do the presentation. Please find attached documents for dissemination to your staff. Is it possible to provide a laptop and power point for use? We would prefer a start time of 1030. That will give us approximately 60 minutes for the presentation and room for questions.
Will that work for you? Thank you for giving us the opportunity to meet your staff.
Respectfully,
Rich Farrell

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

*The contents of this message are CONFIDENTIAL Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is PROHIBITED. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Sent:** Monday, October 18, 2021 12:10 PM
**To:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Subject:** FW: Code of Ethics training

Pls see if you can cover this

**From:** Judy Tilton <jtilton.cca@gmail.com>
**Sent:** Monday, October 18, 2021 11:12 AM
**To:** Fenton, Diana <Diana.Fenton@doe.nh.gov>
**Subject:** Code of Ethics training

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Good Morning,
I was wondering if you could give a COE training to our staff on their next PD day, 11/3/2021? We can do it at whatever time is convenient for you.
Thank you in advance,
Judy Tilton
Compass Classical Academy
603-455-3455



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1.    What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

**In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination.**

### 2.    What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

DOE-09645

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

### 3.    Does the law prohibit teachers from teaching U.S. history?

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

### 4.    Are schools allowed to teach students historical concepts related to discrimination?

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

### 5.    A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

### 6.    Can parents or guardians refuse to allow their children to participate in specific course material?

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

### 7.    Does the law apply to public schools?

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

### 8.    Does this law apply to all school activities or just teaching?

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.

DOE-09646

**9.     Does this law apply to instruction in colleges, universities, or other post-secondary educational institutions?**

No for teaching students, yes for staff and volunteer training.

The prohibitions detailed above apply only to instruction of students in K-12 programs. However, this law does apply to trainings for staff and volunteers at colleges, universities, or other post-secondary educational institutions, because these institutions are considered public employers and/or government programs. For questions regarding restrictions on training staff and volunteers by public employers and government programs, find more information here.

**10.    Does this law apply to trainings for post-secondary school employees or volunteers?**

Yes.  For questions regarding restrictions on training staff and volunteers in all educational programs, find more information here.

**11.    What remedies are available to students or parents who believe that a school has violated the Prohibition on Teaching Discrimination?**

A student or parent who believes that they have been subject to discrimination may file a complaint with the New Hampshire Commission for Human Rights; a complaint with the New Hampshire Office of the Attorney General; or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**12.    Can an educator's credential be disciplined for teaching these prohibited subjects?**

Yes. If an educator is found to have discriminated against an individual or identified group, it is a violation of the educator code of conduct and may result in disciplinary sanction by the state board of education.

**13.    Can a student or parent file a claim based upon instruction or other conduct that occurred in 2020?**

No. Complaints alleging a violation of the new law may only be considered for conduct that occurred after the enactment of that law on June 25, 2021.

DOE-09648



New Hampshire
**Department of Education**



# CONTINUED EXCELLENCE

ELEVATING AN ESTEEMED PROFESSION

**Diana E. Fenton**, Esq., Chief, Governance Unit

**Richard Farrell**, Investigator

# Code of Conduct is Not Punishment—

## It is about Process!!!

"An ethics code reflects a collective decision that a profession is better off when ethical standards are not based solely on individual assessments of what is or is not acceptable."

Fisher. C. (2013). Decoding the Ethics Code: A practical guide for psychologists (3rd edition).

DOE-09649

DOE-09650

# A BRIEF HISTORY OF CREATING THE CODE OF ETHICS & CODE OF CONDUCT

June 2015—PSB began to look into a code of ethics;

August 2016—Commissioner Barry created Ethics Task Force;

Sept-Dec 2016—Task Force begins work on Code of Ethics;

April 2017—HB 210 signed into law;

Sept-Dec 2017—Task Force transitions focus to Code of Conduct;

Summer of 2018—State Board accepts Code of Ethics;

November 2018—State Board adopts Code of Conduct



# STAKEHOLDERS

New Hampshire
Professional Standards Board

NEA New Hampshire

New Hampshire
Council for Teacher Education

**IHE NETWORK**
A CONSORTIUM OF IHE EDUCATION
PREPARATION PROGRAMS

New Hampshire
**Department of Education**

New Hampshire
**Department of Education**

**NHSAA**
New Hampshire School Administrators Association

New Hampshire
**Department of Education**

1837

DOE-09652

# STATUTE

**TITLE I**
**STATE AND ITS GOVERNMENT**

**CHAPTER 21-N**
**DEPARTMENT OF EDUCATION**

Section 21-N:9

...tively. The establishment and enforcement of a code of ethics for certified educational personnel, which shall be adopted no later than July 1, 2018. The professional code shall include a statement of purpose and standards defining each of the 4 principles which are:

(A) Responsibility to the education profession and educational professionals.

(B) Responsibility to students.

(C) Responsibility to the school community.

(D) Responsibility and ethical use of technology as it relates to students, schools, and other educational professionals.

(2) The professional code of ethics shall apply to all teachers, supervisors, administrators, and other personnel licensed or seeking licensure in the education profession in the state of New Hampshire. In this subparagraph, "teacher" means a person who has applied for or holds a valid teaching license, credential, or other equivalent certificate issued by the state board of education.

# RSA 21-N:9, II(CC)



New Hampshire
**Department of Education**

# RULES



**New Hampshire
Department of Education**

PART Ed 510 CODE OF CONDUCT

Section Ed 510.01 Principle 1 – Responsibility to the Education Profession and Educational Use of Technology

Section Ed 510.02 Principle 2 – Responsibility to Students

Section Ed 510.03 Principle 3 – Responsibility to the School Community

Section Ed 510.04 Principle 4 – Responsible and Ethical Use of Technology

Section Ed 510.05 Duty to Report

Principle 2 – Responsibility to Students
Principle 3 – Responsibility to the School Community
Principle 4 – Responsible and Ethical Use of Technology
510.05 Duty to Report

... DENIAL, INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS
... Complaints, Checks and Investigations
... Requested, Suspension, or Revocation
... Disciplinary Sanctions
Status of a Credential Pending Completion of Disciplinary Proceeding
... in Records for Reinstatement After Suspension

PART Ed 511 DENIAL OR CERTIFICATION

DOE-09654

# THE DIFFERENCE



**Code of Conduct**
NH's Principles of Professional Conduct



**Code of Ethics**
The Code of Ethics for New Hampshire Educators


New Hampshire
**Department of Education**

# ARE YOU TALKING TO ME?

Who is the document applicable to??

<u>Code of Ethics</u>—Applicable to all educators and all school personnel

<u>Code of Conduct</u>—Applicable to all credential holders

"Credential" is defined in Ed 501.02(g)—page 9 of the Code of Ethics & Conduct booklet!



1841

DOE-09656

# WHY IS A CODE OF CONDUCT IMPORTANT?

- **Child Safety should not be determined by zip code!!**

- Teachers are asked to play an increasingly expansive role in students' lives without any discussion of the inherent risks of this.

- All professions that are characterized by intimate relationships rely on professional standards and norms that help them recognize and respond appropriately when navigating interactions.

# CODE OF CONDUCT VS. CODE OF ETHICS

Code of Ethics is guidance—aspirational in nature—articulates responsibilities common to all members of the education profession.

Code of Conduct establishes the lowest standard of care—it is actionable only against credential holders

Applicable on or off duty!



New Hampshire
Department of Education

1843

# CODE OF ETHICS & CONDUCT

## *Difference in language:*

*Code of ethics:*

When communicating with students, utilizes social media responsibly, transparently and primarily for the purposes of teaching and learning

*Code of Conduct:*

An educator shall not engage in harassment, stalking, or bullying via electronic media.



DOE-09658

# EMPLOYMENT VS. LICENSURE

- Licenses are required in professions that require public trust;

- Employment and licensure are separate concepts;

- The Department's role is *broader in jurisdiction*, but *narrower in scope.*

DOE-09659

DOE-09660

# The Analysis......

*Separate and distinct,*
*but sometimes they*
*affect each other.*



Employment

Code of
Conduct

Code of
Ethics

# CODE OF ETHICS & CONDUCT

## Four Principles:



Principle I—Responsibility to the Education Profession and Educational Professionals;

Principle II—Responsibility to Students;

Principle III—Responsibility to the School Community;

Principle IV—Responsible and Ethical Use of Technology

**Principle V—Duty to Report

DOE-09661

1847

DOE-09662

# CODE OF CONDUCT—PRINCIPLE 1 (ED 510.01)

## *Responsibility to the Education Profession & Educational Professionals:*

- Failure to report if arrested for RSA 189:13-a, V offense;

- Falsifying professional qualifications;

- Unlawful possession of drug;

- Possessing or being under influence of drugs or alcohol on school premises or school sponsored activity where students are present.



# CODE OF CONDUCT—PRINCIPLE II (ED 510.02)

*Responsibility to Students:*

- Failure to provide appropriate supervision of students pursuant to local policy;

- Furnishing alcohol or illegal drugs to students;

- Engaging in sexual activity with student;

- Soliciting participation in sexual relationship

* "Student" is defined as being up to 10 months after graduation



DOE-09663

DOE-09664

# CODE OF CONDUCT—PRINCIPLE III (ED 510.03)

## *Responsibility to the School Community:*

- Accepting gifts or favors where there might be an actual or appearance of a conflict of interest

**Gifts of small amount shall NOT be deemed conflict of interest.

- Misuse of funds for use by the school

- Intentional altering or misrepresenting student assessments, results or official school records.



1850

## SO WAIT JUST A MINUTE......

What if a parent gives me a bottle of wine as a present?

Am I going to lose my license for that??

# CODE OF CONDUCT—PRINCIPLE IV (ED 510.04)

## *Responsible & Ethical Use of Technology:*

- Soliciting a sexual relationship with a student

- Engaging in inappropriate communication—intent, timing, subject matter and amount of communication and whether communication could reasonably be interpreted as being sexual in nature.

\* "Student" is defined as being up to 10 months after graduation



DOE-09666

# I NEED SOME EXAMPLES OF WHAT YOU ARE SAYING

- "YOU were one of my rare accomplishments"

- "I saw special in you from the beginning"

- "I felt compelled to both nurture and provocatively challenge [your thoughts]"

DOE-09667

DOE-09668

# CODE OF CONDUCT—PRINCIPLE V (ED 510.05)

## *Duty to Report:*

- Any credential holder shall report any suspected violation of the code of conduct

- Superintendent shall report to office of credentialing when a credential holder has been arrested for RSA 189:13-a and violated code of conduct

- Credential holders shall report abuse or neglect



# PROHIBITION ON TEACHING DISCRIMINATION

- Section 297 & 298 of HB 2 was passed during the 2021 Legislative Session

1. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior

to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual

orientation, race, creed, color, marital status, familial status, mental or physical

disability, religion,

or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

DOE-09670

# PROHIBITION ON TEACHING DISCRIMINATION

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and

should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

race, creed, color, marital status, familial status, mental or physical disability, religion, or national

origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.

# PROHIBITION ON TEACHING DISCRIMINATION

- All suspected violations of this new law are to be reported to the Human Rights Commission

- The Human Rights Commission will adjudicate these cases

- A finding of a violation of this law by the Human Rights Commission shall be a violation of the Code of Conduct for educators.

***Please see Technical Advisory by the NH Attorney General's Office on this law for more guidance.

1857

DOE-09672

# INVESTIGATIONS—ED 511.01

- Initial review
- Credential holder is notified if placed under investigation
- Superintendent is notified if credential holder is placed under investigation



# INVESTIGATIONS—ED 511.01

This letter serves as the official notification, pursuant to New Hampshire Administrative Rule Ed. 511.01, that the New Hampshire Department of Education has initiated an investigation into a complaint against you which alleges that you engaged in an act or acts which violate the New Hampshire Code of Conduct for Educational Professional as enumerated in Ed. 510.01-510.04.

Specifically, the Department of Education has become aware of an action(s) which may have violated Ed ------ of the Code of Conduct for Educational Professionals. Specifically, the allegation is that you ------ ------. At this time, no action has been taken against your teaching credential. Therefore, your teaching credential is still valid during this pending investigation. A copy of this letter will be provided to the superintendent of SAU ---- and the Union.

DOE-09673

1859

# SANCTIONS—ED 511.02

## Four options—3 forms of sanction:

*Close out case*—Allegation unfounded—no action taken

*Suspension*—rescinded for set period of time

*Revocation*—permanently rescinded

*Reprimand*—note to file of credential holder

DOE-09674

# INVESTIGATIONS—ED 511.01

Considerations of sanctions:

- Seriousness of offense;
- Prior disciplinary record
- Potential harm to students
- Purpose of the rule violated

DOE-09676

# REPRIMAND, SUSPENSION OR REVOCATION

Ed 511.02

- All discipline is documented in writing
- Signed by all parties
- Maintained in electronic credentialing file

Ed 502.01

List of suspended and revoked educators is maintained and is on DOE website

Ed 511.05

Grounds for Reinstatement after Suspension



1862

THE STATE OF NEW HAMPSHIRE

In re: NAME

Credential Suspension Agreement

In Consideration For the Suspension of Educator Credential Between:

NAME (EdId: XXXXX)

and

The New Hampshire Department of Education

WHEREAS NAME (EdId: XXXX) maintains an Educator Certificate in ――――.

WHEREAS NAME (EdId: XXXX)

NOW THEREFORE, NAME (EdId: XXXX) agrees to voluntarily surrender his Educator
Credential in ―――――, which will result in a suspension of his educator credential
pursuant to the following conditions:

1. NAME shall voluntarily surrender his educator credential. This voluntary surrender will
result in the SUSPENSION of his New Hampshire Educator Credential (EdId: XXXX).
This suspension shall become effective on XXXX, immediately upon all required parties
signing this agreement. The terms of this suspension are as follows:

DOE-09677

1863

# OTHER ISSUES TO BE AWARE OF—ED 511.04

If arrested for RSA 189:13-a, V, DOE can do an immediate suspension of credential

- Credential holder and school district will be notified
- Credential holder is entitled to hearing within 10 days.

DOE-09678

# NEED TO REPORT?

**Richard Farrell, Investigator**

271-8372 (office)

231-0521 (cell)

**Diana Fenton, Esq. Chief of the Governance Unit**

271-3189 (office)

325-2198 (cell)



New Hampshire
**Department of Education**

**EXHIBIT 45**

July 21, 2021
Guidance

(Depo. Ex. 55)

1866



EXHIBIT  55
WIT: _Malachi_
DATE: _5-24-2_
Cynthia Foster, RPR, LCR

# EXHIBIT 19

July 21, 2021
Guidance

PL 00415



From: **Giaquinto, Kate** <Kate.M.Giaquinto@doj.nh.gov>
Date: Wed, Jul 21, 2021 at 4:45 PM
Subject: NH AG NEWS RELEASE: State Issues Guidance
Regarding New Anti-Discrimination Laws
To: Giaquinto, Kate <Kate.M.Giaquinto@doj.nh.gov>

### NEWS RELEASE

Released by:          Frank Edelblut,
Commissioner, Department of Education
Ahni Malachi, Executive Director,
Commission for Human Rights
John M. Formella, Attorney General
Subject:          State Issues Guidance
Regarding New Anti-Discrimination Laws
Date:          July 21, 2021
Contact:          Kate Giaquinto,
Directory of Communications

kate.m.giaquinto@doj.nh.gov | (603) 573-6103

Concord, NH – Attorney General John M. Formella, Department of
Education Commissioner Frank Edelblut, and Commission for
Human Rights Executive Director Ahni Malachi announce the release
of guidance related to Sections 297 and 298 of House Bill 2.
The guidance for public employers and government programs is
available at: https://www.doj.nh.gov/civil-rights/documents/faq-
public-government.pdf
The guidance for public schools is available at:
https://www.doj.nh.gov/civil-rights/documents/faq-educational-
programs.pdf
Any person who believes that they have been subjected to
discrimination may file a complaint with the New Hampshire
Commission for Human Rights, nh.gov/hrc/howto.html, or the
Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-
rights/.

### ###

**New Hampshire**

# Department of Justice

*Office of the Attorney General*

## News Release

**For Immediate Release**
July 21, 2021

**Contact:**
Kate Giaquinto, Director of Communications
kate.giaquinto@doj.nh.gov | 603-573-6103

## State Issues Guidance Regarding New Anti-Discrimination Laws

Concord, NH – Attorney General John M. Formella, Department of Education Commissioner Frank Edelblut, and Commission for Human Rights Executive Director Ahni Malachi announce the release of guidance related to Sections 297 and 298 of House Bill 2.

The guidance for public employers and government programs is available at: https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-public-government.pdf]**

The guidance for public schools is available at: https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf **[https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf]**

Any person who believes that they have been subjected to discrimination may file a complaint with the New Hampshire Commission for Human Rights, nh.gov/hrc/howto.html **[https://www.nh.gov/hrc/howto.html]** , or the Attorney General's Office's Civil Rights Unit, doj.nh.gov/civil-rights/ **[https://www.doj.nh.gov/civil-rights/index.htm]** .

New Hampshire Department of Justice
33 Capitol Street | Concord, NH | 03301
Telephone: 603-271-3658

PL 00417



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to k-12 educational programs[1]

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to schools and educational programs contained in RSA chapter 193. Please see separate document that addresses changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A.

## Changes Regarding Schools and Educational Programming

### 1.    What are schools prohibited from teaching students?

Schools are prohibited from teaching that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

> **In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination.**

### 2.    What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

---

[1] House Bill 2, Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education;
Legal Reference: RSA 354-A:29; RSA 354-A:30; RSA 354-A:31; RSA 354-A:32: RSA 354-A:33; RSA 354-A:34; RSA 193:40.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

### 3.    Does the law prohibit teachers from teaching U.S. history?

No. Nothing prohibits the teaching of historical subjects including, but not limited to: slavery, treatment of the Native American population, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights movement. Nor does anything prohibit discussions related to current events including, but not limited to: the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups.

### 4.    Are schools allowed to teach students historical concepts related to discrimination?

Yes. Schools are allowed to discuss "as part of a larger course of academic instruction, the historical existence of ideas and subjected identified" in the new law. Nothing prohibits schools from teaching about discrimination, including the historical existence of these ideas.

### 5.    A parent or student has complained that certain lessons, subjects, or areas of discussion related to racism have made them uncomfortable. Has the school district violated the Prohibition on Teaching Discrimination?

No. It is important to note that education related to racism, sexism, and other practices or beliefs that have harmed or continue to harm certain identified groups may make students, faculty, or parents uncomfortable. These lessons may encourage or prompt students to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a lesson may make students, faculty or parents uncomfortable does not mean that the school has violated the Prohibition on Teaching Discrimination.

### 6.    Can parents or guardians refuse to allow their children to participate in specific course material?

Yes. Where parents or guardians object to specific course materials, they are encouraged to follow school policies related to RSA 186:11, IX-c dealing with objectionable education material.

### 7.    Does the law apply to public schools?

Yes. All K-12 public schools are subject to this law. This includes charter schools and public academies.

### 8.    Does this law apply to all school activities or just teaching?

The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work.

The law does not apply to all activities that my occur on a public school's property and does not prohibit public schools or school districts from making physical space available to third parties for events or activities, i.e. a voluntary after-school program but is administered by a third-party organization.



# Frequently Asked Questions: New discriminatory practice prohibitions applicable to public employers and government programs

**Issued by:** Department of Education, Commission for Human Rights and Department of Justice

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

The purpose of these FAQs is to provide guidance to public employers, government program administrators, and school systems as they review their compliance with this new law.

This FAQ document addresses questions that may arise regarding the changes to the New Hampshire Law Against Discrimination, RSA chapter 354-A, that impact public employers and government programs. Please see separate document that addresses changes to schools and educational programs contained in RSA chapter 193.

## Changes Regarding Public Employers and Government Programs

### 1.   What are public employers and government programs prohibited from training and advocating?

Public employers and government programs are prohibited from training and advocating that one identified group (a group based upon: age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin) is:

- Inherently superior or inferior to people of another identified group;
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously;
- Should be discriminated against or receive adverse treatment; or
- Should not treat members of other identified groups equally.

**In short, do not train or advocate that a person or a group is inherently oppressive, superior, inferior racist, or sexist.  Train and treat all equally and without discrimination.**

### 2.   What do the phrases "inherently superior or inferior" or "inherently racist, sexist, or oppressive" mean?

"Inherent" means characteristics that are natural, biological, or innate, as opposed to characteristics that are merely apparent, accidental, or based on external factors.

This new law makes it illegal to teach, train or advocate that a person, because of their membership in one or more identified group(s), is inherently either: (1) racist, sexist, or oppressive, consciously or unconsciously or (2) superior or inferior to people of another identified group.

### 3.   Are these the same prohibitions as those contained in the "divisive concepts" bill, HB 544?

No. HB 544 did not become law and therefore, does not apply or impact public employers, government programs, or schools in New Hampshire. The term "divisive concepts" is not found anywhere in the new law.

### 4.   Can public employers and government programs undertake efforts designed to examine issues related to equity, diversity, inclusion, equality, and other related topics?

Yes. Nothing in this new law prohibits public employers or government programs from taking steps to examine issues related to equity, diversity, inclusion, equality and other related topics.

### 5.   Can trainings address practices or ideas that have harmed or continue to harm certain identified groups?

Yes. Nothing prohibits trainings geared toward educating participants about practices or ideas that may disproportionately affect certain identified groups.

### 6.   Can public employers and government programs conduct trainings designed to improve diversity, equity, and inclusion, such as implicit bias training?

Yes. Nothing prohibits trainings geared towards diversity, equity, equality and inclusion.

Nor does anything prohibit implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally.

The new law expressly permits public employers and government programs to provide and require "sensitivity training" based on the "inherent humanity and equality of all persons" and the "ideal that all persons are entitled to be treated with equality, dignity, and respect."

### 7.   A public employee has claimed that a required diversity training has made them uncomfortable. Has the public employer or government program discriminated against that employee?

No. It is important to note that trainings that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups may make participants uncomfortable. These trainings may encourage or prompt participants to reflect upon whether and how racism, sexism, or other practices have or have not affected their lives. Even discussion of historical practices and their lingering impact upon different identified groups can cause this discomfort.

The mere fact that a training may make participants uncomfortable does not mean that the training has violated New Hampshire's anti-discrimination laws and does not give employees or participants the license to refuse to participate in the training without consequence.

**8.    What remedies are available to public employees or program participants who believe that a public employer or government program has violated one of the new anti-discrimination statutes?**

A person who believes that they have been subject to discrimination, may file a complaint with the New Hampshire Commission for Human Rights, a complaint with the New Hampshire Office of the Attorney General, or may file a civil claim in superior court to seek damages or declaratory or injunctive relief.

**9.    Can a public employee file a claim based upon a training that occurred in 2020?**

No. Complaints alleging a violation of the new laws may only be considered for conduct that occurred after the enactment of those laws on June 25, 2021.

**10.   If I am an individual or group simply using a public facility for non-government use, for example a private event or activity at a school building or town hall, does this new law apply to me?**

No.

PL 00423

# EXHIBIT 46

DOJ's
Interrogatory
Responses

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

****************************************

Local 8027, AFT-New Hampshire, et al.    *

                                         *

                Plaintiff,               *

        v.                               *        No. 1:21-cv-01077-PB

                                         *

Frank Edelblut, Commissioner et al,      *

                                         *

                Defendants.              *

                                         *

****************************************

## ATTORNEY GENERAL JOHN FORMELLA'S OBJECTIONS AND RESPONSES TO THE PLAINTIFFS' FIRST SET OF INTERROGATORIES

John Formella, in his official capacity as Attorney General of the State of New Hampshire, by and through undersigned counsel, submits the following objections and responses to the plaintiffs' first set of interrogatories.

## GENERAL OBJECTIONS

The Attorney General incorporates the following General Objections into each and every individualized response contained herein, as set forth below, and into each and every amendment, supplement or modification to the objections and answers hereafter provided to the interrogatories. The Attorney General does not waive any General Objection in response to any interrogatory.

1.      The Attorney General objects to each definition, instruction, and interrogatory to the extent that it seeks to impose obligations beyond those imposed by the Federal Rules of Civil Procedure or any other applicable law or rule. As such, the Attorney General's objections and responses do not constitute an adoption of plaintiffs' definitions or instructions.

2.      The Attorney General objects to each definition, instruction, and interrogatory to the extent it purports to require the disclosure or production of information subject to the attorney-client privilege, the work product doctrine, the executive privilege, the legislative privilege, the deliberative process privilege, or any other privilege or is otherwise immune from disclosure under state or federal law.  Any inadvertent disclosure of information that is protected under any privilege, immunity, or legal bar shall not constitute a waiver of that privilege, immunity, or legal bar and shall not prevent the Attorney General from objecting to discovery with respect to such information or use of such information in court.

3.      The Attorney General objects to each definition, instruction, and interrogatory to the extent it seeks the production of information that is irrelevant to the issues germane to this matter or is unduly broad or would subject the Attorney General's Office to unreasonable, oppressive, or undue burden or expense, or is otherwise not proportional to the needs of the case.

4.      The Attorney General objects to each definition, instruction, and interrogatory insofar as it seeks to have the Attorney General identify information or documents already in the plaintiffs' possession or readily accessible to plaintiffs or that the plaintiffs may produce in this case.

5.       The Attorney General objects to each definition, instruction, and interrogatory to the extent that it purports to seek information which is not within the knowledge, possession, custody, or control of the Attorney General's Office.

6.      The Attorney General objects to each definition, instruction, and interrogatory to the extent it calls for speculation or conjecture, opinion, or legal conclusions.

7.      The Attorney General objects to each definition, instruction, and interrogatory to the extent that it is vague or ambiguous.

8.     The Attorney General objects to each definition, instruction, and interrogatory to the extent it assumes certain legal conclusions or certain facts not established in this proceeding. The Attorney General does not admit, adopt, or acquiesce to any factual or legal contention, characterization, or implication that is contained in any definition, instruction, or interrogatory.

9.     The Attorney General objects to each definition and instruction to the extent it: (i) is unclear, ambiguous, overbroad, or unduly burdensome; (ii) is inconsistent with the ordinary, customary meaning of the words or phrases it purports to define; or (iii) purports to impose any requirement or discovery obligations beyond those set forth in the Federal Rules of Civil Procedure or pertinent case law.

10.     The Attorney General reserves all objections as to the relevance or admissibility of any response provided herein and reserves the right to supplement or amend any such answer as discovery continues.

## SPECIFIC OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.     The Attorney General specifically objects to every definition and instruction on relevancy grounds.  The Attorney General maintains that the plaintiffs' remaining claims present pure questions of law and that discovery in this case is unnecessary.

2.     The Attorney General specifically objects to every definition and instruction other than the fourth definition and instruction (defining "amendments") as overly broad, unduly burdensome, and not proportional to the needs of the case.  The parties have agreed to expedited, streamlined discovery in this case.  During the hearing on the motion to dismiss and the preliminary pretrial conference, the Court made clear that discovery in this case was to be narrow and targeted.  The Court approved the parties' discovery plan with this understanding.  The definitions and instructions reflect no attempt at narrowing or targeting discovery in the manner

contemplated by the parties and the Court.  Rather, the definitions and instructions are as broad,

if not broader, than what would typically be included in a case set on a standard or complex trial

schedule.  The Attorney General specifically objects to the definitions and instructions, except

the fourth definition and instruction, on this basis.  In responding to these interrogatories, the

Attorney General provides the information set forth in the responses based on a reasonably

diligent search commensurate with the expedited, streamlined discovery plan set in this case.

### **INTERROGATORIES**

1.      Please identify the following: (i) your name, title and professional address; and
(ii) the name and address, and title and professional address, of each person consulted by you in
answering these Interrogatories, specifying on which Interrogatories such person was consulted.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks the
personal address of each person consulted by the Attorney General's Office in answering
these interrogatories.  Such information is irrelevant and unduly burdensome to produce
in light of privacy interest in such information.

The Attorney General further objects on the basis that part (i) of this interrogatory is
ambiguous.  Plaintiffs have specifically defined the word "your" to include a vast number
of individuals not limited to the present Attorney General John Formella.  As such, it is
unclear whether plaintiffs intend the term "your" to mean the Attorney General's Office
generally, Attorney General John Formella specifically, or something else.  In responding
to this interrogatory, the Attorney General interprets the term "your" as used in part (i) to
mean the Attorney General's Office, generally.

Subject to and without waiving any of the foregoing general or specific objections, the
Attorney General answers this interrogatory as follows.

**Response:**         (i) New Hampshire Department of Justice
                    Office of the Attorney General
                    33 Capitol Street
                    Concord, NH 03301

                    (ii) Sean R. Locke
                     Assistant Attorney General
                     33 Capitol Street
                     Concord, NH 03301
                     Consulted on Interrogatory Nos. 1–9

Jill A. Perlow
Associate Attorney General
33 Capitol Street
Concord, NH 03301
Consulted on Interrogatory Nos. 1–9

Nathan W. Kenison-Marvin
Assistant Attorney General
33 Capitol Street
Concord, NH 03301
Consulted on Interrogatory Nos. 1–9

2.     Please describe any policies, protocols, procedures, or standards that exist or have existed concerning the enforcement of the amendments, stating when and to whom promulgated or copied and how you have interpreted the amendments' terms.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory to the extent it asks the Attorney General to "interpret the amendments' terms," as "[t]he interpretation of a statute is a question of law," *Appeal of Cole,* 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

The Attorney General further objects to this interrogatory as not proportional to the needs of the case.  The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement.  This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** On July 21, 2021, the New Hampshire Department of Justice, the New Hampshire Department of Education ("NHED"), and the New Hampshire Commission for Human Rights ("HRC") issued guidance documents in the form of Frequently Asked Questions ("FAQs"). One set of FAQs was for public employees and government programs and the other was for public schools. Links to the FAQs are available on the

DOJ's website at https://www.doj.nh.gov/news/2021/20210721-anti-discrimination-laws.htm, and NHED's website at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination.

On September 7, 2021, the New Hampshire Department of Justice issued Attorney General Opinion No. 2021-01.  Attorney General Opinion No. 2021-01 is "an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 [ ], to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40."  A link to Attorney General Opinion No. 2021-01 is available on the DOJ's website at https://www.doj.nh.gov/public-documents/opinions.htm.


3.      Please identify all memorandum or other written materials explaining the Department of Justice's procedure for evaluating and responding to complaints filed pursuant to the amendments, stating when and to whom promulgated or delivered.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory to the extent it asks the Attorney General to "interpret the amendments' terms," as "[t]he interpretation of a statute is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

The Attorney General further objects to this interrogatory because the phrase "all . . . other written materials" is not defined and unclear.  For purposes of responding to this interrogatory, consistent with the streamlined, expedited discovery plan the parties agreed to in this case, the Commissioner interprets the phrase "other written materials" to refer to formal documents such as policies, procedures, protocols, standards, training documents, or written information on DOJ's website.

The Attorney General further objects to this interrogatory because the phrase "complaints filed pursuant to the amendments" is not reasonably clear.  Specifically, it is unclear whether this is intended to refer to complaints filed with a government entity other than DOJ, complaints filed with DOJ, or complaints filed with either a government entity other than DOJ or with DOJ.  In answering this interrogatory, the Attorney General interprets this phrase to mean complaints filed with the DOJ and not with any other government entity.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** There is no memorandum or other written material that explains a procedure specific to evaluating and responding to complaints filed pursuant to the amendments specifically.  Since January 2021, the DOJ Civil Rights Unit has had internal written "Procedures and Protocols" related to evaluating and responding to all complaints that it receives.


4.      Please describe the training provided to any employees concerning how to implement the amendments, identifying by name, position and duties of each such employee, when, where and how such training was conducted and by whom.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory because the term "training" is not defined and vague.  The Attorney General interprets accordingly interprets this term in accordance with its plain and ordinary meaning, as understood by the Attorney General.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** The Department of Justice did not provide training to any employees concerning how to implement the amendments.

5.      Please describe the "order of operations" of how the amendments are enforced as referenced on pages 33-35 of Defendants' March 25, 2022 motion to dismiss—including the contention that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted"—and how this process has been formalized by your office.

> **Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.
>
> The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.
>
> The Attorney General further objects to this interrogatory to the extent it seeks a legal opinion beyond the scope of a proper interrogatory. *See Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).
>
> Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.
>
> **Response:** The description of the "order of operations" on pages 33–35 of Defendants' March 25, 2022 motion to dismiss speaks for itself.  With respect to the statement therein that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed education is warranted," this statement is based on the plain and ordinary meaning of the language of RSA 193:40, as interpreted in the context of the overall statutory scheme within which it exists.

6.      Please describe all complaints (either written or oral) received or concerns raised to and/or by your office alleging a possible violation of the amendments. This request includes a description of: (i) the complainant; (ii) the date and content of, or basis for, the complaint or concern, and identify each item of written matter made, received or exchanged in connection therewith (including the use, retention, or teaching of any books or course materials); (iii) the date your office received the complaint or concern; (vi) who the complaint or concern was delivered to within your office; (v) any response from your office; (vi) if and how the complaint or concern was investigated, by whom and utilizing what means or measures, including but not limited to any other agencies consulted or notified or school officials notified of the complaint; (vii) how the complaint or concern was resolved, and (viii) the school district and educator implicated, if any. "Complaints" as defined herein are not limited to those that have led to a

notice of a public adjudicative hearing issued by the New Hampshire Commission for Human Rights.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. In responding to this interrogatory, the Attorney General interprets the phrase "complaints (either written or oral) received or concerns raised to and/or by your office" to not include attorney-client privileged communications between the DOJ and any governmental agency to which DOJ has provided legal counsel to the agency with respect to any such "complaint" or "concern" received by that agency.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to the definition of "complaints" set forth in this interrogatory, as it does not comport with any relevant legal definition.  Likewise, the undefined phrase "concerns raised" is ambiguous and unduly broad.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** The Attorney General has not received any complaints alleging a possible violation of the amendments, nor has the Attorney General received or raised any concerns alleging a possible violation of the amendments.


7.      Please characterize and set forth your best present recollection of any conversations with which you have been involved concerning or relating to how to interpret the amendments, including but not limited to: (i) questions that have been brought to your attention about the scope of applicability of the amendments; (ii) discussions within your agency about the meaning of the amendments; (iii) conversations between agencies about how to interpret the amendments; and (iv) discussions that led to the production of guidance documents about the meaning and scope of the amendments. Please identify each person (other than your counsel) consulted by you in connection with any aspect of the foregoing and your best present recollection of the approximate date and circumstances of each such consultation and the matters then discussed.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory because the word "conversations" is not defined and is vague and overbroad.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** To the extent the word "conversations," as used in this interrogatory, refers to written communications, review of such communications remains ongoing in response to plaintiffs' document requests and the Attorney General will seasonably produce any responsive, non-privileged written communications that are identified during such review, subject to the above objections and the stipulated limits of the review for such written communications.

8.      Please identify each and every extra-curricular or school-based activity that (i) you and (ii) your agency believes is covered by the July 21, 2021 FAQ 8 issued by the Department of Education, New Hampshire Commission of Human Rights, and Department of Justice concerning the applicability of the amendments to extra-curricular activities.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory to the extent it requests information about what any individual, apart from an agency, personally "believes."

The Attorney General further objects to this interrogatory to the extent it can be read to imply that any defendant has the burden of proof on any of the remaining claims in this case.

The Attorney General further objects to this interrogatory to the extent it asks the Attorney General to interpret the scope of the amendments, as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

The Attorney General further objects to this interrogatory on the basis that it asks the Attorney General to express the Attorney General's legal position on unstated hypotheticals rather than on facts. *See Kendrick v. Sullivan*, 125 F.R.D. 1, 3 (D.D.C. 1989).

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** As stated in the FAQs, the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work. The amendments do not apply to activities that may occur on a public school's property and do not prohibit public schools or school districts from making physical space available to third parties for events or activities, including voluntary after-school programs that are administered by third-party organizations.

9.      Please identify each item of written matter made, received or exchanged in connection with any aspect of items 2 through 8, inclusive, of the foregoing and your responses thereto.

**Objections:** The Attorney General objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege.

The Attorney General further objects to this interrogatory on relevancy grounds, as the remaining claims in this case present pure legal questions and this discovery is therefore unnecessary.

The Attorney General further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.  Moreover, this interrogatory is unduly burdensome in that it seeks information duplicative of plaintiffs' requests for documents.

Subject to and without waiving any of the foregoing general or specific objections, the Attorney General answers this interrogatory as follows.

**Response:** The Attorney General will produce any responsive, non-privileged documents that have been identified through a reasonably diligent search commensurate with expedited, streamlined discovery plan entered in this case in conjunction with the defendants' responses to the plaintiffs' first requests for production of documents, subject to the objections asserted by the defendants with respect to those requests for production and to any stipulated limits as to the scope of the search for documents responsive to plaintiffs' document requests.

Respectfully submitted,

JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General,

By and through,

Dated: May 12, 2023

/s/ *Nathan W. Kenison-Marvin*
Nathan W. Kenison-Marvin, Bar #270162
Assistant Attorney General
Civil Bureau
N.H. Department of Justice
(603) 271-3650
nathan.w.kenison-marvin@doj.nh.gov

## **VERIFICATION**

I, Sean R. Locke, am commissioned as Assistant Attorney General for the State of New Hampshire. The factual matters stated in the foregoing responses are made in my official capacity as an Assistant Attorney General, and they are not necessarily within my personal knowledge or within the personal knowledge of any single individual. Based on the reasonable of inquiry of staff within the New Hampshire Department of Justice, I am informed and believe, and based on such information and belief hereby verify, under penalty of perjury, that the factual statements in the foregoing interrogatory responses are true and correct to the best of my knowledge, information, and belief.

/s/ Sean R. Locke
Sean R. Locke
Assistant Attorney General
New Hampshire Department of Justice

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was provided to Plaintiffs' counsel via email on May 12, 2023.

/s/ *Nathan W. Kenison-Marvin*
Nathan W. Kenison-Marvin

# EXHIBIT 47

HRC's
Interrogatory
Responses

(Depo. Ex.
58)



EXHIBIT 58
1889
WIT: _Malachi_
DATE: 5-24-23
Cynthia Foster, RPR, LCR #14

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

************************************

Local 8027, AFT-New Hampshire, et al.　　*
　　　　　　　　　　　　　　　　　　　*
　　　　　　Plaintiff,　　　　　　　　　*
　　v.　　　　　　　　　　　　　　　　*　　　No. 1:21-cv-01077-PB
　　　　　　　　　　　　　　　　　　　*
Frank Edelblut, Commissioner et al,　　　*
　　　　　　　　　　　　　　　　　　　*
　　　　　　Defendants.　　　　　　　　*
　　　　　　　　　　　　　　　　　　　*

************************************

### CHRISTIAN KIM AND AHNI MALACHI'S OBJECTIONS AND RESPONSES TO THE PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendants, Christian Kim and Ahni Malachi (the "HRC Defendants"), by and through counsel, submit the following objections and responses to the plaintiffs' first set of interrogatories.

### General Objections

The HRC Defendants incorporate the following general objections into each and every individualized response contained herein, as set forth below, and into each and every amendment, supplement or modification to the objections and answers hereafter provided to the interrogatories. The HRC Defendants do not waive any general objection in response to any interrogatory.

1.　　The HRC Defendants object to each definition, instruction, and interrogatory to the extent that it seeks to impose obligations beyond those imposed by the Federal Rules of Civil Procedure or any other applicable law or rule. As such, the HRC Defendants' objections and responses do not constitute an adoption of plaintiffs' definitions or instructions.

2.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent it purports to require the disclosure or production of information subject to the attorney-client privilege, the work product doctrine, the executive privilege, the legislative privilege, the deliberative process privilege, or any other privilege or is otherwise immune from disclosure under state or federal law. Any inadvertent disclosure of information that is protected under any privilege, immunity, or legal bar shall not constitute a waiver of that privilege, immunity, or legal bar and shall not prevent the HRC Defendants from objecting to discovery with respect to such information or use of such information in court.

3.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent it seeks the production of information that is irrelevant to the issues germane to this matter or is unduly broad or would subject the HRC Defendants' office to unreasonable, oppressive, or undue burden or expense, or is otherwise not proportional to the needs of the case.

4.      The HRC Defendants object to each definition, instruction, and interrogatory insofar as it seeks to have the HRC Defendants identify information or documents already in the plaintiffs' possession or readily accessible to the plaintiffs or that the plaintiffs may produce in this case.

5.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent that it purports to seek information which is not within the knowledge, possession, custody, or control of the HRC Defendants.

6.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent it calls for speculation or conjecture, opinion, or legal conclusions.

7.      The HRC Defendants object to each definition, instruction, and interrogatory to the extent that it is vague or ambiguous.

- 2 -

8.    The HRC Defendants object to each definition, instruction, and interrogatory to the extent it assumes certain legal conclusions or certain facts not established in this proceeding. The HRC Defendants do not admit, adopt, or acquiesce to any factual or legal contention, characterization, or implication that is contained in any definition, instruction, or interrogatory.

9.    The HRC Defendants object to each definition and instruction to the extent it: (i) is unclear, ambiguous, overbroad, or unduly burdensome; (ii) is inconsistent with the ordinary, customary meaning of the words or phrases it purports to define; or (iii) purports to impose any requirement or discovery obligations beyond those set forth in the Federal Rules of Civil Procedure or pertinent case law.

10.    The HRC Defendants reserve all objections as to the relevance or admissibility of any response provided herein and reserves the right to supplement or amend any such answer as discovery continues.

<div align="center">

**Specific Objections to Instructions and Definitions**
</div>

1.    The HRC Defendants specifically object to every definition and instruction on relevancy grounds. The HRC Defendants maintain that the plaintiffs' remaining claims present pure questions of law and that discovery in this case is unnecessary.

2.     The HRC Defendants specifically object to every definition and instruction other than the fourth definition and instruction (defining "amendments") as overly broad, unduly burdensome, and not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery in this case. During the hearing on the motion to dismiss and the preliminary pretrial conference, the Court made clear that discovery in this case was to be narrow and targeted. The district court approved the parties' discovery plan with this understanding. The definitions and instructions reflect no attempt at narrowing or targeting discovery in the manner contemplated by the parties and the Court. Rather, the definitions and instructions are as broad, if not broader, than what would typically be included in a case set on a standard or complex trial schedule. The HRC Defendants specifically object to the definitions and instructions, except the fourth definition and instruction, on this basis. In responding to these interrogatories, the HRC Defendants provide the information set forth in the responses based on a reasonably diligent search commensurate with the expedited, streamlined discovery plan set in this case.

### Interrogatories

1.     Please identify the following: (i) your name, title and professional address; and (ii)the name and address, and title and professional address, of each person consulted by you in answering these Interrogatories, specifying on which Interrogatories such person was consulted.

**Response:**     Ahni Malachi, Executive Director
Sarah Burke Cohen, Assistant Director
New Hamsphire Commission for Human Rights
2 Industrial Park, Building 1
Concord, NH 03301

2.     Please describe any policies, protocols, procedures, or standards that exist or have existed concerning the enforcement of the amendments, stating when and to whom promulgated or copied and how you have interpreted the amendments' terms.

- 4 -

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it asks them to "interpret the amendments' terms," as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The Attorney General issued an opinion relative to the amendments that included interpretation of the amendments. This opinion was posted on the HRC website and the New Hampshire Department of Justice ("DOJ") website. In addition, the HRC, DOJ, and New Hampshire Department of Education ("NHED") published Frequently Asked Questions ("FAQs") on the amendments, which were also published on each agency's website.

Complaints received by the HRC under the amendments are docketed and processed the same way as all other cases. The cases are processed in accordance with N.H. Rev. Stat. Ann. § 354-A and the HRC's administrative rules, both of which are available on the HRC's website.

3.     Please identify all memorandum or other written materials explaining the Commission for Human Rights' procedure for evaluating and responding to complaints filed pursuant to the amendments, stating when and to whom promulgated or delivered.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it asks them to "interpret the amendments' terms," as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** See response to Interrogatory 2.

4.       Please describe the training provided to any employees concerning how to implement the amendments, identifying by name, position and duties of each such employee, when, where and how such training was conducted and by whom.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it asks a question of law beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory because the term "training" is not defined and vague. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

Complaints received under the amendments are processed in the same manner as all HRC cases. No additional training was required on this process. HRC staff did receive copies of the FAQs and Attorney General Opinion. Those documents were discussed during a staff meeting at some point after the Attorney General Opinion issued. The HRC Defendants have not been able

- 7 -

to determine the precise date of that meeting or who specifically was in attendance. HRC staff were not instructed to process complaints received under the amendments in a manner different from how all other complaints are processed.

5.      Please describe the "order of operations" of how the amendments are enforced as referenced on pages 33-35 of Defendants' March 25, 2022 motion to dismiss—including the contention that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted"—and how this process has been formalized by your office.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it seeks a legal opinion beyond the scope of a proper interrogatory. *See Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

Complaints received under the amendments are processed in the same manner as all HRC cases. The "order of operations" referenced in this interrogatory does not affect how the HRC

- 8 -

processes complaints. At the time of this response, no complaint brought under the amendments has been fully adjudicated by the HRC.

     6.     Please describe all complaints (either written or oral) received or concerns raised to and/or by your office alleging a possible violation of the amendments. This request includes a description of: (i) the complainant; (ii) the date and content of, or basis for, the complaint or concern, and identify each item of written matter made, received or exchanged in connection therewith (including the use, retention, or teaching of any books or course materials); (iii) the date your office received the complaint or concern; (vi) who the complaint or concern was delivered to within your office; (v) any response from your office; (vi) if and how the complaint or concern was investigated, by whom and utilizing what means or measures, including but not limited to any other agencies consulted or notified or school officials notified of the complaint; (vii) how the complaint or concern was resolved, and (viii) the school district and educator implicated, if any. "Complaints" as defined herein are not limited to those that have led to a notice of a public adjudicative hearing issued by the New Hampshire Commission for Human Rights.

     **Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it seeks information that is protected under N.H. Administrative Rule Hum 219.04, which provides that "[n]o information regarding complaints filed, investigation of complaints,

pre-determination settlement negotiations, or conciliation negotiations shall be disclosed to the public by any commissioner or staff member prior to the issuance of a notice of public hearing after a finding of probable cause." The HRC Defendants further object to the definition of "complaints" set forth in this interrogatory, as it does not comport with the legal definition under N.H. Rev. Stat. Ann. Ch. 354-A or the HRC's administrative rules. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The HRC Defendants can confirm that the HRC has docketed one complaint made under the amendments. The HRC has received additional inquiries purportedly related to the amendments that the HRC determined were either fraudulent on their face or otherwise did not fall within HRC jurisdiction. In light of the above objections, and particularly the confidentiality protections set forth in N.H. Administrative Rule Hum 219.04, the HRC Defendants cannot provide the information sought in this interrogatory with respect to the complaint or inquiries.

7.      Please characterize and set forth your best present recollection of any conversations with which you have been involved concerning or relating to how to interpret the amendments, including but not limited to: (i) questions that have been brought to your intention about the scope of applicability of the amendments; (ii) discussions within your agency about the meaning of the amendments; (iii) conversations between agencies about how to interpret the amendments; and (iv) discussions that led to the production of guidance documents about the

meaning and scope of the amendments. Please identify each person (other than your counsel) consulted by you in connection with any aspect of the foregoing and your best present recollection of the approximate date and circumstances of each such consultation and the matters then discussed.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The HRC Defendants had conversations with respect to the amendments that are subject to the attorney-client privilege. The HRC Defendants decline to identify those conversations. The Chair of the HRC also requested an opinion from the Attorney General with respect to the amendments. After the Attorney General Opinion issued, it was discussed during the HRC staff meeting identified in the response to Interrogatory 4 above. The Director of the HRC also emailed the Intake Questionnaire used by HRC to Diana Krol at NHED. A copy of this email and the Intake Questionnaire will be provided in discovery. It is possible that members of the HRC

staff had other conversations with respect to the amendments that the HRC Defendants are unaware of and have not been able to identify. To the extent the HRC Defendants identify any additional non-privileged conversations that are responsive to this interrogatory, they will supplement their response in accordance with the rules.

8.    Please identify each and every extra-curricular or school-based activity that (i) you and (ii) your agency believes is covered by the July 21, 2021 FAQ 8 issued by the Department of Education, New Hampshire Commission of Human Rights, and Department of Justice concerning the applicability of the amendments to extra-curricular activities.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory to the extent it can be read to imply that any defendant has the burden of proof on any of the remaining claims in this case. The HRC Defendants further object to this interrogatory to the extent it asks them to interpret the scope of the amendments, as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed

discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

As stated in the FAQs, the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work. The amendments do not apply to activities that may occur on a public school's property and do not prohibit public schools or school districts from making physical space available to third parties for events or activities, including voluntary after-school programs that are administered by third-party organizations.

9.     Please identify each item of written matter made, received or exchanged in connection with any aspect of items 2 through 8, inclusive, of the foregoing and your responses thereto.

**Objections:** The HRC Defendants object to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The HRC Defendants further object to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The HRC Defendants further object to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

- 13 -

**Response:** Notwithstanding the above objections, and without waiving them, the HRC Defendants respond to this interrogatory as follows.

The HRC Defendants will produce any responsive, non-privileged documents that have been identified through a reasonably diligent search commensurate with expedited, streamlined discovery plan entered in this case in conjunction with the defendants' responses to the plaintiffs' first requests for production of documents.

## **VERIFICATION**

I, Ahni Malachi, am Executive Director of the New Hamsphire Commission for Human Rights. The factual matters stated in the foregoing responses are made in my official capacity as Executive Director, and they are not necessarily within my personal knowledge or within the personal knowledge of any single individual. Based on the reasonable of inquiry of staff within the New Hamsphire Commission for Human Rights, I am informed and believe, and based on such information and belief hereby verify, under penalty of perjury, that the factual statements in the foregoing interrogatory responses are true and correct to the best of my knowledge, information, and belief.

/s/ Ahni Malachi
Ahni Malachi
Executive Director
N.H. Commission for Human Rights

Respectfully submitted,

Frank Edelblut, Commissioner of the Department of
Education; John Formella, New Hampshire
Attorney General; Christian Kim, Chair of the New
Hamsphire Commission for Human Rights, Ahni
Malchi, Executive Director of the New Hamsphire
Commission for Human Rights; Ken Merrifield
Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: March 24, 2023

/s/ *Samuel Garland*
Samuel R.V. Garland, Bar #266273
Senior Assistant Attorney General
Civil Bureau
N.H. Department of Justice
(603) 271-3650
samuel.rv.garland@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was provided to Plaintiffs' counsel via email.

/s/ *Samuel Garland*
Samuel R.V. Garland

- 16 -

# EXHIBIT 48

HRC's
Interrogatory
Responses

(Depo. Ex.
57)



EXHIBIT 57
WIT: _Edelblut_
DATE: 5-24-23
Cynthia Foster, RPR, LCR #14

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Local 8027, AFT-New Hampshire, et al.   \*
                                        \*
            Plaintiff,                  \*
    v.                                  \*        No. 1:21-cv-01077-PB
                                        \*
Frank Edelblut, Commissioner et al,     \*
                                        \*
            Defendants.                 \*
                                        \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMMISSIONER FRANK EDELBLUT'S OBJECTIONS AND RESPONSES TO THE PLAINTIFFS' FIRST SET OF INTERROGATORIES

Frank Edelblut, in his official capacity as Commissioner of the New Hampshire Department of Education ("the Commissioner"), by and through counsel, submits the following objections and responses to the plaintiffs' first set of interrogatories.

### General Objections

The Commissioner incorporates the following general objections into each and every individualized response contained herein, as set forth below, and into each and every amendment, supplement or modification to the objections and answers hereafter provided to the interrogatories. The Commissioner does not waive any general objection in response to any interrogatory.

1.     The Commissioner objects to each definition, instruction, and interrogatory to the extent that it seeks to impose obligations beyond those imposed by the Federal Rules of Civil Procedure or any other applicable law or rule. As such, the Commissioner's objections and responses do not constitute an adoption of plaintiffs' definitions or instructions.

2.      The Commissioner objects to each definition, instruction, and interrogatory to the extent it purports to require the disclosure or production of information subject to the attorney-client privilege, the work product doctrine, the executive privilege, the legislative privilege, the deliberative process privilege, or any other privilege or is otherwise immune from disclosure under state or federal law. Any inadvertent disclosure of information that is protected under any privilege, immunity, or legal bar shall not constitute a waiver of that privilege, immunity, or legal bar and shall not prevent the Commissioner from objecting to discovery with respect to such information or use of such information in court.

3.      The Commissioner objects to each definition, instruction, and interrogatory to the extent it seeks the production of information that is irrelevant to the issues germane to this matter or is unduly broad or would subject the Commissioner's office to unreasonable, oppressive, or undue burden or expense, or is otherwise not proportional to the needs of the case.

4.      The Commissioner objects to each definition, instruction, and interrogatory insofar as it seeks to have the Commissioner identify information or documents already in the plaintiffs' possession or readily accessible to the plaintiffs or that the plaintiffs may produce in this case.

5.      The Commissioner objects to each definition, instruction, and interrogatory to the extent that it purports to seek information which is not within the knowledge, possession, custody, or control of the Commissioner.

6.      The Commissioner objects to each definition, instruction, and interrogatory to the extent it calls for speculation or conjecture, opinion, or legal conclusions.

7.      The Commissioner objects to each definition, instruction, and interrogatory to the extent that it is vague or ambiguous.

- 2 -

8.      The Commissioner objects to each definition, instruction, and interrogatory to the extent it assumes certain legal conclusions or certain facts not established in this proceeding. The Commissioner does not admit, adopt, or acquiesce to any factual or legal contention, characterization, or implication that is contained in any definition, instruction, or interrogatory.

9.      The Commissioner objects to each definition and instruction to the extent it: (i) is unclear, ambiguous, overbroad, or unduly burdensome; (ii) is inconsistent with the ordinary, customary meaning of the words or phrases it purports to define; or (iii) purports to impose any requirement or discovery obligations beyond those set forth in the Federal Rules of Civil Procedure or pertinent case law.

10.     The Commissioner reserves all objections as to the relevance or admissibility of any response provided herein and reserves the right to supplement or amend any such answer as discovery continues.

### Specific Objections to Instructions and Definitions

1.      The Commissioner specifically objects to every definition and instruction on relevancy grounds. The Commissioner maintains that the plaintiffs' remaining claims present pure questions of law and that discovery in this case is unnecessary.

2.  The Commissioner specifically objects to every definition and instruction other than the fourth definition and instruction (defining "amendments") as overly broad, unduly burdensome, and not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery in this case. During the hearing on the motion to dismiss and the preliminary pretrial conference, the Court made clear that discovery in this case was to be narrow and targeted. The Court approved the parties' discovery plan with this understanding. The definitions and instructions reflect no attempt at narrowing or targeting discovery in the manner contemplated by the parties and the Court. Rather, the definitions and instructions are as broad, if not broader, than what would typically be included in a case set on a standard or complex trial schedule. The Commissioner specifically objects to the definitions and instructions, except the fourth definition and instruction, on this basis. In responding to these interrogatories, the Commissioner provides the information set forth in the responses based on a reasonably diligent search commensurate with the expedited, streamlined discovery plan set in this case.

## Interrogatories

1.  Please identify the following: (i) your name, title and professional address; and (ii) the name and address, and title and professional address, of each person consulted by you in answering these Interrogatories, specifying on which Interrogatories such person was consulted.

**Response:**    (i)    Frank Edelblut
                        Commissioner of the New Hampshire Department of Education
                        N.H. Department of Education
                        25 Hall Street
                        Concord, NH 03301

                        Diana E. Fenton, Esq.
                        Chief, Governance Unit
                        New Hampshire Department of Education
                        Office of the Commissioner
                        25 Hall Street
                        Concord, NH 03301

- 4 -

Christopher G. Bond, Esq.[1]
Legal Counsel
New Hampshire Department of Education
25 Hall Street
Concord, NH 03301

(ii) The above individuals were consulted on the responses to all interrogatories.

2.      Please describe any policies, protocols, procedures, or standards that exist or have

existed concerning the enforcement of the amendments, stating when and to whom promulgated

or copied and how you have interpreted the amendments' terms.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks

information that is subject to any applicable privilege, including but not limited to the attorney-

client privilege, the work-product doctrine, the executive privilege, and the deliberative process

privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all

defendants maintain that the remaining claims in this case present pure legal questions and that

discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the

extent it asks him to "interpret the amendments' terms," as "[t]he interpretation of a statue is a

question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the

scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018

U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to

this interrogatory as not proportional to the needs of the case. The parties have agreed to

expedited, streamlined discovery, and the district court accepted the parties' proposed discovery

plan based on that agreement. This interrogatory seeks information beyond the scope of the

expedited, streamlined discovery contemplated by the discovery plan.

---

[1] Attorney Bond was Legal Counsel for the Department of Education until May 2022. He is now a Senior Assistant
Attorney General at the New Hampshire Department of Justice, where he serves as Chief of the Client Counseling
Unit within the Civil Bureau.

**Response:** Notwithstanding the above objections, and without waiving them, the Commissioner responds to this interrogatory as follows.

On July 21, 2021, the New Hamsphire Department of Education ("NHED"), the New Hampshire Commission for Human Rights ("HRC"), and the New Hampshire Department of Justice ("DOJ") issued joint guidance documents in the form of Frequently Asked Questions ("FAQs"). One set of FAQs was for public employees and government programs and the other was for public schools. Links to the FAQs are available on the DOJ's website at https://www.doj.nh.gov/news/2021/20210721-anti-discrimination-laws.htm, and NHED's website at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination. NHED worked with DOJ and HRC in developing these guidance documents.

The Commissioner is aware that the DOJ also issued an Attorney General Opinion in relation to the amendments. A copy of that opinion is available on the DOJ's website at https://www.doj.nh.gov/public-documents/documents/opinion-2021-01-hb2-anti-discrimination.pdf. NHED did not play a role in developing that opinion.

NHED also added a page to its website in relation to the amendments. That website is available at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination.

It is the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator following a finding of discrimination by the HRC.

- 6 -

3.      Please identify all memorandum or other written materials explaining the

Department of Education's procedure for evaluating and responding to complaints filed pursuant

to the amendments, stating when and to whom promulgated or delivered.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks

information that is subject to any applicable privilege, including but not limited to the attorney-

client privilege, the work-product doctrine, the executive privilege, and the deliberative process

privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all

defendants maintain that the remaining claims in this case present pure legal questions and that

discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the

extent it asks him to "interpret the amendments' terms," as "[t]he interpretation of a statue is a

question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the

scope of a proper interrogatory, *see Martin v. Evans*, Civil Action No. 16-cv-11362-PBS, 2018

U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to

this interrogatory because the phrase "all . . . other written materials" is not defined and unclear.

The Commissioner further objects to this interrogatory as not proportional to the needs of the

case. The parties have agreed to expedited, streamlined discovery, and the district court accepted

the parties' proposed discovery plan based on that agreement. This interrogatory seeks

information beyond the scope of the expedited, streamlined discovery contemplated by the

discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the

Commissioner responds to this interrogatory as follows.

For the purposes of this response, consistent with the streamlined, expedited discovery

plan the parties agreed to in this case, the Commissioner interprets the phrase "other written

- 7 -

materials" to refer to formal documents such as policies, procedures, protocols, standards, training documents, or written information on NHED's website. In addition to the documents previously identified in response to Interrogatory 1, NHED referenced the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator following a finding of discrimination by the HRC in a PowerPoint presentation used during trainings related to the Educator Code of Conduct. A copy of that PowerPoint presentation will be provided to the plaintiffs in discovery. NHED also added a page to its website in relation to the amendments. That website is available at https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination. A link added to that website allows individuals to file complaints under the amendments directly with the HRC via an internet portal. NHED did not and does not have access to any complaints filed through this system.

    4.     Please describe the training provided to any employees concerning how to implement the amendments, identifying by name, position and duties of each such employee, when, where and how such training was conducted and by whom.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the extent it asks him to "interpret the amendments' terms," as "[t]he interpretation of a statue is a

question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to this interrogatory because the term "training" is not defined and vague. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the Commissioner responds to this interrogatory as follows.

NHED employees did not receive training concerning implementation of the amendments.

5. Please describe the "order of operations" of how the amendments are enforced as referenced on pages 33-35 of Defendants' March 25, 2022 motion to dismiss—including the contention that "[i]t is only after a finding of discrimination becomes final that the Department of Education may begin the process of bringing a claim before the Board of Education to determine whether discipline against the licensed educator is warranted"—and how this process has been formalized by your office.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that

discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the extent it seeks a legal opinion beyond the scope of a proper interrogatory. *See Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018).

**Response:** Notwithstanding the above objections, and without waiving them, The Commissioner responds to this interrogatory as follows.

It is the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator following a finding of discrimination by the HRC. Any such investigation and disciplinary proceeding would be handled in accordance with the processes and procedures already in existence for educator misconduct cases. NHED did not create any additional process or procedure for implementing the amendments.

6.       Please describe all complaints (either written or oral) received or concerns raised to and/or by your office alleging a possible violation of the amendments. This request includes a description of: (i) the complainant; (ii) the date and content of, or basis for, the complaint or concern, and identify each item of written matter made, received or exchanged in connection therewith (including the use, retention, or teaching of any books or course materials); (iii) the date your office received the complaint or concern; (vi) who the complaint or concern was delivered to within your office; (v) any response from your office; (vi) if and how the complaint or concern was investigated, by whom and utilizing what means or measures, including but not limited to any other agencies consulted or notified or school officials notified of the complaint; (vii) how the complaint or concern was resolved, and (viii) the school district and educator

- 10 -

implicated, if any. "Complaints" as defined herein are not limited to those that have led to a notice of a public adjudicative hearing issued by the New Hampshire Commission for Human Rights.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to the definition of "complaints" set forth in this interrogatory, as it does not comport with any relevant legal definition. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, The Commissioner responds to this interrogatory as follows.

It is the DOJ's legal interpretation that complaints related to violations of the amendments be filed in the first instance with the HRC under N.H. Rev. Stat. Ann. ch. 354-A and that NHED can initiate an investigation and disciplinary proceeding against an educator only after the HRC enters a finding of discrimination. The Commissioner is not aware of any finding of discrimination by the HRC that would permit NHED to initiate an investigation and disciplinary proceeding against an educator for a violation of the amendments.

- 11 -

7.     Please characterize and set forth your best present recollection of any

conversations with which you have been involved concerning or relating to how to interpret the

amendments, including but not limited to: (i) questions that have been brought to your intention

about the scope of applicability of the amendments; (ii) discussions within your agency about the

meaning of the amendments; (iii) conversations between agencies about how to interpret the

amendments; and (iv) discussions that led to the production of guidance documents about the

meaning and scope of the amendments. Please identify each person (other than your counsel)

consulted by you in connection with any aspect of the foregoing and your best present

recollection of the approximate date and circumstances of each such consultation and the matters

then discussed.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks

information that is subject to any applicable privilege, including but not limited to the attorney-

client privilege, the work-product doctrine, the executive privilege, and the deliberative process

privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all

defendants maintain that the remaining claims in this case present pure legal questions and that

discovery is therefore unnecessary. The Commissioner further objects to this interrogatory

because the word "conversations" is not defined and is vague and overbroad. The Commissioner

further objects to this interrogatory as not proportional to the needs of the case. The parties have

agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed

discovery plan based on that agreement. This interrogatory seeks information beyond the scope

of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, The

Commissioner responds to this interrogatory as follows.

- 12 -

To the extent the word "conversations," as used in this interrogatory, means written communications, review of those communications remains ongoing and the Commissioner will seasonably produce any responsive, non-privileged written communications that are identified during this review, subject to the above objections.

To the extent the word "conversations," as used in this interrogatory, means verbal communications, the only non-privileged, responsive conversation the Commissioner specifically recalls is a Zoom meeting with leaders of the Educator Preparation Programs during which he brought to their attention the FAQs and encouraged them to make sure that participants in the respective educator preparation programs are made aware of these requirements. The Commissioner believes this conversation happened sometime in Fall 2021 but has not been able to determine the specific date. The Commissioner believes that there have been instances in which NHED officials have been asked questions by members of the press or members or the public but has no specific recollection or knowledge of those conversations.

8.      Please identify each and every extra-curricular or school-based activity that (i) you and (ii) your agency believes is covered by the July 21, 2021 FAQ 8 issued by the Department of Education, New Hampshire Commission of Human Rights, and Department of Justice concerning the applicability of the amendments to extra-curricular activities.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory to the

- 13 -

extent it can be read to imply that any defendant has the burden of proof on any of the remaining claims in this case. The Commissioner further objects to this interrogatory to the extent it asks him to interpret the scope of the amendments, as "[t]he interpretation of a statue is a question of law," *Appeal of Cole*, 171 N.H. 403, 408 (2018), and questions of law are beyond the scope of a proper interrogatory, *see Martin v. Evans,* Civil Action No. 16-cv-11362-PBS, 2018 U.S. Dist. LEXIS 233381, at *5 (D. Mass. Feb. 6, 2018). The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, The Commissioner responds to this interrogatory as follows.

As stated in the FAQs, the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work. The amendments do not apply to activities that may occur on a public school's property and do not prohibit public schools or school districts from making physical space available to third parties for events or activities, including voluntary after-school programs that are administered by third-party organizations.

9. Please identify each item of written matter made, received or exchanged in connection with any aspect of items 2 through 8, inclusive, of the foregoing and your responses thereto.

**Objections:** The Commissioner objects to this interrogatory to the extent it seeks information that is subject to any applicable privilege, including but not limited to the attorney-

- 14 -

client privilege, the work-product doctrine, the executive privilege, and the deliberative process privilege. The Commissioner further objects to this interrogatory on relevancy grounds, as all defendants maintain that the remaining claims in this case present pure legal questions and that discovery is therefore unnecessary. The Commissioner further objects to this interrogatory as not proportional to the needs of the case. The parties have agreed to expedited, streamlined discovery, and the district court accepted the parties' proposed discovery plan based on that agreement. This interrogatory seeks information beyond the scope of the expedited, streamlined discovery contemplated by the discovery plan.

**Response:** Notwithstanding the above objections, and without waiving them, the Commissioner responds to this interrogatory as follows.

The Commissioner will produce any responsive, non-privileged documents that have been identified through a reasonably diligent search commensurate with expedited, streamlined discovery plan entered in this case in conjunction with the defendants' responses to the plaintiffs' first requests for production of documents, subject to the objections asserted by the defendants with respect to those requests for production.

## **VERIFICATION**

I, Frank Edelblut, am Commissioner of the New Hampshire Department of Education. The factual matters stated in the foregoing responses are made in my official capacity as Commissioner, and they are not necessarily within my personal knowledge or within the personal knowledge of any single individual. Based on the reasonable of inquiry of staff within the New Hampshire Department of Education, I am informed and believe, and based on such information and belief hereby verify, under penalty of perjury, that the factual statements in the foregoing interrogatory responses are true and correct to the best of my knowledge, information, and belief.

/s/ Frank Edelblut
Frank Edelblut
Commissioner, New Hampshire Department
of Education

Respectfully submitted,

Frank Edelblut, Commissioner of the Department of Education; John Formella, New Hampshire Attorney General; Christian Kim, Chair of the New Hamsphire Commission for Human Rights, Ahni Malchi, Executive Director of the New Hamsphire Commission for Human Rights; Ken Merrifield Commissioner of the Department of Labor

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: March 24, 2023

/s/ *Samuel Garland*
Samuel R.V. Garland, Bar #266273
Senior Assistant Attorney General
Civil Bureau
N.H. Department of Justice
(603) 271-3650
samuel.rv.garland@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was provided to Plaintiffs' counsel via email.

/s/ *Samuel Garland*
Samuel R.V. Garland

# EXHIBIT 49

HRC Website
and
Questionnaire

(Depo. Ex. 60)



*an official* NEW HAMPSHIRE *government website*

**NEW HAMPSHIRE**
# Commission for Human Rights

Monday, May 22, 2023

- Home
- About Us
- Law and Rules
- Required Posters
- Pregnancy Discrimination
- Disability Discrimination
- Mediation Resolution
- Commission Meetings
- Commission Data
- Commission Decisions
- Human Rights Links
- How to File a Complaint
- Contact Us
- Site Map

## ▪▪ How To File A Complaint

EXHIBIT ___
WIT: 5 Burbelater
DATE: 6-26-23
Cynthia Foster, RPR, LCR

### Who May File

- Any person who believes that he or she has been subjected to unlawful discrimination on the basis of age, sex, gender identity, race, creed (religion), color, marital status, physical or mental disability, national origin or sexual orientation in employment, housing, public accommodations or commercial property, may file a complaint with the Commission. In addition, in the area of housing only, charges alleging familial status discrimination can be filed.

### When to File

- A charge should be filed as soon as possible after the act of discrimination occurs.
- A charge MUST be filed within 180 days of the last date of discrimination. (Under certain circumstances a charge may be filed up to 300 days from the date of alleged discrimination. If you are beyond 180 days, contact the Commission immediately to find out if you have the basis to file a timely charge.)

### Procedure After Filing

- A copy of the Charge is sent to the respondent for a written response.
- An investigator is assigned to the case and begins an impartial investigation of the Charge.
- If the complainant decides during the investigation that he or she does not want the investigation to be completed, the complainant may withdraw the Charge without prejudice.
- Throughout the investigation, the Commission encourages both parties to consider how they might be willing to resolve the case. The Investigator can assist the parties at any time with settlement discussions. The Commission also offers voluntary mediation at no cost.
- The parties will provide relevant information to the assigned investigator upon request.
- If the case cannot be resolved, the investigator completes the investigation and prepares a report. The assigned Investigating Commissioner will make a decision of Probable or no Probable Cause. The parties are sent a copy of the Investigative Report.
- If there is a finding of Probable Cause by the Investigating Commissioner, the Executive Director will issue an Order of Notice scheduling a Public Hearing. Prior to the Public Hearing, the Commission will attempt to conciliate the case. The parties can decide to remove the case to court. If the Commission hears the case, a Decision is issued either finding in favor of the charging party and ordering appropriate relief, or finding in favor of the responding party and dismissing the charge. Either party can appeal the Commission's decision to Superior Court.
- To get a further understanding of the complaint, investigation, and post-Probable Cause process, please review our Commission Statute, RSA 354-A, and the Commission's Administrative Rules, HUM 100-406.
- ***There is no filing fee to file a complaint at the Commission.***

### If You Want to File

You may contact the Commission either by telephone, or in writing by using an Intake Questionnaire form. Neither being interviewed, nor filling out the questionnaire automatically creates a formal charge of discrimination. You will be contacted by the Commission regarding the filing of a formal charge if your situation comes under our jurisdiction.

If your issue involves a claim of **employment discrimination** or **discrimination in hiring**, you may either,

Click on this link and fill out the Employment Discrimination Intake Questionnaire form,
✍ you may then email the form directly to us at humanrights@hrc.nh.gov or print it and mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a **housing or commercial property discrimination** claim you may either,

Print our Housing or Commercial Property Discrimination Intake Questionnaire form, write or type in your answers and mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a claim for discrimination in a place of **public accommodation**, you may either:

Print our Public Accommodation Intake Questionnaire form, write or type in your answers and mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a claim of discrimination in **public education**, you may either:

Print our "Public Education General Questionnaire", write or type in your answers and email or mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

If your issue involves a claim of discrimination relative to the **Right to Freedom from Discrimination in Public Workplaces and Education**, you may either:

Print our "Public Education RSA 354-A:29 Questionnaire", write or type in your answers and email or mail to the Commission at the address below;

or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

## Intake Questionnaire Mailing Address:

Intake Department
NH Commission for Human Rights
2 Industrial Park Drive
Concord, NH 03301

**Post Filing Withdrawal Form**

**Case procedure diagram**



nh.gov | privacy policy | accessibi                                          Copyright (c) State of New Hampshire, 2005

This symbol indicates the document is in Portable Document Format (PDF). To view PDF files, you will need the Adobe Acrobat Reader which is available for free from **Adobe**.

New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One, Concord, NH 03301

# CONFIDENTIAL
## THIS IS NOT A CHARGE OF DISCRIMINATION.

NEW HAMPSHIRE COMMISSION FOR HUMAN RIGHTS
2 INDUSTRIAL PARK DRIVE
CONCORD, NEW HAMPSHIRE 03301
(603) 271-2767
FAX: (603) 271-6339
TTD ACCESS: RELAY NH 1-800-735-2964
Email: humanrights@hrc.nh.gov

### PUBLIC EDUCATION INTAKE QUESTIONNAIRE FOR RSA 354-A:29-34
### (RIGHT TO FREEDOM FROM DISCRIMINATION IN PUBLIC WORKPLACES & EDUCATION)

**INSTRUCTIONS:** *This is a questionnaire, not a charge of discrimination.* Please fill out this questionnaire as completely as possible and send a copy back to the Commission either via regular mail, fax or email using the contact information above and keep a copy of the completed questionnaire for your records. The questionnaire will provide a Commission Investigator with information about your claim. The Investigator will use this information to determine whether you have the basis to file a formal charge. After reviewing the questionnaire, the Investigator will contact you to gather further information, as necessary and either explain the next steps in filing a formal charge or explain why you do not have the basis to file a charge of discrimination.

**Is your claim relative to a public school?**                     *Yes  or  No*

**Does the school or school district teach grades K-12?**       *Yes  or  No*

**Was the offered program/training part of a class?**          *Yes  or  No*

**Was the offered program/training part of an extra-curricular activity?**       *Yes  or  No*

---

Student's Name: _____

Parent/Guardian Name: _____

Address: _____

City: _____ State _____ Zip Code _____

Primary Phone number: _____ Secondary Phone Number _____

Email address: _____

**Is the student currently enrolled at the school?**            *Yes  or  No*

If yes, present Grade: _____

---

**Optional**: What is your Race? _____ What is your National Origin? _____

## CONFIDENTIAL
## THIS IS NOT A CHARGE OF DISCRIMINATION.

Name of Public School: _____

Address: _____

City: _____ State: _____ Zip Code: _____

Phone Number (include area code): _____

**First date of Discrimination:  Month        Day        Year**
**Last date of Discrimination*: Month        Day        Year**

*\* Please keep in mind that you only have 180 days from the last date of discrimination to file a Charge of Discrimination with the Commission under state laws.*

**Please briefly explain in the space provided below or on a separate piece of paper what action was taken against you that you believe to be discriminatory to include a description of the program/training alleged to violate RSA 354-A: 29-34.  Provide details such as names and dates, etc. Were other persons treated differently than you? Please describe.  What harm, if any, was caused as a result of that action?**

# EXHIBIT 50

DOE
December
2021
Presentation

(Depo. Ex. 3)


EXHIBIT 31930
D. Fenton
5/17/2023
Reporter: Sharon Saalfield RDR, CRR

# OVERVIEW OF THE DEPARTMENT OF EDUCATION'S EDUCATOR MISCONDUCT PRACTICES & CONDUCTING EFFECTIVE INVESTIGATIONS

Diana E. Fenton, Esq.
Chief, Governance Unit
Department of Education

December 2021

# Code of Conduct

* The reason behind the CoC

Local Control Does not solve a State Wide problem.

Dealing with educator misconduct issues in the realm of employment only does not solve the entire issue.

Child safety is not a zip code issue!



DOE-05650

# Code of Conduct

- District jurisdiction vs. State jurisdiction

- Now issues involving educator misconduct have a two step process/analysis:

1) Dealt with at the district (employment)

2) Lateral pass to DOE for possible action on the credential

DOE involvement breaks the cycle of an educator moving to another district and possibly harming another child

Ed 511 sets out the process for DOE to follow

DOE-05651

# When Should I call DOE?

* Anytime there is a suspected CoC violation

* Anytime an educator is placed out on leave**
  (*when/why should an educator be placed on leave*)

* Anytime a superintendent has a question of whether the activity in question rises to a level of the CoC



DOE-05652

# RULE OF THUMB

° IF THE ISSUE DIRECTLY AFFECTS <u>CHILD SAFETY</u> THEN IT IS NOT JUST AN EMPLOYMENT ISSUE.

**DOE MUST BE NOTIFIED**

DOE-05653

# When Should I call the DOE?

- Best Practice is to call DOE as soon as possible

- DOE and District can then determine which agency can lead the investigation/process

Who will lead—the district or DOE?

Often district will lead—district lead investigation and DOE will await the report/result of the district investigation

Typically, DOE will lead on older (aka "cold") cases

DOE-05654

# Off Duty Conduct

- What if the allegation is "off-duty" conduct

- Analysis:

DOE will look to see if there is a nexus to:

1) The educator's ability to be effective in the classroom and

2) The educator's ability to be safe around children

DOE-05655

# Who Do I Call?

* All reports of Educator Misconduct are made to:

Richard Farrell contact info:

(603) 271-8372 (work)

(603) 231-0521 (cell)

Richard.J.Farrell@doe.nh.gov

Diana Fenton contact info:

(603) 325-2198

Diana.Fenton@doe.nh.gov

DOE-05656

# So what happens next?

- DOE will do an initial screening—is this employment or credentialing

DOE-05657

# "Investigation"

- When does DOE place an educator under formal investigation?

- Credential holder is notified in writing via certified mail that an investigation has been opened.

- A copy of the letter is sent to the superintendent

- A copy of the letter is sent to the Union

- Credential is still valid during a pending investigation

DOE-05658

# Immediate Suspension

- If an educator is arrested for a Section V violation, it must be reported to DOE

- Immediate suspension with a right to a hearing within 10 days

DOE-05659

# INVESTIGATIONS

- How does the DOE Investigation help the district?

DOE-05660

# DOE Action

- DOE will review the district's report

- DOE might do additional investigation (if necessary)

- DOE communication with the district is KEY!!

DOE-05661

# Credential Sanction

- 4 forms of action/3 forms of discipline

- Close out Case

-Revocation

-Suspension

-Reprimand

**WAIT!!**

What if DOE takes action which is contrary to what the district did?

DOE-05662

# Close Out

- Thank you letter
- Close out letter

DOE-05663

# HB 1240 (2019-2020 Leg Session)

- HB 1240 became law Jan 1, 2021

- Amends RSA 632-A:2 (Aggravated Felonious Sexual Assault) and RSA 632-A:3 (Felonious Sexual Assault)

- Prohibits "an employee, contractor, or volunteer at a primary or secondary educational institution" from having a sexual relationship with a student.

- Prohibition continues up to 10 months after the student's graduation or departure from school.

DOE-05664

# CRT/HB2 Sec 297 and 298

- Any allegation of the violation of HB 2 is adjudicated by the HRC/complaint with AG's office/ or a civil claim in superior court

- Department DOES NOT adjudicate these matters

- So why the website?

DOE-05665

# Investigations Tips

DOE-05666

# Things to be Aware of

* Always best to farm investigations out to third party
* Be aware of conflicts—can you do this investigation and be fair?
* Who to interview—even "minor" players can be relevant
* Important to build a foundation—do not assume a level of familiarity
* Two types of questions to ask
  1) Open-ended questions
  2) Direct questions

DOE-05667

# DOE Innovations

- January 1, 2022

DOE will start running the criminal history on all first-time teacher applicants

This does not alleviate District from running check upon employment

DOE will also begin checking a new applicant's name against the Central Registry at DCYF and MA DCF for findings of abuse.



Questions, Comments, Concerns??

Diana.fenton@doe.nh.gov

325-2198

DOE-05669

# EXHIBIT 51

DOE's August
2021
Presentation

(Depo. Ex. 7)



1952

**From:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
    **To:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
**Subject:** code of conduct
    **Date:** Tue, 17 Aug 2021 12:44:24 -0000
**Importance:** Normal
**Attachments:** continued_excellence--HB2.pptx

I updated it to include Section 297 or HB 2—pls review.

~~~~~~~~~~~~~~~~~

Diana E. Fenton, Esq.
Chief, Governance Unit
New Hampshire Department of Education
Office of the Commissioner
101 Pleasant Street
Concord, NH 03301
Diana.fenton@doe.nh.gov
(603) 271-3189

DOE-10058



New Hampshire
**Department of Education**

CONTINUED EXCELLENCE
ELEVATING AN ESTEEMED PROFESSION

Diana E. Fenton, Esq., Chief, Governance Unit
Richard Farrell, Investigator

"An ethics code reflects a collective decision that a profession is better off when ethical standards are not based solely on individual assessments of what is or is not acceptable."

Fisher, C. (2013). Decoding the Ethics Code: A practical guide for psychologists (3rd edition).

Code of Conduct is Not Punishment—

It is about Process!!!

DOE-10059

# A BRIEF HISTORY OF CREATING
## THE CODE OF ETHICS & CODE OF CONDUCT

June 2015—PSB began to look into a code of ethics;

August 2016—Commissioner Barry created Ethics Task Force;

Sept-Dec 2016—Task Force begins work on Code of Ethics;

April 2017—HB 210 signed into law;

Sept-Dec 2017—Task Force transitions focus to Code of Conduct;

Summer of 2018—State Board accepts Code of Ethics;

November 2018—State Board adopts Code of Conduct



DOE-10060

1956

DOE-10061



1957

DOE-10062

# STATUTE

## TITLE I
### STATE AND ITS GOVERNMENT

#### CHAPTER 21-N
#### DEPARTMENT OF EDUCATION

Section 21-N:9

(CC) The establishment and enforcement, at a rate of rates for certified educational personnel. This professional rate shall include a statement of purpose and standards defining each of the 4 primary principles which are:

(A) Responsibility to the education profession and educational professionals.

(B) Responsibility to students.

(C) Responsibility to the school community.

(D) Responsible and ethical use of technology as it relates to students, schools, and other educational professionals.

(3) The professional code of ethics shall apply to all teachers, supervisors, administrators, and other personnel licensed or seeking licensure in the education profession in the state of New Hampshire. In this subparagraph, "teacher" means a person who has applied for or holds a valid teaching license, credential, or other equivalent certificate issued by the state board of education.

**RSA 21-N:9, II(CC)**



New Hampshire
**Department of Education**

1958

# RULES

**PART Ed 510 CODE OF CONDUCT**

Section Ed 510.01 Principle 1 – Responsibility to the Education Profession and Educational Professionals

Section Ed 510.02 Principle 2 – Responsibility to Students

Section Ed 510.03 Principle 3 – Responsibility to the School Community

Section Ed 510.04 Principle 4 – Responsible and Ethical Use of Technology

Section Ed 510.05 Duty to Report

Principle 1 – Responsibility to the Education Profession and Edu...

Principle 2 – Responsibility to Students

Principle 3 – Responsibility to the School Community

Principle 4 – Responsible and Ethical Use of Technology

510.05 Duty to Report

.10 DENIAL, INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS
Section Ed 511.01 Complaints, Data and Investigations
Section Ed 511.02 Reprimand, Reprimand, or Revocation
Section Ed 511.06 Disciplinary Hearings
Section Ed 511.10 Terms of a Consent Decree; Conditions of Disciplinary Proceeding
Section Ed 511.10c Reason for Reinstatement After Suspension

PART Ed 512 DENIAL OR CERTIFICATION

T MASTER PLANS AND RECERTIFICATION
2 a Clinical Professional Development Master Plan
Development Plan
of Educator Under the Professional Development Master Plan
n of Educators Not Under the Local Professional Development Master Plan
1.1

... Ed 513 REQUIREMENTS FOR INITIAL CERTIFICATION
Section Ed 514.01 their Academic Skills, and Subject Area Assessment
Section Ed 514.02 Validated Studies
Section Ed 514.01 Highly Qualified Teacher

PART Ed 600 APPROVAL OF PROFESSIONAL PREPARATION PROGRAMS
PART Ed 601 DEFINITIONS
Section Ed 601.01 Definitions

Ed 602 PROCEDURES FOR APPROVAL
Section Ed 602.01 Scope of Approval Process
Section Ed 602.02 Evaluation Requirements
Section Ed 602.08 Demonstrated Competencies
602.04 Approval Requirement
602.05 Application Fees for Program Approval
Option 1
Option 2
Option 3

... and Approval Recommendations

New Hampshire
**Department of Education**

DOE-10063

DOE-10064



THE DIFFERENCE

Code of Conduct
NH's Principles of Professional Conduct

Code of Ethics
The Code of Ethics for New Hampshire Educators

New Hampshire
Department of Education

# ARE YOU TALKING TO ME?

Who is the document applicable to??

<u>Code of Ethics</u>—Applicable to all educators and all school personnel

<u>Code of Conduct</u>—Applicable to all credential holders

"Credential" is defined in Ed 501.02(g)—page 9 of the Code of Ethics & Conduct booklet!



DOE-10065

1961

# WHY IS A CODE OF CONDUCT IMPORTANT?

- **Child Safety should not be determined by zip code!!**

- Teachers are asked to play an increasingly expansive role in students' lives without any discussion of the inherent risks of this.

- All professions that are characterized by intimate relationships rely on professional standards and norms that help them recognize and respond appropriately when navigating interactions.

DOE-10066

DOE-10067

# CODE OF CONDUCT   VS. CODE OF ETHICS

Code of Ethics is guidance—aspirational in nature—articulates responsibilities common to all members of the education profession.

Code of Conduct establishes the lowest standard of care—it is actionable only against credential holders

Applicable on or off duty!



New Hampshire
Department of Education

# CODE OF ETHICS & CONDUCT

*Difference in language:*

*Code of ethics:*

When communicating with students, utilizes social media responsibly, transparently and primarily for the purposes of teaching and learning

*Code of Conduct:*

An educator shall not engage in harassment, stalking, or bullying via electronic media.

DOE-10068

# EMPLOYMENT VS. LICENSURE

- Licenses are required in professions that require public trust;

- Employment and licensure are separate concepts;

- The Department's role is *broader in jurisdiction*, but *narrower in scope.*



DOE-10069



# The Analysis......

*Separate and distinct, but sometimes they affect each other.*

Employment

Code of
Conduct

Code of
Ethics

DOE-10070

DOE-10071

# CODE OF ETHICS & CONDUCT

## Four Principles:

Principle I—Responsibility to the Education Profession and Educational Professionals;

Principle II—Responsibility to Students;

Principle III—Responsibility to the School Community;

Principle IV—Responsible and Ethical Use of Technology

**Principle V—Duty to Report

# CODE OF CONDUCT—PRINCIPLE 1 (ED 510.01)

## *Responsibility to the Education Profession & Educational Professionals:*

- Failure to report if arrested for RSA 189:13-a, V offense;

- Falsifying professional qualifications;

- Unlawful possession of drug;

- Possessing or being under influence of drugs or alcohol on school premises or school sponsored activity where students are present.

DOE-10072

# CODE OF CONDUCT—PRINCIPLE II (ED 510.02)

*Responsibility to Students:*

- Failure to provide appropriate supervision of students pursuant to local policy;

- Furnishing alcohol or illegal drugs to students;

- Engaging in sexual activity with student;

- Soliciting participation in sexual relationship

\* "Student" is defined as being up to 10 months after graduation



DOE-10073

DOE-10074

# CODE OF CONDUCT—PRINCIPLE III (ED 510.03)

## *Responsibility to the School Community:*

- Accepting gifts or favors where there might be an actual or appearance of a conflict of interest

**Gifts of small amount shall NOT be deemed conflict of interest.

- Misuse of funds for use by the school

- Intentional altering or misrepresenting student assessments, results or official school records.



1970

DOE-10075

**SO WAIT JUST A MINUTE......**

What if a parent gives me a bottle of wine as a present?

Am I going to lose my license for that??



# CODE OF CONDUCT—PRINCIPLE IV (ED 510.04)

## *Responsible & Ethical Use of Technology:*

- Soliciting a sexual relationship with a student

- Engaging in inappropriate communication—intent, timing, subject matter and amount of communication and whether communication could reasonably be interpreted as being sexual in nature.

\* "Student" is defined as being up to 10 months after graduation

DOE-10076

DOE-10077

# I NEED SOME EXAMPLES OF WHAT YOU ARE SAYING

- "YOU were one of my rare accomplishments"

- "I saw special in you from the beginning"

- "I felt compelled to both nurture and provocatively challenge [your thoughts]"



1973

# CODE OF CONDUCT—PRINCIPLE V (ED 510.05)

## *Duty to Report:*

- Any credential holder shall report any suspected violation of the code of conduct

- Superintendent shall report to office of credentialing when a credential holder has been arrested for RSA 189:13-a and violated code of conduct

- Credential holders shall report abuse or neglect

DOE-10078

DOE-10079

# PROHIBITION ON TEACHING DISCRIMINATION

- Section 297 & 298 of HB 2 was passed during the 2021 Legislative Session

I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior

to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

familial status, mental or physical disability, religion, or national origin;

(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical

disability, religion,

or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

DOE-10080

# PROHIBITION ON TEACHING DISCRIMINATION

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and

should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

race, creed, color, marital status, familial status, mental or physical disability, religion, or national

origin.

II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.

DOE-10081

# PROHIBITION ON TEACHING DISCRIMINATION

- All suspected violations of this new law are to be reported to the Human Rights Commission

- The Human Rights Commission will adjudicate these cases

- A finding of a violation of this law by the Human Rights Commission shall be a violation of the Code of Conduct for educators.

*** Please see Technical Advisory by the NH Attorney General's Office on this law for more guidance.



DOE-10082

# INVESTIGATIONS—ED 511.01

- Initial review
- Credential holder is notified if placed under investigation
- Superintendent is notified if credential holder is placed under investigation



# INVESTIGATIONS—ED 511.01

This letter serves as the official notification, pursuant to New Hampshire Administrative Rule Ed. 511.01, that the New Hampshire Department of Education has initiated an investigation into a complaint against you which alleges that you engaged in an act or acts which violate the New Hampshire Code of Conduct for Educational Professional as enumerated in Ed. 510.01-510.04.

Specifically, the Department of Education has become aware of an action(s) which may have violated Ed ------ of the Code of Conduct for Educational Professionals. Specifically, the allegation is that you ------ ----------. At this time, no action has been taken against your teaching credential. Therefore, your teaching credential is still valid during this pending investigation. A copy of this letter will be provided to the superintendent of SAU ----- and the Union.

DOE-10083

# SANCTIONS—ED 511.02

**Four options---3 forms of sanction:**

*Close out case*—Allegation unfounded—no action taken

*Suspension*—rescinded for set period of time

*Revocation*—permanently rescinded

*Reprimand*—note to file of credential holder



DOE-10084

# INVESTIGATIONS—ED 511.01

Considerations of sanctions:

- Seriousness of offense;
- Prior disciplinary record
- Potential harm to students
- Purpose of the rule violated



DOE-10085

# REPRIMAND, SUSPENSION OR REVOCATION

Ed 511.02

- All discipline is documented in writing
- Signed by all parties
- Maintained in electronic credentialing file

Ed 502.01

List of suspended and revoked educators is maintained and is $\circ$━━ n
DOE website

Ed 511.05

Grounds for Reinstatement after Suspension




D⊂══⊃E-10086

# OTHER ISSUES TO BE AWARE OF—ED 511.04

If arrested for RSA 189:13-a, V, DOE can do an immediate suspension of credential

- Credential holder and school district will be notified
- Credential holder is entitled to hearing within 10 days.



DOE-10088

DOE-10089

# NEED TO REPORT?

**Richard Farrell, Investigator**
271-8372 (office)
231-0521 (cell)

**Diana Fenton, Esq. Chief of the Governance Unit**
271-3189 (office)
325-2198 (cell)



New Hampshire
**Department of Education**

# EXHIBIT 52

# Nov. 24, 2021 J. McKim Email Chain

**From:** "Rotman, David" <David.S.Rotman@doj.nh.gov>
**To:** "James T. McKim, MP" <james.mckim@organizationalignition.com>
**Cc:** "Formella, John" <john.m.formella@doj.nh.gov>
**Subject:** RE: Training on "Divisive Concepts"
**Date:** Wed, 24 Nov 2021 15:31:20 -0500
**Importance:** Normal

---

Dear James:

The next time I see the General (who I see was "cc'ed" on this email), I will mention your question.

David

**From:** James T. McKim, MP <james.mckim@organizationalignition.com>
**Sent:** Wednesday, November 24, 2021 3:04 PM
**To:** Rotman, David <David.S.Rotman@doj.nh.gov>
**Cc:** Formella, John <john.m.formella@doj.nh.gov>
**Subject:** Re: Training on "Divisive Concepts"

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Thanks, David.

I wasn't so much thinking of training, but guidance on how to interpret the statute given the questions raised about whether affirmative action actions would be considered in violation of the statute.

Happy to chat if it would help in clarifying how the statute is perceived.

Cheers,

James T. McKim, Jr., PMP, ITIL
Managing Partner, Organizational Ignition
www.organizationalignition.com
(603) 540-3988
Schedule a meeting: calendly.com/jtmckimjr

On Wed, Nov 24, 2021 at 2:51 PM Rotman, David <David.S.Rotman@doj.nh.gov> wrote:

> James, I am sorry for not getting back to you sooner. I did speak to the General and it is my understanding we will not be doing a training in the immediate future on how to interpret the statute. When that changes, I will be sure to reach out to you. I hope you and your family have a wonderful thanksgiving.
>
> David
>
> **From:** James T. McKim, MP <james.mckim@organizationalignition.com>
> **Sent:** Wednesday, November 24, 2021 1:35 PM
> **To:** Rotman, David <David.S.Rotman@doj.nh.gov>
> **Subject:** Re: Training on "Divisive Concepts"

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hi David,

I hope this finds you well.

I'm wondering if there were any thoughts on the question I posed in the email below.

A recent article in Nonprofit Quarterly highlighting the recent case in North Carolina also discussed this case and the sense that it seems to challenge the entire notion of hiring racially diverse candidates.

Cheers,

James T. McKim, Jr., PMP, ITIL
Managing Partner, Organizational Ignition
www.organizationalignition.com
(603) 540-3988
Schedule a meeting: calendly.com/jtmckimjr


On Tue, Oct 19, 2021 at 9:42 AM James T. McKim, MP <james.mckim@organizationalignition.com> wrote:

Hi David,

I hope this finds you well.

With the recent University of North Carolina Affirmative Action case, I received a question about how an Affirmative Action case would stack up against the Right to Freedom from Discrimination in Public Workplaces and Education language in HB2.

This made me reflect on the conversation we had with the General about the topic of Affirmative Action where I believe the consensus was that Affirmative Action would not violate the law because the law prohibits action based "soley" on age, sex, gender identity, sexual orientation, race, creed, color, etc.

But upon review of the actual statute, I find the wording to be "That an individual should be discriminated against or receive adverse treatment **solely or partly** because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;..."

Because the words "or partially" are in the statute, this makes me think that Affirmative Action could, in fact, be seen as violating the law. This made me wonder if you had or were planning any training on how to interpret the statute that might shed some light on this in a proactive manor so we don't get a case brought that will take up time and money?

Cheers,

James T. McKim, Jr., PMP, ITIL
Managing Partner, Organizational Ignition

www.organizationalignition.com
(603) 540-3988
Schedule a meeting: calendly.com/jtmckimjr

DOJ-00501

# EXHIBIT 53

Attorney
General
Opinion
2021-01
(Sept. 7,
2021)

(Depo. Ex.
12)

1989



**EXHIBIT 12**

D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 20

Attorney General
Opinion No. 2021-01
(Sept. 7, 2021)

# ATTORNEY GENERAL
## DEPARTMENT OF JUSTICE

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

JOHN M. FORMELLA
ATTORNEY GENERAL



JANE E. YOUNG
DEPUTY ATTORNEY GENERAL

## ATTORNEY GENERAL OPINION NO. 2021-01

September 7, 2021

Doug Palardy, Chair
Ahni Malachi, Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Building One
Concord, NH 03301

RE:   Request for Attorney General's Opinion regarding new anti-discrimination
protections

Dear Chair Palardy and Director Malachi:

You requested, on behalf of the New Hampshire Commission for Human Rights, that this office provide an official Attorney General Opinion concerning the scope and application of the recently passed Sections 297 and 298 of House Bill 2 ("Sections 297 and 298"),[1] to be codified at RSA 354-A:29, RSA 354-A:30, RSA 354-A:31, RSA 354-A:32, RSA 354-A:33, RSA 354-A:34; and RSA 193:40. These statutes collectively comprise a subdivision in RSA chapter 354-A titled "Right to Freedom from Discrimination in Public Workplaces and Education" and new section in RSA chapter 193 titled "Prohibition on Teaching Discrimination."

Some have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions. *See* Governor's Advisory Council on Diversity and Inclusion, *Letter to Gov. re HB 544* (June 2, 2021). To help address these concerns, the Department of Justice, Commission for Human Rights, and the Department of Education released guidance shortly after the new anti-discrimination laws took effect. Recognizing the important need for public employers, government programs, and school systems to engage in sensitivity training that may include frank and candid discussions of the historical aspects of oppression and its contemporary effects, you requested that this office provide an official Attorney General Opinion.

The Commission for Human Rights (the "Commission") was created with the power to eliminate and prevent discrimination in employment, places of public accommodation, housing,

---

[1] Before final passage by the legislature, this legislation was included in HB 2 as Section 330 and 330-a. The final version of HB 2 includes the legislation at Section 297 and 298.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 2 of 9

and, effective in 2019, public education. The Commission is charged with receiving, investigating, and adjudicating complaints related to violations of RSA chapter 354-A that may be filed by members of the public or the Commission and holding hearings as required to execute the Commission's duties. Section 297 prohibits certain public sector activities and expands the Commission's jurisdiction to address such activities. Section 298 prohibits the teaching of certain subjects in elementary and secondary schools and it also places review of violations within the Commission's jurisdiction.

The Attorney General's duties include advising "any state board, commission, agent or officer as to questions of law relating to the performance of their official duties, and he shall, under the direction of the governor and council, exercise a general supervision over the state departments, commissions, boards, bureaus, and officers, to the end that they perform their duties according to law." RSA 7:8. In situations where requests for legal advice are significant to the operation of the state board, commission, or agency and are likely to be of continuing importance, the advice may be issued by an official Attorney General Opinion. In such situations, the questions posed are researched and an opinion drafted by a group of attorneys. The draft opinion is also subject to multiple layers of review, including by the Associate Attorney General for the Division of Legal Counsel and the Solicitor General. The Attorney General provides a final review and approval.

Given the importance of your questions to the education and training of your staff to best serve New Hampshire residents, I am providing an official Attorney General Opinion as set forth below.

## QUESTIONS PRESENTED

1.      What is the scope of Sections 297 and 298 and what types of education and training activities do those sections prohibit and permit?

2.      Do the new sections of RSA chapter 354-A prohibit trainings or programs designed to promote diversity and inclusion or to educate participants about concepts such as implicit bias?

3.      Does RSA 193:40 prohibit education on the historical concepts related to discrimination or oppression?

## CONCLUSION

1.      The new sections added to RSA chapter 354-A prohibit trainings or programs that teach participants that one identified group possesses inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive. The new sections added to RSA chapter 354-A also prohibit trainings or programs that teach participants that any identified group can or should be treated unequally to

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 3 of 9

any other identified group and that one identified group should be discriminated against or
treated adversely.

Similarly, RSA 193:40 prohibits teaching students that one identified group possesses
inherent characteristics, meaning natural, biological, or innate characteristics, as opposed to
apparent or accidental characteristics that: (1) make them superior or inferior to other identified
groups or (2) make one identified group racist, sexist, or oppressive. RSA 193:40 also prohibits
teaching students that any identified group can or should be treated unequally to any other
identified group and that one identified group should be discriminated against or treated
adversely.

2.      No. The new sections added to RSA chapter 354-A **explicitly permit** public
employers and government programs to provide sensitivity training, which RSA 354-A:29
defines as "based on the inherent humanity and equality of all persons" and based upon the
"ideal that all persons are entitled to be treated with equality, dignity, and respect." Implicit bias
training, for example, is premised on teaching people about biases they may have of which they
are not consciously aware and helping people become aware of those biases so as to encourage
treating others with dignity and respect and to avoid treating others less than equally. Implicit
bias training does not violate Section 297. Similarly, the new sections added to RSA chapter
354-A do not prohibit other diversity, equity, inclusion, and equality trainings. Section 297
prohibits trainings if and only if they include concepts of group superiority or inferiority based
on inherent or innate group characteristics or advocate for less than equal treatment of identified
groups.

3.      No. RSA 193:40 does not prohibit discussion of historical concepts related to
discrimination. RSA 193:40 prohibits education related to solely the four subjects identified in
Short Answer 1. Specifically, it prohibits teaching that one or more identified groups are: (1)
inherently superior or inferior to people of another identified group; (2) inherently racist, sexist,
or oppressive, whether consciously or unconsciously; (3) should be discriminated against or
receive adverse treatment; or (4) should not treat members of other identified groups equally. It
is important to note that although education related to racism, sexism, and other practices or
ideas that have harmed or continue to harm certain identified groups may make some parents,
students, or faculty uncomfortable, that fact alone does not mean that a school has violated RSA
193:40.

## BACKGROUND

On June 25, 2021, the Governor signed into law House Bill 2, which added, in Section
297, new provisions to RSA chapter 354-A entitled, "Right to Freedom from Discrimination in
Public Workplaces and Education." Specifically, Section 297 adds six new sections to RSA
chapter 354-A: (1) RSA 354-A:29, "Right to Freedom from Discrimination in Public
Workplaces and Education"; (2) RSA 354-A:30, "Definitions"; (3) RSA 354-A:31, "Prohibition
on Public Employers"; (4) RSA 354-A:32, "Prohibition on the Content of Government Programs
and Speech"; (5) RSA 354-A:33, "Prohibition on Public Employees"; and (6) RSA 354-A:34,
"Remedies."

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 4 of 9

Section 297 is part of the amended progeny of House Bill 544, which was commonly
known as the "divisive concepts" bill. The House of Representatives voted to table House Bill
544 but to incorporate its language into House Bill 2. During its review, the Senate Finance
Committee stripped the language of House Bill 544 out of House Bill 2 and added the language
that is now Sections 297 and 298. The House of Representatives acceded to these changes during
the Committee of Conference.

The major provisions of Section 297, codified as RSA 354-A:31, RSA 354-A:32, and
RSA 354-A:33, prohibit training, education, or other state-sponsored speech that incorporates
any of the following four concepts:

1. That people of one age, sex, gender identity, sexual orientation, race,
   creed, color, marital status, familial status, mental or physical disability,
   religion, or national origin, are inherently superior or inferior to people of
   another age, sex, gender identity, sexual orientation, race, creed, color,
   marital status, familial status, mental or physical disability, religion, or
   national origin;

2. That an individual by virtue of that person's age, sex, gender identity,
   sexual orientation, race, creed, color, marital status, familial status, mental
   or physical disability, religion, or national origin is inherently racist,
   sexist, or oppressive, whether consciously or unconsciously;

3. That an individual should be discriminated against or receive adverse
   treatment solely or partly because of that person's age, sex, gender
   identity, sexual orientation, race, creed, color, marital status, familial
   status, mental or physical disability, religion, or national origin; and

4. That people of one age, sex, gender identity, sexual orientation, race,
   creed, color, marital status, familial status, mental or physical disability,
   religion, or national origin cannot and should not attempt to treat others
   equally and/or without regard to age, sex, gender identity, sexual
   orientation, race, creed, color, marital status, familial status, mental or
   physical disability, religion, or national origin.[2]

These four new statutory provisions combine to limit the types of training and education
public employers may introduce to their employees, and protects employees who object to
participating in training programs inconsistent with the new statutory provisions. RSA 354-A:31
prohibits public employers from teaching, advocating, instructing, or training anyone any of the
above listed concepts. RSA 354-A:32 prohibits "government programs," which it defines as any

---

[2] This Opinion will use the term "identified group" to mean age, sex, gender identity, sexual orientation,
race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.
With this inclusive of a definition, every resident and visitor to New Hampshire is a member of one or
more identified groups.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 5 of 9

activity undertaken by a public employer including in the performance of its government
function, from teaching, advocating, or advancing any of the above listed concepts. RSA 354-
A:33 prohibits a public employer from disciplining a public employee for refusing to participate
in any training, program, or other activity that advocates for or compels the employee to express
support for any of the above listed concepts.

Section 298 is the remainder of the amended progeny of HB 544. This section creates a
new statute, RSA 193:40: "Prohibition on Teaching Discrimination." RSA 193:40 prohibits
teaching students in an elementary or secondary education program any of the four concepts that
the new sections in RSA chapter 354-A prohibit.

The statutory changes within Sections 297 and 298 are legislation of limited reach. The
new statutes do not prohibit racial, sexual, religious, or other workplace sensitivity training
"based on the inherent humanity and equality of all persons." They do not prohibit workplace
trainings based upon the "ideal that all persons are entitled to be treated with equality, dignity,
and respect." These statutes explicitly exclude such sensitivity trainings from the scope of the
new prohibitions created by RSA 354-A:31, RSA 354-A:32, and RSA 354-A:33. Nor do they
prohibit discussing or teaching students about the historical existence of ideas related to the four
prohibited subjects, such as the history of discrimination.

## ANALYSIS

The scope of Sections 297 and 298's prohibitions hinges on the meaning of the language
those sections employ. When interpreting a statute, a court or agency charged with such
interpretation must first look to the language of the statute itself. *Conduent State & Local
Solutions, Inc. v. N.H. Dep't of Transportation*, 171 N.H. 414, 419 (2018). In doing so, the
agency must begin with the plain meaning of the words used. *Union Leader Corp. v. Town of
Salem*, 173 N.H. 345, 350 (2020); *see also* RSA 21:2 (2012) ("Words and phrases shall be
construed according to the common and approved usage of the language."). The agency must
confine itself to the statute as written and not consider what the legislature might have said or
add language the legislature did not include. *Conduent State & Local Solutions, Inc.*, 171 N.H. at
420. The agency must look at the statute as a whole and should construe the statute to avoid
absurd or unjust results.[3] *Id.* Absent an ambiguity[4] examination of any legislative record beyond
the actual text of the statutes is inappropriate.

---

[3] Examples of absurd results include, but are not limited to, situations where the interpretation of one
statute negates another. *See Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405 (2005)
("When interpreting two statutes that deal with a similar subject matter, we construe them so that they do
not contradict each other."). The goal of statutory interpretation is to strive to read statutes in harmony
with one another rather than in dissonance with one another. *See id.* ("[W]e do not construe statutes in
isolation; instead, we attempt to do so in harmony with the overall statutory scheme.").
[4] In this context, ambiguity is a legal term of art that applies only if two or more reasonable interpretations
of a statute exist after the agency considers the plain meaning of the words in the statute. *Attorney
General v. Loreto Publications, Inc.*, 169 N.H. 68, 74 (2016).

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 6 of 9

Prohibitions Related-to Inherent Traits

The scope of Section 297 and 298's first two prohibitions derives substantially from the meaning of the term "inherent." In the first prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently superior or inferior" to another identified group. In the second prohibition, a trainer, government program, or educator may not teach that one identified group is "inherently racist, sexist, or oppressive, whether consciously or unconsciously." Neither section defines the term "inherent," nor are we aware of any other relevant statutory provisions that define "inherent" as the Legislature used it in Sections 297 and 298. When the Legislature does not specifically define a term within a statute, the Legislature is presumed to have used that term as it is commonly understood. *Franciosa v. Hidden Pond Farm, Inc.*, 171 N.H. 350, 359 (2018). In such situations, the New Hampshire Supreme Court will consult a standard dictionary to discern the common understanding of any given term. *Id.* As an adjudicatory body, the Human Rights Commission should also consult a standard dictionary to discern the common understanding of any given term.

"Inherent" means "structural or involved in the constitution or essential character of something : belonging by nature or settled habit : intrinsic, essential." *Webster's Third New International Dictionary* 1163 (unabridged ed. 2002). The definitions of "intrinsic" and "essential" further illuminate the meaning of "inherent." "Intrinsic" means "belonging to the inmost constitution or essential nature of a thing : essential or inherent and not merely apparent, relative, or accidental." *Id.* at 1186. "Essential" means "forming or constituting the essence of something: making up or being the constituent or intrinsic character or very nature of a thing . . . belonging to or being part of the essence of something: belonging to the constituent fundamental character of a thing: not accidental to something." *Id.* at 777.

The common thread that runs through these definitions is that an inherent characteristic is natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging.

"Inherent," therefore, is properly viewed as a limitation of the scope of Sections 297 and 298's first two prohibitions. With respect to the first, Sections 297 and 298 proscribe training, advocacy, or education that teaches participants that, solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, superior or inferior to members of other identified groups. With respect to the second, Sections 297 and 298 proscribe training, advocacy, or education that informs participants that solely by belonging to one identified group, they are naturally, biologically, or innately, as opposed to merely apparently, accidentally, or because of external action or external factors, consciously or unconsciously racist, sexist, or oppressive.

Prohibitions Related-to Promoting Discrimination

Interpreting Sections 297 and 298's third and fourth prohibitions does not turn on the meaning of key terms that define the scope of the prohibition. The statutory language makes

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 7 of 9

plain that a public employer or government program may not provide training or education that informs participants that members of an identified group should be discriminated against or receive adverse treatment. Nor may a public employer or government program provide training or education that informs participants that members of one identified group should not treat members of other identified groups equally.

<u>Permitted Trainings, Activities, and Education</u>

Separate from its prohibitions, Section 297 expressly permits certain trainings and programming within the category of "sensitivity training." This is defined as training "based on the inherent humanity and equality of all persons" and based upon the "ideal that all persons are entitled to be treated with equality, dignity, and respect." Sensitivity training consistent with the provisions of Section 297 readily encompasses trainings and programming that promote concepts of equality and the equal, respectful, and dignified treatment of all persons—particularly as they relate to the interactions of members of those identified groups with public employers or government programs.

"Sensitivity training" includes implicit bias training. Implicit bias training is premised on teaching people about biases they may have of which they are not consciously aware and helping them become aware of those biases so as to encourage treating others with dignity and respect and to avoid treating others less than equally. Implicit bias training recognizes that biases develop over time through such means as personal experiences, messaging people may receive from media, and other sources. Implicit bias training does not violate Section 297 unless it includes concepts of group superiority or inferiority based on inherent or innate group characteristics or concepts that an identified group should be treated unequally or discriminated against.

"Sensitivity training" is not limited to implicit bias training, however. For example, a public employer or government program may create a web-based resource entitled, "Anti-Racist Resources," and include information designed to promote a better understanding of racism and how to combat racism. But, if that web-based resource stated that it was designed to "serve as a resource to white people" or to "serve as a resource for our white employees," then it could violate Section 297 because it may imply that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.

Section 298 expressly permits schools to educate about and discuss the historical existence of ideas and subjects that are otherwise prohibited under Section 298. Section 298 does not prohibit schools from teaching about discrimination or how discrimination has existed throughout history. Nor does Section 298 prohibit schools from teaching about the role that discrimination may play in creating disparities among different identified groups. Similar to Section 297, Section 298 does not prohibit teaching students about implicit biases nor does it prohibit schools from creating web-based resources designed to promote a better understanding of racism, sexism, or other forms of oppression. Section 298 is violated only when a school educates about concepts of group superiority or inferiority based on inherent or innate group

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 8 of 9

characteristics divorced from history or educates that an identified group should be treated
unequally or discriminated against.

Section 298 applies to educational instruction in K-12 schools only. Nothing in Section
298 limits instruction by educators in post-secondary schools. Section 297's prohibitions,
however, do apply to the teaching and training of employees and volunteers in public, post-
secondary educational institutions.

## Construing the Prohibited Activities Together with the Permitted Activities

Construing these new statutes harmoniously, Sections 297 and 298 allow public
employers, government programs, and schools to train and educate in a manner that promote
concepts of equality and the equal, respectful, and dignified treatment of all persons. Both
sections permit public employers, government programs, and schools to train and educate about
concepts such as implicit bias. Public employers, government programs, and schools violate
Sections 297 and 298 only when trainings or education programs advocate that identified groups
are either: (1) oppressive by their nature and not simply oppressive by accident, apparently
oppressive, or oppressive because of external action or external factors; (2) consciously or
unconsciously biased by their nature and not simply biased (racist or sexist) by accident,
apparently biased (racist or sexist), or biased (racist or sexist) because of external action or
external factors; (3) deserving of discrimination or adverse treatment; or (4) deserving of unequal
treatment.[5]

This construction comports with traditional definitions of racism and sexism. For
example, "racism" means, among other things, "the assumption that psychocultural traits and
capacities are determined by biological race and that races differ decisively from one another,
which is usually coupled with a belief in the inherent superiority of a particular race and its right
to domination over others." *Webster's Third New International Dictionary* at 1870. This
construction also strikes a harmonious balance between expressly permitted "sensitivity training"
or programming and prohibited programming that exacerbates discrimination.

For the reasons set forth above, the new sections added to RSA chapter 354-A and RSA
193:40 prohibit only those trainings or educational programs that: (1) teach participants that one
identified group possesses inherent characteristics, meaning natural, biological, or innate
characteristics, as opposed to characteristics which are apparent, accidental, or based on external
action or external factors, that make them superior or inferior to other identified groups, or that
those inherent characteristics make one identified group consciously or unconsciously racist,
sexist, or oppressive or (2) teach participants that one identified group should be discriminated
against or treated adversely. The new sections added to RSA chapter 354-A and RSA 193:40 do
not prohibit trainings or educational programs that teach participants about disparities that may

---

[5] Like many discrimination claims, review of a claimant's allegations will involve a fact-intensive, case-
by-case analysis of the training or programming at issue to determine whether the training or
programming violated Sections 297 or 298's prohibitions.

Doug Palardy, Chair
Ahni Malachi, Executive Director
September 7, 2021
Page 9 of 9

exist among different identified groups, the current or historical practices that may have
contributed to those disparities, or about concepts such as implicit bias.

Sincerely,

John M. Formella
Attorney General

#3293122

# EXHIBIT 54

Excerpts of
How to Be
an Anti-
Racist

(Depo. Ex.
50)

EXHIBIT 50
2000
WIT: Edelblut
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14



# HOW TO
# BE AN
# ANTIRACIST

## IBRAM X.
## KENDI



ONE WORLD
NEW YORK

2001

Copyright © 2019 by Ibram X. Kendi

All rights reserved.

Published in the United States by One World, an imprint of Random House,
a division of Penguin Random House LLC, New York.

ONE WORLD is a registered trademark and its colophon is a trademark
of Penguin Random House LLC.

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA
Names: Kendi, Ibram X., author.
Title: How to be an antiracist / Ibram X. Kendi.
Description: New York : One World, 2019. | Includes index.
Identifiers: LCCN 2018058619 | ISBN 9780525509288 |
ISBN 9780525509295 (ebook)
Subjects: LCSH: Anti-racism—United States. | Racism—Psychological
aspects. | United States—Race relations. | Kendi, Ibram X.
Classification: LCC E184.A1 K344 2019 | DDC 305.800973—dc23
LC record available at https://lccn.loc.gov/2018058619

From The New York Times. © 2019 The New York Times Company.
All rights reserved. Used under license.

Printed in the United States of America on acid-free paper

randomhousebooks.com

26  28  29  27

Book design by Jo Anne Metsch

riage of racist policies and racist ideas that produces and normalizes racial inequities. Okay, so what are racist policies and ideas? We have to define them separately to understand why they are married and why they interact so well together. In fact, let's take one step back and consider the definition of another important phrase: racial inequity.

Racial inequity is when two or more racial groups are not standing on approximately equal footing. Here's an example of racial inequity: 71 percent of White families lived in owner-occupied homes in 2014, compared to 45 percent of Latinx families and 41 percent of Black families. Racial equity is when two or more racial groups are standing on a relatively equal footing. An example of racial equity would be if there were relatively equitable percentages of all three racial groups living in owner-occupied homes in the forties, seventies, or, better, nineties.

A racist policy is any measure that produces or sustains racial inequity between racial groups. An antiracist policy is any measure that produces or sustains racial equity between racial groups. By policy, I mean written and unwritten laws, rules, procedures, processes, regulations, and guidelines that govern people. There is no such thing as a nonracist or race-neutral policy. Every policy in every institution in every community in every nation is producing or sustaining either racial inequity or equity between racial groups.

Racist policies have been described by other terms: "institutional racism," "structural racism," and "systemic racism," for instance. But those are vaguer terms than "racist policy." When I use them I find myself having to immediately explain what they mean. "Racist policy" is more tangible and exacting, and more likely to be immediately understood by people, including its victims, who may not have the benefit of extensive fluency in racial terms. "Racist policy" says exactly what the problem is and where the problem is. "Institutional racism" and "structural racism" and "systemic racism" are redundant. Racism itself is institutional, structural, and systemic.

"Racist policy" also cuts to the core of racism better than "ra-

ist ideas that produces and normal-
⸱ what are racist policies and ideas?
rately to understand why they are
t so well together. In fact, let's take
ıe definition of another important

wo or more racial groups are not
ual footing. Here's an example of
f White families lived in owner-
pared to 45 percent of Latinx fam-
ımilies. Racial equity is when two
ding on a relatively equal footing.
ɔuld be if there were relatively eq-
ʞe racial groups living in owner-
seventies, or, better, nineties.
ıre that produces or sustains racial
⸱. An antiracist policy is any mea-
ıcial equity between racial groups.
unwritten laws, rules, procedures,
elines that govern people. There is
race-neutral policy. Every policy
ɔmmunity in every nation is pro-
al inequity or equity between ra-

ːscribed by other terms: "institu-
ɩ," and "systemic racism," for in-
rɪns than "racist policy." When I
ɔ immediately explain what they
tangible and exacting, and more
ːood by people, including its vic-
ıefit of extensive fluency in racial
ly what the problem is and where
ːism" and "structural racism" and
ıt. Racism itself is institutional,

ıe core of racism better than "ra-

cial discrimination," another common phrase. "Racial discrimi-
nation" is an immediate and visible manifestation of an underlying
racial policy. When someone discriminates against a person in a
racial group, they are carrying out a policy or taking advantage of
the lack of a protective policy. We all have the power to discrim-
inate. Only an exclusive few have the power to make policy. Fo-
cusing on "racial discrimination" takes our eyes off the central
agents of racism: racist policy and racist policymakers, or what I
call racist power.

Since the 1960s, racist power has commandeered the term
"racial discrimination," transforming the act of discriminating on
the basis of race into an inherently racist act. But if racial dis-
crimination is defined as treating, considering, or making a dis-
tinction in favor or against an individual based on that person's
race, then racial discrimination is not inherently racist. The defin-
ing question is whether the discrimination is creating equity or
inequity. If discrimination is creating equity, then it is antiracist. If
discrimination is creating inequity, then it is racist. Someone re-
producing inequity through permanently assisting an overrepre-
sented racial group into wealth and power is entirely different
than someone challenging that inequity by temporarily assisting
an underrepresented racial group into relative wealth and power
until equity is reached.

The only remedy to racist discrimination is antiracist discrim-
ination. The only remedy to past discrimination is present dis-
crimination. The only remedy to present discrimination is future
discrimination. As President Lyndon B. Johnson said in 1965,
"You do not take a person who, for years, has been hobbled by
chains and liberate him, bring him up to the starting line of a race
and then say, 'You are free to compete with all the others,' and still
justly believe that you have been completely fair." As U.S. Su-
preme Court Justice Harry Blackmun wrote in 1978, "In order
to get beyond racism, we must first take account of race. There is
no other way. And in order to treat some persons equally, we
must treat them differently."

The racist champions of racist discrimination engineered to

maintain racial inequities before the 1960s are now the racist opponents of antiracist discrimination engineered to dismantle those racial inequities. The most threatening racist movement is not the alt right's unlikely drive for a White ethnostate but the regular American's drive for a "race-neutral" one. The construct of race neutrality actually feeds White nationalist victimhood by positing the notion that any policy protecting or advancing non-White Americans toward equity is "reverse discrimination."

That is how racist power can call affirmative action policies that succeed in reducing racial inequities "race conscious" and standardized tests that produce racial inequities "race neutral." That is how they can blame the behavior of entire racial groups for the inequities between different racial groups and still say their ideas are "not racist." But there is no such thing as a not-racist idea, only racist ideas and antiracist ideas.

So what is a racist idea? A racist idea is any idea that suggests one racial group is inferior or superior to another racial group in any way. Racist ideas argue that the inferiorities and superiorities of racial groups explain racial inequities in society. As Thomas Jefferson suspected a decade after declaring White American independence: "The blacks, whether originally a distinct race, or made distinct by time and circumstances, are inferior to the whites in the endowments both of body and mind."

An antiracist idea is any idea that suggests the racial groups are equals in all their apparent differences—that there is nothing right or wrong with any racial group. Antiracist ideas argue that racist policies are the cause of racial inequities.

Understanding the differences between racist policies and antiracist policies, between racist ideas and antiracist ideas, allows us to return to our fundamental definitions. Racism is a powerful collection of racist policies that lead to racial inequity and are substantiated by racist ideas. Antiracism is a powerful collection of antiracist policies that lead to racial equity and are substantiated by antiracist ideas.

**EXHIBIT 55**

Sept. 28, 2020 Executive
Office of the President's
Memorandum



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

September 28, 2020

M-20-37

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:        Russell T. Vought
             Director

SUBJECT:     Ending Employee Trainings that Use Divisive Propaganda to Undermine the
             Principle of Fair and Equal Treatment for All

On September 4, 2020, M-20-34 was issued at the President's direction, which states in part, "The President, and his Administration, are fully committed to the fair and equal treatment of all individuals in the United States."

M-20-34 alerted agencies that some Federal worker "training" sessions are being held – at taxpayer expense – that demonstrably undermine this core American principle by stereotyping and scapegoating specific groups of people. These divisive trainings constitute a malign subset of a larger pool of Federal agency trainings held to promote diversity and inclusiveness. The sort of training at issue does neither; it sows division among the workforce by attempting to prescribe and impose upon employees a conformity of belief in ideologies that label entire groups of Americans as inherently racist or evil (e.g., critical race theory).

On September 22, 2020, the President issued an Executive Order on Combating Race and Sex Stereotyping. The Executive Order encourages diversity and inclusion efforts consistent with principles of fair and equal treatment, and it defines the sort of divisive trainings the Administration seeks to end.

The President and the Administration believe the fair and equal treatment of individuals is an inviolable principle that must be maintained in the Federal workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. As stated previously in M-20-34, the Federal government is proud that as an employer we have employees of all races, ethnicities, and religions. Our commitment and efforts to welcome all individuals who seek to serve the American people remains, and our commitment to the fair and equal treatment of Federal employees is enduring. Taking the steps described in this memorandum will help ensure that all Federal workers are treated with the individual respect they deserve and that the Federal government continues to foster a workplace of respect for all. Agencies should take immediate and substantive action to begin this implementation, and complete implementation within the time frame required by the E.O.

Agency employees and contractors are not to engage in divisive training of Federal workers. Noncompliance by continuing with prohibited training will result in consequences, which may include adverse action for Federal employees who violate the Order.

Federal contractors are to be required to represent that they will not conduct such trainings for their own employees, with potential sanctions for noncompliance. Agencies are to review their grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the divisive concepts set forth in the E.O.

With respect to spending transparency, the EO states that, "Within 90 days of the date of this order, each agency shall report to OMB all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion, whether conducted internally or by contractors. Such report shall, in addition to providing aggregate totals, delineate awards to each individual contractor."

In furtherance of the Executive Order on Combating Race and Sex Stereotyping and M-20-34, agencies must:

- Identify all agency training programs related to diversity and inclusion held during Fiscal Year 2020, including both those conducted by the agency's own employees and those conducted by others (e.g., outside vendors). Determine the spending on each such session, and the aggregate spending on all such sessions. The data should be presented so that all awards to an individual contractor are viewable together. Since these trainings and the dollars spent on them may be difficult to track or identify, it is recommended that agency leadership consult with the heads of component offices that offer such trainings to obtain their assistance in identifying them and determining the sums obligated.

- Review these trainings to determine whether they teach, advocate, or promote the divisive concepts specified in the Executive Order on Combating Race and Sex Stereotyping (e.g., that the United States is fundamentally racist or sexist or that an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive). Reviews of specific training curriculum materials can be supplemented by a broader keyword search of agency financial data and procurements for terms including, but not limited to: "critical race theory," "white privilege," "intersectionality," "systemic racism," "positionality," "racial humility," and "unconscious bias." When used in the context of diversity training, these terms may help to identify the type of training prohibited by the E.O. Searching for these key words without additional review does not satisfy the review requirements of the E.O.

To prevent prohibited trainings going forward, except for those contracts specifically exempted by the E.O. (see Section 4 and FAR Subpart 22.807), every government contract must include the provisions required by Section 4 of the E.O.

Where diversity and inclusion training is to be provided to Federal employees by contractors, the following steps must be taken:

- Agencies must ensure that requirements are scoped consistent with the E.O. Existing contracts should be reviewed to ensure that training is consistent with this E.O. and any work identified as inconsistent is immediately removed, if necessary and permissible through a partial termination for convenience of the government.

- For future awards, agency solicitations or statements of work concerning Federal employee training shall include the provisions set forth in Section 4 of the E.O.

Contractors who are found to have provided a training for agency employees that teaches, advocates, or promotes the divisive concepts specified in the E.O. in violation of the applicable contract will be considered for suspension and debarment procedures consistent with the E.O. and in accordance with the procedures set forth in Part 9 of the Federal Acquisition Regulation.

For Federal financial assistance, as required by Section 5 of the E.O., Federal awarding agencies are required to identify all programs for which the agency may, as a condition of receiving Federal grants and cooperative agreements, require the recipient to certify that it will not use Federal funds to promote the concepts listed in Section 5 of the E.O. Additionally, although training and education for employee development may otherwise be an allowable cost under 2 CFR 200.472, training or education on the divisive concepts specified in the Executive Order is not an allowable cost unless otherwise provided by law.

As Federal awarding agencies are conducting their review of programs to identify those for which the agency may lawfully impose the condition described in Section 5 of the E.O., they must look at all Federal grant and cooperative agreement programs, not just those for the purposes of providing training. For those programs so identified, Federal awarding agencies must update their guidance, practices, and procedures to ensure that future notice of funding opportunities and the terms and conditions of Federal awards restrict the use of Federal funds, including funds to meet cost share requirements, from being used to promote the divisive concepts set forth in the E.O. (including by conducting research premised upon these concepts), to the extent consistent with the statute(s) governing the grant program and all other applicable law.

By November 20, 2020, Federal awarding agencies are required to report to OMB, through their RMO, those programs for which the agency may impose the conditions identified in Section 5 of the E.O.

The agency head shall designate at least one senior political appointee to review and approve in advance any expenditure on Federal employee diversity and inclusion training (via contract or SF-182), and the senior political appointee shall do so only after certifying that the curriculum meets the standard of fair and equal treatment of individuals.

Pursuant to Section 7 of the E.O. all training programs for agency employees relating to diversity or inclusion must be reviewed by the Office of Personnel Management (OPM) for compliance with the E.O. prior to the training program being used. OPM will issue guidance to agencies on the process for submitting training programs for review and the approval process.

Finally, agencies should take all appropriate actions to align their public-facing information with the requirements for training Federal employees outlined in the E.O. Agencies should encourage their employees to report to the agency Inspector General (IG) any agency-sponsored training session that violates the standard of fair and equal treatment of individuals set forth in the E.O., to support the IG reviews described in Section 6(c)(ii) of the E.O.

# EXHIBIT 56

Excerpts of
July 8, 2021
Board of
Education
Meeting

**1**

TRANSCRIPTION OF AUDIO FILE
NEW HAMPSHIRE BOARD OF EDUCATION MEETING
JULY 8, 2021

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

**3**

1 doesn't happen in New Hampshire.  These are not
2 issues.  But there are a number of issues that we
3 starting with at the Department.  We get a number of
4 different complaints, and there are many things that
5 we are looking into.
6          And I -- this is a little -- it's a little
7 long, and I'll try and go quickly.  But there's --
8 this is a book that is used in middle school.  Some
9 of you may have seen it.  It's called, "This Book is
10 Anti-Racist."  And it is really designed for, you
11 know, a young adolescent, you know, in terms of the
12 engagement and stuff like that.
13          But I thought I would just like share stuff
14 out of one chapter, which -- and the reason I'm
15 picking this chapter is that, you know, reading this
16 material when I share this with you, I would think
17 that this would be unsettling to our educators in
18 terms of what they're being taught.
19          So it's amazing that, you know, in very --
20 we're teaching this to them.  And then I'm going to
21 read you something about it because you're just
22 like, how is that going to play out?  So I'll just
23 start.  This is chapter 10.
24          "You know more history, the parts you are
25 told about and what has been left out.  You are

**2**

1          (START OF REQUESTED PORTION)
2          COMMISSIONER EDELBLUT:  And then another
3 aspect that was through the law is the anti-
4 discrimination, you know, the right to, you know,
5 freedom from discrimination in the workplace and
6 education.  So it was another pivotal -- it was
7 another piece that was included in the legislative
8 thing.  And we are in the process -- I've written a
9 technical advisory for the schools.  That was over
10 at the Attorney General's Office.
11          Today while I've been sitting here I got
12 some information back from the Attorney General's
13 Office.  So we will tune that up and make sure that
14 we get good technical advisory out to the District.
15          And there is -- you know, it was
16 interesting.  At the superintendent's meeting I
17 asked many superintendents, I was like, "So what do
18 you guys think about this?"  And they didn't really
19 have a lot of misinformation, but they didn't
20 actually have information about what the law said.
21 So the technical advisory, I think, is going to be
22 very important.
23          And then I just -- I wanted to share with
24 you, you know, a part of this topic because we are
25 -- you know, people say will say like, well, this

**4**

1 attuned to microaggressions and are aware of their
2 impact.  You see the work institutions have put in
3 over hundreds of years to maintain the structure of
4 racism.
5          Your school may have rules around how
6 students can wear their hair and for what folks can
7 wear on their head, and you understand how this is
8 affirming the dominant culture.
9          You notice that, still, most of the shows
10 and movies you watch have nearly all white casts and
11 how every time there is a terrorist, that person is
12 Western Asian and speaks Arabic.
13          What do you do next?
14          Use your voice to speak the truth about
15 injustice.  Talk to your family, your friends, your
16 classmates, anyone and everyone who will listen.  I
17 wish I had used my voice when my teacher was so
18 continually awful to us.  I wish I had stood up to
19 my teacher and to our school administration and
20 allowed her to remain -- rather than allow her to
21 remain there.
22          What would I do today if I were in that
23 classroom?  I'd physically stand up to her in all my
24 nine-year-old self.  I'd get out of my seat, stand
25 up, and tell her, "You can't talk to him like that.

**5**

1 It's not okay."  Then I'd walk out of that
2 classroom, bringing my friend with me and anyone
3 else who wanted to -- who wanted and needed to come.
4         I would walk down the stairs to the office,
5 where I'd ask the school secretary or principal to
6 file a complaint against that teacher.  I'd tell
7 them she verbally abused my friend, and I'd file
8 that complaint.
9         I would ask the office to call my friend's
10 parents.  He shouldn't have to sit through another
11 minute in the classroom with our teacher who
12 assaulted him with her racist words.  No one should.
13        We would all attend the next school board
14 meeting to demand our school be a place where we can
15 learn free from racial violence, both verbal and
16 physical.
17        What if you and your family or friends are
18 driving through town, and you see four police
19 officers surrounding two young black men?  You may
20 be able to see if the police are armed.  You can see
21 that the young black men are not armed, and that
22 they look confused.  And that their hands are up.
23        You know that this happens every day, and
24 today could be the day that you change that.  Here
25 is where you can make a plan so you'll know what you

**7**

1         UNIDENTIFIED FEMALE:  What subject would
2 that (indiscernible)?
3         COMMISSIONER EDELBLUT:  I don't know the
4 answer to that.
5         UNIDENTIFIED MALE:  I don't think they know
6 the answer to it either.  Right now it kind of goes
7 to that question when we were talking about the
8 holocaust, where -- especially use like Critical
9 Race Theory or examining how everything in our life
10 has some racist element to it.  So there's really no
11 boundaries where you might see it look like that.
12 That book could be liable in a mathematics class and
13 liable to the social science class.
14        (Indiscernible)
15        COMMISSIONER EDELBLUT:  I'm just sharing
16 some actual (indiscernible).  Okay.
17        (END OF REQUESTED PORTION)
18
19
20
21
22
23
24
25

**6**

1 can do if this does come up in your life."
2         And so I just shared that because this is
3 what we're teaching, you know, 9, 10, 11, 12-year-
4 old students in our school, and I'm not sure that
5 this is as constructive as we might want it to be
6 for our students.  So I just wanted to share that,
7 so you can have some concrete --
8         UNIDENTIFIED FEMALE:  So how do we find out
9 -- if were a parent and I had child, how do we find
10 out if that book is --
11        COMMISSIONER EDELBLUT:  So I'm thinking
12 you'd go to your school board.  You'd go to your
13 superintendent.  I just want to know if this
14 resource is being used.  It would be appropriate if
15 you're a parent to be able to request to see all of
16 the actual resources that are being used in the
17 education of your children, right.  That's --
18 they're your children, and you want to know what
19 they're being taught.
20        UNIDENTIFIED MALE:  Is that it?
21        COMMISSIONER EDELBLUT:  Yeah.  That's all.
22 And then that's the end of the report.
23        UNIDENTIFIED FEMALE:  I just -- one more
24 question.
25        COMMISSIONER EDELBLUT:  Yeah.

**8**

1         CERTIFICATE OF TRANSCRIPTIONIST
2         I certify that the foregoing is a true and
3 accurate transcript of the digital recording
4 provided to me in this matter.
5         I do further certify that I am neither a
6 relative, nor employee, nor attorney of any of the
7 parties to this action, and that I am not
8 financially interested in the action.
9
10
11
12         _____
13              Julie Thompson, CET-1036
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1                    CERTIFICATE OF TRANSCRIPTIONIST

2              I certify that the foregoing is a true and

3     accurate transcript of the digital recording

4     provided to me in this matter.

5              I do further certify that I am neither a

6     relative, nor employee, nor attorney of any of the

7     parties to this action, and that I am not

8     financially interested in the action.

9

10

11

12            _____

13            Julie Thompson, CET-1036

14

15

16

17

18

19

20

21

22

23

24

25

2014

# EXHIBIT 57

Dec. 14, 2021
Email Chain with
DOE
Commissioner F.
Edelblut

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
   **To:** "Malay, Robert" <rmalay@sau29.org>
   **Cc:** "D'Eon, Sharyn" <sdeon@sau29.org>, "VanStechelman, Jay" <jvanstechelman@sau29.org>,
      "Brian Campbell" <bcampbell@sau29.org>
   **Bcc:** "Bond, Christopher" <Christopher.G.Bond@doe.nh.gov>
   **Subject:** RE: Here are the materials you asked Jay for
   **Date:** Tue, 14 Dec 2021 21:48:50 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

Dear Rob,

Thanks for reaching out. While I appreciate your willingness to engage with me on this, I want to clarify that I was simply passing along a parent concern that had come to my attention. I have not reviewed the attached materials, nor do I intend to, as NHDOE does not have a role in adjudicating violations of the new law. That role falls to the NH Human Rights Commission and/or the Superior Court. Thus, I'm not in a position to give you any direction as to whether the materials here are or are not in conformity with the new legislation. If you have questions about the material, I would encourage you to reach out to your district's legal counsel. Again, I simply wanted to alert you to a parent complaint.

Remember also that, leaving the new law aside, you might want to consider whether your district's "opt-out" policy under RSA 186:11, IX-c is applicable to this parent concern.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Malay, Robert <rmalay@sau29.org>
**Sent:** Monday, December 13, 2021 8:28 AM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Cc:** D'Eon, Sharyn <sdeon@sau29.org>; VanStechelman, Jay <jvanstechelman@sau29.org>; Brian Campbell <bcampbell@sau29.org>
**Subject:** Fwd: Here are the materials you asked Jay for

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

Good Morning Commissioner Edelblut,

Thank you for bringing the concern raised to you regarding the showing of a film in one of our schools. I attempted to conference call you in with both the teacher and Principal on Friday so that you could hear directly

from our boots on the ground educators.

Out of context, and given the title of the film, it would be easy to assume that the use of the film "White Like Me" would be inappropriate to show in the classroom given the recently passed legislation in NH. However, when put into real teaching and learning context, I don't believe that to be the case in this situation.

To be clear, the film has NOT been shown this school year at this time and it will not be shown as planned as we are seeking your input. The classroom teacher (copied on this email), has gone to great lengths to openly communicate the lessons being taught in his classroom. He has also attended in depth training on what is and what is not acceptable given the passage of the new law. We have a policy in place with regard to objectionable material to which the school follows.

Because we were not able to connect on Friday, I have asked the teacher to send forth the attachments for your review. If you feel this is still inappropriate to ignite higher level thinking in the classroom, the film simply will not be shown. Please let us know your thoughts on this so that our teacher doesn't become the test case for the new law.

Thank you,
Robb

**Environmental awareness message**

**Please do not print this email unless you have to**

CONFIDENTIALITY NOTICE:
This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If the reader of this message is not the intended recipient, or an authorized employee or agent of the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and may subject you to civil action and/or criminal prosecution. If you have received this communication in error, please notify us by replying to this message and deleting it from your computer and any network to which your computer is connected. Thank you.

DOE-00858

2018

# EXHIBIT 58

July 22, 2021
Email from S.
Gibson to A.
Malachi

(Depo. Ex.
47)

EXHIBIT 47
WIT: Edelblut
DATE: 5/23/23
Cynthia Foster, RPR, LCR #14

**From:** Sarah Gibson <sgibson@nhpr.org>
**To:** "Malachi, Ahni" <Ahni.N.Malachi@hrc.nh.gov>, "Ahni.malachi@nh.gov"
  <Ahni.malachi@nh.gov>, "DOE: Communications Office" <Comms@doe.nh.gov>, "Edelblut,
  Louis (Frank)" <frank.edelblut@doe.nh.gov>, "Giaquinto, Kate"
  <Kate.M.Giaquinto@doj.nh.gov>
**Subject:** Follow-up inquiry on DOE guidance
**Date:** Thu, 22 Jul 2021 13:27:56 +0000
**Importance:** Normal

---

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hi all -

I'm following up on the guidance issued yesterday on the Freedom from Discrimination bill. I am assuming that training from third parties - i.e. an organization that provides teachers with professional development, which is paid for and approved by the district - must also adhere to this guidance. Is that correct?

Here's a description of a workshop that's been offered in the past by an organization: "The pre-cursor to anti-bias, anti-racist work is the awakening that whiteness is the deeply-held root of racism. Examining white culture and who whiteness manifests as privilege, immunity, and complicity is key in divesting from it."

Would this workshop run afoul of the new law?

My deadline is 1 pm this afternoon.

Thanks,
Sarah

Sarah Gibson
Pronouns: She/Her/Hers
Reporter

**NEW HAMPSHIRE PUBLIC RADIO**
2 Pillsbury Street, 6th Floor, Concord NH 03301
**C:** 802.779.2356
**E:** sgibson@nhpr.org

# EXHIBIT 59

Nov. 15,
2021
Edelblut/
Northwood
GOP Meeting
Exchange

(Depo. Exs.
37 and 52)

2021

**EXHIBIT 37**

R. Farrell
5/18/2023
Reporter: Sharon Saalfield
RDR, CRR

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "Cheryl Dean" <CHE_DEA@msn.com>
**Cc:** "Adams, Angela" <Angela.M.Adams@doe.nh.gov>
**Subject:** RE: Thank you
**Date:** Mon, 15 Nov 2021 15:55:29 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

Happy to come and speak to education issues. I am cc'ing Angela to find a time that would work for your group.



*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov

🐦 📷 📘

 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

---

**From:** Cheryl Dean <CHE_DEA@msn.com>
**Sent:** Monday, November 15, 2021 9:56 AM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Subject:** Thank you

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

---

Dear Frank

I wanted to thank you for all you've done in ensuring that  the new NH law prohibiting  the teaching of racism in our schools is honored.  Your new website addition for parents to report concerns is exactly what NH parents needed!
I am the chair of Northwood  GOP and we have been investigating  CRT in our school and were concerned with what we found.  We are very happy with the new law and sent a flyer with information on it to everyone in our town.  We also created a hotline for our town to report concerns.   Your website is far better and so much more efficient and effective.  Thank you!
I was extremely disappointed  to see Sununu  discourage your work and outreach with NH parents .
Unfortunately Sununu has been a disappointment  for quite some time.
We would love to have you speak with our group anytime and  especially if you are running for governor!  (Hint...hint)

Thanks again for all hard work for NH children!

Cheryl Dean
Northwood GOP chair
603-344-2190

2022

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

DOE-00870

EXHIBIT 52
W2023 *Edelblut*
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "Cheryl Dean" <CHE_DEA@msn.com>
**Cc:** "Adams, Angela" <Angela.M.Adams@doe.nh.gov>
**Subject:** RE: Thank you
**Date:** Mon, 15 Nov 2021 15:55:29 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

Happy to come and speak to education issues. I am cc'ing Angela to find a time that would work for your group.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Cheryl Dean <CHE_DEA@msn.com>
**Sent:** Monday, November 15, 2021 9:56 AM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Subject:** Thank you

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Dear Frank

I wanted to thank you for all you've done in ensuring that the new NH law prohibiting the teaching of racism in our schools is honored. Your new website addition for parents to report concerns is exactly what NH parents needed!
I am the chair of Northwood GOP and we have been investigating CRT in our school and were concerned with what we found. We are very happy with the new law and sent a flyer with information on it to everyone in our town. We also created a hotline for our town to report concerns. Your website is far better and so much more efficient and effective. Thank you!
I was extremely disappointed to see Sununu discourage your work and outreach with NH parents .
Unfortunately Sununu has been a disappointment for quite some time.
We would love to have you speak with our group anytime and especially if you are running for governor! (Hint...hint)

Thanks again for all hard work for NH children!

Cheryl Dean
Northwood GOP chair
603-344-2190

DOE-00869

2024

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

DOE-00870

# EXHIBIT 60

Jan. 20. 2023
D. Fenton
Email
Exchange

(Depo. Ex.
10)


2026
**EXHIBIT 10**

D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

**From:** Pierre Couture <pcouture@sau4.org>
  **To:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
**Subject:** Re: Devisive topics
  **Date:** Fri, 20 Jan 2023 08:12:54 -0500
**Importance:** Normal

---

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Thank you.

On Wed, Jan 18, 2023 at 1:34 PM Fenton, Diana <Diana.E.Fenton@doe.nh.gov> wrote:

Pierre—

Thanks for reaching out to the Department—because this issue—divisive topics is handled by the Human Rights commission and the AG's office the Department has not issued much information on this topic—but I did find this document on the Attorney General's website—hope it helps!

https://www.doj.nh.gov/public-documents/documents/opinion-2021-01-hb2-anti-discrimination.pdf

Thanks!

**From:** Pierre Couture <pcouture@sau4.org>
**Sent:** Wednesday, January 18, 2023 11:43 AM
**To:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Subject:** Devisive topics

---

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hello Diana, I hope all is well.  Is there somebody at the DOE who can speak with a teacher and principal here in Newfound with specifics about what she can say or not say regardings issues that might pertain to divisive topics?

Pierre

--

Pierre Couture

Superintendent of Schools

Newfound Area School District

603-744-5555

ext. 8500


--
Pierre Couture
Superintendent of Schools
Newfound Area School District
603-744-5555
ext. 8500

# EXHIBIT 61

HRC May 2,
2022 Letter
to NEA-NH

2029

# New Hampshire Commission for Human Rights



**COMMISSIONERS**
CHRISTIAN KIM, CHAIR
HARVEY KEYE
ALEX SAMUEL
NANCY LEROY
BASRA MOHAMED
DOUGLAS PALARDY
ELIZABETH ASCH

**EXECUTIVE DIRECTOR**
AHNI MALACHI

**ASSISTANT DIRECTOR**
SARAH E. BURKE COHEN, ESQ.

**INVESTIGATORS**
KATRINA E. TAYLOR
NICOLE LEMELIN
DAN DEYERMOND
KELLY MEDEROS

**2 INDUSTRIAL PARK DRIVE, Bldg. One
CONCORD, NEW HAMPSHIRE 03301
TEL (603) 271-2767
TDD Access: Relay NH 1-800-735-2964
FAX (603) 271-6339
E-MAIL: humanrights@nh.gov
www.nh.gov/hrc**

SENT VIA EMAIL

May 2, 2022, 2022

Attorney Esther K. Dickinson
NEA-NH
9 S. Spring St.
Concord, NH 03301

Re: Request for Information and Public Records Under the New Hampshire's Right to Know Law, RSA 91-A

Dear Attorney Dickinson,

Thank you for your correspondence regarding your Right to Know request pursuant to NH RSA 91-A. The request made as I understand it is as follows:

1. *"Documents sufficient to identify, including any applicable emails, the following information concerning any written or oral complaints your Commission has received alleging a violation of RSA 354-A:29-34 or RSA 193:40, which became effective on approximately July 1, 2021: (i) the content of the complaint; (ii) the date the Commission received the complaint; (iii) who the complaint went to within the Commission; (iv) any response from the Commission; and (v) the school district implicated, if any. This request specifically includes any complaints concerning the use, retention, or teaching of any books. This request is not seeking the identity of the complainant or any applicable educator.*

2. *[To] include any complaints, allegations, or communications (including to/from the Department of Education) concerning the law.*

3. *Regarding N.H. Admin. R. PART Hum 219.04 as a basis for withholding this information concerning non-docketed complaints.*

4. *...[A]sk that the HRC revisit its decision to withhold this information and, instead, produce this information to NEA-NH. [W]e are willing to accept the redactions of students an complainant names, as well as the names of any applicable educator.*

5. *We would ask the HRC to inform the NEA-NH how many allegations have been brought to the Commission's attention under the law since its enactment."*

In providing an answer to your request, it is instructive to explain several crucial areas associated with case processing for the NH Commission for Human Rights (the "Commission"), relative to the section of RSA 354-

A:29-34, a new subdivision entitled *"Right to Freedom From Discrimination in Public Workplaces and Education,"* effective June 25, 2021.

It is important to have a full understanding of the complaint process. The Commission, in accordance with our state statute and outlined by our administrative rules, has the power to receive, investigate, or pass upon allegations of discrimination. As such, an assessment is made to ensure the Complainant ("CP") has made a *prima facie* case (i.e., "at first sight" the claim meets the legal standard to file a charge with the Commission). If this is the determination, the allegation of discrimination is verified (signed by the CP and witnessed by a notary), submitted to the Commission, and becomes a docketed charge of discrimination whereby both parties are notified in writing. It is important to state for the Commission, a complaint is defined as a verified and docketed charge of discrimination.

The complaint is investigated, and a determination is made by the Investigating Commissioner whether the charge of discrimination has a *Probable Cause (PC)* or *No Probable Cause (NPC)* finding. If the charge has an NPC finding, the process ends with both parties being notified of the outcome.

The CP does, however, have a prescribed window of time for an appeal should they choose to request one. Once that window is closed, so is the case.

If there is a PC finding, the parties move on to *Conciliation* (i.e., settlement of the case with the assistance of a neutral third party, the Commission) or a *Public Hearing*. If Conciliation fails, a public hearing is scheduled then noticed appropriately for the public. At the end of the public hearing, the Commission hearing panel will deliberate and make a finding. The parties are notified of the Commission's decision and said decision is uploaded to and maintained on the Commission's website where the public has access.

Both parties are afforded the opportunity to appeal a decision or request that a motion be granted. Should either party (Complainant or Respondent) disagree with the outcome of the investigation, they can request the decision be reconsidered. Additionally, should either party disagree with the outcome of the hearing, they have an opportunity to appeal in a public forum, New Hampshire Superior Court.

Although the Commission is allowed to provide statistical information, in general, the Commission has stated administrative rules that speak to the confidentiality afforded during our process.

Pursuant to our Administrative Rules, specifically N.H. Admin. R. PART HUM 219.04, which reads in part *"[n]o information regarding complaints filed, investigation of complaints, pre-determination settlement negotiations, or conciliation negotiations shall be disclosed to the public by any commissioner or staff member prior to issuance of a notice of public hearing after a finding of probable cause,"* the Commission cannot acknowledge and/or provide you at any time with information as outlined in your above request specific to the confidential elements of a charge.

To further speak to the Commission's confidentiality, RSA 354-A:21(II), specifically discusses our investigation and complaint review process be it a housing, employment, public accommodation, or an education complaint (education was added to RSA 354-A upon passage of SB263 in 2019). To the extent policy decisions were made to keep this portion of our process confidential, those pronouncements were made by the legislature when RSA chapter 354-A was first codified in 1965. All the regulations do is flesh out what the statute already provides which is confidentiality during the pre-PC investigation and conciliation process.

Additionally, the adjudication of a complaint for which there is a PC finding is a public proceeding whether that adjudication is done by the Commission or in Superior Court. Even NPC findings can become public if CP seeks judicial review in Superior Court.

In reading your request, it appears the inference is that RSA 91-A is explicit and therefore would supersede RSA 354-A:21, II. The Commission's confidentiality is clearly stated in the statute and consequently not optional. RSA chapter 354-A is an order which states that the Commission's records must remain confidential.

Relative to your request of a post-NPC disclosure, the Commission recognizes that this is a novel area of law and will keep in mind the heightened concerns of those who may be the targets of complaints when it considers whether to unseal findings after the initial investigation and PC determination.

In summary, the previous information was necessary to explain our process, address your request that the Commission consider removing our statutorily ordered confidentiality, and to allow an answer to your final question. The Commission's statement is as follows regarding the statistical number of formal complaints:

> *"Zero charges have been filed since the Right to Freedom From Discrimination in Public Workplaces and Education law went into effect."*

As you know, should a charge meet the statutory hurdle of N.H. Admin. R. PART HUM 304.04 which states *"[a]fter a notice of a public adjudicative hearing has been issued…(b) [t]he parties, other participants in the hearing and the public shall have access to the investigative report,"* the Commission will facilitate a request for information as referenced above.

This completes the Commission's response to your Right to Know requests.


Respectfully,

*Ahni Malachi*

Ahni Malachi
Executive Director
Ahni.N.Malachi@hrc.nh.gov

2032

# EXHIBIT 62

Nov. 15, 2021 R. Farrell Email Exchange

(Depo. Ex. 34)

**From:** "terridd@metrocast.net" <terridd@metrocast.net>
   **To:** "'Farrell, Richard'" <Richard.J.Farrell@doe.nh.gov>
**Subject:** RE:
   **Date:** Mon, 15 Nov 2021 12:35:04 -0500
**Importance:** Normal



**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hi Rich,
I was not upset with you at all. I understand what you are saying but one cannot overlook the optics of this whole thing. A $500 bounty. Nothing is innocent about that web page.
We are good. I hope though you can see this through the eyes of educators.
Terri

**From:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Sent:** Monday, November 15, 2021 12:29 PM
**To:** Donovan, Terri <terridd@metrocast.net>
**Subject:** RE:

Good Afternoon,
Have you had time to calm down a bit? Certainly, don't want to damage our professional working relationship and friendship. Believe me when I say that I will follow the law to the letter. In answer to your question, we have had allegations of Educator Misconduct related to the new law.
Each has been triaged and sent to the HRC for their review. I have not undertaken any formal investigation related to "Divisive Content."
Rich

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

*The contents of this message are **CONFIDENTIAL** Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is **PROHIBITED**. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** terridd@metrocast.net <terridd@metrocast.net>
**Sent:** Thursday, November 11, 2021 3:35 PM
**To:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Subject:** RE:

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

I understand the HRC part however there are tons of things where people could be educated on ow to file complaints etc. Are those things worry of their own page? Nope. I am curious how many complaints over the new law have been received? This is wrong on so many levels.

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hi Rich,
So it looks like the NH DOE has crossed the Rubicon.
Terri

Terri D. Donovan, Esquire
Director of Collective Bargaining and Field Services
AFT-NH
785 Route 3A, Unit 102
Bow, NH  03304
603-832-9232 (direct line)
603-393-9705 (cell)
terridd@metrocast.net

# EXHIBIT 63

Aug. 20,
2021 F.
Edelblut
Email
Exchange

(Depo. Ex.
45)

EXHIBIT 45
2036 Edelblut
DATE: 5/23/23
Cynthia Foster, RPR, LCR #14

**From:** "sanborn.kyle" <sanborn.kyle@protonmail.com>

**To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>, Hoppy & Harry <froggytouttaint@aol.com>

**Subject:** RE: CRT Advisory

**Date:** Fri, 20 Aug 2021 01:29:50 +0000

**Importance:** Normal

**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

Hello Sir,

Yes. I would also think about referencing the applicable section from HB2

193:40  Prohibition on Teaching Discrimination.

IV.  Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

V.  For the purposes of this section, "educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term.

Best,
Kyle Sanborn

Sent with ProtonMail Secure Email.

------- Original Message -------
On Tuesday, August 17th, 2021 at 10:20 AM, Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov> wrote:

Kyle,

Thanks for following up. Just to make sure we are on the same page, the section that I will be referencing is from Ed 510.05, Principle 5 – Duty to Report.

Is this correct?

# Ed 510.05 Duty to Report

(a) Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b) Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c) The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:.

(1) When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2) When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d) If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e) Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1) His or her immediate supervisor, superintendent, or both; and

(2) The department of health and human services, pursuant to RSA 169-C:29.

(f) If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g) The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

) Any credential holder shall report any suspected violation of the code of conduct following the school, school district or SAU reporting procedures.

*Frank Edelblut*

Frank Edelblut | Commissioner of Education

**Phone:** 603-271-3144

Frank.Edelblut@doe.nh.gov





New Hampshire
**Department of Education**

The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.

**From:** sanborn.kyle <sanborn.kyle@protonmail.com>
**Sent:** Monday, August 16, 2021 8:27 PM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>; Hoppy & Harry <froggytouttaint@aol.com>
**Subject:** CRT Advisory

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Commissioner Edelblut,

My name is Kyle Sanborn and I am a member of the Gilford School Board. We briefly spoke at last Wednesday 's Belknap County Meeting along with Representative Harry Bean about possibly sending out an advisory to all NH districts highlighting the fact that if an educator disregards the new law, they would be violating the educator code of conduct and would face disciplinary action by the state board of education and by their local school board.

Thank you for you time and for what you have been able to accomplish at the NH DOE.

Best,

Kyle Sanborn

(603)832-4086

Sent with ProtonMail Secure Email.

# EXHIBIT 64

# Aug. 25, 2022 Email to F. Edelblut

# (Depo. Ex. 48)

EXHIBIT  48
WIT 2040  Edelblut
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

**From:** Ian Huyett <ihuyett@nhcornerstone.org>
  **To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>, Shannon McGinley
    <smcginley@nhcornerstone.org>
  **Subject:** Inquiry Regarding Educator Code
    **Date:** Thu, 25 Aug 2022 16:24:21 -0400
**Importance:** Normal

---

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

---

Frank,

I hope you are well. I'm following up on a conversation you recently had with Shannon.

I understand you and the Department have taken the position that the Department cannot investigate educators who may have broken their obligations under the Educator Code of Conduct by teaching discrimination in violation of RSA 193:40, IV.

I hope you can understand why it seems to us that a plain meaning of the relevant statutes and the Code itself require exactly that the Department of Education investigate suspected violations of the Educator Code. Could you or someone else in the Department please explain the legal basis for your interpretation so that Cornerstone and others do not need to continue pushing on this issue?

For context, as you know, RSA 21-N:9 mandates that the board of education "shall adopt" rules encompassing "the establishment *and enforcement* of... a code of conduct for licensed or certified educational personnel."

The Educator Code, in turn, explicitly says numerous times that the Department of Education itself shall investigate suspected violations of the Educator Code of Conduct.

For example, Ed 511.01(f)-(i) explains that "Investigations *shall* be handled *by the department*," that "*[t]he department shall* make every attempt to interview all people," and that "*[t]he department shall* make every attempt to obtain any and all documentation."

Ed. 511.01 in the Code goes on to say that "*[t]he department shall* create a report" and "*the department shall* determine the sanctions to be imposed." 510.05(f) in the Code says that "*the department shall* undertake an investigation, as enumerated in Ed. 511.01" if "the department has reason to suspect" a violation was not reported by an educator.

While this provision cites Ed. 510.01 and the following sections, all of these sections state that unprofessional conduct "shall... not be limited to" the offenses which those sections list explicitly.

Since RSA 193:40, IV says that teaching discrimination "shall be considered a violation of the educator code of conduct," we do not understand the idea that the Commission for Human Rights or another entity has exclusive power, or even sole responsibility, to investigate the teaching of discrimination.

Assuming I've understood your view correctly, why has the Department concluded that it does not have the power to investigate the suspected teaching of discrimination?

Moreover, is it your or the Department's understanding that the Department is not bound by RSA 21-N:9 or the terms of the Educator Code when it comes to RSA 193:40, IV? If so, could you or someone else in the Department please explain the legal basis for this position?

Best,

Ian



**Ian B. Huyett, Esq.**
General Counsel
📞  603-228-4794
🌐 www.ianhuyett.com
📍 P.O. Box 4683, Manchester NH 03108

Cornerstone

 @IanHuyett

**EXHIBIT 65**

Excerpts of
Mar 8, 2023
HB533
Hearing

(Depo. Ex. 6)

EXHIBIT 6
D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

## Page 1

New Hampshire House of Representatives

House Judiciary Hearing - HB 533

March 8, 2023

## Page 2

1    (Excerpt begins)

2        CHAIRMAN LYNN:  So with that, I'm going to

3    open the hearing on HB533, the amendment, and I would

4    recognize Diana Fenton from the Department of

5    Education.

6        Oh, I'm sorry.  Do we have -- you have

7    somebody with you, Ms. Fenton?

8        MS. FENTON:  I do.  Good morning.  My name is

9    Diane Fenton.  I'm an attorney with the Department of

10   Education.  With me is Richard Farrell, who's an

11   investigator for the Department.

12       I want to be clear, as an initial matter,

13   this bill before you, this amendment which requests

14   subpoena power for the Department of Education for

15   purposes of conducting investigations of educator

16   misconduct is not about Commissioner Frank Edelblut.

17   It's not for Commissioner Frank Edelblut.  It is for

18   Investigator Richard Farrell, in order for him to

19   conduct his investigations.  The Department has been

20   working very hard over the past few years to enhance

21   our child safety initiatives.  We have seen various

22   stories in the news where the Department has been

23   working on addressing those matters.  Concord always

24   comes to mind, where we are finding educators who

25   should not be around children, who are having

## Page 3

1    inappropriate relationships with children.  They are

2    few and far between, but they're very, very important

3    and critically important.

4        The Code of Conduct was passed in 2016, and

5    under that document, the Department conducts

6    investigations of educator misconduct and subpoena

7    power, which other state agencies have in order to

8    facilitate their investigations, OPLC as a point --

9    case in point, has subpoena power would help to

10   facilitate that.  But you don't have to take my word

11   for it.  That's why Richard Farrell is here, to speak

12   on the work that he does.

13       Please.

14       MR. FARRELL:  Good morning.  My name is

15   Richard Farrell.  I'm currently employed by the

16   Department of Education as an investigator.  I began

17   this mission on July 1st, 2013.

18       CHAIRMAN LYNN:  Okay.  You know, Mr. Farrell,

19   can I just ask you, when you -- I'm not going to

20   interrupt you now, but when -- before you leave, would

21   you just fill out one of the pink cards?

22       MR. FARRELL:  Yes, please.

23       CHAIRMAN LYNN:  Thank you.

24       MR. FARRELL:  I began this mission in July

25   1st, 2013, after serving 30 years as a member of the

## Page 4

1    New Hampshire State Police.  Before that, I was a

2    licensed educator.  I spent three years teaching high

3    school English and coaching football in Massachusetts

4    and in a private school in Southern New Hampshire.  At

5    the time of my employment, the New Hampshire -- New

6    Hampshire relied on administrative rules to define the

7    conduct -- to define and conduct investigations into

8    allegations associated with educator misconduct.  The

9    Code of Conduct didn't exist at all.  Unfortunately, I

10   learned very quickly that the tools available to me to

11   complete my assigned cases were very limited.  In fact,

12   I didn't have any at all.  Therefore, the best approach

13   forward for me was to make the determined effort to

14   identify myself to, create relationships with, and

15   cultivate trust with the field.  This included with

16   superintendents, principals, union attorneys, union

17   reps, attorneys representing school districts, and

18   other stakeholders.

19       At first, and very understandably, there was

20   skepticism, but I'm a person of Irish heritage, and

21   I've been gifted with the ability to tell people where

22   to go and convince them to look forward to the trip.

23   You see, I had no tools.  I had no warrants.  I had no

24   subpoenas.  I just had administrative rules and

25   relationships.  I asked Dr. Judy Fillion almost

1  (Pages 1 to 4)

Page 5

1   immediately, my immediate supervisor, legendary
2   Dr. Fillion, why we didn't at least have subpoena
3   powers while other investigators overseeing licensure
4   had that tool over at OPLC. I didn't get a reasonable
5   answer, and I've been asking ever since for ten years.
6       I think it's very important to understand
7   very definitively that my first and most important
8   mission is to keep kids safe. I have been called to
9   public service for nearly 40 years, and I take this
10  responsibility very, very seriously. This is about kid
11  -- keeping kids in our school safe and protecting them
12  from the 1 percent of educators who do not share in
13  this belief. That's right, 1 percent. I worked for
14  Commissioner Barry. I now work for Commissioner
15  Edelblut, and God willing, I will work for another
16  commissioner in the future. This is not, as a local
17  newspaper trumpeted this past Sunday, "Edelblut seeks
18  subpoena power to investigate educator misconduct."
19  That's not what this is about.
20      I am asking, the agency is asking, and we
21  need to do three things. This request has nothing to
22  do with political agenda or me carrying water for any
23  commissioner. I need these tools to complete my
24  mission. The three-pronged mission is, protect our
25  most vulnerable neighbors, our children, protect our

Page 6

1   educators. That's right. Well over 90 percent of our
2   cases alleging misconduct are deemed to be unfounded.
3   We exonerate more teachers every day than we do take
4   action against the license of a teacher. Over the past
5   ten years, I've been -- investigated, on average, 150
6   cases that we log in as cases that meet our triage
7   process. In any given year, we take action,
8   suspensions or revocations, involving ten educators on
9   average. This does not count the many reports we get
10  that do not survive our triage process.
11      And finally, the third part of our mission is
12  to remove educators that did damaging our kids. Over
13  the past ten years, I've been faced with difficult task
14  of asking for information. Many times, I've been
15  denied access to reports, statements, witness
16  information, names, ages, local disciplinary records,
17  investigative findings, and other crucial bits of
18  evidence that would've assisted in protecting students,
19  exonerating educators falsely accused, and removing bad
20  apples from our classrooms.
21      CHAIRMAN LYNN: I'm sorry. Did you say --
22  you said you had been denied access? Is that what
23  you're saying?
24      MR. FARRELL: That's correct.
25      CHAIRMAN LYNN: All right.

Page 7

1       MR. FARRELL: Over the past two to three
2   years, school districts are routinely hiring
3   third-party investigators, attorneys that work for the
4   districts as contractors. And, in fact, a new company
5   has been started that focuses strictly on providing
6   third-party investigations for school districts. Most
7   of the time, we are not allowed to look at those
8   reports. We don't have subpoena power to get those
9   reports. Sometimes we're allowed to review them
10  in-camera in a conference room at a law firm and glean
11  the information from those. Many times, we're not
12  allowed to touch them at all. Many of our most
13  difficult and heinous cases involving the exploitation
14  of our children, the sexual exploitation of our
15  children, began on social media postings, text
16  messaging, and the use of cell phones. Often, the
17  initial triage of these cases do not appear to be
18  criminal in nature. Therefore, our many, many partners
19  in law enforcement could not assist us in getting the
20  information that we needed. We have no tools to get
21  this information because we have no subpoena powers.
22  Again, the kids are left hanging. The teachers accused
23  have no support and don't have the information to
24  exonerate them, and the bad teacher has the possibility
25  of slipping off the hook. Again, this comes down to

Page 8

1   relationships I've created and creativity in the
2   investigations.
3       We have all -- have been very lucky that this
4   agency and I and school districts and their staff,
5   union reps and their attorneys work reasonably well
6   together to get the job done, but the day is coming
7   when this will not happen. I am -- I'm amazed,
8   absolutely amazed, that an investigator for OPLC can
9   subpoena records associated with barbers, cosmeticians,
10  nurses, and other licensees, and the Department of
11  Education, who oversee the safety of children, do not
12  have that authority. It's 2023. Our children should
13  be protected, and subpoena power will allow us to do
14  that.
15      Thank you very much. If you have any
16  questions, I'll --
17      CHAIRMAN LYNN: Questions for this -- for
18  either of these witnesses?
19      Yes, Representative Perez.
20      REPRESENTATIVE PEREZ: Thank you. Thanks for
21  taking my question. Will this cover all school
22  employees? For example, will it cover the principals:
23  the custodians, or is it just educators?
24      MR. FARRELL: So for my purposes as educator
25  misconduct, it's for license holders. So that would be

2   (Pages 5 to 8)

Page 9

1   superintendents, assistant superintendents, principals,
2   administrators, teachers, paraprofessionals that hold
3   licenses.
4          CHAIRMAN LYNN: All right. Other questions
5   for this witness? Seeing none, thank you --
6          Oh, I'm sorry. Representative Brennan.
7          REPRESENTATIVE BRENNAN: Thank you,
8   Mr. Chairman. Thank you for taking my question.
9          Earlier in your testimony, you stated that
10  1 percent of teachers do not share the common goal of
11  keeping our children safe, and I'm wondering if you
12  might be able to provide the source for that number.
13         MR. FARRELL: I'd be happy to give you the
14  list of suspended and revoked educators that we've
15  compiled. We can do it by year, we can do it by a
16  alphabetical order, but it's a small percentage of
17  people that have engaged in misconduct that have put
18  children at risk, and that's the 1 percent I'm talking
19  about.
20         REPRESENTATIVE BRENNAN: Follow up, please.
21         MR. FARRELL: Yes.
22         REPRESENTATIVE BRENNAN: Would that 1 percent
23  be in regards to New Hampshire educators, or is that a
24  nationwide figure?
25         MR. FARRELL: That'd be New Hampshire. I

Page 10

1   don't have any facts or figures to support any other
2   state but the one that I work in.
3          REPRESENTATIVE BRENNAN: Thank you.
4          CHAIRMAN LYNN: Any questions?
5   Representative DiLorenzo.
6          REPRESENTATIVE DILORENZO: Thank you,
7   Mr. Chair.
8          Sir, could you tell me what the significance
9   of your Irish heritage has to do with this bill?
10         MR. FARRELL: Oh, it's kind of like to -- a
11  little bit of blarney that I have. It's nice to be
12  able to communicate with, create relationships, get
13  people to trust that I'm not working opposed to their
14  position. It's -- sometimes it's easier to convince
15  people to be on your team than trying to pound them
16  over the head.
17         REPRESENTATIVE DILORENZO: Thank you.
18         CHAIRMAN LYNN: Representative Paige.
19         REPRESENTATIVE PAIGE: Yeah. Thanks for
20  taking my question. Top of the morning.
21         So the -- just I want to -- I have a question
22  on terms of what you defined. You said the license
23  holders would come under the purview of this subpoena
24  power, right? So if I have a license to teach or
25  administrate or whatever, a neighbor does, that -- the

Page 11

1   Department would have that authority over that person
2   wherever they may be?
3          MS. FENTON: I'm going to assist on this
4   question.
5          REPRESENTATIVE PAIGE: Well, I just -- could
6   he answer that question, though? I think -- he
7   mentioned that. I want to understand. He's doing the
8   investigation. That's why he's here, right?
9          MS. FENTON: He certainly is, yes.
10         REPRESENTATIVE PAIGE: Thank you.
11         MR. FARRELL: So the Code of Conduct is the
12  method that we use to conduct investigations. And the
13  Code of Conduct is very limited in its scope, and the
14  scope is a license holder. So, for example, we cannot
15  go in and examine a custodian, a kitchen staffer, a
16  secretary, because they don't hold licenses with the
17  Department of Education. So my investigations and the
18  Code of Conduct is limited to those persons who hold
19  licenses that we control. Anybody else in the school
20  district, any other employee, we can't use the subpoena
21  power for them because they're not license holders. So
22  it's limited to those persons that hold the license.
23         CHAIRMAN LYNN: Other -- follow-up? Sure.
24         REPRESENTATIVE PAIGE: Yeah.
25         Changing subjects quickly, it sounded like.

Page 12

1   if I understood your testimony correctly, you said that
2   you're having success in your job right now, but the
3   day will come. Is that what you said?
4          MR. FARRELL: Yeah. We are having success,
5   and we are getting increasingly pushback from certain
6   stakeholders that are saying, "No, we're not going to
7   provide that information for you." I can give you
8   anecdotal -- or I can give you definitive information
9   that -- for example, just this week we had a -- an
10  educator that has come under our radar, this licensed
11  educator that was -- that is under investigation. And
12  I had to deal with three different superintendents to
13  ask for assistance in an investigation to determine
14  whether or not misconduct may have occurred. I got
15  three different answers from three different
16  superintendents, two of which were great and very
17  assisting. One flat out said, "No, I'm not going to
18  give you that information." And it's crucial
19  information to determine whether or not educator
20  misconduct occurred and any action that we might take
21  regarding this educator. So I had one case, three
22  superintendents. One flat out said, "No, thank you."
23  I don't have any authority to say to the
24  superintendent, no, I really need this information,
25  please, please, please give me this information. I

3/8/2023                    House Judiciary Hearing - HB 533              Audio Transcription

---

Page 13

1   don't have the authority to do it. So I have three
2   superintendents, two had levels of cooperation, one
3   said no.
4        CHAIRMAN LYNN: Other questions? Yes.
5   Representative Greeson.
6        REPRESENTATIVE GREESON: Thank you,
7   Mr. Chairman.
8        Thank you, sir, for answering our questions.
9   Is a subpoena a first line of action or a last line of
10  action for you?
11       MR. FARRELL: For me, it'd be the last line
12  of action. I would exhaust every other opportunity I
13  had and that would be the last thing that I would use.
14       CHAIRMAN LYNN: Other questions for this
15  witness? Representative Manos.
16       REPRESENTATIVE MANOS: Thank you, Mr. Chair.
17  I believe you talked about third-party
18  investigators, and those are contractors with the
19  Department of Education.
20       MR. FARRELL: No, contractors for school
21  districts.
22       REPRESENTATIVE MANOS: Okay. And so you're
23  having difficulty getting their reports?
24       MR. FARRELL: Correct.
25       REPRESENTATIVE MANOS: Thank you.

---

Page 14

1        CHAIRMAN LYNN: Representative Andrews.
2        REPRESENTATIVE ANDREWS: Thank you,
3   Mr. Chair. Thank you for taking my question. And
4   either one of you can answer this. If this only deals
5   with licensed employees of a school district, where
6   does it fall? Other employees, if they are -- come
7   under misconduct, who do they complain to?
8        MS. FENTON: It would be an employment issue
9   that the district would address.
10       CHAIRMAN LYNN: Other questions?
11  Representative Smith.
12       REPRESENTATIVE SMITH: Yes. Thank you.
13       Following up on my colleague's question. In
14  that situation, if you were aware of a problem, would
15  you -- if someone is not licensed but employed in the
16  public schools in this state, would you be able to go
17  to the Attorney General's Office, Attorney General
18  providing counsel for all agencies, to ask for help in
19  getting that information, whether it requires a
20  subpoena or not?
21       MR. FARRELL: When it comes to non-licensed
22  persons, I routinely have referred those type of cases
23  to the local county attorney, the local police, and
24  other partners that we have. Because sometimes that
25  behavior that is in question maybe border on criminal

---

Page 15

1   behavior. So we would immediately -- I immediately
2   pass that on to other authorities. We just had -- I
3   think you probably saw the news that a bus driver was
4   arrested yesterday. We got that information from the
5   school district, from the superintendent almost within
6   minutes after he became aware of it. We immediately --
7   I immediately forwarded it to the Chief of Police in
8   the Hudson Police Department and they conducted a
9   robust investigation that had had nothing to do with
10  us, but we were able to refer it to the right agency.
11       CHAIRMAN LYNN: Other questions for this
12  witness? Yes, Representative Leavitt.
13       REPRESENTATIVE LEAVITT: Thank you for taking
14  my question.
15       So you just mentioned that an educator was
16  found -- or you're looking into investigating. And why
17  would you have more than one superintendent to ask
18  the -- you know, to question about that person? Don't
19  you normally just have one superintendent that that
20  educator would be under?
21       MR. FARRELL: In this particular case, and
22  very often this is the case, this involved three
23  superintendents. One was superintendent of a district
24  at the time the person was initially hired, the second
25  superintendent was the new superintendent who works in

---

Page 16

1   the -- that same district, and the third superintendent
2   was a previous employer. So we went out and asked each
3   one of those superintendents to assist us in triaging
4   that case.
5        CHAIRMAN LYNN: All right. Representative
6   Horgan.
7        REPRESENTATIVE HORGAN: Thank you very much.
8   You mentioned the case of the bus driver, and I read
9   about that in the newspaper. I guess it was this
10  morning or yesterday morning. They all kind of meld
11  together and the -- actually, the case of the bus
12  driver, bus drivers are licensed, but I think they're
13  to drive school buses, but they're licensed by the DOT.
14  But -- and this is a little bit out of the purview of
15  our --
16       CHAIRMAN LYNN: So is there a question?
17       REPRESENTATIVE HORGAN: Yes, there's going to
18  be, yes. A little bit out of the purview of question,
19  and we're going against the political trend, as anybody
20  listened to governor's budget address knows, but would
21  it make your job easier if perhaps we licensed
22  everybody who was in a child-facing role with the
23  schools, regardless of whether or not they were
24  educators or paraprofessionals or just support staff?
25       MR. FARRELL: Well, it -- no, the answer is

---

4  (Pages 13 to 16)

Page 17

1   no. It wouldn't make my job easier. And I think we
2   have to define who educators are and what the Code of
3   Conduct is. So I think by expanding -- I wouldn't want
4   to expand the role of this agency to be involved with
5   persons that are not licensed.
6          REPRESENTATIVE HORGAN:  Thanks.
7          CHAIRMAN LYNN:  Other -- yes.
8   Representative MCBEATH.
9          REPRESENTATIVE MCBEATH:  Good morning.
10         CHAIRMAN LYNN:  Good morning.
11         REPRESENTATIVE MCBEATH:  I'm in a different
12  place.
13         CHAIRMAN LYNN:  All right.
14         REPRESENTATIVE MCBEATH:  No, Chair. Good
15  morning and thank you for taking my question.
16         I think you testified that you said without
17  the subpoena power, you would have no authority to get
18  the information that you were requesting. So what is
19  the scope of the subpoena?  Is it, you can get any
20  information you want?  I mean, what's the hook for, you
21  know, containing what information your subpoena power
22  has?
23         MR. FARRELL:  The subpoena power would be
24  limited to what I ask for. So I wouldn't -- it's not a
25  fishing net that would go out and, you know, drag the

Page 18

1   ocean for all types of information. It'd be
2   specific -- a report, for example, personnel record,
3   for example. Past disciplinary practices or actions
4   against the educator. Those are the type of things,
5   witness statements. We're not casting a wide net and
6   trying to capture people in that net. We want to be
7   very limited and focused on the allegation and those
8   things associated with the allegation.
9          CHAIRMAN LYNN:  Yes.
10         REPRESENTATIVE MCBEATH:  So I think that's
11  what I'm asking. So you are not limited within the
12  scope of whatever you want?
13         MR. FARRELL:  Absolutely not. And keep in
14  mind, Code of Conduct is my guide. That's the -- my
15  boundaries. Those -- just like when I was in the state
16  police, there are certain things, those are -- I have
17  to stay within my lane. And the Code of Conduct is my
18  lane, and I don't go outside that Code of Conduct. I
19  don't go outside those lanes. So the idea that --
20  you'll see, if you look at the Code of Conduct, you
21  have to be very careful that people weaponize the Code
22  of Conduct. Parents weaponize it on occasion, school
23  districts perhaps. We don't want to weaponize the
24  code. We want to stay within the bounds of the code
25  and weaponizing it is really a bad idea.

Page 19

1          REPRESENTATIVE MCBEATH:  Thank you.
2          CHAIRMAN LYNN:  Other questions for this
3   witness?  Yes, Representative, excuse me, Turer.
4          REPRESENTATIVE TURER:  Thank you, Mr. Chair.
5   Thanks for taking the question.
6          I am sort of going back to the idea this is a
7   -- an amendment to the original bill that came before
8   us. And I know it's a full replacement of that bill.
9   But I guess my question is, the original bill
10  basically, and I believe that's why it's before this
11  committee, specifically targeted complaints related to
12  student discriminatory practices. And I'm wondering,
13  is the request before us now -- sounds like it may be
14  much broader than sort of things related to student
15  discriminatory practices. So I'm wondering how you see
16  the split between the two and whether or not this is
17  actually much broader than sort of what originally was
18  put before us. Thanks.
19         MS. FENTON:  This is a completely different
20  concept than the original House Bill 533. And as I
21  mentioned at the beginning of my testimony, Richard
22  Farrell had been asking for this type of bill for quite
23  a while. And in working with Representative Lynn and
24  working with the Attorney General's office on the
25  original House Bill 533, we have since worked with the

Page 20

1   AG's office to come up with an SOP as to how we
2   transfer those cases to the Human Rights Commission and
3   the AG's office. It was brought up in that
4   conversation kind of separate and apart from it, that
5   the Department should probably seek subpoena power for
6   the Code of Conduct investigations that we do. And so
7   we thought that this would be the opportunity to do
8   that. And my understanding is Representative Lynn has
9   worked -- or spoken to the attorney general's office
10  about this amendment. But obviously, I will let him
11  speak to that.
12         MR. FARRELL:  No, that's true. The second --
13  the Amendment 20230739H is -- you'll see that the
14  wording of that is slightly different than the earlier
15  proposed amendment. And that change in wording
16  reflects suggestions by the Attorney General's office.
17  That's why the -- that's the slight change in wording.
18         REPRESENTATIVE TURER:  Okay. So just quick
19  follow-up. And I don't know whether I'm asking this of
20  -- the scope then of what we're talking about today
21  would go beyond sort of the original bill in terms of
22  not just targeting discriminatory complaints, but
23  targeting essentially any issue before the -- that
24  comes before you.
25         MS. FENTON:  The short answer to your

5  (Pages 17 to 20)

Page 21

1   question is, yes, it is broader, but I'm going to --
2   it's a nuance because it falls directly within the Code
3   of Conduct. So to reference back to Richard Farrell,
4   we are within the bounds of the Code of Conduct, but it
5   is outside of the discriminatory practices, yes. Thank
6   you.
7              CHAIRMAN LYNN: Other questions for the --
8   Yes, Representative Payne -- Paige? I'm sorry.
9              REPRESENTATIVE PAIGE: Could -- that could be
10  true. So I'm just trying an off -- bouncing a little
11  bit off of Representative Turer's question in the
12  timeline. And I'm trying to catch up from the original
13  bill to the amendments we have with the subpoena issue
14  here before us. But if I'm understanding this
15  correctly, Mr. Farrell's been working at the Department
16  of Education for about ten years. 2018 is when the
17  Code of Conduct has -- was passed or adopted, however
18  we want to phrase that. And now it's 2023. But Mr.
19  Farrell's been asking for the subpoena power for as
20  long as he's been employed there. Is this the first
21  time the department's asked -- this is a yes or no. Is
22  this the first time the department's asked for subpoena
23  power?
24             MS. FENTON: Yes.
25             CHAIRMAN LYNN: Other questions for this

Page 22

1   witness? Seeing none, thank you very much.
2              (End of excerpt)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 23

1        CERTIFICATION
2
3        I, Alicia Jarrett, do hereby certify that the
4   foregoing is a correct transcript from the electronic
5   sound recording provided for transcription and prepared
6   to the best of my professional skills and ability.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  ALICIA JARRETT, AAERT NO. 428    DATE: April 14, 2023
25

6  (Pages 21 to 23)

Page 23

1                    C E R T I F I C A T I O N

2

3                I, Alicia Jarrett, do hereby certify that the

4        foregoing is a correct transcript from the electronic

5        sound recording provided for transcription and prepared

6        to the best of my professional skills and ability.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21      *Alicia J. Jarrett*

22

23      _____

24      ALICIA JARRETT, AAERT NO. 428      DATE:  April 14, 2023

25

# EXHIBIT 66

Redacted version of Aug. 27, 2021 F. Edelblut Email Exchange

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** ██████████████ @gmail.com>
**Subject:** RE: Interview
**Date:** Fri, 27 Aug 2021 19:38:37 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

If you could share with me the names of those educators (if the incident happened after 6/29/2021, the effective date of the statute) I would be happy to look into it.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ██████████████ @gmail.com>
**Sent:** Friday, August 27, 2021 12:46 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Interview

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

---

Dear Commissioner Edelblut,

Thank you for doing a fine job on the NHPR interview regarding the Divisive Concepts Bill.

My sons have been informed by high school teachers that they are inherently racist and sexist because they are white males.   When we react by being appalled, we have been "educated"  that we are inherently racist too, by virtue of being white.  I do hope this Bill makes a difference.

Thank you for your strong work.

Kindly,



Amherst, NH 03031

# EXHIBIT 67

Redacted version of Oct. 21, 2021 F. Edelblut Email Exchange

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "SAU 29" <rmalay@sau29.org>
**Subject:** FW: Curriculum Information
**Date:** Thu, 21 Oct 2021 19:32:30 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

I tried to call back. Below is what I was calling on.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Edelblut, Louis (Frank)
**Sent:** Thursday, October 21, 2021 3:30 PM
**To:** ████████████ @msn.com>
**Subject:** RE: Curriculum Information

Let me try one more time.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ████████████ @msn.com>
**Sent:** Thursday, October 21, 2021 3:04 PM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Cc:** Cline, Andrew <andrew.c.cline@affiliate.doe.nh.gov>
**Subject:** Fwd: Curriculum Information

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

Hi Frank,

I reached out to Superintendent Malay by phone the day we talked. His assistant took a message and my info. She then called me back and and said Superintendent Malay asked for me to correspond with the him by email.

I then sent the following email to Superintendent Malay back on September 23 (ignore 9/16 date on email). I also sent a reminder a couple of weeks later, followed by a phone call to his assistant, Cathy. I asked Cathy if she knew if the Superintendent intended to respond. She was going to check with him. I have yet to hear.

I guess I'm ready for the RTK.

█████

Get Outlook for iOS

---

**From:** ████████ msn.com>
**Sent:** Thursday, September 23, 2021 3:04 PM
**To:** rmalay@sau29.org
**Subject:** Curriculum Information

September 16, 2021

**Robert Malay**
**Superintendent SAU29**
**167 Maple Avenue**
**Keene NH 03431**

**Dear Superintendent Maylay:**

Thank you for the follow up connection from Commissioner Edulblut.

I represent a group of concerned parents and taxpayers in our community, all of whom want a public education system that is effective, efficient, and focused exclusively on serving the needs of all individual children in its care.

I apologize for the delay. I had a two page Right To Know request ready to send and sat on it a few days. It just felt best to have a conversation first.

With the new age of Covid and Zoom, parents have had a larger window into the classroom. Questions about subject content and academic rigor have been raised. Along with the recent passage of the anti-discrimination curriculum law, all of have brought quite the spotlight on education to us all.

Personally, I am appalled at some of what I've heard. One friend of mine (in another NH school district) asked her son what he learned about racism. He was told since he is white he is racist, was born racist because of his skin color, and will always be a racist. He never told this to his parents before being asked. I can't imagine being told that as a child.

Earlier in the year I approached Principle Sharyn D'Eon at Chesterfield for information. I was sent a lesson for voting rights (4th grade I believe). Not only did it have some political bias, there was quite a lot of misinformation in it. It was a surprise this was an ELA lesson, but didn't seem to have a lot of instruction specific for that subject.

After reading the lesson there were questions on how content is decided. I was told a curriculum committee at the SAU level approves textbooks and content for the schools. From what I understand, this is not decided at a school board meeting.

While concerned about discrimination and bias which may be obvious or subtle in our classrooms, there is the question of how much instruction time or focus is the social justice/equity agenda taught at the expense of academic skills and

excellence?

What is the long term psychological impact on children?

Maybe it is all positive and that would be important to know, but what if it's not?

Our group is willing to invest the time and energy to get a better view of what is being taught to our students, but it's hard to know where to start.   How can we work together to identify bias and discrimination?  What access do we have to review teacher trainings, subject content in textbooks, handouts, or any type of instruction? Is there a committee or department for Diverstiy or Equity?

How will schools monitor for compliance for the new anti-discrimination law and make sure this does not take place in any classroom?

Examples of such discriminatory ideas:

-*White Privilege*

-*White Guilt*

-*White Rage*

-*Critical (Race) theory*

-*Any race is superior or otherwise advantaged compared to another, Inherited traits define you, your worth, or your ability to achieve that which you set out to do.*

-*Equity  (unlike Equality) – The concept that all outcomes should be equal regardless of behavior or effort, and furthered by Ibram X Kendi to claim that "all inequity between races is always the result of racism and that the only cure for past racism is current racism and the only cure for current racism is future racism" (How To Be An Anti-Racist)*

-*Any suggestion of any form of segregation by race, religion, sex, gender or any other heritable trait.*

I'll include a graphic of some of the buzzwords which can be of concern.

Please let me know how best we can learn more, review and give feedback, and ultimately support and empower every child.

Thank you,

██████████

Spofford, NH 03462
██████████

# EXHIBIT 68

Redacted version of Dec. 13, 2021 F. Edelblut Email Exchange

(Depo. Ex. 15)

2057
**EXHIBIT 15**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>

**To:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>

**Cc:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>, "Bond, Christopher" <Christopher.G.Bond@doe.nh.gov>

**Subject:** FW: Cheshire County SAU29 - Concerned Parent

**Date:** Mon, 13 Dec 2021 16:05:24 +0000

**Importance:** Normal

**Attachments:** received_599899994398162.pdf; ACFrOgCEUqTQie3kzvlfQjk1IXPLNcNe8WQKqki...pdf

**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

The first part of this email is for Chris, the second is relative to procedural and disciplinary issues and a request for an investigation at Keene.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov

🕊🎥 ▣


New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** @gmail.com>
**Sent:** Monday, December 13, 2021 9:45 AM
**To:** Edelblut, Louis (Frank) <Frank.Edelblut@doe.nh.gov>
**Subject:** Cheshire County SAU29 - Concerned Parent

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

---

Good Morning Frank,

I am writing you this e-mail as a follow up to our conversation on Friday 12/10/21 in regards to some concerns I have with the SAU29 School System in Cheshire County. I have a son who is a Sophomore at KHS, and a daughter who is a Freshman at KHS. Both have attended Keene Schools since pre-school and we have lived and paid taxes in Keene since 2005.

The first concern I have is in regards to a Permission Slip (attached) that was sent out to parents of 8th Grade students at the Chesterfield School. It asks parents to give permission for their 8th graders to watch a film "White Like Me by Tim Wise"..."a leading researcher in the field of "Race Relations" and oft commentator for CNN, and someone who has also been on Fox News on this topic." This film emphasizes "White Privilege" and equates Conservatism with White Supremacy. The film should not be shown at all, as it is clearly CRT, and in direct violation of NH Bill "HB 2 Sections 297 and 298, Right to Freedom from Discriminaton in Public Workplaces and Education."

This was the first I had seen anything like this being sent home from school, and it was shared with me by a parent with a child in the Chesterfield School 8th grade class. However, I have heard from multiple other parents

of situations like this happening often in their classrooms. Although it goes against NH Law, it is being enabled and encouraged by local School Boards, School Administrators, and Teachers Unions. There needs to be an investigation into "at the very least" the Chesterfield School and their curriculum, their policies on CRT and if it is in line with NH Law, if they are following the Law, and if not, it be brought up to meet the standards of the Law to protect the students from teacher's biased and politically driven lesson plans.

The second concern I have is with the Keene High School, SAU29 School Board, and School Administrators, in regards to Safety, Assaults, Lack of Teacher Supervision or Staff on Duty, Destruction of Property (I pay for that with my Taxes) and multiple days a week with no class instruction, with students are being given all day Study Hall instead.

I received the attached letter from KHS on 12/9/21 about a student threatening to "Shoot up the School". This is not the first incident of a threat made by a student at KHS just this year. Earlier this year, my son was brought into an office and questioned by the School Resource Officer, who is also a Keene Police Officer, because my son and a few of his friends had overheard another student making similar threats to the school, to come to school and shoot students. I was first surprised that the resource officer had questioned my son without my knowledge or permission or presence, nor was I notified beforehand. I found out about it later when my son got home from school. I called the school and questioned the resource officer on what happened and I also spoke with Cindy Gallagher, the school principal. She explained that the only recourse the school has is to suspend the student who was making threats for 10 days, after which the student must be allowed back into the school with steps made for counseling and rehabilitation of the student "According to NH State Law" (I was told by the principal). That student is now back in school and walking the halls with the other students, who he threatened to shoot. I find it very hard to process that NH Law would allow a student who made threats on other students' lives, to be allowed back into the regular student population, with very little to no safety precautions taken for the rest of the students.

This leads me to the other concerns I have in regards to Student Safety. My kids have come home on several days and told me that a lot of teachers are constantly absent from school at the same time. They have said that on more than one occasion, there have been 30 teachers out at one time, with no student teacher backup. So many teachers are absent from school at one time, that there are no classes being taught, At All, on those days. Instead, the students are ushered into the auditorium or the cafeteria for "Study Hall".

During these all day Study Halls, there is no supervision, teachers or adult staff (because they have all called out). There is open drug use (and dealing), vaping, sexual assault, and violent fighting going on during this time, and in the hallways in between periods. When fights break out, teachers and staff do not intervene in defense of the victim, but instead they turn and walk away, as if instructed by policy Not to intervene...when it is their duty to protect all students in their care. There have been students who have been severely injured by being attacked, not in a Fight, but being Attacked! And the teachers do nothing and the attacker is allowed to walk the halls and also be confined in the auditorium or cafeteria with their victims, and no staff.

For what I have stated above...the students are filming all of this in real time. I have seen the videos myself, as my children show it to me. I have discussed this with the principal of KHS and have been told that a lot of what is happening is out of her control and at the state level. That she cannot suspend a student indefinitely, even when that student threatens to shoot and kill their fellow students. That students who have threatened or physically assaulted other students, are part of a protected class. Well, what about my children who just want to go to school, go to classes, with teachers teaching, and not fear for their safety?

I am calling for an immediate investigation into SAU29 School Board, KHS School Administrators, and KHS Teachers and Staff. There are laws being broken while my children are in school every day. I will no longer sit by and watch it happen. I am part of a much larger group of parents that are starting to gather their resources to fight against the school, system when it comes to our kids. We are fed up!

Lastly...I encourage you to watch the video below in its entirety. This was posted on 12/10/21 titled "Oxford school mass shooting: Two $100M lawsuits allege school officials knew of threats". What was happening at

Oxford High School was well known. It was known by the students, the teachers, the guidance counselors, the principal, the school board...they all knew. And they did nothing. What is happening at Keene High School, where you have all the kids in two large rooms all day, all together, with little to no supervision, and students who have already threatened to shoot and kill their classmates, are in there with them...this is tactically and morally a recipe for disaster.

https://fb.watch/9S_aSWLMU_/

Concerned Parent

# EXHIBIT 69

Redacted
version of
Aug. 23,
2021 F.
Edelblut
Email
Exchange

(Depo. Ex.
19)

**From:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
   **To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**Subject:** RE: Latest update
   **Date:** Mon, 23 Aug 2021 11:45:24 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

2061
**EXHIBIT 19**
D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

Sure—let me see what I can do.

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Friday, August 20, 2021 8:15 AM
**To:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Subject:** FW: Latest update

I did call David Ryan to ask for and about the book. Can you get a copy? He has not returned my call.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ▮▮▮▮▮▮▮▮▮▮▮ @msn.com>
**Sent:** Thursday, August 19, 2021 8:44 PM
**To:** Christopher Andriski <candriski@sau16.org>; Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>; Adams, Angela <angela.adams@doe.nh.gov>; Governor Sununu <governorsununu@nh.gov>
**Cc:** Becky Ruel <bruel@sau16.org>; ▮▮▮▮▮▮▮▮▮▮▮▮ @sau16.org>; SAU 16 <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson <robin@vikingwelding.net>; ▮▮▮▮▮▮▮▮▮▮▮; Patrick & Jenn Marr <rpjmarr@yahoo.com>; jason.a.bonnevie@gmail.com
**Subject:** Latest update

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

I'm writing again in hopes to seek the answers that I have been desperately seeking with books that are being read and also teachers Kelsey Plourde, principal Becky Ruel and Assistant Super Intendant Chris Andriski all ignoring to comply with The Board of Education and Comissioner of Education. There has definitely been lies and cover ups about inappropriate content being read to 4th grade students. You have violated my rights with a special education student and you have violated the entire group of parents and students in the 4th and 5th grade Cohort in May of 2021. I realize there will be no response to the answers I seek in a formal email. Therefore I have spoken to an attorney to seek legal action.

DOC 70
DOF 00070

One last thing that I would like to bring to the attention of administration is that I along with several parents in town spoke either secretary Kristin Griggs asking why an important board meeting was not posted at Kensington Elementary School, on the front board that town residents drive by and rely on. Kristin stated that it was in the works and was going to be posted. It was NOT POSTED ON OR BEFORE THE MEETING ON August 18th. It however was posted today August 19th, after the meeting had already been conducted. WHY? What is it that you are hesitant for parents to be informed of?

Chris Andriski and David Ryan you will be hearing from the attorney that is representing me soon as you have left me no other choice.

Attached is a picture of how staff, school teachers posted the meeting after it was held. These administrators, teachers and Becky Ruel principal need to be held accountable and held responsible for violating codes of conduct. I will speak with you through my attorney that is representing me.

Because of you lack of response and poor administration with everyone that I have contacted within the Sau16, I have had t ok become boisterous. This has caused my entire family and home to be threatened! I have received horrible messages from community and also have had nails thrown in our driveway. I have 3 children that live here and an elderly parent who will be 79 this September 4th, 2021. You lack of proper administration has caused my family and I a tremendous amount of unwanted stress considering we pay almost $8,000k in property taxes. You all need to be held accountable, I will make sure my attorney takes care of these matters. God Bless you all!

Sincerely,

**From:** ▮▮▮▮▮▮▮▮▮▮▮ @msn.com>
**Sent:** Tuesday, August 10, 2021 5:26 PM
**To:** Christopher Andriski <candriski@sau16.org>; frank.edelblut@doe.nh.gov <frank.edelblut@doe.nh.gov>; angela.adams@doe.nh.gov <angela.adams@doe.nh.gov>; governorsununu@nh.gov <governorsununu@nh.gov>
**Cc:** Becky Ruel <bruel@sau16.org>; ▮▮▮▮▮▮▮▮▮▮ @sau16.org>; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson <robin@vikingwelding.net>; ▮▮▮▮▮▮▮▮▮▮ >; Patrick & Jenn Marr <rpjmarr@yahoo.com>; jason.a.bonnevie@gmail.com <jason.a.bonnevie@gmail.com>
**Subject:** Re: Gender Book & Review RSA 186:11,IX-b and IX-c. Section 186:11 Duties of State Board of Education.

No worries Chris Andriski and David Ryan; at this time our cat and mouse game has come to a complete STOP! I have spoken to the Commissioner of Education Stephen Berwick and Frank Edelblut. I'm requesting that this be reviewed by the SAU16 School Board. After a week, if I have not received a written response, I will file for an appeal under Ed 204 with my local school board, addressed to the chair. Ed 200 (state.nh.us)

By law the SAU16 and teacher ▮▮▮▮▮▮▮▮▮ has violated my parental rights; along with other parent's rights to read any objectionable material to my child and other children. By law you are required to give parents a two week notice of sexual material and also any material that contains equity and inclusion. You have ignored this repeatedly, David and Chris. By law you as teachers and administrators need to give ALL parents a two-week notice. I know there are hundreds of parents that are not in favor of this DEIJ program/CRT. I will make all elementary schools aware of this. Hopefully if many parents are not in favor of these books; together as parents we can ask to have the DEIJ Director fired since he may likely not be needed. I also request as others have at the school board meetings that David Ryan and Chris Andriski resign. These two supposed leaders have lost our

trust and faith far too many times. They simply can no longer be trusted. These two board members are the first two that parents have requested and demanded to RESIGN! The next should be Kimberly Meyer since she kept our schools closed however housed hundreds of kids at the YMCA in Exeter. This was for her benefit not for our children's!

If I am dissatisfied with the resolution, it will then go to the state! I have expressed my concerns with these controversial books, for these young age groups. Since you seem to not have not been to be able to understand what I am demanding, I have been advised by the Education Commission Manager Stephen Berwick to reiterate why these materials are damaging. So here we go! First you violated my rights and my daughters (H.J) civil rights along with all the other students in the entire classroom. You have these children very confused, and they are all saying they are gay, lesbian, pan gender, two spirited. All these ridiculous things that parents should speak to their children about NOT YOU!

Regarding the book "A Good Kind of Trouble," it is a terrible book that shames "white" children into thinking, they are the oppressors in society. This book talks about gunshots, rioting, looting, burning down buildings. It also made our daughter very uncomfortable and scared. Most parents try to monitor and protect their children just from watching the news whether local or world news because of the violence and bloodshed. I still don't understand why you think these scary, controversial subjects are ok to read to children without parental consent. The last I knew you all work for us. Teachers and administrators are paid through our high property taxes. Without our tax dollars there would not be funding to have job security. So, I suggest you start taking these matters seriously. If you do not, I have been told by Stephen Berwick that he will be meeting with you to make sure these rules are followed. So, I believe now that I will have to have this in writing that you will be following these guidelines. I'm beyond ecstatic that I finally got my way with you after you putting me off since May, ignoring me and trying to run me around in circles. One last quote that I would like to mention from this book is how it said "white cops" kill innocent black people. First, I do not like the phrase COPS, as it sounds disrespectful. Also, If this is not a white HATE book it would have said bad police officers kill innocent people, excluding the gesture of color.

I'm also requesting that Black Lives Matters Organization be removed immediately from our SAU16. This is not working out very well already. You're going to have major lawsuits out very soon, parents at the August 3, 2021, meeting showed extreme dissatisfaction. BLM wants to defund and dismantle our police, what are we to do if that were to happen. They are not a positive organization, This is becoming too political!

I was born in 1974 to an average, middle class, LOVING, CARING FAMILY! My best friend lived across the street from me in a Veteran Housing Project. To this day we still remain best friends. When I was in high school, I would give some of my classmate's rides to or from school. Some were Asian, Vietnamese, Bi-racial, African American. Some were also very poor white families. Some of those white kids went to bed hungry at night. Some had single parent homes. Others had drug addicted or alcoholic parents. STOP reading these books! These BLM books are designed to shame all children of every color and more importantly SHAME WHITE CHILDREN and to MAKE THE WHITE CHILD THE OPRESSOR! It stops here! This book has proven that!

Thank you for your time,

Please schedule a meeting or refer to Stephen Berwick 603-271-2299. He will advise you where you need to start to rectify this problem that you have ignored since May 2021. You can also contact Frank Edelblut 603-271-3144. I'm relieved that we are finally going to head in the right direction of the education that these children deserve.

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Tuesday, August 10, 2021 12:53 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮@msn.com>
**Cc:** Becky Ruel <bruel@sau16.org>; ▮▮▮▮▮▮@sau16.org>; dryan@sau16.org <dryan@sau16.org>;
Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson
<robin@vikingwelding.net>; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Patrick & Jenn Marr
<rpjmarr@yahoo.com>
**Subject:** Re: Gender Book

Good afternoon ▮▮▮,

I understand that you are looking for an answer in writing, however I am not sure what you are asking us to
answer as we have not had the chance to speak as a group about the concern you have raised. That is why I have
invited Dr. Ryan, Mr. Mejia, Ms. Ruel, Ms. ▮▮▮ and myself to meet with you to discuss and understand the
statements you have made about the teaching and curriculum that your daughter engaged in last year. Again, so
that we can all be on the same page and together, please let us know your availability on Monday and Tuesday
afternoon.

On Tue, Aug 10, 2021 at 9:58 AM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

Chris Andriski and David Ryan

I need to be very specific with you Chris! What part do you NOT understand?? I want my simple questions
answered in writing! I do not know why you seem to think you are more superior than me. You work for me,
and I want my simple questions answered by you and your $95,000k, DEIJ director Andres Mejia. Again, I will
not let you run me around in circles this time around. You clearly are not going to answer my questions in
writing. It is extremely frustrating to me that you do not realize that you and your teacher ▮▮▮▮▮▮▮
have VIOLATED our child's Civil Rights. You leave me no other option than to seek a lawyer for a lawsuit. I will
work as hard as I can to get DEIJ/CRT out of SAU16; just as other parents are in the SAU16 District. Teachers
and Principals that assume this is OK need to be held accountable and be TERMINATED! You will be hearing
from my attorney as you leave me and other parents no other choice! I hope you realize that when you play
with fire you are going to get burned! I will not be complacent any longer! I wish you a blessed day.

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Tuesday, August 10, 2021 8:32 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Cc:** Becky Ruel <bruel@sau16.org>; ▮▮▮▮▮▮@sau16.org>; dryan@sau16.org <dryan@sau16.org>;
Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson
<robin@vikingwelding.net>; ▮▮▮▮▮▮▮▮▮▮▮▮▮; Patrick & Jenn Marr
<rpjmarr@yahoo.com>
**Subject:** Re: Gender Book

Good morning ▮▮▮▮▮▮,

As I stated in my responses on June 7 and June 8, we would welcome you to come meet with us at the SAU
office to discuss this concern in greater depth. What is your availability next Monday or Tuesday afternoon? I
look forward to scheduling a time to meet with you.

On Tue, Aug 10, 2021 at 4:06 AM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮msn.com> wrote:

2065

Dr. David Ryan and Chris Andriski I would like a reply to this email on Tuesday, August 10, 2021. Is this how you want to make children become "global citizens?" My e-mail was never fully resolved the last time I questioned literature being read to my daughter's class. Perhaps you can refer to your DEIJ director to answer this question that I have. I find it discriminatory that my questions cannot be fully resolved/answered. David Ryan seems to send out Mass e-mails answering questions instead of dealing with parents directly; to answer questions parents seek. David Ryan, your salary is beyond an average income, you are paid very well. My husband and I pay an astronomical amount of property tax that goes directly to the SAU16. I would like a reply today for you to start answering my questions. I have lost faith in teachers and you being the Superintendent/leader of our SAU16 school district. David Ryan your trust has been broken so badly that I cannot send my daughter to school any longer. That is a HUGE PROBLEM. Please get back to me today before I need to seek alternative help to resolve this matter.

Thank you,

████████████████████

**From:** ████████████
**Sent:** Monday, August 9, 2021 1:30 PM
**To:** Becky Ruel <bruel@sau16.org>; candriski@sau16.org <candriski@sau16.org>; ██████████
████████; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield
<Melissa.Litchfield@leg.state.nh.us>
**Cc:** Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson <robin@vikingwelding.net>;
████████; Patrick & Jenn Marr <rpjmarr@yahoo.com>
**Subject:** Gender Book

Good afternoon,,

It appears there has been a gender book read to Hannah's class. She came home saying that her female friends at school are saying that they are bisexual and pan gender. I'm not sure what Pan Gender is can you please enlighten me as to what Pan Gender is? Also what is two spirted?

I have married gay and lesbian friends but I've never heard of these other sexualities. I'm not HOMOPHOBIC, I love my gay friends. It appears that these books are confusing these children and I'm extremely concerned.

I look forward to having this discussion.

████████████████████

--

Christopher Andriski
Assistant Superintendent
**SAU #16**
**603-775-8679**
30 Linden Street
Exeter, NH . 03833
www.sau16.org

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities. SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice. Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

Christopher Andriski
Assistant Superintendent
**SAU #16**
**603-775-8679**
30 Linden Street
Exeter, NH . 03833
www.sau16.org

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities. SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice. Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

# EXHIBIT 70

# Redacted version of Aug. 12, 2021 F. Edelblut Email Exchange

**From:** ████████████████████████.com>
**To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**Subject:** RE: CRT - Hopkinton
**Date:** Thu, 12 Aug 2021 19:21:53 +0000
**Importance:** Normal
**Attachments:** common_challenges_when_teaching_about_equity___social_justice__.pdf; NCTE19__CARBTE_Full_Handout.pdf
**Inline-Images:** image005.png; image007.png; image008.png; image009.png; image010.png; image011.jpg

---

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Frank:

I am not sure if you had a chance to view Kate LaClair's twitter feed in relation to the study guide materials that she was circulating to teachers. Because of our presentation Tuesday night, she has now restricted access – i.e. her twitter feed is no longer open to the public.  Attached is the study guide that she was circulating plus the "book replacement" recommendations.

████████████████████
*Admitted in NH and DC*


**Orr&Reno**
**Sustained Excellence Since 1946**

45 South Main Street, P.O. Box 3550
Concord, NH 03302-3550
Phone: 603.224.2381
Direct Ext: 603.223.9187
Fax: 603.223.9087
www.orr-reno.com

This transmission is intended only for the designated recipient(s). It contains confidential information that may be subject to the attorney-client privilege or other confidentiality protections under applicable law. If you are not a designated recipient, you must not read, use, copy or distribute this message. If you received this transmission in error, please notify the sender by telephone (603.224.2381) or by reply e-mail and delete this message.

---

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Monday, August 9, 2021 8:56 PM
**To:** ████████████████████████.com>
**Subject:** RE: CRT - Hopkinton

Tomorrow early 7:30/8:00 might be best. My cell is 603 ████████

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144

Frank.Edelblut@doe.nh.gov





New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ███████████████████████.com>
**Sent:** Monday, August 9, 2021 3:14 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** RE: CRT - Hopkinton

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

Frank:

When you get a moment, could you give me a call? Or I could call you.

Let me know, thanks.

██





**Sustained Excellence Since 1946**

45 South Main Street, P.O. Box 3550
Concord, NH 03302-3550
Phone: 603.224.2381
Direct Ext: 603.223.9187
Fax: 603.223.9087
www.orr-reno.com

This transmission is intended only for the designated recipient(s). It contains confidential information that may be subject to the attorney-client privilege or other confidentiality protections under applicable law. If you are not a designated recipient, you must not read, use, copy or distribute this message. If you received this transmission in error, please notify the sender by telephone (603.224.2381) or by reply e-mail and delete this message.

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Wednesday, April 7, 2021 5:15 PM
**To:** ██████████████████.com>
**Subject:** RE: [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

Yes.

*Frank Edelblut*

DOE-07884

2070

Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov




New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ███████████████████.com>
**Sent:** Wednesday, April 7, 2021 5:06 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** RE: [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

Frank:

I am assuming that Dan Richards was the gentlemen you were going to introduce me to?

Let me know, I may want to chat with Dan and his wife.





**Orr&Reno**
**Sustained Excellence Since 1946**

45 South Main Street, P.O. Box 3550
Concord, NH 03302-3550
Phone: 603.224.2381
Direct Ext: 603.223.9187
Fax: 603.223.9087
www.orr-reno.com

This transmission is intended only for the designated recipient(s). It contains confidential information that may be subject to the attorney-client privilege or other confidentiality protections under applicable law. If you are not a designated recipient, you must not read, use, copy or distribute this message. If you received this transmission in error, please notify the sender by telephone (603.224.2381) or by reply e-mail and delete this message.

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Thursday, April 1, 2021 1:02 PM
**To:** ███████████████████.com>
**Subject:** RE: [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

I shared this with Steve.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov

 

 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ▉▉▉▉▉▉▉▉▉▉.com>
**Sent:** Thursday, April 1, 2021 12:43 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** RE: [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

Frank:

This video is fantastic. We are going to work this (and the compelling substance contained therein) into our plea to the Hopkinton School District.



**Orr&Reno**
**Sustained Excellence Since 1946**

45 South Main Street, P.O. Box 3550
Concord, NH 03302-3550
Phone: 603.224.2381
Direct Ext: 603.223.9187
Fax: 603.223.9087
www.orr-reno.com

This transmission is intended only for the designated recipient(s). It contains confidential information that may be subject to the attorney-client privilege or other confidentiality protections under applicable law. If you are not a designated recipient, you must not read, use, copy or distribute this message. If you received this transmission in error, please notify the sender by telephone (603.224.2381) or by reply e-mail and delete this message.

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Thursday, April 1, 2021 11:54 AM
**To:** ▉▉▉▉▉▉▉▉▉▉▉.com>
**Subject:** RE: [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

Here is the video link.

DOE-07886

<u>Ian Rowe talks with New Hampshire State Board of Education 3/11/2021 - YouTube</u>

*Frank Edelblut*

Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
<u>Frank.Edelblut@doe.nh.gov</u>



 New Hampshire
**Department of Education**

*The contents of this message are confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ███████████████████████ .com>
**Sent:** Thursday, April 1, 2021 10:55 AM
**To:** Edelblut, Louis (Frank) <<u>Louis.F.Edelblut@doe.nh.gov</u>>
**Cc:** Julie L <<u>julielaboe@gmail.com</u>>
**Subject:** FW: [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Frank:

It was great to talk with you and I hope we can coordinate a meaningful resistance to the divisive critical race theory agenda.

Below is the superintendent's response to my email.



**Orr&Reno**
**Sustained Excellence Since 1946**

45 South Main Street, P.O. Box 3550
Concord, NH 03302-3550
Phone: 603.224.2381
Direct Ext: 603.223.9187
Fax: 603.223.9087
<u>www.orr-reno.com</u>

This transmission is intended only for the designated recipient(s). It contains confidential information that may be subject to the attorney-client privilege or other confidentiality protections under applicable law. If you are not a designated recipient, you must not read, use, copy or distribute this message. If you received this transmission in error, please notify the sender by telephone (603.224.2381) or by reply e-mail and delete this message.

2073

**From:** Steven Chamberlin <schamberlin@hopkintonschools.org>
**Sent:** Thursday, April 1, 2021 5:20 AM
**To:** ██████████████████████.com>
**Subject:** Re: [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

April 1, 2021

Hi ██,

Thanks for the email.

The Hopkinton School District has not adopted Critical Race Theory...

The District is entering a process to learn more of the experiences of others and have conversations with the community about this work.

Please know I will reflect upon this email and appreciate your perspective.

Steve

On Wed, Mar 31, 2021 at 4:19 PM ██████████████████.com> wrote:

Mr. Chamberlin:

We have three children in the Hopkinton School System, one at Maple Street and two in the Middle High School. According to your email below, it would strongly appear that the Hopkinton School District faculty, at all levels, is being trained to teach critical race theory to Hopkinton students.  Is this correct?  If so, please point us to the curriculum for both Maple Street and Middle High School that incorporates the teaching and/or theories espoused in the three books that you referenced below.

As you are well aware, critical race theory is an ideology which falsely maintains that the United States is a fundamentally racist country and that the Constitution, capitalism, and individual rights must be overthrown in the name of "antiracism." Kendi, the author you reference below, advocates for the discrimination against Americans according to their ethnicity – it's OK, he posits. He writes: "[t]he defining question is whether the discrimination is creating equity or inequity. *If discrimination is creating equity, then it's antiracist.* If discrimination is creating inequity it is racist." This is how you become an antiracist – discriminate against whites. How is this acceptable? Critical race theory ignores the vast amount of empirical evidence that family structure, education, and employment are the drivers of inequality. Instead, every instance of disparity between ethnicities – according to Kendi - is evidence of racial discrimination. All other causal factors cannot be considered. Moreover, if you are white, you are inherently racist and must atone for your sins. This type of theory encroaches upon our Christian beliefs and I am positive that others in the community would agree. Kendi, and others like him, refuse to judge people based upon the content of their character, but *only* on the color of their skin. This is quintessential racism. Teaching our children to feel shame because of the color of their skin – something they have no control over – is despicable. Teaching our youngsters to hate this Country runs quite close to advocating subversive doctrines prohibited under NH RSA 191:1. It is identity-based Marxism.

From our experience, the children in Hopkinton are raised by some pretty amazing parents.  They do not see color, they see each other as human beings. I know that we have raised our kids to treat others with the respect that they deserve, regardless of their ethnicity. Critical race theory vehemently rejects such a notion. Instead, critical race theory *requires* the kids to "see color" and act accordingly – this is incredibly divisive. It's espoused goal is to manufacture conflict between ethnicities.

If the Hopkinton School System is teaching critical race theory we need to know this immediately.  Thank you for your immediate attention, we look forward to hearing from you soon.



## Orr&Reno
**Sustained Excellence Since 1946**

45 South Main Street, P.O. Box 3550
Concord, NH 03302-3550
Phone: 603.224.2381
Direct Ext: 603.223.9187
Fax: 603.223.9087
www.orr-reno.com

This transmission is intended only for the designated recipient(s). It contains confidential information that may be subject to the attorney-client privilege or other confidentiality protections under applicable law. If you are not a designated recipient, you must not read, use, copy or distribute this message. If you received this transmission in error, please notify the sender by telephone (603.224.2381) or by reply e-mail and delete this message.

**From:** mssnews <mssnews-bounces@hopkintonschools.org> **On Behalf Of** Steven Chamberlin
**Sent:** Friday, March 19, 2021 12:39 PM
**To:** Harold Martin School <hmsnews@hopkintonschools.org>; HMS School Staff <hms@hopkintonschools.org>; HSD Email List Serve <hsdnews@hopkintonschools.org>; Maple Street School <mssnews@hopkintonschools.org>; Maple Street School Staff <mss@hopkintonschools.org>; Middle and High School <hmhsnews@hopkintonschools.org>
**Subject:** [MSS News] Annual Meeting and HSD - Hopkinton Town Library Hopkinton Reads Program

March 19, 2021

Hello Everyone -

The third and hopefully final stage in the 2021 version of the Hopkinton School District Annual Meeting - the drive-through vote - will take place tomorrow (Saturday) from 8:00 am - 2:00 pm at Hopkinton Middle and High Schools. Please remember to enter through the Keasare Avenue entrance. To reduce the early rush, Moderator Newsom is encouraging people to come after 10:00 am if possible.

***Status Report - Case Update - as of March 19***
Harold Martin School
No staff members are currently impacted.
One student is in dilation.
Two students are waiting for test results.

Maple Street School
Two students have confirmed positive tests and are in isolation.
Four staff members are out waiting for test results.
Two teachers are in quarantine.
Two students are in quarantine.

Hopkinton Middle and High Schools
No staff members are currently impacted.
Threes students are in quarantining; one is ill, waiting for test results.

DOE-07889

Please remember to complete the screening and reach out to the school nurses with any "yes" answers to the questions.

***Hopkinton School District joins the Hopkinton Reads Program***
The Hopkinton School District and the Hopkinton Town Library are working together to create conversations about culturally responsive teaching and learning. Dr. Dottie Morris, Associate Vice President for Institutional Equity and Diversity at Keene State College, will be leading the discussion.

The event will take place through zoom on Thursday, March 25, beginning at 7:00 pm. Please register for the event at the following link.

https://keene.zoom.us/meeting/register/tZMvcu6tqzoqE9CA0LF5AjBMoGcTZLv_AkPz

I hope you will join this critical discussion.

Thank you for your support. Have a great weekend.

Steve


--
Steven M. Chamberlin, Superintendent
Hopkinton School District
"Above All, Care"

204 Maple Street
Contoocook, NH 03229
Office: (603) 746-5186
schamberlin@hopkintonschools.org

 PLEASE CONSIDER THE ENVIRONMENT BEFORE PRINTING THIS E-MAIL.
-------------------------------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: This email and any attachments thereto are intended only for use by the addressee(s) named herein and may be proprietary, confidential, and/or privileged, and the disclosure is governed by applicable law.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying this email and any attachments thereto, without the prior written permission of the sender, is strictly prohibited. If you received this email in error, immediately telephone or e-mail the sender, and permanently delete the original copy.  The sender accepts no liability for any damage caused by any virus transmitted by this e-mail. Thank you.
-------------------------------------------------------------------------------------------------------


--
Steven M. Chamberlin, Superintendent
Hopkinton School District
"Above All, Care"

204 Maple Street
Contoocook, NH 03229
Office: (603) 746-5186
schamberlin@hopkintonschools.org

 PLEASE CONSIDER THE ENVIRONMENT BEFORE PRINTING THIS E-MAIL.
-------------------------------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE: This email and any attachments thereto are intended only for use by the addressee(s) named herein and may be proprietary, confidential, and/or privileged, and the disclosure is governed by applicable law.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution, or copying this email and any attachments thereto, without the prior written permission of the sender, is strictly prohibited. If you received this email in error, immediately telephone or e-mail the sender, and permanently delete the original copy.  The sender accepts no liability for any damage caused by any virus transmitted by this e-mail. Thank you.
-------------------------------------------------------------------------------------------------------

# EXHIBIT 71

Redacted version of June 14, 2022 Email to R. Farrell (Depo. Ex. 36)

2078



**EXHIBIT 36**

R. Farrell

5/18/2023

Reporter: Sharon Saalfield
RDR, CRR

**From:** ▮ ▮ ▮ @aol.com>

   **To:** "Stephen.W.Berwick@doe.nh.gov" <Stephen.W.Berwick@doe.nh.gov>

**Subject:** Fwd: Oyster River DEIJ coordinator

   **Date:** Tue, 14 Jun 2022 11:22:04 +0000 (UTC)

**Importance:** Normal

**Inline-Images:** Screenshot_20220614-063833.png; Screenshot_20220614-063802.png; Screenshot_20220614-063739.png

---

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

-----Original Message-----
From: ▮ ▮ @aol.com>
To: RICHARD.J.FARRELL1@DOE.NH.GOV <RICHARD.J.FARRELL1@DOE.NH.GOV>
Sent: Tue, Jun 14, 2022 6:42 am
Subject: Oyster River DEIJ coordinator

Good morning Mr. Farrell,
I wasn't sure exactly who to contact within the board of education, I found your email under code of ethics complaints.
Oyster River has hired a diversity coordinator, Rachael Blansett, who runs a blog called "2 Heauxes". An openly racist blog
which thankfully parents in the district saw before she made it password protected.
The shirt she is wearing for the press release says "Pro black, Pro Queer, Pro Hoe".
I've attached images of her site, clearly fueling racism which isn't needed in our schools.
This individual should not be guiding children, of which she clearly states is not a fan of the color they are.

I've attached a few images.
Thank you for your time.

-Concerned Parent







DOE-09911

 **2 Happy Heauxes**

# Wh*te Women: The Cultural Competency Starter Pack

## S1: EP1 - *"Top 10 Do's & Don'ts For White Women"*

- Do your baby's hair, bitch
- WASH YOUR FUCKING LEGS
- Do say "excuse me" when you need to cut around someone in a public space (this includes the sidewalk)
- Do give CREDIT where CREDIT is due aka Black women and women of color
- Do season your food (we promise you, it'll taste better)
- Don't get dreads. Just don't. Please.
- Don't wear Rainbows or





Sent from the all new AOL app for Android

# EXHIBIT 72

DOE Nov.
15, 2021
Email
Exchange

(Depo. Ex.
22)

**From:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>

**To:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>

**Subject:** RE: New Hampshire Moms for Liberty chapter offers $500 to anyone who can catch teachers breaking a new 'discrimination' law

**Date:** Mon, 15 Nov 2021 18:26:03 +0000

**Importance:** Normal

An Anti LGBTQ group is also offering $500

**EXHIBIT 22**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

*The contents of this message are CONFIDENTIAL Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is PROHIBITED. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Sent:** Monday, November 15, 2021 1:25 PM
**To:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Subject:** RE: New Hampshire Moms for Liberty chapter offers $500 to anyone who can catch teachers breaking a new 'discrimination' law

I saw that when I was talking with Chris earlier today

**From:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Sent:** Monday, November 15, 2021 12:48 PM
**To:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Subject:** New Hampshire Moms for Liberty chapter offers $500 to anyone who can catch teachers breaking a new 'discrimination' law

I thought that you'd be interested in this article from Business Insider Australia:
https://www.businessinsider.com.au/anti-crt-moms-for-liberty-teachers-breaking-new-discrimination-law-2021-11

# EXHIBIT 73

# Redacted version of Nov. 15, 2021 F. Edelblut Email Exchange

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "Houghton, Kimberly C" <kimberly.c.houghton@doe.nh.gov>
**Subject:** FW: Please comment on the "bounty" being placed on NH educators
**Date:** Mon, 15 Nov 2021 19:28:08 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov




New Hampshire
**Department of Education**

*The contents of this message are confidential.  Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited.  If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ████████████████@gmail.com>
**Sent:** Monday, November 15, 2021 2:24 PM
**To:** Walker, Kate <Kate.A.Walker2@doe.nh.gov>; Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>; Governor Sununu <governorsununu@nh.gov>
**Subject:** Please comment on the "bounty" being placed on NH educators

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Good afternoon,

I am a history and English teacher who has just moved to New Hampshire after teaching for several years in Detroit and Philadelphia. I have an undergraduate degree in history and a master's in secondary education, and I take my job very seriously. Like most educators, I find myself working well beyond my contracted hours to plan, grade, and support my students both academically and in their social-emotional lives. I am an advocate for *all* students and work to provide them with a rich and inclusive curriculum that highlights the experiences of a diverse nation - which is what the U.S. is and has historically been.

The "divisive concepts" law, as written, is certainly one thing. The language is very clearly broad in its conception of oppression and in identifying ways in which educators should not be discussing inherent superiority or inferiority. However, the spirit in which this law was written seems to reflect a political agenda of those who specifically do not want to revisit traditional historical narratives with a critical lens and an eye to the experiences of marginalized peoples.

Regardless of anyone in the Department of Education or Governor's Office political beliefs, it should deeply concern you that there are groups like Moms for Liberty NH who are actively calling on parents to report educators in order to potentially receive a bounty of $500 for successful prosecution and loss of license. You know as well as I do that people will be rushing to report educators for even broaching the topics of racism, sexism, or other forms of discrimination along the lines of a McCarthy-era witchhunt.

There is a dire shortage of highly qualified educators both in this state and across the country. We are still dealing with a pandemic and have not had a moment to address any of the many collective traumas we have endured during the past 18 months. To remain silent while teachers are being targeted in this manner is criminal.

I look forward to reading your timely public condemnation of this group and their scare tactics.

Thank you,

████████████

# EXHIBIT 74

Dec. 28, 2021 F. Edelblut Email Exchange

(Depo. Ex. 43)

EXHIBIT 43
WIT 2088 _Leblut_
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "Mike Breen" <dr.breen@roadrunner.com>
**Subject:** RE: Request for information
**Date:** Tue, 28 Dec 2021 22:08:21 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

Dr. Breen,

Information relative to New Hampshire educators can be found here: Bureau of Credentialing | Department of Education (nh.gov)

Simply click on "Educator Search," enter the educators name, and the relevant information is available.

Please let me know if you need any additional information.

*Frank Edelblut*

Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Mike Breen <dr.breen@roadrunner.com>
**Sent:** Monday, December 27, 2021 6:17 PM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Subject:** Request for information

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

December 27, 2021
Frank Edelblut, Commissioner
New Hampshire Department of Education
RE: Request for information

This request emanates from Critical Race Theory's (CRT) inculcation in public school curriculums. Rejecting biological and historical realties, and decades of economic and social science research, CRT's cult like assertions include convictions that all racial economic disparities are caused solely by racism, all white individuals are irrefutably racist since infancy, the United States was and is still purposed to promote racism, and genders are disengaged from biology. These bizarre beliefs, alongside allied "cancel culture" efforts of this ilk, which "Great Leap Forward" witnesses say parallel the 1960s social experiment in China, sponsor a science-free evolving eugenics style taxonomy of identity intersectionalities of Marxist-like "oppressed" population cohorts. In this vein, investigative surveys, disengaged from legitimate educational goals, explore some student's intersectionalities of proletarian like "oppression" and other student's bourgeoisie like "privilege." These

2089

investigations document the race, gender, emotional, mental and physical disabilities, economic status of families, and whether parents are living together. Pornographic materials are often employed alongside inquiries of unprepared children as to whether they are "in the right body." Typically, parents are not informed and/or are misled about their children's real or conjured proclivities. Like parents, professional child psychologists are also excluded in this process. Typically, ironically, paternalistic secretive School Boards have denied these practices take place in schools while the Marxist Zinn website accumulated public educator pledges to violate state laws prohibiting its discriminatory practices in the classroom.

New Hampshire, among other States enacted legal prohibitions against the anti-intellectual propagation of harmful CRT beliefs when being taught as fact and/ or when being used to discriminate, segregate or otherwise abuse students. Attached is a list of New Hampshire educators who made the Zinn pledge. We seek to contact the appropriate School Administrative Units (SAUs) to determine if, among the vast majority of otherwise professional New Hampshire educators, these self-avowed lawless educators have fulfilled their pledge to discriminate against, mislead, shame or emotionally incense students, by communicating as factual:

"that people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or "inferior" to another person of any of these immutable characteristics or personal identities."

"that an individual is inherently racist, sexist or oppressive, whether consciously or unconsciously, because of some immutable characteristic or group identity."

- "that an individual should be discriminated against or receive adverse treatment because of some immutable characteristic or group identity;" or
- "that people of one identity group or immutable characteristic should not treat other classes of people equally, without regard to those traits or classes."

Please provide us with the appropriate SAU's of these educators. We are confident that this information is available under New Hampshire's Right-to-Know law. That said, we thought it would be easiest for both us and your department if we simply submitted this informal request. This email will be followed by a hard copy letter.

Respectfully submitted,

Michael D. Breen, Ph.D.

Director, No Left Turn in Education, New Hampshire Chapter

DOE-00849

**EXHIBIT 75**

Mar. 4, 2022
HRC Letter


(Depo. Ex. 53)

# New Hampshire Commission for Human Rights



**COMMISSIONERS**
CHRISTIAN KIM, CHAIR
HARVEY KEYE
ALEX SAMUEL
NANCY G. LEROY
BASRA MOHAMED
DOUGLAS J. PALARDY
ELIZABETH ASCH

2 INDUSTRIAL PARK DRIVE, BLDG. 1
CONCORD, NEW HAMPSHIRE 03301
TEL (603) 271-2767
TDD Access: Relay NH 1-800-735-2964
FAX (603) 271-6339
E-MAIL: humanrights@nh.gov
www.nh.gov/hrc

**EXECUTIVE DIRECTOR**
AHNI MALACHI

**ASSISTANT DIRECTOR**
SARAH E. BURKE COHEN, ESQ.

**INVESTIGATORS**
KATRINA E. TAYLOR
NICOLE LEMELIN
DAN DEYERMOND
KATE MULLEAVEY

**PARALEGAL**
KELLY MEDEROS

March 4, 2022
Representative Charlotte DiLorenzo
9D River Street, Apt. D34
Newmarket, NH 03857

> **EXHIBIT** 53
> WIT: _Malachi_
> DATE: 5-24-23
> Cynthia Foster, RPR, LCR #14

Re: Request for Information under the New Hampshire's Right to Know Law, RSA 91-A

Dear Representative DiLorenzo,

Thank you for your email and letter regarding your Right to Know request pursuant to NH RSA 91-A. In providing answers and additional information to your initial question, I have taken the liberty to further explain several related areas contained in your request.

Generally speaking, the Commission's response to your initial inquiry relative to the statistical number of complaints in NH Public Schools (K-12), Charter Schools, and Public Academies alleging a violation under NH RSA 354-A:29-34 and RSA 193:40 which became effective on June 25, 2021, that have been filed with the Commission is below. It is important to state for the Commission, a "complaint" is defined as a verified (signature of the Complainant witnessed by a notary) and docketed (officially received by the Commission) charge of discrimination.

> *"Zero charges have been filed since the Right to Freedom From Discrimination in Public Workplaces and Education law went into effect."*

With that said, the remainder of the questions presented relative to NH Public Schools (K-12), Charter Schools, and Public Academies would also be "zero" as well as there is no initial charge. However, I thought it instructive to further expand on the answer to each question and provide needed context on the Commission's process as well as our statutory requirements further explained by our Administrative Rules.

## Information Relative to NH Public Schools K-12, Charter Schools, and Public Academies:

1. Number of school district complaints filed since June 25, 2021, to present date
   a. The specific, statistical answer to this question would be "zero" as stated above.
   b. Although the Commission is allowed to provide statistical information, in general, the Commission has stated administrative rules that speak to the confidentiality afforded during our process.
   c. Pursuant to our Administrative Rules, specifically N.H. Admin. R. PART HUM 219.04, which reads in part *"[n]o information regarding complaints filed, investigation of complaints, pre-*

*NH Commission for Human Rights – Response to 91-A Request*                                                                 *1*

2092

*determination settlement negotiations, or conciliation negotiations shall be disclosed to the public by any commissioner or staff member prior to issuance of a notice of public hearing after a finding of probable cause."* Therefore, the Commission cannot acknowledge and/or provide you at any time with information as outlined in a request specific to the confidential elements of a charge, until such time as our rules release us to do so.

d. To further speak to the Commission's confidentiality, RSA 354-A:21(II), specifically discusses our investigation and complaint review process be it a housing, employment, public accommodation, or an education complaint (education was added to RSA 354-A upon passage of SB263 in 2019). To the extent policy decisions were made to keep this portion of our process confidential, those pronouncements were made by the legislature when RSA chapter 354-A was first codified in 1965. As you know, all the regulations do is flesh out what the statute already provides which is confidentiality during the pre-Probable Cause *("PC")* investigation and conciliation process.

e. Additionally, the adjudication of a complaint for which there is a PC finding is a public proceeding whether that adjudication is done by the Commission or in Superior Court. Even No-Probable Cause *("NPC")* findings can become public if the Complainant seeks judicial review in Superior Court.

2. Number of school district complaints resolved beginning June 25, 2021, to present date
   a. The statistical answer to this question would be "zero" based on the general answer written above.

3. Number of school district unresolved complaints beginning June 25, 2021, to present date
   a. See response in question 1, subsections 1.b – 1.d.

4. Number of school district complaints dismissed beginning June 25, 2021, to present date
   a. If I understand the use of the phrase "complaints dismissed", I will assume you are asking about "docketed charges that are closed or not taken by the Commission". If that is the case, a docketed charge would have one of two reasons to be dismissed:
      i. there has been a full investigation and there is a finding of NPC or
      ii. the Commission does not have jurisdiction.
   b. If the Commission has performed an investigation and the Investigating Commissioner finds NPC, the individual still retains the right to request a 'Motion for Reconsideration' ("*Motion*") of the finding pursuant to NH Admin. HUM 210.03. The Complainant may also appeal to Superior Court pursuant to RSA 354-A:21(II)(a) and RSA 354-A:22(IV).
   c. If the Motion is denied by the Commission, the complaint is closed (pursuant to Admin. Rule HUM 317).
   d. Finally, please see my response in question 1, subsection 1.c as it speaks to confidentiality relative to a dismissed complaint (i.e., NPC finding or if the Commission has no jurisdiction).

5. Number of school district educators disciplined beginning June 25, 2021, to present date
   a. To fully answer your question, it is important to have a comprehensive understanding of the complaint process. The Commission, in accordance with our statute and outlined by our rules, has the power to receive, investigate, and pass upon allegations of discrimination. As such, an assessment is made to ensure the complainant has a *prima facie* case (i.e., "at first sight" the

claim meets the legal standard to file a charge with the Commission). If this is the determination, the allegation of discrimination is verified (signed by the Complainant and witnessed by a notary), submitted to the Commission, and becomes a docketed charge of discrimination whereby both parties are notified in writing.

b. The complaint is investigated, and a determination is made by the Investigating Commissioner whether the charge of discrimination has a *Probable Cause (PC)* or *No Probable Cause (NPC)* finding. If the determination is an NPC finding, the process ends with both parties being notified of the outcome. The Complainant does, however, have a prescribed window of time for an appeal should they choose to request one. Once that window is closed, so is the case.

c. If there is a PC finding, the parties move on to *Conciliation* (i.e., settlement of the case with the assistance of a neutral third party, the Commission) or a *Public Hearing*. If Conciliation fails, a public hearing is scheduled then noticed appropriately for the public. At the end of the public hearing, the Commission panel will deliberate and make a finding. The parties are notified of the Commission's decision and said decision is uploaded to and maintained on the Commission's website where the public has access.

d. Both parties are afforded the opportunity to appeal a decision or request that a motion be granted. Should either party (Complainant or Respondent) disagree with the outcome of the investigation, they can request the decision be reconsidered. Additionally, should either party disagree with the outcome of the hearing, they have an opportunity to appeal in a public forum, New Hampshire Superior Court.

e. Finally, the Department of Education (DOE) would be the arbiters of "educator discipline" according to RSA 193:40 (IV), and as "educator" is defined by RSA 193:40 (V).

    i. The Commission would not provide "discipline"; however, the Commission would provide either a sustained finding that discrimination has taken place based upon RSA 354-A:29-33, or, the charge of discrimination has not met the burden and would therefore be dismissed. The parties, as discussed earlier, do retain the right to settle the case.

    ii. As such, the DOE would not weigh in on the Commission's work, likewise, the Commission would have no bearing as to the "educator discipline" that would presumably take place after the Commission has completed its work.

    iii. For more specific information relative to your question, although there are no complaints today, discussion would need to take place with DOE regarding "educator discipline".

6. Names of School Districts, NH Charter Schools, and Public Academies disciplined beginning June 25, 2021, to present date

a. Since the initial question is "zero" relative to complaints made, the answer to this question is "zero" as well.

b. However, the DOE would be the correct agency to provide answers relative to questions about "discipline" as this is a function of RSA 193:40.

Relative to your final question:

    *"Please furnish a summary of the nature of all complaints filed, dismissed, and investigated,"*

a. Since the initial question is "zero" relative to complaints made, the answer to this question is likewise "zero" as well.

b. The Commission is able to provide statistical information such as the basis for charges filed (race, sex, national origin, etc.), or the number of charges filed under a particular basis.

c. As previously outlined in question 1, subsections 1.b – 1.d, specific information relative to filed, dismissed, or investigated complaints, would fall under the confidentiality provided to both parties per the Commission's Administrative Rules established in 1965.

I hope the information provided on the above pages has been helpful. If further clarification on any of the points covered is needed, please do not hesitate to reach out.

Respectfully,

*Ahni Malachi*

Executive Director
NH Commission for Human Rights

**Links:**
NH Statues RSA 354-A located here
General Court State of NH Administrative Rules: Human Rights Commission Rules located here

Cc: Commissioner Frank T. Edelblut

DOE-10272

# EXHIBIT 76

## Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on November 20, 2020

11/23/21, 12:26 PM    Case 1:21-cv-01077-PB    Document 25-17 Implicit Bias Training | NH Department of Justice Filed 09/14/23    Page 2 of 109

2096

**New Hampshire**

# Department of Justice

*Office of the Attorney General*

# 2020 Implicit Bias Training Hosted by the New Hampshire Attorney General's Office

*November 20, 2020 9 a.m. – 12:30 p.m.*

*Required for all attorneys, investigators, legal staff and victim/witness advocates in the Attorney General's Office, all County Attorney Offices, all state agency attorneys, and all prosecutors, including police prosecutors.*

## Presenters:

### Jarvis Parsons - District Attorney of Brazos County Texas

- Bias: What You Don't Know Can Hurt Others 📄

Currently serving his second term, District Attorney Parsons was an assistant D.A. for 10 years prior. A Louisiana native, Parsons graduated from McNeese State University in 1998 and graduated from the University Of Maine School Of Law in 2001. He was a judicial law clerk for a year in Warren County, New Jersey before becoming a Brazos County prosecutor in 2002, prosecuting everything from state jail felonies up to death penalty cases and everything in between.

Parsons is currently the chairman of the board for the Texas District and County Attorneys Association and has served on its Legislative Committee, Training Committee, and is one of the founding members of the Diversity Recruitment and Retention Committee.

He is on the Board of the TEEX Central Texas Police Academy, which guides the Police Academy leadership on needs specific to training and courses and establishes standards and methods to evaluate the effectiveness of training, equipment and facilities at the training academy.

### James McKim, PMP, ITIL - President of the Manchester NAACP

- Presentation: Are You Your Implicit Bias? 📄

Mr. McKim is Founder and Managing Partner of Organizational Ignition, a management consulting firm. Prior to his current role, Mr. McKim was Chief of Staff of the Technical Training Division at Hewlett Packard Enterprise where he led the organization to deliver award-winning performance enhancement solutions. He has, also, held business and technology leadership roles in for-profit and non-profit organizations such as FIRST, Hawkeye Data, LLC, and Digital Equipment Corp.

Mr. McKim has facilitated startup and growth of statewide organizations such as the Economic Vitality New Hampshire and the Software Association of New Hampshire. He has played an active role in the shaping of public policy affecting the Technology industry. He serves, currently on several Boards playing leading roles as Vice-President of Membership a the Project Management Institute NH Chapter, Chair of the NH PBS Finance Committee, Chair of the Episcopal Church's National Executive Council Committee Anti-Racism, and President of the Manchester NAACP.

## Links:

- Register for Implicit Bias Training **[https://nhgov.webex.com/mw3300/mywebex/default.do? nomenu=true&siteurl=nhgov&service=6&rnd=0.13424712364303681&main_url=https%3A%2F%2Fnhgo v.webex.com%2Fec3300%2Feventcenter%2Fevent%2FeventAction.do%3FtheAction%3Ddetail%26%26 %26EMK%3D4832534b00000004dacaad18d1077ec99dbcbbc64d287582dc9277bc4b1ed0dcae760fbaffe55 13f%26siteurl%3Dnhgov%26confViewID%3D175086893217620704%26encryptTicket%3DSDJTSwAAAAR ZS9f3rBoMFJ_v1B4et_2m4n2dUMlng2m3lLOSmjTHFA2%26]**

- Certificate of Attendance [PDF]

- Implicit Bias Training Itinerary [PDF]

- Implicit Bias Training Video

[PDF] Portable Document Format (.pdf). Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

New Hampshire Department of Justice
33 Capitol Street | Concord, NH | 03301
Telephone: 603-271-3658

# NEW HAMPSHIRE ATTORNEY GENERAL'S OFFICE IMPLICIT BIAS TRAINING

November 20, 2020

## <u>AGENDA</u>

**9:00 a.m.** – Welcome and Introduction

*Attorney General Gordon J. MacDonald*

*Senior Assistant Attorney General David Rotman*

**9:10 a.m.** – Presentation*

*Jarvis Parsons, District Attorney of Brazos County Texas*

**10:50 a.m.** – Presentation*

*James McKim, PMP, ITIL, President of the Manchester NAACP*

**12:25 p.m.** – Concluding Remarks

*Attorney General Gordon J. MacDonald*

*There will be a five minute break during each presentation.*

# BIAS: WHAT YOU DON'T KNOW CAN HURT OTHERS

## Jarvis Parsons,
## Brazos County District Attorney

# How I Became a Prosecutor



# #SQUAD GOALS

- To be intelligent as we can is a moral obligation—that if we haven't exhausted every opportunity to know whether what we are doing is right, it will be **no excuse** for us to say that we meant well.
  - John Erskine (1915)

3



# Prosecutorial Power

- Charging Decision
- Bond
- Jury Selection
- Plea Offer
- Closing Argument

# Cognitive Bias Defined

- A **cognitive bias** is a type of error in thinking that occurs when people are processing and interpreting information in the world around them.

- Cognitive biases are often a result of your brain's attempt to **simplify** information.



# Confirmation Bias

- **The tendency to search for, interpret, focus on, and remember information in a way that confirms ones preconceptions/beliefs. \*\***
- **Also called the "Prosecutor's Bias".**
- **What you believe, you see.**

# **Confirmation Bias**



# CONFIRMATION BIAS: REAL WORLD EXAMPLE



# TUNNEL VISION



# What You See Is All There Is



# % Of DV Victims Who Recant?

We presume they will recant…so we look to:

911 call, EMS record, Medical Records

Social Media, text messages, jail calls

Determine Primary Aggressor On Scene

Meet w/victim early in process, neighbors, family, friends, etc...

Look for prior victims

13

# Just World Theory



# Just World Theory

People have an automatic tendency to look for something or someone to blame for unfortunate events. But rather than simply attributing a bad turn of events to bad luck, people tend to look at the individual's behavior as a source of blame.

- What was she wearing?

- Why did she let him walk her home?

- How much she had to drink?

# Just World Theory



# Just World Theory



# Defensive Attribution



# Defensive Attribution

- The similarity of the witness to the person(s) involved in the misfortune – in terms of situation, age, gender, personality, etc. – changes the amount of blame one is ready to ascribe.

- This is related to the empathy response, which is more likely to be activated if the witness sees similarities between themselves and the person(s) involved.

# Defensive Attribution



20



# Michael Morton Act



# Implicit Bias: How We See People

2121



23

# Implicit Bias

We all have differences. We see age, gender and skin color. That's not bias.



# "Halo Effect"

- Research has shown that we automatically assign to good-looking individuals favorable traits such as talent, kindness, honesty, and intelligence –*Thorndike 1920*



# "Halo Effect"

- Physically attractive individuals are more likely to be…
  - Hired and less likely to be fired
  - More likely to get a call back for interviews
  - Higher wage earners (10-15%)
  - Less likely to get in trouble when they are children

# Sexual Harassment Study



# GENDER



# Gender Bias:
# Police Chief Edition

Michael vs. Michelle

- Michael—streetwise, worked tough neighborhoods, got along with fellow officers. Poorly educated and lacked administrative skills.

- Michelle—smart, well schooled and experienced in administration, family oriented, little street experience and didn't get along with officers.

# Gender Bias:
# Who Do You Hire?



# Gender Bias:
# Who Do You Hire?

When the male applicant had experience and no education, participants chose…

The Man

When the male applicant had no experience and was educated, participants chose…

The Man

31

# Gender Bias:
# Women's Studies Professor



# Implicit Racial Bias

- Researched for over two decades.
- A majority of Americans harbor negative implicit attitudes toward African-Americans

# Implicit Racial Bias

- Influenced by attitudes and stereotypes that we all hold based on our experiences.

- Guides how we act in a subconscious way, even if we renounce prejudice and stereotypes explicitly.





# Microaggression

**Prejudices that leak out in many interpersonal situations. A.K.A. Slights, insults, indignities and denigrating messages.**

# Microaggression Examples

- Can I touch your hair?
- You don't sound black.
- You look too white to be Hispanic/Arab/etc...
- When I look at you, I don't see color.

# Robbery In Black and White

- University of Hawaii Study, 66 participants
  - Japanese American, White, Chinese, Native Hawaiian, Pacific Islander, Korean American and Latino

# Robbery In Black and White



# Ambiguous Crime Details

- Prior drug addict, served with eviction notice
- Left handed
- Golden Gloves boxing champ in 2006
- NO License
- Owner Identifies defendant's voice
- Defendant had movie ticket stub for show that started 20 minutes before robbery

# Robbery In Black and White: Results

How Guilty Is The Defendant?
Scale (0-100)
- Darker Skin Tone  66.97

- Lighter Skin Tone  56.37

# What About Victims?



# U. Nebraska at Lincoln: Harrison and Esqueda (2000)

- Police respond to anonymous phone call reporting a domestic dispute.
- Jeff Davis is a Black (White) male,
- Cindy Davis is a Black (White) female,
- Drinking and Non-drinking scenarios.

44

# Same Facts? Different Race? Different Results

- AA women who drank were perceived as **more blameworthy** than AA women who did not.

- **No distinction** between drinking and non-drinking white females.

- AA women received **more blame** in DV situations for the **same amount** of drinking as white women.

# Not Just Black Women…

- Black boys as young as 10 are seen as **more responsible** for their actions compared to their white counterparts.
  - Viewed as **older** (up to 4½ years) and less innocent.
  - *The Essence of Innocence: Consequences of Dehumanizing Black Children (Goff, 2014).*
- Black Girls are viewed as **less innocent** and need **less nurturing** than their white counterparts.
  - *Girl Interrupted: The Erasure of Black Girls Childhood (Epstein, Blake & Gonzalez, 2017)*

46

# But I'm Educated…



# Written in Black and White

Memo drafted by a hypothetical law student given to 60 partners in 22 law firms.

- 37 men, 23 women, 39 white,

- 21 racial/ethnic minorities

- Memo had **22** writing and analytical errors.

- Same memo. **Only** difference was race of the "writer".

# Results

- **White "Thomas Meyer" averaged 4.1/5.0.**

- **Black "Thomas Meyer" averaged <u>3.1</u>/5.0 scale, for the same memo.**

# Quantitative Results: Errors Spotted by Lawyers

**White Thomas Meyer:**

**10.2 errors found avg.**

**Black Thomas Meyer:**

**<u>14.6</u> errors found avg.**

# Qualitative Results: Opinion of the Students

**White Thomas Meyer:**

"good writer but needs to work on", "has potential", "good analytical skills".

**Black Thomas Meyer:**

"Needs lots of work", "can't believe he went to NYU", "average at best".

51

# Greg vs. Jamal

- Study of 1300 ads and over 5,000 resumes.

- White-sounding names like Emily or Greg get 50% more call backs for job interviews with the exact same resume.

- "A white-sounding name yields as many more callbacks as black sounding name with **eight** years of experience".
  - *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment in Market Discrimination. (Bertrand and Mullainathan, 2003)*

52

# The Implicit Association Test (IAT)

- **Designed to measure implicit bias**
- **https://implicit.harvard.edu/implicit/takeatest.html**
- **Flowers vs. Insects**

# My Story

- **Took the Implicit Association Test…**



🔒 implicit.harvard.edu



## Your result:

**Your data suggest a slight automatic preference for White people over Black people.**

The sorting test you just took is called the Implicit Association Test (IAT). Half of you completed the task for African Americans and European Americans, whereas the other half completed the task for Black People and White people. You categorized good and bad words with images of African Americans (or Black People) and European Americans (or White People).

# My Story

- **About 50% of African-Americans show a preference toward whites.**
  - ***Nosek, Banaji, & Greenwald, 2002***.



# Attacking Implicit Bias

- Understand and acknowledge cognitive bias
- Start With Yourself And Just Begin
- Evidence/words that hits on a stereotype (misdemeanor murder).

# Blinding



# Other Disciplines Use Blinding

- Scholarly Journal editors routinely remove author names and institutions.
- Professors mask student names when grading
- Lineups (Double Blind Lineups)
- Federal Death Penalty Decisions

# Empirical Example



# Orchestra Blinding Results

- **Using a Screen to conceal candidates from the raters increased the likelihood that a female would advance to the next round by**
- **11%**
- **During the final round "blind" auditions increased the likelihood of female musicians being selected by**
- **<u>30%</u>.**

# Outsmarting The Bias



# Collaboration



# Outsmarting The Bias: Group Decision Making

- 200 participants
- 83% white, 17% Black
- Ages 18-78
- Created 29 juries of 6 people per jury (some alternates).

# Outsmarting The Bias: Group Decision Making

- Viewed a video of a 30-minute Court TV summary of Black Male Defendant and White Female Victim.

- Heard testimony of 10 Witnesses (7 state & 3 defense)

# Outsmarting The Bias: Group Decision Making

**Recorded jury deliberations**

- **Looking for breadth of discussion**

- **Accuracy of statements**

- Corrected Inaccuracies

# Outsmarting The Bias: Group Decision Making

**Diverse Juries**

- **Discussed <u>more</u> facts**
- **Made <u>more accurate</u> statements of facts**
- **<u>Corrected</u> more inaccurate statements**

# IMPLICATIONS

**The more you bring in <u>different perspectives</u>, the better your outcome will be.**

2168

# Any Questions?

# Jarvis Parsons

## [jparsons@brazoscountytx.gov](mailto:jparsons@brazoscountytx.gov)

# 979-361-4320

# Are You Your Implicit Bias?

## James McKim

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Introduction



## What is the underlying issue in the photos?

# Objectives & Agenda

## Objectives

- Understand the depth of the problem with implicit bias
- Understand the 9 de-biasing techniques
- Understand how implicit bias & discrimination can be eliminated

## Non-Objective

- Make you an expert on Implicit Bias
- De-bias you

## Agenda

- Demographics
- 6 Key Concepts
- Manifestations of Implicit Bias – including in your own
- Forms/Types of Implicit Bias
- Eliminating Bias & Discrimination
- Wrap-up
- Homework

Copyright© 2020 Organizational Ignition

# Current NH Demographics By Age/Gender



Percentage in each age cohort per year of age.[1] Gray areas represent percentile bands from the states.
Scope: population of the United States, New Hampshire, and other states

Percentage in each age cohort per year of age.[1]
Scope: population of the United States and New Hampshire

Count  number of people in age cohort
%  age cohort as a percentage of the total population
[1] normalized with respect to the number of years in each interval

4

# Current NH Demographics By



## Race and Ethnicity                                      #1

Percentage of the total population.

*Scope: population of the United States and New Hampshire*

**Percentage of Population by Racial or Ethnic Group**
*Estimates for 2014-2018, Hispanic Origin Included in Racial Groups*

■ New Hampshire   ■ Manchester   ■ Nashua

Percentage of Population

<- Margin of Error

Black or African American          Asian          Hispanic or Latino, of Any Race

**Racial or Ethnic Group**
Note: Margins of Error represent 90 percent confidence intervals
Source: U.S. Census Bureau, American Community Survey, 2014-2018

New Hampshire Fiscal Policy Institute

Copyright© 2020 Organizational Ignition                    5

# 6 Key Concepts



# What is Race?



- Q: What word or phrase comes to mind after viewing this video?

VOX – "The myth of race, debunked in 3 minutes
https://www.youtube.com/watch?v=VnfKgffCZ7U

Copyright© 2020 Organizational Ignition

7

# Gender



Copyright© 2020 Organizational Ignition

8

# Diversity



*Diversity* is counting, and *inclusion* is cultivating… Diversity is being invited to the party, but inclusion is being asked to dance."

**VOL. 37, NO. 4**
ABA Bar Leader
"Beyond diversity: The bar leader's role in fostering inclusion"

Copyright© 2020 Organizational Ignition

# Equality Vs. Equity



2180

"isms"

Imagine…



**Structural/ Systemic Discrimination**

**Micro aggressions**

Using our power to reinforce our discrimination and prejudice in the institutions and groups to which we belong

**White Privilege**

**Discrimination** taking an action on our prejudice

**Prejudice** a value judgment based on our feelings associated with the stereotype

**Stereotype** an incomplete or distorted picture in our head

**Generalization:** The process of formulating general concepts by abstracting common properties of instances

Unconscious Implicit Bias

Copyright© 2020 Organizational Ignition

2181

# Structural/Systemic Discrimination



Media

Wealth

Housing

## Cultural

"Culture is how our bodies retain and re-enact history through the foods we eat; the stories we tell; the things that hold meaning for us; the images that move us...Change culture and you change lives.... Social activism is necessary for changing the world in productive ways." – Resmaa Menakem

## Institutional

Best Practices /Policies /Procedures

## Legal

State*      Local

Education

Criminal Justice

Copyright© 2020 Organizational Ignition

12

# The Cause of Discrimination…
# Unconscious Cognitive Implicit Bias



https://www.youtube.com/watch?v=KCgIRGKAbfc

Copyright© 2020 Organizational Ignition

# Examples of Implicit Bias on Individuals



A "Best"

B "Still Desirable"

C "Definitely Declining"

D "Hazardous"

Copyright© 2020 Organizational Ignition

# Interpersonal Examples of Implicit Bias

**Cases and deaths by race/ethnicity**

| Race/ethnicity | Percentage of population | Percentage of cases | Percentage of deaths |
|---|---|---|---|
| Black or African American alone | 1% | 6% ◆ | 2% |
| Hispanic or Latino * | 4% | 13% ◆ | 3% |
| Asian alone | 3% | 3% | <1% |
| Native Hawaiian and Pacific Islander alone | <1% | 0% ① | 0% ① |
| American Indian or Alaska Native alone | <1% | 0% ① | 0% ① |
| Two or more races | 2% | 0% ① | 0% ① |
| White alone | 90% | 74% | 94% |
| Some other race alone | <1% | 4% ① | <1% ① |



- **Discrimination in every day life & the emotional toll it takes**
- **Special fear of life when pulled over by police – regardless of agency**

Copyright© 2020 Organizational Ignition

# Examples of Implicit Bias on Organizations (Employment Cycle)











# Understand Your Own Biases (Breakout)

2186



- When and how did you first become aware that there was such a thing as racial/ethnic differences, and that people were treated differently on the basis of those differences?

- Growing up, what contact did you have with people whose racial and ethnic heritage was different from your own?

# 5 Minute Break



# Types of Implicit Biases

**Decision-making, Belief, and Behavioral/Confirmational (125+)**



- Automation bias
- Bias blind spot
- Dunning–Kruger effect
- Stereotyping
- Zero-sum bias

**Social /Attributional (220+)**



- Group attribution error
- In-group/Affinity
- Puritanical bias

**Memory Errors (40+)**



- Consistency bias
- Cross-race effect
- Stereotypical bias

Copyright© 2020 Organizational Ignition

# Bias Impact Context

- Information Overload
- Feelings Over Facts
- Need for Speed
- What to remember



**The Cognitive Bias Codex: A Visual Of 180+ Cognitive Biases**

Copyright© 2020 Organizational Ignition

# Eliminating Bias & Discrimination



Mindset

How we behave

How we think

Actions

Copyright© 2020 Organizational Ignition

# How We Think



## Which are You?

Copyright© 2020 Organizational Ignition 22

# Types of De-Biasing Techniques

## Countersterotype Training

- Dasgupta and Asagari (2004)

## Negation

- Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

## Perspective-taking

- Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

## Meditation/Lovingkindness meditation (LKM)

- Stell, A. J., & Farsides, T. (2016).

## Implicit bias workshops

- like the one we offer

Copyright© 2020 Organizational Ignition

# Critical Thinking/Decision-Making



Wasabi Learning Flow Charts   https://www.wabisabilearning.com/blog/5-useful-critical-thinking-flowcharts

Copyright© 2020 Organizational Ignition

24

# How We Behave



Communication

Difficult Conversations

Steps in Criminal Justice

Eliminating Discrimination

EQ

Copyright© 2020 Organizational Ignition

# Emotional Intelligence

- Critical in understanding and dealing with diversity is **Emotional intelligence**
- The ability to manage your own **emotions**, as well as the **emotions** of others.
  - Self (our own feelings and how they impact our perceptions an behavior - aka Implicit Bias) "How do I feel?"
  - Others (the feelings of others and why they behave the way they behave - aka empathy) "Put yourself in their shoes."

**Empathy**

Rapport    Affinity
           Communion        Emotion

Compassion

**Feelings**    Sorrow

**Pity**

Copyright© 2020 Organizational Ignition

# Understanding Communication Basics



*Shannon and Weaver Model*

*Dr. Albert Mehrabian's 7-38-55 Rule of Personal Communication*

Copyright© 2020 Organizational Ignition

27

2197

# Rules for Difficult Conversations



- Who's right?
- What was the intent?
- Who's to blame?

- Uncontrollable urge

**What happened**

**Feelings**

**Way forward: Shift to a learning stance**

**Identify**

- Have your feelings or they will have you!
- Not who's right - understand each other's story
- Don't assume they meant it - disentangle intent from impact
- Abandon blame

- Am I competent?
- Am I a good person?
- Am I worthy of love?

<u>Difficult Conversations </u>by Douglas Stone, Bruce Patton, & Sheila Heen

Copyright© 2020 Organizational Ignition

28

# Criminal Justice Process



https://www.fbi.gov/resources/victim-services/a-brief-description-of-the-federal-criminal-justice-process

# Pulling It All Together



Justice mindful
of an equity lens

2200

# Seeing Through an Equity Lens (Breakout)



- What decision is being made?
- Who is at the table?
- How is the decision being made?
- What assumptions are at the foundation of the issue?
- What is likely impact?
- What is your decision?



31

# Wrap-up

















What will you do?



**Counterstereotype Training**
- Dasgupta and Asagari (2004)

**Negation**
- Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

**Perspective-taking**
- Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

**Meditation/Lovingkindness meditation (LKM)**
- Stell, A. J., & Farsides, T. (2016).

**Implicit bias workshops**
- like the one we offer

Copyright© 2020 Organizational Ignition

# Homework Assignment

- Record an example of microaggression and what caused it to happened
- Record an example of where you observed/experienced white privilege
- Record an example of discrimination in an institution or organization
- Record an example of discrimination through culture



Copyright© 2020 Organizational Ignition

33

# Contact

James McKim

Organizational Ignition

James.McKim@organizationalignition.com

http://www.organizationalignition.com

# EXHIBIT 77

May 3, 2021 and May 4,
2021 Presentations to N.H.
Court System

# Week Three Agenda – Understanding the Communities We Serve

### May 3, 2021 – The Communities We Serve
*1 Granite Place*
**Facilitator: Gina**

9:00 – 10:00: Access to Justice: What do we mean?
- **Presenter(s):** Margaret Huang, Heather Kulp
- **Location:** In-person

10:00 – 11:00: New Hampshire's Diverse Communities
- **Presenter(s):** Dr. Jessica Carson, UNH Carsey School of Public Policy
- **Location:** WebEx

11:00 – 11:15: Break

11:15 – 12:45: Diversity, Equity, and Inclusion
- **Presenter(s):** James McKim, President, Manchester NAACP
- **Location:** WebEx

12:45 – 1:15 Lunch

1:15 – 2:15: Introduction to the Disability Community and Access to Justice (New Judge Education > Week 3 > Disability Community, Accessibility, and Access to Justice)
- **Presenter(s):** Pamela Phelan, Litigation Director, Disability Rights Center; Déodonné Bhattarai, Communications Specialist, Disability Rights Center
- **Location:** In-person

2:15 – 2:30: Break

2:30 – 3:30: Queer in the Granite State
- **Presenter(s):** Chris Erchull, Staff Attorney, GLBTQ Legal Advocates and Defenders (GLAD)
- **Location:** WebEx

3:30 – 4:15: Veterans Justice Outreach Program
- **Presenter(s):** Diane Levesque, Manchester VA; Daniel Bricker, Manchester VA
- **Location:** In-person

# Introduction to Diversity, Equity, & Inclusion

James McKim, Managing Partner
James.McKim@OrganizationalIgnition.com

Copyright© 2020 Organizational Ignition



Organizational
Ignition

# Imagine…

Copyright© 2020 Organizational Ignition

# Introduction



## What is the underlying issue in the photos?

Copyright© 2020 Organizational Ignition

3

# Objectives & Agenda

**Objectives**

- Understand basic concepts in diversity
- Relate your experiences to the diversity challenge

**Non-Objective**

- Make you an expert on diversity

**Agenda**

- 8 Key Concepts
- Manifestations of Implicit Bias
- Wrap-up

Copyright© 2020 Organizational Ignition

# 8 Key Concepts



# What is Race?



- Q: What word or phrase comes to mind after viewing this video?

VOX – "The myth of race, debunked in 3 minutes
https://www.youtube.com/watch?v=VnfKgffCZ7U

Copyright© 2020 Organizational Ignition

# Gender



# Age

# Characteristics of Generations

| | Traditionalists | Boomers | Gen X | Millennials |
|---|---|---|---|---|
| **Born** | 1922-1943 | 1943-1960 | 1960-1980 | 1980-2000 |
| **Influences** | Great Depression; military model; formality; patriotism; atomic bomb | Korean War; Civil, Women and Reproductive Rights and Ecology Movements; Woodstuck, Sputnik; TV; dual incomes | moon landing; Watergate; MTV; video games; AIDS; CNN; Web; latchkey; divorce | 9/11; Challenger; cell phones; pagers; computers; IM |
| **Values** | respect; security; loyalty; obedience | challenge; ambition; achievement; power | leadership; freedom; truth; independence | safety; loyalty; security; hope |
| **Work Preferences and Style** | hierarchical command and control; formal environment with dress code and strict conduct rules; one job, one employer | politically savvy; competitive environment; challenge authority for feedback; opportunity seekers; frequent job changers | work-life balance; skeptical of authority; self-reliant; oppose hierarchy; innovative; intentional, frequent job changing | diverse culture; collaborate; meaningful work; fun at work; flexibility |
| **Meeting Career Needs** | define and build legacy; annual feedback outlining contributions | define promotional opportunities; annual feedback on progress with documentation | define career path expectations; real time feedback on progress | define career path opportunities; real time feedback on progress and alignment |

# Neurodiversity

**Thinking Styles**



**Neurodivergent**



James McKim - Copyright© 2020
Organizational Ignition

# Diversity



*Diversity* is counting, and *inclusion* is cultivating… Diversity is being invited to the party, but inclusion is being asked to dance."

**VOL. 37, NO. 4**
ABA Bar Leader
"Beyond diversity: The bar leader's role in fostering inclusion"

Copyright© 2020 Organizational Ignition

# Equality Vs. Equity



# "isms"

## Imagine…



**Structural/ Systemic Discrimination**

**Micro aggressions**

Attitude Isms

Using our power to reinforce our discrimination and prejudice in the institutions and groups to which we belong

**White Privilege**

**Discrimination** taking an action on our prejudice

**Prejudice** a value judgment based on our feelings associated with the stereotype

**Stereotype** an incomplete or distorted picture in our head

**Generalization:** The process of formulating general concepts by abstracting common properties of instances

Unconscious Implicit Bias

Copyright© 2020 Organizational Ignition

# Structural/Systemic Discrimination <sup>2218</sup>



Copyright© 2020 Organizational Ignition

13

# Institutional/Systemic Racism

"The complex interaction of culture, policy, and institutions that holds in place the outcomes we see in our lives."  - Glen Harris, President of the New Race Forward

"The collective failure of an organization to provide an appropriate and professional service to people because of their colour, culture, or ethnic origin. It can be seen or detected in processes, attitudes, and behavior that amounts to discrimination through prejudice, ignorance, thoughtlessness, and racist stereotyping which disadvantage minority ethnic people". - Sir William Macpherson

Copyright© 2020 Organizational Ignition

# The Cause of Discrimination…
# Unconscious Cognitive Implicit Bias



https://www.nytimes.com/video/us/100000004818663/peanut-butter-jelly-and-racism.html

Organizational Ignition Copyright © 2020

15



# Cycle of Socialization

**Lens of Socialization & Teaching**

**Lens of Identity**

Socialized—Taught on a personal level by Parents, Relatives, Teachers, People We Love & Trust—Shapers of Expectations, Norms, Values, Roles, Rules, Models of Ways to Be, Sources of Dreams

**1st Socialization**

**Institutional & Cultural Socialization**

**The Beginning**

Born into a World with Mechanisms in Place
No Blame, No Consciousness
No Guilt, No Choice
Limited Information
No Information
Misinformation
Biases
Stereotypes
Prejudices
History
Habit
Tradition

**Core**

Reinforced/bombarded with messages from:

| Institutions | Culture |
|---|---|
| Churches | Practices |
| Schools | Lyrics |
| Television | Language |
| Legal system | Media |
| Mental Health | Patterns of |
| Medicine | Thought |

On Conscious and Unconscious levels

**Fear
Ignorance
Confusion
Insecurity**

Enforced
Sanctioned
Stigmatized

**Actions**

Do Nothing

Don't Make Waves

Promote Status Quo

**Lens of Experience**

Rewards and Punishments

Privilege
Persecution

Change
Interrupt
Educate
Take a Stand
Raised
Consciousness
Question
Reframe

Resulting in:
Dissonance, Silence, Anger,
Dehumanization, Guilt,
Collusion, Ignorance,
Self-hatred, Stress,
Lack of Reality, Violence,
Horizontal Violence,
Inconsistency, Crime,
Internalization of
Patterns of Power

Discrimination
Empowerment

**Enforcements**

**Results**

**Direction for Change**

12/9/2020

B. Harro (1982), in <u>Teaching for Diversity and Social Justice: A Sourcebook.</u> (1997). Adams, Bell, Griffin [Eds.].

Copyright© 2020 Organizational Ignition



GLBTQ LEGAL ADVOCATES & DEFENDERS

## NH CIRCUIT COURT NEW JUDGE EDUCATION

CHRIS ERCHULL

MAY 3, 2021

2223

CALL GLAD ANSWERS!!!
M-F, 1:30-4:30 PM



2

**Sexual orientation** refers to a person's emotional, romantic, or sexual attraction to people of the same sex, different sex, or any sex.

**Gender identity** is an individual's insistent, persistent, and consistent understanding of themselves as male, female, both, or neither. For most people, gender identity aligns with sex assigned at birth. E.g., person assigned male at birth identifies as a man. For many people, gender identity and assigned sex do not align.

**Gender expression/presentation** is an individual's external expression and/or perception of their gender, manifested through clothing, voice, mannerisms**,** names/pronouns, or even physical features.



**Sexual orientation** means having or being perceived as having an orientation for heterosexuality, bisexuality, or homosexuality. This definition is intended to describe the status of persons and does not render lawful any conduct prohibited by the criminal laws of this state or impose any duty on a religious organization. This definition does not confer legislative approval of such status, but is intended to assure basic rights afforded under this chapter.
RSA 354-A:2 (XIV-c)



4

**Gender Identity** means a person's gender-related identity, appearance, or behavior, whether or not that gender-related identity, appearance, or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth. Gender-related identity may be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity provided, however, that gender-related identity shall not be asserted for any improper purpose.
RSA 354-A:2 (XIV-e)



5

**Gender dysphoria** is a medical condition recognized in the DSM-5.

- Clinically significant distress caused by incongruence between a person's gender identity and assigned sex
- A serious but highly treatable medical condition
- Untreated or under-treated gender dysphoria can be disabling for some people



6

2228

**Gender transition** is the ONLY widely accepted treatment for gender dysphoria, but the course of treatment is highly individualized.

- Social Transition
  - *Legal Transition*
- Hormone Therapy
- Surgical Treatment



7

- RSA 354-A (1965)
  - *Created the NH Commission on Human Rights*
  - *Bars discrimination in employment, housing, public accommodations*
  - *Sexual Orientation-1996 Gender Identity-2018*
- RSA 193:38-39 (2019)
  - *Prohibits discrimination in public schools*
- RSA 5-C:87 (2005)
  - *Corrections to birth records*



8

- "A judge shall perform the duties of judicial office impartially and diligently."
- Sexual Orientation & Gender Identity are listed with the protected classifications in parts (5) & (6)
- Applies to:
  - *Judges*
  - *Staff, court officials under the judge's direction*
  - *Lawyers before the judge*



- Respect preferred names and pronouns
  - *Avoid assumptions*
  - *Ask when uncertain*
- Avoid gendered terms and honorifics
  - *Use Attorney Jones instead of Mr./Ms. Jones*
  - *Use "the defendant" or "your client" instead of Mr./Ms. ___.*
- Generously allow motions to amend captions, etc., whenever possible



2232

- Boston Straight Pride Parade: Aug. 31, 2019
  - *Counter-protesters significantly outnumbered the Straight Pride demonstrators*
  - *36 arrests, predominantly LGBTQ people*
- Boston Municipal Court Judge denies ADA's request to drop charges against 18 defendants
- Judge intentionally misgenders one transgender defendant and forces her to wait house under guise of clarifying her "alias"



11

- In Ohio, parents of a transgender teenage boy petition for name change
  - *Parents present evidence that the boy has been treated for over a year for gender dysphoria*
- Judge denies petition, claiming it is premature, against the advice of medical providers and the wishes of the young person's parents



- In Texas, parents disagree about young child's gender transition in the midst of custody dispute
- Jury verdict awarded legal custody to the mother
- Judge reverses jury verdict
    - *Judge made comment about case on Facebook*
    - *Judge removed from case*
    - *Jury verdict reinstated*
- Appeals still pending



13

- Jury selection in a civil trial
- Plaintiff's attorney exercises peremptory strike
  - *Defense counsel objects, claims improperly struck based on sexual orientation*
- Record demonstrates no basis for strike other than sexual orientation

How do you proceed with respect to the defense counsel's Batson objection?



14

# GLAD Answers:
# 1-800-455-GLAD

## Questions & Contact

CHRIS ERCHULL
CERCHULL@GLAD.ORG





DISABILITY RIGHTS
CENTER - NH

# The Disability Community and Access to Justice

*Pamela E. Phelan, Litigation Director*
*Déodonné Bhattarai, Communications Specialist*

*Protection and Advocacy System for New Hampshire*

## Presentation outline

- About DRC-NH
- What is the 'disability community'?
- What is a 'disability'?
- Disability data
- Disability etiquette
- Discussion/Q&A


DISABILITY RIGHTS
CENTER - NH

## About DRC-NH

- New Hampshire's designated *Protection and Advocacy* agency.

- Authorized by federal statute "to pursue legal, administrative and other appropriate remedies" on behalf of individuals with disabilities.

- Statewide organization independent from state government or service providers.



DISABILITY RIGHTS
CENTER - NH

The disability rights movement's struggle for access [has shown] that the exclusion of persons with disabilities from the public sphere was not only the outcome of stigma, but also the product of an exclusionary environment that includes physical and structural barriers. In the absence of access, disabled people cannot benefit from the services and opportunities that are available to the public at large and are unable to exercise their rights as citizens of equal value and status.

Sagit Mor, *With Access and Justice for All*, Cardozo Law Review, Vol. 39, Issue 2 (2018).



Ensuring equal access necessarily must encompass considerations of legal capacity, physical access to courts and other legal tribunals, access to legal proceedings and representation, communication, information, language barriers, socioeconomic barriers, structural biases within the legal process and more. *Id.*



# What is the 'disability community'?

- Only minority group anyone can join at anytime
- Plaintiff, defendant, witness, victim, lawyer, CASA volunteer, guardian, friend, family, court employee, or visitor





DISABILITY RIGHTS
CENTER - NH

# What is a 'disability' - Legal

The ADA defines a person with a disability as a person who has a physical or mental impairment that substantially limits one or more major life activity. This includes people who have a record of such an impairment, even if they do not currently have a disability. It also includes individuals who do not have a disability but are regarded as having a disability. The ADA also makes it unlawful to discriminate against a person based on that person's association with a person with a disability.
https://adata.org/faq/what-definition-disability-under-ada



# What is a 'disability' – Lived

- Disability is a natural part of the human experience.

- Types of disabilities are as diverse as the individuals who experience them. Among other things, a disability may affect a person's mental health, vision, hearing, movement, ability to learn or communicate. Disabilities include substance abuse disorder.

- Disabilities affect people in different ways. Two people with the same diagnosis may experience it very differently.

- Disabilities are both visible (e.g., a wheelchair) and invisible (e.g., an intellectual disability). One individual may have multiple disabilities (27%).

DRC

DISABILITY RIGHTS
CENTER - NH

# Data – Disability by the numbers

- About 1 out of every 8 NH residents (**12.6%**) report having a disability

- Number of children and adults engaging in the state's public mental health system is increasing



**UNITED STATES**

**POPULATION**
&#9855; 39,792,082
&#9913; 316,027,641

**% OF TOTAL**
&#9855; 12.6%
&#9913; 87.4%

**NEW HAMPSHIRE**

**POPULATION**
&#9855; 165,149
&#9913; 1,314,875

**% OF TOTAL**
&#9855; 12.6%
&#9913; 87.4%

&#9855; WITH DISABILITY &#9913; WITHOUT DISABILITY



DISABILITY RIGHTS
CENTER · NH

# Data – Disability by the numbers

- Less likely to attend college
  - 19.2 percentage points
- Less likely to be employed
  - 40.2 percentage points
- Higher rates of poverty (19.6% v. 5.8%)
- More likely to have public insurance (50.1% v. 12.8%)





# Disability etiquette

- Everyone who works in or comes to court

- Dignity + Respect

- They're the experts about disabilities + needs

- People first language



Image credit: Disabled and Here



# Etiquette: Person-first language

| Preferred | Avoid |
|---|---|
| an individual who has a disability | disabled or special needs |
| an individual with a physical disability | crippled, handicapped; deformed; defective; lame |
| an individual who uses a wheelchair | wheelchair bound or confined to a wheelchair |
| an individual who is blind or has low vision | the blind |
| an individual who is deaf or hard of hearing | the deaf; deaf and dumb; mute; hearing impaired |
| an individual with an intellectual or a developmental disability | slow; retarded; dim-witted |
| an individual with a psychiatric disability or a mental health diagnosis | crazy; maniac; lunatic; demented; schizo; psycho; feeble-minded |

*Person-first language should be used unless an individual prefers identity-first language. Best guideline when referring to people with disabilities is to ASK.*



DISABILITY RIGHTS
CENTER · NH

# Etiquette (continued)

- Ask before acting

- Assume competence and independence

- Identify auxiliary aids/accommodations

- May be hesitant to acknowledge a disability or need



Image credit: Lawrence Roffee



# Etiquette (continued)

- Be mindful of invisible disabilities

- Secondary trauma

- Implicit biases

- Appreciate barriers to services that may impact matters before the court



Image credit: autismspeaks.org



2251



*Pamela E. Phelan, Litigation Director*
*pamelap@drcnh.org*

*Déodonné Bhattarai, Communications Specialist*
*deodonneb@drcnh.org*

*Protection and Advocacy System for New Hampshire*

# Data-The employment gap detail

In NH, the employment gap is 40.2 percentage points (national is 40.6 pts)



|  | UNITED STATES | NEW HAMPSHIRE |
|---|---|---|
| **POPULATION**\*\* (wheelchair) | 20,276,199 | 83,940 |
| **POPULATION**\*\* (person) | 175,862,600 | 756,678 |
| **% EMPLOYED** (wheelchair) | 35.5% | 42.0% |
| **% EMPLOYED** (person) | 76.1% | 82.2% |
| **EMPLOYMENT GAP** | 40.6 POINTS | 40.2 POINTS |

(wheelchair) WITH DISABILITY (person) WITHOUT DISABILITY

\*\* Ages 18-64



DISABILITY RIGHTS
CENTER-NH

# Data-The education gap detail

In NH, the education gap is
19.2 percentage points
(national is 19.8 pts)





**May 4, 2021 – Confronting the Twin Challenges of Poverty and Racism**
*WebEx*
**Facilitator: Ryan Guptill**


9:00 – 10:00: Understanding Immigrant and Refugee Experiences
- **Presenter(s):** Dawn Higgins, NHTI
- **Location:** WebEx


10:00 – 11:00: Race and Racial Justice in New Hampshire Presentation (New Judge Education > Week 3 > Implicit Bias, Racism, and Racial Justice)
- **Presenter(s):** James McKim, President of Manchester NAACP
- **Location:** WebEx

11:00 – 11:15: Break

11:15 – 12:15: Race and Racial Justice in New Hampshire Panel
- **Presenter(s):** Joseph Lascaze, ACLU Smart Justice Organizer; Donna Brown, Manchester NAACP; Professor John DeJoie, UNH
- **Location:** WebEx

12:15 – 1:15 Lunch and Conversation on Bias and Judicial Decision-Making
- **Presenter(s):** Judge James Leary
- **Location:** WebEx

1:15 – 2:45: The Real Impact of Poverty
- **Presenter(s):** Professor Stephen Pimpare, UNH
- **Location:** WebEx

2:45 – 3:00: Break

3:00 – 4:00: Panel: Poverty, Homelessness, and New Hampshire Families
- **Presenter(s):** Stephanie Savard, Chief External Relations Officer, Families in Transition; Allie Reyes
- **Location:** WebEx

# Race in NH



James McKim, Managing Partner
James.McKim@OrganizationalIgnition.com

Copyright© 2020 Organizational Ignition

Organizational
Ignition

# Agenda



<u>Session Objective</u>
- Understand racism in NH

<u>Agenda</u>
- Recap
- Deeper Dive on Implicit Bias
- Microaggressions & White Privilege
- Racism in NH
- Putting It All Together

# Recap







**EQUALITY VERSUS EQUITY**



"isms"





Copyright© 2020 Organizational Ignition

19

2258

# Big Picture View of Racism



Safehouse Progressive Alliance for Nonviolence (2005)
"Building a Multi-Ethnic, Inclusive & Antiracist Organization-Tools for Liberation Packet for Anti-Racist Activists, Allies, & Critical Thinkers")

Copyright© 2020 Organizational Ignition                    20

# Types of Implicit Biases

**Decision-making, Belief, and Behavioral/Confirmational (125+)**



- Automation bias
- Bias blind spot
- Dunning–Kruger effect
- **Stereotyping**
- **Zero-sum bias**

**Social /Attributional (220+)**



- **Group attribution error**
- **In-group/Affinity**
- **Puritanical bias**

**Memory Errors (40+)**



- Consistency bias
- **Cross-race effect**
- **Stereotypical bias**

Copyright© 2020 Organizational Ignition

# Bias Impact Context

- Information Overload
- Feelings Over Facts
- Need for Speed
- What to remember



**The Cognitive Bias Codex: A Visual Of 180+ Cognitive Biases**

Copyright© 2020 Organizational Ignition

# Micro-aggression Summary

| | | |
|---|---|---|
| Alien in own land | Ascription of Intelligence | Color Blindness |
| Denial of racism | Myth of meritocracy | Pathologizing cultural values/styles |
| Second class citizen | Environmental | Assumption of criminal status |

## 9 Flavors – 2 forms

# Verbal Micro-aggression Exercise

**"Where are you from? You speak good English!"**

"You are a credit to your race."
"You are so articulate."

"When I look at you, I don't see color."
"America is a melting pot."
"There is only one race, the human race."

A person asking an Asian American to teach them words in their native language.

Assuming everyone can read English

Everyone is the same.

You are not American.
You are a foreigner.

People of color are generally not as intelligent as Whites.
All Asians are intelligent and good in Math / Sciences.

Racial /ethnic experiences are don't matter. There is no value in them.

Copyright ©  Organizational Ignition 2020

# Behavioral Micro-aggression Exercise

PoC mistaken for a service worker.
Taxi cab passes a PoC – picks up a white person
PoC ignored at a store counter

College/University w/buildings with all white heterosexual upper class male names.
Media without PoC.
Overcrowding of public schools in communities of color.

White person clutching purse/wallet as PoC approaches/passes.
Store owner follows PoC around the store

PoC are servants to whites.
PoC are likely t cause trouble.
You don't belong. You are a lesser being.

You don't belong/won't succeed here.
You are an outsider./You don't exist.
PoC don't value education.
PoC are deviant and belong together in schools.

PoC are dangerous.
PoC are likely to cause trouble.

James McKim                                                                 25

# What is White Privilege?



https://www.youtube.com/watch?v=ysj_8fqnNcY

# Current NH Demographics By Age/Gender



# Current NH Demographics By



## Race and Ethnicity                    #1

Percentage of the total population.

*Scope: population of the United States and New Hampshire*

**Percentage of Population by Racial or Ethnic Group**
*Estimates for 2014-2018, Hispanic Origin Included in Racial Groups*

Legend: ■ New Hampshire   ■ Manchester   ■ Nashua

Y-axis: Percentage of Population (0% to 16%)

X-axis categories: Black or African American, Asian, Hispanic or Latino, of Any Race

<- Margin of Error

**Racial or Ethnic Group**

Note: Margins of Error represent 90 percent confidence intervals
Source: U.S. Census Bureau, American Community Survey, 2014-2018

New Hampshire Fiscal Policy Institute

Copyright© 2020 Organizational Ignition                    28

# NH Examples of Implicit Bias – Part I



A "Best"

B "Still Desirable"

C "Definitely Declining"

D "Hazardous"

Copyright© 2020 Organizational Ignition

# NH Examples of Implicit Bias – Part II

## Cases and deaths by race/ethnicity

| Race/ethnicity | Percentage of population | Percentage of cases | Percentage of deaths |
|---|---|---|---|
| Black or African American alone | 1% | 6% ◆ | 2% |
| Hispanic or Latino * | 4% | 13% ◆ | 3% |
| Asian alone | 3% | 3% | <1% |
| Native Hawaiian and Pacific Islander alone | <1% | 0% ① | 0% ① |
| American Indian or Alaska Native alone | <1% | 0% ① | 0% ① |
| Two or more races | 2% | 0% ① | 0% ① |
| White alone | 90% | 74% | 94% |
| Some other race alone | <1% | 4% ① | <1% ① |



- **Discrimination in every day life & the emotional toll it takes**
- **Special fear of life when pulled over by police – regardless of agency**

Copyright© 2020 Organizational Ignition

30

# Criminal Justice Process



## Overview of the criminal process

https://www.fbi.gov/resources/victim-services/a-brief-description-of-the-federal-criminal-justice-process

# Seeing Through an Equity Lens (Breakout)



- What decision is being made?
- Who is at the table?
- How is the decision being made?
- What assumptions are at the foundation of the issue?
- What is likely impact?
- What is your decision?



Overview of the criminal process

# Wrap-up





AN **INTRODUCTION TO UNCONSCIOUS BIAS**

An Introduction to Unconscious Bias













What will you do?



**Counterstereotype Training**
- Dasgupta and Asagari (2004)

**Negation**
- Kawakami, Dovido, Moll, Hermsen, and Russin (2000)

**Perspective-taking**
- Shih, M. J., Wang, E., Bucher, A. T., & Stotzer, R. (2009).

**Meditation/Lovingkindness meditation (LKM)**
- Stell, A. J., & Farsides, T. (2016).

**Implicit bias workshops**
- like the one we offer

Copyright© 2020 Organizational Ignition

# Eliminating Bias & Discrimination



Mindset

How we think

How we behave

Actions

Copyright© 2020 Organizational Ignition

34

# How We Think



Wasabi Learning Flow Charts    https://www.wabisabilearning.com/blog/5-useful-critical-thinking-flowcharts

Copyright© 2020 Organizational Ignition

35

# How We Behave



Difficult Conversations

Communication

Steps in Criminal Justice

Empathy

Rapport   Affinity Communion   Emotion

Compassion

Feelings   Sorrow   Pity

Eliminating Discrimination

EQ

EQUITY   LENS

# Understanding Communication Basics



*Shannon and Weaver Model*

*Dr. Albert Mehrabian's 7-38-55 Rule of Personal Communication*

Copyright© 2020 Organizational Ignition

# Rules for Difficult Conversations



- Who's right?
- What was the intent?
- Who's to blame?

- Uncontrollable urge

**What happened**

**Feelings**

**Way forward: Shift to a learning stance**

**Identify**

- Have your feelings or they will have you!
- Not who's right - understand each other's story
- Don't assume they meant it - disentangle intent from impact
- Abandon blame

- Am I competent?
- Am I a good person?
- Am I worthy of love?

<u>Difficult Conversations</u> by Douglas Stone, Bruce Patton, & Sheila Heen

Copyright© 2020 Organizational Ignition

# Pulling It All Together



Justice mindful of an equity lens

# References

Garcia, C. E. (2020). Belonging in a predominantly White institution: The role of membership in Latina/o sororities and fraternities. *Journal of Diversity in Higher Education, 13*(2), 181–193. https://doi.org/10.1037/dhe0000126

National Organization of Nurse Practitioner Faculties. (2018, August). *NONPF Calls for Greater Racial and Ethnic Diversity in Nurse Practitioner Education.* Retrieved May 20, 2020 from https://cdn.ymaws.com/www.nonpf.org/resource/resmgr/docs/20180807_diversity_statement.pdf

Perez, R. J., Robbins, C. K., Harris, L. W., & Montgomery, C. (2020). Exploring graduate students' socialization to equity, diversity, and inclusion. *Journal of Diversity in Higher Education, 13*(2), 133-145. https://doi.org/10.1037/dhe0000115

# EXHIBIT 78

Sept. 22, 2020 Trump
Executive Order



60683

**Federal Register**

Vol. 85, No. 188

Monday, September 28, 2020

# Presidential Documents

Title 3—

**The President**

Executive Order 13950 of September 22, 2020

## Combating Race and Sex Stereotyping

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*, and in order to promote economy and efficiency in Federal contracting, to promote unity in the Federal workforce, and to combat offensive and anti-American race and sex stereotyping and scapegoating, it is hereby ordered as follows:

**Section 1.** *Purpose.* From the battlefield of Gettysburg to the bus boycott in Montgomery and the Selma-to-Montgomery marches, heroic Americans have valiantly risked their lives to ensure that their children would grow up in a Nation living out its creed, expressed in the Declaration of Independence: "We hold these truths to be self-evident, that all men are created equal." It was this belief in the inherent equality of every individual that inspired the Founding generation to risk their lives, their fortunes, and their sacred honor to establish a new Nation, unique among the countries of the world. President Abraham Lincoln understood that this belief is "the electric cord" that "links the hearts of patriotic and liberty-loving" people, no matter their race or country of origin. It is the belief that inspired the heroic black soldiers of the 54th Massachusetts Infantry Regiment to defend that same Union at great cost in the Civil War. And it is what inspired Dr. Martin Luther King, Jr., to dream that his children would one day "not be judged by the color of their skin but by the content of their character."

Thanks to the courage and sacrifice of our forebears, America has made significant progress toward realization of our national creed, particularly in the 57 years since Dr. King shared his dream with the country.

Today, however, many people are pushing a different vision of America that is grounded in hierarchies based on collective social and political identities rather than in the inherent and equal dignity of every person as an individual. This ideology is rooted in the pernicious and false belief that America is an irredeemably racist and sexist country; that some people, simply on account of their race or sex, are oppressors; and that racial and sexual identities are more important than our common status as human beings and Americans.

This destructive ideology is grounded in misrepresentations of our country's history and its role in the world. Although presented as new and revolutionary, they resurrect the discredited notions of the nineteenth century's apologists for slavery who, like President Lincoln's rival Stephen A. Douglas, maintained that our government "was made on the white basis" "by white men, for the benefit of white men." Our Founding documents rejected these racialized views of America, which were soundly defeated on the blood-stained battlefields of the Civil War. Yet they are now being repackaged and sold as cutting-edge insights. They are designed to divide us and to prevent us from uniting as one people in pursuit of one common destiny for our great country.

Unfortunately, this malign ideology is now migrating from the fringes of American society and threatens to infect core institutions of our country. Instructors and materials teaching that men and members of certain races, as well as our most venerable institutions, are inherently sexist and racist are appearing in workplace diversity trainings across the country, even in

components of the Federal Government and among Federal contractors. For example, the Department of the Treasury recently held a seminar that promoted arguments that "virtually all White people, regardless of how 'woke' they are, contribute to racism," and that instructed small group leaders to encourage employees to avoid "narratives" that Americans should "be more color-blind" or "let people's skills and personalities be what differentiates them."

Training materials from Argonne National Laboratories, a Federal entity, stated that racism "is interwoven into every fabric of America" and described statements like "color blindness" and the "meritocracy" as "actions of bias."

Materials from Sandia National Laboratories, also a Federal entity, for non-minority males stated that an emphasis on "rationality over emotionality" was a characteristic of "white male[s]," and asked those present to "acknowledge" their "privilege" to each other.

A Smithsonian Institution museum graphic recently claimed that concepts like "[o]bjective, rational linear thinking," "[h]ard work" being "the key to success," the "nuclear family," and belief in a single god are not values that unite Americans of all races but are instead "aspects and assumptions of whiteness." The museum also stated that "[f]acing your whiteness is hard and can result in feelings of guilt, sadness, confusion, defensiveness, or fear."

All of this is contrary to the fundamental premises underpinning our Republic: that all individuals are created equal and should be allowed an equal opportunity under the law to pursue happiness and prosper based on individual merit.

Executive departments and agencies (agencies), our Uniformed Services, Federal contractors, and Federal grant recipients should, of course, continue to foster environments devoid of hostility grounded in race, sex, and other federally protected characteristics. Training employees to create an inclusive workplace is appropriate and beneficial. The Federal Government is, and must always be, committed to the fair and equal treatment of all individuals before the law.

But training like that discussed above perpetuates racial stereotypes and division and can use subtle coercive pressure to ensure conformity of viewpoint. Such ideas may be fashionable in the academy, but they have no place in programs and activities supported by Federal taxpayer dollars. Research also suggests that blame-focused diversity training reinforces biases and decreases opportunities for minorities.

Our Federal civil service system is based on merit principles. These principles, codified at 5 U.S.C. 2301, call for all employees to "receive fair and equitable treatment in all aspects of personnel management without regard to" race or sex "and with proper regard for their . . . constitutional rights." Instructing Federal employees that treating individuals on the basis of individual merit is racist or sexist directly undermines our Merit System Principles and impairs the efficiency of the Federal service. Similarly, our Uniformed Services should not teach our heroic men and women in uniform the lie that the country for which they are willing to die is fundamentally racist. Such teachings could directly threaten the cohesion and effectiveness of our Uniformed Services.

Such activities also promote division and inefficiency when carried out by Federal contractors. The Federal Government has long prohibited Federal contractors from engaging in race or sex discrimination and required contractors to take affirmative action to ensure that such discrimination does not occur. The participation of contractors' employees in training that promotes race or sex stereotyping or scapegoating similarly undermines efficiency in Federal contracting. Such requirements promote divisiveness in the workplace and distract from the pursuit of excellence and collaborative achievements in public administration.

Therefore, it shall be the policy of the United States not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes. In addition, Federal contractors will not be permitted to inculcate such views in their employees.

Sec. 2. *Definitions.* For the purposes of this order, the phrase:

(a) "Divisive concepts" means the concepts that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "divisive concepts" also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

(b) "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

(c) "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex. It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

(d) "Senior political appointee" means an individual appointed by the President, or a non-career member of the Senior Executive Service (or agency-equivalent system).

Sec. 3. *Requirements for the United States Uniformed Services.* The United States Uniformed Services, including the United States Armed Forces, shall not teach, instruct, or train any member of the United States Uniformed Services, whether serving on active duty, serving on reserve duty, attending a military service academy, or attending courses conducted by a military department pursuant to a Reserve Officer Corps Training program, to believe any of the divisive concepts set forth in section 2(a) of this order. No member of the United States Uniformed Services shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to these concepts.

Sec. 4. *Requirements for Government Contractors.* (a) Except in contracts exempted in the manner provided by section 204 of Executive Order 11246 of September 24, 1965 (Equal Employment Opportunity), as amended, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

"During the performance of this contract, the contractor agrees as follows:

1. The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt

to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term "race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.

2. The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under the Executive Order of September 22, 2020, entitled Combating Race and Sex Stereotyping, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

3. In the event of the contractor's noncompliance with the requirements of paragraphs (1), (2), and (4), or with any rules, regulations, or orders that may be promulgated in accordance with the Executive Order of September 22, 2020, this contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246, and such other sanctions may be imposed and remedies invoked as provided by any rules, regulations, or orders the Secretary of Labor has issued or adopted pursuant to Executive Order 11246, including subpart D of that order.

4. The contractor will include the provisions of paragraphs (1) through (4) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States."

(b) The Department of Labor is directed, through the Office of Federal Contract Compliance Programs (OFCCP), to establish a hotline and investigate complaints received under both this order as well as Executive Order 11246 alleging that a Federal contractor is utilizing such training programs in violation of the contractor's obligations under those orders. The Department shall take appropriate enforcement action and provide remedial relief, as appropriate.

(c) Within 30 days of the date of this order, the Director of OFCCP shall publish in the *Federal Register* a request for information seeking information from Federal contractors, Federal subcontractors, and employees of Federal contractors and subcontractors regarding the training, workshops, or similar programming provided to employees. The request for information should request copies of any training, workshop, or similar programing having to do with diversity and inclusion as well as information about the duration, frequency, and expense of such activities.

**Sec. 5.** *Requirements for Federal Grants.* The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use Federal funds to promote the concepts that

(a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. Within 60 days of the date of this order, the heads of agencies shall each submit a report to the Director of the Office of Management and Budget (OMB) that lists all grant programs so identified.

**Sec. 6.** *Requirements for Agencies.* (a) The fair and equal treatment of individuals is an inviolable principle that must be maintained in the Federal workplace. Agencies should continue all training that will foster a workplace that is respectful of all employees. Accordingly:

(i) The head of each agency shall use his or her authority under 5 U.S.C. 301, 302, and 4103 to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming (for purposes of this section, "training") to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in section 2(a) of this order. Agencies may consult with the Office of Personnel Management (OPM), pursuant to 5 U.S.C. 4116, in carrying out this provision; and

(ii) Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by Federal law.

(b) The Director of OPM shall propose regulations providing that agency officials with supervisory authority over a supervisor or an employee with responsibility for promoting diversity and inclusion, if such supervisor or employee either authorizes or approves training that promotes the divisive concepts set forth in section 2(a) of this order, shall take appropriate steps to pursue a performance-based adverse action proceeding against such supervisor or employee under chapter 43 or 75 of title 5, United States Code.

(c) Each agency head shall:

(i) issue an order incorporating the requirements of this order into agency operations, including by making compliance with this order a provision in all agency contracts for diversity training;

(ii) request that the agency inspector general thoroughly review and assess by the end of the calendar year, and not less than annually thereafter, agency compliance with the requirements of this order in the form of a report submitted to OMB; and

(iii) assign at least one senior political appointee responsibility for ensuring compliance with the requirements of this order.

**Sec. 7.** *OMB and OPM Review of Agency Training.* (a) Consistent with OPM's authority under 5 U.S.C. 4115–4118, all training programs for agency employees relating to diversity or inclusion shall, before being used, be reviewed by OPM for compliance with the requirements of section 6 of this order.

(b) If a contractor provides a training for agency employees relating to diversity or inclusion that teaches, advocates, or promotes the divisive concepts set forth in section 2(a) of this order, and such action is in violation of the applicable contract, the agency that contracted for such training shall evaluate whether to pursue debarment of that contractor, consistent with

applicable law and regulations, and in consultation with the Interagency Suspension and Debarment Committee.

(c) Within 90 days of the date of this order, each agency shall report to OMB all spending in Fiscal Year 2020 on Federal employee training programs relating to diversity or inclusion, whether conducted internally or by contractors. Such report shall, in addition to providing aggregate totals, delineate awards to each individual contractor.

(d) The Directors of OMB and OPM may jointly issue guidance and directives pertaining to agency obligations under, and ensuring compliance with, this order.

**Sec. 8.** *Title VII Guidance.* The Attorney General should continue to assess the extent to which workplace training that teaches the divisive concepts set forth in section 2(a) of this order may contribute to a hostile work environment and give rise to potential liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* If appropriate, the Attorney General and the Equal Employment Opportunity Commission shall issue publicly available guidance to assist employers in better promoting diversity and inclusive workplaces consistent with Title VII.

**Sec. 9.** *Effective Date.* This order is effective immediately, except that the requirements of section 4 of this order shall apply to contracts entered into 60 days after the date of this order.

**Sec. 10.** *General Provisions.* (a) This order does not prevent agencies, the United States Uniformed Services, or contractors from promoting racial, cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the requirements of this order.

(b) Nothing in this order shall be construed to prohibit discussing, as part of a larger course of academic instruction, the divisive concepts listed in section 2(a) of this order in an objective manner and without endorsement.

(c) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

(d) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(e) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(f) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*September 22, 2020.*

[FR Doc. 2020–21534
Filed 9–25–20; 8:45 am]
Billing code 3295–F0–P

# EXHIBIT 79

HB544 Docket and
Language

# HB544

| Body | Description |
| --- | --- |
| H | Introduced (in recess of) 01/06/2021 and referred to Executive Departments and Administration **HJ 2** P. 53 |
| H | ==RECESSED== Public Hearing: 02/11/2021 11:30 am Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/91078617911 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | ==CONTINUED== Public Hearing: 02/18/2021 01:30 pm Members of the public may attend using the following link: To join the webinar: https://zoom.us/j/97238685330 / Executive session on pending legislation may be held throughout the day (time permitting) from the time the committee is initially convened. |
| H | Majority Committee Report: Ought to Pass with Amendment # 2021-0611h (Vote 10-9; RC) **HC 18** P. 45 |
| H | Minority Committee Report: Inexpedient to Legislate |
| H | Lay on Table (Rep. Osborne): MA DV 347-18 04/08/2021 **HJ 6** P. 72 |

2289

**HB 544  - AS INTRODUCED**

2021 SESSION

21-0732
05/04

HOUSE BILL          *544*

AN ACT          relative to the propagation of divisive concepts.

SPONSORS:          Rep. Ammon, Hills. 40; Rep. Cordelli, Carr. 4; Rep. J. Osborne, Rock. 4

COMMITTEE:          Executive Departments and Administration

───────────────────────────────────────────────────────────────

ANALYSIS

This bill defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Explanation:          Matter added to current law appears in ***bold italics.***
Matter removed from current law appears [in brackets and struckthrough.]
Matter which is either (a) all new or (b) repealed and reenacted appears in regular type.

**HB 544 - AS INTRODUCED**

21-0732
05/04

STATE OF NEW HAMPSHIRE

*In the Year of Our Lord Two Thousand Twenty One*

AN ACT                relative to the propagation of divisive concepts.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

1    1  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after
2  chapter 10-B the following new chapter:
3                                          CHAPTER 10-C
4                            PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED
5    10-C:1  Definitions.  In this chapter:
6        I. "Contractor" means any and all persons, individuals, corporations, or businesses of any
7  kind that in any manner have entered into a contract, or perform a subcontract pursuant to a
8  contract, with the state of New Hampshire.
9        II. "Divisive concept" means the concept that:
10        (a) One race or sex is inherently superior to another race or sex;
11        (b) The state of New Hampshire or the United States is fundamentally racist or sexist;
12        (c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or
13  oppressive, whether consciously or unconsciously;
14        (d) An individual should be discriminated against or receive adverse treatment solely or
15  partly because of his or her race or sex;
16        (e)  Members of one race or sex cannot and should not attempt to treat others without
17  respect to race or sex;
18        (f) An individual's moral character is necessarily determined by his or her race or sex;
19        (g)  An individual, by virtue of his or her race or sex, bears responsibility for actions
20  committed in the past by other members of the same race or sex;
21        (h)   Any individual should feel discomfort, guilt, anguish, or any other form of
22  psychological distress on account of his or her race or sex; or
23        (i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by
24  a particular race to oppress another race.
25        (j)  The term "divisive concepts" includes any other form of race or sex stereotyping or
26  any other form of race or sex scapegoating.
27        III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical
28  codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or
29  sex.
30        IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to
31  members of a race or sex because of their race or sex.  It similarly encompasses any claim that,

**HB 544  - AS INTRODUCED**
**- Page 2 -**

1   consciously or unconsciously, and by virtue of his or her race or sex, members of any race are

2   inherently racist or are inherently inclined to oppress others, or that members of a sex are

3   inherently sexist or inclined to oppress others.

4       V.  "The state of New Hampshire" means all agencies and political subdivisions of the state

5   of New Hampshire, including counties, cities, towns, school districts, and the state university

6   system.

7       VI.  "Student" means any and all students of any school district, school, college, or university

8   which receives grants, funds, or assets from the state of New Hampshire.

9   10-C:2  Unlawful Propagation of Divisive Concepts.

10      I.  Requirements for the state of New Hampshire:

11      (a)  The state of New Hampshire shall not teach, instruct, or train any employee,

12  contractor, staff member, student, or any other individual or group, to adopt or believe any of the

13  divisive concepts defined in RSA 10-C:1, II.

14      (b)  No employee, contractor, staff member, or student of the state of New Hampshire

15  shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse,

16  embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

17      II.  Requirements for government contractors:

18      (a)  All state contracts entered into on or after the effective date of this chapter shall

19  include the following provision:

20  "During the performance of this contract, the contractor agrees as follows:

21  The contractor shall not use any workplace training that inculcates in its employees any form of race

22  or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race

23  or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or

24  sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual

25  should be discriminated against or receive adverse treatment solely or partly because of his or her

26  race or sex; (d) members of one race or sex cannot and should not attempt to treat others without

27  respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race

28  or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed

29  in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt,

30  anguish, or any other form of psychological distress on account of his or her race or sex; or (h)

31  meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular

32  race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

33  values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual

34  because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault,

35  blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

36      (b)  The contractor shall send to each labor union or representative of workers with

37  which the contractor has a collective bargaining agreement or other contract or understanding, a

**HB 544  - AS INTRODUCED**
- Page 3 -

notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)  In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)  The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.  The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.  The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.  Requirements for agencies.

(a)  The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.  Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)  The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training", to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

(2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic protected by federal or state law.

(b)  The commissioner of the department of administrative services, pursuant to RSA 541-A, shall develop regulations for the enforcement of the provisions of this statute.

(c)  Each agency head shall:

**HB 544  - AS INTRODUCED**
**- Page 4 -**

1     (1) Issue a policy incorporating the requirements of this chapter into agency

2 operations, including by making compliance with the policy a provision in all agency contracts;

3     (2) Request that the agency thoroughly review and assess not less than annually

4 thereafter, agency compliance with the requirements of the policy in the form of a report submitted

5 to the department of administrative services; and

6     (3) Assign at least one senior political appointee responsibility for ensuring

7 compliance with the requirements of the policy.

8   VI. Review of agency training.

9    (a) All training programs for state agency employees relating to diversity or inclusion

10 shall, before being used, be reviewed by the department of administrative services for compliance

11 with the requirements of RSA 10-C:2, V.

12    (b) If a contractor provides a training for agency employees relating to diversity or

13 inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and

14 such action is in violation of the applicable contract, the agency that contracted for such training

15 shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and

16 regulations.

17  10-C:3 General Provisions.

18   I. Nothing in this chapter shall prevent agencies or contractors from promoting racial,

19 cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the

20 requirements of this chapter.

21   II. Nothing in this chapter shall be construed to prohibit discussing, as part of a larger

22 course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner

23 and without endorsement.

24   III. If any provision of this chapter, or the application of any provision to any person or

25 circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions

26 to any other persons or circumstances shall not be affected thereby.

27  2 Effective Date.  This act shall take effect January 1, 2022.

Rep. Ammon, Hills. 40
March 3, 2021
2021-0611h
05/04

Amendment to HB 544

1  Amend RSA 10-C:1, I as inserted by section 1 of the bill by replacing it with the following:

2

3      I. "Contractor" means any and all persons, individuals, corporations, or businesses of any

4  kind that in any manner have entered into a contract to perform a service for, or perform a

5  subcontract pursuant to a contract to perform a service for, or with the state of New Hampshire.

6

7  Amend RSA 10-C:2, V(a)(1) as inserted by section 1 of the bill by replacing it with the following:

8

9      (1) The head of each agency shall ensure that the agency, agency employees while on

10  duty status, and any contractors hired by the agency to provide training, workshops, forums, or

11  similar programming to agency employees do not teach, advocate, act upon, or promote in any

12  training to agency employees any of the divisive concepts listed in RSA 10-C:1, II; and

13

14  Amend RSA 10-C:3 as inserted by section 1 of the bill by inserting after paragraph II the following

15  new paragraph and renumbering the original paragraph III to read as paragraph IV:

16

17      III  Nothing in this chapter is meant to include as a "contract or subcontract" certain

18  government financial assistance, including but not limited to the taking or receiving of loans, tax

19  credits, tax incentives, tax abatements or gifts deriving from money sent from the federal

20  government or agency designed or meant to assist during or after a declared emergency, including

21  but not limited to health, weather, riot, civil disobedience or acts of foreign agents, or designed as

22  economic stimulus during economic emergency.



# HOUSE RECORD

### First Year of the 167th General Court

## Calendar and Journal of the 2021 Session

### Web Site Address: www.gencourt.state.nh.us

**State of
New Hampshire**

---

| Vol. 43 | Concord, N.H. | Friday, April 2, 2021 | No. 18 |

**Contains: House Deadlines; House Bills Amended by Senate; Committee Reports;
Meetings and Notices; Revised Fiscal Notes**

---

# HOUSE  CALENDAR

**MEMBERS OF THE HOUSE:**

The House will meet in session on Wednesday, April 7th at 9:00 a.m., Thursday, April 8th, at 9:00 a.m., and Friday, April 9th at 9:00 a.m. in the NH Sportsplex facility at 68 Technology Dr. in Bedford, NH.

Session day logistics, including arrival times, parking, entry, materials and lunch distribution will be similar to the previous event, and where necessary, updates and modifications have been made. Those details appear in the back of this House Calendar. House members can expect an email with any further details early next week.

I have discussed with the Democratic and Republican Leaders our need to work together to manage our time wisely during the House session days. While there may be disagreement on many issues, we all agree that we can complete our business in a timely manner if we work together with mutual respect and understanding.

The House Finance committee will offer a budget briefing for House members on Monday April 5th at 1:00 p.m. via Zoom webinar. As in prior budget years, members of the public may watch a livestream via YouTube. A link to the YouTube stream is published in a notice in this House Calendar. House members will receive a link to the webinar by email so they may raise their hand and ask questions of the Finance Committee and Legislative Budget Assistant, if desired.

The amendment to House Bill 1 adopted by the majority of the House Finance Committee is one that replaces the entire bill and is over 700 pages long. Rather than print 400 copies of that amendment for next week, the Legislative Budget Assistant's Office has posted a link to that amendment here: http://www.gencourt.state. nh.us/LBA/Budget/Capital_Budget_House/Week%20of%203-29/HB_1_H_Finance_COMBINED_33021.pdf All other amendments to bills will be printed in two addendum calendars.

Additionally, if you are interested in the other documents used throughout the entire House budget process, the LBA has a webpage with those available to you found here:http://www.gencourt.state.nh.us/LBA/Budget/ fy2022_2023_budget.aspx

The New Hampshire Automobile Dealers Association will be sponsoring one of our session day's lunches next week at session. Typically the NHADA hosts an annual Crossover reception for all legislators and staff, however in this unusual time, we have not been able to attend the usual social events that may exist for legislators. These receptions go a long way in terms of allowing members across the whole chamber to socialize and get to know their colleagues, and I know I speak for myself when I say this has been missed. We are thankful to the NHADA for sponsoring this lunch.

I am happy to announce that captioning for House sessions is now available. The link to access captions is a separate link from the session streaming link and will be available on the General Court website before the start of each session.

Sherman A. Packard, Speaker of the House

---

## NOTICE

The **Finance** Committee will hold **budget briefings** on *HB 1-A*, making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023, and *HB 2-FN-A-L*, relative to state fees, funds, revenues, and expenditures on April 5th at 1:00 pm. House members will receive secure Zoom links. Members of the public may attend using the following link: https://www.youtube.com/watch?v=MvMW6Lf-ltw.

Rep. Kenneth Weyler, Chairman
Finance Committee

Rep. John Sytek for Executive Departments and Administration. The last major expansion of the franchise – the right to vote and to hold office – occurred 50 years ago. That was the passage of the 26th amendment which granted that right to 18- to 21-year olds. Indeed, many in this chamber witnessed this history-making event. The committee felt that this bill commemorating the anniversary was fitting and appropriate. **Vote 18-0.**

**HB 345,** establishing a license for mushroom harvesters. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Sallie Fellows for the **Majority** of Executive Departments and Administration. This bill legalizes the sale of safe varieties of wild harvested mushrooms in restaurants and markets. The Food and Drug Administration Food Code explicitly prohibits the sale of wild harvested mushrooms unless an oversight agency establishes an approval process for licensed harvesters. Some wild mushrooms are poisonous. Licensing will ensure those sold in NH are safe. The Department of Health and Human Services (DHHS) will oversee training programs, testing and licensing of harvesters, and will specify the authorized varieties. Harvesters must have permission to take wild mushrooms from someone else's land. This bill doesn't apply to cultivated mushrooms or picking wild mushrooms for personal consumption. DHHS supports this bill and indicated they can absorb the operational cost. The amendment simply adds a definition of mushrooms. **Vote 12-7.**
Rep. Tony Lekas for the **Minority** of Executive Departments and Administration. This bill would license wild mushroom harvesters. Wild mushrooms have been harvested for sale in New Hampshire for many years. Up to now that has not caused enough trouble for there to have been a call for regulating the practice in our state. That would likely still be the case except that, unfortunately, the Department of Health and Human Services chose to adopt the 2017 Food and Drug Administration Food Code into New Hampshire rule and the legislature accepted that action. There are reasons that there are separate states. What is necessary and appropriate for one state may not be for another. We should end the practice of adopting standards without carefully considering if they are all really necessary for New Hampshire. We should not be licensing additional professions just to deal with an earlier error.

**HB 417,** relative to the powers of the governor during a renewal of a declared state of emergency. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill, as amended, changes the emergency powers laws in three ways. First, it extends a declared emergency to 30 days, rather than 21, so that the common weather-related emergencies are not affected. Second, if a state of emergency is renewed, the legislature must meet to approve the extension and any executive orders issued during the emergency. If the legislature cannot meet, the state of emergency and the orders continue in force and are extended in 14-day increments until the legislature can meet. Thirdly, any gifts, grants or other funds obtained for emergency purposes must be accepted by the Governor and Council, rather than the governor alone, which requires Fiscal Committee involvement from amounts over $100,000. These changes go into effect after the end of the current emergency, and so are prospective only. These changes address the most common concerns about the current emergency powers statute, which was updated after the terrorist attacks on September 11, 2001 and never used for an extended period of time until the COVID-19 outbreak. This emergency raised concerns about imposing too much responsibility on the governor alone, and so this bill presents a plan to share the responsibility and provide policy oversight. **Vote 16-2.**
Rep. Peter Schmidt for the **Minority** of Executive Departments and Administration. This bill seeks to address widespread objections to a number of aspects of the Governor's emergency order regime, which is currently in effect in New Hampshire. The minority of the ED&A Committee recognizes and shares many of the majority's concerns, and also supports a review and revision of the existing emergency statute. Nevertheless, the minority opposes passage of HB 417 at this time for the following reasons. First, the bill is entirely prospective; it cures none of the actual or supposed abuses of the Governor's authority at this time. Hence, it has no urgency and should not be substituted for a truly deliberative investigation of the deficiencies of the existing statute, nor of any instances of gubernatorial overreach. Second, instead of this bill, a blue ribbon committee should be empaneled, not to assess blame, but to lay the basis for a wisely revised statute to more perfectly protect the state and its citizens in the future. Third, the bill mistakenly conflates every living NH citizen's experience and expectations of a state of emergency with the fundamentally different duration and reality of this pandemic, which is, in addition, by no means fully understood or resolved. Further, the bill creates a legislative oversight and control structure which the minority believes would likely be in its own way in a typical emergency, in other words, unnecessary, and very likely to hamstring effective emergency management in the case of a future pandemic, or nuclear emergency, in other words, unworkable and counterproductive. For these reasons, this bill should be found Inexpedient to Legislate.

**HB 544,** relative to the propagation of divisive concepts. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**
Rep. Terry Roy for the **Majority** of Executive Departments and Administration. This bill is an anti-racism piece of legislation that would prohibit the teaching racist ideology to students and employees of state schools.

It would also bar mandatory racist ideology training to employees of state agencies and businesses who contract with the state to provide services to or on behalf of the state. The committee heard testimony that these trainings and teachings do currently occur in New Hampshire and seem to be becoming more of a trend both here and nationwide. The committee also heard testimony that the teaching and training of the concepts prohibited by this bill cause disharmony, resentment and hatred. The majority agrees. The bill does not prohibit teaching about racism and its negative effects throughout history on the people of New Hampshire and the United States. The majority believes teaching about actual history including institutional racism that has existed and the steps we have taken to eradicate it are important aspects of a proper education and a healthy and diverse workplace. The bill, simply put, prohibits teaching that one race is at fault in perpetuity for challenges and disadvantages faced by another race. The majority acknowledges that racism still exists and that we must always be on guard against it to challenge it whenever it rears its ugly head but the majority also believes in the inherent good of each individual Granite State citizen and in the greatness of this state and of the United States of America. Of all the nations on Earth, it is the United States that provides the most opportunity and legal protections to minorities of every race, creed and religion. **Vote 10-9.**

Rep. Sallie Fellows for the **Minority** of Executive Departments and Administration. In 2020 we all saw George Floyd die, Black Lives Matter demonstrations, and white supremacists' counter protests. Public interest led to an exponential growth in books, documentaries, zoom seminars, and courses about racism and bias. The function of this bill is to suppress teaching about racism and sexism. It does so by banning discussion of any "form of race or sex stereotyping." This prohibition applies to state and municipal governments, and all public schools, private schools and colleges receiving state funding. The ban also applies to the internal operations of businesses with state contracts, which would likely result in fewer bidders and higher costs for state projects. In this time of heightened awareness about racism, this bill will tarnish the image of New Hampshire as a great place to live and work. The minority believes it also violates the First Amendment's protection of free speech, which is why we oppose this bill.

**HB 575,** relative to licensure of applicants for cosmetology, esthetics, and manicuring through apprenticeship programs. **OUGHT TO PASS.**

Rep. Tony Lekas for Executive Departments and Administration. This bill would permit an applicant for a license as a cosmetologist, manicurist, or esthetician to complete the training requirement either in an apprenticeship program or a school. While current statute does permit an applicant to complete the training requirement through an apprenticeship it requires twice as many hours in an apprenticeship program than in a school. If this bill is adopted, the number of training hours would be the same for a school or apprenticeship program. The bill also makes it clear that the apprenticeship program must be one approved by the board. In current statute, approval is not required for apprenticeship programs for cosmetologists although it is required for manicurists and estheticians. In either case, the applicant must pass an examination conducted by the board. This would especially benefit those who must work and/or raise a family while training for a new career. It is often not possible for such people to put their lives on hold in order to attend a school full time. An apprenticeship program can offer more schedule flexibility and changing the hours required in such a program the same as those required in a school would reduce the burden on such people. Another potential benefit to an apprenticeship program is that the applicant is likely to receive more hands on practical training than in a school. **Vote 10-9.**

**HB 606,** exempting services provided without renumeration from license requirements for barbering, cosmetology, and esthetics. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Mark Alliegro for the **Majority** of Executive Departments and Administration. Under current New Hampshire law, it is illegal to cut your daughter's hair or file your grandmother's fingernails. This bill remedies such regulatory overreach by stipulating that a person may provide barbering, cosmetology, or esthetics services without payment and not be in violation of the law. This bill does not affect licensure requirements for paid, professional service providers. Opponents warned that this change would put the public at risk from the unauthorized use of dangerous chemicals such as shampoo and hair coloring, or transmissible disease, but no evidence in support of this claim was presented during hearings or deliberation. It was also argued that selective law enforcement renders this bill unnecessary. It is not government's role to interfere with the highly personal acts mentioned in this summary. The adoption of HB 606 is a small step in restoring the inalienable right of caring for one another. **Vote 10-8.**

Rep. Jeffrey Goley for the **Minority** of Executive Departments and Administration. Supporters of this bill believe that under the current RSA a parent who cuts a child's hair or someone who helps a neighbor color their hair is breaking the law. But there is no documented evidence that this type of enforcement has ever been practiced. The bill as written would allow anyone to practice barbering, cosmetology, or esthetics provided they are is no remuneration. Testimony from professionals was that an untrained person doing these procedures may not be as conscientious about necessary sanitation or not trained in the possible dangers of chemicals involved and could subject the recipient to severe chemical burns or injuries. The minority believes this bill should be voted ITL as it is trying to solve a problem that does not exist.

# EXHIBIT 80

Select Written Testimony From Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added

My name is Dr. Karlyn Borysenko, I am an organizational psychologist and I reside in Merrimack New Hampshire.

I'm testifying today in strong support of HB544.

How did we get to a place where it would be necessary to have a bill specifying that individuals, by virtue of their race or sex, are not inherently racist, sexist, or oppressive?

It started with a fringe ideology that came out of academia starting in the late 1970s called Critical Race Theory. There are entire libraries of books written about this ideology, but the easiest way to understand it is this:

Martin Luther King, Jr. famously said "I look to a day when people will not be judged by the color of their skin, but by the content of their character."

Critical Race Theory teaches exactly the opposite of this: It says that the ONLY thing we should judge people by is the color of their skin RATHER THAN the content of their character.

Critical Race Theory starts with a simple assumption: That racism exists everywhere.

You and I might define racism as the belief that one race is inherently superior to all other races. I think we can all agree that is a fundamentally bad concept and an idea that should not be perpetuated in any form.

However, that is not how Critical Race Theory defines racism.

This is critical to understand, no pun intended.

Critical Race Theory changes the definition of common words in order to gain wider acceptance. After all, no one wants to be called a racist.

Critical Race Theory views race as a political construction that was invented by white people to give themselves power while excluding all other races from it.

It views racism as the ordinary state of affairs in society, present in all interactions and institutions. Anytime you hear the term "systemic racism," that is what they mean.

Think you're not racist? If you were born white, you would be wrong.

Critical Race Theory teaches that if you are white, you are inherently racist.

There is not a question of if you are a racist. That is assumed. There is only a question of how your racism manifests, and what work you are doing to stop it.

Don't believe me? The bestselling book White Fragility is one of the bibles of Critical Race Theory. In it, author Robin DiAngelo confesses that she has been racist since the womb, has been racist her entire life, and will always be a racist simply because she is white.

I have been working non-stop to understand this ideology and its impact for the last two years, and I have seen how detrimental it is to individuals, and to organizations. I'm currently authoring a book on the subject and have been blessed to receive guidance from some of the foremost experts in the world on the topic.

I encountered Critical Race Theory in organizations I was working with as a consultant, where it's commonly billed as diversity training to gain buy-in and support.

Now, I have to be very clear: Not all diversity training in organizations teaches people that they are inherently racist and sexist based on how they were born. It's important to note that this bill would not eliminate the good kinds of diversity and inclusion training related to exploring different cultures and life experiences.

However, in the aftermath of George Floyd's death, training that was grounded in Critical Race Training took over the corporate training industry. Organizations were suddenly requiring that their employees read texts like DiAngelo's White Fragility or Ibram X Kendi's How To Be An Anti-Racist, and forced white employees to go to internal struggle sessions where they were required to confess their inherent racism at risk of losing their job.

And it's even worse when you look at the school systems.

Right now, in schools all over the country, children as young as five are being taught this ideology.

School systems are integrating these ideas throughout their curriculums, and children who are white and/or male are being forced to confess to their classmates that they are oppressors. If they don't fit into one of the oppressor categories, they are taught they are a victim and will never get ahead in the world because of the oppressors.

And if you think it can't happen in New Hampshire, I have some bad news for you: It already has.

Over the summer, I know of teachers in schools in New Hampshire who read White Fragility as a part of "optional" training courses. In Critical Race Theory, "optional" very rarely means optional, because if you don't do it your colleagues will label you a racist and you could lose your job.

Being called a racist is one of the very worst things we can be called in our society. It is a scarlet letter that followers the wearer around, something they can never escape from.

There is absolutely still work to do with regards to making sure everyone in our society has access to opportunity regardless of the color of their skin or gender, and that everyone is treated fairly.

However, Critical Race Theory is not the way to get there. It is a regressive ideology that is going to lead to MORE racism and misogyny, not less.

I strongly encourage you to support the bill and protect the people of New Hampshire from this harmful ideology.

Additional information about Critical Race Theory can be found here:
https://newdiscourses.com/2021/01/what-is-critical-race-theory/

**Archived:** Friday, April 16, 2021 12:52:12 PM
**From:** Thomas Petrucka
**Sent:** Thursday, March 4, 2021 2:50:16 AM
**To:** ~House Executive Departments and Administration
**Subject:** Support for proposal HB544
**Importance:** Normal

---

To whom it may concern,

I am extremely excited to see progress being made in resisting the inherently toxic ideology of critical race theory, and I wanted to applaud your state's proposal to ban it from publicly funded settings.

I grew up a white man in a predominantly white area; but as a child, race and gender have never been some to separate people over. My mother saw her mother's prejudices, and carefully taught me love and listen to everyone while growing up. I wouldn't say that I didn't "see" color, but even through high school--I tried to foster an environment where everyone can feel included and accepted. I did this as a founder of my school's improv troop, and leader in my school theatre program.

And then I went to college. After attending one semester at a local publicly funded university (in its theatre arts programs) I experienced three classes in which I was singled out as a white man, told I was inherently bigoted because of the color of my skin, and listen to performances that reinforced that ideology on repeat--in a required class for my particular program.

I was never very vocal about my moderate conservative viewpoints, but my previously conquered depression resurfaced. I never felt like I could comfortably share any of my opinions without igniting backlash or political debate, and so I stayed silent while my mental health (and subsequently my grades).

I support diversity, and there are plenty of inclusion trainings that have been verified for use, and are effective in uniting a classroom or workplace. *Critical Race Theory* (which this bill opposes) is divisively conceived. It assumes that people of color will always be oppressed. It requires white people to apologize for the acts of some (often imagined) ancestor. Every book or article I have found discussing *critical race theory* lists virtually no sources, and the few studies I see proving any systemic racism present a clear confirmation bias. I cannot thank you enough for leading the charge in combating this corrosive ideology.

I hope this letter may be received well, and I thank you for considering this bill. If someone is truly reading this, I thank you for your public service. Small steps HB544 will be crucial to preserving the American ideals that have allowed this nation to thrive in the past, and I hope the bill passes.

May God bless you,

~ Thomas Petrucka

**Archived:** Friday, April 16, 2021 12:52:12 PM
**From:** gem122782
**Sent:** Thursday, March 4, 2021 1:37:32 AM
**To:** ~House Executive Departments and Administration
**Subject:** SUPPORT for HB544 Bill!!!
**Importance:** Normal

Dear Committee members,

I am emailing you as a concerned parent of New Hampshire, to voice my SUPPORT for the HB544 Bill to ban Critical Race Theory. My daughter has already experienced forms of this at Pinkerton Academy and it is a form of racism. This is very harmful and dangerous rhetoric and should absolutely be banned from being taught in our NH schools. A person is not born automatically racist solely based on the color of their skin etc. As I mentioned above my daughter attends Pinkerton Academy and her American Government teacher Mrs. Diane Gioseffi is using her classroom (which is a required credit to graduate) as a platform to indoctrinate all her students during 90 minute classes. In this class my daughter has had lessons on Implicit Bias, White Privilege and been forced to watch The Peanut Butter, Jelly & Racism video and much more. This has no place in American Government class or any other class for that matter. Critical Race Theory is divisive, harmful to the childrens self esteem, mental and emotional well-being, causes racism and teaches children to hate themselves and their Parents. It is so sad to see what this is doing to our children and the future generation, it is a very powerless feeling as a parent. New Hampshire parents need your help in order for our children to have a brighter future! I implore you to please pass this bill and protect the children of New Hampshire's mental health and well-being. You have more support than you know!! Thank you for your time!

Sincerely,
Kristen M.

Sent from my Galaxy

**Archived:** Friday, April 16, 2021 12:52:14 PM
**From:** Lauren Smith
**Sent:** Wednesday, March 3, 2021 5:32:12 PM
**To:** ~House Executive Departments and Administration
**Subject:** I Support HB544
**Importance:** Normal

---

Good morning,

I am reaching out in support of HB544.

I understand many people will be contacting you to oppose this bill by stating it's the equivalent to banning diversity training. This is not the case and I am not opposed to diversity training. This bill targets race and gender scapegoating, which shouldn't be included in diversity training if your aim is a more inclusive and understanding society/workplace.

Critical race theory based training (or anti-racists training) segregates groups based on race (white and non-white). The white group is told they are the oppressor and made to confess to their sin of racism. I realize it sounds outlandish, but individuals in workplaces and colleges have been secretly recording these conversations for at least the last few years. When listening to these conversations there are eerie similarities to the struggle sessions during the cultural revolution in China. During these struggle sessions, a white individual that resists being told they are an oppressor or racists provides additional proof of their guilt. There is no way out for the individual. On the flip side, non-white individuals are grouped together and told they are oppressed by the white population. If a non-white individual resists, by reporting no sense of oppression, this proves they are complicit in systemic racism. Non-white individuals that resist can be ridiculed and labeled race traitors. Essentially this process is striping away individuality and placing everyone into collectives based on immutable characteristics.

Unfortunately it appears our country is forgetting MLK Jr.'s I have a dream speech. Individuals should be judged on the content of their character, not the color of their skin. I'm honestly worried this continued shift is going to increase actual racism in the country and teach a whole new generation of Americans to judge fellow citizens on their skin color (it's already being pushed on children as young as kindergarten). We must stand up for our liberal values and push back on this illiberal ideology.

Thank you for your time.
Lauren

**Archived:** Friday, April 16, 2021 12:52:15 PM
**From:** Scott Slone
**Sent:** Wednesday, March 3, 2021 3:47:38 PM
**To:** ~House Executive Departments and Administration
**Subject:** Live Free or Die, Vote Yes on HB544
**Importance:** Normal

Greetings to the House Executive Department,

My name is Scott, I'm a recent New Hampshirite, having moved to the state for work and opportunity in 2017. In the four years I've been here, I've grown in love with the state. It reminds me of my homeland in Alaska, both in culture and nature. I want to live here for years to come, I would like to make a life here, I would like to grow old here.

That being said, the infectious disease known as Critical Race Theory threatens to tear down all we hold dear. It ruins lives, solidarity with our friends, teaches us we are all evil and racist, with the end result being time and time again that all good folk give up all desire to be good, since what is the point? CRT destroys businesses, governments, societies, and the hate that is its source has no intention of peace or justice. It only wants more hate, whether that's through sayings like "Systemic Racism" and "Be Less White." These phrases drip with hatred for our fellow Man, when they should be the ones we love most.

I do know know if anyone in NH's legislative system will read this, but I hope you will. Vote Yes on ending the hatred. Vote Yes on HB544.

-Scott Slone

**Archived:** Friday, April 16, 2021 1:03:44 PM
**From:** Michael Maloney
**Sent:** Tuesday, March 2, 2021 11:09:35 PM
**To:** ~House Executive Departments and Administration
**Subject:** Voicing my support for HB544 [Relative to the propagation of divisive concepts]
**Importance:** Normal

I am writing in to voice my complete support for HB544 to ban the dissemination of divisive concepts in New Hampshire schools.

The Constitution of the United States under the First Amendment mandates the separation of church and state. While a common, myopic interpretation of this is that the state (and state schools) should be separate from any particular denomination of Christianity, the spirit of this Right should be understood in much broader terms, extending even to areas that would be widely considered secular.

Indeed, the rightful interpretation of the separation of church and state is that no man shall ever be compelled to believe any set of doctrines or principles by the state or any public institution. This should be understood to mean not only religion, classically understood, but also secular worldviews

But what we are experiencing right now, with this spreading of Critical Theory (CRT) (including related notions, such as Critical Race Theory, Intersectionality, or watered-down variations which often surround themselves with terms such as "Equity" and "Inclusion"), is several schools and other institutions mandating the belief in a particular secular worldview -- that of Critical Social Justice. Refusal of these ideas often put the student or employee at risk of their grades, their careers, and their future prospects. There is a serious threat of humiliation and ostracization for those who refuse to conform to these beliefs.

We would think it completely *absurd* in modern day America that a public school would ever tolerate a teacher who inquired into their students' belief in God. The belief in God is legitimate, but public schools are the wrong place in society for such inquiry. And moreover, it would be a scandal if any teacher were to do so *publicly* of a student, in front of the entire rest of the class. Such reckless abuse of teacher-parent trust would quickly land the school district in a barrage of costly lawsuits and would further erode trust in a public school system of whose public opinion has been in decline since the 1990s.

And even if the State of New Hampshire does not officially recognize this emerging "Wokeism" as a kind of pseudo-religion, as I and many other American taxpayers do, the above would hold just as firmly for secular beliefs. If a teacher were to publically interrogate their students on the "Failings of Capitalism" or the "Untrustworthiness of the Police" or of "the Importance of Free Love in Society", the religious connotations would not be there, but the sharp sense of a moral overstep on the part of the school system would remain. And this feeling becomes even more acute the younger the students are. Race and gender are important subjects. But the moral disgust felt by parents who feel revulsion at them being taught to (say) third graders is a force that the school systems, and ultimately, the state itself, will have to bear the cost of.

At the public hearing for HB544, there were dozens and dozens of arguments that were presented in support of the bill. It has precedent from the former presidential administration, as HB544 was closely modeled on the relevant executive order to ban "racial scapegoating" in the federal government. This executive order was received with wide support. James Lindsay gave a very

powerful, objective, and well-informed analysis of the underlying philosophy of Critical Theory. He brought up that these ideas have been implemented in several institutions already across the country, and in every case, they lead to decoherence of the social fabric. And, as James explains, this was what the Critical worldview was *designed* to do. Very similar ideas promoting "racial consciousness" have been tried abroad in other countries, including South Africa, with disastrous consequences. The result is more racial tension between students and faculty -- the exact opposite of the outcome Critical Race Theory purports to champion. As was in the very moving testimony by the older Chinese woman "Lily", despite the warm, fuzzy language used by the proponents of Critical Race Theory, the actual policies are disturbingly similar to those that were used in China during the 1960s during the Cultural Revolution under Mao.

Why would we tolerate such practices in our children's curricula?

Of the many testimonies *against* HB544, there were two types of arguments presented.

The first type of argument, presented by the vast majority of speakers, simply promoted Critical Racist Theory and "Anti-Racist" training as being social goods. These were moral arguments, offered by people who, in all likelihood, already subscribe to the Critical worldview. They claimed that HB544 would impede efforts to address racism in society. At a few points during the hearing, there were attempts to insinuate that certain people offering their testimony were, themselves, racist. The most notable example of this, again, was James Lindsay at the end of his testimony, where Rep. Kris Shultz tries several times to suggest that James is involved with white supremacist groups. James's response to her behavior was perhaps the most important part of the whole day's hearing:

Any opposition to Critical Social Justice will be met with animosity and an attempt to silence the dissenting voice.

This is what makes Critical Race Theory so dangerous. Rather than inviting open a conversation about race, it prescribes its interpretation (the so-called "Anti-Racist" approach) and fiercy attacks anyone who proposes alternative ideas.

But the truth is that for nearly 60 years, the United States has been engaging in an alternate interpretation of how to handle the issue of race in our society. Namely, the liberalist approach advocated by Dr. Martin Luther King, Jr. In what is perhaps the most important speech in the history of modern America, Dr. King articulated his belief so concisely that every American over 30 knows it: Judge people not by the color of their skin, but by the content of their character. Despite his hardships while he was alive, Dr. King's message was so powerful and so resonant with our society, that race relations had been objectively improving since the 1960s up until very recently. (And I will leave it to the reader to decide if it is coincidence -- until the last decade where the Critical worldview became prominent).

But sadly, Dr. King's message -- do not judge a person by their race -- is not only an alternative to Critical Race Theory, but it is antithetical to it. Critical Race Theory teaches that race is the *primary* factor on which to judge someone. The idea that all white people have an inherent "White Privilege" and that all black people suffer from "White Oppression" are basic tenets of Critical Race Theory. Although this language is often couched and softened, it is a short exercise in academic history to trace the more administrative dressings of these ideas back to their original sources. And even now, popular accounts of these ideas, such as the various books published in the last few years by Robin DiAngelo and Ibram X Kendi, are very explicit in their language about the problems of society stemming directly from "Whiteness".

It is an absurdity that we must indulge in the Marxist-derived notion of "Anti-Racism" lest our society succumb to racism.  As Americans and as lovers of liberty and equality, we all have a duty to uphold Dr. Martin Luther King, Jr.'s vision of America.

The second point I heard in the hearing for HB544 is also worth addressing here: that HB544 would infringe on the free speech of private companies contracted to create curricula for the New Hampshire school systems.

It's interesting that it is the First Amendment that both protects free speech and also excludes the state from mandated doctrine. That alone is enough to suggest that those presenting the "free speech" argument against HB544 bear just as much the burden of proof as do the proponents of it do.

In defense of the free speech of these companies, I do believe it is their right to design and produce curricula based on Critical Race Theory. This is despite my personal belief that Critical Social Justice is a danger to our society. To the credit of the opponents of HB544, the danger of advocating for state censorship is equally or more dangerous than CRT. And so let me state that I believe it is the right for these companies to sell these materials in the *private* sector, including to the private school system in New Hampshire. If parents want their children to receive an education based on Anti-Racism, they should have every right to do so.

Where I feel there are *limits* to the rights of those in favor of CRT is the teaching of it in *public* schools. This is precisely where we find the conflicting rights: that of the curriculum-writers to sell their product and that of parents and students to be free of indoctrination.

Perhaps to present a thought-experiment for the reader: In any school teaching Critical Race Theory as part of its curriculum, is it possible for a student to pass a class with full marks if they publicly denounce their belief in "Anti-Racism"? Is it possible to get full marks without ever being compelled to write affirmatively about ideas the student and his or her family may not believe in, such as "Privilege", "Systemic Racism", or "Oppression"? --- with all of these taken to mean the technical concepts, as they are written about in the peer-reviewed literature on the subject and not taken to mean the obviously extant notions we mean when these words are used in every-day speech. Is it possible for a student to pass such a class with full marks if they opt out of *all* activities where students are required to affirm or declare their Race, Privilege status, or Oppression status?

My belief is that these situations would not be tolerated by the schools. Students who refuse to affirm would be humiliated by their teachers and failed on the grounds that they were not compliant with the coursework.

To a careful observer, the hearing for HB544 was revealing in more ways that you could count. This bill isn't the result of a special interest lobby group. It is the result of a plurality of concerned parents and American citizens who want to make sure the next generation is able to get the education they deserve without being coerced into believing in a false Critical worldview. It is a concern not just to white parents, but to hispanic parents, asian parents, black parents, and others. The concerns raised against the teaching of Critical Race Theory are diverse and many. And the arguments, by and large, are not grounded in race or racism. While on the other side, those opposed to the bill are singularly preoccupied with both. And they would be content to see every other parent's children be preoccupied with them as well.

The public school system in America is a relatively young institution. The sentiment among a rapidly growing sector of the American public is that if schools are not serving the interests of their children, then they will find alternative ways to find their children succeed in life. It may feel

easy to succumb to the enormous pressures exerted by the activist-class pushing Critical Social Justice. But to vote against HB544 is an invitation to a decade of expensive litigation, with accusations of racial discrimination and violations of Title IX in the short-term --- and a collapse of the school system in the long-term, as Critical Social Justice does what it has a reputation for doing to institutions.

The HB544 bill is perhaps one of the most influential pieces of legislation in the country at the moment. Just as with Brown v. Board of Education in 1954, the great state of New Hampshire is being asked to make an enormously important choice which will affect the future of our the rest of America. Segregation was an evil in our country -- an ugly, residual after-effect of slavery. Today, we see a horrifying resurgence of advocates calling *for* the re-segregation of our society. It is unfathomable. And it is pernicious --- for these advocates have made use of purposefully obscuring language to pass these illiberal ideals off as social justice. Indeed, those pushing Critical Social Justice into our schools, use the Orwellian inversion, "de-segregation", to refer to the practice of creating racially separated spaces.

Thank you for taking the time to read this. Support HB544 and ban the teaching of divisive concepts based on the ideas of Critical Race Theory in public schools.


Michael Maloney

**Archived:** Friday, April 16, 2021 1:04:37 PM
**From:** Diane Champa
**Sent:** Tuesday, March 2, 2021 7:04:12 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

Dear Committee Members,

I urge you to pass HB544 that would ban educators from teaching systemic racism and sexism in schools. It is the job of parents to teach their children moral values, not teachers or educators. As a teacher, my job is difficult enough teaching academic subjects, and our job just became more difficult with children out of school for an entire year. However, I do teach kindness and respect to my students, and so far, those simple values seem to work for most children.

Thank you for listening to an educator,

Diane Champa

**Archived:** Friday, April 16, 2021 1:05:11 PM
**From:** Annie Jung
**Sent:** Tuesday, March 2, 2021 5:49:38 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

Hello committee members,

I'm writing in support of HB544.
I'm not a resident of NH, but I've started to see critical race theory creep up in my home state of NY, which has disturbed me profoundly. And I'm not a white person. I'm Asian. I sincerely hope this does not bleed into NH and that's why I'm writing this email.

Below link shows a recent material that was distributed by a NYC public school to the parents of their students. A prime example of critical race theory in practice.
https://www.syracuse.com/state/2021/02/ny-principal-asks-students-parents-to-reflect-on-their-whiteness.html
It lays out "8 white identities", one of which is "white abolitionists".
I'm not a white person, but this is incredibly racist. If anyone reduced me down to 8 possible identities of "Asian" or if anyone did that to any other race, that person would be justifiably condemned and fired immediately .

I'm not writing this to complain. I'm writing to ask you to help stop this kind of racist rhetoric at our public schools, where kids are so impressionable. This only encourages people to see life through race, which is incredibly divisive and patronizing. Furthermore, I wonder if our schools are in fact racist since they are sending these things out. Is this an admission of guilt? They are proclaiming we are governed by whiteness (I'm assuming they mean their school, too, since they're sending it out). If that's the case, there should be an investigation and the staff, principles, and the school board should be fired for white supremacy/racism.

I spent a good part of my teens and early 20's being afraid that whatever I did was a reflection of my race and always feeling insecure about it. I learned this behavior from my family, not white people. It was my non-Asian friends  who helped me realize none of them were judging my actions through my race, but only as an individual. When I realized this, it was incredibly freeing. Critical race theory and materials like the one distributed by East Side Community High School does exactly the opposite. It only reinforces stereotypes, which helps no-one. Groups of people will grow up thinking their destiny is somehow fixed because of their skin color and that they are "oppressed" and will never achieve the same level of success as whites, which stunts them from the beginning. How will they ever achieve something if they don't aim for it because they are told they will never get there because of "systemic racism"? This is called the soft bigotry of low expectations. On the other hand, another group of people will grow up thinking they are bad racist people just because of the color of their skin and that they should live every aspect of their lives to atone for the sin that is the color of the skin - regardless of their beliefs or actions. This is racist. This is backwards. This isn't why my grandparents and father risked everything to come to this country.
Instead, we should be teaching our kids that while life is unfortunately unfair, hard work, persistence, and kindness will get them closer to their goals and a better community. Bashing a group of people for their supposed privilege is lazy, racist, and anything but kind.
Whether intentional or not, CRT is a way to skew the socio-economic class issue into a racial one to divide our communities, rather than unify to solve problems.

Racism is a problem, yes. I have been at the receiving end of racial slurs thrown at me. However, I realize that those who called me names are mentally ill or at such fringes of society that they practically don't matter in my life or the vast majority of my community members' lives, too. So they don't bother me at all. This is what we should be teaching our kids. Racism exists, but we need to be rational, tough, and persevere through the difficulties in life to make our own lives better through hard work and surrounding ourselves with those who uplift us.

I have told my councilmembers that this kind of rhetoric in the public space where my future children will attend has made me looking to other states to put down roots and pay taxes. I am not alone, and I'm sure I wouldn't be alone in NH. Please pass this bill.

Thank you for your time.

--
Annie Jung
anniejung90@gmail.com
661-714-7625

**Archived:** Friday, April 16, 2021 1:05:38 PM
**From:** Adrian Zavalza
**Sent:** Tuesday, March 2, 2021 5:12:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

---

To whom it may concern,

When I was young, I learned about the Civil Rights movement and the words of Dr. Martin Luther King. I remember being taught the concept of not judging a book by its cover. Being shown that no matter who you are or what you look like, working twice as hard as the person next to you leads to success. I grew up in a diverse neighborhood where skin color was never considered to create friendships.

Today, I see all of the amazing progress the people of this country have made is being forgotten. History rewritten. Critical Race Theory requires that a person view every aspect of society through the lens of race. If you're not white, somehow you have been oppressed by whites. If you are white, somehow you are inherently oppressive or a beneficiary of your immutable characteristic.

I'm not a college graduate or a renowned thinker, but it doesn't take a genius to see the irony in promoting a school of thought which peddles racist ideology in order to rid the world of racism. CRT is the antithesis of our nation's values. HB544 must pass before more unsuspecting citizens and even children are indoctrinated into this horrible ideology.

Proponents of CRT claim it is necessary to overcome systemic racism and to help minorities succeed. The reality is that CRT is just another scheme to support the false idea of systemic racism. It is simultaneously a detriment to society and a distraction from real solutions that would entail reforming or removing actual government policies that negatively impact minority communities.

I support HB544.

Thank you,

Adrian Zavalza

**Archived:** Friday, April 16, 2021 12:52:16 PM
**From:** Orlando Campa
**Sent:** Wednesday, March 3, 2021 3:32:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

Good morning,

I am reaching out to you to bring to your attention why Critical Race Theory should not be supported by your State. As a Mexican-American immigrant who is racially of European descent, I take personal umbrage with this supposed "anti-racist" program telling any race that they are lesser than.

I am not "lesser than" because of my Caucasian blood, nor has "Whiteness" made me more arrogant. This type of reasoning may lead to more racial, social, cultural, and political division in your State, but worse, it may set a precedent to other States or even Federally that this kind of indoctrination is okay.

Please do as much research into Critical Race Theory as you can and realize that this is divisive, not unifying, speech.

Thank you for your time.

Orlando Campa

**Archived:** Wednesday, April 7, 2021 1:18:19 PM
**From:** D Hyde
**Sent:** Wednesday, March 3, 2021 9:38:58 AM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal
**Digitally Signed:** Yes

To whom it may concern

As an employer, we are committed to inclusion and diversity in the workplace. However, we have been very concerned about the popularity of Critical Race Theory based programmes being offer to us. We have banned any course or trainer that uses racist stereotyping, makes racial generalisations or promotes discrimination. We support this legislation to help protect all workplaces from racist training like this.

There has been extensive research into CRT based diversity programmes, including by the  United Kingdom government  and they are proven not to work, to promote racism and racial disunity as well as to increase inefficiencies and damage interpersonal dynamics. The programmes do not foster real anti-racist workplaces. The use of the term 'anti-racism', when used by these programmes does not mean against racism. Indeed it encourages it.

There are wonderful positive diversity and inclusion programmes such as Chloe Valdery's, which we use and is very successful.

In conclusio,n  I urge you not to be swayed by very load activists in this matter. There inteention is not to improve the culture, it is to dismanttle it including your own venerable institution.

Thank you for your attentions.

Yours sincerely,

Danielle Hyde

**Archived:** Friday, April 16, 2021 12:52:18 PM
**From:** austindpowers89@yahoo.com
**Sent:** Wednesday, March 3, 2021 11:57:20 AM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

---

To whom it may concern, I want to voice my support for HB544. Critical Race Theory is a disgusting and racist ideology that helps divide people along racial lines and antagonize them toward one another. It promotes using shame, intimidation and other bullying tactics in order to berate and belittle people of particular races and justify discriminating against them. Proponents use the guise of "anti-racism" and "social justice" to justify their racist actions and ideology, but while these concepts on their face may sound good, they are just names meant to conceal the racism and injustice they promote.

The critical race theorists believe the only solution for past discrimination is present discrimination. They just want to point the present discrimination in the opposite direction. They say these groups of people were discriminated against and marginalized in the past, and so now its your turn. "It's not enough to be not racist," they say, "you have to be anti-racist..." aka racist against white people. This ideology is directly antithetical to Dr. Martin Luther King Jr's dream where we are not judged by the color of our skin. Critical Race Theory wants people judged by the color of their skin in a racial hierarchy, telling white people to shut up and check their privilege, while promoting "diversity" to favor people of color.

This ideology is dangerous and divisive and has no place being endorsed, promoted or funded by state or federal government dollars. I hope you will support HB544 and help promote and ensure the continued strive toward both Dr. King's and the American dream.

**Archived:** Friday, April 16, 2021 12:52:18 PM
**From:** ellen
**Sent:** Wednesday, March 3, 2021 11:40:59 AM
**To:** ~House Executive Departments and Administration
**Subject:** HB544 - Please Support
**Importance:** Normal

---

Good morning,

I am reaching out in support of HB544. I understand many people will be contacting you to oppose this bill by stating it's the equivalent to banning diversity training. This is not the case and I am not opposed to diversity training. This bill targets race and gender scapegoating, which shouldn't be included in diversity training if your aim is a more inclusive and understanding society/workplace. Critical race theory based training (can also be called anti-racists training) segregates groups based on race (white and non-white). The white group is told they are the oppressor and made to confess to their sin of racism. I realize it sounds outlandish, but individuals in workplaces and colleges have been secretly recording these conversations for at least the last few years. When listening to these conversations there are eerie similarities to the struggle sessions during the cultural revolution in China. During these struggle sessions, a white individual that resists being told they are an oppressor or racists provides additional proof of their guilt. There is no way out for the individual. On the flip side, non-white individuals are grouped together and told they are oppressed by the white population. If a non-white individual resists, by reporting no sense of oppresson, this proves they are complicit in systemic racism. Non-white individuals that resist can be ridiculed and labeled race traitors. Essentially this process is striping away individuality and placing everyone into collectives based on immutable characteristics.

Unfortunately it appears our country is forgetting MLK Jr.'s I have a dream speech. Individuals should be judged on the content of their character, not the color of their skin. I'm honestly worried this continued shift is going to increase actual racism in the country and teach a whole new generation of Americans to judge fellow citizens on their skin color (it's already being pushed on children as young as kindergarten). We must stand up for our liberal values and push back on this illiberal ideology.

Thank you for your time.
Ellen

**Archived:** Friday, April 16, 2021 1:03:57 PM
**From:** Jason Walters
**Sent:** Tuesday, March 2, 2021 9:59:56 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544 Support
**Importance:** Normal

Hello all,

I'm writing to show my support for ending the funding of Critical Race Theory. I wanted to let you know that I'm in favor of ending the funding of this racist training. Don't be fooled by the manipulative word play they like to use. Critical Race Theory is what these racists want to make more people racist. Take a close look at the leaders and what they say. They asspose that they are racist and therefore all people of their race must be racist. They preach Anti-Racism but that is only a cover for being racist against those in the racial majority. These people only see you as a racial monolith. To think differently than your group is to be othered.

If you believe that you should be judged on actions, not words, then look at their actions. The people who are pushing Critical Race Theory have pushed to have minorities removed from common place media. You can see examples of this with the removal of positive black role models from store shelves with brands like Uncle Ben and Aunt Jamima, real people who worked hard and brought delight to many, while White faces are allowed to remain without issue. Dr. Suess books have been removed for depicting images of people in traditional ethnic outfits, further removing non-White European images from our cultural landscape.

This ideology pushes people into thinking of themselves as a racial group, and for those in the majority group to punish themselves and hate themselves for being born in the majority. This just breeds more belief that the majority is superior. They would have you believe that the homeless Majority man on the corner is better off than Former President Obama just because they have different skin color.

Don't be fooled by this racist ideology. Please lead the way on removing this cancerous ideology from our society.

Take care and have a nice day.
-Jason Walters
CA Resident hoping for NH to lead the way to MLK's dream.

**Archived:** Friday, April 16, 2021 1:04:43 PM
**From:** Joshua Sanders
**Sent:** Tuesday, March 2, 2021 6:46:33 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

Dear Honorable New Hampshire Representative,

I support the passing of HB544 to restrict the usage of public funds teaching of Critical Race Theory (CRT). CRT or otherwise known as Anti-Racism is an Ideologically driven mindset that advocates its adheres to make moral judgements about people based upon their race. Which is the general understanding of the term Racism.

Our nation fought a war to combat institutionalized racism please do your part to prevent our nation from reversing course.

Sincerely,
Joshua Sanders

**Archived:** Friday, April 16, 2021 1:04:48 PM
**From:** Matt Malkan
**Sent:** Tuesday, March 2, 2021 6:32:16 PM
**To:** ~House Executive Departments and Administration
**Subject:** please vote FOR HB544
**Importance:** Normal

---

Having spent many good times in New Hampshire with the good people there,
I urge you to pass HB544. I stress that this is NOT a partisan issue.
Hardly anybody in either party wants schools or businesses to embrace
ideological indoctrination, whatever name it is called ("Critical Race Theory",
'Anti-Racism' or many other deliberately misleading euphemisms).
This indoctrination is  harmful because it is
founded on the factually incorrect assumption that your skin color
is the most important thing about you, determining your views,
attitudes, values and behavior. It falsely assumes that any differences
can only be explained by unconscious 'racism', and that heavy-handed
government intervention is then required to take away things some people
earned, and give them to others, SOLELY BASED ON THEIR SKIN COLOR.
this is utterly against everything our country stands for, from Dr. King
back to Lincoln.
Please support the passage of HB544.

Thank you for your consideration,
Sincerely
Matt Malkan
Distinguished Prof of Physics, UCLA

**Archived:** Friday, April 16, 2021 1:05:13 PM
**From:** Bob Danielson
**Sent:** Tuesday, March 2, 2021 5:47:48 PM
**To:** ~House Executive Departments and Administration
**Subject:** Please support HB544 and banish the divisive and racist critical race theory movement.
**Importance:** Normal

---

To whom it may concern,

Please support NH HB544 to ban critical race theory training.

Common sense should tell you that critical race theory and it's bedfellow; Anti-Racist and White Fragility training is a horrible political movement/development and will set back race relations and the continued advancement of black people in America.  The teaching from these initiatives is in itself RACIST and frankly bizarre.

You may not know this, but the foundation of critical race theory et al is an offspring of and backdoor to advancing Socialism. I kid you not. But even setting that aside, you do not minimize racism by pushing forward with racist training based in identity politics.

Please Please Please I beg of you... use your heads and do not buckle to the "woke" activists who have become a fixture in many once excellent media organizations (including PBS to my despair for Gods sake).

Thank you for helping put a stop to this madness.

Sincerely,
Robert Danielson

**Archived:** Friday, April 16, 2021 1:05:55 PM
**From:** James Lindsay
**Sent:** Tuesday, March 2, 2021 4:46:41 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

To whom it may concern,

I am writing as an expert and concerned American, though not a New Hampshire citizen, in unequivocal support of HB544 which bans the teaching of certain divisive tenets as though they are fact. I also testified in the committee hearing as an expert on Critical Race Theory, against which this bill is ultimately based, on February 18 of this year. Please give this important, necessary bill your full-throated endorsement and a positive recommendation.

I don't know that this is the time for lengthy written testimony, so I'll try to keep my remarks brief. The bill being proposed, it should immediately be noted, bans not only the divisive tenets that stem from the Critical Race Theory worldview and its related activism, which is very aggressive and very interested in achieving dominance in our schools, workplaces, and lives, but it also bans trainings and uncritical teaching of what would be the more commonly understood forms of unacceptable bias, behavior, and ideology, including both white supremacy and patriarchy. It prohibits recipients of state funding from the same things the Civil Rights Acts and the Fourteenth Amendment are already supposed to protect against, although these are failing. Namely, the bill would prohibit teaching as uncontested fact or mandating training in racial and sex stereotyping, scapegoating, and discrimination, as well as positioning the state, institutions, etc., as intrinsically racist in a "systemic" way, which has allowed them thus far to avoid being found in violation of either the Civil Rights Acts or Fourteenth Amendment despite openly and explicitly advocating, in the words of the theorist Ibram X. Kendi, "present discrimination," which is billed as a necessary remedy to past discrimination. While someone might argue that this bill is unnecessary because of the Civil Rights Act, in practice this has not been borne out, making a bill like this more necessary than not. Every American, and every New Hampshire citizen, should not want discrimination, stereotyping, and scapegoating to be a part of their workplace training modules or children's education. This bill helps support that fundamentally equal and fair treatment before the law, which is currently at risk.

It should also be noted that this bill has First Amendment relevance as well, and not in the way its opponents would explain. The essence of the First Amendment is that people have freedom of conscience, particularly with regard to matters of spiritual belief, and freedom of speech, such that the state can neither compel nor restrict speech. Opponents of this bill will say that the bill seeks to restrict speech, but this is not true. It explicitly leaves provision for workplace trainings and education that don't teach these already-illegal tenets as uncontested fact. Moreover, the situation is quite the opposite to that portrayed by the opponents to the bill who oppose it on free-speech grounds. These workplace trainings and educational programs violate for very many people both freedom of conscience and freedom of speech. Their freedom of speech is violated by compelling them to admit to complicity in racism and sexism, among other social violations that are unlikely to be true. It also compels them to adopt a particular approach to anti-racism and anti-sexism that is very narrow and to speak on its behalf. This latter example, then, not only violates freedom of speech but also the freedom of conscience implied by both the free-exercise and establishment clauses of the First Amendment. It is not the state's place to be dictating (or funding the dictators of) how one is to feel about the issue of racism and sexism. Citizens, the overwhelming majority of whom firmly reject racism and sexism, should be granted the freedom of conscience to oppose

those on terms they find recognizable, which in a free, liberal country like the United States will mostly likely be rooted in equality, colorblindness, individualism, and universal humanity, which are solidly American values. They may also do so from Judeo-Christian principles, for example the famous injunction from Paul that in Christianity there is "neither Jew nor Greek, slave nor free," etc. They should not be compelled to do so in the terms most often employed by so-called "anti-racist," "diversity," "racial sensitivity," and "culturally responsive" programs today, which are a specific ideology known as Critical Theory, which explicitly rejects virtually all of these values for others, sometimes termed "liberationist" and at other times rightly labeled "neo-Marxist," including in the words of the activists pushings these programs themselves. While the law may not bear out today that these trainings and pedagogical pursuits violate the First and Fourteenth Amendments, as well as existing Civil Rights legislation, it is likely that they will eventually. It is therefore better to get on the right side of this issue now and take proactive steps to strengthen a legal architecture that is failing citizens in their most fundamental rights.

For the sake of brevity, I will not elaborate at length on the theory underlying the overwhelming bulk of these trainings and relevant school curricula, which is Critical Race Theory, the same (neo-Marxist) Critical Theory mentioned above specifically made to take race as a category of difference upon which Marxian conflict theory (oppressors versus oppressed) is to be applied. I will simply remind the committee that in addition to this theory being one among many approaches to the issue of race and racism, it is one that is rooted specifically in making precisely the same mistake that made racism the problem it has been throughout our history as a nation, which is specifically placing social significance into racial categories and considering that significance determinant and in some ways relevant to one's social standing and access to power. This was a horrific thing to have done in the 16th century going forward, and it's no better to do in the 21st century. It didn't work out then, and it won't work out now, unless one's goal is to effect an American Cultural Revolution in mirror image to the one Mao perpetrated on China in the 1960s-1970s, which (as few people know) used many of the same arguments and ideas about race, applied to the Han Chinese race instead of "whiteness."

Critical Race Theory begins from the assumption, in its own words, that racism is the normal state of affairs of society, changing the question from "did racism take place?" to "how did racism manifest in that situation?" (for racism is assumed to be relevant to every situation), and it calls into question "the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and the neutral principles of constitutional law." That is, it is presumptive, divisive, and explicitly un-American, if not anti-American. Moreover, it is designed not to be able to be disagreed with, as all disagreement is framed as some variation of racial "fragility" or "privilege-preserving epistemic pushback," which is to say a cynical drive to maintain one's social dominance, not legitimate criticism of the genuinely bad arguments and cynical assumptions put forth by the theory itself. Because it cannot be disagreed with without accusations of bad intentions and motivations, it is divisive and very difficult to uproot once installed. Because it believes "there is no neutral" between "dominance" and "oppression" (Marxian conflict theory), it is again divisive and in fact polarizing. Because its issues are so sensitive and because it addresses them in such an accusatory way (everyone who doesn't agree with it is racist and white supremacist), it diverts incredible volumes of resources to dividing and polarizing every environment it can gain a foothold in. HB544 exists to minimize that destructive influence and colossal waste of (taxpayer-funded) resources. Even worse, not only is there no evidence supporting the application of this theory, there is evidence against its claims that it can generate that which it claims to generate, so it tears apart organizations and poisons minds (including those of children) with its divisive tenets while profiting off a fraudulent enterprise that robs the taxpayers while destroying their communities.

On these grounds, and possibly hundreds of pages more that I could write if needed, I again urge you in the strongest possible way to support and recommend HB544 as a step in the right

direction, away from these divisive teachings and in support of the fundamental inalienable rights this country has always recognized and strived to extend to all citizens, even the allegedly privileged ones. This bill is important for New Hampshire, and it sends a message to America, whose federal government has just unambiguously signaled it wants to take us in the opposite direction by rescinding a similar federal executive order. That opposite direction is back into racial and sex discrimination, stereotyping, and scapegoating, and its into things America has never been and has never been willing to become, namely whatever it is that Critical Theory (i.e., neo-Marxism) aims to make of it.

Thank you.
James Lindsay, Ph.D.

**Archived:** Friday, April 16, 2021 1:06:05 PM
**From:** Kyle Sherman
**Sent:** Tuesday, March 2, 2021 4:23:52 PM
**To:** ~House Executive Departments and Administration
**Subject:** Support for HB544
**Importance:** Normal

Hello,

I'm writing this email to express profound support for HB544, a desperately needed piece of legislation to combat the rise of dogma and pedagogy in our public institutions. There is no room for divisive and inherently discriminatory critical race theory or anti-racism doctrine within institutions formed to serve the interests of the American people, specifically the people of New Hampshire. We cannot afford to subvert the interests of citizens and students by allowing the this particularly pernicious dogma to infiltrate governance, one that is tantamount to a religion that preaches identarian discrimination, teaches minorities they are hated by the world, and tells youth of a certain skin color that they're inherently evil and born racists. We the people demand these divisive concepts to be outlawed as outlined in HB544.

Yours Truly,
Concerned Citizen

**Archived:** Friday, April 16, 2021 1:06:34 PM
**From:** Mike Breen
**Sent:** Saturday, February 20, 2021 7:41:39 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB 544
**Importance:** Normal

I am contacting you regarding the potential for "Critical Race Theory" being taught in our schools. I have been a professional curriculum developer for the International Association of Chiefs of Police, the Department of State, and the Department of Justice. I have encountered these types of "theories" in the past and rejected their inclusion in curriculum I designed.

Why? "Theories" of this ilk pose as social science theories, presumably grounded in credible replicated research. However, they are not. They are scientifically illiterate radical false narratives sponsored by special interest groups promoting destructive agendas.

Please understand that at its core, "Critical Race Theory" (CRT) is not a Civil Rights Oriented belief system. Rather it asserts that White citizens are unavoidably and inherently racist and that the United States is a racist country. CRT is joined at the hip with a growing Afrocentric racial superiority belief system. Much of the racial scientific and historic illiteracy originates from an assertion that Black citizens are naturally superior to non-Black citizens "spiritually, physically, and intellectually" due to the greater level of melanin in their bodies. Ironically, all this doublespeak gibberish is coined "anti-racism" by radicals sponsoring federally mandated instructions of this ilk to our children. It in fact seeks to explain why all White citizens are inherently and unavoidably racist.

Just how mainstream are these racist beliefs? Despite the fact that claims of natural racial superiority are anathema to our civil rights movement, and the spirit and letter of our civil rights laws, Kristen Clark, [a current nominee for the office of the Assistant Attorney General for the Civil Rights Division of the Department of Justice] has publicly proliferated this widely discredited pseudoscience for decades.

Societies have been at these crossroads in the past. The world has not seen this level of race and ethnic hatred and suppression of genuine science since the rise of the Nazi Regime. Recall their teachings were based upon similar eugenic "science" of the day. The United States itself has not experienced this level of proliferated race pseudoscience since the rise of the Ku Klux Klan and has NEVER experienced mandatory racist teachings in local schools. Because history has clearly revealed the consequence of promulgating the hatred at the core of racial inferior "Theories" it will judge those making this mistake again harshly. To expose our children and their teachers to programs and tutelage which asserts that one race is inherently racist--thus inferior, and another is naturally superior is not simply scientifically illiterate. It is immoral on its face. Please protect our teachers and students from this societal cancer coined "Critical Race Theory" and the racist pseudoscience promoting beliefs of this ilk by making HB 544 the law in New Hampshire.

Michael D. Breen, MPA, Ph.D. 42 Marvin Road Moultonborough, NH 03254 Telephone: 603 253 9114

**Archived:** Friday, April 16, 2021 1:07:07 PM
**From:** Rachel Valk
**Sent:** Wednesday, February 17, 2021 12:08:21 PM
**To:** ~House Executive Departments and Administration
**Subject:** HB544
**Importance:** Normal

Good Morning,
I am writing in support of Bill HB544. I am just a private citizen who has never been involved in politics but I am very concerned. I clearly see that our American rights and values are being stolen from us and it feels like no one is doing anything about it. These policies are all being promoted ==under the guise of love, anti-sexism and anti-racism== and it's so evident to me when digging deeper that that is not true. Critical Race Theory is divisive and we as a state should not be promoting or mandating that. I for one believe that these social issues are things that should be taught at home not in a school. People are free to believe what they want. This is America. People are free to think and to research for themselves. This is America.


Thank you,
Rachel Valk

# EXHIBIT 81

HB2/Budget Trailer
Materials

# HB2-FN-A-L

| Body | Description |
|------|-------------|
| H | Introduced (in recess of) 02/25/2021 and referred to Finance HJ 4 P. 48 |
| H | Division III Work Session: 03/09/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division III Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Public Hearing: 03/16/2021 01:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | Division III Work Session: 03/12/2021 12:00 pm Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/16/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division I Work Session: 03/16/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| H | Division III Work Session: 03/19/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division III Work Session: 03/18/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/17/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/18/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division III Work Session: 03/15/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division I Work Session: 03/23/2021 10:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/94444579237 |
| H | Division III Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | ==CANCELLED== Division III Work Session: 03/25/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | ==CANCELLED== Division III Work Session: 03/26/2021 09:30 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/93701004543 |
| H | Division II Work Session: 03/22/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/23/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/24/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Division II Work Session: 03/25/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | ==CANCELLED== Division II Work Session: 03/26/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/96814127480 |
| H | Executive Session: 03/29/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 |
| H | |

»»CANCELLED»» Executive Session: 03/30/2021 09:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660

| | | |
|---|---|---|
| H | »»TIME CHANGE»» Executive Session: 03/31/2021 10:00 am Members of the public may attend using the following link: To join the webinar: https://www.zoom.us/j/92166004660 | |
| H | Majority Committee Report: Ought to Pass with Amendment # 2021-1059h (Vote 12-9; RC) **HC 18** P. 30 | |
| H | Minority Committee Report: Inexpedient to Legislate | |
| H | FLAM # 2021-1064h (Reps. Walz, Hatch): AF RC 175-203 04/07/2021 **HJ 5** P. 89 | |
| H | FLAM # 2021-1065h (): AF RC 175-206 04/07/2021 **HJ 5** P. 92 | |
| H | FLAM # 2021-1068h (Reps. Rogers, Nordgren, Wallner): AF RC 181-199 04/07/2021 **HJ 5** P. 94 | |
| H | FLAM # 2021-1071h (Rep. McWilliams): AF RC 177-206 04/07/2021 **HJ 5** P. 96 | |
| H | FLAM # 2021-1073h (Rep. Heath): AF RC 174-206 04/07/2021 **HJ 5** P. 99 | |
| H | FLAM # 2021-1062h (Reps. Heath, K. Murray): AF RC 178-203 04/07/2021 **HJ 5** P. 101 | |
| H | FLAM # 2021-1093h (Reps. Leishman, Buco): AF RC 186-197 04/07/2021 **HJ 5** P. 104 | |
| H | FLAM # 2021-1094h (Reps. Hatch, Leishman, Buco, Walz): AF RC 176-208 04/07/2021 **HJ 5** P. 106 | |
| H | FLAM # 2021-1063h (Rep. Hatch): AF RC 186-193 04/07/2021 **HJ 5** P. 109 | |
| H | FLAM # 2021-1069h (Reps. Nordgren, Rogers, Wallner): AF RC 180-201 04/07/2021 **HJ 5** P. 115 | |
| H | FLAM # 2021-1066h (Reps. Rogers, Nordgren, Wallner): AF RC 184-194 04/07/2021 **HJ 5** P. 117 | |
| H | FLAM # 2021-1104h (Rep. Almy): AF RC 161-218 04/07/2021 **HJ 5** P. 120 | |
| H | Ought to Pass with Amendment 2021-1059h: MA RC 200-181 04/07/2021 **HJ 5** P. 123 | |
| H | Reconsider (Rep. Osborne): MF RC 175-204 04/07/2021 **HJ 5** P. 125 | |
| S | Introduced 04/01/2021 and Referred to Finance; **SJ 11** | |
| H | Amendment # 2021-1059h: AA RC 204-178 04/07/2021 **HJ 5** P. 87 | |
| S | Remote Hearing: 05/04/2021, 01:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** | |
| S | Remote Hearing: 05/04/2021, 06:00 pm; Links to join the hearing can be found in the Senate Calendar; **SC 21** | |
| S | Committee Report: Ought to Pass with Amendment # 2021-1799s, 06/03/2021; **SC 26** | |
| S | Sen. Soucy Moved to divide the Question on Committee Amendment 2021-1799s: on Sections 74-75; Sections 427-429, Sections 397-404; and Section 412; 06/03/2021; **SJ 18** | |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** | |
| S | Sen. Bradley Moved to divide the Question on Committee Amendment 2021-1799s Sections 89-102 and then the Remainder; 06/03/2021; **SJ 18** | |
| S | Committee Amendment # 2021-1799s, on Sections 89-102, RC 13Y-10N, AA; 06/03/2021; **SJ 18** | |
| S | Committee Amendment # 2021-1799s, Remainder of the Committee Amendment, RC 14Y-10N, AA; 06/03/2021; **SJ 18** | |
| S | Sen. Bradley Floor Amendment # 2021-1816s, RC 24Y-0N, AA; 06/03/2021; **SJ 18** | |
| S | Sen. Whitley Floor Amendment # 2021-1862s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** | |
| S | Sen. Kahn Floor Amendment # 2021-1855s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** | |
| S | Sen. Rosenwald Floor Amendment # 2021-1850s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** | |
| S | Sen. Kahn Floor Amendment # 2021-1863s, RC 10Y-14N, AF; 06/03/2021; **SJ 18** | |
| S | Sen. Bradley Moved to divide the Question on Floor Amendment 2021-1861s on Sections 89-102 of the Amending Language and then the Remainder of the Amendment; 06/03/2021; **SJ 18** | |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** | |
| S | Floor Amendment #2021-1861s, Sections 89-102 of the Amending Language, RC 10Y-13N, AF; 06/03/2021; **SJ 18** | |
| S | Floor Amendment 2021-1861s; on the Remainder of the Amendment RC 10Y-14N, AF; 06/03/2021; **SJ 18** | |
| S | Sen. Rosenwald Floor Amendment # 2021-1858s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** | |

| | |
|---|---|
| S | Sen. Perkins Kwoka Floor Amendment # 2021-1859s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1847s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Birdsell Floor Amendment # 2021-1842s, RC 14Y-9N, AA; 06/03/2021; **SJ 18** |
| S | Sen. Soucy Floor Amendment # 2021-1874s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Kahn Floor Amendment # 2021-1876s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| S | Sen. Whitley Floor Amendment # 2021-1883s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Sherman Floor Amendment # 2021-1878s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1875s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Kahn Floor Amendment # 2021-1852s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Whitley Floor Amendment # 2021-1867s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Soucy Floor Amendment # 2021-1815s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Rosenwald Floor Amendment # 2021-1882s, RC 9Y-14N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Daniels Floor Amendment # 2021-1821s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Carson Floor Amendment # 2021-1827s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Giuda Floor Amendment # 2021-1838s, RC 8Y-15N, AF; 06/03/2021; **SJ 18** |
| S | Sen. Hennessey Floor Amendment # 2021-1866s, AA, VV; 06/03/2021; **SJ 18** |
| S | Sen. Bradley Moved to divide the Question on Ought To Pass with Amendment on Sections 89-102 and then the Remainder of the Bill; 06/03/2021; **SJ 18** |
| S | The Chair ruled the Question Divisible; 06/03/2021; **SJ 18** |
| S | Sen. Bradley Floor Amendment # 2021-1884s, AA, VV; 06/03/2021; **SJ 18** |
| S | Ought to Pass with Amendment on Sections 89-102, RC 13Y-9N, MA, 06/03/2021; **SJ 18** |
| S | Ought to Pass with Amendment on the Remainder of the Bill, RC 14Y-9N, MA, OT3rdg; 06/03/2021; **SJ 18** |
| S | Committee Amendment # 2021-1799s, on Sections 74-75 Sections 427-429 Sections 397-404 and Section 412, RC 24Y-0N, AA; 06/03/2021; **SJ 18** |
| S | Sen. D'Allesandro Floor Amendment # 2021-1861s; 06/03/2021; **SJ 18** |
| S | Without Objection, the Clerk is authorized to make technical and administrative corrections which are necessary to reflect the intent of the Senate, Relative to Bills and Amendments Passed Today, MA; 06/03/2021; **SJ 18** |
| H | House Non-Concurs with Senate Amendment 2021-1799s and 2021-1816s and 2021-1859s and 2021-1842s and 2021-1821s and 2021-1827s and 2021-1866s and 2021-1884s and Requests CofC (Reps. L. Ober, Weyler, Umberger, Turcotte, Packard) MA VV 06/04/2021 **HJ 9** P. 53 |
| H | Speaker Appoints Alternates: Reps. Edwards, Leishman, Wallner, Major, Emerick 06/04/2021 **HJ 9** P. 53 |
| S | Sen. Daniels Accedes to House Request for Committee of Conference, MA, VV; (In recess 06/03/2021); **SJ 19** |
| S | President Appoints: Senators Morse, Bradley, Rosenwald; (In Recess 06/03/2021); **SJ 19** |
| H | ==RECESSED== Conference Committee Meeting: 06/14/2021 11:00 am LOB 210-211 |
| H | Conferee Change: Rep. Erf added as Alternate 06/10/2021 **HJ 10** P. 22 |
| H | ==RECESSED== Conference Committee Meeting: 06/15/2021 01:00 pm LOB 210-211 |
| H | ==RECESSED== Conference Committee Meeting: 06/16/2021 01:00 pm LOB 210-211 |
| H | ==CONTINUED== Conference Committee Meeting: 06/17/2021 10:00 am LOB 210-211 |
| S | Conferee Change; Senator Daniels Replaces Senator Rosenwald; **SJ 20** |
| H | Conferee Change: Rep. Edwards Replaces Rep. Turcotte 06/10/2021 **HJ 10** P. 23 |
| H | Conferee Change: Rep. Emerick Replaces Rep. Packard 06/10/2021 **HJ 10** P. 23 |
| S | Conference Committee Report Filed, # 2021-2040c; 06/24/2021 |
| S | Conference Committee Report # 2021-2040c; RC 14Y-10N, Adopted; 06/24/2021; **SJ 20** |
| H | Reconsider (Rep. Osborne): MF DV 172-203 06/24/2021 |
| H | Conference Committee Report 2021-2040c: Adopted, RC 198-181 06/24/2021 |

| S | Enrolled Bill Amendment # 2021-2048e Adopted, VV, (In recess of 06/24/2021); **SJ 20** |
| H | Enrolled Bill Amendment # 2021-2048e: AA VV (in recess of) 06/24/2021 |
| H | Enrolled (in recess of) 06/24/2021 |
| S | Enrolled Adopted, VV, (In recess 06/24/2021); **SJ 20** |
| H | Signed by Governor Sununu 06/25/2021; Chapter 91; Unless otherwise specified the remainder of this act shall take effect: 07/01/2021 |

# House

House Finance
March 31, 2021
2021-1059h
05/06

Amendment to HB 2-FN-A-LOCAL

1  Amend the bill by replacing all after the enacting clause with the following:



Amendment to HB 2-FN-A-LOCAL
- Page 155 -

330  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:

CHAPTER 10-C

PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

10-C:1  Definitions.  In this chapter:

I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.

II.  "Divisive concept" means the concept that:

(a)  One race or sex is inherently superior to another race or sex;

(b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

(c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(d)  An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(e)  Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(f) An individual's moral character is necessarily determined by his or her race or sex;

(g)  An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h)  Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j)  The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 156 -**

III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex.

IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex.  It similarly encompasses any claim that, consciously or unconsciously, and by virtue of his or her race or sex, members of any race are inherently racist or are inherently inclined to oppress others, or that members of a sex are inherently sexist or inclined to oppress others.

V.  "The state of New Hampshire" means all agencies and political subdivisions of the state of New Hampshire, including counties, cities, towns, school districts, and the state university system.

VI.  "Student" means any and all students of any school district, school, college, or university which receives grants, funds, or assets from the state of New Hampshire.

10-C:2  Unlawful Propagation of Divisive Concepts.

I.  Requirements for the state of New Hampshire:

(a)  The state of New Hampshire shall not teach, instruct, or train any employee, contractor, staff member, student, or any other individual or group, to adopt or believe any of the divisive concepts defined in RSA 10-C:1, II.

(b)  No employee, contractor, staff member, or student of the state of New Hampshire shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

II.  Requirements for government contractors:

(a)  All state contracts entered into on or after the effective date of this chapter shall include the following provision:

"During the performance of this contract, the contractor agrees as follows:

The contractor shall not use any workplace training that inculcates in its employees any form of race or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (d) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (h) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

Amendment to HB 2-FN-A-LOCAL
- Page 157 -

values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)   The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)   In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)   The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.   The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.   The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.   Requirements for agencies.

(a)   The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.  Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)   The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training," to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

1      (2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency
2  employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic
3  protected by federal or state law.

4      (b)  The commissioner of the department of administrative services, pursuant to RSA
5  541-A, shall develop regulations for the enforcement of the provisions of this statute.

6      (c) Each agency head shall:

7      (1)  Issue a policy incorporating the requirements of this chapter into agency
8  operations, including by making compliance with the policy a provision in all agency contracts;

9      (2)  Request that the agency thoroughly review and assess not less than annually
10  thereafter, agency compliance with the requirements of the policy in the form of a report submitted
11  to the department of administrative services; and

12      (3)  Assign at least one senior political appointee responsibility for ensuring
13  compliance with the requirements of the policy.

14    VI.  Review of agency training.

15      (a)  All training programs for state agency employees relating to diversity or inclusion
16  shall, before being used, be reviewed by the department of administrative services for compliance
17  with the requirements of RSA 10-C:2, V.

18      (b)  If a contractor provides a training for agency employees relating to diversity or
19  inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and
20  such action is in violation of the applicable contract, the agency that contracted for such training
21  shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and
22  regulations.

23  10-C:3  General Provisions.

24    I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial,
25  cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the
26  requirements of this chapter.

27    II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger
28  course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner
29  and without endorsement.

30    III.  If any provision of this chapter, or the application of any provision to any person or
31  circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions
32  to any other persons or circumstances shall not be affected thereby.

33  331  Effective Date.  Section 330 of this act shall take effect January 1, 2022.



# HOUSE RECORD

### First Year of the 167th General Court

## Calendar and Journal of the 2021 Session

#### Web Site Address: www.gencourt.state.nh.us

**State of
New Hampshire**

---

| Vol. 43 | Concord, N.H. | Friday, April 2, 2021 | No. 18 |

**Contains: House Deadlines; House Bills Amended by Senate; Committee Reports; Meetings and Notices; Revised Fiscal Notes**

---

# HOUSE CALENDAR

**MEMBERS OF THE HOUSE:**

The House will meet in session on Wednesday, April 7th at 9:00 a.m., Thursday, April 8th, at 9:00 a.m., and Friday, April 9th at 9:00 a.m. in the NH Sportsplex facility at 68 Technology Dr. in Bedford, NH.

Session day logistics, including arrival times, parking, entry, materials and lunch distribution will be similar to the previous event, and where necessary, updates and modifications have been made. Those details appear in the back of this House Calendar. House members can expect an email with any further details early next week.

I have discussed with the Democratic and Republican Leaders our need to work together to manage our time wisely during the House session days. While there may be disagreement on many issues, we all agree that we can complete our business in a timely manner if we work together with mutual respect and understanding.

The House Finance committee will offer a budget briefing for House members on Monday April 5th at 1:00 p.m. via Zoom webinar. As in prior budget years, members of the public may watch a livestream via YouTube. A link to the YouTube stream is published in a notice in this House Calendar. House members will receive a link to the webinar by email so they may raise their hand and ask questions of the Finance Committee and Legislative Budget Assistant, if desired.

The amendment to House Bill 1 adopted by the majority of the House Finance Committee is one that replaces the entire bill and is over 700 pages long. Rather than print 400 copies of that amendment for next week, the Legislative Budget Assistant's Office has posted a link to that amendment here: http://www.gencourt.state.nh.us/LBA/Budget/Capital_Budget_House/Week%20of%203-29/HB_1_H_Finance_COMBINED_33021.pdf All other amendments to bills will be printed in two addendum calendars.

Additionally, if you are interested in the other documents used throughout the entire House budget process, the LBA has a webpage with those available to you found here:http://www.gencourt.state.nh.us/LBA/Budget/fy2022_2023_budget.aspx

The New Hampshire Automobile Dealers Association will be sponsoring one of our session day's lunches next week at session. Typically the NHADA hosts an annual Crossover reception for all legislators and staff, however in this unusual time, we have not been able to attend the usual social events that may exist for legislators. These receptions go a long way in terms of allowing members across the whole chamber to socialize and get to know their colleagues, and I know I speak for myself when I say this has been missed. We are thankful to the NHADA for sponsoring this lunch.

I am happy to announce that captioning for House sessions is now available. The link to access captions is a separate link from the session streaming link and will be available on the General Court website before the start of each session.

Sherman A. Packard, Speaker of the House

---

## NOTICE

The **Finance** Committee will hold **budget briefings** on **HB 1-A**, making appropriations for the expenses of certain departments of the state for fiscal years ending June 30, 2022 and June 30, 2023, and **HB 2-FN-A-L**, relative to state fees, funds, revenues, and expenditures on April 5th at 1:00 pm. House members will receive secure Zoom links. Members of the public may attend using the following link: https://www.youtube.com/watch?v=MvMW6Lf-ltw.

Rep. Kenneth Weyler, Chairman
Finance Committee

HB 1 provides no funding to the Department of Transportation (DOT) to address the deficit in the Highway Fund and has left DOT with a vacancy level in staffing of 15%. The reduction in the equipment maintenance fund will cause delays in planned road and bridge repairs by about two years.

Four million was cut from the Department of Safety (DOS), resulting in the underfunding of over 50 positions which will likely cause delays in services, especially in the DMV. Constituents using other DOS agencies will find an increase in wait times and a delay in response times across all services due to cuts in almost every line item in the safety portion of HB 1. All of these cuts are compounded by huge lapses back to the general fund in 2021 due to COVID-19. This budget will leave the Department of Safety unable to fully staff its Forensic, CODIS, Toxicology Lab and unable to maintain its vehicle replacement plan.

HB 1 underfunds the Department of Health and Human Services (DHHS) in many areas. This budget fails to fund the gap in federal funding that is vital for family planning providers across the state who provide vital services such as STD testing and cancer screening that do not currently exist in traditionally underserved parts of the state.

The DHHS-Tobacco Prevention and Cessation Unit had requested and was denied in this budget an additional prioritized need of $440,000 to fully implement an adolescent tobacco helpline to address this critical need. Without this additional $440,000, DHHS will be unable to fully implement this program and meet the needs of addicted youth through cessation services. This additional funding is a drop in the bucket compared to the over $214 million New Hampshire generated in tobacco tax revenue in 2020.

The youth rapid rehousing program that addresses teen homelessness is not funded in this budget. The purpose of this program is to support youth 18-24 who are experiencing homelessness by providing two years of rental assistance and supportive services to successfully maintain housing.

This budget directs DHHS to cut $50 million in general funds; $30 million in the first year and $20 million in the second year in any area excluding a few services. At this time there is no way of knowing what services would be reduced since the Finance Committee handed this responsibility to the department. Also, since most general funds at DHHS are matched with federal funds, we stand to lose an additional $50 million in federal matching funds.

In addition to any other required reductions, DHHS is directed to reduce their personnel budget by $22.6 million, which represents 226 full-time positions. This budget also requires that at no time during the biennium shall DHHS exceed 3,000 full-time authorized positions, further restricting the department's ability to provide critical direct services to New Hampshire residents. Here we stand to lose up to an additional $22.6 million in federal matching funds.

This budget fails to fund valuable public health services supported home visiting programs that help strengthen young families in New Hampshire. These services include individualized support, parenting education, and access to resources like primary care, WIC, and early intervention to reduce stress and improve family life. HB 1 dramatically underfunds protective preventive child care services for families who are under stress and involved with DCYF, helping to prevent abuse or neglect.

HB 1 does not fund the widely supported adult dental program that would require DHHS to provide critical adult dental care to residents under the Medicaid managed care program.

The minority finds that it cannot support HB 1 as amended by the Finance Committee due to the extensive underfunding of vital services, programs and positions throughout the state workforce.

**HB 2-FN-A-LOCAL,** relative to state fees, funds, revenues, and expenditures. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Kenneth Weyler for the **Majority** of Finance. HB 1 contains all the spread sheets and line items which are appropriated for spending. However, there are tax changes and reorganizations that are part of the appropriating process. These details are delineated in HB 2, sometimes called the trailer bill. This time HB 2 had more reorganization than normal. We from Finance, asked the policy committee chairmen to review the appropriate sections. The Governor proposed combining the university system with the community college system. The timeline seemed too short, so we stretched it out. Previous budgets funded development money for a 25 bed psychiatric hospital, but in HB 2 it became a 60 bed hospital. We had no warning of such a change, so we will remove that for further study. A 60 page reorganization of the Department of Energy was in the bill. After review by the Science, Technology and Energy Committee, that went forward. We need to not only remember that this is one of our most important votes, but that we all need to support it for the good of our citizens.

A Graphic Services Fund created to better manage Administrative Services, and Payment and Procurement Fund established to pay costs of procurement card collections. Several tax reductions, in Business Profits Tax, Business EnterpriseTax, Rooms and Meals, and Interest and Dividends. Reduction in Carry Forward Tax Credit changed. Historical Horse Racing was added to increase revenue. Some sections eliminated as no longer needed. A major reorganization of the Public Utilities Commission and the Department of Energy were reviewed before inclusion in the bill.

Due to increased revenue projections from Ways and Means and the reduction of the Public School Infrastructure program we were able to fund much needed programs in the Department of Transportation. As you saw in HB 1

we had reduced the highway fund by over $5 million. The extra revenue allowed us to put $19 million back into the highway fund to support the Highway Block Grants, betterment, winter maintenance and provide money for fleet equipment. In the Department of Education (DOE) we were able to put $19,836,000 into building aid and require schools to submit a 10 year plan to the state for building requirements. We also provided $8,000,000 to accelerate payments for current liabilities DOE owes on outstanding school bonds. We also reduce the SWEPT (State-Wide Education Property Tax) to be collected from cities and towns by $100,000. This reduction to the local taxpayers will be reimbursed to the cities and towns from the state so all school districts will be made whole. We also funded dual and concurrent enrollment program at $1,500,000 per year and transferred the management from DOE to the Community College System of New Hampshire. We also increased the charter school lease cap to $50,000. Finally, several schools that began kindergarten in FY20/21 did not receive their start up grants so we allocated $1,906,313. The Governor had proposed a plan for the merger of the University System and the Community College System with one Board of Trustees starting in July 2021. We believed this action needed to slow down a little and we are recommending a commission to bring back to the legislature by January 22 their plan for merging the two systems. If approved, it will be effective in July 23. We outlined numerous areas that they should look at as well as providing $1.5 million to hire outside experts to assist them. We also approved, with the help of the Transportation Committee the definition of unmanned aircraft, and Fish and Game helped us sort through Wildlife Damage Control: damage by bears.

The legislature lent the Governor a large share of its powers under the state of emergency laws passed in 2002 with the image of 9/11 fresh in our minds. With this first use of those laws, it's become clear that the legislature made it easy for the Governor to declare an emergency and made it very difficult for the legislature to either be involved in crisis management policies, federal funding decisions, restriction of civil and constitutional rights, or in bringing the state of emergency to an appropriate end. The legislature gave up too much involvement and too much discretion and part of HB 2 addresses sharing power more appropriately to bring an emergency to a conclusion. We removed an authorization to build a 60-bed new forensic mental health hospital because the size grew from 25 to 60 and the funds being authorized appeared to circumvent standard capital budgeting processes. We removed $1.5 million from a well-intended program to help senior citizen centers with barrier materials to mitigate virus spread because over 800 centers were eligible and the program overhead costs would make an evaluation and award program ineffective. Family planning programs were fully funded with a $50,000 set-aside for new program awardees. This is intended to stimulate the full, fair and open competition as a restriction is added to prohibit abortion services from being provided at the same location as state funded family planning counseling. Opponents argue that it is impossible to separate abortion services from the seven existing centers offering family planning counseling due to costs. This argument does not recognize that the other seven centers have not been offering abortion and Pro-Choice advocates have often stated that "no family planning money is going to fund abortions." HB 2 helps that to be a true statement. The Department of Health and Human Services has been reluctant to provide alternatives to housing juveniles in the Sununu Youth Center in committed and detained statuses. The state spends about $1 million a year per person to maintain a census of 10-16. With new restrictions on who can be housed at the Center, that $13 million a year would go to a population expected to be less than half the current size. With a 60% recidivism rate, the current model is obviously broken and we are shutting it down in FY23. **Vote 12-9.**
Rep. Mary Jane Wallner for the **Minority** of Finance. The minority of the Finance Committee cannot support HB 2 as presented. Included are over $100 million in revenue cuts resulting from cuts to the Business Enterprise Tax, the Business Profits Tax, The Rooms and Meals Tax, and the Interest and Dividends Tax. The outcomes are dangerous reductions in essential services such as the elimination of water grants already awarded to communities throughout the state, likely causing an increase in local property tax burdens. Revenue sharing in the form of direct support to cities and towns across the state from the previous biennium is not continued. Various policies that have never had a public hearing are included. Specifically, HB 2 includes a very flawed creation of a new Department of Energy that expands government, guts the Public Utilities Commission, and is funded by having our citizens pay more in their electric, gas and water utility bills. It also includes the use of our limited public dollars to reimburse those who gambled their money in the Financial Resources Mortgage (FRM) Ponzi scheme. No state has ever used tax dollars to reimburse people for their own bad investments. HB 2 includes the language of HB 544 that prohibits teaching about "divisive concepts" such as unconscious bias, an ideological policy that should have no place in law, much less in a budget.

HB 2 proposes a merger of the University System of New Hampshire and the Community College System of New Hampshire without any public hearing or input from the major stakeholders, including faculty, students, unions and administration. While the idea may have merit, the timeline proposed is unrealistic and could lead to serious unforeseen and unintended consequences.

Additionally, instead of using $100 million to mitigate losses seen by school districts due to the pandemic, a late amendment was introduced to use that money for a one-time reduction of SWEPT (State-Wide Education Property Tax). This would only result in a very small tax reduction to property owners, while using that money to shore up stressed school budgets would benefit all children in all school districts throughout the state.

This budget unfunds any family planning health care clinic that offers abortion services by requiring that no state funds shall be awarded to any "reproductive health facility" unless the state funded family planning program project is physically and financially separate from a reproductive health facility as defined in RSA 132:37, I. In addition to severely restricting abortion service in the Granite State, language in HB 2 will also make receiving health care services for lower income families extremely difficult. Family planning health care clinics provide the vast majority of STD testing, breast exams and pap tests across the state. This budget puts at risk vital health services and basic care to some of our most vulnerable residents.

This budget only partially funds the implementation of the recommendations of a review conducted by Alvarez & Marsal to increase efficiencies and accountability within DHHS. In particular the report recommends bringing back to New Hampshire, and developing adequate care options, for 38 individual adults with developmental disabilities who are currently receiving services in Florida due to lack of appropriate facilities in New Hampshire. By bringing these individuals home, they would be near their families and existing support networks. This implementation also has the potential for cost savings by providing more appropriate care in-state.

A last minute policy addition to HB 2 dramatically alters the powers of the Governor relating to declaring a state of emergency. Similar policy proposals have been introduced and thoroughly addressed in policy committees. HB 2 is not the appropriate place for additions such as this.

The minority finds that it cannot support HB 2 as amended by the Finance Committee due to the significant underfunding of vital services, programs and positions throughout the state workforce as well as the inclusion of wide reaching and controversial matters that we think should have been worked out with public input in policy committees.

# WEDNESDAY, APRIL 7
# REGULAR CALENDAR - PART TWO
## CHILDREN AND FAMILY LAW

**HB 139,** relative to the submission of evidence in divorce proceedings. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Josh Yokela for the **Majority** of Children and Family Law. This bill addresses the current problem of evidence submitted on the day of court, which is in violation of current court rules that are not always enforced. The bill allows for the opposing party to request a continuance if evidence was submitted 5 days prior to the hearing, allowing for preparation of a rebuttal. It also allows for a judge to declare evidence as de minimis and to record reasoning for not granting a continuance. **Vote 8-7.**

Rep. Debra Altschiller for the **Minority** of Children and Family Law. This bill is well-intentioned, but will undermine current NH Family Division rules which actually provide for submissions of evidence up to five days before a hearing, as set forth in the bill. The committee heard testimony from both the NH Judicial branch and from NH Legal Assistance that this bill would have the opposite effect than is intended. The testimony reinforced that current rules already provide the mechanisms necessary to exclude evidence that is not submitted in a timely fashion. The bill seeks to undermine the judicial rules process where there is already legislative representation and is potentially harmful to an already stressed court.

**HB 142,** relative to causes for divorce. **MAJORITY: OUGHT TO PASS. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Debra DeSimone for the **Majority** of Children and Family Law. The current NH statute, reflected in section 458:7, is more than 20 years old and does not reflect societal changes such as same gender marriage and serious drug and alcohol addiction problems. This bill simply updates the law to encompass these issues. **Vote 8-7.**

Rep. Gaby Grossman for the **Minority** of Children and Family Law. This bill is attempting to revise fault-based grounds for divorce to include adultery for same-sex marriage and habitual alcohol and drug abuse. The Supreme Court of NH is currently addressing the issue of adultery in same-sex situations and a finding from the courts related to this matter is expected. The bill text lacks specific language related to alcohol and drug abuse Substance Use Disorder (SUD) treatment may not always be consecutive and recovery from SUD can be a fluid situation which, due to vague language in this legislation, may result in more problems for someone actively seeking treatment.

**HB 161,** relative to the calculation of child support. **MAJORITY: OUGHT TO PASS WITH AMENDMENT. MINORITY: INEXPEDIENT TO LEGISLATE.**

Rep. Josh Yokela for the **Majority** of Children and Family Law. The majority believes that the calculation of child support is overdue for an update and this bill adopts the recommendations of the last child support study which is required by law to happen every four years. The amendment clarifies that the court can make adjustments to child support for the best interest of the child. The bill raises the self-support reserve so people are not put into homelessness by child support. It updates to the percentages in the child support calculation and adds a credit for shared parenting which causes most of the deviations from the current formula. This bill will smooth the process in the courts with a more predictable and just outcome. **Vote 8-7.**

Rep. Hatch, Coos 6
March 31, 2021
2021-1063h
12/08

Floor Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by deleting sections 330 and 331 relative to the dissemination of divisive concepts.

2021-1063h

AMENDED ANALYSIS

Delete:

76.  Defines and prohibits the dissemination of certain divisive concepts related to sex and race in state contracts, grants, and training programs.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**

7Apr2021... 1059h

2021 SESSION

21-1082
08/10

HOUSE BILL            *2-FN-A-LOCAL*

AN ACT            relative to state fees, funds, revenues, and expenditures.

SPONSORS:            Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:            Finance

―――――――――――――――――――――――――――――――――――――――――――――――――――――――――――

AMENDED ANALYSIS

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the retirement system.

9.  Enables the supreme court to transfer funds.

10.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11.  Enables the sale of the lakes region facility in Laconia.

12.  Requires the commissioner of the department of health and human services to make quarterly reports on the status of estimated Medicaid payments in relation to actual costs.

13.  Repeals provisions relative to the senior volunteer grant program.

14.  Establishes the emergency services for children, youth, and families fund.

15.  Eliminates certain parental reimbursements.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 155 -**

330  New Chapter; Propagation of Divisive Concepts Prohibited.  Amend RSA by inserting after chapter 10-B the following new chapter:

CHAPTER 10-C

PROPAGATION OF DIVISIVE CONCEPTS PROHIBITED

10-C:1  Definitions.  In this chapter:

I.  "Contractor" means any and all persons, individuals, corporations, or businesses of any kind that in any manner have entered into a contract, or perform a subcontract pursuant to a contract, with the state of New Hampshire.

II.  "Divisive concept" means the concept that:

(a)  One race or sex is inherently superior to another race or sex;

(b)  The state of New Hampshire or the United States is fundamentally racist or sexist;

(c)  An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(d)  An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex;

(e)  Members of one race or sex cannot and should not attempt to treat others without respect to race or sex;

(f)  An individual's moral character is necessarily determined by his or her race or sex;

(g)  An individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(h)  Any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or

(i)  Meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.

(j)  The term "divisive concepts" includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

1       III.  "Race or sex stereotyping" means ascribing character traits, values, moral and ethical

2    codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or

3    sex.

4       IV.  "Race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to

5    members of a race or sex because of their race or sex.  It similarly encompasses any claim that,

6    consciously or unconsciously, and by virtue of his or her race or sex, members of any race are

7    inherently racist or are inherently inclined to oppress others, or that members of a sex are

8    inherently sexist or inclined to oppress others.

9       V.  "The state of New Hampshire" means all agencies and political subdivisions of the state

10    of New Hampshire, including counties, cities, towns, school districts, and the state university

11    system.

12       VI.  "Student" means any and all students of any school district, school, college, or university

13    which receives grants, funds, or assets from the state of New Hampshire.

14    10-C:2  Unlawful Propagation of Divisive Concepts.

15       I.  Requirements for the state of New Hampshire:

16       (a)  The state of New Hampshire shall not teach, instruct, or train any employee,

17    contractor, staff member, student, or any other individual or group, to adopt or believe any of the

18    divisive concepts defined in RSA 10-C:1, II.

19       (b)  No employee, contractor, staff member, or student of the state of New Hampshire

20    shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse,

21    embrace, confess, act upon, or otherwise assent to the divisive concepts defined in RSA 10-C:1, II.

22       II.  Requirements for government contractors:

23       (a)  All state contracts entered into on or after the effective date of this chapter shall

24    include the following provision:

25    "During the performance of this contract, the contractor agrees as follows:

26    The contractor shall not use any workplace training that inculcates in its employees any form of race

27    or sex stereotyping or any form of race or sex scapegoating, including the concepts that:  (a) one race

28    or sex is inherently superior to another race or sex; (b) an individual, by virtue of his or her race or

29    sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (c) an individual

30    should be discriminated against or receive adverse treatment solely or partly because of his or her

31    race or sex; (d) members of one race or sex cannot and should not attempt to treat others without

32    respect to race or sex; (e) an individual's moral character is necessarily determined by his or her race

33    or sex; (f) an individual, by virtue of his or her race or sex, bears responsibility for actions committed

34    in the past by other members of the same race or sex; (g) any individual should feel discomfort, guilt,

35    anguish, or any other form of psychological distress on account of his or her race or sex; or (h)

36    meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular

37    race to oppress another race.  The term "race or sex stereotyping" means ascribing character traits,

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 157 -**

values, moral and ethical codes, privileges, status, or beliefs to a race or sex, or to an individual because of his or her race or sex, and the term "race or sex scapegoating" means assigning fault, blame, or bias to a race or sex, or to members of a race or sex because of their race or sex."

(b)   The contractor shall send to each labor union or representative of workers with which the contractor has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(c)   In the event of the contractor's noncompliance with the requirements of this section, or with any rules, regulations, or policies that may be promulgated in accordance with this section, the contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further government contracts.

(d)   The contractor shall include the provisions of this section in every subcontract or purchase order unless exempted by rules, regulations, or policies of the department of administrative services, so that such provisions shall be binding upon each subcontractor or vendor.  The contractor shall take such action with respect to any subcontract or purchase order as may be directed by the department of administrative services as a means of enforcing such provisions including sanctions for noncompliance.

III.   The department of administrative services, or an agency designated by the department of administrative services, is directed to investigate complaints received alleging that a state contractor is utilizing such training programs in violation of the contractor's obligations under the binding provisions of this section.  The department shall take appropriate enforcement action and provide remedial relief, as appropriate.

IV.   The heads of all agencies shall review their respective grant programs and identify programs for which the agency may, as a condition of receiving such a grant, require the recipient to certify that it will not use state funds or assets to promote any of the divisive concepts defined in RSA 10-C:1, II.

V.   Requirements for agencies.

(a)   The fair and equal treatment of individuals is an inviolable principle that must be maintained in the state workplace.   Agencies should continue all training that will foster a workplace that is respectful of all employees.  Accordingly:

(1)   The head of each agency shall use his or her authority under to ensure that the agency, agency employees while on duty status, and any contractors hired by the agency to provide training, workshops, forums, or similar programming, for purposes of this section, "training," to agency employees do not teach, advocate, act upon, or promote in any training to agency employees any of the divisive concepts listed in RSA 10-C:1; and

**HB 2-FN-A-LOCAL - AS AMENDED BY THE HOUSE**
**- Page 158 -**

1    (2)  Agency diversity and inclusion efforts shall, first and foremost, encourage agency

2    employees not to judge each other by their color, race, ethnicity, sex, or any other characteristic

3    protected by federal or state law.

4    (b)  The commissioner of the department of administrative services, pursuant to RSA

5    541-A, shall develop regulations for the enforcement of the provisions of this statute.

6    (c)  Each agency head shall:

7    (1)  Issue a policy incorporating the requirements of this chapter into agency

8    operations, including by making compliance with the policy a provision in all agency contracts;

9    (2)  Request that the agency thoroughly review and assess not less than annually

10    thereafter, agency compliance with the requirements of the policy in the form of a report submitted

11    to the department of administrative services; and

12    (3)  Assign at least one senior political appointee responsibility for ensuring

13    compliance with the requirements of the policy.

14    VI.  Review of agency training.

15    (a)  All training programs for state agency employees relating to diversity or inclusion

16    shall, before being used, be reviewed by the department of administrative services for compliance

17    with the requirements of RSA 10-C:2, V.

18    (b)  If a contractor provides a training for agency employees relating to diversity or

19    inclusion that teaches, advocates, or promotes the divisive concepts defined in RSA 10-C:1, II, and

20    such action is in violation of the applicable contract, the agency that contracted for such training

21    shall evaluate whether to pursue debarment of that contractor, consistent with applicable law and

22    regulations.

23    10-C:3  General Provisions.

24    I.  Nothing in this chapter shall prevent agencies or contractors from promoting racial,

25    cultural, or ethnic diversity or inclusiveness, provided such efforts are consistent with the

26    requirements of this chapter.

27    II.  Nothing in this chapter shall be construed to prohibit discussing, as part of a larger

28    course of academic instruction, the divisive concepts listed in RSA 10-C:1, II in an objective manner

29    and without endorsement.

30    III.  If any provision of this chapter, or the application of any provision to any person or

31    circumstance, is held to be invalid, the remainder of this chapter and the application of its provisions

32    to any other persons or circumstances shall not be affected thereby.

33    331  Effective Date. Section 330 of this act shall take effect January 1, 2022.

34

35

36

37

2349

# Senate

Senate Finance
May 28, 2021
2021-1799s
08/10

Amendment to HB 2-FN-A-LOCAL

1    Amend the bill by replacing all after the enacting clause with the following:



**Amendment to HB 2-FN-A-LOCAL**
**- Page 144 -**



297    New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

Amendment to HB 2-FN-A-LOCAL
- Page 145 -

1    II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or

2    other workplace sensitivity training based on the inherent humanity and equality of all persons and

3    the ideal that all persons are entitled to be treated with equality, dignity, and respect.

4    III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty

5    members of the university system of New Hampshire and the community college system of New

6    Hampshire to conduct research, publish, lecture, or teach in the academic setting.

7    354-A:30  Definitions.  In this subdivision:

8    I.  "Government program" means any activity undertaken by a public employer, both as an

9    employer and in performance of its government function.

10   II.  "Public employee" means any person working on a full-time or part-time basis for the

11   state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,

12   water districts, school districts, school administrative units, or quasi-public entities.

13   III.  "Public employer" includes the state or any subdivision thereof, including, but not

14   limited to counties, cities, towns, precincts, water districts, school districts, school administrative

15   units, or quasi-public entities.

16   354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the

17   use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

18   recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the

19   following:

20   I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

21   status, familial status, mental or physical disability, religion, or national origin, are inherently

22   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

23   color, marital status, familial status, mental or physical disability, religion, or national origin;

24   II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

25   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

26   origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27   III.  That an individual should be discriminated against or receive adverse treatment solely

28   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

29   status, familial status, mental or physical disability, religion, or national origin; or

30   IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

31   marital status, familial status, mental or physical disability, religion, or national origin cannot and

32   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

33   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

34   or national origin.

35   354-A:32  Prohibition on the Content of Government Programs and Speech.  No government

36   program shall teach, advocate, or advance any one or more of the following:

## Amendment to HB 2-FN-A-LOCAL
### - Page 146 -

1      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
2  status, familial status, mental or physical disability, religion, or national origin are inherently
3  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
4  color, marital status, familial status, mental or physical disability, religion, or national origin;

5      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
6  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
7  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8      III.  That an individual should be discriminated against or receive adverse treatment solely
9  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
10  status, familial status, mental or physical disability, religion, or national origin; or

11      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
12  marital status, familial status, mental or physical disability, religion, or national origin cannot and
13  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
14  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
15  or national origin.

16      354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse
17  employment action, warning, or discipline of any kind for refusing to participate in any training,
18  program, or other activity at which a public employer or government program advocates, trains,
19  teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
20  following:

21      I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
22  status, familial status, mental or physical disability, religion, or national origin are inherently
23  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
24  color, marital status, familial status, mental or physical disability, religion, or national origin;

25      II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
26  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
27  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28      III.  That an individual should be discriminated against or receive adverse treatment solely
29  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
30  status, familial status, mental or physical disability, religion, or national origin; or

31      IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
32  marital status, familial status, mental or physical disability, religion, or national origin cannot and
33  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
34  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
35  or national origin.

1    354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may

2    pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any

3    other applicable common law or statutory cause of action.

4    298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after

5    section 39 the following new section:

6    193:40  Prohibition on Teaching Discrimination.

7        I.  No pupil in any public school in this state shall be taught, instructed, inculcated or

8    compelled to express belief in, or support for, any one or more of the following:

9            (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital

10   status, familial status, mental or physical disability, religion or national origin is inherently superior

11   to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

12   familial status, mental or physical disability, religion, or national origin;

13           (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual

14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15   or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16           (c)  That an individual should be discriminated against or receive adverse treatment

17   solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

18   marital status, familial status, mental or physical disability, religion, or national origin; or

19           (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

20   marital status, familial status, mental or physical disability, religion, or national origin cannot and

21   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

22   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

23   origin.

24       II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger

25   course of academic instruction, the historical existence of ideas and subjects identified in this

26   section.

27       III.  Any person claiming to be aggrieved by a violation of this section, including the attorney

28   general, may initiate a civil action against a school or school district in superior court for legal or

29   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

30   A:34.

31       IV.  Violation of this section by an educator shall be considered a violation of the educator

32   code of conduct that justifies disciplinary sanction by the state board of education.

33       V.  For the purposes of this section, "educator" means a professional employee of any school

34   district whose position requires certification by the state board pursuant to RSA 189:39.

35   Administrators, specialists, and teachers are included within the definition of this term.

**Amendment to HB 2-FN-A-LOCAL**
**- Page 148 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



**Important Notice**

Due to the COVID-19 pandemic, the General Court is conducting legislative activities remotely with the exception of publicly noticed sessions in the House or Senate Calendar. During this time, the State House and Legislative Office Building remain closed to visitors.

May 28, 2021
No. 26

# STATE OF NEW HAMPSHIRE

**Website Address: http://gencourt.state.nh.us**

**NH Senate Digital Calendar Website Address:**
**http://gencourt.state.nh.us/senate/schedule/dailyschedule.aspx**



# First Year of the 167th Session of the
# New Hampshire General Court

# SENATE CALENDAR

4                                   **Important Notice**

**Due to the COVID-19 pandemic, the General Court is conducting legislative activities remotely with the exception of publicly noticed sessions in the House or Senate Calendar. During this time, the State House and Legislative Office Building remain closed to visitors.**

Senate Finance
May 28, 2021
2021-1799s
08/10

<div align="center">Amendment to HB 2-FN-A-LOCAL</div>

The Senate Amendment to HB 2-FN-A-LOCAL is contained in a separate document labeled as Senate Calendar 26-Supplement 2, Dated May 28, 2021.

Capital Budget
May 27, 2021
2021-1785s
10/04

<div align="center">Amendment to HB 25-A</div>

Amend the bill by replacing all after the enacting clause with the following:

1 Capital Appropriations. The sums hereinafter detailed are hereby appropriated for the projects specified to the departments, agencies, and branches named:

I. Department of Administrative Services

A. Court Facilities

| | |
|---|---|
| 1. Hillsborough County South - Cooling And Controls | 975,000 |
| 2. Lebanon Circuit Courthouse - Remove And Replace Underground Fuel Storage Tank | 310,000 |
| 3. Portsmouth And Dover Circuit Court Boilers | 570,000 |
| 4. Statewide Courthouse Roof Replacements | 2,100,000 |

B. Facilities and Asset Management

| | |
|---|---|
| 1. Life Safety Upgrades | 570,000 |
| 2. Main Building Rewiring Phase 1 | 800,000 |
| 3. Philbrook Building - Sewer Line Replacement | 300,000 |
| 4. Thayer Building - Replace Roof | 650,000 |
| 5. Tunnel System: Repair And Abandonment Plan | 620,000 |

C. Financial Data Management

| | |
|---|---|
| 1. NH First Migration To Information Cloud Environment | 5,100,000 |

D. General Services

| | |
|---|---|
| 1. HHS Roof Replacement | 2,385,000 |
| 2. HHS/DES Mechanical Replacements And Controls | 1,200,000 |
| 3. Morton, Johnson, HHS Underground Tank Removal | 700,000 |
| 4. Safety Mechanical Replacements And Repairs | 3,125,000 |
| 5. Coos County New Parking Lot and Concrete Plaza Entrance | 442,750 |
| 6. Hillsborough County Courthouse North Cooling Tower | 189,750 |
| 7. Annex 1 - Bancroft ADA Connector | 400,000 |

Sen. Soucy, Dist 18
Sen. Cavanaugh, Dist 16
Sen. D'Allesandro, Dist 20
Sen. Kahn, Dist 10
Sen. Perkins Kwoka, Dist 21
Sen. Rosenwald, Dist 13
Sen. Sherman, Dist 24
Sen. Watters, Dist 4
Sen. Whitley, Dist 15
Sen. Prentiss, Dist 5
June 1, 2021
2021-1815s
11/04

Floor Amendment to HB 2-FN-A-LOCAL

1      Amend the bill by deleting sections 297-300.

2021-1815s

AMENDED ANALYSIS

Delete:

70.  Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**

| | |
|---|---|
| 7Apr2021... | 1059h |
| 06/03/2021 | 1799s |
| 06/03/2021 | 1816s |
| 06/03/2021 | 1859s |
| 06/03/2021 | 1842s |
| 06/03/2021 | 1821s |
| 06/03/2021 | 1827s |
| 06/03/2021 | 1866s |
| 06/03/2021 | 1884s |

2021 SESSION

21-1082
08/10

HOUSE BILL        *2-FN-A-LOCAL*

AN ACT              relative to state fees, funds, revenues, and expenditures.

SPONSORS:      Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:    Finance

───────────────────────────────────────────────────────────

AMENDED ANALYSIS

This bill:

1.  Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2.  Makes a transfer of unexpended funds to the state heating system savings account.

3.  Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4.  Establishes the graphic services fund in the department of administrative services.

5.  Consolidates human resources and payroll functions in the department of administrative services.

6.  Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7.  Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8.  Directs the payment of state employee medical benefits payments  from  the  retirement system.

9.  Enables the supreme court to transfer funds.

10.  Provides for the state to reimburse the sheriff's offices for court security for the biennium.

11.  Enables the sale of the lakes region facility in Laconia.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 144 -**

297    New   Subdivision;   State   Commission   on   Human   Rights;   Right   to   Freedom   From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 145 -**

II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect.

III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty members of the university system of New Hampshire and the community college system of New Hampshire to conduct research, publish, lecture, or teach in the academic setting.

354-A:30  Definitions.  In this subdivision:

I.  "Government program" means any activity undertaken by a public employer, both as an employer and in performance of its government function.

II.  "Public employee" means any person working on a full-time or part-time basis for the state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

III.  "Public employer" includes the state or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:32  Prohibition on the Content of Government Programs and Speech.  No government program shall teach, advocate, or advance any one or more of the following:

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 146 -**

1    I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

2    status, familial status, mental or physical disability, religion, or national origin are inherently

3    superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

4    color, marital status, familial status, mental or physical disability, religion, or national origin;

5    II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

6    race, creed, color, marital status, familial status, mental or physical disability, religion, or national

7    origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8    III.  That an individual should be discriminated against or receive adverse treatment solely

9    or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

10   status, familial status, mental or physical disability, religion, or national origin; or

11   IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

12   marital status, familial status, mental or physical disability, religion, or national origin cannot and

13   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

14   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15   or national origin.

16   354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse

17   employment action, warning, or discipline of any kind for refusing to participate in any training,

18   program, or other activity at which a public employer or government program advocates, trains,

19   teaches, instructs, or compels participants to express belief in, or support for, any one or more of the

20   following:

21   I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital

22   status, familial status, mental or physical disability, religion, or national origin are inherently

23   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,

24   color, marital status, familial status, mental or physical disability, religion, or national origin;

25   II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,

26   race, creed, color, marital status, familial status, mental or physical disability, religion, or national

27   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28   III.  That an individual should be discriminated against or receive adverse treatment solely

29   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital

30   status, familial status, mental or physical disability, religion, or national origin; or

31   IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

32   marital status, familial status, mental or physical disability, religion, or national origin cannot and

33   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual

34   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

35   or national origin.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 147 -**

354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any other applicable common law or statutory cause of action.

298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after section 39 the following new section:

193:40  Prohibition on Teaching Discrimination.

I.  No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:

(a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(b)  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(c)  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.

III.  Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.

IV.  Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

V.  For the purposes of this section, "educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are included within the definition of this term.

**HB 2-FN-A-LOCAL - AS AMENDED BY THE SENATE**
**- Page 148 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.

# Committee of Conference

June 17, 2021
2021-2040-CofC
08/04

1    Committee of Conference Report on HB 2-FN-A-LOCAL, relative to state fees, funds, revenues, and

2    expenditures.

3

4    Recommendation:

5        That the House recede from its position of nonconcurrence with the Senate amendment, and

6    concur with the Senate amendment, and

7        That the Senate and House adopt the following new amendment to the bill as amended by the

8    Senate, and pass the bill as so amended:

9

10   Amend the bill by replacing all after the enacting clause with the following:

11



**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 145 -**



297    New Subdivision; State Commission on Human Rights; Right to Freedom From Discrimination in Public Workplaces and Education.  Amend RSA 354-A by inserting after section 28 the following new subdivision:

Right to Freedom from Discrimination in Public Workplaces and Education

354-A:29  Right to Freedom from Discrimination in Public Workplaces and Education.

I.  The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.

Committee of Conference Report on HB 2-FN-A-LOCAL
- Page 146 -

II.   Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect.

III.   Nothing in this subdivision shall be construed to limit the academic freedom of faculty members of the university system of New Hampshire and the community college system of New Hampshire to conduct research, publish, lecture, or teach in the academic setting.

354-A:30  Definitions.  In this subdivision:

I.  "Government program" means any activity undertaken by a public employer, both as an employer and in performance of its government function.

II.  "Public employee" means any person working on a full-time or part-time basis for the state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

III.  "Public employer" includes the state or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

354-A:31  Prohibition on Public Employers.  No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the following:

I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

III.  That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

354-A:32  Prohibition on the Content of Government Programs and Speech.  No government program shall teach, advocate, or advance any one or more of the following:

**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 147 -**

1       I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
2  status, familial status, mental or physical disability, religion, or national origin are inherently
3  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
4  color, marital status, familial status, mental or physical disability, religion, or national origin;

5       II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
6  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
7  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

8       III.  That an individual should be discriminated against or receive adverse treatment solely
9  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
10  status, familial status, mental or physical disability, religion, or national origin; or

11       IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
12  marital status, familial status, mental or physical disability, religion, or national origin cannot and
13  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
14  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
15  or national origin.

16      354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse
17  employment action, warning, or discipline of any kind for refusing to participate in any training,
18  program, or other activity at which a public employer or government program advocates, trains,
19  teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
20  following:

21       I.  That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
22  status, familial status, mental or physical disability, religion, or national origin are inherently
23  superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
24  color, marital status, familial status, mental or physical disability, religion, or national origin;

25       II.  That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
26  race, creed, color, marital status, familial status, mental or physical disability, religion, or national
27  origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

28       III.  That an individual should be discriminated against or receive adverse treatment solely
29  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
30  status, familial status, mental or physical disability, religion, or national origin; or

31       IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
32  marital status, familial status, mental or physical disability, religion, or national origin cannot and
33  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
34  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
35  or national origin.

1    354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may

2    pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any

3    other applicable common law or statutory cause of action.

4    298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting after

5    section 39 the following new section:

6    193:40  Prohibition on Teaching Discrimination.

7        I.  No pupil in any public school in this state shall be taught, instructed, inculcated or

8    compelled to express belief in, or support for, any one or more of the following:

9        (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital

10    status, familial status, mental or physical disability, religion or national origin is inherently superior

11    to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,

12    familial status, mental or physical disability, religion, or national origin;

13        (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual

14    orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,

15    or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

16        (c)  That an individual should be discriminated against or receive adverse treatment

17    solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,

18    marital status, familial status, mental or physical disability, religion, or national origin; or

19        (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,

20    marital status, familial status, mental or physical disability, religion, or national origin cannot and

21    should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,

22    race, creed, color, marital status, familial status, mental or physical disability, religion, or national

23    origin.

24        II.  Nothing in this section shall be construed to prohibit discussing, as part of a larger

25    course of academic instruction, the historical existence of ideas and subjects identified in this

26    section.

27        III.  Any person claiming to be aggrieved by a violation of this section, including the attorney

28    general, may initiate a civil action against a school or school district in superior court for legal or

29    equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-

30    A:34.

31        IV.  Violation of this section by an educator shall be considered a violation of the educator

32    code of conduct that justifies disciplinary sanction by the state board of education.

33        V.  For the purposes of this section, "educator" means a professional employee of any school

34    district whose position requires certification by the state board pursuant to RSA 189:39.

35    Administrators, specialists, and teachers are included within the definition of this term.

**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 149 -**

1    299  Severability.  If any provision of sections 297-298, or the application of any provision to any

2    person or circumstance is held to be invalid, the remainder of such sections, and their application to

3    any other persons or circumstances shall not be affected thereby.

4    300  Effective Date.  Sections 297-299 of this act shall take effect upon passage.



**Committee of Conference Report on HB 2-FN-A-LOCAL**
**- Page 212 -**

The signatures below attest to the authenticity of this Report on HB 2-FN-A-LOCAL, relative to state fees, funds, revenues, and expenditures.

Conferees on the Part of the Senate

Conferees on the Part of the House

_____

Sen. Morse, Dist. 22

_____

Rep. L. Ober, Hills. 37

_____

Sen. Bradley, Dist. 3

_____

Rep. Weyler, Rock. 13

_____

Sen. Daniels, Dist. 11

_____

Rep. Umberger, Carr. 2

_____

Rep. Edwards, Rock. 4

_____

Rep. Emerick, Rock. 21

# EXHIBIT 82

"Compromise Sought on Anti-Critical race Theory Bill" Article from Apr. 19, 2021





Sen. Jeb Bradley (R-Wolfeboro)

NEWS
Politics (https://nhjournal.com/category/politics/)

## Compromise Sought On Anti-Critical Race Theory Bill

Posted to Politics (https://nhjournal.com/category/politics/) April 19, 2021 by Damien Fisher (https://nhjournal.com/author/damienfisher/)

Republicans in the state Senate are looking for a compromise with their House counterparts over the anti-critical race theory amendment contained in the proposed state budget.

"I hope we're able to find an acceptable version of the language that people can buy into and we can move forward with it," said Sen. Jeb Bradley (R-Wolfeboro).

HB 2, the budget proposal approved by the House, includes language that bars the teaching of "divisive" topics on race and gender. The amendment, which replaces HB 544, is seen as critical if the Senate and Gov. Chris Sununu want the budget to pass.

Rep. Keith Ammon (R-New Boston), one of HB 544's sponsors, said getting the critical race theory ban is a priority for the House GOP. He said it prioritizes storytelling over historical facts and has been creeping into the state's education system for years.

"It's slowly embedding itself in our institutions and it's doing it with very little pushback," Ammon said.

Last week, Rep. Ken Weyler (R-Kingston), House Finance Chair, warned the Senate that the ban on critical race theory is essential for the budget to pass. Weyler said the votes are simply not there if the Senate ditches the ban. Wyler himself considered critical race theory to be a "Marxist, anti-American, anti-White" program.

Bradley said people are worried about what is going on in school given the sometimes controversial idea presented under the critical race theory umbrella.

"People are pretty concerned about kids being taught in school, how this made them feel guilty for the way they are born," Bradley said.

Bradley added people still need to be able to talk about racial inequities in society and in American history.

Critical race theory was developed in the 1970s and it prioritizes narrative and storytelling over data. In some materials it connects American racism with the signing of the Declaration of Independence. One of its best-known national advocates for critical re theory, Ibram X. Kendi, describes "whiteness" as inherently problematic to society and advocates discrimination as part of an "anti-racism" solution.

Ammon's push to ban critical race theory has garnered plenty of opposition, including from Sununu who has expressed worries about the free speech implications of the ban. Last week, the New Hampshire Business and Industry Association, essentially the statewide chamber of commerce group, came out squarely against the ban, saying it will hurt the economy.

According to Jim Roche with the NH BIA, the proposed bans would halt discussions of race and gender inequality, among all state departments, educational institutions, and political subdivisions of the state, including cities and towns. The problem for Roche is that the ban would extend to private businesses that contract with the government. An estimated 1,000 businesses provide services to the state.

"Essentially, this language contains unnecessary restrictions on some private sector companies. We cannot support language where the state is in a position to dictate to private enterprises what they can and cannot discuss with their employees," Roche said.

Ammon responded by questioning if the NH BIA is going "woke." He says his real concern, though, is what sort of compromise the Senate will offer. Ammon is not interested in seeing the bill get watered down, noting conservatives have had enough of that kind of compromise.

"The visual is Charlie Brown and Lucy with the football, 'Hey, we'll give you this' and then whoop, they take it away," Ammon said.

---

## About the Author



### Damien Fisher (https://nhjournal.com/author/damienfisher/)

Damien Fisher is a veteran New Hampshire reporter. He wrote this for NHJournal.

## More from New Hampshire Journal

**EXHIBIT 83**

Rep. Daniel Itse,
"Taxpayers Money is
Being Used to Promote
Systemic Racism in
NH," Union Leader
(Apr. 28, 2021)

Case 1:21-cv-01077-PB Document 85-34 Filed 08/14/23 Page 2 of 5

https://www.unionleader.com/opinion/op-eds/daniel-itse-taxpayers-money-is-being-used-to-promote-systemic-racism-in-nh/article_e81b9b26-e3f5-5e03-8276-742475a3968c.html

# Daniel Itse: Taxpayers money is being used to promote systemic racism in NH

Apr 28, 2021



Daniel Itse

IT IS IMPORTANT to understand what is happening around us. In the name of anti-racism, our schools and institutions are engaging in racist education.

Here are a few examples:

The University of New Hampshire has a webinar for employees that said the role of White people was to "shut up" and "school yourself."

Southern New Hampshire University has a 5-year plan that involves employees having conversations with their managers about their unconscious bias.

Manchester schools mandated anti-Whiteness training for employees, including a webinar called "what is White privilege really?"

Exeter schools have emailed parents information to educate themselves about anti-racism teaching that Whites are inherently racist.

Holderness has on their website that they are integrating social justice, socialism, into the curriculum: that traditional American values are evil.

Concord is doing "anti-racism" training with teachers, teaching that Whites are inherently racist

These teachings are an attack on what it has traditionally meant to be an American. They are an attempt to make every American subjects rather than citizens. The proposed cure is to transfer wealth from the "oppressor" to the "oppressed". The inevitable result is Marxism. They ignore the fact that American governments are the creations of the people, and the creator is always greater than the creation.

In 1974, the people of New Hampshire amended their Bill of Rights Article 2 by adding a second sentence. "Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin." This may seem intuitively obvious to us, but not to everyone. Importantly, this amendment puts a particular burden not upon you and me, but upon the State of New Hampshire, and by extension its political subdivisions: counties, towns and ... school districts.

This amendment makes it patently unconstitutional for any part of our state or local governments to assign a quality or characteristic upon any person based upon their race (including Caucasian), their creed (including Jewish and Christian), their color (including White), their sex (including male), or national origin (including American). Unfortunately, some of our school districts have been violating this principle by teaching controversial topics such as Critical Race Theory — the theory that White males are inherently oppressors of everyone else. As government officials, our teachers, school administrators and school board members are prohibited from delving into these subjects.

When they took office, our representatives, senators and the governor all took an oath to uphold the Constitution of the state of New Hampshire. That means that they have the duty to enact laws that enforce the Constitution; particularly to prevent members of government from violating the Constitution, such as by teaching Critical Race Theory and similar topics.

Fortunately, Article 38 of our Bill of Rights gives you, the people, the right to enforce the Constitution upon those in public office. It says, in part: And they (the people) have a right to require of their lawgivers (representatives and senators) and magistrates (governor, school administrators, and teachers), an exact and constant observance of them (the principles of the constitution), in the formation and execution of the laws necessary for the good administration of government.

The purpose of House Bill 544 is to enforce the Bill of Rights, Article 2, of the Constitution of the state of New Hampshire upon the government of New Hampshire. Unfortunately, the House of Representatives has laid HB 544 on the table. That means that though it is not dead, neither will it likely go forward.

Case 1:21-cv-00717-PB   Document 85-34   Filed 08/14/23   Page 5 of 5

You, the people of New Hampshire, have the opportunity to lobby your state representatives and senators, and tell them to protect your children from the malfeasance of their teachers and school administrators. You can find your state senator online here — **http://gencourt.state.nh.us**. Tell them what to do.

If the House of Representatives, the Senate and the governor do not take this opportunity to enforce the Constitution, your Constitution, with the school administrators and teachers of this state, then they are declaring war on you and your children.

Daniel Itse served 18 years in the New Hampshire House of Representatives and as vice chair of the Children and Family Law Committee. He lives in Fremont.

# EXHIBIT 84

Excerpt
from Jan.
11, 2022
HB1313
Hearing

## Page 1

New Hampshire House of Representatives
House Education Hearing
Chairman Rick Ladd on HB1313
January 11, 2022

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

1    VICE-CHAIR CORDELLI:  I think we're about
2 ready to resume.  And we will resume with House Bill
3 1313 relative to the rights to freedom from
4 discrimination in higher education.  And the prime
5 sponsor is ready to go.  And so we welcome the
6 testimony of Representative Ladd.
7          REPRESENTATIVE LADD:  Thank you very much,
8 Mr. Chairman and members of the House Education
9 Committee.  For the record, my name is Rick Ladd.  I
10 come from Haverhill, New Hampshire, and I'm here today
11 to speak and introduce HB1313.
12          On June 25, 2021, Governor Sununu signed HB2
13 into law.  New Hampshire became one of six to prohibit
14 instruction that certain individuals are inherently
15 superior to people of another age, sex, gender,
16 identity, sexual orientation, race, creed, color, and
17 other conditions so stated in the bill.  The law
18 further states that an individual, by virtue of certain
19 identifying conditions, such as the color of one's
20 skin, is inherently racist, sexist, or oppressive,
21 whether consciously or unconsciously.  The law does not
22 prohibit discussing, as a part of a larger course of
23 academic instruction, the historical existence of ideas
24 and subjects identified in this section.
25          HB 1313 adds public post-secondary

## Page 3

1 institutions to the definition of public employer that
2 was passed back in HB2, for the purpose of prohibiting
3 discrimination in higher education.  Be it being a
4 public employee in grades K through 12 or an instructor
5 at the post-secondary levels, the law applies to all.
6          One should not convey to any individual that
7 his or her color, creed, or other defining
8 characteristics is inherently racist, sexist, or
9 oppressive, whether consciously or unconsciously.  Any
10 instructor aligning and communicating one's own vision
11 of race relations, where the national narrative that
12 uses diversity and inclusion as its platform, is
13 unacceptable.  It is the teacher's or the professor's
14 responsibility to carefully weigh words and actions and
15 thoughtfully engage in civil discussion.  Public
16 employees should reflect that -- reflect the approved
17 curriculum of the institution and not personal belief.
18          The false national narrative that professes
19 that all states suffer from centuries of white
20 privilege, white supremacy, and systematic racism does
21 not reflect New Hampshire.  Any instruction promoting
22 that racism is alive and well in New Hampshire does not
23 reflect post-secondary education in our state, nor does
24 it accurately portray our residents, particularly those
25 who have been here for generations, nor does it address

## Page 4

1 the fact that we have invested efforts to attract more
2 individuals and families to New Hampshire, increasing
3 diversity by nearly 75 percent in the decade.
4          In closing, we should not forget
5 Dr. Martin Luther King's famous speech and advice to
6 the nation.  "I have a dream that my four little
7 children will one day live in a nation where they will
8 not be judged by the color of their skin, but by the
9 content of their character."  As a parent and
10 grandparent, I ask that schools and post-secondary
11 institutions teach our young people to think but not
12 tell them what to think.  Advocating CRT is
13 discriminatory and does not reflect New Hampshire's way
14 of life and certainly doesn't align Dr. King's vision.
15 It does the opposite by pitting people against each
16 other.
17          Thank you, Mr. Chair.
18          VICE-CHAIR CORDELLI:  Thank you,
19 Representative.
20          Are there questions from the Committee?
21 Representative Porter?
22          REPRESENTATIVE PORTER:  Thank you, Mr. Chair,
23 and thank you, Representative Ladd for taking my
24 question.
25          Can you tell me, do you believe in such a

1 (Pages 1 to 4)

## Page 5

1  thing as inclusive bias?
2      REPRESENTATIVE LADD:  I think we have a law
3  in place that we passed with HB2, and now I'm asking
4  that that same law be put in place for the other end of
5  education, post-secondary education.
6      REPRESENTATIVE PORTER:  But my question is,
7  do you believe in -- that there's such a thing as
8  implicit bias?  Because implicit bias is not allowed
9  under the under -- my understanding.  The -- we have to
10 deny that that exists.  I want to know if you believe
11 it exists.
12     REPRESENTATIVE LADD:  I don't deny that we
13 have a history that has good, bad, ugly points
14 throughout it.  I agree 100 percent.  As a teacher
15 myself, I was teaching when I was in Alaska that in
16 slavery, as done by the Russians when they came over to
17 Alaska, was absolutely not acceptable and a portion of
18 our history, which should be, you know, corrected, and
19 it was.
20     I also taught the Holocaust, and reading a
21 book right now dealing with "The Tattooist of
22 Auschwitz," which is a wonderful book that all should
23 read.  We have a history in this country that is
24 developing and -- but I don't believe I should be
25 tagged or you should be tagged or anybody in this room

## Page 6

1  be tagged with the idea that you are racist because of
2  our past.  Our past is our past.
3      REPRESENTATIVE PORTER:  May I have one more
4  question, sir?
5      REPRESENTATIVE LADD:  We can learn from it.
6      VICE-CHAIR CORDELLI:  Yes.
7      REPRESENTATIVE PORTER:  The definition that
8  I'm here from perception.org, "What does it mean to
9  have an implicit bias?  We have a bias when, rather
10 than being neutral, we have a preference for or
11 aversion to, a person or group of people.  Thus, we use
12 implicit bias to describe when we have attitudes toward
13 people or associates stereotypes with them without our
14 conscious knowledge."  Do you believe that that exists?
15     REPRESENTATIVE LADD:  I think that as you
16 grow and one acquires the wisdom through life, as I did
17 when I moved to Alaska to a small community where I was
18 in the minority.  My younger daughter grew up learning
19 how to speak Yup'ik.  I didn't see one person different
20 from another person.  Yes, there are people you like
21 and you don't like.  That's in every society.  However,
22 I didn't see it in the way, in the format, in the
23 direction you're going.
24     REPRESENTATIVE PORTER:  Then you're a better
25 person than I am, Representative Ladd.

## Page 7

1      REPRESENTATIVE LADD:  Well, thank you for the
2  compliment.
3      VICE-CHAIR CORDELLI:  Thank you.  Other
4  questions from the Committee for Representative Ladd?
5      Seeing none -- oh, I'm sorry.  Sorry I missed
6  you.  Please proceed, Representative.
7      UNIDENTIFIED REPRESENTATIVE:  Thank you, Mr.
8  Chair, and thank you, Representative, for taking my
9  question.
10     Would it be allowed in an elementary school
11 to illustrate what discrimination is by, for example,
12 allowing children with only brown eyes to line up first
13 for lunch or to get drinks at the water fountain for
14 lunch as opposed to the blue-eyed children, and then
15 the next day reverse it and allow the blue-eyed
16 children as opposed to the brown-eyed children?
17     REPRESENTATIVE LADD:  I've seen that occur in
18 schools and with younger children, and that has a
19 reverse effect, as well.  And that will oftentimes pit
20 children against children who don't really understand.
21 And I think that that's something I wouldn't do.  I
22 wouldn't line a lot of kids up and say, "Okay, John and
23 Susan, you pick the kids in your team, and the person
24 standing there last is the one that's always hurt."
25 That's not correct.

## Page 8

1      I also believe that when we say that we're
2  going to separate based upon a physical characteristic,
3  and, who knows, that young child may go home saying, "I
4  don't have blue eyes, and I'm not the same as that
5  person that has brown eyes."  I don't think young kids
6  see that difference.  I don't think young kids know
7  that when they come to school.  We teach them these
8  discriminatory actions by some of our actions.
9      We should be teaching in our schools what's
10 happened in our past, which is negative, I agree.  But
11 I don't think we should be doing an activity such as
12 that and giving them that experience so they take home
13 the wrong message and they start believing the wrong
14 message.  I think there's other ways to teach what
15 you're trying to teach and what you're trying to do
16 through that activity.
17     VICE-CHAIR CORDELLI:  Representative Mullen?
18     REPRESENTATIVE MULLEN:  Thank you,
19 Representative Cordelli, and thank you, Representative
20 Ladd, for taking the question.
21     So post-secondary students are college
22 students.  Is -- am I correct in assuming that that's
23 what the term means in this bill, Representative Ladd?
24     REPRESENTATIVE LADD:  Yes, that means that
25 they're -- the pupils are K through 12, and that those

## Page 9

1  students on the other side of this --
2        MS. CULLEN:  Yeah.
3        REPRESENTATIVE LADD:  -- are graduated from
4  high school --
5        MS. CULLEN:  Okay.  So they're --
6        REPRESENTATIVE LADD:  -- and on to the next
7  level --
8        REPRESENTATIVE MULLEN:  -- beyond K through
9  12.
10        REPRESENTATIVE LADD:  Yes.
11        REPRESENTATIVE MULLEN:  So in this bill, it
12  says that, "No pupil in elementary or second and no
13  post-secondary educational student shall be taught,
14  instructed, inculcated, or compelled to express a
15  belief in or support for any one of the following" --
16  and then I don't have the list in front of me.  But I
17  mean, we basically know that it's the sort of divisive
18  concepts language that follows at this point, correct?
19        REPRESENTATIVE LADD:  Everything that's in
20  the highlighted dark area is new.  Everything that is
21  in the non-bold font is what is in law right now.
22        REPRESENTATIVE MULLEN:  Okay.  So could I
23  have a follow-up, Representative Cordelli?  Thank you.
24        So by adding this to the statute, by adding
25  post-secondary to the statute, are we saying then that

## Page 10

1  colleges -- in college classes, people can't discuss
2  critical race theory?
3        REPRESENTATIVE LADD:  No, we're not saying
4  that.  We're not saying that you can't be teaching
5  issues that are in our past that have dealt with race.
6  You can teach, but you're not going to advocate it as
7  your personal belief.
8        REPRESENTATIVE MULLEN:  One more follow-up?
9        VICE-CHAIR CORDELLI:  Yes.
10        REPRESENTATIVE MULLEN:  And I promise I'll
11  get off of this.
12        VICE-CHAIR CORDELLI:  Got the promise.
13        REPRESENTATIVE MULLEN:  I'll -- I wouldn't
14  have given it, Representative, if I didn't mean it.
15        So I guess I'm having a hard time with the
16  nebulousness of the word "instructed" or "taught at the
17  post-secondary level" because it would seem to me that
18  we would not -- we would want adults to be able to talk
19  about anything in an instructional situation.  We would
20  want them to use critical thinking to draw their own
21  conclusions at the post-secondary level.  And so I'm
22  wondering how this cannot be a violation of someone's
23  freedom of speech.
24        REPRESENTATIVE LADD:  We have to look at the
25  rest of that law that was passed last year, which you

## Page 11

1  don't see here.
2        MS. CULLEN:  Mm-hmm.
3        REPRESENTATIVE LADD:  And when it talks about
4  "any one or more of the following", and then you go
5  down and you'll see the areas which this bill talks to,
6  which I spoke to at the beginning of my presentation.
7  Those are the issues which we're directing this bill,
8  this post-secondary education instruction towards.
9        REPRESENTATIVE MULLEN:  But my question to
10  you -- and it's the same question, Representative
11  Cordelli, it's not a new one.  My question to you is:
12  Why would we want to prohibit adults from talking about
13  anything in their post-secondary education that they
14  have paid for and are capable of formulating their own
15  opinions?  I mean, we're talking college students.  Why
16  would we want to do that?  Would that not be considered
17  curtailing the freedom of speech?
18        REPRESENTATIVE LADD:  I would just love to be
19  -- have the opportunity to attend and join some of
20  these classrooms where I have been told by college
21  students you echo back exactly what you want to that --
22  what that professor wants and you'll get your A; you
23  show a divergent way of thinking, and hang it up.  I
24  think that we got to be very careful that we don't
25  narrow down the -- where we're going with our

## Page 12

1  instruction in a post-secondary level by coming across
2  and saying, I as the instructor, am advocating this,
3  I'm pushing this.  I, as this young student, would be
4  kind of like, well, I guess I know how I can get out of
5  this class; I'll just echo what that individual's
6  saying; if I go the other way, I know where I'm going
7  to be.
8        So I think that there's certain ways of
9  communicating.  We don't want to teach them what to
10  think.  We want to teach them how to think.  And we
11  ought to be able to respect perspectives from different
12  directions.
13        REPRESENTATIVE MULLEN:  I'm not sure that you
14  answered my question, Representative, but thank you for
15  the attempt.
16        REPRESENTATIVE LADD:  You're welcome.
17        VICE-CHAIR CORDELLI:  Representative Tanner?
18        REPRESENTATIVE TANNER:  Thank you, Mr. Chair,
19  and thank you, Representative Ladd, for taking the
20  question.
21        I think there has been nothing since I've
22  been legislator that has caused more of my
23  constituents, in particularly teacher friends of mine,
24  to contact me and talk to me.  And we've wrestled with
25  this about this bill.  And you're making it even --

3  (Pages  9  to  12)

Page 13

1  I -- in my opinion, even harder on teachers, and now
2  even college professors.  And I'm wondering, because
3  you were an administrator and because you were a
4  teacher, given what we have here, how do you feel a
5  person in a classroom would be when some student in the
6  class asks a question that enters into this critical
7  race theory, divisive concept, nebulous cloud that
8  we're talking about?  How would you counsel a teacher
9  as to how to handle that?
10         REPRESENTATIVE LADD:  You can respond to a
11  question, you don't have to say, "This is my way of
12  thinking" though.  You can respond to a question.  You
13  can have open dialogue.  I don't object to that, and I
14  don't think that that a college professor should.
15  However, when you come out and you're advocating for
16  that or forming committees or groups to work on
17  subjects like this on this topic, you're advocating for
18  it, you're pushing it.  And that's something we don't
19  want to push discrimination because that's exactly what
20  it is.  It's ending up pitting individuals against
21  other individuals when we didn't need to go that
22  direction.
23         I believe our society is changing, and it's
24  changing for the better.  We're all more aware, and
25  it's moving forward.  This legislation or CRT or any of

Page 14

1  these projects that have come out are just, I think,
2  tearing the fabric of this country apart.  And I think
3  there are different opinions on the committee right now
4  on this topic.  And you're welcome to have your own
5  opinion.
6         REPRESENTATIVE TANNER:  Well --
7         REPRESENTATIVE LADD:  And I respect that.
8         REPRESENTATIVE TANNER:  Thank you for that.
9  I'm glad I have still free speech.
10         REPRESENTATIVE LADD:  Yes, you do.  We all
11  do.
12         VICE-CHAIR CORDELLI:  Any other questions for
13  the representative?
14         Maybe, if I could ask, Representative, it's
15  my recollection that the existing statute currently has
16  a provision explicitly stating that subjects, as we've
17  been discussing, can be part of any academic
18  instruction that would, I think, or should satisfy any
19  teacher concerns?  Am I correct in my recollection of
20  that statute?
21         REPRESENTATIVE LADD:  That is in law, and you
22  are correct, Representative Cordelli.
23         VICE-CHAIR CORDELLI:  Thank you very much for
24  your testimony.
25         Oh, I'm sorry.  Representative Ford?

Page 15

1         REPRESENTATIVE FORD:  Thank you, Mr. Chair.
2         Representative, one question that's puzzled
3  me throughout this entire discussion is that there
4  never seems be a definition of a theory; and that what
5  is often advanced in terms of a theory is advanced as
6  fact.  And a theory is, as I've always been taught,
7  something that is not yet proved.  And so I wonder
8  about if part of the issue here isn't that people who
9  are perhaps not as skillful in their teaching, but are
10  teaching the theory as though it's a fact, when in fact
11  it's nothing more than a speculation.  The thing falls
12  on its face in terms of just rational and analysis.
13         REPRESENTATIVE LADD:  I think that's well-
14  stated.
15         VICE-CHAIR CORDELLI:  Thank you very much.
16         REPRESENTATIVE FORD:  Thank you.
17         VICE-CHAIR CORDELLI:  Seeing no further
18  questions, thank you very much, Representative.
19         REPRESENTATIVE LADD:  Thank you.
20      (Excerpt ends)
21
22
23
24
25

Page 16

1       C E R T I F I C A T I O N
2
3       I, Alicia Jarrett, do hereby certify that the
4  foregoing is a correct transcript from the electronic
5  sound recording provided for transcription and prepared
6  to the best of my professional skills and ability.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23  _____
24  ALICIA JARRETT, AAERT NO. 428    DATE:  April 14, 2023
25

4  (Pages 13 to 16)

Page 16

1                   C E R T I F I C A T I O N

2

3          I, Alicia Jarrett, do hereby certify that the

4    foregoing is a correct transcript from the electronic

5    sound recording provided for transcription and prepared

6    to the best of my professional skills and ability.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    *Alicia J. Jarrett*

22

23    _____

24    ALICIA JARRETT, AAERT NO. 428    DATE:  April 14, 2023

25

# EXHIBIT 85

Redacted version of Feb. 1, 2022 F. Edelblut Email Exchange

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** ███████████ @gmail.com>
**Subject:** RE: FW: The Regulated Classroom disappointing
**Date:** Tue, 01 Feb 2022 13:47:04 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

I do not have an "independent" review of the actual trainings. There will be an on-line version that I would be happy to share with you to watch and share any feedback.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ███████████ .@gmail.com>
**Sent:** Tuesday, February 1, 2022 8:38 AM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: FW: The Regulated Classroom disappointing

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

I don't know what your other options were to deal with the classroom fallout from Covid-19 policies, but I do appreciate that you were attentive to and attempted to mitigate the potential damage in advance.

Is there a review process in place for Ms. Daniel's training and methods that includes anonymous feedback from individual teachers?

Thank you for your prompt response and your leadership at NH DOE.

Best regards,

███████████

On Tue, Feb 1, 2022, 8:14 AM Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov> wrote:

███ ,

Thank you for sharing that with us.

I can tell you that I personally reviewed the materials for this program and reserved, as part of the contract (you can see the contract on the Governor and Council site), the right to edit such content to ensure that the "woke" CRT type concepts would not be included in this program that may be a violation of our laws. I further spoke with Emily to ensure that she too was aware of the proper scope of this contract to ensure the services provided are directed at

supporting the students and teachers with tools relative to dysregulation. I am happy to discuss this further with you if you like. My cell number is 603 ██████

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov

NHDOE-logo-fullWide

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Houghton, Kimberly C <kimberly.c.houghton@doe.nh.gov>
**Sent:** Tuesday, February 1, 2022 8:03 AM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Fwd: The Regulated Classroom disappointing

**From:** ██████ @gmail.com>
**Sent:** Monday, January 31, 2022 9:15:50 PM
**To:** Houghton, Kimberly C <kimberly.c.houghton@doe.nh.gov>
**Subject:** The Regulated Classroom disappointing

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Dear Ms. Houghton,

As a school board member, I am sad to see that the NH DOE is partnering with an organization whose founder is so steeped in critical race theory. A cursory reading of the two blog posts which are linked to her web page was disturbing, especially in view of the current legislation which has drawn attention to educators who are engaging in a form of racism themselves. Ms. Daniels by her own woke words fits the description of one who seeks to divide our world into the oppressed and the oppressor based on skin color.

Disappointed,

██████

Pittsfield

# EXHIBIT 86

Redacted version of Mar. 18, 2022 D. Fenton Email Exchange

(Depo. Ex. 23)

**From:** ▮▮▮▮▮▮▮▮▮@hotmail.com>
**To:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
**Subject:** Re: Devise Concepts Policy and Complaint Process
**Date:** Fri, 18 Mar 2022 18:45:03 +0000
**Importance:** Normal



EXHIBIT 23
D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

---

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

---

Much appreciated Diana! - ▮▮▮

---

**From:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Sent:** Friday, March 18, 2022 2:36 PM
**To:** ▮▮▮▮▮▮▮▮▮▮@hotmail.com>
**Subject:** Devise Concepts Policy and Complaint Process



Richard Farrell forwarded the email that you sent to him.  You are correct that the subject matter of HB 544 was put into HB 2 and was passed into law last year.  The Attorney General's Office issued a Technical Advisory on this matter back in July and you can access it here:

https://www.doj.nh.gov/news/2021/20210721-anti-discrimination-laws.htm

You may file a grievance directly with the Human Rights Commission and there is also a link to a submission form on the DOE website.

I hope that helps provide clarification.  Please feel free to contact me with any additional questions as it pertains to this matter.

Best,

diana


~~~~~~~~~~~~~~~~~
Diana E. Fenton, Esq.
Chief, Governance Unit
New Hampshire Department of Education
Office of the Commissioner
101 Pleasant Street
Concord, NH 03301
Diana.fenton@doe.nh.gov
(603) 271-3189

# EXHIBIT 87

# Drummond Woodsum August 5, 2021 Presentation



**Drummond**Woodsum

# Another Brick in the Wall?

**Thursday, August 5, 2021**
9:00-11:00 AM | Live Online via Zoom

**Presented by Drummond Woodsum Attorneys:**

**Meghan S. Glynn**
mglynn@dwmlaw.com

**James A. O'Shaughnessy**
joshaughnessy@dwmlaw.com

**Milliana R. Zonarich**
mzonarich@dwmlaw.com

800.727.1941 | dwmlaw.com | SchoolLaw.com | ServingSchools.com

© Copyright 2021 Drummond Woodsum. All rights are expressly reserved.

PL 00441



# CERTIFICATE OF ATTENDANCE

This is to certify that _____ has successfully completed 2 contact hours of continuing education at the program, **"Another Brick in the Wall?"** presented by Drummond Woodsum, held on Thursday, August 5, 2021.

_James A. O'Shaughnessy_
603.792.7411 Direct
joshaughnessy@dwmlaw.com

*This form denotes attendance at entire program.*
*If you arrive late or leave prior to the program ending time, it is your responsibility to adjust hours accordingly.*

*Thank you for attending!*

Adriana Grimes, Events Coordinator
Drummond Woodsum
800.727.1941 Ext. 232
agrimes@dwmlaw.com

PL 00443

# ZOOM LOGIN

Topic: **Another Brick in the Wall?**
Time: **Aug 5, 2021 09:00 AM** Eastern Time (US and Canada)

Join Zoom Meeting
https://dwmlaw.zoom.us/j/82437490390?pwd=TGxqeG1PN2tRaDM1aW9xK0tFbE1yQT09

**Meeting ID: 824 3749 0390**
**Passcode: 281510**

One tap mobile
+19294362866,,82437490390#,,,,*281510# US (New York)
+13017158592,,82437490390#,,,,*281510# US (Washington DC)

Dial by your location
        +1 929 436 2866 US (New York)
        +1 301 715 8592 US (Washington DC)
        +1 312 626 6799 US (Chicago)
        +1 669 900 6833 US (San Jose)
        +1 253 215 8782 US (Tacoma)
        +1 346 248 7799 US (Houston)
Find your local number: https://dwmlaw.zoom.us/u/kYlv7rSx

PL 00445



## INTRODUCTION

- Topics Covered Today:
  - Prohibition on particular mandated employer trainings
  - Prohibition on teaching "prohibited concepts"
  - Jurisdiction and remedies
  - Protections for public employees
- NOT Covered
  - Critical Race Theory – CRT

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum    2

## PROTECTED CLASSES: RSA 354-A

- Age
- Sex
- Gender identity
- Sexual orientation
- Race
- Color

- Marital status
- Familial status
- Disability
- Religion
- National origin

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                                                   3

## NEW HAMPSHIRE'S DIVISIVE CONCEPTS BILL

- Originally considered in the Legislature as House Bill 544

  - The early versions of this bill had a much broader definition of "divisive concepts" – i.e. there were lots more concepts that were considered to be divisive that educators would have had to avoid.

  - HB 544 was NOT enacted into law.

  - However, certain amendments to the New Hampshire Human Rights Act (RSA 354-A) and RSA 193 (Pupils) were appended to the 2022 budget bill, also known as House Bill 2. These amendments include a prohibition on teaching certain divisive concepts. This bill DID pass and is now the law in all New Hampshire school districts.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                                                   4

## "DIVISIVE CONCEPTS" (1 OF 4)

- That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, **are inherently superior or inferior** to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin

- *Inherent: existing in someone or something as a permanent and inseparable element, quality, or attribute (www.dictionary.com)*

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum    5

## "DIVISIVE CONCEPTS" (2 OF 4)

- That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin **is inherently racist, sexist, or oppressive, whether consciously or unconsciously**

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum    6

## "DIVISIVE CONCEPTS" (3 OF 4)

- That an individual **should be discriminated against or receive adverse treatment** solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin

Copyright 2021 Drummond Woodsum. All rights expressly reserved.
DrummondWoodsum    7

## "DIVISIVE CONCEPTS" (4 OF 4)

- That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin **cannot and should not attempt to treat others equally and/or without regard to** age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

Copyright 2021 Drummond Woodsum. All rights expressly reserved.
DrummondWoodsum    8

## EQUITY VS. EQUALITY

- **Equity**: treating individuals based on their individual needs and requirements. Equity involves trying to understand and provide people with what they actually need to function on the same level as others.

- **Equality**: treating individuals equally and in the same manner, regardless of their individual needs or requirements. Equality aims to ensure that everyone receives the same opportunities and that individuals and groups are not treated differently or less favorably.

## PROHIBITION: PUBLIC EMPLOYERS

- No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group [any prohibited concept].

  - Note that K-12 students are covered under this provision, as are volunteers.

## PROHIBITION: TEACHING IN PUBLIC SCHOOLS

- **RSA 193:40**

  - No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any [prohibited concept].

    - <u>Inculcate</u>: "to teach and impress by frequent repetitions or admonitions…. Implies persistent or repeated efforts to impress on the mind."
      – *Merriam-Webster* (*https://www.merriam-webster.com/dictionary/inculcate*).

    - <u>Compel</u>: "to drive or urge forcefully or irresistibly…. to cause to do or occur by overwhelming pressure."
      – *Merriam-Webster* (*https://www.merriam-webster.com/dictionary/compel*).

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum                11

## REMEDIES AND PENALTIES

- **People asserting that a school district has violated RSA 354-A (NH Law Against Discrimination) can bring claims in:**

  - Superior Court:

    RSA 354-A and other causes of action; Whistleblower Protection Act; RSA 98-E:3 (Public Employee Freedom of Expression)

  - NH Commission for Human Rights: RSA 354-A

    - These remedies include compensatory damages, administrative fines, reinstatement, back-pay, unpaid wages, liquidated damages, attorney's fees, criminal penalties, equitable damages, injunctive relief, and declaratory judgment.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum                12

## PENALTIES FOR EDUCATORS

- **For violations of RSA 193:40** (i.e., teaching or training on "divisive concepts"):

  - "Any person" claiming to be aggrieved by this section (including the Attorney General) may:

    - File a civil action against a school **or** school district in Superior Court for legal or equitable relief

    - File a complaint with the NH Commission for Human Rights

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

13

## CODE OF CONDUCT VIOLATION

- **Educator Code of Conduct**

  - Violation of RSA 193:40 by an educator (including any professional employee whose position requires certification by the state board under RSA 189:39) is considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.

- <u>Duty to Report – Ed 510.05</u>

  - Every credential holder also has a duty to report <u>any suspected violation</u> of the code of conduct in accordance to local procedures (usually to their principal)

    - Every Principal shall report when the principal <u>has been notified</u> or <u>is personally aware</u> that a credential holder has violated the code of conduct (usually to the Superintendent).

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

14

PL 00452

## REPORT TO DEPARTMENT OF EDUCATION

- <u>Duty to Report – Ed 510.05</u>

  - Superintendent must report violations to the Office of Credentialing at the NH Department of Education when:

    - The superintendent <u>has knowledge</u> that a credential holder has violated the code of conduct

- If a credential <u>has made a report</u> and believes the local reporting procedures have not been followed, the reporting credential holder <u>shall</u> notify the department directly.

    - *Note: at the time of the training, Ed 510 has not yet been amended to incorporate the new law.*

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum          15

## PROTECTIONS FOR PUBLIC EMPLOYEES

- A public employee may refuse to participate in any training, program, or other activity at which the public employer "advocates, trains, teaches, instructs, or compels participants to express belief in or support for" a prohibited concept.

  - Such an action may fall under the Whistleblower Protection Act.

- The public employer may not take adverse action against the employee for this refusal.

- Per the NH Department of Education, the NH Commission for Human Rights, and the NH Department of Justice ("State Guidance"), the law does not prohibit employers from mandating attendance at training programs that comply with the law.

- Employees cannot refuse to attend or walk out simply because the training makes them uncomfortable.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum          16

## SCHOOL EMPLOYERS: PROHIBITED

- Retaliation or adverse action resulting from a good-faith refusal to participate in a program that violates the new provisions of RSA 354-A

- Programs stating that people:

  - Are inherently superior or inferior,

  - Are inherently racist, sexist, or oppressive (consciously or unconsciously),

  - Should be discriminated against or receive adverse treatment, or

  - Cannot or should not treat others equally and/or without regard to a protected characteristic

  On the basis of a protected characteristic.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                    17

## SCHOOLS AS EMPLOYERS: PERMITTED

- Trainings in compliance with federal and state civil rights laws

  - Title IX

  - Title VII

  - The IDEA

  - The ADA/Section 504

  Notwithstanding language in the statute, employers and public entities still have an obligation under federal law to provide accommodations and other differential treatment to individuals with disabilities.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum                    18

## SCHOOLS AS EMPLOYERS: GRAY AREA

- Programs that involve discussion of power structures or power imbalances in society
  - Depending on how the topic is approached...
    - Safe harbor: discussion of concepts and ideas, rather than compelling a person to adopt a belief or even agree with the concept or idea.
    - Exposure to ideas and viewpoints, rather than asking or requiring acceptance or agreement with the ideas or viewpoints.
- Programs that involve advocating for these concepts will be more problematic:
  - Affirmative action to promote equity
  - Reparations for past wrongs
  - White privilege

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum          19

## STATE GUIDANCE FOR SCHOOL EMPLOYERS

- According to State Guidance, employers may:
  - Take steps to examine issues related to "equity, diversity, inclusion, equality, and other related topics"
  - Conduct trainings "geared towards diversity, equity, equality and inclusion" including implicit bias training
  - Conduct trainings "that address racism, sexism, and other practices or ideas that have harmed or continue to harm certain identified groups," even if it makes participants uncomfortable
- Practice Pointers:
  1) Review training materials in advance for compliance
  2) Notify employees that training conforms with RSA 354-A
  3) Add disclaimer to materials: "the Districts/School has reviewed the content of this training program and can confirm that it is in compliance with RSA 354-A."

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum          20

PL 00455

## SCHOOLS AS EDUCATORS: PROHIBITED

- Programs, including classroom instruction, stating that people:

  - Are inherently superior or inferior,

  - Are inherently racist, sexist, or oppressive (consciously or unconsciously),

  - Should be discriminated against or receive adverse treatment, or

  - Cannot or should not treat others equally and/or without regard to a protected characteristic

  On the basis of a protected characteristic.

## SCHOOLS AS EDUCATORS: PERMITTED

- Discussing, as a part of a larger course of academic instruction, the historical existence of facts, topics, and subjects identified in the new law (including the prohibited concepts)

- Compliance with the ADA/Section 504 and the Individuals with Disabilities Education Act (IDEA), which require accommodation and other differential treatment for certain students with disabilities

- Teaching about the existence of racism, sexism, and other forms of discrimination

2410

## CLASSROOM TEACHING: GRAY AREA

- Discussions regarding power structures in present-day society
  - These discussions could include debate about possible solutions to social problems, some of which may involve treating some groups differently than others.
  - Again, consider the difference between presenting ideas and concepts vs. compelling belief or agreement.
- Discussions of cultural sensitivity
  - Again, these discussions could involve recommendations about how to treat others in accordance with how *they* wish to be treated, which may not always be "without regard to" their protected characteristics.
- Caution:
  - Testing on controversial subjects
  - Requiring students to adopt belief in or to agree with certain ideas, viewpoints, concepts, or values.
  - Remember that students have first amendment rights in the classroom where the teacher opens up a discussion. Teachers can shut down students' comments only where they cause a "substantial disruption" to the school environment.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum                23

## SCHOOLS AS EDUCATORS: STATE GUIDANCE

- According to **guidance** from the NH Department of Education, NH Commission for Human Rights, and the NH Department of Justice, public schools may:
  - Continue to teach historical subjects such as: slavery, treatment of Native American populations, Jim Crow laws, segregation, treatment of women, treatment of LGBTQ+ people, treatment of people with disabilities, treatment of people based on their religion, or the Civil Rights Movement.
    - This may include discussion about the lingering impact of historical practices upon different identified groups.
  - Continue to have discussions related to current events, including the Black Lives Matter movement, efforts to promote equality and inclusion, or other contemporary events that impact certain identified groups
  - Present lessons, subjects, or areas of discussion that make students, faculty, or parents uncomfortable

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

**Drummond**Woodsum                24

## CLASSROOM TEACHING: BEST PRACTICES

- Train staff at the beginning of this school year on this new law

- Review lesson plans that related to controversial subjects

- Principals should work with teachers have specific concerns on how to adapt or modify their curriculum and lesson plans if necessary

- Review and prepare for pushback related to "divisive concepts"

- Consider the joint state guidance, as it provides insight into how the Department of Education interprets the law and how it will likely review allegations of teacher misconduct under this statute.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

25

## FREE SPEECH: STUDENTS

- Free speech – students in the classroom:

  - Schools and the teachers in the classrooms have significant control over student expression in the classroom. Classrooms are not open forums for expression. Teachers can exercise control over student speech to assure that participants learn whatever lessons the activity is designed to teach.

  - Accordingly, teachers should continue to regulate classroom discussions to maintain control of the discussion and to ensure compliance with the law.

  In general, remember that students maintain some free speech rights under the *Tinker* standard, which protects speech that does not create a substantial disruption to the school environment.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

26

## ACADEMIC FREEDOM: TEACHERS

- Free speech – teachers in the classroom:

  - While teachers retain some limited free speech rights at work, courts have consistently held that primary and secondary school teachers really do not have academic freedom while engaged in teaching.

  - Teachers lack the same kind of freedom that professors enjoy to express their personal views and opinions.

  - Translation: teachers have the freedom in the classroom to discuss the assigned subject matter in the manner they deem appropriate, but must ensure that their comments are directly related to the curriculum established by the Board and do not delve into unlawful topics.

  - Collective bargaining agreements – some CBAs contain provisions titled, "Academic Freedom" which, for the most part, do not permit teachers to express their own views and opinions. However, if you have such a provision, teachers should be cautioned that state law now sets limits on what can be taught in the classroom.

## SCHOOL BOARD POLICIES

- Every school district in NH should have board policies which provide a process for:

  - Parents to object to objectionable course material

  - Parents and students to challenge the instructional materials and library resources used in the school's educational program on the basis of appropriateness.

- Familiarize yourself with these policies, ask your policy committee to review and update, and direct the pubic to follow the processes contained therein if they have complaints or issues:

  - IJL - Library and Instructional Materials

  - IGE/IGC - Objectionable Course Material

## OBJECTIONABLE CLASSROOM MATERIAL

- **RSA 186:11, IX-c (board policy IGC/IGE)**

  - Requires school districts to adopt a policy allowing for an exception to objectionable course material.

  - Parent notifies the school principal in writing of the specific material to which they object

  - Principal and parents agree upon an alternative program, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area.

  - Instruction on human sexuality and sexual education – schools must also provide parents and legal guardians not less than 2 weeks advance notice of curriculum course material used for instruction of human sexuality or human sexual education.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

29

## OBJECTION TO LIBRARY AND INSTRUCTIONAL MATERIALS

- American Library Association Positions:

  - Freedom to Read Statement

  - Library Bill of Rights – American Library Association believes that libraries are forums for information and ideas, and that the following basic policies should guide their services (partial list only):

    I.   Books and other library resources should be provided for the interest, information, and **enlightenment of all people of the community** the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation.

    II.  Libraries should provide materials and information presenting **all points of view on current and historical issues.** Materials should not be proscribed or removed because of partisan or doctrinal disapproval.

    III. Libraries should **challenge censorship** in the fulfillment of their responsibility to provide information and enlightenment.

**800.727.1941 | dwmlaw.com**
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

Drummond Woodsum

30

PL 00460

## STUDENT AND STAFF CODE OF CONDUCT

- School districts as both employers and educators should continue to follow and enforce their code of conduct.

- This law does not provide an opportunity for students or staff to engage in discriminatory conduct and such misconduct must continue to be addressed through appropriate methods.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum    31

## CLOSING THOUGHTS

- The state guidance, while helpful, does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law.

- The law is difficult to understand, often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions.

- We know from recent US Supreme Court decisions that it is challenging for schools to regulate student conduct without infringing on student's First Amendment rights to free speech.

- One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech.

800.727.1941 | dwmlaw.com
Copyright 2021 Drummond Woodsum. All rights expressly reserved.

DrummondWoodsum    32



**Contact Us**

670 N. Commercial Street, Suite 207
Manchester, NH 03101
603.716.2895  Main
603.716.2899  Fax

78 Bank Street
Lebanon, NH 03766
603.433.3317  Main
603.433.5384  Fax

84 Marginal Way, Suite 600
Portland, Maine 04101
207.772.1941  Main
207.772.3627  Fax

© Copyright 2021 Drummond Woodsum.  All rights are expressly reserved.

PL 00463

# EXHIBIT 88

DOE Nov. 10, 2021 Website

(Depo. Ex. 21)

☐ Change Site Language   ☐ Search The Site

11/10/21 *Wayback Machine*

☐      **Get the latest Coronavirus COVID-19 update at**
**ALERT**    **https://www.covid19.nh.gov**

**EXHIBIT 21**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

☐ **OPEN MENU**

Home   ☐   Who We Are   ☐   Deputy Commissioner's Office   ☐   Office of Governance   ☐   Right to Freedom from Discrimination in Public Workplaces and Education

# Right to Freedom from Discrimination in Public Workplaces and Education

*The department of education wants to ensure that all students have the opportunity to learn in a safe and encouraging environment that instills hope and promise for a bright future. One aspect of that environment, both for students and teachers alike, is that it is free from discrimination.*

House Bill 2 was passed by both bodies of the legislature and signed into law by the Governor on June 25, 2021. Included in HB 2 are sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.

There has been much discussion about this law and what prohibitions it imposes on public employers, government programs, and schools. The State of New Hampshire and its political subdivisions recognize that they have a duty to ensure that they treat all residents and visitors equally. This means that all employees or individuals who work to provide or administer programs and services on behalf of the State of New Hampshire, including teachers in an educational setting, must continually strive to treat all of those with whom they may come into contact equally and with dignity and respect.

This web page is being offered in support of the New Hampshire Commission for Human Rights (Commision) for those who believe that they, or their child, was discriminated against because their child's school was teaching and/or advocating that one identified group is:

- Inherently superior or inferior to people of another identified group
- Inherently racist, sexist, or oppressive, whether consciously or unconsciously
- Should be discriminated against or receive adverse treatment
- Should not treat members of other identified groups equally

Completion of a Public Education Intake Questionnaire does not constitute a formal charge of discrimination, but the first step in making such a determination.

## Filing a Public Education Intake Questionnaire

Please complete and submit the Public Education Intake Questionnaire form below. Before submitting, ensure all contact information provided on the form is as current and up to date as possible. Once the completed questionnaire is received, it will be reviewed by the Commission's Intake Coordinator. The Coordinator may need to reach out to gather more information to determine if the individual filing has grounds to file a formal complaint. Once review is complete, the Intake Coordinator will provide information to explain the next steps in filing a formal complaint or to explain why there is no basis to file a charge of discrimination. We recommend saving or printing a copy of the completed questionnaire for your personal records.

The below form can be submitted to the Commission directly by using the submit button when opened in Adobe. If Adobe is unavailable, please complete the form and submit it via email to humanrights@hrc.nh.gov.

Public Education Intake Questionnaire Form

If you believe an educator may have violated the code of conduct, such a complaint can be filed to the Department of Education by email to Kate Walker, Kate.A.Walker2@doe.nh.gov.

Educator Code of Conduct and Ethics

## Resources and Links

- New Hampshire Commission for Human Rights Case Processing Procedure and Summary Fact Sheet
- Frequently asked Questions: New Discriminatory practice prohibitions applicable to k-12 public educational programs
- Frequently asked Questions: New Discriminatory practice prohibitions applicable to public employers and government programs
- State Issues Guidance Regarding New Anti-Discrimination Laws
- Chapter 91: HB 2-FN-A-LOCAL Final Version
- NH RSA 354-A

## Contact

New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301
Telephone: (603) 271-2767
Fax: (603) 271-6339
E-mail: humanrights@hrc.nh.gov

Portable Document Format (.pdf) . Visit nh.gov for a list of free .pdf readers for a variety of operating systems.

**101 Pleasant Street | Concord, NH | 03301-3860**
(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 |
info@doe.nh.gov

NH Career and Technical Education

NH Schools

NH Government Careers

NH Travel & Tourism

NH Web Portal - NH.gov

https://web.archive.org/web/20211110220932/https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination                2/3

Directions to NHDOE ☐        Subscribe to e-news ☐

iPlatform                    ReadyNH.gov

myNHDOE                      Transparent NH

Educator Search

© 2021 State of New Hampshire • All rights reserved  |  Accessibility Policy  |  Privacy Policy        AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE

# EXHIBIT 89

# DOE Nov. 10, 2021 Press Release

# (Depo. Ex. 25)

 🌐 Change Site Language   🔍 Search The Site

 **New Hampshire**
# Department of Education


**EXHIBIT 25**
R. Farrell
5/18/2023
Reporter: Sharon Saalfield
RDR, CRR



☰ **OPEN MENU**

Home  >  NHDOE launches webpage for reporting alleged discrimination in schools

---

## Press Release

For Immediate Release
**Posted:**  November 10, 2021

### Contact

Kim Houghton, Communications Administrator
(603) 513-3030 | kimberly.c.houghton@doe.nh.gov

# NHDOE launches webpage for reporting alleged discrimination in schools

CONCORD, NH — The New Hampshire Department of Education has launched a new webpage in support of the New Hampshire Commission on Human Rights aimed to ensure that students and educators are free from discrimination, and that they have the opportunity to learn and teach in a safe environment.

This website in support of the Commission provides parents with an online site to address concerns that their child may have been discriminated against. Parents, guardians and teachers are able to submit a public education intake questionnaire that will be reviewed by a Commission intake coordinator to determine if there are grounds to file a formal complaint.

This project was spearheaded following the passage of House Bill 2, Right to Freedom from Discrimination in Public Workplaces and Education.

"This update to the law provides a mechanism for individuals who believe they are being discriminated against or aggrieved to have a neutral, third party review and weigh the information. This also creates a unique opportunity for NHDOE and New Hampshire school districts to have more robust conversations about discrimination, educational efforts on the topic and a better understanding of how to differentiate between discrimination and nondiscrimination," said Ahni Malachi, executive director at NHCHR.

"We know that here in New Hampshire, teachers do their best to treat everyone equally, and genuinely strive to communicate with both dignity and respect," said Frank Edelblut, commissioner of education. "This webpage is now available to the public so, in the rare instance that something might appear to be adverse treatment, individuals have a place to go where they can voice their concerns and receive assistance — whether that be parents or teachers."

The new webpage is Right to Freedom from Discrimination in Public Workplaces and Education | Department of Education (nh.gov).

###

---

 **New Hampshire**
## Department of Education

**25 Hall Street | Concord, NH | 03301-3860**
(603) 271-3494 | TDD Access: Relay NH 1-800-735-2964 |
info@doe.nh.gov

Directions to NHDOE >     Notice of Non-Discrimination >

Request for Proposals

NH Career and Technical
Education

myNHDOE

Educator Search

Right to Freedom from
Discrimination

COVID-19 Resources

NH Government Careers

NH Travel & Tourism

NH Web Portal - NH.gov

ReadyNH.gov

Transparent NH

---

© 2023 State of New Hampshire · All rights reserved  |  Accessibility Policy  |  Privacy Policy          AN OFFICIAL NEW HAMPSHIRE GOVERNMENT WEBSITE

# EXHIBIT 90

Nov. 15, 2021 F. Edelblut Email Exchange

(Depo. Ex. 41)

EXHIBIT 4
WIT: Edelblut
2424
DATE: 5/23/22
Cynthia Foster, RPR, LCR #14

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "m4l hillsboroughnh" <m4lhillsboroughnh@gmail.com>
**Subject:** RE: Press Release - M4L Offers incentive for evidence on HB2 violations
**Date:** Mon, 15 Nov 2021 15:54:44 -0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

Thank you.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** m4l hillsboroughnh <m4lhillsboroughnh@gmail.com>
**Sent:** Monday, November 15, 2021 9:56 AM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Subject:** Press Release - M4L Offers incentive for evidence on HB2 violations

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Good morning Mr Edelblut,

A few days ago on the M4L Hillsborough County Twitter account, we offered a $500 incentive for individuals to come forward with information on those violating HB2, the Prohibition on Teaching Discrimination.

Attached is the official Press Release.
https://www.momsforliberty.org/files/671

We look forward to working with you, teachers, schools, parents, and the greater community to create the best possible environments for our children to learn.

All the best,
Moms For Liberty - Hillsborough County, NH

# EXHIBIT 91

Nov. 17,
2021 HRC
Email
Exchange

(Depo. Ex.
61)

**From:** "BurkeCohen, Sarah" <Sarah.E.BurkeCohen@hrc.nh.gov>
  **To:** "Sheldon, Linda" <Linda.L.Sheldon@affiliate.doit.nh.gov>, "DoIT-wcm" <wcm@nh.gov>
  **Cc:** "Malachi, Ahni" <Ahni.N.Malachi@hrc.nh.gov>
**Subject:** RE: NHCHR - Website Updates and Document Uploads
  **Date:** Wed, 17 Nov 2021 16:21:50 -0000
**Importance:** Normal
**Attachments:** NHCHR_Public_Education_General_Questionnaire.pdf
**Inline-Images:** image001.gif

EXHIBIT 61
WIT: S Burke Cohen
DATE: 6-20-23
Cynthia Foster, RPR, LCR

Hello Linda,

I have a revision to yesterday's requests:

**"How to File A Complaint" Page:** https://www.nh.gov/hrc/howto.html

1. Please delete the current document hyperlinked to the "Public Education General Questionnaire" and connect the hyperlink to the attached pdf document.

Thank you.
Sarah

*Sarah E. Burke Cohen, Esq.*
Assistant Director
NH Commission for Human Rights
2 Industrial Park Drive
Concord, New Hampshire 03301
Phone: (603) 271-6840
Fax: (603) 271-6339

## **\*\*PLEASE NOTE MY NEW EMAIL ADDRESS AND UPDATE YOUR ADDRESS BOOK\*\* Sarah.E.BurkeCohen@hrc.nh.gov**

### Statement of Confidentiality

The information contained in this electronic message and any attachments to this message may contain confidential or privileged information and is intended for the exclusive use of the addressee(s). Please notify the Human Rights Commission immediately at (603) 271-6840 or reply to Sarah.E.BurkeCohen@hrc.nh.gov if you are not the intended recipient and destroy all copies of this electronic message and any attachments.

**From:** Sheldon, Linda <Linda.L.Sheldon@affiliate.doit.nh.gov>
**Sent:** Tuesday, November 16, 2021 2:46 PM
**To:** BurkeCohen, Sarah <Sarah.E.BurkeCohen@hrc.nh.gov>; DoIT-wcm <wcm@nh.gov>
**Cc:** Malachi, Ahni <Ahni.N.Malachi@hrc.nh.gov>
**Subject:** RE: NHCHR - Website Updates and Document Uploads

**From:** BurkeCohen, Sarah <Sarah.E.BurkeCohen@hrc.nh.gov>
**Sent:** Tuesday, November 16, 2021 2:34 PM
**To:** Sheldon, Linda <Linda.L.Sheldon@affiliate.doit.nh.gov>; Hassan, Ruthie - DoIT Affiliate <Ruthie.A.Hassan@affiliate.doit.nh.gov>; DoIT-wcm <wcm@nh.gov>
**Cc:** Malachi, Ahni <Ahni.N.Malachi@hrc.nh.gov>
**Subject:** NHCHR - Website Updates and Document Uploads

Hello!

Below please find uploads and changes to be made to the HRC's internal web pages. The links for each page are listed for your convenience and documents attached that correspond with sections in need of updates as outlined.

**"Commission Meetings" Page:** https://www.nh.gov/hrc/minutes.html

1. Please add the following .pdf documents to the "2021 Commission Meetings Minutes" as a hyperlink on the date of the meeting. The attached document is named to correspond with the date that should appear in text on the website at the link above.

    October 7, 2021 (see "Meeting Minutes - 20211007 – Approved.pdf")

**"How to File A Complaint" Page:** https://www.nh.gov/hrc/howto.html

1. Please delete the following paragraph and hyperlink:

    If your issue involves a claim for discrimination in a place of **public education**, you may either:

    Print our Public Education Intake Questionnaire Form 📎, write or type in your answers and mail to the Commission at the address below;
    or
    call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

2. In the place of the above deleted paragraph, please put the following with hyperlinks to the indicated pdf. Documents, which are attached above:

    If your issue involves a claim of discrimination in **public education**, you may either:

    Print our "Public Education General Questionnaire", write or type in your answers and email or mail to the Commission at the address below;

    or

    call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

    If your issue involves a claim of discrimination relative to the **Right to Freedom from Discrimination in Public Workplaces and Education**, you may either:

    Print our "Public Education RSA 354-A:29 Questionnaire", write or type in your answers and email or mail to the Commission at the address below;

    or

call the Commission @ 603.271.2767 (or TDD ACCESS: Relay NH 1.800.735.2964) to speak with an intake investigator.

Please don't hesitate to reach out with any questions.

Thank you for your assistance!
Sarah

*Sarah E. Burke Cohen, Esq.*
Assistant Director
NH Commission for Human Rights
2 Industrial Park Drive
Concord, New Hampshire 03301
Phone: (603) 271-6840
Fax: (603) 271-6339

## **\*\*PLEASE NOTE MY NEW EMAIL ADDRESS AND UPDATE YOUR ADDRESS BOOK\*\***
### **Sarah.E.BurkeCohen@hrc.nh.gov**

### Statement of Confidentiality

The information contained in this electronic message and any attachments to this message may contain confidential or privileged information and is intended for the exclusive use of the addressee(s). Please notify the Human Rights Commission immediately at (603) 271-6840 or reply to Sarah.E.BurkeCohen@hrc.nh.gov if you are not the intended recipient and destroy all copies of this electronic message and any attachments.

**EXHIBIT 92**

Redacted
version of
Oct. 25,
2021 F.
Edelblut
Email
Exchange

(Depo. Ex.
33)

2430

**EXHIBIT 33**

R. Farrell
5/18/2023
Reporter: Sharon Saalfield
RDR, CRR



**From:** ▆▆▆▆▆▆▆▆▆▆@msn.com>
**To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**Cc:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>, "candriski@sau16.org" <candriski@sau16.org>, ▆▆▆▆▆▆▆▆@sau16.org>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given
**Date:** Mon, 25 Oct 2021 17:56:36 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

 EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

I feel that I deserve an explanation. Were my rights violated? I'm left now without an alternative other than to homeschool my child because of poor administration. I would like to know what is being done about this book being read to the entire class without parental knowledge.

The Sacred Heart School is filled to the maximum capacity for 5th grade this year. I feel that I should be compensated to fulfill my child's educational need. Why is it fair that my child gets left behind because the school feels they need to teach this ridiculous diversity and political propaganda?

Tina Johnson

---

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Monday, October 25, 2021 9:54 AM
**To:** ▆▆▆▆▆▆▆@msn.com>
**Cc:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Subject:** RE: Inappropriate reading Material, No 2 weeks notice given

▆▆▆

I met with the school last week. As with any type of inquiry, we are not able to discuss any actions the department may take.

Know that I have read the book and we are taking appropriate action.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
 Frank.Edelblut@doe.nh.gov

 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ████████████████ @msn.com>
**Sent:** Monday, October 25, 2021 9:12 AM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

Just checking in. Do you have a timeline of when I should be hearing back from you?

I hope that you have been enjoying the fall season!

████████

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Wednesday, October 13, 2021 1:15 PM
**To:** ██████████████████ msn.com>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

██,

Working through this. I personally read the book this weekend.

**From:** ████████████████ @msn.com>
**Sent:** Wednesday, October 13, 2021 12:24:33 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

I'm following up with you regarding the emails I sent last week. When will I hear back and what is the resolution going to be with this book being read?

████████████

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Friday, October 1, 2021 10:01 AM
**To:** ████████ @msn.com>
**Subject:** RE: Inappropriate reading Material, No 2 weeks notice given

Thank you for refreshing my memory. I know the issue and spoke with the superintendent. Can you give me a call so we can discuss next steps?

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov




New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ████████ @msn.com>
**Sent:** Friday, October 1, 2021 9:54 AM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

Kensington Elementary SAU16

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Thursday, September 30, 2021 2:58 PM
**To:** ████████████ @msn.com>
**Subject:** RE: Inappropriate reading Material, No 2 weeks notice given

Can you let me know your district again? Sorry ...

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov

🐦📷 📘

New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ████████████ @msn.com>
**Sent:** Thursday, September 30, 2021 11:47 AM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Subject:** Inappropriate reading Material, No 2 weeks notice given

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

Hi Frank,

We spoke in late July regarding a book that I was concerned about. This book was read aloud to my daughter's entire class. It contains matters of BLM, gunshots, violence, gang colors, rioting, looting, sexual matters, and white privilege. I feel that I haven't gotten anywhere with the school administration and the teacher that read this material has not been disciplined for this. Can you please tell me what the next step should be. I brought this up at the school board meeting and the school has done nothing to resolve my problem.

I look forward to hearing from you.

**EXHIBIT 93**

Redacted
version of
Oct. 26,
2021 F.
Edelblut
Email
Exchange

(Depo. Ex.
38)



EXHIBIT 38
WIT: _Ecee blut_
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
**Subject:** FW: Inappropriate reading Material, No 2 weeks notice given
**Date:** Tue, 26 Oct 2021 13:23:13 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:**                                  @msn.com>
**Sent:** Monday, October 25, 2021 2:14 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>; candriski@sau16.org;
              @sau16.org>; Becky Ruel <bruel@sau16.org>
**Cc:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

One other important factor that should be mentioned of how the KES is run by poor administration.

1. Our Chief of Police (Scott Sanders) had to leave his position (2018) in Kensington because he was having a sexual affair with the principal Becky Ruel. That is completely inappropriate and unprofessional. The whole administration is corrupt at the tiny little Kensington Elementary School, school since Becky came along.

2.

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Monday, October 25, 2021 9:54 AM
**To:**                                  @msn.com>
**Cc:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Subject:** RE: Inappropriate reading Material, No 2 weeks notice given

I met with the school last week. As with any type of inquiry, we are not able to discuss any actions the department may take.

Know that I have read the book and we are taking appropriate action.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ███████████████ @msn.com>
**Sent:** Monday, October 25, 2021 9:12 AM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Just checking in. Do you have a timeline of when I should be hearing back from you?

I hope that you have been enjoying the fall season!

███████

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Wednesday, October 13, 2021 1:15 PM
**To:** ███████████████ @msn.com>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

██,

Working through this. I personally read the book this weekend.

**From:** ███████████████ @msn.com>
**Sent:** Wednesday, October 13, 2021 12:24:33 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

I'm following up with you regarding the emails I sent last week. When will I hear back and what is the resolution going to be with this book being read?

███████

2436

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Friday, October 1, 2021 10:01 AM
**To:** ▓▓▓▓▓▓▓▓ @msn.com>
**Subject:** RE: Inappropriate reading Material, No 2 weeks notice given

Thank you for refreshing my memory. I know the issue and spoke with the superintendent. Can you give me a call so we can discuss next steps?

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov

 
New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ▓▓▓▓▓▓▓▓ @msn.com>
**Sent:** Friday, October 1, 2021 9:54 AM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Re: Inappropriate reading Material, No 2 weeks notice given

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Kensington Elementary SAU16

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Thursday, September 30, 2021 2:58 PM
**To:** ▓▓▓▓▓▓▓▓ @msn.com>
**Subject:** RE: Inappropriate reading Material, No 2 weeks notice given

Can you let me know your district again? Sorry ...

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov


New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** ▓▓▓▓▓▓▓▓ @msn.com>
**Sent:** Thursday, September 30, 2021 11:47 AM

**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Subject:** Inappropriate reading Material, No 2 weeks notice given

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

Hi Frank,

We spoke in late July regarding a book that I was concerned about. This book was read aloud to my daughter's entire class. It contains matters of BLM, gunshots, violence, gang colors, rioting, looting, sexual matters, and white privilege. I feel that I haven't gotten anywhere with the school administration and the teacher that read this material has not been disciplined for this. Can you please tell me what the next step should be. I brought this up at the school board meeting and the school has done nothing to resolve my problem.

I look forward to hearing from you.

# EXHIBIT 94

Redacted
version of
Oct. 1,
2021 F.
Edelblut
Email
Exchange

**From:** ███████████████ @msn.com>
**To:** Christopher Andriski <candriski@sau16.org>
**Cc:** "frank.edelblut@doe.nh.gov" <frank.edelblut@doe.nh.gov>, "stephen.berwick@doe.nh.gov" <stephen.berwick@doe.nh.gov>, Becky Ruel <bruel@sau16.org>, ██████████ @sau16.org>, "dryan@sau16.org" <dryan@sau16.org>, Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>, Whitney Schwartz <wschwartz@sau16.org>, ████████████████████████████ .net>
**Subject:** Re: Gender Book
**Date:** Fri, 1 Oct 2021 14:24:10 +0000
**Importance:** Normal

---

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

Good morning,

Frank Edelblut, the Commissioner of Education informed me that anything that contains **equity and inclusion** or sexual content, parents must be given a 2-week notice. This was not done. I have spoken to Frank again this morning, he is giving me instructions on proceeding with disciplinary actions of breaking educational codes of conduct. I'm hoping this will result in Kelsey Plourde losing her license to teach. I will not let this rest until this happens. Because of the lies and cover ups with your poor administration policies my husband and I have lost complete trust in the SAU16 educating our 5th grade child.

I will follow up with you or Frank will do so as well.

Sincerely,

███████████

---

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Thursday, September 30, 2021 3:03 PM
**To:** ███████████████ @msn.com>
**Cc:** frank.edelblut@doe.nh.gov <frank.edelblut@doe.nh.gov>; stephen.berwick@doe.nh.gov <stephen.berwick@doe.nh.gov>; Becky Ruel <bruel@sau16.org>; ████████████████ @sau16.org>; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; █████████████████████████ .net>
**Subject:** Re: Gender Book

Good afternoon ████,

I hope that you and your family had a relaxing time in Montana as you travel through the National Parks. I have attached policies IGE and BEDG for you to review. Policy IGE- Parental Objection to Specific Course Material does have a two week notice to parents if specific instruction is going to be in the instruction of human sexuality or human sexual education. At no time was human sexualtiy or human sexual education a part of the curriculum in your daughter's class last year. The school did reach out to you and looked to set up a meeting time to discuss concerns of materials that you found objectionable, however no meeting date was scheduled so that an alternative assignment could be agreed upon.

As for your question about modifying the board meeting minutes, I have included policy BEDG- Minutes so that you are aware of what is required to be captured in the minutes. If you believe that information has been left out, I again recommend that you send an email to myself and all three board members as general correspondence. In that general correspondence please indicate what you feel should be added or edited in the minutes for the board to review. All general correspondence to the board is attached to the board minutes and becomes part of the public minutes.

I am always willing to have a meeting at the SAU to assist you with your questions and concerns. Just as a reminder, the Kensington School Board meeting takes place at Kensington Elementary School and therefore ███ would have to address the board in person. Thank you and please let me know if you have any further questions.

On Thu, Sep 30, 2021 at 12:04 PM ███████████████ @msn.com> wrote:
Hi Chris,

Sorry for my lack of response on the board meeting minutes. We were traveling for 10 days in Montana through the National Parks.

Again, this issue has not been resolved with inappropriate reading material. By law, your teachers and staff are supposed to give a two week opt out notice for the inappropriate material being reading. I have contacted Frank Edeblut once again. I ask that I have a meeting at the next school board meeting to seek the answers that you do not want to provide in writing. Would this be done at KES or Exeter High?

Talk soon.

███████

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Tuesday, August 10, 2021 12:53 PM
**To:** ███████████████ @msn.com>
**Cc:** Becky Ruel <bruel@sau16.org>; ███████████████ @sau16.org>; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson <robin@vikingwelding.net>; ███████████████████████████; Patrick & Jenn Marr <rpjmarr@yahoo.com>
**Subject:** Re: Gender Book

Good afternoon ███,

I understand that you are looking for an answer in writing, however I am not sure what you are asking us to answer as we have not had the chance to speak as a group about the concern you have raised. That is why I have invited Dr. Ryan, Mr. Mejia, Ms. Ruel, Ms. ███ and myself to meet with you to discuss and understand the statements you have made about the teaching and curriculum that your daughter engaged in last year. Again, so that we can all be on the same page and together, please let us know your availability on Monday and Tuesday afternoon.

On Tue, Aug 10, 2021 at 9:58 AM ███████████████ @msn.com> wrote:
Chris Andriski and David Ryan

2441

I need to be very specific with you Chris! What part do you NOT understand?? I want my simple questions answered in writing! I do not know why you seem to think you are more superior than me. You work for me, and I want my simple questions answered by you and your $95,000k, DEIJ director Andres Mejia. Again, I will not let you run me around in circles this time around. You clearly are not going to answer my questions in writing. It is extremely frustrating to me that you do not realize that you and your teacher ███████████ have VIOLATED our child's Civil Rights. You leave me no other option than to seek a lawyer for a lawsuit. I will work as hard as I can to get DEIJ/CRT out of SAU16; just as other parents are in the SAU16 District. Teachers and Principals that assume this is OK need to be held accountable and be TERMINATED! You will be hearing from my attorney as you leave me and other parents no other choice! I hope you realize that when you play with fire you are going to get burned! I will not be complacent any longer! I wish you a blessed day.

███████████

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Tuesday, August 10, 2021 8:32 AM
**To:** ███████████████@msn.com>
**Cc:** Becky Ruel <bruel@sau16.org>; ███████████████@sau16.org>; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson <robin@vikingwelding.net>; ej@vikingwelding.net <███████████████>; Patrick & Jenn Marr <rpjmarr@yahoo.com>
**Subject:** Re: Gender Book

Good morning ████ and ████,

As I stated in my responses on June 7 and June 8, we would welcome you to come meet with us at the SAU office to discuss this concern in greater depth. What is your availability next Monday or Tuesday afternoon? I look forward to scheduling a time to meet with you.

On Tue, Aug 10, 2021 at 4:06 AM Alex Settings <summerdahlias@msn.com> wrote:
> Dr. David Ryan and Chris Andriski I would like a reply to this email on Tuesday, August 10, 2021. Is this how you want to make children become "global citizens?" My e-mail was never fully resolved the last time I questioned literature being read to my daughter's class. Perhaps you can refer to your DEIJ director to answer this question that I have. I find it discriminatory that my questions cannot be fully resolved/answered. David Ryan seems to send out Mass e-mails answering questions instead of dealing with parents directly; to answer questions parents seek. David Ryan, your salary is beyond an average income, you are paid very well. My husband and I pay an astronomical amount of property tax that goes directly to the SAU16. I would like a reply today for you to start answering my questions. I have lost faith in teachers and you being the Superintendent/leader of our SAU16 school district. David Ryan your trust has been broken so badly that I cannot send my daughter to school any longer. That is a HUGE PROBLEM. Please get back to me today before I need to seek alternative help to resolve this matter.
>
> Thank you,
> ███████████████

**From:** ███████████
**Sent:** Monday, August 9, 2021 1:30 PM
**To:** Becky Ruel <bruel@sau16.org>; candriski@sau16.org <candriski@sau16.org>; ███████████████ sau16.org>; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield

<Melissa.Litchfield@leg.state.nh.us>
**Cc:** Whitney Schwartz <wschwartz@sau16.org>; Robin Johnson <robin@vikingwelding.net>;
████████████.net>; Patrick & Jenn Marr <rpjmarr@yahoo.com>
**Subject:** Gender Book

Good afternoon,,

It appears there has been a gender book read to ████ class. She came home saying that her female friends at school are saying that they are bisexual and pan gender. I'm not sure what Pan Gender is can you please enlighten me as to what Pan Gender is? Also what is two spirted?

I have married gay and lesbian friends but I've never heard of these other sexualities. I'm not HOMOPHOBIC, I love my gay friends. It appears that these books are confusing these children and I'm extremely concerned.

I look forward to having this discussion.

████████████

--
Christopher Andriski
Assistant Superintendent
**SAU #16**
**603-775-8679**
30 Linden Street
Exeter, NH . 03833
www.sau16.org

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities.  SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice.  Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

--
Christopher Andriski
Assistant Superintendent
**SAU #16**
**603-775-8679**
30 Linden Street
Exeter, NH . 03833
www.sau16.org

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities. SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice. Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

--
Christopher Andriski
Assistant Superintendent
**SAU #16**
**603-775-8679**
30 Linden Street
Exeter, NH . 03833
www.sau16.org

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities. SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice. Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

# EXHIBIT 95

Redacted
version of
Oct. 7,
2021 F.
Edelblut
Email
Exchange

**Krol, Diana**



**From:** Berwick, Stephen
**Sent:** Monday, October 11, 2021 8:50 AM
**To:** Bond, Christopher <Christopher.G.Bond@doe.nh.gov>; Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
**Cc:** Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Subject:** FW: A Good Kind of Trouble

---

**From:** ███████████████████████████
**Sent:** Thursday, October 7, 2021 1:43 PM
**To:** Edelblut, Louis (Frank) <frank.edelblut@doe.nh.gov>
**Cc:** Berwick, Stephen <stephen.berwick@doe.nh.gov>; Kelsey Plourde <kplourde@sau16.org>; SAU 16 <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>█████████████████ candriski@sau16.org
**Subject:** Re: A Good Kind of Trouble

---

<mark>**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.</mark>

---

Good Afternoon, Frank,

Can you please let me know if I will need to seek an attorney to help resolve these inappropriate, vulgar, violent, hateful BLM book and content that contains sexual matter? Chris Andriski has never resolved this matter; David Ryan has never once gotten back to me which is no surprise as I hear complaint after complaint at the SAU16 board meetings. The lack of trust and true leadership is a serious problem throughout the entire SAU16. What is especially disconcerting is the lack of trust of what used to be a nice little school in beautiful Kensington. School here has gone down the drain!

I hear from my teacher friends in Maine and in NH that they are being forced to read this material to students. This made my daughter extremely uncomfortable. When I asked how this book being read to her class made her feel she stated disrespected. The fact the book is not even accurate history contains, gun violence, gangs, gang colors, rioting, looting, burning buildings down, "white cops" killing black people, BLM is UNACEPTABLE! The book also contained making out/kissing, swapping saliva, budding breasts, panties with hearts. White privilege is all over this book along with BLM. What is sad is that this book has an underlying tone that white people and police officers are against black people all the way down to how white people look at a black person (page 22).

PL 00560

Our child is significantly behind, and this is what is being taught in our school? This is SHAMEFUL! The so-called professionals that are allowing this in school need to be disciplined! I don't think Kesey Plourde/Curley would read this to any of her three children. So why is it okay for her to read this to our child along with the entire Silver Cohort? All that is done is the administration run parents around in circles and leave you with no answer other than this is part of their DEI-J program. Nonsense!

Most parents shelter their children from the evening news. Why wasn't the 2 week opt out notice given to parents? Do I need to contact parents in the entire class to let them know their right were violated? Where are the parent's rights of offensive, hateful, violent content being read to our children without consent?

The other issue that I have is gender books being read. My daughter came home and said that all the girls in her class are saying they are bi-sexual and Pan-Gender. I had to look up Pan-Gender as I didn't know the definition. These are topics that families should talk to their children about or guidance counselors not teachers!

I see that there are other lawsuits coming out with the SAU16. So, my question is that the route I need to take? One last question that I have is why we have a BLM member Andres Meija teaching about conflicting diversity?

Andres Meija states in an article that I read: Meija is listed as a board member for Black Lives Matter Seacoast. That group's website gives its mission: "Our purpose is to dismantle anti-Blackness, fight against racial injustices and end police brutality." During last year's election season, BLM Seacoast released a list of demands for candidates, including "no more school resource police officers."

This man does not even have an educational background. How was he hired at $95,000?? This is what our property taxes goes toward?? Ridiculous!! What's next?? Let me also include we do not have police brutality in this area and what kind of example is this for our children? Is Andres Meija going to teach kids how to hate police officers. In the book A Good Kind of Trouble it suggests that police officers are bad, especially "white" police officers.

My questions are as follows:

1. Who chose this book to be read?
2. Why?
3. What disciplinary action will result?
4. Where was the 2 week opt out notice?
5. Why do we have a BLM director to pick vulgar books for kids of all ages?
6. How do we proceed? Do I need to get a lawyer?
7.

Sincerely,

████████████

---

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Thursday, September 30, 2021 3:03 PM
**To:** ████████████████████████

PL 00561

**Cc:** frank.edelblut@doe.nh.gov <frank.edelblut@doe.nh.gov>; stephen.berwick@doe.nh.gov
<stephen.berwick@doe.nh.gov>; Becky Ruel <bruel@sau16.org>; Kelsey Plourde <kplourde@sau16.org>;
dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz
<wschwartz@sau16.org>; ej@vikingwelding.net ███████████████
**Subject:** Re: Gender Book

Good afternoon ████

I hope that you and your family had a relaxing time in Montana as you travel through the National Parks. I have
attached policies IGE and BEDG for you to review. Policy IGE- Parental Objection to Specific Course Material
does have a two week notice to parents if specific instruction is going to be in the instruction of human sexuality
or human sexual education. At no time was human sexualtiy or human sexual education a part of the curriculum
in your daughter's class last year. The school did reach out to you and looked to set up a meeting time to discuss
concerns of materials that you found objectionable, however no meeting date was scheduled so that an
alternative assignment could be agreed upon.

As for your question about modifying the board meeting minutes, I have included policy BEDG- Minutes so
that you are aware of what is required to be captured in the minutes. If you believe that information has been
left out, I again recommend that you send an email to myself and all three board members as general
correspondence. In that general correspondence please indicate what you feel should be added or edited in the
minutes for the board to review. All general correspondence to the board is attached to the board minutes and
becomes part of the public minutes.

I am always willing to have a meeting at the SAU to assist you with your questions and concerns. Just as a
reminder, the Kensington School Board meeting takes place at Kensington Elementary School and therefore
Errick would have to address the board in person. Thank you and please let me know if you have any further
questions.

On Thu, Sep 30, 2021 at 12:04 PM ████████████████████████████ wrote:

Hi Chris,

Sorry for my lack of response on the board meeting minutes. We were traveling for 10 days in Montana
through the National Parks.

Again, this issue has not been resolved with inappropriate reading material. By law, your teachers and staff
are supposed to give a two week opt out notice for the inappropriate material being reading. I have
contacted Frank Edeblut once again. I ask that I have a meeting at the next school board meeting to seek the
answers that you do not want to provide in writing. Would this be done at KES or Exeter High?

Talk soon.

████████

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Tuesday, August 10, 2021 12:53 PM
**To:** ████████████████████
**Cc:** Becky Ruel <bruel@sau16.org>; Kelsey Plourde <kplourde@sau16.org>; dryan@sau16.org <dryan@sau16.org>;

PL 00562

2448

Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; ██████████

██████████████████████

**Subject:** Re: Gender Book

Good afternoon ████████

I understand that you are looking for an answer in writing, however I am not sure what you are asking us to answer as we have not had the chance to speak as a group about the concern you have raised. That is why I have invited Dr. Ryan, Mr. Mejia, Ms. Ruel, Ms. Plourde and myself to meet with you to discuss and understand the statements you have made about the teaching and curriculum that your daughter engaged in last year. Again, so that we can all be on the same page and together, please let us know your availability on Monday and Tuesday afternoon.

On Tue, Aug 10, 2021 at 9:58 AM ████████████████████████ wrote:

> Chris Andriski and David Ryan
>
> I need to be very specific with you Chris! What part do you NOT understand?? I want my simple questions answered in writing! I do not know why you seem to think you are more superior than me. You work for me, and I want my simple questions answered by you and your $95,000k, DEIJ director Andres Mejia. Again, I will not let you run me around in circles this time around. You clearly are not going to answer my questions in writing. It is extremely frustrating to me that you do not realize that you and your teacher Kelsey Plourde have VIOLATED our child's Civil Rights. You leave me no other option than to seek a lawyer for a lawsuit. I will work as hard as I can to get DEIJ/CRT out of SAU16; just as other parents are in the SAU16 District. Teachers and Principals that assume this is OK need to be held accountable and be TERMINATED! You will be hearing from my attorney as you leave me and other parents no other choice! I hope you realize that when you play with fire you are going to get burned! I will not be complacent any longer! I wish you a blessed day.
>
> ██████████████

---

**From:** Christopher Andriski <candriski@sau16.org>
**Sent:** Tuesday, August 10, 2021 8:32 AM
**To:** ███████████████████████
**Cc:** Becky Ruel <bruel@sau16.org>; Kelsey Plourde <kplourde@sau16.org>; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>; Whitney Schwartz <wschwartz@sau16.org>; ██████████

██████████████████████████

**Subject:** Re: Gender Book

Good morning ████ and ████,

As I stated in my responses on June 7 and June 8, we would welcome you to come meet with us at the SAU office to discuss this concern in greater depth. What is your availability next Monday or Tuesday afternoon? I look forward to scheduling a time to meet with you.

On Tue, Aug 10, 2021 at 4:06 AM ████████████████████████ wrote:

> Dr. David Ryan and Chris Andriski I would like a reply to this email on Tuesday, August 10, 2021. Is this how you want to make children become "global citizens?" My e-mail was never fully resolved the last time I

PL 00563

questioned literature being read to my daughter's class. Perhaps you can refer to your DEIJ director to answer this question that I have. I find it discriminatory that my questions cannot be fully resolved/answered. David Ryan seems to send out Mass e-mails answering questions instead of dealing with parents directly; to answer questions parents seek. David Ryan, your salary is beyond an average income, you are paid very well. My husband and I pay an astronomical amount of property tax that goes directly to the SAU16. I would like a reply today for you to start answering my questions. I have lost faith in teachers and you being the Superintendent/leader of our SAU16 school district. David Ryan your trust has been broken so badly that I cannot send my daughter to school any longer. That is a HUGE PROBLEM. Please get back to me today before I need to seek alternative help to resolve this matter.

Thank you,

███████████████████

---

**From:** ██████████
**Sent:** Monday, August 9, 2021 1:30 PM
**To:** Becky Ruel <bruel@sau16.org>; candriski@sau16.org <candriski@sau16.org>; Kelsey Plourde <kplourde@sau16.org>; dryan@sau16.org <dryan@sau16.org>; Melissa Litchfield <Melissa.Litchfield@leg.state.nh.us>
**Cc:** Whitney Schwartz <wschwartz@sau16.org>; ████████████████████
███████████████████
**Subject:** Gender Book

Good afternoon,,

It appears there has been a gender book read to Hannah's class. She came home saying that her female friends at school are saying that they are bisexual and pan gender. I'm not sure what Pan Gender is can you please enlighten me as to what Pan Gender is? Also what is two spirted?

I have married gay and lesbian friends but I've never heard of these other sexualities. I'm not HOMOPHOBIC, I love my gay friends. It appears that these books are confusing these children and I'm extremely concerned.

I look forward to having this discussion.

███████████████████

--

Christopher Andriski
Assistant Superintendent
**SAU #16**
**603-775-8679**
30 Linden Street
Exeter, NH . 03833
www.sau16.org

PL 00564

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities. SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice. Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

--

Christopher Andriski
Assistant Superintendent
SAU #16
603-775-8679
30 Linden Street
Exeter, NH . 03833
www.sau16.org

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities. SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice. Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

--

Christopher Andriski
Assistant Superintendent
SAU #16
603-775-8679
30 Linden Street
Exeter, NH . 03833
www.sau16.org

PL 00565

SAU 16 does not discriminate on the basis of race, color, national origin, gender, sex, sexual orientation, religion, nationality, ethnic origins, country of origin, economic status, status as a victim of domestic violence, harassment, sexual assault, or stalking, disability, age or other protected classes under applicable law in its educational programs and activities. SAU 16 also provides equal access to buildings for youth groups. Questions about Title IX can be referred to the SAU 16 District Coordinator at titleix@sau16.org, (603) 775-8426, or the assistant secretary for civil rights. On the SAU 16 District website, find the Statement of Non-discrimination notice. Included in the statement are the following: 1. The link to the materials SAU 16 utilized to train school district personnel in the Title IX process. 2. The link to the form used by SAU 16 to report a concern.

PL 00566

# EXHIBIT 96

Redacted version of Sept. 7, 2021 F. Edelblut Email Exchange

(Depo. Ex. 16)

**From:** "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
    **To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>, "Farrell, Richard"
        <Richard.J.Farrell@doe.nh.gov>
    **Cc:** "Brennan, Christine" <Christine.M.Brennan@doe.nh.gov>
    **Subject:** RE: Email from a Hollis parent
    **Date:** Tue, 7 Sep 2021 12:51:46 +0000
**Importance:** Normal
**Inline-Images:** image001.png; image002.png; image003.png; image004.png



**EXHIBIT 16**

D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

---

Thank you—we will look into it.

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Friday, September 3, 2021 3:32 PM
**To:** Fenton, Diana <Diana.E.Fenton@doe.nh.gov>; Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
**Cc:** Brennan, Christine <Christine.M.Brennan@doe.nh.gov>
**Subject:** FW: Email from a Hollis parent

I think we need to look into this. The events happened prior to the anti-discrimination law, but – if true – certainly would be considered unprofessional.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited  If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** [redacted] @gmail.com>
**Sent:** Friday, September 3, 2021 1:32 PM
**To:** Deborah Hobson <deb.hobson@me.com>; Glenn Cordelli <cordellig@roadrunner.com>; Erica Layon <ericaforderry@gmail.com>; Michael Moffett <mofmichael@aim.com>; Denise Ricciardi <dnricciardi@aol.com>; Ruth Ward <ruthward@myfairpoint.net>; jeb.bradley@leg.state.nh.us; ralph.boehm@leg.state.nh; rick.ladd@leg.state.nh.us; beshaw3@comcast.net; lynchford@comcast.net; rep.jsoti@gmail.com; Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>; bill.nelson@leg.state.nh.us; kimberly.rice@leg.state.nh.us; Melissa.Litchfield@leg.state.nh.us; John.Potucek@leg.state.nh.us; Keith.Ammon@leg.state.nh.us; Jason@osborne4nh.com; Max.Abramson@leg.state.nh.us; Daryl.Abbas@leg.state.nh.us; Terry.Roy@leg.state.nh.us; john.burt@leg.state.nh.us; dave@sanbornhall.net; ramarston1@gmail.com; kpo@leg.state.nh.us; Ross@berryfornh.com; barbara.griffin@leg.state.nh.us; elephantsmarching@msn.com; fentongroen@gmail.com; Judy.Aron@leg.state.nh.us; Howard.Pearl@leg.state.nh.us; kevin.verville@leg.state.nh.us; kweyler@aol.com; house@joepitre.com; jess.edwards@leg.state.nh.us; Carol McGuire <carol@mcguire4house.com>; john.sytek@leg.state.nh.us; Tom Lanzara <tomlanzara@gmail.com>; tracyemerick@gmail.com; Nikikelsey@yahoo.com; Leah.Cushman@leg.state.nh.us; kurt.wuelper@leg.state.nh.us; Erin.Hennessey@leg.state.nh.us; Bob.Greene@leg.state.nh.us; Bob Guida <Bob.Giuda@leg.state.nh.us>; Kevin Avard <Kevin.Avard@leg.state.nh.us>; Sharon Carson <sharon.carson@leg.state.nh.us>; John Reagan

<john.reagan111@gmail.com>; Regina Birdsell <Rbirdsell@comcast.net>
**Subject:** Email from a Hollis parent

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

## *The kind of emails I've been receiving from parents around NH:*

Dear Ms ▮▮▮▮▮ :

Thank you for helping publicize the indoctrination going on in our public school systems. Below please find an email I shared with our district earlier in the year. It sparked a few meetings, and an ongoing discussion with the administration, but little apparent change. Abouthollis.com is a good reference for reading up on the state of the situation. The Hollis school system has become rife with indoctrinators, and school board members have stated that the complaints of parents and students are falsified, that no indoctrination occurs. This week, we pulled our daughter out of the school system upon my daughter's assigned teacher refusing to agree not to politically indoctrinate our child.

Kind regards,

\*\*\*\*\*\*

----- Forwarded Message -----

On Mon, May 24, 2021 at 7:42 AM
Superintendent Corey:

I have a daughter in the 3rd grade at Hollis Primary School (HPS). She has benefitted from some excellent teachers in her years at HPS, such as (but not limited to) the legendary Dennis Kane; the dynamic and engaging Jennifer Goldthwaite; and the creative and inquisitive Tara Happy. I am grateful for the work these good teachers have done in building a strong foundation for both learning and kindness to others.

In the fall of 2019, our then-7-year-old daughter came home from school troubled. She asked me, "Was Christopher Columbus evil?" I asked her what brought that question to mind, and she told me that one of the specialist teachers had told the class that Columbus was evil. I thought she must have misinterpreted something a teacher had said, and used this as a seed for discussing the nature of good and evil. I did not think much more of it at the time.

Then came Thanksgiving. My daughter told my wife and I that a specialist teacher had said that people should not celebrate Thanksgiving because it celebrates white people doing bad things. This sounded like indoctrination to a racist ideology, and an echo of the comment about Columbus, but I convinced myself that it must again have been a misinterpretation of what had been said. We went through another discussion of good and evil, and I let the issue rest.

In the spring came the pandemic and a season of politics. As my daughter's 2nd grade year came to its close, though, my wife and I heard of no further racist indoctrination.

That changed in the 3rd grade. With our daughter taking classes remotely, and me working remotely, I had the opportunity to hear much of what her teacher, Matthew Ostrowski, shared with the class. Prior to Columbus Day, Ostrowski read from Howard Zinn's A People's History of the United States,

emphasizing the Marxist activist's condemnation of Christopher Columbus. The following are a couple of quotes I transcribed:

* "It was white people who created slavery."
* "The white people brought slavery to the Americas."

These factually inaccurate statements undercut the foundation laid by my wife and I, and our daughter's previous teachers, which had emphasized kindness toward others, without judgment based on skin color.

The indoctrination did not stop. As the year progressed, I overheard and transcribed other statements intended to portray skin color as a defining characteristic of good or evil:

* "White people cause racism."
* "White people treat people in very bad ways because they have the power."
* "White people are the only ones who can be racists."

There have been other incidents of indoctrination, such as the sharing of a video (https://www.brainpop.com/socialstudies/ushistory/civilrights/) by library and media specialist Sarah Proulx, in February this year. I happened to be nearby when it played, and much of the video is informative and interesting. In the closing minutes, though, the video changes. The images shown single out whites as being violent and in the wrong if they do not express public support of a Marxist organization. The audience is told that history is on the side of such organizations; a statement which closely echoes the teachings of Marx, Mao, and Xi who all spoke of a "law of history" inevitably leading to Marxism. The approach of telling kids that they are in the wrong if they do not support the "correct" causes reminds one of the use of intimidation and humiliation by Communist agitators to silence those who disagree with them.

Ongoing indoctrination to racist prejudice is part of what led my wife and I to decide not to send our daughter back to HPS when her remote class returned to the school; we could not in good conscience expose her to more of this propaganda as part of an isolated captive audience. Instead, we opted to continue remote learning, and hoped for a teacher who focused on the fundamentals of education (And, as a side note, we now have that in Susan Lewis, who has done an excellent job with her class, and is one of the more effective teachers I have observed in raising our children.).

The recent discussions in our community around whether or not the Critical Race Theory (CRT) ideology should be championed by teachers and taught as fact in our schools are beside the point. CRT is already in our schools, whatever name it uses, and it starts early in our kids' education.

I have spoken to other parents in our community about this, and reached out to some of our political representatives. They encouraged me to share my experiences with you, and I do so now in the hope that our community may address this indoctrination. I have no desire to have teachers hobbled in their ability to discuss history. I simply want our teachers to educate, and not indoctrinate.

I have shared my concerns with Principal Izbicki and the teachers mentioned above separately. My hope is that we can discuss what occurred, and find a way to reach an equitable understanding.

Thank you for your work, and for considering the best interests of our town and our children.

Respectfully,

******
Hollis Primary School parent

DOE-00061

cc:

Paula Izbicki, HPS principal (paula.izbicki@sau41.org)

Hollis School Board:
* Brook Arthur (brooke.arthur@sau41.org)
* Tammy Fareed (tammy.fareed@sau41.org)
* Amy Kellner (amy.kellner@sau41.org)
* Robert Mann (robert.mann@sau41.org)
* Carryl Roy (carryl.roy@sau41.org)

Hollis/Brookline COOP School Board
* Holly Babcock (holly.babcock@sau41.org)
* Elizabeth Brown (elizabeth.brown@sau41.org)
* Tom Solon (tom.solon@sau41.org)
* Kate Stoll (kate.stoll@sau41.org)
* Cindy VanCoughnett (cindy.vancoughnett@sau41.org)
* Krista Whalen (krista.whalen@sau41.org)
* Beth Williams (beth.williams@sau41.org)

**EXHIBIT 97**

Redacted
version of
Sept. 3,
2021 F.
Edelblut
Email
Exchange

(Depo. Ex.
17)

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>

    **To:** " ▓▓▓▓▓▓ " < ▓▓▓▓▓▓ @gmail.com>

    **Cc:** "Brennan, Christine (Christine.Brennan@doe.nh.gov)" <Christine.M.Brennan@doe.nh.gov>

  **Subject:** RE: Email from a Hollis parent

    **Date:** Fri, 03 Sep 2021 19:31:28 -0000

  **Importance:** Normal

 **Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

If I open an inquiry on the referenced educators, would this woman be willing to provide testimony to our investigator?

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**EXHIBIT 17**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

**From:** ▓▓▓▓▓▓ @gmail.com>

**Sent:** Friday, September 3, 2021 1:32 PM

**To:** Deborah Hobson <deb.hobson@me.com>; Glenn Cordelli <cordellig@roadrunner.com>; Erica Layon <ericaforderry@gmail.com>; Michael Moffett <mofmichael@aim.com>; Denise Ricciardi <dnricciardi@aol.com>; Ruth Ward <ruthward@myfairpoint.net>; jeb.bradley@leg.state.nh.us; ralph.boehm@leg.state.nh; rick.ladd@leg.state.nh.us; beshaw3@comcast.net; lynchford@comcast.net; rep.jsoti@gmail.com; Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>; bill.nelson@leg.state.nh.us; kimberly.rice@leg.state.nh.us; Melissa.Litchfield@leg.state.nh.us; John.Potucek@leg.state.nh.us; Keith.Ammon@leg.state.nh.us; Jason@osborne4nh.com; Max.Abramson@leg.state.nh.us; Daryl.Abbas@leg.state.nh.us; Terry.Roy@leg.state.nh.us; john.burt@leg.state.nh.us; dave@sanbornhall.net; ramarston1@gmail.com; kpo@leg.state.nh.us; Ross@berryfornh.com; barbara.griffin@leg.state.nh.us; elephantsmarching@msn.com; fentongroen@gmail.com; Judy.Aron@leg.state.nh.us; Howard.Pearl@leg.state.nh.us; kevin.verville@leg.state.nh.us; kweyler@aol.com; house@joepitre.com; jess.edwards@leg.state.nh.us; Carol McGuire <carol@mcguire4house.com>; john.sytek@leg.state.nh.us; Tom Lanzara <tomlanzara@gmail.com>; tracyemerick@gmail.com; Nikikelsey@yahoo.com; Leah.Cushman@leg.state.nh.us; kurt.wuelper@leg.state.nh.us; Erin.Hennessey@leg.state.nh.us; Bob.Greene@leg.state.nh.us; Bob Guida <Bob.Giuda@leg.state.nh.us>; Kevin Avard <Kevin.Avard@leg.state.nh.us>; Sharon Carson <sharon.carson@leg.state.nh.us>; John Reagan <john.reagan111@gmail.com>; Regina Birdsell <Rbirdsell@comcast.net>

**Subject:** Email from a Hollis parent

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

*The kind of emails I've been receiving from parents around NH:*

Dear Ms ▓▓▓▓ :

Thank you for helping publicize the indoctrination going on in our public school systems. Below please find an email I shared with our district earlier in the year. It sparked a few meetings, and an ongoing discussion with the administration, but little apparent change. Abouthollis.com is a good reference for reading up on the state of the situation. The Hollis school system has become rife with indoctrinators, and school board members have stated that the complaints of parents and students are falsified, that no indoctrination occurs. This week, we pulled our daughter out of the school system upon my daughter's assigned teacher refusing to agree not to politically indoctrinate our child.

Kind regards,

\*\*\*\*\*\*


----- Forwarded Message -----


On Mon, May 24, 2021 at 7:42 AM
Superintendent Corey:


I have a daughter in the 3rd grade at Hollis Primary School (HPS). She has benefitted from some excellent teachers in her years at HPS, such as (but not limited to) the legendary Dennis Kane; the dynamic and engaging Jennifer Goldthwaite; and the creative and inquisitive Tara Happy. I am grateful for the work these good teachers have done in building a strong foundation for both learning and kindness to others.

In the fall of 2019, our then-7-year-old daughter came home from school troubled. She asked me, "Was Christopher Columbus evil?" I asked her what brought that question to mind, and she told me that one of the specialist teachers had told the class that Columbus was evil. I thought she must have misinterpreted something a teacher had said, and used this as a seed for discussing the nature of good and evil. I did not think much more of it at the time.

Then came Thanksgiving. My daughter told my wife and I that a specialist teacher had said that people should not celebrate Thanksgiving because it celebrates white people doing bad things. This sounded like indoctrination to a racist ideology, and an echo of the comment about Columbus, but I convinced myself that it must again have been a misinterpretation of what had been said. We went through another discussion of good and evil, and I let the issue rest.

In the spring came the pandemic and a season of politics. As my daughter's 2nd grade year came to its close, though, my wife and I heard of no further racist indoctrination.

That changed in the 3rd grade. With our daughter taking classes remotely, and me working remotely, I had the opportunity to hear much of what her teacher, Matthew Ostrowski, shared with the class. Prior to Columbus Day, Ostrowski read from Howard Zinn's A People's History of the United States, emphasizing the Marxist activist's condemnation of Christopher Columbus. The following are a couple of quotes I transcribed:

\* "It was white people who created slavery."
\* "The white people brought slavery to the Americas."

These factually inaccurate statements undercut the foundation laid by my wife and I, and our daughter's previous teachers, which had emphasized kindness toward others, without judgment based on skin

DOE-10180

color.

The indoctrination did not stop. As the year progressed, I overheard and transcribed other statements intended to portray skin color as a defining characteristic of good or evil:

* "White people cause racism."
* "White people treat people in very bad ways because they have the power."
* "White people are the only ones who can be racists."

There have been other incidents of indoctrination, such as the sharing of a video (https://www.brainpop.com/socialstudies/ushistory/civilrights/) by library and media specialist Sarah Proulx, in February this year. I happened to be nearby when it played, and much of the video is informative and interesting. In the closing minutes, though, the video changes. The images shown single out whites as being violent and in the wrong if they do not express public support of a Marxist organization. The audience is told that history is on the side of such organizations; a statement which closely echoes the teachings of Marx, Mao, and Xi who all spoke of a "law of history" inevitably leading to Marxism. The approach of telling kids that they are in the wrong if they do not support the "correct" causes reminds one of the use of intimidation and humiliation by Communist agitators to silence those who disagree with them.

Ongoing indoctrination to racist prejudice is part of what led my wife and I to decide not to send our daughter back to HPS when her remote class returned to the school; we could not in good conscience expose her to more of this propaganda as part of an isolated captive audience. Instead, we opted to continue remote learning, and hoped for a teacher who focused on the fundamentals of education (And, as a side note, we now have that in Susan Lewis, who has done an excellent job with her class, and is one of the more effective teachers I have observed in raising our children.).

The recent discussions in our community around whether or not the Critical Race Theory (CRT) ideology should be championed by teachers and taught as fact in our schools are beside the point. CRT is already in our schools, whatever name it uses, and it starts early in our kids' education.

I have spoken to other parents in our community about this, and reached out to some of our political representatives. They encouraged me to share my experiences with you, and I do so now in the hope that our community may address this indoctrination. I have no desire to have teachers hobbled in their ability to discuss history. I simply want our teachers to educate, and not indoctrinate.

I have shared my concerns with Principal Izbicki and the teachers mentioned above separately. My hope is that we can discuss what occurred, and find a way to reach an equitable understanding.

Thank you for your work, and for considering the best interests of our town and our children.

Respectfully,

******
Hollis Primary School parent

cc:

Paula Izbicki, HPS principal (paula.izbicki@sau41.org)

Hollis School Board:
* Brook Arthur (brooke.arthur@sau41.org)
* Tammy Fareed (tammy.fareed@sau41.org)
* Amy Kellner (amy.kellner@sau41.org)

DOE-10181



\* Robert Mann (robert.mann@sau41.org)
\* Carryl Roy (carryl.roy@sau41.org)

Hollis/Brookline COOP School Board
\* Holly Babcock (holly.babcock@sau41.org)
\* Elizabeth Brown (elizabeth.brown@sau41.org)
\* Tom Solon (tom.solon@sau41.org)
\* Kate Stoll (kate.stoll@sau41.org)
\* Cindy VanCoughnett (cindy.vancoughnett@sau41.org)
\* Krista Whalen (krista.whalen@sau41.org)
\* Beth Williams (beth.williams@sau41.org)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                    Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs has
conventionally filed the following attachment or exhibit:
Exhibit 98 to Plaintiffs' Statement of Material Facts (Depo. Ex. 31).

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023              /s/  Gilles Bissonnette
                                   Gilles Bissonnette
                                   265393
                                   ACLU of New Hampshire
                                   18 Low Avenue
                                   Concord, NH 03301
                                   603-224-5591
                                   gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette
Gilles Bissonnette
265393
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
603-224-5591
gilles@aclu-nh.org

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                              Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that  Plaintiffs                                              has
conventionally filed the following attachment or exhibit:
Exhibit 99 to Plaintiffs' Statement of Material Facts (Depo. Ex. 40)                      .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                   /s/  Gilles Bissonnette
                                        Gilles Bissonnette
                                        265393
                                        ACLU of New Hampshire
                                        18 Low Avenue
                                        Concord, NH 03301
                                        603-224-5591
                                        gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette

Gilles Bissonnette

265393

ACLU of New Hampshire

18 Low Avenue

Concord, NH 03301

603-224-5591

gilles@aclu-nh.org

# EXHIBIT 100

# Feb. 7, 2022 No Left Turn Letter

# (Depo.Ex. 26)





No Left Turn in Education
P.O. Box 1101
Moultonborough, NH 03254

February 7, 2022

NH State Board of Education
NH Department of Education
101 Pleasant Street
Concord, NH 03301

CC: Drew Cline, Chair
NH State Board of Education
361 North Amherst Road
Bedford, NH 03110

CC: Richard Farrell, Investigator
Bureau of Credentialing
NH Department of Education
101 Pleasant Street
Concord, NH 03301

Chair Cline, Members of the State Board of Education, and Bureau of Credentialing:

No Left Turn in Education (NLTE) is a national education advocacy organization. I am the director of the New Hampshire Chapter. I am writing you today to present the Board and the Bureau with evidence of probable widespread violation of New Hampshire's Educator Codes of Conduct.

As you know, on June 25, New Hampshire enacted a Prohibition on Teaching Discrimination. This law prohibits teaching that any person or group of people is inherently racist, sexist, or oppressive, or that any person or group of people should be discriminated against on the basis of their race or sex.

New Hampshire's Department of Education, Department of Justice, and Commission for Human Rights have issued a joint memorandum summarizing this law in the following words: "In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination."[1]

As acknowledged in the joint memorandum, New Hampshire law also makes any violation of the Prohibition on Teaching Discrimination a breach of the Educators Code of Conduct. The statute

---

[1] https://www.doj.nh.gov/civil-rights/documents/faq-educational-programs.pdf

says that "[v]iolation of this section by an educator *shall be considered a violation* of the educator code of conduct that justifies disciplinary sanction by the state board of education."

On August 11, in explicit response to the Prohibition on Teaching Discrimination—along with eleven analogous bills introduced in other states—the political organization Zinn Education Project, named for Marxist historian Howard Zinn,[2] called upon educators around the country to sign a pledge (the "Zinn Pledge") promising to openly violate any such prohibitions that might become law. The organization claims to base this pledge upon the principle that "one has a moral responsibility to disobey unjust laws."[3]

The Zinn Pledge and its signatories are publicly available online. In confirming these names two categories of signatories have emerged. Of the sixty-two individuals who asserted they were New Hampshire educators, 35 were confirmed as such by the NH Department of Education. The NH DOE could not confirm or deny the legitimacy of the remaining 27 signatories as individuals employed in the New Hampshire school system. Both lists are attached.

The goal of these signatories to the Zinn pledge to teach racism and sexism is not an overstatement. In its own words, the Zinn Pledge says that it opposes banning education which "identifies people or groups of people… as inherently, immutably, or systemically sexist, racist, anti-LGBT, bigoted, biased [or] privileged." All of the signatories of the Zinn Pledge, whether currently identified as N. H. educators or allied professions within the NH school system, can be assumed to have read the public document to which they signed their names.

While some educators signed the Zinn Pledge before New Hampshire's law was passed, they did so, anticipating passage of New Hampshire's law and promising to break it after enactment. The Zinn Pledge is evidence that all the educators who signed it, whether before or after the law was passed, are actively using their positions to instill racism, sexism, and other forms of invidious prejudice in their students.

It is also more than enough evidence for this Board to act, and for the Bureau to open investigations into all NH Zinn Pledge signatories. The Educator Code itself states that "the department [of education] *shall undertake* an investigation" of an educator if the department merely "has reason to suspect" that any educator knowingly failed to report a violation of the Codes.[4]

Organized educator defiance of this magnitude endangers both our children and those educators who oppose invidious discrimination. Accordingly, we urge the Board and Bureau to protect New Hampshire's children by investigating each of the Zinn Pledge signatories for potential violations of their ethical obligations and the law.[5]

---

[2] For more information regarding Howard Zinn, *see e.g.*, *Howard Zinn's History Lessons*, by Michael Kazin (2004), *Howard Zinn*, by Discover the Networks; *Howard Zinn: Fake Historian* (2020); *Where Howard Zinn's a People's History Falls Short*, by Sam Wineburg (2012-2013); and *The Left's Blindspot*, by Rick Shenkman (2010).

[3] https://www.zinnedproject.org/news/pledge-to-teach-truth

[4] Ed. 510.05(f).

[5] In our view it is non sensical on its face to assume that lessons and/or curriculum grounded in cult like intellectually illiterate beliefs, such as all white citizens are racist since infancy, that only whites can be racist, the United States

The names and school districts of each New Hampshire Zinn Pledge signatory—all derived from the Zinn Pledge itself and other publicly available information—are provided below. We encourage the Bureau to verify these names directly by viewing the Zinn Pledge online at https://www.zinnedproject.org/news/pledge-to-teach-truth.

Sincerely,

Michael D. Breen Ph.D. Director, N.L.T.E. New Hampshire Chapter

Attached:

[1] Full list of educators, confirmed by DOE and their SAUs.

(2) Full list of individual Zinn signatories not confirmed by NH DOE as employees within the NH school system.

---

was purposed to promote slavery, is now purposed to suppress minorities, and that due to this "systemic racism," and "white privilege" the morally inferior white race including school children need to be discriminated against, as non-discriminatory.

## Zinn Signatories who are confirmed NH educators and their SAU's

| | Name | SAU# | SAU Address | Superintendent |
|---|---|---|---|---|
| | | | | |
| 1 | Vivian·Jablonski | 5 | Oyster River SAU Office | James Morse |
| 2 | Kate Zimar | 5 | 36 Coe Dr. | jmorse@orcsd.org |
| | | | Durham, NH 03824-2200 | |
| | | | | |
| 3 | Olivia Bregani | 6 | Claremont SAU Office | Michael Tempesta |
| | | | 165 Broad St. | mtempesta@sau6.org |
| | | | Claremont, NH 03743-2624 | |
| | | | | |
| 4 | Heather Ouellette-Cygan | 8 | Concord SAU Office | Kathleen A. Murphy |
| | | | 38 Liberty St. | kmurphy@sau8.org |
| | | | Concord, NH 03301-2934 | |
| | | | | |
| 5 | Misty Crompton | 10 | Derry Cooperative SAU Office | Mary Ann Connors - Krikorian |
| 6 | Meredith Walker | 10 | 18 South Main St. | makrikorian@sau10.org |
| | | | Derry, NH 03038-2197 | |
| | | | | |
| 7 | Heather Hyvari | 16 | Exeter SAU Office | David Ryan |
| 8 | Mary Vogt | 16 | 30 Linden St. | dryan@sau16.org |
| 9 | Abby Hood | 16 | Exeter, NH 03833-2522 | |
| 10 | Daniel Stowell | 16 | | |
| | | | | |
| 11 | Ross Phillips | 21 | Winnacunnet SAU Office | Meredith Nadeau |
| 12 | Lara Johnson | 21 | 2 Alumni Dr. | mnadeau@sau21.org |
| 13 | Charlotte Scott | 21 | Hampton, NH 03842-2281 | |
| 14 | Wendy Bergeron | 21 | | |
| 15 | Amy Scholes | 21 | | |
| 16 | Stacy Brown | 21 | | |

000071
Nolan Perroni 4.19.23
AFT/NEA v. NH DOE - USDC NH 1:21 cv 01063
No Left Turn R.45 Response

| | Name | SAU | SAU Address | Superintendent |
|---|---|---|---|---|
| 17 | Barbara Kaufmann | 29 | Keene SAU Office | Robert Malay |
| 18 | Laura White | 29 | SAU# 29 | rmalay@sau29.org |
| | | | 193 Maple Avenue | |
| | | | | |
| 19 | Joanne Lazarus | 31 | Newmarket SAU Office | Susan K. Givens |
| | | | 186A Main St. | givenss@newmarket.k12.nh.us |
| | | | Newmarket, NH 03857-1838 | |
| | | | | |
| 20 | Mary Ann Wood | 37 | Manchester SAU Office | John Goldhardt |
| 21 | Megan Kilar | 37 | 20 Hecker Street | jgoldhardt@mansd.org |
| 22 | Sean Russell | 37 | Manchester, NH 03102-9999 | |
| 23 | Gregory Giorgio | 37 | | |
| | | | | |
| 24 | Samantha Leone | 42 | Nashua SAU Office | Garth J. McKinney |
| 25 | Paul Menard | 42 | 141 Ledge St. | mckinneyg@nashua.edu |
| 26 | Jocelyn Merrill | 42 | Nashua, NH 03061-0687 | |
| 27 | Stephane Cassidy | 42 | | |
| | | | | |
| 28 | Cindy Falabella | 46 | Merrimack Valley SAU Office | Mark T. MacLean |
| 29 | John Cassidy | 46 | 105 Community Dr. | mmaclean@mvsdpride.org |
| | | | Penacook, NH 03303-1625 | |
| | | | | |
| 30 | Elizabeth England | 59 | Winnisquam Regional SAU Office | Robert T. Seaward |
| | | | 433 West Main St. | rseaward@wrsdsau59.org |
| | | | Tilton, NH 03276-5026 | |
| | | | | |
| 31 | Nick Belsky | 60 | Fall Mountain Regional SAU Office | Lorraine Landry |
| | | | 122 NH Route 12A | Llandry@sau60.org |
| | | | P O Box 720 | |
| | | | Langdon, NH 03602-0720 | |
| | | | | |
| | | | | |

000072
Nolan Perroni 4.19.23
AFT/NEA v. NH DOE - USDC NH 1:21 cv 01063
No Left Turn R.45 Response

| | Name | SAU | SAU Address | Superintendent |
|---|---|---|---|---|
| 32 | Lauren Duquette | 65 | Kearsarge Regional SAU Office | Winfried Feneberg |
| | | | New London, NH 03257-4554 | |
| | | | | |
| 33 | Jennifer Kenney | 77 | Monroe SAU Office | Leah D. Holz |
| | | | 77 Woodsville Rd. | lholz@monroeschool77.com |
| | | | PO Box 130 | |
| | | | Monroe, NH 03771-0130 | |
| | | | | |
| 34 | John Dube | 106 | Timberlane Regional SAU Office | Interim Superintendent Christopher Kellan |
| | | | 30 Greenough Road | Christopher Kellan |
| | | | Plaistow, NH 03865 | |
| | | | | |
| 35 | Sarah Wirein-Rudy | 1057 | Mount Prospect Academy | Jay Marshall, M.Ed., Head of Schools |
| | | | 354 Main Street | Jeffrey Caron. M.Ed., President |
| | | | Plymouth, NH 03264 | |

| | Zinn Signatories claiming to be NH educators not confirmed as such by NH Department of Education | |
|---|---|---|
| | **Name** | **SAU** |
| 1 | Landis Brown | |
| 2 | Jay Reiter | |
| 3 | Tiffany Gagnon | |
| 4 | Clare Ringwall | |
| 5 | Siobhan Senier | |
| 6 | Christie Cho | |
| 7 | Lindsay Mears | |
| 8 | Mika Court | |
| 9 | Louise Pajak | |
| 10 | Patricia Patricia | |
| 11 | Lianne Prentice | |
| 12 | Whitney Howarth | |
| 13 | Jacob Bennett | |
| 14 | Yekaterina McKenney | |
| 15 | Cailey Mastrangelo | |
| 16 | Eric Meth | |
| 17 | Barbara Tobin | |
| 18 | Ryan Buchanan | |
| 19 | Candace Moulton | |
| 20 | Marianne Salcetti | |
| 21 | Shannon Kelly | |
| 22 | Yussra Ebrahim | |
| 23 | Jasmine Soleyn | |
| 24 | Kristi Lockhart | |
| 25 | Sherry Frost | |
| | | |

| | Zinn Signatories claiming to be NH educators not confirmed as such by NH Department of Education | |
|---|---|---|
| | **Name** | **SAU** |
| 26 | Joanna Preucel | |
| 27 | Carissa Corrow | |

000075
Nolan Perroni 4.19.23
AFT/NEA v. NH DOE - USDC NH 1:21 cv 01063
No Left Turn R.45 Response

**EXHIBIT 101**

Feb. 22, 2022 F. Edelblut Email Exchange

(Depo. Ex. 27)

2476
**EXHIBIT 27**
R. Farrell
5/18/2023
Reporter: Sharon Saalfield
RDR, CRR

**From:** "Krol, Diana" <Diana.C.Krol@doe.nh.gov>
**To:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**Subject:** RE: media inquiries (we can discuss at our 10 a.m.)
**Date:** Tue, 22 Feb 2022 17:40:40 +0000
**Importance:** Normal
**Inline-Images:** image005.png; image006.png; image007.png; image008.png; image009.png

---

I have Rich doing some digging as well, below is the link to the contact section on their website if all else fails
https://www.nolefttturn.us/contact-us/

Stay safe and stay well,

*Diana Krol*

Diana C. Krol | Front Desk Support
Office of the Commissioner
Phone: 603-271-6133


New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

---

**From:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Sent:** Tuesday, February 22, 2022 11:09 AM
**To:** Krol, Diana <Diana.C.Krol@doe.nh.gov>
**Subject:** FW: media inquiries (we can discuss at our 10 a.m.)

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
**Phone:** 603-271-3144
Frank.Edelblut@doe.nh.gov



New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

---

**From:** Houghton, Kimberly C <kimberly.c.houghton@doe.nh.gov>
**Sent:** Tuesday, February 22, 2022 8:54 AM
**To:** Edelblut, Louis (Frank) <Frank.Edelblut@doe.nh.gov>
**Subject:** media inquiries (we can discuss at our 10 a.m.)

I have some media inquiries from over the weekend. Please let me know if you are available to speak with these reporters, or whether there is someone else within the department who would be better suited.

**\*Krysten Maddocks 603-817-1080 works with Granite State News Collaborative and is asking about :**

**Striking the balance between academics and fun this summer.**
Questions for expert:

- - Are kids still behind in their academics due to the pandemic? How do we know this?
- - Are there activities parents can engage their children in to prevent "summer slide?"
- - Should parents spend some time this summer focusing on academics? If so, how should they approach it? Does this differ significantly according to how old your child is?
- - Physical activity and socialization are still very important. What is the balance between keeping kids' minds engaged and making sure they are outside playing?
- - If you do think your child is behind academically, who should you contact in your school?
- Are there district- or state-sponsored activities that are available to NH kids this summer? (Prenda, VLACS, summer schools run by the district.)
- - When should you consider tutoring or enrolling your student in an academic program such as Kumon or Sylvan Learning?

Questions for the commissioner:

- Why was it important for NH to again offer Prenda and Rekindling Curiosity this summer?
- In your opinion, what should parents do to strike the balance between making sure their children are caught up academically vs. making sure they are getting fresh air and exercise?
- Are any of the public school districts offering additional summer catch up programs this year (funded through the federal government, grants or other means.)

**How to keep your teen busy this summer.**

Too old for camp, too young to drive. It can be a long summer for teens home along.

SEL expert or other expert focused on teen behavior:

1. Why is it important that teens (12-17) stay busy during the summer? What is the best mix of activities for them?
2. How can you tell if your teen is "bored?" What activities should they avoid? (social media, video games, TV, excessive computer time.)
3. How can internships or volunteer activities help provide learning experiences for kids not yet old enough to work?

---

**\*Megan Fernandes** 603-943-4008 **of Fosters Daily Democrat is asking about this press release and seeking a comment:**
35 New Hampshire teachers subject of requests for investigations at affected SAUs and the Department of Education.

## A PRESS RELEASE

### February 11, 2022
### New Hampshire Chapter of No Left Turn in Education
### P.O. Box 1101, Moultonborough, NH 03254

No Left Turn in Education (NLTE) is a national education advocacy organization. Its New Hampshire Chapter has requested investigations by affected School Administrative Units (SAUs) and the New Hampshire Department of Education into the professional conduct of 35 New Hampshire educators in an array of SAUs across the state. In a manner wholly inconsistent with American Civil Rights legislation, and the teachings of Dr. Martin Luther King, these misguided educators from the school systems of Oyster River, Claremont, Concord, Derry, Exeter, Winnacunnet, Keene, Newmarket, Manchester, Nashua Merrimack Valley, Winnisquam, Fall

2478

Mountain Regional, Kearsarge Regional, Monroe, Timberlane Regional, and the Mount Prospect Academy have publicly vowed to violate New Hampshire law.

Motivated by decency and common sense, New Hampshire law, prohibits teaching that any individual is inherently racist, sexist, oppressive, or that any person or group of people should be discriminated against on the basis of their race or sex. New Hampshire's Department of Education, Department of Justice, and Commission for Human Rights has articulated this intent by simply saying "In short, do not teach that a person or a group is inherently oppressive, superior, inferior, racist, or sexist. Teach and treat all equally and without discrimination." Conversely, the "Zinn Pledge" made by these educators unambiguously seeks to teach racism and sexism. In its own words, following the classic Marxist playbook of creating combative groups of "oppressors" and "the oppressed," the Zinn Pledge opposes banning education which "identifies people or groups of people… as inherently, immutably, or systemically sexist, racist, anti-LGBT, bigoted, biased [or] privileged."

By publicly pledging on the Marxist Zinn Project website to violate New Hampshire law, these teachers have pledged to violate their professional code of conduct. In fact, the statute itself mandates that such a violation "*shall be considered a violation* of the educator code of conduct that justifies disciplinary sanction by the state board of education."

Lost upon these signatories is an understanding that investigations into private mental, emotional, or physical disabilities, gender, race, or private family issues, are not—and have never been, a legitimate function of public education. As suggested by New Hampshire law, an education's proper role is to simply help *any* student perform at their best, in spite of the anti-intellectual "identity" constructs these educators have imposed.

By making this type of race and gender discriminatory treatments illegal, the New Hampshire law attempts to blunt the worst aspects of *Critical Race Theory* (CRT) which is now stressed in virtually all topics under a growing array of pseudonyms. No matter how obliquely taught, sanitized, or word-smithed with labels such as "antiracism, equity, inclusion, social justice," and/or "diversity," CRT's fundamental hate-laden racist, sexist, and anti-scientific dogma, is as well documented as it is bizarre. While openly discarding science and rationality itself, these beliefs advance five foundational ethical and factual absurdities.

(1) It causes harmful often life-altering gender confusion among children. This disorientation is inflicted by wholly unqualified educators absent professional psychological oversight, or even parental knowledge and consent; all under the deceptive guise of the otherwise laudable, albeit inappropriate school-based goal, of assisting the socialization of gender minorities.

(2) Likewise, under the deceptive guise of assisting victims of the evidence-free notions of "systemic racism," and "white privilege," it isolates, shames and discriminates against one race. It asserts that every individual of this one race is morally inferior in that they are unavoidably and permanently "*systemically racist… and born oppressors,*" and *must* be discriminated against in the future. Its allied science-free belief is that melanin makes one race superior "*cognitively, spiritually, and physically.*" This blatant racist philosophical foundation is succinctly communicated by CRT advocates. Consider one example; the comments of CRT writer Noel Ignatiev: "*If you are a white male, you do not deserve to live, you are a cancer; a disease…. The key to solving the social problems of our age is to abolish the white race.*"

(3) CRT inspired education insists upon "instructing through a lens;" e.g.: their anti-historical and anti-scientific preconceptions. U.S. history is presented in a highly selective manner to support conclusions otherwise unsupported by the data or the centuries old professional "lens free" *objective analysis* by professional historians. CRT oriented conclusions now being taught in many schools nationwide are not simply unsupported; they are demonstrably false. Not surprisingly, as with all Marxist political efforts, their "history" supports concepts of collectivism, as it demeans concepts of individualism, democratic rule of law, equality theory, capitalism itself, and the individual freedoms in which these democratic concepts are founded. In seeking to eradicate these democratic legal pillars, these law violating educators have taken to heart Derrick Bell's (the father of CRT) instruction, that: *"Private rights and public sovereignty mediated by the rule of law need to be exploded."*

(4) Although wholly disproved by aggregate data, police officers, (about one third of which are women or racial minorities), are typecast as a single-minded group of racists and murderers. Children are repeatedly encouraged to fear their police in CRT "equity" styled surveys and in class instruction. Random assassination of police officers is at its highest rate in twenty years.

DOE-06883

2479

(5) Honest discourse inconsistent with these anti-intellectual beliefs are verboten by classroom CRT advocates just as they are in the public square. Social science research that identifies genuine cultural reasons for disparities among groups is left undiscovered by students. CRT advocates renounce this science by claiming it is *"Masculine and Western."* Parents, students, academics, historians, or citizens attempting disagreement with the encouragement of hateful racism, false history, and gender confusion, are systematically humiliated, perversely labeled and ostracized. CRT proponents trained to employ this bullying practice to distract one from genuine facts. They call the strategy "Upstanding."

No Left Turn in Education, alongside the vast majority of informed citizens oppose employing our educational system to facilitate harm to vulnerable children and their families. No matter how implicitly accomplished, there is no "free speech right" among educators to deceive children, to coerce them to surrender private information relative to physical, mental, or emotional maladies, income data, gender issues, racial pedigree, or other issues inherently private to their families. Educators do not have a "right" to discriminate against some children, to alienate children from one another, or manipulate them into feeling angry, afraid, victimized, or ashamed. Surrendering parental roles to ideologically driven teachers deliberately undermine the foundation of a child's basic support structure, the nuclear family. NLTE will assist with any student or family complaints regarding these ideological transgressions emanating from a school environment. We also request that the Department of Education in alliance with other responsible educators protect children from the damage these 35 educators have pledged to promote in violation of New Hampshire Law.

Respectfully submitted,

Michael D. Breen Ph.D. Director, N.L.T.E. New Hampshire Chapter

- **\*SHE IS ALSO ASKING ABOUT THIS:  School Boards are being targeted with folks threatening to file claims on surety bonds, in order to try to force districts to remove mask mandates. Is the DOE aware of this, and are they taking any action?  What purpose do these bonds serve and is the DOE concerned about the impact this has on the districts?**

*Kimberly Houghton*
*Communications Administrator*
*603-513-3030*
*Kimberly.C.Houghton@doe.nh.gov*

 New Hampshire
**Department of Education**

**EXHIBIT 102**

Feb. 14, 2022 R. Farrell Email Exchange

(Depo. Ex. 28)

**From:** "/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B73ED742D2BC41A4BD75EE92045AC4 8E-FARRELL, RI" <Richard.J.Farrell@doe.nh.gov>

**To:** "Garth McKinney" <McKinneyG@nashua.edu>

**Subject:** RE: Message from KM_C550i

**Date:** Mon, 14 Feb 2022 14:32:45 -0000

**Importance:** Normal

**Inline-Images:** image002.png; image003.png



**EXHIBIT 28**

R. Farrell

5/18/2023

Reporter: Sharon Saalfield
RDR, CRR

Good Morning,

I wanted to give you an update regarding the "No Left Turn Letter."

I received a similar letter with ALL the names on it. Additionally, Drew Cline (State Board Chair) and the State Board members got the same letter. Every school district with an identified teacher received the same letter (Specific to the identified educator).

I have consulted with The Assistant Attorney General assigned to our office (Chris Bond) and Atty. Diana Fenton. Neither of these lawyers feel we have an interest in the allegations. We reviewed the same list back in the summer and the decision was the same. Moreover, the Day of Action in New Hampshire took place on June 12, 2021.

Therefore, it is believed that the signatures (if confirmed) were affixed to the "pledge" prior to HB2 becoming law.

I hope this helps a bit. If you have any additional questions, give me a call.

Thanks.

Rich

Richard J. Farrell Jr.

New Hampshire Department of Education

Investigations

101 Pleasant Street

Concord, New Hampshire 03301

(603) 271-8372

*The contents of this message are __CONFIDENTIAL__ Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is __PROHIBITED__. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

**From:** Garth McKinney <McKinneyG@nashua.edu>

**Sent:** Wednesday, February 9, 2022 11:06 AM

**To:** Farrell, Richard <richard.farrell@doe.nh.gov>

**Subject:** FW: Message from KM_C550i

**EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.**

FYI – should we investigate?

----



**GARTH MCKINNEY Ed.D.**
SUPERINTENDENT OF SCHOOLS (INTERIM)
141 LEDGE ST NASHUA NH 03060
603.966.1003
603.594.4350
MCKINNEYG@NASHUA.EDU
FOLLOW US ON TWITTER
@NASHUASCHOOLS

---

**From:** Gabriele Bernardo <Bernardog@nashua.edu>
**Sent:** Wednesday, February 9, 2022 11:05 AM
**To:** Garth McKinney <McKinneyG@nashua.edu>
**Subject:** FW: Message from KM_C550i

Thank you,

*Gabriele Bernardo*
**Office of the Superintendent**



141 Ledge Street
Nashua, NH 03060
bernardog@nashua.edu
Ph#: 603-966-1002
Fax#: 603-594-4350

**From:** DO-MainOffice@nashua.edu <DO-MainOffice@nashua.edu>
**Sent:** Wednesday, February 9, 2022 11:02 AM
**To:** Gabriele Bernardo <Bernardog@nashua.edu>
**Subject:** Message from KM_C550i

DOE-00701

**EXHIBIT 103**

Redacted version of Apr. 7, 2022 DOE Email Exchange

(Depo. Ex. 18)

2484

Reporter: Sharon Saalfield
RDR, CRR

EXHIBIT 18
D. Fenton
5/17/2023

From: "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
To: "Fenton, Diana" <Diana.E.Fenton@doe.nh.gov>
Subject: Re: Londonderry
Date: Thu, 07 Apr 2022 22:02:33 -0000
Importance: Normal
Inline-Images: image001.png; image002.png; image003.png; image004.png; image005.png; image006.png; image007.jpg

You should review the text messages

From: Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
Sent: Thursday, April 7, 2022 6:01:18 PM
To: Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>; Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
Cc: Bond, Christopher <Christopher.G.Bond@doe.nh.gov>; Brennan, Christine <Christine.M.Brennan@doe.nh.gov>
Subject: RE: Londonderry

Yes, we need to discuss at our next and misconduct meeting in further detail.

From: Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
Sent: Thursday, April 7, 2022 3:46 PM
To: Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
Cc: Fenton, Diana <Diana.E.Fenton@doe.nh.gov>; Bond, Christopher <Christopher.G.Bond@doe.nh.gov>; Brennan, Christine <Christine.M.Brennan@doe.nh.gov>
Subject: RE: Londonderry

Rich,

Can we discuss in our next meeting? Looking at the "opt out/in" content, I would say that the content of the materials may not match the relatively benign syllabus.

*Frank Edelblut*
Frank, Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov

New Hampshire
Department of Education

The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.

From: Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
Sent: Thursday, April 7, 2022 9:55 AM
To: Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
Cc: Fenton, Diana <Diana.E.Fenton@doe.nh.gov>; Bond, Christopher <Christopher.G.Bond@doe.nh.gov>; Brennan, Christine <Christine.M.Brennan@doe.nh.gov>
Subject: FW: Londonderry

Please Review the responses from Londonderry.
Rich

Richard J. Farrell Jr.
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-3372

The contents of this message are CONFIDENTIAL. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is PROHIBITED. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.

From: Scott Laliberte <slaliberte@londonderry.org>
Sent: Thursday, April 7, 2022 9:54 AM
To: Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
Cc: Daniel Black <dblack@londonderry.org>; Jason Parent <jparent@londonderry.org>; Kim Lindley-Soucy <klindley@londonderry.org>
Subject: RE: Londonderry

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

Good morning Rich,

We have had an opportunity to review the material that you'd sent and have the following information for you in response to the inquiry.

First and foremost, the activities identified are from the Human Relations Course at LHS. After review with the principal, curriculum coordinator, and assistant superintendent, we have determined that these activities do fall within the scope of the course. For your information, I have attached a copy of the syllabus. You'll also notice that this syllabus includes a form, for parental notification, as well as an invitation for parents to review class assignments on Google Classroom at any time. I'm told that all participants in this class have submitted signed acknowledgements. Furthermore, neither the teacher nor school administrators have received any complaints to date regarding the course content. Should any such objection be received, the district will handle it in accordance with our Policy IGE— Exceptions to Use of Specific Course Material(s). We have also reviewed this material through the lens of the new Divisive Concepts law and find that the subject of these activities do not apply.

I have copied the school staff involved in this matter on this email—please feel free to let us know if you require further information.

DOE-10286

2485

Regards,
Scott

**Scott A. LaBurto**
**Superintendent**
**Londonderry School District – S.A.U. #12**
**6A Kitty Hawk Landing, Ste 101**
**Londonderry NH 03053**

(603) 432-6920 ext. 1109



From: Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
Sent: Tuesday, April 5, 2022 10:03 AM
To: Scott Laliberte <plaliberte@londonderry.org>
Subject: FW: Londonderry

Please Review:
I am not familiar with _____. I do not know if she is a parent of an interested party. Is she on your radar?
Thanks.
Rich

Richard J. Farrell Jr
New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8573

The contents of this message are CONFIDENTIAL Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is PROHIBITED. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.

From: Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
Sent: Tuesday, April 5, 2022 9:03 AM
To: Farrell, Richard <Richard.J.Farrell@doe.nh.gov>
Subject: FW: Londonderry

Can you look into this?

From: Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
Sent: Tuesday, April 5, 2022 7:58 AM
To: Fenton, Diana <Diana.E.Fenton@doe.nh.gov>
Subject: FW: Londonderry

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



**Department of Education**

The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.

From: _____ @gmail.com>
Sent: Monday, April 4, 2022 8:19 PM
To: Edelblut, Louis (Frank) <Frank.edelblut@doe.nh.gov>
Subject: Londonderry

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

Good evening,

This was brought to my attention today. A Human Relations teacher at the Londonderry High School gave these worksheets out to students. Is this allowed?

Thank you,
_____

DOE-10287



DOE-10288

## DIVERSITY BINGO

Directions: Find someone in the class to fill each square and ask them to print their name in that square. Each person can only fill ONE square on your card. The first goal is to get Bingo: a row, column, down or diagonally. When you are full: "BINGO!"

| Knows what Diwali is | Has memorized a poem | Has travelled to South America | Is a vegetarian | Has a quote that inspires them |
|---|---|---|---|---|
| ...es from an interracial family | Celebrates Yom Kippur or knows what it is | Is a twin or triplet | Has a family member who has a service animal | Has travelled to Europe |
| musical ...ment | Speaks more than one language (fluently) | Lives on the planet Earth | Is a first generation American (both parents were born in another country) | Was born in another country |
| ...e ...ts | Has travelled to Canada | Celebrates Kwanzaa or knows what it is | Sent a handwritten 'thank you' note recently | Does NOT have SnapChat |
| | Is of Native American heritage | Does not use binary gender pronouns | Has lived in more than one state | Has a cause they are passionate about |

DOE-10289



DOE-10290

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-New Hampshire, et al.
Plaintiff(s)/United States

v.                                        Case No.  1:21-cv-01077-PB

Frank Edelblut, in his Official Capacity, et al.
Defendant(s)

**NOTICE OF CONVENTIONAL FILING**

Please take notice that Plaintiffs                                    has
conventionally filed the following attachment or exhibit:
Exhibit 104 to Plaintiffs' Statement of Material Facts (Depo. Ex. 46) .

This attachment or exhibit has not been filed electronically because:

It either contains information that has been designated by Defendants as "Confidential—
Attorneys' Eyes Only" pursuant to the Protective Order (DN 76) insofar as Defendants assert
that this information is protected under RSA 354-A:21, II(a) and/or N.H. Admin. R. PART
Hum 219.04(a), or it contains personal identifying information.

Date: August 14, 2023                    /s/  Gilles Bissonnette
                                         Gilles Bissonnette
                                         265393
                                         ACLU of New Hampshire
                                         18 Low Avenue
                                         Concord, NH 03301
                                         603-224-5591
                                         gilles@aclu-nh.org

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing attachment/exhibit was conventionally served on the following persons on this date and in the manner specified herein:

All counsel of record

Date: August 14, 2023

/s/ Gilles Bissonnette
Gilles Bissonnette
265393
ACLU of New Hampshire
18 Low Avenue
Concord, NH 03301
603-224-5591
gilles@aclu-nh.org

**EXHIBIT 105**

Aug. 24, 2022 R. Farrell Email Exchange

(Depo. Ex. 29)



**From:** Karlyn Borysenko <kb@activelyunwoke.com>
**To:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
**Subject:** Re: Inquiry
**Date:** Wed, 24 Aug 2022 11:39:36 -0400
**Importance:** Normal

---

EXTERNAL: Do not open attachments or click on links unless you recognize and trust the sender.

---

Hi Richard,

While I am more than happy to play this out in the public square to see how the citizens of New Hampshire feel about their own department of education refusing to investigate this obvious violations, I must point out that you are patently incorrect in your assertion that it does not name individuals.

It does.

As I have outlined, the following individuals are named: https://karlyn.substack.com/p/the-exeter-region-cooperative-school

David Ryan
Adam Krauss
Dennis Magliozzi
Kristina Peterson

They are all individual educators and they are all named in the information I submitted.

Karlyn Borysenko

On Aug 24, 2022, at 9:37 AM, Farrell, Richard <Richard.J.Farrell@doe.nh.gov> wrote:

Good Morning,
Thank you for the information provided in your Email (19 August 2022). Pursuant to guidance from the Office of the Attorney General (Department of Justice), this complaint should first be reviewed by the Human Rights Commission (HRC). You may find information regarding how to file a complaint with the HRC on their website. **New Hampshire Commission for Human Rights (nh.gov)** If the HRC determines that there is a violation of RSA 354-A, the Department of Education will examine their findings (if any) and determine if they are consistent with the possible violation of the Code of Conduct regulations. Moreover, this agency reviews the License Status of New Hampshire Educators. The current complaint does not allege the violation of any portion of the Code of Conduct by individual educators within SAU 16.
The issues raised are likely systemic and approved by administrative supervision and the boards of governance within SAU 16. Therefore, we will await the decision made by the Human Rights Commission before any further action is undertaken.
Moreover, Commissioner Edelblut has forwarded your inquiry directly to Ahni Malachi (HRC) on 19 August 2022 for her review.
Respectfully,
R.J. Farrell Jr.

Richard J. Farrell Jr.

New Hampshire Department of Education
Investigations
101 Pleasant Street
Concord, New Hampshire 03301
(603) 271-8372

*The contents of this message are __CONFIDENTIAL__ Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is __PROHIBITED__. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

DOE-00750

**EXHIBIT 106**

Redacted version of Sept. 21, 2021 F. Edelblut Email Exchange

(Depo. Ex. 39)

EXHIBIT 39
2495 Qdelblut
Wit:
DATE: 5-23-22
Cynthia Foster, RPR, LCR #14

**From:** "Edelblut, Louis (Frank)" <Louis.F.Edelblut@doe.nh.gov>
**To:** "Farrell, Richard" <Richard.J.Farrell@doe.nh.gov>
**Subject:** FW: Sex groups???
**Date:** Wed, 21 Sep 2022 11:05:56 +0000
**Importance:** Normal
**Attachments:** 77E7A8F5-2799-43BF-AB74-7CDA0702F361.jpeg
**Inline-Images:** image001.png; image002.png; image003.png; image004.png

---

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and any attachments from your system.*

---

**From:** ████████████████ @comcast.net>
**Sent:** Tuesday, September 20, 2022 9:05 PM
**To:** Edelblut, Louis (Frank) <Louis.F.Edelblut@doe.nh.gov>
**Subject:** Sex groups???

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

This is what results from the agenda pushed at SAU34. I'll call tomorrow. Boundaries are necessary.

████████████, MSW

On 09/19/2022 11:04 AM Edelblut, Louis (Frank) <louis.f.edelblut@doe.nh.gov> wrote:

████,

If you can give me a call to discuss the below, that would be helpful. 603-931-████.

*Frank Edelblut*
Frank Edelblut | Commissioner of Education
Phone: 603-271-3144
Frank.Edelblut@doe.nh.gov



 New Hampshire
**Department of Education**

*The contents of this message are confidential. Any unauthorized disclosure, reproduction, use or dissemination (either whole or in part) is prohibited. If you are not the intended recipient of this message, please notify the sender immediately and delete the message and*

*any attachments from your system.*

**From:** [redacted] @comcast.net>
**Sent:** Thursday, September 1, 2022 1:52 PM
**To:** Edelblut, Louis (Frank) <Frank.edelblut@doe.nh.gov>
**Subject:** This Book Is Anti-Racist

**EXTERNAL:** Do not open attachments or click on links unless you recognize and trust the sender.

The book in the subject line is actually the total opposite of it's title. It's a blatantly racist book directing kids to redistribute wealth from those who earned it, giving it to those who didn't. The book openly denies any and all racism exists against whites. As a person who has experienced white racism, I KNOW this is untrue. It violates the law put into place to protect against this exact thing, racism.

I am requesting an investigation of SAU34 and it's practices to knowingly advertise racist and sexual education books to it's students through their liberal Sora reading app. The app was brought up to the school board, but no investigation occurred, just blind support with no questions about what was found. We have taken it off our children's computers, but the law remains for the others. They have a right to educational materials that aren't racist or sexually educational.

The Sora app is being used by many schools in the state now without knowing the harms and legal liabilities they have signed up for. I'm happy to discuss what I have found. I know most people don't have the time to look through their children's curriculum like I do. I want to protect students by way of following our laws. This app and it's sexual and racist curriculum violates our laws. As the education director, I'm asking you to investigate and keep sex Ed and racist texts and teachings, out of our schools, per the law.

The Sora app is an agenda driven "reading" (or listening app) that has zero conservative content but over 150 books in their reading rainbow section with straight up porn available to children AT school. These questionable books have embedded links in the back, straight to the authors or any link they put there. The children have already gotten past the school's Internet

blockers, leading them right into the hands of offenders. I was reading The Beginner Kama Sutra in two clicks. No kidding. A sex position handbook! I'm happy to show you how.

The book Flamer was fully read by me on the app. I am glad to see it was recently removed. It was nothing but graphic porn for kids. The Sora app advertises these questionable books to the kids through their computers. There is no way to ask for content controls. The parents can't interact with the app in any way, they cannot see what their kids are reading and the kids can delete their history from ALL eyes. Not even their teachers will know the new positions they learned from The Beginner Kama Sutra, unless the student brings it up. I hope not. The kids are forced to see these titles because of the app's advertising of new reading or "suggested reading". My 15-year-old was advertised: Lesbiana's Guide to Catholic School and Here and Queer a few months ago. "Lesbiana's" is just completely inappropriate, in my opinion, and Here and Queer is a sexual education book for questioning lesbians. It defines the terms in an educational manner. There is no story line, just information on being a lesbian. Probably NOT the best book to advertise to BOYS. It's sex Ed. Parents should be able to opt out of these materials being advertised to our children. It's inappropriate and illegal. Sexual education materials are for sexual education classes, not for private advertising to children when parents aren't around to approve. How do we keep it that way when the app bypasses all of the laws and the schools just blame the app and take no responsibility? How to I keep sexual education materials in sexual education class, when the school is knowingly advertising sexual education materials to my unsuspecting kids?
I'm requesting your help to protect the kids and follow the laws meant to do that. Racist and sexual education materials are being distributed to our kids. They deserve better and the law supports my concerns. Please let me know how I can support YOU in getting these illegal materials out of our schools. I know we can do better.

██████████, MSW
Mother of two at NH SAU34

# EXHIBIT 107

Jan. 7, 2022 Email from Ann Marie Banfield Opposing SB304

2500

**Received:**   Fri 1/7/2022 5:30:14 PM
**Subject:**   VOTE ITL on SB304
**From:**   Ann Marie Banfield <banfieldannmarie@gmail.com>
**To:**   "Sharon.Carson@leg.state.nh.us" <Sharon.Carson@leg.state.nh.us>, William.Gannon@leg.state.nh.us,
Harold.French@leg.state.nh.us, Becky.Whitley@leg.state.nh.us, jennifer.horgan@leg.state.nh.us
**Cc:**   Ruth Ward <Ruth.Ward@leg.state.nh.us>, Denise Ricciardi <denise.ricciardi@leg.state.nh.us>,
Erin.Hennessey@leg.state.nh.us, Jay Kahn <Jay.Kahn@leg.state.nh.us>, Suzanne.Prentiss@leg.state.nh.us, Senators New Hampshire
<Senators@leg.state.nh.us>, "Louise (Frank) Edelblut" <Frank.Edelblut@doe.nh.gov>
Screen Shot 2021-08-24 at 11.39.33 PM.jpg
Screen Shot 2021-06-15 at 9.57.54 AM.jpg
Screen Shot 2021-06-22 at 1.27.50 PM.jpg
White Supremecy culture.jpg
Screen Shot 2021-09-05 at 12.44.34 AM.jpg
Screen Shot 2022-01-07 at 2.12.00 PM.jpg

Dear Members of the Senate Judiciary Committee:

My name is Ann Marie Banfield and I am a resident of North Hampton, New Hampshire. **I urge you to vote ITL on SB304** which would reinstate discriminatory actions within the public school system.

In 2021, we saw an influx of the radicalized Critical Race Theory training for teachers, and the curriculum aimed at children in the public schools. This came in under the umbrella of Diversity, Equity, Inclusion and Justice. It was so alarming to teachers and parents, that many of them mobilized to affirm our civil rights through the non-discriminatory language that was passed in HB2.

We saw teacher training in SAU16 that described everyone as white supremacists if they believed in a colorblind society. We had New Hampshire parents assuring their children that they were not responsible for slavery after receiving a lesson in history that placed the actions of slave owners on their children.

These are violations of the Civil Rights Act, but parents and teachers do not want to have to take their school district to court. There are costs involved, and it can be a lengthy process, as we are seeing in SAU16 right now. The school districts have tax-payer funded attorneys at their disposal, so it can be a daunting task to spend thousands of dollars on a private attorney to fight for our basic civil rights.

Currently there is an ongoing lawsuit in SAU16 where a resident is just trying to compile documents to see how CRT was implemented in the school district. Residents already uncovered information that shows that they were planning to push more bias and prejudice on the students. The Superintendent is using tax-payer funded attorneys to fight against producing these documents. SAU16 has already spent roughly $10,000.00 to keep these documents hidden.

We do know that SAU16 purchased books for the students on anti-racism. Anti-racism includes the same toxicity as the radicalized Critical Race Theory we are seeing in k-12 schools.

For instance, in the book SAU16 purchased for 8th grade children, the author says that there are two identities that we all fit in.
  You fit into the ***dominant culture*** if you fit into any of these identities:
1) White
2) Upper-middle-class

BAN00000690

3) Cisgender
4) Male
5) Educated
6) Athletic
7) Neurotypical
8) Able-bodied

You are in the **subordinate culture** if you fit into any of these identities:
1) Brown
2) Indigenous people of color of the global majority
3) Queer, transgender, nonbinary, cisgender women, youth
4) Muslim, Jewish, Buddhist, atheist, non-Christian
5) Neurodiverse
6) Those living with disabilities
7) Those living in poverty, and more.

A student or teacher must then determine which of those two boxes they fit in.

This is why Condoleeza Rice rejected the narrative of CRT that we are seeing in k-12. She disagreed with requiring white people to feel guilty for everything that has happened in the past. She mentions one of the most important features of CRT which is, the idea that black people have to feel disempowered.


Rice rejects this radical worldview, and goes on to say that she wants black kids to be completely empowered, and to know that they are beautiful in their blackness. But in order to do that, she doesn't want them to make white kids feel bad for being white. Condoleeza Rice just summed up why the radicalized CRT agenda is wrong for students in New Hampshire.

While this radical agenda in our schools may be wrong, the CRT/DEIJ/Anti-Racist agenda also violates our basic civil rights. Those rights were affirmed in HB2 with the anti-discrimination language.

Why would anyone think it's ok to discriminate against any group of people based on their skin color? Why would we want to go backwards? Why would you **not** want to affirm the civil rights of all of the children and teachers in the public school system?

This kind of discriminatory behavior has been happening in many of the New Hampshire schools like Litchfield, Sanborn, Exeter, Hollis-Brookline, and Hopkinton, to name a few.

Parents have set up websites, Facebook pages, and have objected to this discriminatory behavior at school board meetings. HB2 has helped those parents and teachers demand that their school administrators focus on academic achievement for all of their students.

Teachers are in a very difficult position speaking publicly, but HB2 helped them so they aren't subjected to this kind of hate and prejudice in Professional Development.

It was David Ryan, Superintendent of SAU16 who admitted in a public meeting that they would

2502

have to change their professional development because of the anti-discriminatory law. The professional development in SAU16 provided by 2Revolutions was questioned at a public meeting when someone asked about the Professional Development East Kingston teachers had to endure **1:22:29**.

According to 2 Revolutions, teachers and children are covert racists and a white supremacists if they are:

1. Of the belief that we should be colorblind when judging someone
2. Silent
3. Are white parents self-segregating in certain neighborhoods & schools
4. Live in an area where education funding is from property taxes
5. Supports the message of Make America Great Again
6. Denies White Privilege
7. Believes in Exceptionalism
8. Celebrates Columbus Day
9. Claims reverse racism
10. Assumes good intentions are enough
11. Believes : But we're all one big human family....there's only one human race.

This is the kind of professional development we have seen in New Hampshire Schools. This is not training that is focused on helping all students succeed academically, but training teachers to blame and shame their colleagues and the children in their care.

The teachers in SAU16 were subjected to professional development by 2Revolutions who was hired to work with the teachers. According to 2 Revolutions if you live in an area that funds public education through property taxes, you are a white supremacist.  That would mean that every resident in New Hampshire is a white supremacist, including all of the members of the Senate Judiciary Committee. They then work on dismantling your inherent white supremacy. But if you look at this new world view, you can never dismantle your inherent racism. These vendors sell their anti-racist propaganda for profit to schools that are willing to violate the civil rights of the teachers and children.

There are many more examples I can share but I think you can see that this kind of destructive bias we saw in New Hampshire schools prior to the passage of HB2. This was damaging to teachers and children in our public schools, but more importantly, it was violating their civil rights. The children who are in the subordinate culture may then begin viewing themselves as abnormal and inferior just as Condoleeze described in her interview.

HB2 provided a way for parents and teachers to fight back against the prejudice aimed at them. They shouldn't be used as a political tool by political radicals. Our schools should be focused on academic excellence and literacy in the core subjects. They should be nurturing children in kindness and compassion instead of the character assassination we've witnessed.

It's unfortunate that some of our educators thought that this radicalized approach in our classrooms was ok. It is not-- it violates our most basic civil rights. There are ways that teachers and children can learn the truth about history without this kind of psychological game being played on them, and it shouldn't include discriminatory actions aimed at teachers and children.

BAN00000692

For these reasons I urge you to vote ITL on SB304 and affirm our civil rights.

ADDITIONAL Information:

2REVOLUTIONS:



2504





**Ibram X. Kendi's books have been assigned to children in districts like Hopkinton.**

BAN00000694

Thriving Families Learning Session 1 Final...
1 page — Edited

# SOME CHARACTERISTICS OF WHITE SUPREMACY CULTURE

| CHARACTERISTIC | WHAT IT LOOKS LIKE IN ACTION |
|---|---|
| Perfectionism | Little appreciation expressed among people for the work that others are doing; appreciation that is expressed usually directed to those who get most of the credit anyway |
| Sense of Urgency | Continued sense of urgency that makes it difficult to take time to be inclusive, encourage democratic and/or thoughtful decision-making, to think long-term, to consider consequences |
| Defensiveness | The org structure is set up & much energy spent trying to prevent abuse and protect power as it exists rather than to facilitate the best out of each person or to clarify who has power and how they are expected to use it |
| Quantity over Quality | Things that can be measured are more highly valued than things that cannot; Little or no value attached to process; If it can't be measured, it has no value |
| Paternalism | Those with power think they are capable of making decisions for and in the interests of those without power |
| Either/Or thinking | Good/bad; right/wrong; with us/against us; linked to perfectionism in making it difficult to learn from mistakes or accommodate conflict. No sense that things can be both/and |
| Power Hoarding | Little, if any, value around sharing power |
| Fear of Open Conflict | When someone raises an issue that causes discomfort, the response is to blame the person for raising it, rather than looking at the issue which is actually causing the problem. Culture of politeness |
| Right to Comfort | The belief that those with power have a right to emotional and psychological comfort (valuing logic over emotion) Scapegoating those who cause discomfort |

Source: showingupforracialjustice.org

ANALYSIS    RACIAL ISSUES

# VIDEO: 'White people should commit suicide as an ethical act,' Duquesne professor says

MATT LAMB - ASSOCIATE EDITOR    ·    AUGUST 30, 2021

SHARE THIS ARTICLE:   

*He defended a proposition by a fellow professor*

Duquesne University **Professor Derek Hook** said there are merits to the argument proposed by another professor who argued that it would be ethical for white people to kill themselves.

The anti-critical race theory group Mythinformed MKE posted the video recently. "This is part of an 'anti-racist' discussion on 'nice white therapists held by the [American Association for Psychoanalysis in Clinical Social Work]," the group wrote on Facebook. The video appears to be from a **summer session** hosted by Hook, though the content is not otherwise publicly available.

"White people should commit suicide as an ethical act," the top of a presentation by Hook said.

 **Rebecca** 

I just can't 😡, My 9 year old asked me this weekend if slavery was her fault because she's a white person. (We have an open question/answer about anything) and she is super interested in Rosa Parks and the Underground Railroad. We happened to be in Boston when she asked this one.
I guess we prob need a separate FB page 😩. The look in her eyes thinking that slavery was HER/OUR fault was soul-crushing.

Like · Reply · 1d                                    👍😢 5

**Rebecca is a New Hampshire who posted this on Social Media**

BAN00000696

**EXHIBIT
108**

Feb. 18,
2021
email from
D.
Richards in
HB544
Legislative
History

(Depo. Ex.
49



EXHIBIT 49
2508
WIT: _____
DATE: 5-23-23
Cynthia Foster, RPR, LCR #14

**Archived:** Wednesday, April 7, 2021 1:18:19 PM
**From:** Daniel Richards
**Sent:** Thursday, February 18, 2021 10:56:22 PM
**To:** ~House Executive Departments and Administration
**Subject:** Testimony
**Response requested:** No
**Importance:** Normal
**Attachments:**
Exploring Whiteness .pdf ;House Testimony 2-18-21 Final.docx ;

Dear House EDA Committee,

Attached to this email is my testimony for today including the "Exploring Whiteness" course syllabus. Please confirm receipt.

Thank you,

Daniel Richards
Etna, NH

Thank you members of the Committee for the opportunity to speak.

My name is Dan Richards and I live in Etna, New Hampshire. I also own and run a company that employs over 200 people that is headquartered in Lebanon, NH.

I come to you today to support and respectfully request you vote in favor of HB 544. My family and our fellow citizens in NH do not believe racist and discriminatory practices are acceptable under <u>any</u> circumstances and this bill would forever enshrine that belief in NH State law.

My wife Melissa and I have two young children, our daughter is in second grade and our son will be entering kindergarten next year at SAU70. My wife and I are deeply concerned about what is being taught and the trainings that are being conducted in our district. But I don't come here just for myself and my family. I also come here today out of concern for the dozens of my employees' children who are being educated in New Hampshire.

Let me give you an example of what is happening. This past spring, a course was taught entitled "Exploring Whiteness and Becoming an Anti-Racist Activist" that contained blatantly racist and anti-American topics. The course syllabus will be submitted following my testimony for your review.

A brief summary of the objectionable content includes:

1. A quiz that asks: The rise of white supremacy was tied most directly to:
   a. Indian removal
   b. Slavery
   c. **The Declaration of Independence**
   d. The US Constitution
   e. Ancient Greece

   The answer demanded is c: The Declaration of Independence.

2. A 2hr 13min <u>lecture</u> given by an individual named Tim Wise. Mr. Wise's lecture includes frequent and repeated racist and anti-American statements, including:
   a. "Rich white people telling working class white people that their problem is other working class people who just so happen to be browner than themselves. That is the whole history of America."
   b. "Let's be clear. Our ancestors from Europe were the losers of their societies."
   c. "Liberty and freedom? You think we believed in that? What history book have you been reading? We didn't believe in that."

3. A 1hr23 minute <u>lecture</u> from Robin DiAngelo whose entire talk is consumed with how all whites are "fragile" due their culpability and complicity in our "racist system."

4. We have also been told by a member of our elementary school leadership team that they will be using "achievement debts accumulated over hundreds of years" to "teach for social transformation." To accomplish this, equity, diversity and inclusion trainings have been conducted for months, I'm told partially funded by state grants, for all teachers, faculty and staff.

In my opinion, these kinds of teachings and trainings are as objectionable as they are false, inflammatory and racist. They have no place in our NH schools and the training programs of NH companies.

I'd like to conclude by saying I am the son of a Marine veteran and my grandfather and several great uncles served in the armed forces and fought the Axis during WWII. Some of my ancestors were rounded up, sent to camps and exterminated. My family knows what racism and white supremacy looks like. We have fought and we have died to defend the United States and the egalitarian principles for which it stands. It is sad commentary about our times that we need HB 544, but the reality is that we do. Our children deserve to be taught the history of this nation, for all of its greatness and flaws. They do not deserve to be indoctrinated with hatred not only of themselves, but also of those who choose to love this country.

I humbly request you pass HB 544 so I can send my kids to a school free from racism, discrimination and racial stereotyping.

Thank you.

Daniel L. Richards

# Exploring Whiteness and Becoming an Anti-Racist Activist

INSTRUCTORS *John Peterman (cm), Nicole Hansen, Devon Voake (½ day), Amy Good (½ day), Johari Ajwang (s)*
LOCATION HHS Classroom Room 302
READINGS TBD
TIME **Full Day**   MAX ENROLLMENT 16   STUDENT COST $0

DESCRIPTION *Students will join in honest, frank, and respectful examination of what it means to be a white person in 21st century America. We will explore many topics on race including: personal identity and power, white privilege, guilt, and fragility, and taking anti-racist action. We will learn how whiteness and race were invented in the early years of our country's formation, further sustained through government programs, and how this has played out in our own community. Students will learn how to take anti-racist action by meeting with college students who currently are engaged in national and local anti-racist work, including where anti-racist work intersects with gun safety, climate change, and LGBTQ rights. This MI is open to all students, and we hope that we will have a diverse group. The course will be designed to be a dynamic and interactive experience based at HHS, but also involving field trips off campus. Tentative plans include interaction with Dartmouth students/staff members and other local community members involved with anti-racism work and correspondence with students from Ashley Hall School in Charleston SC to discuss how we perceive race and each other in New England and the South.*

Tuesday 3/10
8:00-8:30 Introductions/Rules of Engagement/ Race Literacy Quiz (John)
8:30-9:00 Equity and Inclusion Terms, Language, and Definitions (Meredith/Johari)
9:00-9:45 The Invention of Whiteness/ Race the Power of an Illusion (John)
9:45-10:00 Break
10:00-11:00 Action Plan Design planning (Group led by Johari and Meredith)
11:00-12:00 Lunch
12:00-1:00  "Understanding Racism and Systemic Oppression " Brian Cook/Groundswell Change
1:00-1:30 Discussion on Brian Cook's Presentation
1:30-1:45 Break
1:45-2:45 iPod walk-around  (Nicole)
2:45-3:00 Journaling (Amy prompts)

Wednesday 3/11
8:00-9:00 How we got here: Jim Crow, Redlining, Racial Wealth Gap (John)
9:00-9:30 Shadows Fall North film excerpt (John)
9:30 -10:00 Citrus Preview (Nicole and Johari)
10:00-10:30 Brunch
10:30-1:30 (including travel time) Citrus at Northern Stage
1:30-2:00 Citrus Discussion and Journaling (John/Amy's prompts)

Thursday 3/12
8:00-9:00  White Privilege/ White Fragility (John/Meredith) (with selected video)
9:00-9:45   Intro to Kendi: Anti-racism/ in-class reading (Johari/Meredith)
9:45-10:00 Break
10:00-10:30 Action Plan Design planning (Group/Johari/Meredith)
10:30-11:30 "Carol Street" Being a Person of Color in an All White Environment (film maker Demetrius Borge)

*First Draft of Daily Schedule Topics*
*Speakers/video/presentations/discussion TBD*

## Tuesday 3/10

### Introductions/ / Rules of Engagement/ Opening Exercises

*http://www.pbs.org/race/002_SortingPeople/002_00-home.htm*
*race literacy quiz*
*http://newsreel.org/guides/race/quiz.htm*

### Language and Definitions

#### The Invention of Race and Whiteness

*Tim Wise:what is race  invention of whiteness*
*https://www.youtube.com/watch?v=jBUnziGqN4o     1:53-2:01*
*Race the Power of an Illusion*
*Ep 1 The difference between us ... segments*
*https://www.youtube.com/watch?v=OXEV0tqox9k&t=2s*
*Discussion Guide pages 7&8 http://newsreel.org/guides/race/race-guide-lores1.pdf*
*The Other Race (Mixed Race)  Documentary...segments*
*https://www.youtube.com/watch?v=GfM-F172548*

### White Privilege

The advantages of wealth and whiteness  10 question walk/race
**https://www.youtube.com/watch?v=4K5fbQ1-zps**
**https://www.nasponline.org/resources-and-publications/resources-and-podcasts/d
iversity/social-justice/social-justice-lesson-plans/talking-about-race-and-privilege-l
esson-plan-for-middle-and-high-school-students**
**https://www.huffpost.com/entry/explaining-white-privilege-to-a-broke-white-perso
n_b_5269255**
*"White Immunity": Working through the pitfalls of "privilege" discourse*
*https://www.youtube.com/watch?v=JtLpAfB-DEc  segments*

### Affirmative Action

A Long History of Affirmative Action - For Whites
http://newsreel.org/guides/race/whiteadv.htm

### Black Lives Matter

*NYT A conversation with police*
**https://www.nytimes.com/video/opinion/100000004027684/a-conversation-with-poli
ce-on-race.html?module=inline     1:59-2:30**
Tim Wise  Black Lives Matter/All Lives Matter
https://www.youtube.com/watch?v=jBUnziGqN4o  42:06

HB544 0243

**Wednesday 3/11**

**How we got here: Jim Crow, Redlining, Racial Wealth Gap**

*Race the Power of An Illusion - ep3 The House We Live*

*https://www.youtube.com/watch?v=QHo8AKNfB68*

*https://www.youtube.com/watch?v=mW764dXEI_8*

*THE POWER OF AN ILLUSION How the Racial Wealth Gap Was Created*

*https://www.youtube.com/watch?v=QHo8AKNfB68&t=4s*

*Discussion Guide pages 11-13 http://newsreel.org/guides/race/race-guide-lores1.pdf*

**Being a Person of Color in an all white environment**

**Documentary film maker speaker**

**White Fragility/ White Guilt**

**Robin DiAngelo lecture**

**https://www.youtube.com/watch?v=45ey4jgoxeU&t=1230s**

**https://www.nytimes.com/video/opinion/100000003773643/a-conversation-with-white-people-on-race.html?module=inline**

**Thursday 3/12**

**Anti-racism**

**Dartmouth Student Leaders and others**

**Skype with school in South Carolina  North/South perspectives on race**

**Friday 3/13**

**Becoming and activist**

**Dartmouth Student Leaders and others**

**Closing/ Goals/ Action Steps**

2514

**EXHIBIT
109**

Educator
Code of
Conduct



**EXHIBIT 2**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 2

New Hampshire
Code of Conduct
for
Educational
Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  Purpose.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d)  Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  Definitions.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

PL 00009

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

(1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

(2)  Meets at least one of the following qualifications:

a.  Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1) Pathway 4 certification as specified in Ed 505.04; or

(2) Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  Confidentiality of Credential Holder Certification Records.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1) The name of the credential holder;

(2) The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3) The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4) The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1) Informal or formal investigations; or

(2) Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1) A party in an adjudicatory proceeding when:

a. The credential holder is a party to the proceeding; and

b. The credential holder's credential record is relevant to the proceeding;

(2) A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3) A certifying agency of another jurisdiction for:

a. Purposes of credentialing the credential holder in the other jurisdiction; or

b. An investigation of the credential holder by the other jurisdiction, when:

1. The credential holder was the subject of a formal investigation under Ed 511; or

2. Disciplinary action was taken against the credential holder by the board under Ed 511;

(4) Board investigators or prosecutors; or

(5) Persons to whom the credential holder has given a release.

(d) The bureau shall report:

(1) Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

(2) Any reprimand to the credential holder's current superintendent of school in N.H.;

(e) The department shall maintain a list of all credential holders whose credentials has *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04 Emergency Authorization.

(a) The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b) The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

(1) Paid the applicable application fee, provided in Ed 508.06(c); and

(2) Filed with the bureau the information and documentation required in (c) and (e).

(c) An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13) Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14) Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15) Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a. American Indian;

    b. Asian/Pacific;

    c. African-American/Non-Hispanic;

    d. White/Non-Hispanic;

    e. Hispanic;

    f. Multi-ethnic; and

    g. Other/do not wish to specify.

(d) If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e) If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f) An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a) The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b) If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

    (1) Is in the process of certification;

    (2) Has submitted a completed application for certification; and

(3) Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01 Principle 1—Responsibility to the Education Profession and Educational Professionals.

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02   Principle 2—Responsibility to Students.

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b)  Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

  a. Abuse, including, but not limited to physical and emotional abuse;

  b. Cruelty or any act of endangerment;

  c. Any sexual act with or from any student; and

  d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03   Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04    Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b) Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2) Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)   Whether:

a. The communication made was covert in nature;

b. The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c. The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05  Duty to Report.

(a) Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:-

(1)  When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2)  When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d)  If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e)  Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1)  His or her immediate supervisor, superintendent, or both; and

(2)  The department of health and human services, pursuant to RSA 169-C:29.

(f)  If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g)  The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01   Complaints, Cases and Investigations.

(a)  A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b)  After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c)  Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d)  Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

   (1) The department shall create a report which documents the results of the investigation;

   (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

      a. Suspension;

      b. Revocation; or

      c. Reprimand; and

   (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

   (4) The following shall be considered aggravating circumstances:

      a. The seriousness of the offense;

      b. The credential holder's prior disciplinary record;

      c. The credential holder's lack of willingness to cooperate with the department during an investigation;

      d. Potential harm to public health and safety; and

      e. The purpose of the rule violated;

   (5) The following shall be considered mitigating circumstances:

      a. Absence of a prior disciplinary record;

b. The credential holder's willingness to cooperate with the department during an investigation;

c. The credential holder's acknowledgment of his or her wrongdoing; and

e. The purpose of the rule or statute violated;

(6) The credential holder shall be notified in writing of any proposed discipline;

(7) If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k) Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2) If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a. A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b. A certifying agency of another jurisdiction for:

1. Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i) The credential holder was the subject of a formal investigation under Ed 5101; or

(ii) Disciplinary action was taken against the credential holder by the board pursuant to Ed 5101;

c. Other states' licensing board investigators or prosecutors; and

d. Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

(a)  If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b)  All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline.  The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c)  Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03  <u>Disciplinary Hearings</u>.

(a)  If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1)  Completion of an informal or formal investigation; and

(2)  Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b)  The provisions of Ed 200 shall apply to all disciplinary hearings and *such hearings* shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.04  <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

(a)  When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b)  The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c)  In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 Grounds for Reinstatement After Suspension.

(a) A credential which has been suspended shall be reinstated for one of the following reasons:

(1) The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2) A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b) Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512  DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 Denial of Credential.

(a) A credential application shall be denied by the board based on the following grounds:

(1) Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b) An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision. If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

PL 00022

## APPENDIX I

| RULE | STATUTE |
|------|---------|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO, RYAN RICHMAN, JOHN DUBE and JOCEYLN MERRILL, teachers in the New Hampshire Public Schools, and KIMBERLY GREEN ELLIOTT and MEGHAN EVELYN DURDEN, parents or guardians of children in the New Hampshire public schools. | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his Official Capacity as Commissioner of the DEPARTMENT OF EDUCATION, CHRISTIAN KIM in his Official Capacity as the Chair of the NEW HAMPSHIRE COMMISSION ON HUMAN RIGHTS, and JOHN FOMELLA in his Official Capacity as ATTORNEY GENERAL of the State of New Hampshire. | ) ) ) ) ) ) ) |
| Defendants. | ) |
| ------------------------------------------------------------------------- | ) |
| ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, and NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| FRANK EDELBLUT, in his official capacity only as the Commissioner of the New Hampshire Department of Education, JOHN M. FORMELLA, in his official capacity only as the Attorney General of the State of New Hampshire, AHNI MALACHI, in her official capacity only as the Executive Director of the New Hampshire Commission for Human Rights, CHRISTIAN KIM, in his official capacity only as the Chair of the New Hampshire Commission for Human Rights, KEN MERRIFIELD, in his official capacity only as the Commissioner of the Department of Labor, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Civil No. 1:21-cv-01077-PB

## PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT [***REDACTED PUBLIC VERSION***][1]

---

[1] An unredacted, sealed version of this statement has been filed with the Court.

## TABLE OF CONTENTS

Statement of Undisputed Facts [Local Rule 56.1(a)]……………………………………………...1

I.    The Educator Code of Conduct and the Department of Education's Complaint
      Process Generally……………………………………………………………………...1

II.   The Human Rights Commission Complaint Process Generally………………………9

III.  The Amendments' Origins……………………………………………………...14

      A. Increasing Diversity and Inclusion Efforts in New Hampshire Following George
         Floyd's May 2020 Murder……………………………………………………14

      B. The Backlash………………………………………………………………..19

IV.   The Drafting of the Amendments in New Hampshire………………………………21

      A. The New Hampshire House of Representatives…………………………………22

      B. The New Hampshire Senate, and the Commissioner's June 13, 2021 Op-ed…...24

V.    The Amendments' Confusion and Defendants' Purported "Guidance"……………..27

VI.   Defendants' Lack of Clear Policies, and Failure to Explicitly Say What the
      Amendments Mean…………………………………………………………………..37

VII.  Complaints Under, and Defendants' Enforcement of, the Amendments…………….44

      A. Department of Education Complaints and Investigations Under the Amendments,
         and the Commissioner's April 15, 2022 Op-ed Highlighting Some of These
         Complaints ……………………………………………………………………48

      B. Human Rights Commission Complaints Under the Amendments………………57

VIII. Confusion as to Who Enforces RSA 193:40, and the Amendments' Impact on
      Extracurricular Speech ………………………………………………………………64

IX.   The Chill of the Amendments on New Hampshire Educators…………………………67

Plaintiffs in the first above-captioned action (the "AFT Plaintiffs" or the "AFT Action") and Plaintiffs in the second above-captioned action (the "Mejia Plaintiffs" or "Mejia Action") each filed separate complaints in this consolidated case challenging the provisions of Sections 297 and 298 of 2021 House Bill 2 ("HB2"), codified at N.H. Rev. Stat. Ann. ("RSA") 354-A:29-:34 and RSA 193:40.  These provisions were enacted on June 25, 2021 and ban teaching, instructing, inculcating, or compelling a student to express belief in (or support for) four concepts in public schools and places of public employment.  They are herein referred to as the "Amendments" and are attached, along with Plaintiffs' other exhibits, as *Ex. 1* (Depo. Ex. 1) to the accompanying declaration of Attorney Gilles Bissonnette.  Plaintiffs have moved for summary judgment as to (i) the Fourteenth Amendment's procedural due process/vagueness claim alleged in Counts I and II of the AFT Action and in Count I of the Mejia Action and (ii) the First Amendment's freedom of speech claim alleged in Count III of the AFT Action given the Amendments' impact on educators' private, extra-curricular speech.

In support of this Motion for Summary Judgment, Plaintiffs submit this Statement of Undisputed Facts pursuant to Local Rule 56.1(a).

### **STATEMENT OF UNDISPUTED FACTS [LOCAL RULE 56.1(A)]**

**I.     The Educator Code of Conduct and the Department of Education's Complaint Process Generally**

1.     RSA 193:40, IV states that a violation of RSA 193:40 constitutes an independent violation of the Educator Code of Conduct.

2.     The Educator Code of Conduct was authored by the Department of Education ("DOE") in 2018 in response to a legislative enactment.  *See* Fenton Depo. 16:15-17:2.[2]

---

[2] Attorney Fenton's deposition transcript referenced throughout is attached as *Ex. 3* to the accompanying declaration of Attorney Gilles Bissonnette.

3.      Any person, aggrieved or not, may file a complaint about an educator's conduct with the DOE.[3]  Complaints under the Code of Conduct can come from several different sources, including individual parents, self-reporting through superintendents or their staff, principals, law enforcement, and the Department of Children, Youth, and Families ("DCYF").  *See* Farrell Depo. 15:25-16:22.[4]

4.      Complaints under the Code usually arrive at the DOE by email or phone call.  *See* Farrell Depo. 16:23-17:1. Conceivably though, the DOE's administrative rules allow the DOE to open cases because of a news article or posting on social media which contain information related to possible misconduct by an educator.[5]

5.      While the Human Rights Commission ("HRC") can only take action against a "public employer" under RSA 354-A:31 of the Amendments[6], a violation of RSA 193:40 is enforceable against an individual educator.  *See* RSA 193:40, IV ("Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.").

6.      The DOE has the sole authority to enforce the Educator Code of Conduct.  DOE Attorney Diana Fenton acknowledged at deposition that the Educator Code of Conduct is

---

[3] *See* Fenton Depo. 41:3-7, 17-19 ("Q. Is there any language that you're aware of in the code of conduct in Exhibit 2 that limits who can make a complaint under the code? A. No."; acknowledging that "anyone can make a complaint under that language").

[4] Investigator Farrell's deposition transcript referenced throughout is attached as *Ex. 4* to the accompanying declaration of Attorney Gilles Bissonnette.

[5] N.H. Code Admin. R. Ed 511.01(a) of the Educator Code of Conduct states that "[a] case *shall* be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting *or other means*."  (emphasis added)

[6] *See* Cohen Depo. 60:20-61:8 ("Q. What I'm trying to get at is under RSA 354-A:31, can an individual public employee be sued?  MR. KENISON-MARVIN: Same objection.  Q. Or is that statute limited to public employers? That's really the question that I'm trying to get at.  MR. KENISON-MARVIN: Same objections. A. It appears from the writing of 354-A:31 and the definition of what a public employer means at 354-A:30 that a public employer includes the state or any subdivision, does not include individuals in that definition."), 118:6-9 ("The intake inquiries have been generally from the documentation the School Districts with the exception I think as I recall one is naming the Commissioner of Education directly.").

investigated and enforceable by the DOE,[7] and that a violation of the Amendments constitutes a violation of the Educator Code of Conduct.[8]

7.      As N.H. Code Admin. R. Ed 511.01(a) of the Educator Code of Conduct states, "[a] case *shall* be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means."  (emphasis added).  When a case is "opened," the DOE investigator "would document the name of the person [that] the allegation is against, the name of the person making the allegation, the school district, [and] any other facts which might be relevant."[9]  *See also Ex. 109 (Depo. Ex. 2)* (Educator Code of Conduct).

8.      In practice, and according to rule, the DOE "opens a case" and conducts an "initial review" on every complaint it receives in which any possible misconduct is alleged.[10]  *See* N.H. Code Admin. R. Ed 511.01 (a)-(b). This occurs before the DOE determines that a "possible

---

[7] *See* Fenton Depo. 24:24-25:15 (acknowledging that "the Department of Education enforce[s] the code of conduct"), 151:25-152:2 (same).

[8] *See* Fenton Depo. 35:18-36:6 (testifying that a violation of HB2 "would be a violation of the Educator Code of Conduct"), 151:25-152:5 ("Q. And violations of HB 2 are violations of the code of conduct, are they not? A. That is what the law says."); *see also* Edelblut Depo. 124:18-126:12 (RSA 193:40, IV "states clearly that the violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education").

[9] *See* Fenton Depo. 152:23-153:10 ("Q. And when it says 'a case shall be opened,' can you describe for me what it means for a case to be opened?  A. I've already testified to that.  Q. Well, you said that things get documented, but you didn't specify how they get documented. A. I believe I did go into detail as to what that means. Q. I don't recall. Can you refresh my recollection? A. In large part, it would be the investigator, Richard Farrell, and he would document the name of the person the allegation is against, the name of the person making the allegation, the school district, any other facts which might be relevant.").

[10] *See* Fenton Depo. 46:4-25 ("Q. [I]s it inaccurate to say that the Department makes a determination as to whether or not possible misconduct occurred before opening a case? A. I think that Ed 511.01 (A) has to be read in conjunction with Ed 511.01 (B). Q. Okay. Is there a difference between opening a case and opening an investigation within the Department? A. Based upon my understanding of the code of conduct and Ed 511, yes, there is. … Q. Does the Department make a determination as to whether possible misconduct may have occurred in deciding whether to open a case? A. No. Q. So how do you -- how would you then explain the process in deciding whether to open a case, just so I understand the process clearly. A. My understanding of the code of conduct in Ed 511.01 and the Department of Education's practice as it relates to this area is that a case is opened when information is received.")

violation of the code of conduct" exists and before the DOE opens a formal investigation under N.H. Code Admin. R. Ed 511.01(b).[11]

9.      These "initial reviews" occur any time a case is "opened" under N.H. Code Admin. R. Ed 511.01(a) and are done so the DOE can determine whether there was a "possible violation of the code of conduct" that would then require the opening a formal investigation under N.H. Code Admin. R. Ed 511.01(b).

10.     These "initial reviews" can take many forms depending on the facts of the case. They may include interviewing the complainant, contacting superintendents, principals, and other school administrators to interview them or request information, contacting witnesses, including other rank and file teachers or other school employees, and requesting documents.[12]

11.     DOE Investigator Richard Farrell has informed school districts about complaints under the Code of Conduct concerning school library books even before a case was opened under N.H. Code Admin. R. Ed 511.01(a) or before there was a determination that the book or teaching of a book potentially violates the Code of Conduct under N.H. Code Admin. R. Ed 511.01(b).[13]

---

[11] See Fenton Depo. 47:17-21 (acknowledging that, "[i]n terms of documenting information received," a case will be opened before a determination has been made that there's possible misconduct), 45:8-46:18 (acknowledging that facts could be gathered by reaching out to school superintendents in deciding whether to open a case, including the requesting of documents); Farrell Depo. 23:19-25 ("Q. And all the factual investigation that goes—that comes after the opening of a case? A. Yes. Q. Okay. And this is before the Department of Education determines whether to open a formal investigation, right? A. Yes."), 25:1-3 (noting that, in deciding whether to open a case, he "look[s] at the complaint, the facts of the complaint, and determine whether or not the code of conduct applies").

[12] See Fenton Depo. 45:8-13 ("Q. Okay. Are facts gathered by reaching out to school superintendents at this stage in deciding whether to open a case? A. That could be done, yes. Q. Are documents requested? A. That request could be made, yes."), 48:20-49:6 ("Q. So in determining whether there has been a possible violation, I want to make sure I understand your testimony correct. That would also include reaching out to gather information from school districts, correct? A. It could. Q. What else could it include? A. We could talk to other individuals that might be administrators. Depends on the nature of the facts. Q. And it could include requesting documents from school districts, right? A. I believe I've already testified to that, yes."); Farrell Depo. 17:16-18:5 ("Q. Okay. And now when you receive one of these complaints, can you describe what you do as the investigator for the Department of Education? A. The first thing that I would do is determine back up. I will gather facts and circumstances from the complainant. Q. Does that include reaching out to superintendents? A. Occasionally. Q. Does that include speaking to principals? A. Occasionally. Q. Does that include speaking to other educators at the school? A. Sometimes. Q. Does that include requesting documents? A. Sometimes.").

[13] See Farrell Depo. 124:24-129:9 ("Q. And each time you go and you speak with the superintendent about the book being where it was complained of, something similar? A. Yeah. You know, is it in the high school library? Is it the

Investigator Farrell has, in fact, conducted initial reviews of books and school libraries based on these complaints.[14]

12.     Commissioner of Education Frank Edelblut also will often personally react to parental complaints of alleged educator misconduct by responding to parents directly and/or contacting superintendents and other school administrators to alert them to the complaint, and will sometimes do so even when there is no possible violation of the Code of Conduct raised.[15]

13.     The Commissioner engages in these inquiries, in part, because the Commissioner views parents as his "customers," and "if I have a complaint from a parent, I bring that to the attention of the superintendent so they can manage it appropriately."[16]   He also views teachers as having a "[r]esponsibility to support the parents and not undermine their values."   *See Ex. 40 (Depo. Ex. 14)* at PL00683.

14.     After the DOE's "initial review" of a complaint under the Code of Conduct, the DOE has little discretion in deciding to conduct a formal investigation if it concludes that there has been a "possible violation."   This is because an investigation *shall* be opened if there is a

---

middle school library? Is it in the elementary school library? Those have bearings. You know, those are important facts to know. Or is it even in the building at all? And is it in the SORA app? So it's a fact-based question. Is it there? Isn't it there? Once I get the facts, I provide it to Diana Fenton for her review.  Q. And just in the stage of, you know, sort of from the code of conduct, what you're describing is not a formal investigation, but it's when a complaint—a case has been opened because of a complaint? A. It's even before the case has been opened. I mean, so a parent is angry and upset about a book being in a library. So let's collect the data and determine whether or not we even go to the triage phase.").

[14] *Id.*

[15] *See* Edelblut Depo. 20:22-22:4 (noting his communication with these parties) 24:9-25, 58:18-59:16 (noting he contacted a superintendent directly about a parent complaint);32:2-16 (explaining a meeting with superintendent and assistant superintendents about a parent complaint); 38:4-13 (acknowledging direct communication with a parent about a curricular complaint) *see also Ex. 57*, DOE 857 (elevating parental concern under the Amendments about usage of the film "White Like Me" without determining whether there was a violation).

[16] *See* Edelblut Depo. 29:4-8 ("So my duty is to support my customers to the agency which include a variety of constituencies.  Parents are one of them.  So I try to be as prepared as possible to support my constituencies."), 77:15-78:9 ("What is within the domain of the Department is to make sure that the system is able to function well, and part of functioning well is to make sure that the constituencies are being served.  So as I support my superintendents, if have a complaint from a parent, I bring that to the attention of the superintendent so they can manage it appropriately.").

"possible violation of the code of conduct."  *See* N.H. Code Admin. R. Ed 511.01(b) (emphasis added).

15.     If an investigation is formally opened under N.H. Code Admin. R. Ed 511.01(b), the employing superintendent and usually the educator's union attorney are notified via letter.  *See* Fenton Depo. 63:2-14, 154:1-4.  Subsequent steps by the DOE could include receiving additional documentation from the school district, further conversation with school administration, meeting with the educator, interviewing other witnesses, and speaking with the educator's union representative.  *See* Fenton Depo. 63:21-64:3.

16.     Whether a "violation" has occurred under N.H. Code Admin. R. Ed 511.01(j)(2) is determined solely by the DOE and depends on the "individual facts of the case."  There are no additional criteria as to what constitutes a "violation" beyond what exists in the Code of Conduct.  *See* Fenton Depo. 65:22-67:9.

17.     Commissioner Edelblut, DOE Attorney Fenton, DOE Investigator Richard Farrell, and occasionally DOE Deputy Commissioner Christine Brennan meet regularly in a meeting called the "Educator Misconduct Meeting" where they discuss investigations that are ongoing or finished.  *See* Farrell Depo. 29:2-16; Edelblut Depo. 41:20-42:3, 42:19-43:4.[17]  The group discusses the facts of individual cases, any necessary next steps, and possible sanctions for the educator.  *See* Farrell Depo. 28:24-30:1; Edelblut Depo. 45:6-19. Depending on the facts and circumstances of the specific case, any one of those persons may make the recommendation as to what sanction should issue, but ultimately the Commissioner must agree with any recommendation made.[18]

---

[17] Commissioner Edelblut's deposition transcript referenced throughout is attached as *Ex. 2* to the accompanying declaration of Attorney Gilles Bissonnette.

[18] Farrell Depo. 40:12-25 ("Q. I just want to be clear. The commissioner is involved in the decision as to whether there's been a violation of the code of conduct, right? A. He is—the meetings have different levels within the meetings and different stages of the investigation, so to the extent that he—we conduct those meetings, and he asks questions, he is involved in the process. But it's not until a decision is made that he then becomes in agreement or disagreement with the recommendation. Q. Right. And I think you said the buck stops with him, right? A. Correct. Q. So he's thumbs

18.     While the DOE has discretion regarding what sanction will be imposed, it has far less discretion in declining to discipline at all. "If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department _shall_ propose a form of discipline as follows: a.  Suspension; b.  Revocation; or c. Reprimand."  N.H. Code Admin. R. Ed 511.01(j)(2) (emphasis added); _see also Ex. 50 (Depo. Ex. 3)_, at DOE-05662 (listing sanctions in superintendent presentation); _Ex. 51 (Depo. Ex. 7)_, at DOE-10084-86 (in DOE presentation to educators, listing sanctions and considerations); _Ex. 44 (Depo. Ex. 24)_, at DOE-09674-76 (same).  If there is a violation, "[m]ore likely than not" a sanction will be issued.  _See_ Farrell Depo. 32:6-10.

19.     The DOE considers various aggravating and mitigating circumstances in imposing a sanction.   N.H. Code Admin. R. Ed 511.01(j)(3)-(5) (listing aggravating and mitigating circumstances that shall be considered in imposing a sanction).

20.     Once determined by Commissioner Frank Edelblut, DOE Deputy Commissioner Christine Brennan, DOE Attorney Fenton, and DOE Investigator Farrell—or some combination thereof—the proposed sanction is conveyed to the educator.  _Id._ Ed 511.01(j)(6).  The educator can either accept the sanction and sign an agreement with the DOE under N.H. Code Admin. R. Ed 511.02(a) or request an adjudicatory hearing to contest the proposed sanction under N.H. Code Admin. R. Ed 511.03.

21.     If the educator chooses to contest the proposed sanction, a hearing examiner holds an adjudicatory hearing to determine a sanction to recommend to the State Board of Education, which then makes the final determination.  _Id._ Ed 200 et. seq.; _see also_ Farrell Depo. 138:10-21

up, thumbs down? A. At the end of the day."); _see also_ Edelblut Depo. 45:13-19 ("Well, I mean we all are collaborating around what would happen next. So it would depend on the individual case. Q. And to coin a phrase, does the buck stop with you, sir? MR. KENISON-MARVIN:· Objection. Vague. A. The buck does stop at Commissioner.").

(stating that "the hearings officer will make a recommendation based upon a hearing with the Department of Education, me, Attorney Fenton, and witnesses, and they would make a proposal to the state board after that hearing for sanction. So the state board takes the action."). Appeals from the State Board of Education's decision are made to the New Hampshire Supreme Court under N.H. RSA ch. 541.

22.     In a contested or non-contested matter, if an educator's credential is suspended or revoked, it becomes public.  N.H. Code Admin. R. Ed 502.01(a)(3) ("Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request: …. The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable.").

23.     DOE presentations to administrators—including those that reference the Amendments—state that school officials should call the DOE "[a]nytime [sic] there is a suspected [Code of Conduct] violation."  *See Ex.  50 (Depo. Ex. 3)*, at DOE-05652, 5654, 5656 (DOE presentation stating that the DOE should be called "as soon as possible").

24.     A licensed educator's failure to report a suspected violation of the Code of Conduct is itself punishable as a violation of the Code.  *See* N.H. Code Admin. R. Ed 510.05(a) (stating that "[a]ny credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures"); *id.* Ed 510.05(f) (stating that, "[i]f the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c)").[19]

---

[19] *See also* Fenton Depo. 40:24-41:2, 51:18-52:4, 55:1-13 ("Q. In evaluating the duty to report, the Department can conduct investigations concerning whether an educator has complied with that duty, right?  A. You're referring to

25.     This duty to report includes suspected violations of the Amendments.  *See Ex. 63 (Depo. Ex. 45)* (in Aug. 17, 2021 email responding to a school board member "about possibly sending out an advisory to all NH districts highlighting the fact that if an educator disregards the [Amendments], they would be violating the educator code of conduct and would face disciplinary action by the state board of education and their local school board," Commissioner Edelblut acknowledged the duty to report in the Code).

26.     DOE Investigator Farrell testified that Commissioner Edelblut may have asked him to request documents from a superintendent in a case, and the Commissioner has sent him emails regarding complaints to look into.  *See* Farrell Depo. 22:16-23.

## II.     The Human Rights Commission Complaint Process Generally

27.     The HRC receives intake questionnaires under the Law Against Discrimination, RSA ch. 354-A, which are managed by an intake coordinator.  "[T]he intake coordinator's role is [to] receive calls that come in, inquiries that come into the Commission.  These inquiries come in both orally via the phone or via someone coming, a walk-in.  Or they come in in written form via email or regular mail.  The intake coordinator role is to sort of look at the jurisdictional components, and if the intake meets the jurisdictional components, to send out an intake questionnaire to that person …."  *See* Cohen Depo. 15:7-18.[20]  The intake coordinator generally does not do any additional fact gathering beyond asking the complainant to submit an intake

---

510.05 (A), right?  Q. Mm-hm.  A. I believe my testimony previous was yes.  Q. Okay. A. The Department would have that authority.  Q. So my question is can the Department investigate simultaneously a potential duty to report violation alongside an investigation into the educator whose conduct substantively violated the code? A. I suppose that the Department could do that, yes."), 56:13-58:13 (acknowledging duty, and testifying that educators have a duty to comply with this section, and the DOE can conduct investigations with respect to this duty); Edelblut Depo. 124:4-17 (acknowledging the duty to report under the Code of Conduct); Farrell Depo. 33:3-37:15 (describing duty to report; "Q. But it is possible that you would open an investigation or you would—sorry—you would open a case to look into a failure to report for a teacher that didn't report a possible violation of the code of conduct? A. It is possible."); *Ex.51 (Depo. Ex. 7)*, at DOE-10078 (in DOE presentation to educators, listing duty to report obligation under the Code of Conduct); *Ex. 44 (Depo. Ex. 24)*, at DOE-09668 (same).

[20] Attorney Cohen's deposition transcript referenced throughout is attached as *Ex. 6* to the accompanying declaration of Attorney Gilles Bissonnette.

questionnaire.[21]   The HRC Assistant Director directly supervises the intake coordinators.   *See* Malachi Depo. 32:3-4.[22]

28.     When the complainant submits the completed intake questionnaire, the intake coordinator then evaluates whether the allegation presents a *prima facia* claim of discrimination. *See* Cohen Depo. 15:18-21, 16:13-17.   In determining whether there is a *prima facia* claim of discrimination, the HRC "look[s] at the jurisdiction" and "what the statute reads," and it "determine[s] in a light most favorable to the intake inquiry whether we'll take it or not.   We base it on jurisdiction of number of employees, whether it substantively falls within the scope of 354-A." *Id.* 12:2-7.[23]   Beyond the text of RSA ch. 354-A, there is no written policy or guidance that the Commission uses in determining whether the *prima facie* standard is satisfied.[24]

29.     Intake meetings at the HRC occur bi-weekly.   The HRC Assistant Director meets with intake coordinators to "discuss any questions the intake coordinator has about intakes that are coming in."   Sometimes decisions are made in these meetings about whether the *prima facie* standard has been met in a case.   Cohen Depo. 11:8-18.

30.     The intake coordinator may, though not always, decide whether the *prima facia* standard has been satisfied in consultation with the assistance of the HRC Assistant Director.   The HRC Director may further assist if the Assistant Director is unavailable.   *Id.* 22:4-22:13; Malachi

---

[21] Cohen Depo. 32:6-14 ("Q. Okay. So I guess that's helpful so beyond kind of reaching out to the complainant and asking them to submit a questionnaire, is there any other fact gathering that the Human Rights Commission would do before it's decided to docket a complaint? MR. KENISON-MARVIN: Same objection. Scope.  A. Not generally.").

[22] Director Malachi's deposition transcript referenced throughout is attached as *Ex. 5* to the accompanying declaration of Attorney Gilles Bissonnette.

[23] *See also* Cohen Depo. 16:22-17:12 ("From my personal experience, evaluating an inquiry is looking at the statutory jurisdiction of the Commission for Human Rights pursuant to 354-A which looks at number, looking at what type of claim it is, public accommodation, public education, housing, or employment, and looking at the statutory requirements depending on that from there.  If it's employment you look at the number of employees to ensure that there are the requisite number of employees. From there you also look to see if the allegations actually fall within what our statute says we can investigate.").

[24] Malachi Depo. 79:14-21 ("Q. How about this.  Beyond the FAQs that we just presented to you ..., and beyond the language of the statute in RSA 354-A:29-34, is there any other policy or guidance that the Commission uses in deciding whether an allegation of discrimination under RSA 354-A:29-34 should be docketed?  A. No.").

Depo. 30:14-20, 35:12-17.   The HRC Director may attend intake meetings depending on her schedule.   *See* Cohen Depo. 23:19-22.   If there is additional consultation needed on whether the *prima facie* standard is satisfied, the HRC will consult the DOJ.   *See* Malachi Depo. 30:14-20. Whether the HRC seeks guidance from the DOJ may depend on the complexity of the law being applied.   *See* Cohen Depo. 108:4-21.   Nevertheless, the HRC Director ultimately decides whether the *prima facie* standard is met.   *Id.* 101:8-22.

31.   When the HRC finds that an allegation of discrimination meets the *prima facie* threshold of discrimination, the intake coordinator sends the complainant a draft charge of discrimination. *Id.* 11:19-12:7.   Upon the HRC's receipt of the charge of discrimination that is signed and verified by the complainant, the complaint now becomes a "docketed complaint"/"docketed charge"/"filed charge" of discrimination.   *See* Malachi Depo. 23:13-24:17, 78:17-79:1.   To be docketed, the complaint must be "[i]n writing," "[s]igned and dated by the complainant," and "[v]erified."   N.H. Code Admin. R. Hum 202.01(b); *see also* RSA 354-A:21, I(a) ("Any person claiming to be aggrieved by an unlawful discriminatory practice may make, sign and file with the commission a verified complaint in writing …."); Malachi Depo. 28:16-22.   Once a charge becomes docketed, both the complainant and the respondent are notified in writing.   *See also Ex. 75 (Depo. Ex. 53)*, at DOE-10270-71 (describing the process).   The HRC's "Summary Fact   Sheet"   concerning   how   it   processes   cases   is   here: https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/summary-fact-sheet.pdf.

32.   Once a claim of discrimination is docketed, the HRC Assistant Director assigns the case to one of the HRC's five investigators.   *See* Cohen Depo. 21:18-22:7; N.H. Code Admin. R. Hum 206.01(a) ("After the filing of a complaint, the chair of the commission shall designate one

of the commissioners to act as the investigating commissioner for that complaint."); Malachi Depo.
31:12-17.   The HRC Assistant Director meets with investigators monthly about the status of
docketed cases that are being investigated.[25]

33.    The investigator investigates the case, including "requesting information" and
"interviewing complainants and individually named parties and any other witnesses that would
have relevant information for the case."  *See* Cohen Depo. 18:12-18, 98:18-99:22 (describing the
investigation process); *see also* N.H. Code Admin. R. Hum 206.03(a) ("The staff investigator
shall: (1) Discover facts; (2) Make reports and recommendations to the investigating
commissioner; and (3) Assist the parties in settlement negotiations.").  With respect to complaints
in the education context, this investigation can involve contacting school principals and school
superintendents.  *See* Cohen Depo. 99:23-100:6.  The investigator has discretion with respect to
who is contacted.  *See id.* 100:12-15; *see also* N.H. Code Admin. R. Hum 207.02(a) (noting the
information that the investigator "shall" request from the respondent if "the investigator considers
the information relevant to the investigation"); RSA 354-A:21, II(a) ("After the filing of any
complaint, one of the commissioners designated by the chair shall make, with the assistance of the
commission's staff, prompt investigation in connection therewith….").

34.    After an investigation, the investigator then determines whether there is probable
cause for a case to move forward.[26]  As HRC Assistant Director Sarah Burke Cohen explained: "If
a case is found to be no probable cause, it is dismissed with appeal rights.  If the case is found to

<hr>

[25] Cohen Depo. 12:13-19 ("I meet with the investigators once a month.  We discuss their caseload, we discuss any
questions they have moving cases along legal standard wise, any research that we need to do relative to a specific
case, and I review their reports before they go up to the Commissioners to ensure they are complete.").
[26] Cohen Depo. 13:7-14 ("You have cases that we go through what we call a full investigation so they get to the point
where there is a finding issued by an investigating commissioner of either probable cause or no probable cause."); *see
also* N.H. Code Admin. R. Hum 210.01(a) ("On the basis of the investigative report the investigating commissioner
shall make a determination of probable cause or no probable cause."); <u>*Ex. 75 (Depo. Ex. 53)*</u>, at DOE-10271
(describing the process after a PC/NPC finding is made).

be probable cause, it moves on in the process towards the public hearing.  In between the public hearing and moving it from probable cause to public hearing, the parties meet for a conciliation and a prehearing, and then it moves to public hearing.  After probable cause is found, both parties have the ability to remove the case to Superior Court."  *See* Cohen Depo. 116:4-18; *see also* N.H. Code Admin. R. Hum 210.01(c)-(e) (describing events after PC/NPC determination); RSA 354-A:21, II(a) (describing process, including that, "if such commissioner shall determine after such investigation that probable cause exists for crediting the allegations of the complaint, the commissioner shall immediately endeavor to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion").

35.     Cases can get resolved in other ways, including where a complainant removes the case to superior court, the case settles, or the complainant decides to no longer pursue the case.[27] Absent resolution through these alternative ways, HRC investigators complete reports concerning their investigation of docketed complaints.  *See* Cohen Depo. 14:1-6.

36.     "Complaints received by the HRC under the amendments are docketed and processed the same way as all other cases. The cases are processed in accordance with N.H. Rev. Stat. Ann. § 354-A and the HRC's administrative rules …."  *See* Ex. 47 *(Depo. Ex. 58)* (HRC Int. Resp. No. 2).

---

[27] Cohen Depo. 13:15-23 ("However, there are other times that a case can sort of be resolved at the Commission. Complainants have the ability to remove the case to court. There's also potential of settlement of the cases.  So if there's a resolution of settlement, then it gets closed.  Or there are times where complainants decide they do not want to pursue their charge at the Commission any longer.").

## III.    The Amendments' Origins

### A.    Increasing Diversity and Inclusion Efforts in New Hampshire Following George Floyd's May 2020 Murder

37.    Following George Floyd's murder on May 25, 2020, many schools created diversity, equity, and inclusion ("DEI") positions in an increased effort to expose students to the lived experiences, contributions, and history—both past and present—of BIPOC (Black, Indigenous, and People of Color) individuals. These efforts are part of a growing and widespread consensus among educators that inclusive education practices giving voice and attention to the experiences of all students are critical.[28]  Students must see themselves in the books they read and in their classroom discussions to become contributing participants in our increasingly diverse and multi-racial democracy.  Educational opportunities for all students are expanded by presenting a more informed and truthful portrayal of topics such as the empowering experiences and achievements of BIPOC and marginalized communities in the face of African enslavement, Jim Crow, segregation, and racial discrimination, as well as discussing with students the existing legacy of these actions, racial stereotypes, prejudice, explicit and implicit bias or "unconscious bias."  This expansion of educational opportunities takes many forms, but is unified in ensuring equal access to educational content for students of all backgrounds, and exposure to various perspectives that reflect the diversity of New Hampshire and America.  *See Ex. 13*, Philibotte Decl. ¶¶ 6-8.

---

[28] *See, e.g.*, Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Res. J. 127 (2017) ("These surprisingly large effects suggest that CRP ["culturally relevant pedagogy"], when implemented in a high-fidelity context, can provide effective support to at-risk students."), https://files.eric.ed.gov/fulltext/EJ1132535.pdf; Alfred Tatum, Aaron Johnson, & David McMillon, *The State of Black Male Literacy Research, 1999-2020*, 70 Literacy Research: Theory, Method, and Practice 129-151 (Nov. 2021) (explaining "how literacy research positions Black males to sustain, empower, and protect themselves and their communities within and across social and scientific disciplines and technical and nontechnical fields"), https://journals.sagepub.com/doi/epub/10.1177/23813377211038368; *Understanding Culturally Responsive Teaching* New America (discussing and citing studies), https://www.newamerica.org/education-policy/reports/culturally-responsive-teaching/understanding-culturally-responsive-teaching/.

38.     Similarly, in the wake of George Floyd's murder, many New Hampshire educators engaged in professional development opportunities to enhance their skills to teach both (i) to BIPOC students and students from historically marginalized groups, and (ii) about these groups' experiences and perspectives.  *See Ex. 7*, Tuttle Decl. ¶ 6.

39.     For example, in 2020, Misty Crompton, a member of the Plaintiff NEA-NH and an educator who teaches in Derry, was awarded the prestigious Christa McAuliffe Sabbatical from the New Hampshire Charitable Foundation for her project called "Promoting Just Schools."[29]  The sabbatical, created in 1986 in honor of the Concord High School teacher and astronaut, gives one exemplary New Hampshire teacher a year off with pay and a materials budget to bring a great educational idea to fruition. Ms. Crompton's project focused on educational equity—namely, levelling the playing field for students by recognizing how identity, race, and culture of students and teachers play out in the classroom.  *See Ex. 7*, Tuttle Decl. ¶ 7.

40.     The 2020 census confirmed the importance of elevating the perspectives and histories of individuals of color.  The results indicated that New Hampshire is rapidly growing more racially diverse.  While New Hampshire's population grew by a modest 4.6% during the past decade, the number of residents who are people of color increased by 74.4% to 176,900 in 2020.  Black, Hispanic, and other people of color now represent 12.8% (176,900) of the state's population compared to 7.5% (101,400) in 2010.[30]

41.     This diversity is particularly prevalent in the southern part of New Hampshire.  For example, the population of Manchester and Nashua was 98% White in 1980.[31]  Manchester now

---

[29] Dave Tirrell-Wysocki, *Misty Crompton Awarded Christa McAuliffe Sabbatical*, N.H. Charitable Foundation (June 11, 2020), https://www.nhcf.org/what-were-up-to/misty-crompton-awarded-christa-mcauliffe-sabbatical/.

[30] Kenneth Johnson, *Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard*, Carsey School of Public Policy (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.

[31] *See* Census Data for 1980, *available at* https://www.census.gov/content/dam/Census/library/working-papers/2005/demo/POP-twps0076.pdf (Table 30, page 76).

is 80.3% White, 11.0% Hispanic (approximate population 12,665), and 6.0% Black (approximate population 6,908).[32]  Nashua now is now 79.2% White, 13.2% Hispanic (approximate population 12,033), and 3.6% Black (approximate population 3,281).[33]

42.     As the Carsey School of Public Policy at the University of New Hampshire explained, "children are at the leading edge of the state's growing diversity."[34]  The *Union Leader* also reported that "more than 2 of every 5 children in Manchester and Nashua hail from families of color," and that, "[i]n 30 years, Manchester's youngest generation has shifted from 94% White in 1990 to 57% last year."[35]  Students of color in Manchester are also more likely to live in poorer areas of the city.[36]

43.     Consistent with these demographic trends, the Manchester School District—the largest and most diverse school district in New Hampshire—hired a Chief Equity Officer, Plaintiff Christina Kim Philibotte, in the summer of 2021.  This position was crafted to ensure that—especially given the disproportionate rates of graduation, reading and math proficiency, as well as suspension rates among students of color—institutional systems are created to support and rectify the hardship that many students of color experience.[37]  One of the goals of this work is to train

---

[32]     2022     Population     Estimates     for     Manchester, https://www.census.gov/quickfacts/fact/table/manchestercitynewhampshire/PST045219.

[33]     2022     Population     Estimates     for     Nashua, https://www.census.gov/quickfacts/fact/table/nashuacitynewhampshire/PST045219.

[34] Kenneth Johnson, *Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard*, Carsey School of Public Policy (Aug. 30, 2021), https://carsey.unh.edu/publication/modest-population-gains-but-growing-diversity-in-new-hampshire-with-children-in-vanguard.

[35] *See* Michael Cousineau, *NH grows more diverse, faces call for change*, Union Leader (Dec. 18, 2021) (updated Mar. 20, 2022), https://www.unionleader.com/news/business/whats_working/nh-grows-more-diverse-faces-call-for-change/article_8c1cfc2d-73c1-51f3-9a5d-939525c3c21e.html.

[36] *See* Michael Cousineau, *Manchester schools' Diversity Efforts Will Take Years*, Union Leader (Dec. 18, 2021) (updated Mar. 20, 2022), https://www.unionleader.com/news/business/whats_working/manchester-schools-diversity-efforts-will-take-years/article_e92b6c28-4b28-5df0-b407-7d5bc2031009.html.

[37] For example, a report from the Juvenile Reform Project—a coalition of New Hampshire advocacy organizations—demonstrates that school discipline in New Hampshire is disproportionately harsh on students of color.  During the 2014-2015 academic year, "[w]hile students of color made up 13.9 percent of the student population, they comprised approximately 22.7 percent of students receiving out-of-school suspensions."  *Keeping Kids in School: The Urgent Need for Reform of School Discipline in NH* (January 2019), *available at* https://www.nhla.org/assets/customContent/FINAL_Keeping_Kids_in_School_-

teachers and faculty to understand the needs of students of color and those with marginalized identities by creating a more culturally fluent teaching staff to better connect with their learners. This effort reinforces the creation of a sense of belonging for students where they feel more connected to, and better represented in, the books they read and the discussions they have in the classroom.  *See Ex. 13*, Philibotte Decl. ¶¶ 3-4.

44.      The Exeter Region Cooperative School District—and later the entire SAU16—made a similar decision, hiring Plaintiff Andres Mejia as Director of Diversity, Equity, Inclusion, and Justice ("DEIJ").  He started in this role on August 2, 2021, but only on behalf of the Exeter Region Cooperative School District.  His role expanded to the entire SAU16 on July 1, 2022.  *See Ex. 15*, Mejia Decl. ¶ 3.  As the District's then superintendent, Dr. David Ryan, stated in announcing the position: "The work around diversity, equity, inclusion and justice is critically important and is helping us create an educational community where every student, educator, parent, guardian and community member feels like they belong."[38]  This work is also vital in SAU16.  As of the 2022-2023 academic year, SAU16 has 4,779 students, with at least 425 students of color.   Approximately  153  students  identify  as  Asian,  approximately  53  identify  as Black/African American, approximately 124 identify as Hispanic or Latino, approximately 28 identify as Native American/Alaska Native, approximately 10 identify as Native Hawaiian/Pacific Islander, and approximately 59 identify as belonging to two or more races.  This work not only helps White students in the Exeter area learn about the growing diversity of their community, but

_The_Urgent_Need_to_Reform_School_Discipline_in_NH.pdf.   Concord  High  School  also  experienced  similar racial disparities.  *See* Eileen O'Grady, *Suspensions, Expulsions are Used Disproportionately to Discipline N.H. Students of Color*, CONCORD MONITOR (July 4, 2020), https://www.concordmonitor.com/Race-and-discipline-in-NH-schools-34921292 ("That data showed that in the 2015-16 school year at Concord High School, Black students made up 8% of the student body, but made up 22% of out-of-school suspensions.").

[38] *See 'Deep Understanding': Exeter Schools Hire New Director to Focus on Diversity and Equity*, PORTSMOUTH HERALD   (Aug.   2,   2021),   https://www.seacoastonline.com/story/news/2021/08/02/exeter-nh-schools-hire-new-director-focus-diversity-and-equity/5455939001/.

also helps students of color in the Exeter area know that they are not alone and that they are welcome.  *See Ex. 15*, Mejia Decl. ¶¶ 3-4, 6-7.

45.     Plaintiffs Andres Mejia and Christina Kim Philibotte have dedicated their professional lives to learning and advancing DEI principles.  Their experiences confirm the findings that such instruction is vital for the provision of a quality education and thriving democracy for all Granite Staters, and particularly Granite Staters of color.  This instruction has increased the engagement, participation, and sense of belonging for students of color in their districts.  And students of color have expressed to Mr. Mejia and Ms. Philibotte their desire to gain greater exposure to the perspectives of communities of color and theories related to race and gender because such conversations make them feel more connected to the curricula and prepared to tackle the issues facing their communities.  White students also have asked them to learn more about DEI concepts, gender, LGBTQ+ race, racism, and other perspectives about marginalized identities.  These courageous conversations are essential for all students—especially those of color—as they build community where people feel seen and validated in a secure space, and thus more comfortable speaking and sharing their experiences on complex topics which, in turn, teaches other students.  *See Ex. 15*, Mejia Decl. ¶ 9; *Ex. 13*, Philibotte Decl. ¶¶ 12-13.

46.     Since the filing of this lawsuit, the Oyster River Cooperative School District hired a DEIJ Coordinator who started in August 2022.[39]  And, in November 2022, the Concord School District hired a DEIJ Director.[40]  *See Ex. 15*, Mejia Decl. ¶ 4.

47.     These New Hampshire efforts at improving diversity, equity, and inclusion were not limited to education in the wake of George Floyd's murder.  Following the August 31, 2021

---

[39] *See* Eileen O'Grady, "Concord School District hires DEIJ director," *Concord Monitor* (Nov. 8, 2022), https://www.concordmonitor.com/Concord-School-District-hires-DEIJ-coordinator-48720832.
[40] *See* Eileen O'Grady, "Concord School District hires DEIJ director," *Concord Monitor* (Nov. 8, 2022), https://www.concordmonitor.com/Concord-School-District-hires-DEIJ-coordinator-48720832.

recommendations of the Commission on Law Enforcement Accountability, Community, and Transparency ("LEACT"), trainings on implicit bias have occurred for New Hampshire prosecutors and state judges.  *See Ex. 76* (Implicit Bias Training Hosted by the New Hampshire Attorney General's Office on Nov. 20, 2020; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 11-12, 33 of James McKim's presentation "Are You Your Implicit Bias?"); *Ex. 77* (May 3, 2021 and May 4, 2021 Presentations to N.H. Court System; addressing concepts like "structural/systemic discrimination" and "white privilege" in slides 12-13 of James McKim's May 3, 2021 presentation "Introduction to Diversity, Equity, and Inclusion," and slides 18 and 26 of James McKim's May 4, 2021 presentation "Race in NH").

**B.      The Backlash**

48.      Amidst the political intensity of the 2020 general election—and in the wake of these types of efforts in New Hampshire and nationally—then President Donald J. Trump signed an Executive Order on September 22, 2020 entitled "Executive Order on Combatting Race and Sex Stereotyping."  *See Ex. 78* (Sept. 22, 2020 Trump Executive Order).

49.      The Executive Order sought to censor certain viewpoints and chill speech.  The Executive Order, in part, banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on the following "divisive" concepts:

> *(1) one race or sex is inherently superior to another race or sex;*
> (2)    the    United    States    is    fundamentally    racist    or    sexist;
> *(3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive,    whether    consciously    or    unconsciously;*
> *(4) an individual should be discriminated against or receive adverse treatment solely    or    partly    because    of    his    or    her    race    or    sex;*
> *(5) members of one race or sex cannot and should not attempt to treat others without    respect    to    race    or    sex;*
> (6) an individual's moral character is necessarily determined by his or her race or sex;
> (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed    in    the    past    by    other    members    of    the    same    race    or    sex;
> (8) any individual should feel discomfort, guilt, anguish, or any other form of

> psychological distress on account of his or her race or sex; or
> (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were
> created by a particular race to oppress another race.
> [(10)] The term ''divisive concepts'' also includes any other form of race or sex
> stereotyping or any other form of race or sex scapegoating.

*See id.* (Sept. 22, 2020 Trump Executive Order, with the emphasized text reflecting those concepts that are substantially similar to the prohibited concepts in the Amendments).

50.     The Executive Office of the President's September 28, 2020 memorandum implementing this Order specifically referenced the Order's third banned concept—namely, that "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously."   The memorandum made clear that it was targeting trainings that, for example, used the phrases "white privilege," "intersectionality," "systemic racism," "racial humility," and "unconscious bias."  *See Ex. 55* (Sept. 28, 2020 Executive Office of the President's Memorandum indicating that such phrases "may help to identify the type of training prohibited by the" Executive Order).  This banned concept in the Executive Order is analogous to the second banned concept in the Amendments challenged in this case.

51.     The Executive Order followed President Trump's September 17, 2020 announcement that he was establishing the "1776 Commission."  This Commission was created to oppose Critical Race Theory, the New York Times' 1619 Project, and Howard Zinn's *A People's History of the United States*—a 1980 book that offers an alternative to telling the story of the United States via the top-down achievements of elite White men.[41]

---

[41] Olivia B. Waxman, *Echoing Decades of Fighting Over U.S. History Classrooms, President Trump Announces a Push for 'Patriotic Education*, TIME (Sept. 17, 2020), ("Speaking on Constitution Day from the National Archives—where original copies of the Declaration of Independence, the Constitution of the United States and the Bill of Rights are on display—during a White House conference on American History, President Donald Trump announced that he was signing an executive order to establish the '1776 Commission,' a group that would 'promote patriotic education,' and that the National Endowment for the Humanities would be awarding a grant to support the development of a 'pro-American curriculum that celebrates the truth about our nation's great history.'"), https://bit.ly/3xs1qHX; Establishing the President's Advisory 1776 Commission, Pres. Exec. Order No. 13958, 85 Fed. Reg. 70951 (Nov. 2, 2020),

52.    On December 22, 2020, a federal court partially enjoined President Trump's

Executive Order, in part, ruling that plaintiffs were likely to succeed on their vagueness challenge.

*See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).

The district court found that the Executive Order's banned concepts are "so vague that it is

impossible for Plaintiffs to determine what conduct is prohibited." *Id*.[42]

53.    This Executive Order was rescinded by President Joseph R. Biden on his first day

in office.[43]

**IV.    The Drafting of the Amendments in New Hampshire**

54.    Despite the Court's decision in *Santa Cruz Lesbian & Gay Cmty. Ctr.*, bills copying

President Trump's Executive Order began spreading in statehouses throughout the United States,

in part, at the initiative of political activists.   These activists—including Christopher Rufo, who

was then a visiting fellow at the Heritage Foundation and who promoted and helped draft President

Trump's Executive Order—brought forward proposals to limit how race and gender are taught in

schools under the premise that "critical race theory" was being taught in schools.   "Critical race

theory" is a phrase that Mr. Rufo has acknowledged is being used to conflate any number of

---

https://www.federalregister.gov/documents/2020/11/05/2020-24793/establishing-the-presidents-advisory-1776-commission.

[42] A separate lawsuit was filed by the NAACP Legal Defense Fund in October 2020 (amended complaint filed in January 2021), challenging the Executive Order on behalf of the National Urban League, the National Fair Housing Alliance, and the American Association for Access, Equity and Diversity.   *See National Urban League v. Trump*, 1:20-cv-03121-APM (D.D.C. Jan. 11, 2021), *available at* https://www.naacpldf.org/wp-content/uploads/Amended-Complaint-EO-AAAED.pdf.   The lawsuit raised three constitutional claims: vagueness, viewpoint discrimination, and equal protection. The Court did not issue any substantive orders in the case.   The plaintiffs filed a notice of dismissal with prejudice on June 15, 2021.

[43] Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, Pres. Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021), https://www.federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government.

topics.[44]  Anti-"critical race theory" laws or restrictions have been passed in approximately 18 states as of June 2023.[45]

56.     New Hampshire is one of these 18 states and was among the first to propose such a law.  The complete paper legislative history of the Amendments was filed with this Court on May 16, 2022 and is incorporated here by reference.  *See* Docket No. 43.

### A.      The New Hampshire House of Representatives

56.     The Amendments' origin begins with its precursor, HB544.  HB544 was proposed in January 2021 and was entitled "Propagation of Divisive Concepts Prohibited Act."  HB544 copied all ten banned concepts contained in President Trump's September 22, 2020 Executive Order and applied them not only to all government agencies and primary and secondary public schools, but also to (i) private companies that contract with the state, and (ii) course instruction at New Hampshire public colleges and universities.  *See Ex. 79* (HB544 Docket and Language).

---

[44] *See* Benjamin Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*, NEW YORKER (June 21, 2021) ("Soon after, Rufo flew to Washington, D.C., to assist in drafting an executive order, issued by the White House in late September, that limited how contractors providing federal diversity seminars could talk about race."), https://www.newyorker.com/news/annals-of-inquiry/how-a-conservative-activist-invented-the-conflict-over-critical-race-theory; Trip Gabriel, *He Fuels the Right's Cultural Fires (and Spreads Them to Florida)*, N.Y. TIMES (Apr. 24, 2022) ("The next day [after appearing on Fox News in 2020], he said, he received a call from Mark Meadows, the White House chief of staff, telling him that Mr. Trump had seen him on Fox, and asking him to consult on an executive order."), https://www.nytimes.com/2022/04/24/us/politics/christopher-rufo-crt-lgbtq-florida.html; Laura Meckler & Josh Dawsey, *Republicans, spurred by an unlikely figure, see political promise in targeting critical race theory*," WASHINGTON POST (June 21, 2021), https://www.washingtonpost.com/education/2021/06/19/critical-race-theory-rufo-republicans/ ("Spurred by Rufo, this complaint has come to dominate conservative politics. Debates over critical race theory are raging on school boards and in state legislatures."; noting Mr. Rufo's tweet: "We have successfully frozen their brand—'critical race theory'—into the public conversation and are steadily driving up negative perceptions. We will eventually turn it toxic, as we put all of the various cultural insanities under that brand category …. The goal is to have the public read something crazy in the newspaper and immediately think 'critical race theory.' *We have decodified the term and will recodify it to annex the entire range of cultural constructions that are unpopular with Americans*.") (emphasis added); Matthew S. Schwartz, *Trump Tells Agencies To End Trainings On 'White Privilege' And 'Critical Race Theory*, NPR (Sept. 5, 2020), https://www.npr.org/2020/09/05/910053496/trump-tells-agencies-to-end-trainings-on-white-privilege-and-critical-race-theor ("On Saturday, Trump retweeted Rufo's appearance on Fox, arguing that diversity training is a threat to American unity.").

[45] *See* Sarah Schwartz, *Map: Where Critical Race Theory Is Under Attack*, Education Week (updated June 13, 2023), https://www.edweek.org/policy-politics/map-where-critical-race-theory-is-under-attack/2021/06.

57.     The text of HB544, for example, banned any form of "race or sex scapegoating" and any other teaching concept that "[a]ny individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex."  *See* Docket No. 43-1, Filed Legislative History of HB544 at 0005, 06 (HB544 as introduced).

58.     The chief sponsor of HB544 argued that this legislation was necessary to address "critical race theory" and, more specifically, to ban certain "diversity training or inclusion training[s]," which he described as "snake oil" that "propos[es] to cure a disease but in actuality it's even making it worse."[46]

59.     Other proponents of HB544 argued that the bill was necessary to eliminate discussion of and instruction on concepts like "implicit bias," "systemic racism," "white privilege," and "anti-racism" in schools and in government trainings, with many specifically calling such topics "Marxist" or "advancing Socialism," and identifying certain books as problematic.  *See Ex. 80* (Select Written Testimony from Public Supporting HB544 to House Executive Departments and Administration Committee, With Highlights Added).

60.     National anti-"critical race theory" activist Christopher Rufo also testified in support of HB544 before the New Hampshire House Executive Departments and Administration Committee.[47]

61.     On April 7, 2021, as part of a legislative strategy to ensure the passage of HB544's language in the face of a threatened veto, the House of Representatives amended the larger budget trailer bill, HB2, to insert the operative provisions of HB544.  HB2 passed the House that same

---

[46] *See* Executive Departments and Administration Hearing on HB 544 (Feb. 11, 2021), https://www.youtube.com/watch?v=ycrODcuaLDc (Rep. Keith Ammon's remarks at 1:31:50, with quotation at 1:37:20).
[47] *See* Executive Departments and Administration Hearing on HB 544 (Feb. 18, 2021), https://www.youtube.com/watch?v=0ClyrvZ-lv4 (Rufo's remarks at 4:09:40).

day.  *See Ex. 81* (HB2/Budget Trailer Materials, Docket Entry Approving Amendment 2021-1059h).  The next day, having accomplished its mission of passing this legislation through the budget process, the House of Representatives tabled the original version of HB544.  *See Ex. 79* (HB544 Docket and Language).

62.     At around this time, Representative Ken Weyler, the House Finance Chair and a supporter of HB544, "warned the Senate that the ban on critical race theory is essential for the budget to pass. Weyler said the votes are simply not there if the Senate ditches the ban. Wyler himself considered critical race theory to be a 'Marxist, anti-American, anti-White' program." *See Ex. 82* (Damien Fisher, *Compromise Sought on Anti-Critical Race Theory Bill*,  N.H. Journal (Apr. 19, 2021)).

63.     After this language was inserted in HB2, one legislator supporting HB544 explained that the legislation was needed to address, for example, a staff training in a school district that referenced "white privilege," as well as programs at one New Hampshire university where employers and managers discuss "unconscious bias."  *See Ex. 83* (Rep. Daniel Itse, *Taxpayers Money is Being Used to Promote Systemic Racism in NH*, Union Leader (Apr. 28, 2021)).

   **B.     The New Hampshire Senate, and the Commissioner's June 13, 2021 Op-ed**

64.     When HB2 moved to the Senate, the Senate Finance Committee, on or about May 28, 2021, proposed an amendment to HB2's "divisive concepts" provisions.  *See Ex. 81* (HB2/Budget Trailer Materials, Senate Finance May 28, 2021 2021-1799s amendments).  This amendment deleted six of the ten "divisive concepts" and made some other changes to the language.

65.     In an effort to rebrand the restrictions as an "anti-discrimination law," the amendment also inserted its banned concepts in the Law Against Discrimination at RSA ch. 354-A and expanded the focus of the restrictions from "race or sex" to "age, sex, gender identity, sexual

orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin." Lastly, the amendment changed the restrictions to no longer apply to (i) private companies contracting with the State of New Hampshire, or (ii) course instruction at state colleges and universities by faculty. *See* RSA 354-A:29, III.

66.     However, New Hampshire's Law Against Discrimination as amended in 2019—as well as the DOE's administrative rules—already banned discrimination on the basis of race, gender, and other classes. *See* RSA 354-A:27-28; RSA 193:38; N.H. Code Admin. R. Ed 510.01(b)(1), 510.02(b)(1), 510.03(b)(1) (banning discrimination under RSA 354-A:1).

67.     With these changes in the Senate, the four concepts that were to be banned in teaching, instruction, and advocacy in schools and places of public employment were the following:

(A) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

(B) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(C) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; and

(D) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

68.     Notwithstanding the Senate's effort to rebrand these provisions as an "anti-discrimination law," the Senate went even further than the original language in HB544 insofar as

this new version now included the penalty provisions specifically targeting certified educators by making violations of the law punishable under the Educator Code of Conduct.  *See* RSA 193:40, IV.

69.     The new language also provided a private right of action for a violation of the Amendments, stating that "[a]ny person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34."  RSA 193:40, III.

70.     When the Senate Finance Committee debated the new Senate version on May 27, 2021, supporter Senator Bob Giuda stated that it is designed, in part, "to ensure that the minds of the future generations of our state are not being unduly influenced by advocacy for such toxins as critical race theory."[48]

71.     Statements from at least one prominent supporter after the enactment of the Amendments further confirm that supporter's view that the law would impact diversity, equity, and inclusion instruction.  During the January 11, 2022 testimony of Chairman of the House Education Committee Rick Ladd on an unsuccessful bill designed to expand the Amendments to public colleges, he critiqued "critical race theory," and noted that "[a]ny instructor aligning and communicating one's own vision of race's relations, where the national narrative that uses diversity and inclusion as its platform, is unacceptable."  *See Ex. 84* (PL00789-9, at p. 3:9-13).

72.     On June 3, 2021, the Senate passed HB2, including the provisions constituting the Amendments, by a vote of 14 to 9.  *See Ex. 81* (HB2/Budget Trailer Materials).

---

[48]     Senate   Finance   Committee,   May   27,   2021   HB2   Deliberations   (at   27:13), https://www.youtube.com/watch?v=0AbLc51xKrU.

73.     The House did not concur with the Senate's version of HB2.  As a result, a committee of conference was appointed.

74.     As this committee of conference process was getting underway, Defendant Commissioner Edelblut published an op-ed on June 13, 2021 in which he attacked "those who promote Critical Race Theory or similar concepts," and claimed that the Amendments were "important" and "needed" to prevent concepts like those in Dr. Ibram X. Kendi's 2019 book *How to Be an Antiracist* from being taught in schools.  *See* <u>*Ex. 21 (Depo. Ex. 4)*</u>.

75.     In the meantime, the committee of conference ultimately agreed on a report recommending the language to be included in HB2, and it included the Senate's version of the Amendments.  This report was filed on June 24, 2021, and it was approved in both chambers.  *See* <u>*Ex. 81*</u> (HB2/Budget Trailer Materials).

76.     The governor signed the Amendments, along with all of HB2, into law on June 25, 2021 as part of the larger budget process.  The Amendments immediately became effective upon this signing.  *See* <u>*Ex. 81*</u>  (HB2/Budget Trailer Materials).

**V.     The Amendments' Confusion and Defendants' Purported "Guidance"**

77.     On July 8, 2021, Defendant Commissioner Edelblut again criticized "CRITICAL RACE THEORY" and stated that he "support[s] this new legal language in New Hampshire."



78.     He tweeted this July 8, 2021 "support" for the Amendments—and published a June

13, 2021 op-ed stating that the Amendments were an "important" and "needed contribution to our

education system" (*see Ex. 21 (Depo. Ex. 4)*)—despite testifying at deposition that "[w]e do not

take positions on legislation.  We simply provide legislators with either the benefits or the negative

consequences as we understand them associated with proposed legislation."  *See* Edelblut Depo.

146:20-147:4.[49]     "Critical race theory" and the Amendments were also referenced by

Commissioner Edelblut in various emails.  *See e.g., Ex. 85* (in February 1, 2022 email from

Commissioner Edelblut, stating that, as part of a particular contract, he has "reserved … the right

to edit such content to ensure that the 'woke' CRT type concepts would not be included in this

program *that may be a violation of our laws*") (emphasis added).

79.     On July 8, 2021, Commissioner Edelblut also raised a concern at a State Board of

Education meeting about Tiffany Jewell's 2020 book entitled *This Book is Anti-Racist*—a book by

a woman of color with a focus on 11-to-15-year-old students of color.  At this meeting where the

Commissioner referenced the Amendments, the Commissioner read portions of Chapter 10 from

this book to rebut the claim of "people [who] will say like, well, this doesn't happen in New

Hampshire."  *See Ex. 56* (Transcript of July 8, 2021 remarks).  As noted below, Commissioner

---

[49] Similarly, while DOE Attorney Fenton testified that the DOE "only provides what we refer to as technical assistance" to the legislature and does not support or oppose legislation, *see* Fenton Depo. 30:18-24, 171:3-8, the DOE openly advocated to the legislature on March 8, 2023 for the passage of an amendment to HB533 that would give the DOE subpoena power under the Educator Code of Conduct.  *See Ex. 65 (Depo. Ex. 6)*, at PL0803 (DOE Investigator Farrell noting that "I am asking, the agency is asking, and we need to do three things …."; "Our children should be protected, and subpoena power will allow us to do that.").  This bill was retained before the House Judiciary Committee.

    Commissioner Edelblut also issued a public statement on May 18, 2023 in response to the House of Representative's indefinite postponement of the so-called "parental bill of rights" bill at SB272.  He stated: "The New Hampshire Department of Education is disappointed with the indefinite postponement (of) SB 272 by the House and is hopeful that this conversation will continue, since it is possible to simultaneously support students, educators and parents..."   https://twitter.com/KlandriganUL/status/1659249716335345668.   At deposition, despite this public statement, Commissioner Edelblut would not concede that this statement indicated support for the bill because "it's not possible to support something that is no longer a bill and is indefinitely postponed."  *See* Edelblut Depo. 148:8-15.

Edelblut also cited Ms. Jewell's book as an attachment to an April 15, 2022 op-ed in which he argued that educators were overstepping and that "biases are beginning to seep into our own institutions."  *See Ex. 40 (Depo. Ex. 14)*, at PL00682, 742-745 (attaching chapter of this book).

80.     After the Amendments were enacted, Plaintiff NEA-NH received information from its members that they are confused about what is and is not permissible under the law.  *See Ex. 7*, Tuttle Decl. ¶ 8.  AFT-NH, too, had many questions from its members about prohibited topics of instruction.  *See Ex. 8*, Howes Decl. ¶¶ 7-9.  Accordingly, on July 12, 2021, NEA-NH President Megan Tuttle wrote to the DOJ requesting clarification of the Amendments given their ambiguities.  *See Ex. 42 (Depo. Ex. 11)*.  The letter asked 12 specific questions reflecting NEA-NH members' concerns regarding the Amendments' impact on them.  AFT President Deb Howes, too, requested that Commissioner Edelblut attend a Town Hall to explain the Amendments because her members were having similar difficulty understanding the law and its prohibitions.  *See Ex. 8*, Howes Decl. ¶ 13.

81.     The DOJ did not respond to that NEA-NH letter.  *See Ex. 7*, Tuttle Decl. ¶ 9. Commissioner Edelblut declined to speak to the AFT.  *See Ex. 8*, Howes Decl. ¶ 13.

82.     On July 21, 2021, Defendants DOE Commissioner Frank Edelblut, Attorney General John Formella, and HRC Director Ahni Malachi issued "guidance" on the Amendments in the form of FAQs.  *See Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*.

83.     The answers to Question Nos. 11 and 12 in these FAQs do not explicitly state that a complaint under the Amendments cannot be filed with the DOE.  *See Ex. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*; *see also* Farrell Depo. 57:22-58:3, 92:11-15 (noting that "it doesn't say either way" whether "a complaint can be filed for a code of conduct violation with the Department of Education").  The DOE was one of the entities that issued the FAQs.

84.     As these July 2021 FAQs confirm, "[t]he prohibitions apply to all activities carried out by public schools in their role as public schools, *including extracurricular activities that are part of the public school's work.*" *Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)* (emphasis added). The DOJ, HRC, and DOJ also acknowledged in their interrogatory responses that "the amendments apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work." *See Exs. 46, 47 (Depo. Ex. 58), 48 (Depo. Ex. 57)* (DOJ Int. Resp. Nos. 8; HRC Int. Resp. 8; DOE Int. Resp. No. 8).

85.     Given what Plaintiff NEA-NH perceived to be as deficiencies in the July 21, 2021 FAQs, the NEA-NH wrote Defendants Attorney General Formella and Commissioner Edelblut on August 5, 2021 presenting a plausible interpretation of the Amendments, based on the FAQs.  They asked for confirmation that their interpretation of the guidance was correct before disseminating that advice to their concerned members prior to the 2021-2022 school year.  For example, the NEA-NH sought confirmation, among other things, that the following was appropriate:

> (i) "[i]ntroducing students to the concept of implicit bias, discussing the topic, and discussing student experiences with bias is permitted, so long as students are not taught that bias is inherent in students due to their status as members of a specific group";
>
> (ii) discussion of "Structural Racism (a.k.a Societal Racism, Systemic Racism) [which] describes the ways in which institutional, historical, cultural, and interpersonal practices that are learned or imposed create racism within structures of society, the economy and the government";
>
> (iii) "[a]ssigning students the writings of certain authors that express the author's particular view or theory about discrimination, racism or other prejudices is permitted provided the educator conveys to students that the book represents the author's opinion or theory and the educator does not require the student to adopt the theory or opinion"; and
>
> (iv) discussion of "the subject of 'white privilege,' a set of social and economic advantages that are a product of systems, structures, and learned biases, so long as

the privilege is not discussed in such a way as to indicate that the racial favoritism
at the core of white privilege is 'inherent' or cannot be overcome."

*See Ex. 42 (Depo. Ex. 11).*

86.     The NEA-NH also sought confirmation that "[s]pecific books or works of certain

authors are not 'banned' under the law." *Id.*  The NEA-NH asked this question because, as the

letter explained, "[o]n June 13, 2021 Commissioner Edelblut wrote an Op-Ed in the *Union Leader*

leaving the distinct impression that Dr. Ibram Kendi's book, *How to be an Anti-Racist* may not be

assigned under the new law.  He raised the same proposition at the July 8, 2021 State Board of

Education Meeting."  *See Ex. 42 (Depo. Ex. 11)*.  The NEA-NH added that, "if there are certain

texts which your offices believe are *per se* prohibited under this law, please provide a list so

educator's know that prior to making 2021-2022 lesson plans."  *Id.*

87.     Neither the DOJ nor Commissioner Edelblut responded to the NEA-NH's August

5, 2021 letter. *See Ex. 7*, Tuttle Decl. ¶ 9; *see also* RSA 21-N:1, II(a) (noting that "[t]he department

[of education] shall have the dual role of providing regulatory direction and instructional assistance

to public elementary and secondary schools").

88.     Commissioner Edelblut stated in a July 26, 2021 email that the Amendments' fourth

banned concept was confusing, writing that "[t]he double negative is confusing (welcome to

legislative language)."  *See Ex. 19*.

89.     Assistant Director Cohen testified that the HRC consulted with the DOJ on at least

one complaint concerning the Amendments because the HRC was "looking for clarity on how to

apply the new amendments."  *See* Cohen Depo. 55:4-21, 104:14-108:21.  DOE Attorney Fenton

further testified that, if she received questions during educator presentations as to what might be

covered under the Amendments, she thinks that she would have referred them "to the Attorney

General's Office," as she "would not have felt comfortable answering them."  *See* Fenton Depo.

94:7-14.  She added that "there was a lot of confusion in the field" concerning the Amendments, including among attorneys, superintendents, and parents—many of whom are "fairly educated people."[50]  And when DOE Investigator Farrell was asked at deposition "[w]hat would [he] not be able to teach under" the Amendments if he knew, he said "I don't."  *See* Farrell Depo. 52:12-18.

90.      As the 2021-2022 school year was beginning, Commissioner Edelblut, in a late August 2021 *WMUR* interview, stated that, "if there are educators who are concerned about a particular curricular material or something like that, they can reach out to the Department [of Education] and we can take a look at that for them and provide feedback for them on that."[51]  Further, in response to a specific question from *WMUR* as to whether under the Amendments "a teacher should lose their license if they teach [that] systemic racism exists in the United States," Commissioner Edelblut did not directly answer and, instead, said that the circumstance would have to be looked at individually.  He agreed that there is "not a bright line," but that the "bright line … [that we] all share is that we are not discriminating against one another, whether that is in the classroom or outside the classroom."[52]

91.      Commissioner Edelblut also noted in a separate *NHPR* interview in late August 2021 that, "if educators believe that somehow this is providing a chilling effect—the conversations

---

[50] *See* Fenton Depo. 158:1-19 ("Q. Okay. Why did you incorporate [sections on the Amendments in your code of conduct training]?  A. I incorporated it at the time into my trainings that we've referenced because it seemed to me there was *a lot of confusion in the field*. I received calls from attorneys that had some confusion as to the Department's role under HB 2, and I wanted to take an opportunity to clarify that.  Q. So there was confusion among attorneys, you said; is that right?  A. Yes.  Q. Confusion among superintendents, too, in your view?  A. In my view, yes.  Q. Among parents as well?  A. I would expect so, but my -- when I say there was confusion in the field, I am referring to educators, attorneys for school districts, and union attorneys, and superintendents.  Q. Fairly educated people, right?  A. In my experience, yes.") (emphasis added).

[51] Adam Sexton, *CloseUp: Commissioner expects to fund 1000-1500 Education Freedom Accounts this year*, WMUR (Aug. 29, 2021), https://www.wmur.com/article/closeup-commissioner-expects-to-fund-1000-1500-education-freedom-accounts-this-year/37424825 (starting at 9:58).

[52] *Id.*

that they're having—they should consider what it is that they're talking about."[53]  He stated that, under the Amendments, our students should "understand important history, but at the same time, [educators should not] come at those topics with any type of bias."[54]

92.    Commissioner Edelblut made no mention in the *WMUR* or *NHPR* interviews that the DOE does not enforce the Amendments.

93.    When pressed for direct answers as to what is covered under the Amendments by one superintendent and at deposition, the DOE referred specific educator questions to the HRC as the agency responsible for applying and enforcing the Amendments.[55]

94.    The DOE appears to not have responded to one specific July 22, 2021 question from a media outlet asking whether an "anti-bias, anti-racist" workshop would be covered under the Amendments.  *See Ex. 58 (Depo. Ex. 47)*; Edelblut Depo. 133:20-134:12 (not knowing whether there was a response).  No written response has been produced in this litigation.

95.    In August 2021, one teacher restricted access to his Twitter feed following a DOE presentation regarding the Amendments.  *See Ex. 70*.

96.    On September 7, 2021, Defendant Attorney General Formella issued "Attorney General Opinion No. 2021-01" entitled "Request for Attorney General's Opinion Regarding New Anti-Discrimination Protections."  *See Ex. 53 (Depo. Ex. 12)*.

---

[53] "N.H. Education Commissioner: *Divisive Concepts' Restrictions Won't Hinder Classroom Conversations*, NHPR (Aug. 24, 2021), https://www.nhpr.org/nh-news/2021-08-24/nh-education-divisive-concepts-restrictions-wont-hinder-classroom-conversations.
[54] *Id.*
[55] *See Ex. 60 (Depo. Ex. 10)* (in a January 18, 2023 response to an inquiry from a superintendent asking whether "is there somebody at DOE who can speak with a teacher and principal … with specifics about what she can say or not say regarding issues that might pertain to divisive topics," DOE Attorney Fenton stated that the issue of "divisive topics is handled by the Human Rights Commission and the AG's office" and the DOE "has not issued much information on this topic"); Fenton Depo. 105:10-106:2 ("matters falling within HB 2 are to be handled by the Human Rights Commission"); Farrell Depo. 39:18-20 ("We would only be – involve ourselves after the Human Rights Commission process is over.").

97.     The opinion was in response to the HRC's request for an official opinion "concerning the scope and application of the" Amendments.  *See Ex. 53 (Depo. Ex. 12)*.  In responding to the Commission, the Attorney General's nine-page opinion effectively memorialized the July 21, 2021 FAQs, while acknowledging that "[s]ome have voiced concerns that these new statutes are confusing and that public employers and schools will struggle to understand the scope of the new prohibitions."  *See Ex. 53 (Depo. Ex. 12)*, PL00425.  Director Ahni Malachi acknowledged that the HRC requested this opinion because the HRC received concerns from some members of the public that the Amendments were confusing and that some would struggle to understand their scope.[56]

98.     The DOJ's September 7, 2021 opinion declares that a violation may occur not just because of the content of a lesson or instructional material, but also because of implications and inferences that a student or trainee may subjectively draw from the material.  For example, the opinion explains that, while it may be permissible to provide "Anti-Racist Resources," those resources may not be offered in a way that "may imply that white people … are in need of anti-racist resources."  *See Ex. 53 (Depo. Ex. 12)*, PL00431.

99.     HRC Assistant Director Sarah Burke Cohen testified that the HRC uses the Attorney General's September 7, 2021 opinion in applying the Amendments to complaints received, which would include the opinion's "implication" instruction.[57]  However, Director Malachi testified that the Attorney General opinion "wasn't requested with the intent to assist the

---

[56] *See* Malachi Depo. 88:11-89:16 ("The Commission was aware of concern from the public about Sections 297 and 298 and requested the opinion."); *see also* Cohen Depo. 107:7-17 ("Q. In your view was there -- shortly after the passage of the amendments, in your view was there confusion amongst the public as to where to file a complaint? MR. KENISON-MARVIN: Objection. Scope. Calls for speculation. Vague. You can answer.  A. In my opinion, I suppose. Q. Why do you say that? MR. KENISON-MARVIN: Same objections.  A. Because I believe it was in the newspapers, the press.").

[57] *See* Cohen Depo. 114:20-115:3 ("Q. Do you know whether anyone at the HRC uses the Attorney General's opinion or the FAQs?  MR. KENISON-MARVIN: Objection to form.  A. Uses it for what?  Q. Applies it to complaints that come in through the complaint process.  A. Yes.").

Commission in enforcing the statute," and that the HRC has not used the opinion in interpreting RSA 354-A:29-34 relative to an allegation of discrimination received under the Amendments.[58]

100.    When the NEA-NH asked the HRC in September 2021 (after being referred to the HRC by the DOE) for "someone … who might provide further clarification on the law and answer questions from educators using a virtual platform," no response was received.  *See Ex. 43 (Depo. Ex. 54)*; *Ex. 7*, Tuttle Decl. ¶ 10.

101.    When AFT inquired on September 22, 2021 about whether the Commissioner would speak about the Amendments, the Commissioner did not directly respond to the invitation, and instead "reiterate[d] our offer to try to work through individual circumstances that may be unclear to teachers.  In these cases, the best approach is for them to reach out directly and share the specific facts and circumstances so that we can provide them with clear guidance."  *See Ex. 41 (Depo. Ex. 9)*; *see also Ex. 8*, Howes Decl. ¶ 13 (noting that the Commissioner declined AFT's invitation to speak at a Town Hall).

102.    During an October 7, 2021 meeting of the HRC's Commissioners, Director Malachi said that the Amendments were "complex."  One commissioner asked Director Malachi what she thought inspired the Amendments.   "Assistant Director Burke Cohen and Director Malachi explained that the likely inspiration was that there have been instances in which information has been presented in trainings and K-12 classrooms that states directly *and/or impliedly* that inherent traits establish a person's inferiority/superiority."  *See Ex. 20 (Depo. Ex. 56)* (emphasis added).

103.    In an October 19, 2021 email, one DEI trainer who has given presentations throughout New Hampshire (including to the New Hampshire Department of Justice, *see Ex. 76*

[58] *See* Malachi Depo. 93:6-94:4 ("Q.  Has the Commission since the issuance of the September 7, 2021, opinion used this opinion in interpreting the provisions of RSA 354-A:29 to 34?  A. Could you clarify relative to what?  Q. Relative to any allegation of discrimination that has been received by the Commission under the challenged law in this case. A. No.").

and the state court system, *see Ex. 77*), James McKim, expressed concern to the DOJ that teaching on affirmative action under banned concept three—particularly its use of the phrase "solely or partly because of his or her … race"—could violate the Amendments.  *See Ex.  52*.

104.    The Commissioner of Education has received invitations to speak on the Amendments from political groups such as local GOP committees, and he has spoken to political groups where he "may have answered a question on" the Amendments.  *See Ex. 59 (Depo. Exs. 37, 52)* (Northwood GOP invitation to speak on the Amendments); Edelblut Depo. 175:20-176:21 (not recalling speaking to the Northwood GOP but acknowledging that he speaks to political groups).  One of these groups—the Northwood GOP—told Commissioner Edelblut on November 21, 2021 that he could speak to the group anytime, and that "[w]e are very happy with the new law and sent a flyer with information on it to everyone in our town."  *See Ex. 59 (Depo. Exs. 37, 52)*. That flyer appears to be entitled "CRT Parents' Guide," and it states that "NH legislators passed strong anti-discrimination language this year to supplement current civil rights for the protection of all children."  The flyer goes on to include a sample letter to educators asking to "provide a lesson plan for my review if there will be class content, discussion, or assignments related to," among other things, "Race," "Gender identity, or LGBT issues," "Sexuality," or "Equity."  *See Ex. 22 (Depo. Ex. 51)*.  The group added that they had created a "hotline for [their] town to report concerns" about teachers.  *See Ex. 59 (Depo. Exs. 37, 52*).

105.    On March 18, 2022, DOE Attorney Diana Fenton acknowledged to one person who had a question about the Amendments that, in part, "the subject matter of HB 544 was put into HB 2."  *See Ex. 86 (Depo. Ex. 23)*; *see also* Fenton Depo. 166:9-12 (standing by what she wrote in that email).

106.    In June 2022, a "concerned parent" emailed DOE Investigator Richard Farrell to report a DEI coordinator's "openly racist blog." *See Ex. 71 (Depo. Ex. 36)*. The parent, citing the Amendments, attached images of the coordinator's personal blog, which that parent maintained "clearly fuel[s] racism which isn't needed in our schools." *Id*.

107.    In an August 25, 2022 email, one lawyer directly wrote to the DOE explaining that Defendants were not complying with the law based on Defendants' view that the DOE cannot independently investigate educators who may have broken their obligations under the Amendments. *See Ex. 64 (Depo. Ex. 48)*.

108.    On June 8, 2023, one member of the DOE's State Board of Education, which has the power to issue sanctions under RSA 193:40, IV, made clear his view—with several other Board members agreeing—that DEI "teaching methodologies … [are] extremely divisive ideologies that … are counter towards students' productivity and counter towards their success" and are "destructive," as well as "degrad[e] our American excellence," "degrad[e] Western society," and have an "inherent Communist belief baked into" them.[59] This same Board member, in a February 27, 2023 op-ed, attacked the "wokeness" of DEI instruction, and complained about the pushing of "woke indoctrination onto students," "devout woketivists," and "woke demands."[60]

## VI.    Defendants' Lack of Clear Policies and Failure to Explicitly Say What the Amendments Mean

109.    Both Defendant Commissioner Edelblut and Attorney Fenton admitted at deposition that there are no criteria to further understand the phrases "taught, instructed, inculcated or compelled to express belief in, or support for" under RSA 193:40, I beyond the July 2021

---

[59] *See* June 8, 2023 N.H. State Board of Education Meeting (starting at 3:24:00-3:28:14), https://vimeo.com/836403362.
[60] Ryan Terrell, *Paying teachers well should be a priority*, Union Leader (Feb. 27, 2023), https://www.unionleader.com/opinion/op-eds/ryan-terrell-paying-teachers-well-should-be-a-priority/article_af0cbb8e-663e-568e-a5e1-caf0a5d11a2e.html.

FAQs.[61]  This includes no policies or procedures about whether the Amendments include a scienter requirement.  There is no definition for what qualifies as "teaching" or "instructing."  Nor have DOE employees received training concerning implementation of the Amendments, which would include training on whether the Amendments contain a scienter requirement.  *See Ex. 48 (Depo. Ex. 57)* (DOE Int. Resp. No. 4).

110.    The educator presentations conducted by the DOE referencing the Amendments have not explained what the Amendments' banned concepts mean aside from reciting their terms. These presentations make no reference to the Amendments having a mental state requirement.  *See Ex. 50 (Depo. Ex. 3)*, at DOE-05665 (in presentation for superintendents and administrators focusing on the DOE's role with districts in evaluating misconduct, referencing Amendments on one slide without stating what they mean); *Ex. 51 (Depo. Ex. 7)*, at DOE-10079-10081 (in presentation addressing the Code of Conduct for credentialed educators, referencing the Amendments' terms); *Ex. 44 (Depo. Ex. 24)*, at DOE-09669-9671 (same); *see also* Fenton Depo. 118:6-119:15 (explaining audiences for presentations).  The Amendments were added to these presentations because "[t]here was a great amount of concern when this was first put into place," and there "was a perception of murkiness."  *See* Farrell Depo. 47:22-49:4.

111.    Similarly, the HRC did not conduct any trainings regarding the Amendments' meaning, including whether they contain a scienter requirement.[62]  The HRC has no internal policy

---

[61] *See* Fenton Depo. 111:4-114:7 ("Q. So beyond the FAQ that's the attachment to Exhibit 9, is there any other criteria that you're aware of that the Department uses in determining what 'teach, instruct, inculcate, or compel to express a belief in' means?  A.   To the best of my knowledge, no."); Edelblut Depo. 150:17-153:4 ("Q. …. So is there written criteria that the Department has that defines what it means to teach, instruct, inculcate or compel to express belief in or support for something?  A.  I would need to make reference to other people in the agency to get a more specific response to that question.  Q.  We have done that, in fairness, but I just want to ask you are you aware of any written criteria that defines those terms on page 00006 of Exhibit 1, lines 24 to 25 [the terms in RSA 193:40, I stating "shall be taught, instructed, inculcated or compelled to express a belief in, or support for"]?  A.  So I'm not familiar with them.")

[62] *See* Malachi Depo. 48:23-49:8 ("Q …. Have you or members of the Commission conducted any trainings on those provisions, public trainings?  A. No.").

or guidelines as to what it means to "teach, advocate, instruct, or train" any employee or student on any of the banned concepts under RSA 354-A:31.[63]  The only guidance the HRC has as to whether any particular educational materials violate the Amendments are the materials "issued by the Attorney General's office in his opinion and our FAQ on the statutes."  Cohen Depo. 114:13-19.

112.    The DOJ has "no memorandum or other written material that explains a procedure specific to evaluating and responding to complaints filed pursuant to the amendments specifically," nor has it provided "training to any employees concerning how to implement the amendments." *See* *Ex. 46* (DOJ Int. Resp. Nos. 3, 4) *see also* *Ex. 52* (in a November 24, 2021 email, the Attorney General's Office indicated to DEI trainer James McKim that "I did speak to the General and it is my understanding we will not be doing a training in the immediate future on how to interpret the statute.  When that changes, I will be sure to reach out to you.").

113.    DOE Investigator Richard Farrell also stated at deposition that he had "no idea" what a teacher cannot teach under the fourth banned concept.  *See* Farrell Depo. 144:23-145:13, 204:7-207:19 (while aiming to later clean up this telling testimony with the assistance of counsel, he acknowledged that he is not "aware of any book that is prohibited from being taught in New Hampshire public schools under subsection D of the law").

114.    When asked at deposition about whether the *teaching* of specific books would be covered under RSA 193:40, Commissioner Edelblut directed Plaintiffs—and educators who may have specific questions—solely to the text of the Amendments and Defendants' July 2021 FAQs:

---

[63] *See* Malachi Depo. 75:3-78:2 (Q….So my question is does the Human Rights Commission have any internal policy or guidance as to what the terms mean, 'teach, advocate, instruct or train' under that statute?  A. No."); 69:18-70:3 ("Q. Have there been any writings issued by either you or the Commissioners to staff about whether to accept allegations of discrimination under the challenged law from the Department of Education?  A. Could you be more specific on the writings? Q. Sure. By writing, what I mean are any directive, policies, or guidance.  A. No.").

Q.      So if a teacher has questions about whether specific instruction is covered by the law, they could come to the Department [of Education] and work through individual circumstances that may be unclear to them; is that still something that could occur today?

A.      Correct, and the guidance that we would provide them today would be in the form of a Q & A guidance and questionnaire as well as reference to the statute.

Q.      Is that the only guidance that they would be provided to a teacher if they were confused, the Q & A from July 2021 and the statute?  Is that all you'd give them?

        MR. KENISON-MARVIN: Objection. Vague and scope.

A.      And I believe pending this lawsuit that that would be the extent of the guidance that we would provide to them.

*See* Edelblut Depo. 166:13-169:7; *see also id.* 158:17-160:6; 162:23-164:14.

115.    Commissioner Edelblut testified that "content is not the subject of the purported HB 2 or 193:40"[64] and that whether a violation exists would depend on "context."[65]

116.    As to whether a quotation from Dr. Ibram X. Kendi's 2019 book *How to Be an Antiracist* directly implicating affirmative action (*see* Ex. 54 (Depo. Ex. 50)) was covered under the Amendments, the Commissioner restated the Amendments' provisions and referred these questions back to educators and the HRC.[66]  Despite quoting and condemning the book in his June

---

[64] *See, e.g.,* Edelblut Depo. 62:10-63:3 ("Q. The question is simply this.  Have you ever formed an opinion as to whether any content read aloud from a book by a teacher in a classroom rises to the level of concern with respect to HB 2?  A. So with all due respect, *content is not the subject of the purported HB 2 or 193:40*. The activities, as I understand the law, you know, no pupil in any public school in this state shall be taught, instructed, inculcated, or compelled to express belief in or support for one or more of the following. So an educator could use a wide variety of content that doesn't then violate A, B, C or D.") (emphasis added).

[65] *See, e.g.,* Edelblut Depo. 75:21-76:2 (stating need for "context"), 154:1-158:16 (in the context of Dr. Kendi's quotation Commissioner Edelblut cited for why the Amendments were needed, stating: "So to your question, I think it would depend upon the context of the instruction.  The content itself of Exhibit 50, again, content being neutral, it's what you do with that content.").

[66] *See* Edelblut Depo. 149:18-150:16 (acknowledging that he had not read Dr. Kendi's book); 155:8-156:14, 157:7-160:2 ("Q….If a teacher taught, instructed or inculcated students along the lines of what's been underlined on Exhibit 50 that you also quote in your OpEd on Exhibit 4, would that fit any of the four concepts that are listed at the bottom of page 6 and go on to the beginning of 07?  MR. KENISON-MARVIN: I'll make the same objection.  Vagueness. Legal contention and compound.  And it represents the nature of the first elements of the statute.  You can answer.  A. So I think that it would be most clear in the mind of an educator to determine whether or not in teaching the text that you refer to in Exhibit 50 if they are teaching that, one, a group in this list of things is inherently superior, that one

2021 op-ed justifying the need for the Amendments, the Commissioner admitted at deposition that he never read the book.  *See* Edelblut Depo. 149:18-150:16.

117.    At deposition, the Commissioner would not say whether teaching Tiffany Jewell's 2020 *This Book is Anti-racist* would violate the Amendments, notwithstanding having attached a chapter of this book to his April 15, 2022 op-ed (*see Ex. 40 (Depo. Ex. 14)*, at PL00742-745) and citing the same book in his July 8, 2021 remarks before the State Board of Education for the purpose of referencing the Amendments and rebutting the claim of "people [who] will say like, well, this doesn't happen in New Hampshire," *see Ex. 56*.  At deposition, he said that would depend on if the text of the Amendments was violated.[67]

118.    The Commissioner testified that educators are the ones who are best left to determine what constitutes "teaching," "instruction," or "inculcation" under the Amendments.[68]

---

group is inherently racist, that one group receives adverse treatment or should receive adverse treatment and should be discriminated against or receive adverse treatment solely because of those characteristics or that they cannot and should not attempt to treat others without regard to those items.  So those are the four salient questions that I think an educator would ask relative to any content.  Am I teaching that the inherent superiority, the inherently racist, the adverse treatment, and to not attempt to treat others without regard to."; "Q.  Even with that, if an educator still had a question and thought it was maybe a little bit less clear than you seem to think it is, could they come to you for advice with respect to how to comply with HB 2? A. So right now we're in the midst of a lawsuit with HB 2.  So most of the questions that we would have would probably end up as a question for perhaps the Human Rights Commission to answer."); 167:9-169:4 ("Q. So you wouldn't answer if they had a follow up question, is Dr. Kendi's book, if I teach it, is that covered under the statute, you wouldn't be able to answer that question?  MR. KENISON-MARVIN: Objection. Vague.  A. So I would, and I would answer that question for the educator principally by looking at the Q & A but principally coming back to RSA [193]:40, and I would say are you teaching, inculcating, or are you compelling to express a belief in or support for any one or more of the following; that one's immutable characteristics are inherently superior, that an individual by virtue of these immutable characteristics is inherently racist, sexist or oppressive or that an individual should be discriminated against because of these immutable characteristics and that people cannot and should not attempt to treat others without regard to these immutable characteristics, and I believe in that conversation with an educator given the highly educated state and status of our educators that they would be able to understand that and apply that to their pedagogy.").

[67] *See* Edelblut Depo. 171:7-172:10 ("Q. Given that you referenced that text during the July 8, 2021, Board of Education meeting, if I taught that chapter, if I'm a middle school teacher in Exeter, would I be violating HB 2?  MR. KENISON-MARVIN: Objection. A.  So that would depend on whether you are teaching, instructing, inculcating or compelling to express a belief in or support for any one or more of the following:· That one's age, sex, gender identity, sexual orientation, et cetera, are inherently superior to other, that they are inherently racist, that they receive adverse treatment solely or partly because of or that they cannot or should not attempt to treat others without regard to these immutable characteristics.").

[68] *See* Edelblut Depo. 66:3-5 , 75:7-20 ("Q…. You would have no problem with a teacher putting forward Mr. Kendi's book and focusing on that paragraph.  [Vagueness objection].  A. *So the teacher themselves would be in the best position to know if they are teaching, instructing, inculcating or compelling to express a belief in or support for any*

119.    Commissioner Edelblut also added that the DOE has no adjudicatory authority under the Amendments and RSA 193:40, instead deferring to the HRC and indicating that the HRC would have to first make a finding of discrimination under the Amendments before DOE involvement.[69]   DOE Investigator Farrell referred similar questions about whether teaching specific texts would be covered to the school district's counsel and to DOE Attorney Diana Fenton.[70]   And Attorney Fenton referred these questions to the HRC.[71]

_one or more of the following_, as I've repeated, that one's age, you know or this immutable characteristic is inherently superior to another one.  The teacher themselves have clarity of the action that they are doing at that time.  I have a hypothetical construct that is really limited."), 171:23-172:10 ("Q. Besides reading that statue though, you can't tell me whether if I taught that I'm violating the law, right? A. I would have to see how it's being used in this context.  When you say 'if I taught that,' there is not a content standard.  There is an activity standard.  So I would have to see it in this context, and again, _I think that the best person to know if they're violating these statutes really are the individuals who are actually doing the teaching_.") (emphasis added).

[69] _See_ Edelblut Depo. 65:8-10 (stating that the "adjudication of that [whether a teacher could teach that affirmative action is a wonderful thing] is something that would be made by the Human Rights Commission"), 67:10-11 ("My response is not to adjudicate whether or not they are violations of the particular law"), 67:23 ("So my responsibility is not to adjudicate [HB2]"), 70:5-15 ("I don't have adjudicatory responsibility" for HB2), 153:16-20 ("So I will start with the fact that it's not my job, it's not within the purview of my responsibility to adjudicate whether or not certain actions by an educator would be some type of an action under 193:40."), 159:16-160:2 ("Even with that, if an educator still had a question and thought it was maybe a little bit less clear than you seem to think it is, could they come to you for advice with respect to how to comply with HB 2? A. So right now we're in the midst of a lawsuit with HB 2.  So most of the questions that we would have would probably end up as a question for perhaps the Human Rights Commission to answer.").

[70] _See_ Farrell Depo. 149:8-150:19 ("Q. If I'm a teacher, and I want to sign a book, and I'm unsure if it's covered under HB 2, could I call the Department of Education and get an answer as to whether a book is covered or not?  A. I don't know the answer.  I know I have never taken such a call."; acknowledging that, "besides inviting that superintendent to reach out to his district counsel, [his] other likely response would be to talk to [Farrell's] supervisor [Diana Fenton]"), 166:7-167:3 ("Q. Okay. If I were a teacher, though, and I read Commissioner Edelblut's op-ed, and I read the book How to Be an Antiracist, and I thought I would want to include it in a high school class, how would I get an answer as to whether that book is covered or not? A. Well, I think I would begin at the local level. Q. Okay. A. I would go to my principal or my department head, principal, curriculum director, superintendent, and the local elected school board. I think it's important to note that New Hampshire is a local-control state, and I would think that that would be my first series of steps.  Q. And if I were a teacher and I couldn't get that answer from my superintendent [as to whether _How to be an Antiracist_ by Ibram X. Kendi is covered under the Amendments], could I get that answer from the Department of Education as to whether or not this particular book is covered under HB 2?  A.  I think that that question would ultimately go to Diana Fenton.").

[71] _See_ Fenton Depo. 105:10-106:2 (in response to the question of, "[i]f an educator reached out to you with individual circumstances that they thought was unclear, and they reached out to try to obtain clear guidance from the Department [of Education], would they currently get it?," stating in part that these "matters falling with HB 2 are to be handled by the Human Rights Commission," and, "[i]f anything, I would refer that individual to … the frequently asked questions created by the Attorney General's office"); _see also Ex. 60 (Depo. Ex. 10)_ (in responding to a superintendent's question of whether "is there somebody at the DOE who can speak with a teacher and principal … about what she can say or not say regarding issues that might pertain to divisive topics," DOE Attorney Fenton stating in part that "divisive topics is handled by the Human Rights commission").

120.    When Plaintiffs asked HRC Assistant Director Cohen questions about what specific books would be covered under RSA 354-A:29-24 if taught, she did not answer directly, stating that it is a "complicated question because you have to look at the context of things" and that "I could not give a teacher or complainant legal advice on whether them teaching that would make a charge or not."  Cohen Depo. 93:7-23, 94:1-19.  Instead, she "would suggest that the educator read the law, read the [July 2021] FAQs that are available as well as the [September 2021] opinion issued by the Attorney General's office."  *See id.* 95:21-96:8.  And if there are further questions, Assistant Director Cohen testified that "I would suggest they contact their legal counsel for legal advice."  *See* Cohen Depo. 96:9-17; *see id.* 94:21-22, 95:12-20.  Commissioner Edelblut similarly told at least one superintendent that he should ask his district's counsel if he had questions under the Amendments.  *See Ex. 57*, DOE 856-57 ("[i]f you have questions about the material, I would encourage you to reach out to your district's legal counsel").

121.    Lawyers who regularly represent school districts have concluded that the Amendments are ambiguous.  For example, attorneys at the law firm Drummond Woodsum—who represent many school districts throughout New Hampshire—have conducted trainings for educators on behalf of their education institution clients. The attorneys' materials explained the Amendments' ambiguity.  For example, these lawyers highlighted as a "*gray area*" the following: (i) "[p]rograms that involve discussion of power structures or power imbalances in society"; and (ii) "programs that involve advocating for … [a]ffirmative action to promote equity, [r]eparations for past wrongs, [and] [w]hite privilege."  *See Ex. 87* (Drummond Woodsum August 5, 2021 Presentation).  These lawyers also added that a "gray area" includes "[d]iscussions regarding power structures in present-day society," and "[d]iscussions of cultural sensitivity."  *Id.*  These lawyers further explained that: (i) "The state guidance [issued on July 21, 2021], while helpful,

does not fully resolve many of the concerns caused by the use of imprecise or vague language in the new law;" (ii) "The law is difficult to understand, often relying on double-negative sentence construction and undefined terms, which will have a chilling effect on otherwise lawful academic discussions"; and (iii) "One of the biggest compliance issues is how to appropriately monitor and control classroom discussions while lawfully regulating student speech." *Id.*

122. Plaintiff NEA-NH has counsel on staff routinely representing educators in Code of Conduct matters. They similarly conveyed their view that the Amendments "contain[] ambiguity requiring clarification." *See Ex. 42 (Depo. Ex. 11)*.

123. Neither Commissioner Edelblut, DOE Attorney Fenton, DOE Investigator Farrell, nor Assistant HRC Director Cohen could cite at deposition any example of instruction occurring in New Hampshire before the Amendments were enacted on June 25, 2021 that would be barred under the Amendments' terms.[72]

## VII. Complaints Under, and Defendants' Enforcement of, the Amendments

124. After the issuance of the DOJ's September 7, 2021 opinion, HRC Director Malachi emailed to the DOE the intake questionnaire used by HRC under the Amendments. *See Ex. 47 (Depo. Ex. 58)* (HRC Int. Resp. No. 7).

---

[72] *See* Edelblut Depo. 174:2-8 ("Q. Can you identify, Commissioner, an incident of instruction that occurred in New Hampshire before HB 2 that would violate HB 2 had it been in effect at the time the instruction occurred? MR. KENISON-MARVIN: Objection. Vague. Calls for legal contention. A. I'm not familiar with any."); Fenton Depo. 172:23-173:9 ("Q. How about specific books? Are there books that you know of that were—could have previously been taught and now cannot be taught because of HB 2? MR. KENISON-MARVIN: Same objection. You can answer. THE WITNESS: I'm not aware of any exact books, no.  BY MR. KAHNE:  Q. Any material at all? Instructional material?  MR. KENISON-MARVIN: Same objections.  THE WITNESS: No, I am not aware of any books or instructional material."); Farrell Depo. 170:20-24 ("Q.  So based on your communications with Commissioner Edelblut, are you aware of any instruction that previously occurred in New Hampshire before HB 2 that now could not occur in New Hampshire?  A.  I don't know of any."); *see also id.* 169:12-18 (stating that he did not believe there have been direct conversations within the DOE "about instruction that had occurred in New Hampshire that would be banned by HB 2"); Cohen Depo. 35:15-23 ("Q. Sure. I guess what I'm trying to figure out is could you identify, are you aware of any instruction that occurred by an educator in New Hampshire before the enactment of the amendments that would have violated the amendments had the amendments been in effect during that time of instruction? MR. KENISON-MARVIN: Same objections. A. No.").

125.    Commissioner Edelblut and the DOE, on or about November 10, 2021, published a website and press release inviting members of the public to file complaints against teachers under the Amendments.  *See Ex. 88 (Depo. Ex. 21)* (website as of Nov. 10, 2021); *Ex. 89 (Depo. Ex. 25)* (Nov. 10, 2021 DOE Press Release).  The DOE website contains the HRC intake questionnaire that can be sent directly to the HRC.

126.    DOE Attorney Fenton testified, in part, that, because "there was so much information that was coming into the Department of Education, which, again, may or may not have fallen within the purview of [the Amendments]," the DOE "wanted to provide a resource, for lack of a better term, by which individuals could directly file those complaints with the Human Rights Commission."  *See* Fenton Depo. 160:13-161:2.

127.    The DOE's November 2021 website initially (and before it was later deleted) included the email address of a DOE employee, Kate Walker, who could field inquiries directly.  *See Ex. 88 (Depo. Ex. 21)* (website as of Nov. 10, 2021); *see also* Fenton Depo. 167:3-7 (noting removal of Kate Walker's name from the website; while not knowing why Ms. Walker's name was removed, Ms. Walker had expressed some hesitation about having her name on the website).

128.    The DOE initially included a DOE employee as a person to field complaints even though Defendants' July 21, 2021 FAQs said that complaints should be sent to the HRC or the New Hampshire Office of the Attorney General.  *See Exs. 41 (Depo. Ex. 9), 44 (Depo. Ex. 24), 45 (Depo. Ex. 55)*.

129.    The DOE established and advertised this website even though, to the best of Plaintiffs' knowledge, the DOE has not established a similar, specific website for violations of

other provisions of the Law Against Discrimination at RSA 354-A:27-28 or RSA 193:38-39 that were added in 2019 to apply to public schools.[73]

130.    As of August 10, 2023, the DOE's complaint website[74] does not mention the Attorney General's September 7, 2021 opinion purporting to interpret the Amendments' provisions.

131.    In response to the DOE's complaint website announced on November 10, 2021, the group "Moms for Liberty NH" published a tweet on November 12, 2021.  The tweet stated the following:



[73] *See* Department of Education, Complaints and Concerns, https://www.education.nh.gov/who-we-are/commissioner/complaints-and-concerns; *see also* RSA 354-A:27-28 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion or national origin, all as defined in this chapter"); RSA 193:38-39 (added in 2019, and stating, in part, that "[n]o person shall be excluded from participation in, denied the benefits of, or be subjected to discrimination in public schools because of their age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, or national origin, all as defined in RSA 354-A").
[74] *See* Department of Education, *Right to Freedom from Discrimination in Public Workplaces and Education*, https://www.education.nh.gov/who-we-are/deputy-commissioner/office-of-governance/right-to-freedom-from-discrimination.

132.    One educator, in a November 15, 2021 email to the DOE responding to this development, raised grave concerns about these tactics.  The educator feared that "people will be rushing to report educators for even broaching the topics of racism, sexism, or other forms of discrimination along the lines of a McCarthy-era witch hunt." *Ex. 73*.

133.    The DOE was aware of this bounty after it was published, as Moms for Liberty directly emailed Commissioner Edelblut on November 15, 2021 notifying him of the bounty.  *See Ex. 90 (Depo. Ex. 41)* (Mom's for Liberty email to Commissioner Edelblut); *see also Ex. 72 (Depo. Ex. 22)* (DOE internal email about bounty).  DOE Attorney Diana Fenton found the bounty "very upsetting." *See* Fenton Depo. 164:18-20.

134.    The Northwood GOP told Commissioner Edelblut on November 21, 2021 that his "new website addition for parents to report concerns is exactly what NH parents needed!" *See Ex. 59 (Depo. Exs. 37, 52)*.

135.    After the Amendments' enactment, the HRC similarly posted on its website an intake questionnaire form for potential violations under the Amendments.  *See Exs. 49 (Depo. Ex. 60), 91 (Depo. Ex. 61)*.  The form originally had a line asking complainants whether they had filed a "complaint[] with another entity," including the "Court," "NH DOE," or "Other."  *See Ex. 34 (Depo. Ex. 72)* (December 2021 questionnaire containing line).  The HRC, at some point, deleted this line from the questionnaire form.  *See Ex. 49 (Depo. Ex. 60)* (current questionnaire not containing line).  Assistant HRC Director Cohen testified that she supposes that there was public confusion about where to file a complaint shortly after the passage of the Amendments. *See* Cohen Depo. 107:7-17

**A.      Department of Education Complaints and Investigations Under the
Amendments, and the Commissioner's April 15, 2022 Op-ed Highlighting
Some of These Complaints**

136.    The DOE, including the Commissioner himself, received complaints after the

Amendments were enacted and took action.  As detailed below, the Commissioner has forwarded

complaints to his staff tasked with enforcing the Code of Conduct.

137.    For example, a parent complained in an August 27, 2021 email to Commissioner

Edelblut that his "sons have been informed by high school teachers that they are inherently racist

and sexist because they are white males …. I do hope this Bill makes a difference."   The

Commissioner responded that day: "If you could share with me the names of those educators (if

the incident happened after 6/29/2021, the effective date of the statute) I would be happy to look

into it."  *See Ex. 66*; *see also Ex. 67* (in October 21, 2021 email from Commissioner Edelblut to a

superintendent, Commissioner Edelblut indicating that he tried to call the superintendent with

respect to a person's September 23, 2021 email to that superintendent where that person stated, in

part, that "[e]xamples of discriminatory ideas [under the Amendments]," include "[w]hite

privilege," "[w]hite guilt," and "[e]quity").

138.    Additional DOE complaints referencing the Amendments are detailed below.

Some of these complaints led the DOE to engage in varying degrees of inquiries, including using

other potential violations (especially under RSA 186:11, IX-c and RSA 186:11, IX-d) to

investigate or elevate these complaints to superintendents:

   a.   <u>*Good Kind of Trouble* Complaint</u>: In August 2021, a 2019 book by Lisa Moore
        Ramée entitled *A Good Kind of Trouble*—which was written by a woman of
        color for 8-12-year-old readers about a 12-year-old girl of color in a
        predominantly White school—was the subject of a DEI/"critical race theory"
        complaint where the book was part of a "read along" in a fourth-grade class in
        approximately May or June 2021, before the Amendments were enacted.  The
        parent claimed that the read along violated her child's civil rights, and noted
        that she "will work as hard as [she] can to get DEIJ/CRT out of [the district]."
        The superintendent, the teacher, and Commissioner Edelblut were copied on

the complaint.  *See Ex. 69 (Depo. Ex. 19)*.  Portions of this book are attached to the declaration of Plaintiff Andres Mejia.  *See Ex. 15*, Mejia Decl. ¶ 16.

In response, the Commissioner spoke to the parent, called the superintendent in August 2021 (*see Ex. 69 (Depo. Ex. 19)*), personally read the book in October 2021 after asking DOE Attorney Fenton to obtain it, and met with the superintendent in October 2021 so he could convey "there was a parent who was concerned about the content of this book."  *Exs. 92 (Depo. Ex. 33), 93 (Depo. Ex. 38)*; *see also* Edelblut Depo. 26:1-4, 28:17-18, 30:19-33:1, 55:18-56:16 ("So I would assume as the superintendent they would want to know if they have a parent who is upset about something happening in their instructional environment so I'm trying to bring that to their attention."), 57:6-58:15.  Commissioner Edelblut testified at deposition that he recalled thinking that the book was poorly written.  *Id.* 31:13-19.

In an October 1, 2021 email to various school district and DOE officials (as well as Commissioner Edelblut), the parent conveyed her understanding that the Commissioner "informed [her] that anything that contains **equity and inclusion** or sexual content, parents must be given a 2-week notice."  *See Ex. 94*, DOE-07022 (emphasis in original).  The parent likely was referring to RSA 186:11, IX-c, which requires districts to have a policy allowing an exception to specific course material based on the parent's determination that the material is objectionable, and which requires not less than two weeks advance notice for instruction of human sexuality or human sexual education.

This parent also sent an email to Defendant Commissioner Edelblut on October 7, 2021 stating that the "so-called professionals that are allowing this in school need to be disciplined!"  The parent complained that the "book has an underlying tone that white people and police officers are against black people all the way down to how white people look at a black person."  Further, she objected to certain so-called "gender books" being read.  The parent concluded by asking Commissioner Edelblut, in part, "[w]hat disciplinary action will result?," and "[h]ow do we proceed? Do I need to get a lawyer?"  *See Ex. 95*, PL00560-61.

b.   Zinn Complaint: On September 3, 2021, a woman shared with Commissioner Edelblut and legislators a May 24, 2021 email that had been sent by a parent, who then had a third-grade student in the school system, to the school district's superintendent.   The May 24, 2021 email from the parent complained about a teacher, prior to Columbus Day, reading from Howard Zinn's 1980 book *A People's History of the United States* "emphasizing the Marxist activist's condemnation of Christopher Columbus."  *See Ex. 96 (Depo. Ex. 16)*.  The parent also complained of statements like "White people cause racism" that were alleged to have been heard over the year.  The complaint stated, in part, that "[t]he indoctrination has to stop" and that "CRT is already in our schools, whatever name it uses, and it starts early in our kids' education."  *Id.*

Commissioner Edelblut forwarded the email on September 3, 2021 to DOE Attorney Diana Fenton stating that "we need to look into this," and that "[t]he events happened prior to the anti-discrimination law [the Amendments], but— if true—certainly would be considered unprofessional." *Id.* On September 7, 2021, Attorney Fenton responded to the Commissioner, stating "Thank you— we will look into it." *Id.* On September 3, 2021, Commissioner Edelblut wrote to the complainant stating that, "[i]f I open an inquiry on the referenced educators, would this woman [the parent] be willing to provide testimony to our investigator?" *See Ex. 97 (Depo. Ex. 17)*.

At deposition, Attorney Fenton could not recall if she had conversations with the complainant who shared the email or what exact step she took. Fenton Depo. 129:6-7, 20-25. However, she testified that, generally, her "typical process would be to have Richard Farrell call the superintendent and find out more information about the underlying issue." *See* Fenton Depo. 129:12-19. She added that, generally, before a determination is made as to whether this would be a code of conduct issue, there would "still be outreach to the superintendent, potentially to the complainant." *See* Fenton Depo. 130:10-12.





d. <u>*White Like Me* Complaint</u>: On December 13, 2021, a parent emailed Commissioner Edelblut directly complaining about a 2013 film entitled "White Like Me: Race, Racism & White Privilege in America; featuring Tim Wise" being shown to eighth graders in a school district. The parent said that "[t]he film should not be shown at all, as it is clearly CRT, and in direct violation of NH Bill 'HB 2 Sections 297 and 298, Right to Freedom from Discrimination in Public Workplaces and Education.'" *See <u>Ex. 68 (Depo. Ex. 15)</u>*. This email apparently followed a conversation that the parent had with Commissioner Edelblut.

Commissioner Edelblut forwarded the complaint to DOE Attorney Diana Fenton, stating that this part of the email was for then DOE Attorney Christopher Bond. *Id.* DOE Attorney Diana Fenton and DOE Investigator Richard Farrell could not recall if the DOE took any action with respect to the film (Mr. Farrell testified that his interactions with the district were focused on other aspects of the parent's complaint and not the Amendments). Fenton Depo. 125:21-126:9; Farrell Depo. 161:2-5, 161:17-162:11.

However, it does appear that either the DOE or Commissioner Edelblut directly elevated this complaint concerning the Amendments directly to the attention of the district's superintendent, who perceived the Amendments as being implicated. In response, the superintendent told the Commissioner the following: "Out of context, and given the title of the film, it would be easy to assume that the use of the film … <u>*would be inappropriate to show in the classroom given the recently passed legislation in NH*</u>. However, when put into real teaching and learning context, I don't believe that to be the case in this situation." *See <u>Ex. 57</u>*, DOE857 (emphasis added). The Commissioner responded, stating that "I want to clarify that I was simply passing along a parent concern that had come to my attention." While stating that the HRC or Superior Court adjudicates violations of the Amendments and that the DOE does not have a role, the Commissioner stated that he "simply wanted to alert you to a parent complaint." He added that "[i]f you have questions about the material, I would encourage you to reach out to your district's counsel." *See <u>Ex. 57</u>*, DOE857.

Demonstrating the scope of the Commissioner's enforcement authority, the Commissioner concluded the email by stating that the superintendent "might want to consider whether your district's 'opt-out' policy under RSA 186:11, IV-c is applicable to this parent concern."  *Id.*[75]

e.   "No Left Turn" Complaint: On February 7, 2022, Michael Breen of the group "No Left Turn in Education" wrote to the DOE with "evidence of probable widespread violation of the Education Codes of Conduct."  *See Ex. 100 (Depo. Ex. 26)*.   The letter complained that multiple New Hampshire educators promised "to openly violate any such prohibitions that might become law."  The letter went on to state that, "[o]f the sixty-two individuals who asserted they were New Hampshire educators, 35 were confirmed as such by the N.H. Department of Education."  *Id.*; *see also Ex. 101 (Depo. Ex. 27)* (DOE receiving No Left Turn press release).  The letter added that this was "more than enough for" the State Board of Education to act and open an investigation into the signatories because "[t]he Educator Code of Conduct itself states that 'the department [of education] *shall undertake* an investigation' of an educator if the department merely 'has reason to suspect' that the educator knowingly failed to report a violation of the Codes."  *See Ex. 100 (Depo. Ex. 26)* (emphasis in original).

Prior to the submission of this letter, Commissioner Edelblut, on December 28, 2021, informed Mr. Breen how to find information online concerning New Hampshire educators.  *See Ex. 74 (Depo. Ex. 43)*.

Some superintendents reached out to the DOE in response to this letter because they were concerned.  Farrell Depo. 77:21-78:4.  In response to a February 9, 2022 email from an interim superintendent asking whether the district should investigate, DOE Investigator Richard Farrell stated on February 14, 2022 that—after consulting with the Attorney General's Office—the DOE had no interest in the allegations because the "signatures (if confirmed) were affixed to the 'pledge' prior to HB2 becoming law."  *See Ex. 102 (Depo. Ex. 28)*.

f.   Human Relations Materials Complaint: On April 4, 2022, M.P. emailed Commissioner Edelblut various attachments and wrote: "A Human Relations teacher at [a] High School gave these worksheets out to students.  Is this allowed?"  The worksheets, among other things, addressed "diversity bingo,"

---

[75] RSA 186:11, IX-c requires school districts to adopt a policy allowing an exception to specific course material based on a parent's or legal guardian's determination that the material is objectionable. "Such policy shall include a provision requiring the parent or legal guardian to notify the school principal or designee in writing of the specific material to which they object and a provision requiring an alternative agreed upon by the school district and the parent, at the parent's expense, sufficient to enable the child to meet state requirements for education in the particular subject area. The policy shall also require the school district or classroom teacher to provide parents and legal guardians not less than 2 weeks advance notice of curriculum course material used for instruction of human sexuality or human sexual education. The policy shall address the method of delivering notification to a parent or legal guardian …."  *See* RSA 186:11, IX-c.

as well as racial, gender, disability, religious, sexual orientation, and other identities.  *See Ex. 103 (Depo. Ex. 18)*.

The next day, Commissioner Edelblut forwarded this email and attachments to DOE Attorney Diana Fenton, who then forwarded the email and attachments to DOE Investigator Richard Farrell with the text "[c]an you look into this?"  *Id.*  Mr. Farrell then forwarded the attachments to the district's superintendent.

On April 7, 2022, the superintendent wrote Mr. Farrell, stating that "[w]e have had the opportunity to review the material that you'd sent and have the following information for you in response to the inquiry."  He explained that "the activities identified are from the Human Relations Couse at [the district's high school]," and that the district has concluded that the attachments "do fall within the scope of the course."  He noted that the syllabus included parental notification and an invitation for parents to review class assignments.  He added that he was told that all parents submitted acknowledgments, and that no complaints had been received.

Mr. Farrell testified that he "talked a couple times" with the superintendent, "provided [the material] to him, talked to him about it, got additional information … and then we met and discussed the matter with Attorney Fenton."  Farrell Depo. 123:1-7.  Mr. Farrell engaged in this inquiry even though "he didn't do anything with the material in terms of educator misconduct."  *Id.*  He testified that he was not looking at whether the worksheets implicated the Amendments, and rather guessed that the focus instead was on whether the opt-in rules for nonacademic surveys were followed at RSA 186:11, IX-d, *see* Farrell Depo. 102:2-3, 105:24-106:15, 108:22-109:22, 123:8-22.[76]  However, the superintendent apparently assumed that the Amendments were implicated, adding in his April 7, 2022 email that "*[w]e have also reviewed this material through the lens of the new Divisive Concepts law*, and find that the subject of these activities do not apply."  *See Ex. 103 (Depo. Ex. 18)* (emphasis added); Farrell Depo. 123:1-7 (acknowledging that he spoke with the Superintendent a couple times, provided the worksheets to him, got additional information, and then discussed it with Attorney Fenton).  Mr. Farrell forwarded the Superintendent's email to other DOE staff, including the Commissioner.  The Commissioner responded, stating: "Can we discuss in our next meeting?  Looking at the 'opt out/in' content, I would say that the content

---

[76] It is not entirely clear that these worksheets even constitute "a non-academic survey or questionnaire" on their face under RSA 186:11, IX-d.  In any event, Mr. Farrell acknowledged at deposition that violation of the opt-in law with respect to nonacademic surveys at RSA 186:11, IX-d can be considered a violation of the Educator Code of Conduct.  *See* Farrell Depo. 110:12-18, 111:22-112:7.  However, there does not appear to be an explicit statute deeming a violation of RSA 186:11, IX-d as a violation of the Educator Code of Conduct, which demonstrates the breadth of how the DOE perceives its authority.  *See* Farrell Depo. 130:12-132:2 ("Q. Which—which provision of the code [of conduct] would that [the statutory requirement that there be a parental notification and opt-in] violate?  MR. KENISON-MARVIN: Objection. Legal conclusion. THE WITNESS: Well, again, you'd have to ask my superior that. I just—my bottom line is that I've been told if there is a question about opting into a nonacademic survey, we will investigate it as a possible code of conduct violation.").  Unlike RSA 186:11, IX-d, RSA 193:40, IV makes explicit reference to the Educator Code of Conduct.

of the materials may not match the relatively benign syllabus."  Ms. Fenton responded that "Yes, we need to discuss at our next ed misconduct meeting in further detail."  *Id.*

While this complaint triggered inquiries to the Superintendent, DOE Attorney Fenton testified that, "[t]o the best of my knowledge, sitting here today, this matter would not have prompted an investigation to have been opened, nor would it have been a violation of the code of conduct …."  Fenton Depo. 142:16-20.

One week later, on April 15, 2022, Commissioner Edelblut cited these documents in an op-ed in which he argued that educators were overstepping and that "biases are beginning to seep into our own institutions."  *See Ex. 40 (Depo. Ex. 14)*, at PL00696-700 (attaching Human Relations Course syllabus), PL00736-737 (attaching worksheets).

g.  "Actively Unwoke" DEI Complaint:
K.B.'s complaint also became the subject of an online article (*Ex. 27 (Depo. Ex. 65)*) and a series of tweets (*Ex. 29 (Depo. Ex. 67)*).  There, she not only attacked DEI training as violating the Amendments (including the second banned concept), but also the fact that the district's Racial Unity Project apparently worked with English teachers about ways to re-teach Harper Lee's 1960 book *To Kill a Mockingbird* "through the lens of underrepresented characters," which will "serve[] as an entry point into critical conversations about race and equity."  *See Ex. 29 (Depo. Ex. 67)*, at PL00629; *Ex. 27 (Depo. Ex. 65)*, at 10 of 19.

On August 24, 2022, DOE Investigator Farrell, in part, responded that "Commissioner Edelblut has forwarded your inquiry directly to Ahni Malachi (HRC) on 19 August 2022 for her review."  *See Ex. 105 (Depo. Ex. 29)*.  Commissioner Edelblut could not remember whether he forwarded this inquiry to the HRC, *see* Edelblut Depo. 132:9-16, but DOE Investigator Farrell testified that, "[i]f I wrote that he did, then he did."  *See* Farrell Depo. 88:16-24 (noting that "Commissioner does what the commissioner wants to do.  I'm not his boss.").  HRC Assistant Director Cohen also testified that the HRC has "received referrals from the Department of Education," but "[g]enerally we ask that the referring agency tell the person to contact us directly."  Cohen Depo. 102:14-103:1.

h. _This Book is Anti-racist_ Complaint: On September 1, 2022, a parent complained about a book entitled _This Book is Anti-racist_ that was apparently accessible on the school district's Sora application—an application that gives students one-tap access to ebooks, audiobooks, Read-Alongs, magazines and other materials on electronic devices.  The parent complained that the book is "blatantly racist" and "direct[s] kids to redistribute wealth from those who earned it, giving it to those who didn't."  The parent stated that the "book openly denies any and all racism exists against whites," and that, "[a]s a person who has experienced white racism, I KNOW this is untrue."  She added that "_[i]t violates the law put into place_ to protect against this exact thing, racism," and that students "have a right to educational materials that aren't racist or sexually educational."  She explained that she wants "to protect students by way of _following our laws_," and that the Sora application and its "Sexist and racist curriculum _violates our laws_."  She asked Commissioner Edelblut "to investigate and keep sex Ed and racist texts and teachings, out of our schools, _per the law_."  _See Ex. 106 (Depo. Ex. 39)_ (emphasis added).

In response, Commissioner Edelblut said, "[i]f you can give me a call to discuss the below, that would be helpful," apparently referencing his cell phone number.  He then forwarded the email chain to DOE Investigator Richard Farrell the next day to take any action he deemed appropriate.  _Id._; Edelblut Depo. 39:12-13.

Though the complaint appears to have referenced the Amendments, Commissioner Edelblut testified that he did not go through the exercise of evaluating whether the content mentioned by the complainant would violate the Amendments.  Instead, the DOE viewed the complaint as creating questions of how does a "student access it [the Sora application]" and "what are the protections that are afforded relative to this application."  Edelblut Depo. 48:11-14.  He stated that "there was concern that when a student is outside of the school environment and outside of the school's either devices or firewall that there may be an opportunity for that student to use a third party device to use their log-in to access the app and access material _that may be developmentally inappropriate for those students_."  Edelblut Depo. 49:1-8.  In other words, concerns about a book apparently under the Amendments led the DOE to engage in an investigation of the Sora application at this district out of a concern that students may be accessing books that are "developmentally inappropriate."  This culminated in "a number of conversations," including with the superintendent and library so controls were in place.  Edelblut Depo. 49:10-22.

139.    On April 15, 2022, Commissioner Edelblut published an op-ed entitled "Education's Sacred Trust."  _See Ex. 40 (Depo. Ex. 14)_.  This op-ed argued, among other things, that "[r]ecent experiences in New Hampshire show that some of these biases are beginning to seep into our own institutions."  This op-ed also attached a document containing examples that, in his

view, "exemplifies actual instructional material from New Hampshire schools that parents have identified as conflicting with their values." *See Ex. 40 (Depo. Ex. 14)*.  Many of these attachments directly implicated the Amendments, including some of the complaints that the DOE itself had directly received under the new law:

    a.   <u>The Book Stamped</u>: Printouts of Jason Reynolds/Dr. Ibram X. Kendi's 2020 book for individuals ages 12 and older entitled *Stamped: Racism, Antiracism, and You: A REMIX of the National Book Award-winning "Stamped from the Beginning"*  See Ex. 40 (Depo. Ex. 14), at PL00716-725.

    b.   <u>Human Relations Materials Complaint</u>: An April 4, 2022 complaint to the DOE from M.P. concerning diversity materials provided in a Human Relations course that, in response to inquiries from the DOE, led to the superintendent to "review[] this material through the lens of the new Divisive Concepts law." *See Ex. 40 (Depo. Ex. 14)*, at PL00696-700, 736-737; *see also Ex. 103 (Depo. Ex. 18)*.  This complaint is detailed above.

    c.   <u>This Book is Antiracist</u>: Chapter 10 of the 2020 book *This Book is Anti-Racist* by Tiffany Jewell. *See Ex. 40 (Depo. Ex. 14)*, at PL00742-745.  Commissioner Edelblut also cited this specific chapter in his July 8, 2021 remarks before the Board of Education where he referenced the Amendments and argued that this book rebuts the claim of "people [who] will say like, well, this doesn't happen in New Hampshire." *See Ex. 56* (Transcript of July 8, 2021 remarks).  A district's purchase of this book was used by a person, in January 2022 written testimony, to argue why the legislature should not repeal the Amendments. *See Ex. 107*, BAN00690, 694.  Indeed, boxes of this book were bought by one district, but were then set aside by the district particularly because of concerns about the Amendments.  Some community members in that district cited this book in public meetings as evidence of why DEI work should not occur in schools. *See Ex. 15*, Mejia Decl. ¶ 16.

    d.   <u>Exploring Whiteness Couse Summary</u>: A course summary of a class entitled "Exploring Whiteness and becoming an Anti-Racist Activist." *See Ex. 40 (Depo. Ex. 14)*, at PL00749-58.  This is the same summary submitted by a parent to the legislature in support for why HB544 was necessary. *See Ex. 108 (Depo. Ex. 49)* (from HB544 legislative history at Docket No. 43-1); Edelblut Depo. 139:1-7 (agreeing that "the syllabus on Exhibit 49 that Mr. Richards

submitted to the House Executive Department's Administration Committee is the same document that you received from Mr. Richards, a portion of which you attached as Topic Ten to Exhibit 14"). The course was apparently an "elective class that students signed up for in a specials week that they have." Edelblut Depo. 174:19-20.

**B.      Human Rights Commission Complaints Under the Amendments**

140.    Since the enactment of the Amendments on June 25, 2021, there have been

approximately ▇▇▇ allegations of discrimination submitted to the HRC in various forms

complaining that specific educators and school districts were violating the Amendments. The

HRC has deemed one these complaints as presenting a *prima facia* claim of discrimination under

RSA ch. 354-A and, as a result, has formally docketed the complaint ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See Ex. 47 (Depo. Ex. 58)* (HRC Int.

Resp. No. 6) ("The HRC Defendants can confirm that the HRC has docketed one complaint made

under the amendments."), Resp. No. No. 5 ("At the time of this response, no complaint brought

under the amendments has been fully adjudicated by the HRC."). The remaining complaints are

either pending review, have not been responded to or resulted in agency action for various reasons,

or have been denied as presenting a *prima facie* claim. These complaints are detailed below:

a. 







2593





[80] *Things Fall Apart – Thug Notes: Summary and Analysis,*
https://www.youtube.com/watch?v=0_xtOMiW0ys&list=PLghL9V9QTN0hRGuj-cajzmO_WvTrFnAlq&index=16.
[81] https://www.youtube.com/@WisecrackEDU/about.



141.   With respect to complaints made under the Amendments specifically, the HRC Director is always involved in the docketing decision where an inquiry is made as to whether the complaint reaches the *prima facie* threshold of discrimination.  Cohen Depo. 23:1-7.

142.     The HRC has no obligation to notify the DOE if the HRC decides to docket a complaint under the Amendments or if the HRC concludes that there has been a violation under the Amendments.[82]

143.     The HRC has refused to publicly release to the public (and teachers) information concerning the substance of complaints in which the HRC has determined there is no *prima facia* claim.  *See Ex. 61*; *see* RSA 354-A:21, II(a) ("the commission may publish the facts in the case of any complaint which has been dismissed, and the terms of conciliation when the complaint has been so disposed of").

## VIII.   Confusion as to Who Enforces RSA 193:40, and the Amendments' Impact on Extracurricular Speech

144.     Two HRC witnesses testified that the HRC has no enforcement authority over RSA 193:40, explaining that the entity that enforces RSA 193:40 would be the state department that enforces that section of state law (which, here, would be the DOE).   HRC Director Malachi testified as follows:

> Q.     Okay.  I'm just going to direct your attention back to Exhibit 1, and page PL 006 starting at line 23.  It goes on to page 7, line 15.  So this is the statute RSA 193:40, and when you see that language just let me know.
>
> A.     I'm sorry.  Line 23 through?
>
> Q.     I'm sorry.  Line 23 to the next page, line 19, and it's RSA 193:40 on Exhibit 1.
>
> A.     I see it.
>
> Q.     Okay.  Do you have any authority in enforcing that statute?
>
> MR. KENISON-MARVIN: Objection.  Legal contention.  You can answer.
>
> A.     The [Human Rights] Commission does not have jurisdiction over 193:40.

---

[82] *See* Cohen Depo. 115:11-17 ("Q. Does the HRC have any obligation to notify the Department of Education when there's been a docketed complaint? A. No.   Q. How about when there's been a finding of probable cause for discrimination? A. No.").

Q.      So if someone brought a claim to the Human Rights Commission under RSA 193:40, your view is you would have no jurisdiction to adjudicate it; is that correct?

        MR. KENISON-MARVIN: Same objection.

A.      The Commission has jurisdiction over 354-A.

Q.      And RSA 193:40 is not within RSA 354-A so is it fair to say in your view you do not believe the Commission has jurisdiction to hear a claim under RSA 193:40?

        MR. KENISON-MARVIN: Same objection.

A.      As I sit here today it would be my understanding that the Commission only has authority over 354-A.

Q.      Do you know sitting here today who would have jurisdiction over a complaint made exclusively under 193:40?

        MR. KENISON-MARVIN: Same objection.

A.      I do not have expertise in 193 so whose RSA that belongs to would be the body that has authority over 193:40.

*See* Malachi Depo. 73:5-74:17; *see also id.* 12:18-20 (testifying that RSA 193:40 is "not the statute that I work with").  Similarly, HRC Assistant Director Sarah Burke Cohen testified that she was "not familiar with" RSA 193:40 and that the DOE appears to be the enforcer of its provisions.[83]

This testimony from Director Malachi and Assistant Director Cohen is consistent with the fact that the HRC's own intake questionnaire form and "charge of discrimination" form under the Amendments make no reference to RSA 193:40.  *See Ex. 49 (Depo. Ex. 60)* (questionnaire); *Ex.*

---

[83] *See* Cohen Depo. 25:5-26:1 ("I can only testify as to 354-A. The remaining sections of 006 and 007 [at Exhibit 1, including RSA 193:40] are not the statute that I am familiar with."; "Q. Okay. So I just want take make sure I understand your testimony that you're prepared to, you're prepared to talk about with respect to complaints in particular those made under 354-A:29 to 34. Correct?  A. That is correct.  Q. And that's not the case with respect to RSA 193:40.  Is that fair to say?  A. That is correct.  Q. And I just want to make sure I understand your testimony that is not a statute that you're familiar with, correct?  A. correct."), 59:9-21 ("Q….With respect to on Exhibit 1, the amendments that have been challenged in this case, with respect to RSA 193:40 on the page Bates stamped 006 to 007, I believe your testimony earlier was you're not familiar with that section; is that correct?  A. Not familiar.  Have I read it before, yes.  Am I familiar with it, not particularly.  Q. Is it the Department of Education that's tasked with enforcing those provisions? MR. KENISON-MARVIN: Objection. Scope. Calls for legal conclusion. You can answer. A. It appears that is what RSA 193 does.").

*24 (Depo. Ex. 62)*.  The "denial" letters sent by the HRC under the Amendments also make no reference to RSA 193:40.  *See Exs. 34 (Depo. Ex. 72), 35 (Depo. Ex. 73)* (denial letters).

145.    The DOE said the opposite at deposition, insisting that the agency tasked with finding violations of the Amendments and applying RSA 193:40 is the HRC.[84]

146.    It is also unclear whether the DOE can make direct referrals to the HRC for violations under RSA 193:40.  Defendants have declined to produce documents relating to a purported agreement that was reached between the DOE and the DOJ on or about February 14, 2023 where "a procedural mechanism [was put] in place by which the Department of Education could transfer cases that could or could not fall within HB 2 … to the Attorney General's office for their review.'"  *See* Fenton Depo. 85:23-86:10; *see also Ex. 65 (Depo. Ex. 6)*, at PL806 (DOE Attorney Diana Fenton testifying before the House Judiciary Committee on March 8, 2023 that "we have since [late January 2023] worked with the AG's office to come with an SOP as to how we transfer those cases to the Human Rights Commission and the AG's office").  DOE Attorney Fenton answered "yes" when asked whether the agreement that was reached during that February 14, 2023 meeting has "been in effect since that meeting."  *See* Fenton Depo. 90:24-91:18.  Despite the apparent agreement that is currently in place, Defendants have declined document requests that would help Plaintiffs and this Court learn more about this process.  HRC was not invited to these meetings.

147.    DOE Investigator Farrell testified what "extra-curricular" means at deposition:

Q.    How would you define "extracurricular activities" [referenced in the July 2021 FAQs]?

---

[84] *See* Edelblut Depo. 65:8-10 (stating that the "adjudication of that [whether a teacher could teach that affirmative action is a wonderful thing] is something that would be made by the Human Rights Commission"), 67:10-11 ("My response is not to adjudicate whether or not they are violations of the particular law"), 67:23 ("So my responsibility is not to adjudicate [HB2]"), 70:5-15 ("I don't have adjudicatory responsibility" for HB2), 153:16-20 ("So I will start with the fact that it's not my job, it's not within the purview of my responsibility to adjudicate whether or not certain actions by an educator would be some type of an action under 193:40.").

A.     Extracurricular activities could be anything from sporting situations, coaching, dance, plays. . . . Anything that happens within the confines of the definition of the Safe Schools Act.  So anything—if it's defined as a safe school, the property of the Safe Schools, anything that happens within the confines of that Safe Schools Act would apply.

. . .

So, for example, under the Safe Schools Act, a teacher on a bus to and from a field trip, that's Safe Schools.  That's covered.  A teacher that's becoming a coach and working as a coach, theater, drama.  Anything within the curtilage or the extended portion of a school.  It gets kind of creative because many hockey programs—for example, hockey rinks are not—they're private facilities, but if a hockey team for a high school is playing and/or practicing on that facility, it becomes an extension of Safe Schools.  So I would say the answer to that would be anything that falls within the curtilage of the Safe Schools definition.

See Farrell Depo. 174:23-177:3.  He also testified that the Educator Code of Conduct can apply to educators or credential holders when they are off duty.  See Farrell Depo. 197:22-198:1.

## IX.    The Chill of the Amendments on New Hampshire Educators

148.    The Amendments have caused educators and administrators to self-censor with respect to instruction and trainings on race, gender, sexual orientation, and gender identity. Examples of this chill are detailed below.

149.     Plaintiff Christina Philibotte, the Manchester School District's Chief Diversity Officer, testified to the following: "Previously, in conducting DEI trainings before the Amendments and before I assumed the role of Chief Equity Officer for the Manchester School District, I would specifically use terms and concepts like 'anti-racism' and 'anti-bias.'  Because of the Amendments and their penalties, I now rarely use terms and concepts focusing on 'anti-racism' in staff trainings—and have advised others to avoid them as well."  See Ex. 13, Philibotte Decl. ¶ 15.  She added that: "I rarely use the term 'anti-racism' because of its connection to Ibram X. Kendi's 2019 book How to be an Antiracist, which the Commissioner of Education cited as a reason why the Amendments are necessary."   See id. ¶ 17.  Further, she "recommended that

teachers omit reciting during a 'read aloud' certain lines of text in Jewell Parker Rhodes's 2018 book *Ghost Boys*—a book that follows the story of Jerome, a 12-year-old Black boy, who is shot and killed by a White police officer before coming back as a ghost."  *See id.* ¶ 19.

150.    Plaintiff Andres Mejia, SAU16's Director of Diversity, Equity, Inclusion, and Justice, has similarly testified to the following: "As a result of this uncertainty [surrounding the Amendments], instructional choices have been chilled in order to avoid enforcement consequences.  Professional development around implicit bias, race, and racism has either been put on hold or modified in ways that prevent or dilute a full discussion of these concepts."  *See Ex. 15*, Mejia Decl. ¶ 13.   He added: "[A middle school] has temporarily set aside Tiffany Jewell's 2020 book entitled *This Book is Anti-Racist* and Beverly Daniel Tatum's 2017 book *Why are All the Black Kids Sitting Together in the Cafeteria (Revised and Updated edition)* which were to be used by a teacher group for professional development.  Boxes of these books were bought by the 2020-2021 principal of that middle school, but were then set aside by SAU16 in the Fall of 2021 after the enactment of the Amendments.  These books remain in my office, and I have no ability to know whether they are covered under the Amendments because the Amendments are unclear.  Tiffany Jewell's book was especially set aside because some Exeter Region Cooperative School District community members cited this book in public meetings as evidence of why DEI work should not occur in schools."  *See id.* ¶ 16.

151.    A former high school teacher who left her role at the end of the 2022 school year, testified that the Amendments were one of the reasons why she left the profession.  She noted that, "[w]hile I was still teaching, even though I may not have been violating the Act, I had to change my teaching methods significantly out of fear that I would be accused of doing so."  For example, she "went from using assessments such as essay questions and open-ended short answer questions

to using only multiple-choice assessments."  Her concern was that in teaching World History—which includes units on different political movements and figures—"essay questions or short answer prompts would be misinterpreted as students believing that they had to agree with a certain position to score well on the assessment."  *See Ex. 14*, Given Decl. ¶¶ 6-7.  In addition, she "significantly reduced open discussion and debate of ideas in [her] classroom out of fear that these discussions would be misinterpreted as teaching or inculcating one of the opinions or concept the students were arguing about."  *Id.* ¶ 8.  For example, her "World History units cover Marxism, Stalinism, Naziism and other dictatorship regimes.  Instead of allowing students to analyze and critique these dictatorships [she] lectured on the topic. It seemed to [her] that an open discussion where students may offer their own personal support for Marxism or Communist ideas or even Nazi ideas was too fraught for [her] to consider regardless of the tremendous amount students can learn while hearing their peers exhibit critical thinking skills."  *Id.*  She also "could not accurately answer students' questions because [she] did not feel comfortable making any commentary other than simply the historical context and facts relevant to their inquiry."  *Id.* ¶ 10.  She "severely limited" her use of the "widely understood best practice" where a teacher applies "material to students' own experiences and interests so that they can identify material and relate it to their own lives"—a practice that "is particularly important in social studies curriculums and historical courses where students can easily believe historical events only happened in the past."  *See id.* ¶ 12.  She left the profession "out of frustration because of the frustrating conditions that public school teachers are subjected to," like the Amendments.  *Id.* ¶ 5.

152.    An AP English teacher at a high school testified that the Amendments have changed the way he teaches the 1899 book *Heart of Darkness* by Joseph Conrad and the 1987 book *Beloved* by Toni Morrison, as well as the 1899 poem *The White Man's Burden* by Rudyard Kipling—a

poem that is thematically similar to *Heart of Darkness* and discusses colonialism, imperialism, and racism. *Ex. 12*, Keefe Decl. ¶¶ 9-16.  Further, prior to the Amendments' passage, he would use a technique when assigning books that asked students to "identify whether the legacy of slavery is evident in the modern world? Could they connect the characters' stories to their own experiences or observations?"  *Id.* ¶ 18.  He feels "less comfortable placing these books in a contemporary framework and asking students, for example, if they think the Black Lives Matter movement could be considered a result of the destructive legacy of slavery or asking, 'does the legacy of slavery continue and if so, how?'"  *Id.* ¶ 19.  Prior to the Amendments' passage, he would also ask "students to draw on things they saw in the news, popular culture, or their own experiences and use these frameworks to inform their analysis." *Id.* ¶ 15.  He does this because "the state standards require students to be able to write about experiences" (both their own and others), understand different cultures and experiences other than their own, and critically examine the information they receive in the media every day.  *Id.*  Now, he is concerned about doing so.  *Id.*

153.    An eighth-grade social studies teacher in Cheshire County has also testified that, "[b]ecause our students learn early American history, including slavery, the Civil War, and Reconstruction, we determined that part of instruction would need to address the history of racism in America." *Ex. 16*, O'Mara Decl. ¶ 8.  Accordingly, after approval by the school board, 250 copies of Jason Reynolds/Dr. Ibram X. Kendi's 2020 book for individuals ages 12 and older entitled *Stamped: Racism, Antiracism, and You: A REMIX of the National Book Award-winning "Stamped from the Beginning"* were purchased with the intent that all eight graders would read the book.  The intent was that many subject areas would interweave this book into their curriculum. *Id.* ¶ 10.  It was identified as age appropriate for the students, relevant to the course of study, and authored by credible and knowledgeable scholars.  *Id.* ¶ 9.  However—seemingly because of the

Amendments and Commissioner Edelblut's June 13, 2021 Op-Ed in the *Union Leader* entitled "Teach Children About Racism, Not to be Racists" that named Dr. Ibram X. Kendi's 2019 book *How to Be an Anti-Racist* as a text that "support[s] Critical Race Theory"—this educator "understood that our school administration had asked [educators] to set the project aside due to this uncertainty [over whether the book was covered under the Amendments due to the Commissioner's statements] and that we should not make further plans for grade-wide engagement with *Stamped*." *Id.* ¶ 19.  Over the next school year, the planned grade-wide reading of *Stamped* was not implemented. The books sat on the shelf untouched.  *Id.* ¶ 20.

154.    Further, one educator was subjected to a DOE inquiry because a parent complained that the educator played two music videos created by two modern Black artists as part of a unit on the Harlem Renaissance.  The teacher was told the context of the inquiry by the DOE was the Commissioner's April 15, 2022 op-ed.  *See Ex. 11,* O'Brien Decl. ¶¶ 7-9, 13-19.

155.    AFT President and former reading and math intervention teacher testified that her colleagues have concerns about "what the 'Divisive Concepts' language would mean in practical terms for them."  *Ex. 8*, Howes Decl. ¶ 7.  They have questions like: "How much can you explain about the conditions of slavery and its impact on our country before you would break the law?," or whether they can "still assign a classic American novel 'To Kill a Mockingbird.'"  *Id.* ¶¶ 7-8. She laments the Amendments' "black cloud over educators," particularly because they have "chilled [AFT members'] ability to have open discussions in their classrooms and to teach and prepare our New Hampshire public school students to be critical thinkers." *Id.* ¶¶ 16.

156.    A former U.S. History teacher at Timberlane Regional High School testified about leaving the teaching profession due to the Amendments.  *Ex. 9*, Dube Decl. ¶¶ 20-22.  Recognizing the importance of "[a]llowing students to debate topics such as woman's suffrage, affirmative

action, reparations and the criminal justice system," he "encouraged [his] students to debate and learn, to inquire and analyze, and to learn from our history and compare it to our current world circumstances." *Id.* ¶¶ 5-6. The Amendments' passage "chilled" these important discussions in the classroom. *Id.* ¶ 11. After a political group in New Hampshire published his name for signing an online petition pledging to teach "honest history," he was subjected to "online harassment, threats and obscenities." *Id.* ¶¶ 12-14. He left the profession after the police department sent patrols to his home in light of these threats. *Id.* ¶¶ 17-18.

157.    A transgender art educator in Nashua also resigned because they felt "disrespected, afraid, and targeted" after the Amendments' passage. *Ex. 10*, Munz Decl. ¶ 17. They believed they were taking a risk "whenever [they] introduced [themselves] to students, staff, or community members saying, 'Hi, my name is Mx. Munz. My pronouns are they/them.'" *Id.* ¶ 6. In the previous four years, and without incident, they handed out an ungraded, nonmandatory, 'Welcome to Art!' get-to-know-you form, asking students to indicate their pronouns. *Id.* ¶¶ 7-8. After the Amendments' passage, a parent complained to the principal and posted her complaint on social media, threatening the educator professionally and personally. *Id.* ¶¶ 9-10. The educator's teaching materials were also attached to Commissioner Edelblut's April 15, 2022 op-ed *Education's Sacred Trust*, with damaging accusations like, "activist educators who might be knowingly dismantling the foundations of a value system," and "squander[ing] the credibility of the profession as a whole." *Id.* ¶ 16; *see also* *Ex. 40 (Depo. Ex. 14)*, at PL00709-713. The op-ed and attachments effectively outed them as a trans educator. *See* *Ex. 10*, Munz Decl. ¶ 16. As a result, they resigned from the profession and continue to fear for their safety. *Id.* ¶ 19.

158.    A ninth grade English and Journalism teacher at Nashua High School testified that "[t]he Divisive Concepts Law has impacted how [she] teach[es]," including "tak[ing] certain

articles and materials out of [her] curriculum." *Ex. 18*, Merrill Decl. ¶ 2.  She no longer shares articles that she previously used in connection with the book "To Kill a Mockingbird" to discuss systemic racism and "white privilege." *Id.*  She also refrains from showing videos like "White Like Me" because she "fear[s] that using these materials would be considered a violation of the Divisive Concepts Law." *Id.*  In her view, "[t]he law interferes with [educators'] ability to educate freely and hampers one of the most essential parts of a high school education—guiding students to be critical thinkers" *Id.*  It has also led to the disbanding of a diversity and inclusion group comprised of both students and faculty.  *See id.* ¶¶ 7-8. Last school year, the Gay-Straight Alliance[85] at Timberlane High School organized a school dance.  Shortly thereafter, one of the district's statement representatives went to the Timberlane School Board meeting and insisted that it was "not right" for the group to have a school-sponsored dance that was not open to everyone (despite the dance being open to all).  In the representative's view, the dance should not have taken place without a similar homecoming dance because if "you're not gay, you're not showing up" for fear of being ridiculed by other students.  She insisted that the School Board "stop this from happening in the future."  Richman Decl. ¶ 9.

159.    A high school World history teacher at Timberlane Regional High School describes feeling "reticent about teaching certain material in the classroom" after the Amendments were passed.  *Ex. 17*, Richman Decl. ¶ 2.  He is "nervous" and "guarded" when discussing topics like affirmative action, the Voting Rights Act, and the Equal Rights Amendment.  *See id.* ¶ 4.  As an example, he is uncertain whether he will teach about this election's primaries during civics and economics classes, notwithstanding having taught about current events and the election process in

---

[85] "GSA" is a common abbreviated name for Gender and Sexuality Alliance or Gay-Straight Alliance—a club where students can meet to discuss, among other things, sexual orientation and gender identity in a safe and confidential setting.

prior years.  *See id.* ¶ 11.  He is "constantly worried that there will be a complaint about [his] teaching and that [he] will be subject to investigation, charges, or worse."  *See id.* ¶ 12.  This fear extends to his work as a faculty advisor for Model UN.  He is restrained about what he can say around students in their research for Model UN competitions, including about topics like the War in Ukraine.  *See id.* ¶ 10.  This will be his last year teaching at Timberlane Regional High School because he does not feel like he can teach honestly under current legislative and political circumstances.  *See id.* ¶ 13.

August 14, 2023

Respectfully Submitted,

*/s/ Peter J. Perroni*

NOLAN PERRONI PC
NH Bar. No. 16250
73 Princeton Street
North Chelmsford, MA 01863
(978) 454-3800
peter@nolanperroni.com

STROOCK & STROOCK & LAVAN LLP
Charles G. Moerdler, Esq.*
David J. Kahne, Esq.*
Elizabeth Milburn, Esq.*
180 Maiden Lane
New York, New York 10038
(212) 806-5400
cmoerdler@stroock.com

David J. Strom*
American Federation of Teachers
555 New Jersey Ave. NW
Washington DC 20001
Tel.: 202.393.7472
dstrom@aft.org

Mark Richard*
Phillips, Richard & Rind P.A.
9360 S.W. 72nd Street, Suite 283
Miami, FL 33137
Tel.: 305.412.8322
mrichard@phillipsrichard.com

SELENDY & GAY PLLC
Faith Gay, Esq.*
1290 6th Avenue
New York, NY 10104
(212) 390-9000
fgay@selendygay.com

*Co-Counsel for Local 8027, AFT-New
Hampshire, AFL-CIO, Ryan Richman,
John Dube and Jocelyn Merrill,*

*teachers in the New Hampshire Public Schools, and Kimberly Green Elliot and Meghan Evelyn Durden parents or guardians of children in the New Hampshire public schools.*

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No.
  21177)
SangYeob Kim (N.H. Bar No. 266657)
AMERICAN CIVIL LIBERTIES UNION OF NEW
  HAMPSHIRE
18 Low Avenue, Concord, NH  03301
Tel.  603.224.5591
gilles@aclu-nh.org

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org

Jennifer Eber (N.H. Bar No. 8775)
Kayla Turner (N.H. Bar No. 270167)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
JenniferE@drcnh.org
kaylat@drcnh.org

*Co-counsel for Plaintiffs Andres Mejia and*
*Christina Kim Philibotte*

*/s/ Morgan C. Nighan*
Morgan C. Nighan (N.H. Bar No. 21196)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA  02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com

*/s/ David A. Vicinanzo*
David A. Vicinanzo (N.H. Bar No. 9403)
S. Amy Spencer (N.H. Bar. No. 266617)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com
aspencer@nixonpeabody.com

William E. Christie (N.H. Bar No. 11255)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, NH  03302
Tel.: 603.225.7262
wchristie@shaheengordon.com

Emerson Sykes*
Speech, Privacy, and Technology Project
Leah Watson*
Sarah Hinger*
Racial Justice Program
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18th Floor
New York, NY  10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

*/s/ Jason Walta*
Alice O'Brien*
Jason Walta*
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
aobrien@nea.org
jwalta@nea.org

Esther K. Dickinson (N.H. Bar No. 20764)
Lauren Snow Chadwick (N.H. Bar No. 20288)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
   NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
edickinson@nhnea.org
lchadwick@nhnea.org

Nathan R. Fennessy (N.H. Bar No. 264672)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
rtoland@preti.com


*Co-Counsel for National Education Association-New Hampshire*

*Admitted *pro hac vice*.

# **<u>EXHIBIT A</u>**

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | Doc. # | Pages | Filename | Additional Description | Date | Applicable Privileges |
|---|---|---|---|---|---|---|
| **1** | 3825.1 | 5 | 10fd0.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.M. regarding "does HB2 make Sununu's Diversity and Inclusion (DIE) Advisory Council illegal?"** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **2** | 4066.1 | 1 | 11304.eml | **Email correspondence of Attorney General Formella to Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials concerning revisions to draft FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| **3** | 4557.1 | 3 | Frequently_Asked_Questions_for_K-12_educational_programs_v3.docx | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials concerning revisions to draft FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege; work product. |
| **4** | 4679.1 | 3 | Frequently_Asked_Questions_for_K-12_educational_programs_v3.docx | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials concerning revisions to draft FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege; work product. |
| **5** | 4355.1 | 1 | 11398.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding draft FAQ document.** | July 20, 2021 | Attorney/client privilege; work product; deliberative process privilege; work product. |
| **6** | 5607.1 | 8 | Frank_Notes.pdf | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding draft FAQ document.** | July 20, 2021 | Attorney/client privilege; work product; deliberative process privilege; work product. |
| **7** | 4750.1 | 2 | 113df.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.G. subject "Follow-up inquiry on DOE guidance."** | July 22, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **8** | 4905.1 | 2 | 1010f.eml | **Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, and Associate Attorney General Anne Edwards regarding decision-making concerning potential DOE outreach to company regarding website content.** | September 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 9 | 5916.1 | 4 | 10d51.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from A.S. subject "VNH JEDI Taskforce July Meeting- Open Invite- Doodle Poll." | August 3, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 10 | 5352.1 | 4 | 10073.eml | Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, Attorney General Formella, and Associate Attorney General Anne Edwards regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 22, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 11 | 5467.1 | 4 | 10fb7.eml | Email correspondence of Angela Adams to DOE legal counsel Christopher Bond and DOE's Stephen Berwick regarding DOE decision-making concerning potential response to email from T.J. regarding subject "Gender Book." | August 10, 2021 | Attorney/client privilege; deliberative process privilege. |
| 12 | 5813.1 | 2 | 1133b.eml | Email correspondence of Attorney General Formella, Commissioner Edelblut, DOE legal counsel Christopher Bond, and other DOJ officials regarding draft FAQ document. | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege; work product. |
| 13 | 5849.1 | 3 | 108f8.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT." | August 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 14 | 6081.1 | 3 | 11fb9.eml | Email correspondence of Kimberly Houghton, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request. | February 15, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 15 | 6091.1 | 8 | 11a8a.eml | Email correspondence of Stephen Berwick, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response related to email of J.L. subject "Re: [MSS News] Annual Meeting and HSD -Hopkinton Town Library Hopkinton Reads Program." | June 10, 2021 | Attorney/client privilege; deliberative process privilege. |
| 16 | 6241.1 | 1 | 116ae.eml | Email correspondence of Senior Assistant Attorney General Jill Perlow to Commissioner Edelblut, DOE legal counsel Christopher Bond, and Associate Attorney General Anne Edwards regarding potential draft guidance and process for release of such potential guidance. | June 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 17 | 6505.1 | 3 | 130ae.eml | Email correspondence of Susan Blake to Commissioner Edelblut regarding decision-making concerning potential response to RSA 91-A request. | January 3, 2022 | Deliberative process privilege. |
| 18 | 7411.1 | 3 | 1001c.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

2614

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 19 | 7732.1 | 10 | 11ab7.eml | **Email correspondence of Stephen Berwick, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response related to email of J.L. subject "Re: [MSS News] Annual Meeting and HSD -Hopkinton Town Library Hopkinton Reads Program."** | June 10, 2021 | Attorney/client privilege; deliberative process privilege. |
| 20 | 8123.1 | 4 | 1010e.eml | **Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, and Associate Attorney General Anne Edwards regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 21, 2021 | Attorney/client privilege; work product privilege; deliberative process privilege; executive privilege. |
| 21 | 8241.1 | 3 | 10d65.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Kimberly Houghton regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers"** | February 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 22 | 8266.1 | 1 | 12247.eml | **Email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential op-ed.** | June 7, 2021 | Attorney/client privilege; work product privilege; deliberative process privilege; executive privilege. |
| 23 | 8601.1 | 2 | 108fe.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email of G.S. subject "Request for Further Clarification Concerning Implementation Guidance on House Bill 2 for Public School Districts."** | August 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 24 | 8611.1 | 2 | 10576.eml | **Email correspondence of Angela Adams to Commissioner Edelblut regarding decision-making concerning potential response to voicemail concerning "some clarification on the divisive concepts law that was recently passed."  *See* DOE-07767.** | September 8, 2021 | Deliberative process privilege. |
| 25 | 9093.1 | 1 | 118eb.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut concerning revisions to draft FAQs.** | July 7, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 26 | 24618.1 | 8 | Attorney_General_Opinion_-_Application_of_HB_2_Section_330_-_Draft_v4.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut concerning revisions to draft FAQs.** | July 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 27 | 24640.1 | 9 | FAQs_from_DOJ_DOE_andHRC_re_HB_2_v4.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut concerning revisions to draft FAQs.** | July 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| --- | --- | --- | --- | --- | --- | --- |
| 28 | 9167.1 | 4 | 10846.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Stephen Appleby regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 29 | 9376.1 | 5 | 10fc6.eml | **Email correspondence of Steven Berwick, DOE legal counsel Christopher Bond, Angela Adams, and Commissioner Edelblut regarding DOE decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 30 | 9511.1 | 3 | 11fb2.eml | **Email correspondence of Kimberly Houghton, Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request.** | February 15, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 31 | 9743.1 | 3 | 1080a.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 32 | 10920.1 | 2 | 1011f.eml | **Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, and Diana Fenton regarding decision-making concerning potential response to RSA 91-A request.** | February 1, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 33 | 11737.1 | 2 | 1211d.eml | **Email thread between DOE legal counsel Christopher Bond, Commissioner Edelblut, and Representative Glenn Cordelli concerning potential legislation.** | June 2, 2021 | Legislative privilege; attorney/client privilege; work product. |
| 34 | 12383.1 | 5 | 110cv.eml | **Email correspondence of Diana Fenton to DOE legal counsel Christopher Bond, Commissioner Edelblut, Stephen Berwick, and Richard Farrell regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 12, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 35 | 13022.1 | 3 | 11bd3.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to Deputy Commissioner Christine Brennan and other DOE officials regarding potential response to RSA 91-A request.** | September 23, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 36 | 13189.1 | 4 | 10813.eml | **Email correspondence of Stephen Appleby to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 37 | 13776.1 | 1 | 111fa.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to DOE officials regarding present litigation.** | September 14, 2022 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 38 | 32494.1 | 1 | Unnamed | **Calendar item forwarded by Senior Assistant Attorney General Samuel Garland regarding attorney/client meeting concerning present litigation.** | November 24, 2022 | Attorney/client privilege; work product. |
| 39 | 14668.1 | 4 | 10814.eml | **Email correspondence of Stephen Appleby to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 40 | 14871.1 | 3 | 11449.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.G. subject "Follow-up inquiry on DOE guidance."** | July 23, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 41 | 15145.1 | 5 | 10fbc.eml | **Email correspondence of Stephen Berwick to DOE legal counsel Christopher Bond, Angela Adams, and Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 42 | 15271.1 | 2 | 11f6a.eml | **Email correspondence of Richard Farrell, Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to media article regarding "No Left Turn in Education NH Complaints Filed Against NH Teachers who Pledged to Break the Law."** | February 14, 2022 | Deliberative process privilege. |
| 43 | 15698.1 | 2 | 103ad.eml | **Email correspondence of Executive Director Malachi to Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Senior Assistant Attorney General Jill Perlow regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 1, 2021 | Deliberative process privilege; attorney/client privilege. |
| 44 | 16075.1 | 5 | 10fbf.eml | **Email correspondence of DOE legal counsel Christopher Bond to Steven Berwick, Angela Adams, and Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 45 | 16197.1 | 5 | 10fba.eml | **Email correspondence of DOE legal counsel Christopher Bond to Steven Berwick, Angela Adams, and Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 46 | 17871.1 | 2 | 113cd.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from S.G. subject "Follow-up inquiry on DOE guidance."** | July 22, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 47 | 18226.1 | 1 | 1130b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning draft potential FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 48 | 38532.1 | 3 | Frequently_Asked_Questions_for_K-12_educational_programs_v3.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning draft potential FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 49 | 38610.1 | 3 | Frequently_Asked_Questions_for_Public_Employers_v4.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning draft potential FAQs.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 50 | 18228.1 | 1 | 1027a.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to RSA 91-A request.** | January 31, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 51 | 18460.1 | 2 | 1200b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding potential draft AG opinion.** | June 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 52 | 19611.1 | 2 | 10ea7.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training."** | August 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 53 | 20712.1 | 1 | 11346.eml | **Email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential press release.** | July 21, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
| 54 | 42672.1 | 3 | faq-public-governement.pdf | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential press release.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 55 | 42774.1 | 1 | 20210721-_State_Issues_Guidance_Regarding_New_Anti-Discrimination_Laws.docx | **Draft document attached to email correspondence of Attorney General Formella to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft potential press release.** | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 56 | 22258.1 | 3 | 10d61.eml | **Email correspondence of Kimberly Houghton to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers"** | February 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 57 | 223112.1 | 1 | 1128f.eml | Email correspondence of Senior Assistant Attorney General Jill Perlow to Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding draft potential FAQ. | July 16, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 58 | 44999.1 | 8 | FAQs_from _DOJ_DOE _andHRC_r e_HB_2_v6. docx | Draft document attached to email correspondence of Senior Assistant Attorney General Jill Perlow to Commissioner Edelblut, and DOE legal counsel Christopher Bond regarding draft potential FAQ. | July 15, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 59 | 22690.1 | 2 | 10c42.eml | Email correspondence of Kimberly Houghton to DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers" | February 4, 2022 | Attorney/client privilege; deliberative process privilege. |
| 60 | 22703.1 | 2 | 10db4.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training." | August 3, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 61 | 48763.1 | 4 | 10213.eml | Email correspondence of DOE legal counsel Elizabeth Brown, Senior Assistant Attorney General Samuel Garland, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 62 | 49042.1 | 9 | 10c9f.eml | Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)." | September 12, 2022 | Deliberative process privilege. |
| 63 | 49103.1 | 3 | 10c39.eml | Email correspondence of Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown. | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| 64 | 49451.1 | 2 | 10c38.eml | Email correspondence of Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown. | August 22, 2022 | Attorney/client privilege; deliberative process privilege. |
| 65 | 49639.1 | 5 | 10d11.eml | Email correspondence of Richard Farrell, Diana Fenton, and Commissioner Edelblut regarding decision-making concerning potential response to email from "M.P." subject "Londonderry" | April 12, 2022 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 66 | 50007.1 | 8 | 10c94.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 12, 2022 | Deliberative process privilege. |
| 67 | 50030.1 | 8 | 10c9d.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 13, 2022 | Deliberative process privilege. |
| 68 | 50191.1 | 1 | 10c31.eml | **Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law."** | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 69 | 50253.1 | 2 | 10c32.eml | **Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law."** | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 70 | 50335.1 | 3 | 10c3e.eml | **Email correspondence of Richard Farrell, Diana Fenton, DOE legal counsel Elizabeth Brown, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown.** | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| 71 | 50538.1 | 8 | 10c9e.eml | **Email correspondence of Richard Farrell, Diana Fenton, and Commissioner Edelblut regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 13, 2022 | Deliberative process privilege. |
| 72 | 51042.1 | 5 | 10821.eml | **Email correspondence of Richard Farrell to Commissioner Edelblut, Diana Fenton, DOE legal counsel Christopher Bond, and D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry"** | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| 73 | 52231.1 | 6 | 1006b.eml | **Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut."** | December 7, 2022 | Deliberative process privilege. |
| 74 | 52232.1 | 6 | 1006a.eml | **Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut."** | December 7, 2022 | Deliberative process privilege. |
| 75 | 52268.1 | 1 | 10727.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to Dover CRT accusations.** | February 7, 2023 | Deliberative process privilege. |
| 76 | 53329.1 | 4 | 11439.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE** | February 22, 2023 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | officials regarding process of responding to plaintiffs' discovery requests. | | |
| 77 | 53354.1 | 3 | 11438.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 78 | 53358.1 | 3 | 11475.eml | Email correspondence of DOE legal counsel Elizabeth Brown, Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct." | August 23, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 79 | 53365.1 | 3 | 1146a.eml | Email correspondence of DOE counsel Elizabeth Brown to Richard Farrell regarding decision-making concerning potential response to RSA 91-A request. | July 5, 2022 | Attorney/client privilege; work product. |
| 80 | 53370.1 | 3 | 11436.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 81 | 53374.1 | 3 | 1143b.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 82 | 53378.1 | 3 | 11435.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 83 | 53445.1 | 2 | 133a3.eml | Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law." | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 84 | 53446.1 | 2 | 133a4.eml | Email correspondence of Diana Fenton, Richard Farrell, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown. | August 22, 2022 | Attorney/client privilege; deliberative process privilege. |
| 85 | 53447.1 | 3 | 133a5.eml | Email correspondence of Diana Fenton, Richard Farrell, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown. | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 86 | 53448.1 | 1 | 133a1.eml | **Email correspondence of Richard Farrell and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to media article "The Exeter Region Cooperative School District is openly violating New Hampshire's anti-CRT law."** | August 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
|----|---------|---|-----------|---|---|---|
| 87 | 54633.1 | 8 | 130f5.eml | **Email correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 13, 2022 | Deliberative process privilege. |
| 88 | 54738.1 | 7 | 130f0.eml | **Email correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 12, 2022 | Deliberative process privilege. |
| 89 | 55008.1 | 1 | 12fdc.eml | **Email correspondence of Richard Farrell to Diana Fenton regarding decision-making concerning potential response to RSA 91-A request.** | November 10, 2022 | Deliberative process privilege. |
| 90 | 55446.1 | 6 | 12ed5.eml | **Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut."** | December 7, 2022 | Deliberative process privilege. |
| 91 | 55501.1 | 7 | 130f1.eml | **Email correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 12, 2022 | Deliberative process privilege. |
| 92 | 55833.1 | 3 | 12e4b.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland, DOE legal counsel Elizabeth Brown, and other DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests.** | February 22, 2022 | Attorney/client privilege; work product. |
| 93 | 56642.1 | 2 | 14d6d.eml | **Email correspondence of Commissioner Edelblut, Diana Fenton, and Richard Farrell regarding decision-making concerning potential response to media article regarding "No Left Turn in Education NH Complaints Filed Against NH Teachers who Pledged to Break the Law."** | February 14, 2022 | Deliberative process privilege. |
| 94 | 56942.1 | 5 | 14c3b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Richard Farrell regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 7, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 95 | 58418.1 | 6 | 15588.eml | **Email correspondence of Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, Commissioner Edelblut, D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 8, 2022 | Attorney/client privilege; deliberative process privilege. |
| 96 | 59480.1 | 1 | 19cfe.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding litigation hold.** | December 21, 2021 | Attorney client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| **97** | 59494.1 | 3 | 19efe.eml | **Draft email correspondence of Diana Fenton to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding potential response to email from T.J. regarding "Inappropriate reading Material, No 2 weeks notice given."** | October 25, 2021 | Attorney client privilege; deliberative process privilege. |
| **98** | 60105.1 | 3 | 19e43.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, and Kate Walker regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | December 1, 2021 | Deliberative process privilege. |
| **99** | 60591.1 | 5 | 15593.eml | **Email correspondence of Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, Commissioner Edelblut, D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| **100** | 61119.1 | 3 | 160e8.eml | **Email correspondence of Richard Farrell, Commissioner Edelblut, Diana Fenton, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent." *See* DOE-10134.** | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| **101** | 61916.1 | 8 | 16a37.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU 21)."** | September 13, 2022 | Deliberative process privilege. |
| **102** | 62557.1 | 6 | 16bc4.eml | **Email correspondence of Richard Farrell regarding decision-making concerning potential response to email from S.S. subject "Ms Fenton and Mr Edelblut."** | December 7, 2022 | Deliberative process privilege. |
| **103** | 62701.1 | 1 | 15bea.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding DOE decision-making concerning potential response to email subject "No Left Turn Issues."** | February 8, 2022 | Deliberative process privilege. |
| **104** | 62911.1 | 6 | 1558b.eml | **Email correspondence of Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, Commissioner Edelblut, D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| **105** | 63595.1 | 3 | 17023.eml | **Email correspondence of Richard Farrell, Diana Fenton, and Diana Krol regarding decision-making concerning potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct," seeking legal advice of DOE legal counsel Elizabeth Brown.** | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| **106** | 63712.1 | 3 | 182e2.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and Executive Director Malachi regarding decision-making concerning potential response to W.C. email** | December 1, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  |  |  | subject "Discovery of CRT materials (Stamped) and lessons being taught." |  |  |
| **107** | 64004.1 | 3 | 182f6.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, Diana Krol, and Kate Walker regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | December 1, 2021 | Deliberative process privilege. |
| **108** | 64960.1 | 2 | 17fa0.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding DOE decision-making concerning potential response to email subject "No Left Turn Issues."** | February 8, 2022 | Deliberative process privilege. |
| **109** | 64979.1 | 5 | 15590.eml | **Email correspondence of Commissioner Edelblut, Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, and D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 7, 2022 | Attorney/client privilege; deliberative process privilege. |
| **110** | 65324.1 | 5 | 155af.eml | **Email correspondence of DOE legal counsel Christopher Bond, Commissioner Edelblut, Diana Fenton, Richard Farrell, and D.C. Brennan regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 7, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| **111** | 65418.1 | 2 | 186c4.eml | **Email correspondence of Richard Farrell and Diana Fenton regarding decision-making concerning potential response to feedback regarding DOE web page.** | November 12, 2021 | Deliberative process privilege. |
| **112** | 66275.1 | 3 | 17035.eml | **Email correspondence of Diana Fenton, D.C. Brennan, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Attorney/client privilege; deliberative process privilege. |
| **113** | 66899.1 | 6 | 1558a.eml | **Email correspondence of Richard Farrell, Diana Fenton, Commissioner Edelblut, D.C. Brennan, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from "M.P." subject "Londonderry."** | April 8, 2022 | Attorney/client privilege; deliberative process privilege. |
| **114** | 66999.1 | 4 | 182da.eml | **Email correspondence of Diana Fenton, D.C. Brennan, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and Kate Walker regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | December 1, 2021 | Deliberative process privilege. |
| **115** | 67156.1 | 4 | 18519.eml | **Email correspondence of Diana Fenton to Commissioner Edelblut regarding decision-making concerning potential response to email from T.J. subject "Inappropriate reading Material, No 2 weeks notice given."** | October 25, 2021 | Deliberative process privilege. |
| **116** | 67518.1 | 3 | 182c9.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, Kimberly Houghton, and Kate Walker regarding** | December 1, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught." | | |
|---|---|---|---|---|---|---|
| **117** | 68878.1 | 2 | 18386.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Diana Fenton regarding decision-making concerning potential response to report regarding Bartlett teacher.** | December 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **118** | 68920.1 | 10 | 1831f.eml | **Email correspondence of Kimberly Houghton, Commissioner Edelblut, Diana Fenton, and Richard Farrell regarding decision-making concerning potential response to email from B.S. regarding "Notice of Maladministration"** | November 30, 2021 | Deliberative process privilege. |
| **119** | 69242.1 | 3 | 182cc.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, Richard Farrell, and Kimberly Houghton regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | November 29, 2021 | Deliberative process privilege. |
| **120** | 69284.1 | 2 | 17005.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, and Kimberly Houghton, and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught"** | October 7, 2021 | Attorney/client privilege; deliberative process privilege. |
| **121** | 70002.1 | 1 | 16910.eml | **Email correspondence of Diana Fenton and Commissioner Edelblut regarding decision-making concerning potential response concerning report regarding "complaints filed against NH teachers who pledged to break the law"** | February 13, 2022 | Deliberative process privilege. |
| **122** | 71764.1 | 1 | 156b4.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Diana Fenton regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training."** | August 3, 2021 | Attorney/client privilege; deliberative process privilege. |
| **123** | 73426.1 | 3 | 169c1.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | November 29, 2021 | Deliberative process privilege. |
| **124** | 74845.1 | 2 | 16a9e.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher.** | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **125** | 74961.1 | 5 | 14f66.eml | **Email correspondence of Stephen Berwick to Diana Fenton, Richard Farrell, DOE legal counsel Christopher Bond, and D.C. Brennan regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | October 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| **126** | 74983.1 | 2 | 16a8a.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher.** | December 6, 2021. | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 127 | 75001.1 | 2 | 16a96.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher.** | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 128 | 75240.1 | 2 | 1466c.eml | **Email correspondence of Richard Farrell to Diana Fenton regarding decision-making concerning potential response to report regarding "complaints filed against NH teachers who pledged to break the law"** | February 14, 2022 | Deliberative process privilege. |
| 129 | 75860.1 | 1 | 13139.eml | **Email correspondence of Senior Assistant Attorney General Sam Garland to DOJ and DOE officials regarding litigation strategy.** | September 14, 2022 | Attorney/client privilege; work product. |
| 130 | 261073.1 | 1 | Unnamed | **Calendar item shared by Senior Assistant Attorney General Sam Garland regarding litigation strategy.** | September 15, 2022 | Attorney/client privilege; work product. |
| 131 | 759791 | 3 | 14742.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent"** | December 13, 2021 at 6:57 PM | Attorney/client privilege; deliberative process privilege. |
| 132 | 76451.1 | 2 | 1636e.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel regarding decision-making concerning potential response to 91-A request.** | January 31, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 133 | 76915.1 | 3 | 1473f.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent"** | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| 134 | 77130.1 | 3 | 1502c.eml | **Email correspondence of D.C. Brennan to Commission Edelblut and Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Deliberative process privilege. |
| 135 | 77253.1 | 5 | 156ff.eml | **Email correspondence of Stephen Berwick to Diana Fenton and Richard Farrell regarding legal advice of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from T.J. regarding subject "Gender Book."** | August 10, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 136 | 78666.1 | 1 | 16e50.eml | **Emails correspondence of Diana Fenton and Richard Farrell regarding decision-making concerning release of report in conjunction with timing of release to legislature.** | November 12, 2021 | Deliberative process privilege. |
| 137 | 79376.1 | 2 | 16a97.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to report regarding Bartlett teacher.** | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 138 | 81443.1 | 2 | 17c9b.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and Richard Farrell regarding DOE decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 5, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 139 | 81735.1 | 9 | 169ae.eml | **Email correspondence of Kimberly Houghton, Commissioner Edelblut, and Diana Fenton regarding decision-making concerning potential response to email from B.S. regarding "Notice of Maladministration"** | November 29, 2021 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 140 | 81877.1 | 3 | 15b85.eml | **Email correspondence of Stephen Appleby to Commissioner Edelblut and Diana Fenton regarding DOE decision-making concerning potential draft letter responding to email from S.R. subject "Teacher resignations requested."** | July 7, 2021 | Deliberative process privilege. |
| 141 | 82322.1 | 2 | 16cd8.eml | **Email correspondence of Diana Krol to Kimberly Houghton and Diana Fenton regarding proposed drafts concerning forms and webpage.** | November 1, 2021 | Deliberative process privilege. |
| 142 | 263927.1 | 3 | Anti-Discrimination_Intake_Website_Draft.docx | **Draft document attached to email correspondence of Diana Krol to Kimberly Houghton and Diana Fenton regarding proposed drafts concerning forms and webpage.** | November 1, 2021 | Deliberative process privilege. |
| 143 | 264251.1 | 2 | Discrimination_intake-draft2-doe.pdf | **Draft document attached to email correspondence of Diana Krol to Kimberly Houghton and Diana Fenton regarding proposed drafts concerning forms and webpage.** | November 1, 2021 | Deliberative process privilege. |
| 144 | 82380.1 | 4 | 134c8.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton, Richard Farrell, D.C. Brennan regarding decision-making concerning potential response to email from A.M.B. subject "Email from a Hollis parent."** | September 3, 2021 | Deliberative process privilege. |
| 145 | 83268.1 | 6 | 134da.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email from E.J. and T.J. subject "Gender Book & Review RSA 186:11,IX-b and IX-c. Section 186:11 Duties of State Board of Education."** | August 11, 2021 | Deliberative process privilege. |
| 146 | 83371.1 | 4 | 169c5.eml | **Email correspondence of Diana Krol to Diana Fenton and Kate Walker regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | December 1, 2021 | Deliberative process privilege. |
| 147 | 85028.1 | 7 | 116f3.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email from A.M.B. subject "Follow up to my Meeting with Superintendent Nadeau (SAU21)."** | September 12, 2022 | Attorney/client privilege; deliberative process privilege. |
| 148 | 85487.1 | 2 | 11f1f.eml | **Email correspondence of Commissioner Edelblut to Representative Cordelli referring to legal advice from DOE legal counsel Christopher Bond concerning potential legislation.** | June 30, 2022 | Legislative privilege; attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 149 | 86052.1 | 3 | 169ea.eml | **Email correspondence of Kate Walker to Diana Fenton and Diana Krol regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | December 1, 2021 | Deliberative process privilege. |
|-----|---------|---|-----------|---------|---------|---------|
| 150 | 86498.1 | 3 | 1504e.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and D.C. Brennan regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2022 | Deliberative process privilege. |
| 151 | 86512.1 | 3 | 15b87.eml | **Email correspondence of Commissioner Edelblut to Stephen Appleby and Diana Fenton regarding decision-making concerning proposed letter responding to email from S.R. subject "Teacher resignations requested."** | July 7, 2021 | Deliberative process privilege. |
| 152 | 86729.1 | 4 | 11bd3.eml | **Email correspondence of DOE legal counsel Christopher Bond to Richard Sala, Andrew Cline, and Angela Adams containing legal advice regarding matter before Board of Education regarding RSA 354-A:27** | December 2, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 153 | 86730.1.1 | 3 | 11bd1.eml | **Email correspondence of Andrew Cline to DOE legal counsel Christopher Bond, Richard Sala, and Angela Adams regarding legal advice concerning matter before Board of Education regarding RSA 354-A:27.** | December 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 154 | 86734.1 | 3 | 11bcd.eml | **Email correspondence of DOE legal counsel Christopher Bond to Richard Sala, Andrew Cline, and Angela Adams containing legal advice regarding matter before Board of Education regarding RSA 354-A:27.** | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 155 | 86736.1 | 3 | 11bd4.eml | **Email correspondence of Richard Sala to DOE legal counsel Christopher Bond, Andrew Cline, and Angela Adams regarding legal advice concerning matter before Board of Education regarding RSA 354-A:27.** | December 2, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 156 | 87170.1 | 3 | 15029.eml | **Email correspondence of D.C. Brennan to Commissioner Edelblut and Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Deliberative process privilege. |
| 157 | 88919.1 | 3 | 1152e.eml | **Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE officials regarding plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 158 | 89462.1 | 2 | 11abe.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email subject "Inquiry Regarding Educator Code."** | August 30, 2022 | Attorney/client privilege; deliberative process privilege. |
| 159 | 89485.1 | 3 | 1151f.eml | **Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE officials regarding plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 160 | 89645.1 | 3 | 12591.eml | **Email correspondence of Commissioner Edelblut to Kiana Krol regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | April 12, 2022 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 161 | 89656.1 | 4 | 12998.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Senior Assistant Attorney General Jill Perlow regarding legal advice concerning potential RSA 91-A response.** | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 162 | 89804.1 | 1 | 14147.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding litigation hold notice.** | December 21, 2021 | Attorney/client privilege; work product. |
| 163 | 89830.1 | 3 | 12992.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Senior Assistant Attorney General Jill Perlow regarding legal advice concerning potential RSA 91-A response.** | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 164 | 89940.1 | 3 | 15053.eml | **Email correspondence of D.C. Brennan to Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Deliberative process privilege. |
| 165 | 90074.1 | 5 | 157c9.eml | **Email correspondence concerning legal analysis of DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from T.J. subject "Gender Book."** | August 11, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 166 | 90374.1 | 1 | 16410.eml | **Email correspondence of Richard Farrell to Diana Fenton regarding decision-making concerning potential response to email subject "No Left Turn Issues."** | February 8, 2022 | Deliberative process privilege. |
| 167 | 91155.1 | 3 | 1279a.eml | **Email correspondence of Commissioner Edelblut and Angela Adams involving DOE legal counsel Christopher Bond and Executive Director Malachi regarding decision-making concerning potential response to questions concerning RSA 354-A:29-34.** | November 15, 2021 | Attorney/client privilege; deliberative process privilege. |
| 168 | 91279.1 | 1 | 16a6b.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Diana Fenton regarding decision-making concerning potential response to report regarding Bartlett teacher.** | December 6, 2021 | Attorney/client privilege; deliberative process privilege. |
| 169 | 93379.1 | 3 | 11687.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to email subject "Banning books and CRT concerned citizen."** | September 6, 2022 | Deliberative process privilege. |
| 170 | 94133.1 | 1 | 11369.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and D.C. Brennan regarding review of draft of proposed legislation of Representative Cordelli.** | November 4, 2022 | Legislative privilege; deliberative process privilege. |
| 171 | 98425.1 | 4 | 11538.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton, DOE legal counsel Elizabeth Brown, and Angela Adams regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 172 | 98600.1 | 3 | 11a68.eml | Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE and DOJ officials regarding responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 173 | 100947.1 | 3 | 120e2.eml | Email correspondence of Senior Assistant Attorney General Sam Garland, DOE legal counsel Elizabeth Brown, and DOE and DOJ officials regarding responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 174 | 101796.1 | 2 | 11759.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding DOE decision-making concerning potential response to email subject "Inquiry Regarding Educator Code." | September 14, 2022 | Attorney/client privilege; deliberative process privilege. |
| 175 | 101971.1 | 4 | 11548.eml | Email correspondence of Commissioner Edelblut to Diana Fenton, DOE legal counsel Elizabeth Brown, and Angela Adams regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 176 | 102101.1 | 5 | 129f2.eml | Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email subject "CRT Concern regarding Nashua BOE contract with Achievement Network." | March 8, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 177 | 102477.1 | 1 | 12668.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.P subject "Londonderry Investigation." | April 19, 2022 | Attorney/client privilege; deliberative process privilege. |
| 178 | 104505.1 | 1 | 141dd.eml | Email correspondence of Diana Fenton to Richard Farrell and Stephen Berwick regarding process of preparing responses to plaintiffs' discovery requests and involving advice of DOJ and DOE legal counsel. | February 24, 2024 | Attorney/client privilege. |
| 179 | 106680.1 | 3 | 141c8.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 180 | 107001.1 | 3 | 148c8.eml | Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown and Richard Farrell regarding DOE process of responding to RSA 91-A request. | May 20, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 181 | 107238.1 | 4 | 12d76.eml | Email correspondence of DOE legal counsel Elizabeth Brown, D.C. Brennan, Diana Krol, Rhonda Kelley, and Angela Adams regarding DOE process of responding to RSA 91-A request. | September 26, 2022 | Attorney/client privilege; work product. |
| 182 | 107358.1 | 5 | 1257d.eml | Email correspondence of Commissioner Edelblut to Diana Krol regarding decision-making concerning potential response to email from M.P subject "Londonderry Investigation." | April 12, 2022 | Deliberative process privilege. |
| 183 | 107575.1 | 3 | 11bf8.eml | Email correspondence of Commissioner Edelblut to Office of the Governor officials Deanna Jurius and Jayne Millerick regarding educator certification renewal data and DOE press release. | July 19, 2022 | Executive privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 184 | 108130.1 | 2 | 1137b.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |
|-----|----------|---|-----------|---|---|---|
| 185 | 112483.1 | 3 | 141dc.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege; work product. |
| 186 | 112867.1 | 1 | 11ad3.eml | Email correspondence of Commissioner Edelblut, Angela Adams, Diana Fenton, and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege. |
| 187 | 278775.1 | 2 | Search_Term_doc.docx | Document attached to email correspondence of Commissioner Edelblut, Angela Adams, Diana Fenton, and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 188 | 113326.1 | 2 | 12483.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding legal advice concerning potential response to email subject "Reviewing Books in the Merrimack Valley School District Libraries." | May 16, 2022 | Attorney/client privilege; deliberative process privilege. |
| 189 | 113328.1 | 2 | 131a9.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email subject "Inquiry Regarding Educator Code." | November 15, 2022 | Attorney/client privilege; deliberative process privilege. |
| 190 | 113459.1 | 2 | 11376.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |
| 191 | 113479.1 | 3 | 11a4e.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and DOE legal counsel Elizabeth Brown regarding Senior Assistant Attorney General Sam Garland's email concerning responding to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege; work product. |
| 192 | 113826.1 | 3 | 1256d.eml | Email correspondence of Commissioner Edelblut, Diana Krol, Diana Fenton, and Richard Farrell regarding DOE decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | April 12, 2022 | Deliberative process privilege. |
| 193 | 118452.1 | 2 | 1323e.eml | Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown, Commissioner Edelblut, and DOJ's Christopher Bond regarding decision-making concerning potential response to email subject "Inquiry Regarding Educator Code" | September 14, 2022 | Attorney/client privilege; deliberative process privilege. |
| 194 | 118642.1 | 1 | 130ad.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 195 | 118716.1 | 1 | 130b5.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |
|---|---|---|---|---|---|---|
| 196 | 119080.1 | 1 | 1481b.eml | Email correspondence of Diana Fenton to Commissioner Edelblut and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege. |
| 197 | 281411.1 | 2 | Search_Term_doc.docx | Document attached to email correspondence of Diana Fenton to Commissioner Edelblut and DOE legal counsel Elizabeth Brown regarding DOE's preparation of responses to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 198 | 119437.1 | 2 | 1683c.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum. | March 22, 2022 | Attorney/client privilege; work product. |
| 199 | 120203.1 | 3 | 16d8e.eml | Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Senior Assistant Attorney General Jill Perlow regarding legal advice concerning potential RSA 91-A response. | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 200 | 120638.1 | 4 | 127d0.eml | Email correspondence of Diana Fenton to DOE legal counsel Diana Fenton, DOJ's Christopher Bond, and other DOE and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 201 | 123591.1 | 2 | 1266d.eml | Email correspondence from Diana Fenton to Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533. | February 2, 2023 | Legislative privilege. |
| 202 | 124950.1 | 3 | 13d6c.eml | Email correspondence of Diana Fenton, Commissioner Edelblut, DOE legal counsel Elizabeth Brown, DOJ's Christopher Bond and other DOE and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023. | Attorney/client privilege; work product. |
| 203 | 125224.1 | 2 | 137ea.eml | Email correspondence of Diana Fenton to Commissioner Edelblut regarding Representative Cordelli's draft of proposed legislation regarding "Human Rights complaints." | November 1, 2022 | Legislative privilege; deliberative process privilege. |
| 204 | 125747.1 | 3 | 15ba9.eml | Email correspondence of DOE legal counsel Christopher Bond to Cali Egan and Angela Adams regarding DOE process of preparing response to RSA 91-A request. | March 9, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 205 | 126020.1 | 1 | 1304e.eml | Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints." | November 1, 2022 | Legislative privilege. |
| 206 | 126071.1 | 1 | 127de.eml | Email correspondence of Diana Fenton to DOJ attorneys and DOE legal counsel Elizabeth Brown regarding preparation of responses to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 207 | 284233.1 | 2 | Search_Term_doc.docx | **Document attached to email correspondence of Diana Fenton to DOJ attorneys and DOE legal counsel Elizabeth Brown regarding preparation of responses to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 208 | 126102.1 | 1 | 13025.eml | **Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints."** | October 31, 2022 | Legislative privilege. |
| 209 | 126132.1 | 3 | 131b1.eml | **Email correspondence of Diana Fenton to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Banning books and CRT concerned citizen."** | September 6, 2022 | Deliberative process privilege. |
| 210 | 126245.1 | 2 | 1272e.eml | **Email correspondence of Diana Fenton to DOJ's Sean Locke regarding email subject "CRT in Dover Schools-response to Ed Comm question during HB61 hearing."** | February 14, 2023 | Deliberative process privilege. |
| 211 | 126253.1 | 1 | 1267a.eml | **Email correspondence of Diana Fenton to DOJ's Sean Locke and Executive Director Malachi regarding decision-making process concerning possible memorandum of understanding and draft proposed amendment regarding HB 533.** | February 2, 2023 | Deliberative process privilege; legislative privilege. |
| 212 | 126360.1 | 4 | 127c1.eml | **Email correspondence of Diana Fenton, Commissioner Edelblut, DOE legal counsel Elizabeth Brown, and Angela Adams regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 213 | 128498.1 | 1 | 130b8.eml | **Email correspondence of Representative Cordelli and Diana Fenton regarding review of draft of proposed legislation concerning "Human Rights complaints."** | November 4, 2022 | Legislative privilege. |
| 214 | 129174.1 | 1 | 14816.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to DOJ and DOE officials regarding process of responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 215 | 129719.1 | 1 | 152b4.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding legal advice concerning "emails to HRC."** | June 17, 2022 | Attorney/client privilege; work product. |
| 216 | 130017.1 | 2 | 1588d.eml | **Email correspondence of Diana Fenton, DOE legal counsel Christopher Bond, and Commissioner Edelblut regarding decision-making concerning potential response to email subject "SAU 16."** | May 25, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 217 | 130044.1 | 3 | 144dd.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to DOE and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 218 | 131294.1 | 1 | 127e0.eml | **Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown, Commissioner Edelblut, and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 219 | 132614.1 | 3 | 112ab.eml | Email correspondence of Diana Fenton to DOE legal counsel Elizabeth Brown, Commissioner Edelblut, and DOJ officials regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 220 | 132670.1 | 3 | 112ac.eml | Email correspondence of Angela Adams to DOE legal counsel Elizabeth Brown and Diana Fenton regarding Senior Assistant Attorney General Samuel Garland's email concerning responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 221 | 132867.1 | 3 | 1185b.eml | Emails correspondence of Richard Farrell to Diana Fenton and DOE legal counsel Elizabeth Brown regarding discussion of potential response to email from K.B. subject "Exeter Region Cooperative School District Violation of Educator Code of Conduct." | August 23, 2022 | Attorney/client privilege; deliberative process privilege. |
| 222 | 133585.1 | 2 | 130c1.eml | Email correspondence of Diana Fenton to Commissioner Edelblut regarding Representative Cordelli's draft of proposed legislation regarding "Human Rights complaints." | November 4, 2022 | Legislative privilege; deliberative process privilege. |
| 223 | 134024.1 | 2 | 12672.eml | Email correspondence of Diana Fenton to Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533. | February 2, 2023 | Legislative privilege. |
| 224 | 134614.1 | 3 | 16dcf.eml | Email correspondence of Representative Cordelli to Commissioner Edelblut and state legislators regarding proposed legislation HB 1255. | March 5, 2022 | Legislative privilege. |
| 225 | 134791.1 | 2 | 15535.eml | Email correspondence of Representative Cordelli, Diana Fenton, and Commissioner Edelblut regarding proposed legislative and concerning legal advice of DOE legal counsel Christopher Bond | June 30, 2022 | Attorney/client privilege; work product; legislative privilege; deliberative process privilege. |
| 226 | 135102.1 | 2 | 13e29.eml | Email correspondence of DOE legal counsel Elizabeth Brown regarding process of preparing responses to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 227 | 136050.1 | 2 | 1c82f.eml | Email correspondence of Commissioner Edelblut regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same. | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 228 | 288617.1 | 2 | RTFDiscrimination Page.docx | Draft document attached to email correspondence of Commissioner Edelblut regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same. | November 4, 2021 | Deliberative process privilege. |
| 229 | 136062.1 | 2 | 1c6e7.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding potential response to email subject "New Hampshire allowing racism with CRT restrictions." | February 24, 2022 | Attorney/client privilege; deliberative process privilege. |
| 230 | 136137.1 | 2 | 1d5b4.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning proposed potential response to RSA 91-A request. | July 22, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 231 | 1363118.1 | 4 | 1cfee.eml | Email correspondence of Commissioner Edelblut to Diana Fenton and Richard Farrell regarding decision-making concerning potential response to email subject "Email from a Hollis parent." | September 3, 2021 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 232 | 136399.1 | 2 | 1d5b6.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning proposed potential response to RSA 91-A request. | July 22, 2021 | Attorney/client privilege; deliberative process privilege. |
| 233 | 136420.1 | 1 | 1c4e0.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Kimberly Houghton regarding DOE decision-making concerning publishing information publicly. | December 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| 234 | 136666.1 | 2 | 1c7e2.eml | Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release regarding DOE webpage. | November 4, 2021 | Deliberative process privilege. |
| 235 | 136764.1 | 4 | 1c502.eml | Email correspondence of Commissioner Edelblut and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 236 | 136801.1 | 2 | 1c2aa.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding litigation hold. | December 21, 2021 | Attorney/client privilege; work product. |
| 237 | 136808.1 | 2 | 1c615.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from F.L. subject "URGENT: Report of Discrimination." | November 15, 2021 | Attorney/client privilege; deliberative process privilege. |
| 238 | 136903.1 | 3 | 1c49e.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent." | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| 239 | 137097.1 | 2 | 1db6f.eml | Email correspondence of Commissioner Edelblut to Attorney General Formella and DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 8, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
| 240 | 137151.1 | 1 | 1db8c.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Attorney/client privilege; deliberative process privilege. |
| 241 | 289124.1 | 2 | Divisive_Concepts_Op_ed_6-7-2021.docx | Draft document attached to email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Deliberative process privilege. |
| 242 | 137221.1 | 4 | 1d0ac.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested." | August 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 243 | 137225.1 | 2 | 1d5ca.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to RSA 91-A request. | July 23, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 244 | 137237.1 | 2 | 1da87.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond requesting advice related to Montana AG Opinion letter. | June 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| 245 | 137254.1 | 1 | 1c57c.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from F.L. subject "Report of Discrimination." | November 12, 2021 | Attorney/client privilege; deliberative process privilege. |
| 246 | 137408.1 | 1 | 130bf.eml | Email correspondence of Diana Fenton to Christine Brennan regarding Representative Cordelli's draft legislation concerning "Human Rights complaints." | November 4, 2022 | Legislative privilege. |
| 247 | 137518.1 | 3 | 127f1.eml | Email correspondence of Diana Fenton to Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533. | February 24, 2023 | Legislative privilege; deliberative process privilege. |
| 248 | 139348.1 | 1 | 11122.eml | Email correspondence of Representative Cordelli to Diana Fenton regarding draft legislation concerning "Human Rights complaints." | October 31, 2022 | Legislative privilege. |
| 249 | 139574.1 | 1 | 106be.eml | Email correspondence of DOJ's Christopher Bond regarding process for responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 250 | 140069.1 | 6 | 1453d.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Diana Fenton and Commissioner Edelblut regarding decision-making concerning potential response to RSA 91-A request. | February 23, 2023 | Attorney/client privilege; deliberative process privilege. |
| 251 | 140411.1 | 2 | 1612b.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email of L.A. subject "Reviewing Books in the Merrimack Valley School District Libraries." | May 16, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 252 | 140417.1 | 2 | 17836.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Commissioner Edelblut concerning order on motion to dismiss and email of Senior Assistant Attorney General Samuel Garland concerning the same. | January 12, 2023 | Attorney/client privilege; work product. |
| 253 | 140767.1 | 1 | 1a1d6.ics | Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel. | February 24, 2023 | Attorney/client privilege. |
| 254 | 141517.1 | 3 | 1c4a7.eml | Email correspondence of Commissioner Edelblut and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for" | December 13, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 255 | 290595.1 | 3 | Freedom_From_Discrimation_Techn | Draft document titled "Right to Freedom from Discrimination Technical Guidance for Schools" | June 29, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | ical_Advisory.docx | | | |
|---|---|---|---|---|---|---|
| 256 | 141675.1 | 2 | 1c843.eml | **Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release regarding DOE webpage.** | November 10, 2021 | Deliberative process privilege. |
| 257 | 141705.1 | 2 | 1c92c.eml | **Email correspondence of Commissioner Edelblut to Executive Director Malachi and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |
| 258 | 290718.1 | 4 | public-education-intake-questionnaire.docx | **Draft document attached email correspondence of Commissioner Edelblut to Executive Director Malachi and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |
| 259 | 142071.1 | 2 | 1c860.eml | **Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release regarding DOE webpage and including legal advice of DOE legal counsel Christopher Bond.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 260 | 142145.1 | 2 | 1c48e.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 13, 2021 | Attorney/client privilege; deliberative process privilege. |
| 261 | 142184.1 | 5 | 1cd51.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to inquiry regarding UNH curriculum.** | September 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| 262 | 142705.1 | 1 | 1d868.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from Gilles Bissonnette subject "Forthcoming Guidance Concerning Legislation Entitled 'Right to Freedom from Discrimination in Public Workplaces and Education.'"** | July 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| 263 | 142740.1 | 2 | 1da4d.eml | **Email correspondence of Commissioner Edelblut to Kimberly Houghton and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to request for information from NH Journal by email subject "Anti-discrimination complaints."** | February 14, 2022 | Attorney/client privilege; deliberative process privilege. |
| 264 | 142862.1 | 1 | 1d854.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Senior Assistant Attorney General Jill Perlow regarding decision-making concerning potential response to email from Gilles Bissonnette subject "Forthcoming Guidance Concerning Legislation Entitled 'Right to Freedom from Discrimination in Public Workplaces and Education.'"** | July 14, 2021 | Attorney/client privilege; deliberative process privilege. |
| 265 | 142897.1 | 2 | 1ce89.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential DOE outreach to company regarding website content.** | September 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | |
|---|---|---|---|---|---|
| 266 | 142947.1 | 2 | 1d0ae.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT."** | August 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 267 | 143027.1 | 5 | 1d022.eml | **Email correspondence of Commissioner Edelblut to Senior Assistant Attorney General Jill Perlow and Executive Director Malachi regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 8, 2021 | Attorney/client privilege; deliberative process privilege. |
| 268 | 143029.1 | 5 | 1c4f3.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding email from D.S. subject "AFT Lawsuit."** | December 15, 2021 | Attorney/client privilege. |
| 269 | 143036.1 | 2 | 1c80f.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Kimberly Houghton regarding decision-making concerning draft press release with respect to DOE webpage.** | November 5, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 270 | 143045.1 | 2 | 1c2e5.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to RSA 91-A request.** | December 28, 2021 | Attorney/client privilege; deliberative process privilege. |
| 271 | 143144.1 | 2 | 1ce10.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 17, 2021 | Attorney/client privilege; deliberative process privilege. |
| 272 | 143219.1 | 1 | 1d123.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email of G.S. subject "Request for Further Clarification Concerning Implementation Guidance on House Bill 2 for Public School Districts."** | August 20, 2021 | Attorney/client privilege; deliberative process privilege. |
| 273 | 143380.1 | 2 | 1d367.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.R. subject "Divisive Concepts Training."** | August 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 274 | 143437.1 | 3 | 1cc8e.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton and D.C. Brennan regarding decision-making concerning potential response to W.C. email subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 7, 2021 | Deliberative process privilege. |
| 275 | 143466.1 | 5 | 1d40f.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond requesting legal advice concerning email from S.M. regarding "does HB2 make Sununu's Diversity and Inclusion (DIE) Advisory Council illegal?"** | August 10, 2021 | Attorney/client privilege. |
| 276 | 143562.1 | 1 | 1d365.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email of G.S. subject "Request for Further Clarification Concerning Implementation Guidance on House Bill 2 for Public School Districts."** | August 5, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| **277** | 143670.1 | 2 | 1655d.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from B.C. subject "Londonderry Investigation."** | April 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| **278** | 144223.1 | 2 | 14094.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown concerning process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| **279** | 144953.1 | 1 | 11eaf.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commission Edelblut and Diana Fenton regarding decision-making concerning potential response to emails regarding SAU 16.** | May 24, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| **280** | 145165.1 | 3 | 10178.eml | **Email correspondence of Angela Adams to D.C. Christine Brennan concerning DOE legal counsel Elizabeth Brown email related to process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| **281** | 151705.1 | 3 | 18888.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding Attorney Brown's email related to process of responding to plaintiffs' discovery requests.** | February 24, 2023 | Attorney/client privilege; work product. |
| **282** | 152236.1 | 3 | 16b15.eml | **Email correspondence from Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding filing of legal memorandum.** | March 31, 2022 | Attorney/client privilege; work product. |
| **283** | 152460.1 | 3 | 1c6fc.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request from freelance editor/writer R.F.** | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **284** | 294159.1 | 8 | Anti-Discrimination_Q&A.docx | **Draft document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 12, 2021 | Deliberative process privilege. |
| **285** | 152516.1 | 1 | 1d4ce.eml | **Email correspondence of Commissioner Edelblut to Governor's legal counsel James Scully regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 17, 2021 | Executive privilege; deliberative process privilege; attorney/client privilege. |
| **286** | 152624.1 | 3 | 1d0cf.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Steven Appleby regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | August 17, 2021 | Attorney/client privilege; deliberative process privilege. |
| **287** | 294207.1 | 8 | Anti-Discrimination_Q&A.docx | **Draft document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 12, 2021 | Deliberative process privilege. |
| **288** | 152674.1 | 1 | 1d7d7.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Senior Assistant Attorney General Jill Perlow** | July 12, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination" | | |
|---|---|---|---|---|---|---|
| 289 | 152675.1 | 2 | 1c2f0.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from M.B. subject "Request for information." | December 28, 2021 | Attorney/client privilege; deliberative process privilege. |
| 290 | 152743.1 | 2 | 1d2a8.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning DOE attendance at Drummond Woodsum & McMahon program. | August 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 291 | 152817.1 | 2 | 1ce6d.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 20, 2021 | Attorney/client privilege; deliberative process privilege. |
| 292 | 152874.1 | 2 | 1cc21.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught." | October 5, 2021 | Attorney/client privilege; deliberative process privilege. |
| 293 | 152913.1 | 3 | 1cea3.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions." | September 21, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 294 | 153010.1 | 2 | 1c5d9.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond, Angela Adams, and Executive Director Malachi regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form." | November 15, 2021 | Deliberative process privilege; attorney/client privilege. |
| 295 | 153413.1 | 2 | 1c38e.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form." | December 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| 296 | 153949.1 | 3 | 106a0.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland to Diana Fenton, DOE legal counsel Elizabeth Brown, and other DOJ officials regarding process for responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 297 | 154222.1 | 3 | 106d2.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding Attorney Brown's email related to process of responding to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege; work product. |
| 298 | 154589.1 | 2 | 16847.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants regarding draft legal memorandum. | March 22, 2022 | Attorney/client privilege; work product. |
| 299 | 155725.1 | 2 | 10497.eml | Email correspondence of Diana Fenton and Representative Cordelli regarding draft of amendment to proposed legislation concerning HB 533. | February 2, 2023 | Legislative privilege. |
| 300 | 155777.1 | 2 | 106c0.eml | Email correspondence of DOJ's Christopher Bond to DOJ and DOE officials regarding process for responding to plaintiff's discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |

2640

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 301 | 156225.1 | 1 | 10547.eml | Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to Dover CRT accusations. | February 8, 2023 | Deliberative process privilege. |
|-----|----------|---|-----------|------|------|------|
| 302 | 156303.1 | 3 | 16d92.eml | Email correspondence of DOE legal counsel Christopher Bond to Senior Assistant Attorney General Jill Perlow and Commissioner Edelblut regarding decision-making concerning potential response to RSA 91-A request. | March 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 303 | 156440.1 | 1 | 189c7.ics | Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel. | February 22, 2023 | Attorney/client privilege. |
| 304 | 156940.1 | 1 | 18952.ics | Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel. | February 24, 2023 | Attorney/client privilege. |
| 305 | 157002.1 | 1 | 18946.ics | Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel. | February 24, 2023 | Attorney/client privilege. |
| 306 | 157013.1 | 3 | 18887.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding process of responding to plaintiffs' discovery requests. | February 24, 2023 | Attorney/client privilege; work product. |
| 307 | 157169.1 | 3 | 1695e.eml | Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants regarding draft memorandum. | March 25, 2022 | Attorney/client privilege; work product. |
| 308 | 296228.1 | 38 | 3501727.doc | Draft document titled "Memorandum of Law in Support of Motion to Dismiss" attached to email correspondence of Senior Assistant Attorney General Samuel Garland to defendants regarding draft memorandum. | March 22, 2022 | Attorney/client privilege; work product. |
| 309 | 157263.1 | 5 | 14c3c.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Commissioner Edelblut and Kimberly Houghton regarding DOE process of responding to RSA 91-A request. | February 24, 2023 | Attorney/client privilege; work product. |
| 310 | 157814.1 | 3 | 18860.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Elizabeth Brown and Diana Fenton regarding process of responding to plaintiffs' discovery requests. | February 22, 2023 | Attorney/client privilege; work product. |
| 311 | 158560.1 | 2 | 1c481.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding potential response to report concerning Bartlett teacher. | December 7, 2021 | Attorney/client privilege. |
| 312 | 158606.1 | 2 | 1d566.eml | Email correspondence of Commissioner Edelblut to Attorney General Formella, DOE legal counsel Christopher Bond, and other DOJ officials regarding draft FAQs. | July 21, 2021 | Attorney/client privilege; work product; deliberative process privilege; executive privilege. |
| 313 | 158628.1 | 4 | 1d2a3.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from A.S. subject "VNH JEDI Taskforce July Meeting- Open Invite- Doodle Poll." | August 3, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 314 | 158660.1 | 1 | 1db7b.eml | Email correspondence of Commissioner Edelblut to Attorney General Formella and DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
|---|---|---|---|---|---|---|
| 315 | 296965.1 | 2 | Divisive_Concepts_Op_Ed_6-7-2021.docx | Draft document attached to email correspondence of Commissioner Edelblut to Attorney General Formella and DOE legal counsel Christopher Bond regarding draft potential op-ed. | June 7, 2021 | Attorney/client privilege; deliberative process privilege; executive privilege. |
| 316 | 158895.1 | 3 | 1c51e.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 317 | 159093.1 | 2 | 1cb43.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to vendor screening document. | October 1, 2021 | Attorney/client privilege/work product; deliberative process privilege. |
| 318 | 159389.1 | 1 | 1da1b.eml | Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning draft content of technical assistance document. | June 23, 2021 | Attorney/client privilege; deliberative process privilege. |
| 319 | 159578.1 | 3 | 1da51.eml | Email correspondence of Commissioner Edelblut to Kimberly Houghton and DOE legal counsel Christopher Bond regarding decision-making concerning potential response to interview request. | February 15, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 320 | 159671.1 | 3 | 1d7c6.eml | Email correspondence from Commissioner Edelblut to Stephen Appleby regarding decision-making concerning proposed letter responding to email subject "Teacher resignations requested." | July 8, 2021 | Deliberative process privilege. |
| 321 | 159769.1 | 3 | 1d1ff.eml | Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, and Kimberly Houghton regarding decision-making concerning potential response to request for information from N.G. subject "Query re: discrimination complaints against teachers" | February 4, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 322 | 159802.1 | 3 | 1c86a.eml | Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft press release concerning DOE webpage. | November 8, 2021 | Deliberative process privilege. |
| 323 | 159821.1 | 1. | 1c972.eml | Email correspondence of Commissioner Edelblut, Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage. | October 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 324 | 297518.1 | 3 | Anti-Discrimination_Intake_Website_Draft.docx | Draft document attached to email correspondence of Commissioner Edelblut, Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage. | October 18, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 325 | 159848.1 | 3 | 1cb3d.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.C. subject "Please attend: 'Divisive Concepts:' A Chilling Effect on Teaching History 2/6 @ 2 PM."** | January 28, 2022 | Attorney/client privilege; deliberative process privilege. |
| 326 | 159870.1 | 3 | 1d113.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from D.T. subject "Laconia CRT."** | August 20, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 327 | 161409.1 | 3 | 106a1.eml | **Email correspondence of DOE legal counsel Elizabeth Brown to Senior Assistant Attorney General Samuel Garland and other DOJ and DOE officials regarding process for responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 328 | 16140.1 | 2 | 104e9.eml | **Email correspondence of Representative Robert Lynn to Representative Cordelli and Diana Fenton regarding draft of amendment to proposed legislation concerning HB 533.** | February 4, 2023 | Legislative privilege. |
| 329 | 163807.1 | 5 | 16ec7.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.C. subject "CRT Concern regarding Nashua BOE contract with Achievement Network."** | March 8, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 330 | 165883.1 | 3 | 1c7bd.eml | **Email correspondence of Commissioner Edelblut, Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and regarding draft DOE webpage.** | November 2, 2021 | Deliberative process privilege. |
| 331 | 165891.1 | 1 | 1d0a1.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond and Associate Attorney General Anne Edwards regarding decision-making concerning potential response to letter of A.D. subject "Expanding our commitment to diversity, equity, and inclusion."** | August 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 332 | 166067.1 | 1 | 1c3c5.eml | **Email correspondence of Commissioner Edelblut to Kimberly Houghton regarding draft statement in potential response to request for information from NHPBS.** | November 30, 2021 | Deliberative process privilege. |
| 333 | 166962.1 | 3 | 1e75e.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for."** | December 13, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 334 | 167168.1 | 3 | 1e7b8.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 335 | 167198.1 | 1 | 1f27a.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage.** | October 13, 2021 | Deliberative process privilege. |
| 336 | 301092.1 | 2 | 354-A.docx | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage.** | October 6, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 337 | 301406.1 | 4 | public-education-intake-questionnaire-submit.pdf | Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage. | October 4, 2021 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 338 | 167224.1 | 2 | 1f777.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to vendor screening document. | October 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 339 | 167427.1 | 4 | 1e7e4.eml | Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for." | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 340 | 167470.1 | 3 | 1ecf1.eml | Email correspondence of DOE legal counsel Christopher Bond to Kimberly Houghton and Commissioner Edelblut regarding decision-making concerning potential response to interview request. | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 341 | 167653.1 | 2 | 1e943.eml | Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft DOE webpage. | November 10, 2021 | Deliberative process privilege. |
| 342 | 168191.1 | 2 | 104f1.eml | Email correspondence of Representative Cordelli to Representative Lynn and Diana Fenton regarding draft of amendment to proposed legislation concerning HB 533. | February 4, 2023 | Legislative privilege. |
| 343 | 168350.1 | 2 | 106c1.eml | Email correspondence of DOJ and DOE attorneys regarding process of responding to plaintiffs' discovery requests. | February 23, 2023 | Attorney/client privilege; work product. |
| 344 | 168820.1 | 1 | 1053a.eml | Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to Dover CRT accusations. | February 8, 2023 | Deliberative process privilege. |
| 345 | 168905.1 | 2 | 11b13.eml | Email correspondence of Representative Cordelli to Diana Fenton referring to legal advice from DOE legal counsel Christopher Bond concerning potential legislation. | July 5, 2022 | Legislative privilege; attorney/client privilege; deliberative process privilege. |
| 346 | 169945.1 | 2 | 16842.eml | Email correspondence from Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding filing of legal memorandum. | March 22, 2022 | Attorney/client privilege; work product. |
| 347 | 170373.1 | 2 | 106bf.eml | Email correspondence of DOJ and DOE attorneys regarding process of responding to plaintiffs' discovery requests | February 2023 | Attorney/client privilege; work product. |
| 348 | 171117.1 | 2 | 1538b.eml | Email correspondence of DOJ's Christopher Bond to DOE legal counsel Elizabeth Brown and Commissioner Edelblut regarding draft reply to plaintiffs' objection to defendants' motion to dismiss. | June 22, 2022 | Attorney/client privilege; work product. |
| 349 | 302832.1 | 7 | AFT-Mejia_-_Draft_Reply_6-24- | Draft document attached to email correspondence of DOJ's Christopher Bond to DOE legal counsel Elizabeth Brown and Commissioner Edelblut regarding draft reply to plaintiffs' objection to defendants' motion to dismiss. | June 22, 2022 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | 2022_-_Ready_for_Review.docx | | | |
|---|---|---|---|---|---|---|
| **350** | 172885.1 | 2 | 1fc54.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 17, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **351** | 172975.1 | 2 | 1f0fb.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **352** | 173107.1 | 1 | 1e79b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Kimberly Houghton regarding filing of this lawsuit.** | December 13, 2021 | Attorney/client privilege; work product. |
| **353** | 173254.1 | 3 | 1e8e2.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 9, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **354** | 173322.1 | 3 | 1e7b3.eml | **Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **355** | 173589.1 | 2 | 1fc4b.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from J.S. subject "HB544 Questions."** | September 17, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **356** | 173626.1 | 2 | 1f142.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **357** | 303904.1 | 2 | RTFDiscriminationPage.docx | **Draft document attached to email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 4, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **358** | 173999.1 | 3 | 1f0fa.eml | **Email correspondence of Kimberly Houghton regarding draft press release regarding DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **359** | 174146.1 | 2 | 1e612.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | December 6, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **360** | 175017.1 | 2 | 1f3e4.eml | **Email correspondence of Commissioner Edelblut, Executive Director Malachi, and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 361 | 304395.1 | 2 | NHCHR_Public_Education_RSA_354-A29_Questionnaire.docx | **Draft document attached to email correspondence of Commissioner Edelblut, Executive Director Malachi, and Diana Krol regarding decision-making concerning revisions to draft questionnaire.** | October 19, 2021 | Deliberative process privilege. |
| 362 | 175525.1 | 3 | 100e4.eml | **Email correspondence of Diana Fenton to DOJ and DOE counsel regarding process of responding to plaintiffs' discovery requests.** | February 23, 2023 | Attorney/client privilege; work product. |
| 363 | 175527.1 | 3 | 100e2.eml | **Email correspondence of Diana Fenton to DOJ and DOE counsel regarding process of responding to plaintiffs' discovery requests.** | February 22, 2023 | Attorney/client privilege; work product. |
| 364 | 175544.1 | 1 | 100cv.eml | **Draft email correspondence of Diana Fenton to DOJ's Sean Locke subject "HRC complaint."** | February | Deliberative process privilege. |
| 365 | 175569.1 | 1 | 100c1.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 366 | 175573.1 | 1 | 100c5.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 367 | 178479.1 | 1 | 16834.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 368 | 305912.1 | 30 | AFT-Mejia_-_Draft_Memorandum_3-22-2022.doc | **Draft document attached to email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 369 | 178606.1 | 2 | 14783.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | November 15, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 370 | 178889.1 | 2 | 14069.eml | **Email correspondence of DOE legal counsel Elizabeth Brown, DOJ's Christopher Bond and Jill Perlow, Commissioner Edelblut, and other DOJ officials regarding AG opinion.** | September 1, 2022 | Attorney/client privilege; work product. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 371 | 178975.1 | 3 | 1e7ad.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from M.C. subject "Cheshire County SAU29 – Concerned Parent." *See* DOE-10134.** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
|---|---|---|---|---|---|---|
| 372 | 179179.1 | 1 | 1e475.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft statement in potential response to request for information from NHPBS.** | November 30, 2021 | Deliberative process privilege. |
| 373 | 179514.1 | 3 | 1e7b5.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 374 | 179530.1 | 3 | 1e79e.eml | **Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 375 | 179613.1 | 2 | 1fa41.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email of K.D. subject "Resolutions for NHSBA."** | October 7, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 376 | 179784.1 | 2 | 1f0b5.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commission Edelblut and Kimberly Houghton regarding draft press release concerning DOE webpage.** | November 5, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 377 | 197785.1 | 1 | 1dee6.eml | **Email correspondence of Office of the Governor official Deanna Jurius to Commissioner Edelblut regarding draft letter to C.L. concerning Public Education Intake Questionnaire concerns.** | December 17, 2021 | Executive privilege; deliberative process privilege. |
| 378 | 306477.1 | 1 | School_Admin_Assoc_Response_Final.docx | **Draft document attached to email correspondence of Office of the Governor official Deanna Jurius to Commissioner Edelblut regarding draft letter to C.L. concerning Public Education Intake Questionnaire concerns.** | December 17, 2021 | Executive privilege; deliberative process privilege. |
| 379 | 179911.1 | 2 | 1df71.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding litigation hold.** | December 21, 2021 | Attorney/client privilege; work product. |
| 380 | 179919.1 | 3 | 1eeb4.eml | **Email correspondence of Diana Krol regarding draft intake form and draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 381 | 306533.1 | 2 | Discrimination_intake-draft2-doe-fill-submit.pdf | **Draft form attached to email correspondence of Diana Krol regarding draft intake form and draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 382 | 306725.1 | 4 | Anti-Discrimination_Intake_ | **Draft webpage attached to email correspondence of Diana Krol regarding draft intake form and draft webpage.** | November 1, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | Website_Draft.docx | | | |
|---|---|---|---|---|---|---|
| 383 | 180030.1 | 3 | 1e3fb.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut and Kimberly Houghton regarding decision-making concerning potential response to interview request.** | November 29, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 384 | 180079.1 | 2 | 1e79c.eml | **Email correspondence of DOE legal counsel Christopher Bond and Commissioner Edelblut regarding decision-making concerning potential response to email of K.L and B.L. subject "White Like Me – Movie Permission."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 385 | 180411.1 | 3 | 1e7f8.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 386 | 180958.1 | 2 | 1e925.eml | **Email correspondence of Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft press concerning DOE webpage and legal advice of DOE legal counsel Christopher Bond concerning the same.** | November 9, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 387 | 180988.1 | 1 | 1f800.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to vendor screening document.** | September 30, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 388 | 181077.1 | 2 | 1e1fc.eml | **Email correspondence of Representative Alicia Lekas to Commissioner Edelblut and state legislators regarding proposed legislation HB 1255.** | February 22, 2022 | Legislative privilege. |
| 389 | 183227.1 | 2 | 16843.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 22, 2022 | Attorney/client privilege; work product. |
| 390 | 183269.1 | 4 | 169ae.eml | **Email correspondence of Senior Assistant Attorney General Samuel Garland to defendants and defendants' legal counsel regarding draft memorandum.** | March 25, 2022 | Attorney/client privilege; work product. |
| 391 | 183541.1 | 2 | 1503e.eml | **Email correspondence of Diana Krol to Angela Adams regarding decision-making concerning potential response to email from V.C. subject "Merrimack School Board."** | October 1, 2021 | Deliberative process privilege. |
| 392 | 185309.1 | 2 | 1f003.eml | **Email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning draft press release regarding DOE webpage.** | November 4, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 393 | 308944.1 | 2 | RTFDiscriminationPage.docx | **Draft document attached to email correspondence of DOE legal counsel Christopher Bond regarding decision-making concerning draft press release regarding DOE webpage, with commentary/redlines.** | November 4, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 394 | 185367.1 | 2 | 1e44a.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding decision-making concerning potential response to request for information from NHPBS.** | November 30, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 395 | 185560.1 | 1 | 1fc03.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding AG opinion.** | September 16, 2021 | Attorney/client privilege. |
| 396 | 185802.1 | 1 | 1f828.eml | **Email correspondence of Diana Krol to Commissioner Edelblut and Angela Adams regarding draft questionnaire and decision-making regarding the draft.** | October 4, 2021 | Deliberative process privilege. |
| 397 | 309148.1 | 4 | Public-education-intake-questionnaire.pdf | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut and Angela Adams regarding draft questionnaire and decision-making regarding the draft.** | October 4, 2021 | Deliberative process privilege. |
| 398 | 186033.1 | 1 | 1df07.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut, Kimberly Houghton, and Diana Krol regarding litigation hold.** | December 20, 21 | Attorney/client privilege; work product. |
| 399 | 186049.1 | 3 | 1f009.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft press release concerning DOE webpage.** | November 4, 2021 | Deliberative process privilege. |
| 400 | 186168.1 | 2 | 1f437.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage.** | October 18, 2021 | Deliberative process privilege. |
| 401 | 309296.1 | 4 | Public-education-intake-questionnaire.docx | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concerning draft DOE webpage.** | October 18, 2021 | Deliberative process privilege. |
| 402 | 186277.1 | 4 | 1e7e2.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email subject "Here are the materials you asked Jay for."** | December 14, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 403 | 186557.1 | 3 | 1eaa0.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut and DOE legal counsel Christopher Bond regarding draft press release concerning DOE web page.** | November 17, 2021 | Attorney/client privilege; deliberative process privilege. |
| 404 | 186593.1 | 2 | 1e0a1.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from M.B. subject "Request for information."** | December 28, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 405 | 186715.1 | 3 | 1ea63.eml | **Email correspondence of Jennifer Doris and Commissioner Edelblut regarding decision-making concerning potential response to email subject "Newfound School District: Reapplication to Promising Futures Grant 2021-2022."** | November 15, 2021 | Deliberative process privilege. |
| 406 | 186827.1 | 2 | 1ea4f.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | November 15, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 407 | 187725.1 | 1 | 1ee67.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding draft intake form.** | October 29, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 408 | 309923.1 | 2 | Discriminati on_intake-draft2-doe.docx | **Draft form attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft intake form.** | October 29, 2021 | Deliberative process privilege. |
|---|---|---|---|---|---|---|
| 409 | 187731.1 | 2 | 1f02d.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding draft press release concerning DOE webpage.** | November 4, 2021 | Deliberative process privilege. |
| 410 | 187733.1 | 4 | 1e415.eml | **Email correspondence of Kimberly Houghton to Commissioner Edelblut regarding decision-making concerning potential responses to media inquiries.** | February 22, 2022 | Deliberative process privilege. |
| 411 | 187846.1 | 1 | 106e2.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 412 | 187929.1 | 1 | 10594.ics | **Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel.** | February 24, 2023 | Attorney/client privilege. |
| 413 | 191784.1 | 1 | 11d04.eml | **Email correspondence of Commissioner Edelblut to Governor's legal counsel James Scully regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | September 18, 2021 | Executive privilege; deliberative process privilege; attorney/client privilege. |
| 414 | 312190.1 | 8 | Anti-Discriminati on_Q&A.do cx | **Draft document attached to email correspondence of Commissioner Edelblut to Governor's legal counsel James Scully regarding draft of document titled "Technical Advisory Regarding RSA 193:40 Prohibition on Teaching Discrimination"** | July 12, 2021 | Executive privilege; deliberative process privilege; attorney/client privilege. |
| 415 | 193494.1 | 5 | 152cf.eml | **Email correspondence of Executive Director Malachi to Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Senior Assistant Attorney General Jill Perlow regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 8, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 416 | 193856.1 | 1 | 11919.ics | **Calendar item of Commissioner Edelblut related to meeting with DOE and DOJ counsel and Executive Director Malachi.** | November 10, 2021 | Attorney/client privilege. |
| 417 | 194002.1 | 2 | 11bfd.eml | **Email correspondence of Commissioner Edelblut to Stephen Appleby regarding decision-making concerning potential response to S.R. email subject "Teacher resignations requested."** | July 7, 2021 | Deliberative process privilege. |
| 418 | 195531.1 | 3 | 1582d.eml | **Email correspondence of Senior Assistant Attorney General Jill Perlow regarding discussion of process concerning anti-discrimination incidences at UNH.** | September 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| 419 | 196119.1 | 5 | 15249.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Senior Assistant Attorney General Jill Perlow, Executive Director Malachi, and other DOJ and DOE officials regarding decision-making concerning potential response to inquiry regarding UNH curriculum.** | September 8, 2021 | Attorney/client privilege; work product |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| **420** | 199602.1 | 3 | 1479f.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Executive Director Malachi regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | November 15, 2021 | Deliberative process privilege; attorney/client privilege. |
| **421** | 203562.1 | 2 | 1b3ba.eml | **Email correspondence of Commissioner Edelblut to Diana Fenton regarding decision-making concerning potential response to email from W.C. subject "Discovery of CRT materials (Stamped) and lessons being taught."** | October 5, 2021 | Deliberative process privilege. |
| **422** | 204418.1 | 4 | 147a3.eml | **Email correspondence of Commissioner Edelblut, DOE legal counsel Christopher Bond, Angela Adams, and Executive Director Malachi regarding decision-making concerning potential response to email from D.C. subject "Flowchart for Form."** | November 15, 2021 | Deliberative process privilege; attorney/client privilege. |
| **423** | 206474.1 | 2 | 15055.eml | **Email correspondence from Representative Roderick Ladd to Angela Adams, Representative Cordelli, and Commissioner Edelblut regarding proposed legislation.** | October 4, 2021 | Legislative privilege. |
| **424** | 206648.1 | 1 | 1b3cd.eml | **Email correspondence of Commissioner Edelblut to Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage.** | October 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| **425** | 344843.1 | 3 | Anti-Discrimination_Intake_Website_Draft.docx | **Draft document attached to email correspondence of Commissioner Edelblut to Diana Krol, DOE legal counsel Christopher Bond, Executive Director Malachi and Senior Assistant Attorney General Jill Perlow regarding draft DOE webpage, with commentary and redlines.** | October 18, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **426** | 207206.1 | 2 | 1bc4c.eml | **Email correspondence of DOE legal counsel Christopher Bond to Commissioner Edelblut regarding decision-making concerning potential response to vendor screening document.** | October 1, 2021 | Attorney/client privilege; work product; deliberative process privilege. |
| **427** | 208600.1 | 1 | 1a4bf.eml | **Email correspondence of Commissioner Edelblut to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from B.C. subject "Londonderry Investigation."** | April 19, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| **428** | 216338.1 | 2 | 10ba8.eml | **Email correspondence of Commissioner Edelblut, Diana Fenton, and DOE legal counsel Elizabeth Brown with DOJ legal counsel regarding discovery scheduling and briefing.** | February 17, 2023 | Attorney/client privilege; work product. |
| **429** | 217129.1 | 2 | 10818.eml | **Email correspondence of Commissioner Edelblut and DOE legal counsel Elizabeth Brown with DOJ legal counsel regarding discovery scheduling and briefing.** | February 17, 2023 | Attorney/client privilege; work product. |
| **430** | 223393.1 | 2 | 13932.eml | **Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential DOE response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education."** | September 22, 2022 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 431 | 225971.1 | 3 | 12e8e.eml | Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential response to email from "Matthew" subject "CRT in NH." | March 4, 2022 | Deliberative process privilege. |
|-----|----------|---|-----------|------|------|------|
| 432 | 226076.1 | 1 | 12a18.eml | Email correspondence of Diana Krol to DOE legal counsel Christopher Bond regarding decision-making concerning potential response to email from L.G. subject "Help seeking information." | March 28, 2022 | Attorney/client privilege; deliberative process privilege. |
| 433 | 228067.1 | 2 | 12e8b.emlE | Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential response to email from "Matthew" subject "CRT in NH." | March 4, 2022 | Deliberative process privilege. |
| 434 | 229313.1 | 1 | 12cfe.eml | Email correspondence of Diana Krol to Kimberly Houghton regarding decision-making concerning potential response to email from M.B. subject "Holocaust & genocide education." | April 18, 2022 | Deliberative process privilege. |
| 435 | 231124.1 | 2 | 149ed.eml | Email correspondence of Kimberly Houghton to Diana Krol regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education." | September 21, 2022 | Deliberative process privilege. |
| 436 | 231967.1 | 2 | 11881.eml | Email correspondence of Diana Krol to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education." | September 22, 2022 | Attorney/client privilege; deliberative process privilege. |
| 437 | 231978.1 | 1 | 11833.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Diana Krol and Rhonda Kelley regarding potential response to RSA 91-A request. | January 5, 2023 | Attorney/client privilege; work product; deliberative process privilege. |
| 438 | 231981.1 | 2 | 117df.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Diana Krol, Rhonda Kelley, and D.C. Brennan regarding potential response to RSA 91-A request. | January 23, 2023 | Attorney/client privilege; work product; deliberative process privilege. |
| 439 | 232022.1 | 2 | 1186d.eml | Email correspondence of DOE legal counsel Elizabeth Brown to Diana Krol regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education." | September 22, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 440 | 232125.1 | 2 | 1186e.eml | Email correspondence of Diana Krol to DOE legal counsel Elizabeth Brown regarding decision-making concerning potential response to email from J.L. subject "Right to Freedom from Discrimination in Public Workplaces and Education." | September 22, 2022 | Attorney/client privilege; work product; deliberative process privilege. |
| 441 | 234396.1 | 1 | 11784.eml | Email correspondence of DOJ counsel to DOE officials regarding motion argument preparation. | September 14, 2022 | Attorney/client privilege; work product. |
| 442 | 361887.1 | 1 | Unnamed | Calendar event organized by Senior Assistant Attorney General Samuel Garland to DOE officials regarding present litigation. | September 14, 2022 | Attorney/client privilege; work product. |
| 443 | 237259.1 | 1 | 113bb.ics | Calendar item of Commissioner Edelblut related to discussion of plaintiffs' discovery requests with DOE legal counsel. | February 24, 2023 | Attorney/client privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 444 | 237377.1 | 3 | 112b9.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding decision-making concern potential response to email from S.S. subject "Update with pdf's: CRT in Dover Schools-response to Ed Commquestion during HB61 hearing."** | February 6, 2023 | Deliberative process privilege. |
|-----|----------|---|-----------|---|---|---|
| 445 | 240665.1 | 2 | 159c1.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 446 | 240668.1 | 4 | 159c6.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 447 | 240676.1 | 4 | 159df.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding feedback concerning draft DOE webpage.** | November 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 448 | 240679.1 | 4 | 159c0.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 449 | 240682.1 | 4 | 159e4.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding feedback concerning draft DOE webpage.** | November 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 450 | 240690.1 | 3 | 159c4.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 451 | 240691.1 | 3 | 159d7.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding feedback concerning draft DOE webpage.** | November 1, 2021 | Attorney/client privilege; deliberative process privilege. |
| 452 | 240692.1 | 1 | 159ce.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 453 | 240696.1 | 2 | 159bf.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 6, 2021 | Deliberative process privilege. |
| 454 | 240698.1 | 2 | 159cc.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 455 | 364292.1 | 4 | Public-education-intake-questionnaire-fill.pdf | **Draft document attached to email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege |
| 456 | 240699.1 | 2 | 159cd.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 457 | 240700.1 | 1 | 159f3.eml | **Email correspondence of Diana Krol regarding draft questionnaire.** | November 16, 2021 | Deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| 458 | 364262.1 | 2 | NHCHR_Public_Education_RSA_354-A29_Questionnaire.pdf | **Draft document attached to email correspondence of Diana Krol regarding draft questionnaire.** | November 16, 2021 | Deliberative process privilege.240702.1 |
|-----|----------|---|-----|-----|-----|-----|
| 459 | 240701.1 | 2 | 159f2.eml | **Email correspondence of Diana Krol regarding draft questionnaire.** | November 16, 2021 | Deliberative process privilege. |
| 460 | 240702.1 | 3 | 159dd.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 2, 2021 | Attorney/client privilege; deliberative process privilege. |
| 461 | 240706.1 | 2 | 159ea.eml | **Email correspondence of Diana Krol, Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft webpage.** | November 4, 2021 | Deliberative process privilege. |
| 462 | 240707.1 | 2 | 159e9.eml | **Email correspondence of Diana Krol, Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft webpage.** | November 3, 2021 | Deliberative process privilege. |
| 463 | 240708.1 | 2 | 159c7.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | October 18, 2021 | Attorney/client privilege; deliberative process privilege. |
| 464 | 364267.1 | 4 | public-education-intake-questionnaire.docx | **Draft document attached to email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | October 18, 2021 | Deliberative process privilege. |
| 465 | 240710.1 | 1 | 159d3.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 29, 2021 | Deliberative process privilege. |
| 466 | 364266.1 | 2 | discrimination_intake-draft2-doe.docx | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 29, 2021 | Deliberative process privilege. |
| 467 | 240711.1 | 2 | 159e8.eml | **Email correspondence of Diana Krol, Kimberly Houghton, Commissioner Edelblut, and Executive Director Malachi regarding draft webpage.** | November 4, 2021 | Deliberative process privilege. |
| 468 | 240715.1 | 3 | 159c2.eml | **Email correspondence of Diana Krol, Douglas Schelb, and Ryan Petrain regarding development of DOE webpage.** | October 11, 2021 | Deliberative process privilege. |
| 469 | 240717.1 | 3 | 159d2.eml | **Email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 1, 2021 | Attorney/client privilege; deliberative process privilege. |

Local 8027, AFT-New Hampshire, et al. v. Frank Edelblut, Commissioner et al. (1:21-cv-01077)
Privilege Log – NH Department of Education

| | | | | | | |
|---|---|---|---|---|---|---|
| 470 | 364332.1 | 2 | discrimination_intake-draft2-doe-fill-submit.pdf | **Draft document attached to email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 471 | 364673.1 | 4 | Anti-Discrimination_Intake_Website_Draft.docx | **Draft document attached to email correspondence of Diana Krol, Commissioner Edelblut, DOE legal counsel Christopher Bond, Executive Director Malachi, and Senior Assistant Attorney General Jill Perlow regarding draft webpage.** | November 1, 2021 | Deliberative process privilege. |
| 472 | 240722.1 | 1 | 159d0.eml | **Email correspondence of Diana Krol to Commissioner Edelblut, Angela Adams regarding draft DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 473 | 364320.1 | 4 | public-education-intake-questionnaire.pdf | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut, Angela Adams regarding draft DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 474 | 240728.1 | 1 | 159c9.eml | **Email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 13, 2021 | Deliberative process privilege. |
| 475 | 364287.1 | 2 | 354-A.docx | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 6, 2021 | Deliberative process privilege. |
| 476 | 364642.1 | 4 | public-education-intake-questionnaire-submit.pdf | **Draft document attached to email correspondence of Diana Krol to Commissioner Edelblut regarding draft DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 477 | 240735.1 | 1 | 159cf.eml | **Email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 478 | 364313.1 | 4 | public-education-intake-questionnaire.pdf | **Draft document attached to email correspondence of Diana Krol and Douglas Schelb regarding development of DOE webpage.** | October 4, 2021 | Deliberative process privilege. |
| 479 | 247900.1 | 2 | 1899d.eml | **Email correspondence of DOE legal counsel Christopher Bond to Diana Krol regarding decision-making concerning potential response to email from L.G. subject "Help seeking information."** | March 28, 2022 | Attorney/client privilege; work product; deliberative process privilege. |

**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 8/13/24
Case 1:21-cv-01077-PB  Document 108  Filed 05/28/24  Page 1 of 11

2655

<pre>
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
 2

 3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                              *
 4    LOCAL 8027 AFT-NEW HAMPSHIRE,            *
      AFL-CIO, ET AL.,                         *
 5                                             *
                         Plaintiffs.          *
 6                                             *
                   v.                          *  No. 1:21-cv-1077-PB
 7                                             *  January 16, 2024
                                               *
 8    FRANK EDELBLUT, IN HIS OFFICIAL          *
      CAPACITY ONLY AS THE                      *
 9    COMMISSIONER OF THE NEW                    *
      HAMPSHIRE DEPARTMENT OF                    *
10    EDUCATION, ET AL.,                        *
                                               *
11                       Defendants.           *
                                               *
12    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

13          TRANSCRIPT OF TWO EXCERPTS FROM MOTION HEARING
                BEFORE THE HONORABLE PAUL J. BARBADORO
14

      APPEARANCES:
15

      For the Plaintiffs:      Charles Moerdler, Esq.
16                             Stroock Stroock & Lavan LLP

17                             Gilles R. Bissonnette, Esq.
                               American Civil Liberties Union
18                             of New Hampshire

19                             Joshua M. Goldman, Esq.
                               Harry Sandick, Esq.
20                             Patterson Belknap Webb & Tyler

21                             Morgan C. Nighan, Esq.
                               Nixon Peabody LLP
22
                               Chris Erchull, Esq.
23                             GLBTQ Legal Advocates & Defenders
                               (GLAD)
24

25             (Appearances continued next page)
</pre>

<u>For the Defendants</u>:          Samuel R. V. Garland, Esq.
                                    Nathan W. Kenison-Marvin, Esq.
                                    New Hampshire Department of Justice
                                    Office of the Attorney General (Civil)


<u>Court Reporter</u>:              Brenda K. Hancock, RMR, CRR
                                    Official Court Reporter
                                    United States District Court
                                    55 Pleasant Street
                                    Concord, NH 03301
                                    (603) 225-1454

1                          I   N   D   E   X

2                                                    Page

3       Excerpt No. 1...........................4
        Excerpt No. 2...........................8

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>EXCERPT NO. 1</u>

2              THE COURT:  Well, is the Socratic method a teaching

3    method?

4              MR. GARLAND:  For sure, your Honor, in the abstract.

5              THE COURT:  Are you teaching when you ask questions

6    using the Socratic method?

7              MR. GARLAND:  Yeah, I think you are, for sure.

8              THE COURT:  When you ask questions of your students

9    about white privilege, are you teaching it, even though you're

10   not taking a view about white privilege; you're trying to get

11   them to think about white privilege, what it means, is it real,

12   what is the extent of it?  If you ask questions, are you

13   teaching?

14             MR. GARLAND:  I think you are, your Honor, and I think

15   that falls within the definitions that we've identified, that,

16   still, it's some sort of affirmative and deliberate act

17   designed to convey information.  As I understood --

18             THE COURT:  So, let me try a hypothetical on you.  So,

19   suppose a high school teacher is teaching Thoreau's book

20   *Walden*, okay, a book near and dear to my heart, I grew up five

21   miles away from Walden Pond, and there's a famous statement

22   that Thoreau makes in that book:  It's never too late to give

23   up our prejudices.  Suppose a teacher writes that on the board,

24   and a student raises his hand and says, People can't give up

25   their prejudices; they're inherent.  What is the teacher

1  supposed to do in response to that to avoid losing their

2  teaching license?

3          MR. GARLAND:  I think a teacher may well have to

4  consider adding context or disclaimer to that sort of

5  statement, may have to identify that it is --

6          THE COURT:  That's wrong?  They have to affirmatively

7  tell the student, That's wrong; that isn't true?

8          MR. GARLAND:  I'm not saying that, your Honor.

9  Something more general in the sense of that's one particular

10  way of looking at it, and I think that's really where this

11  starts to, in my mind, blur the vagueness inquiry and the

12  policy inquiry.  A lot of people of very good faith profoundly

13  disagree that a teacher should have to do that.

14          THE COURT:  Nothing in my ruling -- I don't take any

15  position on whether any of the banned concepts are good or bad,

16  should be in the curriculum, should not be in the curriculum.

17  That's not my job.  I say it's the responsibility of the State.

18  I suggest that school boards are in a better position most

19  often to do that, in conjunction with public hearings and so

20  forth, but it's the State's responsibility, not mine, to

21  declare whether concepts are good.

22          So, I don't take any position on should there be,

23  should it allow, should it not be.  I'm concerned about the

24  vagueness of the statute and how teachers can lose their job,

25  lose their teaching license, potentially be subject to damages

1    for not responding to a comment from a student in a classroom

2    in the right way.  That's my concern.

3            What can you tell me about whether in that

4    hypothetical, what other context would you want to know that

5    could give a teacher guidance about how to respond to a student

6    that challenges Thoreau's statement that, It's never too late

7    to give up our prejudices?

8            MR. GARLAND:  I think the additional guidance that a

9    teacher would need can be found in the statutes, and I think

10   that goes down to Roman numeral I and the letter portions of

11   the statutes, which is, if the statement is coming back of the

12   kind you're describing, a teacher may well have to add a

13   caveat, may well have to add a disclaimer, not a rejection of

14   the notion, I don't think that's contemplated by the statutes,

15   but may well have to make clear how it fits within the larger

16   context of education.  I think the statutes provide sufficient

17   guidance on this, and I do think this is where, when we're

18   talking about cases, that I would posit around the margins the

19   fact that a teacher has to make those judgment calls does not

20   mean the statute is vague.

21           THE COURT:  Could a teacher in a high school civics

22   class assign to students -- and I'm picking up specifically on

23   something from the plaintiffs' brief, where they were picking

24   up on something I said in my opinion about the affirmative

25   action case -- could a teacher assign and have a class

1    discussion about Justice Sotomayor's dissent in that case?

2         MR. GARLAND:  For sure, your Honor.

3         THE COURT:  And they could talk about affirmative

4    action and why reparations might be necessary, not just

5    diversity promotion?  They could talk about that, and that

6    wouldn't in any way endanger a teacher for teaching,

7    advocating, inculcating that one group should be preferred over

8    another?

9         MR. GARLAND:  No, I don't think it would run afoul of

10   it, because the statutes don't simply prohibit what you just

11   described, which is one group preferred over another.  They

12   prohibit the idea that --

13        THE COURT:  I don't know if the plaintiffs will agree

14   with you on that.

15        MR. GARLAND:  I doubt they will, your Honor.

16        THE COURT:  I don't think I'll agree with you on it

17   either.  I mean, I won't try to argue with you on it.  But I

18   think the banned concepts can be read to encompass that, that

19   one group should be -- it is wrong that one group should be

20   preferred over another based on their race, for example.

21        MR. GARLAND:  I don't agree with that, your Honor, but

22   the point that I -- the main point that I would make in

23   response to that focuses on the word "could" have that you just

24   used, because I do think a lot of what we're talking about and

25   part of the peril in hypotheticals is it is a question of

1   could, and it's a question of could in cases that are on the

2   margins, could this violate it.

3          You resisted the notion in the earlier argument, and I

4   remember it well, that you can rewrite the statute, and I'm not

5   advocating that you can, but what you can do, sitting in the

6   context of a federal judge looking at state law, is you can try

7   to divine what the Supreme Court, New Hampshire Supreme Court,

8   would do, again using its rules of construction, and one of its

9   rules of construction is construing language, if it is

10  susceptible of a reading that's broader that creates a

11  constitutional problem and susceptible to narrow

12  construction --

13                    (End of excerpt)

14  (Proceedings continued on the record that are not included in

15  this excerpt transcript)

16                    * * * * * *

17                    EXCERPT NO. 2

18          THE COURT:  Well, how about the concept of structural

19  racism?  You understand what that term is understood to mean,

20  right?

21          MR. GARLAND:  Yes.

22          THE COURT:  Doesn't structural racism -- don't you,

23  engaging in discussions about structural racism, can they not

24  be discussions about how discrimination can evolve into

25  intolerance over time?

1       MR. GARLAND:  I would say they certainly can, your

2   Honor, but, as I understand the concept of structural racism,

3   it doesn't get into the sort of inherent

4   superiority/inferiority, inherent racism, sexism, et cetera,

5   that the statute contemplates.  That's something far narrower,

6   it's something biological, innate, not just simply something

7   that would be more cultural or learned behavior, and I think

8   that is reflected in the AG opinion, it's reflected in our

9   briefing, and that's the distinction.  You can certainly teach

10  about the concept.  I don't understand structural racism to say

11  person X is white and therefore was born racist, which I think

12  is where you would start to cross the line with the statute.

13      THE COURT:  And you would say teachers have no trouble

14  teaching implicit bias training in their classroom, implicit

15  bias, linking them to the famous website where you can engage

16  in questions and get an implicit bias score?  None of that

17  could in any way cross into the line of being impermissible, in

18  danger of violation of the statute?  Is that your view?

19      MR. GARLAND:  It may well, again, require a teacher to

20  identify what they're not providing the information to do, and

21  the teacher may well have to say, and this is, again, trying --

22      THE COURT:  What if a student says, The implicit bias

23  data tells us that we're inherently biased; we can't avoid our

24  discriminatory thinking?  That isn't my view of what the

25  implicit bias data suggests, but students are going to raise

1    those kinds of concerns.  Are you saying that, unless they give

2    what you call a disclaimer, they have to correct the student,

3    essentially; otherwise they will be in violation?

4          MR. GARLAND:  Well, I think it depends on how the

5    student raises it.  I think if a teacher were to provide

6    implicit bias training or to teach about implicit bias, and a

7    student were to run home and say, The teacher taught me that I

8    am inherently racist, I don't think that's a violation.  I

9    think that perhaps could result in a complaint, but that's the

10   sort of thing that would be weeded out based on the constraints

11   that are in the statute.  I think if a student, going back to

12   your initial hypothetical, were to bring it up to the teacher

13   in class, a teacher might have to consider how to contextualize

14   that statement.

15                        (End of excerpt)

16   (Proceedings continued on the record that are not included in

17   this excerpt transcript)

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    knowledge, skill, ability and belief, a true and accurate

8    transcription of the within proceedings.

9

10

11

12

13   Date: ___5/28/24_____    /s/ Brenda K. Hancock
                                 Brenda K. Hancock, RMR, CRR
14                               Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE

2

3   * * * * * * * * * * * * * * * * *
                           *

4   LOCAL 8027 AFT-NEW HAMPSHIRE,   *
   AFL-CIO, ET AL.,              *

5                            *
               Plaintiffs.   *

6                            *
               v.          *  No. 1:21-cv-1077-PB

7                            *  January 16, 2024
                            *  10:00 a.m.

8   FRANK EDELBLUT, IN HIS OFFICIAL  *
   CAPACITY ONLY AS THE        *

9   COMMISSIONER OF THE NEW      *
   HAMPSHIRE DEPARTMENT OF      *

10  EDUCATION, ET AL.,        *
                            *

11               Defendants.   *
                            *

12  * * * * * * * * * * * * * * * * *

13     TRANSCRIPT OF HEARING ON MOTIONS FOR SUMMARY JUDGMENT
          BEFORE THE HONORABLE PAUL J. BARBADORO

14

   APPEARANCES:

15

   For the Plaintiffs:    Gilles R. Bissonnette, Esq.

16                    American Civil Liberties Union
                    of New Hampshire

17
                    Charles Moerdler, Esq.

18                    Joshua M. Goldman, Esq.
                    Harry Sandick, Esq.

19                    Patterson Belknap Webb & Tyler

20                    Morgan C. Nighan, Esq.
                    Nixon Peabody LLP

21
                    Chris Erchull, Esq.

22                    GLBTQ Legal Advocates & Defenders
                    (GLAD)

23

24          (Appearances continued next page)

25

For the Defendants:        Samuel R. V. Garland, Esq.
                           Nathan W. Kenison-Marvin, Esq.
                           New Hampshire Department of Justice
                           Office of the Attorney General (Civil)


Court Reporter:            Brenda K. Hancock, RMR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1454

1                    P R O C E E D I N G S

2            THE CLERK:  All rise for the Honorable Court.  Please

3    be seated.

4            This Court is in session and has before it for

5    consideration hearings on Motions for Summary Judgment in

6    21-cv-1077-PB, <u>Local 8027, et al. versus New Hampshire</u>

7    <u>Department of Education, et al</u>.

8            THE COURT:  I was made aware of an email from

9    Mr. Bissonnette about the Protective Order and redactions that

10   were made in the briefing materials.  What more do you want to

11   tell me about that, whoever is speaking?

12           MR. BISSONNETTE:  Thank you, your Honor.  Gilles

13   Bissonnette on behalf of plaintiffs Andres Mejia and Christina

14   Philibotte, also here speaking on behalf of NEA-New Hampshire.

15           I don't have much to add beyond that email.  We just

16   did want to flag, consistent with the Protective Order, that

17   there's some information, I think a small, very small subset of

18   information that is protected.  It principally has to deal with

19   information that has been sent to the Human Rights Commission.

20   There's an assertion that that information is confidential by

21   statute.  That was one of the reasons why we entered into a

22   Protective Order in this case.  The redactions are targeted to

23   that.  Though that could come up in various ways in the course

24   of this argument, we are happy to bifurcate, to not communicate

25   about those issues in open court and have a very small,

1    bifurcated hearing at the end, in the event that the Court

2    wants to hear more about that information in those documents.

3    But that was the reason for bringing it to this Court's

4    attention.

5             THE COURT:  Yeah.  What I would suggest is that no one

6    should unilaterally, without getting permission from the Court,

7    raise a matter that is subject to the Protective Order, but I'm

8    open to hearing the argument that I need to know about

9    something subject to Protective Order.  If someone wants to

10   make that argument, I'll hear it, decide what to do, which

11   could involve a discussion under seal or might involve my

12   decision with respect to the State process.  To the extent that

13   I need to have in the public record something that is required

14   to resolve the claim, I might be required to disclose it,

15   notwithstanding the State provision making it confidential.

16   I'd certainly want to hear from the State and would respect the

17   State interests here.

18            But ultimately I've got to decide a case, and I don't

19   decide cases based on secret information, so that would be a

20   problem for me, if I needed to do it.  It's not apparent to me

21   at the present time that I need to have that information, but

22   I'm open to hearing why I should.  Okay?  Is that acceptable to

23   you?

24            MR. BISSONNETTE:  That is, your Honor.  We are

25   planning today in public court to not bring up that

1    information, not unilaterally breach that agreement that we

2    have entered into.

3            THE COURT:  Mr. Garland, what's your view?

4            MR. GARLAND:  Yeah, I have no problem with any of

5    that, your Honor.  I believe you do have the information --

6            THE COURT:  I do.

7            MR. GARLAND:  -- in the sealed versions of it.  I

8    think you know what our argument is as to whether you need it

9    to resolve the case one way or the other based on the briefing.

10           THE COURT:  You don't think I need anything that was

11   gleaned in the last year to resolve the case.  We're going to

12   get into that.  But I understand your view on that point.

13           MR. GARLAND:  And my only ask would be, if you don't

14   consider that information -- if we don't bring it up today, I'm

15   not planning on getting into the specifics, but in the course

16   of coming to a decision you determine you may need to disclose

17   it, we obviously haven't briefed the State's interest, and I

18   would just ask for an opportunity to do that.

19           THE COURT:  Yeah.  I will make an effort, and my Clerk

20   will remind me as we go through the drafting process, that, to

21   the extent we need to look beyond the redacted briefing and

22   need to refer to materials that are redacted, I'll first

23   consult with the parties and give you an opportunity to be

24   heard about that.

25           MR. GARLAND:  That works for me.  Thank you, your

1    Honor.

2            THE COURT:  Okay.  All right.  A second issue which

3    relates to something that Mr. Garland has raised, and that is,

4    it appears to me, from reading the briefs, that both the

5    plaintiffs and the defendants agree that this case is ready for

6    resolution.  There are Cross-Motions for Summary Judgment

7    pending, and I don't see either party arguing that the other

8    party's motion must be denied because facts material to the

9    resolution of a claim they are making is in genuine dispute,

10   and, if I'm wrong about that, speak now or forever hold your

11   peace.

12           I don't want someone coming up to the Court of

13   Appeals, saying, The judge shouldn't have decided the case

14   because there were facts that were in dispute.  If they're in

15   dispute, tell me, but I didn't see any reference to that from

16   either the plaintiff or the defendant.  In fact, the defendant

17   says, if I'm understanding the defendants' position correctly,

18   is you could have decided this at the complaint level.  To the

19   extent you are inclined to rule against us, we think you made a

20   mistake, but that mistake is a mistake of law, not anything

21   that's factual.  There's no fact that the State thinks in any

22   way affects the resolution of this case, because, to the extent

23   facts were produced, they have no bearing on the question

24   before the Court.

25           So, I take you both to say that, and if either of you

1    says that, Oh, Judge, you know, we should win on summary

2    judgment, but the other side shouldn't, you need to speak up

3    now.

4             Are the plaintiffs making that contention?

5             MR. BISSONNETTE:  No.  We -- I agree with your

6    assessment, your Honor.

7             THE COURT:  Do you agree?  I'm sorry.  Counsel, you

8    agree as well?

9             MR. MOERDLER:  No.

10            THE COURT:  Okay.  Thank you.

11            MR. GARLAND:  Likewise, your Honor.

12            THE COURT:  I tend to forget that there are two

13   plaintiffs, two cases.  I don't want to foreclose anyone from

14   being heard.  I hope that we can, in dealing with the

15   plaintiffs, try not to be redundant but to identify certain

16   areas in which there may be supplemental argument that needs to

17   be made that pertains to one complaint or another, and one of

18   those I will be asking about at some point during the

19   plaintiffs' presentation, in particular, about the nature of

20   the First Amendment claim here, what is or is not being made,

21   which is -- I'll lay on the table my view.

22            I understand the parties to be pressing a facial

23   vagueness argument in which it is facially vague and violates

24   both the Due Process Clause of the Fourteenth Amendment and the

25   First Amendment, to the extent the facial vagueness endangers

1    speech values.  It's not clear to me that there is any other

2    First Amendment claim that's being pressed by anyone, but I do

3    see some allegations about overbreadth as a distinct theory;

4    and, to the extent one of you is asserting an overbreadth

5    claim, I'll ask that person, when I question about it -- and I

6    think it's your group that is raising that argument, Counsel --

7    I will ask for a brief exchange about that particular issue,

8    and I'll disclose to you my view about this very confusing

9    subject of how do facial First Amendment vagueness claims and

10   First Amendment overbreadth claims overlap, and how are they

11   distinct, and, to the extent that they are distinct, does the

12   distinctness matter to this particular case.

13            So, you can start thinking about that.  I'll ask you

14   about it at the appropriate time.

15            All right.  So, I propose, then, to move right into

16   the cross-motions.  Since both sides are seeking judgment, it

17   makes sense to me to have the party who has the burden of proof

18   to go first, have the plaintiffs explain to me why the

19   plaintiffs should win, and then have the defendants respond.

20            I'll also say that we have a distinct issue with

21   respect to severance that I want to leave to the end.  So,

22   don't present your -- you have a severability argument that,

23   even if I say the statute or the amendments are

24   unconstitutional in certain respects, that I should sever off

25   and deal with other portions of the statute.  We're going to

1    save that to the end, okay?

2         So, with that in mind, why don't you briefly present

3    your position, and I'll have some questions as we go along, and

4    if you could explain to me, if at all, how you and

5    Mr. Bissonnette are dividing up the argument.

6         MR. MOERDLER:  Exactly what I intend to do.

7         THE COURT:  Okay.  Go ahead.

8         MR. MOERDLER:  Your Honor, what we have decided to do

9    is to break this essentially into two parts on our side.  The

10   first part is for me to deal with a couple of issues that

11   relate to standard very briefly; then my colleague,

12   Mr. Bissonnette, will deal with vagueness; and I will deal with

13   overbreadth and First Amendment.

14        THE COURT:  Okay.

15        MR. MOERDLER:  Let me just make one more point, if I

16   may, so we have it clear.  It is in that last point, in

17   overbreadth, that we will encounter the issue of the Protective

18   Order.

19        THE COURT:  All right.  When we get to it, you'll

20   point out --

21        MR. MOERDLER:  I just wanted you to know.

22        THE COURT:  Okay.  Yeah.  And that's fine.  I

23   appreciate that.

24        I'm a little bit concerned about your reference to

25   standing.

1          MR. MOERDLER:  No, not standing.  Standards.  I

2     apologize.

3          THE COURT:  Standards.  Okay.  I misheard you.  I

4     said, wow, the defendants, I think wisely, didn't make a

5     standing argument here.  It's complicated enough.  I don't want

6     to hear standing arguments being raised.  Okay.  Standards I'm

7     fine with.  Standing?  Oh, I thought we were past that point.

8          Okay.  Go ahead.

9          MR. MOERDLER:  Your Honor, Charles Moerdler, Patterson

10    Belknap, on behalf of the plaintiffs.

11         When we first appeared before your Honor, you

12    expressed, and it stayed with me throughout, a, quote, core

13    concern, and that core concern, as you put it, was does the

14    statute leave educators, quote, in great doubt as to whether

15    their conduct may or not be read properly.  That was a point

16    that stayed with me, because we were focusing on different

17    legal aspects and question, and that was the gut issue in this

18    case:  Does it confuse?  Does it leave people in doubt as to

19    what they should be doing?  That's the measure in every major

20    Supreme Court decision.

21         THE COURT:  I think you're absolutely right.  I'm only

22    speaking about my concern.  My concern all along has been about

23    educators who have to confront these amendments, and the

24    concern is certainly a notice concern, but there is a related

25    concern which is almost as important, and that is concern about

1    arbitrariness in enforcement.

2            MR. MOERDLER:  I agree.

3            THE COURT:  So, it is a dual concern with facially

4    vague statutes.  The dual concern is do they give adequate

5    notice?  And these are both concepts that are fundamental to

6    the rule of law.

7            Anyone who identifies rule of law concerns as

8    important will list why are they important, what are the

9    essential attributes of a rule of law system.  One of the most

10   important is people need to be able to discern whether their

11   conduct is in violation of the rule of law or not.

12           And the second related rule of law concern is law

13   needs to be enforced evenhandedly, and to the extent that

14   decision-makers are given the power to arbitrarily enforce the

15   law, because the statute is so vague, there is a very serious

16   rule of law concern, and those dual concerns are at the heart

17   of what I have been focused on in examining your claims.

18           MR. MOERDLER:  And I should tell the Court that was

19   the second point I was about to make.

20           THE COURT:  All right.

21           MR. MOERDLER:  And, indeed, we followed both of those

22   points, and, as you will hear at the First Amendment end of it,

23   although it may equally apply to the vagueness point, that's

24   where we focused in the depositions, and that's where I think

25   we hit the smoking gun, if you will, and I will get to that in

1    precise terms.

2            Let me make a point by way of background.  In these

3    depositions, which I must thank the Court for giving us the

4    opportunity to flesh out this record, not one State official,

5    not the Commissioner of Education nor any member of his staff,

6    not the Human Rights Commission or any member of its staff

7    could tell us what conduct was absolutely proscribed.  Not one

8    of them could tell us, and we asked, and we asked again, and we

9    asked again, and all we ever got was to have the statutory

10   language read back us to.

11           THE COURT:  From my reading, they added one other word

12   that they repeated over and over again, which is "context,"

13   right?  They said, Here's the language, and it all depends on

14   context, and I can't say more about it.  I may be

15   oversimplifying, but that's what I took from the briefs that

16   I --

17           MR. MOERDLER:  They were well prepared, your Honor.

18   They did what they had to do, and I compliment them for it as a

19   lawyer.

20           But it is a fact that at no point has any official of

21   the State of New Hampshire been willing to tell us, and I'm not

22   saying able, I said willing to tell us what is proscribed, what

23   was proscribed previously, it is proscribed again, what was not

24   proscribed before and is proscribed now.

25           THE COURT:  Well, let me ask you to engage with

1    Mr. Garland's, I think one of his principal points about that.

2    He argues and cites some cases to support the proposition that

3    what the administrators or the implementers of the law think

4    about how it applies -- if I'm misrepresenting your argument,

5    you'll tell me -- but I understood you to be saying that what

6    matters is the Court's construction of the statute and the

7    analysis of vagueness the way the Court construes the statute,

8    and what the Commissioner of Education thinks the statute means

9    is not relevant at all, so it shouldn't matter.

10          Am I oversimplifying or misstating your position on

11   that?

12          MR. GARLAND:  I don't think you're misstating it, your

13   Honor, probably not oversimplifying it either.  There are

14   certainly portions of the rules of construction that allow you

15   to stray into things like official guidance documents, but,

16   when we're getting into hypotheticals and depositions and

17   things along those lines, that's where I think the case law

18   suggests that's beyond the scope of the Court's analysis.

19          THE COURT:  All right.  So, you're saying that,

20   whether they answered those questions or not, their answers

21   really don't have content that is useful to me in trying to

22   discern the outer boundaries of the statutory language.  That's

23   a job I have to do based on the text of the statute.

24          MR. GARLAND:  And the rules of construction.

25          THE COURT:  And the rules of construction.

1          MR. GARLAND:  That's a fair --

2          THE COURT:  All right.  So, that's what he's saying.

3     What's your response?  Anything you have to say about that?

4          MR. MOERDLER:  He's wrong.  And if I may make the

5     point, it is very clear from Supreme Court of the United States

6     teaching, from Grayned in a direct quote from Frankfurter, no

7     less.  In Grayned the Court made the point that extrinsic

8     evidence is appropriate to define words, to define conduct, to

9     define excess.  There are a half a dozen additional cases,

10    including First Circuit cases, which make exactly the same

11    point, and after the argument, with the Court's permission,

12    since this came up in his brief --

13         THE COURT:  Yes.  I didn't want replies.

14         MR. MOERDLER:  All I want is to give you the

15    citations.

16         THE COURT:  You should just provide the citations.  I

17    would appreciate that.

18         MR. MOERDLER:  Good.  Your Honor, let me just make the

19    point you made from an advocate's point of view.  If you

20    cannot, as the entity charged with enforcement, under oath tell

21    me A is good and B is bad, C is good and D is bad, then how can

22    you enforce it?  Do I have to wait until you punish me?  Do I

23    have to wait until then?

24         Indeed, as I shall point out later on, one of the most

25    concerning pieces of paper in this entire case was touched upon

1   in question number 85 in the Statement of Undisputed Facts.  It

2   was a letter written by one of the unions to the Commissioner,

3   asking specifically, Is A, B, C and D all right, and, if not,

4   what can we do?  No answer.  That was before this litigation

5   started.  They were looking for a path to go forward, not an

6   excuse or an aftermath, because the moment a teacher is

7   criticized to her principal or his principal, that teacher is

8   damned; that career is tainted.

9        That's true of all of us.  When I say to an associate,

10  You did a lousy job, that associate's guaranteed to remember it

11  forever, and that's true of the teacher, and I will demonstrate

12  the proof of that pudding later on.

13       THE COURT:  Can I ask you about -- you're, of course,

14  familiar with a number of Supreme Court decisions.  When the

15  Court decides that a statute is not unconstitutionally vague,

16  you will often see in the Court's opinion statements like

17  these:  A careful advocate could come up with any number of

18  hypothetical cases for which the answer is not clear, and

19  courts should be very cautious about getting lost in

20  hypotheticals, when it comes to vagueness challenges about

21  conduct that is not in fact in issue, and in fact a court,

22  exercising it's appropriate principles of judicial restraint,

23  should be cautious about taking hypotheticals.

24       So, that's what courts say when they say a statute is

25  not vague.  When they say a statute is vague, they oftentimes

1    focus on how it could be applied in other contexts and say

2    that's highly important.  How do I draw the line between not

3    getting lost in hypotheticals and, on the other hand, looking

4    at applications that, in fact, teachers could want to engage

5    in?  One of the things I thought was what is in the record

6    about evidence in this case of teachers who are actually

7    self-censoring or identifying conduct that they would like to

8    engage in but they are not engaging in because of the very

9    extraordinarily serious consequences of later being found in

10   violation?

11        So, first, how do I draw the line between those two

12   bodies of cases, which you're well aware of; and, second, do

13   you agree with me that it may be relevant to look at what the

14   evidence in the case shows about how plaintiffs or other

15   teachers are self-censoring out of fear that their conduct

16   might be later swept into the very wide net that these

17   amendments create?

18        MR. MOERDLER:  And that was the third lesson you

19   taught me at the outset, because we cited one hypothetical -- I

20   cited to you one hypothetical after another, and you made that

21   exact point at that time.  And you were right, because the

22   answer is what is the proof of the pudding?  But for this

23   discovery, I would still be out there on that limb.  This

24   discovery showed in plain and precise terms, and I'm going to

25   give you at the end three precise examples from this record of

1    where you draw the line, because you, better than most, better

2    than all that I've seen so far, can draw that line with

3    dispatch.

4        That line is essential.  It says to you one thing:

5    Not only in my gut, but in my mind I know that you have crossed

6    a line between what you shouldn't be doing hypothetically and

7    what you are on the verge of doing.  It is where it becomes

8    clear that you really have such flexibility as your rule that

9    you can do anything.  That's the difference.  That's the

10   demarcation line between arbitrary and enforceability.  If you

11   are empowered to make a decision flexibly, without constraints,

12   without the guidelines that Marshall spoke of and are spoken of

13   in Kolender and the other cases, absent the guidelines you have

14   a potential, a high potential, for arbitrary and capricious

15   action, and that is exactly what has happened with this

16   statute, and that is exactly what was predicted for it.  I

17   apologize, but that is the fact.

18       Your Honor, I have one more point or two more points

19   very quickly before I leave this.

20       The first one is to turn back to the statement of

21   facts.  I must compliment my friend, Bissonnette, for a superb

22   job in pulling those materials together.  It is comprehensive,

23   it touches the good, the bad and the ugly, and tells you the

24   story in plain terms.  That's why I was able to point you to

25   specifically number 85, to show you what the teachers wanted

1    before all of this started, before the litigation.

2         With respect to one more issue, and that is standards,

3    not standing, we have here, as you have observed, a First

4    Amendment issue abutting a vagueness issue, and the courts have

5    been very clear about the fact that, when those two abut there

6    is a heightened standard, a standard in some of the cases of

7    strict scrutiny.

8         There's another issue that abuts here that we have not

9    touched upon, we did in the briefs, but we have not touched

10   upon in argument before, and that is content.  Where you have

11   content, where you have content challenged because it is

12   content based --

13        THE COURT:  Can I stop you?  And I think that's a

14   point worthy of emphasis.  This statute -- and if Mr. Garland

15   has a different view, it's important for him to point this out

16   when he speaks.  I have no doubt about the fact that this

17   statute is a speech-restriction statute.  That is fundamentally

18   what it does.  It is speech restriction, it is content based,

19   and, even more powerfully, it is viewpoint based.  And so, when

20   we look at how the First Amendment treats speech, how do we

21   view viewpoint-based discriminations on speech?  It is with

22   very, very demanding standards before you can extend

23   viewpoint-based speech restrictions and validate them.

24        Now, here we have to acknowledge, though, there is

25   this overlay of the Garcetti doctrine, and you, respectfully,

1   will disagree with me on this, but I have marked out an area

2   that I believe is not subject to First Amendment protection.

3   It's still a speech restriction; it's just unprotected speech

4   in this area.  But to the extent it goes beyond what Garcetti

5   says is unprotected speech, the fact that it is a

6   viewpoint-based statute that discriminates on speech based on

7   viewpoint suggests that the court has to exercise special

8   caution in that area.  I assume you would agree.

9       MR. MOERDLER:  And, your Honor, I would make two

10  points in that regard.  The first is, because it is content

11  based, one looks as well as to whether it is overbroad, so that

12  Garcetti may protect it to a certain point; for, if you take

13  the king's shilling, you are required to adhere to the king's

14  command, but when the command is unlawful, when the command is

15  improper, when it is arbitrary, capricious, any one of those

16  things, it is no longer a command, and that is open under the

17  case law, as I will point out later.  I just wanted to focus on

18  the content-based one, because there are two cases, neither of

19  which have been cited to date, and both of which should be.

20      The Supreme Court touching on a content-based statute

21  in Reed against Gilbert, 576 U.S. 155 at 163-64 --

22      THE COURT:  I cited Reed -- I've found two state

23  statutes to be unconstitutional, in violation of First

24  Amendment grounds, in 30 years of doing this work.  One of them

25  was what's called the "ballot selfie" case in New Hampshire,

1   where I relied extensively on the Reed decision.  The First

2   Circuit did not think it needed to rely on that standard.  So,

3   I'm very familiar with that particular issue.

4           MR. MOERDLER:  And the other one, of course, is

5   Sorrell against ISM, reported at 564 --

6           THE COURT:  So, you know that decision -- I found the

7   identical statute unconstitutional.  The First Circuit said I

8   was wrong.  The Supreme Court said I was right and upheld the

9   -- excuse me -- invalidated the statute, an identical statute

10  in Vermont, and the State had to come back and agree that the

11  New Hampshire identical statute was now unconstitutional --

12          MR. MOERDLER:  So that I am not accused of plagiarism,

13  I did indeed trace your cases, but I do want to note for the

14  record that that is an issue that has not been touched upon

15  enough, because here you have the spectacle of a vague statute,

16  at least arguably so, you have a statute that is viewpoint

17  restrictive, and you have a statute that on its face is content

18  based, viewpoint based, and therefore strict scrutiny may not

19  even be enough if you read cases like Reed, which really say

20  don't do it.

21          And so, I would add one last point, and that is that

22  the vagueness challenge here can never get lost entirely as

23  being by itself because of the additional points I have just

24  made and the standards they force the Court, with respect, to

25  bring to bear in judging a statute like this.

1            And, with the Court's permission, I would ask the

2      Court to let Mr. Bissonnette deal with the vagueness point

3      directly.

4            THE COURT:  All right.  Thank you.

5            MR. MOERDLER:  And I thank the Court.

6            MR. BISSONNETTE:  Thank you, your Honor.  Again,

7      Gilles Bissonnette on behalf of the plaintiffs Andres Mejia,

8      Christina Kim Philibotte, who are present today, as well as

9      NEA-New Hampshire.

10            I want to get right to some of the points, your Honor,

11      that you raised at the outset:  the deposition testimony

12      concerning this kind of additional criteria of context; in

13      addition, I want to just add some elaborating points on

14      extrinsic evidence, if I may.  Is that appropriate?

15            THE COURT:  Yes.

16            MR. BISSONNETTE:  Thank you.  So, the notion of

17      context matters, which we heard time after time after time

18      again in the deposition, in addition to simply having the

19      statute recited back to us when we asked basic questions

20      concerning what was covered, educators need to know, at least

21      according to the State, what is barred by reading the statute,

22      but, by adding the notion that additional context matters, it

23      shows once again I think, your Honor, the subjective nature of

24      this inquiry, that a violation is in the eye of the beholder,

25      and that there are an infinite number of ways in which this law

1    may apply or may not apply.  Teachers are left with no answers

2    as to what context is okay and what context is not.

3          I want to get to both the practical problems with that

4    and the underlying legal issue which the State raises, which is

5    does any of that really matter, all of that deposition

6    testimony?

7          First off, I'm trying to ground this case and not make

8    this the law school exam problem that the State is trying to

9    present to this Court.  This is a real case, where hundreds, if

10   not thousands, of teachers are genuinely trying to figure out

11   what is covered and what is not.  Can I teach this particular

12   book?  If so, how can I teach it?  Are classroom discussions

13   covered?  Are read-alongs covered?  Can I assign multiple

14   perspectives to different students and have them have a

15   discussion or even debate a particular issue?  These aren't

16   hypotheticals.  These are vital questions for educators so they

17   can know and have some certainty that they're not violating the

18   statute, because, if they guess wrong, they can lose their

19   license.  So, I just want to just highlight that these aren't

20   just hypothetical questions; these are critical questions for

21   New Hampshire educators.

22          THE COURT:  Well, to the extent -- and I think you do

23   make some references in your brief, but if you want to draw to

24   my attention specific examples, that would be helpful, and I'll

25   hear Mr. Garland's argument that I should ignore that, but it

1    does seem to me relevant.  To the extent that you have evidence

2    that teachers are, in fact, changing the way they are teaching

3    now because of a concern that they may be swept into the net

4    that's cast by the amendments, that strikes me as worthy of

5    consideration, certainly.

6         MR. BISSONNETTE:  Yes.  I think that evidence was well

7    developed by the plaintiffs in this case, and it is the last

8    section of the Plaintiffs' Statement of Facts here.

9         But just to summarize, though, these weren't just

10   hypotheticals.  We asked -- in addition to whether certain

11   texts were covered, we asked questions like, What is teaching

12   under the statute?

13        But even setting that aside, we raised specific books

14   that the Department of Education actually asserted in the

15   public record were reasons for why the law was actually

16   necessary.

17        THE COURT:  Well, let me just -- I need to underscore

18   this point; this is so that Mr. Garland can be prepared to

19   address this:  When we look at the vagueness challenge here, I

20   think we have to look, and I think your brief makes this point,

21   but I want it to be quite clear to Mr. Garland that I see it as

22   significant, that the problem, from your perspective, is not

23   only a problem about what speech is banned, what concepts

24   cannot be spoken, what they mean.  There's also a concern about

25   what it means to teach --

1          MR. BISSONNETTE:  Yes.

2          THE COURT:  -- to inculcate, to instruct.  And so, you

3    have vagueness across two dimensions.  One is as to the content

4    of the banned concept, what is the banned concept, what is or

5    is not banned, and then what is teaching.  If a student raises,

6    Teacher, I'd like to talk about white privilege, is that

7    teaching if the teacher allows the student to talk about white

8    privilege, or is that not covered teaching, instruction,

9    inculcating?  So, there's a question about the vagueness of the

10   concepts, and there's a question about what is teaching.

11         MR. BISSONNETTE:  Yes.

12         THE COURT:  And if you go back to the old

13   anticommunist cases like Keyishian, that the Court, Justice

14   Brennan, makes that point in his discussion of teaching in that

15   case about a different subject, kind of communism or conduct

16   that is advocating the violent overthrow.  He makes the point,

17   in finding that statute unconstitutionally vague, that there's

18   a problem with these concepts of identifying when something is

19   teaching or not.  So, there's a need for guidance about that

20   that is -- I understand you to make the argument that that's

21   one of the reasons why it's unconstitutional.

22         If you think of it as -- and that also bears upon the

23   First Amendment vagueness argument, because, to the extent one

24   can encompass within this concept of inculcating, instructing,

25   teaching, communications between a teacher and a student in

1    contexts other than in the classroom, it starts to raise

2    questions about how that may infringe on protected conduct that

3    the teacher might want to engage in but that an administrator

4    of the statute might consider teaching, advising, inculcating,

5    I would use the term advocating.

6         MR. BISSONNETTE:  Yes.

7         THE COURT:  So, I just want to make that -- to me that

8    is very important, that this is not, in your view, only vague

9    because it doesn't explain, provide sufficient guidance as to

10   what concepts are or are not banned.

11        MR. BISSONNETTE:  Yes.

12        THE COURT:  It also is vague and it doesn't describe

13   adequately what kinds of behaviors by teachers in what contexts

14   are prohibited.

15        MR. BISSONNETTE:  And there's even disagreement I

16   think within the state as to what's covered.  Is it just

17   teaching?  Can it be by implication?  Does there have to be

18   knowing requirement?  I mean, I think the state is all over the

19   map.

20        But I do agree with you that I think the way that I

21   have looked at the statute is you break it down into its

22   component parts.  The first is the how, that is to say, what

23   constitutes teaching, what constitutes inculcating, what

24   constitutes compelling to express a belief in support of or

25   against something.  That is a key element of the statute, and

1   we asked multiple questions trying to get to the bottom of what

2   the enforcers think that means, and we couldn't get any

3   answers.  That's where the defendants kept saying, well,

4   context matters.

5        And they went even further to say, you know what?

6   That's just left for educators to decide.  That is an

7   exceedingly unhelpful response from the enforcers of the

8   statute, to just pawn it right back on educators who are trying

9   to figure out what's required of them so they don't

10  inadvertently break this law and end up getting hauled either

11  into court or before a DOE proceeding.  That is element one,

12  though, of the statute.

13       Element two is, of course, assuming there's been

14  teaching, assuming there's been inculcating or compelling to

15  express a belief and/or support for something, is was a banned

16  concept implicated, was a banned concept taught, assuming

17  something was taught?  And that's where, if you look at the

18  deposition testimony very carefully -- I'm going to be blunt.

19  I was incredibly frustrated by the responses, and that's

20  because I was saying throughout.  Let's assume there was

21  teaching, let's assume there was inculcating, and I want to

22  teach, using the words of the statute, teach, I want to teach

23  this particular book, or I want to teach this particular

24  sentence from Dr. Kendi, the very same sentence that the

25  Department of Education said was a reason why this law was

1   necessary in the first place.  Is it covered?  And I kept

2   getting, Context matters, context matters.  I am giving you the

3   context, I am teaching this particular sentence, but is it one

4   of the four banned concepts?  No answer.  So, if I can't get a

5   straight answer at a sworn deposition, how are educators

6   supposed to figure out what's covered or not, when it's either

7   punting it back to them or just plainly not answering direct

8   questions?

9        This wasn't a matter, your Honor, of just I'm trying

10  to figure out, like, what are the close cases in this

11  particular case.  I want any case so teachers can have at least

12  some guidance what the contours are of this particular statute.

13       THE COURT:  Well, let me ask you a related point that

14  I was wondering about.  You're focusing on the outer boundaries

15  of the amendment.  What about the core ideas that the amendment

16  is addressed to?  Can you identify evidence in the record of

17  either conduct prior to the adoption of the amendment that

18  legislative history demonstrates was clearly what was the

19  problem or conduct subsequent to the enactment of the

20  amendments that someone says is prohibited?

21       MR. BISSONNETTE:  Yes.

22       THE COURT:  Because evaluating vagueness can involve

23  not only a look at the outer boundaries but at the core, and to

24  the extent there's no core identified --

25       MR. BISSONNETTE:  Yeah.

1          THE COURT:  -- it's harder to determine the outer

2     boundaries.  So, do you have a thought about that?

3          MR. BISSONNETTE:  I do.  So, let's look at -- well,

4     first off, let me just say at deposition I asked that very

5     question of the enforcers, so, What is covered by this statute

6     that was taught before that would be banned?  And no one would

7     answer the question.  They said, you know, I don't know, or, I

8     can't point to any information.

9          So, let's just set that aside.  Not a very helpful

10    response.  Laws are supposed to mean something, they're

11    supposed to do something, and I can't even get the enforcers to

12    point at prior texts that have been taught that they think are

13    problematic, that they think now would be banned.

14          But setting that aside, we do know of two specific

15    texts that the Department of Education has referenced publicly

16    for why this law is necessary.  The first is a two-sentence

17    snippet from this book by Dr. Kendi, *How to Be an Antiracist,*

18    cited by the Commissioner of Education in an op-ed explaining

19    why these amendments were, quote, needed and necessary.

20    Setting that aside.

21          In addition, a second book --

22          THE COURT:  I can't remember.  Is the op-ed in the

23    record?

24          MR. BISSONNETTE:  Yes, the op-ed is in the record.

25          THE COURT:  So, are the two sentences you're talking

1    about identified in the op-ed?

2           MR. BISSONNETTE:  Yes.  Yes.  And, in fact, I would

3    just note at the outset, your Honor -- Exhibit 40 -- that the

4    two sentences that he cites, The only remedy to racist

5    discrimination is antiracist discrimination; the only remedy to

6    past discrimination is present discrimination; the only remedy

7    to present discrimination is future discrimination.

8           Now, you take that out of context, what does that

9    mean?  The very next portions of that same paragraph are citing

10   Linden B. Johnson in a 1965 speech as well as U.S. Supreme

11   Court Justice Harry Blackmun, who wrote -- was writing about

12   affirmative action.

13          So, your concern was does the statute sweep within its

14   scope statements concerning affirmative action?  We have proof

15   right here that it potentially would.  But let's set that

16   aside.

17          We also have a second book that the Department of

18   Education cited for why this law is necessary, Tiffany Jewell's

19   book, *This Book is Anti-Racist*, a book written by a woman of

20   color really designed to kind of empower students, particularly

21   students of color, to talk about injustices that they see in

22   the world, including racism.  This book, Commissioner of

23   Education says in a State Board of Education meeting, This

24   shows why -- that these things are happening in New Hampshire.

25   That was in July of 2021.

1          So, these aren't hypotheticals, right?  These are real

2     books, real texts that have been propounded by the Department

3     of Education to say this is why this law is necessary.

4          So, at deposition what do we do?  Is this book

5     covered?  If I were to teach this book that you referenced,

6     teach, using the words of the statute, would an educator be in

7     violation?  No answer.  If I were to teach those two sentences

8     in Dr. Kendi's book that you referenced in your op-ed, if I

9     were to teach it would I be in violation?  No answer.  Those

10    are specific examples of texts in the record that I just want

11    to --

12         THE COURT:  I will say Mr. Garland's thought resonates

13    with me, at least to this extent:  In interpreting the statute,

14    what the statute means, and my interpretation obviously is not

15    authoritative, it would be what the New Hampshire Supreme Court

16    ultimately says, I ordinarily wouldn't take into account

17    beliefs from people off the street or even administrators as to

18    what the statute means, but it does seem to me -- Mr. Garland,

19    when it comes to your turn, you'll tell me why I'm mistaken

20    about this -- that it is important to understand if the

21    administrator is unable to point out in a deposition whether

22    teaching that would be wrong but says in op-eds, as the chief

23    administrator of the statute ultimately -- and we'll get to

24    this issue of the relationship between the Human Rights

25    Commission and the Department -- tells the world of teachers,

1   These are the problems, but I won't tell you in a regulation,

2   or I won't tell you in a deposition, isn't that exactly the

3   kind of arbitrariness that is one of the two fundamental

4   concerns that vagueness law is trying to address?

5          MR. BISSONNETTE:  Yes.

6          THE COURT:  That's my initial thought on that, and

7   Mr. Garland can respond when his time comes.

8          MR. BISSONNETTE:  Well, that's my thought, too.  This

9   isn't a person off the street, your Honor, right?  This is the

10  Department of Education Commissioner.  He heads a misconduct

11  committee with other individuals.  He fields -- he has been

12  fielding complaints under this statute, and ultimately he is

13  tasked with enforcing it, including going so far as engaging in

14  license ramifications with respect to educators.  So, you know,

15  this a person whose opinion matters in evaluating this statute.

16         I would just note for the record that summary judgment

17  Exhibit 21 is Commissioner Edelblut's op-ed.

18         So, those are two specific texts.

19         But also in the trenches of the justice system --

20  excuse me -- the education system, pardon me, how have those

21  public statements from the DOE actually trickled down to

22  educators?  And they've had a real effect.

23         The Mejia declaration, Exhibit 15, paragraph 16, texts

24  like Tiffany Jewell's book, *This Book is Anti-Racist,* Jason

25  Reynolds, Dr. Kendi's 2020 book for individuals 12 and older

1    entitled *Stamped* have been removed from instruction.  Why?

2    Because we have the DOE talking about these books, and it's

3    only natural for educators, Oh, my gosh.  Are these going to be

4    violative?  So, they pull them from instruction, even when

5    there are plans to do so.

6            The O'Mara declaration, which is Exhibit 16 of the

7    summary judgment record, *Stamped* was expressly approved by at

8    least one school board for eighth graders only to never come

9    off the shelf in one district, following Commissioner

10   Edelblut's July 13, '21 public statements concerning Dr. Kendi.

11           Plaintiffs Ryan Richman and John Dube have also

12   curtailed and restrained their classroom discussion.

13           So, real-life ramifications for educators.

14           I would like to get to extrinsic evidence, though, as

15   well, just really brief on that.

16           THE COURT:  Okay.

17           MR. BISSONNETTE:  I think it might be appropriate to

18   turn it over to Attorney Garland.  I know I've been --

19           THE COURT:  Well, I've got a few questions for you,

20   though.

21           MR. BISSONNETTE:  Oh, sure.

22           THE COURT:  Whatever you need to do, finish up, and

23   then I'll ask my questions.

24           MR. BISSONNETTE:  Thank you.  On the extrinsic

25   evidence piece, we do think that defendants are wrong that

1    extrinsic evidence cannot be categorically considered in a

2    facial vagueness challenge.  You can consider this evidence,

3    you should.  But, even if you disagree, I think you reach the

4    same conclusion, that the law is vague on its face similar to

5    the conclusion at least at the 12(b)(6) stage that this Court

6    reached, which was just based on the contours of the particular

7    statute.

8          So, I think this is an important legal question.  At

9    the end of the day I don't think it matters with respect to the

10   ultimate end result.  I think the law is unconstitutional,

11   whether you consider the well-developed record or not.

12         So, I think the short of it is I don't think we need

13   to present extrinsic evidence, but we have it, and it confirms

14   that we're right.

15         And I want to just echo what my colleague,

16   Mr. Moerdler, said at the outset, that I think we start here

17   with the language in Grayned that says precedent allows

18   consideration in a facial challenge of, quote, the

19   interpretation of the statute given by those charged with

20   enforcing it.  We did that.  That was what the point of those

21   depositions were all about.  These are enforcers.  How do they

22   interpret and apply it in practice?

23         The cases that the defendants cite, in those cases the

24   courts concluded that extrinsic evidence did not render a law

25   vague where the law was otherwise sufficiently clear, and I

1    would submit that predicate just doesn't exist here, where the

2    text of the amendments is far from sufficiently clear; and we

3    know it's not clear, because there's already been two efforts

4    through guidance to try to reimagine or reframe or reinterpret

5    the particular statute.  So, I think we know right away that

6    this law isn't sufficiently clear.  It's appropriate to bring

7    in extrinsic evidence concerning how enforcers have interpreted

8    it not just through guidance but in application and as well the

9    trickle-down effect to educators themselves.

10        But I think here, of course, extrinsic evidence can

11   and should be a two-way street, because I think, of course, you

12   have the State saying, You can't consider extrinsic evidence,

13   but you can consider our extrinsic evidence, which is the two

14   guidance documents they've issued.  I think you have to look at

15   both.  You can't just say, You can consider my extrinsic

16   evidence but not the extrinsic evidence presented by the

17   plaintiffs.

18        Just with respect to some of the cases that have kind

19   of evaluated this question, we did cite the Carolina Youth

20   Action Project case.  I think that is a very powerful case on

21   this particular question.  So, there there was a challenge to a

22   school's disorderly conduct or disorderly action statute, and

23   there there was deposition testimony presented, there was

24   extrinsic evidence concerning disparities presented, and I just

25   think it's a very, very powerful case that shows the power and

1     importance of extrinsic evidence.  So, I just wanted to --

2          THE COURT:  What do you make of the defendants'

3     citation to Lachman, 387 F.3d 42, and I think Platt, 894 F.3d

4     251, which are two decisions that they cite for the proposition

5     that I really shouldn't consider the materials that you're

6     drawing to my attention?

7          MR. BISSONNETTE:  Sure.  I think there's two points

8     with respect to Lachman.  In Lachman that predicate was met,

9     the law sufficiently clear just on its face, I don't need to

10    evaluate extrinsic evidence.  We don't have that here.  The law

11    is unclear on its face.  We know, because we have all of these

12    extrinsic interpretations and reimaginings of the statute that

13    have been proffered by the State.

14         But also, too, that is a very different case.  I

15    actually think, when you read it very carefully, it's a federal

16    court case looking at the interpretation of a federal statute,

17    where there is more latitude, frankly, than there is here with

18    respect to how a federal judge interprets a state statute.

19    Grayned itself says, It is not within our power to construe and

20    narrow state laws.

21         The language that the defendants pull from Lachman

22    have to do with Chevron deference, have to do with in the

23    context of Chevron and the Administrative Procedures Act what

24    is the appropriate interpretation to evaluate.  That's not what

25    we're dealing with here.  We're dealing with a state statute

1    that, in our view, is sufficiently vague and ambiguous that it

2    can require -- or this Court can evaluate extrinsic evidence.

3    Carolina Products demonstrates that.

4         And why do we know that it's met that predicate for

5    this Court to be able to look at extrinsic evidence?  Because

6    they've already presented extrinsic evidence themselves in the

7    context of two guidance documents and, in addition, further

8    reimagining of the statute in their briefing.

9         THE COURT:  From your position, I at least understand

10   your argument, it is the defendants, Mr. Garland's boss, can

11   issue Attorney General opinions without notice, public notice

12   and comment, you can issue guidance documents, as many as you

13   want or as few as you want.  They aren't laws, they aren't

14   rules, they aren't subject to rulemaking, but I should consider

15   those, but I shouldn't consider anything else, and that gives

16   one party complete control over what kind of extrinsic evidence

17   to be considered.

18        MR. BISSONNETTE:  Yeah.  I think it's pretty unfair,

19   to be honest with you, your Honor.  But I think Carolina Youth

20   Action Project just has some really good language here.  That

21   is also a vagueness case, and there the court explicitly

22   rejected there the State's argument that the court shouldn't

23   consider statistics in the record, stating that the evidence

24   had, quote, value to confirm that the disorderly conduct law

25   fails to give sufficient guidance to prevent discrimination

1    enforcement.  So, I just think it's very powerful there, when

2    you have a law that is going to have broad-based application to

3    thousands of individuals, as the statute did in the Carolina

4    case, and could have broad application to a significant amount

5    of speech and conduct.  So, I think that's very informative.

6    The Hills (ph) case -- was it the _Platt_ or Hills case you

7    wanted me to address?

8              THE COURT:  _Platt_ was the one I had in my notes.

9              MR. BISSONNETTE:  Exactly.  _Platt_ really, I think the

10   focus in _Platt_ really is that, the thrust of why the State is

11   relying on it is because they think we're just using

12   hypotheticals throughout the deposition testimony, and I just

13   think these aren't hypotheticals; these are real examples,

14   using real books proffered by the Department of Education.  So,

15   I just don't think that that's --

16             THE COURT:  I know your colleague is going to want to

17   address overbreadth at some point, so I'm going to give him a

18   chance to do that, but I do have a couple of questions for

19   you --

20             MR. BISSONNETTE:  Oh, sure.  Of course.

21             THE COURT:  -- about how the statute is administered,

22   the amendments are being administered now, and that is, they

23   create this responsibility, some of which are assigned to the

24   Human Rights Commission, and some of which are assigned to the

25   Department of Education, and I expressed a view in my ruling on

1    the Motion to Dismiss as to how I understood that relationship

2    to work as a matter of law, but, in reading the briefs, it

3    seems like the defendants take the position that it doesn't

4    really work that way.  The defendants take the position that

5    the Department of Education basically takes a hands-off

6    approach to any allegation of a violation of the Educator Code

7    of Conduct, won't take any disciplinary action against any

8    teacher until and unless it has first been fully passed through

9    the Human Rights Commission and the Human Rights Commission has

10   found a violation.  I don't see anything in the statute that in

11   any way authorizes that, and in my order I can only look at

12   law.  So, I looked at the law, and the Department of

13   Education's own regulations don't contemplate anything like

14   that.

15        What am I missing there?

16        MR. BISSONNETTE:  You're not missing anything.  This

17   same argument was raised at the Motion to Dismiss.

18        THE COURT:  Yeah.  And I told people how I thought it

19   worked, and I didn't see anybody in their brief telling me, Oh,

20   you just overlooked something.

21        MR. BISSONNETTE:  No, no.  I think we are in the same

22   place we were a year ago, where it continues to be the

23   defendants' position that the DOE isn't involved in making

24   determinations under the amendments, and it's really a

25   question --

1          THE COURT:  There is nothing in the amendments or in

2     the regulations that prohibit the Commissioner from doing that

3     at any point, other than that he decides with the Commissioner

4     of the Human Rights Commission, Let's agree that you do

5     something first.

6          MR. BISSONNETTE:  I totally agree.  To be blunt, we

7     think that is a manufactured construction of the statute to try

8     to get at or address the arbitrary and discriminatory

9     enforcement concerns that we've raised in this case.  We don't

10    see any validity to the assertion raised by the State that, no,

11    the DOE doesn't have enforcement power.  The DOE has

12    enforcement power.  It was contemplated in 193:40, IV.  This is

13    a violation of the Educator Code of Conduct.  The whole point

14    behind that provision is to give the DOE enforcement --

15         THE COURT:  I read the regulations to obligate the

16    Commissioner --

17         MR. BISSONNETTE:  Absolutely.

18         THE COURT:  -- to enforce the Educator Code of Conduct

19    and not to simply stand back and say, Well, I'm not going to do

20    anything.

21         So, that was a concern of mine.  I've tried to use the

22    law to interpret the statute, but apparently the State is

23    taking a different view about what the law requires, or maybe

24    they agree, No, that's what the law requires, but we have

25    agreed amongst ourselves to do something different.

1        MR. BISSONNETTE:  I'll have to allow the State to

2   articulate their position there.  To me, I think the law is

3   very clear.  The four corners of the statute mandate that the

4   DOE has enforcement authority.  When you look at the Code of

5   Conduct rules, the DOE has to engage in investigations under

6   this particular statute.  It is everything that this Court said

7   we think is true, when you look at the very four corners of the

8   Code of Conduct and the statute at issue here.

9        I do want to say that there's I think, going back to

10  the extrinsic evidence, I know that they said that DOE doesn't

11  have enforcement power, even though we think that's wrong,

12  looking at the four corners of the statute.  I actually think

13  in the trenches the DOE is pretty active here, right?  They get

14  complaints under the amendments.  They have an obligation under

15  their own rules to engage in what are called initial inquiries.

16  These occur before there's even been a *prima facie* or initial

17  determination that there's a violation.  What do they do?  They

18  call superintendents up and they say, Hey, I got this

19  complaint.  This is something that maybe you should look into,

20  including complaints where the amendments are referenced.  And

21  I think what the State --

22        THE COURT:  That's in the record here?

23        MR. BISSONNETTE:  Yes.  And I would refer the Court to

24  Plaintiffs' Statement of Facts 138 to 141, where we documented

25  this extensively.  I mean, what the State is going to say --

1          THE COURT:  You never need to get to an actual

2     enforcement action if you can simply make someone aware, Hey,

3     something might happen if you continue to engage in that

4     conduct.

5          MR. BISSONNETTE:  I think it's probably subtler than

6     that, to be honest.  But you have the enforcer calling

7     superintendents up.  It would be like if the Attorney General's

8     Office called the ACLU up, Hey, I may be asking you questions

9     about your nonprofit status.  These are conversations.  These

10    are touches.

11         THE COURT:  I'll look at those things in the record.

12         MR. BISSONNETTE:   Thank you.

13         THE COURT:  The last question I have for you is about

14    Footnote 7 of my opinion.  I don't know if anybody paid any

15    attention to Footnote 7, but I laid out in Footnote 7 a concern

16    that I have that the way in which the amendments interact with

17    Chapter 354-A, that individual teachers can be exposed to

18    individual damage liability for violating the

19    antidiscrimination laws, and I laid that out in Footnote 7 very

20    specifically, because, if I'm wrong about that, somebody should

21    tell me.  I happen to know the case that the Supreme Court

22    worked on, <u>Fred Fuller Oil</u>, where the Court recognized aiding

23    and abetting individual liabilities.

24         MR. BISSONNETTE:  Yes.

25         THE COURT:  That was my case.

1              MR. BISSONNETTE:  Yes.

2              THE COURT:  They sent it to the New Hampshire Supreme

3     Court for an opinion, and they clarified and changed our view

4     of the statute.

5              MR. BISSONNETTE:  Yup.

6              THE COURT:  And I discussed the specific provisions in

7     the amendments that make certain things a violation of the

8     antidiscrimination law and explained my view that they appear

9     to subject individual teachers to damage actions for violation

10    of the antidiscrimination law.  So, if that's true, when I

11    consider the consequences of a teacher being deemed to be in

12    violation, they include not only potentially losing your

13    employment, losing your certification to teach, but they could

14    subject teachers to individual liability as to damages.

15             MR. BISSONNETTE:  Yes.

16             THE COURT:  Am I right or wrong about that?

17             MR. BISSONNETTE:  You're 100 percent right.  And this

18    is also germane to severance, which I know we'll get to at the

19    end of the argument, right?

20             THE COURT:  Yeah.

21             MR. BISSONNETTE:  If you sever 135:40 does that

22    address everything?  Not necessarily, because, as this Court

23    concluded, I think accurately summarized, there could be aider

24    and abettor liability.  I think this Court's interpretation is

25    right.  I also think the Attorney General's Office would have

1    to agree, because they just brought an aider and abetting civil

2    rights action against NSC-131 against actual individuals.

3           So, I think you are right.  I agree with Footnote 7.

4           THE COURT:  Well, let me ask Mr. Garland, have I

5    correctly interpreted the State's law on the possibility that a

6    teacher who teaches a banned concept, in violation of the

7    amendments, engages in an antidiscriminatory act which can

8    subject a teacher as an aider and abettor to their employer of

9    a violation of the antidiscrimination law and can expose that

10   teacher to liability for damages?

11          MR. GARLAND:  So, I disagree with that, your Honor.

12          THE COURT:  What is your argument, because you didn't

13   put it in your brief?

14          MR. GARLAND:  Yeah.

15          THE COURT:  But you understand the way I've set out

16   the law there?

17          MR. GARLAND:  Yes.

18          THE COURT:  What's wrong with it?

19          MR. GARLAND:  So, the big difference, right, is Fred

20   Fuller is focused on the interplay between three provisions.

21   It's 351-A:2, 351-A:7, which is limited to employment

22   discrimination, which isn't relevant here.  I guess it's maybe

23   four provisions, 354-A:21 and 21-a.  And I think the big

24   disconnect between Fred Fuller and this case here is that

25   354-A:21 and 354-A:21-a kind of set forth the general way that

1    violations under the law against discrimination are enforced.

2    They say you can go to the Human Rights Commission, and the

3    Supreme Court said and you can name an employee as part of the

4    HRC complaint.  21-a says then you can, based on certain time

5    frames, go to Superior Court.  There's no constraining language

6    in there.

7          And, as I read Fred Fuller, the Supreme Court was

8    saying, Well, you have the aiding and abetting provision in

9    A:2, and you have this -- nothing limiting it when you go into

10   court or to the HRC, and so, therefore, individual liability

11   works.

12         The big difference between that and here is we have

13   193:38 and 193:40, III, and those two provisions are the ones

14   that contemplate enforcement specifically of the

15   antidiscrimination provisions of the amendments, and they say

16   enforced against a school or school district in the HRC --

17         THE COURT:  But, although, the general

18   antidiscrimination laws say enforcement against employer, which

19   caused the federal courts in this District to uniformly say the

20   analogy to Title VII applies, and you can't bring claims

21   against individuals, and notwithstanding that fact the New

22   Hampshire Supreme Court made the determination that there can

23   be individual liability.  So, I don't think that cuts it at

24   all, because the antidiscrimination law is a law against

25   discrimination by employers, and yet it has been interpreted to

1    allow for discrimination claims to be brought against

2    individuals like Mr. Fuller.

3           MR. GARLAND:  So, I would just ask the Court to

4    compare A:21 and A:21-a versus 193:38, 193:40, III.  Excuse me.

5    I think I said IV before.  I think that's where the distinction

6    exists, because, if those general provisions can be enforced

7    against everybody, we have much more specific language in

8    193:38, 193:40, III, where the specific rules -- controls over

9    the general.

10          THE COURT:  I'll take a look at it, but it's just, as

11   I said, the antidiscrimination law is a law that on its face

12   only allows for actions against employers, just as this law

13   that you're talking about, the amendment to 354-A, deals with

14   school districts.  It works the same way.  I don't see how you

15   can say in one case it does and the other case it doesn't.

16          MR. GARLAND:  As I read Fred Fuller, your Honor, it

17   was very largely dependent upon those two provisions I keep

18   noting, A:21, A:21-a, which I do think are supplanted by the

19   provisions I'm mentioning here, and so I disagree that the

20   analysis works as cleanly as you're describing.  I would just

21   ask that you look at that.

22          THE COURT:  I will.  I will take a careful look at it.

23          At least there is a risk, unless the New Hampshire

24   Supreme Court comes up with a distinction that's not apparent

25   to me and says, Oh, don't worry about that, there's a risk that

1    teachers could be subjected to individual liability for

2    damages.  That's a concern here.  Do I think it was an intended

3    consequence of the legislation?  No, I don't, but that's what

4    happens when you put legislation like this onto an

5    appropriations bill and run it through without extensive

6    analysis.  But that is a real potential problem.  I'll look at

7    the statutes that you're talking to me about, but that is at

8    this point -- I didn't see in your brief any discussion that

9    took issue with that portion of Footnote 7.  That's why I'm

10   asking the question now.

11        MR. GARLAND:  And that's why I'm prepared for it

12   today, your Honor.

13        THE COURT:  All right.

14        MR. GARLAND:  Thank you.

15        MR. BISSONNETTE:  I just have one brief comment to

16   that, and I'll then cede my time to Attorney Garland.

17        193:40 and 354 are different statutes, right?  So, I

18   don't think you can kind of, like, well, if we merge them or

19   think about them in concert -- they're different statutes.

20   Now, educators are on the hook under both sections, right?

21   They're on the hook under 193:40.  But, even if you were to,

22   like, get rid of that statute, they're on the hook under

23   354-A:32, which deals with no government program shall teach,

24   advocate or advance.  Teachers, obviously, are part of

25   government programs, right?  And then you look, of course, at

1   RSA 354-A:31, no public employers, either directly or through

2   the use of an outside contractor, shall teach, advocate,

3   instruct.  Of course, teachers are part of public employers.

4   They are on the hook in both statutes.  They independently

5   impose liability.

6          And I would submit again Footnote 7 is correct, and I

7   would also submit again that in a different case that was filed

8   about a month ago the Attorney General's Office is seeking to

9   employ -- apply 354 to specific individuals that are part of

10  NSC-131.  So, they have a very broad application of that

11  statute here.

12          THE COURT:  NSC-131 --

13          MR. BISSONNETTE:  They're a horrible neo-Nazi group,

14  frankly, that has been protesting outside the Teatotaller in

15  Concord.

16          But I just think it's important context here that they

17  have a fairly broad, rightly or wrongly, your Honor, right,

18  they have a fairly broad interpretation of 354-A, including its

19  application to individuals which could and does apply to

20  teachers.

21          THE COURT:  But Mr. Garland's argument is, Don't worry

22  about it, because 193:40 is very different, right?  That seems

23  to be what you're suggesting.

24          MR. GARLAND:  Yeah, in a general sense, your Honor.

25  It's very different, because it supplants the more general

1    language, the more general enforcement language in 354-A.

2         THE COURT:  All right.  So, your argument is kind of,

3    to the extent that the Legislature provides a specific remedy

4    as to individuals, it impliedly displaces additional remedy.

5    But there's a provision in the statute that says none of these

6    remedies in any way limit a right of action that exists in any

7    way, shape or form against these people.  I don't have the

8    exact language in front of me, but there is a provision in the

9    amendments that essentially, if I'm remembering correctly, say

10   nothing displaces any remedy that may exist anywhere else by

11   common law or otherwise.

12        MR. BISSONNETTE:  354-A:34 is that statute.  Part of

13   the amendments:  Any person aggrieved by an act made unlawful

14   under this subdivision may pursue all of the remedies available

15   under RSA 354-A.  There are some more statutes:  RSA 491,

16   RSA 275-E, RSA 98-E, or any other applicable common law or

17   statutory cause of action.  It would be weird, I think, for the

18   language of 193 in this bill to somehow supersede or negate or

19   repeal earlier language in the same bill.  That doesn't make

20   any sense to me.

21        THE COURT:  Just a quick comment, Mr. Garland, and

22   then we'll move on.

23        MR. GARLAND:  I just would clarify that I'm not saying

24   it abrogates it, that it supersedes it.  If I used that word,

25   that probably was imprecise.  I'm saying that just under

1    general rules of construction it supplants it, that, when you

2    have a general provision with general enforceability, and then

3    in some other statute dealing with similar subject matter

4    there's something more specific, the New Hampshire Supreme

5    Court has time and again said the more specific language

6    controls.  So, that's the construction point I'm making.  I

7    appreciate you'll take a look at it.

8              THE COURT:  Okay.  I'll take a close look.

9              All right.  So, we're going to get close to a break.

10   Maybe I should hear your argument about overbreadth, and then

11   we'll take a break, and then we'll come to the defendants,

12   okay?  And then after we get the defendants,' I'm going to ask

13   the defendants to make their severance argument, and then the

14   plaintiffs to respond, and then we'll finish.  Okay?

15             MR. MOERDLER:  Your Honor, just one thought.  I do

16   need about five minutes to give you some testimony from the

17   record, that I can put it in the overbreadth, I can put it in

18   later, whatever your Honor please.

19             THE COURT:  You want to read it into the record

20   yourself?

21             MR. MOERDLER:  No, no.  I want to summarize.  It's a

22   summary of it.

23             THE COURT:  Oh, okay.  Yeah, you can do that now.

24             MR. MOERDLER:  Okay.

25             THE COURT:  Do that, and then we'll address your

1    overbreadth argument, and then we'll move on.  Is that

2    acceptable?

3         MR. MOERDLER:  Before I do that, may I do one other

4    thing?

5         THE COURT:  Yes.

6         MR. MOERDLER:  You asked three questions.  I'd like to

7    answer them, if I may.  All right?

8         THE COURT:  All right.

9         MR. MOERDLER:  The first question was on the issue of

10   explicit and the two cases cited by Mr. Garland.  I would rest

11   entirely on the following quotation of the Supreme Court, as

12   voiced by Justice Marshall.  In this situation, as Mr. Justice

13   Frankfurter put it:  We must extrapolate its allowable meaning.

14   Here, we are relegated to the words of the ordinance itself, to

15   the interpretations the court below has given to analogous

16   statutes.  Perhaps to some degree we must look to the

17   interpretation of the statute given by those charged with

18   enforcing it.

19        That is the point about using case law and practice to

20   interpret a statute and holding.  That language has been cited

21   in half a dozen cases that we will give you, including the

22   First Circuit.

23        THE COURT:  Okay.  Thank you.  That's helpful.

24        MR. MOERDLER:  The second point you made, or it was

25   really more than a second point, it was multiple, is also

1    answered by a quotation by a late, great jurist by the name of

2    Sandra Day O'Connor:  Although the doctrine, vagueness, focuses

3    both on actual notice to citizens and arbitrary enforcement, we

4    have recognized recently that the more important aspect of the

5    vagueness doctrine is not actual notice, but the other

6    principal element of the doctrine - the requirement that the

7    legislature establish minimal guidelines to govern law

8    enforcement.  And that's where the problem pops up.

9         From the standpoint of the teacher, in answer to a

10   question you put earlier, the concern is risk.  These are

11   content statute.  I run a risk.  If I teach it and it is wrong,

12   I can lose my license, and indeed that has been the testimony

13   on the depositions.

14        Number two, does it give one party complete control,

15   as you had indicated, of the process?  When it's vague, when,

16   as I shall show you, the Department of Education enforcement

17   mechanism says to a teacher, Look at the op-ed, look at the

18   op-ed to determine how you should conduct yourself, that's

19   about as vague an enforcement and lack of guidelines as you can

20   possibly imagine.  And, again, that's in this record, and I

21   shall get to it, although that's the part that has to be dealt

22   with separately.

23        And you asked, lastly, how does the system work?  The

24   system doesn't, because what works is what is said by the

25   administrator of that system.  If I can write an op-ed -- and

1    understand this op-ed is a little different from most.  It is

2    one that is in language relatively little, two pages, but on

3    the flip side there's a notation that attaches 72 pages of

4    photographs, documents and the like which are characterized in

5    that op-ed, Exhibit 40, are characterized as teachers going

6    beyond the pale.  When you have that, as I shall demonstrate,

7    in an actual case now pending, albeit *in camera* or wherever,

8    when you have that you have no guidelines, you have no system,

9    you have anarchy and dictatorship, and I apologize for saying

10   that.  I've lived through both.

11         When you can have someone say, *Stamped* is not a book I

12   like, and that means you cannot read it, you cannot have it in

13   a room, the teacher is prosecuted affirmatively for having had

14   books in a room, then you have a problem.  You don't have to

15   burn the book; you just ban the book.

16         So, having said that, your Honor, let me go, if I may,

17   to one last point on this.  You asked one last question:  What

18   is the intention of the bill in this regard?

19         My colleague, Mr. Goldman, gives me the following

20   quotation:  The bill is designed in part to ensure that the

21   minds of future generations of our state are not being unduly

22   influenced by advocacies for such toxins as critical race

23   theory, Senator Robert -- Bob Giuda, Statement of Facts number

24   70.

25         Now, with that said, your Honor, if I may go to the

1    overbreadth point, or should I wait?

2              THE COURT:  Yes.

3              MR. MOERDLER:  Your Honor ruled that Garcetti carved

4    out a whole exception in this area, saying the First Amendment

5    may not apply or be enforced in this area because, when you

6    take the king's shilling, you work for the king.  That's the

7    parent law.  But it doesn't say that everything you have that

8    comes from the king is a command that must be obeyed.  And

9    that's not what the courts say.

10             So, for example, following on Bremerton is the case of

11   Beathard against Lyons, 620 F. Supp. 3d 775, from the District

12   Court in Illinois.  It said as follows:  The replacement of a

13   Black Lives Matter poster with an All Lives Matter poster on an

14   office door is private speech and not covered by Garcetti.  It

15   is protected by the First Amendment, so that you have the

16   beginnings there.  And now let me, if I may, show you where

17   this case goes in the real world of the teacher.

18             THE COURT:  I don't want to get too far into

19   abstraction, but I am interested in your thinking about the

20   relationship between a First Amendment facial vagueness

21   challenge and a First Amendment overbreadth challenge, and I'll

22   tell you my view, and then you can explain to me, if yours

23   differs, why.

24             I find this area of law, as do most of the

25   commentators, if you read a constitutional law treatise, they

1   will say things like, Many courts treat the two as

2   interchangeable arguments, they're very difficult to untangle,

3   courts oftentimes don't talk about the differences between

4   them.  I do understand them to overlap in certain areas but to

5   be analytically distinct types of claims.  I draw some support

6   for that view from the Supreme Court's decision in <u>Holder</u>

7   <u>against Humanitarian Law Project</u>, a 2010 decision, where I

8   think the majority describes the relationship of a vagueness

9   and an overbreadth claim.  I'll just quote from a portion of it

10  for you and then explain my thinking so you can react to it:

11       The Court of Appeals contravened the rule that a

12  plaintiff who engages in some conduct that is clearly

13  proscribed cannot complain of the vagueness of the law as

14  applied to the conduct of others, citing to <u>Hoffman</u>, a case

15  we've all cited many times.  The rule makes no exception for

16  conduct in the form of speech.  Thus, even to the extent a

17  heightened vagueness standard applies, a plaintiff whose speech

18  is clearly proscribed cannot raise a successful vagueness claim

19  under the Due Process Clause of the Fifth Amendment for a lack

20  of notice, and he certainly cannot do so based on the speech of

21  others.  Such a plaintiff may have a valid overbreadth claim

22  under the First Amendment, but our precedents make clear that a

23  Fifth Amendment vagueness challenge does not turn on whether a

24  law applied to a substantial amount of protected expression.

25       In my mind, an overbreadth challenge does not require

1    vagueness.  You can have a successful overbreadth law challenge

2    to a statute that is not vague at all.  So, vagueness is not

3    required.  You can have overbreadth challenges that involve

4    statutes that are vague.

5            Another fundamental difference is, if you are being

6    prosecuted for violating a statute and it's agreed that you

7    violated the statute and the violation is one that is

8    Constitutionally permissible, overbreadth is a special

9    analytical method that the Court will entertain arguments that,

10   even though as applied to you, the person who is being

11   prosecuted, the statute is nevertheless invalid, because in a

12   substantial number of other applications it violates the First

13   Amendment.

14           So, I see overbreadth as being a very powerful

15   doctrine, but I'm not sure that in its application here it in

16   any way is distinguishable from what I consider the core claim

17   that both plaintiffs are really making, which is that this is

18   an overbroad statute, and it violates the First Amendment to

19   the extent it's overbroad in ways that could chill protected

20   speech, and it's overbroad in violation of the Due Process

21   Clause to the extent it doesn't give fair notice, allows for

22   arbitrary enforcement.

23           I don't see a distinct overbreadth claim in which

24   those claims fail but the overbreadth claim survives, because

25   this is not a case in which any of the named plaintiffs are

1   being charged with doing something that violates the statute.

2   So, they can bring a facial vagueness challenge, and it's not

3   necessary for them to bring an overbreadth challenge, and it

4   doesn't do any analytical work to bring a distinct argument

5   under an overbreadth theory.

6         I don't know if that's been clear enough for you, but

7   that's my sort of general thinking about it.  Your reaction?

8         MR. MOERDLER:  I would agree with you, but I would

9   take you to the next step, which is on this record, and it came

10   up in the course of the examination of the chief investigator

11   for the Department of Education.  He was asked a question:

12   What if a teacher was seen in the hallway wearing a Don't be a

13   Racist pin?  Now, in New York the courts have so far held the

14   attire that you may wear in the office, in school, may not

15   include pins.  It was because of that case, which I lost,

16   because of that case I focused on it here, because the

17   investigator said, Be careful; you don't know whether that pin

18   is going to be allowed to be worn.

19         When I read that, it brought it back as the

20   distinction of a separate area.  That person in New York would

21   have violated the New York code in terms of attire, and yet on

22   the speech side it's overbroad.  That was my point in trying to

23   say that on that issue you have that potential.

24         In this case you are 100 percent correct.  There is no

25   distinction here.  Whether you view this case as a First

1    Amendment case, unfortunately only in a narrow area, perhaps

2    larger, as you look at the overbreadth, and I will show you in

3    a moment it is really large, it is in that area that <u>Garcetti</u>

4    takes a backseat.  It's the area in which the teachers have a

5    concern.  Because let me, if I may, give you a quick series of

6    just the points that were made by the chief investigator, who

7    was, fortuitously, once a teacher --

8            THE COURT:  Can I just interrupt to make one other

9    quick point before it escapes me so that you understand my

10   thinking?  In saying that I don't think there is a meaningful

11   distinction between an overbreadth claim in this case and a

12   First Amendment facial vagueness claim in this case, that

13   argument -- that view of mine hinges on an earlier decision

14   that I have already made that the government doesn't agree

15   with, that you can maintain a facial vagueness claim even

16   though the statute is not vague in all applications.

17           And I will point out, Mr. Garland, there are now two

18   more Circuits, one a few days ago that agrees with my view on

19   this, it's now four to one, but, once you make that leap, as I

20   have done -- maybe the Circuit will disagree, but four Circuits

21   agree with me, one does not -- once you make that leap in the

22   context of this case there's no need to get into overbreadth as

23   a distinct claim, because the facial vagueness encompasses all

24   of the First Amendment concerns that we have in this particular

25   case, and someone is allowed to maintain that claim.

1              And I think of overbreadth as the unusual case where

2      someone has engaged in conduct that unquestionably is

3      sanctionable under the statute without violation of the First

4      Amendment, someone who is given a curricular guidance from the

5      district that, You shall teach X, and they say, I am not doing

6      it, I'm teaching Y, and they are subject to liability under

7      this provision, sanction under the Educator Code of Conduct,

8      they are allowed under an overbreadth rule to say, Strike it

9      down, because, even if it isn't unlawful as to me, it's

10     unlawful in a substantial number of other applications.  That's

11     where overbreadth gives you a special right, and I just don't

12     think it's necessary to get to in this case.

13             MR. MOERDLER:  Let me tell you why I do it, your

14     Honor.  The late Charles L. Brieant, former Chief Judge of the

15     United States District Court for the Southern District of New

16     York, and a close friend, was wont to say to me, Never, ever

17     assume that the Circuit goes along.  Put the argument on the

18     record.

19             THE COURT:  Wise advice.  Wise advice.  So, in any

20     event, just a last comment on that, and then we'll take our

21     break, okay?  Is there anything else you wanted to add on that

22     point?

23             MR. MOERDLER:  I just wanted to take you through a few

24     examples, because they make your point, but you need to have

25     them in, background in terms of this is this case.

1        THE COURT:  Let me do this:  I'm going to give my

2    reporter a break, and then I'll ask you to do that very briefly

3    in just a couple of minutes --

4        MR. MOERDLER:  I will do it very briefly, I promise.

5        THE COURT:  -- and then we'll turn to you,

6    Mr. Garland, and we will finish up.  Okay?  All right.  We'll

7    take a break.

8        THE COURT:  We'll take a break.

9        MR. MOERDLER:  I might add he referred to it as the

10   "circus," not the "circuit."

11       THE COURT:  I will not comment on that.

12        (Recess taken from 11:25 a.m. to 11:48 a.m.)

13       THE CLERK:  All rise for the Honorable Court.  Please

14   be seated.  This hearing is back in session.

15       THE COURT:  Okay.  Just take a couple of minutes, wrap

16   up, and then we'll hear from Mr. Garland.

17       MR. MOERDLER:  I will.  No more than a couple, I

18   promise.

19        Your Honor, let me just give you one point.  The

20   Court, the Supreme Court has made clear, quote, Vagueness leads

21   to overbreadth, and that you will find in the Coates case,

22   402 U.S. 611, and in Houston against Hill, 402 U.S. 451 and to

23   Judge Kennedy's dissent in Hill against Colorado, 530 U.S. --

24       THE COURT:  I was reading Hill over the weekend.  I

25   agree with that statement, but I don't think vagueness is

1    required for overbreadth.

2            MR. MOERDLER:  I agree with you.

3            THE COURT:  Okay.

4            MR. MOERDLER:  That was why my first question to

5    Farrell was about the pin, and his answer very simply was,

6    There are people who will argue that that is in violation of

7    the code.

8            Your Honor, I just want to go into some of these so

9    you can quickly see the flavor of this, and I promise you I

10   will not be long.

11           Mr. Farrell was asked if he was aware of any incident

12   where extracurricular activities were disrupted because a

13   teacher discussed a barred topic.  Answer:  No.  These are the

14   quick Garcetti questions that we put to him.  He was asked if

15   the teacher Code of Conduct applies outside of school property.

16   Answer:  Yes, depending, of course, on the conduct.  He was

17   asked:  What is the function of reporting up or reporting down

18   on violators?  He said:  The code requires you to report to the

19   next higher up and the higher ups to report as well, so that,

20   if they see somebody misbehaving or not reporting a violation,

21   they are themselves guilty of a violation.

22           THE COURT:  As I understand it, that works the same

23   way it does, and I'm more familiar, with the Code of

24   Professional Conduct, in which we, as lawyers, sometimes have

25   obligations to report violators of the Code of Professional

1     Conduct.  The teacher Code of Conduct works the same way.

2              MR. MOERDLER:  That's correct.

3              THE COURT:  So, not only the person who is actually

4     teaching the banned concept but the teacher who fails to report

5     the teaching of the banned concept can be in violation of the

6     code.

7              MR. MOERDLER:  I serve on the disciplinary committee,

8     so I know, but I will tell you it shows the breadth and the

9     reach of the problem and why for the teacher it's a risk issue.

10              And two more points.  Loss of license is a sanction,

11     again, Farrell's testimony.  And finally he said, Indeed, even

12     when teachers are off duty, the teacher is subject to the

13     educators' Code of Conduct, transcript 197 to 198.

14              Your Honor, I have two points, and then I'm done.

15              One is an example of where the breadth of this gets

16     out of sight and really does illustrate vagueness leads to

17     overbreadth.  There is in the packet of papers before the Court

18     an affidavit of a teacher by the name of Alison O'Brien.  She

19     was teaching a course in music and teaching the Harlem

20     Renaissance and taught by giving two videos of music,

21     commercially available videos.  Within moments a parent

22     complained to the Commissioner, the Commissioner signaled the

23     chief investigator, and he called the principal or

24     superintendent.  Within moments she was pulled out for the

25     first of three times, publicly out of the classroom, first to

1   report to the assistant principal, then to the principal, and

2   then to the superintendent at what she had done was so bad, and

3   in each instance they said, It's okay.  And then is the whole

4   point of this:  The chief investigator communicated through the

5   superintendent to that teacher, it's in that affidavit, that

6   declaration, Read the op-ed of April 22 of the Commissioner,

7   and it will provide you your guidance.

8        So, it isn't just FAQs, it isn't just opinions of the

9   Attorney General.  It's articles, op-eds, statements and quotes

10  by the Commissioner of Education, who can do it because the

11  statute is overbroad, who can do it because it's vague, and who

12  can enforce it because -- you asked a question, and here's the

13  answer:  Here are the teachers' affidavits, which show you how

14  they have had to change their scholastic programs.  Keefe,

15  English.  Changed the way that certain courses were taught.

16  Mejia, the plaintiff in one of the cases, no longer conducts

17  implicit bias classes and training.  Merrill, English, stopped

18  assigning articles about systemic racism and white privilege.

19  O'Brien, stopped assigning commercially available videos.

20  O'Mara, history, no more assignment of the book *Stamped* by

21  Kendi.  It was one of the books that was depicted in that

22  op-ed, which I'll just finish with in a second.  And

23  Philibotte, the Chief Equity Officer, no longer references

24  implicit bias and other concepts when conducting bias training.

25        This is the op-ed.  It's not very big, but attached to

1    it and part of it and keyed into it are 72 pages of thou shall

2    nots.

3            THE COURT:  I'm a little confused.  When you say

4    "attached to it," do you mean there is an electronic version of

5    the op-ed --

6            MR. MOERDLER:  Correct.

7            THE COURT:  -- that included hyperlinks to specific

8    materials you're talking about?

9            MR. MOERDLER:  Correct.  Yes.  72 pages of it.

10           THE COURT:  Okay.

11           MR. MOERDLER:  Your Honor, I have one last point,

12   which, at your convenience, I would like to do *in camera*, just

13   to be on the right side of the Protective Order, and that is a

14   specific case that I think teaches you, if you need it.

15           THE COURT:  Let's do that at the end so that we don't

16   have to clear the courtroom --

17           MR. MOERDLER:  I agree.

18           THE COURT:  -- and bring everybody back in.

19           MR. MOERDLER:  Fine.

20           THE COURT:  I'll give you a chance to do that right at

21   the end.

22           MR. MOERDLER:  And I thank the Court for its great

23   courtesy.  I much appreciate it.

24           THE COURT:  Thank you.

25           All right.  Mr. Garland, I heard a statement read to

1   me that teachers are subject to the Code of Conduct when off

2   duty.  Is that something you agree with?

3            MR. GARLAND:  You got me with the very first question,

4   your Honor, that I'm not --

5            THE COURT:  You heard what he just said.

6            MR. GARLAND:  I heard what he said.

7            THE COURT:  That was from an affidavit in --

8            MR. MOERDLER:  It was the deposition of Mr. Farrell,

9   the chief investigator.

10           THE COURT:  Okay.  Yeah.  And I just don't know -- I'm

11   catching you cold on that.  I don't want to throw you off your

12   stride, but that is interesting to me, because we are -- I know

13   you're going to be prepared for and I am going to be asking you

14   about how I should understand the limits of the prohibition on

15   teaching, instructing, inculcating, et cetera, and I was not

16   aware of that statement until it was read.  So, if you don't

17   have anything to say on it now, you can move on, but I am

18   interested in it.

19           MR. GARLAND:  I don't have anything to say right now.

20   I can understand your interest.  I'm happy to provide you --

21           THE COURT:  If I need clarification, I will ask for a

22   supplemental brief, but I will look at it in the record and

23   make what I will of it, and we can just move on.  But I don't

24   want to start questioning you before you say a word.  That was

25   just -- it just came up in his comments.

1          So, what do you want to say in support of your

2     position?

3          Let me ask one last question.  I think I have

4     understood you correctly that, in your view, nothing that has

5     been acquired during the discovery process should affect my

6     analysis in any way.  Do you agree with that?

7          MR. GARLAND:  I do, your Honor.  Yes.

8          THE COURT:  Okay.  And, since nothing that's been

9     learned in discovery should affect my analysis in any way,

10    you've also said, And the problem before you is a question of

11    law.  You agree with that?

12         MR. GARLAND:  I do, your Honor.

13         THE COURT:  Okay.  So, what you really are saying to

14    me is, to the extent you didn't rule in our favor on the Motion

15    to Dismiss, you should reconsider your ruling and now change

16    your mind and agree with us?

17         MR. GARLAND:  I would modify that slightly, and that's

18    only because, and I recall you mentioning this, your Honor, at

19    the February conference, that your order had lots of statements

20    in it that were couched with qualifiers like "plausible" and

21    things like that, and you identified some things that we hadn't

22    briefed, you identified some specific concerns you had that, as

23    I understood it, we were coming at a fairly high level of

24    generality, and you said, Well, wait a second, I've got X, Y

25    and Z concerns, and part of what we've tried to do in our

1  briefing is to identify why those concerns shouldn't result in

2  where you seemed to be leaning in your order.

3          THE COURT:  So, because we were at 12(b)(6), what is

4  the standard?  Plausibility.  Why would I use that language?

5  Because I try to use the standard of review that I'm supposed

6  to use.  But the analysis, absent some change, either a

7  correction of law or some additional evidence, would have led

8  to the conclusion on certain claims you prevailed.  I accepted

9  your view at least insofar as the right to dictate curriculum

10 is a right that the government has, and teachers don't have a

11 First Amendment right to teach contrary to curriculum

12 instruction, so you prevailed on that issue.  But on the

13 fundamental issues of vagueness, my order leads to the

14 conclusion that, unless what was plausible then is no longer

15 plausible now, that you lose on this particular issue.  You

16 understand that?

17         MR. GARLAND:  I do, your Honor.  And, if you'll

18 recall, I think at the February conference, too, we did resist

19 the notion that discovery was necessary.  We were prepared to

20 brief those issues then.  I think I -- I believe I was candid

21 on the record then, understanding what direction you were

22 leaning.

23         But we do think that, given the benefit of the ability

24 to refine our briefing on -- especially on the statutory

25 construction question, because that was largely absent from our

1    initial round of briefing, you identified some concerns as you

2    construed the statute, and we did try to take the opportunity

3    to explain why those concerns shouldn't lead you down the road

4    that I acknowledge you were going down in the earlier order.

5        THE COURT:  Yeah.  I just want to be clear I gave the

6    plaintiffs' arguments and your responses to them very careful

7    consideration.  Certain areas I agree I went into that the

8    parties had not explored with the same depth, and maybe now

9    there's an opportunity to, on reflection -- and one of my

10   purposes in doing that was to make sure everybody had a full

11   opportunity to point out any mistakes in the analysis, which is

12   what I'm understanding you're really trying to do now in a

13   respectful way, and I'm completely fine with that.  This is my

14   giving you an opportunity to tell me where I may have gone

15   wrong in my analysis.

16       I think you have adequately responded, I will reserve

17   judgment as to whether you're right, to the plaintiffs' use of

18   extrinsic evidence.  Unless you want to add something more to

19   that, I'll rely on what you've said now and on your briefs.

20       But I am interested in hearing anything you have to

21   tell me about why I didn't quite get it right the first time or

22   why, when I abandoned plausibility and simply rule, I should

23   rule differently than what I thought was plausible at the time.

24       MR. GARLAND:  Understood, your Honor.  I would just

25   like to make just a couple of points on the extrinsic evidence

1   that I think is reflected in our briefing, but to respond to

2   things I heard today.

3            THE COURT:  Go ahead.

4            MR. GARLAND:  The reason why, and I would dispute the

5   notion that there's a fairness concern around it that the Court

6   can consider things like an AG opinion or the FAQs, is because

7   that is part of the New Hampshire Supreme Court's statutory

8   constructional analysis, as I understand it, and our position

9   is that the Court really, when it's determining whether this

10  statute is vague, has to construe the statute, because it's a

11  state law, has to look at the rules of construction the New

12  Hampshire Supreme Court would use, and they don't have

13  authoritative weight, and you've identified that, and I don't

14  dispute it, but they are the sort of official guidance

15  documents that that court has looked at when construing a

16  statute, and in our mind that's very different from testimony

17  during a deposition, comments that are embedded in an op-ed or

18  something of those sorts or the sort of affirmative extrinsic

19  evidence, for lack of a better word, that the plaintiffs bring

20  in.

21           THE COURT:  Well, let me throw this at you and see

22  what your reaction is.  I'm inclined to agree with you that

23  with respect to -- when I am engaged in simply the task of

24  statutory construction I am not going to give significant

25  weight to what someone says.  To the extent New Hampshire says

1  give weight to an AG opinion, I'll, of course, do that, but

2  beyond that what legislators testify they think the statute

3  means or what the Commissioner thinks that he's not willing to

4  develop in terms of regulations that are put out for notice and

5  comment and are within the fair scope of implementing a statute

6  that may be under the New Hampshire version of Chevron should

7  be given some kind of deference, apart from that I'm not

8  inclined to attach weight when interpreting the statute.  But,

9  when trying to understand the way the statute applies gives

10  rise to the potential for arbitrariness and enforcement,

11  evidence about arbitrariness in the enforcer's viewpoint seem

12  to me to be entirely appropriate for consideration, and to the

13  extent there are deposition excerpts and inability or refusal

14  to provide any further guidance than what is in the actual text

15  of the statute does seem to be appropriate for consideration

16  when determining whether the statute, as I construe it, allows

17  for arbitrary enforcement by someone who is going to choose to

18  apply it here, not apply it there.  So, why isn't it relevant

19  at least for that purpose?

20        MR. GARLAND:  I don't find in the case law, your

21  Honor, anyplace where that is given dispositive weight.  It's

22  only ever given kind of confirmatory weight.  And so the

23  courts, even in the Carolina case that they've cited, and one

24  major distinction there is I think it's a class action where

25  you have class-based evidence and statistics, which is largely

1    absent here, and the court grappled with whether that's really

2    just a big as-applied challenge or a facial challenge, but

3    setting that distinction aside, even in the cases where courts

4    do consider it, courts start with looking at the text.

5         THE COURT:  I'm never going to give dispositive

6    weight.  I'm a totality of circumstances guy.  You learn one

7    thing when you do this job for a while that courts always want

8    to express things in terms of totality of relevant

9    circumstances, so I won't be doing that, I guarantee you.  I'm

10   just saying it may be relevant, not dispositive, to see

11   examples in which the people charged with enforcing are

12   expressing views about the statute which could support a claim

13   that, as construed, it permits arbitrariness and enforcement,

14   because that's one of the two principal concerns that you

15   address with the vagueness challenge.

16        MR. GARLAND:  Your Honor, my principal response to

17   that is I don't see that, as I read the cases, as something

18   courts are giving that sort of consideration to.  In a few of

19   the cases we've cited courts have actually rejected the notion

20   that, because people who are charged with enforcing it give

21   inconsistent statements that really is evidence of that.

22        THE COURT:  All right.  Let's turn from that and turn

23   to a second type of evidence that I see the plaintiffs

24   producing, and that is evidence about how behaviors are being

25   changed without enforcement actions ever having to be brought.

1    The case law on this is replete with references to when speech

2    regulations are vague one of the principal dangers is they can

3    chill protected speech because you impose a high enough

4    sanction to a vague speech regulation people will stay a mile

5    away from it so they don't end up getting killed.  You can go

6    back to the communist cases, the <u>Keyishian</u> case, and you'll see

7    it replete through case law.  It would seem that evidence that

8    in fact that's occurring here, to the extent there is evidence

9    of that fact, it would be relevant to the analysis.  Do you

10   disagree with that?

11           MR. GARLAND:  I do, your Honor, insofar as any of that

12   evidence would be evidence of ways that curricular choices are

13   being changed.  I don't think that the notion that people are

14   modifying their behavior in a realm where it isn't protected by

15   the First Amendment is evidence of vagueness at all.  We live

16   in a society that's largely governed by proscriptive statutes.

17   Every single day we have to make determinations whether we're

18   going to conduct ourselves in one way or another, Johnson

19   speaks of this, Williams speaks of this, and make judgment

20   calls, and where the concern really becomes one of

21   constitutional magnitude is if it is implicating First

22   Amendment protected conduct.

23           So, when we're talking about the core classroom

24   speech, and I know we have talk about extracurricular coming

25   up, I don't think that is evidence that shows anything with

1    respect to vagueness.  What I do think it might show is the

2    profound policy disagreements that exist around this statute.

3    I'm not disputing that, the idea that there are people of good

4    faith on both sides who have very strong disagreements about

5    what teachers should be doing in the context of curricular

6    speech, but that shouldn't inform whether the statute's vague.

7    I don't think that bears on that at all.

8         THE COURT:  All right.  Well, the last area I'd ask,

9    and then you can wrap up on this issue of what I can and cannot

10   consider, I noted at the outset that courts that find statutes

11   to be -- reject vagueness challenges speak critically about

12   hypotheticals, courts that find statutes vague often use

13   hypotheticals to address the potential vagueness.  I assume

14   you're in the camp of no hypotheticals should be allowed, I

15   shouldn't be allowed to ask you any.  Is that your position?

16        MR. GARLAND:  I wouldn't go so far as that, your

17   Honor.  I don't think that they ultimately control or really

18   persuasively inform the vagueness analysis.  As I read the

19   cases in I think the second camp you just identified, again,

20   it's really confirmatory.  It may well be a kind of artifact of

21   an attempted persuasive judicial writing, right?  There's

22   always attorneys who are trying to belt and suspenders their

23   positions, and I know judges very often will do that too.

24        I'm not in here saying, and I do want to make this

25   clear, that there is a case that clearly says in or out with

1    respect to hypotheticals with respect to extrinsic materials,

2    but if you look through both sides of the cases, and I think

3    the weight of authority is on our position on this, it is

4    always first a statutory construction, and then the remainder

5    of it, when courts do get into it, I think is largely

6    superfluous.  I don't see it as controlling the analysis.  I

7    don't really see it as putting a major thumb on the scales.

8            THE COURT:  I would say everything in moderation.

9    Hypotheticals are very important in trying to understand the

10   limits of a provision that is charged with being overly broad

11   or vague in its application.  So, I'm going to have a couple of

12   hypotheticals for you, whether you like it or not.  You can try

13   to answer them.  But what else did you want to say about the

14   scope of things I should and shouldn't consider?

15           MR. GARLAND:  Going back to one point, your Honor, I

16   was trying to make before with respect to the statements during

17   depositions, again, it's our position that you don't need to

18   look at any of that, that it's not relevant, but I would ask

19   the Court to consider, and you identified this I think when

20   Attorney Moerdler or Attorney Bissonnette was arguing, that the

21   one thing that all of those officials kept saying is context,

22   and I do think that's critical.  I don't think that's something

23   that could be swept aside, because it really is what will

24   inform whether any book, whether any subject falls --

25           THE COURT:  Certainly as someone who has to make

1    decisions about difficult things, context is always very

2    important, but that doesn't mean no answers can be given, no

3    guidance can be provided.  The statute might potentially

4    encompass anything, and we aren't going to tell you until and

5    unless we charge you with something.  That isn't consistent

6    with rule of law.  Rule of law requires a reasonable ability to

7    understand what you can do and can't do.  So, I'm not sure just

8    invoking the word "context" is sufficient if the statute in its

9    application doesn't provide sufficient guidance as to what is,

10   in fact, prohibited or not.

11            MR. GARLAND:  So, one kind of specific response to

12   that, and then I think it dovetails nicely with the more

13   general argument that I want to make with respect to the

14   language of the statute, I would ask that the Court, if it

15   hasn't already, and I think you may well have, take a close

16   look at the sort of questions that were being asked, because

17   you know that any deponent's going to be instructed, Don't

18   answer a question that isn't asked here, and the questions are

19   very specific, yes or no, can you teach it, can you not teach

20   it.

21            THE COURT:  Well, then, maybe I can ask you whether

22   something is covered or not, ask you, well, what context would

23   you like to know before you answer the question and then have

24   you answer the question, because that might help me in

25   understanding whether the plaintiffs' argument that the statute

1    potentially covers things that are subject to constitutional

2    protection or not, whether a concept is or is not banned,

3    whether a statement of a concept that is banned is unlawful

4    because it's teaching instruction.  To the extent you can

5    provide me your views as to those things, that might be

6    helpful, because I think that's where the problem is.

7          So, I get your point.  I'll be restrained in my

8    hypotheticals.  I understand the realities of deposition.

9    They're in a defensive crouch; they're not inclined to just

10   have an informative conversation.

11         But the problem remains how do we help teachers know

12   what they can and can't do?  I assume you're not trying to trap

13   people.  You want them to be able to clearly understand what

14   they can and can't do, and that's a legitimate interest that

15   you should share with the plaintiffs in this case.

16         MR. GARLAND:  For sure, your Honor, and we certainly

17   do, and I think that's where, if you look to the statutory

18   construction that we've articulated in our briefing, and I

19   think we've tried to address both of the potential areas of

20   vagueness that you've identified on the record today, the idea

21   of what does it mean to teach, to inculcate, the additional,

22   instruct, to compel, as embodying a question what does that

23   mean, and that's one question in this case, and then

24   ultimately, okay, what is prohibited under the statutes, under

25   the I(a), (b), (c), (d), is separate, and we've tried to break

1   it down in a way that allows for the Court to understand our

2   position on that.

3       We've largely turned to dictionary definitions with

4   respect to "teach," with respect to "instruct," with respect to

5   "inculcate" and "compel."  That's a common tool the New

6   Hampshire Supreme Court uses, and, when you look through the

7   dictionary definitions, they contemplate something that isn't

8   just the conveying information by inference or something along

9   those lines.  It's something more affirmative, it's something

10  more deliberate.

11      THE COURT:  Well, is the Socratic method a teaching

12  method?

13      MR. GARLAND:  For sure, your Honor, in the abstract.

14      THE COURT:  Are you teaching when you ask questions

15  using the Socratic method?

16      MR. GARLAND:  Yeah, I think you are, for sure.

17      THE COURT:  When you ask questions of your students

18  about white privilege, are you teaching it, even though you're

19  not taking a view about white privilege; you're trying to get

20  them to think about white privilege, what it means, is it real,

21  what is the extent of it?  If you ask questions, are you

22  teaching?

23      MR. GARLAND:  I think you are, your Honor, and I think

24  that falls within the definitions that we've identified, that,

25  still, it's some sort of affirmative and deliberate act

1  designed to convey information.  As I understood --

2  THE COURT:  So, let me try a hypothetical on you.  So,

3  suppose a high school teacher is teaching Thoreau's book

4  *Walden*, okay, a book near and dear to my heart, I grew up five

5  miles away from Walden Pond, and there's a famous statement

6  that Thoreau makes in that book:  It's never too late to give

7  up our prejudices.  Suppose a teacher writes that on the board,

8  and a student raises his hand and says, People can't give up

9  their prejudices; they're inherent.  What is the teacher

10  supposed to do in response to that to avoid losing their

11  teaching license?

12  MR. GARLAND:  I think a teacher may well have to

13  consider adding context or disclaimer to that sort of

14  statement, may have to identify that it is --

15  THE COURT:  That's wrong?  They have to affirmatively

16  tell the student, That's wrong; that isn't true?

17  MR. GARLAND:  I'm not saying that, your Honor.

18  Something more general in the sense of that's one particular

19  way of looking at it, and I think that's really where this

20  starts to, in my mind, blur the vagueness inquiry and the

21  policy inquiry.  A lot of people of very good faith profoundly

22  disagree that a teacher should have to do that.

23  THE COURT:  Nothing in my ruling -- I don't take any

24  position on whether any of the banned concepts are good or bad,

25  should be in the curriculum, should not be in the curriculum.

1    That's not my job.  I say it's the responsibility of the State.

2    I suggest that school boards are in a better position most

3    often to do that, in conjunction with public hearings and so

4    forth, but it's the State's responsibility, not mine, to

5    declare whether concepts are good.

6           So, I don't take any position on should there be,

7    should it allow, should it not be.  I'm concerned about the

8    vagueness of the statute and how teachers can lose their job,

9    lose their teaching license, potentially be subject to damages

10   for not responding to a comment from a student in a classroom

11   in the right way.  That's my concern.

12          What can you tell me about whether in that

13   hypothetical, what other context would you want to know that

14   could give a teacher guidance about how to respond to a student

15   that challenges Thoreau's statement that, It's never too late

16   to give up our prejudices?

17          MR. GARLAND:  I think the additional guidance that a

18   teacher would need can be found in the statutes, and I think

19   that goes down to Roman numeral I and the letter portions of

20   the statutes, which is, if the statement is coming back of the

21   kind you're describing, a teacher may well have to add a

22   caveat, may well have to add a disclaimer, not a rejection of

23   the notion, I don't think that's contemplated by the statutes,

24   but may well have to make clear how it fits within the larger

25   context of education.  I think the statutes provide sufficient

 1   guidance on this, and I do think this is where, when we're

 2   talking about cases, that I would posit around the margins the

 3   fact that a teacher has to make those judgment calls does not

 4   mean the statute is vague.

 5         THE COURT:  Could a teacher in a high school civics

 6   class assign to students -- and I'm picking up specifically on

 7   something from the plaintiffs' brief, where they were picking

 8   up on something I said in my opinion about the affirmative

 9   action case -- could a teacher assign and have a class

10   discussion about Justice Sotomayor's dissent in that case?

11         MR. GARLAND:  For sure, your Honor.

12         THE COURT:  And they could talk about affirmative

13   action and why reparations might be necessary, not just

14   diversity promotion?  They could talk about that, and that

15   wouldn't in any way endanger a teacher for teaching,

16   advocating, inculcating that one group should be preferred over

17   another?

18         MR. GARLAND:  No, I don't think it would run afoul of

19   it, because the statutes don't simply prohibit what you just

20   described, which is one group preferred over another.  They

21   prohibit the idea that --

22         THE COURT:  I don't know if the plaintiffs will agree

23   with you on that.

24         MR. GARLAND:  I doubt they will, your Honor.

25         THE COURT:  I don't think I'll agree with you on it

1    either.  I mean, I won't try to argue with you on it.  But I

2    think the banned concepts can be read to encompass that, that

3    one group should be -- it is wrong that one group should be

4    preferred over another based on their race, for example.

5         MR. GARLAND:  I don't agree with that, your Honor, but

6    the point that I -- the main point that I would make in

7    response to that focuses on the word "could" have that you just

8    used, because I do think a lot of what we're talking about and

9    part of the peril in hypotheticals is it is a question of

10   could, and it's a question of could in cases that are on the

11   margins, could this violate it.

12        You resisted the notion in the earlier argument, and I

13   remember it well, that you can rewrite the statute, and I'm not

14   advocating that you can, but what you can do, sitting in the

15   context of a federal judge looking at state law, is you can try

16   to divine what the Supreme Court, New Hampshire Supreme Court,

17   would do, again using its rules of construction, and one of its

18   rules of construction is construing language, if it is

19   susceptible of a reading that's broader that creates a

20   constitutional problem and susceptible to narrow

21   construction --

22        THE COURT:  I am very cautious about the doctrine of

23   constitutional avoidance.  I'm dealing with that in another

24   case right now in which Mr. Bissonnette is one of the litigants

25   involving the Zadvydas opinion, where Justice Breyer applied

1    the doctrine in a different context.

2            But I think the argument for a federal judge applying

3    the doctrine of constitutional avoidance to adopt a

4    construction of a New Hampshire statute is extremely

5    problematic, as a general rule, and I would be inclined,

6    frankly, rather than do that, to certify, because it would be

7    an assumption of power on my part that would be -- my job is I

8    would say is the statute constitutional or not?  If it's not

9    constitutional the way it's written, I'm done, it's

10   unconstitutional.  But to say, Well, it really is an important

11   constitutional principle, and it could be read that way, so I'm

12   going to avoid it, that should be up to the New Hampshire

13   Supreme Court, not to me, because I'm not the final interpreter

14   of New Hampshire law, as you know.

15           I also find the doctrine of constitutional avoidance

16   to be a very problematic concept that should be applied in only

17   very narrow circumstances, because it assumes -- it applies

18   judicial power to control over the legislative process that I

19   think courts should be very cautious about accepting.  We have

20   the power to say they're unconstitutional.  We don't have the

21   power to adopt -- we shouldn't ordinarily adopt reading A over

22   reading B because we think one reading might present

23   constitutional -- we're not sure, we are not saying it would,

24   but we think it might, and I would be using that as a

25   last-resort principle.  Certainly, I'd be cautious about

1    applying it to the state statutes.

2    MR. GARLAND:  Understood, your Honor, and we haven't

3    since our opening brief advocated certification here, but the

4    point -- the point I would make is there is a middle ground,

5    and it may well be certification, between -- sitting here

6    today, I can think of hypothetical ways that this language can

7    apply that would present constitutional problems, strike down

8    the statute or strike down an application of the statute

9    versus, well, the State's telling me there's a better way to

10   read it or a narrow way to read that saves the statute, and I

11   think it is that question, and I do think invalidating a

12   statute facially, state statute, presents many of the same,

13   I'll call them federalism concerns -- you didn't use that

14   word -- or comity concerns that would countenance making sure

15   we know how the New Hampshire Supreme Court would apply it.

16   I would say, too, the New Hampshire Supreme Court

17   applies its doctrine of constitutional avoidance, as I

18   understand it, a bit differently than I understand Federal

19   Courts do, and it may well be that, if it were presented with

20   competing readings of the statute.  Now, I'm not trying to

21   retreat from the notion that I think our reading based on the

22   definitions we've identified is the better reading and solves

23   the problem, but if there's a question there I do think that

24   that court would be the one that could provide some guidance

25   before kind of, root and stem, the whole statute falls.

1          THE COURT:  When you were last before me you agreed

2     that the amendments do not have a scienter standard.  Are you

3     backing away from that now?  Is that what you're doing?  I'm

4     trying to understand your position on that.

5          MR. GARLAND:  So, not backing away from that

6     statement, your Honor, and I tried to make clear in the

7     briefing that we're not backing away from it.  There isn't any

8     reference to knowing, to purposeful, even negligence or

9     something like that in the standard.

10         I do think, though, and this is really to some of the

11    initial points I was making something that was missing from our

12    initial briefing.  I don't think it's a difference from our

13    initial briefing.  We really didn't get into, because we didn't

14    understand that to be the main concern that the plaintiffs were

15    focused on, the kind of, the very close read of the language in

16    the statutes that we've now provided you, and so, I think when

17    you do that close read, sure, the word "knowing" is not in

18    there, the word "purposeful" is not in there.  I'm not backing

19    away from that.  I take that as it is, and how it fits into the

20    analysis is a matter that I know you've identified, but I do

21    think it contemplates and it fairly contemplates that you know

22    what you're doing.  You're not just tripping into a violation

23    of this statute but, rather, doing something affirmative,

24    something deliberate, and you're aware of what you're

25    conveying.

1              THE COURT:  So, you know, and I went into this in my

2        opinion, New Hampshire law requires teachers in Section 189 to

3        specifically teach -- and let me pull the actual language out

4        so we can talk about it.  189 requires teachers to teach, I'm

5        quoting now, how intolerance, bigotry, anti-Semitism, and

6        national, ethnic, racial or religious hatred and discrimination

7        have evolved in the past, which is not an issue here, can

8        evolve into genocide and mass violence, such as the Holocaust,

9        and how to prevent the evolution of such practices.  So, the

10       teachers, on the one hand, are required to talk about how

11       things can evolve in the future, and how does that not place

12       pressure on teachers to affirmatively teach, on the one hand,

13       while threatening them with loss of licensure on the other if

14       they stray, even unintentionally, into something that an

15       administrator later determines with context involves advocacy

16       of a banned concept?

17              MR. GARLAND:  I guess this is a place where I could

18       use a more specific example, because I think advocating

19       concepts like affirmative action, advocating concepts like --

20              THE COURT:  Well, how about the concept of structural

21       racism?  You understand what that term is understood to mean,

22       right?

23              MR. GARLAND:  Yes.

24              THE COURT:  Doesn't structural racism -- don't you,

25       engaging in discussions about structural racism, can they not

1    be discussions about how discrimination can evolve into

2    intolerance over time?

3           MR. GARLAND:  I would say they certainly can, your

4    Honor, but, as I understand the concept of structural racism,

5    it doesn't get into the sort of inherent

6    superiority/inferiority, inherent racism, sexism, et cetera,

7    that the statute contemplates.  That's something far narrower,

8    it's something biological, innate, not just simply something

9    that would be more cultural or learned behavior, and I think

10   that is reflected in the AG opinion, it's reflected in our

11   briefing, and that's the distinction.  You can certainly teach

12   about the concept.  I don't understand structural racism to say

13   person X is white and therefore was born racist, which I think

14   is where you would start to cross the line with the statute.

15          THE COURT:  And you would say teachers have no trouble

16   teaching implicit bias training in their classroom, implicit

17   bias, linking them to the famous website where you can engage

18   in questions and get an implicit bias score?  None of that

19   could in any way cross into the line of being impermissible, in

20   danger of violation of the statute?  Is that your view?

21          MR. GARLAND:  It may well, again, require a teacher to

22   identify what they're not providing the information to do, and

23   the teacher may well have to say, and this is, again, trying --

24          THE COURT:  What if a student says, The implicit bias

25   data tells us that we're inherently biased; we can't avoid our

1   discriminatory thinking?  That isn't my view of what the

2   implicit bias data suggests, but students are going to raise

3   those kinds of concerns.  Are you saying that, unless they give

4   what you call a disclaimer, they have to correct the student,

5   essentially; otherwise they will be in violation?

6           MR. GARLAND:  Well, I think it depends on how the

7   student raises it.  I think if a teacher were to provide

8   implicit bias training or to teach about implicit bias, and a

9   student were to run home and say, The teacher taught me that I

10  am inherently racist, I don't think that's a violation.  I

11  think that perhaps could result in a complaint, but that's the

12  sort of thing that would be weeded out based on the constraints

13  that are in the statute.  I think if a student, going back to

14  your initial hypothetical, were to bring it up to the teacher

15  in class, a teacher might have to consider how to contextualize

16  that statement.

17          But, again, I appreciate the fact that there are very

18  many people of good faith who do not think a teacher should

19  have to do that, but whether the statute provides sufficient

20  guidance to a teacher about how to do that, I think it does,

21  particularly when that sort of statement coming up in the

22  context of curricular speech would not, as I understand it,

23  impinge upon the First Amendment.

24          THE COURT:  You've had this on the books now for a

25  while.  Have you put in place any training from the Department

1    of Education for teachers about what they can and cannot do to

2    violate the statute?

3         MR. GARLAND:  I don't think there has been any -- I

4    know the record that you have had since the briefing happened

5    there was no training.  I don't believe there has been since.

6         THE COURT:  I think you will remember from my opinion

7    I understood the Commissioner and the Attorney General to take

8    the view that one can transgress the statute by implication.

9    Do you still stand by that position?  Do you think that that's

10   wrong?  And, if so, how do you respond to the analysis that I

11   provided of that?

12        MR. GARLAND:  I think the analysis you provided, your

13   Honor, and we've tried to address this in our briefing, too,

14   overstated or read too much into the word "imply" within the AG

15   opinion, because my recollection is of both your opinion and

16   our exchange at the last hearing was you were focused on that

17   statement within the AG opinion that's saying posting something

18   on the website and conveying on the website that this may be

19   beneficial to white people, or something along those lines,

20   could imply that they're inferior or in a way that would

21   violate the statute.  But that isn't what I understood the

22   general concern about implied violations to be, which is you

23   have no idea what you're doing, and you happen to make some

24   sort of offhand comment, and all of a sudden you are swooped up

25   into an enforcement action; but, rather, there's affirmative

1     deliberate acts there.  There is taking this information,

2     posting it on a website, and conveying out to the world that

3     this may be beneficial to white people because -- for whatever

4     reason, and then ultimately where that shakes out, what was the

5     purpose of putting it up there, what was the understanding when

6     it was posted on the website, or, if this were conveyed in a

7     classroom is -- as I read United States versus Williams, much

8     more within the realm of what Justice Scalia says there is the

9     sort of things courts or adjudicators have to deal with all the

10    time.  These are kind of the thoughts that are in people's

11    minds and the motivations for conduct, not what I understood

12    your concern to be, which is you can do something completely

13    accidentally and, based entirely upon how it's subjectively

14    taken --

15              THE COURT:  Right.

16              MR. GARLAND:  -- it could violate.

17              THE COURT:  Yeah, you don't say it directly, you don't

18    intend to say it, but someone later viewing your statement can

19    deem it to be in violation because it implies that a banned

20    concept is correct, and that seems to be what the AG is saying

21    there.

22              MR. GARLAND:  I disagree with that, your Honor.  I

23    think what the AG is saying there is taking -- affirmatively

24    putting this stuff on the website would be, and conveying the

25    statement, I can't remember it exactly --

1           THE COURT:  And he's not saying what the statement

2      itself is violates; they're saying it violates because it may

3      imply something.  That's the problem.  It suggests not only

4      what you actually say, but what implications can be drawn from

5      it can get you fired and lose your teaching license.  To the

6      extent that is what the statute potentially allows, it has

7      inherent vagueness problems.

8           MR. GARLAND:  So, what I think is not present in the

9      AG opinion, and where I would resist what you just said, is the

10     notion that *ipso facto* it is a violation of the statute.  I

11     think what would happen is, and you're well aware of this, I'm

12     sure, sitting in the position you're in, and we certainly are

13     in our office, is anyone can complain about anything at any

14     time, right, and whether it ultimately is a violation of a law

15     is part of the adjudicative process, and that's where arbitrary

16     or discriminatory enforcement --

17          THE COURT:  What do you say about, I don't know this

18     is true, this is what they're saying, that the Commissioner is

19     having communications with superintendents about things that

20     might be violations that never get to an adjudication; they're

21     just an informal communication from the Commissioner to a

22     superintendent that, Hey, you ought to be aware that this might

23     be a problem for you?  Isn't that completely divorced from this

24     kind of nuanced hearing process that you say I engage in?

25     Yeah, but I don't call people up who are potential litigants

1    and say, You know, you'd better not do that or you might end up

2    in trouble.  I adjudicate things.

3         Is the Commissioner doing what the plaintiffs say he's

4    doing?

5         MR. GARLAND:  So, I believe the plaintiffs have

6    identified in the record one example of that, and I guess I

7    have two responses, one specific direct response, and one more

8    general one.  The first direct response is that the

9    Commissioner isn't the adjudicator here, the Board of Education

10   is the adjudicator, and if you look within the State regs, the

11   Commissioner through his investigator can investigate whether

12   there's been a violation, but it still must go to the

13   adjudicator.  So, if the Commissioner thinks, right, wrong or

14   otherwise, something has happened and engages in an

15   investigation, that isn't a finding that there's been a

16   violation of the law that subjects somebody to a loss of their

17   licensure; there's still that process around it.

18        THE COURT:  Do you think that could potentially have a

19   chilling effect on a teacher if they get called into the

20   superintendent's office and told the Commissioner of Education

21   has raised a concern about something that you're doing in your

22   office, or a Department of Education investigator comes out to

23   the school and says, You know, we're just investigating this,

24   and we can't tell you whether it's a violation or not, but read

25   the op-ed?  I don't know if that's happening, but that's what

1    the plaintiffs suggest is happening.

2          MR. GARLAND:  The plaintiffs have, as I understand it,

3    identified one example of it happening or one example specific

4    to what you were just describing.  More generally, to the

5    extent the record's relevant, there haven't been widespread

6    investigations, there have been no Board of Education

7    enforcement actions, and so we really have one example.

8          THE COURT:  You seem to make something of the fact in

9    your brief that there have been no findings of violation and

10   few complaints under the -- what are you trying to make from

11   that?  What inference are you asking me to draw from that?

12         MR. GARLAND:  Well, I think, your Honor, as I read

13   your order, and as I've understood the plaintiffs' arguments

14   from the get-go, there was this concern that there would be a

15   widespread effect of teachers kind of facing potential loss of

16   their license in the face of a potentially vague law, and so I

17   guess the first point I'm making is I don't think you need to

18   consider that at all, because that's beyond the record that I

19   think you need to consider.

20         THE COURT:  You cite it, so I assume you think it

21   helps you, and I'm trying to figure out why you think it helps

22   you.

23         MR. GARLAND:  Because I think it pretty firmly

24   demonstrates a year and a half into this law, I guess, 2 1/2

25   years into this law being in effect that there isn't this

1    widespread threat of loss of licensure; it really isn't

2    happening.

3            THE COURT:  Well, I'm not sure that's an inference

4    that you can really draw.  There are several other inferences

5    one might draw, right?  You tell me why yours is a better one.

6    One inference might be the whole law is a solution in search of

7    a problem that doesn't exist, and so, since there were no

8    violations before, there aren't going to be any violations now.

9    That's certainly a plausible explanation, because no one has

10   produced evidence that this was a problem in New Hampshire

11   before the enactment of the statute.  I have not seen any

12   evidence that you've produced or anyone else has produced that

13   was, in fact, a real problem.  So, to the extent it's a

14   solution in search of a problem, that would explain why there

15   are few violations and not an argument that would be favorable

16   to your cause, because, to the extent there is no even core to

17   the statute that addresses a legitimate concern, the vagueness

18   problems of the statute are enhanced.

19           Another potential inference is because it's

20   accomplishing exactly what we want, which is chill as much

21   expression as we can; we don't need to enforce, we just need to

22   have the threat of enforcement.

23           A third explanation is we're all lying low until the

24   judge rules on the constitutionality of this statute.

25           Those are all possible explanations for the fact that

1    there are few, and the only one that's potentially helpful to

2    you, as I see it, is the one you're advocating, but those other

3    explanations are certainly at least plausible explanations as

4    well.  So, I'm not sure I can draw much one way or the other

5    from the absence of complaints.

6            MR. GARLAND:  I think that's fair, your Honor.  The

7    one way that I think all those inferences are, in fact, helpful

8    to us is that, if the Court is going to consider these

9    extrinsic materials, it's still in the context of a facial

10   claim, and I do have a hard time imagining, even with the

11   exacting standard you've identified, and even considering

12   extrinsic materials of this kind, that one example without any

13   additional explanation as to why there's only one example is

14   proof that this statute is facially unconstitutional.  And so,

15   I do think in that regard it certainly doesn't hurt us, but,

16   again, my principal argument on that is you don't need to worry

17   about it at all.

18           THE COURT:  I hear you.  Okay.  Let me ask you, you

19   alluded to this, you knew I was going to get into this one,

20   this curricular/extracurricular distinction, and I want to be

21   clear about this.  I drew on the existing body of case law to

22   conclude that, with respect to curricular speech, there is no

23   protected First Amendment right on the part of teachers or

24   students to demand a particular curriculum or the right to

25   teach their own curriculum contrary to the curriculum dictated

1    by the government.  In saying, though, drawing a distinction

2    between curricular and extracurricular, I am not suggesting

3    that there's a black-and-white end line between curricular and

4    extracurricular and Garcetti only applies to curricular speech.

5    There is some, certainly in my view, some area beyond

6    curricular in which you are still doing what you are paid to

7    do, speaking the speech that you are paid to speak.  Okay?

8              So, I agree with you to that extent, but that doesn't

9    mean that this statute doesn't potentially reach beyond the

10   areas in which Garcetti says the speech is entitled to no

11   constitutional value, and, given a statement like the one

12   quoted from the investigator that the Code of Conduct applies

13   when you're off duty, there's concern about the extent to which

14   the amendments apply when you're off duty.

15             Do you have a view about that particular issue?

16             MR. GARLAND:  So, with respect to the investigator's

17   statement, I may well have to take up your invitation, if it

18   comes to it, to address it separately, because that wasn't

19   something I had thought about in advance of today.  What I

20   would say, and I hope this is clear from our briefing, is with

21   respect to Garcetti there may well be, and I'm not disputing

22   there may well be, some extracurricular speech, there certainly

23   is, that falls beyond the scope of what Garcetti would apply

24   to.  But when making that determination --

25             THE COURT:  Right.  Bremerton makes that clear.

1    Certainly, when you're doing prayer on school grounds, on the

2    football field right after the game, with your players gathered

3    around you, the Supreme Court didn't emphasize that fact, but

4    it is in the record below and not contradicted, that raises --

5    and the Court says that's not Garcetti unprotected speech,

6    that's protected speech, that suggests that there are many

7    things that teachers can do on school property while students

8    are around that is entitled to First Amendment protection.  You

9    would agree, wouldn't you?

10        MR. GARLAND:  I agree with that, your Honor, but what

11   I think Bremerton shows is that's not something that can be

12   done sitting here in the abstract on the record that we have,

13   that, if you look at the majority opinion in Bremerton, and I

14   believe it's the Ninth Circuit's majority opinion in the

15   underlying case, there are profoundly different views based on

16   the specific facts and contexts that existed there about

17   whether this was speech made pursuant to an official duty or

18   not.

19        THE COURT:  Right.  But when you have vagueness

20   problems, again, when you're imposing severe consequences like

21   loss of a -- you would agree with me, because the case law is

22   just so overwhelming, depriving people of employment,

23   particularly depriving teachers of employment who have

24   statutory protections and a due process property interest in

25   their jobs, taking away a license of somebody, those are very,

1   very serious consequences, can have very profound, chilling

2   effects.  So, I understand your point that it's sometimes

3   difficult to discern where the line of constitutional

4   protection is, but that's an argument that tends to reinforce

5   the vagueness problem rather than undermine it.

6   MR. GARLAND:  I don't think so, your Honor, because I

7   think it ultimately goes to the burden that the plaintiffs

8   would have -- what the plaintiffs have here with respect to a

9   facial claim, even if it is a facial claim subject to an

10   exacting standard.  I don't think you can say, well, there is

11   some category, we're not going to tell you exactly what that

12   is, we can't define it in the abstract, but there is some

13   category which none of us dispute that falls beyond Garcetti

14   and therefore takes the First Amendment and kind of overlay it

15   on the entire statute and the statute falls because of this

16   exacting standard.  I think what you need to have before you,

17   and I don't think this record reflects it, is what that speech

18   is, what that speech is that's beyond the scope of Garcetti

19   that there will be some First Amendment protection to, so that

20   we can actually do, once we get beyond there, a

21   Pickering-Connick balancing.  And, as I read the cases that

22   postdate Garcetti, including Bremerton, this isn't being done

23   in the abstract, it's not being done through facial challenges,

24   it's not being done whether they're overbreadth or they're

25   vagueness; it's being done on a case-by-case basis in the

1      context of an as-applied challenge where the record is

2      developed and the Court can say, I'm looking at this

3      nonexhaustive list of factors and these considerations, and

4      it's on this side of the line or that side of the line, a

5      question that I would posit is very close in some cases and may

6      well have been in <u>Bremerton</u> in light of the competing opinions.

7      So, that's really the point I'm trying to make with respect to

8      that.

9              THE COURT:  Look, I recognize trying to convince a

10     judge that he made a mistake is a challenging job, and you've

11     responded to my questions very well, and I appreciate that,

12     because it's a hard thing to do, to stand up and tell somebody

13     why you think they've got it wrong, and I'll give you a chance

14     to say anything else you want to say pretty much without

15     interruption, because you've addressed my questions, but I want

16     to then finish by talking about the severance argument that

17     you're presenting here.  So, before we get to that, is there

18     anything else you'd like to add or say to support your

19     position?

20             MR. GARLAND:  I don't think so, your Honor.  I think

21     the one other point that I would just like to make, it's in our

22     brief, is the concept of an as-applied challenge here.  We

23     don't think it exists.  We think it's really part and parcel --

24             THE COURT:  My own view, frankly, is that I resolved

25     that issue in my prior order.  These issues are -- these are

1   complicated questions, and the plaintiffs did try to assert

2   what I called an as-applied-to-teachers claim, which I say is

3   not an as-applied challenge, it's a facial challenge, because

4   they are not having a teacher come up in front of me and

5   identify, This is the behavior that I'm engaging in or want to

6   engage in, and I want you to tell me that it would be

7   unconstitutional to apply this statute to me.  I think some

8   courts have referred to that as a hybrid applied challenge.

9        And so, I get the point, but in terms of analysis I

10   analyze this -- they preserve their arguments for something

11   different -- I analyze this as a facial vagueness challenge,

12   which I believe they can maintain.  I believe they can maintain

13   it because the unlawful and all-application standard doesn't

14   govern here for the reasons I set forth in my prior order.

15        If I'm wrong about that and you appeal, as I expect

16   you will, and the Court of Appeals agrees, that will be the end

17   of the litigation, from my perspective, because there is no

18   as-applied challenge here the way I'm seeing it.

19        MR. GARLAND:  I think we're on the same page, your

20   Honor.  The only reason I bring it up and we tried to brief it

21   is, as you noted in your prior order, that we hadn't briefed it

22   earlier, and so I just wanted to make sure we were all on the

23   same page.

24        THE COURT:  Okay.  I concluded that it was not

25   appropriate as an as-applied challenge in that prior order.

1          MR. GARLAND:  So, shifting to severability, then, I

2     think we've made two different arguments, kind of depending on,

3     and I don't think they're inconsistent, but it depends on kind

4     of where the Court identifies, if it does identify, a problem

5     in the statute, and the first one is reflected in our opening

6     briefing, where we advocate striking 193:40, IV, and I want to

7     make very clear that I'm not advocating you do this, because I

8     don't think the statute is vague, but ultimately, if the Court

9     concludes it is, as I read your order and as I understand from

10     our exchange today, your big concern is the particularly

11     punitive repercussion of loss of licensure, and that is the

12     provision that triggers that.

13          THE COURT:  I think you may be underestimating what I

14     see as the problem here.  Certainly the sanction that is

15     involved focuses the mind about the problems associated with

16     vagueness.  To the extent that it intrudes into First Amendment

17     areas, the greater the sanction, the stronger the chilling

18     effect, the more obvious the violation, right?  So, that's

19     really important.  And with respect to even the due process

20     violation, the greater the sanction the more danger that is

21     attendant to allowing an overly vague statute to stand.  But

22     that doesn't mean that there are no concerns, when you restrict

23     teacher behavior, that could stray into First Amendment grounds

24     simply by eliminating the penalty.

25          More likely, I would be more receptive to the idea

1    that what I should do is strike 193:40 in its entirety and any

2    provision of 354-A that purports to subject teachers to

3    liability for advocating a banned concept, leaving other

4    portions of the statute alive.

5         So, do you want to respond to that as a response?

6         MR. GARLAND:  Yes, your Honor.  So, I think the case

7    law, particularly the U.S. Supreme Court case law, on this is

8    clear, that the Court should strike no more than is invalid,

9    and I do think -- I understand your point, but, as I view the

10   prism through which this claim is being analyzed, one of the

11   major thumbs on the scale for an exacting standard is 193:40,

12   IV.  We've made our Fred Fuller argument, and I'm not going to

13   repeat that argument here, but that's the basis for why it

14   really doesn't extend, the repercussions don't really extend

15   beyond 193, IV with respect to teachers.  So, the focus here is

16   on teachers, it's on the unique repercussions that teachers

17   face, and --

18        THE COURT:  Certainly there would be no basis for

19   striking 354-A:33, which nobody said anything that that affects

20   teachers in some adverse way.  Is anybody going to stand up and

21   argue that that should be stricken?  That's the no public

22   employee shall be subject to adverse employment action, warning

23   or discipline of any kind for refusing to participate in a

24   training.  That's a protection, to the extent it applies to

25   anybody, it isn't a restriction on anything a teacher can do,

1   so I wouldn't understand the plaintiffs, who are only teachers,

2   parents, students -- I wouldn't understand them to be seeking

3   that I strike that provision, and I wouldn't find any basis to

4   do it on this particular record.  I've had no argument.

5        I would understand an argument from the plaintiffs,

6   which I expect they will make, that 193:40 is so entangled with

7   354-A potential aider and abettor liability that you have to go

8   beyond 193:40 and also address 354-A to the extent it can

9   subject teachers, not employers, but teachers to liability,

10  because I think the concerns that public employers; that is,

11  one level of government interacting with another level of

12  government are much less problematic when they are done through

13  vague statutes, and I don't have any superintendent of schools

14  joining this litigation trying to say the State Department of

15  Education can't apply this vague statute to us.  We can leave

16  that for another day, if it should arise.

17        My concern is about teachers.  My concern is about how

18  people can be restricted in engaging in protected speech they

19  would otherwise feel free to engage in and not be chilled by a

20  vague statute.  My concern is that teachers not be subject to

21  punishment, loss of license, being fired based on an overly

22  vague statute.  That's my concern.  To the extent I can address

23  that by striking some portions of the statutes but not others,

24  I'm open to hearing that.

25        So, your starting point is just strike IV of 193:40.

1   If it's unconstitutional, that's all you need to do.

2          MR. GARLAND:  And the reason why that's our position,

3   your Honor, is twofold.  First, that gets rid of the specific

4   concerns you've identified with licensure being on the line.

5   That's the portion of it that authorizes it.  And so that, to

6   the extent there's a thumb on the scale of the vagueness

7   analysis because of that particular concern, that eliminates

8   it.

9          It's our position that the plaintiffs have failed just

10  as a matter of law with respect to their burden here to show

11  that this statue does, in fact, extend to speech that is beyond

12  the scope of Garcetti, and so I think that our pitch to you

13  here is, well, because they fail to do that, that First

14  Amendment thumb on the scales is no long there either.

15         To the extent the Court disagrees, and this gets kind

16  of into the second severability argument we've made in our

17  reply brief or our objection, and this goes more to the

18  remedies available under the Ayotte decision, I think the Court

19  can say, because of the severability clause here, it is invalid

20  insofar as it applies to teachers' extracurricular speech.  I

21  don't think that's rewriting the statute, and I think

22  ultimately what Ayotte says, when you're talking through the,

23  considering the concepts of --

24         THE COURT:  See, I don't draw that bright line that

25  you're talking about, curricular/extracurricular.  I think when

1  you get beyond curricular you start to have real concerns about

2  the vagueness of the scope of the statute.  So, you have

3  potential vagueness concerns as to what a banned concept means,

4  potential concerns about what it means to teach, instruct,

5  inculcate, et cetera, and potential concerns about the extent

6  to which it extends into behaviors by teachers that would be

7  protected First Amendment speech.  One thing, for example, and

8  this isn't hypothetical, this is true, back during the protests

9  following the George Floyd killing there were walkouts, and

10  teachers and students together marched in support of BLM, and

11  if there were discussions between teachers and students during

12  a march like that, it would arguably be teaching, and yet it

13  would clearly be entitled to constitutional protection of some

14  degree.

15       And so, that's where I start to see problems.  It's

16  not a bright-line curricular/extracurricular.  It is that it

17  isn't restricted to curricular speech and can extend to

18  anything that constitutes teaching, inculcating with a student.

19  I agree it doesn't apply to purely private conduct, but if a

20  teacher has a blog and they know the students are accessing the

21  blog, are they inculcating with their blog?  All those things

22  start to become real significant problems that aren't

23  hypothetical.  Teachers have blogs.  Teachers take positions on

24  things like BLM, and they've done it with students.

25       So, those are my concerns about the scope being too

1    broad.

2         MR. GARLAND:  And my reaction to that, your Honor, is,

3    setting aside my argument with respect to the merits that has a

4    First Amendment overlay, or if it's a separate First Amendment

5    claim, which I understand your view on it, and I do believe I

6    agree with that, what I understand Ayotte versus Planned

7    Parenthood to talk about is, when you have a statute that has

8    some scope, that reaches -- that would infringe upon the

9    constitutional right, the preference, based on considerations

10   of federalism, based on considerations of comity, is to

11   invalidate it only to the extent it's invalid.  I think the

12   Court can do that consistent with the --

13        THE COURT:  I think that is true when there's a

14   severance clause, as there is here, but not in ways that

15   distort the scope of the statute.  That is the concern I have,

16   is that judges can't change the meaning of statutes by picking

17   and choosing and striking out provisions of it.  That would be

18   a misuse of the judicial power, in my view.

19        MR. GARLAND:  And I think where we disagree is that it

20   would be ultimately rewriting the statute in some way to say

21   strike out IV and ultimately say it would be invalid insofar as

22   it reaches extracurricular speech based on the enhanced

23   vagueness concerns that you've identified with the First

24   Amendment overlay; and the two reasons for that are, first,

25   Ayotte versus Planned Parenthood, which I know you know, and I

1   don't want to belabor that, but also the severability clause

2   here doesn't just talk about provisions within the statute.

3   The Legislature was very clear that applications are also

4   something that should be kept out.  And here, because that

5   language is expressed in there, I have a hard time seeing how

6   the Legislature would have said you need to strike down all of

7   193:40 when -- I'm using "core" differently from how we've used

8   it in the vagueness --

9            THE COURT:  But if I only struck down 193:40 and those

10   portions of 354-A that dealt with teacher liability, the

11   prohibitions on programs and schools from teaching the banned

12   concepts would still be alive.  That would be consistent with

13   your view about how I should be cautious about severing.  It

14   still would be unlawful for a district to teach a banned

15   concept.  You just couldn't use the fact that teachers wouldn't

16   be subject to liability, they wouldn't be subject to discipline

17   for teaching it; it would be the responsibility of the school

18   district to make sure that it didn't happen, take whatever

19   steps that are required to do it.  If they start doing it in

20   ways that are unconstitutional, lawsuits might have to be

21   brought against them for doing it.  If the school district

22   thinks that it unconstitutionally restricts, they would

23   probably be better off bringing a lawsuit in state court to

24   adjudicate the relative responsibilities between school

25   districts and -- because the State usually speaks with one

1   voice, ultimately, on those issues.

2          So, that seems to me to be a measured response.  I get

3   your point I should be even more narrow, I shouldn't do

4   anything, but I can just strike that one sentence at the end of

5   193:40 and we're good to go, in your view.

6          MR. GARLAND:  And I would just point to our objection.

7   To the extent you have concerns when you get beyond curricular

8   speech, and I understand you're not drawing a bright line, but

9   where there are enhanced First Amendment concerns when you get

10  beyond the kind of core of Garcetti we've talked about here you

11  can issue an order that makes clear it's invalid with respect

12  to that application consistent with the severability clause.

13         We may not be saying very different things.  I think

14  it's just a question of what statutory language --

15         THE COURT:  Let me ask you one last question, and then

16  I'll turn to the plaintiffs for their response on severability.

17  In the very rare cases where I have found a state statute to be

18  unconstitutional, I have relied on case law where I have said

19  essentially, relying on this case law, I've declared this

20  statute to be unconstitutional in the following ways.  I assume

21  that I don't need to issue an injunction against the State,

22  because the State will comply with this order or seek to have

23  relief from it with the Court of Appeals or get the order

24  overturned in the Court of Appeals and I won't need to issue an

25  injunction as such.  Is that consistent with the State's

1    position, or would you require me to issue an injunction --

2    evaluate the applicability of the injunction standard, issue an

3    injunction and actually enjoin you from doing certain things?

4        MR. GARLAND:  I don't think you need to in this

5    context, your Honor.  I think a federal court order applying

6    the federal *Constitution* to say this portion of the statute or

7    these applications are invalid, subject to it being reversed on

8    appeal, I can't envision --

9        THE COURT:  That wouldn't bar you from seeking some

10   kind of order from the Court of Appeals to allow the statute to

11   continue to be implemented while it's on appeal.  I don't take

12   lightly the idea of enjoining the State from doing or not doing

13   things, and, as long as it's clear to me the State's going to

14   abide by my orders while they appeal, I don't think it's

15   necessary.

16       So, you can take a final view on that when the time

17   comes, if it comes, but I take your answer as you probably

18   don't think I will need to do that.  You'll respect the order,

19   appeal it, take whatever actions to undermine it you can, but

20   you'll bide by it until and unless you get a court to authorize

21   you to do otherwise.

22       MR. GARLAND:  So, I think it's more than probable that

23   that's the case, but I would propose doing it this way.  That's

24   not an issue I thought about coming in today.  No one really

25   briefed a question of an injunction.  I will take that back to

1    people who have the authority to be --

2         THE COURT:  Yeah.  Notify the Clerk if you're not in

3    agreement on that, and I'll set a briefing schedule and have

4    short five-page briefs and pick it up on the briefs without

5    further oral argument.

6         MR. GARLAND:  That's perfect.  That works for me.  I

7    have nothing further, your Honor.

8         THE COURT:  Thank you.  Who from the plaintiffs wants

9    to address severability?

10         MR. BISSONNETTE:  I'm happy to, your Honor.  I think

11    Attorney Moerdler might have follow-up.  I do need to use the

12    restroom, though.

13         THE COURT:  Okay.  I understand.  These marathon

14    hearings, you have to constantly think of that.  We are coming

15    to an end, we are going to end in a very few minutes, but I'm

16    going to just sit there.  Let's take a three-minute break for

17    anybody that needs to use the restroom.  We're going to finish

18    up very quickly, though, okay?

19         MR. BISSONNETTE:  I understand, your Honor.

20         MR. MOERDLER:  One quick footnote?

21         THE COURT:  Yes.

22         MR. MOERDLER:  I have some severe reservations with

23    respect to the severability.

24         THE COURT:  All right.  We'll hear both of you on it,

25    then, but very quickly, though.

1          MR. MOERDLER:  I can do that later.  That's no

2     problem.

3          THE COURT:  Okay.  Good.  All right.

4          (Recess taken from 1:00 p.m. to 1:03 p.m.)

5          THE COURT:  Let's reconvene.  All right.

6          So, Mr. Bissonnette, your response to what Mr. Garland

7     has said about severance and what I've said about severance.

8          MR. BISSONNETTE:  Sure.  So, I want to first start

9     with the severability argument raised by the State, which is

10    that you just kind of take out RSA 193:40, IV, and I don't

11    think that works for various reasons.  But I do want to say at

12    the outset here that the first question, of course, is what's

13    the violation of the statute, right?  That is going to

14    ultimately dictate what gets severed at the end of the day, if

15    anything can, in fact, be severed, absent wholesale striking of

16    the statute.

17         And I think, just to piggyback off of what Attorney

18    Garland is saying, I just want to be very clear that the

19    violations here exist far beyond any First Amendment-related

20    issues, right?  The concern here, the due process-related

21    concern here, à la vagueness, applies far beyond the

22    extracurricular speech that is protected under the First

23    Amendment that this Court found, right?  And that's because the

24    statute, even with respect to curricular speech, is incredibly

25    broad, and that's because, of course, the law can be violated

1    by implication, there's no *mens rea* requirement and, of course,

2    because of the severe penalties that exist even for curricular

3    speech that may not be protected under the First Amendment,

4    even though we've preserved that it is, but that is still an

5    independent violation, regardless of whether or not that type

6    of curricular instruction is protected under the First

7    Amendment.  So, I just wanted to be very clear.

8              Obviously, to the extent that any First Amendment

9    protected speech falls within the scope, that requires even

10   more heightened due process vagueness analysis, but we already

11   have that here, independent of the First Amendment, for all the

12   reasons that this Court flagged in its original order.

13             So, I just wanted to be very clear, because the

14   severability argument started kind of moving into, you know, is

15   it only limited to extracurricular speech.  I just want to be

16   very clear what our claim is about at the end of the day.

17             THE COURT:  I completely agree with you.  Where I

18   think I might disagree with you is the full extent of

19   severance, because my focus is on how this affects teachers.

20             MR. BISSONNETTE:  Yeah.

21             THE COURT:  Engage in a thought experiment with me.

22   Assume that the statutes had been enacted, the amendments were

23   enacted but they had no references to teachers at all, it was

24   purely programs, government agencies, the state government

25   telling local governments, Don't teach X in your schools, and,

1    if you do, we are going to make people who are aggrieved, give

2    them the right to sue you for damages.  The problems associated

3    with vagueness there are not nearly as severe, in my mind.  If

4    a school district then starts to fulfill its obligation by

5    threatening teachers, sanctioning teachers, then there would be

6    as-applied challenges that a teacher could make to any

7    potential discipline.  But one program -- one level of

8    government telling another level of government, Do this, don't

9    do that, are ordinarily not nearly as problematic as something

10   that addresses the freedoms of individuals.

11        MR. BISSONNETTE:  I still think it would be very

12   problematic.  But I first want to get to the license piece.

13   Even if you severed 193:40, IV, I actually think under the

14   Educator Code of Conduct there are still licensing

15   ramifications, so I just wanted to address that, even with that

16   severance.  And I can just point the Court to Exhibit 109,

17   which is the Code of Conduct, Sections 510.01(b)(1), Section

18   510.02(b)(1) -- sorry.  I just said that.  Sorry.

19   510.01(b)(1), 510.02(b)(1) and 510.03(b)(1).  And why those are

20   relevant is because, independent of 193:40, IV, those portions

21   of the Code of Conduct independently bootstrap any violation of

22   354-A, which would include the banned concepts law, even if you

23   struck 193:40, IV from the statute.  So, I just want to be very

24   clear.  You sever the statute, there are still licensing

25   ramifications, number one.

1          Number two, setting aside those licensing

2     ramifications, even if you were to leave teachers to the whim

3     of the HRC process and not the DOE disciplinary process, that

4     doesn't cure the infirmities of this law, because there are

5     still practical career ramifications for educators, right?

6     Setting aside that that's aider and abettor liability and they

7     still could be on the hook for administrative fines, which is

8     what the DOJ is seeking in that other case I referenced against

9     individuals, right, but if your district is brought in under a

10    claim made under 354-A alleging that the educator's conduct

11    violated the statute, that is still inevitably going to have

12    ramifications on your career.  It could very well mean internal

13    disciplinary ramifications, not with respect to licensure but

14    with respect to employment, which is the purview of local

15    school districts.

16         So, I think the notion that we can just get rid of

17    licensing and that cures the kind of penalty aspect of the

18    statute is really just incorrect, because, from a practical

19    reality perspective, it is the individual educator that is

20    still getting hauled through that process under 354-A, because

21    it is their instruction that is the subject of the complaint

22    and the ultimate adjudication.

23         THE COURT:  But if they're not subject to liability

24    for it, they may be a witness in the proceeding, but they're

25    not subject to liability.  We have a lot of experience, because

1    that's the way the employment discrimination laws work under

2    the federal system.  You're not subject to individual

3    liability.  You might be a witness, your employer might fire

4    you because you engaged in improper discrimination, but you

5    aren't exposed to personal liability.

6             MR. BISSONNETTE:  That's the key point, though.  I

7    want to just kind of lightly push back against that, your

8    Honor, because you might be a witness, sure.  You might still

9    also lose your job.  I mean, that is a real consequence of

10   this, even though that you may not be a direct party through

11   the 53, 54-A proceedings.  I just think that that is a very

12   real practical development here that we can't kind of detach

13   ourselves from.  That is a real issue that would confront an

14   educator going through the 354-A process.  And I just think

15   that really needs to be uplifted here and shows, again, that I

16   think we still have a law with vague provisions combined with

17   onerous penalties.  It may not be licensure, but it's still

18   being effectively hauled through a 354-A proceeding, maybe not

19   as a party, but as a witness, with the end result being that

20   your livelihood is still on the line; you can get fired at the

21   end of the day.

22             And I'll add one additional caveat, your Honor, that

23   you flagged.  Well, in a 354-A proceeding they may be a party

24   -- they may not be a party.  That is a problem as well, right,

25   one would think, because, if they're not a party to that

1   particular proceeding, are they going to have their own

2   counsel?  How are they going to be represented?  Is there

3   appropriate due process afforded to them at the end of the day?

4   And I think those are real questions and ones, as well, that

5   are raised in the information that's under seal in this case.

6          THE COURT:  So, you say strike the programmatic

7   language as well, not just -- so you have to start --

8          MR. BISSONNETTE:  Yeah.

9          THE COURT:  -- 193:40 in its entirety out.

10          MR. BISSONNETTE:  Absolutely.

11          THE COURT:  And you would say the 354-A provisions

12   that address the teaching or advocacy of a banned concept would

13   also go out, which would be the entirety of 354-A:31.

14          MR. BISSONNETTE:  And 32.

15          THE COURT:  And 32.  So, you would agree with me that

16   it wouldn't reach 33, right, because there's nothing you're

17   saying that --

18          MR. BISSONNETTE:  Yeah.  I think I'm inclined to

19   agree.  That's not something --

20          THE COURT:  If you, on reflection, disagree, you'll

21   notify the Court.

22          MR. BISSONNETTE:  I will.  I will, your Honor.  I

23   will, your Honor.

24          THE COURT:  Okay.  So, I get what you're saying.

25   Probably 354-A:34, to the extent it allows a remedy for

1   violating the antidiscrimination provisions of 354-A.

2          MR. BISSONNETTE:  This begs the question that what

3   you're doing still could end up being a rewrite, when you look

4   at the provisions of 354-A --

5          THE COURT:  The problem that's bothering me is,

6   whether I like it or not, I'm not taking any position on that,

7   it's not my province to do that, I do believe under the State

8   law that the Legislature has reserved certain power to give

9   instruction to school districts about what they can and cannot

10   teach.  I think my opinion suggests that a better way to do

11   that is to allow school boards to make decisions, but there's

12   no doubt that the State legislature has the power to do that,

13   and there's no First Amendment issue implicated in instructing

14   what can and can't be done in the curriculum because it's at

15   least my view that the politically accountable branches should

16   determine curriculum, not individual teachers.

17          And I've tried to draw what I think is an important

18   distinction between post-secondary education and primary and

19   secondary education.  Where I think academic freedom is

20   constitutionally protected with respect to state universities,

21   college, post-secondary instruction, I don't think it exists

22   with respect to primary and secondary instruction.

23          And so, I'm cautious about trying to interfere with

24   the State's effort to instruct lower governmental units what

25   they can and can't do, but I'm going to think about your

1    concern.  Your concern essentially is in the end of the day,

2    whether teachers can be disciplined under the code or can be

3    subject to damages, even if they aren't and they can't,

4    allowing this to be in place because of its vagueness will

5    inevitably cause lower school districts to overbroadly apply

6    it, and it will end up hurting teachers indirectly, because

7    school districts will come under pressure to apply this in the

8    arbitrary way that you think it could be applied and impose

9    restrictions, and then school districts will enforce those

10   against teachers in ways that will cause them the kind of harm

11   you're concerned about.

12        MR. BISSONNETTE:  There would still be a sanction,

13   maybe not as direct as licensure, but all kinds of other

14   direct, indirect --

15        THE COURT:  All right.  I'll have to think that one

16   through.  I haven't really focused on it.

17        MR. BISSONNETTE:  Yeah.  But, listen, with

18   severability, at the end the day, even if you were to take out

19   193:40, IV, it doesn't address the fact that the amendments

20   still lack a scienter requirement, it doesn't address the

21   infirmities in the text of the several banned concepts,

22   including the infirmities that the Court addressed in its prior

23   decision.  So, I think the notion that the licensing piece is

24   the only problem is just incorrect, including according to this

25   Court's prior analysis.  And, again, of course it is improper

1       through severance to rewrite a statute.  And I think the issues

2       with there not being a scienter requirement, the only way to

3       fix that is to rewrite the statute to impose a scienter

4       requirement that the Legislature clearly decided not to impose

5       in this particular piece of legislation, and we just don't

6       think that that's something that can be done.

7              So, that's my summary of severance.  I do have some

8       closing remarks.  Should I reserve those for a later period?

9              THE COURT:  We're getting done here.  So, I will say

10      your colleague wanted to say something on severance.  Let him

11      say it, and then you can wrap up, and we'll be done.  All

12      right.

13             MR. BISSONNETTE:  Thank you.

14             MR. MOERDLER:  Your Honor, I hate to be the gainsayer,

15      but I do have a problem.  I have it on several scores.  Let me

16      take the least concerning personally, but I think I have to, to

17      protect your Honor's record.  In Ayotte and in other cases we

18      have seen the courts make the point, the appellate courts, that

19      the legislative intent is a trump card.  The Legislature, when

20      you look at how this bill was passed in the first instance and

21      you look at subsequent attempts to change it, it is not of a

22      mind, at least the former Legislature, to do this piecemeal,

23      and so the question then you must add to your pile of woes is

24      are you now taking something that the Legislature wanted as

25      part of a whole and keep it as part of the whole?  I am less

1    concerned about the Legislature than anyone, but I think for

2    the record we need to know that the Legislature made it clear

3    in its deliberation it was going to be an all deal.  That was

4    the Committee discussion.  So, please bear that one in mind.

5           Now the more important one.  Teachers now are attuned

6    to the fact that there is risk.  They're not attuned to how

7    broad it is or what the penalties are fully, but they know

8    there's something here that's dangerous.  When virtually all of

9    them shy away from anything in the area, you know something is

10   wrong.  You also know it when you have private suits available

11   to you, that you can get sued from it.

12          And, lastly, hold that thought, if you will, until you

13   hear five minutes and no more of presentation which I want to

14   do so that I do not violate a code.

15          THE COURT:  All right.  We're going to do that.  We're

16   going to finish, close the courtroom, and I'll hear you on

17   that, and we'll end up then.

18          MR. MOERDLER:  All right.

19          THE COURT:  Good.  Thank you.

20          All right.  Mr. Bissonnette, any last remarks from you

21   before we deal with that process?  And then we'll hear anything

22   Mr. Garland wants to say; then we'll conclude the public

23   hearing, and I'll just address any *in camera* concerns that the

24   parties want to raise with me.

25          MR. BISSONNETTE:  Thank you, your Honor.  So, I'm just

1   getting my bearing here.  There's just a few kind of

2   housekeeping matters.

3            There's been discussion of op-eds in this case from

4   the Commissioner.  I just wanted to be clear there are two

5   op-eds, and I just wanted to kind of differentiate them.  Both

6   are incredibly important and I think critical to evaluate in

7   this case.

8            The first is the June 13th, 2021 op-ed, that's summary

9   judgment Exhibit 21; and the second is the April 15th, 2022

10   op-ed, and that's summary judgment Exhibit 40.  So, I know

11   we've been talking about op-eds.  I just wanted to be clear

12   that there's two of them in this case.

13            I want to just go to the interpretations that we heard

14   from Attorney Garland earlier, because I do think they're

15   important to kind of get in the weeds on, and I'm going to do

16   it incredibly briefly, because it is in our brief, but I just

17   think it's worth flagging.  I think kind of this effort to put

18   a knowledge requirement in through dictionary definitions just

19   doesn't work, and it doesn't work when you look at the very

20   definitions that the defendants are employing in this case.

21            So, their own cited dictionary definitions of "teach"

22   don't require that an educator has, quote, knowledge of what

23   information is being conveyed.  Rather, their own dictionary

24   definitions simply require that only the educator, quote,

25   provide knowledge.  So, just look carefully at their dictionary

1    definitions, because it doesn't create a mental state

2    requirement at all, even though I think they're kind of trying

3    to bootstrap it in.  What their definitions talk about is what

4    is knowledge being conveyed as a noun, not the mental state of

5    an educator when they're providing knowledge.  I think that

6    that may sound like an argument that only a lawyer can

7    appreciate, but I think it's incredibly important here when you

8    look at these definitions.

9            THE COURT:  I think they're doing the best they can

10   under difficult circumstances, because they recognize the

11   statute doesn't have any scienter associated with it, and so

12   they're trying to help me see that teaching, that those words

13   involve some volitional action, but I'm not sure that's

14   sufficient to say that you are knowingly advocating this

15   concept or that concept.  Those are different, and they exist

16   as requirements in the criminal law for very good reasons.  We

17   just don't have strict liability statutes.  Because the

18   consequences of a violation are so substantial, part of the

19   rule of law function is to impose some mental state requirement

20   for a criminal sanction, and this sanction is not criminal.

21   It's not so much as, like, removal from the United States when

22   you're a noncitizen who has entered illegally and is subject to

23   removal.  But short of that, it's about one of the most serious

24   sanctions that one can have, a loss of licensure, and that's a

25   loss of the ability to practice your livelihood.  It's about as

1    serious a sanction as you can impose short of a criminal

2    sanction, and that's why I think we have to be especially

3    careful about this.

4           MR. BISSONNETTE:  It's technical but vitally

5    important, given this Court's prior analysis, where it said the

6    lack of a scienter requirement was important in your thinking.

7    So, I did think that was important to uplift, but these new

8    dictionary definitions, we talk about extrinsic evidence, this

9    is the third piece of extrinsic evidence now that I think we've

10   received from the State concerning how to interpret or apply --

11          THE COURT:  They don't like your extrinsic evidence.

12          MR. BISSONNETTE:  Well, they don't like mine, but I

13   think this is really a third crack at the apple, and I think

14   all of this really demonstrates that this law is just a mess

15   from beginning to end and needs to be enjoined.  This

16   requirement, this knowing requirement, it's not in any of the

17   depositions, it's not really in any of the two prior iterations

18   of the guidance in this case, and I think, to me, that just

19   kind of tells us what we need to know, that this law is really

20   hopeless and needs to be enjoined.

21          And we can make one further point, which we will *in*

22   *camera*, about the current HRC docketed complaint.  The fact

23   that there is one docketed complaint is public; the context and

24   content of it is what's under a Protective Order in this case.

25          But you flagged as well, though, it's also

1    inconsistent, this knowing requirement, with the DOJ, Attorney

2    General opinion that says it could be violated by implication.

3    Listen, I know we could try to say that's not what he meant,

4    but that's what it says.  It's the Attorney General of the

5    State of New Hampshire trying to provide an example of what

6    could violate the statute.  Educators have to take that

7    seriously, superintendents have to take it seriously, and they

8    are.

9         And that gets to my second-to-last point, which is

10   what you raised at the outset, which is, well, you know, we've

11   seen a small number of complaints, according to the State.  I

12   just want to uplift what I think is really going on here in

13   this law.  The point of this law I don't really necessarily

14   think is to take a license away.  It's to use the threat of

15   loss of license and career ramifications to chill instruction

16   in schools by scaring them, and I think that is what is

17   happening; but I don't just think it, I know it, because that

18   is in the record in this case through the numerous declarations

19   that have been submitted by educators here.

20        And who loses at the end of the day in the face of all

21   of these ramifications and censorship of educators?  It's

22   students.  Students are the reason why teachers show up every

23   day, why they join the profession.  They're doing this work for

24   them.  Their instruction is chilled.  It's not just

25   instruction, it's not just the ability to link history to the

present day, which is how students learn.  They relate the past

to what's going on in their lives, their feelings, their views.

That is how you make education relatable.

It not only inhibits that type of instruction.  It

also inhibits statements that validate the lived experiences of

students, what they're thinking, what they're feeling, which

are critically important not just for every student but

students of color, trans students that suffer very high rates

of bullying and high incidents of depression and suicide, the

ability of an educator to say, You feel that way, I hear you,

I'm with you, you are not alone, and it is those types of

statements that have to be made clearly and unequivocally.

The Attorney General's Office says, Why don't you

caveat it to death or do a disclaimer?  That's not what these

students need.  They need to feel heard in the classroom, and

this law prevents that from happening.  Thank you.

THE COURT:  All right.  Thank you.

Mr. Garland, your final remarks before we do this *in

camera* session.

MR. GARLAND:  Very briefly, your Honor.  So, with

respect to the last point, I understand what Attorney

Bissonnette is saying.  It's throughout the briefs, it's

identified, and I think those points are all made in extremely

good faith.  There is no claim here on behalf of students.  The

plaintiffs had the opportunity to bring that claim.  It wasn't

1   amended.  And so, I do think that is starting to divorce what

2   is before this Court from kind of the claim that doesn't --

3        THE COURT:  Well, yeah.  Mr. Bissonnette makes a very

4   powerful point.  None of us are unmindful of that, not me, not

5   you, not him, but I want to make sure people understand the

6   difference, as I know you do, between what you do as a

7   policymaker, as a political person, as a citizen and what you

8   do as a judge.  I don't make decisions about the law based on

9   my personal policy preferences, what I would like the world to

10  be, what would be the most effective form of education, how we

11  can best reach students.  I have to address things in a

12  somewhat different way, and I know you all know that.  But I

13  certainly am not at all indifferent to or unmindful of the

14  problems that students face and how anything which leaves

15  teachers second-guessing themselves about whether they can

16  express empathy to their students, can try to understand their

17  students' predicaments is a real concern.  It's just my

18  analysis is this kind of constitutional analysis that I feel

19  I'm required to engage in.

20       I don't think we need to say more than that.  I

21  understand your views, Mr. Bissonette's views, all of that.

22       MR. GARLAND:  And so, really just two other points,

23  your Honor, and they're related.  I know there has been a

24  couple of references to the fact that we're trying to kind of

25  have our cake and eat it too with respect to what we think you

 1   can consider versus what the plaintiffs think you can in terms

 2   of extrinsic materials.  I reject that.  I think the things

 3   that we're asking you to look at, including dictionary

 4   definitions, are just core tools that courts use when they're

 5   doing text-based analyses of statutes.  And so --

 6                THE COURT:  They are extrinsic materials, but they're

 7   the kinds of extrinsic materials that are used in statutory

 8   interpretation.

 9                MR. GARLAND:  That's my point, your Honor.  I know you

10   understand it.

11                And the last point I'd make is we think we've given

12   you a plausible reading of the statute based on our own

13   construction.  We think it is the better reading of the statute

14   based on our own construction.  I know from your past order and

15   your comments today you may not agree with that, but it's our

16   view that Federal Courts don't strike down statutes.  It really

17   only invalidates statutes or portions of statutes as a last

18   resort, and I don't think that it is necessary -- that the

19   statute is necessarily read in the way that creates the

20   concerns you've identified, creates the concerns the plaintiffs

21   identified, and that should inform your analysis for the

22   reasons in our briefing and what I've already said today.

23   Thank you.

24                THE COURT:  All right.  Thank you.

25                All right.  So, I want to just commend the parties.

1   Very helpful, very helpful arguments on all sides here.  I will

2   hear this matter *in camera* and otherwise take the matter under

3   advisement.

4            In a few instances I've identified for you, Here's

5   what I think you're saying.  If you, on reflection, take a

6   different view, you can notify the Clerk.  I don't want to

7   hear -- invite supplemental briefing.

8            I did allow plaintiffs' counsel to submit a list of

9   citations.  You can go ahead and do that through the Clerk,

10  make sure that opposing parties have a copy of it.  I

11  otherwise -- I don't want to delay to get supplemental briefs.

12  You've all been thinking about this for a year; I've been

13  thinking about it for a year.  I want to get working on it.

14           So, unless you are inclined to change a position or

15  feel that I've invited you to do something different to notify

16  the Clerk, I'm going to assume that I have the record in front

17  of me and I can make my decision, and I'm going to go about

18  making it.  If you should notify the Clerk about some issue,

19  I'll potentially hear you about why I should take additional

20  materials, but I'm ready to decide it, you're ready for me to

21  decide it.  I want to get it going.  So, don't come back and

22  ask to file something unless there's a real good reason.  Okay?

23  All right.

24           Yes.

25           MR. GARLAND:  Can I ask for one clarification on that,

1    your Honor?  Based on my notes, I think my homework is to let

2    you know, if you rule against us, whether a declaration would

3    be enough, or whether we're going to insist on an injunction.

4           THE COURT:  Yes.

5           MR. GARLAND:  And my understanding with respect to the

6    first question you asked me, which was about Investigator

7    Farrell's statement about the application of the Code of

8    Conduct --

9           THE COURT:  I don't think I invited you to make any

10   additional, but if you, on reflection, feel there is some

11   clarification that you could make that would be succinct and

12   submitted easily, you notify the Clerk that you want to do it,

13   and opposing counsel, and I'll make a decision about whether

14   I'll even allow you to do it.  I'm inclined to sort of take the

15   record as we've got it at this point, just because we've

16   already devoted so much time and effort to it.

17          MR. GARLAND:  Thank you.  Understood, your Honor.  I'm

18   not asking for the opportunity.  That was just the other point

19   I had in my notes.  Thank you.

20          THE COURT:  Okay.  Again, thank you, everybody.  That

21   concludes the public portion of the hearing.  I'd ask people

22   who are not here with a party -- if you are a party or employed

23   by a party and the lawyers want you to be able to be here, I

24   don't have any objection, but otherwise any member of the

25   public should exit now, because I need to seal the courtroom

1    for a brief proceeding.

2          MR. BISSONNETTE:  Your Honor, based on the record, I

3    believe under the Protective Order it is attorneys' eyes only.

4          THE COURT:  Oh, it is attorneys' eyes only?  Then, in

5    that case, just the attorneys.  Thank you.

6          (WHEREUPON, the proceedings adjourned at 1:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, Brenda K. Hancock, RMR, CRR and Official Court
Reporter of the United States District Court, do hereby certify
that the foregoing transcript constitutes, to the best of my
knowledge, skill, ability and belief, a true and accurate
transcription of the within proceedings.




Date:  ___6/2/24_____     /s/ Brenda K. Hancock
                            Brenda K. Hancock, RMR, CRR
                            Official Court Reporter

# EXHIBIT
# 109

Educator
Code of
Conduct



EXHIBIT 2

D. Fenton
5/17/2023
Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 2

New Hampshire
Code of Conduct
for
Educational
Professionals

PL 00008

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  Purpose.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d)  Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  Definitions.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

(1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

(2)  Meets at least one of the following qualifications:

a.  Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w) "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1) Pathway 4 certification as specified in Ed 505.04; or

(2) Pathway 5 certification as specified in Ed 505.05;

(x) "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y) "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  Confidentiality of Credential Holder Certification Records.

(a) Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1) The name of the credential holder;

(2) The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3) The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4) The school, if known or stated, where the credential holder is currently employed.

(b) The provisions of this section shall not require the release of information related to:

(1) Informal or formal investigations; or

(2) Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c) The complete record of a credential holder shall be released by the division upon written request to the following:

(1) A party in an adjudicatory proceeding when:

a. The credential holder is a party to the proceeding; and

b. The credential holder's credential record is relevant to the proceeding;

(2) A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3) A certifying agency of another jurisdiction for:

    a. Purposes of credentialing the credential holder in the other jurisdiction; or

    b. An investigation of the credential holder by the other jurisdiction, when:

        1. The credential holder was the subject of a formal investigation under Ed 511; or

        2. Disciplinary action was taken against the credential holder by the board under Ed 511;

(4) Board investigators or prosecutors; or

(5) Persons to whom the credential holder has given a release.

(d) The bureau shall report:

    (1) Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

    (2) Any reprimand to the credential holder's current superintendent of school in N.H.;

(e) The department shall maintain a list of all credential holders whose credentials has *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04 Emergency Authorization.

(a) The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b) The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

    (1) Paid the applicable application fee, provided in Ed 508.06(c); and

    (2) Filed with the bureau the information and documentation required in (c) and (e).

(c) An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

(1) Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2) Date of birth;

(3) Name;

(4) Address;

(5) Sex, which may be specified at the option of the applicant;

(6) Telephone number;

(7) Date of application;

(8) Educational information, including the following:

    a. Degree, if any;

    b. Major;

    c. State;

    d. College or university;

    e. Date degree granted; and

    f. Transcript for each degree listed;

(9) Educational employment record for the last 7 years including:

    a. Dates;

    b. State;

    c. School district;

    d. Position;

    e. Assignment/subject;

    f. Grade level;

    g. Credential held;

    h. Number of years of any public school experience;

    i. Number of years of any non-public school experience; and

    j. Copy of each teaching credential held in New Hampshire , other state, or both;

(10) Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11) Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12) Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13) Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14) Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15) Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a. American Indian;

    b. Asian/Pacific;

    c. African-American/Non-Hispanic;

    d. White/Non-Hispanic;

    e. Hispanic;

    f. Multi-ethnic; and

    g. Other/do not wish to specify.

(d) If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e) If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f) An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a) The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b) If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

    (1) Is in the process of certification;

    (2) Has submitted a completed application for certification; and

(3) Has paid any applicable fees.

(c) An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01 Principle 1—Responsibility to the Education Profession and Educational Professionals.

(a) In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02   Principle 2—Responsibility to Students.

(a) In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

    a. Abuse, including, but not limited to physical and emotional abuse;

    b. Cruelty or any act of endangerment;

    c. Any sexual act with or from any student; and

    d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03  Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04   Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b) Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2) Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)   Whether:

a. The communication made was covert in nature;

b. The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c. The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05  Duty to Report.

(a) Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:.

(1) When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2) When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d) If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e) Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1) His or her immediate supervisor, superintendent, or both; and

(2) The department of health and human services, pursuant to RSA 169-C:29.

(f) If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g) The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01   Complaints, Cases and Investigations.

(a) A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b) After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c) Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d) Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

    (1) The department shall create a report which documents the results of the investigation;

    (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

        a. Suspension;

        b. Revocation; or

        c. Reprimand; and

    (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

    (4) The following shall be considered aggravating circumstances:

        a. The seriousness of the offense;

        b. The credential holder's prior disciplinary record;

        c. The credential holder's lack of willingness to cooperate with the department during an investigation;

        d. Potential harm to public health and safety; and

        e. The purpose of the rule violated;

    (5) The following shall be considered mitigating circumstances:

        a. Absence of a prior disciplinary record;

b. The credential holder's willingness to cooperate with the department during an investigation;

c. The credential holder's acknowledgment of his or her wrongdoing; and

e. The purpose of the rule or statute violated;

(6) The credential holder shall be notified in writing of any proposed discipline;

(7) If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k) Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2) If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a. A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b. A certifying agency of another jurisdiction for:

1. Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i) The credential holder was the subject of a formal investigation under Ed 5101; or

(ii) Disciplinary action was taken against the credential holder by the board pursuant to Ed 5101;

c. Other states' licensing board investigators or prosecutors; and

d. Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

(a) If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b) All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline. The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c) Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03 <u>Disciplinary Hearings</u>.

(a) If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1) Completion of an informal or formal investigation; and

(2) Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b) The provisions of Ed 200 shall apply to all disciplinary hearings and *such hearings* shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.04 <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

(a) When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b) The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c) In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 Grounds for Reinstatement After Suspension.

(a) A credential which has been suspended shall be reinstated for one of the following reasons:

(1) The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2) A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b) Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512 DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 Denial of Credential.

(a) A credential application shall be denied by the board based on the following grounds:

(1) Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b) An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision. If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

PL 00022

## APPENDIX I

| RULE | STATUTE |
|------|---------|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

# EXHIBIT 109

Educator Code of Conduct



**EXHIBIT 2**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 2

New Hampshire
Code of Conduct
for
Educational
Professionals

PL 00008

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  Purpose.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d) Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  Definitions.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h) "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i) "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m) "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n) "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

(1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

(2)  Meets at least one of the following qualifications:

a.  Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1) Pathway 4 certification as specified in Ed 505.04; or

(2) Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  Confidentiality of Credential Holder Certification Records.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1) The name of the credential holder;

(2) The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3) The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4) The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1) Informal or formal investigations; or

(2) Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1) A party in an adjudicatory proceeding when:

a. The credential holder is a party to the proceeding; and

b. The credential holder's credential record is relevant to the proceeding;

(2) A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3) A certifying agency of another jurisdiction for:

    a. Purposes of credentialing the credential holder in the other jurisdiction; or

    b. An investigation of the credential holder by the other jurisdiction, when:

        1. The credential holder was the subject of a formal investigation under Ed 511; or

        2. Disciplinary action was taken against the credential holder by the board under Ed 511;

(4) Board investigators or prosecutors; or

(5) Persons to whom the credential holder has given a release.

(d) The bureau shall report:

    (1) Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

    (2) Any reprimand to the credential holder's current superintendent of school in N.H.;

(e) The department shall maintain a list of all credential holders whose credentials has *have* been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04 Emergency Authorization.

(a) The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b) The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

    (1) Paid the applicable application fee, provided in Ed 508.06(c); and

    (2) Filed with the bureau the information and documentation required in (c) and (e).

(c) An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

PL 00012

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

PL 00013

(13) Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14) Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15) Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a. American Indian;

    b. Asian/Pacific;

    c. African-American/Non-Hispanic;

    d. White/Non-Hispanic;

    e. Hispanic;

    f. Multi-ethnic; and

    g. Other/do not wish to specify.

(d) If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e) If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f) An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a) The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b) If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

(1) Is in the process of certification;

(2) Has submitted a completed application for certification; and

(3) Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01 Principle 1—Responsibility to the Education Profession and Educational Professionals.

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a fellow professional as specified in RSA 354-A:1;

(2) Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3) Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4) Unlawful possession of a drug;

(5) Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6) Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7) Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02   Principle 2—Responsibility to Students.

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

    a. Abuse, including, but not limited to physical and emotional abuse;

    b. Cruelty or any act of endangerment;

    c. Any sexual act with or from any student; and

    d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03    Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04   Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2)  Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)  Whether:

a.  The communication made was covert in nature;

b.  The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c.  The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05   Duty to Report.

(a)  Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:.

(1)  When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2)  When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d)  If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e)  Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1)  His or her immediate supervisor, superintendent, or both; and

(2)  The department of health and human services, pursuant to RSA 169-C:29.

(f)  If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g)  The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01  Complaints, Cases and Investigations.

(a)  A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b)  After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c)  Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d)  Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

    (1) The department shall create a report which documents the results of the investigation;

    (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

        a. Suspension;

        b. Revocation; or

        c. Reprimand; and

    (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

    (4) The following shall be considered aggravating circumstances:

        a. The seriousness of the offense;

        b. The credential holder's prior disciplinary record;

        c. The credential holder's lack of willingness to cooperate with the department during an investigation;

        d. Potential harm to public health and safety; and

        e. The purpose of the rule violated;

    (5) The following shall be considered mitigating circumstances:

        a. Absence of a prior disciplinary record;

b. The credential holder's willingness to cooperate with the department during an investigation;

c. The credential holder's acknowledgment of his or her wrongdoing; and

e. The purpose of the rule or statute violated;

(6) The credential holder shall be notified in writing of any proposed discipline;

(7) If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k) Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

(1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

(2) If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

a. A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

b. A certifying agency of another jurisdiction for:

1. Purposes of certification of the credential holder in the other jurisdiction; or

2. An investigation of the credential holder by the other jurisdiction when:

(i) The credential holder was the subject of a formal investigation under Ed 5101; or

(ii) Disciplinary action was taken against the credential holder by the board pursuant to Ed 5101;

c. Other states' licensing board investigators or prosecutors; and

d. Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 Reprimand, Suspension, or Revocation.

(a) If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b) All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline. The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c) Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03 Disciplinary Hearings.

(a) If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1) Completion of an informal or formal investigation; and

(2) Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b) The provisions of Ed 200 shall apply to all disciplinary hearings and *such hearings* shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.04 Status of a Credential Pending Completion of Disciplinary Proceeding.

(a) When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b) The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c) In accordance with RSA 541-A:30, III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 Grounds for Reinstatement After Suspension.

(a) A credential which has been suspended shall be reinstated for one of the following reasons:

(1) The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2) A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b) Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512 DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01 Denial of Credential.

(a) A credential application shall be denied by the board based on the following grounds:

(1) Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b) An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision. If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

## APPENDIX I

| RULE | STATUTE |
|------|---------|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |