UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

—————————————

No. 24-1690

—————————————

ANDRES MEJIA; CHRISTINA KIM PHILIBOTTE; NATIONAL EDU-
CATION ASSOCIATION - NEW HAMPSHIRE; LOCAL 8027, AFT-
NEW HAMPSHIRE, AFL-CIO; JOCELYN MERRILL; KIMBERLY
GREEN ELLIOT; RYAN RICHMAN; MEGHAN EVELYN DURDEN;
JOHN DUBE,

Plaintiffs - Appellees,

v.

FRANK EDELBLUT, in their official capacity as Commissioner, New
Hampshire Department of Education; JOHN M. FORMELLA, in their
official capacity as New Hampshire Attorney General; AHNI MALA-
CHI, in their official capacity as Executive Director, New Hampshire
Commission for Human Rights; CHRISTIAN KIM, in their official ca-
pacity as Chairperson, New Hampshire Commission for Human Rights;
KEN MERRIFIELD, in their official capacity as Commissioner, New
Hampshire Department of Labor,

Defendants – Appellants.

—————————————————————————

On Appeal from the United States District Court for the
District of New Hampshire

—————————————————————————

**BRIEF FOR DEFENDANTS – APPELLANTS**

| | | |
|---|---|---|
| JOHN M. FORMELLA | | ANTHONY J. GALDIERI |
| NEW HAMPSHIRE | and | NEW HAMPSHIRE |
| ATTORNEY GENERAL | | SOLICITOR GENERAL |

MARY A. TRIICK, No. 1213543
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H.  03301
(603) 271-0447

and

SAMUEL R.V. GARLAND, No. 1189913
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H.  03301
(603) 271-3650

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... 3

TABLE OF AUTHORITIES ...................................................................... 5

JURISDICTIONAL STATEMENT ............................................................ 8

STATEMENT OF ISSUES ......................................................................... 9

STATEMENT OF CASE............................................................................ 10

    A.    The Challenged Statutes...................................................... 10

    B.    Procedural History ............................................................. 14

SUMMARY OF ARGUMENT ................................................................... 17

ARGUMENT .............................................................................................. 18

I.      THE VAGUENESS DOCTRINE. ................................................... 18

II.     RULES OF STATUTORY INTERPRETATION............................. 21

III.    THE DISTRICT COURT INCORRECTLY CONCLUDED RSA 193:40 AND RSA 354-A:31-:32 WERE FATALLY VAGUE. ................................. 24

    A.    The District Court's Ruling................................................. 24

    B.    Applying the Rules of Statutory Interpretation to RSA 193:40. .......... 28

    C.    Applying the Rules of Statutory Interpretation to RSA 354-A:29-:34. 35

    D.    The Appropriate Vagueness Standard to Apply in this Case............... 38

    E.    When the Appropriate Vagueness Standard and the Appropriate Rules of Statutory Construction are Applied, Neither RSA 193:40 Nor RSA 354-A:31-:32 Are Unconstitutionally Vague. ........................................ 44

IV.    THE DISTRICT COURT ERRED IN EXTENDING ITS VAGUENESS ANALYSIS BEYOND A TEXTUAL ANALYSIS. ........................................... 48

V.     ALTERNATIVELY, IF SOME VAGUENESS EXISTS IN THE STATUTORY SCHEME, THE PROVISIONS FROM WHICH THE VAGUENESS ARRISES

SHOULD BE SEVERED FROM THE REMAINING PORTIONS OF THE
STATUTE. ................................................................................................ 55

CONCLUSION ............................................................................................ 58

CERTIFICATE OF COMPLIANCE .......................................................... 60

CERTIFICATE OF SERVICE ................................................................... 61

# TABLE OF AUTHORITIES

**Cases**

*Appeal of Plantier*, 126 N.H. 500, 494 A.2d 270 (1985).........................43

*Bond v. United States*, 564 U.S. 211 (2011) ..........................................18

*Boos v. Barry*, 485 U.S. 312 (1988) .................................................22, 31

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ....................................49

*Cahoon v. Shelton*, 647 F.3d 18 (1st Cir. 2011) ................................22, 55

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016) .........................................20

*Frese v. Formella*, 54 F.4th 1 (1st Cir. 2022)..............................45, 47, 51

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................39, 40

*Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975)..............................44

*Griffiths v. Superior Court*, 96 Cal. App. 4th 757 (2002) ........................44

*Hill v. Colorado*, 530 U.S. 703 (2000)....................................................18

*Johnson v. United States*, 576 U.S. 591 (2015) ..........................19, 20, 42

*Keepers, Inc. v. City of Milford*, 807 F.3d 24 (2d Cir. 2015)...................53

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)...........................39

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) .................................27

*Lane v. Franks*, 573 U.S. 228 (2014) ....................................................40

*Modern Continental/Obayashi v. Occupational Safety and Health Review Commissioner*, 196 F.3d 274 (1st Cir. 1999)..............................51

*N.H. Democratic Party v. Sec'y of State,*
174 N.H. 312, 262 A.3d 366 (2021) ...................................................55, 57

*Natal v. GMPM Co.*, 175 N.H. 74, 280 A.3d 782 (2022) .........................23

*Petition of Lafasciano*, 175 N.H. 518,
293 A.3d 1164 (2022) ................................................................ 22, 23, 24

*Polonsky v. Town of Bedford*, 171 N.H. 89, 190 A.3d 400 (2018)...........30

*Sessions v. Dimaya*, 584 U.S. 148, 184 (2018) .................................42, 43

*Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 881 A.2d 693
(2005) ..............................................................................................23

*State v. Bakunczyk*, 164 N.H. 77, 53 A.3d 569 (2012)......................26, 27

*State v. Ploof*, 162 N.H. 609, 34 A.3d 563 (2011).............................22, 31

*State v. Stratton*, 132 N.H. 451, 567 A.2d 986 (1989) ...........................42

*United States v. Bronstein, 849 F.3d 1101 (D.C. Cir. 2017)*.................52

*United States v. Davis*, 588 U.S. 445 (2019) ...................................18, 19

*United States v. Lachman, 387 F.3d 42 (1st Cir. 2004)*. ........... 44, 49, 50

*United States v. Taylor*, 596 U.S. 845 (2022) ........................................21

*United States v. Williams*, 553 U.S. 283 (2008) .............................48, 49

*URI Student Senate v. Town of Narragansett,*
631 F.3d 1 (1st Cir. 2011).........................................................................20

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982) ........................................................................ passim

## Statutes

28 U.S.C. § 1291 ........................................................................8

28 U.S.C. § 1331 ........................................................................8

N.H. Rev. Stat. Ann. § 193:40 ....................................... passim

N.H. Rev. Stat. Ann. § 354-A ........................................ passim

N.H. Rev. Stat. Ann. § 354-A:29 ......................... 10, 12, 14, 35

N.H. Rev. Stat. Ann. § 354-A:31 .................................... passim

N.H. Rev. Stat. Ann. § 354-A:32 .................................... passim

N.H. Rev. Stat. Ann. § 354-A:33 ..........................................55

## Other Authorities

*Webster's Deluxe Unabridged Dictionary* (2d ed. 1979) ....... 29, 32-34, 36

*Webster's Third New International Dictionary*
(unabridged ed. 2002) ....................................................... 32, 37

## JURISDICTIONAL STATEMENT

The Defendants initiated this appeal by filing a notice of appeal with this Court on July 24, 2024, appealing from a judgement issued by the district court on June 24, 2024. The district court's judgement was a final appealable order as it awarded the plaintiff's requested declaratory relief based upon a finding that N.H. Rev. Stat. Ann. §§ 354-A:31, 354-A:32, and 193:40 were unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. Jurisdiction of this action was proper in the district court pursuant to 28 U.S.C. § 1331 and jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.  Whether N.H. Rev. Stat. Ann. (RSA) 193:40 and RSA 354-A:31-:32 are unconstitutionally vague.

II. Whether a court in considering a facial vagueness challenge should look to extrinsic evidence beyond a textual analysis.

III. Whether any unconstitutional portions of RSA 193:40 and RSA 354-A:31-:32 should have been severed as a remedy in lieu of declaring both statutory schemes unconstitutional in their entirety.

# STATEMENT OF CASE

## A.    The Challenged Statutes

The questions at issue in this appeal relate to the constitutionality of two sets of statutory provisions within New Hampshire's Revised Statutes Annotated (RSA): RSA 193:40 and RSA 354-A:29-:34. Add.164 -67.[1]

RSA 193:40 contains a "prohibition on teaching discrimination" in public schools.  It provides:

> I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:
>
> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
>
> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

---

[1] 'Add.' refers to the addendum following this brief and 'App.' refers to the joint appendix.

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA 193:40, I.

These specific prohibitions are followed by a number of additional statutory provisions further explaining application of the prohibitions. First, the statute provides: "Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section." RSA 193:40, II.  Second, the statute authorizes persons aggrieved to bring civil actions against the school or school district or with the New Hampshire Commission for Human Rights. RSA 193:40, III.  Third, the statute makes clear that teaching the banned concepts may justify dis-

ciplinary sanction related to a teacher's license by the state board of education. RSA 193:40, IV.

The Plaintiffs also challenge the constitutionality of RSA 354-A:29-:34. These statutory provisions are entitled: "Right to Freedom from Discrimination in Public Workplaces and Education." In enacting these provisions, the state legislature expressed a public policy that discriminatory practices will not be tolerated as they not only threaten the rights of citizens but also "menace[] the institutions and foundation of a free democratic state and threaten[] the peace, order, health, safety and general welfare of the state and its inhabitants." RSA 354-A:29.

In carrying out this public policy, the legislature enacted three substantive sections: one related to government employers, one related to government programs, and one outlining protections for public employees. Public employers may not "teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group, any one or more of" four enumerated concepts. RSA 354-A:31. Likewise, "[n]o government program shall teach, advocate, or advance any one or more of" the same four enumerated concepts. RSA 354-A:32. Finally, public employees may not

"be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for, any one or more of" the same four enumerated concepts.

These four enumerated concepts include:[2]

> I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

> III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

---

[2] These four enumerate concepts are closely related to those included in RSA 193:40, but their wording is not identical.

IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA 354-A:31–:33.

Like the prior section, RSA 354-A also contains some exceptions, which make clear that nothing in the statute should be construed "to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect" or "to limit the academic freedom of faculty members of the university system of New Hampshire and the community college system of New Hampshire to conduct research, publish, lecture, or teach in the academic setting." RSA 354-A:29, II-III.

## B.    Procedural History

Two plaintiff groups filed complaints in the United States District Court in the District of New Hampshire in late 2021 challenging the

constitutionality of the above discussed statutory provisions. App. 41-105, 589-640. Both complaints raise void-for-vagueness challenges, and the complaint filed by one plaintiff group—referred to in this brief and in the briefing below as the AFT plaintiffs—also brought a challenge under the First Amendment.

The matters were consolidated, and the defendants moved to dismiss both complaints. (ECF Doc. Nos. 36 & 37.) After extensive briefing and oral argument, the district court issued a memorandum order granting the motions to dismiss in part and denying them in part. (ECF Doc. No. 63). The district court dismissed the AFT plaintiffs' First Amendment claim to the extent it was based on curricular speech. (*Id.* at 9–16). The court allowed the AFT plaintiffs' First Amendment claim to proceed to the extent it concerned teachers' extracurricular speech. (*Id.* at 16–17). The court denied the defendants' motions to dismiss as to the plaintiffs' facial vagueness challenge. (*Id.* at 19–42). The court also declined to dismiss the plaintiffs' as-applied vagueness challenge. (*Id.* at 19–20).

The court adopted a scheduling order by which the parties would engage in limited, expedited discovery before filing cross-motions for

summary judgment. (Feb. 15, 2023 Oral Order; Feb. 21, 2023 Endorsed Order). The plaintiffs' motion for summary judgment was granted and the defendants' cross-motion was denied based upon the court's conclusion that the relevant statutory provisions constituted "viewpoint-based restrictions on speech that do not provide either fair warning to educators of what they prohibit or sufficient standards for law enforcement to prevent arbitrary and discriminatory enforcement." Add. 154. The defendants now appeal from that order.

## SUMMARY OF ARGUMENT

The statutory provisions at issue in this case—RSA 193:40 and RSA-A:31-:32 are not unconstitutionally vague. When the court applies the appropriate standards of statutory interpretation (so as to delineate the proper scope of the statutory provisions) and applies the appropriate facial vagueness standard, the provisions duly engaged by New Hampshire's legislative branch do not violate federal constitutional principles.

## ARGUMENT

## I.   THE VAGUENESS DOCTRINE.

The modern vagueness doctrine allows a court to invalidate an otherwise duly enacted statute when the court finds the statute to be impermissibly vague. *United States v. Davis*, 588 U.S. 445, 447 (2019) ("In our constitutional order, a vague law is no law at all.").  "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A statute is vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.*

This doctrine "rests on the twin constitutional pillars of due process and separation of powers."[3] *United States v. Davis*, 588 U.S. 445, 451 (2019) (internal citation omitted).  Vague laws run afoul of substantive due process when they fail to give individuals "fair notice of what the law demands of them"; they run afoul of separation of powers prin-

---

[3] Because this case involves a request for a federal court to invalidate a state law, these "separation of powers" concerns can be more accurately described as federalism concerns. *See Bond v. United States*, 564 U.S. 211, 220-21 (2011) (describing how our federal system "serves to grant and delimit the prerogatives and responsibilities of the State and the National Government vis-à-vis one another" in order to "preserve the integrity, dignity, and residual sovereignty of the States.").

ciples when they "threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.* "Only the people's elected representatives in the legislature are authorized to make an act a crime." *Id.* (internal citation omitted).

The Supreme Court generally focus on how these basic constitutional principles caution against courts enforcing vague laws. *See generally Davis*, 588 U.S. at 451. However, this Court should also consider how the available remedy – invalidating laws duly enacted by the legislative branch – presents its own separation of powers and federalism concerns. *See generally Johnson v. United States*, 576 U.S. 591, 621 (2015) (Thomas, J. concurring) ("[W]e as a Court have a bad habit of using indefinite concepts — especially ones rooted in "due process"—to invalidate democratically enacted laws."). Courts should be careful to not violate the very separation of powers principles they seek to protect through the widespread invalidation of the laws enacted by the people's elected representatives.

Furthermore, it is important for courts to remember that "words are rough-hewn tools, not surgically precise instruments" and, as such,

"some degree of inexactitude" is acceptable and likely inevitable within statutory language. *Draper v. Healey*, 827 F.3d 1, 4 (Souter, Circuit Justice, 1st Cir. 2016) (quoting *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011)). Even with relation to criminal statutes, where the dangers of vagueness are at their highest and one's substantive due process rights at their strongest, statutes are not unconstitutional simply because they "call for the application of a qualitative standard . . . to real world conduct[.]" *Johnson v. United States*, 576 U.S. 591, 604 (2015) (citations and quotation marks omitted). "[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Id.*

Understanding that all statutory provisions will come with some level of vagueness given the nature of language itself, "[t]he degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). In examining the nature of a challenged enactment, "a more stringent vagueness test" should be applied to laws which interfere with individual's rights to free speech or

otherwise "threaten[] to inhibit the exercise of constitutionally protected rights." *Id.* at 499. Conversely, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.* Finally, a greater tolerance is given to vagueness in statutes which impose civil rather than criminal penalties "because the consequences of imprecision are qualitatively less severe." *Id.*

## II.   RULES OF STATUTORY INTERPRETATION

When determining how the above discussed factors apply to a specific challenged statutory provision – and therefore what level of vagueness the Constitution will tolerate – the court must first engage in statutory interpretation. A federal court engaging in such statutory interpretation must keep two things in mind. First, state courts are the final arbiters of state law. *See United States v. Taylor*, 596 U.S. 845, 859 (2022) ("Appreciating the respect due state courts as the final arbiters of state law in our federal system, this Court reasoned that it made sense to consult how a state court would interpret its own State's laws."). As such, "[w]hen interpreting state law, a federal court employs

the method and approach announced by the state's highest court." *Cahoon v. Shelton*, 647 F.3d 18, 22 (1st Cir. 2011). Second, courts must remain mindful of the duty to construe statutes as constitutional whenever possible. *See Boos v. Barry*, 485 U.S. 312, 331 (1988) ("[T]he federal courts have the duty to avoid constitutional difficulties by doing so if such as construction is fairly possible."); *State v. Ploof*, 162 N.H. 609, 620, 34 A.3d 563, 572 (2011) (explaining that it is "a basic principle of statutory construction" within New Hampshire "that a legislative enactment will be construed to avoid conflict with constitutional rights wherever reasonably possible").

The New Hampshire Supreme Court is clear that, when interpreting statutes, judges must "first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." *Petition of Lafasciano*, 175 N.H. 518, 521–22, 293 A.3d 1164, 1168 (2022) (citation and quotation marks omitted). In doing so, New Hampshire courts consider "the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." *Id.* at 522 (same omissions). When a statute "does not define the meaning of the terms [used] within [it],"

the New Hampshire Supreme Court "look[s] to the dictionary for guidance as to the ordinary meaning of those terms." *Natal v. GMPM Co.*, 175 N.H. 74, 78, 280 A.3d 782, 786 (2022).

While courts are to avoid adding language to statutes or looking beyond the words the legislature chose to use, it remains necessary and proper for courts engaged in statutory interpretation to consider the broader statutory context. This contextual analysis allows a court to "construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result." *Petition of Lafasciano*, 175 N.H. 518, 522, 293 A.3d 1164, 1168 (2022) (citations and quotation marks omitted). It also allows courts to interpret statues which "deal with similar subject matter," in a way such that they "do not contradict each other, and so that they will lead to reasonable results and effectuate the legislature purpose of the statutes." *Soraghan v. Mt. Cranmore Ski Resort, Inc.*, 152 N.H. 399, 405, 881 A.2d 693, 698 (2005).

## III. THE DISTRICT COURT INCORRECTLY CONCLUDED RSA 193:40 AND RSA 354-A:31-:32 WERE FATALLY VAGUE.

### A. The District Court's Ruling.

The district court concluded that the challenged statutory provisions were "fatally vague in three ways: (1) they do not provide fair notice as to the concepts that teachers may not teach, (2) they do not sufficiently explain when classroom discussions of a banned concept qualifies as impermissible teaching, and (3) they do not give teachers enough guidance to know when their extracurricular communications are within the Amendments' reach."[4] Add. 126-27.

In reaching this conclusion, the district court did not begin with the statutory language as is required. *See Petition of Lafasciano*, 175 N.H. 518, 521–22, 293 A.3d 1164, 1168 (2022) (judges interpreting New Hampshire law must "first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning."). Instead, the district court skipped directly to opining on the intent of the supporter of these statutory provisions, concluding that "[o]ne of the most difficult interpretive challenges the Amendments

---

[4] This conclusion, and the discussion which follows, are nearly entirely focused upon RSA 193:40 without engaging with RSA 354-A and the ways that statute is similar to and different from RSA 193:40.

present is that they fail to address their intended target directly." Add. 127.

The district court then discussed the enumerated concepts and attempted to explain its conclusion that the statutory language did not provide fair notice as to the concepts that teachers may not teach. Add. 127-35. This explanation largely consisted of a recitation of possible educational topics to which the district court found the statutory language's application unclear. *Id.* The district court also noted possible overlap between what is covered by the fourth enumerated concept in RSA 193:40 and what is covered by the preceding three enumerate concepts, without explanation as to how this possible overlap creates constitutionally impermissible vagueness. *Id.*

It is worth noting that the district court's discussion of the ambiguity the court sees in each of the enumerated concepts skips over the first concept with the exception of one footnote. In that footnote, the district court conceded that "the plaintiffs have not explained how the first concept fails to give adequate notice or invites arbitrary enforcement[.]" Add. 128. Nevertheless, the district court concluded (effectively sua sponte) that this first concept "suffers the same interpretive chal-

lenges as the other three concepts" because it "does not address its intended target directly" and is therefore unclear "what is prohibited beyond literally espousing that, for example, 'White people are superior to Black people.'" *Id.*

Following this consideration of the enumerated concepts, the district court then considered the verbs the legislature chose to use in RSA 193:40—"taught, instructed, inculcated or compelled to express belief in, or support for"— and concluded that the statutory language was "fatally flawed because [it did] not sufficiently explain when a teacher will be subject to sanctions for teaching a banned concept." Add. 135-36. In explaining this conclusion, the district court proceeded down two paths: first focusing on overlap between the meaning of the various verbs used and, second, focusing specifically on the word teach.

To find ambiguity based upon an inability to give each of the terms a separate and distinct meaning, *id.*, the district court pointed out that "the legislature is presumed not to use words that are superfluous or redundant[,]" *id.* (citing *State v. Bakunczyk*, 164 N.H. 77, 79, 53 A.3d 569, 570 (2012)), and faulted the State Defendants for offering arguments that suggest these words are all closely related and may

have similar, and at times overlapping, meanings. *Id.* This observation does not engage with the reality that presumptions, ostensibly including the presumption against finding redundancy in statutory language, may be rebutted and do not represent mandatory rules.

The district court also discussed possible ways to understand what it means to teach a concept. Add. 137-40. In doing this, the court discussed another series of hypothetical cases and emphasized the court's uncertainty as to how those situations would be resolved under the applicable statutory language.[5] *Id.*

Finally, moving on from the verbs in RSA 193:40, the district court engaged with two concepts which affect the level of vagueness the constitution will tolerate. First, the court discussed the uncertainty it believed teachers face with relation to determining when their extra-curricular speech in which they have First Amendment protections is covered. Add. 140-42. Second, the court concluded that, even if the statute contains a scienter requirement which allows application of the

---

[5] The district court also discusses a 1967 U.S. Supreme Court case – *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) – finding a statute which penalized university staff who "advocates, advises or teaches" that the U.S. government should be overthrown. The current case is distinguishable as *Keyishian* found the statute in question vague given it was "plainly susceptible to sweeping and improper application" in a manner that violated First Amendment rights. As will be discussed in detail below, no such First Amendment implications are at issue in this case.

amendments when a teacher deliberately conveys information to his or her students, "the absence of a true scienter requirement leaves teachers vulnerable to sanctions if they inadvertently cross the boundary between permissible and prohibited speech." Add. 142-43.

**B.    Applying the Rules of Statutory Interpretation to RSA 193:40.**

As outlined above, RSA 193:40 provides: "No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following" enumerated concepts.  Neither these verbs nor the enumerated concepts that follow are unconstitutionally vague.

**1.    RSA 193:40's Verbs.**

The statute does not define the words teach, instruct, inculcate, or compel.  However, they are commonly used words with readily ascertainable meanings.  Specifically, they are all verbs with related, sometimes overlapping dictionary definitions.

- The word "teach" means "to show how to do something; to give instruction to; to train"; "to give lessons to (a student or pupil); to guide the study of; to instruct"; "to give lessons in (a subject); to

hold classes in"; or "to provide with knowledge, insight, etc." *Webster's Deluxe Unabridged Dictionary* 1870 (2d ed. 1979).

- The word "instruct" means "to communicate knowledge to; to teach; educate"; "to give facts of the matter to; to inform"; or "to give directions or orders to." *Id.* at 951.

- The word "inculcate" means "to impress upon the mind by frequent repetition or insistent urging." *Id.* at 927.

- The word "compel" means "to drive or urge with force, or irresistibly; to constrain; to oblige; to necessitate, either by physical or moral force"; or "to take by force or violence; to bring about by force." *Id.* at 370.

These dictionary definitions reveal clear bounds for the statute's application, covering affirmative and deliberate acts of conveying information with knowledge of what information is being conveyed. The act of giving lessons or holding classes in a subject, for example, would be commonly understood to require both the affirmative and deliberate act of giving the lessons or holding the classes and an understanding of the subject being taught. The same is true of communicating knowledge to someone, giving facts of the matter to someone, giving di-

rections to someone, impressing something upon the mind of someone with frequent repetition or insistent urging, or driving or urging someone to believe something by force or violence. It is reasonable to read RSA 193:40 as proscribing the affirmative and deliberate act of conveying information prohibited by the statute with knowledge of the information being conveyed.

To the extent the district court declined to accept this statutory interpretation, believing it to be "judicial rewriting of legislation to save it from a vagueness challenge," that conclusion was in error. Add. 125. To be sure, the directive that courts are to construe statutes to avoid constitutional problems, "does not justify disregarding unambiguous language." *Polonsky v. Town of Bedford*, 171 N.H. 89, 96, 190 A.3d 400, 406 (2018) (same omissions). However, the district court found that ambiguity existed in the statutory language and used that ambiguity to declare the statute constitutionally vague. *See* Add. 143 (noting "the inherent ambiguity as to when a concept is 'taught'"). Instead of using any ambiguity the district court believed existed within the statutory language to invalidate the duly enacted statute passed by the New Hampshire legislature, the district court should have resolved the found

ambiguity in favor of the interpretation offered above as it is both reasonable and avoids constitutional infirmity. *See Boos v. Barry*, 485 U.S. 312, 331 (1988) ("[T]he federal courts have the duty to avoid constitutional difficulties by doing so if such as construction is fairly possible."); *State v. Ploof*, 162 N.H. 609, 620, 34 A.3d 563, 572 (2011) (explaining that it is "a basic principle of statutory construction" within New Hampshire "that a legislative enactment will be construed to avoid conflict with constitutional rights wherever reasonably possible").

### 2. RSA 193:40's Enumerated Concepts.

RSA 193:40 prohibits the deliberate act of conveying four enumerated concepts. The first two of these concepts are:

> That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> [and]

> That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

RSA 193:40, I(a) & (b) (formatting altered). The only term in either category that the plaintiffs have suggested is vague is the word "inherently."

That word is not defined in the statute. However, the word "inherent" has a commonly understood dictionary definition: it means "structural or involved in the constitution or essential character of something: belonging by nature or settled habit: intrinsic, essential." *Webster's Third New International Dictionary*, 1163 (unabridged ed. 2002). Other dictionaries contain similar definitions. *See, e.g.*, *Webster's Deluxe Unabridged Dictionary* 943 (2d ed. 1979) (defining "inherent" as "existing in someone or something as a natural and inseparable quality, characteristic, or right; innate; basic; inborn"). In other words, an "inherent" characteristic is one that is natural, biological, or intrinsic, not one that is perceived, accidental, or the result of one's individual external environment. Under some definitions an inherent characteristic may be something obtained through "settled habit" rather than inborn. But, irrespective of the manner in which an "inherent" characteristic is obtained, it nevertheless clearly must be intrinsic or essential such that the very nature of a thing would be changed without it.

An educator, school, or school district therefore violates RSA 193:40, I(a) by affirmatively and deliberately conveying to a public-school student that a person is naturally, biologically, or intrinsically superior or inferior by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

Similarly, an educator, school, or school district violates RSA 193:40, I(b) by affirmatively and deliberately conveying to a public-school student that a person is naturally, biologically, or intrinsically racist, sexist, or oppressive by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

The third enumerated concept is:

> That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA 193:40, I(c). In the context of this provision, the word "should" is "an auxiliary used to express (a) obligation, duty, propriety, necessity." *Webster's Deluxe Unabridged Dictionary* 1679. This category therefore

prohibits teachers from conveying to students that there is some obliga-

tion or duty or that it is otherwise necessary or proper for an individual

to be discriminated against or treated adversely because that individual

possesses one of the characteristics identified in the statute.

> The fourth enumerated concept is:

> That people of one age, sex, gender identity, sexual orienta-
> tion, race, creed, color, marital status, familial status, men-
> tal or physical disability, religion, or national origin cannot
> and should not attempt to treat others without regard to age,
> sex, gender identity, sexual orientation, race, creed, color,
> marital status, familial status, mental or physical disability,
> religion, or national origin.

RSA 193:40, I(d). The word "should" is used in the same sense discussed

in the last paragraph. The word "cannot" is a negation of the verb "can,"

which means "to be able to." *Webster's Deluxe Unabridged Dictionary*

261. Accordingly, this category prohibits teachers from conveying to

students that individuals are somehow unable to treat other persons

without regard for the characteristics identified in the provision or that

individuals otherwise should not treat others without regard for those

characteristics.

## C. Applying the Rules of Statutory Interpretation to RSA 354-A:29-:34.

RSA 354-A:29–:34 has three separately applicable prohibitions. All of these prohibitions relate to the same four enumerated concepts and, while the language used in RSA 354-A's enumerated concepts vary slightly from the language used in RSA 193:40's enumerated concepts,[6] these differences are sufficiently non-substantive that the Defendants would rely on the argument above as to how they should be interpreted. However, there is reason to consider the verbs used in RSA 354-A separately from those used RSA 193:40 because, while there is some overlap, they are not identical.

RSA 354-A provides:

1. Public employers may not "teach, advocate, instruct, or train" the four enumerated concepts. RSA 354-A:31.

2. Government programs may not "teach, advocate, or advance any one or more of" the four enumerated concepts. RSA 354-A:32.

---

[6] Enumerated concepts two and three are identical within both statutory provisions. There are two variations in enumerated concept one. RSA 193:40 begins "That one's age, sex…" whereas RSA 354-A begins "The people of one age, sex, …". Additionally, RSA 193:40 contains the phrase "is inherently superior to" whereas RSA 354-A contains the phrase "are inherently superior or inferior to". There is one variation in enumerated concept four. RSA 193:40 contains the phrase "attempt to treat others without regard to age, sex …" whereas RSA 354-A contains the phrase "attempt to treat others equally and/or without regard to age, sex …".

3. Public employees may not "be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for, any one or more of" the four enumerated concepts.

In total, RSA 354-A's verbs include three of the four used in RSA 193:40 (teach, instruct, and compel) as well as three new ones (advocate, train, and advance). These are all commonly used words with readily ascertainable meanings.

- The word "teach" means "to show how to do something; to give instruction to; to train"; "to give lessons to (a student or pupil); to guide the study of; to instruct"; "to give lessons in (a subject); to hold classes in"; or "to provide with knowledge, insight, etc." *Webster's Deluxe Unabridged Dictionary* 1870 (2d ed. 1979).

- The word "instruct" means "to communicate knowledge to; to teach; educate"; "to give facts of the matter to; to inform"; or "to give directions or orders to." *Id.* at 951.

- The word "compel" means "to drive or urge with force, or irresistibly; to constrain; to oblige; to necessitate, either by physical or

36

moral force"; or "to take by force or violence; to bring about by force." *Id.* at 370.

- The word "advocate" means "to plead in favor of: defend by argument before a tribunal or the public: support or recommend publicly[.]" *Webster's Third New International Dictionary*, 32 (unabridged ed. 2002).

- The word "train" means "to instruct or drill in habits of thought or action: shape or develop the character of by discipline or precept". *Id.* at 2424.

- The word "advance" means to "move forward along a course or toward a terminus or goal" or "to help on or aid the success or implementation of". *Id.* at 30.

The dictionary definitions of this list of verbs again reveals clear bounds for the statute's application, covering affirmative and deliberate acts of conveying information with knowledge of what information is being conveyed. One cannot advocate for, train others in, or advance subjects without understanding both the subject being conveyed and intending to convey it.

### D. The Appropriate Vagueness Standard to Apply in this Case.

Once the statutory language is properly construed, the next step in the vagueness analysis is to determine whether that language "reaches a substantial amount of constitutionally protected contact." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982). If constitutionally protected conduct is not implicated, the statute will be declared facially vague "only if the enactment is impermissibly vague in all of its applications." *Id.*

However, in this case, district court determined it was appropriate to apply a "more exacting vagueness review" for three reasons: the statute impacts First Amendment protected speech, is devoid of a scienter requirement, and imposes harsh sanctions on teachers. Add. 119-24, 140-45. While these are each legitimate reasons to decrease the vagueness the constitution will tolerate in a statutory provision, they are not applicable to the current statutory provisions. RSA 193:40 and RSA 354-A do not impact first amendment protected speech, they do contain a scienter requirement, and they impose civil sanctions different in both kind and degree from the serious sanctions justifying a higher-level vagueness review.

### i. The Statutes' Impact (or Lack Thereof) on Free Speech

Speech of public employees is not entitled to First Amendment protections when it is made pursuant to the speaker's official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 420–22 (2006). When determining if the speech of a public employee is protected by the First Amendment, courts apply a two-step test known as the *Pickering-Garcetti* framework. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022). When applying this framework, courts will first determine whether the employee was speaking "as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. If the answer is no, then the employee's speech has no First Amendment protections. *Id.* Only if the answer is yes is there even a possibility that the speech is protected. *Id.*

In this case, the AFT plaintiffs are the only ones who claim First Amendment violations and, in doing so, do not identify any specific type of extracurricular speech that they believe would be protected under the *Pickering-Garcetti* framework and would also be subject liability under the challenged statutory provisions. The district court seems to find such specific allegations unnecessary, instead relying upon the broad conclusion that: "Even though the First Amendment does not protect a

teachers' curricular speech, it is beyond dispute that at least some interactions between students and teachers are protected by the First Amendment, even if they occur on school grounds or during school hours." Add. 140.

The mere existence of some protected interactions between students and teachers is insufficient to support the district court's conclusion that the statutory provisions "implicate constitutionally protected interactions between teachers and students[.]" *Id.* To the contrary, the statutory provisions are applicable to teacher/student interactions in which the *teacher* is seeking to *teach* the student something. The Supreme Court has stressed that the central holding of *Garcetti* is that speech is not protected when it is "ordinarily within the scope of an employee's duties[.]" *Lane v. Franks*, 573 U.S. 228, 240 (2014). If anything falls within a teacher's express job duties, it is teaching students. The vague notion that the statutes might reach some small, unidentified quantum of protected extracurricular speech is not sufficient to trigger heightened vagueness review. *See Village of Hoffman Estates*, 455 U.S. at 494-95 (noting that a statute must "reach[] a *substantial* amount of constitutionally protected contact." (emphasis added)).

### ii. Scienter

"[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

As discussed above, the dictionary definitions of the verbs used in both RSA 193:40 and RSA 354-A require that a teacher intentionally convey information to his or her students and know what information is being conveyed. The district court discounts this scienter requirement, finding it not to be a "true scienter requirement" and concluding that the statutory provisions "leave[] teachers vulnerable to sanctions if they inadvertently cross the boundary between permissible and prohibited speech." Add. 143.

The problem with this line of reasoning is twofold. First, it would seem to require scienter requirements to be directed at the actor's knowledge that they are breaking the law to be a 'true scienter' requirement. Even in the criminal law, it is rarely if ever a requirement

that an individual must know they are breaking a law.[7]  Scienter requirements regularly focus on an actor's knowledge of the nature of their actions and their intention to take those actions.  Secondly, laws do not present a constitutional problem simply because individuals may be held liable for crossing a boundary between permissible and impermissible conduct.  "[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Johnson v. United States*, 576 U.S. 591, 604 (2015)

### iii.  Penalties

The district court concludes that the sanctions imposed by the statutes at issue here were sufficient grave to justify a higher-level vagueness review because they "'strip persons of their professional licenses and livelihoods.'" Add. 122 (quoting *Sessions v. Dimaya*, 584 U.S. 148, 184 (2018) (Gorsuch, J., concurring in part)).  This quoted language relied upon by the district court, from Justice Gorsuch's concurrence in *Sessions*, was not a sound basis upon which to rely for two reasons.

---

[7] It is well established that ignorance of the law itself or a mistaken belief as to what to what the law prohibits is not an excuse. *See State v. Stratton*, 132 N.H. 451, 457–58, 567 A.2d 986, 990 (1989).

First, it is contained in a concurring opinion and relates to a subject clearly irrelevant to the Court's holding.  In *Sessions*, the Supreme Court applied a heightened vagueness standard to a civil statutory sanction which worked to deport an individual who had been a lawful resident of the United States for more than twenty years. 584 U.S. 148 (2018).  Telling an individual who has lived, worked, and built a family in the United States for decades that they must leave and never return is different in kind, and certainly substantially different in gravity, from taking someone's state issued teaching license.

Second, the language used by Justice Gorsuch, when employed in the manner the district court did in this case, is inconsistent with the majority holding of *Flipside*.  The defendants recognize that "[t]he right to engage in one's occupation is a privilege of fundamental significance." *Appeal of Plantier*, 126 N.H. 500, 507, 494 A.2d 270, 273 (1985).  However, the penalty here does not preclude an individual from practicing their chosen profession.  Losing one's New Hampshire teaching license merely precludes someone from being employed as a teacher in a K-12 public school in the state of New Hampshire.  This is distinct from losing a medical or law license which would preclude entirely the practice

of those professions.  As such, the statutory scheme at issue here is more akin to the economic regulations at issue in *Flipside*, *see generally Griffiths v. Superior Court*, 96 Cal. App. 4th 757, 779 (2002) ("[E]conomic regulation, under the state's police power, includes establishing standards for licensing practitioners and regulating the practice of professions.") (citing *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975)), and "economic regulation is subject to a less strict vagueness test." 455 U.S. at 498.

### E.    When the Appropriate Vagueness Standard and the Appropriate Rules of Statutory Construction are Applied, Neither RSA 193:40 Nor RSA 354-A:31-:32 Are Unconstitutionally Vague.

Having construed RSA 193:40 and RSA 354-A and determined the appropriate vagueness standard to apply, the Court must next "determine whether the [statute] is void for vagueness under the construction . . . adopted." *Lachman*, 387 F.3d at 50. As discussed above, statutory provisions may be unconstitutionally vague under either a lack-of-notice and discriminatory-enforcement theory. Neither theory persuades in this case.

"A statute is impermissibly vague for lack of notice only if it prohibits an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application." *Frese*, 53 F.4th at 10 (internal quotation omitted). As construed above, the statutory provisions in question reach a narrow band of conduct: the act of affirmatively and deliberately conveying prohibited information with knowledge of the information being conveyed. This is an objectively discernible standard that a person of average intelligence would understand.

Furthermore, a person of average intelligence would understand what information the enumerated concepts prohibit from being conveyed. For example, with relation to RSA 193:40:

- Under the first category, a teacher may not convey to a public-school student that they should believe a person to be naturally, biologically, or intrinsically superior by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

- Under the second category, a teacher may not convey to a public-school student that they should believe a person is naturally, biologically, or intrinsically racist, sexist, or oppressive by virtue of that person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

- Under the third category, a teacher may not convey to a public-school student that they should believe there is some obligation or duty or that it is otherwise necessary or proper for an individual to be discriminated against or treated adversely because that individual possesses one of the characteristics identified in the statute.

- Under the fourth category, a teacher may not convey to a public-school student that they should believe individuals are somehow unable to treat other persons without regard for the characteristics identified in the provision or that individuals otherwise should treat others based on those certain characteristics.

These are discernible standards that persons of average intelligence would understand.

The statutes are also not unconstitutional under an arbitrary-enforcement theory. "A statute authorizes an impermissible degree of discriminatory enforcement discretion—and is therefore void for vagueness—where it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Frese*, 54 F.4th at 7 (citation and quotation marks omitted). A statute is not vague "because it requires some exercise of law enforcement judgment—indeed, enforcement inevitably requires the exercise of some degree of police judgment, and the question thus becomes whether the degree of judgment involved is acceptable." *Id.* at 9 (cleaned up). Thus, "what renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been provided; but rather the indeterminacy of precisely what that fact is." *Id.*

Under the construction set forth above, both statutory provisions provide sufficiently clear guidelines for law enforcement officials and triers of fact to survive a vagueness challenge. For example, those enforcing RSA 193:40 must determine whether an educator (1) affirmatively and deliberately conveyed information to a public-school student

that is (2) prohibited under RSA 193:40, I, with (3) knowledge of the information conveyed. These determinations present quintessential "questions of fact." *United States v. Williams*, 553 U.S. 285, 306 (2008). Indeed, triers of fact "pass every day upon the reasonable import of a [person's] statements—whether, for example, they fairly convey a false representation or a threat of physical injury." *Id.* at 306–07 (citations omitted). They likewise routinely assess "the state of men's minds . . . having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition can be inferred." *Id.* at 306. That this sometimes can be a difficult endeavor or that "close cases can be envisioned" does not create a vagueness problem. *Id.* at 305–06.

## IV.  THE DISTRICT COURT ERRED IN EXTENDING ITS VAGUENESS ANALYSIS BEYOND A TEXTUAL ANALYSIS.

In addition to applying the wrong vagueness standard and refusing to accept a reasonable and constitutional interpretation of the statutory language, the district court also erred by extending its analysis to include an examination of extrinsic evidence. Add. 145-52.  This expansion beyond a textual analysis was improper as the inquiry in a case

where a facial vagueness claim is advanced turns on the text of the statute itself, when construed using the normal tools of statutory interpretation. Statutes are facially vague not because "close cases can be envisioned," but rather because the statutory *language* is indeterminate. *United States v. Williams*, 553 U.S. 285, 305-06 (2008). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it established has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306. As the Supreme Court has made clear: "The determination whether a . . . statute provides fair warning of its prohibitions must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants." *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964).

This Court has adhered to this textual approach when analyzing vagueness claims. For example, in *United States v. Lachman*, this Court observed that a vagueness claim requires a court "to decide two questions: first, [the court] must construe the meaning of the [challenged law]," and "[s]econd, [the court] must determine whether the

[law] is void for vagueness under the construction [the court] ha[s] adopted." 387 F.3d 42, 50 (1st Cir. 2004). This Court then conducted the first step in this analysis by employing several traditional tools of statutory construction, *see id.* at 50–53, and rejected an argument that extrinsic sources of evidence such as "affidavits of former regulators and industry participants regarding the [regulated] industry's understanding of the term" were relevant to inquiry. *Id.* at 53. This Court went on to make clear that, while an agency's interpretation of a law can inform a court's analysis when "reflected in public documents," "[t]he nonpublic or informal understandings of agency officials concerning the meaning of a [law] are . . . not relevant[.]" *Id.* at 54. This Court clearly rejected an argument that these extrinsic materials were relevant evidence that the challenged regulation, when properly construed, was vague. *See id.* at 57–60.

This Court has employed a similar analysis in other cases. In *McKee*, this Court emphasized that "a statute is unconstitutionally vague only if it prohibits an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application." 649 F.3d at 62 (cleaned up). This Court then

applied tools of statutory interpretation to the statutory language to conclude that the terms "promoting," "support," "opposition," "influencing," and "initiation," as used in several Maine election laws, did not render those laws vague on their face. *See id.* at 62–70. Similarly, in *Modern Continental/Obayashi v. Occupational Safety and Health Review Commissioner*, this Court rejected a facial challenge to a provision in the Code of Federal regulations based on the "plain language" of the challenged regulation. *See* 196 F.3d 274, 281 (1st Cir. 1999). This Court noted that because the regulation's application was clear "from a plain reading of the regulation," it was inappropriate to "inquire into industry standards." *Id.* And while this Court more recently in *Frese v. Formella* declined to "address precisely what extrinsic context a court may consider in a vagueness analysis," it did so because "the core statutory text of the [challenged] statute provide[d] adequate enforcement guidelines and the prosecution scheme d[id] not alter or overcome this conclusion." 54 F.4th 1, 9 n.5 (1st Cir. 2022). These cases reflect that, under circuit precedent, a vagueness claim presents a question of law that turns on the language of the challenged provision itself, as construed using the standard tools of legal interpretation.

The D.C. Circuit shares this view. In *United States v. Bronstein*, the plaintiffs brought a facial vagueness challenge to a federal statute making it a crime to "make a harangue or oration, or utter loud, threatening, or abusive language in the Supreme Court Building or grounds." 849 F.3d 1101, 1104 (D.C. Cir. 2017). The D.C. Circuit observed that "[t]he vagueness analysis . . . is objective" and "turns on the tools of statutory interpretation," and therefore "involves only pure questions of law." *Id.* at 1104, 1106 (citations and quotation marks omitted). The D.C. Circuit noted that a statute "is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules of statutory interpretation." *Id.* at 1106. The D.C. Circuit emphasized that "the question is whether the term [at issue] provides a discernable standard when legally construed." *Id.* at 1107.

The D.C. Circuit noted in *Bronstein* that "a statutory term is not rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere." *Id.* (cleaned up). The D.C. Circuit noted that "[t]he question is whether the terms converge upon certain behavior that is useful as a descriptor of the core behavior to which the statute may constitutionally be applied." *Id.* at 1108 (cleaned

up). The D.C. Circuit accordingly applied common interpretative tools, including dictionary definitions and canons of construction, to conclude that "a person of ordinary intelligence could read [the challenged] law and understand that, as a member of the Supreme Court's oral argument audience, making disruptive public speeches is clearly proscribed behavior—even in staccato bursts, seriatim." *Id.* at 1111.

The Second Circuit, too, has eschewed relying on extrinsic evidence when assessing a vagueness challenge. In *Keepers, Inc. v. City of Milford*, the Second Circuit affirmed a district court determination that a city ordinance regulating "adult-oriented establishments" was not unconstitutionally vague. 807 F.3d 24, 27 (2d Cir. 2015). The plaintiff there argued that the district court had improperly considered an affidavit supplied by the city's police chief "because it contradicted testimony given by [the city's] former city attorneys" during a Rule 30(b)(6) deposition. *Id.* The Second Circuit held that this was at most harmless error, because "a court evaluating a challenge for vagueness must begin with the text [of the challenged law] itself." *Id.* at 37–38 (cleaned up). The Second Circuit emphasized that the district court "focused, *as it should have*, primarily on the ordinance's plain meaning." *Id.* at 37

(emphasis added). The Second Circuit observed that "[w]hen the text of an ordinance is sufficiently clear to satisfy the Due Process Clause, a municipal officer's inability to supply precise answers regarding its hypothetical application is insufficient to render that ordinance unconstitutionally vague." *Id.* at 37–38.

The throughline in these cases is the same: that determining whether a statute is unconstitutionally vague requires only an objective assessment of the statute's terms using the traditional tools of statutory interpretation. As such, when the district court in this case considered extrinsic evidence of how a statute has been applied in the past, of what individual government officials may informally believe a statute means, and of how the plaintiffs may subjectively believe the statute will be applied in the future, the court erred. These considerations have no bearing on an appropriate facial vagueness analysis.

## V. ALTERNATIVELY, IF SOME VAGUENESS EXISTS IN THE STATUTORY SCHEME, THE PROVISIONS FROM WHICH THE VAGUENESS ARRISES SHOULD BE SEVERED FROM THE REMAINING PORTIONS OF THE STATUTE.

The district court's opinion discusses RSA 193:40 nearly exclusively without meaningful consideration of RSA 354-A. While some provision of RSA 354-A—such as section RSA 354-A:31—have overlapping application to public school teachers, other sections—such as RSA 354-A:33—do not. The district court erred in declaring the entirety of both statutory schemes unconstitutional without justification relevant to all parts of the statutory schemes.

Because this case involves state statutes, the court must apply the New Hampshire Supreme Court's severability doctrine. *Cahoon*, 647 F.3d at 22. Under that doctrine, "[i]n determining whether the valid provisions of a statute are severable from the invalid ones, [a court is] to presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved." *N.H. Democratic Party v. Sec'y of State*, 174 N.H. 312, 331, 262 A.3d 366, 382 (2021). A court "must also determine, however, whether the unconstitutional provisions of the statute are so integral and essential

in the general structure of the act that they may not be rejected without the result of the entire collapse and destruction of the statute." *Id.*

The presumption in favor of severability is redundant in the current case because the legislature chose to include an express severability clause when enacting the statutory scheme which provided: "If any provision of [the antidiscrimination provisions], or the application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby." H.B. 2, 2021 Session (N.H. 2021) § 91:299 (Add. 158-63).

This Court should not disregard this legislatively enacted policy choice as the district court did. Instead, if this Court determines that the statutory provisions in RSA 193:40 and RSA 354-A:31-:32 are unconstitutional as applied to public school teachers in one of the manners claimed by the plaintiffs in this case, then it should sever the invalid provisions from the rest of the statutory scheme.

This severance could take several forms depending on the nature of the constitutional deficiency found. If this Court finds there to be a viable First Amendment concern related to the extra-curricular speech of

public-school teachers, this Court should limit its holding to finding the statutes unconstitutional when applied to extra-curricular speech of public-school teachers.  In other words, this Court should give effect to the express intentions of the legislature that if "the application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby." H.B. 2, 2021 Session (N.H. 2021) § 91:299 (Add. 158-63).

Alternatively, if this Court concludes that the severity of the penalties imposed upon teachers' professional licenses render the statute unconstitutional, the Court should simply invalidate RSA 193:40, IV, which provides for disciplinary sanction by the New Hampshire Board of Education. This provision has no application to RSA 354-A whatsoever and is not the only remedy provided for within RSA 193:40.  As such, it is certainly not "so integral and essential in the general structure of the act that [it] may not be rejected without the result of the entire collapse and destruction of the statute." *N.H. Democratic Party*, 174 N.H. at 331, 262 A.3d at 382.

## CONCLUSION

For the foregoing reasons, the district court's decisions should be overruled. Neither RSA 193:40 for RSA 354-A:31-:32 are unconstitutionally vague when the appropriate vagueness standard is applied to the appropriate statutory interpretation.

> Respectfully submitted,
>
> FRANK EDELBLUT, in their official capacity as Commissioner, New Hampshire Department of Education; JOHN M. FORMELLA, in their official capacity as New Hampshire Attorney General; AHNI MALACHI, in their official capacity as Executive Director, New Hampshire Commission for Human Rights; CHRISTIAN KIM, in their official capacity as Chairperson, New Hampshire Commission for Human Rights; KEN MERRIFIELD, in their official capacity as Commissioner, New Hampshire Department of Labor,
>
> By their attorneys,
>
> JOHN M. FORMELLA
> N.H. ATTORNEY GENERAL
>
> and
>
> ANTHONY J. GALDIERI
> N.H. SOLICITOR GENERAL

November 1, 2024

    */s/ Mary A. Triick*

Mary A. Triick, No. 1213543
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H.  03301
(603) 271-0447
mary.a.triick@doj.nh.gov

and

    */s/ Samuel R.V. Garland*

Samuel R.V. Garland, No. 1189913
Senior Assistant Attorney General
Office of the Attorney General
1 Granite Place, South
Concord, N.H.  03301

## CERTIFICATE OF COMPLIANCE

This document complies with Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 9,271 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared with a proportionally spaced typeface using Microsoft Word in 14-point Century font.

November 1, 2024

*/s/ Mary A. Triick*
Mary A. Triick, No. 1213543

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that the following par-ties or their counsel of record are registered as ECF filers and will be served via the CM/ECF System:

Peter J. Perroni, Esq.
Harry Sandick, Esq.
Gilles R. Bissonnette, Esq.
SangYeob Kim, Esq.
Jennifer Eber, Esq.
Morgan C. Nighan, Esq.
S. Amy Spencer, Esq.
Emerson Sykes, Esq.
Sarah Hinger, Esq.
Lauren Snow Chadwick, Esq.
Sarah J. Jancarik, Esq.
Tavis Hill, Esq.
Nathan R. Fennessy, Esq.
Alice O'Brien, Esq.
David Kahne, Esq.
David Strom, Esq.
Mark Richard, Esq.

Charles G. Moerdler, Esq.
Joshua M. Goldman, Esq.
Henry R. Klementowicz, Esq.
Chris Erchull, Esq.
Kayla Turner, Esq.
David A. Vicinanzo, Esq.
William E. Christie, Esq.
Leah Watson, Esq.
Jason Walta, Esq.
Pamela E. Phelan, Esq.
William E. Christie, Esq.
Esther Kane Dickinson, Esq.
Rue Toland, Esq.
Callan Sullivan, Esq.
Elizabeth Milburn, Esq.
Faith, Gay Esq.
David McNeil, Esq.

November 1, 2024

*/s/ Mary A. Triick*
Mary A. Triick, No. 1213543

# ADDENDUM TABLE OF CONTENTS

Memorandum and Order 1............................................................63

Memorandum and Order 2........................................................ 106

Judgement ...........................................................................156

Exhibit 1: House Bill 2 ...........................................................157

RSA 193:40 Prohibition on Teaching Discrimination ................164

RSA 354-A:29-:34 Right to Freedom from Discrimination in
PublicWorkplaces and Education ...............................................165

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Local 8027, AFT-N.H.,**
**AFL-CIO, et al.**

      v.

**Frank Edelblut, Commissioner,**
**N.H. Department of Education, et al.**

Case No. 21-cv-1077-PB
Opinion No. 2023 DNH 005

## MEMORANDUM AND ORDER

The plaintiffs in these consolidated actions are public school teachers, administrators, and teachers' associations. They challenge the constitutionality of several recent amendments to New Hampshire's education and antidiscrimination laws that restrict what public school teachers can say to their students about how to understand, prevent, and redress discrimination in our society. Several of the plaintiffs contend that the new laws violate their First Amendment right to free speech. They all argue that the laws are unconstitutionally vague. The defendants have responded with a motion to dismiss for failure to state a claim.

## I.    BACKGROUND

The laws at issue in this case have their genesis in New Hampshire House Bill 544 ("HB544"), which was captioned "An Act relative to the propagation of divisive concepts." The core components of HB544 were later

added by amendment to House Bill 2 ("HB2"), a budget bill that was passed by the House and sent to the Senate on April 7, 2021. The Senate made substantial changes to HB2's divisive concepts provisions, which appear in Section 297 and 298 of the bill, and rebranded them as antidiscrimination laws. Differences between the House and Senate versions of the bill were resolved in conference, and HB2 became law on June 25, 2021.

HB2 made several changes to the state's education and antidiscrimination laws.[1] The amendment to the education laws, codified at N.H. Rev. Stat. Ann. ("RSA") § 193:40, identifies four concepts that a public primary or secondary school student may not be "taught, instructed, inculcated or compelled to express belief in, or support for":

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

---

[1]     The parties cannot agree on a name for the new laws. Plaintiffs call them "divisive concept" or "banned concept" laws. Defendants refer to them as "antidiscrimination provisions." Rather than pick a side on this inconsequential point, I refer to the new laws as the "education and antidiscrimination amendments" or the "amendments."

(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA § 193:40, I.

HB2 also added several new sections to chapter 354-A, known as the "Law Against Discrimination," that employ substantially similar versions of the banned concepts. RSA § 345-A:31 makes it unlawful for a public employer to "teach, advocate, instruct, or train" the banned concepts to "any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group." RSA § 354-A:32 similarly states that "[n]o government program shall teach, advocate, or advance" any of the banned concepts. And RSA § 354-A:33 protects public employees from being disciplined for refusing to participate in any activity "at which a public employer or government

program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," any of the banned concepts.[2]

RSA § 193:40, III permits the Attorney General, or any other person "claiming to be aggrieved by a violation" of the new law, to obtain damages and injunctive relief from an offending school or school district, either by filing a lawsuit in superior court or by filing a complaint with New Hampshire's commission for human rights. RSA § 345-A:34 similarly permits a person "aggrieved" by a violation of the antidiscrimination amendments to pursue "all of the remedies available under" chapter 354-A, which include compensatory damages and injunctive relief.

RSA § 193:40, IV provides that a "[v]iolation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." An "educator" is defined as "a professional employee of any school district whose position requires certification by the state board [of education]." RSA § 193:40, V. Potential disciplinary sanctions include reprimand, suspension, or revocation of an educator's certification. See N.H. Code Admin. R. Ed 511.01. In other words, an educator who is found to have taught or advocated a banned

---

[2]      The education and antidiscrimination amendments use several different terms to describe the speech that they prohibit. For ease of reference, I refer to the prohibited types of expression collectively as "teaching or advocacy."

concept may lose not only his or her job, but also the ability to teach anywhere in the state. See id.; see also id. Ed. 501.02(ad).

The new laws create safe harbors for certain conduct that may otherwise constitute teaching or advocacy of a banned concept. RSA § 193:40, II allows "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified" by a banned concept. RSA § 354-A:29, II permits public employers to conduct "racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons." And RSA § 354-A:29, III disavows any limitation on "the academic freedom of faculty members" at public colleges and universities.

Passage of the education and antidiscrimination amendments led to immediate controversy over their scope. The following month, three state agencies — the department of education, the commission for human rights, and the department of justice ("enforcing agencies") — produced collective guidance regarding the scope and effects of the new provisions. Framed as "Frequently Asked Questions" ("FAQs"), one guidance document dealt with K-12 educational programs and the other concerned public employers and government programs. Both FAQs defined the term "inherent" in the first two banned concepts as referring to characteristics that are "natural, biological, or innate, as opposed to characteristics that are merely apparent,

accidental, or based on external factors." Doc. Nos. 36-8 at 1; 36-9 at 1. The
FAQs also explained that the amendments do not prohibit training or
education geared toward diversity, equity, equality, and inclusion, such as
implicit bias training.

In September 2021, the New Hampshire Attorney General ("AG")
issued an official opinion concerning the scope and application of the new
laws, after some stakeholders raised concerns that they were "confusing and
that public employers and schools will struggle to understand the scope of the
new prohibitions." Doc. No. 36-10 at 1. Describing the new statutory
provisions as "legislation of limited reach," id. at 5, the AG opined that the
first two banned concepts proscribe advocacy that one identified group has
"natural, biological, or innate characteristics, as opposed to apparent or
accidental characteristics that: (1) make them superior or inferior to other
identified groups or (2) make one identified group racist, sexist, or
oppressive." Id. at 3. According to the opinion, the last two banned concepts
prohibit advocacy "that any identified group can or should be treated
unequally to any other identified group and that one identified group should
be discriminated against or treated adversely." Id.

In December 2021, two groups of plaintiffs challenged the new laws in
separate complaints filed against the education commissioner and other state
officials. The first group consists of five educators, two of whom are also

parents of children enrolled in New Hampshire's public schools, and Local 8027 of the American Federation of Teachers-New Hampshire, a labor union that represents approximately 3,400 public school teachers, school support staff, city and town employees, police officers, library employees, and higher education faculty in the state (collectively, "AFT plaintiffs"). The second group includes two diversity, equity, and inclusion school administrators and the National Education Association-New Hampshire, a professional association representing more than 17,000 educators in the state (collectively, "NEA plaintiffs"). The two actions were later consolidated.

The AFT plaintiffs allege that the amendments violate their First Amendment right to free speech. Both complaints assert that the new laws are impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause.

## II.    <u>STANDARD OF REVIEW</u>

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

In testing a complaint's sufficiency, I employ a two-step approach. See

Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). First, I

screen the complaint for statements that "merely offer legal conclusions

couched as fact or threadbare recitals of the elements of a cause of action." Id.

(cleaned up). A claim consisting of little more than "allegations that merely

parrot the elements of the cause of action" may be dismissed. Id. Second, I

credit as true all of the plaintiff's non-conclusory factual allegations and the

reasonable inferences drawn from those allegations, and then determine if

the claim is plausible. Id. The plausibility requirement "simply calls for

enough fact to raise a reasonable expectation that discovery will reveal

evidence" of illegal conduct. Twombly, 550 U.S. at 556. The "make-or-break

standard" is that those allegations and inferences, "taken as true, must state

a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v.

Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

## III.   ANALYSIS

Defendants contend that the consolidated complaints must be

dismissed because the education and antidiscrimination amendments do not

on their face violate either the First Amendment's Free Speech Clause or the

Fourteenth Amendment's Due Process Clause. Plaintiffs, unsurprisingly,

disagree.

**A.      First Amendment Claim**

The AFT plaintiffs base their First Amendment claim on both their claimed right to speak as teachers and their children's corresponding right to receive information as public school students. I turn first to the claims they bring as teachers.

1.   Teachers' First Amendment Claim

Defendants' challenge to plaintiffs' claim as teachers can be simply stated: (1) plaintiffs are government employees; (2) the education and antidiscrimination amendments only restrict curricular speech; (3) curricular speech is government speech; and (4) the First Amendment does not protect speech by government employees when, as is the case here, they speak for the government rather than as citizens. Defendants base this argument on the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006), where the Court considered "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Id. at 413. In answering that question, the Court built upon its prior decisions in Pickering v. Board of Education of Township High School District 205, 391 U.S. 563 (1968) and Connick v. Myers, 461 U.S. 138 (1983). As the Court explained the analytical framework:

> "Pickering and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires

determining whether the employee spoke as a citizen on a matter
of public concern. If the answer is no, the employee has no First
Amendment cause of action based on his or her employer's
reaction to the speech. If the answer is yes, then the possibility of
a First Amendment claim arises."

Garcetti, 547 U.S. at 418 (cleaned up).[3]

When an employee's speech may be protected because the employee is

speaking as a citizen on a matter of public concern, Garcetti, Connick and

Pickering instruct that a court must "attempt to balance the value of the

employee's speech — both the employee's own interests and the public's

interest in the information the employee seeks to impart — against the

employer's legitimate government interest in preventing unnecessary

disruptions and inefficiencies in carrying out its public service mission."

Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 137 (1st Cir. 2022)

(cleaned up).

Garcetti involved speech by a deputy district attorney that the Court

concluded was unprotected because he was speaking as a government

---

[3]     The Supreme Court later qualified its holding in Garcetti by stating
that "[t]he critical question under Garcetti is whether the speech at issue is
itself ordinarily within the scope of an employee's duties, not whether it
merely concerns those duties." Lane v. Franks, 573 U.S. 228, 240 (2014). In a
recent case, the First Circuit interpreted both Garcetti and Lane to require
courts to determine "whether an employee spoke 'pursuant to their official
duties'" by focusing on "whether the speech was 'part of what' the employee
was 'employed to do' rather than merely whether the employee engaged in
the speech 'at work.'" Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129,
136 (1st Cir. 2022) (quoting Garcetti, 547 U.S. at 420, 421).

employee rather than as a citizen. 547 U.S. at 422-24. Although that case did not concern curricular speech by public primary and secondary school teachers, defendants contend that Garcetti supplies the standard that I must apply when ruling on plaintiffs' First Amendment claim.

Plaintiffs argue Garcetti does not apply here because teachers have a First Amendment right to academic freedom that differentiates them from other public employees, at least when they are engaged in teaching. To support their position, they point out that the Supreme Court has not expressly extended Garcetti to curricular speech and argue that the controlling precedent on that issue is the First Circuit's earlier decision in Ward v. Hickey, 996 F.2d 448 (1st Cir. 1993). I disagree.

In Ward, a high school teacher was denied tenure after she discussed the abortion of fetuses with Down syndrome in her ninth-grade biology class. Id. at 450. The First Circuit analyzed the teacher's free speech claim by drawing on Supreme Court precedent addressing student speech. See id. at 452 (citing Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969); Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271 (1988)). Adopting the Tinker-Hazelwood test, the court held that a school may restrict a teacher's curricular speech if "(1) the regulation is reasonably related to a legitimate pedagogical concern, and (2) the school provided the teacher with notice of what conduct was prohibited." Id. (cleaned up).

Ward predates Garcetti by more than a decade, and it does not discuss Pickering or Connick. Significantly, the First Circuit has not relied on Ward in any subsequent case for the proposition that plaintiffs advance here, not even in a case involving "curricular discretion" where the district court had relied on Ward. See Griswold v. Driscoll, 625 F. Supp. 2d 49, 60 (D. Mass. 2009), aff'd, 616 F.3d 53, 60 (1st Cir. 2010). Instead, the First Circuit affirmed the district court in Griswold on alternative grounds, holding that the challenged curriculum guide "did not implicate the First Amendment." 616 F.3d at 60. In another decision decided after Ward but prior to Garcetti, the First Circuit similarly rejected a curricular speech claim by a student teacher by using Pickering and Connick rather than Ward. See Hennessy v. City of Melrose, 194 F.3d 237, 248-49 (1st Cir. 1999). Accordingly, I am not persuaded by plaintiffs' contention that Ward rather than Pickering, Connick and Garcetti supply the standard of review in this case.

Plaintiffs alternatively argue that Garcetti does not apply to curricular speech claims even if such claims are governed by Pickering and Connick because the Garcetti majority expressly declined to consider in that case "whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." Garcetti, 547 U.S. at 425. A careful reading of Garcetti, however, leaves no doubt that the Court's concerns there were directed primarily at academic freedom claims by

college and university faculty rather than public primary and secondary school teachers. We know this to be true because the majority's comment responds expressly to Justice Souter's concern in dissent that the majority opinion might "imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write pursuant to official duties." Id. at 438 (Souter J., dissenting).

In Garcetti's wake, several circuit courts have recognized that public college and university professors retain substantial academic freedom under the First Amendment while engaged in teaching and scholarship. See, e.g., Meriwether v. Hartop, 992 F.3d 492, 505 (6th Cir. 2021); Buchanan v. Alexander, 919 F.3d 847, 852-53 (5th Cir. 2019); Demers v. Austin, 746 F.3d 402, 411 (9th Cir. 2014); Adams v. Trs. of Univ. of N.C.-Wilmington, 640 F.3d 550, 564-65 (4th Cir. 2011).[4] But the circuits that have considered whether public primary and secondary school teachers enjoy similar freedom to determine what they will teach have concluded that their curricular speech is

---

[4]     The Ninth Circuit held in Demers that Garcetti does not apply to the curricular speech of public university professors, but the opinion includes dicta that could be read to also extend similar protection to public high school teachers. See 746 F.3d at 412-13. Demers does not discuss the Ninth Circuit's earlier decision in Johnson v. Poway Unified School District, which holds that the curricular speech of public primary and secondary teachers is not protected by the First Amendment. See 658 F.3d 954, 966-70 (9th Cir. 2011). Thus, I read these opinions together to exempt only curricular speech by public college and university professors from Garcetti's holding.

not protected by the First Amendment. See Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 966-70 (9th Cir. 2011); Evans-Marshall v. Bd. of Ed. of Tipp City Extended Village Sch. Dist., 624 F.3d 332, 342 (6th Cir. 2010); Mayer v. Monroe Cnty. Comm. Sch. Corp., 474 F.3d 477, 479-80 (7th Cir. 2007); cf. Lee v. York Cnty. Sch. Div., 484 F.3d 687, 694 n.11, 700 (4th Cir. 2007) (declining to apply Garcetti but concluding under Pickering and Connick that a teacher's speech was not protected by the First Amendment).

The reasons for treating curricular speech by college and university faculty differently from similar speech by primary and secondary school teachers are compelling. The Supreme Court has long recognized that "universities occupy a special niche in our constitutional tradition." Grutter v. Bollinger, 539 U.S. 306, 329 (2003); see also Sweezy v. New Hampshire, 354 U.S. 234, 249-55 (1957) (plurality opinion); Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603 (1967) (recognizing that a university "classroom is peculiarly the 'marketplace of ideas'"). In such environments, "academic freedom . . . is of transcendent value to all of us and not merely to the teachers concerned." Keyishian, 385 U.S. at 603. In short, academic freedom concerns are paramount on college and university campuses.

Public primary and secondary school teachers, by contrast, are hired to teach the curriculum developed by the politically accountable branches of state and local government. Individual primary and secondary school

teachers simply aren't given the latitude to teach whatever they believe

students need to hear. As the Seventh Circuit observed in Mayer:

> A teacher hired to lead a social-studies class can't use it as a
> platform for a revisionist perspective that Benedict Arnold wasn't
> really a traitor, when the approved program calls him one; a
> high-school teacher hired to explicate Moby-Dick in a literature
> class can't use Cry, The Beloved Country instead, even if Paton's
> book better suits the instructor's style and point of view; a math
> teacher can't decide that calculus is more important than
> trigonometry and decide to let Hipparchus and Ptolemy slide in
> favor of Newton and Leibniz.

474 F.3d at 479.

College and university faculty also teach their classes in a very

different environment from the world of primary and secondary education.

No one is required to attend a public college or university, but primary and

secondary school education is compulsory, and most families lack either the

financial means or the spare time to satisfy the requirement through private

schools or home schooling. Id. While local school boards may have good

reasons to grant teachers substantial autonomy in choosing how best to

implement curricular standards, parents, students, and teachers will

inevitably disagree about what should be taught in public school classrooms.

When disagreements arise, they generally are better resolved by politically

accountable officials than by federal judges. See Evans-Marshall, 624 F.3d at

341. Accordingly, I agree with defendants that Garcetti applies and that the

First Amendment does not protect the curricular speech of primary and secondary school teachers.

For defendants, that ends the matter. Because they contend that the education and antidiscrimination amendments only apply to curricular speech, they argue that I need not consider plaintiffs' ancillary claim that the amendments also impermissibly restrict their extracurricular speech. I disagree. RSA § 193:40, I provides that "[n]o pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for," a banned concept. As plaintiffs argue, this provision can plausibly be read to cover interactions with pupils outside the classroom and even beyond the school grounds. After all, a pupil in a public school may interact with a teacher in a school hallway, schoolyard, lunchroom, or library, not to mention during extracurricular activities that take place on or off school grounds. Even the enforcing agencies' guidance in the FAQs recognize the arguably broad scope of the amendments by construing them to apply to extracurricular activities. See Doc. No. 36-8 at 2 ("The prohibitions apply to all activities carried out by public schools in their role as public schools, including extra-curricular activities that are part of the public school's work."). To underscore the point, the only acknowledged exception in the FAQs for activities that take place on a public school's property is for third-party events or activities, such as voluntary after-school programs

administered by outside organizations. <u>See</u> <u>id.</u> Thus, I agree with plaintiffs

that the amendments arguably prohibit any advocacy of a banned concept

that a teacher directs at a student, even outside the confines of a classroom.

Because the education and antidiscrimination amendments are

susceptible to an interpretation that encompasses extracurricular speech,

they plausibly restrict teachers' speech as private citizens. <u>See, e.g.</u>, <u>Kennedy</u>

<u>v. Bremerton Sch. Dist.,</u> 142 S. Ct. 2407, 2424-25 (2022) (holding that a high

school coach who engaged in prayer while on school property and in the

immediate vicinity of students did not engage in government speech). As to

such speech, <u>Garcetti</u> indicates that the court should apply the <u>Pickering-</u>

<u>Connick</u> balancing test. Defendants have not analyzed plaintiffs'

extracurricular speech claim under that test. Accordingly, I decline to dismiss

the AFT plaintiffs' First Amendment claim to the extent it is based on the

theory that the education and antidiscrimination amendments restrict their

extracurricular speech.

2.   <u>Students' First Amendment Claim</u>

Two of the AFT plaintiffs have children who attend public schools in

New Hampshire. Although they did not expressly allege a distinct First

Amendment claim on behalf of their children, they left no doubt in their

objection to defendants' motion to dismiss that they believe that the

education and antidiscrimination amendments also violate their children's

right to free speech. Defendants object to what they see as an improper attempt by plaintiffs to add a claim that is not asserted in their complaint.

I do not doubt that a parent can assert a First Amendment claim on behalf of a child either as a "general guardian" pursuant to Fed. R. Civ. P. 17(c)(1), or as a "next friend," as is typically done in New Hampshire when a parent represents a child in a state court proceeding, see, e.g., Roberts v. Mills, 85 N.H. 517, 519 (1932). Plaintiffs, however, did not sue in either capacity. Nor did they include a distinct First Amendment claim on behalf of their children in their complaint. Accordingly, if plaintiffs want to sue on behalf of their children, they must file an amended complaint asserting the children's interests in a distinct claim for relief.[5]

---

[5]    In allowing plaintiffs to amend their complaint, I do not mean to suggest that the First Amendment gives plaintiffs' children any greater control over a school's curriculum than it gives to teachers. Although the First Amendment protects a recipient's right to receive information from a willing speaker, Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 757 (1976), a recipient's right to receive information is derivative of the speaker's right to speak. See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 867 (1982) ("the right to receive ideas follows ineluctably from the sender's First Amendment right to send them"); Doe ex rel. Doe v. Governor of N.J., 783 F.3d 150, 155 (3rd Cir. 2015); Ind. Right to Life, Inc. v. Shepard, 507 F.3d 545, 549 (7th Cir. 2007); Pa. Family Inst., Inc. v. Black, 489 F.3d 156, 165 (3rd Cir. 2007); In re Application of Dow Jones & Co., 842 F.2d 603, 608 (2d Cir. 1988). Should plaintiffs seek to amend their complaint to add a First Amendment claim on behalf of their children, defendants remain free to argue that a child's First Amendment right to receive information about a banned concept is no broader than a teacher's right to speak about the concept.

**B.    Vagueness Challenge**

Plaintiffs also argue that the education and antidiscrimination amendments are unconstitutionally vague, both facially and as applied to educators. Construing the claim as a facial vagueness challenge only, defendants argue that it cannot succeed for several reasons. First, defendants contend that the amendments are not vague in all of their applications, the standard that they believe should apply in this case. But even if a less stringent vagueness test applies, defendants argue that the amendments pass muster because they provide a discernible standard of conduct and protect against arbitrary or discriminatory enforcement.

1.    Classifying Plaintiffs' Vagueness Challenge

The complaints purport to assert both facial and as-applied vagueness challenges. Plaintiffs confirmed at oral argument that they are presenting both claims and that, in its current form, their challenge is as applied in the sense that they seek to invalidate the statutory prohibitions as applied to educators. Defendants, in a conclusory manner, construe the vagueness claim to be facial only, without addressing plaintiffs' nuanced as-applied challenge.

Generally, a facial challenge raises constitutional defects as to the terms of the statute itself, independent of its application to a plaintiff's particular set of circumstances. See United States v. Playboy, 529 U.S. 803, 834 n.3 (2000) (Scalia, J., dissenting). By contrast, an as-applied challenge is

focused on whether the statute's application to a plaintiff's actual or proposed conduct is unconstitutional. See id. Plaintiffs who bring a prospective as-applied vagueness challenge typically must identify specific activities that they plan to engage in but that are arguably barred. See Holder v. Humanitarian Law Project, 561 U.S. 1, 18-25 (2010); Copeland v. Vance, 893 F.3d 101, 112 (2d Cir. 2018). "The challenger cannot instead rely on hypothetical situations in which the statute could not validly be applied." Copeland, 893 F.3d at 113; see also Humanitarian Law Project, 561 U.S. at 22 (refusing to analyze "hypothetical situations designed to test the limits" of statutory prohibitions).

The complaints here are silent as to any particular advocacy that plaintiffs would pursue but for fear of running afoul of the statutory prohibitions. Rather, plaintiffs seek to redefine the nature of an as-applied challenge to encompass a facial challenge to a statute as applied to a subset of individuals whom it affects. Although there is reason to doubt plaintiffs' position that they have adequately pleaded an as-applied challenge, defendants' motion to dismiss does not present a developed argument regarding the viability of such a claim. Because the issue has not been adequately briefed, I deny defendants' motion to dismiss plaintiffs' as-applied vagueness claim without prejudice to their ability to argue at a later stage that the claim is without merit.

2.  Applicable Standard for Plaintiffs' Facial Vagueness Claim

The parties dispute the appropriate standard for evaluating plaintiffs' facial vagueness challenge. Defendants argue that plaintiffs must prove that the amendments are vague in all of their applications, citing Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489 (1982). Plaintiffs disagree, pointing to the Supreme Court's more recent rejection of that standard in Johnson v. United States, 576 U.S. 591 (2015), Sessions v. Dimaya, 138 S. Ct. 1204 (2018), and United States v. Davis, 139 S. Ct. 2319 (2019).

The Supreme Court has not taken a consistent position over time on the standard a court should use when evaluating facial vagueness challenges outside of the First Amendment context. See generally Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321 (2000). In Flipside, the Court set a high bar for such challenges: a plaintiff had to show that the statute was "impermissibly vague in all of its applications." 455 U.S. at 495. As Justice Thomas noted in his dissent in Johnson, this standard "is simply an application of the broader rule" espoused in United States v. Salerno, 481 U.S. 739 (1987), that "a statute is facially unconstitutional only if 'no set of circumstances exists under which the Act would be valid.'" Johnson, 576 U.S. at 636 n.2 (Thomas, J., dissenting) (quoting Salerno, 481 U.S. at 745). Because plaintiffs must show

under this standard that a statute has no valid applications, a single clear

application of the law would defeat a facial vagueness challenge under this

test. As the Second Circuit has noted, "[t]his standard effectively eliminates

facial challenges outside of the First Amendment context that could not also

be brought as an as-applied challenge, since any law that is unconstitutional

in every set of circumstances is also necessarily unconstitutional when

applied to any plaintiff." Dickerson v. Napolitano, 604 F.3d 732, 743-44 (2d

Cir. 2010).

　　　　About a decade after Flipside was decided, a plurality of the Supreme

Court in City of Chicago v. Morales challenged the notion that the Salerno

standard applies in facial vagueness cases. See 527 U.S. 41, 55 n.22 (1999)

(Stevens, J., with Souter, J. and Ginsburg, J., concurring) ("To the extent we

have consistently articulated a clear standard for facial challenges, it is not

the Salerno formulation, which has never been the decisive factor in any

decision of this Court, including Salerno itself . . . ."). Although several courts

of appeals subsequently questioned the continued vitality of the "no set of

circumstances" standard, lower courts continued to apply it after Morales.

See, e.g., Alphonsus v. Holder, 705 F.3d 1031, 1042 n.11 (9th Cir. 2013);

United States v. Comstock, 627 F.3d 513, 518 (4th Cir. 2010).

　　　　More recently, however, the Supreme Court has decisively rejected the

notion that clarity in some applications can save a statute from a facial

vagueness attack. In a trio of facial challenges not involving the First Amendment, the Court refused to adopt the view that "a statute is void for vagueness only if it is vague in all its applications." Johnson, 576 U.S. at 602; accord Dimaya, 138 S. Ct. at 1214 n.3; see also Davis, 139 S. Ct. at 2336. The residual clauses in the statutes at issue in those cases required judges to determine whether an offense qualified as a violent felony or a crime of violence by using a categorical approach, divorced from a defendant's actual conduct. The Court struck down all three statutes on vagueness grounds.

In Johnson, the Court considered a facial challenge to the residual clause of the Armed Career Criminal Act (ACCA), which imposed enhanced penalties for offenders with prior convictions for a "violent felony," defined to include any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 576 U.S. at 593-94 (cleaned up). The Court concluded that the clause was unconstitutionally vague even though there were some "straightforward cases" that clearly fell within its scope. See Id. at 602-03. In doing so, the Court acknowledged that some of its opinions have used the "vague in all applications" language that would have mandated a different result. See id. But, the Court concluded, "our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." Id. at 602. The Court cited two prior holdings to illustrate the point:

> For instance, we have deemed a law prohibiting grocers from
> charging an "unjust or unreasonable rate" void for vagueness —
> even through charging someone a thousand dollars for a pound of
> sugar would surely be unjust and unreasonable. We have
> similarly deemed void for vagueness a law prohibiting people on
> sidewalks from "conduct[ing] themselves in a manner annoying
> to persons passing by" — even though spitting in someone's face
> would surely be annoying.

Id. at 602-03 (quoting United States v. L. Cohen Grocery Co., 255 U.S. 81, 89

(1921); Coates v. Cincinnati, 402 U.S. 611, 611 (1971)). "These decisions," the

Court reasoned, "refute any suggestion that the existence of some obviously

risky crimes establishes the residual clause's constitutionality." Id. at 603.

Further, the Court observed that the "supposed requirement of vagueness in

all applications is not a requirement at all, but a tautology: If we hold a

statute to be vague, it is vague in all its applications (and never mind the

reality)." Id. Because the ACCA's residual clause "produce[d] more

unpredictability and arbitrariness than the Due Process Clause tolerates," id.

at 598, the Court invalidated it in its entirety, even as to "straightforward

cases." Id. at 602-03. In his dissent, Justice Thomas defended Flipside's

"vague in all applications" standard as an extension of Salerno's "no set of

circumstances" test and suggested that the majority was carving out an

exception to that rule in facial vagueness cases. See id. at 636 & n.2 (Thomas,

J., dissenting).

In Dimaya, the Supreme Court relied on Johnson to strike down as facially vague a similarly worded residual clause in an immigration statute that authorized the removal of aliens convicted of "a crime of violence." See 138 S. Ct. at 1213-16. Dissenting again, Justice Thomas reiterated his view that "a facial challenge requires a statute to be vague 'in all applications,'" but he acknowledged that Johnson "weakened" that principle. Id. at 1250 (Thomas, J., dissenting). In response, the majority confirmed that "Johnson made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" Id. at 1214 n.3 (majority opinion) (quoting Johnson, 576 U.S. at 602).

In the last installment of the trilogy, the Supreme Court invalidated on facial vagueness grounds the residual clause of a criminal statute that authorized enhanced penalties for certain firearms offenses. See Davis, 139 S. Ct. at 2336. Without expressly reiterating its rejection of the "vague in all applications" standard, the Court in Davis endorsed its approach in Johnson and Dimaya and held that the statute's categorical approach was void for vagueness. See id. at 2325-36.

At least three circuit courts have analyzed the impact of Johnson and its progeny on facial vagueness challenges. The Seventh and Ninth Circuits have interpreted those cases as "put[ting] to rest the notion — found in any

number of pre-Johnson cases — that a litigant must show that the statute in question is vague in all of its applications in order to successfully mount a facial challenge." United States v. Cook, 914 F.3d 545, 553 (7th Cir.), vacated on other grounds, 140 S. Ct. 41 (2019); see Guerrero v. Whitaker, 908 F.3d 541, 544 (9th Cir. 2018) ("[W]e [previously] observed that the 'no set of circumstances' standard was subject to some doubt but that we would continue to apply that standard until a majority of the Supreme Court directs otherwise. That day has come. Johnson and Dimaya expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope.") (cleaned up).

By contrast, the Second Circuit has limited the Johnson line of cases to their "exceptional" facts. See United States v. Requena, 980 F.3d 30, 41-42 (2d Cir. 2020), cert. denied sub nom., Raymond v. United States, 141 S. Ct. 2761 (2021). In Requena, that court held that "vague in all applications" continues to be the default rule in facial vagueness cases with three limited exceptions: the First Amendment context, criminal laws lacking a scienter requirement, and Johnson-type cases where the statute calls for a categorical approach. See id. at 39-40. In doing so, the Second Circuit held "that Johnson's license to strike down a 'criminal statute . . . as facially vague even where it has some valid applications' extends only to the 'exceptional

circumstances' present in that case and its progeny." Id. at 42 (quoting

Copeland, 893 F.3d at 111 n.2). Thus, the Second Circuit has narrowly read

Johnson's rejection of the "vague in all applications" standard as limited to

the residual clause of the ACCA and its functional equivalents.

I agree with the Seventh and Ninth Circuits that the Johnson trio

heralded a more meaningful shift in the void for vagueness doctrine than the

Second Circuit recognized. In those cases, the Supreme Court rejected the

language in Flipside and Salerno that the mere existence of some clear

application can save a statute from unconstitutional vagueness. The Court

did not tie the demise of that standard to the facts of those cases. Instead, it

unequivocally rejected the notion that its holdings support the view that

clarity in some instances is enough to survive a vagueness challenge.

Moreover, the cases cited in Johnson to support its abandonment of the

"vague in all applications" standard did not concern categorical applications

of law such that the Court's discussion in Johnson could be construed as

limited to that context. See Coates, 402 U.S. at 611; L. Cohen Grocery Co.,

255 U.S. at 89. Therefore, the Supreme Court's rejection of the "vague in all

applications" standard was in no way tethered to the facts in Johnson. And if

any doubt remained after Johnson, it was dispelled in Dimaya, when the

Court plainly stated that Johnson had rejected the "vague in all applications"

standard as inconsistent with its holdings. See Dimaya, 138 S. Ct. at 1214

n.3. Because the Supreme Court's rationale in the Johnson line of cases was carefully considered and not expressly limited to the facts of those cases, it is binding on lower courts. Cf. United Nurses & Allied Pros. v. Nat'l Lab. Rels. Bd., 975 F.3d 34, 40 (1st Cir. 2020) (explaining that lower courts are "bound by the Supreme Court's considered dicta") (cleaned up).

In support of their view that the "vague in all applications" standard remains viable post-Johnson, defendants cite to the First Circuit's recent decision in Frese v. Formella, 53 F.4th 1 (1st Cir. 2022). That case challenged New Hampshire's criminal defamation statute on First Amendment and vagueness grounds. Id. at 5. In setting forth background principles applicable to the vagueness claim, the court in Frese cited Salerno for the proposition that a successful facial vagueness challenge requires a showing "that no set of circumstances exists under which the [statute] would be valid." Id. at 7 (citing Dutil v. Murphy, 550 F.3d 154, 160 (1st Cir. 2008) (quoting Salerno, 481 U.S. at 745)). Because the case arose in the First Amendment context, however, the court in Frese did not apply that standard. Rather, it determined that the statute in question passed muster because it provided adequate notice and meaningful enforcement guidelines. See id. at 7-11. In other words, the fact that some conduct clearly fell within the provision's scope was not the reason the statute survived constitutional scrutiny. Considering that the court's brief mention of the Salerno standard played no

part in the disposition of the case, which gave the court no occasion to
consider the impact of the Johnson line of cases on that standard, it does not
bind lower courts. See Rossiter v. Potter, 357 F.3d 26, 31 (1st Cir. 2004).

Although not raised by the parties, I am also mindful that, post-
Johnson, the Supreme Court has continued to cite to Salerno's "no set of
circumstances" test when addressing other types of facial constitutional
challenges. See Ams. for Prosp. Found. v. Bonta, 141 S. Ct. 2373, 2387 (2021);
City of L.A. v. Patel, 576 U.S. 409, 417 (2015). But, like Salerno, those cases
did not involve facial vagueness claims. Salerno addressed a facial attack on
the federal Bail Reform Act based on substantive due process and Eighth
Amendment grounds. See 481 U.S. at 746-55. In Bonta, the facial challenge
to a state regulation was based on the First Amendment, and the Court noted
that Salerno did not apply in that context. See 141 S. Ct. at 2387. Lastly,
Patel involved a facial challenge to a state ordinance on Fourth Amendment
grounds. See 576 U.S. at 419-28.

The continued viability of Salerno in these other contexts can fairly be
reconciled with my interpretation of Johnson. As Justice Thomas suggested
in his dissent in Johnson, the Supreme Court has effectively recognized that
"void-for-vagueness claims are different from all other facial challenges not
based on the First Amendment." 576 U.S. at 636 n.2 (Thomas, J., dissenting).
Writing for the majority in Davis, Justice Gorsuch explained why vagueness

challenges merit special treatment. The core concern of the vagueness doctrine is lack of fair notice, that is, subjecting people to laws without giving them adequate warning about what those laws require. See Davis, 139 S. Ct. at 2323. In addition, vague laws constitute an impermissible delegation of legislative power because "[t]hey hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges." See id. Because of these constitutional infirmities, "a vague law is no law at all." Id. This reasoning is consistent with Johnson and leads me to conclude that plaintiffs should have a wider path to raise facial vagueness challenges than the stringent "vague in all applications" standard otherwise allows.

But even if I am wrong that Johnson requires more than such a minimal showing to defeat a vagueness claim, the "vague in all applications" standard would not apply here for several reasons. First, plaintiffs have alleged that the amendments abridge their First Amendment freedoms, which is a recognized exception to that standard. See, e.g., United States v. Williams, 553 U.S. 285, 304 (2008); Frese, 53 F.4th at 6-7; see also Grayned v. City of Rockford, 408 U.S. 104, 109 (1972) (recognizing that "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms") (cleaned up).

Second, unlike the statute in Flipside, the education and antidiscrimination amendments neither "simply regulate business behavior"

nor "contain[] a scienter requirement." See 455 U.S. at 499. Rather, as defendants conceded at oral argument, the amendments lack a scienter requirement and their violation can lead to serious consequences, including the loss of livelihood. These features make the amendments more analogous to the anti-loitering statute in Morales, where a plurality of the Supreme Court sustained a facial vagueness challenge because the statute had no scienter requirement, burdened a constitutional right, and vagueness "permeate[d] the text" of the law. See 527 U.S. at 55.

To summarize, the void-for-vagueness doctrine does not require a showing that a statute is vague in all of its applications, especially where, as here, the law subjects a violator to serious consequences, lacks a scienter requirement, and implicates First Amendment rights. Therefore, that some conduct clearly falls within the amendments' scope is insufficient to defeat plaintiffs' vagueness claim.

3. Application of the Vagueness Standard to Plaintiffs' Claim

"The vagueness doctrine, a derivative of due process, protects against the ills of laws whose prohibitions are not clearly defined." Frese, 53 F.4th at 6 (cleaned up). The Supreme Court has stated that "[t]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." Flipside, 455 U.S. at 498. Notably, greater clarity is required

when a statute either restricts speech, imposes a particularly severe penalty, or lacks a scienter requirement.

The prospect of "the chilling of constitutionally protected speech" has led courts to "apply a heightened standard" when reviewing statutes that impose restrictions on speech. Frese, 53 F.4th at 6 (cleaned up); see also Grayned, 408 U.S. at 109. As a result, speech restrictions "require a greater degree of specificity." Frese, 53 F.4th at 6 (cleaned up). The amendments at issue in this case are explicit viewpoint-based speech limitations that, as discussed above, arguably affect both the curricular and extracurricular speech of public primary and secondary school teachers. Because their extracurricular speech is plausibly entitled to First Amendment protection, a rigorous vagueness review is required.

The need for clarity is likewise paramount when a statutory provision authorizes severe consequences for a violator. For example, it is well-settled that criminal laws are subjected to the most exacting vagueness review. See Dimaya, 138 S. Ct. at 1212. Although the Supreme Court has at times endorsed "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," Flipside, 455 U.S. at 498-99, the Court in Dimaya rejected the notion that a less stringent standard should apply in civil cases involving particularly severe consequences. See Dimaya, 138 S. Ct. at 1212-13. In light

of the "grave nature of deportation" at issue in that case, the Court reasoned that the same standard of certainty required of criminal laws applies in the civil removal context. Id. at 1213 (cleaned up). In his concurrence, Justice Gorsuch also called into question the basis for imposing a lesser standard in the civil context in part because many civil laws carry greater penalties than some criminal laws, such as those "that strip persons of their professional licenses and livelihoods." Id. at 1229 (Gorsuch, J., concurring). Considering that teachers who are found to have advocated a banned concept can be stripped of their teaching credentials and thus deprived of their livelihoods, this factor points in favor of requiring the most exacting vagueness review.

Lastly, laws that fail to incorporate a scienter requirement may also receive greater scrutiny. See, e.g., United States v. Nieves-Castano, 480 F.3d 597, 603 (1st Cir. 2007) (explaining that the statute's "scienter requirement ameliorates any vagueness concerns") (citing Hill v. Colorado, 530 U.S. 703, 732 (2000)). Indeed, the Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea." Colautti v. Franklin, 439 U.S. 379, 395 (1979), abrogated on other grounds, Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022) (citing United States v. U.S. Gypsum Co., 438 U.S. 422, 434-46 (1978); Papachristou v. City of Jacksonville, 405 U.S. 156, 163 (1972); Boyce Motor Lines v. United States,

342 U.S. 337, 342 (1952)). As defendants have acknowledged, the education

and antidiscrimination amendments lack a scienter requirement. In other

words, teachers are not "protected from being caught in [the statute's] net by

the necessity of having a specific intent to commit" a violation. See

Papachristou, 405 U.S. at 163. As a result, inadvertent statements that are

later deemed to advocate a banned concept can violate the amendments. This

concern, combined with the amendments' viewpoint-based speech restrictions

and the severe consequences that can follow if a teacher is found to have

taught or advocated a banned concept, lead me to conclude that the exacting

vagueness standard applied in criminal cases should apply here as well.

    That standard requires that the law must give "a person of ordinary

intelligence fair notice of what is prohibited" and must not be "so

standardless that it authorizes or encourages seriously discriminatory

enforcement." Williams, 553 U.S. at 304. A law is unconstitutionally vague if

it fails either requirement. See id. Even under this demanding standard,

however, vagueness doctrine does not require "perfect clarity and precise

guidance." Id. (cleaned up). Rather, a statute is unconstitutionally vague for

failing to provide adequate notice "only if it prohibits . . . an act in terms so

uncertain that persons of average intelligence would have no choice but to

guess at its meaning and modes of application." Frese, 53 F.4th at 10 (cleaned

up). Similarly, a "statute authorizes an impermissible degree of enforcement

discretion — and is therefore void for vagueness — where it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." Id. at 7 (cleaned up).

Defendants argue that they should prevail even under this standard because the education and antidiscrimination amendments provide adequate notice and sufficient enforcement guidelines. I disagree. Although the amendments identify certain core concepts that may not be taught, they do not give either teachers or enforcers the guidance they need to find the line between what the amendments prohibit and what they permit. This is so especially because the amendments allow teachers to be sanctioned for speech that advocates a banned concept only by implication.

In addition to express advocacy, the AG has opined that the amendments can be violated by conduct that merely implies the truthfulness of a banned concept. See Doc. No. 36-10 at 7. For example, the opinion states that a public employer could violate the amendments if it creates a web-based anti-racist resource and states that it was designed to "serve as a resource for our white employees." Id. According to the AG, this conduct could violate the amendments because it "may imply that white people, specifically and for no other reason, are in need of anti-racist resources." Id. (emphasis added). In other words, a teacher could unknowingly violate the amendments by making

a statement that does not expressly endorse a banned concept but that could be understood to imply it. Coupled with the enforcing agencies' view that the amendments are not limited to curricular speech but also governs teachers' conduct during extracurricular activities, this statutory construction leaves open countless applications where a teacher does not directly assert a banned concept but, in the view of an enforcer, implies its correctness.

Consider, for example, the third banned concept, which bars an educator from teaching or advocating "[t]hat an individual should be discriminated against or receive adverse treatment solely or partly because of his or her . . . race." RSA § 193:40, I(c). In the coming months, the Supreme Court will decide whether colleges and universities can continue to use race-conscious admission policies. The plaintiffs in those cases assert that such policies improperly favor Black applicants at the expense of white and Asian-American applicants, whereas the defendants argue that the policies are necessary to ensure diversity in higher education. If a high school teacher attempts to explain the diversity argument to her class during a discussion of the case, will she face sanctions for teaching a banned concept? We simply don't know.

Likewise, consider the fourth banned concept, which prohibits, among other things, teaching or advocating that white people cannot treat Black people "without regard to" their race. RSA § 193:40, I(d). Given that advocacy

can take many forms, there is a real risk that a teacher could face sanctions for discussing the concept of implicit bias with a student.

Although I do not understand implicit bias to expressly embrace the notion that a person in one group "cannot" treat a person in another group equally, a discussion may certainly imply as much in the minds of others who have a different understanding of the concept. For example, a teacher may state that white persons can have difficulty treating non-white persons without regard to their race. An enforcer may later decide that the discussion implied support for the proposition that a white person "cannot" treat a Black person without regard to race, in violation of the fourth banned concept.

These examples illustrate the principal problem with the amendments: they do not give teachers fair notice of what they can and cannot teach. Teachers can be sanctioned for speech that they do not intend to advocate a banned concept. They can be sanctioned even for speech that is later deemed to violate the amendments only by implication. Because teachers can lose their jobs and teaching credentials if they cross the line into prohibited speech, they should not be left to guess about where that line will be drawn.

These problems are compounded because, as plaintiffs point out, teachers in New Hampshire have an affirmative duty to teach topics that potentially implicate several of the banned concepts. For example, state law explicitly mandates teaching about the evolution of "intolerance, bigotry,

antisemitism, and national, ethnic, racial, or religious hatred and discrimination," as well as "how to prevent the evolution of such practices." RSA § 189:11, I(j). Although the education and antidiscrimination amendments create an exception for teaching the "historical existence of ideas and subjects identified" as banned concepts, see RSA § 193:40, II, this exception does not fully encompass the broader scope of learning that RSA § 189:11 mandates. For example, beyond teaching the historical existence of Jim Crow laws, teachers are supposed to discuss their evolution and how such practices can be prevented. In this context, it is not difficult to imagine that a discussion of remedies for past discrimination such as reparations would take place, which could subject a teacher to sanctions for teaching a banned concept. As a result, teachers could, in plaintiffs' words, be left with "an impermissible Hobson's choice": shirking their responsibilities under RSA § 189:11, or teaching what RSA § 189:11 requires and potentially violating the prohibition against teaching a banned concept in RSA § 193:40. See Doc. No. 46 at 9. This is even more reason to require clarity in the amendments. Teachers should not be put in a position where they must instruct students on certain concepts but face the threat of job loss if their instruction unintentionally and only by implication crosses the line drawn in RSA § 193:40.

Defendants argue that a sufficiently narrow construction of the amendments would allay these fair notice concerns. In fact, during oral argument, defendants — one of whom is the AG — invited me to reject the AG's opinion that implied advocacy of a banned concept can violate the amendments. This position is untenable for several reasons.

First, a federal court is "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." Stenberg v. Carhart, 530 U.S. 914, 944 (2000) (quoting Boos v. Barry, 485 U.S. 312, 330 (1988)). This principle is an extension of the rule that a court cannot simply rewrite a statute to make it sufficiently clear. See id. Although defendants now seem to endorse the view that only express advocacy of a banned concept is prohibited, they have not persuaded me at this early stage in the case that the amendments are readily susceptible to such a construction.

Second, defendants' interpretation is at odds with the position that the AG has taken and that, to my knowledge, remains his official opinion on the subject. Although the AG's opinion does not have the force and effect of law, see id. at 940, it is a plausible reading of the statutory text. RSA § 193:40, I provides that "[n]o pupil . . . shall be taught, instructed, inculcated or compelled to express belief in, or support for," the banned concepts. It is arguable that these forms of expression encompass not only express

statements but also conduct that, by implication, constitutes teaching, instruction, or inculcation, such that the amendments sweep as broadly as plaintiffs fear.

So construed, the amendments also lack sufficient standards to guide agency discretion when determining what conduct constitutes a violation. How is an agency to determine whether a teacher has implied the truth of a banned concept? The amendments are silent on the matter, leaving it to the subjective ad hoc judgment of an enforcer. Cf. U.S. Lab. Party v. Pomerleau, 557 F.2d 410, 412 (4th Cir. 1977) ("Because a violation depends on the subjective opinion of the investigator, the speaker has no protection against arbitrary enforcement of the ordinance."); James v. Wilkinson, No. 89-0139-P(CS), 1991 WL 626750, at *5 (W.D. Ky. May 20, 1991) (explaining that when the focus is on what was implied rather than expressed, "the implication is, as with beauty, in the eye of the beholder"). As such, the amendments arguably create a significant risk of arbitrary enforcement. See Grayned, 408 U.S. at 108 ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.").

Defendants argue that the amendments' enforcement structure protects against arbitrary or discriminatory enforcement. But nothing precludes a person from reporting a teacher to the department of education for violating the educator code of conduct. Under that department's

regulations, "[a] case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means." N.H. Code Admin. R. Ed 511.01(a). Further, an investigation must be opened if there is a "possible violation" of the educator code of conduct. Id. Ed 511.01(b). Thus, the department of education must investigate possible violations of RSA § 193:40, which provides an avenue for directly pursuing teachers.

Defendants maintain, however, that the enforcing agencies have informally settled on a process whereby such complaints against teachers are not considered until there has been a finding of a violation against the school. This process, defendants assert, is designed to "weed out the types of harassing or spurious complaints [that plaintiffs] appear to be concerned with." Doc. No. 36-1 at 35. But that process is neither a statutory nor a regulatory requirement. It is only at the sufferance of the education commissioner that complaints against teachers are purportedly held in abeyance.[6] As such, the procedural safeguards that defendants tout are arguably insufficient to protect plaintiffs against arbitrary enforcement.

---

[6]    In any event, plaintiffs have alleged that the department of education is independently investigating such complaints prior to any finding of a statutory violation against a school. They appended to their pleading material suggesting that the department has engaged in investigative activities concerning complaints that are at least plausibly based on alleged violations of RSA § 193:40. See Doc. No. 45-2 at 17–21.

Instead, as plaintiffs suggest, "the fragmented and multiple layers of enforcement only serve to create many more opportunities for arbitrary and discriminatory enforcement." Doc. No. 45 at 36.[7]

In sum, the amendments' vague terminology, their lack of a scienter requirement, and the possibility that teachers could be found liable for teaching a banned concept by implication, leave both teachers and enforcers to guess at what speech the amendments prohibit. Given the severe consequences that teachers face if they are found to have taught or advocated a banned concept, plaintiffs have pleaded a plausible claim that the amendments are unconstitutionally vague.

---

[7]     Although the issue has not yet been briefed, it is difficult to reconcile the AG's position that teachers will not face individual liability for damages with a fair reading of chapter 354-A as amended. RSA § 354-A:31 now prohibits a public employer from teaching or advocating a banned concept to a student. RSA § 354-A:2, XV(a) provides that any violation of chapter 354-A is an "unlawful discriminatory practice." RSA § 354-A:2, XV(d) states that aiding and abetting an unlawful discriminatory practice is itself an unlawful discriminatory practice. And the New Hampshire Supreme Court ruled in U.S. Equal Opportunity Commission v. Fred Fuller Oil Company, 168 N.H. 606, 611 (N.H. 2016) that individual employees can be sued for aiding and abetting an unlawful discriminatory practice by an employer. Thus, in its current form, chapter 354-A appears to allow damage actions to be brought against individual teachers for aiding and abetting a violation of RSA § 354-A:31 by their employers.

## IV. <u>CONCLUSION</u>

Defendants' motion to dismiss the AFT plaintiffs' First Amendment claim (Doc. No. 36) is granted in part and denied in part. Defendants' motions to dismiss plaintiffs' vagueness claims (Doc. Nos. 36 and 37) are denied.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

January 12, 2023

cc:    Counsel of record

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-N.H., AFL-CIO, et al.,

     v.

Frank Edelblut, Commissioner,
N.H. Department of Education, et al.

Case No. 21-cv-1077-PB
Opinion No. 2024 DNH 040

**MEMORANDUM AND ORDER**

In 2021, the State of New Hampshire substantially amended its education and antidiscrimination laws. The new laws were quickly challenged in two separate lawsuits. The cases, both filed on behalf of public school educators, were subsequently consolidated into the present action. The matter is before me on the parties' cross-motions for summary judgment.

## I.    BACKGROUND

### A.    The Amendments

The laws at issue in this case have their genesis in New Hampshire House Bill 544 ("HB544"). HB544, in turn, was based on President Trump's executive order on "Combating Race and Sex Stereotyping." See Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020), revoked by Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 20, 2021). That executive order sought to end federally-funded training based on "anti-American propaganda," such as

"critical race theory" ("CRT")[1] See OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT, OMB MEMORANDUM NO. M-20-34, TRAINING IN THE FEDERAL GOVERNMENT (2020). To this end, the executive order prohibited the use of public funds to promote so-called "divisive concepts" pertaining to race and sex. Exec. Order No. 13950, 85 Fed. Reg. at 60685.

After President Biden revoked President Trump's executive order, New Hampshire state legislators introduced HB544 to prohibit the state from teaching the same "divisive concepts" identified in President Trump's executive order. The core components of HB544 were later added by amendment to House Bill 2 ("HB2"), a budget bill that was passed by the House and sent to the Senate on April 7, 2021. The Senate made substantial changes to HB2's divisive concepts provisions, which appear in sections 297

---

[1]    CRT refers to a 1970s-era movement within the legal academy that sought to analyze the role of race and racism in the American legal system. VICTOR RAY, ON CRITICAL RACE THEORY xxi-xxiii (2022). Although the phrase is used to describe a diverse category of scholarship, CRT fundamentally looks to "the various ways in which assumptions about race affect the players within the legal system (judges, lawyers, and lay people) and have a determining effect on substantive legal doctrines." Douglas E. Litowitz, Some Critical Thoughts on Critical Race Theory, 72 NOTRE DAME L. REV. 503, 503-04 (1999). CRT is premised on several "core tenets," including, most notably, that race is a social construct, rather than a biological reality; that racism is a common and pervasive force throughout society that exists on a structural, rather than purely individual, level; and that racism cannot be effectively addressed through "[c]olorblindness" or race-neutral policies. Angela Onwuachi-Willig, The CRT of Black Lives Matter, 66 ST. LOUIS U.L.J. 663, 669-70 (2022) (collecting sources); accord RAY, supra, at 3, 17, 32.

and 298 of the bill, and rebranded them as antidiscrimination laws.

Differences between the House and Senate versions of the bill were resolved

in conference, and HB2 became law on June 25, 2021.

HB2 modified the state's education and antidiscrimination laws in

several ways.[2] It added a new provision to the education laws, codified at

N.H. Rev. Stat. Ann. ("RSA") § 193:40, which identifies four concepts that

public primary or secondary school students may not be "taught, instructed,

inculcated or compelled to express belief in, or support for":

> (a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

> (b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

> (c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

> (d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical

---

[2]   I refer to the amendments to the state's education and antidiscrimination laws collectively as the "Amendments."

> disability, religion, or national origin cannot and should not attempt
> to treat others without regard to age, sex, gender identity, sexual
> orientation, race, creed, color, marital status, familial status, mental
> or physical disability, religion, or national origin.

RSA § 193:40, I.

HB2 also added several new sections to Chapter 354-A, known as the "Law Against Discrimination," that employ substantially similar versions of the banned concepts. RSA § 354-A:31 makes it unlawful for a public employer to "teach, advocate, instruct, or train" the banned concepts to "any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group." RSA § 354-A:32 similarly states that "[n]o government program shall teach, advocate, or advance" any of the banned concepts. And RSA § 354-A:33 protects public employees from being disciplined for refusing to participate in any activity "at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for," any of the banned concepts.

RSA § 193:40, III permits the Attorney General, or any other person "claiming to be aggrieved by a violation" of the new law, to obtain damages and injunctive relief from an offending school or school district, either by filing a lawsuit in superior court or by filing a complaint with New Hampshire's Commission for Human Rights. RSA § 354-A:34 similarly permits a person "aggrieved" by a violation of the antidiscrimination

amendments to pursue "all of the remedies available under" Chapter 354-A, which include compensatory damages and injunctive relief.

RSA § 193:40, IV provides that a "[v]iolation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education." An "educator" is defined as "a professional employee of any school district whose position requires certification by the state board [of education]." RSA § 193:40, V. Potential disciplinary sanctions include reprimand, suspension, and revocation of the educator's certification. See N.H. Code Admin. R. Ed 511.01. In other words, an educator who is found to have taught or advocated a banned concept may lose not only his or her job, but also the ability to teach anywhere in the state. See id.; see also N.H. Code Admin. R. Ed 501.02(ad).

The new laws create safe harbors for certain conduct that may otherwise constitute teaching or advocacy of a banned concept. RSA § 193:40, II allows "discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified" as a banned concept. RSA § 354-A:29, II permits public employers to conduct "racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons." And RSA § 354-A:29, III

states that the new laws do not impose any limitations on "the academic freedom of faculty members" at public colleges and universities.

Passage of the Amendments led to immediate controversy over their scope. The following month, three state agencies—the Department of Education, the Commission for Human Rights, and the Department of Justice ("enforcing agencies")—collectively produced guidance regarding the scope and effects of the new provisions in the form of two "Frequently Asked Questions" documents ("FAQs"). Doc. 36-8; Doc. 36-9. Educators and other stakeholders, however, continued to raise concerns that the Amendments were "confusing and that public employers and schools will struggle to understand the scope of the new prohibitions." Doc. 36-10 at 1.

Accordingly, in September 2021, the New Hampshire Attorney General ("AG") issued an official opinion concerning the scope and application of the new laws. Id. Describing the new statutory provisions as "legislation of limited reach," the AG opined that the first two banned concepts proscribe advocacy that an identified group has "natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive." Id. at 3, 5. According to the opinion, the last two banned concepts prohibit advocacy "that any identified

group can or should be treated unequally to any other identified group and that one identified group should be discriminated against or treated adversely." Id. at 3.

Defendant Frank Edelblut, the Commissioner of the Department of Education, also published two opinion articles in the *New Hampshire Union Leader* that expressed his support for the Amendments. The first of the two op-eds was published on June 13, 2021, prior to HB2's passage. In it, Edelblut argued that the Amendments were "important" and a necessary "contribution to our education system." Doc. 85-22 at 4. The second op-ed, entitled "Education's Sacred Trust" and published on April 15, 2022, criticized "activist educators who might be knowingly dismantling the foundations of a value system [parents] are attempting to build." Doc. 85-41 at 3.

In its online version, the April 2022 article appended several documents that, according to Edelblut, exemplified "actual instructional material from New Hampshire schools that parents have identified as conflicting with their values" and which demonstrated "biases [that] are beginning to seep into our own institutions." Id. Several of those attachments had been submitted to the Department of Education by parents and other community members, including two books—Stamped: Racism, Antiracism,

and You: A Remix of the National Book Award-winning "Stamped from the Beginning," by Jason Reynolds and Dr. Ibram X. Kendi, and This Book is Anti-Racist, by Tiffany Jewell—as well as materials concerning diversity that were provided to students in a Human Relations course. Id. at 20, 39-40, 63-66.

## B.   **Procedural Background**

In December 2021, two groups of plaintiffs filed suit against the education commissioner and other state officials, challenging the Amendments in separate complaints. The first group consists of five educators and Local 8027 of the American Federation of Teachers-New Hampshire, a labor union representing approximately 3,400 public school teachers, school support staff, city and town employees, police officers, library employees, and higher education faculty in the state (collectively, "AFT plaintiffs"). The second group includes two diversity, equity, and inclusion ("DEI") school administrators, and the National Education Association-New Hampshire, a professional association representing more than 17,000 educators in the state (collectively, "NEA plaintiffs"). Both sets of plaintiffs argued that the Amendments are unconstitutionally vague on their face. The AFT plaintiffs also asserted that the Amendments violate their First

Amendment right to free speech. The two actions were later consolidated, and the defendants moved to dismiss both complaints.

My memorandum order, issued on January 12, 2023, granted the defendants' motions in part and denied them in part. Doc. 63. I dismissed the AFT plaintiffs' First Amendment claim to the extent that it was based on the plaintiffs' assertion that primary and secondary school teachers have a constitutional right to control their curricular speech. Id. at 17. Because, however, I determined that the Amendments plausibly could be construed to also reach teachers' constitutionally protected private speech, I declined to dismiss the claim in full. Id.

When addressing the plaintiffs' vagueness claim, I first resolved a dispute concerning the standard a court must use when evaluating a pre-enforcement facial vagueness claim.[3] Id. at 21. The defendants, relying on Village of Hoffman Estates v. Flipside, Hoffman Estates., Inc., 455 U.S. 489 (1982), took the position that a facial vagueness challenge can never succeed

---

[3]    In addition to the plaintiffs' pre-enforcement facial vagueness claim, they also assert what they describe as an as-applied vagueness claim in the sense that the Amendments are vague "as applied" specifically to teachers. I expressed skepticism that their claim is really an as-applied challenge when I addressed the defendants' motions to dismiss, but I declined to dismiss the claim because the issue had not been adequately briefed. Id. at 20. The parties have again declined to brief the issue. Because I conclude that the Amendments are facially invalid, I need not consider whether the plaintiffs can maintain their as-applied challenge as a distinct cause of action.

unless the challenged statute is vague in all applications. I rejected the

defendants' argument based on Johnson v. United States, 576 U.S. 591

(2015), Sessions v. Dimaya, 584 U.S. 148 (2018), and United States v. Davis,

588 U.S. 445 (2019), a trio of more recent decisions in which the Supreme

Court refused to apply the "vague in all applications" standard to the facial

vagueness challenges that were before the Court.[4] Applying the generally

accepted test for vagueness challenges, I then determined that the plaintiffs

had stated a plausible claim for relief. Doc. 63 at 42.

The parties have since engaged in expedited discovery and filed cross-

motions for summary judgment. Both sides agree that no material facts are

---

[4]     The defendants maintain that Village of Hoffman Estates remains good
law, and they argue again in favor of the "vague in all applications" standard.
I see no reason to revisit my earlier conclusion, beyond noting that, since I
issued my order, the Courts of Appeals for the Fourth and Eleventh Circuits
have also concluded that Johnson, Sessions, and Davis widened the path for
facial vagueness challenges beyond the "vague in all applications" standard.
See Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth., 89
F.4th 1337, 1349-50 (11th Cir. 2024) (explaining that pursuant to United
States v. Salerno, 481 U.S. 739 (1987), a "successful facial challenge
require[d] a showing that the law in question is unconstitutional in all of its
applications," but that "in its more recent cases," including Sessions and
Johnson, "the Supreme Court has cut back on the broad statement . . . at
least when vagueness is the constitutional vice"); Carolina Youth Action
Project v. Wilson, 60 F.4th 770, 781-82 (4th Cir. 2023) ("[T]he Supreme Court
has now twice clarified that 'although statements in some of [its] opinions
could be read to suggest otherwise,' the Court's 'holdings squarely contradict
the theory that a vague provision is constitutional merely because there is
some conduct that clearly falls within the provision's grasp.'") (emphasis in
original) (quoting Johnson, 576 U.S. at 602).

in dispute and the case is ready for resolution. Because I conclude that the Amendments are unconstitutionally vague, I grant the plaintiffs' motion for summary judgment (Doc. 83) and deny the defendants' corresponding cross-motion (Doc. 84) without addressing the AFT plaintiffs' First Amendment argument.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." Perea v. Editorial Cultural, Inc., 13 F.4th 43, 50 (1st Cir. 2021) (cleaned up). The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A material fact "is one 'that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). If the moving party satisfies this burden, the nonmoving party must then "produce evidence on which a reasonable finder

of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala–Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

When parties cross-move for summary judgment, the standard of review is applied to each motion separately. Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006); see Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."). Thus, I must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

## III.   ANALYSIS

The plaintiffs argue that the Amendments violate the Fourteenth Amendment's Due Process Clause because they are unconstitutionally vague. I begin with the legal principles that shape my analysis.

### A.   The Vagueness Standard

Vagueness doctrine "rests on the twin constitutional pillars of due process and separation of powers." Davis, 588 U.S. at 451; see also Sessions, 584 U.S. at 155-56. The doctrine serves due process concerns by requiring

that those subject to the law be given "a reasonable opportunity to know what is prohibited." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). It also promotes the proper allocation of power among the three branches of government by requiring legislatures, rather than less politically accountable judges and executive branch officials, to "define what conduct is sanctionable and what is not." Sessions, 584 U.S. at 156. Accordingly, a legislative enactment will be found to be unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008); see also McCoy v. Town of Pittsfield, 59 F.4th 497, 509 (1st Cir. 2023) (applying Williams to a vagueness challenge to a town ordinance).

Vagueness doctrine does not require perfect legislative precision. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." Williams, 553 U.S. at 306. "Because words are rough-hewn tools, not surgically precise instruments, some degree of inexactitude is acceptable in statutory language. Reasonable breadth in the terms employed by an ordinance does not require that it be invalidated on vagueness grounds."

Draper v. Healey, 827 F.3d 1, 4 (Souter, Circuit Justice, 1st Cir. 2016)

(cleaned up). Instead, a statute is unconstitutionally vague "only if it

prohibits an act in terms so uncertain that persons of average intelligence

would have no choice but to guess at its meaning and modes of application."

Frese v. Formella, 53 F.4th 1, 10 (1st Cir. 2022) (cleaned up). And a "statute

authorizes an impermissible degree of enforcement discretion—and is

therefore void for vagueness—where it fails to set reasonably clear

guidelines for law enforcement officials and triers of fact in order to prevent

arbitrary and discriminatory enforcement." Id. at 7 (quoting Act Now to Stop

War & End Racism Coal. v. District of Columbia, 846 F.3d 391, 410 (D.C.

Cir. 2017)).

1.    Speech Restrictions

The degree of scrutiny that a legislative enactment will receive when it

is challenged on vagueness grounds will vary depending on both the nature of

the enactment and the consequences that follow from its violation. When

assessing a vagueness challenge, the "test of vagueness applies with

particular force in review of laws dealing with speech." Hynes v. Mayor of

Oradell, 425 U.S. 610, 620 (1976); see also Vill. of Hoffman Ests., 455 U.S. at

499 (noting that "a more stringent vagueness test should apply" to laws

interfering with the right of free speech). This is because First Amendment

"freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 415, 433 (1963) (citations omitted). "[W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms." Grayned, 408 U.S. at 109 (cleaned up). "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Id. (cleaned up). Such self-censorship is inimical to our democracy, as "[t]he right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949).

The danger presented by vague speech restrictions is especially severe when a law purports to regulate speech based on the speaker's viewpoint. As the Supreme Court has explained:

> Discrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from

regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828-29 (1995) (citations omitted); see also Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004) ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses."). Courts should thus "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994).

2.      Penalty Provisions

The consequences that follow from a violation of an allegedly vague statute can also affect "[t]he degree of vagueness that the Constitution tolerates." Vill. of Hoffman Ests., 455 U.S. at 498. Civil statutes will often be subject to lesser scrutiny than criminal statutes because "the consequences of imprecision are less severe." Sessions, 584 U.S. at 156 (quoting Vill. of Hoffman Ests., 455 U.S. at 498-99). But "the happenstance that a law is found in the civil or criminal part of the statute books" is not dispositive. Id. at 184 (Gorsuch, J., concurring in part). As Justice Gorsuch observed in

Sessions, certain civil penalties are "routinely graver than those associated with misdemeanor crimes—and often harsher than the punishment for felonies." Id.; see also Kashem v. Barr, 941 F.3d 358, 370 (9th Cir. 2019) ("A provision that nominally imposes only civil penalties but nonetheless carries a 'prohibitory and stigmatizing effect' may warrant 'a relatively strict test.'") (quoting Vill. of Hoffman Estates, 455 U.S. at 499)). Grave civil penalties can include "remedies that strip persons of their professional licenses and livelihoods." Sessions, 584 U.S. at 184 (Gorsuch, J., concurring in part).

Those are precisely the sanctions that the Amendments contemplate here. RSA § 193:40, IV states that teaching a banned concept constitutes a "violation of the educator code of conduct." Because those who violate the educator code of conduct may have their teaching credentials revoked, the education amendments threaten teachers with the loss of their livelihood as well as the inability to practice their chosen profession anywhere in the state. See N.H. Code Admin. R. Ed 511.01(j)(2)(b). And, despite the defendants' arguments to the contrary, the antidiscrimination amendments expose teachers to civil liability. The antidiscrimination amendments provide that anyone aggrieved by a violation of the statute can pursue "all of the remedies available under" the Law Against Discrimination. RSA § 354-A:34. The Law Against Discrimination, in turn, authorizes aggrieved

parties to sue not only employers but also individual employees who aid and

abet in an employer's "unlawful discriminatory practice." See RSA

§ 354:A-21, I(a); see also U.S. Equal Opportunity Comm'n v. Fred Fuller Oil

Co., 168 N.H. 606, 610 (2016). Because the phrase "unlawful discriminatory

practice" is defined to include a violation of any provision of Chapter 354-A—

including the antidiscrimination amendments—a teacher found to have

aided and abetted the teaching of a banned concept in violation of RSA

§ 354-A:31 may be subject to monetary damages.[5] See RSA § 354-A:2, XV.

---

[5]     Although the defendants did not address the issue in their brief, they
argued at the motions hearing that teachers cannot be held liable for
monetary damages under the antidiscrimination amendments. Relying on the
"well established canon of statutory interpretation . . . 'that the specific
governs the general,'" the defendants argue that the narrow relief against
teachers specified in RSA § 193:40 supersedes the broader relief that is
generally permitted under the Law Against Discrimination. RadLAX
Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012)
(quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992)). The
defendants' argument, however, rests on the faulty premise that RSA
§ 193:40 provides an exclusive remedy against teachers who teach banned
concepts. RSA § 193:40 addresses the professional consequences that could
befall teachers who violate the education amendments, but it does not imply
that those consequences are to the exclusion of any other remedies. And RSA
§ 193:40 does not reference, let alone restrict, the availability of damages for
violations of the antidiscrimination amendments. Cf. In re Johnson, 161 N.H.
419, 424 (2011) (noting that the specific/general canon comes into play where
"one statute deals with a subject in general terms, and another deals with a
part of the same subject in a more detailed way") (quoting State v. Bell, 125
N.H. 425, 432 (1984)); In re Heinrich, 160 N.H. 650, 654-55 (2010) (finding

In sum, RSA § 193:40 threatens teachers with the loss of their license, while RSA § 354-A:31 threatens teachers with civil liability. Although teachers do not face criminal penalties for teaching a banned concept, it is difficult to conceive of more serious consequences that could befall a person in a civil proceeding than those that a teacher might face if they are found to have done something that the Amendments prohibit. For this reason, the laws are subject to the "most exacting vagueness review." Doc. 63 at 33.

3.    Statutory Interpretation

Before determining whether the Amendments satisfy this standard, I must first attempt to determine what they prohibit. Because the Amendments are state laws, I construe them using the interpretive principles that the New Hampshire Supreme Court employs when it interprets legislation. See Faber v. Ciox Health, LLC, 944 F.3d 593, 602 n.7 (6th Cir. 2019) (explaining that federal courts use state law when construing state statutes); see generally Abbe R. Gluck, Intersystemic Statutory Interpretation: Methodology as "Law" and the Erie Doctrine, 120 YALE L.J. 1898 (2011). Following this approach, I begin with the statutory text. State v. Priceline.com, Inc., 172 N.H. 28, 33 (2019). If a statute defines its terms, a

that a statute that provided detail as to a particular subject controlled over one that lacked any detail).

court ordinarily will defer to the meaning provided by the legislature. Id. But where those terms are left undefined, a court must attempt to determine whether legislative language has a "plain and ordinary meaning." Id. (quoting Appeal of Town of Pelham, 143 N.H. 536, 538 (1999)). In undertaking this process, a court "will not consider what the legislature might have said or add language that the legislature did not see fit to include." Conduent State & Local Sols., Inc. v. N.H. Dep't of Transp., 171 N.H. 414, 420 (2018). Statutes must be read "in the context of the overall statutory scheme, not in isolation." Czyzewski v. N.H. Dep't of Safety, 165 N.H. 109, 111 (2013).

There is an important difference, however, between ordinary statutory interpretation and judicial rewriting of legislation to save it from a vagueness challenge. As the Supreme Court has explained when considering vagueness challenges to federal statutes, "[t]his Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction. We will not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place." United States v. Stevens, 559 U.S. 460, 481 (2010) (cleaned up); see also Davis, 588 U.S. at 448 ("When

Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again."). Because the Amendments are state laws, the New Hampshire Supreme Court has the final say as to their meaning. Accordingly, I will sustain the plaintiffs' vagueness challenge only if I determine that the Amendments are "not readily subject to a narrowing construction by the state courts." Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 (1975).

**B.    The Amendments**

The Amendments identify four banned concepts that a student may not be "taught, instructed, inculcated or compelled to express belief in, or support for." RSA § 193:40, I. They do not, however, define any of the terms that must be understood to determine what is prohibited. Nor has either the Department of Education or the Commission on Human Rights adopted regulations to explain the Amendments. See, e.g., In re Weaver, 150 N.H. 254, 256 (2003) (explaining that although "the interpretation of a statute is to be decided ultimately by" the courts, "statutory construction by those charged with its administration is entitled to substantial deference").

In light of the limited guidance as to what the Amendments prohibit, I am persuaded they are fatally vague in three ways: (1) they do not provide

fair notice as to the concepts that teachers may not teach, (2) they do not

sufficiently explain when classroom discussion of a banned concept qualifies

as impermissible teaching, and (3) they do not give teachers enough

guidance to know when their extracurricular communications are within the

Amendments' reach. I address each of these defects below and then explain

why the vagueness of the Amendments is compounded by the fact that they

permit teachers to be disciplined without a finding that a teacher has acted

with scienter. In the concluding section, I review the evidence in the record

that reveals how teachers have been affected by the Amendments since their

enactment.

1.   <u>The Concepts</u>

One of the most difficult interpretive challenges the Amendments

present is that they fail to address their intended target directly. <u>Cf.</u> Teeboom

v. City of Nashua, 172 N.H. 301, 310 (2019) (noting that statutory

construction is guided by "the circumstances which led to [the statute's]

enactment, and especially the evil or mischief which it was designed to

correct or remedy") (quoting Appeal of Coastal Materials Corp., 130 N.H. 98,

103 (1987)). Supporters of the Amendments have made no secret of the fact

that their aim is to restrict what teachers can say about what plaintiffs call

DEI initiatives but supporters of the Amendments call CRT.[6] But rather than take on issues like structural racism, implicit bias, and affirmative action directly, the Amendments employ general terms such as teaching that one race is superior to another, that individuals are inherently racist, and that individuals should not be subject to adverse treatment because of their race. While these banned concepts may appear straightforward at first glance, their ambiguity comes to light when put into practice.[7]

Take, for example, the second concept, which prohibits teaching that a person, by virtue of his status in an identified group, is "inherently racist,

---

[6]   See, e.g., Doc 85-22 at 4 (Edelblut op-ed asserting that the law will address "those who promote Critical Race Theory or similar concepts"); Senate Finance Committee, HB 2 Deliberations, YOUTUBE (May 26, 2021), https://www.youtube.com/watch?v=0AbLc51xKrU (statement by Senator Bob Giuda advocating for the Amendments as necessary to "ensure that the minds of our future generations of our state are not being unduly influenced by advocacy for such toxins as Critical Race Theory").

[7]   The first concept, which prohibits teaching that certain groups are "inherently superior" to others, is only scarcely addressed in the parties' briefs. The defendants have not attempted to interpret the concept beyond reiterating its prohibitions, and the plaintiffs have not explained how the first concept fails to give adequate notice or invites arbitrary enforcement. Given the lack of developed argument on the matter, I do not address the first concept beyond noting that it suffers from the same interpretive challenges as the other three concepts. That is, because the first concept does not address its intended target directly, it is unclear "what is prohibited beyond literally espousing that, for example, 'White people are superior to Black people.'" Honeyfund.com, Inc. v. DeSantis, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022).

sexist, or oppressive, whether consciously or unconsciously." One broadly

accepted form of bias is "implicit bias," which is understood to be a "negative

attitude, of which one is not consciously aware, against a specific social

group." See Implicit Bias, AM. PSYCH. ASS'N,

https://www.apa.org/topics/implicit-bias [https://perma.cc/2ES7-YE4V].

Implicit biases are "thought to be shaped by experience and based on learned

associations between particular qualities and social categories" and may

influence behavior, even if unconsciously. Id. Does instructing students on

the prevalence of implicit bias teach them that some groups are "inherently

racist, sexist, or oppressive"?

   The AG addressed this question in an official opinion, which concluded

that implicit bias trainings are not prohibited by the second concept. Doc. 85-

54 at 9. But, because the AG's opinion substantially departs from any

accepted method of statutory interpretation, it exacerbates, rather than

resolves, the significant ambiguity created by the second concept.

   The AG begins his argument by quoting a dictionary definition of

"inherent" as something that is "structural or involved in the constitution or

essential character of something : belonging by nature or settled habit :

intrinsic, essential." Id. at 8 (quoting WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY 1163 (2002)). He then focuses on the terms "intrinsic" and

"essential," without addressing the fact that the definition on which he relies includes tendencies that arise out of either "nature" or "settled habit." Id. Then, for reasons that the AG does not provide, he proceeds to develop his own definition of inherent as something that is "natural, biological, or innate, as opposed to being apparent, accidental, or a characteristic created by external action or external factors, such as current or historical discrimination, stereotyping, environment, or cultural messaging." Id. Again, without further explanation, the AG applies this definition to conclude that the second concept does not prohibit teaching about implicit bias because it is not an inherent form of bias. Id. at 8-9.

The AG's analysis fails to persuade for several reasons. First, the AG considers only a portion of the dictionary's definition of "inherent," without grappling with the fact that the definition also states that something can be inherent if it arises out of "settled habit." Second, he does not attempt to explain why implicit bias is not "inherent" even under his newly proffered definition. And, finally, he does not specify what other forms of unconscious bias may not be taught if the second concept does not include implicit bias.

Accordingly, the AG's opinion does not resolve the lack of clarity left by the text of the second concept. See Appeal of Pub. Serv. Co. of N.H., 124 N.H. 79, 87 (1983) (noting that, although an enforcing agency's interpretation of a

statute is "entitled to [the court's] consideration," it need not be deferred to where it is "based upon a misconstruction of the statute"). Without sufficient guidance from the text of the Amendments or the AG, teachers cannot know what, if any, instruction they can provide on implicit biases.

The third concept suffers from a similar vagueness problem. By its terms, it prohibits only teaching that a person "should be discriminated against or receive adverse treatment" because they belong to an identified group. But how, if at all, does the concept apply to teaching about affirmative action?

If one accepts the premise that providing a preference to one group necessarily entails discrimination against other groups, then advocating for at least some forms of affirmative action would be prohibited by the Amendments. See Pernell v. Fla. Bd. of Governors of State Univ. Sys., 641 F. Supp. 3d 1218, 1233-34 (N.D. Fla. 2022) (recognizing that teaching the merits of affirmative action would be prohibited by a similarly worded statute); see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 218-19 (2023) (concluding that giving preference to members of certain racial groups in college admissions necessarily subjects members of other racial groups to unlawful discrimination). But whether this premise is correct in all applications is an issue on which there is no real

consensus.[8] See, e.g., Caroline Mala Corbin, A Critical Race Theory Analysis of Critical Race Theory Bans, 14 U.C. IRVINE L. REV. 57, 83 (2024) (asserting that the third concept does not impact teaching about affirmative action because "taking race into account" is not the same as "teaching that an individual should be discriminated against" on the basis of race) (cleaned up). Because the third concept makes no mention of this premise, and expressly prohibits only teaching that a person should be "discriminated against" because of their group status, teachers are left to guess when, if at all, the third concept prohibits teachers from teaching about the benefits of affirmative action.

The issue only becomes murkier when considering specific efforts to redress past discrimination and promote diversity. The Supreme Court has concluded that at least some race-conscious remedies are legally permissible and, indeed, constitutionally mandated in order to remedy the effects of past discrimination. See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 18 (1971) (approving use of race conscious remedies to redress state-imposed segregation); see also Parents Involved in Cmty. Schs., 551 U.S. 701,

---

[8]     Indeed, at the motions hearing, counsel for the defendants appeared to recognize a distinction between teaching that one group "should be discriminated against" and teaching that "one group [should be] preferred over another." Doc. 108 at 7.

737 (2007) ("[N]o one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies . . . ."). Can teachers extol the virtues of these court-sanctioned efforts to remedy past discrimination, even though they expressly involve differential treatment on the basis of race?

What of efforts to increase diversity on which there is no judicial consensus? For example, the First Circuit recently held that schools may implement facially neutral measures to increase diversity, even if those measures are adopted with the intention of reducing the percentage of over-represented races within a particular institution. Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for Bos., 89 F.4th 46, 60 (1st Cir. 2023). But at least two members of the Supreme Court have questioned this holding, expressing their view that even facially neutral policies can constitute racial discrimination if undertaken with the purpose of increasing diversity. Coal. for TJ v. Fairfax Cnty. Sch. Bd., No. 23-170, --- S. Ct. ----, 2024 WL 674659 (Mem), at *4 (Feb. 20, 2024) (Alito, J., joined by Thomas, J., dissenting from the denial of certiorari).

As these cases demonstrate, the question of when efforts to redress past discrimination or increase diversity cross into impermissible racial discrimination presents a legal quandary on which reasonable minds can,

and do, differ. Yet the Amendments force teachers to guess as to which diversity efforts can be touted and which must be repudiated, gambling with their careers in the process.

The most obvious vagueness problem is presented by the fourth concept, which prohibits teaching that individuals of one group "cannot and should not attempt to treat others without regard to" their membership in another group. As other courts have observed, this language is "bordering on unintelligible" because it employs the dreaded triple negative form. Honeyfund.com, 622 F. Supp. 3d at 1182; see also Pernell, 641 F. Supp. 3d at 1281 ("[C]oncept four thus features a rarely seen triple negative, resulting in a cacophony of confusion."). The defendants' failure to resolve this confusion and offer a substantive explanation as to the meaning of the concept only highlights its lack of clarity.

But even if this were not enough, I cannot determine what, if anything, the fourth concept prohibits that is not already banned by the first three concepts. The New Hampshire Supreme Court has consistently made clear that "[t]he legislature is not presumed to waste words or enact redundant provisions and whenever possible, every word of a statute should be given effect." State v. Beattie, 173 N.H. 716, 720 (2020) (quoting Garand v. Town of Exeter, 159 N.H. 136, 141, (2009)); see also White v. Auger, 171 N.H. 660,

666-67 (2019). Thus, the legislature presumably intended to ban something in the fourth concept that was not already covered by the first three.

But I am unable to discern what this might be given the substantial—if not total—overlap between the first three concepts and the fourth. How, if at all, is teaching that individuals should be discriminated against on the basis of race different than teaching that individuals should not be treated without regard for race? And how is teaching that certain individuals cannot treat others without regard for sex different than teaching that certain individuals are inherently sexist? The text provides no clues, thus rendering it impossible to interpret the fourth concept consistent with the New Hampshire Supreme Court's rules of statutory construction.

All told, the banned concepts speak only obliquely about the speech that they target and, in doing so, fail to provide teachers with much-needed clarity as to how the Amendments apply to the very topics that they were meant to address. This lack of clarity sows confusion and leaves significant gaps that can only be filled in by those charged with enforcing the Amendments, thereby inviting arbitrary enforcement.

2.   Teaching

The Amendments are also fatally flawed because they do not sufficiently explain when a teacher will be subject to sanctions for teaching a

banned concept. The Amendments provide that students may not be "taught, instructed, inculcated or compelled to express belief in, or support for" the banned concepts, but they lack clarity as to what it means to "teach" a banned concept.

In attempting to construe the Amendments, the defendants cite to various dictionary definitions but do not grapple with the individual meaning of the word "taught" (or, for that matter, any of the other enumerated verbs). Rather, the defendants read the Amendments' text as collectively prohibiting "the affirmative and deliberate act of conveying information with knowledge of what information is being conveyed." Doc. 84-1 at 27.

I cannot accept the defendants' reading of the Amendments because it fundamentally ignores the separate prohibitions against teaching, instructing, inculcating, and compelling and instead construes each prohibition as essentially synonymous. See id. (asserting that each of the prohibited acts relies on "similar dictionary definitions"). Adopting such a construction would violate "the well-recognized principles of statutory construction that all words of a statute are to be given effect, that the legislature is presumed not to use words that are superfluous or redundant, and that when the legislature uses two different words, it generally means two different things." State v. Bakunczyk, 164 N.H. 77, 79 (2012). Thus,

contrary to the defendants' argument, "taught" ordinarily means something different from "instructed," "inculcated," or "compelled to express belief in, or support for." But what exactly is prohibited by the word "taught" is far from clear.

While teaching can sometimes consist of merely instructing students on objective facts, teachers often employ more nuanced techniques designed to encourage the development of critical thinking skills. For example, teachers may attempt to stimulate discussion by asking students pointed questions or encourage debate by presenting students with ideas contrary to their own. When such techniques are used to explore a banned concept, it is impossible to know whether a banned concept has been impermissibly taught.

Take, for example, a teacher who decides to teach the Supreme Court's most recent affirmative action decision and touts the dissenters' analysis while paying limited attention to the majority opinion. See generally Students for Fair Admissions, Inc., 600 U.S. at 190. The teacher may view herself as simply teaching students about the dissenters' method of constitutional analysis, but a student may interpret her lesson as teaching that the dissenters were correct. Could her discussion of the case expose her to discipline if she does not explain that the dissenters' analysis is wrong? The text of the Amendments provides no hint, leaving the teacher's fate

subject only to an enforcing agency's subjective interpretation of what was taught.

Or suppose that, during a class discussion of the affirmative action case, a student forcefully argues that the majority's decision was wrong and that race-conscious remedies should be permitted to promote diversity even if they tend to favor one group over another. Will the teacher be subject to discipline if she fails to immediately rebuke the student? The defendants suggest that she might, noting that teachers may sometimes be required to offer "disclaimers" in response to student statements to avoid running afoul of the Amendments. Doc. 108 at 4-6, 10.  When the failure to issue a disclaimer constitutes teaching, however, remains a mystery.

A similar ambiguity as to what it means to teach a concept proved fatal in Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589 (1967). In that case, the Supreme Court invalidated a statute that banned state universities from employing any person who "by word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine that the government of the United States . . . should be overthrown or overturned by force, violence or any unlawful means." N.Y. CIV. SERV. § 105(1)(a). The Court explained that, because "advocacy of the doctrine of forceful overthrow is separately prohibited," the prohibition against teaching the doctrine could

ostensibly extend to a professor who merely "informs his class" about the
banned doctrine, without in any way advocating for that doctrine. Keyishian,
385 U.S. at 600. For this reason, the Court concluded that the statute was
"plainly susceptible of sweeping and improper application" and
unconstitutionally vague. Id. at 599.

So too here, the Amendments' ambiguity as to when a concept is
"taught" means that teachers could be prohibited from merely discussing
ideas that fit within the banned concepts.[9] Given the unclear line between
acceptable and unacceptable discussions, teachers have virtually no way of
knowing whether a lesson that touches upon the banned concepts violates the
Amendments.[10] Teachers are thus left in the untenable position of having to

---

[9]    Indeed, the Amendments here implicate even greater vagueness
concerns than those at issue in Keyishian given that, as I will explain, the
Amendments do not contain a scienter requirement. Cf. id. at 600 (finding
that the word "teach" rendered the statute impermissibly vague, even though
the statute only prohibited "wilful[]" and "deliberate[]" teaching).

[10]    The safe harbor for discussions involving the "historical existence" of
banned concepts "as part of a larger course of academic instruction" does
little to guide teachers as to what they may and may not do. As an initial
matter, it applies only to historical discussions and therefore has no bearing
on discussions of current matters. Moreover, the safe harbor still requires
teachers to guess as to when a permissible discussion of a banned concept
goes too far and becomes prohibited teaching. See, e.g., Santa Cruz Lesbian &
Gay Cmty. Ctr. v. Trump, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020) ("The
line between teaching or implying (prohibited) and informing (not prohibited)
'is so murky, enforcement of the ordinance poses a danger of arbitrary and

wager their careers on a guess or else refrain from discussing matters that implicate the banned concepts altogether. This lack of clarity renders the statute unconstitutionally vague.

3.     Extracurricular Speech

Another profound problem with the Amendments is that they do not provide sufficient guidance as to when teachers may be subject to sanctions for engaging in speech that is protected by the First Amendment. Teachers do not have the right to control their curricular speech, Doc. 63 at 15-16, but nor do they "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969). Whether and to what extent the First Amendment protects a teacher's extracurricular speech is a context-specific and fact-intensive question that turns on the balance of the interests involved. See generally Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). Even though the First Amendment does not protect a teachers' curricular speech, it is beyond dispute that at least some interactions between students and teachers are protected by the First Amendment, even if they occur on school grounds or during school hours. See,

discriminatory application.'") (quoting Hunt v. City of Los Angeles, 638 F.3d 703, 712 (9th Cir. 2011)).

e.g., Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 529-30 (2022)

(concluding that a football coach's post-game, on-field prayers with students

were entitled to First Amendment protection); Wood v. Fla. Dep't of Educ.,

No. 4:23cv526, --- F. Supp. 3d ----, 2024 WL 1536749, at *17 (N.D. Fla. Apr. 9,

2024) (concluding that a teacher's decision to share her pronouns at the start

of class was protected by the First Amendment).

On their face, the Amendments apply whenever and wherever a

teacher instructs a student on a banned concept and thus implicate

constitutionally protected interactions between teachers and students.

Indeed, the defendants made their intention to apply the Amendments to

extracurricular speech clear by asserting in the July 2021 FAQs that the

Amendments "apply to all activities carried out by public schools in their role

as public schools, including extra-curricular activities that are part of the

school's work." Doc. 36-8 at 2. Accordingly, as the plaintiffs note in their brief:

> The Amendments restrict speech at sporting events, bus rides to
> and from events, chess competitions, yearbook club meetings,
> newspaper meeting discussions, orchestra rehearsals, and all
> spontaneous run-ins between students and teachers outside the
> classroom and in the halls of the school. The Amendments cover
> off-campus, non-instructional interactions with students, often
> without pay and frequently in response to searching questions,
> at student-led initiatives such as Young Republicans Club, the
> Gay-Straight Alliance, and Students for Racial Justice.

Doc. 83-2 at 61.

Because the Amendments apply broadly to both curricular and extracurricular speech, they potentially intrude on many informal communications between teachers and students that could be entitled to constitutional protection. Where, as here, a law "is capable of reaching expression sheltered by the First Amendment, [due process] demands a greater degree of specificity than in other contexts." Smith v. Goguen, 415 U.S. 566, 573 (1974). Yet, for the reasons I have explained, the Amendments fail to draw the bright line between covered and noncovered speech that the Constitution demands of laws affecting free speech. See Ozonoff v. Berzak, 744 F.2d 224, 231 (1st Cir. 1984) ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms. Without precision, an inhibitory regulation may prevent speech far beyond the regulation's intent.") (cleaned up).

4.    Scienter

As the Supreme Court has recognized, a "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."[11] Vill. of Hoffman Ests.,

---

[11]    Scienter is the "degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission; the fact of an act's having been done knowingly, esp[ecially] as a ground for civil damages or criminal punishment." Scienter, BLACK'S LAW DICTIONARY (11th ed. 2019).

455 U.S. at 499; see also Hill v. Colorado, 530 U.S. 703, 732 (2000). The defendants concede that the Amendments do not contain an "express scienter requirement," but they assert that this omission is largely irrelevant because the act of teaching "requires that a teacher affirmatively and deliberately convey information and know what that information is." Doc. 84-1 at 35.

I am unpersuaded by the defendants' argument because it misconstrues the role that scienter plays in mitigating vagueness concerns. The value of a scienter requirement is that it limits a law's scope to those who knowingly engage in a particular course of conduct. Even if I were to accept the defendants' contention that a teacher can violate the Amendments only by deliberately conveying information to her students,[12] the absence of a true scienter requirement leaves teachers vulnerable to sanctions if they inadvertently cross the boundary between permissible and prohibited speech.

---

[12]    For the reasons I have explained, the defendants' assertion that the Amendments' prohibition against teaching applies only to the "affirmative and deliberate act of conveying information with knowledge of what information is being conveyed" rests on an untenable reading of the text. Id. at 27. Given the inherent ambiguity as to when a concept is "taught," a teacher could violate the Amendments without affirmatively and deliberately instructing students on a particular concept—for example, by failing to offer a disclaimer in response to a student's advocacy for a banned concept, which the defendants concede could form the basis for liability. Doc. 108 at 4-6, 10.

The First Circuit's decision in United States v. Nieves-Castano, 480 F.3d 597, 603 (1st Cir. 2007), illustrates the way in which a scienter requirement can mitigate the impact of an otherwise vague statute. There, the court considered a vagueness challenge to a criminal statute that prohibited a person from knowingly possessing a firearm "at a place that the individual knows, or has reasonable cause to believe, is a school zone." Id. at 602 (quoting 18 U.S.C. § 922(q)(2)(A) (amended 2015)). Because the statute defined the term "school zone" broadly as "the area 'within a distance of 1,000 feet from the grounds of a public, parochial[,] or private school,'" the defendant argued that the statute failed to provide objective criteria that a person could use to determine when they had entered a school zone. Id. at 603 (quoting 18 U.S.C. § 921(a)(25)(B)). In rejecting this argument, the court emphasized the importance of the statute's scienter requirement by stating that the defendant "could only have been convicted if she knew or reasonably should have known that her possession of the firearm was within a school zone, and this scienter requirement ameliorates any vagueness concerns." Id.

The legislation at issue in this case differs from the statute before the court in Nieves-Castano because teachers can face discipline for violating the Amendments by conveying banned information to a student without any proof that they have knowingly crossed the line that separates permissible

and prohibited speech. Because teachers can be found to have crossed that indistinct line without any finding of scienter, the vagueness of the Amendments is compounded rather than mitigated.

## C.   **Impact**

For the reasons I have explained, the Amendments are vague in ways that cannot be resolved through ordinary statutory interpretation. The record demonstrates that these ambiguities invite arbitrary enforcement and deprive teachers of fair notice, not only in theory but also in practice.

### 1.   Arbitrary Enforcement

Because the Amendments fail to establish "minimal guidelines to govern [their] enforcement," officials are free to "pursue their personal predilections" when applying the law. Kolender v. Lawson, 461 U.S. 352, 358 (1983) (quoting Goguen, 415 U.S. at 574-75 (1974)). Indeed, the record demonstrates that those charged with enforcing the law have relied on Commissioner Edelblut's personal opinions on what is appropriate instruction, as expressed in his op-ed articles, to guide their efforts.

The articles, which were written by Edelblut in his personal capacity, identified various actions by teachers and instructional materials that he viewed as problematic. Doc. 85-22 at 4; Doc. 85-41 at 3-4. The June 2021 article advocates for the Amendments by asserting that they are necessary to

address content that undermines American values and teaches students "to be racists," such as Kendi's book <u>How to Be an Antiracist</u>. Doc. 85-22 at 4. The April 2022 article does not reference the Amendments at all, but rather identifies various classroom materials pertaining to race and sexuality that, in Edelblut's view, "undermin[e] the sacred trust that educators hold" by "compromis[ing] the values of families." Doc. 85-41 at 4. Neither article explicitly states that the identified content runs afoul of the Amendments, let alone explains how it conflicts with the law.

Despite the fact that the articles offer minimal interpretive guidance, Department of Education officials have referred educators to them as a reference point. For example, after showing two music videos to her class as part of a unit on the Harlem Renaissance, Alison O'Brien, a social studies teacher at Windham High School, was called into a meeting with her principal and informed that she was being investigated by the Department of Education in response to a parent's complaint. Doc. 85-12 at 3. Department of Education Investigator Richard Farrell recommended that Windham's administrators consult Edelblut's April 2022 opinion article to understand the context of the investigation against O'Brien, without otherwise explaining why O'Brien's lesson warranted investigation. <u>Id.</u> at 5-6. After witnessing her

experience, O'Brien's colleagues grew anxious about facing similar actions themselves and modified their lesson plans accordingly. Id. at 6.

The threat of arbitrary enforcement based on Edelblut's personal views has impacted teachers even in the absence of a formal complaint. For example, teachers at Keene Middle School planned to have their eighth graders read another one of Kendi's books, Stamped: Racism, Antiracism, and You: A Remix of The National Book Award-winning "Stamped from the Beginning". Doc. 85-17 at 3. The school purchased 250 copies of the book but, after reading Edelblut's June 2021 article criticizing one of Kendi's other books, the planned reading was cancelled. Id. at 3-4.

As one teacher at the school explained, he and his colleagues were confused about what "kinds of teaching could take place and what kind[s] of materials could be used" under the Amendments and looked to "publicly available comments from the Commissioner" for guidance. Id. at 4. After reading Edelblut's June 2021 op-ed, the teachers concluded that Edelblut "believed the work of Dr. Kendi violated the [Amendments]." Id. Accordingly, the teachers decided against the planned reading. Id.

As these examples demonstrate, the Amendments' ambiguities leave significant gaps that both officials and teachers understand can only be filled by those charged with their enforcement. By referring educators to Edelblut's

articles for guidance, the department relies on Edelblut's personal views to
serve as gap-filler and therefore threatens teachers with enforcement on an
"ad hoc and subjective basis" guided by the "personal preferences" of an
unelected official rather than clearly delineated statutory standards.
Grayned, 408 U.S. at 109, 113 n.22.

　　　　2.　　Insufficient Notice

Vague laws have been likened to a sword of Damocles, dangling above
the heads of those it governs and threatening to drop without any warning.
As Justice Marshall observed in Arnett v. Kennedy, the "value of a sword of
Damocles is that it hangs—not that it drops. For every employee who risks
his job by testing the limits of the statute, many more will choose the
cautious path and not speak at all." 416 U.S. 134, 231 (1974) (Marshall, J.,
dissenting).

Justice Marshall's remarks ring true here. As the record demonstrates,
uncertainty surrounding what the Amendments do and do not prohibit has
caused teachers to err on the broad side of caution by self-censoring their
lesson plans and, in some circumstances, leaving the profession altogether.

Consider, for example, Jennifer Given, a former high school social
studies teacher at Hollis/Brookline High School with 19 years of experience in
the field. Doc. 85-15 at 3. Based on the "constant confusion with students and

parents" caused by the Amendments, Given felt the need to significantly modify her teaching methods "out of fear that [she] would be accused of" violating the Amendments, regardless of whether she was actually doing so. Id. at 3. For example, Given stopped assessing student performance through essay and open-ended short answer questions out of concern that those methodologies might be misinterpreted by students who believed they had to agree with a certain position to score well on an assessment. Id. Given also significantly restricted open class discussion and stopped allowing her students to choose their own topics for research papers out of a concern that the students would include subject matter in their papers that could violate the Amendments. Id. at 3-4. Additionally, Given refrained from "analogizing material to students' own experiences and interests"—despite the pedogeological value of doing so "in social studies curriculums and historical courses where students can easily believe historical events only happened in the past"—out of fear that such discussions could lead to a complaint against her. Id. at 4. Given found that these changes negatively impacted student learning and resulted in decreased class participation. Id. at 3-4. Given was so troubled by this fact, and so frustrated by the difficulties presented by the Amendments, that she decided to leave teaching altogether. Id. at 3.

Patrick Keefe, a high school English teacher at Campbell High School, has also modified his teaching practices out of fear of violating the Amendments. Doc. 85-13 at 3. For example, Keefe's students read the novel Beloved, by Toni Morrison, which examines the "destructive legacy of slavery" through the story of a formerly enslaved woman in the post-Civil War period. Id. at 5. Prior to the Amendments' passage, Keefe would attempt to place the novel "in a contemporary framework" by inviting students to consider, for example, whether the legacy of slavery is evident in the modern world or how the novel's themes relate to current events like the Black Lives Matter movement. Id. Now, however, Keefe is uncomfortable engaging with students in this way because he worries that it could be "misunderstood" as implying that "there is a 'correct' answer to [his] question[s]" or that students are "'require[ed]' . . . to agree" with the premise of those questions. Id. at 5-6. Keefe fears that, because "parents and students misunderstand instruction techniques, such as using the Socratic method, playing devil's advocate, or seemingly agreeing or disagreeing with a student in order to draw out analytical thinking," he might be subject to a complaint based on a misinterpretation of his lesson. Id. at 6. In an attempt to assuage his fears, Keefe asked the school administration for additional guidance on how to comply with the Amendments, but he "was told there was none available

other than the Attorney General's Frequently Asked Questions." Id. Given the uncertainty as to the law's reach, Keefe is unsure how to engage in "any contemporary investigation of race" without violating the Amendments and feels compelled to avoid the topic altogether, despite the "valuable analytical training" that the exercise provides to students. Id.

The Amendments have chilled extracurricular speech as well. Ryan Richman, a high school history teacher at Timberlane Regional High School, has censored not only his lesson plans but also his interactions with students through his role as a faculty advisor for the school's Model United Nations team. Doc. 85-18 at 3-4. Richman explains that he has restricted what he says "around the students in their research for competitions, on the way to competitions, and in everyday interactions"—conversations which could be subject to First Amendment protection—out of fear that he might violate the Amendments by commenting on the sort of "controversial topics" that frequently arise at Model UN competitions. Id. at 4. As a result of these constraints and Richman's concerns about the effects that they are having on his students, Richman is considering resigning. Id.

These examples are only illustrative of the wide-ranging difficulties that teachers face in attempting to conform their behavior to the vague strictures of the Amendments. Without adequate notice of what the

Amendments prohibit, teachers are incentivized to steer well clear of anything that could be construed as violating the Amendments, even if it means utilizing less effective teaching methods. As a result, the work teachers do best is inhibited, and students are forced to bear the costs of the Amendments' ambiguity.

## IV.  <u>REMEDY</u>

Having concluded that the Amendments' prohibitions against teaching banned concepts are unconstitutionally vague, I must consider which, if any, parts of the Amendments may nonetheless be upheld. The Amendments are subject to a severability clause that requires courts to preserve any parts or applications of the Amendments that are unaffected by a judicial determination that other parts or applications are invalid.[13] Relying on this clause, the defendants argue that, if the plaintiffs' vagueness claim has merit, it should be resolved by invalidating only subsection IV of RSA § 193:40, which treats any violation of RSA § 193:40 as a violation of the educator code of conduct. The defendants appear to base this argument on their view that the Amendments can only be unconstitutionally vague if

---

[13]    The clause states that "[i]f any provision of sections 297-298, or the application of any provision to any person or circumstance is held to be invalid, the remainder of such sections, and their application to any other persons or circumstances shall not be affected thereby." HB2 § 91:299.

teaching a banned concept can be sanctioned as a code of conduct violation. I am unpersuaded by this argument because the premise on which it is based is false.

The Amendments are vague not because they subject teachers to severe professional sanctions, but because they fail to provide teachers with sufficient notice of what is prohibited and raise the specter of arbitrary and discretionary enforcement. Invalidating RSA § 193:40, IV would fail to address these concerns because the plaintiffs would continue to be directly barred from teaching the banned concepts by the remaining subsections of RSA § 193:40. They would also be indirectly prohibited from teaching the banned concepts by RSA §§ 354-A:32 and 354-A:33, which bar public schools from teaching the concepts, because schools would be required to enforce the prohibitions against their teachers to avoid damages actions. And, for the reasons I explained, teachers who aid and abet their employers in teaching the concepts would themselves continue to face the prospect of individual damages actions under RSA § 354-A.

Thus, although striking down RSA § 193:40, IV would certainly lessen the harm that teachers would face for teaching a banned concept, its invalidation alone would not free teachers from the need to guess as to whether they are acting unlawfully. Nor would it provide those charged with

enforcing the Amendments with the guidance they need to prevent arbitrary enforcement. Accordingly, I cannot resolve the plaintiffs' vagueness claim merely by invalidating RSA § 193:40, IV. Instead, the constitutional infirmities I have identified require the invalidation of not only the sanction provided by RSA § 193:40, IV, but also the vague provisions themselves—RSA §§ 354-A:31, 354-A:32, and 193:40.[14]

## V.   CONCLUSION

The Amendments are viewpoint-based restrictions on speech that do not provide either fair warning to educators of what they prohibit or sufficient standards for law enforcement to prevent arbitrary and discriminatory enforcement. Thus, the Amendments violate the Fourteenth Amendment to the U.S. Constitution.

Although the plaintiffs have sought both declaratory and injunctive relief, I have no reason to believe that the defendants will fail to respect this

---

[14]    The plaintiffs do not expressly challenge RSA §§ 354-A:29 or 354-A:33, nor do those provisions include the vague language that plagues RSA §§ 354-A:31, 354-A:32, and 193:40. Thus, I decline to invalidate these provisions. See N.H. Democratic Party v. Sec'y of State, 174 N.H. 312, 331 (2021) (explaining that under New Hampshire law, courts are to "presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved" and consider "whether the unconstitutional provisions of the statute are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the statute") (quoting Associated Press v. State, 153 N.H. 120, 141 (2005)).

court's ruling that the Amendments are unconstitutional on their face.

Accordingly, I grant the plaintiffs' request for declaratory relief but

determine that injunctive relief is not necessary at the present time. See

Wooley v. Maynard, 430 U.S. 705, 711 (1977) (explaining that injunctive

relief is not required if the plaintiffs' interests will be protected by a

declaratory judgment).

     For the reasons discussed, the plaintiffs' motion for summary judgment

(Doc. 83) is granted as set forth herein. The defendants' cross-motion for

summary judgment (Doc. 84) is denied.

     SO ORDERED.

                        /s/ Paul J. Barbadoro
                        Paul J. Barbadoro
                        United States District Judge

May 28, 2024

cc:   Counsel of Record

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

Local 8027, AFT-N.H., AFL-CIO, et al.,

    v.                                  Case No. 21-cv-1077-PB

Frank Edelblut, Commissioner,
N.H. Department of Education, et al.

## **JUDGMENT**

In accordance with the Memorandum and Order dated January 12, 2023, and the Memorandum and Order dated May 28, 2024, judgment is hereby entered as follows:

1.  Plaintiffs are awarded declaratory relief that N.H. Rev. Stat. Ann. §§ 354-A:31, 354-A:32, and 193:40 are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

2. Plaintiffs' claim that they have a First Amendment right to control their curricular speech is dismissed for failure to state a claim.

3.  Plaintiffs' remaining claims are dismissed as moot.

BY THE COURT:

Daniel J. Lynch
Clerk of Court

June 24, 2024

APPROVED AS TO FORM:

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

cc:    Counsel of Record



**EXHIBIT 1**

D. Fenton

5/17/2023

Reporter: Sharon Saalfield
RDR, CRR

# EXHIBIT 1

Full text of
The Banned Concepts Act

CHAPTER 91
HB 2-FN-A-LOCAL - FINAL VERSION

7Apr2021... 1059h
06/03/2021   1799s
06/03/2021   1816s
06/03/2021   1859s
06/03/2021   1842s
06/03/2021   1821s
06/03/2021   1827s
06/03/2021   1866s
06/03/2021   1884s
24Jun2021... 2040CofC
24Jun2021... 2048EBA

2021 SESSION

21-1082
08/10

HOUSE BILL     *2-FN-A-LOCAL*

AN ACT         relative to state fees, funds, revenues, and expenditures.

SPONSORS:      Rep. Weyler, Rock. 13; Rep. L. Ober, Hills. 37; Rep. Edwards, Rock. 4; Rep. Umberger, Carr. 2

COMMITTEE:     Finance

---

## AMENDED ANALYSIS

This bill:

1. Requires the judicial branch to reimburse the sheriff's offices for costs of court security and prisoner custody and control, within available funds appropriated by the legislature, and requires remote technology whenever possible.

2. Makes a transfer of unexpended funds to the state heating system savings account.

3. Eliminates the bureau of planning and management functions and moves such functions to the division of plant and property.

4. Establishes the graphic services fund in the department of administrative services.

5. Consolidates human resources and payroll functions in the department of administrative services.

6. Repeals the memorandum of understanding with the commissioner of the department of health and human services for the purpose of delineating the functions to be assumed by the department of administrative services.

7. Extends the date on which an appropriation to the department of administrative services for scheduling software lapses.

8. Directs the payment of state employee medical benefits payments from the retirement system.

9. Enables the supreme court to transfer funds.

PL 00002

## CHAPTER 91
## HB 2-FN-A-LOCAL - FINAL VERSION

66. Removes the consideration of weighted apportionment factors under the business profits tax from inclusion in the tax expenditure report and includes the regional career and technical education center tax credit.

67. Allowing the department of employment security to participate in a department of labor information hub to combat fraud and waste.

68. Establishes and describes a right to freedom from certain types of discrimination based on age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin in public workplaces and education.

69. Requires violations of the governor's emergency orders regarding the Covid-19 pandemic to be reversed.

70. Creates a database for animal records; renames animal health certificates as certificates of transfer; authorizes the commissioner of the department of agriculture, markets, and food to transfer money to and from certain funds in order to establish the animal record database and to repay monies transferred from other funds; and establishes a position in the department of information technology for the building and management of the animal records database.

71. Establishes the dual and concurrent enrollment program in the community college system of New Hampshire and amends the administrative responsibilities for the program.

72. Makes an appropriation to the community college system of New Hampshire for the dual and concurrent enrollment program.

73. Increases the limit on the amount of the annual grant for leased space provided to a chartered public school.

74. Requires the department of education to develop and maintain a 10-year plan for school building grant projects.

75. Provides that the amount necessary to fund kindergarten adequate education grants shall be appropriated from the education trust fund; authorizes the governor to draw a warrant to eliminate a deficit if the balance in the education trust fund falls below zero; and makes an appropriation to the department of education for fiscal year 2020 kindergarten funding.

76. Provides that members-at-large are included as representatives of the same town as a deceased member of a school planning committee for the purpose of filling vacancies.

77. Makes an appropriation to the department of transportation for the highway and bridge betterment program and the acquisition of fleet vehicles.

78. Makes an appropriation to the department of education for school building aid payments to school districts and suspends the cap on school building aid grants for the biennium ending June 30, 2023.

79. Reduces the amount of education tax revenue to be raised for the 2023 fiscal year.

80. Requires the department of health and human services to fund employment-related child care services without a wait list and to provide enrollment-based reimbursement to certain child care providers for the fiscal year ending June 30, 2022 without using general funds.

81. Makes an appropriation to the department of health and human services to operate the Sununu youth services center and closes the Sununu youth services center in 2023.

**CHAPTER 91**
**HB 2-FN-A-LOCAL - FINAL VERSION**
**- Page 145 -**

1 ████████████████████████████████████████████
2 ████████████████████████████████████████████
3 ████████████████████████████████████████████
4 ████████████████████████████████████████████
5 ████████████████████████████████████████████
6 ████████████████████████████████████████████
7 ████████████████████████████████████████████
8 ██

9  91:297   New Subdivision; State Commission on Human Rights; Right to Freedom From

10 Discrimination in Public Workplaces and Education. Amend RSA 354-A by inserting after section 28

11 the following new subdivision:

12            Right to Freedom from Discrimination in Public Workplaces and Education

13    354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education.

14    I. The general court hereby finds and declares that practices of discrimination against any

15 New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed,

16 color, marital status, familial status, mental or physical disability, religion, or national origin are a

17 matter of state concern, that discrimination based on these characteristics not only threatens the

18 rights and proper privileges of New Hampshire inhabitants but menaces the institutions and

19 foundation of a free democratic state and threatens the peace, order, health, safety and general

20 welfare of the state and its inhabitants.

21    II. Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or

22 other workplace sensitivity training based on the inherent humanity and equality of all persons and

23 the ideal that all persons are entitled to be treated with equality, dignity, and respect.

24    III. Nothing in this subdivision shall be construed to limit the academic freedom of faculty

25 members of the university system of New Hampshire and the community college system of New

26 Hampshire to conduct research, publish, lecture, or teach in the academic setting.

27    354-A:30 Definitions. In this subdivision:

28    I. "Government program" means any activity undertaken by a public employer, both as an

29 employer and in performance of its government function.

30    II. "Public employee" means any person working on a full-time or part-time basis for the

31 state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts,

32 water districts, school districts, school administrative units, or quasi-public entities.

33    III. "Public employer" includes the state or any subdivision thereof, including, but not

34 limited to counties, cities, towns, precincts, water districts, school districts, school administrative

35 units, or quasi-public entities.

36    354-A:31 Prohibition on Public Employers. No public employer, either directly or through the

37 use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service

1    recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the
2    following:

3           I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
4    status, familial status, mental or physical disability, religion, or national origin, are inherently
5    superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
6    color, marital status, familial status, mental or physical disability, religion, or national origin;

7           II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
8    race, creed, color, marital status, familial status, mental or physical disability, religion, or national
9    origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10          III. That an individual should be discriminated against or receive adverse treatment solely
11   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
12   status, familial status, mental or physical disability, religion, or national origin; or

13          IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color,
14   marital status, familial status, mental or physical disability, religion, or national origin cannot and
15   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
16   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
17   or national origin.

18   354-A:32  Prohibition on the Content of Government Programs and Speech.  No government
19   program shall teach, advocate, or advance any one or more of the following:

20          I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
21   status, familial status, mental or physical disability, religion, or national origin are inherently
22   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
23   color, marital status, familial status, mental or physical disability, religion, or national origin;

24          II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
25   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
26   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

27          III. That an individual should be discriminated against or receive adverse treatment solely
28   or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
29   status, familial status, mental or physical disability, religion, or national origin; or

30          IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color,
31   marital status, familial status, mental or physical disability, religion, or national origin cannot and
32   should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
33   orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
34   or national origin.

35   354-A:33  Protection for Public Employees.  No public employee shall be subject to any adverse
36   employment action, warning, or discipline of any kind for refusing to participate in any training,
37   program, or other activity at which a public employer or government program advocates, trains,

CHAPTER 91
HB 2-FN-A-LOCAL - FINAL VERSION
- Page 147 -

1   teaches, instructs, or compels participants to express belief in, or support for, any one or more of the
2   following:

3        I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital
4   status, familial status, mental or physical disability, religion, or national origin are inherently
5   superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed,
6   color, marital status, familial status, mental or physical disability, religion, or national origin;

7        II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation,
8   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
9   origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

10       III. That an individual should be discriminated against or receive adverse treatment solely
11  or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital
12  status, familial status, mental or physical disability, religion, or national origin; or

13       IV.  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
14  marital status, familial status, mental or physical disability, religion, or national origin cannot and
15  should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual
16  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
17  or national origin.

18       354-A:34  Remedies.  Any person aggrieved by an act made unlawful under this subdivision may
19  pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any
20  other applicable common law or statutory cause of action.

21       91:298  New Section; Prohibition on Teaching Discrimination.  Amend RSA 193 by inserting
22  after section 39 the following new section:

23       193:40  Prohibition on Teaching Discrimination.

24       I.  No pupil in any public school in this state shall be taught, instructed, inculcated or
25  compelled to express belief in, or support for, any one or more of the following:

26            (a)  That one's age, sex, gender identity, sexual orientation, race, creed, color, marital
27  status, familial status, mental or physical disability, religion or national origin is inherently superior
28  to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status,
29  familial status, mental or physical disability, religion, or national origin;

30            (b)  That an individual, by virtue of his or her age, sex, gender identity, sexual
31  orientation, race, creed, color, marital status, familial status, mental or physical disability, religion,
32  or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

33            (c)  That an individual should be discriminated against or receive adverse treatment
34  solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color,
35  marital status, familial status, mental or physical disability, religion, or national origin; or

36            (d)  That people of one age, sex, gender identity, sexual orientation, race, creed, color,
37  marital status, familial status, mental or physical disability, religion, or national origin cannot and

## CHAPTER 91
### HB 2-FN-A-LOCAL - FINAL VERSION
#### - Page 148 -

1   should not attempt to treat others without regard to age, sex, gender identity, sexual orientation,
2   race, creed, color, marital status, familial status, mental or physical disability, religion, or national
3   origin.

4       II. Nothing in this section shall be construed to prohibit discussing, as part of a larger
5   course of academic instruction, the historical existence of ideas and subjects identified in this
6   section.

7       III. Any person claiming to be aggrieved by a violation of this section, including the attorney
8   general, may initiate a civil action against a school or school district in superior court for legal or
9   equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-
10  A:34.

11      IV. Violation of this section by an educator shall be considered a violation of the educator
12  code of conduct that justifies disciplinary sanction by the state board of education.

13      V. For the purposes of this section, "educator" means a professional employee of any school
14  district whose position requires certification by the state board pursuant to RSA 189:39.
15  Administrators, specialists, and teachers are included within the definition of this term.

16  91:299 Severability. If any provision of sections 297-298, or the application of any provision to
17  any person or circumstance is held to be invalid, the remainder of such sections, and their
18  application to any other persons or circumstances shall not be affected thereby.

19  91:300 Effective Date. Sections 297-299 of this act shall take effect upon passage.



# TITLE XV
# EDUCATION

## CHAPTER 193
## PUPILS

## Discrimination in Public Schools

### Section 193:40

**193:40 Prohibition on Teaching Discrimination. –**
I. No pupil in any public school in this state shall be taught, instructed, inculcated or compelled to express belief in, or support for, any one or more of the following:
(a) That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
(b) That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
(c) That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or
(d) That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.
II. Nothing in this section shall be construed to prohibit discussing, as part of a larger course of academic instruction, the historical existence of ideas and subjects identified in this section.
III. Any person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights as provided in RSA 354-A:34.
IV. Violation of this section by an educator shall be considered a violation of the educator code of conduct that justifies disciplinary sanction by the state board of education.
V. For the purposes of this section, "educator" means a professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39. Administrators, specialists, and teachers are included within the definition of this term.

**Source.** 2021, 91:298, eff. June 25, 2021.

# Right to Freedom from Discrimination in Public Workplaces and Education

## Section 354-A:29

**354-A:29 Right to Freedom from Discrimination in Public Workplaces and Education. –**
I. The general court hereby finds and declares that practices of discrimination against any New Hampshire inhabitants because of age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are a matter of state concern, that discrimination based on these characteristics not only threatens the rights and proper privileges of New Hampshire inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.
II. Nothing in this subdivision shall be construed to prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect.
III. Nothing in this subdivision shall be construed to limit the academic freedom of faculty members of the university system of New Hampshire and the community college system of New Hampshire to conduct research, publish, lecture, or teach in the academic setting.

**Source.** 2021, 91:297, eff. June 25, 2021.

## Section 354-A:30

**354-A:30 Definitions. –**
In this subdivision:
I. "Government program" means any activity undertaken by a public employer, both as an employer and in performance of its government function.
II. "Public employee" means any person working on a full-time or part-time basis for the state, or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.
III. "Public employer" includes the state or any subdivision thereof, including, but not limited to counties, cities, towns, precincts, water districts, school districts, school administrative units, or quasi-public entities.

**Source.** 2021, 91:297, eff. June 25, 2021.

## Section 354-A:31

**354-A:31 Prohibition on Public Employers. –**
No public employer, either directly or through the use of an outside contractor, shall teach, advocate, instruct, or train any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group, any one or more of the following:
I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or
IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial

status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**Source.** 2021, 91:297, eff. June 25, 2021.

## Section 354-A:32

**354-A:32 Prohibition on the Content of Government Programs and Speech. –**
No government program shall teach, advocate, or advance any one or more of the following:
I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or
IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**Source.** 2021, 91:297, eff. June 25, 2021.

## Section 354-A:33

**354-A:33 Protection for Public Employees. –**
No public employee shall be subject to any adverse employment action, warning, or discipline of any kind for refusing to participate in any training, program, or other activity at which a public employer or government program advocates, trains, teaches, instructs, or compels participants to express belief in, or support for, any one or more of the following:
I. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin are inherently superior or inferior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;
II. That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
III. That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or
IV. That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin cannot and should not attempt to treat others equally and/or without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

**Source.** 2021, 91:297, eff. June 25, 2021.

## Section 354-A:34

**354-A:34 Remedies.** – Any person aggrieved by an act made unlawful under this subdivision may pursue all of the remedies available under RSA 354-A, RSA 491, RSA 275-E, or RSA 98-E, or any other applicable common law or statutory cause of action.

**Source.** 2021, 91:297, eff. June 25, 2021.