**24-1690**

IN THE

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

◆◆

ANDRES MEJIA; CHRISTINA KIM PHILIBOTTE; NATIONAL EDUCATION
ASSOCIATION – NEW HAMPSHIRE; LOCAL 8027, AFT–NEW HAMPSHIRE,
AFL–CIO; JOCELYN MERRILL; KIMBERLY GREEN ELLIOT;
RYAN RICHMAN; MEGHAN EVELYN DURDEN; JOHN DUBE,

*Plaintiffs-Appellees,*

—v.—

FRANK EDELBLUT, in their official capacity as Commissioner, New Hampshire
Department of Education; JOHN M. FORMELLA, in their official capacity as New

(*Caption continued on inside cover*)

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

## BRIEF FOR PLAINTIFFS-APPELLEES
## [REDACTED]

CHARLES G. MOERDLER
  (No. 1213343)
HARRY SANDICK
  (No. 1213342)
JOSHUA M. GOLDMAN
  (No. 1204166)
PATTERSON BELKNAP WEBB
  & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
cmoerdler@pbwt.com
hsandick@pbwt.com
jgoldman@pbwt.com

PETER PERRONI
  (No. 91613)
NOLAN PERRONI PC
73 Princeton Street
North Chelmsford, Massachusetts 01863
(978) 454-3800
peter@nolanperroni.com

*Counsel for Plaintiffs-Appellees*
  *Local 8027, AFT-New Hampshire,*
  *AFL-CIO, Ryan Richman, John Dube,*
  *Joceyln Merrill, Kimberly Green*
  *Elliott and Meghan Evelyn Durden*

GILLES R. BISSONNETTE
  (No. 123868)
HENRY R. KLEMENTOWICZ
  (No. 1179814)
SANGYEOB KIM
  (No. 1183553)
AMERICAN CIVIL LIBERTIES UNION
  OF NEW HAMPSHIRE
18 Low Avenue
Concord, New Hampshire 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org
sangyeob@aclu-nh.org

*Counsel for Plaintiffs-Appellees*
  *Andres Mejia and Christina*
  *Kim Philibotte*

(*Counsel continued on inside cover*)

Hampshire Attorney General; AHNI MALACHI, in their official capacity as Executive Director, New Hampshire Commission for Human Rights; CHRISTIAN KIM, in their official capacity as Chairperson, New Hampshire Commission for Human Rights; KEN MERRIFIELD, in their official capacity as Commissioner, New Hampshire Department of Labor,

*Defendants-Appellants.*

———————————

CHRIS ERCHULL
  (No. 1199326)
GLBTQ LEGAL ADVOCATES
  & DEFENDERS
18 Tremont, Suite 950
Boston, Massachusetts 02108
(617) 426-1350
cerchull@glad.org

MORGAN C. NIGHAN
  (No. 1157304)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 345-1031
mnighan@nixonpeabody.com

DAVID A. VICINANZO
  (No. 27729)
S. AMY SPENCER
  (No. 1180937)
Nixon Peabody LLP
900 Elm Street, 14th Floor
Manchester, New Hampshire 03101
(603) 628-4000
dvicinanzo@nixonpeabody.com
aspencer@nixonpeabody.com

JENNIFER EBER
  (No. 39766)
KAYLA TURNER
  (No. 1213333)
DISABILITY RIGHTS CENTER-
  NEW HAMPSHIRE
64 North Main Street, Suite 2
Concord, New Hampshire 03301
(603) 228-0432
jennifere@drcnh.org
kaylat@drcnh.org

WILLIAM E. CHRISTIE
  (No. 84929)
SHAHEEN & GORDON, P.A.
107 Storrs Street
P.O. Box 2703
Concord, New Hampshire 03302
(603) 225-7262
wchristie@shaheengordon.com

EMERSON SYKES
  (No. 1197408)
LEAH WATSON
  (No. 1213334)
SARAH HINGER
  (No. 1184271)
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

*Counsel for Plaintiffs-Appellees Andres Mejia and Christina Kim Philibotte*

JASON WALTA
  (No. 78674)
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth Street NW
Washington, DC 20036
(202) 822-7035
jwalta@nea.org

LAUREN SNOW CHADWICK
  (No. 1213339)
CALLAN E. SULLIVAN
  (No. 1213504)
NATIONAL EDUCATION ASSOCIATION–
  NEW HAMPSHIRE
9 South Spring Street
Concord, New Hampshire 03301
(603) 224-7751
lchadwick@nhnea.org
csullivan@nhnea.org

NATHAN R. FENNESSY
  (No. 1159549)
PRETI FLAHERTY BELIVEAU
  & PACHIOS LLP
57 North Main Street
Concord, New Hampshire 03301
(603) 410-1500
nfennesy@preti.com

*Counsel for Plaintiffs-Appellees
  National Education Association –
  New Hampshire*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................1

STATEMENT OF THE ISSUES ....................................................................5

STATEMENT OF THE CASE .......................................................................5

I.    Factual Background..................................................................................5

      A.    The New Hampshire Legislature Targets Critical Race Theory .........5

      B.    The Banned Concepts Law's Prohibitions and Penalties ...................8

            1.    The Law Sets Forth Broad and Undefined Concepts ...............8

            2.    The Law Imposes Harsh Consequences for Its Violation .........9

            3.    New Hampshire's Enforcement Scheme Spreads
                 Enforcement Authority to Multiple Agencies with
                 Unfettered Interpretive Discretion..........................................10

      C.    Defendants' Attempted Guidance Fails To Remedy the Law's
          Confusion ........................................................................................13

      D.    Defendants' Enforcement Actions and the Law's Impact on
          Educators........................................................................................18

II.    Procedural History.................................................................................21

      A.    Plaintiffs File Suit and the District Court Denies Defendants'
          Motion to Dismiss...........................................................................21

      B.    The District Court Granted Summary Judgment to Plaintiffs,
          Ruling That the Banned Concepts Law Was Void for
          Vagueness ......................................................................................22

SUMMARY OF THE ARGUMENT ...........................................................25

ARGUMENT ................................................................................................27

I.    Standard of Review ...............................................................................27

A.   The Law Warrants the Most Exacting Vagueness Review ..............28

B.   A Statute Need Not Be "Vague in All Circumstances" to Be Unconstitutional ...................................................................................31

C.   The District Court Properly Considered Factual Evidence in Its Vagueness Analysis .............................................................................32

II.   The Banned Concepts Law Is Unconstitutionally Vague ...........................35

A.   The Law's Text Fails to Give a Person of Ordinary Intelligence a Reasonable Opportunity to Know What Is Prohibited so That They May Act Accordingly .................................................................35

1.   The Four Banned Concepts Are Hopelessly Unclear..............35

2.   The Law Is Likewise Vague as to What It Means to "Teach," "Instruct," "Inculcate" or "Compel[] [a student to] Express Belief" in a Banned Concept ................................43

3.   Defendants' Reliance on Dictionary Definitions in Defining "Teaching" Does Not Remedy this Confusion. .......48

4.   Compounding the Law's Vagueness, It Lacks a Scienter Requirement and Can Be Violated by Implication..................53

B.   The Law Is Susceptible to Arbitrary and Discriminatory Enforcement .........................................................................................55

III.   Severing RSA 193:40, IV Would Not Cure the Law's Ambiguities...........62

IV.   Alternatively, the Law Violates Educators' First Amendment Rights ........68

A.   The Law Reaches Educators' Private, Protected Speech on Matters of Public Concern ....................................................................68

B.   The Law Is Subject to Strict Scrutiny, Which Defendants Cannot Satisfy .....................................................................................74

CONCLUSION....................................................................................................76

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Baggett v. Bullitt,
377 U.S. 360 (1964) ........................................................................49

Baird v. Bellotti,
450 F. Supp. 997 (D. Mass. 1978)....................................................65

Black Emergency Response Team v. Drummond,
No. 21-cv-1022-G, 2024 WL 3015359 (W.D. Okla. June 14,
2024)................................................................................................27

Bruce v. Worcester Reg'l Transit Auth.,
34 F.4th 129 (1st Cir. 2022) .......................................................70, 71

Carolina Youth Action Project; D.S. by & through Ford v. Wilson,
60 F.4th 770 (4th Cir. 2023)......................................................*passim*

City of Chicago v. Morales,
527 U.S. 41 (1999) ....................................................36, 55, 56, 60

City of San Diego, Cal. v. Roe,
543 U.S. 77 (2004) ..........................................................................75

Claremont Sch. Dist. v. Governor (Statewide Property Tax Phase-in),
144 N.H. 210 (1999)........................................................................64

Cleveland Bd. of Educ. v. Loudermill,
470 U.S. 532, 543 (1985) ...............................................................29

Colautti v. Franklin,
439 U.S. 379 (1979) ........................................................................31

Cole v. Richardson,
405 U.S. 676 (1972) ........................................................................32

Connick v. Myers,
461 U.S. 138 (1983) ........................................................................73

Ehlert v. United States,
    402 U.S. 99 (1971) ............................................................................32

Formella v. Hood, et al.
    (filed Dec. 13, 2023, N.H. Human Rights Commission) ...................66

Frese v. Formella,
    53 F.4th 1 (1st Cir. 2022) ...........................................................34, 35

Garcetti v. Ceballos,
    547 U.S. 410 (2006) ..................................................................69, 70

Giaccio v. State of Pennsylvania,
    382 U.S. 399 (1966) ........................................................................28

Grayned v. City of Rockford,
    408 U.S. 104 (1972) .................................................................*passim*

Guerrero v. Whitaker,
    908 F.3d 541 (9th Cir. 2018) ..........................................................31

Honeyfund.com, Inc. v. Desantis,
    622 F. Supp. 3d 1159 (N.D. Fla. 2022) ....................................*passim*

Hunt v. City of Los Angeles,
    638 F.3d 703 (9th Cir. 2011) ..........................................................47

Hynes v. Mayor & Council of Borough of Oradell,
    425 U.S. 610 (1976) ........................................................................30

Johnson v. United States,
    576 U.S. 591 (2015) .................................................................*passim*

Kennedy v. Bremerton Sch. Dist.,
    597 U.S. 507 (2022) ..............................................................69, 70, 74

Keyishian v. Bd. of Regents of Univ. of State of N.Y.,
    385 U.S. 589 (1967) ...............................................................2, 44, 49

Kolender v. Lawson,
    461 U.S. 352 (1983) .................................................................*passim*

Konits v. Valley Stream Cent. High Sch. Dist.,
    394 F.3d 121 (2d Cir. 2005) .................................................................73

Lanzetta v. New Jersey,
    306 U.S. 451 (1939) .........................................................................31

League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,
    66 F.4th 905 (11th Cir. 2023) ............................................................51

Loc. 8027 et al. v. Edelblut et al.,
    No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024)...................22

Loc. 8027 et al. v. Edelblut et al.,
    651 F. Supp. 3d 444 (D.N.H. 2023) ....................................................22

MacRae v. Mattos,
    106 F.4th 122 (1st Cir. 2024) ............................................................72

Manning v. Caldwell for City of Roanoke,
    930 F.3d 264 (4th Cir. 2019)................................................29, 32, 57

Meriwether v. Hartop,
    992 F.3d 492 (6th Cir. 2021)..............................................................73

Modern Cont'l/Obayashi v. Occupational Safety and Health Rev.
    Comm'r,
    196 F.3d 274 (1st Cir. 1999) ..............................................................34

N.H. Democratic Party v. Sec'y of State,
    174 N.H. 312 (2021)..................................................................63, 68

Nat'l Org. for Marriage v. Daluz,
    654 F.3d 115 (1st Cir. 2011) ..............................................................36

Nat'l Org. for Marriage v. McKee,
    649 F.3d 34 (1st Cir. 2011) ...............................................................27

Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.,
    938 F.3d 424 (3d Cir. 2019) ........................................................40, 41

Opinion of the Justices, 106 N.H. 202 (1965).........................................63

Ozonoff v. Berzak,
    744 F.2d 224 (1st Cir. 1984) ........................................................44, 49

Papachristou v. City of Jacksonville,
    405 U.S. 156 (1972) ...................................................................53, 62

Pernell v. Fla. Bd. of Governors,
    641 F. Supp. 3d 1218 (N.D. Fla. 2022).......................................*passim*

Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.,
    Illinois,
    391 U.S. 563 (1968) ...........................................................................70

R.I. Med. Soc'y v. Whitehouse,
    239 F.3d 104 (1st Cir. 2001) ......................................................63, 64

Ridley v. Mass. Bay Transp. Auth.,
    390 F.3d 65 (1st Cir. 2004) ........................................................29, 74

Robinson v. Shell Oil Co.,
    519 U.S. 337 (1997) ...........................................................................48

Roman Catholic Bishop of Springfield v. City of Springfield,
    724 F.3d 78 (1st Cir. 2013) ........................................................27, 28

Rosenberger v. Rector & Visitors of Univ. of Va.,
    515 U.S. 819 (1995) ...........................................................................74

Santa Cruz Lesbian & Gay Cmty. Ctr. V. Trump,
    508 F. Supp. 3d 521 (N.D. Cal. 2020)................................6, 26, 38, 47

Sessions v. Dimaya,
    584 U.S. 148 (2018) .............................................................28, 29, 31

Smith v. Goguen,
    415 U.S. 566 (1974) .....................................................30, 33, 49, 62

Stonkus v. City of Brockton Sch. Dep't,
    322 F.3d 97 (1st Cir. 2003) ...............................................................18

Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    College,
    600 U.S. 181 (2023) ...........................................................................39

Thornhill v. Alabama,
310 U.S. 88 (1940) ........................................................................62

Tinker v. Des Moines Indep. Cmty. Sch. Dist.,
393 U.S. 503 (1969) ......................................................................69

U.S. Equal Opportunity Comm'n v. Fred Fuller Oil Company,
168 N.H. 606 (2016).......................................................................66

United States v. Cook,
914 F.3d 545 (7th Cir. 2019).........................................................31

United States v. Davis,
588 U.S. 445 (2019) ...............................................3, 31, 39, 49

United States v. Facteau,
89 F.4th 1 (1st Cir. 2023) .............................................................33

United States v. George,
886 F.3d 31 (1st Cir. 2018) ..........................................................68

United States v. JDT,
762 F.3d 984 (9th Cir. 2014).........................................................60

United States v. L. Cohen Grocery Co.,
255 U.S. 81 (1921) ...................................................................26, 33

United States v. Lachman,
387 F.3d 42 (1st Cir. 2004) ..........................................................34

United States v. Nat'l Treasury Emps. Union,
513 U.S. 454 (1995) .................................................................74, 75

United States v. Nieves-Castano,
480 F.3d 597 (1st Cir. 2007) ........................................................53

United States v. Requena,
980 F.3d 30 (2d Cir. 2020) ...........................................................32

United States v. Williams,
553 U.S. 285 (2008) ..........................................................25, 59, 60

URI Student Senate v. Town of Narragansett,
    631 F.3d 1 (1st Cir. 2011) .................................................36

Urofsky v. Gilmore,
    216 F.3d 401 (4th Cir. 2000) .............................................73

Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,
    455 U.S. 489 (1982) ...................................................28, 32

Whiting v. Town of Westerly,
    942 F.2d 18 (1st Cir. 1991) ...............................................33

Yates v. United States,
    574 U.S. 528 (2015) .........................................................48

Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit
    Auth.,
    89 F.4th 1337 (11th Cir. 2024) .........................................31

**Statutes**

N.H. Code Admin. R. Ed 502.01 ..............................................12

N.H. Code Admin. R. Ed 510.01 ..............................................65

N.H. Code Admin. R. Ed 510.02 ..............................................65

N.H. Code Admin. R. Ed 510.03 ..............................................65

N.H. Code Admin. R. Ed 510.05 ..........................................11, 61

N.H. Code Admin. R. Ed 511.01 ...............................11, 57, 60, 61

N.H. Code Admin. R. Hum 202.01 ...........................................13

N.H. Code Admin. R. Hum 206.01 ...........................................13

N.H. Code Admin. R. Hum 210.01 ...........................................13

RSA 186:11 .......................................................................19, 20

RSA 189:11 ............................................................................42

RSA 189:13-a .........................................................................30

RSA 193:38.................................................................................................65

RSA 193:40..............................................................................................*passim*

RSA 354-A ..............................................................................................*passim*

RSA 275-E ...............................................................................................56, 67

**Other Authorities**

U.S. Const. Amend. 1 ..............................................................................*passim*

U.S. Const. Amend. 14 ............................................................................*passim*

## **INTRODUCTION**

New Hampshire's "Banned Concepts Law" (or the "Law") is unconstitutionally vague. Enacted in June 2021, the Law bans the teaching, instruction, advocacy, advancement, and training of—or compelling a student to express belief in or support for—four concepts in public schools and places of public employment. The four concepts implicate aspects of "age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin." ADD157-67; APP1223-1230.[1]

The Law is unconstitutional because its proscriptions "border[] on unintelligible." See ADD134. For example, using a triple negative, one banned concept *prohibits* instruction "[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *cannot* and *should not* attempt to treat others *without regard to*" these same categories. RSA 193:40, I(d) (emphasis added). As such, the Law fails to provide necessary guidance to educators about what they can and cannot include in their lessons, thereby leaving total discretion to Defendants— namely, the Commissioner of the New Hampshire Department of Education ("DOE"), the New Hampshire Commission for Human Rights ("HRC") and its

---

[1] A brief key of citations: "APP" refers to the Appendix filed by Appellants; "SA" refers to the Sealed Appendix; "ADD" refers to the Addendum; and "Def's Br." refers to Defendants-Appellants opening brief in this Court.

1

directors, and the New Hampshire Department of Justice ("DOJ")—to both interpret and enforce the Law. What is more, the undisputed summary judgment record shows not just the risk of arbitrary and discriminatory enforcement, but also the chilling reality of it.

The Law's enforcement gravely impacts educators. Violating the Law imposes serious consequences on educators, from civil fines to the loss of their teaching licenses. And educators _must_ report any suspected violation of the Law to the DOE; failure to do so is itself punishable. Rather than clearly tell educators what they can and cannot teach, the Law has fostered a climate of fear and uncertainty. In practice, the Law's lack of clarity has incentivized educators to interpret the Law's prohibitions as expansively as possible to avoid the prospect of a complaint, investigation, or career ruin. As a result, teachers have pulled planned readings merely because they touched on topics like race in class materials and discussions. APP2599-2606; see Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 604 (1967) ("When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone.'") (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)). For example, one school district shelved Jason Reynolds and Dr. Ibram X. Kendi's 2020 book for students ages 12 and older entitled Stamped: Racism, Antiracism, and You: A Remix of the National Book Award-winning Stamped from the Beginning

2

("Stamped") after purchasing 250 copies for all the district's eighth graders to read. APP 1532-34 (O'Mara Decl. ¶¶ 8-20).

Abandoned by the state officials tasked with enforcing the Law, educators have been forced to make daily instruction decisions in a vacuum while the Law—and the prospect of Defendants' enforcement action—lurked in the background every time they assigned reading material or addressed student questions and comments.  While masquerading as an "anti-discrimination" law, the Law has suppressed instruction that is vital to creating a sense of belonging for New Hampshire youth, including for those students from historically marginalized communities and identities.  This untenable climate for New Hampshire's educators led Plaintiffs-Appellees—public school educators and staff, and two unions of public sector teachers (together, "Plaintiffs")—to bring this lawsuit, and lasted for three school years until the district court invalidated the Law on May 28, 2024. APP1490 (Keefe Decl. ¶¶ 15-18); APP1512 (Given Decl. ¶ 12); APP1496-97 (Philibotte Decl. ¶ 13).

The Due Process Clause's vagueness doctrine recognizes that a law like the Banned Concepts Law is "no law at all."  United States v. Davis, 588 U.S. 445, 447 (2019).  When presented with such a law, the role of the court "is not to fashion a new, clearer [one] to take its place, but to treat the law as a nullity and invite [the legislature] to try again."  Id. at 448.  The district court did just that here.  In a

carefully reasoned 50-page decision, the district court recognized the Law's defects and declared it void for vagueness. The district court correctly explained why the Law is vague and how it permits standardless enforcement in violation of the Due Process Clause. In addition, the Law fails to pass muster under the First Amendment, as it restricts the extracurricular speech of teachers on matters of public concern.

On appeal, Defendants urge this Court to ignore the Law's glaring deficiencies. They cabin their arguments about the Law's text to parsing and isolating each word, locating the word in the dictionary, and cobbling together a statutory meaning that is nowhere in either the Law's actual text or the Defendants' own guidance about the Law. In some instances, Defendants even add words to the statutory text—like "affirmative" and "deliberate"—to support their own interpretation. To argue that arbitrary and discriminatory enforcement is unlikely, Defendants also ignore the undisputed record in this case confirming that such arbitrariness has already occurred. They instead rely on their own manufactured meaning of the Law to deny its vagueness. Defendants' arguments fail to demonstrate any error in the district court's ruling, let alone reversible error. This Court should affirm.

## STATEMENT OF THE ISSUES

1.    Did the district court correctly hold that the Law violates the Fourteenth Amendment's Due Process Clause on its face because its "prohibitions against teaching banned concepts are unconstitutionally vague," and because the law contains "viewpoint-based restrictions on speech that do not provide either fair warning to educators of what they prohibit or sufficient standards for law enforcement to prevent arbitrary and discriminatory enforcement"?

2.    As an independent basis for affirmance, does the Law violate the First Amendment where it implicates the private, extracurricular speech of educators on matters of public concern?

## STATEMENT OF THE CASE

### I.    Factual Background

### A.    The New Hampshire Legislature Targets Critical Race Theory

Out of fear that so-called "Critical Race Theory"[2] had entered public-school curricula, New Hampshire legislators proposed what would become the Banned Concepts Law in early 2021 (then-New Hampshire House Bill 544, or "HB544"). HB 544's chief legislative sponsor argued that the bill's ban on so-called "divisive

---

[2] As described by the district court, CRT is an academic framework that contends that racism is more than just individual bias and prejudice, but rather systemic in American society, and embedded in laws, policies and institutions that uphold and reproduce racial inequalities.  ADD 107.

5

concepts" was necessary to prohibit "critical race theory" and, more specifically, to ban diversity and inclusion training, which he described as "snake oil" that "propos[es] to cure a disease but in actuality it's even making it worse."[3]

HB544 lifted its key prohibitions from an Executive Order that then-President Trump signed in September 2020, which sought to end federally funded training based on "propaganda" such as "CRT." APP2279-86; APP2005-09. The Executive Order banned federal contractors and federal grant recipients from engaging in workplace training that purportedly "inculcates" employees on various "divisive" concepts pertaining to race and sex. APP2279-86. Now targeted under the Order were trainings that used phrases like "white privilege," "intersectionality," "systemic racism," and "unconscious bias." APP2005-09. A federal court enjoined the Executive Order nationwide, ruling (in part) that the Order likely was unconstitutionally vague. See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020) (holding that banned concepts were "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited").

The New Hampshire legislature charged ahead. To ensure passage of HB544's prohibitions in the face of a threatened gubernatorial veto, the New

---

[3] See Executive Departments and Administration Hearing on HB 544 (Feb. 11, 2021), https://www.youtube.com/watch?v=ycrODcuaLDc (at 1:31:50, 1:37:20, 1:37:51).

Hampshire House of Representatives added HB544's core components as amendments to House Bill 2 ("HB2"), the annual budget trailer bill, and tied the budget's passage to keeping the Law in place.  APP2345-48; APP2373-2380.  In taking up HB2, the Senate rebranded these restrictions as an "anti-discrimination law," and inserted the banned concepts language into the preexisting New Hampshire "Law Against Discrimination" at N.H. Rev. Stat. Ann. ("RSA") ch. 354-A.  APP2351-55.  In other words, teaching about discrimination could now be treated as discrimination.  The Senate further aggravated the Law's prohibitions by including penalty provisions that specifically targeted certified educators under the Educator Code of Conduct ("Code") and creating a right of action for anyone "aggrieved" by violation of the Law, including the New Hampshire Attorney General. RSA 193:40, IV; RSA 193:40, III.  Like HB544, the Senate version sought "to ensure that the minds of the future generations of our state [were] not being unduly influenced by advocacy for such toxins as critical race theory."[4]

On June 13, 2021, while the bill was under consideration, Defendant DOE Commissioner Frank Edelblut published an op-ed in the *Union Leader*.  There, he attacked "those who promote Critical Race Theory or similar concepts," and claimed that the proposed law was "important" and "needed" to prevent concepts

---

[4] Senate Finance Committee, May 26, 2021 HB2 Deliberations (at 27:11), https://www.youtube.com/watch?v=0AbLc51xKrU.

like CRT from being taught in schools. APP1566-1570. As an example, Commissioner Edelblut highlighted Dr. Ibram X. Kendi's 2019 book How to Be an Antiracist as contradictory to "the very premises of the civil rights movement and Dr. Martin Luther King himself." Id.

A legislative committee of conference adopted the Senate's proposed version, and HB2 became law on June 25, 2021. APP456-63; APP2365-2372.

**B.     The Banned Concepts Law's Prohibitions and Penalties**

   1.     *The Law Sets Forth Broad and Undefined Concepts*

The Law identifies four "banned concepts" that a public primary or secondary school student may not be "taught, instructed, inculcated or compelled to express belief in, or support for":

   a.    That one's age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion or national origin is inherently superior to people of another age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin;

   b.    That an individual, by virtue of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

   c.    That an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin; or

   d.    That people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical

8

disability, religion, or national origin cannot and should not attempt to treat others without regard to age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin.

RSA 193:40, I.

The Law also added several new sections to Chapter 354-A, known as the "Law Against Discrimination," that incorporate the same banned concepts. Under those provisions, a public employer may not "teach, advocate, instruct, or train" the banned concepts to "any employee, student, service recipient, contractor, staff member, inmate, or any other individual or group," nor may any "government program . . . teach, advocate, or advance" any of the banned concepts. RSA 354-A:31-32.

### 2. *The Law Imposes Harsh Consequences for Its Violation*

HB2 created two primary means to enforce the Banned Concepts Law against educators. First, the Law creates a right of action for any person, including the Attorney General, "claiming to be aggrieved by a violation" to seek damages and injunctive relief from an offending school or school district. The plaintiff can commence such an action by filing a lawsuit in Superior Court or by filing a complaint with the HRC. RSA 193:40, III; RSA 354-A:34. Second, a violation of the Law was deemed a *per se* violation of DOE's Educator Code of Conduct. Teachers who violate the Law can face "disciplinary sanction by the state board of education." RSA 193:40, IV. Sanctions include reprimand, suspension, and

9

revocation of the educator's certification.  APP2823-26.[5]  In other words, if DOE finds that an educator taught or advocated a banned concept, the educator may lose their job and even the ability to teach at any New Hampshire public school.  Id.[6]

> 3.  *New Hampshire's Enforcement Scheme Spreads Enforcement Authority to Multiple Agencies with Unfettered Interpretive Discretion*

The DOE and HRC are the primary state agencies charged with enforcement of the Law against educators, by virtue of the Law's incorporation into the Educator Code and the Law Against Discrimination.  However, neither agency has provided clear guidance about what the Law prohibits, nor the procedures they follow under the Law.  Infra, pp. 13-17.  Further confusing matters, New Hampshire state courts, the DOJ, and the Department of Labor also have independent and concurrent

---

[5] N.H. Code Admin. R. Ed 511 was amended as of June 13, 2024 in ways that are not material to this case. See https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/sonh/Ed%20511%20Adopted%20Rule.pdf.  The version of N.H. Code Admin. R. Ed 511 referenced below as it existed before June 13, 2024 can be found at APP2806-10.

[6] The Law purports to create safe harbors for certain conduct that may otherwise constitute teaching or advocacy of a banned concept.  See RSA 193:40, II (permitting educators to "discuss[], as part of a larger course of academic instruction, the historical existence of ideas and subjects identified [as a banned concept]"); RSA 354-A:29, II (permitting public employers to conduct "racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect").  As explained below, this too is vague. Infra, pp. 46-47.

enforcement authority.  Infra, p. 56.

a.    The Department of Education's Enforcement Authority

The DOE enforces the Law through the Code, treating an allegation that the Banned Concepts Law has been violated as an allegation that the Code has been violated.  APP1263-64 (124:18-126:12).  *Anyone* can complain to the DOE that an educator has violated the Code.  N.H. Code Admin. R. Ed 511.01(a)-(b).  Educators, too, *must* report suspected Code violations, and a licensed educator's failure to report a suspected violation of the Code is itself punishable as a violation of the Code.  N.H. Code Admin. R. Ed 510.05(a), (f).

Before the DOE opens a formal investigation, an initial review is conducted either by DOE Investigator Richard Farrell, who simply looks at a complaint and determines whether the Code applies, or by Commissioner Edelblut himself.  The DOE conducts an initial review on every complaint it receives in which any possible misconduct is alleged.  N.H. Code Admin. R. Ed 511.01 (a)-(b); APP1296 (46:4-25).  In practice, these initial reviews amount to a preliminary investigation even before a determination has been made that there is a potential Code violation.  APP1339 (23:19-25), 1364-66 (124:24-129:9), APP1296 (47:17-21); see also APP1296-97 (45:8-13, 48:20-49:6), APP1338 (17:16-18:5).    Commissioner Edelblut often personally handles parental complaints of alleged educator misconduct, responding to parents directly and/or contacting superintendents and

11

school administrators to alert them to the complaint and investigate it, irrespective of whether the complaint raises a Code violation on its face. APP1237-40 (20:21-22:4, 24:8-26:18, 32:2-16), 1242 (38:4-13), 1339-40 (23:19-25; 25:1-3), 2014-16.

The DOE has sole discretion to determine whether a Code violation has occurred, and a violation depends on the DOE's interpretation of the Code and the individual circumstances of each case. APP1301 (65:22-67:9). The same individuals involved in the decision to open cases and initiate investigations also decide whether a Code violation has occurred at the DOE's so-called "Educator Misconduct Meeting." There, a committee (including Commissioner Edelblut and Investigator Farrell) decides whether there has been a violation of the Code and considers possible sanctions for the accused educator. APP1340-41 (28:24-30:1), APP1243-44 (41:20-42:3, 42:19-43:4-17, 45:6-19). If there is a violation, "[m]ore likely than not" a sanction will be issued, including suspension or revocation. APP1341 (32:6-10). Any suspension or revocation of a teaching license is public. N.H. Code Admin. R. Ed 502.01(a)(3).

> b.   The Human Rights Commission's Enforcement Authority

The HRC also enforces the Law through its own quasi-judicial litigation docket, and violation of the Banned Concepts Law is a violation of the Law Against Discrimination, which falls under the HRC's enforcement purview. The HRC's administrative procedure requires it to investigate any complaint that, in its sole

discretion, presents a *prima facie* claim of discrimination. APP1423-24 (15:18-21, 16:13-17, 12:2-7). The HRC's Director ultimately makes the *prima facie* determination. APP1446 (101:8-22). The HRC has no written policy or guidance to determine whether a complaint satisfies the *prima facie* standard under the Law. APP1407 (79:14-21).

Once the *prima facie* threshold is met, HRC sends the complainant a draft charge of discrimination, and once approved, the charge is docketed. APP1423 (11:19-12:7); N.H. Code Admin. R. Hum 202.01(b) (explaining complaint approval process); APP1393 (23:13-24:17); APP1407-08 (78:17-79:1); APP2092-93 (discussing *prima facie* assessment). A docketed case is then investigated by the HRC, which will determine whether there is probable cause of discrimination. APP1424 (13:7-14), 1426 (21:18-22:7); N.H. Code Admin. R. Hum 206.01(a); N.H. Code Admin. R. Hum 210.01(a). If so, the case moves toward an administrative law trial, a quasi-judicial proceeding where the HRC is empowered to make findings of fact and conclusions of law, and impose injunctive relief and levy damages, if it finds a violation of the Law Against Discrimination. APP1424 (13:15-23); RSA 354-A:21, II(d).

## C.     Defendants' Attempted Guidance Fails To Remedy the Law's Confusion

Once the Banned Concepts Law took effect in June 2021, educators quickly expressed confusion over its scope. Plaintiffs requested clarification from the

13

agencies charged with both interpreting the Law and enforcing it against them. APP1455 (Tuttle Decl. ¶ 8); APP1461-62 (Howes Decl. ¶¶ 7-9); APP1818-20.

In July 2021, the DOE, HRC and DOJ collectively published a "Frequently Asked Questions" ("FAQs") document intended to "provide guidance to public employers, government program administrators, and school systems as they review their compliance with the [Law]." APP1813-15, 1830-32, 1866-73. These FAQs merely parroted the Law's vague statutory language: "In short, do not teach that a person or a group is inherently oppressive, superior, racist, or sexist. Teach and treat all equally and without discrimination." Id. at 1813.

The FAQs did nothing to address the confusing rules faced by educators and other stakeholders, who continued to raise concerns that the Law was "confusing and that public employers and schools will struggle to understand the scope of the new prohibitions." APP1990. In August 2021, Plaintiff NEA-NH asked Defendants Attorney General John Formella and DOE Commissioner Edelblut to confirm that NEA-NH's understanding of the FAQs (and the Law) was correct before it provided guidance to NEA-NH members for the 2021-22 school year. NEA-NH asked for confirmation that "[s]pecific books or works of certain authors are not 'banned' under the law." APP1822. The NEA-NH asked this question because Commissioner Edelblut's June 2021 op-ed (and comments he made at a July 2021 State Board of Education meeting) suggested that the Law prohibited

14

specific books, including Dr. Ibram X. Kendi's 2019 book <u>How to be an Antiracist</u> and Tiffany Jewell's 2020 book for middle schoolers <u>This Book is Anti-Racist</u>. APP1818-24; APP2010-13; APP1566-1570.

Rather than directly answering this question by prohibiting or authorizing the use of these books, Defendants issued a series of additional public statements and documents to "guide" educators and the public on the Law's prohibitions. This guidance caused even more confusion.

First, in September 2021, the Attorney General issued an official opinion concerning the scope of the Law, confirming that "[s]ome have voiced concerns that these new statutes are confusing and that public employees and schools will struggle to understand the scope of the new prohibitions." APP1988-98. In that opinion, the Attorney General stated that the first two banned concepts proscribe advocacy that an identified group has "natural, biological, or innate characteristics, as opposed to apparent or accidental characteristics that: (1) make them superior or inferior to other identified groups or (2) make one identified group racist, sexist, or oppressive." APP1992, 1994. The Attorney General's opinion also declared that a violation of the Law may occur not just because of the content of a lesson, but also by implication or inference drawn by a student from that instructional material. For example, the opinion explains that, while it may be permissible to provide "Anti-Racist Resources," those resources may not be offered in a way that "may imply

15

that white people . . . are in need of anti-racist resources." Id. at 1996.

Commissioner Edelblut published his own informal guidance in April 2022, in another opinion article. The article criticized "activist educators who might be knowingly dismantling the foundations of a value system [parents] are attempting to build." APP1732-1810. In a version published on the DOE's website, the article appended several documents that exemplified "actual instructional material from New Hampshire schools that parents have identified as conflicting with their values" and which demonstrated "biases [that] are beginning to seep into our own institutions." Id. As explained below, several of those attachments came from actual complaints submitted to the DOE by parents and other community members under the Law, █████████████████████████████ APP1751, 1770-71, 1794-97; see also APP2587-89 (¶ 139); SA436-448; SA 570-586; SA461.

In response to specific questions about how it would guide educators on their compliance with the Law, the DOE referred educators back to the FAQs and to the text of the statutes. APP523-28. For example, when asked whether teaching an excerpt from How to Be an Antiracist—the very book Commissioner Edelblut referenced in his June 13, 2021 op-ed for why the Law was necessary (APP1566-1570)—was barred under the Law, the Commissioner merely restated the Law's provisions and referred these questions back to both the educators themselves (including each school district's legal counsel) and the HRC. APP1270 (149:18-

16

150:16), 1271 (155:8-156:14), 1272 (157:7-160:2), 1274-75 (167:9-169:4). Commissioner Edelblut also claimed, erroneously, that the DOE had to defer to the HRC to first make a finding of discrimination under the Law before DOE involvement. APP1249 (65:8-10, 67:10-11, 67:23), 1250 (70:5-15), 1271 (153:16-20), 1272 (159:16-160:2); see also ADD103 (district court noting that, under the DOE's rules, "the department of education must investigate possible violations of RSA § 193:40, which provides an avenue for directly pursuing teachers"). And when DOE Attorney Diana Fenton received questions from investigators about what was prohibited, she referred these questions to the HRC. APP1311 (105:10-106:2; 2025-27), 1371 (149:8-150:19), 1375 (166:7-167:3).

The HRC provided no more guidance than did the DOE. When Plaintiffs asked HRC Assistant Director Cohen whether teaching specific books would violate the Law, she did not answer directly, stating only that it is a "complicated question because you have to look at the context of things," adding that she "could not give a teacher or complainant legal advice on whether them teaching that would make a charge or not." APP1444 (93:7-23, 94:1-19). Assistant Director Cohen "suggest[ed] that the educator read the law, read the [July 2021] FAQs that are available as well as the [September 2021] opinion issued by the Attorney General's office." Id. (95:21-96:8). And if there are further questions, she "would suggest [educators] contact their legal counsel for legal advice." Id. (96:9-17; 94:21-22,

95:12-20).

### D.    Defendants' Enforcement Actions and the Law's Impact on Educators

The undisputed factual record shows how Defendants have enforced the Law.[7]  Members of the public were invited to, and did, lodge complaints against educators under the Law through a DOE website, which provided instructions for directly filing a complaint with the HRC.  APP2417-20, 1923-28, 2425-28.  In response, the DOE engaged in ad-hoc investigations that focused on texts and instructional materials involving race, gender and other attributes.  APP2580-87 (¶ 138).

A single parental complaint was enough for an educator to become the subject of a DOE informal inquiry, often directed by the Commissioner himself. APP2050-55.  As a matter of course, the educator's supervisor was informed that the educator's conduct warranted investigation by the Commissioner's office. Some of these complaints led the DOE to engage in varying degrees of inquiries,

---

[7] Defendants never objected below to Plaintiffs' statement of undisputed facts (and supporting record) beyond arguing that the district court should ignore the record because "extrinsic materials [like affidavits and deposition] testimony do not bear on whether a statute is facially vague."  See ECF No. 96 at 4, Local, 8027 AFT-New Hampshire, et al., v. Edelblut, 21-cv-1077.  Setting aside that Defendants' argument is incorrect for the reasons explained below, see infra pp. 32-35, Defendants' failure to controvert Plaintiffs' statement of facts results in those facts being deemed admitted for this Court's consideration.  See Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003).

including using other potential violations (especially under parental opt-out laws like RSA 186:11, IX-c, IX-d) to investigate or elevate these complaints to superintendents. APP2580-87 (¶ 138); SA54-61 (¶ 138). A review of several of the many enforcement inquiries is instructive:

- In September 2021, Commissioner Edelblut and legislators were forwarded a parent's complaint that a teacher had read to students from Howard Zinn's <u>A People's History of the United States</u>, and allegedly stated that "White people cause racism." APP2452-56. Commissioner Edelblut relayed the complaint to DOE Attorney Diana Fenton, stating "we need to look into this[.]" While "[t]he events happened prior to the anti-discrimination law," the conduct "if true—certainly would be considered unprofessional." APP2453. The Commissioner also asked another DOE employee if the complainant would "be willing to provide testimony to our investigator[.]" APP2457-2461.

- In September 2022, a parent complained that the book <u>This Book is Anti-Racist</u> was accessible on the school district's e-book application, asserting that it was "blatantly racist" and "direct[s] kids to redistribute wealth from those who earned it, giving it to those who didn't." APP2494-98. She added that "[i]t violates the law put into place to protect against this exact thing, racism." <u>Id.</u> Commissioner Edelblut apparently gave the parent his cell phone number and asked DOE Investigator Farrell to take any action he deemed appropriate. <u>Id.</u>; APP1242 (39:12-13).



19

- Educator Alison O'Brien was subjected to a DOE inquiry because a parent complained that she played two music videos by performers Beyoncé and Childish Gambino as part of a unit in which "students [were] asked to look for historical connections between these modern artists and those of the Harlem Renaissance." APP1479-85 (O'Brien Decl.). O'Brien was called out of her class, advised that she was under DOE investigation, and told by her school's principal that DOE Investigator Farrell was investigating the teacher based on complaints about the videos. At the meeting, and at Investigator Farrell's suggestion, the department director brought the teacher a copy of Commissioner Edelblut's April 2022 article to review, effectively treating it as formal guidance. Id. (¶ 18).

Another teacher who has suffered harm from the Law is Plaintiff John Dube, a U.S. History teacher with 38 years of experience. In the wake of the Law's passage, Dube signed a petition pledging to teach "honest" history. APP1467-71 (Dube Decl.); see also APP2466-74. Commissioner Edelblut advised a group called "No Left Turn in Education" about how to find employment information for the petition's signatories. APP2087-89. The group then released that information about Dube and the other New Hampshire educators who signed the petition, and urged the DOE to investigate the educators who signed the "honest" history petition. APP2472, 2468. As a result, Dube faced harassment so severe that the FBI and police department needed to ensure his safety, and Dube installed security cameras at his home. APP1470-71 (Dube Decl. ¶¶ 14-19). Rather than face continued threats and harassment, Dube retired from teaching and moved out of New Hampshire. Id. (¶¶ 20-22).

20

## II.    Procedural History

### A.    Plaintiffs File Suit and the District Court Denies Defendant's Motion to Dismiss

In December 2021, two groups of plaintiffs filed suit challenging the Law. The first group consisted of five educators and Local 8027 of the American Federation of Teachers-New Hampshire, a labor union representing approximately 3,400 members, including many public-school teachers, school support staff and higher education faculty in the state (together, "AFT Plaintiffs"). APP589-642. The second plaintiff group included two diversity, equity, and inclusion ("DEI") school administrators—Andres Mejia and Christina Kim Philibotte[8]—and the National Education Association-New Hampshire ("NEA-NH"), a professional association representing more than 17,000 educators in the state (collectively, "Mejia Plaintiffs"). APP41-588. The district court consolidated these actions, though their claims were not identical. While each case challenged the Law as unconstitutionally vague under the Fourteenth Amendment, the AFT Plaintiffs also claimed that the Law violates the First Amendment.

Defendants moved to dismiss both complaints. On January 12, 2023, the district court granted Defendants' motions in part and denied them in part. ADD63-

---

[8] Andres Mejia was no longer employed as the Director of Diversity, Equity, Inclusion, and Justice for SAU16 after May 31, 2024. Christina Kim Philibotte left her position as the Manchester School District's Chief Equity Officer on October 29, 2024.

105; see also Loc. 8027 et al., v. Edelblut et al., 651 F. Supp. 3d 444 (D.N.H. 2023).

Relevant here, the district court first concluded that the Supreme Court has recently

"rejected the 'vague in all applications' standard [for facial vagueness challenges]

as inconsistent with its holdings."  ADD87-88.  Applying the correct vagueness

standard, the court held that Plaintiffs had stated a plausible claim for relief under

the Fourteenth Amendment's Due Process Clause.  The court dismissed the AFT

Plaintiffs' First Amendment claim, but only to the extent that it was based on the

assertion that primary and secondary school teachers have a constitutional right to

control their curricular speech.  ADD79.  However, because the Law could also be

construed to reach teachers' constitutionally protected extracurricular speech, the

court allowed that aspect of the AFT Plaintiffs' First Amendment claim to proceed.

Id.

> **B.     The District Court Granted Summary Judgment to Plaintiffs,
>         Ruling That the Banned Concepts Law Was Void for Vagueness**

After the development of a record requested by the district court to aid the

First Circuit's review of the Law, see APP1195-96 (21:1-22:7), the parties filed

cross-motions for summary judgment.  On May 28, 2024, the district court granted

Plaintiffs' motion for summary judgment and denied Defendants' motion, declaring

the Law unconstitutionally vague.  ADD106-155; see also Loc. 8027 et al. v.

Edelblut et al., No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024).[9]

In granting Plaintiffs' motion and declaring the Law vague, the district court carefully analyzed the statutory language under the proper standard of review and made the following conclusions of law.

First, the district court concluded that it should apply heightened review because the Law (1) touched upon First Amendment speech restrictions, and (2) imposed grave civil penalties—including loss of licensure and livelihood—more akin to a criminal statute. ADD119-24.

Second, the district court closely read the Law and determined that it was unconstitutionally vague for several reasons. As written, the district court could not determine what the Law's four banned concepts actually prohibited. ADD127-35. The district court explained that the Law does not clearly define what it means to "teach" (or any other enumerated verb the Law uses) a prohibited concept, meaning that an educator cannot determine whether their actions, not just the educational subject matter, falls under the Law's sweep. ADD135-40. The district court also faulted the Law for not clearly distinguishing between educators' curricular speech (which lacks First Amendment protection) and extracurricular speech (which is

---

[9] In its decision, the district court declined to rule on the AFT Plaintiffs' First Amendment claim given its holding that the Law was unconstitutionally vague. ADD116. As such, the AFT Plaintiffs have separately briefed that claim as an alternative ground for affirmance. See infra Part IV.

23

protected), such that the Law blurs the lines between when educator conduct may or may not be protected. ADD140-42. Finally, the district court concluded that the Law's vagueness and danger to protected rights were exacerbated by the absence of a scienter requirement in the Law, noting that Defendants conceded as much. ADD142-45.

Third, the district court assessed the Law's impact, concluding that the Law's lack of clear guidance led to arbitrary and discriminatory enforcement. Here, the district court looked at both the statutory context of the Law and the undisputed record of how the Law was being enforced on the ground, highlighting the DOE's ad hoc enforcement of the Law to stop teachers from including most any topic touching on race. ADD145-48. The district court highlighted the Law's chilling effect on educators, and how they were self-censoring their instruction because the Law gave them insufficient notice of what was prohibited under it. ADD148-52. Finally, the district court declared the Law vague in its entirety, concluding that severing one section involving educator discipline (RSA 193:40, IV) was not sufficient to save the Law from the vagueness deficiencies the court exhaustively highlighted. ADD152-54.

Defendants now appeal.

## SUMMARY OF THE ARGUMENT

The Banned Concepts Law fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and is "so standardless that it authorizes or encourages seriously discriminatory enforcement," thereby rendering it unconstitutionally vague. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) (internal citations omitted); United States v. Williams, 553 U.S. 285, 304 (2008). The Law's four banned concepts do not provide fair notice to educators about which lessons would run afoul of it. Moreover, verbs like "teach," "instruct" and "advocate" that together should inform an educator of which actions violate the Law are also vague. To make matters worse, as the district court accurately observed, the Law "permit[s] teachers to be disciplined without a finding that a teacher has acted with scienter," compounding its vagueness. ADD127. Defendants' manufactured dictionary definitions of the Law's prohibitions do not cure the Law's fatal ambiguities, nor does Defendants' attempt to impose an "affirmative and deliberate act" requirement onto verbs like "teach" or "instruct" through their briefing. See Defs.' Br. at 29.

The Law is also a textbook example of arbitrary and discriminatory enforcement. It provides multiple state agencies with independent enforcement authority, all of whom not only enforce the law (at their whim), but also interpret it. Underlying that enforcement regime is neither guidance nor guardrails for

25

enforcement. Arbitrary and discriminatory enforcement is not just likely; the undisputed record in this case confirms its existence. The district court properly took account of the record of implementation and enforcement here, where the agencies could neither all agree among themselves nor put forward a consistent and clear explanation of what the Law covers, let alone one that is understandable by the "ordinary" person. See Johnson v. United States, 576 U.S. 591, 598 (2015) ("This Court has acknowledged that the failure of 'persistent efforts . . . to establish a standard' can provide evidence of vagueness.") (quoting United States v. L. Cohen Grocery Co., 255 U.S. 81, 91 (1921)). For these reasons, the Law is unconstitutionally vague.

Notably, every court to review similar statutory prohibitions has raised constitutional concerns. See Santa Cruz Lesbian & Gay Cmty. Ctr., 508 F. Supp. 3d at 543 (holding that similar banned concepts in federal Executive Order are "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited"); Pernell v. Fla. Bd. of Governors, 641 F. Supp. 3d 1218, 1287 (N.D. Fla. 2022) (preliminarily enjoining Florida's H.B. 7's prohibition on college instruction in part because it was "impermissibly vague"), appeal filed and stay of injunction denied, Nos. 22-13992-J, 22-13994-J, 2023 WL 2543659 (11th Cir. Mar. 16, 2023); see also Honeyfund.com, Inc. v. Desantis, 622 F. Supp. 3d 1159, 1184 (N.D. Fla. 2022) (same for Florida H.B. 7's restrictions in workplace), aff'd on other grounds, 94

26

F.4th 1272 (11th Cir. 2024) (enjoining law on First Amendment grounds); <u>Black</u>

<u>Emergency Response Team v. Drummond</u>, No. 21-cv-1022-G, 2024 WL 3015359,

at *11 (W.D. Okla. June 14, 2024) (preliminarily enjoining portions of law with

identical language) (appeal filed July 16, 2024).

     Separately, and as an independent basis for affirmance, the Law violates the

First Amendment where it implicates the extracurricular speech of educators on

matters of public concern.  As to the AFT Plaintiffs' First Amendment claim, the

district court correctly concluded at the motion to dismiss stage that, "[b]ecause the

education and antidiscrimination [Law] [is] susceptible to an interpretation that

encompasses extracurricular speech, [it] plausibly restrict[s] teachers' speech as

private citizens."  ADD79.  Both the record and Defendants' own guidance confirm

the Law's unconstitutional application to protected extracurricular speech.

APP1814, 1831, 1870 (FAQ No. 8).

     Accordingly, this Court should affirm the judgment of the district court.

## <u>ARGUMENT</u>

### I.    **Standard of Review**

     This Court reviews vagueness challenges *de novo*.  <u>Nat'l Org. for Marriage</u>

<u>v. McKee</u>, 649 F.3d 34, 62 (1st Cir. 2011).  Likewise, the Court reviews a summary

judgment order *de novo*, applying the same criteria as the district court.  <u>Roman</u>

<u>Catholic Bishop of Springfield v. City of Springfield</u>, 724 F.3d 78, 89 (1st Cir.

2013).  On an appeal from cross-motions for summary judgment, the standard does not change.  Id.

### A.    The Law Warrants the Most Exacting Vagueness Review

This Court must employ heightened review in evaluating the Law's vagueness because it is quasi-criminal (i.e., a categorical prohibition), imposes severe sanctions for violations, and has a stigmatizing effect where these sanctions are public record.  See Sessions v. Dimaya, 584 U.S. 148, 156-57 (2018); Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499-500 (1982).

Relying on Dimaya, the district court correctly concluded that "[t]he need for clarity is . . . paramount when a statutory provision authorizes severe consequences for a violator," thereby applying the "most exacting vagueness review."  ADD94. Indeed, the Supreme Court in Dimaya rejected the notion that a less stringent standard applies in civil cases involving particularly severe consequences.  584 U.S. at 156-57.  Given the "grave nature of deportation" at issue in Dimaya, the Supreme Court reasoned that the same standard of certainty required of criminal laws applies in the civil removal context.  Id. at 157; see also Giaccio v. State of Pennsylvania, 382 U.S. 399, 402 (1966) (rejecting distinction between criminal and civil penalties in vagueness analysis, and noting that due process protection "is not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute").

28

Dimaya's reasoning applies with equal force here. The loss of an educator's license for violating the Law is similarly "grave" and implicates due process protections no matter how Defendants seek to label this deprivation. As the district court concluded, "[c]onsidering that teachers who are found to have advocated a banned concept can be stripped of their teaching credentials and thus deprived of their livelihoods, this factor points in favor of requiring the most exacting vagueness review." ADD95; see Manning v. Caldwell for City of Roanoke, 930 F.3d 264, 273 (4th Cir. 2019) (en banc) ("[E]ven laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi-criminal' and has a stigmatizing effect.") (quotation omitted); see also Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 95–96 (1st Cir. 2004) ("[V]agueness concerns are more pressing when there are sanctions (such as expulsion) attached to violations of a challenged regulation."); cf. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985) (recognizing "severity of depriving a person of the[ir] means of livelihood").[10]

---

[10] Defendants are wrong to contend that the district court's analysis of Dimaya was based exclusively on Justice Gorsuch's concurrence. See Defs.' Br. at 42-43; ADD94 (district court citing majority opinion in Dimaya). In any event, as these cases demonstrate, Justice Gorsuch's concurrence is correct that the vagueness doctrine has been applied equally in civil and criminal contexts since "civil laws regularly impose penalties far more severe than those found in many criminal statutes." Dimaya, 584 U.S. at 183-84 (Gorsuch, J., concurring). Here, the civil penalties faced by teachers include "remedies that strip persons of their professional licenses and livelihoods." See id. at 184.

29

Defendants counter that educators who lose their license could still teach elsewhere. Defs.' Br. at 43. But that assertion is unpersuasive where most teaching jobs in New Hampshire are in the public school system and require certification. APP2797. Moreover, New Hampshire law provides that private schools may not employ individuals with suspended or revoked credentials, and any such suspension or revocation is public record.[11]

Finally, independent of the severity of the sanction, heightened vagueness review also applies here because the Law implicates speech and expression. See Hynes v. Mayor & Council of Borough of Oradell, 425 U.S. 610, 620 (1976); Smith v. Goguen, 415 U.S. 566, 572-73 (1974). Heightened vagueness review applies to regulations on expression because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." Grayned, 408 U.S. at 109 (internal quotations omitted). Here, as the district court correctly held, "[t]he [Law] at issue in this case are explicit

---

[11] See RSA 189:13-a, I(c)(1)-(2) ("[a] school administrative unit, school district, chartered public school, _or nonpublic school_ shall not hire any individual whose credential issued by the department of education is currently suspended or revoked, except…") (emphasis added); see also https://www.education.nh.gov/pathways-education/private-schools (NH DOE guidance that the terms nonpublic schools and private schools are used interchangeably); N.H. Code Admin. R. Ed 401.01(e) ("'[n]onpublic school' means a school established by an individual or group other than the state, subdivision of the state, or federal government and whose operation, or any portion thereof, rests with those officials who have not been publicly elected or appointed").

viewpoint-based speech limitations that . . . arguably affect both the curricular and extracurricular speech of public primary and secondary school teachers," and, thus, "a rigorous vagueness review is required."  ADD94.  Because of these speech implications, heightened review also applies here.  See infra Part IV.

### B.    A Statute Need Not Be "Vague in All Circumstances" to Be Unconstitutional

The Supreme Court has long held that a law may be facially invalid "even when it could conceivably have had some valid application."  Kolender v. Lawson, 461 U.S. 352, 358 n.8 (1983) (citing Colautti v. Franklin, 439 U.S. 379, 394-401 (1979)); Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939)).  Johnson v. United States reaffirmed this longstanding rule and made crystal clear that, "although statements in some of our opinions could be read to suggest otherwise, our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  576 U.S. at 602; see also Davis, 588 U.S. at 447-48; Dimaya, 584 U.S. at 159 n.3.

The district court recognized as much in its decision on Defendants' motion to dismiss, noting that—at that time—two Courts of Appeals had categorically rejected the "vague in all applications" standard.  ADD87-88 (citing United States v. Cook, 914 F.3d 545, 553 (7th Cir. 2019) and Guerrero v. Whitaker, 908 F.3d 541, 544 (9th Cir. 2018)).  Since the district court's ruling, two other Circuits have followed suit.  See Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit

Auth., 89 F.4th 1337, 1349-50 (11th Cir. 2024); Carolina Youth Action Project;

D.S. by & through Ford v. Wilson, 60 F.4th 770, 781-82 (4th Cir. 2023).[12]

In short, Defendants' assertion that a law must be vague in _all_ applications to

be invalid on its face, Def's Br. at 38 (citing Village of Hoffman Estates, 455 U.S.

at 494-95), has been rejected by the Supreme Court and by a majority of the Courts

of Appeals to consider this issue.  This Court should join the chorus of courts that

have followed Johnson and apply its standard.

### C.    The District Court Properly Considered Factual Evidence in Its Vagueness Analysis

The district court properly reviewed the Law "in [its] context and with a view

to [its] place in the overall statutory scheme," Manning, 930 F.3d at 273, and

correctly    considered    evidence    of    Defendants'    actual    enforcement    and

"interpretation of the statute given by those charged with enforcing it,"

see Grayned, 408 U.S. at 110 (citing Cole v. Richardson, 405 U.S. 676, 685 (1972)

(assessing vagueness of statute by looking to record of enforcement before the

Court)); Ehlert v. United States, 402 U.S. 99, 105, 107 (1971) (considering

---

[12] Against the weight of this near-uniform authority, only the Second Circuit has treated Johnson differently.  It held that "vague in all applications" continues to be the default rule in facial vagueness cases, other than those that arise, _inter alia_, in the First Amendment context, or where the relevant laws lack a scienter requirement.  See United States v. Requena, 980 F.3d 30, 41-42 (2d Cir. 2020). Here, the Law impacts First Amendment rights and imposes harsh penalties without a scienter requirement, suggesting that the Second Circuit would not follow its default rule if confronted with this case.

government's interpretation of statute during litigation and record evidence of agency interpretation (a guidance letter)); see also Johnson, 576 U.S. at 598 (quoting L. Cohen Grocery Co., 255 U.S. at 91) (concluding that statute was vague where record showed failure of "persistent efforts . . . by administrative officers . . . to establish a standard" for enforcement)); Smith, 415 U.S. at 580 (rejecting as unsupported in the record state's argument that "law enforcement authorities have shown themselves ready to interpret this penal statute narrowly"). Courts today readily consider factual evidence in assessing a statute's vagueness. See Carolina Youth Action Project, 60 F.4th at 784 (considering record showing "the interpretation of the statute given by those charged with enforcing it," including deposition testimony, statistics showing disparate enforcement, and evidence from individual enforcement actions).

This Court has also considered factual evidence to be relevant to the vagueness analysis. See Whiting v. Town of Westerly, 942 F.2d 18, 22 (1st Cir. 1991) (holding that ordinance prohibiting sleeping in public was not vague based on the text and Defendants' narrowing construction, and noting that "plaintiffs presented no evidence to suggest that the ordinance had ever been enforced against 'mere nappers'"); see also United States v. Facteau, 89 F.4th 1, 35 (1st Cir. 2023) (noting that the Court may consider contradictory or misleading public

interpretations issued by federal agencies in assessing the vagueness of agency regulations), cert. denied, No. 23-1016, 2024 WL 4426540 (U.S. Oct. 7, 2024).

Accordingly, Defendants' argument that the district court erred in "extending its vagueness analysis beyond a textual analysis" fails. See Defs.' Br. at 48-54. To be sure, the Law is facially vague even without reliance on the record created in this case. But Defendants cite no case from this Court or any other barring the use of factual evidence to highlight a law's textual ambiguity or holding that a court must ignore actual evidence of arbitrary and discriminatory enforcement. Defendants' cases merely establish that, unlike here, such evidence cannot render a law vague when the law is otherwise sufficiently clear from the text. See United States v. Lachman, 387 F.3d 42, 58-59 (1st Cir. 2004) (declining to consider informal interpretation of agency officials to determine the meaning of a federal regulation where the court otherwise arrived at a clear interpretation consistent with congressional intent); Modern Cont'l/Obayashi v. Occupational Safety and Health Rev. Comm'r, 196 F.3d 274, 281 (1st Cir. 1999) (concluding that, because a federal regulation's application was clear "from a plain reading of the regulation," it was inappropriate to "inquire into industry standards"). [13]   Here, as explained below, a

---

[13] Likewise, in Frese v. Formella, this Court declined to "address precisely what extrinsic context a court may consider in a vagueness analysis," because there, "the core statutory text of the [challenged] statute provide[d] adequate enforcement guidelines," so the "prosecution scheme d[id] not alter or overcome this

"plain reading" of the Law illustrates its lack of clarity, so it is appropriate for this Court to know how agencies have interpreted and enforced it.  See <u>Grayned</u>, 408 U.S. at 110; <u>Carolina Youth Action Project</u>, 60 F.4th at 784.

## II.    The Banned Concepts Law Is Unconstitutionally Vague

### A.    The Law's Text Fails to Give a Person of Ordinary Intelligence a Reasonable Opportunity to Know What Is Prohibited so That They May Act Accordingly

#### 1.    *The Four Banned Concepts Are Hopelessly Unclear*

The Law's vagueness is apparent from the text of the four banned concepts themselves.  As the district court concluded, "[o]ne of the most difficult interpretive challenges" the Law presents is that it does not address its "intended target directly[.]" ADD127-28.  While the legislature "made no secret of the fact that their aim is to restrict what teachers can say about" issues of race, sex, gender, disability status and the like, the Law does not outright prohibit discussion of certain disfavored topics (e.g., "structural racism, implicit bias, and affirmative action"). Rather, the Law uses "general terms such as teaching that one race is superior to another," or "that individuals are inherently racist." ADD127-28.  This legislative strategy presents a classic vagueness problem because it "broadly covers a

---

conclusion." 53 F.4th 1, 9 n.5 (1st Cir. 2022), <u>cert. denied</u>, 144 S. Ct. 72 (2023). Here, however, the Law has no enforcement guidelines.  See Part II.B., <u>infra</u>.

significant amount of additional activity," perhaps by design.  City of Chicago v. Morales, 527 U.S. 41, 51–52, 59-60 (1999).

Defendants reject the district court's mode of interpretation and urge this Court to rely on rigid statutory interpretation that employs dictionary definitions instead of reading the statute in the context in which it applies.  See Def's Br. at 24-25.  But this Court does not assess vague laws using such a rigid approach and, instead, reads the words of the challenged statute in the context in which they appear.  URI Student Senate v. Town of Narragansett, 631 F.3d 1, 14 (1st Cir. 2011) (reading challenged statutory language in context, rather than "in a vacuum"); see also Nat'l Org. for Marriage v. Daluz, 654 F.3d 115, 120-21 (1st Cir. 2011) (same). Using this approach, the Law is unconstitutionally vague.

The first banned concept—which prohibits teaching that certain types of people are "inherently superior" to others—is vague because the concept does not address its intended target directly, and thus it is unclear "what is prohibited beyond literally espousing that, for example, 'White people are superior to Black people.'" ADD128 n.6 (quoting Honeyfund.com, 622 F. Supp. 3d at 1181).  As to the first two banned concepts collectively, it is unclear what it means to suggest that someone is "inherently superior" (concept one) or "inherently racist [or] sexist" (concept two).   Do these concepts, for example, bar instruction on "unconscious/implicit bias" or "white supremacy" in an American history class

36

where students grapple with whether the goals of the Civil Rights Movement have been fully realized? And do these concepts further prohibit instruction where students contend with whether, in 2025, the rights sought during the women's suffrage movement or by supporters of the 1972 Equal Rights Amendment have been fully secured?

Defendants' own guidance enhances this confusion. In their brief and in the September 2021 Attorney General opinion (but not in the July 2021 FAQs), Defendants use dictionary definitions in the hope of narrowing the term "inherent" to mean something that is "intrinsic or essential." Defs.' Br. at 31-33. But Defendants also state that a trait acquired "by . . . settled habit" is also "inherent," which only adds to the Law's confusion. Id. at 32. This is because the dictionary definition of "inherent" that references "settled habit" also includes beliefs that are habitual in nature—such as racism or sexism—and _not_ "intrinsic" or "essential." As noted by the district court, even the Defendants' own definition of "inherent" and its encapsulation of "settled habits" may implicate concepts like implicit or unconscious bias. ADD129-31; see also APP1498 (Philibotte Decl. ¶ 19) (noting fear of reciting during a "read aloud" portions of a book addressing unconscious racial bias). One cannot expect educators to distinguish between racist or sexist beliefs that are developed through "settled habit" (or even know what those "settled habits" are) and those developed through external factors that are not "extrinsic" or

37

"essential."  Cf. Santa Cruz Lesbian and Gay Cmty. Ctr., 508 F. Supp. 3d at 543 (enjoining order that also used the term "inherent" because of its vagueness).  It is even more challenging to do so quickly in the classroom.

As to the third banned concept—which bars instruction "[t]hat an individual should be discriminated against or receive adverse treatment solely or partly because of his or her age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin"—the district court correctly explained that this concept arguably applies "to teaching *about* [concepts like] affirmative action," especially if one accepts the premise left unaddressed in the Law "that providing a preference to one group necessarily entails discrimination against other groups."  ADD131-32; see also ADD98, ADD108; Pernell, 641 F. Supp. 3d at 1233-34 (recognizing that teaching about affirmative action would be prohibited under similarly worded statute).[14] Given this uncertainty, "the [Law] force[s] teachers to guess as to which diversity efforts can be touted and which must be repudiated, gambling with their careers in the process."  ADD134.  The Defendants' brief does not meaningfully engage with the district court's analysis on this point.  Defs.' Br. at 33-34.  While Defendants

---

[14]  This concept arguably even bans teaching on one of the foundational premises of disability law, which recognizes that people with disabilities must be provided with reasonable accommodations, when necessary, to enable them to access and fully participate in school, work, and all aspects of community life.

propose a new interpretation of the third banned concept to replace the word "should" with the phrases "obligation or duty" or something "that is otherwise necessary or proper," id. at 34, this does nothing to address the district court's concerns, and impermissibly rewrites the statute.  See Davis, 588 U.S. at 447-48.

Take a high school civics class learning about the Fourteenth Amendment. An educator who explains the position articulated in Justice Sotomayor's dissent in Students for Fair Admissions, Inc. v. President & Fellows of Harvard College— namely that the Fourteenth Amendment's guarantee of racial equality "can be enforced through race-conscious means," 600 U.S. 181, 318 (2023)—may violate the Law's third prohibition on teaching that "an individual should be discriminated against or receive adverse treatment solely *or partly* because of his or her . . . race." Explaining that position is especially precarious where Chief Justice John Roberts' majority opinion characterizes affirmative action in higher education as a practice that is racially discriminatory and that engages in "racial stereotyping[.]" Id. at 230. Considering a similar lesson, the district court explained, "[w]e simply don't know" whether the Law prohibits it.  ADD98.

These are not hypothetical concerns.  At his deposition, Commissioner Edelblut would not answer whether teaching about affirmative action violates the Law, stating that he would need "more context" (and then avoiding the question when provided such context).  APP1249, 1251, 1271-72 (65:11-66:5, 75:21-76:2,

154:2-158:16).  The very quotation that Commissioner Edelblut used in his June 13, 2021 op-ed as an example to show why the Law is "an important, and needed contribution to our education system," APP1569, comes from an excerpt on affirmative action in Dr. Ibram X. Kendi's 2019 book How to be an Antiracist. APP2003.

The fourth banned concept—which *bars* instruction "[t]hat people of one age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin *cannot and should not* attempt to treat others *without regard to* age, sex, gender identity, sexual orientation, race, creed, color, marital status, familial status, mental or physical disability, religion, or national origin"—fares no better.  See RSA 193:40, I(d) (emphasis added).  This concept is "bordering on unintelligible because it employs the dreaded triple negative form."  ADD134 (internal quotations omitted); see also Pernell, 641 F. Supp. 3d at 1281; Honeyfund.com, 622 F. Supp. 3d at 1182; see also Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys., 938 F.3d 424, 437 n.2 (3d Cir. 2019) (striking down prohibition on political speech with "a tangle of double negatives that [was] vague enough to ensnare nearly any message" and lacked "a sufficiently definite standard . . . to exercise discretion").  Even the Commissioner conceded that the fourth banned concept "is confusing."  APP1559.

40

Setting aside the district court's correct concern that it could not "determine what, if anything, the fourth concept prohibits that is not already banned by the first three concepts," ADD134, the district court also explained in its motion to dismiss decision that this fourth concept "prohibits, among other things, teaching or advocating that white people cannot treat Black people 'without regard to' their race . . . . Given that advocacy can take many forms, there is a real risk that a teacher could face sanctions for discussing the concept of implicit bias with a student." ADD98-99.

Even worse, the Law can be violated by implication.  As the district court noted, instruction on implicit bias "may certainly imply" in the mind of the recipient the notion that a person in one group "cannot" treat a person in another group equally.  ADD99.  "For example, a teacher may state that white persons can have difficulty treating non-white persons without regard to their race.  An enforcer may later decide that the discussion implied support for the proposition that a white person 'cannot' treat a Black person without regard to race, in violation of the fourth banned concept."  Id.

Defendants' efforts before the district court to argue that concepts like "implicit bias" are not prohibited under the Law also are belied by the Law's origins and the Commissioner's own public statements decrying CRT.  APP1569.  The Law was modeled after President Trump's September 2020 Executive Order, which was

41

drafted to specifically target DEI trainings and other instruction that used the phrases "white privilege," "intersectionality," "systemic racism," and "unconscious bias." APP2005-09. Attacks on DEI concepts—and its labeling as "CRT"—were rampant as the Law was being discussed and debated. This legislative history only highlights that the Law is so imprecisely worded that it can mean whatever one wishes it to mean—the hallmark of constitutional vagueness.

Finally, the Law's four banned concepts conflict with preexisting New Hampshire education and antidiscrimination law. RSA 189:11, I-c(j) *mandates* instruction on "*how to prevent the evolution of*" "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination." However, as the district court suggested, the language in RSA 193:40, II did "not fully encompass the broader scope of learning" that RSA 189:11(j) mandates, thereby heightening the uncertainty existing under the Law. ADD100. Conflicting statutory edicts—one requiring teaching (e.g., RSA 189:11, I-c(j)) and the other proscribing such teaching (those here challenged)—pose an obvious dilemma; which of the conflicting statutory guidelines should the "ordinary" educator now obey?

2.     *The Law Is Likewise Vague as to What It Means to "Teach," "Instruct," "Inculcate" or "Compel[] [a student to] Express Belief" in a Banned Concept*

The Law suffers from a second fatal defect:  the "lack [of] clarity as to what it means to 'teach' a banned concept."  ADD136.

The Law proscribes any teaching, instruction, inculcation, or compelling to express a belief in, or support for, or advocacy, training, or advancement of a banned concept.  See RSA 193:40; RSA 354-A:31-32.  The Law also does not merely prohibit an educator from stating their personal agreement with a concept on its face; rather, the Law broadly states—in the passive voice—that no public-school student "shall be taught, instructed, inculcated or compelled to express belief in, or support for," a banned concept.  RSA 193:40.  The legislature chose not to define these phrases, thereby leaving such interpretive questions for the Law's enforcers, which is itself a facet of vagueness.

This lack of clarity is devastating to educators.  As the district court explained, "teaching can sometimes consist of merely instructing students on objective facts," but "teachers often employ more nuanced techniques designed to encourage the development of critical thinking skills," like "attempt[ing] to stimulate discussion by asking students pointed questions or encourage debate by presenting students with ideas contrary to their own."  ADD137.  Thus, the court

43

concluded that "it is impossible [for a teacher] to know whether" they have taught a banned concept.  Id.

The Supreme Court addressed these same concerns in Keyishian v. The Board of Regents of the University of the State of New York, 385 U.S. 589 (1967). There, the Court held that regulations prohibiting employment of a higher education instructor who "advocates, advises or teaches the [prohibited] doctrine" were impermissibly vague because they "may well [reach] one who merely advocates the doctrine in the abstract without any attempt to indoctrinate others."  385 U.S. at 599–600; see also Ozonoff v. Berzak, 744 F.2d 224, 232 (1st Cir. 1984) (Breyer, J.) (relying on Keyishian to conclude that language in executive order prohibiting "advocacy" of "treason and sedition" was vague where it was unclear whether this language applied to protected speech).  As Keyishian and the district court recognized, there are many reasons why an instructor might "teach," "advocate," or "advance" a particular viewpoint during class, including simply as a means of prompting students to take it seriously, to contest it, to debate it, or to think critically about it.  Yet it is entirely unclear whether the Law permits such traditional forms of teaching.

Here, the DOE has no policies—much less a public protocol—as to whether the phrases "teach," "instruct" "inculcate" or "compel to express a belief in or support for" include teacher-facilitated group discussion, a teacher playing "devil's

44

advocate" in presenting two sides of a controversial subject, assigning to a student a point of view to argue, engaging in "read-alongs," assigning a book for general discussion in class, or simply answering a student's question. APP1312-13 (111:15-114:7); APP1270-71 (151:23-153:4). Meanwhile, Commissioner Edelblut has cryptically told educators that they are in the "best position to know" what it means to "teach"—thus leaving educators to guess as to what the DOE believes is covered. APP1251 (75:11-20). Combine that with Commissioner Edelblut's refusal at deposition to provide any further clarity on his public statements criticizing specific texts, stating again that "it would depend upon the context" of the instruction. APP1251 (75:21-76:2); APP1271-72 (154:2-158:16). This reticence hardly provides "guardrails" for enforcement, let alone provides "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned, 408 U.S. at 108. And the enforcement practices discussed above in the case of educator Alison O'Brien, supra pp. 19-20, strongly suggest that the Commissioner's public statements are a benchmark for permissible behavior, with deviation from these statements' implicit guidelines leading to a DOE inquiry or even discipline.

Yet more confusing, Defendants have offered contradictory positions in this litigation as to what constitutes "teaching," with none of it found in their prior guidance. See Johnson, 576 U.S. at 598 ("This Court has acknowledged that the

45

failure of 'persistent efforts . . . to establish a standard' can provide evidence of vagueness.") (citation omitted).  For example, at oral argument before the district court, Defendants' counsel claimed that an educator's use of the Socratic method by asking questions to students would constitute "teaching" under the Law. APP2741-42 (76:11-77:14).  Contrast the Socratic method's indirect form of teaching with Defendants' proposed (and conflicting) "clear" definition of "teaching" that requires "the affirmative and deliberate act of conveying information prohibited by the statute with knowledge of the information being conveyed."  Defs.' Br. at 29-30.  And if an educator writes on the board Henry David Thoreau's famous quote that "[i]t's never too late to give up on prejudices," Defendants' counsel added that an educator "may well have to consider adding . . . [a] disclaimer" in response to a student's statement that "people can't give up their prejudices; they're inherent."  APP2742-44 (77:2-79:4).  This example highlights the potential breadth of the phrase "teaching" that far exceeds (and conflicts with) any "affirmative and deliberate act of conveying information" requirement that Defendants now seek to superimpose on the Law—a requirement that, as explained below in Part II.A.3 <u>infra</u>, this Court should reject.

Finally, while an educator may teach the "historical existence of" the four banned concepts, <u>see</u> RSA 193:40, II, it is unclear whether educators may teach the continuing relevance of this history and make it relatable to students through current

46

events and personal experiences.[15]  This provision "does little to guide teachers" because it "applies only to historical discussions and therefore has no bearing on discussions of current matters."  ADD139 n.10.  It is impossible for educators to discern where instruction crosses the line between permissible instruction about the "historical existence" of discrimination and present reality.  See Santa Cruz Lesbian and Gay Cmty. Ctr., 508 F. Supp. 3d at 544 ("The line between teaching or implying (prohibited) and informing (not prohibited) 'is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.'" (quoting Hunt v. City of Los Angeles, 638 F.3d 703, 712 (9th Cir. 2011)).

As a result, during the three years in which the Law was in effect, teachers pulled back on having students analogize material to students' own experiences and interests—a "widely understood best practice" that helps students "identify material and relate it to their own lives."  APP1512 (Given Decl. ¶ 12); APP1490 (Keefe Decl. ¶¶ 15-18); APP1496-97 (Philibotte Decl. ¶ 13).  This harms students. Debating and discussing these topics from different personal perspectives is

---

[15] The Law also adds that it does not "prohibit racial, sexual, religious, or other workplace sensitivity training based on the inherent humanity and equality of all persons and the ideal that all persons are entitled to be treated with equality, dignity, and respect."  See RSA 354-A:29, II.  But this proviso only adds to the Laws' ambiguity, given that it provides no definition of "sensitivity training" that would allow educators or trainers to understand when concepts like implicit bias and systemic racism may be discussed, nor was such "sensitivity training" addressed in Defendants' guidance.

instrumental to fostering critical thinking for New Hampshire students, as well as helping students relate to course material through the lens of their own personal experiences.  See also APP1469 (Dube Decl. ¶ 5).

3.  *Defendants' Reliance on Dictionary Definitions in Defining "Teaching" Does Not Remedy this Confusion.*

The clarity of a statutory provision "does not turn solely on dictionary definitions of its component words."  Yates v. United States, 574 U.S. 528, 537 (2015).  Rather, "'[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'"  Id. at 537 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).

However, throughout their brief, Defendants resort to dictionary definitions of the Law's key words, offering them as a panacea to the vagueness problems identified by the district court.  See Defs.' Br. at 28-30, 36-37, 40.  The district court appropriately rejected Defendants' effort to fill the void with a dictionary, ADD136, and this Court should reject these arguments too.

Courts assessing similar statutes to the Banned Concepts Law have rejected Defendants' approach of using dictionary definitions to isolate words from their context, explaining that using "real words found in an English dictionary does not magically extinguish vagueness concerns."  Honeyfund.com, 622 F. Supp. 3d at 1181.  "If that were true, the Due Process Clause would tolerate laws containing the

most incomprehensible stream-of-consciousness word salads so long as they used actual words." Id.; see also Pernell, 641 F. Supp. 3d at 1280-81.  And the Supreme Court has repeatedly concluded that terms with ordinary meaning and in common usage are still vague in the context of a challenged statute.  See, e.g., Johnson, 576 U.S. at 596-97 ("serious potential risk of physical injury to another"); Kolender, 461 U.S. at 358 ("credible and reliable"); Smith, 415 U.S. at 576-78 ("contemptuous" treatment of a flag); Keyishian, 385 U.S. at 599-600, 603-04 ("advocating, advising or teaching" of doctrine); Baggett v. Bullitt, 377 U.S. 360, 367-68 (1964) ("advises, teaches, abets or advocates").

What Defendants cannot do is use the dictionary to rewrite a law that, on its face, flouts the Constitution in order to save it.  See Davis, 588 U.S. at 464; Ozonoff, 744 F.2d at 234 ("But, even if we indulge 'every presumption of a narrow construction,' we must do so in a manner 'consistent . . . with a proper respect for the English language.'  Here, we see no obvious or natural interpretation of 'advocacy' or 'sedition' that would render the Order constitutional." (quoting Baggett, 377 U.S. at 372)).  Yet this is what Defendants aim to do here, in several different ways that this Court should reject.

First, Defendants' use of various dictionary definitions to conclude that the Law collectively only applies to "the affirmative and deliberate act of conveying information prohibited by the statute with knowledge of the information being

49

conveyed" fails because this collective reading "fundamentally ignores the separate prohibitions against teaching, instructing, inculcating, and compelling and instead construes each prohibition as essentially synonymous." ADD136.

Second, Defendants' use of dictionary definitions to argue that an educator must convey information "with knowledge of what information is being conveyed," Defs.' Br. at 29-30, misreads the dictionary definitions upon which Defendants rely and adds words to the statute that the legislature saw fit not to include. For example, Defendants' own cited dictionary definitions of "teach" and "instruct" do _not_ require that an educator have "knowledge of what information is being conveyed"; rather, Defendants' recited dictionary definitions of these two terms simply require only that the educator "_provide_ with knowledge" or "_communicate_ knowledge to." Id. at 29 (emphasis added). In other words, these definitions use "knowledge" as something to be conveyed, _not_ as a purposeful mental state for educators. Thus, Defendants' effort to impute a mental state requirement to the Law not only is inconsistent with the definitions upon which they rely, but also would constitute an improper rewrite of the statute.

Third, if there was any doubt that these new definitions go beyond the Law's plain terms, it is confirmed by the fact that no document or deposition testimony elicited in discovery supports a "knowing" standard or Defendants' new dictionary definitions. This "knowing" standard is absent from the July 2021 FAQs

50

(APP1813-15, 1830-32, 1869-73) and the September 2021 Attorney General opinion (APP1988-98); to the contrary, the September 2021 opinion suggests that the Law can be violated by implication.  And both Commissioner Edelblut and DOE Attorney Fenton admitted that there are no policies or procedures indicating that the Law contains a "knowing" requirement.  APP1312-13 (112:13-114:7); APP1270-71 (151:23-153:4).

Fourth, RSA 193:40, I's prohibition on students being "compelled to express belief in, or support for" a banned concept compounds these vagueness concerns because it turns on how a listener reacts and, likewise, contains no scienter requirement for the speaking educator.  Defendants focus on the definition of "compel," Defs.' Br. at 29, but ignore the subjectivity of the phrase "belief in" or "support for" that triggers a violation based on a listener's reaction.  Like a law prohibiting actions that have the "effect of influencing," see League of Women Voters of Fla. Inc. v. Fla. Sec'y of State, 66 F.4th 905, 947 (11th Cir. 2023), this provision gives educators no way of knowing whether their statements will have the prohibited effect of "compell[ing]  to express belief in" a banned concept.  See RSA 193:40, I.

Finally, Defendants suggest that RSA 193:40, I's passive voice "shall be taught" language refers to "the *affirmative and deliberate act* of giving the lessons or holding the classes and an understanding of the subject being taught."  See Defs.'

Br. at 29, 30 (emphasis added). But, once again, neither the July 2021 FAQs nor the September 2021 Attorney General opinion explicitly stress such an "affirmative and deliberate act" requirement, and, in fact, broadly extend the application of the Law to all school activities even beyond teaching. APP1814, 1831, 1870 (acknowledging in response to Q&A No. 8 that the law does not apply to "just teaching," but rather applies to "all activities carried out by public schools in their role as public schools"). In any event, this argument fails because the legislature could have used active language limiting the Law's reach to instruction specifically taught by teachers and did so elsewhere in RSA 354-A,[16] but refused to do so in the portion of the Law explicitly governing teacher conduct in RSA 193:40, I. Instead, lawmakers intentionally used the passive voice in RSA 193:40, I's "shall be taught" language to plausibly cover the "mere[] discussi[on] [of] ideas that fit within the banned concepts." ADD139. Confirming this broader interpretation, at least one complaint received by the DOE (███████████████████

███████) implicated the presence of a book in the classroom without the complainant knowing the contents of what, if anything, was taught. APP1767-1778; SA63-64 (¶ 140(a)).

---

[16] See RSA 354-A:31 ("[n]o public employer . . . *shall teach* ….") (emphasis added); RSA 354-A:32 ("[n]o government program *shall teach* ….") (emphasis added).

4. *Compounding the Law's Vagueness, It Lacks a Scienter Requirement and Can Be Violated by Implication*

The Law lacks a mental state requirement, which compounds the vagueness problems created by the breadth of the statutory language and makes it possible or even likely that the Law will be violated by accident or through inadvertence, thus leading to serious consequences for the educator.

A scienter requirement is essential given the lack of clarity as to what it means to teach, instruct, inculcate or compel to express a belief in, yet Defendants themselves have admitted that the Law does not have a scienter requirement "insofar as it doesn't say 'knowing,' it doesn't say 'purposely,' et cetera." APP1090 (12:17-24). This admission demonstrates that educators are not "protected from being caught in [the statute's] . . . net by the necessity of having a specific intent to commit an unlawful act." See Papachristou v. City of Jacksonville, 405 U.S. 156, 163 (1972).[17]

Accordingly, "the absence of a true scienter requirement leaves teachers vulnerable to sanctions if they inadvertently cross the boundary between permissible and prohibited speech." ADD143; see also Pernell, 641 F. Supp. 3d at

---

[17] This admission also distinguishes this case from United States v. Nieves-Castano, 480 F.3d 597 (1st Cir. 2007), where this Court rejected a vagueness challenge to a firearms statute because the defendant "could only have been convicted if she knew or reasonably should have known that her possession of the firearm was within a school zone." Id. at 603. Here, the Law contains no such mental state provision.

1285 (noting that "Defendants identify no explicit scienter requirement in the statute with respect to instructors' actions"). The Attorney General's September 2021 opinion only intensifies this concern over inadvertent violations, stating that the Law can be violated by implication. APP1996 ("But, if that web-based resource stated that it was designed to 'serve as a resource to white people' or to 'serve as a resource for our white employees,' then it could violate Section 297 because it _may imply_ that white people, specifically and for no other reason, are in need of anti-racist resources—resources that could benefit people from all backgrounds.") (emphasis added).

The undisputed record has borne out that Defendants, in practice, do not require any scienter to find an educator liable for a violation of the Law and that the Law can be violated by implication. At one meeting, the HRC agreed that these provisions can be violated by implication. APP1563 (explaining that the "inspiration" for HB2 was instances in which information had been presented in a K-12 classroom that "state[d] directly _and/or impliedly_ that inherent traits establish a person's inferiority/superiority") (emphasis added). Both DOE Commissioner Edelblut and DOE Attorney Diane Fenton admitted at deposition that there are no policies or procedures as to what the terms "taught, instructed, inculcated or compelled to express belief in, or support for" mean, beyond the July 2021 FAQs, including whether they contain a scienter requirement. APP1312-13 (111:4-14);

APP1270-71 (150:17-153:4). DOE employees have received no training concerning implementing the Law, including whether a scienter requirement exists. APP1912-14 (Resp. No. 4). Similarly, the DOE's limited presentations referencing the Law do not make any reference to a mental state requirement. ADD1946, 1974-76, 1854-56. The HRC also has no criteria for interpreting the corresponding phrase "teach, advocate, instruct, or train" in RSA 354-A:31, including whether a scienter requirement exists. APP1406-07 (75:3-78:2). The HRC also has conducted no training as to what these phrases mean, including whether they contain a scienter requirement. APP1399-1400 (48:23-49:8).

In short, while a scienter requirement would not remedy the Law's unconstitutional vagueness, the absence of one further confirms the Law's invalidity.

### B. The Law Is Susceptible to Arbitrary and Discriminatory Enforcement

A statute can also be unconstitutionally vague if it allows for "arbitrary and discriminatory enforcement." See Grayned, 408 U.S. at 108. Where there is an absence of "minimal guidelines to govern law enforcement," see Kolender, 461 U.S. at 357-58 (citation and internal quotation marks omitted), or established "standards" to guide enforcement authorities, see Morales, 527 U.S. at 42, an independent basis exists for invalidation. That independent basis exists here.

The Law provides neither guidance nor guardrails to enforcement agencies, which instead are empowered to rely on their own subjective interpretation of the Law, entrusting enforcement to the whims of the individual government officers with decision-making authority. "[V]est[ing] virtually complete discretion in the hands of the [enforcement agencies] to determine whether" an educator has violated the Law offends Due Process. See Kolender, 461 U.S. at 358 (observing that the "important aspect of the vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to govern law enforcement") (citation and internal quotation marks omitted); see also Morales, 527 U.S. at 62-64 (explaining that a "standard . . . is inherently subjective," and therefore constitutionally infirm, where its application depends on the enforcing officer's interpretation of it).

Here, the Law's enforcement scheme confers unbridled discretion to enforcement agencies without any guardrails for enforcement. Multiple agencies (namely the DOE, HRC and DOJ) have independent enforcement authority over the Law. See RSA 193:40, IV (DOE), RSA 354-A:29-34 and RSA 193:40, III (DOJ), RSA 354-A:29-34 and RSA 193:40, III (HRC).[18] These laws require each agency to follow its own internal processes and, in the DOE's case, conduct initial

_____

[18] The state courts also have enforcement authority under the Law. See RSA 354-A:29-34 and RSA 193:40, III. And so does the Department of Labor under RSA 354-A:34 given that section's reference to RSA ch. 275-E, which is New Hampshire Whistleblowers' Protection Act.

"reviews" (which constitute *de facto* preliminary investigations) upon receipt of a complaint. See, e.g., N.H. Code Admin. R. Ed 511.01(a), (b) (requiring DOE to conduct "review[s]" if there is a "possible violation" of the Code). This multi-agency enforcement approach leads to disparate outcomes that offend Due Process. See Carolina Youth Action Project, 60 F.4th at 784 (striking down a school disorderly conduct law that allow enforcement by schools and/or by the police, leading to "starkly disparate outcomes" that "turn[ed] on the whims of a school resource officer" who had "unbridled discretion" to refer the case); see also Manning, 930 F.3d at 276–77 (explaining that grave penalties "cannot rest on the use of. . . subjective standards" where different enforcement agencies "likely will have differing perceptions" of when a statute is violated).

These concerns are real, not hypothetical. As the district court recognized, "the record demonstrates that those charged with enforcing the law have relied on Commissioner Edelblut's personal opinions on what is appropriate instruction, as expressed in his op-ed articles, to guide their efforts." ADD145-47. Again, one educator was explicitly told that a DOE investigation into her use of two music videos featuring Black musicians (in a lesson on the Harlem Renaissance) was guided by Commissioner Edelblut's April 2022 article, suggesting that the article was the measure for educator conduct under the Law. APP1479-85 (O'Brien Decl. ¶¶ 13-19). The chilling effect of such enforcement is front and center in O'Brien's

57

case.  After O'Brien was conspicuously removed from her classroom to discuss the matter, O'Brien's colleagues took note.  Fearing for their own jobs, these educators decided to limit relevant instruction, including one teacher that opted not to incorporate current data about how race has impacted business practices.  Id. at 1484 (¶¶ 21-24).

And throughout this litigation, the DOE and HRC officials charged with enforcing the Law have, at various times, referred educators seeking to understand the Law's proscriptions to the FAQs (APP1274 (166:13-169:7)), the text of the statutes (APP1248 (62:10-63:3)), their school district's legal counsel (APP2014-16, APP1371 (150:1-9)), other officials within the agencies, other agencies, and even private lawyers (APP1444 (94:14-19)), but wholly refused to define a violation of the Law or answer whether specific texts or lessons would violate its provisions. Reference to disparate and inconsistent sources only increases the likelihood of arbitrary enforcement.  For example, Defendants punted among themselves questions seeking to identify concrete examples of a lesson or instruction prohibited under the Law.[19]  DOE Commissioner Edelblut and DOE Attorney Fenton deferred

---

[19] Throughout this lawsuit, and even beforehand, Plaintiffs sought to understand whether DOE and HRC considered certain books to violate the Law.  As detailed above, Defendants refused to answer directly, leading to the shadow-banning of certain books based upon the personal whims of the Commissioner.  See supra, pp. 19-20.  Indeed, school districts set aside books like Stamped and This Book is Anti-Racist.  APP 1532-34 (O'Mara Decl. ¶¶ 8-20), APP1519 (Mejia Decl. ¶ 16). Understandably, educators do not want to face the stress and scrutiny that comes

these questions to the HRC. APP1248-50 (64:15-65:10, 67:10-11, 70:5-15); APP1311 (105:10-106:2). Yet when Plaintiffs asked the HRC similar questions as to what specific books would be covered under the Law, the HRC claimed that it "could not give a teacher or complainant legal advice on whether them teaching that would make a charge or not." APP1444 (94:14-19, 94:21-22, 95:12-20); see also APP1406 (73:5-74:17). "The Constitution prohibits this type of inequitable, freewheeling approach." <u>Carolina Youth Action Project</u>, 60 F.4th at 784.

In response to these serious constitutional concerns, Defendants barely develop an argument about the susceptibility of the Law to arbitrary and discriminatory enforcement. They ignore the undisputed record in this case, and what they do manage to assert fails to appreciate the problematic dynamic at play here. Instead, Defendants claim that the Law does provide guidance, but they merely rehash (i) the same contorted reading of the statutory language, which as explained above finds no support in the Law itself, or (ii) the agencies' guidance. Def. Br. at 47.

Citing <u>United States v. Williams</u>, 553 U.S. 285 (2008), Defendants contend that enforcement decisions under the Law pose no arbitrary or discriminatory enforcement concern because they "present quintessential 'questions of fact,'"

---

with even a preliminary inquiry or "initial review," causing some to leave materials out of lessons altogether, including shelving books already purchased for inclusion.

which "triers of fact 'pass [upon] every day." Def's Br. at 48 (quoting Williams, 553 U.S. at 305-06). Defendants' reliance on Williams is misplaced. Williams involved a federal criminal law related to child pornography that required *juries* to determine whether such material was shared "in a manner that reflects the belief, or that is intended to cause another to believe" that the material contained child pornography. Williams, 553 U.S. at 289–90. The Court distinguished that dynamic from cases where statutes tied criminal culpability to "wholly subjective judgments [of the police] without statutory definitions, narrowing context, or settled legal meanings." Id. at 306. Key to the distinction is that in Williams, unlike here, the jury could make a "true or false" determination about whether a certain element of the offense is present based upon the evidence before it. Id.; United States v. JDT, 762 F.3d 984, 998–99 (9th Cir. 2014) (noting distinction between Williams, and Kolender and Morales, where, in the latter cases, "it was unclear which individuals would be prosecuted because enforcement officials could determine who was in violation of the statute in an ad hoc manner").

Here, however, the DOE, HRC, and DOJ serve as the police, the prosecutor, and the jury in enforcing a law that has an infinite number of interpretations and applications. Under DOE rules, *anyone* can complain to the DOE that an educator has violated the Educator Code of Conduct, and once the DOE receives a complaint, it *must* conduct an initial review of it. N.H. Code Admin. R. Ed 511.01 (a)-(b).

And educators _must_ report suspected Code violations, with a licensed educator's failure to report a suspected violation of the Code constituting a violation itself of the Code.  N.H. Code Admin. R. Ed 510.05(a), (f).

The DOE also conducts a _de facto_ investigation through an initial "review" on every complaint it receives in which any misconduct is alleged, including before the DOE has determined that a "possible violation of the code of conduct" exists and before the DOE has opened a formal investigation.  N.H. Code Admin. R. Ed 511.01(a)-(b); APP1296 (46:4-25, 47:17-21); APP1339-40 (23:19-25, 25:1-3). These informal "reviews" can take many forms, including personal outreach by DOE Commissioner Edelblut and DOE Investigator Richard Farrell to complainants, and to school administrators who control the teacher's career. APP1237-40 (20:22-22:4, 24:9-26:18, 32:2-16), 1242 (38:4-13), APP1296-97 (45:8-13, 47:17-21, 48:20-49:6); APP1338-39 (17:16-18:5, 23:19-25), 1364-66 (124:24-129:9); APP2014-16.

Moreover, as to the HRC complaint process, the record shows that the HRC makes a _prima facie_ determination that the Law has been allegedly violated based solely on its view of the allegations and interpretation of the Law's prohibitions. Beyond the text of the Law Against Discrimination, there is no written policy or guidance that the HRC uses in determining whether the _prima facie_ standard is satisfied.  APP1407 (79:14-21). █████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████

In other words, the Law allows enforcement agencies to pursue cases based upon their own interpretation of the Law's prohibitions, and for those same agencies to decide whether a specific case merits violation and subsequent punishment.  It is unconstitutional to "entrust[] lawmaking 'to the moment-to-moment judgment of the policeman on his beat,'" Kolender, 461 U.S. at 360–61 (quoting Smith, 415 U.S. at 575), and to "furnish[] a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups," or here, particular topics, "deemed to merit their displeasure,'" Papachristou, 405 U.S. at 170 (quoting Thornhill v. Alabama, 310 U.S. 88, 97–98 (1940)); see also Grayned, 408 U.S. at 108-109 ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

## III.    Severing RSA 193:40, IV Would Not Cure the Law's Ambiguities

The district court concluded that severing just the Code of Conduct sanction in RSA 193:40, IV "would fail to address these concerns [of lack of notice and the specter of arbitrary enforcement] because the plaintiffs would continue to be directly barred from teaching the banned concepts by the remaining subsections of

[the Law]," and they would continue to be susceptible to enforcement through other means, including private lawsuits.  ADD153.  In other words, severing just one piece of the enforcement scheme cannot save the Law altogether because "the unconstitutional provisions of the statute are so integral and essential in the general structure of [it]."  N.H. Democratic Party v. Sec'y of State, 174 N.H. 312, 331 (2021); see also Opinion of the Justices, 106 N.H. 202, 207 (1965) (A severability clause will not save a statute if, after severing, "[v]ital objectives in the entire scheme … cannot be carried out.").  Indeed, the record reveals peripheral DOE enforcement pressure of the Law even when the DOE claims that it is not enforcing the Law, and instead is deferring to the HRC.  APP1479-85 (O'Brien Decl. ¶¶ 13-19).  The district court's severability analysis was correct for several reasons.[20]

First, the Law is vague not only because of the severe sanctions imposed under RSA 193:40, IV, but also "because [it] fail[s] to provide teachers with sufficient notice of what is prohibited and raise the specter of arbitrary . . . enforcement."  ADD153.  Even with the removal of RSA 193:40, IV, the Law would continue to lack a scienter requirement and impose vague restrictions on "teaching," and thus could be violated without any purposeful conduct—including

---

[20] Whether language that renders a statute facially unconstitutional may be severed is a question of state law.  See R.I. Med. Soc'y v. Whitehouse, 239 F.3d 104, 106 (1st Cir. 2001).  Further, the district court did not declare RSA 354-A:29 (the Law Against Discrimination) or 354-A:33 (anti-retaliation in public employment) unconstitutional.  ADD154 n. 14.

by implication.  See supra, Part II.A.2-4.  Similarly, severing RSA 193:40, IV would do nothing to address the unconstitutional ambiguities with the four banned concepts themselves.  See supra, Part II.A.1.  Even without RSA 193:40, IV, the lack of a scienter requirement, vague restrictions on "teaching," and nebulous language found in the four banned concepts permeate and infect the entirety of the Law.  See Honeyfund.com, 622 F. Supp. 3d at 1184 n.13 (holding that the "Court need not confront severability because the unconstitutionally vague 'objectivity' requirement, which governs the entire challenged provision, renders the statute as a whole unconstitutionally vague"); Pernell, 641 F. Supp. 3d at 1286 n.62 (same).

A severability clause requires textual provisions that can be severed, but here, it would be impossible to sever these unconstitutional infirmities without radically altering the scope of the statute.  Given that one of the Law's key infirmities is the *absence* of a scienter requirement, this infirmity could not be resolved without a wholesale rewrite of the law that adds statutory text that the legislature saw fit to *not* include.  See Claremont Sch. Dist. v. Governor (Statewide Property Tax Phase-in), 144 N.H. 210, 218 (1999) ("While there is a presumption in favor of severability, the principle is not to be applied if it gives a statute meaning the legislature did not intend, either by addition or subtraction from its terms.") (citation omitted); see also R.I. Med. Soc'y, 239 F.3d at 107 (rejecting severability where there is no particular section, paragraph, sentence, or word that the court could strike

leaving behind any coherent remains, as doing so would rewrite the challenged law); Baird v. Bellotti, 450 F. Supp. 997, 1005 n.10 (D. Mass. 1978) ("Severability is a process of striking out, not of insertion or rewriting.") (citation omitted), aff'd, 443 U.S. 622 (1979).

Second, DOE licensure penalties under the Code of Conduct effectively would still remain if RSA 193:40, IV is severed. This is because, following the 2019 enactments at RSA 193:38 applying the Law Against Discrimination in the education context, a violation of that Law Against Discrimination's *entire* chapter at RSA ch. 354-A—which includes the subsequently-enacted Law under RSA 354-A:31 and RSA 354-A:32—was bootstrapped into the Code of Conduct and, thus, already applies to individual educators even without RSA 193:40, IV. N.H. Code Admin. R. Ed 510.01(b)(1), 510.02(b)(1), 510.03(b)(1) (barring discrimination "as specified in RSA 354-A:1"); see also RSA 193:38 (under 2019 law, bootstrapping under RSA ch. 193's "discrimination in public schools" statute *all* Law Against Discrimination violations "as defined in RSA 354-A," which would include the subsequently enacted challenged Law at RSA 354-A:29-34).

Third, even if this Court disregarded the DOE's own rules and concluded that only the enforcement process under RSA ch. 354-A remains with the removal of RSA 193:40, IV, this would not eliminate the severe penalties that would continue to exist under RSA 354-A:31 and RSA 354-A:32 in proceedings before the HRC,

nor would it eliminate the agencies' standardless enforcement. The Law's vague prohibitions will continue to be applied against educators even under RSA 354-A:31 and RSA 354-A:32 "because schools would be required to enforce the prohibitions against their teachers to avoid damages actions." ADD153. And "teachers who aid and abet their employers in teaching the concept would themselves continue to face the prospect of individual damages actions under RSA 354-A." ADD153; see also ADD123 & n.5; ADD104 n. 7; RSA 354-A:2, XV; U.S. Equal Opportunity Comm'n v. Fred Fuller Oil Company, 168 N.H. 606, 611 (2016) (holding that individual employees can be sued for aiding and abetting an unlawful discriminatory practice by an employer).[21]

To make matters worse, in any HRC proceeding, the educator—with potential sanctions on the line from the DOE if the HRC concludes that there is a violation—may now *not* even be placed on notice of any pending HRC proceeding because such an HRC proceeding often is *only* filed against a district. See RSA 354-A:31 (provisions applying to "public employer[s]"). ███████████████

████████████████████████████████████████████

---

[21] The DOJ has embraced this broader "attempt[] to aid [and] abet" interpretation under RSA ch. 354-A in suing multiple individuals for "civil penalties" and "damages." See Formella v. Hood, et al. (filed Dec. 13, 2023, N.H. Human Rights Commission), ¶ 5, available at https://www.doj.nh.gov/sites/g/files/ehbemt721/files/inline-documents/20231213-nationalist-social-club.pdf.

████████████████████████████████

████████████████████████████████

██████████████

Fourth, severing RSA 193:40, IV would not cure the problem of multiple agency enforcement. Even with severance of RSA 193:40, IV, the number of agencies with independent enforcement power over the Law would, at best, be reduced from five to four: (i) the state courts under RSA 354-A:29-34 and RSA 193:40, III, (ii) the DOJ under RSA 354-A:29-34 and RSA 193:40, III, (iii) the HRC under RSA 354-A:29-34 and RSA 193:40, III, and (iv) the Department of Labor under RSA 354-A:34 given that section's reference to RSA ch. 275-E, which is New Hampshire Whistleblowers' Protection Act.

Finally, the Law's unconstitutional impact on protected extracurricular speech under the First Amendment would be unaffected by severing RSA 193:40, IV. This constitutional violation—and its resulting chill—exists independent of how the Law is enforced under RSA 193:40, IV. See infra Part IV. Nor can this Court simply "limit its holding to finding the statutes unconstitutional when applied to extra-curricular speech of public-school teachers," Defs.' Br. at 57, when such severance would not fully resolve the Law's core Fourteenth Amendment due process/vagueness concern given their ambiguity, their lack of a scienter requirement, their severe penalties, and their ability to be violated by implication—

67

all of which "are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the statute."  See N.H. Democratic Party, 174 N.H. at 331 (citation omitted).

## IV.    Alternatively, the Law Violates Educators' First Amendment Rights

Having concluded that the Banned Concepts Law is unconstitutionally vague, the district court found it unnecessary to separately address the AFT Plaintiffs' First Amendment challenge.  Below, the AFT Plaintiffs argued that the Law impermissibly restricts educators' private, extracurricular speech, which the district court found to be a plausible-cognizable claim.  See ECF No. 83 at 57; ADD79.  The AFT Plaintiffs now separately address that claim, both because the record, including Defendants' admissions, supports the underlying merits of it as an alternative ground for relief, see United States v. George, 886 F.3d 31, 39 (1st Cir. 2018) ("We are at liberty to affirm a district court's judgment on any ground made manifest by the record."), and because it buttresses Plaintiffs' Fourteenth Amendment vagueness challenge since "a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,'" see Grayned, 408 U.S. at 109.

### A.    The Law Reaches Educators' Private, Protected Speech on Matters of Public Concern

In denying Defendants' motion to dismiss as to the AFT Plaintiffs' First Amendment claim, the district court recognized that educators have a First Amendment right to speak as private citizens, even on school grounds, but that the

Law serves to prohibit that speech because it applies to "*all activities* carried out by public schools . . . including extra-curricular activities."  ADD78-79 (citing Kennedy v. Bremerton Sch. Dist., 597 U.S. 507 (2022)) (emphasis added).

The "First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" Bremerton, 597 U.S. at 527 (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)).  Even though public-school teachers are "government employees paid in part to speak on the government's behalf and convey its intended messages," they are still "private citizens." Id.  Thus, when a teacher brings a First Amendment claim, courts must first inquire "into the nature of the speech at issue." Id.  "If a public employee speaks 'pursuant to [their] official duties,'" that speech is properly "the government's own speech." Id. (quoting Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)).  In that case, the teacher may not claim First Amendment protection. See id. But when the teacher "speaks as a citizen addressing a matter of public concern," the First Amendment applies, and courts should proceed to the familiar balancing of the "competing interests surrounding the speech and its consequences," such as whether a teacher's speech interests are outweighed by "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 528 (quoting Garcetti, 547 U.S. at 421 and Pickering v. Bd.

69

of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S. 563, 568
(1968)).  This Court has explained that the critical inquiry under Garcetti (i.e.,
whether an employee spoke "pursuant to their official duties") is "whether the
speech was 'part of what' the employee was 'employed to do' rather than merely
whether the employee engaged in the speech 'at work.'"  Bruce v. Worcester Reg'l
Transit Auth., 34 F.4th 129, 136 (1st Cir. 2022) (quoting Garcetti, 547 U.S. at 420-
21).

     Here, as the district court concluded, the Law indisputably extends beyond
the classroom to reach educators' private speech.  The agencies' FAQs confirm as
much, advising that the Law's prohibitions extend to "all activities carried out by
public schools in their role as public schools, including extra-curricular activities
that are part of the public school's work."  APP524.  The FAQs carve out one
limited exception, for "public schools or school districts . . . making physical space
available to third parties for events or activities."  Id.  Beyond the FAQs, Defendants
confirmed the Law's boundless reach.  The DOE considers "extracurricular
activities" to include "*anything* that happens within the curtilage of the school,"
including after school debate practice, theater, dance, a conversation with a student
in the hallway, and even extending to programs occurring at off-site private
facilities, such as sports facilities, if they are part of the schools' activities. See
APP1377 (175:16-176:3) (emphasis added).  The DOE also considers the Educator

70

Code of Conduct to apply to educators when they are off duty. APP1383 (197:22-198:1). Commissioner Edelblut amplified this reach in a television interview where he characterized the Law's scope as prohibiting discrimination "against one another, whether that is in the classroom or *outside the classroom*."[22]

Contrary to this Court's precedent, Defendants define the applicability of the law solely based upon *where* the speech takes place, instead of the key question of whether the speech was "'part of what' the employee was 'employed to do.'" <u>See Bruce</u>, 34 F.4th at 136 (citation and internal quotation marks omitted); <u>see also id.</u> at 136-37 (identifying "nonexclusive factors that indicate that a public employee is speaking 'as a citizen,'" including whether the employee is being paid to make the speech in question by the employer, among others). In that case, a city bus driver gave a television interview about transportation budget cuts while in uniform and driving a city bus, but this Court still held that the driver was speaking as a citizen because, among other reasons, the driver was not paid to give the interview, and he did not give the interview with the imprimatur of his job as a bus driver. <u>See id.</u> at 137; <u>accord</u> <u>MacRae v. Mattos</u>, 106 F.4th 122, 127 (1st Cir. 2024) (parties and court

---

[22] Adam Sexton, CloseUp: Commissioner expects to fund 1000-1500 Education Freedom Accounts this year, WMUR (Aug. 29, 2021), https://www.wmur.com/article/closeup-commissioner-expects-to-fund-1000-1500-educationfreedom-accounts-this-year/37424825 (starting at 9:58) (emphasis added).

agreed that public school teacher was speaking as a citizen where she made social media posts about political issues, including CRT).

Here, Defendants' broad interpretation of the Law's scope necessarily sweeps in instances where teachers may engage in speech as citizens. For example, a New Hampshire public-school teacher may volunteer to chaperone or attend a school event, not in their capacity as a teacher, but as a citizen in the community, where their speech could implicate the Law's prohibitions. AFT President Deborah Howes explained the innumerable interactions and touchpoints that AFT members have with students outside the classroom. See APP1463 (Howes Decl. ¶ 11); see also APP1474 (Munz Decl. ¶ 2); APP1552 (Richman Decl. ¶ 10); APP1498 (Philibotte Decl. ¶ 21 ("I have also spoken to public school students about issues concerning race at events in my individual capacity.")).

The record contains instances where Defendants apparently considered the private speech of an educator to implicate the Law. One undisputed and straightforward illustration makes the point. As noted above, Plaintiff John Dube exercised his right to petition by signing an online pledge to teach "honest" history. APP1470 (Dube Decl. ¶ 12); see also APP2466-74. By definition, the pledge was not part of the school curriculum, and there is no indication that Dube spoke of it to any students. However, Commissioner Edelblut helped an anti-DEI advocacy group learn Dube's employment information (see APP2087-89), which led to Dube

suffering harassment and threats to his safety. Notwithstanding FBI and local police intervention, or the installation of home security cameras, Dube left the teaching profession and the state rather than endure continued harm.[23] This episode starkly illustrates how DOE's apparent inclination to pursue educators under the Banned Concepts Law adversely impacted the legitimate First Amendment activity of educators as private citizens.

The Law undoubtedly implicates matters of public concern. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145 (1983) (citation and internal quotation marks omitted); see also Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000) ("Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community.") (citation omitted). The Law covers topics like discrimination based on race, sex, gender identity, sexual orientation, and the like which are "inherently of public concern." Connick, 461 U.S. at 148 n.8; accord Meriwether v. Hartop, 992 F.3d 492, 508 (6th Cir. 2021) (sex and gender identity inherently a matter of public concern); Konits

---

[23] The DOE ultimately determined that it would not pursue any action against signatories because the petition was circulated (and signed by many) "prior to HB2 becoming law." APP2481.

v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121, 125 (2d Cir. 2005) (collecting cases where speech on the existence of discrimination is a matter of public concern).

### B. The Law Is Subject to Strict Scrutiny, Which Defendants Cannot Satisfy

The Law is subject to strict scrutiny because, as the district court recognized, the Law "regulate[s] speech based on the speaker's viewpoint" by "target[ing] not subject matter, but particular views taken by speakers on a subject," and "suppress[es] speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses."  ADD120-21 (first quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828-29 (1995), then quoting Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004)).  Viewpoint-based restrictions on speech are subject to strict scrutiny. See Bremerton, 142 S. Ct. at 2426.[24]  To satisfy "strict scrutiny," Defendants must show that the Law "serve[s] a compelling interest and [is] narrowly tailored to that end."  Id. at 2425.

Such balancing easily favors Plaintiffs.  Educators have a strong interest in commenting on matters of public concern outside the classroom, including during

---

[24] Even if this Court determines that the Law is not a viewpoint-based restriction, its broad statutory "sweep" applying to every public educator in New Hampshire makes Defendants' burden "heavy," necessitating heightened scrutiny.  United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 466 (1995) (applying heightened scrutiny to federal government's statutory honoraria ban where it chilled potential speech and had a widespread impact).

74

extracurricular activities where students may be present.  See <u>City of San Diego, Cal. v. Roe</u>, 543 U.S. 77, 82 (2004) ("The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.").

Defendants have yet to demonstrate that the Law addresses any compelling government interest, let alone a speculative harm purportedly caused by any of the speech in question.  Rather, the legislative history here demonstrates that the Law's express goal (as pressed by its sponsors) was to censor speech based on subjective political beliefs related to CRT and diversity training.   See <u>supra</u>, pp. 5-8. Importantly, none of the Defendants' witnesses articulated any specific objectionable educational material that was permissible before the passage of the Law, but that the Law has prohibited.   See <u>APP1276 (174:2-8); APP1327-28 (172:23-173:9); APP1376 (169:12-18, 170:20-24); APP1429 (35:15-23).

To the extent Defendants have any government interest (let alone a compelling interest) in restricting educator's protected speech—which they do not—the Law is not narrowly tailored to that end.  Instead, the Law directly targets all public employees on endless topics of discussion to which a student could be exposed. See <u>NTEU</u>, 513 U.S. at 477 (ban reached all executive branch employees at certain level).  And the hastily concocted statutory language belies any effort by legislators to tailor a specific speech ban where there could be any true risk of

"discrimination." To the contrary, and as explained above, New Hampshire already has robust anti-discrimination laws for public schools. <u>See</u> <u>supra</u>, p. 42.

Thus, the Law fails strict scrutiny because Defendants cannot show a compelling interest in its restrictions, nor can they show that it was narrowly tailored to achieve that end. For these reasons, the Law should also be declared unconstitutional under the First Amendment to the extent that it restricts speech by public school teachers that is outside of the scope of their prescribed official duties.

## <u>CONCLUSION</u>

As explained above, the Banned Concepts Law is unconstitutionally vague on its face because the Law fails to provide adequate notice of its proscriptions and invites arbitrary and discriminatory enforcement. In the alternative, the Law violates educators' First Amendment rights. Accordingly, this Court should affirm the district court's grant of summary judgment.

Respectfully submitted,

LOCAL 8027, AFT-NEW HAMPSHIRE, AFL-CIO,
RYAN RICHMAN, JOHN DUBE AND JOCELYN
MERRILL, TEACHERS IN THE NEW HAMPSHIRE
PUBLIC SCHOOLS, AND KIMBERLY GREEN ELLIOT
AND MEGHAN EVELYN DURDEN PARENTS OR
GUARDIANS OF CHILDREN IN THE NEW HAMPSHIRE
PUBLIC SCHOOLS,

By their attorneys,

January 10, 2025          */s/ Charles G. Moerdler*
Charles G. Moerdler (No. 1213343)
Harry Sandick (No. 1213342)
Joshua M. Goldman (No. 1204166)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel.: 212.336.2000
cmoerdler@pbwt.com
hsandick@pbwt.com
jgoldman@pbwt.com

Peter Perroni (No. 91613)
NOLAN PERRONI PC
73 Princeton Street
North Chelmsford, MA 01863
Tel.: 978.454.3800
peter@nolanperroni.com

ANDRES MEJIA AND CHRISTINA KIM PHILIBOTTE,

By their attorneys,

January 10, 2025

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (No. 123868)
Henry R. Klementowicz (No. 1179814)
SangYeob Kim (No. 1183553)
AMERICAN CIVIL LIBERTIES UNION OF NEW
    HAMPSHIRE
18 Low Avenue
Concord, NH 03301
Tel.  603.224.5591
gilles@aclu-nh.org
henry@aclu-nh.org
sangyeob@aclu-nh.org

Chris Erchull (No. 1199326)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont, Suite 950
Boston, MA 02108
Tel.: 617.426.1350
cerchull@glad.org

Morgan C. Nighan (No. 1157304)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109-2835
Tel.: 617.345.1031
mnighan@nixonpeabody.com

David A. Vicinanzo (No. 27729)
S. Amy Spencer (No. 1180937)
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101
Tel.: 603.628.4000
dvicinanzo@nixonpeabody.com
aspencer@nixonpeabody.com

Jennifer Eber (No. 39766)
Kayla Turner (No. 1213333)
DISABILITY RIGHTS CENTER-NEW HAMPSHIRE
64 N Main St, Ste 2
Concord, NH 03301-4913
Tel.: 603.228.0432
JenniferE@drcnh.org
kaylat@drcnh.org

William E. Christie (No. 84929)
SHAHEEN & GORDON, P.A
107 Storrs Street
P.O. Box 2703
Concord, NH 03302
Tel.: 603.225.7262
wchristie@shaheengordon.com

Emerson Sykes (No. 1197408)
Leah Watson (No. 1213334)
Sarah Hinger (No. 1184271)
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org

79

NATIONAL EDUCATION ASSOCIATION –
NEW HAMPSHIRE,

By its attorneys,

January 10, 2025

*/s/ Jason Walta*
Jason Walta (No. 78674)
NATIONAL EDUCATION ASSOCIATION
1201 Sixteenth St. NW
Washington, DC 20036
Tel: 202.822.7035
jwalta@nea.org

Lauren Snow Chadwick (No. 1213339)
Callan E. Sullivan (No. 1213504)
Staff Attorneys
NATIONAL EDUCATION ASSOCIATION-
    NEW HAMPSHIRE
9 South Spring Street
Concord, NH 03301-2425
Tel.: 603.224.7751
lchadwick@nhnea.org
csullivan@nhnea.org

Nathan R. Fennessy (No. 1159549)
PRETI FLAHERTY BELIVEAU & PACHIOS LLP
57 North Main Street
Concord, NH 03301
Tel.: 603.410.1500
nfennesy@preti.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system.

Mary A. Triick (No. 1213543)
Senior Assistant Attorney General
Samuel R.V. Garland (No. 1189913)
Senior Assistant Attorney General
1 Granite Place
Concord, NH 03301

January 10, 2025                                    /s/ *Harry Sandick*
                                                            Harry Sandick (No. 1213342)

<u>**CERTIFICATE OF COMPLIANCE**</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f):

✓ This document contains 17,939 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

✓ This document has been prepared in a proportionally spaced typeface in size 14 Times New Roman font.

January 10, 2025                    /s/ *Harry Sandick*
                                   Harry Sandick (No. 1213342)