# United States Court of Appeals

*for the*

# First Circuit

Case No. 24-1690

ANDRES MEJIA, CHRISTINA KIM PHILIBOTTE, NATIONAL
EDUCATION ASSOCIATION – NEW HAMPSHIRE, LOCAL 8027,
AFT–NEW HAMPSHIRE, AFL–CIO, JOCELYN MERRILL, KIMBERLY
GREEN ELLIOT, RYAN RICHMAN, MEGHAN EVELYN DURDEN
and JOHN DUBE,

*Plaintiffs-Appellees,*

v.

FRANK EDELBLUT, in their official capacity as Commissioner,
New Hampshire Department of Education, JOHN M. FORMELLA, in their
official capacity as New Hampshire Attorney General,

*(For continuation of caption see inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

## BRIEF FOR *AMICUS CURIAE* PEN AMERICAN CENTER, INC. IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

OF COUNSEL:
JOHN B. HARRIS
JEREMY BATES
KRISTEN NIVEN
CESARINA DA PARMA
RUBY STRASSMAN

RONALD C. MINKOFF
FRANKFURT KURNIT KLEIN
  & SELZ P.C.
28 Liberty Street
New York, New York 10005
(212) 980-0120

*Counsel for* Amicus Curiae *PEN American Center, Inc.*

---

AHNI MALACHI, in their official capacity as Executive Director, New Hampshire Commission for Human Rights, CHRISTIAN KIM, in their official capacity as Chairperson, New Hampshire Commission for Human Rights, KEN MERRIFIELD, in their official capacity as Commissioner, New Hampshire Department of Labor,

*Defendants-Appellants.*

---

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29 and First Circuit Rule 29, *Amicus Curiae* PEN AMERICAN CENTER, INC. ("PEN America") hereby certifies that, in addition to persons listed by the parties in their briefs, the following persons have an interest in the outcome of this case or appeal: None.

PEN America and its undersigned counsel further certify that:

(1) *Amicus Curiae* PEN America has no parent corporations or any other publicly held corporations that own 10% or more of its stock;

(2) Counsel from Frankfurt Kurnit, Klein & Selz, P.C. authored the brief in its entirety;

(3) No party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and

(4) No person other than the *Amicus Curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT .................................................................. i

INTEREST OF *AMICUS CURIAE*...........................................................1

SUMMARY OF ARGUMENT .................................................................2

BACKGROUND ........................................................................................3

    A.    The Proliferation of Educational Gag
           Orders in the United States.................................................3

    B.    The Banned Concepts Laws Around the Country............................7

ARGUMENT ..........................................................................................11

    I.    THE VAGUE NEW HAMPSHIRE LAW AND
         SIMILAR PROLIFERATING "ANTI-WOKE"
         ENACTMENTS CHILL PROTECTED SPEECH ............................11

    II.    THE NEW HAMPSHIRE LAW DISCRIMINATES
         ON THE BASIS OF VIEWPOINT AND CASTS A
         PALL OF ORTHODOXY OVER THE CLASSROOM ....................13

CONCLUSION ......................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967)..........................................................................14

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995)...................................................................14, 15

*United States v. Associated Press*,
    52 F. Supp. 362 (S.D.N.Y. 1943) ...................................................15

**Statutes**

Georgia Code Section 20-1-11....................................................................12

Individual Freedom Act .........................................................................5, 14

**Other Authorities**

AARP, *Report of a Special Committee: Political Interference and
    Academic Freedom in Florida's Public Higher Education System*
    (December 2023),
    https://www.aaup.org/file/AAUP_Florida_final.pdf ..........................6

Executive Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020)......................7, 9

Friedman, Jonathan, and Tager, James, *Educational Gag Orders:
    Legislative Restrictions on the Freedom to Read, Learn, and Teach*
    (2021), https://pen.org/report/educational-gag-orders/...................3, 5

Golden, Daniel "Muzzled by DeSantis, Critical Race Theory
    Professors Cancel Courses or Modify Their Teaching",
    *ProPublica*, (Jan. 3, 2023),
    https://www.propublica.org/article/desantis-critical-race-theory-
    florida-college-professors ...................................................................6

Jill Anderson, The State of Critical Race Theory in Education (Feb.
    23, 2022), https://www.gse.harvard.edu/ideas/edcast/22/02/state-
    critical-race-theory-education ..............................................................8

Leslie Postal, "New state rules tell librarians to 'err on the side of caution' when picking books", Orlando Sentinel (Jan. 19, 2023), https://www.orlandosentinel.com/2023/01/18/new-state-rules-tell-school-librarians-to-err-on-side-of-caution-when-picking-books/..................6, 7

"Map: Where Critical Race Theory is Under Attack," Education Week (updated November 1, 2024), www.edweek.org/policy-politics/map-where-critical-race-theory-is-under-attack/2021/06.......................7

Meckler, Laura and Natanson, Hannah, "New Critical Race Theory Laws Have Teachers Scared, Confused and Self-Censoring", The Washington Post (February 14, 2022), https://www.washingtonpost.com/education/2022/02/14/critical-race-theory-teachers-fear-laws/ ..........................................................12

Patricia Mazzei & Anemona Hartocollis, "Florida Rejects A.P. African American Studies Class", N.Y. Times (Jan. 19, 2023) ..........................6

PEN America, "America's Censored Classrooms 2024" (October 8, 2024), www.pen.org/report/Americas-censored-classrooms-2024/.....................4

PEN America, *Banned in the USA* (2024), https://pen.org/report/beyond-the-shelves/ ..........................................4

PEN America, *Index of Educational Gag Orders* (2024), https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl 49yod7l01o0TCk/viw6VOxb6SUYd5nXM?blocks=hide. ................................4

Virginia Executive Order 1 "Ending the Use of Inherently Divisive Concepts Including Critical Race Theory, and Restoring Excellence in K-12 Public Education in the Commonwealth" (2022).....................................................................................8

Waxman, Olivia, "Anti-'Critical Race Theory' Laws Are Working. Teachers Are Thinking Twice About How They Talk About Race", TIME, (June 30, 2022), https://time.com/6192708/critical-race-theory-teachers-racism/...........................................................11

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus* PEN America is a nonprofit, nonpartisan public-policy organization that sits at the intersection of literature and human rights. For more than a century, PEN America has sought to protect free speech and expression as the cornerstone of a robust and healthy democracy. Consistent with its name, PEN America champions the freedom to write and speak, recognizing the power of the word to transform the world.

PEN America has extensively researched recent efforts to suppress the expression of disfavored viewpoints in American classrooms and has filed *amicus curiae* briefs in courts across the country in support of academic freedom, academic autonomy, and the right to speak inside and outside the classroom without fear of reprisal based on unduly restrictive laws or regulations. With this brief, *Amicus* seeks to: (1) place the New Hampshire law at issue here within the broader context of classroom censorship nationwide; and (2) show why that law is unconstitutional and, like others of its ilk, violates the First and Fourteenth Amendments.

*Amicus* supports the ruling of the court below insofar as it struck down aspects of the New Hampshire law. PEN America recognizes the severe, chilling consequences of allowing such a law to govern teaching and learning in New

---

[1] All parties have consented to the filing of this brief by *Amicus Curiae*.

Hampshire's classrooms.  As an organization dedicated to protecting free speech and academic freedom, PEN America is compelled to speak out in opposition to the law.

## SUMMARY OF ARGUMENT

The New Hampshire law at issue here is one of many "Educational Gag Orders" ("EGOs") that are chilling speech across the United States.  These orders have two primary goals.  First, they are intended to muzzle views that a legislative majority disfavors.  Second, they install a curriculum that is designed to prevent or chill teachers from teaching their students about subjects the legislatures deem inappropriate—the continuing existence of unconscious bias or systematic racism, sexism, and other forms of discrimination.  In so doing, EGOs force teachers either to espouse a particular worldview or to risk professional and financial ruin.  Rather than promote classroom discussion and debate, EGOs ban entire topics that legislatures view as divisive or "woke," thereby effectively imposing prior restraints on classroom speech.  (Point I.)

*Amicus'* extensive familiarity with the nationwide push to impose EGOs gives it an important perspective on the issues raised by this New Hampshire law.  New Hampshire's law is one of many that seek to ban the teaching of concepts that are considered divisive—in this case, four concepts that, read together, essentially preclude any discussion of differential treatment on the basis of race, sex, gender identity, or other characteristics.  The law's effect is both to chill classroom speech

due to its vagueness and overbreadth and to compel teachers to adhere to a particular government-mandated viewpoint and ideology. The law affects entire subject areas, periods of history, and social theories. The New Hampshire law thus severely hampers teachers from educating effectively. (Point II.)[2]

## BACKGROUND

### A.    The Proliferation of Educational Gag Orders in the United States

Legislative attempts to ban the teaching of "divisive" concepts in public schools, higher education, state agencies, and elsewhere in the public realm are proliferating. In some cases, these efforts are intended to muzzle the teaching of concepts bearing on societal inequalities and social injustice, considered by the legislative majority to be unduly divisive and even subversive. In other cases, the legislative efforts reflect an attempt to impose a particular curriculum or viewpoint. Where, as here, violating such a statute may have real personal, professional, and financial consequences for teachers, it is inevitable that teachers will interpret an unclear statute broadly and err on the side of self-censorship. Indeed, that self-censorship appears to be the intent of the statute. In essence, as *Amicus* has documented, these bills function as gag orders because they chill academic speech and institute state-controlled viewpoint discrimination.[3]

---

[2] This brief refers to laws identifying impermissible concepts as "Banned Concepts" laws.

[3] Friedman, Jonathan, and Tager, James, *Educational Gag Orders: Legislative Restrictions on the Freedom to Read, Learn, and Teach* (2021), https://pen.org/report/educational-gag-orders/

Between January 2021 and October 2024, fully 365 EGO bills were introduced in 46 states, of which 38 were enacted into law.[4]  There has also been a marked increase in less formal measures: in the 2023-2024 school year, *Amicus* recorded 10,046 instances of book-banning across the country, with a disproportionate number of the banned books including characters of color or LGBTQ+ characters.[5]  This surge in educational censorship is a direct result of a coordinated effort by partisan lawmakers across the country who share a commitment to advance a particular ideology.

*Amicus* described the disturbing phenomenon of EGOs in a November 2021 report entitled "Educational Gag Orders."  The report sought to "sound the alarm" so that the public would recognize that these measures "amount to a sweeping crusade for content-and-viewpoint-based state censorship."  Even more than three years ago, *Amicus* understood that:

> These bills will have—and are already having—tangible consequences for both American education and democracy, both distorting the lens through which the next generation will study American history and society and undermining the hallmarks of

---

(last accessed January 6, 2025); *see also* PEN America, "America's Censored Classrooms 2024" (October 8, 2024), www.pen.org/report/Americas-censored-classrooms-2024/.

[4] PEN America, *Index of Educational Gag Orders* (last updated Oct. 1, 2024), https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yod7l01o0TCk/viw6VOxb 6SUYd5nXM?blocks=hide.

[5] PEN America, *Banned in the USA* (2024), https://pen.org/report/beyond-the-shelves/.

liberal education that have set the U.S. system apart from those of authoritarian countries.[6]

The PEN America report noted that EGOs were having widespread negative effects on academic freedom, including consequences such as: (1) suspending a sociology course on race and ethnicity in Oklahoma; (2) forcing professors at Iowa State University to seek guidance about how to avoid "drawing scrutiny" for their teaching; (3) causing Texas administrators to instruct teachers that they should balance books on the Holocaust with books on "opposing views"; and (4) challenging the teaching of civil rights activist Ruby Bridges's autobiographical picture book about school desegregation in Tennessee.[7]

The chilling effect of EGOs is particularly visible in Florida. In 2022, Governor Ron DeSantis signed the Individual Freedom Act—which, belying any claim of promoting "freedom," is commonly referred to as the "Stop WOKE Act." Although portions of the Stop WOKE Act regarding workplace training have been struck down as unconstitutional, and the challenge concerning higher education resulted in a preliminary injunction (currently on appeal in the Eleventh Circuit), the K–12 educational bans remain in place. Despite the success of the legal challenges to the law (HB7), professors at universities and educators all over Florida have been forced to recalibrate their curricula and pedagogy or in some instances to cancel

---

[6] *Educational Gag Orders* (supra n. 3), https://pen.org/report/educational-gag-orders/

[7] *Id.*

classes entirely.[8]  One sociology professor at Florida State University reported that her department chair recommended that she delay her candidacy for tenure due to concerns over her past courses on Critical Race Theory ("CRT").[9]  In addition, changes in tenure review in Florida to try to detect liberal bias have reportedly resulted in tenure denials, in several instances based on the thinly veiled pretext that the public institution is "moving towards a more traditional liberal arts institution."[10]

And with respect to K–12 public education, this climate led Florida initially to reject an AP African American studies course as "lacking educational value"[11] while state training for educators and librarians instructed them to "err on the side of caution" when selecting materials, resulting in the shuttering of classroom libraries and the removal of thousands of books across the state.[12]

The effects of these EGOs extend beyond the states that have enacted formal Banned Concepts legislation.  Some teachers believe that instilling fear about the

---

[8]  Golden, Daniel "Muzzled by DeSantis, Critical Race Theory Professors Cancel Courses or Modify Their Teaching", *ProPublica* (Jan. 3, 2023), https://www.propublica.org/article/desantis-critical-race-theory-florida-college-professors.

[9] *Id.*

[10] *See* AARP, *Report of a Special Committee: Political Interference and Academic Freedom in Florida's Public Higher Education System* (December 2023), https://www.aaup.org/file/AAUP_Florida_final.pdf (last reviewed January 15, 2025).

[11]  Patricia Mazzei & Anemona Hartocollis, "Florida Rejects A.P. African American Studies Class", N.Y. Times (Jan. 19, 2023), at https://www.nytimes.com/2023/01/19/us/desantis-florida-ap-african-american-studies.html.

[12]  Leslie Postal, "New state rules tell librarians to 'err on the side of caution' when picking books", Orlando Sentinel (Jan. 19, 2023), https://www.orlandosentinel.com/2023/01/18/new-state-rules-tell-school-librarians-to-err-on-side-of-caution-when-picking-books/.

teaching of certain subjects is the whole point: "All someone has to do to win is to just chill people" from speaking.[13]

### B. The Banned Concepts Laws Around the Country

Banned Concepts laws are a significant subset of the EGO universe. New Hampshire's version is a copy-cat statute based largely on federal Executive Order No. 13950,[14] which was issued in 2020, found unconstitutional, and then revoked in January 2021. Despite this ignominious history, Executive Order 13950 led to an explosion of state legislation containing some or all of the 9 banned concepts recited in the Order. Since January 2021, 44 states have reportedly introduced bills or taken other steps to enact some form of the Executive Order's Banned Concepts, to restrict the teaching of CRT, or limit how teachers can discuss racism and sexism. At least 18 states have reportedly imposed strictures by legislation or other means.[15]

Like New Hampshire's version, these laws are based on claims that, by enacting "Banned Concepts" laws, teachers will "educate, not indoctrinate students" and teach students "how to think – not what to think."[16] Although critical race theory is not an elementary or high school subject (CRT originated in the 1960's and has

---

[13] *Id.*

[14] 85 Fed. Reg. 60683 (Sept. 22, 2020).

[15] *See* "Map: Where Critical Race Theory is Under Attack," Education Week (Nov. 1, 2024), www.edweek.org/policy-politics/map-where-critical-race-theory-is-under-attack/2021/06.

[16] State of Arkansas, Executive Order To Prohibit Indoctrination and Critical Race Theory in Schools, EO 23-05 (Jan. 10, 2023).

almost exclusively been a subject addressed in law and graduate schools),[17] it has been used across the country to justify EGOs, often accompanied by heated rhetoric that CRT "emphasizes skin color as a person's primary characteristic, thereby resurrecting segregationist values, which America has fought hard to reject."[18]

Although a number of states simply copied the Executive Order's Banned Concepts verbatim, New Hampshire included only four of the concepts in its 2021 version. However, the decision to exclude five of the concepts does not suggest the legislature exercised restraint. Rather, the New Hampshire law is in other ways far broader than the federal version, including not only race and sex as characteristics, but also age, gender identity, sexual orientation, creed, color, marital status, family status, disability, religion, or natural origin. The addition of these 10 additional characteristics in the statute makes it all the more sweeping and ensures wide-ranging censorship of teachers' speech.[19]

The New Hampshire law precludes primary or secondary school students from being "taught, instructed, inculcated or compelled, to express belief in, or

---

[17] Jill Anderson, The State of Critical Race Theory in Education (Feb. 23, 2022), https://www.gse.harvard.edu/ideas/edcast/22/02/state-critical-race-theory-education.

[18] *Id.*; *see also* Virginia Executive Order 1 "Ending the Use of Inherently Divisive Concepts Including Critical Race Theory, and Restoring Excellence in K-12 Public Education in the Commonwealth" (2022) ("Inherently divisive concepts, like Critical Race Theory and its progeny, instruct students to only view life through the lens of race … Our children deserve far better from their education than to be told *what to think*") (emphasis original).

[19] The law covers other public employees. *Amicus* focuses here on the issues posed for teachers.

support for" purportedly socially divisive concepts pertaining to a person's age, sex, gender identity, sexual orientation, race, creed, color, marital status, family status, disability, religion, or natural origin (collectively, the "Characteristics"). The law specifically bans teaching that:

1.  One's own Characteristic "is inherently superior to people [*sic*] of another" Characteristic;

2.  An individual, "by reason of his or her [Characteristics]", is "inherently racist, sexist, or oppressive, whether consciously or unconsciously";

3.  An individual "should be discriminated against or receive adverse treatment solely or partly because of his or her [Characteristics]"; or

4.  People belonging to one or more of these Characteristics "cannot and should not attempt to treat others without regard to" the Characteristics.

(Addendum at 162-63 (RSA 193:40, I).)

For teachers, the law allows them to be sued for damages by anyone claiming to be aggrieved by a violation and gives rise to potential "disciplinary sanction by the state board of education," including termination. *Id*. at 163. Thus, as the district court found (Addendum at 93, Opinion at 19), a teacher could face—without any finding of scienter—both civil suits for damages and preclusion from teaching again if found to have espoused a Banned Concept in the classroom (or potentially outside

as well).[20]  In an apparent attempt to avoid the palpable restraint on speech, the New Hampshire law creates a "safe harbor" for certain speech that might otherwise be considered teaching a banned concept.  This harbor permits educators to have a "discussion," "as part of a larger course of academic instruction," as to the "historical existence of ideas and subjects" constituting the banned concepts.[21] (Addendum at 163 (RSA 193:40, II).)

In May 2024 the District Court for the District of New Hampshire found the statute unconstitutionally vague under the heightened standard applied to a law that restricts viewpoint-based speech because: (1) the statute failed to provide "fair notice as to the concepts" that teachers may not teach; (2) it did not sufficiently explain when classroom discussion of a banned concept crosses the line into "impermissible teaching"; and (3) it gave teachers insufficient guidance as to when their "extracurricular communications" might be subject to the statute.  The court cited evidence that the law had actually chilled teachers' legitimate speech.

---

[20] See RSA 193:40, I (prohibition on being "taught, instructed, inculcated or compelled" in banned concepts contains no language confining its reach to four walls of classroom).

[21]  In the "FAQ" published by the State of New Hampshire to provide guidance regarding HB2, the State asserts that the safe harbor of HB2 in fact allows for discussions "related to current events."  (App. 1814)  How the plain language of the statute relating only discussion of "historical existence" can be squared with "current events" is mystifying.

# ARGUMENT

## I.  THE VAGUE NEW HAMPSHIRE LAW AND SIMILAR PROLIFERATING "ANTI-WOKE" ENACTMENTS CHILL PROTECTED SPEECH

The evidence shows that the proliferating EGO statutes achieve their goal, at least until these statutes are held unconstitutional.  In states that have enacted laws similar to New Hampshire's, educators report thinking twice about how they talk about race and other "divisive" characteristics such as gender and identity.[22]  Many teachers have reported that "they are struggling to provide historical context for current events" and are "worried that speaking out on controversial issues could cost them their jobs."[23]  The vague and sweeping language in many EGOs compounds this problem: teachers are being exceptionally cautious because they do not want to risk running afoul of a law they do not fully understand.  In New Hampshire specifically, at least one teacher has asked for clarification on the bounds of the law "from the state, from the union, [and] from school lawyers," only to find that "the universal response is no one's really sure."[24]

*Amicus* notes its agreement with the court below that each of the Banned Concepts expressed is void for vagueness.  Of special concern is the attempt by New

---

[22] Waxman, Olivia, "Anti-'Critical Race Theory' Laws Are Working. Teachers Are Thinking Twice About How They Talk About Race", TIME, (June 30, 2022), https://time.com/6192708/critical-race-theory-teachers-racism/.

[23] *Id.*

Hampshire and many other states to insert legislative language: (a) insisting that the statutes fully comport with the First Amendment; and (b) creating supposed safe harbors allowing discussion of banned concepts where supposedly academically appropriate.  These attempts are both cynical and paradoxical.  For example, after defining the many Banned Concepts covered by the law, Iowa House File 802 asserts that it should not be applied to "inhibit or violate the first amendment rights of students or faculty" and that "The intellectual vitality of students and faculty shall not be infringed under this section."  Georgia Code Section 20-1-11 similarly recites that the prohibition against advocating the Banned Concepts shall not "undermine intellectual freedom and free expression."

Given the evidence amassed by *Amicus* of the chilling effect of these statutes on classroom speech, these legislative platitudes that the statutes shall not "undermine free expression" or "inhibit first amendment rights" ring hollow.  Nor does including a "safe harbor" for certain speech make these laws any less onerous or chilling.  For example, New Hampshire's law would permit (a) "discussion," as (b) "part of a larger course of academic instruction," of (c) the "historical existence of ideas and subjects" constituting the banned concepts.  (Addendum at 163.)  This provision forces a teacher first to determine the difference between "discussing" a

---

[24] Meckler, Laura and Natanson, Hannah, "New Critical Race Theory Laws Have Teachers Scared, Confused and Self-Censoring", The Washington Post (February 14, 2022), https://www.washingtonpost.com/education/2022/02/14/critical-race-theory-teachers-fear-laws/.

banned concept (permitted) and teaching a banned concept (forbidden).  Then, the teacher must determine what it means for a discussion to be "part of a larger course of academic instruction."  Larger than what?  The teacher's regular class size?  The scope of whatever class in which the teacher would otherwise have referenced a banned concept?  Finally, the teacher must assess whether the reference to a banned concept deals with the "historical existence of ideas and subjects," forcing a decision as to when yesterday's events become history.  Is the Black Lives Matter movement clearly within the safe harbor because it began several years ago?  If it is not, then a ban on discussing that movement because it is "non-historical" becomes an obvious prior restraint on speech.

In the face of these uncertainties, few teachers would ever take the risk of speaking.

## II.  THE NEW HAMPSHIRE LAW DISCRIMINATES ON THE BASIS OF VIEWPOINT AND CASTS A PALL OF ORTHODOXY OVER THE CLASSROOM

Like the other EGOs proliferating through the country, New Hampshire's Banned Concepts law adopts prohibitions on speech that have the effect of both: (a) chilling classroom speech, because they are intentionally vague and overbroad; and (b) compelling a teacher to espouse a particular state-imposed viewpoint.  In essence, the law prohibits speech that does not express the view that race-and-gender blindness has been achieved and that it is anathema to teach students anything else.

Or, put differently, a teacher must subscribe to the political view that unconscious bias and systematic racism simply do not exist (or at least cannot be mentioned).

Similar statutes around the country, such as Florida's "Stop WOKE Act," impose a similar orthodoxy on universities, adding to a national trend of chilling research, exploration, and discourse on entire subject areas, historical periods, or theories on social injustice and inequality. The New Hampshire law and its companions not only target an opposing viewpoint—namely, that racism and sexism are endemic and inherent in American society—but also forbid any view in between, *i.e.*, any concept or approach to remedying the historical realities of discrimination. *See Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 831 (1995) ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one)."

*Amicus* believes that the torrent of laws forbidding the teaching of certain concepts in the classroom risks the erosion of academic freedom, discouraging any form of dissent and making teachers fear for their livelihoods if they say the wrong words to their students. The resulting censorship is antithetical to core First Amendment principles because it "casts a pall of orthodoxy over the classroom"— the future of the country "depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection." *Keyishian v. Bd. of*

*Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603, (1967) (citing, *inter alia*, *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)); *Rosenberger*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction").

This Court now has the opportunity not only to affirm the unconstitutionality of the New Hampshire law, but also to send a message heard across the country that courts will not condone legislative attempts to gag teachers or to compel teachers to acquiesce to a particular political viewpoint.

## CONCLUSION

For these reasons, *Amicus* respectfully requests that the Court affirm the decision of the lower court to the extent that it found the New Hampshire law unconstitutional.

FRANKFURT KURNIT KLEIN & SELZ PC

By: */s/ Ronald C. Minkoff*

Ronald C. Minkoff [Bar No. 1199609]
28 Liberty Street
New York, NY 10005
(212) 980-0120

Of Counsel:

John B. Harris
Jeremy Bates
Kristen Niven
Cesarina da Parma
Ruby Strassman

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3407 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated: January 22, 2025

*/s/ Ronald C. Minkoff*
Ronald C. Minkoff

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.


Dated: January 22, 2025

*/s/ Ronald C. Minkoff*
Ronald C. Minkoff
