No. 24-1690

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

ANDRES MEJIA; CHRISTINA KIM PHILIBOTTE; NATIONAL EDU-
CATION ASSOCIATION - NEW HAMPSHIRE; LOCAL 8027,
AFTNEW HAMPSHIRE, AFL-CIO; JOCELYN MERRILL; KIMBERLY
GREEN ELLIOT; RYAN RICHMAN; MEGHAN EVELYN DURDEN;
JOHN DUBE,

Plaintiffs-Appellees,

v.

FRANK EDELBLUT, in their official capacity as Commissioner, New
Hampshire Department of Education; JOHN M. FORMELLA, in their
official capacity as New Hampshire Attorney General; AHNI MALA-
CHI, in their official capacity as Executive Director, New Hampshire
Commission for Human Rights; CHRISTIAN KIM, in their official ca-
pacity as Chairperson, New Hampshire Commission for Human Rights;
KEN MERRIFIELD, in their official capacity as Commissioner, New
Hampshire Department of Labor,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of New Hampshire

## BRIEF OF AMICI CURIAE CIVIL RIGHTS ORGANIZATIONS IN
## SUPPORT OF AFFIRMANCE

Sean Ouellette
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
souellette@publicjustice.net

Catherine E. Stetson
Kristina Alekseyeva*
Melody Zargari
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

Gaylynn Burroughs
Hunter Iannucci
Shiwali Patel
Auden Perino
Rachel Smith
Elizabeth E. Theran
NATIONAL WOMEN'S LAW CENTER
1350 I St. NW, Ste. 700
Washington, DC 20005
(202) 588-5180
etheran@nwlc.org

*Admitted only in New York.
Supervised by principals of the firm
admitted in the District of Columbia*

**Counsel for Amici Curiae**

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, no amicus has a parent corporation, no amicus is owned in whole or in part by any publicly held corporation, and no amicus is a publicly held company.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... C-1

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES.......................................................... iii

INTEREST OF AMICI CURIAE ................................................... x

INTRODUCTION ...................................................................... 1

BACKGROUND........................................................................ 2

ARGUMENT............................................................................ 4

I.  New Hampshire's Banned Concepts Laws Chill Teachers' Discussion of Racism and Sexism. ................................... 5

II.  New Hampshire's Banned Concepts Laws Will Cause Profound and Long-Lasting Harms to Students from Historically Marginalized Communities. ........................................... 9

    A.  The laws perpetuate discrimination by suppressing discussions about race and gender...................................... 10

    B.  The laws undermine educational opportunities by inhibiting culturally responsive teaching. ........................... 12

    C.  The laws create hostile environments for minority teachers and deprive students of their perspectives........................... 15

    D.  The laws ignore experiences of students of color, students with disabilities, and LGBTQIA+ students and destroy their sense of community............................................................. 20

    E.  The laws enable race and gender-based harassment. ......... 25

    F.  The laws' harmful effects will last a lifetime. ...................... 28

CONCLUSION ........................................................................ 30

CERTIFICATE OF COMPLIANCE ....................................... 32

CERTIFICATE OF SERVICE ............................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Amusement Mach. Ass'n v. Kendrick*,
  244 F.3d 572 (7th Cir. 2001) ........................................................ 29, 30

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) ................................................................. 10

*Black Emergency Response Team v. Drummond*,
  No. 21-CV-1022, 2024 WL 3015359 (W.D. Okla. June 14, 2024) ........................................................................... 3

*Brown v. Bd. of Ed. of Topeka*,
  347 U.S. 483 (1954) ................................................................. 10

*Honeyfund.com, Inc. v. DeSantis*,
  622 F. Supp. 3d 1159 (N.D. Fla. 2022) ................................... 3

*Keyishian v. Bd. of Regents of Univ. of the State of N.Y.*,
  385 U.S. 589 (1967) ............................................................. 4, 9

*Lau v. Nichols*,
  414 U.S. 563 (1974) ................................................................. 15

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
  641 F. Supp. 3d 1218 (N.D. Fla. 2022) ................................... 3

*Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020) ...................................... 3

*Shively v. Green Loc. Sch. Dist. Bd. of Educ.*,
  579 F. App'x 348 (6th Cir. 2014) ......................................... 25

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ................................................................. 20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
600 U.S. 181 (2023) ............................................................... 16

*Trends in Violence Victimization and Suicide Risk by Sexual Identity Among High School Students – Youth Risk Behavior Survey, United States, 2015–2019*, 69 Morbidity Mortality Wkly. Rep. Supplement 19 (2020) ........................................................ 27

*United States v. Williams,*
553 U.S. 285 (2008) ................................................................. 4

**Statutes and Executive Orders**

2024 Ala. Act No. 2024-34 ............................................................ 3

2021 Iowa Acts Ch. 163 ................................................................ 3

Ariz. Rev. Stat. Ann. § 15-717.02 (2021) .............................. 3

Ark. Code. Ann. § 25-1-901 (2022) ..................................... 3

Fla. Stat. § 1000.05 (2024) ........................................................ 3

Ga. Code. Ann. § 20-1-11 (2022) ........................................ 3

Idaho Code Ann. § 33-138 (2021) ........................................ 3

La. Exec. Order No. JML 24-132 (La. 2024) ........................ 3

Miss. Code Ann. § 37-13-2 (2022) ....................................... 3

N.D. Cent. Code § 15-10.7-01 (2023) .................................. 3

N.H. Rev. Stat. Ann. § 193:40 (2021) ......................... 42, 7, 22

N.H. Rev. Stat. Ann. § 193:40, II ........................................ 23

N.H. Rev. Stat. Ann. § 354-A:29-34 .................................. 2

Okla. Stat. Ann. tit. 70, § 24-157 (2021) ............................. 3

S.D. Codified Laws § 13-1-67 (2022) ........................................................... 3

Tenn. Code Ann. § 49-6-1019 (2021) ......................................................... 3

Tex. Educ. Code Ann. § 28.0022 (2021) .................................................... 3

Va. Exec. Order 1 ...................................................................................... 3

**Other Authorities**

Anna J. Egalite et al., *Representation in the Classroom: The Effect of Own-Race Teachers on Student Achievement*, 45 Econ. Educ. Rev. 44 (2015) ................................................................. 18

Ashley S. Castro & Esther J. Calzada, *Teaching Latinx Students: Do Teacher Ethnicity and Bilingualism Matter?* 66 Contemporary Educ. Psych. 101994 (2021) ................................... 19

Ashley Woo et al., *The Diverging State of Teaching and Learning Two Years into Classroom Limitations on Race or Gender: Findings from the 2023 American Instructional Resources Survey*, RAND Corp. Research Report (2024) ............... 7, 15

Ashley Woo et al., RAND Institute, *Walking on Eggshells— Teachers' Responses to Classroom Limitations on Race- or Gender-Related Topics* 12-13 (Jan. 2023) ....................................*passim*

Blessing Ngozi Iweuno, et al. *Impact of Racial Representation in Curriculum Content on Student Identity and Performance*, 23 World J. Advanced Rsch. Revs. 2913 (2024) ...................................................................................... 24

Brooke Donald, *Stanford Study Suggests Academic Benefits to Ethnic Studies Courses*, Stanford Report (Jan. 12, 2016) ............. 14

California Teachers Association, *Your Voice: The Value of Educators With Disabilities*, Cal. Educator (Feb. 9, 2022) ................ 20

Christine E. Sleeter & Miguel Zavala, *What the Research Says About Ethnic Studies*, Nat'l Educ. Ass'n, 4–6, 9 (2020) ...................................................................................... 21

Cobb Schools, Watch Meetings Online, Sept. 14, 2023 Board of Education Meeting, 1:07:28–1:09:26 (Broadcasted 9/14/23 6:55 pm – 9/14/23 8:40 pm)..................................................... 24

Daniela Saucedo & Cris Jimenez, *Valuing Student Experiences: An Introduction to Culturally Responsive Education (CRE)*, Institute of Education Sciences (July 20, 2021) ...................................................................................... 13

Davis Dixon et al., Education Trust, *If You Listen, We Will Stay: Why Teachers of Color Leave and How to Disrupt Teacher Turnover* (Sept. 2019) ........................................................... 16

Ellen Eliason Kisker et al., *The Potential of a Culturally Based Supplemental Mathematics Curriculum to Improve the Mathematics Performance of Alaska Native and Other Students*, 43 J. Rsch, Mathematics Educ. 75 (2012) ......................... 14

Free Speech Under Attack: Book Bans and Academic Censorship: Hearing Before the Subcomm. on C.R. and C.L. Comm. on Oversight and Reform, 117th Cong. 2 (2022). ............................................................................................... 26

Gabrielle Kassel, *Out LGBT+ Teachers Are Essential for the Survival of LGBT+ Kids*, Healthline (Aug. 2022) ............................. 19

Jenny Muñiz, *Culturally Responsive Teaching: A 50- Survey of Teaching Standards, New America* 9 (Mar. 2019) ........................ 14

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022) ............................................. 25, 26, 27, 28

Jung Hyun Choi et. al., The Urban Institute, *Explaining the Black-White Homeownership Gap: A Closer Look at Disparities across Local Markets* 7 (2019) ......................................... 29

Kendi's, *Stamped: Racism, Antiracism, and You* ................................ 6, 22

Kirsten N. Morehouse & Mahzarin R. Banaji, *The Science of Implicit Race Bias: Evidence from the Implicit Association Test*, 153 Daedalus 21 (2024) ...................................................... 11, 12

Kyle Wanberg, *Pedagogy against the state: The ban on ethnic studies in Arizona*, *Pedagogy against the state: The ban on ethnic studies in Arizona*, 4 J. of Pedagogy 15 (2013) ....................... 12

Leah M. Watson, *The Anti-"Critical Race Theory" Campaign - Classroom Censorship and Racial Backlash by Another Name*, 58 Harv. C.R.-C.L. L. Rev. 487 (2023) ................................... 11

Madeline Will & Ileana Najarro, *What is Culturally Responsive Teaching*, EducationWeek (Apr. 18, 2022), https://perma.cc/799M-QHHZ ............................................ 13

Marla E. Eisenberg et. al., *School-Based Diversity Education Activities and Bias-Based Bullying Among Secondary School Students*, 37 J. Interpersonal Violence 15992 (2022) ................................................................................ 26

Melissa K. Diliberti et al., *7 Takeaways on How Teachers are Reacting to Restrictions on Discussing Race and Gender*, Brookings Institute (May 16, 2024) ..................................... 3

Melissa Kay Diliberti & Heather L. Schwartz, *Districts Continue to Struggle with Staffing, Political Polarization, and Unfinished Instruction: Selected Findings from the Fifth American School District Panel Survey*, RAND Corporation (July 19, 2022) ................................................. 18

Michael Hansen et al., *It Matters More Now Than Ever: What New Developments Say About Teacher Diversity and Student Success*, Brookings Institute (Aug. 2022) ........................... 18

Michelle M. Johns et al., *Trends in Violence Victimization and Suicide Risk by Sexual Identity Among High School Students – Youth Risk Behavior Survey, United States, 2015–2019*, 69 Morbidity Mortality Wkly. Rep. Supplement 19 (2020) ....................................................... 27

Morenike Fajana et al., *The Anti-Truth Movement in Context: Rethinking the Fight for Truth and Inclusive Education*, 16 Drexel L. Rev. 787 (2024) ................................. 8

Movement Advancement Project et al., *A Broken Bargain for LGBT Workers of Color* 41 (2013) ....................................... 29

Nanette Goodman, Michael Morris, & Kelvin Boston, National Disability Institute, *Financial Inequality: Disability, Race and Poverty in America* 5 (2019) ............................. 29

New York University, *Educators and Parents Reveal Culture of Fear, Censorship, and Loss of Learning Opportunities in the Wake of Florida Policies* (Sept. 23, 2024) ................................. 15

Noah L. Cabrera et. al., *Missing the (Student Achievement) Forest for All the (Political) Trees: Empiricism and the Mexican American Studies Controversy in Tucson*, 51 Am. Educ. Rsch. J. 1084 (2014) ................................. 14

PBS NewsHour, *Student Voice: What Young People Can Do About Book Bans* (April 2024) ............................. 21

Philip Baiden et al., *Perceived Racial Discrimination and Suicidal Behaviors Among Racial and Ethnic Minority Adolescents in the United States: Findings from the 2021 Adolescent Behaviors and Experiences Survey*, 317 Psychiatry Research 114877 (2022) ................................. 27

Rebecca Gaunt, *"Divisive Contepts" Law at Work*, Cobb Courier (July 9, 2024) ............................. 8

Rudine Sims Bishop, *Mirrors, Windows, and Sliding Glass Doors*, 6 Persp. Choosing Using Books 3 (2000) ................................. 23

S.E. Smith, *Empower Your Students Through Disability-Conscious Teaching*, Rooted in Rights (Sept. 6, 2018) ................................. 21

Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Rsh. J. 127 (January 2016) ................................. 14

Topos Partnership, *Teachers' Experiences Amid Attacks on Public Education* (Sept. 2024) ............................................................ 16

The Trevor Project, *Accepting Adults Reduce Suicide Attempts Among LGBTQ Youth* (June 2019), https://perma.cc/BM4P-VGA5 ............................................................ 28

Tyler Smith, *Teacher Diversity in the Classroom,* American Economic Association (January 2023) ................................................ 19

UCLA CRT Forward, https://crtforward.law.ucla.edu/map/ .................... 3

U.S. Bureau of Labor Statistics, *Education pays, 2023,* Career Outlook (Apr. 2024) .................................................................. 29

U.S. Dep't of Ed., Office for Civil Rights, Region IV, OCR Complaint No. 04-22-1281 Outcome Letter (May 19, 2023) .............. 24

*Why Does Attendance Matter*, National Center for Education Statistics .................................................................................................... 28

Anthony P. Carnevale et. al., Georgetown University Center on Education and the Workforce, *The Unequal Race for Good Jobs* (2019) ....................................................................................... 29

# INTEREST OF AMICI CURIAE[1]

Amici are non-profit organizations who advocate for the rights of Black people, indigenous people, people of color, LGBTQIA+ people, and women and girls to learn and thrive in school and the workplace free from discrimination. Some engage in federal and state policy advocacy; others represent students in litigation and administrative complaints filed with federal agencies. Based on their collective experience and expertise, Amici believe that laws and policies that limit what students can learn about race and gender inflict grave harm on both teachers and students, and they are well-positioned to provide the Court with relevant research and analysis about the effects of such laws on marginalized groups.

Amici are:

Advocates for Trans Equality Education Fund
Autistic Self Advocacy Network
California Women Lawyers
Coalition of Labor Union Women, AFL-CIO
Desiree Alliance
Education Law Center Pennsylvania
Equality California
Justice and Joy National Collaborative
Lawyers Club of San Diego
Lift Louisiana

---

[1] Counsel for amici curiae authored this brief. No party's counsel authored this brief in whole or in part, and no party beyond amici contributed any money toward the brief. The parties consented to its filing.

Maine Women's Lobby
National Association of Women Lawyers
National Organization for Women Foundation
National Women's Law Center
National Women's Political Caucus
National Workrights Institute
Nurses for Sexual and Reproductive Health
People For the American Way
Pride At Work, AFL-CIO
Reproaction
SIECUS: Sex Ed for Social Change
Southern Poverty Law Center
Women Lawyers On Guard Inc.
Women's Bar Association of the State of New York
Women's Law Project

# INTRODUCTION

The New Hampshire "banned concepts" laws are thinly veiled attempts to purge disfavored views about race and gender from New Hampshire's public schools. App. 107. But, like the rash of similar new laws in other states, they do not "address their intended target directly." *Id.* at 127. Instead, masquerading as "anti-discrimination" laws, they use vague language that leaves teachers guessing about what topics they can discuss with their students and how they can broach them. As a result, teachers "steer well clear of anything that could be construed as violating the [laws], even if it means utilizing less effective teaching methods." *Id.* at 152.

Laws like these do irreparable harm to school communities. Although they purport to forbid discrimination, they do just the opposite: They suppress vital conversations that prepare students to participate in our diverse democracy, invite discrimination, and create hostile school environments for both students and teachers, especially students of color, students with disabilities, and LGBTQIA+ students.[2]

---

[2] We use "LGBTQIA+" to refer to the broader community; we sometimes use a different acronym, such as "LGB," when discussing research surveying a subset of the community.

Amici urge the Court to affirm the judgment below.

## BACKGROUND

New Hampshire's HB544 and HB2, now codified at N.H. Rev. Stat. Ann. ("RSA") §§ 193:40 and 354-A:29-34, forbid the teaching, instruction, advancement, and training of a list banned concepts: (a) that a person's "sex, gender identity, sexual orientation, race, [or another characteristic] is inherently superior to people of another," (b) that "an individual, by virtue of [the same] is inherently racist, sexist, or oppressive, whether consciously or unconsciously"; (c) "that an individual should be discriminated against or receive adverse treatment solely or partly because of his or her sex, gender identity, sexual orientation, race," or another characteristic, or (d) that members of one race or sex "cannot and should not attempt to treat others without regard to" race or sex. RSA § 193:40(I).

Although the laws are dressed up as "anti-discrimination" provisions, their "[s]upporters ... have made no secret of the fact that their aim is to restrict what teachers can say about" certain modern approaches to race and gender: "what plaintiffs call [diversity, equity, and inclusion] initiatives but supporters of the [laws] call [critical race theory]." App. 127-28.

At least fifteen states have passed similar measures.[3] Like the New Hampshire law, these measures all prohibit teaching, promoting, or advocating the same or similar banned concepts. *See supra* n.3.

Every court addressing a vagueness challenge to a similar law has held it unconstitutionally vague. *See Black Emergency Response Team v. Drummond*, No. 21-CV-1022, 2024 WL 3015359, at *5 (W.D. Okla. June 14, 2024) (Oklahoma law); *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1281 (N.D. Fla. 2022) (Florida law); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022) (striking down similar Florida law regarding DEI workplace trainings), *affirmed on other grounds*, 94 F.4th 1272 (11th Cir. 2024); *see also Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 544

---

[3] Melissa K. Diliberti et al., *7 Takeaways on How Teachers are Reacting to Restrictions on Discussing Race and Gender*, Brookings Institute (May 16, 2024), https://www.brookings.edu/articles/7-takeaways-on-how-teachers-are-reacting-to-restrictions-on-discussing-race-and-gender/; UCLA CRT Forward, https://crtforward.law.ucla.edu/map/; 2024 Ala. Act No. 2024-34; Ariz. Rev. Stat. Ann. § 15-717.02 (2021); Ark. Code. Ann. § 25-1-901 (2022); Fla. Stat. § 1000.05 (2024); Ga. Code. Ann. § 20-1-11 (2022); Idaho Code Ann. § 33-138 (2021); La. Exec. Order No. JML 24-132 (La. 2024), 2021 Iowa Acts Ch. 163; Miss. Code Ann. § 37-13-2 (2022); N.H. Rev. Stat. Ann. § 193:40 (2021); N.D. Cent. Code § 15-10.7-01 (2023); Okla. Stat. Ann. tit. 70, § 24-157 (2021); S.D. Codified Laws § 13-1-67 (2022); Tenn. Code Ann. § 49-6-1019 (2021); Tex. Educ. Code Ann. § 28.0022 (2021); Va. Exec. Order 1 (Va. 2022).

(N.D. Cal. 2020) (holding similar federal executive order unconstitutionally vague). The district court reached the same conclusion. Add. 116.

## ARGUMENT

A law is void for vagueness if (1) it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or (2) it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Such laws can have damaging chilling effects, especially when they apply to teachers and school communities. *See Keyishian v. Bd. of Regents of Univ. of the State of N.Y.*, 385 U.S. 589, 603-04 (1967). That is because when a teacher "must guess what conduct or utterance may lose him his position," he "necessarily will 'steer far wider of the unlawful zone.'" *Id.* at 604. Lest the state cast a "pall of orthodoxy over the classroom," courts must guard against that "chilling effect" with "sensitive tools which clearly inform teachers what is being proscribed." *Id.* at 603-04.

New Hampshire's laws trigger both concerns animating the vagueness doctrine. As the district court correctly found, the laws leave readers guessing about whether they ban discussion of a range of topics related to the study of race and gender in American life, including structural

racism, implicit bias, and affirmative action. Add. 127-35. In doing so, they invite state officials to enforce the laws in a discriminatory manner and force teachers to self-censor to avoid losing their licenses.

This comes at a tremendous cost. If the laws are allowed to be enforced, students will no longer learn about key moments that shaped American history, major literary works, and ideas that challenge white supremacy, homophobia, transphobia, and sexism. And school environments will become even more hostile to both students and teachers—particularly those from historically marginalized[4] groups and communities.

## I. New Hampshire's Banned Concepts Laws Chill Teachers' Discussion of Racism and Sexism.

As the district court found, because New Hampshire's banned concepts laws fail to give teachers adequate notice of what they prohibit, teachers have modified or altogether abandoned their lesson plans to "steer well clear of anything that could be construed to violate the [laws], even if it means utilizing less effective teaching methods." Add. 152. The laws have muzzled classroom conversations about movies, books, and

---

[4] In this brief, we use this term to include Black people, brown people, LGBTQIA+ individuals, disabled people, and women and girls, in recognition of how law, policy, and practice have resulted in historical and systemic disadvantage and oppression against them.

other materials that grapple with how discrimination has historically affected, and continues to affect, Black and brown communities, people with disabilities, and LGBTQIA+ people.

Examples abound in the record:

- Teachers in one school district have stopped teaching books that discuss race and acknowledge the existence of racism, including Dr. Ibram X. Kendi's *Stamped: Racism, Antiracism, and You*, which the school board had expressly approved for use across multiple subjects. App. 1532-34.

- "Out of fear that [she] would be accused" of violating the law, a history teacher stopped discussions of ideologies like Marxism, Communism, or Nazism and stopped analogizing historical events to current events or students' "own experiences and interests." App. 1511-12.

- An AP English teacher stopped asking students about "the legacy of slavery" or "instances of racism or colonialism" in contemporary culture to help them understand literature that deals with those topics. App. 1490.

- An English teacher stopped sharing articles and videos she used to facilitate discussions of white privilege and systemic racism in connection with *To Kill a Mockingbird*. App. 1556.

- A school district official warned teachers to restrict lessons about race and LGBTQIA+ issues to avoid punishment. App. 1518.

- The Chief Equity Officer for the Manchester School District limited references to implicit and unconscious bias in teacher trainings and encouraged teachers to do the same in their classroom instruction. App. 1497.

- A social studies teacher was investigated by the New Hampshire Department of Education ("NH DOE") because she showed music videos by Beyoncé and another popular Black artist as part of a lesson in which students compared those works to music, poetry, and art of the Harlem Renaissance, causing her colleagues to censor their own lesson plans for fear that they would be targeted next. App. 1481-84.

New Hampshire's teachers are not alone in censoring themselves to avoid the vague sweep of banned concepts laws. *One-third* of all teachers in states with similar laws said the restrictions had influenced their choice of curriculum materials or instructional practices.[5] And sworn testimony backs these findings. After Oklahoma passed its similar banned concepts law, teachers discontinued lessons related to racism, sexism, and implicit bias. Mem. in Support of Mot. for Prelim. Injunction, *Black Emergency Response Team v. O'Connor*, 5:21-cv-01022, 5:21-cv-01022, ECF No. 27 at 10 (W.D. Okla. filed Oct. 29, 2021) (citing testimony). One school district struck *To Kill a Mockingbird* from its reading list and directed teachers to stop using the terms "white privilege" and "diversity." *Id.* at 4. Similarly, in the wake of Florida's school censorship law,

---

[5] Ashley Woo et al., *The Diverging State of Teaching and Learning Two Years into Classroom Limitations on Race or Gender: Findings from the 2023 American Instructional Resources Survey*, RAND Corp. Research Report, at 12 (2024) ("2023 Rand Survey"), https://www.rand.org/pubs/research_reports/RRA134-22.html.

professors limited the way they taught about the role of race in law, history, and education because they risked losing their jobs if they guessed wrongly about what the law meant. *See* Mem. in Support of Mot. for Prelim. Injunction. *Pernell v. Lamb*, Case No. 4:22-cv-00304, ECF No. 13 at 10-14, 18-21 (N.D. Fla. filed Aug. 24, 2022).

Laws like New Hampshire's have also caused extensive book bans. For example, after Texas passed its banned concepts law, twelve school districts purged school libraries of 625 books, including books about the Holocaust and the experiences of Black and queer people in America, such as *The Diary of Anne Frank*, *The Bluest Eye* by Nobel laureate Toni Morrison, and *All Boys Aren't Blue* by George M. Johnson.[6] And in Georgia, school districts pulled at least thirty books that contained LGBTQIA+ themes or characters.[7]

---

[6] *See* Morenike Fajana et al., *The Anti-Truth Movement in Context: Rethinking the Fight for Truth and Inclusive Education*, 16 Drexel L. Rev. 787, 799-800 (2024).

[7] Rebecca Gaunt, *'Divisive Concepts' Law at Work*, Cobb Courier (July 9, 2024), https://cobbcountycourier.com/2024/07/divisive-concepts-law-at-work-lgbtq-books-pulled-from-cobb-schools-shakespeare-flagged-for-review/#google_vignette.

Other examples of official and self-censorship abound.[8]

In short, by prompting the widespread censorship of works and discussions about the experiences of people of color and LGBTQIA+ people, and about the realities of racism, sexism, homophobia, and transphobia in America, school censorship laws have cast a "pall of orthodoxy" over classrooms in New Hampshire and across the country—an outcome the vagueness doctrine is designed to prevent. *Keyishian*, 385 U.S. at 603.

## II. New Hampshire's Banned Concepts Laws Will Cause Profound and Long-Lasting Harms to Students from Historically Marginalized Communities.

Laws like New Hampshire's do not just harm teachers. Students lose out on valuable lessons about the role of race and gender in American society that would "prepare [them] for active and effective participation" in the diverse and "pluralistic" communities of "which they will soon be adult members." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982). And the laws inflict special harm on Black, brown, and LGBTQIA+ students, as well as students with

---

[8] *See* Ashley Woo et al., RAND Institute, *Walking on Eggshells—Teachers' Responses to Classroom Limitations on Race- or Gender-Related Topics* 12-13 (Jan. 2023) ("2022 Rand Survey"), https://perma.cc/V6WT-TBMY.

disabilities. They perpetuate discrimination, inhibit culturally responsive teaching, ostracize teachers who share those students' backgrounds, erase these students' experiences from the classroom, and enable bullying and harassment. If allowed to stand, the laws portend a bleak future for marginalized students, who will no longer see themselves reflected in the curriculum, will feel disconnected from their educational communities, and will face harassment and other discrimination at ever higher rates. The result will be a "feeling of inferiority … that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 494 (1954).

## A. The laws perpetuate discrimination by suppressing discussions about race and gender.

Chilling discussions of ideas that underlie racism and sexism only perpetuates discrimination. As the district court found, like the laws in other states, New Hampshire's legislation intentionally chills discussions of "issues like structural racism, implicit bias, and affirmative action." Add. 128.[9] In doing so, it prevents students from learning about present-

---

[9] Implicit bias is a widely accepted concept in the social-scientific community and, in simple terms, means an unconscious tendency to act on stereotypes and prejudices without intending to do so. *See, e.g.*, Kirsten N.

day imbalances of power that flow from historical discrimination; about how people's subconscious assumptions may operate to perpetuate bias, even in the absence of conscious animus; and about ways to address those challenges in the real world.

Such censorship perpetuates the discrimination it purports to target. For example, studies have shown that children who "learn to talk about race and ethnicity constructively . . . develop empathy for others, learn about new perspectives, understand their own identity, avoid engaging in practices that reproduce structural inequality, and even exhibit less racial bias."[10] As a result, meaningful classroom discussions about racism "improve racial attitudes among White children, allowing them to see how racism affects everybody and offering a vision for addressing it, and lead students to value racial fairness and to engage in less stereotyping."[11]

---

Morehouse & Mahzarin R. Banaji, *The Science of Implicit Race Bias: Evidence from the Implicit Association Test*, 153 Daedalus 21 (2024).

[10] Leah M. Watson, *The Anti-"Critical Race Theory" Campaign - Classroom Censorship and Racial Backlash by Another Name*, 58 Harv. C.R.-C.L. L. Rev. 487, 495 (2023) (collecting academic literature).

[11] *Id.* (internal quotation marks omitted) (same).

Ignoring race does the opposite—and yet ignoring race is exactly the intent behind the laws.[12] Supporters of banned concepts laws champion "color-blind" ideology, which became popular during the 1970s-1990s in part because of an easy claim to fairness in treating everyone "without regard" to race. App. 1569.[13] But superficial neutrality on topics of race or gender prevents acknowledging imbalances of power resulting from historical discrimination and injustice that exist today at all levels of society.[14] As studies have found, "[c]olorblindness is associated with a greater level of prejudice, both unconscious/implicit and conscious/explicit, and is often used as a justification for inequality."[15]

## B. The laws undermine educational opportunities by inhibiting culturally responsive teaching.

New Hampshire's laws also impair students' education—particularly for students of color, students with disabilities, and LGBTQIA+ students—by inhibiting teachers from connecting lessons to their experiences. Teachers are most effective when they "analogiz[e] material to

_____

[12] *See id.* at 496.

[13] Kyle Wanberg, *Pedagogy against the state: The ban on ethnic studies in Arizona*, 4 J. of Pedagogy 15, at 16, 18 (2013).

[14] Watson, 58 Harv. C.R.-C.L. L. Rev. at 495-96.

[15] *Id.* at 496.

students' own experiences and interests." Dkt. 109 at 44; App. 57.[16] This widely practiced method, called "culturally responsive teaching," "incorporat[es] the experiences, culture, and identity of students (including those from historically marginalized groups) to help expand their educational opportunities." App. 1497.[17] Such a lesson might, for example, place Toni Morrison's *Beloved* "in a contemporary framework," inviting students to consider "whether the legacy of slavery is evident in the modern world or how the novel's themes relate to current events like the Black Lives Matter movement." App. 1490 (cleaned up).

Research shows that this practice measurably improves learning for all but is particularly significant for students whose experiences are often erased from the classroom.[18] For example, when elementary school

---

[16] *See also* Madeline Will & Ileana Najarro, *What is Culturally Responsive Teaching*, EducationWeek (Apr. 18, 2022), https://perma.cc/799M-QHHZ ("Will & Najarro").

[17] *See also* Will & Najarro, *supra*, n.12; Daniela Saucedo & Cris Jimenez, *Valuing Student Experiences: An Introduction to Culturally Responsive Education (CRE)*, Institute of Education Sciences (July 20, 2021), https://perma.cc/783M-6QKE.

[18] Thomas Dee & Emily Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Rsh. J. 127 (January 2016); *see also* Jenny Muñiz, *Culturally Responsive Teaching: A 50- Survey of Teaching Standards*, New America, 9 (Mar. 2019), https://perma.cc/E4HT-E6RQ (marginalized students especially "benefit

teachers in Alaska connected math concepts to traditional Native cultural activities, Native students demonstrated a significant increase in understanding and achievement.[19] And low-income Latinx students who enrolled in a Mexican-American studies curriculum improved their test scores in math, reading, and writing, and were more likely to graduate from high school compared to their peers.[20]

New Hampshire's laws gut this practice for students of color and LGBTQIA+ students, denying them "a meaningful opportunity to participate in the educational program." *Lau v. Nichols*, 414 U.S. 563, 568 (1974); App. 1497-98; *supra* 6-7. That is precisely what has happened in states with similar laws: Teachers in those states overwhelmingly report

from 'mirrors' that allow them to see themselves, their experiences, and their communities in school").

[19] Ellen Eliason Kisker et al., *The Potential of a Culturally Based Supplemental Mathematics Curriculum to Improve the Mathematics Performance of Alaska Native and Other Students*, 43 J. Rsch, Mathematics Educ. 75 (2012).

[20] Noah L. Cabrera et. al., *Missing the (Student Achievement) Forest for All the (Political) Trees: Empiricism and the Mexican American Studies Controversy in Tucson*, 51 Am. Educ. Rsch. J. 1084 (2014); *see also* Brooke Donald, *Stanford Study Suggests Academic Benefits to Ethnic Studies Courses*, Stanford Report (Jan. 12, 2016), https://perma.cc/AA8W-W5R8 (documenting that enrollment in a pilot ethnic-studies program raised students' average attendance by 21% and their GPA by 1.4 points, among other benefits).

that the new restrictions have "hampered their ability to select materials that connect to students' backgrounds."[21] The results have been "especially detrimental for students from historically marginalized backgrounds, such as students of color or students who identify as LGBTQ+," who no longer feel "seen."[22] These types of laws have also prevented teachers from pursuing training to better connect with their students. Indeed, schools in states with similar laws have even "limited" professional development opportunities that help teachers support students with disabilities, citing state-law "restrictions on discussing 'bias.'"[23]

### C. The laws create hostile environments for minority teachers and deprive students of their perspectives.

New Hampshire's laws also harm students by silencing teachers who share those students' experiences.

The laws' vagueness invites such discrimination. Imagine, for example, a teacher discussing the Supreme Court's affirmative action

---

[21] 2022 Rand Survey, *supra*, at 17, https://perma.cc/V6WT-TBMY.

[22] *Id.* at 17-18; *see also* 2023 Rand Survey, *supra*, at 25 (noting a drop in reading scores among young students of color because those students cannot "relate to" reading materials).

[23] New York University, *Educators and Parents Reveal Culture of Fear, Censorship, and Loss of Learning Opportunities in the Wake of Florida Policies* (Sept. 23, 2024), https://perma.cc/4N4J-UU8A.

decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023). Suppose her students agree with the majority opinion and, playing devil's advocate, she asks about the dissenters who favored affirmative action. Because of implicit biases, a Black teacher's questions might be perceived not as pedagogy but as "indoctrination," prompting administrative action or even a lawsuit even when they are talking about the same issues as a white teacher.[24]

That example is not theoretical. A Black teacher in Pennsylvania was accused of pushing a Critical Race Theory "agenda" even though she taught exactly the same material as her white colleagues.[25] And Black teachers in other states consistently report changing "curriculum materials or instructional practices" in greater numbers than white teachers for fear of legal action or administrative discipline.[26]

Even if they are not sued, disciplined, or fired in greater numbers, marginalized teachers may nonetheless feel compelled to leave their

---

[24] *See* Davis Dixon et al., Education Trust, *If You Listen, We Will Stay: Why Teachers of Color Leave and How to Disrupt Teacher Turnover* (Sept. 2019), https://perma.cc/6F73-E2DK.

[25] Topos Partnership, *Teachers' Experiences Amid Attacks on Public Education*, 12 (Sept. 2024), https://perma.cc/AP66-VAC8.

[26] 2022 Rand Survey, *supra*, at 9.

schools due to banned concepts laws. Because New Hampshire's laws are intentionally vague about what counts as "teaching" about discrimination, they discourage teachers of color, teachers with disabilities, and LGBTQIA+ teachers from sharing their experiences with colleagues and students, making the teachers themselves feel "as though they [do not] belong."[27] These daily humiliations make teaching "more difficult and less attractive as a profession,"[28] and many teachers from historically marginalized backgrounds in states with similar laws have expressed a desire to leave their professions—or at least leave those states.[29] The same is true in New Hampshire. One teacher who uses non-binary pronouns testified that they quit teaching altogether after they were reprimanded and publicly shamed on NH DOE's website for referring to themselves with a gender-neutral title and asking students what pronouns they preferred. Munz Decl. ¶¶ 6-18. Another testified that this will likely be his last year teaching, citing "a rise in hostility" and discrimination against him "as a gay and Jewish teacher." Richman Decl. ¶ 7.

---

[27] 2022 Rand Survey, *supra*, at 16-17.

[28] *Id.* at 17; Op. 16-18.

[29] 2022 Rand Survey, *supra*, at 17.

An exodus of teachers from the state will exacerbate the post-pandemic teacher shortage for all students, but—yet again—students of color and LGBTQIA+ students will be particularly harmed.[30] Studies overwhelmingly show that "having a same-race teacher improves test scores, a student's likelihood of being selected for gifted and talented programs, graduating high school, and intending to enroll in college."[31] For example, Black and Asian American and Pacific Islander students performed statistically better in math when their math teachers are the same race.[32] "Black students randomly assigned to at least one Black teacher in grades K–3 were 13 percent more likely to graduate from high school" and "19 percent more likely to enroll in college" "than their same-school, same-cohort Black peers who were not assigned to a Black teacher."[33]

---

[30] *See* Melissa Kay Diliberti & Heather L. Schwartz, *Districts Continue to Struggle with Staffing, Political Polarization, and Unfinished Instruction: Selected Findings from the Fifth American School District Panel Survey*, RAND Corporation (July 19, 2022), https://perma.cc/JMH2-5J2S.

[31] Michael Hansen et al., *It Matters More Now Than Ever: What New Developments Say About Teacher Diversity and Student Success*, Brookings Institute (Aug. 2022), https://perma.cc/PE6K-4VNP.

[32] Anna J. Egalite et al., *Representation in the Classroom: The Effect of Own-Race Teachers on Student Achievement*, 45 Econ. Educ. Rev. 44 (2015).

[33] Tyler Smith, *Teacher Diversity in the Classroom*, American Economic Association, (January 2023), https://perma.cc/S5U8-QJDH.

And Latinx students had a better grasp of the material when they had Latinx teachers, particularly ones fluent in Spanish.[34]

The same is true of LGBTQIA+ educators and students: Being taught by teachers who share similar backgrounds and experiences helps students feel understood and creates a more inviting learning environment.[35] And teachers with disabilities not only serve as "powerful role models" for students with disabilities, but can also train those students to use specialized educational devices far better than their colleagues, who have never needed to rely on those devices themselves.[36]

When these teachers leave the classroom to avoid exposure to lawsuits or discipline due to censorship laws, everyone loses—but especially students from historically marginalized groups.

---

[34] Ashley S. Castro & Esther J. Calzada, *Teaching Latinx Students: Do Teacher Ethnicity and Bilingualism Matter?* 66 Contemporary Educ. Psych. 101994 (2021).

[35] Gabrielle Kassel, *Out LGBT+ Teachers Are Essential for the Survival of LGBT+ Kids*, Healthline (Aug. 2022), https://perma.cc/LJF9-MWZ3.

[36] California Teachers Association, *Your Voice: The Value of Educators With Disabilities*, Cal. Educator (Feb. 9, 2022), https://perma.cc/95C2-5PV7.

**D. The laws ignore experiences of students of color, students with disabilities, and LGBTQIA+ students and destroy their sense of community.**

New Hampshire's laws harm students in other ways far beyond test scores and graduation rates. They prevent students from historically marginalized communities from exploring their histories, erase their identities from teaching materials and curricula, and cause them to disconnect from their school community. Not only do these laws violate students' rights "to receive" "information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (cleaned up) (quoting *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)), but they also place students of color and LGBTQIA+ students on a fundamentally different footing from their peers whose histories and experiences are not similarly censored.

Open and honest discussions help us think through difficult questions of discrimination and inequality. And learning about our country's history, including slavery, genocide of Indigenous people, exclusion laws, Japanese internment, Jim Crow laws, and LGBTQIA+ criminalization laws, as painful as they are, give us context for current inequities and experiences. As one student noted, reading about characters who encounter the same struggles helps us learn "who we are, who we aspire to be,

and how we view the world around us."[37]  Studies also find that inclusive curricula that encourage discussions about contentious topics and expose students to diverse points of view promote student "identity development and sense of empowerment."[38]

New Hampshire's laws deny all of that to students, particularly students of color, students with disabilities, and LGBTQIA+ students. By their very title, the laws purport to ban "teaching discrimination." N.H. Rev. Stat. Ann. § 193:40. As the district court explained, that vague command could be construed to prohibit *any* discussion of discrimination based on sexual orientation, gender identity, race, and disability. Dkt. 109 at 40-43. The district court is right: one middle school teacher has stopped teaching about Frederick Douglass and even Black American

---

[37] PBS NewsHour, *Student Voice: What Young People Can Do About Book Bans* (April 2024), https://perma.cc/HA7P-LVAF.

[38] Christine E. Sleeter & Miguel Zavala, *What the Research Says About Ethnic Studies*, Nat'l Educ. Ass'n, 4–6, 9 (2020) ("NEA Review") (collecting studies); *see also, e.g.*, Ryan Schey, *Fostering Youth's Queer Activism in Secondary Classrooms: Youth Choice and Queer-Inclusive Classrooms*, 64 J. of Adolescent and Adult Literacy 623 (2021), https://doi.org/10.1002/jaal.1150 ("LGBTQ-inclusive curriculum [is] associated with more welcoming schools."); S.E. Smith, *Empower Your Students Through Disability-Conscious Teaching*, Rooted in Rights (Sept. 6, 2018), https://perma.cc/37YU-HD3T ("disability-conscious teaching and the sense of 'I feel seen' can be transformative"),.

music after his State passed a similar law, because people in his community do not "know the difference between teaching [Black] history and teaching critical race theory."[39] Others have stopped assigning Kendi's celebrated *Stamped: Racism, Antiracism, and You* because they "were confused about what kinds of teaching could take place and what kinds of materials could be used" under the new laws. Add. 147 (cleaned up). And others worry that teaching "constitutional law to … high school students," including "affirmative action, the Voting Rights Act, and the Equal Rights Amendment," will prompt complaints and calls from the administration. App. 1551. Indeed, New Hampshire's restrictions are so comprehensive they might preclude teachers from discussing *Plessy, Brown,* and *Korematsu*.[40]

---

[39] 2022 Rand Survey, *supra*, at 12.

[40] New Hampshire's law purports to create a safe harbor for "discussi[ons]" of "the historical existence of ideas" "as part of a larger course of academic instruction." RSA § 193:40(II). As the district court concluded, however, this "does little to guide teachers" because it fails to explain the difference between "teaching" (prohibited) and "discussing" (allowed). Add. 139 n.10. Nor does Section II explain how much "larger" a course of instruction needs to be before the exception comes into play. If anything, Section II makes the constitutional problem worse.

While New Hampshire's restrictions will impair the education of all children, the brunt of these restrictions once again will fall on LGBTQIA+ students and students of color. The histories and stories of the communities that these students belong to will be censored. And they will "learn a powerful lesson about how they are devalued in the society of which they are a part."[41]

This is already happening in other states with similar laws. As one Georgia student put it after her state passed a similar law, she used to see herself "represented in the material [she] read"—she felt "seen" and "understood." But after her school district banned books featuring marginalized characters, she felt that her "gender, race, ethnicity," and her very "identity [were] negated," causing her to feel "lost and unsupported."[42] Other students similarly report that when schools censor discussion that invoke their identities and experiences, they feel that their

---

[41] Rudine Sims Bishop, *Mirrors, Windows, and Sliding Glass Doors*, 6 Persp. Choosing Using Books 3 (2000).

[42] Cobb Schools, Watch Meetings Online, Sept. 14, 2023 Board of Education Meeting, 1:07:28–1:09:26 (Broadcasted 9/14/23 6:55 pm – 9/14/23 8:40 pm), https://www.cobbk12.org/page/8993/watch-meetings-online.

schools do "not see them as equals," do "not take them and their diverse identities seriously," and do "not care about diversity."[43]

Statistics bear out those individual experiences. One survey, involving over a thousand students across four states, found that students of color feel "erased" when the lessons taught in the classroom are disconnected from their experiences.[44] And a national study reports that only about a third of LGBTQIA+ students in schools without culturally inclusive curricula believe that their classmates are "somewhat or very accepting" of their identity.[45]

---

[43] U.S. Dep't of Ed., Office for Civil Rights, Region IV, OCR Complaint No. 04-22-1281 Outcome Letter (May 19, 2023) at 6-7, https://perma.cc/8BFH-6G54 ("Forsyth Compl."); *see also* Compl. to Office for Civil Rights Against Collier Cnty. Pub. Sch. Dist. at 15 (May 13, 2024), https://perma.cc/2Y5G-DBE4 (when schools "erase gay people from history," "gay students … believe that they are lesser, that there's something wrong with them, because unlike their heterosexual peers, they're not allowed to be spoken [about] in class"). ("Collier Compl.")

[44] Blessing Ngozi Iweuno et al., *Impact of Racial Representation in Curriculum Content on Student Identity and Performance*, 23 World J. Advanced Rsch. Revs. 2913, 2914 (2024).

[45] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, 65 (2022) ("GLSEN Survey").

## E. The laws enable race and gender-based harassment.

Laws like New Hampshire's also threaten students' "well established" "right to be free from student-on-student discrimination." *Shively v. Green Loc. Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 358 (6th Cir. 2014) (collecting cases recognizing that right).

As one student explained in a wrenching letter, book bans have legitimized bullying of LGBTQIA+ students, erased their "safe spaces," and made them afraid to go to school.[46] Other students agree: When curricula "erase gay people from history, stigmatize, and portray them as villains," bullies become "emboldened to treat students like me like a second-class citizen because people in power that we're supposed to admire, respect, emulate did it too."[47] Students of color similarly have reported a rise in harassment and discrimination after their states' censorship laws went into effect.[48]

---

[46] Forsyth Compl., *supra*, at 6-7.

[47] Collier Compl., *supra*, at 16.

[48] Free Speech Under Attack: Book Bans and Academic Censorship: Hearing Before the Subcomm. on C.R. and C.L. Comm. on Oversight and Reform, 117th Cong. 2, 7 (2022).

Studies, too, show a strong link between censorship and harassment. For example, boys of color in schools that lack diverse curricula had significantly higher odds of being bullied about their race, ethnicity, and national origin.[49] And LGBTQ+ students in schools without inclusive curricula are almost twice as likely to "frequently" hear derogatory slurs (47.8% vs. 26.7%) and negative remarks about transgender people (42.7% vs. 23.6%).[50]

To make matters worse, students at those schools are half as likely to intervene when they hear *others* making homophobic remarks.[51] And teachers feel similarly constrained. For example, a New Hampshire educator explained how, as a result of the laws, teachers are afraid to respond to "incidents of racism and bullying against students of color and LGBTQ+ students" because they might be "accused of … 'discriminating' against a person's beliefs." App. 1518. As a result, "[d]uring the 2022-2023 academic year" in his district, "bias incidents implicating racism

[49] Marla E. Eisenberg et. al., *School-Based Diversity Education Activities and Bias-Based Bullying Among Secondary School Students*, 37 J. Interpersonal Violence 15992 (2022).

[50] GLSEN Survey, *supra*, at 63.

[51] *Id.* at 65.

increased to 25 from 15 in the prior academic year," and antisemitism bias incidents likewise increased. *Id.*

Increased bullying has serious consequences for the safety and well-being of students. One national survey showed that LGBTQ+ K-12 students have lower levels of self-esteem, higher levels of depression, and higher likelihood of having seriously considered suicide in the past year when mistreated by their peers.[52] And another study concluded that lesbian, gay, and bisexual students were *three times* more likely to attempt suicide than their heterosexual peers when violently victimized by other students.[53] Similarly, studies find that students are twice as likely to attempt suicide when they experience racial or ethnic discrimination.[54]

Those risks are not inevitable. The presence of just one supportive adult can stave off the most horrific consequences of bullying and

---

[52] GLSEN Survey, *supra*, at 65.

[53] Michelle M. Johns et al., *Trends in Violence Victimization and Suicide Risk by Sexual Identity Among High School Students – Youth Risk Behavior Survey, United States, 2015–2019*, 69 Morbidity Mortality Wkly. Rep. Supplement 19 (2020).

[54] *See, e.g.*, Philip Baiden et al., *Perceived Racial Discrimination and Suicidal Behaviors Among Racial and Ethnic Minority Adolescents in the United States: Findings from the 2021 Adolescent Behaviors and Experiences Survey*, 317 Psychiatry Research 114877 (2022), https://doi.org/10.1016/j.psychres.2022.114877.

harassment.[55] Students who are vulnerable to discrimination and harassment thrive when they are offered support and protection from such harm, but they suffer when deprived of that support.

**F. The laws' harmful effects will last a lifetime.**

Harms to students from laws like New Hampshire's last a lifetime. When students feel disconnected from school, are bullied relentlessly, or have a "sense of inferiority," they have less "motivation … to learn." *Brown*, 347 U.S. at 494. Over time, that lack of motivation can cause students to fail, miss school and, eventually, be forced out of school altogether.[56] Indeed, the GLSEN survey found that one in six LGBTQ+ students have changed schools due to feeling unsafe or uncomfortable.[57]

Withdrawing from school dramatically changes the course of a young person's life. In 2023, for example, persons without a high school diploma had the highest unemployment rate and lowest median weekly

---

[55] *See, e.g.*, The Trevor Project, *Accepting Adults Reduce Suicide Attempts Among LGBTQ Youth* (June 2019), at 1, https://perma.cc/BM4P-VGA5 (finding that LGBTQ youth with one accepting adult in their life were 40% less likely to attempt suicide).

[56] *See* NEA Review, *supra*, at 8; *Why Does Attendance Matter*, National Center for Education Statistics, https://perma.cc/6NV4-TQW7.

[57] *See* GLSEN Survey, *supra*, at 12-13.

earnings, bringing in *half* of what persons with a college degree typically earn.[58] And the stakes are even higher for people of color, LGBTQIA+ people, and disabled people.[59]

New Hampshire's banned concepts laws also impair our mutual obligations to each other as members of our shared democracy. "People are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *Am.*

---

[58] U.S. Bureau of Labor Statistics, *Education pays, 2023*, Career Outlook (Apr. 2024), https://www.bls.gov/careeroutlook/2024/data-on-display/education-pays.htm?_hsenc=p2ANqtz-938oa8x84lHlUL-wMxuI1yUWha3QFiYfnfKv3J057o3ZYVsLVF5uuByVF9YSx3jJdOT-ZGnI.

[59] *E.g.*, Jung Hyun Choi et. al*.,* The Urban Institute, *Explaining the Black-White Homeownership Gap: A Closer Look at Disparities across Local Markets* 7 (2019), https://perma.cc/2PXE-YN78 (Black people without a high school diploma are half as likely to own a home than white people without one); Anthony P. Carnevale et. al., Georgetown University Center on Education and the Workforce*, The Unequal Race for Good Jobs*, 7 (2019), https://perma.cc/4RRT-ZY7N ("White workers are more likely than Black or Latino workers to have a good job at every level of educational attainment."); Nanette Goodman, Michael Morris, & Kelvin Boston, National Disability Institute, *Financial Inequality: Disability, Race and Poverty in America* 5 (2019), https://perma.cc/BE2U-MQV9 ("Having a disability creates extra costs for people and can limit their economic opportunities."); Movement Advancement Project et al., *A Broken Bargain for LGBT Workers of Color* 41 (2013), https://perma.cc/LF2F-YUL2 ("workers of color … earn less even after" educational levels are "taken into consideration").

*Amusement Mach. Ass'n v. Kendrick,* 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J.). This is why a central pillar of secondary education is to equip students to see things from multiple perspectives, rigorously evaluate arguments, and form their own judgments. New Hampshire's banned concepts laws will have the opposite effect: they will produce students unprepared to think critically and unequipped to tolerate difference, disagreement, or dissent. And those effects will be felt most acutely by the students from historically marginalized communities who will see their mentors disappear, their voices silenced, and their identities erased from collective memory.

## CONCLUSION

The Court should affirm.


January 17, 2025                    Respectfully submitted,


                                   */s/ Sean Ouellette*
                                   Sean Ouellette
                                   Adele P. Kimmel
                                   PUBLIC JUSTICE
                                   1620 L Street NW
                                   Suite 630
                                   Washington, DC 20036
                                   (202) 797-8600
                                   souellette@publicjustice.net

Catherine E. Stetson
Kristina Alekseyeva*
Melody Zargari
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

Gaylynn Burroughs
Hunter Iannucci
Shiwali Patel
Auden Perino
Rachel Smith
Elizabeth E. Theran
NATIONAL WOMEN'S LAW CENTER
1350 I St. NW, Ste. 700
Washington, DC 20005
(202) 588-5180
etheran@nwlc.org

*Admitted only in New York.
Supervised by principals of the firm
admitted in the District of Columbia*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 6,291 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

January 17, 2025

*/s/ Sean Ouellette*
Sean Ouellette
*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

January 17, 2025

*/s/ Sean Ouellette*
Sean Ouellette
*Counsel for* Amicus Curiae