October 10, 2025

<u>**VIA CM/ECF**</u>

Hon. Anastasia Dubrovsky, Clerk of Court
United States Court of Appeals for the First Circuit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

      Re:    *Local 8027, AFT-New Hampshire, AFL-CIO, et al. v. Frank Edelblut, et al.*, No. 24-1690; Letter Pursuant to Pursuant to Fed. R. App. P. 28(j).

Dear Ms. Dubrovsky:

      Pursuant to Fed. R. App. P. 28(j), Plaintiffs-Appellees write to inform this Court of pertinent legal authority that has become available since briefing and oral argument: *Nat'l Educ. Association-New Hampshire v. NH Att'y Gen.*, 2025 WL 2807652 (D.N.H. Oct. 2, 2025) ("*NEA-NH*"), and *Reporters Committee for Freedom of the Press v. Rokita*, 147 F.4th 720 (7th Cir. 2025). A copy of these decisions is enclosed.

      In *NEA-NH*, the District of New Hampshire granted a preliminary injunction facially enjoining New Hampshire's anti-DEI statutes as to "covered entities" in a pre-enforcement context based on void-for-vagueness grounds. Citing *Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, Civ. No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024), the court concluded that the statutes' prohibitions on "DEI-related" activities were so broad and undefined that they authorized arbitrary enforcement and failed to provide fair notice, even where violations carried severe financial penalties. *NEA-NH*, 2025 WL 2807652 at *11-18 (also noting lack of scienter requirement). Moreover, the decision illustrates the established principle that facial vagueness challenges often occur in pre-enforcement contexts, as confirmed by both district and appellate courts. *See id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). Chief Judge McCafferty cited several recent parallel decisions granting pre-enforcement facial relief on vagueness grounds, including *NAACP v. U.S. Department of Education*, 779 F. Supp. 3d 53, 66-67 (D.D.C. 2025), and *American Federation of Teachers v. Department of Education*, No. SAG-25-628, 2025 U.S. Dist. LEXIS 157166, 2025 WL 2374697, at *29-30 (D. Md. Aug. 14, 2025).

1

Likewise, the Seventh Circuit recently reaffirmed this principle in *Reporters Committee for Freedom of the Press v. Rokita*, 147 F.4th 720 (7th Cir. 2025), holding that pre-enforcement facial vagueness challenges are justiciable as independent and distinct claims even where First Amendment rights are incidental to the underlying vagueness claim. *See id.* at 725, 727 (addressing pre-enforcement vagueness claim "because that is the issue at the center of this appeal" and where "[t]he district court did not reach the plaintiffs' First Amendment claims").

Respectfully submitted,

*/s/ Gilles Bissonnette*
Gilles Bissonnette (No. 123868)
AMERICAN CIVIL LIBERTIES UNION OF
 NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
Tel.: (603) 333-2081
gilles@aclu-nh.org

*Counsel for Plaintiffs-Appellees NEA-NH, Andres Mejia, and Chrstina Philibotte*

*/s/ Charles G. Moerdler*
Charles G. Moerdler (No. 1213343)
PATTERSON BELKNAP WEBB & TYLER
 LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
cmoerdler@pbwt.com

*Counsel for Plaintiffs-Appellees Local 8027, AFT-New Hampshire, AFL-CIO, Ryan Richman, John Dube, Joceyln Merrill, Kimberly Green Elliott and Meghan Evelyn Durden*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

National Education Association-
New Hampshire et al

  v.

NH Attorney General et al

Civil No. 25-cv-293-LM
Opinion No. 2025 DNH 123 P

**O R D E R**

Various organizations, school districts, and individuals bring this action against four New Hampshire agency heads seeking to enjoin recently enacted New Hampshire statutes that ban schools and public entities from engaging in any activity that is "related" to "diversity, equity, and inclusion," or "DEI." The stakes for noncompliance with these "anti-DEI laws" are high. If a school engages in "DEI-related" activity—even unknowingly—the challenged laws mandate termination of all public funding. It goes without saying that, for many schools in New Hampshire, even a temporary loss of public funding would be crippling. Given impending deadlines for submitting certifications of compliance with the new anti-DEI laws, plaintiffs have filed a motion for a preliminary injunction seeking expedited relief. Doc. no. 14.

This is the third in a series of recent lawsuits in this court seeking to enjoin similar laws or executive action targeting "divisive concepts" or "DEI" in schools and the classroom. See Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut, Civ. No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024) ("Local 8027 II"), appeal filed, No. 24-

1690 (1st Cir. July 26, 2024); Nat'l Educ. Ass'n v. U.S. Dep't of Educ., 779 F. Supp. 3d 149 (D.N.H. 2025). Each time, this court has found the at-issue laws unconstitutional because they "threaten[ed] teachers with enforcement on an ad hoc and subjective basis guided by the personal preferences of an unelected official rather than clearly delineated statutory standards," Loc. 8027 II, 2024 WL 2722254, at *16 (quotation omitted), and because they imposed significant penalties for noncompliance without affording "a reasonable opportunity to know what the [law] even requires," Nat'l Educ. Ass'n, 779 F. Supp. 3d at 193. So too here. Because plaintiffs are likely to succeed in arguing that this latest round of anti-DEI laws is unconstitutional, the court grants their motion for a preliminary injunction (doc. no. 14) as set forth in this order.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the movants must demonstrate that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in the movants' favor; and (4) an injunction is in the public interest. Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). Of these, likelihood of success on the merits and irreparable injury are the most important factors. González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009). When, as here, the defendants are government entities or officials sued in their official capacities,

the balance of equities and public interest factors merge. [Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).]

## FINDINGS OF FACT

I.    <u>The Anti-DEI Laws</u>

The at-issue statutes were enacted in June 2025 as part of House Bill 2 ("HB2"), one of the legislature's biannual budget bills, and became effective on July 1, 2025. 2025 N.H. Laws 141:321, :322, :461. HB2 enacted two new subdivisions that are relevant to this case.[1]

First, HB2 amended RSA chapter 21-I by enacting a new statutory subdivision entitled "Prohibition on Diversity, Equity, and Inclusion." 2025 N.H. Laws 141:321. This new subdivision comprises RSA 21-I:112 through :116, and applies to "public entit[ies]," "agencies," and "political subdivisions." RSA 21-I:113, :114; <u>accord</u> RSA 21-I:115, :116. Second, HB2 amended RSA chapter 186 by enacting a new statutory subdivision entitled "Prohibition on Diversity, Equity, and Inclusion in Public Schools." 2025 N.H. Laws 141:322. This new subdivision comprises RSA 186:71 through :77,[2] and it applies to "public school[s]." RSA 186:72;

---

[1] Throughout this order, the court will refer to the new statutes contained in these subdivisions collectively as "the anti-DEI laws."

[2] The text of HB2 provides that this new statutory subdivision amends RSA chapter 186 by inserting into the chapter RSA 186:71 through :76, as well as RSA 187:77. <u>See</u> 2025 N.H. Laws 141:322. It is unclear why chapter 186 would be amended to include RSA 187:77, i.e., a section from a different statutory chapter. Following HB2's enactment, RSA 187:77 was renumbered as RSA 186:77.

accord, e.g., RSA 186:73. This order will first explain the new statutes added to RSA chapter 21-I, then turn to the new statutes in RSA chapter 186.

A.      Amendments to RSA Chapter 21-I

RSA 21-I:113, entitled "Prohibition on DEI Initiatives," provides that "[n]o public entity shall implement, promote, or otherwise engage in any DEI-related initiatives, programs, training, or policies," and that "[n]o state funds shall be expended for DEI-related activities, including but not limited to implicit bias training, DEI assessments, critical race theory, or race-based hiring, promotion, or contracting preferences." RSA 21-I:113. The subdivision does not define "public entity."[3] However, RSA 21-I:112 defines "[d]iversity, equity, and inclusion," or "DEI," to "mean any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1[4] for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." RSA 21-I:112, II. The subdivision does not define "DEI-related."

In addition to the foregoing prohibitions, the subdivision prohibits "agencies" from entering into or renewing "any contract that includes DEI-related provisions, including requirements for contractors to implement DEI programs, conduct DEI

---

[3] At the hearing on plaintiffs' preliminary injunction motion, defendants took the position that public entity is an umbrella term for "agencies" and "political subdivisions," which are defined in RSA 21-I:112 and are expressly subject to RSA 21-I:114 through :116.

[4] Those characteristics are: "age, sex, gender identity, race, creed, color, marital status, familial status, physical or mental disability, or national origin." RSA 354-A:1.

training, or comply with DEI-related reporting obligations." RSA 21-I:114. "Agency" is defined as "any department, office, commission, board, subdivision, or other unit, however designated, of the executive branch of state government." RSA 21-I:112, I. Every agency "shall, no later than October 1, 2025," provide the New Hampshire Department of Administrative Services with "a report identifying all contracts under its control that include DEI-related provisions," including "descriptions of each contract, the specific DEI-related provisions contained therein, and the total financial obligation associated with each contract." RSA 21-I:115. Those reports are then consolidated by the Department of Administrative Services and presented to the New Hampshire Governor and legislature. Id.

The subdivision also prohibits "political subdivisions" from entering into or renewing "any contract that includes DEI-related provisions" in the same manner it prohibits agencies from doing so. RSA 21-I:114. "Political subdivision" is defined as "any village district, school district, town, city, county, or unincorporated place in the state." RSA 21-I:112, III. The new statutes do not themselves require political subdivisions to report contracts containing DEI-related provisions, but instead require the New Hampshire Department of Justice to "establish a process by which all political subdivisions review their existing contracts for the presence of DEI-related provisions." RSA 21-I:116.

B.    Amendments to RSA Chapter 186

RSA 186:72, entitled "Prohibition on DEI Initiatives," provides that "public school[s]" may not "implement, promote, or otherwise engage in any DEI-related

initiatives, programs, training, or policies." RSA 186:72. "Public school" is broadly defined to include "any school, academic institution, or institution of higher education" in New Hampshire that is "supported by public funds." RSA 186:71, II. The subdivision defines "[d]iversity equity and inclusion," or "DEI," in the same manner as RSA 21-I:112: "any program, policy, training, or initiative that classifies individuals based on a characteristic identified under RSA 354-A:1 for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." RSA 186:71, I. And, as with RSA 21-I:112, the subdivision does not define "DEI-related."

In addition to barring schools receiving public funding from engaging in DEI-related activities, RSA 186:72 prohibits the expenditure of state funds to public schools "for DEI-related activities, including but not limited to implicit bias training, DEI assessments, critical race theory, or race-based hiring, promotion, or contracting preferences." RSA 186:72. This prohibition on the expenditure of public funds for DEI-related activities "shall extend to any public school as defined by RSA 186:71, II." Id.

RSA 186:73 similarly provides that public schools may not "enter into, renew, or amend any contract that includes DEI-related provisions, including requirements for contractors to implement DEI programs, conduct DEI training, or comply with DEI-related reporting obligations." RSA 186:73. Public schools must "submit a signed and certified report" to the Commissioner of the New Hampshire Department of Education "identifying any contract containing DEI-related

6

provisions" by "[n]o later than September 30, 2025." RSA 186:75, II. "The report shall include contract descriptions, the specific DEI-related provisions, and the total financial obligation associated with each contract." Id.

The subdivision provides that the Department of Education must prepare two reports. First, "[n]o later than October 1, 2025," the Department must submit a "single report" to various legislative committees "identifying all existing contracts containing DEI-related provisions in public schools," which must include "contract descriptions, the specific DEI-related provisions, and the total financial obligation associated with each contract."[5] RSA 186:74. Then, on or before April 1, 2026, the Department must submit a "final compliance report" to the Governor, Executive Council, and those same legislative committees "detailing the progress of public schools in eliminating DEI-related provisions from contracts."

Finally, the subdivision imposes severe consequences on public schools for noncompliance. "Should a public school fail to abide by any section of this subdivision, either knowingly or unknowingly," the Commissioner of the Department of Education "shall immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with all sections of this subdivision." RSA 186:77, I. In addition, the Commissioner "shall notify" the State Treasurer "if a public school is not in compliance with this subdivision, at which time the [T]reasurer shall halt all forms of public funding to

---

[5] Given the September 30 deadline for schools to submit their reports to the Department, it is unclear how the Department could compile all such reports by the October 1 deadline into a "single report."

the school until the [C]ommissioner has certified [that] the school [has] come into compliance with this subdivision." RSA 186:77, II. The subdivision provides no mechanism by which a public school can challenge the Commissioner's determination that it is noncompliant with any section of the subdivision. Nor does it establish any procedures by which the Commissioner determines a public school's compliance with any section of the subdivision.

II.    Post-Enactment Developments

A.    Defendants' Enforcement of the Anti-DEI Laws

As noted, the anti-DEI laws took effect on July 1, 2025. See 2025 N.H. Laws 141:461. On July 11, the Department of Education sent a letter to public school districts[6] requiring them to complete a "comprehensive review" of their "policies, procedures, programs, training materials and initiatives" to ensure compliance with HB2's requirements that public schools not engage in DEI-related activities, expend state funding on DEI-related activities, or enter into or renew any contract that includes DEI-related provisions. Doc. no. 15-2 at 6. The letter stated that, after completing this comprehensive review and "no later than September 5, 2025,"[7] each school must submit a signed and certified report to the Commissioner identifying

---

[6] Although the definition of "public school" in RSA 186:71 includes private institutions that are "supported by public funds," the department did not send the July 11 letter to private K-12 schools that receive public funding.

[7] The statutory deadline for submitting the required certification is September 30, 2025. The Department has identified no authority permitting it to insist on an earlier deadline.

any contract containing DEI-related provisions. Per RSA 186:75, the letter stated that each school's report "shall include contract descriptions, the specific DEI-related provisions, and the total financial obligation associated with each contract." Id. The July 11 letter also notified the school districts that, if the Commissioner determined that a public school was "knowingly or unknowingly" violating "any section of the DEI provisions to HB 2," the Commissioner would "immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with" RSA 186:71 through :77. Id. at 7.

Attached to the July 11 letter is the report that the Department stated school districts needed to complete and submit by September 5 "to comply with" the anti-DEI laws. Id. at 9. Although RSA 186:75 only requires public schools to submit a certified report "identifying any contract containing DEI-related provisions," the report attached to the July 11 letter purports to require additional information. It requires schools to certify, under pains and penalties of perjury, whether they have "implemented, promoted, or engaged in any DEI-related initiatives, training, assessments, or policies," as well as whether they have "used state funds . . . for DEI-related activities including but not limited to implicit bias training, DEI assessments, critical race theory, or race-based hiring, promotion, or contracting preferences." Id. at 10-11.

On July 17, 2025, the Department of Education sent a letter to private and public institutions of higher learning in the state, including religious institutions, that "receive[ ] public support" in the form of state-funded scholarships "through the

UNIQUE Program[8] . . . and/or the Governor Scholarship Program."[9] Doc. no. 15-3 at 2. Similar to the July 11 letter to school districts, the July 17 letter states that colleges and universities receiving public funding must complete a comprehensive review of their programs, policies, trainings, and initiatives to ensure compliance with the anti-DEI laws. The July 17 letter instructs that its recipients must complete a signed and certified report containing detailed information about their contracts containing DEI-related provisions, and submit that report to the Department by the statutory deadline of September 30, 2025.[10] And, as with the prior letter to school districts, the July 17 letter warns that "fail[ure] to abide by any section of the DEI provisions to HB 2, either knowingly or unknowingly," will result in the Commissioner "immediately halt[ing] all sources of public funding . . . until such as that the school comes into compliance." Id. at 3.

---

[8] The UNIQUE Program is a state grant program that awards college students with scholarships of up to $3,250 each semester based on merit, financial need, and achieving certain academic progress requirements, among other criteria. See University of New Hampshire, College of Professional Studies, Federal and State Grants, https://cps.unh.edu/online/tuition-aid/types-aid/federal-state-grants#:%7E: text=UNIQUE%20ENDOWMENT%20AND%20ALLOCATION%20PROGRAMS,at %20a%20New%20Hampshire%20institution (last visited Sept. 30, 2025).

[9] The Governor's Scholarship Program provides eligible New Hampshire residents with scholarships of up to $2,000 each year which may be used toward the cost of a postsecondary educational or training program. See New Hampshire State Treasury, Governor's Scholarship Program, https://www.nh.gov/treasury/scholarship -program/index.htm (last visited Sept. 30, 2025).

[10] The July 17 letter noted that, although the September 30 deadline was the "statutorily required" one, the Department was "requesting" that certifications be submitted by September 5 "to permit [the Department] to compile the results and meet its statutory reporting requirement to the legislature of October 1, 2025." Doc. no. 1-3 at 3.

On July 23, 2025, the Commissioner of the Department of Administrative Services sent an email regarding the anti-DEI laws to New Hampshire agencies.[11] See doc. no. 15-4. The Commissioner stated that the anti-DEI laws require each state agency to submit, no later than October 1, 2025, a report identifying all contracts under the agency's control that include DEI-related provisions. The Commissioner also directed each agency to fill out a spreadsheet, attached to the email, providing the required information. Once the Department received each agency's submission, it stated it would compile them into a consolidated report to submit to the Governor and the legislature. The Commissioner stated that the Department "will submit the report immediately and . . . note the agencies that didn't respond, so the [October 1] deadline is not flexible at all." Id. at 5.

III.    The Plaintiffs

A.    NEA-NH

The National Education Association of New Hampshire ("NEA-NH") is a membership-based organization that represents the majority of public-school employees in New Hampshire. Its members include current and former teachers at the K-12 level and in higher education, as well as aspiring teachers, support professionals, and special education teachers and professionals. NEA-NH's self-described mission "is to unite our members and the nation to fulfill the promise of

---

[11] For reasons that are not clear, the Commissioner also sent this email to Judge Christopher Keating, who is the Director of New Hampshire's Administrative Office of the Courts. The Commissioner also sent the email to the Executive Director of the Judicial Council.

public education, to break down the barriers to racial equity, and to prepare every student to succeed in a diverse and interdependent world." Doc. no. 15-34 at 3.

NEA-NH offers several services to its members in addition to advocating for their interests. It assists with collective bargaining of its members' contracts with school districts, which cover areas such as grounds for termination of employment, discipline, evaluation, and academic freedom. NEA-NH also advises members regarding compliance with the New Hampshire Educator Code of Conduct and what actions may result in discipline from the Department of Education for Code violations.[12] Finally, NEA-NH offers training and professional development opportunities to its members, including continuing education programming on achieving compliance with federal, state, and local law and how to avoid liability and discipline for violating the New Hampshire Educator Code of Conduct.

B.    School District Plaintiffs

There are four school districts involved as plaintiffs in this case. The Oyster River Cooperative School District educates students in Lee, Madbury, and Durham, New Hampshire, and its current enrollment is approximately 2,000 students. The Dover School District serves approximately 3,500 students in Dover, New Hampshire. The Somersworth School District provides education to approximately 1,300 students in Somersworth, New Hampshire. And the Grantham School District

---

[12] NEA-NH represents that, in the past, the Department of Education has taken the position that violations of state laws pertaining to education—even those that lack enforcement mechanisms—may result in discipline under the Code. Defendants have not disputed this assertion.

enrolls approximately 450 students at the Grantham Village School in pre-kindergarten through sixth grade.

    C.    <u>Individual Plaintiffs</u>

    1.    <u>Dr. Dottie Morris</u>

Dr. Dottie Morris is the Associate Vice President for Community and Belonging at Keene State College, a public liberal arts college in the University of New Hampshire ("UNH") system. Previously, her title was Associate Vice President for Institutional Equity and Diversity, but Keene State changed her title one day before the anti-DEI provisions of HB2 became effective. Her work aims to provide opportunities for all students to have a wide range of experiences and encounter persons from diverse backgrounds before they graduate. For example, every March she organizes a "civil rights tour" to southern states designed to both educate students on the United States' history of racial discrimination and provide students at a rural New Hampshire college with the opportunity to interact with persons who are different from them. She regularly engages students on concepts like implicit bias, and the trainings she conducts for college orientation leaders and resident assistants involve an examination of how conscious and unconscious biases can impact how students relate to each other. She also teaches about implicit bias in her psychology classes, which she believes is critical in training future counselors how to understand human behavior and offer effective counseling.

### 2.    James T. McKim, Jr.

James T. McKim, Jr., is a consultant, trainer, and speaker whose work focuses on helping organizations improve efficiency and growth through increasing diversity, inclusivity, equity, and accessibility, including accessibility for persons with disabilities. He regularly contracts with state and local government bodies. For example, in November 2020, he participated in a training on implicit bias for employees of the New Hampshire Department of Justice. He has also worked with multiple public-school districts and the UNH system. Following enactment of the anti-DEI laws, McKim's clients have communicated that they are unsure whether they can continue to work with him. At least one public entity has backed out of an engagement with McKim because it fears that his work violates the anti-DEI laws.

### D.    New Hampshire Outright

New Hampshire Outright is a nonprofit organization that serves, supports, and advocates for "LGBTQ+ youth and their families." Doc. no. 15-44 at 2. One of its core functions is to provide trainings to educators and staff at New Hampshire public and private K-12 schools, colleges, and universities. These trainings are geared toward helping educators create spaces where persons of all backgrounds feel welcome, with a focus on improving educational environments and outcomes for LGBTQ+ students. New Hampshire Outright fears that schools will no longer engage them to conduct these trainings in the wake of the anti-DEI laws' enactment. Indeed, one school district has already cancelled a previously planned training, citing HB2 and the Department of Education's July 11 letter. And, both

14

before and after enactment of the anti-DEI laws, New Hampshire Outright's

contracts with school districts have generally required assurances that New

Hampshire Outright's contracted services comply with state law.

IV.    <u>This Lawsuit</u>

Plaintiffs filed the instant lawsuit challenging the legality of HB2's anti-DEI

provisions on August 7, 2025, just over a month after the anti-DEI laws took effect.

The complaint includes the following counts brought by the following plaintiffs:

- In Count I, NEA-NH, the individual plaintiffs, and New Hampshire Outright contend that the anti-DEI laws are impermissibly vague in violation of their due process rights under the Fourteenth Amendment.

- In Count II, NEA-NH and Dr. Morris contend that the anti-DEI laws censor speech based on content and viewpoint in violation of the First Amendment rights of Dr. Morris and NEA-NH's members.

- In Count III, NEA-NH, the school district plaintiffs, and the individual plaintiffs contend that the anti-DEI laws conflict with, and are therefore preempted by, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.

- In Count IV, all plaintiffs contend that the anti-DEA laws violate their due process rights under Part I, Article 15 of the New Hampshire Constitution.

- In Count V, NEA-NH and Dr. Morris contend that the anti-DEI laws violate free speech protections under Part I, Article 22 of the New Hampshire Constitution.

The complaint names four agency heads as defendants. Specifically, the

complaint names the Attorney General of the State of New Hampshire, the

Commissioner of the New Hampshire Department of Education, the Commissioner of the New Hampshire Department of Administrative Services, and the State Treasurer of New Hampshire. All defendants are sued only in their official capacities. The complaint seeks declaratory and injunctive relief, as well as costs and attorney fees under 42 U.S.C. § 1988.

Plaintiffs filed the instant motion for a preliminary injunction on August 11, four days after this action commenced. Plaintiffs contend that they are likely to succeed on the merits of Counts I, II, and III of their complaint.[13] And, pointing to the Department of Education's July 11 letter to public schools requiring certification of compliance with the anti-DEI laws by September 5 or else face loss of all public funding, plaintiffs requested that this court issue a decision on their motion before that date. In the alternative, plaintiffs asked that the court issue a temporary restraining order ("TRO") prior to September 5 if the court did not grant or deny the requested preliminary injunction before that date.

The court held a status conference on August 14 and set an expedited briefing schedule. Briefing concluded on August 26, and the court held a motions hearing on August 27.[14] The court issued a TRO on September 4, which was to remain in effect until September 18. On that date, the court extended the TRO until October 2.

---

[13] Plaintiffs do not move for a preliminary injunction on the basis of Counts IV or V.

[14] None of the parties wished to present evidence at the August 27 hearing.

16

**RULINGS OF LAW**

The court now considers plaintiffs' motion for a preliminary injunction. As noted, to obtain a preliminary injunction, plaintiffs must demonstrate (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. Arborjet, 794 F.3d at 171. The court will consider each factor in turn.

I.      Plaintiffs Are Likely to Succeed on the Merits

As an initial matter, defendants assert that plaintiffs are not likely to succeed on the merits of any of their claims because they lack standing. See Pietrangelo v. Sununu, Civ. No. 21-cv-124-PB, 2021 WL 1254560, at *5 (D.N.H. Apr. 5, 2021) ("'[T]he "merits" on which a plaintiff [seeking a preliminary injunction] must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction,' including standing." (quoting Waskul v. Washtenaw Cnty. Cmty. Mental Health, 900 F.3d 250, 256 n.4 (6th Cir. 2018))). The court first addresses standing before considering the merits of plaintiffs' claims.

A.      Standing

1.      Applicable Legal Principles

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" FDA v. All. for Hippocratic Med., 602 U.S. 367, 378 (2024) (quoting U.S. Const. art. III, § 2). The doctrine of standing emanates from the case-or-controversy requirement. United States v. Texas, 599 U.S. 670, 675

(2023). To establish standing, a plaintiff must show (1) injury in fact, (2) causation, and (3) redressability. Id. at 676.

An injury in fact must be "both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical." Nat'l Educ. Ass'n, 779 F. Supp. 3d at 173. "An injury is concrete when it is 'real, and not abstract,' though it need not be 'tangible' or large." Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 86 (1st Cir. 2025) (citation omitted) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016)). "It is particularized if it 'affects the plaintiff in a personal and individual way.'" Id. at 87 (brackets omitted) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 n.1 (1992)). And the threatened enforcement of a law satisfies the imminence prong when there is "a realistic danger of sustaining a direct injury as a result of the [law's] operation or enforcement." Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)); see also, e.g., All. for Hippocratic Med., 602 U.S. at 381 (imminence satisfied where injury is "likely to occur soon"); Susan B. Anthony List v. Driehaus (SBA List), 573 U.S. 149, 158 (2014) (explaining that "[a]n allegation of future injury" may satisfy the imminence prong "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur'" (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 414 n.5 (2013))).

To satisfy the causation requirement, "the plaintiff must show a predictable chain of events leading from the government action to the asserted injury." All. for Hippocratic Med., 602 U.S. at 385. Assuming causation is satisfied, redressability

usually will be too. Id. at 380-81 (characterizing causation and redressability as "often 'flip sides of the same coin'"; "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury" (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 288 (2008))).

2.    Plaintiffs Have Sufficiently Demonstrated Standing

At the preliminary injunction stage, the plaintiff "must show a substantial likelihood of standing." Pietrangelo, 2021 WL 1254560, at *5 (quoting Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015)). Defendants assert that plaintiffs have failed to make this showing. However, defendants do not develop an argument challenging the merits of the plaintiffs' standing showing. Defendants instead point out that it is plaintiffs' burden to show standing, and assert that they have not carried their burden. It is, of course, hornbook law that a plaintiff seeking to invoke this court's jurisdiction bears the burden of establishing standing, Spokeo, 578 U.S. at 338, and that this court has an independent obligation to assure itself of its jurisdiction, even when neither party raises the issue, Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010). Nevertheless, defendants' "lack of direct engagement with the substance" of plaintiffs' evidence of standing paints their bare assertions in a less-than-persuasive light. Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior, 123 F.4th 1, 18 (1st Cir. 2024); see also Hague v. Mass. Dep't of Elementary & Secondary Educ., Civ. Nos. 10-30138-DJC, 10-30142-DJC, 10-30143-DJC, 10-30144-DJC, 2011 WL 4073000, at *5 (D. Mass. Sept. 12, 2011) (rejecting standing challenge where defendants "raise[d] the specter that the Plaintiffs lack standing" but failed to

19

"clearly develop this argument"). In any event, following this court's independent review, the court is satisfied that each plaintiff has shown a substantial likelihood of standing.

a.    NEA-NH

Beginning with NEA-NH, plaintiffs have shown a substantial likelihood of both organizational and associational standing.[15] See Nat'l Educ. Ass'n, 779 F. Supp. 3d at 174, 180 (explaining organizational and associational standing). As for organizational standing, the anti-DEI laws "directly affect[ ]" NEA-NH's "core business activities." All. for Hippocratic Med., 602 U.S. at 395. Those core activities include (1) conducting professional development and continuing education programs for its members' compliance with federal and state antidiscrimination law, (2) advising its members on whether their teaching practices could result in an investigation by the Department of Education for a potential violation of the Educator Code of Conduct, and (3) assisting its members in the collective bargaining of their employment contracts, which include provisions governing discipline and termination. Given the anti-DEI laws' vague and far-reaching scope, NEA-NH is "perceptibly impaired" in its ability to train and counsel its members on their legal obligations. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982).

NEA-NH has also shown a substantial likelihood of associational standing. "[A]n association has standing to bring suit on behalf of its members when: (a) its

---

[15] The reasons NEA-NH has sufficiently demonstrated organizational and associational standing are materially identical to the reasons this court found standing in National Education Association, 779 F. Supp. 3d at 173-82. Rather than repeat that analysis here, the court will provide a condensed version.

20

members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 553 (1996) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)). NEA-NH's members would have standing in their own right to bring the due process, First Amendment, and preemption claims in Counts I through III. See doc. no. 15-35 (declaration of 8th grade social studies teacher explaining how the vague and far-reaching language of the anti-DEI laws impacts her); doc. no. 15-34 (declaration of NEA-NH explaining how the anti-DEI laws restrict expressive activities of its members in higher education); doc. no. 15-37 (declaration of high school teacher explaining effect of the anti-DEI laws on her ability to comply with federal disability law); see also Housatonic River Initiative v. EPA, New England Region, 75 F.4th 248, 265 (1st Cir. 2023) (only one member need have standing for associational standing to exist). These members' interests in academic freedom, avoiding discipline, and educating students with disabilities are germane to NEA-NH's purposes, and nothing about NEA-NH's claims or the relief it seeks requires that their members participate in this case as plaintiffs.

> b.   School District Plaintiffs

The school district plaintiffs have also shown a substantial likelihood of standing with respect to their preemption claim. They contend that the anti-DEI laws are preempted by the ADA, Section 504, and the IDEA because the anti-DEI laws forbid what these federal laws require: granting preferential treatment to

students with disabilities. Section 504 and the IDEA were enacted pursuant to Congress's Spending Clause powers. Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212, 217-18 (2022); Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 295 (2006). "Spending Clause legislation operates based on consent: 'in return for federal funds, the recipients agree to comply with federally imposed conditions.'" Cummings, 596 U.S. at 219 (brackets omitted) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)). Thus, if a school district fails to comply with Section 504 or the IDEA, they risk loss of federal funding. Gonzaga Univ. v. Doe, 536 U.S. 273, 280 (2002). In addition, a violation of Section 504 or the ADA may give rise to a damages action against the school district. See 42 U.S.C. § 12133; 29 U.S.C. § 794a; Cummings, 596 U.S. at 218. "[M]onetary injury" is an "obvious" example of a concrete injury giving rise to Article III standing. TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021).

Defendants assert that it is an open question in the First Circuit "whether political subdivisions of the state like school districts have standing . . . to challenge state law." Doc. no. 26 at 11. While defendants are correct that the First Circuit has not yet addressed the circumstances in which a political subdivision may sue its own state, this is an issue not of Article III standing, but of whether a political subdivision has rights that are enforceable against its own state—which is a merits issue. See Kerr v. Polis, 20 F.4th 686, 692-96 (10th Cir. 2021) (en banc) (tracing development of "political subdivision standing" doctrine, which is a "misnomer" because the Supreme Court cases that spawned this doctrine by refusing to

entertain a suit by a subdivision against its state "meant only that, on the merits, the municipality had no rights under the particular constitutional provisions it invoked" (quoting Rogers v. Brockette, 588 F.2d 1057, 1070 (5th Cir. 1979)); Rogers, 588 F.2d at 1070 (explaining that, at the time political subdivision standing doctrine began to develop, "'standing' generally meant something somewhat different from what it means today" and a party was thought to have standing "if it was correct in its claim on the merits that the statutory or constitutional provision in question protected its interests; standing was not seen as a preliminary or threshold question").

Because defendants have not developed an argument that the school district plaintiffs lack a right to enforce the Supremacy Clause against the state—which is not an issue of this court's subject matter jurisdiction under Article III—they have waived that argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Even if they had not waived that argument, however, "the Supreme Court has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause." Tweed-New Haven Airport Auth. v. Tong, 930 F.3d 65, 73 (2d Cir. 2019) (collecting cases).

### c. Individual Plaintiffs and New Hampshire Outright

That leaves Dr. Morris, McKim, and New Hampshire Outright. All three plaintiffs have standing to seek a preliminary injunction.

New Hampshire Outright's core activities include contracting with schools and colleges to provide trainings on how fully understanding LGBTQ+ youth identity can help foster inclusive learning environments and the free exchange of

information and ideas. Those trainings are within the crosshairs of the anti-DEI laws, which prohibit schools receiving public funding from "implement[ing], promot[ing], or otherwise engag[ing] in" any "training" that "classifies individuals based on" sex or gender identity "for the purpose of achieving demographic outcomes." RSA 186:71, I, :72; RSA 354-A:1. Indeed, New Hampshire Outright has already lost one contract due to the anti-DEI laws. Because the challenged laws directly affect the organization's core activities, New Hampshire Outright has standing to seek a preliminary injunction. See Nat'l Educ. Ass'n, 779 F. Supp. 3d at 176 (nonprofit whose mission was to run educational programs to prepare Black teachers for the workforce had standing to challenge "Dear Colleague" letter targeting DEI because the letter "threaten[ed] to put [the nonprofit] out of business entirely").

For similar reasons, McKim has standing to request a preliminary injunction. He is a consultant whose work centers around contracting with organizations to provide trainings on how prioritizing diversity and inclusivity can promote efficiency. Public entities and schools are among McKim's current and former clients, including the New Hampshire Department of Justice. As with New Hampshire Outright, he has already lost one contract with a public entity due to that entity's well-founded concern that McKim's trainings violate the anti-DEI laws.

Finally, Dr. Morris has standing to seek a preliminary injunction. Her title and job responsibilities at Keene State College have already been scrubbed of any reference to diversity, equity, or inclusion. Previously, her job responsibilities

24

included conducting implicit bias trainings for orientation leaders and resident assistants. She also teaches about implicit bias in her psychology courses, and regularly conducts "civil rights tours" for her students to enable them to gain an understanding of and exposure to persons with diverse background and lived experiences. Dr. Morris now faces potential discipline from her employer if she continues to engage in these practices. As a result, she feels compelled to censor herself in her academic and professional pursuits.

For the foregoing reasons—and given the lack of any developed challenge to the merits of plaintiffs' standing showing—the court concludes that each plaintiff has demonstrated a substantial likelihood of standing such that plaintiffs may seek a preliminary injunction. Having found standing, the court proceeds to consider whether plaintiffs are likely to succeed on the merits of one or more of the claims upon which they seek a preliminary injunction—Counts I, II, and III. Count I is a vagueness claim, Count II is a First Amendment claim, and Count III is a preemption claim. Because the court concludes that plaintiffs are likely to succeed on the merits of their vagueness and preemption claims, it does not address the First Amendment claim.

B.      Plaintiffs Are Likely to Succeed on the Merits of Their Vagueness Claim

In Count I, NEA-NH, the individual plaintiffs, and New Hampshire Outright contend that the anti-DEI laws are void for vagueness in violation of their due process rights as well as the due process rights of NEA-NH's members. "A fundamental principle in our legal system is that laws which regulate persons or

entities must give fair notice of conduct that is forbidden or required." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). To that end, the Due Process Clause of the Fourteenth Amendment forbids states from enacting "[v]ague laws." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). A plaintiff may succeed on a facial vagueness challenge by making either of two showings.[16]

First, a law is impermissibly vague if it does not provide fair notice of the conduct it prohibits. Hill v. Colorado, 530 U.S. 703, 732 (2000). "Vague laws may trap the innocent by not providing fair warning." Grayned, 408 U.S. at 108. That is all the truer when the law omits a scienter requirement—i.e., a requirement that the person act with a sufficiently culpable mental state. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982); see Scienter, Black's Law Dictionary (12th ed. 2024). And where a vague law regulates speech, the Constitution requires even greater clarity. Hoffman Ests., 455 U.S. at 499; accord, e.g., Smith v. Goguen, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."). That is so given the "supremely precious" yet

---

[16] At the hearing on plaintiffs' preliminary injunction motion, the parties agreed that Judge Barbadoro's analysis in Local 8027 regarding the standard of review for facial vagueness challenges applies in this case. See Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut, 651 F. Supp. 3d 444, 459 (D.N.H. 2023) ("Local 8027 I"); see also Nat'l Educ. Ass'n, 779 F. Supp. 3d at 186 (adopting Judge Barbadoro's analysis). Thus, the fact that some conduct may "clearly fall[ ] within the [laws'] scope is insufficient to defeat plaintiffs' vagueness claim." Local 8027 I, 651 F. Supp. 3d at 459.

"delicate and vulnerable" nature of the right to free speech. NAACP v. Button, 371 U.S. 415, 433 (1963). Vague laws engender self-censorship, causing "citizens to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." Grayned, 408 U.S. at 109 (ellipsis omitted) (quoting Baggett v. Bullitt, 377 U.S. 360, 372 (1982)); accord Button, 371 U.S. at 433 ("The threat of sanctions may deter . . . almost as potently as the actual application of sanctions."); see also Arnett v. Kennedy, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting) (vague laws "hang over [citizens'] heads like a sword of Damocles . . . for the value of a sword of Damocles is that it hangs—not that it drops"). "Such self-censorship is inimical to our democracy, as 'the right to speak freely and to promote diversity of ideas and programs is one of the chief distinctions that sets us apart from totalitarian regimes.'" Local 8027 II, 2024 WL 2722254, at *6 (brackets and ellipsis omitted) (quoting Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949)).

Second, a law is impermissibly vague if it authorizes or encourages arbitrary enforcement. Hill, 530 U.S. at 732. "A vague law impermissibly delegates basic policy matters to [those charged with enforcing the law] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S. at 108-09. When a law fails to provide "minimal guidelines" governing its enforcement, it may sweep in so much conduct that, in practice, the only actions or entities subject to enforcement are those that raise the ire of the enforcement authority's "personal predilections." Kolender v. Lawson, 461 U.S. 352, 358 (1983) (quoting Goguen, 415 U.S. at 575). "In that sense, the doctrine

27

is a corollary of the separation of powers—requiring that [the legislature], rather than the executive or judicial branch, define what conduct is sanctionable and what is not." Sessions v. Dimaya, 584 U.S. 148, 156 (2018) (plurality opinion); accord City of Chicago v. Morales, 527 U.S. 41, 60 (1999) (explaining that void-for-vagueness doctrine prohibits legislatures from "entrust[ing] lawmaking to the moment-to-moment judgment of the policeman on his beat" (quoting Kolender, 461 U.S. at 360)). A legislature may not "set a net large enough to catch all possible offenders," and leave it to the executive branch "to step inside and say who could be rightfully detained, and who should be set at large." Kolender, 461 U.S. at 358 n.7 (quoting United States v. Reese, 92 U.S. 214, 221 (1875)).

At the same time, a law is not void for vagueness simply because its terms are not "surgically precise." Draper v. Healey, 827 F.3d 1, 4 (1st Cir. 2016) (Souter, Circuit Justice) (quoting URI Student Senate v. Town of Narragansett, 631 F.3d 1, 14 (1st Cir. 2011)). "Because 'words are rough-hewn tools . . . some degree of inexactitude is acceptable in statutory language." Id. (quoting URI Student Senate, 631 F.3d at 14). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." United States v. Williams, 553 U.S. 285, 306 (2008).

The court must determine whether the anti-DEI laws satisfy these standards. In so doing, the court must construe the statutes according to the New Hampshire Supreme Court's principles of statutory interpretation. See Local 8027

28

II, 2024 WL 2722254, at *8 (explaining that a court considering a vagueness challenge to New Hampshire laws must "first attempt to determine what [the laws] prohibit . . . using the interpretive principles that the New Hampshire Supreme Court employs when it interprets legislation"). The New Hampshire Supreme Court will "first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." Att'y Gen. v. Hood, 177 N.H. 176, 181 (2025). The Court "interpret[s] the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. And the Court will not "consider words and phrases in isolation, but rather within the context of the statute as a whole." Id.

The anti-DEI laws provide that no "public entity" or "public school" may "implement, promote, or otherwise engage in any DEI-related initiatives, programs, training or policies." RSA 21-I:113; RSA 186:72. "Diversity, equity, or inclusion," or "DEI," is defined as "any program, policy, training, or initiative that classifies individuals based on" age, sex, gender identity, race, creed, color, marital status, familial status, physical or mental disability, or national origin, "for the purpose of achieving demographic outcomes, rather than treating individuals equally under the law." RSA 21-I:112, II; RSA 186:71, I; see RSA 354-A:1. The statutes do not define what it means to "classif[y] individuals" based on one of these enumerated characteristics, nor do they define what it means for such a classification to have a "purpose of achieving demographic outcomes." RSA 21-I:112, II; RSA 186:71, I. When statutory terms are undefined, the New Hampshire Supreme Court construes

29

them according to their common usage, using a dictionary for guidance. In re Carter, 176 N.H. 635, 638 (2024).

"Classify" is defined as "to consider (someone or something) as belonging to a particular group." Classify, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/classify (last visited Oct. 1, 2025). "Demographics" is defined as "the statistical characteristics of human populations (such as age or income) used especially to identify markets." Demographic, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/demographic (last visited Oct. 1, 2025). And "outcome" means "something that follows as a result or consequence." Outcome, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/outcome (last visited Oct. 1, 2025). Taken together, these definitions suggest that the anti-DEI laws prohibit public entities and public schools from considering a person as belonging to an enumerated demographic group set forth in RSA 354-A:1 (such as a particular age, race, sex, gender identity, or disability status) for the purpose of achieving a result that relates to one of those enumerated characteristics. Indeed, the parties agree that the statutes' plain language is best read in this way. See doc. no. 14-1 at 20; doc. no. 26 at 19.

For defendants, that is the end of the matter. They argue that, because one can construe the statutes' terms according to their common usage and paraphrase their requirements, the statutes comport with due process. But the void-for-vagueness doctrine is not satisfied merely because the terms used in a statute are "real words found in an English dictionary." Honeyfund.com, Inc. v. DeSantis, 622

F. Supp. 3d 1159, 1181 (N.D. Fla. 2022). Where the plain language of a statute prohibits such a wide swath of conduct that it authorizes or encourages arbitrary and discriminatory enforcement, the statute is void for vagueness. Kolender, 461 U.S. at 358.

Such is the case here. To "classify" someone based on their age, race or gender, for example, simply means to identify a person as belonging to a particular age group, race or gender. Thus—as the parties agree—the anti-DEI laws prohibit public entities and public schools from identifying a person based on their age, race, gender, or other enumerated characteristic for the purpose of achieving anything related to that identified characteristic. The plain language of the anti-DEI laws prohibits schools and their teachers from, among other things:

- Identifying students based on age for the purpose of ensuring that children enrolling in kindergarten will be five years old by September 30 of the year of their enrollment;

- Identifying students based on age for the purpose of ensuring that children between the ages of six and eighteen are attending school as required by New Hampshire's compulsory attendance law, RSA 193:1;

- Identifying students based on sex or gender identity for the purpose of having a basketball team restricted to that sex or gender identity;

- Identifying students based on sex or gender identity for the purpose of restricting bathrooms to members of a particular sex or gender identity;

- Identifying students with disabilities as having disabilities for the purpose of ensuring such students are receiving accommodations needed to function in a given academic environment;

31

- Identifying students with mental health diagnoses for the purpose of ensuring that such students have adequate access to their guidance counselors;

- Identifying Tom Robinson (in the book "To Kill A Mockingbird") as a Black man for the purpose of giving students an understanding of the discrimination historically experienced by Black Americans;

- Identifying students by national origin for the purpose of ensuring that students who are not fluent in English receive an opportunity to develop English-speaking proficiency.

The breadth of the anti-DEI laws' prohibition is startling. The definition of "DEI" contained therein is so far-reaching that it prohibits long-accepted—even legally required—teaching and administrative practices. It is hard to imagine how schools could continue to operate at even a basic level if the laws' prohibitions were enforced to their full extent.

What is more, the anti-DEI laws do not simply prohibit schools and public entities from implementing, promoting or engaging in initiatives, programs, trainings, or policies that come within this expansive definition of DEI. They prohibit implementing, promoting, or engaging in those things to the extent they are "DEI-related." RSA 21-I:113; RSA 186:72 (emphasis added). Nowhere in the anti-DEI laws is there a definition of "DEI-related," or any criteria by which to assess how "related" a program or policy must be to one that comes within the definition of DEI in order to be prohibited. So, not only is a school prohibited from, for example, classifying students based on age to achieve existential requirements necessary to operate a public school district—they are also prohibited from doing anything "related" to that forbidden classification.

32

Defendants make the breathtaking assertion that, far from a fatal flaw, the anti-DEI laws' breadth in banning "DEI-related" programs dispels vagueness concerns. In responding to the concern that the anti-DEI laws do not provide criteria to determine how "related" a program, training, policy, or initiative must be to "DEI," defendants state:

> The answer is[:] <u>at all</u>. An initiative, policy, or program either classifies people based on certain characteristics for the purpose of achieving outcomes based on demographics, or it does not. <u>If it does, even if the impermissible classification were subtle and the intended demographic outcome unremarkable, then it violates the challenged provisions</u>. That much is made clear by the statutes' lack of exceptions. The statute provides for no circumstance in which it is permissible to classify people based on [age, sex, gender identity, race, creed, color, marital status, familial status, physical or mental disability, or national origin] for the purpose of achieving outcomes based on demographics.

Doc. no. 26 at 21-22 (emphasis added). Defendants are correct insofar as the statutes' breadth is clear. This fact does not render them constitutional. To the contrary, as this court explained in <u>National Education Association</u>, "[t]he Supreme Court has repeatedly struck down legal prohibitions that sweep in a wide swath of conduct while leaving individual enforcement decisions to the subjective determinations of enforcement authorities." <u>Nat'l Educ. Ass'n</u>, 779 F. Supp. 3d at 187.

In <u>Kolender</u>, for example, the Supreme Court held unconstitutionally vague a criminal statute that required persons to provide "credible and reliable" identification when subject to a <u>Terry</u> stop because the statute conferred "virtually complete discretion" on officers to determine when a person's identification was

sufficient and provided "a convenient tool for harsh and discriminatory enforcement by local prosecuting officials . . . against particular groups deemed to merit their displeasure." Kolender, 461 U.S. at 353-54, 358, 360 (quoting Papachristou v. City of Jacksonville, 405 U.S. 156, 170 (1972)). And in Goguen, the Court struck down a statute that prohibited the "contemptuous[ ]" treatment of the American flag; the statute was so "unbounded [as] to prohibit . . . any public deviation from normal flag etiquette," which left police and prosecutors free to "pursue their personal predilections" in enforcing the law and "free to react to nothing more than their own preferences for treatment of the flag." Goguen, 415 U.S. at 567-69, 575, 578 (quotation omitted).

As the Court said in Papachristou, "[a] direction by a legislature to the police to arrest all 'suspicious' persons would not pass constitutional muster." Papachristou, 405 U.S. at 169 (footnote omitted). That is so even though the word "suspicious" is simple and may be looked up in the dictionary. To the contrary, such a law offends the Constitution because "[t]hose generally implicated by the imprecise terms of the [law]—poor people, nonconformists, dissenters, idlers—may be required to comport themselves according to the [lifestyle] deemed appropriate by the . . . police and courts." Id. at 170. But in our Constitutional system, it is the people's representatives—the legislatures—who make the law, not the police or those charged with the law's enforcement. Dimaya, 584 U.S. at 156; see also id. at 182 (Gorsuch, J., concurring in part and concurring in the judgment) ("Allowing the legislature to hand off the job of lawmaking risks substituting this design for one

where legislation is made [by] a mere handful of unelected judges and prosecutors free to 'condemn all that they personally disapprove of and for no better reason than they disapprove it.'" (brackets omitted) (quoting Jordan v. De George, 341 U.S. 223, 242 (1951) (Jackson, J., dissenting))).

Guided by these principles, several courts, including this one, have struck down similar anti-DEI laws as void for vagueness. See Nat'l Educ. Ass'n, 779 F. Supp. 3d at 188; Am. Fed'n of Teachers v. Dep't of Educ., --- F. Supp. 3d ----, 2025 WL 2374697, at *30 (D. Md. Aug. 14, 2025) (ban on DEI void for vagueness where the ban "leaves it entirely within [the Department of Education's] discretion to decide what conduct counts as DEI at all, and what conduct is unlawful DEI"); Perkins Coie LLP v. U.S. Dep't of Justice, 783 F. Supp. 3d 105, 174-77 (D.D.C. 2025) (finding executive order that targeted law firm for DEI practices void for vagueness because "even the government cannot decide what exactly the grounds for its actions were"), appeal filed, No. 25-5241 (D.C. Cir. July 2, 2025); NAACP v. U.S. Dep't of Educ., 779 F. Supp. 3d 53, 66-67 (D.D.C. 2025) (ban on DEI void for vagueness where prohibition was so broad that "agency decisionmakers will shape [the ban's] contours through their enforcement decisions" (quoting Nat'l Ass'n of Diversity Offs. in Higher Educ. v. Trump, 767 F. Supp. 3d 243, 278 (D. Md. 2025))); see also Local 8027 II, 2024 WL 2722254, at *15-16 (striking down law that prohibited the teaching of "divisive concepts" as impermissibly vague where law was so indeterminate that enforcement decisions were being made based on Commissioner's personal opinions as expressed in op-ed articles); Tenn. Educ. Ass'n

35

v. Reynolds, 732 F. Supp. 3d 783, 809 (M.D. Tenn. 2024) ("[T]he Act does not so much forbid teachers from suggesting that, for example, Americans are not created equal, so much as it prohibits teachers from suggesting that Americans are not created equal as the Commissioner understands that concept—an understanding that the Commissioner does not have to share with the public until after a school district . . . face[s] enforcement."); Honeyfund.com, 622 F. Supp. 3d at 1184 ("[L]acking explicit standards to circumscribe enforcement of 'objectivity,' Defendants can weaponize this term to further discredit the prohibited concepts.").

The anti-DEI laws do not simply ban public schools and public entities from engaging in "DEI-related activities," however. They also prohibit the expenditure of "state funds . . . for DEI-related activities, including but not limited to implicit bias training, DEI assessments, critical race theory, or race-based hiring, promotion, or contracting preferences." RSA 21-I:113; RSA 186:72. Use of the phrase "including but not limited to" indicates legislative intent for these specified categories to constitute illustrative examples of "activities" that are "related" to DEI. See In re Liquidation of Home Ins. Co., 158 N.H. 396, 399-400 (2009). Yet, as the government acknowledges, a "training" on implicit bias, depending on the manner in which it was conducted, might not meet the definition of DEI set forth in the statute if the "purpose" of the training is not to "achiev[e] demographic outcomes." RSA 21-I:112, II; RSA 187:71, I; see Local 8027 II, 2024 WL 2722254, at *9 (explaining that implicit bias is a "broadly accepted form of bias" pursuant to which one holds an unconscious, negative attitude toward a particular social group). It is true that

36

listing specific categories that are "included" within a general category can assist in ascribing a limiting construction to the general category. See In re J.H., 176 N.H. 238, 243 (2023). Here, however, the inclusion of specific statutory categories purported to be illustrative of "DEI-related activities" exacerbates rather than diminishes vagueness concerns, because "implicit bias training" and "critical race theory" do not necessarily meet the statutory definition of "DEI," and are not necessarily "related" to that definition either.

Ultimately, the ban on "DEI-related" activities in the anti-DEI laws is so broad that the laws' contours—the activities that the laws actually prohibit—will necessarily be shaped by the manner in which enforcement decisions are made. But "[t]he government cannot simply tell people to 'be good' and leave it up to the enforcers to decide what 'good' is." Tenn. Educ. Ass'n, 732 F. Supp. 3d at 808. Such a broad, indeterminate law both fails to give adequate notice of what is prohibited, and impermissibly delegates lawmaking to unelected officials.

The scope of the ban on DEI-related activities in the challenged laws leaves open the danger that those who will be subject to enforcement will be those who run afoul of the enforcement authorities' subjectively held "political, social, and moral assumptions." Id. at 807. The record demonstrates that the laws are already being enforced arbitrarily.

The anti-DEI laws prohibit "public school[s]" from "engag[ing] in DEI-related initiatives, programs, training, or policies." RSA 186:72. The phrase "public school," however, is broadly defined to include "any school, academic institution, or

37

institution of higher education in this state supported by public funds." RSA 186:71, II. In light of the Department of Education's July 17 letter to institutions of higher learning, it is clear that the Department is interpreting this definition as encompassing private universities and colleges that are "supported by public funds" in the form of state-funded scholarships—even those receiving comparatively little funding from such scholarships. See doc. no. 15-3 at 2-5. This includes religious colleges like Saint Anselm College. See id. However, the Department is not enforcing the anti-DEI laws against private and religious K-12 schools "supported by public funds" in the form of Education Freedom Accounts, or EFAs, under RSA chapter 194-F.[17] In the 2024-2025 school year, nearly $28 million in public funds was disbursed via EFAs.[18] In previous years, as much as ninety percent of funds distributed via EFAs was spent toward the cost of tuition at religious schools.[19] The court takes judicial notice that the former Commissioner of the Department—who

---

[17] EFAs allow eligible New Hampshire students to direct state-funded per-pupil education grants toward education expenses associated with enrollment at nonpublic schools, including religious schools. See RSA 194-F:2.

[18] Press Release, New Hampshire Department of Education, Expanding learning options statewide, more than 5,000 students participate in fourth year of Education Freedom Accounts (Nov. 14, 2024), https://www.education.nh.gov/news-and-media/expanding-learning-options-statewide-more-5000-students-participate-fourth-year-education-freedom.

[19] Jeremy Margolis, Inside EFAs: A quarter of all Education Freedom Account tuition dollars went to five Christian schools, Monitor analysis finds, Concord Monitor (Dec. 9, 2024), https://www.concordmonitor.com/2024/12/09/education-freedom-account-funding-analysis-new-hampshire-tuition-religious-schools-58220424/.

was still serving as the Commissioner at the time of the Department's July letters to K-12 schools and colleges—has repeatedly made public statements of support for EFAs.[20] See Fed. R. Ev. 201(b)(2) (providing that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). The incongruity in enforcing the anti-DEI laws against private colleges and universities supported by state-funded scholarships, but not private K-12 schools supported by EFAs, demonstrates that the laws permit or encourage arbitrary enforcement based on an enforcement authority's subjective preferences.

The standardless sweep of the anti-DEI laws is exacerbated by the lack of a scienter requirement. "[T]he [Supreme] Court has recognized that a scienter requirement may mitigate a law's vagueness," Hoffman Ests., 455 U.S. at 499, because it "limits a law's scope to those who knowingly engage in a particular course of conduct," Local 8027 II, 2024 WL 2722254, at *14. In other words, a scienter requirement ordinarily requires that a person act with a culpable, or blameworthy, mental state. Such requirements reduce the possibility that a person will be held responsible for certain actions without fair notice that such actions are prohibited. See, e.g., Frese v. Formella, 53 F.4th 1, 4, 11 & n.8 (1st Cir. 2022)

---

[20] See, e.g., Frank Edelblut, Public education for all, New Hampshire Union Leader (Dec. 21, 2024), https://www.unionleader.com/opinion/op-eds/frank-edelblut-public-education-for-all/article_a64a263a-bbb6-11ef-90e2-4f7979de820e.html; WMUR-TV, Frank Edelblut touts unheralded changes as he prepares to depart Department of Education | CloseUp, YouTube (May 18, 2025), https://www.youtube.com/watch?v=JdUH1uQ9LhA.

(rejecting vagueness challenge to state criminal defamation statute in part because statute required that defendant "purposely" communicate a statement he "knows" is false and "knows" is likely to expose another person to disapproval (quoting RSA 644:11, I)).

The anti-DEI laws do not require that a violator act with a culpable mental state. They do not require that the violator act intentionally, willfully, knowingly, recklessly, or even negligently. See, e.g., RSA 626:2, II, IV (establishing and defining culpable mental states for purposes of New Hampshire's criminal code). To the contrary, the anti-DEI laws specifically provide that a public school loses all sources of public funding if the school acts "unknowingly." RSA 186:77 (emphasis added). This is of great concern given that: (1) the definition of "DEI" is so broad that it encompasses fundamental educational and administrative practices necessary for schools to function on a day-to-day level; (2) the anti-DEI laws do not simply prohibit activities falling within that expansive definition but rather prohibit anything "related" to that definition, without defining how close the relation must be; and (3) some of the laws' illustrative examples of "DEI-related activities" ("implicit bias training" and "critical race theory") can be undertaken in at least some instances without a purpose to achieve a particular demographic outcome, which would make them unrelated to the definition of "DEI." In short, the anti-DEI laws' prohibitions border on unintelligible, yet a school can be punished without even realizing they have done something wrong.

Nor can the court ignore the crippling penalties for noncompliance. The greater the consequences for noncompliance with a law, the more courts will insist on precision in delineating the conduct the law prohibits. Local 8027 II, 2024 WL 2722254, at *7. While the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," Hoffman Ests., 455 U.S. at 498-99, "due process protections against vague laws are 'not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute,'" Dimaya, 584 U.S. at 184 (Gorsuch, J., concurring in part and concurring in the judgment) (quoting Giaccio v. Pennsylvania, 382 U.S. 399, 402 (1966)). Indeed, "civil laws regularly impose penalties far more severe than those found in many criminal statutes." Id.

RSA 186:77 provides that, if a public school "unknowingly" violates "any section" of RSA 186:72 through :77, the Commissioner of the Department of Education "shall immediately halt all sources of public funding to that public school, until such time as the school comes into compliance with all sections" of RSA 186:72 through :77. This mandatory termination of "all sources of public funding" includes all sources of state funds, and arguably extends to federal funds that the Department is responsible for disbursing to public schools and school districts. The termination of public funding poses an existential threat to public schools. Schools cannot meet their obligations to educate New Hampshire's children without public funding. The evidence in the record demonstrates that, if faced with a loss of state or federal funding, a school district would need to make severe cuts, including by:

laying off staff; eliminating extracurricular and elective offerings; limiting advanced placement programs; cutting mental health, alcohol, and drug counseling; increasing class sizes by as much as 100%; eliminating field trips; and reducing or eliminating maintenance or renovation efforts. Depending on the Commissioner's assessment of the breadth of "public funds"—i.e., if the Commissioner interpreted that phrase to encompass federal, state, and local funds—violation of the anti-DEI laws could risk "collapse of [an] entire [school] district." Doc. no. 15-40 at 12.

Speaking of the import of the Commissioner's interpretation of the anti-DEI laws, it bears repeating that those laws provide no mechanism for a public school to challenge a determination by the Commissioner that the school has committed a violation. If the Commissioner concludes that a school has violated his or her beliefs as to what conduct is punishable under the anti-DEI laws, the only way for that school to regain critical public funding is to bow to the Commissioner's demands. But even then, the anti-DEI laws do not require the Commissioner to provide an explanation for any determination of noncompliance. They do not set forth any criteria by which the Commissioner is to judge whether a given activity is sufficiently "related" to DEI so as to come within the laws' prohibitions. Indeed, the anti-DEI laws do not delegate rulemaking authority, and the July letters to K-12 schools and institutions of higher learning provide no guidance on the laws, other than parroting the statutes' language. Nor do the laws provide an avenue for the return of funds that were "halt[ed]" as a result of a determination of noncompliance by the Commissioner.

42

The Commissioner's unreviewable authority to impose severe financial penalties upon public schools itself poses a danger of arbitrary enforcement, as demonstrated by the Department of Education's July 11 letter to public schools. In that letter, the Commissioner instructed public schools to complete a "certified report of compliance" under "pains and penalties of perjury" attesting to whether the school has (1) entered into any contract containing DEI-related provisions, (2) implemented, promoted, or engaged in any DEI-related initiatives, training, assessments, or policies, or (3) used state funds for DEI-related activities. Doc. no. 15-2. However, while the anti-DEI laws do require public schools to submit a signed and certified report "identifying any contract containing DEI-related provisions," RSA 186:75, they do not require public schools to affirmatively disclose whether they have previously, or are currently, engaged in DEI-related activities, or whether they have expended, or are expending, state funding on such activities. Yet the Commissioner is purporting to require public schools to do so anyway, or else face a loss of all sources of public funding. But the anti-DEI laws provide no way for schools to challenge the Commissioner's conclusion that she is empowered to require schools to undertake reporting obligations that appear nowhere in the anti-DEI laws, or else face termination of all sources of public funding. Unless public schools are willing to forego public funding, they must simply bow to the Commissioner's assertion of extra-statutory authority. "The power given to [the Commissioner] is not confided" to her ability to make enforcement decisions within the bounds of her statutory discretion—it "is granted to [her] mere will. It is purely

43

arbitrary, and acknowledges neither guidance nor restraint." Yick Wo v. Hopkins, 118 U.S. 356, 366-67 (1886).

The same holds true for the July 11 letter's assertion that public schools are required to submit the purportedly required certification by September 5, 2025. That date appears nowhere in the anti-DEI laws. Rather, RSA 186:75, II merely requires that public schools "submit a signed and certified report to the [C]ommissioner . . . identifying any contract containing DEI-related provisions" "[n]o later than September 30, 2025." There is no statutory authority for the Commissioner to insist on an earlier reporting deadline than September 30— defendants acknowledged as much at the status hearing in this matter on August 14, 2025. But because schools lack any mechanism to challenge the Commissioner's assertion of a submission deadline absent from the statute, they must simply accede to the Commissioner's imposition of an extra-statutory deadline if they want to keep their funding.

All told, the penalty provisions of RSA 186:77 are devoid of procedural protections for public schools, allowing the Commissioner to hold schools hostage based on his or her own subjective preferences of which "demographic outcomes" are desirable and which are not, with no ability to challenge the Commissioner's opinion, and with no ability to challenge the Commissioner's assertions of authority nowhere conferred upon her by the anti-DEI laws. The Commissioner has unilateral, unreviewable authority to end a public school's existence based on his or

her own undisclosed, unexplained, and unaccountable opinion. In the context of civil statutes, it is hard to imagine a graver penalty.

Before concluding this vagueness analysis, the court pauses to note an argument raised by defendants in another context. In defending against plaintiffs' preemption claim, defendants seek to reassure the court that the anti-DEI laws do not prohibit schools from providing disabled students with the individualized support they need to succeed in school. Defendants' argument is belied by the plain text of the anti-DEI laws for the reasons explained in the court's preemption analysis below—but that is not the point of noting their argument here. That defendants strain to persuade the court that they will not seek to enforce the anti-DEI laws against schools that seek to improve outcomes for disabled students highlights the potential for those laws' misuse. Rather than wield the anti-DEI laws against schools who seek to improve the educational experience of a comparatively politically popular class of students (such as students with disabilities), the anti-DEI laws—with their expansive prohibitions and potential for arbitrary application—are far more likely to be wielded against schools who seek to improve the experiences of politically unpopular minorities. At the same time they handwave the notion that the anti-DEI laws could be used to punish schools seeking to "achieve demographic outcomes" for disabled students, defendants claim the "question is closer" when it comes to whether the anti-DEI laws would be enforced against a school that established a non-discrimination policy intended to protect transgender students. Doc. no. 37 at 5.

45

A chief danger of vague laws is that they permit "selective enforcement against unpopular causes." Button, 371 U.S. at 435. Thus, a statute which sweeps broad swaths of conduct within its scope "may easily become a weapon of oppression, however evenhanded its terms may appear." Id. at 436; accord Yick Wo, 118 U.S. at 373-74. But "[t]he rule of law, evenly applied to minorities as well as majorities, to the poor as well as the rich," to the popular as well as the unpopular, is the glue "that holds society together." Papachristou, 405 U.S. at 171. The rule of law, foundational to our system of governance, demands "equality and justice in its application." Id. The anti-DEI laws authorize the arbitrary and unequal application of harsh penalties against those who seek to protect politically unpopular minorities. Because laws which operate in such a manner threaten our constitutional order, plaintiffs are likely to succeed on their vagueness claim.

C.     Plaintiffs Are Likely to Succeed on the Merits of Their Preemption Claim

In Count III of their complaint, all plaintiffs except New Hampshire Outright bring a claim that the anti-DEI laws conflict with, and are therefore preempted by, the ADA, Section 504, and the IDEA. For the reasons set forth below, plaintiffs are likely to succeed on the merits of this claim as well.

"The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute 'the supreme Law of the Land.'" Kansas v. Garcia, 589 U.S. 191, 202 (2020) (quoting U.S. Const. art. VI, cl. 2). "The Clause provides 'a rule of decision' for determining whether federal or state law applies in a particular situation." Id. (quoting Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324

(2015)). There are "three different types of preemption . . . but all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." Murphy v. Nat'l Collegiate Athletic Ass'n, 584 U.S. 453, 477 (2018).

This case concerns only one type of preemption: conflict preemption. "[C]onflict preemption arises where state law actually conflicts with federal law, for example 'where it is impossible for a private party to comply with both state and federal requirements,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Estes v. ECMC Grp., Inc., 565 F. Supp. 3d 289, 301 (D.N.H. 2020) (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990)). In order to determine whether the anti-DEI laws are in conflict with the ADA, Section 504, or the IDEA, the court must examine the requirements imposed by those statutes and compare them against the requirements of the anti-DEI laws. See Garcia, 589 U.S. at 208 ("[P]reemption arguments . . . must be grounded 'in the text and structure of the statute at issue.'" (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993))).

      1.    Plaintiffs Are Likely to Succeed In Showing that the Anti-DEI Laws Conflict with the ADA and Section 504

"The fundamental purpose of the ADA is 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" Arnold v. United Parcel Servs., 136 F.3d 854, 861 (1st Cir. 1998) (quoting 42 U.S.C. § 12101(b)(1)), abrogated on other grounds by Sutton

v. United Air Lines, Inc., 527 U.S. 471 (1999). The purpose of Section 504 has been similarly described. See Alexander v. Choate, 469 U.S. 287, 295-96 & n.13 (1985) (noting statements of congressional intent to "no longer tolerate the invisibility of the handicapped in America" (quoting 118 Cong. Rec. 525-26 (1972))). Both statutes were based upon a determination by Congress that discrimination against the disabled was "most often the product . . . of benign neglect" rather than "invidious animus." Id. at 295; accord A.J.T. ex rel. A.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279, 605 U.S. 335, 358-59 (2025) (Sotomayor, J., concurring). In order to remedy discrimination against disabled individuals stemming from such benign neglect, the ADA and Section 504 expressly require that covered entities afford disabled individuals with individualized treatment in order to provide equality of opportunity.

For example, Title II of the ADA, which applies to public school districts, see 42 U.S.C. § 12131(1)(B), provides that a "qualified individual with a disability" is a person with a disability who is able to engage in a school's services or programs when afforded "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. § 12131(2). The ADA requires covered entities to provide reasonable modifications to qualified individuals when failing to provide such modifications would result in the person being "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a [covered] entity." Id. § 12132. Section 504 similarly requires schools receiving

48

federal funding to provide disabled individuals with reasonable accommodations necessary to access the school's programs and services. See Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 287 n.17 (1987); Vergara v. Wesleyan Acad., Inc., Civ. No. 17-1013 (PG), 2019 WL 4199911, at *12 (D.P.R. Sept. 4, 2019).

Simply stated, the ADA and Section 504 require covered entities to treat qualified individuals with disabilities differently than how they treat individuals without disabilities when such differing treatment is reasonable and necessary to permit individuals with disabilities to access the covered entity's programs or services. This necessarily entails that the covered entity "classif[y] individuals" based on one of the characteristics forbidden in the anti-DEI laws—disability—"for the purpose of achieving demographic outcomes," i.e., providing disabled individuals with an opportunity to access the benefits of a covered entity's programs or services. RSA 21-I:112, II; RSA 186:71, I; see RSA 354-A:1. The ADA and Section 504 require schools to treat disabled students differently in order to achieve disability-related outcomes, yet the anti-DEI laws forbid this same conduct. "When federal law [requires] an action that state law [forbids], the state law is 'without effect.'" Mut. Pharm. Co. v. Bartlett, 570 U.S. 472, 486 (2013) (quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)). Thus, plaintiffs are likely to succeed on their claim that the ADA and Section 504 preempt the anti-DEI laws.

In arguing to the contrary, defendants note that the anti-DEI laws prohibit classifying individuals by disability for the purpose of achieving demographic outcomes, but not for the purpose of "treating individuals equally under the law."

49

RSA 21-I:112, II; RSA 186:71, I. Defendants contend that providing reasonable accommodations to disabled individuals is for the purpose of treating individuals equally under the law, such that the anti-DEI laws are in harmony with the ADA and Section 504.

Defendants conflate equality of <u>treatment</u> with equality of <u>opportunity</u>. The ADA and Section 504 expressly require that covered entities treat children with disabilities <u>differently</u> than children without disabilities when differing treatment is necessary to prevent exclusion on the basis of disability. Indeed, the entire "point of an 'accommodation'" is that "children with disabilities receive different treatment." Lartigue v. Northside Indep. Sch. Dist., 100 F.4th 510, 521 (5th Cir. 2024). "By definition, any special 'accommodation' requires the [covered entity] to treat an [individual] with a disability differently, i.e., preferentially." US Airways, Inc. v. Barnett, 535 U.S. 391, 397 (2002). Thus, "preferential treatment of [individuals with disabilities] is necessary to effectuate the ADA," and, by extension, Section 504. Eustace v. Springfield Pub. Schs., 463 F. Supp. 3d 87, 103 (D. Mass. 2020); see Theriault v. Flynn, 162 F.3d 46, 48 n.3 (1st Cir. 1998) (noting that "Title II of the ADA was expressly modeled after Section 504 . . . and is to be interpreted consistently with that provision").

Defendants also argue that the presumption against preemption applies in this case. This presumption is "sometimes invoked" by the Supreme Court in Supremacy Clause cases. Arizona v. Inter Tribal Council of Ariz., Inc., 570 U.S. 1, 13 (2013). "Where it applies," a court considering a preemption challenge "start[s]

with the assumption" that Congress usually does not intend to supplant "the historic police powers of the States." Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Because "'Congress does not exercise lightly' the 'extraordinary power' to 'legislate in areas traditionally regulated by the States,'" overcoming the presumption against preemption requires evidence that preemption "was the clear and manifest purpose of Congress." Id. (first quoting Gregory v. Ashcroft, 501 U.S. 452, 460 (1991), then quoting Rice, 331 U.S. at 230).

However, a conclusion that a federal law preempts a given state law "requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility." Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963); see, e.g., Mut. Pharm. Co., 570 U.S. at 479-80. "[A]ny state law, however clearly within a State's acknowledged power, which . . . is contrary to federal law, must yield." Felder v. Casey, 487 U.S. 131, 138 (1988). Here, even assuming the presumption against preemption applies, that presumption is overcome because simultaneous compliance with the federal and state laws is impossible, rendering the state laws preempted.

#### 2. Plaintiffs Are Likely to Succeed in Showing That the Anti-DEI Laws Conflict With the IDEA

As with the ADA and Section 504, the IDEA requires schools to afford differential treatment to children with disabilities in order to improve outcomes for disabled children. The express purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique

51

needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To achieve this purpose, the IDEA imposes several conditions on public schools in exchange for receipt of federal funding.

Under the IDEA, public schools have an affirmative obligation to identify, locate, and evaluate all children with disabilities to ensure that children with disabilities receive needed special education and related services. 20 U.S.C. § 1412(a)(3); accord Sch. Bd. of the City of Norfolk v. Brown, 769 F. Supp. 2d 928, 942 (E.D. Va. 2010). This system is known as the "[c]hild find" system. 20 U.S.C. § 1412(a)(3). The child find provision of the IDEA "requires that [local education agencies] develop policies and procedures that will enable children with disabilities in need of special education and related services to be identified." A.P. ex rel. Powers v. Woodstock Bd. of Educ., 572 F. Supp. 2d 221, 225 (D. Conn. 2008). These policies and procedures must also locate "[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade," as well as "[h]ighly mobile children, including migrant children." 34 C.F.R. § 300.111(c). Failure to identify, locate, or evaluate a child with a disability may constitute a procedural violation of the IDEA and subject the school district to liability thereunder. See Mr. P. v. W. Hartford Bd. of Educ., 885 F.3d 735, 750 (2d Cir. 2018)

Once an eligible child with disabilities is identified, located, and evaluated, the school must develop and implement an "individualized education program," or "IEP," for that child, to ensure that they receive the "free appropriate public

education," or "FAPE," required by the IDEA. 20 U.S.C. §§ 1401(9), 1412(a)(1)(A), 1414(d). Among other things, an IEP must include:

- "a statement of the child's present levels of academic achievement and functional performance, including . . . how the child's disability affects the child's involvement and progress in the general educational curriculum," id. § 1414(d)(1)(A)(i)(I)(aa);

- "a statement of measurable annual goals, including academic and functional goals," which must be designed to meet the child's individual needs "that result from the child's disability," id. § 1414(d)(1)(A)(i)(II)(aa);

- "a statement of the special education and related services and supplementary aids and services" that will be provided to the child, id. § 1414(d)(1)(A)(i)(IV);

- "a statement of the program modifications . . . that will be provided for the child . . . to be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities," id. § 1414(d)(1)(A)(i)(IV)(bb); and

- "a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance on the child on State and districtwide assessments," id. § 1414(d)(1)(A)(i)(VI)(aa).

In implementing a child's IEP, schools must ensure that "children with disabilities . . . are educated" in the "[l]east restrictive environment," meaning that they must be educated alongside "children who are not disabled" to "the maximum extent appropriate." Id. § 1412(a)(5)(A). Schools must also provide disabled students with behavioral supports to avoid disciplining students based on manifestations of their disabilities. Id. § 1415(k)(1)(D).

As the foregoing discussion makes clear, the IDEA requires conduct that the anti-DEI laws forbid: classifying students based on disability in order to improve

outcomes for students with disabilities. Schools must classify students with disabilities pursuant to the child find system, then develop individualized education plans for such students in order to guarantee a free, appropriate public education suited to their unique needs. A child who suffers from social anxiety might have an IEP that, for example, requires she receive more time for taking tests than other students are given. Or a child with an intellectual disability might have an IEP providing that he receives one-to-one paraprofessional support to enable him to be educated in a general classroom setting alongside nondisabled students. An IEP could provide that a child with autism is exempted from a requirement to attend band or music classes to prevent auditory overstimulation and disruptive manifestations of the student's disability. Or a school could elect to develop an educational curriculum specific to dyslexic students in order to improve dyslexic students' literacy rates. In each of these examples, the school treats students with disabilities differently on the basis of their disability in order to achieve a disability-based result—which the anti-DEI laws prohibit schools from doing. Because the IDEA requires conduct that the anti-DEI laws forbid, plaintiffs are likely to succeed on their claim that the IDEA preempts the anti-DEI laws.[21]

II.    <u>Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Relief</u>

Having determined that plaintiffs are likely to succeed on the merits, the court turns to irreparable harm. Irreparable harm exists when, in the absence of

---

[21] Defendants' arguments to the contrary mirror their arguments regarding the ADA and Section 504. The court is not persuaded by these arguments for the same reason it was not persuaded by them as applied to the ADA and Section 504.

relief, a plaintiff would suffer "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, 102 F.3d 12, 19 (1st Cir. 1996). When, as here, "the likelihood of success on the merits is great," the movant need not make as strong of an irreparable harm showing. EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996).

The injuries that flow from the anti-DEI laws are substantial. Those laws mandate the termination of all sources of public funding to public schools for an unknowing violation of a vague and expansive prohibition that forbids basic educational and administrative practices. Even a temporary loss of public funding would irreparably injure the school district plaintiffs, their teachers, and their students. Indeed, the loss of public funding is an existential threat to the school district plaintiffs. See Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (financial harm can be irreparable where it threatens the movant's existence). Even where a loss of funding would not jeopardize a school or school district's existence, the anti-DEI laws provide no means for the return of funding impermissibly withheld, and sovereign immunity would likely prevent the school districts from seeking the recovery of withheld funds in an action for damages. See, e.g., Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs., 743 F. Supp. 3d 325, 362-63 (D.N.H. 2024) (financial harm constituted irreparable injury for purposes of preliminary injunction where state law under which funds would be

55

clawed back provided no mechanism for reimbursement and sovereign immunity would bar a damages award).

Even without an actual loss of funding, the financial uncertainty faced by school district plaintiffs hinders their ability to budget for the future and educate students. See Bassett v. Snyder, 951 F. Supp. 2d 939, 970 (E.D. Mich. 2013) (noting that "financial uncertainty" may "demonstrate irreparable harm"); doc. no. 15-38 at 15-16; see also S.A. v. Trump, No. 18-cv-03539-LB, 2019 WL 990680, at *9 (N.D. Cal. Mar. 1, 2019) (actions which frustrate an organization's core mission constitute irreparable harm for purposes of preliminary injunction). Even in the context of RSA 21-I:113 and :114, the violation of which does not give rise to the possibility of funding termination, the ban on DEI-related activities contained in those statutes (which apply to school district plaintiffs, see RSA 21-I:112, III) encompasses a ban on foundational education and administrative practices, which hinders the school district plaintiffs' core mission of providing their students with a high quality education. This harm to school district plaintiffs and their students is irreparable because "[c]ompensation in money" cannot undo the lifelong damage caused by "deprivation of a meaningful education in an appropriate manner at the appropriate time." Jon T. ex rel. Paul T. v. Pennsylvania, No. CIV. A. 98-5781, 2000 WL 558582, at *8 (E.D. Pa. May 8, 2000) This is especially true for students with disabilities. Moreover, given that there is no procedure to challenge the Commissioner's determination to terminate funding, in the absence of a preliminary injunction schools will also be forced to censor, discipline, or even fire their employees—

including those who are NEA-NH members—whose conduct is perceived as possibly out-of-line with the Commissioner's subjective preferences. See Nat'l Educ. Ass'n, 779 F. Supp. 3d at 182.

NEA-NH and its members also face irreparable harm. The vague nature of, and potential for arbitrary enforcement engendered by, the anti-DEI laws prevent NEA-NH from: (1) adequately advising its members on how to avoid discipline for running afoul of state and federal law; (2) counseling its members on how to adjust collective bargaining agreements regarding when a school may discipline a teacher for violating state or federal law; or (3) providing professional development services to its members. Such harm to NEA-NH's core activities constitutes irreparable harm for purposes of a preliminary injunction. See id. at 200. In addition, even if NEA-NH's members could achieve full compliance with the anti-DEI laws (which seems impossible given the extent of their prohibitions), full compliance with the anti-DEI laws would require teachers to shirk certification requirements necessary to maintain their teaching credentials. See id. at 192-93 (explaining various certification requirements imposed by New Hampshire regulations which conflicted with a similar DEI ban such that abiding by the DEI ban would put a teacher's teaching license at risk). Loss of the ability to practice one's chosen profession is irreparable harm. Enyart v. Nat'l Conf. of Bar Exam'rs, Inc., 630 F.3d 1153, 1165 (9th Cir. 2011).

In addition, although the anti-DEI laws do not provide for the termination of public funding for "public entities" for violation of RSA 21-I:113 or :114, the

identical ban on "DEI-related" activities and contracts in those statutes interferes with the core activities of plaintiff school districts (which come within the definition of "political subdivision" under RSA 21-I:112, III) and NEA-NH for the reasons already discussed, as well as the core activities of New Hampshire Outright. See S.A., 2019 WL 990680, at *9. New Hampshire Outright's core activities include the provision of trainings at K-12 public schools geared toward enhancing understandings of the experiences faced by LGBTQ+ youth in order to create educational environments where all students can thrive. The anti-DEI laws impair New Hampshire Outright's organizational mission, which constitutes irreparable harm. Id.

Similar to NEA-NH's members, the anti-DEI laws jeopardize Dr. Morris and McKim's ability to practice their chosen profession. Dr. Morris has already had her title stripped as a result of the anti-DEI laws, and McKim's ability to obtain employment as a diversity consultant is in jeopardy.

Defendants argue that plaintiffs' claims of irreparable injury are unfounded because plaintiffs unreasonably delayed in bringing this lawsuit. Although the anti-DEI laws took effect on July 1, 2025 and plaintiffs filed their complaint in this court on August 11, 2025, defendants contend that plaintiffs' failure to act sooner "raises serious questions" about the extent to which they stand to be harmed by the anti-DEI laws. Doc. no. 26 at 42. Defendants' argument is less than persuasive. Plaintiffs filed this action approximately one month after the anti-DEI laws took effect, and less than one month after the Department of Education's letters to

schools and colleges commencing enforcement efforts. They also filed well in advance of the September 30 reporting deadline for public schools set forth in the statute, and approximately one month before the September 5 deadline the Department of Education sought to impose on school districts in their July 11 letter. In addition, plaintiffs' five-count complaint is 109 pages long and is accompanied by 52 exhibits. Those exhibits include extensive legislative history excerpts as well as numerous declarations, all of which are lengthy and detailed. Plaintiffs filed their 63-page motion for a preliminary injunction four days after filing their complaint, which also included numerous attached exhibits.

In these circumstances, the court struggles to understand how any reasonable person could conclude that plaintiffs failed to act expeditiously. The cases relied upon by defendants involved far greater delay. See Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 35 (1st Cir. 2011) (ten years); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004) (plaintiff waited more than a year after bringing suit before seeking preliminary injunction); Health New England, Inc. v. Trinity Health – New England, Inc., Civ. No. 15-30206-MGM, 2016 WL 4925780, at *4 (D. Mass. Sept. 14, 2016) (plaintiff's actions indicated no need for immediate relief where plaintiff knew of action claimed to give rise to injury "at least as early of September of 2015, it commenced this action on November 23, 2015, waited approximately 2 ½ months before requesting and obtaining a waiver of service (thereby extending the date the answer was due until April 11, 2016), and did not file this [preliminary injunction]

59

motion until July of 2016"); Media3 Techs., LLC v. Mail Abuse Prevention Sys., LLC, No. 00-CV-12524-MEL, 2001 WL 92389, at *9 (D. Mass. Jan. 2, 2001) (six-month delay was "some evidence" that irreparable harm was lacking).

For these reasons, and especially in light of the strong showing plaintiffs have made on the merits of their claims, plaintiffs have demonstrated a sufficient likelihood of irreparable harm.

III.    The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction

As noted, when the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. Does 1-6, 16 F.4th at 37. As just discussed, plaintiffs would face substantial and irreparable harm in the absence of preliminary relief. But defendants stand to suffer little harm if a preliminary injunction is granted; a preliminary injunction would merely maintain the status quo prior to the anti-DEI laws' enactment. Moreover, the court has already determined that plaintiffs are likely to be successful in arguing that the anti-DEI laws are unconstitutional. The "government has no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R., 437 F. Supp. 3d 119, 137 (D.P.R. 2020). Thus, the balance of equities and the public interest favor a preliminary injunction.

IV.    Scope of Injunction

The court must next consider the appropriate scope of the preliminary injunction. Plaintiffs request an injunction that would prohibit defendants from enforcing the anti-DEI laws altogether, whereas defendants contend that any injunction must be limited to what is necessary to provide plaintiffs with relief.

As a general matter, "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 702 (1979). In most cases, when a court orders injunctive relief enjoining a governmental defendant from enforcing a particular law, the terms of the injunction will enjoin the defendant from enforcing the law against the plaintiff or other parties to the case but will not expressly enjoin enforcement as to nonparties. Trump v. CASA, Inc., 606 U.S. 831, 837 (2025); see, e.g., Tirrell v. Edelblut, 748 F. Supp. 3d 19, 47-48 (D.N.H. 2024). In CASA, the Supreme Court held that injunctions which "prohibit enforcement of a law or policy" altogether—so-called "universal" or "nationwide" injunctions—"likely exceed the equitable authority that Congress has granted to federal courts" in most circumstances. 606 U.S. at 837. CASA nevertheless acknowledged that district courts possess equitable authority to "administer complete relief between the parties," which sometimes requires that the express terms of an injunction extend to nonparties. Id. at 851 (emphasis omitted) (quoting Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 507 (1928)); see id. at 852-53 (acknowledging in birthright citizenship cases that the district courts could likely "prohibit[ ] enforcement of the Executive Order against the child of an individual pregnant plaintiff" even though

61

the child is not a party, because doing so "will give that plaintiff complete relief: Her child will not be denied citizenship").

The Court in CASA also left open the possibility that, in some cases, an injunction barring enforcement of a challenged law altogether may be necessary to provide "the [plaintiffs] themselves with complete relief." Id. at 853 (emphasis in original); see id. at 853-54 (noting the District of Massachusetts' conclusion that a universal injunction was necessary to provide plaintiff States with complete relief and the parties' arguments for and against that conclusion, but "declin[ing] to take up these arguments in the first instance" and remanding to "[t]he lower courts [to] determine whether a narrower injunction is appropriate"). When the plaintiffs' "injuries" are such that "it is all but impossible for courts to craft relief that is complete and benefits only the named plaintiffs," a universal injunction may be an appropriate exercise of a district court's flexible authority to give an aggrieved plaintiff complete relief. Id. at 852 n.12.

An "archetypal" case fitting this mold, the Court said, is "a nuisance in which one neighbor sues another for blasting loud music at all hours of the night." Id. at 851. There is "only one feasible option" in such a case to give the plaintiff complete relief: "order the defendant to turn her music down." Id. at 851-52. Such an order is no different in effect from a universal injunction; in both cases, the court orders the defendant to cease engaging in unlawful conduct (which benefits the entire neighborhood), rather than cease engaging in conduct just as against the plaintiff.

In this case, plaintiffs assert that a "statewide" injunction is appropriate. Doc. no. 36 at 22. Although plaintiffs do not articulate what they mean by a "statewide" injunction, the court infers that plaintiffs are requesting the court enjoin defendants from enforcing the anti-DEI laws against anyone in the state. Given that the laws plaintiffs seek to enjoin are state laws that do not appear to have extraterritorial effect, plaintiffs are actually requesting a universal injunction by another name. Cf. CASA, 606 U.S. at 837 n.1 ("A universal injunction prohibits the Government from enforcing the law against anyone, anywhere."). It is plaintiffs' burden to demonstrate that an injunction of that scope is appropriate. Id. at 854.

Plaintiffs here fail to meet that high burden. They have not shown that a universal injunction is necessary to provide them with complete relief. Plaintiffs are correct that the Supreme Court has set a "less demanding" standard for success on a facial First Amendment claim (such as plaintiffs assert in Count II) than for other facial challenges in order to "provide breathing room for free expression." Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024) (brackets omitted) (quoting United States v. Hansen, 599 U.S. 762, 769 (2023)). But the extent to which a plaintiff must demonstrate a law's invalidity in order to show a constitutional violation has little to do with whether the injury that flows from the constitutional violation proven can be redressed solely through an indivisible remedy.

When a plaintiff succeeds in bringing a racial gerrymandering claim, for example, a universal injunction may be appropriate not because it is easier to prove a racial gerrymandering claim than other equal protection claims, but because

nothing else would relieve the plaintiff's particularized injury: she has been discriminated against on the basis of race and "denied equal treatment because of the legislature's reliance on racial criteria." United States v. Hays, 515 U.S. 737, 745 (1995); see CASA, 606 U.S. at 852 n.12. In such cases, the only way to provide the plaintiff with complete relief may be to order the legislature to redraw voting districts, which, by definition, is non-plaintiff-specific relief. See, e.g., Reynolds v. Sims, 377 U.S. 533, 585-87 (1964). Apart from identifying that facial First Amendment claims are subject to a lower bar to show a constitutional violation than other facial claims are, plaintiffs offer no argument as to why the injuries they experience from the First Amendment violation they assert can only be remedied by enjoining defendants from enforcing the anti-DEI laws altogether. And, while plaintiffs are of course correct that a universal injunction would redress harms experienced by non-plaintiffs from the anti-DEI laws, that observation is not pertinent to whether a universal injunction would be necessary to redress plaintiffs' harms.

At the same time, an injunction limited to enjoining defendants from enforcing the anti-DEI laws against the named plaintiffs would fail to provide plaintiffs with complete relief. The anti-DEI laws only directly regulate the conduct of "public school[s]," "public entit[ies]," "agencies," and "political subdivisions." RSA 21-I:113, :114; RSA 186:72. Neither NEA-NH, its members, the individual plaintiffs, nor New Hampshire Outright come within any of those categories. Rather, these plaintiffs experience harm through the anti-DEI laws' enforcement against

64

regulated entities that employ or work with plaintiffs or their members. Therefore, to provide these plaintiffs with complete relief, it is necessary to enjoin defendants from enforcing the anti-DEI laws against regulated entities that employ or contract with plaintiffs or plaintiffs' members. Nat'l Educ. Ass'n, 779 F. Supp. 3d at 202.

With respect to the school district plaintiffs, they contend that a universal injunction is necessary to obtain complete relief on their preemption claim. The school district plaintiffs contend that, when they lack necessary resources or expertise to provide a particular disabled student with the unique care they require, they must coordinate with other school districts to meet those students' needs. However, this does not show that a universal injunction is necessary to provide complete relief to the school district plaintiffs—it only shows that the injunction must extend to those entities that assist the school district plaintiffs in meeting their obligations under the ADA, Section 504, or the IDEA. See id.

For these reasons, a universal injunction is broader than necessary to provide plaintiffs with complete relief, but the court must expressly enjoin defendants from enforcing the anti-DEI laws against certain non-parties in order to provide plaintiffs with complete relief.

## V.    Injunction Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." "A district court has 'substantial discretion to

65

dictate the terms of an injunction bond.'" HCC Specialty Underwriters, Inc. v. Woodbury, 289 F. Supp. 3d 303, 330 (D.N.H. 2018) (quoting Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991)). A court may dispense with a bond where one is not requested by the non-movant. Tirrell, 748 F. Supp. 3d at 47. At a status hearing on August 14, defendants stated that they would waive any requirement for a bond in connection with plaintiffs' preliminary injunction motion. See Endorsed Order of Aug. 14, 2025. Defendants thereafter did not request a bond in their preliminary injunction papers. Because defendants have waived bond, the court concludes that a bond is unnecessary.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction (doc. no. 14) is granted as set forth herein:

1.  For purposes of the relief ordered by this order, the term "covered entity" means:

    a.  Any "public entity" within the meaning of RSA 21-I:113 or other entity that meets the definition of "public school" in RSA 186:71, II, "agency" in RSA 21-I:112, I, or "political subdivision" in RSA 21-I:112, III;

    b.  That:

        i.  Employs, contracts with, or works with one or more plaintiffs or one or more of plaintiffs' members or schools; or

66

ii. Provides services to a student of a plaintiff school district under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, or the Individuals with Disabilities Act ("IDEA").

2. Defendants John Formella, in his official capacity as the Attorney General of the State of New Hampshire, Caitlin Davis, in her official capacity as the Commissioner of the New Hampshire Department of Education, Charlie Arlinghaus, in his official capacity as the Commissioner of the New Hampshire Department of Administrative Services, and Monica Mezzapelle, in her official capacity as the State Treasurer of New Hampshire, and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, are enjoined from enforcing or implementing RSA 21-I:112 through RSA 21-I:116 and RSA 186:71 through RSA 186:77, and their reporting and certification requirements, against plaintiffs National Education Association-New Hampshire and its members, Oyster River Cooperative School District, Dover School District, Somersworth School District, Grantham School District, Dr. Dottie Morris, James T. McKim, Jr., New Hampshire Outright, and any covered entity.

3. This injunction shall take effect immediately and shall remain in effect pending further order of this court.

4.      The temporary restraining order issued on September 4, 2025 (doc. no. 38)

and extended on September 17 is hereby dissolved.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

October 2, 2025

cc:     Counsel of Record

68

147 F.4th 720
United States Court of Appeals, Seventh Circuit.

REPORTERS COMMITTEE FOR FREEDOM
OF THE PRESS, et al., Plaintiffs-Appellees,

v.

Todd ROKITA, Attorney General of
Indiana, et al., Defendants-Appellants.

No. 24-2927
|
Argued May 13, 2025
|
Decided August 5, 2025

**Synopsis**
**Background:** Media and media-related organizations brought pre-enforcement action against Indiana Attorney General for injunctive relief, asserting a due process vagueness challenge to Indiana's buffer law making it a misdemeanor to knowingly or intentionally approach within 25 feet of law enforcement officers performing their duties after being ordered to stop approaching. The United States District Court for the Southern District of Indiana, James R. Sweeney, II, Chief Judge, 751 F.Supp.3d 931, denied motion to dismiss for lack of standing but granted motion for preliminary injunction. Attorney General filed interlocutory appeal.

**Holdings:** The Court of Appeals, Pryor, Circuit Judge, held that:

enactment of a second, more narrow buffer law during pendency of appeal did not moot appeal;

organizations had Article III standing;

organizations were likely to succeed on the merits, as factor favoring preliminary injunction; and

abstention to allow Indiana courts to reach a limiting construction that could save buffer law was not appropriate.

Affirmed and remanded.

**Procedural Posture(s):** Interlocutory Appeal; Motion for Preliminary Injunction; Motion to Dismiss for Lack of Standing.

**West Codenotes**

**Validity Called into Doubt**
Ind. Code Ann. § 35-44.1-2-14

Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. No. 23-cv-1805 — **James R. Sweeney II**, *Chief Judge.*

**Attorneys and Law Firms**

KatieLynn Boyd Townsend, Attorney, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, Grayson Clary, Attorney, Reporters Committee for Freedom of the Press, Washington, DC, for Plaintiffs-Appellees.

James A. Barta, Thomas S. Pratt, Jefferson Stewart Garn, Jenna Lorence, Adrienne Pope, Attorneys, Office of the Attorney General, Indianapolis, IN, for Defendants-Appellants Todd Rokita, Ryan Mears.

John P. Lowrey, Attorney, Office of the Corporation Counsel, City of Indianapolis and County of Marion, Indianapolis, IN, for Defendant-Appellant Kerry Forestal.

Before Easterbrook, Brennan, and Pryor, Circuit Judges.

**Opinion**

Pryor, Circuit Judge.

 **\*724** Indiana's "buffer law" makes it a crime for a person to knowingly or intentionally approach within 25 feet of a law enforcement officer who is "lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching." Indiana Code (I.C.) § 35-44.1-2-14.

The plaintiffs, who are various media and media-related organizations, argue that the buffer law is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause because it is susceptible to arbitrary or discriminatory enforcement by the police. The district court concluded that the plaintiffs were likely to succeed in their Fourteenth Amendment challenge to the buffer law, so the court issued a preliminary injunction blocking its enforcement. For the reasons below, we affirm the district court's decision to preliminarily enjoin enforcement of the buffer law.

## I. BACKGROUND

### A. Indiana's Buffer Law

Indiana's "Unlawful Encroachment on an Investigation" law, referenced here as **\*725** the buffer law, took effect on July 1, 2023. It provides:

> A person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching commits unlawful encroachment on an investigation, a Class C misdemeanor.

I.C. § 35-44.1-2-14.

As we recently explained in *Nicodemus v. City of South Bend*, 137 F.4th 654 (7th Cir. 2025), the buffer law operates quite straightforwardly. An officer may only invoke the buffer law against someone who is "approaching," and only someone who nevertheless "knowingly or intentionally approaches" within 25 feet of the officer after being ordered to stop approaching violates the buffer law. *Id.* at 661–62. Nothing in the buffer law allows an officer to order someone to move back. *Id.*

### B. District Court Proceedings

On October 6, 2023, several plaintiffs challenged Indiana's buffer law as facially void for vagueness under the Fourteenth Amendment, facially overbroad under the First Amendment, and failing First Amendment scrutiny as applied to them. The plaintiffs are: The Reporters Committee for Freedom of the Press, a non-profit organization dedicated to First Amendment advocacy on behalf of journalists; the Indiana Broadcasters Association, comprised of more than 250 member radio and television broadcasters; the Indiana Professional Chapter of the Society of Professional Journalists, whose members include full-time Indiana-based reporters; the *Indianapolis Star* newspaper; and Nexstar Media Inc., Scripps Media Inc., and TEGNA Inc., each of which operates local TV news stations and employs full-time reporters. In their complaint, the plaintiffs sought a declaration of the buffer law's unconstitutionality and an injunction restraining the defendants—the Indiana Attorney General, Marion County Prosecutor, and Marion County Sheriff, in their official capacities—from enforcing the buffer law. [1]

On November 3, 2023, the plaintiffs moved for a preliminary injunction, reasserting their constitutional claims and arguing that failure to enjoin enforcement of the buffer law would cause them irreparable harm. On December 1, the State moved to dismiss the lawsuit for lack of jurisdiction, arguing that the plaintiffs lacked standing. FED. R. CIV. P. 12(b)(1).

In a September 27, 2024, order, the district court ruled on both motions. The district court denied the State's motion to dismiss, concluding that it had jurisdiction because the plaintiffs had properly alleged an injury in fact to support their pre-enforcement challenge. Next, the district court granted the plaintiffs' preliminary injunction motion, reasoning that the plaintiffs were likely to succeed on the merits of their Fourteenth Amendment void-for-vagueness claim, that they would suffer irreparable harm to their newsgathering activities absent an injunction, and that the balance of harms and public interest weighed in the plaintiffs' favor. *Reporters Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931, 944–948 (S.D. Ind. 2024); *see Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (explaining considerations underlying a preliminary injunction). The district court did not reach the plaintiffs' First Amendment claims. *Reporters Comm.*, 751 F. Supp. 3d. at 943.

**\*726** The State appeals the district court's order granting preliminary injunctive relief, arguing that the buffer law is not unconstitutionally vague and renewing its objection to the plaintiffs' standing to sue. Such interlocutory appeals are authorized under 28 U.S.C. § 1292(a)(1). *Bevis v. City of Naperville*, 85 F.4th 1175, 1187 (7th Cir. 2023). The district court has stayed further proceedings pending resolution of this appeal.

### C. Indiana's Second Buffer Law

While this appeal was pending, the Indiana legislature passed a second buffer law, which is identical to the buffer law at issue in this case except it specifies that a law enforcement officer may only order an individual to stop approaching if

he "reasonably believes that a person's presence" within 25 feet "will interfere with the performance" of his "duties." This second buffer law was signed by Governor Braun on March 5, 2025, and took effect on July 1, 2025. It is codified adjacent to the original buffer law, at I.C. § 35-44.1-2-15.

## II. DISCUSSION

We begin by assuring ourselves of our jurisdiction. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). We then assess the district court's decision to enter a preliminary injunction in the plaintiffs' favor.

### A. Jurisdiction

We have interlocutory appellate jurisdiction under 28 U.S.C. § 1292(a)(1). But the threshold questions of standing and mootness, which both implicate our subject-matter jurisdiction under Article III of the Constitution, merit further discussion. *Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 813–14 (7th Cir. 2018). We may address standing and mootness "in any order we choose." *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4, 144 S.Ct. 18, 217 L.Ed.2d 155 (2023). We start with mootness.

### 1. Mootness

"It is fundamental to the exercise of judicial power under Article III of the United States Constitution that 'federal courts may not give opinions upon moot questions or abstract propositions.'" *Zessar v. Keith*, 536 F.3d 788, 793 (7th Cir. 2008) (quoting *Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 729 (7th Cir. 2006)). This rule "subsists through all stages of federal proceedings, trial and appellate." *Id.* at 794 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)). Thus, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)). One such event could be the repeal or replacement of a challenged statute. A challenge to the constitutionality of a statute "becomes moot if a new statute is enacted in its place during the pendency of the litigation, and the plaintiff seeks only prospective relief." *Zessar*, 536 F.3d at 793; *Rembert v. Sheahan*, 62 F.3d 937, 940 (7th Cir. 1995).

As mentioned earlier, I.C. § 35-44.1-2-15—Indiana's second buffer law—was passed during the pendency of this appeal. It is narrower than the original buffer law because it requires an officer to have a reasonable belief that someone approaching him will interfere with his duties before he may order the person to stop approaching. The original buffer law contains no reasonable belief requirement. *See* I.C. § 35-44.1-2-14. Since the plaintiffs here **\*727** seek only prospective relief, we must assure ourselves that the second, narrower buffer law has not repealed or replaced the original, broader version, thereby rendering this appeal moot. *See Zessar*, 536 F.3d at 793.

First, I.C. § 35-44.1-2-15 does not purport to repeal or replace any other part of the Indiana Code. Instead, House Bill 1122, which introduced the second buffer law, specified that it would be "added to the Indiana Code as a new section." H.B. 1122, 124th Gen. Assemb. (Ind. 2025). Second, in a supplemental letter to this appeal, the State clarified that the intent behind the second buffer law is to provide "*additional* authority for officers to order someone to stop approaching."[2] At oral argument, which took place before the second buffer law went into effect, the State explained that officers would have discretion to rely on either buffer law when seeking to stop someone from approaching. Because the State intends to continue enforcing the first buffer law, the enactment of the second buffer law did not moot this appeal.

### 2. Standing

Next, we turn to standing, a "bedrock constitutional requirement" rooted in Article III of the Constitution. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024) (quoting *United States v. Texas*, 599 U.S. 670, 675, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023)). Standing at its core is about whether a plaintiff has a "personal stake" in the dispute. *Id.* at 379, 144 S.Ct. 1540. To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380, 144 S.Ct. 1540. The last two requirements—causation and redressability—often go together: after all, if a defendant's action causes an injury, then enjoining that action "will typically redress that injury." *Id.* at 380–81, 144 S.Ct. 1540.

Recall that the plaintiffs here brought a pre-enforcement challenge to the buffer law, arguing in relevant part that

the buffer law is unconstitutionally vague and overbroad. Arguing these theories together is "not unusual." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012). A statute that is too vague may raise the "same chilling concerns that attend an overbreadth challenge." *Bell v. Keating*, 697 F.3d 445, 455 (7th Cir. 2012) (citing *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976)). So, a plaintiff challenging a statute as overbroad under the First Amendment "may also facially challenge [it] as void for vagueness" under the Fourteenth Amendment's Due Process Clause. *Id.* (citing *Penny Saver Publ'ns, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150, 154 n. 2 (7th Cir. 1990)). We focus on vagueness because that is the issue at the center of this appeal.

Relating as it does to due process, the vagueness doctrine "incorporates notions of fair notice or warning." *Smith v. Goguen*, 415 U.S. 566, 572, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). It is unjust to punish a person without providing clear notice as to what conduct is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). A statute that is "so standardless that it authorizes or encourages seriously discriminatory enforcement" similarly leads to concerns about fairness. **\*728** *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). Thus, a vagueness claim alleges that a statute "either fails to provide definite notice to individuals regarding what behavior is criminalized," invites arbitrary or discriminatory enforcement, or both. *Bell*, 697 F.3d at 455 (citing *Skilling v. United States*, 561 U.S. 358, 402–03, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010)).

The State does not contest that the plaintiffs have established an injury in fact for standing purposes, and we see no reason to second-guess the district court's thorough injury analysis. As the district court explained, the plaintiffs submitted affidavits from their journalist members or employees explaining that they conduct newsgathering activities in proximity to police officers every day, and that at least some journalists intend to continue doing so, even if it means flouting the buffer law. Other journalists claim to have engaged in self-censorship by changing how they behave when conducting newsgathering activities near Indiana police officers out of fear that the buffer law will be invoked against them. Given the buffer law's chilling effect on some journalists' speech, and other journalists' intentions to continuing recording police activity, we agree with the district court that the plaintiffs have demonstrated injury in fact. *Bell*, 697 F.3d at 455; *see also Kilborn v. Amiridis*, 131 F.4th 550, 565–66 (7th Cir. 2025).

The State argues, however, that the plaintiffs fail to satisfy the causation and redressability requirements of standing, which are often "flip sides of the same coin." *Sprint Comms. Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). The State maintains that any injury suffered by the plaintiffs is not redressable by enjoining enforcement of the buffer law because law enforcement officers could simply fall back on Indiana's emergency incident statute, which also allows them to ask people to stay at least 25 feet away. We described the emergency incident statute in *Nicodemus*:

> [The statute] makes it a Class A misdemeanor to knowingly or intentionally refuse to leave an emergency incident area when requested to do so by a law enforcement officer. Emergency incidents include crimes scenes, police investigations, and locations where an individual is being arrested. I.C. § 35-44.1-4-1.5. An "emergency incident area" means an area defined by public safety officers either orally or with certain physical markers; or that is 25 feet "in all directions from the perimeter of the emergency incident." I.C. § 35-44.1-4-2.

137 F.4th at 669.

The State's argument fails twice over. First, although there may be some overlap between the buffer law and the emergency incident statute, the overlap is not complete. *See id.* (explaining that "the buffer law aims to fill gaps left by the existing statutory scheme"). As the plaintiffs point out, they conduct newsgathering activities in proximity to the police at a variety of public events—such as public assemblies, rallies, and press conferences—that do not qualify as "emergency incidents." Moreover, an "emergency incident" is defined by a set perimeter; by contrast, the buffer law, by its own terms, operates whenever and wherever a law enforcement officer is "lawfully engaged in the execution" of his duties. I.C. § 35-44.1-2-14. The buffer law applies in a far broader set of situations, as explained below.

Second, even if there were complete overlap, the plaintiffs' injuries would be redressed by enjoining enforcement of the buffer law. The buffer law and emergency incident statute are both criminal laws—when they both apply, one could be charged and convicted under both, thus **\*729** resulting in steeper penalties for the same conduct. In an analogous situation, our colleagues in the Eighth Circuit concluded that removing an additional layer of criminal liability was a form of redress sufficient to confer standing, even though

the underlying behavior was still subject to prosecution. *See Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024) (reasoning that enjoining Iowa's "trespass-surveillance" law would provide relief to animal-welfare groups seeking to surreptitiously record industrial agricultural operations even if they could still be prosecuted for general trespass); *accord Uzuegbunam v. Preczewski*, 592 U.S. 279, 291, 141 S.Ct. 792, 209 L.Ed.2d 94 (2021) ("[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement.") (quoting *Church of Scientology*, 506 U.S. at 13, 113 S.Ct. 447); *Massachusetts v. EPA*, 549 U.S. 497, 526, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (finding standing when the risk of injury "would be reduced to some extent" by the requested relief, even if not completely). We reach the same result. The plaintiffs satisfy the causation and redressability requirements and therefore have standing to challenge the buffer law. [3]

Assured of our jurisdiction, we proceed to reviewing the preliminary injunction underlying this appeal.

### B. The Fourteenth Amendment

A district court may grant a preliminary injunction if a plaintiff shows "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 129 S.Ct. 365 (enumeration added). When evaluating a grant of a preliminary injunction, we "review the district court's findings of fact for clear error, its legal conclusions de novo, and its balancing of the factors for a preliminary injunction for abuse of discretion." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016)).

The district court preliminarily enjoined the buffer law after concluding that the plaintiffs were likely to succeed on their claim that the buffer law is unconstitutionally vague under the Fourteenth Amendment. The State challenges only the district court's likelihood-of-success determination, thereby conceding any argument about irreparable harm, the balance of equities, or the public interest. We limit our discussion accordingly, observing that when a plaintiff establishes a likelihood of success on the merits of a constitutional challenge to a statute implicating First Amendment freedoms, the other preliminary injunction factors are easily met. *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012);

**\*730** *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

To satisfy the Fourteenth Amendment's Due Process Clause, a criminal statute like the buffer law must "define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 561 U.S. at 402–03, 130 S.Ct. 2896 (quoting *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855); *Bell*, 697 F.3d at 461. Failure to satisfy either criterion results in a statute that is void for vagueness.

The State argues that the buffer law meets the "definiteness" requirement because it is "clear about what conduct will lead to an arrest: refusing to obey an officer after being told to move when one is within twenty-five feet." [4] The State points out that 25 feet is an objectively measurable distance, and that ordinary people are unlikely to be confused about whether they are approaching an on-duty police officer after being told to stop approaching. Moreover, the State observes that if someone "is not sure about where a 25-foot marker is, he cannot be arrested" under the buffer law because it only criminalizes those who "knowingly or intentionally" approach within 25 feet following a warning. [5]

We will accept the State's premise that the buffer law is sufficiently definite without so deciding, and we will not analyze definiteness further. *See Gonzales v. Carhart*, 550 U.S. 124, 149, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (explaining with respect to definiteness requirement that "scienter requirements alleviate vagueness concerns"). We instead assess whether the buffer law encourages arbitrary or discriminatory enforcement. [6] *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855.

A statute encourages arbitrary or discriminatory enforcement "if it impermissibly delegates to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis,'" giving police unfettered discretion to make "arbitrary and erratic arrests." *Bell*, 697 F.3d at 462 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), then quoting *Wright v. New Jersey*, 469 U.S. 1146, 1151, 105 S.Ct. 890, 83 L.Ed.2d 906 (1985)). Put another way, a statute may be void for vagueness if it "necessarily entrust[s] lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender*, 461 U.S. at 360, 103 S.Ct. 1855 (modification in original) (internal quotation marks omitted). Such a concern commonly arises in

cases involving statutes with ambiguous wording susceptible to broad interpretation by an **\*731** enforcing officer. In *Bell*, for example, we reasoned that a section of Chicago's dispersal ordinance empowering police to order dispersal based on "serious inconvenience" gave law enforcement "too much discretion in determining when addressing a nuisance permits quieting protected expression and when it does not." *Bell*, 697 F.3d at 463. The ordinance also permitted dispersal based on "annoyance," which again rendered individuals "vulnerable to arbitrary or discriminatory arrest" and therefore "fail[ed] to fulfill due process' second command." *Id.*

Similarly, in *City of Chicago v. Morales*, the Supreme Court considered an ordinance empowering officers to arrest suspected gang members if they were "loitering," which the ordinance defined as "remain[ing] in any one place with no apparent purpose." 527 U.S. 41, 47, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (alteration in original). The Illinois Supreme Court had concluded that the ordinance was unconstitutional because it provided "absolute discretion to police officers to decide what activities constitute loitering." *Id.* at 61, 119 S.Ct. 1849 (quoting *City of Chicago v. Morales*, 177 Ill.2d 440, 227 Ill.Dec. 130, 687 N.E.2d 53, 63 (1997)). The Supreme Court agreed, faulting the ordinance for "how much discretion the police enjoy in deciding which stationary persons to disperse under the ordinance." *Id.* 61–62, 119 S.Ct. 1849. The fact that the ordinance "[did] not permit an arrest until after a dispersal order [had] been disobeyed" did not save it because it did not provide "any guidance to the officer deciding whether such an order should issue" in the first place. *Id.* at 62, 119 S.Ct. 1849. And hinging criminal liability on whether someone had an "apparent purpose" for remaining in place gave officers the discretion "to treat some purposes— perhaps a purpose to engage in idle conversation or simply to enjoy a cool breeze on a warm evening—as too frivolous" to be legal. *Id.*

The buffer law is similarly susceptible to arbitrary enforcement and is therefore unconstitutionally vague. The State attempts to distinguish cases like *Bell* and *Morales* by arguing that the buffer law's "specific, objective terms ensure that it does not invite officers to enforce it in an arbitrary manner"—but that argument only gets the State so far. It is true that a law criminalizing approaching within 25 feet of an officer is more objective than one criminalizing annoying behavior. We also acknowledge that the buffer law requires a do-not-approach warning before subjecting an individual to arrest. But that does not immunize the buffer law from arbitrary or discriminatory enforcement. As the plaintiffs

point out, the problem is more upstream: the buffer law offers no "guidance to the officer deciding whether [a do-not-approach] order should issue" in the first place. *See id.* Without such guidance, any on-duty officer can use the buffer law to subject any pedestrian to potential criminal liability by simply ordering them not to approach, even if the pedestrian is doing nothing more than taking a morning stroll or merely walking up to an officer to ask for directions.

The State offers no real rebuttal to this notion. Indeed, the State doubled down on the vast discretion afforded by the buffer law at oral argument. We asked counsel to explain when an officer could invoke the buffer law to tell someone to stop approaching. The answer? "If an officer is conducting their official duties, an officer may tell someone to stop approaching." For any reason? A good reason, a bad reason, a reason the officer just makes up? "Yes." Could an officer invoke the buffer law just because he had a bad breakfast? Again, counsel answered in the affirmative. **\*732** [7] These responses highlight the problem. As the Supreme Court explained 60 years ago, a law that effectively says "a person may stand on a public sidewalk in [a city] only at the whim of any police officer of that city" is too vague to satisfy due process. *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965). The buffer law does just that. The Fourteenth Amendment will not tolerate a law subjecting pedestrians to arrest merely because a police officer had a bad breakfast—no matter how bitter the coffee or how soggy the scrambled eggs.

Undeterred, the State points to cases in which we and our sister circuits rejected vagueness challenges to statutes affording officers some level of discretion. But those cases are easily distinguished because the challenged statutes in each contained some form of guidance constraining officer discretion. In *Bell*, we upheld a portion of the challenged city ordinance that allowed police to order people to disperse based on likelihood of "substantial harm," but only after concluding that the term was related to property damage and violence. 697 F.3d at 463. And in *United States v. Johnson*, we rejected the argument that the Animal Enterprise Terrorism Act's definition of "animal enterprise," while technically broad enough to encompass any grocery store, restaurant, or clothing store, afforded law enforcement arbitrary discretion to prosecute any property crime against such institutions as incidents of animal enterprise terrorism. 875 F.3d 360, 370 (7th Cir. 2017). That was because the Act also required that a person travel in interstate commerce or use a facility of interstate commerce for the purpose of damaging or

interfering with an animal enterprise's operations, and, in connection with that purpose, conspire to, threaten to, or actually cause bodily injury or tangible property damage. *Id.* These additional elements acted as safeguards against arbitrary enforcement. *See id.*

The State's out-of-circuit cases are similarly distinguishable. In *United States v. Bronstein*, the D.C. Circuit upheld language prohibiting making an "oration" or "harangue" in the Supreme Court building because other acts prohibited in the same one-sentence statute—such as shooting a gun, setting off fireworks, or using loud or threatening language— cabined the meaning of "oration" and "harangue" to conduct that disrupted the Court's operation. 849 F.3d 1101, 1108– 11 (D.C. Cir. 2017). And in *Horton v. City of St. Augustine*, the Eleventh Circuit concluded that a law prohibiting "perform[ing]" in a particular area of town survived a facial vagueness challenge because it specifically listed eight types of street performances that were outlawed, thus clarifying what type of activity was prohibited. 272 F.3d 1318, 1330 (11th Cir. 2001).

The State offers no similar "narrowed construction" that could save the buffer law. *See Shuttlesworth*, 382 U.S. at 91, 86 S.Ct. 211 (discussing Alabama Court of Appeals' narrowing interpretation of Birmingham loitering law). And, given that the buffer law's terms are plain and unambiguous, we see no cause for restraint as the Indiana courts work out the kinks. *See City of Houston v. Hill*, 482 U.S. 451, 468, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) ("If the statute is not obviously susceptible of a limiting construction, then even if the statute has 'never [been] interpreted by a state tribunal ... it is the duty of the federal court to exercise its properly invoked jurisdiction.' " (alteration in original)) (quoting *Harman v. Forssenius*, 380 U.S. 528, 535, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965)); *compare* **\*733** *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 539 (7th Cir. 2019) (explaining, in rejecting vagueness challenge to Indiana statute criminalizing transfer of fetal tissue, that it would be prudent to wait for the Indiana courts to interpret ambiguous terms like "transfer" and "any other part of an aborted fetus" instead of striking the law altogether).

Laws that "encourage arbitrary and discriminatory enforcement" are void for vagueness. *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855. Because that is precisely what Indiana's buffer law does, we agree with the district court that the plaintiffs are likely to succeed in their challenge to its constitutionality.

## C. The Scope of the Preliminary Injunction

One final piece of business remains. The district court's September 27, 2024, preliminary injunction prohibits the defendants—the Indiana Attorney General, Marion County Prosecutor, and Marion County Sheriff—along with their "agents, servants, employees, and attorneys" from enforcing the buffer law "against any individual, corporation, association, or other entity until this case has been finally resolved." [8] On June 27, 2025, the Supreme Court held that federal courts lack the equitable power to issue universal injunctions under the Judiciary Act of 1789 because "the universal injunction lacks a historical pedigree." *Trump v. CASA, Inc.*, 606 U.S. ——, ——, 145 S.Ct. 2540, 2554, —— L.Ed.2d —— (2025). Although an equitable remedy like an injunction is "flexible," explained the Court, its "protection extends only to the suing plaintiff[s]." *Id.* at 2551, 2557. Therefore, when considering the permissible scope of an injunction, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court.*" *Id.* at 2557 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Accordingly, although we agree with the district court's decision to preliminarily enjoin enforcement of Indiana's buffer law, the *CASA* decision suggests that the *scope* of the injunction requires further consideration.

The Supreme Court acknowledged in *CASA* that in some situations, an injunction requiring the defendant to cease the offending activity entirely may be the only way to provide complete relief to the plaintiff. For example, in a nuisance case involving a noisy neighbor blasting loud music, "the court has only one feasible option: order the defendant to turn her music down—or better yet, off." *Id.* Such an injunction would no doubt incidentally benefit the entire neighborhood, yet it would be permissible as the only way to provide relief to the *plaintiff*, and only the plaintiff could enforce it. *Id.* "Extending the injunction to cover all other similarly situated individuals" is not appropriate if doing so would not "render [the plaintiff's] relief more complete." *Id.* at 2557–58.

The question, then, is whether the scope of the district court's preliminary injunction in this case was necessary to provide complete relief to the plaintiffs pending resolution on the merits. To the extent the plaintiff media organizations rely on information and observations from ordinary citizens going about their day as source material for stories, enjoining

the buffer law's enforcement statewide may be necessary to provide the *plaintiffs themselves* with complete relief. After all, a "man on the street" interview could hardly take place if the man's presence on the street were dependent on the "moment-to-moment **\*734** judgment of the policeman on his beat"—even if the journalist conducting the interview were protected from arbitrary enforcement of the buffer law. *Kolender*, 461 U.S. at 360, 103 S.Ct. 1855 (citation omitted).[9]

Given the lack of briefing on these topics both before us and the district court, we "decline to take up these [questions] in the first instance." *CASA*, 606 U.S. at ——, 145 S.Ct. at 2558. Instead, following the Supreme Court and our colleagues in the First and Fifth Circuits, we will leave it to the district court to "determine whether a narrower injunction is appropriate."

*Id.*; *see Doe v. Trump,* 142 F.4th 109, 112 (1st Cir. 2025); *United States v. Texas,* 144 F.4th 632, 687-88 (5th Cir. July 3, 2025).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to enjoin enforcement of the buffer law against the plaintiffs, but we REMAND for the district court to consider, through additional briefing or other means, the appropriate scope of injunctive relief.

**All Citations**

147 F.4th 720

---

**Footnotes**

1    For convenience, we refer to the defendants collectively as "the State."

2    App. Dkt. 39 at 1 (emphasis added).

3    The Reporters Committee's argument for standing rests largely on the resources it has expended to raise awareness about the buffer law. *See Common Cause Ind. v. Lawson,* 937 F.3d 944, 950–53 (7th Cir. 2019) (relying on *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). This is arguably in tension with the Supreme Court's recent decision in *Alliance for Hippocratic Medicine. See* 602 U.S. at 394, 144 S.Ct. 1540. (The Court declared that "an organization that that has not suffered a concrete injury caused by a defendant's action" cannot "manufacture" standing "simply by expending money to gather information and advocate against the defendant's action.") However, because at least one other plaintiff has standing for each claim, we need not resolve whether the Reporters Committee has standing, too. *Chicago Joe's,* 894 F.3d at 813; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264 & n.9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

4    App. Dkt. 18 at 24 (quoting (Dkt. 53, Dist. Ct. Op. at 17)).

5    Id. at 25–26.

6    The challenger in *Nicodemus* advanced a flavor of this argument, relying on a line of cases holding licensing and permitting statutes unconstitutional for vesting "unbridled discretion" in decisionmakers. We declined to extend those cases beyond their specialized context. *See Nicodemus,* 137 F.4th at 666–67. We also did not address vagueness in *Nicodemus* because the challenger explicitly disavowed reliance on a vagueness theory. *Id.* at 667 n.9. Instead, the challenger advanced a facial challenge to the buffer law premised on its impact on the First Amendment right to record the police. *Id.* at 665–71; *see Alvarez,* 679 F.3d at 594–603 (explaining the right to record). We found that the original buffer law was a content-neutral statute that, on its face, was "a reasonable 'time, place, or manner' restriction within the bounds of the First Amendment."

*Nicodemus*, 137 F.4th at 670 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

7      Oral Argument at 2:31, 2:39–2:55, 30:05–30:22.

8      Dkt. 54 at 2–3.

9      *See also* David Bauder, *Detailed 'Open Source' News Investigations Are Catching On*, AP NEWS (May 8, 2022), https://apnews.com/article/opensource-media-investigations-d1093d4ea4e98a3ae21850196847c6e1 (explaining rise of "open-source" journalism based on data generated by others); Jesse Holcomb, *On TV, Few Amateur Journalists Get Credit for their Contributions to the News*, PEW RESEARCH CENTER (June 5, 2014), https://www.pewresearch.org/short-reads/2014/06/05/on-tv-few-amateur-journalists-get-credit-for-their-contributions-to-the-news/ (explaining that TV journalists often rely on the work of others).

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.